ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

**BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER**

UNITED STATES OF AMERICA,

          **Plaintiff,**

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

          **Defendants.**

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____  DEPUTY

| | |
|---|---|
| **Volume:** | III |
| **Pages** | 235 – 362 |
| **Date:** | May 26, 1958 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

APPEARANCES:

    WILLIAM H. VEEDER,
        For United States of America.

    DAVID W. MILLER,
        For United States of America.

    WILLIAM E. BURBY,
        For United States of America.

    FRANZ R. SACHSE,
        For Fallbrook Public Utility District.

    GEORGE STAHLMAN,
        For Vail Estate.

    JOHN B. MYERS,
        For William Butler.

    RAY C. EBERHARD,
        For Sam Wilson.


HOMER C. and MARION J. McDOWELL,
        In proper person.

FRED M. and GRACE R. JONES,
        In proper person.

335

## INDEX TO WITNESSES

For the Plaintiff:                          D        X        RD

    David W. Miller                  5        11        15

    Allen C. Bowen                  16


## INDEX TO EXHIBITS

For the Plaintiff:                          Ident.         Rec'd

    M-31 List of ownership
        De Luz watershed              241             241

    M-32 Land ownership Map           241             242

    M-33A to 33AB
        Quadrangle maps               258             269

    M-34A to G
        Gauging Stations              263             273

    M-35A to D
        Precipitation records         273             275

    M-36 Map                         276             277

    M-37 Map                         324             326

    M-38 Chart                       326             327

    M-39 Engineers Report            357

1
<u>Fallbrook, California, May 26, 1958, 9:30 A.M.</u>

2

3        THE MASTER:   The United States of America versus the

4   Fallbrook Public Utility District.

5        Will counsel who are present please state their names

6   for the reporter?

7        MR. VEEDER:   William H. Veeder.

8        MR. MILLER:   David W. Miller.

9        MR. BURBY:   William E. Burby.

10       THE MASTER:   All appearing for the United States?

11       MR. VEEDER:   Yes.

12       MR. SACHSE:   Franz R. Sachse for the Fallbrook Public

13   Utility District and named individual defendants.

14       MR. STAHLMAN:   George Stahlman for Vail Company.

15       MR. MYERS:   John B. Myers for William Butler.

16       THE MASTER:   Mr. Moskovitz has indicated to me that he

17   will not be here today.

18       Now, the individual defendants who are here, who have

19   filed an answer in proper person, that is those defendants

20   who do not have attorneys, and who own property in the De

21   Luz Creek area, will you please give us your names?

22       MR. McDOWELL:   Homer C. and Marion J. McDowell.

23       MR. JONES:   Fred M. and Grace R. Jones.

24       THE MASTER:   Anyone else on this side of the room in

25   the De Luz Creek area that is appearing without an attorney?

b-3

1    Anyone on this side of the room?

2        I assume, then, that all defendants who are appearing

3    without attorneys have stated their names for the record.

4        In order to facilitate matters as much as possible for

5    the individual defendants, and also for the attorneys of

6    record, I think that I should state now, as definitely as

7    possible, the dates upon which these hearings will be held

8    up until the month of September.  Now, this schedule may be

9    subject to change as to some particular day in the event

10   unforeseen circumstances arise, but as presently scheduled the

11   hearings will, of course, be held today and tomorrow; that is

12   May 26 and May 27.  There will be no further hearings this

13   week.

14       Then next week they will be held on Monday, June 2,

15   Wednesday June 4, and Thursday June 5.  There could be no

16   hearings in this building on Tuesday for two reasons:  First,

17   I believe it is to be used as an election headquarters and

18   also that is, of course, a legal holiday and many persons would

19   wish to be absent in order to vote.

20       The following week there will be hearings on Monday,

21   Tuesday and Wednesday, June 9, 10 and 11.  The following week,

22   beginning June 16, there will be no hearings because, during

23   that week, various motions will be presented to Judge Carter

24   in San Diego and I anticipate that probably counsel for all

25   the parties will be actively engaged in those hearings and it

b-4

1    would not be wise to try to schedule hearings here at the

2    same time.

3        Then there will be hearings on Monday, Tuesday, and

4    Wednesday, June 23, 24 and 25; on Monday, Tuesday and Wednesday,

5    June 30, July 1 and July 2.

6        The following week there will be a slight change in

7    the Monday, Tuesday and Wednesday schedule, and the hearings

8    will be Wednesday, Thursday and Friday, July 9, 10 and 11.

9        The next week, Monday, Tuesday and Wednesday, July 14,

10   15, and 16; the next week Monday, Tuesday and Wednesday, July

11   21, 22 and 23; and the following week Monday, Tuesday and

12   Wednesday, July 28, 29 and 30.

13       And, as presently scheduled, there will be no hearings

14   during the month of August.  I hope by that time there will

15   have been enough evidence presented so that considerable time

16   can be spent in working on findings and conclusions of, at

17   least, a preliminary nature to be presented to Judge Carter.

18       Now, as I have indicated, those dates may be subject to

19   change, particularly if any unforeseen event comes up, if any

20   of counsel cannot be present, or it seems necessary, for other

21   reasons, to change them.

22       Now, the hours which I would expect to follow will be

23   from 9:30 to 12 in the morning and, if it is possible to

24   reconvene at 1:15.  Is that making the lunch hour too short

25   for getting into Fallbrook and back again?

1  MR. VEEDER:  That is pretty short, your Honor.  Very

2  frequently we have to consult with witnesses.

3  THE MASTER:  We will make it 1:30 to 4 in the afternoon.

4  Very well.  Now, Mr. Veeder, are you ready to proceed?

5  MR. VEEDER:  I will call Lt. David W. Miller.

6

7  DAVID W. MILLER,

8  called in behalf of the People, sworn, testified as follows:

9

10  DIRECT EXAMINATION

11  BY MR. VEEDER:

12  Q  Would you state your full name?

13  A  David W. Miller.

14  Q  What is your present position?

15  A  I am assigned as legal officer at the office of

16  the California Ground Water Resources, at Camp Pendleton.

17  Q  How long have you been there?

18  A  About three and a half years.

19  Q  Prior to that time what was your employment?

20  A  Prior to that time I was assistant legal officer at

21  the 12th Naval District in San Francisco.

22  Q  And what were your duties there?

23  A  Generally military, and court martial work.

24  Q  And what is your educationally background?

25  A  I graduated from the University of Colorado Law School

b-6

1    in 1950.

2         Q   Now, while you were at the office of the Ground

3    Water Resources, what duties and functions have you performed?

4         A   I have acted in administering title research regarding

5    property within the Santa Margarita watershed.

6         Q   In connection with the subject case?

7         A   It is--or was.

8         Q   Now, would you state, briefly, what you did in

9    connection with your title investigations?

10        A   The Security Title Insurance Company had, pursuant to

11   a contract with the United States, supplied a list of the

12   owners of property and the holders of encumbrances and liens

13   upon property within the Santa Margarita River watershed.

14   This data was transferred to land ledgers.   After the transfer

15   of this information in these land ledgers, pursuant to a con-

16   tract with the Title Insurance Company, personnel under my

17   supervision had gone to the title company and made entries

18   subsequent to the date of these transfers from these ledgers.

19        Q   Now, how would you evaluate that data from the stand-

20   point of accuracy?

21        A   Well, it is the basic data upon which title companies

22   operate in their daily business.

23        Q   What investigation did you make to determine that it

24   was accurate?

25        A   After the entries were made in the ledgers personnel,

b-7

1    under my supervision, would go to the County Recorder's office

2    in San Diego and Riverside County and make notes concerning

3    the instruments which were reflected in these ledgers, and to

4    that extent we verified the accuracy of the entries.

5         MR. VEEDER:  I would like to have marked for identifica-

6    tion as Plaintiff's Exhibit--

7         THE CLERK:  31.

8         MR. VEEDER:  -- 31.

9    BY MR. VEEDER:

10        Q  I hand you what has been marked M-31 for Identifica-

11   tion, and ask you to state what it is.

12        A  This is an indication of the owners and holders of

13   trust deeds on properties within the De Luz watershed, keyed

14   to a land ownership map of that watershed.

15        MR. VEEDER:  I ask to have this marked Plaintiff's Exhibit

16   M-32.

17        THE CLERK:  M-32.

18        MR. VEEDER:  I offer in evidence this list of ownership

19   of water marked M-31.

20        THE COURT:  There is no objection?

21        MR. SACHSE:  No objection.

22        THE MASTER:  It will be received in evidence as M-31.

23   BY MR. VEEDER:

24        Q  I hand you, Mr. Miller, Plaintiff's Exhibit marked

25   M-32 for Identification, and ask you to state what it is.

b-8

1     A   This is the land ownership map which has been prepared

2 of the De Luz watershed.

3     Q   Will you state the source of information that you

4 used in the preparation of that map.

5     A   Notes taken from the instruments recorded in the

6 County Recorder's offices in San Diego was information on which

7 the map was based.

8     Q   And will you state your opinion as to the accuracy of

9 the map?

10     A   I believe it to be accurate.

11     Q   And under whose direction was it prepared?

12     A   Mine.

13     MR. VEEDER:   We offer in evidence Plaintiff's Exhibit

14 marked M-32.

15     By the way, will you read into the record the designation

16 on the map and the statement as to what it is?

17     A   The block in the lower right hand corner of the map,

18 De Luz Creek watershed ownership map, office of Ground Water

19 Resources, Marine Corps Base, Camp Pendleton, California.

20 They give data as to who it was drawn by, checked by, approved

21 by, the scale and the date.

22     MR. VEEDER:   We offer Plaintiff's Exhibit M-32 in evidence.

23     THE MASTER:   It will be received in evidence and marked

24 Exhibit M-32.

25

243

BY MR. VEEDER:

Q   Would you explain, Lt. Miller, how the list and tabulation is correlated on the map and give some details?

A   On the map are representatively heavy marked solid lines, and within the solid lines are encircled numbers.  This encircled number is the key to the list of ownership.

Q   Now, when you say "ownership" what do you mean by that, Lt. Miller?  Do you mean the record owner as it appears on your--

A   That is right. That is correct, yes.

Q   You are not testifying in regard to the status of the title other than that as reflected in the record owner.  Is that correct?

A   That is correct.

Q   Now, to what date does that record ownership go?

A   It goes until the filing of the lis pendens by the United States.

Q   And on what date was that?

A   I believe it was April 9 of 1958.

Q   Now, you may proceed.

A   The owners and trust deed holders and other lien holders are reflected on the list, martialed by parcels corresponding to the numbers reflected on the De Luz ownership map.

Q   And now observe on the map lines, square lines--I mean lines creating squares and oblongs.  What are those indicative

b-10

1  of?

2     A  By that do you mean the lighter lines?

3     Q  Yes.

4     A  The lighter solid lines?

5     Q  Yes.

6     A  They are reflective of the sections within that

7  area according to the United States Geological Survey.

8     Q  And what about the boundaries of the various units?

9  How were those established?

10    A  The boundaries of the various parcels?

11    Q  Yes.

12    A  Individual parcels; they were plotted from the notes

13  which were taken from the instruments on file in the County

14  Recorder's office.

15    Q  Now, when you say "instruments on file" what do you

16  mean?

17    A  The various deeds which the land ledgers used by the

18  title insurance company reflected to be in effect.

19    Q  Where in the chain of title would you obtain the

20  descriptions?

21    A  The descriptions would be obtained from the last

22  recorded instrument.

23    Q  Have you any further statement to make in regard to

24  the work you have done in that connection?

25    A  I have none.

345

b-11

1    MR. VEEDER:  You may cross-examine.

2

3                          CROSS-EXAMINATION

4    BY MR. SACHSE:

5        Q  Lt. Miller, have those property ownerships been keyed

6    in any way to watersheds within the watershed, that is to

7    tributaries of the De Luz Creek or branches thereof?

8        A  They have not.

9        Q  In other words, from this ownership chart we cannot

10   determine whether a parcel of land abuts upon one stream or

11   another, or how much of it abutts on each stream?

12       A  That is correct.

13       MR. SACHSE:  I have nothing further.

14       MR. STAHLMAN:  No questions.

15       THE MASTER:  For the sake of the record it might be

16   well to ascertain what is meant by a few abbreviations which

17   appear on Exhibit M-31.

18       I note in parcel 3, after the name of the owner, the

19   phrase, in parenthesis, s/m.  What does that mean?

20       THE WITNESS:  That means single man as is reflected on

21   the particular instrument.

22       THE MASTER:  And the expression or abbreviation "hus"

23   means husband?

24       THE WITNESS:  That is correct.

25       THE MASTER: "wf"means wife?

246

b-12

THE WITNESS:  That is correct.

THE MASTER:  And the designation within parenthesis again TD-Tr means what?

THE WITNESS:  Trust deed, trustee.

THE MASTER:  And "TD-Bene"?

THE WITNESS:  Trust deed, beneficiary.

THE MASTER:  And "Wid" is the abbreviation for widow?

THE WITNESS:  That is correct.

THE MASTER:  Will you note if there are any other abbreviations there which have not been explained so there can be no room for argument later as to what they may mean?

THE WITNESS:  Well, with respect to parcel 12 there is a notation, in parenthesis, "Option to Pur" which indicates a contract giving an option to purchase the property.

THE MASTER:  And is the option to purchase in that case given to the person who is named or by the person who is named?

THE WITNESS:  To the person who is named.

On Parcel 9 there is an abbreviation in parenthesis, "dtr" which refers to debtor.

On Parcel 23 there is an abbreviation "Sep prop" which means separate property.

THE MASTER:  That means that that was so designated in the deed, whether it actually is separate property is not within your personal knowledge.  Is that true?

THE WITNESS:  That is true, sir.

b-13

1    On Parcel 25 there is an abbreviation (m/w) which

2  indicates married woman, as shown on the deed.

3    On Parcel 46 there is the abbreviation (s/w) which

4  is referred to as a single woman.

5    On Parcel 47 there is an abbreviation (life est) which

6  indicates a life estate in the person.

7    MR. VEEDER:  At this time, your Honor, the United States

8  assumes no responsibility in regard to these designations as

9  to the status of the title.  We are simply offering this

10  to be helpful and explaining to your Honor so that when a man

11  is called to the stand as the record owner it establishes a

12  prima facie case and reserves the right to the United States

13  to bring in evidence in rebuttal should we find something dis-

14  tinctly different; that the title is not as it is claimed to

15  be.

16    THE MASTER:  That is understood.

17    MR. SACHSE:  I have one other question, if I may.

18    THE MASTER:  Yes, Mr. Counselor.

19  BY MR. SACHSE:

20    Q  Lt. Miller, I notice at least three parcels, maybe

21  more, 67, 81 and 83, are indicated U. S. A.  What is that owner-

22  ship?

23    A  What is the question?

24    Q  They are indicated on the list as U. S. A.  What is

25  the owner, public land, National Forests?  How is it?

b-14

1    A   Our notes indicate that it is unpatented land.

2    Q   Unpatented public land in each of the three cases I
3    named?

4    A   Yes.  I will have to retract part of that statement.
5    I don't know if you mentioned 92.

6    Q   Is that another one?

7    A   I believe 92 is just to signify a portion of Camp
8    Pendleton within the watershed.

9    Q   But 67, 81 and 83, according to your records, are
10   unpatented public domain?

11   A   With respect to 61 that is correct.  And what were
12   the others?

13   Q   I have 67, not 61; 67.

14   A   That is correct.

15   Q   81--

16   MR. VEEDER:  Is there a question about 61 and 67?

17   MR. SACHSE:  No.  He misstated it.  61 is privately
18   owned.

19   Q   81 is U. S. A., indicated?

20   A   That is correct.

21   Q   Unpatented public domain?

22   A   That is correct, yes.

23   Q   And 83?

24   A   That would be correct in that case.

25   MR. SACHSE:  Thank you.  That is all.

249

b-15

1    MR. VEEDER:   Thank you.

2

3                    REDIRECT EXAMINATION

4    BY MR. VEEDER:

5        Q  There is forest land, is there not?

6        A  Yes, there is.

7        Q  How do you designate that, or has it been designated?

8        A  We have not designated the unpatented land within

9    the forest areas as such, except in so far as the boundary

10   of the National Forest is indicated on Plaintiff's Exhibit M-32,

11   the map.

12       Q  M-32?

13       A  The map.

14       MR. VEEDER:   I would like the record to show that counsel

15   has been handed copies of Plaintiff's Exhibit M-31 and we have

16   given to Mr. Sachse and to counsel the map, M-32.

17       That is all, Mr. Miller.

18       (Witness excused.)

19       MR. VEEDER:   I would like to have the record show at this

20   time that Mr. Sachse has requested the United States for a re-

21   port in regard to sections of the area which now constitute

22   Camp Pendleton Naval Ammunition Depot and the Naval Hospital

23   areas which are involved in this litigation.  He has been

24   advised that Colonel Robertson will recommend the release of that

25   data--by reason of the military character of it--he will contact

b-16

1    the Commandant of the Marine Corps with that recommendation

2    which will be made in regard to Mr. Sachse's request.  I might

3    add that I believe the stipulation of November 29, 1951, con-

4    templates withholding of data under the circumstances that I

5    have outlined.

6         I will call Colonel Bowen.

7

8                    ALLEN C. BOWEN,

9    called as a witness, sworn, testified as follows:

10

11                 DIRECT EXAMINATION

12   BY MR. VEEDER:

13        Q  Would you state your full name, Colonel Bowen?

14        A  Allen C. Bowen, B-o-w-e-n.

15        Q  How old are you?

16        A  Forty-three.

17        Q  And where were you born?

18        A  I was born in the State of Utah.

19        Q  And would you state, briefly, your education from

20   elementary school on up through college?

21        A  Well, I followed, beginning in high school, a scientific

22   course designed for further education as an engineer.  I

23   entered the University of Utah in Salt Lake City.

24        Q  One moment.  To what high school did you attend?

25        A  I went to the East Side High School in Salt Lake City,

b-17

1   Utah.

2       Q   Go ahead.

3       A   Upon graduation from that high school I attended

4   the University of Utah for a period of two years, taking pre-

5   liminary engineering studies.   I later transferred to Utah

6   State College in Logan, Utah.

7       Q   Will you state the years when you were attendance

8   in those schools?

9       A   Yes.   I attended the University of Utah from 1932 to

10  '34 and Utah State from '35 to '37.   I was graduated with the

11  degree of Bachelor of Science in 1937.

12      Q   Now, would you state with some detail the courses

13  that you took and explain what they mean?

14      A   My major subject was Agronomy with a minor in mathe-

15  matics and chemistry.   I also attained a minor in physics while

16  I was about it and picked up another minor in Animal Husbandry.

17      Q   Now, in regard to your work in Agronomy, what were

18  the principal courses that you took?

