ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

        Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**Volume:** 4

**Pages** 363-513

**Date:** May 27, 1958

**Place:** Fallbrook, California

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3

4        APPEARANCES:

5            WILLIAM H. VEEDER, ESQ.
             DAVID W. MILLER, ESQ.
6            WILLIAM E. BURBY, ESQ.
                For United States of America
7
             FRANZ R. SACHSE, ESQ.
8                For Fallbrook Public Utility District

9            GEORGE STAHLMAN, ESQ.
                For Vail Estate
10
             ADOLPHUS MOSKOVITZ, ESQ.
11               For State of California

12           CHLOE R. BAXTER
                In Propria Persona
13

14

15

16

17

18

19

20

21

22

23

24

25

363

## INDEX TO WITNESS

For the Plaintiff:                                    D

    Allen C. Bowen                                    366


    VOIR DIRE                          463

                        470

                        479

# INDEX TO EXHIBITS

FOR THE PLAINTIFF:

| No. | | Ident. | Rec'd. |
|---|---|---|---|
| M-39 | Engineering report re Baxter | | 366 |
| M-40 | Engineering report re W. McDowell | 382 | 381 |
| M-41 | Engineering report re G. R. Shaver and Bisek | 383 | 384 |
| M-42 | Engineering report re Herbert Shaver | 388 | 389 |
| M-43 | Engineering report re Parker | 390 | 391 |
| M-44 | Engineering report re Dodge, etc. | 392 | 392 |
| M-45 | Engineering report re Kuhnis | 393 | 394 |
| M-46 | Engineering report re Poston | 394 | 395 |
| M-47 | Engineering report re Bleeker | 396 | 396 |
| M-48 | Engineering report re McDowell | 397 | 397 |
| M-49 | Engineering report re Towne | 398 | 399 |
| M-50 | Engineering report re Goodchap | 399 | 400 |
| M-51 | Engineering report re R. Jave | 400 | 401 |
| M-52 | Engineering report re M. Jave | 401 | 402 |
| M-53 | Engineering report re Pyeatt | 403 | 403 |
| M-54 | Engineering report re Couch | 404 | 405 |
| M-55 | Engineering report re Butler | 405 | 410 |
| M-56 | Engineering report re Klein | 416 | 418 |
| M-57 | Engineering report re Wilson | 418 | 419 |
| M-58 | Engineering report re Frank | 419 | 420 |
| M-59 | Engineering report re Bryant | 420 | 421 |
| M-60 | Engineering report re Chestmolowicz | 421 | 422 |

| No. | | Ident. | Rec'd. |
|---|---|---|---|
| M-61 | Engineering report re Holsworth | 422 | 423 |
| M-62 | Engineering report re Stinston | 423 | 424 |
| M-63 | Engineering report re Mosher | 425 | 426 |
| M-64 | Map symbols | 447 | 454 |
| M-65 | Aerial maps of Santa Margarita watershed within Camp Pendleton | 451 | 454 |
| M-66 | Aerial photo 4-0071 | 454 | 458 |
| M-67A | Oblique photo without trees | 455 | 458 |
| M-67B | Oblique photo with trees | 455 | 458 |
| M-66A | Aerial photo 4-0070 | 475 | 477 |
| M-66B | Aerial photo 4-0072 | 477 | 478 |
| M-66C | Aerial photo 4-0073 | 478 | 481 |
| M-66D | Aerial photo 4-0084 | 481 | 483 |
| M-66E | Aerial photo 4-0085 | 483 | 487 |
| M-66F | Aerial photo 4-0086 | 484 | 484 |
| M-66G | Aerial photo 4-0087 | 487 | 488 |
| M-66H | Aerial photo 4-0088 | 490 | 491 |
| M-66I | Aerial photo 4-0089 | 491 | 491 |
| M-66J | Aerial photo 4-0090 | 492 | 492 |

366

Fallbrook, California, May 27, 1958, 9:30 a.m.


MR. VEEDER:  Are you ready to proceed, your Honor?

THE MASTER:  Yes.

·

ALLEN C. BOWEN,

resumed the stand, testified further as follows:


DIRECT EXAMINATION (Continued)

BY MR. VEEDER:

Q  Colonel Bowen, I hand you Plaintiff's Exhibit marked

for identification M-39, and state whether there was any

further explanation that you felt necessary for the Court

fully to understand the kind and type of work you have done in

connection with the individual investigation.

A  No, sir.  I have outlined yesterday the information

contained in this report.  And I believe I completed the

explanation at that time.

MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

marked M-39 for identification, which is the soil survey -- the

engineering report of the John C. Baxter and Chloe L. Baxter

property.

THE MASTER:  It will be received in evidence and marked

Exhibit M-39.

MR. STAHLMAN:  I want to get certain data.

1  MR. VEEDER: While Mr. Stahlman is reviewing these mat-

2  ters, I wish to have the record show that Mr. Dennis appeared

3  in court yesterday. I don't believe his appearance was noted.

4  THE MASTER: That is correct. He was in the rear of the

5  room and not at counsel table.

6  MR. VEEDER: Well, it is important to me, your Honor, to

7  know whether Santa Margarita Mutual Water Company was here.

8  THE MASTER: Incidentally, I don't think the record shows

9  the appearing of counsel this morning. I might ask counsel

10  who are present to state their names.

11  MR. VEEDER: William H. Veeder, representing the United

12  States. William Burby, representing the United States, and

13  David W. Miller, representing the United States.

14  MR. SACHSE: Franz Sachse for the Fallbrook Public Utility

15  District and individual defendants.

16  MR. STAHLMAN: George Stahlman, representing the Vail

17  Company.

18  THE MASTER: And Mr. Dennis, are you here?

19  MR. WILLIAM DENNIS: I am here as an observer today.

20  THE MASTER: Behind the bar.

21  MR. DENNIS: Behind the bar.

22  THE MASTER: The record will note that you are in the

23  courtroom but not at the counsel table.

24  MR. DENNIS: Perfectly satisfactory.

25  MR. VEEDER: I would also like to have the record show

1   that Mr. Martin was quite angry yesterday about our soil sur-

2   veys.  Our records show they were delivered to Mr. Dennis, and

3   that we have done all that we could to keep Mr. Martin

4   informed in regard to this matter.  And I was anxious to know

5   whether Mr. Dennis could arrange for further consultation with

6   Mr. Martin, to the end that if he is dissatisfied with his soil

7   survey that he tell us precisely in what regard.  Or if he

8   doesn't want the soil survey, to advise us of that.  We don't

9   care.  But we feel this way, that this is a gratuity on the

10  part of the United States and we don't want anyone thinking,

11  as Mr. Martin obviously felt -- and I understood he talked to

12  you, your Honor -- that in some manner we were imposing on him.

13  We simply can't afford to have anyone feel that the United

14  States of America is assuming more than to assist these people.

15  We are not obligating ourselves in any way.  And I hope that

16  everyone understands that.  Because we want to help them.  But

17  we certainly don't want men like Mr. Martin to think that we

18  are imposing on them.

19       THE MASTER:  The only thing that Mr. Martin told me,

20  inasmuch as you mentioned the subject, was that he was dis-

21  satisfied with the soil survey and it was incorrect.  But I

22  presume not all soil surveys are accepted by the owner.  So

23  that is to be expected.

24       Are there any individual defendants who are not represented

25  by counsel, who are here present?

1    MRS. BAXTER:  Baxter.

2    THE MASTER:  And what is your first name?

3    MRS. BAXTER:  John C. and Chloe.  I think Mr. Stahlman

4  just read --

5    MR. VEEDER:  Yes, that is correct.

6    THE MASTER:  Are there any defendants here in proper

7  person, represented by attorneys?

8    MR. DENNIS:  I was just -- --

9    MR. VEEDER:  I thought you weren't appearing.

10    MR. DENNIS:  In view of the statement by Mr. Veeder, I

11  think the government in 152 did deliver a copy of the soil

12  survey to my office, and Mr. Baxter was dissatisfied with it,

13  and he is even more dissatisfied today than he was at that

14  time.

15    THE WITNESS:  That was not Baxter, that was Martin.

16    MR. DENNIS:  Pardon.  I mean Martin.  I believe it is

17  K. I. Martin or I. K. Martin.

18    THE MASTER:  Very well.  You may proceed, Mr. Veeder.

19    MR. VEEDER:  Mr. Stahlman, may I just interrupt for a

20  moment so that I may proceed with the interrogation, then I

21  will give it back to you.

22    MR. STAHLMAN:  Fine.

23  BY MR. VEEDER:

24    Q  Now, Colonel Bowen, I ask you to take the red pencil

25  and mark on Exhibit M-31 the parcel owned by John C. and Chloe

1    Baxter.    Just circle it.

2        A   On the first page of Plaintiff's Exhibit M-31 appears

3    the designation "Parcel 6, DeLuz watershed, Baxter, John C.,

4    husband; Baxter, Chloe L., wife."  I will circle that desig-

5    nation.

6        Q   Will you also step to Plaintiff's Exhibit M-32, the

7    map, and put a cross on the location of this property, to the

8    end that it will be tied to that exhibit?

9        A   Plaintiff's Exhibit M-39, designated Parcel number 6,

10   DeLuz watershed, appears on Plaintiff's Exhibit Number 32,

11   designated Parcel 6.  And I have marked that parcel with an X,

12   it being located partly in Section 19 and partly in Section 30,

13   Township 8 South, Range 4 West, San Bernardino Baseline and

14   Meridian.

15       MR. VEEDER:  This is essential, your Honor, because some-

16   times names are different.  The record owner is different than

17   the name on the soil survey.  And we desire to have it clari-

18   fied.

19       I ask to have marked for identification Plaintiff's

20   Exhibit Number 40.

21       It has been suggested by Mr. Stahlman and Mr. Sachse if

22   the Baxters are here we might inquire, are they satisfied with

23   the soil survey made by the United States?

24       THE MASTER:  I thought there was going to be some further

25   testimony from Colonel Bowen with regard to that, then I was

1    going to ask --

2        MR. VEEDER:  There will be no further --

3        THE COURT:  If there is no testimony from Colonel Bowen

4    with regard to the soil survey, I think it might be well to

5    inquire, do you wish to have them sworn in that connection?

6        MR. VEEDER:  I would just as soon have it informal,

7    because I feel they might want to call Colonel Bowen and cross-

8    examine him.

9        THE MASTER:  Mr. and Mrs. Baxter, I believe you understand

10   the soil survey on your property has been introduced in evi-

11   dence.  Are you satisfied with that survey or do you think it

12   is incorrect in any fashion?

13       MRS. BAXTER:  No, we are satisfied.

14       THE MASTER:  That is, you believe that correctly repre-

15   sents the condition of your property and its water needs?

16       MRS. BAXTER:  Well, it is near enough that we are satis-

17   fied with it.

18       THE MASTER:  Are there any questions that you wish to ask

19   Colonel Bowen in connection with that survey?

20       MRS. BAXTER:  Well, the only thing -- I don't know whether

21   this is just proper or not.

22       MR. VEEDER:  Mrs. Baxter, why don't you come up here.  It

23   might be easier for all of us to keep track of it.  If you

24   want to interrogate the witness, it is fine with us.

25       MRS. BAXTER:  I was just thinking the other day -- the

1  thought hadn't occurred to me before -- we have a spring on

2  our property, then we have a tributary of the DeLuz Creek.  And

3  we haven't -- we haven't done anything with the tributary yet.

4  But what would happen in case of anything would happen to the

5  spring, would we be allowed to put down a well for the house

6  use or something like that?

7        THE WITNESS:  Certainly.

8        MRS. BAXTER:  That was the only question.

9        THE WITNESS:  Yes, ma'am.

10       MR. VEEDER:  May I interpose here?

11       THE COURT:  Yes.

12       MR. VEEDER:  And explain the position of the United States

13  in that regard.  We assume that this land is riparian.

14       THE WITNESS:  Yes.

15       MRS. BAXTER:  Yes.

16       MR. VEEDER:  And if that is the case, as Colonel Bowen has

17  stated, the matter of practical and profitable irrigation in

18  future and potential development is certainly in my view

19  embraced in Mrs. Baxter's claim.  And if in the future she did

20  exercise her rights as a riparian, why she could put the full

21  burden on the stream, based upon availability of water, her

22  relative rights with other people on the stream, and the United

23  States of America.  Now, your Honor, that would be our position

24  in this claim.

25       THE MASTER:  I understand that you would agree that the

1    land is riparian land.

2    THE WITNESS:  Parcel number 6, as marked with a red cross

3    on Plaintiff's Exhibit Number M-32, is riparian to some small

4    streams which dissect it, and are tributary to Cottonwood Creek,

5    which in turn is tributary to DeLuz Creek.

6    MRS. BAXTER:  The small tributary that might be developed,

7    there is a spot there that is down to bedrock.  That doesn't

8    flow all the year.  I don't know enough about water laws to

9    know exactly what a person could do but there wouldn't be water

10   flowing there all year.  And that was the reason that I -- a

11   person wouldn't be able to pump from there all the year, you

12   know, to have water for your house in case the spring did go

13   dry.  That was the reason I wondered if a person could put down

14   a well.

15   THE MASTER:  My understanding was the colonel stated that

16   would be permitted, and Mr. Veeder agreed.

17   MRS. BAXTER:  This little dam I spoke of, if we did that,

18   it would, of course, be just what waters probably that would

19   be in there for irrigating.  And, like I say, it is a small

20   tributary.  The boys probably know what it is, of course.

21   THE MASTER:  Then are there any other questions you want

22   to ask Colonel Bowen?  I gather --

23   MRS. BAXTER:  If there is, I don't know enough to know,

24   to be perfectly honest with you.

25   MR. VEEDER:  We have no desire to restrain Mrs. Baxter, if

1    she should subsequently have some questions.

2         THE MASTER:  Yes.

3         MR. VEEDER:  Even during the day.

4         MRS. BAXTER:  I don't know.  Like I say, if there are I

5    don't know enough to know it.

6         THE MASTER:  Thank you very much, Mrs. Baxter.

7         MR. SACHSE:  Let me ask you, your Honor.  I am a little --

8    I am very interested in this, because I have a great many

9    individual clients.  Now am I to understand that there has been

10   or has not been -- I don't have the record straight -- testi-

11   mony on the existence of a spring?  Has there been a consent

12   by the United States?  I am not doing this in behalf of Mrs.

13   Baxter.  I am doing this to try to find out for the future.

14   Has the United States conceded this particular spring, or that

15   all springs are going to be available to the use of the land

16   owner?  And finally, aren't we taking rather a hazard if we

17   tell any individual defendant that they will be given a right

18   to drill a well or to use a spring, without evidence in the

19   record, in the light of the order of the Court, stating that

20   all parties are adverse to all other parties?

21        MR. VEEDER:  Well, to begin with, I would like to respond

22   to about a six barrel statement.  One, I haven't the slightest

23   idea whether there is a spring there or not.  Mrs. Baxter said

24   there is.

25        MR. SACHSE:  Are you consenting to it?

1    MR. VEEDER:  If you will wait until I finish, I will tell

2    you.  We reserved the right yesterday, and we continue to

3    reserve the right, to introduce rebuttal evidence if when we

4    check this matter out there is disagreement.  In regard to the

5    use of wells or springs, I would assume that there is a problem

6    perhaps of state law.  Now I also assume that Mrs. Baxter will

7    comply with it.  But so far as we are concerned -- so far as

8    we are concerned at this juncture, she has said there is a

9    spring there.  She has said there is a tributary there.  It is

10   part of the evidence in the record.  We will check it and per-

11   haps rebut it.  Similarly, we have proceeded on an assumption

12   that this land is riparian.  We will check it out.  And, as we

13   said yesterday, we reserve the right to rebut it if there is

14   error.  But at this juncture I think the record is just about

15   the way it is going to be in each individual.  An individual

16   proceeds in the manner that Mrs. Baxter has proceeded.  I don't

17   know how to take care of it.

18   THE MASTER:  The engineering report, which has been intro-

19   duced in evidence, states the property is traversed by a small

20   tributary of DeLuz Creek.  So that the record shows it is

21   riparian.  And the engineering report also states that there

22   is a spring located in a canyon, from which water is being

23   taken.

24   MRS. BAXTER:  It is high.  It is on a hill.

25   THE MASTER:  So the evidence in the record supports the

1   contention of riparian qualification and also supports the

2   contention that there is a spring.  It also shows an estimated

3   future ultimate water use of 79.07 acre feet.  And my under-

4   standing of Mr. Veeder's position is that the government will

5   recognize as correct the information in these surveys, unless

6   and until some further recheck might indicate some error.  If

7   there is any such error, before any evidence in rebuttal of

8   such a report would be offered, the individual defendants would

9   be personally notified and be given an opportunity to be pre-

10  sent, and requested to be present, if any such rebuttal evi-

11  dence should be offered.

12      Now as far as the adverse character of each defendant to

13  the other, that is, of course, a factor in the case.  Some one

14  defendant might choose to controvert the evidence offered in

15  support of the claim of another defendant.  If that was done,

16  I think that before such evidence by the contesting defendant

17  was submitted that the other defendant should be personally

18  notified and given an opportunity to appear.  Of course, we

19  can't expect every defendant to be present while every other

20  defendant is presenting evidence.  That would be physically

21  impossible.  I think in that manner the danger you seek to

22  avoid can be overcome.  Of course, any statements that are

23  made to the effect that any defendant would have the right to

24  dig a well or obtain water from any other source would be

25  subject to any final judgment of the Court limiting the total

1    amount which one defendant could take so as not to injure the

2    rights of other defendants.   In other words, this 79 acre feet

3    may or may not be the amount finally allowed by any judgment.

4    I think that has been explained to many defendants individually.

5    It should be stated here in the record publicly, that the

6    Court, of course, is not bound by these statements of ultimate

7    use in the sense that if the supply is not adequate, the supply

8    will have to apportioned on the basis which the Court will

9    finally determine.

10       MRS. BAXTER:   What was it Judge Carter said on the opening

11   day about springs?

12       MR. VEEDER:   I just think he was making a general state-

13   ment, Mrs. Baxter.

14       MRS. BAXTER:   He said if you have a spring up on the hill

15   -- and, of course, he was talking to the audience and not to

16   me.   He didn't know he from Adam.   He said, "If you have a

17   spring on the hill, that is considered local water."   And it

18   doesn't feed any stream.   And, of course, our spring doesn't

19   feed any stream and wouldn't in any way affect anyone below us.

20   We don't want to take any water away from anybody else or any-

21   thing of the kind.   And anything we did wouldn't take any water

22   away from anybody else, because --

23       THE MASTER:   That is, the water from your spring com-

24   pletely soaks into the ground on your own property and does

25   not go onto the property of anyone else?

1    MRS. BAXTER:  Not that we know of.

2    MR. VEEDER:  Well, again, your Honor, I think that if I

3  may tender the additional thought we have had about this, that

4  there will be findings of fact by your Honor, which will be

5  reflective of just the things Mrs. Baxter stated.  And I would

6  assume that they will be afforded a full opportunity to tender

7  their objections, if they desire to, as to those findings.

8    THE MASTER:  That is correct.  Under the order of appoint-

9  ment findings will be made and all defendants will have an

10  opportunity to object to all findings as to any defendant, and

11  to controvert them.

12    MRS. BAXTER:  We have used this spring, I might say, since

13  1922.  About 1930 my husband went in and developed it a little

14  more than it was, don't you know.  And it has never in any way

15  affected anyone else.  It couldn't affect anyone else.

16    MR. STAHLMAN:  If I may make a bystander's suggestion, I

17  would think in order to -- we are going to have a lot more of

18  these individual cases.  To button them up, so to speak, the

19  statements she has made here as her own counsel, they would be

20  considered as sworn testimony in the record.  You would have

21  one case complete.

22    MR. SACHSE:  That is right, your Honor.  The witness isn't

23  sworn.  She is not my client but I think she is putting in

24  evidence in here that is very valuable to her.  I think she

25  should be sworn.

379

1       THE MASTER:  I was going to ask Counsel if they would

2   stipulate that the evidence already admitted be considered as

3   sworn testimony in the case.

4       MR. SACHSE:  I have no objection whatsoever.

5       MR. STAHLMAN:  We have no objection.  But there may be

6   other individuals.  To protect her, I think if she were sworn

7   right now and asked the question if the statements she made to

8   the Court in relation to that were under oath, then her case

9   would be completed.

10      THE MASTER:  I think that is a very good observation.  Mr.

11  Clerk, will you swear Mrs. Baxter.

12      (Chloe L. Baxter sworn as a witness herein.)

13      THE MASTER:  Now, Mrs. Baxter, you have already made

14  certain statements prior to having been sworn.  Were all those

15  statements true and correct statements?

16      MRS. BAXTER:  They were.

17      THE MASTER:  And if you would repeat them now, now that

18  you have been sworn, just the same as you stated them prior to

19  being sworn --

20      MRS. BAXTER:  How do you want me to begin?

21      THE MASTER:  I say you don't have to actually do it.

22      MRS. BAXTER:  Oh, yes, I do.  If there is anything else

23  I should give, why I will be glad to do it.

24      THE MASTER:  Now you also made certain statements in the

25  Answer which you filed in this action.  Would you now state

1   under oath that the statements contained in your Answer are

2   true and correct?

3   　　MRS. BAXTER:　They are.

4   　　THE MASTER:　I think that is probably sufficient, unless

5   there is something else.

6   　　MRS. BAXTER:　No.

7   　　MR. VEEDER:　Do I have an exhibit marked for identifi-

8   cation?

9   　　MR. SACHSE:　Mr. Veeder, may I suggest something?　Your

10  Honor I notice has been using the term "soil survey" referring

11  to that document.　I believe it is entitled "engineering

12  report", and there will be documents entitled "soil survey",

13  which are drawn by the U. S. D. A., in evidence later.　I think

14  we are going to run into some confusion if we don't get our

15  nomenclature --

16  　　MR. VEEDER:　I think I referred to it as an engineering

17  report.

18  　　MR. SACHSE:　His Honor referred to it as a soil survey.

19  　　THE MASTER:　I believe I referred to it as an engineering

20  report on one occasion and a soil survey on another.　The point

21  is well taken.　Some differentiation should be made.　May the

22  record also show at this time Mr. Moskovitz, Deputy Attorney

23  General for the State of California, has appeared.

24  　　MR. SACHSE:　That is all.

25  　　MR. VEEDER:　Do you want to examine these?

1    MR. STAHLMAN:  I just want to get certain data, when you
2  get around to it.  Is that the Baxter?
3    MR. VEEDER:  The name on this one is --
4    MR. STAHLMAN:  I won't take them ahead of time.
5    MR. VEEDER:  I want to check this again.
6    MR. STAHLMAN:  When you are finished with it, if I can
7  just get certain data off of them.
8    MR. VEEDER:  That is McDowell.
9    MR. STAHLMAN:  Who?
10    MR. VEEDER: McDowell.
11    MR. STAHLMAN:  Go ahead and introduce it and then we will
12  get it.
13    MR. VEEDER:  I offer in evidence the exhibit marked for
14  identification M-40.  Apparently no objection.
15    THE MASTER:  No objection.  It will be received in evi-
16  dence.  This is an engineering report for a soil survey?
17    MR. VEEDER:  This is an engineering report.
18    MR. STAHLMAN:  Would you also indicate the parcel number
19  when you designate it?
20    MR. VEEDER:  I am about to, just about to.
21  BY MR. VEEDER:
22    Q  Now, Colonel Bowen, will you mark on Plaintiff's
23  Exhibit M-31 the parcel number that is designated there?  State
24  the name appearing there and then proceed to M-32 and put a
25  cross where that appears.

1      A   Plaintiff's Exhibit M-40 may be further identified as

2  a folder containing the report of various engineer surveys and

3  investigations.   It is known as DeLuz watershed Parcel Number

4  8 and appears on page 2 of Plaintiff's Exhibit M-31, at the

5  top of the page.   I will circle that with a red pencil.

6  Parcel 8, DeLuz watershed, is shown as McDowell, Wilmore --

7  M-c-D-o-w-e-l-l, Wilmore, W-i-l-m-o-r-e, husband.   McDowell,

8  Lucienne, L-u-c-i-e-n-n-e, wife.   Bank of America, deed of

9  trust.   Thorson, Clarence A., and Thorson, Vera T.   Deed of

10  trust.

