Case 3:51-cv-01247-JO-SBC   Document 4724   Filed 09/24/63   PageID.42932   Page 1 of 163

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

Volume:   V

Pages     514 - 674

Date:     June 2, 1958

Place:    Fallbrook, California

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

APPEARANCES:

    WILLIAM H. VEEDER, ESQ.,
        For United States of America.

    FRANZ R. SACHSE, ESQ.,
        For Fallbrook Public Utility District.

    GEORGE STAHLMAN, ESQ.,
        For Vail Company.

    RAY C. EBERHARD, ESQ.,
        For Samuel and Hazel Wilson.

    JOHN BRICKER MYERS, ESQ.,
        For Lawrence William and
            Mary Constance Butler.

    W. B. DENNIS, ESQ.,
        For Santa Margarita Mutual Water
            District.

# INDEX TO WITNESSES

|  |  | D | X | RD | RX |
|---|---|---|---|---|---|
| **For the Plaintiff:** |  |  |  |  |  |
| Allen C. Bowen |  | 659 |  |  |  |
|  |  |  |  |  |  |
| **For Defendants Samuel M. and Hazel Wilson:** |  |  |  |  |  |
| Samuel Wilson |  | 518 | 529 | 538 548 551 565 | 543 549 553 562 |
|  |  |  |  |  |  |
| **For Defendants Lawrence William and Mary Constance Butler:** |  |  |  |  | 631 |
| Lawrence William Butler |  | 568 | 619 | 628 637 | 633 638 |
| Samuel Edward Brode |  | 639 |  |  |  |
| Louise Butler |  | 652 |  |  |  |

# INDEX TO EXHIBITS

FOR THE PLAINTIFF:

| No. | | | Ident. | Rec'd. |
|-----|---|---|--------|--------|
| M-66K | Aerial photo | 4-0091 | 660 | 661 |
| M-66L | Aerial photo | 4-0092 | 661 | 661 |
| M-66M | Aerial photo | 4-0093 | 661 | 662 |
| M-66N | Aerial photo | 4-0105 | 664 | 665 |
| M-66O | Aerial photo | 4-0107 | 665 | 666 |
| M-66P | Aerial photo | 4-0108 | 666 | 667 |
| M-66Q | Aerial photo | 4-0109 | 668 | 668 |
| M-66R | Aerial photo | 4-0110 | 669 | 670 |
| M-66S | Aerial photo | 4-0111 | 670 | 671 |
| M-66T | Aerial photo | 4-0112 | 672 | 672 |
| M-66U | Aerial photo | 4-0113 | 673 | 673 |

## INDEX TO EXHIBITS

FOR DEFENDANTS SAMUEL M. AND HAZEL WILSON:

| No. | | Ident. | Rec'd. |
|---|---|---|---|
| M-A-50 | Chain of Title Report, and Letter, from Union Title Insurance Company, dated August 3, 1911 | | 520 |
| M-B-50 | Notice of Appropriation, recorded August 11, 1939 | | 522 |


FOR DEFENDANTS LAWRENCE WILLIAM AND MARY CONSTANCE BUTLER:

| No. | | Ident. | Rec'd. |
|---|---|---|---|
| M-A-49 | Grant Deed | | 571 |
| M-B-49 | Water Claim | | 573 |
| M-C-49 | Chain of Title Report | | 574 |
| M-D-49 | Photograph | 576 | 584 |
| M-E-49 | Fallbrook Quadrangle Map | 588 | |
| M-F-49 | Document | 629 | |

Fallbrook, California, June 2, 1958, 9:30 a.m.

THE CLERK:   Court is now in session.

THE MASTER:   Mr. Veeder, I understand that you and Mr. Eberhard have agreed to put on certain witnesses of Mr. Eberhard's at this time out of order?

MR. VEEDER:   Yes.  He is here from Los Angeles and it might be convenient for him and for Mr. Myers, both.  As I understand, Mr. Myers has some witnesses to call later.

THE MASTER:   There is no objection from the other defendants, I assume?

MR. SACHSE:   No, except we might have to bring some of them back later.  In the Myers case, at least, there is a potential conflict between Myers' clients and mine.

Who is yours, Ray?

MR. EBERHARD:   Wilson.

MR. SACHSE:   Where is he?

MR. EBERHARD:   Right next to Myers'.

MR. SACHSE:   I have no objection, certainly, to go ahead. I will have to see what happens.

THE MASTER:   Yes.  Well, of course it should be understood that if at a later time it should be necessary to recall them they would be available.

For the record may we have the appearances of counsel?

MR. VEEDER:   William Veeder, United States of America.

1    MR. SACHSE:  Franz Sachse, Fallbrook Public Utility Dis-

2 trict, and certain individual defendants.

3    MR. EBERHARD:  Ray C. Eberhard for Samuel Wilson and

4 Hazel Wilson.

5    MR. MYERS:  John Myers for Butler.

6    MR. STAHLMAN:  George Stahlman for Vail Company.

7    THE MASTER:  Now, are there any defendants here from the

8 De Luz Creek area in pro per, that is, not represented by at-

9 torneys?

10    I assume there are no defendants present not represented

11 by counsel.

12    If you are ready, Mr. Eberhard, you may proceed.

13

14                    SAMUEL WILSON

15 called as a witness, sworn, testified as follows:

16

17                  DIRECT EXAMINATION

18 BY MR. EBERHARD:

19    Q  Your name is Samuel Wilson?

20    A  Yes, sir.

21    THE MASTER:  You can speak towards the reporter.

22    THE WITNESS:  Yes, sir.

23    MR. EBERHARD:  Some of these questions may be leading, but

24 they will expedite matters.

25    Q  Are you the owner of the property known as the southwest

1 quarter of the northwest quarter and the northwest quarter of

2 the southwest quarter of Section 32, Township 8 South, Range

3 4 West, San Bernardino Meridian?

4     A  Yes, sir.

5     Q  How long have you owned that property?

6     A  Twenty years.

7     Q  And from whom did you buy it?

8     A  I bought it from Mrs. Harry Alexander.

9   MR. STAHLMAN:  I wonder if it would be advisable to have

10 the number of parcel as on the exhibit?

11     MR. EBERHARD:  It is Parcel 50.

12     MR. SACHSE:  What is the name?

13 BY MR. EBERHARD:

14     Q  Samuel M. Wilson?

15     A  Yes, sir.

16     Q  And Hazel Wilson is your wife?

17     A  Yes, sir.

18   MR. EBERHARD:  I don't know if it is going to be necessary,

19 but I would like to have it in the record I have a letter from

20 the Union Title Insurance Company of San Diego showing who the

21 owner of the property was on August 3, 1911.

22   And we are going to put in a Notice of Appropriation, as

23 recorded in the office of the San Diego County Recorder on that

24 date.

25   We could go through the necessary procedure, I suppose, of

1  proving the chain of title.  We have the chain of title and a

2  letter from the Union Title Insurance Company setting up the

3  facts.

4      If there is no objection I would like to put that in.

5      THE MASTER:  I had understood, Mr. Veeder, that in a case

6  like that you would accept that as prima facie evidence, subject

7  to --

8      MR. VEEDER:  If we are permitted rebuttal that is all we

9  would ask for.

10      THE MASTER:  Very well then.

11      Is there any objection to the admission of the letter into

12  evidence as prima facie evidence of the state of title in 1911,

13  subject to any rebuttal by you at a later date?

14      MR. VEEDER:  No.

15      MR. SACHSE:  No objection.

16      MR. STAHLMAN:  This is a letter showing the title of 1911?

17      MR. EBERHARD:  That is right.

18      MR. STAHLMAN:  And you made some mention about appropri-

19  ation?

20      MR. EBERHARD:  Notice of Appropriation recorded on August

21  11 --

22      MR. STAHLMAN:  That is in this document here?

23      MR. EBERHARD:  I have a certified copy of that.

24      MR. STAHLMAN:  I have no objection.

25      THE MASTER:  Then the letter from the Title Company will be

1    introduced in evidence as Defendant Wilson's Exhibit M-1.

2         MR. VEEDER:  Mr. Eberhard, you have checked this out your-

3    self and you know this to be correct yourself?

4         MR. EBERHARD:  I haven't checked it, but I am positive it

5    is correct.

6         MR. VEEDER:  I have no objection.

7         Are you going to offer that, Mr. Eberhard?

8         MR. EBERHARD:  I am going to offer that.  And I am going

9    to offer also -- Do you want to see that?

10        I will make a note of that so I won't forget it, that is

11   M-A?

12        THE MASTER:  That is Defendant Wilson's Exhibit M-A.

13        MR. VEEDER:  I have no objection to that.

14        MR. EBERHARD:  Do you want to see this one?

15        MR. SACHSE:  Yes.

16        MR. EBERHARD:  They will both go in on the same number,

17   the letter and the chain of title both on the letterhead of

18   the Union Title Insurance Company, and both signed by the same

19   company?

20        THE MASTER:  Yes.

21        MR. VEEDER:  May I inquire as to how this is going to be

22   numbered?  How are we going to get the designation on this of

23   the exhibit number?  What will that be?

24        THE MASTER:  Defendant Wilson's Exhibit M-A.

25        MR. VEEDER:  Defendant Wilson's?

1    THE MASTER:  Yes.  I think we will have to keep a separate

2  list of each defendant.  And if we subsequently get some other

3  Wilson we will give his a first name, but since this is the

4  first Wilson --

5    MR. STAHLMAN:  You could do it by parcel like on the map,

6  50.  If you had two Wilsons it would make a difference.

7    THE MASTER:  That is possibly a good suggestion.  You

8  could make it M-A-50.

9    Of course that would confuse it with the Plaintiff's

10  numbered exhibits.

11    MR. VEEDER:  I think it would be better to put the letter

12  first and the number afterwards, M-A-50.

13    MR. EBERHARD:  I have shown Counsel, and I offer in evi-

14  dence at this time a certified copy of a document headed Notice,

15  and it is signed by the original -- purportedly signed by Kate

16  Sidle Regan.  It is a claim for water in De Luz Creek to the

17  extent of 50 inches a year under 4 inch pressure for use on the

18  Wilson property, described as the southwest quarter of the

19  northwest quarter and the northwest quarter of the southwest

20  quarter of Section 32, Township 8 South, Range 4 West, San

21  Bernardino Meridian.

22    THE MASTER:  Is there any objection?

23    MR. SACHSE:  No objection.

24    THE MASTER:  That will be received in evidence and marked

25  as Defendant Wilson's M-B-50.

1    MR. EBERHARD: That was recorded August 11, 1939.

2    MR. VEEDER: We are not carrying the defendant's name as

3    part of the exhibit any more?

4    THE MASTER: Defendant Wilson Exhibit M-B-50. I think we

5    should have Mr. Wilson as part of the designation of the

6    exhibit.

7    BY MR. EBERHARD:

8    Q Dr. Wilson, how long have you been familiar with this

9    property? When was the first time you ever saw that property?

10   A Well, to my knowledge when I was about nine years old.

11   We were coming back from the Old Soldiers' Encampment from San

12   Diego, there was a group of five families of us; we came back,

13   went down through Escondido, and came back through Oceanside

14   and up through the Santa Margarita Ranch, and up the De Luz

15   Creek, that was the road at that time, and by this place, and

16   came out at Murietta.

17   Q Did you stop at this place at that time?

18   A We did not stop. We went by, and it at that time was

19   a stop on the stage line, an old kind of a hotel proposition.

20   Q It was a stage station on that --

21   A I understood they changed horses there.

22   Q And was it green around the place showing use of water?

23   A It was just like it is now, the sycamores and oaks, and

24   running water.

25   Q You say that was when you were about nine years old?

1    A  Eight or nine years old.

2    Q  About what year was that, Doctor?

3    A  That would be hard to say.  I was either finishing up

4 the second or third grade in school.

5    Q  But I mean about what year?

6    A  Well, I was born in '88, and I was seven years old

7 when I started in the first grade; I was nearly seven.

8    Q  It was around 1896 or '97?

9    A  It was about two years later, it might have been three.

10    Q  Then when did you see it again?

11    A  I never saw it until I visited it after Mrs. Alexander

12 proposed to sell it.

13    Q  You went down then?

14    A  Yes, I visited the place.

15    Q  You went down shortly before you purchased it?

16    A  Yes, sir.

17    Q  In other words, that was something like twenty years

18 ago?

19    A  That was twenty years ago.

20    Q  And at that time was water being used around the place?

21    A  The water was there, and that is --

22    Q  Was there any evidence of irrigation around there at

23 that time?

24    A  Well, the yard was irrigated, and they had their lawns,

25 and they had a grape vineyard between the two houses, and they

1    were -- I didn't see the vineyard being irrigated, but it was

2    irrigated.

3        Q   Were there some citrus trees on the place?

4        A   There were some citrus trees up on the top of the hill

5    to the southwest of the house, and they pumped the water out of

6    the creek and up to irrigate those avocado and lemon and orange

7    trees that were terraced near the top of the hill.

8        Q   And since that time have you been using water on the

9    property to irrigate?

10       A   Well, I did for about a year or so.  And they didn't

11   prove to be of much force, so I abandoned that.  But I started

12   to irrigate the other fields and develop pasture, and things of

13   that kind that would do better, and it has done better.

14       Q   Have you been gradually increasing the amount of water

15   you have used for irrigation?

16       A   Yes, I have.

17       Q   Have you examined the engineering report that has been

18   introduced into evidence here by the government?

19       A   I have read it, yes, sir.

20       MR. EBERHARD:  Can we have the exhibit number of that

21   report on the Wilson property?

22       MR. VEEDER:  That is 50, isn't it?  57.

23       THE MASTER:  Do you want the exhibit?

24       MR. EBERHARD:  I would like to have the exhibit number.

25       THE MASTER:  That is Exhibit M-57.

1      MR. EBERHARD:  Thank you.

2      Q  M-57, you have examined the copy of that report, have

3  you?

4      A  Yes, I have read the report through.

5      Q  In your opinion does that report correctly show the

6  description of the various qualities of land on your place?

7      A  It does.  I have always realized that the 50 inch

8  clause there was more than could be reasonably used on the

9  property and --

10     Q  You mean the 50 inch claim?

11     A  The original water title.

12     Q  And the amount of water that Exhibit M-57 states could

13  be reasonably used on your property, in your opinion is that --

14     A  That is according to the survey, and I agree with it

15  that that would -- and I have had the advice of a water

16  engineer that that would take care of it according to what they

17  have here in this area required for avocados, and required for

18  permanent pasture, and all, per acre.

19     Q  Well, in your opinion is the amount of water recommended

20  in this M-57 necessary for reasonable use on your property?

21     A  To the best of my knowledge that is true, and I have been

22  advised by a water engineer that that would be adequate.

23     MR. VEEDER:  May I have the question that was asked by Mr.

24  Eberhard?

25     (Record read.)

11-L

1    BY MR. EBERHARD:

2        Q  Well, is it your opinion that that amount is necessary?

3        A  Yes, sir.

4        Q  Now, this M-57 doesn't say anything about any consump-

5    tive use of water by the natural vegetation along the stream.

6    Have you an opinion as to how much water should be allowed for

7    that?

8        A  That should be taken into consideration.  The natural

9    vegetation has to have water.

10       Q  Have you any opinion as to how much that natural vege-

11   tation would require in the course of a year on your property?

12       A  Well, I wouldn't have an opinion as to the amount, but

13   I would say that that was done by the man who made my survey

14   for me, the water engineer who made the survey, and that I

15   would accept his opinion on the matter as being reliable.

16       Q  Do you remember what his opinion was?

17       A  No, I do not.  It is written down.

18   MR. EBERHARD:  Well, does anyone have any objection to my

19   showing Dr. Wilson a copy of that report?

20   MR. SACHSE:  Who made it?

21   MR. EBERHARD:  Don Dresselhaus.

22       Q  This report was made by Don Dresselhaus of Oceanside,

23   was it not?

24       A  Yes, sir.

25   MR. EBERHARD:  Any objection to my showing it to the witness?

1    MR. VEEDER:  May I see it?

2    MR. SACHSE:  What is the date on it, please?

3    MR. EBERHARD:  January 31, 1958.

4    MR. VEEDER:  Well, go ahead.  I would like to have Colonel

5    Bowen look at it, if I may.

6    MR. SACHSE:  No objection, go ahead.

7    THE MASTER:  Are you going to later offer that for identi-

8    fication, or in evidence, or is this merely for the purpose of

9    refreshing his recollection on one thing?

10    MR. EBERHARD:  For the purpose of refreshing his recol-

11    lection.  He said in his opinion that was correct.

12    THE WITNESS:  The consumptive use of water, acre feet per

13    year, 2.4.

14    BY MR. EBERHARD:

15    Q  Well, that is per acre?

16    A  Yes, per acre.  Annual gross use of water would be 20

17    acre feet for the native trees.

18    MR. EBERHARD:  Colonel Bowen, do you want to look at this?

19    Q  Aside from that fact you think you should have that

20    amount for the natural cover, you are satisfied that the govern-

21    ment's report is correct?

22    A  I am.

23    MR. EBERHARD:  That is all.

24    MR. VEEDER:  May I proceed with cross-examination?

25    THE MASTER:  Yes, certainly.

CROSS-EXAMINATION

BY MR. VEEDER:

Q  Have you given any consideration to the effect of the
Fallbrook Public Utility District building a dam at Fallbrook-
Lipincott site upon your rights?

MR. SACHSE:  Object, if the Court please, not proper cross-
examination, not covered in the direct.

THE MASTER:  The objection will be sustained.

THE WITNESS:  I don't have any opinion --

THE MASTER:  The objection to the question has been sus-
tained, so you don't have to answer.

MR. VEEDER:  Well, I will make an offer then.  I think
that I can either make him my witness or cross-examine him,
your Honor.

I think that these witnesses, your Honor, each one of them
must have brought to their attention, and I certainly intend to
bring it to each one's attention as we go along, the fact that
when Fallbrook competes with the United States of America for
the very short supply of water, the United States of America
as a stipulated riparian owner downstream is necessarily in
sharp competition with the people on De Luz Creek.

THE MASTER:  Well, of course you are entitled to make an
offer of proof if you so desire.

MR. VEEDER:  I would elicit from this witness evidence as
to the effect of competition between riparian owners on De Luz

530

1   Creek with the riparian acreage of the United States of America

2   on the Santa Margarita with the result that if Fallbrook Public

3   Utility District is permitted to impound water at the Fallbrook-

4   Lipincott site that there would be a reduction in the quantity

5   of water which would be available for riparian owners on the

6   watershed of De Luz Creek.

7        MR. SACHSE:   Same objection, your Honor.

8        THE MASTER:   The offer of proof will be rejected.

9   BY MR. VEEDER:

10       Q   Now, you stated, Doctor, that there was a grape vine-

11  yard.  Is that on the property now?

12       A   No, that entirely died out.  It was an old vineyard at

13  the time.

14       Q   Now, in regard to the citrus trees, are those on the

15  premises now?

16       A   No, they are not.  You can see that they have been there,

17  but they haven't been removed.  They haven't been irrigated or

18  cultivated, and they have died.  The ones that are there are

19  just the skeleton of what was there.

20       Q   Now, have you diverted and applied water actually to

21  irrigate your pasture?  Are you doing that at the present time?

22       A   I have done that, yes, sir.

23       Q   And how many acres of pasture do you have?

24       A   I have twelve acres, approximately, of permanent pasture

25  on the north side of the creek.  And I have two fields, and the

1    olive orchard on the south side of the De Luz Creek in which I

2    have planted perennial crops and annual crops, and harvested

3    hay, and have pastured stock on those plots of ground.

4        Q   Now, are you irrigating any orchards at all at the

5    present time?

6        A   Yes, I am irrigating the entire approximately three

7    acres of the olive orchard, and I raise feed in the ground that

8    it occupies, as well as when the olives were doing well and the

9    price was such that I made a profit on it, why, I marketed the

10   olives and they were bought from me.  When the price is down

11   and less than it would cost to produce it, why, I have not.

12   But I haven't failed to irrigate the trees, because they are

13   producing and they live a good many years, and we do not know

14   what time that their fruit will be of value.  And in the mean-

15   time I have planted both perennial and annual seed in the same

16   ground, and have not only pastured it, but once in a while I

17   have enough that I can cut a little hay to put in the barn.

18       Q   What kind of an irrigation system have you?

19       A   We have a 20 -- a 15 horsepower Perron-Jackson centri-

20   fugal pump; it is powered by a 15 horsepower, 3 phase motor; it

21   is electricity.

22       Q   And have you calculated the quantity of water that you

23   divert and annually apply?

24       A   I have never kept an annual amount of it.  And I

25   couldn't tell you right now what the capacity is.  It depends

1   on how high up you put it, and the other factors come into it.

2   It has a good flow.  It will run two 95 Rainbird sprinklers,

3   which put out from about 90 to 100 gallons a minute themselves,

4   each one.  And when the two go, why, they don't double it, but

5   with the two running at the same time, why, the output is more.

6       Q  Now, how do you divert the water?  Is it from the sur-

7   face stream or from a well, or how do you get it?

8       A  No, I have a weir that goes across on bedrock at a

9   certain point where the river is kind of a sandy and level place

10   there that I put in this weir to divert; like the water right

11   calls for a diversion weir, and I put that in, and I have it so

12   that I don't obstruct the stream when I am not using it, I can

13   pull the gates and let the whole stream go through.  But when I

14   need to accumulate it, why, in order to get the pumping out of

15   the stream and make it a quantity that I can pump hour after

16   hour when the stream is good, why, I can do that.

17       In the summertime when the stream is very low, why, I maybe

18   only can pump a couple of hours or so and then I have to allow

19   the water to accumulate until it would be enough there that it

20   will supply the pump, and that way I have to break my irrigation

21   time.  When the water goes down to a certain level I have to

22   stop and let it accumulate until it can be properly pumped and

23   irrigate at that time.

24       Q  How many months a year do you actually irrigate?

25       A  Well, we irrigate some every month of the year.

1    Q   You do?

2    A   Yes, we do.

3    Q   And do you use the water every month of the year on

4    your pasture?  Is that what you do?

5    A   Well, that isn't necessarily so.  If it rains and it

6    is wet we might not start the motor for a couple of months, if

7    it happens to be at a time when it is raining; but we use the

8    motor and that water, and we have a system where it is avail-

9    able for in case of fire of the houses, we have a good stream

10   that will take good care of us, and we have facilities whereby

11   we can use that if the pump -- if the switch is turned and it

12   pumps, why, you could throw water up onto the top of the roof

13   of the houses.

