Case 3:51-cv-01247-JO-SBC   Document 4726   Filed 09/24/63   PageID.43109   Page 1 of 110

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

                        Plaintiff,

         vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                  Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

| | |
|---|---|
| **Volume:** | VI |
| **Pages** | 675 – 782 |
| **Date:** | June 4, 1958 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3       APPEARANCES:

4           WILLIAM H. VEEDER
              For United States of America

5

6           WILLIAM E. BURBY
              For United States of America

7           FRANZ R. SACHSE
              For Fallbrook Public Utility District

8

9           GEORGE STAHLMAN
              For Vail Estate

10          W. B. DENNIS
              For Santa Margarita Mutual Water Company

11

12

13          HOMER C. and MARION J. McDOWELL
              In Proper Person

14          FRED M. and GRACE R. JONES
              In Proper Person

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

|  |  | D | X |
|---|---|---|---|
| **For the Plaintiff:** | | | |
| Allen C. Bowen | | 684 | 691 |
| | | 707 | |
| | | 735 | 749 |
| **For the Defendants:** | | | |
| Homer C. McDowell | | 679 | |
| | | 699 | |

# INDEX TO EXHIBITS

| For the Plaintiff: | Iden. | Rec'd |
|---|---|---|
| M-68   U.S.G.S. Quad | 688 | 689 |
| M-66V  Aerial Photographs | 707 | 707 |
| M-66W  Aerial Photograph | 708 | 708 |
| M-66X  Aerial Photograph | 709 | 709 |
| M-66Y  Aerial Photograph | 712 | 712 |
| M-66Z  Aerial Photograph | 713 | 713 |
| M-66AA Aerial Photograph | 718 | 719 |
| M-66AB Aerial Photograph | 720 | 720 |
| M-66AC Aerial Photograph | 721 | 721 |
| M-66AD Aerial Photograph | 722 | 722 |
| M-66AE Aerial Photograph | 723 | 723 |
| M-69   Tabulation of Stream flow | 739 | 741 |
| M-70   Petition to change point of diversion | 743 | |
| M-71   Sketch entitled Rainbow & Sandia Reservoir | 744 | |

| For Defendants: | Iden. | Rec'd |
|---|---|---|
| MDA   Oceanside Quad | 765 | |

1    Fallbrook, California, June 4, 1958, 9:30 a.m.

2

3    THE MASTER:  You may proceed.

4    MR. SACHSE:  Mr. Veeder, before you go ahead, can I bring

5    up two very quick matters?

6    On the transcript of May 26, Volume III there is what I

7    think is a very serious error that we ought to correct.

8    MR. VEEDER:  All right.  What is it?

9    MR. SACHSE:  Volume III of May 26, it is in Mr. Veeder's

10   statement found from line 19 to the bottom of page 249.  The

11   transcript makes it in the affirmative and I definitely under-

12   stood it to be a negative.

13   MR. VEEDER:  You are very right, Mr. Sachse.

14   MR. SACHSE:  It is on line 24.

15   MR. VEEDER:  I will read the sentence as it should be.

16   "He has been advised that Colonel Robertson will" -- following

17   the word "will" insert the word "not" -- "recommend the release

18   of that data -- by reason of the military character of it --

19   he will contact the Commandant of the Marine Corps with that

20   recommendation which will be made in regard to Mr. Sachse's

21   request."

22   In other words, the word "not" should be put into the

23   record.

24   MR. SACHSE:  The word "not" on line 24, page 249.

25   THE MASTER:  The transcript will be corrected to insert

1    the word "not" following the word "will" on line 24, page 249.

2         MR. SACHSE:  One other matter, your Honor, if I may.

3         (At this point another matter was taken up which will be

4    found in Volume V-A of the transcript, following which pro-

5    ceedings were had as follows:)

6         THE MASTER:  Will counsel please state their appearance

7    for the record?

8         MR. VEEDER:  William H. Veeder for the United States of

9    America.

10        MR. BURBY:  William E. Burby for the United States of

11   America.

12        MR. SACHSE:  Franz R. Sachse for the Fallbrook Public

13   Utility District.

14        MR. STAHLMAN:  George Stahlman for the Vail Company.

15        MR. DENNIS:  W. B. Dennis for the Santa Margarita Mutual

16   Water Company.

17        THE MASTER:  Are there any individual defendants here from

18   the De Luz Creek area who are not appearing by counsel that

19   filed an Answer in proper person?

20        MR. McDOWELL:  Homer C. and Marion J. McDowell.

21        MR. JONES:  Fred M. and Grace R. Jones.

22        MR. VEEDER:  Does Mr. McDowell desire to put in his state-

23   ment now?  Do you want to put in your evidence, Mr. McDowell?

24        THE MASTER:  I understand from talking to Mr. McDowell,

25   prior to court, that he is more or less in agreement with your

1  Soil Conservation report, and I didn't think he had any affir-

2  mative testimony to the contrary.

3  MR. VEEDER:  I didn't know.  The only thing was I wanted

4  to put on Colonel Bowen.

5  THE MASTER: Mr. McDowell, did you wish to offer any testi-

6  mony at this time in addition to the Soil Conservation report?

7  MR. McDOWELL:  The only thing that I wanted to find out is

8  in regard to 40 acres whether, if I sold the 40 acres, if they

9  could put a well on it.

10  THE MASTER:  I take it that the rights of the additional

11  40 acres would be the same whether the property is sold or not

12  sold.  Would that be your opinion?  I explained that a few

13  minutes ago.

14  MR. SACHSE:  If Mr. McDowell is going to testify I believe

15  he should be sworn.

16

17              HOMER C. McDOWELL,

18  called on his own behalf, sworn, testified as follows:

19

20  MR. STAHLMAN:  I see two McDowells in the list of defen-

21  dants, Mr. Veeder.  I wonder whether they are the same or not.

22  THE MASTER:  This is Homer C. McDowell, Parcel 36.

23  MR. VEEDER:  Parcel 36.  Is that correct?

24  THE MASTER:  Yes.

25  MR. SACHSE:  Exhibit M-48.

1    MR. VEEDER:  Your Honor, I hand you Exhibit M-48, which

2  is the report on Mr. McDowell's property.

3

4                    DIRECT EXAMINATION

5    THE MASTER:  Now, Mr. McDowell, I understand that you have

6  examined this report, engineering report number 211, which was

7  made on your property, and which is now in evidence as Exhibit

8  M-48; that you agree that this report correctly represents the

9  condition of your property.

10    THE WITNESS:  It does, yes.

11    THE MASTER:  Now, is there anything which you wish to

12  state with regard to your property in addition to the inform-

13  ation which is set forth in this report?

14    THE WITNESS:  The only thing I would like to know is if

15  we should sell the 40 acres, this 40 acres here --

16    THE MASTER:  That is the westerly 40 acres?

17    THE WITNESS:  The westerly 40 acres, if we was to sell

18  that -- there is no water on there now -- what I want to know

19  is if we sold it if, whoever bought the property, could drill a

20  well which would be a matter of, say, 25 or 30 feet.

21    THE MASTER:  My answer to that would be, as I view the

22  case, the right to irrigate that property would remain the same

23  whether it was your property or whether it was sold to someone

24  else, and if you would have the right to dig a well on that

25  property, or to use water on that property in the event you

5-L

1   retained it, why then the person to whom you sold it would

2   also have the right to use the same amount of water.  In other

3   words, by selling the property you would neither increase nor

4   decrease the amount of water which the property would be en-

5   titled to.

6       Now, if there is any counsel here that would challenge

7   that statement of fact, I would like to have them do so.

8       MR. VEEDER:  I would express the same thought.  I stated

9   to Mr. McDowell -- he asked me that question -- and I, of course,

10  am not counsel for Mr. McDowell and I am sure he understands

11  that.  I think the record is clear on that.  But I expressed

12  to him that it was a matter to be adjudicated by the Court;

13  that when his evidence went in, which he is now putting in, it

14  would be a matter for determination depending upon all physical

15  aspects of it.  I know of no reason, myself.  But that was what

16  we said to Mr. McDowell, and that is certainly our position in

17  regard to it.

18      THE MASTER:  I think that is correct.  In other words, we

19  can't say at the present time what the rights of anybody will

20  be when you sell the property to somebody.  It would only be

21  determined at the conclusion of the lawsuit.  But the general

22  principle would be that the rights of anyone to whom you would

23  sell the property would be the same rights as you would have if

24  you retained it.  And if you retain it and if you would have the

25  right to drill a new well on that property, or to take water

1  from some other well not put on that property, then your suc-

2  cessor in interest would retain the same rights that you would

3  have.

4       Is there any evidence?  Are there any facts that you wish

5  to present with reference to the property that aren't set forth

6  in this report?

7       THE WITNESS:  The only thing that I have is this:  Is it

8  possible for us to lease the land, to lease the ranch, rather?

9       MR. VEEDER:  May I answer in regard to that?  It is cer-

10  tainly the position of the United States in regard to this law-

11  suit, and all that it entails, that the owner's right to lease

12  the property remains unchanged; the right to administer, the

13  right to sell or lease it or to use it in any way he chooses.

14  We are limiting the matter simply to an adjudication, general

15  in character, of the respective rights of the property in the

16  use of waters of the Santa Margarita River and its tributaries.

17  It has nothing whatever to do with the  alienability of the

18  land or any of the other factors such as leasing that might be

19  involved.

20       THE WITNESS:  Well, that is about all the questions I would

21  like to know.  Of course Cottonwood stream runs here --

22       MR. VEEDER:  May I suggest this?  Now the witness is

23  testifying to very important things and I am not being critical,

24  but when he says the Cottonwood Creek runs here, or this 40 is

25  up here, we would like to have him say where those are.

7L

1    THE MASTER:  Well, I am wondering if, possibly, the best

2    way to proceed would not be to have Mr. McDowell step down,

3    temporarily for Colonel Bowen to describe the actual physical

4    features while Mr. McDowell can listen to it, and then if he

5    has any corrections he can state them and I believe in that way

6    they will possibly be set forth in the record more accurately

7    and precisely.

8    MR. VEEDER:  Colonel Bowen has been advised that he would

9    be interrogated along this line.

10    THE MASTER:  Step down temporarily and let the Colonel

11    testify.  You can listen to him and see if you have any correc-

12    tions as to any testimony he may give.

13    THE WITNESS:  Thank you.

14    (Witness temporarily excused.)

15    MR. DENNIS:  I wonder, in all fairness to the witness, if

16    he shouldn't be advised that if the government takes any posi-

17    tion that there is an underground basin within the confines of

18    his property, that adjudication by the Court as to the size of

19    that basin and the location might affect his right as to whether

20    or not he would have the right to put wells on the 40 acres; de-

21    pending on what might be adjudicated in regard to the size of

22    the basin.

23    THE MASTER:  I think, Mr. McDowell, you have heard the

24    statement of Mr. Dennis.  I believe that is a correct statement.

25    MR. MCDOWELL:  That is right.

1        THE MASTER:  And you are aware of that fact?

2        MR. McDOWELL:  Yes, sir.

3        MR. VEEDER:  That is why I said the matter is to be adjudi-

4   cated.

5        THE MASTER:  That is implied in what I said before, and Mr.

6   Dennis simply made it more definitely clear.  I don't think it

7   changes the actual meaning of what I said.

8        But, Colonel Bowen, will you resume the stand then.

9        COLONEL BOWEN:  Yes, sir.

10

11                    ALLEN C. BOWEN,

12   the witness on the stand at the time of adjournment, resumed the

13   stand and further testified as follows:

14

15                    DIRECT EXAMINATION (Cont.)

16   BY MR. VEEDER:

17        Q   Colonel Bowen, you are the same Colonel Bowen who has

18   been sworn and who has been testifying in this case?

19        A   Yes, sir.

20        Q   I hand you Plaintiff's Exhibit M-48 and ask you to first

21   state what it is.

22        A   Plaintiff's Exhibit M-48 is the report of an engineering

23   investigation of the De Luz watershed, Parcel Number 36, and

24   Plaintiff's Exhibit M-31 reveals that Parcel 36 is presently

25   occupied by Homer C. McDowell and Marion J. McDowell, his wife.

Q   Now, would you read into the record the legal de-scription of that property?

A   The legal description as contained in the report, Plaintiff's Exhibit M-48, is as follows:   The southeast quarter of the southwest quarter, Township 8 South, Range 4 West, Section 29; and the north half of the northwest quarter and the southeast quarter of the northwest quarter, Township 8 South, Range 4 West, Section 32, all with reference to the San Bernardino Base Line and Meridian.

Q   Now, would you state, Colonel Bowen, the streams, if any, which traverse the property, the description of which you just read into the record?

A   Referring to the soil survey made on aerial photographs contained in Plaintiff's Exhibit M-48, the streams which traverse this property are Cottonwood Creek, a tributary to De Luz Creek, and the main De Luz Creek and the east fork of the De Luz Creek all traverse this property.

Q   Now, what does your record show in regard to irri-gability and irrigated acreage?

A   The tabulation --

Q   From the standpoint of size?

A   Yes.   The tabulation contained in Plaintiff's Exhibit M-48 indicates that there are 20.3 acres of Class II land, 42.7 acres of Class III land; 21.5 acres of Class IV land and 20.6 acres of Class VI land.

1    Q  Of that total what would you say would be irrigable,

2  Colonel?

3    A  Of the total of the land classes, the total areas suit-

4  able for irrigation, 38.7 acres and the total area of the

5  property is about 160 acres.

6    Q  Would you state whether you have any other comments in

7  regard to this property which might be helpful to Mr. McDowell

8  in clarifying his claims and -- You did not state -- strike

9  what I said before -- you did not state the irrigated acreage

10  at the present time, as I recall.

11    A  No, sir, I did not.  That information is not contained

12  in the report.

13    Q  Now, would you state whether there are any other or

14  further comments in regard to Mr. McDowell's property that

15  would be helpful in delineating and defining his claims to the

16  right of the water in De Luz Creek?

17    A  Yes, sir.  The tabulation also contained in Plaintiff's

18  Exhibit M-48, showing the acreage of crops adapted to this

19  irrigable acreage, reveals 20 acres that could be devoted to

20  the production of avocados; 6 acres in citrus; 37.6 acres are

21  adapted to the production of row crops and 25.1 acres adapted

22  to the production of permanent pasture.

23    The future potential water rights to irrigate these crops

24  in the acres enumerated would be approximately 305 acre feet

25  per year.

1    Q   Is there any further data that would be helpful in

2    arriving at conclusions in regard to this property?

3    A   Contained within the report, Plaintiff's Exhibit M-48,

4    is an overlay on the aerial photograph entitled geology. This

5    overlay reveals a substantial area of recent alluvium.

6    Q   Were you aware --.

7    A   And a considerable area of older alluvium which could

8    be considered -- the combined recent and older alluvium --

9    could be considered a ground water storage unit from which

10    water could be extracted by wells.

11    Q   Colonel Bowen, is that area within the 40 acres to

12    which Mr. McDowell made reference? I don't believe he stated

13    the legal description of that. In that case it should be

14    clarified.

15    A   As I understood Mr. McDowell's inquiry it was with

16    regard to the west 40.

17    MR. McDOWELL: The west 40, yes, sir.

18    THE WITNESS: The 40 that Mr. McDowell referred to in his

19    testimony could then be described as the northwest quarter of

20    the northwest quarter of Section 32, Township 8 South, Range 4

21    West. And within that 40, the geology overlay shows that there

22    is no alluvial deposit, either recent or older. The geology

23    of the 40 last referred to shows, primarily, granitic materials,

24    Woodson granodiorite --

25    THE MASTER: What is granodiorite?

12L

THE WITNESS:  Granodiorite is one of the granitic form-
ations of the particular period in which the molten material
below the earth's crust welled up through fractures in the crust
and cooled and crystallized.  Generally the granodiorites and
gabbros are referred to by the general term of granitic materials.
There is also some San Marcos gabbro, which is one of the
granitic rocks, and some Robalar leucoganite, which is another
of the granitic materials.

