Case 3:51-cv-01247-JO-SBC Document 4727 Filed 09/24/63 PageID.43219 Page 1 of ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

## REPORTER'S TRANSCRIPT

| | |
|---|---|
| **Volume:** | VII |
| **Pages** | 783 - 928 |
| **Date:** | June 5, 1958 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1
2
3       APPEARANCES:

4           WILLIAM H. VEEDER, ESQ.,
5               For the United States of America

6           WILLIAM E. BURBY, ESQ.,
                For the United States of America

7           FRANZ R. SACHSE, ESQ.,
8               For Fallbrook Public Utility District

9           GEORGE STAHLMAN, ESQ.,
                For Vail Company

10          W. V. DENNIS, ESQ.,
11              For Santa Margarita Mutual Water Company

12          ADOLPHUS MOSKOVITZ
                For the State of California

13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX TO WITNESSES

For the Plaintiff:                           D        X        RD        RX

    Allen C. Bowen                                    788

INDEX TO EXHIBITS

| For the Defendants: | Ident. | Rec'd. |
|---|---|---|
| MDA | | 790 |
| MDB | 905 | 906 |
| MDC | 906 | 907 |
| MDD | 908 | 908 |

1    Fallbrook, California, June 5, 1958, 9:30 a.m.

2

3    MR. SACHSE:  Will you resume the stand.

4    THE MASTER:  Since this is a play with a changeable cast,

5    I think each morning we should have the list of appearances

6    for that particular day.  So will counsel state their appear-

7    ances.

8    MR. VEEDER:  William H. Veeder and William E. Burby for

9    the United States.

10   MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility

11   District and named defendants.

12   MR. STAHLMAN:  George Stahlman for the Vail Company.

13   MR. DENNIS:  W. V. Dennis for the Santa Margarita Mutual

14   Water Company.

15   THE MASTER:  Are there any defendants here in pro per who

16   are not represented by attorneys?  Apparently not.

17   MR. DENNIS:  If your Honor please, I think it might be

18   well to have some expression from the Master in regard to two

19   matters that concern my client.  First, as you recall, there

20   was an order made by the Court ordering a special trial as to

21   Santa Margarita, the State of California, and the Fallbrook

22   Public Utility District.  Subsequent to the time that order was

23   made and subsequent to the time that there was a pretrial order

24   and order on pretrial hearing made by Judge Yankwich approving

25   certain stipulations to facts and reciting also certain

1   contentions of the government and the two parties involved,

2   other two parties, the State of California and the Santa Mar-

3   garita Mutual Water Company and the Fallbrook Public Utility

4   District, the case went to trial only as against Santa Mar-

5   garita and the State of California, Fallbrook having obtained

6   an alternative writ of mandate prohibiting going to trial as

7   to Fallbrook.   The case was tried.   Plaintiff' put in a large

8   number of exhibits.   And the case was submitted.   And sub-

9   sequently a judgment was entered as to the State of California

10   and Santa Margarita Mutual.   That judgment was reversed.   There

11   is some question perhaps in the minds of some of the people

12   involved as to whether or not the judgment only reversed the

13   order of the court in entering final judgment.   It did recite

14   that the separate trial as to separate defendants was within

15   the discretion of the trial court.

16      The question that I have in mind now is are the exhibits

17   which the plaintiff introduced in evidence at the trial of the

18   action against the State of California and as against the Santa

19   Margarita Mutual Water Company before the Master for his con-

20   sideration in this hearing?

21      And second, is it the intention of the Master to treat

22   this proceeding as a trial de novo or a proceeding de novo so

23   far as the Santa Margarita Mutual Water Company is concerned?

24      I think that we are approaching that point where at least

25   we should have some understanding, if not a ruling.   So far as

1    I know when the judgment on appeal came down the Clerk set

2    aside the judgment which was entered, but there has never been

3    any order setting aside the order of the judge submitting the

4    case between Santa Margarita, the State of California and the

5    United States of America.  The order requiring a separate trial

6    as to the three defendants has never been set aside, nor has

7    there been any order setting aside the original order on pre-

8    trial and order on pretrial hearing.

9        MR. VEEDER:  Mr. Dennis, you were asked by the Court to

10   prepare such an order and tender it to all parties in regard

11   to the revocation of the order, as I remember.

12       MR. DENNIS:  That is correct.

13       MR. VEEDER:  And I think that that would be an initial

14   step to take in regard to this matter.

15       Secondly, I believe that in light of the rulings that

16   were made yesterday by your Honor that the issue which Mr.

17   Dennis has raised could only properly be considered by the

18   Court.

19       THE MASTER:  I think that is true.  I might make this

20   observation, that I do not see how exhibits which have been

21   introduced at the so-called prior separate trial could be

22   considered at the present hearing, unless they were at least

23   reintroduced here, because we now have additional parties.

24   They certainly would be admissible, if at all, only as against

25   the plaintiff, and not as against any of the other defendants.

1   And that would so limit their value that I would think the

2   orderly course to pursue would be to, in effect, offer them

3   again for whatever purposes they might be pertinent in the

4   proceeding before me or in the subsequent trial before Judge

5   Carter.   I would think the same rule would prevail there.   Of

6   course, I am not in any way trying to bind Judge Carter as to

7   how he might rule if the question were presented to him.

8       MR. DENNIS:   That is perfectly satisfactory.   I just

9   thought we should have an understanding, because if you had a

10   contrary opinion I didn't want to clutter up the record with

11   a lot of offers.

12       THE MASTER:   Mr. Sachse, you may proceed.

13

14               ALLEN C. BOWEN,

15   resumed the stand, testified further as follows:

16

17               CROSS-EXAMINATION (Cont.)

18   BY MR. SACHSE:

19       Q   Colonel Bowen, you were going to check your file and

20   see if you could find the original of MDA for Identification.

21   Did you succeed in doing that?

22       A   I didn't find the original, Mr. Sachse, but I did find

23   a photostatic copy of that particular sheet in my files.

24       MR. SACHSE:   May I have MDA also, Mr. Clerk?

25       Q   Have you compared the two photostats?

5-L

1          A   Yes, sir.

2          Q   And they were prepared in your office, under your

3     direction?

4          A   Yes, sir.

5          MR. SACHSE:   I will offer in evidence MDA for Identifi-

6     cation, if your Honor please.

7          THE MASTER:   It will be received.

8          MR. VEEDER:   I am going to object on the grounds that

9     your Honor has already ruled that only matters relating to

10    De Luz Creek could be admitted here.   And I further object on

11    the grounds that these exhibits which are being offered are --

12    at least an attempt is being made to ascribe them to the United

13    States of America.   We, of course, state that they are in error,

14    based upon investigations which we have now made.   I don't know

15    whether you are attempting to impeach this witness or not, Mr.

16    Sachse, but I certainly believe that if you are attempting to

17    do so it is contrary to the rulings of the Special Master in

18    regard to the scope of this proceeding.   I understood from the

19    rulings made yesterday that we were to consider only here the

20    respective rights of the small users on De Luz Creek.   So I

21    think that we are going far overboard now in the approach that

22    is being taken.

23         THE MASTER:   I believe that the objection is not well

24    taken.   The purpose of the exhibit, as I understand it, is to

25    show a discrepancy between that indication of the boundary of

the watershed and the boundary shown on the exhibit of the government. I do not know of any rule which limits the search on cross-examination as to accuracy to the precise issues before the court. Now I would not permit detailed examination as to the effect of this change upon the rights of the plaintiff in the Camp Pendleton area. But for the purpose for which I conceive it to be offered, I take it it is proper, and the exhibit will be admitted in evidence as Exhibit MDA.

BY MR. SACHSE:

Q   Colonel Bowen, the delineation of the watershed line on MDA is not the same as the delineation of the line on M-13, is it?

A   There is a variance.

Q   And MDA was prepared, you have testified, under your direction?

A   Yes, sir.

Q   I believe that on the first trial of this cause --

MR. VEEDER:   I am going to object to any further reference to the first trial of this case as being incompetent, irrelevant and immaterial, and going far beyond the scope of the direct examination.

MR. SACHSE:   If your Honor please, for impeachment purposes I can use a prior transcript to the same extent as I can use a deposition. If I can find inconsistencies between the testimony of the witness under oath on one occasion in a prior trial of

1     this same cause and testimony in this case, that is certainly

2     proper impeachment.

3       THE MASTER:  The objection is overruled, Mr. Veeder.

4    BY MR. SACHSE:

5       Q  I am reading, Colonel Bowen, from page 354 of your

6     testimony as reported in the transcript on appeal in the prior

7     trial of this case, and I will ask if you recollect this testi-

8     mony.  Answer of Colonel Bowen:  "To determine the location of

9     the watershed of the Santa Margarita River within Camp Pendle-

10    ton I used as a base map the $7\frac{1}{2}$ minute quadrangles prepared

11    by the United States Geological Survey.  With these $7\frac{1}{2}$ minute

12    quadrangles, I personally traversed the crest of the watershed

13    and plotted the high points along it, indicating the watershed

14    on the topographic maps."

15       Do you recall making that testimony?

16       A  Yes, sir.

17       MR. VEEDER:  Your Honor, I desire to have the record show

18    a continuing objection to this whole course of testimony.  And

19    I also interpose additional objection that all this is incom-

20    petent, irrelevant, and immaterial, not tending to prove any

21    issue before your Honor because of the restricted matter into

22    which these hearings are supposed to be conducted.

23       THE MASTER:  Your objection may be regarded as continuing

24    as to questions of this particular character.  Of course, in

25    the event the inquiry takes a new line, then if you wish to

8-L

1    raise an objection you should raise it at the appropriate time.

2        MR. SACHSE:  The inquiry at the moment, your Honor, is

3    limited to impeachment purposes.

4        THE MASTER:  Yes.

5    BY MR. SACHSE:

6        Q  Now, Colonel Bowen, I will call your attention to your

7    testimony given in this proceeding on May 26 of this year as

8    reported in the official transcript, and I will ask you if you

9    recall this testimony?  Answer by you:  "The determination of

10   the location of this watershed line was made by myself,

11   travelling afoot, horseback and by jeep over the entire peri-

12   meter of the watershed, and connecting on contour maps pub-

13   lished by the United States Geological Survey the high points

14   which determine the location of this watershed."  Do you recall

15   that testimony?

16       A  Yes, sir.

17       (Adolphus Moskovitz, Esq., attorney for the State of Cali-

18   fornia, enters the hearing room.)

19   BY MR. SACHSE:

20       Q  Is it not a fact, Colonel Bowen, that what you said on

21   both those occasions is exactly the same thing?

22       A  Yes, sir.

23       Q  That you determined the high points of the watershed

24   and located it on U. S. G. S. maps after personal observation;

25   is that correct?

1      A   That is correct.

2      Q   All right.  Which of your two personal observations,

3   the one that is delineated on MDA, or the one that is deline-

4   ated on M-13, is correct?  Just tell me which one, please.

5   An explanation later, if you desire.

6      A   The one which is on MD -- correction, the one which is

7   on Plaintiff's Exhibit M-13 correctly shows the watershed

8   boundary of the Santa Margarita River as it was in the state of

9   nature.

10     MR. SACHSE:   I will move the answer be stricken as not

11   responsive.   I want to know --

12     THE MASTER:   The motion is denied.  I think the answer is

13   responsive.

14     MR. SACHSE:   All right, I will ask another question.

15     Q   Colonel Bowen, which of the delineations, on MDA or

16   M-13, shows correctly the watershed boundary as it existed at

17   the time you made the physical observation you testified to?

18     A   The watershed boundary as shown on Defendants' Exhibit

19   MDA shows the crest of the watershed as it exists under the

20   alterations imposed by construction of a boat basin and filling

21   of a tidal lagoon.

22     Q   Then the Exhibit MDA correctly delineates the watershed

23   line as it exists today; is that correct?

24     A   It delineates the watershed line as it exists today,

25   yes, sir.

Q  And then Exhibit M-13 does not correctly delineate it as it exists today; is that correct?

A  That is right.  But it does correctly delineate it as it existed in the state of nature.

Q  In other words, M-13 represents the attempt of your office to hypothetically reconstruct the contour of the area delineated in administrative area 21 on M-13?

A  No, sir.  The contours have not been changed.  The only alterations that have been made are down here on the beach. This tidal lagoon formerly extended --

MR. VEEDER:  I am going to ask the question now.  "The only alteration".  Will you be explicit?  The only alteration to what?

THE WITNESS:  The only alteration to the drainage area of the Santa Margarita River is as it is affected by the construction of a boat basin and filling of a tidal lagoon which formerly extended through the present boat basin site.

BY MR. SACHSE:

Q  Colonel Bowen, I call your attention to your testimony given on May 26 as reported on page 278 of the transcript, where the following answer is reported, and ask you if you recall this answer:  "As I pursued this journey" -- referring to your journey by jeep, horseback and on foot -- "I observed these points from which water flowing on the surface of the ground would flow partly into the Santa Margarita watershed and

partly into the adjoining watershed.   At the ridge, standing

on the ridge the water flowing on either side of you will flow

in opposite directions."  Continuing to describe adjoining

watersheds.  Now today, standing on the watershed line as

delineated on MDA, does the water flow to the south or to the

north?

A  With reference to Defendants' Exhibit MDA, the crest

of the watershed of the Santa Margarita River as it is shown

immediately to the north of the boat basin within Camp Pendle-

ton correctly separates the water which would flow into the

Santa Margarita River and that which would be intercepted by

the boat basin.

Q  In other words, water falling on the watershed as

delineated on MDA will divide at that line, some flowing south

to the boat basin, some flowing north to the Santa Margarita;

is that your testimony?

A  Yes, sir.

Q  Now, Colonel Bowen, yesterday we also asked you if you

could make some calculations.

MR. SACHSE:  Mr. Clerk, may we have M-35.  No, wait a

minute, not M-35.  It is the Oceanside Quadrangle, M-33.  What

was the number?  I will get it in just a moment.  Just a

second, Mr. Reporter.  Off the record while I find it.

(Discussion off record.)

MR. SACHSE:  M-33A, Mr. Clerk, M-33H and M-33J.  That is

Oceanside, Morrow Hill and Las Pulgas Quadrangles.

MR. VEEDER:  What is that?

MR. SACHSE:  I want A, H and J.

Q  Colonel Bowen, did you make a calculation of -- I am referring now to M-33H.  We requested you to make some calculations of acreage of areas delineated on M-33H.

MR. VEEDER:  At this point I interpose an objection on the ground that this testimony is incompetent, immaterial and irrelevant in regard to this Special Master's hearing, going beyond the scope of the order of reference.

MR. SACHSE:  Now, if your Honor please --

THE MASTER:  Mr. Veeder, it is directed to evidence which you brought out on your direct examination.

MR. SACHSE:  That is right.

THE MASTER:  And I believe it is therefore pertinent.  The objection is overruled.

BY MR. SACHSE:

Q  Did you calculate those acreages as I requested you, Colonel Bowen?

A  Yes, sir.

Q  I believe I asked you the acreage of the rifle range which is delineated partly on M-33H and partly on M-33A.  No, wait a minute.  Partly on M-33J.  Did you calculate that acreage?

A  Yes.

1    Q  And what did you find the acreage to be?

2    A  The area of the rifle range, which is shown partly on

3  Plaintiff's Exhibit M-33H and partly on Plaintiff's Exhibit

4  M-33J, lying partly within Section 14 and partly within Section

5  23, Township 10 South, Range 5 West, is approximately 770 acres.

6    Q  Did you also calculate the acreage of the industrial

7  area which we delineated as the Joe Fegan area?

8    A  Yes, sir.

9    Q  And what do you find the area to be?

10   A  The area described as the Joe Fegan siding, shown on

11 Plaintiff's Exhibit M-33H, and lying largely within Section 8,

12 10 South, 4 West, is approximately 40 -- four-zero - acres.

13   MR. VEEDER:  Your Honor, I would like the record to show

14 that the State of California is now represented in this hearing.

15   THE MASTER:  Yes.  The record will show Mr. Moskovitz has

16 entered during the proceedings.

17 BY MR. SACHSE:

18   Q  Did you also calculate, Colonel Bowen, that portion of

19 the home ranch area which is irrigated, as distinguished from

20 subirrigated, or is in dwelling houses?

21   A  Yes, sir.

22   Q  What was that area?

23   A  Approximately 2 acres.

24   MR. SACHSE:  Now may I have, Mr. Clerk -- I think I can

25 find it.

1      (Discussion off record.)

2      MR. SACHSE:  I would like M-65, Mr. Clerk, also M-660,

3  M-66P and M-66K. O, P, and K.

4      THE MASTER:  Mr. Sachse, are you through with these

5  exhibits?

6      MR. SACHSE:  No, sir.

7      MR. VEEDER:  Your Honor, I ask leave to have Colonel

8  Robertson join us at the counsel table, so he could help follow

9  through on the exhibits, if it is permissible.

10      THE MASTER:  Yes, the Colonel may join you.

11      THE CLERK:  66A?

12      MR. SACHSE:  No, 660, P and Q.

13      Q  Colonel Bowen, calling your attention first to Exhibit

14  M-660 -- P.  Pardon me, M-66P.

15      MR. SACHSE: I am going to be pointing to some things on

16  this exhibit, Mr. Veeder, if you want to come up here.

17      Q  The area in the southwest corner, extending out of the

18  matching lines and into the matching lines, and roughly tri-

19  angular in shape, is the airfield, is it not?

20      A  Referring to Plaintiff's Exhibit M-66P, the area

21  described by Mr. Sachse as lying partly within the lower left-

22  hand corner of the area within the match lines and partly

23  without that area within the match lines  comprises the air-

24  strip at Camp Pendleton.

25      Q  And is that the same airstrip and in the same location

1  as the airstrip indicated on M-33H?

2  A  Yes, sir.

3  Q  Now, the area immediately adjoining the airstrip,

4  referring now to M-33P, which in the aerial photograph appears

5  to be occupied by buildings, is that the supply area, which

6  is also shown on M-33H?

7  A  The area shown on Plaintiff's Exhibit M-66P which lies

8  southerly of the airfield and across Vandegrift Boulevard,

9  which is the road which traverses M-66P from the southwest

10  corner generally towards Lake O'Neill in the northeast corner,

11  is the industrial area which is shown on Plaintiff's Exhibit

12  M-33H, lying partly within Section 23 and partly within Section

13  24, 10 South, 5 West.

14  Q  And indicated on M-33H as "Supply Depot"; is that

15  correct?

16  A  That is correct.

17  Q  Now calling your attention on M-66P to the area im-

18  mediately southwest of the Supply Depot buildings there appears

19  on the photograph what appears to me to be structures of some

20  kind.  Can you tell me what they are?

21  A  Yes, sir.  That area referred to as lying southeast

22  of the easterly end of the Supply Depot is illustrated on

23  Plaintiff's Exhibit M-66P as a regimental barracks area.  The

24  buildings that are pictured there are barracks, administration

25  buildings, mess halls and so forth.

16-L

800

1    Q   Now those buildings do not show on M-33H, do they?

2    A   No, sir.   They are not shown on the Plaintiff's

3    Exhibit M-33H.

4    Q   Now, Colonel Bowen, if you want to make some notes

5    again I am going to ask you if you will calculate also the

6    area of that regimental building area.

7    MR. VEEDER:   I want to object.

8    MR. SACHSE:   May I finish the request? -- area in the same

9    fashion that you calculated the area of the other item I asked

10   for yesterday.

11   MR. VEEDER:   I am going to object to the testimony on the

12   ground it is going beyond the scope of the direct examination.

13   Moreover, I am going to object on the grounds that the refer--

14   ence to M-66P, as it was not offered and could not be used for

15   the purpose of proving acreages by reason of the aerial dis-

16   tortion.   The witness couldn't possibly calculate acreages, nor

17   was this exhibit offered for the purpose of showing acreages

18   outside of match lines.

19   MR. SACHSE:   I will accept the latter objection by Mr.

20   Veeder and I will rephrase my request.

21   Q   Colonel Bowen, will you please calculate on the ground

22   for me the acreage of the regimental area depicted on M-66P?

23   MR. VEEDER:   In other words, you are withdrawing your

24   original question?

25   MR. SACHSE:   I will withdraw the request he calculate it

1    from the photograph and I will ask that he calculate it on the

2    ground.

3        THE WITNESS:  Yes, sir.

4    BY MR. SACHSE:

5        Q   Now still using M-66P for reference purposes, Colonel --

6        THE MASTER:  Do you wish the witness to make the calcu-

7    lation now?

8        MR. SACHSE:  No.  I just wanted to give him time to make

9    his notes.  If he wants, that is before our next session.

10       MR. VEEDER: Mr. Sachse, why don't you refer to the proper

11   exhibit, rather than 66P.  There is an aerial that will disclose

12   the particular area to which you are making reference.  I am

13   perfectly willing to have Colonel Bowen do what you are asking

14   him to do, but why not get the proper exhibit.

15       MR. SACHSE:  If Colonel Bowen understands the request I

16   made --

17       THE MASTER:  I think it is immaterial from what information

18   he makes the calculation.  He can make it either from the

19   proper aerial photograph or any way he desires.

20       MR. VEEDER:  It is 660, is the proper one, is it?

21       MR. SACHSE:  Is this the one the proper reference would

22   be to?  That is the point I am trying to make.

23       THE MASTER:  Colonel Bowen could use that or anything else

24   he wishes.

