# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

                Plaintiff,

    vs.

**FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,**

           Defendants.

No. 1247-SD-C

---

### REPORTER'S TRANSCRIPT

**Volume:**   8

**Pages**   929-1069

**Date:**   June 9, 1958

**Place:**   Fallbrook, California

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

---

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3          APPEARANCES:

4                  WILLIAM H. VEEDER
                       For United States of America
5
                   WILLIAM E. BURBY
6                      For United States of America

7                  FRANZ R. SACHSE
                       For Fallbrook Public Utility District
8
                   ADOLPHUS MOSKOVITZ
9                      For the State of California

10                 GEORGE STAHLMAN
                       For Vail Estate
11
                   W. B. Dennis
12                     For Santa Margarita Mutual Water Company

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## INDEX TO WITNESSES

2

3   For the Plaintiff:                          D      X      RD      RX

4        Allen C. Bowen                               936    933
                                                      960    1008    1029
5                                                                     1043

6        Frank Cannon                           1046

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

930

# INDEX TO EXHIBITS

|  | Iden. | Rec'd |
|---|---|---|
| **For the Plaintiff:** | | |
| M-65A   Map guide | 933 | 935 |
| M-72    Public Works drawing number 1207 | 1053 | 1055 |
| | | |
| **For the Defendant:** | | |
| M-DE   Acreage tabulations | 938 | 941 |

21

1        Fallbrook, California, Monday, June 9, 1958.   9:30 A.M.

2

3        THE CLERK:  Court is now in session.

4        MR. VEEDER:  Your Honor, I had mentioned to you--  Are we

5   on the record now?

6        THE MASTER:  Yes.  Shall we have the appearances for the

7   record, please?

8        MR. VEEDER:  William H. Veeder for the United States of

9   America, and William E. Burby for the United States of America.

10        MR. SACHSE: Franz R. Sachse for the Fallbrook Public

11   Utility District and named defendants.  And will you add to the

12   named defendants that I am also appearing for Franz R. Sachse

13   and Rowena Sachse.

14        MR. MOSKOVITZ:  Adolphus Moskovitz, State of California,

15   Deputy Attorney General.

16        MR. STAHLMAN:  George Stahlman for Vail Company.

17        MR. DENNIS:  W. B. Dennis for the Santa Margarita Mutual

18   Water Company.

19        THE MASTER:  Are there any individual defendants in the

20   De Luz Creek area here in pro per?  There seem to be none.

21   Very well.

22        MR. MOSKOVITZ:  Your Honor, I would like to clarify some-

23   thing on one of the exhibits at some early time in this hearing,

24   if I may.  I wanted to ask Mr. Veeder a question about a portion

25   of an exhibit.

Z2

1        THE MASTER:  On the record?

2        MR. MOSKOVITZ:  I would like to have it on the record.

3   We had some discussion about the '57-58 table for the De Luz

4   Creek near Fallbrook, and at that time I didn't have my own

5   copy to check to see whether the error that apparently existed

6   was on mine.  And on checking it I find that the whole page is

7   not in my exhibit, and I wonder--

8        MR. VEEDER:  You would save a lot of time, Moskovitz, if

9   you would do this, rather than burning up the record about such

10  matters-- It is inconceivable why you are on the record.  I

11  can't answer your question.  I haven't the slightest idea what

12  you are talking about.

13       THE MASTER:  I would suggest you talk to Mr. Veeder at the

14  recess and show him your copy of the exhibit, and tell him the

15  part--

16       MR. VEEDER:  That is right.  These smart alec tactics

17  are driving me nuts.

18       THE MASTER:  We don't need those comments from you,

19  either, Mr. Veeder.

20       MR. VEEDER:  I would like, your Honor, to interrupt the

21  proceedings for the moment, because I think it would be helpful

22  to offer an exhibit in regard to the aerial photographs and

23  have an explanation by Col. Bowen in that connection, if it

24  would be helpful to your Honor.

25       THE MASTER:  Well, I see on the table in front of you

1  what I presume is an exhibit.  Is that another index or guide

2  to the exhibits?

3       MR. VEEDER:  That is a guide to the area.

4       THE MASTER:  I think it would be helpful, and I would

5  suggest you proceed to call the Colonel back to the stand as

6  your witness on redirect examination temporarily.

7       MR. SACHSE:  I have no objection at all.

8       MR. VEEDER:  I think this will be marked Identification

9  M-65A, if that is agreeable.

10       THE MASTER:  Yes.  The original guide was M-65, so I

11  think it would be appropriate to call this M-65A.

12       THE CLERK:  What number?

13       MR. VEEDER:  It will be M-65A.

14

15                    ALLEN C. BOWEN

16  resumed the stand, testified further as follows:

17

18                  REDIRECT EXAMINATION

19  BY MR. VEEDER:

20       Q  Col. Bowen, I ask you to step to the Identification

21  M-65A and explain it, and if you would please correlate it with

22  the Exhibit M-65.

23       A  Referring to Plaintiff's Exhibit M-65, the small

24  index, photo index which was enclosed to indicate the location

25  of the aerial photographs containing soils information of a

Z-4

1   portion of Camp Pendleton, and U. S. Navy Hospital, and the

2   Naval Ammunition Depot within the Santa Margarita River, M-65

3   is a reduction of the map marked for identification M-65A. The

4   map was prepared on the scale of 1 to 24,000--

5       THE MASTER:  That is M-65A was prepared to that scale?

6       THE WITNESS:  Yes, sir.  M-65A was prepared on the scale

7   of 1 to 24,000.  And the aerial photographs which have been

8   entered as exhibits are indexed with reference to their location

9   on the ground by a right angle-- by an angle, I should say--

10  they are not all right angles-- an angle which opens to the left

11  of M-65A, and within the angle-- within the arms of the angle

12  is a figure 4-0159, for example, indicates the approximate

13  location of the aerial photograph with that number, 4-0159.

14      Now, for the convenience of the Court and counsel, your

15  Honor, we have added to M-65A the photo numbers 4-0159, and

16  4-0141, and 4-0142, which were last week marked in with a red

17  pencil on Plaintiff's Exhibit M-65 by myself.

18      We have also, your Honor, changed one number on Plain-

19  tiff's Exhibit M-65.  There appears the number 4-0106, and that

20  is located in the lower central part of the Exhibit M-65 and

21  corresponds to the location in the lower central part of M-65A,

22  to the number 4-0105; 105 was used instead of 106.

23  BY MR. VEEDER:

24      Q  Would it need alteration on M-65, Colonel?

25      A  Yes, sir.  I will take a red pencil and I will change

Z5

1   that for 4-0105.

2       Similarly now all of the photographs that are introduced

3   to show the soils sites and land capability classes within the

4   watershed of the Santa Margarita River lying within the naval

5   enclave are shown on Plaintiff's Exhibit M-65A, and M-65 is

6   corrected to conform to that.

7       Q   Are there any further statements that should be made

8   in connection with the correlation of those two exhibits?

9       A   No, sir.

10      MR. VEEDER:   I offer M-65A in evidence.

11      THE MASTER: That will be received and so marked.

12      Do I understand, then, Colonel, that the corner indication

13  which you have referred to represents the lower left-hand corner

14  of each of the pictures, of each of the aerial photographs?

15      THE WITNESS:   The lower right-hand corner.

16      THE MASTER:   Correct.

17      THE WITNESS:   Yes, sir.

18      MR. VEEDER:   And the designation which I didn't refer to

19  is the Santa Margarita watershed in Camp Pendleton, 1955 aerial

20  photo index.

21      THE MASTER:   That will be received as Exhibit M-65A.

22      MR. SACHSE:   May I have one question on this?   Were you

23  through?

24      MR. VEEDER:   Yes.

25      MR. SACHSE:   I see one more, Colonel.   Isn't there an

26

1  0073 added to the bottom of this that doesn't appear on M-65?

2       THE WITNESS:  Thank you.  Yes, sir, that is correct, your

3  Honor.  There is one other addition in the extreme lower left-

4  hand corner of M-65A appears the number 4-0073, which is within

5  the group.  And I will conform M-65 with a red line, and the

6  number 4-0073 in the lower left-hand corner of Plaintiff's

7  Exhibit M-65.  Thank you very much, Mr. Sachse.

8       MR. DENNIS:  As I understand, this M-65 is being substi-

9  tuted for the other M-65?

10      THE MASTER:  No, this is M-65A, both remain in evidence.

11      Then, Mr. Sachse, I believe you may proceed with the

12  cross-examination of Col. Bowen.

13

14                    CROSS-EXAMINATION (Continued)

15  BY MR. SACHSE:

16      Q  Col. Bowen, are any of the tabulations of acreages,

17  and so on, that you were to prepare available at this time?

18      A  Yes, sir, I have them in my briefcase.

19      Q  I would like to have them, if I might.  May we inter-

20  rupt for a minute and let him get them?

21      THE MASTER:  Yes.

22  BY MR. SACHSE:

23      Q  According to my notes I wanted a tabulation of the

24  photograph of the buildings shown on the photograph 4-0108.

25  Are these notes sufficient to help you know what I am talking

Z7

1   about, Colonel?

2   MR. VEEDER:  Could I make a suggestion, Mr. Sachse.  Let

3   you go ahead on the basis of cross-examination, and it would be

4   simpler for me, too.

5   MR. SACHSE:  I haven't even seen his notes.  I don't know

6   how he has got these things indexed.

7   MR. VEEDER:  I thought you had a list of the things you

8   wanted.

9   MR. SACHSE:  I have a list of the things I wanted, but I

10  don't know how to--  May I look at it?  That would be the easiest.

11  Q  Is this your only copy of this document, Col. Bowen?

12  A  Yes, sir.

13  Q  All right.  I will read over your shoulder, then, if I

14  may.

15  Col. Bowen, the figures you have here are recalcula-

16  tions also of some estimates you made the other day, as I under-

17  stand it.  Is that correct?

18  A  Yes, sir.  You asked me to prepare tabulations showing

19  all of the developed areas, so I made some estimates in court

20  which have been revised.

21  Q  Let's start at the top. The first one, as I see it, is

22  the United States Naval Hospital.  And what is the correct area

23  of that?

24  A  The area of the United States Naval Hospital within

25  Camp Pendleton is 61 acres.

1          THE MASTER:  I am wondering whether it wouldn't be simpler

2  to offer the notes in evidence as speaking for themselves, as

3  a tabulation of various areas.  And any additional information

4  you want could be elicited verbally.

5          MR. SACHSE:  It is all right with me.  It is his only

6  copy, and it is in pencil.

7          THE MASTER:  I think it would save time.

8  BY MR. SACHSE:

9          Q  Have you totaled them, Colonel?

10         A  Yes, sir.

11         Q  Let me get quite clear as to what this represents.

12  This represents, as I understand it, the entire area--

13         MR. STAHLMAN:  This--  You had better mark it so we will

14  have our record straight.

15         MR. SACHSE:  Thank you.  Mark it for identification,

16  please.

17         THE CLERK:  M-DC.

18         MR. SACHSE:  Two pages.

19         Q  M-DC represents, as I understand, the areas within the

20  Santa Margarita River basin within the naval reservations,

21  which are developed acreages and not subirrigated.  Is that

22  correct?

23         MR. VEEDER:  I am going to object to that statement, be-

24  cause it is not correct.  The area of the acreage overlying the

25  subterranean basins within the enclave, is that not correct?

29

1  It is not the Santa Margarita basin, it is the areas overlying

2  the subterranean basin.  Is that right?

3       THE WITNESS:  Yes, sir.

4       MR. SACHSE:  Thank you, Mr. Veeder.

5       Q  And it is the areas that are not subirrigated.  Is that

6  correct?

7       A  No, sir.

8       Q  Well, what portions of this are subirrigated?

9       MR. STAHLMAN: We are going back again to splitting it up,

10  which is already on there.  I think the object is finding out

11  what is the acreage that is in native plants and what has been

12  developed, and what doesn't require water from the basin.

13       THE MASTER:  My understanding, it was the area which was

14  covered with structures of some kind or was actually irrigated

15  from the surface and was not depending on subirrigation.  Is

16  that correct, Colonel?

17       THE WITNESS:  No, sir, that isn't quite correct.  Some

18  of these areas do draw water from the subterranean basin, your

19  Honor, at times.  For example, the off-channel spreading basins

20  which Mr. Sachse asked me to include in here are covered with

21  native vegetation, and during the dry months of the year they

22  draw water from the subterranean.

23       The O'Neill ditch diversion, 17 acres.  Lake O'Neill is a

24  body of water, there is evaporation loss from there, and some

25  of this reclamation and salvage area and base heavy equipment

210

1   is unsurfaced and used to store loose stores which may or may

2   not be present, and when they are not there the vegetation may

3   grow.

4        The air field which Mr. Sachse asked me to compute, he

5   asked for the entire area within the outer perimeter of the

6   landing strip and taxiways, and that includes a large unsurfaced

7   portion which is covered with native vegetation, islands in

8   effect within the taxiways and landing strip.  The areas of

9   these ponds behind our channel spreading dams are in the channel

10  and vegetation grows on them, and in dry seasons of the year

11  draw water from the basin.  He also asked for the area of this

12  what we call the 22 area valley floor.  I think Mr. Sachse

13  referred to that as the bare area.  And much of that so-called

14  bare area is in vegetation.  The rifle range is in vegetation

15  to keep down the dust and to keep down the heat in the summer.

16       Incidentally, the air field, these island areas in

17  vegetation must be kept vegetated to keep down the dust that

18  would occur when helicopters land, they create quite a down-

19  draft of air.  And there is a necessity for keeping those in

20  vegetation.

21       THE MASTER:  Well, those are, in any event, the areas

22  that Mr. Sachse asked you to prepare?

23       THE WITNESS:  Yes, sir.

24       THE MASTER:  I would suggest it be presented in evidence,

25  and any counsel can pick out any specific area.

Z11·

1      MR. SACHSE:  Your Honor, the number is wrong.

2      THE CLERK:  That should be M-DE.

3      MR. VEEDER:  Have you offered it, Mr. Sachse?

4      MR. SACHSE:  I will offer it now.

5      THE MASTER:  It will be received in evidence as Exhibit

6  M-DE.

7  BY MR. SACHSE:

8      Q  Col. Bowen, I want to call your attention to M-45,

9  which is typical of your engineering studies, I believe, and

10  I will call your attention to the fifth page in it headed

11  "Water Duty for Agricultural Crops Grown in the Santa Margarita

12  Watershed."  Would you please look at that?

13      A  Yes, sir.

14      Q  That identical tabulation appears to me to be in each

15  of your studies.  Is that correct?

16      A  That is correct, sir.

17      Q  And where did you obtain those figures or those water

18  duties?

19      A  Well, the references are on the tabulation.

20      Q  With reference to what?

21      A  The references are contained in the table.

22      Q  Now, is that same table and those same references

23  the ones you used in all of your analyses of reasonable irriga-

24  tion requirements?

25      A  Yes, sir.

212

1    Q   Does that apply also to your studies within Camp

2  Pendleton?

3    A   Would you tell me which studies now, Mr. Sachse?

4    Q   Did you apply that same table to your irrigation

5  requirement studies within Camp Pendleton?

6    A   Of which irrigation studies?

7    Q   Of your irrigable land within Camp Pendleton.

8    A   I haven't made any mention of irrigable lands within

9  Camp Pendleton.  I am at the moment lost, Mr. Sachse, as to

10  which studies you are referring to.

11    Q   You have offered in evidence a great many aerial

12  photographs which carry soil classification numbers II through

13  VII of Camp Pendleton lands?

14    A   Yes, sir.

15    Q   And you have also testified that certainly II through

16  V, and in many cases II through VI are irrigable lands.  Now,

17  in determining the reasonable irrigation requirements have you

18  applied the same yardstick to the private lands studied on

19  the De Luz watershed that you applied to the Government lands

20  in Camp Pendleton?

21    A   I have applied the same yardstick in each instance

22  on Government land as on private land.  There is no difference

23  in our consideration at all.

24    MR. STAHLMAN:  Keep your voice up, Colonel.

25    MR. SACHSE:  Now, would you hand me any one of the blue

Z13

1  folders, Mr. Clerk?

2      Q  Now, nowhere in that tabulation do I find a water duty

3  of 4.2 acre feet per year, or am I mistaken?

4      MR. VEEDER:  Are you referring to a specific exhibit,

5  Mr. Sachse?

6      MR. SACHSE:  I am referring to the tabulation which he

7  has testified is contained the identical one in all of your M

8  series, M-55, M-54, et cetera.

9      THE WITNESS:  Referring to Plaintiff's Exhibit M-45, the

10 table contained therein entitled "Water Duty for Agricultural

11 Crops Grown in the Santa Margarita Watershed," the tabulation

12 includes three columns, the first headed "Crops," the second,

13 "Yearly Water Duty, Acre Feet Per Acre," and the third, "Refer-

14 ences," giving the source of the information.

15     The highest figure which appears in the central column

16 entitled, "Yearly Water Duty, Acre Feet Per Acre," is 4.00.

17 BY MR. SACHSE:

18     Q  Then can you tell me where you  obtained the yearly

19 water duty figure of 4.2 acre feet per year alleged as the

20 reasonable water duty for the Government lands in the Trabuco

21 area of the De Luz watershed?

22     A  Yes, sir.

23     Q  Please do.

24     A  That is the project duty--

25     Q  Is the what?

214

1     A  The project duty, as opposed to the field duty or

2  applied duty.  The figures contained in this tabulation pre-

3  viously referred to which appears in M-45, and other similar

4  exhibits, is the actual consumptive use of plant, water that it

5  consumes, and there are losses in transporting and applying

6  water which have to be added on to this to arrive at the gross

7  diversion, or a diversion duty where the gross amount is pumped

8  and diverted from the surface stream in order to supply this

9  amount of water to the plant in the field.

10     Q  In other words, in making your studies for the indi-

11  vidual landowners in the De Luz Creek watershed you have

12  ignored this project duty factor?

13     A  Yes, sir, because it varies with the type of system

14  and type diversion, be it surface or pumpage.

15     Q  And if an order should be entered in any single case

16  determining the reasonable correlative share of a riparian

17  owner in the De Luz watershed based upon the irrigation require-

18  ments contained in your engineering reports, that order would

19  be short then by the difference between the applied duty and

20  the project duty.  Is that right?

21     MR. VEEDER:  I object to the question.  There are many

22  facets and factors that will go into the ultimate determination

23  by this Court as to what the water duty will be, the quantities

24  of water that will be utilized.  And there is no evidence that

25  this would be the basis of the decree.

Z15

1    THE MASTER:   I think the Court has in mind the fact that

2    you have in mind, Mr. Sachse.   And that point would have to be

3    considered in the entry of any decree.

4        MR. SACHSE:   Is the objection sustained, your Honor?

5        THE MASTER:   The objection is sustained to the form of

6    the question, and also on the ground that the material would

7    be self-evident.

8        MR. SACHSE:   For the sake of the record I am going to try

9    one more time.

10       Q   I will call your attention to the Exhibit M-45, and to

11   the language appearing on page 4 thereof, "The following table

12   represents the future irrigation potential for full development

13   of all irrigable areas," and a table follows it.

14           Now, is that table representative of the amount of

15   water the property owner has to extract from the stream or

16   the underground, or is it representative of the amount of water

17   he must apply to the land?

18       A   This figure, or this table which appears on page 4

19   of Plaintiff's Exhibit M-45 represents the field duty, and does

20   not take into consideration project losses.

21       Q   On the other hand, the duty of 4.2 acre feet per acre

22   per year claimed for the National Forest lands in the watershed

23   does take into account project losses.   Is that correct?

24       A   Yes, sir.

25       Q   Have you made any such calculation as to what are the

1   duty on the Vail lands within the De Luz watershed?

2       A   No, sir.

3       Q   Not even a project duty, in other words?

4       A   No, sir.

5       Q   Then you have not determined whether the duty for the

6   Vail lands in the watershed would be greater or less than 4.2

7   acre feet per acre per year?

8       MR. STAHLMAN:   I think that was brought out here that the

9   Vail study has not been completed in the De Luz watershed, that

10  they had pulled them off to work on other projects, and they

11  will go back and complete the Vail study.

12      THE MASTER:   That was the testimony.

13      MR. SACHSE:   But also that the project studies had not

14  been completed on the National Forest, your Honor.   But they

15  have arrived at the 4.2 figure on the National Forest.   I want

16  to know if he has done the same thing on the Vail land.

