ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**Volume:** 9

**Pages** 1070-1207

**Date:** June 10, 1958

**Place:** Fallbrook, California

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191.

1

## INDEX TO WITNESSES

2

3  For the Plaintiff:                          D      X      RD      RX

4      Frank Cannon                          1073
5                                                  1136
                                                   1150
                                                   1168
6                                                  1172
                                                          1183
7                                                                  1196
                                                                   1196
8                                                                  1197
                                                                   1201
9                                                          1201
        Joseph McNearny                       1202

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# INDEX TO EXHIBITS

2

3  For the Plaintiff:                                      Iden.    Rec'd

4  M-73  Key Map of Camp Pendleton                         1079     1081

5  M-74A Water Distribution and Sanitary Sewer
          System Maps                                      1089     1091
6  M-74B Water Distribution and Sanitary Sewer
          System Maps                                      1091     1092
7  M-74C Water Distribution and Sanitary Sewer
          System Maps                                      1093     1093
8  M-74D Water Distribution and Sanitary Sewer
          System Maps                                      1094     1094
9  M-74E Water Distribution and Sanitary Sewer
          System Maps                                      1095     1095
10 M-74F Water Distribution and Sanitary Sewer
          System Maps                                      1095     1095
11 M-74G Water Distribution and Sanitary Sewer
          System Maps                                      1096     1096
12 M-74H Water Distribution and Sanitary Sewer
          System Maps                                      1096     1097
13 M-74I Water Distribution and Sanitary Sewer
          System Maps                                      1097     1097
14 M-74J Water Distribution and Sanitary Sewer
          System Maps                                      1097     1097
15 M-74K Water Distribution and Sanitary Sewer
          System Maps                                      1098     1098
16 M-74L Water Distribution and Sanitary Sewer
          System Maps                                      1098     1098
17 M-74M Water Distribution and Sanitary Sewer
          System Maps                                      1098     1099

18
   M-75A Key Maps                                          1099     1101
19 M-75B Key Maps                                          1101     1102
   M-75C Key Maps                                          1102     1102
20 M-75D Key Maps                                          1103     1103

21 M-76 Panoramic Photograph                               1124     1128

22 M-77 U.S.G.S.   Oceanside Quad                          1183     1183

23

24

25

Z-1

1      Fallbrook, California, June 10, 1958.  9:30 A.M.

2

3      MR. VEEDER:  Are you ready to proceed, your Honor?

4      THE MASTER:  When counsel is ready.

5      Will counsel indicate their appearance for the record?

6      MR. VEEDER:  W. H. Veeder for the United States, and Mr.

7  Burby for the United States.

8      MR. SACHSE:  I appear for the Fallbrook Public Utility

9  District and the named individual defendants.

10      MR. MOSKOVITZ:  Thomas Moskovitz, for the State of

11  California.

12      MR. STAHLMAN:  George Stahlman for the Vail Company.

13      MR. DENNIS:  W. B. Dennis for the Santa Margarita River

14  Water Company.

15      THE MASTER:  There seem to be no spectators of any kind,

16  or any individual named defendants present.

17      MR. SACHSE: There is one correction in the record of

18  June 4, which I pointed out to Mr. Veeder and he agrees it

19  should be corrected.

20      THE MASTER:  Will you state what that is?

21      MR. SACHSE:  It is on page 776, lines 7 and 8, a state-

22  ment by me.  The statement reads, "There have been no in-

23  ternal improvements in the District and never have been."

24  The statement should read, "There are no internal Improvement

25  Districts," capital I and capital D-- there are no Internal

Z-2

1    Improvement Districts and never have been.

2         Have I made myself clear?

3         THE MASTER:  Yes, capital I in Improvement and capital

4    D in District.

5         MR. SACHSE:  There are no internal Improvement Districts

6    and never have been.

7         THE MASTER:  The reporter will so indicate and the

8    transcript will be changed to make the sentence read, "There

9    have been"--

10        MR. SACHSE: "There are no internal Improvement Districts,

11   and never have been."

12        MR. VEEDER:  May we proceed, your Honor?

13

14                    FRANK H. CANNON,

15   resumed the stand, testified further as follows:

16

17              DIRECT EXAMINATION (Continued)

18   BY MR. VEEDER:

19        Q  Now, approaching Exhibit M-72, would you state, Mr.

20   Cannon, whether there are additional sewage disposal plants

21   which, as yet, have not been marked upon that exhibit?

22        A  Yes, there are.  This is not intended as a sewage

23   distribution, but--

24        Q  Will you place those on in their proper place and

25   state for the record what they are and where they are added?

Z-3

1    A   At Camp Margarita, you will notice here there is also

2  a primary sewage treatment plant, approximately at this loca-

3  tion.

4    Q   Does it have a name, Mr. Cannon?

5    A   Just Camp Margarita Plant.  It has a number.  I don't

6  recall the number.  They are numbered but I don't recall it.

7    Q   If you will draw a line then from that to a line

8  under Camp Margarita, why I think it will be evident as to the

9  location.

10     Where is the effluent disposed of?

11    A   The effluent escapes by gravity to the bed of the

12  Santa Margarita River, which is comparatively low.

13    Q   Now, would you add--

14    A   I have indicated that by this dotted line.

15    Q   Yes.  We want it correct.  Will you state what addi-

16  tional sewage plants are yet to be added to it?

17    A   Camp Vado del Rio has a disposal plant indicated at

18  that point on the map.  The effluent-- let's see now.  The

19  effluent from that plant extends over the river to the outfall

20  sewer line from the hospital which goes down to a plant at

21  lower Chappo.  I will put a dotted line in and then indicate

22  the outfall sewer from the hospital to the plant.

23    Q   Will you do that?

24    A   It consists of a sewer, as shown by a dotted line.

25    Q   I will ask you to add that to the legend in the

Z-4

1    right-hand corner, then, to be more demonstrative.

2          A   This main outfall sewer from the hospital is approx-

3    imately four miles long and finally the effluent runs into a

4    sewage plant No. 3 at the lower end of the Chappo Industrial

5    District.  From there the sewage-- that is a bio-filtration

6    plant.

7          Q   Will you spell that?

8          A   B-i-o hyphen f-i-l-t-r-a-t-i-o-n.  That means there is

9    both primary and secondary treatment to the effluent and the

10   effluent is quite well purified.  But it passes into an

11   oxidation pond on the adjacent area and escapes then to the

12   channel of the river.

13         THE MASTER:  Mr. Cannon, you have stated that you indi-

14   cated sewage lines by a dotted line and the water lines by

15   solid lines.  That is with the exception of this temporary

16   pipe line to the Naval Ammunition Depot?

17         THE WITNESS:  That is correct.  I will make that solid,

18   then, and the legend would apply.

19         MR. VEEDER:  If you will make the legend down there, then

20   there would be no further doubt.

21         THE MASTER:  That should also be made solid on the upper

22   portion of the map.

23   BY MR. VEEDER:

24         Q   I didn't interrogate you about that temporary line.

25   When you say "temporary line" is it going to be removed?

Z-5

1     A  Probably it has been removed by nature.  It was an

2  emergency line put in with salvage pipe of very small diameter

3  and terrific hurry.

4     Q  Now would you put the legend down, please.

5     A  I have noted the water lines as solid red lines, and

6  the sewage or effluent lines as a dash red line.

7     Q  Now, would you show on the coastal area where the

8  sewage disposal plants are located?

9     A  There are approximately three sewage disposal plants

10  which are located in the Camp Del Mar area, one in the southerly

11  end, one in the northern and one in the center.  Those plants

12  are presently on the way out.  We have a contract underway

13  which provides for the pumping of all raw sewage from Camp Del

14  Mar up to an existing plant which now serves the housing area

15  and the trailer area near  what is known as Twin Lakes.

16     Q  Would you indicate the present system and, with your

17  statement as to the changes so the record will be clear?

18     A  Would it be satisfactory to put one figure for the

19  sewage disposal plant?

20     Q  That is correct, and then double arrows.

21     MR. MOSKOVITZ:  I am suggesting that you indicate the

22  other disposal plant.  I am just trying to be of assistance,

23  Mr. Veeder.  He neglected to do it at that point.

24     THE WITNESS:  I have indicated three disposal plants,

25  numbers 4, 5 and 6, with three arrows.

Z-6

BY MR. VEEDER:

1   Q   How much longer are those going to be in operation?
Do you know, Mr. Cannon?

4   A   The contract has about three months to go, I believe.

5   Q   Now, in regard to Fallbrook Creek, I observe that it
is not a broken line, yet it is a disposal plant.  Why don't
you follow along--

8   A   Shall I erase it?

9   Q   No.  I would just run immediately below that another
line, and that would take care of that.

11   Is there sewage effluent material in there, in Fall-
brook Creek?

13   A   Yes, I believe there is.  I believe that the Fallbrook
Sanitary District also empties into Fallbrook Creek, just off
the Ammunition Depot.

16   Q   Now, are there any other sewage or other water lines
that should be added to make this a complete demonstration of
those utilities?

19   A   There is a system separate from the one indicated
here which has to do with the irrigation of the Stuart area.

21   Q   We will get to that later on.  I want to get the
utilities into the record at this time.

23   A   That is, I believe, a fairly good representation of
the domestic sewage system.  There are, of course, various
localized septic tanks.

Z-7

Q   What about the De Luz housing area?   Where is the sewage from there taken?   Does that go--

A   The sewage from the De Luz housing goes to Sewage Plant No. 1, indicated here.   There is an outfall sewer from that area which comes over and intercepts the collection line of that plant.

Q   Now, would you proceed to explain the operation of the system for the delivery of water?   You covered some points on it yesterday, but the method of pumping and the points of delivery should be indicated on the schematic profile that you have prepared there, unless it is complete in itself.

A   The general system of water supply in the Santa Margarita Valley of Camp Pendleton is furnished by a series of wells in the water-bearing sands of the river from underground accumulation of runoff and, in general, a number of wells in the upper Chappo and Ysidora Basins are used to provide the water for both domestic and irrigation purposes.

There is no domestic pumping from Ysidora Basin.

The wells, for the most part, pump from the basin by means of deep-well pumps directly to booster stations which are at approximately elevation 250-- 250 feet above mean sea level, that is-- with an overflow elevation of about 268.   That is represented by these booster stations, No. 1, 2, 3 and 4, and the Santa Margarita 500,000 gallon regulating reservoir is also attached, as is also the hospital reservoir.

Z-8

1    The effect of that is to give a more or less constant
2    static head against which these various well pumps pump.  And
3    it also makes the water interchangeable at that level to
4    furnish the hospital and the lower housing area and the Chappo
5    Industrial Basin and Camp Margarita from that static level
6    which gives a suitable pressure for ordinary domestic uses.

7    Those booster tanks are also used for temporary stor-
8    age to provide a flooded suction to the booster pumps which,
9    in turn, boost the water from elevation about 268 up to eleva-
10   tion 540 feet above sea level.  That provides the necessary
11   storage to take care of fire demands or temporary breakdowns
12   and to furnish the rather large division area which is on
13   higher ground.

14   Q   When you say "the division area" what are those areas?
15   A   That is the portion which is marked within the circle
16   as the division area.  It includes what is known as Areas 12,
17   13, 14, 15, 16 and 17.

18   Q   And those are on higher land.  Is that correct?
19   A   All except two of them are on higher land.  Area 14
20   is somewhat lower and does not require the static head you
21   would get from elevation 540.

22   MR. VEEDER:  At this moment I would like to have marked
23   for identification Plaintiff's Exhibit M-73.

24   If you would proceed, Mr. Cannon, and state what
25   Plaintiff's Exhibit marked for identification M-73 represents?

Z-9

1   A Exhibit M-73 represents-- is a key map of the entire

2 Camp Pendleton area which is marked off in rectangles, which

3 are delineated by coordinates in the Lambert System. Each one

4 of these rectangles bears a number and it serves as a key map

5 for all other utility maps for the entire Base.

6   Q Now, Mr. Cannon, was that prepared under your direc-

7 tion?

8   A It was.

9   Q And is it accurate, to your own knowledge?

10   A To my knowledge it is a true representation of the

11 conditions in the field.

12   MR. VEEDER: We will have copies of all these exhibits

13 for distribution.

14   Q Will you state what the orange line is, Mr. Cannon?

15   A I have outlined with the orange line the area covered

16 by other exhibits which have not been entered, I believe; those

17 portions covering the Santa Margarita Valley, the sheets which

18 are shown in greater detail and greater accuracy.

19   MR. VEEDER: I wish to offer in evidence M-73.

20   MR. DENNIS: If your Honor please, our failure to object

21 to the offer in evidence of these documents does not preclude

22 us from objecting if they are offered at the time of the trial

23 before Judge Carter, does it?

24   THE MASTER: My understanding is that if they are offered

25 here they are admissible and it would be considered by Judge

1   Carter for whatever weight he may give them.

2       MR. DENNIS:  Even as against the defendants in other sub-

3   watersheds and on the main stream?

4       MR. VEEDER:  I understand that any exhibit can be re-

5   butted.

6       THE MASTER:  You can, of course, rebut, and as to the

7   defendants who may not now have been served, there might be some

8   question as to having some proceeding so as to make them ad-

9   missible against them, but as to any defendant who is repre-

10  sented here, they are admitted for any purpose throughout the

11  trial.

12          This will be received in evidence.

13      MR. DENNIS:  Then I wish to object to this exhibit on the

14  ground that it is incompetent, irrelevant and immaterial, and

15  does not tend to prove or disprove any issues between the

16  defendants and the Santa Margarita Mutual Water Company and the

17  plaintiff in this action; on the further ground that no proper

18  foundation has been laid.

19      THE MASTER:  The objection is overruled.  The document

20  will be received as Exhibit M-73.

21  BY MR. VEEDER:

22      Q  Would it be helpful to have this up while you are

23  finishing your examination, Mr. Cannon, with regard to this

24  exhibit?  If it is I will put it up on the easel board.  It

25  might be a good idea for you to start correlating it with this

1662

Z-11

1  exhibit right now.

2  THE WITNESS:  These units are not delineated on Exhibit

3  M-72.

4  BY MR. VEEDER:

5  Q  We have the location of the administrative areas, which

6  you have referred to as the Division Area, and I have asked

7  that you point out on M-73 where they are located.

8  A  The areas, so-called numbered areas, are within blue

9  circles.  In other words, the circles 12, 24, 14, 17, 26, 16,

10  15 and 7 and so forth represent the Division Area which I

11  mentioned in describing that division area up there.  The un-

12  circled numbers-- it is rather confusing-- but the uncircled

13  ones are the numbered sheets.

14  MR. VEEDER:  Which will be subsequent exhibits, your

15  Honor.

16  THE MASTER:  Then the figures that are in circles on

17  Exhibit M-73 are the area numbers which you have testified to

18  with reference to M-72?

19  THE WITNESS:  That is correct, yes, sir.

20  MR. STAHLMAN:  Let me see if I have got this right.  This

21  original map is what?

22  MR. VEEDER:  The master plan for water distribution only.

23  MR. STAHLMAN:  And sewage?

24  MR. VEEDER:  Now made into a sewage map.

25  MR. STAHLMAN:  Now this--

Z-12

1      THE MASTER:  --referring to M-73 now.

2      MR. STAHLMAN:  M-73-- this supplements, and it is in

3  addition to M-72.  Is that correct?

4      THE WITNESS:  The purpose of M-73 is to delineate the

5  individual sheets for all utilities throughout the Base.

6      MR. VEEDER:  Which we are now going to offer.

7      THE WITNESS:  Those are divided into one, structure and

8  grounds; water and sewers; I believe it is intended to go into

9  those, one for the telephone and one for the steam distribution

10  and all other utilities that are involved.

11      MR. VEEDER:  We are trying to get the key.

12      MR. STAHLMAN:  I understand now.  O.K.

13      MR. SACHSE:  Mr. Veeder, may I ask one question?  As I

14  understand it when Mr. Cannon refers to these areas as the

15  Administrative Areas, like the Division Area and so on, he is

16  referring to the same numbers that appear on M-13?

17      MR. VEEDER:  Right.

18      Q  Now, would you proceed with further explanation of

19  the distribution of water, Mr. Cannon, as to the location of the

20  structures?

21      A  There are some exceptions to the distribution scheme

22  that I described before.  One of those is the Camp Margarita

23  Reservoir System where the deep-well pump pumps directly to the

24  day-to-day storage, which is a 500,000 gallon reservoir.

25      The other exception is the whole distribution system,

Z-13

1   storage and distribution system of Camp Del Mar and the housing

2   area known as Wire Mountain Homes.

3        Q  Will you spell that?

4        A  W-i-r-e Mountain.  That system is provided with its

5   main water supply from the Chappo Basin by means of an 18-inch

6   line, cast iron transmission line, which is indicated on the

7   plan in that location to the lower Ysidora profile by means

8   of this connecting line here, which goes down.

9        Q  When you say "connecting line here," would you be

10  more specific?

11       A  That is a line about three miles long extending from

12  the Chappo Basin down to the lower end of Ysidora Basin.

13       Q  I observe that there is the number 12 and then 18.

14  Will you state what that is?

15       A  Those represent pipe sizes.

16       Q  Those are pipe sizes?

17  THE MASTER:  One is a 12-inch and one is an 18-inch?

18  THE WITNESS:  No, sir; from the area between the

19  neighborhood of the sewage disposal plant No. 3, and Ysidora,

20  there is only the one 18-inch line.

21  THE MASTER:  I see.

22  THE WITNESS:  From that point, presently, a booster

23  station boosts water to two higher reservoirs, one at elevation

24  of 223 feet, which provides water for the main portion of Camp

25  Del Mar and the other reservoir is at elevation 309 feet above

Z-14

sea level and that provides a water supply for the housing

area, the trailer area, and also serves as a supply to a second

booster which elevates the water up to elevation 434 feet,

approximately.

BY MR. VEEDER:

Q   Would you state the capacities of those reservoirs

and standbys, whatever you call them, as you go along?

A   To go back to the first reservoir I mentioned, which

serves Camp Del Mar, that is known as Reservoir No. 7 and has

a capacity of 1,000,000 gallons.

The second reservoir, which is at elevation 309 above

sea level, has a capacity of 750,000 gallons.

Q   Where are those located with relation to the watershed,

the State watershed line, if you know?

A   I am not sure, without referring to topography, the

Reservoir No. 5--

Q   Well, approximately?

A   I think Reservoir No. 7 is within the watershed;

Reservoir No. 5 is the higher one and is on the ridge, and it

is on the borderline.   It would require determination.

Q   We will have other exhibits on that.

A   Reservoir No. 5, which has elevation 309, provides a

water supply for a second booster pump which elevates the water

to an elevated steel tank, with a capacity of 250,000 gallons.

The purpose of that tank is to provide water at suitable

Z-15

1   pressure for an officers housing area which happens to lie on

2   the hilltop.

3        MR. SACHSE:  Where?  I didn't get that.

4        THE WITNESS:  On the hilltop.

5   BY MR. VEEDER:

6        Q  What is the name of that?

7        A  It is Wire Mountain Housing.

8        Q  Wire Mountain Housing?

9        A  An officers' area.  It is possible to get water for

10  fire fighting from both reservoirs at the same time by means

11  of pressure regulating valves, connection and valving at Camp

12  Del Mar.

13       THE MASTER:  You mean both reservoirs, Reservoir No. 5 and

14  7?

15       THE WITNESS:  5 and 7.  The plan will indicate the net-

16  work of pipes and the size to indicate how that is received;

17  the interconnection.

18       Now, there is one portion I haven't described and that

19  is the Ammunition Depot.

20  BY MR. VEEDER:

21       Q  I was going to ask you about that.  Would you explain

22  that and state its location?

23       A  The Naval Ammunition Depot supply is located upriver

24  about three miles from the confluence of De Luz Creek with

25  Santa Margarita River.

Z-16

1      THE MASTER:  Maybe, Mr. Cannon, if you stood on this

2   side it would be easier for everybody.  You have your back to

3   all of them.

