ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

             Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

          Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
            DEPUTY

**Volume:** 10

**Pages** 1208-1376

**Date:** June 11, 1958

**Place:** Fallbrook, California

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3        APPEARANCES

4            WILLIAM H. VEEDER
                 For United States of America
5
             WILLIAM E. BURBY
6                For United States of America

7            FRANZ R. SACHSE
                 For Fallbrook Public Utility District
8
             GEORGE STAHLMAN
9                For Vail Estate

10           W. B. DENNIS
                 For Santa Margarita Mutual Water Company
11
             ADOLPHUS MOSKOVITZ
12               For State of California

13

14

15

16

17

18

19

20

21

22

23

24

25

1208

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Joseph R. McNearny | 1212 | 1226 | 1240 | 1241 |
| William D. Taylor | 1242 | 1259 | 1296 | 1298 |
| Allen C. Bowen | | 1302 | | |
| | | 1323 | | |
| | | 1350 | | |

| For the Defendants: | | | | |
|---|---|---|---|---|
| Helen E. Holsworth | 1314 | 1321 | | |
| Frank Chestmolowicz | 1332 | | | |
| John Kuhnis | 1366 | | | |

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25

# INDEX TO EXHIBITS

| No. | | Iden. | Received |
|-----|------|-------|----------|
| M-78 | Map | 1247 | 1248 |
| DA-72 | Deed (Holsworths) | 1313 | 1314 |

<u>Fallbrook, California, June 11, 1958, 9:30 A.M.</u>

THE CLERK:  Court is now in session.  Will counsel state their appearances for the record.

MR. VEEDER:  William Veeder for the United States and William E. Burby for the United States.

MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility District and named individual defendants.

MR. MOSKOVITZ:  Adolphus Moskovitz for the State of California.

MR. STAHLMAN:  George Stahlman for the Vail Company.

MR. DENNIS:  William B. Dennis for the Santa Margarita Mutual Water Company.

THE MASTER:  Are there any defendants from the De Luz Creek area who have filed answers who are not represented by attorneys?  I see Mr. and Mrs. McDowell here.

MR. McDOWELL:  I have answered.

THE MASTER:  Yes, you have already appeared.

You may proceed then, Mr. Veeder.

MR. STAHLMAN:  Your Honor, I would like to have permission to call a witness out of order.

(Discussion off record.)

MR. VEEDER:  I have filed a motion, your Honor, in connection with the proceedings for June 16th.  You had inquired as to arrangements for sequence of hearings of the many motions that

2b

1   are now pending.  And I have filed today a motion designated

2   "Motion respecting appearing on June 16, 1958", in which we

3   have asked that the motion of the United States of America for

4   summary judgment against the Fallbrook Public Utility District

5   be advanced on the docket so as to be the number one motion for

6   hearing.  Mr. Sachse said in so far as he is concerned he is

7   agreeable to it.

8         MR. SACHSE:  I think I am backing up, Bill.

9         MR. VEEDER:  What?

10        MR. SACHSE:  I am backing up.  I don't think it is agree-

11   able.

12        THE MASTER:  Of course that--

13        MR. SACHSE:  I have only seen this piece of paper since it

14   was handed to me this morning.

15        THE MASTER:  In any event, the determination of that matter

16   would be made by Judge Carter, not by me, so I don't know that

17   there is any reason to consider that in the hearings here.

18        MR. SACHSE:  I don't either.

19        MR. VEEDER:  I thought it was purely a routine matter. I

20   thought it was agreed.  You had asked about it on the record.  I

21   was responding to you on the record.

22        THE MASTER:  I think if counsel can agree before the hear-

23   ings with Judge Carter, that is fine.  If you can't, it will just

24   have to be submitted to Judge Carter for the order of procedure.

25        MR. VEEDER:  Mr. Sachse said he agreed to it and then

1312

3b

1    withdrew.

2        Now I will call Mr. McNearny.

3

4            JOSEPH R. McNEARNY,

5    resumed stand, further testified as follows:

6

7            DIRECT EXAMINATION   (continued)

8    BY MR. VEEDER:

9        Q  Mr. McNearny, why is it so difficult to determine which

10   water will be used within and without the watershed of the

11   Santa Margarita River when you have pumped the water from the

12   basin and delivered it into the distribution system?

13       A  The distribution system, after it leaves the reservoirs,

14   is by gravity.  And the only actual demand that exists is the

15   user.  If in the case of number 2 reservoir, on document M-72,

16   which has a capacity of 1,700,000 gallons--

17       Q  Would you just mark that where it appears with the

18   orange pencil?  That doesn't show up very well.  I will get you

19   another pencil.  I will give you the green pencil, because I

20   think it will stand out better.  I would like to have you mark

21   first the reservoir to which you alluded, as appears on the

22   profile, and then mark it on the diagram if you would.  Now say

23   that an acre foot of water has been pumped from the basin, and

24   show where it would be--what would be the factors entailed in

25   the point where it would be used.

1213

4b

1      MR. VEEDER:  We have a severe problem, your Honor, in

2  determining just exactly how much water is used inside and out-

3  side.  That is the reason why we are taking this course.

4      THE WITNESS:  If an acre foot of water was demanded from

5  number 2 reservoir, which is indicated by this green crayon,

6  the demand, as I stated before, is from the user.  When a faucet

7  is opened, water will come out of it if there is any water in

8  the line.

9  BY MR. VEEDER:

10      Q  Now is that--

11      A  Anywhere.

12      Q  Suppose the faucet is in 17 area.

13      A  If the water was demanded in the 17 area the water would

14  run from that reservoir out into the main water system.  So this--

15  this is the 17 area.  If that demand was put in the 12 area it

16  could run from that same reservoir, going into the 12 area, which

17  is within the watershed.   There would be no way that I could

18  show exactly what amount of water would go into the 12 area and

19  what amount of water would go into the 17 area without having a

20  complete separate system of lines going directly to 17 area,

21  with the meters recorded as we have on all of our units.

22      Q  Which you do not have?

23      A  No, sir, we do not have them.

24      Q  Now in regard to a faucet being opened in the Wire

25  Mountain Housing, is there any way of determining where that

5b

1    water would be used?

2         A   The origin of that water comes from the same source that

3    the water comes from in 17 area, in 12 area, in 14 area.   The

4    only way that we have of checking the amount of water used in

5    Wire Mountain is by meters.   We do have meters in Wire Mountain.

6    But where the water actually comes from, which reservoir, we do

7    not have any system whereby to indicate so.

8         Q   What about the United States Naval Hospital, do you

9    have any way of determining the source of the water that is used

10   there, or is that all part of the main system?

11        MR. SACHSE:   I will object, if your Honor please.   The

12   source I don't think is material.   I don't know whether Mr. Veeder

13   meant that.   The source is all out of the basin.   What do we care

14   where it comes from, each well in the basin.   We care where it

15   goes.

16        MR. VEEDER:   I would say the source.   Which reservoir, is

17   what I was talking about.

18        MR. SACHSE:   Oh.

19        THE WITNESS:   The Naval Hospital have  their own water

20   system, with their own reservoir, but they are tied into our main

21   line only for fire protection purposes.   And when and if they

22   have an emergency breakdown  on their wells.   Other than that--

23   BY MR. VEEDER:

24        Q   Why would you have such a tie-in as that, Mr. McNearny,

25   for the fire protection purposes?

6b

1      A   Fire protection.   Well, I imagine there is something

2  like eight to ten million dollars worth of Government property

3  there.   And naturally anywhere you go in the Government they

4  protect it everyway they possibly can.   And the water is one of

5  the protections, plus the fact that those buildings are all

6  wood.

7      Q   Now what, from your standpoint of operation, would it

8  mean to have a separate, independent system for each unit from

9  the standpoint of fire protection, each unit such as the Naval

10 Hospital, the industrial areas and the other areas?

11     THE MASTER:   You may sit down.

12     THE WITNESS:   When you say "each unit", each unit has its

13 own separate fire setup   cut right into the main line, controlled

14 by sprinklers in each building,which in turn turns the water on

15 automatically by the temperature rising at the fire.   There is

16 normally no way for the occupant of the building to tamper with

17 that water, because the valve is placed immediately adjacent to

18 the main line and nowheres near any of the buildings.   The water

19 that normally comes into each one of those buildings for the

20 user has a valve right outside of the building.

21 BY MR. VEEDER:

22     Q   Assuming a severe conflagration of fire broke loose in,

23 for example, the industrial area.   What would be the sources of

24 water that could be drawn upon to extinguish that fire?

25     A   Reservoirs number 2, 3, and 4 could immediately be used.

1216

x&b
7b

1    Number 1 is too low to come back into that area.

2         Q   Now assuming the same circumstance in the 17 area, what

3    sources could be drawn upon for those to put out the conflagra-

4    tion?

5         A   Number 2, 3 and 4 reservoirs.

6         Q   Now who controls the operation of that system in the

7    event of fire?  Is that under your direction and control?

8         A   There is a dual control.  We--when I say "we" I mean the

9    maintenance department--handle all valves in camp and the fire

10   department handles all of the operations of control.  By that

11   I mean this:  Each building has a very delicate valve that works

12   on a pressure system, other than the normal operation that we

13   have for the water system in camp.  The water system in camp is

14   operated, as I said yesterday, by float switches which change

15   as the water comes up and down.  But the fire valves operate

16   on a pressure system.  When the valve pressure drops, the indi-

17   cator would mean that water is being used and the demand would

18   then electrically be called into each fire department in each

19   area.  They immediately make their run to the designated spot of

20   the valve in use, and from there they start operating in regard

21   to fire.

22        Immediately upon a call of one of those valves into the

23   fire--or central fire house, a call is sent out immediately to

24   the maintenance, who in turn--

25        Q   Now who is maintenance, please?

8b

1      A   When I say "maintenance", that is the--well, I was

2   going to say the Marine Corps maintenance are the housekeepers

3   of Camp Pendleton.   And in the maintenance group consists of

4   all craftsmen, plumbers, pipe fitters, electricians, carpenters,

5   painters, and all the required people to maintain a city.   The

6   call is immediately sent from the central fire department to the

7   maintenance office, and they in turn demand an electrician and

8   plumber or pipe fitter to stand by at each fire for the cutting

9   off of the electrical switches in the building, which is handled

10  by the electrician, and either making certain that all valves

11  are ready, that the pressure is proper usage--those things are

12  taken care of by the plumber or pipe fitter.   And the fireman,

13  after all his name designates what he does.   He takes care of the

14  fire.

15      Q   Now assuming such a conflagration should take place

16  where you had a tremendous demand, what would be the means of

17  maintaining an adequate supply of water to meet the fire?   How

18  would that be done?

19      A   When there is a great demand in any given area, naturally

20  the first place that will call will be the reservoir.

21      Q   I didn't hear what you said.   "would fall"?

22      A   The first place that would call would be the reservoir.

23      Q   Yes, sir.

24      A   When I say "call", I mean a call of water.   I mean a

25  great amount of use of water would mean a great amount of drop in

1   the reservoir.  The reservoir, immediately with this float switch,

2   would check back into the booster station, which in turn would

3   start a pump.

4       Q  Now where would that pump go?

5       A  Right in the booster station, to pick up the water that

6   is adjacent to it in the 75,000 gallon redwood tank.  As that

7   water is pumped from the redwood tank up into the reservoir, the

8   booster redwood tank, in dropping, would immediately make a de-

9   mand on the well down in the river bottom.

10      Q  Which well, or is there any particular well?

11      A  Not necessarily.  We have them set up on a dial system,

12  so that one well is not overworked.  They work in series of two.

13  Each time a demand is made on a well, these electrical impulses

14  will indicate which one of the two wells would come on.  Imme-

15  diately upon the call from the booster station, redwood tank,

16  one of the wells will start and deliver water to the 75,000 gal-

17  lon redwood tank.  And the booster station or the booster pump

18  adjacent to the redwood tank, will immediately take that water

19  and deliver it to the reservoir.  And that will keep going that

20  way until the demand in the reservoir ceases.  When the demand

21  ceases, the float switch will indicate to the booster station it

22  needs it no longer.  The well will continue to fill the 75,000

23  gallon tank, and when that is completely full the float switch

24  will cut the well off.  And that is the way any time, whether it

25  is a great demand or a small demand, water is delivered to the

10b

1    reservoirs.

2        Q  Now what is the interrelationship between those redwood

3    reservoirs in the event of such a tremendous demand, the bigger

4    reservoirs?

5        A  Well, I don't know if I--

6        THE MASTER:  You referred to "redwood reservoirs".  He has

7    talked about a redwood tank and also about a reservoir.

8        MR. VEEDER:  I meant the reservoir.

9        THE WITNESS:  Reservoir.  All reservoirs, with the excep-

10   tion of number 1, are setting at the same elevation in camp.

11   If I remember correctly it is 400 and--540 feet.  And number 1

12   reservoir is 450 feet.  The connections are with 16 inch cast iron

13   lines from the booster station, and the redwood tank, the 75,000

14   gallon redwood tank, with Clayton valves controlling-- do you

15   want me to say what a Clayton valve is?

16   BY MR. VEEDER:

17       Q  Go ahead.  I wish you would, please.

18       A  A Clayton valve is a mechanical valve operated by water

19   pressure being injected into the diaphram to open and close a

20   valve.  That is all it is.

21       Q  Now, would there be a demand--what would be the operation

22   between the reservoirs and the pumps?  Would they work together

23   or would there be water pumped in as it was being  taken out, or

24   how is that operated during such a time?

25       A  The well--when you say "pumps", you mean the well?

11b

1      Q   I mean the basin?

2      A   In the basin.

3      Q   That is correct.

4      A   There are three stages, and it would be a physical im-

5   possibility to get the water from the well into the reservoir

6   without first going into the booster station, which has the red-

7   wood tank, because all wells are figured on the demand to the

8   booster stations, not to the reservoirs.  The reason for that is

9   when you are setting a line in the ground you save yourself

10   a tremendous amount of money in size of pipe due to your friction

11   loss.

12      They use the booster station to pick the water from the

13   well and kick it up into the reservoir.  That is the only way

14   you can get water from a well in the basin up to the reservoir.

15      Q   Are the high reservoirs interconnected, and if so would

16   a sudden large demand drain more than one of them?

17      A   All of the reservoirs are interconnected, and as one

18   reservoir goes  down the rest of the reservoirs go up.

19      Q   What was your function or responsibility during the

20   period in which the salt water intrusion occurred?  Did you per-

21   form any duties in that connection?

22      A   At that time, prior to that time, we were pumping water

23   from the Ysidora Basin.  When I say "we", I mean Camp Pendleton.

24   And each week a water report is made and sent to the Eleventh

25   Naval District chemist to analyze  all water from each designated

12b

1   well.  And the salinity content was running very, very high.

2        MR. SACHSE:  Your Honor, please, I am going to object on

3   the basis this is not responsive to the question, and he is

4   testifying to hearsay until he answers the question.  The question

5   is what were his duties on it.  I don't want him to tell what

6   was done until he states what his duties were.

7        THE MASTER:  Yes.  Will you try to answer the questions

8   specifically as to what your own duties were?

9        THE WITNESS:  My duties were the civilian in charge of the

10  removal of the pump that had to be closed down because of the

11  salt intrusion in Ysidora.  That is correct.  Is that what you

12  are looking for?

13  BY MR. VEEDER:

14      Q   Did you make any observations in connection with--what

15  were your personal observations in regard to the salt situation?

16      A   Well, my personal observation is that every week we get

17  a report.  And you could see that the salt content was going up

18  and up and up.

19      Q   Now do you take the samples, or how is that carried out?

20      A   We have certain routines to take samples from all diff-

21  erent areas.  And each Thursday one of the pump men on a normal

22  run from pump to pump will take a sample in a bottle that is

23  furnished from the Eleventh Naval District.  We maintenance,

24  pipe plumbing shop, Thursday evening, turn all of those bottles

25  over to Public Works, labeled, and they in turn take it down to

13b

1    the Eleventh Naval District for the chemist.

2         Q   Now what did you do at the time that this salt intru-

3    sion situation took place?  What actual function did you perform?

4         A   We removed the pump from the well, sealed the casing,

5    and just left a two inch opening with a coupling there and a

6    plug, so that from time to time we could continue to drop and

7    make a test of the water.

8         Q   What is being done in that connection now?

9         A   It is now being used as a sight well.  In other words,

10   a gauging station.  In that particular well I am talking about,

11   4C.

12        Q   4C has been marked on the map, but I would like to have

13   you point to it again, if you would?

14        A   Well, 4C is not down here.  4C--

15        Q   It is not on the profile?

16        A   No, it is one of the  pumps that is used on the irriga-

17   tion.  There it is.

18        Q   Would you take the green pencil and make a round circle

19   there?  Now, how far is that well from the Pacific·Ocean?  Do

20   you personally know?

21        A   I would say it is four miles, three miles.

22        Q   When did the analysis first show up that there was a

23   saline situation, a salt situation, that caused concern in the

24   camp?

25             MR. SACHSE:  If your Honor please, I still think this is

14b

1  hearsay.  This gentleman has already testified that he takes

2  the samples, sends them to somebody else for analysis.  We have

3  had the testimony of the man who I thought knew yesterday.  I

4  think that Mr. McNearny is merely testifying to hearsay.

5  THE MASTER:  I think that is objection is well taken, and

6  to a certain extent cumulative, Mr. Veeder.

7  MR. VEEDER:  I was opening up an additional field.  We

8  didn't locate the distance from the Pacific Ocean, or we didn't

9  identify all the wells in which the saline situation has arisen.

10  And this man certainly, from the standpoint of hearsay, he can

11  send in samples and be advised of a course to be taken by reason

12  of the results of the saline--of the salt situation, without

13  entering into the field of hearsay.  I framed my question in

14  such a manner that it was not hearsay as to what occurred when

15  this saline--"What did you do when this saline took place?"

16  MR. SACHSE:  Let's ask the reporter to check back the

17  question.  "When did this situation show up?"  That is the ques-

18  tion I am objecting to.  Rephrase it.

19  THE MASTER:  I think it will save time.  If you can re-

20  phrase the question along the line indicated, Mr. Sachse appar-

21  ently will not object.

22  MR. SACHSE:  Proceed.

23  BY MR. VEEDER:

24  Q  What action did you take when this saline situation

25  showed up, Mr. McNearny, from the standpoint of delivery of water?

15b

1    A   We immediately put that particular well 4C out of

2    operation.

3    Q   What other wells have been put out of operation by

4    reason of the saline situation?

5    MR. SACHSE:   Now, if your Honor please, I will object un-

6    less he lays a foundation to show that this man knows why each

7    well was put out of operation.   And I don't think he does.   He

8    is the maintenance shop, and somebody says, "Put a well out of

9    operation."

10   THE MASTER:   I believe, Mr. Sachse, he would be permitted

11   to state    the reason which was given to him for putting the

12   well out of operation.   You would then have the opportunity to

13   cross-examine him in regard to it.

14   BY MR. VEEDER:

15   Q   What other wells have been put out of operation by rea-

16   son of that situation?

17   A   5A2.

18   Q   Where is 5A2 situated?   Now where is that from the well

19   that you said the saline situation first showed up at, that 5C?

20   A   4C.

21   Q   4C.

22   A   4C and 5A2 are right in Ysidora Basin, not more than

23   400 feet apart, 500 feet apart.

24   Q   And where were there other wells which had been closed

25   down for the same reason?

16b

1    A   4C1.   And that is it.

2    Q   Where is that?

3    A   Right in the same vicinity, right there.

4    Q   Would you circle that, please?  Now in regard to the

5 delivery of sewage effluent into the Santa Margarita River Basin,

6 under whose responsibility--who has the responsibility in charge

7 of that operation?

8    A   Well, the maintenance officer had the responsibility

9 of that and he in turn details me to see that the water is picked

10 up from the disposal plants and pumped through the golf course

11 and placed in the open lagoon adjacent to the golf course, which

12 in turn runs through the--I don't remember the name of the area

13 there, but just in back of Ysidora, and headed by a dam, which

14 in turn runs through a 16 inch hendskin pipe right out into the

15 base and to the bed of the Santa Margarita River.

16    MR. VEEDER:  I have no further questions.

17    MR. SACHSE:  I have some.

18    MR. STAHLMAN:  May I have the word of what kind of a pipe

19 that is.

20    THE WITNESS:  Hendskin.  That is a piece of metal that has

21 a heavy wrapping on it, very light pipe.  In some instances a

22 14 gauge pipe.  It is a phrase used by the pipe people.

23    MR. SACHSE:  Would your Honor object if we take a recess

24 first?  I forgot my pocket magnifying glass.  Mr. Dennis says he

25 has one in his car.

     (Recess.)

17b

Z-1

THE CLERK:   Court is now in session.

MR. VEEDER:   I have one more question.

THE MASTER:   Mr. Sachse, Mr. Veeder I believe has one more question.

MR. VEEDER:   Yes.

Q   Would you state what use is being made of well 4C1 at the present time?

A   4C1 is now being used by the lessees to distribute water to the lemon groves.

Q   And you mentioned another well which you had closed down.   What number was that?

A   4C.

Q   Is any use being made of that at all?

A   Only as a gauging station.

MR. VEEDER:   I have no further questions.


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. McNearny, maybe if you would approach the map M-72, and again looking at 4C1, there appears to be a ten-inch line that runs from 4C1 down to Reservoir No. 5; is that right?

A   It is still connected, yes.

Q   Now when you say the "lemon grove", do you mean the lemon grove on the South Mesa or the lemon grove on the North Mesa or both?

Z-2

1     A   The lemon grove on the -- well, wait.

2     Q   Camp Del Mar area?

3     A   In the Del Mar area, surely.  That is what I mean.

4     Q   Now, I also notice that the symbols on M-72 for a well

5 in operation is a triangle in a circle, and I see that 5A2 is

6 a triangle in a circle, but you are stating now it is not in

7 operation; is that correct?

8     A   That is correct, it is not in operation.

9     Q   The symbol then in this instance is wrong?

10     A   That is correct.

11     Q   Now, how about 5A5, is that in operation?  That shows--

12     A   That is not one of my wells.

13     Q   You don't know about that one?  Now as I understood--

14 I want to clarify something here on this.  As I understood

15 Mr. Cannon's testimony yesterday, he stated that the entire

16 reservoir booster well system was not yet entirely mechanical.

17 That is what I understood him to say.  Is it entirely mechan-

18 ized, as you described, or are there parts of it that still

19 have to be done manually?

20     A   There are parts that will have to be manually operated,

21 that is correct.

22     Q   In other words, there is not then a complete automatic

23 system covering all reservoirs, all boosters and all wells?

24     A   No, sir, there is not.

25     Q   Now, you discussed briefly the difficulty of determining

Z-3

1    whether water from any given reservoir went into or outside of

2    the watershed, particularly with reference to the 17 Area and

3    the Division Area.

4        A   Yes, sir.

5        Q   Now, looking at the map-- pardon me, at M-72, it

6    appears to me-- and correct me if I am wrong-- that there are

7    four main feeder lines approaching that area from the north,

8    16-inch, 19-inch, 16-inch--

9        A   They are all 16.

10       Q   They are all 16?

11       A   Yes.

12       Q   There are four feeder lines that serve that area, four

13   big ones; is that correct?

14       A   When you say "that area", from each one of the reser-

15   voirs there is a 16-inch line leading away.

16       Q   And I am confining my discussion now to the area marked

17   on M-72 as Division Area.   That is Mr. Cannon's language.

