ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

   Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT

| | |
|---|---|
| Volume: | 11 |
| Pages | 1377-1535 |
| Date: | June 23, 1958 |
| Place: | Fallbrook, California |

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
   DEPUTY

---

RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS

1113 FIRST NATIONAL BUILDING

SAN DIEGO 1, CALIFORNIA

BELMONT 9-4191

1  APPEARANCES:

2       DAVID W. MILLER
             For United States of America.

3       FRANZ R. SACHSE
             For Fallbrook Public Utility District.

4

5       W. B. DENNIS
             For Santa Margarita Mutual Water Company.

6       GEORGE STAHLMAN
             For Vail Estate. (Morning session only.)

7       ADOLPHUS MOSKOVITZ
             State of California. (Morning session only.)

8

9

10

11  HOMER C. and MARION J. McDOWELL,
             In proper person.

12  EMERY A. COOK,
             In proper person.

13  FRED M. and GRACE R. JONES,
             In proper person.

14

15  ADOLPH B. and RUTH KELLUM DINSEN,
             In proper person.

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX | Voir Dire |
|---|---|---|---|---|---|
| Allen C. Bowen | 1382 | 1389 | | | |
| | | 1392 | | | |
| | | 1394 | | | |
| | | 1422 | | | |
| | | | 1429 | | |
| | | | 1451 | | |
| | | | | 1456 | |
| | | 1456 | | | |
| | | 1467 | | | |
| | | 1488 | | | |
| | | | | 1491 | |
| | | | | 1492 | |
| | | | 1497 | | |
| | | 1499 | | | |

For the Defendants:

| | D | X | RD | RX | Voir Dire |
|---|---|---|---|---|---|
| Emery Cook | 1395 | | | | |
| | | 1401 | | | |
| | | 1407 | | | |
| | | 1410 | | | |
| | | | 1429 | | |
| Robert B. Bleecker | 1430 | | | | 1437 |
| | 1442 | | | | |
| | | 1446 | | | |
| Mart J. Le Vack | 1468 | 1480 | | | |
| | | 1484 | | | |
| | | 1487 | | | |

# INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | | 1544 | | |
| | | 1559 | | |
| | | 1572 | | |
| | | 1575 | 1604 | |
| **For the Defendants:** | | | | |
| Mercy Anderson | 1547 | 1552 | | |
| Georgia P. Walling | 1565 | 1568 | | |
| Herbert Elwood Shaver | 1606 | 1613 | 1620 | 1621 |
| Gaius Ray Shaver | 1623 | 1628 | | |
| George Webster Towne | 1629 | 1633 | 1634 | |
| Roberta Lacey Goodchap | 1637 | | | |
| Burton David Lewis | 1640 | | | |
| Beatrix Rowley | 1646 | | | |

1

### INDEX TO EXHIBITS

2

| For the Plaintiff: | | Iden. | Rec'd |
|---|---|---|---|
| M-79 | Engineering Report | 1382 | 1386 |
| M-80 | Engineering Report | 1382 | 1387 |
| M-81 | Engineering Report | 1387 | 1388 |
| M-82 | Assignment of Application | 1407 | 1411 |
| M-83 | Special Use Permit | 1407 | 1412 |

| For the Defendants: | | | |
|---|---|---|---|
| MD-F | Chart of change of levels in wells | 1434 | 1441 |
| MD-G | Photostatic copy of deed | 1458 | 1458 |

1      Fallbrook, California, June 23, 1958, 9:30 A.M.

2

3      THE CLERK:  Court is now in session.

4      THE MASTER:  Will you state the appearances this morning

5  for the record.

6      LT. MILLER:  David W. Miller for the United States.

7      MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility

8  District and named individual defendant.

9      MR. MOSKOVITZ:  Adolphus Moskovitz, State of California.

10     MR. DENNIS:  W. B. Dennis for the Santa Margarita Mutual

11  Water Company.

12     THE MASTER:  Are there any defendants here who have filed

13  answers in propria persona--that is, who are not represented

14  by counsel?

15     MR. COOK:  Yes.

16     THE MASTER:  Will you state your name?

17     MR. COOK:  Emery A. Cook.

18     MR. JONES:  Fred M. Jones.

19     THE MASTER:  And Mr. and Mrs. McDowell.

20     MRS. McDOWELL:  Well, we have taken--

21     THE MASTER:  But you are in the courtroom.

22     MRS. McDOWELL:  Yes.

23     THE MASTER:  Are there any other defendants?

24     MRS. DINSEN:  Mrs. Ruth Kellum Dinsen and Adolph B. Dinsen.

25     THE MASTER:  Are there any other defendants who are not

2b

1    represented by counsel?

2         I understand, Lt. Miller, that Colonel Cook wishes to have

3    his evidence presented early this morning, and I would suggest

4    then that Colonel Bowen be called to present the report in

5    connection with his property.

6         LT. MILLER: Yes, sir. That would be our wish. And in

7    addition to introducing Colonel Cook's engineering report, we

8    have two others which we would like to introduce at the same

9    time, for convenience of time.

10        THE MASTER: Very well. Then, Colonel Bowen, will you

11   resume the stand?

12        MR. DENNIS: Your Honor please, because of certain events

13   which transpired before the Master when we last met, I want to

14   introduce in evidence a letter which was delivered to me while

15   the Federal Court was in session, and state that pursuant to the

16   terms of the agreement which we entered into at the time Mr.

17   Stahlman made his accusations, I have the four volumes of briefs

18   of the Rancho Santa Margarita versus Vail in court, which I

19   told him that I would deliver to him this morning pursuant to

20   the terms of the agreement when he made his first demand, which

21   was after the delivery of that letter to me.

22        THE MASTER: Very well. Is there need to introduce it in

23   evidence?

24        MR. DENNIS: I would like to have it. Because of the

25   nature of the accusations that Mr. Stahlman made here, I think

3b

1   that letter should go in.  However, I have no objection to it

2   being a part of the transcript which I understand was written

3   up separately.

4        THE MASTER:  Very well.  Is there any objection?  This

5   letter then will be marked as Defendant Santa Margarita's

6   Exhibit A and received in evidence as such.

7        MR. SACHSE:  Your Honor, before the Colonel takes the

8   stand I find that my office notes, my office calendar and my

9   pocket calendar are wacky for the next two weeks.  They disagree.

10  We have Monday, Tuesday and Wednesday this week, as I understand

11  it, and no Thursday or--

12       THE MASTER:  It is Monday, Tuesday and Wednesday of this

13  week.  And Monday, Tuesday and Wednesday of next week have been

14  presently scheduled for hearings.

15       MR. SACHSE:  All right, sir.  Thank you.  I have Thursday

16  on both of them and no Monday on both of them.

17       THE MASTER:  So those dates, of course, are subject to

18  change, if necessary, for convenience of parties or in the event

19  it is necessary to continue them in order to give the Government

20  time to finish the engineering reports.

21       MR. SACHSE:  Thank you.

22

23                      ALLEN C. BOWEN

24  recalled, further testified as follows:

25

1          DIRECT EXAMINATION   (continued)

2     BY LT. MILLER:

3          Q  Colonel, you are the same Lt. Colonel Allen C. Bowen

4     who has testified here before?

5          A  I am.

6          Q  You have previously been placed under oath?

7          A  I have.

8          Q  Colonel, I wish to hand to you two folders, and ask

9     you if you recognize these folders.

10         A  I do.

11         LT. MILLER:  I will ask the Clerk mark these Plaintiff's

12    Exhibits for Identification, please.

13         THE CLERK:  Let me get these numbers, please.

14         LT. MILLER:  While the Clerk is marking them for Identifi-

15    cation, your Honor, I wish to preface the questions which I am

16    going to place to the witness by stating that the United States

17    is going to submit into evidence tomorrow a statement to be

18    attached to each of the engineering reports which has heretofore

19    been introduced in evidence.  And in order that certain matters

20    may be clarified in the record at this time I am going to ques-

21    tion Colonel Bowen with respect to this addendum which will be

22    introduced tomorrow.  For the information of counsel, I give

23    them a copy of what we intend to introduce tomorrow, and I sub-

24    mit one to the Master.

25

5b

BY LT. MILLER:

Q   Colonel Bowen, I am going to read to you a sentence and ask that you make any explanation that you consider necessary of this sentence.   "In the event the irrigable lands are devoted to the raising of permanent pasture, a project duty of 4.2 acre feet per year would be required."

A   Well, the explanation of that sentence is that we concede that any lands that are irrigable can be devoted to the production of permanent pasture, irrigated permanent pasture, and that in so devoting that acreage to pasture would require 3-83/100 acre feet of water applied to each acre of the field, with the 10% combined losses between the point of diversion and the place of use, bringing the total to a project duty, as contrasted to a field duty, of 4.2 acre feet per acre per year.

(George Stahlman, attorney for the Vail Company, enters the hearing room.)

BY LT. MILLER:

Q   I will read the next sentence on this sheet.   "However, a smaller quantity of water per acre per year would be adequate with the adoption of a more practical and profitable agricultural development."   Could you state what is meant by that sentence, Colonel?

A   Yes, sir.   In developing the land use plan for each of these properties on which we make an investigation and write a

6b

1  report, we develop the highest beneficial use.  In other words,

2  we plan the production of crops which would bring the greatest

3  return financially to the land owner.  And in many instances

4  those crops might not require as great an application of water

5  as would permanent pasture.

6      Q  And then I will read you the third sentence.  "Project

7  duty is the water which must be applied to the crop, plus the

8  sum  of those losses which occur between the point of supply

9  and the point of use."  And I ask you if there is anything in

10  addition that needs to be stated with respect to that sentence

11  to clarify it?

12      A  Project duty is the total amount of water that must

13  be diverted in order to supply the field requirement, and does

14  include losses in transmission, which we have conservatively

15  estimated here to be 10% of the applied duty.

16      LT. MILLER:  I will ask the Clerk if he has marked these

17  for Identification.

18      THE CLERK: Those are marked.

19      LT. MILLER:  I hand Plaintiff's Exhibit M-79 for Identi-

20  fication to the counsel for examination, and Plaintiff's Exhibit

21  M-80 for Identification to counsel for their examination.

22      THE MASTER:  May the record show Mr. Stahlman has entered

23  the courtroom since the beginning of the hearing and is now

24  present.

25      MR. STAHLMAN:  The later Mr. Stahlman.

7b

BY LT. MILLER:

Q   Colonel, I will hand you Plaintiff's Exhibit M-79 for Identification and ask you if you would identify what it purports to be?

A   Plaintiff's Exhibit M-79 is a copy of a report of an engineering investigation made on De Luz watershed Parcel number 7.   And the cover shows that this report is on the property of Truman C. and Beatrix Rowley.

Q   Would you examine that report and see if you find therein your signature at the end thereof?

A   Yes, sir.   My signature appears on page 3 of the report.

Q   Would you step to the board and point out, if you can, the location of this property on Plaintiff's Exhibit M-32?

A   The Parcel reported on in Plaintiff's Exhibit M-79 appears on Plaintiff's M-32 approximately in the center of the watershed, delineated by a line, including a number encircled, number 7, in Plaintiff's M-32.   The property lies astride De Luz Creek.

THE MASTER:   Colonel, can you mark that with a red pencil in the same manner in which the other areas concerning which engineering reports have been introduced have been marked?

THE WITNESS:   Yes, sir.   I will make a X with a red pencil on Plaintiff's Exhibit M-32, Parcel number 7.

LT. MILLER:   I submit into evidence Plaintiff's Exhibit

8b

1   M-79 for Identification.

2        THE MASTER:  It will be received in evidence as Plaintiff's

3   Exhibit M-79.

4   BY LT. MILLER:

5        Q  Colonel, I hand you Plaintiff's Exhibit M-80 for Iden-

6   tification and ask you to state what it purports to be.

7        A  This is a copy of a report prepared following an en-

8   gineering investigation of De Luz watershed Parcels 28 and 29,

9   as shown on the cover  of the report, the property of Mart J.

10  and Rosamond E. Le Vack.

11       MR. SACHSE:  What is the parcel number again on that one,

12  please, Colonel?

13       THE WITNESS:  28 and 29.

14  BY LT. MILLER:

15       Q  Was this report made under your direct supervision?

16       A  Yes, sir.  This report was made under my supervision

17  and direction.

18       Q  I will ask you to step to the board and mark on Plain-

19  tiff's Exhibit M-32 the property which is covered by this re-

20  port.

21       A  Referring to Plaintiff's Exhibit M-32, the property

22  reported on and shown as Plaintiff's Exhibit M-80 appears as

23  two parcels, a small parcel north of the east fork of the De

24  Luz Creek, number 28, which I will mark with a red X, and a larger

25  parcel which is astride the east fork of De Luz Creek, with a

9b

1  number 29 encircled within the exterior boundaries.  Parcel 28

2  is a small one, and the number 28, encircled, is outside of the

3  boundaries of Parcel 28, but has a line indicating the parcel

4  to which it refers.

5      Q  Colonel, I will ask you to examine that report and see

6  if your signature appears at the end thereof.

7      A  My signature is not affixed to Plaintiff's Exhibit M-80,

8  but--

9      LT. MILLER:  With the Court's permission, I will ask

10  the witness to affix his signature at this time, and in the

11  presence of counsel and the Court, prior to submitting it into

12  evidence.

13      THE MASTER:  Well.

14      LT. MILLER:  At this time I submit Plaintiff's M-80 for

15  Identification into evidence as Plaintiff's Exhibit M-80.

16      THE MASTER:  That will be received in evidence and so

17  marked.

18      LT. MILLER:  I hand a folder to the Clerk and ask him to

19  mark it Plaintiff's Exhibit M-81 for Identification.

20      I hand Plaintiff's Exhibit M-81 for Identification to

21  counsel for their examination.

22  BY LT. MILLER:

23      Q  Colonel, I will hand you Plaintiff's Exhibit M-81 for

24  Identification and ask you to state what it purports to be?

25      A  Plaintiff's Exhibit M-81 is the report of an engineering

10b

1   investigation made on the property known as De Luz watershed

2   Parcel number 86.  As shown on the cover of the report, this is

3   the property of Emery A. and Betty B. Cook.

4       Q   I will ask you to examine that report and see if your

5   signature is affixed to the end thereof.

6       A   On page 3 of the report a facsimile of my signature

7   appears, with the initials D. W. M.

8       Q   Was this report made under your direct supervision?

9       A   This report was made under my direction and supervision.

10      Q   Would you step to Plaintiff's Exhibit M-32 and mark in

11  red the area which is covered by that report?

12      A   Referring to Plaintiff's Exhibit M-32, the property

13  reported on, shown in Plaintiff's Exhibit M-81, appears in the

14  westerly portion of the watershed of De Luz Creek, approximately

15  80 acres, with the number 86 encircled, contained within the

16  exterior boundaries of the property delineated.  And I mark with

17  a red X on Plaintiff's Exhibit M-32 to indicate the property

18  mentioned.

19      LT. MILLER:  I submit into evidence Plaintiff's Exhibit

20  M-81 for Identification as Plaintiff's Exhibit M-81.

21      THE MASTER:  It will be received in evidence as Plaintiff's

22  Exhibit M-81.

23      LT. MILLER:  No further direct examination, your Honor.

24      THE MASTER:  That is, you do not wish to ask the Colonel

25  any specific questions about the report?

11b

1          LT. MILLER:  No, sir.

2          THE MASTER:  Very well.  Now, Colonel Cook, are there any

3     questions concerning this report which you wish to ask Colonel

4     Bowen?

5          COLONEL COOK:  Yes.

6          LT. MILLER:  I suggest if you do you come down and sit

7     at the table here, where it will be more convenient for you.

8

9                         CROSS-EXAMINATION

10    BY COLONEL COOK:

11         Q   I just have a few questions I would like to ask.

12    First of all, is the report correct in stating that you feel

13    that I should be entitled to 35.6 acre feet of water per year

14    for irrigation purposes?

15         A   Well, we don't state, Colonel Cook, that you are en-

16    titled to that.  We state you could use that amount of water

17    if it were available.

18         Q   So that would be the yearly usage of water that I could

19    use, if it were available?

20         A   For irrigation of the property--of that portion of the

21    property we have found to be irrigable.  We have found 9.3 acres

22    of this property irrigable land and that growing permanent pas-

23    ture on that land, with an acreage duty of 3-83/100 acre feet

24    per year, the future potential requirement would be a total of

25    35-6/10 acre feet.  That is the acreage duty times the number of

12b

1    acres considered irrigable.  And then we have shown in the

2    paragraph following, the tabulation which appears on page 2 of

3    Plaintiff's Exhibit M-81, that an additional water requirement

4    of 10% for project loss might be reasonably assumed.  That would

5    be over and above the 35-6/10, or $3\frac{1}{2}$--3-56/100 acre feet per

6    year for project loss.

7         Q  Does this report concern itself merely with water I

8    could use for irrigation of soils, or does it also include water

9    for domestic use and miscellaneous use?

10        A  This concerns itself, Colonel, only with the water

11   required for irrigation, and not with water that you might use

12   for domestic purposes.

13        COLONEL COOK:  That is all the questions I have to ask

14   Colonel Bowen.  I would like to make a statement about domestic

15   use and some miscellaneous uses of water.

16        THE MASTER:  Very well.  First there are a couple of

17   questions I would like to ask Colonel Bowen, and then we will

18   have you sworn so you may testify.

19   BY THE MASTER:

20        Q  Colonel Bowen, if you stated, I missed it.  Is this

21   land riparian?  Is there a stream going through the property?

22        A  Your Honor, there is a--

23        MR. SACHSE:  Could we have M-68?

24        THE WITNESS:  May we have M-68, please.

25        THE CLERK:  Yes.  Just a moment.

13b

1          THE WITNESS:   Referring to Plaintiff's Exhibit M-68, which

2     is the U.S.G.S. topographic map of the area, it is noted that

3     an unnamed tributary of Cottonwood Creek traverses the length of

4     Parcel number 86 from west to east.

5     BY THE MASTER:

6          Q  Do you know whether that stream flows during any major

7     portion of the year or whether it flows immediately following

8     rains and during rains?

9          A  That stream flows only during and immediately follow-

10    ing periods of precipitation and runoff.

11         Q  Do you know whether there are at present any wells on

12    this property?

13         A  Your Honor, the report indicates that domestic water

14    is supplied from a small dam on the creek, which is fed by a

15    spring.  No indication of any wells on the property.

16         Q  In your opinion if wells were sunk on the property,

17    and water were produced, would that water be local water, as

18    defined by Judge Carter or would that be a part of the subsurface

19    stream of this unnamed tributary?

20         A  On the basis of the information that we have to date,

21    your Honor, this property is underlain by Woodson Mountain

22    granodiorite and San Marcos gabbro, which are not highly produc-

23    tive of ground water.  The only ground water that exists in

24    formations of this type is contained within the fractures in the

25    bedrock and the thin soil mantle which overlies the rock.  And on

14b

1   the basis of this information I would say that these waters are

2   vagrant percolating waters which have been termed heretofore as

3   local waters.

4         THE MASTER:   That is all the questions I have.   Does any

5   other counsel desire to examine Colonel Bowen?   Very well, you

6   may step down.

7         MR. DENNIS:   I have one or two questions in response to

8   the Master's question about the flow of this unnamed tributary.

9

10                        CROSS-EXAMINATION

11   BY MR. DENNIS:

12         Q   Would that apply to both the surface and subsurface

13   flow of the tributary?

14         A   Surface flow only, Mr. Dennis.

15         Q   Have you made any investigations regarding whether

16   there is subsurface flow or not?

17         A   The presence of the spring indicates there is some

18   subsurface flow.

19         Q   What is the location of the spring to the unnamed trib-

20   utary?

21         A   Referring to Plaintiff's Exhibit M-81, it is noted

22   the spring is located in the northeast quarter of the southeast

23   quarter of Section 23.   That is an error in the report, your

24   Honor, a typographical error.   It is shown on the first page

25   that the section is 24, and this was 23, in error.   May I correct

1393

15b

1    this?

2          THE MASTER:  You may correct that on Exhibit M-81.  And,

3    Colonel Cook, if you have a copy of the report you should make

4    a similar correction on your copy.

5          COLONEL COOK:  I don't think, sir, there is an error in

6    it.  The spring itself is--

7          THE WITNESS:  Is it in Section 23?

8          COLONEL COOK:  Yes, it is in Section 23.  It is in the

9    northeast corner.

10          THE WITNESS:  Of the southeast quarter, which would be

11    off the property.  Is that correct?

12          COLONEL COOK:  It is in the National Forest, yes, sir.

13          THE MASTER:  Then the report is correct.

14          THE WITNESS:  The report is correct, sir.

15          THE MASTER:  Do you have any further questions, Mr. Dennis?

16          MR. DENNIS:  I have one other question.

17    BY MR. DENNIS:

18          Q  Colonel Bowen, are you in a position to know whether

19    in a state of nature the flow of that spring would leave Colonel

20    Cook's property?

21          A  Well, it is my opinion that it would not, Mr. Dennis.

22          Q  That it would not.  Do you know or do you have any

23    information as to when the dam was erected that impounds the

24    flow of the spring?

25          A  No, sir.  I do not.

16b

1        MR. DENNIS:  No further questions.

2        MR. SACHSE:   No questions of Colonel Bowen.

3        THE MASTER:  Very well.

4        MR. MOSKOVITZ:  I would like to ask a question.

5

6                        CROSS-EXAMINATION

7    BY MR. MOSKOVITZ:

8        Q  Colonel Bowen, am I correct now in my understanding

9    that the spring is located off Colonel Cook's property?

10       A  Yes, sir, west of Colonel Cook's property.

11       Q  And there is a dam which holds the water from its

12   normal flow; is that correct?

13       A  Referring to Plaintiff's Exhibit M-81 on page 2, it is

14   stated that the domestic water is supplied this property from

15   a small dam on a creek fed by a spring, all located in the north-

16   east quarter of the southeast quarter of Section 23.  A three

17   inch pipe carries the water by gravity flow to a branch which

18   feeds the house and a small cottage.

19       MR. MOSKOVITZ:  That is all.

20       THE MASTER:  Any further questions?

21       MR. DENNIS:  I have one further question now.

22

23                   FURTHER CROSS-EXAMINATION

24   BY MR. DENNIS:

25       Q  Now is the creek in which the dam is erected the unknown

1    tributary we have referred to which is shown on the topographic

2    map, which is Plaintiff's Exhibit M-68?

3        A   Yes, sir.

4        Q   It is the same?

5        A   Yes, sir.

6        MR. DENNIS:   That is all.

7        THE MASTER:   Are there any further questions?   Very well,

8    Colonel Bowen, you may step down.   And, Colonel Cook, will you

9    be sworn and you may testify.

10

11                          EMERY COOK,

12   one of the defendants herein, called as a witness in his own

13   behalf, sworn, testified as follows:

14

15       THE MASTER:   You may state whatever you wish, Colonel,

16   with reference to your property and its water rights affecting

17   that.

