# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

**BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

**REPORTER'S TRANSCRIPT**

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

| | |
|---|---|
| **Volume:** | 12 |
| **Pages:** | 1536-1657 |
| **Date:** | June 24 & 25, 1958 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1
2
3
4          **APPEARANCES:**
5
6                   LT. DAVID W. MILLER, Representing
7                    the United States of America.

8              FRANZ R. SACHSE, Representing
9               Fallbrook Public Utility District.

                 W. B. DENNIS, Representing Santa
10                Margarita Irrigation District.
11
12                              - - -
13                               -
14                               -
15
16
17
18
19
20
21
22
23
24
25

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | | 1544 | | |
| | | 1559 | | |
| | | 1572 | | |
| | | 1575 | 1604 | |

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Mercy Anderson | 1547 | 1552 | | |
| Georgia P. Walling | 1565 | 1568 | | |
| Herbert Elwood Shaver | 1606 | 1613 | 1620 | 1621 |
| Gaius Ray Shaver | 1623 | 1628 | | |
| George Webster Towne | 1629 | 1633 | 1634 | |
| Roberta Lacey Goodchap | 1637 | | | |
| Burton David Lewis | 1640 | | | |
| Beatrix Rowley | 1646 | | | |

## INDEX TO EXHIBITS

| Plaintiff's Exhibit - | | Iden. | Evid. |
|---|---|---|---|
| M-84 | Map | 1655 | 1657 |

| Defendants' Exhibits - | | | |
|---|---|---|---|
| MD-I | Copy of Mercy Anderson Homestead Patent | 1547 | 1548 |
| MD-J | Copy of Walling Homestead Patent | 1565 | 1566 |
| MD-K | Copy of Walling Homestead Patent | 1565 | 1566 |
| MD-L | Grant Deed (Herbert Shaver) | 1606 | 1606 |
| MD-M | Grant Deed (Gaius Shaver | 1623 | 1623 |
| MD-N | Grant Deed (Geo. W. Towne) | 1630 | 1630 |
| MD-O | Grant Deed (Roberta Goodchap) | 1637 | 1637 |
| MD-P | Grant Deed (Burton Lewis) | 1641 | 1642 |
| MD-Q | 3 Deeds (Rowley | 1647 | 1647 |

Z-1

<u>Fallbrook, California, June 24, 1958.  9:30 A.M.</u>

THE MASTER: Will counsel state their appearances for the record?

LT. MILLER:  David W. Miller for the United States.

MR. SACHSE:  Franz Sachse for the Fallbrook Utility District and named defendants.

MR. DENNIS:  W. B. Dennis for the Santa Margarita Water Company.

THE MASTER:  All right.

MR. DENNIS:  I don't want to belabor this point we were discussing last night at the close, but there is one other thought I would like to put in the record because of the Master's comments relative to having witnesses before us to testify to certain facts and that we eliminate certain types of testimony.  It seems to me we are going to be in exactly the same situation if the Master or Court should decide that the proper formula or yardstick is going to be the number of acres which are susceptible of economic and profitable irriga-tion when we have not, to date, on any parcel, put in any evidence which would support a finding as to profitable and economic irrigation, and it will be necessary to call the people back or, through the Government witnesses, attempt to prove whether or not the land, the acreage which has been testified to as irrigable, and the amount of water which it

Z-2

1   will require, is going to be susceptible of profitable and

2   economic irrigation which, of necessity, takes in to consider-

3   ation the type of crop that can be raised on it; the returns

4   you can get from that crop; the cost of putting water on the

5   land itself, and the cost of actually operating the water

6   system.

7       So I think that before too long goes past, we ought to

8   at least tentatively come to some conclusion as to what our

9   formula is going to be for determining how the water rights of

10  the various defendants and the plaintiff are going to be

11  measured.

12      THE MASTER:   I concur in that statement, Mr. Dennis, and

13  I have been considering sending out a request or a statement

14  to all counsel of record setting forth this problem, and giving

15  any one of them an opportunity to express his opinion so that at

16  as early a date as possible I will be able to come to a de-

17  termination, at least, as to the formula which I will apply.

18      Now, even though I did make a certain determination that

19  would not necessarily mean that I would exclude these other

20  points.  But, of course, you have pointed out a deficiency in

21  all the evidence so far, which deficiency may or may not be

22  capable of being remedied.

23      I don't know whether any person could qualify, properly,

24  to state just what land in this watershed is capable of feasible

25  economical irrigation and, as was indicated yesterday, any

Z-3

1  determination which would be made would, presumably, be subject

2  to change with changing mechanical developments; changing

3  agricultural developments.  You have a situation where you

4  might have an interlocutory decree which would be subject to

5  modification,  Of course, a good many decrees involving water

6  rights are modified from time to time by the courts.  Of course,

7  in a suit affecting so many parties, and affecting as large an

8  area as this, subsequent modifications would be more difficult

9  and would involve more of a problem than where you only have

10  five or ten or fifteen defendants affected by it.

11      But, I am giving that problem consideration.  As I say,

12  it will probably be within a few days time when a written notice

13  to all counsel will be sent.  Of course, this will include

14  counsel who are here as well as others such as Mr. Eberhard

15  and Mr. Grover, Mr. Myers, and all counsel who have appeared

16  for any of the defendants, so that each one of them will have

17  an opportunity to express their views on this subject.

18      MR. SACHSE:  Let me add one more word on the same

19  subject.  It is not my job to try to try the United States'

20  case.  I can't.  I can see problems that exist, perhaps

21  peculiar to the De Luz watershed, and I would urge your Honor--

22  I am sorry I don't have the citation here-- I would urge your

23  Honor to read Cowell against Armstrong-- I will get it for you

24  tomorrow, the exact citation-- which is the case that is cited

25  as authority for the principle that a downstream riparian, who

Z-4

1  gets no water, in a state of nature, no surface flow, has no

2  complaint on anything an upstream riparian might do.

3      The case is most interesting and even describes Pewter

4  Creek in much the same way that we have described-- that Col.

5  Bowen has described De Luz Creek.  He describes it as inter-

6  mittent, having potholes with water in it during the summer

7  months, and other places that are dry.

8      The heart and soul of the decision was a suit involving

9  some 400 parties and an attempt to adjudicate an intermittent

10  stream, and it was nonsuited; plaintiff was nonsuited at the

11  end of his case.  The heart and soul of the decision is that

12  the plaintiff didn't prove, in his case in chief, didn't prove

13  any summer flow that gave him a right to complain at anything

14  they might do, even completely unreasonable or completely non-

15  riparian uses upstream.  We have in evidence here-- I was just

16  checking to get the exact numbers-- but we have in evidence the

17  De Luz Creek runoff figures from the gauge maintained by the

18  United State Geological Survey which shows that there was no

19  runoff and has been none since the gauge has been maintained

20  except in wet seasons.

21      THE MASTER:  I would assume that the Cowell case would

22  have to include subsurface as well as surface flow?

23      MR. SACHSE:  Correct.

24      THE MASTER:  And the fact it has to be established here

25  that there is no subsurface flow--

Z-5

1      MR. SACHSE:  No, no.  Because the point in the Cowell

2  case, they recognize subsurface flow, but the point was that

3  the diversion upstream during the summer had no effect, or let

4  us say there was no proof that the diversions upstream had any

5  effect on the water available to the downstream riparian.

6      THE MASTER:  That is true.  My point was that that case

7  did not consider subsurface flow but it would have to be

8  established here, not only that there was no surface flow in

9  the De Luz Creek which would be affected, but that there was

10  no subsurface flow which would be affected.

11      MR. SACHSE:  Your Honor is overlooking the fact that this

12  is an action by plaintiff, and it is not a question of us prov-

13  ing that there is no subsurface flow, it is the question of the

14  plaintiff establishing that any single diversion at any par-

15  ticular point on this De Luz Creek watershed adversely affects

16  the riparian rights of the United States.

17      THE MASTER:  Yes.  By my statement I was not trying to

18  impose this particular burden on the defendants.  I was merely

19  stating that your reference to the fact that there was evidence

20  as to surface flow did not mean that there was affirmative

21  testimony, so far, in regard to the subsurface flow.  In other

22  words, you are almost indicating that the plaintiff, so far,

23  affirmatively established that--

24      MR. SACHSE:  Affirmatively established that there is no

25  surface flow.

Z-6

1          THE MASTER:  Is there any proof one way or the other at

2   the present time on subsurface flow?

3          MR. SACHSE:  It is going to come right smack up to us,

4   and you know a nonsuit in Federal Court-- but there are similar

5   motions, and I certainly am not giving away any secret-- I am

6   sure Lt. Miller and Mr. Veeder both know, when this is argued

7   before you, I will make a pitch, at least, that there has been

8   no proof offered up to this moment of any basis to enjoin any,

9   or restrain or allocate any water to any individual defendant

10  upstream-- any one of them.  That will be one of my arguments;

11  no question about it.  So we might as well be thinking about it

12  a little now and it will let you understand the purpose behind

13  some of the evidence I am attempting to elicit.

14          I have nothing further to offer.

15          LT. MILLER:  Your Honor, the only statement I would like

16  to make is that the United States will be happy to undertake

17  to give you its views when we receive the notice.  We have

18  several thoughts and we would like to reduce them to writing

19  and give them the thought that we think is necessary to give

20  you our views.

21          THE MASTER:  Certainly.  I am not making up my mind at

22  the present time, and I am not until, as I say, all counsel

23  have had an opportunity to present their argument in written

24  form.

25          LT. MILLER:  Yes, sir.

Z-7

1      THE MASTER:  I believe, Mr. Sachse, you might as well

2  proceed.

3      MR. SACHSE:  I will call Col. Bowen again, then, if I

4  may.

5

6                        ALLEN C. BOWEN,

7  called as a witness, having been previously sworn, testified as

8  follows:

9

10                      DIRECT EXAMINATION

11      MR. SACHSE:  I would like, Mr. Clerk, M-51 and M-53.

12      Q  Col. Bowen, I am directing your attention first to

13  M-53, being Parcel 46, indicated on M-68 in the name of Mercy

14  Pyeatt, and the answer indicates a change in name to Mercy

15  Anderson.

16          Are you familiar with that parcel, Colonel?

17      A  Yes, sir.

18      Q  What water sources exist on it, to your knowledge, or

19  are indicated by the report prepared under your supervision?

20  Perhaps you better locate it on the map for his Honor, if you

21  would.

22      A  Parcel No. 46, your Honor, on Plaintiff's Exhibit M-68,

23  is approximately the Northwest Quarter of the Northwest Quarter

24  of Section 31, Township 8 South, Range 4 West.

25          The only source of water on this parcel of land, as

Z-8

1   shown or reported on in Plaintiff's Exhibit M-53, is a limited

2   supply of ground water.  As stated on page 2 of Plaintiff's

3   Exhibit M-53, the above-described property is presently supplied

4   with domestic water from a spring located on the property.  This

5   spring flows into a small sump and from there it is piped by

6   gravity to the house.

7        Q  Now, based on your knowledge of the geology in that

8   area, and the parcel in question, would you characterize that

9   water as being part of the water of any stream?

10       A  No, sir.  I would characterize the water underlying

11  the property reported on in Plaintiff's Exhibit M-53 as being

12  vagrant, percolating  water, not a part of any stream.

13       Q  In this addenda to the report, which was discussed

14  yesterday, and which goes into the question of water duty of

15  4.2 acre feet per acre per year for permanent pasture-- you are

16  aware of the addenda to which I refer, Colonel?

17       A  Yes.

18       Q  Will that addenda be attached also to your report on

19  Parcel-- will that be also attached to the report, Exhibit

20  M-53?

21       A  Yes, sir.

22       MR. SACHSE:  I have no further questions.

23       LT. MILLER:  No questions.

24       THE MASTER:  Col. Bowen, I take it from your answer that

25  there is no tributary of any tributary of De Luz Creek flowing

Z-9

1  through this property?

2      THE WITNESS:  Your Honor, there are only small arroyos

3  and dry washes which traverse the property.  No significant

4  named tributary of De Luz Creek traverses this property.

5      THE MASTER:  Very well.

6  BY MR. DENNIS:

7      Q  Col. Bowen, then the symbol which indicates an inter-

8  mittent stream as flowing through the southeast corner of

9  Parcel 46 on Plaintiff's Exhibit M-32 and 68 would be in error?

10      A  That symbol is not inconsistent with my statement,

11  Mr. Dennis-- and your Honor-- that there is no significant

12  named tributary of De Luz Creek traversing the property.  The

13  symbol indicates an intermittent stream and the same symbol

14  appears on the aerial photograph included with Plaintiff's

15  Exhibit M-53, traversing the southeast corner of the property

16  in an easterly direction.

17      THE MASTER:  I see that your answer, in combination with

18  the map, would mean to me that water would flow only in that

19  stream actually during a period of rainfall, for an extremely

20  short period.

21      THE WITNESS:  That is correct, your Honor.

22  BY MR. DENNIS:

23      Q  Colonel, do I understand, then, that your answer would

24  indicate that the symbol which we use to indicate an inter-

25  mittent stream could also be used to indicate what we generally

Z-10

1  know as an arroyo or a dry wash?

2      A  Yes.  I think that an arroyo or a dry wash meet the

3  definition of an intermittent stream, in that water does flow

4  there from time to time.

5      MR. DENNIS:  That is all.

6      MR. SACHSE:  I have no further questions.

7      MR. MILLER:  Nothing further.

8      THE MASTER:  All right.

9      MR. SACHSE:  I will call Mrs. Mercy Anderson.

10

11             MERCY ANDERSON,

12  one of the defendants, called as a witness on her own behalf,

13  sworn, testified as follows:

14

15            DIRECT EXAMINATION

16  BY MR. SACHSE:

17      Q  Mrs. Anderson, will you state your full name?

18      A  My full name is Mercy Pyeatt Anderson.

19      Q  And you are sued in this case and summons was served

20  as Mercy E. Pyeatt, P-y-e-a-t-t.  Is that correct?

21      A  Yes, sir.

22      MR. SACHSE:  Will you mark this, Mr. Clerk; MD-I, I

23  believe.

24      THE CLERK:  Yes.

25

Z-11

1  BY MR. SACHSE:

2  Q  I will hand you, Mrs. Anderson, what has been marked

3  Defendant's Exhibit MD-I for Identification, being a U. S.

4  Patent, and ask you if that is the instrument upon which you

5  hold title to Parcel 46?

6  A  Yes, sir.

7  MR. SACHSE:  I will offer this in evidence, your Honor.

8  THE WITNESS:  It is a copy of the original from the

9  United States; homestead patent.

10  THE MASTER:  This will be received in evidence as

XR  11  Defendant's Exhibit MD-I.

12  BY MR. SACHSE:

13  Q  Now, Mrs. Anderson, how long have you--  Where do you

14  live?

15  A  I am living on this land.

16  Q  How long have you lived there?

17  A  Well, I have lived there all the time with the ex-

18  ception of about four years, since 1938, when they started

19  building the house there.

20  Q  As indicated by the patent this property was home-

21  steaded by you.  Is that right?

22  A  Yes, sir.

23  Q  Can you describe it, tell us what you have there,

24  please?

25  A  Well, we have-- we built a house there-- my son and I

Z-12

1    built a house.  I have a nine-room house there, four bedrooms

2    and two baths, a living room, dining room; it is part stone,

3    all of the lower three feet in the back and six feet in the

4    front are native stone.

5        Q  What about your water supply?

6        A  Well, we built a tunnel in there.  We had to develop.

7    The United States Government demanded that I develop water

8    sufficient for this land before they would allow me this

9    patent, and my husband and I, in 1938, started a tunnel back

10   there in to this spring that came dribbling out of the mountain.

11       Q  May I interrupt you.  You had a wet spot, a spring?

12       A  Yes.

13       Q  Which you developed by digging a tunnel to increase

14   the flow.  Is that correct?

15       A  The flow of the water, yes.  Mr. Baxter, and also on

16   the Jave Ranch, they have followed that same procedure and

17   had water systems under that same plan, previous to my going

18   up to that country.

19       Q  Is that your present water supply?

20       A  Yes, it is.

21       Q  Do you pipe that to the house for domestic purposes?

22       A  Yes, pipe it to the house for domestic purposes and

23   I had, before the 1949 fire, I had seven acres of lemons and

24   three acres of avocados in there.

25       Q  Now, with relation-- you can look, if you will, at the

Z-13

1  map, M-53, and this indicates a roadway and a clearing?

2     A  Yes.  We built that road in there.

3     Q  Observe M-53, and indicate to his Honor where your

4  planting was.

5     A  It was south of the house here, in this little--

6     Q  In the area indicated in pink on the map?

7     A  Yes, and along the south side and back west of the

8  house there, too, is where we had the avocados.

9     Q  And that planting was destroyed by fire?

10     A  The trees were so burned and scorched by that fire

11  that they just gradually died and we had to remove them.

12     Q  And at the present time do you have any agricultural

13  development other than your plantings around the house?

14     A  No, just-- I have a garden and I have about, just about

15  six of those avocado trees that are left there, and then I have

16  eight citrus trees and then we have a few deciduous trees north

17  of the house and I have a large yard and terraced grounds around

18  the house there.