19      A   The recommended courses that I took were in the field

20  of soil science.

21      Q   And now, in making--go ahead.

22      A   Also, of course, some crop studies, qualifying in the

23  agronomic field.

24      Q   During that period when you were attending college,

25  did you do any field work or any investigation in the field in

regard to matters in your Agronomy course?

A   I did, indeed.  I took the standard field exercises or field courses and various crop courses, and, in the various courses soil courses that were required for the degree.

Q   Now, what would some of those courses be?

A   Well, actual field surveys; field soil surveys under the jurisdiction and supervision and direction of the now defunct Bureau of Chemistry and Soils, which has since been incorporated in the Soil Conservation Service, a part of the United States Department of Agriculture.  I also made some surveys, some soil surveys in the summertime before I got my degree, with the Utah State Extension Service, and the Experiment Station.

Q   What kind of work was entailed in that?

A   Evaluation of the various features of the soil; determination of soil series, soil type.

Q   What relationship did those studies have to do with the use of land and water?

A   Well, the surveys made at that time were contemplated to be of as wide usefulness as possible.  The Bureau of Chemistry and Soils was the only national agency making such surveys, and the surveys were designed to satisfy the needs of construction people, road builders, earth fill builders, and various types of earth construction.

Q   What would be an example of earth construction?

253

b-19

1    A  Well, the preparation of sub grades; selection of

2  materials for placing in sub grades for highways, for example,

3  or selection of materials for construction of an earth filled

4  dam, would be two paramount examples.

5    Q  Would you continue?

6    A  Also in the field of soil mechanics, the investigation

7  of foundation characteristics of large structures, such as

8  buildings, factories, mills and so forth, and in addition to

9  this the result of the surveys were used by county agents and,

10  as they are known in California, farm advisors, for the purpose

11  of advising farmers as to the type of crops that could be grown;

12  the amount of water that would be required on various soils and

13  the depth to which they should be irrigated and so forth.

14    Q  Now, in regard to the use of water, would you state

15  whether there was an investigation made involved in that?

16    A  Very definitely, because soil, of course, pretty much

17  determines not only the type of crop but the amount of water that

18  could be profitably or economically applied; drainage factors

19  which may appear under an artificial system, such as irrigation

20  on a desert area type of soil; also knowledge of the soil.  It

21  might lead to accumulation of salts and alkaline materials which

22  would result in the ultimate deterioration and degradation of

23  the soil.  Those factors are also taken into account in making

24  a soil survey.

25    Q  Now, would you continue with this general statement of

b-20

1   your educational background in regard to any other courses that

2   would be relevant in connection the work you have been perform-

3   ing?

4       A   I already mentioned chemistry in which I acquired a

5   minor, it being very vital in the field of edaphology.

6       Q   Will you explain what that is?

7       A   Edaphology is a combination of two Greek roots, edaphos

8   meaning soil, and ology meaning the study or science of soils,

9   which may be called soil science for an interpretation of it.

10  Sometimes it is also known as pedology, but it might get con-

11  fused with pediatrics.   There is no kinship between the two.

12  Pedology is from pedo, foot, underfoot, and thus indirectly

13  referring to the soil.

14      Q   Having completed your college work, will you state your

15  first employment upon leaving college, and so on, and in general

16  detail what your experience has been?

17      A   My first employment after receiving this shiny certifi-

18  cate stating I was qualified as a Bachelor of Science, was with

19  the United States Bureau of Reclamation, Department of Interior.

20      Q   State what your position was.

21      A   My position was that of an earth fill and concrete

22  inspector on the Moonlake project in the Unita Mountains in

23  Northeastern Utah.

24      Q   What is the Moonlake project?

25      A   The Moonlake project was a project to construct a large

b-21

1    earth filled dam for the purpose of impounding water for use

2    in irrigating the valley below.

3        Q  How would you compare that area where the project was

4    built with the area in the Santa Margarita River Valley?

5        A  Well, the mountain looked more like San Jacinta, which

6    is a little outside the Santa Margarita Valley.  They loom some

7    3,000 feet higher than that.  The basin itself is about 6,000

8    feet which would put it up close to the top of Palomar Mountain.

9    It is high rugged mountain country.  The Uinta Mountains are

10   the only chain of mountains that runs east and west in North

11   America, as I recall.  The only comparison we might say between

12   that country, where game and fresh fish abound, and the Santa

13   Margarita Valley would be the fact that the areas below require

14   irrigation.

15       Q  How do they compare from the standpoint of aridity?

16       A  Well, the Uinta Basin itself is comparable to the

17   Santa Margarita Valley in their aridity.  They depend primarily

18   for water irrigation on the snow that falls on the Uinta Moun-

19   tains to the north of the basin which is collected during

20   spring and summer runoffs by their various storage reservoirs,

21   and later is released for irrigation purposes downstream.

22       Q  Now, what was your next employment?

23       A  My next employment was as a soil surveyor with the

24   United States Department of Agriculture, Soil Conservation

25   Service in the State of Texas.

b-22

1    Q  What were your functions on that?

2    A  My functions there were to make maps, delineate soil

3  series, types, and delineating the mapping and topography

4  of the area as to drainage features and so forth.

5    Q  What part of Texas was that in?

6    A  Well--

7    Q  The arid areas?

8    A  I surveyed in the subhumid areas, beginning the first

9  survey in Stephenville, about 90 miles west of Fort Worth, which

10  is timber area, and, I believe, would be called subhumid. From

11  there I went to the very humid areas in south Louisiana.

12    Q  And would you go on and delineate your experience?

13    A  From there I was transferred up to Spokane, Washington,

14  where I made surveys in the Palouse Hills area which again

15  verges from semi-arid to humid as you proceed eastward. With

16  the influence of the rising land surface, the mountains bring

17  more water out of the clouds, and increases the precipitation.

18  I surveyed soils and I became chief of the party up there and

19  had a soil survey crew in the area around Moscow, Idaho, Colfax,

20  Washington, Nez Perce and Lewiston Idaho and Grangeville, Idaho.

21    Q  How does the precipitation in those areas compare with

22  the Santa Margarita Valley?

23    A  Well, the Nez Perce prairie, and a portion of the Pa-

24  louse area around Moscow has a much higher precipitation than the

25  Santa Margarita Valley.

Q   Are there any areas in there comparable to the precipitation in this area?

A   As you go westward into Washington and Oregon there are areas which are much more arid than Santa Margarita, and it is evenly graded from, say, the area around Grande Coulee Dam, where the precipitation would be around seven and a half inches a year down to 35 inches on Moscow Mountain, but it is a fairly even gradation, so you could select an area in which the precipitation would be identical to any area in Santa Margarita Valley.

Q   Now, will you proceed to state your experience?

A   From this Nez Perce Idaho, which was my last headquarters with the Soil Conservation Service, I joined the United States Marine Corps in 1942, and undertook officer's candidate training and stayed with Marine Corps for the duration of the war. I was released on inactive duty in January of 1946.  At that time I returned to employment with the Soil Conservation Service in charge of irrigation and drainage activities in the Imperial Valley of California.

Q   Now, how long have you been acquainted with the Santa Margarita Valley?

A   Well, I have driven through the Santa Margarita Valley, and have been generally familiar with some of the larger holdings, such as the Vail Ranch, for many years.  But I have become eminently acquainted with the area since 1951 when I was recalled to active duty with the Marine Corps as officer in

b-24

1  charge of the Office of Ground Water Resources, at Camp Pendleton.

2  Since that time I have spent a great deal of time and effort in

3  becoming familiar with the physical aspects of the Santa Margar-

4  ita watershed.

5      MR. VEEDER:  Now, I ask to have marked for identification,

6  as Plaintiff's Exhibit No. 33, the quadrangles prepared by, I

7  think, the Geological Survey.  I think they should be marked as

8  33 and then A, B, C, D, E, F and G and so on.

9      THE MASTER:  Is there any objection?

10     MR. SACHSE:  No objection.  Can we run through them so

11  we are sure what order you have them in.

12     MR. VEEDER:  I will hand them to the Colonel--

13     THE MASTER:  I suggest Exhibit 33, and consecutive follow-

14  ing letters beginning with A and continuing with as many as

15  there are maps.

16     MR. VEEDER:  That is my proposal, your Honor, if that is

17  satisfactory.

18     THE MASTER:  That is satisfactory.

19     THE CLERK:  A to U.

20     MR. VEEDER:  33 A to U, consecutively.

21     Q  Now, would you proceed, Colonel Bowen, to identify

22  those quads and just give the number and what areas are covered

23  by them?

24     A  In the seven and a half minute series of the United

25  States Geological Survey Topographical Maps, we have the

259

b.-25

1    quadrangle labeled Oceanside, California.

2         MR. SACHSE:  Is that A?

3         MR. VEEDER:  That is M-33A, if you didn't mark it 33.

4         THE CLERK:  33, yes.

5         THE WITNESS:  B as in Bob is Bachelor Mountain--these are

6    all in California, of course.

7    BY MR. VEEDER:

8         Q  Are they in the Santa Margarita Valley, some of them?

9         A  Yes.  C is Boucher Hill; D is Bonsall; E is Elsinore;

10   F is Fallbrook; G is Hemet; H is Morro Hill; I is Palomar

11   Observatory; J Las Pulgas Canyond; K is Pechanga; L is Romoland.

12        THE MASTER:  One word or two?

13        THE WITNESS:  One word.  M is Sage; N is Sefton Peak; O

14   is Temucula; P is Vail Lake; Q is Wildomar; R is Winchester, as

15   in rifle.

16        MR. VEEDER:  Those are not marked.  I would ask you to

17   wait until they are.

18        THE MASTER:  They are in order, are they not?

19        MR. VEEDER:  They have been marked past this.  I would

20   rather see them changed.

21        THE WITNESS:  They would just as well come at the end.

22        MR. VEEDER:  All right.

23        Q  You may proceed.

24        A  The last one I gave was R as in Winchester.  Then S

25   is Margarita Peak; T is Murrieta.

b-26

1      MR. STAHLMAN:   Like in bandit?

2      THE WITNESS:   U is Aguanga.

3      THE MASTER:   There are some more maps that should be

4  marked in the same series and made a part of Exhibit 33?

5      THE WITNESS:   These are all seven half minute series,

6  your Honor.

7      MR. VEEDER:   I will attach them and mark them 33V--

8      THE CLERK:   33V.

9      MR. VEEDER:   And on throughout.

10      MR. SACHSE:   Those should be marked M-33?

11      MR. VEEDER:   I will mark those individually, V, W, X, Y

12  and so on.

13      THE MASTER:   That would be up to Z and 33AA?

14      MR. VEEDER:   The marking of the first one is 33A, not

15  33.

16      THE CLERK:   That is correct.

17  BY MR. VEEDER:

18      Q   Now, would you proceed with the rest of those, then,

19  Colonel?

20      A   The seven half minute quadrangles which I have just

21  listed are the only ones available covering the Santa Margarita

22  watershed area.   Now the very eastern most portion of the water-

23  shed--

24      Q   Could you delineate that area, Colonel?

25      A   Might I approach the map?

b-27

1    THE MASTER:  Yes.

2    MR. VEEDER:  Referring to M-14.

3    THE WITNESS:  The quadrangles in Plaintiff's Exhibit M-33,

4  which I have just enumerated, cover that portion of the water-

5  shed of the Santa Margarita River lying east of Range line 2

6  East.

7    THE MASTER:  East or west of that line?

8    THE WITNESS:  The ones I have just enumerated lie west

9  of this Range line 2 East.  In other words, all of this area

10  covered, the area westerly of that Range line, a. is covered by

11  seven half minute series, U. S. Geological Survice quadrangles.

12  The areas lying generally easterly of that range line--let me

13  back up.  That is Range line 2-3 East, the common line between

14  those ranges.  And easterly of that line the watershed is covered

15  by photographic enlargements of the 15 minute surveys of the

16  U. S. Geological Survey maps--

17    MR. VEEDER:  We offer Exhibit M-33A through 33AA.

18    MR. SACHSE:  May we have identified the 15 minute series

19  by numbers?

20    THE MASTER:  Yes.  I think these last ones from V to AA

21  should be separately identified and then all offered at once.

22  BY MR. VEEDER:

23    Q  Go ahead then.  Referring to V?

24    A  Referring to M-33V, this is one quarter of the 15 minute

25  quadrangle known as Hemet Reservoir.  It is the northeasterly

262

b-28

1    quarter, enlarged.

2        MR. STAHLMAN:  We have 33A to U and from 33--we have some

3    more letters--aren't we going to be confused?  Should it be

4    33-1?

5        MR. VEEDER:  I think this is simply going from A to Z and

6    AA.

7        MR. STAHLMAN:  What is V again?

8        THE MASTER:  V is the northeasterly quarter of the 15

9    minute quadrangle of Hemet.

10       THE WITNESS:  The Hemet Reservoir,  W is the southwesterly

11   quarter of the Hemet Reservoir quadrangle enlarged to scale

12   to approximately one to 24,000.  X is the southeasterly quarter

13   of Hemet Reservoir quadrangle  enlarged to a scale of approxi-

14   mately one to 24,000.  Y is a portion of the northeasterly

15   quarter of Warner Springs, 15 minute quadrangle, enlarged to

16   the scale of approximately one to 24,000.  Z is the southeasterly

17   quarter of Warner Springs 15 minute quadrangle enlarged to a

18   scale of approximately one to 24,000.  33-AA is the--  To clarify

19   the record here, I think I said that Y was the northeasterly

20   portion of Warner Springs quadrangle; that is the northwesterly

21   quarter of Warner Springs quadrangle.  AA is the northeasterly

22   quarter of the quadrangle.

23       THE CLERK:  AB.

24       THE WITNESS:  AB is the southeasterly quarter of the

25   Hemet Reservoir quadrangle.

b.-29

1     MR. SACHSE:  We are confusing it.  We have X as the

2   southeasterly quarter of Hemet, unless I have my notes wrong.

3     THE MASTER:  That is right.

4     THE WITNESS:  I would have to get those quadrangles and

5   clear this up.

6     MR. SACHSE:  I think we should.

7     THE WITNESS:  I think we can probably get copies together

8   and make sure they are correct.

9     THE MASTER:  I would suggest that during the recess this

10   morning, or at noon, that you verify the identification of

11   these quarters of the 15 minute quadrangles, and as soon as you

12   have done that, if any corrections are necessary they can be

13   made in the record.

14     THE WITNESS:  Yes.

15     MR. VEEDER:  I will phone the office on that.

16     Q  Is that all of that, Colonel?

17     A  Yes.

18     MR. VEEDER:  May I have marked for identification as

19   Plaintiff's Exhibit M-34, the U. S. Geological Survey runoff

20   records, or copies of them, at the various gauging stations of

21   the watershed of the Santa Margarita River?

22     MR. SACHSE:  Those are all going in as one exhibit?

23     MR. VEEDER:  Yes, I intended to do that.  I will show

24   counsel these copies that I have here.  They are copies, Mr.

25   Sachse, of what we showed you in the office the other day, 34A

b-30

1    through G.

2    BY MR. VEEDER:

3        Q  Colonel Bowen, I hand you Exhibit marked for Identifica-

4    tion Plaintiff's M-34A through G, and ask you to state what

5    those are.

6        A  M-34A are prints from a photographic reproduction of

7    the original U. S. G. S. Service Water Branch of the Water

8    Resources Branch of records of the stream flow at the O'Neill

9    Ditch, near the Ysidora station.

10       Q  Will you state the period that those pages cover?

11       A  The period of record covered here begins October 1st,

12   1930 and continues through September 30, 1957.

13       MR. VEEDER: Now, if it is agreeable to your Honor, I

14   think I will ask the Colonel, as he reads each of these Exhibit

15   numbers to write them on Plaintiff's Exhibit M-14, for the

16   purpose of locating where each of these stations are.

17       MR. SACHSE:  That is on Exhibit M-14 would you indicate

18   34A, for example?

19       MR. VEEDER:  That is correct.

20       MR. SACHSE:  Let's do it all at once.  I think it would be

21   very helpful.

22   BY MR. VEEDER:

23       Q  If you would mark M-14, marking where 34A is situated

24   on that general map.

25       A  34A is located on the easterly boundary of the U.S.

b-31

1   Navy Hospital area, delineated on Plaintiff's Exhibit M-14.

2   I will mark the location with an X and write "M-34A".

3       MR. VEEDER:  I will now offer Plaintiff's Exhibit M-34A.

4       MR. SACHSE:  No objection.

5       THE MASTER:  That may be received.  I would suggest possi-

6   bly all may be offered at once, at the end.

7       MR. VEEDER:  I thought you might want them one at a time.

8       Q  Will you proceed on to the Exhibit, Colonel, and mark

9   them on the map?

10      A  M-34B is a folder containing photographic reproductions

11  of U.S. Geological Survey records of De Luz Creek, near Fall-

12  brook, beginning October 1st 1950 and--

13      THE MASTER:  1950?

14      THE WITNESS:  1950, yes, sir; 50--and continuing through

15  September 30--correction--continuing through April 30, 1958.

16      M-34B station is located on De Luz Creek within the

17  boundaries of Camp Pendleton, approximately a mile upcreek from

18  its confluence with the Santa Margarita River.  I will mark

19  that on Plaintiff's Exhibit 14 as M-34B.

20      The folder marked 34C, is a photographic--contains a

21  photographic reproduction of U.S. Geological Survey records

22  showing the stream flow on the Santa Margarita River at  the

23  Isadore gauging station, beginning in February 19, 1923 and

24  continuing through September 30, 1957.

25

b-32

BY MR. VEEDER:

Q   I will ask you if, in making your designation on M-14, if you will draw an arrow to it.

A   The Ysidora gauging station is located approximately two and a half miles upstream from the confluence of the Santa Margarita River with the Pacific Ocean.  I will draw an X at the approximate location of the station, and extend an arrow leading to M-34C.

The folder numbered 34D, contains a photographic repro-duction of U.S. Geological Survey records of the stream flow on the Santa Margarita River near Fallbrook, California, beginning November 25, 1924 and continuing through September 30, 1957.

Q   I ask you to designate that and run an arrow from south to north, showing that mark.

A   I am marking a location of the Fallbrook gauging station, or of the gauging station on the Santa Margarita River near Fallbrook at his present location.  It lies within the boundaries of Camp Pendleton.  It has been at times just below the conflu-ence of Sandia Creek with the Santa Margarita River.  Should I mark both locations or the present location?

Q   I would think that you  should mark two marks on it and bring them together with a single arrow.