11      Parcel Number 8, Plaintiff's Exhibit M-40, appears on

12  Plaintiff's Exhibit M-32 adjoining the Santa Rosa Grant of the

13  Vail Ranch, which at this point is common with the Riverside

14  County line.   It is an irregular piece of land.   And I will

15  delineate it with a red X.   It is also shown with Parcel 8,

16  encircled, and the property is partly in Section 17 and partly

17  in Section 20, Township 8 South, Range 4 West.

18      MR. VEEDER:   I ask to have marked for identification

19  Plaintiff's Exhibit Number --

20      THE CLERK:   41.

21      MR. VEEDER:   41.

22      THE MASTER:   Mr. Veeder, may I inquire, what is the basis

23  of the selection of the order of these exhibits?

24      MR. VEEDER:   There has been none.   The fact is we are

25  making the order as we go along.   My view is the people should

1   be notified on the basis on which Colonel Bowen is introducing

2   this evidence.

3       THE MASTER:  That is, we had thought at the beginning we

4   would try to commence near the ocean and work up the stream.

5   This does not seem to be the procedure you are following.

6       MR. VEEDER:  Our experience has been this.  We have these

7   soil surveys, and they are somewhat scattered throughout the

8   watershed. And I don't believe there is any real continuity

9   that could be worked out.

10  BY MR. VEEDER:

11      Q   Colonel Bowen, I hand you Plaintiff's Exhibit marked

12  M-41 for identification, and ask you to state the name of the

13  party, and state what that exhibit is.

14      A   Plaintiff's Exhibit M-41 is a copy of a report showing

15  the results of an engineering investigation on DeLuz watershed

16  Parcel Number 11.  And referring to Plaintiff's Exhibit M-31,

17  page 2, Parcel 11 appears midway in the page.

18      MR. SACHSE:  At the bottom.

19      THE WITNESS:  With a note, "See below".  And Parcel 11,

20  DeLuz watershed, is at the bottom, with the name Shaver,

21  Gaius, G-a-i-u-s, Ray, R-a-y.  That is two words.  Husband.

22  Shaver, Stella C., wife.  Bank of America.  Bisek, B-i-s-e-k,

23  Theresa Brosius, B-r-o-s-i-u-s.  And Bisek, Joseph W.  I will

24  encircle that also in red.  And referring to Plaintiff's Exhibit

25  M- --

1      MR. VEEDER:  May I make an offer before we go any further

2   on that?

3      THE WITNESS:  Excuse me.

4      MR. VEEDER:  I wish to offer in evidence M-41.

5      THE MASTER:  Is there any objection?  It will be received

6   in evidence.

7      MR. SACHSE:  No objection.  May the record indicate I am

8   counsel for the owner of this particular parcel, and we will

9   offer evidence on this matter later.

10      THE MASTER:  I see.  The record will so indicate.

11      MR. STAHLMAN:  May I make this inquiry?  I am just wonder-

12   ing if when these are introduced and the evidence is taken at

13   this time, whether it should not show on the record whether

14   the party whose report is being introduced is either in court

15   or represented by counsel.

16      MR. VEEDER:  I have assumed if they were here --

17      MR. STAHLMAN:  I know you did in this case.

18      MR. SACHSE:  McDowell, you mean?

19      MR. STAHLMAN:  The one previous.

20      MR. VEEDER:  If your Honor would, I think that is a good

21   idea.  Your Honor might inquire if anyone is here.

22      MRS. CHLOE BAXTER:  No, they are not here.

23      THE MASTER:  Is either Mr. or Mrs. McDowell in the court-

24   room?

25      MRS. BAXTER:  No, they were here.

1      THE MASTER:  And Mr. and Mrs. Shaver and Mr. and Mrs.

2  Bisek. I understand are represented --

3      MR. SACHSE:  Represented by me, your Honor.

4      MR. STAHLMAN:  There is one other inquiry I have here, and

5  that is when Mr. Veeder has completed with a report whether or

6  not we should make inquiry in relation to that report or

7  reserve any examination we have until later.  For instance, on

8  the previous exhibit, Number 40, I have one question here in

9  relation to that.

10      THE MASTER:  I would think probably it would be better to

11  have the examination as to any report made at the time.

12      MR. STAHLMAN:  At the time.  It would all be together in

13  the record.

14      MR. VEEDER:  Yes.  May I tender a thought on that, your

15  Honor.  I think that time would be saved and there would be a

16  greater continuity in the record if interrogation on the

17  report was made at the time that the property owner appeared,

18  give everyone an opportunity to study the report, and then all

19  the data.  Both inquiries by counsel and by the person appear-

20  ing would be in one part of the record, rather than scattered.

21      MR. STAHLMAN:  Except for this, Mr. Veeder.  Now I don't

22  anticipate being here when every property owner is here.  We

23  have property at the upper regions of this area.  And I only

24  have one question that relates to this property that I am

25  unable to determine from the report, and it may be in there.

1    MR. VEEDER:  I want the record to show I was not arguing

2  with Mr. Stahlman.  I was simply tendering a thought.

3    THE MASTER:  I think also, despite any notices which may

4  be given, it is quite possible certain property owners simply

5  will not appear.  And I think it is probably just as well to

6  have the testimony from any counsel who is present with refer-

7  ence to a report in the record at the point where that point

8  is introduced, as it is to have it at the time the particular

9  defendant is present.  It is going to be evidence in two places

10  anyway.

11    MR. VEEDER:  I have no objection.

12    THE MASTER:  So if you have any questions, Mr. Stahlman,

13  with reference to Exhibit M-40, you may ask them at this time.

14    MR. STAHLMAN:  Very well.  I have just one question.

15

16                    CROSS-EXAMINATION

17  BY MR. STAHLMAN:

18    Q  Colonel Bowen, in connection with the property desig-

19  nated M-40, is there present use of water being made at this

20  time?

21    A  Yes, sir, there is.

22    Q  I beg your pardon?

23    A  Yes, sir.  There is.

24    Q  And what is the quantity presently used?

25    MR. VEEDER:  Now I am going to have to object to that

1    question.   The offer is not made on present use, Mr. Stahlman.

2    It was when the report was prepared.   Some of those --

3        MR. STAHLMAN:   Yes, when it was prepared.   Yes.   I just

4    couldn't find it in the report.

5        THE WITNESS:   We report in the engineering section, page

6    3 of Plaintiff's Exhibit M-40, that there is a surface

7    diversion on DeLuz Creek.   And describe that diversion in

8    general terms.   We describe the storage reservoirs which are

9    on the property, with a combined capacity of one acre foot.

10   And describe also a conservation dam on the property, with a

11   capacity of one acre foot.   But we do not describe the actual

12   amount of water diverted from the surface diversion on DeLuz

13   Creek.

14   BY MR. STAHLMAN:

15       Q   Then is that the only use made by diversion from those

16   dams?

17       A   Yes, sir.   We note here that all the water used here on

18   this property is taken from the surface diversion on DeLuz

19   Creek from the inflow to this conservation dam, if and when

20   precipitation and runoff occurs.

21       MR. STAHLMAN:   Thank you very much.   That is all I wanted

22   to know.   I will keep those together over here, if you wish.

23       MR. VEEDER:   Now, there was an interruption at the time I

24   made the offer.   The offer has been made.   It is in evidence?

25       THE MASTER:   Exhibit M-41 is in evidence, yes.

1    MR. VEEDER:  That is correct.

2    BY MR. VEEDER:

3        Q  Would you proceed then, Colonel?

4        A  Exhibit Number 41 has been shown as Parcel Number 11

5    on Plaintiff's Exhibit M-31.  It appears also on Plaintiff's

6    Exhibit M-32 as DeLuz watershed, Parcel Number 11, which I

7    will mark with a red pencil.  This parcel is located in Section

8    20, Township 8 South, Range 4 West.

9        THE MASTER:  Now, Mr. Sachse, I understand that you will

10   wish to offer some evidence at a later time in rebuttal.

11       MR. SACHSE:  I would prefer to let the whole matter wait

12   and put it all on at once, both the cross-examination of

13   Colonel Bowen on the exhibit, and our own evidence.

14       THE MASTER:  Very well.

15       MR. VEEDER:  I desire to have marked for identification

16   Plaintiff's Exhibit M-42.

17       MR. SACHSE:  I don't know whether I made it clear for the

18   record.  I will stipulate the admissibility.  There is no

19   objection whatsoever to the admissibility.

20       THE MASTER:  Yes, it has been admitted.

21   BY MR. VEEDER:

22       Q  Colonel Bowen, I hand you the Plaintiff's Exhibit marked

23   M-42 for identification, ask you to state the name and what is

24   contained in that exhibit.

25       A  Plaintiff's Exhibit M-42 is a folder reporting the

engineering investigation of Parcel Number 13, DeLuz watershed.

Parcel Number 13 is shown on Plaintiff's Exhibit M-31, page 2,

as the property of Shaver, Robert E. -- correction, Shaver,

Herbert E., husband; and Shaver, Joan B., wife.  I will circle

Parcel 13 on Plaintiff's Exhibit 31 -- M-31.

Q   And would you proceed?

A   Parcel 13 is designated on Plaintiff's Exhibit M-42,

appears also on Plaintiff's Exhibit M-32.  I will mark with an

X this parcel, which has the number 13 inside of the parcel,

as shown on the map, surrounded by a circle.  And this parcel

is located in Section 20, Township 8 South, Range 4 West.

MR. VEEDER:  I desire to offer in evidence Plaintiff's

Exhibit marked M-42.

THE MASTER:  That will be received and so marked.  Are

Mr. and Mrs. Shaver here or represented by counsel?

MR. SACHSE:  I am representing Mr. and Mrs. Shaver.  How-

ever, in this case I have a question at this time.

THE WITNESS:  Very well.


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Colonel Bowen, I see no date of any kind on this report.

Can you tell me how -- other than at the very beginning, 3

November '56, the engineering personnel made the survey.  But

there is no date at the back.  Now as of what date does this

report purport to be accurate?

Q  You had better look at the original.  This is my copy.

A  Excuse me.  Plaintiff's Exhibit M-32 --

Q  M-42.

A  M-42.  Thank you.  The date appearing at the beginning, at the introduction, 3 November 1956 is the only date shown in this report.  And the information contained in the report is as of that date and a few days subsequent to that date.

MR. SACHSE:  That is all.  Thank you.

MR. VEEDER:  The offer has been made, your Honor.

THE MASTER:  Yes.  The exhibit has been introduced in evidence and received.

MR. VEEDER:  I ask to have marked for identification Plaintiff's Exhibit Number 43.

THE CLERK:  When you put them in evidence, will you give them to me so I can complete it?

MR. VEEDER:  Yes.

THE CLERK:  If you will, please.

BY MR. VEEDER:

Q  I hand you Plaintiff's Exhibit marked for identification M-43, and ask you to state the name of the party referred to in that exhibit and to state what the exhibit constitutes.

A  Plaintiff's Exhibit M-43 is a report of an investigation,

1    an engineering investigation made on DeLuz watershed, Parcel

2    Number 20.   Referring to Plaintiff's Exhibit M-31, page 4,

3    Parcel 20, DeLuz watershed, appears at the top of that page

4    and shows Parker, John, husband, and Parker, Margery -- this

5    is M-a-r-g-e-r-y L., wife.   I will circle that information on

6    Plaintiff's Exhibit M-31 with red pencil.

7        MR. VEEDER: I would like to make the offer now, before we

8    go any further, if I may, Colonel, so I can get the sequence.

9    Is there objection to M-43?

10       MR. SACHSE:  No, sir.

11       THE MASTER:  M-43 will be received in evidence.

12       THE WITNESS:  Plaintiff's Exhibit M-43, the report of

13   engineering investigation on Parcel Number 20, DeLuz watershed,

14   is shown on Plaintiff's Exhibit M-32 with the number 20 en-

15   circled.   This parcel also adjoins the Santa Rosa Grant of the

16   Vail Ranch, and is located partly in Section 22 and partly in

17   Section 27, Township 8 South, Range 4 West.   And I have marked

18   that parcel with a red pencil.

19   BY MR. VEEDER:

20       Q   Colonel, would you hand the exhibit to the Clerk, and

21   let's get the sequence from you to the Clerk on to the other

22   lawyers.

23       MR. SACHSE:  Keep it going zip, zip, zip.

24       MR. VEEDER:  It will work faster if we do.

25       THE MASTER:  Are Mr. and Mrs. Parker here or represented

by counsel?

MRS. BAXTER:  They are not present.  May I speak up?'
This Mr. John Parker is in Fresno.  He lives in Fresno.  But
his mother lives on this property.

THE MASTER:  Thank you.

BY MR. VEEDER:

Q  I have had marked for identification Plaintiff's
Exhibit M-44, and I hand it to you, Colonel Bowen, and I ask
you to state the name of the party to whom that has reference,
and to state what is in the report.

A  Plaintiff's Exhibit M-44 is a report of the engineering
investigation made on Parcel Number 23, DeLuz watershed.
Referring to Plaintiff's Exhibit M-31, page 4, it is noted that
Parcel 23, DeLuz watershed, has the names Dodge, Mildred E;
Farmers and Merchants Trust Company of Long Beach; Doville,
Laura, and Doville, Paul, listed thereunder.  And I will en-
circle that with red.

MR. VEEDER:  I wish to offer in evidence Exhibit marked
for identification M-44.

MR. SACHSE:  No objection.

THE MASTER:  It will be received in evidence as M-44.

BY MR. VEEDER:

Q  And will you proceed to M-32 and indicate where the
property is located?

A  With reference to Plaintiff's Exhibit M-32, Plaintiff's

393

1   Exhibit M-44 is shown on M-32 as Parcel Number 23.  The number

2   is written in the boundaries describing Parcel 23, encircled,

3   and I will indicate that with a red cross.  And Parcel 23 is

4   part of Section 26, 8 South, 4 West.

5        THE MASTER:  Is Mildred Dodge or Farmers and Merchants

6   Trust Company or Mr. and Mrs. Doville represented by counsel

7   or present in person?  Apparently not.

8        MR. VEEDER:  Did you have a question, Mr. Stahlman?

9        MR. STAHLMAN:  No, thanks.

10       MR. VEEDER:  Would you please mark for identification

11   Plaintiff's Exhibit Number 45?

12       Q  I hand you, Colonel Bowen, Plaintiff's Exhibit marked

13   M-45 for identification, and ask you to state the name that

14   appears there and state the contents of the exhibit, the

15   identification.

16       A  Plaintiff's Exhibit M-45 is the report of the engi-

17   neering investigation made on DeLuz watershed Parcel Number 26.

18   The name on the cover of this report is that of John Kuhnis.

19   And referring to Plaintiff's Exhibit M-31, page 34, it is

20   noted that Parcel 26, DeLuz watershed, has the name Kuhnis,

21   John, listed thereon.  I will circle that with red.

22       MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

23   marked for identification M-45.

24       MR. SACHSE:  No objection.  May the record indicate that

25   I represent Mr. Kuhnis and that evidence will be offered on

1   this property, and I will take up at the same time the cross-

2   examination of Colonel Bowen.

3   THE MASTER:  The record will so indicate.  The exhibit is

4   received in evidence.

5   BY MR. VEEDER:

6   Q  Colonel Bowen, I ask you to step to M-32 and mark down

7   the location of M-45 on that exhibit.

8   A  Referring to Plaintiff's Exhibit M-32, the area

9   reported in Plaintiff's Exhibit M-45 is delineated hereon and

10   identified with a number 26, encircled.  And I will mark that

11   property with a red cross.  And the property reported in

12   Plaintiff's Exhibit M-45 lies partly -- or lies wholly within

13   Section 28, 8 South, 4 West.

14   Q  I hand you Plaintiff's Exhibit marked for identifi-

15   cation M-46, ask you to state the name of the person referred

16   to in there and state the content of the identification.

17   A  Plaintiff's Exhibit M-46 is an engineering report made

18   on DeLuz watershed, Parcel Number 27.  The name shown on the

19   cover of the report is that of Elizabeth Poston.  And referring

20   to Plaintiff's Exhibit Number 31, M-31, on page 4, at the

21   bottom of the page, under Parcel 27, DeLuz watershed, appears

22   the name Poston, Elizabeth, widow.  I will circle that in red.

23   THE MASTER:  Is Mrs. Poston present or represented by

24   counsel?

25   MRS. BAXTER:  She isn't present, your Honor.

1    THE MASTER:  Mr. Sachse.

2    MR. SACHSE:  No, she is not one of mine, your Honor.

3    THE MASTER: Very well.

4    MR. VEEDER:  I offer in evidence Plaintiff's for identi-

5    fication marked M-46.

6    THE MASTER:  It will be received in evidence and marked

7    M-46.

8    BY MR. VEEDER:

9    Q  Colonel, would you step to Plaintiff's Exhibit M-32 and

10   mark on that the location of Plaintiff's Exhibit M-46?

11   A  Referring to Plaintiff's Exhibit M-32, the area

12   reported on and identified as Plaintiff's Exhibit M-46 is shown

13   by -- is identified by the number 27, which number is outside

14   of the actual boundary of the area reported on -- encircled --

15   number 27 encircled, with a line pointing inside of the

16   property.  Which I will mark with an X.  This property is

17   within Section 28, 8 South, 4 West.

18   Q  There is no doubt, Colonel, from your standpoint, that

19   27 is sufficiently identified, or shall we mark it outside of

20   the area?  If you think it would cause any confusion, maybe we

21   had better draw an arrow.

22   THE MASTER:  It seems to me it is clear from the map the

23   parcel intended to be number 27 lies immediately to the right

24   of the circle.  Is that correct?

25   MR. VEEDER:  If that is understood, that is all I wanted

1    to clear up.

2        THE COURT:  I think it is clear from the map.

3    BY MR. VEEDER:

4        Q  I hand you marked for identification M-47, and ask you

5    to state the name of the party and the content of that identi-

6    fication.

7        A  Plaintiff's Exhibit M-47 is an engineering -- is the

8    report of an engineering investigation made on Parcel Number

9    30, DeLuz watershed, and referring to Plaintiff's Exhibit M-31,

10   on page 5, near the top of the page, shown under Parcel 30,

11   DeLuz watershed, is the name Bleeker, Robert B.  I will circle

12   that entry with red.

13       MR. VEEDER:  Your Honor, do you prefer to inquire whether

14   anyone is present, before I make the offer, or not?

15       THE MASTER:  Yes.

16       MR. SACHSE:  Mr. Bleeker is represented by me, and we will

17   defer examination of Colonel Bowen until the presentation of

18   Mr. Bleeker's case.  And there is no objection to the admission

19   of the exhibit.

20       THE MASTER:  It will be received in evidence as Exhibit

21   M-47.

22   BY MR. VEEDER:

23       Q  Colonel Bowen, would you take Exhibit M-47 and mark its

24   location on Plaintiff's Exhibit M-32?

25       A  Referring to Plaintiff's Exhibit M-32, the report of

1  engineering investigation described as Plaintiff's Exhibit

2  M-47 is shown -- is delineated -- the exterior boundaries are

3  delineated and shown on Plaintiff's Exhibit M-32, identified

4  by the number 30, encircled.  And I will indicate with a red

5  cross the area contained in the report.  This property is

6  partly within Section 20, partly within Section 28, and partly

7  within Section 29, 8 South, 4 West.

8       Q  I hand you Plaintiff's for identification marked M-48,

9  and ask you to state the name of the party to whom it makes

10  reference, state the contents of that identification.

11      A  Plaintiff's Exhibit M-48 is a report of an engineering

12  investigation made on property described as DeLuz watershed,

13  Parcel Number 36.  And referring to Plaintiff's Exhibit M-31,

14  on page 5, at the bottom, it is noted under Parcel 36, DeLuz

15  watershed, the names McDowell, Homer C., and McDowell, Marion

16  J.  I will encircle that with a red pencil.

17      THE MASTER:  Are either Mr. or Mrs. McDowell present or

18  are they represented by counsel?

19      MRS. BAXTER:  They are not present, your Honor.  I don't

20  know whether they are represented by counsel or not.

21      THE MASTER:  Thank you.

22      MR. VEEDER:  I make the offer, your Honor, of 48.

23      THE MASTER:  It will be received in evidence as Exhibit

24  M-48.

25

BY MR. VEEDER:

Q   I hand you Exhibit M-48, Colonel, and I ask you to mark its location on M-32.

A   The area reported on in M-48 is shown on Plaintiff's Exhibit M-32.  The exterior boundaries are drawn in, and Number 36 encircled.  And I will mark with a red cross the property just noted.  And state that that property lies partly in Section 29 and partly in Section 32, 8 South, 4 West.

Q   Where is it located in connection with the main stem of DeLuz Creek?

A   Well, the main stem of DeLuz Creek runs through the property.

Q   I hand you Plaintiff's for identification M-49, and ask you to state the name of the party to whom it has reference and to state its contents.

A   Plaintiff's Exhibit M-49 is a report of engineering investigations made on DeLuz watershed, Parcel Number 40.  The names appearing on the first page of this report are those of George W. Towne and Rose G. Towne.  Referring to Plaintiff's Exhibit M-31, page 6, it is noted near the bottom that Parcel 40, DeLuz watershed, has the names Towne, George W., and Towne, Rose G.  I will circle that information on Plaintiff's Exhibit M-31 in red.

THE MASTER:  Is Mr. or Mrs. Towne present?

MR. SACHSE: May the record indicate Mr. and Mrs. Towne are

1   represented by me, and we will offer evidence and cross-examine

2   at the same time.

3        MR. VEEDER:  I offer in evidence Plaintiff's Exhibit M-49.

4        THE MASTER:  It will be received in evidence as M-49.

5   BY MR. VEEDER:

6        Q  Will you step to the Exhibit M-32 and mark its location

7   on that exhibit?

8        A  The area reported on in Plaintiff's Exhibit M-49 is

9   delineated on Plaintiff's Exhibit M-32 and identified with the

10  number 40, encircled, and I will indicate with a red cross the

11  location of that property.

12       Q  I observe, Colonel, you are marking on M-31 some of the

13  pages, and I would suggest you mark them all.  Then there will

14  be no question about where those marks came from.

15       A  I noticed the pages aren't numbered.  I have completed

16  numbering the pages.

17       Q  I hand you Plaintiff's for identification M-50, and ask

18  you to state the parties to whom it refers, and to state its

19  contents.

20       A  Plaintiff's Exhibit M-50 is the report of an engineering

21  investigation made on DeLuz watershed, Parcel Number 41, and

22  the first page of that report contains the names William A.

23  Goodchap and Robert L. Goodchap.  Referring to Plaintiff's

24  Exhibit Number M-31, page 6, at the bottom, Parcel 41, DeLuz

25  watershed, it is shown with the names Goodchap, William A., and

36-L

400

1    Goodchap, Roberta L.  I will encircle that information with a

2    red pencil.

3        THE MASTER:  Is either Mr. or Mrs. Goodchap here?

4        MR. SACHSE:  They are represented by me, your Honor.  May

5    the same stipulation apply as to evidence?

6        THE MASTER:  Very well.

7        MR. VEEDER:  And we offer M-50.

8        THE MASTER:  It will be received in evidence as M-50.

9    BY MR. VEEDER:

10       Q  Would you step to Exhibit M-32, Colonel, and mark M-50's

11   location on that exhibit?

12       A  The area reported on in Plaintiff's Exhibit M-50 is

13   shown on Plaintiff's Exhibit M-32 and identified with the

14   Parcel Number 41, encircled, with a line leading from that

15   encircled 41 to the interior boundaries of the property reported

16   on.

17       Q  I hand you Plaintiff's for identification M-51 and ask

18   you to state the names of the parties to whom it has reference

19   and to state its contents.

20       A  Plaintiff's Exhibit M-51 is the report of an engi-

21   neering investigation conducted on DeLuz watershed, Parcel

22   Number 44.  The cover of this report contains the name of

23   Georgia P. Walling.  Referring to Plaintiff's Exhibit M-31, on

24   page 7, Parcel Number 44, DeLuz watershed, contains the name

25   Jave, Georgia F.  I will encicle that information.

1    MR. SACHSE:  What is the number of that exhibit?

2    THE WITNESS:  Parcel 44.

3    MR. SACHSE:  And the exhibit is 51?

4    THE WITNESS:  M-51.

5    MR. SACHSE:  May the record indicate that parcel is repre-

6    sented by me.