14   Q   You say houses.  How many do you have?

15   A   Well, there is two houses on the property.  The large

16   house was the old hotel that was there in the early days and

17   was the stage stop, and then quite a few years before I bought

18   it, why, the Alexanders built a second little house over about

19   200 feet to the north of the house, and that is a five room,

20   two bedroom -- I would say it is a four room and screen porch

21   house.

22   Q   Now, what is the source of domestic water that you have

23   there?

24   A   The source of domestic water is a warm sulphur spring.

25   Q   A what?

1   A   A warm sulphur spring.  And it is blasted out of bed-

2   rock, and the water comes up, spring water comes up; and it is

3   right on a corner of what we have for a swimming pool.

4       The swimming pool is about 18 feet wide and about twenty

5   some feet long, and that will -- the water comes from bubbling

6   out of the bedrock in the bottom.  I understand that was used

7   many years before when this was kind of a hollowing out in the

8   rock, that the Indians came there and washed their blankets in

9   that water.

10      Q   Now, is that tributary to the creek?

11      A   That is tributary in this sense, when it reaches a

12  certain level in the pool, why, there is an overflow that goes

13  down and it empties in tributary to the creek below.

14      Q   Now, in its natural state, if you know, do you know did

15  it flow --

16      A   I wouldn't know.  I would say that it was, because

17  there would be no evidence -- At that time there was a hollow

18  enough that there was an accumulation.  The Indians didn't have

19  to dam it up or anything to wash their blankets.  It was the

20  natural formation that made it so they could sit down and bathe

21  themselves, because if we take all of the sand out of the bottom

22  of the pool you would get down to bedrock and you would find

23  still the evidence of these hollows and depressions in this

24  right at the junction of where we take out our domestic water,

25  we have walled that off so that the domestic water rises and it

1    reaches a certain level, why, it flows over into the swimming

2    pool and that way it takes care of itself, it keeps reducing.

3    And whenever it gets above a certain level to use for domestic

4    purposes, and the other one we use for swimming purposes, we

5    call it a bathing pool.

6        And that is divided into two sections, there is one part

7    that was rocked off inside of the other main swimming pool that

8    is about 8 by 8 square, and that comes up out of the bottom

9    and bubbles up out there, and we have an overflow in that, and

10   that stands at 85 degrees.  Put a thermometer in there, it

11   registers 8t degrees; and the other pool is warm, and if you

12   put a thermometer in there, why, it registers 78.

13       Q   Now, do you have any livestock on your property?

14       A   Yes, we do.

15       Q   And what is that?

16       A   We have cows and calves, and we have a hog once in a

17   while.  At one time I had four or five horses, but the day came

18   when I found that the cattle were more profitable, and at times

19   I did take in pasture stock.  But I am not taking in pasture

20   stock; I could take pasture stock in now profitably.

21       Q   Now, what is the source of water for the livestock?  Do

22   you take it from the creek?

23       A   They pasture down in the creek, and they get water from

24   the creek.  But the main source of the livestock, they go down

25   into the creek at any time; there is a trap that the gate can

1   be left open, any one of the three traps, and they can go down

2   into the creek and get the water.  But they can also go up to

3   the springs, and they can wade down in the spring and take their

4   water.  They can get water.  They are all so that they are

5   intercommunicating, and stock can be left there and they will

6   be fed and they will be watered.  And the source for the

7   watering trough at the barn is both from the -- can be pumped

8   in from the creek or can have gravity flow from the springs.

9   And both springs empty into -- right at the present time one

10   spring is disconnected and doesn't empty into the irrigating

11   system, but they are high enough up that they do both flow

12   down by gravity, and you can use either.

13       If the springs were dry you could pump the water that

14   would reach everything.  And if the springs are adquate in the

15   wintertime, why, and we don't pump, then we can take it down --

16   Originally there was a 2 inch pipeline went from one spring

17   all the way and was on a cable across the creek, and supplied

18   all of the household water previous to the putting in of the

19   warm sulphur springs.  Well, that was the source of their

20   domestic water, was the spring I call number 1.

21       Q  Now, you mentioned natural foliage and forage on your

22   property.  What would be the acreage of that type of growth,

23   do you know?

24       A  Well, I have never been told any definite amount of

25   acreage, except that I would say that Mr. Dresselhaus figured

1   it, he said how much it would take.

2       Q   And would you describe that type of growth?  What are

3   they, oak trees?

4       A   It is sycamore trees, and it is alder, and there is

5   grass that grows in with it, and there is some oak trees down

6   in the bottom.  The oak tree principally is up on the hills and

7   on higher land, up out of the stream bed.  But the stream bed

8   has all of that, it has willow, it has oak, live oak, and it

9   has some of the Calabasus oak, the hard oak, and alders, and

10  there is a very few -- I think I could count them on the fingers

11  of my hand -- of cottonwood trees along this stream bank.  And

12  the sycamore and the alder are the predominant growth in the

13  creek bottom, but the hills are I believe it is sumac, and oak,

14  and sage, or the white sage, and some thistle sage.

15      Q   Now, are you claiming water for those trees that you

16  have just mentioned that are farther up away from the creek?

17      A   I do not irrigate that part.  No, I am not claiming

18  water for that, that isn't the point.

19      Q   But you are claiming water for the --

20      A   For the river bottom, and all that would naturally get

21  it from the springs.  I am not claiming anything that can't be

22  legitimately used.

23      MR. VEEDER:  Now, your Honor, I don't know whether this

24  report is going to be offered or not.  Is it, Mr. Eberhard?

25      MR. EBERHARD:  I will be glad to offer it.

1    MR. VEEDER:  Well, I didn't know.  I would rather you

2  wouldn't, frankly, because I would have to object to it.

3    MR. EBERHARD:  I didn't offer it unless somebody wants it.

4    MR. VEEDER:  He had mentioned it.  If it is not going to

5  be offered, I have no objection.

6    MR. EBERHARD:  I suppose any counsel is entitled to have

7  it offered in evidence since the witness referred to it.

8    THE MASTER:  Apparently counsel are agreed that it will

9  not be offered.

10    MR. VEEDER:  We are very happy, because I didn't want to

11  make an objection.

12    MR. EBERHARD:  I thought I might have Mr. Dresselhaus here

13  today, but he is down in Mexico.

14    THE WITNESS:  That was a tentative proposition that was

15  made.

16    MR. VEEDER:  There are references to bulletins in there

17  that we would have objections to.

18    No further questions.

19    MR. EBERHARD:  I think we might get a clearer picture of

20  the physical situation.

21

22              REDIRECT EXAMINATION

23  BY MR. EBERHARD:

24    Q  The two springs that you referred to as the sulphur

25  springs for domestic use are just below the house, are they not?

1    A   Yes, sir.

2    Q   On the east side of the creek?

3    A   They are to the south side of the creek.

4    Q   The south. And that is on the same side that the road

5 is on, the highway?

6    A   That is right, the De Luz Road.

7    Q   And those two springs are within 15 feet of the stream,

8 are they not?

9    A   Well, when it comes up and it is really flooded it

10 overflows there, and once in a while when we have our big years

11 I have had to get in and clean it out.

12    Q   I mean they are in close proximity to the stream?

13    A   Yes, but they are not in the stream bottom.

14    Q   But they are just above it, and there is no place for

15 the water to go except in the stream if you were not using it?

16    A   Yes, sir.  If the walls were six feet higher the water

17 would never go into it.  It doesn't ordinarily, but it is only

18 in the high waters that it comes up and flows in.

19    Q   At times when the water from the other sources is short

20 for irrigation use do you pump out of that swimming pool?

21    A   Yes, I do.

22    Q   Now, you referred to some other springs.  Where are they

23 located?  Across the stream from the house where your permanent

24 pasture is --

25    A   It is up on the north and the south side of the hill,

the hills that are along the north portion of the place.  On
the south side there are two springs, one we call number 1, and
that is an old spring that was the original spring that was
developed and used for household purposes and irrigation pur-
poses, and it has a three-quarter inch pipeline that went from
that spring and down to the edge of the river, and a cable was
stretched from an oak tree on one side to a sycamore on the
other, and that three-quarter inch pipe was put across on that
and it supplied the water -- the domestic water for the houses,
and the irrigation of the lawns, and those things.

Q  Have you done any development work around the springs
up there in the pasture?

A  Yes, yes.  About ten years ago we went in and opened
them up so that they would have greater volume of accumulation
there to take care of the stock, and it was just a matter of
production that we wanted there, and so we call it opening up
the springs so that they will flow more freely, otherwise they
become closed up with mud and things of that kind.

Q  Well, did you leave sort of a tank around where the
water comes out of the springs?

A  Beg pardon?

Q  You spoke of the stock watering there.  Did you leave
sort of a tank there?

A  No.  They can go right into the water -- The water from
those springs is not used for domestic purposes at all.  We get

541

1    all of our domestic water from the source that I spoke of, that

2    is walled in and covered and kept clean.

3        Q    I see.  But the water from those springs is applied

4    directly to the pasture there, is it?

5        A    That goes into the pasture, and if it seeps over we can

6    still get water from that.

7        Q    And where does the water from the -- the water for the

8    olive orchard come from?

9        A    Well, the water for the olive orchard comes entirely

10    from the pump, or we have it so that we can utilize the water,

11    all the water.

12        Q    Now, you have said that there were twelve acres of

13    permanent pasture now in use, now irrigating?

14        A    Yes, sir.

15        Q    And three acres of olive orchard?

16        A    Yes, sir.

17        Q    And two acres of other --

18        A    There is two or more.

19        Q    Of what was that?

20        A    Well, it is for crops, raise hay on.

21        Q    That is along the road?

22        A    That is along the road.  That is simply modified.

23    Sometimes we have gone in and cultivated the bottom land and

24    planted it in among the trees.  I would say it was not bothered

25    by the stream, because the stream is off to the north side of the

1   river bottom, and that is cultivated land, is irrigable land.

2       Q   Adjoining your present permanent pasture and above it

3   on the hillside that is a rather gentle slope on that hillside

4   as I remember it.  Is that correct?

5       A   That is correct.

6       Q   And above the land that is now irrigated there is other

7   land of the same general character that could be irrigated?

8       A   I could run a pipeline up about an eighth of a mile

9   further and irrigate that all along the north side.  It is good

10  soil, and it is just as -- It had been used like for annual

11  crops in the early days, they raised oat hay on it, and things

12  of that kind.  But it was out of the facilities of the watering

13  district -- the water facilities at that time.  But if I

14  figured that it would be a profitable thing to do, why, I could

15  extend my pipeline up that distance and irrigate all of that

16  land.  It is good fertile soil and could be put in crops.

17      Q   In general you would say that the land classification

18  set up in the government's Exhibit M-57, the engineering report

19  is correct.  Is that correct?

20      A   I would say to the best of my knowledge that it is

21  correct.

22      MR. EBERHARD:  That is all.

23      THE MASTER:  Mr. Sachse, do you have any questions?

24

25

RECROSS-EXAMINATION

BY MR. SACHSE:

    Q  Dr. Wilson, do you have any knowledge as to whether or not Mrs. Regan ever posted this Notice of Appropriation?

    A  Well, that would have to be -- How could I have any knowledge?

    Q  If you have a copy of a posted notice.  Do you?

    A  That is taken from the records of San Diego County.

    Q  This is the only document you have then relating to appropriation.  Is that right?

    A  That is the only document that I have, yes.

    Q  Now, I notice that the government's report, Exhibit M-57, allows you a reasonable irrigation requirement for future potential use of 187 acre feet a year.

    A  Yes.

    Q  To your knowledge has the property ever used that much water in the past?

    A  Well, it is possible that we have done that.  I don't think that -- I think that is taking in this land that we just spoke of.  And they made a survey and they picked out what was the reasonable amount if everything that could be used on the property were irrigated, why, that would be --

    Q  I understand that.  But I am asking if you know whether or not at any time in the past that amount of water has actually been used?

1    A   Well, I would say no.

2    Q   It has not?

3    A   Yes, I would say no.

4    Q   Now, do you know in acre feet per year what 50 inches

5   amounts to?

6    A   Well, I know that it is a big sum.

7   MR. SACHSE:  I will ask then -- Ray, will you stipulate

8   that 50 inches -- and possibly Mr. Veeder also -- that 50 inches

9   equals 1 cubic foot per second, which for a year's constant

10   flow would be 724 acre feet?  Will you so stipulate?

11   MR. EBERHARD:  I will so stipulate.

12   MR. VEEDER:  Yes.

13   THE WITNESS:  Yes, I have always realized that 50 inches

14   was more than the property needed.

15   MR. VEEDER:  A completely honest man.

16   MR. EBERHARD:  Absolutely.

17   BY MR. SACHSE:

18    Q   Do you know when Mrs. Regan actually commenced to put

19   the water to use?  I realize that this document is dated July

20   31, 1911.  Do you have any hearsay information as to when she

21   started to use it?

22    A   Not at all.

23    Q   Do you have any hearsay information as to how fast the

24   property was developed --

25   MR. VEEDER:  I am going to object.

1    MR. SACHSE:  I am asking if he has the information.

2    MR. VEEDER:  I am objecting.  An inquiry if you have hear-

3    say information we necessarily would object to it.

4    MR. SACHSE:  I haven't asked him for the information.

5    THE MASTER:  I think the question is proper.  He is asking

6    him if he has the information.

7    The question is proper.  You may complete the question,

8    and the witness may answer it.

9    BY MR. SACHSE:

10   Q  Have you any information from anyone in the past as to

11   how fast this water was put to use on the property?

12   A  No.

13   Q  Now, Doctor, about these two older springs that you

14   referred to, one of them, number 1.  Would you tell me again

15   where it is with relation to the stream?  Is it on the east --

16   A  It is on the north side of the stream.

17   Q  That is the side away from the road, opposite to the

18   road?

19   A  The De Luz Road, yes.  The road up the north side of my

20   property that goes up the neighbors and goes back up in --

21   Q  But it is opposite to the county road, across the stream?

22   A  It is not parallel.  The county road is on the east side

23   of my property, and this other road is on the north side of the

24   property.

25   Q  Now, how far are those springs removed away from De Luz

1   Creek?

2       A   They are at least 200 or more yards away from the creek,

3   they are at least that much.   It has never been measured.

4       Q   Now, at any time during the past -- Withdraw that.

5       How long have you lived on the property?

6       A   I have owned the property I would say for ten years.

7   I have never more than just vacationed and lived there week-ends,

8   and things of that kind; it is not my legal residence.

9       MR. EBERHARD:   The Doctor said ten years.   I understood

10  him to testify twenty years ago.

11      THE MASTER:   Did you buy the property ten years ago or

12  twenty years ago?

13      THE WITNESS:   It was twenty years ago.

14  BY MR. SACHSE:

15      Q   Well, now, during that twenty year period have those

16  springs delivered surface flow to De Luz Creek, or has the flow

17  disappeared before it reached De Luz Creek?

18      A   Well, the spring number 1 had no influence on anything

19  except what went over to the house for irrigation and domestic

20  purposes from long before I ever bought it.

21      Q   What about the other spring?

22      A   Well, the other spring, as far as I know it was just

23  pretty well plugged up and wasn't active, and was in a water --

24  the rain came down through it in a hollow, and just went by it

25  -- as it went down, and at some time of the year it may have

1 flowed past it and down, and other times of the year there was

2 no seepage at all.

3     Q  Now, as I -- Withdraw that.

4     It is true, is it not, Doctor, that the rainfall is pretty

5 heavily concentrated in the winter season?

6     A  Yes.  It didn't hit the number 1 spring, the rainfall

7 had nothing to do with that at all.  But the rainfall and the

8 drainage from these upper fields up at the northwest corner

9 came down, and it came right along the spring number 2, and it

10 filled that in with mud and things of that kind.

11     Q  The map appears to indicate, if I have your property

12 right, that the lower end of Fern Creek crosses your property.

13 Is that true?

14     A  That is right.  And Camps  Creek, also.

15     Q  And does that enter De Luz Creek below your weir or

16 above your -- below your weir or above your weir?

17     A  Below it.

18     Q  Below your weir?

19     A  Yes, sir.

20     Q  In other words, your diversions from the weir are taken

21 from the De Luz Creek water before the Fern Creek-Camps  Creek

22 water has entered the stream?

23     A  A hundred percent.

24     Q  Then you claim no appropriative right of any kind to

25 the waters of Fern Creek or Camps  Creek?

1    A   Well, I have a right to make a file on them. I have not

2  ever made any appropriative claim, but I still have the right

3  to.

4    Q   But I mean as of this time you claim no appropriative

5  right to Fern Creek or Camps Creek?

6    A   No, that matter has never been taken up. But as long

7  as they flow through there I can still do that. I am never

8  outlawed on that.

9    MR. SACHSE:   Excuse me one moment.

10   Your Honor, I have no further questions, but I would like

11  to ask Mr. Eberhard a question for the record. It is a legal

12  one, and I don't think the examination is clear, and I don't

13  know that the witness can answer it.

14   I would like Mr. Eberhard to state whether or not he has

15  searched rights to the use of riparian water from these streams,

16  as well as the appropriative right he has filed.

17   MR. EBERHARD:   Absolutely.

18   MR. SACHSE:   I have no further questions.

19   MR. EBERHARD:   I want to clear up another thing.

20

21                REDIRECT EXAMINATION

22  BY MR. EBERHARD:

23   Q   Camp's Creek flows into Fern Creek on your land?

24   A   Yes, sir.

25   Q   And the merged streams flow into De Luz Creek?

1    A   Yes, sir.

2    Q   Between the house and the olive grove?

3    A   No, the olive grove is to the south of the house, and

4    where it enters is at a different angle, it is further down the

5    creek.

6    Q   But it is on your land?

7    A   Oh, yes, quite a few hundred feet before it crosses my

8    south line.

9    THE MASTER:  Do you have any questions?

10   MR. SACHSE:  I have nothing further.

11   THE MASTER:  Mr. Veeder.

12   MR. VEEDER:  I have another question I would like to ask.

13

14                    RECROSS-EXAMINATION

15   BY MR. VEEDER:

16   Q   In regard to Camps Creek and Fern Creek are there any

17   of these natural growth for which you are making claim?

18   A   It is the Fern Creek, it has got oak, that is not

19   entering into it because that is being left natural.  I am not

20   irrigating that.

21   Q   But nevertheless there is a use of water from Fern

22   Creek --

23   A   I don't believe that that is taken in consideration.  I

24   would have to --

25   Q   Well, you are claiming it, aren't you?

1    A   I don't believe.  No, that is a different creek bottom

2   altogether, because the amount of acreage that is given there

3   would not include that much acreage.

4    Q   Do you water livestock from there?  Does your stock get

5   any water?

6    A   Do you mean in the De Luz Creek?

7    Q   No, I am talking about the Fern and Camps Creeks.

8    A   Yes, they water there when they are down in the pasture,

9   that is their source of water.  They go all the way down to

10  where we have a fence across to keep them from going further

11  down, and they drink out of the De Luz Creek.  They drink out

12  of the Fern Creek, and they drink out of the Camps Creek,

13  wherever they happen to be.

14   Q   Do Fern and Camps Creeks maintain any grass or forage

15  for the -- do they naturally irrigate some of that foliage?

16   A   There is seepage there.  This is springs along the

17  edges, water rises right in the Fern Creek before it empties

18  into the De Luz Creek, there is water production there.

19   Q   So as a matter of fact there is a use made by you of --

20   A   There is no use made except for water, and that doesn't

21  necessarily need be because they would have only to walk a

22  little bit further to get it out of the De Luz Creek.

23   Q   Are those two streams, Camps  and Fern Creeks, inter-

24  mittent in time?

25   A   Yes, they go dry above me, and there is no water comes

1    onto my property for a good share of the summertime, they are

2    completely dry.  If it was not for the fact that the springs

3    produce, why, there would not be water; and once in a while

4    there is not a little stream running down in the De Luz.

5         MR. VEEDER:  I have no further questions.

6         MR. EBERHARD:  I think I have some more questions, since

7    you have brought up this subject of the streams drying up.

8

9                    REDIRECT EXAMINATION

10   BY MR. EBERHARD:

11        Q  In the summertime when you are irrigating and the

12   streams are low anyhow does any water go past your weir?

13        A  There is days that it doesn't go past the weir.

14        Q  What is that?

15        A  It is quite a struggle, and that is why I have to aug-

16   ment my water or I wouldn't be able to irrigate, and the crops

17   would die.  That is why I pump out of the swimming pool.

18        Q  There is not enough water --

19        A  To augment it, the stream is not sufficient to supply

20   it.  The crops would die if I had to depend entirely upon the

21   De Luz Creek, the amount of crops.

22        Q  Do you take all of the water that there is at De Luz

23   Creek at times?

24        A  Oh, yes, I take every drop there is.

25        Q  Now, these springs up on the pasture, they are up on a

1      slope?

2          A   We take all of that.

3          Q   And the slopes from those springs run down directly to

4      De Luz Creek, do they not?

5          A   Yes, sir.

6          Q   It slopes from these springs down to --

7          A   A lot of times the water runs by number 2, and it goes

8      by to the edge of number 2 now so that it doesn't get into the

9      spring and goes on down into De Luz Creek.

10         THE MASTER:  Have you any further questions, Mr. Myers?

11     Mr. Stahlman?

12         MR. STAHLMAN:  No, your Honor.

13         MR. DENNIS:  Your Honor, I haven't made an appearance, but

14     I think because of the offer of proof that Mr. Veeder made

15     today and the fact that I wouldn't want to require Dr. Wilson

16     to come back that I would like to ask some questions.

17         THE MASTER:  You are making a formal appearance at this

18     time?

19         MR. DENNIS:  I am making a formal appearance for the Santa

20     Margarita Mutual Water District at this time.

21         THE MASTER:  The record may show that you have been in the

22     courtroom this morning.

23         MR. DENNIS:  All day, yes.

24

25

RECROSS-EXAMINATION

BY MR. DENNIS:

Q   Dr. Wilson, as I understand your testimony, you irrigated an olive orchard containing about three acres?

A   Yes, sir.

Q   And the pasture that you irrigate, how many acres are there?

A   There is three in the olive orchard.

Q   How many acres of the irrigated land are permanent pasture?

A   That is twelve acres.

Q   That is irrigated by sprinkler?