BY MR. VEEDER:

Q  Does that constitute your statement in regard to that
area, Colonel Bowen?

A  Yes, sir.

MR. VEEDER:  Your Honor, I am going to have marked, if
your Honor will permit it--

THE CLERK:  Do you want this to follow the other maps?

MR. VEEDER:  I think this would be 67.  I think we were
in the 66 series and I was going to have this marked 67.

THE CLERK:  The next one would be 68.

THE MASTER:  We have an Exhibit 67A and 67B.

MR. VEEDER:  This would then be 68.  I would like to
have marked for identification this U.S.G.S. quad, which has
been prepared at the request of Mr. Sachse, and which I believe
will be helpful in this phase of the testimony.

BY MR. VEEDER:

Q  Colonel Bowen, I hand you Plaintiff's Exhibit marked

1    M-68 for Identification, and I ask you to state what it is.

2         I would like the record to show that a copy of M-67 has

3    been delivered -- M-68 has been delivered to counsel.

4         THE COURT:  The record may so show.

5         THE WITNESS:  Plaintiff's Exhibit M-68 is a copy of the

6    Fallbrook Quadrangle in the United States Geological Survey

7    7.5 minute photographic series.

8         MR. VEEDER:  I would make an offer.

9         MR. SACHSE:  No objection.

10        THE MASTER:  It will be received in evidence as Plaintiff's

11   Exhibit M-68.

12        MR. VEEDER:  I will ask you to put it on the easel and

13   point out, if there are any subwatersheds appearing in that

14   exhibit.

15        Is that accommodating?

16        MR. SACHSE:  Thank you very much.  As I understand it,

17   M-32 is overlaid on the U. S. G. S.

18        THE MASTER: M-32 is overlaid on M-33-F, I believe.

19        MR. VEEDER:  That is right, your Honor.

20        Again I want the record to show that I am not representing

21   Mr. McDowell in any way.

22        THE MASTER:  The record is quite clear on that point.

23        THE WITNESS:  Plaintiff's Exhibit M-68 has drawn thereon

24   the watershed boundary of the De Luz Creek, and the parcel as

25   delineated on Plaintiff's Exhibit M-32.

1      Plaintiff's Exhibit M-48 is a report of an investigation

2  conducted on the parcel of land described as Number 36, and

3  the parcel is shown in the central part of Plaintiff's Exhibit

4  M-68 with a Number 36 encircled, contained in the outer limits

5  of the property.

6  BY MR. VEEDER:

7      Q  And does it appear to be a subwatershed in there?

8      A  Yes, sir.  Cottonwood Creek -- correction -- Camps

9  Creek joins De Luz Creek in the northwest corner of the pro-

10  perty.  I have previously testified that Cottonwood Creek and

11  entered the property, but Cottonwood Creek joins De Luz Creek

12  north of the McDowell property and it is Camps Creek at its

13  confluence with De Luz Creek in the northeast corner of the

14  property.  De Luz Creek continues southerly through the property

15  and leaves it on the westerly boundary of the south 40.

16      The east fork of De Luz Creek enters the property about

17  midway on the easterly boundary and continues to confluence

18  with De Luz Creek just before the creek leaves the property at

19  the point heretofore described.

20      Q  When you state that there is a subwatershed, what does

21  that mean from a technical standpoint, Colonel Bowen?

22      A  That would be the watershed draining into a tributary

23  of the major stream under consideration.  For example, De Luz

24  Creek watershed is, as shown on Plaintiff's Exhibit M-68, a

25  subwatershed of the Santa Margarita River.  Similarly Camps

15-L

691

1   Creek is one of the subwatersheds of De Luz Creek.

2       MR. VEEDER:  I have no further questions, your Honor.

3

4                      CROSS-EXAMINATION

5   BY MR. SACHSE:

6       Q  Colonel Bowen, are you not in error when you state that

7   Camps Creek crosses the property?  Take a look, please.  I

8   think you will find it is an intermittent stream and it is not

9   Camps Creek.  Camps Creek is on Parcel 50 to the south of this

10  parcel.

11      A  I thank you, sir.

12      Q  So this parcel abuts upon the two stems of De Luz Creek.

13  Is that correct?

14      A  That is correct.  That is an unnamed tributary which

15  joins De Luz Creek in the northeast corner of the property.

16      MR. SACHSE:  Now that is all I wanted to ask you concerning

17  the map, if you want to sit down.

18      Q  Now, in testifying to the westerly 40 of Mr. McDowell's

19  property, that is the northwest quarter of the northwest quar-

20  ter of Section 32 -- Do you know what I am talking about?

21      A  Yes, sir.

22      Q  You testified that no alluvial material appeared under-

23  neath that property.  Is that correct?

24      A  Yes, sir.

25      Q  Now, immediately before you answered that question you

1    made a statement -- my notes are quite hazy -- you made an

2    answer something about old alluvium from which water could be

3    extracted by wells.  Do you recall about what that testimony

4    was?

5        A  Yes, sir.  I mentioned that there were substantial areas

6    of recent alluvium and older alluvium within the parcel.

7        Q  And that would be an area, generally speaking, lying

8    along the two streams that traverse the property?

9        A  Yes, sir; along De Luz Creek, east fork.

10       Q  From which you say water could be extracted by wells?

11   You are speaking of the physical fact that it could be ex-

12   tracted?

13       A  Yes, sir.

14       Q  You do not mean to imply that any specific legal right

15   to extract water exists, or do you?

16   MR. VEEDER:  I will state he was speaking and I was

17   speaking of the physical possibilities of extracting water.

18   BY MR. SACHSE:

19       Q  Do you have any opinion as to the physical ability of

20   extracting water in that west 40?

21       A  As I testified that west 40 is underlaid by granitic

22   material which is generally considered to be a poor source of

23   water, and it is my opinion that it would be impossible to

24   drill a well that would produce any substantial quantity of

25   water.

17L

Q  Would you then have an opinion as to whether or not, assuming water would produce on that west 40, such water was or was not a part of the waters of any stream traversing the property?

MR. VEEDER:  I ask that that sentence be read.  I don't understand it.

THE MASTER:  Mr. Reporter, would you read the question?

(Record read.)

MR. VEEDER:  You may answer.

THE WITNESS:  It would be my opinion that waters which might be extracted from a well drilled on that west 40 would be contained only in the fractures in the granitic material and might be considered what has been referred to as vagrant--

Q  Percolating--

A  Percolating ground water.

Q  It might be referred to also, to use the non-technical, just as local water.

A  Yes, sir.

Q  Now, if you will look--I don't know whether that exhibit is sufficient, that overlay--but I think it might be-- the property immediately to the north of the west 40 of McDowell is it still within the McDowell--

A  No.  This parcel is not.  It is immediately to the north of the north line of the west 40.  It is underlain with the same type of material.

MR. DENNIS:  Parcel 42.

1    MR. SACHSE:  That would be Parcel 43.

2    MR. VEEDER:  Is the owner of that property in the court-

3  room?

4    MR. SACHSE:  I am his counsel.

5    MR. VEEDER:  All right.

6  BY MR. SACHSE:

7    Q  In other words have you any opinion -- withdraw that.

8  Would your opinion as to water produced on Parcel 43, immedi-

9  ately north of the west 40 of Parcel 36, be the same that you

10  have just expressed as to 36?  Percolating ground water?

11    MR. VEEDER:  There is an objection; beyond the scope of

12  direct examination, and beyond the scope of Mr. McDowell's

13  testimony, and I don't believe that the report is in the

14  record as yet.  I believe there is still some checking being

15  conducted in regard to it, and I object to the inquiry as being

16  improper.

17    THE MASTER:  Is it properly designated as 43?

18    MR. SACHSE:  I beg your pardon.  My parcel indicates -- 43

19  is the smaller and 37 is the large one.

20    THE MASTER:  Now the objection is on the basis that that

21  has nothing to do with Mr. McDowell's property?

22    MR. VEEDER:  That is correct; beyond the scope of his

23  examination.

24    THE MASTER:  Mr. Sachse, unless this is being introduced

25  in an effort to effect Mr. McDowell's rights in some way I

1    believe, probably, the ordinary procedure would be to finish

2    with Mr. McDowell and then take up Mr. Garnsay's property at

3    another time.

4         MR. SACHSE:  The only point I am seeking to make, and I

5    do not intend to go into the Garnsay property in detail, is

6    that I have two clients, one of whom abuts this particular west

7    40 on the west and the other one on the north.  Now, I would

8    like to ascertain whether Colonel Bowen's opinion as to the

9    water in the McDowell 40 being vagrant ground water would apply

10   with equal force to the Anderson 40 adjoining it on the west

11   and the Garnsay 40 adjoining it on the north.  I think it is

12   proper cross-examination.

13        MR. VEEDER:  Certainly it is beyond the scope of the

14   direct examination at this juncture, and certainly, in my view,

15   is entirely out of place until the Garnsay report is completed.

16   That is being rechecked now.

17        THE MASTER:  Just a minute.  The objection is sustained.

18   The objection that Mr. Veeder raises is certainly a sound

19   objection at the present time.  If, at the time the Garnsay

20   property is being considered, Colonel Bowen makes a statement

21   which, in your opinion is inconsistent with the statement now,

22   you will have full latitude of cross-examination at that time

23   but I do not believe that it is proper to interject that into

24   the case at this time, particularly in the absence of the

25   complete report on that property.

1    In any event the objection is well taken, that it is going

2  beyond the scope of the direct examination.

3    MR. SACHSE:  Even in view of the fact, your Honor, that we

4  are, by order of the Court, an adverse party to Mr. McDowell?

5    THE MASTER:  That is why I asked you were you making any

6  contention with reference to Mr. McDowell's property.

7    MR. SACHSE:  I think if Mr. McDowell is the only indivi-

8  dual who has, in Colonel Bowen's view, such a right to capture

9  vagrant ground water that is a serious matter and I am much

10  concerned.  If Colonel Bowen thinks the adjoining properties

11  are exactly the same, then I have no further questions, but it

12  is most important to me.

13    THE MASTER:  Just a minute.  I can see no -- You are making

14  no claim to the water on Mr. McDowell's property?

15    MR. SACHSE:  Absolutely none, your Honor.

16    THE MASTER:  Then on that basis the objection is sustained.

17    MR. SACHSE:  Very well.

18    MR. VEEDER:  I move to strike the Colonel's answer.

19    MR. SACHSE:  Which answer?

20    MR. VEEDER:  To your question.  The Colonel made response

21  before my objection was complete.  I am going to speak to him

22  about it.

23    THE MASTER:  Well, the objections have been sustained,

24  and the answer which was made will be stricken.

25    MR. SACHSE:  Now, your Honor, I didn't even hear an answer.

1   Did the answer relate to the Garnsay and the Anderson pro-

2   perties?

3       THE MASTER:  No.

4       MR. SACHSE:  All right.

5       THE MASTER:  Is there any further question, Mr. Sachse?

6       MR. SACHSE:  No, no further question.

7       MR. VEEDER:  I have no questions.

8       THE MASTER:  Mr. McDowell, you have heard Colonel Bowen's

9   testimony?

10      MR. McDOWELL:  Yes, sir.

11      THE MASTER:  Do you wish to ask Colonel Bowen any question

12  or do you have any points on which you disagree with Colonel

13  Bowen's testimony?

14      MR. McDOWELL:  None.

15      MR. VEEDER:  There are one or two questions that were not

16  related in regard, one, to the acreage he is presently irri-

17  gating and, two, in regard to how long he has been operating

18  his place.  I think those might be significant to Mr. McDowell.

19      THE MASTER:  Colonel Bowen, will you step down, then?

20      MR. DENNIS:  Before Colonel Bowen steps down, I think it

21  might be well, because of conflicting statements in the

22  engineering report and his testimony, to get one or two things

23  established.  Camps Creek, as I understand your testimony,

24  Colonel Bowen, Camps Creek and Cottonwood Creek do not traverse

25  Mr. McDowell's property?

THE WITNESS:  That is correct.

MR. DENNIS:  It is the main fork of the De Luz Creek?

THE WITNESS:  Yes, sir.

MR. DENNIS:  And does the east fork of the De Luz Creek traverse it?

THE WITNESS:  Yes.

MR. DENNIS:  I wonder if, on the map, you could label, then, where you consider -- what you consider the east fork. I think there is only one water course which is labeled on either M-32 or M-68.  I think it would be helpful to verify it in the record if we get the names of these streams.

THE WITNESS:  The east fork of De Luz Creek is that tributary which rises on the Santa Rosa Ranch, part of the Vail Ranch, and crosses the Riverside County line within Section 22 Township 8 South, Range 4 West.

THE MASTER: That is also within Parcel 20 as marked on the map?

THE WITNESS:  Yes, sir.  It is within Parcel 20 as marked on Plaintiff's Exhibit M-68.

It continues to flow across Parcels 19, 26, 27, 29 and again across the northeast corner of 26; again through 29, 30, 34, 31, a small corner of 53, from which it enters Parcel Number 36, and within Parcel 36 it has confluence with the main stream of the De Luz Creek entering from the north.  Is that understood?

1      MR. DENNIS:  Yes.  Just one other question.  I notice on

2   M-32 you have the east fork as a solid line and the main stream

3   a dashed dot line.  Does that have any significance?

4      THE WITNESS:  No, sir, it does not.  They are both inter-

5   mittent streams.

6      THE MASTER:  Have you any more questions of Colonel Bowen?

7      MR. VEEDER:  No, I haven't.

8      THE MASTER:  Then I would suggest, Mr. McDowell, that you

9   take the witness chair as Mr. Veeder has a few more questions.

10      (The witness Colonel Bowen temporarily excused.)

11

12                      HOMER C. McDOWELL,

13   recalled as a witness, testified further as follows:

14

15                   DIRECT EXAMINATION (Cont.)

16   BY MR. VEEDER:

17      Q  How long have you occupied the premises, Mr. McDowell?

18      A  Eighteen years.

19      Q  And have you continuously operated your place in that

20   period?

21      A  Yes.

22      Q  And how many acres of irrigated land do you have there

23   at the present time?

24      A  Irrigated land?  You mean what I do irrigate now?

25      Q  Actually applying water to, yes.

A   I irrigate, I would say, 5 acres.

Q   Is that the maximum acreage that you have ever irrigated?

A   It is for me, but for the parties who were on before, they used to irrigate the land.

Q   How much more?  How much more land did they irrigate, do you know?

A   Well, I would say 15 acres.

Q   And you think 15 acres is the maximum acreage ever irrigated on that parcel concerning which you are now testifying?

A   So far as I know, yes.

Q   Mr. McDowell, you raise livestock?

A   I did, yes.

Q   And what was the source of water for the livestock?

A   Well, when we first moved on the ranch we pumped from the stream, which is De Luz stream.  Then after we got in our pump well, after we dug a well, then we used well water for irrigation and for cattle.

Q   Now, where is that well located with reference to De Luz Creek?

A   It is within 150 feet of the east section -- it is the first lower section there -- I can't -- 38, I think it is -- but it sets back off from the stream.

Q   Have you observed any relationship between the well and the stream itself?

1    A  Well, no, I don't think so.

2    Q  In other words, what occurs when your stream is in

3 short supply?  Is there any diminution in the quantity of water

4 in the well?

5    A  It never bothers the well at all.

6    Q  It does not?

7    A  No, sir.

8    Q  Now, in regard to your household uses, what is the

9 source of water for that?