25

1    BY MR. SACHSE:

2       Q  Colonel Bowen, still referring to Plaintiff's Exhibit

3    66P, M-66P, in the upper left center of the area enclosed in

4    the match lines I see an area delineated that appears to me to

5    be covered with buildings.  Will you tell me what that area is?

6       A  Depicted on Plaintiff's Exhibit M-66P, in the upper

7    left quadrant of the area contained within the match lines is a

8    camp which is known as Vado del Rio, Camp Vado del Rio.

9       THE COURT:  V-a-d-o?

10      THE WITNESS:  Yes, sir.

11   BY MR. SACHSE:

12      Q  Calling your attention to M-33H, is Camp Vado del Rio

13   located within the -- withdraw that.  Is the area where Camp

14   Vado del Rio is located part of the land overlying the subbasin

15   of the Santa Margarita River?

16      A  No, sir.

17      Q  Now, still referring to M-66P, I will call your at-

18   tention to an area in the upper right quadrant of the match

19   lines, touching the northerly match line, and ask you what that

20   area is.

21      A  The area referred to, Mr. Sachse, is the Joe Fegan

22   siding, with attendant warehouse.  This spur here running gener-

23   ally north and south as depicted on Plaintiff's Exhibit M-66P

24   is the same as the spur track symbolized on Plaintiff's Exhibit

25   M-33H, lying within the southwest quarter of Section 8, 10 South,

1   4 West.

2       Q   Now, Colonel Bowen, it appears from the aerial photo-

3   graph taken in 1955 that a substantial area lies westerly of

4   the siding you just delineated; is that correct, the area you

5   just delineated on M-33H?

6       A   I just discussed the spur siding, Mr. Sachse.

7       Q   Let me ask you this then.  I want to make it short.

8   With reference to the calculation you made last night of the

9   Joe Fegan area, did you calculate the entire area that appears

10  to be developed in the photograph, M-66P, or did you only

11  calculate the area that appears on M-33H?

12      MR. VEEDER:  Now your request, Mr. Sachse, was to M-33H?

13      MR. SACHSE:  That is correct.  I want to find out if he

14  calculated the rest.  If not, I am going to ask him to.

15      THE WITNESS:  You requested me to determine the triangular

16  area enclosed by the spur track, the shortest line, straight

17  line from the end of the spur track to Vandegrift Boulevard,

18  and around Vandegrift Boulevard, as depicted in the southwest

19  quarter of Section 8 --

20      MR. SACHSE:  That is correct.

21      THE WITNESS: --10 South, 4 West, Plaintiff's Exhibit M-33H.

22  And that was the figure that I gave you on the question this

23  morning.

24  BY MR. SACHSE:

25      Q   Then will you please calculate the remainder of that --

1    I believe you referred to it as "industrial area"--lying

2    westerly and northerly of the railroad siding you referred to.

3    Do you know to what I am referring, Colonel?

4        A   That area that lies westerly from the Joe Fegan spur

5    is loose stores connected with the reclamation and salvage areas.

6    It is sometimes occupied with loose stores, it sometimes isn't.

7    There are no permanent buildings or structures in there.

8        Q   Is there permanent forage and grass cover growing on

9    it?

10       A   No, sir.  There is forage and grass cover from time to

11   time.

12       Q   Well, will you please calculate it?

13       A   Yes, sir.

14       Q   Now, Colonel Bowen, I am calling your attention to

15   M-660, and I will call your attention to some dark areas that

16   appear in the upper right-hand corner of the photograph, not

17   the match lines.  It looks like rather dark areas.  Can you tell

18   me what those are?

19       MR. VEEDER:  I am still objecting.  He is going beyond

20   the scope of the direct examination, for I did not refer to

21   anything of that character in the direct examination.

22       MR. SACHSE:  Perhaps the objection is well taken.  Let me

23   save time.

24       Q   Is the thing to which I am pointing, whatever it is,

25   is it within the basin of the Santa Margarita as delineated on

1  M-33H?

2      THE MASTER:  It also appears to be on M-66P, the same.

3      MR. SACHSE:  That is right. the same one appears on M-66P.

4      THE WITNESS:  Yes, sir.

5  BY MR. SACHSE:

6      Q  That is within the basin area of the Santa Margarita

7  River as depicted on M-33H, to which you testified yesterday?

8      A  Yes, sir.

9      Q  All right.  Will you tell me what it is, please?

10     A  The dark area referred to by Mr. Sachse, which appears

11  on Plaintiff's Exhibit M-66P, on the far left edge, western

12  edge of the photograph, and immediately to the left of the

13  numeral "4-0090" is a sewage effluent lagoon.

14     Q  Can you tell me how many acres that covers, or will

15  you make such calculation for me, please?

16     A  We will determine that.

17     MR. VEEDER:  Couldn't this be materially shortened, your

18  Honor, by simply having the United States agree to produce the

19  acreage, within that acreage that constitutes the surface of

20  the subterranean basin, to show the difference between the

21  forage area and the industrial areas and the camp areas,

22  instead of depicting each little bit as we are doing today?

23  We are perfectly glad to do it.  I will be more than happy to

24  do it.

25     MR. SACHSE:  Let me finish.  You have got testimony in the

1   record there is 4600 acres in the basin, and I have a calcu-

2   lation made by Colonel Bowen multiplying 4600 acres by 1.4

3   acre feet.

4        MR. STAHLMAN:  5300.

5        MR. SACHSE:  Thank you, Mr. Stahlman.

6        MR. VEEDER:  All I do is pull a plug and you make a speech.

7   All I want to do is tender to him a calculation of every acre-

8   age covered in the basin, covering the sewage effluent acres.

9        MR. SACHSE:  I will be happy to have that.

10        THE MASTER:  If you will prepare that, Mr. Veeder, that

11   will shorten it.

12        MR. SACHSE:  That will shorten it very much.

13        MR. DENNIS:  Mr. Veeder, does that also include the area

14   in which Colonel Bowen testified haywas raised on the Ysidora

15   Basin?

16        THE MASTER:  Very well, it will include that area also.

17        MR. VEEDER:  Yes.

18        MR. SACHSE:  Now, Mr. Clerk, may I have M-66M.  This is

19   for a different purpose.

20        THE MASTER:  M-66M.

21        MR. SACHSE:  You had better stay here, Mr. Veeder, for I

22   want to ask what some things are, for I don't know.

23        Q  Now, Colonel Bowen, referring to M-66M, and calling

24   your attention to the Santa Margarita River winding down through

25   the upper left quadrant, I see a dark line which appears to

have been drawn on the map, and has teeth, like teeth of a

comb, extending downstream.  What is that?

A   That is a channel spreading structure.

Q   Now at a point somewhat farther downstream I see a

similar dark line, not quite as long, with teeth like a comb.

What is that?

MR. VEEDER:  I am going to object.  That is going far

beyond the scope of the direct examination.

THE MASTER:  What is the purpose of this question, Mr.

Sachse?

MR. SACHSE:  The photos are in evidence.  I want to know

what it is.  I didn't know.  It is a truthful question.  I had

no idea what it is.  The photos are in evidence.  How can I

cross-examine if I don't know what things depicted on the

photograph are.  I have no question in regard to this channel

spreading structure.  I wanted to know what it is.  That is all.

THE MASTER:  I think that question is proper.  The ob-

jection is overruled.

MR. STAHLMAN:  Am I correct these photographs were intro-

duced for the limited purpose of showing the soil studies?

MR. VEEDER:  These were offered to show the areas, yes.

Well, they are in for all purposes, but so far as this hearing

is concerned they relate only to the acreages which are in

competition with the De Luz area.

MR. SACHSE:  Mr. Veeder, all I wanted to know is what they

1   are.  I have been told.

2       MR. VEEDER:  All right.

3       MR. SACHSE:  I think there is one or two others.  I want

4   to find out what something is.  Just a moment.

5       Q  Outside of the matching lines, and upstream, is what

6   appears to be not drawn in, but photographed in, a gray shallow

7   V across the river bed, with a dark area behind it.  Can you

8   tell me what that is?

9       MR. VEEDER:  I want to make an objection for the reasons

10  that I have said before.  It goes behond the scope of this

11  hearing and goes beyond the scope of the direct examination.

12      THE MASTER:  The objection is overruled.

13      THE WITNESS:  Yes, sir.  I can tell you from this photo-

14  graph what that is.  That would be symbolized on that aerial

15  4-0092.  That is an earth fill channel spreading structure too,

16  your Honor.

17  BY MR. SACHSE:

18      Q  What is the dark area in the photograph upstream from

19  it?

20      A  The dark area upstream from the channel spreading

21  structure, appearing in the upper center portion of Plaintiff's

22  Exhibit M-66M, is water surface.

23      Q  Impounded behind this structure?

24      A  Yes, sir.

25      MR. SACHSE:  M-66Q, please.

THE CLERK:  Q?

MR. SACHSE:  Q.

Q  Now in M-66Q, in the upper right-hand quadrant, appears another dark line, with teeth like a comb.  Would you tell me what that is?

A  Yes.

MR. VEEDER:  May I have a continuing objection?

THE MASTER:  It is understood.

THE WITNESS:  In the upper right-hand quadrant, within the area delineated by match lines on Plaintiff's Exhibit M-66Q, is a symbol indicating an earth fill structure astride the Santa Margarita River.  And I have previously testified that that was commonly called the O'Neill diversion structure.

Q  This is the O'Neill diversion to which you testified, then?

A  Yes, sir.

MR. VEEDER:  That is all of this?

MR. SACHSE:  That is all for the moment, please.

Q  Now, Colonel Bowen, when were these photographs, M-66 series, flown?

A  The day of the month, the month and the year are shown on each, and I am not absolutely certain they were all flown on the same day of the same month.  But referring specifically to M-66Q, that picture was taken on the 29th of March, 1955.

Q  In other words, the date that appears on each of these

810

1    photos is the date at which it was flown; is that correct?

2        A   Yes, sir.

3        Q   Colonel Bowen, on my last visit to Camp Pendleton I

4    noticed an area which does not appear to me on the photograph,

5    M-66Q.

6        MR. VEEDER:   Now I object to this because it is clearly

7    beyond the scope of the direct examination.

8        MR. SACHSE:   Please let me finish.

9        THE MASTER:   Let's see what the question is.

10       MR. VEEDER:   A man goes out and checks.

11   BY MR. SACHSE:

12       Q   I noticed an area which appears immediately downstream

13   southwest of the Lake O'Neill dam, which appeared to me to be

14   cut up into what I would describe as -- they look like rice

15   checks.   Do you know what a rice check is?

16       A   Yes, sir.

17       Q   Is there such an area there today?

18       MR. VEEDER:   I am objecting to this because this is clearly

19   beyond the scope of the direct examination and has nothing to

20   do whatever with the evidence that is now in the record, not

21   proper cross-examination.

22       THE MASTER:   I believe it goes to the question as to

23   whether the pictures which were taken in 1955 are a correct

24   portrayal of the area today, and I believe for that purpose it

25   is admissible.   I assume he is not going to go into any detail

1    beyond the mere physical condition of the property.

2         MR. SACHSE:  I want to identify the physical condition,

3    and if it is what I think it is I will ask him for a further

4    calculation.

5         Q  You know what a rice check is?

6         A  Yes, sir.

7         Q  Then you know what the area is to which I refer?

8         A  Yes, sir.

9         Q  Now what is it?

10        MR. VEEDER:  I object.

11        THE MASTER:  Your objection will be considered to be a

12   continuing objection.

13        THE WITNESS:  The area referred to, Mr. Sachse, is shown

14   on Plaintiff's Exhibit M-66Q immediately west of the Navy

15   Hospital and Lake O'Neill.  And the checks referred to are

16   border checks in an area used for spreading water.

17   BY MR. SACHSE:

18        Q  Will you please make a separate calculation?  In other

19   words, do not simply include it in the blanket calculation

20   that Mr. Veeder is making, but make a separate calculation of

21   the area of that spreading basin.

22        A  Yes, sir.

23        Q  Now, Colonel Bowen, referring to your testimony yes-

24   terday on the general subject of the effect of the lowering

25   the water table in the basin, I understood you to testify that

1    a one foot lowering of the water table would result in the death

2    of shallow-rooted grasses; is that correct?

3        A   Yes, sir.  If that one foot lowering of the elevation

4    of the water plane occurred about at the lower extremity of

5    the grass roots.  It would have to be a particularization

6    within the profile of the basin.

7        Q   You gave us a depth range for trees and deep-rooted

8    grasses, as I recall, of 14 to 21 feet.

9        A   I believe it was 14 to 20 feet.

10       Q   14 to 20 feet.  But my notes do not indicate that you

11   gave us any range of the rooting system for what you describe

12   as shallow-rooted grasses.  What is their rooting range?

13       A   I would say 3 to 6 feet.

14       Q   3 to 6 feet?

15       A   Yes, sir.

16       Q   In other words, if the water table in any basin was

17   6 feet below the surface, then no grasses would grow except

18   insofar as they were irrigated by winter rain, is that correct?

19       A   No, sir.

20       Q   Well, will you explain the distinction, please?

21       A   Well, there is a phreatic zone.

22   THE MASTER:   There is a what zone?

23   THE WITNESS:   Phreatic, p-h-r-e-a-t-i-c, above the surface

24   of the ground water plane.  That is the zone in which water is

25   drawn up by capillary -- capillary movement.  And capillary

1    movement can substantially extend the depth at which even

2    shallow-rooted plants -- or the depth at which the water plane

3    can be lowered without affecting even shallow-rooted plants.

4    BY MR. SACHSE:

5        Q   I think I understand that.   Then how deep is this

6    phreatic zone where the capillary action raises water in soils

7    of the type you find in the Santa Margarita River Basin?

8        MR. VEEDER:   Now I am going to object to that.   Are you

9    limiting yourself to the subterranean basin concerning which

10   the witness testified?

11       MR. SACHSE:   Yes.   I mean my questions to be limited to

12   the basin you designated as a single basin, with the subtitles

13   "upper, Chappo and Ysidora."

14       THE WITNESS:   Well, the capillary movement -- the range of

15   capillary movement varies directly with the -- correction.   It

16   varies inversely with the size of the capillary spaces.   In

17   other words, the larger the capillary spaces the less the water

18   will rise in the capillary cavity.   The smaller the capillary

19   spaces, the higher it will be moved up.

20   BY MR. SACHSE:

21       Q   In other words, at the upper end of the basin, where

22   you testified the larger and coarser material had spilled,

23   there would be less --

24       MR. VEEDER:   Had spilled now?

25

1    BY MR. SACHSE:

2         Q   Had been precipitated out of the stream to form the

3    alluvial basin.

4         MR. VEEDER:   I don't believe he testified "precipitated

5    out of the stream".

6         THE MASTER:   I think you are correct in that, Mr. Veeder,

7    but I believe Mr. Sachse's question is apparent, and I don't

8    think there is anything intended by his use of that word in

9    this particular question.   In any event, it will be considered

10   by the Court that Mr. Sachse is attempting to state the general

11   testimony of the witness.

12        MR. SACHSE:   That is what I am attempting to state.   And

13   I hope the witness will correct me.   I will start off again.

14        Q   As I understood your testimony a day or two ago, Colonel,

15   you stated it was characteristic of alluvial basins such as

16   these that the coarser and the heavier material tended to pre-

17   cipitate -- I don't recall your exact word -- to settle to the

18   bottom at the top of the basin, upstream end.   And as you pro-

19   gressively got farther downstream finer and finer materials

20   tended to settle.   And that the lowest end of the basin would

21   be, generally speaking, would generally speaking have the least

22   permeable material, and generally speaking the upper end of

23   the basin the most permeable material.   Now am I correct?   If

24   not, please correct me.

25        A   Yes, sir, generally correct.   The phenomenon might be

815

stated as the power of water to move alluvium dimishes as its velocity diminshes.  So the steeper the stream gradient the greater the velocity, the larger particles will be moved.  And as the gradient lessens and the velocity diminishes, the heavier particles are deposited and the finer particles are progressively deposited and the velocity of the stream diminishes.

Q  So again, now back to the basins in Camp Pendleton, that segment which you have designated the upper basin. I believe you testified contains, generally speaking, the coarsest material, does it not?

A  Yes, sir.

Q  And that segment which you designated as the Ysidora Basin contains, generally speaking, the finest material, does it not?

A  Yes, sir.

Q  So if I follow your testimony correctly, the capillary action of the soil would provide a moist zone for the cultivation of grasses closer to the surface in the Ysidora Basin area than it would in the upper basin area?

A  There again that would be dependent on the elevation of the water plane with respect to the surface of the land.

Q  Well, let me put it this way, the capillary action of the soil will affect a greater depth of soil regardless of where the water table is in the Ysidora area than it will in the upper area?

1        MR. VEEDER:  Before you respond to that, I would like to

2   have the question read.

3        (Question read.)

4        MR. VEEDER:  It is incoherent.

5        MR. STAHLMAN:  It is not a question, it is a statement.

6        MR. SACHSE:  I will rephrase it.  It may take a long time.

7   I think the witness knows what I want.

8        Q  Did I understand you, Colonel Bowen, to say the capil-

9   lary action is more effective in the fine soils than in the

10  coarse soils?

11       A  The capillary range is greater in the fine soils than

12  it is in the coarser soils, yes, sir.

13       Q  And you say "capillary range."  You mean water is drawn

14  over a larger area, do you not?

15       A  I mean that the movement -- the distance that the

16  particle of water is moved by capillary action is greater in

17  finer soils than it is in coarser soils.

18       Q  Fine.  So regardless of where the water table is, a

19  greater depth of soil will be affected by capillary in the

20  Ysidora Basin than in the upper basin; is that correct?

21       A  We might say the phreatic zone in the Ysidora Basin

22  will be deeper than the phreatic zone in the upper basin.

23       Q  Will you define "phreatic zone"?  Maybe you have

24  answered me.  I don't know.

25       MR. VEEDER:  He has already done it.

THE WITNESS:  I have already defined phreatic zone as that zone above the surface of the water plane which is affected by the capillary movement or in which capillary water exists.

BY MR. SACHSE:

Q  So the phreatic zone will be shallowest in the upper basin and deepest in the Ysidora Basin; is that right?

A  Yes, sir.

Q  So shallow-rooted grasses will have a better chance of survival, regardless of water table, in the Ysidora Basin than they will in the upper basin; is that correct?

A  No, sir.  There again you have to go back to the location of the surface of the water plane with respect to the land surface.

Q  Assuming --

A  At some point you will break contact with the surface of the ground, or with the plant root zone.

Q  Assuming the same water table, and let's take an arbitrary figure of 10 feet below the surface, would a shallow-rooted plant have a better chance of survival in the Ysidora zone or the Ysidora Basin or in the upper basin?

MR. VEEDER:  I am going to object, your Honor, on the basis this goes beyond the scope of the direct examination. And to this point he hasn't touched on the question that was presented to the witness.  The question presented to the witness was what would be the effect of lowering the water plane one

818

1    foot as of July, 1957.  Now I think that I have given Counsel

2    a lot of latitude in wandering up and down the area here.  But

3    I think he had better get back to the question that was pre-

4    sented in the original case.  And the assumption he just

5    tendered does not relate to any evidence in the record.

6    MR. SACHSE:  May I make this comment, your Honor?  Mr.

7    Veeder has just very effectively pointed out one of the things

8    I am trying to accomplish.  Mr. Veeder asked the witness the

9    blanket question, "What effect would the lowering of one foot

10   in the water table have?"

11   MR. VEEDER:  As of July, 1957.

12   MR. SACHSE:  As of July 1, 1957.  But with no segmentation

13   whatsoever of the basin.  And he got an answer.  And I am

14   trying to show, with permission of Mr. Veeder and the Court,

15   that the portion of the basin he is talking about has a tre-

16   mendous difference in whether one foot lowering of water table

17   affects the grasses or doesn't affect the grasses.

18   THE MASTER:  Well, Mr. Sachse, if I understand the testi-

19   mony of the witness so far, including the testimony on cross-

20   examination this morning with regard to the phreatic zone, the

21   only effect of the phreatic zone is to permit grasses to grow

22   when the water table itself --

23   MR. SACHSE:  Is below --

24   THE MASTER:  -- is below the roots. Now --

25   MR. SACHSE:  If your phreatic --

35-L

819

THE MASTER:  I may be in error.  But if the water table is lowered a foot in the upper basin, the top of the phreatic zone in that area is also lowered a foot.  If it is lowered a foot in the lower basin, the top of the zone is also lowered a foot, regardless of the top of the zone and the bottom of the zone.  The difference between the top and bottom of the zone might have been greater in the upper than in the lower.  So I do not perceive how the location in the basin, that is, whether it is upper or lower, has any effect because of the fact that the zone is greater in one area than the other.  I may have lost track of your cross-examination.  But it seems to me that it isn't actually accomplishing anything.

MR. SACHSE:  The point I am trying to make -- I will drop the subject with this further explanation, if your Honor so desires.

MR. VEEDER:  Why an explanation?

MR. SACHSE:  I am still --

THE MASTER:  Mr. Veeder, let Mr. Sachse explain it.

MR. SACHSE:  There is a point in any soil at which capillary action will no longer bring the water close enough to the surface to supply a plant root.

THE MASTER:  That is obvious.

MR. SACHSE:  No question about it.  In some soils that point is farther removed from the surface than in other soils.