17      MR. VEEDER:   Where did the witness testify to the 4.2

18  figure in the record?   If you are referring to our pleadings

19  that is something entirely different than this man's testimony.

20      MR. SACHSE:   Col. Bowen testified--

21      MR. VEEDER:   I don't recall that he did.

22      MR. SACHSE:   Just a minute and I will try to tell you,

23  and if I am wrong I will be corrected.

24      Col. Bowen testified at our last hearing, whatever day it

25  was, that he had worked up the figures of irrigable land in the

Z17

1   Trabuco area of the National Forest pleaded in the complaint.

2   I personally questioned him on it, he said he had.  Now, I am

3   asking him where he obtained the water duty he applied to those

4   lands.

5       MR. VEEDER:  The question was whether he testified or

6   not, and where did it come from.

7       THE MASTER:  Let's get away from that.  And Mr. Sachse

8   can ask him whatever question he wants to ask him now.

9   BY MR. SACHSE:

10      Q Col. Bowen, did you give counsel the figure of 4.2 acre

11  feet per year per acre for the National Forest lands?

12      A  Yes, sir.

13      Q  We wasted a lot of time getting that.  Now, you did

14  that without having completed studies of the National Forest

15  lands.  Is that correct?

16      A  As I testified last week, Mr. Sachse, we make

17  reconnaissance surveys.

18      Q  Now, have you arrived at any figure for the Vail lands

19  within the watershed?

20      A  Negative.

21      Q  Is your study in the National Forest lands sufficiently

22  complete that you are able to tell me how many acres you found

23  suitable for row crops?

24      A  No, sir.

25      Q  Is it sufficiently complete that you are able to tell

Z18

1   me how many acres you found suitable for avocados?

2        A   No, sir.

3        Q   Is it sufficiently complete that you are able to tell

4   me how many acres you found suitable for alfalfa?

5        A   No, sir.

6        Q   Is it sufficiently complete that you are able to tell

7   me how many acres you found suitable for any specific crop?

8        A   No, sir.

9        Q   Is it not then a fact that you have ascribed to the

10   National Forest lands in the De Luz watershed the highest pos-

11   sible water duty you can find?

12        MR. VEEDER:   That is, of course, the established practice

13   in this kind and type of litigation, you wouldn't take anything

14   less than the maximum.

15        THE MASTER:   Mr. Veeder, let the witness answer.

16        THE WITNESS:   No, sir, that isn't the highest figures we

17   could find.

18   BY MR. SACHSE:

19        Q   What is the higher figure, please?

20        A   Are you speaking now of water duty in general, Mr.

21   Sachse?

22        Q   I am speaking of water duty in the De Luz Creek water-

23   shed.

24        A   Well, again you would have to describe the nature of

25   taking and applying the water in order to arrive at whatever

949

Z19

1   project duty--

2           Q  You are not answering my question, Col. Bowen.  I am

3   not talking about project duty now, I am talking now about duty

4   for specific crops.  And you have already testified that you

5   can't tell me how many acres are suitable for row crops, how

6   many acres are suitable for alfalfa, avocados, and so on.

7           So did you not take the highest possible duty and

8   ascribe that to all of the lands in the National Forest?

9           A  No, sir.  Let us refer again to Plaintiff's Exhibit

10  M-45, the table shown as water duty for agricultural crops.

11          We show commercial row crops with an annual water

12  duty of 4 feet per acre per year.  Now, a very reasonable

13  project loss would be 10%, very conservative.  10% of 4.00

14  would be .4, and the project duty there would be 4.4.  Now,

15  it could be much higher than that even with a less efficient

16  system.

17          Q So if the entire irrigable area of the Trabuco forest

18  area of the watershed were in row crops the highest water duty

19  you could squeeze out would be 4.4?

20          A  No, sir, that wasn't my answer at all.  I said the

21  most conservative project loss would be 10%, and it could well

22  exceed that.

23          Q  Will you please tell me exactly how you arrived at the

24  figure of 4.2?

25          A  Well, on the basis of reconnaissance survey, in my

Z20

1  opinion a permanent pasture would be best adapted to the

2  irrigable lands contained within the Trabuco lands of the

3  Cleveland National Forest as shown here on Plaintiff's Exhibit

4  M-45, and contained in the table water duty for agricultural

5  crops the duty for pasture is 3.83.  I took a very modest

6  project loss of 10%, rounded it off at .4, added to 3.83,

7  brought it to 4.20.  Is that the figure in the complaint?

8      MR. VEEDER:  That is right.

9      MR. SACHSE:  4.2 is the figure.

10     Q  Now, is that the same procedure you followed in all

11  of your calculations of water duty for public lands in the

12  complaint?

13     MR. VEEDER:  It is beyond the scope of the examination,

14  your Honor, beyond the whole area of this--

15     THE MASTER:  The question should be limited to the De

16  Luz Creek area.

17     MR. SACHSE:  It may be objectionable.  I would like to

18  offer it and have it ruled on.  The question on the De Luz

19  area goes to the 4.2 in the complaint.

20     THE MASTER:  I think it would be sustained on the ground

21  it goes beyond the De Luz Creek area.

22  BY MR. SACHSE:

23     Q  That same calculation was used in the case of all

24  public lands, Forest and Land Management lands in the De Luz

25  Creek area.  Is that correct?

951

221

1      A   With the exception of the lands contained within the

2   naval reservation.

3      Q   All public and forest lands outside Vail, outside the

4   reservation and within De Luz Creek, had their water duty cal-

5   culated in that manner?

6      A   Yes, sir.

7      Q   And the net result of that calculation is that the

8   water duty required for Government lands is greater without ex-

9   ception than the water duty required for private lands.   Is that

10  correct?

11     A   No, sir.

12     Q   We will have to go through that one at a time, Col.

13  Bowen.

14  THE MASTER:  Well, Mr. Sachse, I think it is evident that

15  the project duty is greater, but he has testified that the

16  figures there are the net to which the 10% or more has not been

17  added.

18  MR. SACHSE:  Your Honor has missed what I am getting at.

19  Col. Bowen testified that he took an irrigated pasture basis

20  and then increased it by project duty.

21     Q   Now, will you please look at your calculation in the

22  case of John Kuhnis, Exhibit M-45, and tell me what duties you

23  applied instead of the 3.8 that you found for irrigated pasture,

24  what did you apply in his case?

25     A   Referring to Plaintiff's Exhibit M-45, contained on

9532

Z22

1   page 4 is a tabulation listing crops, maximum acreage under

2   maximum development for each crop, and the irrigation require-

3   ments and the irrigation-- and the potential future water use

4   in the future.   We found that a portion of it was suited to

5   row crops.

6         Q   How many in acres, please?

7         A   17.8 acres, and water requirement of 4.--

8         Q   Take the next one--

9         A   --which is higher than the irrigation requirements I

10  have previously referred to that we based our estimate on for

11  Government lands.

12        Q   What is the next item in acreage and water duty?

13        A   Citrus is 12.2 acres, with an irrigation requirement

14  of 1.86.

15        Q   And that is substantially less than the 3.8 used in

16  the forest, is it not?

17        A   Yes, indeed, Mr. Sachse.

18        Q   Pardon me?

19        A   Surely.

20        Q   What is the next one?

21        A   The next one is suited to deciduous crops with a one-

22  acre, and an irrigation requirement of 1.07 feet per year.

23        Q   Now then, let me ask the question in this fashion,

24  if you had applied to each of your private studies exactly the

25  same test that you applied to the Government land, that is

1   found all irrigable land to be suitable for permanent pasture,

2   would not the water duty in every single study be higher?

3       A  We are talking about two completely different things,

4   Mr. Sachse.  On these reports which are offered in evidence as

5   reports of engineering investigations we have made detailed

6   surveys and we have much more information to base our crops and

7   crop requirement on.  Our surveys on Government land, exclusive

8   of the naval reservation, within the De Luz Creek watershed have

9   been on a reconnaissance basis.  We don't have the detail.

10      MR. SACHSE:  I move to strike the answer as not respons-

11  ive, and have the witness answer my question.

12      THE MASTER:  The answer is responsive, Mr. Sachse.

13  BY MR. SACHSE:

14      Q  I will ask you, Col. Bowen, to take a pencil and mark

15  on this exhibit, and apply your irrigated pasture yardstick

16  to all of the irrigable lands.

17      THE MASTER:  Mr. Sachse, that is self-evident.  You have

18  made your point, that if all of that land was treated as

19  irrigated pasture and if you allowed for project losses the

20  water requirement would be greater, that is mathematics.  It

21  is also contrary to the usage that property is to be put to.

22  It is also obvious if part of the National Forest were planted

23  to citrus the water would be less.  You are laboring the point

24  to me.

25      MR. SACHSE:  Your Honor, you are forgetting the fact

Z24

1   that I appreciate the fact that it is obvious to you, I want

2   it obvious in the record.

3        THE MASTER:  It is obvious in the record, there is no use

4   of proceeding along that line.

5        MR. SACHSE:  In view of your interpretation I think it is

6   now obvious in the record.

7        Q  Can you point out to me, Col. Bowen, any parcel of

8   land in private ownership in the De Luz Creek watershed which

9   you would give a project water duty for all of its irrigable

10   land of 4.2 acre feet per acre per year?

11        MR. VEEDER:  I am going to object to the question.  It

12   is--

13        THE MASTER:  The objection is sustained.  If there is any

14   report which shows 4.83-- or, 4.4, the answer is yes; if there

15   is no report, the answer is no.

16        MR. SACHSE:  Your Honor, I am almost through, and it is

17   early for a recess, but I would like about ten minutes to whiz

18   through some of my notes and see if there are some points I

19   would like to take up.

20        THE MASTER:  We will take our recess now, a ten-minute

21   recess.

22        (Recess.)

23        THE CLERK:  Court is now in session.

24   BY MR. SACHSE:

25        Q  Col. Bowen, I am referring to Exhibit M-DE, your

Z-25

1   tabulation of areas.  Can you tell me which of the off-channel

2   spreading basins or spreading areas is the one that I referred

3   to as looking like a rice check?

4       MR. VEEDER:  I am going to ask that there be a definition

5   of terms here.

6       MR. SACHSE:  I am using his own language.

7       MR. VEEDER:  Spreading basin or spreading areas, what do

8   you mean by spreading basins?

9       MR. SACHSE:  I am simply asking which of the items he has

10  listed that I have referred to as the rice check--

11      THE MASTER:  The witness can refer to the language used

12  on Exhibit M-DE and indicate which of those phrases is used to

13  designate the area which Mr. Sachse referred to last week.

14      THE WITNESS:  Yes, sir, your Honor.  Referring to Plain-

15  tiff's Exhibit-- excuse me, Defendant's Exhibit M-DE, there is

16  only one item shown as off-channel spreading basins, and that

17  item is the one which refers to the area immediately west of

18  the U. S. Navy Hospital, and Lake O'Neill, which I believe is

19  the area you referred to as having the appearance somewhat of

20  rice paddies.

21      MR. SACHSE:  That is correct.

22      Q  Now, can you tell me when that area described in M-DE

23  as off-channel spreading basins was constructed, when those

24  basins were constructed?

25      A  It has been a continuous project in there.  It started

Z-26

1   out, as I recall, in the summer and fall of 1955, and has been

2   more or less a training project in there.  We have engineering

3   troops and we have to have them trained in the use of heavy

4   equipment, and as we could work it into the training schedule

5   we have continued to make improvements.  It is a continuous

6   deal, I wouldn't say it began in November-- not November, but

7   the summer of '55.

8       Q   Now, similarly, referring to the item in M-DE identified

9   as spreading dam No. 1, when was that constructed, if you know?

10      A   I don't believe I could recall the date that that was

11  constructed, Mr. Sachse.  Those spreading dams which are listed

12  here on Defendant's Exhibit M-DE shown as spreading dams No. 1,

13  No. 2, No. 3, No. 4, No. 5 and No. 6.  Now, some of them have

14  been in for-- before I came to Camp Pendleton in 1951, some of

15  them were in.

16      Q   Can you tell me the date of construction, any of those

17  listed on M-DE?

18      A   They have washed out a couple of times and been re-

19  constructed.  I would hesitate at the moment to give you any

20  date on those, Mr. Sachse.  One of them, for example, is the

21  old Stage Road which has been there for a hundred years or

22  more, I guess.

23      Q   Now, there is one other that you have identified on

24  M-DE as Twin Lakes, and I have no idea where Twin Lakes is.

25  Can you by any reference or description tell me where it is

Z-27

or what it is?

A   Yes, sir.   Referring to Plaintiff's Exhibit M-65A, Twin Lakes appears in the lower left-hand corner adjoining the highway marked Vandegrift Boulevard, and near the aerial photo No. 4-0071.

Q   When was that--  Is that an artificial lake, an artificial impoundment?

A   That is now a sewage effluent lagoon, yes, sir.

Q   I don't know whether you can answer these next three questions, but if you can give me an estimate I would appreciate it.

I would like the percentage, approximately, of the total surface area of the De Luz Creek watershed that is owned by the Government, by the Vail, and private ownership.  I realize this is not going to be accurate, but approximate percentages; any Government, the Navy reservation, the Forest, and everything, on Vail and private.

A   The percentage of the combined total acreage owned by Vail Company and the United States?

Q   And private.  In other words, what percentage of the De Luz Creek watershed is in private ownership, what percentage is in United States ownership, and what percentage is in Vail ownership?  Vail is private ownership.  I should say other than Government.

A   Your Honor, may I refer to this exhibit?

Z28

1    THE MASTER:  Yes.

2    THE WITNESS:  Starting at the upper end of the watershed,

3    and referring to Plaintiff's Exhibit M-32, the Vail Ranch, the

4    Santa Rosa Grant, includes everything within the De Luz Creek

5    watershed which is northerly of the Riverside County line, a

6    diagonal dashed line, which crosses Plaintiff's Exhibit M-32

7    above the center and somewhat diagonally across the page.

8    And just eyeballing the percentage of Vail land within the De

9    Luz watershed, it would be about 20%, I would guess.  That can

10   be calculated, of course.

11   BY MR. SACHSE:

12   Q  If you don't want to do it, that is all right.  I

13   thought you might have a figure that you could give me the

14   approximate percentages.  If not, just say so.

15   A  If you would like to have me calculate it so that you

16   have a precise figure--

17   Q  Ultimately I think it will be important, but not now.

18   THE MASTER:  I suggest then, Col. Bowen, that sometime

19   you try to calculate those percentages and then we will have

20   them accurately instead of a guess.

21   THE WITNESS:  Yes, sir.

22   BY MR. SACHSE:

23   Q  Col. Bowen, in your calculation of reasonable water

24   duty did you consider the provisions of Section 1004 of the

25   Water Code of California?  Just yes or no, please.  And if

Z29

1    you don't know what it is, it is here, you can look at it.

2        MR. STAHLMAN:  I don't know that section by code number.

3    I would like to know what it is.

4        MR. SACHSE:  I just handed it over to Mr. Veeder.

5        MR. VEEDER:  Yes.  I would like to see it so I will under-

6    stand the question.

7        THE WITNESS:  I don't understand the question myself, be-

8    cause I don't know the Water Code by number.

9        MR. SACHSE:  I will show it to you.

10       THE MASTER:  Will you show the code section to the witness?

11       MR. VEEDER:  I object to the question on the ground it is

12   incompetent, irrelevant and immaterial.

13       MR. SACHSE:  I think your Honor ought to read the section

14   first.  I just asked him if he considered it, your Honor.  1004,

15   Col. Bowen.

16       THE MASTER:  Well, the objection will be overruled.  You

17   may answer the question whether or not you did consider that

18   section.

19       MR. VEEDER:  Could the Colonel read it into the record?

20   I would like to have it--

21       MR. SACHSE:  I will read it into the record, I will be

22   happy to.

23       MR. VEEDER:  I have no objection to it.

24       MR. SACHSE:  I will rephrase the question, then.

25       Q  In determining the reasonable irrigation duties did

230

1   you consider the provisions of Section 1004 of the Water Code

2   of California, reading as follows:

3           "As used in this division 'useful or beneficial

4       purposes' shall not be construed to mean the use

5       in any one year of more than two and a half acre

6       feet of water per acre in the irrigation of un-

7       cultivated areas of land not devoted to cultivated

8       crops."

9   Did you consider that section?

10  A   No, sir.

11  MR. SACHSE:   I have no further questions.

12  THE MASTER:   Mr. Dennis?

13  MR. DENNIS:   Yes, I have quite a few questions, I think.

14

15                      CROSS-EXAMINATION

16  BY MR. DENNIS:

17      Q   Col. Bowen, at the time that this case was tried as to

18  the Santa Margarita and as to the State of California you were

19  then the Major Bowen that was referred to?

20      A   Yes, sir.

21      Q   The same person?

22      A   Yes, sir.

23      Q   And as I understand it, all of the land classification

24  studies which were placed in evidence at that trial were pre-

25  pared under your supervision and direction.   Is that correct?

861

231

1    A   Yes, sir.

2    Q   And the present exhibits and information relative to

3    land classification which have been introduced at this time are

4    prepared under your direction and supervision?

5    A   Yes, sir.

6    Q   In relationship to the studies which were made in the

7    De Luz Creek watershed, and in relation to the studies which

8    have been made in the lands overlying the Pendleton Basin, I am

9    referring to either the-- or, three basins-- And this is for

10   the purpose of the record, as I understand you sometimes call

11   the O'Neill Basin the upper basin, that would be one and the

12   same?

13   A   Yes, sir.

14   Q   And the Home Ranch Basin, Chappo or Middle Basin would

15   be one and the same?

16   A   Yes, sir.

17   Q   And the Lower Basin and the Ysidora Basin would be

18   one and the same?

19   A   Yes, sir.

20   Q   And we use those terms as being basins or segments of

21   one basin?

22   A   Yes, sir.

23   Q   And all of the basins are the Pendleton Basin, I

24   believe you have referred to them?

25   A   Yes, sir.

Z-32

1    Q   In the preparation of your studies after the trial of

2    the other action certain aerial photographs were flown by Marine

3    personnel.   Is that correct?   Certain aerial photographs were

4    made after the first trial of this action by Marine personnel?

5        A   Photographs of what area, Mr. Dennis?

6        A   Of the M-66 series, the M-66 series here.

7        A   I know what you are talking about now.   You are

8    talking about the aerial photographs that we used as the basis

9    for field sheets, introduced as Plaintiff's Exhibit M-66?

10       Q   Those were flown and made by Marine personnel after

11   the trial of the first action?

12       A   No, sir.

13       Q   Well, now, do they not bear the date on them of March,

14   1955, March the 29th, 1955?

15       A   Yes, sir.

16       Q   And that would be after the trial of the first action?

17       A   Yes, sir.

18       Q   By your answer then I assume they were not flown and

19   photographed by Marine personnel?

20       A   Yes, sir.

21       Q   Who did fly them and photograph them?

22       A   The Navy Photographic Squadron-- the number is on the

23   picture, I can't recall it at the moment-- VJ-61, I think.

24       Q   Flown by Navy personnel?

25

963

Z-33

1    A   Yes, sir.

2        Q   I misunderstood you, I thought you said the Marines did

3    it.

4        After those photographs were made they were sent to

5    your office and the various lines we find on the photographs

6    were made by personnel under your direction and supervision?

7        A   Yes, sir.

8        Q   And the thing that I am just a little bit in the dark

9    about is that in connection with these land classifications and

10   soil characteristic studies which you made you had three types

11   which you referred to as a detailed, and reconnaissance, and

12   reconnaissance study.   Is that right?

13       A   Yes, sir.

14       Q   The actual mechanics of placing those lines on the

15   photographs was done by personnel within the office of the

16   Office of Ground Water Resources.   Is that correct?

17       A   Yes, sir.

18       Q   And the lines which we see on those photographs

19   depicting certain areas were primarily made from an examination

20   of the photographs, taking into consideration the terrain and

21   the type of vegetation which was showing on the terrain.   Is

22   that correct?

23       A   Well, soil sites were determined by inspection on the

24   site.

25       Q   But actually you made no field survey?   I mean you

Z-34

1   didn't go out with a survey party and a surveying instrument

2   and survey each site?

3       A   Oh, yes, sir.  We took the photograph out in the field

4   and drew the contacts in in accordance with the natural features

5   portrayed on the photograph.

6       Q   But you didn't take a transit out and survey the area?

7       A   You don't need a transit, you have got an image of

8   everything on the ground.