4      THE WITNESS:  The system is different from any of those

5   at Camp Pendleton, in that the water is really a surface water

6   obtained from a gallery under the river.

7   BY MR. VEEDER:

8      Q  Describe that gallery for us.

9      A  That gallery, as I recall, is a 24-inch concrete pipe

10   with perforations, and it is less than 15 feet below the

11   riverbed.  That pipe conducts--

12      Q  When you say "below the riverbed," it is dug in there

13   and buried?

14      A  It is in a trench and is backfilled.

15      Q  And what kind of earth is in it? Would you describe

16   the earth?

17      A  It is a sand, river sands.  There is some crib work

18   and rock put over it to keep it from washing out when it floods,

19   but that is displaced by the regular normal river sands which

20   come from granite bedrock.

21      Q And how does the gallery of that character work?

22      A  The theory is that the water will penetrate into the

23   perforated pipe, from which it is conducted over to one side

24   of the river, to an artificial well, which is below any portion

25   of the pipe.  A deep-well pump is placed within that.

Z-17

Q   You said "In theory". How does it actually work?   Is that the way it actually works?

A   Well, there are difficulties in the sanding of that type of water collection system.   They have a great deal of difficulty with it sanding up, because those are fine sands and the holes are rather large in the gallery.   The sands wear the pumps out and it causes a nuisance in a system.   For that purpose the profile on Exhibit M-72 indicates a deep-well pump and a descending tank.   The water is pumped from the collection well by means of a deep-well pump to a descending tank which, in turn, provides a flooded suction for a booster pump which boosts it a great distance, approximately one, two, three, four, 550 feet, something like that, to a million-gallon reservoir which, in turn, provides water to a second booster to elevate the water to an elevated tank.   The purpose of the elevated tank is to provide the higher areas with suitable pressures, and the million-gallon reservoir provides the lower areas of the Ammunition Depot.

The capacity of the elevated tank is 100,000 gallons.

Q   Now do you have any other statements to make, Mr. Cannon, in regard to the system that has been provided for sewage and water distribution on M-72?

A   I believe that covers the main points and describes the complete system of water supply and sewage disposal.

MR. VEEDER:   This will be marked--

Z-18

THE CLERK:  74.

MR. VEEDER:  M-74.  There will be a series of these maps. We might as well call it M-74A.

THE WITNESS:  There is a logical sequence of those maps.

MR. VEEDER:  I am going to elicit that.

Q   Mr. Cannon, I hand you M-74A, Plaintiff's Exhibit marked for identification, and I will ask you to state what is depicted on that for identification, and a statement as to under whose direction it was made.

A   This map is a detailed map of the water supply and sewage system for a very small portion of Exhibit M-73.  It is that portion outlined within the rectangle numbered 31 on this Exhibit M-73 and it includes the water supply system for the De Luz Homes Area and an oxidation pond which receives effluent from Sewage Disposal Plant No. 1 which is located on M-72 exhibit.  Also water lines, distribution lines, for a very small portion of the hospital and a small portion of Area 12.

Q   That was made under your direction, was it?

A   It was made under contract.  I had the direction of the contract, an architect-engineering contract, and all of the replacements.  These are kept up to date.  Those have been made under my direct supervision.

Q   Now, I ask you if these are correct?

A   They are correct to the best of my knowledge.

MR. VEEDER:  I offer in evidence M-74A.

Z-19

1    MR. DENNIS:  Might I ask a question?

2    THE MASTER:  Yes.

3    MR. DENNIS:  I notice this map is undated.  I wonder,

4    also, of what date this is.

5    THE WITNESS:  The maps-- we try to keep them up to date.

6    We have a department which does nothing but that kind of work,

7    to keep these up to date.  That is the reason that they do not

8    bear a date.

9    MR. DENNIS:  You would say this map then was correct as

10   of June 1st?

11   THE WITNESS:  That is correct.

12   MR. SACHSE:  I will object, if the Court please, and I

13   think I should have preserved this all the way through, on the

14   ground that it is incompetent, irrelevant and immaterial; no

15   proper foundation laid and no showing that any of this area

16   is within the watershed or has any bearing on the considera-

17   tion before the Master as to the De Luz Creek water rights.

18   I think I have probably been lax in not objecting previously to

19   Exhibits M-72 and 73.  The purpose of this is to preserve a

20   motion to strike.

21   MR. DENNIS:  I make the same objection, that it is in-

22   competent, irrelevant and immaterial, and does not tend to

23   prove or disprove any of the issues in the case in respect to

24   the defendant that I represent, the Santa Margarita River

25   Mutual Water Company; and no proper foundation laid.

Z-20

1    THE MASTER:  The objections are overruled and this will

2    be received as Exhibit M-74A.

3    MR. SACHSE:  May I understand and will it be stipulated

4    that I have a continuing objection in order to protect my

5    objections, and a motion to strike later on?

6    THE MASTER:  I think that would follow as to all of the

7    74 series.

8    MR. SACHSE:  That is what I am referring to, the 74

9    series.

10    THE MASTER:  However, if we do get onto a different

11    subject, you will have to renew your objection.

12    MR. VEEDER:  The offer has been received?

13    THE COURT:  Yes, the document has been received.

14    MR. VEEDER:  I would like to have this marked as Plain-

15    tiff's Exhibit M-74B, marked for identification.

16    Q  I hand you exhibit marked M-74B for identification,

17    Mr. Cannon, and I ask you to state-- first, I will ask you to

18    read the description of the drawing into the record.

19    A  This is one of the sheets of the master plan showing

20    Station Development Plan, Part 4, Section 6, which has to do

21    with utilities.  This one in particular is Area 11 through 17

22    and 26; utilities, water distribution and sanitary sewer

23    systems.

24    THE MASTER:  Is that the area shown as No. 24 on M-73?

25    THE WITNESS:  Yes, sir.  That is the area indicated as

Z-21

No. 24 which lies directly south of the first Exhibit M-74A.

BY MR. VEEDER:

Q   Do you know if this is accurate?

A   It is accurate and up to date, to the best of my knowledge, yes.

MR. VEEDER:   We offer M-74B.

MR. DENNIS:   Might I ask the witness a question?   Your previous testimony relative to the date, and the time which the map reflects, your reply to all these undated maps would be the same?

THE WITNESS:   That is correct.   They are current maps.

MR. DENNIS:   They are current maps?

THE WITNESS:   They are current maps.

THE MASTER:   This is true of all of them?

MR. DENNIS:   Of this series.

THE WITNESS:   Yes.

THE MASTER:   The objections made to the whole series are overruled, and as to this map, it is received in evidence as Exhibit M-74B.

MR VEEDER:   I would like to have this map marked for identification M-74C.

Is it stipulated I have asked the same question for foundation purposes?

THE MASTER:   That is perfectly proper.

MR. VEEDER:   And we make the offer.

Z-22

1    MR. MOSKOVITZ:  Where does that show on M-73?

2    THE WITNESS:  This was the distribution and sanitary

3    sewer map, including portions of Areas 12, 13, 16, 22, 23, 24

4    and 33.

5    MR. SACHSE:  32 was the last?

6    THE WITNESS:  33.

7    MR. MOSKOVITZ:  What number on M-73 does that refer to?

8    THE WITNESS:  This map is key map No. 23, which lies

9    directly to the west of the last exhibit, which was M-74B.

10   Incidentally, the matching numbers are indicated on each one

11   of these maps.  The adjacent map is indicated on the margins.

12   MR. MOSKOVITZ:  And where is the number that it refers

13   to as indicated in the legend?  Each indication is on the M-74

14   series?

15   THE WITNESS:  Yes, a Public Work No. 23, W and S, and

16   that stands for Water and Sewer.  That is indicated-- the

17   numbers that are not circled.

18   THE MASTER:  In other words, on each of these maps the

19   number which is set forth in the rectangle which is above and

20   to the left of the word Master Shore Station Development Plan

21   is the key number shown on M-73?

22   THE WITNESS:  That is correct.

23   THE MASTER:  The objections will be overruled and this

24   will be received as M-74C.

25

Z-23

BY MR. VEEDER:

1  Q  I will ask you to read from the legend on Plaintiff's
2  Exhibit marked for identification M-74D, giving-- would you
3  read slowly--
4
5  A  This is Map No. 30, which represents the water
6  distribution and sanitary sewer system scheme for Areas 23, 25,
7  26, 27, 33 and 38.  This sheet lies directly westerly from the
8  first exhibit which was 74A.
9  MR. VEEDER:  We offer it into evidence.
10  THE MASTER:  The objections are overruled and this will
11  be received as Exhibit M-74D.
12  I note that this does not, apparently, have the
13  numerals on the borders to indicate the adjacent sections.
14  MR. VEEDER:  You are right.
15  The offer has been made, your Honor.
16  THE MASTER:  It has been received in evidence.
17  MR. SACHSE:  Now that is No. 30 of the key map?
18  THE WITNESS:  That is correct, No. 30.
19  MR. VEEDER:  I would like to have marked for identifica-
20  tion M-74E.
21  Q  Would you read the legend into the record, Mr. Cannon,
22  and slowly, please.
23  A  This Exhibit M-74E is a part of the utilities section
24  of the Master Shore Station Development Plan and indicates the
25  water, sewers, the water distribution and sewer system for

Z-24

1    Areas 15, 16, 17, and 18.  It is Sheet No. 17 on the key map.

2        MR. VEEDER: We offer M-74E.

3        THE COURT:  The continuing objections are overruled and

4    it may be received as M-74E.

5    BY MR. VEEDER:

6        Q   I hand you Plaintiff's Exhibit marked M-74F, and ask

7    you to read into the record the legend, and refer to the areas,

8    the Administration Areas which are contained.

9        A   This is Sheet 3 of the utility drawings, indicating

10   the water distribution and sanitary sewer systems involving

11   Areas 20 and 21.

12           You will note that this indicates most of the Del Mar

13   section; the trailer housing and the Wire Mountain Housing

14   Areas.

15       MR. VEEDER:  I offer M-74F.

16       THE MASTER:  The continuing objections are overruled

17   and it will be received in evidence as Exhibit M-74F.

18       THE WITNESS: I might note that on this sheet, No. 3, M-74F,

19   certain water lines are shown that was used to go to the

20   Homaja Housing Area.  It is true the water lines are still

21   there, but they service nothing.  That is in the area adjacent

22   to the crossing of Highway 101 with the Santa Fe Railroad.

23       THE COURT:  The area immediately to the east of that

24   crossing?

25       THE WITNESS:  That is right, yes.

425

1    THE MASTER:  There are water lines there but they serve

2  nothing at the present time?

3    THE WITNESS:  That is true.

4  BY MR. VEEDER:

5    Q  Would you refer to this legend on M-74G?

6    A  This is Sheet 6, water distribution and sanitary

7  sewer systems, including portions of Areas 19, 20, 31.  This

8  locates the Ysidora Booster Station, the two Boat Basin

9  Reservoirs-- Camp Del Mar is a good substitute for that-- as

10  well as the portion of the Wire Mountain Officers Housing Area.

11    MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

12  marked M-74G.

13    THE MASTER:  The continuing objections are overruled and

14  it will be received in evidence as Exhibit M-74G.

15  BY MR. VEEDER:

16    Q  I hand you Plaintiff's Exhibit marked M-74H for Iden-

17  tification, and ask you to state into the record the area to

18  which it refers.

19    A  Exhibit M-74H is represented as Sheet No. 16 on the

20  key map, which was M-73.  It represents portions of the water

21  distribution and sanitary sewer systems in Areas 16, 17, 22,

22  23 and 24.

23    MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

24  marked M-74H for Identification.

25    THE MASTER:  The continuing objections are overruled and

Z-26

1  it will be received in evidence as Exhibit M-74H.

2  BY MR. VEEDER:

3      Q  I hand you Plaintiff's Exhibit marked 74-I for Iden-

4  tification, and ask you to read into the record the areas

5  served, the Administrative Areas served by the utilities which

6  are shown on this.

7      A  Exhibit M-74I represents Sheet No. 1 on the key map,

8  Exhibit M-73.  It represents a very small portion of the water

9  and sewer connection systems in Area 21.  It only shows the

10  extreme southerly tip of the Marine Corps Base.

11      MR. VEEDER:  I offer in evidence the exhibit marked

12  M-74I for Identification.

13      THE MASTER:  The objections are overruled and it is

14  received in evidence as Exhibit M-74I.

15  BY MR. VEEDER:

16      Q  I hand you Plaintiff's Exhibit marked 74-J for Iden-

17  tification, and ask you to state or read into the record the

18  areas which are depicted on that map for identification.

19      A  M-74J is represented on the key map as Sheet No. 22.

20  It indicates, in part, the water distribution and sanitary

21  sewer systems in Areas 23, 32, 33, 42 and 43.

22      MR. VEEDER:  I offer in evidence the exhibit marked M-74J

23  for Identification.

24      THE MASTER:  The objections are overruled and it is

25  received as Exhibit M-74J.

Z-27

BY MR. VEEDER:

1    Q   I hand you Plaintiff's Exhibit marked M-74K for Iden-

2    tification and ask you to state into the record the areas de-

3    picted on that for identification.

4    A   Exhibit M-74K is represented on the key map, Exhibit

5    M-73, as No. 15.  It indicates, in part, the water distribution

6    and sanitary sewer systems in Areas 19, 22, 23, 32 and 33.

7    MR. VEEDER:  I offer in evidence that Plaintiff's Exhibit

8    M-74K marked for identification.

9    THE MASTER:  The objections are overruled and it is

10   received in evidence as Exhibit M-74K.

11   BY MR. VEEDER:

12   Q   I hand you M-74L, marked for identification, and ask

13   you to state the areas to which that pertains.

14   A   Exhibit M-74L is represented on the key map, Exhibit

15   M-73, as No. 2.  It indicates, in part, the water distribution

16   and sanitary sewer systems for Area 21, which is Camp Del Mar.

17   MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

18   marked M-74L for Identification.

19   THE MASTER:  The objections are overruled and it is

20   received as Exhibit M-74L.

21   BY MR. VEEDER:

22   Q   I hand you Plaintiff's Exhibit marked M-74M for

23   Identification, and ask you to refer to the Administrative

24   Areas to which that identification pertains.

Z-28

1    A   Exhibit M-74M is represented on the key map, Exhibit

2    M-73, as portions of No. 10.   It indicates the water distribu-

3    tion and sanitary sewer systems, in part, involved in Areas 19,

4    31 and 32.   The main portion-- this includes no housing areas.

5    They are merely transmission lines, and indicates the 18-inch

6    connecting line between Chappo and the Ysidora Area, as well

7    as effluent lines which come over from Area 17.

8        MR. VEEDER:   I offer M-74M in evidence.

9        THE MASTER:   The continuing objections are overruled

10   and it is received as Exhibit 74M.

11       MR. VEEDER:   This will be a new series number, M-75A

12       THE MASTER:   All right.

13       MR. VEEDER:   Copies of all these exhibits are going to

14   be made available.

15       Q   Now, I hand you Plaintiff's Exhibit marked 75A for

16   Identification, and ask you, Mr. Cannon, to state in the record

17   the areas to which it pertains.

18       A   Exhibit M-75A is represented on the key map as the

19   rectangle numbered 11.   It serves the same purpose as exists

20   in the M-74 group.

21       Q   Would you state what is depicted on the map?

22       A   It is labeled Composite Utility.   The reason for that

23   is that there are no housing areas, and there are very few

24   utilities of any kind, so that all the utilities--

25       Q   Very few what?

Z-29

1     A  All the utilities were put on the one map.

2     MR. MASTER:  This includes an addition to the water and

3 sewer systems, electricity and other utilities?

4     THE WITNESS:  What other utilities may occur; electrical

5 lines.

6     MR. VEEDER:  I offer M-75A in evidence, if your Honor

7 please.

8     MR. SACHSE:  I am objecting on the ground it is incompe-

9 tent, irrelevant and immaterial, and no proper foundation laid,

10 and that an extremely large part of this area is outside the

11 watershed and has no possible bearing on any of the issues now

12 going to the De Luz Creek claims.

13     MR. VEEDER:  As to foundation, your Honor, I was going

14 to use the same foundation as in 74A, B, C, and so forth, of

15 that was agreeable.

16     MR. SACHSE:  I am assuming you would, and I concede you

17 would ask the same questions and have the same answers.

18     THE MASTER:  Yes.  I am assuming for the purpose of these

19 objections the same foundation has been laid for each of the

20 74 series and will be considered to be laid for each of the 75.

21     MR. SACHSE:  I will go along with that.  I am still

22 urging on your Honor that there is insufficient foundation;

23 the dates don't tell us anything.  The record of the date is

24 as of today and I think that is of no significance to conditions

25 that existed at the time of the filing of the lawsuit, without

Z-30

1   further foundation.

2       MR. VEEDER:  Mr. Sachse, in that regard I think the

3   record should show that as we proceed the time, place and facts

4   will be brought out.

5       THE MASTER:  I presume you renew your objection, Mr.

6   Dennis, on the 75 series, the same as to the 74?

7       MR. DENNIS:  Yes.  I assume that Mr. Cannon's testimony

8   would be the same with regard to the date in this series as

9   well as to the other series.

10      THE WITNESS:  That is correct.

11      THE MASTER:  Yes.  The foundation is the same as to the

12  entire series 74 and also 75.

13      MR. VEEDER: Correct.

14      MR. SACHSE:  Your Honor, since I did not realize that

15  they had switched series, I would like to make a motion to

16  strike the 74 series on the grounds heretofore stated.

17      THE MASTER:  The motion will be denied and the offer of

18  Exhibit M-75A will be accepted and the document will be re-

19  ceived in evidence as Exhibit No. M-75A.

20  BY MR. VEEDER:

21      Q  I hand you Plaintiff's Exhibit marked M-75B for

22  Identification and ask you to state the areas to which that

23  for identification pertains.

24      A  Exhibit M-75 is represented on the key map as the

25  rectangle No. 38.  It is a composite utility map indicating

Z-31

1   all of the utilities involved in portions of Area 25, 27, 28,

2   33, 34 and 44.

3        MR. VEEDER:  I offer M-75B.

4        THE MASTER:  The objections will be continuing, by agree-

5   ment, and will be overruled and the document will be received

6   as Exhibit M-75B.

7   BY MR. VEEDER:

8        Q  I would like you--

9        MR. SACHSE:  I can't hear you, Mr. Veeder.

10  BY MR. VEEDER:

11       Q  I hand you Plaintiff's Exhibit marked M-75C for Iden-

12  tification, and ask you the areas to which it pertains.

13       A  Exhibit 75C is indicated on the key map, Exhibit M-73,

14  as the rectangle numbered 39.  It is a composite utility map

15  indicating portions of the utilities in Area 25.

16       MR. VEEDER:  I offer in evidence Plaintiff's Exhibit M-75C.

17       THE MASTER:  The objections are overruled and it is

18  received as Exhibit M-75C.

19  BY MR. VEEDER:

20       Q  I hand you Plaintiff's Exhibit marked M-75D for Iden-

21  tification, and ask you to state the areas, the Administrative

22  Areas to which this exhibit pertains.

23       A  Exhibit 75D is represented on the key map, Exhibit 73,

24  as the rectangle numbered 47.  It represents an indication,

25  in part, of the composite utilities in Area 28, which is near

1103

Z-32

1    the intersection of De Luz Creek and Santa Margarita River.

2         Q   I observe, Mr. Cannon, that that is outside of the

3    orange line that you have marked on M-73.  Would you explain

4    that?

5         A   The orange lines on M-74 include only those which

6    were strictly water supply and sewage disposal lines.  Another

7    line could be added to it.

8         MR. VEEDER:   I wanted this straightened out as this is a

9    different series.

10        THE WITNESS:   Incidentally, this Exhibit M-75D indicates

11   the line which is described as a temporary water line between

12   Camp Pendleton and the United States Naval Ammunition Depot.

13        MR. VEEDER:   I offer M-75D in evidence.

14        THE COURT:   It will be received as Exhibit M-75D and the

15   objections are overruled.