18       A   Yes, that is correct.

19       Q   And 17 Area, that is all I am talking about.

20       A   Yes.

21       Q   And there are four main lines that would serve that

22   area; is that correct?

23       A   Actually there is only one line that serves that, the

24   pipe line that is going to that particular area.   There is only

25   one line, one pipe line running into this area.   The water line

Z-4

1   is not--

2       Q   You still haven't followed my question.  To get water

3   into these two areas, the Division Area and the 17 Area, it

4   could come through any one of four lines, could it not?

5       A   Yes, that is correct.  That is correct.

6       Q   Now is there any reason why each of those lines could

7   not be metered at the watershed line?

8       MR. VEEDER:   Now I object to that question.

9       THE MASTER:   The question is proper.  You may answer.

10  BY MR. SACHSE:

11      Q   Is there any reason why each of those could not be

12  metered at the watershed line?

13      A   I don't imagine there is any reason why they couldn't.

14      Q   Now with regard to your Wire Mountain Homes, if I

15  understood you correctly you said the water is metered there.

16  You mean it is metered to the house, in that case?

17      A   Metered to the area.

18      Q   To the area?

19      A   To the area.

20      Q   How is that done, on what line?  Can you indicate,

21  please?

22      A   There are two separate areas of housing, this indicated

23  here, housing area.  When I say "here", I mean down at Wire

24  Mountain and a trailer area.  The line coming into the trailer

25  area has a meter on it.

1230

Z-5

1    Q   In other words,-- let's stop right there for a minute.

2    In other words, all water that goes out of the watershed to

3    the trailer area is metered?

4        A   That is correct.

5        Q   Now let's go on.   Explain Wire Mountain Housing.

6        A   The water going into the housing area is also metered.

7    De Luz.

8        Q   Now that is the next one I want to ask you.   Now De

9    Luz Housing Area is within the watershed?

10       A   It is also metered.

11       Q   But the water to the housing area is metered?

12       A   That is correct.

13       Q   But the water to the Division Area and the 17 Area

14   is not metered?

15       A   That is correct, other than our meter at the wells.

16       Q   At the wells, yes.   You can be seated.   Do you know

17   how long--  Withdraw that.   I believe it was testified-- and

18   please correct me if I am wrong-- that 4C1 was shut off in '47

19   or '48; is that right?   The pump was pulled in '47 or '48, or

20   tell me, if you know?

21       A   4C1, the pump was never pulled.   4C, the pump was

22   pulled.   Those are two different wells.   4C and 4C1 are two

23   different wells.

24       Q   Well 4C, then the pump was pulled when, about?

25       A   '49, 1949 or 1950, right in that time.

Z-6

1    Q   And it is still out of operation?

2    A   Yes, it is not longer operated.

3    Q   But 4Cl, although the pump wasn't pulled, pumping was

4  discontinued for a time?

5    A   By the Marine Corps.

6    Q   Yes.  Now when was that done?

7    A   1950, I believe.

8    Q   But pumping for agricultural use from that well was

9  never discontinued; is that right?

10    A   I wouldn't want to make a statement like that.

11    Q   You don't know?

12    A   Because I don't know.

13    Q   Then if you could not answer if it was discontinued

14  at any time, you wouldn't know whether it was resumed again

15  either?

16    A   No, sir, I would not.

17    Q   Now similarly, M-72 indicates that 5A2 and 5A5 and 4B2

18  are not pumped.  It bears that legend on it.  It bears that

19  legend on the diagram.  Is that true today?

20    A   That is true.

21    Q   Do you know when they stopped pumping those wells?

22    A   I would say as a guess in 1950 or thereabouts.

23    MR. VEEDER:  Now I am going to move to strike that.  "Yes,

24  no" shouldn't be in the record.

25    THE MASTER:  That can be stricken, unless you have some

Z-7

1   definite source of information.

2       THE WITNESS:  No, no more than I have the other.

3       THE MASTER:  That will be stricken, then.

4   BY MR. SACHSE:

5       Q  Do you have specific knowledge as to when any of these

6   wells were shut off or turned on?

7       A  By checking my records I have, yes.

8       Q  But as of now, no?

9       A  No.

10      MR. VEEDER:  Do you want us to get that information for

11  you, Mr. Sachse?

12      MR. SACHSE:  No, not at the moment.

13      Q  Do you know anything about when well 35925 was shut off?

14      A  Come again?

15      MR. SACHSE:  Even with a glass I can't read these numbers.

16  I am trying to look at this one, whatever the number of that

17  well is.

18      THE WITNESS:  Let's see.

19  BY MR. SACHSE:

20      Q  If you know.

21      A  Again I can give you the answer if I look at my

22  records.

23      Q  But you do not know now?

24      A  I do not know.

25      Q  And you would give that same answer if I went right

Z-8

1   down the line of any of these, that you do not know today?

2       A   That is correct.

3       MR. SACHSE:   All right, I have no further questions.

4       THE MASTER:   Mr. Dennis.

5       MR. DENNIS:   Yes, I have some questions.

6       Q   How far away is well 4C located from 4C1?

7       A   Well, it is in the very immediate vicinity.

8       Q   100 or 150 feet?

9       A   Well, there is no great distance.

10      Q   Do you know the depth of well 4C1?

11      A   No, sir.

12      Q   Or can your answer be the same for well 4C?

13      A   I can get it for you.

14      Q   From your records.   I notice you have had a chance

15   to examine the plan which is contained on Plaintiff's Exhibit

16   M-72.

17      A   Well, no more than since I have been up there.

18      Q   Would you say it is correct, so far as you know, so

19   far as it attempts to state the water system in both irrigation

20   and domestic?

21      A   I know nothing about the irrigation system.   But as

22   far as the domestic, I would say it is correct.

23      Q   Now I notice that the symbol for wells 4C and 4C1 and

24   5A2 show that it is an operating well and a part of the

25   domestic system.   Would that be correct?

Z-9

1    A  At one time it was.

2    Q  But not now?

3    A  No, sir.  It is no longer operating, as far as the

4  Marine Corps is concerned.  And 4C-- you said 4C?

5    Q  Yes, I did.

6    A  That no longer exists.  It is not any more than a

7  hole in the ground.

8    Q  Not any more than a hole in the ground.  So, so far

9  as that symbol would indicate there was an operating well there

10  at the present time, it is incorrect?

11    A  It is in correct, that is right.  I believe I told

12  Mr. Sachse that before.

13    Q  Now calling your attention to this area on the plan

14  of M-72 labeled "California Department of Agriculture Irrigation

15  Area," that is an irrigated area, is it?

16    A  That is correct.

17    Q  Is that irrigated from the domestic system or from

18  the irrigation system?

19    A  From the irrigation system.

20    Q  From the irrigation system?

21    MR. VEEDER:  We will have to get some terms straightened.

22  Domestic and irrigation, is that the question asked?

23    MR. DENNIS:  That is correct, yes.

24    MR. VEEDER:  You mean the military and the agriculutural?

25    MR. DENNIS:  Well, we have two lines on the legend that

Z-10

1    indicate that, a solid line as water line-- and I think that

2    has been referred to as the domestic system.  And then we have

3    a dash line which in the legend is referred to as the irriga-

4    tion line.

5         MR. VEEDER:  I was just trying to keep Mr. McNearny

6    straight.

7         THE WITNESS:  Yes, that is right.

8    BY MR. DENNIS:

9         Q  So is the domestic line, or water line, tied into the

10   lines that irrigate the area I have referred to as being

11   occupied by the California Department of Agriculture?

12        A  You say is it tied into it?

13        Q  Yes.  Is it tied in?  Can you deliver water from the

14   domestic system to this area?

15        A  By changing some valves we could, but it has been

16   definitely cut off.

17        Q  But it would be-- to turn water through the water lines

18   which constitute a part of the domestic system, all you would

19   have to do is open some valves to turn water into the area?

20        A  Make some changes.

21        Q  And I think in reference to well 4C1, you said that

22   was no longer operated by the Marine Corps?

23        A  That is correct.

24        Q  By that you mean that it is operated by certain

25   lessees of the Marine Corps?

Z-11

1     A   That is correct.   Also--

2     Q   Are there other wells which are operated by the

3  lessees of the Marine Corps, so far as you know?

4     A   Yes, sir.

5     Q   What wells?

6     A   All of the irrigation wells are operated by the-- as

7  a matter of fact, Mr.-- what is his name?

8     Q   Stuart?

9     A   No, Nichols.

10    Q   Nichols?

11    A   He is the one that handles all of the operation for

12  the lessees.

13    Q   Now those two wells that are operated by the lessees,

14  what wells are they, do you know?

15    A   Well, they are all indicated in here now.

16    Q   But there is no-- so far as I can determine, there

17  isn't anything that indicates which are domestic wells and

18  which are irrigation wells, so far as the symbol is concerned.

19  Do you have a symbol--

20    A   That is correct.

21    Q   You have a symbol for wells in operation, observa-

22  tion wells, and wells not in operation.   But there is nothing

23  on the plan which indicates which wells are used for irriga-

24  tion.

25    A   That is right.

Z-12

1      Q   And which wells are used for your domestic water

2   system.

3      A   That is right.

4      THE MASTER:   Mr. Dennis, wait a minute.   Did you speak

5   correctly there?   As I understood you to say the symbol for

6   operation.

7      MR. DENNIS:   Observation.

8      THE MASTER:   I apparently misunderstood.

9      THE WITNESS:   This morning was the first time I ever

10   actually got a look at this.   I believe that Mr. Cannon had

11   this drawn out for a first check through all of the water

12   system and the effluent lines from the disposal water.   And

13   very definitely there is some incorrect notations because of

14   this particular well right there.

15      MR. VEEDER:   May I make a statement here now?   Mr. Cannon

16   explained that this is a map that has been brought forward,

17   and he explained fully that it is a map reflective of changes

18   that have been made down through the years.   And it was offered

19   on that basis.   There is no-- it shows what was correct at one

20   time.

21      MR. DENNIS:   I am not trying to make any point of the

22   fact there was errors made in connection with the drafting of

23   the map.

24      MR. VEEDER:   There weren't any.

25      MR. DENNIS:   But what I am trying to get is the fact of

Z-13

1   which wells are irrigation wells or which wells are operated

2   by lessees of the Marine Corps and not by the Marine Corps it-

3   self.

4        THE WITNESS:  Let me put it an easier way.  There are no

5   wells being operated by the Marine Corps in Ysidora Basin.

6   BY MR. DENNIS:

7        Q  Now do you supply any water for irrigation from the

8   domestic system?

9        A  No, sir.

10       Q  Do you know of your own knowledge whether or not there

11  are charges made to the lessees for the water consumed by them?

12       A  Only from hearsay.  I have no--

13       Q  You have no knowledge?

14       A  No knowledge.

15       Q  Have you had an opportunity of examining the area

16  which is labeled here 'Stuart Agricultural area", the 1,100

17  acres?

18       MR. VEEDER:  Beyond the scope of the direct examination,

19  your Honor.

20       THE MASTER:  I think the objection is well taken, unless

21  you wish to make him your own witness.

22       MR. DENNIS:  Well, not at this time.

23       MR. VEEDER:  Do you have any further questions?

24       THE MASTER:  Do you have any further questions, Mr. Dennis?

25       MR. DENNIS:  Yes, I have one other question.

Z-14

4

1    Q   When did the Marine Corps cease to operate any wells

2    in the Ysidora Basin?

3        A   1950, I believe.

4        Q   And you stated you have the water analyzed in each

5    well I think weekly.

6        A   Yes, sir.

7        Q   Do you also have the water in the wells in the

8    Ysidora Basin which are operated by the lessees analyzed

9    chemically?

10       A   Only when they are requested.

11       Q   And are those records kept under your jurisdiction?

12       A   In Public Works.

13       Q   In Public Works.   That would be Mr. Cannon's depart-

14   ment?

15       A   That is correct.

16       MR. DENNIS:   I think that is all.

17       MR. VEEDER:   I have just--

18       THE MASTER:   Just a minute.   Mr. Stahlman, do you have

19   any questions?

20       MR. STAHLMAN:   Your Honor, may I have a right to reserve

21   my cross-examination.   He will be available for cross-examina-

22   tion, will he not?

23       MR. VEEDER:   Oh, yes.

24       MR. STAHLMAN;   Right at this time I will not burden the

25   record.

Z-15

THE MASTER:  Mr. Moskovitz?

MR. MOSKOVITZ:  I have one question.


CROSS-EXAMINATION

BY MR. MOSKOVITZ:

Q  Mr. McNearny, I think at one point in the direct examination you said that all reservoirs are tied together in your domestic system; is that correct?

A  Yes, sir.

Q  Am I correct in my understanding that there is at least one reservoir which is on a different elevation than the others?

A  No. 1.

Q  Is that also tied to the other four?

A  Yes, sir.  It gets its water from No. 2, 3, and 4.

Q  I see.  It is not hooked up with its own booster and its own-- well, its own booster?

A  No, sir.  They are all tied together.

MR. MOSKOVITZ:  That is all.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q  Mr. McNearny, you stated that there is no irrigation whatever from the system which delivers water to the military establishments.  How about the area directly across from the Base Headquarters Parade Grounds.  Now they do have a sprinkler

1241

Z-16

1  working there sometimes, do they not?

2      A  Well, you said-- the question was "irrigation".  I

3  assumed Mr. Dennis meant in the area of Del Mar.  We have many

4  sprinkling systems throughout the camp.

5      Q  What are they used for, Mr. McNearny?

6      A  What?

7      Q  What are they used for?

8      A  To keep grass so that the dust will be kept down.

9      MR. VEEDER:  Well, I wanted to clear that up, your Honor.

10  There might have been some question of when we use our sprinklers

11  on our lawns and shrubbery, there might be some questions on

12  it.  I have no further questions.

13      MR. DENNIS:  Just one further question.

14

15                    RECROSS-EXAMINATION

16  BY MR. DENNIS:

17      Q  However, you do not irrigate any row crops, vegetables

18  or flowers that are raised for the market?

19      A  No, sir.

20      MR. VEEDER: I have no further questions.

21      THE MASTER:  That is all, then, Mr. McNearny.

22      MR. VEEDER:  Call Mr. William D. Taylor.

23

24

25

Z-17

1            WILLIAM D. TAYLOR,

2    called as a witness by and on behalf of the plaintiff, sworn,

3    testified as follows:

4

5            DIRECT EXAMINATION

6    BY MR. VEEDER:

7        Q   Would you state your full name, Mr. Taylor?

8        A   William D. Taylor.

9        Q   And what is your residence?

10       A   1650 San Luis Rey Avenue, Vista.

11       Q   How old are you, Mr. Taylor?

12       A   Forty-six.

13       Q   And would you state briefly your educational back-

14   ground, starting with the elementary school and--

15       A   I attended elementary school and high school in

16   Redondo Beach, California.  I received a minor degree from

17   Compton Junior College in Compton, California.  And I have a

18   Bachelor's Degree-- or a Bachelor of Science Degree in Forestry

19   from the University of Idaho.

20       Q   And when did you receive that degree?

21       A   1938.

22       Q   Would you briefly state your experience since

23   graduating from college in 1938?

24       A   I was employed almost immediately after graduation by

25   the Soil Conservation Service of the Department of Agriculture,

Z-18

1    United States Department of Agriculture in Nevada and Northern

2    California and in San Diego County for ten years.

3        Q   And what were your responsibilities at that time?

4        A   For the first five years I was doing range and soil

5    survey work on what was known as a mobile crew.  And for the

6    last five years I was in San Diego County-- that was '41 to

7    '48, the last seven years-- I was a district farm planner.

8        Q   What work did that entail?

9        A   Advising farmers, drawing up complete soil conserva-

10   tion farm plans for farmers and ranchers.

11       Q   When you say drawing up farm plans, will you be a

12   little more specific as to what was done?

13       A   Using the physical characteristics of their land as

14   a guide, we set forth proper land use for each soil on the

15   property, together with the conservation practices, minimum

16   conservation requirements to keep the soil in good condition

17   and still maintain an adequate productive level.

18       Q   Now, Mr. Taylor, what are your present responsibili-

19   ties?

20       A   I am a soil conservationist.

21       Q   With whom are you employed?

22       A   Employed by the Marine Corps Base, Camp Pendleton.

23       Q   Now would you describe your duties in that regard?

24       A   My overall general duties are early soil conservation,

25   land management throughout Camp Pendleton.  I am responsible

Z-19

1    for land management planning for the whole Base.

2        Q   Now what does that entail, land management planning

3    for the whole Base?

4        A   It entails making plans for the prevention of land

5    deterioration from whatever cause might arise, primarily

6    military causes.

7        Q   Of what character would that be?

8        A   Well, we all know that military activity is extremely

9    damaging to land.   And we all know that it is desirable to

10   keep land in good condition, even for military training.   And

11   it is the desire of the Marine Corps to maintain their com-

12   plete reservation in the best possible condition, not only as

13   a matter of principle, but to insure that future generations

14   of marines will have an adequate and suitable place to train.

15       Q   When you say that the war activity or military ac-

16   tivity is destructive of the land, would you describe what

17   particular-- or any of the activity that has that result?

18       A   Well, a good example would be artillery.   You fire a

19   155 howitzer, the missile lands on the ground and blows a

20   hole in it.   That is quite damaging.

21       MR. SACHSE:   I think we will stipulate to that.

22       MR. VEEDER:   Let the record show that Mr. Sachse has

23   at last agreed to stipulate to something.

24       Q   What is the fact of operating tanks?

25       A   Tanks also.   Certainly when they operate rather

Z-20

1   continuously over the same terrain year in and year out they

2   have a tendency to wear the ground away.  Certainly they

3   destroy the vegetative cover and they give rise to erosive

4   action.

5        Q   Where are some of these places where the tanks are

6   used for training within the enclave?

7        A   The primary area where tanks are used is the coastal

8   strip north of Cocklebur Canyon, between Cocklebur Canyon and

9   Las Flores.

10       MR. SACHSE:  Now, if your Honor please, I happen to know--

11   and I will ask if that is not out of the watershed.  And if it

12   is out of the watershed I will move the answer be stricken.

13   Mr. Veeder is dragging in matter that is completely outside the

14   watershed, and he knows it.

15       MR. VEEDER:  I assure your Honor that I was simply

16   getting from this gentleman statements as to what his ac-

17   tivities were.  And I am sure that you are not going to be very

18   far misled by--

19       THE MASTER:  Well, as long as we don't go into any ex-

20   tended narration of activity outside of the watershed, I think

21   that the witness should be permitted to state the scope of

22   his operations, even though those do include some activity

23   outside the watershed.  So the objection will be overruled.

24   Would you go ahead?

25       THE WITNESS:  Well, I could continue that by stating

Z-21

1  we have considerable tank activity within the watershed.

2  BY MR. VEEDER:

3      Q  And where is that?

4      MR. VEEDER:  And I want to thank Mr. Sachse for it.  Go

5  ahead.

6      THE WITNESS:  We have tank activity all up and down the

7  Santa Margarita River.  It is confined to relatively narrow

8  trails through the lower stretches of the Santa Margarita

9  River.  In the vicinity of the Ranch House it branches out

10  and becomes somewhat more widespread.  In other words, they

11  don't stick to a narrow trail farther upstream.

12  BY MR. VEEDER:

13     Q  Now, what are your responsibilities in connection

14  with the agricultural operations within the watershed of the

15  Santa Margarita River?

16     A  I have the responsibility of administering the physi-

17  cal aspects of the farming activity.

18     Q  Now when you say the "physical aspects", would you

19  state in particular what you mean by that?

20     A  The legal aspects, for example the preparation of

21  leases, the collection of rentals and that sort of thing is

22  not within my responsibility.  It is handled by the District

23  Public Works Office in San Diego.

24     Q  But what do you do yourself?

25     A  Physical aspects, soil conservation, it is my duty

Z-22

1   to-- to insure that the lessees are fulfilling their-- the

2   terms of their contracts, that they are using the land properly,

3   that they are not wasting water, that-- I think that sums it up.

4        MR. VEEDER:   I would like to have marked for identifica-

5   tion Plaintiff's Exhibit 78.

X   6        THE CLERK:   78.

7   BY MR. VEEDER:

8        Q   I hand you Plaintiff's Exhibit marked for identifica-

9   tion M-78, and I ask you to state what it is, and to read the

10   designation in the upper left-hand corner, including the

11   legend.

12        MR. SACHSE:   78?

13        MR. VEEDER:   78.

14        THE WITNESS:   Would you like to have me display it?

15        MR. VEEDER:   No, you just identify it now.

16        THE WITNESS:   Well, it is identified as Camp Joseph H.

17   Pendleton, Scale 1 to 50,000, Date 1 October, 1956, Farming

18   and Grazing.

19        MR. SACHSE:   Farming and what was the last word?

20        THE WITNESS:   Farming and Grazing.

21   BY MR. VEEDER:

22        Q   And you know it to be accurate from the-- the iden-

23   tification to be accurate from your own personal knowledge?

24        A   I made it.

25        Q   Would you answer the question?

Z-23

1    MR. MOSKOVITZ:  What was the answer?

2    THE WITNESS:  I do.  May I say that it is as accurate as

3    can be made on this scale.

4    MR. VEEDER:  Have you had an opportunity to look at the

5    exhibit?

6    MR. SACHSE:  Yes, no objection.

7    MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

8    marked M-78 for Identification.

9    THE MASTER:  It will be received as Plaintiff's Exhibit

XR    10   78.

11   MR. MOSKOVITZ:  Mr. Veeder, how many copies of M-78 did

12   you put on this table?

13   MR. VEEDER:  I put one set there.  There is another set,

14   Mr. Moskovitz.  There will be copies available for all counsel,

15   if each counsel wants a set.

16   MR. MOSKOVITZ:  Well, I would like a set of everything

17   you have copies of.

18   MR. VEEDER:  Here is another copy, if you desire.

19   MR. SACHSE:  Isn't that the same one?

20   MR. MOSKOVITZ:  No.

21   MR. SACHSE:  I guess it is.

22   MR. STAHLMAN:  How about me, do I get one, too?

23   MR. MOSKOVITZ:  We have to pull teeth.

24   MR. VEEDER:  The firm of Sachsovitz-- I think when I give

25   them a map it takes care of both.

Z-24

1          MR. MOSKOVITZ:  If Mr. Veeder doesn't already know, I

2     represent the State of California.

3          MR. SACHSE:  My name is not Sachsovitz.

4          MR. VEEDER:  I am talking about the firm.

5     BY MR. VEEDER:

6          Q   I am going to hand you the pointer, Mr. Taylor, and

7     ask you to refer to Plaintiff's Exhibit M-78 and to point out

8     the areas in which --

9          MR. DENNIS:  I think I am going to interpose an objection

10    to this portion of the map which refers to the areas outside

11    the watershed of the Santa Margarita River, on the grounds

12    that anything on the map which depicts physical features out-

13    side of the watershed of the Santa Margarita River are totally

14    incompetent, irrelevant, and immaterial, and fail to tend to

15    prove or disprove any issues in this action as to the various

16    defendants.

17         MR. SACHSE:  I concur in the objection.  And I would like

18    to call to your Honor's attention this is the whole camp.  It

19    goes clear up to Orange County.  It has San Onofre in it, Las

20    Pulgas, Aliso, all of which are outside the scope of any issue

21    in this proceeding.

22         THE MASTER:  The exhibit is in evidence.  If questions

23    are asked concerning portions of the exhibit and the questions

24    themselves are outside the scope of the inquiry, why objec-

25    tions will be sustained to those questions.