18

19                      DIRECT EXAMINATION

20       THE WITNESS:   All right, sir.   I have answered the summons,

21   stating that I have a State Water Right to the water within this

22   spring, that I have a Special Use Permit from the Forest Service

23   to run a pipe line from this spring, and that I do use this water

24   for my domestic use at the present time.   I have claimed riparian

25   rights to water which does appear in this stream as it flows

18b

1   through my property.  This water is not at the present time be-
2   ing used by this pipe line.  I intend to develop this very soon,
3   Which leads me to the point that I wanted to make.  In addition
4   to the water which Colonel Bowen has stated I could use for
5   irrigation, the maximum amount I could use, I would like to state
6   that ultimately I intend to develop  this property into a sort
7   of a dude ranch type operation.  And I would like to state that
8   the requirements for water for such an operation will be 18,000
9   gallons for a swimming pool and approximately 150 gallons a day
10  for livestock and poultry, and approximately 1,200 gallons a
11  day for domestic use of people.  I would like to have this in
12  the record as an additional requirement for water.  And beyond
13  that I have no argument at all with the report.  I think the re-
14  port is very, very just, and amazingly close to my own estimates.

15       THE MASTER:  That is, in so far as the characterization of
16  the land classes, the report is correct.

17       THE WITNESS:  The report is correct.  I think it is a very
18  good report.

19  BY THE MASTER:

20       Q  Now, you stated before you were sworn, and I think it
21  probably should be repeated at the present time, that the spring
22  is on the forest land to the west of your property.  Is that
23  correct?

24       A  The spring from which I take my water at present is on
25  the forest land, and is covered by a State Water Right permit and

19b

1  a Special Use Permit from the Forest Service.

2      Q  When were those permits obtained?

3      A  Let's see, the original permit was filed in 1939.  I

4  think the Special Use was filed at that time.

5      Q  Do you have copies of those permits?

6      A  Yes, I do.  I don't have any extra ones, though.

7  Correction on that.  Filed May 13, 1938.

8      LT. MILLER:  Your Honor, in connection with the applica-

9  tion for appropriation filed with the State and the Special Use

10  Permit, we do have copies, which we had intended to introduce.

11  So if Colonel Cook does not have an extra copy we could submit

12  this to him now and let him make it his own exhibit, if he

13  wishes, or we will do it on cross-examination.

14      THE MASTER:  I think it probably should be introduced in

15  evidence.  It might simplify matters if you would introduce it

16  as your exhibit.  Otherwise we have this question of numbering

17  of defendants' exhibits.

18      LT. MILLER:  Yes, sir.

19      THE WITNESS:  It serves the same purpose.

20      THE MASTER:  Yes, sir.

21  BY THE MASTER:

22      Q  Do you know if this unnamed tributary is flowing at

23  the present time?

24      A  It is what you would call an intermittent flow.  It

25  flows at the spring and for a distance of approximately 500 feet

20b

1   down the creek.   Then it goes under water.

2      Q   Underground?

3      A   I mean underground.   And reappears approximately 500

4   feet further down.   In total, there are two springs on my pro-

5   perty which are flowing at the present time, and one spring

6   from which I am taking water at the present time, this one spring

7   being on the National Forest land.

8      Q   And now the two springs on your property, as I under-

9   stand it then, are fed by the flow on the surface and beneath

10   the surface from the original spring on the forest land; is that

11   correct?

12      A   That is correct.

13      Q   Do the springs on your property flow the year round?

14      A   The springs flow the year round, yes.

15      Q   That is all three of them?

16      A   Yes.

17      Q   Does the water from the springs in its natural state

18   leave your property?

19      A   You mean if I do not divert water, does it leave the

20   property?

21      Q   Yes.

22      Q   Yes, except for the--well, it leaves my property.   The

23   spring which is in the National Forest land, Cleveland National

24   Forest, is dammed with a very small dam.   It is almost insigni-

25   ficant.   It is just enough to create a pool of water for the

21b

1  flow into the pipe.

2      Q  How far below your property would the water flow in a

3  state of nature if you were not diverting?

4      A  Oh, I really don't know.  You mean from the property

5  line?

6      Q  Yes.

7      A  I doubt that it would flow very far.  But I have never

8  been down there.  I don't know.  It is pretty rugged country.

9      THE MASTER:  Is there any cross-examination of Colonel

10  Cook by any of the other defendants?

11      MR. DENNIS:  I am wondering if he has testified to the

12  ownership of his property.  He has not put a deed in evidence

13  or testified as to what actual property he owns.

14      THE MASTER:  The Government has indicated he is the

15  owner of this property.

16  BY THE MASTER:

17      Q  Colonel Cook, do you have any documentary evidence

18  to that effect?

19      A  Well, I have a grant deed.

20      MR. DENNIS:  I mean I would be perfectly willing to take

21  his statement, but there are other defendants here whose inter-

22  ests are adverse, and it might be well to have something in the

23  record.

24      THE WITNESS:  I have a joint tenancy grant  deed, but this

25  is the only copy I have.  I can get a photostat made and send it

1400

22b

1    in, if you desire to have it.

2        THE MASTER:  Well, I think that to avoid that the Court

3    can state that you have produced a joint tenancy grant deed

4    which was recorded April 20th, 1956, purporting to convey to

5    Emery A. Cook and Betty Bird Cook, husband and wife as joint

6    tenants, the north half of the southwest quarter of Section 24,

7    Township 8 South, Range 5 West, of the San Bernardino Meridian,

8    California, containing 80 acres, as per recorded patent number

9    1103450.

10       My understanding is that the plaintiff has investigated

11   and is satisfied you were the owner of this property, and there

12   is no defendant in the courtroom at the present time questioning

13   that.  I believe that would establish a prima facie case, and

14   it would not be necessary to introduce the deed in evidence.

15       MR. DENNIS:  I have two other questions.

16   BY MR. DENNIS:

17       Q  You heard the testimony of Colonel Bowen relative to

18   the character of the flow of this unnamed tributary of De Luz

19   Creek.  Would your testimony be the same as his?  That is, that

20   it only flows during periods of rainfall and immediately there-

21   after?

22       A  This is correct in regards to the flow of the stream.

23   It is incorrect in regards to the flow of the springs.  I don't

24   think he testified as to the flow of the spring.  The spring

25   does flow the year around.

23b

1    Q   Have you taken all of the water that you could obtain

2    from the springs since you put in the dam and the three and a

3    half inch pipe?

4    A   I have not taken it all to date.   I am in the process

5    of developing this property.

6    Q   The developments you have made to date, are they of

7    such a capacity to take the entire flow of the spring that you

8    have testified to?

9    A   No, they are not.

10   MR. DENNIS:   They are not.   That is all.

11   THE MASTER:   Mr. Stahlman.

12   MR. STAHLMAN:   No questions.

13   THE MASTER:   Mr. Moskovitz.

14

15                    FURTHER CROSS-EXAMINATION

16   BY MR. MOSKOVITZ:

17   Q   The amended complaint, Exhibit F, on page 62, lines

18   14 to 20, state there is a diversion in the name of Emery A.

19   Cook, and describes the location, gives the number of an appli-

20   cation to appropriate water, and the number of a permit, and

21   the fact the U.S. Forest Service Special Use permit has issued.

22   Are you familiar with that complaint?

23   A   Yes.

24   Q   Is that the description of your property?

25   A   That is.

1402

24b

Q   And your diversion?

A   It is.

Q   Has there been a license issued yet by the State of California?

A   Not yet, no.

Q   Have you applied for one yet?

A   Yes.

Q   Are you taking--perhaps this was already asked.   But are you taking the amount of water that the permit permits you to take?   Have you built up to that point?

A   No. The application is for a lesser quantity of water, because the other has not yet been developed.   I have reapplied for the water which I intend to use for the irrigation purposes which the land will support.

Q   So you have another application on file?

A   That is correct.

Q   And what is the number of that application?

A   That application is--excuse me just a minute.   May I have my briefcase?   18151.

Q   When was that filed?

A   May 22, 1958,  11:51 A.M.

Q   Do you know if notice has been issued on that applica-tion yet by the Water Rights Board?

A   I am not clear on what you mean by "notice".

Q   Well, there is ordinarally a publication of a notice

25b

1    by the Water Rights Board to inform those that might be inter-

2    ested of the filing of the application.

3        A   I don't know whether it has been issued or not.

4        Q   And what is the amount of water you have applied for

5    under this application?

6        A   16,000 gallons a day.  However, that is not total.

7        Q   That is not total, you say?

8        A   Well, it is actually an additional amount, 14,650

9    gallons.

10       Q   14,650 gallons a day?

11       A   Right.  That makes a total of 16,000.

12       Q   I see.

13       A   Which is just the amount--

14       Q   Of the total.  Where did you get the rest?

15       A   That is on the license  which is to be issued at pre-

16   sent for domestic use is 1,350.

17       Q   And you estimate that 16,000 is the safe capacity of

18   this spring?

19       A   Yes.

20       Q   You will be using all the water that the spring pro-

21   duces, if you receive the permit on this new application and

22   proceeded to use the water?

23       A   Well, the years immediately past this is just about the

24   capacity.  In the present year, I believe the capacity is going

25   to be more than that, because there has been considerable rain.

26b

1    Q   I see. And I think you stated that the two springs on

2    your land were fed from this upper spring where you are now

3    diverting; is that right?  So if you diverted all the water at

4    the point where the springs comes out in the National Forest

5    land, there would be no springs on your land.

6    A   Well, I don't believe that is true.

7    Q   Oh.

8    A   I don't really know where the water--who knows where

9    water comes from?

10    Q   I see.

11    A   But I don't believe that it all comes from there.

12    Q   Are you now using any water from the springs which

13    arises on your own land?

14    A   Not through direct diversion, no.  I have no pipe

15    lines or pumping facilities on that water at the present.

16    Q   So you are making no use of that water?

17    A   No, not in the matter of irrigation or domestic use.

18    Q   Are you making any use of it now?

19    A   Well, we use it as a swimming hole, yes.

20    Q   I see.  Have you offered into evidence your existing

21    applications or permits?

22    THE MASTER:  Lt. Miller will offer copies of those.

23    BY MR. MOSKOVITZ:

24    Q   Including the most recent one that you filed?

25    A   I don't think he has a copy of this one.  I just

27b

1  received the notice back on it myself.  And as soon as I get

2  an official copy of it I will forward it into evidence.  But I

3  have really nothing to date except the notification it has been

4  received and has been given a number.

5  THE MASTER:  Will counsel stipulate that Colonel Cook may

6  send a copy of the application and that it may be received in

7  evidence after it has been received?

8  MR. DENNIS:  So stipulated.

9  MR. SACHSE:  You are getting into a funny position, your

10  Honor.  This is a pending application before the State Water

11  Rights Board.  And it is on the same stream that at least two

12  of my clients have prior appropriations.  Now no notices have

13  been issued on this.  This is the first I have ever heard of it.

14  We are running into the same controversy here that is before

15  Judge Carter on the basic question of whether, having taken

16  jurisdiction of this case, he will now hear  every controversy

17  between appropriators, even if the United States is not directly

18  affected.  This is an exact parallel of that kind of situation.

19  And I don't like to encourage Colonel Cook, tell him that he

20  might be through here, when none of us know until Judge Carter

21  makes his rulings in the next month or so whether the thing is

22  going to be tried here or before the Water Rights Board.  Where-

23  ever it is tried, I unquestionably will have to dig into it.

24  And I would not want to stipulate to anything, because I have,

25  as I say, downstream appropriators who would undoubtedly be

28b

1    concerned on the same creek.

2        MR. DENNIS:  Could you stipulate it could be introduced,

3    subject to any objections?

4        MR. SACHSE:  Yes, I have no objection to the document

5    going in, but I don't want Colonel Cook to think that--I want

6    to be sure that Colonel Cook doesn't misunderstand that because

7    I agree to the document going in that the controversy--possible

8    controversy over the right is necessarily determined.

9        THE MASTER:  I think that that would be clear.

10       THE WITNESS:  I wouldn't assume that at all.  No, it is

11   just a piece of evidence that goes before the Court, as far as

12   I am concerned.

13       LT. MILLER:  I think in that regard, your Honor, the

14   United States should state that in introducing his original

15   application and in stipulating to the introduction of this

16   future application that we in no way ascribe what the legal

17   significance of the document is, only the fact that there is a

18   document.

19       THE MASTER:  Yes.  I think that is clear in each of these

20   cases.  The documents are simply introduced as evidence that

21   they exist.  And that the legal affect of any one of them is not

22   conceded by any party at the time that it is introduced.  Now,

23   do you have any further questions, Mr. Moskovitz?

24       MR. MOSKOVITZ:  No.

25       THE MASTER:  Mr. Sachse, do you have any questions at this

29b

1   time?

2       MR. SACHSE:   Please, may I see the application?

3

4                   CROSS-EXAMINATION

5   BY MR. SACHSE:

6       Q   Colonel Cook, referring to your application 9291--per-

7   mit 5201, is that an assignment to you of an application filed

8   by another party?

9       A   That is correct.

10      Q   When was it assigned to you?

11      A   May 7, 1950.

12      Q   I notice in this--

13      MR. SACHSE:   May we have this marked for Identification

14  now?

15      THE MASTER:   That is to be marked as the Government's

16  for Identification.

17      LT. MILLER:   Plaintiff's Exhibit M-82 for Identification.

18  You might as well mark the Special Use Permit at this time too,

19  your Honor.

20      THE MASTER:   Yes.

21      LT. MILLER:   Plaintiff's Exhibit M-83 for Identification.

22  BY MR. SACHSE:

23      Q   I will hand you Plaintiff's M-82 for Identification,

24  Colonel Cook, and the rest of my questions are going to be

25  directed to it.

30b

1      A   All right.

2      Q   Your most recent extension of time that appears on

3  the top document, was that granted on your request or on the

4  request of your predecessor, Mr. Nelson?

5      A   On the request of my predecessor, Mr. Nelson, to the

6  best of my knowledge.

7      Q   And you state you  have requested a license?

8      A   No, I did not request it.   The State, as I understand

9  it, is trying to clear up all these permits by issuing licenses

10  on them.   They have made an inspection and have made a recommen-

11  dation that a license be issued.   And that is all that I know

12  about it.

13     Q   When was this?

14     A   The inspection I believe was May 15, 1958.

15     Q   Now, may I please see your current application?

16     A   Yes.

17     Q   The one you just described.

18     MR. SACHSE:   Your Honor, would you indulge me for a minute?

19     THE MASTER:   Sure.

20     MR. SACHSE:   Your Honor, I am not going to have any further

21  cross-examination, but with your permission I am going to suggest

22  very, very strongly to Colonel Cook that he get this thing

23  photographed and that he come back here and put it into evidence.

24  This is an inchoate water right, at least, there is no question

25  about it.   And it is a right dependent on the possible future

31b

1   granting of a State Permit.  And as I pointed out, it may or

2   may not be determined by this Court.  That may or may not be

3   granted, if it is determined by the Water Rights Board.  But I

4   think he ought to have his application pleaded or--it is none

5   of my business to look out for him, but I think he ought to have

6   it on the record.

7        THE MASTER:  I think it is understood he will have this

8   photographed and will submit a photographic copy for introduc-

9   tion in evidence.  Now, the only question I would have now would

10  be do you wish at this time to cross-examine him in connection

11  with this application?  If you do, I would suggest that this

12  original could be introduced, with permission granted to remove

13  it for the purpose of making the copy, and then the substitution

14  of the copy.

15        MR. SACHSE:  No, I would prefer to drop the whole thing.

16  I have no further cross-examination at this time.  And we can

17  recall Colonel Cook if the decision is that your Honor is going

18  to hear these applications when one factually presents itself,

19  or one legally--if the determination is that your Honor will

20  simply make a finding of the date that he holds this inchoate

21  right, and the final determination of the right will be depen-

22  dent on action by the State Water Rights Board, then a different

23  situation presents itself.  So I would rather just defer the

24  whole thing until Judge Carter has ruled on these pending ques-

25  tions of law and we know where to go.  Otherwise we will waste

1410

32b

1    time here.

2    THE MASTER:  Very well.  It is understood, Colonel, you

3    will have that photographed and will send a copy.  And it is

4    agreed by counsel that the copy will then be received in evidence,

5    subject to the necessity of possibly recalling you to testify

6    concerning it in the event Judge Carter rules that he will have

7    the power to determine the priorities to such applications.

8    THE WITNESS:  Where should I send this to?

9    THE MASTER:  I would suggest that you send it to me at

10    1410 Bank of America Building.  And I will see that it is intro-

11    duced in evidence.

12    THE WITNESS:  All right.

13    THE MASTER:  Now, Lt. Miller, I believe you have further

14    questions, and you actually wish to offer the documents which

15    have been identified.

16    LT. MILLER:  Yes, sir.

17

18    CROSS-EXAMINATION

19    BY LT. MILLER:

20    Q  Colonel, I hand you Plaintiff's Exhibit M-82 for

21    Identification and ask you to examine that and determine if

22    you have originals of those various documents in your possession?

23    THE MASTER:  Counsel, isn't all that is required that they

24    are copies of documents which he has had in his possession?

25    LT. MILLER:  Well, I think that would be the next step,

33b

1  your Honor, if he doesn't have them here.  The point is he

2  didn't sign most of those.  That is the reason for the question.

3  MR. SACHSE:  If the Government will accept them as true

4  copies, that is all right with me.  I am not going to argue.

5  It is all right with me.

6  LT. MILLER:  We would just as soon take the few seconds

7  it takes, your Honor, and then proceed from that point.

8  THE MASTER:  All right.

9  THE WITNESS:  I have all except the extension to December

10  1st, '46, an extension to December 1st, '49.

11  BY LT. MILLER:

12  Q  Do you recognize those two extensions as copies of

13  documents you have had in your possession or you have seen?

14  A  I have never seen them, no.

15  LT. MILLER:  At this time I submit into evidence Plaintiff's

16  Exhibit M-82 for Identification as Plaintiff's Exhibit M-82.

17  THE MASTER:  Is there objection?

18  MR. SACHSE:  No objection.

19  THE MASTER:  It will be received in evidence then as

20  Plaintiff's Exhibit M-82.

21  BY LT. MILLER:

22  Q  I will show you, Colonel, what has been marked Plain-

23  tiff's Exhibit M-83 for Identification, and ask you to state

24  what it purports to be.

25  A  This is a Special Use Permit allowing me to run a pipe

34b

1   line from the spring in the forest service to my dwelling.

2       Q   And would you examine the end of that document and see

3   if your signature appears thereon, or a copy of your signature?

4       A   That is my signature.

5       LT. MILLER:   I submit into evidence Plaintiff's Exhibit

6   M-83 for Identification as Plaintiff's Exhibit M-83.

7       THE MASTER:   Any objection?

8       MR. SACHSE:   No objection.

9       THE MASTER:   That will be received then in evidence as

10  Plaintiff's Exhibit M-83.

11  BY LT. MILLER:

12      Q   Colonel, in your testimony you have stated that you

13  anticipated developing your property to the point where you would

14  have a swimming pool, and that your requirements would be

15  18,000 gallons for the swimming pool.

16      A   For the swimming pool itself, right.

17      Q   Now, does that mean it would be 18,000 gallons per day

18  that would be used or is that just--

19      A   No.

20      Q   --per year, or what would that be?

21      A   Well, I can't tell exactly because I don't know how

22  often I would change the water.  But I anticipate having a

23  filtering plant.  And my guess is that, oh, it wouldn't be drained

24  more than maybe once a month.

25      Q   Once a month would be your estimate?

35b

1     A  Yes.

2     Q  Now, if you were to develop your property in the manner

3  you have testified, you would not intend to have the areas under

4  irrigation that were shown to be suitable for irrigation in the

5  engineering report which has been admitted into evidence as

6  Plaintiff's Exhibit M-81; is that correct?

7     A  No, those areas would be used for permanent pasture.

8     Q  And you would intend to build on other areas, and make

9  this additional use of water in addition to having these areas

10  in permanent pasture?

11     A  That is correct.

12     LT. MILLER:  No further questions, your Honor.

13     THE MASTER:  Are there any further questions?

14     MR. DENNIS:  I have one, in view of some comments I heard

15  by counsel here at the table.  I think Colonel Cook testified

16  as to what his use was on a per day basis for livestock, poultry,

17  and domestic, but when he gave the 18,000 gallons for his

18  swimming pool I think he neglected to say whether that would be

19  a daily, a weekly, a monthly or a yearly use.

20     THE MASTER:  He just answered Lt. Miller's questions on

21  that.

22     MR. DENNIS:  He did?  I beg your pardon.  And the other

23  thing is it seems to me for his protection he should introduce

24  the use permit granted to A. Nelson in 1937 also at the time he

25  introduces the other document.

36b

1          THE MASTER:  Do you have a copy of that use permit?

2          THE WITNESS:  Yes, I have that.  The 20th of November,

3     1937.

4          THE MASTER:  Do you have any copies of that?

5          THE WITNESS:  No, this is the only one.  I can also get

6     a copy of this.

7          THE MASTER:  Will you have that copied, and will you sub-

8     mit a copy of that at the same time that you submit the copy of

9     the recent application?  And stipulate, subject to the same

10    reservation with reference to the legal effect, that the copy

11    of this use permit of 1937 may also be admitted in evidence.

12         LT. MILLER:  The United States so stipulates.

13         MR. DENNIS:  So stipulated.

14         MR. SACHSE:  So stipulated.

15         MR. DENNIS:  I assume we stipulate the A. Nelson named in

16    that permit is his grantor.

17         MR. SACHSE:  So stipulate.

18         THE WITNESS:  I didn't hear the last statement.

19         MR. DENNIS:  I assume the A. Nelson named in that permit

20    is your grantor.

21         THE WITNESS:  Yes, that is right.

22         THE MASTER:  Will that be stipulated by the State?

23         MR. MOSKOVITZ:  That will be stipulated.

24         THE MASTER:  Very well.  Any further questions by Mr.

25    Stahlman, Mr. Moskovitz?  Mr. Stahlman?

37b

2

1    MR. STAHLMAN:  None.

2    THE MASTER:  Mr. Moskovitz?

3    MR. MOSKOVITZ:  No.

4    THE MASTER:  Mr. Sachse?

5    MR. SACHSE:  No, sir.

6    THE MASTER:  Very well then, Colonel, you may be excused

7    at the present time, subject to  being recalled in the event

8    testimony by you with reference to any of these documents later

9    appears to be necessary.  In the absence of such recalling,

10   however, it will not be necessary for you to be present at any

11   further hearing.  And you will submit the copies of the documents.

12   THE WITNESS:  Yes, I will send them to you.

13   THE MASTER:  Very well.  We will take our morning recess

14   now, ten minutes.

15   MR. DENNIS:  Just before we recess, I think Mr. Stahlman

16   said he wanted to leave early, can the record show I am turning

17   over to him four volumes of the briefs in the Rancho Santa

18   Margarita case in pursuance to the agreement we reached in Court?

19   THE MASTER:  The record may show the volumes are turned

20   over to Mr. Stahlman and that he holds them in his hands.

21   (Recess.)

22   THE CLERK:  Court is now in session.

23   THE MASTER:  Mr. Stahlman, I believe you have a statement.

24   MR. STAHLMAN:  Yes, your Honor.  I would like to state for

25   the record that on these tributaries, such as your Honor is

38b

1    hearing at the present time, where Vail has no property, or its

2    property may be upstream, as it is in this case, we desire to

3    be excused from the proceedings.  However, we are interested

4    in any testimony which would affect the stream system as a whole,

5    as distinguished between these matters pertaining to the

6    individual properties on these tributaries.  And I would appre-

7    ciate it if any of the counsel that intends to introduce evi-

8    dence of that character would let me know, and put it on a day

9    following, rather than coming up suddenly with it, if it should

10   happen.