19     Q  But you have no commercial agriculture of any kind?

20     A  No, I have no commercial agriculture at the present

21  time of any kind.

22     Q  Now the engineering report that is before you, M-53,

23  is the same one of which you have a copy?

24     A  Yes.

25     Q  Mrs. Anderson--

Z-14

1      A   Yes, it is the same.

2      Q   And that report indicates that Col. Bowen and his staff

3   determined that approximately 10.2 acres of your total acreage

4   is irrigable.

5      A   Yes.

6      Q   Do you agree or disagree?

7      A   Well, I think, really, there is more of that land on

8   the hillside there that could be developed.  There is, back

9   north-- or south and west of the house there, there is very

10  little rock; practically all of the rock that there is is on that

11  slope there that runs east from the house down there along the

12  road.  And, you know, there is a large number of these hills

13  and places that have been put into avocados and are terraced

14  and cleared, and I think more of that land than approximately

15  10 acres here that is allowed could be put into avocados or

16  grapes or commercial crops.

17     Q   Now, Mrs. Anderson, you heard Col. Bowen's testimony

18  a moment ago?

19     A   Yes.

20     Q   And Mr. Dennis's questions about the stream which,

21  again, if you look at the aerial photograph there, there is an

22  intermittent stream running down through the lower right-hand

23  corner of the parcel.

24     A   Yes.

25     Q   You are familiar with that canyon or stream?

Z-15

1    A  Yes.

2    Q  What kind of a stream is it?

3    A  Well, during the rains water runs through there, but

4  there is no permanent flow of water in any of that land in there;

5  even on Camps Creek, during the summer months.  We have a flow

6  of water during the rains, of course, but from the first of June

7  until the rains begin in the fall there is no water flows in

8  any of those streams or arroyos, not even in Camps Creek.

9    Q  Your development, then, or profitable development of

10  your property, you would depend upon utilizing that percolating

11  vagrant ground water rather than any stream flow?

12    A  Yes, we would have to depend on the springs there.

13  There is another spring, possibly two more-- I have two that are

14  developed-- and I have another  spring that comes out on the

15  north side of that hill there right close to the section line.

16  That comes in there and I get a small stream of water from it,

17  that I use on the garden and trees.  I have two springs there,

18  in reality, that I am receiving gravity from.

19    MR. SACHSE:  I have no further questions.

20

21                    CROSS-EXAMINATION

22  BY LT. MILLER:

23    Q  Mrs. Anderson, didn't you at a date later than the

24  patent execute a deed that gave your son Niler a partial inter-

25  est in the property?

Z-16

1      A He has a tenancy deed with me.

2      MR. SACHSE:  I will so stipulate that this witness is

3 appearing on behalf of Mercy Anderson, sued as Mercy and Niler

4 Pyeatt.  It is a tenancy deed.

5      LT. MILLER:  Right.

6      Q  The springs that you speak of, is there any surface

7 flow over  your property from the springs?

8      A  No, not-- No, not from the springs proper.  There is

9 no surface flow whatever.

10      Q  Right.  Do you know if there is any surface or sub-

11 surface flow from the springs?  Do you know if it goes under-

12 neath the ground?  Would you have any way of knowing?

13      A  No, I don't think so because that spring there is

14 tapped.  You see, that is quite high on that hill.

15      Q  As far as you know there isn't?

16      A  There isn't any subsurface flow, no, from any of those

17 springs in there or any of that water.  Well, I guess I would

18 say it comes from a percolation and there is no flow on that 40

19 anywhere of subsurface water.

20      Q  Now, Mrs. Anderson, you say that you believe that more

21 of your property could be developed than the ten-plus acres

22 as indicated in this report.  Is that opinion based upon any

23 scientific studies on your part or is it just your idea?

24      A  Well, it is based upon the plan that is used in this

25 country for growing grapes and avocados and, you know how they

Z-17

1  are. You take all over Fallbrook and all these hills here,

2  they are cleared and planted and produce abundantly.

3      Q  Well, you haven't made any tests of the soil?

4      A  No.

5      Q  Chemical tests of the soil?

6      A  No.  I have made no chemical tests, but I know whate-

7  ever I have planted there has grown.  Of course, it does not

8  grow without water.

9      LT. MILLER:  Right.  No further questions.

10      MR. SACHSE:  I have no further questions.

11      THE MASTER:  Mrs. Pyeatt, you say that wherever you have

12  planted has grown.  Have you planted any crops on any portion

13  of this land which is not included within the area that Col.

14  Bowen referred to as irrigable land?

15      THE WITNESS:  No, there is no crops, no planting on those

16  hills.  It is still just the native virgin brush land like all

17  of our land here in San Diego County, you know.

18      THE MASTER:  You haven't actually planted anything on the

19  area that he says is non-irrigable?

20      THE WITNESS:  No, I haven't.  I have never planted.  It

21  has not been cleared.  It is virgin brush land-- native, just

22  virgin growth, you know.

23      THE MASTER:  Now, you have referred to two springs that

24  you had developed; that is, one you testified to in regard

25  to this tunnel and then there was, apparently, another one.

Z-18

1    Can you tell me in what portion of your property these springs

2    are located?

3        THE WITNESS:  Well, there is one spring that is right on

4    the border, right in here.  On this map here there is an arroyo.

5        THE MASTER:  You have indicated a spot right on the

6    northerly boundary of your property just to the east of the

7    center of your property.  Is that correct?

8        THE WITNESS:  Yes.  It is in approximately that-- right

9    in there.

10       THE MASTER:  And that is the one where you have de-

11   veloped it with a tunnel?

12       THE WITNESS:  No.  The tunnel is back in here on this

13   mountain.

14       THE MASTER:  The other one with the tunnel?

15       THE WITNESS:  Right in here is where this other spring

16   is.

17       THE MASTER:  The tunnel is approximately in the center of

18   the property from north to south and slightly to the west of

19   the center line?

20       THE WITNESS:  Yes.

21       THE MASTER:  Now, where are the other springs or spring

22   that could be developed?

23       THE WITNESS:  There is another spring right in here that

24   comes up in that little valley down in there.

25       THE MASTER:  That is the approximate center of the pink

1556

Z-19

1    colored area?

2        THE WITNESS:  Yes.  That has never been developed, but

3    there is a seep in there, because the water comes up from the

4    ground.  But that would have to be pumped.  But there is

5    another in there.

6        THE MASTER:  And is there any other spring site that

7    could be developed, in your opinion?

8        THE WITNESS:  There is another arroyo just this side of

9    the one where we developed in there, but it didn't show the

10   flow of water like it did when we put this tunnel in.  But there

11   is another arroyo in there that shows there is a possibility

12   that that could be developed.  Whether it would be justifiable

13   or not is a question, it being so close to this other de-

14   velopment, this other spring.  There is a ridge in between the

15   two.

16       THE MASTER:  The spot that you have indicated as the last

17   site is approximately due north of the spring where the tunnel

18   is developed?

19       THE WITNESS:  No, it is east.

20       THE MASTER:  This is north.

21       THE WITNESS:  It is east.  You see that would be in here.

22       THE MASTER:  Well, no, you testified to that one, the

23   center of the pink area, but the last spring that you were

24   testifying to I understood to be located in this portion.

25       THE WITNESS:  We developed that in here.

Z-20

1    THE MASTER:  And the last spring site is approximately

2  north, is that not correct?

3    THE WITNESS:  Where I had the other spring developed, you

4  mean?

5    THE MASTER:  No, where you think a spring could be de-

6  veloped.

7    THE WITNESS:  No, it is east.

8    THE MASTER:  That is in the center of the pink field?

9    THE WITNESS:  Yes.

10    THE MASTER:  Now, is there any other site north of the

11  present tunnel?

12    THE WITNESS:  There is one more site in there at the

13  present time.

14    THE MASTER:  Very well.

15    LT. MILLER:  Your Honor, I think I will ask the witness

16  to mark those in case we want to refer back, even though we

17  have the description.

18    THE MASTER:  Very well.  Can you mark those sites then

19  with the colored pencil on the map?

20    THE WITNESS:  Well, will I mark the sites where I have

21  developed or where I haven't?

22    THE MASTER:  Well, mark, first, the ones that are de-

23  veloped.  Number one for the well where the tunnel is.

24    THE WITNESS:  That is here.

25    THE MASTER:  The spring where the tunnel is?

1553

Z-21

1      THE WITNESS:  That one is in, approximately, I would say,

2  right in here.  Is that not right?

3      THE MASTER:  I don't know.

4      THE WITNESS:  It is right here, I think, on this; right

5  in there.

6          And then this other development--

7      THE MASTER:  Will you mark a 2 there?

8      THE WITNESS:  2 is right here.  Then I think there is a

9  possibility that on this wash there could be another, that

10  arroyo.

11      THE MASTER:  That is 3?

12      THE WITNESS:  Yes.  And then right in here, down where

13  this wash comes through, down in here, there is a seep that

14  comes up approximately right in there.

15      THE MASTER:  You have marked that with a 4?

16      THE WITNESS:  Yes.  There is a seep that comes up.  The

17  water seems to come out there and seeps, and I thought in the

18  future a pump could be put in there and a well that would

19  increase my water supply there.

20      THE MASTER:  That is all as far as I am concerned.

21      MR. SACHSE:  I have no further questions, your Honor.

22      MR. MILLER:  Nothing further.

23      THE MASTER:  You are excused.  Thank you.

24      MR. SACHSE:  I would like to call Col. Bowen again.

25

Z-22

1                              ALLEN C. BOWEN,

2    recalled as a witness, having been previously sworn, testified

3    as follows:

4

5                            CROSS-EXAMINATION

6    BY MR. SACHSE:

7         Q  Col. Bowen, I am directing your attention to Plain-

8    tiff's Exhibit M-51, being the engineering report on Parcel 44,

9    the property of Georgia P. Walling.  Are you familiar with that

10   property?

11        A  Yes, sir.

12        Q  Now, that property corners on the northwest on the

13   parcel we have just discussed, does it not?

14        A  Yes, sir.

15        Q  We have no common boundary but they have a common

16   corner?

17        A  Yes.

18        Q  Will you indicate it, please, on Exhibit M-68?

19        A  The property in Plaintiff's Exhibit M-51 is delineated

20   on Plaintiff's Exhibit M-68 and is shown as comprising the

21   South Half and the Northeast Quarter of Section 25, Township 8

22   South, Range 5 West, and Lots 1 and 2 in the Southeast Corner

23   of the Northwest Quarter and the Southwest Quarter of the

24   Northeast Quarter of Section 30, Township 8 South, Range 4 West.

25        Q  Can you indicate the boundary?  Will you take your

Z-23

1  pointer and go around the edge and show his Honor the boundar-

2  ies?

3      A  On M-68 I circumscribe with the pointer the exterior

4  boundaries of Parcel No. 44, to your Honor, the parcel being

5  described in Plaintiff's Exhibit M-51.  The section corner

6  common with 31, 36, 35 and 30, is the common boundary with

7  Parcel 46.

8      Q  Now, Col. Bowen, on M-68 I notice the intermittent

9  stream symbol is actually a name, Camps Creek, as running

10  across the property from southeast to northwest, roughly.  Is

11  that correct?

12     A  The stream actually runs from the northwest to the

13  southeast.

14     Q  Pardon me.

15     A  And leaves the property here at the section corner,

16  the southeast corner of Section 25, and continues on to

17  confluence with De Luz Creek outside of the boundaries of the

18  Parcel No. 44.

19     Q  You can resume your seat, Colonel.  Now, I direct your

20  attention to the aerial photograph which is attached to Exhibit

21  M-51, and I think I see on the aerial photograph the canyon of

22  Camps Creek, but I notice that your staff has not brushed it

23  in with an intermittent stream symbol.  Am I correct?

24     A  Here, your Honor, is Camps Creek, traversing the

25  photograph.  The symbol does not appear to have been used in

Z-24

1   there, but the photograph speaks for itself and indicates the

2   position of Camps Creek.

3       Q   Are there any-- to your knowledge-- are there any water

4   sources on this property other than Camps Creek?

5       A   Other than Camps Creek the water sources available on

6   the property described in Plaintiff's Exhibit M-51 is largely

7   confined to ground water and water in the fractures of the

8   geological formation.

9       Q   And again, with the exception of Camps Creek, or other

10   arroyos that might flow during a period of rainfall, would you

11   characterize these ground waters as vagrant percolating ground

12   waters, or as part of the stream?

13       A   Yes, with the exception of the Camps Creek area I

14   would describe these on the basis of the geological information

15   available in the report, in Plaintiff's Exhibit M-51, as ground

16   water, largely vagrant percolating, and not part of any stream

17   system.

18       Q   Col. Bowen, I will direct your attention particularly

19   to page 3 of your report, and the first two sentences under the

20   heading "Engineering."  Do those reflect your conclusions at

21   the present time, specifically the sentence, "There is in

22   Camps Creek a possible source of diverting intermittent surface

23   flow.  Due to the storage facilities required, and the

24   irregularity of flow in Camps Creek, this is not economically

25   feasible."

Z-25

1      Is that your present conclusion?

2      A  Yes, sir.

3      Q  In other words, the only way that any economic use

4  could be made of the irrigable land you find would be either by

5  development of local percolating ground waters or storage of

6  intermittent flow of Camps Creek.  Is that correct?

7      A  Yes.

8      MR. SACHSE:  I have no further questions.

9      LT. MILLER:  No questions.

10  BY MR. DENNIS:

11      Q  I am not sure whether you said the property was also

12  traversed by tributaries of Camps Creek.

13      A  Well, there are numerous tributaries of Camps Creek.  I

14  don't believe I testified in that regard.

15      Q  I notice that on Plaintiff's M-32 and M-68 you have a

16  tributary of Camps Creek that traverses this Parcel 44.

17      A  Camps Creek-- referring to Plaintiff's Exhibit M-68--

18  Camps Creek is near the westerly boundary of the Southeast

19  Quarter of Section 25, Township 8 South, Range 5 West, and there

20  are, of course, numerous other tributaries that are not symbol-

21  ized on the map.

22      Q  That is the same tributary that I believe yesterday

23  you testified extended into Parcel 83 which is owned by the

24  United States of America?

25      A  Yes, sir.  I testified that the headwaters of Camps

Z-26

1    Creek arose within Parcel 83, as shown on Plaintiff's Exhibit

2    M-32.

3        Q   And when you refer to it as an intermittent stream,

4    can you also refer to it as an arroyo or a dry wash?

5        A   Yes, sir.

6        Q   That would be a proper designation?

7        A   It is an arroyo seco.

8        MR. DENNIS:   That is all.

9            There is one thought in my mind in referring to some

10   of the unknown tributaries of various streams-- and this par-

11   ticular watershed is one of the most complicated of any that

12   we are going to encounter-- it seems to me that we should

13   derive some system for designating the particular tributaries

14   that we are referring to.  Now I tried to come up with some kind

15   of a thing, such as a tributary of De Luz Creek proper being

16   designated as D-1, D-2 and D-3; and a tributary of Camps Creek

17   as C-1, C-2 and C-3, and Robilar as R-1, R-2 and so forth.

18   Unless we give some designation to them, and place it on the

19   map at the time that the witness is testifying to the particular

20   intermittent stream, we are going to get lost before we go many

21   months.

22           THE MASTER:   Well, I believe so far, Mr. Dennis, the

23   streams that have been referred to have been visible on the maps,

24   and so far we have not had any complications where it was

25   difficult to determine the course of a particular stream through

Z-27

1    the various parcels.  I assume that is what you have in mind,

2    where the same tributary goes through different parcels.

3         MR. DENNIS:  When we referred to it by another name--

4    for instance, yesterday we got a notice of appropriation that

5    revealed the name Nelson and Coleman Creeks and we have nothing

6    on the map to show Nelson or Coleman Creek.  The witness has

7    testified as to a couple of intermittent streams, and I think

8    it will be very difficult to tie those in.  The same thing might

9    happen as to Parcel 83.  Colonel Bowen testified as to a stream

10   that was going through there, but whether that is the same creek

11   which would be referred to in the engineering report that was

12   just put in evidence it might be somewhat hard to determine.  It

13   seems to me we ought to tie them down either with a name or

14   some type of a designation so that we can readily determine

15   from the record, without going back to our notes, whether we are

16   referring to the same stream.

17        MR. SACHSE:  Your Honor, as long as we do understand,

18   in tying them down, as long as we don't assume that they are

19   streams, I am very happy with Mr. Dennis's suggestion.

20        MR. DENNIS:  I agree on that.

21        MR. SACHSE:  I have very definitely in mind that there is

22   going to be some rather extended and, perhaps, heavy argument

23   over the question of which of these things are watercourses at

24   all.

25        THE MASTER:  That is true.  Of course, any designation

1565

Z-28

1   would have to be actually placed on the map when it was first

2   used, because, otherwise, we would make confusion even worse

3   by duplication or misreference later on.

4        MR. DENNIS:  I think your Honor is entirely right on that;

5   where it is on the map it is going to be easy to refer to it,

6   much more so than by saying it goes through the southeast

7   corner, or otherwise.