A   I have placed two X's on the map indicating the approx-imate location of the Fallbrook gauging station and have extended lines from them and marked that M-34D.

b-33

1    THE MASTER:  Can you state during what period of time

2  each one of those X's was the gauging station?

3    THE WITNESS:  The lower gauging station, which is located

4  just upstream from the county road known as De Luz Road, leading

5  from Fallbrook to the community of De Luz, was placed in opera-

6  tion in 1955.

7    THE MASTER:  The upper station was used prior to that

8  time?

9    THE WITNESS:  It was used prior to that time.

10  BY MR. VEEDER:

11    Q  Did you give the date on that?

12    (Discussion off record.)

13    THE MASTER:  If you want to check that, Colonel, this may

14  be a good time to take about a ten minute recess.

15    (Short recess.)

16  BY MR. VEEDER:

17    Q  Colonel Bowen, are you able to state whether you are

18  able to check out the quads?

19    A  Yes, sir, I was.

20    Q  Have you arranged them to your own satisfaction?

21    A  Yes.

22    MR. VEEDER:  Under those circumstances I am going to make

23  the offer, then.

24    THE MASTER:  I think it should be identified in the record.

25  We have two both referred to as the southwest quarter of the

b-34

1    Hemet Reservoir, so if you can identify, specifically, Exhibit

2    M-33X and AB, I believe--

3         THE WITNESS:   I believe, your Honor, I better go through

4    all of these photographic enlargements to make the record clear.

5         THE MASTER:   Very well.

6         THE WITNESS:   M33V as in victor, is a photographic enlarge-

7    ment of the northeastern quarter of the Hemet quadrangle.

8         MR. SACHSE:   The Hemet Reservoir?

9         THE WITNESS:   Hemet.

10        THE MASTER:   My notes show that M-33G was Hemet.

11        THE WITNESS:   That was the seven half minute series.

12        THE MASTER:   Is this a duplication of this one?

13        THE WITNESS:   No, sir.   These are enlargements of the

14   15 minute series, and the scale on the seven half minute series

15   is one to 24,000 and on the 15 minute series is one to 42,500.

16        MR. SACHSE:   That was my only question, do those cover

17   the same area?

18        THE WITNESS:   No, sir.

19        MR. SACHSE:   Hemet and Hemet Reservoir are two different

20   things.

21        THE WITNESS:   Hemet and the Hemet Reservoir area in the

22   15 minute series, the Hemet quad in the seven and a half minute

23   series, does not cover the same area as this northeastern

24   quarter of Hemet quadrangle in the 15 minute series.

25        THE MASTER:   Very well.   It is not a duplication.

b-35

1        What is W?

2        THE WITNESS:   W is the southeastern quarter of the Hemet

3    quadrangle.

4        MR. STAHLMAN:   That is a correction, then?

5    BY MR. VEEDER:

6        Q   You may proceed.

7        A   33AB--I am taking these out of order here--33AB is the

8    southeastern quarter of the Hemet Reservoir quadrangle.

9        THE MASTER:   What about X?

10        THE WITNESS:   33X is the southwestern quarter of the Hemet

11    Reservoir quadrangle.   33Y is the northwestern quarter of the

12    Warner Springs quadrangle; 33AB is the northeastern quarter of

13    the Warner Springs quadrangle; 33Z is the southwestern quarter

14    of Warner Springs quadrangle.

15        MR. VEEDER:   Is that satisfactory to your Honor now?

16        THE MASTER:   Yes.

17        MR. VEEDER:   Then I would like to offer Exhibit 33A through

18    33AB.

19        THE MASTER:   Inclusive?

20        MR. VEEDER:   Yes.

21        THE MASTER:   They will be received in evidence and so

22    marked.

23        MR. VEEDER:   At this time, your Honor, I would like to

24    have the privilege of withdrawing M-14 at intervals for the

25    purpose of bringing to date our own copies of that map and

b-36

1    trying to provide counsel with current copies as we go along.

2    I am not going to give everyone one, but they will be available,

3    if that is agreeable to your Honor.

4         THE MASTER:  As I understand it, you wish to withdraw

5    that temporarily to make at least one copy of it, and at least

6    one copy for defense counsel?

7         MR. VEEDER:  Yes, to keep the copies current.

8         THE MASTER:  Yes.

9         MR. VEEDER:  Is that agreeable?

10        MR. SACHSE:  Yes.

11        THE MASTER:  That will be permitted, then.

12        Now, we were down to M-34E, I believe.

13        MR. VEEDER:  As I understand we will be permitted to

14   withdraw 33A for the purpose of binding them?

15        THE MASTER:  That is correct.

16   BY MR. VEEDER:

17        Q  Would you proceed, Colonel, with 34?

18        A  34A is a folder containing photographic reproductions

19   of U.S. Geological Survey stream flow records made on the

20   Santa Margarita River near Temecula beginning January 30, 1923

21   and continuing through September 30, 1957.

22        Q  Now, would you mark on the map, using an arrow running

23   south to north?

24        A  The Santa Margarita gauging station, near Temecula is

25   in a canyon within Vail Ranch, and a short distance downstream

1   from the confluence of Murrieta Creek with the Santa Margarita

2   River.  I am marking an X on the approximate station, and am

3   extending an arrow downward to M-34E.

4        MR. STAHLMAN:  May I ask a question?  It may be of some

5   help in identifying these--I know it will occur later--some of

6   the gauging stations have numbers, do they not?

7        THE WITNESS:  No.

8        MR. STAHLMAN:  Some of them have numbers.  Is that the

9   only place they are numbered, the U.S.G.S. doesn't number them?

10        THE WITNESS:  No.

11   BY MR. VEEDER:

12        Q   I hand you 34F, Colonel, and ask you to state what it

13   is.

14        A   34F is a folder containing photographic reproductions

15   of the U.S. Geological Survey stream flow records for the

16   station at Temecula Creek, at the Vail Dam, beginning January

17   31, 1923 and continuing on through the period of construction

18   and storage of water at the Vail Dam to September 30, 1957.

19        Q   Now, were there-- were there not two gauging stations

20   at that point, and one was removed, was it not?  Wasn't there

21   a change of location on that, if you recall?

22        A   A small change in location concurrent with the construc-

23   tion of the Vail Dam, and since that time the station is measured

24   by observation, observing changes in elevation of the Vail Dam,

25   or of the Vail Reservoir rather than the flow passing.

272

b-38

Q   It didn't change the elevation of the dam?

A   No, it does not change that, but the reservoir fluctu-ates.

Q   Now, would you mark on M-14, using an arrow from north to south, and off the watershed, if you would, for that station?

A   This station is located at the head of Nigger Canyon on the Pauba Grant of the Vail Ranch.  I will mark an X at the Dam site, and extend the line southerly and label it M-34F.

Q   I hand you 34G, and ask you to state what it is.

A   The folder labeled 34G is a photographic reproduction of the U.S. Geological Survey stream flow records made on Murrieta Creek near Temecula, beginning October 1st, 1930 and continuing through September 30, 1957.

This station is located on Murrieta Creek a short distance upstream from its confluence with Temecula Creek.

Q   I will ask you to note your designation northward.

A   I am extending northward a line and labeling it M-34G.

Q   Now, is that the extent of the U.S. Geological Survey gauging stations in the watershed of the Santa Margarita River?

A   They have just last year, put another station above Vail, up near Radec, but there is no record of that.  It was installed in the summer of last year.  With that one exception these include all of the stations observed by the U. S. Geological Survey.

MR. VEEDER:  I will offer in evidence Plaintiff's Exhibit

b-39

1   M-34A through G.

2        THE MASTER:   It will be received in evidence and so

3   marked.

4        MR. VEEDER:   I ask to have marked for Identification,

5   as Plaintiff's Exhibit M-35, the monthly and seasonal precipita-

6   tion records, and I will have them marked 35A through D.

7   BY MR. VEEDER:

8        Q   Colonel, I hand you 35A to D, and ask you to state

9   what they are.

10       A   These are tabulations showing monthly and seasonal

11  precipitation in inches at various stations in Southern Califor-

12  nia.   The stations selected were those with the longest length

13  of record, and included precipitation in inches at Fallbrook,

14  California, 35A.   35B shows the monthly and seasonal precipita-

15  tion in inches at Los Angeles, California for the period 1877

16  through 1957.   The record for 35A shows precipitation for the

17  period 1875 to 1957.

18       35C shows the seasonal precipitation in inches at selected

19  sites in Southern California for the period of record.   They

20  include San Diego, beginning in 1850; Escondido beginning in

21  1875; Warner Springs beginning in 1906; Valley Center beginning

22  1872; Fallbrook beginning 1876; Elsinore with an intermittent

23  record beginning in '87; Riverside with a record beginning in

24  '81; Tustin beginning at '77; Los Angeles, beginning at '77.

25       Q   Will you state the source of that data, Colonel?

274

A   These sources came from the United States Weather Bureau, U. S. Geological Survey compilation.

Q   Are those official publications?

A   They are official publications, published by the Bureau of the Department of the Interior.   35D, the final tabulation, gives the monthly and seasonal precipitation in inches at San Diego, California, for the period 1950 to 1957.

THE MASTER:   Now, this indicates that Fallbrook is on A and C, and San Diego is on both C and D; Los Angeles is on both B and C.

THE WITNESS:   Yes, sir.

THE MASTER:   Will you explain that?   Was there some reason for that?

THE WITNESS:   To coordinate the exhibit numbers with the tabulation--if I may see them--

MR. SACHSE:   There is a difference between them.

BY MR. VEEDER:

Q   Would you view these Exhibits for Identification, 35A through D, and explain, first, in response to the Master's question in regard to the variance to which he has made reference, and then explain the caption on each of those, if you would.

A   35C, which includes each of these other stations named, such as Fallbrook, Los Angeles and San Diego, also includes other stations and reveals only the annual precipitation recorded

b-41

1   at the various stations named.

2   THE MASTER:   That is the seasonal precipitation only and

3   is not monthly?

4   THE WITNESS:  That is right, sir.  35A, B and D show the

5   monthly--correction--they show the precipitation month by month

6   for each of the years of record at the stations in San Diego,

7   Los Angeles and Fallbrook.

8   THE MASTER:   A, B and D, showing monthly and seasonal?

9   THE WITNESS:   Yes.

10  THE MASTER:   C shows only the seasonal?

11  THE WITNESS:   Yes, sir, that is correct.   They are also

12  summarized on the bottom of each tabulation to show the minimum,

13  maximum and average for each month on the station and for the

14  season on the seasonal station.

15  MR. VEEDER:   Does that answer you satisfactorily?

16  THE MASTER:   Yes, sir.

17  MR. VEEDER:   And, Mr. Sachse?

18  MR. SACHSE:   Yes.

19  MR. VEEDER:   I will offer this Exhibit, 35A through D.

20  THE MASTER:   They will be received in evidence and so

21  marked.

22  MR. SACHSE:   No objection, your Honor.   By notice that is

23  a photostatic copy.   Are we going to receive a copy of that?

24  MR. VEEDER:   Oh, yes, counsel, we will have copies.

25  I ask to have marked for Identification a map of the

b-42

1   Santa Margarita River watershed.

2        THE CLERK:   36.

3        MR. VEEDER:   Counsel, you have copies of these.

4        MR. SACHSE:   That is the one you gave us down in court?

5        MR. VEEDER:   Yes.

6        Q   I hand you, Colonel Bowen, Plaintiff's Exhibit M-36,

7   and ask you to state under whose direction that was prepared,

8   and also state for the record what it is.

9        A   36 reveals a map of the watershed of the Santa Margarita

10  River which was prepared under my supervision and direction.

11  I should qualify the Santa Margarita River watershed area by

12  stating that a small portion of the area near the ocean is

13  deleted from the lower left hand corner of the map.   With that

14  exception the heavy black lines, irregular in nature which

15  circumscribe the outer portion of the map is the watershed of

16  the Santa Margarita River.

17        Also shown on the map is a vertical red line marking the

18  location of the San Bernardino meridian; a horizontal dash-dot

19  line marking the county boundaries between, or common to River-

20  side and San Diego.

21        This map also shows the location of the Pechanga Indian

22  Reservation which is partly within the Santa Margarita River

23  watershed; the Coahuila Indian Reservation and the Ramona Indian

24  Reservation.

25        In addition to the location of those reservations, it shows

877

b-43

1   the location of the Vail Ranch and a portion of the Naval

2   Reservation including Camp Pendleton, the Naval Ammunition Depot,

3   Lake O'Neill.  This map shows the location, the approximate

4   location of the town of Fallbrook and it shows the location of

5   the Santa Margarita River, its principal tributaries, the ground

6   water storage units comprised of recent alluvium over which the

7   Santa Margarita River and its tributaries descend.

8        There are portions of the stream shown on the map in red

9   which indicate perennial stream flow as it generally is observed

10  in August in this area.  The scale of this map is one to 250,000.

11       MR. VEEDER:  Is there objection?

12       MR. SACHSE:  No.

13       MR. VEEDER:  I offer this.

14       THE MASTER:  It may be received in evidence as Plaintiff's

15  Exhibit M-36.

16  BY MR. VEEDER:

17       Q  Colonel, I will ask you to take the pointer and to step

18  to Plaintiff's Exhibit M-14, which is the Santa Margarita River

19  watershed, and point to the heavy line that surrounds the area

20  of the basin, and state what the line depicts.

21       Q  The solid heavy line, irregular in nature, which

22  bounds the major portion of the map is the drainage area of the

23  Santa Margarita River and its tributaries, and it includes

24  within its irregular outline the watershed of that river system.

25       Q  Now, how was that determined, Colonel?

b.-44

A   The determination of the location of this watershed line was made by myself, traveling afoot, horseback and by jeep over the entire perimeter of the watershed and connecting, on contour maps published by the United States Geological Survey the high points which determine the location of this watershed.

Q   Now, would you state what kind or type of observation you made as you pursued the course you just described?

A   As I pursued this journey I observed these points from which water, falling on the surface of the ground, would flow partly into the Santa Margarita watershed and partly into the adjoining watersheds at the ridge.  Standing on the ridge, the water falling on either side of you will flow in opposite directions, and this watershed here is surrounded on the north by the Jacinto River watershed, on the east by the Saltan Sink watershed and on the south by the San Luis Rey River watershed. So, as I traversed this route, I observed the points where water on either side might flow into either of these three major basins, or into the Santa Margarita basin.

Q   Is that an established scientific method in determining the watershed?  Is that the method usually pursued?

A   Yes, at the high point of land that forms the ridge.

Q   Now, would you trace--first locate the sources of water on the principal tributaries of the Santa Margarita River as shown on Plaintiff's Exhibit M-14.

A   Well, the principal tributary of the Santa Margarita

b-45

1  River, without question, is the Temecula Creek which rises

2  on the northeasterly slope of Aguanga, located generally in

3  Township 9 South Range 2 East, San Bernardino Base Line and

4  Meridian.

5      Temecula Creek, from its origin, descends through a series

6  of valleys and canyons.

7      Q  What is the principal monument in that area that you

8  were just pointing to?

9      A  The monument of greatest importance is the Palomar

10 Observatory which is located approximately three and a half miles

11 west of the Aguanga mountain.

12     Q  Take the red pencil and mark that Palomar.

13     A  The Palomar Observatory is about a mile west of Palomar

14 Mountain.  It is not the only high point shown on the map.  The

15 Observatory itself would be located upon the crest of the water-

16 shed, where I have drawn a circle, in Section 26--this is approx-

17 imately Section 26, Township 9 South, Range 1 East.

18     Q  I ask you to write that on there so we will have that.

19 Is that where Mr. Swing's snowflake fell?

20     A  Snow has been known to fall up there, but not often.

21     Q  Would you proceed with the description of the Temecula

22 Creek?

23     A  The Temecula Creek extends through a series of valleys

24 such as Oakgrove Valley, which is a valley characterized by

25 alluvium fill, and into which the creek may sink and flow as a

b-46

1  subsurface stream and into a narrow rocky defile below the

2  valley then may become a surface stream for a distance.  That

3  characterizes  the extent of Temecula Creek.through Dodge Valley,

4  Radec, Aguanga Valley and the Pauba Grant until it reaches and

5  enters the ground about 14 miles from its origin.

6      Q  Will you state what you mean when you refer to the

7  Pauba Grant?

8      A  The Pauba Grant is one of the old Mexican Land Grants

9  presently occupied by the Vail Company.  It is a portion of the

10  Vail Ranch.

11      The Temecula Creek flows through Nigger Valley a distance

12  of approximately three miles where, in state of nature, it

13  enters a narrow defile known as Nigger Canyon and flows for a

14  distance of about two miles to a point where the valley opens

15  into the Temecula Valley and the creek descends in Temecula

16  Valley crossing through portions of Temecula and Little Temecula

17  Grants, also a part of the Vail Ranch, to its confluence with

18  Murrieta Creek which flows from a northerly direction southerly

19  and easterly and the confluence of these two creeks marks the

20  origin of the Santa Margarita River.

21      The Temecula Creek is joined as it flows down through the

22  upper reaches by Chihuahua Creek, flowing generally or origina-

23  ting in Chihuahua Valley, flowing generally in a westerly direc-

24  tion to its confluence with Temecula Creek in Oakgrove Valley ;

25  there are other minor tributaries.  The major tributary from the

b.-47

1    north is Coahuila Creek.

2         Q   I think I will have you mark on there Oakgrove, if

3    you would, Colonel.  You have made reference to it on two or

4    three occasions.  Just draw an arrow to it and mark an X and

5    then mark--

6         A   Oakgrove is written on here.

7         Q   It is?  I think we better have it written.

8         A   The Coahuila Creek rises on the southerly slope of

9    Thomas Mountain.

10        Q   I will ask you to mark Thomas Mountain.

11        A   Thomas Mountain is the highest point on the perimeter

12   of the watershed.  It rises 6,812 feet above sea level.  From

13   the southerly slope of Thomas Mountain, Coahuila Creek descends

14   in a southerly direction through the Coahuila Valley, picking

15   up tributary flow from the Terwilliger Valley and continuing

16   as Coahuila Creek it enters the Coahuila Indian Reservation and

17   flows through that reservation for a distance of about seven and

18   a half miles.  It continues on down as it leaves Coahuila, lower

19   Coahuila Valley, until it joins Wilson Creek at a point approxi-

20   mately 17 and three quarters miles from its origin.  It joins

21   Wilson Creek coming up from the north and continues as Wilson

22   Creek, sometimes known as Lancaster Creek, until it also enters

23   the easterly boundary of the Pauba Grant and Nigger Valley and

24   joins in Nigger Valley with Temecula Creek.