7    THE MASTER:  It will so indicate.

8    MR. VEEDER:  Do you want to inquire?

9    THE MASTER:  He is here.

10   MR. VEEDER:  I offer Plaintiff's 51.  I wasn't paying

11   attention to what he said.

12   THE MASTER:  It will be received in evidence as Plaintiff's

13   M-51.

14   BY MR. VEEDER:

15   Q  Will you mark on Plaintiff's Exhibit M-32 the location

16   of M-51?

17   A  The area reported on in Plaintiff's Exhibit M-51 is

18   delineated on Plaintiff's Exhibit M-32 and identified with the

19   number 44, encircled.  And contained within the exterior

20   boundaries delineated on the map, I will indicate with a red

21   cross the location of the Parcel Number M-44.  Parcel 44, cor-

22   rection.  It is Plaintiff's Exhibit M-51.

23   Q  I hand you Plaintiff's for identification M-52, and ask

24   you to refer to the parties to whom that has reference and to

25   state its contents.

1    A   Plaintiff's Exhibit M-52 contains the report of an

2  engineering investigation of DeLuz watershed, Parcel Number 45.

3  And referring to Plaintiff's Exhibit M-31, page 7, midway in

4  the page is shown the information, Parcel 45, DeLuz watershed,

5  Jave, Minna, and I will encircle that information in red.

6      THE MASTER:  Do you represent Minna Jave also, Counsel?

7      MR. SACHSE:  No.

8      THE MASTER:  Is Minna Jave present in court?

9      MRS. BAXTER:  No, she isn't, your Honor.

10     THE MASTER:  Thank you.

11     MR. VEEDER:  I offer M-52 in evidence and ask it be

12  received.

13     THE MASTER:  That will be received in evidence as M-52.

14     MR. VEEDER:  Very well.

15     Q  Would you step to M-52 and mark it on the map?

16     A  Referring to Plaintiff's Exhibit M-32, the area reported

17  on in Plaintiff's Exhibit M-52 is delineated and identified

18  with the number 45, encircled, within the exterior boundaries

19  of the area reported on.  And I will mark that area with a red

20  cross.  It is located on Camps Creek and lies -- is a portion

21  of Section 30, 8 South, 4 West.  I believe on the previous

22  exhibit, Plaintiff's Exhibit M-51, I failed to mention that

23  that Parcel 44 consists partly of Section 25 and partly of

24  Section -- partly of Section 25, Township 8 South, Range 5

25  West, and part of Section 30, 8 South, 4 West.

39-L

1   Q  I hand you Plaintiff's for identification M-53 and ask

2   you to state the party to whom it has reference, and to state

3   its contents.

4   A  Plaintiff's Exhibit M-53 contains a report of an

5   engineering investigation made on DeLuz watershed, Parcel

6   Number 46.  And referring to Plaintiff's Exhibit M-31, on page

7   7, Parcel 46, DeLuz watershed, is followed by the name Pyeatt,

8   Mercy E.; Pyeatt, Niler R.; and Goodwin, Ewart W.  I will

9   encircle that information on Plaintiff's Exhibit M-31 in red.

10   MR. SACHSE:  May the record indicate that Mercy E. Pyeatt

11   is now Mrs. Mercy E. Anderson, and is represented by me in

12   these proceedings.

13   THE MASTER:  The record may so indicate.

14   MR. SACHSE:  No objection.

15   THE MASTER:  The exhibit will be received in evidence as

16   M-53.

17   MR. VEEDER:  We offer M-53.

18   THE MASTER:  It will be received as Exhibit M-53.

19   BY MR. VEEDER:

20   Q  Will you step to Plaintiff's Exhibit M-32 and mark the

21   location of that exhibit?

22   A  Referring to Plaintiff's Exhibit M-32, the area reported

23   on in Plaintiff's Exhibit M-53 is delineated thereon and

24   identified with the number 46, and encircled, and located

25   within the exterior limits of the property.  I will mark that

1   with a red X. And the property comprises a portion of Section

2   31, 8 South, 4 West.

3   THE MASTER:  We will take a ten minute recess at this

4   time.

5   (Recess.)

6   MR. VEEDER:  Your Honor, I have a little housekeeping to

7   do.  I have four copies here of the U. S. G. S. records.

8   MR. SACHSE:  This is available for all counsel, I under-

9   stand?

10  MR. VEEDER:  They are.

11  MR. SACHSE:  You are not distributing it to counsel?

12  MR. VEEDER:  You can take them.  And I want the record to

13  show I am offering you copies of them.

14  MR. SACHSE:  What I am trying to say is I would like to

15  get a set.

16  MR. VEEDER:  Yes, it is for you.  Christmas just went by.

17  And I think there is another copy there for Mr. Stahlman.  And

18  we have copies available.  I didn't know how many were going to

19  need them.

20  THE MASTER:  Those are copies of the U. S. --

21  MR. VEEDER:  U. S. Geological Survey records.  And maybe

22  the Clerk would give us the exhibit number.  I haven't yet got

23  a copy of the list of exhibits.

24  BY MR. VEEDER:

25  Q  Colonel Bowen, I hand you for identification M-54, and

1    ask you to state the name of the party to whom it makes refer-

2    ence and to state its contents.

3        Q  Plaintiff's Exhibit M-54 is the report of an engineering

4    investigation made on DeLuz watershed, Parcel Number 47.  The

5    names appearing on the cover of the report are Frank E. and

6    Anna A. Couch.  Referring to Plaintiff's Exhibit M-31, page

7    number 7, Parcel 47, DeLuz watershed, is followed by the names

8    Berg, Charles, also known as Burg, Carl; Couch, Frank E., and

9    Couch, Anna J.  I will encircle that information on M-31 with

10   a red pencil.

11       MR. SACHSE:  Those are my clients, your Honor.

12       THE MASTER:  The record will so indicate.

13       MR. VEEDER:  We offer M-54 in evidence.

14       THE MASTER:  It will be received in evidence as Exhibit

15   M-54.

16   BY MR. VEEDER:

17       Q  Will you step to M-32, Colonel, and kindly mark down

18   that exhibit, showing the location of M-54.

19       A  The area reported in Plaintiff's Exhibit M-54 is

20   delineated on Plaintiff's Exhibit M-32 and identified with the

21   number 47, encircled, within the exterior boundaries of the

22   property.  And I will mark that property with a red cross.  And

23   note that it is contained within Section 31, 8 South, 4 West.

24       Q  I hand you Plaintiff's for identification M-55, ask you

25   to state the name of the party to whom it has reference, and

42-L

106

1    then state the contents of it.

2        A  Plaintiff's Exhibit M-55 contains the report of an

3    engineering investigation of DeLuz watershed, Parcel 49.  And

4    referring to Plaintiff's Exhibit M-31, page 7, at the bottom

5    of the page is shown Parcel 49, DeLuz watershed, and the names

6    Butler, Lawrence William and Butler, Mary C.  And I will

7    circle that information in red.

8        MR. SACHSE:  In that matter, your Honor, that is not my

9    client.  However, this is a parcel where I anticipate contro-

10   versy between that land owner and a client of mine.  This

11   parcel is represented by Mr. Myers, who was here yesterday.

12   What do we do? I don't want to stipulate to the admission of

13   this.  I would like to reserve an objection or something.  I

14   don't know what is in it.  I have never seen the report.  And

15   there may be a controversy in this case, a very serious con-

16   troversy between two adjoining land owners.

17       THE MASTER:  I think the exhibit should be received in

18   evidence in the same manner in which the others have been

19   received.  The record will show that there may be a contention

20   between your client and the Butlers.

21       MR. SACHSE:  May I reserve then cross-examination of

22   Colonel Bowen and possible motions to strike on anything in

23   connection with this?  I don't know what is in it.

24       THE MASTER:  Yes.

25       MR. SACHSE:  As far as Butler is concerned --

407

1    THE MASTER:  Any of your rights, motion to strike or to

2  cross-examine Colonel Bowen, may be reserved.

3    MR. SACHSE:  Thank you.

4    THE MASTER:  By the way, Mr. Veeder, do you know whether

5  Mr. Myers will be here this afternoon?

6    MR. VEEDER:  No, he will not.  At least he said he would

7  not.

8    THE MASTER:  Is he expecting to return next week?

9    MR. VEEDER:  Yes.  He asked me to keep in contact with

10  him.  And as I understand it, he is going to call.  I can't

11  assume responsibility for him.  But we will be in touch with

12  him.

13    THE MASTER:  Then any cross-examination of Colonel Bowen

14  by Mr. Myers or also by Mr. Sachse can take place when Mr. Myers

15  is present next week.

16    MR. VEEDER:  There is an inquiry I would like to make,

17  strictly from the procedural standpoint.  Whether Mr. Sachse

18  contemplates filing pleadings or cross-pleadings in connection

19  with this matter.  If you have affirmative defenses or some-

20  thing like that, we would certainly like to know them ourselves.

21    MR. SACHSE:  Well, I may have exaggerated the seriousness

22  of it.  What it amounts to is two conflicting old-statutory

23  appropriations on the stream and a possible prescriptive right.

24  Now Mr. Myers and I are trying to work it out.  It may well

25  be stipulated to.  But as it stands today, there are no cross-

408

1  pleadings filed.  But we are both equally aware of the con-

2  flicting old appropriations, dating back prior to 1900 on these

3  two parcels.  And we are going to try to get together on it

4  between ourselves.  But if we don't, there may be a disagree-

5  ment and there may be cross-pleadings filed.

6      MR. VEEDER:  Conceivably there is a conflict with -- and

7  probably there is a conflict with us, then.

8      MR. SACHSE:  Well, I am still assuming -- I will speak now

9  only for my client, who has an appropriation.  I am still

10  assuming that you will be very much interested in the extent

11  and the validity of our appropriation.  I assume you will also

12  be very much interested in the extent and validity of the

13  Butler appropriation.

14      MR. VEEDER:  As I say, we are in an exploratory inquiry

15  here, so far as I am concerned.  If there are going to be

16  additional pleadings, it is conceivable that we will be

17  required to file a reply.  I don't know.

18      MR. SACHSE:  I can see no immediate need for additional

19  pleadings.  Mr. Butler showed me his yesterday.  He didn't give

20  me a copy.  And he has set forth both our claimed appropriative

21  right and his claimed appropriative right.  I have pleaded our

22  claimed appropriative right.  Now I don't think any further

23  pleadings are necessary in this case.

24      THE MASTER:  What is the name of the client whom you repre-

25  sent?

MR. SACHSE:  We get into more complications.  I filed my Answer in the name of Ross, who holds nothing but a trust deed on the property, because we couldn't get ahold of Anderson, the owner.  Anderson has filed a pro per Answer in this case.  And Anderson has asked me to represent him at the actual hearing.  He has finally gotten ahold of me.  So there is a pro per Answer from Anderson, an Answer by Sachse for Ross, and an Answer by Myers in behalf of Butler.

THE MASTER:  Well, in the absence of any objection from Mr. Veeder, certainly you will be permitted to appear and represent Mr. Anderson as well as Mr. Ross in connection with this.

MR. SACHSE:  The parcel I am referring to is the one immediately above it on your Exhibit M-31. It is Parcel 48.

MR. VEEDER:  Certainly we have no objection.  And I think it is highly desirable.  I think a crystallization of the issues might be important, though.

THE MASTER:  In this connection I take it you do not have any engineering report on Parcel 48; is that correct?

MR. VEEDER:  I don't know.  We will have to check it, or do we?

THE WITNESS:  No, sir.  We have none.

THE MASTER:  You are taking these in numerical order, apparently?

THE WITNESS:  Yes, sir.  May I see that?  No, not that one.

46-L

1   MR. SACHSE:  Are we taking this in numerical order?

2   THE MASTER: They seem to be, where they have them.

3   MR. SACHSE:  Except one startling exception, where I think

4   they passed and haven't introduced.

5   THE MASTER:  Very well.  M-55 has been received in evidence,

6   subject to the rights reserved by Mr. Sachse.

7   THE WITNESS:  We have some uncompleted surveys, and Parcel

8   48 is one of those.

9   THE MASTER:  Those uncompleted surveys will be offered as

10  soon as they have been completed, I assume?

11  MR. VEEDER:  That is right.

12  THE MASTER:  Do you anticipate that will be by next

13  Monday?

14  MR. VEEDER:  I will be governed pretty largely by Colonel

15  Bowen on that.

16  THE WITNESS:  I couldn't answer, your Honor, right at the

17  moment, because we are pretty well swamped with applications

18  for survey.  And we are trying to do them as rapidly as pos-

19  sible.  And I can inquire and let your Honor know Monday what

20  the status is on the DeLuz Creek investigations.

21  THE MASTER:  It would appear obvious that the hearings,

22  as far as DeLuz Creek is concerned, should not be concluded

23  until all those surveys have been completed.

24  MR. VEEDER:  I think that is true.  I think there may be --

25  you asked a question earlier about where we would go from here.

1   A man comes in and asks today for a survey.  He is certainly

2   entitled to it.  And it appears to me that there will be a

3   situation where we will leave DeLuz Creek to work elsewhere,

4   and perhaps reopen the record on DeLuz Creek to take any ad-

5   ditional evidence.  I see no other course now, because these

6   people are entitled to it.  And they are asking for it.  And

7   while we are doing all we can to try to get some more soil

8   scientists in, it is --

9        THE MASTER:  Very well.  We will have to proceed more or

10  less by ear.  It may be that the hearings will have to be

11  suspended temporarily and not held as frequently as I had

12  indicated yesterday.  In the event that it becomes necessary

13  to give more time for these soil surveys to be presented, so

14  that we can proceed and not jump back and forth too rapidly

15  from one tributary to another, if it appears that the DeLuz

16  Creek reports could be completed within a reasonable time I

17  would say it would be better to adjourn the hearings say for a

18  week, rather than to try to take on some other area for two or

19  three days and then come back to DeLuz.  Because that merely

20  confuses everyone.

21       MR. VEEDER:  It is a problem with which we are now con-

22  fronted, and one which we didn't anticipate in the form it has

23  taken, because we didn't realize so many people would ask.

24       THE MASTER:  Between now and next Monday, if you can try

25  to ascertain your best estimate how long it will take to get

48-L

412

1  these soil surveys completed.  I realize you can't do the

2  impossible.  If it is going to take two weeks or six weeks, we

3  want to know the correct answer, not to have an optimistic

4  guess.

5        THE WITNESS:  Sure.

6        MR. SACHSE:  Your Honor, this intrigues me at this time

7  very much.  Am I to understand that we are not going to trial

8  on this case today and that we are not getting ready to wind

9  up our case with the weaknesses and strengths that various

10  litigants may be able to prove, but that when we get half

11  through -- and again I will, let's say, talk about Butler and

12  Ross.  I think I have got a case as of now.  Now Ross's property

13  has not been surveyed.  Am I to assume that I have miscalculated

14  the strength and weakness of the case and we will continue

15  this case for six months and let any land owner around here who

16  wants to go ahead and have additional evidence brought in six

17  months later, or are we trying this issue now?

18        THE MASTER:  We are trying it as nearly as possible as of

19  now.  But in the cases where requests for surveys have been

20  made heretofore and because of lack of manpower have not been

21  completed, I don't see how we can in fairness to anyone close

22  the hearings on that area until the survey which has previously

23  been requested is completed.

24        MR. SACHSE:  Well, it is my understanding that these sur-

25  veys are not done by officers of the court, as it were, that

1    they are surveys done by the United States, out of the goodness

2    of its heart, for these defendants.

3        THE MASTER:  That is correct.

4        MR. SACHSE:  Now, I think it is the defendant's responsi-

5    bility to have his evidence in court when the case is set for

6    trial, and to roll on it.  And I don't think that we are to

7    drag this thing out for months and let somebody wait and wait

8    and wait and come in three or four or five months from now.

9    Some of these parcels that are up in the upper edge of the

10   stream may come in and ask for a report just before the case

11   is closed.  Then what happens?.

12       THE MASTER:  Well, I think the Court will have to be

13   guided by the time that the request was made.  But if the

14   request has been made at a seasonable time, I don't think the

15   Court will be justified in concluding the hearings pending the

16   completion of the report, merely because the government agency

17   was overtaxed.  Now I would be inclined to agree with you, if

18   the defendant waited for another three months before he even

19   asked for a report; that the conduct of the case should not be

20   held up pending the receipt of that report.

21       MR. SACHSE:  Now then, there is the additional factor

22   involved that goes beyond the individual defendants.  The United

23   States brought this cause for trial on its own motion.  Now I

24   think it is obvious to all of us, although all of the reports

25   are not yet introduced, that the cross-hatching on Exhibit M-32

50-L

1   is not going to cover the entire watershed.  It is obvious that

2   to whatever extent your Honor chooses to give it weight the

3   conclusions expressed by Colonel Bowen yesterday as to the

4   nature of the watershed, the types of soil, those things are

5   going to be less effective or carry less weight than if twice

6   the number of parcels were delineated on that map as having

7   been exhaustively examined.  And if three times the number had

8   been exhaustively examined, I presume his testimony would be

9   allowed still greater weight.  Now for how long is this door

10  open to the United States to continue to bolster its own case.

11      MR. VEEDER:  Well, now, if Mr. Sachse wants us to cease

12  taking soil surveys, he can go on record to that effect.  And

13  that suits me very well.  We are the plaintiffs.  And I have no

14  objection whatever undertaking to help the defendants with the

15  preparation of their case.  I think the national government is

16  very proper in doing so.  But I don't think that we should be

17  called upon to pick up the check by reason of that fact.

18      THE MASTER:  Mr. Moskovitz.

19      MR. MOSKOVITZ:  Your Honor, I find myself taking issue

20  with Mr. Sachse in urging a termination--in his urging a

21  termination of these soil surveys.  I think it has been well

22  publicized throughout the watershed that these engineering

23  reports are being made at the request of land owners by the

24  United States.  And I certainly feel if there is going to be

25  a cut-off date when the soil surveys--the engineering reports

1    may no longer be made for introduction in the case; that there

2    ought to be some warning to that effect.  And I think it is

3    very important that the United States continue to do this.

4         THE MASTER:  Well, I think that you are certainly right,

5    Mr. Moskovitz.  If there is to be any cut-off date, it should

6    be publicized.  And I am somewhat surprised that the suggestion

7    should be made that there should be any definite cut-off date.

8    This is a matter which I think will require some further con-

9    sideration.  It doesn't have to be decided today.  I would

10   suggest we proceed to introduce these additional surveys that

11   have been made.  And I will give the question raised by Mr.

12   Sachse consideration.

13        MR. VEEDER:  As I say, we don't want to be prevented by

14   this attack -- that is all I can call it -- on the United

15   States, because it is a gratuity that is being performed; that

16   the individual in all other lawsuits prepares his own lawsuit.

17        THE MASTER:  I don't think there has been any attack upon

18   the United States for making these soil surveys.  I think it

19   is a service which is helpful to the land owners.  You may now

20   proceed with your engineering reports.

21        MR. VEEDER:  I would like the record to show that I have

22   offered M-55 for some time back.

23        THE MASTER:  I believe it has already been received, but

24   if not it will now be received in evidence.

25

410

BY MR. VEEDER:

Q   Would you step to the Exhibit M-32 and mark on there the location of M-55?

A   The area reported on in Plaintiff's Exhibit M-55 is delineated on Plaintiff's Exhibit M-32 and identified with the numeral 49, encircled, and contained within the exterior boundaries of the property.   I will mark that with a red cross on Plaintiff's Exhibit Number M-32.   To further identify this parcel of land, it lies partly in Section 31, 8 South, 4 West, and partly within Section 6, 9 South, 4 West.

Q   And did you state the tributary?

A   The northerly portion of the property is traversed by Fern Creek.

Q   I hand you Plaintiff's for identification M-56, and ask you to state the name of the party to which it has refer- ence -- to whom it has reference, and to state the contents of that report.

A   Plaintiff's Exhibit M-56 contains the report of an engineering investigation of DeLuz watershed, Parcel Numbers 39 and 42.   At the time the survey was made these parcels were under -- apparently under one ownership, and subdivision -- or division of the property subsequent to the making of this report accounts for two parcel numbers.

Q   May I inquire, Colonel, are they separately analyzed? I mean are the surveys separately made?

417

A   The tabulations contained with the report relating to acreage of land classes and the summary showing the adapted crops under maximum development, duty of water and so forth, relates to the entire property.  But the front page of the report indicates that the property of Lloyd E. Klein, and Elizabeth Klein is the southeast quarter of the northwest quarter, and that Lewis J. Klein and Eleanor L. Klein have the remainder.  And the description of the property contained in the report is the southeast quarter of the northwest quarter, west half of the northeast quarter of the northwest quarter, the south half of the southeast quarter of the northeast quarter of the northwest quarter, and the northwest quarter of the northwest quarter, all in Section 29, Township 8 South, Range 4 West.  Referring to Plaintiff's Exhibit M-31, on page 6 appears, under Parcel 39, DeLuz watershed, the names Klein, Lloyd E. and Klein, Elizabeth.  I will encircle that in red. And on page 7 of Plaintiff's Exhibit M-31, appearing under Parcel 42, DeLuz watershed, at the top of the page are the names Klein, Lewis J.; Klein, Eleanor; Bank of America; and Thorkildsen, Ida May.  I will encircle that information with red.

THE MASTER:  Are any of the individuals to whom Colonel Bowen has referred present or are they represented by counsel?

MRS. BAXTER:  No, they are not here.

THE MASTER:  Apparently not.

54-L

418

1    MR. VEEDER:  We offer in evidence M-56.

2    THE MASTER:  It will be received in evidence as M-56.

3  BY MR. VEEDER:

4    Q  Would you step to the map, M-32, and mark the location

5  of that track?

6    A  The area reported on in Plaintiff's Exhibit M-56 is

7  delineated on Plaintiff's Exhibit M-32 and identified in part

8  with the number Parcel Number 39, encircled, within the

9  boundaries of the property; and in part with the number 42,

10  which parcel adjoins Parcel 39.  And the number 42 is encircled

11  and contained within the exterior boundaries of that parcel.

12  So I will mark both of those Parcels 39 and 42 in red.

13    Q  I hand you Plaintiff's for identification M-57 and ask

14  you to state the name to whom it has reference and to describe

15  the contents of that identification.

16    A  Plaintiff's Exhibit M-57 is a report of an engineering

17  investigation of the DeLuz watershed, Parcel Number 50.  The

18  name on the first page of the report is that of Samuel M.

19  Wilson.  Referring to Plaintiff's Exhibit M-31, on page 8, at

20  the top of the page, appears, under Parcel 50, DeLuz watershed,

21  the names Wilson, Samuel M. and Wilson, Hazel A.  I will

22  encircle that information in red.

23    THE COURT:  Are either Mr. or Mrs. Wilson present?

24    MR. SACHSE:  I believe Mr. Wilson is represented by Ray

25  Eberhard, your Honor.

1    MRS. BAXTER:  They were here yesterday, your Honor.

2    MR. SACHSE:  Eberhard is their counsel.

3    MRS. BAXTER:  But they are represented by counsel in Los

4    Angeles.

5    THE MASTER:  Yes.  I knew Mr. Eberhard represented a Mr.

6    and Mrs. Wilson.

7    MR. SACHSE:  This is it.

8    MR. VEEDER:  I offer M-57 in evidence.

9    THE MASTER:  That will be received in evidence as M-57.

10   I believe Mr. Eberhard plans to return next Monday.

11   MR. VEEDER:  He also asks that we be in touch with him if

12   there was any change.

13   BY MR. VEEDER:

14   Q  Would you mark that on M-32, Colonel?

15   A  The area reported in Plaintiff's Exhibit M-57 is

16   delineated on Plaintiff's Exhibit M-32 and marked with a

17   number 50, encircled, contained within the exterior boundaries

18   of the property.  And I now mark that property with a red cross.

19   Q  I hand you Plaintiff's for identification M-58, and

20   ask you to state the parties to whom it has reference and to

21   state its contents.