A   And there is another patch of ground that would constitute an acre and a half or two acres that I irrigate.  That is on the east side of the property, and the olive orchard is on the same side.  So that it all amounts to -- the system goes this way, when the water is pumped it goes through a four inch main, and if I want to take it over to the olive orchard or along the east side in these parts that goes by the house, I shut a valve and it goes up, and there is a three inch pipeline on a cable that goes across the creek and then it goes down along the road to the south, and that is where we get the water that irrigates the olive orchard and the land that is between the two houses, and irrigate the lawns and those things.  And then from the house up to where this pipeline begins, why, there

1    is a strip about 75 or 80 feet wide, and it continues and that

2    pipe goes down the middle, and I have sprinklers on that pipe

3    and irrigate that and raise -- I did put it in permanent pas-

4    ture and we use it in intermittent crops; right now it is in

5    Sudan grass, and we will mow it as it comes along and keep it

6    irrigated.   That produces food for the cattle.

7        Q   But all three parcels are irrigated by sprinklers?

8        A   Everything --

9        Q   By sprinklers?

10       A   Yes, sir.

11       Q   And are you familiar with what I mean when I use the

12   term watershed?

13       A   Watershed is right.

14       Q   You are familiar with that term?

15       A   Yes, I am.

16       Q   And is the irrigated pasture within the watershed of

17   Camps Creek or within the watershed of De Luz Creek?

18       A   It is within De Luz Creek.

19       Q   And the same would be true of the two or three acre

20   parcel and the olive orchard?

21       A   Everything is in the De Luz watershed.

22       Q   Everything that is irrigated is in the watershed of the

23   De Luz Creek?

24       A   Yes, sir.

25       Q   And have you each year been able to irrigate all three

1    parcels?  Have you had sufficient water to irrigate all three

2    parcels?

3         A  We just get by by the skin of our teeth.

4         Q  In other words, you have irrigated, I think your state-

5    ment was --

6         A  We take all of the stream.

7         Q  You have utilized all of the water that there was or

8    could be developed on the stream?

9         A  I wouldn't dare to plant more land until I could be

10   sure that I could either develop the springs or put down a

11   well, or something like that to supply me with water, because

12   the creek won't take any more.

13        Q  I believe, too, that you stated -- I think these were

14   your words -- "If I figured it would be a profitable thing to

15   do I could extend my system and irrigate all of that land,"

16   referring to the top land?

17        A  The north land.

18        Q  I take it from that that you figure it wouldn't be

19   economically feasible to irrigate that land from the supply of

20   water which you have?

21        A  That is right.  I know when to quit.

22        Q  And I wonder if you could give us a little more descrip-

23   tion of the flow of Camps Creek and Fern Creek?  As I under-

24   stand, the two creeks, Camps and Fern, meet on your property?

25        A  Yes, they do.

Q   And then they form one tributary that flows into De Luz Creek?

A   I would say that Fern Creek is the one that empties into De Luz Creek on my property.

Q   And then Camps  Creek enters into Fern Creek?

A   I would judge that is it.  It makes little or no difference, but I believe on the map -- You can tell me which way or the other it is.

Q   I don't know that it makes any difference.

A   They converge on my property.

Q   Fern Creek is the one that enters into Camps  Creek. I take it from your testimony that during the summer months there is no surface or underground flow?

A   That is right. There may be underground flow.

Q   Have you had any opportunity to make any investigations whether there was underground flow?

A   No, I have never dug down.

Q   Ordinarily when does the surface flow on Camps  Creek and Fern Creek cease?  Does it just flow during the periods of heavy rainfall, or does it sometimes flow until say May or June?

A   No, I don't believe it entirely quits flowing but two or three months at the most in summertime.

Q   Ordinarily you wouldn't expect to see any surface flow we will say in August or September?

A   That is right.

41-L

557

Q   Would you in July?

A   Well, I don't know that. I cannot say, because I have never paid any attention to fixing that in my mind. I know that it goes dry when it goes dry and there is no water there if I walk down and see it, and that is for quite a long period in the summertime. Some years it is more than others.

Q   And as I understand, when you are pumping from the surface diversion from the weir you have to close the gates and stop all of the flow of the river during the summer months?

A   Yes, sir.

Q   And how long a period of time do you have to have those gates closed?

A   That would be at least three months.

Q   For three months they will be closed continuously?

A   They won't be closed, because we are not irrigating. And it isn't necessarily for a week or two that we hold it, because when we close the gates, why, as soon as the weir is full it starts flowing over, and we do nothing to interfere with that flow.

Q   About how long would it take from the time you closed the gates until it starts to flow over?

A   Well, usually we have to wait a part of the day, twenty-four hours. We may miss part of a day irrigation, and if it is full we irrigate again. That is all governed by the length of time it takes the stream to make it so that I can pump the water.

1     Q   And then you will continue after it is full to pump

2  until it is dry?

3     A   Until it is below my suction line.

4     Q   And about how long will that take from the time you

5  start your pump?

6     A   Well, that is a matter of hours.   I believe it can be

7  pumped out in less than twelve hours.   I have never counted it,

8  we just when it gets low enough that it begins to suck air, why

9  we shut it off.   And we stay shut off until it accumulates

10  enough so that we can profitably start the pump again and

11  irrigate for a length of time.   We don't just keep sucking it

12  down, we wait until it gets up to -- or, if we need to irrigate

13  immediately, if there was two feet there and the pump could run

14  for the time that it took to irrigate whatever I wanted to

15  irrigate I would start the pump.

16     Q   Have you ever used more than the two Rainbird 90's at

17  one time?

18     A   That is probably -- I only have the two Rainbiard 95's,

19  but I have 70's, and I have 40's, and I have 20's for different

20  jobs that are done.

21     Q   Now, how many 40's or 20's would you use at one time?

22  As I take it you pump directly from the line into the sprinklers?

23     A   I do no gravity flow.

24     Q   So that you pump directly into the sprinklers.   What

25  are the maximum number of 40's or 20's that you have ever used?

A   The stream will only supply so many.  And there was a time when we can only run eight or ten sprinklers.

Q   That is eight or ten 20's, or eight or ten 40's?

A   I think we used to run seven or eight 40's, and more 20's.  That is all according to the discharge capacity of the sprinklers.

Q   You gave us your estimate of what the 90's would handle per minute.  Have you any estimate of what the 20's or 40's or 70's would handle per minute, each sprinkler?

A   I have got a catalog that tells me how much they will produce under certain pressures.

Q   I wonder if you could help the Master out by giving him that figure?

THE MASTER:  I wonder if this would be a good time to take a short recess while he is finding that figure.  A ten minute recess.

(Recess.)

THE MASTER:  Mr. Dennis, I believe you were interrogating the witness?

MR. DENNIS:  Yes.  I believe the witness was going to find an answer to the question as to the capacity of the Rainbird 20, 40 and 70.

THE WITNESS:  The Model 95 Part Circle Sprinkler, pounds pressure, 60; radius feet, that is the flow that it will make, is 112 feet, that is the radius; and the discharge gallons per

1  minute is 94.1 gallons.

2  BY MR. DENNIS:

3      Q  Then on the 20's and the 40's what would be the capacity?

4      A  On the 20 it is at 20 pounds pressure, the diameter is

5  72, and 1.97 discharge.

6      Q  And on the 40's?

7      A  40's at 25 pounds pressure, diameter of flow is 82; and

8  4.74 gallons discharge.

9      Q  All right.  Now --

10      A  The 70's.  Do you want the 70's?

11      Q  You have some 70's, have you?

12      A  Yes, I have a few 70's.

13      Q  Yes.

14      A  The pressure on the 70's, 25 -- this is the top one I

15  am giving you -- the diameter of the flow would be 113 feet,

16  and the discharge would be 12 gallons per minute.  And that is

17  all.

18      Q  Dr. Wilson, I have one other question, and that is you

19  are familiar with the government's Exhibit I think M-57, which

20  is the engineering report on your property?

21      A  I have read it.

22      Q  And you will recall that they divided your land up in

23  four or five classes, you had some Class II land, some Class

24  III, some Class IV, some Class V, some Class VI, and some Class

25  VII?

1    A   Yes, sir.

2    Q   Would you have any idea as to what amount of acreage

3  of each one of those classes  would be in the watershed of the

4  De Luz Creek, and what amount of acreage would be in the water-

5  shed of Fern Creek or the watershed of Camps  Creek?

6    MR. MYERS:  I would --

7    MR. DENNIS:  I just asked if he had any knowledge.

8    THE WITNESS:  I would say that 90 percent of the land is

9  in De Luz Creek.  There is no real streams -- or, runoff that

10  goes into Camps  Creek and Fern Creek.

11    MR. DENNIS:  That is all.

12    THE MASTER:  Any further questions by any counsel?

13    MR. VEEDER:  Yes, I have some questions, your Honor.

14    MR. EBERHARD:  I want to make one thing clear, that the

15  watershed of Camps  Creek and Fern Creek are a part of the

16  watershed of De Luz Creek.

17    THE MASTER:  That is understood.

18    MR. DENNIS:  I think that wouldn't be true of an owner

19  above the confluence of Camps  Creek and Fern Creek.

20    THE MASTER:  I think the record is clear as to the dis-

21  tinction.

22    MR. VEEDER:  The witness has said 90 percent is in De Luz

23  Creek.

24    MR. DENNIS:  That is his estimate.

25

RECROSS-EXAMINATION

BY MR. VEEDER:

   Q  I have some additional questions, Doctor, if you don't

mind.  Are you getting tired?

   A  I can take it.

   Q  All right.  I don't mean to impose on you, but there

are certain questions that I would like to ask based on Mr.

Dennis' cross-examination.

   MR. SACHSE:  Excuse me.  Is that the exhibit?  You have

got the wrong one, that is Mr. Wilson's own.  May we look at

that one and you get the exhibit?

BY MR. VEEDER:

   Q  Dr. Wilson, in regard to the lands that are classed III

which lie along De Luz Creek, do you recall what lands those

are?  I will show you the map.

   Now, I hand you the Exhibit M-57, and you will note where

Class II and III lands are situated.  Do you see that?

   A  Yes.

   THE MASTER:  You are referring to the pinkish area?

   MR. VEEDER:  And also the class numbers are shown on this

exhibit.

   Q  Now, that land is good land, isn't it, Doctor?

   A  That is the river bottom land.

   Q  That is good land?

   A  Yes.

1    Q  And is that land where your forage, your pasture is?

2    A  The pasture begins here at the beginning of the property.

3    Q  You are pointing at the northern end of the --

4    A  No, that is north and east end.

5    Q  Repeat, if you would, Doctor.

6    A  This is De Luz Creek, is it not, here?

7    Q  Yes.

8    A  Well, beginning at the northeast corner where the road

9 goes into the barn, why, the land to the north is all in per-

10 manent pasture up to the north fence.  And then it continues

11 on over until it is even with the house, the large house, across

12 the creek from the large house.  That is where the permanent

13 pasture ceases to be grown.  And that is all under irrigation,

14 that is the twelve acres here.

15    Q  Now, there are additional acres of land, are there not,

16 of about the same kind and character as the twelve acres of

17 pasture?

18    A  On the back, on the north side there is good land all

19 the way to my west fence.

20    Q  And it would be possible, would it not, to put in pumps

21 and put the water up there?

22    A  Yes, sir.

23    Q  So as a matter of fact there is development going on

24 up along De Luz Creek all the time now, isn't there, new places

25 going in?

1   A   That could be sold and people could develop that.

2   Q   And people are actually going in there, there is new

3   development going in up there all the time?

4   A   Yes, sir.

5   Q   So it is reasonable to assume, is it not, that there

6   will be a greater burden on the creek as the years go by?

7   A   That is right.

8   Q   So the mere fact that you are not using during the

9   higher runoff -- the mere fact that you are not using all of

10  the water at the present time during the time of high runoff,

11  it is entirely possible, is it not, that in the future that

12  more of that high runoff will be used on that land, is it not?

13  A   Yes, that is true.

14  Q   So you are claiming water for that land as a riparian

15  owner, are you not?

16  A   I would --

17  Q   You are?

18  A   I am.

19  Q   It is also possible that rather than natural pasture or

20  seeded pasture that more intensive cultivation could go in on

21  that land.  Isn't that right?

22  A   That is true.

23  Q   Would you point out on the map for me where the citrus

24  trees were situated when you came up there?

25  A   They were situated at the point -- on the south point

1    here -- is this the road along here?

2         Q  Yes.

3         A  It would be about on this hill.

4         Q  And have you a recollection as to the number of acres

5    that were in citrus at that time?

6         A  It wouldn't be more than an acre.

7         Q  It wouldn't be more than an acre?

8         A  No.

9         Q  How about the other land, the lands which are not

10   presently irrigated by you, do you think that those are suit-

11   able for citrus?

12        A  No, I do not.

13        Q  You do not?

14        A  No.  This over here on the west line, on the slopes up

15   there, if there was ample water to irrigate it it would be

16   above the frost line and it would be practical.

17        MR. VEEDER:  I have no further questions.

18        THE MASTER:  Mr. Eberhard?

19

20                     REDIRECT EXAMINATION

21   BY MR. EBERHARD:

22        Q  Dr. Wilson, you testified that during the summertime

23   when you are using -- when you are irrigating and the water in

24   the stream is low you take all of the water out of De Luz Creek

25   at your weir?

A   Yes, sir.

Q   How long has that condition continued?  Has that been during all of the time that you have been there?

A   That has been ever since I have been taking from the weir.

Q   When did you put in that weir?

A   That was put in -- That is hard to say.  I have been irrigating at least --

Q   No.  I say when did you build that weir?

A   I have no date on when I built that weir.

Q   Well, was it soon after you bought the property?

A   Well, it came soon after I bought the property, because -- Just a minute.  Can I ask my wife?  She can tell me.

THE MASTER:  If none of the counsel object, you can ask her.

MR. VEEDER:  I have no objection.

MR. MYERS:  No objection.

MRS. WILSON:  I would say twelve years.

THE WITNESS:  Twelve years.  That was when Stephens came there?

MRS. WILSON:  Yes.

THE WITNESS:  He has been with us how many years?

MRS. WILSON:  Fourteen years.

THE WITNESS:  Fourteen years.

BY MR. EBERHARD:

Q   That is when Stephens came to work for you?

A   Yes, sir.

Q   Ever since then has there been a part of the year when you have shut off all of the water on De Luz Creek?

A   Yes.

Q   For how long would you say?

A   We have never shut it all off.  We would have to shut it off for a short time until we get our irrigating done, until it fills up and goes over.  But it is shut off periodically at that time.

Q   And has that been for the last twelve years?

A   I don't believe there has been a year that it hasn't had to be done.

MR. EBERHARD:  That is all.

THE MASTER:  Any further questions by any counsel or by any individual defendant who may be present without counsel?

Dr. Wilson, I guess you are excused then.

Mr. Eberhard, do you have any other witnesses?

MR. EBERHARD:  I learned this morning that there may be a man that may be able to throw some light on earlier water use on Dr. Wilson's property, and I would like to reserve the right to put him on at some later time before the De Luz Creek hearings are finished, if it develops that he does have that information that I think he may have.

1  THE MASTER:  In that event I would assume you would advise

2  counsel so that they could be present if they so desire?

3  MR. EBERHARD:  Yes.

4  THE MASTER:  You have no further witnesses at this time?

5  MR. EBERHARD:  No.

6  THE MASTER:  Mr. Myers, I believe you have some witnesses

7  here that you wish to present?

8  MR. MYERS:  Yes, I do.  I only have one client I am repre-

9  senting.

10  I am prepared to go ahead now.

11  THE MASTER:  You may proceed.

12  MR. MYERS:  Mr. Butler, will you take the stand?

13

14  LAWRENCE WILLIAM BUTLER,

15  called as a witness, sworn, testified as follows:

16

17  DIRECT EXAMINATION

18  BY MR. MYERS:

19  Q  Will you state your name for the record, Mr. Butler?

20  A  Lawrence William Butler.

21  Q  And you are the owner of certain properties in De Luz

22  Canyon?

23  A  That is correct.

24  MR. MYERS:  At this time before we go into the evidence,

25  your Honor, I would like to make a little statement, since I

1 haven't appeared in any of the legal proceedings over the period

2 of the last seven years, except to answer, merely to state our

3 proposition in this case.

4 Since the Court is to make findings of fact and conclusions

5 of law I feel that as far as our legal position is concerned,

6 and it will be revealed by the evidence, that the case in Cali-

7 fornia more in line with our particular factual situation is

8 3rd Cal 2nd, Tulare vs. Strathmore.  I merely make this state-

9 ment so the Court will realize our position.  In a finding in

10 '25 the Court makes this statement, I think this is applicable

11 to our case.  I appreciate the Court is aware of this case, but

12 I merely wish to reiterate it.

13 "In said action the findings of the trial court to the

14 effect that the appropriators were entitled to take a certain

15 number of cubic feet of water per second during certain months

16 and another amount during the remainder of the year, were not

17 intended to award each appropriator a quantity of water that

18 could be provided by a continuous flow of the number of second

19 feet of water during each period, but the trial court intended

20 to award a maximum rate of flow, and found that when the river

21 flows at that rate, including all lesser flows, there will be

22 produced the quantity that the court found that said appropri-

23 ators had theretofore appropriated and put to beneficial use.

24 "In said action, where the flow of the stream was extremely

25 variable, and the appropriators could not and did not

appropriate a fixed quantity each year, but had to take the

1   water when, as and if it was in the stream, and the uncertainty

2   in the findings as to the exact quantity awarded to each

3   appropriator was caused by the fact that, because of the physi-

4   cal conditions, the appropriators were unable to appropriate a

5   fixed quantity, the trial court did not commit reversible error

6   in fixing the awards in cubic feet per second instead of acre feet."

7        Now, of course I am not aware of what the Court will do in

8   this case because of the particular factual situation which

9   seems to be unique.  I feel that this case is important, and

10  decided after the Vallejo vs. Peabody, which is simple because

11  it applies to riparian rights.

12       So with that in mind that is the way I am proceeding.

13       Q  Mr. Butler, you are the owner of, as you stated, certain

14  property in De Luz Canyon?

15       A  That is right.

16       Q  And do you know the description of that property from

17  your answer?

18       A  From memory, no.  I have 80 acres in Section 31, and

19  Lot 1 in Section 6.  The east half of the southwest quarter of

20  Section 31, I believe.

21       MR. STAHLMAN:  Do you know the number of it on the identi-

22  fication map, Counsel?

23       MR. SACHSE:  It is 49.

24       MR. MYERS:  49.

25       Q  Does this refresh your recollection?  Would you read it

1   into the record?

2      THE MASTER:  Well, I would suggest that if it is a lengthy

3   meets and bounds description that the document be offered, if

4   there is any question, rather than read into the record.

5      MR. MYERS:  I would like to withdraw -- This is the deed.

6   Could I put into evidence the grant deed, a photostatic copy?

7      MR. VEEDER:  I would prefer it, then we wouldn't have to

8   read the description into the record.

9      MR. MYERS:  I will offer the photostatic copy as the

10   Defendant's first in order.

11      THE MASTER:  It will be Defendant Butler's Exhibit M-A-49.

12   It will be so received and so marked.

13   BY MR. MYERS:

14      Q  You own that property, do you, jointly with someone

15   else?

16      A  With my wife, Mary Constance Butler.

17      Q  When did you purchase the property?

18      A  In 1945.

19      Q  Do you remember the month?

20      A  In the fall; I believe it was September.

21      Q  And have you lived on it ever since?

22      A  My father and stepmother have lived on it ever since,

23   until he passed away, and I come down every week.

24      Q  Well, when did you first start coming to this property?

25      A  In 1945.

56-L

572

1    Q  And this is not your residence.  Is that correct?

2    A  This is not my residence.

3    Q  Where is your residence?

4    A  In Los Angeles.

5    Q  And could you estimate how often you have come down to

6 the property since 1945, that is weekly or monthly?

7    A  Nearly -- At least three week-ends a month, and usually

8 four.

9    Q  And is that continuously?

10    A  Yes.

11    Q  Now, Mr. Butler, do you do any irrigating on this

12 property?

13    A  Personally?

14    Q  Yes.

15    A  I do some.  It is usually done by help that has been on

16 the property.

17    Q  And have you had help on the property continuously since

18 this time?

19    A  Yes, there has been someone there using water ever since

20 I owned the place.

21    Q  So although you live in Los Angeles you have had people

22 living on the property ever since that time.  Is that right?

23    A  That is right.

24    MR. MYERS:  If these questions are leading, Counsel, I am

25 only doing that to save time.  I realize I am asking leading

1    questions.

2        Q   Where do you get your water for irrigating?

3        A   From Fern Creek.

4        Q   I hand you what purports to be a water claim, and I ask

5    you if you can identify that from your knowledge?

6        A   This was given to me by the man I purchased the property

7    from, Allen.  This, along with another bit of paper which I

8    don't see here, he gave it to me at the time I purchased the

9    property.

10       MR. MYERS:  I would like to offer this as Defendant Butler's.

11       THE MASTER:  It would be Exhibit M-B-49.  Any objection?

12       MR. STAHLMAN:  What is it?

13       MR. SACHSE:  It is what I just handed you, you have a

14   typed copy of it.

15       MR. VEEDER:  May I inquire, Counsel, is that on file in

16   San Diego County?

17       MR. MYERS:  Yes.

18       Q   Now, Mr. Butler, at the time that this suit was filed,

19   or recently did you apply for a chain of title report to this

20   property?

21       A   Yes.

22       Q   And to whom did you apply for it?

23       A   Well, actually I think it is the Union Guarantee in San

24   Diego.

25       Q   In other words, you applied for it through counsel?

1    A   I applied for it through counsel.  You applied for it.

2    MR. VEEDER:  This is unsigned, Counsel.  This is unsigned.

3    MR. MYERS:  Well, he didn't sign it.  Let's see if I have

4  a letter of transmittal here.  There should be a letter with

5  it.

6    THE MASTER:  Mr. Veeder, are you raising any question

7  because the letter is unsigned?

8    MR. VEEDER:  Well, I would hope that he would get it signed,

9  it would be that much easier for us, frankly.

10    MR. MYERS:  Well, I have a letter of transmittal somewhere

11  I could show you the bill that came with the title report.

12    MR. VEEDER:  Why don't we do this, why don't you go ahead,

13  Mr. Myers, offer it in evidence and then withdraw it and get it

14  signed and make the record complete on that.  Is that satis-

15  factory with you, your Honor?