10    A  I use it all from the well, electric pump.

11    Q  Now, have you any other uses up there for water?  Is

12 there, for example -- are you in an area where there is natural

13 forage or grass coverage and trees that are supported by, who

14 receive -- which appear to you to receive their water from the

15 De Luz Creek?

16    A  Through Cottonwood and De Luz Creek.

17    Q  Now, they produce grass?

18    A  They produce grass for the cattle, yes.

19    Q  And also trees, shade?

20    A  Yes.

21    Q  From the stream.  Is that right?

22    A  Sycamore and alder and the oak.

23    Q  And they are along --

24    A  All along the creek, yes; both sides.

25    MR. VEEDER:  I have no further questions.

1    MR. SACHSE:  No questions.

2    BY MR. DENNIS:

3    Q  Mr. McDowell, when Mr. Veeder used the term "when the

4    stream is in short supply" what did you understand him to mean

5    by that question, Mr. McDowell?

6    A  When a stream is short it has no interference with my

7    well at all.

8    THE MASTER:  The question was what do you understand the

9    phrase "short supply in the stream" to mean?

10    THE WITNESS:  Well, it means that if I expected to take

11    the water from the stream it would be very low.

12    BY MR. DENNIS:

13    Q  You have had an opportunity to observe the stream over

14    a period of years?

15    A  Well, I walked that every day.

16    Q  Yes.  What is the condition of the stream in August

17    and September?

18    A  All last year, say '57, was the highest water that we

19    have had in De Luz Creek for, I would say, over a period of

20    twelve or fifteen years.

21    Q  It did flow on the surface?

22    A  Yes.

23    Q  All during the month of August?

24    A  It always does, yes, sir.

25    Q  And that is true in the past, I mean every year since

1  you have observed it there has been surface water in the

2  stream?

3      A  I have known Mr. Willmont, who owns the property beyond

4  us, figures out that never in 75 years that the stream has ever

5  been dry.

6      Q  And during the winter months is there a substantial

7  increase in flow?

8      A  Oh, I hope so, yes.  It was this year, anyway.  It

9  cost me a lot of money.

10     Q  During rains, and immediately thereafter, why the flow

11  of these streams multiply many times?

12     A  It goes down very rapidly after a rain.

13     Q  And when you say "very rapidly" is that a matter of

14  days?

15     A  Well, I should say maybe in a day or a day and a half

16  the stream is really down where you can get across.

17     Q  But during the time of this rain, and for a day or so

18  thereafter, why the flow is so that you can't even cross the

19  stream?

20     A  Well, I have a catwalk so I get over to my well all

21  right; otherwise I wouldn't get across.

22     Q  Now, during August about what quantity of water flows

23  in the stream?

24     A  There is plenty of water in the stream that I could

25  irrigate probably 15 or 20 acres.

1   ·   Q  But that probably would be the extent of it?

2       A  Yes.

3       Q  And you can walk across the stream at that time, can

4   you?

5       A  Oh, yes, yes.

6       Q  And when did you last use your surface diversion?  You

7   stated that prior to the time of the well you diverted water

8   directly from the stream.

9       A  You mean in years?

10      Q  Yes.

11      A  Well, I would say that was sixteen years ago.

12      MR. DENNIS:  About sixteen years ago.  That is all.

13      THE MASTER:  Any further questions?

14      MR. VEEDER:  I have none.

15      MR. DENNIS:  Just one question.

16      Q  When I was referring to the stream I was referring to

17  both the main stream and the east fork.

18      A  Well, no, I didn't understand it that way.  Cottonwood

19  stream last summer was very, very low; in fact Dr. Wilson below

20  me had to irrigate at night.  There wasn't any water.  If it

21  hadn't been for the De Luz stream, well, he wouldn't have had

22  any water at all.

23      Q  Now Cottonwood does not traverse your property?

24      A  Cottonwood runs clear through the property, from one end

25  to the other.

29-L

705

1    MR. SACHSE:  I think we should straighten that out.

2    MR. DENNIS:  I think probably Mr. McDowell ought to

3    designate the stream when he says Cottonwood Creek.

4    THE MASTER:  Which stream or creek do you call Cottonwood

5    Creek?

6    THE WITNESS:  That is the main stream.  This is De Luz,

7    here, and this is Cottonwood here.

8    THE MASTER:  The stream that you call Cottonwood Creek is

9    the one which runs into your property from the north through

10   Parcel Number 43?

11   THE WITNESS:  That is it, and this is De Luz, here.

12   THE MASTER:  And the stream which you refer to as De Luz

13   Creek is the stream which was explained by Colonel Bowen as

14   the east fork of the De Luz?

15   THE WITNESS:  That is it, yes.

16   BY MR. DENNIS:

17   Q  And when we were talking we were referring to what is

18   labeled on the map as the east fork?

19   A  Yes.

20   Q  And what is the condition of Cottonwood Creek during

21   the summer months?  Is there surface flow?

22   A  I told you last summer it was very, very low.

23   Q  And during periods of rainfall, and immediately there-

24   after, what is its condition?

25   A  Well, it comes up just like De Luz Creek comes up and

1    goes down.

2        Q   And it goes down within twenty-four or forty-eight hours

3    after the rain stops?

4        A   I would say,twenty-four hours you can go across it.

5        Q   During that time there is a large quantity of water

6    that comes down?

7        A   Yes.

8        MR. DENNIS:  That is all.

9        THE MASTER:  Any further questions by any counsel or any

10   individual defendant?  If not, Mr. McDowell, you are excused.

11       (Witness excused.)

12       THE MASTER:  We will take our recess at this time.

13       (Short recess.)

14       THE MASTER:  Now, Mr. Veeder, will you proceed with

15   Colonel Bowen?

16       MR. VEEDER:  Unless there are some other owners that want

17   to testify.

18       THE MASTER:  Is there any other individual owner on the

19   De Luz Creek area who has come in since the commencement of the

20   hearing this morning who would care to testify at this time?

21   Apparently not, so you may proceed, then, Mr. Veeder.

22       MR. VEEDER:  Colonel Bowen will you take the stand.

23

24

25

1                          ALLEN C. BOWEN,

2      recalled as a witness, testified further as follows:

3

4                          DIRECT EXAMINATION (Cont.)

5      BY MR. VEEDER:

6          Q  Colonel Bowen, I hand you Plaintiff's for Identifi-

7      cation marked M-66-V and I ask you to state what that is.

8          A  Exhibit M-66-V is a photographic reproduction of a

9      vertical aerial photograph number 4-0137.

10         MR. SACHSE:  May I have the number?

11         MR. VEEDER:  M-66-V.

12         Q  What does that disclose?

13         A  Described on this photograph within match lines in the

14     reservation boundary are soil sites, with soil symbols and

15     land use capabilities and classes, included within the soil

16     site.

17         MR. VEEDER:  I offer Plaintiff's for Identification M-66-V

18     in evidence.

19         THE MASTER:  It will be received and so marked.

20     BY MR. VEEDER:

21         Q  Are there any structures within the area disclosed on

22     that exhibit M-66-V which use any water?

23         A  No, sir, other than roads and firebreaks there are no

24     structures within the area contained within the match lines and

25     the reservation boundary.

32L

1   MR. SACHSE:  One question.  This whole thing is within

2   the watershed, apparently.  Is that right?

3   THE WITNESS:  Yes, it is entirely within the watershed

4   of the Santa Margarita River.

5   BY MR. VEEDER:

6   Q  Colonel Bowen, I hand you M-66W, and ask you to state

7   what it is?

8   A  Plaintiff's Exhibit M-66W is a photographic repro-

9   duction of a vertical aerial photograph number 4-0138.  De-

10   lineated within match lines on this photograph are soil sites

11   and the fractional symbols describing the soils within those

12   sites; the land use capabilities, and land classes in Roman

13   numerals depicted hereon.

14   MR. VEEDER:  I offer in evidence M-66W.

15   THE MASTER:  It will be received as Exhibit M-66W.

16   BY MR. VEEDER:

17   Q  Would you locate the Santa Margarita River as it appears

18   on that Exhibit M-66W?

19   A  The Santa Margarita River enters the area and flows

20   within the match lines on the easterly boundary and traverses,

21   diagonally, across the lower right-hand corner of the area and

22   leaves that area within the match line a little to the right

23   of the lower center match line.

24   Q  Are there any structures appearing on that exhibit?

25   A  No, sir, other than road and firebreaks there are none.

Q  I hand you Plaintiff's for Identification M-66-X, and ask you to state what it is?

A  Plaintiff's Exhibit M-66-X is a photographis reproduction of a aerial photograph number 4-0139.  Delineated on this photograph within the match line area, roughly rectangular in shape, are the soil sites enclosed in solid black lines.

MR. VEEDER:  I will offer in evidence Exhibit marked for Identification M-66-X.

THE MASTER:  It will be received in evidence.

BY MR. VEEDER:

Q  Would you proceed with your statement as to what appears on that exhibit, Colonel?

A  De Luz Creek passes through the area within the match line in the extreme upper left-hand corner.  The Santa Margarita River enters the northerly match line slightly to the right of center, and traverses, diagonally across the area within match lines leaving that area in the lower left-hand corner.

Q  Are there any structures appearing in that photograph?

A  There are substantial developments within the Naval Ammunition Depot.

Q  Would you describe their character?

A  Ammunition storage igloos with their connecting roads and railroads.

Q  What is the source of water for the area within the entities of the Naval Ammunition Depot?

1      A   The source of water for use by the Naval Ammunition

2   Depot is a surface diversion on the Santa Margarita River.

3      Q   Would you describe, just briefly, the methods of taking

4   water from the Santa Margarita River at that point?

5      A   The method of taking water diversion for the Naval

6   Ammunition Depot is by what is commonly known as an infiltration

7   gallery.  A thin mantle of alluvium overlying the bedrock in

8   the canyon was stripped away and an 18 inch concrete pipeline,

9   perforated, was laid along a grade descending completely across

10   the river and terminating on the southerly side of the river

11   in a concrete sump.

12      Water which drains down --

13      Q   When you say "a concrete sump" would you describe that

14   with some particularity?

15      A   Well, the sump is a circular concrete structure approxi-

16   mately 35 feet in depth.  It penetrates into bedrock.  This is

17   approximately 5 or 6 feet in diameter, and serves as a storage

18   reservoir to accumulate water which percolates down through

19   the gallery.  That water is then lifted up to the distribution

20   system of the depot.

21      Q   How is it lifted?

22      A   It is pumped from the sump into a 10,000 gallon tank

23   reservoir and boosted from this reservoir to a million gallon

24   reservoir on the top of the hill, and from that million gallon

25   reservoir it is further boosted to the 100,000 gallon standpipe

711

1    which serves the depot with water.

2         Q  Will you describe the utilization and utility of that

3    gallery through the last several years with particular refer-

4    ence to the period of short supply in the Santa Margarita

5    River?

6         A  Well, the gallery provides the needs for the depot for

7    the winter season, but for several months in the summer, or

8    the dry season of the year, it has been necessary to supple-

9    ment the Naval Ammunition Depot water supply by pumping from

10   a well at the confluence of De Luz Creek with the Santa Mar-

11   garita River through a pipeline roughly 5 miles long following

12   the meander of the Santa Margarita River, delivering water to

13   the sump which is a part of the N.A.D. diversion.  This pipe-

14   line was connected in 1952 and it has been used every summer

15   since that time to augment the depot's water supply when there

16   is insufficient surface flow in the Santa Margarita River to

17   fill their needs.

18        THE MASTER:  Might I ask one question on that?

19        MR. VEEDER:  Yes.

20        THE MASTER:  Did I understand you to say that De Luz

21   Creek reaches within the match line?

22        THE WITNESS:  In the extreme upper left-hand corner or

23   the extreme northwest corner.

24        THE MASTER:  And then it goes to the west of the match

25   lines and proceeds down.  Is that correct?

1    THE WITNESS:  Yes, sir.  It appears west of the match line.

2  The match line would appear on the photograph 4-0111 and 4-0112.

3    THE MASTER:  Thank you.

4  BY MR. VEEDER:

5    Q  I hand you Plaintiff's for Identification M-66-Y, and

6  ask you to explain what that is.

7    A  Plaintiff's Exhibit M-66-Y is a photographic repro-

8  duction of an aerial photograph number 4-0140.  The photograph

9  represents the field survey sheet which was used in making a

10  survey of the soils of the Naval reservation and contained

11  within the rectangular area bounded by match lines are soil

12  sites with their attendant symbols.

13    MR. VEEDER:  I offer that in evidence, Plaintiff's Exhibit

14  marked for Identification M-66-Y.

15    THE MASTER:  It will be received in evidence as Plaintiff's

16  Exhibit M-66-Y.

17  BY MR. VEEDER:

18    Q  Which structures appear to be on that exhibit, Colonel?

19    A  Well, the area within the match lines of Plaintiff's

20  Exhibit M-66-Y consist, in large portion, of the part of the

21  U. S. Naval Ammunition Depot and the ammunition storage

22  structures, connecting roads, railroads, and the main road

23  which crosses the depot is shown in the lower right-hand corner

24  of the area within the match lines.

25    The branch line of the Atchinson, Topeka and Santa Fe

1    Railroad, which serves the depot, is also shown in the lower

2    right-hand corner, and is roughly parallel to the main highway

3    through there.

4        Q   I hand you Plaintiff's for Identification marked

5    M-66-Z, and ask you to state what appears on that?

6        A   Plaintiff's Exhibit M-66-Z is a photographic repro-

7    duction of an aerial photograph number 4-0141.  Depicted on

8    this aerial photo is a roughly rectangular area which repre-

9    sents the boundary of the -- which rectangle represents the

10   match lines, and traversing this area within the match line is

11   an irregular black dash-dot line which is the watershed of the

12   Santa Margarita -- the crest of the watershed of the Santa

13   Margarita River.

14       Northerly and westerly of that crest line out to the

15   westerly and northerly match lines on the photograph, is within

16   the watershed and the soil sites with their standard symbols

17   are delineated thereon.

18       MR. VEEDER:  I am going to offer Z in evidence.

19       THE MASTER:  It will be received in evidence as Plaintiff's

20   Exhibit M-66-Z.

21       MR. SACHSE:  Might I ask another question?  I don't find,

22   Colonel Bowen, it at all on the index sheet M-65.

23       MR. VEEDER:  Well, let's get the exhibit now to which you

24   are making reference.

25       MR. SACHSE:  M-65.

1    MR. VEEDER: I realize that.  Let's get M-65 so that the

2    Colonel can testify from that exhibit when he is making

3    response to an inquiry.

4        Do you have M-65 here, Mr. Clerk?

5        THE WITNESS:  Would you please ask the question?

6        MR. SACHSE:  I want him to show me -- I am lost -- if he

7    can locate it for me.

8        THE MASTER:  You are referring, Mr. Sachse, to Plaintiff's

9    Exhibit M-66-Y?

10       MR. SACHSE:  M-66-Z.  I can't find it on that.

11       THE MASTER:  Oh.  I assume it is immediately  south of

12   4-0140, but it is not so indicated on Exhibit 65.

13       THE WITNESS:  That is correct, your Honor.

14       THE MASTER:  It would include the area with the letters

15   "ON" of Camp Pendleton.  Is that correct?

16       THE WITNESS:  Yes, sir, it would include that area.

17       MR. VEEDER:  Can you put those down on M-65 so they will

18   be clear?

19       THE MASTER:  All right.

20       MR. VEEDER:  If it would be helpful to your Honor I think

21   he should.

22       THE MASTER:  Colonel, would you indicate, then, on Exhibit

23   M-65 the location of the area covered, in general, by the

24   exhibit marked M-66-Z?

25       THE WITNESS:  May I again please see Plaintiff's Exhibit

715

1   M-66-Z.   It would appear, your Honor, that the area shown on

2   Plaintiff's Exhibit M-66-Z approximates the area shown or

3   depicted on Plaintiff's Exhibit M-65 as photograph 4-0140.