THE MASTER:  That is obvious and the witness has --

1      MR. SACHSE:  Now that is exactly what I am trying to bring

2  out from Colonel Bowen.

3      THE MASTER:  If you ask him that question I think that is

4  a proper question.

5  BY MR. SACHSE:

6      Q  Colonel Bowen, let's put it that way then.  At what

7  point in depth from the surface -- and let's take the type of

8  soil you find in the Ysidora Basin -- at what point in depth

9  from the surface can the shallow-rooted plants cease to survive

10  on moisture obtained from below ground?

11      MR. VEEDER:  Now I am going to object.  There is absolutely

12  nothing in the record to this point upon which such an as-

13  sumption could be predicated.  And I renew the objection I

14  originally had to Mr. Sachse's examination.  And I ask to have

15  a continuing objection.

16      MR. SACHSE:  Mr. Veeder --

17      THE MASTER:  The objection is overruled.  You may have a

18  continuing objection.

19      THE WITNESS:  Your Honor, may I have Plaintiff's Exhibit

20  M-66M, I believe.  May I also have M-66L?

21      THE MASTER:  L?

22      THE WITNESS:  Please.  Thank you, sir.

23      MR. VEEDER:  May I have reference to the exhibits that

24  you are viewing, Colonel?

25      THE WITNESS:  Yes, sir.  I am viewing exhibits --

1   Plaintiff's Exhibits M-66L and M-66M, which together portray

2   the surface of the Ysidora Valley, a portion of the Santa Mar-

3   garita alluvial fill basin.  And as indicated by the soil sur-

4   vey symbols on these two exhibits, there is a substantial

5   variation in the surface texture and surface permeability, Mr.

6   Sachse, which makes it difficult to -- to answer your question

7   with regards to the entire area of the Ysidora Valley.

8   BY MR. SACHSE:

9        Q  All right.  Then you can't generalize; is that right,

10  on that area?  You can't make a general statement, in other

11  words?

12       A  No, sir.  It varies within the area.  And the same is

13  true throughout the valley.  You must understand that the

14  deposition was not uniform of material through here.  That is,

15  it is not a uniform grading.  There are some fines that during

16  low stream flow are deposited in the upper basin, and during

17  some of the historically high flow periods the stream has had

18  enough velocity to bring coarse materials into the Ysidora.

19  That is what makes it possible for us to extract water from the

20  Ysidora, the fact there are aquifers in there.

21       Q  What was the depth of the water table in the Ysidora

22  Basin in July, 1957?

23       A  As I recall, Mr. Sachse, it was about 5 -- 4½ feet

24  below ground surface in some places and about -- let's see,

25  probably 12 to 15.  The range was between 4½ feet below ground

1  surface and 12 to 15 feet below ground surface.

2      Q  In July of '57 now I am talking about.

3      A  Yes, sir.

4      Q  Any portion of the Ysidora Basin where the ground water

5  table was from 12 to 15 feet below the surface, your answer

6  about a 1 foot drop in the table would be incorrect, wouldn't

7  it?

8      A  Not anywhere within that area, Mr. Sachse.  Some of

9  these finer soils have capacity to raise water by capillary to

10  substantial distances.

11      Q  In other words, it varies, doesn't it?

12      A  Yes, sir.

13      Q  Then your answer that a 1 foot drop in the ground water

14  table in the Santa Margarita Basins would have caused the death

15  of the shallow-rooted grasses in July of '57 is not correct,

16  is it?

17      A  It is correct in part, Mr. Sachse.

18      MR. SACHSE:  Correct in part.  Thank you very much.  It

19  sure took a long time to get that.

20      THE MASTER:  We will take our recess at this time.

21      (Recess.)

22      THE CLERK:  Are you ready to resume?

23      MR. SACHSE:  Yes, sir.

24      Q  Colonel Bowen, what was the range of the water table

25  below the surface in the Chappo Basin in July, '57?

A   I would say that the surface of the water plane in the Chappo Basin of the lower Santa Margarita River Valley, a segment of the ground water basin within Camp Pendleton, was about 17 feet below land surface.

Q   Average?

A   Yes, sir.

Q   Is that an average?

A   Yes, sir.

Q   What would you say its range would be as you gave me the Ysidora figure?

A   Well, our wells are better distributed arealy in the Chappo Basin, and the lowering of the water plane is more uniform.

Q   Now how about the upper basin, the same question, please.

A   In the upper basin of the Santa Margarita Valley, a segment of the ground water storage basin, the depth of the surface of the water plane below land surface in July of '57 was approximately 7 or 8 feet.

Q   7 to 8 feet?

A   Yes, sir.

Q   Now you testified yesterday, I believe, that a 1 foot lowering of the water table would have a negligible effect on this hay crop for the Special Services horses.  Am I correct?

A   Yes, sir, because in July of '57 the hay crop had been

1    harvested.

2        Q   Yes.   That was the question I was going to ask.   Was

3    that because the hay crop is what I would call a dry farm crop?

4    It is planted in the fall and gets rains and then is cut?

5        A   Yes, sir.

6        Q   And you testified that the 1 foot lowering of the water

7    table in July of '57 would have a negligible effect on the

8    deep-rooted cover.   Is that because of the great depth of the

9    roots?

10       A   Yes. sir.   Because a 1 foot lowering of the surface of

11   the water plane as of July, '57, would have still not lowered

12   the water available to the plants below their capacity to reach

13   it.

14       Q   When you referred to deep-rooted plants, what plants

15   growing in the basin do you have in mind?

16       A   Plants growing on the surface of the Santa Margarita

17   Basin within Camp Pendleton which are deep-rooted in my opinion

18   are sycamore, willows, quadamote.

19       Q   Trees, these are so far?

20       A   Trees and shrubs, bushes.

21       Q   You don't have any what we would call heavily timbered

22   areas in the basin, do you?

23       A   Well, the definition of timber, of course, might --

24       Q   I will put the question this way, Colonel.   Is it not

25   a fact that within the limits of the basin, as you described

1    it, the only trees are scattered trees along the stream and

2    what we might class as ornamental or shade trees along the

3    road, around buildings and so on?

4        A   No, sir.   There are some areas of willows and brush

5    that -- this quadamote occupies substantial areas of the surface

6    of the basin.

7        Q   Is it not a fact that extensive removal of water loving

8    vegetation, phreatophytes, has been conducted by the Marines

9    during the past several years in the basin?

10       A   Yes, sir.

11       Q   Before I leave the subject, and as an afterthought,

12   Colonel, will you add to the calculations that I requested,

13   acreage calculations of the water impounded behind the O'Neill

14   ditch diversion at maximum?   Do you understand to what I am

15   referring?

16       A   You mean as of today?

17       Q   No, at maximum, the maximum impoundment behind the dam

18   for the O'Neill ditch diversion.

19       THE MASTER:   That is, the capacity of the diversion?

20       MR. SACHSE:   Surface capacity.   Not acre feet, surface

21   acres of surface flooded.   Do you follow me?

22       THE WITNESS:   Yes, sir.   But that has varied from year to

23   year.

24   BY MR. SACHSE:

25       Q   You have got a higher dam now, I know.   In other words,

8826

1  the maximum that can be now in acres covered by water impounded

2  behind the O'Neill ditch diversion dam.

3     A  Right now?

4     Q  The maximum as of now.

5     A  Yes, sir.

6     Q  And the same information, please, as to the other three

7  spreading works.

8     MR. VEEDER:  You mean irrigation systems?

9     MR. SACHSE:  No.  I am stumbling at the word.  I am trying

10  to think of the word Colonel Bowen used.  These --

11     MR. VEEDER:  He used spreading areas to irrigate.

12     MR. SACHSE:  The combs.  I would like the same calculations,

13  Colonel, as to the works I pointed out to you on M-66M.  And

14  I forget the exact word you used to identify them.  Black lines

15  with a comb effect below them.  The same information as to these

16  points that I pointed out to you on M-66M.  Channel spreading

17  devices, I believe you called them.

18     THE WITNESS:  Your question there, Mr. Sachse, was --

19  BY MR. SACHSE:

20     Q  What is the maximum surface acreage that can be flooded

21  behind those channel spreading structures?

22     A  The area that can be flooded without regard to whether

23  it is --

24     Q  The area that can be, the maximum.

25     A  The area, the maximum pond that can be impounded behind

1   the channel spreading structures shown on Plaintiff's Exhibit

2   M-66-M.

3       Q   That is correct?

4       A   Yes, sir.

5       Q   Now are there any other channel spreading structures in

6   the basin of the Santa Margarita River, as you have described

7   it, other than those you have so far discussed?

8       MR. VEEDER:   Now are you talking about the subterranean

9   basins?

10      MR. SACHSE:   Within the surface area of the so-called

11  basin.

12      MR. VEEDER:   I just wanted to be sure.

13      THE WITNESS:   Yes, sir, there are.

14  BY MR. SACHSE:

15      Q   Will you make the same calculation for each of those,

16  then, please?

17      A   Yes, sir.

18      MR. VEEDER:   I would like to know what relation this has

19  to the De Luz water users.   But as long as I have my objection

20  continuing, why there is nothing more I can do.

21  BY MR. SACHSE:

22      Q   Colonel Bowen, there is also a sewage effluent

23  spreading works upstream from Lake O'Neill somewhere.   Is that

24  within or without the basin?

25      A   I don't understand the question, Mr. Sachse.

1      MR. VEEDER:  That is again outside of the scope of the

2   direct examination.

3      MR. SACHSE:  I want to get some information.

4      Q  Is there or not?

5      A  I didn't understand your question.

6      Q  Is there or not a sewage effluent spreading area and

7   settling area up one of the canyons of Lake O'Neill?

8      A  There is a sewage effluent lagoon.

9      Q  Now is that within or without the basin, that lagoon?

10     A  The surface of the alluvial fill ground water basin of

11  the Santa Margarita?

12     Q  Yes.

13     A  It is without, sir.

14     Q  The lagoon is without the basin?

15     A  Yes.  The sewage effluent lagoon, described as lying

16  upstream from Lake O'Neill, is without the basin.

17     Q  Now, there are paved surface roads that cross and

18  traverse the basin, are there not?

19     A  Yes, sir.

20     MR. VEEDER:  We have agreed to get all this.

21     MR. SACHSE:  I just want to be sure it is included.

22     Q  Will you include then also the area of the basin that

23  is covered by  railroad right of way, paved surface roads and

24  right of ways?

25     A  Yes, sir.

1    Q  One last question on the basin, unless I am inspired

2    during the lunch hour.  I have notes of two different acreages

3    you used to describe the surface area of the basin, 4600 and

4    5300.  Which is correct?

5    A  I used the figure of 5300 as the total area of the

6    surface of the alluvial fill ground water basin of the Santa

7    Margarita River downstream from the confluence of De Luz Creek

8    with the Santa Margarita River.  And the figure 4600 was the

9    area covered in native vegetation.

10    Q  The area 45 --

11    A  Covered by native vegetation.

12    Q  Within the basin?

13    A  On the surface of the alluvial fill ground water basin,

14    yes, sir.

15    MR. SACHSE:  Now I am going to start working with more

16    of these aerials, so I think if you will just bring them all

17    over.

18    THE CLERK:  Bring them all over?

19    MR. SACHSE:  We can take these away.

20    MR. VEEDER:  Is your time schedule the same as you set,

21    Franz?  You are going to run all day on this?

22    MR. SACHSE:  Yes, sir.

23    (Discussion off record.)

24    BY MR. SACHSE:

25    Q  Colonel Bowen, I am calling your attention to M-662

1  and M-65, which I think you will recall we had some confusion

2  over yesterday.  We couldn't locate it on M-65, do you recall?

3     A  Yes, sir.

4     Q  Now on M-65 you have drawn two different ink squares

5  which, as I understood your testimony, were designed to correct

6  M-65 so as to reflect the match line 4-0124; is that correct?

7     A  I did draw some blue lines on Plaintiff's Exhibit M-65

8  which attempted to locate the positions of Plaintiff's Exhibit

9  M-66Z as it relates to Plaintiff's Exhibit M-65.

10    Q  Now will you now -- and since both of the lines you

11  drew yesterday are in blue ink -- take, please, the red and

12  locate approximately -- I realize it won't be to scale -- where

13  M-66Z should appear on M-65?  With a red line, now.

14    A  Referring to Plaintiff's Exhibit M-66Z, also known as

15  aerial photograph number 4-0141, I am plotting the location of

16  that photograph on Plaintiff's Exhibit M-65.  I would like to

17  call to your Honor's attention that these lines showing the

18  photograph on M-65, with the number in the lower right-hand

19  corner, are the perimeter of the photograph and not the match

20  line.  The match lines as plotted on Plaintiff's Exhibit M-65

21  series A through however far it went, plot the perimeter of the

22  photograph with the 0141 on it.  In the lower left-hand corner

23  of Plaintiff's Exhibit M-66Z appears a double line, which is

24  known as Rattlesnake Grade.  That line appears on Plaintiff's

25  Exhibit M-65 leading across the center of the exhibit, and

1    lying approximately three-quarters of a mile south of Lake

2    O'Neill.  Plotting the outer perimters of the photograph,

3    shown as M-66Z, in red on M-65, come just below that road and

4    connect approximately in line -- it doesn't come quite out to

5    the reservation boundary.  This line that appears on M-66 7

6    running --

7         THE MASTER:  M-66Z.

8         THE WITNESS:  M-66Z, running southerly from the northwest

9    corner, cornering to the east of Lake O'Neill, and then running

10   easterly across the center of the photograph, is the Naval

11   Ammunition Depot boundary, which is shown on Plaintiff's Exhibit

12   M-65 as a dash-dot line.

13   BY MR. SACHSE:

14        Q   That is interesting.  But I would like you to draw it.

15   That is what I want.

16        A   I complete drawing and inscribe in the lower right-hand

17   corner the number of the photograph "4-0141", and strike

18   from Exhibit --

19        Q   Wait a minute.  I am going to come to that in a second.

20   Now the two red lines you have just drawn are the correct

21   location of M-66Z on M-65; is that right?

22        A   That is right, sir.

23        Q   It is also the third such delineation you have made on

24   M-65, is it not?

25        A   I don't recall, sir, that it is the third.

832

1    Q   I believe that the blue -- you drew two different blue

2    squares.  You drew one up here yesterday, then you changed it

3    and drew it down here.  And now you have drawn a third one in

4    red.  Is that correct?

5    A   The one I have drawn in red is correct, yes, sir.

6    Q   All right.  Now in blue ink yesterday you changed a

7    series of numbers, stating that it appeared that the photograph

8    numbers had been mistransposed to M-65.  Is that correct?  One

9    digit off.

10   A   That is correct, sir.

11   Q   Now, go ahead, please, and tell us -- and correct with

12   a red pencil, if these are not correct.  Correct the photo

13   numbers on them.

14   A   The photograph numbers shown in black as they originally

15   appeared on M-65 are correct.  So I will draw a red line through

16   the numbers inscribed in blue ink by myself yesterday.

17   Q   In other words --

18   A   In other words, the numbers as they originally appeared

19   on the Exhibit M-65 are correct, yes, sir.

20   Q   Then the changes you put on them yesterday are wrong;

21   is that correct?

22   A   That is right.

23   MR. VEEDER:  You were wrong in asking for the corrections.

24   That is the problem.

25   THE WITNESS:   The difficulty of the attempt to infer that

1    these areas shown from the photograph were the match line areas

2    when it is actually the entire photograph which is depicted.

3         MR. SACHSE:  Now I am looking for M-66AB.

4         Q  Now will you check M-65 and tell me where M-66AB

5    appears on M-65?

6         A  Yes. sir.  M-66AB, also known as -- which is a copy of

7    aerial photograph 4-0159, is not shown on Plaintiff's Exhibit

8    M-65.

9         Q  All right.  Will you draw that one in with a red line,

10   please?

11        A  Yes, sir.  Referring to the margin of the photograph

12   of Plaintiff's M-66AB, I observe that it crosses the Camp

13   Pendleton reservation boundary approximately in the lower

14   center of the photograph, and approximately three-quarters of

15   a mile south of the Naval Ammunition Depot boundary, which

16   traverses the lower half of the photograph generally from east

17   to west.  So I will draw a red line locating the approximate

18   position of Plaintiff's M-66AB as it would appear on Plaintiff's

19   Exhibit M-65, and write in the lower right-hand corner the

20   photograph number 4-0159.

21        Q  Thank you.  Now let's find AA, M-66AA.  Now will you

22   please locate M-65 for me --

23        A  Yes, sir.

24        Q  Plaintiff's Exhibit M-66AA.

25        A  Exhibit M-66AA is a copy of aerial photograph 4-0124.

1   It shows the Rattlesnake Canyon Road appearing in the central

2   portion of the left-hand half of Plaintiff's Exhibit M-66AA,

3   also shown on Plaintiff's Exhibit M-65.

4       Q   Do you want a glass?

5       A   No, sir.  So I will plot in --

6       Q   Is it shown on M-65?  Is photograph 0124?

7       A   The outline of Plaintiff's Exhibit M-66AA is not shown

8   on Plaintiff's Exhibit M-65.

9       Q   All right.  Now please draw it in.

10      A   I will draw the outline of Plaintiff's Exhibit M-66AA

11  as it relates approximately to M-65.

12      MR. VEEDER:  Your Honor, I tender this thought, that for

13  our purpose we would desire to prepare M-65 so as to conform

14  with what the Colonel is now testifying to.  I think it would

15  save a great deal of time.  I don't think it is going to make

16  any difference to any counsel during this phase of the exami-

17  nation if we brought another exhibit in.  I think it would

18  save your Honor a great deal of time.

19      THE MASTER:  Well, if it is for the purposes for which I

20  understand M-65 was prepared, the offer which you have made

21  would be entirely satisfactory and would solve the problem.  Is

22  that satisfactory to you, Mr. Sachse?

23      MR. SACHSE:  Your Honor, I believe it is my privilege,

24  since Colonel Bowen has already testified that he is the of-

25  ficer in charge of this operation, and as such is cursed or

835

1   or blessed, as the case may be, with the talents of his sub-

2   ordinates, I have a right to demonstrate to your Honor the

3   accuracy or inaccuracy of the work produced.  And that is

4   definitely what I am attempting to do at this time.

5        THE MASTER:  Well, I would state this, Mr. Sachse, that is

6   certainly your right.  If you wish to proceed along this line,

7   I will permit you to do so.  However, frankly, I am not im-

8   pressed by any effort to show that the lines as shown on here

9   do not precisely correspond with this, in view of the statement

10  this was merely as a guide to find a picture and was not in-

11  tended to show the total picture accurately.

12       MR. SACHSE:  I will point out some of the photos don't even

13  appear on it and that others are mislocated. We have just got

14  three that don't appear.

15       THE MASTER:  To the extent they do not appear, that is

16  obvious and I don't think it needs to be pointed out any

17  further.  If there is any picture which is actually mislocated,

18  it might be pertinent to go into that.

19       MR. SACHSE:  All right.  Give me a moment.

20       MR. VEEDER:  As I say --

21       MR. STAHLMAN:  We are wasting a lot of time on trivialities.

22  This is taking up hours.

23       THE MASTER:  That is true, Mr. Stahlman, but if Mr. Sachse

24  wants to do this, maybe some other court might be more impres-

25  sed with it than I am.

BY MR. SACHSE:

Q   Now, Colonel, we are concerned with actual mislocations
of the photographs.  Will you get out and examine M-66Q, please.
I think it is one I used earlier.  It might be at the bottom.
Now, Colonel, did I understand you to testify a moment ago --
I am calling your attention now to M-65 -- that the heavy
black lines delineate the perimeter of the photograph?

A   Yes, sir.

Q   All right.  Will you please locate for me photograph
0109 on M-65?

A   Photograph 0109 is Plaintiff's Exhibit M-66Q, and the
outlines of that exhibit are shown on Plaintiff's Exhibit M-65
and the letters 4-0109 appear right below center in Plaintiff's
Exhibit M-65.

Q   Now will you trace, please, the perimeter outline of
photo 4-0109 as it appears on M-65?

A   Well, it is correctly placed.

Q   I want to know where -- how far it goes among all these
lines.  Show me.

A   Each one of these are -- just show the lower right-
hand corner of the photograph.

Q   Each one?  This photograph --

A   These photographs overlap each other about 65 percent
in line of flight, about 25 percent between flights.  So we
only show the lower right-hand corner of each photograph on

887

1   this Plaintiff's Exhibit M-65, which is used as an index for

2   the location of the photographs.

3       Q   In other words, -- let me get it clear -- the red lines

4   you have just drawn, showing an approximate right angle, should

5   represent the two sides of this; is that correct?

6       A   No, sir.

7       Q   Then draw what would represent the two sides of this,

8   please.

9       A   Will you remove your hand from the exhibit, please, Mr.

10  Sachse?  You will note it continues on up through the Naval

11  Ammunition Depot boundary, which intersects the right margin

12  of the photograph about midway, and the Naval Ammunition Depot

13  boundary intersects the northern border of the picture in the

14  upper right-hand corner a short distance above a pond which is

15  pictured on Plaintiff's Exhibit M-66Q, in the upper right-hand

16  corner, and which also shows on Plaintiff's Exhibit M-65

17  located northerly of Lake O'Neill.  It comes across like so on

18  Plaintiff's Exhibit M-65.

19      MR. VEEDER:  Your Honor, the problem here is that Mr.

20  Sachse doesn't understand the exhibit.

21      THE MASTER:  Colonel Bowen, maybe this will facilitate

22  matters.  As I understand it, it seems obvious to me each of

23  these pictures overlaps the others by a terrific extent.