9       Q   So those lines were made as a result of the examination

10  of the topography and the vegetation which was growing on the

11  ground at the time that you made the actual physical inspection

12  of the property, plus an inspection of the--

13      A   During the course of the detailed soil survey, yes, sir.

14      Q   And how did you arrive at the acreage within each of

15  those areas, was it done--

16      A   A planometer, yes, sir.

17      Q   And the lines which I see on these various-- One other

18  question.

19          The various portions of aerial photographs which are

20  contained in the engineering reports for the various land-

21  owners are just portions of those photographs that were taken

22  in March of '55?

23      A   March or April.  It took several months to complete

24  covering of the watershed, but it was all within that same

25  period of time.

965

Z-35

Q   But within the De Luz watershed, the M-66 series that are in now were all made in March of '55?  I went through them and--

A   The dates are on them.

Q   And the dates are correct?

A   Yes, sir, the dates shown on them are correct.

Q   Now, in addition to the lines on the photographs which were introduced as the M-66 series, and on the photographs which are in the engineering reports, the various reports, I find a dash line with three dots, and a dash line.  And I find that same line on M-37.  Practically all of the maps I find those same type of line, on M-14, M-13, M-37, M-32, M-33, M-49, and M-65A.

Is it your intention that wherever we find a line consisting of a dash, three dots, and a dash, that that is an intermittent stream?

MR. VEEDER:  I am going to object to that question, "Is it your intention."

THE MASTER:  Rephrase the question.

MR. DENNIS:  Well, I can do it.  I thought I could save a little time.

MR. STAHLMAN:  What do the lines mean?

MR. VEEDER:  I want to know what you are talking about.

BY MR. DENNIS:

Q   On M-37, Colonel, I find a number of lines that are

Z-36

1    dash, three dots, dash.  What does that line stand for?

2       A  That is the standard symbol for an intermittent stream,

3    Mr. Dennis.

4       Q  And it is your intention that wherever that appears

5    you are using that as a symbol for an intermittent stream?

6       MR. VEEDER:  I am going to object to "Is it your intention."

7    It doesn't make sense.

8       THE MASTER:  You can ask the witness if that does indi-

9    cate--

10   BY MR. DENNIS:

11      Q  Does that symbol indicate an intermittent stream on

12   each one of the exhibits on which it appears?

13      A  Yes, sir.

14      Q  And where there is a conflict in various areas--

15   Let's reframe that.

16      Say, for instance, if there is a conflict between the

17   engineering reports and M-37 which one is more apt to be

18   correct?

19      MR. VEEDER:  I am going to ask him to be explicit as to

20   what kind and type of conflict he is making reference to.

21      MR. DENNIS:  Well, I don't want to spend a lot of time

22   here.  I thought we could get this by a general type of ques-

23   tion.  The exhibits show that there will be intermittent

24   streams depicted on certain exhibits that are not on other

25    exhibits.

Z-37

1     MR. VEEDER:  Well, now, your Honor, this becomes import-

2     ant, because some exhibits are very specialized, directed to a

3     particular area, such as this M-45, that is an exhibit showing

4     a small landowner's property.  Necessarily there is more speci-

5     ficity in that kind and type of an exhibit.  Now, I think that

6     we should be a little bit specific when we are referring to the

7     types of exhibits whether it conflicts.

8           THE MASTER:  That certainly should be true, unless there

9     is some general rule which the Colonel can so state.  If there

10    is no general rule he can so advise the Court.

11          MR. DENNIS:  That is all I want. We can do that before

12    Judge Carter in the trial of the case.  If there is a rule that

13    is all I want to know.

14          THE MASTER:  Is there any general rule in the order of

15    priorities in the event of conflict?

16          THE WITNESS:  Your Honor, Mr. Dennis made reference to,

17    for example, Plaintiff's Exhibits M-37, M-32 and M-45.  Plain-

18    tiff's Exhibit 45 is the engineering report of a property and

19    shows in considerable detail the soils topography, and would be

20    the most accurate representation of the streamflow conditions

21    for that particular section.

22          THE MASTER:  That would be true of any individual soil

23.   report, that it would be more accurate than any one of these

24    general maps as to the particular area covered in the soil

25    report?

Z-38

1     THE WITNESS:  Yes, sir.

2   BY MR. DENNIS:

3       Q   Between the trial of the first action and the time

4   that you prepared the exhibits which have been introduced before

5   the Master, how many actual physical inspections of the property

6   in the De Luz Creek watershed did you make?

7       A   Was that question between the trial?

8       Q   Between the trial of the action as against Santa

9   Margarita and the State, and between the time that you prepared

10   the various exhibits entitled Land Capability Classifications

11   and the engineering reports.

12       A   I don't know, Mr. Dennis, I would have to go back and

13   check it.

14       Q   Would it be a considerable number?

15       A   I believe most of these that are introduced in evidence

16   have been done since then.

17       Q   Since then?

18       A   Yes, sir.  The dates are on them.

19       Q   At the time that you prepared the exhibits for the

20   first trial had you made any detailed studies of the land

21   within the United States Naval Reservation that lies within

22   the De Luz Creek watershed?

23       A   If I understand your question correctly, Mr. Dennis--

24       MR. VEEDER:  Then please, Mr. Witness, don't respond

25   until you find out exactly what he wants.

Z-39

1      MR. DENNIS: Will you read the question back?

2      MR. VEEDER:  I don't understand it myself.

3      (Record read.)

4      THE WITNESS:  Yes, sir.

5  BY MR. DENNIS:

6      Q  Have you made any additional detailed surveys or exam-

7  ination of the same land since the trial against the Santa

8  Margarita and the State?

9      A  Yes, sir.

10      Q  And I suppose if I asked you the same question that

11  would be-- I would get the same answer to all of the land

12  within the De Luz Creek watershed?

13      A  Yes, sir.  We have made continuing surveys.

14      Q  I say detailed surveys.

15      A  Yes, sir.

16      Q  And you had made detailed surveys of the land within

17  the reservation within the De Luz Creek watershed prior to the

18  time of the first trial?

19      A  Yes, sir.

20      Q  Major, I want to show you Exhibit M-66B--

21      THE MASTER:  You shouldn't demote him.

22  BY MR. DENNIS:

23      Q  --and ask you if you can explain to me what this dark

24  coloring that is along there that is labeled Santa Margarita

25  River represents?  I will ask you if that is the same area

Z-40

1   general location that shows better on M-66C?

2       MR. VEEDER:  You have got two questions.  I would like to

3   have them divided up and let him answer them one at a time.

4       THE WITNESS:  Referring to Plaintiff's Exhibit M-66B,

5   within the area bounded by the match lines and the Pacific

6   Ocean is a dark area with the words "Santa Margarita River"

7   labeled thereon.  And a black dash, three-dot line, running

8   through that area.  The dark area referred to by Mr. Dennis

9   here is the water surface.  It is noted that the beach is con-

10  tinuous across the mouth of the Santa Margarita River, and

11  this is a tidal lagoon which exists in the mouth of the river.

12  BY MR. DENNIS:

13      Q  And it is my understanding then that where there was

14  any considerable amount of water standing at that time it would

15  appear darker on these photographs than the surrounding

16  territory?

17      A  That depends, Mr. Dennis, on the angle at which the

18  sun is reflected from the water surface.  Note on the Pacific

19  Ocean in Plaintiff's Exhibit 66B, for example, in the lower

20  center portion it is almost white; whereas the same water

21  surface in the upper left-hand corner of  66B is dark, because

22  the light from that surface is not reflecting into the lens.

23      Q  Now, on all of these photographs in the M-66 series--

24  and I will hand you also M-66R, which I would like you to

25  compare with-- I notice the series of light lines where the

Z-41

1  terrain is much higher than the adjoining.  Are those roads and

2  firebreaks?

3      A  Yes, sir, by and large.

4      Q  What else would that represent other than roads and

5  firebreaks, these long narrow white lines that you see travers-

6  ing the photograph?

7      A  Well, some of the white lines there represent building

8  areas.  Being more specific, referring to M-66R, on the right-

9  hand side of the photograph and lying outside of the area de-

10  lineated by the match lines are some irregular grayish-white

11  lines within and without the Naval Ammunition Depot.  This

12  line traversing the right half of M-66R and running generally

13  north and south is the boundary of the Naval Ammunition Depot.

14  And these other irregular lines in here are either firebreaks

15  or roads.

16      Q  Then calling your attention to M-66M--

17      MR. SACHSE:  M or N?

18      MR. DENNIS:  M-66M.

19      Q  You will find a light area here, what does that repre-

20  sent, overlying the dash, three-dot line?

21      A  Referring to Plaintiff's Exhibit M-66M, as in Mike,

22  and traversing the upper left quadrant of the area delineated

23  by the match lines and the naval reservation boundary is a

24  light-colored strip with the words "Margarita," and "River,"

25  contained therein, and that light-colored strip are the sands

z-42

1    in the channel of the Santa Margarita River.

2         Q   In other words, wherever you find a dry channel you

3    would expect to find a lighter color than if there was water

4    running in the river at that particular point?

5         A   With that caution that sunlight reflecting into the

6    lens may give you a white image, also.

7         Q   And calling your attention to M-66Q, which has Lake

8    O'Neill within the match lines, a portion of the Santa Margarita

9    River bed just to the west of it, would you say that if there

10   was water in the Santa Margarita it would show approximately

11   the same color as Lake O'Neill, depending upon the angle at

12   which this photo was taken?

13        MR. STAHLMAN:   What is the point, Bill?

14        THE WITNESS:   Yes, sir, it would have about the same

15   color tone as the Lake O'Neill water surface.

16   BY MR. DENNIS:

17        Q   I wonder then if during the recess you would examine

18   these photographs and be able to tell me in which portion of

19   the Santa Margarita River contained within the naval reserva-

20   tion-- and when I use the term naval reservation I am including

21   all of Camp Pendleton, the Naval Hospital, and the United

22   States Naval Ammunition Depot--

23        A   Yes, sir.

24        Q   --was water flowing on the surface at the time these

25   photographs were taken?

Z-43

1    A   Yes, sir.

2    Q   And I wonder if you will examine the exhibits and tell

3 me what the rainfall was in March of '55 and in February of

4 '55, which would have been the months during which these

5 photographs were taken and the preceding month?

6        Colonel, calling your attention to the engineering

7 reports, and particularly to that page that Mr. Sachse was

8 asking you about in regard to the yearly water duty, I will hand

9 you for examination M-51 and ask you if you would define the

10 term yearly water duty?

11   A   I already defined into the record the duty of water.

12   Q   For one year?

13   A   Do you want this to be repetitious?

14   Q   Yes, because I am not sure whether your definition

15 included whether it applies to the yearly applied water duty

16 or the yearly consumptive water duty.  You did define, as I

17 recall, a consumptive duty of water and the applied duty of

18 water, did you not?

19   A   No, sir.  I simply defined duty of water.  And the

20 only time I believe these other adjectives were applied to

21 duty was this morning.

22   Q   I thought several days ago, during one of the first

23 days you were on the stand, you did define consumptive use

24 of water?

25   A   I defined consumptive use, yes, sir.

Z-44

1    Q   You defined consumptive use.  Now, in your term yearly

2    water duty does that include all of the applied water, or is that

3    the total use of water?

4    A   That is water applied, Mr. Dennis.

5    Q   That is applied water?

6    A   Yes, sir.

7    Q   And does not take into consideration such natural

8    water as rainfall or such water as the vegetation or the plant

9    might obtain from any basin?

10   A   No, sir.  As you know, Mr. Dennis, the amount of water

11   applied in this area varies greatly from year to year, and this

12   is simply a guide.  You might be able to get by one year with

13   only two feet of water on an acre of alfalfa in a very wet,

14   cold year; and a very dry year you might have to put as much

15   as five feet on.  But on an average these figures as shown on

16   the water duty for agricultural crops represent the amount of

17   water that would be applied to the crops listed here.

18   Q   Applied artificially?

19   A   Yes, sir.

20   Q   And does not take into consideration any drafts on

21   underground basins or rainfall?

22   A   That depends on the site, of course.  If you are

23   growing alfalfa on the valley floor where water is within the

24   range of the plants in this country you might successfully

25   grow alfalfa for years without applying any water at all.  It

Z-45

1    would be what we call subirrigating.

2        Q  So that your yearly water duty on land that overlies

3    the Pendleton Basin would be different than alfalfa grown on the

4    Trabuco unit of the Cleveland National Forest?

5        A  No, sir, the plant would still have to have a demand

6    for water whether it was artifically supplied or applied by

7    subirrigation.

8        THE MASTER:  Let me see if I get this straight, Colonel.

9    The figures which you give, for example 4 feet for row crops,

10    that figure is the amount of water which the row crops would

11    require to be grown, whether that was received from irrigation

12    or from rainfall, or partly from irrigation, partly from rain-

13    fall, partly from subterranean sources.  It is the total that

14    the crops would use, regardless of the source.  Is that correct?

15        THE WITNESS:  Now, this is--  These figures --

16        MR. SACHSE:  What is this?

17        THE WITNESS:  Referring to Plaintiff's Exhibit M-51, the

18    table entitled "Water Duty for Agricultural crops," and in the

19    column entitled "Yearly Water Duty in Acre Feet Per Acre" is

20    the overall average of the water that must be applied to the

21    land exclusive of rainfall, but it is possible that in a very

22    wet year less water than this could be applied-- I referred

23    to alfalfa, for example-- in a cold, wet year alfalfa may

24    successfully grow without placing three feet of water on the

25    field.  And in a very dry and hot year it might be necessary

Z-46

1  to place as much as 6 feet of water on alfalfa in a year.  For

2  example, in the Imperial Valley, which gives us a good con-

3  trast, 6 is the commonly-accepted duty of water for alfalfa.

4       THE MASTER:  Then these figures are the water which must

5  be added to natural rainfall?

6       THE WITNESS:  Yes, sir.

7  BY MR. DENNIS:

8       Q  They are applied water figures?

9       A  Yes, sir.

10       Q  Now, I noticed we have under truck gardening a yearly

11  water duty of 1.67 acre feet per acre in the engineering

12  report.  What type of crops would you expect to raise with truck

13  gardening?

14       A  Truck gardening, as it is referred to in these reports,

15  is defined as the home garden which the farmer or rancher grows

16  for domestic purposes.

17       Q  So you would expect to find tomatoes, corn, radishes,

18  beets, peppers in a truck garden?

19       A  Yes, sir.

20       Q  And what type of crop would you expect to find grown

21  in the De Luz watershed or the Santa Margarita watershed under

22  the heading "Row Crops, Commercial"?

23       A  It would include any crops that are commonly grown in

24  rows, those which counsel has just enumerated plus flowers,

25  lettuce, celery.

        Q  Well, why if you are growing the same crop in a truck

Z-47

1    garden would it take 1.67 feet per acre, while if you are grow-

2    ing it commercially it would take 4 acre feet per acre?

3        A   The reason we have the commercial row crop higher than

4    the truck gardening as far as yearly water duty is concerned

5    is that the average domestic garden produces only one crop a

6    year, and in some of the Santa Margarita area, at least, it is

7    possible to double and triple a commercial crop; hence, it is

8    higher.   This infers that the maximum of three crops would be

9    grown on that ground.

10        Q   We have certain areas within the Santa Margarita

11    watershed in which three crops can be grown during the season

12    because of climatic season.   Is that correct?

13        A   Yes, sir.

14        Q   And we have other areas where because of climatic

15    conditions you can only raise one crop?

16        A   Yes, sir.

17        Q   And the climatic conditions, the primary importance

18    is whether the land is frost-free or is not frost-free.   Is

19    that correct?

20        A   Yes, sir.

21        Q   So if you were raising row crops on ground that was

22    not frost-free you would expect to raise only one crop during

23    the year?

24        A   You might be lucky and crowd in two.

25        Q   Some years?

978

z-48

1      A   Some years.

2      Q   All right.  Now, I think that you testified that

3   certain land in the Trabuco unit of the Cleveland National

4   Forest was susceptible of irrigation.   Where would they obtain

5   the water to irrigate that land?

6      A   From local sources, if any.

7      Q   Well, what local sources are available to that par-

8   ticular unit?

9      A   The headwaters of Camps Creek, the Cottonwood Creek.

10      Q   During the summer months, which we will say is July

11   through September, is there any flow in the headwaters of

12   Camps Creek or in the headwaters of Fern Creek, or any other

13   creek that traverses the Trabuco unit of the Cleveland National

14   Forest?

15      A   I don't know.

16      Q   Now, you have observed all of these lands, haven't

17   you, from '51 to '55?

18      A   Yes, sir.

19      Q   And you are not in position to say whether there was

20   any surface or subsurface water in Camps Creek during the

21   summer months?

22      A   There is some springs.

23   MR. VEEDER:   I suggest you change your question to sur-

24   face and subsurface--

25   MR. DENNIS:   I did change it.

979

Z-49

1    Q  Do you know whether or not Camps Creek within the

2 Trabuco unit of the Cleveland National Forest has any surface

3 flow?

4    A  At this moment?

5    Q  During the summer months.

6    A  It would depend on the summer.

7    Q  Well, let me say during the months from July to

8 September have you ever seen any surface flow in any tributary

9 of the De Luz Creek within the Trabuco unit of the Cleveland

10 National Forest?

11    A  No, sir, I don't recall having seen any.

12    Q  Have you made any investigation to determine whether

13 or not there is any subsurface flow in any tributary of the

14 De Luz Creek within the Trabuco unit of the Cleveland National

15 Forest?

16    A  No, sir.

17    MR. VEEDER:  I am going to object to any further questions

18 along this line.  I think it is completely irrelevant in this

19 area of the duty of water or the quantity of water adjudicated

20 to a particular piece of land, it doesn't have anything to

21 do with the availability of water.  Very frequently there will

22 be areas which will go for years without any water, but should

23 there be water available they are entitled to have water

24 adjudicated to them.

25    Now, I see no purpose whatever in this line of examining.

Z-50

1    Certainly throughout the West, and it is true in every area

2    concerning which I have any knowledge, streams are in short

3    supply.  Nevertheless, you will have adjudicated to a particular

4    parcel of land the right to use a certain quantity of water.

5            I see no conceivable line for this examination.  What

6    is he shooting for, what does he want?  We all know that there

7    are areas which will not receive water, but nevertheless they

8    are riparian and they are entitled to have water adjudicated to

9    them.  And in the event some is available they are entitled to

10   participate in it.

11           THE MASTER:  I think that is correct, Mr. Dennis.  As I

12   understand it, the judgment in this case would determine on

13   some basis the amount of water which would be available--

14   correction, which a particular parcel of land would get if put

15   to beneficial use, and then there would have to be some pro-

16   vision for division of water in the event there was an in-

17   adequate supply to furnish that particular parcel of land.

18   So that your question would only refer to the probability that

19   some provision might have to be made to meet a deficiency, and

20   I take it such provision would have to be included as to every

21   parcel of land within the entire watershed, even though in

22   99 years out of 100 there was an ample supply of water flowing,

23   because in the one that there was not some provision would have

24   to be made.  So that your questions relate primarily to a

25   question which would be only a matter of degree.  Unless there

Z-51

3

1   is something else that you have in mind that I don't see I

2   think Mr. Veeder's objection is well taken.

3         MR. DENNIS:   I think I should explain the reason for my

4   question.   We took the position at the trial of this action

5   when it was tried before, and I believe the position is

6   supported by the Ninth Circuit Court of California, Half Moon

7   Bay vs. Crowell, that land has to be susceptible of profitable

8   and economic irrigation, because it can place a burden on the

9   stream when there is a stream with a short supply.

10         In other words, in the Crowell case the court failed to

11   find that certain acreages owned by Mr. Crowell was riparian

12   by the stream, water was obtained by the construction of a

13   dam and by bringing a line across the place.   And the court

14   said in the absence of any evidence that the transportation

15   and the development of that water supply and bringing it to

16   this land which was riparian was economically sound that the

17   court could not consider that that land was susceptible of

18   irrigation so as to give that landowner a certain proportion

19   of the stream during times of short supply.   Now, the other

20   reason, that I think your Honor is well aware of, is the fact

21   that a riparian owner has no right by virtue of his riparian

22   right to store water for seasonal or cyclic storage, and the

23   riparian owner is only entitled to his particular portion of

24   the stream at such time as there is flow within that stream.

25   In other words, he may be riparian so that he is able to share

9582

Z-52

1   in the flow of that stream in the months of November, December

2   and January, but not if the stream is dry during August,

3   September and October.

4           What the plaintiff is trying to do here, as I see it,

5   or has done here, he has introduced evidence that lands are

6   capable of irrigation, irrespective of whether they have any

7   water supply whatever, either practically or legally, and ir-

8   respective of what it might cost to develop water and put water

9   on those lands, or whether a party could legally develop water

10  and take it to those lands.