16        Mr. Cannon, the line that you referred to as a temporary

17   supply line is the heavy black line just above the Santa

18   Margarita River?

19        THE WITNESS: That is correct.  You will notice a W,

20   which indicates water.

21        THE MASTER:   There is a further indication of 16 and 18,

22   as being the size of the line?

23        THE WITNESS:   Yes; the size of the line varies, and some

24   portions are 4-inch and some are 6-inch.

25        THE MASTER:   Mr. Veeder, is that the last in this series?

Z-33

3

1        MR. VEEDER:  Yes, it is, your Honor.

2        THE MASTER:  We will take a recess at this time.

3        (Recess.)

4    BY MR. VEEDER:

5        Q  For the record I would like to have the witness

6    testify as to the correlation, if any, between the profile

7    appearing on Plaintiff's Exhibit M-72 and the schematic drawing

8    of the water and sewer lines which appear on the same exhibit.

9        A  The profile drawing which is at the bottom of the sheet

10   is intended to, in so far as possible-- These are the same

11   horizontal scale.  Of course, this is taken along the river bed

12   and represents the profile of the river bed itself for a

13   distance of approximately 14 miles from the sea.  The river,

14   on the plan, meanders throughout that area, so, of necessity,

15   when you lay that out as a straight line, it stretches somewhat

16   a longer distance than it would by direct projection.

17       MR. VEEDER:  If that is satisfactory to you, Mr. Sachse--

18       MR. SACHSE:  Yes, thank you.

19   BY MR. VEEDER:

20       Q  Now, in the construction of the project, did you have

21   occasion to consider the elevations of the various areas of

22   land when you laid out and planned the camp, Mr. Cannon?

23       A  Yes.  It was quite--

24       Q  You may sit down.

25       A  It was quite a problem to find enough usable area to

Z-34

1    lay out a camp of the size that it is.

2        Q    At what period did you lay out this plan of construc-

3    tion?

4        A    The master plan of the original camp was--

5    MR. STAHLMAN:   I can't hear you.

6    THE WITNESS:   The master plan of the original camp was

7    evolved in early 1942.   I came to Camp Pendleton May 16, 1942,

8    and we had a hundred architects and engineers on contract.   It

9    was my duty to ride herd on them and direct them.

10   BY MR. VEEDER:

11       Q    When you say "ride herd", Mr. Cannon, what do you mean

12   by that?

13       A    That word I borrowed from instructions that were given

14   me by a captain of the Civil Engineer Corps.

15       Q    I have no objection to it, I just want to be very sure

16   of your responsibilities in that regard.

17       A    Any further--

18       Q    What were your responsibilities in regard to the

19   layout of the camp?

20       A    I was delegated the authority to guide the architect-

21   engineer group.

22       Q    And what factors did you take into consideration when

23   you were locating these various administrative areas, concerning

24   which you have testified?

25   MR. SACHSE:   I will object, if the Court please.   The

Z-35

1    factors he took into consideration have absolutely nothing

2    whatsoever to do with water rights; absolutely nothing.  There

3    is no possible remote connection between whether they considered

4    the factors for elevation, for frost, or even for availability

5    of water supply.  We are getting now into this question of

6    appropriations, of prescription, and of a great many questions

7    that can be much better met in the trial before Judge Carter.

8         MR. VEEDER:  I believe it is absolutely essential, from

9    the standpoint of the case of the United States here, and in

10   the main case, to show the factors that were taken into con-

11   sideration when the various areas were located.  For example,

12   if Fallbrook were to build this dam, indeed, each individual

13   user on De Luz is directly and immediately interested in where

14   we use the water; the circumstances under which we use the

15   water; how much water we use and how long we have been using it.

16        Now these questions are very important.  I would like

17   to ask three or four more questions along this line as founda-

18   tion to demonstrate the reason why such a large proportion of

19   this camp was located outside of the watershed.  I believe it

20   is extremely important.  I think the kind and type of rights

21   that we have is going to be a matter which your Honor will

22   necessarily take into consideration when determining the

23   respective correlative rights with the De Luz water users.  I

24   think your Honor is going to consider that.

25        MR. SACHSE:  I might make one further comment, your

Z-36

1   Honor.  This is going to be an important issue.  Now I disagree

2   vigorously with Mr. Veeder's statment that the people on the

3   De Luz, or Fallbrook, have the slightest interest in where this

4   water is used.  What they are concerned with is the extent of

5   the water rights.

6         It was pointed out crystal clear in a Ninth Circuit

7   Court decision that the use of water once it reaches its way

8   within an area under the sovereign control of the United States

9   is entirely under the power of the United States.  They can, if

10  they see fit, bottle up each drop of water that comes down that

11  river to them and ship it to the Sahara Desert and no one can

12  object, not only because of the sovereign nature of the owner-

13  ship involved, but because of the physical fact that they are

14  the last users on the stream, and there is no one below them

15  to object.

16        What we are talking about is the extent of the right

17  which they can reach upstream beyond the boundaries of the

18  enclave and acquire water which comes down to them.  Now that

19  is what we are concerned about, not what they do with it once

20  it gets there.

21        MR. DENNIS:  Your Honor, in view of Mr. Veeder's statement

22  of the purpose for which this evidence is being offered, I

23  offer an objection on the ground it is incompetent, irrelevant

24  and immaterial and not tending to prove or disprove any issues

25  between the United States and the defendant Santa Margarita

Z-37

1  Mutual Water Company or the Santa Margarita Mutual Water

2  Company and the other defendants.

3      THE MASTER: Well, Mr. Veeder, my understanding, and the

4  theory I have been following on the introduction of evidence

5  so far has been that evidence can properly be introduced before

6  me dealing with the actual physical facts as to the development

7  of the water system on Camp Pendleton in the same manner in

8  which the physical facts as to the De Luz Creek and any other

9  portions of the watershed could be developed; that any argument

10  as to the legal rights of the United States within Camp

11  Pendleton were to be determined by Judge Carter.

12      Now, to the extent that you are offering evidence through

13  Mr. Cannon with reference to the actual physical conditions

14  in Camp Pendleton, it would seem to me that that would be

15  properly admissible to the same extent as the other testimony

16  which has already been offered with regard to the actual loca-

17  tion of the water mains.  But in so far as you would be

18  eliciting information as to why certain things were done, the

19  motives and the legal consequences which would ensue from that,

20  that evidence would seem to me should be presented to Judge

21  Carter.  Now, of course, until the testimony is in it is pretty

22  hard for me to tell what the evidence would tend to prove.  I

23  would only say that I would not think that any evidence should

24  be tendered at the present time as to motives for actions.

25      Now, if the question is intended simply to indicate

Z-38

1  that he took into consideration physical characteristics and

2  elevations, it would seem to me it would be proper. If it is

3  taking into consideration various claims, legal consequences,

4  it would seem to be improper.

5      MR. VEEDER:  At this point, your Honor, I agree with

6  everything that you have said. What we are eliciting here is

7  the information which I think is very crucial to all concerned

8  as to when this construction was undertaken, particularly in

9  view of the objections that have been made to Mr. Cannon's

10  testimony that some of these buildings are located outside of

11  the watershed. Now that is one of Mr. Sachse's objections,

12  an objection to this phase of the testimony. The point that I--

13  if you desire me to outline it, and if your Honor sustains

14  the objection why it might save time if I outline the purpose--

15      THE MASTER:  I would like to know what your purpose is

16  before we go into any considerable questioning.

17      MR. VEEDER:  I am very glad to do that. The objective

18  that we have here is to demonstrate that these locations them-

19  selves are brought about by reason of a state of war which

20  caused the present plans and developments and situations and

21  locations of these utilities concerning which he has testified.

22  We have additional exhibits. I have an exhibit here, this

23  panoramic map, which will show the areas which, I think,

24  probably are located outside of the watershed, very largely,

25  and I believe that your Honor will necessarily, in making his

Z-39

1    determination as to the rights to participate in water in the

2    De Luz area, among the parties, must consider the location of

3    these properties.  I think then that from them may flow some

4    legal conclusions that will have to be arrived at and, as I

5    understand the reference, we will make legal conclusions to

6    Judge Carter.

7         I do believe that in making out our prima facie case here

8    we have to demonstrate where these buildings are located by

9    this, the only witness we have, who did it.

10        MR. MOSKOVITZ:  Your Honor, I believe the United States

11   is entitled to show the fact as to where water is used, both

12   within and outside the watershed.  I don't think there is any

13   question about that.  Those are, I believe, facts that can be

14   taken into account, but the motives of the United States in

15   locating buildings or making use of certain areas I think is

16   irrelevant, entirely, to any issue which can be considered

17   either by you or by Judge Carter.

18        I don't see what value motives have in determining water

19   rights.  That is the distinction I would urge upon you.

20        THE MASTER:  Mr. Veeder, it appears to me that this

21   testimony which you are now intending to offer is outside the

22   scope of any issue which is presented to me, in any event,

23   and that if it is pertinent at all it would be pertinent only

24   in an argument before Judge Carter in connection with evidence

25   which would be presented before him.  So, on the basis of what

1111

Z-40

1   you have stated you intend to prove, I would sustain the objec-

2   tions which have been made.

3       MR. VEEDER:  I would like to proceed, though, your Honor,

4   in connection with the location of the watershed lines-- bowing

5   to your ruling in regard to the question that was asked-- the

6   watershed line is important to you, I believe, from the stand-

7   point of the location of these buildings and, I think, also,

8   that it is important to your Honor why it was that Mr. Cannon

9   selected these areas to build them.  If your Honor rules against

10  me on that, nevertheless it is important to us to have marked

11  on M-72-- and that is where I was heading with this line of

12  testimony-- the location, to have him draw the watershed line

13  on M-72 as it relates to these various administrative areas.

14      MR. SACHSE:  I have no objection to him doing that at all.

15      MR. STAHLMAN:  May I make a belated remark here, your

16  Honor?  Vail Company will, of course, be concerned with some

17  of these matters when they reach the Court, and I don't think

18  that there is anyone more conscious of the drastic effect that

19  could occur by error in the record.  We have experienced that

20  in the first day of the case.

21      Sometimes it becomes necessary, notwithstanding the

22  desire of the person to keep evidence out, to realize what im-

23  portance the effect of that evidence may be.

24      Vail Company has land not only concerned by the water

25  usage as far as Camp Pendleton is concerned, but will be or may

Z-41

1   be dependent upon some of the rulings hereafter made, and also

2   as to what the rights are in the area in which your Honor now

3   is holding the hearing on.

4        Now, if your Honor feels that in deciding the various

5   character of rights and correlation of rights and so forth the

6   question as to the reasonable use is not covered by this kind

7   of testimony, then I would say your ruling is completely

8   correct.  I would certainly go along with it.  But, if there

9   is any contention, and Mr. Veeder has not said so, that the

10  evidence here would affect and determine your Honor's determina-

11  tion of the facts would enter into the division of water from

12  this DeLuz area would have a bearing upon the quantity of

13  water that was put to use by people outside of the watershed,

14  as to whether or not reasonable and beneficial use would be a

15  factor, then, notwithstanding the fact that I don't like this

16  testimony to go in, I may think that it should go in because I

17  don't want to be met with a situation later on where that

18  factor was not considered.

19       MR. VEEDER:  May I add one more statement in that connec-

20  tion?  It works both ways, your Honor.  We will ask this wit-

21  ness to draw the watershed line as nearly as he can on the

22  basis of the data he has, not only personal knowledge which I

23  think is great in this connection, but certainly the location

24  of the watershed line which, in my view, will be of extreme

25  importance downstream from De Luz.  Here are areas in which

Z-42

1   we say riparian uses are being made.  That means, I believe,

2   that your Honor will have to take into consideration the

3   correlative rights of at least the areas within the watershed

4   in making a determination.

5       THE MASTER:  I think that is conceded, Mr. Veeder.  And,

6   as I understand it, counsel have no objection to Mr. Cannon's

7   indicating the watershed lines and I would, as far as that is

8   concerned, permit you to offer any evidence that you would

9   wish through Mr. Cannon as to what actual buildings are lo-

10   cated outside the watershed as well as inside, in order to

11   present the physical picture.

12       MR. VEEDER:  Very well.  Then I will withdraw the question

13   as to what facts he took into consideration when he located

14   the buildings.

15       THE MASTER:  Very well.

16       MR. DENNIS:  I certainly have no objection to his draw-

17   ing the watershed lines.  That would be one of the things I

18   intended to bring out on cross-examination.

19       MR. STAHLMAN:  In order not to get into one of these

20   hassles concerning which a good deal of time is spent, could I

21   more clearly understand what your object is in introducing this

22   testimony?

23       MR. VEEDER:  I attempted to explain it.  In my view we

24   are desirous of locating the watershed line.  We are insistent,

25   of course, that we have riparian rights that we are exercising.

1114

Z-43

1  This is a prime witness who built the camp; who located the

2  buildings; who knows where the buildings are, who services the

3  buildings and who maintains them.  I think he is a better

4  qualified man than any we could have for that purpose, and

5  that is why we called him.

6      THE MASTER:  Very well.

7      MR. VEEDER:  Does that mean you are objecting, Mr.

8  Stahlman?

9      MR. STAHLMAN:  Go ahead.

10     MR. DENNIS:  He also has been charged with all of the

11 replacement and alteration and new construction since he went

12 to the camp.

13     MR. VEEDER:  Yes.  You have qualified my witness even

14 more than I did.  That is true.

15     THE COURT:  Very well, then.  Proceed with the location

16 of the watershed line, then, Mr. Veeder.

17 BY MR. VEEDER:

18     Q  Now, Mr. Cannon, in constructing the camp and in

19 administering the camp, what experience have you had in locat-

20 ing that watershed line of the Santa Margarita River watershed?

21     A  Well, I have been fairly well acquainted with the

22 topography out there-- if it is a matter of topography-- and

23 we have done a great deal of work with very accurate surveys.

24     Q  For example, what would be the effect of the location

25 of the watershed line upon the delivery of water or sewage

Z-44

1   effluent?

2     A  Well, it is a nuisance in both directions, as far as

3   that goes, to have to pump over a hill and pump sewage back

4   up over a hill.  That is a costly operation.

5     Q  In other words, will you go on and explain why the

6   watershed is quite important to you, and why you have had to

7   locate it?

8     A  Normally, in planning a large complex-like thing,

9   which was originally planned for 20,000 people up in one

10   neighborhood--

11     Q  Will you state the neighborhood where the 20,000

12   originally was planned?

13     MR. SACHSE:  I object to that as being immaterial as to

14   how many people there would be in one neighborhood.  It has no

15   relation to water rights.

16     THE MASTER:  I think this is only preliminary.  You may

17   continue.

18     THE WITNESS:  Well, as I started to say, we did try to

19   do it in the most economical manner, and while economy was not

20   the most important thing when we were in the middle of the war,

21   we did not know we were going to win it or not and one of the

22   rules that we had to abide by, or tried to at that time, was

23   that we were ordered to locate buildings 300 feet apart, and

24   no three in a line.  Well, that was very difficult with the

25   terrain we had to work with.  We found it impossible, in fact.

Z-45

1    We found that we could make out with buildings 270 feet apart

2    and no three in line-- because the Jap subs were off the coast

3    and we expected to be bombed all the time--

4        MR. SACHSE:   I move to strike that, your Honor, as having

5    nothing whatever to do with water rights.   This is just, in the

6    language of the Ninth Circuit Court, beating of the war drums.

7        THE MASTER:   The objection is overruled, but I would ask

8    the witness to try to answer the question, which is the location

9    of the watershed line.   I think you are getting away from the

10   area of location.

11   BY MR. VEEDER:

12       Q   Will you go ahead and state the reasons why the water-

13   shed line was important to you in establishing the utilities

14   that you built?   Why did you take into consideration the water-

15   shed line?

16       MR. SACHSE:   He has already stated that in the camp it

17   was hard to pump successfully uphill, and that it was a nuisance.

18       MR. VEEDER:   I would like to have him go into a further

19   statement of it.

20       THE MASTER:   I think that the answer as to why the water-

21   shed line is important-- the question about why the watershed

22   line is so important-- has been fully answered.   The objection

23   is sustained.   It is mere repetition.

24   BY MR. VEEDER:

25       Q   Now, will you look at Exhibit M-72, and view Exhibit

Z-46

1   33H, and 13, and state, if you will, if you have located the

2   watershed lines in the course of your work in connection with

3   the areas--

4       A   I haven't examined the numbers.

5       Q   M-13 and this is M-33H.  This is the United States

6   Geological Survey of the area.

7       A   It is to the scale of--

8       Q   Are you familiar with that particular quad?

9       A   I am quite familiar with that.  I assisted the men who

10  made it at the time, and we cooperated with them in providing

11  them with ground controls and information that we had in the

12  area.  I have many times traced out the watershed on this sheet.

13      Q   Now, will you proceed and draw on the watershed line

14  as you know it, as you have located it, on Exhibit M-33H as a

15  preliminary step in the location of the watershed line on the

16  other exhibits?

17      A   There are many pitfalls  and hilltops, so it is hard

18  to follow the right line.  Let's start at a point at which I

19  am very familiar, which will be coming down the ridge.  The

20  contour interval being 20 feet on here, there is some question--

21  it is not possible to draw it accurately.  You couldn't draw

22  it within the accuracy as indicated by this scale.  The main

23  object is to jump from hill to hill.

24      MR. DENNIS:  May I ask a question of the witness?

25      THE MASTER:  Yes.

Z-47

1    MR. DENNIS:  At what time was this particular topographic

2    map prepared?

3    THE WITNESS:  Without even looking-- it tells on the

4    quad-- but it was approximately 1948-- the aerial was '46 and

5    the field check '48.

6    MR. DENNIS:  I think you said that they got information

7    from you relative to the preparation of the map.  Would that

8    be the location of the buildings?

9    THE WITNESS:  Aerials were made and we had many visits

10   from the gentlemen who actually did the field check on here.

11   We-- of course, we had a very accurate topographic survey,

12   two-foot contour intervals, and a scale of one inch to a

13   hundred feet.

14   BY MR. VEEDER:

15   Q   Was that prepared under your direction?

16   A   That was prepared under my direction at one time.

17   Q   The contour map?

18   A   Of a great portion of that area involved in the camp

19   and buildings.

20   MR. DENNIS:  Would you say then that this map, Exhibit M-

21   33H, correctly portrays the location of the buildings, of the

22   structures and improvements?

23   THE WITNESS:  It does within the scale of the map.

24   MR. DENNIS:  Within the scale of the map?

25   THE WITNESS:  Yes.

Z-48

1      MR. DENNIS:  There are no corrections that you want to

2  make in regard to the location of the buildings or the struc-

3  tures?

4      THE WITNESS:  No, I would not.

5  BY MR. VEEDER:

6      Q  Now, would you proceed?  First, would you refer to

7  M-33H, and state what you have just placed on that exhibit?

8      A  I have placed a line--

9      Q  Using what type of a pencil?

10      A  Using a red grease pencil which represents the water-

11  shed line between the Santa Margarita River watershed and the

12  San Luis Rey River watershed.  The water falling to the north

13  and west of that line would eventually enter the Santa Margarita

14  River, and the water to the south and east of that line would

15  reach the San Luis Rey River.

16      Q  Would you take the line and extend the line on down

17  through the Wire Mountain Housing and on down through that

18  area?

19      THE MASTER:  By the way, before you do that, Mr. Cannon,

20  on this line that you have put on here there are at least two

21  places where you have made what looks like a Y.

22      THE WITNESS:  I made an error.  I will remove those.  I

23  was following the ridge.  I was going to follow on up the ridge,

24  but if I did that I would be off the main line.

25

Z-49

1 BY MR. VEEDER:

2      Q  Put your initials there, if you would, Mr. Cannon.

3      THE MASTER:  So you have now erased those areas to which

4 I have referred?

5      THE WITNESS:  This ridge extends on up.  However, if you

6 go over there the water going through here will go to the

7 Santa Margarita River and the water to the left has to go to

8 the San Luis Rey.