Z-25

1        MR. VEEDER:   I would ask the witness, if he can, to just

2   draw-- I hate to hear all this magpie-- you just draw on here

3   roughly the watershed, as you know it, Mr. Taylor.   Then there

4   will be no question about the areas in which you are testify-

5   ing.

6        THE WITNESS:   May I change the position of the map?

7        MR. VEEDER:   Yes, set it up any way you want.

8        Q   Just very roughly delineate it with that red pencil.

9        A   Well, it will be very rough.   I don't know where--

10   about Stuart Mesa.

11        MR. VEEDER:   I am just trying to meet the objection that

12   has been raised, your Honor.

13        Q   Would it be helpful to look at M-13?

14        A   No.   That is as near as I can do offhand.

15        Q   Would you take the pointer then and indicate the areas

16   under your administration as in your official capacity?   Just

17   indicate the areas where the farm operations are conducted

18   within the watershed.

19        A   You are talking about farm operations?

20        Q   That is right.

21        A   Right here.

22        Q   When you say "right here", you are indicating what

23   area?

24        A   Stuart Mesa.

25        Q   And where is that located in regard to the Santa

Z-26

1    Margarita River?

2        A   It lies north of the Santa Margarita River and

3    adjacent to the Pacific Ocean.

4        Q   And what use is being made of that land for agri-

5    cultural purposes at the present time?

6        A   40 acres of lemons, and the remaining area is in row

7    crops.

8        Q   And when you say "row crops", would you state the

9    kind and types of crops generally that are raised there?

10       A   Flowers, tomatoes, cabbage, string beans.  Those are

11   the main crops.

12       Q   What period of the year are those lands utilized for

13   the row crops?

14       A   There is a little something in the year round.

15       Q   When you say "a little something", what do you mean by

16   that?

17       A   Well, there is a rotation.  We have certain crops that

18   are grown during the winter, throughout the winter, and certain

19   crops that are grown throughout the summer.

20       Q   All right.  For example, what are your winter crops?

21       A   Cabbage, primarily.

22       Q   And what are the summer crops that are raised?

23       A   We have a spring crop of squash, string beans.  Summer

24   crops are primarily tomatoes.  The flowers, of course, are a

25   year-round proposition.  There is always some type of flower

1252

Z-27

1  that is growing.

2      Q   Now, Mr. Taylor, pointing to-- referring to the area

3  south of the Santa Margarita River and adjacent to the Pacific

4  Ocean, would you state what agricultural use is made there?

5      A   There are 65 acres of lemons and 163 acres leased to

6  the State of California.

7      Q   What does the State use that land for?

8      A   The State's use of the land is for testing seed

9  potatoes for virus diseases.

10     Q   By the way, how long have you been in the present

11  position that you hold?

12     A   I started the 15th of November, 1948.

13     Q   How long, to your knowledge, has the State of Cali-

14  fornia been utilizing that land?

15     A   It was there when I came.

16     Q   Has it been continually using the land since that time?

17     A   Yes, sir.

18     Q   Now, what other agricultural activities are conducted

19  south of the river, in what you call South Mesa?

20     A   I have named the only two leases. the State of

21  California does not do its own operating.  It has a contract

22  with a private operator.  You could probably call him a sub-

23  lessee.  In exchange for doing the State's operating for them,

24  he is allowed to use whatever land is left over for his own

25  private crop production.

Z-28

1    Q   Have you knowledge of how much acreage is planted by

2  the State and how much acreage that he plants?

3    A   The State's acreage, of course, varies from year to

4  year.  It averages around 50 acres of potatoes per year.  And

5  the farmer will average around 50 acres per year.

6    Q   Now, in regard to the other agricultural areas, would

7  you point to them on the map?  Are there any other agricultural

8  activities on the camp that are under your jurisdiction?

9    A   Within the watershed?

10    Q   Within the watershed.

11    A  We are still talking about farming?

12    Q   Yes.  Yes.  Agricultural crops.

13    A   No, there are no others.

14    Q   Now, what about the utilization of lands within the

15  watershed for livestock purposes, grazing.  Does that come

16  under your jurisdiction?

17    A   Yes, sir.

18    Q   And would you describe that activity?

19    A   We make an attempt to graze as many livestock on the

20  Base as is possible without conflicting with military activity,

21  partly to utilize a resource and partly to assist the camp in

22  fire control, reduction of our fire hazard.

23    Q   How would that be accomplished by grazing the area?

24    A   The native vegetation in this country becomes ex-

25  tremely dry and inflammable in the summertime, and we make an

Z-29

1   effort to remove as much of it as we can while it is green,

2   before it is allowed to dry up.  And, of course, it can be an

3   extreme fire hazard if it is not thinned out, removed.

4       Q   Now, how many head of livestock are pastured within

5   the watershed, do you know?

6       MR. DENNIS:  That is the watershed of Santa Margarita?

7       THE WITNESS:  The number of livestock of course, is ex-

8   tremely variable.  There are seasons of the year when we have

9   nothing there.

10  BY MR. VEEDER:

11      Q   What would be such a time?

12      A   In late summer, when everything is so dry that it

13  simply isn't grazable, it is customary that the livestock are

14  removed.

15      Q   Now, what is the maximum--  Well, tell the periods

16  then when the livestock are on the land?

17      A   Well, the ideal grazing season is from roughly the

18  1st of December till sometime in June.  Of course, that coin-

19  cides with the rainy season.

20      Q   Now, what about the maximum number that you have ever

21  grazed on these lands, alluding to the watershed of the Santa

22  Margarita River.

23      A   Within the watershed we have had as many as 2,200 head

24  of cattle.

25      Q   At what time was that?  What period was that?

Z-30

A   Between December and June.

Q   All right.

A   And as many as 4,000 sheep.

Q   How many head of stock are there grazing on the land now, Mr. Taylor, do you know?

A Approximately 2,000 sheep and approximately 200 cattle.

Q   Now, do you know the number of acres of land that is subject to irrigation under the system as it presently exists on the Stuart Mesa?

A   Would you restate that, please?

Q   Do you know how many acres of irrigable lands are situated on the Stuart Mesa which are susceptible of irrigation, under the irrigation system as it presently exists?

A   Approximately 1,100.

Q   And would you state the same-- would you state the number of acres under the irrigation system which is susceptible of irrigation on the South Mesa?  If you want to refresh your memory, you can.

A   Well, I will have to do a little guessing.

Q   Don't guess.

A   I mean I don't have that figure in my head.  I would say at the moment, with the housing developments and so forth--

Q   No, I say susceptible, including the area where the houses are situated, the whole area.

MR. SACHSE:  Wait a minute.  I don't understand the

1256

Z-31

1  question either.   Now I am lost.

2        THE MASTER:   That is, do you mean by the question the

3  area which could be irrigated if there weren't any houses in

4  the way?

5        MR. VEEDER:   That is right.

6        THE MASTER:   Take the total area just as if there weren't

7  any houses on it.

8        THE WITNESS:   I would say 600.

9  BY MR. VEEDER:

10       Q  Now under whose direction--

11       MR. DENNIS:   I wonder-- I am a little confused.   Is the

12  witness's answer 600 acres within the watershed of the Santa

13  Margarita that is under irrigation?

14       THE WITNESS:   No, sir.   I didn't say within the water-

15  shed.   I said on the South Mesa.

16       MR. VEEDER:   On Stuart Mesa.

17       MR. DENNIS:   On South Mesa.

18       MR. VEEDER:   South Mesa and Stuart Mesa both.

19       THE WITNESS:   Two separate questions.

20       MR. VEEDER:   That is right.

21       Q  Now under whose direction is the irrigation system

22  operated to serve both the Stuart and South Mesa farming

23  operations?

24       A  Whose immediate--

25       Q  Yes.

Z-32

1    A   Robert A. Nichols.

2    Q   And would you state who he is?

3    A   Robert A. Nichols is a lessee.  The irrigation system

4    which, incidentally, was in existence prior to the Marine

5    Corps, has been leased to a private operator, who in turn

6    operates the system and sells water to individual farmers.

7    Q   And do you have personal knowledge as to the quan-

8    tities of water that are delivered, that have been delivered,

9    the maximum quantity that has been delivered in the past?

10   A   I do.

11   Q   And would you state what that is?

12   A   Again, it varies.

13   Q   I said the maximum.

14   A   The maximum?

15   Q   That has ever been delivered, to your knowledge.

16   A   Approximately 3,000 acre feet.

17   Q   And what has--

18   MR. SACHSE:  What period?

19   THE MASTER:  That is one year?

20   THE WITNESS:  Yes, sir.

21   MR. SACHSE:  Excuse me.  Is that for both areas or--

22   THE WITNESS:  That is for both areas.

23   MR. SACHSE:  O.K.

24   MR. DENNIS:  That would be within and without the water-

25   shed, too?

Z-33

1        THE WITNESS:   Total area.

2        MR. DENNIS:   Whether within or without?

3        THE WITNESS:   Within and without.

4    BY MR. VEEDER:

5        Q   And again that is for the period since you have been

6    there?

7        A   Yes, sir.

8        Q   Now, what has been the method of operations of these

9    agricultural lands in so far as they relate to the military

10   activities within the Camp Pendleton area, which has priority?

11       A   Well, the military always has priority.   All of the

12   leases contain clauses that they can be made null and void

13   without notice in case of military necessity or training

14   necessity.

15       Q   Now what action was taken during the extremely dry

16   period from 1952 through 1957 in regard to the number of acres

17   which were under cultivation?

18       MR. SACHSE:   Where?

19   BY MR. VEEDER:

20       Q   On the Stuart and South Mesa.  How does the acreage

21   compare with the maximum acreage that was--

22       A   Well the acreage at the present time is somewhat more

23   than 200 acres less than it was eight years ago.

24       Q   What was the reason for that?

25       A   Primarily the lack of water.

Z-34

1    Q  And how do you handle the situation when there is a

2    shortage of water, from the standpoint of the lessee?

3    A  We are-- the lessees-- every lessee on Camp Pendleton

4    is on a water ration.  He is allotted a certain number of

5    acre feet for a 12-month period, above which he doesn't dare

6    use.

7    MR. VEEDER:  I have no further questions.

8    THE MASTER:  Mr. Sachse.

9

10                   CROSS-EXAMINATION

11   BY MR. SACHSE:

12   Q  Is it characteristic of your operation of the grazing

13   areas that the stock is all off by late summer?

14   A  I would say so, yes, sir.

15   Q  And is it also likewise characteristic that the heaviest

16   stock population would be in the spring after the rains?

17   A  That is correct.

18   Q  In other words, you have a gradual increasing stock

19   population say from the first of October until the time there

20   is a good grass coverage, and then a gradual   decreasing until

21   July?

22   A  That is correct.

23   Q  You used a word in describing Mr. Nichols' operation

24   that I don't understand.  You stated, as I understood it, that

25   Mr. Nichols has charge of the irrigation district system and

Z-35

1  that he sells water to the individual farmers.  Did I under-

2  stand you correctly?

3      A   That is correct.

4      Q   How does that operate?

5      A   Each individual farmer receives water through a meter.

6  The lease is written in such a way that the lessee pays as rent

7  a certain percentage of gross receipts that he receives from

8  farmers for water sales.

9      Q   Does Nichols also sublease the land itself?

10      A   No, sir.  Mr. Nichols has control of no lands, only

11  the water system.

12      Q   So if we take any individual lease-- and I am not

13  trying to be specific-- but any particular parcel say on Stuart

14  Mesa-- let's just imagine 10C down here is in the hands of a

15  man named Jones, who has a lease with the Navy; is that right?

16      A   Correct.

17      Q   Which requires a payment to the Navy for the use of

18  the land.

19      A   Yes, sir.

20      Q   And Jones also makes a payment to Nichols for the use

21  of the water; is that correct?

22      A   Based on meter readings, yes, sir.

23      Q   And that would be true then of any individual agri-

24  cultural leases, that the lessee has two people that he pays,

25  the Navy for land and Mr. Nichols for the water; is that right?

Z-36

1    A   Yes, sir.

2    Q   Do you know what rate is charged for the water?

3    A   Yes, sir.

4    Q   What is it?

5    A   6 cents per hundred cubic feet.

6    Q   Now, who fixes the limitations or the quantity of acre

7    feet to be used on any given property, your office?

8    A   Yes, sir.

9    Q   In other words, you determine what you feel is a

10   reasonable duty for the crop that is to go in; is that it?

11   A   No, sir, I don't.  Would you like me to describe the

12   whole operation?

13   Q   Yes, tell me how you do it.

14   A   The Base Water Control Board at Camp Pendleton pre-

15   scribes the amount of water use that they feel is available

16   for irrigation throughout the Base to the Commanding General,

17   who makes the decisions that that prescription is correct.  And

18   I then get a ration for each watershed, so many acre feet for

19   Santa Margarita, so many acre feet for Las Pulgas, so many for

20   San Onofre, and so forth.

21   Q   Oh, oh, you are getting out of the watershed.

22   A   Out of the watershed.  Then the--

23   Q   Excuse me, please.  That is given you in a gross acre

24   foot quantity?

25   A   That is right.

Z-37

1    Q  Go ahead.

2        A  I then ration that water strictly on the basis of

3    acreage, under each lease.

4        Q  Now, strictly on the basis of acreage.  In other words,

5    it would make no difference to you in your rationing, as I

6    understand you, what crop a tenant intends to put in.

7        A  No, sir.

8        Q  If he puts in or has in or has in operation a lemon

9    grove--

10       A  Let me--

11       Q  Go ahead and explain it.

12       A  I will go one step further.  We do not ration the

13   water to the lemon grove.

14       Q  What do you do?  How does it operate?

15       A  It uses the water it needs.  We, of course, make an

16   assumption that the lemon grove will operate as economically

17   as possible, and that the lemon grove lessee will not waste

18   water.  But we feel that to ration his water would be to con-

19   trol the production of the trees.  And the lessee in that

20   particular case is on his honor to use the proper amount of

21   water to get the most out of the trees.

22       Q  What time of year does this rationing operation take

23   place?  When does the Base Water Board give you your figures?

24       A  The water year is from the 1st of April to the 31st

25   of March.

Z-38

1     Q  And so you get your figures shortly prior to that, I

2  presume.

3     A  That is right.

4     Q  All right.  Let's say for the water year starting the

5  1st of April, '57, a year ago, what was your gross per acre

6  rationing figure?

7     A  Per acre?  Well, I will have to give you that to the

8  best of my recollection.  It is in the neighborhood of 1.3

9  acre feet per acre.

10     Q  As I understand it, you received a gross entitlement--

11     A  That is right.

12     Q  --for a given area.

13     A  That is right.

14     Q  And then you, strictly on a per-acre basis, segregated

15  it among the lessees?

16     A  That is correct.

17     Q  Are these plots that I see on the insert to the map,

18  numbered 15, 10, 10A and 10B, 10C and so forth, do they have

19  any relationship to a lease?  In other words, might one man

20  own more than one or lease more than one plot?

21     A  Yes, sir.

22     THE MASTER:  Mr. Sachse, you refer to Exhibit M-78?

23     MR. SACHSE:  Yes.  Thank you, your Honor.

24  BY MR. SACHSE:

25     Q  They are simply identifying parcels of land, then?

Z-39

1    A   The parcels when-- under the old ranch setup were

2  designated the way they are here, and they simply have never

3  been changed.   Even though one man might have two adjacent

4  parcels, the old designation has been continued throughout the

5  life of Camp Pendleton.

6    Q   So if one man-- I hope my figure I am quoting is

7  correct of the 1,100 irrigable acres on Stuart Mesa.   If one

8  man has a lease of 300 acres, you don't care how much of that

9  300 he plants.

10    A   No, sir.

11    Q   You don't care what he puts on it.

12    A   I would object to certain crops, yes, sir.

13    Q   Well, I presume no marijuana, things like that.   Are

14  there other considerations?   I am interested.

15    A   We have another restriction, an administrative re-

16  striction handed down from Washington, D.C., that no price-

17  supported crops may be grown on any federally-owned land under

18  lease.

19    Q   But within those limits you don't care whether he

20  decides he is going to gamble on beans or squash or carrots or

21  tomatoes?

22    A   No, sir.

23    Q   And likewise you don't care how much of his total

24  water allotment he pours on any one acre?

25    A   We object to wasting water.

Z-40

1    Q   Well,--

2    A   We don't have any rules and regulations under which

3    we would go down and say, "You used five feet of water on this

4    one acre.   Therefore, your lease is cancelled."   We have nothing

5    of that sort.   We do caution our farmers that, for the sake of

6    good public relations, if nothing else, they are expected to

7    use the water in the most efficient manner they can.

8        Q   But if a man in this particular case has a hundred

9    acres-- and your recollection it was 1.3-- he had 130 feet.

10   If he chose to pour that on ten acres, he could do so, or could

11   he?

12       A   I would wonder about him.

13       Q   I might question his judgment myself.   I am trying to

14   get at your rules only, Mr. Taylor.   If he chose to pour it on

15   20 or 30 he could do so, as I understand it.

16       A   We have not foreseen that sort of a thing and made any

17   rules about it.

18       Q   If he chose to pour it on half of his hundred, he

19   could do it?

20       A   That would not be an unusual situation.

21       Q   That happens very commonly?

22       A   It can happen, yes, sir.

23       Q   You stated, I believe, there are 200 acres less being

24   irrigated today than there were eight years ago, approximately.

25   Is that the result of a sudden drastic chopoff or a gradual

Z-41

1   attrition?

2       A   A gradual attrition.

3       Q   Eight years ago.   That would be 1950.   Is there a

4   particular point in that intervening period of time when any

5   marked change was made in the area under irrigation?

6       A   No, sir.

7       Q   So just on a straight average basis then, it would

8   have gone down about 25 acres a year, if it was uniform all the

9   way through?

10      A   That is right.

11      Q   Now during that period since 1950 there have been two

12  rather wet winters, one the one we just passed, and one 1952-

13  53, I believe.   Do you recall?

14      A   '51-52.

15      Q   '51-52.   All right.   Was there any change upward in

16  the amount of land under irrigation following the wet winter

17  of '51-2?

18      A   No, sir.

19      Q   In other words, it has been a steadily downward

20  quantity since 1950?

21      A   In the irrigation ration?

22      Q   No.   No, not the water now.   The number of acres.   You

23  testified, Mr. Taylor, that there were about 200 acres less

24  being irrigated now than there were in 1950.   Now has that been

25  a steady-- has that been a steady decline, or did the number of

Z-42

1    acres being irrigated go up following the wet year?

2        A  No, it has not gone up following any wet year. And the

3    decline-- I wouldn't say there has been a steady decline.  May

4    I explain it in my own words?

5        Q  Yes, go ahead.

6        A  During the drouth period we had one or two lessees

7    choose to go out of business.  And we simply didn't put those

8    parcels back on the market for continued leasing.  That happened

9    all within a year or two.

10       Q  About when?

11       A  In other words, it wasn't a steady--  About when?

12   About 1950, '51, in there somewhere.

13       Q  And then after the wet year of '51-2, those lands were

14   not put back on the lease market?

15       A  That is right.

16       MR. SACHSE:  I think I have run out of gas, your Honor.

17   That is all.

18       THE MASTER:  That is good.  Mr. Dennis.

19

20                     CROSS-EXAMINATION

21   BY MR. DENNIS:

22       Q  Mr. Taylor, you referred to a Base Water Control

23   Board.  How long has that board been in operation?

24       A  If my memory serves me correctly, about four years.

25       Q  About four years.  And so for each year that they have

Z-43

1  been in operation they have furnished you with the amount of

2  water which would be available for agricultural use?

3      A   That is right, sir.

4      MR. DENNIS:   I wonder if you could get those figures for

5  us during the recess or the next time we meet, Bill?   I will

6  stipulate it is not necessary to have him here, or stipulate

7  with you he would testify they are correct.

8      MR. VEEDER:   All right.   Fine.

9      THE MASTER:   Very well.   If you can procure those figures

10 and give them to Mr. Veeder, then.

11     THE WITNESS:   Yes, sir.

12     THE MASTER:   That is agreeable to other counsel, too?

13     MR. SACHSE:   Fine.

14     MR. MOSKOVITZ:   Yes.

15 BY MR. DENNIS:

16     Q   Now, Mr. Taylor, calling your attention to M-78, as I

17 read the symbols, those areas which are surrounded by a dash

18 broken line, a dash line with a letter within the center, are

19 areas which are used for grazing purposes.

20     A   That is correct.

21     Q   And would the area, for instance, that has "H" in the

22 center of it, would that represent one lease?

23     MR. VEEDER:   Now is that out of the watershed?

24     MR. DENNIS:   That is within the watershed.

25     THE MASTER:   Partly in and partly out.

Z-44

1          MR. DENNIS:  Partly in and partly out.

2          THE WITNESS:  The grazing is not handled at Camp Pendle-

3     ton by leases.

4     BY MR. DENNIS:

5          Q  How is grazing handled in Camp Pendleton?

6          A  At the moment it is handled by revocable permits.

7          Q  By revocable permits.  Does that represent one

8     revocable permit?

9          A  The revocable permits do not specify a specific area.

10    These lines are my own management lines.  These lines indicate

11    roughly where I have told the sheep man he can operate.

12         Q  Or the cattle man that he can operate?

13         A  That is right.

14         Q  And how many grazing permits have you in Pendleton

15    at the present time?

16         A  Seven of them.

17         Q  And do they all occupy portions of the watershed of

18    the Santa Margarita River?

19         A  No, sir.

20         Q  How many do you have that occupy portions of the Santa

21    Margarita River?

22         A  Four.

23         Q  And are any of those permits limited entirely to the

24    Naval Ammunition Depot?

25         A  No, sir.  I have nothing to do with those permits.

Z-45

1        Q   So there would be permits covering grazing rights in

2    the watershed of the Santa Margarita River, in the Naval

3    Ammunition Depot that you have no jurisdiction over, and your

4    testimony does not refer to those things?

5        A   That is right.

6        Q   You are referring only to Camp Pendleton and the

7    United States Naval Hospital?

8        A   Only to Camp Pendleton.

9        Q   Now, are any cattle or sheep allowed in the immediate

10   vicinity of the United States Naval Hospital?

11       MR. STAHLMAN:   If they get sick they might take them over

12   there.

13   BY MR. DENNIS:

14       Q   In the area?

15       A   In the immediate vicinity?

16       MR. VEEDER:   Wait just a moment.   Let's have this defined.

17   What is the immediate vicinity?

18       THE WITNESS:   That is what I was going to ask.

19   BY MR. DENNIS:

20       Q   Well, all right.   Calling your attention to M-78, Mr.

21   Taylor, I notice that there is an area in which the air strip

22   is shown and certain other installations, shaded portions which

23   are surrounded by a dash line, but has no number in it.   Does

24   it mean that that particular area is not available to people

25   who hold grazing permits?

Z-46

1    A   That is correct.

2    Q   Now I notice another area immediately south of there

3    which doesn't have a number in, but it does have a line which

4    indicates that it ties into the "N" area?

5    A   That is right.

6    Q   Do they allow grazing within that portion of the area

7    that has no letter within it?

8    A   Yes, sir.  I might explain "N" and "M" area a little

9    more fully.  N is a sheep permit and M is a cattle permit, and

10   they overlap.  We graze cattle and sheep together in the two

11   portions, in the portions of those two areas which are in

12   common.

13   Q   Are you familiar with the area that is generally

14   referred to as the Ysidora Basin?

15   A   Yes, sir.

16   Q   And the area that is referred to as Chappo Basin?

17   A   Yes, sir.

18   Q   And O'Neill Basin?

19   A   Yes, sir.

20   Q   Would it be possible for you to draw roughly the limits

21   of the basins on Plaintiff's Exhibit M-78?