11          THE MASTER:  I am sure counsel will endeavor to cooperate

12   with you on that.  However, it would be understood that if any

13   evidence of a general nature should be offered, even though

14   you are not present, your client would be bound by it, subject

15   to the usual rights to object to findings and introduce con-

16   flicting evidence at a later time.

17          MR. STAHLMAN:  I understand that.  There is a calculated

18   risk involved.  To make our position clear, we feel we do not

19   wish to controvert the individual properties that may be down-

20   stream from us.  Now, when we get on the Murrieta stream we

21   have a different problem.  We have property that is downstream

22   from those users there, and so we will have a different situa-

23   tion.  When your Honor makes his findings and determines the

24   total use, why we will naturally be interested in what relation-

25   ship that may bear to the Vail use.

39b

1        Now, I understand that the studies for Vail in this pro-

2   perty as described on the Exhibit M-32 have not been completed.

3   Of course, when that is made we will come back here, if your

4   Honor is going to hear it here, or in Judge Carter's Court,

5   wherever it is heard.

6        THE MASTER:  My understanding was Judge Carter was going

7   to hear the entire Vail case.  If any different arrangements

8   were to be made, we would expect you at that time.

9        MR. STAHLMAN:  Yes, sir.

10        THE MASTER:  You may be excused, then, subject to the

11   statements that have been made.

12        MR. STAHLMAN:  I hope I am not missed too badly by my

13   associates here.

14        MR. MOSKOVITZ:  Your Honor, it might be helpful at this

15   point for counsel for the other parties to give a little outline

16   of what we may expect in the next few weeks in the Master's

17   hearings.  That is, just what sort of evidence will be coming

18   in.

19        THE MASTER:  Lt. Miller, can you state what evidence the

20   plaintiff will expect to introduce?

21        LT. MILLER:  As of this time, your Honor, I believe our

22   case is submitted.  There is a possibility we may introduce

23   evidence at a future date.  But we haven't definitely decided

24   if we would have it ready, or if it would be necessary, so I

25   can't make any definite statement in so far as the United States

40b

1    is concerned.

2        THE MASTER:  Mr. Sachse.

3        MR. SACHSE:  Well, I have the greatest number of individual

4    defendants.  And for counsel's information, the way it is

5    scheduled now is this:  I have for today Mr. Bleecker and then

6    this afternoon Mr. LeVack.  Tomorrow I have Mrs. Walling and

7    Mrs. Mercy Anderson, which will not be a full day, unless I can

8    drum up some more people, or unless we can get some pro per

9    defendants.  On the 25th I have at the present time arranged for

10   four owners, who are all contiguous, and all on the same branch

11   of the stream, all right together.  I am trying to get a fifth.

12   That would be H.E. Shaver, Gaius Shaver, Goodchap and Rowley.

13       Now, I have gone no further.  And I had hoped today, or

14   at the very latest tomorrow, to find out from Lt. Miller and

15   Colonel Bowen what their anticipated schedules with some of these

16   reports would be.  Because some of these people are out-of-

17   towners, most of them, and if I know when the report is going to

18   be available I will try to schedule next week's hearings in a

19   logical manner.  Now, that is as far as I have gone, though,

20   is just this week with those parties named.

21       THE MASTER:  Lt. Miller, can you or Colonel Bowen answer

22   Mr. Sachse's question about these reports?

23       LT. MILLER:  I am not in a position to do so now, but we

24   will undertake to get together and advise him of the dates when

25   we expect to have the particular reports completed, so that he

41b

1   can make his plans.

2           MR. SACHSE:   That is all I could add.

3           THE MASTER:   You have how many defendants altogether, Mr.

4   Sachse, that have not testified so far?

5           MR. SACHSE:   One, two, three, four, five, six, seven,

6   eight who I have just named, your Honor, and nine to come.   Two

7   of the nine have engineering reports already completed, but both

8   of them are out-of-town owners and I tried to get them by long-

9   distance telephone all week, and I went over to their places

10  in De Luz, and just didn't get them.   So I will have to send

11  them a card or something.   But there are seven--seven reports

12  that I am waiting for, before I can put their cases on.

13          THE MASTER:   In other words, you only will have a total

14  of nine defendants in this area after we finish the eight this

15  week.

16          MR. SACHSE:   That is right, sir.

17          THE MASTER:   Mr. Dennis, do you have any?

18          MR. DENNIS:   I have no defendants in the De Luz Creek

19  watershed.

20          THE MASTER:   Mr. Moskovitz.

21          MR. MOSKOVITZ:   No, we have no State owned parcels in this

22  area.

23          THE MASTER:   It would appear on that basis if the engineer-

24  ing reports were completed we should probably be able to com-

25  plete the hearings in the De Luz Creek area next week, then.

42b

1    MR. SACHSE:  I would think so.

2    THE MASTER:  Of course, as I have indicated, I would have

3    some personal questions to ask Colonel Bowen with regard to

4    property of pro per defendants, and also property of defendants

5    who have not filed any type of answer at all.  And that would

6    take us some time.  That is, questions in regard to the nature

7    of individual parcels concerning which no specific testimony has

8    so far been introduced.  That is, there has been Colonel Bowen's

9    general testimony to the entire watershed.  So there would have

10   to be some time for questions in regard to that property.

11   MR. SACHSE:  Then also, your Honor, I have some questions

12   that I plan to ask Colonel Bowen, and I am just leaving them in

13   abeyance until we run into a dead spot.  Maybe tomorrow would

14   be the day.  I intend to ask Colonel Bowen some questions about

15   the Government parcels in the watershed that are indicated on

16   M-68.  In other words, I think it is just as important for us

17   to eliminate acreage as non-riparian as it is to establish acre-

18   age that is.  And I want to pin down, if I can, some of these

19   areas that I think are not--about which you probably will have

20   nothing at all to say.

21   THE MASTER:  I think that is unquestionably correct, that

22   we are not interested in trying to increase or decrease the

23   amount of riparian land.  We are interested in trying to find

24   out what it actually is.

25   LT. MILLER:  Your Honor, in respect to the scheduling, it

1421

43b

1    would appear the pro pers who have had engineering studies made

2    of their land should be notified that on a certain day that they

3    could come in and examine those.  They have received copies of

4    them.  That it may well be they would like to get some evidence

5    in the record.  I believe in most cases those people have not

6    appeared and testified with respect to their land and asked any

7    questions of Colonel Bowen with respect to those reports, and

8    that would be appropriate after we complete the evidence on the

9    parties who are represented by counsel.

10    THE MASTER:  Well, my tentative thought then would be that

11    apparently there will be enough defendants who are represented

12    by counsel to take the balance of this week and the hearings

13    that are scheduled for next week.  Incidentally, there is one

14    pro per defendant who has written me and stated he will be here

15    next Monday, a Mr. Emmes.  And I believe he has a report.  And

16    if you can put that on your schedule, Lt. Miller, to have Colonel

17    Bowen prepared to testify in regard to the Emmes property on

18    Monday.  That then the following week should probably be devoted

19    to these pro per defendants.  And it may be that we can very

20    well finish the De Luz Creek hearings by the middle of July, and

21    will not have to take the balance of the month for those hearings.

22    Well, with that in mind I believe you have a witness that

23    you wish to present now, Mr. Sachse.

24    MR. SACHSE:  I would like to call Colonel Bowen with re-

25    lation to the Bleecker parcel.  This is cross-examination, your

44b

1    Honor.

2           THE MASTER:   Yes.

3

4                    ALLEN C. BOWEN,

5    having been previously sworn, recalled for cross-examination.

6           MR. SACHSE:   May I have M-47, please?

7           THE CLERK:   47?

8           MR. SACHSE:   M-47.

9

10                   CROSS EXAMINATION

11   BY MR. SACHSE:

12          Q  Colonel Bowen, I hand you Plaintiff's Exhibit M-47,

13   being a report on Parcel 30, De Luz watershed, owned by Mr.

14   Robert Bleecker.   Are you familiar with that parcel?

15          A  Yes, sir.

16          MR. SACHSE:   Your Honor, before we go further with Colonel

17   Bowen on this question, the only direct evidence of title in

18   this case is a decree of distribution order settling first and

19   final account.   We do not have a certified copy.   I believe the

20   Government will stipulate, however, their records indicate that

21   Mr. Bleecker is presently the owner of the parcel in question.

22   Is that right?

23          LT. MILLER:   We will stipulate that our records indicate

24   that he is the owner of Parcel 30, as shown on Exhibit M-32.

25          MR. SACHSE:   On Exhibit M-32.

1      THE MASTER:  Very well.

2  BY MR. SACHSE:

3      Q  Colonel Bowen, if you will examine the soil map and

4  particularly the geological overlay at the back of that report.

5  Am I correct in saying that a large part--or that that parcel

6  has a large area of alluvium, both recent and older?

7      A  Yes, sir, as shown on the geological overlay accompany-

8  ing the soils map, included as part of Plaintiff's Exhibit M-47,

9  the symbols indicate that significant areas of present alluvium,

10  marked as "QAL," and delineated by dashed lines, and an older

11  alluvium, marked as "QOAL", the area delineated by dashed lines,

12  are in the vicinity of the stream system traversing the property.

13      Q  Now, Colonel Bowen, directing your attention to--and

14  keep that, please.  But directing your attention also to the

15  table of water duties appearing in the report, am I correct in

16  understanding that those duties are averages for San Diego

17  County, for the different crops indicated?

18      A  Yes, sir.  They are averages.  They may be more than

19  adequate some years, and other years they may be inadequate.

20      Q  And am I also correct in assuming that as an average

21  they necessarily take into consideration highly permeable soils

22  and rather tight soils?

23      A  Yes, sir.  The duty figures here would embrace the

24  normal range or soils.  It wouldn't go to excessively permeable

25  soils.

46b

1     Q   In other words, if any given parcel of land has a soil

2   of extremely high permeability, then the water duty given for

3   any crop might be low for that particular soil; is that correct?

4     A   I defined earlier water duty.  And if you mean by

5   "low" that the figures shown on the table entitled "Water Duty

6   for Agricultural Crops" included in Plaintiff's Exhibit M-47

7   might be lower than a quantity of water applied per acre, then

8   your use of the word "low" would be correct.

9     Q   That is what--

10    A   But in the definition of "water duty", a higher quan-

11   tity of water applied per acre gives you a lower duty, inasmuch

12   as fewer acres are irrigated by a continuous flow.

13    Q   I will rephrase it.  I think I understand you, but

14   let's be sure.  We indicate as a yearly irrigation requirement

15   for avocados 2.35 acre feet.

16    A   Yes, sir.

17    Q   Now that is an average figure, is it not?

18    A   Yes, sir.

19    Q   Now, if the soil on which the given avocados are planted

20   is extremely permeable soil, then a somewhat larger amount than

21   2.35 would be needed; is that right?

22    A   Yes, sir.

23    Q   And if, on the other hand, it were a tight soil, not

24   permeable, then a lesser amount would be needed?

25    A   Yes, sir.  But, of course, if it was too tight, as you

47b

1   well know, avocados wouldn't grow.

2       Q   Avocados wouldn't grow.   The same thing would apply

3   to alfalfa, desiduous, or anything.   If the soil were rather

4   permeable, more water might be needed, if it is rather tight,

5   less water is needed; is that correct?

6       A   Yes, sir.   A good illustration of that might be over

7   in the desert, Imperial Valley.   In the Valley itself, which

8   is comprised of alluvial deposits from the Colorado River,

9   alfalfa might be grown with say six feet of water per acre per

10  year.   But on some of the old terrace formations to the east

11  between Holtville and the sand dunes, comprised largely of sandy

12  soils of considerable depth, it might require double that, or

13  as much as 12 feet of water per acre per year for the same crop,

14  the same climate.

15      Q   Now then, specifically directing our attention again

16  to the geological overlay map, and bearing in mind other pro-

17  perties in the De Luz Creek watershed, am I right in assuming

18  if there is a large percentage of recent and older alluvium

19  such soils might take somewhat more water per acre per year for

20  any crop then some of the heavier non-alluvial soils?

21      A   Yes, sir, that is possible.

22      Q   Now, Colonel Bowen, if you will approach the map, M-68,

23  please, I want to clarify for the record a few things.

24      As I observe the Bleecker Parcel 30, it appears to me that

25  it is riparian in the physical sense of the word, abuts  on

48b

1 three streams, Cottonwood Creek in the extreme west, the east

2 fork of De Luz Creek in the southeast corner, and an unnamed

3 intermittent stream which more or less runs down the center of

4 it; is that correct?

5     A  Referring to Plaintiff's Exhibit M-68, Mr. Sachse, your

6 first reference to Cottonwood Creek would be correct in accor-

7 dance with Mr. McDowell's testimony earlier offered.  But accor-

8 ding to the map, the U.S.G.S. has called that De Luz Creek,

9 and we have adopted that nomenclature.

10     Q  All right.  Instead of Cottonwood Creek--

11     A  And the confluence of Cottonwood Creek with De Luz

12 Creek is not the property, and what we have chosen to call the

13 main stream of De Luz Creek traverses the entire length of the

14 westerly 40 acres on the Bleecker property.

15     Q  All right.  Now, the easterly fork of De Luz Creek,

16 where does that--

17     A  Similarly what we have called the east fork of De Luz

18 Creek traverses the southerly extention of the Bleecker property,

19 and an unnamed tributary arising on the Santa Rosa Grant, a

20 portion of the Vail Ranch, crosses the county line, passing

21 through De Luz watershed Parcels number 18, 16, 15,from whence

22 it enters Parcel number 30, and travels in a southerly direction

23 to its confluence with the east fork of De Luz Creek, beyond the

24 boundary of the Bleecker property.

25     Q  Now, again referring to your geological overlay, am I

49b

1    correct in assuming that a great deal of this recent and old

2    alluvium lies up and down the stem of this unnamed creek you just

3    referred to?

4    A  Yes, sir, that is correct.  Referring to the geological

5    overlay in Plaintiff's Exhibit number 47, it shows a substantial

6    portion of the recent and older alluvium adjacent to the unnamed

7    tributary running in a southerly direction through the Bleecker

8    property.

9    Q  Now that type of alluvium is generally considered to

10   be a good water producer, is it not?

11   A  It may and it may not be.  The mere fact that it is

12   alluvium does not define the permeability of the alluvium.  But

13   by referring to the soils map  contained as a part of Plaintiff's

14   Exhibit M-47, the nature of the permeability of the subsoil

15   can be determined by examination of the fractional symbols.

16   Q  Would you consider that the water found by drilling

17   into or tapping the alluvium along the stem of this unnamed

18   intermittent stream is a part of the stream?

19   A  In my opinion, yes, sir, it would be a part of the

20   stream.

21   Q  Now, calling your attention particularly to the most

22   easterly 40 of the Bleecker property, Parcel 30,--you see the

23   one I mean?

24   A  Yes, sir.

25   Q  When you get up into that you are getting into this

50b

1 granodiorite that you discussed previously, are you not?  Pre-

2 viously in connection with other parcels?

3 A  Yes, sir.  It shows both Woodson Mountain granodiorite

4 and Santiago Peak granodiorite occupying a large portion of that

5 easterly 40 of the Bleecker property.

6 Q  Then I will ask you the same question.  Waters that

7 you might find by tapping that area you would assume were not

8 a part of the stream, or were a part?

9 A  Well, that is in contact with the older alluvium and

10 the recent alluvium which is astride the unnamed tributary, and

11 hence any drainage from the fractures and thin soil mantle of

12 the geological formation might be in contact with the stream.

13 Q  Now, your addenda, which Lt. Miller discussed earlier

14 this morning, in the event the irrigable lands are devoted to

15 the raising of permanent pasture and so forth, this is to be

16 attached to all engineering reports, as I understand  it.

17 A  Yes, sir.  All that have been submitted.  And the lan-

18 guage will be incorporated in the ones that are to be written.

19 Q  So in analyzing the Bleecker report, we shall assume

20 that if all of the irrigable lands were devoted to the raising

21 of permanent pasture, in your opinion, a project duty of 4.2

22 acre feet per year would be reasonable.

23 A  Yes, sir.

24 MR. SACHSE:  I have no further questions.

25 THE MASTER:  Any redirect examination?

51b

REDIRECT EXAMINATION

BY LT. MILLER:

Q  Colonel, directing your attention to page 3 of Plaintiff's Exhibit M-47, at the top of that exhibit and that page there is a statement that the soil permeability varies from moderately slow, .2 to .8 inches per hour, to moderately rapid, 2.5 to 5 inches per hour.  Is that your opinion in so far as the permeability of these soils is concerned?

A  Yes, sir.

LT. MILLER:  No further questions.

BY THE MASTER:

Q  Colonel Bowen, you stated in answer to Mr. Sachse's question that water in the easterly 40 acres might be in contact with the stream.  Do you think it is more probable that it would be, or less probable that it would be?

A  Your Honor, I think more probable that it would be. I used the term "might", because we made no subsurface explorations in that.  But it is my opinion that it would be in contact  with the stream, inasmuch as the granodiorites abut  upon the alluvium which serve as a ground water reservoir.

THE MASTER:  Very well.  Do you have any further questions?

MR. SACHSE:  Nothing further from the Colonel at this time.

LT. MILLER:  Nothing further, your Honor.

MR. DENNIS:  No questions.

1430

52b

1      THE MASTER:  You may step down again.

2      MR. SACHSE:  I would like to call Mr. Bleecker.

3

4                    ROBERT B. BLEECKER,

5  one of the defendants herein, called as a witness in his own

6  behalf, sworn, testified as follows:

7

8                    DIRECT EXAMINATION

9  BY MR. SACHSE:

10     Q  Will you state your full name, please?

11     A  Robert Boynton Bleecker.

12     Q  What is the spelling of the last name?

13     A  B-l-e-e-c-k-e-r.

14     Q  What is your residence, Mr. Bleecker?

15     A  In De Luz.

16     Q  Is it on the parcel we have been discussing as Parcel

17  30 here?

18     A  It is.

19     Q  And how long have you lived there?

20     A  Since about June of '41.  The place was purchased in

21  either February or March of '41.

22     Q  And it has been your continuous residence since that

23  time?

24     A  Yes, sir.

25     Q  What is your education and training, Mr. Bleecker?

1431

53b

1    A  I am--was what might be termed an industrial management

2    engineer.  And Stanford and Harvard Business School have been

3    my educational background.

4    Q  Now, will you please describe for the Court generally

5    your property, just in general terms?

6    A  Well, it is--other than this alluvium that Colonel

7    Bowen referred to--

8    Q  How big is it, how many acres?

9    A  I think it is 392, some such thing.  There is a dis-

10   puted two or three acres, which we waived at the title company.

11   Q  Is it improved with a house?

12   A  I beg your pardon.

13   Q  Has it got a dwelling house on it?

14   A  It has a dwelling house.

15   Q  And how much of it is cleared, or has ever been put to

16   agricultural use?

17   A  Prior to my occupancy a great deal of land had been

18   used for various purposes, for vineyards and for deciduous

19   orchards of a fruit nature, and walnuts.  And there had been

20   various crops of the nature of alfalfa and various other vege-

21   tables grown.

22   Q  Now, you can look, if you will, Mr. Bleecker at Exhibit

23   M-47, which is right there.  That is the engineering report.

24   And if you would look at page 3 of the report, the study indi-

25   cates that in the opinion of Colonel Bowen and his staff

54b

1    approximately 287 acres of your property is irrigable.  What

2    is opinion of that finding?

3        A  I will accept that.

4        Q  And all this area that you have just referred to as

5    having been in walnuts or deciduous is included within this

6    287 figure?

7        A  Yes.

8        Q  Now, if you will turn to the next page of the report--

9    pardon me, the last page of the report, number 5, you will find

10   the calculations of Colonel Bowen and his staff as to water

11   requirements.  And if you care to do the arithmetic, I think

12   you will find out that the average for all your crops is about

13   2.9 acre feet per acre per year.  What is your opinion of the

14   accuracy of that conclusion?

15       A  My--of course, all of this soil I have, of my own

16   knowledge and justification I would not know the degree of per-

17   meability.  This general alluvium that has been referred to,

18   I should say that my water use would have to be very materially

19   higher.  I will be very glad to cite examples here.  It would

20   come probably between the six and 12 as of the Imperial Valley

21   reference of Colonel Bowen.  My grounds for this are that in

22   an experimental orchard we had in there of a very wide variety

23   of fruits, nuts, and so on, we irrigated these by fixed sprinklers

24   of the Browning type, and I should say with a throat of--I think

25   we were two diameters at the end, three sixteenths and a quarter.

55

1   And with an all day use we were unable to have any water accumu-

2   lation at all.  This was affixed.   It would cover an area

3   perhaps of 15 to 16 square feet.  Not the rotating thing, which

4   would have given more water per tree..

5         Q   Excuse me.  Let me restate it.  You mean affixed

6   sprinkler, not a rotating sprinkler?

7         A   That is right.

8         Q   With an all day use, it left no standing water?

9         A   Left no standing water.  With  camellias that I raise

10  there, I am familiar with the frequency of water used in various

11  areas, and I will have to irrigate there in hot weather--oh,

12  frequently it is daily, particularly if that is combined with

13  some dry wind.  As against the areas in Fallbrook here where

14  every four days would be more than adequate.

15        Q   Now, is this use--you mentioned the dry wind.  Is this

16  increased frequency of irrigation as a result of the dry wind

17  or as a result of the permeability of the soil?

18        A   It is the permeability of the soil.  It will take a

19  different kind of an engineer that I to tell with a relatively

20  porous soil what difference there would be in attraction from the

21  sun from that as against a packed soil or clay.  I mean it would

22  be greater, too.  Basically it would be the permeability of the

23  soil that would do that.

24        I may say further there that various other irrigating of

25  other crops would tend to confirm these examples I have given.

56b

LT. MILLER:   Your Honor, it will probably save us a little time if I would interject an objection at this point. This testimony is very general, and unless he can pin it down to particular times and particular places I believe we will have to move to strike.  We are anxious to hear the testimony, but we do desire to have it pinned down to the time and place, and if Mr. Bleecker was there, so we may be fully advised and the Court may be fully advised as to these facts.

THE MASTER:  Will you try to make the testimony as specific as possible, Mr. Sachse?

MR. SACHSE:  We get into another defendant's number. What number will you give me for this identification, MD-F?

THE CLERK:  That will be MD-F.

BY MR. SACHSE:

Q   Mr. Bleecker, I will hand you a sheet of paper containing many, many pencil notes marked Defendant's Exhibit MD-F for Identification.  Will you tell us what it is?  Don't go into detail, but just tell us what it represents.

A   It is a change in well levels with rainfalls and by dates.  And this was suggested as procedure we follow at the ranch--this particular one I have here is a '51-'52--by Mr. Franklin Holmstead, who is the water geologist of the U.S.G. S. And we followed his directions.  And the point of this--

Q   Not the point yet.  Let's explain it for a minute.

A   Oh.

57b

1       Q   What does the report--

2       A   It shows a degree of water rise.

3       Q   Again, please, Mr. Bleecker, you are trying to tell us

4   the conclusions.   I want you to tell us what is on here.   Does

5   it list certain wells, certain dates?

6       A   Yes, it lists my wells.   One of these wells is an   en-

7   cased well.   But that is beside the point, I take it.   And these

8   are in different parts of the place.   And I think these are

9   located--four of them on the Navy report, for your reference.