8        THE MASTER:  We will see how that works out with future

9   witnesses.  We can't go back.

10       MR. DENNIS:  We can't go back.

11       MR. SACHSE:  I will call Mrs. Georgia Walling.

12

13                    GEORGIA P. WALLING,

14   called as a witness on her own behalf, sworn, testified as

15   follows:

16

17                    DIRECT EXAMINATION

18       MR. SACHSE:  Will you mark these two as MD-J and K,

XI  19   please.

20       Q  Will you state your full name, Mrs. Walling?

21       A  Georgia Pyeatt Walling.

22       Q  And were you formerly known as Georgia P. Truitt?

23       A  Right.

24       Q  T-r-u-i-t-t?

25       A  Yes, sir.

Z-29

Q   I will hand you two documents marked MD-J and MD-K for Identification, and ask you if those are the patents to your land involved in this case, being Parcel 44 as indicated on Exhibit M-68-- copies of the patent?

A   Yes.

MR. SACHSE:   I offer these in evidence as Defendant's MD-J and MD-K, your Honor.

THE MASTER:   They will be received in evidence and so marked.

BY MR. SACHSE:

Q   Mrs. Walling, did you yourself patent this property, homestead this property?

A   Yes.

Q   And how long have you been familiar with it?

A   Well, for about 25 years, I guess.

Q   What present water development, not sources but development, is there on the property?

A   None, now.

Q   What, in your opinion, what sources of water exist on the property?

A   Well, there could be, like any of that, it could be developed springs; you can develop them all across my property.

Q   Now, what about Camps Creek which flows across the southerly portion of your property?   What kind of a stream is that?

Z-30

1      A  Well, during the rainy season, like any of the rest

2  of them, it runs and there is water, but at this time of the

3  year, from now until in the fall, it sinks and there isn't any

4  stream or any flowing water.

5      Q  Actually has there been any surface--  How long ago did

6  the surface flow disappear from Camps Creek on your property,

7  about?

8      A  Oh, well, it is better, I should say-- about 15 years,

9  during all the dry seasons that we have had-- I would say it

10  has not really flowed very much at all.

11      Q  You misunderstood my question.  I mean during this

12  past winter when did your surface flow stop, about?

13      A  Oh, the latter part of this month, I would say.

14      Q  The latter part of last month?

15      A  Last month, I mean; May.

16      Q  Now, have you examined the engineering report on your

17  property?

18      A  Yes.

19      Q  As referred to by Col. Bowen?

20      A  Yes.

21      Q  I believe you can refresh your recollection with that

22  copy, Mrs. Walling, and I am calling your attention, first, to

23  page 2 of the report.  You will notice a tabulation near the

24  bottom of the page showing 44 acres of Class VI land and 597

25  acres of Class VII land.  Do you see the tabulation to which

Z-31

1   I refer?

2       A   Yes.

3       Q   Col. Bowen and his staff have indicated, in their

4   opinion, the Class VI land is potentially irrigable, assuming

5   the existence of a water supply.  Do you agree or disagree with

6   his conclusion?

7       A   Well, I disagree with that because that land, like any

8   other land on the slopes there can be terraced and, with a water

9   supply, can grow avocados and grapes.

10       There should be more acreage than just the 44 of the

11   160 acres in Lots 1 and 2, for instance.  There is more land

12   than the 44 acres, I would say, that could be cultivated.

13       Q   Now, all of this testimony you have just given us,

14   however, assumes the existence of a water supply?

15       A   Yes.  I am assuming, of course, that I have the water

16   supply.

17       Q   Is there any stream of any kind on the property now,

18   actually?

19       A   No, none.

20       MR. SACHSE:   I have no further questions.

21

22                         CROSS-EXAMINATION

23   BY LT. MILLER:

24       Q   Mrs. Walling, you were made a party to this action in

25   the name of Georgia Jave?

Z-32

1    A  Yes.

2    Q  Were you formerly known as Georgia Jave?

3    A  Yes.

4    Q  Now, you have stated that you believe that more of
5    your land is irrigable than is shown by the report?

6    A  Yes.

7    Q  Is your opinion based on any scientific study on your
8    part?

9    A  No, not scientific.

10   Q  Have you actually irrigated any of this land which the
11   report says is non-irrigable?

12   A  Yes, I have, because I had a cabin on Section 25 at
13   one time, also, and had a spring developed until the fire
14   burned it.

15   Q  And what--

16   A  And trees around it, and it was high and that is why
17   I say that I think that there is more land can be developed be-
18   cause we did grow trees and we did grow grapes and a few other
19   things around the house.

20   Q  And this, you say, was in Section 25?

21   A  Yes-- Section 30.

22   Q  Would you mark with an X the area in which you had
23   your cabin, and in which you stated that you planted crops?

24   A  Yes.  My cabin was right here; right here.  That is
25   where I homesteaded and where I proved up, and I had a five-

Z-33

1 room cabin.

2       LT. MILLER:  Let the record show that Mrs. Walling made a

3 red X at the spot.

4       Q  Now, exactly when did you first live at this spot,

5 if you recall, approximately?

6       A  Well, approximately in-- it was the year before I

7 established residence there, and I started my homestead in '35.

8       Q  So that would be 1935?

9       A  '36, because we had to build a road.  But, of course,

10 I established my residence within the year, you see.

11       Q  Of '35?

12       A  Yes.

13       Q  And then how long did you live there thereafter?

14       A  Three years, the requirement.

15       Q  And that was the last time that you lived on the

16 property?

17       A  No-- well, yes, because I married and left.  But,

18 of course, my mother and my father lived there while they

19 worked on their property below us, you see.

20       Q  Mrs. Anderson, who has testified here this morning,

21 is your mother?

22       A  Yes.

23       Q  Now, during the three-year period that you lived there

24 you have stated that you did plant some grapes?

25       A  Yes.

Z-34

1    Q   And what else, if anything, did you plant?

2    A   Of course, we just had a domestic garden and of course

3    we had our domestic water developed.

4    Q   Well, I am speaking of what you actually planted in a

5    crop or an orchard?

6    A   Well, a few grapes.  I wouldn't say that it would be

7    of any commercial value because there wasn't that many.  We

8    didn't continue to develop.

9    Q   Just a small grapevine.  Would that be about it?

10   A   Yes.

11   Q   Was there anything else that you planted at that time?

12   A   Well, as I say, our garden and flowers and that was

13   about it.

14   Q   And was it just a small garden near the house?  Would

15   that be the kind you planted?

16   A   Yes.

17   Q   And you didn't have any difficulty raising--  What did

18   you raise in the garden?

19   A   Oh, all types; squash, corn, beans, any type-- just a

20   regular garden like they grow anywhere in this country.

21   Q   And this went on for about a three-year period while you

22   lived there?

23   A   Yes.

24   Q   Is that the total extent of the irrigation that has

25   been done on the property, to your knowledge?

Z-35

A   Yes, sir, that is right.

Q   The total land that you probably had in irrigation--

A   Probably half an acre at the most.

LT. MILLER:   We have no further questions.

MR. SACHSE:   I have nothing further, your Honor.

MR. DENNIS:   No questions.

MR. SACHSE:   I neglected to ask Col. Bowen a question.
I don't think there is any point in recalling him.   I would
like to continue a question.

Col. Bowen, will the addenda that we discussed in
the other cases be attached to this parcel?

COL. BOWEN:   Yes.

THE MASTER:   Mrs. Walling, on this domestic garden that
you planted, did that require terracing to plant it?

THE WITNESS:   Yes.

THE MASTER:   That is all.   We will take our morning
recess at this time.

(Recess.)


ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified
as follows:

CROSS-EXAMINATION

BY MR. DENNIS:

Q   Col. Bowen, as Officer in Charge of the Office of Ground

Z-36

1  Water Resources at Camp Pendleton, have the studies of geology

2  at Camp Pendleton been made under your supervision and direc-

3  tion?

4       A  No, sir.

5       Q  Who has had charge of making those studies?

6       A  The United States Geological Survey personnel.

7       Q  And at the conclusion of their study do they issue

8  reports?  I mean do they have reports as to the result of their

9  examination or investigation of the property?

10      A  Yes.  I have a preliminary report.

11      Q  And your testimony that you have given here in rela-

12  tionship to the various parcels is based partially on the

13  information which is contained in the preliminary report?

14      A  No.  That is a preliminary report of the geology of

15  Camp Pendleton and we have been testifying in regard to privately

16  owned land.

17      Q  You did give some testimony, did you not, of Camp

18  Pendleton, the geology of Camp Pendleton?  Did you refer to

19  the Pendleton Basin?

20      A  Yes, sir, I referred to the Camp Pendleton Basin.

21  Plaintiff's Exhibit M-32 has encircled at the confluence of

22  De Luz Creek with the Santa Margarita River the letters PB which

23  refer to the Pendleton Basin.

24      Q  And your testimony in that respect was based partially

25  on the preliminary report that you had?

1574

Z-37

1    A   The testimony in that respect was based on well logs

2    which are the basic data available outside of the report.

3    Q   Well, at the time that you gave that testimony did

4    you have the preliminary report in your possession?

5    A   Yes, sir.

6    Q   And has the United States Geological Survey-- is that

7    the name of the agency that was doing the geology for you?

8    A   Yes, sir.

9    Q   They are making a report on their investigation in

10   those portions of the De Luz watershed-- pardon me, of the

11   Santa Margarita watershed that lie outside of Camp Pendleton?

12   A   Some portions of the Santa Margarita River watershed

13   outside of Camp Pendleton are being investigated by the United

14   States Geological Survey.

15   Q   But no portion of the De Luz Creek watershed--

16   A   No, sir.

17   Q   --outside?

18   A   No, sir.

19   MR. DENNIS:   That is all.

20   LT. MILLER:   No questions.

21   (Discussion off the record.)

22   THE MASTER:   Then at this time we will recess until 9:30

23   tomorrow morning.

24   (Adjournment at 11:00 A.M., June 24, 1958, until 9:30

25   A.M., June 25, 1958.)

Z-38

<u>Fallbrook, California, June 25, 1958.   9:30 A.M.</u>

THE CLERK:   Court is now in session.

THE MASTER:   May we have the appearances?

LT. MILLER:   David W. Miller for the United States.

MR. SACHSE:   Franz Sachse for the Fallbrook Public Utility District, and named defendants.

THE MASTER:   I believe there are no defendants in pro per here that are not represented by attorneys.   Is that correct?

MR. SACHSE:   Everybody here I believe are mine, or a spectator.

THE MASTER:   You may proceed, Mr. Sachse.

MR. SACHSE:   Col. Bowen, will you take the stand, please.

ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified as follows:

CROSS-EXAMINATION

BY MR. SACHSE:

Q Col. Bowen, I am going to examine you on all six of these parcels at once instead of interrupting, so for the record the parcels involved are Parcel 40, Towne, being Exhibit M-49; Parcel 41, Goodchap, being Exhibit M-50; Parcel 7, being

Z-39

1  Exhibit M-79, Rowley.

2      THE MASTER:  Rowley?

3      MR. SACHSE:  Rowley.

4      Parcel 13, being Exhibit M-42, Herbert E. Shaver; and

5  Parcel 11, being Exhibit M-41, your report is in the name of

6  Bisek, the present owner is Gaius Shaver; and finally, Parcel

7  12, on which no engineering report has been completed, your

8  Honor, but since it is in this same general block and the soil

9  work has been done I believe Col. Bowen will be able to testify

10  about that also, will you not?

11      A  Yes, sir.

12      Q  Now, Colonel, will you indicate for the Court the

13  parcels on the Exhibit M-68, please?

14      A  Your Honor, referring to Plaintiff's Exhibit M-68,

15  parcels contained in the reports mentioned by Mr. Sachse, be-

16  ginning with Parcel No. 7, shown as Plaintiff's Exhibit M-79,

17  is delineated on the map Plaintiff's Exhibit M-68 with the

18  numeral 7 encircled, and is astride the main stem of the De Luz

19  Creek.

20      Parcel No. 11, which is reported in Plaintiff's Exhibit

21  M-41, is delineated on Plaintiff's Exhibit M-68 with the number

22  11 encircled, contained within the exterior boundaries, and it

23  is noted that the main stem of De Luz Creek cuts through the

24  southeast corner of the parcel.

25      Q  So we can keep these clear for the benefit of the

Z-40

1  audience, also, that is Gaius Shaver or Bisek.  Is that correct?

2      A  Yes, sir.

3      Q  The first one was Rowley?

4      A  The first one was Rowley, yes, sir.

5          Parcel No. 12, on which we have not completed our

6  report of engineering investigation, but which we will go ahead

7  and complete it, I am prepared to testify in regard to the

8  irrigable soils.  That is delineated on Plaintiff's Exhibit

9  M-68 with the number 12 encircled, contained within the ex-

10 terior boundaries, and it shows De Luz Creek flows southerly

11 through the property.

12     Q  That is Taylor-Lewis.  Is that correct?

13     A  Taylor-Lewis, yes, sir.

14         Parcel No. 13, a report of the property of Herbert E.

15 and Joan B. Shaver, the report contained in Plaintiff's Exhibit

16 M-42, the property is delineated on Plaintiff's Exhibit M-68,

17 with the number 13 within the exterior boundaries encircled, and

18 it is noted that De Luz Creek flows through the-- or, cuts

19 across the northwesterly corner of this property.

20         Parcel No. 40, which is the Towne property, reported in

21 Plaintiff's Exhibit M-49, is delineated on Plaintiff's Exhibit

22 M-68, with the number 40 encircled outside of the parcel, and a

23 dotted line leading from the circle around the number 40 into

24 the property.  It is also noted that the-- Correction.  This

25 property here, your Honor, is shown in two pieces of the main

Z-41

1 body, with the 40 to the right of it encircled, and a dotted

2 line leading into an area of approximately 10 acres, with a

3 narrow corridor extending northward, dividing Parcel No. 41,

4 indicated by another numeral 40 with a dotted line pointing to

5 that corridor.

6      And finally, Parcel No. 41, the Goodchap property, the

7 report contained in Plaintiff's Exhibit M-50, and the property

8 delineated on Plaintiff's Exhibit M-68, with the numeral 41

9 encircled outside of the exterior boundaries, but with a

10 dotted line indicating the property to which the 41 refers.

11      Now, De Luz Creek flows through the westerly portion of

12 the Goodchap property; the scale on this map doesn't show this.

13 The thickness of this line here actually represents the corridor

14 that is part of Parcel No. 40, with this small rectangle repre-

15 senting the westerly portion of the Goodchap property, and the

16 larger rectangle representing the easterly portion of the

17 Goodchap property.

18     Q  Now, since you have finished with Goodchap, Colonel--

19     A  Also, if you please, Mr. Sachse--

20     Q  Have you got one more?

21     A  I didn't mention to his Honor that De Luz Creek flows

22 through the northeasterly corner of the Towne property.

23     Q  Since you have finished--

24     MR. GEORGE TOWNE:  Northwestern, it is.

25     THE WITNESS:  Thank you, northwestern, that is correct.

Z-42

BY MR. SACHSE:

1   Q   Now, running through these in order again as apparent

2   riparian status, it is your testimony that Parcels 11 and 13,

3   that is the two Shavers, Parcel 12, Taylor-Lewis, Parcel 7,

4   Rowley, Parcels 40 and 41, Towne and Goodchap, are all appar-

5   ently riparian to De Luz Creek?

6   LT. MILLER:   Your Honor, I would object to the compound

7   nature. I would like to have it broken up parcel by parcel.

8   MR. SACHSE:   Let's withdraw it.

9   Q   Let's start with Goodchap.  That is Exhibit M-50.

10   A   Yes, sir.

11   Q   What is the area of this parcel, Colonel?

12   A   The area is about 4.7 acres, the area of the Goodchap

13   property reported on Plaintiff's Exhibit M-50.

14   Q   And that property would appear to be riparian to De

15   Luz Creek which flows through the westerly portion thereof.  Is

16   that correct?

17   A   The westerly portion of the property, your Honor,

18   appears to be riparian.  This map contained in Plaintiff's

19   Exhibit M-50 is a larger scale, and it shows the nature of the

20   corridor which apparently splits the Goodchap property into two

21   segments, the De Luz Creek traversing the westerly portion of the

22   property.  This corridor, according to our information, is a

23   part of the Towne property, lying to the south.

24   Q   What water development do you find on the Goodchap

Z-43

1  property?

2      A   There is a well on the Goodchap property, which is

3  shown in the engineering section of our Plaintiff's Exhibit M-50,

4  which is approximately 45 feet deep, equipped with a Fairbanks-

5  Morse pump driven by one-horse electric motor.

6      Q   And am I correct in assuming that with particular

7  reference to page 2 of your engineering report that you find

8  approximately 4.4 of the 4.7 acres is irrigable?

9      A   Yes, sir, that is correct.

10     Q   And is the addenda which we discussed Monday covering

11 the water duty of 4.2 acre feet per acre per year for pasture,

12 would that addenda also apply to and attach to Exhibit 50?