25        Murrieta Creek, which is the major tributary to the river

b-48

1   from the north, drains the entire area south of Hemet within

2   the watershed of the Santa Margarita River.

3        The tributaries to Murrieta Creek, the principal creeks,

4   are known as Warm Springs Creek and Tecolata, T-e-c-o-l-a-t-a,

5   which is the common spelling for the area, and Santa Gertrudis,

6   which also rises on the Santa Rosa Grant, and which is also

7   a part of the Vail Ranch.

8        Q   Is that a Mexican Land Grant?

9        A   Yes, sir.   That is also one of the old Mexican Land

10  Grants presently being occupied by the Vail Company.

11       Also rising on that Santa Rosa Grant is a stream known

12  sometimes as Cold Creek, sometimes also known as Slaughterhouse

13  Creek, which descends northerly and then reverses its course

14  southerly to confluence with Murrieta Creek and contributes a

15  substantial amount of water to the flow recorded in Murrieta

16  Creek, if any.

17       Murrieta Creek then continues in its course which is with-

18  in the Elsinore Fault zone to its confluence with Temecula

19  Creek and at that point, as I have previously stated, the stream

20  becomes known as the Santa Margarita River.   It enters the

21  granitic lip, which is a manisfestation of the Elsinore Fault,

22  and descends through a narrow precipitous canyon underlain al-

23  most entirely by bedrock for a distance of approximately 11 miles.

24  Incidentally, it leaves the Vail Ranch at a point about a half

25  a mile below the confluence of Murrieta and Temecula Creeks.

b-49

1  It descends through this narrow precipitous canyon a distance

2  of about 11 miles to a point where it enters Camp Pendleton.

3  From that point the Santa Margarita River continues to flow en-

4  tirely within the Naval Reservation boundaries a distance of

5  approximately 20 miles to its confluence with the Pacific Ocean.

6       For a portion of that distance the bed of the stream forms

7  a common boundary between the Naval Ammunition Depot and Camp

8  Pendleton, this irregular line here.

9       Q  You stated that the Santa Margarita River, from the

10 mouth for some distance was underlaid by rock.  What was that?

11      A  Granitic impervious material.

12      Q  Does that have any significance from the standpoint of

13 stream flow in that area?

14      A  It is entirely significant because no water which

15 descends the lower portion of the basin, that is below this

16 Elsinore Fault zone, comes down as other than surface flow.

17 There is no subsurface flow or connection between the area below

18 and that area above the Fault.  We might say the Elsinore Fault

19 is a hydraulic barrier and any water that comes down the stream

20 must rise and come down as a surface flow because of the imper-

21 vious nature of the confining material, the granitic rock, and

22 there is practically no loss other than transpirational losses

23 in this canyon reaches of the river.  There is very little loss

24 to bank storage or streambed storage.  There is actually no

25 alluvium, and in the remainder of the area the alluvium fill is

284

b.-50

1    very thin.

2        Q   Now, would you point out where the granitic underlay

3    material terminates in the course of the stream below Temecula

4    Canyon and below the mouth of Temecula Canyon?

5        A   Well, this granitic material continues through the

6    entire 20 mile reach of the canyon to a point just about at the

7    confluence of the De Luz Creek with the Santa Margarita River.

8    At that point the alluvium mantle increases substantially in

9    depth as the valley widens out and forms the Santa Margarita

10   Valley, and the alluvium basin forms a ground water storage

11   at Camp Pendleton.

12       Q   Now, would you describe the tributaries below the mouth

13   of Temecula Canyon?

14       A   The principal tributary in the lower part of the water-

15   shed below the Elsinore Fault is Rainbow Creek which rises over

16   by Highway 395 in Rainbow Valley and drains a little area easter-

17   ly of Rainbow Valley and joins the Santa Margarita River at

18   Section 8 Township 9 South, Range 3 West, San Bernardino Base Line

19   and Meridian.

20       The next in order, descending or downstream--I am not

21   stating there is any significance in the size or contribution of

22   flow--but continuing on down the stream, the next major tributary

23   is the Sandia Creek which arises on the Santa Rosa Grant, a por-

24   tion of the Vail Ranch, and descends in a southerly direction to

25   it confluence with the Santa Margarita River in Section 7,

285

b-51

1    Township 9 South, Range 3 West.

2         Continuing on down the stream into the Naval Reservation,

3    we find that De Luz Creek arises on the Santa Rosa Grant of

4    the Vail Ranch and descends in a southerly direction and joins

5    the Santa Margarita River.  At a point about a mile downstream

6    from that point it ceases to be a common boundary of the Naval

7    Ammunition Depot and Camp Pendleton.

8         Then, of course, we have Fallbrook Creek which originates

9    in the town of Fallbrook and enters the Naval Ammunition Depot

10   and flows across that Depot into Lake O'Neill located in Camp

11   Pendleton and the United States Navy Hospital.

12        Q  What, generally, are the sources of water for those

13   tributaries to which you have made reference?

14        A  The only source of water for those tributaries is the

15   precipitation that falls on the surface and accumulates and is

16   runoff in the streams.

17        Q  What would be the sources of contribution of water above

18   the confluence of Rainbow Creek with the main stem of the Santa

19   Margarita River?

20        A  The sources above the confluence of Rainbow Creek and

21   Santa Margarita River would be the same.  The only contribution

22   there is rainfall that gathers in the little streams and creeks

23   and branches and drains into the Santa Margarita River through

24   the canyon reaches of the river.  That condition can be, during

25   periods of high runoff, substantial.  There are some spectacular

b-52

1 waterfalls that fall into Temecula Gorge during and shortly after

2 a heavy rain.

3 Q  Now, will you describe the subterranean basin within

4 the confines of the enclave, particularly Camp Pendleton, stating

5 the general surface area of those basins?

6 A  The subterranean basin within Camp Pendleton is a long

7 relatively narrow valley, originating at about the confluence of

8 De Luz Creek and the Santa Margarita River and continuing through

9 the confluence of the Santa Margarita River with the sea.  The

10 entire unit is geologically and hydraulically connected.  It is

11 similar to all other streams on this southern coast of California.

12 It is the result of errosion through the containing bedrock

13 subsequently filled by alluvium precipitated out owing to the

14 rising of the sea concurrent with the melting of the ice cap.

15 So we have an alluvium filled valley which, for purposes of

16 location, we define generally into three segments.

17 I will reiterate that there is no break in the hydraulic

18 and geological continuity.  We sometimes refer to the upper

19 portion of the basin near the hospital and down to the ranch

20 house as the upper basin or segment.  The intermediate areas

21 where the landing field and the industrial area is located is

22 known as the Chappo, and then the lower segment is known as the

23 Ysidora.

24 Leaving Ysidora Valley the river continues through a

25 narrow canyon known as the Ysidora arrows for approximately a

b-53

1   mile until it enters this lagoon at the mouth of the river.

2   Q  Solely for the purpose of location, I am going to ask

3   you to draw the exterior boundaries of the subterranean basins

4   and delineate, solely for purposes of loaation, the upper,

5   chapel and Ysidora subbasins.  Locate the subbasin by drawing

6   a line across the area and then, with a north-south arrow,

7   writing in the names of the basins at the base of the map.

8   A  That is represented on Plaintiff's Exhibit M-34, the

9   ground water storage unit known as the lower Santa Margarita

10  Valley, subdivided. into the upper basin, the Chappo and the

11  Ysidora basins.

12  Q  Now, would you characterize, based on your observations,

13  the kind and type of alluvium generally which would be found

14  at those subbasins, starting with the upper basin?

15  A  The upper basin is a much coarser alluvium, running

16  into gravel, some boulders, cobbles and coarse sand,  Inasmuch

17  as the grade of the stream is steeper in there, the velocity of

18  the water is greater and it enhances its capacity to carry sedi-

19  ment load and some bed load.  Consequently the coarser materials

20  precipitate out up in here as the stream continues on down.

21  Q  From the standpoint of permeability, what about that?

22  A  That means it is much more permeable, the losses from

23  the stream as it would flow during rare periods as a surface

24  stream.  It disappears into the coarse alluvium of this upper

25  basin very rapidly.  Seepage loss is very great.

1    · As we continue southerly down the valley the nature of

2    the alluvium tends to become wider in Chappo where it is dis-

3    tinguished more by coarse sands.  There are some gravels in the

4    aquifer.  There are some gravels in the aquifer, but by in large

5    the character of the alluvium in the Chappo Basin tends to be

6    a little lighter than that in the upper basin.

7            As we get to the Ysidora Basin, except for some good

8    aquiferal lying approximately a hundred feet below the surface

9    of the ground, the alluvium is rather thin in character, running

10   pretty much to silt and sands; very fine sands.

11           Q   What would you say as to the permeability of the

12   alluvium at the Chappo segment?

13           A   Of the Chappo segment?

14           Q   Yes.

15           A   As compared to the upper one it is less, but it is

16   still highly permeable and there is a very good seepage loss

17   experienced when we have stream flow over the surface.

18           Q   Now, would you state your response to the same question

19   with regard to Ysidora?

20           A   The permeability of the lower basin, or the rate at

21   which water will enter the alluvium from surface flow at the

22   Ysidora segment is substantially less than it is in the Chappo

23   and upper basins.  Fine materials have been deposited in that

24   area to considerable depth and hence the loss from surface

25   stream flow across that portion of the basin is much less than

1    it is over the upstream portions of the basins.

2        Q During the period that you have been in Camp Pendleton,

3    and also from your studies of the United States Geological

4    Survey records, how would you describe Santa Margarita River

5    from the standpoint of constancy of flow?

6        A  Well, the flow is highly erratic,not only within the

7    enclave, but anywhere within the watershed.

8        Q  How is that phenomena usually characterized?  What

9    kind of a stream?

10       A  Well, it is what we call a flashy stream, subject to

11   flash flows or runoff which would occur during and subsequent

12   to rainfall, but it tends to come to a peak rather rapidly,

13   particularly following a period of a brief high intensity rain-

14   fall.  The rainfall would accumulate rapidly in the river.  If

15   you take a look at the Murrieta Gauge, which is described and

16   shown in M-34G, it will appear about 12 hours before it appears

17   at the Fallbrook Gauge which is on M-34D, and it will pass

18   equally rapidly.

19       Q  Now, you have described the stream from both the

20   standpoint of a periodic flow and the surface and subsurface

21   flow.  Would you give us a definition as to the term usually

22   used for that kind of a stream?

23       A  That is an intermittent stream.

24       Q  Thank you.  I worked real hard to get that.

25       Now, would you say that such a description would be

applicable throughout the entire watershed?

A   There are portions of the watershed which you might call a stream perennial in nature.

Q   Will you describe that?

A   Because of the discontinuity of those perennial reaches of the stream, they might still qualify as an intermittent stream in that it occurs from time to time.

Q   Tell me where you would find the perennial stream?

A   The major stream which has perennial flow is this portion between the head of Railroad Canyon and the Fallbrook Gauge.

Q   Now, have you observed the Vail Dam in Nigger Canyon?

A   Indeed I have.

Q   Would you state the period that you have observed it and--

A   Well, we have observed the Vail Dam since the gates were closed November 13, 1951, and somewhat prior to that, during a portion of the construction of that dam--1948--I am sorry, the gates were closed November 13, 1948.  I did observe it at that time and subsequent and prior to that time.

Q   Have you noted the quantity of water impounded behind that structure during that period?

A   I have observed personally, with frequent inspections, the quantity of water impounded, and also have available to me records maintained daily by a hydrographer.

291

b-57

1   Q   Under whose direction are those maintained?

2   A   Under my direction.

3   Q   Now, will you go on and just generally describe the

4   quantities of water impounded and the periods in which the

5   impoundments were made and discuss the carryover behind that

6   structure?

7   A   As I previously testified the gates on the structure

8   were closed November 13, 1948.  The capacity of the reservoir

9   behind Vail Dam is approximately 50,000 acre feet.  The maximum

10  elevation of the water surface behind the Vail Dam occurred,

11  as I recall, sometime about May of 1952 following the season of

12  high precipitation and runoff recorded in the water year of '51-

13  '52, the winter and spring of '52, and at the high stage in

14  about May of '52 the amount of water stored behind the Vail Dam,

15  within the reservoir, was about 13,000 acre feet, which is some-

16  what less than a third of its total capacity.

17  From that high point of storage the volume of water

18  impounded in the reservoir deminished to a low of about 550--

19  that is 550--feet in November or October of last year, October

20  1957.  Some early rainfall last year, in October, contributed a

21  little runoff which started the pond to back up, and as of the

22  end of April this year the contribution by runoff into that

23  reservoir brought the water storage back up to about 10,500 acre

24  feet.

25  Q   From your observations of that impounding has there

b-58

1   been a pattern from which you could make any deductions?

2       A   Well, if you mean any pattern whereby a group of persons

3   could regulate the water behind the dam, I would say no.

4       Q   Or forecast the future operations from that structure?

5       A   No, sir, not during the period of operation of the

6   structure.

7       Q   Now, would you state how that structure has been oper-

8   ated, based on your own personal observations?

9       A   Since the gates were closed on the structure the only

10   water that has passed the dam has been through the outlet

11   structure.   There has been absolutely no spill.   It is obvious,

12   if the reservoir had never been more than around 30 per cent

13   full, there has been no spillover the structure whatsoever.

14   Water is released from an outlet structure which is part of the

15   dam itself into the natural stream channel of Nigger Canyon and

16   it flowed down the natural stream channel for about a half a

17   mile where it enters an intake structure and is conveyed by a

18   concrete pipeline on down Nigger Canyon and the entire length of

19   Temecula Valley with lateral lines taking off at various points

20   to feed irrigating reservoirs in the valley.   There is a lateral

21   that goes across and serves this portion of Pechanga.

22       Q   When you say "this portion" will you state--

23       A   Excuse me--the portion of Pechanga Valley which is loca-

24   ted within the Vail Ranch.

25       Q   Have you observed the culture  operation in that area?

b-59

1      A   Yes, I have.

2      Q   What culture are they pursuing now in regard to their

3   farming operations?

4      A   Their farming operations are designed entirely around

5   their cattle feeding operations.  The Vail Ranch is a cattle

6   producing ranch.  They produce feeders--I should say they feed

7   cattle for market.  They are not--they don't have a breeding

8   operation.  They buy calves and steers and, depending on the

9   age of the animal, the time of the year and the condition of the

10   range, they may put them out on the range for a few months and

11   then, alternately, when the market and other conditions are

12   right, they will put them into dry feed lots, and market them

13   as fat cattle.

14      But, the irrigated area in the Temecula Valley at the

15   present time is devoted almost entirely to the production of

16   feed for this cattle finishing operation; alfalfa, corn, silage

17   and, I guess, most of their grain or corn concentrate is grown

18   on dry land culture.

19      Q   How many crops of alfalfa have you observed up there,

20   if you have?

21      A   I have observed on the average of about six cuttings

22   a year up there.  In addition to making hay with these six

23   cuttings the ranch operation, generally, uses the alfalfa as

24   feed, as pasture for a period of months which may amount to as

25   much as two additional cuttings.  That is a common operation

b-60

1    in this part of the world.

2        Q   When you say it amounts to as much as two, what does

3    that mean, the calves and cattle consume it directly?

4        A   Instead of taking a mower out there and cutting the

5    alfalfa and taking a baler out there and baling it and hauling

6    it in, they take the steer out there and let him--

7        Q   Do the cutting of the harvest himself?

8        A   Yes.  It cuts down the middle man.  It eliminates the

9    middle man.

10       Q   How does that operation compare with the operation

11   antecedent to the closing of this Vail Dam and the operation of

12   the reservoir?

13       A   Well, antecedent to the development of this water

14   conservation project up here, the operation differed significantly

15   in several respects, one of which--

16       MR. SACHSE:   I will object because I think the witness's

17   testimony is that he was not with the Marine Corps prior to the

18   time of the closing of the dam in 1948.  I would like to find

19   out if he knows what he is talking about or if this is hearsay.

20       THE MASTER:   I don't think he was here then.

21   BY MR. VEEDER:

22       Q   When was the time you saw the operation?

23       A   Well, I have been in the Imperial Valley, working over

24   there since--actually I was with the Marines over there in '44

25   and I came to know the Vail people at that time.  They had some

b-61

1   interests in Imperial Valley and I have seen this operation from

2   time to time since about '45.  That was three and a half or

3   four years, anyhow, prior to the completion of the dam.

4        MR. VEEDER:  Would your Honor--

5        MR. SACHSE:  I repeat the objection.  It seems pretty

6   obvious he is talking about the Imperial Valley.

7        THE MASTER:  During the time, Colonel, did you come from

8   Imperial Valley to this area and personally observe this?

9        THE WITNESS:  Yes.  That is the point I wish to make, your

10  Honor.  I was over here right next door and I knew the Vail's

11  and I came over and observed this operation.

12       THE MASTER:  The objection will be overruled subject to

13  a motion to strike if, upon cross-examination, counsel can

14  establish the fact that the witness was not personally acquainted

15  with the matters to which he now testifies.

16       MR. VEEDER:  May I ask a couple of questions to go a little

17  further into his qualifications on this matter?

18       Q  Colonel, in your studies of the valley, Santa Margarita

19  Valley, have you, as an expert, reviewed the productivity of the

20  area in general?

21       A  Yes, sir.

22       Q  And what studies have you made in regard to the kind

23  and type of agriculture operation in the area?

24       A  Throughout the watershed?

25       Q  Yes, including the Vail area.

1    A   Well, the bulk of the operations in the watershed is

2  either range land, that is utilizing the natural forage produced

3  for range cattle or sheep.  As far as the farming operation

4  is concerned, the bulk of that is confined to dry farming.  I

5  would say from the standpoint of acreage the bulk of the farming

6  is dry farming, and much of that is found in these golden hills

7  lying in the vicinity of the town of Murrieta and easterly from

8  there.  There are irrigated operations in the   higher valleys

9  such as Terwilliger, Coahuila, and some irrigation in Chihuahua,

10  Dodge, Oakgrove, Radec and Aguanga.

11    The Vail operation is primarily irrigated in the valley

12  and dry farmed on the hills joining the valley, and ranged on

13  the Santa Rosa, in the lower reaches of the valley.

14    In this canyon reach in here, there are some small avacado

15  and citrus developments that have been made in recent years.

16    The Fallbrook area has, of course, established the possi-

17  bility of development in the avacado field, by recent plantings

18  up in the vicinity of the town of Fallbrook.

19    The De Luz area here is predominantly-- it has been rela-

20  tively slow in developing, but there are recent plantings of

21  subtropical fruits and avacados and citrus in there.   Some

22  operations in the central part of the De Luz area are producing

23  nuts and grapes and corn and some other irrigated crops of a

24  field variety.