22   A  Plaintiff's M-58 is a report of an engineering investi-

23   gation made on DeLuz watershed, Parcel Number 51.  The names

24   appearing on the first page of the report are those of Mahlon

25   and Agnes Frank.  Referring to Plaintiff's Exhibit Number M-31,

1    on page 8 appears under Parcel 51, DeLuz watershed, the name

2    Frank, Agnes M., widow.

3        THE MASTER:  Mrs. Frank is not present in the courtroom.

4    Is she represented by counsel?  Apparently not.

5        MRS. BAXTER:  I don't know, your Honor.

6        MR. VEEDER:  We offer in evidence M-58.

7        THE MASTER:  It will be received in evidence as M-58.

8    BY MR. VEEDER:

9        Q  Will you step to the Exhibit M-32 and mark --

10       MRS. BAXTER:  She lives in San Marino.  Pardon me.

11       THE MASTER:  Thank you.

12       MR. VEEDER:  I think you can guess what I was going to

13   say, Colonel, so just go ahead.

14       THE WITNESS:  With reference to Plaintiff's Exhibit M-32,

15   the area reported on in Plaintiff's Exhibit M-58, is delineated

16   on M-32 and identified with the number 51, encircled, and con-

17   tained within the exterior boundaries of the property.  And I

18   will mark that on M-32 with a red cross.

19   BY MR. VEEDER:

20       Q  I hand you Plaintiff's for identification M-59 and ask

21   you to state the party to whom it has reference, and to state

22   what that identification contains.

23       A  Plaintiff's Exhibit Number M-59 is the report of an

24   engineering investigation made on DeLuz watershed, Parcel

25   Number 69.  The names appearing on the first page of the report

1    are Newton and Willie Mae Bryant.  And referring to Plaintiff's

2    Exhibit M-31, page 10, in the middle of the page, under Parcel

3    69, DeLuz watershed, appear the names Bryant, Newton, and Bryant,

4    Willie Mae.  I will encircle that information on M-31 with a

5    red pencil.

6        THE MASTER: I know that Mr. and Mrs. Bryant are not pre-

7    sent, because I prepared an Answer for them and they are not

8    here.  Nor are they represented by counsel.

9        MR. VEEDER:  Then I offer the identification M-59 in

10   evidence.

11       THE MASTER:  It will be received in evidence.

12   BY MR. VEEDER:

13       Q  Colonel Bowen, would you step to Exhibit 32 and locate

14   the exhibit on that?

15       A  The area of the property reported on in Plaintiff's

16   Exhibit M-59 is delineated on Plaintiff's Exhibit M-32 and

17   identified with the Parcel Number 69, encircled, and contained

18   within the exterior boundaries of the property.  And I will

19   mark that property with a red cross on Plaintiff's Exhibit M-32.

20       Q  I hand you Plaintiff's for identification M-60 and ask

21   you to state the name of the parties to whom that has refer-

22   ence and to state its contents.

23       A  Plaintiff's Exhibit M-60 contains the report of an

24   engineering investigation of DeLuz watershed, Parcel Number 71.

25   On the first page of the report is shown the names Frank J.

1   Chesmolovich and Patricia Ann Chesmolovich.  Referring to

2   Plaintiff's Exhibit M-31, on page 10, near the bottom of the

3   page, under Parcel 71, DeLuz watershed, appear the names

4   Chestmolowicz, Frank J.; Chestmolowicz, Patricia Ann.  Security

5   Title Insurance Company; Tomlinson, W. S. and Tomlinson, Lena

6   N.

7        MR. SACHSE: Mr. and Mrs. Chestmolovich are represented by

8   me, your Honor.

9        THE WITNESS:  I will encircle that information on Plain-

10  tiff's Exhibit M-31 in red.

11       THE MASTER:  Now the record will show that Mr. Sachse

12  represents Mr. and Mrs. Chestmolovich.  Do you offer the

13  report in evidence?

14       MR. VEEDER:  Yes.

15       THE MASTER:  It will be received as Exhibit M-60.

16  BY MR. VEEDER:

17       Q  Would you step to M-32 and mark the location of that

18  property on that exhibit?

19       A  The area of the property reported on in Plaintiff's

20  Exhibit M-60 is delineated on Plaintiff's Exhibit M-32 and

21  identified with the parcel number 71, encircled, and contained

22  within the exterior boundaries of the property.  And I now

23  mark that property with a red X on Plaintiff's Exhibit M-32.

24       Q  I hand you Plaintiff's Exhibit for identification M-61

25  and ask you to state the names of the parties to whom it has

reference and to state its contents.

A  Plaintiff's Exhibit M-61 is a report of an engineering investigation conducted on DeLuz watershed, Parcel Number 72, and contained on the first page of the report are the names Holsworth, Alfred and Holsworth, Helen E.  Referring to Plaintiff's Exhibit Number M-31, at the bottom of page 10, appears, under Parcel 72, DeLuz watershed, the names Holsworth, Alfred and Holsworth, Helen E.  I will encircle that information with a red pencil on Plaintiff's Exhibit M-31.

MR. SACHSE:  I am representing the Holsworths.

MR. VEEDER:  We offer M-61 in evidence.

THE MASTER:  It will be received in evidence, Exhibit M-61.

BY MR. VEEDER:

Q  Will you step, Colonel, to the Exhibit M-32 and locate M-61 on that exhibit.

A  The area of the property reported in Plaintiff's Exhibit M-61 is delineated on Plaintiff's Exhibit M-32 and identified with the Parcel Number 72, encircled, and contained within the exterior boundaries of the property.  I will now mark with a red cross the location of that property on Plaintiff's Exhibit M-32 and state that it is located in Section 8, Township 9 South, Range 4 West.

Q  I hand you Plaintiff's for identification M-62 and ask you to state the name of the parties to whom it has reference and to state its contents.

A   Plaintiff's Exhibit M-62 is the report of an engineering investigation made on DeLuz watershed, Parcel Number 77.   On the front cover of the report appears the names Dale L. and Emma G. Stinson.  Referring to Plaintiff's Exhibit M-31, on page 11, under Parcel 77, DeLuz watershed, appear the names Stinson, Dale L. and Stinson, Emma G.  I will encircle that information in red.

THE MASTER:  Mr. and Mrs. Stinson are not in the courtroom.  Are they represented by counsel?

MRS. BAXTER:  I don't believe they are, your Honor.  They are neighbors, of course, of all of us.  And they were here. I saw them Wednesday.  Mr. Stinson and Mrs. Ben Mosher are brother and sister, and they were here and came with Mr. and Mrs. Mosher Wednesday.  And I asked Mr. Mosher if he was represented by counsel and he said "No."

THE MASTER:  Thank you.

MR. VEEDER:  I am not going to move to strike this as hearsay.

THE MASTER:  Do you offer --

MR. VEEDER:  No, I am going to offer M-62.

THE MASTER: It will be received in evidence as M-62.

BY MR. VEEDER:

Q   Would you step to the Exhibit M-32 and mark on that exhibit the location of M-62?

A   The area reported on in Plaintiff's Exhibit M-62 is

425

1   delineated on Plaintiff's Exhibit M-32 and identified as Parcel

2   Number 77.  The number 77 is encircled, and lies outside of

3   the property reported on, but has a line extending from the

4   circle northward to indicate the property, which is a very thin

5   property.  And I will shade it in with a red pencil.  It is

6   located in --

7        Q   When you say "thin", you mean narrow?

8        A   Narrow.  It appears on the map as a pencil line.  That

9   is located in Section 5, 9 South, 4 West.

10       MR. VEEDER:  Now there are no further reports than those

11  that we have offered at the present time.  And I propose now

12  to -- hasn't 91 been offered?

13       THE CLERK:  That is 63.

14  BY MR. VEEDER:

15       Q   I hand you M-63, and ask you to state the parties to

16  whom it has reference and to state the contents of M-63.

17       A   Plaintiff's Exhibit M-63 contains the report of an

18  engineering investigation of DeLuz watershed, Parcel Number 91.

19  The names appearing on the first page of the report are those

20  of Bennie R. and Lura G. Mosher.  Referring to Plaintiff's

21  Exhibit M-31, on the last page, page number 13, near the bottom

22  of the page, appears, under Parcel 91, DeLuz watershed, the

23  names Mosher, Bennie R. and Mosher, Lura G.  I will encircle

24  that information with a red pencil.

25       THE MASTER:  Mr. Sachse, do you represent the Moshers?

1    They do not appear to be in court.

2         MR. VEEDER:  We offer M-63 in evidence.

3         THE MASTER:  It will be received in evidence as Exhibit

4    M-63.

5    BY MR. VEEDER:

6         Q  Colonel, I hand you Exhibit M-63 and ask you step to

7    M-32 and to locate it on that exhibit.

8         A  The area reported on in Plaintiff's Exhibit M-63 is

9    delineated on Plaintiff's Exhibit M-32, and identified with the

10   number 91, encircled, placed within the exterior boundaries of

11   the property.  And I will mark with a red X the location of

12   that parcel on Plaintiff's Exhibit M-32.

13        Q  Colonel Bowen, have you calculated the --

14        MR. SACHSE:  Can I go off the record and speak to Mr.

15   Veeder for a moment?

16        THE MASTER:  Surely.

17        (Discussion off record.)

18        MR. SACHSE:  I am sorry, your Honor.

19        MR. VEEDER:  May we go back on the record?

20        MR. SACHSE:  Yes.  I am sorry.

21   BY MR. VEEDER:

22        Q  Colonel Bowen, have you calculated the irrigable acreage

23   within the DeLuz watershed on the basis of the several land

24   classifications concerning which you testified yesterday?

25        A  Yes, I have.

1    Q   Would you state into the record the results of those

2   calculations?

3    MR. SACHSE:   I will object, if your Honor please.   No

4   possible foundation for a statement of the irrigable acreage

5   within the DeLuz. You have in front of you a visible repre-

6   sentation of the number of parcels of property on which the

7   United States has made these calculations.   And while I am not

8   as expert as Colonel Bowen at calculating acreage, I venture

9   to guess it is less than 10 percent of the watershed.

10   MR. VEEDER:   Your Honor, the foundation that was laid

11   yesterday went far beyond the investigations that are shown on

12   M-32.  Colonel Bowen at considerable length explained the kind

13   and types of soil surveys that can be made.   He referred to

14   the reconnaissance type.  He referred to the intensive type.

15   The very basis for asking this question was laid at that time.

16   Now what Mr. Sachse says may go to the weight that your Honor

17   would ascribe to this calculation by Colonel Bowen.   But

18   certainly it is inconceivable to me that there is no foundation

19   for that determination.

20   THE MASTER:  I think you are correct, Mr. Veeder.   This

21   does go to the weight of the testimony rather than the admis-

22   sibility.  The testimony yesterday with reference to Exhibit

23   M-37, I believe it was, the character of the soil, would

24   indicate at least a sufficient basis for the witness to express

25   an opinion upon the question which he has been asked.   You may

1    answer the question.

2    BY MR. VEEDER:

3        Q   If you have notes you would care to refer to, Colonel.

4        A   Yes, sir.  If I recall the question it was with regard

5    to the acreage of irrigable land by land classes within the

6    DeLuz watershed.

7        Q   That is correct.

8        A   And I would like to refer to notes to refresh my memory

9    in that regard.  With reference to Plaintiff's Exhibit M-37 and

10   M- -- and Plaintiff's Exhibit M-38, which gives the legend for

11   the colors and defines the land capability classes, I have

12   measured the areas in each of the land classes shown, section

13   by section, within the DeLuz Creek watershed.  May I approach

14   the exhibit?  It might be helpful --

15       THE MASTER:  You may.

16       THE WITNESS:  -- if I orient, your Honor, with respect to

17   the particular section.

18       THE MASTER:  Yes.  Please refer to Exhibit M-37 in con-

19   nection with your answer.

20       THE WITNESS:  Beginning in Section 17, Township 8, South,

21   Range 4 West, which is largely within the Santa Rosa Grant of

22   the Vail Ranch, a small triangular portion of it being outside

23   of the Vail Ranch and southerly of the Riverside line, contains

24   no irrigable land, but contains 39 acres of Class VII non-

25   irrigable land.  And the total area within that triangular

1   portion of Section 17, 8 South, 4 West, is 39 acres.

2   Referring to a portion of Section 18, 8 South, 4 West,

3   which lies southerly of the Riverside County line, that portion

4   of Section/has a total of 280 acres, and none of it is ir-

   18

5   rigable.  It is all Class VII land.

6   Referring to Section 19, 8 South, 4 West, the total area

7   of that section is 644 acres.  And it adjoins the Vail Ranch

8   and is also partly within and partly without the watershed of

9   the DeLuz Creek.  In that particular section there are 3 acres

10  of Class II land.  Correction.  I am in the wrong section.

11  19 is located south of 18, and this is Section 19, 8 South, 4

12  West, contains 3 acres of Class II land.  This little portion

13  here.  Cottonwood Creek traverses Section 19, roughly bisecting

14  it diagnonally, flowing southerly and easterly to its conflu-

15  ence with DeLuz Creek.  There are 3 acres of Class II land,

16  4 acres of Class IV land -- or III land, and 5 acres of Class

17  VI land.  The total irrigable acreage in Section 19 is 12, and

18  the remainder of 632 acres is non-irrigable, being Class VII

19  land.  It is largely Class VII land.

20  In Section 20, which adjoins 19 on the east, 8 South,

21  4 West, the total area of that section is 612 acres.  It con-

22  tains 69 acres of Class II land, the area shown in yellow.  52

23  acres of Class III land, this area shown in red.  And 47 acres

24  of Class IV land, the area shown in blue.  78 acres of Class VI

25  land, the area shown in orange.  The acreage of Class VII land

is 350, and Class VIII land is 16.  The total irrigable acreage

in this section is 246.  The non-irrigable acreage is 366.

In Section 21, 8 South, 4 West, the portion which lies

southerly of the Riverside County line, contains 385 acres,

of which 2 are Class II land, in this southwesterly corner of

the section.  37 acres of Class VI land and 346 acres of Class

VII land.  Giving a total irrigable acreage of 39 acres, non-

irrigable acreage, 346.  Now the portion of Section 22 which

lies southerly of the Riverside County line contains 123 acres,

of which 5 acres are Class II land, the yellow area; 20 acres

are Class IV land, the blue area; and 38 acres Class VI land,

the orange area; Class VII, 54 acres; Class VIII land, 6 acres;

giving a total irrigable acreage of 63; non-irrigable acreage,

60.

Referring to Section 26, a portion of which is within the

DeLuz Creek watershed, there are 495 acres of Section 26 within

DeLuz Creek watershed, and the remainder is outside of the

DeLuz Creek watershed in the Sandia Creek watershed.  The

portion within DeLuz Creek watershed of Section 26, 8 South,

4 West, contains 125 acres of Class II land, this large yellow

area here.  No Class III.  5 acres of Class IV.  No Class VI.

152 Class VII and 7 of Class VIII.  Total irrigable acreage is

130.  Non-irrigable, 159.

Referring to Section 27, as shown on Plaintiff's Exhibit

M-37, Section 27, 8 South, 4 West, it is noted that 4 acres of

1  Class II land are within the section, a small portion in the

2  northerly part of the section.  20 acres of Class IV land are

3  within the section.  20 acres of Class VI land are within the

4  section, and 588 acres of Class VII land, 8 acres of Class

5  VIII land.  With a total of 44 acres irrigable and 596 non-

6  irrigable.  The total area of the section being 640 acres.

7      Referring to Section 28, 8 South, 4 West, it is noted that

8  67 acres are Class II, the yellow area shown on Plaintiff's

9  Exhibit M-37.  42 acres are Class III, the pink area.  50 acres

10  are Class IV, the blue area.  And 46 acres Class VI, the orange

11  area.  419 acres of Class VII, the brown area.  And 16 acres of

12  Class VIII, the purple area along the thread of the stream.

13      Section 28 then has 205 acres of irrigable land, 435 acres

14  of non-irrigable land, a total of 640 acres in the section.

15      Section 29, which is in the -- you might say the heart of

16  the DeLuz Creek Valley, shown on Plaintiff's Exhibit M-37,

17  Section 29, 8 South, 4 West, contains 177 acres of Class II

18  land, the yellow area; 84 acres of Class III land, 110 of

19  Class IV land, 132 acres of Class VI land, 79 acres of Class

20  VII and 58 acres of Class VIII.  The total irrigable acreage

21  in Section 29 is 503, the non-irrigable area is comprised of

22  137 acres, for a total area in that section of 640 acres.

23      Section Number 30, Township 8 South, 4 West, contains 48

24  acres of Class II land in the easterly portion of the section,

25  20 acres of Class III land in the southeasterly portion of the

1    section, 51 acres of Class IV land in the south central portion

2    of the section, 168 acres of Class VI land in the general

3    southern half of the section, and 322 acres of Class VII land

4    and 32 acres of Class VIII.  The total irrigable acreage in

5    Section 30, 8 South, 4 West, is then 287, and the non-irrigable

6    acreage is 356.  The total for the section being 643.

7        Section 31, 8 South, 4 West, south of Section 30, and

8    traversed by Fern Creek, a tributary to the DeLuz Creek, con-

9    tains 16 acres of Class II land, 72 acres of Class III land,

10   19 acres of Class IV land, 70 acres of Class VI land.  And it

11   should be noted that all of these irrigable classes lie in the

12   easterly half of Section 31.  Non-irrigable acreage is comprised

13   of 453 acres of Class VII land, 11 acres of Class VIII land.

14   The total irrigable acreage in Section 31, 8 South, 4 West,

15   is 177, the non-irrigable 464.  The total area of the section

16   being 641 acres.

17       Section 32, 8 South, 4 West, contains some irrigable acre-

18   age, largely confined to the westerly half of Section 32.

19   Contains 40 acres of Class II land, 226 acres of Class III

20   land, 41 acres Class IV land, 65 acres Class VI.  And the non-

21   irrigable acreage is comprised of 244 acres of Class VII, 24

22   acres of Class VIII.  The total irrigable acreage is 372; non-

23   irrigable acreage 268.  Bringing the total area of Section 32,

24   8 South, 4 West, to 640 acres.

25       MR. VEEDER:  Your Honor, in view of the short lunch hour

69-L

433

1          THE MASTER:  I guess it is 12:00.  We will recess then

2     until 1:30.

3          (Noon recess.)

4

5                                        - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

234

1       <u>Fallbrook, California, May 27, 1958, 1:40 P.M.</u>

2

3       ADDITIONAL AFTERNOON APPEARANCE OF

        Curtis K. Price, Esq.
4                   For Fallbrook Public Utility District

5       COL. ALLEN C. BOWEN, resumed stand

6       DIRECT EXAMINATION    continued

7

8    BY MR. VEEDER:

9       Q  Will you proceed, Colonel, with your statement as to

10   acreage?

11      MR. VEEDER:  May I inquire one thing, your Honor?  In

12   regard to the tabulations that you mentioned, is it satisfactory

13   to set that up on a quarter section basis?  I would like to have

14   this in the record so I will be completely sure.  A quarter

15   section basis, with the record owner designated in regard to the

16   parcel, then the irrigated and irrigable acres.

17      THE MASTER:  As I understand, you are referring to an

18   Exhibit to be prepared which will show the analysis which Colonel

19   Bowen has made of the land in the watershed, to be shown--

20      MR. VEEDER:  In the De Luz watershed.

21      THE MASTER:  In the De Luz watershed, to be shown on a

22   parcel by parcel basis, provided that any parcel is more than a

23   quarter section  in area, it will also be further subdivided into

24   a quarter subdivision basis.

25      MR. VEEDER:  That is right.  It will be the smaller legal

b-2

1 | subdivision within the parcel. That will be the basis on which

2 | it is presented.

3 | THE MASTER: Yes. But if a particular owner has three

4 | acres, his three acres will be shown separately?

5 | MR. VEEDER: Yes.

6 | THE MASTER: Yes. Yes, I believe that is the form in

7 | which it should be presented.

8 | MR. SACHSE: Does it include the Vail property, may I

9 | ask?

10 | MR. VEEDER: No, I am going to ask some interrogation

11 | in regard to the Vail property before we leave what we are on

12 | now.

13 | THE MASTER: This is on the defendants' between Camp

14 | Pendleton and the Vail property.

15 | MR. SACHSE: All right. I don't want to foreclose Mr.

16 | Veeder from going ahead, but if you want to do it straight on

17 | an exhibit, I have no objection at all. Just prepare the exhibit

18 | and introduce it without having Colonel Bowen go over the whole

19 | thing in the record, unless you want.

20 | MR. VEEDER: He has reasons and so have I.

21 | MR. SACHSE: Go ahead. No objection.

22 | BY MR. VEEDER:

23 | Q And will you proceed?

24 | A Yes, sir. May I ask the reporter, your Honor, to con-

25 | firm the last section in which I described the areas?

b-3

1    MR. SACHSE:  To avoid copious notes, could we have a

2    copy of this?

3    MR. VEEDER:  Yes.  When he has made the divisions.  What

4    he is doing is testifying as to the exact ratio.

5    MR. STAHLMAN:  Do you expect to prepare an exhibit for the

6    purpose of illustration to show, for instance, the amount of

7    land that is riparian?

8    MR. VEEDER:  No.

9    MR. STAHLMAN:  You don't?

10   MR. VEEDER:  I would avoid that if I could, Mr. Stahlman.

11   I think it is a legal question and may come up in rebuttal.

12   I assume--here is my own observation.  The smallest legal sub-

13   division abutting upon the stream is my view of what is riparian.

14   MR. STAHLMAN:  Will you have this acreage then and tabula-

15   ted in the form of an exhibit for further illustration?

16   MR. VEEDER:  Yes.

17   MR. STAHLMAN:  What I am getting at is this, when we tie

18   into Vail Company, such an exhibit would be very helpful in order

19   to show the relationship of the land  and its water duty in

20   Vail as it relates to other land in that particular watershed.

21   MR. VEEDER:  Well, here is my view on that.  Again I think

22   this is the defendants' responsibility.  But we have that data.

23   I think we can go back to the patent.  We have the patent and

24   then we have the present parcel of land.  And it is our view if

25   there has been severance why, of course, the riparian character

b-4

1    has been lost.

2        MR. STAHLMAN:   In the final analysis, when findings are

3    made so that any judgments that may be entered may be operative

4    and effective, so we know what we are doing, there is going to

5    have to be that tied in together.

6        MR. VEEDER:   But you know, Mr. Stahlman, the Government

7    cannot assume the full responsibilities for the defendants in

8    regard to the riparian issue.

9        MR. STAHLMAN:   I understand that, but you did assume some

10   responsibility in regard to preparing these nice engineering

11   reports.   And it might work out the same way.

12       MR. VEEDER:   Well, I never thought I would be telling

13   the defendants what the riparian acreage is.

14       MR. STAHLMAN:   No, you won't.   I said for purposes of

15   illustration.

16       MR. VEEDER:   We will attempt to do it.   Is that agreeable

17   to my client?

18       THE WITNESS:   We can do it.

19       MR. VEEDER:   You can undertake that?

20       THE WITNESS:   Yes, sir.

21       MR. VEEDER:   If you would go ahead with this acreage.

22       (Record read.)

23       THE WITNESS:   In moving to Section 33, 8 South, 4 West,

24   referring to Plaintiff's Exhibit M-37, I note that Section 33 is

25   largely comprised of Class VII land, indicated by the brown

b-5

1  coloration.  However, it does have 46 acres of Class II land,

2  colored in yellow on Plaintiff's Exhibit M-37.  Thirty-two

3  acres of Class III land, shown by the pink areas.  Five hundred

4  and sixty-two acres of Class VII land.  The total irrigable

5  land, therefore, in that section is 78 acres, non-irrigable,

6  562 acres.  The total area of Section 33, 8 South, 4 West, being

7  640 acres.

8       Section 34, 8 South, 4 West, which is in the easterly and

9  central portion with respect to the north-south limits of the

10  De Luz watershed, is largely composed of Class VII land, indica-

11  ted by the brown color, with what amounts to an island of

12  irrigable land within the center of the section, and extending

13  westerly across the central portion of Section 34.