16    THE MASTER:  It is satisfactory with me if it is satis-

17  factory with Counsel.

18    MR. SACHSE:  I have no objection.

19    THE MASTER:  I would suggest you follow that course, Mr.

20  Myers, you can offer it in evidence now.

21    MR. MYERS:  There is a letter of transmittal here some

22  place.

23    I would like to offer this then.

24    THE MASTER:  That would be M-C-49.

25    MR. MYERS:  Subject to being withdrawn and signed.  I will

1  get it signed, but I would like to have it here so he can refer

2  to it during his testimony.

3      MR. EBERHARD:  What is that number?

4      THE MASTER:  Defendant Butler's M-C-49.  It is accepted

5  subject to Mr. Myers' right to withdraw it for signature.

6  BY MR. MYERS:

7      Q  You are familiar with that chain of title report, are

8  you not?

9      A  Fairly well, yes.

10      Q  And also that document claim of title, the water claim?

11      A  Yes.

12      Q  And you will note that in the chain of title, and

13  referring to Parcel 2, do you refer to a David S. Lacey as one

14  of the predecessors on Parcel 2?

15      A  Yes.

16      Q  And you have also perused the deed which refers to

17  Parcel 2?

18      A  Yes.

19      Q  Is that the same property as Parcel 2 on the deed?

20      A  Yes, it is.

21      Q  About how many acres of land are in Parcel 2?

22      A  Eighty.

23      Q  And Parcel 1 referred to in the deed, about how many

24  acres of land?

25      A  Forty-three and a fraction.

1    Q  Mr. Butler, are you familiar with the government survey

2  made by the U. S. Government, land utilization overlay, geology?

3  Have you perused that?

4    A  Yes, I have seen it.

5    Q  And also with the two overlays on the report?

6    A  Yes.

7    Q  And you have read that?

8    A  Yes.

9    Q  And are you satisfied with the facts contained therein?

10   A  Yes, I am.

11   Q  To the extent that they apply to your property?

12   A  Yes.

13  MR. SACHSE:  What is the number of that?

14  THE MASTER:  That is Exhibit M-55, Mr. Myers?

15  MR. MYERS:  Yes, M-55.

16  I don't propose to offer this into evidence, but I would

17  like to have it marked for identification for the assistance of

18  Counsel and the Court.  I don't intend to offer that as an

19  exhibit, but I would like to have it marked for identification

20  so the parties will be acquainted with this particular piece of

21  land.

22  THE MASTER:  Will you ask the Clerk to have it marked for

23  identification?

24  That is Defendant Butler's Exhibit M-D-49.

25  MR. SACHSE:  What is that, a photo of the property?

1       MR. MYERS:  Yes.  I will show it to you.

2       We would withdraw that later on.

3       MR. VEEDER:  This is a panorama, is that it?

4       MR. MYERS:  Yes.

5       Q  I hand you what purports to be a panorama of a piece

6   of property and ask you if you can identify it?

7       A  Yes.  I took the picture.

8       Q  When did you take that picture?

9       A  Well, I would say it would be about the winter of '46.

10      Q  Do you remember what month?

11      A  Well, that would be a guess.  It would be one of the

12  winter months of '46, and just which one I don't think I could

13  remember that accurately, I would be guessing.

14      Q  Now, at the time that you purchased this property, Mr.

15  Butler, where, if you know -- at what point did you divert the

16  water onto your property for irrigation purposes?

17      MR. VEEDER:  May I ask that -- You are speaking of Fern

18  Creek now?

19      MR. MYERS:  Fern Creek.  I will withdraw that question.

20      Q  Does any stream run through your property?

21      A  Yes.

22      Q  What is the name of that stream?

23      A  Three streams run through.  Fern Creek, Camps Creek

24  cuts across the corner of it, and the one comes through Parcel

25  1, and I don't actually know the name of that.

1      Q   Well, now, Parcel 2, does any stream come through

2   Parcel 2 of your property?

3      A   Fern Creek.

4      Q   And do you divert water from Fern Creek?   Withdraw the

5   question.

6      At the time that you purchased the property where was the

7   water diverted for irrigation purposes?

8      A   About 200 yards west of the property line.

9      Q   West of what property line?

10     A   Of my property line, the property line of Parcel 2.

11     Q   And do you know on whose property that was diverted?

12     A   At the time I bought my place a gentleman by the name

13   of Mangin owned the property.

14     Q   Dr. Mangin?

15     A   Dr. Mangin.

16     Q   Now, with reference to the U. S. Government's exhibit

17   entitled "Ownership of De Luz Watershed," are you aware of what

18   number shown on that exhibit is Dr. Mangin's property?

19     A   Gee, I don't remember.

20     Q   Well, who is that property owned by at the present time?

21     A   Anderson is that gentleman's name; it was purchased

22   rather recently.

23     MR. MYERS:   Counsel, that is Parcel Number 48.

24     MR. SACHSE:   I represent Mr. Anderson.   I will stipulate

25   that the diversion point to which Counsel is referring is

1    Anderson Parcel 48 on the government exhibit.

2        MR. VEEDER:   May I inquire as to the status of the plead-

3    ings in regard to the Butler and Anderson claims?

4        MR. SACHSE:   No cross-claims have been filed by me.

5        MR. MYERS:   No cross-claims have been filed by me because

6    of one particular order of the court.   I wasn't there.

7        MR. VEEDER:   That has been entered, but I didn't know if

8    there had been a specific claim set up.

9        MR. MYERS:   Now, at this particular time I think it is

10   proper for Counsel and myself to be clarified on it.   Any of

11   the evidence which I introduce will not be regarding any ease-

12   ment across the Anderson property, I do not think that it is

13   in issue in this case, that the only rights, whether they be

14   riparian, appropriative or prescriptive, apply to water rights

15   and not to easements in real property.   Does that meet your

16   understanding?

17       MR. SACHSE:   That is fine.

18       MR. MYERS:   I will offer evidence on this, but it is for

19   the water and not over the land, it is not an issue in this

20   case.   Is that correct?

21       MR. SACHSE:   That is satisfactory.

22       MR. MYERS:   So we do not make in our affirmative statement

23   of rights, we do not make any claim for easement over real

24   property, we merely set forth the right to divert it by diver-

25   sionary pipes to certain points on our property.

1          THE MASTER:  By any decree if it is found you had any such

2     right to water it would leave it up to you and your clients and

3     Mr. Sachse's clients so far as the real property rights were

4     concerned.

5          MR. MYERS:  As far as the prescriptive or appropriative

6     rights we may have in the water?

7          MR. SACHSE:  That is correct, that is satisfactory.

8          THE MASTER:  By the way, Mr. Sachse stipulated that the

9     point of diversion had been on Mr. Anderson's property.  Do you

10    so stipulate, Mr. Veeder?

11         MR. SACHSE:  He probably doesn't know.

12         MR. VEEDER:  I don't know.

13         THE MASTER:  It is stipulated between you two, but it is not

14    stipulated as far as the plaintiff is concerned?

15         MR. VEEDER:  The point that I was interested in -- we might

16    as well talk about it -- I assume the decree will reflect the

17    point of diversion on the Anderson property?

18         THE MASTER: I assume any decree that found such a right to

19    exist would have to specify the point of diversion.

20         MR. MYERS:  I might add -- I think it is proper -- that

21    in the original Answer filed by this defendant, we offered as

22    an exhibit and it is not in my second Answer to the supplemental

23    Complaint, we offered as an exhibit certain water claims of Mr.

24    Sachse's client.  We showed those as exhibits because our claim

25    excepts certain old water claims filed by predecessors in

65-L

581

1   interest of Mr. Sachse to which I think we are also bound,

2   because I have admitted in our exhibits in our original Answer --

3        MR. SACHSE:  Yes, those pleadings are still in effect.

4   They are still valid pleadings, as I understand Judge Carter's

5   order, and the original Answer does include an exhibit which

6   sets forth the old figures upon which Anderson will base his

7   claimed prescriptive right.  Of course I will introduce them

8   independently, also, when Anderson's case goes on, but they are

9   now in the file.

10       THE MASTER:  That is correct.  Any Answer to the original

11  Complaint is still effective for all purposes, and any exhibits

12  attached to that would have the same effect as if they were

13  attached to the Answer to the amended supplemental Complaint

14  with reference at least to the original portion of the Answer,

15  with regard to whether they would have --

16       MR. MYERS:  I did not incorporate those in the supplemental

17  Answer because the nature of this case has changed legally to

18  a certain point, and so I didn't feel it necessary.  So we just

19  incorporated in the second Answer our Exhibit B, which is our

20  own water claim but has no reference, however, to the -- the

21  Answer has no reference to the original exhibits which were

22  admitted in the original Answer, if you follow me from that.

23       THE MASTER:  Yes, those are still in effect.

24       MR. MYERS:  I just wanted to make that statement at this

25  time, because we did do that.

1    Q   Mr. Butler, are you familiar with this survey?   I hand

2    you the copy of the --

3    A   Yes, fairly.

4    Q   -- of the government survey.

5    Where is the original?   This is the Exhibit M-55.

6    Are you familiar with that overlay survey?

7    A   Well, I assume this is identical to the one you gave me

8    from the government.   It looks the same.

9    Q   Now, at the time that you took possession of this

10   property did you examine your irrigation system?

11   A   Yes, I examined it before I bought the property.

12   Q   Before you bought the property.   And at the time that

13   you did buy the property how was the water diverted from Fern

14   Creek, by what method?   Tell us in your own words.

15   A   On the Anderson property was what might constitute a

16   weir, a small outcropping of live rock; there was a small stone

17   structure built I would say three feet high, or so, and this

18   served the purpose of raising the stream bed so that the water

19   would run from that point onto the property I purchased.

20   There was an 8 inch concrete pipe let in through the stone

21   into the creek, and this ran then into a flume, a wooden flume,

22   built of redwood, across what we might call a small gully.

23   Then about just as it reached my property the ground was high

24   enough that it could continue in the form of an open concrete

25   flume, and there was a concrete flume and pipe down to a

1   reservoir at the old house on the ranch.

2   Q  Well, now, just a second.

3   A  That was 2000 feet of pipe and flume.

4   Q  For the assistance -- Using this, will you show us ap-

5   proximately where Fern Creek is located on that panorama

6   picture?

7   A  Well, Fern Creek is in the picture on the right down in

8   these trees.  And the flume and pipeline run parallel through

9   here to the house, which again is in the trees here.

10   THE MASTER:  Then the flume and the pipeline run across

11   the picture from almost the extreme right to the trees which

12   are located in the second picture from the left?

13   THE WITNESS:  That is right.

14   MR. VEEDER:  I wonder if Counsel would permit us to have

15   that reproduced?  That strikes me as a good --

16   MR. MYERS:  That is why I am offering it.

17   MR. VEEDER:  It seems to me that now we are identifying

18   from it.  I am not trying to run your case.  I would like a

19   copy of it.

20   MR. SACHSE:  I would like a copy.

21   THE MASTER:  If that can be reproduced I would suggest that

22   you let Mr. Veeder make copies for himself and Mr. Sachse.

23   MR. MYERS:  All right.

24   THE WITNESS:  It is vaguely possible that I may have the

25   negatives, and if I do I will be happy to send them to you.  Of

1    course that is pretty old now.  I can't guarantee I have them,

2    I will look.

3        MR. VEEDER:  But as I understand that can be reproduced.

4    It might be a little dark.  I would like to do it.

5        THE MASTER:  It is understood that you will make copies

6    available?

7        MR. VEEDER:  And that that will be received in evidence?

8        MR. MYERS:  Yes.

9        THE MASTER:  That will be received in evidence as Defen-

10   dant Butler's Exhibit M-D-49.

11       Will you give it to the Clerk to be so marked?

12       MR. MYERS:  You will withdraw it and make the copies from

13   it?

14       MR. VEEDER:  Thank you.

15   BY MR. MYERS:

16       Q  Now, this diversion that you speak of, will you explain

17   again how that was diverted immediately at the diversion point,

18   by what kind of a pipe?

19       A  There was an 8 inch concrete pipe let into the rock,

20   the water ran from the stream into the pipe down through the

21   flume, by gravity throughout the ranch.

22       Q  And all of this irrigation is by gravity through all

23   of your outlets?

24       A  Yes.  It was not necessary to pump.  The only time any

25   pumping was involved in getting water onto the ranch is in a

1  dry time of year, which occurs usually in the month of August

2  or September, and at this time the water level in Fern Creek

3  drops, particularly during the daytime, to on hot days it might

4  virtually disappear.  It never has completely disappeared, but

5  almost.  Then it yields water well again in the evening after

6  the sun has gone down, and in the morning.

7  Now, we have pumped out -- There is water underground, but

8  the stream seems to drop and go underground between where I

9  take water and where Mr. Anderson or Mr. Mangin had his outlet,

10  they let water come down to me.  Sometimes in the hot months

11  it seems to go underground a part of the day.  And during that

12  time I have a sump pump to replenish the supply of water.

13  Q  From a well?

14  A  Yes.

15  Q  How close to the creek is this well?

16  A  Very close.

17  Q  In other words, in your opinion is it creek water?

18  A  I would say it was.

19  Q  And how many months-- I will withdraw that.

20  When do you use that well, if any time?

21  A  Well, this will vary with the years.  If we have had a

22  good rainfall it will be later in the year; if it has been a

23  hot, dry year we will pump frequently.

24  Q  Let's be more specific.  Excluding this year of '58,

25  let's take the year '56.  How many months during '56 did you

1    pump from this well?

2          A    I would say we pumped during the months of July, August

3    and September.

4          Q    And how about the year '57?

5          A    The same.   Those are the bad months for water.

6          Q    Now, during that time did any water come into your 8

7    inch pipe that you spoke about?

8          A    Oh, yes, indeed, but not sufficient quantities.

9          Q    Not sufficient quantities for what?

10         A    To irrigate.

11         Q    Now, do you know what the cubic foot per second yield

12    is through this pipe?

13         A    Well, I assume the government's survey is correct, and

14    they state that it handles a half a cubic foot a second.   I

15    have never actually measured this other than roughly, and I

16    assume that would check fairly well with what I measure.

17         Q    And do you know how many acre feet a day that would be,

18    if any?

19         A    On that basis I believe that would be an acre foot a

20    day, or somewheres in there.

21         Q    Now, Mr. Butler, have you checked this flow of water

22    from the time it enters the diversionary pipe at its headwater,

23    or head point, initiation point, down to the time it reaches

24    say about the middle of this irrigation system?   Have you

25    checked the flow?

71-L

1    A   Well, I have never actually measured it, you know, in

2 various sections, you know, in different places along the pipe.

3    Q   At this point, Mr. Butler, what is the nature of your

4 work, your vocation?

5    A   Well, I run a photographic effects department in a

6 studio, and I have done a great deal of mechanical work.

7    Q   Do you do processing?

8    A   Yes.

9    Q   And, for instance, if you want to make -- let's say

10 improvise a war picture, have you in the past improvised it by

11 making ships that look like a real war scene?

12    A   Yes.

13    Q   What kind of work do you call that?

14    A   Photographic effects work.

15    Q   Is that processing?

16    A   Well, it covers a number of phases.

17    Q   And do you estimate sizes and estimate -- make these

18 estimations so that it will look real?

19    A   Well, yes.

20    Q   Can you give us in the past any such instances where

21 you have done that that we might be familiar with?

22    A   Well, I don't know, the last picture I worked on that

23 involved ships was Caine Mutiny.

24    Q   Well, animals, anything like that?

25    A   I worked on a picture called Jungle Book.

1    Q  All right.  But that is your work?

2    A  Yes.

3    Q  And you still do it?

4    A  Yes.

5    Q  For television as well as picture work?

6    A  Some for television.

7    Q  All right.  Now, you are making claim to certain tempo-

8  rary storage reservoirs.  At the time you purchased this

9  property were there any storage tanks on the property?

10   A  Yes, there was a reservoir near the old Brode house,

11 a concrete reservoir; and a smaller tank which I later destroyed

12 near the house.

13   Q  Well, Mr. Butler, I am going to -- This is Fallbrook

14 Quadrangle 7.5 minute series, number, I think, 32 --

15   MR. SACHSE:  It is in evidence.  If you don't want to

16 mark it up --

17   MR. MYERS:  We are going to mark it up, this will be ours.

18   THE MASTER:  Do you want to mark this for identification?

19   MR. MYERS:  Yes, your Honor, as Defendant Butler's next in

20 order.

21   THE MASTER:  Defendant Butler's Exhibit M-E-49 for Identi-

22 fication then.

23   MR. MYERS:  I had a colored pencil, but I don't seem to

24 have it here.  Can I borrow this pencil, Counsel?

25   THE MASTER:  May I inquire, Mr. Veeder, do you know if

1   that is the same map as M-33-F?

2        MR. VEEDER:  I want to be sure on that.

3        MR. MYERS:  I have it 33-A.

4        THE MASTER:  That was Oceanside.  I thought this was Fall-

5   brook.

6        MR. MYERS:  I thought it was 33-A.

7        MR. SACHSE:  It is F.

8        MR. EBERHARD:  F was Fallbrook Quadrangle.

9        MR. SACHSE:  The lower right-hand corner has an addition

10   number, if there is any difference on it.

11        MR. VEEDER:  It is 49, it is identical.

12        THE MASTER:  Yes, this seems to be identical with Exhibit

13   M-33-F.

14        MR. VEEDER:  But he is going to modify it.

15        MR. MYERS:  Yes, so I didn't want to mark that.

16        THE MASTER:  It is proper to have that.  But I want the

17   record to show that it is the same map.

18   BY MR. MYERS:

19        Q  Now, you are familiar with this map that you have before

20   you?

21        A  Yes.

22        Q  Can you mark on that map in red Parcel 2 to the best of

23   your recollection as it is shown in the deed?  Will you draw a

24   line over to the left from that and put over in the left-hand

25   white margin over there Parcel 2.

1    Now, will you mark on that map the Parcel 1 as reflected

2    in your deed, to the best of your knowledge and recollection?

3    Will you put that over there in the left-hand side.

4        Now, I realize that is a small map, Mr. Butler, but it has

5    on it certain markings that indicate certain characteristics of

6    your property on Parcel 2.  With that map can you in blue mark

7    the Fern Creek as it enters your property, beginning at the

8    point where you take the water from the stream on Mr. Anderson's

9    land, in blue, as close as possible?

10       A  Do I understand you correctly, you want me to mark Fern

11   Creek?

12       Q  Across your property down to its confluence with De Luz

13   Creek.

14       Now, at that point where you take the diversion on Mr.

15   Anderson's land, can you in blue put over to the left, in the

16   left-hand margin, with a line to the left, can you put diversion,

17   and then after that I.

18       Now, you will notice on the map quadrangle there are cer-

19   tain figures.  Can you take the black pencil which you have and

20   trace your pipeline, or ditch, or whatever it is, across your

21   property from that initiation point to its complete extremity

22   on your property?

23       Now, you will note on that map a marking on the northern

24   part of your property which appears to be a round circle.  Will

25   you circle that -- Withdraw that.

1    Will you tell us to the best of your knowledge what that

2 represents, that round circle on that map?

3    A  Well, it is an earth regulation reservoir.

4    Q  Will you circle that with a blue pencil and point it

5 out to us where you are circling?

6    And will you now tell us what that is in your opinion?

7    A  Well, we catch the water when it comes down the flume

8 and pipe into this reservoir, and we irrigate out of the

9 reservoir.  In other words, at times there isn't enough water

10 to irrigate directly from the flow of the creek, and this makes

11 a head to pump against.  However, we can irrigate out of it

12 with gravity, but we oftentimes hook a pump under the reservoir

13 and pump out of it.

14    Q  Well, referring to the government's overlay map there

15 can you refresh your recollection?  Does that point that you

16 have marked there reflect anything there on the overlay, similar

17 to the overlay?

18    A  They indicate this with a figure 1, and call it 106,000

19 gallon reservoir.

20    Q  And is that approximately -- You accepted that as the

21 figure?

22    A  I accept it.  I never measured it, I can only assume it

23 would be.  I have every reason to believe it would be.

24    Q  Now, will you tell us how you fill that reservoir?

25    A  We run the water from Fern Creek down through the

1  pipeline, and open a valve that runs into the reservoir. And

2  during some time of the year we may have to pump out of the

3  creek, or out of the well as I call it.

4      MR. VEEDER:  I didn't hear what the witness said.

5      (Record read.)

6      THE MASTER:  You have also referred to it as a sump?

7      THE WITNESS:  Yes.  It is also what they call a Mexican

8  well, an open hole.  And last year I lined it with concrete to

9  help keep the water clean.

10 BY MR. MYERS:

11     Q  Now, calling your attention to the photograph here as

12 M-D-49, the panoramic photograph, pointing to what appears to

13 be a reservoir or a temporary regulator here, whatever it may

14 be, up in the right-hand section --

15     A  That is it.

16     Q  -- which seems to be under construction, is that the

17 one you are pointing to now?

18     A  Yes, it is.

19     Q  And did you construct that?

20     A  Not personally.  I had it constructed.  At the time I

21 bought the place I bought a Diesel caterpillar and a dozer, and

22 it was built at that time.

23     THE MASTER:  We will take our recess now until 1:30.

24     MR. EBERHARD:  In looking over my original Answer I find

25 some discrepancies between the testimony this morning and the

1    original Answer.   I would like permission to file an amendment

2    to my original Answer.

3         MR. VEEDER:   I think he has already amended it now.

4         THE MASTER:   I think you can file an amendment to conform

5    to the proof, in any event.

6         Recess to 1:30.

7                              - - -

Fallbrook, California, June 2, 1958,  1:30 P.M.


ADDITIONAL AFTERNOON APPEARANCE OF

William E. Burby, Esq.,
    For United States of America.

Lt. David W. Miller, Esq.,
    For United States of America.

LAWRENCE WILLIAM BUTLER, resumed stand.

DIRECT EXAMINATION  (Continued)


THE CLERK:  Court is now in session.

MR. VEEDER:  Your Honor, I would like to have the record show that we are returning M-14, which we withdrew for the purpose of bringing a Marine Base Map copy to date and make it current with M-14, and to reflect the same material as M-14. And your Honor asked that we provide counsel with a copy, which we have done.  And I would like the record to show that we are providing them a copy at this time.

THE MASTER:  The record will so show.

MR. VEEDER:  I am returning that to the Clerk.  Mr. Sachse

MR. SACHSE:  What is this?