4   You see there is about a 65 percent overlap in line of flight,

5   and there are actually three photographs which would show the

6   center point of this photograph; the one to the north of it

7   and the one to the south of it.

8       THE MASTER:   Can you indicate, say with a pencil, on

9   Exhibit M-65, the area covered by M-66-Z?

10      THE WITNESS:   May I suggest, your Honor, that we run this

11  line out to see whether all of these may not have been shifted?

12      MR. VEEDER:   Do whatever is necessary.

13      THE MASTER:   We want to identify them as accurately as

14  possible; whatever is necessary for that.

15      THE WITNESS:   May I see Plaintiff's Exhibit M-66-X and Y,

16  sir.

17      It is apparent, your Honor, that these numbers have been

18  shifted down one.   The area shown on Plaintiff's Exhibit M-66

19  -- M-65 as covered by photograph 4-0140, should be changed to

20  4-0141.

21      The area on Plaintiff's Exhibit M-65 shown as covered

22  by aerial 4-0139 would be 4-0140.

23      And referring to Plaintiff's Exhibit M-65 the area shown

24  covered by aerial photo 4-0138 should be changed to show

25  4-0139.

1      To complete this, your Honor, if I may refer to Plain-

2  tiff's Exhibit V and W, M-66-V and M-66-W -- I will check out

3  the rest of this --

4      THE MASTER:  Colonel Bowen, if that is true, then by

5  reference to indications on the exhibit to the numbers of the

6  photographs immediately to the west, each photograph in the

7  next block would also be moved up one, would it not?

8      THE WITNESS:  That is possible, your Honor.  I previously

9  testified in regard to Plaintiff's 65, that this gives a

10  general indication of the location of the photograph.  If you

11  get within a mile of the location on this exhibit it is easy

12  to pick out, from the physical features depicted on the photo-

13  graph, the exact location.

14      THE MASTER:  It would appear that the entire numbering

15  system has dropped down one peg, approximately.

16      THE WITNESS:  Yes, sir.

17      THE MASTER:  Because your aerial photographs, Exhibit

18  M-66 series, indicates the relationship between photos from

19  left to right and top to bottom?

20      THE WITNESS:  Yes, sir.

21      THE MASTER:  And if you shift any one to the north you

22  would have to shift the others?

23      THE WITNESS:  Yes, sir.

24      THE MASTER:  In any event the area covered by M-66-Z is

25  immediately south of the area covered by 66-Y?

1      THE WITNESS:  Yes, sir.  That is correct, your Honor.

2      THE MASTER:  Mr. Sachse, do you wish to have a new index

3   map prepared or is this sufficient to identify the fact that

4   each one of these appear to be actually one removed from its

5   location on the present index?

6      . MR. SACHSE:  Well, this particular one which was pointed

7   out to me, presented a problem which bothered me all the way

8   through.  I realize that this would be proper on cross-exami-

9   nation rather than to bother at this time, but, for instance,

10   all the way along, your Honor, I notice that the match lines --

11   if you want to compare X and Y, for instance, show it is a

12   straight match line and here it shows it is an irregular match

13   line.  In other words they do not match.

14      THE MASTER:  I think those are matters for cross-exami-

15   nation.

16      MR. VEEDER:  Similarly, if he would choose to have techni-

17   cal assistance with him it might help here.  The point I would

18   make, though, if he wants to put in an exhibit in rebuttal, he

19   can.  So far as we are concerned we are offering our case in

20   chief, on the basis of these exhibits, your Honor -- and I

21   simply tender the idea under the Anglo-Saxon method of trying

22   a lawsuit, he should cross-examine.

23      THE MASTER:  The only purpose of Exhibit M-65 was conven-

24   ience in identifying the pictures in the M-66 series, and with

25   the knowledge that the series does appear to have shifted one,

1  I think that M-65 still serves its purpose, although it might

2  be helpful if you wish to check M-65, during some recess period,

3  and perhaps at a later time offer in evidence a revision which

4  would more accurately set forth the exact location of each

5  picture.

6      Proceed with the next exhibit, anyway, Mr. Veeder.

7  BY MR. VEEDER:

8      Q  I hand you, Colonel Bowen, Plaintiff's Exhibit M-66-AA.

9  Now then, what is that?

10      A  Plaintiff's Exhibit M-66-AA is a photographic repro-

11  duction of an aerial photograph number 4-0142.

12      Q  Now, would you correlate that onto Plaintiff's Exhibit

13  M-65 to the extent that there will be no question on it?

14      A  Aerial photograph number M -- I mean 4-0142 is immedi-

15  ately below aerial photo 4-0141.  And this aerial photograph

16  number has not been added on the photo index which is Plain-

17  tiff's Exhibit M-65.

18      Q  Would you please enter it on at the proper place?

19      A  It would appear immediately below 4-0141, and would

20  include a portion of the Santa Margarita River watershed

21  delineated on Plaintiff's Exhibit Number 65 with a blue pencil.

22      Q  I offer --

23      A  May I make --  Counsel has a copy of this entry of mine

24  -- and I made reference to Plaintiff's Exhibit M-66-AA -- the

25  area of the watershed depicted thereon is located south and

1  east of Lake O'Neill.  The previous entry that I made was in-

2  correct.  This would be 4-0142.

3      MR. SACHSE:  All right.

4      MR. VEEDER:  I offer in evidence for identification M-66-AA.

5      THE MASTER:  It will be received and so marked.

6  BY MR. VEEDER:

7      Q  Colonel, would you describe the structures that are

8  disclosed on Plaintiff's Exhibit M-66-AA?

9      A  It is the main diversion area of Camp Pendleton and

10  the De Luz Housing.

11      Q  Now, where, in reference to the watershed, will be

12  found the largest portion of the section to which you just made

13  reference?

14      A  The largest portion of the main diversion area lies

15  outside of the watershed of the Santa Margarita River as shown

16  on Plaintiff's Exhibit M-66-AA.

17      Q  If you know, would you state the administrative areas

18  which are located outside of the watershed in that area?

19      A  A part of the 14 area lies --

20      Q  Is that the Roman numeral XIV?

21      A  No, sir, these are Arabic numerals.  Part of 14 area

22  lies outside of the watershed and part lies within the water-

23  shed.

24      12 area lies partly within and partly without.

25      The 13 area lies entirely outside the watershed.

1        The 11 area lies entirely without the watershed.

2        The 15, 16 and 17 areas lie entirely outside of the water-

3   shed of the Santa Margarita River.

4   BY MR. VEEDER:

5        Q   In what watershed are those administrative areas to

6   which you have made reference, and which are located outside

7   the Santa Margarita --

8        A   The areas which lie outside of the watershed of the

9   Santa Margarita River are within the watershed of the San Luis

10  Rey River.

11       Q   What, if any subwatersheds, are located in that general

12  area of the San Luis Rey?

13       A   Pilgrim Creek is the subwatershed of the San Luis Rey

14  River represented on this photograph, Plaintiff's Exhibit

15  M-66-AA.

16       Q   I hand you Plaintiff's for Identification M-66-AB, and

17  ask you to state, Colonel Bowen, what appears on that photo-

18  graph.

19       A   Plaintiff's Exhibit M-66-AB is a photographic repro-

20  duction of an aerial photograph number 4-0159, which does not

21  appear on Plaintiff's Exhibit M-65, but would be immediately

22  below photograph 4-0160.  It shows a portion of the Naval Ammu-

23  nition Depot.

24       MR. VEEDER:  I offer in evidence M-66-AB.

25       THE MASTER:  It is so received as Exhibit M-66-AB.

BY MR. VEEDER:

Q   What are the structures that appear on that exhibit?

A   The crest line of the Santa Margarita watershed is the irregular dash-dot line which contains the upper left corner of the area within the match lines in the Naval reservation boundary.   Shown on the photograph are portions of ammunition storage facilities of the Naval Ammunition Depot with the connecting roads.

Q   Are there structures both within and without the watershed on that photograph?

A   Yes, sir, there are.

Q   I hand you for Identification M-66-AC, and ask you to state what appears on that exhibit for identification.

A   Plaintiff's Exhibit M-66-AC is a photographic reproduction of a vertical aerial photograph 4-0160, which appears on Plaintiff's Exhibit M-65 on the easterly boundary of the Naval reservation.

MR. VEEDER:   I offer in evidence M-66-AC.

THE MASTER:   It will be received in evidence and so marked.

BY MR. VEEDER:

Q   Will you state where the watershed line appears on that?

A   Yes.   The watershed line appears within the area by match lines and the dash-dotted line represents the Naval reservation boundary as a short irregular dash-dot line,

46L

1  crossing the boundary just to the right of the word "Mabel"

2  and crossing the match line a little west -- south of the

3  northerly point, just to the right of number 4-0159, shown on

4  Plaintiff's Exhibit M-66AC.

5      Q   What structures are there?

6      A   The area to the right of that crest line are outside

7  the watershed.

8      Q   And what structures, if any, are located outside of

9  the watershed?

10     A   The area is contained within the match lines of the

11 Naval Reservation boundary.  The principal structures shown on

12 the photograph outsde the watershed are roads.

13     Q   I hand you Plaintiff's Exhibit M-66AD for Identifica-

14 tion and ask you to state for the record what it is?

15     A   Plaintiff's Exhibit M-66AD is a photographic repro-

16 duction of a vertical aerial photograph number 4-0161, which

17 appears on Plaintiff's Exhibit M-65 and within an area delineated

18 by straight match lines and the reservation boundary shown as

19 a straight dash-dot line, and labeled "Naval Reservation

20 Boundary" are shown soil sites with attendant symbols.

21     MR. VEEDER:  I offer M-66AD.

22     THE MASTER:  It will be received as Exhibit M-66AD.

23 BY MR. VEEDER:

24     Q   What are the structures, if any, which appear on

25 Plaintiff's Exhibit M-66AD?

1    A   The structures within the area contained by match

2    lines of the reservation boundary are ammunition storage

3    facilities of the Naval Ammunition Depot with connecting roads.

4    Q   Where, with reference to the Santa Margarita River are

5    those properties?

6    A   The Santa Margarita River is to the north, and a loop

7    of that river enters the northerly match line a little to the

8    left of center, and leaves the northerly match line a little

9    to the right of the northwest corner. Within the match lines

10   of this particular photograph is contained the diversion here-

11   tofore described for the Naval Ammunition Depot.

12   Q   I hand you Plaintiff's Exhibit M-66-AE, and I ask you

13   to state what appears on it.

14   A   Plaintiff's Exhibit M-66-AE is a photographic repro-

15   duction of an aerial photograph number 4-0162.  Contained in

16   the center of this photograph bounded by match lines and the

17   dash-dot line symbolizing the Naval reservation boundary, and

18   so labeled, are soil site symbols and land capability and land

19   class symbols.

20   MR. VEEDER:  I offer that in evidence.

21   THE MASTER:  It will be received as Plaintiff's Exhibit

22   M-66-AE.

23   BY MR. VEEDER:

24   Q   Are there any structures which appear on the area in

25   question, Colonel?

1    A   Only a road and firebreaks through this area.

2    MR. VEEDER:  I would like to put on the easel Plaintiff's

3  Exhibit M-14, if I could, your Honor.

4    THE MASTER:  Do we have Exhibit M-14?

5  BY MR. VEEDER:

6    Q   Colonel, would you refer to Plaintiff's Exhibit M-14

7  and, briefly, point out the lines depicting the subterranean

8  basins within the confines of the Naval enclave?

9    A   The line roughly depicting the subterranean basin is

10  this red line which is contained within the watershed of the

11  Santa Margarita River lying within the Naval reservation,

12  extending roughly from the confluence of De Luz Creek and the

13  Santa Margarita River; extending along both sides of the river

14  within the watershed and terminating near the Pacific Ocean.

15    Q   Now, I hand to you Plaintiff's Exhibit M-33-A through

16  M-33-U, and I ask you to make reference to those exhibits

17  which relate to the basin areas within Camp Pendleton area.

18    MR. SACHSE:  I will object, incomprehensive.

19    THE MASTER:  Can you explain the question, Mr. Veeder?

20    MR. VEEDER:  Well, yes.  33-A is one part --

21    MR. SACHSE:  I beg your pardon.

22  BY MR. VEEDER:

23    Q   Will you go ahead?  Would you define each one of those

24  that relate to and on which the basin is shown?  Which one of

25  the quads of the areas show a subterranean basin?

1    A   I understand now, sir.   Plaintiff's Exhibit M-33-A

2    contains a portion of the alluvium fill basin of the Santa

3    Margarita River lying within Camp Pendleton.

4        Plaintiff's Exhibit M-33-H contains a portion of the

5    surface area of the alluvium fill ground water basin of the

6    Santa Margarita River lying within Camp Pendleton.

7        M-33-J contains a portion of the surface of the alluvium

8    filled basin of the Santa Margarita River lying within Camp

9    Pendleton.

10   Q   Are there other quads that have the surface areas of

11   the subterranean basin depicted there?

12   A   No. These three exhibits, M-33-A, M-33-H and M-33-J

13   include the entire -- correction, there is one more.   It ap-

14   pears on -- there appears to be a missing exhibit.

15   THE MASTER:   Exhibit M-33-F is not here.   That was removed

16   at the last session for comparison with another document and

17   is not back in this sequence.   Is that the one you are looking

18   for?

19   THE WITNESS:   May I have the description of M-33-F, please,

20   sir?

21   MR. SACHSE:   That is the same map.

22   MR. VEEDER:   Now you are referring to an exhibit of the

23   De Luz area?   M-33-F is the same as the De Luz area.

24   MR. SACHSE:   It is the Fallbrook Quadrangle, according to

25   my notes.

726

1    THE MASTER:  Do you have Exhibit M-33-F?  It is one of

2    this series but is not included in this group.  It was

3    separated from the group in the hearing the other afternoon.

4    THE WITNESS:  That is not F, if that is it.  It is the

5    San Luis Rey Quadrangle.

6    The San Luis Rey Quadrangle in the 3.5 minute series,

7    U. S. G. S. Topographic Map, contains a portion of the surface

8    of the ground water basin within the Santa Margarita River and

9    lying within the Naval reservation.

10   MR. VEEDER:  I made a general offer on these.

11   THE MASTER:  I don't have it even for identification by

12   that name.  That is the Fallbrook Quadrangle.

13   THE WITNESS:  That is not the one.

14   MR. VEEDER:  May I proceed with the question, your Honor,

15   and then we will finish, and if there is a quadrangle that

16   should be added, we will do so.

17   Q  Would you state the kind and type of investigation that

18   you have undertaken in connection with the surface area of the

19   subterranean basins, and when I say "basins" I am referring to

20   the upper basin, the Chappo and the Ysidora.

21   A  Well, the surface area of the lower Santa Margarita

22   Valley which overlies the alluvial filled ground water basin

23   of the Santa Margarita River was included within our detailed

24   soil survey -- that portion of the Naval reservation lying

25   within that portion of the Santa Margarita River watershed

1    lying within the Naval reservation.  I examined it in detail.

2        Q  And what did you find to be the surface area of the

3    subterranean basin within the area?

4        A  The surface area of the subterranean basin is about

5    4500 acres.

6        Q  Now, would you state the use presently being made of

7    that 4500 acres to which you just made reference?

8        A  Well, a variety of uses are being made of that 4500

9    acres, including use for an airfield, highway, railroad,

10   industrial area, barracks and housing facilities; messes,

11   facilities for troops.

12       Q  Would you describe the natural growth, the covering

13   within the areas which are not so used that you have just

14   mentioned?

15       A  Well, the natural growth varies from open grass cover

16   to brush and trees.

17       Q  And what utilization is made of those areas to which

18   you just made reference?