24      THE WITNESS:  Yes, sir.

25      THE MASTER:  To portray them on Exhibit M-65, you followed

1    the procedure which would in essence consist in starting down

2    in the lower right-hand corner, putting that picture on the

3    table, laying the other pictures on top of it, so that the

4    upper portion of each of the lower pictures is obscured by the

5    picture above it, and also by the picture to the left of it.

6    THE WITNESS:  Exactly, your Honor.

7    THE MASTER:  With the result that the area shown on here

8    is only a small portion of the area shown on the actual aerial

9    photograph.

10   THE WITNESS:  Yes, sir.  That is exactly correct.

11   THE MASTER:  I can see no discrepancy so far as any repre-

12   sentation on M-65 with these pictures when they are understood

13   as they were actually made.

14   MR. VEEDER:  It took a lot of money to educate Mr. Sachse.

15   MR. SACHSE:  You can't find any discrepancy, your Honor,

16   even on the ones where he didn't even have them?

17   THE MASTER:  Those were explained, and as I understand it

18   was purely for the purpose of convenience in indexing it.  I

19   think you are wasting time, Mr. Sachse.

20   MR. SACHSE:  Okay.

21   MR. STAHLMAN:  Wasting everybody else's time, too.

22   MR. VEEDER:  Wasting a lot of time.

23   THE MASTER:  I want to give you every right to cross-

24   examine but I don't believe in taking unnecessary time in

25   belaboring the obvious.

BY MR. SACHSE:

Q   Colonel Bowen, does your office maintain the stream flow and runoff records which you obtained from the U. S. G. S. and I think from your own sources also?

A   Yes, sir.

Q   Does your office have any supervision or control over gauging, rain gauging stations on the reservation?

MR. VEEDER:   What is a rain gauging station?

MR. SACHSE:   Rainfall gauging station.

MR. VEEDER:   Thank you.

THE WITNESS:   Yes, sir.

BY MR. SACHSE:

Q   You maintain the rainfall records on the station also?

A   Some of them, sir.

Q   And have you examined rainfall records of other sources of information?

A   Yes, sir.

Q   We have introduced in evidence here -- I seem to have forgotten to bring my copy of the exhibit -- but a tabulation, M-35 series, giving monthly and seasonal precipitations at various locations in Southern California.   Do you recall the tabulation?

A   Yes, sir.

Q   Was that prepared in your office?

A   No, sir.

56-L

840

1    Q   Where was it prepared?

2    A   It was prepared by the U. S. Geological Survey.

3    Q   In other words, I realize it was U. S. Geological data,

4    but their assemblage of them on one sheet, was that yours or

5    done by U. S. G. S.?

6    A   It was done by U. S. G. S.

7    Q   To the best of your knowledge, those figures are ac-

8    curate, aren't they?

9    A   Yes, sir.

10    Q   Now can you tell me -- and you are at liberty to examine

11    the exhibits, if you want -- what percentage of the rainfall

12    from Camp Pendleton on the average occurs during the months of

13    November through April?  Perhaps he wants the exhibit.

14    A   May I see the exhibits, climatological data? — I don't

15    know what numbers they were.

16    MR. SACHSE:  They were Numbers M-35 series, Mr. Clerk.

17    THE WITNESS:  M-35.

18    BY MR. SACHSE:

19    Q   I will remind you, Colonel Bowen, there is no tabu-

20    lation for Camp Pendleton as such.

21    A   Yes, sir.

22    THE CLERK:  These?

23    THE WITNESS:  Yes, sir.  Thank you.

24    MR. STAHLMAN:  May I have that question read?

25

BY MR. SACHSE:

Q   The percentage of the rainfall that occurs on the average during the months of November through April at Camp Pendleton.

MR. STAHLMAN:   For one year?

MR. SACHSE:   On the average.

MR. VEEDER:   For the period of record?

THE WITNESS:   For the period --

MR. SACHSE:   For the period of record.

MR. STAHLMAN:   Is that something that is on there or does that have to be calculated, too?

THE MASTER: Is there any summary already shown there, Colonel, on that?

THE WITNESS:   Referring to Plaintiff's Exhibit M-35A, which shows the monthly and seasonal precipitation in inches at Fallbrook, California, for the period 1875 to 1957, there are no percentages worked out.  However, the minimum, maximum and average for each month of the year, and the seasonal, minimum, maximum and average are shown here.  I could calculate the percentage that falls at Fallbrook during those months named, which would be reasonably presumed as comparable to Camp Pendleton's rainfall.

BY MR. SACHSE:

Q   Will you then, if you are not prepared to answer the question now, will you then calculate for me the average for

the reported period at Fallbrook which falls for the months November through April annually?  Now did you understand my question?  I want the percentage of the rainfall that occurs in the months of November through April.

THE MASTER:  That is from November 1 to May 1?

MR. SACHSE:  Correct, sir.

THE WITNESS:  Both dates inclusive?

MR. SACHSE:  November 1, April 30, inclusive.

MR. VEEDER:  This is beyond the direct again, your Honor. We didn't touch on this at all.  And I think we are wasting a tremendous amount of time.

THE MASTER:  Well, if the calculation can be made out of court and given in a few seconds, that is all right.  I don't want to take the time to calculate it in court.

MR. SACHSE:  No, I don't want him to calculate it in court.

MR. STAHLMAN:  If it is calculated off these things, any-body could calculate it, couldn't they?

MR. VEEDER:  I will bet Franz could.  It is a matter of adding and dividing.

MR. SACHSE:  Now, if your Honor please, I don't relish this.  Mr. Veeder introduced --

MR. STAHLMAN:  Oh --

MR. SACHSE:  Do you mind letting me make my own statement, Mr. Stahlman?

THE MASTER:  Mr. Sachse, let's go ahead and get on with

59-L

1    it.   If Mr. Veeder has said something he shouldn't, that does

2    not justify you saying something you shouldn't.

3    BY MR. SACHSE:

4        Q   Will you prepare a calculation, Colonel?

5        A   Yes, sir.

6        Q   Now, in your testimony yesterday -- and this is related

7    I might add -- not yesterday, pardon me.   In your testimony on

8    May 26 you described the characteristics of De Luz Creek.   I

9    beg your pardon, it is the characteristics of the Santa Mar-

10   garita River.   And you used these words:  "Well, the flow is

11   highly erratic, not only within the enclave, but anywhere

12   within the whole watershed."  Question, by Mr. Veeder:  "How

13   is that phenomena usually characterized?  What kind of a stream?"

14   Answer:  "Well, it is what we call a flashy stream, subject to

15   flash flows or runoff which would occur during and subsequent

16   to rainfall, but it tends to come to a peak rather rapidly,

17   particularly following a period of a brief high intensity

18   rainfall."  Do you recall that testimony?

19       A   Yes, sir.

20      MR. MOSKOVITZ:   I object to it as immaterial.   It is in

21   the record, your Honor.   It just takes a lot of time.   I don't

22   think that it is a competent question.   It doesn't add to the

23   question, just merely to read a statement that is of record in

24   this case.

25      THE MASTER:   I presume it is preliminary to asking him

1  some further question, and I think that that is proper under

2  cross-examination, as long as it is not prolonged unduly.

3  BY MR. SACHSE:

4      Q  Do you recall that testimony, Colonel Bowen?

5      A  Yes, sir.

6      Q  Is it not a fact that as much as 90 percent of the

7  total runoff of the Santa Margarita River and of its tribu-

8  taries occurs during the months of November-April, inclusive,

9  on the average?

10     MR. STAHLMAN:  No objection to the question, but that

11  proves merely the reading of testimony to a witness adds

12  nothing to the question.  There is the question there.

13     THE MASTER:  I think that your observation is well taken

14  in this case, Mr. Stahlman, but you can't tell in advance what

15  the subsequent question is going to be.  I would ask Mr. Sachse

16  to try to reduce the cross-examination as much as possible and

17  still achieve your goal.

18     MR. SACHSE:  Your Honor, I am going to try to reduce the

19  cross-examination as much as I possibly can.  And I will state

20  for the record that the gratuitous interference of counsel

21  representing a client who is upstream, not representing the

22  United States of America, isn't making the job any easier.

23     MR. STAHLMAN:  It is costing us money.  We have a trans-

24  cript here.  We have time being taken, and I --

25     THE MASTER:  These observations on both sides are simply

61-L

845

1    adding to the cost.  So let's stop the observations and get on.

2        MR. STAHLMAN:  I objected to it a long time ago.  I

3    thought it was frivolous and improper.

4        THE MASTER:  Your objection has been noted.

5        MR. SACHSE:  Will you read the question back?  I don't

6    think I got an answer from the Colonel.

7        (Question read.)

8        THE WITNESS:  I would prefer to make my own calculation,

9    Mr. Sachse.  I don't know whether it would be 90 percent, more

10   or less.

11   BY MR. SACHSE:

12       Q  Well, Colonel Bowen, you have been testifying --

13       THE MASTER:  Just a minute.  You have asked him to make

14   the precise calculation, and I think under those conditions

15   where you ask for a precise figure he is entitled to make the

16   figure.

17       MR. SACHSE:  All right.  Have him make it.

18       MR. VEEDER:  Now?

19       MR. SACHSE:  No, at his convenience.

20       Q  Now in your testimony last week you named the principal

21   tributaries of De Luz Creek as being the two branches -- excuse

22   me.

23       A  Please continue, Mr. Sachse.  I heard your question.

24       Q  As being the two branches of De Luz Creek itself,

25   Cottonwood Creek, Camps Creek and Fern Creek.  Those are the

846

1  tributaries; is that correct?

2  MR. STAHLMAN:  The record is the best evidence of what he

3  said.

4  THE MASTER:  Mr. Stahlman, the question was not related

5  to that.

6  THE WITNESS:  Did I not mention Roblar Creek also?

7  MR. SACHSE:  I beg your pardon, you did.

8  Q  You also characterized them as intermittent, both in

9  time and in location; is that correct?

10  A  Yes, sir.

11  Q  By intermittent in time, you mean, if I understand you

12  correctly, that at certain times of the year they may run and

13  at other times they may be dry.

14  A  Yes, sir.

15  Q  And intermittent in location, you mean that at the same

16  time of the year some parts may be running and other parts may

17  be dry; is that correct?

18  A  At the same time of the year?

19  Q  At the same period of the year one portion of the creek

20  might have water in it and another portion might be dry.

21  A  Yes, sir.  That phenomenon might occur at the same time.

22  Q  Now, I don't think we need to refer to the quad, but I

23  am referring to M-33S, the Fallbrook Quad.  You are aware that

24  there are also many other small intermittent streams indicated

25  by broken lines, and unnamed, in that watershed?

A   Oh, yes, sir.

Q   And you would characterize them also, would you not, as being intermittent as to time?

A   Yes, sir.

Q   And intermittent as to location also?

MR. VEEDER:   What do you mean by intermittent as to location?

MR. SACHSE:   That is the phrase you used, Mr. Veeder.   You ought to know.

MR. VEEDER:   I want to know what you are talking about.

MR. SACHSE:   He answered you.

THE MASTER:   The witness has already stated, I believe, what he means by intermittent as to location.

THE WITNESS:   Yes, sir.

BY MR. SACHSE:

Q   Now would you agree that in large part those unnamed streams have no substantial flow, except during and immediately after heavy rains?

A   Yes, sir.

Q   Now is it not also true that the great bulk of the De Luz Creek runoff occurs during and immediately after heavy rains?

A   Yes, sir.

Q   Now I will call your attention to Exhibit M-34B.

MR. SACHSE:   May I have it, Mr. Clerk?   It is one of those

1    gray folders under here.

2        MR. VEEDER:  I think your Honor will take judicial notice

3    of all this.

4        MR. SACHSE:  I am going to ask him for another calculation

5    in a moment, without asking you to do it now, Colonel, but

6    simply to prepare it for use at your convenience.

7        Q  Will you calculate the percentage of the runoff of

8    De Luz Creek, as measured at the De Luz Creek gauge, that

9    occurred during the period November 1, 1957, through April 30,

10   1958?

11       A  1 November '57.

12       Q  April 30, '58.

13       A  Through 30 April '58.

14       THE MASTER:  Percentage of what, Mr. Sachse?

15       MR. SACHSE:  The percentage of the total runoff reported

16   at the De Luz Creek gauge that occurred during the period

17   November 1, '57, through April 30, '58.

18       THE MASTER:  Do you mean the ratio between the rainfall

19   for that six months period and --

20       MR. SACHSE:  No, not a ratio.  If you will examine the

21   exhibit you will see what I am after.  The exhibit purports --

22   the runoff purports to describe the runoff of De Luz Creek.

23   I want to know what percentage of that runoff occurred during

24   the months in question.

25       THE MASTER:  My question is, is it the percentage of the

1     total runoff shown for 1951 to date?

2          MR. SACHSE:  No, sir.  The first question I asked was

3     simply the percentage of the runoff for the water year.

4          THE MASTER:  You never specified water year.  That is

5     what I was trying to find out.

6          MR. SACHSE:  I gave the dates.

7          THE MASTER:  The only dates you gave were November 1, '57,

8     to April 30, '58.

9          MR. SACHSE:  All right.  I will rephrase it.

10          Q  Will you calculate the percentage of the runoff of

11     De Luz Creek for the water year '57-'58 that occurred in the

12     period 1 November '57, through 30 April '58, inclusive?

13          A  Yes, sir.

14          MR. VEEDER:  Isn't there a limit to what can be asked of

15     our witness to do for the defendants?  I truly believe this is

16     material that Sachse should have himself prepared for the

17     trial of his lawsuit.

18          MR. SACHSE:  I am prepared to tell him what I have calcu-

19     lated it to be right now, if you want.

20          MR. STAHLMAN:  Why don't you do it?

21          THE MASTER:  I think if you have the figures, Mr. Sachse,

22     I think it would be simpler for you to present them, and if

23     that is your purpose, simply to get the information.

24          MR. STAHLMAN:  This is merely taking calculations off the

25     exhibit.

BY MR. SACHSE:

Q   All right, I will give you another figure that I have calculated, and examine you as to that.

MR. VEEDER:  None of those, Mr. Sachse.

MR. STAHLMAN:  And it is not proper cross-examination.

MR. SACHSE:  This is proper cross-examination.

THE MASTER:  It is proper cross-examination, but it is getting tedious.

BY MR. SACHSE:

Q   Colonel Bowen, I have calculated the entire De Luz Creek runoff as reported in the government's M-34B.  Do you follow me?  I have totaled all of them that are reported in this for all the water years.  And I have then calculated the percentage of that runoff that occurred for the period 1 November through 30 April for the period reported in M-34B. And I have arrived at the calculation that 99 percent of the runoff of De Luz Creek for the period reported in M-34B has occurred during the period 1 November through April 30.  Do you agree with that calculation?  Okay, recalculate it.

A   No, sir.

MR. SACHSE:  I submit that is proper cross-examination.

MR. VEEDER:  I think it is improper.

THE WITNESS:  It is possible to make arithmetical errors, Mr. Sachse.  I wouldn't agree without checking.

MR. SACHSE:  I agree, I want you to check it.

1    Q   Now you testified, did you not, there are no true

2    alluvial basins of any size on the De Luz Creek watershed?

3    A   Well, I don't know as those were my exact words, but

4    there are no substantial volumes of alluvium in the De Luz

5    watershed.

6    Q   Would you care to be more specific in what you mean by

7    no substantial areas by describing acres or acre foot capacity?

8    A   No, sir.

9    Q   You will agree that the underground storage on De Luz

10   Creek could handle only a very small amount of the runoff; is

11   that correct?

12   A   Well, small is comparative.

13   MR. VEEDER:  Don't answer the question.  That is beyond

14   the scope of the direct examination for sure.  We are calling

15   a special witness to take care of it.  Colonel Bowen did not

16   testify in regard to subterranean storage.

17   MR. SACHSE:  Well, I will give you the page number, if

18   you want it, Mr. Veeder.  And we most certainly are on a

19   question of the small De Luz Creek land owners.  Now we are

20   getting right down to brass tacks.

21   THE MASTER:  Just a minute.  The question is whether the

22   witness testified to the storage capacity.

23   MR. SACHSE:  If he says he doesn't know, I will be very

24   happy with the answer, your Honor.

25   THE MASTER:  Repeat your question.

BY MR. SACHSE:

Q   Then would you agree, Colonel Bowen, --

MR. STAHLMAN:  The shorthand reporter is ready to read it.

MR. SACHSE:  All right.  I thought he said to repeat the question.

THE MASTER:  Let Mr. Sachse state it.

BY MR. SACHSE:

Q   Would you agree, Colonel Bowen, that the underground storage on De Luz Creek could handle only a very small part of the annual runoff?

A   De Luz Creek runoff?

MR. VEEDER:  I am going to object.  The witness has not been qualified on that particular point.

THE MASTER:  If the witness cares to answer the question, he can.  If he doesn't, he can so state.

MR. STAHLMAN:  If you have a heavy runoff, it is one thing, a light runoff another thing.  It depends on how much draught.

THE MASTER:  Do you feel qualified to answer the question?

THE WITNESS:  It would be in general terms, your Honor. The effect, of course, would be variable.  Mr. Sachse asked me what effect it would have on annual runoff.  And some years it would have -- years of light rainfall and low runoff, the absorption of water by the alluvium in the De Luz watershed area would be substantial.  And in other years of high

1   precipitation and runoff the absorption of water from the stream

2   flow might be rather insubstantial.

3   BY MR. SACHSE:

4      Q  Now, Colonel Bowen, I will call your attention to

5   Exhibit M-34B, and particularly to the last runoff calculation

6   therein, being the De Luz Creek gauge near Fallbrook for the

7   period/September 30, 1958.  Do you have that calculation before

8   you?

9      A  Yes, sir.  I have in my hand Plaintiff's Exhibit M-34B

10   and I am looking at the tabulation of daily runoff as it is

11   shown on a copy of the U. S. G. S. record for the period 1

12   October through 30 April.

13      Q  Now before we go further with that, can you indicate

14   for us, perhaps on M-14, the approximate location of the De Luz

15   gauging station, if it is not there already?

16      A  It is there already.

17      Q  It is there?

18      A  Mr. Sachse, the approximate location of De Luz Creek

19   is shown on Plaintiff's Exhibit M-14, with a red cross and the

20   symbol M-34-B written directly above it.

21      Q  In other words, practically the entire De Luz Creek

22   watershed is upstream from that gauge, isn't it?

23      A  Yes, sir.

24      Q  Now I notice that on April 1 of this year the gauge

25   runoff at that station was 920 cubic feet per second; is that

    correct?

A  Yes, sir.

Q  How many acre feet would that be in a day?

A  That would be -- 920 cubic feet per second, flowing continuously for twenty-four hours, would deliver approximately 1840 acre feet.

Q  I notice that there was a flow as high as 862 cubic feet per second on April 3.  How many acre feet will that deliver?

A  Well, a continuous flow of 862 cubic feet per second for a period of twenty-four hours would deliver approximately 1724 acre feet of water.

Q  Now the mean runoff for the period for April was 192 cubic feet per second, is that not correct, or do I read this wrong, the mean runoff for the month of April?

A  Yes, sir, that is correct.

MR. STAHLMAN:  Which is correct, you read it wrong or the compound question?

THE WITNESS:  It appears on the tabulation here in the column headed "April" at the top, and in the cross column near the bottom the figure "Mean" appears and the mean calculation for each month is given, and that for the month of April, 1958, appears as 192.

BY MR. SACHSE:

Q  And the acre feet of runoff for the month of April from De Luz Creek this year was 11,450 acre feet; is that correct?

1    A   Yes, sir, as shown on this record.

2    Q   And you have no reason to question the accuracy of the

3    U. S. G. S. record, do you?

4    A   Yes, sir.

5    Q   Oh, you do?

6    A   Yes, sir.

7    Q   Well, this is your exhibit.  I would be most happy to

8    hear what is wrong with the exhibit.  Please tell me.

9         THE WITNESS:   Your Honor, it will be noted that this last

10   page to which Mr. Sachse has been referring, Plaintiff's

11   Exhibit M-34B, had stamped on it "Unpublished record, subject

12   to revision", and this sheet is a photographic reproduction

13   of the U. S. G. S. record.  And in response to Mr. Sachse's

14   question it would be noted that before this was entered into

15   evidence that a red pencil correction was made in the month of

16   February, purely --

17        MR. SACHSE:   Wait a minute.  What red pencil correction?

18        THE MASTER:   Just a minute.  Let the witness finish his

19   answer.

20        THE WITNESS:   Purely an arithmetical error, which we

21   detected after the photograph had been made.  So the U. S  G. S.

22   reserves the right, as they do, to revise this, after many

23   checks, to work out all of the arithmetical errors and so

24   forth.  So instead of 11,060 acre feet for the month of

25   February it should read 1060.

1    MR. SACHSE:  Let me ask a question.  I have before me the

2    exhibit handed me by Mr. Veeder, which he told me was a copy

3    of this.  And I have absolutely no correction of any kind on

4    it.  Maybe the noon recess is a good time to straighten this

5    out.  This is absolutely news to me.  Mr. Bowen has just --

6    THE MASTER:  Since it is approximately 12:00 o'clock we

7    will take our recess until 1:30, and you can compare your copy

8    of the exhibit with the exhibit in evidence.