11          Now, I am bringing it up at this time because I think

12  it is a matter which should have some discussion at this phase

13  of the case, because it is going to have a great deal of

14  bearing on the evidence.  If our position is correct that Joe

15  Doakes has 20 acres of land which is not riparian to the stream

16  nor does it overlie any land which constitutes a basin which

17  tends to support or be supported by the streamflow, even though

18  he can irrigate that whole 20 acres, and the 20 acres would

19  take a hundred acre feet yearly to irrigate that 20 acres, then

20  he could use that water, put it to beneficial use under ap-

21  proved practice, certainly your Honor is not entitled to say

22  he is entitled to take any flow of the Santa Margarita River

23  20 miles below him, you are not entitled to say that he can

24  take or is entitled in August to any portion of that flow if

25  there is no flow in the stream either surface or underground

Z-53

1   when it goes through or traverses his property, during the month

2   that he needs to get water from that stream.  And in determin-

3   ing whether or not there is any water subject to appropriation,

4   you are not going to be able, I don't believe, to take into

5   consideration the uses of landowners who have no rights to the

6   water and on whose land the water could not be put to economical

7   uses under approved engineering practices.

8          And so the reason for this question is that we may

9   have 500 acres in the Trabuco unit of the Cleveland National

10  Forest that can use a thousand acre feet of water per year,

11  but if there is no water there it can't constitute any burden

12  on the creek, it can have no effect on whether there is any

13  water subject to appropriation at the confluence of De Luz

14  Creek and the Santa Margarita River.  It can have no bearing

15  on the correlative rights of any landowner on whose land the

16  water flows during the month of August, and I think it is

17  material.

18         THE MASTER:  Well, Mr. Dennis, I think that what you

19  have to say would, of course, have to be considered, as I have

20  indicated, in any judgment that was rendered, but if there is--

21  and if there is no water, either surface or subsurface, at the

22  particular point in a particular year that would be considered

23  in the judgment, but I don't think that has any limitation

24  upon the rights of the land to water if it is available at the

25  time in question.

Z-54

1    MR. DENNIS:   I agree with you on that, your Honor.

2    MR. VEEDER:   Or at any time.

3    MR. DENNIS:   I think, though, that we are going to have

4    to look into this question as to whether or not that land has

5    any rights to water at all.   In other words, we find that on

6    certain exhibits we have this dash, three-dotted line, dash

7    line, which the Colonel says indicates an intermittent stream,

8    and on certain of the Plaintiff's exhibits that line will ex-

9    tend into certain areas and parcels of land.   On other exhibits

10   it does not extend into these parcels of land, and certainly

11   Col. Bowen from his testimony has had ample opportunity-- more

12   so, I would say, than anybody else-- to observe these various

13   areas.   And so I think that we are entitled to what knowledge

14   he has as to whether this intermittent stream actually exists.

15   It is going to have a bearing on the correctness of the exhibits

16   as to whether the parcel has any riparian or overlying rights.

17   THE MASTER:   If you are trying to establish that the

18   stream does or does not exist at all you are entitled to ex-

19   amine the witness on that line.

20   MR. DENNIS:   Or during certain parts of the year.

21   THE MASTER:   You can continue the examination.   You are

22   trying to establish the facts as to the existence or non-

23   existence of a stream?

24   MR. DENNIS:   Whether it is an intermittent stream or not

25   an intermittent stream, and when the flow starts and stops.

Z-55

1     THE MASTER:  I take it you would also-- or, Mr. Veeder

2  would have an opportunity, if you did not, he would have an

3  opportunity to develop that there might be a subsurface flow

4  so that you would have a stream.  Very well.

5  BY MR. DENNIS:

6     Q  Col. Bowen, have you ever observed any flow during

7  the months of July, August and September in any tributary that

8  traverses the Trabuco unit of the Cleveland National Forest?

9     MR. VEEDER:  I am going to raise my objection again to

10  this question on exactly the same grounds that I made before.

11  This land could be riparian and receive water during particular

12  times, there is no question about it.  But he proposed this

13  statement to you, your Honor, and I certainly agree that he

14  should be permitted to cross-examine as to whether a creek

15  exists or not.  But I respectfully submit that it has nothing

16  whatever to do with this lawsuit when he says, as he did, have

17  you ever seen water in such and such a tributary.  I think it

18  is incompetent, irrelevant and immaterial for the reasons that

19  I expressed in the original instance, and I truly believe that

20  Mr. Dennis is confused somewhat as to the kind and type of

21  relief that we are seeking.

22     THE MASTER:  I think the objection is well taken to the

23  form of the question, because the question in its present form

24  does not seek to elicit the information which I have held you

25  were entitled to obtain.  So the objection is sustained to the

986

Z-56

1   question in its present form.

2         MR. DENNIS:  I will ask Col. Bowen this question:

3         Q  Exhibit 37 was prepared under your direction and

4   supervision, was it not?

5         A  Plaintiff's Exhibit 37 was prepared under my direction

6   and supervision.

7         Q  I notice that on M-37 you have a symbol for an inter-

8   mittent creek extending into the Trabuco unit of the Cleveland

9   National Forest.  Will you tell us what information you had

10  within your office to show the existence of the intermittent

11  stream within the limits of the Trabuco unit of the Cleveland

12  National Forest at the time you prepared M-37?

13        A  Yes, sir.  If I may refer to Plaintiff's Exhibit--

14        MR. VEEDER:  33?

15        THE WITNESS:  The U. S. Geological Survey.

16        Referring, your Honor, to Plaintiff's Exhibit M-33F

17  and also to Plaintiff's Exhibit M-37, and Plaintiff's Exhibit

18  M-32, in Plaintiff's Exhibit M-33, 4 was used as the base for

19  a portion of the De Luz Creek watershed, the remainder of it

20  is included on the--

21        MR. STAHLMAN:  Where is Sachse?

22        MR. VEEDER:  I think the record should show that Mr.

23  Sachse is not here, and the Fallbrook Public Utility District

24  isn't here, and it may be reversible error.  I don't want the

25  witness to respond until Mr. Sachse is back.

Z-57

1    THE MASTER:  Mr. Dennis, reframe your question, then.

2  You started to ask the witness a question-- or, rather, you

3  were still answering the question.

4    MR. DENNIS:  I asked the question.

5    THE WITNESS:  I refer, your Honor, to Plaintiff's Exhibit

6  M-33F and M-33S, which are the basis for determining the pres-

7  ence or absence of the intermittent streams which traverse the

8  Trabuco unit of the Cleveland National Forest within the De Luz

9  Creek watershed.

10    Your Honor will note on the Plaintiff's Exhibit M-33S,

11  centrally situated on the right-hand margin is the name "Roblar

12  Creek," and a dash, three-dot line, which heads northerly of

13  the line marked National Forest Boundary, and it proceeds

14  southerly, leaving the National Forest on the line-- on the

15  southerly boundary of Section 26, 8 South, 5 West, which con-

16  forms to the location of that line on Plaintiff's Exhibit M-37

17  and Plaintiff's Exhibit M-32.  In other words, the U.S.G.S. top-

18  ographic 7.5 minute series, topographic quadrangles of the

19  area, are the basis for the exhibit.

20  BY MR. DENNIS:

21    Q  Did you have any other information relative to the

22  location of the intermittent streams than that located on M-33F

23  and M-33S at the time that you prepared Plaintiff's Exhibit

24  M-37?

25    A  No, sir, the geographic--

Z-58

1    Q  If I asked you the same questions on the streams in

2  the watershed of the De Luz Creek your answer would be the same?

3    A  Yes, sir.

4    Q  Colonel, is there any portion of the Pendleton Basin

5  that lies within the watershed of the De Luz Creek?

6    A  Yes, sir.

7    Q  Which portion would that be?  I wonder if you would

8  take a pencil and outline it on Plaintiff's M-37?

9    A  The alluvium which fills the Santa Margarita Basin

10  and forms the reservoir, the underground reservoir, is con-

11  tinuous from the area referred to as the Pendleton Basin or the

12  Lower Santa Margarita Basin with the alluvium which is found

13  along the De Luz Creek stream channel.  The alluvium is in the

14  neighborhood of 105 feet deep right near the confluence of

15  De Luz Creek with the Santa Margarita River.  And my references

16  to the basin have been generally to and including the con-

17  fluence of the De Luz Creek.

18    Now, it is possible that ground water storage units

19  continue up on the creek, and I think it is a matter that has

20  to be arrived at by definition.  There is no hydraulic barrier

21  in there which limits the upper portion.  It would be rather

22  a transitional zone here somewhere through the De Luz Creek.

23    Q  Colonel, you testified, as I recall, to the surface

24  area of the Pendleton Basin?

25    A  Yes, sir.

Z-59

1    Q  Does any portion of the surface area of the Pendleton

2  Basin included within the basin fall within the De Luz watershed?

3  I will rephrase that.

4        Colonel, does any portion of the Pendleton Basin as

5  heretofore testified to by you lie within the watershed of the

6  De Luz Creek?

7        A  Yes, sir.

8        Q  Would you outline on Plaintiff's Exhibit M-37 that

9  portion of the Pendleton Basin that I have just referred to?

10       A  It might be better, your Honor, if I used Plaintiff's

11  Exhibit M-32, since that is colored and the red pencil would

12  now show well on M-37.

13       Q  Are M-37 and M-32 drawn to the same scale?

14       A  Yes, sir.

15       Q  Would you outline it on M-32?

16       A  The approximate area would be delineated at the lower

17  center portion of Plaintiff's Exhibit M-32, the confluence of

18  De Luz Creek with the Santa Margarita River.

19       Q  And approximately how many acres would be contained

20  in there, could you give us your estimate?

21       A  Very small.

22       THE MASTER:  Can you mark that area that you have just

23  indicated, Colonel, with the letters P. B. to indicate

24  Pendleton Basin.

25       THE WITNESS:  Yes, sir.

990

Z-60

BY MR. DENNIS:

1    Q  Would you estimate a surface area of approximately

2    ten acres?

3    A  It would be somewhere in the neighborhood of ten

4    acres, Mr. Dennis, more or less.

5    Q  Now, does any portion of the Naval Ammunition Depot

6    lie within the De Luz watershed?

7    A  No, sir.

8    Q  Now, you are familiar with the areas that were

9    acquired by the Government from the Baumgardners, and the area

10    from the Floods that are shown in Plaintiff's Exhibit M-2, I

11    believe it is?

12    A  May I see Plaintiff's Exhibit M-2, please?

13    MR. VEEDER:  I submit, your Honor, that this is a terrible

14    waste of time.

15    THE MASTER:  Well, I take it this question is prelimin-

16    ary.  I don't know what counsel is driving at, but quite often

17    on cross-examination he has some purpose in mind that is

18    apparent only at a later date.

19    THE WITNESS:  Plaintiff's Exhibit M-2 is a legal

20    document, Mr. Dennis, and I am not too familiar with it.

21    BY MR. DENNIS:

22    Q  You are not too familiar with it.  You are not familiar

23    then with what property was acquired from the Baumgardners and

24    what property was acquired from the Floods?

Z-61

1       A   No, sir.   I am familiar with the property, Mr. Dennis,

2   but I am not familiar with the property that was acquired in the

3   manner you have described it.

4       Q   And as I understand it, and you testified as to what

5   land was irrigable and what land was non-irrigable, you gave

6   no consideration as to the water rights of that particular land?

7   Your studies in arriving at what land was irrigable, the only

8   thing that you took into consideration was the physical

9   characteristics of the soil and the topography of the land and

10  the climate.   Is that correct?

11      MR. VEEDER:   Don't answer that.   You have got two ques-

12  tions posed at the same time.

13      THE MASTER:   I think that is a double question, Mr.

14  Dennis.   Which precise question do you wish him to answer first?

15  BY MR. DENNIS:

16      Q   Did you take into consideration in arriving at what

17  land was irrigable, other than the characteristics of the soil,

18  the topography of the land itself and the climate?

19      A   Are you referring now to lands within the naval

20  reservation?

21      Q   All lands that you testified to were irrigable and

22  non-irrigable.

23      A   Now, you have mentioned testimony in '52, and testi-

24  mony given last week.   And now which one are you referring to,

25  Mr. Dennis?

Z-62

Q  All testimony that you have given before the Master in regard to irrigable and non-irrigable lands.

A  We haven't taken water rights into consideration, no, sir, that is just the physical fact that those lands are irrigable.

Q  And you didn't take the availability of water into consideration?

A  No, sir.

Q  And you didn't take into consideration the cost of putting in a water distribution system?

A  That was taken into consideration in determining which lands are irrigable.  That is, we didn't actually plan and include in our report an estimate of cost or plan a water distribution system.

Q  Nor did you take into consideration the cost of plac-ing the water on those lands, the cost of operation and main-tenance, including power costs for pumping?

A  No, sir, we didn't break that down in detail.

Q  But you did take into consideration the type of crops which could be grown?

A  The type of crops adaptable to each soil type, yes, sir.  And we tried to select, of course, the crop which would give the greatest return per acre.

MR. VEEDER:  May I have counsel's question?  Did you say could or would be grown?

393

Z-63

1    MR. DENNIS:  Could be grown.

2    MR. VEEDER:  You said could?

3    MR. DENNIS:  Yes.

4    Q  Now, in respect to the term I think it was yearly duty

5    of water as contained in the engineering reports, would the same

6    yearly duty of water apply to crops raised in the San Luis Rey

7    watershed?

8    A  The climatic and soil conditions are similar in the

9    San Luis Rey watershed, yes, sir.

10   Q  And it would be similar in those watersheds lying to

11   the north and west of the Santa Margarita watershed, would it

12   not?

13   A  Yes, sir.

14   MR. STAHLMAN:  How far north?

15   MR. DENNIS:  In Camp Pendleton.

16   Q  Are any portions of the lemon grove which is located

17   in Camp Pendleton within the watershed of the Santa Margarita

18   River?

19   A  Yes, sir.

20   Q  Have you any information as to what the yearly duty

21   of water of that grove has been in the past?

22   A  Yes, sir, I have records in my office of the water

23   used there, but I don't recall them at the moment.

24   Q  Did you take those into consideration when you pre-

25   pared the table which is enclosed in the engineering report

Z-64

1   showing the yearly duty of water?

2      A  Yes, sir, that and other information.

3      Q  You did take that into consideration?

4      A  Yes, sir.

5      Q  In addition to the sources of information which are

6   set forth under the column "References"?

7      MR. VEEDER:  I truly don't understand where this line

8   of testimony is taking us.

9      THE MASTER:  Well, it seems to me to be pertinent enough

10  to be admissible, even though it is not too apparent for the

11  time being what it is leading to.  You can't restrict counsel

12  unduly on cross-examination, Mr. Veeder.

13  THE WITNESS:  As I recall, Mr. Dennis, the irrigated water

14  applied to that lemon grove is somewhat comparable to the

15  figure given there, and we only listed the Government references.

16  BY MR. DENNIS:

17     Q  Now, I think you testified that the basin, Pendleton

18  Basin, was used for grazing purposes, and you gave an estimate

19  of approximately a thousand head of cattle and two thousand

20  head of sheep?

21     A  Well, that varies from time to time, Mr. Dennis.  There

22  is no constant population in there; the population of cattle

23  and sheep is subject to requirements for training.

24     Q  But they are not grazed entirely on the Pendleton

25  Basin, are they; that is, the total number of cattle and the

Z-65

1    total number of sheep grazed on the entire United States naval

2    reservation?

3         A   No, sir.  I didn't even attempt to estimate that.

4         Q   But you do estimate that there are a thousand head

5    of cattle and three thousand head of sheep that are maintained

6    on the Pendleton Basin?

7         MR. VEEDER:  Now, that wasn't his testimony, your Honor.

8         MR. DENNIS:  I understood it, and wanted it clarified.

9         THE MASTER:  Was that your testimony?

10        MR. VEEDER:  He said it was a fluctuating number.

11        THE WITNESS:  That number of head of stock, sheep and

12   cattle, do have access to the basin.  Pasture includes some

13   healed land.

14   BY MR. DENNIS:

15        Q   And the cattle and sheep are all maintained under

16   leases?  I mean --

17        A   Leases or permanent, Mr. Dennis, yes, sir.

18        Q   The base itself, the Marine Corps, does not pasture

19   any cattle or sheep?

20        A   No, sir.  That is, if you mean owned by the United

21   States Government.

22        Q   That is right.

23        A   The answer would be no.

24        Q   Mr. Veeder just made a suggestion.  I think you testi-

25   fied that Special Service horses were grazed in the Pendleton

Z-66

1    Basin?  How many horses does Special Services have?

2         MR. VEEDER:   I wanted something relevant in this part of

3    the testimony.

4         THE WITNESS:  As I recall, we have about 120 head.

5    BY MR. DENNIS:

6         Q   And they are pastured on the Pendleton Basin?

7         A   No, sir.

8         Q   How many on the Pendleton Basin?

9         A   Well, at the present time, Mr. Dennis, I think there

10   is only about two and a half, our famous SGT.RECKLESS,an Arabian

11   stud horse, and a colt.

12        Q   And you heard the testimony of Mr. Wilson and Dr.

13   Butler?

14        A   Yes, sir.

15        Q   Relative to the flow of Fern, Camps and De Luz Creeks?

16        A   Yes, sir.

17        Q   Have you any information to indicate that that was

18   incorrect?

19        A   No, sir.

20        Q   You would be willing to accept their testimony as

21   being correct?

22        A   Yes, sir.

23        Q   On the basis of investigations that you have made to

24   date?

25        A   Yes, sir.

Z-67

1    Q   Now, I think in your testimony one time you stated that

2    the duty of water as reflected on the property of various

3    owners in the engineering report were considered the highest

4    and best use.  Do you recall so testifying?

5        A   Yes, sir, I may have so testified, and that is the

6    basis that we used for arriving at our cropping system or land

7    utilization plan.

8        Q   So in making those reports you considered the quantity

9    of water and the purpose for which the water was to be used

10   would be the highest and best use for each particular parcel

11   of property?

12       A   Yes, sir.

13       Q   In the engineering reports I find the statement I

14   think it is intermontane, i-n-t-e-r-m-o-n-t-a-n-e, basin.  I

15   wonder if you could define for us that term?

16       A   An intermontane basin?

17       Q   Yes, sir.

18       A   Is a basin surrounded by mountains or hills.

19       Q   And has no reference to the character of the soil in

20   the basin itself?

21       A   No, sir.

22       Q   Or the porosity of the basin?

23       A   No, sir.

24       Q   And in other engineering reports such as M-47 I find

25   that you use the term "considerable depth weathering."  I

Z-68

1  wonder if you could give us some idea what you mean by that

2  term?

3      A  Well, weathering as referred to in those reports is

4  the effect of the climatic changes upon the original rock

5  material, the granitic rock which are predominant in the area

6  are composed of a mass of various types of minerals which have

7  crystalized out, and the mineral crystals are scattered

8  throughout the formation in varying amounts, and they have

9  varying physical characteristics.  For example, different

10  coefficients of expansion so that the hot summer sun shining

11  on these rocks will expand portions of them more rapidly than

12  others, or greater than others, and cause them to fracture

13  away, to break up.  Then moisture which might seep in through

14  them would dissolve away some of the minerals and cause further

15  weathering.  And the depth of weathering which we used in our

16  report indicates the depth of which these climatological

17  changes, moisture, and temperature, and so forth have changed

18  the original magma.

19      Q Would considerable depth mean five feet, fifty feet

20  or a hundred feet?

21      A  Well, considerable depth would be probably 25 to 100

22  feet.

23      Q  Did you find any places within the De Luz watershed

24  where the weathering extended to a depth of a hundred feet?

25      A  I don't recall any now, Mr. Dennis.

999

Z-69

1    Q   Colonel, calling your attention to Plaintiff's Exhibit

2    M-34C--

3        MR. VEEDER:  Before proceeding further I would like to

4    ask a question.  Mr. Dennis, do you represent any clients in

5    the De Luz watershed?

6        MR. DENNIS:  I represent no clients in the De Luz water-

7    shed, but Col. Bowen has made certain statements in which he

8    is tying the De Luz watershed into the Pendleton Basin and the

9    effect on it.  And, as you know, the effect of the Pendleton

10   Basin either gravityor the necessity of being recharged as in

11   the state of nature has considerable effects on the rights of

12   my client.