9      THE MASTER:  That is if it was outside the watershed?

10      THE WITNESS:  It would; I was drawing an indication of

11 the watershed line.

12 BY MR. VEEDER:

13      Q  Go ahead and state the buildings which are located --

14 Would you proceed, then, to state the buildings that are

15 located outside of the watershed and the use to which the water

16 is placed?

17      A  The watershed line bisects what is known as 12 and 14

18 Areas in the Division.  This is the 12 Area westerly of

19 Vandegrift Boulevard, the northerly end of the Division, and

20 the 14 Area is easterly of Vandegrift Boulevard.  The water-

21 shed line divides both of those areas.  It includes all of the

22 area used for De Luz Housing purposes.

23      Q  Now, is the De Luz Housing shown on M-33H?

24      A  No, sir, it is not.

25      Q  Would you take--

Z-50

1    A  This was made before the map was made.

2    Q  Will you take a grease pencil and mark the area where

3  that was situated?

4    A  Black or colored?

5    Q  I prefer blue, if you would.  Would you write in there

6  De Luz Housing?

7        What school-- do you know what school district that is?

8    A  That is in the Fallbrook School District.  There is

9  18 acres, approximately, which was turned over to the Depart-

10  ment of Health-- Welfare-- the Department of Health, Education

11  and Welfare.  The school is administered by the Fallbrook

12  Elementary School District.

13    Q  Now, would you proceed to, just for purposes of loca-

14  tion, run the watershed line on M-72 so that it can be identi-

15  fied there-- very roughly and only for the purposes of loca-

16  tion?

17    A  Suppose I use this exhibit-- they are on here, but

18  they are so dim it is difficult to do it.  I will transfer this

19  to M-72.

20    Q  Put it on there very rapidly, if you will.

21    MR. SACHSE:  I would like the record to indicate that the

22  reference used by the witness in drawing the line on M-72 is

23  from Exhibit M-13 and he worked on M-33H.  We want the record to

24  show that.

25

Z-51

BY MR. VEEDER:

1

2          Q   Where you have your legend would you put that at the

3     legend-- I am satisfied where it is-- write the watershed line,

4     and that will be it.

5               Now, would you state the significance, if any--

6          A   What is this?  M-13?

7          Q   That is correct, M-13.  Would you locate the watershed

8     line, Mr. Cannon, north of the Santa Margarita River to the

9     extent that it has significance from the standpoint of the

10    location of structures under your jurisdiction?

11         A   I would take that to be only the lower portion, then?

12         Q   That is correct.

13         A   I would say that much of the watershed line would be

14    all that had effect on location of any of the facilities here.

15         Q   Where are the other areas served by utilities north

16    of the Santa Margarita River in relationship to the watershed

17    line as you know it?

18         A   The only areas north of the watershed line is the

19    irrigated portion of Stuart, Camp Margarita and Camp Vado del

20    Rio.  Those are the only ones.

21         Q   How many-- and they are within the watershed?

22         A   They are within the watershed.

23         Q   Now, would you briefly state the areas, either wholly

24    or partially situated outside of the watershed?  Would you

25    just give the names of those areas?

Z-52

1    A  21 Area is partially outside the watershed.

2    Q  When you say "21 Area", what is located there?

3    A  Camp Del Mar.

4    Q  Yes.

5    A  The Wire Mountain Housing area is partly outside; the

6 golf course, which is 19 Area, is entirely outside the water-

7 shed; 17 Area is entirely outside as are Areas 15, 16 Area,

8 11 Area, 13 Area--

9    MR. SACHSE:  What is that last one?

10    THE WITNESS:  11 Area and 13 Area.  The remaining two

11 areas in the Division are divided by the watershed line and

12 that is 12 Area and 14 Area.

13    The De Luz Housing Area is entirely within the watershed,

14 within the Santa Margarita watershed, and all of the installa-

15 tions at the Naval Ammunition Depot are within the watershed.

16 The Naval Hospital is entirely within the watershed as are--

17 do you want me to enumerate them?

18 BY MR. VEEDER:

19    Q  You might as well go on through the Industrial Area.

20    A  Camp Vado del Rio, Camp Marguerita and the Headquarters

21 Area, 24 Area, the 22 Industrial Area, and the greater portion

22 of Camp Del Mar area are within the Santa Margarita watershed.

23    Q  North of the watershed what areas are located either

24 partially or entirely--

25    A  North of the watershed area is the field camp.

Z-52

1    Q   --may I rephrase that.  The northern limits of the

2    watershed line is the area to which I now have reference.

3    A   That is an uninhabited area.  It is used in general

4    as an impact area.  There are rifle ranges involved-- a place

5    for bullets to go.

6    Q   Now what is in the areas close to the ocean, which

7    areas are located north of the watershed line?

8    A   Camp 13 indicates the division of the agricultural

9    area, the Stuart area.

10   Q   What about agricultural operations south of the water-

11   shed line, the southern watershed line?

12   A   There is an area, at least in this neighborhood, which

13   is right adjacent to the Wire Mountain Housing and the North

14   Terrace School, which is a portion of the Oceanside Libby

15   School District.

16   Q   The California land is outside the watershed.  Is that

17   correct?

18   A   For the most part.  The watershed line is indicated

19   here and may cover a portion of it, but just a very small

20   portion is inside the Santa Margarita River watershed.

21       MR. VEEDER:  Now, I would like to have marked for iden-

22   tification Plaintiff's Exhibit 76.

23       Now, Mr. Cannon, you may sit down, if you desire.

24   I would like to have identified now, and passed to you gentle-

25   men, if I may--

         Mr. Cannon, I hand you a panoramic photograph of an

1125

Z-53

1    area and ask you to state whether the photograph was taken

2    under your direction.

3        A   I did supervise the men who took it-- Roger Summer--

4    that was taken in 1942 and it represents an assembly of

5    individual photographs to simulate a panoramic photograph.

6        Q   Each of the pictures comprising the panoramic view

7    are true representations of the areas which they purport to

8    relate to?

9        A   In so far as you can get the topography, I guess.

10       Q   Would you answer the question?

11       A   It represents a progress picture of construction,

12   during construction.

13       Q   Of what?

14       A   Of portions of 12, 14, 11, --

15       Q   Well, that is enough.

16       A   It doesn't seem to go much further.

17       MR. VEEDER:   I will show them to counsel.  Mr. Sachse,

18   would you care to scrutinize it?

19       MR. DENNIS:   Could I ask a question about the photograph?

20       MR. VEEDER:   Yes, by all means.

21       MR. DENNIS:   Is this the portion of Camp Pendleton that

22   lies in Pilgrim Canyon?

23       THE WITNESS:   Well, not in the canyon, no.  A portion of

24   this would be inside and a portion outside of the Santa

25   Margarita River watershed.

Z-54

1          MR. DENNIS:  I wonder if you could indicate on Plain-

2    tiff's M-72 the approximate position from which the pictures

3    were taken, and give the direction at which the camera was

4    facing at the time the picture was taken.

5          MR. VEEDER:  I would like to make the offer and--

6          THE MASTER:  I think possibly this question of this

7    witness can be answered; that is preliminary to the offer.

8          MR. DENNIS:  That was the purpose of the question.  I

9    wanted to clarify some questions in my own mind as to the

10   photographs.

11         THE WITNESS:  Does anybody want me to talk?

12         MR. VEEDER:  We have a question pending.

13         THE MASTER:  Mr. Dennis asked if you could identify the

14   location from which the picture was taken.

15         THE WITNESS:  Yes.

16         THE MASTER: And where you were facing.

17         THE WITNESS:  Yes.  This picture is northwesterly, and

18   the portion in the immediate foreground is the 14 Area and the

19   portion in the left is the 12 Area.  The other areas are

20   entirely built up now and were barley fields at the time.  It

21   is just 12 and 14.

22         MR. STAHLMAN:  You indicated to the left of the photo-

23   graph?

24         THE WITNESS:  Yes.

25         MR. DENNIS:  I think you indicated the second photograph

Z-55

1  from the right was 12 Area and the third photograph from the

2  right was 14 Area?

3       THE WITNESS:  The 12 Area is in the far distance.  The

4  area indicated in the first, second and third photographs from

5  the right are in the 14 Area, and most of the 12 Area is

6  indicated in the third, in the far distance of the third

7  photograph from the right.  It is quite an early photograph

8  which was made in, I would say, about the latter part of July--

9  or in July-- 1942.  I couldn't set a date on it, but that

10  would correspond to it.

11  BY MR. VEEDER:

12       Q  That is your personal recollection to the condition

13  of the structures at that time?

14       THE MASTER:  Can you indicate on M-32 the approximate

15  position of the camera?

16       MR. DENNIS:  Your Honor, 33 might be helpful.

17       THE WITNESS:  I would say that in the photograph the

18  Santa Margarita Mountain is in the far background on a portion

19  of 12 Area and that would mean that the photograph would have

20  to be taken-- you have a number of photographs, and each one

21  is taken in a different direction-- but that portion of the

22  building is what roughly would be taken from about that spread,

23  from a hill in the neighborhood of what is now used for the

24  general office quarters.

25

Z-56

1  BY MR. VEEDER:

2       Q  Now, would you mark that point and, proceeding down

3  below the boundary line, point an arrow to it and say "Point

4  where photograph was taken."

5            I would like to offer it, your Honor.

6       THE MASTER:   76?

7       MR. VEEDER:   I offer M-76 in evidence.

8       THE MASTER:   It will be received.

9       MR. SACHSE:   I am trying to figure this one out, your

10  Honor.

11      THE MASTER:   Is there any objection?

12      MR. SACHSE:   Yes.  M-76 is incompetent, irrelevant and

13  immaterial and has no bearing whatsoever on any issue involved

14  in the case, since the entire area of the picture is outside

15  the watershed of the Santa Margarita River.

16      THE MASTER:   The testimony of the witness is to the

17  contrary.

18      MR. SACHSE:   I should say not the entire area, but the

19  improvements depicted thereon are outside the watershed.

20      THE MASTER:   The testimony of the witness is again to the

21  contrary.  The objection is overruled and the document will

22  be admitted as Exhibit M-76.

23  BY MR. VEEDER:

24      Q  Would you draw an arrow down there and then write on--

25  what kind of a pencil are you using?

Z-57

1     A  A lead pencil.

2     Q  Put your initials on there, if you would, please.

3     A  I have put a note, photograph taken from this approx-

4 imate location, and pointed two arrows indicating about the

5 limits.

6     Q  Now, when was the construction undertaken at the

7 particular point in question?  What year?

8     A  1942.

9     Q  And how long did it take you to develop that area to

10 its present size?

11     MR. SACHSE:  I will object, incompetent, irrelevant and

12 immaterial.  It can bear only on one thing, and that is

13 appropriations or prescription to water rights outside the

14 watershed and it has no other conceivable purpose.

15     THE MASTER:  The witness has testified that part of the

16 property shown in that area to which he has testified is

17 within the watershed.

18     MR. SACHSE:  Then I will object that the question should

19 be clarified, instead of a shotgun question about it all, the

20 question should be when the construction within the watershed

21 took place.

22     THE MASTER:  I believe that the question is sufficiently

23 definite.  The witness can answer by areas, as to a certain

24 area being constructed at a certain time, and another certain

25 area at another time, and if that is not sufficiently definite

Z-58

1   you can further elicit additional information on cross-examina-

2   tion.   The objection is overruled.

3   BY MR. VEEDER:

4       Q   Would you look at the photograph and make your

5   response, Mr. Cannon, if that would be helpful?

6       A   I would have to have the question re-read to me now.

7       THE MASTER:   Would you want to rephrase the question?

8   BY MR. VEEDER:

9       Q   When was the construction undertaken which is depicted

10  on Plaintiff's Exhibit M-76?

11      A   The construction depicted on Exhibit M-76 was the

12  first construction at Camp Pendleton.   Construction was started

13  there in about April, 1942, and it indicates Areas 12 and 14.

14  They were built on the original cost-plus-fixed-fee contracts,

15  and were approximately finished before we got the go-ahead

16  on the rest of the Division Area.

17      Q   Now, what areas within the watershed, in addition to

18  the areas appearing on 76, were undertaken in 1942?

19      A   Construction in 26 Area, 24 Area, 23, portions of

20  Camp Del Mar, within the watershed.

21      Q   What about the areas without the watershed at Camp Del

22  Mar?

23      MR. SACHSE:   I object to testimony regarding construction

24  on areas outside the watershed.

25      THE MASTER:   Objection overruled.

Z-59

THE WITNESS:  The portion of Camp Del Mar built first was, I would say, right on the watershed line.  Most of it is within the Margarita watershed.  A portion may have been without, right in this immediate area indicated by the water-shed line.

BY MR. VEEDER:

Q  And would you go ahead and state what other areas were constructed in 1942, or the construction undertaken in 1942?

A  After the 12 and 14 Areas were approximately finished, then the other areas enumerated outside the watershed were built.  Those consist of 11, 13, 15, 16 and 17 Areas.

Q  Now, when was the United States Naval Hospital constructed, the Naval Hospital undertaken?

A  The Naval Hospital construction, I believe to the best of my remembrance, was early in 1942.  It came under the first added portion of the first contract, on a cost-plus-fixed-fee early, I would say, perhaps January, 1943.

Q  Now, when was the construction undertaken on the United States Naval Ammunition Depot?

A  I have no accurate knowledge of that.  The Ammunition Depot antedates Camp Pendleton, and it was a different con-tract and I am not an expert on that.

Q  It was prior to 1942?

A  It was prior to 1942.

Z-60

1    Q  Now, when you laid out those plans for the construc-

2    tion of utilities, were they the same as are depicted on this

3    M-72?

4    A  For the most part.  Some portions are later, like the

5    golf course, for instance, and that was not put in until 1949.

6    Camp Margarita came along later, and so also did Camp Vado del

7    Rio.

8    Q  Would you point out the areas in which there have been

9    changes from the original plan of utilities which were built

10    under your direction?

11    A  They were all built more or less under my direction,

12    but changes are constantly occurring.

13    Q  I mean in the general design, Mr. Cannon.

14    A  I don't think I quite understand the question.

15    Q  Have there been changes in the overall plan for the

16    providing of sewage and sewage disposal and water supply system

17    since the original plans were formulated?

18    A  There have been no changes.  There have been additions,

19    principally additions.  We are making one major change right

20    now, but it is the first real major change, and that is doing

21    away with the three sewage disposal plants in Camp Del Mar

22    area.  We are collecting all of that raw sewage and are pumping

23    it over the hill so the effluent can be returned to the Santa

24    Margarita River and not dumped into the sea directly.

25    Q  What other changes, if any, have been made?

1133

Z-61

1        A   The other changes have to do with water or sewage

2    disposal would be the pumping of the sewage back to the river.

3    That occurs from the two largest plants, sewage disposal plants,

4    which serve the large Division Area, Plant No. 1 and No. 2 on

5    this Exhibit M-72, and the effluent from both those plants

6    is pumped in its entirety over the watershed and returned to

7    the Santa Margarita River bed.

8        Q   Have you pending plans for any changes in the system

9    as depicted on M-72?

10       MR. SACHSE:   I object, if the Court please.   That has

11   nothing whatsoever to do with water rights.

12       MR. VEEDER:   From our standpoint, your Honor, the camp

13   was not built for a day, and plans are going forward which,

14   if the witness can testify in regard to them, I think will be

15   important in so far as demands on the Santa Margarita River,

16   upon riparian rights, upon future uses upon the Santa Margarita

17   River Basin.   Of course, it is our view that we have the right

18   to expand our uses, and certainly it will be a matter to be

19   taken into consideration from the standpoint of potential uses

20   under the riparian rights within the watershed.

21       MR. SACHSE:   I will still point out, your Honor, that it

22   has nothing to do with the extent of the rights as such.

23       MR. VEEDER:   You mean potential demand in riparian right

24   has nothing to do with the rights?

25       MR. SACHSE:   That is right, potential use as such

Z-62

1   has nothing to do with it.

2      THE MASTER:  It seems to me that the discussion between

3   counsel isn't entirely on the point as I see it.

4      Under the rulings made by Judge Carter, any findings

5   I would make would not be directly with reference to the rights

6   of the plaintiff as such.  The Order of Reference referred to

7   determining the rights of the defendants which, of course,

8   are correlative to the plaintiff in so far as the plaintiff

9   and the defendants would be ripariam owners, in considering

10  the rights of the defendants in connection with their future

11  uses as well as their present uses.  To that extent the future

12  uses, as well as the present uses of the plaintiff would, of

13  course, be material.  But, I believe on the whole evidence along

14  this line, as to future uses of the plaintiff, would come in

15  more properly before Judge Carter on the hearing on the so-

16  called main stem of the Santa Margarita River.  It would affect

17  the rights of the plaintiff as against all users, as well as

18  the De Luz users, and as I interpret my obligations, and the

19  findings and conclusions which I make, which would be of a

20  somewhat preliminary nature, and certainly not of a permanent

21  nature, with reference to the De Luz Creek owners, I believe

22  that the evidence as to the future uses should be reserved for

23  presentation to Judge Carter, and I will sustain the objection.

24     MR. VEEDER:  That brings us to an important point from the

25  standpoint of the witnesses that we are going to call.  For

Z-63

1  example, we have witnesses that we had anticipated calling who

2  would testify in regard to the maximum, the ultimate maximum

3  demands of the camp.

4      THE MASTER:  I think that that testimony is more properly

5  presented to Judge Carter with reference to the rights of the

6  major defendants and the rights on the so-called main stem

7  of the Santa Margarita River.

8      MR. VEEDER:  Your Honor understands that we are seeking

9  direction, partly.

10     THE MASTER:  Yes.

11     MR. VEEDER:  We truthfully don't know what the limits are.

12     THE MASTER:  I am feeling my way on it, too, but that is

13  the way I feel upon the result of our previous conferences with

14  Judge Carter.

15     It is time now for our recess.  We will recess until

16  1:30.

17     (Adjournment taken until 1:30 o'clock P.M.)

18

19

20

21

22

23

24

25

1      <u>Fallbrook, California, June 10, 1958, 1:30 P.M.</u>

2

3      MR. VEEDER:  I have no further questions, your Honor.

4      MR. SACHSE:  I would like to cross-examine, briefly.

5

6                      FRANK H. CANNON,

7      resumed stand, further testified as follows:

8

9                      CROSS-EXAMINATION

10     BY MR. SACHSE:

11         Q  Mr. Cannon, I want to direct your attention particularly

12     to the profile portion of Exhibit M-72.  Now, as I understand

13     that exhibit, it is in scale both vertically and horizontally.

14     Is that right?

15         A  No, sir.

16         Q  I don't mean the scales are the same, but I mean the

17     vertical-- You have a vertical scale and you also have a hori-

18     zontal scale.  Is that right?

19         A  That is correct, yes.   The two scales are entirely

20     different.

21         Q  The two scales are entirely different?

22         A  Yes.  This is to show the difference in elevation.

23         Q  You drew the red line, the division point between

24     Ysidora and Chappo and Chappo and Upper.  Will you approximately

25     indicate there on the lower end of the Ysidora and the upper

2b

1    edge of the Upper?

2         MR. VEEDER:   The lower end of Ysidora?

3    BY MR. SACHSE:

4         Q   I mean on the vertical chart.   You have indicated only

5    one line for Ysidora.   Do you follow me?

6         A   It has to be, of necessity, it has to be approximately.

7         Q   I realize that.   Would you do the same thing, please,

8    to indicate the approximate upper end of the Upper Basin on the

9    profile chart?

10        A   Well, there is no definition that I know of which is

11   found in the upper end of it.   We just go--in other words, there

12   is a well, the De Luz well which is right at the confluence of

13   the De Luz Creek and Santa Margarita River.   That is not really

14   considered a pumping basin, although it is the most uppermost

15   well.

16        Q   Would you say, in your opinion, that it is within or

17   without the Upper Basin?

18        MR. VEEDER:   I am going to object.   The witness has not

19   testified, on direct examination, as to that area.

20        MR. SACHSE:   I will submit, your Honor, that the witness

21   has indicated the basins; he has not only testified regarding

22   them but he has drawn some lines.