22   MR. VEEDER:  Now I want it understood in that regard

23   that the position of the United States is that there are no--

24   these are subbasins.  They are not basins.  They are inter-

25   connected, both geophysically and hydrologically.

Z-47

1     MR. DENNIS:  I made a statement I think we all agreed to,

2  by using those terms we weren't attempting to convey any

3  thought that it was one basin with three segments or three

4  basins.  And as I recall I made that statement sometime ago.

5  And we also used the names "O'Neill" and "Upper Basin" inter-

6  changeably, and "Chappo, Home Ranch and Middle Basin" inter-

7  changeably, and the "Lower Basin" and "Ysidora Basin" inter-

8  changeably.  And I am just trying to have the witness place

9  on 78 the surface area of that particular basin or segment of

10  basin as he understands it.

11     THE WITNESS:  You don't want me to draw the lateral

12  boundaries of those basins, do you, just the upstream and

13  downstream limits?

14  BY MR. DENNIS:

15     Q  Yes, the entire line which would show the entire

16  surface area of the three basins.

17     A  It would be very difficult on this map.

18     Q  Will you give us the best information you can that

19  you have, then, relative to the lower end of the basin and the

20  upper end, the upper end being upstream?

21     MR. VEEDER:  When you say "give us the best information

22  you can", do you expect him to go ahead and draw it?  Is that

23  it?

24     MR. DENNIS:  If he will just mark it, yes.

25     THE WITNESS:  Well, Ysidora Basin.  Well, about like that.

Z-48

BY MR. DENNIS:

Q  Will you do the same for the Mid Basin?

A  I am not sure about the boundary between these.

Q  Just approximately.  I realize you can't do it accurately.

THE WITNESS:  It is very difficult.

MR. VEEDER:  This is strictly for location purposes, your Honor.

MR. DENNIS:  That is correct.

Q  Now what would be the maximum amount of cattle-- change that question.  Have you ever had any permit allowing pasturing of sheep in the area designated H?

A  Yes, sir.

Q  And have you had any sheep in the area designated L?

A  Yes, sir.

Q  I think you said that you have both sheep and cattle in N and M.

A  That is right, sir.

Q  Have you had cattle in the H area?

A  No, we never have.

Q  Never pastured any cattle in the H area.  How about the L area?

A  We have pastured cattle in the L area.

Q  Recently?

A  This year.

Q  How far prior to this year?

1274

Z-49

1      A   In the past seven years we have pastured cattle in the

2   L area, five of them.

3      Q   Five of the years.   And approximately how many sheep

4   are pastured in the area labeled N?

5      A   N, Nancy?

6      Q   Nancy, yes.

7      A   200.

8      Q   During the summer months?

9      A   None.

10     Q   None in the summer months.

11     MR. VEEDER:   I ask it be defined as to what the summer

12   months are.

13     MR. DENNIS:   I was just going to ask that question.

14     Q   What months do you consider the summer months?

15     A   So far as sheep grazing is concerned, after the green

16   feed season is over and the sheep move out.

17     Q   When you say the green feed, that would be on the hills?

18     MR. VEEDER:   Now wait a minute.   I don't--

19     THE WITNESS:   Not necessarily.

20   BY MR. DENNIS:

21     Q   Where?

22     A   So long as there is any green feed left in sufficient

23   amounts to support a band of sheep, they will stay.   I don't

24   send them away.   They stay as long as there is feed.

25     Q   As long as there is feed.   Have you had any experience

Z-50

1    to know in the type of country such as enclosed within the H

2    area, how many acres it takes to support a head of cattle or

3    a unit of cattle?

4            MR. VEEDER:  When you say "a unit", what do you mean?

5            MR. DENNIS:  I always say "one head", but some of the

6    technical--

7            MR. VEEDER:  Well, it may be a cow and a calf.

8            THE WITNESS:  Most of the H area will handle one animal

9    unit, which is a matured cow with or without a calf.  One acre

10   will support one animal unit for a month.

11   BY MR. DENNIS:

12           Q  So it would take, maybe, if you are going to have one

13   unit on for six months, it would take six acres?

14           A  That is right.

15           Q  And in respect to sheep, how many acres would it take

16   to support one unit?

17           A  The same, except for a 5 to 1 ratio.

18           Q  5 to 1 ratio?

19           A  Yes.

20           MR. SACHSE:  Maybe I am thick. What does that mean?

21           THE WITNESS:  Five sheep to one cow.

22           MR. SACHSE:  Oh.

23   BY MR. DENNIS:

24           Q  Now, in regard to the various parcels of land shown

25   on the insert of M-78, how many lessees were there in the year

Z-51

1    1957?

2         A   Would you tell me which area that was?

3         Q   That would be Stuart Mesa.   You have the insert in the

4    right-hand corner, upper right-hand corner of M-78.   It shows

5    the number of parcels.   I was wondering how many lessees.

6         A   Six.

7         Q   And the usual method of irrigation within that area is

8    by sprinkler, furrow, or flooding?

9         A   Sprinkler and furrow, no flooding.

10        Q   And are the vegetables all irrigated by furrow and

11   the flowers by sprinklers?

12        A   No, sir.   That is not true.

13        Q   It is not true?

14        A   No, sir.

15        Q   In other words, so the vegetables are irrigated both

16   by furrow and by sprinkler?

17        A   That is right.

18        Q   And are the flowers irrigated both by sprinkler and

19   by--

20        A   I would say primarily by sprinkler.   I wouldn't want

21   to say exclusively.

22        Q   And does the acreage which you give include the houses

23   in which they are raising carnations?

24        A   Yes, sir.

25        Q   And in connection with that portion of the acreage

Z-52

1    which is irrigated by furrows, is there any effort made to

2    conserve the tail waters?  You know what I mean by tail waters.

3        A   There certainly is.

4        Q   And what efforts are being made to conserve those

5    tail waters?

6        A   In most instances the individual checks are laid out

7    on a downhill slope, so that the tail waters from the upper

8    check is used to irrigate the next check downhill.  In some

9    instances in a series of four or five repetitions.

10       Q   Now when you get to the lower one, what efforts are

11   made?  Are there any in which the tail waters are collected

12   and then pumped up to a higher elevation and re-used?

13       A   I don't know of an instance where there is any tail

14   water any more.

15       Q   Would you say during the month of June there were no

16   tail waters which were being allowed to return into the Santa

17   Margarita River?

18       A   Not to my knowledge.

19       Q   Now have you ever made any investigation to determine

20   how many acres were irrigated in Stuart Mesa area and in the

21   year 1957, calendar year 1957?

22       A   Yes, sir.

23       Q   How many acres were actually irrigated?

24       A   I do not have that knowledge at hand.

25       Q   But you do have that knowledge in your possession?

Z-53

1     A  Yes, sir.

2     Q  And that area is an area in which you would expect

3 three crops a year to be raised, a winter, summer and spring

4 crop?

5     A  On any individual piece of land?

6     Q  Yes.

7     A  No, sir.

8     Q  Are there any parcels of land in which more than one

9 crop are raised in the calendar year 1957 on Stuart Mesa?

10    A  If there is, I don't know about it.

11    Q So that they rotated from one parcel to another during

12 the year 1957?

13    A  That is right.  That is right.

14    Q  And what type of crop was raised in 1957?  As you

15 stated, there were flowers.  Now what vegetables were raised

16 in '57?

17    A  Tomatoes, cabbage, string beans, squash and cucumbers.

18 That cucumbers I am not--

19    MR. VEEDER:  That goes beyond the direct.  He didn't

20 mention cucumbers.  I move to strike.

21    THE WITNESS:  There may have been cucumbers.

22 BY MR. DENNIS:

23    Q  Now are there any portions of Stuart Mesa included

24 within the 1,100 acres that you have referred to which are so

25 watersoaked that crops could not be raised on them?

Z-54

1        A   No, sir.

2            MR. DENNIS:   Mr. Stahlman calls to my attention it is

3    12 o'clock.   Shall we adjourn?

4            THE MASTER:   I was wondering how much longer.

5            MR. DENNIS:   I will have four or five questions, but I

6    think I can reduce them down to three or four.

7            MR. VEEDER:   There will be some redirect on this now.

8            THE MASTER:   If there is going to be redirect on this

9    now we will recess until 1:30.

10           (Noon recess.)

Z-55

1      Fallbrook, California, June 11, 1958.  1:30 P. M.

2

3      THE CLERK:  Court is now in session.

4      THE MASTER:  Mr. Dennis, I believe you were examining

5  the witness.

6      MR. DENNIS:  May we have the witness, Mr. Taylor.

7

8                    WILLIAM D. TAYLOR

9  resumed stand.

10

11                 CROSS-EXAMINATION (Continued)

12  BY MR. DENNIS:

13      Q  Mr. Taylor, would you consider that the area in

14  which Stuart Mesa is located is a frost-free area?

15      A  Yes, sir.

16      Q  And would you consider the area in which the South

17  Mesa is situated a frost-free area?

18      A  With some very minor exceptions.

19      Q  Some minor exceptions.  Now, in talking with a couple

20  of other counsel, I didn't seem to make myself quite clear this

21  morning, and so as to clarify the matter for myself and for the

22  Master, I wonder if you would shade in that portion of the

23  Chappo Basin which is restricted against grazing?  I think you

24  testified it was that area that was surrounded by the dash line

25  which had no number or letter within it.  Would you on Plaintiff's

1231

Z-56

1   Exhibit M-78 shade in that area?

2       MR. VEEDER:  You have been using this red pencil, Mr.

3   Taylor.

4       THE WITNESS:  Well, I would hesitate to say that any of

5   it is actually restricted to grazing.  The areas have never

6   actually been assigned for grazing.  But under, let's say,

7   unusual circumstances, everything in the basin is grazeable.

8   It depends on who is running the show over there.

9   BY MR. DENNIS:

10      Q  Who was responsible for placing these lines on Plain-

11  tiff's Exhibit 78, showing the grazing area?

12      A  I was.

13      Q  And how did you arrive at the location in which you

14  placed those lines?

15      A  Arbitrarily.  I never show as a grazing area an in-

16  habited area or an improved area.

17      Q  It is not usual to graze cattle or sheep on the air-

18  port?

19      A  That is right, it is not usual.

20      Q  Or any industrial area?

21      A  That is right.

22      Q  Or in the neighborhood of say occupied by the Naval

23  Hospital?

24      A  That is right.

25      Q  Well, could you, to the best you can in a rough sketch

Z-57

1    of this kind, shade in that area that in the past cattle and

2    sheep have not been grazed on?

3         A   Yes.   They are already shaded in by the drawing, out-

4    side of the air strip.   I will shade the air strip in.   This

5    part here.   This is an arbitrary line.   We skirted what we

6    thought was the industrial area with a reasonable margin.   There

7    actually is a fence around this.   Whether this line coincides

8    with the fence, I wouldn't attempt to say.

9         Q   It would be approximately correct, though?

10        A   That is right.

11        Q   And there is a combat firing range in this area, is

12   there?

13        A   No, sir.

14        Q   No firing range?

15        A   No, sir.   There is a firing range right there.

16        Q   And do you graze cattle in that area?

17        A   Yes, sir.

18        Q   You do?

19        A   Yes, sir.

20        MR. VEEDER:   May I suggest the witness mark where he says

21   "Right here".

22        MR. DENNIS:   It is shown.   It says "Firing Range".

23        · MR. STAHLMAN:   Is that where they shoot the bull?

24   BY MR. DENNIS:

25        Q   Now who are the members of the Base Water Control

1283

Z-58

1    Board, if you know?

2        A   I am not sure that I could name all of them.

3        Q   Well, those that you know and remember?

4        A   The Assistant Chief of Staff, G4, the Base Public

5    Works Officer, the Officer in Charge, Office of Ground Water

6    Resources, the Public Works Officer from the Naval Hospital,

7    Public Works Officer from the Naval Ammunition Depot, Fallbrook,

8    the Base Maintenance Officer, Camp Pendleton, the Base Supply

9    Officer at Camp Pendleton.  Those are, to the best of my

10   knowledge, the regular voting members.

11       Q   Now, are all of the agricultural requirements met from

12   wells in the Ysidora Basin?

13       A   You are speaking of the leased lands within-- watered

14   from the Santa Margarita River?

15       Q   I am referring to Stuart Mesa and South Mesa, the

16   agricultural land.

17       A   The answer is "Yes".

18       Q   And how long has that been true?

19       A   It has never been otherwise.

20       Q   I understand your testimony then is that the agri-

21   cultural lands have always derived their water from the Ysidora

22   Basin?

23       A   That is correct.

24       Q   Now, it has been necessary from time to time to with-

25   draw land for the purpose of agriculture as increased training

Z-59

1    needs were developed in Camp Pendleton?

2         A   Yes, sir.

3         MR. VEEDER:  Can I have that question read?

4         (Question read.)

5         MR. VEEDER:  Read the first part of it again.

6         (Record read.)

7         MR. VEEDER:  What does he mean "withdrawn for the pur-

8    pose of agriculture"?

9         MR. DENNIS:  From agriculture.

10        MR. VEEDER:  It makes a difference.

11        THE MASTER:  Will you reframe the question then, Mr.

12   Dennis?

13   BY MR. DENNIS:

14        Q   It has been the custom in the past, has it not, as

15   training needs required additional lands to cancel out leases

16   made for agricultural purposes?

17        A   Sir, would you explain what you mean by custom?

18        Q   Well,--

19        A   It has not been done enough to establish what I would

20   consider a custom.

21        MR. VEEDER:  The word "practice", Mr. Dennis, may be all

22   right.

23        MR. DENNIS:  Practice.

24        THE WITNESS:  It has occurred.

25

Z-60

BY MR. DENNIS:

Q   It has occurred?

A   Yes, sir.

Q   Have you any idea of the acreage that has been with-drawn from agricultural development because the land was needed for training purposes?

A   No acreage has been thus withdrawn in the Santa Margarita watershed, or watered from the Santa Margarita River.

Q   Those lands all lie without the Santa Margarita watershed?

A   Yes, sir.

Q   Now has it been customary to graze cattle or sheep in the Ysidora Basin, in that portion of the Ysidora Basin that has been farmed to grain?

A   Yes, sir.

Q   And what time of the year?

A   Well, that would depend on whether it was farmed in that particular year for grain.  As a matter of fact, getting back to this matter of farming for grain, since I have known anything about the Ysidora Basin it has never been farmed for grain.

Q   Have they ever raised hay?

A   Yes, sir.

Q   Have they raised hay during 1957?

A   Yes, sir.

Z-61

1    Q   Well, was cattle grazed while that hay crop was being

2    raised?   Was it the custom to graze cattle or sheep within the

3    same area?

4        A   Sheep were grazed on the aftermath of the hay crop.

5        Q   The stubble?

6        A   The stubble.

7        Q   But not while the crop itself was being--

8        A   No, sir.

9        Q   Now have you ever made any effort to determine what

10   water was delivered to that portion of Stuart Mesa which lies

11   outside the watershed of the Santa Margarita River?

12       A   No, I have not.

13       Q   And are there any measuring devices in existence

14   which would measure the quantities of water delivered to that

15   portion of Stuart Mesa outside the Santa Margarita watershed?

16       A   I do not believe so, without changes in the installa-

17   tion.

18       Q   Then your testimony would be the same as to the South

19   Mesa?

20       A   That is right.

21       Q   Now do you have in your possession records that show

22   the quantities of water delivered each month to the various

23   lessees?

24       A   Not in my possession.

25       Q   Who would have those records?

Z-62

1      A   Mr. Nichols.

2      Q   Mr. Nichols would have those records?

3      A   Yes.

4      Q   Would you have in your possession and under your

5  jurisdiction records showing the quantity of water that Mr.

6  Nichols developed from the system which you leased to him?

7      A   Yes, sir.

8      MR. VEEDER:   Now the word "develop", what does he mean

9  by that?

10      THE MASTER:   Mr. Dennis, do you mean he created the water

11  or he took it from the Marine Base?

12      MR. DENNIS:   That he took from the Marine Base.

13      MR. VEEDER:   Let's rephrase it.   I don't think that

14  question is intelligible.

15      MR. DENNIS:   I think the witness understood the question,

16  but I will reframe it.

17      Q   Do you have in your possession records which would

18  indicate the amount of water which Mr. Nichols pumps from wells

19  situated in Ysidora Basin?

20      A   I have it for the past approximately three years.

21      Q   And do you have that by months?

22      A   Yes, sir.

23      MR. DENNIS:   I think that is all, if we can have an under-

24  standing, Mr. Veeder, that you will supply us with the tabula-

25  tion showing the amount of water which Mr. Nichols has

Z-63

1    extracted from the Ysidora Basin through wells for such period

2    as Mr. Taylor has records, by months.

3         MR. VEEDER:  If those records are available we will have

4    them for you, Mr. Dennis.  I don't know that personally.  But

5    you do know, Mr. Taylor?

6         THE WITNESS:  I do know.

7         MR. DENNIS:  And if you wish I will stipulate with you

8    that Mr. Nichols-- or that Mr. Taylor, who is present, would

9    testify that the records are correct.

10        MR. VEEDER:  Well, now, I truly don't know whether Mr.

11   Taylor knows that or not, because they are not kept under his

12   direction.  That was the problem when Mr. Nichols is an in-

13   dependent entrepreneur, so far as I see.

14        THE WITNESS:  May I clarify that?  I am responsible for

15   keeping those particular records.

16        MR. VEEDER:  You are?  Very good.

17        THE MASTER:  Then you will procure those records, Mr.

18   Veeder, for the defendants?

19        MR. VEEDER:  Yes, we certainly will.

20        MR. DENNIS:  As I understand it--

21        THE MASTER:  Well, will counsel for the other defendants

22   enter into the same stipulation then that Mr. Taylor need not

23   return to identify the records?

24        MR. SACHSE:  So stipulate.

25        MR. STAHLMAN:  So stipulate.

Z-63

1    MR. MOSKOVITZ:  Yes.

2    MR. VEEDER:  Now, I-- Excuse me.

3    THE MASTER:  Mr. Moskovitz, did you have any question

4  on cross-examination?

5    MR. MOSKOVITZ:  Yes, I do have a few questions.

6    THE MASTER:  You have completed, Mr. Dennis, haven't you?

7    MR. DENNIS:  Yes, I have completed.

8

9                     CROSS-EXAMINATION

10  BY MR. MOSKOVITZ:

11    Q  Mr. Taylor, you gave some figures as to the number of

12  acres which are presently being irrigated to various crops on

13  Stuart Mesa.  I have my notes that you testified that there

14  were 40 acres of lemons.  Am I correct?

15    A  That is correct.

16    Q  And then you said there was a quantity of acreage in

17  row crops and flowers.  What was that acreage?

18    A  Well, at any one moment I couldn't tell you without

19  going out and measuring it.

20    Q  Did you give any figure at that time?

21    A  No, I didn't.  I said the remaining acreage which is

22  irrigated is in row crops and flowers.

23    Q  And what is the remaining acreage which is irrigated?

24    A  Well,--

25    Q  That you cannot give; is that it?

Z-64

1    A   That I cannot give for any one moment.

2    Q   I think you did testify that 1,100 acres are presently

3  susceptible of irrigation from the system which exists.

4    A   And I testified that 900 of those acres are under

5  lease, approximately.

6    Q   900 of the 1,100?

7    A   That is right.

8    Q   So the difference between 40 acres and 900 would be

9  the maximum acreage which would be in row crops and flowers;

10  is that correct?

11    A   Which conceivably could be, but would never be because

12  of the water ration.  There simply is not enough water avail-

13  able to plant 900 acres at one time.

14    Q   I see.  I think you said there was a ration of 1.3

15  acre feet per acre during this last year.

16    A   That is right.

17    Q   And that would be allocated on the basis of the total

18  acreage leased?

19    A   That is correct.

20    Q   Which is the total of 900?

21    A   That is correct.

22    Q   And then the lessees could use it on whatever quantity

23  of land they wanted to?

24    A   That is right.

25    Q   Now, in giving the figure of the total of 1,100 acres

Z-65

1    susceptible of irrigation and 900 actually irrigated, does that

2    include land both within and without the Santa Margarita River

3    watershed?

4        A   Yes, sir.

5        Q   Do you have any breakdown?

6        A   No, I don't.

7        Q   Is it something you can easily determine by looking

8    at any of the material that is on the map, or is it something

9    you would have to go back to your office and calculate?

10       A   I would go out in the field and draw it.  I never

11   have done it.

12       Q   I see.  You don't have any records in your office

13   which segregate the amounts that way?

14       A   No, I don't.  I have never done that.

15       Q   Could you include that information in the material

16   that you are going to bring in for Mr. Dennis?

17       A   I believe that information is already a matter of

18   record, or am I wrong on that?

19       MR. VEEDER:   You can rest assured it is going to be part

20   of our case in chief.

21       THE MASTER:   In other words, if this is to be supplied

22   by another witness, then it is not necessary to ask this witness

23   to obtain it.

24       MR. MOSKOVITZ:   Yes, it is unnecessary.

25       Q   Now you gave some figures as to the total acreage which

Z-66

1  is susceptible of irrigation from the present system on the

2  South Coast Mesa, 600 acres.

3       A   That is right.

4       Q   Is that also both within and without the watershed?

5       A   That is right.

6       Q   And the figures you gave as to the number of acres

7  planted to lemons, 65 acres; is that right?

8       A   That is correct.

9       Q   And that also is both within and without the watershed?

10      A   Yes, with this provision, that I don't know whether

11  all of it is in or all of it is out.  It may all be in the

12  watershed.

13      Q   Or it may all be out?

14      A   That is right.  I don't pretend to know.

15      Q   I see.  That is also true as to the remaining acreage

16  on the South Mesa--

17      A   Yes, sir.

18      Q   --which is irrigable?  You just don't know?

19      A   That is right.

20      Q   It could be all within or all without or part?

21      A   That is correct.

22      Q   Now I think you testified concerning the purposes for

23  which the livestock grazing was used.  I think you said that

24  it was used to reduce the fire hazard.

25      A   Yes, sir.

Z-67

1      Q   I am not sure I completely understand the relationship

2   between the grazing and the fire hazard.  Could you explain

3   that?

4          MR. VEEDER:   Do you understand what a cow does with grass?

5          THE MASTER:   Mr. Veeder.

6          MR. VEEDER:   I am sorry.

7          THE MASTER:   These interruptions don't help anything.

8          THE WITNESS:   It is simply the fact that any land surface

9   will produce grass when there is rain on it.  When the rain

10  stops the grass dries up and becomes a fire hazard.

11  BY MR. MOSKOVITZ:

12     Q   I see.

13     A   The livestock consume the grass, remove it, and thereby

14  remove a fire hazard.

15     Q   And this grass which is produced when it rains and

16  dries up when the rains stop, is that grass within these areas

17  that are designated on M-78 as the areas which are leased

18  for grazing or on which there are grazing permits?

19     A   Grass is throughout the whole base.

20     Q   Throughout the whole base.  And this grass is produced

21  when it rains; is that right?

22     A   For the most part.

23     Q   And it dies when the rains stop?

24     A   For the most part.

25     Q   For the most part.  Can you explain your qualification?

Z-68

1    A   We have some perennial grasses which do a small amount

2    of growing even during the dry season.  But they are in the

3    minority.  The major portion of our grass, herbaceous vegeta-

4    tion, at Camp Pendleton is annual vegetation.  In other words,

5    grows from a seed, goes through its life cycle and dies all in

6    the same year.