10      Q   And tell us the dates at which readings were taken?

11      A   Very well.   We start here at January 1, '52.   I had

12  better say December 17, '51.   This is the depth to water, not

13  the depth of water.   To water.   Was 33.   And on January 1st--

14  January 21st that had risen to 22 feet from the surface.

15      LT. MILLER:   Your Honor, I will have to move to strike

16  that as a conclusion of the witness.

17      MR. SACHSE:   It can go out.

18      LT. MILLER:   It would appear if he could identify it and

19  get it in.

20      THE MASTER:   The motion to strike will be granted.

21  BY MR. SACHSE:

22      Q   What I would like you to do, because these notes are

23  hard to read, Mr. Bleecker, I would like you to state how many

24  wells this study covers, the dates that it covers, or the span

25  of dates.

1436

58b

1    A   Yes.

2    Q   And then without giving us the conclusions, simply

3   tell us what it shows.  And now I think you have already done

4   that.  It shows the depth to water on each date.

5    A   Yes.

6    Q   Will you run through it again and just tell us how many

7   wells and the period covered?

8    A   These are for five wells, and the period covered is

9   from December 17th, '51, in this event, to the 30th of January,

10   '52.

11    Q   And the figures given are the depth to water in each

12   case?

13    A   The depth to water, and change from well to well over

14   the period of time.

15    Q   And was this done by you?

16    A   Yes, me and one or two others.

17    MR. SACHSE:  Your Honor, I am going to offer this in

18   evidence.  And I have already discussed it with Colonel Bowen,

19   and they have said they would like to have copies, and I would

20   like to consent to have it withdrawn and see if they can produce

21   it in more readable form.  Is there any objection?

22    LT. MILLER:  I think we should examine the witness with

23   respect to this before we state whether or not we have objections

24   to it.

25    MR. SACHSE:  Very well.

59b

1     THE MASTER:  Very well.  If you wish to examine him at

2  the present time on voir dire--

3     LT. MILLER:  Yes, sir, if I may.

4

5             VOIR DIRE EXAMINATION

6  BY LT. MILLER:

7     Q  Mr. Bleecker,  could you by reference to Plaintiff's

8  Exhibit M-47 point out the various wells that are involved, if

9  they are shown on there?

10     A  Yes, be glad to.

11     Q  With the Court's permission if he could mark it in

12  red there with the number corresponding to the columns here,

13  so that we could pin it down to the particular points and wells.

14     THE MASTER:  Very well.

15  BY LT. MILLER:

16     Q  The Exhibit MD-F for Identification shows wells in

17  columns; is that correct?

18     A  Yes.  These, your Honor, are the five wells, and I can

19  identify them on the map.

20     THE MASTER:  You can then identify them on the map?

21     THE WITNESS: Yes.

22     THE MASTER:  And mark them 1, 2, 3, 4, 5 on the map in

23  descending order as shown on MD-F for Identification.

24     LT. MILLER:  I think, your Honor, that a red pencil might

25  show up a little better.

60b

1          THE WITNESS:   Could we have the family reading glass here?

2          MR. SACHSE:   I didn't bring mine.

3          THE MASTER:   Mr. Dennis, did you bring your reading glass

4    today?

5          MR. SACHSE:   I knew I forgot something.

6          MR. HALL:   Here is one.

7          THE WITNESS:   This is going to be very rough.

8          MR. SACHSE:   May I offer a suggestion?  If you will look

9    at the first top overlay, the Government has indicated where

10   they think wells are located.  Now, that might--

11         THE WITNESS:   Number 1 here.

12         THE MASTER:   Can you speak up so the reporter can hear

13   you?

14         THE WITNESS:   Number 1 here would be "main abandoned" here,

15   is very close to the actual main that we are using.  So that

16   could be used as far as location goes.  I will take their number

17   1 here as my number 1.

18         THE MASTER:   Now, when you say "their number 1"--

19         THE WITNESS:   I mean this here as well as number 1 here.

20         MR. SACHSE:   Number 1--

21         THE WITNESS:   It has a "1" above it and the circle "W".

22         THE MASTER:   That is on Plaintiff's M-47?

23         THE WITNESS:   Um-hmm.  And I believe what is called

24   domestic well number 3 is at this point, and that on the list

25   here I will put a number 3.  Is that satisfactory, the one that

1    is on the Government map?

2            LT. MILLER:   Yes.   That would be fine.

3            THE MASTER:   And so-called "central" is probably number

4    2.

5            THE WITNESS:   Yes, that is right.

6            THE MASTER:   That is, well number 2 as shown on Exhibit

7    M-47--

8            THE WITNESS:   Yes.

9            THE MASTER:   --is the well you have referred to as

10   "central"?

11           THE WITNESS:   And I am identifying them here by their map.

12           THE MASTER:   On Exhibit MD-F for Identification.

13           THE WITNESS:   Now, the furthest north, if I can find one

14   here, and which I have labeled as Whitner.   I am trying to find

15   that.   Here it is, their number 4.   That will be the same here,

16   my number 2--correction, number 4 on the map.   Yes, I was

17   correct.   The one well you have referred to, this is it now.

18   I meant--wait a minute.

19           THE MASTER:   Clarify that.

20           MR. SACHSE:   Well number 4 as indicated on M-47 you have

21   marked as well number 4 on Exhibit MD-F; correct?

22           THE WITNESS:   Um-hmm.   Perhaps here for clarity, this

23   fifth one listed here is one that was an uncased one, but which

24   for a number of years had water in it, stood with water in it,

25   so we could get our water--

62b

1      MR. SACHSE:  You are saying this fifth listed.  You are

2  referring to the fifth listed in MD-F?

3      THE WITNESS:  Yes.

4      MR. SACHSE:  Do you find that on Exhibit M-47?

5      THE WITNESS:  That is very close to--I should say was

6  almost directly southeast of this well number 4 we have taken

7  last, and perhaps 300 feet in that direction.

8      MR. SACHSE:  Will you then place a little X where you--

9  approximately.  We realize it can't be entirely accurate.  Now,

10  the X on M-47--

11      THE WITNESS:  Will be number 5 as on this list now.

12      MR. SACHSE:  As indicated number 5 on your list.

13      THE WITNESS:  Yes.

14  BY LT. MILLER:

15      Q  Now, Mr. Bleecker, you stated that you had made some

16  of these readings yourself.

17      A  Yes.

18      Q  And could you state that you had made all of the readings

19  yourself?

20      A  No.  My then partner in this enterprise, a Mr. Mason,

21  did this in many cases with me.  And those were the two of us.

22  In other words, the ones that were chiefly and  entirely con-

23  cerned with the readings.

24      Q  Whose handwriting were those made in?

25      A  His hand.

Case 3:51-cv-01247-JO-SBC   Document 4731   Filed 09/24/63   PageID.43887   Page 68 of 162.

1441

63b

1    Q   Mr. Mason's?

2    A   Mr. Mason.

3    Q   What manner did you actually use to determine the

4    depth?  How did you make the measurement?

5    A   We made it with a chalk steel tape, and a  weight in

6    the bottom.  And we calculated.  I have some other field notes

7    here, if it won't confuse the thing further.  We made it to the

8    net ground level, made—compensated for the depth above which

9    it was used.

10   Q   So in essence what you arrived at was the distance from

11   the ground level at this particular site to the height of the

12   water in the well.

13   A   To the height of the water.

14   LT. MILLER:  We have no objection, your Honor, to its

15   introduction.  I may ask, though, if it is intended to introduce

16   both sides of it.

17   MR. SACHSE:  I haven't even looked at the other side.

18   LT. MILLER:  There are a lot of miscellaneous notes on

19   there, your Honor, which we have no objection to, but they

20   haven't been testified to.

21   MR. SACHSE:  I am not offering the other side.  I don't

22   know what it is, but I am not offering it.  What I wanted was

23   the well data.

24   THE MASTER:  Then the document will be received in evidence

25   as Exhibit MD-F, and the only portion that is so offered and

64b

1    received is the side showing the depth of the water in the wells

2    upon which the witness has made the notations 1, 2, 3, 4, and

3    5, indicating the wells.  The other side has neither been

4    offered nor received in evidence.

5         MR. SACHSE:  May I ask consent of Court to permit Colonel

6    to take it and see if he can do a better job, that will be more

7    permanent than this, some sort of reproduction.

8         THE MASTER:  The consent asked by Mr. Sachse is granted,

9    and it is understood Colonel Bowen will endeavor to photograph

10   that and make copies, and the copies may then be substituted for

11   the original, and the copies may be given to counsel.

12        LT. MILLER:  Yes, sir.  We would  refer to make Verifax

13   copies, if that is satisfactory, assuming we can get a good

14   clear copy.

15        MR. SACHSE:  Anything that will show the data.

16

17                    FURTHER DIRECT EXAMINATION

18   BY MR. SACHSE:

19        Q  Mr. Bleecker, if you will approach the map behind you,

20   I want to ask a couple of questions about these streams.  The

21   stream that you and I referred to as Cottonwood Creek, which

22   flows in the most westerly portion of your property, but which

23   Colonel Bowen corrected me on, is below the junction of Cotton-

24   wood and De Luz Creek.  What kind of a stream is that as far as

25   intermittent or continuous flow is concerned?

65b

1      A   It is the one that is commonly referred to there as

2   the all year creek.

3      Q   When you say "Is commonly referred to", you mean that

4   is a neighborhood name for that stream?

5      A   Neighborhood name.

6      Q   And is there usually water in that stream?

7      A   Yes.

8      Q   At the point where it crosses your land?

9      A   Yes, that is true.

10      Q   Now, the next stream to the east there, going east

11   across your property, is the stream identified by Colonel Bowen

12   as an unnamed intermittent stream, running through your property

13   roughly from north to south.  You know the one to which I refer?

14      A   Yes.

15      Q   What kind of a stream is that?

16      A   That I should say would be intermittent.  It runs

17   heavily in winter.  It is still--for instance, with this heavy

18   winter just passed, it is still running.  And I noticed it is

19   running, but it is definitely an intermittent stream.

20      Q   By intermittent, you mean it flows principally during

21   and immediately after a rain?

22      A   Yes.

23      Q   Its flow will come up very rapidly with a rain and then

24   drop off rapidly; is that right?

25      A   Yes, rapidly as the rain begins, from absorption.  But

66b

1   less--but a little more definitely on its duration of flow.

2   I will say it is still flowing, an  indication of this wet

3   winter, and has flown across the road which is shown on the

4   exhibit here as late as early July in I believe '43 or '44.

5   This is the maximum now that it could flow.

6       Q   Now, will you please repeat that?  That was the next

7   question I was going to ask you, and I think you anticipated.

8   What is the latest in the year that you have ever observed that

9   stream carrying any surface flow since you have been on the

10   property, 1941?

11      A   Up to the first week of July it had flowed at that

12   point, to what Colonel Bowen referred to as the confluence.   It

13   was in the first week of July.  It had flowed at that late a

14   point through my property and into this point of the confluence

15   with the east fork of the De Luz Creek.

16      Q   All right.  Now, take the other stream, the east fork

17   of De Luz Creek.  Will you describe that stream?

18      A   As to surface indications, actual surface flow, I

19   would have to term it intermittent.  I have not seen a time

20   when--I point out here, perhaps here on the map--it is not

21   shown on the surface, which I would conclude was rocks at that

22   point on or something bringing it there.  And I think to my

23   knowledge--I haven't made a point of finding it out.  But it

24   has flowed below there and under the crossing of the school.

25      Q   In other words, from your own observation, you have seen

1445

67b

1   times when the stream is above surface at one point and then--

2       A   Shows again.

3       Q   Then no stream visible on the surface?

4       A   That is right.

5       Q   At  others?

6       A   That is right.

7       Q   Now, are you making any agricultural use of this

8   property at this time?

9       A   Yes, I am.

10       Q   Tell us about it, please.

11       A   Well, at the moment I am raising camellias.  I have

12   a lot of them in the ground and I plan to have more.  .  I have--

13   if this is in point--two classes, one by developing a species under

14   stock, and the other by hybridization.  One in specific hybridi-

15   zation and within the species, and if that egg hatches why I

16   shall expect to enlarge the territory used.

17       Q   Do you have any immediate plans for what I might class

18   as more conventional agriculture, the ordinary crops or orchards?

19       A   No, unless it were by a possible leasing.  I have tried

20   to find out pretty well what the soil is good for.

21       Q   To come back to the question I asked you at the very

22   beginning of your examination, with specific reference to the

23   irrigable acreage calculations contained in Exhibit M-47, I

24   understood you to say you were, generally speaking, satisfied

25   with the analysis.  '

68b

1    A   I am, yes.

2    MR. SACHSE: I have no further questions.

3    LT. MILLER:  At this point, your Honor, I will have to

4    move to strike the testimony concerning the experimental nut

5    grove or whatever it was.  Counsel hasn't seen fit to be more

6    specific, and the testimony didn't have the proper foundation as

7    to date and place.

8    THE MASTER:  Well, the place is specified, at least in

9    general, in that it was in the area which has been included in

10   Exhibit M-47 as irrigable land.  The date was not specified.

11   MR. SACHSE:  The date is, as I understand, since 1941.

12   The objection goes to weight and not admissibility.  If he wants

13   to pin him down, cross-examine.

14   THE MASTER:  The motion to strike will be denied.

15   LT. MILLER:  Thank you, your Honor.

16

17                    CROSS-EXAMINATION

18   BY LT. MILLER:

19   Q   Mr. Bleecker, referring to M-47 and the soil map in the

20   back, could you point out on here to the Court exactly what

21   area was involved in this experimental grove that you testified

22   concerning?

23   A   I believe I can.  It would be the general area to the

24   west of what we put down there as the windmill.  Is it number

25   2?  Is it windmill well or Whitner well?  I have forgot whether

1447

69b

1    we put it as number 2.  That exhibit is no longer here.

2          THE MASTER:  Pardon me.  The exhibit is on the Clerk's

3    desk, if you wish it.

4          THE WITNESS:  Thank you.  In a general area west of that

5    labeled "windmill well".

6          THE MASTER:  That is well number 3.

7          THE WITNESS:  Well number 3.  Now, that would be in the

8    alluvial area below the westward turning of the creek, as a

9    good location, generally southward from that.

10   BY LT. MILLER:

11         Q  Now, let me stop you right there.

12         A  Sure.

13         Q  And see if we could pin it down as to a particular

14   legal subdivision.

15         A  Yes.

16         Q  Now, this is 40 acres in the south--

17         A  It would be--

18         Q  --west quarter, right here.  I am pointing to the north-

19   east quarter of the southwest quarter.

20         A  No.

21         Q  Right here?

22         A  No, not there.  It would be--

23         Q  Just a second, Mr. Bleecker, let me try and pinpoint

24   this.  It is not in the northeast quarter of the southwest

25   quarter of Section 29.  Just a second.  Let me see if I can pin

70b

1  it down up here.  I direct your attention to M-32, and could

2  you state if it is in the quarter that would be described as the

3  northwest quarter of the southeast quarter--this being the south-

4  east quarter, and this is the northwest quarter?

5       A   I can't follow on this map very well.  If we had either

6  a good plain map, I could find it very easily.

7       Q   You can look at M-68.  This would be the quarter I am

8  referring to right here.

9       A   Now is this a creek or a road?

10      Q   That is a road.  That is a creek.

11      A   Very well.  It will be in this alluvial matter here.

12  I should say the eastern half of this 30 in the circle.  It

13  would be about in the middle of it.

14      LT. MILLER:  Now, your Honor, would you have any objection

15  to marking on M-68 the exact location?  We have it pinned down

16  there.  Or would you prefer not to have that map marked?

17      THE MASTER:  No, I think it is proper, as long as all the

18  markings stay within  Mr. Bleecker's own property.

19      LT. MILLER:  Yes, sir.

20      Q   Would you mark with a red X on Parcel 30 the general

21  locality of this grove you have been testifying about?

22      THE MASTER:  That has been marked on Exhibit M-68.

23  BY LT. MILLER:

24      Q   And would you go ahead and resume your seat, Mr.

25  Bleecker.  Now, exactly what year or years did this experiment

1249

71b

1  go on?  Take them one at a time, if there was more than one.

2  What was the first year?

3      A  Well, I should say--I don't have my invoice here, the

4  dated invoice from Armstrong Nursery, for example, but from

5  about forty--let's say December of '42, on through for the next

6  five years.  There is some, by the way, of this orchard still

7  existing.  It would be easy to determine this point of location.

8      Q  So approximately a five year period that this orchard

9  was in existence?

10     A  Um-hmm.

11     Q  Now, during that period, if I understand your testimony,

12  you observed that the fixed sprinklers that were used in connec-

13  with the irrigation could be allowed to run all day--

14     A  Um-hmm.

15     Q  --and still you would have no water standing?

16     A  At all, that is right.

17     Q  On the surface?

18     A  Um-hmm.

19     Q  Mr. Bleecker, do you have these well measurements

20  similar to these that have been made on Defendant's Exhibit

21  MD-F for any other years, the levels from the surface to the

22  water?

23     A  This is going to require--if I may answer it in this

24  way--a little study.  I have here a  set of field notes.  If

25  this offered a little trouble to interpret, this might offer

72b

1   more.  The answer would be "Yes".  This was done over other

2   years.

3          LT. MILLER:  Thank you.  No further questions, your Honor.

4          MR. SACHSE:  I have no further questions.

5          THE MASTER:  Any questions by Mr. Dennis?

6          MR. DENNIS:  No questions.

7          THE MASTER:  Mr. Moskovitz?

8          MR. MOSKOVITZ:  No questions.

9          THE MASTER:  Then, Mr. Bleecker, you are excused.  We

10  will take our noon recess  then at this time.

11          (Thereupon at 12 o'clock a noon recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12511

Z-1

<u>Fallbrook, California, June 23, 1958. 1:30 P.M.</u>

THE CLERK:  Court is now in session.

THE MASTER:  Lt. Miller, then you have no further testimony to present at this time?

LT. MILLER:  I have some evidence with reference to Mr. Bleecker's property, if Mr. Sachse has concluded.

MR. SACHSE:  I am through with Mr. Bleecker.

THE MASTER:  Very well.

LT. MILLER:  I would like to call Lt. Col. Bowen to the stand.


ALLEN C. BOWEN,

recalled as a witness herein, having been previously sworn, testified as follows:


REDIRECT EXAMINATION

BY LT. MILLER:

Q  You are the same Lt. Col. Allen C. Bowen who has testified and been sworn heretofore?

A  I am.

Q  Colonel, directing your attention to Plaintiff's Exhibit M-68 and to Parcel 30, delineated thereon, can you locate thereon a red X which has previously been placed by Mr. Bleecker in his testimony?

Z-2

1     A   I note that on Plaintiff's Exhibit M-68 within the

2   line delineating De Luz watershed Parcel No. 30 there is a red

3   cross which is immediately to the right of the numeral 30

4   encircled.

5     Q   Would you resume your chair?   Would you see if you can

6   locate on M-47, the aerial photograph, that same X, in general

7   locale?

8     A   Yes.   Referring to Plaintiff's Exhibit M-47, the

9   approximate location of the site marked with a red X by Mr.

10   Bleecker on Plaintiff's Exhibit M-68 would appear in the lower

11   center portion of the soil survey of the property shown in

12   Plaintiff's Exhibit M-47, adjacent to the unnamed creek here-

13   tofore mentioned, and located within the area of older alluvium,

14   as shown on the geology overlay contained in Plaintiff's Ex-

15   hibit M-47.

16     Q   You were here when Mr. Bleecker testified to the fact

17   that sometime during the period 1942 to 1947 he had operated an

18   experimental orchard in that area, were you not?

19     A   Yes, sir.

20     Q   And you will recall that in substance he stated that

21   they had operated a fixed sprinkler and operated it for a full

22   day, with the observation that there was no surface water left

23   standing at completion of the day?

24     A   Yes, sir.

25     Q   What, in  your opinion, is the significance of this

Z-3

1  observation?

2      A  Well, the significance of the operation that a sprinkler

3  could be run all day on this older alluvium without any surface

4  runoff is that the alluvium is much deeper than the adjacent

5  soils on the hill lands.  It is comparatively pervious to depths

6  of 35 to 40 feet, as we put it in the geology section of

7  Plaintiff's Exhibit M-47, page 2.  And would indicate a sub-

8  stantial seepage loss from the upper portion of the soil into

9  the underlying alluvial fill.

10      Q  Would it in your opinion indicate any error in the

11  report, Plaintiff's Exhibit M-47, showing the irrigation

12  requirement for that area?

13      A  No, sir.  It would indicate no error in the report,

14  but would point out the need for careful irrigation on that

15  particular soil site.  I did mention this morning as illustra-

16  tion to Mr. Sachse that soil sites in the Imperial Valley,

17  the same climatic conditions, but differing in depth and tex-

18  ture, permeability of soil and subsoil, might account for say

19  double the use of water on the more permeable site in relation

20  to the production of alfalfa.  However, that doesn't indicate

21  that double the use is a reasonable use.  It does indicate that

22  a revision of irrigation practices might be necessary.  For

23  example, these two sites I mentioned in Imperial Valley, one

24  on the valley floor, one on the east mesa, were irrigated in

25  the same fashion, namely, the construction of borders and the

Z-4

1  leveling or grading of the land uniformly between the borders,

2  and the flooding of those lands by gravity from a head ditch.

3      In order to reach the bottom of the border on the most

4  pervious soils, it was necessary to, in effect, over-irrigate

5  the upper portion.  Which indicated that either shorter lengths

6  of run should be constructed, or that a change of irrigation

7  system to a sprinkler type system is indicated.

8      With sprinklers it is possible to regulate the applica-

9  tion of moisture to certain required depths for the crop grown,

10 as it is known for any specific crop what the root depth is.

11 And on permeable soils overlying alluvium which is rather porous,

12 there are many reasons why water should be applied only to

13 the depth of the root zone.  If it is applied so it is lost into

14 the underlying alluvium, it not only wastes water, but it

15 leaches out the plant nutrients which would be available for

16 the production of the crop.  Of course, in an instance like

17 this that water returned to the alluvial fill may be recirculated.

18 It can be picked up by lower pumps and reapplied to the land.

19 But not all of the water in excess of the requirements indi-

20 cated in the report shown  as Plaintiff's Exhibit M-47 would

21 be utilized by the plant.  Some would be return flow to the

22 alluvial basin.

23      LT. MILLER:  We have no further questions of the witness

24 at this time, your Honor, but we would like to reserve the

25 opportunity to recall Lt. Col. Bowen after we have had an

14955

Z-5

1   opportunity to study Defendant's Exhibit MD-F concerning the

2   well measurements, if we deem it advisable.

3        MR. SACHSE:  No objection.

4        THE MASTER:  If there is no objection, that leave will be

5   granted to recall Col. Bowen at that time, if you desire.

6        LT. MILLER:  Yes, sir.

7        THE MASTER:  Unless you recall him, though, the evidence

8   in so far as Mr. Bleecker will be terminated with what evidence

9   you have already introduced, then.

10       LT. MILLER:  Well, there is one other reservation I would

11  like to make, your Honor.  Our title records indicate that the

12  Parcel 30 is not the smallest contiguous parcel on each of these

13  streams, that initially when the patents were issued covering

14  this area there were several different patents.  And we would

15  like also to reserve permission to introduce certified copies

16  of those patents.