13     A   Yes, sir.

14     Q   Now, it would appear to me that--   Withdraw that.

15         What would your conclusion be as to the waters under-

16 lying the Goodchap property as to their relationship to the

17 stream?

18     A   A large portion of the property reported on in Plain-

19 tiff's Exhibit M-50 overlies the recent and older alluviums

20 along the De Luz Creek, and the water contained therein would

21 be, in my opinion, a part of the De Luz Creek system.

22     Q   Now, may we take up M-49, please, the Towne property?

23         Am I correct in assuming, Colonel, that it would

24 appear that the Towne property is riparian to De Luz Creek,

25 both in its extreme northwest corner, and also by reason of

Z-44

1  the corridor which you referred to earlier in discussing the

2  Goodchap property?

3       A   The corridor appears to be separated from the stream,

4  but the larger portion of the property, approximately 10 acres

5  in area, does have the De Luz Creek cutting through the north-

6  west corner.

7       Q   And this entire parcel consists of 10.3 acres?

8       A   Yes, sir, that is the approximate area.

9       Q   Now, with reference to the alluvium, am I correct in

10  assuming that the older and recent alluvium is, generally

11  speaking, found in the northwest corner of this property,

12  and the northwest corridor-- northwest corner, I should say,

13  not northwest corridor?

14       A   Yes, sir, the alluvial material is largely confined

15  in the northwest corner of the property.  And referring to the

16  land class map contained in Plaintiff's Exhibit M-49, it would

17  be largely confined to the yellow or Class II area, which is

18  situated in the northwest corner, and the Class VIII or stream

19  wash material in the extreme northwest corner.

20       Q   That is the purple on the diagram?

21       A   Yes, sir.

22       Q   What water development do you find on this property?

23       A   There is a reservoir on this property, that is reported

24  in Plaintiff's Exhibit M-49, page No. 3, the engineering

25

Z-45

1    section.  The well described in the section here is the same
2    well as described in Plaintiff's Exhibit M-50 on the Goodchap
3    property.  However, there is a concrete reservoir with a capacity
4    of approximately 25,000 gallons on the Towne property, and the
5    Goodchaps and the Townes have a joint system wherein the
6    reservoir is on the Goodchap property and the-- correction, the
7    well is on the Goodchap property and the reservoir on the Towne
8    property.

9        Q   Is there any agricultural development on the Towne
10   property at the present?  I will direct your attention to page
11   3 of the report, Colonel, the second paragraph from the top.

12       A   In the engineering section it states-- engineering
13   section of Plaintiff's Exhibit M-49, that approximately two
14   acres of avocado trees were being irrigated at the time the
15   report was made.

16       Q   Am I correct in assuming that with reference to page
17   2 of your report that you find approximately eight acres of
18   the total of ten acres in this parcel to be irrigable-- of the
19   total of 10.3?

20       A   Yes, sir.  The combined totals of Classes II, IV and
21   VI, as shown on page to of Plaintiff's Exhibit M-49, is eight
22   acres, and that is the area which is considered irrigable.

23       Q   And does the same addenda with reference to the use
24   of 4.2 acre feet per acre per year apply to this report?

25       A   Yes, sir.

Z-46

1    Q   Now, Colonel, with particular reference to the south-

2  easterly portion of this parcel, which I believe you discussed

3  on page 1 of your report under geology, would you be of the

4  opinion that water developed anywhere on the property would be

5  other than a part of the stream?

6    A   Well, inasmuch as the upland portion of this property

7  lying in the southeasterly corner is in close proximity to the

8  stream and to the alluvium over which the stream flows, it is

9  my opinion that that water moves through the soil mantle and

10  through the fractures in the bedrock into the alluvium, and

11  hence in this position would be a part of the stream.

12    Q   And it is your opinion that the best water source for

13  this property would be the water stored in the alluvial deposits

14  in or adjacent to the stream.   Is that right?

15    A   Yes, sir.

16    Q   Now, may we consider M-42, please, the Herbert Shaver

17  parcel, being Parcel 13?

18    THE MASTER:   Parcel 13?

19    MR. SACHSE:   13, yes, sir.

20    Q   I understand you to testify that this parcel is

21  riparian to De Luz Creek which runs through it in the north-

22  westerly corner?

23    A   Yes, sir, it appears to be riparian.   The stream cuts

24  through the extreme northwest corner of the property.

25    Q   Can you tell us what the present-- What is the area

Z-47

1  of this total parcel?

2      A  Approximately 30 acres.

3      Q  What present water development does it have?

4      A  At the time we made the report, as shown on page 3

5  of Plaintiff's Exhibit M-42, the engineering section, there

6  were two hand-dug wells, one 17 feet, and the other 46 feet in

7  depth.  There is a concrete lined reservoir with a capacity of

8  about 225,000 gallons.  Water is pumped from the wells to this

9  reservoir, and then utilized for both domestic and irrigation

10  purposes.

11      Q  Now, with reference to page 3 of your report you have

12  a statement there that an earth-filled reservoir adjacent to

13  the present reservoir is under construction.  Have you been

14  on the property since, and do you know whether or not that has

15  been completed?

16      A  Yes, sir, I believe that has been completed.  I haven't

17  seen it complete.

18      Q  What about the agricultural development of this parcel?

19      A  At the time we made the report there were approximately

20  13 acres of avocado trees being irrigated.

21      Q  Am I correct that you find approximately 22.3 acres

22  of the total of 30 acres in this parcel to be irrigable?

23      A  That is correct.

24      Q  Now, Col. Bowen, with particular attention-- directing

25  your particular attention to the land utilization map, have

Z-48

1   you been on this property recently, or how recently?

2       A  We made our report in November of '56, and I haven't

3   been on the property since then; but I have traversed the road

4   that runs up the creek and observed it from the road.

5       Q  Well, I will ask you if it isn't a fact that a portion

6   of this avocado planting on the Herbert Shaver property is

7   actually located in the field marked No. 2 on your overlay,

8   indicated by you as Class VII soil suitable for grazing?

9       A  Yes, sir, I believe that is true.

10      Q  In other words, the northwesterly portion of the field

11  indicated as No. 2 has been terraced, the slopes have been

12  terraced and are in fact planted in avocados?

13      A  I believe that is the easterly portion.

14      Q  Pardon me.  The northeasterly portion has been

15  terraced and planted to avocados?

16      A  Yes, sir.

17      Q  Would that fact that they are physically in avocados

18  at the present time change your conclusions expressed in this

19  report in 1956 as to irrigability?

20      A  No, sir.

21      Q  You still don't think they are irrigable, even if they

22  have got trees on them?

23      A  There is no question but what they can be placed there

24  and irrigated, but the soils are shallow and stony, the slopes

25  are steep, and it is questionable whether avocados can be

Z-49

1 produced on a site such as that in competition with much more

2 favorable sites.

3    Q  Do you have any idea of the acreage of Field 2 that

4 is presently in avocados?

5    A  No, sir, I don't.  A total area of Field 2 is about

6 7.7 acres.

7    Q  Now, would I be correct in stating that the westerly

8 portion of Field 2 has the same average slope, the same basic

9 soil conditions as we find in the easterly portion that is now

10 planted?

11    A  Yes, sir.

12    Q  So if his Honor should find that the planting of

13 avocados in the east renders that land irrigable then there

14 would be no reason why the entire Field 2 should not be con-

15 sidered irrigable soil?

16    A  That is correct.

17    Q  Now, if you please, look at M-41, Parcel 11, the

18 engineering report being in the name of Bisek, but the present

19 owner being Mr. and Mrs. Gaius R. Shaver.

20    Am I correct in assuming that this parcel is riparian

21 to De Luz Creek which crosses the extreme southeasterly corner?

22    A  Yes, sir, the main stem of De Luz Creek cuts through

23 the extreme southeasterly corner of the property reported on

24 in Plaintiff's Exhibit M-41.

25    Q  And am I also correct in assuming that the recent and

1587

Z-50

1    older alluvial deposits do exist in the southeasterly corner

2    of this parcel, and that thereafter it rises rather steeply

3    to the northwest?

4        A   That is correct, sir.

5        Q   Now, is there any water development on this parcel

6    at the present time?

7        A   At the time we made our survey, which was in July of

8    '56, at that time there was no evidence of development of water.

9    I don't know what improvements have been made since that date.

10       Q   You have been past the property on the road, though,

11   on several occasions, have you not?

12       A   Yes, sir.

13       Q   Would you recall, or am I not correct in stating that

14   a goodly part of this has been cleared and brushed off but is

15   not planted at the present time?

16       A   Yes, sir, that is my recollection.

17       Q   Now, with particular attention again to your soil map

18   at the back of the exhibit, is there any basic difference

19   between the soils in the Class VII portion of this parcel and

20   the soils in the Class VII portion of the Herbert Shaver

21   property?

22       A   Yes, sir, there is.

23       Q   What is it?

24       A   The soils in the Class VII property-- the soils in

25   the Class VII shown on the map contained in Plaintiff's Exhibit

Z-51

1   M-41 are much shallower than the Class VII soils as shown in

2   the Plaintiff's Exhibit M-42.

3       Q   In other words--

4       A   Also, there are many outcroppings of rock on this

5   property, whereas the Class VII lands shown in M-42 is stony.

6   The underlying material is approximately the same, the slopes

7   are about the same, the erosion symbol indicates greater erosion

8   on the Class VII lands reported in Plaintiff's Exhibit M-41

9   than on the Class VII lands reported in Plaitiff's Exhibit M-42.

10      Q   As I recall your testimony earlier in this case con-

11  sidering the question of soil depth, and so on, did I not under-

12  stand you to say that generally speaking the north slopes in

13  this kind of country, semi-arid country, did tend to have

14  somewhat deeper soils than the south slopes?

15      A   Yes, sir.

16      Q   And you find on the Gaius Shaver property a southerly

17  or southeasterly exposure, and on the Herbert Shaver property

18  a northwesterly exposure.  Is that right?

19      A   No, the steep slopes on the property reported in

20  Plaintiff's Exhibit M-41 is facing to the south and east.

21      Q   Yes, I say southeasterly.  And on the other one, on

22  the M-40, you find the slope generally to the north and some-

23  what to the west?

24      A   The slopes of the property reported on in Plaintiff's

25  Exhibit M-42, and shown as Class VII land are generally sloping

Z-52

1    to the north and west, yes, sir.

2        Q   The reporter tells me I asked for M-40, it should be

3    corrected.

4        A   M-42.

5        Q   Yes.  Now, Col. Bowen, directing your attention to the

6    northwesterly part of Parcel 11 as indicated in M-41, is that

7    the portion that your report states is underlaid by Woodson

8    Mountain granodiorite?

9        A   Yes, sir.

10       Q   Which you classify as a rather poor water producing

11   subsoil?

12       A   Yes, sir.

13       Q   The only water therein being usually found in frac-

14   tures or--

15       A   Joints, and the thin residual material which overlies

16   the weathered granitic rock.

17       Q   And you would be of the opinion that the best water

18   source on this property would be the recent and older alluvium

19   in the southeasterly portion.  Is that right?

20       A   Yes, sir.

21       Q   Colonel, I overlooked something on M-42.  Could you go

22   back to it for just a moment, please?

23       A   Yes, sir.

24       Q   Do you have any knowledge or does your report indicate

25   the existence of any springs on this property?

1590

Z-53

1    A   There is no report in Plaintiff's Exhibit M-42 of the

2   existence of any springs, and I know of none of my own knowledge.

3    Q   Have you ever examined this soil conservation dam

4   which your report testifies was under construction at the time

5   the report was written?

6    A   I haven't examined it since it was completed.

7    Q   Well, were you up there when it was under construction?

8    A   Yes, sir.

9    Q   Do you have any recollection of a spring or a water

10  seep at the upper end of that-- of what is now covered by the

11  dam-- by the lake?

12   A   No, sir, I have no recollection of that.

13   Q   Now, I will direct your attention, if I may, to

14  Parcel 12, being the parcel for which we have no engineering

15  report.  And if you would, tell me, Colonel, which of these

16  others you think are the easiest to follow the land symbols on.

17  I would assume that 13, Parcel 13, might be a good one.

18   A   Yes, sir, Plaintiff's Exhibit M-42.  The soils map

19  contained in Plaintiff's Exhibit M-42 shows the property

20  contained in Parcel 12.

21   Q   Now, first as to riparian status, am I correct in

22  assuming that this photograph indicates two streams, or maybe

23  just two branches of De Luz Creek flowing through this parcel?

24   A   Yes, sir, from north to south.

25   Q   From north to south.

Z-54

1     A   The easterly stream is the main stem of De Luz Creek

2   flowing in a southwesterly direction through the property, and

3   the westerly stream is an unnamed tributary to De Luz  Creek,

4   which is flowing in a southerly direction and has its confluence

5   with De Luz Creek within the property shown as Parcel 12.

6      THE MASTER:  Well, in accordance with our discussion

7   yesterday, maybe this unnamed tributary to which you have

8   referred should be numbered as Stream No. 1 on Exhibit M-68,

9   then we will know in future reference as to any other parcels

10   when we are referring to a tributary whether that would be the

11   Stream No. 1.

12      THE WITNESS:  I wonder, your Honor, if tying it in with

13   the parcel doesn't sufficiently identify the stream?

14      THE MASTER:  Well, there was a question raised yesterday,

15   for example, that there might be two streams say that would

16   originate in a particular parcel, each one unnamed, and one of

17   them might flow through certain other parcels, and the other

18   might flow through different parcels, and there might be some

19   confusion.

20      MR. SACHSE:  Your Honor, I didn't agree with Bill yesterday.

21   If we start numbering these things 1, 2, 3 and 4 it is going to

22   be too much for memory to keep track of them as to where we are.

23   I think it is pretty specifically identified by Col. Bowen's

24   testimony that it runs -- that it comes from the northwest and

25   runs into the main stem of De Luz Creek on Parcel 12.  And there

Z-55

1  is obviously only one such stream on the map, we couldn't

2  confuse it with anything else.  Frankly, I am afraid of the

3  numbering.

4      THE MASTER:  Well, the numbering does have certain dis-

5  advantages.  In this case, at least, it appears there is only

6  one stream, and any other parcels through which it goes there

7  doesn't seem any possibility for confusion.  So I think we

8  will eliminate reference to it, because it would clutter up the

9  map.

10  BY MR. SACHSE:

11      Q  Col. Bowen, am I correct in assuming that practically

12  the whole of this parcel would be overlying recent or older

13  alluviums?

14      A  Yes, sir, with the exception of the high ground shown

15  in the southeast corner.

16      Q  In the extreme southeast corner?

17      A  In the extreme southeast corner.

18      Q  And those recent and older alluviums again, as in the

19  other parcels, are in your opinion the best source of water

20  for any of these plans?

21      A  Yes, sir.

22      Q  Now, do you know whether or not there is any water

23  development on this property at the present?

24      A  No, sir, I don't.  We have not completed our investiga-

25  tion of the property as yet.

1593

Z-56

1        Q   Well, now, with particular reference to the soils, and

2   I--   Have you made any planimeter calculations?   Are you able

3   to tell us what you calculate as irrigable?

4        A   Yes, sir.

5        Q   What is your calculation of irrigable land in Parcel

6   12?

7        A   I would like to explain to your Honor that we have

8   made this calculation based on our surveys surrounding the

9   property; we have extended these contacts through the property,

10   both from evidence on the photographs and from observations made

11   when surveying the adjoining properties, and they are accurate

12   to the best of our knowledge, but there may be some slight

13   revisions when we have gone on the property and made our survey.

14        THE MASTER:   Well, you will prepare a final report similar

15   to the other exhibits?

16        THE WITNESS:   Yes, sir, we will.   Mr. Sachse asked for

17   convenience that we make these estimates, and I wanted it to be

18   shown they might be revised.   I don't think they would be revised

19   downward.   It might be, for example, that we would decide on

20   closer examination that part of it was Class III instead of

21   Class II; or Class II instead of Class III, which would not

22   affect the irrigability and would not affect the land use.

23        On the basis of the information we have, we found 31.9

24   acres to be irrigable.

25

Z-57

BY MR. SACHSE:

 Q  Out of a total of 40 acres?

 A  Out of a total of 40 acres.

 Q  And can we make a few generalizations, Colonel?  I presume that you would find that the actual streambeds themselves because of rocks, danger of overflow, and so on, you would classify as VIII?

 A  Yes, sir.  That classification has been made and appears on the soils map contained in Exhibit M-42, with a line pointing into the streambed material indicating the soil characteristics, and the Class of VIII.  And the area of that is about .77 acres.

 Q  And I find, if I am reading this correctly, I find almost nothing else that you would classify as non-irrigable on this parcel.  Is that correct?

 A  We found .4 of an acre of Class VII land in the extreme northeast corner where the hill projects out within the boundaries of this property.

 Q  Where the stream cuts in toward the hill on that loop of De Luz Creek?

 A  Yes, sir, that contact which makes a loop through the northeast corner of the Parcel No. 12 is Class VII.

 Q  So you find roughly--

 A  .4 of an acre.

 Q  So you find roughly 32 out of the 40 acres as irrigable?