25    Of course, since the Marines have  occupied the Rancho

1  Santa Margarita, there has been some farming in the valley that

2  produces horse feed for our special service of horses.

3  THE MASTER:   At this time we will recess until 1:30.

4  I might announce that Mr. Veeder has indicated that the Govern-

5  ment's case will take all this afternoon and probably all day

6  tomorrow.   That is merely for the information of any defendants

7  that may be present.

8  (Noon recess.)

Fallbrook, California, May 26, 1958, 1:30 p.m.


MR. VEEDER:  We are ready to proceed.

THE MASTER:  We will proceed, then, Mr. Veeder.


ALLEN C. BOWEN,

resumed the stand and further testified as follows:


DIRECT EXAMINATION (Continued)

BY MR. VEEDER:

Q  Colonel, you made reference to the location of the Fallbrook gauge station.  Do you have information to amplify what you have already said?

A  May I see Plaintiff's Exhibit M-34D.  Plaintiff's Exhibit M-34D is a photographic copy of the stream gauging records on the Santa Margarita River near Fallbrook and a photographic reproduction of the U. S. G. S. description of that station reveals that prior to October 1, 1955, the measurement was made at a site one and seven-tenths miles upstream from the present gauging station.

Q  Colonel, would you turn to Plaintiff's Exhibit M-14 and take the red pencil and draw the basin to which you made reference below the Vail Dam?

A  Referring to Plaintiff's Exhibit M-14 --

Q  This is strictly for location purposes.

A   I will describe the Temecula Creek as flowing through Nigger Canyon for a distance of approximately two miles, at which point it flows as an intermittent stream across the Temecula Basin which, for purposes of location only, I am outlining with a red pencil to show a T shaped area -- that is a little wide in there --

Q   When you said "in there" you meant --

A   The T shaped area, the top.  It is bounded by the Elsinore fault which is slightly upstream from the Santa Margarita River gauging station near Temecula.

Q   And the point where you now have your pencil, where you have a double line, is where you say you went a little too far west.  Is that correct?

A   That is correct.  And I am connecting the red line to form the stem of the T which circumscribes, generally, the area known as the Temecula alluvium basin.

Q   Have you observed the characterization of the alluvium immediately downstream from the Vail Dam?

A   I have.

Q   And would you describe it, please?

A   Immediately downstream from the Vail Dam the stream runs in a narrow deep canyon known as Nigger Canyon.  Opening up from Nigger Canyon to the Temecula alluvial basin the stream crosses what is known as the outwash area, a very coarse alluvial, permeable alluvium material, into which flows the

1   streams which would seep into the underground water basin.

2       From the outwash area immediately below the mouth of

3   Nigger Canyon the character of the alluvium tends to become

4   finer as we approach downstream, in somewhat the same manner

5   as previously described in the lower Santa Margarita basin in

6   the Naval reservation.   .

7       Q  Would you draw with an arrow, running north and south,

8   to point out the outside of the watershed, and mark the name

9   of the basin as generally enclosed in it?

10       A  It is generally known as the Temecula Basin, but it

11   is known in some reports as the Pauba Basin.

12       Q  Will you put "Pauba" in parenthesis below it.

13       Now, in your official position have you had any -- strike

14   that, please.  In your official position have you considered

15   the operation of the Temecula Basin as it relates to the

16   ground water basin within the enclave of Camp Pendleton?

17       A  Yes, I have.

18       Q  Have you found any relationship between the two?

19       A  Very definitely.

20       Q  What are they, please?

21       A  Well, in the summer months known as the irrigation

22   season, beginning about April and continuing through to about

23   the first of November, water rises from the Temecula Basin at

24   a point near the headquarters camp.

25       Q  When you say "headquarters camp" --

A   The Vail Ranch, and flows as a surface stream to the point where Murrieta and Temecula Creek join to form the Santa Margarita River, which flows, continues down the Temecula Canyon as a surface stream, through the summer months, to a point at or near the easterly boundary of Camp Pendleton.

Q   Now, have you observed the extent of irrigable acreage on the Vail Estate?

A   I have.

Q   How does that compare, and the demand for water to irrigate that area with the available supply of water?

MR. SACHSE:   As of what date, please, Mr. Veeder?

MR. VEEDER:   As of the period of your acquaintance to the area.

MR. SACHSE:   I object to the question as being totally indefinite; the period is not definite.

THE MASTER:   Can you ask him as to the beginning of the period and the end of the period? I know there are specific portions and this covers a period of several years.

BY MR. VEEDER:

Q   Would you state the first time you became acquainted with the area?

A   The first time that I became acquainted with the area and observed the farming operation in the Temecula Valley was in the fall of 1944, at which time I was still in the Marine Corps but I had purchased a little place out north of El Centro

302

in Imperial Valley and planned to continue my profession in Southern California as soon as the war was over and I got out of the Marine Corps.

So, as time was available, I reconnoitered all of Imperial Valley and Riverside County and much of San Diego County. At that time, I, on several occasions, took the highway that comes up from -- State Highway 78 -- up to San Felipe, past Warner Springs, down through Oakgrove, Aguanga, Radec and Highway 71 which traverses the entire length of the Pauba Grant to the town of Temecula.

Q  When you say the Pauba Grant, you are referring to the Vail Ranch?

A  To the Vail Ranch.  That would be my first close-up observation of the farming operations in that particular valley.

Q  Would you state again the year?

A  1944.

Q  Would you answer the question now that I asked in regard to the relationship at that time between the irrigable acreage and availability of water to meet the demand of that acreage?

A  Well, at that time --

MR. SACHSE:  I will object, if the Court please.  There is no proper foundation laid as it is only shown that the witness has driven along in an automobile down the highway and

has observed the ranch out of the car window.  I don't think, without showing as to the amount of acreage involved, the crops, the use of the water, that he can testify to improvements and the relationship between irrigable acreage and water supply. I don't believe there is any foundation as to his knowledge as to the water supply.

BY MR. VEEDER:

Q  Would you state at that time what crops were being grown on the Vail property?

A  At that time there was some alfalfa; there was a peach grove; there were fields in carrots and potatoes.  That is the predominant culture.  There was, of course, alfalfa being produced in the area at that time.

Q  What has been your experience in calculating acreage in your college preparation and in your work as a soil scientist?  Did you have any experience along that line?

A  Well, you might say I cut my teeth on a Number 2 shovel in an irrigating area.  That is tantamount to saying that I seasoned the wooden handle of an irrigation shovel.  I was born and raised in a community descended from the pioneers. My grandfather farmed extensive acreage in the upper Snake River Valley of Idaho in the vicinity of Rexburg and Ashton and that area was all subdivided into sections, quarter sections, sixteenths and so forth.  Almost from earliest memory I have been familiar with the size of a forty or an eighty or a one

1   hundred and sixty or of a square mile, six hundred and forty

2   acres.

3       My formal education, of course, in the field of engineering

4   included surveys, technical surveys, and actual field surveys

5   to determine boundaries.  And my work in soil required famili-

6   arity with areas, working with maps, aerial photographs, field

7   notes and so forth.

8       Q  What has been your acquaintance with Mr. Sachse, who

9   is now making an objection to your qualifications?  Have you

10  had any dealings with Mr. Sachse or his client in regard to

11  acreage or soil surveys?

12      MR. SACHSE:  I make no objection whatsoever to Colonel

13  Bowen's qualifications.  Basically I am making an objection to

14  the foundation as to the specific question.  I am quite

15  willing to stipulate to Colonel Bowen's qualifications.

16      THE MASTER:  That is the Court's view at the present

17  moment, Mr. Veeder.  His objection is to a foundation, not to

18  qualification.

19      THE WITNESS:  To continue, if I may, Mr. Veeder, on my

20  general background, all my work being tied in with agricultural

21  development, small watershed planning and so forth, has required

22  continuing estimation and measurement of acreage, of land.

23  BY MR. VEEDER:

24      Q  Now, is it possible for you to view an area and estimate

25  acreages?

A   Yes.

Q   Just from your observation?

A   Yes.

Q   Even from driving down the road in a car?

A   Yes, sir.

Q   Have you done that?

A   Yes, sir.

Q   When you were going through the Vail property, if you recall, what did you observe?

THE MASTER:   This relates to 1944?

MR. VEEDER:   Yes.

THE WITNESS:   Well, I observed an area in there of between four and five thousand acres of land in the valley.

BY MR. VEEDER:

Q   And what else did you observe from the standpoint of the crops they raised?

A   Well, I previously named the types of crops that I recall being grown at that time.

Q   From the standpoint of acreage, however?

A   From the standpoint of acreage I would say at that time there was approximately half of that area, or somewhere between two thousand and twenty-five hundred acres was being irrigated.

Q   And what was your acquaintance with the runoff of the Santa Margarita River at that time, if any?

A   I have no acquaintance with the runoff of the Santa Margarita River.

Q   Have you considered -- have you reviewed the kind and type of stream?

A   Yes, I did.

Q   During your work have you observed comparable areas to Santa Margarita, in 1944, and have you made observations in area comparable to the Santa Margarita Valley?

A   Well, I made, at that time and for years previously, many observations of the Colorado River and its tributaries, some of which might be comparable in character and precipitation to the Santa Margarita watershed.

Q   How did they compare from the standpoint of aridity and precipitation?

A   Well, by and large they have -- they are much more arid than this, but some of them would verge on the same character of semi-aridity of the watershed that is on the Santa Margarita River.

Q   What was the condition of the stream flow when you drove through the Santa Margarita River at the time, in 1944?

MR. SACHSE:   Now just a minute.  The question, as I get it, was when you drove through the Santa Margarita River.

MR. VEEDER:   The Santa Margarita River Valley.  Even he could have driven through the river as there is no question there was no water in it.

THE WITNESS:  As I recall, in the fall of 1944, there were places where there was water and places where there was not.  The stream was intermittent in character.  I do remember, of my own personal knowledge, being on Camp Pendleton at the time when we ran some problems, and as I recall then the Santa Margarita River was flowing well into the Chappo Basin below Basilone Ford.

BY MR. VEEDER:

Q  Based upon your observations at that time, how would you compare the availability of water on the Vail Estate with the number of acres that you observed and what appeared to be irrigable?

MR. SACHSE:  I object, if the Court please.  There is no foundation laid.  There is no showing of any kind as to the availability of water on the Vail lands, except these statements by Colonel Bowen as to his acquaintance with the Santa Margarita River runoff; that he saw water in some places in the river and he did not see it in others.  I submit that is not a proper foundation to speak of the entire Vail Estate.

MR. VEEDER:  In regard to this man and his qualifications and background, I respectfully submit that he could observe an intermittent stream, as he undoubtedly did; he could observe that there was no retaining reservoir.  He could observe, in a dry arid country like that, with five thousand acres of land which appeared to him to be susceptible of irrigation -- he

said they were irrigable -- and two thousand acres under irrigation, I think that even Mr. Sachse could be competent to make a determination whether the acreage which could be irrigated far exceeded the available supply.  I think there is proper foundation.  Indeed, we now have, without objection, all of the runoff records of the Santa Margarita Valley, and there is no doubt that anyone -- I think we are wasting a lot of time, frankly -- there is no doubt that anyone knows that the Vail Estate has irrigable acreage far in excess, and had at that time irrigable acreage far in excess of the runoff that would be available in Temecula Creek.

MR. SACHSE:  Now just a minute, please.  That is not the question.  As I understood the question it was how does the water supply compare with the irrigable acreage.  There is a real distinction.  I don't want an expression of opinion without a more adequate foundation.  I object to an expression of an opinion without better foundation.  As to the relation of water supply to the acreage under irrigation, there is no showing of any knowledge of the water supply, particularly underground, except what he knows of now.

THE MASTER:  I think that the witness has the qualifications and I will permit him to answer the question.  I think that the objection made by Mr. Sachse goes to the weight of the evidence rather than to its admissibility.  If he wishes, on cross-examination, he may show that the witness did not have

1   actual sufficient acquaintance to have his opinion be of much

2   value.  The objection will be overruled.

3   BY MR. VEEDER:

4       Q   Would you proceed to answer the question?

5       A   May I have the question, please?

6       Q   Well, I will restate it.  At the time in 1944 when you

7   observed this area, in your opinion was there sufficient water

8   in the Temecula Creek to supply water to the acreage which you

9   considered to be irrigable at that time?

10      A   At that time there was insufficient surface water in

11  Temecula Creek to irrigate the area under irrigation in the

12  Temecula Valley, and the Vail Ranch.

13      Q   Now, in subsequent years would you detail your observ-

14  ations from the standpoint of water use on the Vail Estate?

15  When last did you see that area, in 1945 or '46, whenever it

16  was?

17      A   Well, in early '45 I was assigned to the Coronado

18  Amphibious Training Base near San Diego, California, as a

19  cartographer and instructor in map reading with an air support

20  training unit, and my duties required me to travel to the

21  various Marine Corps Air Stations and Auxiliary Air Stations

22  on the West Coast for the purpose of making maps and giving

23  instruction to pilots in map reading.  I made frequent trips

24  by air -- you might say an airplane pilot took me around --

25  and I frequently flew from El Toro to El Centro, and the route

1    almost always came in over Elsinore and the Vail Ranch and over

2    Oakgrove and on down into the desert area.

3        Q  By the way, in trips of that character are you able to

4    observe the irrigation system that would supply the area, the

5    Vail acreage?

6        A  I was very, very close.  The pilot who had the duty of

7    flying me down, I told him I would like to get down close to

8    the ground and look things over, so I had an opportunity to

9    observe rather closely their operations.  There were times when

10   I would fly as many as two or three times a week and other

11   times it would only be once a week over this area.

12       Q  And what was the kind and type of distribution system

13   that was installed on the Vail property?

14       A  Well, the distribution system at that time was pri-

15   marily wells in the valley floor which pumped water into the

16   various irrigation reservoirs where it was further distributed

17   out to the fields.

18       Q  What phenomena could you observe that would delineate

19   the areas which were actually being irrigated?

20       A  Well, the phenomena, the crops that cannot successfully

21   be grown by dry farming methods in this area, general field

22   crops, alfalfa, vegetables, fruit and so forth were sharply

23   delineated from the rolling area to the north and south on

24   which the Vail Company at that time, and currently, produces

25   dry land barley.  This would appear as a green oasis wherever

1    irrigation water supplied it from, say, this time of the year

2    on through into the next winter.

3        Q   Since that date what investigation or contact have you

4    made with the Vail Estate with regard to the availability of

5    water as it relates to the irrigable acreage on the Vail Estate,

6    pinpointing it to the year 1951?

7        A   My first contact with the Vail Company relative to

8    water use was in '51 when I was recalled to active duty with

9    the United States Marine Corps.  At that time I personally

10   covered the Vail agricultural operations; the operation of

11   Vail Lake, which was completed in '48.

12       Q   What is your opinion based upon those investigations as

13   to the acreage there that is irrigable as related to the

14   quantity of water?

15       A   The irrigable acreage of Vail Ranch far exceeds the

16   available supply of water.

17       Q   You have a personal knowledge of that?

18       A   Yes, sir.

19       Q   Now, you stated that the culture in 1944 and the years

20   subsequent were row crops.  Would you state the significance

21   of that from the standpoint of water use?

22       A   Well, inasmuch as this area here, the area of the

23   Temecula Basin, is in excess of a thousand feet above sea level,

24   and not favored so much with the temperate conditions of the

25   ocean breeze, it is more susceptible to frost and, generally,

1  they will only grow one crop at a particular time what we some-

2  times call row type crops.  And those row crops, as related to

3  general field crops, sugar beets, alfalfa, corn and so forth,

4  usually have relatively smaller consumptive use of water.

5      Q  And at this time would you define for the Court, and

6  into the record, your understanding of the term consumptive

7  use?

8      A  Consumptive use as it relates to water refers to the

9  water which is actually utilized in building plant tissues; the

10  water which is lost by transpiration from the stomata of the

11  leaf surface, and the water which is lost by evaporation from

12  the soil and free water surfaces adjoining the field or in the

13  field during application.

14      Q  Now, you have used the term evaporation and transpir-

15  ation.  Would you also, for the record, state the meaning of

16  them?

17      A  Evapo-transpiration, which is a coined term, is a term

18  in accepted usage and combines the word evaporation and trans-

19  piration with a hyphen -- e-v-a-p-o hyphen transpiration, to

20  indicate all of the loss occurring either from evaporation of

21  water from the water surface, evaporation of water which is in

22  contact with the soil itself, and the transpiration loss from

23  the plant.

24      Q  During your period of working with soils and soil sur-

25  veys, what has been your experience in regard to studies of

1    precipitation runoffs, water uses?

2        A  Well, of course, in small watershed studies, which has

3    been one of my primary occupations, precipitation and runoff

4    must be determined in order to evaluate the water yield of the

5    shed, the watershed, and the design of erosion control struc-

6    tures.

7        Q  What has been your experience in regard to erosion

8    control structures?

9        THE MASTER:  Just a moment.  As long as you are not

10   referring to the map, you might as well sit down.

11   BY MR. VEEDER:

12       Q  Go ahead.

13       A  Well, the Soil Conservation Service, for which I worked

14   for a number of years, has the primary responsibility of

15   assisting farmers and public entities with the development of,

16   and planning and development of design of erosion control

17   structures and small flood control structures, so my entire

18   period with the Soil Conservation Service brought me into daily

19   contact with it.

20       Q  Did you make determinations of runoff in connection with

21   that work?

22       A  Yes, sir.

23       Q  Now, what would be the effect upon the runoff of Tem-

24   ecula Creek and the uses of the water -- strike that.  What

25   would be the effect of the change of the culture from row crops

1  to the culture of livestock operations of the Vail Estate

2  which they raise predominantly, stock feed?

3      A  You say the effect on runoff?

4      Q  No, of the quantity of water used.

5      A  The quantity of water used?

6      Q  Yes.

7      A  Well, the quantity of water would increase greatly

8  because in growing feed for the stock, the area in alfalfa was

9  increased and some area was placed in irrigated pasture, a

10  substantial area was placed in corn, which was grown for silage

11  and the perennial irrigated pasture and perennial crops, might

12  require irrigation almost any month of the year.  In this area,

13  generally the irrigation season runs 1 April through 30 October.

14      Q  When you say generally to what crops are you making

15  reference?

16      A  I am making reference to perennial crops.  If you run

17  into a dry month in December, January, February or March, the

18  farmer or rancher irrigates his crops and may thereby exceed

19  the amount which we generally consider necessary for the growth

20  of perennial crops.

21      Q  And what would be the period of irrigation for carrots

22  and potatoes and other crops?