14       The Class II land is 40 acres in area.  The Class III land,

15  16 acres.  Class IV land is seven acres.  The total irrigable

16  land of 63 acres.  The area of the Class VII land is 577 acres.

17  That amount is non-irrigable.  The total area of Section 34,

18  8 South, 4 West, is 640 acres.  A portion of Section 34, 8 South,

19  4 West, is within the De Luz Creek watershed.  The remainder of

20  that section is in the adjoining watershed, Sandia Creek and

21  other tributaries.  All of the section is within the Santa

22  Margarita watershed.  But 107--173 acres is within the De Luz

23  Creek watershed, and that is all Class VII land, and hence non-

24  irrigable.

25       Moving into Township 8 South, 5 West, Section 13, a portion

b-6

1  of which is within the De Luz Creek watershed, it adjoins the

2  county line, with a portion lying southerly of the county line

3  and within the perimeter of the De Luz Creek watershed.  There

4  are 40 acres of Class II land shown in yellow, 24 acres of

5  Class III land shown in pink.  And 261 acres Class VII land.

6  The total area of Section 13, 8 South, 5 West, within the De

7  Luz Creek watershed is 414 acres.  Of that amount 64 acres are

8  irrigable and 261 acres are non-irrigable.

9       Section 14, 8 South, 5 West, a small portion only is in the

10  watershed of the De Luz Creek.  And of the portion within the

11  watershed there are four acres in the southeast corner of the

12  section which are Class II land.  The remaining area of Section

13  14, 8 South, 5 West, within the De Luz Creek watershed is Class

14  VII.  Forty acres of Class VII land.

15  BY MR. VEEDER:

16       Q  Colonel, could I ask you to return to Section 13, to

17  which you made reference, and calculate your acreage again.

18  I believe Mr. Dennis's figures add differently than yours.  Am

19  I right?

20       MR. DENNIS:  If I heard him correct, they don't add up.

21       THE WITNESS:  That is correct.  With reference to Section

22  14, Township 8 South, 5 West, the portion within the watershed

23  of De Luz Creek, I stated the irrigable land as 64, the non-

24  irrigable land 261.  The sum of those two values is 325 acres

25  within the watershed of the De Luz Creek.  I had previously

b-7

1   given an erroneous total.  So 414 previously given should be

2   corrected to read 325.  Thank you, Mr. Dennis.

3       In Section 14, four acres are considered irrigable and

4   40 acres are non-irrigable, a total of 44 acres within the

5   watershed of De Luz Creek.  The remainder of Section 14, 8 South,

6   5 West, is outside the watershed of the Santa Margarita River,

7   and hence outside of the watershed of De Luz Creek.

8       Section 23, 8 South, 5 West, a portion only is within

9   the watershed of De Luz Creek and the Santa Margarita River.

10  The remainder of the section lies outside of the watershed, as

11  shown on Plaintiff's Exhibit M-37.  For the portion of the water-

12  shed of De Luz Creek, 29 acres are Class II land, shown with the

13  yellow color.  Twenty-five acres are Class III land.  Two acres

14  IV land and IV acres are Class VI land.  The area of the Class

15  VII, or non-irrigable land, is 177 acres.  The area of irrigable

16  land is 80 acres.  The non-irrigable area is 177 acres.  The

17  total area of Section 23, 8 South, 5 West, within the watershed

18  of De Luz Creek, is 257 acres.

19      Section 24, 8 South, 5 West, is comprised of 640 acres,

20  all within De Luz Creek watershed.  Cottonwood Creek and its

21  tributaries rise in part within and flow through Section 24.  This

22  land is entirely Class VII land, 640 acres of non-irrigable land.

23      Section 24, 8 South, 5 West.

24      Section 25, which is south of Section 24, and within which

25  the headwaters of Camps Creek, tributary to the De Luz Creek,

b-8

1   arise, has three acres of Class VI land, located in the south-

2   east corner, and the remainder of that section is Class VII

3   land.   Six hundred and thirty-seven acres of Class VII land.

4   For a total of 640 acres in Section 25, 8 South, 5 West.

5        A portion of Section 26 is within the watershed of De

6   Luz Creek.   The remainder of the section is outside of the

7   watershed of De Luz Creek and outside the watershed of the

8   Santa Margarita River.

9        For the portion within the watershed of De Luz Creek,

10  14 acres, Class II land, shown by the yellow area in the north-

11  easterly portion of the section.   Forty-two acres are Class

12  III land.   For a total of 56 acres of irrigable land.   And the

13  remainder is Class VII, 529 acres of Class VII land, for a total

14  of 585 acres of Section 26, 8 South, 5 West, being within the

15  watershed of the De Luz Creek.

16       Section 35, 8 South, 5 West, joins the Naval Reservation,

17  Camp Pendleton, on the north and the Trabuco unit of the Cleve-

18  land National Forest on the south.   That is, the National Forest

19  land is to the north of Section 35.   The Naval Reservation is

20  to the south of Section 35, 8 South, 5 West, and the entire of

21  that section, 679 acres, is classified as VII land and is non-

22  irrigable.

23       MR. SACHSE:   What was the figure, please, 675?

24       THE WITNESS:   679, the area of Section 35, 8 South, 5 West.

25       MR. SACHSE:   You have got a 675 acre section there?

b-9

1    THE WITNESS:   679 acres.   There are many sections in the

2    watershed that are not rectangular.

3    MR. SACHSE:   Evidently.

4    THE MASTER:   You should see some of the sections farther

5    east.

6    THE WITNESS:   Now Section 36, immediately to the east of

7    the last named--also having a common boundary with its southern

8    line with the Naval Reservation, has an area of 653 acres, all

9    of which is Class VII land, and all of which is non-irrigable.

10   There is 653 acres of Section 36, 8 South, 5 West, which are

11   non-irrigable.

12   Township 9 South, 4 West, start with Section 2 on the

13   portion of which is within the watershed of De Luz Creek.  Sec-

14   tion 2,  9 South, 4 West, has 300--correction.  Has 31 acres of

15   Class VII land within the watershed of De Luz Creek.  And that

16   31 acres of Class VII land is non-irrigable.  The remainder of

17   Section 2, 9 South, 4 West, lies outside the watershed of De

18   Luz Creek, but within the watershed of the Santa Margarita River.

19   Section 3, 9 South, 4 West, lies partly within the water-

20   shed of De Luz Creek and partly without the watershed of De Luz

21   Creek.  The portion within De Luz Creek has 372 acres of Class

22   VII land.  There are, therefore, 372 acres of non-irrigable land

23   in Section 3, 9 South, 4 West, lying within the De Luz Creek

24   watershed.  None of the portion within De Luz Creek watershed

25   is irrigable.

143

b-10

1    Section 5, 9 South, 4 West--correction. I skipped Section

2  4.  Section 4, 9 South, 4 West, contains 30 acres in four separ-

3  ate bodies of Class III land, and the remainder of 634 acres is

4  Class VII land.

5  BY MR. VEEDER:

6    Q  Would you allude to the Exhibit to which you are

7  pointing every once in awhile, so that the record will show that

8  you are pointing to Plaintiff's Exhibit 37?

9    A  Yes, sir.  As shown on Plaintiff's Exhibit M-37.

10  Section 4, Township 9 South, 4 West, contains 30 acres of irri-

11  gable land, 634 acres of non-irrigable land, for a total of

12  664 acres in Section 4, 9 South, 4 West.

13    Section 5, 9 South, 4 West, is partly within and partly

14  without the Naval Reservation.  It is solely within the water-

15  shed of De Luz Creek, and the main stem of De Luz Creek traverses

16  Section 5, 9 South, 4 West, from north to south, as illustrated

17  on Plaintiff's Exhibit M-37.  This section shows 20 acres of

18  Class II land, 53 acres of Class III land, 20 acres of Class IV

19  land, 87 acres of Class VI land, 229 acres of Class VII land,

20  and 48 acres of Class VIII land.  The sum of the Classes that are

21  irrigable is 180 acres, located through the central portion of

22  the section, and oriented generally north and south through the

23  center of the section.  Two hundred and seventy-seven acres are

24  non-irrigable, and the remainder of that section is within

25  Camp Pendleton and is contained on another tabulation, your

b-11

1    Honor, which I will come to after this one.  So that that area

2    of 457 acres lies outside of the Naval Reservation known as

3    Camp Pendleton, and the total area of that section is 661 acres.

4    That is Section 5, 9 South, 4 West.

5         Section 6, 9 South, 4 West, also is partly within and

6    partly without Camp Pendleton.  The portion outside of Camp

7    Pendleton has 18 acres of Class VI land, 170 acres of Class VII

8    land, and four acres of Class VIII land.  The VIII is this

9    purple body that lies along the stream.

10   BY MR. VEEDER:

11        Q  On which Exhibit?

12        A  As shown on Plaintiff's Exhibit M-37.  The irrigable

13   acreage outside of Camp Pendleton in this section is 18.  The

14   non-irrigable acreage is 174.  The total area outside of Camp

15   Pendleton is 192 acres.  And the remainder lies inside Camp

16   Pendleton.

17        Reference to Section 7, 9 South, 4 West, partly within

18   Camp Pendleton and partly without Camp Pendleton.  The portion

19   outside of Camp Pendleton is Class VII land, 212 acres, and is

20   non-irrigable.  The remainder of the section, Section 7, 9 South,

21   4 West, lies inside Camp Pendleton.

22        Section 8, 9 South, 4 West, is partly within Camp Pendleton

23   and partly outside of Camp Pendleton.  With reference to Plain-

24   tiff's Exhibit M-37, it is noted that De Luz Creek bisects

25   Section 8, flowing in a southerly direction across the length of

b-12

1   the Section 8.  The area outside of Camp Pendleton has four

2   acres of Class III land, 221 acres of Class VII land.  Seven

3   and eight was combined in one.  Those are both non-irrigable.

4   I don't have a separate detail of the Class VIII land.  There

5   should be a purple strip adjoining the stream on Plaintiff's

6   Exhibit M-37.  The total irrigable land is four acres.  The

7   total non-irrigable land is 221 acres.  The remainder of Section

8   8, 9 South, 4 West, lies within Camp Pendleton.

9        The record should show that this Class VIII land in

10  Section 8, 9 South, 4 West, is entirely within Camp Pendleton,

11  and that is why it is not reported on this tabulation.  So this

12  figure I gave of 221 acres refers only to the Class VII land in

13  private ownership and lies outside of Camp Pendleton.

14       Section 9, 9 South, 4 West, partly within and partly

15  without Camp Pendleton.  The part without has 14 acres of Class

16  III land, as is shown by the pink area on Plaintiff's Exhibit

17  M-37, astride the hard surface De Luz Road which leads from the

18  town of Fallbrook to the community of De Luz.  There is one acre

19  of Class IV land in that same vicinity, and the remainder of

20  that section outside of Camp Pendleton is Class VII land, total-

21  ing 156 acres.  The total irrigable acreage in Section 9, 9

22  South, 4 West, outside of Camp Pendleton is 15 acres.  The total

23  non-irrigable is 156 acres.  The remainder of the sections lies

24  within Camp Pendelton.

25       Section 10, 9 South, 4 West, a small portion is outside of

b-12

#1

1   Camp Pendleton.   Correction, a small portion is within the

2   De Luz Creek watershed, but all of it within De Luz Creek water-

3   shed, as shown on Plaintiff's Exhibit M-37 lies within Camp

4   Pendleton, and hence there is no report on this tabulation.

5   Your Honor, that completes the coverages of the area of land

6   classed section by section as shown on Plaintiff's Exhibit M-37

7   in the De Luz Creek watershed, with the exception of the Vail

8   Ranch and the Naval Reservation.

9        THE MASTER:   I understand you have a separate tabulation

10   on the Naval Reservation.

11        THE WITNESS:   Yes, sir, I do.

12   BY MR. VEEDER:

13        Q   Will you proceed with that, unless, Colonel, it would

14   fit in better with the soil surveys.   Now I would like to have

15   all the De Luz land classification in together, irrespective of

16   where it is situated, unless there is some technical reason why

17   we can't proceed.

18        A   I have another tabulation for the Camp area, itemizing

19   section by section.

20        Q   Would you go ahead and finish that out, then?

21        MR. SACHSE:   If the Court please, I will object.   There is

22   absolutely no foundation on the Camp.   Mr. Veeder, you took

23   Colonel Bowen at great detail over the De Luz, what he did.

24   But you haven't told us one word about what soil studies have

25   been made within the Reservation.

b-13

1    THE MASTER:  Mr. Veeder, will you proceed on that basis

2  then?

3    MR. VEEDER:  That is very true.

4    THE MASTER:  Will you proceed on that basis then to lay

5  the foundation?

6    MR. VEEDER:  Yes, sir, I will.  I desire to have marked

7  for Identification a--what is that?

8    THE CLERK:  This will be 64.

9    MR. VEEDER:  64.  I hand you designation map symbols,

10  the M-64 marked for Identification, and ask you to state into

11  the record what that is.

12    THE WITNESS:  Plaintiff's Exhibit M-64, entitled map

13  symbols, is the legend which interprets the fractional symbols

14  used to illustrate the various factors taken into consideration

15  in a soil survey.

16  BY MR. VEEDER:

17    Q  Is that the established practice in the science of soil

18  surveys, to use that--

19    A  Yes, sir.

20    Q  --series of symbols?

21    A  This is an established practice.  It is a practice

22  which was developed and has been adopted nationwide and is called

23  the National Standard of Soil Surveys, for utilitarian type sur-

24  veys of this nature.  The legend as shown in Plaintiff's Exhibit

25  M-64 is attached to copies of the reports that are prepared for

b-14

1   defendants.   And the Exhibits--

2       Q   It is identical?

3       A   Yes, sir.   I should qualify that.   The science of

4   edaphology, as most other sciences, is subject to changes.   Its

5   knowledge increases.   And we have from time to time made some--

6   some changes, some additions, some deletions to this legend.

7   And it may vary in part with some of the legends affixed to older

8   investigations and reports.

9       MR. VEEDER:   Is there going to be any objection to the

10   symbols?

11      MR. SACHSE:   Not to that.

12      THE WITNESS:   Where we have made any changes which might

13   substantially affect the land's class, we have tried to get back

14   on those private properties we surveyed and bring them up to date

15   in accordance with our most recent legend.   This legend illus-

16   trates how the fractional symbol on soil surveys might be inter-

17   preted.   For example, the major soil characteristics are shown

18   on the upper part of the fraction, and limiting factors, such

19   as  the slope classes, errosion, wetness, salinity, frequency of

20   overflow and alkali are shown on the lower part of the fraction.

21      This gives an illustrative example of a symbol that shows,

22   with a line leading from number 2 in the depth column, the 2 in

23   the symbol would indicate the soil was 36 to 60 inches in depth.

24   The G as denoted by "G" in the texture modifiers column, would

25   denote a gravelly condition.   The L, as denoted in the column

b-15

1  entitled "Texture of Topsoil" indicates a light textured topsoil.

2  That would be sandy soils and sandy loams.

3     MR. VEEDER:  Does your Honor want to have further explan-

4  ation of that?

5     THE MASTER:  I think it might be advisable for the sake

6  of the record to explain this complete symbol.

7     MR. VEEDER:  Yes.

8     THE WITNESS:  The number 5 following the L, as indicated

9  in the column entitled "Permeability of Subsurface" is a moder-

10  ately rapid permeability, underlain by a 3.  The 3 following

11  the 5 indicates the moderately full permeability.  The permea-

12  bility decreases in the subsoil from moderately rapid to moder-

13  ately slow.

14     THE MASTER:  That is, the first figure in that instance

15  indicates the surface permeability and the second figure the

16  subpermeability?

17     THE WITNESS:  No, sir.  This permeability relates to the

18  subsoil as headed in the column "Permeability of Subsurface".

19  And where there is a significant change in permeability within

20  that subsurface section it is indicated by using two figures.

21  The permeability may increase or it may decrease.  In this

22  instance it decreases within the subsoil from a moderately rapid

23  rate to a moderately slow rate.  It indicates the rate of move-

24  ment of water through the subsoil.

25     THE MASTER:  And the first figure represents the higher

b-16

portion then of the subsoil?

THE WITNESS:  Yes, sir.  That is correct.  Then the final symbol in the upper portion of the fraction, in this instance of "Y", may be interpreted by referring to the final column entitled "Type of Underlying Material".  The Y indicates a claypan as the limiting factor in this particular soil.  That is revealed here by the decrease in permeability as you go down. It goes from moderately rapid to moderately slow to a dense claypan, which is the effective depth of the soil.  And that determines this depth, as shown by the first digit, number 2.

The lower portion of the fractional symbol may be interpreted by reference to the lower portion of the legend.  And the line leading from the 5C over to the "slope classes" indicate that the general slope--the first number, the 5, indicates the general slope as 5 percent.  And the C indicates the slope class.  It may range from 8 to 15 percent on moderately erodible soils  or  5 to 8 percent on highly erodible soils.

In this instance this would be a highly erodible soil and the 5 percent would place it in the class C rather than in the class B.

THE MASTER:  That is if it was a moderately erodible soil the 5 percent grade would be class B instead of class C.

THE WITNESS: Yes, sir.  That is correct.  There is a hyphen, another digit.  In this instance it is a 1 which indicates that slight errosion has occurred on this particular body of soil.

1 But the other erosion symbols here indicate varying stages of

2 erosion, from slight to very severe or very severely gullied.

3    MR. VEEDER:  I would like to have identified and offer

4 an aerial from which the Colonel could speak.  Then the symbols

5 would be more effective, your Honor.

6    THE MASTER:  Well, very well, you may offer that.  Then

7 he can complete the testimony on that.

8    MR. VEEDER:  I would like to do it, if I may.  Could I

9 make the offer on the symbol now, because I have had--

10    MR. SACHSE:  You have only got two more columns there.

11    THE MASTER:  I think we might as well offer the other.

12 Let him testify concerning both at the same time, then.

13    MR. VEEDER:  I would like to.

14    Plaintiff's Identification M-65 is a schematic showing of

15 a map--a map, rather, of the Santa Margarita River watershed

16 within Camp Pendleton.

17    Q  I hand it to you, Colonel, and ask you to explain.

18    MR. SACHSE:  May I have a look, Mr. Veeder?

19    MR. VEEDER:  Yes.

20    MR. SACHSE:  65.

21    MR. VEEDER:  You can follow through on this if you want

22 to.  Would you go ahead?

23    THE WITNESS:  Plaintiff's Exhibit M-65 is a reduction of

24 our base map of Camp Pendleton and the Naval Ammunition Depot

25 lying within the watershed of the Santa Margarita River.  The

b-18

grid shown on this map is the section grid with some land grants shown by dash lines.  The portion of the reservation boundary is shown by dash-dot lines.  And the Pacific Ocean appears in the lower right corner.  Now the--

THE MASTER:  The lower left corner?

THE WITNESS:  The lower left corner.  Excuse me, sir. The Pacific Ocean appears in the lower left corner.  The heavy continuous and irregular line which traverses the map diagonally from the upper right to the lower left, and subtending an area across the center of the map, is the watershed of the Santa Margarita River.  That appears on both sides of the watershed, the crest on both sides as it appears in Camp Pendleton as shown on this map.  And then there are irregular quadrilaterals, for the most part, which have in their lower right hand corner a number consisting of a 4, a dash, and four additional digits.

Now the numbers refer to the numbers of aerial photographs which were used as field sheets in making the soil survey of Camp Pendleton.  And the irregular geometric body, in which that number appears in the lower right corner, is the area of the Camp which was mapped on that photograph denoted by that particular number.

This is an aerial photo index of a 1955 aerial photo coverage, or of a portion of that coverage.

MR. VEEDER:  I would like to offer--

MR. SACHSE:  Before it goes in--I said I had no objection,

b-19

1    Mr. Veeder.   Your Honor please, it appears to me to the naked

2    eye that the watershed boundaries as delineated on this map

3    are entirely different than the watershed boundaries as delin-

4    eated on M-14.

5        MR. VEEDER:   The naked eye may not be effective.

6        MR. SACHSE:   It purports to be a map of the same area and

7    a grid of the same area.   I think we ought to have an explana-

8    tion, or else I will object to its admission.

9        MR. VEEDER:   You can ask him some questions.

10       THE MASTER:   I think this is offered as an index to the

11   aerial photograph.   It is admitted for that purpose.   If there

12   are any discrepencies between the watershed boundaries shown

13   on that exhibit and on M-37 they can either be explained or they

14   cannot be explained.   And that would affect the final decision

15   of the case.   But it would not affect the admissibility of this

16   document.

17       MR. VEEDER:   May I call to your Honor's attention, he has

18   been referring to M-14 rather than M--

19       MR. SACHSE:   M-14, yes.

20       MR. VEEDER:   Rather than M-37.

21       THE MASTER:   Quite right.   It should be M-14.   The objec-

22   tion will be overruled.

23       MR. VEEDER:   I make the offer of Plaintiff's Identification

24   M-65.   Have I made the offer of 64?

25       MR. BURBY:   Yes.

b-20

1    THE MASTER:   64 has not been offered yet.

2    MR. SACHSE:   There is no objection to 64.

3    MR. VEEDER:   I offer 64.

4    THE MASTER:   It will be received as M-64.

5    MR. VEEDER:   I would like to have this in before M-65.

6    THE MASTER:   And M-65 will be received.

7  BY MR. VEEDER:

8    Q   Now I hand you an aerial photograph marked M-66, Colonel

9  Bowen, and I ask you to state what that aerial shows.

10    A   Plaintiff's Exhibit--

11    MR. SACHSE:   Are those all in here, Bill?

12    MR. VEEDER:   Yes, they are.

13    THE WITNESS:   M-66 is an aerial photo.  Referring to the

14  index, your Honor, 4-0071, which is shown in this instance in

15  the upper right hand corner of Plaintiff's Exhibit M-66, is a pho-

16  tographic reproduction of one of the field sheets used in--

17  as a basis for making the soil survey of a portion of Camp

18  Pendleton and the associated Naval Reservation.

19    Plaintiff's Exhibit M-66 has a more or less rectangular

20  area outlined in the center of the photograph, with the numbers

21  of the adjoining photographs shown on the match line, for purposes

22  of placing these together.  For example, aerial Number 4-0070

23  joins this on the north and the other photographs numbered joins

24  it on the south, east, and west as indicated.

25    MR. VEEDER:   I would like the record to show that counsel

b-21

1   for Fallbrook, Mr. Sachse, Mr. Moskovitz and Mr. Stahlman have

2   been supplied with copies of the aerials and of the Plaintiff's

3   Exhibits M-64, 65 and M-66, before we proceed any further.

4       THE MASTER:  The record will so show.

5       MR. MOSKOVITZ:  Which is 66?

6       MR. VEEDER:  66 has not been offered yet.

7       THE WITNESS:  The north arrow in the lower right hand

8   corner of the photograph orients the picture with respect to

9   geographic grid.  Traversing the portion which was used in this

10  survey, running generally north and south across the area of

11  the map, is a dash-dot line, which is the watershed boundary of

12  the Santa Margarita River.  To the left of that dash-dot line

13  the area is outside of the watershed, and was not included in

14  this survey.  To the right of the watershed line the area is

15  within the watershed of the Santa Margarita River.  And the solid

16  lines drawn thereon are the contacts between the various soil

17  bodies determined by the field survey.  And within those contacts,

18  soil contact lines, are fractional symbols similar to the ones

19  that appear on the explanation on Plaintiff's Exhibit M-64.

20  And in addition thereto are Roman numerals, which may be keyed

21  to  Plaintiff's Exhibit M-38 for definition thereon.

22      MR. VEEDER:  Now I desire to have marked for Identification

23  --I would like to have those marked 67A and B, please.

24      MR. STAHLMAN:  Are those contained within this folder?

25      MR. VEEDER:  Yes, those are simply the line classification

b-22

1  areas.  It shows the symbols on these.

2       MR. SACHSE:  Are they in these?

3       MR. VEEDER:  Yes, they are.

4       Q  Colonel, I ask you to look at Plaintiff's Exhibit for

5  Identification 67A and B and state in the record what those

6  photographs represent.

7       MR. SACHSE:  Which is which?  Can you hold them up so I

8  can mark them on my--is that A or B?