MR. VEEDER:  We withdrew M-14 to bring it to date.  I thought you would want a copy of it.

THE MASTER:  Mr. Myers, you may proceed.

MR. MYERS:  At this time, for the record, I would like to offer an amendment to my pleadings, if I may for the record.

On page 9 in the answer will be noted that page no. 10

1  follows page 8; actually page 10 of the answer should be 9, and

2  page 11 should be 10.   This is the supplemental answer.   There

3  was no page 9.   Actually page 10 is 9, and page 11 is 10.

4       THE MASTER:  That is so indicated on the copy which I have

5  before me.

6       MR. MYERS:  That is not in the original answer which I

7  mailed, I picked it up afterwards, I think I changed it on that.

8       Now, page 9 as amended, line 5, '49 should be changed to

9  1946, it is a typographical error.

10      And page 9, line 11, as amended, should be changed from

11 1949 to 1946.

12      Page 7, line 29, the word "The approximate flow" should

13 be changed to "The maximum flow."

14      And page 9 as amended, line 29, the word "That such water

15 has been used prodigally" the word "not" should be inserted to

16 read "That such water has not been used prodigally."

17      THE MASTER:  Those amendments would be made on the answers

18 as filed.   I assume on page 9, on line 30, in order to avoid

19 a double negative before the words "without waste" that the

20 amendment should also read "And has been used without waste."

21      MR. MYERS:  Yes, sir.

22      THE MASTER:  And it will be so amended.

23      MR. VEEDER:  I reserve objection, your Honor, if I may,

24 until we run it through ours.

25      THE MASTER:  Very well.

1        MR. MYERS:  I didn't get that objection, sir.

2        MR. VEEDER:  I say we reserve objection.  I don't really

3   know the import of your amendments, until we put them into the

4   answer we won't know.

5        THE MASTER:  You may proceed with the witness then, Mr.

6   Myers.

7   BY MR. MYERS:

8        Q  Mr. Butler, referring to the land utilization overlay,

9   and the mark which you have made on the map there as indicated,

10   did I understand you to say before the recess that you had--is

11   that a reservoir that you made and created yourself?

12        A  That is right.

13        Q  And is that the one which shows on the photograph as

14   being under construction?

15        A  Yes.  That is the one you clearly see to the right of

16   the photograph.

17        Q  In 1946?

18        A  Yes.

19        Q  Now, will you explain the purpose for which you use

20   that?

21        A  Well, the yield of the creek varies, and we let the

22   water come down the flume, down the pipe into the reservoir, and

23   irrigate out of the reservoir.  In other words, certain times of

24   the year the yield of the creek is not enough, and this accumu-

25   lates water enough to make the working practical.  I think this

1   is a customary practice in irrigation.

2       Q   And do you know how much water that tank or reservoir

3   holds?

4       A   The Government Survey showed 106,000 gallons, and I

5   have no reason to question this.   I am sure that their estimate

6   would be much more accurate than mine.   That would be about a

7   third of an acre foot of water.

8       Q   And is the land adjacent to that reservoir that you

9   irrigate?

10      A   Yes, right under it.

11      Q   Now, calling your attention to the exhibit from which

12  you are testifying, you will find another circle--

13      A   Yes.

14      Q   --south of that about which you have testified.   Can

15  you tell us what in your opinion that represents?

16      A   That represents a reservoir that was there when I

17  bought the place, and built by a predecessor.

18      Q   Will you put a circle commensurate with the size of

19  that?   Will you circle that in blue, also, indicating right

20  below the other reservoir?

21      Will you describe that to the Court?

22      A   That is a concrete reservoir, and I would have to refer

23  to this overlay.   I believe they said it held 56,000 gallons.

24  They designated that as number 2.   No, 58,000 gallons.

25      Q   And in your opinion is that substantially accurate?

398

1   A   I would suspect that it is.  I have no reason to sus-

2   pect that it isn't.

3   Q   Now, that is concrete, is it?

4   A   Yes, that is concrete.

5   Q   And you say that was there when you purchased the

6   property?

7   A   That was there when I purchased the property, and I

8   believe it was constructed by Mr. Brode.

9   Q   You don't know that, do you?

10   A   He has informed me of this in the past.

11   Q   And is that concrete?

12   A   Yes, that is concrete.

13   Q   Now, what purpose do you use that for?

14   A   Well, that is the same as the one we just discussed,

15   number 1.  We collect water in this and irrigate out of it.

16   Q   Incidentally, how do you take the water out of the

17   reservoir which you designated as 106,000 gallons?   How do you

18   irrigate from that?

19   A   There is a pipe out of the bottom of the reservoir.

20   Sometimes they run it out gravity, and sometimes we pump it out.

21   It runs into the pump, and it is pumped out.

22   Q   And in this concrete reservoir, how did you irrigate

23   from that?

24   A   The same means.  There is a pump located--  There is a

25   pipeline runs, oh, I guess there is about 800 feet of pipe runs

599

1   out of the reservoir and into a pump; we can irrigate either

2   gravity or pump.  If we are in a hurry--

3       Q   Now, Mr. Butler, in this top reservoir that you have

4   designated, that is the one with 106,000 gallons, what kind of

5   a basin does that reservoir have?

6       A   That is earth.

7       Q   What?

8       A   That is earth.

9       Q   Earth.  All right.  Now, you will also see on this map

10  another small circle which indicates some type of a water con-

11  tainer.  Will you describe that to us?

12      A   That is also an earth reservoir, it is smaller than the

13  other two.  I believe they listed that something around 70,000

14  feet, but this one I didn't think held that much.

15      Q   Check your overlay and see--

16      A   No, I am sorry.  It is 36,000 gallons, and I think that

17  is just right.

18      Q   Now, will you tell us what purpose you use that for?

19      A   Well, that is for irrigation around the house, the

20  lawn, and so forth, yard; what you might call domestic irrigation.

21      Q   Now, Mr. Butler, these three particular reservoirs that

22  you call them, where are they located in relation to Parcel 2

23  and Parcel 1 which you have shown on the map?

24      A   Reservoir number 1 and 2 are in Parcel 2.  And reservoir

25  number 3 is in Parcel 1, and that is the one we use for the

1    irrigation around the house, the domestic irrigation.

2       Q  Now, in addition you will see on this map a larger.

3    example or designated item that looks like it represents some-

4    thing.  Tell us what that is, will you?

5       A  That is a large reservoir that holds about 27 acre

6    feet of water, and this is used for irrigation in the summer

7    when the yield of Fern Creek is not sufficient for our needs.

8       Q  And referring to the geology there, can you tell us

9    which one that is?  Is that referred to as a reservoir, or how

10   is it referred to?  What is the reference designation?

11      A  They call it a lake.

12      Q  Was that on the property when you purchased it?

13      A  It was on the property, but I have substantially en-

14   larged it since that time.

15      Q  Is that object shown in the photograph there, as you

16   will note has some trees in it?

17      A  Yes, it is.

18      Q  And are those trees now in it?

19      A  No.  Two years ago it was enlarged by the Soil Conserva-

20   tion people, I believe that is what they are referred to--and

21   they took the trees out.

22      Q  And they enlarged it, did they?

23      A  Yes.

24      Q  And at that time did they do anything else other than

25   enlarge the lake?

8b

1    A   Well, they took the trees out, enlarged the lake, and

2    some of the top soil they moved to another field.

3    Q   Do you know how many acre feet there are in that lake,

4    or reservoir, or whatever you call it?

5    A   I believe there is 27.

6    Q   Did they do anything--  Withdraw that.

7    Before you had this enlarged was there a dam on this lake?

8    A   Yes, there was a small dam there before I enlarged it.

9    Q   And adjacent to this dam was there a spillway?

10    A   Yes.

11    Q   Now, did they enlarge this dam?

12    A   Yes.

13    Q   Do you know--

14    A   I had previously enlarged it when I got the place, and

15    the State--this I did myself, and then the Soil Conservation

16    people enlarged it two years ago.

17    Q   Was this lake enlarged under your supervision?

18    A   No, they supervised it.  You apply for their aid, and

19    they supervise the project, and it is done to their specifica-

20    tions.

21    Q   They paid a part of it and you paid a part of it, and

22    it was all done under their supervision?

23    A   That is right.

24    Q   Do you know how high that dam is from your own knowledge?

25    A   It is probably 21 or 22 feet, something like that.

9b.

1    Q   You say probably.

2    A   It is under the limit of 25.   I understand they are

3    not allowed to go over that, and it is under the limit.

4    Q   Is that what they told you?

5    A   That is what they told me.

6    Q   Now, is this lake--   How does water reach this lake

7    in relation to the point of initiation?

8    A   It comes down the flume, and I have a valve, and any

9    time the reservoir--the concrete reservoir is full we let it

10   run into the lake.  This is particularly during the rainy months

11   when there is a surplus of water, if I can use that word.

12   Q   In other words, do I understand you to say that the

13   water which reaches the lake on your pipeline system is all

14   by gravity?

15   A   Yes.

16   Q   You don't pump into the lake?

17   A   No.

18   Q   It is all by gravity?

19   A   It is all by gravity.

20   Q   So in your opinion the lake is below the elevation of

21   the Fern Creek initiation point?

22   A   Substantially.   I would say at least 60 feet.

23   Q   Now, do you know of your own knowledge where the water

24   goes from the spillway when this is full?

25   A   I have not traced it, but I would suspect--

Ob.

1        MR. VEEDER:  Now, I am going to object to this, your

2   Honor.  I have waited all day.

3        THE MASTER:  Objection sustained.

4   BY MR. MYERS:

5        Q  You don't know then, do you?

6        A  I know it goes back into De Luz Creek, but whether it

7   goes back into Fern Creek I don't know.

8        Q  Now, from Mr. Veeder's assistance or information, on

9   what do you base that that you know?

10       A  Well, as I said before, I have not walked down the

11  canyon, it is heavily brushed, but I know that the ground slopes

12  from that point down to De Luz Creek, because it is just a little

13  off the road.  I haven't traversed it on foot inch by inch, but

14  since water usually runs downhill, I would assume so.

15       MR. VEEDER:  I will stipulate to that.

16       THE WITNESS:  It is downhill from the lake, it must end up

17  in the creek.

18  BY MR. MYERS:

19       Q  Now, what type of a basin has this lake?

20       A  Clay.

21       Q  Clay?

22       A  Yes.

23       Q  Now, let's talk about this pipeline that you have

24  designated here.  When you first moved on the property what kind

25  of an irrigation system did you have, and I am referring to your

604

conveyance, the method of conveyance from the creek to these

particular reservoirs or tanks that you have talked about?  What

kind of a conveyance system did you have?

A  Across the Anderson property there was--from the creek

there was a wooden flume one by twelve redwood.  It, I judge,

was about 200 yards long, and was set up on a trestle so that

it maintained the gravity flow.

Q  You say you judge.  Had you seen it at that time?

A  Yes, I saw it.  I am sure of that.  As it approached

the property line, my property line, it changed from a wooden

flume to a concrete flume; and the concrete ran, oh, a third of

the way down, and then it went into pipe.

Q  A third of the way down to what?

A  A third of the way down to this concrete reservoir.  A

third or a half, I didn't actually measure it.  And then it went

into a pipe, and the pipe ran on down into the concrete reservoir.

THE MASTER:  Now, which concrete reservoir was that?

THE WITNESS:  That would be the one designated as 2 in

this.

MR. MYERS:  Refer to them in gallonage.

THE MASTER:  The 58,000 gallon?

THE WITNESS:  That would be the 58,000 gallons.

BY MR. MYERS:

Q  Then did it go any further?  Is that the end of it?

A  That was the end.

12b

1      Q   All right.  Will you explain to us what is your present

2   system of irrigation as it exists at the present time?

3      A   At the present time the water comes down--I have changed

4   it, repaired the wooden flume in 1949 when we had a forest fire,

5   and when it came through it burnt the trestle legs off and it

6   dropped, and I replaced that with metal pipe and set it on con-

7   crete pylons in the event we had another fire.

8      Q   Do you know the size of that pipe in diameter?

9      A   It is eight inch.  It is the same size as was originally

10  there.

11     Q   All right.  Go ahead.

12     A   Then I replaced part of the flume that was old and

13  damaged, and renewed it down through the ranch.  The water now

14  runs into the concrete reservoir.  I have added a number of metal

15  pipelines throughout the ranch, and pumps, and we irrigate both

16  gravity and pumping.

17     Q   Now, referring to the Government report, geology report,

18  will you tell us how many acres you have irrigated--how many

19  acres you are irrigating at the present time?

20     MR. VEEDER:  Now, I am going to object to this.  There is

21  no foundation, your Honor.  There is nothing to show that this

22  witness knows acreages, or methods of calculating or determining

23  the size of the area irrigated.

24     THE MASTER:  Mr. Myers, can you ask him any questions which

25  will establish that he is aware of the size of the fields referred

13b

1    to?

2    BY MR. MYERS:

3        Q   Referring to the geology--

4        MR. VEEDER:   The point that I desire to bring out, your

5    Honor, we have provided a report, and we of course are willing

6    to accept the report.

7        Now, I have some difficulty in understanding why this

8    witness would be asked in regard to acreages when I believe that

9    Colonel Bowen's report has covered the whole matter.

10        THE MASTER:   I assumed the question covered which one of the

11    areas in the report had been irrigated.

12        MR. MYERS:   That is correct, for this reason, we accept

13    the report and think it is a fine report and are awfully glad

14    it was made, but Mr. Bowen's report refers to the usable acreage

15    and the best adaptable methods.   I do not see any place--

16        THE MASTER:   If you wish to ask Mr. Butler which of the

17    areas in the report have actually been irrigated I think that is

18    a perfectly proper question.

19        MR. VEEDER:   He went into an area where I don't truly know

20    where we are going, and we are within the four corners of the

21    report.   If he is not contradicting the report it is immaterial

22    to me.

23        THE MASTER:   As I understand it, he wants to ask that ques-

24    tion, which is perfectly proper, and I suggest that the witness

25    answer it.

14b

1    MR. MYERS:  All right.

2    Q  Will you tell us which of the acreages mentioned in

3  there is under irrigation, referring to the overlay, or the

4  geology?

5    A  They mark it here generally as RC-5, or 5-RC.  And in

6  the report that is the area that we irrigated, 5, and part of--

7  the flume runs I would say above--I am speaking of elevation--

8  above the area marked as 5.  And this, Mr. Veeder, representing

9  the pipeline and flume, and this is the area which we irrigate,

10  this section in here, and we pump onto this knoll, which they

11  designate--no, that is still 5; 5, and this area here.  I would

12  assume this area would represent about 40 acres, since that

13  represents 80.

14    Q  Well, now, from the geology and from the land which

15  you have observed, and from the map which is in Parcel 2, and

16  from the geology, can you give us an estimate in your opinion

17  as to how many acres are being irrigated at the present time?

18    A  Well, we will irrigate at about 40 this summer, but we

19  will run out of water before we get there.

20    MR. VEEDER:  Now, I didn't understand that response, we

21  irrigate at.

22    THE WITNESS:  We will attempt to irrigate them, but I doubt

23  if we will have water enough for 40 acres this summer.

24  BY MR. MYERS:

25    Q  Now, in relation to the past, have you substantially

15b

1    irrigated the same property as you have just testified to that

2    you are going to attempt to irrigate now?

3        A  This is a section of the property that has been farmed,

4    and we have farmed since we have had it, the land that lies be-

5    low the pipeline.

6        Q  I refer you to the photograph, the aerial photograph,

7    and can you point out to us on that aerial photograph substan-

8    tially the property which is being irrigated?

9        A  This section in here.

10       Q  Referring to?

11       A  This hillside here.  These trees are now gone.  That

12   was an olive grove, that is gone.

13       THE MASTER:  That is on the left hand side of the picture.

14       THE WITNESS:  This field along through here, and this one

15   is the brow of the hill, you don't see it, it runs down in here.

16   This field in here, and on through here, and out here.

17       MR. VEEDER:  Now, he must have been flying awfully low.

18       THE WITNESS:  It is not taken from the air, I took it from

19   the top of a hill.

20   BY MR. MYERS:

21       Q  Where did you take it from?

22       A  From this point right here.

23       Q  Is there a knoll there?

24       A  Yes, there is a knoll there, I am standing on it.

25       Q  Then you weren't flying?

16b

#1

A   No, I can't fly.

Q   There is an area way over here in the corner, and I refer to the top of the photograph, the second part--

A   That is Parcel 1.

Q   --is that under irrigation?

A   No.

Q   What do you irrigate, what kind of--for what purpose do you irrigate?

A   Feed for cattle, stock.

Q   Do you have any row crops?

A   We have had, but we do not have this year.

Q   When you say feed for cattle, how many head of cattle do you have at the present time?

A   About 30.

Q   And for how many years continuously last past have you had cattle?

A   Well, we have always had some, ever since we had the place. Not always that many, we have had a few more each year.

Q   Well, can you give us at this time approximately how many you had say in 1955?

A   Probably 20.

Q   Now, what else do you irrigate besides pasture?

A   Alfalfa, hay.  Cattle feed mostly.

Q   Can you give us an estimate of how many acres of alfalfa you had this last year?

17b

1   A We had Sudan last year, we didn't have alfalfa.  I

2 would assume probably ten or 12 acres.

3   MR. VEEDER:  Again we are getting into foundation, your

4 Honor.

5   MR. MYERS:  Well, he is the only witness that can testify

6 as to what has happened on the land, Mr. Veeder.  Even if we

7 had an expert he would be far less credible than this witness.

8 I don't know--

9   MR. VEEDER:  Well, Mr. Myers, I am not trying to interfere

10 with your case.  I think that when we start reviewing the record

11 maybe this gentleman has had experience in reviewing acreage and

12 estimating acreage, I don't know.

13   THE MASTER:  Can you lay a foundation to show his ability

14 to estimate acreage?

15   MR. VEEDER:  This is going on beyond our report, is the

16 point I am trying to make, and I just don't know where it is

17 going to take us, because we have no information at all on this

18 phase of it.

19   MR. MYERS:  I feel, your Honor, that that goes to the

20 weight.  I think that he has been qualified to a certain extent,

21 that he could estimate.  I realize that he is not an expert,

22 but I don't know what kind of an expert could testify unless you

23 went out there with a survey each particular season and at some

24 particular time of each year as he changes crops, how you could

25 possibly get even a mean average at any particular time except by

18b

1   a survey. And I am trying to stick to the Government Survey

2   here which they have estimated the highest use of any of these

3   acres. I am willing to accept their survey, they having put it

4   into evidence, and certainly we are using their figures. I don't

5   know whether they went out and surveyed each one as to feet,

6   either.

7       THE MASTER: Can you identify the area planted with a

8   particular crop at a particular time by reference to one of the

9   Parcel numbers as shown in the Government's exhibit?

10      MR. MYERS: Yes, we can do that.

11      Q Now, calling your attention to the Government's geology,

12   can you--and having relation to the overlay, and in relation to

13   the overlay which shows the various items from which you testi-

14   fied as to the location of these tanks, and so on--can you point

15   out the specific land that was irrigated last year?

16      A We irrigated here.

17      Q 22?

18      A The edge of the lake to here, this section.

19      THE MASTER: Will you identify that for the record, Mr.

20   Myers?

21      MR. MYERS: All right.

22      Q You have indicated a point south of the lake at the--

23   assuming a line drawn straight across from the lake to the west

24   to the pipeline, to a point south to approximately the south-

25   eastern line of Parcel 2?

15b

1    A  I would say it would be the land east of the pipeline

2  and to the front property line.

3    MR. VEEDER:  To the east property line?

4    THE WITNESS:  To the east property line.

5    MR. MYERS:  To the east property line.

6    Q  Now, is that the property under irrigation?

7    A  Yes.

8    Q  Is there any other property that is under irrigation?

9    A  We will start now to irrigate the back section for

10  Sudan.  That would be the rest of the area designated as RC-5.

11    Q  You say you will start now.  Have you ever irrigated

12  any land north of the lake?

13    A  Yes, we have irrigated this.  We had onions and sweet

14  corn in one year in this area.

15    Q  Now, you are referring to the property north of the

16  lake to approximately how far north of the lake?

17    A  I would say that is the edge of Fern Canyon Gully.

18    Q  For how long last past have you irrigated that particu-

19  lar property?

20    A  Well, there has been something grown on it every year,

21  and we have used all of the water we have had to irrigate this

22  general area of the ranch.

23    Q  Now, based upon the amount of land in Parcel 2 can you

24  give us an opinion of how many acres of land you have irrigated?

25    MR. VEEDER:  Now, I am going to object again to this, your

20p

1  Honor.   There is no foundation, and I don't believe this witness

2  can express an opinion.

3      THE MASTER:   I think there is sufficient foundation.   It

4  may affect the weight of his testimony, possibly.   But I think

5  he has shown sufficient familiarity with the area to answer the

6  question.

7      THE WITNESS:   I would judge, and according to this report

8  they list 31 acres in what they call RC-5, indicating row crop

9  in area 5.   And we have raised feed on this, and above that there

10  is a section which is east of the flume which we irrigate, and

11  just out of the concrete pipe we have small outlets and let the

12  water run down the hill, and that irrigates the grass land as

13  pasture.

14      MR. SACHSE:   I didn't get the total.

15  BY MR. MYERS:

16      Q   How many acres would you estimate?

17      A   I would say 40 acres at times.

18      MR. VEEDER:   I object, your Honor.

19      THE MASTER:   We don't want your guess, we want your

20  statement as to what you have actually done.

21      THE WITNESS:   I would say 40.

22  BY MR. MYERS:

23      Q   And that is based on your continued observation?

24      I will ask you this question:   Have you done any of this

25  irrigating yourself over a period of years?

21b

1      A   I have from time to time when I have been here over

2   weekends.

3      Q   Would you say in the year of '57 how often did you

4   irrigate this property yourself personally?

5      A   Not often myself personally.  I have helped in the

6   irrigating on the weekends.  As I said before, I am only down

7   here weekends, so it would be weekends myself.

8      Q   On an average how many times a month would you say you

9   do the irrigating during the irrigating season yourself?

10      A   I might help, oh, once a month.  I don't do it actually.

11   This is only when they need help, why, I help them.  But I mean

12   usually I have something else to do.

13      MR. VEEDER:   I am going to renew my objection and move

14   to strike.

15      THE MASTER:   The objection is still overruled, and the

16   motion denied.

17   BY MR. MYERS:

18      Q   Now, since your purchase of the property have you em-

19   ployed help on the property?