19       A  The areas covered in that natural vegetation is used

20   for the purpose of raising sheep and cattle.

21       Q  And for what use, if any, for military purposes in the

22   area?

23       A  They are also used for training Marines in moving through

24   various types of cover and are used in training Marines in the

25   art of camouflage, concealment, scouting and sniping.

1     Q  Now, in regard to agricultural uses, what are the uses

2  made of that area?

3     A  Well, with regard to agricultural uses, a portion of

4  the area of the alluvial basin is used to produce feed for the

5  Base special service horses, retained for recreation of the

6  Marines, and a portion is used for grazing, as I mentioned

7  heretofore.

8     Q  Have you any idea of the number of livestock that are

9  grazed in the area?

10    A  Well, it is variable.  There is around 3000 head of

11  sheep and approximately between 750 and 1000 head of cattle

12  grazed within the valley, on the surface of the valley.

13    Q  Now, what is the source of the water which maintains

14  this natural coverage which you just described?

15    A  It is partly rainfall that falls directly on the basin

16  and partly draught on the ground water contained within the

17  alluvium.

18    Q  What consideration have you given to determine the

19  quantity of water, consumptively used, to maintain that cover-

20  age?

21    A  Well, studies of consumptive use of the native vege-

22  tation on the surface of the ground water basin of the Santa

23  Margarita River within Camp Pendleton indicated an average

24  consumptive --

25      MR. SACHSE:  I will object, if the Court please.  The

1    question was what consideration have you given and he is now

2    testifying to hearsay, what a study disclosed.  I want to find

3    out which it is, him or some other study.  The answer is hear-

4    say.

5    BY MR. VEEDER:

6        Q  Would you please state the studies which were conducted

7    under your direction in regard to the consumptive use of water

8    regarding the area in question?

9        A  Studies of the consumptive use of native vegetation on

10   the surface of the Santa Margarita ground water basin within

11   Camp Pendleton were made under my supervision and direction.

12       Q  Would you state what those studies showed?

13       A  Those studies revealed -- all those studies were a

14   series of evaporation observation climatology observations

15   to determine the nature and character of cover; the relationship

16   of the evapo-transpiration losses to nature and cover of the

17   basin.

18       We have been conducting evaporation studies in the basin

19   since 1952.

20       Q  What is the source of water for the subterranean basin?

21       A  The source of water for the subterranean basin is

22   water which flows down the Santa Margarita River and percolates

23   into the alluvium.

24       Q  Would you state what your studies revealed from the

25   standpoint of the consumptive use of water in connection with

1  natural coverage concerning which you have just been testifying?

2  A  The studies revealed that the consumptive use of water

3  by the natural vegetation growing upon the surface of the Santa

4  Margarita Basin is 2.56 feet per acre per year.

5  Q  Now, would you state with some specificity the kind of

6  growth that utilizes that gross quantity of water?

7  A  Well, that is a combination of types of vegetation and

8  consumptive use of that vegetation times the acreages or area

9  occupied by the vegetation.  Some of the areas are in grasses;

10  some is in herbaceous plants and some is in woody brush and

11  tree type plants, and each of those varieties of plants have

12  different consumptive use values.

13  We took into consideration the area occupied by each of

14  these broad types of plants, and the consumptive use as deter-

15  mined, 2.56 feet per acre, represents the average of the entire

16  area.

17  Q  Now, would you state what portion of that 2.56 acre

18  feet per acre consumptive use is attributable to the Santa

19  Margarita River?

20  A  Well, the average annual rainfall for the area, from

21  a forty-eight year period of record kept at the ranch house

22  on the Santa Margarita River, is 1.16 feet per year and --

23  MR. SACHSE:  What was that?

24  THE WITNESS:  1.16 -- 1.16 feet.  It is assumed in studies

25  of this character that the native vegetation will consume the

1   entire amount of that precipitation tand will satisfy its

2   requirements of water over and above the precipitation by

3   extraction from ground water. .

4   BY MR. VEEDER:

5      Q   What did your study reveal then as to extraction of

6   ground water from the subterranean basin by this plant cover-

7   age?

8      A   Well, it would be 2.56, which is the consumptive use,

9   less rainfall which is 1.16, leaving 1.4 acre feet per acre,

10  would be draught on the ground water basin.

11     Q   What then would be the aggregate draught on the ground

12  water basin underlying your study?

13     MR. SACHSE:  I will object to the question.  The witness

14  has identified 4500 acres, of which very, very large parts,

15  from his own testimony, are houses, messes, industrial build-

16  ings, railroads --

17     MR. VEEDER:  Is this an objection or an appeal?.

18     MR. SACHSE:  It is an objection.

19     MR. VEEDER:  Why don't you state your objection?

20     MR. SACHSE:  The statement of 2.56 acre feet consumptive

21  use for native vegetation has no conceivable relation to the

22  4500 acre foot area, a large part of which is industrial in

23  character, where there is no --

24     MR. VEEDER:  This is not an objection.  It is a speech.

25  If he wants to cross-examine --

732

THE MASTER:   The objection is sustained on the ground, at the present time, there is no foundation as to the area covered by the native vegetation font which this draught would be drawn.

BY MR. VEEDER:

Q   Would you state then the estimated area in natural coverage of the 4500 acres concerning which you have been testifying?

A   I would have to check my notes on that.

Q   Would you do that?

THE MASTER:   Colonel Bowen, it is now two minutes to twelve and I suggest that we take our recess until 1:30 and during the recess you can check your notes and we will proceed with this question when the court reconvenes at 1:30.

(Thereupon at 12:00 o'clock noon a recess was taken.)

- - -

Fallbrook, California, June 4, 1958, 1:30 P.M.

MR. VEEDER:  Your Honor, I tender a thought in regard to the record this morning, in which the question arose regarding the request of Mr. Sachse on June 3, to me, in regard to certain materials he wanted from the Soil Conservation Service.

. It appears to me that that has no proper place in this record here.  To begin with, it is an incomplete record.  I would tender the thought that in preparing the record, the transcript of the record, that those pages be kept separate and apart from your Honor's record in regard to the water users in the De Luz area and that we reserve the matter concerning which Mr. Sachse brought forth, and to which I responded, and on which Mr. Stahlman commented to another part of the record, because the record as it now stands is incomplete.  I will make a complete record on this matter to Judge Carter.

Would that be amenable to your Honor?

MR. SACHSE:  I object, your Honor.  I made it for the record, for the purpose of getting it in the record.

THE MASTER:  As I understand it was made a part of the record, but it would not be numbered consecutively with the pages of this morning, but would be numbered separately and would be presented in a separate volume for consideration by Judge Carter on June 16.

MR. SACHSE:  I have no objection to that.

2b

1    MR. VEEDER:   That is what I meant.   If that is agreeable
2    I would ask that the reporter be directed to report none of
3    what is transcribed  this morning in the volume that relates to
4    your Honor's hearing, and it continue from the last page of the
5    last volume preceding this morning.

6    THE MASTER:   I would suggest, then, that the material
7    referred to by Mr. Veeder be included in a separate volume to
8    be designated Volume V-A.

9    MR. SACHSE:   That would be agreeable.   That is to be re-
10   produced, as I understand it, and made available to everybody,
11   immediately, as the record is.

12   THE MASTER:   That is correct.   It will be reproduced and
13   made available, but in a separate volume to be known as 5-A.

14   MR. VEEDER:   With the addition that it is not released,
15   and that I finish my response to it, because I don't want--

16   MR. SACHSE:   That is what I objected to.   I want that
17   transcript.

18   THE MASTER:   It can be released to Mr. Sachse and to you.

19   MR. VEEDER:   But no further distribution until I have
20   completed my response.

21   MR. SACHSE:   You mean Judge Carter does not get it?

22   MR. VEEDER:   I have no objection to that.   What I want is
23   that you don't make a newspaper statement.

24   MR. SACHSE:   I released it in my statement, Mr. Veeder,
25   and that is why I had it written out in advance.

3b

1    MR. VEEDER:  That is typical of Mr. Sachse's method of

2    conducting this case.

3        THE MASTER:  We are getting nowhere by this.

4        MR. VEEDER:  Now, with deference to your Honor, I won't

5    respond.  I will leave it.  It is too bad that I am not permitted

6    to respond.

7

8                    ALLEN C. BOWEN,

9    resumed stand, further testified as follows:

10

11                    DIRECT EXAMINATION  (continued)

12   BY MR. VEEDER:

13       Q  Now, Colonel, the question presented to you relates

14   to the acreage comprising the surface area of the subterranean

15   basin underlying a portion of Camp Pendleton.  Would you state

16   for the record the acreage which is in natural forage as dis-

17   tinguished from the acreage which is comprised of industrial

18   buildings, railroads and other structures to which you made

19   reference?

20       A  The area of the surface of the Santa Margarita River

21   alluvial basin lying within Camp Pendleton, which is covered

22   with native vegetation, is about 4,500 acres.  The total area

23   of the lower Santa Margarita Valley overlying the ground water

24   basin from the confluence of De Luz Creek downstream is about

25   5,300 acres exclusive of small tongues of alluvium which project

4b

1    into minor ajoining tributaries.

2         Q   Now, would you state--

3         MR. DENNIS:   I wonder if I might have that last answer

4    read back.

5         (Record read.)

6         THE MASTER:   Is that satisfactory?

7         MR. DENNIS:   Yes, thank you.

8    BY MR. VEEDER:

9         Q   Now, would you state, for the record, the quantity of

10   water which you, in your opinion, have determined to be derived

11   from the Santa Margarita River and consumed by the natural

12   forage concerning which you have testified?

13        A   In my opinion, based on the study of consumptive use

14   of native vegetation growing on the surface of the ground water

15   basin of the lower Santa Margarita River in Camp Pendleton, it

16   is that 1.4 are consumed by the native vegetation; the remaining

17   requirements are satisfied by rainfall.

18        Q   Now, would you state the aggregate, then, for the

19   record that is derived from the Santa Margarita River and con-

20   sumptively used by this native vegetation?

21        A   The aggregate, therefore, is the area in native vege-

22   tation, 4,500 times the draft on the ground water basin, which is

23   1.4, which equals 6,300 acre feet of water per year, which is

24   the total draft of the native vegetation on the ground water

25   and storage in the basin.

5b

1    Q   Now, would you state the effect, in your opinion based

2    upon your studies, the effect of the lowering of the ground

3    water table by, say, approximately one foot?

4    A   Lowering the elevation of the water plane in the ground

5    water basin approximately a foot would result in the death of

6    the shallower rooted plants.

7    Q   Among which would be?

8    A   The grass species, which are comparatively very shallow

9    rooted.   Of course the foot of increment would depend on where

10    the foot of increment was in relation to the surface of the

11    basin.

12    Q   Now--

13    A   And what the elevation of the water plane was at the

14    moment that the foot reduction in level occurred.

15    Q   Well, assuming on the basis of your studies that you

16    have viewed the ground water plane in the basin during the month

17    of July, July of 1957, to be specific--assuming that there was

18    a drop of one foot in the water table during the month of July,

19    what would be the effect upon the shallow rooted vegetation

20    based upon your investigation and your knowledge?

21    A   Well, as the condition prevailed, say, in July, 1957,

22    a foot lowering--a lowering of one foot in the elevation of the

23    water basin would result in the death of the shallow rooted

24    plants.   The deeper rooted plants would continue to draw on the

25    water contained in the basin.

1    Q   From the standpoint of utilization of that 4,500 acres

2    of surface in the basin, what would be the effect of the destruc-

3    tion of the natural forage concerning which you have testified?

4    A   Well, the destruction of the natural forage would,

5    of course, result in a lessening of the surface cover which

6    would diminish substantially the value of the valley floor for

7    training purposes heretofore described, and would result in a

8    loss of a vast amount of forage for livestock grazing.

9    Q   What would be the effect at the same time, still re-

10   ferring to July 1957--what would be the effect at that time

11   upon the deeper rooted plants of a drop, say, two feet in the

12   water plane?

13   A   It probably would have a negligible effect.

14   Q   And what would be--  How deep do the roots of the

15   trees and plants that you have described go into the alluvium?

16   A   Well, the trees and larger brush that grows on the

17   surface penetrates the alluvium to a depth of 14 to 20 feet

18   below the surface.

19   Q   Now, in regard to the areas further down the valley,

20   are there any agricultural--is there agricultural production

21   down there in addition to the forage?

22   A   Well, there is a hay crop harvested in Ysidora Valley

23   each year.

24   Q   What would be the effect of the lowering of the water

25   table a foot in connection with the raising of the hay down

     there?

7b

1    A  Well, that would be negligible.

2    Q  Now, what kind of a crop is that?

3    A  That is an annual grain crop.

4    MR. VEEDER:  Now, I want to have marked for identification

5  Plaintiff's Exhibit--

6    THE CLERK:  M-69.

7    MR. VEEDER:  --M-69.  There are several sheets, so I would

8  like to have them stapled together.

9    THE CLERK:  Do you want them stapled?

10   MR. VEEDER:  Yes.  Would you staple them at the corner.

11   Q  I hand to you Plaintiff's Exhibit M-69, and ask you

12  to state what that is.

13   MR. SACHSE:  Do you have one for counsel's convenience?

14   THE WITNESS:  Plaintiff's Exhibit M-69 consists of a

15  series of tabulations summarizing the stream flow recorded by

16  the U. S. Geological Survey, Surface Water Branch, at various

17  gauging stations described:  The Temecula Creek, near Temecula,

18  California, for the period February 1923 on through the water

19  year '57.

20   The station at Murrieta Creek, at Temecula, California,

21  for the period beginning with the water year of '31 through

22  water year '57.

23   The station described as the Santa Margarita near Temecula,

24  California, beginning February 1923 through water year '57.

25   The gauging station described as Santa Margarita, near

8b

1    Fallbrook, California, beginning December '25 continuing through

2    water year '57.

3        The station described as De Luz Creek beginning '51 and

4    continuing through water year '57.

5        The station described as Santa Margarita at Ysidora,

6    California, beginning March '23 and extending through water

7    year '57.

8        The station described as O'Neill Ditch, near Ysidora,

9    California, beginning the water year 1933 and extending through

10   water year--the water year '32 and extending through water year

11   '57.

12   BY MR. VEEDER:

13       Q   Now, how do these correspond with the stations marked

14   on Plaintiff's Exhibit M-14?

15       MR. SACHSE:   May I see that?

16   BY MR. VEEDER:

17       Q   M-14, on which appears the gauging stations marked M-34A,

18   B and C, through.   Are those the same gauging stations?

19       A   Referring to Plaintiff's Exhibit M-14, those are the

20   same gauging stations with the exception of the station recorded

21   and identified as Plaintiff's M-34F.

22       MR. VEEDER:   I would like to have marked for identification

23   as M-70--   I offer in evidence Plaintiff's Exhibit marked M-69

24   for Identification.

25       THE MASTER:   Any objection?

9b

1    MR. SACHSE:  For Identification?

2    MR. VEEDER:  It has been marked for Identification.

3    MR. SACHSE:  No objection.

4    THE MASTER:  It will be received in evidence as Exhibit

5    M-69.

6    MR. VEEDER:  I desire to offer in evidence for Identifica-

7    tion M-70, which is a petition of the Fallbrook Public Utility

8    District to change the points of diversion, applications 12178

9    and 12179.

10    MR. SACHSE:  If your Honor please, I make objection to

11    this.  Do you want to go ahead and lay any more foundation or

12    should we argue the objection?  May I look at it?  Maybe I can

13    stipulate to the correctness of the contents and then we can--

14    MR. VEEDER:  It has been certified.

15    MR. SACHSE:  It is certified?

16    MR. VEEDER:  Isn't that the copy that you submitted to me?

17    MR. SACHSE:  That I served on you?  Yes.  Well, I will

18    object to its introduction into evidence--I suggest your Honor

19    take a look at it--for the same reasons that were repeated from

20    9:30 in the morning until noon before Judge Carter when Mr.