9    MR. SACHSE:  May I ask this to get one thing straight on

10    this very point?

11    Q   Then this correction, Colonel Bowen, was made before

12    this was offered in evidence?

13    A   Yes, sir.

14    Q   And it should appear then on these ones distributed to

15    us; is that right?

16    A   In error it was left off one.  Who got the other one,

17    Mr. Moskovitz?

18    MR. MOSKOVITZ:  I don't have mine with me now.  I can't

19    tell you whether it was left off or not.

20    MR. STAHLMAN:  I think I asked for one.  Did I get one of

21    those?

22    MR. VEEDER:  I think there were copies.

23    THE MASTER:  I think copies were given to all counsel.

24    But that can be corrected during the noon hour.

25    THE WITNESS:  I might explain how that calculation could

1    be made, your Honor, for the benefit of counsel.  It is noted

2    that the figures in daily runoff cubic feet per second for

3    each day of the month are in the vertical column, and then a

4    figure giving the sum of those daily runoff appears at the

5    bottom of the monthly column.  And in this instance it is 533.9,

6    which is the total for the month.  And by rough calculation,

7    Counsel or their engineers could multiply that figure by 2

8    and arrive at approximately 1060.

9         THE MASTER:  They forgot the decimal point in making the

10   calculation.

11        THE WITNESS:  Yes, sir.

12        MR. SACHSE:  Are we at recess?

13        THE MASTER:  We will recess until 1:30.

14        (Noon recess.)

15

16                              - - -

17

18

19

20

21

22

23

24

25

1       Fallbrook, California, June 5, 1958.   1:30 P. M.
2

3       THE CLERK:   Court is now in session.

4       MR. VEEDER:   If it is agreeable with your Honor, then,

5   I would like in the record that we withdraw the 33 series for

6   the purpose of binding those maps, and also to take the aerial

7   photos, 66 series, and withdraw them for purposes of binding.

8       THE MASTER:   That is understood.   It is in accordance

9   with the agreement at the time they were introduced in evidence.

10  And that will be done over the weekend and they will be ready

11  for us.

12      MR. VEEDER:   There is another thing I would like to

13  raise now and that is in regard to the transcript.   We are

14  going to arrange for reading the transcript, simply for typo-

15  graphical errors and things like that.   We will have a person

16  assigned to that.   And I wonder if the counsel are going to

17  read against their record and then there can be agreement as

18  to the revisions before they are duplicated, to the end that

19  everyone knows that there will be one key transcript in which

20  everyone is in agreement as to form.

21      THE MASTER:   That is, I understand you are referring to

22  having someone from the defendants read the master page before

23  it is duplicated.

24      MR. VEEDER:   That is right.

25      THE MASTER:   And additional copies prepared.

1      MR. VEEDER:  We will do the same thing, then we will have

2  somebody contact their representative, whoever it is, and have

3  agreement as to what the final form is going to be.

4      MR. SACHSE:  I am afraid I can't do it.  I haven't time.

5  I haven't anybody to assign.  If I find a correction I will

6  have to do as I did yesterday, call it to your attention.  I

7  will be happy to correct it.  I am sure Mr. Veeder will find

8  nine times--

9      MR. VEEDER:  What we will do, we will send you a list of

10  them.

11      THE MASTER:  We don't want to perpetuate errors.  Yes, it

12  is advisable if there are any mistakes to catch them before

13  they are duplicated.

14      MR. SACHSE:  I simply would find it impossible to do it.

15  I would have to depend on Mr. Veeder's examination of the master,

16  and if I find something that I think is startling, like a

17  negative for a positive, like we had yesterday, I will bring it

18  up for the record.

19      (Discussion off record.)

20      (Record read.)

21

22              ALLEN C. BOWEN resumed stand.

23              CROSS-EXAMINATION continued.

    BY MR. SACHSE:

24

25      Q  Now then, am I correct in stating for the record,

860

z3

1   Col. Bowen, that the change that is drawn on my copy of M-34B

2   containing the figure 11,060 for the month of February, 1958,

3   to 1,060, is the change that is just referred to in the record?

4        A   That change conforms to the change made on Plaintiff's

5   Exhibit M-34B.

6        Q   That is the change you did after the recess at my

7   request?

8        A   Yes, sir.

9        Q   Now, Col. Bowen, I would like you to assume that you

10  are the owner of an imaginary ten-acre parcel of riparian land,

11  all of which is irrigable, located immediately upstream from

12  the De Luz gauge.  And to further assume that the irrigation

13  requirement for all of that land was three acre feet per acre

14  per year, or a total of 30 acre feet in a year.  Have you

15  followed me?

16       A   Yes, sir.

17       Q   Now referring to M-34B, if you will, the water year

18  1958, will you tell me what percentage of the reasonable

19  irrigation requirements of this hypothetical parcel of land you

20  could have put to beneficial use during the period 16 March--

21  15 April, 1958?

22       MR. VEEDER:  I am going to object to this, your Honor.

23  There is nothing in the direct examination at all about such a

24  thing.  You can't have a hypothesis without having some evidence

25  in the record upon which to predicate the hypothesis.  And there is

1  nothing to show any riparian acreage at all at this point, and

2  certainly none immediately upstream.

3       THE MASTER:  The question in its present form I think is

4  probably unintelligible.  As I understood the question, it is

5  what percentage of reasonable irrigation requirements could have

6  been put to beneficial use.

7       MR. SACHSE:  During a given period of the year.  In other

8  words, if the reasonable irrigation requirement of any parcel

9  of land is 30 acre feet per acre year--

10      THE MASTER:  It is three acre feet per acre.

11      MR. SACHSE:  Three acre feet per acre per year, 30 total.

12      THE MASTER:  Yes.

13      MR. SACHSE:  What percentage of that requirement could

14  have been put to beneficial use during the period 16 March-

15  15 April, he having before him runoff figures, he having before

16  him rainfall figures, and he having testified that the runoff

17  follows closely after the rainfall.

18      MR. VEEDER:  Your Honor, we don't know what kind of crop.

19  We have no idea.

20      MR. SACHSE:  I don't care what the crop is.  He can modify

21  it in any way he wants.  Total reasonable use is three acre

22  feet per year.

23      MR. STAHLMAN:  What does it mean?  What are you getting at?

24      THE MASTER:  The question is still unintelligible to me.

25  It depends also on where the water is obtained.  It contains

z5

1  too many other requirements not contained in the hypothesis.

2  The objection is sustained.

3      MR. SACHSE:  All right.  I will rephrase it.  Withdraw

4  that.

5      Q  Col. Bowen, I will state first before I rephrase it

6  that the purpose of naming it as immediately upstream from the

7  De Luz gauge is for the sole purpose of tying it into the runoff

8  figures contained in M-34B.  There is no contention that such

9  land exists.  Col. Bowen, could a riparian owner of ten acres

10  of riparian land immediately upstream from the De Luz gauge have

11  put to beneficial use any water from the flow of De Luz Creek

12  on his land during the period March 16-April 15, 1958?

13      MR. VEEDER:  I am going to renew my objection, your Honor.

14  This hypothesis is-- there are so many unpredictables and im-

15  ponderables and hallucinations in this thing that we simply--

16  the witness couldn't possibly respond.  And there is certainly

17  no basis upon which to predicate a hypothesis.

18      THE MASTER:  The question is could he put anything to

19  beneficial use, and in that form I take it the witness might

20  be able to answer the question.

21      MR. VEEDER:  He might run a waterwheel.  He could do

22  anything, so far as I know.

23      MR. SACHSE:  I said on his riparian land.

24      MR. VEEDER:  He could have a waterwheel on his riparian

25  land, couldn't he?

z6

1    THE MASTER:  The way the question is framed I think the

2   witness can answer it.  If he can't, the witness can so state.

3    THE WITNESS:  If your Honor please, Mr. Sachse said I

4   have before me the provisional runoff records for the period

5   16 March through 15 April, which is correct, as shown in

6   Plaintiff's Exhibit M-34B.  He further stated I had the pre-

7   cipitation for that same period, which I do not have before me.

8    MR. SACHSE:  I didn't say that.  I say you have precipi-

9   tation records, and have testified that the runoff usually

10   follows immediately, and following a heavy rain.

11    THE WITNESS:  I merely wanted to show I do not have the

12   precipitation figures before me, your Honor.  And in response

13   to Mr. Sachse's question, during the period of 16 March through

14   15 April of 1958 it is unlikely that the owner of ten acres of

15   riparian land immediately upstream from the De Luz Creek gauge

16   near Fallbrook, California, as described in Plaintiff's Exhibit

17   M-34B--

18    MR. VEEDER:  Now, your Honor, there is a pending objec-

19   tion here.

20    MR. SACHSE:  Let him answer it.

21    THE MASTER:  The objection has been overruled.

22    THE WITNESS:  --would have irrigated that ten acres.

23   BY MR. SACHSE:

24    Q  Your answer was it was unlikely he would have irri-

25   gated.

z7

1        A   During that period described, yes, sir.

2        Q   Then I presume a part of that answer is he might have

3   put part of that water to domestic use; is that right?

4        A   Certainly.

5        Q   Now assume that instead of ten acres it is a thousand

6   acres at the same place and the same time.

7        THE MASTER:   Mr. Sachse, I don't see where this discussion

8   is getting any place.

9        MR. SACHSE:   Your Honor, if I may ask your indulgence for

10  two preliminary questions, this one and another one, and then

11  one that is extremely important.

12       Q   Now assume instead of ten acres he had a thousand acres,

13  Col. Bowen.   Would your answer be the same for the same period?

14       MR. VEEDER:   I renew my objection.

15       THE MASTER:   Mr. Sachse has promised to limit this to two

16  questions.

17       MR. SACHSE:   Two preliminary, and then the question.

18       Q   Would your answer be the same for a thousand acres?

19  Is there very little likelihood he could use it for irrigation

20  during that period?

21       A   I would have to know more about the physical character-

22  istics of the thousand acres, Mr. Sachse, of the hypothetical

23  thousand acres.

24       Q   The thousand acres are exactly the same as the ten.

25       MR. STAHLMAN:   Well,--

z8

1      MR. SACHSE:  Mr. Stahlman, will you please give me a

2  chance to get this question in.

3      THE MASTER:  Yes, let Mr. Sachse ask his questions here

4  for the next two questions only.

5      THE WITNESS:  Well, it is possible to operate with much

6  more latitude on a thousand acres than it is on ten, Mr. Sachse.

7  That is the reason I raise the question now.

8  BY MR. SACHSE:

9      Q  I am asking you would your answer be the same, that it

10  is very unlikely he would have put any water to an irrigation

11  use.

12      MR. VEEDER:  Very unlikely?  This is incredible.

13      MR. SACHSE:  That is the witness's answer.

14      Q  Is your answer the same for a thousand acres?

15      A  I would have to say I don't know for a thousand acres

16  on the basis of your premise, Mr. Sachse.

17      Q  Tell me, please, then, what is the difference between

18  the situation between the thousand acres and the ten acres.

19      MR. VEEDER:  He has already answered that.

20      MR. SACHSE:  I submit he has not, your Honor.

21      MR. VEEDER:  He says it has a great deal more latitude on

22  a thousand acres.

23      THE MASTER:  Just a minute.  If the witness can explain

24  the answer any further he may.

25      THE WITNESS:  Well, for example, a thousand acres might

1  have-- I presume that is irrigable.  The hypotheses presumes it

2  is irrigable.

3  BY MR. SACHSE:

4      Q. The hypotheses was it was all irrigable and had a water

5  duty of three feet.

6      A  You might, for example, be able to divert and route

7  stream flow around for spreading purposes.

8      Q  I said for irrigation, and your answer was for irriga-

9  tion.  I said would your answer be the same for irrigation

10  purposes, not spreading.  Irrigation purposes.

11      A  Well, I daresay there would be no need to divert for

12  irrigation, recollecting the pattern and distribution of rain-

13  fall during that period of time.

14      MR. SACHSE:  Thank you.  Now the second question, your

15  Honor.  I admit it took a few to get the first ones answered.

16  And this is the last now.

17      Q  Would your answer be the same for irrigation purposes

18  if there were 10,000 acres of land in that same position?

19      A  Yes, sir.

20      Q  It would be the same?

21      A  Yes, sir.

22      Q  Then is it not a fact, Col. Bowen, that during the

23  past winter-- I will withdraw past winter-- that during the

24  period March 15, '58-- March 16, '58 through April 15, '58,

25  a riparian owner could not possibly have used for irrigation

Z10

1   purposes-- any for irrigation purposes, any of the stream flow

2   at the De Luz gauge?

3       A   Well, Mr. Sachse, assuming that we have this ten or

4   a thousand or ten thousand acres of irrigable land immediately

5   upstream from the De Luz gauge, and that the nature and character-

6   istics of the rainfall and runoff were the same with that land

7   there as they are under the present circumstances, we could also

8   assume that the land owner would, for the irrigation season,

9   rely on pumpage from wells penetrating the soil upon which the

10  surface of which was considered irrigable.  And that during the

11  period of high precipitation and runoff these runoff figures

12  would be substantially different, because there would be a

13  considerable loss to recharge the water withdrawn from the

14  alluvium.

15      MR. SACHSE:  Your Honor,--

16      THE WITNESS:  That is why the question is--

17      MR. SACHSE:  Your Honor, I will--

18      THE WITNESS:  --almost impossible to answer.

19      MR. SACHSE:  It is not responsive to the question, which

20  was could a riparian owner use any part of the stream flow

21  during that period for irrigation of his riparian land.  That is

22  the question I wanted answered.

23      MR. STAHLMAN:  Could he or would he?

24      MR. SACHSE:  Could he.

25      THE MASTER:  The answer was not strictly responsive to

Z11

1  the question.

2      THE WITNESS:  Well, sir, but Mr. Sachse--

3      MR. VEEDER:  That was not the answer to the question.

4      MR. STAHLMAN:  I don't understand it.

5      THE MASTER:  Let the witness continue.

6      THE WITNESS:  No, your Honor.  It was not particularly

7  responsive because Mr. Sachse posed a set of circumstances

8  completely hypothetical, and then so far as I can see he is,

9  in referring to any riparian owner, he is going back to a more

10 factual consideration.  Therefore, I fail to understand the

11 question.

12     THE MASTER:  Mr. Sachse, I have given you considerable

13 latitude in this examination.  But I, after having gone clear

14 through it, I can't see that you are obtaining any facts from

15 this witness.  It seems to me you are endeavoring by his testi-

16 mony to advance an argument of your own which can be advanced

17 as a matter of argument, based upon documents in the record,

18 and that no further testimony of any witness is required.

19     MR. SACHSE:  Well, if your Honor is going to foreclose

20 me I am extremely sorry.  To me this is the type of question

21 that becomes the heart and sole of the entire controversy,

22 namely, the question of whether or not stream flow in these

23 flash streams is any actual part of a riparian right for

24 practical purposes, or whether it is not a fact that the only

25 way such stream flow can be put to beneficial use is through

Z12

1   its storage, either above or below ground.

2        MR. STAHLMAN:  That becomes a legal question.

3        MR. SACHSE:  May I finish?  That at the time the stream

4   flow occurs it is unusable to any riparian.  Now if your Honor

5   wants to foreclose me-- perhaps I should have done it first-- I

6   will make an offer of proof.

7        THE MASTER:  What you have now said is advancing a legal

8   argument.  The question which you directed to the Colonel, as

9   near as I can see, did not produce anything of evidentiary value.

10       MR. SACHSE:  I have asked him--

11       THE MASTER:  I do not believe personally that they are

12   necessary or tend to support your thesis.  It is a legal argu-

13   ment.

14       MR. VEEDER:  And I move to strike them.

15       THE MASTER:  In any event, I think further inquiry along

16   those precise lines will get you no place.

17       MR. VEEDER:  Then I move to strike this whole line of

18   questioning and all the answers, because your Honor has just

19   stated what I think is absolutely correct, that there was no

20   probative value in any of this evidence.  There was no evidence.

21   There is nothing probative.  It doesn't tend to prove any issue

22   in this case.  And I therefore move to strike.  It should not

23   be in the record.

24       THE MASTER:  The motion to strike the questions beginning

25   with the hypothetical question about the ten acres of land is

Z13

1   granted.

2        MR. VEEDER:  Your Honor, I raise an additional factor here.

3   And I hesitate to do it.  But I have sat back as long as I can.

4   Mr. Sachse represents these clients.  Here is one, two, three,

5   four, five, six-- at least seven.  He says that he wants to put

6   in evidence to prove that these people can't use the water.  And

7   there is a direct and immediate conflict of interest between his

8   representation of the Fallbrook Public Utility District and these

9   people here.  We have worked very hard to protect the interests

10  of these people, your Honor.  We are extremely anxious to do it.

11  And I deny that Sachse can represent these seven people and the

12  Fallbrook Public Utility District at the same time.  I was

13  refused permission to introduce evidence in regard to the very

14  thing that he has been attempting to elicit evidence on right

15  now.  I tried real hard when the Court was here.  I have tried

16  real hard in your presence.  And now he comes through with

17  cross-examination conflicting with his own clients, if you

18  please.  I don't see how the people of De Luz can tolerate it.

19  But I tried to bring out in our direct examination that there

20  was a conflict with impounding waters of Fallbrook with these

21  people here.

22        THE MASTER:  Mr. Veeder, the tenor of the cross-examination,

23  as I have permitted it at the beginning, was on the basis that

24  he was examining the credibility and the reliability of Col.

25  Bown.  Now matters can be gone into on cross-examination which

1  cannot be gone into in the case in chief, as you are well aware.

2     MR. VEEDER:  May I add one point, though.  But what he says

3  is, "What I want to elicit from this witness is to show that it

4  is necessary to have storage."  And that was the whole reason

5  for this examination.  And that is why Moskovitz and the rest

6  of them are here.  They are trying to defend their Bulletin 57

7  by this kind and type of examination, your Honor.  This is very

8  important, when he brings in this question of storage.  I was

9  denied the right to bring in that yesterday, your Honor.  I am

10  not objecting to your rulings.  I am objecting, but your Honor's

11  rulings are understood.  I was not permitted on direct examina-

12  tion to touch this very point that Mr. Sachse is attempting to

13  bring in now by not on his statement.

14     THE MASTER:  I am not going to permit evidence to be

15  brought in directly on the question of storage as such.  As I

16  say, the reason for permitting the questioning of the witness

17  was on the theory that it might have some bearing upon his

18  credibility and upon the accuracy of previous statements which

19  he had made.  And for those purposes I think it was proper

20  cross-examination.  But when it became obvious that it was not

21  actually in any way affecting the credibility of the witness

22  or statements previously made, I stated that the examination

23  should proceed no further, and ordered the previous examination

24  stricken from the record.  I think the record is consistent

25  in that respect.

Z15

1    MR. SACHSE:  Now may I make an offer of proof, your Honor?

2    THE MASTER:  Yes, you may make an offer of proof.

3    MR. SACHSE:  I offer to prove by this witness that in his

4    opinion it would be impossible for any riparian owner, regardless

5    of the acres of his irrigable holdings, to have put to use-- to

6    irrigation use-- pardon me-- any of the runoff of De Luz Creek

7    for the period 16 March through 15 April, inclusive, without the

8    use of above or below surface storage.

9    MR. VEEDER:  I object to the offer.

10   THE MASTER:  The objection is sustained and the offer is

11   denied.

12   MR. MOSKOVITZ:  Your Honor, may I ask a question?  I am

13   a little puzzled here.  You stated that the cross-examination

14   was for the purpose only of challenging the credibility or the--

15   THE MASTER:  That is not the sole purpose of cross-

16   examination, of course.

17   MR. MOSKOVITZ:  That is what I wanted to clarify, whether

18   it is-- as I understood Mr. Sachse's question, it went to facts,

19   not law.

20   THE MASTER:  The question as I understood it, he was not

21   inquiring about facts.  He was inquiring about a hypothesis and

22   a theory.

23   MR. SACHSE:  My last statement your Honor, my offer of

24   proof is that he would testify to an opinion.

25   MR. MOSKOVITZ:  As to facts, as I understand it.

Z16

2

1    MR. SACHSE:  I offered to prove that his opinion is that

2  such water could not be put to use during that period.  And I

3  submit it is proper.

4    THE MASTER:  My ruling on that is based upon that particu-

5  lar factor is not before me for ruling.

6    MR. SACHSE:  Very well.  I will not belabor this any

7  further.  I won't follow Mr. Veeder's technique of insisting on

8  twenty offers of proof.  I think one is enough for the record.

9    Q  Col. Bowen, is it not a fact that--  Withdraw that for

10  a moment.  Col. Bowen, I went through the M-34 series of exhibits,

11  which are the runoff exhibits at the several gauging stations,--

12    A  Yes, sir.

13    Q  --during the noon hour, and I find that only one of them

14  has a tentative unpublished record for any part of the water year

15  '58; is that correct?  The rest have not been supplied yet?

16    A  That is correct, sir.

17    Q  Do you have them available for 19--

18    A  No, sir.

19    Q  --58 for any other station?

20    A  No, sir.

21    Q. Do you have records of your own, not U.S.G.S., as to

22  the runoff at any other station during the water year '58?