13       MR. VEEDER:  Where is your client claiming water?

14       MR. DENNIS:  Upstream.

15       MR. VEEDER:  At what point, Lippincott site?

16       MR. DENNIS:  There are four points of diversion from

17   Santa Margarita.  There is one approximately a mile down-

18   stream from the Pauba Reservoir, or the Vail Reservoir.  There

19   is a point of diversion which is just immediately north of the

20   county line.  And there are points of diversion that are the

21   approximate location of the Lippincott site.

22       MR. VEEDER:  And that is the Cuckoo bird theory that

23   you are claiming a right to store in the Fallbrook Dam.  Is

24   that not right?

25       THE MASTER:  Just a minute.  I don't know that we need

Z-70

1    go into this any further, because I would rule that these

2    questions that Mr. Dennis has been asked so far are pertinent

3    questions, and whether he represents a client that might or

4    might not technically be entitled to them they are eliciting

5    information which may be of value to the Court.  So I will

6    permit Mr. Dennis to continue his line of examination.

7         MR. VEEDER:  I hadn't objected, your Honor.

8    BY MR. DENNIS:

9         Q  You have had a chance to examine the exhibit  that I

10   handed to you, Colonel?

11        A  Yes, sir.

12        Q  And that exhibit, as I understand, correctly represents

13   the entire flow of the Santa Margarita River at the Ysidora

14   Gaging Station  during the period of times that are disclosed

15   in the exhibit?

16        A  Yes, sir.

17        Q  Have you any reason to believe that they are not

18   correct?

19        A  No, sir.  I believe they are pretty correct on the

20   Ysidora.

21        Q  Does it purport-- It measures all of the surface

22   flow of the Santa Margarita River?

23        A  Yes, sir.

24        Q  At that point is there any subsurface flow of the

25   Santa Margarita River that is not measured by that gauging

Z-71

station?

A   Yes, sir.

Q   Is there a considerable quantity of water or a small quantity of water?  Let me put it this way--

A   Considerable is relative, Mr. Dennis.

Q   Has your office, or has anybody under your direction and supervision, ever attempted to estimate the subsurface flow of the Santa Margarita River at that point?

A   Estimates have been made.  However, not by me, nor by anyone under my direction or supervision.

Q   Have there been any measuring devices ever installed to your knowledge to record the subsurface flow of the Santa Margarita at the Ysidora Gaging Station?

A   No, sir.

Q   And I presume that if I asked you the same questions relative to the other gauging stations included within Plaintiff's M-34A series your answers would be the same?

MR. VEEDER:  I am going to object to that.

MR. DENNIS:  I will go through each one of them.

MR. VEEDER:  Because of this, there were several questions that were asked, and unless Mr. Dennis is specific as to the questions he wishes to elicit an answer necessarily I think we have to request that he be specific.  He asked so many questions, and I would like to have them specific.

THE MASTER:  I think that probably the question should

Z-72

1   be directed to specific areas.  His answer might be different

2   as to different gauging stations.

3        MR. VEEDER:  And I would like to have him rephrase the

4   question, if you would.

5   BY MR. DENNIS:

6        Q  I will hand you Plaintiff's Exhibit M-34D, which I

7   believe reflects the readings at the Fallbrook Gaging Station

8   on the Santa Margarita River, which is just upstream from the

9   naval-- the boundaries of the naval reservation.  Is that cor-

10  rect?

11       MR. VEEDER:  That is incorrect.

12       MR. DENNIS:  I am asking the witness, not counsel.

13       THE WITNESS:  No, sir, it was moved down to a site

14  between the naval reservation, as noted on the first page of

15  Plaintiff's Exhibit M-34D.

16  BY MR. DENNIS:

17       Q  And when was it moved to that particular location?

18       A  October 1, 1955, is the date that the record began at

19  the lower station.  It was actually constructed in the summer

20  of '55.

21       Q  And so far as you know that record is correct?

22       A  Yes, sir.

23       Q  And it records all of the surface flow of the Santa

24  Margarita River at that particular point?

25       A  Yes, sir.

Z-73

1  Q  Is there any subsurface flow of the Santa Margarita

2  River at that point?

3  A  Yes, sir.

4  Q  Has your office or anybody under your direction or

5  supervision ever made any estimate of the subsurface flow at

6  that point?

7  A  No, sir.

8  Q  To your knowledge has there ever been any recording

9  instruments installed at that point to record the subsurface

10  flow of the Santa Margarita River?

11  A  Any stream gauge penetrates alluvium, and absent

12  suface streamflow the gauge would measure the height of the

13  water, if any, within the alluvium, but it doesn't measure its

14  rate of flow.  The rate of flow through a particular portion

15  of the alluvial fill would be based on the size of the porous

16  bases, the permeability.

17  Q  Well, do I understand that this recording instrument

18  only measures the height of the water table at that particular

19  location, and not the quantity of water that passes that

20  particular spot?

21  A  That is correct.

22  Q  And have you maintained records showing the height

23  of the water table where that recording instrument has been

24  installed?

25  A  There is a continuous recording made.  The recorder

Z-74

1   has a clock mechanism which rotates a chart underneath the

2   scribe which plots the water levels within either surface or

3   subsurface water levels, and then giving a cross-section area

4   and rate of flow of water past the gauge, it is possible to

5   compute the streamflow.  But the meter on the gauge itself

6   doesn't give volume of water in any units that flows past the

7   point, that is a matter of computation.

8       Q   And those records are kept in the office of Ground

9   Water Resources?

10      A   No, sir, they are official U.S.G.S. records.   These

11  are copies of the U.S.G.S. records, Mr. Dennis.

12      Q   I mean the records that you were referring to that

13  record the height of the ground water table.

14      A   The charts are property of the United States

15  Geological Survey.

16      Q   Do you maintain and make the readings on these

17  instruments?

18      MR. STAHLMAN:  This was gone into the other day.

19      THE WITNESS:  They make the computations, Mr. Dennis.

20  BY MR. DENNIS:

21      Q   Who reads the instrument that records the underground

22  water table?

23      A   The chart is read by many people.

24      Q   But I mean somebody has to go out and read the instru-

25  ment.  Who picks up the chart?

Z-75

1      A   It could be Mr. Green, or it could be someone from

2   U.S.G.S.

3      Q   But your office does not pick up the chart?

4      A   Well, Mr. Green works half time for me, so you might

5   say--

6      Q.  Is Mr. Green employed by the office of Ground Water

7   Resources?

8      A   He is employed by the United States Navy half time.

9      Q   Let's get this correct.  My understanding was that

10  Mr. Green was employed by the Vails and by the United States,

11  and not the Marine Corps.  I would like to know whether Mr.

12  Green is being paid by the Marine Corps through the office

13  of Ground Water Resources, from the statement Col. Bowen just

14  made that he worked for him.  It was not my understanding that

15  Mr. Green worked for the office of Ground Water Resources.

16      THE MASTER:  I think it should be clarified.  Who obtains

17  the records?

18      THE WITNESS:  Your Honor, Mr. Green is a hydrographer

19  who was employed jointly by the Santa Margarita and by the

20  Vail Company in accordance with the stipulated judgment of

21  December, 1940, whatever date that was, and when the United

22  States acquired the ranch for the Marine Corps use they assumed

23  the responsibility of  biding by that stipulated judgment.

24  And part of it includes half of the hydrographer's salary,

25  and the United States has paid that salary-- half the salary,

Z-76

1   Vail Company pays the other half.  Mr. Green, it could be said,

2   reports to anyone, reports to me, inasmuch as I certify that he

3   has performed his duties for the month and is eligible to receive

4   his pay check from the United States.  I don't know how Vail

5   Company handles it.

6      THE MASTER: Very well.

7   BY MR. DENNIS:

8      Q  Col. Bowen, just one other question, and that is during

9   the last trial you prepared an exhibit which showed the use

10   of water by months for the Vail, the properties owned by the

11   Vails, and for the properties owned by the United States of

12   America.  Have you had occasion to revise that exhibit?

13      MR. VEEDER:  Is this not beyond the scope of the direct

14   examination and the proceeding?

15      MR. SACHSE:  This is not beyond it, you say?

16      MR. VEEDER:  I say it is.

17      THE MASTER:  I believe that objection is well taken.  The

18   objection is sustained.

19      MR. DENNIS: That is all.

20      THE MASTER:  Mr. Moskovitz, I understood you had no

21   cross-examination?

22      MR. MOSKOVITZ:  I have no cross-examination at this time.

23      THE MASTER:  Mr. Stahlman?

24      MR. STAHLMAN:  As I have indicated, my position is the

25   same, we reserve the right of cross-examination when we reach

Z-77

1 the Vail properties.

2       THE MASTER:  Mr. Veeder, do you want to defer your re-

3 direct until after the noon recess?

4       MR. VEEDER:  I think it would be proper, your Honor.

5       THE MASTER:  We will recess, and reconvene at 1:30.

6

7                    ----------

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      <u>Fallbrook, California, June 9, 1958, 1:30 P.M.</u>

2

3          THE CLERK:   Court is now in session.

4

5                    ALLEN C. BOWEN,

6    resumed stand, testified further as follows:

7

8                    REDIRECT EXAMINATION

9    BY MR. VEEDER:

10         Q   Colonel Bowen, did you prepare data--  What other

11   data did you prepare at the request of Mr. Sachse, in addition

12   to Defendants' Exhibit M-D3?

13         THE MASTER:   M-DE, isn't it?

14         MR. VEEDER:   Yes.

15         THE WITNESS:   Mr. Sachse requested me to make some compu-

16   tations to arrive at the amount of precipitation and runoff.

17   BY MR. VEEDER:

18         Q   Did you make that preparation?

19         A   Yes, sir, runoff and precipitation in the area.   And

20   selecting the--  For the precipitation data, selected the Fall-

21   brook station, the monthly rainfall is shown on Plaintiff's

22   Exhibit M-35A, and at the bottom of the sheets are minimum,

23   maximum, and average.   As I understood Mr. Sachse's request of

24   me was that I determine the percent precipitation at a typical

25   place in the vicinity of Camp Pendleton between the months of

1005

b2.

1   1 November, and 30 April, inclusive.  That was the reason for

2   selecting the Fallbrook station reported in Plaintiff's Exhibit

3   M-35A.

4   And for the period specified by Mr. Sachse the average--

5   taking it from the average precipitation, 1 November to 30

6   April would account for 88.7% of the rainfall on the average

7   occurs.

8   Q   What about precipitation for the water year 1958, did

9   you make any calculation for him on that?

10   A   No, sir, there was no request for calculations in the

11   water year '58 on precipitation.  But Mr. Sachse further re-

12   quested some runoff computations.

13   Q   For the De Luz runoff.  Isn't that correct?

14   A   Both De Luz and Santa Margarita, at Ysidora.  The

15   figure on the De Luz Creek, as I understood Mr. Sachse's re-

16   quest, was to compute the percent of runoff gauged at De Luz

17   Creek for the water year only of '57-58, and for the period

18   1 November, '57, to 30 April, '58.  And that, of course is

19   an impossible task, as the water year hasn't completed yet, we

20   might still get some runoff at De Luz.

21   Q   And what other and additional data did you prepare at

22   his request?

23   A   I also made a determination of the percent of the

24   average flow of the Santa Margarita at Ysidora, which occurs

25   during the period 1 November to 30 April; that is the average,

3b

1  using the average figures for that station, 97.8% of the flow

2  at Ysidora is recorded during the months 1 November to 30 April.

3  MR. SACHSE:  Are these--

4  MR. VEEDER:  This is the data you have asked for.

5  MR. SACHSE:  I apparently am confused.  I thought I asked

6  Colonel Bowen what he had done, and it was my understanding

7  these weren't ready yet or I would have certainly introduced

8  them myself.  I thought all he had available was the acreage

9  table.  My only interest is in having them in evidence.

10  MR. VEEDER:  I thought there may be some pertinency to

11  them.

12  MR. SACHSE:  I just misunderstood his answer.

13  MR. VEEDER:  We have an eager witness here.

14  THE MASTER:  Apparently it is available.  So it is satis-

15  factory to Mr. Sachse, the evidence is now in.

16  MR. SACHSE:  Yes.  Are they formally introduced, Colonel?

17  THE WITNESS:  These are just figures you asked for.

18  MR. SACHSE:  These are just figures?

19  THE WITNESS:  You asked me for a figure, and that is in

20  the record.

21  BY MR. VEEDER:

22  Q  What other data did you prepare at Mr. Sachse's request?

23  A  Mr. Sachse's request, as I recall, was for the runoff

24  at the Fallbrook gauge month by month for the water year '57-58,

25  and I have those figures with me.  Beginning November, 1957, and

4b

1  continuing through December of '57, January, '58, February, '58,

2  March, '58, and April, '58.  Those are the months, according

3  to my notes, for which Mr. Sachse requested runoff data at

4  Fallbrook gauge.

5      Q  Would you state what those are, please?

6      A  For November, '57, the total flow at the Fallbrook

7  station was 46.16 cubic feet per second.  The final computation

8  hasn't been made to convert this to acre feet, but that figure

9  times 1.98 would give the total in acre feet for that month.

10  And the same is true for each of the other months, I overlooked

11  carrying that out to a final computation, since these are

12  preliminary figures only.

13      The month of December, 1957, at the Fallbrook gauge there

14  was recorded a total of 101.4 cfs., times 1.98 would give the

15  acre feet.

16      For the month of January, '58, at the Fallbrook gauging

17  station on the Santa Margarita River, reported 50.37 cfs., times

18  1.98 would give the value in acre feet.

19      For the month of February, 1958, reported 869.1 cfs.,

20  which multiplied by 1.98 would give the acre feet for the month.

21      For the month of March, 1958, at the Fallbrook gauge on

22  the Santa Margarita River, 2,150.6, it appears to be, csf.,

23  times 1.98 would give the acre feet for the month.

24      Then for the month of April, '58, 5,781.0, times 1.98 would

25  give the acre feet for the month.



1    Q   Now, Colonel Bowen, in the Defendants' Exhibit M-DE

2    reference is made to a series of acreages, computed by you at

3    Mr. Sachse's request.  Now, would you state the acreages, if you

4    will, that you found to be the surface area of the subterranean

5    basin underlying Camp Pendleton, less the areas which were

6    covered by buildings and industrial areas, roads, railroads and

7    similar acreages?

8    A   Yes, sir.  May I have Defendants' Exhibit M-DE?

9    Defendants' Exhibit M-DE contains a penciled tabulation

10   on lined note paper listing certain areas  or features  of--

11   which overlie or rest upon the surface of the lower Santa Mar-

12   garita ground water basin.  Included in these features listed

13   on M-DE is the area of the maximum pond behind the O'Neill

14   Ditch diversion, shown to be 17.

15   The area of the off-channel spreading basins--

16   Q   Now, I would rather--  I was just going to ask you for

17   the total of that, rather than each individual area.

18   A   I haven't totaled that up, Mr. Veeder.

19   Q   Don't you have the total acreage?

20   A   The total acreage of all of these figures?

21   Q   Yes.

22   A   Oh, yes, sir, I have that.

23   Q   Would you state that?

24   A   1,587.

25   Q   Of what is that reflective, Colonel, from the standpoint

6b

1   of lands which are covered by vegetation, which vegetation is

2   important to the operation of Camp Pendleton military establish-

3   ment?

4       A   Did you ask me what percentage of this?

5       Q   Is that reflective of the areas which are not in need of

6   coverage for their highest utilization in the military estab-

7   lishment?

8       A   No, sir.

9       Q   Well, would you state, if you can, which of those

10  areas are in need of grass coverage so that they can be utilized

11  to the fullest extent for the military purposes for which they

12  have been established?

13      MR. SACHSE:   Just so I am clear.   Your question, Mr.

14  Veeder, was grass, or do you want to make it broader?

15      MR. VEEDER:   Well, I will let the Colonel make the deci-

16  sion on that.

17      MR. SACHSE:   O.K.

18      THE WITNESS:   Well, there are some of each of these items

19  that are covered with vegetation some of the time, some of them

20  covered with vegetation all of the time.   For example, the

21  U.S. Navy Hospital listed here includes the area of the grounds.

22  BY MR. VEEDER:

23      Q   What percent, roughly, do the buildings occupy in

24  relation to the total area of the United States Naval Hospital?

25      A   Well, the buildings and roads, and the U.S. Navy

7b

1   Hospital probably don't cover more than about a third, as an

2   estimate, of the area included within this figure.

3       Q  As an estimate would you state what that acreage would

4   be?

5       MR. SACHSE:  I want the question repeated.  I don't

6   follow.

7       MR. VEEDER:  He said roughly 20%.

8       Q  Isn't that what you said?

9       A  Roughly a third.

10      Q  A third?

11      A  Yes.

12      Q  Then would you state the acreage which is not occupied

13  by buildings, based on your calculation?

14      A  Based on my estimation, about 40 acres of the area

15  included in this tabulation and shown as U.S. Navy  Hospital

16  would not be occupied by buildings and roads.

17      Q  From the standpoint of the utilization of that area

18  what would be the effect of the deprivation of the grass coverage

19  from the area surrounding the United States Naval Hospital?

20      A  Well, the grass coverage around the hospital is required

21  to keep down dust, and in the interests of better sanitation at

22  the hospital, and also used to boost the morale of the patients.

23      Q  Would you go on down the line then and in each one of

24  those items state the acreages which you estimate to be actually

25  occupied by buildings, and the acreage actually with grass

1  coverage?

2      MR. SACHSE:  If your Honor please, I am going to object.

3  The acreage covered by grass cover, the grass is irrigated, it

4  is a lawn.  And lawns that are irrigated by sprinkler systems

5  have no relation whatsoever to the draft on the underground.

6  I presume I can straighten it out on cross, but it is going to

7  take hours of time again.

8      THE MASTER:  Well the evidence was requested in connection

9  with Mr. Sachse's interrogation concerning areas which were

10 dependent upon so-called subirrigation, or irrigation without

11 the application of the water by artificial means.

12     Now, it is understood that this exhibit was to represent

13 areas which were either artificially irrigated or would con-

14 tain buildings and grounds, or would not be drawing water from

15 underground sources.  At least, that was the purpose for which

16 it was presented.

17     MR. SACHSE:  That is correct, your Honor.

18     MR. VEEDER:  Well, it was my understanding that in regard

19 to this exhibit as it was offered that it was offered for all

20 purposes.

21     THE MASTER:  It is offered for all purposes, and I presume

22 you would have the right to show that although it was not taking

23 water from a subterranean area it might be taking water from

24 some other area--correction, it might be irrigated.  But there

25 is nothing in the record to indicate that that is not true.  That

9b

1016

1    would simply be going into details of specific irrigated areas.

2         MR. VEEDER:  So the record is correct on it, your Honor,

3    it is offered to indicate that there is 1,587 acres of land

4    which would not require water or which would not benefit from--

5    I had better make the correction--from subterranean source of

6    water.  Now, I think that any of the grass that is on any of

7    the areas do benefit to some degree, even the hospital land,

8    by this subterranean subirrigation.

9         MR. SACHSE:  I will withdraw the objection, and I will

10   expect to spell out on cross how much of this is surface irrigated

11   and how much is subirrigated, that is all.  Go ahead.

12        THE MASTER:  I think, Mr. Veeder, that is the main issue,

13   the extent to which any areas in here are surface irrigated or

14   artificially irrigated, and the extent to which they are subirri-

15   gated.

16        MR. VEEDER:  Well, I will ask the Colonel a question.

17        Q   What area, if it is possible to segregate it, would you

18   state of this 1,587 acres are benefited by the subirrigation

19   concerning which you testified?

20        MR. SACHSE:  I object on the basis "benefit by" is too

21   indefinite.

22        MR. VEEDER:  I will rephrase it.

23        Q   What area of the 1,587 acres has grass coverage on it

24   which is wholly or in part supported by the subirrigation coming

25   from the basin which underlies this area?

10b

1    A   I haven't separated those areas and added the total--

2    or, added those figures to arrive at the total, Mr. Veeder.

3    There are substantial areas within these features which Mr.

4    Sachse requested which do draw on the ground water basin.

5        THE MASTER:   Can you go to the exhibit now and state the

6    acreage as to each classification there, or would you require

7    further study?

8        THE WITNESS:   No, sir, I believe I could go through this

9    and state generally each area and its relation to the ground

10   water basin.