23        THE MASTER:   Your objection is overruled.   The witness

24   may answer the question.

25   BY MR. SACHSE:

         Q   Where do you think,  in your opinion, the Upper Basin

1138

3b

1   ends?

2       A   Well, I happen to know the depth.  The De Luz well is

3   105 feet, and it is a basin, though somewhat restricted, in that

4   we have pervious material that you can extract water from so long

5   as there has been runoff enough to replenish that water.  So it

6   would be considered, as far as we are concerned out there in the

7   harvesting of water, the upper end of the Upper Basin.

8       Q   Please so indicate on the vertical scale, which is the

9   one I am most interested in, the profile.

10      A   I have placed what may be considered the upper limits

11  of the Upper Basin, although there is no exact line of demarca-

12  tion that would determine that.

13      Q   Now, as I understand your testimony, the only diversion

14  by the Government within the military reservations--and I am

15  using the word in the plural to include Camp Pendleton, the

16  hospital and the ammunition depot--the only diversion by the

17  Government  that you might describe as a surface diversion, would

18  be the ammunition depot.  Is that correct?

19      A   Any answer to that would have to be qualified.  Do you

20  mean for domestic purposes?

21      Q   For any purpose.

22      A   Well, there is a diversion up here.

23      Q   Pardon me.  I forgot that.

24      A   The O'Neill Ditch.

25      Q   Then the only two you might call surface diversions are

4b

1   the ammunition depot and the O'Neill Ditch diversions, is that

2   correct, or are there others?

3       A   There is another diversion in the neighborhood of the

4   hospital that is used for refilling the basin. Of course that

5   is partly from the O'Neill Ditch, too.   In other words, the

6   O'Neill Ditch will tend to divert water into either Lake O'Neill

7   or to settle in the infiltration pond in the bed of the river.

8       Q   It is the same diversion point?

9       A   It is the same diversion point, yes.

10      Q   Now, do your wells indicate all the wells that are in

11  the basin?   I am again referring particularly to the profile.

12      A   No, they do not.   There are many unused wells, wells

13  that are obsolete and wells that salted up that are not indicated

14  here.   These, at the time this was drawn, was more or less the

15  active wells.   There are abandoned wells in Chappo, many of them,

16  which are not indicated here.

17      Q   So I understand--I just want to get this clear--now,

18  are there any diversions, either surface or subsurface, within

19  the limits of the military reservations by anyone other than

20  the United States?

21      A   There are none that are not under control of the United

22  States.

23      Q   There is no private ownership of land within the reser-

24  vations?

25      A   That is correct.

5b

1     Q  You can be seated again, Mr. Cannon.  Do you know the

2 location of the Fallbrook Public Utility diversion on the Santa

3 Margarita River?

4     A  I know the location of one diversion.  I did not know

5 there was more than one.

6     MR. VEEDER:  This is going beyond the scope of this hear-

7 ing and beyond the scope of the direct examination.

8     THE MASTER:  I presume it might be material to showing the

9 witness's general knowledge of diversions in the area.

10     MR. VEEDER:  Well--

11     THE MASTER:  The objection is overruled.

12 BY MR. SACHSE:

13     Q  Isn't the Fallbrook Utility District diversion not

14 upstream and above all of the Navy diversions from the river,

15 all of the Government diversions from the river?

16     A  Yes, it is.

17     MR. MOSKOVITZ:  I wasn't clear as to what the question

18 was.  Is the Fallbrook diversion or is it not upstream from all

19 Government diversions?

20     MR. VEEDER:  I am going to object to this.

21     THE MASTER:  The same ruling.  The objection is overruled.

22     MR. VEEDER:  May I interpose an argument for a minute?

23     The most important diversion that we have, of course, is

24 just west of the Pauba Grant concerning which this witness has

25 not testified.  That is where our water is delivered to us from

6b

1    the Vail's, and that is certainly the most important diversion

2    point in the western part of the United States of America, so

3    there we  are.

4         THE MASTER:  That merely goes to the form which the answer

5    should take, not to the pertinency of the question, so the ob-

6    jection is overruled.

7         MR. VEEDER:  I didn't want Mr. Sachse to make too much of

8    a speech.

9         MR. SACHSE:  I am making no speech.  Will you answer the

10   question?

11        THE WITNESS:  Now, may I have the question restated?

12   BY MR. SACHSE:

13        Q  Is the Fallbrook diversion upstream from all of the

14   Government diversions within the naval reservations?

15        A  From my knowledge of the geography of the neighborhood,

16   Camp Pendleton extends up, approximately, 14 miles from the sea,

17   the river portion, and the Fallbrook diversion is above that.

18        MR. STAHLMAN:  Isn't that a fact that the Court has to

19   determine, what a diversion is and where it is and where it isn't,

20   and point that out?

21        MR. SACHSE:  Are you objecting, Mr. Stahlman?

22        MR. STAHLMAN:  No.  I was just doing what you fellows have

23   been doing a lot of, and I am trying not to do, but I do get

24   over anxious at times, say things that would be better to have

25   unsaid.

THE WITNESS:  I might qualify my answer.  I am not very familiar with the Fallbrook diversion.  The only thing I know about the Fallbrook diversion point is where it was located 14 years ago when it was pumping the ten miners inches of water that Rancho Santa Margarita granted to Fallbrook for domestic purposes.  As far as I know it is at the same location.

MR. STAHLMAN:  It grew up since then.

MR. SACHSE:  Your Honor, may I continue my cross-examination of the witness?

THE MASTER:  I think there has been enough of this byplay between counsel.

BY MR. SACHSE:

Q  Now, Mr. Cannon, again calling your attention to the profile--you better approach it--at the extreme left end of it, up at the top, I see the legend "To Camp Stuart."  Do you see what I mean?

A  Yes, sir.  That is explained; that is proposed.

Q  In other words, there is no--

A  It does not exist.

Q  All right.  Fine.  Now I have a note--I am referring to the well furthest to the left on the profile, the very extreme left well, well number 401, if I read it correctly.

A  4 C1.

Q  4 C1.  Did you say that that well is pumping to a lemon grove?

8b

1    A   Yes, sir.

2    Q   Now, there are two lemon groves, are there not, one

3  south of the river and one north of the river?

4    A   That is right.

5    Q   Now which grove--

6    A   They are pumping to the one south of the river.

7    Q   Which of the wells indicated pump to the Stuart mainten-

8  ance agricultural area north of the river?

9    A   On the plan, well 4I is indicated here as the principal

10  source of supply for the Stuart irrigation system.  Well, number

11  5A5 can also pump, although pumping is held to a minimum.  5A2

12  used to be hooked up but it is--no pumping is allowed on that

13  well.

14    MR. DENNIS:  I wonder if I could have the answer to that

15  question?  I have not been able to identify those wells on my

16  copy.

17    MR. SACHSE:  If you will go up there you can see it.

18    THE MASTER:  Mr. Reporter, will you read the answer?

19    (Record read.)

20  BY MR. SACHSE:

21    Q   I also have a note that you testified yesterday that

22  the temporary line from the De Luz well to the Naval Ammunition

23  Depot pumps is not in operation since the floods. What do you

24  mean "since the floods?"

25    THE MASTER:  You may be seated.

9b

THE WITNESS:   That is purely an emergency supply.   When available the ammunition depot gets its water from the infiltration gallery under the river bed,that is the only way that the booster pumps can work at full capacity, to boost up the hill. But there was a time during the dry season when there was no water in the sands of the Santa Margarita River and because of the  shallowness of those sands, and as an emergency measure, a temporary line was laid, hastily up the river bed in the old railroad right of way there to breech the gap.

BY MR. SACHSE:

Q   You haven't answered my question, Mr. Cannon.   I asked you what you meant by "since the floods," first.

A   I was referring to the flood of a month ago.

Q   All right.   Now, why is it not in operation since the flood?

A   I don't believe that the line has been checked since the floods.   Chances are it is washed out, because it was in very precarious land, sliding land, and any little disturbance in the river bed would put it out of commission.   I can't verify that of my own knowledge, though.

Q   Are you familiar with the history of the water supply system to the Naval Ammunition Depot?

A   I wasn't there at the time it was constructed.   I have studied the plans of the original construction, and have administered some contracts in connection with the water supply up

1175

10b

1    there since 1942.  I know of additional wells that have been

2    drilled or enlarged to try to improve the supply, without very

3    much luck.

4         Q  Have you ever had occasion to examine the Navy contracts

5    with the Fallbrook Public Utility District for the supply of

6    water to the Naval Ammunition Depot?

7         MR. VEEDER:  Now I object.  I asked--this is beyond the

8    scope of direct examination.

9         THE MASTER:  I think it is pertinent as to the source of

10   his information for all of his testimony, as long as we are not

11   going  into the subject of the contract.

12        You may answer the question.

13        THE WITNESS:  I have access to all of the water files at

14   Camp Pendleton, I believe, and I have looked over such a contract,

15   yes.  I couldn't recite its whole contents, but it is my under-

16   standing that advantage was not taken of it.  But I am acquainted

17   --

18        THE MASTER:  I think you have answered the question suffi-

19   ciently.  We are not going into your interpretation of it.

20        MR. SACHSE:  One more question on that score.

21        Q  Do you know whether or not for a period of approximately

22   five years--

23        MR. VEEDER:  I object--

24        MR. SACHSE:  --a connection, a physical connection existed

25   between the irrigation system of the Fallbrook Public Utility

11b

1    District and the water system--the water system of the Fallbrook

2    Public Utility system and the water system of the Naval Ammuni-

3    tion Depot?  Do you know that?

4          A   I said that--I couldn't swear to it of my own knowledge.

5    It is my understanding that such a connection did exist.

6          Q   Any knowledge you have about that would be pure hearsay?

7          A   That is right.

8          Q   On your map M-72, or your plat M-72, appears "Date

9    revised 9 June 1958, and revised 6 June 1958, revised 5 October,

10   1951, and then an approval signature 9 June '58." Am  I to

11   understand that this map then is accurate to the minute, as of

12   yesterday?

13         A   No.  I wouldn't state that it is absolutely accurate.

14   As I explained before, this is a map which was originally done

15   in 1950 and has not been kept up to date precisely.  Certain

16   additional information was put on to indicate, in general, the

17   water system.  It was used because it combined the plan and pro-

18   file only, as a map which could be put together, within a day,

19   that would indicate, in general, the complete system.  But I

20   wouldn't want to attest to its accuracy, because there is so

21   much indicated that there probably would be minor inaccuracies

22   that would appear on the map.

23         Q   But, to the best of your general knowledge then it is

24   reasonably accurate?

25         A   It is reasonably accurate.  It is reasonably accurate

12b

1   for the purpose for which it was intended.  For greater accuracy

2   I would refer to Exhibit M-74 as those are in much greater de-

3   tail.

4        Q  Now, I would like to call your attention, Mr. Cannon,

5   to M-13, M-14, M-DA--could you help me with the number of the

6   U.S.G.S., Mr. Veeder, the one Mr. Cannon drew the boundary on?

7        MR. VEEDER:   M-33H, which is right here.

8   BY MR. SACHSE:

9        Q  Now, Mr. Cannon, I wish you would examine the Exhibit

10  M-13, M-14, M-DA--those three exhibits--with particular refer-

11  ence to the watershed line of the Santa Margarita River at and

12  near the point where it enters the ocean.

13       THE MASTER:  Just the southerly or the northerly watershed

14  line?

15       MR. SACHSE:  Both watershed lines at the point at or near

16  where it enters the ocean.

17       Q  Now I am asking you which of those delineations you

18  believe to be correct?

19       A  Because I have never seen these exhibits before--

20       MR. VEEDER:  I think that is one reason why the witness

21  should have an opportunity--

22       MR. SACHSE:  He can have all the time he wants.

23       MR. VEEDER:  --to study the maps.  This will be extremely

24  important.

25       MR. STAHLMAN:  What is the question?

1148

13b

1    MR. SACHSE:  Which map he believes is correct, of the

2  watershed lines.

3    THE WITNESS:  May I answer this question.  I don't think

4  any of them are correct.

5    MR. SACHSE:  Thank you.  No further questions.

6    MR. VEEDER:  I want to know the explanation.

7    MR. SACHSE:  I have no further questions of the witness.

8    THE MASTER:  He can either explain his answer or he can

9  answer questions asked by Mr. Veeder or any of the counsel who

10  desire.

11    Do you wish to amplify your answer to Mr. Sachse's ques-

12  tion?

13    THE WITNESS:  To make a watershed line that is absolutely

14  correct on comparatively flat country is very difficult.  And it

15  is quite difficult, also, to look at a map without topography

16  and tell whether a watershed line is correct or not.  I don't

17  think it can be done.  But he asked me a specific question.

18    Similarly some, I believe, are more correct than others,

19  and the reason, one of the reasons why--in the area adjacent to

20  the present boat basin,that was occupied, formerly, by a tidal

21  swamp which emptied into the mouth of the Santa Margarita River.

22  For that reason I would say that this one is not right because

23  it is not the watershed line--that, of course, has been altered

24  by physical features here.  Also this area, the tidal swamp,

25  originally came clear over within a couple of hundred yards of

1    the south boundary of Pendleton, and that meandering tidal creek,

2    which you see indicated on this map over here, would delineate--

3         MR. VEEDER:  He better identify which map he is referring

4    to.

5         THE WITNESS:  Is this map 14?

6         THE MASTER:  That is map 14.

7         THE WITNESS:  The southerly boundary of the intersection

8    of the ocean is more nearly correct on M-14 than it is on this

9    Exhibit--

10        MR. SACHSE:  M-DA.

11        THE WITNESS:  --M-DA.  It is placed too far to the north

12   there.

13        There are differences, and this is the nearest correct,

14   according to my knowledge of the geography and especially the

15   original geography and terrain.

16        On this Exhibit 13 the line is almost midway between the

17   two points.  There again it is not quite far enough to the south.

18        THE MASTER:  M-13 is not far enough to the south?

19        THE WITNESS:  M-13 is not far enough to the south.  Some

20   of the actual watershed conditions have been changed due to

21   drifting, the depth of the dredge material in that area, and

22   conditions as originally existing in 1942 have been altered.

23   I don't know exactly where the division point is, where a drop

24   of water will split in two and  half would go one way and half

25   the other.  It is very difficult to determine even by a precise

15b

1    survey.  I do know where it was where we claim, because water

2    generally runs one way, and it did start right near the south

3    boundary at the tidal creek which would run dry in low tide and

4    fill up at high tide.  But these are more or less trick questions

5    because there is no one single answer for them.  I don't know

6    when these maps were made, and when this was delineated here.

7    That delineated 16 years ago would not be the same as today,

8    because of the physical changes in the surface of the earth in

9    that area.

10        THE MASTER:  I think you have answered the question suffi-

11   ciently.

12        Do you have any further questions?

13        MR. SACHSE:  No further questions.

14        MR. DENNIS:  I have a number of questions.

15

16                    CROSS-EXAMINATION

17   BY MR. DENNIS:

18        Q   Mr. Cannon, I think that you testified--  You testified

19   that M-72 substantially and correctly represents the water distri-

20   bution system and the sewage system as it now exists on Camp

21   Pendleton?

22        A   Substantially so, yes.

23        Q   And there have been some changes, some substantial

24   changes made since 1951 in the system, both the sewer system

25   and the water system?

1151

16b

1        A   Some systems have been added, such as Camp Margarita,

2   both water distribution and sewage disposal plants, which are

3   indicated on this drawing.

4        Q   Well, Mr. Cannon, from an examination of M-72 can you

5   tell us which wells shown on the profile were in operation in

6   1951, in January of 1951?

7        A   It is a little easier to tell which were not.

8        Q   Could you tell us which wells were not in operation

9   in January of 1951?

10       A   Is it permissible to put an X below them?

11       Q   If you would put an X below them.

12       MR. VEEDER:   Do you want a different colored pencil?

13       MR. SACHSE:   Here is a blue one.

14       THE WITNESS:   In January of 1951?

15   BY MR. DENNIS:

16       Q   1951.

17       MR. SACHSE:   Would you tell us, as you go along, so we

18   can follow without getting up?

19       THE WITNESS:   The two wells next below the hospital well

20   were not dug at that time.

21       MR. VEEDER:   Is that in 1951?

22       THE WITNESS:   Yes.   They were not in at that time, 1951.

23   One of those has not been put in to use yet.   The capacity is

24   given, but it is only "1,000" there is the notation that says

25   "1,000 test."   The well presently indicated as CB1 on this map

1182

17b

#1

1   actually is a replacement well.  There was a well in close

2   proximity to that which was pumping in 1951 and is not pumping

3   now, but they replaced the well with one they put in.  That is

4   true of a couple of other wells.

5   BY MR. DENNIS:

6       Q  That well is given the same number, however, as the

7   well that has been replaced?

8       A  The well numbers given, for the most part, are the old

9   Rancho numbers.  They are common numbers.  They have another

10  number which, in our language, is known as 2603.  That is the

11  replacement well within 50 feet of well CB1.  It is a common

12  number because it is in the Communication Barracks area.  However

13  that is not the official number on the property.  The numbers

14  given are the ones that are listed on the property records.

15      Q  Let me see if I understand you, then.  The numbers

16  2391 or 2603 would be the number of the well on your property

17  account, and the number of well CB1 would be the old Rancho

18  Santa Margarita number?

19      A  In some cases it is the old Rancho Santa Margarita

20  number and in other cases the numbers date back to 1942.

21      Q  They date back to 1942?

22      A  The other numbers on down, you will notice those 11,

23  11F, 11D, those are the historical Rancho Santa Margarita numbers

24  and for two, 11B and 11D, they are likewise the present well

25  which is numbered 2375 and 2365, and those are replacement wells

18b

1   for the original well in that immediate neighborhood.  The old

2   ones went bad.  They were pumping in 1951 but they are not

3   pumping today, but another well, which replaced them, is pumping.

4   That is not true in the case of 11G, because it is a replacement

5   well there and it does not have its pump in yet.

6           MR. SACHSE:  What was the last number?

7           THE WITNESS:  11G or 2363.  That well is a new well but

8   has no pump installed.

9   BY MR. DENNIS:

10          Q   It would have been drilled within 50 feet of well 11D?

11          A   Yes, sir, within 50 or 75 feet.

12          Q   Within 50 or 75 feet.

13          A   We keep as close as possible to keep out of the caved

14   area.

15          Q   Now, coming back to my original question, which wells

16   were not in operation in January of 1951?

17          A   The wells I have already enumerated were not.

18          Q   Just the two wells?

19          A   These two do have numbers now, well 33925 was not in

20   operation in 1951.  That was drilled since 1951.

21          Q   Now mark that with a X, with your blue pencil.

22          A   That serves Camp Margarita now.

23          Q   How about well 2301?

24          A   Well 2301 is a deep well, submersible pump, and I can't

25   remember the exact date, but I don't think it was drilled in

19b

1   1951.  It was drilled since then.

2       Q   Put a X with a question mark, please.

3       A   That has another number now, also, 6A1, which was the

4   old Rancho number of a well in that immediate proximity.

5       Q   But well 6A1 was not being pumped in January of 1951?

6       A   I don't believe so.  I can't remember the dates quite

7   that close.

8       Q   How about well 22106?

9       A   22106 likewise is a replacement well.  The old Rancho

10  number was 9B, and it is so noted on that well, but there was

11  an old Rancho well 9B, which we rehabilitated in May of 1942,

12  and it pumped for quite a long time until it sanded up and had

13  to be replaced.

14      There again the replacement well is within a very few

15  feet of the original well.  Incidentally, it is covered by a

16  building now, a very large building.

17      Q   Do you recall whether it was being pumped or operated

18  in January of 1951?

19      A   No, I don't.  It was one of the first wells to go bad

20  on us and I don't remember dates that close.

21      THE MASTER:  Would you know whether 22106 went into oper-

22  ation as soon as 9B ceased operation?

23      THE WITNESS:  No, it did not.  They had to--there was quite

24  a wait between the time the old well went out and we could get

25  a contract set up to drill a new well.