7    Q   That is the major part of the grass area?

8    A   That is right.

9    Q   Would you give an estimate as to what portion of the

10   grass area is in that kind of grass?

11   A   95%.

12   Q   And that is the grass which dies after the rains stop?

13   A   That is right.

14   Q   And causes the fire hazard for which the grazing is

15   one of the remedies?

16   A   That is right.

17   Q   You were present at the Base during the dry period

18   that has been referred to between 1950 and 1957, weren't you?

19   A   Yes, sir.

20   MR. VEEDER:  May I ask one question?   Didn't Mr.

21   Moskovitz have cross-examination before this?

22   THE MASTER:  No.

23   MR. VEEDER:  He didn't?  I am not complaining.  I know

24   people are waiting to get on the stand.  Go ahead.

25

Z-69

BY MR. MOSKOVITZ:

Q   Were you here also-- did you say you first came to Camp Pendleton in 1947, was it?

A   1948.

Q   1948.   So you have been at Camp Pendleton continuously since then?

A   That is right.

Q   Between 1948 and 1950 would you say there was a dry period?

A   Yes, sir.

Q   It has been dry all this time.   That is, between 1948 and 1957?

A   With the exception of a minor buildup in 1951-52.

Q   Did you notice the appearance and the amount of grass cover during that period from year to year?

A   Yes, sir.

Q   And did it vary with the rainfall?

A   By all means.

Q   When it was dry?

A   Very much so.

Q   When it was dry, that is, not much rainfall, then there wasn't too much grass; is that it?

A   That is correct.

Q   And when you had a wet year you had a lot of grass?

A   Correct.

Z-70

7

1     Q  It was very much related to the rainfall, so far as

2 you could tell?

3     A  Very much so, yes, sir.

4     Q  Do you have any knowledge as to the level of the water

5 in the underground basin within Camp Pendleton within that

6 period of time?

7     A  Not any direct knowledge.

8     MR. VEEDER:  As this goes beyond the scope of the direct

9 examination, your Honor, I object to it.

10     THE MASTER:  The objection is sustained on the additional

11 ground the witness does not have any direct information.

12     MR. MOSKOVITZ:  I have no more questions.

13     THE MASTER:  Mr. Stahlman?

14     MR. STAHLMAN:  May I reserve the right to cross-examine

15 for a later period?  I think this matter will come up again.

16 Mr. Veeder, you expect to have him before the Court?

17     MR. VEEDER:  Sure.  If it is amenable, as to all witnesses

18 I am reserving the right myself.

19     THE MASTER:  Do you have any further direct evidence?

20     MR. VEEDER:  Yes, I do.

21

22               REDIRECT EXAMINATION

23 BY MR. VEEDER:

24     Q  What would you say would be a reasonable diversion

25 water duty for the lands to which you have been allocating

Z-71

1.3 acre feet per acre per year?

A   I would say that any farmer on that type of land could make efficient and beneficial use of at least 4 acre feet per year.

Q   What would be the diversion duty?   What would be the diversion loss you would figure on an allocation such as that?

A   By that do you mean--

Q   What percentage of loss in transportation of the water?

MR. DENNIS:   Has this witness been qualified as an expert in the field of operating water distribution systems?

MR. VEEDER:   He has been interrogated regarding the water duty of lands for quite a long time.

THE WITNESS:   I have knowledge of the losses of water in the past two years has been in the neighborhood of 10%, between the well and the final distribution.

THE MASTER:   For the sake of the record, if that was an objection by Mr. Dennis, it is overruled.

BY MR. VEEDER:

Q   What would be the aggregate burden upon the stream? What would be the diversion duty that would be efficiently and beneficially used from the Santa Margarita upon the lands concerning which you have testified?

MR. SACHSE:   Just a minute, I think it has been asked and answered.   The first one is diversion duty and the second one is diversion duty.

Z-72

1        MR. VEEDER:  He is talking about transportation losses

2   now.

3        THE MASTER:  Just a minute.  The answer the witness gave,

4   regardless of the form of the first question, would be the

5   amount of water used on the land.  The second was the amount

6   of the loss.  The answer now asked for is a mathematical calcula-

7   tion, which is probably unnecessary.

8        THE WITNESS:  Which I can't work in my head.

9        THE MASTER:  I think there is no need for him to do it.

10  It is a mathematical calculation which the Court can at least

11  make.

12       MR. VEEDER:  And the Court has done it.

13       THE MASTER:  And the Court has done it.

14       MR. VEEDER:  Fine.  I have no further questions.

15       MR. SACHSE:  I have nothing further.

16       THE MASTER:  Any further questions, Mr. Dennis?

17       MR. DENNIS:  I have one question.

18

19                    RECROSS-EXAMINATION

20  BY MR. DENNIS:

21       Q   I think the witness testified there is a 10% loss,

22  transmission loss.  Do you have in your possession the figures

23  showing the actual amount of water delivered to each one of

24  the tenants?

25       A   No, sir.

Z-73

1    Q   What did you base your conclusion of 10% on?

2    A   I have seen those figures.

3    Q   You have seen those figures?

4    A   Yes.

5    Q   And at the time that you examined them, you were

6    examining them with the idea of determining what the trans-

7    mission losses were?

8    A   That is right, sir.

9    MR. DENNIS:  Very well.

10   MR. MOSKOVITZ:  I have one more question.

11

12              RECROSS-EXAMINATION

13   BY MR. MOSKOVITZ:

14   Q   In saying the four acre feet per acre could be used

15   on the land beneficially--

16   A   That is correct.

17   Q   -- and economically, did you have in mind any par-

18   ticular crop pattern?

19   A   I have in mind an average crop pattern of the crops

20   that are now being grown there.

21   Q   You mean lemons?

22   A   No individual crop.

23   Q   You mean lemons?

24   A   No.  I am speaking of the annual crops.

25   Q   The annual crops.  Those are the vegetables and the

Z-74

1 flowers that you referred to?

2      A   That is right.

3      Q   Did you have in mind any particular number of crops

4 during the year?

5      A   I would say that that would approach two crops per

6 year.

7      Q   Two crops per year.   And what has actually been

8 practiced with respect to any particular piece of land in

9 those agricultural areas?

10      A   The practice has been only one crop per year on any

11 piece of land.   And it actually works out to less than that.

12 On many individual parcels of land it works out to one crop

13 every eighteen months, possibly one crop every two years.

14      Q   Is it possible to grow three crops a year on these

15 lands?

16      A   Three crops per year would be stretching very hard

17 on anybody's land.

18      MR. MOSKOVITZ:   O.K.   That is all.

19      MR. VEEDER:   I have no questions.

20      THE MASTER:   You may be excused then, Mr. Taylor.   Do I

21 understand, Mr. Veeder, that you are not calling any further

22 witnesses at the present time, in order that the defense

23 witnesses may testify?

24      MR. VEEDER:   That is correct, your Honor.   As soon as

25 they are through I would like to continue, though.

Z-75

1        THE MASTER:  Yes.  That is my understanding.

2        MR. SACHSE:  I would like, your Honor, in each case to

3   call for cross-examination Col. Bowen, and then proceed with

4   the landowner himself.  I believe that was our understanding

5   the last time.

6        THE MASTER:  Whichever order would be the most expedi-

7   tious.

8        MR. SACHSE:  I think it will be much more expeditious

9   if I do it that way.  So I will call Col. Bowen, please.  May

10  the record indicate this is cross-examination?

11       MR. VEEDER:  What is the basis of he being called for

12  cross-examination?

13       MR. SACHSE:  At the time I rested my cross I asked the

14  Court--

15       MR. VEEDER:  I didn't know whether you were calling him

16  as an adverse witness or what you were doing.

17       MR. SACHSE:  No.  This is simply cross on the documents

18  now in the record.

19       THE MASTER:  Yes, in regard to the engineering reports.

20       MR. SACHSE:  And I think it will be more expeditious,

21  your Honor, if I go over them one at a time with him, if we

22  keep the whole thing parcel by parcel.  In other words, I will

23  examine Col. Bowen on one engineering report, release him,

24  call the property owner, release him.

25       THE MASTER:  Put all the testimony on one parcel together.

1302

Z-76

1      MR. SACHSE:  Yes, sir.

2

3                    ALLEN C. BOWEN,

4   recalled as a witness for further cross-examination, having

5   been previously sworn, testified as follows:

6

7                    CROSS-EXAMINATION

8   BY MR. SACHSE:

9      Q   Col. Bowen, I would like to direct your attention

10  to Exhibit M-72.

11     A   Plaintiff's Exhibit M-61, Parcel No. 72.

12     Q   Thank you.  Plaintiff's Exhibit M-61, Parcel No. 72.

13  Correct.  And I think we had better get--  now can you, please,

14  for the benefit of the Court, with the pointer, show us that

15  parcel?

16     A   Yes, sir.  The parcel of land reported on in Plain-

17  tiff's Exhibit M-61 is Parcel No. 72 of the De Luz area, and is

18  located--  is a 20-acre parcel bounded on both the east and west

19  by the naval reservation boundary, and on the north and south

20  by privately-owned land.

21     Q   Do you know the name of the owner of that parcel?

22     A   Yes, Holsworth.

23     Q   H-o-l-s-w-o-r-t-h.

24     A   Mr. Alfred Holsworth and Helen E. Holsworth.

25     Q   You can resume your seat, Colonel.

Z-77

1        THE MASTER:  Just a minute.  That was bounded you said

2   on the east and on the south?

3        THE WITNESS:  On the east and the west, your Honor, by

4   the naval reservation.

5        THE MASTER:  On both the east and west?

6        THE WITNESS:  It forms a sort of a neck of a peninsula to

7   this block of privately-owned land that is almost completely

8   surrounded by the naval reservation.

9        THE MASTER:  That is all that keeps 73, 74 and 75 from

10  being an island.

11       THE WITNESS:  Yes, sir.

12  BY MR. SACHSE:

13       Q  Colonel, are you familiar generally with that parcel?

14       A  Yes, sir.

15       Q  Can you tell us whether or not it abuts upon De Luz

16  Creek?

17       A  Yes, sir.

18       Q  Does it?

19       A  It does not, sir.

20       Q  Are you familiar with the geological studies as to the

21  underlying material on that parcel?

22       A  Yes, sir.

23       Q  What are your conclusions as to the availability of

24  ground waters underneath that parcel?

25       A  The availability of ground water underneath this parcel

Z-78

1  reported on in Plaintiff's Exhibit M-61 is very limited.

2       Q  And would you conclude that ground water found under

3  that parcel was a part of the water of De Luz Creek or what was

4  referred to generally by Judge Carter as local water?

5       MR. VEEDER:  I believe that calls for a legal conclusion,

6  in part, at least.

7       MR. SACHSE:  If your Honor please, that identical ques-

8  tion was asked and answered in the case of-- the gentleman--

9  I can't think of his name-- McDowell.

10      THE MASTER:  In any event, I will permit the witness to

11  answer it.  The ultimate decision will have to be made by the

12  Court, but I believe the witness can give his opinion.

13      THE WITNESS:  May I have the question again, please?

14      (Question read.)

15      THE WITNESS:  It is my opinion that the water underlying

16  this property is not a part of the De Luz Creek and is what

17  Judge Carter referred to as local water.

18  BY MR. SACHSE:

19      Q  Now in your study-- I am referring to M-61-- you found,

20  I believe, 1.3 acres as the maximum irrigable and arable land;

21  is that correct?

22      A  Yes, sir.

23      Q  And you found the maximum irrigation requirement for

24  that land as 1.67 acre feet per acre per year; is that correct?

25      A  Yes, sir.

Z-79

Q   Now is that irrigation requirement what you referred to as the project requirement or the applied requirement?

A   That is the applied requirement.

Q   What would you consider to be the project requirement?

A   Contained in the report of the engineering investigation of this property, as shown in Plaintiff's Exhibit M-61, is a description of the diversion, which is a sump built around a spring on the property.  And the water is delivered from this developed spring to a pipe line to a wooden storage tank.  And I would estimate under these conditions that 10% would be a reasonable loss.

Q   In other words, the requirement allowed by you would then increase by 16, or 1.67 acre feet per year; is that correct?

A   Yes, sir.

Q   Now you say in answering that question, you stated that the project loss based on the present diversion.  Is not your irrigation requirement calculated on the assumption that there is no limit on the availability of water?

A   We don't say that that amount of water is available, Mr. Sachse.

Q   No.  I appreciate that.

A   But if it were available, that amount could be used.

Q   Now, let's assume that they could drill a well down there and get a thousand gallons a minute.  Would your

Z-80

1  evaluation of the project requirement be greater or less?

2  A .Mr. Sachse, a project loss cannot be ascertained

3  until the project is inventoried and evaluated.

4  Q  In estimating water use for the Government lands in

5  the watershed, you testified that the 4.2 per acre per year

6  figure you gave us was a project figure.  Now can you then

7  explain why the project figure in the case of Mr. and Mrs.

8  Holsworth is only 1.83, whereas the project figure for the

9  United States is 4.2?

10  A  Yes, sir.  This is a 20-acre parcel of land, with

11  much of it dissected, rough mountainous land, and only 1.1 acre,

12  part of which is actually occupied by a house and buildings.

13  It is suitable for a summer cabin site or a recreational site.

14  And it is my opinion if any crop at all were grown there it

15  would have no commercial value, and hence we arrived at the

16  truck gardening land use for the portion considered irrigable.

17  And the water duty for truck gardening is 1.67.

18  Q  Were you aware when you made this calculation that

19  there has been in the past an avocado planting on a portion

20  of the property?  Were you aware of that fact?

21  A  I believe that the Holsworths said avocados had been

22  planted there.  But I have been on the property and saw no

23  evidence of them.

24  Q  You are not aware then that there had been a planting

25  in 1949, which was burned up in the big forest fire of that

1  year?

2          A   That was reported to me by the Holsworths.

3          Q   Did you consider that fact in determining the reason-

4  able water use?

5          A   No, sir, because I don't figure the area outside of

6  the 1.1 acres is suitable for avocados, as shown.

7          Q   Do you figure 1.1 acres could be suitable for avocados?

8          A   Well, if that were used for avocados you would have

9  to hang the house on a cliff.  It could be used for avocados.

10         Q   Are you implying that of the entire remainder of this

11  20-acre parcel there is no single foot upon which a dwelling

12  could be erected?

13         A   Well, certainly, Mr. Sachse, with present-day heavy

14  equipment it is possible to gouge out a site for a building.

15         Q   All right.  Now please answer my question.  Did you

16  consider the possibility of 1.1 acres being used for raising

17  avocados?

18         A   Yes, sir.

19         Q   But you didn't see fit to give it the higher water

20  duty of avocados?

21         A   No, sir.

22         Q   Did you consider the possibility that a portion of this

23  land could be used for let's say raising poultry?

24         A   It wasn't considered, Mr. Sachse.

25         Q   If that were the case, poultry would, of course, require

1308

Z-82

1   water, wouldn't they?

2       A   Yes, sir.

3       Q   Could you express an opinion to me now, based on your

4   knowledge of the property, or on your examination of M-61, as

5   to whether or not in fact the entire parcel could be used for

6   let's say turkey or chicken production?

7       A   I am not familiar with turkey and chicken production,

8   Mr. Sachse.   I wouldn't know what the requirements are.   If it

9   were necessary to build shelters on there, as I have seen on

10  most commercial chicken and turkey outfits-- or at least

11  chicken outfits-- it would be a little difficult and expensive

12  to do so.   Turkeys could range.   I have seen turkeys out on the

13  range.   I am not qualfied to say whether this is adequate

14  turkey range or not, with that limited area.

15      Q   In making your report, did you know that in 1950

16  there had been between a half and an acre of alfalfa raised

17  on the land which you found to be irrigable?

18      A   No, sir.   I didn't know.

19      THE MASTER:   On the land you found to be what?

20      MR. SACHSE:   The land he found to be irrigable in his

21  report.

22      Q   If you assume that as a fact, please,--

23      A   Referring to Plaintiff's Exhibit M-61, on page 2 of

24  the engineering report, we state that the soil of Class III land

25  can be used for a great variety of crops.

Z-83.

1    Q   I appreciate that.

2    A   And therefore we recognized that alfalfa could be

3 grown on it or permanent pasture.

4    Q   Now, what is the water duty that you would use for

5 alfalfa on that soil?

6    A   Again, as reported in the tabulation contained in

7 Plaintiff's Exhibit M-61, entitled Water Duty for Agricultural

8 Crops, the yearly water duty for alfalfa is shown to be 3 acre

9 feet per year.

10   Q   Is that an applied or a cumulative duty?

11   A   That is applied, Mr. Sachse.

12   Q   Pardon me, applied or project duty.

13   A   This is an applied duty.

14   Q   All right.  Would you increase it again by 10% for a

15 project duty?

16   A   Well, again the project would have to be evaluated.

17 But 10% certainly is a reasonable figure.  It could well go

18 above 10%.

19   Q   Then, Col. Bowen, please examine Plaintiff's Exhibit

20 M-61, the last page.  Is it not a fact-- I am calling your

21 attention to the last paragraph on the last page.  Is it not a

22 fact that if you had taken the maximum potential irrigation

23 requirement, as the last paragraph states, you would have come

24 up with a 3.3 acre feet per year for the alfalfa rather than a

25 1.67 for a truck garden?

Z-84

1    A  By the last page of Plaintiff's Exhibit M-61, Mr.

2  Sachse is referring to--

3    Q  I mean the last page of the text.  Page 3, the last

4  page of the text.

5    A  Page 3.  And it is my opinion that the reasonable and

6  beneficial use to which this irrigable acreage could be devoted

7  was that of truck gardening, because of the recreational nature

8  of the site.

9    Q  You haven't answered my question.  If that acre were

10 planted to alfalfa-- and you have testified it is possible to

11 do so--

12   A  Surely.

13   Q  Then would not the reasonable irrigation duty be just

14 about three times what you found?

15   A  If it were planted to alfalfa, which I doubt that

16 anyone would do, then the water requirement would be 3.3 acre

17 feet, based on a reasonable project lot.

18   Q  In other words, double what you allowed in this

19 calculation?

20   A  Well, about a third more.

21   Q  1.67.  I think works out to be pretty close to be 3.3,

22 double.

23   A  Well, 1.67 plus-- you are using the applied duty in

24 one instance and the project duty in another.

25   Q  Now, Col. Bowen, in going over the remainder of the

Z-85

1   property-- and I will call your attention now to the map, your

2   land classification map on the exhibit-- are you prepared to

3   state of your own knowledge-- of your own knowledge now, not

4   solely by the map-- are you prepared to state there is no other

5   parcel even the size of an acre in that entire 20 that could be

6   profitably put in any crop?  Of your own knowledge, please.

7        A  I have been on the property and the particular site

8   of this proper allows one to stand across the canyon and look

9   at it.  And I have been on it. And I have stood across the

10  canyon and looked at it many times.  And it is my opinion that

11  there is no other portion of the property, outside of this 1.1

12  acres of Class III land, which is susceptible of practical and

13  profitable irrigation.

14       Q  I notice that the slope as shown on that same soil

15  classification map -- you had better keep it in front of you,

16  please-- is 36.  Am I correct?

17       A  That is the dominant slope.  It falls in the F group,

18  which by reference to the legend is indicated as over 36%.

19  Some of it is steeper than that.  But dominantly 36 would be

20  the percentage.

21       Q  Have you ever seen anywhere a 36% slop in permanent

22  pasture, sprinkler irrigated?  Anywhere?

23       A  I don't remember that I have seen a 36% slope.  But

24  I have seen slopes approaching that.  And there may have been

25  small areas within them that were 36%.

Z-86

1    Q   Then it is quite possible, is it not, that there are

2    parts of this Class VII land which by use of sprinklers could

3    be permanent pasture, non-tillage, and could also have a

4    reasonable water duty?

5    A   No, sir.  The soil is shown to be moderately deep.

6    Q   Moderately deep, is that right?

7    A   Well, by definition 20 to 36 inches in depth.  The

8    surface is stony.  I am speaking now of the areas shown as

9    Class VII on the map, included within Plaintiff's Exhibit M-61.

10   20 to 36 inches depth of soil, stony modification of a light-

11   textured soil overlying granitic rock.  And under brush cover.

12   The erosion symbol indicates a moderate erosion has occurred.

13   Q   Are you telling me that that type of soil, light

14   soil, 36 inches deep, could not grow permanent pasture under

15   non-cultivation with sprinklers?

16   A   Well, it is possible to grow permanent pasture on

17   there with sprinklers, yes, sir.  But the question of whether

18   it is economic to do so enters into it.

19   Q   But you didn't allow the land your permanent pasture

20   requirement for water use, did you?

21   A   No, sir.

22   Q   No part of it?

23   A   No, sir.

24   MR. SACHSE:  I think that is all.

25   THE MASTER:  Mr. Veeder, do you have any questions?

Z-87

1    MR. VEEDER:  I have no questions.

2    THE MASTER:  You may step down now.

3    MR. SACHSE:  I will call Mrs. Holsworth now, please.

4

5                    HELEN E. HOLSWORTH,

6    one of the defendants herein, called as a witness in her own

7    behalf, sworn, testified as follows:

8    MR. SACHSE:  Will you mark this for identification,

9    please?

10    THE CLERK:  Yes.  That will be--

11    MR. SACHSE:  There will only be one for this defendant,

12    so whatever-- Defendant Holsworth's 1 or Defendant Holsworth's

13    A.  I don't care, whatever is easier for the Clerk.

14    THE MASTER:  I was wondering if we could say --

15    THE CLERK:  DA-72, indicating the parcel number of the

16    property.  Is that going to confuse us with any other numbering

17    system we now have?

18    MR. SACHSE:  All right, DA-72.

19    THE CLERK:  Rather, MA-72.  We have an M-72, of course.

20    But we don't have any with a letter previous to the number.

21    MR. SACHSE: All right.

22    THE MASTER:  MA-72.  I think it is easier to do them by

23    parcel number than any other way, probably.

24    THE CLERK:  We marked others MD.

25    THE MASTER:  Those were because they were general De Luz

1814

Z-88

1    owners, without any parcel numbers. So this would be MA-72.

2          (Deed marked Defendant's Exhibit MA-72 for Identification.)

3          THE MASTER:  By the way, what is the name of your witness,

4    for the record?

5

6                              DIRECT EXAMINATION

7    BY MR. SACHSE:

8          Q  Would you state your name for the record, please, Mrs.

9    Holsworth?

10         A  Helen E. Holsworth.

11         Q  That last name is spelled H-o-l-s-w-o-r-t-h?

12         A  Yes, it is.

13         Q  Are you married?

14         A  Yes, sir.

15         Q  What is your husband's name?

16         A  Alfred Holsworth.

17         Q  I will hand you document marked for identification

18   MA-72, ask you to look at it and tell us if that is the deed

19   to the property you now own in De Luz, a photograph of the deed?

20         A  Yes.

21         MR. SACHSE:  I will offer it in evidence.

22         THE MASTER:  It will be received as Defendant's Exhibit

23   MA-72.

24   BY MR. SACHSE:

25         Q  How long have you owned this property, Mrs. Holsworth?

Z-89

1    A  Since '48.  Does it say there on the deed?

2    Q  You can look at the deed to refresh your recollection,

3  if you want to.