17       MR. SACHSE:  I think that is understood.  That is proper

18  rebuttal.  And my understanding with Mr. Veeder at all times

19  was that the agreement as to riparian status left it entirely

20  up to the United States to rebut if the title search indicated.

21  Although they have agreed that the block as it appears on the

22  map would appear to be riparian, they have sole latitude to

23  rebut it if the title search so discloses.

24       THE MASTER:  Yes.  However, unless such rebuttal evidence

25  is offered the Court would be justified in finding the entire

Z-6

1   area is riparian, in the absence of additional evidence here-

2   after to be offered.

3       LT. MILLER:  Yes, sir.

4       MR. SACHSE: Colonel, I have just one question on this

5   examination.

6

7                       RECROSS-EXAMINATION

8   BY MR. SACHSE:

9       Q  Based on the answers you have just given to Lt. Miller,

10  do you wish to change your testimony to me this morning in any

11  respect when you stated that, generally speaking, highly

12  permeable soils with permeable subsoils took more water to raise

13  any crop than less permeable soils with tighter subsoils?

14      A  No, sir.

15      MR. SACHSE:  That is all.

16      LT. MILLER:  Nothing further.

17      MR. SACHSE:  I would like to keep Col. Bowen on the stand

18  now, if we can, for the Le Vack parcel.

19      THE MASTER:  Very well.

20

21                      CROSS-EXAMINATION

22  BY MR. SACHSE:

23      Q  Col. Bowen, I will call your attention to M-80.

24      MR. SACHSE:  Maybe I have got it here.  Wait a minute.

25      MR. DENNIS:  Is that a defendant that you represent,

Z-7

1  Mr. Sachse?

2  BY MR. SACHSE:

3      Q  Col. Bowen, would you first indicate to the Court on

4  M-68 with a pencil or a pointer the location of Parcel M-80?

5      A  Referring to Plaintiff's Exhibit M-68--

6      Q  M-68, yes.

7      A  --the parcel reported in and shown as Plaintiff's

8  Exhibit M-80 comprises Parcels No. 28 and 29.  No. 29 is

9  traversed by the De Luz-Murrieta Road, and by the intermittent

10  stream known as the East Fork of De Luz Creek.  It traverses

11  Parcel No. 29 diagonally through the upper portion, cuts across

12  a corner of Parcel 26, and re-enters Parcel 29 and leaves

13  Parcel 29 at the westerly boundary.  The stream does not traverse

14  the small portion shown as Parcel No. 28.  By the "stream", I

15  mean the East Fork of De Luz Creek does not traverse Parcel No.

16  28.

17      MR. SACHSE:  Now you can be seated, Col. Bowen.  Lt.

18  Miller, in this same connection our records indicate that the

19  small Parcel 28 is a separate acquisition, and should not be

20  regarded as riparian, and we will at this time offer to so

21  stipulate.  However, I assume the same stipulation applies as

22  to the larger parcel.  If you have any rebutting testimony you

23  will offer it, but in the meantime it would appear the entire

24  parcel is riparian.

25      LT. MILLER: Except for Parcel 28, yes, sir.

Z-8

1    MR. SACHSE:  28 we agree is not riparian.  You won't have

2    to offer any evidence.  We will concede it is not riparian.

3    THE MASTER:  Then it is stipulated that Parcel 28 is not

4    riparian, but the whole of Parcel 29 is riparian, subject to

5    his right to offer any evidence at a later date.

6    MR. SACHSE:  In rebuttal.

7    THE MASTER:  In rebuttal.

8    MR. SACHSE:  Will you mark this as MD-G and MD-H?

9    I will offer Exhibit MD-G for identification, the same

10   being the deed to the parcel indicated as 29; and MD-H, the same

XI   11   being the parcel indicated on Exhibit M-68 as Parcel 28.

12   THE MASTER: Each is a photostatic copy.

13   MR. SACHSE:  Each is a photostatic copy of the deed.

14   THE MASTER:  Is there any objection?

15   LT. MILLER:  May I examine it, your Honor?  Just to com-

16   pare it, and then I can state.

17   No objection to MD-H.  No objection to MD-G.

XE   18   THE MASTER:  And each of them will be received in evidence

19   and they will be marked respectively Defendant's Exhibits MD-G

20   and MD-H.

21   BY MR. SACHSE:

22   Q  Col. Bowen, are you personally familiar with this

23   property?

24   A  Yes, sir.

25   Q  Have you been on it on more than one occasion?

1459

Z-9

1    A   Yes, sir.   I have traversed that Murrieta-De Luz

2    Road many times.

3    Q   Then let me discuss some of the things on the photo-

4    graph.   The white line that traverses the photograph generally

5    from the southwest to the northeast is the Murrieta-De Luz Road;

6    is that correct?

7    A   Yes, sir.

8    Q   And the stream is found in the area immediately south

9    of that, in the area indicated in purple on the map; is that

10   right?

11   A   That is correct, sir.

12   Q   Can you locate the Le Vack residence, approximately?

13   A   I am not absolutely certain whether there is only one

14   group of buildings on the property or not.   But the one I

15   believe to be the residence would be located south of the

16   Murrieta-De Luz Road.

17   Q   I think that is the barn. The residence is to the

18   north of that.

19   A   The residence is across the road to the north.   The

20   barn is to the south of the road.   It is within the area shown

21   in the southerly projecting 40, and in an area of Class II land--

22   the area referred to as the yellow and pink area in the westerly

23   portion of the property.

24   Q   Col. Bowen, how long ago were you familiar with this

25   property?

Z-10

1    A  Well, the last time I--

2    Q  Now, not how recently, but how long ago?

3    A  I would say early 1952 was the first time I saw the

4    area.

5    Q  Was the area in and around the house still in walnuts,

6    or had they been removed?

7    A  I don't remember.  I remember walnuts across the creek,

8    partly on this property and partly on the Kuhnis property.  But

9    I don't recall whether there were walnuts around the buildings

10   or not at that time.

11   Q  Now you do not have a geological overlay on this map.

12   But can you tell us in general by reference to field numbers

13   or any other identification the general location of the alluvial

14   deposits, if any?

15   A  Yes, sir.  By referring to the-- it would be easier

16   to refer to the soil survey, the colored map included in the

17   report, shown as Plaintiff's Exhibit M-80.  The area of

18   alluvial fill is along the stream, and includes the Class VIII

19   lands, colored in purple, and the Class III and Class II lands

20   adjoining the coarse recent alluvium in the stream channel.

21   Q  Those are the pink and the yellow?

22   A  Yes, sir.

23   Q  Are you familiar with the water supply on this property?

24   A  As is shown in the report, Plaintiff's Exhibit M-80,

25   on page No. 3, under paragraph heading "Engineering", it states

Z-11

1  that domestic and stock water is supplied to this property by

2  a 32-foot-deep, 6-foot-square well in the Northwest Quarter of

3  the Southwest Quarter of Section 28, adjacent to the De Luz-

4  Murrieta Road.  It goes on to state the water level and the

5  date of investigation on June 3, '58.  The water level was 19

6  feet below the surface of the ground.  It states that water is

7  pumped through a pressure tank, with a capacity of approximately

8  250 gallons, and then distributed upon demand.

9      Q  You have been on this property personally, you said.

10      A  Yes, sir.

11      Q  In your examination of the property, have you ever

12  encountered an old mine shaft that is pretty full of water?

13      A  No, sir, I have not.

14      Q  Did you discuss the past history of this property with

15  Mr. and Mrs. Le Vack?

16      A  I did not.  But I presume that some member of my office

17  did.

18      Q  You don't know?

19      A  I don't know, no, sir.

20      Q  And this is the first report-- this M--  What is the

21  number, please?

22      THE MASTER:  M-80.

23  BY MR. SACHSE:

24      Q  M-80 is the first report on this parcel you have

25  prepared; is that correct?

1462

Z-12

1    A   Yes, sir.  I don't recall any other.

2    Q   You didn't make one for a prior owner?

3    A   No, sir.

4    Q   Do you know whether or not there are any springs on

5 the property?

6    A   No, sir.  I know of no springs, of my own knowledge.

7    Q   Do you know whether or not there is any indication of

8 possible subsurface water coming to the top in any of the more

9 remote sections of the property?

10    A   No, sir.  I do not.

11    Q   Now, calling your attention again to the soil map in

12 M-80, at the extreme easterly portion of the property there

13 appears to be a watercourse shown on the aerial photograph, and

14 I see Class VIII soil running right up the property from north

15 to south.  Do you see the parcel?

16    A   Yes, sir.

17    Q   What kind of a stream is that?

18    A   To the best of my knowledge that is an intermittent

19 stream.

20    Q   In other words, to the best of your knowledge that would

21 flow only during and after rains?

22    A   Yes, sir.

23    Q   Now how would you classify the East Fork of De Luz

24 Creek?  I believe you testified to this already, but let's get

25 it again for this parcel.

Z-13

1 A I classed that an intermittent stream also.

2 Q Intermittent both as to time and place?

3 A Time and place, yes, sir.

4 Q Can you indicate on the map the location of the Le

5 Vack well?

6 A No, sir.  I don't have-- there is no symbol indicat-

7 ing the location of the well.  The well is located near the

8 house and buildings, but I don't know precisely where.

9 Q Now I want to call your attention to page 3 of your

10 report.  Just a minute.  I think I have got the wrong page.

11 Page 2.  Pardon me.  In the second paragraph at the top of the

12 page, discussing soil permeability, it reads:  "The permeability

13 of the topsoil varies from rapid to moderately rapid, the

14 permeability of the subsoil from moderately rapid to moderate."

15 A Yes, sir.

16 Q Do you recall-- and if you don't, please refresh your

17 recollection-- how does this permeability compare with the

18 permeability you discussed this morning on the Bleecker property?

19 A In referring to Plaintiff's Exhibit M-47, which is the

20 report of the Bleecker property, it states that the soil

21 permeability varies from moderately slow to moderately rapid,

22 and this one, which would indicate-- referring to Plaintiff's

23 Exhibit M-80-- where it states that the permeability is rapid

24 to moderately rapid, would indicate a greater permeability in

25 the portion of the soils within the area shown in Plaintiff's

Z-14

Exhibit M-80.

Q   So then, again referring to your testimony of this morning, the higher permeable soil would, generally speaking, for any crop, require a larger amount of water than the less permeable soil; is that correct?

A   Yes, sir.

Q   Now, Col. Bowen, I want to ask you a couple of questions again.   Look at the map, please, soil map.   About, in particular, avocado culture and citrus culture, as practiced in this area, you are generally familiar with it, are you not?

A   Yes, sir.

Q   I believe you testified earlier in this case that the best avocado soil might not necessarily be the best soil by ordinary soil classification standards.

A   Right.

Q   In that avocado soil could be thin, but it required sectional drainage.

A   That is correct, sir.

Q   Is it not characteristic that the better avocado soils are usually found on the slopes?

A   Yes, sir.

Q   And is it not also characteristic that many slopes, of a degree of steepness not heretofore considered suitable for crops, has been found eminently satisfactory for avocado crops?

A   In speaking of "heretofore", of course you fix the

1465

Z-15

1  time as the present.  I think the time should be moved back

2  several years.  There was a period in the development of this

3  country when these hill lands were considered relatively value-

4  less, because there had been no crop found which could be

5  produced on them.  And with the introduction of subtropical

6  fruits, principally avocados in this area, it was found that

7  lands heretofore deemed of little value suddenly became of

8  tremendous value, because of their ability under prescribed

9  management practices to produce a valuable crop of avocados and

10  other subtropical fruits.

11      Q  Have you noticed, for instance, in this very Fallbrook

12  area, slopes in excess of 33-1/3% planted to avocados?

13      A  Yes, sir.  I have noticed some slopes I would say in

14  excess of 33-1/3% planted to avocados.

15      Q  Just speaking specifically, have you ever driven out

16  Reche Road to its intersection with 395?

17      A  Yes, sir.

18      Q  And have you observed the avocado plantings on both

19  the right and the left side where Reche Road intersects 395?

20      A  Yes, sir.

21      Q  That slope I think is considerably over 33-1/3.

22      A  Yes, sir.

23      Q  Do you think that your personnel gave that factor

24  adequate consideration in evaluating most of your Class VII

25  lands, which I notice they show excellent soil depth, but

Z-16

1  usually pretty steep slopes?

2      A  Well, the symbols on the soil survey included with

3  Plaintiff's Exhibit M-80 within those areas designated as

4  Class VII lands indicate shallow soil, with rock outcrops and

5  stony condition.  And the shallowness of the soil, the prevalence

6  of stone and rock outcrop, in addition to the steepness of the

7  slope, would rule out avocado culture.

8      Q  In other words, the factors that you feel in this case

9  eliminate avocado culture from the Class VII soil are not the

10  steepness of the slope, necessarily, but the other factors,

11  your shallowness of soil, rock outcrops and so on.

12      A  Yes, sir.

13      Q  Now do I understand that your insert or rider is to be

14  attached also to the engineering report on this property?

15      A  Yes, sir.

16      MR. SACHSE:  I have no further questions.

17      THE MASTER:  Any cross-examination, Lt. Miller?

18      MR. DENNIS:  I have one question.

19      THE MASTER:  Just a minute.  I was going to ask if Lt.

20  Miller had any questions.

21      LT. MILLER:  I have no questions, your Honor.

22      THE MASTER:  Mr. Dennis.

23

24

25

Z-17

1                          CROSS-EXAMINATION

2    BY MR. DENNIS:

3        Q   Col. Bowen, does the portion of the aerial photograph

4    which is attached to that engineering report constitute a

5    portion of one of those aerial photographs that were introduced

6    as the M-66 series, as part of the M-66 series, or is that an

7    aerial photograph that was flown at a different time?  Do you

8    know?

9        A   This portion of an aerial photograph which is included

10   with Plaintiff's Exhibit M-80, and used as the basis for soil

11   survey, is part of that same flight which was taken in 1955,

12   and was taken at approximately the same time as those photo-

13   graphs introduced in evidence as Plaintiff's Exhibits M-66

14   series.

15       Q   And would it be a portion of one of the photographs

16   actually introduced in evidence as part of the M-66 series?

17       A   No, sir.  It wouldn't be a portion of one of those

18   photographs.  It would appear on another photograph, which is

19   not in evidence.

20       Q   Flown at a different time?

21       A   Flown at the same time.  We flew the entire area--

22       Q   The same day?

23       A   --over the period of several weeks it took to complete

24   the area.

25       Q   It would be taken sometime during March or April, then,

Z-18

1    of '55?

2         A   Yes, sir, '55.

3         MR. DENNIS:   That is all.

4         MR. SACHSE:   I have nothing further.

5         THE MASTER:   Then you may step down, Col. Bowen.

6         MR. SACHSE:   I will call Mr. Le Vack.  Be sworn, please.

7

8                        MART J. LE VACK,

9    one of the defendants herein, called as a witness in his own

10   behalf, sworn, testified as follows:

11

12                      DIRECT EXAMINATION

13   BY MR. SACHSE:

14        Q   Will you state your full name, Mr. Le Vack?

15        A   Mart J. Le Vack.

16        Q   Will you speak up so that counsel and everybody can

17   hear you, please?  Where do you live?

18        A   De Luz.

19        Q   When did you acquire the property that is indicated on

20   Plaintiff's M-68 as Parcels 28 and 29?

21        A   Well, the Parcel 28 was obtained some months prior to

22   the other larger parcel, which we obtained in January last year,

23   I believe.

24        Q   And have you made your home on that land since you

25   bought it?

Z-19

1    A  Yes.

2    Q  Now you do not stay there full time, do you, you

3 personally?

4    A  Well, I work in town, yes.

5    Q  And does the rest of your family stay there full time?

6    A  Yes.

7    Q  How do you commute?

8    A  Fly.

9    Q  Where do you land your airplane?

10    A  Fullerton.

11    THE MASTER:  You say you work in town.  What town do you

12 mean?

13    THE WITNESS:  Fullerton.

14 BY MR. SACHSE:

15    Q  And where do you land here?

16    A  On my property.

17    Q  Can you take Exhibit 80 and show his Honor approx-

18 imately what you use as your landing area?

19    THE MASTER:  Can you speak louder so the reporter can hear

20 you?

21    THE WITNESS:  Right here is the creek.  Coming in from the

22 east, parallel with the creek, from-- oh, where does the road

23 cross here?  Anyway, I parallel the creek, and on here we are--

24 I am trying to find it.  Come right down here like this.

25

Z-20

BY MR. SACHSE:

Q   Then just draw a red line-- don't be afraid to mark it up-- where your general landing and parking area is.

A   I come in on this line right there, parallel to the creek.   I go right across here to the garage, which adjoins the house right in here.   It is a triangle.   I generally take off across here, and I come in this way.

THE MASTER:   That is, you land in a general direction from northeast to southwest--

THE WITNESS:   Yes, sir.

THE MASTER:   And you take off in a general direction towards the south, but a little towards the east.

THE WITNESS:   Yes, sir.

THE MASTER:   And both those operations take place in the field which is numbered 7, --

THE WITNESS:   Yes, sir.

THE MASTER:   --indicated in the yellow-green on the map.

BY MR. SACHSE:

Q   Now what did you have to do to Field No. 7 to make it suitable for landing your airplance?

A   Well, there was several depressions and a couple of higher spots which I had to bulldoze off.

Q   But, generally speaking, was it a reasonably level area?

A   Oh, yes.   Yes.

1471

Z-21

1    Q   Could you tell from your observation of it whether it

2   had formerly been cultivated?

3    A   Oh, indeed it had been.

4    Q   There was some walnut planting on the property which

5   you yourself partly removed; is that not true?

6    A   I removed hundreds of stumps.

7    Q   The trees had been cut down but the stumps left there?

8    A   Yes, sir.

9    Q   Where were they located?

10    A   They were all over that 7 area.

11    Q   Now, can you take-- I think this will work better,

12   please-- and indicate by a little X, just a small X where your

13   well is on the property?   Indicate it on the map in Exhibit

14   M-80.

15    A   Right under this tree here.

16    Q   Make a little X there.   Now--

17   THE MASTER:   That is just to the east of the area from

18   which you take off?

19   THE WITNESS:   Yes, sir.

20   BY MR. SACHSE:

21    Q   Now, Mr. Le Vack, is there an old mine shaft on your

22   property?

23    A   Yes, sir.

24    Q   Now can you take-- and this time instead of an X,

25   so we can keep them straight, mark a circle on it where this

Z-22

1 mine shaft is.

2      A   It is definitely marked here anyway, so that is easy.

3      THE MASTER:   You have indicated a dotted area.

4 BY MR. SACHSE:

5      Q   You have indicated a light area that is at the upper

6 end of Field 6, the north end of Field 6?

7      A   Yes, sir.

8      Q   Now describe that, please.

9      A   Well, there is a recangular shaft goes into the slope,

10 which starts, oh, I would guess maybe 10 feet above the bottom

11 of the depression in there.   It goes down about 30 degrees for

12 I would say 40 feet, then drops off at a 45-degree angle to

13 about 70 feet overall.

14      Q   70 feet into the hillside in total length?

15      A   Yes, sir.

16      Q   Have you observed that shaft recently?

17      A   Yes, sir.

18      Q   What is its condition as far as water is concerned

19 today?

20      A   Well, today or Sunday-- yesterday it was half full,

21 approximately.

22      Q   Now have you observed it on other occasions?

23      A   Yes, sir.

24      Q   Did you see it when you first acquired the property?

25      A   Approximately a year ago this month I was in there.

Z-23

1    Q  What was its condition a year ago this month?

2    A  Well, the bottom of the shaft was more or less --

3 oh, I would say more or less 10 foot square.  It had about

4 10, 12 feet of water in it, with timbers sticking up from the

5 bottom.  I don't know whether it was deeper than that or not.

6    Q  Now following the heavy rains in early April of this

7 year, was there any change in the water level in that shaft?

8    A  When we had those heavy rains, after it was all over

9 the shaft was completely filled.

10    Q  The shaft was full?

11    A  Yes.

12    Q  Did it actually spill?

13    A  Oh, yes, it run out.

14    Q  Now when you go into that shaft can you see any water

15 seeping out of the sides?  Can you tell where the water comes

16 from?

17    A  Oh, yes.  When we went in there last year the sides

18 were very wet and seeping.  I mean you could see it running.

19 Naturally we were looking.  Friends of mine, one was a

20 geologist, he was looking for minerals.  And I wanted an

21 assay on that, anyway.  So we were putting the light all over

22 the place.  There was water everywhere.  I mean all around.

23    Q  You say this is in a little canyon?

24    A  A draw, gully.

25    Q  A draw.  But it is above the bottom of the canyon;

Z-24

1  is that right?

2      A  Oh, yes, sir.

3      Q  Do you have any plans for the development of that water

4  source from the mine?

5      A  Well, I intend to close up that gully with a dam and

6  pump the water from the mine, put a pump in the mine itself.

7      Q  You have made no attempts to put laterals or run

8  additional shafts in the mine itself, have you?

9      A  Oh, no, sir.

10     Q  So you don't know whether or not it would be possible

11  to develop additional water than that that is now seeping out

12  of the rocks?

13     A  No, sir.  I have no idea.

14     Q  Now anywhere on your property have you found other

15  indications of water anywhere than the stream itself and the

16  mine?

17     A  Well, there is two places in particular.  In the

18  northwest corner there is a lot of this so-called watergrass.

19  From what I have been told by local people, this indicates

20  water.

21     Q  But have you ever--

22     LT. MILLER:  I move to strike that, your Honor.

23     THE MASTER:  All right.  The answer will be stricken.

24  BY MR. SACHSE:

25     Q  Have you ever run any test holes or made any digging

Z-25

1  or experimenting to see if there is water there?

2      A   Just post holes is all.

3      Q   Now with a post hole, what do you find?

4      A   Just damp.

5      Q   Is there any other place where you think that there

6  might be indications of water?

7      A   Well, there is several hundred feet south of the

8  creek, there is some more of this indication that there is

9  water there, but I haven't done anything with it.

10     Q   By saying "indications", can you tell the Court just

11 a little more what you mean, what you see physically with your

12 eyes that makes you think there might be water there?

13     A   Well, you can take your foot and scrape up the dirt,

14 and even in the driest times it is pretty damp.  You can take

15 a handful of it and squeeze it, it stays together.  You know

16 what I mean, it is not dry.

17     THE MASTER:  That is even in the middle of summer?

18     THE WITNESS:  Yes, sir, in June, July last year.  I was

19 very curious about it.

20 BY MR. SACHSE:

21     Q   Now will you indicate, please, on M-80, on the map

22 again-- you can use this pen again-- with an X where the first

23 of these damp places is you referred to, where you spoke of the

24 post hole?

25     A   Let me see, I have to locate myself here.  Right down

Z-26

1  here in this corner, in the northwest corner there is a de-

2  pression.  A gully goes down in there.  And it is apparently in

3  here.  Yes.

4      THE MASTER:  That is in the blue area?

5      THE WITNESS:  Well, it is right in this area anyway, this

6  corner.  There is a fence that comes down there, and that is

7  what I am judging by.  And I imagine it is this line.

8  BY MR. SACHSE:

9      Q  Here is the overlay.

10     A  I believe it is right in this area in here, I am quite

11  sure.