Z-58

1    A  Yes, sir.

2    Q  The same qualification we have expressed on all of these

3  other cases as to water duty in the event permanent pasture is

4  planted would apply in this case?

5    A  Yes, sir.

6    Q  All right. Colonel, now will you take up Parcel 7, I

7  think that is M-80, Rowley?

8    A  Yes, sir.  I would have one additional statement to

9  make, your Honor, with regard to duty of water with regard to

10 this Parcel 12, if I may.

11    Q  Go ahead.

12    A  We have found that the bulk of it would be suited to

13 row crops, and have given the lower duty of 4 acre feet per

14 acre per year.

15    THE MASTER:  That is the higher usage and a lower duty?

16    THE WITNESS:  Yes, sir.  In other words, the Class II and

17 III lands, totaling 27.7 acres, in our opinion could be devoted

18 to row crops, and the remainder 4.2 acres of Class IV and

19 Class VI lands could be devoted to permanent pasture with a

20 requirement of 3.83.

21 BY MR. SACHSE:

22    Q  So adding your 10% for project duty you would come

23 up with 4.4 for the row crops, and approximately 4.2 for the

24 permanent pasture?

25    A  Yes, sir.  If you would care for me to give the total

1596

Z-59

1 figure?

2    Q   I am not concerned about the total acre foot figure.

3    A   You say you are?

4    Q   I am not concerned with the total acre foot figure,

5 I don't think that is a necessary calculation as long as we

6 have the duty figure, unless his Honor wants it.

7    THE MASTER:   Well, you have computed the total figures,

8 as I read it here, is 126.9?

9    THE WITNESS:   Yes, sir.

10    THE MASTER:   That is the water which would actually be

11 used, and you would add your 10%?

12 BY MR. SACHSE:

13    Q   126.9 acre feet per year?

14    A   Yes, sir.

15    Q   Could be used if the water was available on the

16 property?

17    A   Yes, sir.

18    Q   And you would add to that a 10% factor covering loss

19 in transmission or production?

20    A   Yes, sir.

21    Q   All right.   Now, can we take up-- is it M-80?

22    A   M-79.

23    Q   M-79, pardon me.

24    A   The Rowley property.

25    MR. SACHSE:   Now, your Honor, before I ask Col. Bowen

1597

Z-60

1  any questions I want to clarify one thing here for the record

2  myself.  It will appear in a moment, as we introduce the

3  exhibits, the grant deeds, that there is unquestionably a

4  severance of a portion of this property, and that the westerly

5  probably 60 acres or thereabouts are not riparian to De Luz

6  Creek, although they appear to be as a single parcel.  Does

7  that meet with your approval?

8      LT. MILLER:  What I would like to do would be to stipulate

9  that the parcels as you enumerate them in your complaint are

10  separate acquisitions, Parcels 1, 2 and 3, and the fourth parcel

11  which Mr. and Mrs. Rowley claim in their answer is in the

12  community of Fallbrook and would not be relevant here.

13      MR. SACHSE:  I am going to introduce the--

14      THE MASTER:  Where you said complaint you meant answer,

15  did you not?

16      LT. MILLER:  Yes, sir.

17      MR. SACHSE:  The Rowleys also have a parcel in Fallbrook,

18  I am not going to bother to put on any evidence on that now,

19  they will come back.  I don't think you want to hear any

20  evidence on one little parcel in Fallbrook?

21      THE COURT:  No, I think we will have to consider them area

22  by area, and to try to come back and figure what part of this

23  transcript it is in would be too much.

24      MR. SACHSE:  I agree.

25      Q  All right. Colonel, directing your attention to Parcel

Z-61

1   7, shown on Exhibit M-79, De Luz Creek main stem appears to

2   run through it from the northeast corner in a southwesterly

3   direction.   Is that correct?

4        A   That is correct, sir.

5        Q   And again it would appear to me that there is a rather

6   substantial belt of older and recent alluvium on both sides of

7   De Luz Creek?

8        A   Yes, sir.

9        Q   Through the property?

10       A   Yes, sir.   That would be confined predominantly to the

11  area colored in purple and yellow as shown in Plaintiff's Ex-

12  hibit M-79 on the soil survey.

13       Q   Now, perhaps you had better look at M-68.   Regardless

14  of the date of acquisition, I would also conclude from reading

15  the map on M-68 that the westerly part of the Rowley property

16  would not be riparian to De Luz Creek, for the reason that it is

17  in the Cottonwood Creek drainage.   Is that correct?

18       A   Yes, sir.   Referring to Plaintiff's Exhibit M-68,

19  Parcel No. 7, there is a pronounced ridge running north and

20  south paralleling the easterly boundary of Section 19, Township

21  8 South, Range 4 West.   And that ridge divides the drainage;

22  to the east of the ridge the water flows towards De Luz Creek,

23  and to the west of the ridge it flows downward into Cottonwood

24  Creek.

25       Q   Now, with particular reference to that portion west of

Z-62

1    the ridge, are you aware of any water sources in that portion

2    on the Rowley property?

3        A    No, sir, I am not aware of any water development in

4    that westerly portion.

5        Q    And it would appear to me from an examination of the

6    Geological Survey map that that is generally speaking rather

7    steep, rugged country.  Is that correct?

8        A    Yes, sir.

9        Q    And that is the type of country that your reports

10    state are underlain with Woodson granodiorite and similar

11    granitic subsoils?

12        A    Yes, sir.

13        Q    With reference to your photo, the soil classification

14    photo, you show what appears to be an intermittent stream

15    symbol running through that parcel.  Is that correct?

16        A    Yes, sir.  Referring to the soils map in Plaitiff's

17    Exhibit M-69--

18        THE MASTER:   M-79.

19        THE WITNESS:   Thank you, sir, M-79.  An intermittent stream

20    symbol has been placed on the map, flowing in a southwesterly

21    direction throughout the Southeast Quarter of the Southeast

22    Quarter of Section 19, Township 8 South, Range 4 West.

23    BY MR. SACHSE:

24        Q    And that would be a stream that flows only during and

25    immediately after periods of precipitation?

Z-63

A   Yes, sir.

Q   Well, would you conclude that any water sources that might be developed in that block, westerly block of the Rowley property, would or would not be a part of the water system of Cottonwood Creek?

A   By the westerly block, Mr. Sachse, how far?

Q   I am referring to this block that you say is in the Cottonwood Creek drainage.

A   Yes, sir.   I would say that any waters underlying the portion of the property in the Cottonwood Creek drainage are vagrant percolating waters, not a part of any stream system.

Q   Now, moving east from that ridge that divides the two drainages--

A   Yes, sir.

Q   -- and that division line you state is approximately at the section line.   Is that right?

A   It parallels the section line, the easterly line of Section 19, and lies easterly of it.

Q   Well, then, taking the next 40 east--   Are you following me?

A   Yes, sir.   You are referring to the Southwest Quarter of the Southwest Quarter?

Q   That would be the Southwest Quarter of the Southwest Quarter of 20?

A   Yes.

Z-64

1   Q   What would your conclusion be as to the waters under-

2   lying that parcel with relation to their being a part of the

3   waters of De Luz Creek?

4   A   Within that sixteenth of a section there is a gentle

5   sloping area colored in blue, Class IV land, somewhat deeper

6   soils and lesser slopes, and it is possible that water flowing

7   through the joints and fractures of the granodiorite in contact

8   with that Class IV area could be in contact with the stream.

9   Q   You would not be prepared to express an opinion, then,

10  either way as to whether it is or not?

11  A   My opinion would be that the portion in that 40 west-

12  erly of the north-south trending ridge, which forms a divide

13  between the Cottonwood drainage and the De Luz drainage, that

14  any waters underlying that portion westerly of the ridge would

15  not be a portion of the stream system.

16  Q   What about easterly?

17  A   Easterly of the ridge I have the reservation that

18  approaching the contact with the outwash material and the

19  alluvium that water could flow subsurface through the sub-

20  surface and be in contact with the alluvium.

21  Q   How familiar are you with the Rowley property, person-

22  ally?

23  A   Well, I have been through it, the easterly portion,

24  many times.

25  Q   Are you familiar with the spring on the Rowley property

Z-65

1    up in back of the dwelling house in the way the water from that

2    spring is handled?

3         A   Well, they have been making some recent improvements

4    up in there.   If I understand correctly, the spring is what we

5    describe in Plaintiff's Exhibit M-79 on page 2, the engineering

6    section, as an artesian well.

7         Q   Do you know where it is?

8         A   Located between the house and the utility garage.

9         Q   Do you know how the water is piped from that, where

10   it goes?

11        A   Yes, sir.   As shown in the report here, the water is

12   pumped to a 120-gallon pressure tank.

13        Q   Do you know, Colonel, that there is an overflow pipe

14   which runs the spring water to the Rowley well?

15        A   Yes, sir.

16        Q   And the Rowley well is located in the stream at

17   alluvium, is it not?

18        A   Yes, sir.   That is also contained in the report.

19        Q   Now, in other words, there is an artificial mechanical

20   device transmitting a portion of the spring water to the stream

21   itself, is there not, a pipe?

22        A   Yes, sir.

23        Q   Now, was that spring water in your opinion, that

24   artesian flowing spring water, a part of the waters of De Luz

25   Creek, in the absence of this artificial device?

1603

Z-66

1    A   Yes, sir.  I believe there is sufficient flow there

2    to reach the alluvium in a natural state.

3    Q   What agricultural development did you find-- Pardon me.

4        What irrigable acreage did you find for this parcel?

5    A   Referring to Plaintiff's Exhibit M-79, on page 3, the

6    total irrigable acreage is shown as 46.4.

7    Q   Out of a total acreage of how much?

8    A   The total area of the property is about 130 acres.

9    Q   Now, calling your attention particularly again to the

10   Class VII land which you find in the Rowley parcel, and par-

11   ticularly it will be in the westerly part of the Rowley parcel,

12   you have both north and south slopes there, do you not?

13   A   Yes, sir.

14   Q   Now, would you conclude that with modern terracing any

15   of that soil could be used for avocado culture?

16   A   Certainly areas could be terraced and crops could be

17   planted on the terraces, but I don't believe it would be an

18   economic enterprise on the Class VII sites.

19   Q   Your Class II soil in this case you generally classify

20   as suitable for row crops.  Is that correct?

21   A   Yes, sir.

22   Q   So you would give that a water duty of 4 acre feet a

23   year applied?

24   A   Yes, sir.

25   Q   And your same modification as to the avocado area we

Z-67

1    have heretofore discussed would apply, that could be given a

2    water duty of 4.2 as suitable for permanent pasture.   Is that

3    right?

4        A   Yes, sir.

5        MR. SACHSE:   I think that is all.

6        If it would facilitate Lt. Miller's examination, it makes

7    no difference to me how we handle this, if he wants to question

8    Col. Bowen now, or he can reserve cross after he has heard these

9    other people, or what suits him.

10       LT. MILLER:   I think I only have one question now, and

11   then perhaps I could call Col. Bowen back if it appears neces-

12   sary.

13       THE MASTER:   Yes, after the defendants have testified.

14       LT. MILLER:   Yes, sir.

15

16                      REDIRECT EXAMINATION

17   BY LT. MILLER:

18       Q   Colonel, do I gather from your testimony that with

19   respect to the Class VII lands it is your opinion that you

20   could grow trees on them if you put the water on, but that it

21   would not be a practical agricultural development to do so?

22       A   Well, there are pockets of soil, small pockets,

23   throughout most any area where it is possible to grow a tree.

24   However, these Class VII lands that we have been discussing

25   are shallow and stony, many rocks outcrop, and it would be

1805

Z-68

1    difficult and expensive to terrace them  extensively.  And it

2    would be equally difficult to plant and maintain rows on them,

3    harvest and maintain crops.  Hence, it is my opinion that they

4    would not be economically suitable for the production of tree

5    fruits.

6         Q  Now, directing your attention to M-42, the report on

7    the Herbert Shaver property, and particularly referring to the

8    Class VII lands shown there which you testified is currently

9    planted to avocados to the best of your knowledge, would your

10   remarks pertaining generally to the Class VII land also be

11   applicable to that portion of the Class VII land here which is

12   planted in avocados?

13        A  Well, with the exception that the Class VII lands shown

14   in the report, Plaintiff's Exhibit M-42, is not characterized

15   by the outcrops that some of the other Class VII lands are

16   characterized by.

17        Q  But it is your opinion that even though you can grow

18   trees that it is not a practical agricultural venture?

19        A  That is my opinion.

20        LT. MILLER:  Nothing further, your Honor.

21        MR. SACHSE:  It is a little early.  Could we recess

22   before I start calling any witnesses?

23        THE MASTER:  Yes.  We will take our recess now.

24        MR. SACHSE:  Thank you, your Honor.

25        (Recess.)

1606

Z-69

1     (W. B. Dennis, Esq., arrived in courtroom during recess.)

2     THE CLERK:  Court is now in session.

3     MR. SACHSE:  I will call Mr. Herbert Shaver.

4

5                    HERBERT ELWOOD SHAVER,

6     called as a witness in his own behalf, being first duly sworn,

7     testified as follows:

8

9                      DIRECT EXAMINATION

10    MR. SACHSE:  Will you mark this, please?  This will be

11    MD-L.

12    Q  Will you state your full name, Mr. Shaver?

13    A  Herbert Elwood Shaver.

14    Q  Where do you live?

15    A  3819 North Idaho Street, Baldwin Park.

16    Q  You are the owner of the property described in the

17    engineering report of the United States, Exhibit M-42, Parcel

18    13 on M-68.  Is that correct?

19    A  That is correct.

20    Q  I will hand you a grant deed marked MD-L for Iden-

21    tification, and ask you if that is the deed to your property--

22    a copy of a deed to your property?

23    A  Yes, that is a copy of it.

24    MR. SACHSE:  I will offer it in evidence, your Honor.

25    THE MASTER:  It will be received as Defendants' Exhibit

XI

XR

1607

Z-70

MD-L.

BY MR. SACHSE:

    Q  How long have you owned this property, Mr. Shaver?

    A  I think we purchased it in March of 1949 or 1950.  1950.

    Q  And you gave as your address a Baldwin Park address.
What do you do on this property?

    A  Well, I live up there, I am a truck driver for a large
cabinet company in El Monte, and then on weekends I take care
of this place in De Luz.

    Q  And have you done all of the development that is now
on the property yourself?

    A  Yes, sir.

    Q  You planted the avocado trees?

    A  Yes, sir.

    Q  Developed the wells?

    A  Yes, sir.

    Q  Developed the soil conservation dam?

    A  Yes, sir.

    Q  And developed the reservoirs?

    A  Yes, sir.

    Q  What have you on the property now as far as plantings
go?

    A  There is about 13 acres of avocados, and approximately
2 acres of citrus, tangerines and navels, and I have farmed
row crops on there several times; and I have a few grapes in now.

Z-71

1    Q   What improvements other than plantings are on the

2  property?

3    A   Well, we have a small house, and then we have our two

4  wells.  We have a reservoir about 225,000-gallon capacity--

5    THE MASTER:  What capacity?

6    THE WITNESS:  I think it is 225,000.  Then this soil

7  conservation dam it should hold about 10 acre feet of water.

8  BY MR. SACHSE:

9    Q   Now, can you on the photograph attached to the exhibit--

10 and I think you had better use the original-- can you indicate

11 to his Honor the location of your soil conservation dam?

12    A  Well, right here we have a reservoir, and then a dam

13 has been put in right in this area in here.

14    Q  Do you want to mark on that exhibit, if you will, the

15 approximate location of the soil dam?

16    A   It comes right up against this reservoir here.  This

17 is all fill in here and storage.  The storage would come back

18 in here.

19    THE MASTER:  Now, wait.  You have marked the whole area

20 in the same manner.  Maybe you had better make the dam area in

21 one color, and the area of the outline of the water storage

22 another color.

23 BY MR. SACHSE:

24    Q   Now, with pencil you are indicating what, Mr. Shaver?

25    A   This is a fill.

Z-72

1       THE MASTER:  Which creates the storage?

2       THE WITNESS:  Right here, your storage is in behind here.

3       THE MASTER:  Your storage would be in back and to the

4   south of the pencil line, and the boundary would be in the red

5   pencil?

6       THE WITNESS:  Right.

7   BY MR. SACHSE:

8       Q   What is the water supply for that soil dam?

9       A   Well, this year it was built up just by runoff.

10       Q   The winter rains?

11       A   The rains, yes.

12       Q   Do you have any spring or other source in connection

13   with it?

14       A   There is a little spring about three years ago we

15   noticed this growth, kind of a rank growth around there, and we

16   started digging down with a shovel and we could always bring

17   water up there.  There is a bunch of quail around there, and

18   there wasn't much water anywhere else, so all through the summer

19   we used to dig down and make a little sump for the quail.

20       Q   And does that sump stay full most of the time?

21       A   You can keep water in there, yes.

22       Q   Now, your irrigation, however, is entirely from the

23   wells in the De Luz Creek.  Is that right?

24       A   That is right.

25       Q   And you pump to your larger reservoir and then gravity

Z-73

1    to irrigate?