23      A  For those annual crops, where only one crop is grown

24  in a year, generally around four months of the year is suf-

25  ficient to produce the crop.

1    Q  What then -- how, then, would you compare the duty of

2    water for carrots and other row crops as it would relate to the

3    alfalfa, the production of alfalfa?

4    A  Well, the duty of water for alfalfa is -- and for ir-

5    rigated pasture -- is much lower than it is for these vegetable

6    crops, firstly because a longer growing season is required and,

7    secondly, because the vegetable crops are rooted to a shallower

8    depth and don't require as much water for application in order

9    to produce the crop; that is, a lesser volume of the soil must

10   be filled with water to satisfy the plant needs, and therefore

11   you might say that the vegetable crops would have a higher

12   degree of water use.

13   Q  Would you define the term low duty of water and high

14   duty of water as you have used the terms in your testimony?

15   A  Well, the term duty of water refers to the number of

16   acres which can be successfully irrigated with a unit stream

17   flow.  For example, the number of acres that could be satisfied

18   with a continuous stream flow for one cubic foot per second.

19   We use the term lower duty when you have a plant with a high

20   consumptive use in which you can satisfy the requirements of a

21   lesser number of acres with that continuous stream flow of one

22   cubic foot per second.  We use the term higher to denote --

23   higher duty of water, to denote plants which have a lower con-

24   sumptive use, a lower water requirement, and you can cover more

25   acres to satisfy the plant need on a greater acreage or area

1   with one cubic foot per second on continuous flow.

2       Q   Now, would you state, based upon your observations,

3   whether there has been an increased burden on the stream, on

4   Temecula Creek, by reason of the change of the culture from

5   row crops series which you have referred to in 1944 and the

6   livestock economy being followed there at the present time?

7       A   Production of livestock feed has materially increased

8   the burden on the stream.

9       Q   Have you observed that yourself?

10      A   I have.

11      Q   Would you describe -- strike that, please.

12      Would you state what your observations have revealed in

13  that connection from the standpoint of runoff, stream flow of

14  the river?

15      A   Well, the runoff from the river has been drastically

16  reduced because of greater use of water.

17      Q   Now, in regard to the construction of Vail Dam, have

18  you made any observations as to the runoff in Temecula Creek by

19  reason of that structure being placed upon the stream?

20      A   Yes, sir, I have.  The Vail Dam controls the runoff

21  from about three hundred and nineteen square miles of land

22  which lies above it, and at that point, the record shows, that

23  approximately one-third of the entire flow of the Temecula

24  Creek passes that point and because the Vail Dam is a concrete

25  structure -- it is keyed into bedrock -- it completely controls

1    the stream at that point.  No water passes it except that which

2    either would spill or which is released from the outlets of the

3    structure, and no water has spilled since the dam was completed.

4        Q   What has been the effect of that control structure

5    upon the runoff of Temecula Creek and the Santa Margarita River?

6        A   Well, it has limited the runoff from Temecula Creek as

7    gauged at the Santa Margarita station near Temecula, solely to

8    that which drains from the small portion of the watershed of

9    Temecula Creek below the Vail Dam, and has very sharply reduced

10   the flow of that creek.

11       Q   What is the kind and type of control -- strike that.

12   What is the extent of the control that the Vail Company, the

13   defendant here, is able to exercise over the runoff of

14   Temecula Creek from your own observation?

15       A   Well, they completely control the runoff at the Vail

16   Dam.  No water passes that point except that which goes through

17   their gate structure, outlet structure, and is subject to their

18   complete control.

19       Q   What effect does their pumping operation have upon the

20   stream flow of Temecula Creek, if you have made any observation

21   in that regard?

22       A   Well, their pumping operation during periods of low

23   precipitation and runoff pulls the elevation of the water plane

24   down sharply and makes storage room available for future runoff

25   to seep into the ground water basin and diminish the surface

1  flow of the stream.

2      Q  Why does the Vail Estate at the present time, the Vail

3  Company at the present time, deliver water down the Santa

4  Margarita River --

5      MR. SACHSE:  Objected to as calling for a conclusion of

6  the witness; no proper foundation laid for an answer to that.

7      THE MASTER:  Sustained.

8      MR. VEEDER:  Your Honor, I asked him several questions

9  as to whether he had observed the operation of the Temecula

10  Basin as it relates to the operation of the basins within the

11  enclave.  That was asked without objection, and he said that

12  in his official capacity he has a responsibility of observing

13  the operations, and I thought he made quite a statement in that

14  regard.

15      THE MASTER:  He has not stated, and there is no foundation

16  laid, to my knowledge, that would indicate he knows why the

17  operation was conducted in the manner in which it was con-

18  ducted.

19      MR. VEEDER:  Well, we have, of course, in the record the

20  stipulated judgment.

21      Q  Colonel Bowen, are you acquainted with the stipulated

22  judgment between the Vail Estate and the Vail Company and the

23  Rancho Santa Margarita?

24      A  Yes, sir, I am.

25      Q  What is your knowledge in that regard?

A   Well, I have read that contract many times.

Q   And what --

A   And have evaluated it.

Q   What has been the result, if you know, of the existence of that arrangement between the Vail Company and the United States?

MR. SACHSE:   The same objection, your Honor.   There is no showing that he has any knowledge of what the Vails have done or why they have done it.   He is attempting to prove by indirection something that should be proved by direction.

THE MASTER:   I believe that the objection is well taken, Mr. Veeder.   Colonel Bowen can state what he saw, what the actual facts were, but I believe that the reason that it was done must be established by other witnesses.

MR. VEEDER:   By what?

THE MASTER:   By other witnesses.

MR. VEEDER:   Well, your Honor, so far as we are concerned, I think that we can show relationship between Colonel Bowen's activities and the Vail Estate, and he has said he has been up there on the operation through the whole period he has been here.

THE MASTER:   So far all he has stated was what he observed.   He has not indicated any basis for the reasons why they conducted them as they did.

MR. VEEDER:   Well, I will withhold that question for a

1   while.

2       Q  Colonel Bowen, have you undertaken a study of the DeLuz

3   area from the standpoint of land and water uses?

4       A  Yes, sir, I have.

5       Q  Would you state for the record the amount of the period

6   of investigation in that regard?

7       A  Well, the investigation in the DeLuz Creek area began

8   concurrently with investigations throughout the Santa Margarita

9   watershed.  We made some detailed surveys, soil surveys,

10  geological surveys in the DeLuz area, as early as 1951, con-

11  tinuing off and on up to the present time.

12      Q  Now, what was your basic data in the making of that

13  soil survey?  Did you locate the area?  What did you use in

14  making that determination as to the area to be surveyed?

15      A  Well, our earlier surveys were made solely at the

16  request of land owners in the DeLuz watershed, and were con-

17  fined to the boundaries of the land that they occupied.  And,

18  subsequently, as we surveyed more and more of those lands, we

19  managed to complete the surveys of the entire watershed of the

20  DeLuz Creek out to the perimeter of the watershed.

21      Q  What were the sources of information that you used in

22  making that investigation?

23      A  Our investigation was based on the actual field surveys

24  made in the area, and recorded on aerial photographs used as

25  field sheets.

1     Q  What were the dates of those aerial photographs?  Can

2  you state?

3     A  The earlier surveys were made on aerial photographs

4  which were flown in 1951.  We had the area reflown in 1955, and

5  since that date we have used the '55 pictures as a basis for

6  the survey.

7     Q  Now, in conducting that survey what did you do from

8  the standpoint of actually physically going upon the land and

9  checking the area?

10     A  Well, we would go onto the land with soil augers and

11  some field testing kits.  We would bore holes or shallow wells

12  in the soil with a hand auger to a depth of five feet, where

13  the underlying material would permit, or to a refusal if it

14  occurred at a lesser depth than that.  We would make obser-

15  vations in detail of each of the various soil horizons or

16  strata that were penetrated.  And we would determine the break

17  or contact between soil bodies characterized by common profile

18  and would so delineate by a line and record the information

19  found in the surveys with a fractional symbol which would

20  reveal the soil texture, the depth of the soil, the nature and

21  character of the underlying material; the general slope, the

22  range of slope of the land in which the soil body laid; the

23  various factors of susceptibility to flooding and wetness;

24  alkalinity and other factors that might occur.

25     Q  How intense a study did you make when you undertook the

1    survey of the DeLuz watershed?

2        A  We made much of it on what we would call a detailed

3    survey basis; a very intensive survey in which numerous borings

4    would be made in the soil, and numerous determinations of the

5    slope.

6        Q  What are the criterion which guide you in making your

7    determination as to whether or not it would be an intensive or

8    a less intensive study?

9        A  Well, the type of soil surveys are generally known as

10   detailed, which is the very extensive surveys based on frequent

11   examination of the soil and --

12       Q  When you say "frequent" you mean --

13       A  I mean by frequent you might get down on some of those

14   complex areas to a soil boring every acre or every two and a

15   half or five acres.  The capacity with which the survey is

16   conducted depends partly on the purposes for which the survey

17   is made and are influenced largely on the character and com-

18   plexity of the soil patterns in the area.  In the DeLuz Creek

19   area, for example, it is a highly dissected mountainous area.

20       Q  When you say "dissected" what do you mean?

21       A  Well, dissected is cut up into or by a lot of gulleys,

22   drainage channels with reaches, and extreme valleys in sharp

23   relief to one another, and, under those conditions such things

24   as microclimatology can play a significant part.  For example,

25   on a north facing slope, which generally receives less

26-L

3923

sunshine than a south facing slope, experiences the phenomena

of a lesser evapo-transpiration from the northerly slope.

Plants grow more luxuriantly and plants have a larger part in

the soil forming processes and thereby you run into deeper

soils on north slopes, generally, than you do on south slopes

which are exposed to burning rays of the sun practically the

entire day long.  You get, generally, annual grasses growing

on the south face of the slope and shrubs and trees growing

on the more protected north basin slopes; hence plants leave

their own mark on the soil.  You find vast differences between

the bottom of the canyon and the top of the ridge.  For

example, some areas like DeLuz would be considered rather com-

plex.

Q  Now, Colonel, you have discussed the methods used in

making intensive surveys.  What methods are used on the less

extensive investigations?

A  Well, there is what we call a detailed reconnaissance

type of survey which would be the somewhat less intensive

survey than the detailed survey.  It is utilized to make sur-

veys of areas which are characterized by soils of high

potential value interspersed with areas of little or no

economic value where the small value of the land itself pre-

cludes expensive engineering type determinations.  On those

types of areas that are of little value, unless for a special

purpose, we generally bore much less holes and make much less

324

frequent observations.  The less detailed of the three general classes of survey would be called a reconnaissance survey which is made primarily to gather general information.  It is made by widely dispersed observations of the soil depth and character; observations made mostly on the basis of information shown in road cuts, excavations and so forth, where a minimum of hand work or digging is required.

Q  Now, in regard to the individual investigations which you have made in this rea, the DeLuz area, would you state the proceedings that you followed there.  How did you determine the area of an individual property that you would investigate?

A  We determined the area of the property by plotting the description of the land furnished us by the owner or garnered from the County Recorder's records on U. S. Topographic Quadrangles and then transferring those areas to our aerial photographs.  Then we would go out in the field with the map and photographs and make detailed surveys within the perimeter of that plotted boundary.

MR. VEEDER:  Now, I ask to have marked for identification this map, M-37.

May the record show, if I may, that Mr. Myers and the other lawyers being here, I decided that I would go into this phase of the interrogation.  Did you plan to stay the rest of the afternoon?

MR. MYERS:  Yes.

BY MR. VEEDER:

Q   Colonel Bowen, I hand you Plaintiff's Exhibit marked for identification M-37, and ask you to state what that is.

A   This is a planometric map.

Q   Will you state for the record what that means?

A   Well, that means that is a map showing a plane surface, a line drawing.  This map does not show any contours.  It shows the drainage, the principal drainage channels; some of the roads and some of the boundary lines in addition to other information.

Q   Now, viewing that map would you state under whose directions it was prepared?

A   Well, this map was prepared under my direction and supervision.  I might go on to state it is a map showing DeLuz Creek watershed, and plotted thereon are the land capability specifications for the entire watershed area exclusive of the Santa Rosa Ranch.

Q   How much personal investigation of that area did you undertake in the preparation of that map?

A   A great deal.  I personally investigated the area throughout this map or watershed as shown.

Q   What general area did you go into personally?  Just indicate -- did you go into the upper watershed, the center part or just go over every part of it?

A   Well, I have been through every part of it.  Although

1    the soil land capability classes are not shown on the Vail

2    Ranch, I have traversed that many times.  I have been all

3    through the entire medial area between the Vail Ranch and the

4    Naval reservation in detail, and drilled holes and made observ-

5    ations of soil, slopes, crops grown.

6         MR. VEEDER:  I wish to offer in evidence Plaintiff's

7    Exhibit M-37, and will provide copies, uncolored, of this map.

8         THE MASTER:  It will be received in evidence and marked

9    M-37.

10   BY MR. VEEDER:

11        Q   Now, I hand you -- will you mark this Plaintiff's M-38,

12   please?

13        I hand you Plaintiff's Exhibit marked for identification

14   M-38, and ask you to state into the record what it is.

15        A   M-38 is a tabulation of the standard land capability

16   classifications.  Standard refers to the national standards

17   developed by the United States Department of Agriculture, Soil

18   Conservation Service, and these standards interpret the soil

19   information into eight classes designated by Roman numerals

20   I through VIII, inclusive, and colors, also, are assigned to

21   each class:  Class I being green; Class II yellow; Class III

22   pink; Class IV blue; Class VI orange; Class VII brown and Class

23   VIII purple.

24        It also defines the land classes with respect to the

25   limitations on use and general characteristics of the slope

1    and of the soil and degree of management that must be observed

2    in order to keep these particular classes of soil from eroding

3    or being severely degraded or deteriorated by cultural prac-

4    tices.

5         MR. VEEDER:  I wish to offer in evidence this legend,

6    Plaintiff's Exhibit M-38.

7         THE MASTER:  That is the legend which is used on M-37?

8         MR. VEEDER:  That is correct.

9         THE MASTER:  It will be received in evidence as Exhibit

10   M-38.

11   BY MR. VEEDER:

12        Q  Colonel Bowen, would it be wise to make this physically

13   a part of the map?

14        A  Yes, it would.

15        MR. VEEDER:  If we may do that?

16        THE MASTER:  You may staple it to the map.

17   BY MR. VEEDER:

18        Q  Would you put this on the easel, Colonel Bowen, and

19   also put the legend down in the left-hand corner if that does

20   not cover some part of the map, so when you are talking about

21   it you may refer to it.

22        THE MASTER:  The upper right corner of the map.

23        MR. VEEDER:  Very well, wherever there is more room.

24        MR. SACHSE:  Is M-38 the same one that is attached to the

25   geological surveys that were given to each one of the

1    defendants?

2    THE WITNESS:  This is the same legend that is attached

3    to our report of our investigation, yes, sir.

4    BY MR. VEEDER:

5    Q  Now, would you take the pointer, Colonel, and indicate

6    the area green on M-37 which also appears on Plaintiff's M-14?

7    A  The entire area shown on M-37 also appears on Plain-

8    tiff's Exhibit M-14.  The scale of M-37 is one to twenty-four

9    thousand and is the DeLuz Creek area shown on M-14 including

10   a portion of the Santa Rosa grant, part of the Vail Company

11   Ranch, privately owned and some publicly owned lands, and a

12   portion of Camp Pendleton, United States Marine Corps.

13   Q  Taking the red pencil, and for the purpose of location,

14   just delineate with the red pencil the area which appears on

15   37.

16   A  The rectangular area delineated on M-14, including the

17   DeLuz Creek is approximately the area shown on Plaintiff's

18   Exhibit M-37.

19   Q  Now, would you just add, for location, a red line

20   showing, roughly, the watershed area as appears on M-37?

21   A  The watershed of the DeLuz Creek is plotted on M-14

22   which coincides in part with the watershed of the Santa Mar-

23   garita River up to a point like this, and then departs from the

24   watershed of the Santa Margarita River to confluence with the

25   DeLuz Creek, approximately in that manner.  That line

32

1    circumscribed in red diagrammatically represents the heavy

2    black line plotted on M-38 --

3        Q   37?

4        A   37, which shows the perimeter of the DeLuz Creek water-

5    shed.

6        Q   Colonel, would you proceed to refer to the several

7    colors that appear on M-37 and correlate those colors, ex-

8    plaining the reasons why those colors were used from Plaintiff's

9    Exhibit 38 -- if you are not confused by that question.

10       A   Well, the land capability classification has the sum-

11   mation of the various soils, slope, erosion and related factors

12   which are actually plotted by the detail soil survey in the

13   field.   Those factors are evaluated by soil scientists and

14   classified in accordance with the intensity of use that might

15   be exercised in relation to that particualr parcel of land.

16       For example, Class I soil :  As I recall there are no Class

17   I soils in the DeLuz Creek watershed exclusive of the Vail

18   Ranch.   I am not saying anything about that because we haven't

19   plotted it.

20       But, southerly of the county boundary, and on into Camp

21   Pendleton, there is no Class I soil in the watershed.

22       Q   What is the linited practice that creates --

23       A   Class I is defined as one that is very good with little

24   or no limitation of use.   It is nearly level land, land that

25   is not susceptible to erosion and it is deep, has deep soil,

33-L

3380

1   commonly pretty much as it was in a state of nature as regards

2   soil depth.  There has been no truncation of the profile by

3   accelerated erosion and it is generally susceptible of the

4   most extensive use of lands that could be applied to the land.

5   It does not necessarily mean that it is the most valuable land.

6   These are land use capabilities, and although generally Class

7   I is quite valuable, sometimes they might be less valuable

8   than some Class VI land, for example.

9       Class II lands are those lands which are more steep, more

10  subject to erosion.  They are colored yellow on the map.  You

11  will notice all of these yellow areas that are throughout the

12  map, even some near the perimeter of the watershed and they

13  come down to Camp Pendleton.  They would be good lands which

14  might have physical limitations such as gentle slopes, lesser

15  depth of soil, slight manifestations of accelerated erosion.

16  And the choice of crops on these particular Class II soils

17  generally are reduced to those which require special practices

18  with regard to water management, cover cropping and different

19  types of rotation.  In other words, more care, a little more

20  care must be exercised in operating the Class II soils than in

21  the Class Is.

22      The Class III soils, which are indicated by the pink areas

23  on the map, generally are shallower in character than Class II.

24  They occupy lands which are a little more sloping than the

25  Class II lands.  We classify them as moderately good lands with

1    major physical limitations such as relatively steep slopes,

2    shallow soil.  Severe erosion may result in the classification

3    of some soils here in the third class.  And the choice of

4    crops and the nature of cultivation are -- and the frequency

5    of cultivation -- are further reduced with respect to Class II.