9       THE WITNESS:  67A, the one without any trees or brush.

10  The one with some trees in the foreground, 67B.

11       Plaintiff's Exhibit 67A is an oblique photograph taken of

12  a portion of Camp Pendleton, and on that photograph are placed

13  black dashed lines and Roman numerals.  The Roman numerals indi-

14  cate the classes of land as they would be seen from the ground.

15  Offtimes it is easier for the lay person to visualize these

16  classes of land by utilizing such an oblique, giving them a pic-

17  ture of the capability classes as they normally appear to a

18  person, rather than as they are depicted on an aerial photograph.

19  BY MR. VEEDER:

20       Q  Now would you tie those symbols, tie them to Plaintiff's

21  Exhibit 38, to the end that the colors will be identified?

22       A  Yes, sir.  The roman numerals which appear within the

23  dash lines on Plaintiff's Exhibit 67A are defined on Plaintiff's

24  Exhibit M-38.  And the numerals shown on 67A are I, II, III, IV,

25  VI and VII.

b-23

1      Q   Land classifications?

2      A   Land classifications capability.  Plaintiff's Exhibit

3   67B is an oblique photograph of another portion of Camp Pendleton

4   usedfor the purposes of illustrating the land capability

5   classes in the same fraction as was done on 67A.  The dash lines

6   bound the classifications, and the Roman numerals I, II, III,

7   IV, VI, and VII are defined on Plaintiff's Exhibit M-38.  And the

8   colored code on Exhibit M-38 would be utilized to denote classes

9   on Plaintiff's Exhibits 67A and B.

10      MR. VEEDER:  I will make an offer of Plaintiff's Exhibits

11   67A and B.

12      THE MASTER:  Do you want to offer 66 also?

13      MR. VEEDER:  Yes, I do.  I desire to offer that first,

14   M-66.

15      MR. SACHSE:  Your Honor, I am going to object.  I hate to

16   be a pest.  But to me it seems this is absolutely immaterial.

17   We don't know where this land is.  I am certain that Colonel

18   Bowen isn't telling me every time I see a slope in this direction

19   like where Roman numeral VII, it is going to automatically be

20   VII land.  Or every time I see a flat it is going to be automa-

21   tically I land.  This has no bearing or weight whatsoever to

22   this proceeding, unless we know what land this is and get a

23   further explanation of it.  We are not saying that all land--

24      MR. VEEDER:  I don't believe that--

25      MR. SACHSE:  May I finish?  To look at 67B for a minute,I am

1  certain that Colonel Bowen won't tell me that every time there is

2  a hill rising in the middle that it is all automatically Class

3  VII.

4      THE MASTER:  I think that the Exhibits are admissible for

5  purposes of illustration to show the types of land.

6      MR. VEEDER:  That is all.

7      THE MASTER:  They are subject to any legitimate cross-

8  examination, and as far as being decisive in the case, they will

9  only be decisive in the case if they are identified with some

10 specific parcel of land, which may or may not be done in the

11 future.

12     MR. SACHSE:  Then I will object on the grounds of no

13 sufficient foundation, because I want to know where it is if I

14 am going to cross-examine on this.  This might be in Arizona,

15 for all the testimony we have before us.

16     THE MASTER:  The testimony is they are in Camp Pendleton.

17     MR. SACHSE:  Where?  I mean I would like to be able to

18 cross-examine on this.

19     THE MASTER:  I think you may cross-examine when the time

20 comes, Mr. Sachse.  The exhibits will be introduced in evidence.

21     MR. SACHSE:  Your Honor, how can I conceivably attempt to

22 cross-examine Colonel Bowen when I haven't any idea where in the

23 entire reaches of Camp Pendleton this parcel of property is.

24     MR. VEEDER:  That is the type of question.  You say, "Where

25 is it?"

MR. SACHSE:  I am saying there is no foundation.  I would like you to lay it so we will know what you are talking about.

MR. VEEDER:  I don't think you understand the object I have.

THE MASTER:  The foundation has been laid for the purpose for which the offer is made.  They are illustrative of the types of land, and no more, as I understand it, at the present time.  They certainly will not be considered as anything except as illustrations of views from the air and from the ground of different types of soil.  They are not offered--they are not received to show that any particular piece of land is type VII.

MR. VEEDER:  That is the whole and only reason, your Honor.  And if Franz would listen instead of talking he would have heard that.  I made the offer.

Now in regard to M-66 I desire also to make the offer of that aerial photograph.

THE MASTER:  It has been admitted.

MR. VEEDER:  It has?  66 was admitted?

THE MASTER:  Yes.  They were all offered together and admitted together.

MR. STAHLMAN:  So as to keep this straight, that M-66 is in this booklet A-0071.

THE WITNESS:  It is 4-0071.

MR. STAHLMAN:  4-0071.  Yes, 4.

MR. VEEDER:  As we go through these we will identify the

b-26

1   numbers, to the end that you can mark in your folders, which I

2   have given them, so there will be no--

3       MR. STAHLMAN:  I have everything now except the Exhibit

4   number of the map which keys the aerial photographs to the--

5       MR. SACHSE:  That is 64.  No, 65.

6       THE WITNESS:  M-65.

7       MR. STAHLMAN:  M-65.  Thank you.

8       THE MASTER:  Mr. Veeder, are Exhibits 67A and 67B portions

9   of land shown on M-66?

10      MR. VEEDER:  No, they are not.  No.

11      MR. STAHLMAN:  They are strictly--they were taken for the

12  purpose of assisting in identifying the classification.  That is

13  correct, isn't it?

14      THE WITNESS:  That is correct, yes, sir.

15      MR. STAHLMAN:  Let's see if we get this.  You went out--

16  I am talking to Mr. Veeder, if I may.  You took some photographs

17  of a plot of land which you thought would exemplify the character

18  and kind of lands with the complete numbers that you have desig-

19  nated from the land classification.

20      MR. VEEDER:  To the end they would be illustrative of our

21  key numbers.

22      MR. STAHLMAN:  That is all they are for.  They could be

23  taken in Australia or some other place.  It wouldn't make any

24  difference.

25      MR. VEEDER:  Well, the taxpayers might object.  But as far

b-27

1   as I am concerned, that is the way it is.

2      THE MASTER:  Each picture, as I see it, contains all seven

3   types of lands.

4      MR. VEEDER:  Would you go ahead and explain it?  Is that

5   correct?

6      THE WITNESS:  No, sir.  I believe neither of these shows

7   Class VIII, your Honor.  They run I, II, III, IV, VI and VII,

8   but no VIII is illustrated.

9      THE MASTER:  That is right.  There is no Class V.  So al-

10   though they go from I to VII they only show six types of land.

11      THE WITNESS:  Yes, sir.

12      THE MASTER:  In each picture.

13  BY MR. VEEDER:

14     Q  Now, Colonel, you were in the process of discussing

15   the symbols and you had not completed it.  And I ask that you

16   proceed to explain into the record the symbols and the meaning

17   of them, tying it back to Plaintiff's Exhibit 66 as you go.

18     A  Referring to Plaintiff's Exhibit M-64, I had just

19   completed describing the meaning of the symbols in the lower

20   part of the fraction, your Honor.  I had completed the erosion

21   factors.  And for purpose of illustration, a w1, which indicates

22   a slighly wet condition.  And an s1, which indicates a slight

23   salinity, as shown on the fractional symbol.

24     Plaintiff's Exhibit M-64.  Now this legend as shown on

25   Plaintiff's Exhibit M-64 can be used to interpret the symbols

b-28

1   appearing on Plaintiff's Exhibit M-66 in the following manner.

2       MR. SACHSE:   Now just a minute.   I am going to object.

3   There is absolutely no foundation as to who took 66, who drew

4   the lines on it.   Does Colonel Bowen know anything about this

5   or is he just taking down--reading back to us a study made by

6   someone else?

7   BY MR. VEEDER:

8       Q   Would you state, Colonel, the circumstances under

9   which the soil survey was made?

10      A   The soil survey of that portion of the Naval Reserva-

11  tion lying within the Santa Margarita River was made under my

12  direction and supervision.   I have been on every part of it.   I

13  have bored many holes in it myself and made many of the deter-

14  minations.   I am personally acquainted with all the work that

15  was done.   And I personally supervised and directed all the work

16  done in the preparation of this survey, both in the field and in

17  the office.

18      MR. SACHSE:   Is that true of all these photos, Colonel?

19      THE WITNESS:   Yes, sir.

20      MR. SACHSE:   No further objection.   You are very welcome

21  to my helping you make your case, Bill.

22      MR. VEEDER:   I want the record to show that 66 is in with-

23  out objection, Mr. Sachse.

24      MR. SACHSE:   It was received, until he started to talk

25  about it.   The photo went in.

b-29

1      MR. STAHLMAN:  May I ask a question on voir dire for the

2   purpose of understanding, and probably showing my density?

3

4                          VOIR DIRE EXAMINATION

5   BY MR. STAHLMAN:

6      Q  On Exhibit M-64 I believe I understand your explanation

7   with the exception of the lower right hand corner under the

8   column of "wetness".  Slightly wet, moderately wet, very wet,

9   extremely wet.  What does that mean?  Under what conditions or

10  how does that apply?

11     A  Well, Mr. Stahlman, that would apply to a cienaga

12  condition, as you know it in these mountainous areas, where

13  drainage is poor and water, which gathers in there during season

14  of high runoff and precipitation, doesn't drain out readily un-

15  less aided by artificial means.

16     Q  And yet that would be comparable to all other lands in

17  that area, would it be, or would it--or am I on the wrong track?

18     A  It is found in places throughout the watershed.  A

19  good example perhaps would be the Santa Rosa Grant on the Colo-

20  rado Mesa--Mesa de Colorado, where, during the rains and for

21  sometime thereafter  intermittent ponds appear.

22     Q  Oh.

23     A  Water ponds.  The water ponds in there and doesn't

24  drain off.

25     Q  Then it relates to the character of other land in

b-30

1   regard to its ability to retain moisture; is that it?

2        A   No, sir.  No, sir.

3        Q   I don't get it.

4        A   It is an absolutely wet condition where water stays for

5   so long it limits the capability of producing crops.

6   BY MR. VEEDER:

7        Q   Would that result from a high water table, Colonel,

8   or would that be an example of wetness?

9        A   No, sir.  It would be in the nature of an intermittent

10  pond.  It is not--it has little or nothing to do with the soil

11  retaining--with the moisture retaining characteristics of the

12  soil.  For example, a heavy clay soil will retain moisture for

13  a much longer period of time than will a coarse sand.

14       MR. STAHLMAN:  Yes.

15       THE WITNESS:  Or decomposed granite.  The water will drain

16  out through it rapidly.  That has nothing to do with this wetness

17  factor.

18  BY MR. STAHLMAN:

19       Q   Well, would it bear any relationship to its location

20  or topography?  Of course, the water would accumulate at that

21  point.

22       A   Yes, it is a phenomenon of topography, where you have

23  a sink along an  earth fault, for example.  You have these sinks

24  that don't have any outlet, and the water drains down into them

25  and stays there.

b-31

1    Q  Then this relationship between the 1, 2, and 3, desig-

2  nate the characteristics from extreme wetness to slightly wet

3  in relation to that ability to--

4    A  Yes, sir.  For example, slightly wet would mean that

5  in a period of time the water would stand on that particular area

6  for a fairly limited time.  And on the extremely wet area it

7  might be wet throughout the year so you couldn't farm it, with

8  the low lying areas there.

9    Q  It is not necessarily the character of the soil itself?

10    A  No, sir.

11    MR. MOSKOVITZ:  May I ask you some questions on that point

12  also?

13    THE WITNESS:  Sure.

14  BY MR. MOSKOVITZ:

15    Q  Are there any other objective standards such as numbers

16  of days or inches of water standing, something objective aside

17  from these adjectives, slightly, moderately, very and extremely

18  that you use in explaining these?  These are relative terms,

19  and I just wonder how you can determine by looking at something

20  where it fits, if it looks wet.

21    MR. VEEDER:  That is the great advantage of being an ex-

22  pert.

23    MR. MOSKOVITZ:  I would like for him to explain to me

24  what he knows as an expert, because I don't.

25    THE WITNESS:  That would be difficult to give you a bracket

b-32

1  of days.  All the land from time to time is wet, whenever it

2  rains.  And some lands occupy hillside locations and water drains

3  off from them rapidly, and off the surface and doesn't collect

4  on them.  But you get down into a sink or a depression, where

5  the water may run in there and stay for a considerable period

6  of time, you might call that extremely wet.

7  BY MR. MOSKOVITZ:

8      Q  What would a considerable period of time be, a few

9  months or a few weeks or a few days?

10      A  I would say several months.

11      Q  Several months?

12      A  Yes, sir.

13      Q  And that would be called extremely wet?

14      A  Yes, sir.

15      Q  And then suppose the water stayed for about a week,

16  what would you call that, or can you say that just by having that

17  one fact?

18      A  Well, the precipitation is highly variable, as you know,

19  in this area, and there may be some years or several years at a

20  time when there will be no wetness observed at all.  There will

21  be no water to accumulate, any significant amount.  So the

22  actual time in which water stands on there for any given year is

23  insignificant.  But the water standing on the area from time to

24  time over geological ages affects the nature and characteristics

25  of the soil.  And by boring a hole into these soils and observing

b-33

1  the phenomenon which results from wetness, one can determine

2  whether it has been affected slightly, moderately or extremely

3  by the wetness symbol, even though there may be no water present

4  on the particular site.

5     Q  I see.  So the way you determine which one of these

6  classes the soil fits into as to wetness is not by witnessing

7  water sitting on it, but by observing the characteristics of the

8  soil underneath.

9     A  That is correct.  The observation of wetness can be

10 determined by examination of the soil during a dry period of the

11 year.

12    MR. VEEDER:  May I proceed, your Honor?

13    THE MASTER:  Of course if Mr. Moskovitz is finished, I

14 think this would be a good time to take a short recess.

15    MR. MOSKOVITZ:  I am not finished, but I can resume later.

16    THE MASTER:  We will take about a ten minute recess.  Then

17 you can complete your examination.

18    (Recess.)

19    THE MASTER:  Mr. Moskovitz, did you wish to ask any further

20 questions?

21    MR. MOSKOVITZ:  I have a few more questions to clarify

22 the symbols on this Exhibit, I believe M-64.

23    THE WITNESS:  Yes.

24    MR. VEEDER:  The Colonel hasn't finished that yet yourself,

25 have you?  You were down to the wetness, I believe.

b-34

1    THE WITNESS:  Well, we were discussing wetness, and in

2    response to Mr. Moskovitz'question, with reference to Plaintiff's

3    Exhibit M-64, I would like to emphasize that the major soil

4    characteristics are shown in the upper portion of the legend,

5    and that below the solid line which .runs horizontally across

6    the central portion of the page appears certain modifying factors,

7    which may or may not appear in the symbol.  For example, wetness,

8    frequency of overflow, salinity and alkalinity may not even

9    apply to a particular soil site.  Erosion will always apply.

10   There is either no erosion or there is some erosion.  And we

11   will indicate by the proper symbol what stage, if any, acceler-

12   ated erosion occurred.  The same way with the slope classes.

13   Land is absolutely level or it has some slope.  So you would

14   always have a symbol showing the slope.  But these other modify-

15   ing factors, wetness--

16       MR. SACHSE:  May I interrupt one second on the slope,

17   Colonel?

18       THE WITNESS:  Yes.

19       MR. SACHSE:  That 5, is that a percentage figure, where it

20   says "5C"?

21       THE WITNESS: Yes, sir, 5C.  The number appearing with

22   the slope symbol is the general percent, or the predominant

23   percent in that particular soil site.  And to continue, these

24   four modifying factors shown in the lower right hand corner of

25   Plaintiff's Exhibit M-64, indicating wetness, salinity,

b-35

frequency of overflow and alkalinity, may not even be present.

And if they are present it is an additional factor to evaluate

the intensity of farming practices or grazing practices that may

be followed on that particular soil site.  Now, therefore, wet-

ness is observed in general terms.  The slightly, moderately,

very or extremely wet would denote the limitation in say, time

of cultivation that could possibly occur on that particular

site.  We might have a site that one year would be so wet that

it couldn't be farmed at all.  A good example perhaps locally

here would be on Highway 76, coming out of Oceanside, in the

area known the Guajome Ranch, G-u-a-j-o-m-e, at the point where

the Santa Fe--North Santa Fe comes out of Vista and intersects

State Highway 76.  There is a very low spot there, which some

years has a grain crop on it.  Some years is so wet it is im-

possible to put a grain crop in.  And that would be an extremely

wet example, where there were some years when it was impossible

to cultivate it at all.  Slightly wet might mean you couldn't

get your crop in until May, perhaps, when normally you would

put it in in April.  Or you might not be able to get it in

until say April when you would normally try to get it in in

March.  The effect of the slightly wet condition would be to

delay or hamper your farming practices to a slight extent.  And

the other extreme, called extremely wet, it would seriously

hamper the farming operations.

b-36

FURTHER VOIR DIRE

BY MR. MOSKOVITZ:

Q  Let me ask you some questions as to how you would describe the symbols relating to frequency of overflow.  Occasional, frequent and very frequent?

MR. STAHLMAN:  He hasn't come to that yet.

MR. MOSKOVITZ:  I thought you had finished with the whole thing.

MR. VEEDER:  I said he had not.

THE MASTER:  No.  Mr. Veeder was still examining him.

MR. VEEDER:  I had asked him to proceed in accordance with your desires, your Honor.

THE MASTER:  Yes, to explain the remaining factors appearing on the symbol page to which he had not made reference.

THE WITNESS:  The frequency of overflow is symbolized by s1, s2, s3, and described in that order as occasional, frequent and very frequent.  The overflow symbol is used on sites which are in or adjacent to intermittent stream channels.  And here again are some years when it might not overflow at all.  These very dry years, low precipitation and runoff. And other years where they might overflow and remain overflowed for considerable periods of time.  The lower the site in relation to the stream channel, the more subject it is to overflow.  And we would call it--the lowest site would be subject to very frequent overflow, meaning whenever water did run in the stream it would spread

b-37

1    across the surface of that site.  And the frequent overflow

2    would be limited to lands which were a little higher.  Some of

3    the lower flows might not rise sufficiently to flood the sites

4    more than--or as much as they would on the very frequent sites.

5    And the highest sites that were subject to any overflow at all

6    at say the highest stage of stream flow would be occasionally

7    subject to overflow.

8         To continue the explanation of these modifying factors,

9    where observed, salinity is indicated and symbolized as shown

10    on Plaintiff's Exhibit M-64 by the symbols s1, denoting slight

11    salinity; s2, denoting moderate salinity, s3, denoting severe

12    salinity.

13         There again there are no definite limitations to the

14    signs.  The symbol indicates the effect of the accumulation of

15    soluble salts on the production of crops on that site, and the

16    extent to which corrective measures must be taken.

17         Salinity, your Honor, is differentiated from alkalinity

18    in that a saline condition in a soil exists when the solids or

19    salts--soluble solids precipitate in such quantities that they

20    affect the yield from that particular soil site.  And alkalinity,

21    which is denoted by the symbols a1, slight; a2, moderate; and a3,

22    severe,        is a condition which arises from a saturation of

23    the cation exchange complex in the soil.

24         THE MASTER:  Of the what?

25         THE WITNESS:  Cation exchange, C-a-t-i-o-n  exchange

b-38

complex in the soil, formerly called the basic exchange complex

in the soil.  Which is, chemically speaking, the phenomenon of

whereby some ions are adsorbed--that is a-d-s-o-r-b-e-d--ad-

sorbed to the soil particles and set up a complex, a relation-

ship one to the other.  And where the cation exchange complex

has a high rate--has a high percentage of sodium ion, the pH of

that soil becomes highly basic.  In other words the pH will be

in the neighborhood of say eight and a half, eight to eight and

a half or more.  The higher the pH the more alkali the soil.

The lesser the pH, it tends toward an acidic condition.  Seven

would be neutral.  Less than seven would be an acidic, or there

would be a concentration of hydrogen ion over and above the

hydroxyl ion.  And if the pH is higher than seven, then the

hydroxyl ion exceeds the hydrogen ion.  It is a key to the

concentration of hydrogen ion in the soil.

BY MR. VEEDER:

Q  Now these criteria have been made applicable to each of

the reports we have introduced in evidence today with regard to

the areas of the De Luz district; is that right?

A  Yes.

(Discussion off record.)

THE MASTER:  Do you want to read where the Colonel was,

or do you remember?

THE WITNESS:  I remember, your Honor.

MR. VEEDER:  I had asked a question in regard to the soil

b-39

1  surveys which were made in the De Luz Creek area, and whether

2  the criterion concerning which you are now testifying--

3      THE WITNESS:  The same criterion in regard to which I am

4  now testifying was used in making the soil surveys in the De

5  Luz Creek watershed.

6  BY MR. VEEDER:

7      Q  Were those symbols made part of the record in each of

8  the exhibits?

9      A  Each of the exhibits which contain reports of our inves-

10  tigations contain soil survey maps on which these fractional

11  symbols reveal the nature of each soil site.  The site I am using

12  is s-i-t-e.

13      Q  You may proceed.

14      A  Perhaps to cut this brief, alkalinity is a much more

15  serious condition in a soil than salinity.  I mentioned that in

16  a saline condition the toxic salts are soluble and they can be

17  leached out or washed out with just the application of water.

18  But with alkalinity, a chemical situation exists and it is

#3  19  necessary to add a chemical amendment, such as gypsum.  This

20  is calcium sulphate.  Or sulphur or sulphuric acid.  Which will

21  exchange with the sodium ion in the cation exchange, which will

22  allow calcium in the soil to exchange with the sodium ion.  And

23  the sodium goes into combination with the sulphate, sodium

24  sulphate, then becomes soluble and leaches out and is released

25  from the cation exchange complex.

b-40

1       So with the alkaline condition then it is necessary to

2 go to additional steps in order to release the chemicals which

3 are limiting the yields from the land to a slight, moderate or

4 severe--in a slight, moderate or severe manner.  And in each of

5 those cases where alkalinity or salinity occur, we make tests

6 with a pH kit and other--and with chemical reagents to determine

7 the nature and character and degree of that alkalinity and

8 salinity.  And the condition by be alleviated by artificial

9 means.  Artificial--construction of artificial drains, either

10 enclosed drains or open drains.  Impoundment of water on the

11 surface to leach out the soluble salts.

12     Q  And now have you completed the symbol?

13     A  Yes, sir.  We have completed the description of the

14 legend as shown on Plaintiff's Exhibit M-64.

15     Q  Now, turning to Plaintiff's Exhibit M-66, I would like

16 to have you state, based upon your soil survey, the number of

17 irrigable acres that you found situate on that property.

18     A  I have, your Honor, a rough tabulation of acres of

19 land according to land use capability section by section within

20 the Santa Margarita watershed which lies within the Naval Reser-

21 vation.  But I have not tabulated that photograph by photograph.

22 In other words, I have no tabulation which would show the area

23 of irrigable land as revealed on this map.  But with reference

24 to this table I have it.  It gives the sections which appear on

25 here.

b-41

BY MR. VEEDER:

    Q   Would you proceed along that line then and state where those irrigable acres are found?

    A   If I might have access to the U. S. G. S. quadrangles, Plaintiff's Exhibit--

    MR. VEEDER:  You certainly may.

    THE MASTER:  33, isn't it?

    THE CLERK:  What number do you want?

    MR. VEEDER:  It is 33.  However, before proceeding that way I think it might save some time if we could mark each one of these aerials and get them in.  It will be the series M-66, and then this will complete the basic material upon which the soil surveys within Camp Pendleton were made.

    THE MASTER:  We have M-66, which is one aerial photograph, and 67A and 67B, which are the ground photographs.  Now do you wish to number these 66--

    MR. VEEDER:  A, B, C, D.

    THE MASTER:  A, B, C and D.

    MR. VEEDER:  Yes, your Honor.  That will be the 66 series then.  I would like to have them marked as 66A, B, C.

    THE MASTER:  Very well.  Then the next will be 66A.

    MR. SACHSE:  In other words, all the aerials, as I understand it, are to be in the 66 series.

    MR. VEEDER:  That is correct.