20      A   Yes, I have.

21      Q   Since what time?

22      A   Since the time I bought it.

23      Q   And do you have any record showing the help you have

24   had on this property?

25      A   Well, yes, I have books which show the amounts that were

22b

1    paid them.

2        Q   And has there been anyone on this property supervising

3    it during this period?

4        A   My father and step-mother lived there.   She still lives

5    there, and he lived there until he died.

6        Q   And has your step-mother lived continuously on this

7    property since you bought the property?

8        A   Yes, she has.

9        Q   What is her name?

10       A   Louise Butler.

11       MR. VEEDER:   May I inquire, counsel, what is this?

12       (Discussion at counsel table.)

13       MR. VEEDER:   O.K.   I mean O.K., try and lay a foundation

14   for it.

15   BY MR. MYERS:

16       Q   Now, I show you a paper which purports to be a statement

17   relative to your property--

18       MR. SACHSE:   Wait a minute.   If it is a statement, let us

19   have a look, Mr. Myers.

20       MR. MYERS:   While counsel is looking at that I can ask a

21   few questions.

22       Q   Mr. Butler, do you know how many acre feet a half a

23   cubic foot per second will produce of water?

24       A   It would approximately be an acre foot a day.

25       Q   Do you know how much that would be a year?

23b

A   If the stream ran it would be about 365 acre feet a year, approximately.

Q   Have you with reference to the geology report--do you recall the figure that the government estimates is irrigable in this particular 120 acres?

A   I believe they mention a figure of around 65.

Q   Have you ever irrigated that many?

A   No.

Q   Have you ever irrigated more than 40 acres since you have been on the property?

A   I wouldn't say so.  I think, judging from this map, that is about the acreage.

MR. VEEDER:  May I have a continuing objection to all of these questions, your Honor?

THE MASTER:  Yes, your objection will continue to any further questions as to the number of acres irrigated.

MR. VEEDER:  Thank you.

BY MR. MYERS:

Q   How many acre feet of water did you use last year?

MR. VEEDER:  I object to that, your Honor.  There is no foundation for that, nothing to show there was a device for measuring water, and there is no showing the carrying capacity of any of these structures.

THE MASTER:  There is some showing.  But I think a better foundation would be advisable, Mr. Myers.

24b

1     You have the size of some of the structures in the record.

2  I don't know that the size of all of them is in the record.

3     MR. MYERS:  Well, I think he has testified he has irrigated

4  approximately 40 acres, he knows the amount of cubic feet per

5  second, and he knows approximately during what months the water

6  has flowed.

7     Q  I will ask you this, Mr. Butler, have you ever checked

8  the flow of water through these pipes while you have occupied

9  this property?

10     MR. VEEDER:  I am going to renew my objection on the ground

11  that there is no showing what he means by the word "checked."

12     THE MASTER:  Will you restate the question then to define

13  that word?

14     MR. MYERS:  Could I have a few minutes recess, your Honor?

15  It is about that time.  It would be very convenient.

16     THE MASTER:  Yes. We will have a ten minute recess.

17     (Recess.)

18  BY MR. MYERS:

19     Q  Mr. Butler, have you used all the water that you could

20  get from this particular diversion since you have been there?

21     A  Yes.

22     Q  Will you tell us during what months you have used it?

23     A  This would vary year by year, depending on the rainfall.

24  You start to irrigate--  You may irrigate some even during the

25  winter months--

25b

1     Q  Well, what do you irrigate?

2     A  We have been irrigating for the last month.  And I

3 would say about a month after the last rain you begin irrigating,

4 about 30 days after the last rain, and you irrigate through the

5 rest of the summer.

6     Q And you are referring now to this year or the past

7 years?

8     A  Well, in any year.  About a month after the last rain,

9 and we have had years in the past ten that there has been so

10 little rainfall during the winter that it was necessary to irri-

11 gate even during what should have been the rainy months.

12     Q  And say you take a five year period from 1951 say to

13 '56-'57, about how many months--from what time would you say you

14 generally start irrigating?

15     A  I would say you would start to irrigate about the end

16 of April.  But again I will have to average this because the

17 rains don't fall the same each year.  One year they will be late,

18 one year they will be early, and some years there have been

19 hardly any in the last five or six years.  We have had a couple

20 of years I think the rainfall was down around five or six inches.

21 And in this kind of a year you would irrigate as much as you

22 could all winter long.

23     MR. MYERS:  I have no further questions.

24     THE MASTER:  Mr. Sachse, do you have any question?

25     MR. SACHSE:  Yes.

26b

CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. Butler, Camps Creek cuts the extreme northeast corner of your property, doesn't it?

A   That is correct.

Q   And Fern Creek cuts across your property in an almost west to east direction at the north end of your property?

A   That is correct.

Q   How far south of Fern Creek is the watershed divide where water would cease to run into Fern Creek, and instead run the other direction to De Luz Creek?

A   Well, that I would be guessing again.

Q   Well, let me ask you in this fashion then, is it not a fact that where Fern Creek crosses your property it is confined in a fairly narrow deep little gulch, and that very little pro- perty south of Fern Creek—let me rephrase that—very little of your land south of Fern Creek drains into Fern Creek?

A   No, I would say that about half, or so, at least a field what we call in front of the brown house, all of that area.

Q   Let's take reservoir number 1, the upper pond of the three.  If you knocked the wall out of the reservoir number 1 would that water drain into Fern Creek or De Luz Creek?

A   Fern Creek.

Q   Now, from the second reservoir where would that drain?

A   That slopes this way.

27b

1      Q   From reservoir number 2 if you knocked that wall out

2  where would that drain?

3      A   That would go into De Luz Creek.

4      Q   And the third reservoir, if you knocked that out,

5  that would go into De Luz Creek?

6      A   That is right.

7      Q   And the large lake, if you knocked that wall out where

8  would that drain?

9      A   De Luz Creek.

10     Q   I will hand you Exhibit M-B-49, and ask you where did

11  you get that, Mr. Butler?  How did it physically come into your

12  possession?

13     A   The man I purchased the property from, Mr. Allen, gave

14  it to me.

15     Q   Now, do you have or claim to have any rights based on

16  filings with the State of California except those evidenced by

17  M-B-49?

18     A   Except this?

19     Q   Yes.

20     A   No.

21     MR. MYERS:   I think that is a conclusion.

22     MR. SACHSE:   It is an admission against interest, your

23  Honor.

24     MR. MYERS:   I am going to ask that that be stricken on the

25  basis that it calls for a legal conclusion as to whether he

28b

1    claims any riparian interests or not.

2         MR. SACHSE:  I didn't say that.

3         MR. MYERS:  It calls for a conclusion of the witness.

4         MR. SACHSE:  Let me withdraw that question and rephrase it.

5    I don't want to imply any attack on his riparian right at all.

6         THE MASTER:  It was my understanding you did not attack

7    the riparian right.

8         MR. SACHSE:  I am referring to appropriative rights by

9    filings with the State of California.

10        Q  Do you claim any such right other than the one evidenced

11   by M-B-49?

12        A  I believe you are asking me have I filed any other

13   water claims, and the answer is no.

14        Q  Do you claim by any predecessor who you think filed

15   other than M-B-49?

16        A  I can say this is the only one I know of.

17        Q  Now, the point of diversion by which you take water

18   from Fern Creek is immediately--

19        MR. VEEDER:  The United States and Mr. Butler are walking

20   down the road shoulder to shoulder now.

21        THE WITNESS:  Thank you.

22   BY MR. SACHSE:

23        Q  The point of diversion is immediately west of your east

24   line on Fern Creek, isn't it?

25        A  That is right.

1     Q  And the sump or the well to which you referred is

2    immediately east of your west line on your own property on Fern

3    Creek?

4     A  That is right.

5     Q  But you use both the sump and the pressure box for the

6    same diversion, do you not?

7     A  Yes.

8    THE MASTER:  Mr. Sachse, did you say that the point of

9    diversion was immediately west of the east line on Fern Creek?

10    MR. SACHSE:  It is west of his west line on Fern Creek,

11    and the sump is immediately east of his west line on Fern Creek.

12    THE MASTER:  That is what I thought, but I think your

13    question used the wrong word.

14  BY MR. SACHSE:

15     Q  So both those methods of diversion apply to the same

16    water right, do they not?

17     A  Yes.

18     Q  Have you any knowledge whereby you could tell us what

19    the minimum flow in your eight inch pipe since you have owned

20    the ranch amounted to?  I don't mean necessarily in second feet,

21    if you can describe it in how full the pipe was.

22     A  Well, during the spring months and early summer months

23    the pipe runs full.  During the middle of the summer the level

24    of the water will drop.  And I would say at present the pipe is

25    running full.  I would suspect that in another month, through

30b

1  July and August, it will drop down.   Then for some strange reason

2  in the fall, I suspect it is because the trees have stopped

3  sucking water out of the creek, the water level comes back up in

4  the pipe and it will run half full again.   There will be a period

5  of time in the middle of the summer in hot days when it would

6  drop down to I would say a quarter of a pipe.

7       Q  Has there ever been a time since your purchase in 1946

8  to your knowledge when there was not gravity water available

9  through your weir or pressure box?

10      A  There has been times on hot summer days when there has

11  been very little, but there has never been a period of the day

12  in which there was none.

13      Q  In other words, in any 24 hour spread you would be able

14  to get gravity water out of the weir through the eight inch pipe?

15      A  Yes, but this could go down to very little on hot

16  summer days.

17      Q  How deep is this sump?

18      A  It is, oh, 15-- No, it is more than that.   It is

19  about 20 feet from the surface of the ground.

20      Q  And how big an area does it cover?

21      A  Well, I would say it was 40 feet long and 18 feet wide,

22  20 feet wide.

23      Q  How did you dig it?

24      A  It was dug with a dragline.

25      Q  Do you know whether or not it hit bottom, bedrock?

3lb

1    A   I suspect it did.  He quit digging for a reason.  The

2    bedrock in that area, as you are probably aware, is pretty close

3    to the surface.

4    Q   Now, as I understood your testimony, each of these

5    number 1, 2 and 3 reservoirs are filled by gravity from the Fern

6    Creek diversion.  Is that right?

7    A   That is true.

8    Q   But you have an irrigation system that permits you to

9    boost the water out of them at a faster rate if you want?

10   A   That is right.

11   Q   And your large lake is also filled by gravity from the

12   Fern Creek diversion?

13   A   Yes, it is.

14   Q   Do you have any permit from the State of California

15   for the storage of 223 acre feet?

16   MR. MYERS:  I am going to object as not at issue.

17   THE MASTER:  Overruled, with reference to the order of

18   Judge Carter with reference to cross-pleadings.

19   BY MR. SACHSE:

20   Q   Do you have any permit from the State of California for

21   the storage of your 223 acre feet in the lake?

22   MR. MYERS:  I want to continue my objection on the ground

23   that he says storage.  Whether or not it is storage, he has

24   testified that he pumps it out as part of this irrigation system.

25   And as I understand storage it means as distinguished from

32b

1    temporary.  This could be regulation.  I admit that the lake is

2    not regulation, but I don't believe his testimony justifies that

3    he is storing this over a period of time in these particular

4    reservoirs; and we use reservoirs because that is what the

5    government has called them in the survey.

6         MR. SACHSE:  I am not trying to decide whether or not it

7    is storage.  I am simply trying to find out at this stage of

8    the proceedings whether he has a permit for storage.  I just

9    want to know whether he has a permit.

10        THE MASTER:  The question is directed to a fact, not to

11   the question of the legal existence or non-existence of the

12   permit.

13        THE WITNESS:  Not that I know of.

14   BY MR. SACHSE:

15        Q   And that lake is outside of the Fern Creek watershed?

16        A   Yes.  If the lake were to be drained the water would

17   not run into Fern Creek, it would run into De Luz Creek.

18        Q   Have you any record from any source, hearsay or any-

19   thing--

20        A   May I look at this map just a moment, because I am not

21   too sure it wouldn't go in the Fern Creek.

22        Q   Yes.  Excuse me.

23        A   No, it wouldn't.  The lake would not go in the Fern

24   Creek.

25        Q   Do you have any information of any kind, Mr. Butler,

33b

1    even hearsay--now, don't tell me what your information is, just

2    tell me if you have it--as to the water use by David Lacey

3    immediately after he filed the application, your M-B-49?

4        MR. VEEDER:   That is yes or no.

5    BY MR. SACHSE:

6        Q   Just do you have any information as to Mr. Lacey's

7    use of any kind?

8        A   Except--  I have that piece of paper.

9        Q   Which has not yet been offered in evidence?

10       A   Yes.

11       Q   That is the only document?

12       A   Yes.

13       Q   That is the only information from any source?

14       A   And I believe this claim was made by Lacey.

15       Q   I mean evidence of the use made by Lacey after he filed

16   the claim.

17       A   I am in contact with a man who I believe will be called

18   as a witness, who--  No, I don't think he goes to Lacey's time,

19   either.  He can testify that a ditch was there put in by Lacey.

20       MR. VEEDER:   I am going to move to strike that statement

21   as not being responsive, and a pure gratuity.

22       THE MASTER:   It may be stricken.

23   BY MR. SACHSE:

24       Q   Mr. Butler, your weekends have been both winter weekends

25   and summer weekends on the property?

A   That is true.

Q   Have you observed occasions when Fern Creek runs more water than your eight inch diversion can handle?

A   Oh, yes.

Q   Have you observed when the heaviest runoffs in Fern Creek occur?

A   Immediately following a rain.

MR. SACHSE:   Thank you.   I think that is all.

THE MASTER:   Mr. Veeder.


CROSS-EXAMINATION

BY MR. VEEDER:

Q   Have you given consideration to the effect of the Fallbrook-Lipincott Dam upon your claims and your rights to the use of water that you claim?

MR. SACHSE:   I will object, if the Court please, that it is immaterial, that it is not within the scope of the direct, and it is improper cross-examination.

THE MASTER:   Objection sustained.

MR. VEEDER:   I wish to ask this witness and hope to elicit testimony to the effect that if the Fallbrook-Lipincott Dam were constructed that the burden would be increased upon the De Luz and the Santa Margarita, and there has been no consideration by the State or by Fallbrook as to anything but present uses.

MR. SACHSE:   I will repeat the objection.   How he can

35b

1  elicit from this witness what Fallbrook or the State of Califor-

2  nia has done I don't know.

3         MR. VEEDER:  You ponder that.

4         THE MASTER:  The same ruling.

5         MR. VEEDER:  I have no more questions.

6

7                    REDIRECT EXAMINATION

8  BY MR. MYERS:

9         Q   I show you here a document--

10        MR. VEEDER:  I object to this.  This is an entirely new

11 aspect of his case in chief, your Honor.

12        THE MASTER:  That is, your objection is this is not

13 proper redirect examination?

14        MR. SACHSE:  I opened it up on cross.

15        THE MASTER:  I am inclined to agree with Mr. Sachse.

16        MR. VEEDER:  I am going to object, because the piece of

17 paper to which reference is made was not marked for Identifica-

18 tion, and we haven't the slightest idea what Mr. Sachse was

19 talking about at the time, and I submit that it couldn't have

20 been opened up on cross-examination.

21        THE MASTER:  In any event, I will permit Mr. Myers to go

22 into the question as fully as he would have prior to the time

23 of your very brief cross-examination.  I think the document should

24 be marked for Identification, however, if the witness is going

25 to be asked questions concerning it.

36b

1    MR. MYERS:  Yes.  We would like to have this marked for

2  Identification.

3    THE MASTER:  M-F-49.

4  BY MR. MYERS:

5    Q  I show you a document here, Mr. Butler, and I ask you

6  if you can identify it?

7    A  Yes.  That was given to me by Mr. Allen at the same

8  time that he gave me the other document, water claim.  And he

9  told me that they were given to him by Mr. Brode, his predecessor.

10    MR. VEEDER:  I move to strike that as being hearsay.

11    THE MASTER:  The portion of the answer stating what Mr.

12  Allen told him may be stricken as hearsay.  The balance of the

13  answer telling how he obtained physical possession of the docu-

14  ment will stand.

15    MR. VEEDER:  I objected to only the last portion, your

16  Honor.

17  BY MR. MYERS:

18    Q  Do you know who wrote this document?

19    A  No, I don't.

20    Q  Do you know--

21    MR. VEEDER:  I think that is it.

22  BY MR. MYERS:

23    Q  --whether or not Mr. Brode wrote it?

24    A  I couldn't say that Mr. Brode wrote it.  I only know

25  where I got it.

37b

1    Q   Do you know where Mr. Allen got it?

2    A   He told me he got it--

3    MR. VEEDER:  I object.

4    THE MASTER:  That is the same objection.

5    MR. MYERS:  Apparently it is going to be objected to.

6    MR. VEEDER:  That, Mr. Myers, is an understatement.

7    MR. MYERS:  So I offer it as an exhibit next in order as

8    an ancient document, a document that has come down apparently

9    from the various owners of this property, and its contents.

10   MR. VEEDER:  I  object to counsel's statement.  I further

11   object that there is no foundation laid.

12   THE MASTER:  Objection sustained.

13   MR. MYERS:  In that event I will take it with me.

14   THE MASTER:  It is marked, unless counsel wishes to stipu-

15   late it may be released.

16   MR. MYERS:  I will leave it for Identification.

17   MR. VEEDER:  It might be that it would be of some value

18   to them.  I will agree that it can be released, if he desires.

19   MR. MYERS:  I would rather leave it in for Identification,

20   I won't withdraw it.

21   THE MASTER:  It may remain in for Identification.

22   Any further cross-examination?

23   MR. SACHSE:  Nothing further from me.

24   THE MASTER:  Any examination, Mr. Dennis?

25   MR. DENNIS:  I have one or two questions.

RECROSS-EXAMINATION

BY MR. DENNIS:

Q  As I understand your testimony, all of the water diverted
into the lake is from the diversion from the Anderson property
or your property just east of the west line?

A  That is true.  However, there is a certain amount of
runoff from the hillside in the wintertime, but its principal
source of water is shall I say from there.

Q  And the water which is either runoff during the winter-
time or water which is diverted from Fern Creek during winter
months?

A  That is right.

Q  Do you have the opportunity or occasion of diverting
water from Fern Creek during the summer months into the lake?

A  The real answer to that would be no, because we use it
and there isn't that much.  We divert the runoff water into the
lake during the rainy season, and we use it to irrigate when
the yield becomes insufficient.

Q  And your rainy season would be generally sometime
between November and April?

A  That is generally the rainy season in California.

Q  And how long after the rainy season is terminated in
any one year does your eight inch pipe cease to run full?

A  Well, I would say--  When would you say it quit raining
this year?  When would you consider the last rain?

39b

1          MR. VEEDER:  I object to that.  If Mr. Dennis is under

2     oath he can respond.

3     BY MR. DENNIS:

4          Q  When did the eight inch pipe stop running to its full

5     capacity this year?

6          A  It is running full now.

7          Q  And are there any other streams or creeks other than

8     Camps Creek and Fern Creek that traverse your property?

9          A  Not on Parcel 2.  There is another stream on Parcel 1,

10    but we haven't discussed that.  That is a short one that runs

11    back in Section 6.  In fact, it doesn't--  I would say it ran

12    a quarter of a mile in sort of a box canyon.  It, however, does

13    run--I think it stopped running about a week ago.

14         Q  It ordinarily does not run during the summer months?

15         A  No, it is a dry stream.

16         Q  And did I understand your testimony correctly that at the

17    point of diversion where the weir is located on the Anderson

18    property just west of your west line that the artificial struc-

19    ture goes to bedrock?

20         A  Yes.

21         Q  And across the full width of the stream?

22         A  Well, yes.  It is about, oh, I would say--  It is a V

23    possibly six feet wide on the bottom, and ten or 12 on the top,

24    something like that, and about three feet high.

25         Q  So that actually that diverts the flow of the surface

and the subsurface flow at that point?

A  Well, actually what it does, it is not a dam or a weir in that sense, because the sand and gravel have filled in and I have a screen that keeps it out of the pipe; but actually what it has done is raised the stream bed so that we could take the water gravity instead of having it run through a pipe.

Q  But it interferes with the entire surface and subsurface flow of the stream?

A  Yes, I am sure anything I put in would interfere with the stream.

Q  And I believe you testified that the land which was irrigated had been limited by the amount of water which was available?

A  That is true.

MR. DENNIS:  That is all.

MR. VEEDER:  I am going to ask some questions now.

RECROSS EXAMINATION

BY MR. VEEDER:

Q  Is your property situated upstream from Dr. Wilson who testified today, do you know?

A  Upstream?  My property adjoins Dr. Wilson's.  Yes, Fern Creek comes through my place and joins De Luz Creek on Dr. Wilson's property.

Q  And how many other water users are there on Fern Creek,

634

41b

1   if you know?

2        A   There is one user ahead of me, Mr. Anderson.

3        Q   Ahead of you or upstream?

4        A   Upstream.  Would that be ahead?

5        Q   Well, whether it is ahead or back--

6        A   Yes, sir.

7        Q   And is there any new development going on up in the

8   Fern Creek area?

9        A   Not that I know of.

10       Q   Have you brought in--  How much land have you brought

11   in yourself since you went on the Brode property?

12       MR. SACHSE:  I will object, the question is too broad

13   and incomprehensible.

14   BY MR. VEEDER:

15       Q   How many acres have you brought into production?

16       A   More than when I bought the place.  Is that what you

17   mean?

18       Q   Yes.

19       A   Well, I have reason to believe that when the property

20   was owned by my predecessor, Mr. Brode, there was about 30 acres

21   in trees, apricots, peaches, various fruit trees.  When I pur-

22   chased the property I removed the trees, the orchards.  And I

23   wasn't interested in raising fruit, and I put it into hay and

24   pasture land.  And I understand from--

25       Q   Now, do you know this yourself?

42b

1 A Do I know that the trees were there? Yes, I do.

2 Q But you were starting out to say "I understand." I was

3 just wondering if you knew or didn't know of your own personal

4 knowledge?

5 A Of my own personal knowledge I believe there was about

6 30 acres in land farmed by my predecessor, Mr. Brode.

7 Q And how much acreage--

8 A And I have cleared the land on Parcel 1 and more of

9 Parcel 2, which I have used mainly for dry farming. I cleared

10 a hillside off that he didn't farm, but the land under the irri-

11 gation system, or the flume or pipeline, as you choose to call

12 it, is more or less the same. I may have increased it, oh, ten

13 or 15 acres.