21    Holsinger was on the witness stand.  That document before you is

22    one relating entirely to precedings presently pending before

23    the Water Rights Board.  This is such a document and it speaks

24    for itself.

25    THE MASTER:  The objection will be sustained.  I do not

742

10b

1    believe that this pertains to the De Luz Creek area rights of

2    the small owners, which is what is to be presented before me at

3    this time.  If this has any application it would be on the main

4    case between the United States and Fallbrook, which is to be

5    presented and argued at a later date.

6            MR. VEEDER:  Well, your Honor, our position is this in

7    that connection, if I may state it.

8            THE MASTER:  Yes, you may state your opinion.

9            MR. VEEDER:  The record at this point is incomplete.  Now

10   there was admitted, without objection, the applications of the

11   Fallbrook Public Utility District which were numbered application

12   M-15, application 11587; application M-17, application 11586;

13   number M-18, application 12178 and M-19 is application 12179.

14   Then there were amendments to those applications.  Now those were

15   all admitted without an objection.

16           The point that I am making is that we desire to have the

17   record complete in connection with those applications and it

18   seems to me that Judge Carter was proceeding here, and, as he

19   said, he was sitting as a special master in this proceeding.

20   Now, I believe that these two documents are inextricably related

21   to the overall referrals to applications of the Fallbrook Public

22   Utility District, and in particular they are related to Exhibit

23   M-24, which is application 12178 of June 28, 1952, and M-25,

24   which is application 12179, June 28, '52.

25           Now, we are in this situation that if we are not permitted

11b

1  to offer those of having an incomplete record in this part of

2  the case.

3      THE MASTER:  I do not see the pertinency of this petition

4  to the determination of specific questions which were referred

5  to me for determination.  Now you have this document identified

6  and at the time that the effect of the State Water Rights Board

7  is argued before Judge Carter, you can renew your offer and it

8  can then be received or rejected by him in accordance with his

9  ruling on that question.  I don't think it is proper to be

10  introduced in any proceedings in the De Luz Creek area at the

11  present time.  So the objection will be sustained.

12      MR. VEEDER:  I would like to make an offer on it, then,

13  your Honor.

14      What has been identified as M-70, purports to be a peti-

15  tion to change the point of diversion in applications 12178 and

16  12179.  In regard to application 12178, it is proposed to change

17  the point of diversion for storage of 500 acre feet from Rainbow

18  Creek--

19      MR. SACHSE:  Your Honor, I will object to the offer of

20  proof.  The document will speak for itself.  It is not in

21  accordance with any pronouncement from counsel.  It is not offered

22  --when you have the witness on the stand you make an offer which

23  you expect to prove by the witness, but the document speaks for

24  itself.

25      THE MASTER:  I think that objection is well taken, Mr.

12b

1    Veeder.  I don't think any offer of proof of what the document

2    itself shows, by introduction in evidence, is required.

3        MR. VEEDER:  Your Honor's ruling is that I cannot proceed

4    with my offer?

5        THE MASTER:  In other words, you have tendered the docu-

6    ment and it speaks for itself.

7        MR. VEEDER:  Your Honor has directed me not to proceed

8    further?

9        THE MASTER:  Yes.

10       MR. VEEDER:  Well, I will put this in the custody--

11       MR. SACHSE:  It is marked for Identification as M-70, as

12    I have it.  Is that correct?

13       THE MASTER:  That is correct.

14       MR. VEEDER:  I wish to have marked for identification

15    Plaintiff's Exhibit M-71.

16       Q  I hand you Plaintiff's Exhibit marked M-71, and ask you

17    to state what it is?

18       A  Plaintiff's Exhibit marked for Identification M-71 is

19    a sketch entitled Rainbow and Sandia Reservoirs under applica-

20    tion.  Application number 12178 and 12179 of 28 November, 1947.

21       The sketch shows the county line, the Range line between

22    3 West and 4 West; the thread of the stream of the Santa Margar-

23    ita River, Rainbow Creek, Sandia Creek with a reservoir area

24    shown on those tributaries to the Santa Margarita River.

25       Q  Under whose direction was this drawing prepared?

13b

1    A    The drawing was prepared under my direction and super-

2    vision.

3    Q    Do you know it to be correct?

4    A    Yes, sir.

5    MR. VEEDER:   I offer in evidence Plaintiff's Exhibit M--

6    I offer in evidence Plaintiff's Exhibit marked for Identifica-

7    tion M-71.

8    MR. SACHSE:   The same objection, your Honor, that it is

9    material relating to two actions pending before the State Water

10   Rights Board and it shows so on its face.   It is immaterial at

11   this place in the proceedings.   If your Honor is inclined to

12   overrule my objection on that ground I would request permission

13   to put Colonel Bowen under voir dire, to find out from him

14   where he got the engineering data; in other words, to lay a

15   foundation on this.   He has had nothing whatever to do with

16   those applications.   But my basic objection is that it is imma-

17   terial to these proceedings in the De Luz Creek watershed having

18   to do only with the Fallbrook Public Utility District application

19   12178 and 12179.

20   THE MASTER:   I think the objection is well taken, Mr.

21   Veeder.

22   MR. VEEDER:   Then with the ruling prohibiting this witness

23   from making reference to M-71, the United States of America

24   would offer to prove--

25   MR. SACHSE:   I make objection to the offer of proof.   The

746

14b

1  only thing is that the document, being a map, which has been

2  marked for identification will speak for itself.  If he wants

3  to ask Colonel Bowen a question then he can make an offer of

4  proof on the question, but not on the map.

5  BY MR. VEEDER:

6      Q  Colonel Bowen--do you sustain the objection?

7      THE MASTER:  The objection is sustained.

8  BY MR. VEEDER:

9      Q  Colonel Bowen, I ask you to state what, in your opinion,

10  would be the effect of changing the point of diversion of the

11  waters on Sandia and Rainbow Creek in the amount of 10,000 acre

12  feet per year, respectively for each of the storage reservoirs

13  purportedly planned on these two streams upon the runoff of the

14  main stream of the Santa Margarita River, if the aggregate of

15  those two reservoirs, namely, 20,000 acre feet, was to be stored

16  on the main stream of the river as mentioned.

17      MR. SACHSE:  I make the same objection.  It has only to

18  do with applications of the Fallbrook Public Utility District

19  above De Luz Creek and has nothing to do with De Luz Creek

20  watershed.  I make a further objection that the question is

21  unintelligible.

22      THE MASTER:  The objection is sustained.

23      MR. VEEDER:  I will offer to prove, your Honor, with this

24  witness that the runoff of Rainbow Creek is so meager that it

25  would be impossible to impound 10,000 acre feet of water on

747

15b

1   Rainbow Creek.   I would offer to prove by this witness that the

2   runoff of Sandia Creek is so meager that there could not possibly

3   be impounded 10,000 acre feet of storage on Sandia Creek.

4       I would offer to prove by this witness that by moving the

5   two storage structures down to the Lippincott site, and there

6   combining them into a project purportedly to impound 30,000

7   acre feet, 20,000 acre feet of which would come from the Sandia

8   and Rainbow Creeks would greatly increase the burden upon the

9   stream and would greatly reduce the quantity of water flowing

10   down to Camp Pendleton and to the military enclave; that it

11   would result in irreparable damage to the United States of America

12   by reducing the quantities of water impounded underground in the

13   subterranean basin, and would destroy the grass coverage con-

14   cerning which Colonel Bowen has completed his testimony.

15       I would further--I would like to ask one more question.

16       MR. SACHSE:   Well, is that the end of the offer of proof,

17   because I will sustain the objection in regard--pardon me, your

18   Honor, that is your province--I will repeat the objection to

19   the offer of proof on the same grounds.

20       THE MASTER:   The offer is rejected for the reasons hereto-

21   fore given.

22       MR. VEEDER:   I will ask Colonel Bowen a question:

23       Q   Whether the construction of a 35,000 acre foot storage

24   dam at the Fallbrook-Lippincott site, as allegedly proposed by

25   the Fallbrook Public Utility District, would increase the

748

15b

1    competition between the riparian owners on De Luz Creek and the

2    United States of America on the main stem of the Santa Margarita

3    River in connection with the available supply of water from De

4    Luz Creek.

5              MR. SACHSE:   I will make the same objection.

6              THE MASTER:   The same ruling.

7              MR. VEEDER:   We would show by this witness that the

8    Fallbrook Public Utility District, by putting in a dam at the

9    Fallbrook-Lippincott site, is not only irreparably damaging

10   the United States of America but is irreparably damaging all

11   the small owners on the De Luz Creek by reason of the fact that

12   the chief source of supply of the United States of America has

13   heretofore been the main stem of the Santa Margarita River;

14   that it would now be forced, if the Fallbrook Public Utility

15   should build its dam, to look to the De Luz Creek for virtually

16   its entire supply of water.

17             I might add that I see no possible--

18             MR. SACHSE:   Is this still the offer of proof, Mr. Veeder,

19   because I want to object, when the offer is over.

20             MR. VEEDER:   All right.   I will stop there.

21             MR. SACHSE:   I object to the offer on the same grounds,

22   your Honor.

23             THE MASTER:   The same ruling.   The effect, if any, of the

24   dam on the rights of the small property owners would be deter-

25   mined only in the final statement rendered by Judge Carter, and

16b

1   would not be set forth in the preliminary findings which would

2   be made by the Master.

3       MR. SACHSE:  So my record is straight, however, that is

4   M-71 for Identification?  Am I right?

5       THE MASTER:  That is correct.

6       MR. VEEDER:  You may cross-examine.  However, I reserve

7   the right to recall this witness, your Honor.

8       MR. SACHSE:  No objection.  No objection at all.

9

10                          CROSS-EXAMINATION

11  BY MR. SACHSE:

12      Q  Colonel Bowen, first one or two ambiguities which are

13  in my notes that I would like to try to straighten out.

14      In reading the transcript I find that you have used the

15  term Pauba Basin and Temecula Basin and that refers to the same

16  basin.  Is that correct?

17      A  Yes.

18      Q  Still simply reading the transcript, I find you used

19  the term Railroad Canyon and Temecula Canyon.  I think they are

20  the same, are they not?

21      A  Yes, sir.

22      Q  And I have a blank in my notes as to your figures as

23  to how far Ysidora Gauge is from the ocean.

24      A  About two and a half miles upstream from the confluence

25  of the Santa Margarita River with the Pacific Ocean.

17b

1        Q   About what?

2        (Record read.)

3   BY MR. SACHSE:

4        Q   Colonel Bowen, when did you enter the Marine Corps

5   first?

6        A   I was sworn into the Marine Corps in 1942.

7        Q   And will you give me a brief run down of your duty

8   stations and assignments during the war?

9        A   My first duty station was Officer's Candidate School,

10   Marine School at Quantico, Virginia.  From that station I was

11   sent to the Topographic Interpretation School at the Navy

12   Photographic Interpretation Center in Anacostia, Maryland--I

13   believe it is in Maryland--I am not sure whether it is in the

14   District or in the State of Maryland.

15        From that post I was--from that school, I was sent to

16   the Marine Corps Air Station at Cherry Point, North Carolina,

17   and assigned duties as Assistant Intelligence Officer for the

18   Third Marine Aircraft Wing.

19        Q   Can you fix it by years as you go along, Colonel?

20        A   Yes, sir; that was '42.  Early '43 I got out of Officer's

21   Candidate School and the work at the Interpretation Center at

22   Anacostia was completed about June of '43, as I recall, at which

23   time I reported to the Marine Corps Air Station, Cherry Point,

24   North Carolina.  I continued in my assignment as Assistant

25   Wing Intelligence Officer.

18b

1   During the period at Cherry Point I surveyed and super-

2   vised the drafting and preparation of a topographic map of the

3   Air Station from United States Geodetic Survey Datum.

4       I left the Continental United States with the Third Marine

5   Aircraft Wing in my same assignment as Assistant Wing Intelligence

6   Officer in March of '44, and in September of '44 I was detached

7   from my billet as Assistant Wing Intelligence Officer, Third

8   Marine Aircraft Wing, and transferred back to the United States

9   and was assigned to duties at the Marine Corps Air Station,

10  El Centro from September '44 until March of '45. Incidentally,

11  I was a Group Intelligence Officer with the group that was at

12  El Centro.

13      About March of '45 I was transferred to the Coronado

14  Amphibious Training Base for duty as an Instructor in Military

15  Map Reading, and served as Instructor and Cartographer with an

16  Air Support Training Unit, a part of the Air Corps Marine Station

17  Facilities on the West Coast for the purpose of instructing

18  Marine Aviators in the arts of close air support.

19      I remained in that assignment until the fall of '45 at

20  which time I was transferred to the Staff of the Commanding

21  General, Marine Corps Air Station, West Coast, as I recall the

22  title.  It is a little hazy.

23      Q  Where was that?

24      A  At El Toro, near Santa Ana, California.  And at that

25  station--when the war was over I was at that station and I

19b

1   requested release to inactive duty and was placed on inactive

2   duty in January of '46.

3       Q   Then you were released from inactive duty--

4       A   I was released to inactive duty.

5       Q   Released to?

6       A   Yes.

7       Q   Following your release will you please detail your

8   activities as you just have, your military activities, with

9   dates, from the time till you were recalled?

10      A   Upon my release to inactive duty from the United States

11  Marine Corps I returned to duty with the Soil Conservation

12  Service of the United States Department of Agriculture in

13  Imperial Valley, California, with the duties of taking charge

14  of irrigation and drainage work conducted in cooperation with

15  the Imperial Irrigation District.  And I remained in charge of

16  that operation from 1946 until October of '51--1951--at which

17  time I was recalled to active duty by the United States Marine

18  Corps.

19      Q   Your place of duty, your headquarters then from January

20  '46 until October '51 was Imperial County?

21      A   Yes, sir.  My headquarters was the town of Imperial

22  located in the Imperial County, and the area which I served was

23  principally Imperial County, and also Western Riverside County

24  and I did some consulting work in San Diego--correction--Eastern

25  Riverside County, the desert end over there, and Imperial County

20b

1  were in my area. I did consulting work in Western Riverside

2  County and in San Diego County principally on matters relating

3  to reclamation of saline and alkaline soils.

4      Q  I didn't get that, reclamation of what?

5      A  Saline and alkaline soils.

6      Q  Have you been on duty since October 1951?

7      A  No, sir.

8      Q  What interruptions, please?  What interruptions were

9  there in your active duty?

10     A  I requested release to inactive duty in early 1953 and

11  I was released the last day of March, as I recall, 1953, to

12  inactive duty.

13     Q  And how long did you continue inactive before you again

14  rejoined the Corps?

15     A  I was recalled to active duty in October 1954.

16     Q  Now, what did you do from March of '53 to October of

17  '54?

18     A  I took charge of the Soil Conservation Service, United

19  States Department of Agriculture, the area including that por-

20  tion of California from the San Francisco Bay southward to and

21  including the northern part of San Luis Obispo County.

22     Q  Where were your headquarters at that time?

23     A  My headquarters at that time was Watsonville, California.

24     Q  Now, since you were recalled to active duty in '54 have

25  you been continuously on active duty?

21b

1      A   Yes, sir.

2      Q   When were you first assigned to duty in connection with

3   the case of United States against Fallbrook?

4      A   I don't believe I quite understand your question, Mr.

5   Sachse.

6      Q   Well, let me rephrase it, then.  Your present duty

7   assignment is Officer In Charge of Ground Water Resources?

8      A   Yes, sir.

9      Q   And I believe that was your principal duty assignment

10   at the time of the first trial of this case, also?