23    A  Yes, sir.  But these records are made and turned over

24  to U.S.G.S., and they are in their custody at the present time.

25    Q  So you don't know today what the runoff was at Ysidora

Z17

1    in March or April?

2       A   Yes, sir, I do.

3       Q   You do?

4       A   Yes, sir.

5       Q   All right. Will you tell me what the runoff for the

6    month of April, 1958, or the spill, if you choose-- prefer the

7    word-- I don't care-- the measured runoff at the Ysidora gauge

8    for the month of April, 1958, was?

9       A   For the month of April, 1958. As I recall, Mr. Sachse,

10   that was approximately 24,500 acre feet.

11       Q   Do you have in your mind-- Withdraw that. I don't

12   know how to phrase this. Is it easier for you to recall total

13   figures or monthly figures? I would like to ask you about

14   several other months. In other words, do you know better the

15   entire winter season or by months or how do you prefer?

16       A   You mean for this?

17       Q   For the unreported figures at Ysidora.

18       A   I can remember them fairly closely, I believe, Mr.

19   Sachse.

20       Q   By months?

21       A   By months.

22       Q   And the April figure you gave me was how much?

23       A   About 24,500, to the best of my recollection. That

24   is subject to revision.

25       Q   I realize that. How about the March figure at the

Z18

1  same gauge?

2      A  As I recall that was a little less than 8,000, 7,880,

3  I believe.

4      Q  And how about the February figure at the same gauge?

5      A  Zero flow.

6      Q  Col. Bowen, do you recall testifying before the House

7  Committee on Interior and Insular Affairs on the 1st and 2nd of

8  May or the 30th of April of this year?

9      A  Thereabouts.

10      Q  We were both there?

11      A  Yes, sir.

12      Q  And I do not have your transcript here.  It is at my

13  office.

14      MR. VEEDER:  I object to this line of questioning.  It

15  is beyond the scope of the direct examination.

16      MR. SACHSE:  This is direct impeachment.  I am going to

17  give him a chance to refresh his memory.

18      THE MASTER:  I don't know, Mr. Veeder, how you can tell

19  what the question is going to be.

20      MR. VEEDER:  He is going to testify the Colonel testified

21  about 25,000.

22      THE MASTER:  Let's find out what he is going to ask.

23  BY MR. SACHSE:

24      Q  Do you recall testifying at that hearing?

25      A  Yes, sir.

Z19

1    Q  Do you recall testifying that the runoff at the Ysidora

2  gauge for the period 1 February through 30 April had been 45,000

3  acre feet?

4    A  I don't recall having used that date 1 February, Mr.

5  Sachse, but I did testify that the-- to the best of my knowledge

6  at that time the runoff at the Ysidora gauge on the Santa

7  Margarita River for the winter period of '57-'58 was about

8  45,000 acre feet.

9    Q  Thank you.  Do you have any similar information as yet

10  unpublished regarding measured figures at the Fallbrook gauge?

11    A  No, sir, I don't, if they are not in these M-34 series.

12    Q  No, they are not contained.

13    A  I do not have possession of them.

14    Q  Does not your office obtain the readings from Mr.

15  Green that he takes at the Fallbrook gauge?

16    A  Yes, sir.

17    Q  And what do you do with those readings when you get

18  them?

19    A  Put them in the file.

20    Q  Well, then the readings of the Fallbrook gauge for this

21  past winter are available to you, are they?

22    A  You are referring to the official readings, Mr. Sachse,

23  and Mr. Green pulls the charts off of each of those gauging

24  stations and sends them to Los Angeles where the runoff is

25  computed by U.S.G.S. and entered into their official report.

Z20

Q   Does he do that at Ysidora also?

A   At all gauging stations that he observes on the Santa Margarita River or its tributaries.

Q   But you have in your file the figures for Ysidora, but you don't have them for Fallbrook; is that right?

A   Yes, I have some figures for Fallbrook.

Q   For the winter of this past year?

A   Your question, if I remember your question, Mr. Sachse, was with reference to these provisional unpublished reports. And my answer as stated to that question was "No", which is correct.

Q   Do you have runoff figures, measured runoff figures at the Fallbrook gauge for the winter-- for the past winter?

A   Yes, sir, unofficial unpublished.

Q   Do you have any present recollection of those figures by months?

A   No, sir.

Q   None whatsoever?

A   No, sir.  However, they are in my files in my office and I could obtain them and bring them up here.

Q   I wish you would.  Will you do so, please?

A   Yes, sir.

Q   Col. Bowen, I believe I asked you this at the very beginning of my questioning, but I want to double check.  You and your staff made the engineering and land use studies not

Z21

1  only of the private properties in the De Luz  Creek watershed

2  but also of the various Government lands in that watershed, did

3  you not?

4      A  We have made some studies.  You mean of--

5      Q  Forest public domain and so on within the De Luz Creek

6  watershed.

7      A  Yes, sir.

8      Q  Your office made those studies?

9      A  Yes, sir.

10      Q  Now did your office also make studies of the Vail lands

11  within the De Luz Creek watershed?

12      A  We made some studies of the Santa Rosa Ranch, yes, sir.

13      Q  Within the De Luz Creek watershed?

14      A  Yes, sir.

15      Q  I noticed that on the exhibit.

16      MR. VEEDER:  Which exhibit, Mr. Sachse?

17      MR. SACHSE:  The exhibit on which the parcels are

18  described.  This map here, M-32.  You know the one I refer.

19      THE WITNESS:  Yes, sir.

20  BY MR. SACHSE:

21      Q  I notice on M-32 the Vail, the Parcel 1, the number 1

22  appears up in the Vail Ranch.

23      A  Yes, sir.

24      Q  You treated that then as a single parcel?

25      A  Yes, sir.

M22

1    Q  Do you have prepared any bound finished studies of the

2    engineering studies of the lands on the Vail watershed?

3    A  No, sir.  We have been requested by Mr. Vail and his

4    counsel, Mr. Stahlman, to make such studies.  But it was our

5    understanding that those matters would be considered by Judge

6    Carter in his trial of the major issues of the case, so we

7    have deferred our service to the Vail Company in behalf of the

8    smaller users on the watershed who have applied for engineering

9    investigation and report. And that is in concurrence with the

10   Master's desires, too, as I understand it.

11   Q  That is all I wanted to get straight.

12   A  Yes, sir.

13   Q  As of now there are not available engineering studies

14   on the Vail, comparable to those you have made on private in-

15   dividuals?

16   A  That is correct, sir.  At least not from our office.

17   Not from our office.  I don't know what other material the Vail

18   Company has.

19   Q  That is right.  Now you stated you made some studies--

20   I should say studies on some of the Government lands within the

21   watershed, and I should say outside of the military reservation.

22   A  Yes, sir.

23   MR. VEEDER:  Now wait a minute.  Are we outside of the

24   De Luz area now?

25   MR. SACHSE:  No, in the De Luz Creek watershed but outside

Z23

1    of Vail and outside of the military reservation.

2         Q   You did make studies on some Government land?

3         A   Yes, sir.

4         Q   Now can you tell me, to save time, which of the many

5    exhibits would be most helpful to you to show us where you made

6    those studies?

7         A   Well, those various parcels of land under trusteeship

8    of the Federal Government are shown on Plaintiff's Exhibit --

9         Q   M-14 is the one underneath.

10        A   -- M-14.

11        Q   That is the best vehicle to point out where you have

12   made such studies?

13        A   That is the only vehicle to point out where those

14   parcels exist.

15        Q   All right.  Will you tell me, please, and start in

16   wherever is most convenient, where you have made studies of

17   Government land within the De Luz Creek watershed outside of

18   the military reservations and outside of Vail?

19        A   May I borrow your pencil, please, sir, so I can point?

20   A portion of the Trabuco unit of the Cleveland National Forest

21   lies within the watershed of De Luz Creek, on the westerly side

22   of the De Luz Creek watershed.  And it is illustrated on

23   Plaintiff's Exhibit M-14 by the area crosshatched with a wavy

24   diagonal line.

25        MR. SACHSE:  May I interrupt, please?  It would help me

Z-24

1  if we take-- May we have M-32 and put it up on the wall next

2  to that.

3        (Discussion off record.)

4  BY MR. SACHSE:

5        Q  Now so we can start again, Col. Bowen, will you indi-

6  cate-- and please indicate on both M-32 and on M-14-- the loca-

7  tion of such studies on M-32, giving us the parcel numbers.

8        A  I have described heretofore the location of the portion

9  of the Trabuco unit of the Cleveland National Forest as it is

10  shown on Plaintiff's Exhibit M-14.  Now the boundary of the--

11  the exterior boundary of that portion of the Cleveland National

12  Forest is shown also on Plaintiff's Exhibit M-32 and labeled

13  "National Forest Boundary", the line between Sections 26, 27,

14  34 and 35, Township 8 South, Range 5 West.  And then from the

15  southeast corner of Section 26, 8 South, 5 West, the line

16  follows the easterly section line of Section 26 and continues

17  on up the easterly line of Section 23, 8 South, 5 West, and

18  extends on up along the easterly boundary of Section 14, 8 South,

19  5 West, with its intersection with the watershed of the-- the

20  crest of the watershed of the De Luz Creek.

21        Q  Now that is not delineated as a specific parcel then

22  on M-32, is it?

23        A  Yes, sir.

24        Q  What is the number?

25        A  It should be Parcel No. 83.  May I refer to Plaintiff's

Z-25

1   Exhibit-- I believe it is M-38, that list of parcels.  M-38, I

2   believe.

3       MR. VEEDER:  31.

4       THE MASTER:  31.

5       THE WITNESS:  Thank you.  M-31.  Thank you.  Referring to

6   Plaintiff's Exhibit M-31, on page number 11-- correction, on

7   page number 12, is shown under Parcel 83, De Luz Watershed, the

8   initials U.S.A.

9   BY MR. SACHSE:

10      Q  And that then would be the large area, the large square

11  on M-32 that goes both within and without the watershed, the

12  large rectangle; is that right?

13      A  Yes, sir.  But the only parcel considered is that

14  within the watershed.

15      Q  Is that within the watershed?

16      A  Yes, sir.

17      Q  Now to speed this up, instead of telling us all the

18  section lines, if you could just indicate by referring to M-14

19  the Federal parcels involved.

20      A  Referring to Plaintiff's Exhibit M-31 on page 11, at

21  the bottom of the page, Parcel 81, De Luz watershed, is indi-

22  cated as U.S.A. and that appears on Plaintiff's Exhibit M-14

23  as the area with the diamond crosshatching or rectangular-

24  diamond crosshatching.  And Section 30, 8 South, 5 West, appears

25  also on Plaintiff's Exhibit M-32 as Parcel 81, with the number

Z-26

1    indicated within the section and encircled.

2         Q   Is that National Forest also?

3         A   No, sir.   It is symbolized on M-14 as -- that is under

4    the supervision of Bureau of Land Management.

5         Q   All right.   The next one?

6         A   The only National Forest land I have described.   There

7    is no more.

8         Q   The so-called Trabuco area?

9         A   No, sir.

10        Q   I say the only National Forest is the so-called

11   Trabuco area?

12        A   The Trabuco unit of the Cleveland National Forest.

13        Q   Tell us the other.

14        A   The rest I will describe as all Bureau of Land Manage-

15   ment property except the naval reservation, which you have

16   excluded.

17        Q   Yes.   I don't want naval, just the other.

18        A   I have already mentioned Parcel No. 81.   And immediately

19   adjoining that is a smaller parcel, which was included with--

20   since it is contiguous-- was included with 81, and extends on

21   over into Section 31.

22        Q   All right.

23        A   The contiguous area is shown crosshatched with a

24   rectangular and diagonal crosshatching on Plaintiff's Exhibit

25   M-14, and is included within Parcel No. 81 shown on Plaintiff's

Z-27

1  Exhibit M-32 and is the Parcel 81, De Luz Creek watershed, as

2  shown in Plaintiff's Exhibit M-31.  Now referring to Plaintiff's

3  Exhibit M-14, lying easterly of the main stem of De Luz Creek

4  is another parcel of land under Federal ownership.  This is

5  listed on page 8 of Plaintiff's Exhibit M-31 as Parcel 52, De

6  Luz watershed, U.S.A., and Parcel 52, No. 52, encircled, is

7  within the exterior boundaries of that segment of land as shown

8  on Plaintiff's Exhibit M-32.

9       Q  That is all I wanted to do is get them located on this.

10  So go ahead.

11      A  Yes, sir.  Now another small isolated area lying still

12  further east of De Luz Creek is shown on Plaintiff's Exhibit M-14,

13  also under the management of the Bureau of Land Management, and

14  shown on Plaintiff's Exhibit M-32 as Parcel No. 57, with the

15  number 57 encircled within the exterior boundaries of that

16  parcel.  And it is shown also on page 8 of Plaintiff's Exhibit

17  M-31 as Parcel 57, De Luz Watershed, U.S.A.

18          Now contiguous to the east fork of De Luz Creek, and

19  extending southeasterly therefrom is an irregularly-shaped

20  area symbolized as being under the management of the Bureau of

21  Land Management on Plaintiff's Exhibit M-14, and indicated on

22  Plaintiff's Exhibit M-32 as Parcel No. 24, with the number 24

23  encircled and placed within the exterior boundaries.  A portion

24  of this parcel extends easterly outside the watershed of De Luz

25  Creek.  That appears on page 4 of Plaintiff's Exhibit M-31 as

Z28

1 Parcel 24, De Luz watershed, as U.S.A.  And that I believe is

2 the extent of Federal ownership, excepting the area within the

3 naval reservation in the De Luz Creek watershed.

4     Q  O.K.  Thank you.  Now which of those parcels have you

5 completed soil survey studies or engineering studies on?

6     A  Well, we have completed studies on all of them, as

7 shown on our exhibit.

8     MR. VEEDER:  37.

9 BY MR. SACHSE:

10     Q  I understood you to say you had completed on some of

11 them.  That is why I asked the question.

12     MR. VEEDER:  I would like to have that exhibit identified.

13     MR. SACHSE:  The one with all the colors on it.  I think

14 we will want that one next, anyway.  So just bring it out.  I

15 think actually all I want is these two now.

16     Q  Well, perhaps I didn't make myself clear, so sit down

17 and I will ask some more questions on these studies.  Now you

18 testified that you made three different types of studies.  One

19 you referred to as a detailed study.  The second, as I have in

20 my notes, a detailed reconnaissance study.  And then a

21 reconnaissance study.  Is that correct?

22     A  Yes, sir.

23     Q  Now in the detailed study did you determine the

24 boundaries of the property?

25     A  Yes, sir.

Z-29

1      Q   And did you discuss the property with the owner?

2      A   Yes, sir.

3      Q   And did you obtain from him a history of the land's use

4   and its development, if you could?

5      A   If we could, yes, sir.

6      Q   And a history of the water development, if you could?

7      A   If we could.

8      Q   All of these questions, Colonel, are as to detailed

9   studies?

10     A   Yes, sir.

11     Q   And did you determine or attempt to determine his plans

12  for the future, if you could do so?

13     A   Yes, sir.  That was discussed with the owner if he

14  was available.

15     Q   And when I say "you", I am including your staff.

16     A   Yes, sir.

17     Q   I do not mean you personally.

18     A   Yes, sir.

19     Q   And did you make on-the-ground examination of the

20  terrain in a detailed study?

21     A   Yes, sir.

22     Q   How thoroughly was that investigation made by acres?

23     A   As thoroughly as the complexities of the soil and

24  terrain required.

25     Q   In other words, you moved over the property until you

Z-30

1    were satisfied you had covered all of its principal types?

2        A   Yes, sir.

3        Q   Did you make an examination of its water sources other

4    than streams?

5        A   Yes, sir.  We included in our reports the location of

6    wells, if any, distribution systems and reservoirs and so forth.

7        Q   Well, that is not quite the answer I wanted.   Did you

8    make an investigation of other water sources, not water systems

9    or wells, but ground water, springs?

10       A   Where springs existed and we found them, we plotted

11   them on the map, yes, sir.

12       Q   And did you make a determination of whether or not the

13   water underlying portions of the land were what Judge Carter

14   classified loosely as local water, water not being a part of the

15   stream?

16       A   We did not make that specific determination, no, sir.

17       Q   You did not make that in any cases?

18       A   We didn't make a finding in that regard.

19       Q   No finding.  You have stated--

20       MR. VEEDER:  May I inquire at this juncture, is this for

21   purposes of impeachment, Mr. Sachse?

22       MR. SACHSE:  This is cross-examination on the De Luz

23   watershed.  And I don't think I have to spell out for the

24   witness's edification whether I am trying to impeach him or

25   trying to elicit facts.

Z-31

1          MR. VEEDER:  May I make just a brief statement, then, your

2     Honor.  Mr. Sachse's clients have accepted these studies.  Mr.

3     Sachse himself has accepted them.  I don't believe that counsel

4     can impeach his own exhibits.  And if the purpose is to impeach

5     his exhibits, his own evidence, then I certainly object to this

6     line of cross-examination.

7          THE MASTER:  These are not Mr. Sachse's exhibits.  They

8     are introduced by you.

9          MR. SACHSE:  That is right.

10         THE MASTER:  At the time they were introduced he stated

11    he had no objection to their introduction, but that he might

12    wish to question Col. Bowen with reference to some of them at a

13    later date.  And I think he has a perfect right to question him

14    at the present time.

15         MR. SACHSE:  I would like to go a step farther, your

16    Honor, and if the acceptance by any individual landowner of

17    the offer of the United States to make this survey binds that

18    landowner to the acceptance of the survey, I think we had better

19    say it right now on the record, because I have told all of my

20    people, "By all means get the survey.  You are bound to nothing."

21    And if I am wrong I want to learn right now.

22         THE MASTER:  Well, as far as the Court is concerned the

23    acceptance by a landowner of such a statement the request to

24    have the survey made is not an agreement to be bound by every-

25    thing contained in it.

Z-32

3

1    MR. VEEDER:  I was extremely anxious to get this matter

2  cleared up.  As I understand, when Mr. Sachse is representing

3  a man I truly thought these became the evidence in support

4  of that, in support of that claimant's that--defendant's claim.

5    MR. SACHSE:  Some of them may.

6    MR. VEEDER:  And if they are constituted evidence of that

7  man's claim I simply say they are not subject to being impeached.

8  And I object to this line of examination.

9    THE MASTER:  No, they were admitted as evidence subject

10  to correction, verification, explanation--

11    MR. SACHSE:  Objection.

12    THE MASTER:  --objection by Mr. Sachse at a later date.

13    MR. VEEDER:  Well, I have made my objection, your Honor.

14    THE MASTER:  Your objection is overruled.

15    MR. VEEDER:  Thank you.

16  BY MR. SACHSE:

17    Q  Col. Bowen, you testified--

18    MR. DENNIS:  I wonder if Mr. Veeder is still persisting

19  in his objection.  I am curious, too, because I understood

20  Judge Carter in his opening of this hearing in this courtroom

21  to state to these people here that they would not be bound by

22  any engineering report that might be made by the Government,

23  but they were just getting a chance to take a look at what the

24  plaintiff's case is, and they would have ample opportunity to

25  rebut any portion of it that they disagreed with.

Z-33

1      THE MASTER:  That is certainly true.

2      MR. DENNIS:  But if Mr. Veeder is still persisting in his

3  objection, I think we should know it.

4      THE MASTER:  Mr. Veeder is still persisting in his objec-

5  tion, as I understand it, that after he has offered such an

6  exhibit in evidence that it has a certain effect.  That is not

7  binding upon Judge Carter or upon the Master.

8      MR. VEEDER:  Well, I can certainly make my record, as I

9  understand it.

10     THE MASTER:  Yes.  Mr. Veeder is entitled to make a legal

11  objection on the record if he wishes to.

12     MR. MOSKOVITZ:  I think we should know whether Mr. Veeder

13  would reiterate these same objections as to other landowners.

14  If the State asks for the United States to make these surveys,

15  would Mr. Veeder feel we are somehow bound by them?

16     MR. VEEDER:  Mr. Moskovitz, you and your hypothetical

17  questions and what might occur and what might not occur interest

18  me not at all.

19     THE MASTER:  In any event, Mr. Moskovitz, regardless of

20  whether Mr. Veeder might take that position or not, the ruling

21  which I would make-- and I am sure the ruling Judge Carter

22  would make-- would be the same, that you are not bound by them

23  and that you may challenge them to the extent that you can prove

24  they are wrong, or to the extent that you desire to challenge

25  them.  Proceed, Mr. Sachse.

Z-34

BY MR. SACHSE:

Q  You have testified, Col. Bowen, in these detailed studies, and I am still confining myself to detail, that you made numerous soil borings and tests.  And I presume that your answer to a question about "numerous" would be just like it was on the ground examination.  You made as many as you thought necessary to cover the different soil types; is that right?

A  Yes, sir.

Q  In other words, you can't say I made five per acre or two per acre or none per some acres?

A  That is right, sir.

Q  Did you consider frost conditions, climate conditions?

A  Yes, sir.

Q  Such as the exposure of the land to the north and the south, air drainage and so forth?

A  Yes, sir.  Relation to the valley floor, hillside.

Q  And you considered those factors in your determination of irrigable land?

A  Yes, sir.

Q  Now did you drill any deep test holes as distinct from ground augers, hand auger test holes, deep ones to determine possible ground water conditions or substrata?