11       THE MASTER:   Suppose you do so right now then.

12       THE WITNESS:   The O'Neill Ditch diversion, for example,

13   your Honor, is an earth filled structure across the channel of

14   the Santa Margarita River, and at times that water is flowing

15   in the channel of the river a pond may be built up behind the

16   earth structure and water would be diverted through the O'Neill

17   Ditch into Lake O'Neill, or into the up-channel spreading basins.

18   At times then when there is no surface inflow into the O'Neill

19   Ditch diversion structure the pond that has built up behind it

20   will percolate into the alluvium and it will be dry, and then

21   vegetation will grow up during the summer season, the warm summer

22   season, on the surface of what was a pond, that is, the surface

23   of the ground upon which the pond rested, and will begin to draw

24   on water from the ground water basin as the basin dries up.

25       The same is true, to brief this, with each of the spreading

1018

11b

1   dams listed here, numbers 1, 2, 3, 4, 5 and 6 as shown on

2   Defendants' Exhibit M-DE.

3         The same is true of the upchannel spreading basins.

4         Now, in regard to the area described as base heavy equip-

5   ment, and reclamation and salvage (Joe Fegan Spur) those areas

6   are not wholly developed in permanent improvements.  Much of the

7   area is used for the storage of either heavy equipment or mater-

8   ial which is temporarily stockpiled on the ground awaiting

9   reclamation and salvage or disposition.  So the area there is

10  that upon which some native vegetation may grow.

11  BY MR. VEEDER:

12        Q  What benefit is derived from having coverage in that

13  area, grass coverage I am speaking of?

14        A  Well, the materiel which is sent in there for reclama-

15  tion and salvage is machinery and military supplies, and a

16  variety of things, and it is desirable to have as much of the

17  area covered with a vegetative cover as possible to reduce the

18  dust in the dry periods and the mud in the wetter periods.

19        THE MASTER:  Now, returning for a minute to the diversion

20  basins, the original ditch and the spreading basins and the dams,

21  your answer there would be that the entire area is sometimes

22  covered with vegetation.  Is that correct?

23        THE WITNESS:  Yes, sir.

24        THE MASTER:  And on the so-called Joe Fegan area varying

25  portions of the area are covered from time to time?

1019

12b

1      THE WITNESS:  Yes, sir.

2      THE MASTER:  Is there any average?

3      THE WITNESS:  No, sir, I would hesitate to state an aver-
4  age figure in that regard.

5      The area of the landing strip which is shown here, as
6  shown in Defendants' Exhibit M-DE, is divided into two segments,
7  the first surfaced, that is the actual surfaced area of the run-
8  way and the taxiways, is shown as 84 acres, and then appearing
9  as vegetated islands within the outline of the runways and taxi-
10  ways there is an unsurfaced area of 96 acres, and that has a
11  vegetal cover to prevent the blowing of dust into the aircraft
12  motors and moving parts, particularly in connection with the
13  operation of helicopters which land and take off vertically,
14  there is a terrific downblast, and without the vegetal cover
15  there would be a lot of dust which would ruin the machinery.

16      I previously mentioned these spreading dams shown as 1,
17  2, 3, 4, 5 and 6, the only time they have any water behind them
18  is during periods of precipitation and runoff, and shortly
19  thereafter.  Their purpose is to hold the water and to allow it
20  to percolate into the ground water basin.

21  BY MR. VEEDER:

22      Q  What are those areas used for during the balance of the
23  time when they are dried out?

24      A  When they are dry they produce--some of them produce
25  a dense willow cover, and some of the areas in grass may be used

13b

1   both for training Marines in the arts of cover and concealment,

2   and also on certain portions of them for pasture.

3       Q   What reference have you made to Lake O'Neill?

4       A   Well, the area of Lake O'Neill was requested and given.

5   Of course, Lake O'Neill occupies that position, and except for

6   brief periods of the year when water may be released as they

7   presently do to prime the underground basin or return to the

8   underground basin the lake will be essentially full.

9       Q   What losses, if any, are there on the Lake O'Neill

10  surface?

11      A   Well, the losses on Lake O'Neill are the evaporation

12  losses which amount to about 42 inches a year.  The surface of

13  the lake is 124 acres.

14      Q   How many?

15      A   124 acres, as shown on Defendants' Exhibit M-DE.

16      Q   All right.  Would you proceed on through with it?

17      A   I had earlier made an estimate at Mr. Sachse's request

18  of an area in the 22 area, the industrial area of Camp Pendleton

19  which was described as the bare, b-a-r-e, area.  And that also

20  included some barracks and other structures which Mr. Sachse

21  later requested I provide the area in buildings and surfaced

22  areas.

23      The area of the buildings, of course, and surfaced areas

24  in there has been determined and placed on Defendants' Exhibit

25  M-DE,  described as 22 area (barracks), and the  remaining area

14b

1    has been shown as 22 area (valley floor), shown as 280 acres.

2    That 280 acres is largely in vegetal cover.  There is a regiment

3    of Marines billeted there in that barracks, and they do a por-

4    tion of their training in the area immediately surrounding them.

5          Q   What value would you state is the vegetative cover?

6          A   The vegetative cover there, of course, is valuable to

7    keep down the dust in the dry season of the year, and to keep

8    it from blowing into the barracks and mess halls, and also to

9    provide cover for the Marines in training.  And then the area

10   listed as the rifle range is, with the exception of the butts--

11   the lines for the rifle positions, which is a very small portion

12   of the total of 70 acres, which is shown on Defendants' Exhibit

13   M-DE, by far the larger portion of the rifle range is in vegetal

14   cover.  The range is used throughout the year, and there is al-

15   most a constant breeze blowing up the valley there, and if it

16   wasn't in vegetal cover the shooters probably wouldn't be able

17   to see the target.

18          On the second page of Defendants' Exhibit M-DE is shown

19   the Ysidora hayfield, 294 acres, which Mr. Sachse requested.

20   I include in this tabulation there is a vegetal cover on that.

21   We produced a hay crop on there, and it is certainly my opinion

22   that that draws from the ground water basin.

23          And then the final item shown just before the totals in

24   Defendants' Exhibit M-DE is the pond and swamp area at the mouth

25   of the Santa Margarita River.

1022

15b

1    Q   What utilization is made of that area?

2        A   Well, that area is used in part for training the opera-

3    tors of the amphibious tractors who are located at Camp Del Mar,

4    and partly for wildlife recreational hunting during the official

5    season.  And the vegetation growing around there is used for

6    water fowl breeding and cover, and certainly at times it repre-

7    sents a draft on the ground water basin, because that basin ex-

8    tends on out through the Ysidora narrows.

9        Q   What in your opinion would be the effect on this total

10   of 1,587 acres if the vegetative cover was destroyed, from the

11   standpoint of utilization at the Marine Corps camp?

12       A   Well, if the vegetation were destroyed it would be of

13   substantially less value to the Marine Corps.

14       Q   Now, what do you evaluate this--  Strike that.

15   How would you evaluate this 1,587 acres from the standpoint

16   of disclosing the areas which do not draw water from the sub-

17   terranean basin?

18       MR. SACHSE:  Could I have the question read?  I don't

19   understand it.

20       MR. VEEDER:  I will ask the question again.

21       Q   How do you view this Exhibit M-DE from the standpoint

22   of disclosing to the Court the need  or the lack of need of

23   water to support vegetative cover on the 1,587 acres to which

24   reference is made?

25       A   Well, because of the intermixture of these areas with

16b

1   vegetal cover with areas without vegetal cover it is rather

2   meaningless.

3       Q   Now, would you state for the record the number of acres

4   that support vegetative cover which in your opinion is in whole

5   or in part dependent upon the ground water in the subterranean

6   basin?  If you have to make some calculations  you may do so.

7       A   You mean the portion within this 1,587?

8       Q.  No, the subterranean basin.

9       A   As I have testified, about 4,500 acres.

10      Q   And what is your testimony now?

11      A   It is the same.

12      Q   Now, in regard to the ascertainment of water duty,

13  what factors do you take into consideration?  I am speaking now

14  of diversion duty or project duty as you have used the term.

15      A   Well, in determining the project or diversion duty the

16  general nature and character of the crops that will be grown in

17  the irrigation project, be it a small farm or a collection of

18  farms, the general nature and character of the crops that can be

19  grown, their average demand upon the--or, requirement for water,

20  the efficiency of the diversion and distribution system; that is,

21  if water is delivered to the point of use in an earth lined

22  ditch it often occurs, in fact almost always occurs, substantial

23  losses by percolation in the ditch occur and such a diversion

24  and distribution system is much less efficient than one say that

25  would be fully  enclosed in a pipe line.  But even a distribution

1    system in a pipe line is subject to losses; practically any

2    system has some leakage at joints and valves, and those losses

3    must be considered in arriving at the project duty.  There is

4    no 100% irrigation system.  By that I mean there is no irriga-

5    tion system known that takes  100% of the water that is diverted

6    or pumped and delivers that entire amount to the point of use.

7    And it is variable, of course.  As I say, it depends on the

8    nature and character of the diversion, the nature and character

9    of the distribution system, and the method it is applied to the

10   land.

11        Q  What human factors enter into the utilization of water

12   from the standpoint of efficiency of operation?

13        A  There certainly is the human error.  I recall down in

14   Imperial Valley where a farmer made a batch of adobe bricks,

15   for example, stacked them up in his yard to dry.  And one night

16   he left a Mexican irrigator out who was irrigating his fields,

17   and instructed him to run water into  his cistern, which was

18   an underground cistern; the Mexican turned the water into the

19   cistern and forgot to turn it off, and the bricks the next

20   morning were lumps of clay.  So that is one of the human errors

21   that can enter into efficiency of water control.

22        Q  What effect would the fact that in certain areas you

23   have five cuttings of alfalfa and some areas three?  What effect

24   does that have on the burden on the stream?

25        A  Well, actually, the number of cuttings of hay that

18b

1  might be made may vary because of two reasons.  One, climatolo-

2  gical; in other words, the length of the growing season in higher,

3  colder country, fewer cuttings of hay are made because the peri-

4  ods between the last freeze in the spring and the first freeze

5  in the fall are too close together.  Then in other areas where

6  the climate is not so much the limiting factor it may be limited

7  by the method of operation, a person might only want to make

8  five cuttings and then pasture the alfalfa field for awhile.

9       Q  So when you arrived at the water duty of 4.2 per acre

10  per year all these factors were entailed in reaching that con-

11  clusion.  Is that correct?

#1½

12       A  Yes, sir.

13       Q  As an expert how do you evaluate that 4.2 acre feet

14  per acre of water duty in the Santa Margarita River valley?

15  Do you consider that an average?

16       A  I would consider that about an average throughout the

17  valley, yes, sir.

18       Q  When you calculate the water duty for a decree what

19  would be the most important factor in arriving at a fair water

20  duty?

21       MR. SACHSE:  I will object, if the Court please.  That

22  calls for a legal conclusion which the witness is not qualified

23  to express.  The most important factor for a decree.

24       THE MASTER:  I think the objection will be overruled on

25  the basis that the witness may state what factor  or fact he may

19b

1    think is most important.  Of course, the Court is not bound by

2    it, the Court may consider something else more important.

3        MR. VEEDER:  He is not arriving at a legal conclusion, he

4    is simply pointing out a fact.

5        THE MASTER:  I would like to hear what he thinks the most

6    important fact is.

7        THE WITNESS:  May I have the question?

8        (Record read.)

9        MR. VEEDER:  That should be factors.

10       THE WITNESS:  In my opinion the most important factors are

11   the types of crops that can be grown, the nature and the character

12   of the soils, and the assignment of the water to say the highest

13   beneficial use on the soil site.

14   BY MR. VEEDER:

15       Q  When you made your determinations as set out in these

16   exhibits, for example, M-45 which is your engineering plan,

17   what was the objective in fixing a possible farm plan operation?

18       A  Well, the objective  in the presentation of an opera-

19   tion for the property as reported in Plaintiff's Exhibit M-45

20   is to plan an appropriation that will give the land owner the

21   highest monetary return for his investment.

22       Q  What would be the effect if you limited your crops to,

23   for example, citrus in the area, and the farmer decided that he

24   wanted to raise alfalfa?

25       A  Well, the requirements of water for alfalfa are greater

20b

than the requirements of citrus.

Q   Then it is required in making your determinations that you calculate the possible highest burden on the stream.   Is that not right?

A   Yes, sir.

Q   Now, when you calculated the acreages by the planimeter, did you consider the accuracy of that method?

A   Yes, sir.

Q   Would you compare that with other means of measuring lands and determining acreages?

A   Well, on the scale of the maps that we used in making these determinations, and the scale of the photographs we used in assisting to make the determinations, it is my opinion that the determination of the area by use of the planimeter is accurate to units, and even accurate to tenths.   In many of these areas delineated fractional portions of an acre in presenting the whole picture for the private land owner..

Q   From the standpoint of a scientist how would you compare the use of the planimeter compared to taking a transit and going out in the field and taking some shots?

A   If you run a transit survey of course you can--there are various stages of accuracy even on sight survey instruments. It is possible to achieve a greater degree of accuracy with a competent survey party in the field than by the planimeter with the photographs and maps.   But the cost of making such surveys

21b

1   would be exhorbitant, and in my opinion not justified for a re-

2   port of this character.

3      Q   Now, when you were preparing your maps disclosing

4   intermittent streams, what were the sources of information which

5   you used?  For example, would you find Roblar Creek on  this

6   Plaintiff's Exhibit M-66, and point it out to the Court?

7      A   Referring to Plaintiff's Exhibit M-65A, Roblar Creek

8   appears as a tributary of De Luz Creek in the upper central

9   portion of the map.  And reference to the photograph number, it

10  is observed that it traverses 4-0113, 4-0085, 4-0084.

11     Referring now to Plaintiff's Exhibit M-66R, aerial photo

12  number 4-0084, it is noted on Plaintiff's Exhibit M-66D that

13  Roblar Creek is named and symbolized within the portion of the

14  Exhibit M-66D, contained by match lines and reservation boundary.

15  The symbol for Roblar Creek on M-66D is that of an intermittent

16  stream.

17     The symbol on the index Plaintiff's Exhibit M-65A is also

18  that of an intermittent stream.

19     And referring to Plaintiff's Exhibit M-33F, it is noted

20  that Roblar Creek appears as a tributary of De Luz Creek, its

21  confluence with De Luz Creek is in the southwest quarter of

22  Section 1, Township 9 South, Range 5 West, and the symbol

23  identified as Roblar Creek is that of an intermittent stream.

24     Q   What arrangements have you made with the Master and

25  the Court in regard to the preparation of soil and enginerring

22b

1    surveys for the small land owners?

2        A   On the Master's request I returned to my office and

3    evaluated the work load occasioned by receipt of applications

4    for engineering investigations on privately owned land within

5    De Luz Creek, and based on the analysis of that work load I

6    informed the Master that we should be able to complete the work

7    on the applications on hand by July 3rd, by concentrating our

8    entire efforts on that job.

9        Q   What has been the effect upon your soil surveys--your

10   detailed soil surveys upon the Government owned property?

11       A   Well, we have   discontinued making detailed soil

12   surveys; in fact, soil surveys of any type on the Government

13   owned lands in the interests of getting these privately owned

14   lands completed.

15       MR. VEEDER:   I have no further questions.

16       I have the right to recall Colonel Bowen, as I understand.

17       THE MASTER:   Mr. Sachse.

18       MR. SACHSE:   I have a few questions on redirect examination

19   --recross, I should say.

20

21                       RECROSS-EXAMINATION

22   BY MR. SACHSE:

23       Q   Colonel Bowen, the purpose of the spreading basins

24   both on and off channel is to increase percolation into the

25   underground, isn't it?

23b

1     A  Yes, sir, to place water underground.

2     Q  Is the draft on the underground of the natural vegetal

3 cover that you testified exists for a part of the year on those

4 basins, is that draft greater than the amount that is put into

5 the underground by the basin?

6     MR. VEEDER:  I object to that.  There is no basis or foun-

7 dation for this witness to testify to, and it is going beyond

8 the scope of the direct examination.

9     MR. SACHSE:  If your Honor please, this witness has testi-

10 fied that the burden on the underground is 2.56, less the rain-

11 fall which is 1.16, leaving 1.4 acre feet per acre.  I just

12 want to find out if that is the burden in the soil spreading

13 basins, the very purpose of which is to put the water in.

14     THE MASTER:  The objection is overruled.  I have my own

15 ideas what the answer is going to be, but the question is proper.

16     THE WITNESS:  Again, Mr. Sachse, it is impossible to say

17 yes or no to the question, because some years those basins are

18 inoperative.  And I would say that where you have zero input that

19 the draft on the basin for that particular year would be greater

20 than the amount that you put in.

21 BY MR. SACHSE:

22     Q  So all of the water conservation of the Marines with

23 these water spreading basins on and off channel is just increasing

24 the draft on the underground.  Is that what you are telling me?

25     A  No.

Q   Is that right?

A   No, sir.

Q   What are they doing?

A   It may, and it may not.

Q   Over a period of time is it increasing the supply into the underground, or increasing the draft from it?  You can answer that question, Colonel Bowen.

A   Well, over a period of time it is increasing the amount of water we put in the basin, yes, sir.

Q   Thanks.  Now, you testified regarding some of the areas covered with grass, and I frankly do not have it clearly in my mind from the question.  Were any of those areas, for example the Marine barracks in the industrial area, sprinkler irrigated? There are lawns there?

A   Yes, sir.

Q   And they are sprinkler irrigated?

A   Yes, sir.

Q   Now, within the air strips, the grass cover area that is inside of the perimeter of the air strips, is that not from time to time sprinkler irrigated?

A   No, sir.

Q   How about the hospital area, that is sprinkler irrigated?

A   Yes, sir, that is sprinkler irrigated.

Q   And the same statement I just-- The same question I just asked you regarding the on and off channel spreading basins

258

and their net effect on the underground, can you answer that same question as to the O'Neill Ditch diversion . lake?  Does that put more into the underground or does the vegetation take more out?

A   Is that Lake O'Neill?

Q   No, the diversion pond.

A   I would say that that increases the ground water supply.

Q   Now, you testified, if I have my notes correctly, just a moment ago--and you were referring, I believe, to M-45 being one of these individual engineering studies--that in selecting the crops you used in calculating water duty you selected the crops that would in your opinion provide the highest monetary return?

A   Yes, sir.

Q   Even though those crops might have a lesser water duty than other crops?

A   Yes, sir.

Q   What did you do in connection with the lands in the National Forest areas of the De Luz watershed in that connection?

A   Well, lacking the detailed information I have on privately owned lands, Mr. Sachse, I took only one crop  which I knew was adapted up there, and that was the permanent pasture.

Q   So in other words, in all of the studies on Government lands, other than the naval reservation, in the De Luz watershed you did use the highest water duty crop regardless of the

1033

26b

1    monetary return factor.  Is that correct?

2         A  No, sir.  I could have used the row crop  figure which

3    I have used in part in Plaintiff's Exhibit M-45.

4         Q  Can you tell me any single engineering study of this

5    series, of which M-45 is one, that are now in evidence which

6    has a higher--withdraw the word higher--which has as high a

7    diversion duty as 4.2 acre feet per acre per year?

8         MR. VEEDER:  I am going to object to that question.

9         MR. SACHSE:  I want to know if he can tell me one.

10        THE MASTER:  That is essentially the same question that

11   was asked on the previous cross-examination, and the objection

12   was sustained to it.  And I think the objection will be sustained

13   now on the basis that the record will speak for itself.

14        MR. SACHSE:  This may have been asked and answered, but

15   I want to be sure.

16        Q  Then in your calculations found in Exhibit M-41, 45,

17   and so on, the burden on the stream imposed by your irrigation

18   requirement findings is not necessarily as high as possible

19   burden on the stream?

20        MR. STAHLMAN:  Objected to that as being so obvious--

21   Go ahead.

22        THE WITNESS:  No, sir.

23   BY MR. SACHSE:

24        Q  It is not?

25        A  As I recall Dr. Wilson came in here with an additional

27b

#3

1    burden which we hadn't reported, that for riparian vegetation

2    on his property, which increased it by 20 acres per year, is

3    my recollection.

4         THE MASTER:  You mean by 20 acre feet per year?

5         THE WITNESS:  Yes, sir.  As I recall there he used a figure

6    of 2.4 acre feet per acre.

7         MR. VEEDER:  Could we make an observation here?  Here a

8    man comes in such as the doctor, the offer which was made of the

9    exhibit here of these engineering studies did not purport to

10   establish the maximum claim that he might want.  I am making this

11   statement because, from my own standpoint, if I were representing

12   one of these individual clients I would certainly undertake to

13   obtain a decree for the acreage--maximum acreage, and then a

14   decree for the maximum water demand that might be applied to

15   that land, for if you don't you will find yourself in the posi-

16   tion--and I am saying this because I think that when these

17   small owners are on the stand it is extremely important--that

18   they get a quantity of water that would permit them to put all

19   of their land into permanent pasture or any other land use that

20   they want.