20b

1      THE MASTER:  And you don't know when that interval occurred

2  with reference to this January of 1951 date?

3      THE WITNESS:  No.  I couldn't, just that close, without

4  referring to factual data.

5  BY MR. DENNIS:

6      Q  You would have those records in your office?

7      A  It would be possible to determine that, yes.

8      Q  But I mean would the records be in the office of the

9  Public Works?

10      A  Yes.  We would have the records.

11      Q  And going down to the Ysidora Basin, was well 4C1 in

12  operation?

13      MR. VEEDER:  So we can get the record as rapidly as we

14  might, what was the information you wanted us to obtain?

15      MR. DENNIS:  I did not ask for him to obtain anything.

16  I asked him if those records were in his office.

17      MR. VEEDER:  I am sorry.  I thought he was asking for a

18  record.

19  BY MR. DENNIS:

20      Q  With reference to well 4C1, in Ysidora Basin, was that

21  in operation in January 1 of 1951?

22      A  It was still in operation.  It was in operation in

23  1942.

24      Q  And was well 5A2 in operation in January, 1951?

25      A  I believe that it was, although that well was the

21b

1    second well to start to salt up from proximity to the sea. Pump-
2    ing was stopped.  We noted, by our by-weekly examinations of the
3    water, that the chloride content was gradually rising.  Well
4    pumping was stopped for a period of three months or so and then
5    pumping was resumed and I can't put my finger on those dates
6    precisely, but it was after the investigation involving the
7    salinity content of those lower wells was pretty well along,
8    and that was started in 1947.  It was pumped a short time after
9    they started the second time, and the salt content rose so quickly,
10   in such a steep curve, that pumping was ceased altogether and
11   has never been allowed since.

12        Q   And what you say would be true as to well 5A5 and 4BB?

13        A   Not to the same extent.  4BB is a domestic well, furnish-

14   ing Camp Del Mar with its water supply.  It used to, but not

15   at present; it is not pumping at the present time.

16        And 5A5 is a well which provides water for Stuart irriga-

17   tion and was never used as a domestic well by the military.  It

18   is still hooked up.  It is possible to pump that well now, but

19   normally it is not allowed.  The pumping was from a well known

20   as 4I, which is further upstream about a mile.

21        Q   I wonder if you could designate where 5I or 4I is?

22        A   4I is at a point--it would be--there is no precise

23   location here.

24        Q   It does not show on the profile?

25        A   No, it does not, because this is domestic service and

1157

22b

1    none of the irrigation wells are shown on this.

2         Q   You have no irrigation wells on the profile?

3         A   Some of the wells can be used for both.   In other words,

4    this 4Cl is used for irrigation now, but it also is hooked up

5    to the booster and it could be used for domestic purposes.

6         Q   Occasionally you do use the domestic wells for irriga-

7    tion?

8         A   That is the only one that is hooked up to both systems.

9    An  older use to occupy that, in close proximity, and was named

10   4C.   That used to be hooked up to both irrigation and domestic

11   use, but that is the first one.   It was a deeper well than the

12   other well and it got the salt water first, and that was the

13   first well abandoned.

14        Q   As I understand your testimony now, then, the only

15   wells that show on the profile are those that are used for do-

16   mestic purposes or a combination domestic and irrigation, but

17   you do show by the proper symbol on the plan all the wells

18   which are now being used for irrigation or domestic?

19        A   I believe the plan shows--no, it does not show all the

20   wells.   There are some of the newer wells that are not added

21   on the plan, but are indicated on the profile.

22        There are two wells in Section 7 here, just below the

23   hospital, new wells which are indicated on the profile but are

24   not on the plan.   I will put two X's at approximately--at those

25   approximate locations.

Q   Let me ask you this, Mr. Cannon:   Are there wells which aren't being used and are hooked into the water distribution system of Camp Pendleton that serve to irrigate acreage for agricultural purposes or horticultural purposes which are not shown on the plan?

MR. VEEDER:   Would it be any better to cover the whole thing and show every well on that location?

THE WITNESS:   My answer is no; not to my knowledge, I can't.

MR. VEEDER:   Not to your knowledge.

BY MR. DENNIS:

Q   In January of 1951 Stuart Mesa was being irrigated by wells located in the Ysidora Basin?

A   That is correct.

Q   Was it receiving any water from wells located in the Chappo Basin?

A   No.

Q   Was it receiving any water from wells located in the Upper Basin?

A   No.

Q   Now, in relation to the agricultural development south of the river, the lemon grove, the area maintained by the State of California, was that area receiving any water from wells other than in the Ysidora Basin in January, 1951?

A   No, I belive not.

24b

1    Q  And all of the military installations, housing instal-

2 lations in January of 1951 were being supported by water derived

3 from Chappo Basin, were they not, with the exception of the

4 Naval Ammunition Depot?

5    A  I cannot verify that statement.  In January, 1951 I

6 believe we were pumping some Ysidora wells.

7    Q  For domestic purposes?

8    A  Yes.

9    MR. VEEDER:  May I inquire what is the answer to that

10 question?   You--

11    THE WITNESS:  I don't know what the answer is.

12 BY MR. DENNIS:

13    Q  Now, when you first arrived at Camp Pendleton and

14 assumed your duties, I believe you testified that the camp was

15 in the process of constructing buildings in the 12 and 14 areas?

16    A  We were designing them and contracts started almost

17 immediately.

18    Q  At that time what was the extent of the water distribu-

19 tion system in the camp?

20    A  There was none.

21    Q  There was none.

22    A  Well, I take that back.  There was a small section in

23 the neighborhood of the Ranch House and feed corrals. There

24 was a small 50,000 gallon reservoir, which is not indicated on

25 here.  It is not in use.  But it did use this well numbered as

25b

1  2391, or 11F, which was hooked up to that ranch well and there

2  was a semblance of a water system over a small area.

3      Q  And was it customary in connection with the growth of

4  the camp to install a water distribution system to areas in

5  which no immediate construction was contemplated?

6      A  No, sir.  We were not allowed to do anything of that

7  kind.  We couldn't spend money until we had an immediate use for

8  it.

9      Q  In other words, you didn't attempt to extend your water

10  distribution system in the area until you were ready to commence

11  construction?

12      A  That is right.  It went forward as one operation.

13      Q  It went forward as one operation?

14      A  That is right.  You had to have some buildings to have

15  your water supply, and the sewage disposal.  That was all in the

16  one contract.

17      Q  Now, I think that you testified that at the time you

18  assumed your duties at Camp Pendleton we were engaged in war.

19      A  As I recall it, yes.

20      Q  And what were the security   measures at that time?

21  Was the camp fenced at that time?

22      A  No.  The camp was not fenced and it is not fenced yet

23  up in some of the areas.

24      Q  Well, take along Highway 101, and along the boundary

25  line, the southerly boundary line of the camp, was it fenced at

26b

1  all, at that time?

2      A  There was a fence on the southerly boundary in this

3  area here, yes.  That portion was fenced.

4      Q  Extending from the ocean?

5      A  From the ocean to Morro.

6      Q  From the ocean to Morro?

7      A  Yes, sir.

8      Q  Was there a fence extending from Morro to Fallbrook?

9      A  Yes, there was, although not on the original grant line

10  in certain portions.  At that time Rancho Margarita owned about

11  600 acres, or thereabouts, starting at Morro, outside of the

12  grant land.  The grant followed that line.

13      Q  As I understand you had to realign your fence line in

14  that area?

15      A  The Government did not purchase that portion outside

16  the grant.  It wasn't a realignment, it was putting a new fence

17  entirely on the property line.

18      Q  Was there a fence at all along Highway 101?

19      A  Yes.

20      Q  And I suppose you knew under security measures then

21  that people were not authorized and allowed to come on the reser-

22  vation?

23      A  At the time we first came there we had a civilian guard

24  set up.  I don't recall the exact number, but somewhere around

25  a hundred, and those guards were administered from the office

27b

1   that I worked out of.

2       Q   And when were those duties turned over to the Marines?

3       A   After the Marines arrived in force--I don't know--

4       MR. VEEDER:   Your Honor, I am going to object to this line

5   of cross-examination as not covered by direct examination.   I

6   was not permitted to go into or even approach this matter.

7       THE MASTER:   I think it is immaterial.   The objection is

8   sustained.

9       MR. DENNIS:   Perhaps--I don't want to argue that it is

10  immaterial--perhaps Mr. Veeder's objection that it was not gone

11  into on direct is well taken.

12      Q   When did you put in your first sewage disposal plant?

13      A   In 1942.

14      Q   And which plant was that?

15      A   Number 1; plant number 1 was the first one.   We tried

16  to get it ready for the first group of Marines to arrive and

17  we didn't, so we had to build one overnight on a temporary plan,

18  which was put in.

19      Q   And when did you put in your next plant?

20      A   Number 2 plant was the next one and--rather number 2

21  and several of the disposal plants outside of the watershed

22  area were put in about that same time.   They were out at the

23  various tent camps.

24      THE MASTER:   What time was that?

25      THE WITNESS:   That was in 1942, the latter part of 1942

28b

1    and '43.

2    BY MR. DENNIS:

3        Q   What sewage effluent plants were installed after January,

4    1951?

5        A   You said "sewage effluent plants?"

6        Q   Yes.

7        A   I don't know what you mean.

8        Q   Well, maybe I don't either, for that matter.  But you

9    have Plant number 1 here, and we have sewage treatment, and we

10   have various names here which signify that there is a plant there

11   for handling sewage at one time or another.  We have a sewage

12   plant in this area.  Now by the term sewage effluent plant I

13   meant to cover all the different types of sewage plants or sewage

14   treatment plants.

15       A   Well, the effluent is the fine juice out of the plant.

16   We weren't concerned with those until later, and that is the

17   reason I used the term "effluent" alone, and effluent oxidation

18   ponds.  These were later.  Those were not necessary for the

19   operation of the disposal plant.

20       Q   When did you put in your first ponds and plants for

21   that type or nature?

22       A   The two first--the first one was in the neighborhood

23   of 1950 or '51.  I don't recall the date.  But it was in connec-

24   tion with sewage disposal plant number 1, as indicated by this

25   small circle in the neighborhood of the De Luz Housing Area.

29b

1   That was the first one.

2        Q   And that would be in the neighborhood of 1950 or '51?

3        A   I can't testify to the date precisely.

4        Q   And is it true that some of the reservoirs which are

5   only shown on the profile have been enlarged to their present

6   capacity from January 1, 1955?

7        A   No, sir.  We have never--no, sir, we have never changed

8   the reservoir.

9        Q   For instance, referring to hospital reservoir number

10  6, was that always a 1,000,000 gallon reservoir?

11       A   Yes, sir.

12       Q   And referring to reservoir number 7, was that always

13  a 1,000,000 gallon reservoir?

14       A   Yes, sir.  Those are identical reservoirs, made at the

15  same time.

16       Q   And always had the same capacity?

17       A   And always had the same capacity.

18       Q   Mr. Cannon, calling your attention to 74B, M-74B, I

19  assume that the numbers on the buildings or structures adjacent

20  to them indicate the number of that particular building or

21  structure?

22       A   Those are correct.  Those are the official numbers.

23  That is what the structure is known by on the camp records and

24  records of the headquarters, Marine Corps.

25       Q   Would it be possible from the records which are in

30b

1    your possession to tell us at what time constructin was started

2    on any building if we gave you the number of that particular

3    structure?

4        A   Yes, in general, that would be possible.

5        Q   And that would indicate when the construction of the

6    water distribution in that area was commenced?

7        A   That is correct--not necessarily, because buildings

8    were built later, of course, and they took advantage of an ex-

9    isting water system.

10       Q   And were in construction, underway, at the time you

11   assumed your duties at Camp Pendleton?

12       A   Yes.

13       Q   The old buildings were they temporary buildings or

14   permanent?

15       A   They were listed as temporary buildings.

16       Q   Those temporary buildings are still in use?

17       A   Those temporary buildings are still in use.

18       Q   And you contemplate that you will use them for some

19   time?

20       A   Under the present system we will.

21       Q   And calling your attention once more to Plaintiff's

22   Exhibit M-72, I find a number of areas which, according to this

23   legend, are irrigated areas.  Do you have any knowledge whether

24   or not all of the acreage within those areas was irrigated at

25   any one time?

31b

1    A  I doubt if all of the area was irrigated at any one time.

2  I know it is not now, and I know it has not been for some time.

3  This acreage given on the Stuart area, that gives the entire

4  acreage that has ever been under cultivation, but to my knowledge

5  it has never been under cultivation at any one time.

6    Q  At any one time there would be only a fraction of that

7  area?

8    A  Yes.  I don't know what fraction.

9    Q  You don't know what fraction?

10    A  No, I don't.

11    Q  I also notice the two lines which are labeled Santa

12  Margarita River.  Is that drawn to scale, and if so, does it

13  represent the bed of the Santa Margarita River or just what is

14  meant to be represented by those two lines?

15    A  Any representation of the Santa Margarita River--

16    MR. VEEDER:  Wait until the question is asked.

17  BY MR. DENNIS:

18    Q  Can you answer the question or do you want it read by

19  the reporter?

20    A  I would rather have it read.

21    (Record read.)

22    THE WITNESS:  What I started to say, any representation

23  on the map of the Santa Margarita River would, of necessity, have

24  to be approximate.  The exact course of the river changes from

25  year to year.  It meanders.

32b

BY MR. DENNIS:

Q   And there was no attempt made to show the width of the channel on that at the time that the plan was prepared?

A   No.  It is the approximate bed.

Q   And do you maintain in your office any records showing the number of acres that are irrigated?

A   We have records of that kind.  However, presently, we do not take care of that part of the work.

Q   Do you maintain any meters or measuring devices on the pumps?

A   We do not.  That is the function of the Maintenance Department, the Base Maintenance Office.

Q   Are there meters on the pumps?

A   There are meters on the pumps, yes.

Q   And when you designate 15,000 gallons per minute on the profile, on M-72, does that refer to the capacity of the pump or the capacity of the well?

A   In general it is the safe capacity of the pump.  Some of these wells have been test pumped somewhat higher, but it was considered unsafe to pump them at the test pumping rate, and a pump suitable for the production of the well was selected and those are the pumping rates.  Some are the pumping rates due to the condition of the well which is smaller than it was some years ago.  These are fairly new figures.

Q   Now, does your office maintain records relative to the

1163

33b

1   charges made for power consumed in pumping water from one point

2   to the other and pumping the sewage effluent back and forth?

3        A   No, we do not.   That is not a function of our office.

4        Q   What office handles that function?

5        A   I believe that is the Fiscal Department.

6   (Short recess)

7   THE MASTER:   Had you concluded, Mr. Dennis?

8   MR. DENNIS:   Yes.

9   MR. STAHLMAN:   About two questions.

10

11                  CROSS-EXAMINATION

12  BY MR. STAHLMAN:

13       Q   The area that you referred to, the mesa, is the Stuart

14  Mesa?

15       A   Yes.

16       Q   What is the acreage in that area?

17       A   The cultivated acreage is approximately 11,000 acres.

18       Q   Is that the acreage to which water is available?

19       A   I believe it could be made available to approximately

20  that area.   Some of that area has become water soaked, or is

21  out of cultivation.   It can't all be cultivated now.   Areas

22  that were in cultivation in 1942 are not now in cultivation

23  because of a drainage condition.

24       Q   And you mentioned a well that was not operated, I

25  believe 5C--what is it?

34b

1    A   5C is not operated.

2    Q   5C--is that the one--or 5A5--

3    A   5A2 and 5A5.

4    Q   I believe you made a comment that it was not used for

5    domestic purposes?

6    A   It has never been used for domestic purposes to my

7    knowledge.   The history record of wells used for Stuart irriga-

8    tion were 5A2 and 5A5, until salt water intrusion forced us to

9    abandon 5A2 and then later 5A5.

10   Q   When was that?

11   A   I don't recall the exact date, but 5A2 was first.   That

12   had a sharp rise in the salt content in the neighborhood of 1951.

13   Q   Was it South Mesa?

14   A   Yes.

15   Q   Is that a different mesa than Stuart?

16   A   Yes.   That is on the southerly side of the river while

17   Stuart is on the northerly.

18   Q   Is there a water supply available to that area?

19   A   Yes.   The Rancho Santa Margarita, when the land was

20   under Rancho Santa Margarita, there was a large portion of that

21   under lease when we came in.   There was a great number of Japan-

22   ese there and that is where it got the name of "Little Tokyo"

23   at the time.

24   Q   Is that supplied with water at this time from the water

25   system that you described here?

35b

1    A   To a very limited extent; only for that portion needed

2   by the State of California.

3    Q   That is the State area?

4    A   Yes, for their sweet potato program.

5    Q   Is there other farming in that area?

6    A   There is some in the neighborhood of the so-called

7   lemon grove.

8    Q   Where does that water come from?

9    A   That comes from well 4C1.

10    Q   Distributed by the system?

11    A   Through the irrigation system.

12    Q   By irrigation?

13    A   And that is the same irrigation system that was there

14   when it was operated by Rancho Santa Margarita.

15    Q   Was that a pipe system or an open ditch?

16    A   It is a pipe system from the lower end of Ysidora Basin

17   to a pond at which is located a booster pump.  The booster pump

18   boosts the water up to a small reservoir which is at sufficient

19   elevation to distribute the water to the land.

20    Q   And the well that supplies the water to that portion of

21   that South Mesa does not tie in to your--

22    A   It does tie in.

23    Q   It does tie in?

24    A   It is not used for domestic, but it was in the past.

25   And for quite  awhile it served a dual purpose to provide either

1171

36b

1    domestic water or irrigation water.  That is one, and there was

2    one other well and they were the only two wells where that was

3    possible, however.

4         Q   Which one was that?

5         A   The other well was 4C, which is abandoned now.  It does

6    not show on this plan because it has been abandoned.  It is

7    indicated on the plan but not the profile.  You will notice the

8    designation 4C and 4I.  It indicates the piping hook up.

9         Q   Does your department have anything to do with the

10   measurement of wells, the determination of the water level?

11        A   Yes, it does.

12        Q   Do you keep records on that?

13        A   We do keep records and all of our measurements are not

14   made by our personnel; some of them are.  Normally those measure-

15   ments are made by the Base Maintenance Office, but we do keep

16   the records.  We have full records.

17        Q   Do you have a system of measurement at periodic times?

18        A   We have records, whenever we want them; we get pumping

19   records monthly for total pumpings of all wells.  And in addi-

20   tion--

21        Q   That is your meter readings?

22        A   Those are meter readings.  And in addition to that we

23   get monthly reports from the hydrographer appointed by the

24   Court many years ago in the suit between Vail and Rancho Margar-

25   ita.

Q   That is the Green Report?

A   The F. E. Green Report, yes.

MR. STAHLMAN:   That is all.

MR. MOSKOVITZ:   I have a few questions I would like to ask, also.


CROSS-EXAMINATION

BY MR. MOSKOVITZ:

Q   Mr. Cannon, I think you testified that the wells depicted on Exhibit M-72 are those which are presently in use?

A   It includes all of the wells that are presently in use and also some wells that are not presently in use.

Q   Are the wells--I just wanted to make sure--all the wells presently in use are depicted on M-72?

A   Yes, they are.

Q   I noticed well 4I on the plan, and I tried to find it on the profile.   Is it there?

A   It does not show because this does not show the irrigation system.   It is strictly an irrigation well.

Q   I see.

A   That is indicated by the dotted blue line which indicates the transmission line to Stuart Mesa.   The hook up is by way of 5A5 and over to a booster pump which elevates the water for use in Stuart Mesa; irrigation only.

Q   The plan on Exhibit M-72 shows both the wells that are

38b

1  presently in operation for domestic purposes and for irrigation?

2      A  That is correct.

3      Q  Whereas the profile shows only those wells that are

4  used for domestic purposes?

5      A  Those wells for domestic purposes, with their connec-

6  ting lines.

7      Q  I see.  Now, does the plan show all the diversion

8  points on the river which are presently in use?