4    A  '47, huh?

5    Q  You were right the first time.

6    A  '48.

7    Q  Do you presently live on the property?

8    A  We do.

9    Q  You and your husband?

10   A  Yes.

11   THE MASTER:  May I see it a minute?

12  BY MR. SACHSE:

13   Q  Where do you get your water from at the present time?

14   A  Well, it is-- we call it a spring well.

15   Q  Describe it in your own words what it is.

16   A  Well, it is 8 by 8 and about 8 feet deep.

17   Q  Dug into what, the side of the hill?

18   A  Yes, into the side of the hill.

19   Q  And how did you decide where to put it?

20   A  It was there when we moved there and--

21   Q  Is that the only water source for you and your garden?

22   A  Yes, it is.

23   Q  What crops have you grown on your land since you have

24  been on it?

25   A  Well, we have had alfalfa.  We planted avocados, which

Z-90

1   was burnt out by the fire.   And we had boysenberries, and we

2   have a family orchard there now.   And then we have a garden,

3   truck garden.

4       Q   Have you ever kept poultry?

5       A   Yes, we have.

6       Q   How many?

7       A   Oh, I think we bought about five hundred to a thousand

8   at a time.   And we have had turkeys.

9       Q   How many turkeys at one time, about?

10      A   About, oh, say two dozen.

11      Q   Have you ever kept any other stock?

12      A   No, we haven't.

13      Q   No cows, no horses?

14      A   No.

15      Q   Your property does not touch De Luz Creek, does it?

16      A   It does not.

17      Q   Mrs. Holsworth, I will call your attention to

18  Plaintiff's Exhibit M-61, which is the original of the engin-

19  eering report on your property, of which you have a copy.   Do

20  you recognize that?

21      A   I do.

22      Q   Now the pink portion delineated on the soil classi-

23  fication map is that portion which Col. Bowen testified to be

24  irrigable.   Do you believe there are additional parts of your

25  land that are irrigable?

Z-91

1     A  Yes, I do.

2     Q  Will you please take a pencil and sketch on for the

3 Master's help, just roughly, where you believe any additional

4 irrigable parcels are located?

5     A  This is about here where our house is and--

6     THE MASTER:  Speak loud enough so the reporter can hear

7 you.

8     THE WITNESS:  Well, it comes about, oh, up to -- I would

9 say up to this line here.

10    THE MASTER:  That is the pencil line you are drawing

11 across the exhibit?

12    THE WITNESS:  Yes, it is.

13    THE MASTER:  And when you say it comes up to it, you

14 mean from this direction, from the top of the page?

15    THE WITNESS:  This is it.

16    MR. VEEDER:  May I inquire just where the house is

17 located?

18 BY MR. SACHSE:

19    Q  Locate your house, Mrs. Holsworth.

20    A  This is the line that is supposed to be cleared off.

21 Right here is our house right here.

22    THE MASTER:  Mark an X there where the house is located.

23    THE WITNESS:  I would say it would be right here.

24 BY MR. SACHSE:

25    Q  Put an X right there.  Now when you testified there is

Z-92

1   irrigable land comes up to that land, do you mean comes up to

2   it from the top of the page or comes up to it from the bottom

3   of the page?

4       A   Well, it comes up from the -- it goes all the way up

5   to here, up to the top of the page.

6       THE MASTER:  Well, the place you pointed was the side of

7   the page.

8       MR. SACHSE:  Do this, Mrs. Holsworth, please.  This is

9   north.  Now take a pencil--

10      THE WITNESS:  This is north here.

11      MR. SACHSE:  This arrow points to the north.

12      THE WITNESS:  I see.

13      MR. SACHSE:  Take a pencil and go like that to show what

14  you think is irrigable.

15      THE WITNESS:  Oh.  Well, all this up here and here and

16  down in here and all of this along here.

17      THE MASTER:  Cover over with the pencil the entire amount

18  you think is irrigable.

19      MR. SACHSE:  Don't be afraid of marking that up.  Be rough.

20      THE WITNESS:  Be rough with it?  And also over in here

21  and all through here, see, out to here.

22      THE MASTER:  Now did you intend to cover down in this

23  corner or not?

24      THE WITNESS:  Well, right up here, not-- up to about here.

25      THE MASTER:  What about this area between the northerly

Z-93

1 and the southerly portions of the pencil marks?  Is that in

2 your opinion irrigable?

3           THE WITNESS:  Yes, it is.

4           THE MASTER:  Cross that in.  Let the witness do it, Mr.

5 Sachse.

6           MR. SACHSE:  But make marks on it, please, so we can see

7 it.

8           THE WITNESS:  O.K.

9     BY MR. SACHSE:

10          Q  When you grew alfalfa, was it contained within the pink

11 portion of the map entirely or partly in the pink and partly in

12 the brown, or where?

13          A  It was partly-- it was mostly up here in the very top,

14 up in here.  Up in the top up here.

15          MR. SACHSE:  Can we indicate the witness pointed to the

16 easterly end of the pink?

17          MR. VEEDER:  Yes.

18  BY MR. SACHSE:

19          Q  When you had avocados, where were they located?

20          A  They were located up-- up here, too.

21          Q  Were they located on or off what is indicated as the

22 pink parcel?

23          MR. VEEDER:  Why not have the witness make a circle.

24          THE WITNESS:  It was off up here, farther up here.

25

Z-94

1  BY MR. SACHSE:

2      Q  Now, then, please, we will take Mr. Veeder's suggestion.

3  Now show us by just drawing a circle around it where you think

4  the avocados were.

5      MR. VEEDER:  No, I object to the question.  Where she

6  knows the avocados were.

7      MR. SACHSE:  Where you know the avocados were.  Pardon me.

8      THE WITNESS:  How is that?

9      THE MASTER:  That is, the avocados were located within the

10  area which you have located with a red elliptical circle.

11     THE WITNESS:  That is right.

12  BY MR. SACHSE:

13     Q  What happened to those avocados?

14     A  When we had the fire there, they got burned.

15     Q  Do you intend to make this De Luz property your home?

16     A  We do.

17     Q  Intend to stay there indefinitely?

18     A  We hope to.

19     MR. SACHSE:  I have no further questions.  Any cross-

20  examination?

21     THE MASTER:  Mr. Veeder, do you have any questions?

22     MR. VEEDER:  Yes.

23

24

25

Z-95

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Are you aware of the legal implications of saying your land doesn't abut upon De Luz Creek?

A   Pardon?

Q   Are you aware of the legal implications when you say your land does not abut upon De Luz Creek?

A   Well, I am pretty sure.  I know it doesn't.

MR. SACHSE:  She is a truthful lady.

MR. VEEDER:  I was just trying to help her out.

MR. SACHSE:  I have no further questions.

THE MASTER:  That is all, Mrs. Holsworth.

MR. SACHSE:  I don't suppose anybody else wants to cross-examine.

THE MASTER:  I am going on that assumption.  Unless some other defendant expressly states they wish to cross-examine, then I will not ask.

MR. DENNIS:  I think that, representing Santa Margarita Mutual Water Company, I can state that company makes no claim against any waters that might be produced on Parcel 72.

MR. STAHLMAN:  Your Honor, although the Vail Company has a lot of land up on that river, it is not our intention to get into any controversy with the small downstream property owners.  In fact, I probably won't even be here when some of them are examined.  I just wish to express my attitude on it.

Z-96

1    THE MASTER:  Do you have any redirect?

2    MR. SACHSE:  I have no redirect.  And I was going to say

3  if no one has anything else, I will ask Mrs. Holsworth be ex-

4  cused.

5    MR. VEEDER:  She certainly may be, so far as we are

6  concerned.

7    MR. SACHSE:  Thank you very much.  Mrs. Holsworth, you

8  won't have to come back, unless I send you some further word.

9    THE MASTER:  Mr. Veeder, do you wish to have any re-

10  buttal evidence in regard to Parcel 72?

11    MR. VEEDER:  No, your Honor.  I have reserved the right

12  to recall Col. Bowen, and I want to check the matter out with

13  him.

14    MR. SACHSE:  If there is rebuttal, I can always get her

15  again.  If there is rebuttal I can always bring her back.

16    THE MASTER:  In other words, if Mr. Veeder desires to

17  call Col. Bowen at a later time with reference to what Mrs.

18  Holsworth has just testified to, he has that privilege.  That

19  is perfectly all right.  Then you may call Col. Bowen again.

20    MR. SACHSE:  Col. Bowen again, please.

21

22

23

24

25

Z-97

1                            ALLEN C. BOWEN,

2      recalled as a witness for further cross-examination, having

3      been previously sworn, testified as follows:

4

5                           CROSS-EXAMINATION

6      BY MR. SACHSE:

7           Q   Col. Bowen, in this case I will direct your attention

8      to Exhibit M-60, being the property of Frank George and Patricia

9      Ann Chestmolowicz.   Are you familiar with that property?

10          A   Yes, sir.

11          Q   Have you ever been on it yourself?

12          A   Yes, sir.

13          Q   How many times?

14          A   Two different times.

15          Q   Two different times?

16          A   Yes, sir.

17          Q   How recently?

18          A   I would say the last time, about 1956.

19          Q   Would you locate with the pointer, please, for the

20      benefit of the Court, that parcel on Exhibit M-68?

21          A   The property contained and reported on in Plaintiff's

22      Exhibit M-60 is known as De Luz watershed Parcel No. 71, and

23      is located immediately to the north of the Holsworth property,

24      and is described as the Southeast Quarter of the Southwest

25      Quarter, Section 5, Township 9 South, Range 4 West.

Z-98

1          THE MASTER:  How many acres?

2          THE WITNESS:  About 40 acres, your Honor.

3  BY MR. SACHSE:

4          Q  Does that property abut upon De Luz Creek?

5          A  No, sir.

6          Q  Does it touch the recent alluvial stream channel of

7  De Luz Creek?

8          A  No, sir.

9          MR. VEEDER:  May I inquire, Mr. Sachse?  I don't want to

10  interrupt these any more than I have to.  When you say "De Luz

11  Creek", do you mean the main stem or do you mean the creek and

12  its tributaries?

13          MR. SACHSE:  I mean the stem as it touches this property,

14  and this particular property is down on the main stem and not

15  on either of the two forks of the creek.

16          Q  That is right, is it not, Col. Bowen?  This property

17  is down near-- on the main stem, not on the two upper forks?

18          A  Yes, sir.  It is on the main stem of De Luz Creek.

19          Q  You have not answered my question, have you?

20          A  Your question regarding recent alluvium?

21          Q  Whether it overlies the recent alluvium of De Luz

22  Creek.

23          A  I said it did not.

24          Q  It did not.  Is it not a fact that property, however,

25  is traversed by what is indicated on M-68 as an unnamed

Z-99

1    intermittent stream which rises to the west and flows to the

2    east across the northerly third of the property?

3         A  Yes, sir.

4         Q  Are you at all familiar with that stream?

5         A  No, sir.

6         Q  You don't know how much of the year it may have water

7    in it?

8         A  No, sir.

9         Q  You don't know whether or not it is only flowing after

10   rains, or whether it maintains a flow a considerable part of

11   the year?

12        A  Inasmuch as the engineering section of the report

13   contained in Plaintiff's Exhibit M-60 shows the diversion to

14   be in the nature of a spring or developed well, it follows

15   that this is typical of the streams in the area which flow only

16   during and immediately after rainfall.

17        Q  I notice that on page 2 of the text of your report,

18   paragraph 2, is the language "Springs found in the canyon", and

19   then continues.

20        A  Yes, sir.

21        Q  Can you tell me whether that language in this case has

22   reference specifically to this parcel, or is that just a general

23   statement of what springs flow?

24        A  That is a general statement.  The paragraph goes on

25   to state that a well, which extends to a depth of approximately

Z-100

1    30 feet, probably intersects a fissure containing a significant

2    flow of water.  So that statement beginning the paragraph you

3    just read is a general statement.

4        Q   But as applied to this particular parcel, this well

5    that you speak of in the last sentence, if I understand you,

6    is analogous to a spring found in a fissure in a granitic rock;

7    is that right, if I understand the report?

8        A   The portion of the paragraph there discussing the

9    manner in which water is found in these granitic materials is

10   simply placed there to explain how it is possible to drill a

11   well in granitic material and intersect any significant

12   quantity of water.

13       Q   Would you express an opinion as to whether or not the

14   waters underlying Parcel 71-- is that the right number?

15       THE MASTER:  Yes.

16   BY MR. SACHSE:

17       Q   --are or are not a part of De Luz Creek?

18       A   I would say the waters underlying the land, the 40-

19   acre-- approximately 40 acres reported on in Plaintiff's

20   Exhibit M-60 do not form a portion of the De Luz Creek.  They

21   might be considered local waters, as defined by Judge Carter.

22       Q   Thank you.  That is the answer I want.  Now in refer-

23   ence particularly to your land classification map at the end

24   of the report, you have found in the case of the Chestmolowicz

25   property, as I see it, two different soil classifications,

Z-101

1   Classification III and Classification IV that are irrigable;

2   is that correct?

3           A   Yes, sir.

4           Q   And the remainder you have placed in Class VII?

5           A   Yes, sir.

6           Q   Now with particular reference to page 3 of the report,

7   you have found a total of 10.7 acres to be suitable for irriga-

8   tion; is that correct?

9           A   Yes, sir.

10          Q   And you don't give me an average.  You don't give us

11  in this case an average irrigation requirement, but you have

12  given two different classifications, one of row crops at 4

13  acre feet per acre per year, and one of permanent pasture at

14  3.83; is that right?

15          A   Yes, sir.

16          Q   Both of those are applied duties, are they not?

17          A   That is right.

18          Q   As to the diversion duty required on this land, it

19  would be increased again about 10%, in your opinion?

20          A   That would be a nominal increase, yes.

21          Q   A nominal increase.  Now this land immediately adjoins

22  the Holsworth land, does it not?

23          A   Yes, sir.

24          Q   Did you give any consideration--

25          MR. VEEDER:   Before we go any further, I am going to have

Z-102

1   to inquire from counsel, first, if this is the property to

2   which you are making reference?

3          MR. SACHSE:   That is the property.

4          MR. VEEDER:   Frank George Chestmolowicz.

5          MR. SACHSE:   Frank and Patricia Chestmolowicz.

6          MR. VEEDER:   Now respecting the pleadings you filed, Mr.

7   Sachse, I notice this statement.   This is your answer on behalf

8   of your clients.

9              "The lands of the defendants are riparian

10             to an unnamed intermittent stream, which flows

11             through the property in a generally westerly

12             to easterly direction, and approximately 20

13             acres are arable and irrigable.   Defendants

14             claim full correlative riparian rights to the

15             use of the water of said stream in an amount

16             not to exceed 4.2 acre feet per acre annually.

17             The lands of defendants also contain many

18             running springs.   Defendants claim full rights

19             to the use of all water arising from said

20             springs."

21         Now I didn't file any request for clarification on this

22   particular answer.   But are we to understand that you are claim-

23   ing some rights to the use of water in the De Luz Creek water-

24   shed from a tributary to De Luz Creek?   Is that right?

25         MR. SACHSE:   Yes.   The one that Col. Bowen just testified

Z-103

1    to as being intermittent, and probably flowing after heavy

2    rains.

3        MR. VEEDER:   In other words, you are claiming some rights

4    in De Luz Creek?

5        MR. SACHSE: That is right.

6        MR. VEEDER:   It wasn't clear from your pleadings, and I

7    just wanted to be sure.

8        MR. SACHSE:   Is that the only question?

9        MR. VEEDER:   Yes.

10   BY MR. SACHSE:

11       Q   Now, Col. Bowen, with particular reference to the

12   Class VII land, are you prepared to state that, from your own

13   observation, that there is no portion of that land, either in

14   parcels as small as an acre, which could not be planted to

15   permanent pasture, noncultivation, sprinkler irrigation?

16       A   Well, this is the same situation as existed on the

17   Holsworth property which adjoins it on the south, as a common

18   boundary for an eighth of a mile on the southeast line of the

19   property reported in Plaintiff's Exhibit M-60.  And to reach

20   the Hosworth property, in fact, it is necessary to utilize this

21   road traversing the Chestmolowicz property.

22       THE MASTER:   That is this double dotted line is a road.

23       THE WITNESS:   Yes, sir.

24   BY MR. SACHSE:

25       Q   To make that clear, that is the same road that goes

Z-104

1   to the Chestmolowicz property, and appeared on the bottom of

2   their property, is it not?

3        A   Yes, sir.   My observations of the Chestmolowicz

4   property have been made at the same time, and my answer is the

5   same in regards to this one.

6        Q   In the event any substantial-- that any portion of

7   the Class VII land is in fact suitable for a permanent pasture,

8   then, of course, your irrigation requirement for future potential

9   water use figures would be wrong; is that right?

10        A   Well, in the event that it could be shown that water

11   could be put to reasonable and beneficial use for a permanent

12   pasture on that particular soil, 20 to 36 inches in depth on

13   steep slopes, it would be possible, of course, to justify the

14   use of more water there.

15        Q   Did you discuss with Sgt. Chestmolowicz the plans they

16   have for development of the property?

17        A   Discussion was held not by myself but with members of

18   my office working under my direction.

19        Q   Do you know offhand whether any consideration was

20   given to his plans for what he expects to do with it?

21        A   Yes, sir.   We always give consideration to the plans

22   of the property owner.   In this instance-- this answers a

23   question which you asked me sometime back.   We found about half

24   of this land suitable for row crops, which has our highest

25   duty, and the other half is suitable for permanent pasture,

Z-105

1  which has the next to highest duty for the lands considered

2  susceptible of-- or the lands considered irrigable.

3       Q  In other words, you found half of his land--

4       A  Half of his land we found to be irrigable, Mr. Sachse.

5       Q  But you do not know then whether Sgt. Chestmolowicz'

6  plans were to, for instance, terrace and put in avocados or

7  bulldoze brush out and have permanent pasture and fatten

8  stock or raise turkeys or what?  You don't know?

9       A  No, sir.  I am not aware of the details of the conver-

10  sations that were held.

11       MR. SACHSE:  I have no further questions.

12       MR. VEEDER:  I have no questions.

13       MR. SACHSE:  I will call Sgt.--

14       THE MASTER:  Just a minute.  I think we will take our

15  recess at this time.  Before we actually adjourn, I would

16  like to announce that the Clerk will be here either tomorrow

17  or Friday for a considerable period of time, if any counsel

18  wish to look at exhibits at that time.  I would suggest to

19  counsel during the recess if they wish to do that, consult with

20  the Clerk so he will know which day to be here to accommodate

21  counsel to the greatest extent possible.

22       MR. VEEDER:  Do I understand, your Honor that all of the

23  exhibits are going to be transferred down to the Clerk's office

24  in San Diego?

25       THE MASTER:  Yes.  That is the primary reason he will be

Z-106

1    here, to pick up all the exhibits and the pleadings, to take

2    down.  And if any counsel wishes to see him, do so during the

3    recess.

4         (Recess.)

5    MR. SACHSE:  Call Frank Chestmolowicz.

6

7                    FRANK GEORGE CHESTMOLOWICZ,

8    one of the defendants herein, called as a witness in his own

9    behalf, sworn, testified as follows:

10

11                    DIRECT EXAMINATION

12   BY MR. SACHSE:

13        Q  Will you state your full name, please, Mr. Chestmolo-

14   wicz?

15        A  Frank George Chestmolowicz.

16        Q  What is your occupation?

17   THE MASTER:  Just a minute.  How do you spell the last

18   name?

19        THE WITNESS:  C-h-e-s-t-m-o-l-o-w-i-c-z.

20        THE MASTER: Thank you.

21   BY MR. SACHSE:

22        Q  Will you state your occupation?

23        A  Master Sergeant, Marine Corps.

24        Q  Stationed at Camp Pendleton?

25        A  Yes, sir.

Z-107

1    MR. SACHSE:  Before we go any further, your Honor, Mr.

2  Chestmolowicz has not been able to locate his deed.  I under-

3  stand from Mr. Veeder that the Government will stipulate that

4  as far as their records are concerned he is the owner of Parcel

5  71, as indicated on Plaintiff's M-68.  Is that correct?

6    MR. VEEDER:  Yes, sir.

7    THE MASTER:  Very well.  If any other defendant attempts

8  to impeach that fact--

9    MR. SACHSE:  We will get a certified copy.

10    THE MASTER:  --Mr. Chestmolowicz can then introduce

11  evidence to the contrary.

12    MR. DENNIS:  We will enter in the same stipulation.

13    MR. STAHLMAN:  Certainly.

14    MR. SACHSE:  I think one is enough.

15    Q  How long have you owned the property that is indicated

16  as Parcel 71 on Government's M-68?

17    A  Over seven years, sir.

18    Q  And have you lived on that that time?

19    A  Yes, sir.

20    Q  When you say you have lived on it--

21    A  I mean my wife and myself.  I have not been there all

22  the time, naturally.  I have been away.  But my wife has lived

23  there all this time.

24    Q  How do you get your water now?

25    A  Well, I have a well which I use for house water.  I

Z-108

1 have a spring, with a reservoir, that I use for irrigation.

2     Q  How is the spring water transmitted to this reservoir?

3     A  It comes out of the side of this hill.  It runs into

4 a cement reservoir.

5     Q  And you have a pipe at the spring which flows by

6 gravity to a cement reservoir; is that right?

7     A  Well, it is not pipe.  It just runs right into a cement

8 reservoir. Then I pipe it out to my field.

9     Q  What I want to make clear, your reservoir is actually

10 built immediately below where the spring seeps out of the rock?

11     A  Yes, sir.

12     Q  What development is there on your property now?

13     A  This year?

14     Q  Yes, at present.

15     A  Not too much.  I haven't had too much time this year

16 to do too much.

17     Q  Now, in the past you had plantings that were destroyed

18 by the big forest fire, did you not?

19     A  Yes, sir.  I had an orchard up on the upper field.

20     Q  What kind of an orchard?

21     A  Well, I had apricots, walnuts and almonds.

22     Q  Have you ever at any time since the destruction of the

23 orchard had any substantial plantings on the property?

24     A  Yes, sir.  I have got long-range plans.

25     Q  No, plantings.

Z-109

1      A  Oh, plantings.

2      Q  Since the destruction of the orchard, have you had any

3  substantial plantings?

4      A  Oh, yes, sir.  I have had five or six years ago

5  alfalfa, and I put permanent pasture in another year and so

6  forth.

7      Q  What are your long-range plans for the development of

8  the property?

9      A  Wel, when I get out of the service I plan to supplement

10  my income from it.

11      Q  In what way?  How do you expect to use this parcel?

12      A  Oh, I am going to put in some orchards, run cattle,

13  and put in a field of grain, alfalfa, something similar to

14  that to take care of a cow.

15      Q  What can you tell us about whether or not your property

16  is frost-free, or any part of it?

17      A  The upper portions are, sir, the upper fields.

18      Q  By "upper" it would be the westerly portion; is that

19  right?  The hill rises to the west, does it not?

20      A  Yes, sir.

21      Q  And about what in area, upper half, upper third?

22      A  In what sense do you mean that?

23      Q  Well, is it the upper third of your property, the

24  upper quarter of your property, or what percentage of your

25  property would you say is frost-free?

Z-110

1          A   Well, truthfully I couldn't actually answer what per-

2   centage it would be.   I would have to get some of the Soil

3   Conservation boys to take tests.   I know a certain percentage

4   of it is, but I couldn't actually truthfully go by acreage and

5   say how much.

6          Q   You have citrus.   Was citrus included in the trees

7   burned out by the fire?

8          A   In this one field there were citrus trees there at

9   one time.

10         Q   Now your property does not actually touch De Luz Creek,

11   does it?

12         A   No, sir.

13         Q   But it is bisected by a stream that is indicated on

14   the map as an intermittent stream; is that right?