12     Q  If you will mark on Field 1C.

13     THE MASTER:  That is the field in the extreme northwest

14  corner of your property.

15  BY MR. SACHSE:

16     Q  Now, Mr. Le Vack, have you had an opportunity to ex-

17  amine M-80 yet?

18     A  Very briefly.

19     Q  Well, then, let me call your attention to page 2.  The

20  first tabulation on page 2 gives your total acreage, 152½ acres.

21  Do you have any disagreement?

22     A  Well, I thought it was 153, but--

23     Q  We can't quarrel about that.  Now the next tabulation

24  immediately below it on page 2 indicates in round figures 90

25  or 89 acres of your total found by Col. Bowen and his staff to

Z-27

1    be irrigable.  And if you will then look to the map, I believe

2    I am correct in stating that, generally speaking, it is every-

3    thing except the dark brown material.

4        MR. SACHSE:  Is that not correct, Col. Bowen?

5        COL. BOWEN:  Yes, sir.

6    BY MR. SACHSE:

7        Q  In other words, Col. Bowen has found all of the colors

8    except the brown to be irrigable.  Now can you tell us whether

9    you agree or disagree, and to what extent, with those findings?

10       A  I don't agree, because I have planned to utilize all

11   the land it is possible to use.

12       Q  Now tell us something of your plans for the future of

13   this property?

14       LT. MILLER:  Your Honor, I wonder if I might just inter-

15   rupt for a minute, because we did have a colloquy between Mr.

16   Sachse and Col. Bowen about whether or not it was only the

17   brown areas.

18       MR. SACHSE:  Or the purple also.

19       LT. MILLER:  And the purple.  We just wanted to correct

20   that.

21       MR. SACHSE:  The VIII is so bad nobody argues about that

22   one.

23       Q  All right, go ahead and tell us about your plans for

24   development.

25       A  Well, I intend to plant everything above frost line,

Z-28

1   with necessary clearance, to put in avocados.  Other than that,

2   I want to raise cattle, which means doing whatever it requires

3   to do to raise cattle.

4       Q  Do you intend to raise your own feed?

5       A  Yes, sir.

6       Q  So you then feel that the allocation of 89 acres

7   irrigable land is not in keeping with the facts?

8       A  No, I don't believe so.  I have been over every square

9   foot of that myself on foot.  And where my line actually comes,

10  the north line, it is rocky up on top of one slope there.  But

11  that happens to be right at my line.  I am not concerned about

12  it.

13      Q  Do you feel the bulk of the Class VII land-- that is,

14  the brown land-- could be terraced?

15      A  I am quite sure it could.

16      Q  Now I will call your attention to the intermittent

17  stream that you heard Col. Bowen discuss with me during my

18  examination.  And I am showing you to the easterly portion of

19  your land a purple strip running up through your property from

20  south to north, and then the stream continuing on in the pic-

21  ture.  Do you see what I am referring to?

22      A  Yes, sir.

23      Q  Can you describe that stream, or is it a stream?

24      A  Well, sir, that intermittent stream there at one time

25  was a good spring, until it was left go.  And then it petered

Z-29

1   out.   I mean I believe it could be cleaned up and reclaimed

2   again.   I don't know for sure.

3        Q   Now have you any plans for the development of that

4   canyon, or for water conservation in that canyon?

5        A   Not at the present time, no, sir.

6        MR. SACHSE:   Just a moment, your Honor. We are almost

7   done.

8        Q   The only well that is presently on the place is the

9   domestic well that is giving you your house water; is that right?

10        A   Yes, sir.

11        MR. SACHSE:   I have no further questions.

12        LT. MILLER:   Your Honor, for the record I would like to

13   point out that the mine shaft, which Mr. Le Vack marked on

14   Plaintiff's Exhibit M-80, really lies in the field marked 5.

15        MR. SACHSE:   Wait a minute. Wait a minute. Are you

16   testifying or are you going to put a witness on?

17        LT. MILLER:   No.   This is just to correct the record. The

18   exhibit shows that to be a fact.

19        MR. SACHSE:   Oh. Oh, I see.   You mean we read the wrong

20   field number?

21        LT. MILLER:   That is right, you read "8" and it is "5".

22        MR. SACHSE:   I was reading upside down, see.

23        THE MASTER:   Yes, the mark on the exhibit is in the field

24   marked "5".

25        MR. SACHSE:   I see, your Honor.

Z-30

1          THE MASTER:  Near the northerly extremity of the field

2    marked "8", I believe.  Is that correct?

3          MR. SACHSE:  Yes, that is correct.

4

5                    CROSS-EXAMINATION

6    BY LT. MILLER:

7          Q  Mr. Le Vack, if you would again examine Plaintiff's

8    Exhibit M-80, and the aerial photo, is there not also a symbol

9    showing a mine shaft in the Field 6?  And you can use the over-

10   lay.

11         A  Yes, sir.

12         Q  You have made no observations with respect to this

13   particular mine shaft?

14         A  Indeed I have.  I mean I have been in that.

15         Q  You know that it is there?

16         A  Yes, sir.

17         Q  Right.  Now you have testified that in your opinion

18   the land which is the dark brown, and shown as Classification

19   VII, could be irrigable; is that correct?

20         A  Yes, sir.

21         Q  Now your opinion is based not upon any soil tests.  Did

22   you take any soil samples and have a chemical analysis made,

23   or did you do it yourself?

24         A  No, sir.  But I rode a bulldozer up and down there

25   for three or four months, dozing.

Z-31

1    Q   But you did not make any chemical analysis of this

2    land?

3    A   I have not, no, sir.

4    Q   Now with respect to the mine shaft which you have

5    marked in Field 5, as I recall your testimony it was only on

6    two occasions that you observed the water level in that mine

7    shaft; is that correct?

8    A   No, sir.

9    Q   How frequently, starting with the first time, have you

10   actually observed the water level in that shaft?

11   A   Last year I started in June.  The first time I went

12   down was in June.

13   Q   Of 1957?

14   A   '57.  And I went down there, oh, possibly a dozen times

15   I would guess.  I am not sure.

16   Q   Between June of 1957 and this date?

17   A   And when the rains started last year.

18   Q   Now when you went down in June of 1957, that was the

19   first time you had been in the shaft?

20   A   Yes, sir.

21   Q   And what was your observation at that time as far as

22   the level of the water in the shaft?

23   A   Well, I said it was around 10, 12 feet of water.

24   Q   And how did you determine exactly the depth of the

25   water?

Z-32

1       A   I didn't determine it exactly.

2       Q   That is just an estimate--

3       A   Right.

4       Q   --based upon your observation.  You didn't throw a
5   plumb line down to get any measurement such as that?

6       A   I threw several rocks in and waited for them to hit
7   bottom.  You could see by the light.  You could watch them go
8   down.  I had two other persons with me.  And they agreed it was
9   about ten or twelve feet.

10      LT. MILLER:   I will have to move to strike the portion
11  about the people.

12      THE MASTER:   We will agree the portion about what the
13  other people agreed to will be stricken.

14  BY LT. MILLER:

15      Q   Now when is the next occasion that comes to your mind
16  when you were down at the mine?  Can you pin it down to an
17  exact date or month?  You say ten or twelve times between that
18  period and this time.  When would the next be?

19      A   That is right.  Well, I went down the following week,
20  and the following week I was down again.  And, frankly, I was
21  wondering if water snakes were in there at all.

22      Q   When you went down the following week, was the water
23  depth the same, in your opinion?

24      A   I could tell no difference, no.

25      Q   And the week after that, was it any different?

Z-33

8

1    A  Not that I could see for sure.

2    Q  And the week after that?

3    A  No.

4    Q  When was the next time that you noticed it to be a

5 different level?

6    A  Well, after the first heavy rains we had I went right

7 down-- I mean a few days afterwards-- and I didn't notice any

8 difference then.  I think it wasn't a month between the first

9 heavy rain and the second heavy rain.  And after the second one

10 I was curious, because I couldn't get through the canyon.  I

11 went back to look, and there was water up to-- oh, I couldn't

12 go down over 50 feet, I guess.  It was already coming up then.

13    Q  So, to the best of your knowledge, it remained in

14 pretty much a static condition during the summer months, and

15 even with the first rains.  And it wasn't until later in the

16 rainy season of this past year you noticed the water heavily

17 rising in the shaft?

18    MR. SACHSE:  Let the record indicate the witness is

19 saying "Yes".  He is nodding his head.

20    THE WITNESS:  Yes.

21    LT. MILLER:  No further questions, your Honor.

22    MR. SACHSE:  I have nothing.

23    MR. DENNIS:  I have one question.

24

25

Z-34

1                    CROSS-EXAMINATION

2   BY MR. DENNIS:

3        Q   Mr. Le Vack, how many intermittent streams other than

4   the East Fork of De Luz Creek traverse your property?  Is there

5   more than one intermittent stream?

6        A   Frankly, I don't know what an intermittent stream would

7   be, really.

8        MR. DENNIS:  Well, the reason I am asking this question,

9   your Honor, is that the Plaintiff's Exhibits M-68 and M-32 only

10  show one intermittent stream, other than the East Fork of De

11  Luz Creek, traversing Parcel 29.  But I notice M-80 shows two

12  intermittent streams that are not on the other two exhibits,

13  and do not show the intermittent stream which is on Plaintiff's

14  Exhibit M-32 and Plaintiff's Exhibit M-68.  So I am a little

15  confused.

16       MR. SACHSE: So am I.

17       THE MASTER:  What was the question you asked, then?

18       MR. DENNIS:  I asked how many intermittent streams there

19  were that traversed his property, other than the East Fork of

20  De Luz Creek.  I think maybe we ought to clarify the point and

21  find out which map or which exhibit is controling or correct.

22  BY THE MASTER:

23       Q   Mr. Le Vack, can you throw any light upon that point?

24  If you can't, why we will ask some other witness.

25       MR. SACHSE:  I would like to call later on on this same

Z-35

1    question-- I think Mr. Dennis has got a good point.  I didn't

2    realize it. I would like to recall Col. Bowen on it, if I may.

3        THE MASTER:  That will be after we finish with Mr. Le

4    Vack.

5        Q  Is there any light you can shed on this matter, Mr.

6    Le Vack?

7        A  After the heavy rains, naturally there is water running

8    down a number of gullies.  Obviously you could see them from

9    the air or from one of the other hills.  But I don't know

10   whether this is an intermittent stream or not.  I don't know.

11   BY MR. DENNIS:

12       Q  Actually what you are referring to is-- or stating is

13   after a heavy rain the water that falls on the surface does for

14   a short length of time run down the thread of the gully?

15       A  True.

16       Q  And there is a great number of those gullies probably

17   on your property and on other property within the area?

18       A  There are a number of them.  Yes, sir.

19   BY THE MASTER:

20       Q  Now, Mr. Le Vack, you did state that this intermittent

21   stream, or at least one of them, as shown on Exhibit A, was

22   actually the water flowing from a spring; is that correct?

23       A At one time this was a good spring in there, I believe.

24   It is this particular one here.

25       Q  Now you have indicated on Exhibit M-80 the stream which

Z-36

1    is the most westerly of the two streams indicated at the ex-

2    treme easterly portion of your property; is that correct?

3        A   Yes, sir.  That is an old homestead right in here.

4    I believe it is right in this area right in here.

5        Q   That is right on the boundary between Parcel 28 and

6    29?

7        A   Approximately, yes.

8        Q   Yes.

9        A   And right in back of this old homestead they had at one

10   time a nice spring.  It wasn't intermittent.  It run all the

11   time.

12       Q   But that spring does not flow at the present time; is

13   that correct?

14       A   No, sir.  I looked.

15       Q   Now you also stated that you planned to terrace all

16   your land above the frost line for avocados.  Do you know how

17   much of your land is above the frost line and how much is below

18   the frost line?

19       A   Not in acreage, no, sir.

20       Q   Do you know approximately the percentage, half of it

21   or a third of it?

22       A   Well, I would say a good fourth, perhaps.

23       Q   Of the Class VII land, that is, is above the frost line?

24       A   Yes.

25       Q   The balance would be below it?

Z-37

1    A  Yes, sir.

2    Q  Now then, you intended to raise cattle on the balance

3  of the Class VII land; is that correct?

4    A  I intend to raise cattle.  That will be the major part

5  of my production on the place.

6    THE MASTER:  That is all the questions I have.

7    LT. MILLER:  I have one, your Honor.

8

9                  FURTHER CROSS-EXAMINATION

10  BY LT. MILLER:

11    Q  Mr. Le Vack, with respect to this old spring that you

12  have referred to, have you ever seen that yourself, or is that

13  just based upon--

14    A  I have seen the location, the pipe going to it and

15  back to the house.

16    Q  You do not know of your own knowledge whether or not

17  a spring ever existed at that spot?

18    A  I never saw the water running, no, sir.

19    LT. MILLER:  Nothing further, your Honor.

20    MR. SACHSE:  I have nothing further.

21    MR. DENNIS:  No questions.

22    THE MASTER:  You may be excused.  Now I understand you

23  wish to recall Col. Bowen.

24    MR. SACHSE:  I would like to recall Col. Bowen for a few

25  minutes.

Z-38

                            ALLEN C. BOWEN,

recalled for further cross-examination, having been previously

sworn, testified as follows:


                       CROSS-EXAMINATION

BY MR. SACHSE:

     Q   Col. Bowen, I want to again direct your attention to

the aerial photograph and soil map in connection with M-80.

     A   Yes, sir.  I have it before me.

     Q   Is that photo retouched?

     A   What do you mean by retouched, Mr. Sachse?

     Q   Very specifically, the two intermittent streams we were

discussing, they intersect the farthest east portion of the Le

Vack property.  They appear to me to have been darkened up with

a brush or something.  And the largest intermittent stream, the

one that is shown on Exhibit M-68, it runs roughly through the

middle of the Le Vack property from north to south, it hasn't

been touched at all.  So I want to clarify what has happened.

     A   Referring to Plaintiff's Exhibit M-80, the large stream

referred to by Mr. Sachse is the East Fork of De Luz Creek, and

is so labeled, and with an intermittent stream symbol is shown

through the Class VIII or purple areas on the map.  The streams

Mr. Sachse was referring to are the two north and south streams.

     Q   The two north and south streams do not appear on the

U. S. Geological Survey map, whereas the central intermittent

Z-39

1 stream does appear on M-68. Can you account for that?

2       A  Yes, sir.  Your Honor, referring to Plaintiff's Exhibit

3 M-68, it will be noted that every place where the contour lines

4 form a V pointing upstream marks the bed of a -- a stream bed

5 or gully.  For example, you take on Plaintiff's Exhibit M-68

6 where the number 28 encircled appears above Parcel No. 28 in

7 Section 28, Township 8 South, 4 West, there appears a series

8 of V's.  And by connecting the apex of those V's we would draw

9 out a watercourse, which could be just as easily depicted as the

10 one which has been shown by the intermittent stream symbol on

11 Plaintiff's Exhibit M-68, but lying westerly of the one here-

12 tofore described, and arising on Hill No. 1144.

13       It is impossible to show all of the drainage in a highly

14 dissected area like this.  The contour map speaks for itself.

15 The aerial photo speaks for itself.  The map is not retouched,

16 as I understand the meaning of the word "retouched."  By that

17 I mean the aerial photograph contained within Plaintiff's

18 Exhibit M-80.  But boundaries delineating soil sites, soil

19 symbols, some of the intermittent stream symbols, land classi-

20 fication symbols are shown thereon.

21       Q Col. Bowen, very specifically--

22       A And we show again, Mr. Sachse-- the picture will speak

23 for itself.  Being an old airman intelligence officer, as you

24 are, I know that you can pick out the stream channels, as you

25 have done.  There is actually no purpose in showing a symbol

Z-40

1    for one stream course and not showing one for another, except

2    to put enough in there to give the general pattern of the drain-

3    age.

4         Q   All I am trying to find out, Colonel, is whether the

5    two streams that show in the aerial photograph on M-80 running

6    from north to south at the extreme east of the Le Vack property,

7    whether that has been brushed in or touched in.  I think it has.

8         A   That was inked in, yes, sir.

9         Q   Inked in?

10        A   On the picture before the copy was made.

11        Q   Now then, let's move over then to the west.  And thank

12   you for flattering me about being able to read an aerial.  But

13   roughly in the middle of the picture you will see a definite

14   stream channel running from north to south, comes down through

15   Field 6, and then winds down through the pink Field 16.

16        A   Yes, sir.

17        Q   Now look at the U. S. G. S. Map 68, please, and tell

18   me if you don't think that is the stream channel that is

19   delineated on M-68 as the intermittent stream.

20        A   Yes, sir, that is the same one.  The fact it was not

21   inked in on the map contained in M-80, of course, doesn't

22   indicate we don't recognize its presence.

23        Q   That was the next question I was going to ask you.  In

24   other words, the inking in now of the two streams on the east,

25   and the failure to ink the stream to the center, have no

Z-41

1  significance as to the type of runoff that occurs in them, do

2  they?

3      A  No, sir, nothing whatsoever.

4      Q  And you would class all of those three streams equally

5  as intermittent; is that correct?

6      A  Those and the others which may either be indicated

7  by a symbol or not indicated by a symbol.  For example, the

8  little draw which was identified by Mr. Le Vack in relation to

9  the water-filled mine also could have an intermittent stream

10 symbol and be equally correct, but it would clutter up the

11 picture.  There is actually no significance between the presence

12 or absence of those symbols indicating intermittent streams.

13     MR. SACHSE:  Now I had one other question, your Honor, and

14 I realize this is improper redirect, but I am going to ask Col.

15 Bowen to indulge me.  I couldn't do it on cross, because Col.

16 Bowen wouldn't have known what I was talking about.

17

18                    RECROSS-EXAMINATION

19 BY MR. SACHSE:

20     Q  Now, Col. Bowen, you have heard testimony regarding

21 this mine shaft.

22     A  Yes, sir.

23     Q  And you have located it on the map.  And while you do

24 not have a geological overlay sheet here, will you look it over

25 and tell me what your conclusion would be as to where that

Z-42

1   water in that main shaft is coming from?

2       A   My conclusion would be that it is coming from the

3   alluvial fill adjacent to the East Fork of De Luz Creek.

4       Q   Now, just so I can follow you, the alluvial fill is

5   found in Field 7 shown in yellow, and Field 8, shown in pink;

6   is that correct?

7       A   Yes, sir.

8       Q   And the mine shaft is above the alluvial fill?

9       A   Yes, sir.  But I understood from Mr. Le Vack's testi-

10  mony that it is a deep shaft.

11      Q   You have not observed it and you are assuming now,

12  but based upon your observation of the map.

13      A   That is right.

14      MR. SACHSE:   I have no further questions.

15      MR. DENNIS:   I might as well pursue this question of these

16  intermittent streams just a little further.

17

18                    RECROSS-EXAMINATION

19  BY MR. DENNIS:

20      Q   Colonel, did I understand your testimony prior to today

21  that in the preparation of Plaintiff's Exhibits M-32 and M-68,

22  primarily M-32, the intermittent streams that are shown on M-32

23  were taken from M-68?

24      A   M-68  and adjoining U. S. Geological Survey quadrangle

25  7½-minute series.

Z-43

1    Q   And do you have in your office the folder describing

2 the topographic map and the symbols which are referred to on the

3 bottom of each topographic sheet?

4    A   I don't understand your question, Mr. Dennis.

5    Q   Well, the U. S. Geological Survey prepares a folder

6 which prescribes all of the symbols which they use on their

7 topographic maps.  Do you have a copy of that folder?

8    A   Well, I am not certain whether I have one in my office

9 or not, Mr. Dennis.

10    Q   If you do have, will you look it up and bring it in?

11    A   I have a number of publications which have many

12 topographic symbols.  I am not absolutely certain whether I have

13 that one to which they allude or not.

14    Q  Well, you will inspect your records and see if you have

15 the folder that is alluded to on the topographic maps, and

16 particularly M-68, and bring it in to the Master?

17    A   Yes.

18    Q   If you have it.

19    A   I have others which are equally reliable publications.

20    Q   Now, did I understand you correctly to say in drawing

21 these other two intermittent streams that traverse Parcel 29

22 you did so purely from an inspection of the contours contained

23 on the appropriate topographic map that shows that particular

24 area?

25    A   Are you referring to Plaintiff's Exhibit M-80?

Z-44

1    Q   M-80

2    A   Any stream symbols that are drawn on here are drawn

3    on by inspection of the ground and an examination of the photo-

4    graph.  As I say, the photograph speaks for itself.

5    Q   Now you say from an inspection of the photograph and

6    from an inspection made of the ground itself.  You didn't take

7    into consideration the topographic map at the time that you drew

8    them on the photograph?

9    A   No, sir.  This picture contains all of the information.

10   And the topographic map could not hope to duplicate the wealth

11   of material on the picture available for information.

12   Q   What time of the year did you inspect the ground that

13   is shown on M-80?

14   A   I think it was just a few days ago we were out there,

15   We started this survey in February and completed this month,

16   June, 1958.

17   Q   Was there any water flowing down the canyon at the

18   time you made your inspections this year?

19   A   Yes, there was in February.

20   Q   In February?

21   A   February of '58 there was water flowing down the

22   creek.

23   Q   Both of those intermittent streams shown on M-80?

24   A   No, sir.  I couldn't say that water was in both of

25   them.  They flow during and immediately after periods of high

Z-45

1    precipitation and runoff, and there was a lot of water in every

2    one of those little watercourses up there during the periods

3    of this past spring, winter.

4        Q   Now you say you made an inspection in February.   How

5    many inspections in February?

6        A   One.

7        Q   One.   So that you were only on the property one day

8    in February?

9        A   Yes, sir.

10       Q   And then you made your next inspection of the property

11   that is covered by M-80 when?

12       A   Well, I was last up there across that property in the

13   latter part of May, as I recall, about the 19th or 20th of May,

14   1958.

15       Q   Now are those the only two occasions on which you were

16   on the property?

17       A   No, sir.   As I testified in response to Mr. Sachse's

18   questions, I have traversed this road innumerable times.   This

19   is the De Luz-Murrieta Road, and I have been over it many, many

20   times.   It traverses the entire length of the property in an

21   easterly-westerly direction.

22       Q   And can you or can you not say definitely that there

23   was any water flowing in either of the two tributaries shown on

24   Plaintiff's M-80 at the time you inspected the property in

25   February?

Z-46

1      THE MASTER:   That is, you mean the two easterly tributaries?

2      THE WITNESS:   The two--

3   BY MR. DENNIS:

4      Q   The two easterly tributaries that were inked in on the

5   picture?

6      A   I cannot say, Mr. Dennis.   I did not examine those

7   tributaries.   They are very small.   Their watersheds are small.

8   I crossed them, but I have no recollection of whether there was

9   or was not water at the time.

10      Q   And your answer would be the same for May of 1958?

11      A   Yes, sir.   I couldn't say definitely whether there was

12   water in there or not, for I didn't go up there for the purpose

13   of making an observation of that character on those particular

14   streams.

15      Q   And your answer would be the same if I ask you for any

16   time when you went up and down the Murrieta-De Luz Road?

17      A   Yes, sir, in respect to those two water courses de-

18   picted in the easterly portion of the map contained in Plain-

19   tiff's Exhibit M-80, joining the East Fork of Fallbrook Creek

20   from the north.

21      Q   How did you determine where the headwaters of those

22   intermittent streams were located?