2        A  No, we have to pump from the reservoir and boost it

3    up the hill.

4        Q  What is your frost condition there?

5        A  On the low ground it gets pretty cold, so that is one

6    reason we haven't gone into avocados on that lower ground.

7    That would be the ground in the west part, in here.

8        Q  That would be Class III, and it would be Field 1, if

9    you look at the overlay.  Is that correct?

10       A  Yes, that is right, Field 1.

11       Q  Now, with particular reference to Field 2 on the land

12   overlay, is any part of that planted at the present time?

13       A  Well, in Field 2 there is probably right in here--

14   there would probably be an acre to an acre and a half in trees

15   that are about five or six years old now.

16       Q  And would you shade that in with a pencil just where

17   your avocados are on Field 2?

18       A  Right in here like that.  In fact, I think you can

19   see those trees in there right now.  I think those trees are on

20   that map right now.  This wasn't cultivated at the time this

21   aerial photograph was taken, so you would naturally see your

22   weeds as well as your trees in there, that is why it is so

23   dark.  These trees here are about five or six years old right

24   in here.

25       THE MASTER:  That is, you are referring now to the extreme

Z-74

1   easterly area of Field 2 from the north to the south?

2        THE WITNESS:  That is right, yes, sir.

3   BY MR. SACHSE:

4        Q  Well, actually I will call your attention to the photo-

5   graph, there are what appear to be light streaks along in there.

6   Do those signify anything, are those terraces, or what are they?

7        A  Yes, these are terraces.

8        Q  And that is where your planting would be?

9        A  Yes.  And then on around that hill we have trees that

10  are about three years old; there is about four terraces of

11  avocados, and those trees are probably three or four years old.

12  And then this spring we put in two more terraces and put in

13  tangerines with all of those avocados.

14        Q  Now, have you examined Exhibit M-42, the engineering

15  report on your property?

16        A  Yes, sir.

17        Q  And with particular reference to the findings of Col.

18  Bowen and his staff as to irrigable acreage, do you agree or

19  disagree with his findings?

20        A  Well, I disagree myself.  We already have some of this

21  area planted, and then our future plans are to come on around

22  here.  There is some awfully good soil in here.  In this canyon

23  there are some outcropping of rocks which wouldn't be any good.

24        THE MASTER: That is, now you are referring to the southerly

25  portion of Field 2, along the southerly boundary of your property,

Z-75

1   in that area?

2        THE WITNESS:  Yes, sir, that is right.  We feel that

3   there is quite a bit of land right in here; like I say, there

4   is probably about a half an acre in here that is rocky, there

5   is an outcropping right in here, but even some of that could be

6   planted.  We feel that much of this land in Field 2 could be

7   put into terraces and have avocados.

8   BY MR. SACHSE:

9        Q   Well, your disagreement then, as I understand it, is

10  confined to the Class VI soil which is confined entirely  to

11  Field 2.  Is that right?

12       A   Yes.

13       Q   And it is your opinion that a portion of Field 2 could

14  be terraced and used for avocados?

15       A   I think so, yes, sir.

16       Q   As to the rest of the fields shown as irrigable you

17  would have no disagreement, as I understand?

18       A   No, I think that is quite accurate.

19       Q   Do you have any other water source to your knowledge

20  on your property other than the wells and the seep or little

21  spring you referred to earlier?

22       A   Well, we have a sump, we dug it out with a dozer, down

23  in what is by one of the small wells.

24       Q   That is in the creek, though?

25       A   Yes.  And that would be the extent of it.

Z-76

1    Q   And you have no water source outside of the creek,

2    other than the little spring you testified to a moment ago?

3    A   No, sir.

4    Q   Now, as far as De Luz Creek itself is concerned, what

5    are the stream flow characteristics?

6    A   Well, during the winter it probably flows on top of

7    the ground about-- it depends on the amount of rain we have had.

8    It might flow for three, four or five months out of the year.

9    It will flow real heavy maybe a day or two days after we have

10   a big rain, and then it will calm down.

11   Q   And what about summer flows?

12   A   Well, I haven't seen any--  It is still flowing some

13   now, but it usually dries up on top by the 1st of July.

14   MR. SACHSE:   I have no further questions of Mr. Shaver.

15   How do you want to do this?

16   LT. MILLER:   I would just as soon cross-examine Mr. Shaver

17   and exhaust this parcel, if that is agreeable.

18   THE MASTER:   Yes, I think each of the defendants should

19   be completed at one time.

20

21                    CROSS-EXAMINATION

22   BY LT. MILLER:

23   Q   Mr. Shaver, do I understand correctly that you have

24   two wells in the stream itself?

25   A   Yes, sir.

Z-77

1    Q  One which is a sump, and the other which is--

2    A  No, there is two wells and a sump.

3    Q  Two wells and a sump?

4    A  Yes.

5    Q  Now, the sump, do you pump from that sump?

6    A  Sometimes we do, yes.  We pump it into the big well

7 and we put it up in our fill.

8    Q  So you actually have three wells-- You have two wells

9 from which you pump, and the sump from which you pump?

10    A  That is right.

11    Q  And do each of these pumps connect in with the reservoir

12 that you have indicated on the aerial photo M-42?

13    A  Yes.  It can either go into the reservoir or we can

14 bypass the reservoir and put it up into our fill.

15    Q  In your normal operation do you keep the reservoir

16 filled as you need the water and use it?

17    A  Yes.

18    Q  Now, with respect to the flow in De Luz Creek in the

19 winter, you find that you can pump from there throughout the year,

20 even though there won't be any surface flow in the summer, you

21 are still able to pump from De Luz Creek in the summer months?

22    A  I don't pump from the creek, I pump from the well.

23    Q  Well, isn't the well near the creek?

24    A  Yes.

25    Q  And is the sump in the creek or is it on the bank of

Z-78

1   the creek?

2       A   Well, it is off on the bank at the side of the creek,

3   yes.

4       Q   Well, do you find that there is water in that sump the

5   year round?

6       A   Late in the fall, about October or November, it might

7   drop down to hardly anything.

8       Q   But normally you will have something there throughout

9   the summer?

10      A   Yes.

11      Q   Now, with respect to the plantings you testified to

12  on Field 2, I will direct your attention to the aerial photo

13  in M-42.   I believe you stated that you had some trees that were

14  about five years old?

15      A   Yes, that is right.

16      Q   And did you put those trees in yourself?

17      A   Yes, sir.

18      Q   What percentage of the total Field 2 would you say

19  were planted in these five-year-old trees?

20      A   Oh, let's see.   About 20%.

21      Q   So it would be about one and a half acres, in your

22  opinion?

23      A   Yes.   And then I have those three-year-old trees on

24  the other side of that hill.

25      Q   I would like to take them one at a time and talk about

1616

Z-79

1   the five-year-old trees first.

2          Now, when you put those trees in you found it neces-

3   sary to terrace that approximate one and a half acres?

4          A   Yes.

5          Q   And what means did you employ in the terracing?   Did

6   you hire the terracing done or did you do it yourself?

7          A   We hired a machine.

8          Q   Do you recall how much it cost you in the total to get

9   this terracing done?

10          A   Well, it really wasn't much.   This ground wasn't too

11   steep right there.   Well, there is three long rows across that

12   field, and it probably didn't cost us more than $50 in those

13   three terraces there.

14          Q   So it would be $50 total cost to get the terracing

15   done?

16          A   Yes.   There really wasn't too much cutting to be done

17   on that area.

18          Q   Was there any other cost involved in getting the land

19   prepared to put the trees in other than the terracing?

20          A   Just putting our pipeline in.

21          Q   Into the trees?

22          A   Yes.

23          Q   Now, how many years have you been able to get crops

24   off those particular trees?

25          A   Well, these trees when they were about three years old

Z-80

1   started to produce a certain amount of fruit.

2      Q  Have you kept any records of what your production was

3   for each tree, or for this as a unit?

4      A  No, we have never kept any individual records.

5      Q  Would you have any idea what type of production you

6   are getting from those trees in each of the years that they

7   have been productive?

8      A  Well, this year I suppose some of those trees -- well,

9   some of them went maybe four lugs, four lug boxes.

10     Q  And that would be four lugs per tree?

11     A  Per tree, yes.

12     Q  You say that you also have avocados planted on the

13  other lands which this report shows to be irrigable?

14     A  You are not referring to Field 2?

15     Q  No, I am not referring to Field 2, but the other

16  portions of your property which the report did say was

17  irrigable.  You have that in avocados, don't you?

18     A  Yes.

19     Q  Do you know what type of production you are getting

20  from those trees, say in this past year, per tree?

21     A  Well, I would say in the same age group, these trees

22  on the terraces are say six years old, and the trees-- well, I

23  have trees in this Field 3-A, in the blue, I guess it is not

24  blue on your map there, but the same age trees they will do

25  just as good as one another.

Z-81

1    Q   You are not noticing any difference in the production

2    between the trees?

3    A   No.

4    Q   Now, the next plantings that were made, going back in

5    time, were the trees that are three years old?  And I am speak-

6    ing now of the field marked 2.

7    A   Yes.   Those were planted three years ago, yes, sir.

8    Q   And did you do that?

9    A   Yes, sir.

10   Q   Planted them yourself?

11   A   Yes, sir.

12   Q   And did you again hire the terracing done of that land?

13   A   No.   I have my own machine, or we had our own machine

14   at that time.

15   Q   Well, did you keep any records of say how many hours it

16   took you to do it, or would you have any recollection of how

17   many hours it took you to operate your machine?

18   A   Well, I cut a couple of terraces for tangerine trees

19   this spring, and this tractor it is not too sharp of a tractor,

20   and it only took about not more than two hours for each terrace.

21   And those terraces are about -- there is about 13 trees in a

22   terrace, and they are 20 foot apart.  So it is about 260 foot

23   of terrace built in about two hours.

24   Q   And do you recall if the work involved in terracing

25   the area where you have these three-year-old avocado trees was

Z-82

1  about the same?

2      A  Yes, I suppose so.

3      Q  Now, what percentage of Field 2 would you say were

4  planted in the three-year-old avocado trees?

5      A  Can we include those tangerines that I have planted

6  this year?

7      Q  No, I would like to take those separately, if you can

8  break it down.

9      A  Well, I suppose 15%.

10     Q  Well, that is a little over one acre, that would be

11 about right?

12     A  Yes, that would be about it.

13     Q  Have you had any production off those trees as yet?

14     A  No.

15     Q  Now, the third type of plantings you have in this

16 Field 2 are the tangerines that you have spoken of?

17     A  Yes.

18     Q  And what percentage of the field would you say you had

19 planted to tangerines?

20     A  Well, I suppose about 5%.

21     Q  That would be about one-third of an acre?

22     A  Yes, roughly.

23     Q  And you haven't had any production, of course, off of

24 any of those trees?

25     A  No, sir.

Z-83

1    LT. MILLER:  We have no further--  Well, I do have one

2  further question.

3        Q  You are married, Mr. Shaver?

4        A  That is right.

5        Q  Is your wife named Joan B.?

6        A  Joan B., yes, sir.

7    LT. MILLER:  No further questions.

8    MR. SACHSE:  I have one further question, your Honor, on

9  redirect.

10

11                    REDIRECT EXAMINATION

12  BY MR. SACHSE:

13       Q  Mr. Shaver, taking Field 2, what percentage of Field 2

14  in your opinion is irrigable land, including what you now have

15  planted and what you think you could plant?

16       A  Well, I feel that with terraces we could probably--

17  probably 90% of it could be planted.

18    MR. SACHSE:  I have no further questions.

19    THE MASTER:  I just have one question here.

20       Q  You stated that you had farmed row crops and grapes.

21  By that I infer that you no longer have either of those.  Is

22  that correct?

23       A  Well, in this bottom area here I have had Italian

24  squash and corn in this field.

25       Q  And where were the grapes?

Z-84

1     A  Well, now, we just planted some grapes last year in

2  this area here, maybe a half an acre or so.

3     Q  The grapes are now still growing in Field 1?

4     A  Yes, sir.

5     Q  The only crops that you have grown at any time on

6  this Field 2, the Class VII land, are the avocados and the

7  tangerines that you have referred to?

8     A  That is right.

9     Q  And you stated that the reservoir behind the dam

10  filled up this winter from natural rainfall?

11     A  That is right.

12     Q  In the past years has any water collected behind that

13  from natural rainfall, or has the only source of that water

14  been water that was pumped into it?

15     A  Well, last year the rain probably put five to ten foot

16  of water in it.

17     Q  Otherwise it is pumped-- it is filled with water which

18  you pump from the wells or the sump in the spring?

19     A  Yes, sir.

20     THE MASTER:  That is all I have.

21     MR. DENNIS:  I have one or two questions.

22

23                    RECROSS-EXAMINATION

24  BY MR. DENNIS:

25     Q  The soil conservation dam that you referred to, Mr.

Z-85

1    Shaver, that is not directly on De Luz Creek or any tributary

2    creek, is it?

3         A  Would you state your question again?

4         Q  The soil conservation dam you referred to is not located

5    on De Luz Creek or any tributary?

6         A  No, sir, it is up on the hill.

7         Q  Did you secure a permit from the State of California

8    in relation to the construction of the dam?

9         A  No.  All we did was go through the Soil Conservation,

10   and they laid it out for us.

11        Q  And as I understand it, all of the water that is

12   impounded behind the dam at flood stages or during periods

13   of rainfall is restricted so that it does not move downstream?

14   There are no provisions where water can be released from the

15   dam other than the spillway?

16        A  Just the spillway.

17        Q  And the manner which you operate is that all water

18   which is impounded behind the dam is left there during the summer

19   season until it evaporates or seeps out?

20        A  We try to use it for our growth.

21        Q  That is by pumping it out?

22        A  Yes.

23   MR. DENNIS:  That is all.

24   THE MASTER:  That is all.  You are excused, Mr. Shaver.

25   MR. SACHSE:  I will call Mr. Gaius Shaver.

1623

Z-86

1        LT. MILLER:  Your Honor, we have no rebuttal evidence

2   with respect to Mr. Herbert Shaver.

3

4                    GAIUS RAY SHAVER,

5   called as a witness in his own behalf, being first duly sworn,

6   testified as follows:

7

8                    DIRECT EXAMINATION

XI      9        MR. SACHSE:  Will you mark this MD-M, please.

10       Q  Will you state your full name, Mr. Shaver?

11       A  Gaius Ray Shaver.

12       Q  And you are the owner of Parcel 11 as indicated on

13   M-68, covered by engineering report in M-41.  Is that correct?

14       A  That is correct.

15       Q  I will hand you a copy of a photograph of a grant deed

16   marked MD-M, and ask you if that is a copy of the deed to your

17   property?

18       A  It is.

19       MR. SACHSE:  I will offer that in evidence, your Honor,

20   as Defendants' MD-M.

21       THE MASTER:  This will be received in evidence as Defend-

XR      22   ants' Exhibit MD-M.

23   BY MR. SACHSE:

24       Q  How long have you owned this property, Mr. Shaver?

25       A  Just this year, 1958.

Z-87

1    Q  Mr. Herbert Shaver is your brother.  Is that right?

2    A  No, he is my nephew.

3    Q  Pardon me.  Are you familiar with the--  How long have

4  you been familiar with this area?

5    A  Well, I have been coming down here since they have had

6  this property in 1950, off and on two or three or four times a

7  year.

8    Q  What development presently exists on your property?

9    A  About the only thing that is there is--  Well, there

10  are no developments.  I have disced some of it up and cleared

11  some of it.  Outside of that there is no development.

12    Q  Now, calling your attention to aerial photograph on

13  Exhibit M-41, is the area that you have disced and cleared

14  generally the area shown in yellow on the photograph?

15    A  Generally yellow, yes.

16    Q  You have no well on your property, do you?

17    A  I have no well, no.

18    Q  When you come down and spend a weekend you depend on

19  your water from your nephew's property?

20    A  That is correct.

21    Q  And you have no planting that you have irrigated at any

22  time yet?

23    A  Well, I have 17 little trees over there that I carry

24  water to.

25    Q  You tank it in?

Z-88

1    A  Yes.

2    Q  But what are your plans for water development?

3    A  Well, I plan to develop water in the-- down about the

4 creek, and make some kind of storage space when time permits.   I

5 plan to irrigate as much of this as possible, as time permits.

6    Q  What is your profession or trade, Mr. Shaver?

7    A  I am a salesman of construction equipment.

8    Q  And have you had experience in the operation of con-

9 struction equipment?

10    A  Yes, somewhat.

11    Q  Are you generally familiar with the kind of equipment

12 that is available, and the kind of jobs that can be done in

13 terracing?

14    A  I am, yes.

15    Q  Now, have you examined M-41, the engineering report?

16    A  Yes, I have examined it.

17    Q  And I will call your attention particularly to the

18 calculation on page 3 of that report where Col. Bowen and his

19 staff have indicated that in their opinion 13.4 acres of your

20 land is irrigable.  Will you tell the Court whether you agree

21 or disagree with that statement?

22    A  I disagree.  From what I have seen around the country,

23 and from what I have seen of what has been going on at my

24 nephew's place, I believe that there is much more of this

25 property that could be developed.