6    Greater care must be exercised in Class III lands than in

7    Class II.

8        The Class IV lands are characterized by the blue color on

9    the map, and are lands which we say, because of steepness of

10   the soil, or excessive shallowness, is hazardous to farm con-

11   tinuously as an annual operation and should be placed in crops

12   that are not tilled every year.

13       Q   Now, one example of that?

14       A   Well, an example of a Class IV land might be found in

15   some of these fairly steep lands which can grow, say, a good

16   irrigated pasture, with sprinkler irrigation, the irrigated

17   pasture being a perennial crop which does not require annual

18   tillage practices.

19       Q   What is the limitation in regard to land of that

20   character from the standpoint of raising avocados?

21       A   From the standpoint of raising avocados?  When we come

22   to avocados, Class IV land might be better avocado land than

23   Class II and III.  There are other factors taken into con-

24   sideration.  Avocado culture in this country is limited to

25   areas which are relatively frost free and the soils must have

1   free drainage.  The actual solum may not be deep, but if the

2   parent material underlying the solum, such as decomposed

3   granite, is coarse in texture and highly permeable it provides

4   for free drainage conditions that avocados need.  Avocados

5   can't exist in a soil which has restricted drainage which keeps

6   the water for excessive lengths of time around the roots.

7       Some of the Class IV land may or may not be suitable to

8   avocados.  The soil characteristics and climatology, both, must

9   be taken into consideration in some subtropical fruit culture.

10      (Short recess.)

11      MR. VEEDER:  Mr. Reporter, will you read the last question?

12      (Record read.)

13  BY MR. VEEDER:

14      Q  Would you continue your answer?

15      A  I think I made an explanation, a general explanation

16  of avocado culture as it is practiced in this area wherein we

17  find that some lands which are actually in Class IV or, perhaps,

18  even Class VI, are eminently suited for avocados.

19      Now that is not inconsistent with the class by any means.

20  That is one reason I hasten to add that these land classes do

21  not necessarily denote the value of the land.  It is quite

22  possible that you might have an acre of Class I land that may

23  be worth a few hundred dollars on the market and you may have

24  an acre of Class VI land in Fallbrook suited to avocados that

25  might be worth twenty-five hundred.

1     Q  Would you state any -- refer to any observations you

2  have made in regard to the use of Class IV lands in the DeLuz

3  Valley, if you have made such observation?

4     A  Well, the Class IV lands in the DeLuz Valley is indi-

5  cated by the blue areas shown on Plaintiff's Exhibit M-37, and

6  is located intermediate to the stream and the higher lands.

7  Some of it has been subdivided into avocado land and some of

8  the rest of it is being used for the production of hay pasture

9  which is a general crop for Class IV lands.  It is fairly good

10  land as regards soil depth, but generally the factor of the

11  slope being fairly steep rules it out from annual tillage and

12  dictates the growth of a perennial crop such as hay or irri-

13  gated pasture with the exception of, perhaps, one year in six

14  when careful contour tillage may allow the production of an

15  annual crop in rotation.

16     Q  What would be the practice pursued when you are raising

17  crops like avocados in the country to prevent the soil erosion?

18  Is there a method?

19     A  Yes.  If I may go on Class VI I can cover that.

20     Q  All right, you go ahead.

21     A  Generally, nationwide, the concept of these land

22  capability classes is that I through IV would be tillable or

23  cultivable land, land that is susceptible to tillage and the

24  qualification of occasional cultivation only.  Class IV would

25  fall into that, hence  they could be classes which would be

1  susceptible for practical and profitable irrigation.  Classes

2  VI, VII and VIII are generally considered lands that are not

3  suited for cultivation.  They are suited for the growth of

4  timber crops, for use as range or pasture which does not

5  require cultivation and much of the Southern California area

6  is suited only for, say, watershed purposes; shrubs and plants

7  which help prevent the erosive loss of the soils, allowing more

8  or less controlled runoff from these slopes to gather in the

9  stream channels and provide the water required in the areas

10  lower down.

11      Class VI is land that is generally considered good for

12  grazing and forestry.  It has rather minor physical limitations,

13  but does require some protective measures.

14      Class VII is land that is moderately good for grazing or

15  for forestry; has major physical limitations, and needs extreme

16  care to prevent erosion or destructive burning or to overcome

17  other hazards.

18      Class VII land would be the very steep land without out-

19  cropping of rock, very shallow soil.

20      Class VIII land generally is quite barren, not suited,

21  usually, hardly ever suited for range, even.  They are suited,

22  generally, for wildlife, recreation and watershed purposes.

23      Q  Is there any Class VIII which appears on the exhibit?

24      A  Yes.  Class VIII land is shown in purple and is shown

25  here along the DeLuz Creek as being the area of extremely

1    coarse boulders, gravel and considerable outcropping of rock

2    along the channel, along DeLuz Creek.

3        The Class VII area is this large prominent area of

4    brownish tinge which occupies a large proportion of the area

5    of the watershed.

6        Now the Class VI land in this area is, we might say,

7    nontillable--

8        Q  We might, but others have different opinions.

9        A  -- and is land, say, not suitable for cultivation.

10   We find this a national standard set up for conditions gener-

11   ally throughout the United States and was so considered up

12   until a few years ago by local soil scientists and soil con-

13   servationists in the area before the development of avocado

14   growth on these Class VI lands. However, as shown by, probably,

15   most of these people present here, it is possible to grow a

16   crop of subtropical fruit, such as avocados, on Class VI lands

17   by utilizing a minimum of tillage of the soil.

18       Definitely it is the practice in this area to clear the

19   brush, put in the avocado trees, lay a sprinkler system, a

20   pipeline system that conveys the water to each individual tree;

21   fill a basin around the tree to drain the water and keep it

22   from running off down the slope, and henceforth to simply mow

23   the ground cover which grows up around and between the trees

24   so that, in effect, you have a nontillable operation under

25   cultivation on Class VI lands and you are growing a cultivated

1   crop.

2       I think it would be better to say that Class VI land

3   should not be tilled, but you can produce crops of considerable

4   value on them as is well demonstrated in this area, and they

5   have done remarkably well.

6       Q   When you say "within this area", Colonel, within this

7   area means what to you, the DeLuz area?

8       A   Within the area of the DeLuz Creek and some adjacent

9   land, yes, sir.

10      Q   You may go ahead on the question.

11      A   Therefore, in completing the explanation of the legend

12  here, and our concept of irrigable lands, we include Class VI

13  land as irrigable provided that the limiting features, which

14  place them in Class VI, are such as to render them inpracticable

15  or unprofitable for economic irrigation.  Such concept may be,

16  say, within a particular Class VI area.  The slope may be fairly

17  slight, but owing to exposure and, say, one of these southern

18  exposures with a natural shallow soil depth which may have been

19  further reduced by severe erosion with exposed outcropping of

20  rocks and so forth.  We find it physically impossible to plant

21  trees on those, so there are exceptions even to the Class VI

22  lands, but each one of these exceptions is based on examination

23  of all these factors which go in to make up the land class.

24      Q   Would you give us an example of that, first, in the

25  area where Class VI is present, where you have observed that it

1  was susceptible for profitable and practical irrigation and

2  where it was not?  Do we have such on that map to bring forth

3  such testimony?

4       A  We can't sufficiently define it on the map here, but

5  I can state that I have observed areas in class, delineated as

6  Class VI land, shown on this map in the orange color, where

7  there were areas where it would be impossible to grow a tree

8  crop; fairly small areas of local outcropping that would be

9  considered unsuitable for avocado production.  But, by far the

10  majority of the area delineated in VI here is in avocado growth

11  culture.

12       THE MASTER:  May I ask what happened to Class V in the

13  classification?

14       THE WITNESS:  Class V was left out of this particular

15  legend because it also falls in the land not suited for culti-

16  vation and none of that class of land was within the watershed

17  of the Santa Margarita River.  Class V land is range land or

18  forest land which is nearly level, as far as topography is

19  concerned.  It would be somewhat like Class I, but owing to

20  the fact there is wetness such as is in some of these mountain

21  meadows in the northwest, and other limiting factors, would

22  make then not suitable for cultivation and that would be the

23  highest class of the non-cultivated land.

24       THE MASTER:  But there is no such land in this watershed?

25       THE WITNESS:  No, there isn't, so to avoid confusion we

1    left it off.

2    BY MR. VEEDER:

3        Q   Now, have you observed in the area the kind and type

4    of farms that are now in existence?  Is there any general type

5    of farming in this DeLuz area?

6        A   Well, the first development in the DeLuz watershed was

7    made -- of course there are some older farms that have gone

8    back or that have been cultivated for many years, but, popu-

9    lationwise, I would say that back in '51 the bulk of the people

10   living in the DeLuz watershed, between Camp Pendleton and the

11   Vail Ranch, were the owners of recreation, homes, summer homes

12   where they come down from the city and spend a few weeks of

13   the year.

14       Q   What would be the water uses under those circumstances?

15       A   Water uses under those circumstances would be limited

16   to domestic use only.  It would be very small.

17       Q   And what period of time of the year, or is that a year

18   around thing?

19       A   Well, as I say, these recreation areas would only be

20   occupied perhaps for a month or two months during the summer,

21   and the uses on the property would be limited to that property.

22   There are other people that live up here, have their place of

23   residence, and work in other places such as Camp Pendleton,

24   for example, or the Naval Ammunition Depot.

25       A   A good example of that property is shown in this box here,

which appears partly in Section 7 and partly in Section 8,
Township 9 South Range 4 West, almost completely surrounded by
the Naval reservation. There were a couple of old time char-
acters who lived in there, Allie Smith and Frank Smith, now
deceased. This land is all classified as VII. They had no
irrigation except a few geraniums, perhaps, that grew on the
hillside; no place where any farming could be practiced. Those
people lived in there for many years and depended for their
income on outside employment.

That is typical of many who are up in here. Some of them
are in civil service work in Camp Pendleton, the Navy Ammu-
nition Depot, that have cultivated and irrigated various little
areas. The vast majority of the farm land that has any history
of development of use is located in the central part of the
DeLuz watershed where the land classes, II, III, IV and VI,
make the most prominent showing.

Q   Colonel, would it be possible for you to identify the
central area to which you just pointed by reference?

A   Yes, sir.  The central area to which I have just
pointed would include Section 20, a portion of Section 20, a
portion of Section 20, 29 and a portion of 30.

Q   Are they all in the same township and range?

A   Yes, sir; 31, a portion of 32.  That would include the
bulk of the land considered suitable for profitable and
practicable irrigation.

1     Q  Could you give the township and range?

2     A  8 South, 4 West.  They are all in reference to San

3  Bernardino Meridian Base Line.  They are generally described

4  and illustrated very clearly by this colorful area in the

5  center of the map, M-37, and is where the oldest farming

6  operations have been conducted historically.  But, say, in

7  1951 there were a lot of just casual residents in here who

8  spend anywhere from a few weeks to a few months of the year,

9  and since that date frequent trips up through the area have

10  shown an ever increasing development of a more permanent

11  settling of residents.  People are beginning to break out some

12  of these hills and have planted avocados.

13     Q  To which areas were you just pointing there?  You

14  pointed to a section there that you made reference to.

15     A  Up in Section 20, Township 8 South, Range 4 West.

16     There has been a tremendous increase in development in the

17  Class VI lands that are shown within that section up through

18  and adjoining the Riverside County line, which is continuous

19  with the Santa Rose Grant line, occupied by the Vail Company.

20     Other developments in recent years have occurred in and

21  along Cottonwood Creek in Section 30, Township 8 South, Range

22  4 West, as well as in Section 31 along Camp's Creek, Township

23  8 South, Range 4 West.

24     Q  What, if you know, are the factors that have caused

25  this increase land and water use in that area?

1    A  Well, one of the factors is the tremendous upsurge or

2  boost in population in the Southern California area.  People

3  are seeking everywhere land for development, and it has been

4  aided, materially, by the introduction of electrical energy

5  into that territory.

6    Q  Why would you make such a statement as that, about the

7  presence of electricity?  What does that mean?

8    A  Well, that means that people can have power to operate

9  pumps and move water around through the property.

10    Q  Have you observed in that area the impoundment and use

11  of water?

12    A  Yes, sir, I have.

13    Q  Could you point out on that general map any locations

14  where that has taken place?

15    A  Well, there are small earth filled dams that are

16  scattered throughout the area, some dating back over a number

17  of years and others much newer.  I would say one of the major

18  developments in the watershed is the pond on Cottonwood Creek

19  which is operated by Mr. Garnsay.  That is located -- I am not

20  sure I can locate the exact place of the pond -- but as I

21  recall it is Section 30, 8 South 4 West.  I imagine that is

22  probably the major water development in the DeLuz watershed.

23    Then, other than that, there are -- that is an old type

24  development -- I saw that in '51.  The record shows it has been

25  there before that.

1    Much more recent developments have been undertaken by a

2 gentleman named Mathews.

3    Q  When was that development started, as you recall?

4    A  Well, as I recall the Mathews development was started

5 around 1955.  That is located in Section 20, 8 South, 4 West.

6    Q  What is the kind and type of land that he did subject,

7 if that is what he used?  Is it VI or VII?

8    A  Well, I don't have the ownership boundary plotted on

9 this map, but he is up on the main stem of the DeLuz Creek

10 here in Section 20, 8 South 4 West, and joins the Santa Rosa

11 Grant line which coincides with the Riverside County line, and

12 this Exhibit M-37, land classification, shows Class III, VI --

13 II, III, IV, VI and VII lands in that general area and I know

14 that he has some of those within his property.

15    Q  What other developments are there besides that, new

16 developments?

17    A  There are numerous developments up and down each bank

18 of the creek, the main branch of the DeLuz Creek, which would

19 extend southerly.  That is the scene of a great deal of develop-

20 ment, and the fact that there is rising water, or surface

21 water running all year and a portion of DeLuz Creek above the

22 Camp Pendleton reservation line allows people to make surface

23 diversions of water and limited use and domestic use, and

24 limited irrigation.  Also the east fork of the DeLuz Creek,

25 which originates on the Santa Rosa Grant and leaves the Vail

1   Ranch.

2       Below the point where it leaves the Vail Ranch there is

3   considerable development on Class IV, III, II lands, and on

4   each side.

5       Q  Have you observed when that development took place?

6       A  The striking increased development has been in the past

7   four years.

8       Q  Would you describe the type of development that has

9   taken place?  Did you say the east fork of the DeLuz Creek?

10      A  Yes, the east fork of the DeLuz Creek leaves the Vail

11  Ranch in Section 22, 8 South, 4 West, and extends in a south-

12  westerly direction to the confluence with the other tribu-

13  taries and with the main stem of the DeLuz Creek.  Just for

14  example I have been -- this is the east fork area here -- there

15  is an old planting of walnut which is on the Class II soil

16  lying in Section 28, 8 South, 4 West.  There are more recent

17  developments in Class II and III lands in that immediate area.

18      There are significant developments in Section 29, 8 South,

19  4 West.  One of the country's leading camellia growers has

20  land in that particular section and a bunch of it, a large

21  part of it, I should say, is susceptible for practicable and

22  profitable irrigation in having large areas of Class II, Class

23  III and Class IV lands.  There is some Class VI suited for

24  avocados, that is beginning to develop.

25      Q  Now, what about the other branches of this creek?

47-L

1    A  Well, the main developments I have already defined as

2    rising on the Santa Rosa Grant and leaving that grant in

3    Section 20, 8 South, 4 West.  The Cottonwood Creek is a major

4    tributary of the DeLuz system which rises partly on privately

5    owned land, partly on national forest land and runs in a

6    southeasterly direction to its confluence with DeLuz Creek in

7    Section 29, 8 South, 4 West.

8    Camp's Creek rises also on the national forest area, the

9    Cleveland National Forest, and flows in an easterly direction

10    to its confluence with DeLuz Creek in Section 32, 8 South, 4

11    West.  It is joined by Fern Creek which rises in Section 35

12    and 36, flows easterly to the confluence with Camp's Creek in

13    Section 32, 8 South, 4 West.

14    The other tributaries of DeLuz Creek are unnamed with the

15    exception of Roblar.  Roblar Creek rises in the national

16    forest, flows southerly and easterly and enters Camp Pendleton

17    on the southerly side of Section 35, 8 South, 4 West -- 8

18    South, 5 West, Section 35, and then proceeds through Camp

19    Pendleton to its confluence with DeLuz Creek in Section 17,

20    9 South, 4 West.

21    Q  Now, would you describe the characteristics of DeLuz

22    Creek and its tributaries as opposed to that area from a

23    standpoint of whether it is an intermittent type of --

24    A  Throughout the watershed the DeLuz Creek is similar in

25    character to other tributaries of the Santa Margarita River.

It is intermittent in type, and it flows intermittently in places in the creek.  There are areas up in here where the creek has eroded down to the underlying granitic material, which is impervious and does not allow water to escape from the saddle.  It is exposed to the surface stream, and continues for short reaches as a surface stream where, perhaps, a thin mantle of alluvium may exist, and disappears and flows as a subsurface stream and may disappear and reappear several times throughout its flow.

Q  You mentioned the stream disappearing.  Now, what are the physical features that would permit that circumstance to prevail?

A  Well, the features that permit that is a mantle of alluvium material in the stream bed of such depth to absorb the entire flow of the stream.  The material is of sufficient permeability to allow the stream to percolate into it.

Q  How would you compare those areas with the subterranean basin underlying the Vail Estate and Vail Company properties you have described, and also those in Camp Pendleton?

A  Well, comparatively there are now ground water basins in this area that can be compared with the Temecula Basin or the lower Santa Margarita Basin in Camp Pendleton.  The ground water is of extremely small volume.

Q  Have you observed any ground water development in that area?

1    A   Yes, sir, there are wells which have been drilled in

2  some of the recent alluvium and some of the outwash materials

3  that have washed down off the mountain and have accumulated

4  where these streams are above the point where these various

5  tributaries enter DeLuz Creek.  Those recent alluvium materials

6  did absorb water and it is possible to put in a well, and

7  people are drilling wells and withdrawing water from it.

8    Q   Now, what kind and type of diversions are generally

9  used in that area for the purpose of irrigating the steeper

10  slopes?  How do they get the water there?

11    A   Well, there are several types of diversions.  Where

12  people are contiguous to the stream they generally rely on

13  surface diversion, either from surface water if it is avail-

14  able or from shallow wells that are dug into the thin mantle

15  of alluvium.