    THE CLERK:  This is 66A.

b-42

1    MR. VEEDER:  This will be 66A.

2    MR. SACHSE:  Have you got 66 by itself and then we go to

3  A?

4    MR. VEEDER:  66, and then 66A is the next.

5    MR. MOSKOVITZ:  Now what is the number?

6    MR. VEEDER:  I will have Colonel Bowen, when I hand it to

7  him identify the number and then you can mark it in your booklet

8  so there will be a complete cross-reference on each.

9    THE MASTER:  By the way, you don't have another book I

10  could have, do you?

11    MR. VEEDER:  I will get you one, your Honor.  You can use

12  this.  This is our working copy.

13    THE MASTER:  I don't need it right now, but--

14    MR. VEEDER:  Yes, we have them.

15    THE MASTER:  --for later use I would like one, so I will

16  not have to refer to the exhibits.

17    MR. VEEDER:  Yes, we have it for you.

18    MR. SACHSE:  Will you identify by the big numbers?

19    MR. VEEDER:  This is 66A.

20    Q  I hand it to you, Colonel, and ask you to identify the

21  number, to the end it can be correlated with the books that

22  counsel have.

23    A  Plaintiff's Exhibit 66A is a photographic reproduction

24  of aerial photo number 0070.  All of these have the figure 4

25  prefix.  It would be 40070.  Then shown on Plaitiff's Exhibit

b-43

1   66A is a quadrilateral, which is the match line or the area

2   within which surveys would be made on this particular photo-

3   graph, except that we limited the survey to the Santa Margarita

4   watershed only.  And in the lower right hand corner of the match

5   line is a dash-dot line which is the--along the crest of the

6   watershed of the Santa Margarita River.  Northerly and westerly

7   of that line there are no soil survey symbols, because that

8   area is out of the watershed.  And southerly and easterly of the

9   watershed line the soil sites are delineated and marked with

10  fractional symbols.  These numbers in the margin indicate the

11  numbers of the matching photographs.

12      THE MASTER:  Then this Exhibit 66A contains the area

13  immediately to the north of the area shown in Exhibit 66.

14      THE WITNESS:  That is correct, sir.

15      MR. VEEDER:  Then I will get you another map that we have

16  marked up.  I offer in evidence Plaintiff's Identification 66A.

17      THE MASTER:  It will be received as Exhibit M-66A.

18      THE WITNESS:  40070; is that the last one?

19      THE CLERK:  You want this 66B?

20      MR. VEEDER:  66B.

21  BY MR. VEEDER:

22      Q  I hand you Identification M-66B and ask you to state

23  what that is?

24      A  M-66B is a photographic reproduction of an aerial--

25  vertical aerial photograph, which has a match line extending from

b-44

1    the match line--

2         MR. SACHSE:   What is the number?

3         THE WITNESS:   Excuse me.

4         MR. SACHSE:   40072 is the number of this photograph.

5         THE WITNESS:  .The match line extends from the coast line

6    of the Pacific Ocean, which appears on the left of the photo-

7    graph, orienting the photograph with respect to north.   And

8    within the match line delineated on this photograph is an

9    irregular dash-dot line which marks the watershed of the Santa

10   Margarita River.   South of the watershed line and east of the

11   watershed line the soil sites are delineated, and their character

12   and nature is shown by the fractional symbols, with the Roman

13   numerals indicating land use capabilities as defined in Plain-

14   tiff's Exhibit M-38, shown thereon.   And through the central

15   portion of this photograph, running from left to right, is a

16   symbol indicating the Santa Margarita River, and showing the

17   confluence of the Santa Margarita River with the Pacific Ocean.

18        MR. VEEDER:   I offer 66B in evidence.

19        THE MASTER:   It will be received as M-66B.

20   BY MR. VEEDER:

21        Q   I hand you Defendant's  Identification 66C, and state

22   what that is.

23        A   You say "Defendant's Exhibit".   Let the record show

24   this is Plaintiff's Exhibit 66C.

25        Q   Did I say Defendant's M-66C?

b-46

1    A   I am sure you did.

2    Q   Plaintiff's Exhibit M-66C.  Thank you.

3    A   This is a triangular area bounded on--this is 4-0073.

4  This is a match line or triangular area bounded on two sides

5  by a match line and on the third side by the Pacific Ocean,

6  with the area between the match lines and the Pacific Ocean

7  lying north and west of the Santa Margarita crest line, showing

8  the soil survey symbols and the soil sites delineated by the

9  solid black line.

10    MR. VEEDER:  I offer into evidence--

11    THE WITNESS:  This particular aerial photograph contains

12  the boat basin at Camp Del Mar, a portion of Camp Pendleton.

13    MR. SACHSE:  Before you admit that, may I ask some voir

14  dire questions on this one?

15    THE MASTER:  Yes.

16

17                    VOIR DIRE EXAMINATION

18  BY MR. SACHSE:

19    Q   Colonel Bowen, the broken dash-dot line immediately

20  to the right of the boat basin in the photo is what you are

21  testifying is the watershed line in this area?

22    A   Yes, sir.  It is.

23    Q   Are you stating to this Court that there is no drain-

24  age whatsoever into the boat basin from any of that land?

25    A   No, sir.  I am not.

1    Q   Are you stating that everything within the photo OO--

2  within the photograph M-66C drains into the Santa Margarita

3  River?

4    A   No, sir.

5    MR. VEEDER:  I believe this is cross-examination, your

6  Honor.

7    THE MASTER:  The witness has not testified to that effect.

8    MR. SACHSE:  My point is if this is a photograph of some-

9  thing outside the watershed, your Honor, it is going to be

10  immaterial.

11    THE MASTER:  My understanding of the witness's testimony

12  is that the area to the west and north of the dash-dot line is

13  in the watershed.  The area to the south and east is out.  That

14  is what he so testified.

15    THE WITNESS:  Yes, sir.

16    MR. VEEDER:  In other words, --

17    MR. SACHSE:  What I want to do is establish-- I will drop

18  it.  The point again is this is the same question I raised

19  earlier.  There is a clear--let me make it for the record, then

20  I will forget it.  There is a clear differentiation or distinc-

21  tion between exhibits being offered by the United States.  You

22  have got three different ones now as to what the extent and

23  shape of the watershed is.  And since irrigable land is extremely

24  important in this case I would  think as soon as possible we

25  ought to settle this question of where the watershed line is.

b-48

1    This exhbit delineates a different watershed line than does M-14.

2        MR. VEEDER:  Your Honor, I submit this is cross-examination.

3    He can put in his own case.  I don't know what we are doing

4    now.

5        THE MASTER:  Yes.  I think Mr. Veeder is correct in that

6    the United States can introduce exhibits which purport to show

7    the watershed line, even though they be inconsistent with each

8    other.  That can be brought out on cross-examination, if there

9    is an actual inconsistency.  Are you offering the exhibit?

10       MR. VEEDER:  Yes, I have offered the exhibit.

11       THE MASTER:  It will be received as Exhibit M-66C.

12   BY MR. VEEDER:

13       Q  I hand you Identification Plaintiff's 66D, and ask

14   you to state what that is.

15       A  Plaintiff's Exhibit 66D is a photographic copy of an

16   aerial photograph numbered 40084.  And depicted thereon between

17   a heavy straight dash-dot line, and labeled the Naval Reservation

18   boundary, and a lighter solid grey line, which is the match line

19   of the photograph, a portion of the Naval Reservation as shown

20   within the Naval Reservation boundary and the match line.  And

21   a symbol designating the soil site depicted on this portion of

22   the Camp is shown.

23       Roblar Creek, tributary to the De Luz Creek, traverses

24   from--or enters the Naval Reservation within the limits of the

25   photograph, and traverses the section within the Reservation

b-49

1 and the match line, continuing on beyond to its confluence with

2 De Luz Creek.

3     Roblar Creek being a major tributary of De Luz Creek.

4 And the confluence of Roblar Creek is within the Naval Reserva-

5 tion boundary.

6     MR. VEEDER:  I offer--

7     THE MASTER:  Just a minute.  I think it should be explained

8 --the record may be a little ambiguous--there are actually two

9 areas shown on this map that are within the reservation; is that

10 correct?

11     THE WITNESS:  Yes, sir.

12     THE MASTER:  The testimony referred to one area and then

13 referred to the creek area.  That is also within the reservation,

14 but is a separate area on the map.  Is that correct?

15     THE WITNESS:  The small triangular area on the lower left

16 hand corner of the map to which your Honor refers--

17     THE MASTER:  That is also within the reservation.

18     THE WITNESS:  Yes, sir.  That is also within the reserva-

19 tion.

20     MR. MOSKOVITZ:  I can't read that.

21     MR. VEEDER:  Well, put on your bifocals.

22     THE MASTER:  That is all.

23     THE WITNESS:  I might explain into the record that there

24 are section corners located on this particular aerial photo-

25 graph.  They are indicated by a black--a small black cross, and

b-50

1   the numbers placed in the  arms of the cross indicate the sec-

2   tions.

3       MR. VEEDER:  That has been admitted, your Honor?

4.      THE MASTER:  No, it has not been.

5       MR. VEEDER:  I offer it.

6       THE MASTER:  It will be received as Exhibit M-66D.

7   BY MR. VEEDER:

8       Q  I hand you Plaintiff's Identification 66E and ask you

9   to state into the record what it is.

10      A  Plaintiff's Exhibit M-66E is a photographic copy of

11  aerial photograph 0085, and contains an irregularly shaped area

12  delineated by a grey line, which is the match line of the

13  photograph.  And traversing the area within the match line is

14  an irregular dash-dot line, which follows the crest of the

15  watershed of the Santa Margarita River.  There is also in the

16  upper left hand corner of the area, within the match line, a

17  V-shaped dash-dot line, which is composed of straight lines,

18  and labeled the Naval Reservation boundary.  The area contained

19  in the V is outside of the Naval Reservation, and was not included

20  on this survey.  Also on this Plaintiff's Exhibit M-66E it is

21  noted that Roblar Creek appears in the upper right hand corner

22  of the area within the match line, flowing across from the north-

23  east--the northwest to the southeast, and continuing on down,

24  appearing again in the lower right hand corner of the match line

25  area.

b-51

1        MR. VEEDER:  We offer Identification 66E.

2        THE MASTER:  It will be received as Exhibit M-66E.

3    BY MR. VEEDER:

4        Q   Colonel, I hand you Identification 66F and ask you to

5    state into the record what it is.

6        A   Plaintiff's Exhibit M-66F is a copy of aerial photo-

7    graph number 4-0086.  Shown on this copy is an irregular quadri-

8    lateral, shown by a grey line.  And in the upper left hand--

9    in the upper right hand corner of the quadrilateral is an

10   irregular dash-dot line, which is the crest--a portion of the

11   crest of the Santa Margarita watershed.  And the area depicted

12   to the east and north of the watershed line is within the water-

13   shed.  The remainder of the area within the match line is out-

14   side the watershed of the Santa Margarita River.

15       MR. VEEDER:  We offer 66F.

16       THE MASTER:  It will be received in evidence as Exhibit

17   66F.

18       MR. MOSKOVITZ:  I would like to ask a question.  I am

19   confused now in relating 0086, or M-66F  to M-65, this base

20   map, as showing where the photographs are.  I am not objecting,

21   just asking a question of the witness, just to relate the two

22   for me.

23       THE MASTER:  Is this off the record?

24       MR. MOSKOVITZ:  This is off the record, just to clarify

25   my own mind.

b-52

1        (Discussion off record.)

2            MR. MOSKOVITZ:  Maybe we had better get it on the record.

3            MR. VEEDER:  If we get something on the record, I want you

4    to get it in by cross-examination.

5            MR. MOSKOVITZ:  I think this is proper voir dire, just

6    to clarify what this is.  And the witness just indicated--

7            MR. VEEDER:  I never heard of voir dire being used to

8    clarify an exhibit.

9            MR. MOSKOVITZ:  That is just the purpose of it, to clarify

10   the exhibit before it is introduced in evidence.

11           MR. VEEDER:  Go ahead.

12           MR. MOSKOVITZ:  I am not--

13           MR. VEEDER:  Your Honor, so far as I am concerned the

14   witness has been entirely qualified.  There is no doubt about

15   the competency or the admissibility of these exhibits.

16           THE MASTER:  No.  I think, though, Mr. Moskovitz's point,

17   as I listened to the conversation between him and the witness,

18   might be made for the sake of the record to explain an apparent

19   inconsistency between Exhibit M65 and these other exhibits.

20   And I think the statement that the witness gave to Mr. Moskovitz

21   should go into the record at this time.

22           MR. MOSKOVITZ:  I will ask the question.  Would you explain

23   --

24           THE WITNESS:  May I see the exhibit, please, M-66?

25           THE MASTER:  F?

b-53

1    THE WITNESS:  F.  Thank you.

2    MR. MOSKOVITZ:  Would you explain the relationship be-

3    tween the straight lines which seem to outline an area on M-66F

4    and the straight lines that seem to outline an area on M-65,

5    which include within those straight lines the numbers 4-0086.

6    THE WITNESS:  Plaintiff's Exhibit M-65 is for the purpose

7    of showing the relationship of the photographs one to the other,

8    as indicated in the title block of M-65.  This is an aerial

9    photo index.  And the relationship of the photograph one to the

10   other is the only reason for the preparation of this.  If you

11   wanted to locate the aerial photo covering that particular

12   portion of the Camp, you would refer to the index.  You would

13   see 40086, and you would pick this up.  If the information isn't

14   on that, you will note on 40086, or Plaintiff's Exhibit 66F,

15   that the adjoining map on the right is the number of the adjoin-

16   ing map on the right, 40112 as shown, and you can move to that.

17   It is simply an index.  The irregular areas shown with the

18   number of the picture in the lower right hand corner on Plaintiff's

19   Exhibit M-65 is not necessarily the area shown on the photograph

20   itself.  You will note even that that area on M-65 which has

21   40086 in the lower right hand corner does not conform in shape

22   to the shape of the match line on M-66F.  So it purely for

23   location purposes in the index.

24   MR. MOSKOVITZ:  That is what I wanted to clarify.

25   THE MASTER:  In other words, M-65 does not purport in

b-54

1    itself to indicate the precise boundaries of each of the M-66

2    Exhibits.

3        THE WITNESS:  No, sir.  It is simply a guide that will get

4    you close to the area that you are interested in.  You can look

5    at this and, for example, would like to see the photograph that

6    contains Lake O'Neill, refer to Plaintiff's Exhibit M-65, note

7    that Lake O'Neill is approximately in the center of that exhibit,

8    and to the right of Lake O'Neill the number 4-0110 appears,

9    and that photograph would have the image of Lake O'Neill on it.

10   Similarly the photograph below, 4-0109, would have the image

11   of Lake O'Neill.  It might be helpful to explain how a photo-

12   grammetric survey is set up.

13       MR. VEEDER:  It is up to your Honor.  If you want it, it

14   might be helpful.

15       THE MASTER:  I think it might be helpful for the purpose

16   of the record.

17       MR. VEEDER:  May I make an offer of 66G?

18       THE MASTER:  That hasn't even been identified yet.

19       MR. VEEDER:  Well, I want to get it in evidence.  Then I

20   will be through with my marked exhibits.

21       THE MASTER:  I see.  Very well.

22   BY MR. VEEDER:

23       Q  I hand you Identification 66G and ask you to state

24   into the record what that represents.

25       A  This is a copy of aerial photograph number 4-0087, and

b-55

#4

1   it shows an irregular area bounded by a grey straight line,

2   which is the match line within which surveys were to be made.

3   On the right of the area within the match line is a dash-dot

4   line, which is the watershed of the Santa Margarita River.

5   Between the watershed line and the easterly match line, soil

6   sites are delineated and identified by fractional symbol.  The

7   remainder of the area within the match line is outside of the

8   Santa Margarita River watershed, and there are no soil sites

9   depicted thereon.

10       MR. VEEDER:  I offer Plaintiff's Exhibit 66G.

11       THE MASTER:  That will be received.

12       MR. SACHSE:  Is it clear in the record, Colonel, the

13   drainage in this is from left to right?  I don't think you said

14   so.  But I think I know, in that photograph.  In other words,

15   the drainage is from the left to the right, is it no?

16       THE MASTER:  The area to the east of the line?

17       MR. SACHSE:  To the east of the line is in the watershed.

18       THE WITNESS:  Yes, sir.

19       THE MASTER:  That is in the record.

20       MR. VEEDER:  I will take that.

21       THE MASTER:  Colonel, at this point I think it might be

22   well for you to explain the system followed in taking these

23   photographs and the photogrammetric system.

24       THE WITNESS:  Yes, sir.  In writing specifications, your

25   Honor, for an aerial  flight to be used for photogrammetric

purposes, among other things the altitude or elevation at which the aircraft will fly over the area being photographed is desig- nated, generally around twelve and a half to 14,000 feet above the surface of the ground.  And it is specified exposures will be made with approximately 60 to 65 percent overlap in line of flight.  In other words, we will take--referring to Plaintiff's Exhibit M-65, you see 40108 in the lower central portion, and above that is 40107, which overlaps 108, 60 to 65 percent. And above that 106 overlaps 107 about 60 percent.  So that actually a small portion of 106 image--what is shown on 106 will appear two photographs away on 108.  The reason for that is that the camera in photographing an object on the ground has a curved lens, and an exact image is made at the center of the axis of the lens  where it would intersect the earth, and then slight-- you might say slight errors in scale occur in relation to the distance from the center of axis of the lens.  As you get fur- ther away from the center of the photograph, therefore the measurements to be made on the picture itself become increasingly erroneous.  So the object in utilizing photographs such as these for field surveys is to confine the  mapping only to the central portion of the photograph where the most accurate panmetric measurements may be made.  Hence every photograph is used in line of flight, even though--may I see one of those, please?  Now I am referring to Plaintiff's Exhibit M-66G, for example, 40086 would lap over approximately two-thirds of the distance of 40087,

b-57

1  which is Plaintiff's Exhibit M-66G.  And it would be possible to

2  utilize the portion outside of the match line for designating

3  the soil sites, but the accuracy of the measurements made become

4  of much lower value as you depart from the central area.  The

5  overlapping line of flight is specified to be 25 percent, so that

6  it is possible here to get a quarter of the image shown on the

7  photograph represented by Plaintiff's Exhibit M-66G to appear

8  also on this photograph number 4-0111.

9       THE MASTER:  I think that is sufficient.

10 BY MR. VEEDER:

11      Q  I hand you Plaintiff's Identification M-66H, and ask

12 you to depict what is shown on that Identification.

13      A  Plaintiff's Exhibit M-66H is a reproduction of photo-

14 graph number 40088, an irregular quadrilateral, shown by a grey

15 line drawn on the photograph, and in the easterly portion of this

16 match line area--the grey line being a match line--is shown an

17 irregular black dash-dot line which marks the crest of the water-

18 shed--a portion of the crest of the watershed of the Santa

19 Margarita River.  To the right of the watershed line the soil

20 sites are shown and identified with the fractional symbols and

21 Roman numerals heretofore mentioned.  The area to the west, or

22 to the left of the line, orienting north to the south, is out-

23 side of the watershed of the Santa Margarita River.  The surface

24 drainage in the area shown within the Santa Margarita River

25 watershed is from left to right, as shown on this particular

b-58

1   photograph.

2        MR. VEEDER:  I offer Identification 66H.

3        THE MASTER:  It will be received in evidence as M-66H.

4        MR. STAHLMAN:  May I ask a question off the record?

5        (Discussion off record.)

6        THE MASTER:  We are back on the record now.

7   BY MR. VEEDER:

8        Q  I hand you Plaintiff's Identification M-66I, and ask

9   you to state into the record what is represented by that Identi-

10  fication.

11       A  Plaintiff's Exhibit M-66I is a reproduction of aerial

12  photograph number 40089.  On this photograph is revealed an

13  irregular straight line boxing in an area.  The line--grey line

14  is the match line for this photograph. And running across from

15  north to south, to the match line area, is a dash-dot line, which

16  is the watershed--the crest of the watershed of the Santa

17  Margarita River.  The area to the right of the crest line shows

18  the soil site delineations and identifies them by fractional

19  symbols, the drainage being from the watershed line to the right

20  and to the south.  To the east and to the south, to the left of

21  the crest line, the area is outside the watershed of the Santa

22  Margarita River.  And the box-like area in that Aliso Canyon is

23  a rifle range.

24       MR. VEEDER:  I offer M-66 I.

25       THE MASTER:  It will be received in evidence as M-66I.

b-59

1  BY MR. VEEDER:

2       Q  I hand you Plaintiff's Identification M-66J and ask

3  you to state what that is.

4       A  Plaintiff's Exhibit M-66J is a copy of aerial photo-

5  graph number 40090.  Now this photograph has a match line.  It

6  is roughly rectangular, grey.  And in the extreme left hand

7  side--across the left hand portion of the match line an irregular

8  dash-dot line in shown, and that is the crest of the Santa

9  Margarita watershed.  The area between the match line and the

10  --between the left hand match line, orienting the picture to the

11  north, and the watershed line is outside of the watershed of the

12  Santa Margarita River.  And no soil sites or symbols are shown

13  thereon.  The remainder of the area is within the watershed of

14  the Santa Margarita River.  The soil sites are delineated. They

15  are identified by fractional symbols.  And the land capability

16  classes, as identified in Plaintiff's Exhibit M-38, are also

17  shown thereon.  The Santa Margarita River is symbolized crossing

18  the match line area from the northeast to the southwest across

19  the lower right hand corner of the match line area on Plaintiff's

20  Exhibit M-66J.  Again, for Mr. Stahlman's benefit, there is

21  another rifle range shown in the lower portion of the match line

22  area.

23       MR. VEEDER:  I wish to offer that in evidence, 66J.

24       THE MASTER:  It will be received as Exhibit M-66J.

25       MR. VEEDER:  And I would like to make a blanket offer of

b-60

1    all of the exhibits which we have introduced today, of the

2    soil surveys, of the individual parcels, just to be sure there

3    has been no offer overlooked by us in this process.   That would

4    be I believe M-39 through--

5         THE MASTER:   M-63.

6         MR. VEEDER:   M-63.

7         THE MASTER:   I think they have each been offered and

8    received individually, but in the event any one might have been

9    overlooked, they are all now again received, or received for

10   the first time, as the case may be.

11        MR. VEEDER:   Yes.   And I also want to make--the time is

12   now up, I see.

13        THE MASTER:   Yes.

14        MR. VEEDER:   I would like to make an offer in regard to

15   all of these exhibits which have been marked 66 and 66A through

16   J, make a blanket offer on those areas.

17        THE MASTER:   Those I believe have all been received, but

18   if not, any that were formerly omitted will now be received.

19        We will recess.

20        MR. MOSKOVITZ:   Your Honor, I would like to raise a ques-

21   tion before we recess.

22        THE MASTER:   Yes.

23        MR. MOSKOVITZ:   I will be unable to attend all these

24   Master's hearings, because of conflicts in my own schedule.   I

25   do plan to attend all the hearings before Judge Carter.   Now my

question relates to the matters which are introduced now con-
cerning the Government's case, as to whether there would be
any prejudice to cross-examination on the basis of the record
which may be made, in the event the Government doesn't re-intro-
duce the same evidence at the trial.  Will there be any preju-
dice to my cross-examining at that time before Judge Carter?

THE MASTER:  Certainly as far as I am concerned there will
be no prejudice to it.  I do not believe that Judge Carter
would rule there was any prejudice to it.

MR. VEEDER:  I am going to make this observation, your
Honor.  I think that anyone who is interested in the day-to-day
trial should have a representative at the day-to-day trial to
avoid precisely this thing that Mr. Moskovitz has raised.  And
I can see this case going on forever, because with a witness
like the Colonel it would be entirely possible for Mr. Moskovitz
to examine him in regard to the whole De Luz area, as I see it--
and I have had similar circumstances where States have inter-
vened.  And we have always insisted--and I think we should in-
sist here--that the State has personnel where Mr. Moskovitz
or someone else who could be in daily attendance, if they are
going to insist upon cross-examination.

THE MASTER:  Well, as I understand it Mr. Moskovitz merely
meant that his absence on one or more days of the hearings would
not preclude his opportunity to cross-examine Colonel Bowen in
a reasonable, seasonable time when he was here.

b-62

1    MR. VEEDER:  That is what precisely what I am objecting

2    to.  I think the State of California should provide counsel

3    every day.