14 Q And are you using domestic water there now?

15 A Yes.

16 Q What is the source of that?

17 A Fern Creek.

18 Q And is that pumped out of Fern Creek, or how do you

19 get it?

20 A No, that comes gravity, and I pump it into a little

21 tank for drinking water.

22 Q Now, how long are you retaining the water in those

23 structures that you have described, that is your reservoirs 1

24 and 2, how long do you hold the water there?

25 A Reservoir 2, although there is water running in and out

636

43b

1    of it all the time, it makes a basin to irrigate out of.   In

2    other words, while you are changing pipe or moving pipe water

3    runs in the reservoir.  You may let it run in all night and use

4    it the next day.

5    Q   How long do you think you usually hold water in those

6    structures?

7    A   It would be a matter of days, at the most.  It would

8    change in days.  In other words, you would have it running in

9    now, you are irrigating now, it would be running in and out.

10    Q   And you are using those structures as a method for

11    delivery of water to your land.  Is that right?

12    A   That is right. In other words, in a dry time of the

13    year and the yield of the creek is substantially down we let

14    it run in the reservoirs, get our reservoir full and we irrigate

15    it out.

16    Q   Now, when the Soil Conservation people were there did

17    they, or have you had anyone measure the quantity of water that

18    was delivered to your land?

19    A   I have never had anyone measure the quantity of water

20    personally.  According to the survey, the map, they say the

21    pipe yields approximately a half a cubic foot a second.  I built

22    a settling basin in the pipeline several hundred yards from the

23    diversion point to catch the sand and foreign matter that might

24    come in and clog the pipe.  At the time I did this it was in

25    the summer, and I felt I was getting about 150 gallons a minute

44b

1  out of the pipe.  At that time of the year it would check fairly

2  close to their estimate of a half a cubic foot a second.

3       MR. VEEDER:  I have no further questions.

4       THE MASTER:  Mr. Myers?

5       MR. MYERS:  Just to clarify a point.

6

7                    REDIRECT EXAMINATION

8  BY MR. MYERS:

9       Q  I believe you stated that you obstructed this particu-

10 lar Fern Creek at a point there? Will you explain what you mean

11 by obstructed it?

12      A  Well, this little weir or dam, or whatever you want to

13 call it, is an obstruction, it is in the creek.  It was there

14 when I bought the place but, I mean, I guess you would call it

15 an obstruction; anything in the road is an obstruction.  It is

16 certainly in the creek.

17      Q  Well, does the water flow over it?

18      A  Yes, any time there is more water than the pipe takes

19 it flows right over it.  Actually it would look like a precipice,

20 a drop of about so high, and what has been done in the gorge--

21 masonry and stone has been put in there, and as the creek bed

22 filled up what it meant was raising the level of the water at

23 that point so it would run off in the pipe instead of running

24 the pipe farther up the creek.  It was a means primarily of

25 getting the water to stay above the ground.

45b

1     MR. MYERS:  I have no further questions.

2     MR. SACHSE:  Nothing.

3

4               RECROSS EXAMINATION

5  BY MR. DENNIS:

6     Q  When you said about so high you indicated a distance

7  of three and a half to four feet high?

8     A  About like that.

9     Q  I have one other question.  During a period of heavy

10  rainfall, or immediately thereafter, is the flow of Fern Creek

11  more than sufficient to fill your eight inch pipe?

12     A  Yes.  You could have gone down it in a canoe this

13  winter.

14     Q  In other words, there is a great deal more water during

15  a heavy rainfall and immediately after than your pipe can handle?

16     A  That is right.

17     Q  And how long will the access flow continue after a heavy

18  rain storm?

19     MR. VEEDER:  I object to that.  There is no basis whatever

20  for his conclusion on that.  How heavy is the rain storm?

21     THE MASTER:  The question is objectionable.  The objection

22  is sustained.

23     MR. VEEDER:  I have no questions.

24     MR. MYERS:  No further questions.

25     THE MASTER:  Does any individual defendant have any

46b

1    questions?  Mr. Stahlman?

2         MR. STAHLMAN:  No.

3         MR. MYERS:  Call Mr. Brode.

4         THE MASTER:  Mr. Brode.

5

6              SAMUEL EDWARD BRODE,

7    called as a witness by and on behalf of Defendant Butler, sworn,

8    testified as follows:

9

10             DIRECT EXAMINATION

11   BY MR. MYERS:

12        Q  State your name, please, Mr. Brode.

13        A  My name is Samuel Edward Brode.  Nicknamed Ned, so if

14   you hear my name referred to as Ned it is one and the same

15   person.

16        THE MASTER:  How do you spell your name?

17        THE WITNESS:  Ned?

18        THE MASTER:  No, your last name.

19        THE WITNESS:  B-r-o-d-e.

20   BY MR. MYERS:

21        Q  Where do you reside, Mr. Brode?

22        A  Poway.

23        Q  And are you familiar with the property owned by Mr.

24   Butler?

25        A  Yes, sir.

47b

1    Q   And referring to the exhibit which you have before you

2    there, and it is marked as two Parcels, 1 and 2, can you tell me

3    what your familiarity of that property is based on, what you

4    predicate it on?

5    A   The large one is Parcel 2?

6    Q   Yes.

7    A   I have lived on that property since June of 1910, up

8    until 1939.   That was my home address.

9    Q   Mr. Brode, what was your father's name?

10   A   John Edward.

11   Q   Did he have a brother?

12   A   Yes.

13   Q   And what was your brother's name?

14   A   My father's brother?

15   Q   Yes.

16   A   George.

17   Q   Do you know of your own knowledge whether or not he

18   owned this property?

19   A   A partnership.

20   Q   A partnership with whom?

21   A   With John Brode, my father.

22   Q   And how old were you when you first came onto this

23   property?

24   A   I was ten years old.  No, I was eight.  I was born in

25   1902, I was eight years old.

48b

1    Q   And since that time have you visited this property off

2   and on?

3    A   Yes, sir.

4    Q   And would you say you have been there practically--

5   How often have you been there in the past five years?

6    A   Oh, as many times, probably more--  I mean I couldn't

7   exactly say, but I go pretty often.  I don't believe a six-months

8   period goes by that I don't see the property.

9    Q   In other words, do you visit the property about every

10   six months?

11    A   Whenever the occasion comes along.

12    Q   And you have had an opportunity to observe the develop-

13   ment of the property?

14    A   Yes, I have.

15    Q   Now, when was the last time you were on the property?

16    A   The last time was just this last Saturday.

17    Q   This last Saturday?

18    A   Last Saturday.

19    Q   And at that time did you go over the property?

20    A   Yes.

21    Q   With whom did you go over it?

22    A   Mr. Butler and yourself.

23    Q   Now, when you came on the property in--  Withdraw that.

24       On this last visit to the property did you go out to the

25   point of the diversion, where the property is diverted from Fern

49b

Creek to the property?

    A   Yes.

    Q   And--

MR. VEEDER:   May I have that question read back?

(Record read.)

MR. MYERS:   I withdraw the question.

THE WITNESS:   I knew what you meant.

BY MR. MYERS:

    Q   Did you visit the diversion point?

    A   Yes.

    Q   And did you notice how the water is diverted?

    A   Yes, sir.

    Q   And how is it diverted?

    A   It is diverted into an eight inch galvanized pipe from a small diversion dam of concrete.

    Q   And what kind of an opening or what kind of an aperture is that from the creek to the pipe?  That runs into the pipe?

    A   Yes.  Well, the creek runs directly into the pipe, it just has a screen over the entrance.

    Q   And how does that compare with--  Withdraw that.

What is as far back as you can recall of your knowledge that you can recall the method in which that water was diverted from that stream to the property?

    A   Well, very similar as it is now, except we only used a very small earth dam, probably a foot high, and we would run the

1   water directly into the pipe.

2      Q   And about when was that that you recall?

3      A   Well, that would have been in 1910, '11.

4      Q   And at that time did you do any work on this particular

5   diversionary method?

6      MR. VEEDER:   As an eight year old?

7      THE WITNESS:   What type of work?

8   BY MR. MYERS:

9      Q   Well, did you do any work on this system of this diver-

10  sion at the time back in 1910?

11     A   Well, I used to assist my dad, and I would do the wad-

12  ing in the creek and pile up the sand and rocks, and one thing

13  and another; I remember the dam.

14     Q   Do you remember doing any work on the pipeline?

15     A   I remember being with my father when he laid the pipe

16  in the old ditch.

17     Q   And did you do any work on it?

18     A   I doubt whether I did much.   I would carry drinking

19  water for them.

20     Q   Well, can you describe to us the system of diversion

21  say back to about 1914?

22     A   Well, the system of diversion hasn't changed in all of

23  these years, it is about the same.

24     Q   What kind of a pipe was it that diverted the water at

25  that time?

51b

1     A  1914.  We were using the same type of galvanized iron

2 pipe, an eight inch pipe, that is what come directly out of

3 the creek.

4     Q  As far back as you can remember?

5     A  That is as far as I can remember.

6     Q  And was it that type of pipe all the way across the

7 property, or was it anything different?

8     A  Oh, no, it only run a few hundred yards, that type of

9 pipe.

10     Q  And then what type of a conveyance was it?

11     A  Then it run into--  The first that I remember was just

12 an open ditch.

13     Q  When you say the first that you remember, is that the

14 furthest back you remember?

15     A  That was the farthest back.  It was just an open ditch,

16 and that conveyed the water clear down to the ranch house.

17     Q  And then was there any change during the time that you

18 lived on the property?  Was there any change to this system?

19     A  Well, the first change my dad did almost immediately

20 was to build an eight inch concrete pipe, place it in the open

21 ditch, we laid that right into the open ditch.

22     Q  How far did that extend on the property?

23     A  That was the full half mile.  I believe the old photo-

24 graph we had showed us building 2,800 feet of concrete pipe,

25 so I guess that is about what was needed to bring it down.

52b

#3

1   Q  Were there any tanks or reservoirs on the property

2   during the time that you lived there?

3   A  The early part, no.  The first that--  Well, the only

4   one that I had anything to do with was the one I built in about

5   1930, '31.

6   Q  You built a reservoir?

7   A  Yes.

8   Q  And can you describe it to us?

9   A  Well, that was the concrete reservoir that has been

10  talked about.

11  Q  You are familiar with the reservoirs now, are you not?

12  A  Yes, sir.

13  Q  And that is the concrete?

14  A  Yes, sir.

15  Q  And were there any other tanks or reservoirs on the

16  property other than this concrete one you are talking about?

17  A  Well, there was a little dam where Mr. Butler now has

18  his larger structure; and that was only small, though.  I would

19  say it didn't have four or five feet of water, an earth dam.

20  Q  How far back was this that that dam was there?

21  A  Well, that was there when my dad bought the place in

22  1910.

23  Q  Do you remember doing work on this property when you

24  were a youngster?

25  A  I remember working on the property, following a

53b

1  cultivator with an old horse.

2      Q  Do you remember--  Was your father a rancher or a farmer?

3      A  Yes, sir.

4      Q  Did he farm commercially?

5      A  Yes, sir.

6      Q  And did you assist him?

7      A  Yes, I assisted in whatever capacity there was for a

8  boy that age.  I am sure I did, I would have had to.

9      Q  And how long did you remain on the property assisting

10  your father, for how long a time?

11      A  Well, my father lived on the property, of course, until

12  he sold it in 1945, '44.  And I farmed it myself only the last

13  seven years preceding that.  Otherwise he farmed, and I only

14  assisted him, up until that time.

15      Q  You did help your father?

16      A  Yes, sir.

17      Q  About what age were you when you started to help your

18  father work on this farm?

19      A  Oh, I was probably eight, nine, ten years old.

20      Q  That young?

21      A  Oh, sure, a lot of things.

22      Q  Do you recall--  I show you here Exhibit M-55, which

23  purports to be a utilization overlay of this land.  Now, let's

24  go back to the time when you were about 12 years old.  Can you

25  remember what your father raised on this land, or grew?

54b

1    A  Yes, sir.

2    Q  Can you remember that?

3    MR. VEEDER:  I am going to interpose an inquiry, and it

4    perhaps will result in an objection.

5    Are you testifying in regard to this overlay and the map

6    based on your 12 year old recollection?

7    THE WITNESS:  I am not familiar with this.  I will have

8    to see where I am looking so I know exactly what I am looking

9    at.

10    MR. VEEDER:  The two of them are tied together, your Honor,

11    and unless there is some showing that this man can read an

12    area photograph and understand soil surveys I am going to object.

13    THE MASTER:  Are you familiar with the area as shown in

14    that photograph?

15    THE WITNESS:  If you will explain this here.

16    MR. VEEDER:  That is the point, your Honor.

17    BY MR. MYERS:

18    Q  I will show you a photograph which purports to be--  Do

19    you recognize that?

20    A  Yes, sir.

21    Q  What is it to you?  What does that mean to you?

22    A  Well, that is practically the full length of the ranch.

23    Q  Now, when you were 12 years old do you remember what

24    crops were grown on this ranch, of your own knowledge?  What

25    crops were grown there?

55b

1    A  The very first crops that were planted--and there was

2  a crop on the ranch at the time we went there, and we continued

3  that crop for several years after that, in fact, a good many

4  years--was sweet potatoes.  Now, I remember very, very well

5  picking up sweet potatoes.

6    Q  And were there any other crops that were grown there

7  at that time?

8    A  No, back in 1910 or '11 I don't remember anything.  A

9  few years later there was corn, sweet corn, which we raised for

10  market.  And then I think it was about 1912 that we planted the

11  apricot trees, we put out 13 acres of apricot trees.

12    Q  You put out 13 acres?

13    A  My dad.

14    Q  How did you measure the amount of acreage under which

15  you put the crops in production?

16    A  Well, it was the number of trees, and it was 25 foot

17  squares for the trees; and I can't tell you how many trees there

18  was now, but I helped survey.  My brother was a civil engineer,

19  and I assisted him in laying out that whole place, chained it.

20    Q  Did you help your brother survey the land?

21    A  To lay the trees out.

22    Q  Do you know how many acres were under cultivation at

23  that time?

24    A  In acres I wouldn't testify.  I wasn't particularly

25  concerned with acres probably then.

56b

MR. VEEDER:  I am going to object to any further response to the question then.

THE WITNESS:  Hearsay, my dad said we had 25 or 30 acres, that is all.  The 13 acres, that sticks.

MR. VEEDER:  There is an objection, and I move to strike.

THE MASTER:  Objection sustained.  The answer will be stricken.

BY MR. MYERS:

Q  Did you ever measure any of the property that you had under acreage--or, under cultivation?

A  No, not for acreage, only plots that we would plant. I don't know.

Q  Well, what crops did you have in 1912?

A  Well, you would still have your sweet potatoes in.

Q  Did you have anything else?

A  I know my dad raised lots of melons, because we used to take the old wagon and the melons and sell them to the ranchers, which is now Camp Pendleton, the Santa Margarita Ranch; we used to haul them down to O'Neill.

Q  And sell them to them?

A  Yes.

Q  Did you sell anything else to the Santa Margarita Ranch?

A  Sweet corn.

Q  Various crops?  Other crops, too?

A  We had a great variety of crops.  I think we had about

1    ten or 12 varieties of fruit on the place, quite a variety.

2        Q   And how did you irrigate these crops?

3        A   Well, it was all gravity irrigated, we didn't use any

4    pumps at all.   The last seven years I was there was the only time

5    we pumped any water.

6        Q   And during the last seven years did you do some pumping?

7        A   Yes.   We irrigated about an acre or an acre and a half

8    with a pump above the pipeline.

9        Q   How did you pump the water?   How did you do that irri-

10   gating, by what method?

11       A   The pumping?

12       Q   Yes.

13       A   Well, we had an inch and a half centrifugal pump with

14   a three horse gasoline engine, and we just put the suction

15   right directly to the pipe.

16       Q   Did you pump it from a well?

17       A   No, right out of the pipeline.

18       Q   Did you have a well on the property when you lived

19   there?

20       A   Yes, where Mr. Butler has what has been referred to

21   as a sump.   We put a little pump in there during hot weather one

22   year to catch more water, we didn't have enough.

23       Q   Do you remember when that well was put in?

24       A   Oh, let's see.   About 1929, I think around there.

25       Q   How did you pump it out of there?

58b

1    A   We used the pump that way, we used an old Model-T Ford

2    engine with a belt and the same centrifugal pump.

3    Q   And is that in the same place as the well is at the

4    present time?

5    A   Yes, sir.

6    MR. VEEDER:   Would you read the last question and answer?

7    (Record read.)

8    BY MR. MYERS:

9    Q   Now, referring to a time during this period that you

10   were living there, was this the only source of water supply to

11   the farm?

12   A   Fern Creek was, yes, sir.

13   Q   Were there any times when you were short of water?

14   A   Oh, yes, many times.

15   Q   How much of the water did you use that came through

16   the pipe?

17   A   Well, we used every bit of it, and many times before

18   we had our storage reservoir we didn't irrigate after 3:30 in

19   the afternoon, the water was gone practically, on hot days.

20   That was on extremely hot days.  By 10 o'clock at night your

21   water would come back.

22   Q   During this time that you lived there was Fern Creek

23   ever dry?

24   A   It was only dry for a short period, a few hours.  I

25   have never seen Fern Creek dry over a period of time at all.

59b

1  It was one of the few creeks that wasn't.  That is down at the

2  source, the lower end where we took water out.  Above there would

3  be water.

4      Q  So that the method of diversion at the present time

5  that you noticed the other day was substantially the same as it

6  was when you were on the property?

7      A  Yes, sir.

8  MR. MYERS:  I have no further questions.

9  MR. SACHSE:  I have no questions.

10  THE MASTER:  Mr. Veeder?

11  MR. VEEDER:  I have no questions.

12  THE MASTER:  Mr. Dennis?

13  MR. DENNIS:  No, your Honor.

14  MR. STAHLMAN:  No, your Honor.

15  THE MASTER:  Does any individual defendant have any

16  questions?

17      Mr. Brode, you may be excused.

18  MR. MYERS:  I would like to call Mrs. Butler.

19

20                    LOUISE BUTLER,

21  called as a witness by and on behalf of Defendant Butler, sworn,

22  testified as follows:

23

24                  DIRECT EXAMINATION

25  BY MR. MYERS:

    Q  Will you state your name, Mrs. Butler?

60b

1    A   Louise Butler.

2    Q   And you are the widow of?

3    A   William James Butler.

4    Q   Who was the father of?

5    A   Father of Larry Butler.

6    Q   And referring to the property in question, you have

7  heard all of the testimony, have you not?

8    A   I have.

9    Q   How long have you lived there on this property?

10   A   12 years this last March.

11   Q   Since the purchase?

12   A   Well, right soon after we purchased it in September of

13  1945, and we moved there in March of 1946.

14   Q   And how long have you lived on this property?

15   A   Continuously.

16   Q   Ever since?

17   A   Ever since.

18   Q   And do you have any particular duty that you perform

19  on the property?

20   A   Well, when my son isn't there, why I kind of take over

21  and supervise the place and see that the things that are supposed

22  to be done get done.

23   Q   And about how many months of the year would you say

24  you lived there continuously?

25   A   All of the time.

61b

1    Q   All the time?

2    A   All the time.

3    Q   Now, during this time have you employed help on the

4    property?

5    A   Yes, sir.

6    Q   And beginning with what year?

7    A   Right away in 1946.

8    Q   Do you have records showing the number or the people

9    that you have employed there?

10   A   Yes, I have records in this way, that I have always

11   kept track of the wages that we paid out and more or less kept

12   track of who we had.

13   Q   And, in other words, your  record is only for the

14   personnel that have worked there?

15   A   That is right.  I just keep records so that at the end

16   of the year I know what has taken place.

17   Q   Has there been any year when you haven't employed

18   people on the property?

19   A   No.

20   Q   And have you perused that book recently to see about

21   what the maximum wages were for the property?

22   A   We would usually pay from $35.00 to $75.00 a week.

23   Q   And approximately how much does that run a week?

24   A   I am not a good figurer.

25   Q   And do you oversee the irrigation of the property?

62b

1    A   I see that they move all of the pipes and everything,

2  yes.

3    Q   And would you estimate--

4    MR. VEEDER:   I am going to object to the response, that

5  the answer was not responsive to the inquiry.   I think if it be

6  read--   I would like to have it clarified.

7    (Record read.)

8    THE MASTER:   I think that is responsive.

9    MR. VEEDER:   Is she overseeing the work?

10    THE WITNESS:   Yes, sir.

11    MR. VEEDER:   O.K.   That is all I wanted to be sure of.

12    You said, "I see," and I wasn't sure whether it was under

13  your direction or not.

14  BY MR. MYERS:

15    Q   During this period of time how often do you irrigate?

16    A   Well, we irrigate some days about 18 hours a day.

17    Q   Some days you do that?

18    A   That is right.   If we have the water we do, and if we

19  don't have the water, well, we do it a few hours less.

20    MR. MYERS:   I have no further questions.

21    MR. VEEDER:   I have no questions.

22    MR. SACHSE:   No questions.

23    THE MASTER:   No attorney and no individual defendant has

24  any questions?

25    You are excused.

63b

1      MR. MYERS:  I have nothing further, your Honor.

2      THE MASTER:  Mr. Veeder, do you at the present time have

3  any witnesses in opposition to the testimony put on here by Dr.

4  Wilson this morning, or by Mr. or Mrs. Butler or Mr. Brode?

5      MR. VEEDER:  Not at this time, your Honor.

6      I would like to go ahead with our direct.

7      THE MASTER:  Very well. Incidentally, the record might

8  show that Professor Burby and Lt. Miller have appeared for the

9  plaintiff, in addition to Mr. Veeder, this afternoon.

10     MR. VEEDER:  Well, your Honor, there will be no rebuttal

11  other than the advice for the benefit of the two gentlemen from

12  Los Angeles.  We will just advise them now that we are not going

13  to put any rebuttal on, and if we find anything in regard to

14  titles we will advise you as to the points we raise.

15     THE MASTER:  Unless you find some question in regard to

16  the title there will be no rebuttal even in regard to that?

17     MR. VEEDER:  That is correct.  And they will be fully

18  advised.

19     MR. SACHSE:  May I ask a question, your Honor.  This has

20  to do perhaps more with my problem in the future.