11      A   Yes, sir.

12      Q   Then when were you first assigned to that duty?

13      A   To the duty of Officer In Charge of Ground Water

14   Resources?

15      Q   Yes.

16      A   In October of '51.

17      Q   At the time of your first recall?

18      A   Yes, sir.

19      Q   Now, prior to October 1951 did you have any official

20   duty assignment--

21      MR. VEEDER:  I am going to object.  There is an unanswered

22   question in the record.

23      MR. SACHSE:  I am sorry.  What is that?

24      MR. VEEDER:  You asked when he was first employed, or

25   something like that, in connection with the case of United

22b

1 States against Fallbrook Public Utility District.  I don't think

2 he ever was employed in connection the United States versus

3 Fallbrook Public Utility District.  I think the record should

4 be straightened out.  There was no response to the question.

5   MR. SACHSE:  I got what I wanted.  I wanted to find out

6 when he started to work on this problem.  Maybe I phrased it

7 ineptly, your Honor.

8   THE MASTER:  Maybe the witness should be directed to

9 answer the specific question which Mr. Veeder brought up.

10   MR. VEEDER:  Have you ever been employed in connection

11 with United States versus Fallbrook?

12   THE WITNESS:  I have been employed by the United States

13 Marine Corps in the capacity just mentioned, and in that capacity,

14 of course, I have made surveys and investigations on the Santa

15 Margarita River and prepared tables, drafts and documents.

16 BY MR. SACHSE:

17   Q  And you testified as a witness?

18   A  And testified as a witness.  But I don't believe I have

19 ever specifically been employed on this suit as such.

20   MR. VEEDER:  I think that is an excellent answer.  Thank

21 you.

22 BY MR. SACHSE:

23   Q  Now, during the period of your service with the Marines

24 prior to  October 1951, did you ever have any duty assignment

25 requiring studies of the Santa Margarita River basin watershed?

756

23b

A   Prior to October 1951?

Q   In connection with Marine Corps duties prior to '51?

A   No, sir.

Q   Prior to '51 in connection with Soil Conservation duties, did you ever have any specific assignments requiring investigations of the Santa Margarita River watershed?

MR. VEEDER:   Now, is this in connection with the Marine Corps?

MR. SACHSE:   No.   I am saying--the first question was the Marine Corps, Mr. Veeder, and the second question was during the period from '46 to '51.

Q   In connection with your Soil Conservation Service duties, did you ever have any specific assignment involving the Santa Margarita River watershed?

A   You don't mean the entire watershed, of course?

Q   Any portion of the Santa Margarita River watershed?

A   That was the reason for my pause.   I wanted to be sure that my answer was correct.   I did make an investigation of some of the areas around Hemet, and the Diamond Valley, which is partly within and partly without the Santa Margarita River watershed, which was included in that investigation, so to that extent I would say that I did, while employed by the Soil Conservation Service, make investigations of the Santa Margarita River watershed.

Q   Is any part of that shed within the boundary of the

24b

Vail Ranch?

A   No, sir.

Q   Now, under direct examination, on May 26, you testified to certain conclusions regarding--I will withdraw the word "conclusions"--you testified regarding the operation on the Vail Ranch up to 1945, a period of three and a half or four years up to 1945.

The observations upon which you based that testimony were then personal and casual observations and in no sense connected with official duties.  Is that correct?

MR. VEEDER:  Before the witness answers I want that question straightened out.

MR. SACHSE:  I will rephrase it.

Q   The observations of the Vail Ranch which you testified having made for a period of three and a half or four years prior to 1945 were personal and casual observations not made in connection with any official duties.  Is that correct?

MR. VEEDER:  Before he answers the question I want to find out what the word "casual" means to counsel.

MR. SACHSE:  I think the witness knows.

MR. VEEDER:  What does casual mean to you?

THE WITNESS:  Casual means off the cuff; careless, hasty.

MR. SACHSE:  If that is what it means to the witness I don't want a hasty or an off the cuff opinion.

Q   They were not connected with any official duties, were

25b

1    they?

2        A  Would you mind repeating the period, Mr. Sachse, which

3    you mentioned there?

4        Q  Three and a half or four years prior to 1945.

5        A  Is that--

6        MR. SACHSE:  I think that is a mistake in the book.  I

7    think it was '55.

8        MR. VEEDER:  If there is any mistake in the record I

9    certainly want it corrected.

10        MR. SACHSE:  I am asking him what observations he made

11    prior to '45.  Let him answer.

12        MR. VEEDER:  You are striking out what you were saying

13    about referring to the transcript, then?

14        THE MASTER:  Let the witness answer the question as to

15    when the observations which he testified to were actually made

16    and then if it turns out that the transcript was in error that

17    can be corrected.

18        THE WITNESS:  The period during which these personal ob-

19    servations and unofficial in nature were made, extended partly

20    while I was on active duty with the United States Marine Corps

21    and partly while I was on duty with the Soil Conservation Service.

22    I stated the observations were unofficial in nature.

23        My first acquaintance with the property was, as I testified

24    on direct examination, during the period of '44 and '45 when I

25    was stationed with the United States Marine Corps variously at

26b

1   the Air Station in El Centro, at the Coronado Amphibious Train-

2   ing Base and the Air Station at El Toro, during which period

3   I had occasion, many times, to fly over the ranch as a passenger

4   in an SBD type airplane.

5   BY MR. SACHSE:

6       Q   And those observations were not made in connection with

7   any official duty?

8       A   That is correct.

9       Q   In fact, at the time you made them, you had not the

10   slightest idea you might ever be called to testify regarding

11   them, did you?

12       A   No, sir.

13       Q   And did you at that time consciously attempt to calcu-

14   late the acreage, let us say, under cultivation on the Vail

15   Ranch?

16       A   Yes, sir.

17       Q   For your own amusement?

18       A   For my own personal knowledge, Mr. Sachse, as agricul-

19   ture has long been my business; soil, irrigation and drainage.

20       Q   Did you make any records of your observations at that

21   time?

22       A   No, sir.  I might add that I was, during this period

23   of wartime military duty, I was on leave from the Soil Conserva-

24   tion Service job as Chief of Survey Parties in Lewiston, Idaho.

25       Q   What was that?

A   During my wartime active duty with the Marine Corps I was on leave from my job at Lewiston, Idaho, and my interest in Southern California here was prompted by the desire which many people have experienced to move into this salubrious county.

Q   Now the office of Ground Water Resources at Camp Pendleton is permanently under your supervision?

A   Yes.

Q   And has it been at all times to which you have testified here?

A   It has been at all times since I have been assigned to active duty beginning in October of '51 through March of '53 and then--

Q   Again?

A   October of '54 until the present time, yes, sir.

Q   The entire staff of that office reports to you, or is assigned to specific tasks by you?

A   Yes, sir.

Q   Both military and civilian?

A   Yes, sir.

Q   You prepare efficiency reports on military personnel?

A   Yes, sir.

Q   What kind of an efficiency report are you going to give the boy who drew the map we have worked on all morning?

MR. VEEDER:   Now I object to that.   Maybe he has a lot of time--I don't know--

28b

1    MR. SACHSE:   I will withdraw that question.  I will come

2    to that later.   I am not nearly through with the subject of that

3    map.

4        Q   Now, the engineering and land studies--  Before you go

5    any further I want to go into the map to which you made reference,

6    M-65.

7        MR. VEEDER:   There is no map marked M-65.

8        MR. SACHSE:   The chart, the chart to which--

9        MR. VEEDER:   I agree now with counsel.

10   BY MR. SACHSE:

11       Q   Now the engineering and land studies of private pro-

12   perties from the De Luz watershed which we have a large file

13   of here, exhibits--I don't have the number--M-48 through--do you

14   know the ones to which I refer, the engineering studies?

15       A   Yes, sir.

16       Q   Those were all made under your supervision?

17       A   Yes, sir.

18       Q   And the watershed boundary determinations were made

19   under your supervision, also?

20       A   Yes, sir.

21       Q   Did you make the watershed boundary determination prior

22   to the earlier trial of this action?

23       A   Yes, sir.

24       Q   You testified in this proceeding that your watershed

25   determination was made on the basis of traversing the whole

29b

1   watershed line by horseback, jeep, on foot or other means.   Is

2   that correct?

3        A   Yes, sir.

4        MR. VEEDER:   "Traverse" is that what you said?

5        MR. SACHSE:   That is the word I used.

6        MR. VEEDER:   All right.

7   BY MR. SACHSE:

8        Q   Traveling the entire watershed line by jeep, horseback,

9   or on foot, and so on.   Is that right?

10        A   Yes, sir.

11        Q   I believe in your earlier testimony you stated that

12   your earlier watershed determination was made as a result of the

13   same study.   Is that correct?

14        A   Yes, sir.

15        THE MASTER:   Mr. Sachse, do you mean by that the same

16   study or the same type of study?

17        MR. SACHSE:   The same study.   The witness testified-- I

18   will ask the question to be specific.

19        Q   Was your determination of the watershed line made

20   before the last trial of this case based upon a physically

21   traveling over the line by jeep, on horseback or afoot?

22        A   It was made before and has been inproved by continuing

23   survey and observation.   There are some of the areas of the

24   watershed that are rather difficult to delineate the first time

25   around.

1    Q  By your testimony regarding the delineation--pardon me--

2  the determination of the watershed for the purposes of this

3  trial, was I believe, made in connection with Exhibit M-14 which

4  is now on the board.  Is that right?

5    A  Yes, sir.

6    Q  Now, we have a number of other exhibits here which

7  delineate the watershed, do we not?

8    A  Well, we have exhibits showing portions of the watershed.

9    MR. VEEDER:  Don't you know, counsel?

10  BY MR. SACHSE:

11    Q  If there are errors or discrepencies, let me say--not

12  errors but discrepencies--between M-14 and the watershed line

13  delineated on any of the exhibits, which do you regard as the

14  most accurate?

15    MR. VEEDER:  I am going to ask him not to answer that

16  question.  If counsel wants to cross-examine and show the dis-

17  parities, fine, but this is not cross-examination.

18    THE MASTER:  I believe if you have any specific discrepen-

19  cies that you wish to call his attention to, that should be

20  done.

21    MR. SACHSE:  I will certainly do that.

22    THE MASTER:  Exhibit by exhibit.

23    MR. SACHSE:  I am going to have to go a little slower,

24  then.

25    MR. VEEDER:  You have taken an hour now.

MR. SACHSE:  Just relax, brother.  We will be here for days.

Q  Let's take a look through the exhibits and find--I want the one offered before Judge Carter, and then reoffered in this case with a new number.

(Short recess.)

MR. SACHSE:  May we put up Exhibit M-13, on the watershed, so that it will show portions of that watershed?

Q  Now, Colonel Bowen, is the watershed line as delineated on M-13 also the result of studies under your supervision?

MR. VEEDER:  Just a minute.

MR. SACHSE:  I am sorry.

MR. VEEDER:  I will ask that the question be reasked.

(Record read.)

THE WITNESS:  Yes, sir.

BY MR. SACHSE:

Q  Am I not correct, and I will call your attention to the area delineated on M-13 as the administrative area 21, am I not correct in stating that the watershed line appears to be different on the two maps?

A  No, sir.

Q  The watershed lines are the same on the two maps?

A  Yes, sir.

Q  Would you tell me the scale per inch on M-13?

A  M-13 is approximately 2.6 inches per mile.

32b

1    Q  And would you mind telling me the scale on M-14?

2    A  Approximately one inch to the mile.

3    (Discussion off record.)

4  BY MR. SACHSE:

5    Q  Colonel Bowen, I will hand you--

6    MR. VEEDER:  Have it marked for identification.

7    MR. SACHSE:  Will you mark this?  How do you suggest we

8  mark them?

9    THE MASTER:  Well, let's see.  This would be Defendant

10  Fallbrook District--you are offering this on behalf of the

11  Fallbrook Public Utility District?

12    MR. SACHSE:  The District and the individual De Luz

13  defendants.

14    MR. VEEDER:  What do you mean, Fallbrook?  No; no.  I

15  was not permitted to take a deep breath in regard to Fallbrook

16  today, so you are not offering anything in regard to Fallbrook.

17    MR. SACHSE:  I will submit the ruling to your Honor.  We

18  have a great deal of evidence in the record--

19    THE MASTER:  It can be marked simply Defendant's DA,

20  standing for De Luz, in general.

21    THE CLERK:  MDA.

22  BY MR. SACHSE:

23    Q  Colonel Bowen, I hand you what has been marked for

24  Identification as MDA, being a photographic reproduction of the

25  Oceanside quadrangle--

33b

MR. VEEDER:  Now, I am going to object to that statement. There is no showing that it is a photograph--

MR. SACHSE: · May I be permitted to make another offer and then you may--

MR. VEEDER:  Present the document to the witness and then ask him if he knows what it is.

BY MR. SACHSE:

Q · Do you know what that is, Colonel Bowen?

A  Yes, sir.

Q  Will you tell us, please?

A  This is a photostat of the Oceanside quadrangle in the 7.5 minute series of the U.S. Geological Survey, topographic sheet.

Q  And what is the year, the date of it, please?

A  This was printed in 1949, from the information in the lower right hand corner.

Q  In other words, it is, then, a photographic reproduction of the same map, with additions thereto, that is entered in evidence as M-33A?

MR. VEEDER:  I am going to object to that.  This witness has to have an opportunity to examine that.  I want him to compare the two exhibits.

MR. SACHSE:  All right; M-33A.

THE WITNESS:  May I have the question, your Honor?

THE MASTER:  Will you read the question, Mr. Reporter?

767

34b

1          (Record read.)

2          THE WITNESS:  Yes, sir, it is a photostat on a slightly

3     reduced scale.

4     BY MR. SACHSE:

5          Q  And the map also contains certain--pardon me--MDA

6     contains certain markings which do not appear on M-33.  Is that

7     correct?

8          A  Yes, sir.

9          MR. VEEDER:  Now, you have identified it and I am going

10    to object to anything further as being outside the scope of

11    this phase of the testimony, because all of this is limited to

12    the De Luz area.

13         THE MASTER:  I take it  this is being introduced and will

14    be offered in connection with the identification of the watershed

15    boundaries.  I think it is pertinent.  The objection is overruled.

16    BY MR. SACHSE:

17         Q  Do you know what the additional lines delineated on

18    MDA are?

19         MR. VEEDER:  I am going to inquire:  Did he make the

20    markings on there?

21         MR. SACHSE:  That was going to be my next question.

22         Q  If you want to withdraw the last one, Colonel Bowen--

23    As a matter of fact, wasn't the original of MDA prepared in your

24    office and under your supervision in connection with the first

25    trial of this case?

35b

1      A   This appears to conform to a map which was prepared

2   in my office, under my direction and supervision.

3      Q   All right.   Then you do know what the lines that appear

4   the broken dash-dot lines appearing on MDA indicate, do you

5   not?

6      A   Yes, sir.

7      Q   What do they indicate?

8      A   They indicate the crest of the watershed of the Santa

9   Margarita River.

10      Q   Now, will you approach the board with a pointer, and

11   take this with you for reference, and show the Master where the

12   watershed line delineated on MDA differs from the watershed line

13   delineated on M-13?

14      A   Your Honor, the difference between the watershed line

15   as delineated on MDA from that delineated on Plaintiff's Exhibit

16   M-13 is in this area through the south Costa Mesa, extending to-

17   ward the Pacific Ocean in relation to the Boat Basin which is

18   shown on the shoreline of the Pacific Ocean.

19      THE MASTER:   Just south of it are the letters "San"--

20      THE WITNESS:   The San Luis Rey, yes, sir.   On MDA the

21   watershed line joins the Pacific Ocean northerly from the Boat

22   Basin and on Plaintiff's Exhibit M-13 it joins the watershed

23   line of the Santa Margarita River joining the ocean at a point

24   southerly of the Boat Basin.