A  No, sir.

Q  Where did you obtain your data as to the subgeologic conditions deeper than you could get with a hand auger?

Z-35

1    A   From the wells that exist in the area.

2    Q   Did you get well logs for every well?

3    A   No, sir.  I don't believe we got well logs for every

4  well, because it is impossible to get them on some.  But for

5  those that we could get logs on, we did.

6    Q   Did you have any other source of basic data as to the

7  geology in the deeper structures?

8    MR. VEEDER:  This is going beyond the scope of the direct.

9    THE WITNESS:  On the De Luz Creek other than wells?

10    MR. VEEDER:  I am going to object because this is going

11  beyond the scope of the direct examination of this witness at

12  this time.  I am calling a geologist who will be a witness,

13  who will testify in regard to the very subject concerning which

14  Mr. Sachse is touching at the present time, and particularly

15  in regard to the alluvium in the area, and particularly in

16  regard to its depth.  Now--

17    MR. SACHSE:  I am perfectly willing to cross-examine the

18  geologist.  All I want to know is what Col. Bowen considered

19  in his evaluations.  If he used a geologist's report, I would

20  like to know it.  That is all.  I think the question is proper.

21    THE MASTER:  I think the question is proper.  You may

22  answer.

23    THE WITNESS:  Yes, sir.  A section of the report of

24  engineering investigations concerns itself with geology.

25

Z-36

BY MR. SACHSE:

Q  Where did you obtain that data?

A  We obtained that from areal-- and by that I mean a-r-e-a-l, rather than a-e-r-i-a-l-- areal geological mapping, mapping the contacts as they appear on the surface of the ground.

Q  Who did that, you and your staff?

A  That was done under my supervision and direction, yes, sir.

Q  So then you and your staff determined it, or did you and your staff determine the subsoil conditions of the De Luz Creek watershed?  That is what I want to know.

A  Yes, sir.

Q  And your staff?

A  Yes, sir.

THE MASTER:  We will take our ten-minute recess at this time.

(Recess.)

THE MASTER:  You may proceed, Mr. Sachse.

BY MR. SACHSE:

Q  Col. Bowen, then as I understand it on this question of geology, you have geologists actually assigned to each of the teams that conduct these surveys for you; is that right?

A  Well, either assigned to each of the teams or that goes out the same time the soil survey is made, dependent upon

Z-37

1    the number of geologists I have.

2        Q  But you have geologists who work with your soil survey

3    teams?

4        A  Yes, sir.

5        Q  Now what other references or what references have you

6    used in these surveys?  Obviously, you have used U.S.G.S. maps.

7        A  Yes, sir.

8        Q  What else?

9        A  Well, the aerial photograph is the base for the field

10   survey.

11       Q  What have you used up in the De Luz watershed for the

12   line of aerial photographs?  Did you take your own?

13       A  Yes, sir.

14       Q  You did not use U.S. Department of Agriculture aerial

15   photographs?

16       A  No, sir.

17       Q  There are, as I think you know, U.S. Department of

18   Agriculture surveys, Soil Conservation surveys on many De Luz

19   parcels.

20       A  Yes, sir.

21       Q  Did you use any of those as references or cross-checks?

22       A  Wherever possible for us to do so, we have referred

23   to them, because we are using the same type of legend, the same

24   technique of surveying, the same criteria as developed on a

25   nationwide basis by the Soil Conservation Service, and naturally

Z-38

1   we are not anxious to have a great deal of variation between

2   our interpretation and that of the Soil Conservation Service.

3        Q   So whenever you could obtain them, you did refer to

4   them?

5        A   Yes, sir.

6        Q   Now did you use any other studies?

7        A   No, sir, not to my recollection.

8        Q   Now with specific reference to the question of the

9   irrigability of land, did you consider the availability of

10  electric power, for instance, in determining irrigability?

11       A   No, sir.  Our determination of irrigability is only

12  with regard to its physical characteristics of the land itself

13  without regard to the availability of water, source of water,

14  power, and what have you.

15       Q   Then it is possible, if I understand you correctly,

16  that you found land to be irrigable which, at least presently,

17  has no practical possibility of irrigation; is that correct?

18       A   That is very possible, yes, sir, largely due to the--

19       MR. STAHLMAN:  Pardon me, Colonel.  I know you are ex-

20  hausted.  Will you keep your voice up a little bit?

21       THE WITNESS:  Yes, I will.

22  BY MR. SACHSE:

23       Q   Would you repeat the answer, please, then?  You say

24  that is very possible.  Then you said something else.

25       (Answer read.)

Z-39

1        A   --paucity of water at certain seasons of the year.

2    BY MR. SACHSE:

3        Q   Now in determining irrigability, did you consider the

4    cost of bringing water to the land?

5        A   In a general way, yes, sir, we did.

6        Q   Well, can you tell me by an example or by more detailed

7    explanation what you mean, that you did consider it in a general

8    way?

9        A   Well, for example, if say there was an acre or two of

10   land which we found to be irrigable, which was not contiguous

11   to any other body of irrigable land-- in fact, there might be

12   considerable distance separating a small body from other bodies

13   of irrigable land-- we considered it would be improfitable to

14   run a pipe line or convey water over to a small isolated area,

15   and in that manner we may have decided that some lands were

16   not susceptible of practical and profitable irrigation.

17       Q   Now how would such a parcel be shown on your soil

18   study?  Would it be shown by its actual soil type or would it

19   have an arbitrary classification?

20       A   No, sir.  It is shown according to these classes that

21   are depicted here on Plaintiff's Exhibit M-37 and defined I

22   believe on Plaintiff's Exhibit M-38.  May I have M-38, please?

23       THE CLERK:  What was that?

24       THE WITNESS:  That is land classification, about a page

25   size sheet with the colored rectangles and the Roman numerals.

897

Z40

1   Yes, sir.  That is it.  All lands were correctly classified in

2   accordance with the classes listed on Plaintiff's Exhibit M-38.

3   BY MR. SACHSE:

4       Q   Now I haven't read all your reports, but those I have

5   read have arrived at the total of the irrigable acreage by

6   totaling the acreage in land classes II through VI generally,

7   sometimes with slight exceptions in VI, and saying they are

8   all irrigable; is that correct?

9       A   By and large I think we found they all were, because

10  referring to Plaintiff's Exhibit M-37 it is easily seen these

11  classes of land which are considered irrigable, I through VI,

12  by and large are contiguous and located in the heart of the De

13  Luz Creek watershed near and surrounding the confluence of the

14  main tributaries of the De Luz Creek.

15      MR. VEEDER:  Counsel, could I ask you to step to one side?

16  BY MR. SACHSE:

17      Q   Then, Colonel, the example you gave me a minute ago

18  of possibly finding a small parcel isolated from other irrigable

19  parcels and classified as non-irrigable, does that appear any-

20  where on M-37?

21      A   We would not classify it as non-irrigable, Mr. Sachse.

22  But if that occurs-- and I am not saying it did-- you asked me

23  to give you an example, and I can't from these myriad reports

24  pick out one that I could point out.  If that did occur we

25  would simply say that this land is irrigable from the standpoint

Z-41

1    of soil slope, the soil site, but it is not at the present

2    time considered susceptible of practical and profitable irriga-

3    tion due to its location with respect to the source of supply.

4       Q   And then--

5       A   We wouldn't find it non-irrigable simply because --

6       Q   Having made such a determination as you just described,

7    would you include it in your total of lands to which you apply

8    reasonable irrigation requirements?

9       A   Yes, sir.  I am certain that we included all of these

10   lands we considered irrigable in our tabulations in each indi-

11   visual report.

12      Q   Now let me ask you to pin this down a little more,

13   if I can.  A hypothetical question on this very point.  Assume

14   a section, and a stream is running right down one boundary.

15      A   By a section I assume you mean a square mile.

16      Q   A square mile, yes, sir.  And a stream running down

17   one boundary.  Everything in it is Class VII, non-irrigable,

18   excepting a strip on the opposite boundary.  Do I make myself

19   clear?

20      A   Yes, sir.

21      Q   Now does the remoteness of that irrigable land from

22   the water source affect your determination as to irrigability?

23      A   Well, you would have to describe more fully the inter-

24   vening terrain, Mr. Sachse.  That would have some bearing on

25   the determination.

Z-42

1    Q   In other words, if it was a great deal higher elevation

2   say and would require extensive pumping, that might make it

3   non-irrigable?

4        A   Yes, sir.  It wouldn't be non-irrigable, Mr. Sachse.

5        Q   But it would be not subject to practical and profitable

6   irrigation?

7        A   Yes, sir.

8        Q   And would your answer in that kind of a case be

9   affected in the least by the availability of electric power,

10   making pumping cheaper?

11       A   Well, certainly.  If a study of economic feasibility

12   is made the costs must be considered.

13       Q   But did you consider such factors in this study?

14       A   We didn't make any detailed cost studies with regard

15   to economic feasibility.  Again referring to Plaintiff's Ex-

16   hibit M-37, the bulk of the lands are down in the bottom of

17   the valley.

18       Q   In answer to Mr. Veeder's questions you went through

19   the De Luz watershed section by section and gave him totals

20   of irrigable acreage in each section.

21       A   Yes, sir.

22       Q   I have them down in my notes, but I have not totaled

23   the whole thing.  Do you know that offhand, what that figure

24   was, or do you have it in your notes?

25       A   If I may refer to a table, your Honor, I think I have

Z-43

1   the tabulation here.

2       Q   I don't want it at this minute.  But I would like the

3   figure later on at your convenience.

4       A   Yes, sir.

5       Q   Now everything we have discussed so far has been

6   detailed studies.  Now will you tell me how a detailed

7   reconnaissance study differs from a detailed study?

8       MR. VEEDER:  I am going to object to that question, beyond

9   the scope of the direct examination here, because he has said

10   this has been a detailed study on these parcels up here.

11       MR. SACHSE:  On the whole watershed?  I haven't under-

12   stood it.  Let's ask  him.

13       Q   Has the entire watershed been subject to a detailed

14   study, the entire De Luz watershed?

15       A   No, sir.

16       Q   Now may the --

17       A   We are continuing our surveys out there at the present

18   time.

19       Q   What is the difference between a detailed study and

20   a detailed reconnaissance study?

21       A   Well, a detailed reconnaissance study might be defined

22   as that type of a study which would occur in highly dissected

23   mountainous terrain where there were isolated valleys, ridges.

24   Oh, geological surfaces which might be sufficiently complex

25   and perhaps sufficiently valuable to warrant a detailed study

Z-44

1   on that portion.  But the intervening areas might be so pre-

2   cipitous, stony, shallow and so valueless that detailed explor-

3   ation and study would not be warranted.  So it would in part

4   be detailed, where the value of the land warranted; and in part

5   reconnaissance, where the value did not warrant detailed study.

6       Q  Isn't that actually the fact that exists in the De Luz

7   watershed?

8       A  Yes, sir.  That is a very good example of it right there

9   in the De Luz watershed.

10      Q  So the great bulk of the area depicted on M-37 in

11  Class VII then has not been subject to any detailed study; is

12  that correct?

13      A  That is exactly right, because it is not warranted.

14  It would be too time consuming.  Our applications for studies

15  on these habitable lands are so great it would be foolish to

16  go out into the mountains and hills here and waste a lot of

17  time.

18      Q  So taking any individual study of an ownership, any one

19  of your individual engineering reports, are there areas you

20  have classed as Class VII which you did not subject to a de-

21  tailed study?

22      A  In making our surveys on individual properties we

23  covered the entire area.  And where soil sites warranted, we

24  made detailed surveys.  Where they did not warrant, we did not

25  make surveys in detail.

Z-45

1    Q   Is that true regardless of the holding, the size of

2    the holding?

3    A   Yes, sir.  Of course, the smaller the holding the more

4    detail you can put in on the rough land.

5    Q   Well, obviously I assume that one of these detailed

6    reconnaissances are then not as accurate as the detailed study.

7    A   Well, it is possible, Mr. Sachse, in skipping over

8    large areas of rough broken land, such as characterizes the

9    De Luz  Creek watershed, as illustrated on Plaintiff's Exhibit

10   M-37, that small areas of land that could be irrigated or

11   considered irrigable would be overlooked, and if they were in

12   private ownership and a party asked us to come out and look

13   at it we would be very happy to go out and survey that in de-

14   tail.

15   Q   Now then, in what way does the technique used in

16   making what you refer to as a reconnaissance study differ from

17   the detailed?

18   A   Well, the reconnaissance study has no detail study

19   at all.  In effect, the reconnaissance is made, as the term

20   implies, using the same meaning as defined in Webster's

21   Dictionary.  It is a review or quick review of-- once over the

22   area.  It is conducted by-- generally by motor car, or what

23   other forms of transportation might be available, without

24   boring any holes.  Checking soil profiles on road cuts, in

25   drains, any other exposures that might be available, gullies

Z-46

1    and so forth, taking full advantage of the natural means of

2    examining soil profiles, even to examining the mounds of ground

3    squirrels and so forth, gophers, to show what they brought

4    up with them.  Anything of that nature which would develop some

5    information about the soils of the area are considered, but it

6    can be done much more rapidly because you don't spend the time

7    digging holes and that sort of thing.

8         Q · Then would you state-- would you agree that the

9    majority of the large area on M-37, classed in Class VII, has

10   been subjected only to reconnaissance study?

11        A   Areawise, yes.  And that is all the value that that

12   area shown as Class VII would justify from an economic basis.

13   The land, let's say, is worth $5 an acre.  It would be foolish

14   to spend $25 an acre making a survey of it.  Whereas if land

15   is worth $2,500 an acre, you can easily justify $25 an acre

16   spent in surveying it.

17        MR. SACHSE:  Could I have M-64, please, Mr. Clerk?

18        THE CLERK:  What number?

19        MR. SACHSE:  M-64.  Here it is.

20        Q   What do you call this thing?  Has it got a handy name?

21        A   Yes, sir.  We call it a soils legend.

22        Q   Soils legend?

23        A   This is Plaintiff's Exhibit M-64, which has the

24   heading on it  map symbols, and could be called a soils legend.

25        Q   Now as I understand it, Col. Bowen-- and correct me

904

Z-47

1    if I am wrong.  I want some information.  Your basic soil

2    classification as set forth in M-38 is designated in a Roman

3    numeral; is that correct?

4         A  Yes, sir.

5         Q  And that Roman numeral is arrived at by analysis of

6    this fractional symbol that appears; is that right?

7         A  That is correct.  That is an interpretation of the

8    soil factors represented in the fractional symbol.

9         Q  But that fractional symbol is not intended to be, as

10   I understand it, an arithmetic fraction, is it?  It isn't like

11   2 times 2 plus 2 over 2 equals 3?

12        A  No, sir.  It simply means arranging-- it simply is a

13   means of arranging the symbols.

14        Q  You don't apply principles of algebra and multiply

15   and divide to arrive at the conclusion, do you?

16        A  To arrive at the land use capability.

17        Q  To arrive at the land class?

18        A  Land use class on M-38, no, sir.

19        Q  But these are standard symbols you say that you use,

20   also that are used by Agriculture and that are used throughout

21   the United States; is that correct?

22        A  Yes, sir.

23        Q  Now any qualified expert-- I have forgotten the word

24   you used-- edaphologist-- he should be able to, on reading

25   those fractional symbols, should be able to classify them as

Z-48

1  to soil groups, shouldn't he?

2       A  Yes, sir.  It would make a very clear picture to a

3  qualified edaphologist.

4       THE MASTER:  They might have the same difficulty in

5  agreeing that attorneys have in applying the facts.

6       MR. VEEDER:  I was going to raise the point, how long do

7  we cross-examine, for example, on points that are--

8       MR. SACHSE:  Will you mark that for identification?

9       THE MASTER:  You have handed the Clerk one document.

10      MR. SACHSE:  One sheet of paper I want him to mark.

11  That will be M-DB, I guess, on my tabulation.

12      MR. STAHLMAN:  What is it, Franz?

13      MR. SACHSE:  I will show you in a second.  It is a couple

14  of fractional symbols.

15      MR. STAHLMAN:  I probably won't know what they are.

16  BY MR. SACHSE:

17      Q  I will hand you a sheet of paper which has been marked

18  for identification M-DB, which has two fractional soil symbols

19  on it, Col. Bowen.  Will you classify them both for me, please?

20  Mark the classification with a red pencil.

21      A  I assume that these fractional symbols which you show

22  on Plaintiff's Exhibit marked for identification M-DB are keyed

23  to the map symbols shown.

24      Q  They are keyed to the symbols.

25      A  Shown on Plaintiff's Exhibit M-64.

Z-49

1      THE MASTER:  I presume, Mr. Sachse, you wish this done

2  now and not at a later date.

3      MR. SACHSE:  Yes, please.

4      THE WITNESS:  I would classify these as Class II soils,

5  Mr. Sachse.

6  BY MR. SACHSE:

7      Q  Both of them as Class II?  Please write "Class II"

8  after each one.

9      A  Yes, sir.  Correction.  On the second one here this

10  cobbly situation which exists in the surface soil would reduce

11  that to a Class III.  So on Defendant's Exhibit M-DB I have

12  indicated with a Roman numeral II the land classification of

13  the first soil-- fractional symbol, and the Roman numeral III

14  for the second one.

15      MR. SACHSE:  I will offer that document in evidence,

16  your Honor.

17      THE MASTER:  It may be received.

18  BY MR. SACHSE:

19      Q  I am going to hand you another.

20      MR. SACHSE:  Mark it for identification, please, Mr.

21  Clerk.

22      THE CLERK:  M-DC.

23  BY MR. SACHSE:

24      Q  I am going to hand you another one marked M-DC, Col.

25  Bowen, ask you to do the same thing.  And to speed this up, so

Z-50

1    there is no misunderstanding, I will call your attention to the

2    fact that the two on this is the same as the two on the one you

3    just had.

4        A   Yes, sir.

5        Q   Now will you classify those two, please?

6        MR. STAHLMAN:  That has been asked and answered.

7    BY MR. SACHSE:

8        Q   Put the same mark on it, then, or change it, if you

9    want to.

10       MR. VEEDER:  Put the same mark on it or change it?

11       MR. SACHSE:  Suit yourself.

12       THE WITNESS:  On Defendant's Exhibit M-DC I will place

13   the Roman numeral III by the second fractional symbol and the

14   Roman numeral III by the first fractional symbol.

15       MR. SACHSE:  I will offer that document in evidence,

16   please.

17       THE MASTER:  It will be received as Defendant's Exhibit

18   M-DC.

19       MR. VEEDER:  I truly don't understand why we are going

20   into all of this.

21       THE MASTER:  I think I know what Mr. Sachse has in mind.

22       MR. SACHSE:  I think you do too, your Honor.  We will

23   mark one more for identification.  I am not going to prolong

24   it.  This will end it, this one.

25       THE MASTER:  In other words, if your purpose is what I

Z-51

1   have in mind, one or two examples will be sufficient.

2       MR. VEEDER:  I object to this, being incompetent, irrele-

3   vant, and immaterial.

4       THE MASTER:  It is not incompetent.  The objection is

5   overruled. At least he has a possible valid purpose.  Whether

6   that is what it is offered for or not, I don't know.  And I

7   mean no disrespect to Mr. Sachse by the last comment.

8       MR. SACHSE:  Thank you.

9       Q  I will hand you one marked M-DD, and will you please

10  classify those two symbols?

11      A  On Defendant's Exhibit M-DD two fractional symbols are

12  indicated.  I will place the Roman numeral VII by the first

13  one and the Roman numeral IV by the second fractional symbol

14  shown on Defendant's Exhibit M-DD.

15      MR. SACHSE:  I will offer this document in evidence, your

16  Honor.

17      THE MASTER:  It will be received as Exhibit M-DD.

18      MR. SACHSE:  May I have M-45?  Here we are.

19      Q  I will call to your attention M-DB, which you classi-

20  fied.  Now I will call to your attention Government's M-45,

21  and particularly the soil overlay, the soil map, and directing

22  your attention to the field designated  4 C  in the overlay--

23  and if you want a glass-- will you tell me what the classifica-

24  tion given by your office-- Withdraw that.  Compare that soil

25  symbol with symbol 2  in M-DB.

Z-52

1    A   Referring to Plaintiff's Exhibit M-45 and the soil map

2    contained therein, in the lower left-hand corner appears the

3    fractional symbol 1cL5A over 6B-2.

4    Q   Now is that the same symbol as appears as No. 2 on

5    M-DB?

6    A   That is classified as VI land in Plaintiff's Exhibit

7    M-45.  And the Roman numeral III appears by that fractional

8    symbol on Defendant's Exhibit M-DB.  The land was considered

9    irrigable, and is included within the report, shown as Plain-

10   tiff's Exhibit M-45, as being suitable for the production of

11   citrus crops and deciduous crops.

12   Q   Now, will you take, please, a pencil and write, next

13   to the symbol you gave it, the symbol that your soil classifica-

14   tion gave that same parcel?

15   A   The classification shown in Plaintiff's Exhibit M-45

16   for the soil symbol 1cL5A over 6B-2 is VI.  I will mark --

17   which I will mark on M-DB with a black pencil.

18   Q   Now can you explain a possible reason for the dis-

19   tinction between II and VI on these two parcels when the only

20   modifying factor is the small letter "g" in one and the small

21   letter "c" in the other?