21        MR. DENNIS:  Mr. Veeder, do I understand you to say if you

22   were representing a defendant you wouldn't be willing to accept

23   the report made by the Government?

24        MR. VEEDER:  That is not what I said at all.

25        THE MASTER:  That is not what I understood Mr. Veeder to

286

1    say.

2    MR. VEEDER:  Oh, no.  Let's don't confuse the record any

3    more than we have.  The point I am trying to make is that I am

4    hopeful that the decree that runs to these small people, and

5    certainly to Uncle, is going to be reflective of a right to the

6    use of water which would permit them to put all of that acreage

7    into the highest demand crop conceivable.

8    THE MASTER:  In other words, if I understand your position,

9    Mr. Veeder, the report states the opinions of the experts as to

10    the water usages for the currently most economically profitable

11    crops.  That would not necessarily, as has been abundantly

12    brought out, be the crops which would take the most water?

13    MR. VEEDER:  That is right.

14    THE MASTER:  You are stating that the decree should protect

15    their rights to water to a higher water consuming crop than that

16    which is highest economically?

17    MR. VEEDER:  Certainly.  We have no right to dictate to

18    a farmer what kind of culture he is going to operate on his

19    acreage.

20    THE MASTER:  Your position is if he was to put very good

21    land which you could put citrus on and make more money, if he

22    wants to put it in pasture he can put it to pasture?

23    MR. VEEDER:  That is right.

24    MR. STAHLMAN:  He might have to.

25    THE MASTER:  I think those factors are obvious to the

1086

290

1    Court and would be considered in the decree.

2        MR. VEEDER:  The examination today limited me.  I don't

3    think we should limit the man, and I don't think the Colonel

4    intended to limit the man to a quantity of water for his plan.

5    Suppose he wasn't able to operate a concentrated economy on the

6    land, maybe he can only raise live stock, he should be entitled

7    to water for that type of culture.

8        MR. MOSKOVITZ:  Your Honor, this leads me to ask the

9    question what is the relevancy of the figures there if they don't

10   represent the maximum water usages, if they are just something

11   in between.

12       THE MASTER:  I think they are pertinent, because they

13   certainly show the types of land and all the purposes for which

14   land of that type would be available.  That is, Class II land,

15   for example, can be used for a variety of purposes, Class III

16   for a variety of purposes, and so forth.  Now, the actual water

17   tabulation at the end is based upon the currently most econom-

18   ically profitable types, but the judgment of the Court would not

19   necessarily have to be based upon that particular calculation, it

20   could be based upon the type of land and its suitability for

21   various uses, and the use of each type for the growing of the

22   crop which would have the highest water duty, so that a different

23   total figure could be arrived at by the Court in the final

24   judgment.  Now, Mr. Veeder is merely merely suggesting that that

25   is a factor which should be considered, and in my remarks today

30b

1   I am not indicating that the Court will necessarily reach that

2   result; the Court will bear that in mind.

3   MR. STAHLMAN:  This is a formula, and if it applies it

4   applies to land of all kinds and character.  When you come to

5   riparians you have a correlative right.  The rights are based

6   on something, you have to have something to tie to.  My under-

7   standing would be that this type or this system, as he has

8   expressed on direct examination, is expressed by agricultural

9   standards by which the quantity of water could be adapted to that

10   land would be proportionate to all of the people in the water-

11   shed, so it would have something to equalize itself.

12   THE MASTER:  I think what we are going to get to now is

13   the  question of--it is a matter for argument. at  the  time we

14   get down to actually considering findings and a decree.  And

15   the only reason for bringing it up now is that all counsel may

16   have this in mind in the presentation of evidence. We are

17   certainly not making any finding now either that you will always

18   consider the greatest water consuming crop or that you will

19   always consider the crop which is currently most economically

20   profitable to raise; just the fact is now presented clearly

21   that there may be circumstances under which the water usage on

22   land would not necessarily be the same as is now indicated in

23   these current reports.  That in no way discredits the validity

24   of the reports for the purpose  for which they were prepared.

25   MR. SACHSE:  Mr. Veeder has brought this subject up, but

31b

1    I can't resist making this comment.  I heard Judge Carter sitting

2    in that very seat suggest to the assemblage here that the ob-

3    taining of these reports offered a device and a means whereby

4    through agreement, as it were, with the Government it would be

5    unnecessary for them to take an active part in this case.  And

6    now Mr. Veeder is saying that these things are no good and that--

7         THE MASTER:  No, Mr. Sachse.  Mr. Veeder has not said that.

8    And there is nothing which Mr. Veeder has said that indicates

9    anything contrary to what Judge Carter has said.  On the basis

10   of these reports, which Mr. Veeder has just said, the Court,

11   without the introduction of any evidence by the defendant, could

12   determine the maximum water usage for the maximum water consum-

13   ing crop that could be grown on this plot, just as in the crops

14   which could be grown here if all of the land was suitable for

15   pasture or row crops, even though it was not so listed here

16   then you could determine the water usage on that theory without

17   the introduction of any evidence by the defendant.

18        MR. SACHSE:  I am inclined to agree it is a matter of

19   argument, so I will drop it.  I have one or two more questions

20   on redirect.

21        Q  Colonel, do you recall which of these you looked at

22   which was Roblar Creek?  Could you  get those same ones again?

23        A  Yes, sir, Plaintiff's Exhibit M-66D.

24        Q  This photograph was taken on the 29th of March, 1955.

25   Is that correct?

32b

A   That is the date that appears on it, yes, sir.

Q   Can you with the help of a glass perhaps, or with the naked eye, tell me whether there was any water running in Roblar Creek on March 29, 1955, in the area of that photograph?

A   No, sir, not from this picture.

Q   Not even with a magnifying glass?

A   Well, the bed of the creek is covered with trees and brush for the most part.

Q   What is the light area I see, sand?

A   I presume, Mr. Sachse, that you are referring to the course of Roblar Creek which is outside of the naval reservation boundary?

Q   The whole thing.

A   Do you mean the whole thing, Mr. Sachse?

Q   The whole photo of Roblar Creek, you can see some of it in the naval reservation in white?

A   Well, I can see it without the glass, Mr. Sachse, and some of that white that you refer to is a road.

Q   Is a road?

A   And some of it is the stream bed, and some of it is rocky outcropping.

Q   In response to Mr. Dennis's cross-examination of this afternoon--of this morning-- you pointed out a number of places on the Santa Margarita River where water could be seen, and you made quite a point of the fact that depending on the angle of

33b

1    the sun sometimes it appeared white and sometimes it appeared

2    dark. Do you recall your testimony?

3         A  Yes, sir, very well.

4         Q  Can you show me any place in any of your photos of

5    Roblar Creek where there is any water on the 29th of March, 1955?

6         A  Your Honor, Roblar Creek as shown on Plaintiff's

7    Exhibit M-66D is shown in the lower right hand corner immediately

8    to the left of the north arrow and below the match line.  The

9    bottom of the canyon--  This is a fairly deep canyon through

10   which Roblar Creek flows, it is very narrow at the bottom and

11   this area is covered with trees, the shadows on the north side,

12   the light color on the south side.  Those are rather large

13   live oak and sycamore trees, and even at high stage of flow in

14   Roblar Creek you probably couldn't see through those trees in

15   this photograph and see any water.  The stream is wholly inter-

16   mittent in character, and being a very steep and precipitous

17   country--this is the top of a ridge which traverses the lower

18   left hand quadrant of the photograph labeled M-66D.  And the

19   dark slope between the top of the ridge and Roblar Creek pre-

20   viously identified on this picture is a north facing slope.

21   There is a drop in there of probably 750 or 800 feet in eleva-

22   tion, perhaps even more, because this range of hills in here is

23   the lower end of the so-called Santa Margarita Mountains, the

24   highest point of which is around 3,500 feet above sea level.

25        Q  Colonel Bowen, I want to come back for a minute to this

34b

1    question of water use in your reports.  I am going to call your

2    attention--and I am reading from M-47, your Exhibit M-47 being

3    an engineering report on the property of R. B. Bleeker--to the

4    following language at the end of the report:

5        "The maximum potential irrigation requirement for water

6    indicated in this report represents the greatest amount of water

7    which the land owner could reasonably and beneficially use on

8    the land if there was no restriction on the availability of

9    water."

10       I believe the same language appears in all of those

11   reports.  Now, do you want me to understand from your recent

12   testimony that you are now changing that statement and saying

13   that the maximum potential irrigation requirement could be a

14   great deal greater than you have shown here?

15       MR. VEEDER:  I object to the question as being incompetent,

16   irrelevant and immaterial.

17       MR. SACHSE:  Oh, brother.

18       MR. VEEDER:  Well, Mr. Sachse--I might say that it is

19   irrelevant what anybody thinks about Mr. Sachse--I think it is

20   very important to the Court.

21       MR. SACHSE:  I call attention to the Court that this re-

22   port is signed by Allen C. Bowen.  If I have ever seen impeach-

23   ment this is it.

24       THE MASTER:  I will overrule the objection and let the

25   witness answer the question.

35b

THE WITNESS:  Your Honor, I don't change my stand on this statement which appears over my signature on page 4 of Plaintiff's Exhibit M-45--

BY MR. SACHSE:

Q  Then you state that the maximum potential irrigation requirement in this report is the amount stated immediately above it.  Is that correct?

A  Well, you excerpted a portion, Mr. Sachse.

Q  Go ahead, read the rest.  I don't intend to.

A  You have already read it into the record.  The term "beneficially used on the land" is also in there.  That is the question.  We simply show the amount that could be used on the land; not in conflict with anything I have said.

Q  But the maximum that could be beneficially used is the amount that is stated in the figures that appear immediately above.  Is that correct?

A  That is what it says.

Q  Now then, what about this hypothetical case that Mr. Veeder discussed at some length where the man might put the whole thing in permanent pasture, thereby jacking up his potential use?

A  That might be a less reasonable and beneficial use, Mr. Sachse.

Q  Exactly.  Now we are getting down to brass tacks.

So in these reports you have picked the maximum potential

36b

1    irrigation requirement on the basis of the highest beneficial

2    use.   Right?

3         A   Right.

4         Q   What have you done on the basis of the Government land?

5         MR. STAHLMAN:   It has been asked and answered on direct,

6    went into it--

7         THE MASTER:   I think this has been gone into sufficiently,

8    Mr. Sachse.

9         MR. SACHSE:   I have no further questions, your Honor.

10        THE MASTER:   We will take our recess at this time.

11        (Recess.)

12        THE CLERK:   Court is now in session.

13        THE MASTER:   Mr. Dennis, do you have any further cross-

14    examination?

15        MR. DENNIS:   There is one question that I neglected to ask

16    Colonel Bowen, if I can ask him at this time.

17

18                        RECROSS-EXAMINATION

19    BY MR. DENNIS:

20        Q   Since you have been in the habit of inspecting and see-

21    ing the flow of the Santa Margarita River have you ever seen it

22    overflow its banks?   Have you personally ever observed the

23    Santa Margarita River overflowing its banks either within or

24    without the naval reservation?

25        A   Do you mean under natural conditions, Mr. Dennis?

37b

1    Q  Yes, under natural conditions.

2    A  You are not referring to diversions which we make?

3    Q  No, I am not referring to diversions.

4    A  The answer to your question would be no, sir.

5    THE MASTER:  Do you have any further questions?

6    MR. DENNIS:  I have no further questions.

7    MR. SACHSE:  Nothing further, your Honor.

8    MR. VEEDER:  I have one question.  Mr. Sachse--  This is

9    not a question.  Mr. Sachse has declared that in answer to one

10   of our interrogatories there was a patent, I think he said,

11   false statement.  I wish to know whether he interrogated

12   Colonel Bowen on that patently--and I am not seeking to quarrel,

13   I am very concerned about it--whether he interrogated Colonel

14   Bowen in regard to that allegedly patently false statement?

15   MR. SACHSE:  Are you asking me?

16   MR. VEEDER:  Yes.

17   MR. SACHSE:  Colonel Bowen didn't swear to the interroga-

18   tories.

19   MR. VEEDER:  I did.

20   MR. SACHSE:  I haven't had you on the witness stand yet,

21   Mr. Veeder.

22   MR. VEEDER:  If there is something patently in error I

23   would like to clear it up.  Playing games is so silly, if there

24   is something wrong we would like to clear it up.  Colonel Bowen

25   is the one under whose direction this was done.  I am not at all

38b

1    concerned other than there is the statement in the record we

2    are wrong.  Can you tell me where we are wrong?

3        MR. SACHSE:  I have at least two of them.  But you haven't

4    seen fit to have anyone swear to them.

5        MR. VEEDER:  I have sworn to them.

6        MR. SACHSE:  You swear on information and belief.  I want

7    somebody who has the facts to swear to them.

8        THE MASTER:  Gentlemen, if this is going to be a discus-

9    sion on interrogatories it has no place here.

10        MR. VEEDER:  I was hopeful if there was an error it could

11    be straightened out on cross-examination.

12        THE MASTER:  Do you have any further questions of this

13    witness?

14        MR. VEEDER:  No, I don't, your Honor.

15        THE MASTER:  Colonel Bowen, you may step down, subject to

16    the right to be called later as the individual witnesses present

17    their case.  You understand that?

18        THE WITNESS:  Yes.

19        MR. VEEDER:  And subject to the recall of the Government.

20    I want to call Frank H. Cannon.

21        THE MASTER:  What was that name?

22        MR. VEEDER:  Cannon, C-a-n-n-o-n.

23

24

25

39b

FRANK H. CANNON,

called as a witness by and on behalf of Plaintiff, sworn, testified as follows:


DIRECT EXAMINATION

BY MR. VEEDER:

Q   Mr. Cannon, would you state your full name into record?

A   Frank H. Cannon.

Q   And where do you reside, Mr. Cannon?

A   I reside in the Fallbrook area, about four miles south of Fallbrook.

Q   Could you give your address?

A   Star Route 1, Box 65.

Q   How long have you resided there?

A   I have resided in that neighborhood, within a mile, for 12 years.

Q   And what is your age, Mr. Cannon?

A   Sixty-three.

Q   What did you say?

A   Sixty-three.

MR. STAHLMAN:   I hope I look that good when I am 63.

MR. VEEDER:   I couldn't believe it myself.

Q   Would you state briefly your educational background, Mr. Cannon?

40b

1    A   I had two years of college, Washington State College,

2    architectural-engineering course, at which time I left to attend

3    the first officer's training camp in the First World War.   After

4    that I went into the architectural designing business for

5    approximately seven years, mostly on engineering subjects--

6        Q   Before you go into that will you state your elementary

7    education, high school?

8        A   A graduate of high school, scientific course, and grade

9    school.

10       Q   Where was that?

11       A   The State of Washington.

12       Q   Where was that?

13       A   Sprague, Washington.

14       Q   After leaving college would you briefly state the

15   experience that you have had, referring to the positions you

16   have held down through the years?

17       A   Well, I have divided it into about three periods of

18   about seven years each, in order of responsibility; and chrono-

19   logically, also.

20       From the time I got out of the First World War I went into

21   the architectural design work for offices in both Spokane and

22   Los Angeles, and the last one in that group of seven years was

23   a year and a half on the Los Angeles County General Hospital,

24   which I was a straw boss in architectural design.   That about

25   ended my strictly architectural work--

41b

1     Q   When you were doing that architectural work what were

2  the particular fields in which you were engaged?

3     A   Well, they verged on the engineering side of architec-

4  ture, structures mostly.

5     Q   And what type of buildings?

6     A   Mostly clubhouses and hospitals, and large industrial

7  buildings.

8     Q   All right, sir.  Would you proceed from there?

9     A   At the end of that period, which was in about 1925, I

10  became the office engineer in what was then about the largest

11  architectural office in Los Angeles.  Then it was strictly

12  structural design.

13     Q   When you say structural design what do you mean by that?

14     A   The design of structures in connection with architec-

15  tural working drawings, the determination of stresses and sizing

16  of members, columns, beams, floor slabs, and whatnot, wood,

17  steel and concrete.

18     Q   What type of buildings would that involve?

19     A   Mostly industrial buildings, institutional buildings,

20  and some very large residences, very few residences; one in

21  particular that went $375,000 where there were engineering

22  problems.

23     Q   Just for my information, what place was that?

24     A   That was the Rindge residence in Malibu.

25     Q   Now, would you go ahead and outline your further

42b

1    experience?

2        A   In the engineering experience, after a couple of years

3    in the first office I went to the motion picture studios where

4    I was chief engineer in connection with permanent construction,

5    some tricky work in connection with pictures where fairly intri-

6    cate structural design was required, but I wasn't in the enter-

7    tainment business.

8        Q   Now, would you go on and state what kind of buildings

9    were involved there?  Were they industrial buildings, or what

10   were they?

11       A   They were industrial buildings, reinforced concrete

12   storage warehouses, large sound stages, very large ones; office

13   buildings, restaurants, and the grading involved in such pro-

14   posals; fire sprinkling.

15       Q   Did this work entail the planning and constructing of

16   utilities?

17       A   It included utilities of all kinds, especially the

18   one particular one about sprinkling.  That case was at RKO

19   Studio, where every building on the very large lot had to be

20   sprinkled and, of course, that meant a complete utility system,

21   including overhead storage to augment the regular city supplies,

22   and all of the valving.

23       Q   The regular city supplies of what?

24       A   Water.

25       Q   Now, would you go ahead and delineate your further

43b

1    experience, Mr. Cannon?

2         A   At the end of that period--

3         Q   About year would that be?

4         A   Well, that would be about 1933.  In 1933--  In 1932

5    I became licensed as a civil engineer in the State of California,

6    by the State Board of Registration, and late in 1932 I took the

7    examination and became a licensed structural engineer by examin-

8    ation.  And shortly after that, that is when the earthquake

9    occurred in Long Beach, in 1933.  I did some work in my own

10   office, and then went to work for the State of California, the

11   Department of Public Works, the Division of Architecture as a

12   senior structural engineer.  That job I held for seven years.

13   And it was in connection with the administering of the law in

14   regard to earthquake safety for school buildings, and it was a

15   very valuable experience.

16        Q   What would be entailed in work like that?

17        A   Generally the examination of earthquake damaged build-

18   ings, or the examination and a structural determination of their

19   capabilities to withstand the forces of an earthquake, and then

20   a means of building them up to have that inherent resistence

21   necessary to withstand the forces of an earthquake.

22        Q   When you say building them up what do you mean by that?

23        A   I mean by repairing and providing the necessary struc-

24   tural elements that might be required.  And in connection with

25   that same job for quite a long time I was the checking engineer,

1   checking the plans of private architectural engineers with the

2   rather stringent so-called Field Bill, the law involving the

3   safety of school buildings.  And that was checking the engineers'

4   calculations and making corrections on them, preparatory to

5   giving the state permit for the building.

6       Q  After that period?

7       A  After that period I was in business for myself.  I had

8   my own office for about two years or so.

9       Q  And what kind and type of work did you engage in?

10      A  As a consulting structural engineer.  And quite a bit

11  of that work was in connection with earthquake construction,

12  also.  I was consulting engineer for the City of Brawley, and

13  the County of Imperial in 1940.  And after the earthquake in

14  Torrance in 1941 I had a similar job, consulting engineer for

15  the city in charge of the upbuilding of the city after the

16  earthquake.  I actually wrote the ordinance for safety of con-

17  struction, and then administered it for the city.

18      Q  Would you proceed with your statement as to your

19  background, please?

20      A  In 1942 I accepted a job to come to Camp Pendleton for

21  the Navy as Navy supervising engineer in charge of design and

22  construction.

23      Q  What was actually involved in the work there?

24      A  For the first job when I came down it was a $35,000,000

25  cost plus fixed fee contract for the first portions of the camp.

45b

Q   And when you say the first portions of the camp what do you mean?

A   Well, they have spent many, many millions since.  But that was the first contract, it involved all of the utilities for the skeleton of the camp as we know it now, the--

Q   When you say all of the utilities, would you state with some degree and specificity what--

A   Water, sewer, electrical distribution, and to a lesser degree steam and oil distribution, where they do occur.

Q   Since that time would you state what your responsibilities have been at Camp Pendleton?

A   I have always been in charge of design there.  For the first, oh, ten or 12 years I had construction, also.