9      A  No.  The plan was not intended to show the diversion

10  points, if you mean such a diversion as O'Neill Ditch.  This

11  only has to do with domestic water use.  In other words, pipe

12  tanks and necessary regulartory reservoirs.

13      Q  Are you speaking now of the profile or of the plan as

14  showing only the domestic use?

15      A  Well, in general both, because we are only interested

16  in the conduits, that is pipes, pipe lines and there are no

17  ditches indicated here.

18      Q  I see.  You do have all the wells that are used for

19  irrigation purposes on the plan but you don't have the diversions

20  that are used for irrigation purposes on the plan.  Is that

21  correct?

22      A  Well, at present there are no diversions used for irri-

23  gation, to my knowledge.

24      Q  What diversions are there, to your knowledge, in Camp

25  Pendleton?

39b

1    A  The principal diversion is the O'Neill Ditch which

2  delivers water from the high water of the Santa Margarita River

3  to Lake O'Neill, and from the ditch it is possible to divert

4  water to spreading basins in the area below the hospital.  Those

5  are the only surface diversions that I am acquainted with.

6    Q  And you testified about the other gallery conversion,

7  which is a direct diversion--

8    A  If that is considered a direct diversion.

9    Q  Now, are there any other diversions, to your knowledge,

10  which serve the military enclave area either within or without--

11  either diversions which are within Camp Pendleton or which are

12  outside of Camp Pendleton and the associated military area?

13    MR. VEEDER:  From the Santa Margarita River?

14    MR. MOSKOVITZ:  From the Santa Margarita River.

15    THE WITNESS:  Diversions, as I understand them--maybe you

16  better define the word "diversion" before I answer that question.

17  BY MR. MOSKOVITZ:

18    Q  As I understand it, and as I intended to convey it to

19  you, a diversion is a taking away of water from the river and

20  delivering it elsewhere away from the river.

21    A  Surface diversions or--

22    Q  Well, let's say all kinds of diversions, surface or

23  subsurface.

24    A  Of course, in that case, I presume you would call all

25  these wells diversions.

40b

1    Q   Let's exclude wells.  We covered the wells, and there

2    have been several questions about whether or not the wells

3    indicated are all the wells used for the pumping of water, and

4    if that is a diversion from the Santa Margarita River and its

5    neighborhood--that is the neighborhood of the floating water--

6    this does depict all those diversions, except the surface diver-

7    sion of O'Neill Ditch.

8        Now, do you know of any wells which serve the Camp Pendle-

9    ton military enclave which may be outside the enclave?

10       MR. VEEDER:  Outside--

11       THE WITNESS:  Outside of the Santa Margarita watershed?

12   BY MR. MOSKOVITZ:

13       Q   No, sir, outside of Camp Pendleton, the naval depot and

14   the naval boundaries, are there any wells outside those boundaries

15   which serve water to the area within the boundaries?

16       A   I don't know of any that are outside.

17       Q   Would you know of them if there were any?

18       A   I am sure I would.

19       MR. VEEDER:  I object to that.

20       THE MASTER:  Objection sustained.

21   BY MR. MOSKOVITZ:

22       Q   Are there any surface diversions from the river outside

23   the boundaries of the camp, the Naval  Ammunition Depot and

24   hospital which deliver water within--

25       MR. VEEDER:  Object to that as being beyond the scope of

41b

1    the direct examination.

2         THE MASTER:  I think the question is proper because he

3    has testified that the map showed the water distribution system

4    within the Santa Margarita watershed and the enclave, and this

5    question is simply to find out if there is any exterior source

6    of supply in addition to the interior source of supply that is

7    noted, so the objection is overruled.

8         MR. VEEDER:  May I have a word on that?  We are receiving

9    water delivered to us by the Vail Estate, ten miles up the

10   stream, now.

11        THE MASTER:  I think the witness can say there is such

12   a source of supply.  Now I am not going to go into the question

13   as to the rights and so forth.

14        MR. VEEDER:  The point I am making is that had I dreamed

15   the cross-examination was going this far I would have simply--

16        MR. SACHSE:  You would have told him what to say.

17        MR. VEEDER:  I would have gone into the process of bring-

18   ing out the exhibits, the stipulated judgment and showing that

19   water is delivered to us, upstream.  I think we have been

20   severely limited in our direct examination and of course--

21        THE MASTER:  I don't intend to let Mr. Moskovitz go into

22   detail as to what amounts of water are delivered or under what

23   method they are delivered, but that there is a source of supply,

24   period.

25        MR. DENNIS:  I would like the record to show that my

42b

1   failing to object to Mr. Veeder's statement, by that I am not

2   agreeing that Vail  is  delivering water to the Government.

3       MR. VEEDER:  I think the stipulated judgment speaks for

4   itself.

5       MR. DENNIS:  I don't agree to his statement.but I don't

6   want it thrown up to me later.

7       THE MASTER:  I don't think there is any purpose in going

8   further into colloquy.  The objection to the question is over-

9   ruled and the witness may answer whether there is such a supply

10   but I will not permit him to go into any elaboration as to the

11   amounts which are delivered or the terms under which they are

12   delivered or how they are delivered.

13       MR. MOSKOVITZ:  I would like to restate my question be-

14   cause it is not quite the question that I believe you understood

15   I asked.  I asked whether there were any diversions from the

16   river outside of Camp Pendleton and the Naval Ammunition Depot

17   and the Naval Hospita which delivered water to that area.

18       THE MASTER:  The question is a proper question.

19       THE WITNESS:  Well, in answer to that I, to the best of

20   my knowledge--no.  We have indicated on this plan a connection

21   from the Fallbrook Utility District, but to my knowledge it has

22   never been used.  There is indicated--I think it is a five inch

23   pipe or a six inch pipe up there, and I understand there is a

24   valve in it, but I don't know that it has ever been opened.

25   Speaking of a diversion from the river, that is the only one I

43b

1    know of.  I presume some of that water could come from the river.

2    I am fully acquainted with the stipulated judgment, too, but I

3    haven't, in my answer, considered that as a diversion from the

4    river because we can't conduct it in pipe; we get it from the

5    river after it gets down here, if it ever gets down.

6    BY MR. MOSKOVITZ:

7        Q  Now, I believe in answer to a question by Mr. Dennis,

8    you indicated that you did have records in your office as to

9    when the various areas within Camp Pendleton were constructed?

10        A  Yes.  We have those, that information.

11       MR. MOSKOVITZ:  I might ask Mr. Veeder do you plan to

12    introduce that yourself?

13       MR. VEEDER:  Well, I planned to put in the period of

14    expenditures.

15       MR. MOSKOVITZ:  And the dates?

16       MR. VEEDER:  Yes.  But I thought it was beyond the scope

17    of this, however.

18       MR. MOSKOVITZ:  I just wanted to inquire whether it will

19    come in, otherwise I was going to ask the gentleman about it.

20       THE MASTER:  It is going to come in later so you need not

21    ask Mr. Cannon questions concerning it.

22       MR. MOSKOVITZ:  No, apparently not.

23        Q  Mr. Cannon, I notice that there is a line, I think it

24    is a dotted line, that appears on the lower left of Exhibit

25    M-72 which is described as the static water level as of

44b

1  September, 1951, on the exhibit.

2       A   That is an incomplete line.  It was partial information

3  when we were studying the infiltration of sea water in 1951,

4  and it became the greatest in 1951.  In so far as that small

5  bit of information is concerned it is not the exact static

6  level.  It was below sea level and of course, that is the reason

7  that are wells went salty down in that neighborhood, because

8  the water itself does not come from the surface, it comes from

9  the porous sand at the bottom of the aquifer, and the static

10  level of the sea being greater than the static level on the

11  land, the water has to flow from the sea to the land.  That is

12  what that indication is.  It is incomplete.  It has been projected

13  further upstream, but in that same general period, but not on

14  this map, this profile.

15       Q   It seems to end at well 5A5.  Is that correct?

16       A   Yes.  It indicates on this M-72 as 5A5, just beyond

17  Ysidora Narrows.

18       Q   Where did you get the information for which you drew

19  that line?

20       A   As chief engineer at that time in charge of all water

21  problems at the base, I had weekly observations made.  We put

22  in five observation wells extending from the sea clear into  our

23  pumping basin, and of course the wells themselves could be

24  sounded directly.  And we kept a running record of the changes

25  in the underwater profile of the ground water, the ground water

45b

1    profile.

2         Q  So it was drawn from records in your office?

3         A  Yes, sir, definite information which was obtained under

4    my supervision.

5         Q  Have you kept records since of the level?

6         A  We have.  They haven't been drawn up in such detail,

7    but of course it is under control now and that is one reason

8    we did away with the pumping, all domestic pumping down there

9    to allow the water to take the normal underground gradient from

10   the Chappo Basin to the sea, to prevent the infiltration of

11   salt water.

12        MR. MOSKOVITZ:  Mr. Veeder, did you plan to introduce

13   that in evidence, as to the records?

14        MR. VEEDER:  We have a whole line of ground water studies,

15   geology, but this is not proper here.  We have testimony on the

16   whole phase of it.

17   BY MR. MOSKOVITZ:

18        Q  I believe you testified that well 4Cl is not in oper-

19   ation at the present time?

20        A  It is presently used for irrigation for the lemon

21   grove and to a limited extent for some irrigation on the State

22   lease.

23        Q  And I assume, therefore, that the water is not so

24   salty that it is not suitable for that?

25        A  It is on the verge of being.

46b

1       MR. STAHLMAN:  For what use?

2       MR. VEEDER:  Production outside the watershed.

3       THE WITNESS:  While it is in close proximity to 4CI, it

4   has a better quality of water.  It has reached a fairly high

5   salt content, but never to the extent that we had to actually

6   stop pumping it.

7   BY MR. MOSKOVITZ:

8       Q  I want to back up for a moment and ask you if, in

9   January, 1951, to your knowledge there were any wells located

10  within the Santa Margarita River watershed, but outside of

11  Camp Pendleton Naval Ammunition Depot and hospital boundaries,

12  which serve water for use within the boundaries?

13      A  Not to my knowledge.  I think I would have known of

14  it.

15      Q  And as of that same date, to your knowledge--

16      A  Do you have a particular well in mind?

17      Q  No.  I did not ask any such question.  To your knowledge,

18  as of that same date, January, 1951, was there any surface

19  diversion of water from the Santa Margarita River outside the

20  military base boundaries from which water was delivered for use

21  within the boundaries?

22      MR. VEEDER:  May I have that question again?  I simply

23  don't understand it.

24      THE MASTER:  I think the question is intelligible.  Do

25  you understand the question?

47b

1    THE WITNESS:  Yes, I believe I do.  That would imply a

2    pipe line existing some place to transport water from a point

3    up river onto the military reservation, and I know of no such

4    pipe line.

5    MR. MOSKOVITZ:  That answered the question.

6    THE MASTER:  That was the way I understood  the question,

7    Mr. Veeder.

8    MR. MOSKOVITZ:  I am through.

9    THE MASTER:  Mr. Veeder, do you have any redirect examin-

10   ation?

11   MR. SACHSE:  Can I ask one question?  It is not true redir-

12   ect, but it is a question that I would like to ask and I don't

13   think Mr. Veeder would object.

14   With reference to the legend--I didn't specifically refer

15   to the legend--over on the left hand side, the legend indicates

16   different types of wells and so on.  Do you see what I refer to

17   on M-72?  You testified that this map was reasonably accurate

18   as of to yesterday.  You have in mind the designation of the

19   wells not in operation, in operation and observation wells and

20   so on.  Did you have that in mind when you made the answer.

21   A  I had not checked the legend at the time.

22   MR. SACHSE:  O.K.  That is all.

23   THE WITNESS:  I still don't attest to the accuracy of the

24   legend at this date.

25

#4

48b

REDIRECT EXAMINATION

MR. VEEDER:  I would like to have marked for Identification--

THE CLERK:  M-77.

MR. VEEDER:  --Plaintiff's Exhibit M-77.

MR. SACHSE:  Is this redirect examination?

THE MASTER:  Yes.

BY MR. VEEDER:

Q  I hand you Plaintiff's Exhibit marked for Identification M-77, and ask you to state what that exhibit represents.

A  Exhibit M-77 is a United States Geological Survey, topographic sheet, Oceanside Quadrangle, at the scale of one to 62,500.

Q  State the--

A  Contours every 25 feet; surveyed in 1891 and 1898.

MR. VEEDER:  I offer in evidence Plaintiff's Exhibit marked M-77 for Identification.

THE MASTER:  It will be received in evidence as Exhibit M-77.

BY MR. VEEDER:

Q  Now, Mr. Cannon, will you state the development that was carried on under your direction in the area which generally has been referred to as the South Mesa since you have been on the property?

A  The South Mesa area?

49b

1    Q   The   South Mesa area.

2    A   Well, the South Mesa area is the area between the

3   Santa Margarita River and the south boundary--

4    Q   Over to the Pacific Ocean?

5    A   And inland--well, I would say it is bounded on the

6   west by the railroad.

7    Q   And the area between there and the Pacific Ocean, would

8   you state what work has been done there?

9    A   That is the area occupied by Camp Del Mar, the boat

10   basin itself, which was located in the area immediately south-

11   west of Los Angeles Junction, which is now called Fallbrook

12   Junction, on the Santa Fe Railroad.

13      The boat basin was excavated by means of a floating dredge,

14   and this map being made in 1891 and 1898 indicates the swampy

15   area which drained to the Santa Margarita River.

16    Q   Now, what condition existed in that swampy area at the

17   time that you first went to the Camp Pendleton area?

18    A   Well, the area--I supervised the survey of that whole

19   area at that time, and as I recall the average elevation of the

20   swamp land was about 2.2 above mean sea level.  That meant it

21   would be unindated at high date.  That point being at the end

22   of a rainy cycle, the Santa Margarita River stayed open most of

23   the year and there was surface water running.  This map indicates

24   it is so open, and the winding--well,the worm-like type of

25   stream, indicated on this map, was there when I came.

50b

1    Q   And what direction did the water flow in that winding

2    stream?

3    A   The water flowed in and out from the sea.   It was

4    brackish water.

5    Q   In what direction did it flow?

6    A   It flowed from a point which, on this map, would be

7    about 1,500  feet north of the south boundary at the sea, and

8    it flowed from that point north to the Santa Margarita River.

9    Q   The south boundary of what?

10    A   Of Camp Pendleton.

11    Q   It flowed northward?

12    A   Northerly from a point 1,500 feet from the south

13    boundary, from there to the sea.

14    Q   Now, what relationship, then--I will withdraw that.

15    Would you look on Plaintiff's Exhibit M-72, where you

16    drew the south watershed line and state whether, in your opinion,

17    the line as located is sufficiently southerly, based upon your

18    present testimony?

19    A   No, it is not.   I think I qualified that at the time

20    I put the watershed line on that it was from Exhibit M-13--it

21    was a transfer--merely a transfer.

22    Q   Now, would you draw a watershed line on M-72 where,

23    based on your observation, in 1942, it was then located?

24    THE MASTER:   Do you want to use the blue pencil?

25    MR. VEEDER:   I would like to have him do that.

51b

1      THE WITNESS:  As an aid to doing that, this map, Exhibit

2 M-77, indicates the original terrain there, and in order to get

3 the transfer a little more accurately, it might be advantagous

4 to place it on this map, first.

5 BY MR. VEEDER:

6      Q  You trace it on M-77 first.  I ask you to extend that.

7 I will now ask you to extend the blue line which you have put

8 on as the watershed line on M-77 off into the white margin and

9 write beside it "watershed line Santa Margarita River."

10      Now, would you--can you transpose that now onto Exhibit

11 M-72?

12      A  As far as I can see I have got off this small map at

13 that point, and have no way of checking the watershed beyond

14 this point.

15      Q  Now, would you--

16      A  I presume that it was somewhat like this.

17      Q  Would you now put that blue line as the watershed, by

18 Frank Cannon.  I think that is what we can call it--

19      A  Referring to this exhibit?

20      Q  A combination of your testimony and Exhibit M-77.

21      (Discussion off record.)

22      MR. VEEDER:  To save time, if the parties would agree that

23 Mr. Cannon could add, out of Court, this line as he has depicted

24 it on 72 and 77, on the other exhibits, including the exhibit

25 introduced by Mr. Sachse--

52b

1    MR. SACHSE:  Put them on M-DA, M-13 and M-14.  I think

2    that is all.

3    MR. VEEDER: Well, he is to put it on 33A and the rest of

4    them?

5    MR. SACHSE:  I think that is right.

6    MR. VEEDER:  I will ask Mr. Cannon to proceed to put the

7    watershed line on to M-33A because I am hoping that we can get

8    Mr. Cannon off the stand tonight.

9    THE MASTER:  By the way, Mr. Dennis and Mr. Stahlman,

10   did you hear the conversation here that Mr. Cannon, out of

11   Court, in order to save time, will put this same watershed line

12   on M-13--

13   MR. SACHSE:  M-14 and M-DA.

14   THE WITNESS:  The exhibits-- I haven't the exhibits.

15   MR. VEEDER:  I will show you the exhibits.

16   MR. SACHSE:  I wish to ask him some questions on M-33A.

17   THE MASTER:  You wish to ask him some questions on M-33A?

18   MR. VEEDER:  I will have him put them on now, if he wants

19   to recross, why then that is all right.

20      Q  Can you located on this--

21      A  From the information on this map?

22      Q  Can you put it on, transfer it from 77, the watershed

23   line onto this map?

24   MR. SACHSE:  Wait a minute.  I would object to that.

25   That reflects nothing.  I want to know the watershed line, the

1188

53b

1   line of demarcation between the water flowing north to the

2   Santa Margarita and south as it appears on M-33A.  If the con-

3   tours of the country are entirely different, I think it should

4   be reflected.

5        MR. VEEDER:  I will be glad to have that brought out,

6   because I was of the opinion that he would put it on there, but

7   if there is objection to it we simply won't.

8        THE MASTER:  Mr. Veeder, as I understand you wish to have

9   him locate on M-33A the location of the line which would be

10  where the line that is now on M-77 would be?

11       MR. VEEDER:  I would like him to do that.

12       MR. SACHSE:  I wanted him to indicate where the line would

13  be under conditions as they existed, as they are shown, rather,

14  on M-33A.

15       THE MASTER:  Which may or may not be the same line?

16       MR. SACHSE:  They may or may not be.

17  BY MR. VEEDER:

18       Q  As my part of my redirect examination, now, would you,

19  very rapidly, put on M-77 the watershed line where you have

20  located on M-77 and M-72 onto M-33A?

21       MR. SACHSE:  I have no objection if he does it outside of

22  Court, if you don't care if he does mine outside of Court.

23       MR. VEEDER:  We haven't qualified him to put in the other

24  watershed.

25       MR. SACHSE:  He drew a watershed line not only there but

54b

1   on this one.   On M-33H he drew a lengthy watershed line by

2   checking the contours.   I would like him to do the same thing

3   that he did on M-33H on M-33A.

4        MR. STAHLMAN:   Let's get a ruling.

5        THE MASTER:   Mr. Cannon, do you believe that you can draw

6   a watershed line on M-33A similar to the line that you drew on

7   M-33H, showing the watershed as it appears to be from this map?

8        THE WITNESS:   I can do that where the steepness of the

9   ground is enough to determine where the water line should be

10   by the contours indicated.   When you get down to an area where

11   there are no contours--the interval being 20 feet-- you see the

12   first contour back here, and it pretty difficult to determine

13   whether rain falling in this area will flow this way or that way

14   until you have contours to go by.

15        MR. STAHLMAN:   Is it so important?

16        MR. SACHSE:   If he can't do it he can't do it, but I would

17   like him to do so if he can.

18        THE MASTER:   Did you say you could or couldn't draw a line

19   that Mr. Sachse has requested?   If you can't do it, say so and

20   if you can do it we will do it outside of Court.

21        THE WITNESS:   From the information on this map I could

22   draw a line which would approximate the watershed line down to

23   a certain point, down to where the land is so flat that the

24   contour does not show.