15         A   Well, what probably that is classified, sir, during

16   the rainy season there is a small ravine in front of the house

17   that runs-- it runs right in De Luz Creek.

18         Q   And there is no appreciable flow in that canyon except

19   during and immediately after rains?

20         A   That is the only time, sir.

21         Q   Do you have any dams or obstructions of any kind on

22   the stream?

23         A   No, sir.

24         Q   In that canyon?

25         A   No, sir.

Z-111

1   Q  Now will you please look at M-60, and particularly the

2   soil classification map, and I will call your attention to the

3   fact that the portions of your property covered in pink and in

4   blue have been indicated by the Government as being irrigable.

5   Do you believe that delineation is accurate?

6   A  That is to a certain extent.  When I originally de-

7   velop, though, I think the side of this hill-- these fields

8   here-- it is a gentle slope--

9   MR. VEEDER:  May I ask you, sir, what you just said?  When

10  you originally developed?

11  THE WITNESS:  When I originally have the time, which I

12  don't have the time now, from these fields there is a gentle

13  slope, which is all brush and stuff, which I can eventually

14  clear out and use it for--

15  BY MR. SACHSE:

16  Q  You have drawn a red line on the land classification

17  map which extends from the blue Class IV soil southerly clear

18  across your property, through the Class VII soil.  Now what

19  do you intend that red line to indicate?

20  A  Well, this is all brush, brush oak now.  And it is a

21  gentle slope.  And I eventually expect to clear that out.  I

22  can use it for permanent pasture, almost anything.  It is not

23  that steep.

24  Q  In other words, what you are stating, if I am correct--

25  and tell me if I am wrong-- is that the easterly part of the

Z-112

1    brown area is not nearly as steep as the westerly; is that

2    right?  It gets steeper the farther you go in this direction,

3    or am I correct?  Correct me--

4         A  Well, maybe I lost my bearings.  Here are the three

5    fields.  Where is the reservoir on this thing?

6         Q  It is not shown on that.

7         THE MASTER:  This is the south and this is the north.

8         THE WITNESS:  Well, off these three fields there is a

9    gentle slope here.  It is all brush and everything.

10        THE MASTER:  And you believe this land that is included

11   within this red circle could be used for permanent pasture if

12   it was cleared?

13        THE WITNESS: Yes, sir.

14   BY MR. SACHSE:

15        Q  Now,--

16        A  It is all scrub oak and brush now, sir.

17        Q  Now what about the land as you go farther to the left

18   on the map?

19        THE MASTER:  That is to the west.

20        MR. SACHSE:  To the west.

21        THE WITNESS:  Well, after this my property ends.  I mean

22   maybe my circle isn't big enough.

23        MR. SACHSE:  No.  This is your property.

24        THE WITNESS:  Then my slope here would run all the way

25   to the border of my property.

Z-113

1    THE MASTER:  Then you intended your red circle to include

2    all of your property?

3    THE WITNESS:  Yes, sir, the border to my field.

4    BY MR. SACHSE:

5    Q  So, as I understand it, what you are stating is that

6    you feel that practically all of the Class VII land could be

7    cleared and put into permanent pasture; is that right?

8    A  Not all of it, sir.

9    Q  Practically all?

10   A  This area here for my fields, those three strips could

11   be cleared.

12   Q  I am referring to the Class VII land which is shown

13   in brown.  Practically all of the Class VII land could be

14   cleared and put in permanent pasture; is that right?

15   A  Not practically all of it, no, sir.  It would be

16   probably I would say-- the trouble is I can't get my bearings

17   exactly on this from these three fields.

18   THE MASTER:  Mr. Chestmolowicz, these pink and blue areas

19   don't necessarily represent cleared land at the present minute.

20   They indicate land that can be irrigated, that the Government

21   says can be irrigated.

22   THE WITNESS:  Yes, sir.  I am judging from that, sir.

23   And I was just trying to get my bearings on this map.  This

24   is the road through that area, not this wide.  I was judging

25   by these two strips here, sir.

Z-114

1      THE MASTER:  Then the final red marks you have placed on

2   the map of the Master's Exhibit M-60 includes substantially all

3   of Class VII land lying in the upper two-thirds and includes

4   approximately the bottom one-third.

5      THE WITNESS:  Yes, sir.

6      MR. SACHSE:  I have nothing further.  Wait a minute.

7      Q  All that land you feel is susceptible to irrigation

8   for permanent pasture?

9      A  Yes, sir.

10      MR. SACHSE:  I have no further questions.

11      THE MASTER:  Do you have any questions?

12      MR. VEEDER:  Your Honor, I don't know whether it is a

13   question or an observation.  I don't believe your Honor could

14   conceivably enter a decree based upon the evidence that has

15   been introduced in regard to Mrs. Holsworth's property or the

16   Sergeant's property.  I believe that it is essential-- and I

17   am sticking up for these people.  I am for them all the way,

18   and I have been.  There hasn't been shown-- on neither of these

19   parcels has there been a showing of the maximum irrigable

20   acreage or the water duty for those lands, nor the area which

21   could be irrigated.  And I respectfully submit that these

22   people would be in a bad way if the record for them is not

23   cleared up.  I believe that it is essential before we let these

24   people go that there be in the record, for their protection,

25   a showing of the exact acreage, as nearly as possible, that

Z-115

1   would be irrigated.

2        Now I am not cross-examining these people.  I am for them.

3   But I think that we have to show, before your Honor can make

4   findings, the acreage actually to be irrigated, the acreage

5   actually irrigable, the duty of water, and the maximum duty

6   that your Honor would think that would be proper.

7        Now I think 4.2 is all right, if that is what they want.

8   I think there has been a misconception of what the Colonel has

9   done.  Col. Bowen has gone out and analyzed these areas and

10  said this is what could be.  But we want to see these people

11  have declared to them their maximum irrigable acreage that

12  could be irrigated.  And I don't believe you could do it, your

13  Honor, on the basis of the record now complete.

14       MR. SACHSE:  I will be more than happy, if Mr. Veeder

15  is so anxious to help, to ask now if Col. Bowen will take, at

16  his convenience, no rush, the last two maps, Holsworth and

17  Chestmolowicz, and run a planimeter and tell me how many more

18  acres that line that has been drawn amounts to.  There is

19  testimony that it is irrigable.  There is, furthermore, testi-

20  mony  before your Honor right now-- if you want nothing else,

21  there is testimony, the Government's own exhibit.  It is right

22  here in front of us.  It gives an irrigation duty, if your

23  Honor chooses to accept that.

24       THE MASTER:  I think what Mr. Veeder has in mind, if I

25  understood him correctly,--

Z-116

1      MR. VEEDER:  There is a conflict in evidence.

2      MR. SACHSE:  Sure.  He will resolve it.

3      THE MASTER:  That the record contains the Government's

4  estimate, based upon Col. Bowen's observations and those of his

5  staff, which are reflected in this map.  And then in addition

6  we have the statements of the owners of the property, but that

7  the statements by the owners of the property are somewhat

8  vague, and also that the reasons why they believe the land can

9  be irrigated may be too insubstantial to warrant a judgment in

10 their favor.

11     MR. VEEDER:  That is exactly right.

12     THE MASTER:  In other words, asuming, for example, that

13 I should determine that this upper two-thirds of the brown

14 area was irrigable, that it might be held by some other court

15 that the evidence did not sufficiently justify it.

16     MR. SACHSE:  In other words, Mr. Veeder figures on

17 appealing.

18     MR. VEEDER:  No, I do not.  I am simply saying you didn't

19 protect your client.

20     THE MASTER:  No, not necessarily that Mr. Veeder would

21 appeal, but that some other defendant could appeal.  That is,

22 all defendants are adverse to each other.

23     MR. VEEDER:  Your Honor, that is correct.

24     MR. SACHSE:  Your Honor, I am perfectly willing, if Mr.

25 Veeder will show these people and me, for instance, the courtesy

Z-117

1   of what he just said here in the record, if 4.2 is all right,

2   I will buy 4.2 right now.

3        MR. VEEDER:  This is a lawsuit, and his Honor has to

4   make findings based upon facts.

5        MR. SACHSE:  If you and I will agree that 4.2 is a

6   reasonable irrigation duty, he will take it.

7        THE MASTER:  Just a minute.  Of course Mr. Veeder can't

8   bind all the other defendants, either.

9        MR. SACHSE: No, but we can do exactly as we did on title.

10  We can put in our stipulation.  If somebody wants to fight with

11  it, they can fight it.

12       MR. VEEDER:  The point I am making, your Honor, there

13  could not be a finding of irrigable acreage based on this draw-

14  ing here.  I respectfully submit it would be impossible for

15  anyone to say how many acres of irrigable land the Sergeant has,

16  based upon the record.

17       MR. SACHSE:  I contradict you.  If his Honor believes

18  every word he said, it would be an extremely simple matter.

19  We know what this parcel is.  We can calculate irrigable acreage

20  within that line.  There is no problem at all.

21       MR. SACHSE:  I will say this, if it could be calculated,

22  by all means do it, because the record is void right now of

23  irrigable acreage.

24       MR. SACHSE:  All right, let's settle it.  Will your office

25  be kind enough-- you are so anxious to help these people--

Z-118

1  to calculate the area within the lines delineated?  Will you

2  do that?

3      MR. VEEDER:  Why, certainly I will.

4      MR. SACHSE:  Thanks.

5      MR. VEEDER:  Just a  minute.

6      MR. STAHLMAN:  Will you do all that for Vail Company,

7  too, Mr. Veeder?

8      MR. SACHSE:  You are not as little as these people.  He

9  is not as anxious to help you, George.

10      MR. VEEDER:  I submit, your Honor, it is impossible by

11  a planimeter or any other method to determine the irrigable

12  acreage that the Sergeant says he is entitled to.  And I would

13  like to call Col. Bowen and I will say, "Can you check out on

14  that red line how much acreage the Sergeant says he is entitled

15  to?"

16      MR. SACHSE:  There is about four red lines.  Be sure you

17  tell him which one.

18      THE MASTER:  I think the fundamental weakness, of course,

19  is as to the accuracy of the area shown by the red lines.  In

20  other words, the area shown by the red line can be calculated

21  readily enough.  The only question which would exist in my mind

22  would be whether that line had been drawn with sufficient

23  accuracy to justify planimeter measurement.

24      MR. SACHSE:  I frankly say you are going to make any

25  finding you see fit here.  There is no question about it.

Z-119

1    Speaking very frankly now, I believe that the Government's

2    reports are very unjust on the one condition in particular of

3    water duty.  I believe they are very unfair on that, specific-

4    ally.  And I believe there is plenty of evidence in this record

5    and there will, of course, be more, and all of it will have

6    a bearing on every parcel in so far as this question of water

7    duty is concerned.  So I think there is going to be all kinds

8    of evidence on water duty, the way the water duty was calculated

9    for these individuals as against the way it was calculated for

10   the public lands.

11       THE MASTER:  I am much clearer, at least at the present

12   state, on the question of water duty than I am on the question

13   of the actual irrigability of any particular parcel of land.

14       MR. SACHSE:  Now the next--

15       MR. VEEDER:  The point-- I would like to go a step fur-

16   ther.  Again, the question of water duty, dependent upon the

17   studies made by Col. Bowen, is one thing.  If this gentleman

18   wants to put it into permanent pasture, it would be something

19   else.  And I respectfully submit that evidence to that effect

20   should be in the record.  I also say, as I said before, I

21   don't see how anyone could enter a decree on the basis of the

22   Sergeant's record at the present time.

23       MR. SACHSE:  Now just a minute, let's make one thing very,

24   very clear.

25       MR. VEEDER:  And he is not my client.  I just feel sorry

Z-120

1  for him.

2         MR. SACHSE:   I think Mr. Veeder has forgotten and I

3  think your Honor has forgotten both these parcels in so far as

4  every single word of testimony in the record are non-riparian.

5  Both these parcels have, by the word of the Government's own

6  witness, local water.   There is no correlative problem with

7  this.   There is no calculation needed to say what share of the

8  riparian watershed this gentleman is entitled to use water

9  from.   His rights are correlative to his neighbor.   If he is

10  taking percolating ground water, he can keep right on taking

11  it, under California law, until he damages his neighbor.   And

12  he can take all he wants.   Now that I think is the heart and

13  soul of this.   Mr. Veeder may have an argument when we get to

14  a riparian parcel.   But his own witness has said that the

15  water that will be found by Chestmolowicz' well and by

16  Holsworth's well and by the spring are what Judge Carter

17  characterized as local water.

18         THE MASTER:   Mr. Veeder has brought the question up that

19  in the pleading there is claimed to be riparian rights in this

20  unnamed creek or ravine.

21         MR. VEEDER:   That is right.   And there is 20 acres and

22  there is not a scintilla of proof to support his claim for 20

23  irrigable acres.   And that is the point I am making now.   There

24  is not a scintilla of proof that gives this gentleman the 80

25  acre feet of water annually that is pleaded.   Now I submit, your

Z-121

1    Honor, I submit right now is the time to straighten these things

2    out.  There is the pleading and I say the pleading has not been

3    sustained by the evidence that has been introduced.  Had I known

4    it, while I can't represent these people, as you well know, I

5    will cooperate with them.  And I am fighting for them now.  But

6    I want it very clear that we think that there has not been

7    adequate proof in the last two cases to protect the rights of

8    these people.

9        MR. SACHSE:  Is there adequate proof in your engineering

10   study, Mr. Veeder?

11       MR. VEEDER:  We have never undertaken to prove the rights

12   of these people with these reports.

13       MR. SACHSE:  Oh, I appreciate that.  I say is your study

14   a sufficient basis for a finding?

15       MR. VEEDER:  I will say this--

16       MR. SACHSE:  Will you answer that?  Is it a sufficient

17   basis for a finding, your study alone with nothing further?

18       MR. VEEDER:  Why, I truly think so, but you have attacked--

19       MR. SACHSE:  I think so too.

20       MR. VEEDER:  You have attacked the report.  You say it

21   is no good.  And then you come up with a drawing like that.

22   And I say when you do that you have to go on and prove out the

23   acreage and you have to go on and put in the amount of water

24   they are entitled to, or they will lose it.

25       THE MASTER:  Of course Mr. Sachse doesn't have to do that.

Z-122

1    MR. SACHSE:  I don't have to do anything.

2    THE MASTER:  In other words, --

3    MR. SACHSE:  I can sit back and rest.

4    THE MASTER:  It may be your opinion that he should, but

5    he doesn't have to.

6    MR. VEEDER:  As a lawyer--

7    MR. SACHSE:  You let me try my lawsuit.

8    THE MASTER:  Now let me see if maybe I could ask Mr.

9    Chestmolowicz a couple of questions which might help me, since

10   ultimately I am going to have to make some decisions here.

11   BY THE MASTER:

12   Q   You said you had an orchard which had been destroyed

13   by fire?

14   A   Yes, sir.

15   Q   What area did that cover?

16   A   Up the field.

17   Q   That was in part of the pink and the blue area?

18   A   Yes, sir.

19   Q   And you said you also had alfalfa on the property?

20   A   Yes, sir.

21   Q   And was that in either the pink or the blue area?

22   A   Yes, sir.  It was in this area here.

23   Q   That included some of the brown area, or Class VII

24   land, which is located between the middle pink area on the

25   easterly part of your property and the upper pink and blue area?

Z-123

1      A   Yes, sir.

2      Q   That included this brown area in between?

3      A   And this area.

4      Q   Did it go down as far as the pink area in the lower

5   portion of the property?

6      A   No, sir.

7      Q   How far down did it go?

8      A   Well, how much is this pink acreage here?

9      Q   Well, the total of all three of the pink areas is 5.1.

10   So I imagine this looks about a little over 2 acres and this

11   is about 2, and maybe that is somewhere around one acre.

12      A   I had about five or six acres, so it went possibly

13   this way.

14      THE MASTER:   I see.   That is all the questions I have.

15      MR. SACHSE:   I am through with Mr. Chestmolowicz.

16      THE MASTER:   Than you are excused, Mr. Chestmolowicz.

17      MR. SACHSE:   The same understanding if Mr. Veeder wants

18   rebuttal we will call him later.

19      THE MASTER:   Yes.

20      MR. DENNIS:   The Santa Margarita Mutual Water Company is

21   not making any claim against any water that might be developed

22   on Parcel 71.

23      THE MASTER:   That will be understood as to each parcel,

24   unless you state to the contrary, Mr. Dennis.

25      MR. DENNIS:   I think it would be wise to have the statement,

Z-124

1    in view of the pleadings.  We are all cross parties against

2    one another and I think it would be proper if we have no claim

3    to state so.

4        THE MASTER:  That will be understood, unless you state

5    to the contrary.

6        MR. SACHSE:  Col. Bowen.

7

8                      ALLEN C. BOWEN,

9    recalled as a witness for further cross-examination, having

10   been previously sworn, testified as follows:

11

12                    CROSS-EXAMINATION

13   BY MR. SACHSE:

14       Q  This is, I believe, Col. Bowen, M-45.

15       THE CLERK:  Mark for identification MA-35

16       THE MASTER:  MA-45?

17       MR. SACHSE:  No.  No, we are using the parcel number,

18   your Honor.  This exhibit number, that is not the parcel.

19       THE MASTER:  What is the parcel?

20       MR. SACHSE:  It is MA-26

21       THE MASTER:  MA-26.

22   (Copy of deed marked Exhibit MA-26 for Identification.)

23       MR. SACHSE:  Mr. Clerk, would you also get me M-DB

24       THE CLERK:  M-DB.

25       MR. SACHSE:  Any objection to this going in evidence, Mr.

XI

Z-125

1    Veeder?

2           MR. VEEDER:   That is a copy of his deed?

3           MR. SACHSE:   Yes.

4           MR. VEEDER:   No.

5           MR. SACHSE:   I will offer in evidence a deed to John

6    Kuhnis.

7           THE MASTER:   This will be received in evidence as Exhibit

8    MA-26.

9           MR. SACHSE:   Kuhnis, K-u-h-n-i-s.

10   BY MR. SACHSE:

11          Q   Col. Bowen, I also want to refresh your recollection

12   on this parcel.  I show you Exhibit M-DB, which I believe you

13   will recall as one of the exhibits of the fractional symbols

14   I gave you and asked you to classify.

15          A   Yes, sir.

16          Q   I will advise you that Parcel 2, Item 2, on M-DB, is

17   within the John Kuhnis land.  Now will you please take a pointer

18   and locate these lands for the Court?

19          A   The land reported on in Plaintiff's Exhibit M-45 is

20   De Luz watershed Parcel No. 26, and is indicated on Plaintiff's

21   Exhibit M-68, one corner of the East Fork of De Luz Creek and

22   the De Luz-Murrieta Road passing through one corner of this

23   property.  It is marked with a No. 26 and contained in a circle.

24   And it is described as the Southeast Quarter of the Northeast

25   Quarter and the North Half of the Southeast Quarter and the

Z-126

1    Northeast Quarter of the Southwest Quarter, Township 8 South,

2    Range 4 West, Section 28.

3        Q  And that is approximately 160 acres?

4        A  Yes, sir.

5        Q  Now I will call your attention to the classification

6    occurring on page 3 of the report, in which, as I understand

7    it, you have found approximately 31 acres irrigable and 129

8    acres non-irrigable.  Is that correct?

9        A  Yes, sir.

10        Q  Now at the time you made that calculation were you

11    aware that at one time there had been 14 acres of walnuts on

12    the property?

13        A  Yes, we were aware of that and took that into consider-

14    ation.

15        Q  In fact, there still is a walnut planting on the

16    property, isn't there?

17        A  Yes, sir, to the best of my knowledge, unless it has

18    been removed in the past few months.

19        Q  And that, turning to the map now-- is that the part

20    indicated in yellow that looks like eucalyptus trees in the

21    aerial photograph?

22        A  Yes, sir.  That is a portion of the valley floor.

23    And the dots spaced at regular intervals indicate the trees in

24    the groves.  It is also contained in the overlay that goes with

25    the map, which is marked 3RC.

Z-127

1    Q Now still calling your attention to the map, the De

2    Luz Creek runs through this parcel, both in the northwesterly

3    part and the extreme-- Excuse me.  Let me back up.  Both in

4    the northeasterly direction, and in the extreme northwesterly

5    corner of the west line; is that right?

6         A  Yes, sir.

7         Q  As far as you are aware, Col. Bowen, is any portion

8    of this land not riparian to De Luz Creek?

9         MR. VEEDER:  I object.  That is a legal question.

10        MR. SACHSE:  If he knows.

11        MR. VEEDER:  He wouldn't know.

12        MR. SACHSE:  Let him answer, please.

13        THE MASTER:  I think--

14        MR. VEEDER:  He can ask him the question does it abut

15   upon the stream.

16        MR. SACHSE:  I have done that.

17        MR. VEEDER:  Then he is asking strictly a legal question,

18   your Honor. . I object to it.

19        MR. SACHSE:  I believe I have the right, your Honor, of

20   asking him as far as he is aware of whether any portion is not

21   riparian.

22        THE MASTER:  I believe he has the right to ask the witness

23   if he knows.

24        MR. VEEDER:  He is not a lawyer.

25        THE MASTER:  The witness might know, even though he is not

Z-128

1   an attorney.  So I believe he can ask him if he knows.

2       MR. VEEDER:  I will concede he can ask him if he knows,

3   but it is still a legal question and I object to it if he tries

4   to answer.

5       THE MASTER:  Well, the Court would not be bound by the

6   witness's answer, but I think the witness is entitled to answer

7   the question and Mr. Sachse is entitled to ask this particular

8   question.  You may answer the question, Col. Bowen.

9       THE WITNESS:  May I have your question?

10  BY MR. SACHSE:

11      Q   I said as far as you are aware-- without reading it--

12  as far as you are aware is any part of the Kuhnis property

13  not riparian to De Luz Creek?

14      A   I do not know.

15      MR. SACHSE:  Now at this point, so that I am quite clear

16  in my proof, I believe that we had a gentlemen's understanding

17  with Mr. Veeder when this case first started that on the

18  question of riparian status it would be sufficient for the

19  plaintiff to indicate a single contiguous parcel abutting upon

20  a stream, without introducing a chain of title.

21      MR. MOSKOVITZ:  I think he meant defendant.

22      MR. SACHSE:  Defendant, I meant.  Pardon me.  Single

23  contiguous parcel abutting upon a stream without introducing

24  a chain of title, and that Mr. Veeder would accept that as a

25  prima facie showing of the riparian nature without the

Z-129

1   necessity of a chain of title report.  Subject, of course, to

2   any rebuttal he might have as to severances or anything of the

3   kind.

4        MR. VEEDER:  That is correct.  And that was my under-

5   standing as to all other parcels.

6        MR. SACHSE:  To all other parcels.

7        THE MASTER:  That is a continuing understanding.

8        MR. VEEDER:  Oh, yes.

9        THE MASTER:  As to all defendants.

10       MR. SACHSE:  Whenever land touches a stream, if it shows

11  as a single contiguous block it is a prima facie showing of

12  riparian nature, with complete latitude to the Government to

13  rebut by showing severance or any other fact that may be in-

14  volved.

15       THE MASTER:  But unless there is such affirmative evi-

16  dence then offered by the Government or some of the defendants,

17  the finding would be the entire parcel was riparian.

18       MR. SACHSE:  Subject to one more modification.

19       MR. VEEDER:  It has to be within the watershed.

20       MR. SACHSE:  Within the watershed.

21       THE MASTER:  Obviously, yes.

22       MR. SACHSE:  And that is the question I was trying to

23  get at.  I guess I asked it ineptly.