23      A   Again the picture speaks for itself, Mr. Dennis.

24      Q   You did that entirely from the picture and not from

25   any physical inspection?

Z-47

1          A   Yes, sir.   Both physical inspection and the picture.

2   But for your information you can look at the picture and you can

3   see where the headwaters begin.

4          Q   I can see where the head of the canyon is, yes, either

5   from the topographic map.   But how did you determine where the

6   stream first had a surface flow in that canyon?

7          A   Are you speaking of the symbol shown on the photo-

8   graph now, Mr. Dennis,--

9          Q   Yes.

10          A   --contained in Plaintiff's Exhibit M-80?   There is

11   no relationship between the beginning of that line and the

12   course through which water flows from time to time.

13          Q   Purely an arbitrary line?

14          A   No, sir, nothing arbitrary about it.   It shows a

15   portion of the bottom of that particular wash.   If all of these

16   gullies, washes, and arroyos were symbolized there would be

17   nothing but a maze of symbols on there, Mr. Dennis.

18          MR. DENNIS:   That is all.

19          THE MASTER:   Any further questions?

20          LT. MILLER:   Yes, I do have one, and it is not on inter-

21   mittent streams, your Honor.

22

23                         REDIRECT EXAMINATION

24   BY LT. MILLER:

25          Q   Colonel, referring to Plaintiff's Exhibit M-80 and

Z-48

1    the area which has been classified VII, which is shown in the

2    dark brown, this classification was made under your supervision

3    and direction in accordance with the scientific principles you

4    have testified to heretofore?

5         A   Yes, sir.

6         LT. MILLER:  No further questions.

7         THE MASTER:  I have one question, Col. Bowen.

8         Q   You testified this water in the mine shaft in your

9    opinion came from this alluvial fill adjacent to the East Fork

10   of De Luz Creek underlying Fields 7 and 8.  By that did you

11   mean that the water would or would not be a part of the sub-

12   terranean flow of De Luz Creek?

13        A   Well, it is my opinion that that water would be part

14   of the subterranean flow of De Luz Creek.

15        THE MASTER:  That is all.

16        LT. MILLER:  Nothing further.

17        MR. SACHSE:  Nothing further.

18        THE MASTER:  You are excused.  We will take a recess at

19   this time.

20        (Recess.)

21        THE CLERK:  Court is now in session.

22        MR. SACHSE:  Call Col. Bowen.

23        THE MASTER:  We have intermittent streams in the record,

24   and we have intermittent witnesses.

25

Z-49

                              ALLEN C. BOWEN,

recalled, testified further as follows:


                         CROSS-EXAMINATION (Continued)

BY MR. SACHSE:

     Q   Now, Col. Bowen, I am not going to discuss any of the

parcels on which you have made engineering studies now, but I

am going to draw your attention to M-68, and particularly to

some of the parcels of Government land on M-68, regarding which

you testified in chief sometime ago.  For instance, starting

at the extreme easterly side of the watershed you will find

Parcel 24 on M-68.  Do you observe it?

     A   Yes, sir.

     Q   Now according to your Exhibit K-31, Parcel 24 is owned

by the United States of America.  Are you familiar with that

parcel?

     A   You say am I familiar with that parcel?  Just generally.

     Q   Now I will call your attention to Count XIX of the

Complaint.  I don't think you will need have it in front of

you.  But Count XIX refers in paragraph 2 to the United States

being the owner of large tracts of land within the watershed

of the Santa Margarita River, or which are traversed by the

watershed line of that river, and those lands are administered

by the Bureau of Land Management of the Department of the

Interior.  Then there is attached an Exhibit G which describes

Z-50

1    all those parcels.  You know the section of the complaint to

2    which I refer.

3        A  Yes, sir.

4        Q  Now again I take it that Parcel 24 is one of those

5    parcels administered by the Bureau of Land Management.  If you

6    want to check it out on Exhibit G--

7        A  May I have Plaintiff's Exhibit M-31, please?

8        LT. MILLER:  Your Honor, I would say the complaint would

9    speak as to what, whether it was the one covered.

10       MR. SACHSE: There is no question about it.  I am just

11   laying a foundation.

12       LT. MILLER:  That is in the complaint.

13       THE MASTER:  I take it that this is merely a preliminary

14   question.

15       LT. MILLER:  Yes, sir.

16       MR. SACHSE:  It is, if you will agree it is one of them.

17       LR. MILLER:  If it is in there.

18   BY MR. SACHSE:

19       Q  Now directing your attention to Parcel 24, Col. Bowen,

20   on the map.  Look at the extreme southeasterly portion of 24

21   on the map and you will see an intermittent stream symbol

22   running through it.

23       THE MASTER: You mean the extreme southeasterly portion

24   of 24 within the watershed.

25       MR. SACHSE:  Within the watershed, yes, your Honor.

Z-51

1        THE WITNESS:  Yes.  That lies within the Northwest Quarter,

2   Section 35, Township 8 South, Range 4 West.

3   BY MR. SACHSE:

4        Q   That is right.

5        A   And there is shown on Plaintiff's Exhibit M-68 an

6   intermittent stream symbol, arising at approximately 1300 feet

7   elevation, and flowing in a westerly direction.

8        Q   Have you any personal familiarity with that stream?

9        A   No, sir.

10       Q   And based on your knowledge of this country and of the

11   character of other streams in the country, and of the symbols

12   used in these maps, would you conclude that that stream flows

13   only during and after periods of heavy precipitation?

14       A   Yes, sir, that would be my conclusion.

15       Q   All right.  Now looking to the northwest, still on the

16   same parcel, you will get up into the Southeast Quarter of

17   Section 27.  You will see another intermittent stream.  Do you

18   see that one?

19       A   Yes, sir.  That crosses the Southeast Quarter of

20   Section 27, 8 South, 4 West, in a southwesterly direction.

21       Q   And would your answer-- or do you have any personal

22   knowledge of that stream?

23       A   Only by having traveled that fire truck trail, which is

24   symbolized--

25       Q   I see it.

Z-52

1     A  --paralleling approximately the stream course.  I have

2 never had occasion to make any detailed observations of the

3 stream channel.

4     Q Would your conclusion on that stream be the same as the

5 one we just discussed, that it flows only during and after

6 periods of heavy precipitation?

7     A  Yes, sir.  Based on the knowledge that I presently

8 have, that would be my conclusion.

9     Q  Now if you will still proceed to the northwest, and

10 flowing almost along the easterly line of the Northwest Quarter

11 of 27, do you see another intermittent stream?

12     A  Referring to Plaintiff's Exhibit M-68, the stream

13 symbol referred to by Mr. Sachse parallels approximately the

14 easterly boundary of the South Half of the Northwest, and the

15 easterly boundary of the North Half of the Southwest Quarter,

16 Section 27, 8 South, 4 West, and proceeds in a northerly course

17 to confluence with the East Fork of De Luz Creek outside of the

18 Parcel No. 24.

19     Q  Now would your answer in connection with that stream be

20 the same as to the last two?

21     A  Yes, sir.

22     Q  That you assume it would flow only during and after

23 periods of precipitation?

24     A  Yes, sir, based on my present knowledge.

25     Q  All right.  Now, Col. Bowen--

Z-53

1     LT. MILLER:  Excuse me just a second.  Your Honor, I think

2  that we might save a little time in this respect.  It is the

3  intention of the United States to make a detailed study and

4  submission with respect to these parcels in the ownership of the

5  United States.  And perhaps it would be better to wait until

6  those studies are completed for this type of examination.  It

7  would seem to save a little duplication.

8     MR. SACHSE:  Well, I would like to continue a little, your

9  Honor.  It might save a little work for the United States.  They

10  might not have to make the studies if I get what I expect out

11  of this.

12     THE MASTER:  At the present time we don't have another

13  witness to put on if Col. Bowen stepped down, so that I think

14  we will let Mr. Sachse ask his questions.  It may save the

15  United States some work.  If it doesn't, we will have the more

16  detailed report later.

17     LT. MILLER:  Fine.  Thank you, sir.

18  BY MR. SACHSE:

19     Q  Now, Colonel, considering only the water available to

20  a riparian owner, that is, no stored water, I ask you to assume

21  no storage, only water that would be in the alluvium under-

22  ground, or natural stream flow, and directing your attention

23  specifically to the southerly of these streams we just mentioned,

24  what irrigation development could be accomplished with the flow

25  of that stream in Parcel 24?

Z-54

1    LT. MILLER:  Your Honor, I will object to that as assum-

2  ing facts which are not in evidence.  And we are going to have

3  detailed facts from which we could phrase such a question later,

4  even if Col. Bowen is your only witness at this time, it would

5  seem to be pointless to pursue the matter at this time.

6    THE MASTER:  I think counsel is entitled to ask a question

7  assuming a certain state of facts.  If the evidence shows the

8  state of facts assumed is inaccurate or incomplete, then, of

9  course, the **testimony** given in response to that question would

10  probably not be of much value.  But I think this would be

11  proper.  The objection will be overruled.  Do you wish the

12  question re-read, Colonel?

13    MR. SACHSE:  Do you have the question in mind?

14    THE WITNESS:  I believe I do, but I would appreciate it

15  if the reporter would read it, please.

16    (Question read.

17    THE WITNESS:  I can't answer that question, Mr. Sachse,

18  because I don't know what amount would be stored in the soil

19  mantle or in the alluvium.

20  BY MR. SACHSE:

21    Q  Now will you please take another good look at that and

22  tell me if you think there would be very much alluvium in that?

23    A  I think there would be very little alluvium, but I

24  don't know.

25    Q  So would you agree that the potential use of let us say

1 the Northwest Quarter of Sectio 35 in general is going to be

2 governed less by the amount of irrigable soil than it is by

3 the stream flow and the water stored in the alluvium?

4     A   Well, there could be some good springs up there, Mr.

5 Sachse, that I have no knowledge of. Considering the stream

6 flow and the alluvium, I would agree with you that there prob-

7 ably would be but a small development of irrigated land in

8 there.

9     Q   In other words, aside from possible springs, and

10 considering only the stream itself and the possible alluvium,

11 it would be your opinion that only very little irrigation de-

12 velopment could be accomplished, relying on the flow of that

13 particular intermittent stream?

14     A   Yes, sir.

15     Q   All right.  Now moving north to the next one-- and

16 you are at liberty to go look at them any time you want to.

17 These are the same three we just discussed.  On the next one I

18 notice a somewhat larger fairly level area in the middle, which

19 might be alluvium.  Do you see the portion to which I refer?

20     A   Yes, sir.  The contours reveal a valley traversed by the

21 stream.

22     Q   Now on that, of course, we don't know without a

23 geological map.  But it is possible that might be a fairly

24 fair-sized deposit of alluvium; is that right?

25     A   Yes, sir.  That is possible.

Z-56

1 Q But would your answer in general be the same, that

2 considering only the surface flow of the stream and the storage

3 in alluvium, very little irrigation development would appear to

4 be possible in that parcel?

5 A Yes, sir.  Again excepting the possibility of de-

6 velopment of some water from springs.

7 Q Now, going to the next watercourse, that one appears

8 to me, looking at the map, to be an extremely steep, rugged

9 country, with I would guess practically no possibility of

10 alluvium.  Would you agree?

11 A I would agree, Mr. Sachse, that you are a very good map

12 reader.  Yes, sir.

13 Q Now then, the postential water use, riparian water use

14 in that section would be limited to the flow of the stream dur-

15 ing and after periods of precipitation?

16 A Yes, sir, with the possible exception of springs, again.

17 Q All right.  Now I would like to direct your attention

18 to Parcel 57 in the center of the map, and by reference to M-31

19 you will find that also is owned by the United States of

20 America.  And by reference to the complaint you will find that

21 also is public domain land.

22 A Yes, sir.  By reference to Plaintiff's Exhibit M-68 it

23 is shown to lie wholly within Section 33, 8 South, 4 West.

24 Q Now looking at my map, or at my copy of M-68, it appears

25 that the extreme northwest corner of Parcel 57 either is

Z-57

1  intersected by an intermittent stream or is just barely not

2  intersected.  You can't tell.  The line is drawn over it.  Do

3  you see what I mean?

4      A  Yes, sir.

5      Q  Are you familiar with that intermittent stream?

6      A  No, sir, I am not.

7      Q  Would your conclusions be the same, that it probably

8  flows only during and after periods of precipitation?

9      A  Yes, sir.

10     Q  Now, with particular reference to Parcel 57 itself,

11 as I read the map that parcel rises sharply from that stream

12 in the northwest corner towards the southeast; is that right?

13     A  Yes, sir.  That is right.

14     Q  And do you see any possibility from the indications

15 on this map of any substantial deposits of alluvium in this

16 parcel?

17     A  I see no evidence on the basis of this map of any

18 substantial deposits of alluvium in Parcel 57.  The map re-

19 ferred to is Plaintiff's M-68.

20     Q  So then any possible development, excluding springs,

21 and dependent on riparian water, would be dependent upon the

22 supply obtainable during the previous periods of runoff of that

23 stream; is that right?

24     A  Yes, sir.

25     Q  All right.  Now I would like to drop almost due south

Z-58

1  to Parcel 67, right on the corner- right on the edge of-- well,

2  it is a little pie-shaped piece.  Do you see it?

3      A  Yes, sir.

4      Q  Are you familiar with that parcel?

5      A  Now I am familiar with that, inasmuch as Mrs. Ruth

6  Kellum Dinsen this morning showed me a patent to that particular

7  piece of property, and asked me to make a survey of it, which

8  I offered to do.  So that--

9      Q  Is this no longer-- that is most interesting.  Is this

10  no longer United States land, then?

11      A  She showed me the original Patent No. 1182499, dated

12  23 May, 1958.  And I assumed that is the particular parcel that

13  is described as Section 9, Lot 1, Township 9 South, Range 4

14  West, comprising 3-56/100 acres.

15      MR. DENNIS:  Can we have the patent number again?

16      THE MASTER:  Mrs. Dinsen apparently, according to Exhibit

17  M-31, owns Parcel 66, adjoining Parcel 67.  And she stated to

18  me at the time that she came in for assistance in preparing an

19  answer that she was in the process of acquiring title to

20  Parcel 67.  So apparently she acquired the patent last month.

21      MR. SACHSE:  All I was interested in was eliminating

22  Federal land.  Then we can for the time being, at least, until

23  we hear something further, eliminate 67 as a parcel of Federal

24  ownership.

25      THE MASTER:  Yes, apparently as of May 23 she acquired

Z-59

1  title to 67, as well as 66.   And she will be the one whose

2  rights will actually be adjudicated by any judgment as to

3  Parcel 67.

4  BY MR. SACHSE:

5     Q Col. Bowen, will you jump up to the northwest a little

6  to Parcel 52, pretty much in the center of the map, just

7  opposite the De Luz town name.

8     A  Yes, sir.

9     Q  That is owned by the United States, according to

10  Exhibit M-31.  And according to the descriptions in Exhibit G,

11  attached to the complaint, it is Bureau of Land Management land.

12  Are you familiar with the intermittent stream shown paralleling

13  the road in the southerly quarter of that parcel?

14     A  I have driven that fire truck trail symbolized on

15  Plaintiff's Exhibit M-68 and shown paralleling the intermittent

16  stream traversing Parcel No. 52 from east to west, being an

17  unnamed tributary of De Luz Creek.

18     Q  If you have driven that truck trail, as I have, you

19  know then it is in the bottom of kind of a steep canyon, and

20  there isn't very much room for any alluvium there, is there?

21     A  No, sir.

22     Q  Would you conclude that Parcel 52 has any possibilities

23  of water development for riparian purposes, other than springs

24  or other than the flow of the stream during and after rains?

25     A  No, sir.

Z-oO

10

Q All right.  Will you proceed on to the west of Parcel 81, a full section, Section 36.

A  Yes, sir.

Q  That is, according to Exhibit G, all patented public domain?

A  The Parcel 81 also includes in addition to Section 36, 8 South, 5 West, a portion of Section 31.

Q  Yes, I see now.

A  9 South, 4 West.

Q  Considering first Parcel 36-- I mean Section 36, I see two major intermittent streams, apparently being forks of Fern Creek.  Do you identify them?

A  Yes, sir.

Q  Are you familiar with them?

A  I have been on Fern Creek, but I have not been up into Section 36, 8 South, 5 West.

Q  Now, Col. Bowen, as I read the map, would you agree with me that the entire central portion of Section 36 -- in fact, most of it, excepting the extreme northwest-- is extremely steep, approaching in spots the vertical.

A  Yes, sir.  That is a good interpretation of the con- tours of the map shown on Plaintiff's Exhibit M-68.  Section 36, 8 South, 5 West is shown as an extremely steep area, with the exception of a portion of land in the northwesterly portion of the section, and another portion in the northeasterly

Z-61

1  portion of the section.

2       Q  And you would not find anything in that map to indicate

3  the presence of any large alluvial deposits in that section,

4  would you?

5       A  No, sir.  There is nothing on this map to indicate the

6  presence of large alluvial deposits.

7       Q  And would you find any indications to lead you to

8  believe that any substantial irrigation development could take

9  place out of riparian waters, as distinct from spring supplies?

10      A  If your question refers to Parcel No. 81, shown on

11  Plaintiff's Exhibit M-68, the answer would be "No".

12      Q  Now I will ask you the same question as to the remainder

13  of 81, in Section 31, which has only a very small portion of

14  Fern Creek running through the extreme northwest corner of it.

15      A  In it, and in the southeast.

16      Q  And the southeast.

17      A  On the southeast is another intermittent stream that

18  runs through there.

19      Q  Would your conclusion be the same, that there is very

20  little possibility of any irrigation development from riparian

21  water on that parcel?

22      A  That parcel is part of 81, and my conclusion is the

23  same with regard to the entire Parcel No. 81 shown on Plain-

24  tiff's Exhibit M-68.

25      Q  Now I will call your attention to Parcel 88, immediately

Z-62

1   northwest of 81.  According to M-31 that is Federal land.  And

2   according to Exhibit G it is unpatented public domain.  What

3   water sources can you point out to me within the Santa

4   Margarita watershed in that parcel?

5        A   Now, Mr. Sachse, isn't that part of the National

6   Forest land?

7        Q   No.  I guess it is National Forest.  Yes.  What water

8   sources can you point out in Parcel 83?

9        A   Well, in Parcel 83, shown on Plaintiff's Exhibit M-68,

10  the headwaters of Camps Creek and the headwaters of tributaries

11  to Cottonwood Creek are shown within the parcel.

12       Q   I find one tributary in the extreme southeast.  Is

13  there another one I am overlooking?

14       A   Yes, sir.  Up in Section 23, 8 South, 5 West, a

15  portion of which is within the watershed of De Luz Creek, and

16  also--

17       Q   I see, up in the next section.  Let me direct your

18  attention then first to that portion of 83 within Section 26.

19  Let's confine ourselves to that.

20       A   Yes, sir.

21       Q   Is there any water source in that parcel other than the

22  extreme headwaters of a branch of Camps Creek in the lower

23  southeast corner?

24       A   That is where the symbol exists, Mr. Sachse, but again

25  the indentations and the contours reveal numerous water courses

Z-63

1    tributary to Camps Creek which lies within that portion of

2    Parcel No. 83 in Section 26, 8 South, 5 West.

3        Q   Have you any knowledge of any stream there that flows

4    other than during and immediately after periods of precipitation?

5        A   No, sir, not unless it would be spring fed.

6        Q   Now in your testimony in chief you testified to

7    approximately 60 acres of irrigable Class II and III land

8    within the watershed in Section 26, owned by the United States.

9    Do you recall that testimony?

10       A   I don't believe that I testified that that was-- I

11   testified with regards to the irrigable land by classes, sec-

12   tion by section, within the De Luz Creek watershed, without

13   regard to ownership, as I recall.

14       Q   Then my notes are in error.  Then am I to understand

15   now that you did not testify to any irrigable land owned by

16   the United States in that section?

17       A   I testified as to the irrigable land within Section 26,

18   8 South, 5 West, which was within the De Luz Creek watershed.

19       Q   But you did not distinguish between land that might be

20   owned by the United States and land owned by a private citizen?

21       A   I did not.

22       Q   Based on your observation of this map and your knowledge

23   of that portion of Section 26 within the De Luz Creek watershed,

24   would you conclude that there could be any substantial irriga-

25   tion development based on stream flow or alluvial deposits, as

Z-64

1 distinct from springs?

2     A  On the basis of my present knowledge, Mr. Sachse, I

3 couldn't testify.  The map shows the high ground in the north-

4 east quarter of Section 26, 8 South, 5 West, as being com-

5 paratively level land.  A portion of that is in private owner-

6 ship, as shown by Parcel No. 84.  And some land similar to that

7 within Parcel 84 lies within Parcel 83, which is part of the

8 Forest Service, or National Forest.

9     Q  And that is pretty far removed from the water source

10 we are talking about in the extreme southeast corner of Section

11 26, isn't it?

12     A  Yes, sir.

13     Q  And it is pretty far up to it, isn't it?

14     A  Well, the bench mark on the crest of the watershed

15 shows the elevation to be 2,409 feet above sea level.  That

16 bench mark appears on the northerly part of Section 26, 8 South,

17 5 West, as shown on Plaintiff's Exhibit M-68.

18     Q  All right.  Now let's go into Section 23 immediately

19 to the north, and still discussing Parcel 83 of public land.

20 Do you find any water source inticated on the map other than

21 the headwaters of Cottonwood Creek, within the watershed of the

22 Santa Margarita?

23     A  That is the only watercourse that is symbolized on the

24 map.

25     Q  You are familiar with that section by at least traveling

Z-65

1    the truck trail, are you not?

2         A   Yes, sir.

3         Q   Do you know of any other water source than that?

4         A   Well, again the indentations and the contours indicate

5    other tributaries to that symbolized watercourse.  That is a

6    highly dissected country, and the cartographer, for obvious

7    reasons which I have before described, didn't place a symbol

8    in every draw.

9         Q   You heard the testimony of Col. Cook this morning, did-

10   n't you?

11        A   Yes, sir.

12        Q   And his diversion from Forest Service land is just

13   about in the center of Section 23, near the boundary of Parcel

14   86; is that right?

15        A   Yes, sir, it is.  His diversion, as I recall, is in the

16   Northeast Quarter of the Southeast Quarter, Section 23, 8 South,

17   5 West, which is within the National Forest boundary.

18        Q   Did you hear him discuss the character of the stream?

19        A   Yes, sir.  I heard him.

20        Q   Have you any knowledge to indicate that there is any

21   permanent perennial stream flow anywhere in Section 23 within

22   the Santa Margarita River watershed?

23        A   With the exception of the spring flow which was

24   described by Col. Cook, I have none.

25        Q   All right.  Now look at Parcel 92, please, being in

Z-66

1   Section 25, the East Half of the Northwest Quarter, 25.  Do you

2   find any water source indicated on the map in that parcel?

3       A  You are referring to Plaintiff's Exhibit M-68, Del Luz

4   watershed Parcel No. 92.  A symbol for an intermittent stream

5   cuts the southwest corner of that parcel just to the south and

6   west of Rocky Peak, and joins-- or is tributary to Camps Creek.

7       Q  You don't find anything on that parcel to indicate

8   any alluvial deposits, do you?

9       A  No, sir.

10      Q  In fact, again it is pretty much straight up and down,

11  is it not?