Z-89

1    Q   Assuming a water supply was available?

2    A   Assuming a water supply, correct.

3    Q   And by developed you mean what kind of development?

4    A   I mean to terrace it and pipe it, and run laterals

5    off the pipes.

6    Q   Now, generally speaking-- again looking at the aerial

7    photograph-- can you tell us where approximately you think the

8    frost line is on that photo?

9    A   Well, I am not too familiar with the property, but I

10   think that the lines they have designated there between the

11   yellow and blue are probably pretty correct.

12   Q   In other words, you would say that the yellow, which

13   is the lower property, is susceptible to frost?

14   A   I would think so, yes.

15   Q   And as you go up to the slope to the west you get

16   above frost level?

17   A   That is correct.

18   Q   Now, as to specific plans for development after you get

19   your water in, what have you planned to do with the different

20   fields, if you can refer to these fields?

21   A   Well, I plan to possibly in the-- well, what do you

22   call it--

23   Q   These are not numbered, you had better refer to them

24   by color, I think.

25   A   Well, in the yellow area I thought possibly that I

1627

Z-90

1    would go into some deciduous, grapes or row crops, I am not

2    quite sure.  As to the blue and on up I thought possibly I

3    would go into citrus and avocados.

4        Q  Now, looking at the photograph there appear to be a

5    number of, well, shall I say small barrancas or canyons in the

6    brown area classified as VII land.  Do you see to what I am

7    referring?

8        A  Yes.

9        Q  Have you any plans for possible soil conservation

10   structures of the kind your nephew put in?

11       A  Well, I haven't--  I am looking for a possibility of a

12   conservation structure.  There is a possibility over on the

13   northwest corner, which slopes to the west, of a possible canyon

14   in there which could be dammed up for conservation.

15       Q  In other words, that would be sloping into the stream

16   which, on the photo, appears to start practically at your

17   northwest corner, and then leave your property, and then come

18   down to the south again?

19       A  Yes, that is correct.

20       Q  But you have no concrete plans for that at this time?

21       A  I have no concrete plans for it.

22   MR. SACHSE:  I have no further questions, your Honor.

23

24

25

Z-91

CROSS-EXAMINATION

BY LT. MILLER:

Q   Mr. Shaver, your opinion, as far as this land that is marked Class VII, it is your opinion that you could terrace it and plant avocados there is based solely upon what you have seen occurring on your nephew's property?

A   The soil is quite similar, and I also base my opinion on the mighty fine crop of sagebrush which it has been able to produce.

Q   In your opinion if it would produce the sagebrush it would produce the avocados?

A   That is correct.

Q   Have you noticed a difference in the Class VII land on your property and that on your nephew's property in so far as rock outcrops are concerned?

A   There may be more outcroppings.  Also, there is more territory involved.

Q   A greater area?

A   A greater area involved.

Q   You have not had any other type of scientific analysis made of this land?

A   I have not, no.

LT. MILLER:  No further questions, your Honor.

MR. SACHSE:  I have nothing on redirect.

THE MASTER:  Mr. Dennis, do you have any questions?

1629

Z-92

1    MR. DENNIS:  I have no questions.

2    THE MASTER:  I have no questions.  You are excused then,

3 Mr. Shaver.

4    MR. SACHSE:  Thanks very much.  I can excuse the two

5 Shavers to get back to Los Angeles?

6    LT. MILLER:  Yes.

7    THE MASTER:  Yes, they may be excused.

8    MR. SACHSE:  Thank you.

9        Mr. Towne, please.

10

11                GEORGE WEBSTER TOWNE,

12 called as a witness in his own behalf, being first duly sworn,

13 testified as follows:

14

15                DIRECT EXAMINATION

16 BY MR. SACHSE:

17    Q  Will you state your full name, Mr. Towne?

18    A  George Webster Towne.

19    Q  Where do you live?

20    A  4483 Kingsley, Pomona; about a third of the time to a

21 half down in De Luz Canyon.

22    Q  I will hand you Government's Exhibit M-49, being an

23 engineering report on Parcel 40, and ask you if you are the

24 owner of that parcel?

25    A  That is correct.  I am the owner of the colored

Z-93

1  portion here.

2      Q   That is what I mean, the colored portion indicated on

3  Exhibit M-49.

4      A   But this is known as 40.

5      Q   Parcel 40?

6      A   Parcel 40.

7      Q   I will hand you a photostat of a grant deed marked

XI     8  Defendants' MD-M and ask you if that is the deed to your

9  property?

10      A   I believe it is, yes.

11      MR. SACHSE:   I offer this in evidence.

12      LT. MILLER:   No objection.

13      THE MASTER:   That will be received as Defendants' Exhibit

XR     14  MD-N.

15  BY MR. SACHSE:

16      Q   Mr. Towne, how long have you owned Parcel 40?

17      A   I closed the deal on that, as I remember it, in March

18  of 1956.   I think you have the papers on it.

19      Q   Well, what is the present development on the property?

20      A   Two acres of Fuerte and Haas avocados; 50 muscat wines;

21  12 or 14 family orchard, peaches.

22      Q   12 to 14, you mean trees?

23      A   Trees only.   Then the space below, it is very flat,

24  has been used to-- up until this year for kitchen garden,

25  vegetables, and that sort of thing, less than an acre.   And do

Z-94

1   you mean the agricultural development?

2       Q   Yes, first agricultural, and then we will go on.   Now,

3   is that the extent of the agricultural development?

4       A   Yes.

5       Q   Now, what is your present water supply?

6       A   I am in partnership with the Goodchap well, the Fair-

7   banks-Morse into a stone reservoir, and a turbine from there

8   up to the upper ground where the avocado trees grow.

9       Q   In other words, you are deriving your present water

10  supply from a well on the Goodchap property, which is pumped

11  to a reservoir on your property.   Is that correct?

12      A   That is right.

13      Q   Now, your property corners in the extreme northwest

14  corner, however, on De Luz Creek, does it not?

15      A   De Luz Creek intersects it, I have land on both sides

16  of the creek.

17      Q   And have you any immediate plans for developing water

18  on your own property as distinct from--

19      A   Not immediately.   I have plans for development.

20      Q   But as of now--

21      A   Not this year.   I have some other property that I have

22  to sell before I can do much developing here.   That is the idea,

23  to develop more water.

24      Q   Do you have any apparent source of water other than

25  De Luz Creek or the Goodchap well?

Z-95

1     A  Well, like Mr. Shaver's testimony, I have a damp spot

2  in a ravine on the south borderline of this property, or near

3  the south property line, and some distance from the creek.  I

4  have never tried to develop water in it, but I was told when I

5  went in there that it was springy through the summertime.

6     Q  But you have done nothing--

7     A  I have done nothing with it.

8     Q  Now, directing your attention particularly to the

9  soil classification photograph, can you by reference to the

10  colors tell us where your avocado plantings are?

11     A  Well, the avocado plantings would follow very closely

12  this yellow here, then--

13     THE MASTER:  That is the land marked Class VI?

14     THE WITNESS:  That is right.  And I believe that the

15  terraces are cut and ready to plant; that will go probably

16  further to the south, about three terraces.

17     THE MASTER: Into the brown land?

18     THE WITNESS:  Yes, into the brown.  Yes.

19  BY MR. SACHSE:

20     Q  In other words, you are anticipating possible de-

21  velopment of a portion of the brown Class VII land?

22     A  I believe so, yes.  Of course, I haven't taped it off

23  and I can't tell accurately, but that would be my opinion.

24     Q  Well, I will direct your attention particularly to

25  page 3 of the engineering report in which Col. Bowen and his

Z-96

1  staff have expressed the opinion that approximately 8 acres of

2  your total of 10 acres is irrigable.  Do you agree or dis-

3  agree?

4       A  I will agree that that amount is irrigable.

5       Q  You have no particular quarrel then with the soil

6  classifications found by the Office of Ground Water Resources?

7       A  Well, as for the classification, as to those, under

8  pressure every inch of it except the northwest corner could be

9  planted to something and would grow something.  Now, the

10 efficiency would be poor on part of it; part of it is too steep.

11 But the soil is there, and it is deep.  It is deeper than further

12 up the canyon on properties.  And I have no quarrel with this

13 allotment of 5.7 acres for avocados.

14      Q  And similarly the row crop area is about right, in your

15 opinion?

16      A  I should think so.  If anything, the row crop area it

17 might be stated a little more than there actually is.

18      MR. SACHSE:  I have no further questions.

19

20                    CROSS-EXAMINATION

21 BY LT. MILLER:

22      Q  Directing your attention to the aerial photo, Mr. Towne--

23      A  The map?

24      Q  Yes.  --and the area that is dark brown and classified

25 as Class VII--

Z-97

A    Yes.

Q   --you have not at this time planted anything on there and had it productive? It hasn't been cultivated at this time?

A   I am not sure but what there are some trees growing into that Class VII.

Q   You are not positive whether they are on the VI or VII of that southerly portion?

A   No.   I haven't put a tape on it to determine the exact measurements.   However, we have a road that is cut through it that gives a section of the soil very accurately, and the soil is deep on that north portion.

Q   Right at the spot where the road is cut through?

A   Yes.   In fact, during this last winter portions of it have slid out and the soil is excellent.

Q   You haven't had any other type of scientific study made of this soil other than this?

A   No, none.

LT. MILLER:   No further questions, your Honor.

MR. SACHSE:   I have one further question I overlooked, your Honor, if I may go back.


REDIRECT EXAMINATION

BY MR. SACHSE:

Q   Mr. Towne, do you have any place on your property, any location where you plan to go on with a soil conservation dam

Z-98

1   structure?

2        A   I do.

3        Q   Where is that?

4        A   There is a ravine on the south side of the place--

5        Q   Well, let me direct your attention to the extreme

6   southerly end of it, there appears to be a broken line?

7        A   That is right.

8        Q   Is that the ravine to which you refer?

9        A   That is right.   And there is a space there that would

10  be very suitable,   In fact, I made application for a soil

11  conservation dam and didn't go through with it.

12       Q   You have done that heretofore?

13       A   Yes.

14  MR. SACHSE:   That is all, your Honor.

15  THE WITNESS:   I intend to go through with it.

16  MR. SACHSE:   That is all.

17  THE MASTER:   Just a minute, Mr. Towne.   I am trying to

18  correlate the descriptions in your deed with the land itself.

19  Is the Parcel No. 3 referred to in the deed Exhibit MD-N the

20  west 30 feet of the east 510 feet of the North Half of the

21  Northeast Quarter of the Northeast Quarter of the Northwest

22  Quarter of Section 29, Township 8 South, Range 4 West, is that

23  the narrow corridor which protrudes to the north boundary of

24  your property?

25       THE WITNESS:   Yes.

Z-99

1     MR. SACHSE:  I think we can stipulate to it, because the

2 Goodchap has the--

3     THE MASTER:  Yes.  And it conveys an undivided half

4 interest in and to a certain well, and that is the Goodchap

5 well.  Is that correct?

6     THE WITNESS:  Yes.  Now, Parcel 6, that is irrigated from

7 the Goodchap well, is half Whitmer and half Goodchap, they put

8 it down jointly, and I took over Whitmer's part of it when I

9 bought the property.

10     THE MASTER:  As far as you know these parcels have at all

11 times been conveyed by the same deeds, to the best of your

12 knowledge?

13     THE WITNESS:  I am sure of it.

14     MR. SACHSE:  Your Honor, I think it will clear up when

15 the Goodchap deeds go in, the two will tie together, you can

16 compare them.

17     THE MASTER:  That is all.

18     MR. SACHSE:  Can Mr. Towne be excused, your Honor?

19     THE COURT:  Yes, he may be excused.

20     MR. SACHSE:  Mrs. Goodchap.

21

22

23

24

25

Z-100

ROBERTA LACEY GOODCHAP,

called as a witness in her own behalf, being first duly sworn,
testified as follows:

DIRECT EXAMINATION

BY MR. SACHSE:

Q   Will you state your full name, please?

A   Roberta Lacey Goodchap.

Q   Mrs. Goodchap, you are the wife of William Goodchap?

A   That is right.

Q   And you and Mr. Goodchap are the owners of Parcel 41,
as indicated on Exhibit M-68, and as described in engineering
report M-50.  Is that correct?

A   Yes, sir.

MR. SACHSE:  Will you mark that MD-O, please.

Q   Mrs. Goodchap, I will hand you a photostatic copy
of a grant deed from Whitmer to Goodchap, and ask you if that
is the copy of the deed to your property?

A   Yes, sir.

MR. SACHSE:  I will offer it in evidence as Defendants'
MD-O, your Honor.

THE MASTER:  It will be received in evidence as Defendants'
Exhibit MD-O.

BY MR. SACHSE:

Q   Mrs. Goodchap, let's first clarify this pump situation.

Z-101

1    You have a well, a pump, and so on, on your land. Is that right?

2        A   That is right.

3        Q   And that well is-- withdraw that.

4            A one-half interest in that well is owned by Mr. Towne

5    who just testified?

6        A   That is right.

7        Q   And presently water is pumped from your well to a

8    reservoir on the Towne property.   Is that correct?

9        A   Yes.

10       Q   Now, do you want to examine, please, that engineering

11   report M-20, and particularly the little aerial photograph

12   map at the back.   You will notice the purple colored area

13   running through the westerly portion of your property.   That

14   is De Luz Creek, is it not?

15       A   Yes, sir.

16       Q   Now, what have you got-- will you describe to the

17   Court what is on your property at the present time in the line

18   of improvements?

19       A   Nothing but a house, a small house.

20       Q   I am sorry. Speak up, please.

21       A   A small house only.

22       Q   You have no agricultural development?

23       A   No.

24       Q   So actually half of the water of the well hasn't been

25   used by you presently, has it?

Z-102

1    A  No, not in the last three years.

2    Q  If you will examine the aerial photograph, and then

3  if you will refer to page 3 of the text of the report you will

4  see that Col. Bowen and his staff have found that 4.4 acres

5  of your total 4.7 acres is irrigable.  That is, they have

6  eliminated as non-irrigable only the stream channel of De Luz

7  Creek.  Do you generally agree or disagree with their findings?

8    A  I agree.

9    Q  You agree with their findings?

10    A  Yes.

11    Q  Do you have any water source of any kind, to the best

12  of your knowledge, on your property other than De Luz Creek?

13    A  No.

14    Q  You have no springs that you are aware of, or anything

15  of that kind?

16    A  No.

17    Q  Can you tell us by reference to the photograph again,

18  referring to the colors on it, what your plans are for the

19  development of the property, what you intend to do with it?

20    A  Well, eventually we intend to live there and plant a

21  few fruit trees and a garden, and that is just about it.

22    Q  Do you have any location on your property where you

23  have any plans for a soil conservation dam of any kind?

24    A  Not at the moment, no.

25    MR. SACHSE:  I have no further questions.

Z-103

1          LT. MILLER:  No questions.

2          MR. DENNIS:  No questions.

3          MR. SACHSE:  Thank you very much, Mrs. Goodchap.  I guess

4     you can go back to Pomona.

5          Excuse me just a second, your Honor.

6          THE MASTER:  Surely.

7          MR. SACHSE:  I will call Mr. Lewis.

8

9                      BURTON DAVID LEWIS,

10    called as a witness in his own behalf, being first duly sworn,

11    testified as follows:

12

13                      DIRECT EXAMINATION

14    BY MR. SACHSE:

15          Q  Will you state your full name, please?

16          A  Burton David Lewis.

17          Q  Where do you live, Mr. Lewis?

18          A  2531 Purdue, Los Angeles 64.

19          Q  Mr. Lewis, you and Mr. Michael Taylor are the owners as

20    tenants in common of Parcel 12 as indicated on Exhibit M-68.

21    Is that correct?

22          A  Yes.

23          Q  Now, were you present in court this morning and heard

24    Col. Bowen's testimony?

25          A  Yes, I was.

Z-104

XI

1     Q  You understand that there is no engineering report

2  presently available on your land?

3     A  Yes.

4     Q  And that his statements here were tentative, subject

5  to revision as a more detailed study is made, and that such a

6  study will be made?

7     A  Yes, I understand.

8     MR. SACHSE:  Will you mark this MD-P, please.

9     Q  I will hand you an exhibit, a photostat of a grant

10  deed marked Defendants' Exhibit MD-P, and ask you if that is a

11  copy of the deed to your property?

12     A  Yes, it is.

13     MR. SACHSE:  I will offer it in evidence, your Honor.

14     LT. MILLER:  Your Honor, with respect to the deed, well,

15  the records of the United States in this regard had shown the

16  owners to be Norman and Laverne Kogen, with an option to pur-

17  chase in William and Selma Jost, and we only call that to the

18  attention of the Court.  We don't know if Mr. Taylor and Mr.

19  Lewis are the sole owners, or if there are other owners or

20  interests in that property.

21     THE MASTER:  Well, the deed, of course, is acknowledged

22  April 21, 1958, recorded May 28, 1958, which would be after your

23  title search had been made.  And it comes from Selma M. Jost,

24  an unmarried woman.  Now, who was the other owner as shown in

25  your records?