16    There are other areas where they impound substantial

17  quantities of water, such as Mr. Garnsay's operations on

18  Cottonwood Creek.  That water is released from the structure

19  by -- the outlet structure -- and are delivered to the irri-

20  gated lands which lie downstream from the structure.  There are

21  also other people who have built smaller earth filled dams for

22  the purpose of impounding water apparently for release, later

23  release and use in irrigation.

24    Q   From the standpoint of time when has that development

25  been undertaken?

1      A   Much of the development has been undertaken in very

2   recent years, the past four or five years.

3      Q   Would you point to any of them on Plaintiff's Exhibit

4   M-38 where they are presently being constructed?

5      THE MASTER:   You mean Exhibit M-37?

6      MR. VEEDER:   I beg your pardon, 37.

7      THE WITNESS:   Referring to Plaintiff's Exhibit M-37, the

8   most recent development is in an area which is not even on

9   DeLuz Creek, but is located along the hard surface road com-

10   monly called the DeLuz Road which is the road from Fallbrook

11   to the community of DeLuz, and is located in Section 5, I

12   believe, Township 9 South, Range 4 West.   There is a real estate

13   development in there where a number of small earth filled dams

14   have been constructed, and access roads have been built and

15   home sites or sites for residences have been leveled off.   That,

16   apparently, is for a smaller real estate development.

17      But the bulk of development is more or less confined to

18   the bed of the stream and a quarter of a mile east or west of

19   the bed of the stream.

20      In this area shown as Class VII on Plaintiff's Exhibit

21   M-37, the brown areas, there is very sparse settlement.

22      There is one ranch over here in Section 26 and 27, Town-

23   ship 8 South, Range 4 West, where there is considerable area

24   of Class II land, a smaller area of Class IV land.   That is

25   one of the older operations in the area.

1    There is an older operation in Section 32, 33 and 34,

2    8 South, 4 West, where there is a substantial area of Class II,

3    III and IV land, as shown on Plaintiff's Exhibit M-37.  How-

4    ever, the intervening Class VII area, and the large body of

5    Class VII area on the westerly portion of the watershed, is

6    relatively undeveloped.  There are some ranch operations and a

7    little irrigation up on the higher ground near the crest of

8    the watershed, such as Section 13.

9    Q   What tributary is that?

10   A   That is the headwaters of Cottonwood Creek.  Section

11   13, 8 South, 4 West, there is some development in that section

12   as shown on M-37, with substantial areas of Class II and III

13   lands.

14   Also Section 23, 8 South, 4 West, also the headwaters

15   of Cottonwood Creek, a substantial acreage of II, III and IV

16   lands, which is being developed.

17   And, continuing southward in the westerly portion of the

18   watershed, Section 28, 8 South, 4 West, the headwaters  of

19   Camp's Creek, there is a considerable area of II and III land.

20   So the development is fairly well confined to these areas

21   delineated as Class II, III, IV and VI, with relatively little

22   development and little possibility of development in the large

23   area of Class VII.

24   Q   Based upon your observations what effect will that

25   development have upon runoff to the DeLuz Creek?

A   Well, the development requires the use of greater quantities of water.  Although the ground water storage units are not large in volume, there is no question but when they will be exhausted and the water in them will be replaced by runoff.  Some diversion will result in combination with these ground water diversions and will result in a substantial reduction of flow into DeLuz Creek.  All of these conversion ponds, irrigation dams that are being built back in the hills in this Class VII area will retain, individually rather minor quantities of water, perhaps two or three or four, five and maybe ten acre feet of water individually, but collectively they can retain a large amount and hence diminish the flow of large quantities of water.

Q   Have you made any observations as to the yield of water from DeLuz Creek as compared with the water from the main stem of the Santa Margarita River?

A   Yes, I have.

Q   Would you state the results of that investigation?

A   Well, there are times when DeLuz Creek yields more water than the rest of the Santa Margarita River where there is a point of confluence with DeLuz Creek and Santa Margarita River, and the contribution from DeLuz Creek may equal and may at times exceed the stem flow of the Santa Margarita River above it.

Q   What will be the effect, in your view, as to the

1   impoundment of water should the Fallbrook Public Utility

2   District proceed to construct a dam at the Lipincott site upon

3   the demand for water in -- the competition for water -- between

4   the enclave and water users in the District?

5       A   Well, the dam upstream from Camp Pendleton at the

6   Lipincott site would stop substantial quantities of water in

7   the Santa Margarita River and would tend to put more of a

8   burden on the DeLuz Creek.

9       Q   Now, what investigations have you made in regard to

10  the soils and land classes in Camp Pendleton?  Have you made

11  the same kind of investigation?

12      A   Yes, I have.

13      Q   Will you state the investigation that you made there?

14      A   Our investigations were the same surveys on the Camp

15  Pendleton area and it included the entire area of the Naval

16  reservation as was made in the entire Santa Margarita watershed.

17  That included both Camp Pendleton, the Naval Ammunition Depot

18  and the U. S. Navy Hospital.  We used the same criteria for

19  making the survey, the same techniques.  We made surveys on

20  aerial photographs, field sheets.  We interpreted the soil

21  elements in exactly the same manner as we have done on pri-

22  vately owned lands.

23      Q   Now, what did your investigation reveal in regard to

24  the grass covering on the subterranean basin at Camp Pendleton?

25      A   Well, the bulk of it -- referring to Plaintiff's

54

851

1    Exhibit M-14, the diagrammatic representation of the outline

2    of ground water basin or valley, as earlier delineated in the

3    red pencil -- referring to that portion of the exhibit -- this

4    area is covered by a grass and brush cover.

5       Q   How large -- what is the surface area there?

6       A   The surface area of that valley within Camp Pendleton

7    is approximately forty-six hundred acres.

8       Q   Have you given consideration to the source of water for

9    maintaining a cover on that forty-six hundred acres?

10       A   Yes

11       Q   What were the results of that consideration?

12       A   Well, the cover on the basin draws water during the

13    winter season from the rain that falls on the surface.   For

14    the dry season, which extends, usually, from the first of

15    April to the end of October, they rely for water on that which

16    is stored in the underground basin.

17       Q   What would be the effect upon that coverage in the

18    event that the basin, the ground water table in the basin, was

19    reduced?

20       A   Well, if the elevation of the water plane in the lower

21    Santa Margarita Basin were sharply lowered it would result in

22    the death of much of the riparian vegetation on many surfaces

23    of the basin.

24       THE MASTER:   What kind of vegetation?

25       THE WITNESS:   Riparian vegetation.

BY MR. VEEDER:

Q  What comparable areas have you observed, if any, which have a history of destruction of grass coverage by reason of the lowering of the water table?

A  Perhaps one of the most striking is the San Luis Rey Basin to the south.

Q  Would you describe what has transpired there, if you have made observation?

A  Well, the San Luis Rey Basin consists of, in part, of the Bonsall and Mesa Basins, the Mesa Basin being downstream and the Bonsall Basin next to it.  And the competition for water, primarily from the Bonsall Basin, has resulted in a drastic lowering of the water table in that basin and most of the native cover has perished because of it.  Much of it has been replaced by irrigated land.

Q  What present use is being made of that cover on the forty-six hundred acres of basin land within the Camp Pendleton enclave?

A  Well, we have used it primarily for -- we have used it primarily for training purposes.  The Marines can't train out on the open barren land.  He has to have covering for his maneuvering.  We also are making a secondary use of the cover for grazing purposes, and we are harvesting.

Q  What kind and type of arrangements do you have, if you know, for the use of that forage in there with stock grazers?

1    A   We issue permits to cattlemen and sheepmen and a lot

2   of them bring stock in and graze on certain designated areas

3   within Camp Pendleton.

4    Q   What other agriculture is there?

5    A   We do include the Santa Margarita Valley.

6    Q   What other agriculture production is taken on by the

7   surface area of the subterranean basin?

8    A   We grow a hay crop down here in the Ysidora Valley

9   basin, and maintain recreational facilities for troops sta-

10  tioned in Camp Pendleton.

11   Q   What are the sources of water for the maintenance of

12  that hay crop, the production of the hay crop?

13   A   Well, the source of water for the production of the

14  hay crop is partly winter rains, and partly water drawn from

15  the basin.

16   Q   Now have you made and do you have with you a copy of

17  an individual investigation in the DeLuz area where you have

18  been asked to come in and make a thorough survey and investi-

19  gation?

20   A   Yes, sir.

21   Q   Would you produce one of those?

22   A   Yes.

23  MR. VEEDER:  The United States proposes to go ahead and

24  introduce individual soil surveys used in the land classifi-

25  cation studies.

MR. SACHSE:  I missed the first half of that.  What did you just say?  I am sorry.

(Record read.)

BY MR. VEEDER:

Q  Now, when you made this investigation -- I am referring to John C. Baxter -- what did you do to secure the data upon which this report is predicated?

A  Well, first we secured his permission, in writing, to enter onto the property for the purpose of making a survey, and having received such permission we went onto the property with soil surveyors, geologist and an engineer.  They may have been there at different times.  I don't mean they were all there at the same time.  But we made a soil survey of the nature and character which I have just described, which is interpreted and represented on Plaintiff's Exhibit M-37.

We made a geologic survey and reported the findings of our geologists in the report.

Q  When you say you made a geological survey, what do you mean by that?

A  Well, of course the geologist and the land owner is primarily interested in knowing whether there are any sources of water within the formation on the property, geologic formations, where there is a body of recent alluvium or fan material.

Q  Will you state what you mean by "fan material?"

??

1    A   Well, a fan is characterized by the formation, gener-

2    ally in the mouth of the creek where it leaves the mouth area,

3    where it gradually flattens out, and the material is carried

4    by the stream, either as a suspended load or tumbled as a bed

5    load, where there is a sharp reduction of gradient, and it is

6    precipitated at the point where the gradient reduces and tends

7    to build out from the edge of the plane there, where the mouth

8    meets the plane, into a fanlike formation.  It looks like a

9    fan, a woman's fan, when it is fully extended, and that is the

10   reason it is given that name.  Wherever those materials are

11   generally rather coarse it will store water, and oftentimes,

12   although not in this area, there may be older geologic form-

13   ations which will store water and serve as a source of supply.

14   That is the purpose of having a geologist examine the property,

15   to see if there is any possibility of development of water on

16   that property.

17       Q   And what are the other surveys that you undertook on

18   these individual ones?

19       A   We included in the report surveys of irrigation systems,

20   if any; water distribution systems, reservoirs.

21       Q   What about your land use investigation?  What happened

22   there?

23       A   We made a detailed soil survey and the field sheet, or

24   copy of the field sheet, reveals that detailed soil survey,

25   which is included with the report.  We classified the land

1   according to one of these seven classes which I have pre-

2   viously described and which you will find on Plaintiff's

3   Exhibit M-38.  We color in the map and it shows those land

4   classes.  We indicate the type of crops that can be grown on

5   the various areas, considered acceptable for profitable and

6   practicable irrigation, based on our findings as to types of

7   crops grown, and taking into consideration the commonly ac-

8   cepted practice of application of water which is revealed in

9   the report, variously compiled by the Department of Agriculture,

10  the Bureau of Reclamation and the California State Experiment

11  Station or Extension Service which will define the duties of

12  water for each of the crops.  The duty of water is the amount

13  of water that a crop will require in a year, times the acreage

14  adapted to that crop.

15      To sum it up, we give a maximum potential use of water

16  which can be made if the water were available.  That is reported

17  and summarized and tabulated in this investigation.

18      Q  Now, when you are making your investigation do you

19  also consider the highest and best use that can be made of the

20  land?

21      A  Yes.

22      Q  What are the factors that deal with such consideration

23  as that?

24      A  Well, that is more like an appraisal.  Where a parcel

25  of land, say one class of land might be suitable for a variety

1  of crops -- we may find much of it suitable for a variety of

2  crops -- we select a crop that would give the highest monetary

3  return, the highest net return to the farmer, because it is

4  necessary in any area to determine whether irrigable land is

5  susceptible for possible economic use.

6      Q  Are matters such as that involved in that appraisal?

7      A  Well, yes, sir, they are, generally, but they are not

8  too much of a factor in this area.

9      Q  What other investigation did you undertake in con-

10  nection with this particular investigation?  I will hand you

11  an engineer's report to John C. Baxter, and I will have it

12  marked for identification as Plaintiff's Exhibit 39.

13      I will ask you to state the scope of that investigation.

14      A  This is the report entitled Engineering Report of John

15  C. Baxter and Chloe Baxter Property.  It includes a legal

16  description of the property and a general description of

17  physiography, the history of purchase and development, if any,

18  if it can be obtained.  In this instance we do have a short

19  history.  A description of the diversion and distribution system.

20  A description of the land that is susceptible for profitable

21  and practicable irrigation, and the crop water duty on those

22  crops.

23      Q  What about the acreages?  How were those determined?

24      A  Well, the acreage was determined by making a plani-

25  metric measurement of the area delineated on a map, using an

1  instrument known as a planimeter which measures areas shown on

2  the map, and from which the proportional acreage can be deter-

3  mined.

4      Q  What would be the maps that you would use to planimeter

5  the acreage?

6      A  We use the aerial photographs and the U. S. Geological

7  Survey.

8      Q  Now, when you are using an planimeter to determine

9  acreage, what are the processes that you followed?  Did you

10  check that out on the surface of the land or do you think that

11  sufficiently accurate?

12      A  Well, the planimeter is sufficiently accurate without

13  actually running a transit survey on the surface of the land.

14  It is accurate down to, well, a tenth of an acre.

15      Q  Now, in regard to this particular piece of land, would

16  you state the result of that investigation?

17      A  Yes, sir.

18      THE MASTER:  May I ask, Mr. Veeder, do you intend to

19  introduce this in evidence or offer it?

20      MR. VEEDER:  I was going to offer it in evidence.

21      THE MASTER:  I am wondering if there was a duplication

22  and if so --

23      MR. SACHSE:  This happens to be a pro per defendant, also.

24  I don't know what effect this is going to have.  Are you going

25  through that all one at a time?

1      MR. VEEDER:  That is my intention, as I stated earlier to

2   your Honor, and it seems to me we would probably save time,

3   while the Colonel is on the stand, by putting in these investi-

4   gations.  I don't say that there might not be objections to it,

5   but to me it is simply review to have the full statement, and

6   if they want to cross-examine they may if they choose.  I

7   think it would be a time saving factor.  In fact I thought Mr.

8   Sachse had agreed that we could undertake it that way.

9      MR. SACHSE:  I was very much in favor of getting them all

10   in.  I didn't understand you were going to do it quite this

11   way, though.  My thought is -- I don't care how you do it --

12   this is a pro per and my thought is that it might be more

13   logical for the Master and everyone concerned if you simply

14   introduced these things, get them all in the record and then,

15   as each individual parcel came up at one and the same time Mr.

16   Cranston could get a discussion from your expert and the

17   criticisms, if any, from the owner rather than have Colonel

18   Bowen go through whatever number you have -- ninety of them --

19   then have the Colonel come back and start at the beginning and

20   go through the cross-examination again, which is not quite so

21   easy to follow.

22      MR. VEEDER:  I would just as soon go off the record, if

23   you would, for a moment.

24      (Discussion off record.)

25

BY MR. VEEDER:

Q  Colonel, would you go ahead and state the acreage in this instance, then?

A  Well, our report reveals, at the time the survey was made, which began on 29 September 1952, that there was one acre of deciduous fruit being irrigated.  We found, according to our soil classification survey, that there were a total of 37.25 acres considered suitable for irrigation, and of those that have irrigable acreage, we found 21.58 acres suitable for avocados; 14.67 suitable for citrus, and the remaining 1 acre left in deciduous crops.

We tabulated the irrigation requirements for each of these crops in feet per acre per year, as shown on page 2, column 3 of the tabulation; then the column 3 times column 2, the acreage of these crops mentioned in column 1, we arrive at the future ultimate water use, which is added to give a total of 79 plus acre feet of water for future ultimate irrigation requirements.

We have the soil described in the class of land, giving the acreage in each class.  The Class III shown on page 3, acreage suitable or the area suitable for irrigation, Classes III, IV and VI.  Class III shows 13.92 acres; Class IV 8.66 acres and Class VI 14.67, giving the total previously mentioned of 37.25.  Of the area unsuitable to irrigation we found that to be Class VIII land, 22.75 acres were considered unsuitable

1   for irrigation, bringing the total land areas in this report

2   in this investigation, to 60.

3   Then the section on geology indicates it is largely

4   underlaid by aquifer materials.

5   Q  Is there anything further disclosed by that report?

6   A  The report gives a table of water duty for agricultural

7   crops grown in the Santa Margarita watershed, which lists the

8   crops by name, gives the yearly water use and acre feet --

9   feet per acre, and lists the references from which these

10  figures were derived, such as Soil Conservation Surveys,

11  Bureau of Reclamation and the State of California Division of

12  Water Resources.  That is about it.

13  Then we have a map.  In this instance the map classifi-

14  cation was made as a line drawing rather than using the aerial

15  photographs.  The fractional symbols which were developed by

16  the survey in the field, drilling holes in the ground and

17  making the various tests, shows a slope erosion and so forth,

18  and the classes are colored in with the land use capability

19  colors as explained on Plaintiff's Exhibit M-38.

20  The final sheet in here is a legend which shows the

21  meaning of the various portions of the fractional symbols such

22  as the effective depth, texture modifiers, which would include

23  gravely, stoney, cobbly soils; the texture of the topsoil; the

24  permeability of the surface soils and the type of soils such

25  as shale, cemented hardpan and so forth.

The slope classes, for example, Class A would be zero to one percent, moderate, or highly erodible soil. Class B is skipped over, so B and C would be 16 to 25 percent on moderately erodible soils and 9 to 15 on highly erodible soils. Class F would be over 35 percent of moderately erodible soils and over 30 percent on highly erodible soils.

The erosion groups are defined as 1, slight, 2, moderate, 3, severe, 4, very severe, 5, very severe gullied. Wetness is indicated by a symbol W sub 1, W sub 2 and so forth to indicate slightly wet, moderately wet and so forth. An example of wetness as a modifier of the soil would be illustrated by calling your attention to cieniaga, with which you are familiar in the mountainous areas in this part of the country, and finally alkalinity and salinity. Salinity is shown by an SW subscript, and alkalinity is shown with an A in subscript. There is a substantial difference between alkalinity and salinity.

MR. VEEDER:  I am not offering this until tomorrow, because I want to be sure that everybody has understood this. I have some qualms about it myself.

THE MASTER:  We will adjourn now until 9:30 tomorrow morning. During that time you can satisfy yourself on it.

(Thereupon at 4:05 p.m. a recess was taken until Tuesday, May 27, at 9:30 a.m.)

- - -