4    MR. SACHSE:  I have the same request, your Honor.

5    MR. VEEDER:  I can understand an individual--understand

6    an individual being hard pressed in that regard, from the stand-

7    point of Mr. Stahlman and Mr. Sachse, who have a private practice.

8    And I think we could make some adjustment.  But if Mr. Moskovitz

9    were not present for seven, eight days in a row, and we go

10   through our technical witnesses, as we are going through our

11   witnesses that are going to be called now--we are going to have

12   a geologist on either next or very soon--I can't invision several

13   days repetitious cross-examination.  And I am not being the

14   slightest bit captious in the matter.  I think from the practical

15   standpoint, however, that California should provide counsel here

16   daily or pass up the opportunity of cross-examination.

17   MR. MOSKOVITZ:  Your Honor, when Judge Carter made his

18   order of reference there was some discussion as to just how we

19   would work.  I am sure you were present during all the dis-

20   cussions.  And the understanding, as I recall it then, was that

21   the full case would be presented by the United States at the

22   trial before Judge Carter on the main stem.  The main stem, of

23   course, includes the Naval Ammunition Depot, Camp Pendleton, the

24   Naval Hospital.  And that  what Judge Carter denoted as skin

25   cases would be presented by the Government with respect to its

b-63

1    rights in the various tributary watersheds before the Master.

2    And it was on that basis that I planned my own schedule. Now

3    Mr. Veeder has remarked that the State has unlimited people and

4    can certainly provide one for all these hearings. But that is

5    not the case. I am the only man assigned to this case. And I

6    do have other responsibilities which cannot merely be ignored.

7    Now I am going to be present at all the hearings before Judge

8    Carter, and at as many as I can manage before the Master. But

9    I cannot be at all of them. And if something comes up which I

10   read in the record, I certainly won't require Mr. Veeder to

11   repeat anything in his case in chief if he does not want to,

12   but I certainly think I ought to be given an opportunity to

13   cross-examine after reading the record.

14          THE MASTER: For example, next week do you have any days

15   when you will not be present?

16          MR. MOSKOVITZ: Yes, your Honor, I do.

17          THE MASTER: What day will that be?

18          MR. MOSKOVITZ: Monday and Wednesday both. I have other

19   commitments which were made beforehand.

20          THE MASTER: But you will be present on Thursday?

21          MR. MOSKOVITZ: I am not sure I can get down here after

22   my commitment in San Francisco Wednesday, but I will try to.

23          MR. VEEDER: May I tender an additional thought. I have

24   had a circumstance--and I think everybody that has ever had any

25   experience has had a circumstance where a question will be asked

b-64

1  on cross-examination, and for your own protection your redirect

2  examination would take several days.  Now I have seen that occur.

3  And I simply submit that with such a .circumstance confronting

4  your Honor and confronting the United States--we all have com-

5  mitments and we are all adjusting to them.  And we have had

6  to make some pretty sharp adjustments, I might say.  The point

7  I am going to make, if we are going to be confronted with the

8  possibility of perhaps additional exhibits, certainly additional

9  testimony--that is what is entailed.  It isn't a matter of Mr.

10  Moskovitz satisfying himself in regard to an aerial.  It might

11  be a question will be opened up in regard to a particular

12  phenomena that will go on indefinitely from the standpoint of

13  redirect.  I have had that occur, as I said before.  And I am

14  gravely concerned about any such agreement.  And I will object

15  to it.  And if it is overruled, why I will have to live with it.

16  But I see no reason whatever for approaching this lawsuit in

17  that manner.

18      MR. SACHSE:  Your Honor, I appreciate Mr. Veeder saying

19  exceptions could be made in my case, because I am an individual.

20  But my reasoning goes a little beyond the problem of being an

21  individual.  With all due respect to your Honor, I would like

22  as much of this case as possible--at least of the case of the

23  United States, let us say, as distinguished from the case of

24  the small people--presented to Judge Carter in the flesh, to

25  permit Judge Carter to judge for himself factors such as

b-65

1    credibility of witnesses and so on.  For that reason I intend

2    to ask--and you might as well put it on the record now, your

3    Honor,--to reserve to me, even though I am here, to cross-examine

4    Colonel Bowen--to reserve the right of cross-examination on the

5    transcript at the time the case goes before Judge Carter.  I

6    don't say I will do it, but I want the right reserved.

7        MR. VEEDER:  Then I respectfully submit we should spend

8    Monday in San Diego and get this matter straightened out.

9    Because I can't envision calling Colonel back on the stand for

10   the purpose of repeating a great many of these things.  I admit

11   if somebody isn't here, or if someone who, for instance, up in

12   the Anza area might want to have a further review, I can under-

13   stand that.  But as far as opening up these complex matters

14   that we have been through today, I was hoping and I certainly

15   thought it was in the mind of the Court that, absent objection

16   to your Honor's findings, we would be through with this phase

17   of the matter. What would be the purpose of having the Master?

18   I simply cannot understand it.

19       MR. SACHSE:  I have contended from the beginning that this

20   is not the type of Master's hearing, due to the attitude taken

21   by the Government, that I anticipated.  Maybe I am ignorant.

22   Maybe I didn't follow the thinking of your Honor and Judge Carter.

23   But it was my understanding--and I will use the exact words that

24   Mr. Veeder used.  He used "skin cases".  In fact--

25       MR. VEEDER:  Me?

b-66

1    MR. SACHSE:  He said, "I don't like the word."

2    MR. VEEDER:  I didn't use "skin".

3    MR. SACHSE:  He said, "It sounds a little as though I was

4 trying to skin somebody."

5    MR. VEEDER:  I objected to his Honor's using it.

6    MR. SACHSE:  Be that as it may, the phrase "skin case"

7 was very definitely used.  It was my understanding that the

8 United States was going to put into evidence a single individual

9 who could initially testify to the broad outline of the facts

10 contained in the stipulated pre-trial order.  That was the first

11 thing we were going to do, the way I understand.  So we would

12 have evidence in the record before your Honor which would bind

13 all these individuals.  Now we haven't got it.  That hasn't

14 been done.  There is nobody here who has testified to this pre-

15 trial order.

16    THE MASTER:  A good portion of it has been testified to,

17 not all of it.

18    MR. SACHSE:  But not to the order as such.  And the idea

19 was we were going to cover everything in here.  Instead of that

20 we have started to put in the case of the--shall I say water

21 rights of Camp Pendleton.  We are putting it in.  That is what

22 we have been doing all day today.  Not all day--all afternoon

23 today, the water rights of Camp Pendleton.

24    Now with apologies, your Honor, I don't want to try--I

25 want to try it before Judge Carter, that issue.  I think that is

b-67

1   the vital and central issue of this whole proceeding.  And I

2   never understood that the selection of the Master was to try

3   the case.  It was my understanding at all times that the purpose

4   of the Master was to make it easy for these hundreds or thousands

5   of individuals in the remote areas to come to you and to prove

6   their rights.  Not to handle the controversy between the so-

7   called major parties, Vail, Fallbrook, State of California,

8   Santa Margarita and the United States.  And if Mr. Veeder is

9   not in accord with that understanding, and if you are not, I

10  respectfully join in his request.  I think we had better go

11  back down to San Diego and get this straightened out.

12          THE MASTER:  I think there is no doubt about the fundamen-

13  tal purpose of appointing the Master, in that it primarily was

14  to take the testimony of the smaller defendants.  I do not

15  interpret the testimony this afternoon as a presentation of

16  evidence as to the water rights of Camp Pendleton.  I interpret

17  it as a presentation of documents showing areas within the

18  watershed.  In other words, that could have been done here, it

19  could have been done in San Diego.  The evidence which is con-

20  tained in these aerial photographs, which is all that has been

21  testified to in so far as Camp Pendleton is concerned, will then

22  be in the record for whatever argument and further comments and

23  additional testimony are presented.  And I would think that

24  probably in so far as the rights of Camp Pendleton, that would

25  be done in San Diego.

501

b-68

1    MR. MOSKOVITZ:  That is the question, your Honor.  Will

2    that be done?

3    MR. SACHSE:  The order--

4    MR. MOSKOVITZ:  Let's find out if it will be done.  May

5    we have an expression from Mr. Veeder whether that will be done.

6    MR. VEEDER:  It is done if it is ordered to be done.  I

7    view it this way.  Here are matters that are tendered to an

8    officer of the Court.  And that is what your Honor is.

9    THE MASTER:  Yes.

10    MR. VEEDER:  And we are offering those exhibits from the

11    standpoint of the probative value, and for all purposes.  Now

12    I admit that if somebody comes in later and says he was not

13    here, or hadn't been notified, he might desire to cross-examine

14    the Colonel on the basis of matters to which he testified.  But

15    it is impossible for me to envision we will repeat everything

16    that we did today.

17    THE MASTER:  I don't see that under any condition it would

18    be necessary to repeat it.  The question would simply be whether

19    in the hearing before Judge Carter, Colonel Bowen would be avail-

20    able for examination with reference to the documents which he

21    has now introduced.  Now they would not have to be reintroduced,

22    certainly.  And any testimony which he has stated with regard

23    to what they show would not have to be reoffered.

24    MR. VEEDER:  That is right.  That is what my view was.

25    I can't envision and I don't believe that anyone ever expected

b-69

1   to do less than make a prima facie case of our rights in this

2   area.  I wouldn't dare to do any less than we are doing.  Because

3   I think that when your Honor makes a finding I believe that that

4   is gospel until it is upset by the Court.  And I think if it

5   is not upset by the Court it is binding on anyone, unless it is

6   proved to be clearly erroneous.  And I think we are operating

7   under the Federal rules of civil procedure.  And that is how

8   I understand them.

9        MR. SACHSE:  We are operating under an order of reference,

10   Mr. Veeder.  I suggest you flip it open and take a look.

11       MR. VEEDER:  I have.

12       MR. SACHSE:  Your Honor, the order reads as follows:

13       "All parties concerned"--after naming the principal ones--

14   "are desirous of protecting at minimum cost and inconvenience;

15   the principal parties having agreed to the reference of the

16   issue involving proof of the claims of certain users;"--he is

17   talking about the small users.  Then it says:

18       "There shall be taken by the Special Master evidence offered

19   in proof of the claims to rights to the use of water of the

20   Santa Margarita River and its tributaries, of the numerous

21   claimants referred to above"--

22       Now I don't construe this to include the claims of the

23   United States--and I think we had better--or of Fallbrook or the

24   claims of Vail.  I think we should decide whether--and have

25   Judge Carter decide whether we expect a finding from your Honor

503

b-70

1    as to the extent of the rights of the United States of America.

2         THE MASTER:  Well, my present thought would be that I

3    would not make any findings as to the rights of the United States

4    of America under the order of reference.  Now I have regarded

5    this testimony this afternoon as simply being a means of saving

6    the time of Judge Carter, for example, in the identification of

7    these exhibits.  But that as to the testimony based upon them as

8    to the rights of the United States, the legal arguments and the

9    factual argument would be presented to him.

10        MR. VEEDER:  Well, yes.  I may have fallen off the sled

11   completely, but I think that your Honor is empowered to look

12   at these exhibits and say, "I make the findings thus and so in

13   regard to the properties of the United States concerning which

14   evidence was introduced today."  Now isn't that what you intend

15   to do?

16        MR. MOSKOVITZ:  That is in direct contradiction to what you

17   just said, your Honor.

18        THE MASTER:  No, I think under the order of reference these

19   matters can be introduced.  They are in the case then for what-

20   ever consideration Judge Carter will give them, upon evidence

21   to be presented to him.  But that under the order of reference

22   I would not make findings as to the particular rights which the

23   United States would have, unless the order of reference is

24   omitted so as to direct me so to do.

25        MR. VEEDER:  Now I may be--

504

b-71

1    THE MASTER:  That is, I think probably we are all in

2    agreement but we are expressing ourselves in different terms.

3    MR. VEEDER:  We are not coming up with a conclusion of

4    law, as I understand it.  But I certainly understood you were

5    going to consider, for example--I couldn't conceive of a circum-

6    stance where you could consider De Luz Creek independent of the

7    area involved in the matters concerning which we have offered

8    in evidence today.  It would be impossible.

9    THE MASTER:  Well, of course it is impossible to consider

10   any one area without considering the total watershed.

11   MR. VEEDER:  The related areas.

12   THE MASTER:  In other words, you can't consider De Luz

13   Creek without considering all the rest of the watershed.  In the

14   final analysis you consider each portion piecemeal,  and then put

15   all the pieces together.  Now I believe it is theoretically

16   possible to consider the portion of the De Luz Creek exclusive

17   of Camp Pendleton separately from the entire creek, including

18   Camp Pendleton, and then put it together later after the hearing

19   before Judge Carter.

20   MR. VEEDER:  Well, here is the Naval Ammunition Depot--

21   the Naval Reservation boundary.  I think that--and I would assume

22   that you would make   findings in regard to the riparian acreage

23   in the whole watershed, which would include some of the Camp

24   Pendleton riparian acreage.

25   MR. SACHSE:  There we part company.

b-72

1          THE MASTER:  No, I would think under the order of refer-
2  ence I would make findings as to the riparian and other acreage
3  above the boundary, and to the--if you want to use the term--
4  maximum usage of water above the boundary line.  That the rights
5  of the United States below the boundary line, whether within the
6  De Luz Creek area or without the De Luz Creek area, would be
7  determined by Judge Carter.  And that the whole picture is then
8  put together in the final judgment by him.

9          Now it may be that we should have a further pre-trial con-
10  ference with Judge Carter in connection with that matter.  If
11  counsel cannot agree on that interpretation, I would suggest that
12  we have a further conference with the Judge to ascertain that
13  we are either in accord with his interpretation of the reference
14  or that we are in disagreement with it.

15          MR. VEEDER:  Well, I understood that the United States
16  would have to put in--and I would be afraid to do otherwise--
17  put in at least a prima facie case.

18          THE MASTER:  I don't think anybody--

19          MR. SACHSE:  Nobody is quarreling with that.

20          THE MASTER:  I don't think anybody is objecting to your
21  putting in these exhibits and these photographs at the present
22  time.  It is a convenience to the Court later, to Judge Carter
23  later that they are already in evidence and are marked and so
24  forth, and there is some testimony concerning them to which
25  reference can be made, if necessary.  But I don't think that the

b-73

1    purpose of the order of reference was that when those pictures

2    and other testimony were offered here in regard to them that the

3    final word or the last testimony on lands within Camp Pendleton

4    should not be given before the Judge.

5         MR. VEEDER:  I don't think it could be possibly--I com-

6    pletely agree the final analysis and final judgment could not

7    be, and I am proceeding on that basis.  But certainly in regard

8    to the matters that we are touching on today I think that it is

9    just as if we were before the Court for a hearing.  Because we

10   can't possibly have these matters tried out completely independent.

11        THE MASTER:  Well, I think possibly that we are wasting

12   time here in this respect.  We are not dealing with a witness

13   who is here from Asia for a few days.  Colonel Bowen has been

14   with the Marine Corps for some time.  He will be available in

15   the future.  And I do not anticipate that any delayed cross-exam-

16   ination by counsel for the defendants would result in any greater

17   re-direct examination than the same cross-examination would have

18   caused had it been made a day earlier.  That is assuming Mr.

19   Moskovitz delays his cross-examination by one or two days.  Your

20   re-direct examination would be substantially the same, in either

21   event.

22        MR. VEEDER:  Yes.  Yes.  But if there is a ten day delay--

23        THE MASTER:  Well, I don't think Mr. Moskovitz would be

24   away for ten days of the hearings at any one time.

25        MR. MOSKOVITZ:  Well, your Honor, there are two problems

607

b-74

1   there.  First, getting the transcript.  This is not--you don't

2   get it the next day.  There is a few days delay right there.

3       THE MASTER:  Yes.

4       MR. MOSKOVITZ:  Getting it and reading it.  Secondly, as

5   Mr. Sachse has pointed out to me, he is still interested in

6   trying this before Judge Carter.

7       THE MASTER:  In so far as the rights of the United States

8   are concerned and Camp Pendleton, I think that the parties are

9   entitled to try those rights before Judge Carter.

10      MR. MOSKOVITZ:  It puts me in a very funny position.  I

11  have to say I don't want to try the case before your Honor.  And

12  that is not true.  But to be very, very specific I do not believe

13  --or let me say it was not my understanding that your Honor

14  should make a finding as to the irrigable acreage of Camp Pendle-

15  ton.  Now that is putting it as simply as I can.  If I am mistaken,

16  then I am in error.  Now I don't believe that was any part of

17  your Honor's job, to find the irrigable acreage in Camp Pendleton.

18      THE MASTER:  The order of reference by Judge Carter does

19  not so state, and unless all counsel stipulated that the matter

20  should be presented to me I would not feel justified on the

21  basis of the order of reference in proceeding to make findings

22  as to the acreage in Camp Pendleton without an amendment of the

23  order of reference.

24      MR. VEEDER:  May I inquire then how could  we make a prima

25  facie case absent such a determination?

b-75

1    THE MASTER:  You can make a prima facie case as to the

2    matters which are referred to me in regard to the area outside

3    of Camp Pendleton, to the extent that incidental evidence is

4    offered in Camp Pendleton, which can later be considered by the

5    Judge.  It can come in.  But I would not make   findings on that,

6    as I say, without some amendment of the order of reference.

7         Now that brings us to the question do we want to proceed

8    with the hearings here or do we wish to ask for a pre-trial

9    conference with Judge Carter on that point for say next Monday.

10   Now I don't know what the commitments are then.  Now I take it

11   there is plenty of other evidence which can be presented by the

12   plaintiff during the next day or two of the hearings here, re-

13   gardless of what the final ruling on this particular question is.

14   MR. VEEDER:  It may be that--it may be that we could just

15   simply go ahead and let Mr. Sachse start calling his witnesses.

16   That could occur.  And the witnesses I was planning on calling

17   were certainly going to pertain to matters inside the enclave

18   now.

19        THE MASTER:  I understood you are also going to offer

20   evidence on areas outside the enclave, particularly areas that

21   are not covered in the soil surveys.  And those are definitely

22   within the order of reference.

23        MR. VEEDER:  Yes.  Yes.

24        THE MASTER:  Well, that is outside the enclave.  There is

25   no argument by any counsel that that evidence would be properly

b-76

1   presented to me.

2       MR. STAHLMAN:  May I ask your Honor a question right along

3   this line?  I had a little different concept of this thing also.

4   I didn't feel that matters pertaining to the rights within the

5   enclave would be decided here.  However, I did think you would

6   take this watershed, that you would consider what is the acreage,

7   for instance, of Camp Pendleton,  so that when you got through

8   with the De Luz area you would have the material before the

9   Court to submit to Judge Carter in relation to the complete

10  litigation of this here particular watershed.

11      THE MASTER:  Now on that basis that would also include the

12  irrigable acreage in the Vail Ranch.

13      MR. STAHLMAN:  Yes.  I had anticipated that, that this

14  area of the Vail Ranch--in other words, this isn't the main

15  stream, these areas, these tributaries that your Honor is taking

16  testimony on.  That we would then present our evidence in rela-

17  tion to those tributaries here.

18      THE MASTER:  No.  Is it the point of  Mr. Sachse and Mr.

19  Moskovitz that no evidence should be presented to me as to the

20  irrigable acreage, or merely that after the evidence is presented

21  that that is presented then for consideration and determination

22  by Judge Carter?  It is my understanding that the latter one

23  was your point.  That is, that evidence could be offered as to

24  the actual acreage, as long as there is no adjudication attempted

25  as to the rights based upon that acreage.

510

b-77

1      MR. SACHSE:  Let me answer for myself, and I am sure that

2 Adolph agrees with me.  First, my contention is that it is not

3 within the order of reference for your Honor to make a finding

4 as to the irrigable acreage in Camp Pendleton.  My second con-

5 tention is that since the finding on that fact is to be made by

6 Judge Carter I would prefer and I will request the privilege

7 of cross-examination before the man who is to make the finding.

8 And now if Mr. Veeder wants to put the whole case in over again,

9 that is all right.  But either way, I want the privilege of

10 cross-examination before the gentleman who is to make the finding,

11 namely, Judge Carter.  As far as proceeding in this case is

12 concerned, I am perfectly willing to go ahead Monday with De

13 Luz Creek people.  I can get them in here and start putting my

14 case in.  I see nothing illogical about your making a finding

15 concerning the irrigable acreage on every individual in the De

16 Luz watershed, except the United States.

17      MR. STAHLMAN:  You don't--pardon me.

18      MR. SACHSE:  The irrigable acreage, the riparian status.

19 In the few cases where appropriations exist, the facts regarding

20 the permits.  If prescriptive rights, the facts regarding the

21 prescription.  But I do not believe it was within the order of

22 reference that you should make any findings affecting the United

23 States of America.

24      MR. STAHLMAN:  How do you feel about that portion of Camp

25 Pendleton that lies within--

b-78

1        MR. SACHSE:  No.

2        MR. STAHLMAN:  You don't think so?

3        MR. SACHSE:  No.  I don't believe it was referred to the

4    Master to make.

5        MR. STAHLMAN:  I thought it was.  I thought he meant it.

6        MR. SACHSE:  Any rights of the United States--

7        MR. STAHLMAN:  I can see your reason so far as Pendleton

8    is concerned.  I go along with you there.  But as far as De Luz

9    Creek is concerned--

10       MR. SACHSE:  It may be factually inconsequential, George.

11   I don't know.

12       THE MASTER:  Well, I assume then we should adjourn this

13   session until Monday at 9:30.  At that time we will proceed.

14   Either Mr. Veeder will proceed to present evidence as to the

15   rights of the individual defendants outside Camp Pendleton, or

16   if he wishes he can proceed to offer in evidence the additional

17   aerial photograph  of the Camp Pendleton area.  I think there is

18   no objection to that.  I think that is proper.  But I think the

19   ultimate consideration, in view of the objections of counsel for

20   the defendants as to--

21       MR. STAHLMAN:  I have a suggestion.

22       THE MASTER:  --the findings of the irrigable acreage in

23   Camp Pendleton, will be made by Judge Carter, in the absence of

24   an amendment to the order of reference.

25       MR. STAHLMAN:  I have a suggestion that might throw some

b-79

1  light on it.  I don't expect it would settle the over-all problem,

2  which may be necessary to have a pre-trial conference with Judge

3  Carter on.  But why don't you between now and Monday talk to

4  Judge Carter, see what his view is on this particular situation.

5       MR. VEEDER:  Well, I would like to join you in that,

6  conversation, your Honor, because I think that we are running

7  into procedural problems which may touch on the jurisdiction--

8  your jurisdiction and on the jurisdiction of the Court, and very,

9  very serious problems from the standpoint of the United States.

10  Because I think I told--I didn't tell--I suggested to his Honor

11  that we weren't about to put a bobtail case in and then find

12  ourselves in some kind of difficulty because of the very nature

13  of water litigation, where a man can't walk up and say, "I am

14  going to put so much of this in and then stop."  Life is too

15  short for me to undertake such a thing as that.

16       I think this, without a bit of difficulty--and I am not

17  asking for findings necessarily, not at all, not at all.  But

18  before we rest this phase of the hearing I want to feel that I

19  have in this record a prima facie case in regard to the rights

20  of the use of water of the United States, whether you make a

21  findings on them or not.  And that is my view.

22       MR. SACHSE:  Then do it again before Judge Carter.  That

23  is all I care about.

24       THE MASTER:  I don't think we are going to get the counsel

25  to agree here this afternoon, and it is late already.  I will

1    endeavor to see Judge Carter on Thursday, and if I find out he

2    is free and is available for pre-trial conference, why he will

3    get in touch with counsel.  And I assume you will be available

4    for such a conference.

5         MR. SACHSE:  I will be most anxious to attend.

6         THE MASTER:  Then we will adjourn the hearing until Monday

7    morning at 9:30.

8         MR. VEEDER:  Your Honor, I ask to remove this M-14 for

9    the purpose of reproduction.

10        THE MASTER:  Yes.  That was previously requested and

11   granted.

12         (Adjournment.)