21     How are you going to operate on these cases?  Now, assuming

22  Mr. Veeder says he has no rebuttal except possibly on the ques-

23  tion of title, are you going to want to hear argument from

24  counsel as to what they think they have or have not proved in

25  these cases as they go along, assuming there is no further

64b

1    evidence from anybody, or let this thing pile up to the end?

2         MR. VEEDER:   Are you thinking of a motion?

3         MR. SACHSE:   No.   I haven't asked Mr. Eberhard, maybe

4    he wants to argue.   If this happens to me on a given Parcel

5    where Mr. Veeder says there is no rebuttal I think it might be

6    most helpful to tell you what I think I have proved rather than

7    waiting for six months.

8         MR. VEEDER:   Are we going to tell each other and tell the

9    Court what we think we have proved?

10        THE MASTER:   I think that certainly prior to the time

11   any findings are prepared I would appreciate and would desire

12   attorneys for any parties to advise me of the manner in which

13   they summarized the evidence, what they thought their rights

14   were as established by the testimony which they had presented,

15   and to consider in as much detail as they cared to, within

16   reasonable limits, of course, all of the evidence presented which

17   affected their particular parties.   Now, as to whether that would

18   take place this afternoon or at a later date is immaterial,

19   really, as far as I am concerned.

20        In other words, if either Mr. Eberhard or Mr. Myers wish

21   to present that argument at the present time I would certainly

22   be willing to receive it.   However, if they did not wish to do

23   so, or I presume if Mr. Veeder said he wanted to prepare any

24   rebuttal argument it would obviously have to be set at a later

25   time.

658

1    MR. EBERHARD:  If the Court please, I had in mind that I

2  would file the trial brief setting up what I believe we have

3  proved and what the law is with respect to our claim.

4    THE MASTER:  If that can be done in writing that will be

5  preferable, because it will probably be shorter.

6    MR. EBERHARD:  Then we each have a permanent record of

7  what everybody has said.

8    MR. MYERS:  There is this problem, the same problem that

9  the U.S. Government had in the case against the State and the

10  Santa Margarita Mutual, which was reversed by the Ninth Circuit

11  Court, that much of our legal conclusions depend upon whether

12  or not there is an excess or surplus.  The United States Govern-

13  ment apparently didn't prove that there was no surplus, and

14  when they had the burden.  I don't know how we exactly are to

15  tell since it has shifted now to the little person to prove the

16  affirmative of his rights.  Much depends on whether or not there

17  is a surplus in this De Luz watershed.

18    I think we have a sub-watershed within a watershed, myself,

19  sofar as the people on Fern Creek are concerned.  Now, is there

20  or is there not an excess or surplus?  And how long has it

21  existed?

22    THE MASTER:  Well, of course, that cannot be determined

23  at the present time.

24    MR. MYERS:  That is the basis on which we have to determine,

25  as I see it, whether our claims are entirely riparian, or part

66b

1   appropriative which has ripened into prescriptive rights.   We

2   can't get title by prescription to surplus water.

3       THE MASTER:   I believe in your case the matter is further

4   complicated by the fact that at least to some extent you, and

5   I believe it is Mr. Anderson, Mr. Sachse's client, may have

6   some questions as to your rights between each other, and Mr.

7   Anderson's claims have not been presented.   So unless any counsel

8   wishes at the present time to present any oral argument--and I

9   have gathered that Mr. Eberhard does not, and you have not indi-

10  cated that you do, Mr. Myers--I would say that the matter would

11  be postponed until some later date at which time you would file a

12  short written memorandum or be present for any oral argument.

13      MR. MYERS:   That is the way we would prefer to do it.

14  But frankly, we have got that problem as far as the law.

15      THE  MASTER:   Any argument would have to be presented in

16  the alternative, assuming, one, that there was a surplus, and

17  assuming, two, that there wasn't a surplus, what your rights

18  would be.

19      All right, Mr. Veeder, you may proceed with your case in

20  chief.

21      MR. VEEDER:   I will call Colonel Bowen.

22

23              ALLEN C. BOWEN,

24  resumed the stand, testified further as follows:

25

67b

DIRECT EXAMINATION  (Continued)

1

2     MR. VEEDER:  The last exhibit, your Honor, that we were

3 putting in was marked and admitted as M-66J, aerial photograph

4 4-0090?

5     THE MASTER:  Correct.

6     MR. VEEDER:  And we will simply proceed with continuing

7 to put in these aerials.

8     Will you kindly mark this for Identification?

9     THE CLERK:  M-68--

10    THE MASTER:  M-66K.

11    MR. SACHSE:  Mr. Veeder, I didn't get the number.  Is

12 that 4-0091?

13    THE MASTER:  Mr. Clerk, that is M-66K.

14 BY MR. VEEDER:

15    Q  Colonel Bowen, I hand you Plaintiff's Exhibit marked

16 M-66K for Identification, and I ask you to state what appears on

17 that Identification.

18    A  Plaintiff's Exhibit M-66K is a photographic reproduction

19 of field survey sheet number 4-0091.

20    It portrays a portion of the United States Naval Reserva-

21 tion at Camp Pendleton, and the soils information indicated

22 thereon is delineated by solid black lines within a rectangular

23 area of grey lines which forms the matched lines for this photo-

24 graph.

25    The Santa Margarita River traverses the area used--the area

68b

1  of this photograph used for survey purposes from the northerly

2  matched line southerly, and leaves the matched line about at

3  the center of the southern matched line.

4      MR. VEEDER:  We will offer in evidence M-66K.

5      THE MASTER:  It will be received in evidence and so marked.

6  BY MR. VEEDER:

7      Q  I hand you, Colonel Bowen, Plaintiff's Identification

8  M-66L, and ask you to state what appears on that Identification.

9      A  Plaintiff's Exhibit M-66L is a photographic reproduc-

10  tion of a field survey sheet number 4-0092.

11      The matched lines are the straight grey lines surrounding

12  an area on which soil sites have been delineated with a solid

13  black line and a fractional symbol indicating the nature and

14  character of those sites, together with a Roman numeral giving

15  the land class of the site is shown hereon.

16      Through the portion used for--  Through the portion of this

17  field sheet used for survey the Santa Margarita River traverses

18  from north to south through the approximate center of the area

19  in which the soils have been delineated.

20      MR. VEEDER:  I offer in evidence Plaintiff's Exhibit M-66L.

21      THE MASTER:  It will be received, and so marked.

22  BY MR. VEEDER:

23      Q  I hand to you Plaintiff's Identification M-66M, Colonel,

24  and I ask you to state what is disclosed on that Identification.

25      A  Plaintiff's Exhibit M-66M is a photographic reproduction

69b

1   of an aerial photo number 4-0093.   On this vertical aerial

2   photo is depicted a portion of Camp Pendleton, and within

3   straight grey colored lines, the matched lines and a dash-dot

4   line, the Naval Reservation boundary noted in the lower right

5   hand corner of the photograph, and more especially bordered by

6   an irregular black dash-dot line which traverses the survey

7   sheet from the lower left to the upper right, and which line is

8   the crest of the watershed of the Santa Margarita River.

9       Westerly and northerly of the watershed line depicted on

10  this exhibit out to the matched lines on the east and the north

11  the soil sites are delineated by solid black lines, and shown

12  by the fractional symbols and the Roman numeral class.

13      The Santa Margarita traverses the area of this sheet used

14  for survey from the upper center out to the left center.

15      Q   What areas, if any, of the military installations are

16  located outside of the watershed on that Identification?

17      A   The Wire Mountain Housing is the area lying between the

18  crest of the watershed and the Naval Reservation boundary.

19      MR. VEEDER:   I would like to make an offer before I ask

20  you any more questions.

21      THE MASTER:   It will be received in evidence as M-66M.

22  BY MR. VEEDER:

23      Q   Now, the Wire Mountain Housing, would you state what

24  installation that is, please?

25      A   That is an area providing quarters for military and

70b

1  Civil Service Personnel stationed at Camp Pendleton.  It is built

2  under the Wherry Housing Act, Title VIII Housing; it is divided

3  into two sections.

4      Q  What are the sources of water that are delivered to the

5  installations?

6      A  Well, the water delivered to those installations origin-

7  ates in the well field of the Santa Margarita Valley within

8  Camp Pendleton.

9      Q  Now, how is that water delivered to that portion located

10  outside of the watershed?

11      A  The water is delivered through a system of pipes, valves,

12  reservoirs, treatment plants, conducted by pipeline into the

13  area served.

14      Q  And what is the source of the water?

15      A  The source of the water is the Santa Margarita River

16  which, during occasional periods, percolates into the underground

17  basin, and wells which are drilled into the alluvium occupying

18  or filling that basin are pumped to provide the water for this

19  surface area.

20      MR. SACHSE:  May I ask a question for information, Mr.

21  Veeder?  I don't know that I am reading this right.  Colonel

22  Bowen, on that last exhibit--

23      MR. VEEDER:  Would you give the number, Colonel?

24      THE WITNESS:  Plaintiff's Exhibit M-66M is a photographic

25  reproduction of aerial photo 4-0093.

71b

1 MR. SACHSE:  Now, the question I had is this one, I am

2 confused--

3 MR. STAHLMAN:  I can't hear you.

4 MR. SACHSE:  Now, where does the other one tie onto this,

5 the bottom or the top?  Thank you.

6 My question was whether the preceding photograph M-66L

7 matched at the top of M-66M or at the bottom, and Colonel Bowen

8 corrected me to state that it matched at the top.  Is that

9 correct?

10 THE WITNESS:  Plaintiff's Exhibit M-66L adjoins Plaintiff's

11 Exhibit M-66M on the north; the northerly match line of M-66M

12 is common to the southerly match line of M-66L.

13 MR. VEEDER:  Do you have any further questions?

14 MR. SACHSE:  No, that is it.  Thanks.

15 BY MR. VEEDER:

16 Q  I hand to you Plaintiff's Exhibit M-66N marked for

17 Identification, and ask you to state what is disclosed by that

18 exhibit.

19 A  Plaintiff's Exhibit M-66N is a photographic reproduc-

20 tion of a soil survey field sheet, aerial photo number 4-0105.

21 This soil survey field sheet reveals an irregular shaped

22 area bounded on three sides by straight grey colored lines and

23 on the fourth side by a straight dash-dot line marked the Naval

24 Reservation boundary.

25 Cutting across the upper left corner of the area enclosed

1 within the matched lines, the reservation boundary, is an irregu-

2 lar dash-dot line, black in color, which is the watershed of the

3 Santa Margarita River.  And easterly and northerly from the

4 watershed line out to the north and east map lines various soil

5 sites are delineated by solid black lines.

6 MR. VEEDER:  I shall make the offer at this time.

7 THE MASTER:  You mean westerly, don't you?

8 THE WITNESS:  Correction, westerly.  Thank you.

9 THE MASTER:  It will be recieved in evidence as Plaintiff's

10 Exhibit M-66N.

11 BY MR. VEEDER:

12 Q  What structures, if any, are on that Plaintiff's Exhibit

13 M-66N, Colonel?

14 A  Just west of the point where the crest line of the

15 watershed intersects the northerly map line is a fresh water

16 pond which is indicated by the irregularly shaped dark grey area.

17 Outside of the watershed Windmill Canyon runs southerly into the

18 San Luis Rey River.

19 Q  Colonel Bowen, I hand you Plaintiff's M-66O, and I

20 ask you to state what is disclosed on that Identification,

21 A  Plaintiff's Exhibit M-66O is a photographic reproduc-

22 tion of a soil survey field sheet made on photograph number

23 4-0107, an area contained within an irregular grey line, which

24 is the matched line on this photograph, and the dash-dot line

25 running generally through the north and south through the center

73b

1   of the photograph the watershed of the Santa Margarita River.

2       MR. VEEDER:   I will offer this.

3       THE MASTER:   That will be received as Exhibit M-660.

4   BY MR. VEEDER:

5       Q   What structures if any, appear on that exhibit, Colonel

6   Bowen?

7       A   A portion of the air field, a portion of the industrial

8   area.

9       Q   And generally where are those situated in the enclave?

10      A   They are situated in the Chappo Flats area, which is

11  a portion of the alluvial filled Santa Margarita River Valley.

12      Q   Are there any other structures or installations dis-

13  closed on that?

14      A   The barracks and administrative area for the troops that

15  serve the industrial area are also located therein within the

16  matched line, and the base motor pool is located within the

17  matched line.

18      Q   What are the sources of water for those installations?

19      A   The sources of water for those are the alluvium in the

20  Santa Margarita River Valley.

21      Q   How is water delivered to those installations?

22      A   Pumped from wells that pierce the alluvium, and delivered

23  through a distribution system to the service area.

24      Q   Colonel Bowen,   I hand you Plaintiff's for Identifica-

25  tion M-66P, and ask you to state what is disclosed on that.

74b

1     A  Plaintiff's Exhibit M-66P is a photographic reproduction of aerial photo number 4-0108.  And this photograph is used as a field survey sheet, and within the straight grey matched lines and the irregular dash-dot watershed crest line the soil sites are delineated.

6     MR. VEEDER:  I offer in evidence Plaintiff's Exhibit M-66P.

7     THE MASTER:  It will be received and entered as M-66P.

8 BY MR. VEEDER:

9     Q  What structures, if any, appear on that exhibit, Colonel Bowen?

11     A  A portion of the air field on Chappo  Flats, part of the Santa Margarita Basin, the headquarters area of the base, and a small ammunition dump; the ranch house, currently the Commanding General's headquarters,with its satellite structures.

15     Q  Are they in orbit there?

16     A  They are located just left and slightly below the center of the area enclosed within the matched lines.

18     Q  What is the source of water for those structures?

19     A  The source of water for those structures is the alluvial filled ground water basin of the Santa Margarita River.

21     Q  And where is the Santa Margarita River on that aerial photograph?

23     A  The Santa Margarita River traverses the portion of this photograph used for the survey from the upper--from the center of the northerly matched line, diagonally south and west, and to

75b

1    a point slightly below the center of the westerly matched line.

2      Q   I hand you Plaintiff's Exhibit marked M-66Q for

3    Identification, and ask you to state what appears on that Iden-

4    tification:

5      A   Plaintiff's Exhibit M-66Q is a photographic reproduc-

6    tion of an aerial photo number 4-0109. And the portion of this

7    photograph enclosed within the straight grey matched line,

8    rectangular in area, was used for delineating the soil sites in-

9    dicated by the solid black lines.

10      MR. VEEDER:   I will offer in evidence the Identification

11    marked M-66Q.

12      THE MASTER:   It will be received in evidence and so marked.

13   BY MR. VEEDER:

14      Q   I ask you, Colonel Bowen, to describe the structures,

15    if any, that appear on Plaintiff's Exhibit M-66Q.

16      A   Well, the U. S. Naval Hospital is within the area of

17    the matched lines delineated on this photograph; the diversion--

18    the O'Neill diversion from the Santa Margarita are in--

19      Q   When you say the O'Neill diversion what do you mean by

20    that?

21      A   I mean that point on the Santa Margarita River where

22    water is diverted into the O'Neill ditch and thence into Lake

23    O'Neill, which is also shown in this photograph within the matched

24    area.

25      Q   Now, are there any other structures that appear mm that

76b

1   exhibit, and where is it?

2        A  Well, there are some structures.  In the upper right

3   corner is the asphalt mixing plant for base maintenance.  Just

4   within the area of the matched lines our Combat Village is loca-

5   ted in the left center portion of the picture.  Basilone Road

6   traverses the picture across the easterly end--I mean the west-

7   erly end within the matched lines.

8        Q  What are the sources of water for the structures that

9   are used by military personnel?

10       A  The alluvial ground water basin of the Santa Margarita

11  Basin is the source of water for the structures depicted herein.

12       Q  Where does the Santa Margarita appear on that exhibit?

13       A  The  Santa Margarita traverses the area enclosed in

14  the matched lines from north to south; it enters the area within

15  the matched lines to the right of center of the northerly

16  matched line, and intersects the southerly matched line approxi-

17  mately in the center.

18       Q  I hand to you Plaintiff's Exhibit marked M-66R, and

19  ask you to state what appears on that Identification.

20       A  Plaintiff's Exhibit M-66R is a photographic reproduc-

21  tion of an aerial photo number 4-0110.  A portion of this

22  aerial photograph was used in the field as a field sheet in the

23  soil survey.

24       MR. VEEDER:  I will offer in evidence the exhibit marked

25  M-66R.

77b

1    THE MASTER:  It will be received in evidence as Plaintiff's

2  Exhibit M-66R.

3  BY MR. VEEDER:

4    Q  Will you state, Colonel Bowen, what structures, if any,

5  appear on that exhibit?

6    A  Well, there are two small earth filled dams which

7  appear in Wood Canyon on this exhibit, some roads, a portion of

8  the asphalt plant which projects from the Plaintiff's Exhibit

9  M-66Q, adjoining this one on the south.  There are no others--

10    MR. SACHSE:  Would you please indicate which side of the

11  map Wood Canyon is on?

12    THE WITNESS:  Wood Canyon enters from the north, on the

13  left hand side of the northerly matched line.

14    MR. SACHSE:  I see it.

15    THE WITNESS:  A white area.

16    MR. SACHSE:  I see it. Thank you.

17    THE WITNESS:  That is the upper dam on Wood Canyon.  Then

18  Wood Canyon continues on down, and you notice another white

19  area, the second dam.

20    MR. SACHSE:  I see it, thank you.

21  BY MR. VEEDER:

22    Q  Colonel, I hand you Plaintiff's Exhibit marked M-66S

23  for Identification, and ask you to state what appears on that

24  Identification.

25    A  Plaintiff's Exhibit M-66S is a photographic reproduction

78b

1    of aerial photo number 4-0111.  A portion of this particular

2    photograph used for soil survey is included within the roughly

3    rectangular straight grey lines, and the black dash-dot lines

4    traversing the upper left corner of the matched line area which

5    is the crest of the Santa Margarita watershed.

6        MR. VEEDER:   I offer in evidence M-66S marked for Identi-

7    fication.

8        THE MASTER:   It will be received as M-66S.

9    BY MR. VEEDER:

10       Q   Will you state what structures appear on that exhibit?

11       A   Well, the site of Camp De Luz, and the road serving

12   that area.

13       Q   What is Camp De Luz?

14       A   Camp De Luz is one of the satellite training camps

15   which is occupied from time to time by troops in the execution

16   of their training missions, located on De Luz Creek.

17       Q   Are there any other structures on there or any other

18   part of the enclave--  Incidentally, what is the source of water

19   for the De Luz Camp?

20       A   Well, the source of water for the De Luz Camp is a well

21   which is drilled near the confluence of De Luz Creek with the

22   Santa Margarita River.  The Santa Margarita River traverses the

23   extreme lower right hand corner of the area enclosed within the

24   matched lines.

25       Q   I hand you--

79b

1    MR. SACHSE:  May I ask another question?  Is the other

2    stream we see running more or less parallel to the right hand

3    match line, is that De Luz Creek?

4        THE WITNESS:  Yes.

5        MR. SACHSE:  Thank you.

6    BY MR. VEEDER:

7        Q  I hand to you Plaintiff's Exhibit M-66T, and ask you

8    to state what appears on that Identification.

9        A  Plaintiff's Exhibit M-66T is a photographic reproduc-

10   tion of a vertical aerial photo number 4-0112.  The portion of

11   this photograph used for making the soil survey of Camp Pendle-

12   ton is bounded by an irregular line composed of straight segments

13   with a grey tone, and the crest line of the Santa Margarita

14   River in the lower left hand corner of the matched line is shown

15   by a black dash-dot line.

16       MR. VEEDER:  I offer  Plaintiff's Exhibit M-66T.

17       THE MASTER:  It will be received in evidence and so marked.

18   BY MR. VEEDER:

19       Q  What structures are there appearing on that exhibit,

20   Colonel?

21       A  Roads and fire breaks are the principal.

22       Q  Are there any areas outside of the watershed that re-

23   ceive water from the Santa Margarita River?

24       A  In this area?

25       Q  Yes.   There are none?

673

80b

1    A   The area outside of the Santa Margarita River here is

2    primarily for troop exercises.

3    Q   I hand you Plaintiff's Exhibit marked M-66U for Iden-

4    tification, and ask you to state what appears on that Identifi-

5    cation.

6    A   M-66U is a photographic reproduction of aerial photo

7    number 4-0113.   And the portion used in making the soil survey

8    at Camp Pendleton is bounded by an irregular line composed of

9    straight segments, part solid and grey in cast, which are

10   matched lines; the remainder, which are black dash-dot lines,

11   which marks the Naval Reservation boundary.

12   MR. VEEDER:   I will offer in evidence M-66U.

13   THE MASTER:   It will be received and so marked.

14   BY MR. VEEDER:

15   Q   Are there any structures appearing on this exhibit,

16   Colonel, that receive water from the Santa Margarita River?

17   A   No, sir.

18   MR. VEEDER:   Before--   Our closing time is 4.   Is that

19   correct?

20   THE MASTER:   4 o'clock.

21   MR. VEEDER:   Before that time is reached, will this be

22   open tomorrow?   Is this going to be used for an election?

23   THE MASTER:   The building will be used for election pre-

24   cincts, and I presume the exhibits should be locked up so they

25   will not be available to you as well as other people.

81b

1    MR. VEEDER:  That is what I wanted to know.

2    THE MASTER:  On Wednesday, as I indicated to certain

3  counsel, I will have to adjourn Court at about 3:15.  I am

4  willing to begin a little earlier, if you so desire, to get the

5  same number of hours in the day.  That I leave to counsel.

6    MR. SACHSE:  I will defer to anybody else, I am convenient

7  and close.

8    THE MASTER:  I have to get back to San Diego by 4:30 on

9  Wednesday.

10   MR. VEEDER:  What time would we move it up to?

11   THE MASTER:  Move it up to 9:00 o'clock?

12   MR. VEEDER:  That would be all right with us.

13   THE MASTER:  From 9 to 12, and 1:30 to 3:15.

14   MR. VEEDER:  That would be fine.

15   THE MASTER:  Then we will adjourn now until Wednesday at

16  9 o'clock.

17   MR. MYERS:  Your Honor, I would like to withdraw that

18  document that I had up there for Identification only that had

19  objections to be admitted.

20   THE MASTER:  I understood that counsel were willing to

21  stipulate it might be withdrawn.

22   MR. VEEDER:  Yes, I stipulated to it.

23   THE MASTER:  Mr. Myers may withdraw it then, his exhibit

24  M-F-49 for Identification.

25      (Adjournment.)