25

36b

BY MR. SACHSE:

Q   Will you take a pencil and mark on M-13 where the water-shed appears on MDA, as indicated on MDA, with relation to the Boat Basin area?

A   Referring to Plaintiff's Exhibit M-13, using a red pencil, the watershed line as it appears on Defendant's Exhibit marked for Identification MDA--

Q   That is not much of a red pencil.  Maybe this is better, Colonel.

A   I will make it heavier.  The red line superimposed north of the Boat Basin on Plaintiff's Exhibit M-13 would mark the approximate location of the watershed line as it appears on Defendant's Exhibit marked for Identification MDA.

Q   You can resume your chair, Colonel.  Would you care to estimate the acreage involved in that area between the red lines on M-13?

MR. VEEDER:  I object to that as being beyond the scope of direct examination.

MR. SACHSE:  If the Court please, this is cross-examination, and if it has no other value it may have impeachment value.

THE MASTER:  I think that it is proper cross-examination to test the accuracy of statements of the witness with reference to the watershed.  The objection is overruled.

BY MR. SACHSE:

Q   How many acres do you think there are in there?

37b

A   I would estimate there is about 160 or 70 acres in that triangle.

Q   In othrr words, about 160 or 70 acres included within the watershed as delineated on M-13 that is not included within the watershed as delineated on MDA.  Is that right?

MR. VEEDER:   Has MDA been offered?

MR. SACHSE:   Not yet.  It will be.

MR. VEEDER:   I think it  should be offered before there is any more testimony on it.

MR. SACHSE:   May I offer the question and then I will lay the foundation and offer it.

MR. VEEDER:   I object to the question.

THE MASTER:   The question is proper even though the document has not yet been offered.

THE WITNESS:  Yes, sir.  That is correct.

BY MR. SACHSE:

Q   Now, you testified a moment ago, I believe, that MDA is a photographic reproduction of a document which was prepared in your office under your supervision in connection with this trial. Is that right?

A   I testified that it appeared to be, yes.

Q   It appears to be.  Do you believe you could verify that by checking your file?

A   I very likely have the original in my file.

Q   Then I will not offer it at this time. Instead I will ask

771

38b

1    Colonel Bowen if he will be good enough to produce the original

2    here at our next hearing.

3        THE MASTER:  Very well.  Will you examine your file be-

4    tween tonight and tomorrow morning and see if you can find the

5    original of Exhibit MDA for Identification?

6        THE WITNESS:  Yes, sir.

7    BY MR. SACHSE:

8        Q  Now, Colonel Bowen, in connection with your testimony

9    this afternoon concerning the basin of the Santa Margarita River,

10   I particularly am referring now to Exhibit M-33H, and Exhibit

11   M-14, I would like to get a little more clearly in my mind the

12   boundaries of the basin.

13       Referring to M-14, your red line indicates that the basin

14   boundary apparently goes right to the middle of the Naval

15   Hospital.  Is that right?

16       A  Yes, sir.

17       Q  And that Lake O'Neill, as such, is not properly within

18   the basin.  Is that correct?

19       A  Right at the moment I couldn't say whether a portion of

20   the ground upon which Lake O'Neill rests would be properly

21   included within the alluvial basin or not.  I would have to--

22   this red line on M-14 is a rough sketch, drawn from memory.

23       Q  I appreciate that.  I am just trying now to locate

24   where, exactly, the basin boundary is.  So, specifically, can

25   you say whether or not Lake O'Neill is within the basin?

A   Yes.   I would say that Lake O'Neill lies within the basin.

Q   And then, similarly, would you not say that the Naval Hospital lies within the basin?

A   Yes, sir.

Q   Calling your attention to the area indicated on M-33H as the Supply Depot, opposite the degree reading 1730, is that within the basin?

A   The area referred to lies largely within Section 24, Township 10 South, Range 5 West, as revealed on Plaintiff's Exhibit M-33H, and the answer to your question is that the area marked Supply Depot in that section does overlie the ground water basin of the Santa Margarita River.

Q   Now, immediately to the southwest of the structures shown as being the Supply Depot, is a large bare area on the map. Is that within the basin?

MR. VEEDER:   M-33H?

MR. SACHSE:   M-33H, yes.

Southeast--pardon me, Mr. Reporter.

THE WITNESS:   Referring to Plaintiff's Exhibit M-33H, lying partly within Section 24, Township 10 South, Range 5 West, and partly within Section 19 Township 10  South, 4 West, is the bare area, as counsel has described it, and that area also is part of the Santa Margarita River ground water basin.   It overlies it.

40b

Q  All right.  Now, referring to just that bare area to which you have just testified, and the Supply Depot area to which you have testified in answer to the preceding question, is there ground coverage for forage purposes raised in either of those areas?

A  No ground forage for--no ground cover for forage purposes in the Supply Depot area, but there is within the so-called bare area, in part of it.

Q  Do the Marines carry on field training activities, sniping, concealment and so forth, in this Supply Depot area?

A  Well, there is a regiment billeted in that area, and they carry out certain training requirments.

Q  Requirments causing natural ground cover in the Supply Depot area?

A  No, sir.

Q  Is there any training activity carried on in the bare area to the south and west of the Supply Depot?

A  Yes, sir.

Q  That requires natural ground cover?

MR. VEEDER:  I am going to ask you to indicate the point you are testifying to hereafter, if you will, a little more specifically.

THE WITNESS:  With reference to this area located partly in Section 24, 10 South, 5 West, and partly within Section 19, 10 South, 4 West, described by counsel as the bare area,

41b

1    MR. VEEDER:  What is meant by the bare area, please?

2    THE WITNESS:  It would be the area devoid of any--

3    MR. VEEDER:  Contours?

4    THE WITNESS:  --symbols on the map; devoid of contours,

5 white in color, indicating a comparatively level surface.

6    MR. VEEDER:  This wasn't a grizzly bear?.

7    MR. SACHSE:  I think it might be helpful if we ask aColonel

8 Bowen, on M-33H, to indicate in this bare area where he believes

9 the boundary of the basin to be, with a red pencil.

10    THE WITNESS:  The boundary of the ground water basin,

11 your Honor, is at the toe of the hill formation revealed by the

12 closely spaced contours.

13 BY MR. SACHSE:

14    Q  Draw a red line on that.

15    A  And would roughly conform with the red line which I

16 commenced in the southwest quarter of the southeast quarter of

17 Section 23, 10 South, 5 West, and continue on across the southerly

18 portion of Section 24, Range 10 South, 5 West, at the point

19 where the hills meet the valley; continuing on into the south-

20 west quarter of Section 19, 10 South, 4 West, up toward the

21 center of Section 19, extending northerly into the northwest

22 quarter of Section 19, 10 South, 4 West, to the southerly line

23 of Section 18, 10 South, 4 West.

24 BY MR. SACHSE:

25    Q  Can you estimate the acreage of that : area?

42b

1      A   Well, I would estimate that area to be approximately

2   320 acres.

3      Q   Is that including the Supply buildings?

4      A   No, sir, excluding the Supply Depot shown in Section

5   24, 10 South, 5 West.

6      Q   Will you write "320" in there, please?  Now, will you

7   estimate the size of the Supply Depot, please, in acreage?

8      A   May I have a plain piece of paper, please?

9      MR. VEEDER:   While he is doing that may I ask counsel a

10  question?

11     MR. SACHSE:   Is this off the record?

12     MR. VEEDER:   No, I would like to have it on the record.

13  Have there been any amendments or changes to Plaintiff's Exhibit

14  M-16, which I have referred to as the Articles of Incorporation,

15  and concerning which you have had a different name?

16     MR. SACHSE:   To the best of my knowledge--I can answer

17  the question very readily--the only amendments are the amendments

18  that have taken place, enacted by the Legislature from time to

19  time, in the Public Utility Code, which have changed powers of

20  the District, but there is no amendment to the articles.

21     MR. VEEDER:   In other words, you made no other filings?

22     MR. SACHSE:   No other filings.  Mr. Dennis has reminded

23  me that there has been an annexation of area, but it did not

24  require a new filing.  There is no new filing, in other words.

25     MR. VEEDER:   But you have a description in there and the

43b

1    description is changed, then.  Is that correct?

2         MR. SACHSE:  Yes, the description.

3         MR. DENNIS:  The boundary.

4         MR. SACHSE:  The territory is different.

5         MR. VEEDER:  Have there been any other proceedings by the

6    Fallbrook Public Utility District in regard to internal--

7         MR. SACHSE:  There have been no internal improvements

8    in the District, and never have been.

9         MR. VEEDER:  Thank you.

10   BY MR. SACHSE:

11        Q  Are you ready to answer the question?

12        A  Yes, sir.  The area of the Supply Depot shown on

13   Plaintiff's Exhibit M-33H, contained largely within Section 24,

14   10 South, 5 West, but partly within Section 23, same Township,

15   is approximately 160 acres.

16        Q  Will you write "160" in there, please?  Now, what is

17   the area of Lake O'Neill, the surface area?

18        A  The surface area of Lake O'Neill?

19        MR. VEEDER:  At what time of the year, counsel?  When?

20        MR. SACHSE:  At full stage.

21        THE WITNESS:  The surface of Lake O'Neill is approximately

22   130 acres, maximum water level.

23   BY MR. SACHSE:

24        Q  What is the area, if you know, of the buildings and

25   grounds in the United States Naval Hospital?

44b

1    A   The area within the buildings and grounds of the U.S.

2   Navy Hospital at Camp Pendleton is approximately 40 acres.

3    Q   What is the area, if you know--if not, please calculate

4   it--of the area indicated on M-33H as being the landing field.

5    A   The area shown on Plaintiff's Exhibit M-33H, shown

6   partly in Section 18, 10 South 4 West, marked--may I have that

7   question clarified?   Are you referring now to the buildings

8   and landing strips alone, or the whole area?

9    Q   The area enclosed within the landing field; the whole

10  area of the landing field.

11   MR. VEEDER:   The lateral extremities of the runways?

12   MR. SACHSE:   That is correct, the lateral runways.

13   MR. DENNIS:   I notice additional land which is the boundary

14  of an area--

15   MR. VEEDER:   No--the outer extremities of the runway.

16  BY MR. SACHSE:

17   Q   Have you calculated it, Colonel?

18   A   I was mislead.   I would like to have the question

19  again.

20   Q   I will rephrase the question.   I would like you to

21  tell me, if you know, the area that is indicated on M-33H as

22  being the landing field, and by that I mean the buildings and

23  the landing strip area and the area included within the several

24  landing strips.

25   A   And including the taxi ways?

45b

1    Q    The taxi ways; the area within the strips and the build-

2    ings.

3    A    And the grassy area close by?

4    Q    And the area enclosed--

5    A    By the landing area?

6    Q    That is right.

7    A    I was describing the location of the area--partly with-

8    in Section 18, 10 South 4 West, and partly within Section 13;

9    partly Section 24 and both of these last Sections in 10 South,

10   5 West; that area is approximately 320 acres.

11   Q    Now on M-33H, and also ajoining it on M-33J, I see an

12   area indicated rifle range.  Is that area within the basin of

13   the Santa Margarita River?

14   A    Yes, sir, the area that is shown on Plaintiff's Exhibit

15   M-33H, lying partly within Section 23 and partly within Section

16   14, 10 South, 5 West, and the continuation of the same area to

17   M-33J, lying in the same two Sections, and labeled rifle range

18   is, in fact, a rifle range.

19   Q    And what is the area?  What is the area of that rifle

20   range, if you know, or , if not, please calculate it.

21   THE MASTER:  Mr. Sachse, if you have other areas which you

22   wish to have the witness calculate--

23   MR. SACHSE:  Yes, but they are hard to follow until you

24   point them out.

25   THE MASTER:  I wonder if you would ask him to make these

779

46b

1    calculations, make them tonight and give them tomorrow.

2         MR. SACHSE:   I think that might be a good idea.

3         Q   Would you prefer to do that, Colonel Bowen?

4         A   Yes, sir.   That would be fine with me.

5         Q   We have gone as far as the rifle range, and you can

6    stop with the calculation on that now and I will ask you about

7    some more areas I want calculated.

8         Now, with reference to Exhibit M-33H, I see an area--the

9    best way I can describe it--there appears to be a railroad

10   siding, and at the southwesterly end is the word J--

11        A   Jof.   The area that counsel frefers to is a monument

12   to the first Commanding General of the Marine Corp at Camp

13   Pendleton, Joe Fegan.

14        Q   And the siding is now labeled one word, Jofega--

15        A   That is the siding of the Atchison-Topeka and Santa Fe

16   Ranch shown within Section--it is the southeastern corner of

17   Section 7, 10 South 4 West, on Plaintiff's Exhibit M-33H.

18        Q   I would like you to calculate the area enclosed within

19   the limits of Vandegrift Boulevard and the railroad sidings

20   furthest east in the river basin, and the shortest possible

21   straight line connecting Vandegrift and the sidings to the north.

22        A   Yes, sir.

23        THE MASTER:   Is there any other area?

24        MR. SACHSE:   Some of these are kind of hard to spell out.

25   Maybe I can do it very fast.

1    Q   Could you calculate for me, without me specifically

2    delineating by boundaries on the map, the area indicated on

3    M-33H as the Home Ranch which is covered by buildings, garden

4    grounds and so on?

5         THE MASTER:  Is the question specifically clear?

6         MR. SACHSE:  I have a bright idea.

7         Q   Could you calculate the area of the headquarters unit,

8    which is indicated Home Ranch there, the General's house that

9    is under irrigation as distinguished from that which might be

10   subirrigated from the ground water?  In other words, the General's

11   house and the General's lawn is irrigated.

12        MR. VEEDER:  You don't mean the General's house is irriga-

13   ted.

14        MR. SACHSE:  He gets water; it is piped in.

15        Q   Do you see what I mean, Colonel?

16        A   Yes, sir.

17        Q   Will you make that calculation, please?

18        A   Would you, for my benefit, counsel, delineate more

19   closely which area you consider the Home Ranch area?

20        Q   I consider the Home Ranch area as being the buildings,

21   outbuildings, and areas which are under irrigation as distin-

22   tinguished from subirrigation.

23        THE MASTER:  I think we have about reached the time of

24   adjournment.

25        MR. VEEDER:  I would like, if your Honor please--there

48b

1   came up the matter about the withdrawal of an exhibit, Buckner's

2   exhibit, the photograph which was marked M-49--we said we

3   would reproduce it.

4   THE MASTER:  You wish to withdraw that to reproduce it?

5   MR. VEEDER:  Yes.  I can take it to the office this

6   evening.

7   THE MASTER:  Yes, you may withdraw that with the under-

8   standing that you will make copies for counsel and for yourself.

9   MR. VEEDER:  Yes.  May I inquire, Mr. Sachse, how much

10   more cross-examination you are going to have tomorrow?

11   MR. SACHSE:  At the speed we are going I would say my

12   cross-examination ought to take--when do we meet next week?

13   THE MASTER:  Monday, Tuesday and Wednesday.

14   MR. SACHSE:  I will be through about Tuesday night of

15   next week.

16   MR. VEEDER:  All joking aside--

17   MR. SACHSE:  I am not joking.  I am serious.

18   MR. VEEDER:  It will not be necessary for me to have a

19   witness here tomorrow at all?

20   MR. SACHSE:  Absolutely no necessity.

21   MR. STAHLMAN:  When are the hearings?

22   THE MASTER:  Tomorrow of this week, and Monday, Tuesday

23   and Wednesday of next week.

24   MR. SACHSE:  You won't need any witness tomorrow.

25   MR. VEEDER:  You will give me time?

49b

1          MR. STAHLMAN:   I will probably be going until about

2     Christmas.

3          THE MASTER:   We will adjourn until 9:30 tomorrow.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25