22   A   Yes, sir.

23   THE MASTER:  That is, you are referring to the two frac-

24   tions on Exhibit M-DB?

25   MR. SACHSE:  Yes.  Thank you, your Honor.

Z-53

THE WITNESS:  The "g" in the first symbol shown on M-DB indicates a gravelly condition in the surface soil, and the "c" in the second fraction shown on M-DB indicates a cobbly condition.  It is a difference in size of the rock fragments, and hence the difference in the soil texture modification.

BY MR. SACHSE:

Q  Then you disagree, I gather, with the classification given Parcel 4 C, delineated in M-45, by your office; is that right?

A  No, sir.  You are delving now, Mr. Sachse, into the realm of soils interpretation, and I doubt if you could find any two edaphologists who would sit down and look at a fractional symbol and put the same land classification on it.

Q  Would they--

A  After all, when I look at the map or look at the field on the ground I have other information available to me than the mere typewritten symbol which you placed before me.  And in order to make this consistent, we prepare what is known as a posting chart, which--

Q  A what?  I didn't hear.

A  A posting chart, to which we assign a Roman numeral for each of the symbols that we have.  And every report that we prepare will have that same symbol relationship, so that we get away from this-- this matter of interpretation.

Q  You didn't do all these?

Z-54

A   The fractional symbol here indicates the factual condition there and the Roman numeral, the land class, is an interpretation of the limitations for that particular soil site.

Q   I appreciate that.

A   This changes.  I have sat in on conferences twice a year, ofttimes in evolving this particular land capability classification as shown on M-38.

Q   You did not make all these studies yourself. We brought this out already.  Isn't that correct?

A   That is correct.  It would be impossible.  But they are made under my direction and supervision, and the personnel doing them have been trained by me.

Q   And you have just very clearly pointed out to us then, have you not, that the individuals who make these studies may differ as widely as four land classifications apart in what classification they give any different parcel; isn't that right?

A   No, sir, I don't think so, because, as I say, given the site, being on the land, gives more information than is portrayed here by fractional symbols which you present.

Q   Is there any code number of any kind or any idenficia- tion that appears on these engineering studies-- and I am now showing you just M-45-- by which you can identify the actual individuals who made the study?

A   Well, I believe I know from my own personal knowledge

Z-55

generally who made these studies.  Some of them have what you call a code or symbol.  But these latter ones do not.

Q  How many parties are making such studies in the De Luz Creek watershed?

A  At the present time there is one.

Q  How many parties were making such studies in the De Luz Creek watershed on July 6, 1956?

A  One.

Q  So you would not expect to find, when the same party is making these studies, any very wide discrepancies between their findings, would you?

A  That is correct.

Q  Now, Col. Bowen, I want to direct your attention to Class VII lands only, non-irrigable lands, and I believe am I not right that all Class VII land in this watershed has been classed as non-irrigable?

A  Yes, sir.

Q  Now the classification "non-irrigable" does not mean that it can have no water use, does it?

A  I don't quite follow you, Mr. Sachse.

Q  I will be specific.  Is it not perfectly possible that Class VII lands be used for cabin sites?

A  Oh, yes, sir.

Q  And in that case have a water use for domestic purposes?

Z-56

1      A  Yes, sir.

2      Q  Is it not perfectly possible that Class VII lands be

3  used for grazing?

4      A  Yes, sir.

5      Q  Within limits.  I realize it is steep usually.

6      A  By definition, Mr. Sachse, Plaintiff's Exhibit M-38

7  states Class VII land is suitable for grazing, forestry.

8      Q  And as such it has a certain water use in addition

9  to the rainfall.  The stock have to drink, don't they?

10      A  I don't know in this watershed where they would get

11  water other than rainfall or water that was derived from rain-

12  fall and precipitation.

13      Q  I don't make myself clear.  I mean the cover they

14  graze on may feed on rainfall only.

15      A  That is the only source.

16      Q  But there is a use in addition, of water, to the

17  rainfall in that they have to drink, don't they, the cattle?

18      A  Oh, yes, cattle must drink.

19      Q  So if a man owns 640 acres of Class VII land adjoin-

20  ing a stream and he puts cattle on it, he has a water use,

21  doesn't he, for his cattle to drink?

22      A  If there is a stream running within that 600 or 640

23  acres of grazing land, certainly he can water his cattle in the

24  stream.

25      Q  So the point I want to make-- and I don't think there

Z-57

1    is any disagreement between us-- is that the mere fact that

2    land is Class VII does not mean that such land may not have a

3    perfectly proper water use.

4         A   That is correct.

5         Q   Use for water.

6         A   Yes, sir.

7         Q   How about poultry, isn't a lot of Class VII land

8    perfectly suitable for fencing in turkeys and chickens?

9         A   I daresay it would be.

10        Q   And the water use for a large chicken hatchery or

11   turkey farm could be quite substantial, could it not?

12        A   I rather imagine it could, Mr. Sachse, yes.

13        Q   You are not familiar with poultry operations?

14        A   I am not much of a poultryman myself.

15        Q   You are more familiar with strict dirt farming; is

16   that right?

17        A   Well, I am familiar with dirt farming and livestock

18   production.

19        Q   But not poultry?

20        A   No, sir.  My knowledge of poultry was limited to about

21   one short course when I was going to college, and domestic

22   poultry that we had around the house.

23        MR. DENNIS:  Do you know anything about chickens?

24        MR. VEEDER:  Now that wasn't the question.

25

Z-58

BY MR. SACHSE:

Q   Then can I assume, Colonel Bowen-- and again correct me if I am wrong-- that while some water use is possible on Class VII land, for practical purposes you have regarded it so minor-- as so minor that you disregarded it in these engin- eering studies?

A   Well, who knows what is in the mind of the owner, Mr. Sachse?  It is up to him to put in some of this.  We will tell him what  is irrigable, then if he has other plans to put in poultry or has a demand for livestock water--

MR. VEEDER:  He pleads it.  That is the point.

THE WITNESS:  --that is his business.

BY MR. SACHSE:

Q   Then you quite frankly concede that the reasonable water demands of some of these parcels you have studied may be greater than the reasonable irrigation requirement you have allowed them?

A   Oh, yes.  Yes.  We plainly state in here, referring to Plaintiff's Exhibit M-45, the last sentence, or last para- graph which appears in  every one of these reports says "The maximum potential irrigation requirement".  It is limited solely to that.

Q   Limited solely to irrigation?

A   Yes, sir.

Q   Now, Col. Bowen, I want to call your attention to the

Z-59

1   area described as the Trabuco-- do I pronounce it correctly?

2       A   Trabuco.

3       Q   Trabuco unit of the Cleveland National Forest.

4       A   Yes, sir.

5       Q   Without drawing lines on it, could you roughly point

6   it out on this one, on M-37?

7       A   Excuse me, sir.

8       Q   Just delineate it with your finger.

9       A   The exterior boundary of the Trabuco unit of the

10  Cleveland National Forest, which appears within the De Luz

11  Creek watershed, referring to Plaintiff's Exhibit M-37, is

12  shown by this dashed line, which was similarly described on

13  Plaintiff's Exhibit M-32 heretofore, and which on Plaintiff's

14  Exhibit M 37 is labeled "National Forest Boundary".

15      Q   Are the studies of the portions of that area, that

16  are indicated on M-37 in land classes other than VII, are those

17  detailed studies?

18      A   We made one detailed study up there on one of those

19  properties in '52, and right now I can't think which one it was.

20      Q   Is that the only one you ever made, one detailed study

21  in '52 in that area?

22      A   So far as I recall that was the only one we made.

23      Q   You may resume your seat.

24      A   I want to check on the ownership of these other parcels.

25  Perhaps it might refresh my memory.  I can't recall which

Z-60

1    property it was up there that we did make a detailed survey on

2    in '52.

3         MR. SACHSE:  I didn't get that last answer.  What was it?

4         THE MASTER:  Will you read the answer, Mr. Reporter?

5         (Answer read.)

6    BY MR. SACHSE:

7         Q  And to the best of your knowledge only one detailed

8    survey was made within the Trabuco area of the National Forest

9    since '52?

10        A  Yes, sir.

11        Q  Did you supply the attorneys for the United States

12   with the figures as to irrigable acreage in the Trabuco area

13   of the Cleveland National Forest that are pleaded in the

14   complaint?

15        A  Yes, sir.

16        Q  The complaint states that there are 900 acres of land

17   within the Trabuco area of the Cleveland National Forest and

18   within the watershed.

19        A  Yes, sir.

20        Q  The complaint also states that 600 of the 900 acres

21   of that area are susceptible of practical and profitable irri-

22   gation.  Is that your conclusion?

23        A  That was based on a reconnaissance survey.

24        Q  Is that your conclusion?

25        MR. STAHLMAN:  I didn't get the answer.  What was that?

Z-61

1          MR. SACHSE:  It was based on a reconnaissance survey was

2     his answer.

3          Q  Now would you please answer my question.  Is it your

4     conclusion that 600 of the 900 acres are susceptible of prac-

5     tical and profitable irrigation?

6          A  I made the statement with regard to my conclusion

7     based on reconnaissance survey.

8          Q  You testified a little earlier, Col. Bowen, that in

9     considering what was susceptible to practical and profitable

10    irrigation you considered its availability to water sources.

11    What water sources are closely available to any of the

12    irrigable lands in that area?

13         A  Well, Cottonwood Creek.

14         Q  How close?

15         A  Camps Creek heads up in that area.

16         Q  How close?

17         A  Their headwaters rise on that land.

18         Q  Is there electric power in that area?

19         A  Not to my knowledge.

20         Q  Are there roads to that area?

21         A  Yes, sir.

22         Q  There is one road, isn't there?

23         A  You can get into it more ways than one, so I would

24    assume there is more than one road.

25         Q  Is the acreage represented in colors other than

Z-62

1    Class VII in that area representative of two-thirds of the total

2    area?

3        A   No, sir.

4        Q   And yet your complaint states that 600 of the 900

5    acres are irrigable; is that right?

6        A   If it is in the complaint, that is what it says.

7        Q   So in the case of the Government's Class VII land,

8    you are finding that some of the Class VII land in the Trabuco

9    area is irrigable; is that right?

10       A   No, I have found no Government land classified as VII

11   irrigable.   I have made the same findings with regard to

12   Government land as I have with regard to privately-owned land.

13       Q   Then is not the statement that 600 of the 900 acres

14   are susceptible of practical and profitable irrigation, is not

15   that statement wrong?

16       A   Subject to revision based on detailed survey.   We have

17   some more detailed up here.

18       Q   It is wrong now in the complaint, is it?

19       A   Based on the evidence of Plaintiff's Exhibit M-37,

20   yes, sir.

21       Q   And that is the best evidence you have now, isn't it?

22       A   Yes, sir.

23       Q   Now in determining irrigable acreage, again confining

24   myself to the National Forest, did you consider the present

25   laws and executive orders that govern the use of National

Z-63

1    Forests?

2        MR. VEEDER:  I object to that question.  I object to it

3    entirely.  It calls for a legal conclusion, certainly.

4        MR. SACHSE:  I am just asking him if he considered it.

5        MR. STAHLMAN:  No foundation laid.

6        THE MASTER:  The objection is sustained.

7        MR. SACHSE:  Even to the question of whether he con-

8    sidered it, your Honor?  Because it is kind of hard to make an

9    offer of proof.  I will just have to say I make an offer of

10   proof he considered it or didn't consider it, and then there

11   will be another offer of proof.  All I asked him is whether

12   he considered it.

13       THE MASTER:  I think it is immaterial whether he con-

14   sidered it.

15       MR. SACHSE:  I definitely have an offer of proof, but I

16   will ask the next question and he can object.

17       Q  In determining irrigable acreage in the National

18   Forests, did you consider the Federal statutes and executive

19   orders that limit the uses to which such forests can be put?

20       MR. VEEDER:  I object to it.  I object, it calls for a

21   legal conclusion, in the first place.  The question now framed

22   is incompetent, irrelevant, and immaterial here, and goes far

23   beyond anything in the direct examination.

24       THE MASTER:  The objection is sustained.  It appears to

25   me, Mr. Sachse, that the laws could, of course, be changed,

Z-64

1  and the determination of the character of the land is independent

2  of the uses to which it can be put.  That is, you could have

3  land which would be susceptible of irrigation which would be

4  zoned, for example, in such a manner that it could not be

5  irrigated.  That could not determine its classification from

6  a land usage point of view.

7      MR. SACHSE:  That is exactly it.  Your Honor just spelled

8  out what I wanted to prove.  If your Honor believes it is

9  immaterial, I will make an offer of proof.  May I proceed?

10     THE MASTER:  You may proceed to make your offer of proof,

11  yes.

12     MR. SACHSE:  I offer to prove by this witness that the

13  Federal statutes-- this is just like Mr. Veeder-- that the

14  Federal statutes in existence today and executive orders pro-

15  hibit the use of National Forest lands for any agricultural

16  purposes other than grazing, and that therefore any classifica-

17  tion of National Forest lands as being susceptible of practical

18  and profitable irrigation of necessity assumes a change in the

19  statutes of the United States.

20     THE MASTER:  Mr. Sachse, the offer is rejected.  The

21  Court can determine the law from the statutes, and not from

22  what the witness has testified.

23  BY MR. SACHSE:

24     Q  Are you familiar, Col. Bowen, with whether or not

25  any of the Trabuco area to which you have testified is available

Z-65

5.

1  for private cabin sites under special use permit at the present

2  time?

3      A  I don't know, Mr. Sachse.

4      Q  Do you know whether any part of the Trabuco area in

5  the De Luz Creek watershed is available for grazing lease at the

6  present time?

7      A  I do not know, Mr. Sachse.

8      Q  Do you know whether or not any special use permits of

9  any land have been issued by the Forest Service covering the

10  Trabuco area --

11      MR. VEEDER:  I will renew my objection.

12  BY MR. SACHSE:

13      Q  --of the Cleveland National Forest?

14      MR. VEEDER:  It is incompetent, irrelevant, and im-

15  material.

16      MR. STAHLMAN:  Immaterial.

17      MR. VEEDER:  Doesn't tend to prove any issue.

18      THE MASTER:  Objection sustained.

19  BY MR. SACHSE:

20      Q  In paragraph 2, page 31 of the complaint--

21      MR. SACHSE:  He won't need it for this, I am sure, Mr.

22  Veeder--

23      Q --you describe or your generalize as to Bureau of Land

24  Management lands, and then an exhibit is attached, Exhibit G,

25  describing them by section and quarter section and so on in the

Z-66

1    entire watershed.  Now the latter part of that Exhibit G con-

2    tains a few parcels in this watershed.  Do you know whether

3    those are the same parcels that you have checked off on M--

4    What is it, the one to the right, M-32?  In other words, stated

5    differently, do you know whether there is any other National

6    Forest land or Bureau of Land Management land in the De Luz

7    watershed other than those you have checked on M-32?

8        MR. VEEDER:  May I ask you what page of the document?

9        MR. SACHSE:  It is Exhibit G, around page 70, 71.

10       MR. VEEDER:  70?

11       MR. SACHSE:  71.  I am simply trying to find out.  If

12   you want to show it to him--

13       Q  Do these parcels described on page 71 of the complaint,

14   and 70 of the complaint, embrace the parcels that you gave us

15   as Government land on M-32?

16       A  Well, in the first place, you honor me, Mr. Sachse,

17   by stating that I wrote the complaint.  I wish I could.  I

18   don't have the capability.

19       MR. SACHSE:  You will get a raise for that one.

20       MR. VEEDER:  Give him a star.

21       THE WITNESS:  With regard to the properties described

22   in the complaint here, on page 70 of the document entitled

23   "Notice and Order, Complaint and Supplementary and Amendatory

24   Complaint," page 70, I would have to go through in order to--

25   to the best of my knowledge they are.  There may be differences

Z-67

1    in there, but so far as I know it is the same.

2         MR. VEEDER:  The map is in evidence.  If he wants to argue

3    it, fine.

4         MR. SACHSE:  I am not going to plot every one on the map.

5    My next question may clear up what I am getting at.

6         Q  Now, Col. Bowen, is anything other than Class VII

7    land included in those Bureau of Land Management lands in the

8    De Luz watershed?

9         A  May I approach the exhibit, your Honor?

10        THE MASTER:  Surely.

11        THE WITNESS:  I have pointed to Parcel No. 81 as being

12   U. S. A. land, being a section and a portion of another section

13   on Plaintiff's Exhibit M-32.  And the section lines are

14   difficult to see through this color.

15        MR. VEEDER:  Would M-14 be helpful to you, Colonel?

16        THE MASTER:  That is the big map.

17        THE WITNESS:  I think it would, sir.  With the exception

18   of a very small corner of Class III land near Fern Creek,

19   and Class--  No, wait a minute.  That is out.  With the possible

20   exception of a very small corner of Class VI land in the lower

21   right-hand corner of Parcel 81 it would all be in Class VII,

22   non-irrigable.

23   BY MR. SACHSE:

24        Q  Now do you have a detailed survey of that small parcel?

25        A  It may possibly not even be in the section.  As I

Z-68

1   stated, I can't see the section corners from here, and it would

2   be--

3       MR. VEEDER:  Then I am going to object to his response

4   until it is further identified, then.

5       MR. SACHSE:  It is your exhibit.

6       MR. VEEDER:  He may be able to find it from the other

7   exhibit.

8       THE MASTER:  I think the witness should be given an

9   opportunity to examine any exhibits he desires in order to

10  verify the testimony he is to give.

11      MR. SACHSE:  I have no objection.  He can use any exhibit

12  at all.

13      THE WITNESS: Yes, sir.  In plotting the scale of M-37

14  to M-32, they are identical scales.  It would appear that in

15  the lower right-hand corner of Parcel No. 81, under the

16  Bureau of Land Management supervision there was a very small

17  area of Class VI land, which might be considered susceptible

18  of irrigation.

19  BY MR. SACHSE:

20      Q  You do not have a detailed study made of that parcel?

21      A  No, sir.

22      Q  All right.  Now how about the next section of Govern-

23  ment land?

24      A  The next parcel-- May I have reference to that map?

25  Parcel No. 52 in the De Luz watershed, there would appear in

1   the southwest corner of Parcel 52 to be a very small area of

2   Class III land, which is considered irrigable.

3       Q  Do you have a detailed study of that parcel?

4       A  No, sir.

5       Q  All right, let's try Parcel 57.

6       A  There would appear to be none of Parcel 57 as shown

7   on Plaintiff's Exhibit M-32 as irrigable land.

8       Q  I think there is only one more, Colonel. How about

9   Parcel 24?

10      A  There is a small portion of Parcel No. 24, as shown

11  on Plaintiff's Exhibit M-32, which appears to be classified as

12  Class II land on Plaintiff's Exhibit M-37, which would be

13  irrigable.

14      Q  Do you have a detailed engineering report on that

15  parcel?

16      A  No, sir.

17      Q  You may sit down again.  Then the only detailed

18  engineering study that you have available to justify the claims

19  of the United States in the De Luz Creek watershed is one

20  study made in 1952; is that right?

21      A  No, sir.  We also have a study made within the naval

22  reservation.

23      Q  Thank you.  Then the only study--

24      MR. VEEDER:  I would like to hear the rest of that.  There

25  was noise and I couldn't hear the rest.

9 2 7

Z-70

1    (Answer read.)

2    MR. SACHSE:  Thank you.  I will correct my question.

3    Q  Then the only study you have available within the De

4  Luz Creek watershed outside of Vail, outside of the naval

5  reservation to substantiate the Government's claims to irrigable

6  acreage is a single detailed study made in 1952; is that right?

7    A  No, sir.  The detailed survey which I referred to made

8  in '52 was up in that vicinity on privately-owned land.  That

9  is why I was trying to look at the name in Plaintiff's Exhibit

10  M-31.

11    Q  Then you don't have any detailed studies?

12    A  No, sir.

13    Q  On any Government land?

14    A  No, sir, except that within the naval reservation.

15  We are confining this to De Luz Creek, of course.

16    Q  Let me be very sure I understand you.  You have no

17  detailed engineering studies on any Government land in the De

18  Luz Creek watershed outside of the naval reservation?

19    A  That is right, Mr. Sachse.  Private landowners have

20  had priority on our services up there.

21    MR. DENNIS:  Mr. Sachse, when you used the term "naval

22  reservation", you meant the entire reservation.  You meant the

23  N.A.D. or Camp Pendleton plus the Naval Hospital, plus the

24  Navy--

25    MR. SACHSE:  I mean the entire military reservation.

Z-71

1    Q  Is that the way you understood me, Colonel?

2    A  Yes, sir.

3    THE MASTER:  Mr. Sachse, unless you are ready to conclude

4    with one more question, why we will call it a recess.

5    MR. SACHSE:  Well, I think it is a good time, your Honor.

6    And now in response to--

7    THE MASTER:  I can't lead you into admitting you are

8    through with the cross-examination.

9    MR. VEEDER:  If this has been cross-examination.

10   MR. SACHSE:  Thank you, Mr. Veeder.  I can always depend

11   on you for a pat on the back.  Now in response to Mr. Veeder's

12   question and yours, of the afternoon recess--

13   THE MASTER:  We are adjourned until 9:30 o'clock Monday.

14   (Adjournment to 9:30 A.M., Monday June 9, 1958.)

15

16

17

18

19

20

21

22

23

24

25