Q   When you say design, what do you mean by that?

A   The design and planning of all installations necessary for the military establishment.  In general, starting from the time a need would occur, going through the preliminary phases of planning to satisfy a need as determined by the mission of the camp, taking that preliminary design through to a point where the feasibility could be determined, and using those plans as a basis for an application for funds.  After being funded then in some cases our design office itself will get out working drawings for contract.  On the larger jobs that is the responsibility of the Eleventh Naval District.  But for all jobs of that kind our office does the preliminary work and the feasibility

46b

1   determinations, and the original estimates.

2      Q  Would you state your present position?

3      A  My present position is that of chief engineer and

4  design director.

5      MR. SACHSE:  And what?

6      THE WITNESS:  And design director in the Public Works

7  Office at Camp Pendleton.

8  BY MR. VEEDER:

9      Q  And what are your duties in that connection?

10      A  I have approximately 14 professional engineers under

11  me.  They are grouped, some of them are architects, some of them

12  are civil engineers, electrical engineers, mechanical engineers,

13  and the engineers in the water supply department; water and

14  sewer, that is.  I supervise those engineers and guide their

15  work.

16      MR. VEEDER:  What is the next number?

17      THE CLERK:  M-72.

18  BY MR. VEEDER:

19      Q  I hand you, Mr. Cannon, Plaintiff's Exhibit marked

20  M-72 for Identification, and I ask you to state what it is, first

21  referring to the box on the exhibit.

22      A  The plan title Camp Pendleton Water Distribution System

23  is a Public Works Office drawing number 1207.  It has been

24  revised to this date, and it consists of a plan of that portion

25  of the Santa Margarita Basin within the Naval Ammunition Depot

476

1    and Camp Pendleton.  This plan--

2        Q   May I interrupt then?  You used the term Camp Pendleton

3    Basin, did you not?

4        A   No, the Santa Margarita Basin within the Naval Ammuni-

5    tion Depot and Camp Pendleton, it includes both of those

6    facilities.

7        MR. DENNIS:   I wonder if the witness could speak a little

8    louder?

9        MR. VEEDER:   I wonder if you couldn't be quieter with

10   the maps?  Excuse me, your Honor, for such an observation.

11       THE WITNESS:   This plan, it is at a scale of one inch

12   equals 3,000 feet, and indicates the skeleton water system

13   serving the Santa Margarita Basin on both the Naval Ammunition

14   Depot and Camp Pendleton.  The plan is accompanied by a profile--

15       Q   Under whose direction was this prepared?

16       A   This map was prepared under my direction over a period

17   of years.

18       Q   Do you know it to be accurate, Mr. Cannon?

19       A   I can attest to its essential accuracy, scale considered.

20       Q   Would you refer to the schematic drawing beneath  the

21   outline?

22       A   The plan is accompanied by a profile drawing extending

23   from the sea to the Naval Ammunition boundary upon which is

24   indicated all of the production wells--

25       Q   Was that prepared under your direction?

A   This map was prepared under my direction.

Q   And also the profile?

A   That is correct.

Q   And do you know it to be accurate of your own personal knowledge?

A   I know it to represent the schematic water system on the camp.

MR. VEEDER:   I desire to offer in evidence Plaintiff's marked M-72 for Identification.

THE MASTER:   It will be received as Plaintiff's Exhibit M-72.

MR. VEEDER:   I would like to place this on the easel, I think it will be easier for the witness and everyone.

Now, would you step to Plaintiff's Exhibit M-72, and working from the coast inland describe the structures and facilities that you have depicted on the exhibit in question?

A   Starting with the plan, this is the ocean along here, this area to the north is the agricultural area along the coast, the area in this area is Camp Del Mar.

THE MASTER:   Can you make your statements so they will be more intelligible for the record than simply saying "this area"?

MR. VEEDER:   You might refer to the river, and you have the sections appearing there, if that would be helpful.

MR. STAHLMAN:   Would you mark AG.   And Del Mar, and so

49b

1    forth?

2         THE MASTER:  Any means of identifying them in the record,

3    so the thises and thats will be intelligible.

4         THE WITNESS:  With red pencil, your Honor?

5         THE MASTER:  Yes.

6         MR. VEEDER:  I would suggest that you do this, Mr. Cannon,

7    mark the area in the ocean and point to it with an arrow.

8         MR. SACHSE:  And if you will tell us as you do it I can

9    follow you.

10        THE WITNESS:  Camp Del Mar, that portion near the southerly

11   line south of the Santa Margarita River, adjacent to the ocean.

12   BY MR. VEEDER:

13        Q  Now, you had alluded to the agricultural area.  Would

14   you go back and make a similar designation?

15        A  I will refer to that as Stuart.

16        Q  Yes, that will be all right, if that is what it is.

17        A  The Stuart area is north of the Santa Margarita River,

18   Stuart agricultural.

19        The next area involved will be Ysidora, which is approxi-

20   mately two miles inland, the Ysidora Basin.

21        Q  And you are now marking an arrow and the word "Ysidora"

22   to the point where that area is located?

23        A  Yes, sir.  It is also noted on this map as lower basin,

24   but I have got Ysidora Basin.

25        Q  Now, would you draw arrows to the area in question?

50b

MR. DENNIS:  Are the boundaries of the Ysidora Basin on this map, may I ask, Mr. Cannon?

THE WITNESS:  No, sir, they are not, because there is no topography and there are no other delineations other than topo-graphy.

MR. DENNIS:  And the watershed is not delineated on that area.  Go ahead, Mr. Cannon.

THE WITNESS:  Inland from the Ysidora we first encounter the Chappo Flats area, which is the area 22, industrial area.

BY MR. VEEDER:

Q   And you refer to that as Chappo area?

A   Chappo Flats or industrial area.

Q   It is used alternatively.  Is that correct?

A   That is correct.  That in general is the area southerly of the Vandegrift Boulevard and the railroad, the Santa Fe main tracks, extending from the 24 area to lower Chappo, which is sewage disposal plant.  The 24 area, presently the headquarters area, I will note that.

Q   When you say the headquarters area what do you mean by that?

A   That is the headquarters of the Marine Corps base where the Commanding General holds forth, of the base, not the divi-sion.

Q   Would you proceed with the other designations?

A   The division area consists of approximately--well, there

5lb

1    is a 12th, 13th, 14th, 15th and 16th regimental areas, that is

2    this area; I will surround it by a circle and just call it

3    divisional area, that is the old name.  All the division units

4    are not housed there now, but that is the historical name of it.

5        Q  All right, for reference purposes.

6        A  That includes division headquarters, which is up in

7    that neighborhood.

8        Q  When you say in that neighborhood you might as well

9    put an X there.

10        A  The outlying area not included in this division area

11    now is used for housing rather than--that is officers' housing

12    rather than military housing.

13        Q  Would you mark that on there?

14        A  That is down here.

15        Q  Is that going to be circled?

16        A  I will label it 17 area, married officers' housing.

17    Extending--  One area which I have overlooked there is Camp

18    Margarita, that is a field training camp, a permanent camp, which

19    is northerly from the Santa Margarita River from the Chappo

20    industrial area.

21        Going upstream we come to the U.S. Naval Hospital, which

22    is on the shores of Lake O'Neill, half surrounded by it, and

23    approximately ten miles inland.

24        And farther upstream we come to the Naval Ammunition Depot

25    complex, which is in this area here.

52b

1    Q   When you say complex what do you mean, Mr. Cannon?

2    A   It is a separate water system, in general, from the

3    Camp Pendleton water system.   The Camp Pendleton water system

4    has been integrated, all of these areas I have spoken of so far

5    they are all interlocked and hooked together.   The only hook up

6    between Pendleton and the Ammunition Depot is by means of a

7    very temporary and small pipe line which comes from the confluence

8    of De Luz Creek and Santa Margarita River--

9    Q   I will ask you to mark first, however, if you would,

10   sir, the area that you alluded to as a complex.

11   Now, would you mark on the Exhibit M-72 where the tempor-

12   ary emergency supply is situated?

13   A   The temporary--

14   THE MASTER:   The temporary emergency supply line, isn't

15   it?

16   MR. VEEDER:   Yes, sir.   He had made reference to it, and

17   I just wanted it tied down.

18   THE MASTER:   It is a supply pipe line, not a supply of

19   water?

20   THE WITNESS:   It is a very small temporary pipe line.   I

21   doubt if it is in operation now because of the floods.

22   BY MR. VEEDER:

23   Q   Now, would you also mark  the location of the well on

24   the upper area of M-72?  And draw in De Luz Creek, if you would,

25   to the end that we can get identification on that.

53b

1    Mr. Cannon, I observed an area lying westerly of your

2    17 area, and ask you to identify that, if you would, please.

3    A  The area westerly of the 17 area is the Memorial Golf

4    Course.  At the time this map was drawn its main water supply

5    came from the portable water system, and it is so indicated on

6    this map.

7    THE MASTER:  That is a portable water system?

8    THE WITNESS:  Yes, sir, domestic pure drinking water.

9    However, at the present time that portion is served in its

10   entirety by sewage effluent from area 17 plant.

11   BY MR. VEEDER:

12   Q  Would you draw the sewage effluent pipe line from the

13   surface area over to the golf course?

14   A  It will have to be approximate.

15   Q  That is all right for identification purposes.

16   A  I could give it with more accuracy by referring to--

17   Q  This is just for location.  Now, are there any other

18   areas--  Excuse me.  Go ahead and finish up.

19   Would you state what the broken line is?

20   A  This is the course of the sewage effluent which is

21   pumped from sewage disposal plant number 2 in the 17 area to

22   an oxidation pond on the ridge summit between the division area

23   and William L. Canyon.  It flows thence to the golf course under

24   pressure from the oxidizing pond, from which the irrigation

25   water is taken off roughly in the system indicated--piping

546

1    system indicated on this plan.

2        Q   Would you mark a designation on that?

3        A   It is noted Memorial Golf Course.

4        Q   Then would you underline it, because I would like to

5    have it stand out a little better.

6        THE MASTER:   Would you also mark on the map that this is

7    a sewage line in some fashion?

8        THE WITNESS:   I am noting pumped, sewage effluent.

9        THE MASTER:   And the arrow above the word pumped, that is

10   an oxidation pond?

11       THE WITNESS:   That is an oxidation pond.

12   BY MR. VEEDER:

13       Q   Now, referring back to the south side of the river near

14   the ocean would you indicate areas in which water is used both

15   for the military and for the agricultural purposes?

16       A   This map does not purport to be up to date on all uses,

17   it is a map that has gone on from year to year.

18       Q   Just generally, please.

19       A   And the area indicated here is leased to the California

20   Department of Agriculture, Irrigation Area, is partly taken up

21   by houses now, and the location would be approximate there,

22   housing and school.   Housing in the lower area there and--

23       Q   Would you indicate it then, if you please?

24       A   And a trailer camp--  Do you want  numbers on these

25   housing areas?

55b

Q   I think if you just put the names on there it would suffice for the purpose.  We will have other maps to show those specific areas.

A   I believe that is all the pertinent use points, water use points.

Q   Is there not another camp on the area?

A   Yes, you are correct, Vado del Rio Camp right here.

Q   If that was not a leading question I will try again.

A   It is indicated in the plan and elevation of its water distribution system.

THE MASTER:  Now, you have indicated on this map a line extending to the west from the Memorial Golf Course area, and another oxidation pond.  What does this other line indiate?

THE WITNESS:  The use of the effluent is this, the force pumps at the plant raise the effluent approximately 200 feet to the oxidation pond number 1: that pond is placed at such an elevation that we can get a hydraulic gradient down this very deep canyon and up over the hill again, and the water that isn't used for irrigation empties to gravity at the top of the second range of hills.

THE MASTER:  Into the second oxidation pond?

THE WITNESS:  It runs downhill by gravity from that point into this oxidation pond, overflows by gravity and runs down into a third pond adjacent to Ysidora pumps and from there returned to the river, and returning a portion of the unused

1  effluent to the river where it can be absorbed.  We had difficulty

2  near the hills where it was so tight and swampy conditions--

3  BY MR. VEEDER:

4      Q  Are there other sewage effluent returns, Mr. Cannon?

5      A  Yes, sir.

6      Q  Would you kindly indicate those?

7      A  They are not indicated on this map.  I will just have

8  to sketch them in.

9      Q  You can just sketch them in as you have in the past.

10      A  I had better label the plants then.  Sewage plant 2,

11  adjacent to the 17 area; and sewage plant number 1 adjacent to

12  the 14 area.  And the effluent line from that plant is pumped

13  over the watershed line where it empties to gravity and flows

14  into another oxidation pond adjacent to the De Luz Housing

15  Area.  I had better note the De Luz Housing Area.

16      Q  Yes, I was going to ask you to do that.

17      A   From there the effluent overflows, drops about 150

18  feet and flows into Lake O'Neill.  I will note that surface flow.

19  I will note the line from the plant as effluent line.

20      Q  And you have designated the plants by number.  Is that

21  correct?

22      A  Yes, sir.  I believe that completes the naming of the

23  principal points of use of water.

24      Q  Where is the sewage from Wire Mountain Housing, Mr.

25  Cannon?

57b

1    A  Wire Mountain Housing sewage extends down in a gravity

2  complex line, picks up the trailer area, and goes to what is

3  known as Twin Lakes Plant.  That is just about a mile below the

4  Ysidora Narrows.  At that point the effluent from the plant over-

5  flows directly into Twin Lakes as an oxidation pond for secondary

6  treatment.

7    Q  Could you tell us where the Ammunition Depot sewage is?

8    A  The Ammunition Depot sewage plant is approximately

9  in that point, I believe, in Section 27.  It only gets primary

10  treatment, and the effluent overflows directly into the Fallbrook

11  Creek, which eventually empties into Lake O'Neill.

12    Q  You might as well draw Fallbrook Creek in up there and

13  show where the sewage effluent--

14    A  It is all approximate.

15    Q  This is necessarily all approximate.

16    A  I will label it Fallbrook Creek.

17    THE MASTER:  You haven't indicated the actual sewage

18  disposal plant, that is, you haven't marked it as such.

19    THE WITNESS:  I have marked the sewage plant at Fallbrook.

20  BY MR. VEEDER:

21    Q  Now, would you correlate the profile shown at the lower

22  portion of M-72 with the area concerning which you have just

23  placed these designations?

24    A  The profile is drawn at approximately the same horizon-

25  tal scale, but for the sake of clarity and to delineate the

58b

1   booster stations and reservoirs better, the vertical scale  has

2   been exaggerated.  The horizontal scale is one inch equals 3,000

3   feet, whereas the vertical scale is one inch equals 80 feet.

4   By doing that it is possible to indicate the wells in their

5   approximate location in  relation to the profile of the river,

6   the interlocking of the piping, the headers which collect the

7   water from the wells, the connections with the several booster

8   tanks.

9        Q   Now, when you say booster tanks what does that mean?

10       A   Booster pumps.  The well pumps, which are all the deep

11  well type, are designed to pump to the head of a redwood tank.

12  Each of these has a nominal capacity of 75,000 gallons.  From

13  there a fairly large booster pump is used to boost that water

14  up to a much higher elevation; in fact, up to elevation 540 feet.

15       Q   And what is done with the water there?

16       A   The water from that elevation--  That elevation was

17  necessary to furnish all of the higher areas in the division

18  area where the original large number of troops were housed.  As

19  indicated on the plan--  I will mark these reservoirs, labeled

20  reservoirs, 1, 2, 3, and 4, but I will make them red so that

21  they will stand out a little better.  From those high reservoirs

22  the water is fed to the higher places of use.  Some of the lower

23  ones, like reservoir number 1, serves a lower area, which is

24  area 14 and the De Luz Housing Area where such  high pressures

25  are not necessary.  The booster tanks serve as a storage medium

1  for those lower areas down in 24 area, the Chappo industrial

2  area, the airport, and whatnot.

3      Q  When you say whatnot, Mr. Cannon--

4      A  Another lower area is Camp Vado del Rio.

5      Q  I am only worrying about whatnot in the record, Mr.

6  Cannon, I am not being critical.

7      A  When it was evident that salt water intrusion was going

8  to ruin and was ruining Ysidora wells we naturally looked for

9  a remedy, and an 18 inch interconnecting line was built, it is

10 indicated on the map here, connecting the division area and

11 middle basin water system with the lower basin or Ysidora system.

12 The Ysidora wells originally served the entire Del Mar Camp--

13 Del Mar area, the housing area and the Stuart agricultural

14 system, but it has been--  It seemed wise to move out of there

15 entirely, no domestic water is pumped at the present time from

16 the Ysidora area.  And all of that water use is by means of the

17 18 inch supply line which comes from all of the group of Chappo

18 wells.  They are delivered to a booster tank station in lower

19 Ysidora, from whence it is elevated as indicated on the profile--

20     Q  Before proceeding further, I would  ask you to mark

21 Chappo wells and put the word Chappo wells beneath them, and do

22 the same with regard to the Ysidora wells.

23     A  These basins have been called by various names, some-

24 times lower basin, middle basin and upper basin.

25     Q  We have been using them in this as Ysidora, Chappo and

60b

1    upper.  So I would ask you to--

2         A  With that division?

3         Q  Yes.

4         A  With that division in mind--

5         Q  And block off each area as you go along, please.

6         A  The upper basin extends from about the Basilone Ford

7    up beyond the hospital and up to De Luz well.  That would be the

8    line of demarcation, and the line of demarcation between the

9    Ysidora and Chappo is the lower end of Chappo Basin, which is

10   approximately at that point of the map.

11        Now, the profile--  Are there any more questions about--

12        Q  I would like to have you go ahead and explain what

13   the sources of water are with particular reference to that 18

14   inch pipe that you made reference to.

15        A  All of the presently pumped domestic wells for those

16   portions of the camp lying in the Santa Margarita Basin are

17   pumped from the Chappo Basin and upper basin at the present time.

18        Q  Can you state the actual number of wells which are in

19   actual operation at the present time, if you know?

20        A  Well, that is a variable, more or less.  At the present

21   time we have six.  A couple of those wells are down for repairs,

22   and ten days from now the picture may be different.

23        Q  How is it possible to operate a system under the circum-

24   stances in regard to the interrelation of the wells?

25        A  That is quite a little engineering problem.  In general

1  the wells are all connected--interconnected by means of a header,

2  a large header--

3      Q  What is a header?

4      A  It in general is a large pipe which receives a number

5  of small ones.  And in that case the header is a 16 inch line

6  which extends from the upper basin down to the lower Chappo

7  Basin, and into which all of these wells pump.  The system at

8  the present time is not entirely automatic; a construction pro-

9  ject is on the way to make it  entirely automatic.

10     Q  When you say entirely automatic what do you mean by

11 that?

12     A  That means that the temporary storage vessels up here

13 when they need water they actuate a float valve, and that in

14 turn actuates a booster down here and starts the booster running,

15 and when the water in the booster tanks falls to a certain point

16 that actuates a certain number of wells and they pump automa-

17 tically.  That system furnishes a constant pressure to the point

18 of use in the division area and to the lower--that is, the upper

19 basin and lower basin points of use.  In this case the 18 inch

20 line extending from the Chappo area to Ysidora serves as a

21 header fed by three smaller lines, a 14 inch line, and two ten

22 inch lines, and it serves as a means of transporting all of the

23 water from the upper basin where we feel we can pump with doing

24 the least harm to the basins at the present time and to prevent

25 the infiltration of salt water.

1    THE MASTER:   I notice on the designation above Ysidora

2  Basin you have the words "not pumped" and a bracket which takes

3  in apparently three wells, and not the most westerly well.   Is

4  that correct?

5    THE WITNESS:   The most westerly well is presently used for

6  irrigating a lemon grove.   Is that pertinent to this?

7    THE MASTER:   Yes.

8    THE WITNESS:   It is labeled lemon grove.

9  BY MR. VEEDER:

10    Q   And locate the well for us, if you will.

11    A   I will note to lemon grove on well 24 C.I.

12    THE MASTER:   That is the most westerly well of the entire

13  series.   Is that correct?

14    THE WITNESS:   It is that one farthest downstream, yes, sir.

15  BY MR. VEEDER:

16    Q   Where is it located in connection with the lemon grove?

17    A   The well is upstream about a mile and three quarters

18  I would say from the lemon grove.

19    Q   Would you just mark an X there?   And then down below

20  put lemon grove well.

21    We are ready to go to another line of testimony.

22    THE MASTER:   It is 4 o'clock, so I suggest we adjourn

23  until 9:30 tomorrow.

24    (Adjournment.)

25