25        MR. SACHSE:   I will be satisfied with that, your Honor.

55b

1    THE MASTER:  We will ask you out of Court, then, to draw

2  a line for the distance that you feel the information on the

3  map is sufficient to enable you to draw it, and to stop it at

4  whatever point you believe the information becomes insufficient.

5    THE WITNESS:  I will do that.

6    THE MASTER:  Then you also will draw the line for Mr.

7  Veeder.

8    THE WITNESS:  I will request the exhibits because I am not

9  acquainted with the exhibits.

10  BY MR. VEEDER:

11    Q  What was the condition, from the standpoint of rainfall

12  and natural precipitation, at the time that Camp Pendleton was

13  acquired and you commenced your construction of the camp?

14    A  Well--

15    MR. SACHSE:  I think that is too indefinite and is imma-

16  terial as to what was the situation as to rainfall and precipi-

17  tation.  I don't know what he means.

18    THE MASTER:  I will ask you to reframe the question to

19  make it more definite, Mr. Veeder.

20  BY MR. VEEDER:

21    Q  Mr. Cannon, are you acquainted with the runoff records

22  and the precipitation in the area of Camp Pendleton in 1942?

23    A  Yes.  I was there in 1942.

24    Q  And what was that general condition compared with the

25  years which succeeded?

56b

1    A   Well, on January 1, 1943, we had quite a large flood

2    that caused a lot of damage, a lot of flood damage; washed out

3    fords; that changed the course of the river; washed out a trailer

4    court and flooded the construction barracks area, and it is

5    the greatest outflow of water since I have known the area.

6        Q   What was the condition subsequent to 1943 from the

7    standpoint of runoff?

8        A   Well, every year, of course, we get the U.S. Geological

9    Survey rainfall.

10       Q   From your own observations?

11       A   Rainfall and runoff records, and we correlate those

12   with the information we have at the camp, mainly because it is

13   a pretty good study, and a couple--

14   THE MASTER:   Mr. Veeder is there anything you are trying

15   to get from this witness which is not shown in the records

16   themselves?

17   MR. VEEDER:   Yes.

18   THE MASTER:   In other words, the records which show the

19   rainfall and--

20   MR. VEEDER:   Yes, your Honor.   This witness is acquainted

21   with the circumstances that prevailed, and he is acquainted with

22   the impact of the dry periods that succeeded, the impact upon

23   the water use within the camp.   The matter was opened up by

24   cross-examination, I think by Mr. Dennis, when he was asking

25   the conditions that prevailed from the standpoint of availability

57b

1   of water and from the standpoint of salt water intrusion; from

2   the fact that there was a greatly increased use of water by

3   reason of installations in the camp, and this witness is fully

4   acquainted with that fact or with those facts.

5       THE MASTER:  Well, I think that it is proper for you to

6   bring out certain facts just as long as you are not duplicating.

7       MR. VEEDER:  No, your Honor, I  have no desire to duplicate.

8       Q  What has been the impact upon your operations within

9   Camp Pendleton by reason of the precipitation and runoffs since

10  1943?

11      MR. SACHSE:  I will object to that as being indefinite.

12  We have exhibits here.  If Mr. Veeder wants to ask him a specific

13  question as to what was the impact of the runoff on a given

14  year, I don't object.

15  BY MR. VEEDER:

16      Q  What have you done, Mr. Cannon, to husband the available

17  supply of water at Camp Pendleton since 1943?

18      MR.SACHSE:  I will object, if the Court please, as being

19  absolutely immaterial.  Whether an owner husbands water rights

20  or wastes them does not go to determining the extent of his

21  rights.

22      THE MASTER:  The objection will be overruled.  I think that

23  it is material regardless of motives.

24      MR. VEEDER:  Do you want the question read back to you?

25      THE WITNESS:  I would like the question read back, please.

58b

1      (Record read.)

2      THE WITNESS:  Well, as I started to say before, we were

3  very fortunate at the beginning, during the early part of the

4  war, as we seemingly had plenty of water until there was an

5  indication in, I believe, in 1947 it first started that there

6  was an increase in the salt content of the waters in the lower

7  basin.  Of course, that was not until 1947 after five years of

8  comparatively heavy use which had gone on up to that time.

9  That was the time when we first realized that we had a water

10  problem and we began to make the study and began to keep accur-

11  ate records of the salt intrusion from the sea, and studied the

12  problem in general.

13      And then, in 1948 we began to make studies of  surface

14  conservation, flood water conservation and all of that.

15  BY MR. VEEDER:

16      Q  What occurred--what was the result of your investiga-

17  tions and studies from the standpoint of the salt water intru-

18  sion and the general lowering of the water table?

19      A  Well, we were forced to the conclusion that if we kept

20  on pumping in the lower basin we would just ruin the basin so

21  it would be no good for pumping any more to get potable water

22  out.

23      Q  What did you do then?

24      A  That, I believe, is the time we started making inves-

25  tigations about augmenting the water supply.

59b

Q   Now, did you build--what about the use of sewage effluent?  Did you undertake efforts in regard to that?

A   We did.  We made efforts to reclaim the sewage effluent and we are now using it over and over again from plant number 1 in the 14 area.  The sewage effluent is pumped to an oxidizing pond where we get a large percentage of purification.  It is allowed to flow back rapidly into Lake O'Neill from whence it is perfectly able to penetrate into our pumping basin, and it is repumped again and it is real conservation of water.

Q   Now, when you undertook the construction of number 12 administrative area, and the others concerning which you have testified, what kind of system did you install at that time?  Were they complete systems or--

A   The water supply system was complete in so far as the area under consideration was concerned.

Q   When you stated that you had added buildings since then, what did you mean by that?

A   We had to extend the system then.  In fact, in the case of sewage disposal system, it serves areas 12 and 14 and can serve number 13.  When we built the rest of the camp, in order to make it more workable, area 13 was a very large troop area, and by diverting sewage to either plant 1 or plant 2, we tried to design a utility system that would have as much flexibility as possible.

But plant 2, which, in general, serves sewage from areas

60b

11, 13, 15, 16 and 17 was not built until the need appeared, and those areas themselves were built.

Q   Now, upon which natural stream is Lake O'Neill located?

A   Lake O'Neill is a lagoon which is lower than the river bed itself, and it cannot be drained by gravity.  With the outlet at the bottom portion of Lake O'Neill fully opened it would still leave a foot and a half or so of water in it.

Q   What natural water course drains into that stream? Do you know?

A   Fallbrook Creek naturally drains into it, and other minor sized streams, intermittent streams.

Q   What other impounding structures are there on Camp Pendleton, to your  knowledge, besides Lake O'Neill?

A   None for impounding purposes that I know of--

Q   Do you know--

A   Other than man made regulating reservoirs that are only for short time storage.

Q   Now, in regard to the reservoirs which are shown on the profile, would you state the period in which water is actually stored in there?  Of course, there is water in them at all times --I realize that--but assuming after water is pumped from the system how much is generally held in those reservoirs?

A   That depends on the current population of the area served and the time of year and the rate of water used.  I don't think I could give a direct answer.

1196

61b

Q   Well, are you able to state an average?

A   We could--it would be an assumption.  You would have to assume an average use as indicated by--

Q   If you can't answer the question--

A   I can't answer it directly.  I could make a calculation, but it would be an approximation.

MR. VEEDER:  I have no further questions.

MR. SACHSE:  I have one, I think.


RECROSS-EXAMINATION

BY MR. SACHSE:

Q   If I understand correctly, Mr. Cannon, did you state that the sewage effluent conservation program started in 1948?

A   No, not that year.  I think it was 1950 or '51 when we first pumped sewage from plant number 1.

MR. SACHSE:  That is all.

MR. DENNIS:  I have one more too, which is explanatory.


RECROSS-EXAMINATION

BY MR. DENNIS:

Q   With regard to plaintiff's M-77, I believe it is, Mr. Cannon, the contour lines on that particular map are 25 foot contour lines?

A   That is correct, 25 feet.

Q   So that a slope of less than 25 feet would not be

62b.

1    reflected by the contour lines?

2        A   That is right.

3        Q   And within the area close to the coast it is compara-

4    tively flat country and it would be extremely difficult from

5    that map to determine just where the crest between the two

6    watersheds would be and what land would drain directly into the

7    Pacific Ocean as distinguished from the Santa Margarita River

8    watershed --the watershed of the Santa Margarita River?

9        A   On the contrary, it is easy to determine with these

10   contours.  If you examine them closely this is the only place

11   that the watershed line can be, and that is where I have it

12   noted because, if you go beyond that, you go downhill anyways.

13   In other words, you go downhill to the Santa Margarita River.

14   I would depend on this line I have drawn on the map from the

15   information I had to draw it.

16       MR. DENNIS:  That is all.

17       THE MASTER:  Mr. Stahlman, do you have any questions?

18       MR. STAHLMAN:  No.

19       THE MASTER:  Mr. Moskovitz?

20       MR. MOSKOVITZ:  Yes, I have a few questions.

21

22                      RECROSS-EXAMINATION

23   BY MR. MOSKOVITZ:

24       Q   Relating to the conservation practices or problems

25   relating to the observations that Mr. Veeder just asked you

63b

1  about.

2      You testified that you discovered in 1947 there was an

3  increase in the salt content--

4      A   That is correct.

5      Q   --of the wells.  Now which wells were they where you

6  noticed that?

7      A   The most pronounced effect was noticed in well 4C which

8  is indicated on the plan, but would come about in this location

9  in the profile.

10      Q   That was the lower most one on the watershed?

11      A   No, not the lower most one.  It is located right here

12  on the map.

13      MR. VEEDER:  When you are pointing to the map I wish you

14  would mark what you are pointing to.

15      THE WITNESS:  It is noted as 4C on the map, well 4C.

16      THE MASTER:  On M-72?

17      THE WITNESS:  On M-72, yes.  Well 5A2 is actually the

18  closest to the sea because it is directly in the river bed and

19  about an equal distance, the way the crow flies, but this well

20  4C is in a straight line between 4C1 and 525, in a straight line,

21  almost a straight line.  But the furthest one from the river

22  is the one that went to salt first because it was a deeper well.

23      MR. MOSKOVITZ:  I see.

24      Q   Did you notice any increase in salt content in the

25  wells in the so-called Chappo Basin?

64b

A   None but a very gradual increase over the long drought period.   There was an increase in chlorides in the six or seven dry years, but not pronounced like it was nearer the sea.

Q   Did you notice any of the wells in the Upper Basin?

A   To a lesser degree.   There was some change, no doubt due to the concentration of salt due to many dry years, but not from sea water intrusion.

Q   You determined that certain measures should be taken to reverse this process?

A   We were relying and just complying with United States Public Health Service drinking water standards, which allowed 250 parts per million.   And we took wells out of service when they exceeded that.

Q   Now, I think you testified then that you took the wells out of service in the Ysidora Basin?

A   That is correct.

Q   Did you take any out of service in the Chappo Basin?

A   Not for that reason, no.

Q   Did you take any out of service in the Upper Basin for that reason?

A   No, sir.

Q   And after you took the wells out of service in the Ysidora Basin was there any change in the salt water content?

A   We made some experiments with well 5A2.   I don't recall the exact date.   But it was in 1949 or '50.   It was the second

65b

1   well to show a decided increase in chloride, and the chloride

2   got up to 243 parts per million and we stopped pumping the well

3   for three months and then started it again and the chloride had,

4   apparently, dropped down to around 200, something like that.

5   But it rose very rapidly with pumping and got up above 250 in a

6   very short time, so the pumping was ceased and it has never been

7   repumped.   It was obvious the chloride content would keep on

8   increasing and would spoil the pumping basin.

9       Q   So your conclusion was that it was the pumping of those

10  wells in the lower basin, in the Ysidora water basin, which had

11  been the cause of an increase in salt content?

12      MR. VEEDER:   I will object to that.   That is not what he

13  said.

14      MR. MOSKOVITZ:   The witness can answer as to whether I am

15  correctly summarizing his testimony.

16      THE MASTER:   That is correct.   Will you answer?

17      THE WITNESS:   I answered the same question in the question

18  above.   The dotted line over here indicates that was the actual

19  static water level, and it is obvious that the surface water

20  flows downhill, and the water runs in that direction and salt

21  was coming in.

22  BY MR. MOSKOVITZ:

23      Q   Could you give me an answer as to the conclusion as to

24  the question I asked?   Perhaps it should be read to the witness.

25      (Record read.)

1     THE WITNESS:  Yes.

2     MR. MOSKOVITZ:  That is all.

3     THE MASTER:  Any further questions?

4     MR. VEEDER:  Yes, I have some now.

5

6                    RECROSS-EXAMINATION

7  BY MR. DENNIS:

8     Q  I believe you stated it was 1947 that you first became

9  aware that you had a water problem?

10    A  Our investigations on the increase in salinity started

11 in 1947.

12    Q  About what time of the year?  Do you recall?

13    A  In the fall of the year, I believe.

14    MR. DENNIS:  In the fall.  Thank you.

15

16                   REDIRECT EXAMINATION

17 BY MR. VEEDER:

18    Q  What was, in your opinion, the effect of the six or

19 seven years of drought that you made reference to upon the

20 water problems to which you have just testified?

21    A  Well, during that period I kept charts that I do not have

22 at the present time.  They were particularly adapted to the

23 conditions in Ysirdora, and on those charts were delineated the

24 runoff each year in acre feet, and I studied over each year

25 because every year we were getting water to the sea past Ysidora

67b

1  Gauge, and it was assumed that those floods filled the pumping

2  basin, and we plotted against that the water use from those basins.

3  It made a peculiar pattern for several years, and as the drought

4  went on it finally got to the point where no water and no

5  replenishment came on and then the chart indicated nothing but

6  use and no replenishment.  And, of course, that, in itself, was

7  enough to be concerned about and we started making some very

8  definite investigations about the quality of the water and the

9  quantity, as well; and the lowering of the water level.

10       MR. VEEDER:  I have no further questions.

11       MR. SACHSE:  No questions.

12       (Witness excused.)

13       MR. VEEDER:  I will call Mr. McNearny.

14

15                    JOSEPH R. McNEARNY,

16  called as a witness by and on behalf of the Plaintiff, sworn,

17  testified as follows:

18

19                    DIRECT EXAMINATION

20  BY MR. VEEDER:

21       Q  Would you state your full name?

22       A  Joseph R. McNearny, M-c-N-e-a-r-n-y.

23       THE MASTER:  Is that Mc?

24       THE WITNESS:  Yes, capital N.

25

1203

68b

BY MR. VEEDER:

1    Q   How old are you Mr. McNearny?

2    A   Fifty-six.

3    Q   And where are you presently employed?

4    A   At Camp Pendleton.

5    Q   Would you state the position that you hold there?

6    A   I have a Civil Service position known as Chief Quarter-
man, Public Works.

7    Q   Now would you state, briefly for the record, what your
responsibilities are?

8    A   Well, I am the civilian in charge of the pipe and
plumbing shop in that we control all water and sewage in Camp
Pendleton; all wells and the disposal plants, training tanks
and plumbing.

9    Q   Now, how long have you been on Camp Pendleton?

10   A   October, 1942, with a short sea voyage to Saipan and
back again.

11   Q   What has been your responsibility during that entire
period?

12   A   From '42 to 1946 I was an officer in the Marine Corp,
on active duty.  I was put on inactive duty in '46 and I became
a Civil Service worker at that time.

13   Q   And what were your duties in 1942 in connection with
Camp Pendleton?

14   A   I was  the officer in charge of pipe and plumbing,

1204

.69b

1   sheet metal and heating on Camp Pendleton.

2      Q   And when did you first undertake the responsibilities

3   that you described as having at the present time?

4      A   October, 1942.

5      Q   And you have been performing the same responsibilities

6   at all times since then?

7      A   With the exception of that short trip.

8      Q   Now, would you state whether you were on the camp or

9   not during this period of construction concerning which Mr.

10  Cannon has testified?

11     A   Very definitely I was there.

12     Q   And would you state, then, the progress and the extent

13  of the work that you are now performing?  Did you make instal-

14  lations as the work progressed and did you undertake the distri-

15  bution of water and the disposition of sewage as the work

16  developed?

17     A   At the beginning of Camp Pendleton the Marine Corps

18  did not handle the distribution system.  The contractors handled

19  it until such a time as they turned it over the Marine Corps,

20  and I believe in December--

21     Q   December of what year?

22     A   1942, they turned it over to an active maintenance

23  division, all of the installations at that particular time,

24  which were two disposal plants, number 1 and number 2, and four

25  wells in the Margarita River which, in turn, were tied into a

70b

1  like amount of booster stations which, in turn, were tied into

2  a like amount of reservoirs.

3      Q   Now, when you are operating the system as it presently

4  exists, how do you know where the water pumped from a particular

5  well will be used?

6      A   That is a little bit hard to say.

7      Q   Will you explain that?

8      A   As the operation of the water system at Camp Pendleton

9  and in the Margarita area--I say "Margarita area" because we

10  have many other water systems in Camp Pendleton--the actual

11  call and requirement for water always starts in the reservoir.

12      Q   Now,  when you say always starts in the reservoir,

13  would you turn to M-72 and give us an example of what you mean

14  by reference to the profile?

15      A   Well, we all see that this reservoir--

16      Q   Now you are pointing to which reservoir?

17      A   Number 3.

18      Q   And what is the size of it?

19      A   200,000 gallons--oh, I am sorry.  I am sorry--5,200,000

20  gallons--each one of these three reservoirs, one reservoir,number

21  2 of 1,700,000, reservoir number 3 of 5,200,000 and 3,100,000

22  gallons are all on the same level or elevation.  When one

23  reservoir requires water all three require water because each

24  one is under the same control of what is commonly known as a

25  float switch.

71b

1    The float switch is exactly the same as you have in your

2    flush tank at home.

3    The principal requirement for water will always come from

4    the reservoir for this reason:  Each reservoir, as I indicated

5    before, has a float switch.  When that switch drops down or the

6    float drops down to a designated area, it immediately puts a

7    demand down to the closest booster station, which, in turn,

8    has at its disposal a 75,000 gallon redwood tank.  The booster

9    station will start immediately upon the drop of that altitude

10   or float switch, and start to replenish the reservoir from the

11   75,000 gallon redwood tank.

12   When the float switch drops to an indicated area in the

13   redwood tank that immediately will call to the deep well which

14   is located, each one of them, in the Margarita River.  And the

15   demand will be replenished as the water is pumped out of the

16   75,000 gallon tank up into the reservoir.  Immediately upon the

17   float reaching the required elevation in the reservoir the red-

18   wood tank will immediately complete its operation of filling by

19   electrical impulse,and the float switch cuts the well off in the

20   river.

21   So you can see, Mr. Veeder, it would be kind of hard for

22   me to say where the water would be going at any given reservoir

23   or from any given well or any given booster.

24   Q  From the operation of the system, as you have just

25   described it, what is the determining factor as to whether the

72b

1   water will be used within or outside of the watershed?

2       A   The determining factor is where your requirements are

3   going to come from a demand, and the demand would be the reser-

4   voir.

5       Q   Well, what reservoirs are so located, if there are any

6   that water from a reservoir might be delivered to areas both

7   within and outside of the watershed?

8       A   All reservoirs are situated so that they can deliver

9   water within the watershed area and outside of the watershed

10  area.  By that I mean, the 11 area, a portion of 12 area, all of

11  13 area, a portion of 14 area, 15, 16 and 17 areas, are all

12  located outside of the watershed area.

13      Q   What is their source of water?  What reservoirs supply

14  them?

15      A   All areas with the exception of number 1 reservoir.

16  Number 1 reservoir is, if I remember correctly, 450 feet eleva-

17  tion and the other reservoirs are 540 feet and the reason for

18  the number 1 reservoir was to take care of a lower pressure

19  delivery in number 12 and number 14 areas within the watershed

20  area.

21      MR. VEEDER:   I see it is recess time.

22      THE MASTER:   We will recess then until 9:30 tomorrow.

23      (Adjournment.)

24

25