24       Q   Col. Bowen, can you tell or do you know from the

25  examination of the plat whether or not any part of Parcel 26

Z-130

1   is outside the watershed of De Luz Creek?

2       A   It is all inside the watershed of De Luz Creek, well

3   within the watershed of De Luz Creek.

4       Q   Is any part of it located in a subwatershed that does

5   not drain into De Luz Creek?

6       A   Anything that runs off the property in any direction

7   eventually might drain into De Luz Creek.

8       Q   Now I went over your-- I am calling your attention

9   now to page 2.  You have two acres indicated as Class III land.

10      A   $2\frac{1}{2}$ acres.

11      Q   Is that it?

12      A   Indicated as Class III, on page 2 of Plaintiff's

13  Exhibit M-45.

14      Q   $2\frac{1}{2}$.  That is right.  And what color is Class III,

15  please?  Pink?  That is the small pink portion to the left-

16  hand side of the map; is that right?

17      A   Yes, sir.

18      Q   Now, Col. Bowen, if you will look immediately below

19  that pink portion you will see a large yellow area.

20      MR. SACHSE:  Do you have your glass here, Bill?

21  BY MR. SACHSE:

22      Q   --which I can't read the field numeral.  Can you read

23  the field--

24      THE MASTER:  The area below the pink portion is not

25  yellow, at least on the exhibit.

Z-131

1    MR. SACHSE:   It is orange or dark brown.

2    THE MASTER:   Yes.

3    MR. SACHSE:   And it shows three fields, 4C, 5D, 6C.

4    Q   Do you see the one I am speaking of?

5    A   Referring to the land utilization overlay contained

6  in Plaintiff's Exhibit M-45, the field numbers 4, 5 and 6

7  adjoin and lie southerly of the Class III land depicted on the

8  land capability map.

9    Q   Now I do not find in this report what I found in some

10  of the others, namely, a breakdown of the soil classes that

11  you assign to row crops and the soil classes you assign to

12  citrus and the soil classes you assign to deciduous.   Do you

13  know what I mean?   If you will look at page 4 of your report--

14    A   Well, that is handled with the overlay.   Due to the

15  complexity of this particular property, to assist in determin-

16  ing where those areas were to which we had considered a par-

17  ticular land use adaptable, we made an overlay and the overlay

18  speaks for itself.

19    Q   Oh.   In other words, the pink section then is under

20  Area 3.

21    A   In Field 3.

22    Q   And it shows as suitable for RC, for row crops; is that

23  right?

24    A   Yes, sir.

25    Q   In other words, that is not limited only to the

Z-132

1    yellow.

2        A  That is correct.

3        Q  Oh.

4        A  The field boundaries on the land utilization overlay

5    are the dashed lines.

6        Q  Now, Col. Bowen, I will call your attention to the

7    fact that a day or two ago you classified the soil, which I

8    believe you will find to be Field 4C, 5D and 6C, as Class III

9    soil.  Is that not correct?

10       A  The fields are actually 4, 5 and 6 shown on the land

11   utilization overlay.  The C and D indicate the crops adaptable.

12       Q  And you classed -- but those fields bear the frac-

13   tional symbol which you classified as Class III?

14       A  Thank you, sir.  It is a better glass than you had

15   before.

16       MR. SACHSE:  It is not mine.  It is Mr. Dennis's.

17       THE WITNESS:  Actually, Mr. Sachse, only the field shown

18   as No. 5 on the land utilization overlay has the soil symbol

19   1cL5A over 6B-2, which you have typed onto Defendant's Exhibit

20   M-DB.  The remaining orange area has other soil symbols.

21       Q  But the Field 5 you classified on M-DB as Class III

22   soil, did you not?

23       A  On the basis of your exhibition of a typed symbol on

24   a plain piece of paper, referring to Defendant's Exhibit M-DB,

25   yes, sir.

Z-133

1    Q   Now if you change Field 5 to a type III classification,

2    it would then become suitable for cultivation of row crops,

3    as you have allowed other III land, would it not?

4        A   Well, the reason that is classified as VI on the map

5    here, and correctly classified, is because of the presence

6    of cobbles, rounded aggregate three to six inches in diameter,

7    which interferes with tillage.  They are present in sufficient

8    amount to interfere with tillage.

9        Q   That symbol--

10       A   That was the basis for assigning that to a Class VI

11   land use capability class rather than to Class III.  If the

12   cobbles weren't there and you could till it with tillage

13   implements, then it would become Class III.

14       Q   That cobble symbol was present--

15       A   Oh, yes, sir.

16       Q   --on the one you classed as III, was it not?

17       A   Yes, sir.

18       Q   So please answer my question.  If it were Class III

19   soil, would it be suitable for crops of a higher water duty

20   than it is as Class VI soil?

21       A   If it were a Class III soil it would be suited for row

22   crops, as indicated for the Class III soil immediately to the

23   north.

24       Q   And you have allowed row crops a water duty of 4 acre

25   feet per year, have you not, in this study, in this particular

Z-134

1    area?

2        A   Yes, sir.  That was the allowance in Plaintiff's Ex-

3    hibit M-45 for the lands considered suitable for row crops.

4        Q   And again I assume that in all these cases you will

5    state that a reasonable percentage increase for project duty

6    would be 10%; is that right?

7        A   Yes, sir.

8        Q   So for row crops, if you increase the Class III soil

9    by the amount of another 5 acres, being the area of Field No.

10   4--

11       THE MASTER:   Aren't we discussing Field No. 5?

12       THE WITNESS:   Field No. 5, yes, sir, one acre in area.

13       MR. SACHSE:   Now just a minute.

14       Q   Are you stating that symbol does not apply to both 4

15   and 5?

16       A   Absolutely.  As you can see, there is a line indicating--

17   your Honor, there is a line indicating that this symbol applies

18   to the soil site delineated by a solid black line.  Let me

19   borrow a pencil.  The area is not large enough to place the

20   symbol within it, so the symbol was placed outside the area and

21   then a line run between the symbol and the soil site to indicate

22   that the symbol applies to this particular site.  The symbol

23   for this larger area appears off of the limits of the property

24   being reported hereon.

25

Z-135

BY MR. SACHSE:

Q  It is way over here on this thing here?

A  Off on the binding, yes, sir.

Q  In other words-- I am really asking this for informa-tion, then. I had assumed, Colonel, that this line was analogous to that thing that surveyors--

A  The line showing the connection between two properties.

Q  I had assumed that this line that appears on the soil classification chart in Exhibit M-45 was the typical mappers symbol for two connecting--

A  Two adjoining tracts.

Q  Two adjoining tracts.

A  No, sir.

Q  But it is not?

A  No, sir.  The symbol applies to the site, which is too small to inscribe the symbol in.

Q  So it is one acre.  There would be one acre increase, then, one acre subject to an increased water duty, not five?

A  Yes, sir.

Q  Col. Bowen, to save time, all the general questions that I asked you earlier in connection with the Holsworth property and the Chestmolowicz property regarding the possi-bility of use for poultry will apply equally to this?

A  Yes, sir.  It applies equally to all lands in the watershed.  And if you add them to one, you add them to another,

Z-136

1    and you wind up with the same correlative share of water.

2        Q  And also the possibility of raising permanent pastur-

3    age, non-cultivated, sprinkler irrigated, would apply equally

4    to this land?

5        A  Yes, sir.  It is possible to plant seed and water.

6    We are not saying, though, it is economically feasible, simply

7    the physical possibility.

8        Q  That is right.  Now would you say that any part of

9    the lands described in Exhibit M-45A overlie similar subsoils

10   to those-- similar submaterials to those that are on the

11   Chestmolowicz and Holsworth property?

12       A  May I have that question read?

13       (Question read.)

14       THE WITNESS:  Yes, sir.  Some of the soil mantle overlies

15   granodiorite, which is reported as underlying the Chestmolowicz

16   and Holsworth properties.

17       Q  That is the type of submaterial which is referred to

18   on page 2 as being a relatively poor producer of ground water,

19   although intersecting joints may cause some water to accumulate

20   and be expressed in the form of springs.

21       A  Yes, sir.

22       Q  In general, where are those lands located on this

23   parcel?

24       A  Referring to the land capability map, included in

25   Plaintiff's Exhibit M-45, those lands -- the lands generally

Z-137

1    mentioned as having the granitic underlay close to the surface

2    are classified as VII, and some of those classified as VI.  Of

3    course, those materials underlie the whole area.  The valley

4    floor, shown as Class II and III in yellow and red, actually

5    rests upon the underlying red rock material.

6         Q  Would you be of the opinion that water found through

7    a well on Class VII land is water that is a part of De Luz

8    Creek?

9         A  Well, in this particular part, Mr. Sachse, it isn't

10   easy to separate it, because there is valley fill along De Luz

11   Creek which is within the exterior boundaries of this property

12   and which is contiguous to the granitic materials forming the

13   hill lands.  It would require some geological investigation and

14   study.

15        Q  My question was limited to the Class VII land.  Did you

16   understand that?

17        A  I understood it, and I say that I don't know, because

18   there is an entirely different picture.  There isn't a-- if

19   you wanted to describe a particular 40 in here, perhaps I could

20   be helpful.

21        Q  Let's take the 40 in the right angle.  Let's get it

22   by description.  I can give it to you off the map.

23        THE MASTER:  That is the most southeasterly 40 acres.

24        MR. SACHSE:  The most southeasterly 40, yes, sir.

25        Q  How about the water underlying that, now?

Z-138

1      A   That is, referring to Plaintiff's Exhibit M-68, the

2   40 described as the southeasterly 40-- as the Southeast

3   Quarter of the Northeast Quarter-- correction.  As the

4   Northeast Quarter of the Southeast Quarter, Section 28, 8 South,

5   4 West.

6      Q   That is right, northeast of--

7      A   Thank you.  This area is comprised entirely of Class

8   VII land and the symbol indicates -- Could I see that very

9   excellent glass of yours, Mr. Sachse?

10      Q   That is Mr. Dennis's.

11      A   Very shallow soils, rock outcrop, 40% slope, dominantly.

12   I say with respect to that particular 40 that we could describe

13   the waters contained therein as vagrant percolating waters,

14   which might be carried under the local water concept of Judge

15   Carter.

16      Q   All right.  Now the 40 immediately north of that, and

17   again confining yourself only to the Class VII land.

18      A   The 40 immediately north of that, Mr. Sachse, it

19   borders upon the creek-- or the creek, I should say, traverses

20   the northwest corner of that 40 and it is possible that water could

21   move through  the soil mantle within the Class VII area into

22   the creek bed, or into the recent alluvium-- or the recent

23   alluvium adjoining the creek bed.

24      Q   So you could not express an opinion on that?

25      A   No, sir.

Z-139

1    MR. SACHSE:  I have no more questions.

2    MR. DENNIS:  I have one question.

3

4                        CROSS-EXAMINATION

5  BY MR. DENNIS:

6    Q  We are referring to this Parcel 26 being traversed by

7  De Luz Creek.  I think that is the same stream Col. Bowen here-

8  tofore testified was the East Fork of De Luz Creek.  Am I

9  correct or not correct on that, Col. Bowen?

10    A  I believe when I described that, Mr. Dennis, I men-

11  tioned that was the East Fork of De Luz Creek.  But it is now

12  on the record again.  Yes, sir, that is right.

13    THE MASTER:  Are there any further questions, Mr. Dennis?

14    MR. DENNIS:  No further questions.

15    MR. VEEDER:  I would like the record to show, your Honor,

16  we have now substituted in the Butler case a reproduction of

17  the photograph panorama that Mr. Butler entered.  And if we

18  can withdraw it from the Clerk, we will return it to I think

19  Mr. Myers.

20    THE CLERK:  MD-49.

21    THE MASTER:  Yes.  That is agreeable to all counsel,

22  as I understand.

23    MR. SACHSE:  That is.

24    MR. VEEDER:  That is this.

25    THE MASTER:  Then the original Exhibit MD-49 may be

Z-140

1  withdrawn and the substitute will be received in evidence in

2  place of the original exhibit.

3      MR. STAHLMAN:  I was surprised to see the reproduction

4  is seemingly a better photograph than the one it is produced

5  from.

6      MR. VEEDER:  You just can't beat the Marines, there is

7  no question.

8      MR. DENNIS: Do you have copies for counsel, Mr. Veeder?

9      MR. SACHSE:  I think we can finish up this parcel.

10     THE MASTER:  Very well, call your next witness.

11

12              JOHN KUHNIS,

13  one of the defendants herein, called as a witness in his own

14  behalf, sworn, testified as follows:

15

16              DIRECT EXAMINATION

17  BY MR. SACHSE:

18     Q  Will you state your full name, Mr. Kuhnis?

19     A  John Kuhnis, K-u-h-n-i-s.

20     THE MASTER:  Thank you.

21  BY MR. SACHSE:

22     Q  And you are the owner of the property described on the

23  deed, Exhibit MA-26?

24     A  Yes, sir.

25     Q  How long have you owned that property?

Z-141

1    A   Thirty years.   Since '27, thirty years.

2    Q   How long have you lived on it?

3    A   Thirty years.   Ever since.

4    MR. VEEDER:   Mr. Sachse, now on your answer you have

spelled his name John K-u-n-i-s one place and John K-u-h-n-i-s,

a single man, in another place.   It is one and the same party,

is it not?

8    MR. SACHSE:   It is one and the same.   And the text of the

answer is correct, Mr. Veeder.   Let the record show the caption

is erroneous.   The text is correct.

11    Q   You have lived on it thirty years?

12    A   Yes.

13    Q   What agricultural improvements or development is on it

now?

15    A   There is about 14 acres of walnuts, 2 acres of lemons.

16    Q   Is that all?

17    A   That is all.

18    Q   Now what else has ever been improved agriculturally

on the land?   Anything else?

20    A   Well, I cleared most of the land, see.   And you mean

to say what other crops I used to have in there?

22    Q   Yes.   What other crops?

23    A   Oh, I had-- oh, watermelon.

24    Q   How many acres?

25    A   Oh, sometimes ten.   I had corn in there.   I had beans

Z-142

1   in there.   And--

2       Q   All this on more or less the same land?

3       A   Yes.

4       Q   At different times?

5       A   Yes, sir.

6       Q   That is land that is located generally where, if you

7   will look at the map?

8       A   Right here.   Right in the creek bottom.

9       Q   Right in the creek bottom?

10      A   Um-hmm.

11      THE MASTER:   That is the same land that is shown as

12  yellow and pink?

13      THE WITNESS:   Yes.   Yes, sir.

14  BY MR. SACHSE:

15      Q   And tell us some more of the crops now that you had

16  in there.

17      A   Oh, I had all kinds of corns in there and I had hay

18  in there, oats and--

19      MR. VEEDER:   Is he speaking of the same legal subdivision

20  now?

21      MR. SACHSE:   He is speaking of Field 3.

22      MR. VEEDER:   RC.

23      MR. SACHSE:   Field 3 with the symbol RC in front of it.

24      Q   Now, Mr. Kuhnis, have you ever cleared any of the land--

25  look at the map again, please.-- that shows as being brown

Z-143

1   or orange?

2       A   Yes.   This all was cleared by myself.   I cleared all

3   that, and half of this, too.

4       THE MASTER:   When you say that you cleared all this, do

5   you mean both fields which are numbered 4, 5 and 6, and the

6   ones that are numbered 7 and 8?

7       THE WITNESS:   Yes, sir.

8   BY MR. SACHSE:

9       Q   And what crops did you have in those?

10      A   I mostly had oats in there.

11      Q   But the remainder of the property which is shown in

12  brown and marked Field No. 11 in the overlay, you have not

13  cleared any part of that; is that right?

14      A   No.

15      Q   Where did you get your water for your irrigation?

16      A   I got a well.

17      Q   And where is that well located?

18      A   Well, it is about 250 feet away from the stream, De

19  Luz Creek.

20      Q   Can you indicate approximately on the map where it is?

21      A   Yes, right here.

22      Q   Take a red pencil and put an X about where it is

23  located.

24      A   Something about here.

25      Q   How deep is that?

Z-144

1        A    28 feet.

2        Q    Is it a dug well?

3        A    Yes, sir.

4        Q    Has it got laterals in it?

5        A    No.

6        Q    How do you get the water out of it and irrigate?

7        A    I got a 6-horsepower engine on it and I got a jack

8    pump on it.  And I got about a quarter mile 2-inch pipes, two

9    lines of 2-inch pipes.

10        Q    And where do they go?

11        A    They go up to my walnut orchard.

12        Q    Up to where?

13        A    Through my walnut orchard.

14        Q    And do you have a reservoir?

15        A    I got two reservoirs.  One they never found it when

16    they made the soil map.

17        Q    All right.  Will you take-- this time, instead of

18    an X, make a little square somewhere to show the location of

19    your two reservoirs.

20        A    O.K.  One reservoir will be right in here.

21        THE MASTER:  You have marked two reservoirs, one just to

22    the southwest of the well and one --

23        THE WITNESS:  One on the top of the lemon orchard, straight

24    up.  My walnut orchard, it is in the creek bottom.  My lemon

25    orchard is at the side of the hill.

Z-145

BY MR. SACHSE:

1

2    Q  Which of these two is the one the Marines never found

3 when they made the survey?

4    A  This one here.

5    Q  The one that is down in the creek bottom?

6    A  No.  By golly, it is the other one.

7    Q  It is the higher one?

8    A  Yes, it is north.

9    Q  How big are these reservoirs?

10    A  One holds about say 8,000, the other about 50,000.

11    Q  Gallons?

12    A  Yes.  Yes.

13    Q And can you pump into both of those reservoirs from the

14 well?

15    A  Yes, sir.

16    Q  Do you have any soil dams or soil-- water or soil

17 conservation dams on the place?

18    A  No.

19    Q  Have you any plans for constructing them?

20    A  Yes.

21    Q  Can you show on the photo again which canyons you

22 think are best suited for that?

23    A  It is--

24    Q  And perhaps so we don't get all the time red here, try

25 a pencil mark where you think you would like to put your soil

Z-146

1   conservation dam.

2        A   One would be here and one would be up here.

3        Q   Now I don't follow this myself.  Oh, I see.

4        A   This way.

5        THE MASTER:  You have drawn four lines.  Do you mean that

6   all of those are correct?

7        THE WITNESS:  Yes.  You see we are going away-- here is

8   north.  That is the creek.  And my land runs up this way, see.

9        THE MASTER:  But I mean you have two lines drawn near

10  the westerly end of this walnut orchard.  Would you put a dam

11  in each of those places?

12        THE WITNESS:  No, just one here and one up here.

13  BY MR. SACHSE:

14        Q   Then erase the one that you don't need.  Erase the

15  one that is a mistake.

16        A   Well, you see there is two canyons going up on the

17  end of my walnut orchard, see.  So it could be possible-- there

18  could be a dam on each canyon, see.  Two creeks.

19        THE MASTER:  Then you do mean you would have four possible

20  sites?

21        THE WITNESS:  No, only two, see.

22        THE MASTER:  Just erase the two from the map that you

23  don't intend to use there.

24        THE WITNESS: This is one and here would be the other one,

25  see.

Z-147

1     THE MASTER:  Well, but you have got two marks here.

2     THE WITNESS:  Oh, this here, that is a mark we made be-

3  fore.  See, not for the dam.

4     MR. VEEDER:  It represents something else, though, I

5  think.

6     THE MASTER:  No.  He put them all on for dams.  Now would

7  you put the other dam here or here?

8     THE WITNESS:  No, here.

9     THE MASTER:  Then erase that mark up there.

10    THE WITNESS:  See, this was the reservoir.

11    THE MASTER:  Yes.  That is what I was confused by, seeing

12 the dams at the same point where the reservoirs were located.

13 BY MR. SACHSE:

14    Q  Now you have marked the two points at which you think

15 you could make the dams?

16    A  Yes, sir.

17    Q  Do you have any springs on your land, so far as you

18 know?

19    A  No, no springs.

20    Q  You have never found any?

21    A  No.

22    MR. VEEDER:  It is drawing nigh the hour now to quit.

23    MR. SACHSE:  I have about one more question, Mr. Veeder.

24    MR. VEEDER:  All right.

25

Z-148

BY MR. SACHSE:

1   Q   Mr. Kuhnis, do you believe that any part of your land
2   that is colored dark brown on the map in Exhibit M-45 is
3   irrigable?
4
5   A   Yes, I believe-- I own 160 acres.  I believe 50 acres
6   could be irrigated.
7   Q   You believe a total of 50 of your 160 is irrigable?
8   A   Yes, sir.
9   Q   And about where?  Indicate on the map, please, where
10  the remainder of that irrigable land is, in your opinion.
11  A   It could be right in here, up through here.
12  Q   Draw a line.
13  A   Roughly from this portion up this way, see.
14  THE MASTER:  Indicate with your pencil the area you think
15  could be irrigated.  Draw a continuous line.
16  THE WITNESS:  It is a little steep but still I think it
17  could be irrigated.
18  THE MASTER:  That is, you believe the land to the north
19  and west of the red line you have drawn could be irrigated?
20  THE WITNESS:  Yes.
21  BY MR. SACHSE:
22  Q   And just to make it clear, when you say "50 acres
23  irrigable", you mean total 50?
24  A   Yes, total 50.  The total including what is already
25  irrigated.

Z-149

1       MR. SACHSE:  I have no further questions.

2       THE WITNESS:  Could I ask you a question, please?

3       THE MASTER:  Yes.

4       THE WITNESS: There used to be a gold mine on here.  She

5  was worked.  There used to be a gold mine on the place and

6  there is a well there, too.  And the Soil Conservation man--

7  the Colonel, I don't know who, they never found that well.  And

8  that was used, see.  Now, in case if that gold mine or zinc

9  mine would be operated again, where would I get the water from?

10      MR. SACHSE:  That is one of the things that the Judge has

11 to decide, Mr. Kuhnis.

12      THE MASTER:  I said you could ask a question.  I didn't

13 say I could give you the answer to it.

14      MR. SACHSE:  That is one of the things he is going to have

15 to decide.

16      THE MASTER:  That is part of the lawsuit.  So I can't

17 tell you this afternoon.

18      THE WITNESS:  That is all right.

19      THE MASTER:  Any further questions?

20      MR. VEEDER:  I feel this way, that these records aren't

21 sufficient to protect the people's interests.  I am truly

22 concerned about it, your Honor.

23      MR. SACHSE:  So am I, Mr. Veeder.

24      MR. VEEDER:  And Mr. Sachse has failed to prove their

25 cases for them.  I just want the record to show that is how I

Z-150

1   feel about it.

2       MR. SACHSE:  Mr. Veeder, if you will quit worrying about

3   my case.  You have already told us a dozen times.  There is a

4   record here on which a judgment can be entered on your own

5   material.  It is in here.  There is a judgment that can be

6   entered on the basis of your material.

7       THE MASTER:  Well, you have no further questions of this

8   witness to elicit additional information, Mr. Veeder?

9       MR. VEEDER:  I have no questions now.

10      THE MASTER:  Then, Mr. Kuhnis, you are excused.  We will

11  recess at this time until 9:30 on Monday, June 23.  There will

12  be no hearings next week because of the legal arguments in

13  San Diego.  And the hearing on June 23 will be subject to

14  cancellation, if required, in order to continue argument before

15  Judge Carter.  But that will, of course, not be determined

16  finally until sometime next week.

17       (Adjournment to 9:30 o'clock A.M., June 23, 1958.)

18

19

20

21

22

23

24

25