12      A  Portions of it are very steep, as shown by Plaintiff's

13  Exhibit M-68.

14      Q  Would you assume that any substantial irrigation

15  development would be possible on any part of Parcel 92, with the

16  water from the intermittent tributary to Camps Creek?

17      A  No, sir.

18      Q  You can be seated, Col. Bowen.  I don't think we need

19  the map any more.  Lt. Miller stated a minute ago you had

20  planned or hoped to introduce engineering reports, similar to

21  the ones heretofore introduced on private property, covering

22  this Government land; is that right?

23      , A  That is correct, sir.

24      Q  And in those reports do you intend to classify or

25  to indicate highest and best irrigation uses of the property?

Z-67

A   Yes, sir.   We will use the same basis for making our land capability and land utilization survey as we have made on privately-owned land.

Q   Let me take as an example 57 in the middle of the page. And I realize, Col. Bowen, that you probably are not going to find any irrigable land on it, because it is very steep, extremely.   What weight or what effect are you going to give to the facts that we have just elicited from your testimony, namely, that based on the stream that is there, there is no practical possibility of any substantial irrigation development? Assuming that you find no springs, now.

A   Well, we will survey the lands, make a soil survey of the property, and from that soil survey determine whether there are any irrigable lands or not.

Q   In other words, your determination of irrigability is going to be, as a practical matter, entirely without relation to the availability of water?

A   Yes, sir.

Q   And even in a situation such as Parcel 57, where the only conceivable water supply, barring springs, would be the extremely intermittent flow during and following periods of heavy precipitation, you would assert in behalf of the any irrigable acreage you find a share of the water of De Luz Creek?

LT. MILLER:   I have to object to that, your Honor, as being argumentative.   He is certainly not going to assert

Z-68

1    anything.  He is going to report the facts, as has been done

2    in the--

3         THE MASTER:  The objection is sustained.  I think in

4    each of the private reports the concluding paragraph states in

5    effect that the requirements set forth are based on the amount

6    of water that could be used upon the land, and that there is

7    no representation that it is available from any source.  And

8    I take it the Colonel's testimony indicates the same principle

9    would be followed in the reports to be made on the Government's

10   land.

11        THE WITNESS:  Yes, your Honor.

12        MR. SACHSE:  I think the objection is certainly defin-

13   itely well taken, your Honor.  But this is pointing something

14   we are going to have to get to sooner or later, and that is

15   the mechanics of measuring and spelling out in any quantity a

16   riparian right.  Now I do not believe that any briefing or

17   argument on that question has been scheduled before Judge

18   Carter.  I presume it will all have to come later.  But your

19   Honor is going to be asked to make findings on all these

20   parcels, and we are going to run into these situations where

21   lands are theoretically irrigable, but practically, in so far

22   as any water source is concerned -- I mean it would be conceded

23   on all sides that they are not irrigable.  And we are going to

24   have to squarely face the question of how your Honor is going

25   to treat them in cataloging their rights, the rights and

Z-69

1   priorities on this stream.  I concur with Lt. Miller, it is no

2   question on which to get an answer from an expert witness.  It

3   is a question to be argued by lawyers and determined by your

4   Honor.  But we are going to have to bang ahead on into this thing

5   sooner or later.  And I have no suggestion, except to pose the

6   problem to you.  I think this last line of cross-examination

7   has clearly indicated that very substantial tracts in this

8   watershed have no practical possibility of irrigation, regardless

9   of the kind of soil it is on-- riparian irrigation.  Pardon me.

10       I would welcome any suggestions from Lt. Miller or you as

11  to how you would like us to put this proposition up to you.

12       THE MASTER:  Lt. Miller, do you have any suggestions?

13       LT. MILLER:  Well, I think, your Honor, that as you

14  proceed to take the evidence with respect to each individual

15  parcel there is being developed certain evidence along those

16  lines.  And I would assume if, when the hearings are concluded,

17  and you did not feel you had adequate information on that, you

18  could call upon the parties to develop further testimony.  That

19  would be the only statement that I would wish to make at this

20  time.

21       THE MASTER:  Mr. Dennis, do you have any observation?

22       MR. DENNIS:  I have an observation to make.  I think that

23  what Mr. Sachse said-- at least to me-- that it was getting

24  time for us to come to some kind of a conclusion as to what

25  yardstick or measuring instrument we were going to use to

Z-70

1  determine how the water of the stream, or any stream, would be

2  divided between those people who were legally entitled to take

3  it.

4  In other words, are we going to say if there is 10,000

5  acres of land that are riparian to a stream, and I own 1,000

6  acres of those lands, I am going to be entitled to one-tenth

7  of the water that is available?  Or are we going to say the

8  yardstick is going to be those acres, such as they said in the

9  Cowell case, which are susceptible of profitable and economic

10  irrigation only.

11  In other words, there may be 10,000 acres that are

12  riparian to the watershed of the stream.  I may own a thousand.

13  But the Court may find that 5,000 of the 10,000 acres are

14  susceptible of economic and profitable irrigation.  And he

15  may find that I only have 50 acres which are susceptible of

16  economic and profitable irrigation, and therefore I am going to

17  have the same ratio as 50 to 5,000, rather than the ratio of

18  1,000 to 10,000.  Or are you going to use the yardstick which

19  apparently the Government has in mind, or the plaintiff in this

20  case, that we are going to make a guess as to what uses the

21  irrigable acres are going to be put to, and make a guess as

22  to the amount of water which those acres can use, and then

23  divide-- or arrive at the percentage that I am entitled to on

24  the basis of the percentage of the water that I can put to

25  profitable and economic irrigation, or even not profitable and

Z-71

1   economic irrigation, as the evidence has gone to date, but the

2   amount of water that could be used to irrigate my irrigable

3   acres as against the amount of water that all the other

4   irrigable acres are going to be, taking in all these indefinite

5   qualities as to whether you are going to raise alfalfa or

6   whether you are going to raise orchids or whether you are

7   going to raise orchards or whether you are going to raise

8   truck crops on them.  And if you are going to adopt that par-

9   ticular version of the case, which the Government it seems are

10  advancing, then I don't know if you are going to the proposition

11  that has been advanced by counsel in this case, that it is

12  possible to determine today what land will be irrigable tomorrow,

13  because land that was not susceptible of profitable and economic

14  irrigation ten years ago, today is, with advancement in irriga-

15  tion systems, electricity being available.  And so it seems to

16  me that we are at that point where we are in-- as I understood

17  Mr. Sachse to say-- we are at that point where we are going to

18  have to decide whether or not we are going to divide the water

19  on the water duty of the land, as testified to by either Mr.

20  Bowen or any of the defendants.  Because if we are not, then

21  we are wasting a lot of time of the Master and are going to be

22  wasting a lot of the time of the Court.  In my own opinion I

23  don't think the duty of water of these various lands has any

24  relevancy in this action other than an effort to determine

25  whether those lands are susceptible of profitable and economic

Z-72

1    irrigation.  For instance, if we had 500 acres of land that

2    is up on the mesa, and the water would have to be raised 500

3    feet, and so your pumping charges are X dollars, and it costs

4    so much money to put it up there, then to determine you would

5    have to-- and that land is only suitable for permanent pasture.

6    Then you would have to determine whether that land was going

7    to take 4 acre feet or 2 acre feet, in an effort to determine

8    whether it was susceptible of profitable and economic irriga-

9    tion.  Because if it is going to cost $100 to lift that water,

10   the 4 acre feet of water to that mesa, and you are only going

11   to get $75 return from your alfalfa, then it would be un-

12   economic and unprofitable.

13          So it seems to me what we are saying at this time is that

14   we are going to have to make some determination-- or we should

15   make some determination as to what that yardstick is going to

16   be, in an effort to determine how far we are going to go in these

17   investigations as to the yearly water duty of these particular

18   lands.

19          THE MASTER:  Of course, that raises two questions to me,

20   Mr. Dennis.  The first is illustrated to some extent by the

21   testimony already in the record with regard to the change in the

22   attitude towards steep, hilly land for avocado purposes.  In

23   other words, at the present time the experts might agree that

24   the land that you have referred to couldn't be used for anything

25   except permanent pasture, and on that basis it would be

Z-73

1   economically unfeasible.  How are we to tell that five years

2   from now some new crop might be discovered that can be grown on

3   that particular area, and which would sell at a very high price,

4   so it would be economically feasible?  So that you would have

5   the same transformation in the attitude towards that land that

6   has been testified has taken place in the attitude towards

7   certain Class VI and even Class VII lands, which has been

8   regarded as unirrigable until the discovery that avocados would

9   grow on them.

10   MR. DENNIS:  I agree with your Honor, and I think your

11   Honor knows in the development of the Vista Irrigation District

12   those very things happened.  When they went to form their

13   district there was so much water available, and certain lands

14   had to be excluded from the water rights, because the proper

15   State agency said, "You don't have enough water to take care

16   of all acreage within the area."

17   So at that time the bottom lands, truck gardening, they

18   thought that was valuable, and the hill lands, they waived their

19   rights.  Then avocados and citrus came along and they trans-

20   ferred the water right up on to the high land.  Now it has

21   developed the avocados are in the decline, the bottom lands

22   are better for subdividers.  They are in the position of trading

23   their water rights down to the low lands again.  And I think

24   that the proper yardstick in this case should be the amount

25   of acres which a man has that is riparian to the stream in

Z-74

1    relationship to all of the land that is riparian to the stream.

2        THE MASTER:  You made this statement, if the question

3    was decided in the way in which you think it should be decided

4    now, it would obviate the introduction of considerable evidence

5    and the wasting of time as to the amount of water that should

6    be used per acre if a particular crop is grown.

7        MR. DENNIS:  That is right.

8        THE MASTER:  Of course, the difficulty with that theory

9    is that even though I might hold-- or Judge Carter might hold

10   that you are right in that connection, if the case should be

11   appealed, following a final judgment, and the Circuit Court

12   should say we were in error, you would then have the terrific

13   job of going back over each parcel by parcel and getting that

14   additional information.  The thought runs through my mind

15   aren't we better off to get the information as we go along,

16   even though it may possibly turn out that we think it is

17   irrelevant, so that in case a higher court should hold to the

18   contrary, that the information would be in the record and you

19   wouldn't have to retrace the steps of calling back each

20   defendant, or each witness to testify to the actual usages.

21   I mean these are just thoughts which I am passing out.  I haven't

22   made up my mind one way or the other.

23       MR. DENNIS:  I think the answer to that is if the higher

24   court should hold we are right, then we have not wasted the

25   time that it is going to take to go into the matter of the

Z-75

1   yearly water duty of each particular parcel of land.  And, on

2   the other hand, if they held that we were wrong, they would

3   just send it back and we then would consume about the same amount

4   of time then that we are consuming now on the same acreage.

5         Now there is one other reason which alarms me somewhat,

6   in view of what Mr. Sachse just brought out in cross-examination

7   of Col. Bowen, and that is if we look at say Parcel 24 we find

8   that it has land-- that is, one parcel of land, and it is in

9   the watershed of three different tributaries, one tributary

10   which drains into the East Fork, the other two tributaries which

11   drain into unnamed tributaries that meet De Luz Creek some

12   distance below where it is joined by the East Fork of De Luz

13   Creek.  Now as against anybody who own lands between the

14   confluence of the unnamed tributary and De Luz Creek, they are

15   in an entirely different watershed, and there are many owners

16   below tht Government's land in that particular watershed different

17   from the people who are on the East Fork of De Luz watershed.

18   And in any adjudication that we might get into, it is going to

19   be necessary to find the amount of acres in each one of those

20   tributaries.  Because under the order, each and every person

21   has diverse interests as against the other.  And in dividing

22   up the water of the unnamed tributary which flows directly into

23   De Luz Creek, as against we will say the owner of Parcel 58 or

24   Parcel 60, the Government is going to have to determine how

25   many acres it has within the watershed of that particular

Z-76

1   tributary and how many acres which are susceptible of irriga-

2   tion.  And that is true of all of these.  That is the Anaheim

3   case, even the Rancho Santa Margarita vs. Vail itself.

4        There has been up to the present time no effort-- no

5   effort made to determine how many acres are susceptible of

6   irrigation in any one particular watershed.

7        You have the same situation on some of the rest of these

8   parcels.  Take 24.  As I read Plaintiff's Exhibit M-32, part

9   of that land is within the watershed of Roblar Creek, although

10  I don't think Col. Bowen has testified to that.  Part of it is

11  in the watershed of an unnamed tributary to Cottonwood Creek,

12  and part of it is in the watershed of a tributary to Camps

13  Creek.  And we have different owners intervening between the

14  Government lands in each one of those watersheds.  And without

15  dividing them up, it is going to be impossible to make a decree

16  that is going to adjudicate the water rights of the Government,

17  we will say, in Parcel 24 as against the owners of Parcel 60,

18  58, 59, 54 and maybe or maybe not 91.

19       THE MASTER:  That is, you are suggesting that any report

20  made regarding Parcel 24, instead of listing the total irrigable

21  land in the parcel, should properly segregate it and say that a

22  certain percent of the irrigable land is in the subwatershed

23  of this tributary and so many acres are in the subwatershed of

24  the other tributary.

25       MR. DENNIS: I am sure in the Rancho Santa Margarita vs.

Z-77

1  Vail case this is one of the principal points it was reversed

2 on.

3      MR. SACHSE:  There is no question about that.

4      THE MASTER:  I think you are clearly right about that,

5 Mr. Dennis.

6      MR. DENNIS:  I think so.  We are going into a lot of

7 this, and unless we have the evidence presented in a different

8 manner we are going to get into difficulties.  I hate to bring

9 this up when Mr. Veeder isn't here.  I didn't know we were

10 going to get into this this afternoon.

11      LT. MILLER:  I have a few remarks.

12      MR. SACHSE:  I have just one additional thought Mr. Dennis

13 hasn't made clear.  My argument goes just a little beyond this

14 question of how we allocate the water, whether on a gross

15 acreage basis or on an irrigable acreage basis or so on.  And

16 I think the best way to express it is by the obverse of a basic

17 rule of water law.  Now it is ABC in riparian law, as I under-

18 stand it, that if no water naturally reaches the premises of a

19 lower riparian during the summer, he can't complain about

20 anything an upper riparian is doing during the summer.  That is

21 the case in Cowell vs. Armstrong.  And if the stream is dry

22 in the summer and he doesn't get any anyway, what does he care

23 what the fellow does five miles above him who has water.

24      Now I am presenting to your Honor just the exact obverse

25 of that.  If the United States over in Section 24-- pardon me,

Z-78

1   Parcel 24, has a riparian right to an intermittent stream way

2   up at the top of it that only flows for a matter of a day or

3   two immediately during and after heavy rains, what concern is

4   it of that riparian -- whether it is the United States or a

5   private individual, I feel the rule would be the same-- what

6   concern is it to him how much water a man down below him takes.

7   The man down below him can take only what comes to him and the

8   man up above him has taken all he could.   I think that factually--

9   I am speaking now only of the facts-- that factually a great

10  many of these parcels should be completely eliminated from

11  any consideration in so far as riparian use of water is concerned.

12  Because everybody in this room knows that the practical use

13  of riparian water is summer water.  You don't use riparian water

14  when the rains are flowing down.  And I frankly don't know the

15  answer.  As I say, I agree with everything Mr. Dennis said,

16  but he overlooked that one additional point that I think there

17  is much, much land here, Government land and private land, which

18  hasn't got the slightest bit of concern with what somebody down

19  the stream does with the water.  It has all gone past them

20  and they haven't got any summer rights anyway.

21      MR. DENNIS:  I agree with what Mr. Sachse said, and I

22  think what he says is correct.  And the courts of California

23  have held that land is only riparian to a stream when, in a

24  state of nature, water flows by the land.  And therefore you

25  can have land which is riparian to a stream in May that is not

79b

1   riparian to any stream in August.

2          THE MASTER:  It would be intermittent riparian land to an

3   intermittent stream.

4          MR. DENNIS:  Yes.  And I think also some of the testimony

5   here shows many of these so-called intermittent streams are not

6   water courses under the definition of a stream which would

7   create riparian rights under the laws of the State of California.

8   Now, those are all things which the Court is going to have to

9   resolve in addition.

10         THE MASTER:  Lt. Miller.

11         LT. MILLER:  Your Honor, I would like to comment first

12  upon the last proposition that Mr. Sachse raised, as to why the

13  United States would be concerned of what someone used before

14  this public domain land.  And I think the answer to that particu-

15  lar question is the fact that perhaps the United States is not

16  concerned, but the man below the United States is concerned to

17  have the rights of the United States above him adjudicated. And

18  under the circuit decision you are supposed to get all the land

19  adjudicated.  So it would be more to the man below us in his

20  interest, than perhaps in the interest of the United States.

21         Mr. Dennis also made the comment that the United States

22  has taken a position that the soil criterion in this case would

23  be the amount of irrigable acreage.  Definitely the United

24  States intends to introduce other information, such as the geo-

25  logical studies, which we have mentioned heretofore.  And I

80b

1   believe the Court will find that to be of considerable assis-

2   tance to him in dealing with this particular problem.

3        Now, as far as the idea of apportioning the rights solely

4   upon the number of acres, that seems to be contrary to the law.

5   And I think the Court clearly pointed out the danger of taking

6   a new course at this stage.  We are now in the Master's hearings,

7   where we can get the details that would be necessary, regardless

8   of what the law should be determined to be. And it would appear

9   this would be the time to get that evidence.

10       The one further observation that was made is the fact that

11  on the U.S. lands you have several tributaries, the headwaters

12  of the tributaries, that the Court is going to need information

13  as to how much land in each of those tributaries is irrigable.

14  I believe that in looking at the reports that are made, and the

15  way they break them down field by field, that you would normally

16  have that breakdown in essence from the reports that are sub-

17  mitted, and that that problem will vanish pretty much when it

18  comes time to write the factual findings on this area.

19       THE MASTER:  In other words, you are saying the report

20  which you will give will be so written that that information

21  will be available?

22       LT. MILLER:  Well, clearly it could be gained from this

23  report where you have an aerial photo.  If necessary you could

24  put a planimeter.  But I believe in most cases you will find

25  that the land that is irrigable falls within those particular

81b

1    watersheds, as you examine these reports and see where they

2    break them down field by field, and you have an acreage classi-

3    fication on those fields.

4         THE MASTER:   That has been true I believe of the reports

5    on private land, and if that same  system was followed I believe

6    that should meet the requirement mentioned by Mr. Dennis.

7         Well, I think that you have raised some points we are go-

8    ing to have to consider.  I would simply restate I would be very

9    reluctant to delete any evidence or to state that any evidence

10   was immaterial because of the reasons advanced by Mr. Dennis,

11   as long as there would be one chance in a thousand that he was

12   wrong, because I don't agree with the statement it would be just

13   as easy to get the information later if the Appellate Court

14   should reverse.  Because it is hard enough to get a thousand

15   defendants in here at once, and there is no use trying to get

16   them in again.  If we can get the other information in three

17   minutes from them now, it is better than to have to take half

18   a day for each one of them at a later time.  So we are not going

19   to cross that bridge now anyway, Mr. Dennis.

20        MR. DENNIS:   There is one other problem in that respect

21   which I didn't mention.  For instance, if the Court should de-

22   cide--and it seems to me it would be well for the Court or the

23   Master to make a decision now--that it wasn't going to be

24   necessary to determine the yearly water duty of the irrigable

25   acreage within any one parcel, then it isn't going to be

1    necessary for an individual defendant, who is dissatisfied with

2    a report which has been made by Colonel Bowen's office, to go

3    out and employ independent experts, to whose evidence the Court

4    would give the same weight as they would to a man of Colonel

5    Bowen's experience, in an effort to counteract the evidence

6    placed in the file by the Government.  Now, however, if we don't

7    know whether the Court or the Master is going to adjudicate and

8    divide the water on the basis of the yearly water duty of each

9    particular parcel, then the defendants have to make sure that

10   they are going to fully protect their interests.  They are going

11   to have to go out and, where they disagree with Colonel Bowen's

12   report, employ experts to determine the amount of acreage that

13   they have which is irrigable, and the yearly duty of water, the

14   soil characteristics of their land.  Now, that is placing a

15   burden on a defendant, as I see it, financial burden on a small

16   defendant that he should not have to stand if we are not going

17   to decide the amount of water to which he is entitled on the

18   basis of the yearly water duty.  And I would like the Master and

19   the Court to take that into consideration.

20       THE MASTER:  Well, I will consider that point.  I am cer-

21   tainly not going to rule that that issue is immaterial without

22   giving it a great deal more thought and without having more

23   authority cited by counsel.  In other words, if I do cross that

24   bridge I am only going to cross it after considerably more

25   deliberation.

83b

1    MR. SACHSE:  Your Honor, we have come halfway to it I

2    think already in this addendum that Lt. Miller is supplying.  We

3    now have a situation where a 4.2 figure is, in effect, made

4    applicable to everyone.  If you make the same figure applicable

5    to everyone, then water duty doesn't mean anything.  Then your

6    figure could be one or 1,000, your water duty.  The only thing

7    that counts then is your irrigable acreage.  Then water duty

8    ceases to mean a thing, if the water duty is going to be applied

9    to all alike.  So I think Mr. Dennis has a very good point.  We

10    may be right now at the point where we can disregard water duty.

11    MR. DENNIS:  I think it is a serious problem and it is

12    one that can't be passed off lightly.  And as you stated, I

13    think that counsel for both sides perhaps should be instructed

14    to advance to the Court what they believe the law is in regard

15    to dividing this water between those people who are entitled

16    to it.

17    Now, I have sat back and listened to this, because I have

18    been fearful by doing so maybe the Court or the Master would say,

19    "Well, you should have raised this point before."  And it has

20    bothered me.  Because I think that we are all familiar with the

21    fact that Courts don't look with favor on holding back until

22    everything is in and then springing something.  However, I represent

23    nobody in the De Luz watershed.  And this afternoon we took

24    a jump here and got into this thing.     And so I figure I

25    should bring it to the Master's attention at this time.

84b

1       LT. MILLER:  Your Honor, just one remark with respect

2    to Mr. Sachse's remarks on the addenda which we intend to intro-

3    duce in a day or two to these reports.  Even though that addendum

4    states that a 4.2 project duty should be used, it goes further

5    and states if you were to actually use your land in a more

6    practical and profitable way that the water duty could be a

7    smaller quantity.  And I agree with the other counsel that per-

8    haps this matter should be resolved.  But it is not a standard

9    throughout.  In other words, the position of the United States

10   is even though you could use the 4.2, you have to look at the

11   land to see what would be practical and profitable.

12       THE MASTER:  The reports give both figures.  In other

13   words, they give the figures on what the Government now con-

14   ceives the most economically beneficial use to be, and then the

15   adendum would also give the blanket figure.

16       LT. MILLER:  That is correct.

17       THE MASTER:  I think that before I ever prepare findings

18   on this watershed I will want all counsel to furnish me with

19   specific citations to cases which they believe bear upon this

20   point, and to set forth definitely their own views on it.

21       MR. SACHSE:  Give you our formula.

22       THE MASTER:  Yes.  We won't have time obviously for that

23   this afternoon, and I suggest we recess at this time until 9:30.

24   But you are going to have some homework cut out for you on that

25   line before the findings are prepared in this De Luz Creek area.

85B

1   We will recess until 9:30.

2        (Adjournment.)