Z-105

XR

1        LT. MILLER:  Well, we had a record of a William Jost,

2   J-o-s-t, also being together with Selma on an option to

3   purchase the property, with the record ownership being in

4   Norman and Laverne Kogen, K-o-g-e-n.  Now, each of these parties

5   have been served, and the only answer which has been filed is

6   that by Mr. Lewis and Mr. Taylor.

7        THE MASTER:  Well, the deed will be received as Defend-

8   ants' Exhibit MD-P.

9        MR. SACHSE:  May I make it clear, there is no objection

10  that that is not a true copy of the deed?

11       LT. MILLER:  Oh, no.  But we don't know what happened in

12  between all of these parties, and only call it to the attention

13  of the Court.

14       THE MASTER:  The question is simply as to whether Mr.

15  Taylor and Mr. Lewis have or have not acquired the complete

16  ownership of the property?

17       LT. MILLER:  Yes, sir.

18       THE MASTER:  Of course, any decree the Court would make

19  would affect the property and any owners thereof, and the Court

20  is not directly concerned with whether Mr. Taylor and Mr. Lewis

21  have a clear title or there might be some outstanding adverse

22  claim against it.

23       MR. SACHSE:  Furthermore, your Honor, if there is no

24  question on the part of the Court or counsel that it is a correct

25  copy, I think it is a prima facie showing, and in the absence

Z-106

1    of rebuttal testimony would be adequate.

2         THE MASTER:  Yes, that is true.

3    BY MR. SACHSE:

4         Q  Mr. Lewis, you and Mr. Taylor acquired the property

5    on the date indicated in the deed we have just discussed?

6         A  Yes, sir.

7         Q  And did you have any extensive familiarity with this

8    area before you bought this property?

9         A  No.  I have just been through it several times, but

10   nothing extensive.

11        Q  Now, as I said a moment ago, we do not have a detailed

12   soil map of your property but, if Lt. Miller will agree, your

13   property would comprise the 40 lying immediately north of the

14   colored area on Exhibit M-42.  Is that correct?

15        LT. MILLER:  Yes, we will stipulate to the location of

16   his property.

17   BY MR. SACHSE:

18        Q  So in my questions now, Mr. Lewis, I am directing your

19   attention to the square 40-acre parcel lying immediately north

20   of the colored area on Exhibit M-42.  Do you understand me?

21        A  Yes, I do.

22        Q  De Luz Creek runs through that property roughly north

23   to south, or northeast to southwest.  Is that right?

24        A  Yes.

25        Q  And generally speaking, if you will recall the testimony

5

Z-107

1    of Col. Bowen, he found that on your property the stream

2    channels of De Luz Creek were classed as Class VIII, non-

3    irrigable soil, because of the frequency of overflow and rocky

4    nature; and that the remainder, with the exception of a steep

5    portion in the north-- pardon me, southeast-- no, northeast,

6    he found to be irrigable, although he would not be specific

7    as to the soil types.  And he made a finding that 31.9 acres

8    out of your 40 to be irrigable at this time.  Would you

9    generally agree or disagree with those conclusions of Col.

10   Bowen's?

11        A  1 would agree.  I would agree.

12        Q  Now, what are the improvements on your property at

13   the present time?

14        A  Well, there is a cabin.  I don't know when they were

15   made, but there are three terraces that were neglected, and I

16   don't think anything was ever planted on them.  But there are

17   three terraces on the hill in the southeast corner and the

18   west-facing slope of that hill.

19        Q  But there are no plantings of any kind at the present

20   time?

21        A  No.

22        Q  Is there a well on the property at the present time?

23        A  Yes, there is a well.

24        Q  Is it operative?

25        A  No.

Z-108

Q   It has no pump on it?

A   It is in a very bad state of repair now.

Q   Have you ever used it to produce water since you have had the property?

A   No, I haven't.

Q   Have you any immediate plans for improvement or development, you and Mr. Taylor?

A   Nothing immediate, no.

Q   And your future plans in general are what?

A   Well, to develop it as an agricultural enterprise, a profitable one according to its potential, whatever it will allow.

Q   And do you intend to develop water out of De Luz Creek where it flows through your property?

A   Yes.

MR. SACHSE:   I have no further questions.

LT. MILLER:   No questions, your Honor.

MR. DENNIS:   No questions.

THE MASTER:   Very well.

MR. SACHSE:   We could compound this by calling Mr. Taylor, but I don't think there is any point in repeating the story.

THE MASTER:   Not unless he can add something additional to it.

MR. SACHSE:   Thank you very much.

THE MASTER:   Shall we recess now?

Z-100

1      MR. SACHSE:  Yes.  Rowley will be a little longer than

2  these, but not extensive.  Your Honor, could we go off the

3  record a minute?

4           (Discussion off record.)

5      THE MASTER:  We will take a five-minute recess.

6           (Recess.)

7      THE CLERK:  Court is now in session.

8      MR. SACHSE:  Mrs. Rowley.

9

10                    BEATRIX ROWLEY,

11  called as a witness in her own behalf, being first duly sworn,

12  testified as follows:

13

14                    DIRECT EXAMINATION

15      THE CLERK:  Your name?

16      THE WITNESS:  Beatrix Rowley.

17  BY MR. SACHSE:

18      Q  Mrs. Rowley, will you try to speak audibly so every-

19  body can hear you?

20      A  Yes.

21      Q  Where do you live?

22      A  In De Luz.

23      Q  And you are the wife of Truman C. Rowley?

24      A  That is right.

25      Q  And you and Mr. Rowley are the owners of the parcel

Z-110

1    indicated as Parcel 7 on Plaintiff's Exhibit M-68, and which

2    parcel is reported in Plaintiff's Exhibit M-79 engineering

3    report.   Is that right?

4         A   Yes, sir.

5         MR. SACHSE:   Can we staple them together and make them

6    as one exhibit, your Honor?

7         THE MASTER:   Yes.

XI   8    MR. SACHSE:   That will be MD-Q

9         Q   Mrs. Rowley, I will hand you photostats of three deeds

10   that have been marked Defendants' MD-Q.   Will you glance at

11   them and tell me if those are the deeds to the property in

12   question?

13        A   Yes, they are.

14        MR. SACHSE:   Thank you.   I will offer these in evidence,

15   your Honor, as Defendants' MD-Q.

XR   16   THE MASTER:   Well, the three deeds will be received

17   collectively as Defendants' Exhibit MD-Q.

18   BY MR. SACHSE:

19        Q   And have you lived on this property since your

20   acquisition of it?

21        A   Yes, we have.

22        Q   Now, will you start out with the physical improvements,

23   not crops, but buildings and so on, what is on the property?

24        A   Well, when we bought the property there was an old house

25   on it, but we started in right away to build a new one.   We have

Z-111

1 part of the old one left, and partly living in the new one.   And

2 we constructed a utility garage, it is about 30 by 42.

3     Q   That is a workshop, is it?

4     A   Yes, it is.

5     Q   And what about wells?

6     A   Well, we have one spring or artesian, as it has been

7 referred to, right in back of the house, that is between the

8 utility garage and the house.   And that furnishes our domestic

9 water, and it has a constant flow.

10     Q   Then you have also a well in the stream itself, do you

11 not?

12     A   Yes, we do.

13     Q   Now, will you describe for the Court, please, the

14 arrangement whereby you-- what you do with the excess spring

15 water?

16     A   Well, I would say about five feet down in this artesian

17 well we have a pipe or an overflow, and it connects down to the

18 well in the stream.

19     Q   Now, the well in the stream is concrete cased, is it

20 not?

21     A   Yes, it is.

22     Q   So when you are using no water from the spring, this over-

23 flow from the spring goes by pipe into the well in the stream?

24     A   Yes, it does.

25     Q   And when that well fills up what happens?

Z-112

1      A   Well, we have a 5-horsepower pump that pumps it up

2  into a concrete reservoir that we have on top of a hill.

3      Q   Assuming no pumps are operating at all, your spring

4  water will flow into your well in the spring, that will fill

5  the well to the casing, and it will again overflow into the

6  stream.   Is that correct?

7      A   That is what happens, yes.

8      Q   Now, tell us about this reservoir you mentioned.

9      A   Well, the reservoir is a one-acre-foot reservoir on

10  top of the hill, and that in turn furnishes gravity flow for

11  everything below.

12      Q   Now, what plantings do you have?

13      A   Well, at the present time we have about an acre and a

14  half of tangerine trees, and we have a a family orchard I think

15  of about 50 trees, just a variety of peaches, and apricots, and

16  things like that.   And we have a garden plot, and grapevines;

17  and we have nut trees, I think we have about a dozen nut trees.

18      Q   And have you cleared or improved any other property

19  which is not yet planted?

20      A   Yes, we have.   It is in the east portion, there is

21  hills there.   I suppose it would be about five acres that we

22  have terraced and ready to plant.

23      Q   Now, if you will look at Exhibit M-79, and particularly

24  the colored photograph at the back, please.   And I will direct

25  your attention to the extreme easterly portion shown in the

Z-113

1    picture, which has a symbol for a dam across it.  Do you see

2    what I am referring to?

3        A  Yes, I do.

4        Q  Now, what is that?

5        A  Well, that is a dam, and makes a dirt reservoir in

6    back of it.

7        Q  Now, what is the water supply for that dam?

8        A  Well, just rainfall.  And we also have a pipe line, a

9    three-inch pipe line, running from our well in the creek to

10   that.

11       Q  So that dam impounds either rain runoff, or you can

12   pump into it?

13       A  Yes.

14       Q  Now, directing your attention to the yellow section

15   where it has a point going into the blue, I think I see another

16   dam symbol.  Is that correct?

17       A  Oh, up on the other side of the road?

18       Q  On the other side of the creek, yes.

19       A  Yes, there is another dam there.

20       Q  Now, what is the source of supply for that dam?

21       A  Well, that would be the same thing, it can be either

22   from the pump, or it filled this year and overflowed for a

23   long time from rain.

24       Q  Now, did the other one fill from rain?

25       A  No.  No, it didn't.

Z-114

1  Q  Now, could you take, please-- I think this will be as

2  good as anything-- and indicate approximately on the map the

3  location of this artesian spring?

4  A  Well, it would be about 60 feet from the road right

5  in this--

6  Q  Just make a little X.

7  A  Just about there.

8  THE MASTER:  Make it finer..

9  BY MR. SACHSE:

10  Q  And that is located, I think you said, between your

11  house and your workshop garage.  Is that right?

12  A  Yes.  Do you want the location of the cement reservoir?

13  Q  Yes, I think you might as well draw that part.

14  A  It is just directly up the hill here.

15  Q  Draw a circle for the cement reservoir.

16  A  All right.  I think that would be about it.

17  Q  A circle in the blue area?

18  A  Yes.

19  Q  Now, have you named all the water sources that you

20  think you have in this easterly portion of your property that

21  joins in the De Luz Creek, or are there others?

22  A  Well, no.  Oh, for the last two years we have noticed

23  water standing over next to the hill, that would be on the

24  east side of the creek, and so we thought it would be a good

25  idea to explore it a little.  So we had a bulldozer go in there

Z-115

1  last September during the dry season and we made a place about

2  150 feet long and about 10 feet deep, maybe, and immediately

3  water came up into it about four feet deep.

4      Q   That was in September of last year?

5      A   Yes, during the dry season.

6      Q   Now, can you by reference again to the color and

7  fields tell us in which one of those areas --

8      A   I guess I lost my pencil.

9      Q   First just tell us which area it is located in, the

10  brown or the blue?

11      A   Do you mean where this sump is?  Well, it is in this

12  yellow portion, I think, because it is near the line.

13      Q   It is near your easterly property line?

14      A   Yes, it is, on that section.  This section here, you

15  see.

16      THE MASTER:  Do you want to mark that on the map then

17  with a numeral, I presume?

18  BY MR. SACHSE:

19      Q   Or just draw a straight line, or something.  Just draw

20  a little line where you think that is.

21      A   Over here.  Where this water stands it comes right

22  along here, and it seems to rise up there and meanders down

23  through here, and it lasts throughout the summertime.

24      THE MASTER:  The straight line you marked in the yellow

25  to the east of the creek is the area that you bulldozed last

Z-116

1    summer?

2        THE WITNESS:   Yes.   It has been standing full ever since

3    the first rain started in October, I think, of last year.

4    BY MR. SACHSE:

5        Q   You are not using that water in any way?

6        A   No, we have not, we are just exploring.

7        Q   Now, Mrs. Rowley, I am calling your attention now to

8    the westerly part of the photograph.

9        A   Yes, sir.

10       Q   And particularly to that orange section running down

11   through it from northeast to southwest.   Do you see to what I

12   refer?

13       A   Yes.

14       Q   What kind of a stream is that?

15       A   What kind of a what?

16       Q   Stream.   Is that a stream, or what is it?

17       A   Oh, during the rainy season naturally it is quite a

18   drainage area, comes down from the north over there.

19       Q   Is there any flow in it except during and after rains?

20       A   No, I don't think so.

21       Q   Now, do you have any knowledge of any water sources

22   in this easterly portion of your property other than this

23   intermittent stream you just mentioned?

24       A   Coming back over to the east side by the creek?

25       Q   I beg your pardon.   In this westerly portion.

Z-117

1        A   No, we don't.  Possibly there could be some water

2    development.  My husband walked over there yesterday, over

3    across the hills, and he said that there were some, well, real

4    heavy fern growth in there.

5        Q   But you don't know of your own knowledge of any water

6    sources?

7        A   No.

8        Q   Now, I will direct your attention to page 3 of the

9    engineering report, and particularly to the table at the top

10   of the page, and you will see that Col. Bowen and his staff

11   have expressed the opinion that 46.5 acres of your total of 130

12   acres are susceptible to practical and profitable irrigation.

13   Can you tell us whether you agree or disagree, or to what ex-

14   tent?

15       A   I think it is fair enough.

16       Q   You think it is fairly accurate?

17       A   I think so.

18       Q   And you have no disagreement, do you, that the easterly

19   portion of your property, approximately all of your property in

20   Section 19, drains into Cottonwood Creek rather than De Luz

21   Creek?

22       A   That is right.

23       LT. MILLER:  I think counsel meant the westerly portion.

24       MR. SACHSE:  Again I did.  I am sorry.  The westerly

25   portion.

Z-118

1        THE WITNESS:  I thought you did.

2    BY MR. SACHSE:

3        Q  The westerly portion, and specifically your holdings

4    in Section 19?

5        A  Yes.

6        Q  Drain into the Cottonwood Creek rather than De Luz

7    Creek?

8        A  Yes.

9    MR. SACHSE:  I have no further questions, your Honor.

10    LT. MILLER:  No questions, your Honor.

11    MR. DENNIS:  No questions.

12    MR. SACHSE:  Thank you very much, Mrs. Rowley.

13    THE MASTER:  No questions.

14        Then at this time we will recess until--

15    LT. MILLER:  Your Honor, I wonder if we might introduce

16    this map that we spoke to you about during the recess?

17    THE MASTER:  Surely.

18    LT. MILLER:  I will ask the Clerk to mark this as Plain-

XI    19    tiff's Exhibit M-84.

20        I will hand Exhibit M-84 for Identification to counsel

21    for their examination, and state that it purports to be a

22    land classification and land ownership map of De Luz Creek

23    watershed.

24        MR. SACHSE:  Could I ask a question about what this is?

25    Col. Bowen could probably answer it.

Z-119

1          Colonel, is this in effect superimposing on M-32  the

2   findings of your various soil surveys?

3          COL. BOWEN:  May I, your Honor?

4          THE MASTER:  Yes.

5          COL. BOWEN:  I think it is Plaintiff's Exhibit M-31,

6   perhaps we could explain it.

7          Mr. Edwards, may I have M-31, I believe, the map?

8   I am sorry.

9          MR. SACHSE:  It is 32, isn't it, right there on the map?

10         THE CLERK:  Would it be M-37?

11         COL. BOWEN:  Yes, sir.  Your Honor, that exhibit offered

12  by Lt. Miller is a superimposition of the soils classes con-

13  tained on Plaintiff's Exhibit M-37, and the land ownership map,

14  Plaintiff's Exhibit M-32.

15         THE MASTER:  In other words, it is a combination of M-32

16  and M-37, excepting that it has not been colored?

17         COL. BOWEN:  Yes, sir, that is correct, your Honor,  And

18  it was specifically requested by his Honor, and we prepared it

19  in accordance with his request.

20         MR. SACHSE:  Will I be able to get a copy?  I would like

21  very much to get one.

22         LT. MILLER:  Yes, we will bring two or three extra copies

23  Monday for defense counsel.

24         MR. SACHSE:  No objection.

25         LT. MILLER:  Submit it into evidence at this time.

Z-120

XR

1    THE MASTER:  Yes, that will be received in evidence as

2  Plaintiff's Exhibit M-84.  And counsel for the defendants will

3  be furnished with copies on Monday?

4    LT. MILLER:  Yes, sir.

5    THE MASTER:  We will then, if there is no further testi-

6  mony, at this time recess until 9:30 Monday morning.

7

8                              - - - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25