ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

———

**BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**Volume:** 13

**Pages** 1658-1764

**Date:** June 30, 1958

**Place:** Fallbrook, California

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1
2
3
4       APPEARANCES:
5
6           LT. DAVID W. MILLER (USN)
              For the United States of America.
7
           FRANZ SACHSE, ESQ.,
8            For the Fallbrook Public Utility
             District and named individual
9            Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | | 1663 | | 1670 |
| | 1682 | 1684 | | |
| | | 1687 | | |
| | 1688 | 1689 | | |
| | 1690 | 1691 | 1693 | |
| | 1693 | 1694 | | |
| | 1696 | 1697 | 1701 | |
| | | 1714 | | |
| | | 1743 | 1744 | 1747 |
| | | | 1749 | |
| | | 1753 | | |
| | | 1756 | | |
| | | 1760 | | |

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Samuel H. Emmes | 1662 | | | |
| | 1671 | 1674 | | 1677 |
| | | | | 1678 |
| Cora H. Myers | 1708 | 1711 | | |
| Frank E. Couch | 1726 | 1736 | 1740 | |
| Bennie R. Mosher | | 1758 | | |

Z95

1659

# INDEX TO EXHIBITS

| | | Iden. | Evid. |
|---|---|---|---|
| M-85 | Engineering Report on Parcel 85 | 1683 | 1683 |
| M-86 | Engineering Report on Parcel 32 | 1683 | 1684 |
| M-87 | Engineering Report on Parcels 73 and 74 | 1686 | 1687 |
| M-88 | Engineering Report on Parcel 56 | 1688 | 1689 |
| M-89 | Engineering Report on Parcel 53 | 1690 | 1691 |
| M-90 | Engineering Report on Parcel 63 | 1694 | 1694 |
| M-91 | Engineering Report on Parcel 88 | 1696 | 1697 |
| M-39A | Addendum to Engineering Report | 1703 | 1705 |
| M-40A to M-63A | Addendums to Engineering Reports | 1705 | 1706 |
| M-79A | Addendum to Engineering Report | 1713 | 1713 |
| M-80A | Addendum to Engineering Report | 1713 | 1713 |
| MD-R | Copy of Deed (Myers) | 1708 | 1709 |
| MD-S | Copy of Deed (Couch) | 1726 | 1752 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>Fallbrook, California, June 30, 1958, 9:35 A.M.</u>

THE CLERK:  Court is now in session.

THE MASTER:  Will counsel state their appearances for the record?

LT. MILLER:  David W. Miller for the United States.

MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility District and named individual defendants.  I have no defendants present who desire to put on their cases at this time, your Honor.

THE MASTER:  Now, are there any defendants here who have appeared without an attorney who reside in the De Luz Creek area?

MR. SAMUEL H. EMMES:  Yes, sir.  Mr. Emmes.  And I would like to present my side of the case at this time.

THE MASTER:  Very well.

MR. FRED M. JONES:  Jones.  I do not wish to be heard at this time.

THE MASTER:  You do not wish to be heard?

MR. JONES:  No, I want further evidence.

THE MASTER:  Are there any other defendants here in addition to Mr. McDowell?  Very well, then, Mr. Emmes, if you wish to present your case at this time you may come forward and be sworn.

2b

                    SAMUEL H. EMMES,

one of the defendants herein, sworn, testified as follows:


        THE WITNESS:  I realize it is perhaps a little irregular

that I am handling my own case, but perhaps to start out with

we should describe the property that is owned by myself.

        THE MASTER:  Now, will you state your full name for the

reporter, please?

        THE WITNESS:  Samuel H. Emmes, E-m-m-e-s.

        THE MASTER:  Very well.

        THE WITNESS:  And the property described--

        THE MASTER:  Can you locate the parcel number on either

of these exhibits which is on the board, Mr. Emmes?

        THE WITNESS:  There is no parcel number on this piece.

        MR. SACHSE:  Yes.  Yes, there is.

        THE MASTER:  There must be, if it is in the watershed.

Parcel 70 is your property, according to the Government Exhibit.

        THE WITNESS:  I see the number is above the property, not

on it.  I see what you mean.

        THE MASTER:  Yes.  You have this narrow strip of property

which is much wider from east to west than it is from north to

south.

        THE WITNESS:  The northerly 330 feet of the southwest one

quarter of the southeast one quarter, Section 5, Range 9 South,

4 West.

3b

1        THE MASTER:  And that is indicated on Plaintiff's Exhibit

2   M-68 by the number 70 just above the parcel of property.

3        THE WITNESS:  That is correct.  That parcel was acquired

4   by deed dated May 16, 1955.

5        THE MASTER:  Do you have a copy of that deed?

6        THE WITNESS:  I do not have it with me, sir.

7        THE MASTER:  May 16, 1955.

8        THE WITNESS:  That is right.  If there are no further

9   questions to me, I would like to ask Colonel Bowen some questions.

10       THE MASTER:  Well, I would suggest you might state first

11   the property is held by you and your wife, Alice R. Emmes--

12       THE WITNESS:  Alice R. Emmes in joint tenancy.

13       THE MASTER:  Now, is there anything you wish to state in

14   connection with the use of your property, or do you want to ask

15   Colonel Bowen some questions first and then testify yourself

16   at a later time?

17       THE WITNESS:  I would rather do it that way, ask Colonel

18   Bowen first.

19       THE MASTER:  Very well then.  I would suggest maybe you

20   sit down next to Mr. Sachse over here and let Colonel Bowen sit

21   in the witness chair.   Colonel Bowen.

22

23

24

25

1663

4b

1          ALLEN C. BOWEN,

2   recalled as a witness, having been previously sworn, testified

3   as follows:

4

5                    CROSS-EXAMINATION

6   BY MR. EMMES:

7       Q   Colonel Bowen, have you in Parcel number 70 that we

8   were discussing here, have you been on that property at any time

9   that you know of?

10      A   May I have Plaintiff's Exhibit No. 59, your Honor?

11  No. 59, Mr. Edwards.

12      THE CLERK:  Yes.

13      THE WITNESS:  Yes, sir, Mr. Emmes, I have traversed this

14  property many times on the De Luz Road.

15  BY MR. EMMES:

16      Q   Would you state the property is entirely within the De

17  Luz-Santa Margarita watershed?

18      A   Yes, sir.  The property is traversed from north to

19  south by De Luz Creek.

20      Q   Have you examined the general terrain of the property?

21      A   Yes, sir.  As shown in Plaintiff's Exhibit M-59, which

22  is the report on the Bryant property, your property just des-

23  cribed lies north of the Bryant property, and the soil sites and

24  land capability classes are shown on your property in Plaintiff's

25  Exhibit M-59.

5b

1    Q   Then you would state that possibly property within a

2    mile radius of my property would be generally about the same

3    terrain, or would you not?

4    A   No, sir.   There is a great difference in property,

5    particularly in the nature and character of property, particu-

6    larly rising from the stream bed of De Luz Creek to the higher

7    ground to the east and west.

8    Q   Would you feel that a survey conducted by the U.S.

9    Soil Conservation Service to be fairly accurate in ascertaining

10   the possible uses of the property?

11   A   Yes, sir.   The same criterion, the National Soil

12   Survey Standards, is used by the Soil Conservation Service and

13   by ourselves.

14   MR. EMMES:   I have a photostatic copy of the Soil Conser-

15   vation plot on the property.   For clearness sake,  I will bring

16   it up.   If you want to discuss anything about it, you can have

17   it there.

18   THE MASTER:   I wonder if that can be marked for identifi-

19   cation.   Will you give that to the Clerk to be marked?

20   THE CLERK:   Do you want to mark that MD or M--

21   THE MASTER:   It should be MA-70.

22   (Photostatic copy of soil conservation report marked

23   Exhibit MA-70.)

24   BY MR. EMMES:

25   Q   Would you in your opinion feel that the modern

6b

1    development of earth moving equipment could possibly alter the

2    value of any real property such as that?

3         A  Well, certainly grading and leveling could prepare

4    home sites or cabin sites and augment the value of even the

5    rougher portions of your property.

6         Q  Do you feel that the Soil Conservation Survey shows

7    the entire usage of the land of which they have surveyed?

8         A  I haven't had an opportunity to examine it yet, Mr.

9    Couch.

10        MR. SACHSE:  Mr. Emmes.

11        THE WITNESS:  Excuse me.  Mr. Emmes.

12        MR. EMMES:  Mr. Emmes.

13        LT. MILLER:  I may suggest, your Honor, that if Mr. Emmes

14   intends to examine Colonel Bowen with respect to this report

15   in any detail perhaps a five minute break to allow the witness

16   to read it over at his leisure would be in order.

17        THE MASTER:  Do you intend to ask Colonel Bowen various

18   detailed questions about this report?

19        MR. EMMES:  I am nearly finished.

20        THE MASTER:  What is that?

21        MR. EMMES:  I am nearly finished.

22        THE MASTER:  Go ahead and ask him further questions you

23   have, then.

24   BY MR. EMMES:

25        Q  At the time I purchased the property I had intended a

7b

1    possible subdivision, and with that intent in mind and certain

2    water usage which would not show in the Soil Conservation pro-

3    gram, in your opinion, Colonel Bowen, would you think that that

4    land would be adaptable for a subdivision?

5         A   You mean for residential subdivision, Mr. Emmes?

6         Q   Yes.

7         A   Yes, sir.  I see no reason why it wouldn't be adapted

8    to residential development.

9         MR. EMMES:  I guess I have no further questions.

10        THE MASTER:  I would suggest that Colonel Bowen take a few

11   minutes during a short recess to examine the exhibit for iden-

12   tification, and that we then consider whether that should be

13   introduced in evidence.

14        LT. MILLER:  Yes, sir.

15        THE MASTER:  So we will take a short five minute recess

16   and let you examine it, Colonel Bowen.

17        THE WITNESS: Thank you, sir.

18        (Recess.)

19        THE MASTER:  Do you have any other evidence you wish to

20   present now, Mr. Emmes, or any other questions you wish to ask

21   Colonel Bowen at this time?

22        MR. EMMES:  No, not at this time.

23        THE MASTER:  Very well.  Then, Mr. Miller, do you have

24   any questions?

25        MR. SACHSE:  Your Honor, I have just a couple of questions

8b

1    I would like to ask Mr. Emmes.

2         THE MASTER:  We will have him back later.

3         LT. MILLER:  No, sir.  I have no questions.

4         THE MASTER:  You have no questions to ask Colonel Bowen?

5         LT. MILLER:  No, sir.

6         THE MASTER:  Do you have any objection to the introduction

7    in evidence of the document which has been marked for Identifi-

8    cation as MA-70?

9         LT. MILLER:  No, sir.

10        MR. SACHSE:  No objection.

11        THE MASTER:  Very well.  Then the Court will receive

12   in evidence as Exhibit MA-70 the conservation plan map which was

13   offered by Mr. Emmes.

14   BY THE MASTER:

15        Q  Colonel Bowen, can you state for the record the infor-

16   mation which is revealed by this conservation map, Exhibit MA-70?

17        A  Yes, sir.  Defendant's Exhibit MA-70 is a photostatic

18   copy of a conservation plan number CF-SCD-33-878, shows the

19   owner of the property to be Samuel H. Emmes, gives the location

20   and description of the property, type of assistance that the

21   cooperator can get from the Soil Conservation District, contains

22   a land capability map showing the classes of land which the

23   soil survey found to be present on this property.  It shows

24   also that the property is traversed from north to south by an

25   intermittent stream, which I had previously testified was De

9b

1    Luz Creek.

2         It also shows the De Luz Road traversing the property,

3    and a small intermittent stream joining De Luz, south of the

4    property, running from the northeast generally to the southwest.

5    And a symbol on that small intermittent stream indicates an

6    earth filled--a proposed earth filled dam and reservoir.   The

7    date of the document is August 9, '56.   And a legend is contained

8    in the document which shows the various features of the map and

9    describes the land classification symbols used on the map.

10        Q   How many acres are shown of each type of soil on that

11   report?

12        A   The acreage of each class of land is not tabulated,

13   your Honor, but I estimate that the Class III, sub E-1 soils

14   to be about two and a half acres.   And the remainder of the land

15   is contained in Class VII and VIII, which are non-irrigable.

16        Q   What is the total acreage?

17        A   The total acreage of the property as shown on Plain-

18   tiff's Exhibit--correction, Defendant's Exhibit MA-70 is ten

19   acres.

20        Q   In your opinion, is that a fair report?   In other words,

21   does the classification of the soil in that report agree with

22   your own opinion, from what observations you have made of the

23   property?

24        A   No, sir.   In my opinion, there is more irrigable acre-

25   age from my estimate than this map discloses.

10b

1   Q   In your opinion, how many acres are irrigable?

2   A   From examination of the Samuel H. Emmes property as it

3   is shown on Plaintiff's Exhibit M-59, lying north of the Bryant

4   property, it would appear that there was about three and a half

5   acres of land that are irrigable.

6   Q   Is that land frost free?  Could that be used for

7   growing avocados?

8   A   No, sir.  The land that is indicated as irrigable on

9   Plaintiff's Exhibit M-59 is low lying, close to the creek,

10  probably subject to frost hazard, and would in my opinion be

11  better devoted to the production of row crops.

12  Q   And then the amount of water per acre foot that has

13  been used previously in connection with other properties would

14  be needed for this land, namely, about 4.2 acre feet per acre?

15  A   We have given a duty of 4 feet per acre for row crops,

16  with 10% increase for project losses.

17  Q   To your knowledge, are there any wells or springs on

18  the property?

19  A   Passing on--traversing the De Luz Road through this

20  property, I have observed a pipe line running from the De Luz

21  Creek up to the reservoir, earth filled dam reservoir.  And I

22  assume that that connects the reservoir with a well on the creek.

23  MR. SACHSE:  Move to strike.  It is an assumption, your

24  Honor.

25  THE MASTER:  The motion will be granted.

11b

1    Q  In your opinion would any water which was developed

2  from a well or spring on that property be what has been referred

3  to in previous properties as local water, or would it be part of

4  De Luz Creek?

5    A  It would be part of the De Luz Creek, your Honor.

6    THE MASTER:  I think that is all the questions I have.

7  Now, Mr. Emmes, do you wish to ask Colonel Bowen any questions

8  based upon the questions which I have asked?

9

10                    RECROSS-EXAMINATION

11  BY MR. EMMES:

12    Q  Has Camp Pendleton and your engineer's office in any

13  way given any thought to possible subdividing the property,

14  of the water allotment that may be needed?

15    MR. SACHSE:  I will object, if your Honor please.  That

16  would be an absolutely improper factor to be considered by the

17  Court, if it does make any water allocation.

18    THE MASTER:  Will you read the question again, Mr. Reporter?

19    (Question read.)

20    THE MASTER:  I will sustain the objection on the ground

21  that it is immaterial, also on the ground the witness has al-

22  ready stated the land is capable of subdivision.

23    MR. EMMES:  O.K.

24    THE MASTER:  So to that extent it has already been asked

25  and answered.

Z-1

1   MR. EMMES:  I have no further questions.

2   THE MASTER:  Any further questions?

3   LT. MILLER:  No further questions, your Honor.

4   THE MASTER:  Then you may step down, Col. Bowen.  I

5   understand you wish to testify further, Mr. Emmes.

6

7                   SAMUEL H. EMMES

8   resumed stand.

9   THE WITNESS:  In presenting this evidence here I do not

10  entirely agree with the findings of the Soil Conservation

11  people.

12  THE MASTER:  Now you heard Col. Bowen state that in his

13  opinion about three and a half acres are irrigable instead of

14  the two and a half that they show.

15  THE WITNESS:  That is right.  So he does not agree with

16  them.

17  THE MASTER:  Do you agree with this statement or do you

18  disagree with him also?

19  THE WITNESS:  I also disagree with him.  I feel the

20  parcel marked VII EL.--

21  THE MASTER:  I believe that is VII El.

22  THE WITNESS:  VII El I guess is the way you identify that

23  is partially irrigable.  And I have evidence of the fact that

24  it is usable by the fact I have a three-year-old lemon tree

25  growing on it.  And it is possible to grow trees on that piece

Z-2

1   of land.  And that, incidentally, that lemon tree is at the

2   lowest edge of that portion, therefore would be more subject to

3   frost than any other portion of that area.  So in my disagree-

4   ing with the Soil Conservation map, I think I have proven that

5   parcel VII E1 is irrigable and usable.

6        THE MASTER:  Now as I understand, you have just a single

7   lemon tree on the lowest part of that parcel.

8        THE WITNESS:  No.  On the strength of the fact that the

9   lemon tree was apparently surviving and doing very well, I

10  have set out approximately an acre of avocado trees.  I did this

11  on the advice of a former appraiser for the--

12       LT. MILLER: We will have to move to strike any advice

13  that he received.

14       THE MASTER:  Well, he hasn't said what the advice was.

15  He said he did it as a result--

16       LT. MILLER:  It is not very relevant, your Honor.

17       THE MASTER:  I believe it is proper for him to state that

18  he did it after consulting with a particular individual.  That

19  is a statement of what he did.  It is not hearsay.

20       LT. MILLER:  Yes, I agree with that, your Honor, except

21  that any relevancy would have to do with the capacity of the

22  person, and indirectly would be hearsay.  If there is any

23  relevancy to it at all, it would be because of the position of

24  this particular person, and it would be too remote an assumption

25  for the Court to make.  However, that is--

Z-3

1    THE MASTER:  That goes only to the weight, not to the

2  admissibility in evidence.

3    LT. MILLER:  Yes, sir.

4    THE MASTER:  The objection is overruled.

5    THE WITNESS:  It is not an assumption, it is a fact.

6    THE MASTER:  When did you set out this acre of avocados?

7    THE WITNESS:  Approximately January of this year.

8    THE MASTER:  January of 1958?

9    THE WITNESS:  That is correct.

10    THE MASTER:  Now is there any other evidence you have to

11  submit as to the irrigable nature of this tract VII El?

12    THE WITNESS:  No, sir.

13    THE MASTER:  As shown on Defendant's Exhibit MA-70?

14    THE WITNESS:  No, your Honor.

15    THE MASTER:  Now is there any other portion of Col. Bowen's

16  testimony that you wish to comment on, or that you take issue

17  with?

18    THE WITNESS:  No, sir.

19    THE MASTER:  This reservoir which the Colonel mentioned

20  is supplied with water from what source?

21    THE WITNESS:  It is supplied by a shallow well in the De

22  Luz Creek.

23    THE MASTER:  It is not a so-called soil conservation

24  reservoir which catches the flow of water down a canyon but the

25  water is all pumped into it?

Z-4

1          THE WITNESS:  Here again I disagree with the Soil Con-

2    servation survey of the property.  It was originally supposed

3    to be an erosion control reservoir.  But to this date it has

4    ceased to function and has no water in it from the runoff.

5          THE MASTER:  And the actual supply comes only from the

6    well?

7          THE WITNESS:  That is correct.

8          THE MASTER:  Very well.  Now you had some questions, Mr.

9    Sachse?

10         MR. SACHSE:  Yes, just one or two.

11

12                        CROSS-EXAMINATION

13   BY MR. SACHSE:

14         Q  Would you look at the map, please, Mr. Emmes so we can

15   refer to Plaintiff's Exhibit M-68, please.  Your parcel is the

16   one indicated as 70, I believe.  Is that right?

17         A  That is right, Mr. Veeder.

18         MR. SACHSE:  Mr. Sachse.

19         Q  I will call your attention to the fact that the symbol

20   for an intermittent stream runs from west to east across your

21   property and intersects with De Luz Creek.  Do you see the

22   symbol to which I refer?

23         A  Yes, sir.

24         Q  Now, immediately adjoining your property on the west

25   is the property of Frank Chestmolowicz, is it not?

16775

Z-5

1    A   That is true.

2    Q   Do you and Mr. Chestmolowicz have any disagreement at

3   all over the water of that stream?

4    A   No.

5    MR. SACHSE:   That is all I need the map for.

6    Q   Can you make any comments as to the character of flow

7   in that stream I just referred to?

8    A   In the intermittent stream?

9    Q   Yes.

10    THE MASTER:   You may sit down.

11    MR. SACHSE:   You may sit down.

12    Q   When does it run?

13    A   I would say only within 48 hours after rain.

14    Q   Now referring to the other intermittent stream that

15   flows across your property from the east, when does that one

16   run?

17    A   That runs-- well, I will use this year as an example.

18   I would state that around six weeks it ran after the last rain.

19    Q   And is that characteristic--   How long have you been

20   on the property?

21    A   Three and a half years.

22    Q   And what has your previous experience been as regards

23   that stream?

24    A   None.

25    Q   No runoff?

Z-6

1    A   No.

2    THE MASTER:   No runoff or no experience with the stream?

3    THE WITNESS:   No experience with the stream.   Is that

4    your question?

5    MR. SACHSE:   Maybe I had better rephrase it.

6    Q   The stream that flows across your property from east

7    to west you stated this year ran for about six weeks after the

8    last rain; is that right?

9    A   That is right.

10   Q   Now how did it run the year before?

11   A   I don't remember.

12   MR. SACHSE:   I have no further questions.

13   THE MASTER:   Now wait a minute.   Mr. Reporter, will you

14   read Mr. Sachse's last question.   I was writing here and I am

15   not sure I got the approximate quotation of the question.

16   (Record read.)

17   THE MASTER:   My notes are confused or else the witness

18   misunderstood your question.   My understanding, Mr. Emmes, was

19   that the stream that ran from east to west only flowed for about

20   48 hours after a rain.

21   MR. SACHSE:   No.

22   THE MASTER:   But the main stream north and south flowed

23   for the longer period.

24   MR. SACHSE:   No.   Let's do it over.   You are mixed up.

25   Q   Mr. Emmes, the stream that flows across the Chestmolowicz

1677

Z-7

1    property from the west and then enters yours from the west and

2    intersects with De Luz Creek, that is the stream which you

3    state flows for only 48 hours after a rain; is that right?

4          A   Generally speaking.

5          Q   Now the stream that flows across your property from the

6    east is the stream that you state ran this year for about six

7    weeks after the last rain; is that right?

8          A   That is right.

9          THE MASTER:   Very well.

10         MR. SACHSE:   I have nothing further.

11         THE MASTER:   Mr. Miller.

12         LT. MILLER:   Yes, sir.

13

14                        RECROSS-EXAMINATION

15   BY LT. MILLER:

16         Q   Mr. Emmes, could you mark with a red X on Defendants'

17   MA-70 where this lemon tree is that you have planted?   And that

18   is to the east of the De Luz Creek as it runs through your

19   property?

20         A   That is correct.

21         Q   Off of this lemon tree have you taken any crop as yet?

22         A   No.

23         Q   Are you experienced in citrus growth other than your

24   experience on this particular piece of property?

25         A   No.

Z-8

1    Q This is your first experience as a citrus grower?

2    A  Yes.

3    Q  From your observation, what is the characteristic of

4  De Luz Creek as far as its flow, the water flow of De Luz Creek

5  as it goes through your  property?

6    A  Would you repeat the question, please?

7    Q  What are the characteristics of De Luz Creek?

8    A  By characteristics do you mean is it on the surface?

9    Q  On the surface or underground, either way, in so far

10  as you know, and for what periods of the year?

11   A  It is on the surface for about nine and a half months

12  of the year.

13   Q  And then for the remaining portion of the year do you

14  of your own knowledge know if there is subsurface flow?

15   A  Yes, I know there is.

16   LT. MILLER:  Nothing further, your Honor.

17   MR. SACHSE:  Just one question to clarify.

18

19               RECROSS-EXAMINATION

20  BY MR. SACHSE:

21   Q  I presume the two and a half months that De Luz is not

22  on the surface would be, let's say, late August, September,

23  October?  Is that the season it dries up?

24   A  October, about.

25   MR. SACHSE:  That is all.

1679

Z-9

1   THE MASTER:  I wanted to look at your answer here, Mr.

2   Emmes, and see if, based upon that, I wanted to ask you any

3   further questions.

4   No, I have no further questions.

5   MR. EMMES:  Thank you.  Does the Court wish to retain

6   this?

7   THE MASTER:  We will retain the exhibit, but not the

8   photographs, unless you wish specifically to offer them.  You

9   testified to them.  I don't believe they would add anything to

10  the record.

11  MR. EMMES:  Thank you.

12  THE MASTER:  Now Mr. and Mrs. Emmes are excused, unless

13  they wish to remain.

14  MR. EMMES:  We may remain for a little while.

15  THE MASTER: Now have any other defendants entered since

16  the beginning of court and wish to present their cases at this

17  time?  If not, we will take a recess at this time.

18  MR. SACHSE:  I am quite certain I will have no one here

19  until this afternoon, your Honor, myself.

20  THE MASTER:  And I understand, Col. Bowen, that you won't

21  be able to testify concerning these other parcels until a couple

22  of weeks from now.  That is, you want to complete your examina-

23  tion.  Is that correct?

24  COL. BOWEN:  That is correct, your Honor.  I will not be

25  ready for about two weeks.

Z-10

1    THE MASTER:  Well, then, in that event I think we might

2    as well adjourn until 1:30.

3    LT. MILLER:  Your Honor, I will tell you we do have

4    about five or six engineering reports to introduce, plus the

5    addendum to each of the reports that have been introduced before,

6    about the 4.2 acre feet per acre.  And that will be time

7    consuming.  And perhaps it would be a good opportunity to take

8    care of that.

9    MR. SACHSE:  I would like that.  Some of those reports,

10   for instance, I haven't checked them on the map yet, but on

11   the assumption that any one of the pro per defendants, not

12   represented, does not appear, I would probably want to cross-

13   examine Col. Bowen on some of them that may abut on property

14   owners of mine.  So that can take time.

15   THE MASTER:  Well, do you want to proceed now to do that?

16   We might as well.

17   LT. MILLER:  Yes, sir.  Does the Court wish to take a

18   break?

19   THE MASTER:  We will take about five minutes.

20   MR. SACHSE:  Then let me take a look at these in the

21   meantime and I will know how much, if any, I am going to have.

22   (Recess.)

23   THE CLERK:  Court is now in session.

24   THE MASTER:  I might state for the benefit of the de-

25   fendants who are here that one reason that we are in this

Z-11

1  position where we have almost run out of witnesses is because

2  we have sent out notices to various defendants who have filed

3  answers without attorneys, where engineering reports are avail-

4  able, and have asked them to appear if they had any evidence

5  to present, either in opposition to the engineering report or

6  in any other phase of the case, and they simply haven't showed

7  up.  And we didn't want to ask too many people and have them

8  come and have to wait.  Maybe if we sent out notices to 40

9  people, if they all showed up it would require them to wait for

10  a long time-- so with the result we apparently didn't draw

11  anybody in out of those we asked to appear this morning.

12       LT. MILLER:  Your Honor, in that connection Mr. Wilmore

13  McDowell, who is one of the defendants that was noticed for

14  today, was in and stated informally that he agreed with the

15  Government's report and wanted to know if he should stay.  And

16  I informed him it wasn't necessary, as long as he didn't desire

17  to put in any testimony with respect to the report.

18       THE MASTER:  Very well.  Do you have some exhibits to

19  introduce?

20       LT. MILLER:  Yes, sir.  I would like to call Lt.Col.

21  Bowen to the stand.

22

23

24

25

Z-12

1          ALLEN C. BOWEN,

2  recalled as a witness by and on behalf of the plaintiff, having

3  been previously sworn, testified as follows:

4

5          DIRECT EXAMINATION

6  BY LT. MILLER:

7          Q  You are the same Lt. Col. Allen C. Bowen who has been

8  sworn and testified heretofore?

9          A  I am.

10          LT. MILLER:  I hand to the Clerk seven engineering

XI?   11  reports and ask him to mark these as Plaintiff's Exhibits for

12  Identification.

13              I will hand to the defense counsel.

14          MR. SACHSE:  I have seen them all.  Go ahead.

15  BY LT. MILLER:

16          Q  Colonel, I will hand you Plaintiff's Exhibit M-85 for

17  Identification, and ask you what it purports to be.

18          A  Plaintiff's Exhibit M-85 is a report of an engineering

19  investigation of De Luz watershed Parcel No. 14.  The name shown

20  on the cover of the report is that of Richard F. and Rosabel L.

21  Matthews.

22          Q  Was this report made under your direction and super-

23  vision?

24          A  Yes, sir.

25          LT. MILLER:  I submit into evidence Plaintiff's Exhibit

Z-13

XR

M-85 for Identification.

MR. SACHSE:  No objection, your Honor.  But I would like it clearly understood that Matthews is appearing and will contest this report, and there will be examination on it next Wednesday.

THE MASTER:  Very well.  The report will be received in evidence as Exhibit M-85, subject, of course, to cross-examination and the right of Mr. Matthews to challenge it.

BY LT. MILLER:

Q  Colonel, would you step to Plaintiff's Exhibit M-32 and place a red cross in the parcel covered by this report?

A  Referring to Plaintiff's Exhibit M-32, the property reported on in Plaintiff's Exhibit M-85 is delineated with a line.  It adjoins the Riverside County line.  The number 14, encircled, is placed within the delineation.  And the map shows that De Luz Creek traverses the northwesterly portion of the property.  I mark that with a red X.

Q  I hand you Plaintiff's Exhibit M-86 for Identification and I ask you what it purports to be.

A  Plaintiff's Exhibit M-86 is the report of an engineering investigation of De Luz watershed Parcel No. 32.  And the cover of the report shows the name of Cora H. Myers.

Q  Was this report made under your direction and supervision?

A  Yes, sir.

1684

Z-14

1    LT. MILLER:  I submit into evidence Plaintiff's Exhibit

2    M-86 for Identification as Plaintiff's Exhibit M-86.

3        MR. SACHSE:  No objection.  I have brief cross-examina-

4    tion on this report.  Would you rather I do it now or after he

5    has finished the offering of them in evidence, your Honor?

XR

6        THE MASTER:  This will be received in evidence as M-86,

7    and I believe the cross-examination might take place as soon

8    as you finish any direct examination on it as to location on

9    the map.

10        LT. MILLER:  Yes, sir.

11        Q Colonel, would you turn to Plaintiff's Exhibit M-32

12    and mark on the map the location of this property?

13        A  Referring to Plaintiff's Exhibit M-32, the property

14    reported on in Plaintiff's Exhibit M-86 is delineated in the

15    central portion of the map, with the number 32 encircled out-

16    side the boundaries of the property, and a line extending from

17    the circle indicating the property surveyed.  I will mark that

18    with a red X.  The property borders the De Luz-Murrieta Road.

19        LT. MILLER:  I have no further direct examination on this

20    parcel, your Honor.

21

22                    CROSS-EXAMINATION

23    BY MR. SACHSE:

24        Q Col. Bowen, are you familiar with the location of the

25    water supply for this parcel?

Z-15

1    A   Yes, sir.   There is a well in the southern tip of the

2    property adjacent to the De Luz-Murrieta Road.

3    Q   Now have you an opinion as to the character of

4    material that forms the level portion of the valley where this

5    parcel is located?   That is, is it alluvial or rock or what?

6    A   A portion of the property is underlain by alluvium

7    and the remainder is underlain by granodiorite.

8    Q   That is, as I understand the situation regarding this

9    well-- and please correct me if I am wrong-- while the well is

10   not exactly in De Luz Creek, it extracts its water from the

11   alluvial basin immediately adjacent to De Luz Creek; is that

12   correct?

13   A   Yes, sir.   In my opinion the well is located in the

14   alluvium bordering the East Fork of De Luz Creek.

15   Q   Yes.   Thank you.   The East Fork of De Luz Creek.

16   A   And that the water extracted from that alluvium by

17   the well is supplied by the runoff from the East Fork of De Luz

18   Creek.

19   Q   Do you know of any other water sources on the

20   property?

21   A   No, sir, I know of no other water sources on the

22   property.

23   Q   And I believe your Exhibit M-86 indicates that in

24   your opinion the entire parcel, consisting of how many acres--

25   five acres?

Z-16

1     A  4.9 acres.

2     Q  In your opinion the entire parcel of 4.9 acres is

irrigable?

3

4     A  Yes, sir.

5     MR. SACHSE:  I have no further questions.

6     LT. MILLER:  No question.

7     THE MASTER:  As I understand, Col. Bowen, the stream

8 does not actually cross the property, but the well takes water

9 from the flow of the stream; is that correct?

10    THE WITNESS:  Your understanding is correct, your Honor.

11    THE MASTER:  I have no further questions.

12 BY LT. MILLER:

13    Q  I will hand you Plaintiff's Exhibit M-87 for Iden-

14 tification and ask you to state what it purports to be.

15    A  Plaintiff's Exhibit M-87 is the report of an engineer-

16 ing investigation of De Luz watershed Parcels 73 and 74.  The

17 name shown on the cover of the report is that of Frank and Ruth

18 Pfefferkorn.

19    Q  Was this report made under your direction and super-

20 vision?

21    A  Yes, sir.

22    Q  Would you step to Plaintiff's Exhibit M-32 and mark

23 the area covered by this report with a red X?

24    A  Referring to Plaintiff's Exhibit M-32, the property

25 reported on in Plaintiff's Exhibit M-87 is shown as two parcels,

Z-17

1    with the numbers 73 and 74 encircled within the respective

2    parcels.  I will mark these combined parcels with a red X.  It

3    is noted that the property adjoins on four sides Camp Pendleton,

4    with the exception of one-eighth of a mile common boundary with

5    Parcel No. 72, the Holsworth property.

6         LT. MILLER:  I submit into evidence M-87 for Identifica-

7    tion as Plaintiff's Exhibit M-87.

8         THE MASTER:  It will be received into evidence as

9    Exhibit M-87.

10

11                      CROSS-EXAMINATION

12   BY MR. SACHSE:

13        Q  Col. Bowen, I will direct your attention to M-68 on

14   the board, and particularly to the intermittent stream which is

15   shown flowing through Parcel 73 in a roughly westerly to

16   easterly direction, and then it turns south and flows through

17   Parcel 74.  Do you see the stream to which I refer?

18        A  Yes, sir.

19        Q  Are you familiar with that stream?

20        A  Yes, sir.

21        Q  Can you describe its characteristics?

22        A  That is an intermittent stream.

23        Q  Flowing only during and after periods of precipita-

24   tion?

25        A  Yes, sir.

XR

1688

Z-18

1    Q  Now with general reference to the geology of these

2  parcels, do you find any alluvial deposits in those parcels?

3    A  No, sir.

4    Q  And it would be your opinion that any ground water

5  developed in either of those parcels would be vagrant local

6  percolating ground waters of the type we have heretofore dis-

7  cussed?

8    A  That is my opinion.

9    MR. SACHSE:  That is all.

10

11                    DIRECT EXAMINATION

12  BY LT. MILLER:

13    Q  I hand you Plaintiff's Exhibit M-88 for Identifica-

14  tion, and ask you what it purports to be.

15    A  Plaintiff's Exhibit M-88 is the report of an engin-

16  eering investigation made on De Luz watershed Parcel No. 56.

17  The name shown on the cover of the report is that of Eva

18  Uzelac-- U-z-e-l-a-c -- Mitchell.

19    Q  Was this report made under your direction and super-

20  vision?

21    A  Yes, sir.

22    Q  Would you step to Plaintiff's Exhibit M-32 and mark

23  with a red X the location of the property covered by this

24  report?

25    A  The property reported on in Plaintiff's Exhibit M-88

1680

Z-19

1    is delineated on Plaintiff's Exhibit M-32 with the number 56,

2    encircled, contained within the limitations of the property.

3    I will mark that property with a red X.

4         LT. MILLER:   I submit into evidence Plaintiff's Exhibit

5    M-88 for Identification as Plaintiff's Exhibit M-88.

6         MR. SACHSE:   No objection, your Honor.

7         THE MASTER:   It will be received and so numbered.

8         LT. MILLER:   Do you have any questions?

9         MR. SACHSE:   Yes, I have some questions on this, please.

10

11                        CROSS-EXAMINATION

12   BY MR. SACHSE:

13        Q   Again directing your attention to M-68, Colonel, I

14   notice a symbol for an intermittent stream flowing across this

15   parcel from east to west.  Do you see this stream to which I

16   refer?

17        A   Yes, sir.

18        Q   Can you describe that stream for us?

19        A   That is an intermittent stream flowing only during

20   and after periods of rainfall and runoff.

21        Q   Do you find any substantial areas of alluvium capable

22   of constituting a ground water basin in the parcel?

23        A   No, sir, no substantial area.

24        Q   Then I assume your conclusion would be that any water

25   developed on the property, other than runoff, would be local

Z-20

1   vagrant percolating ground waters?

2        A  Yes, sir.

3        MR. SACHSE:  No further questions.

4

5                        DIRECT EXAMINATION

6   BY LT. MILLER:

7        Q  I hand you Plaintiff's Exhibit 89 for Identification,

8   and ask you what it purports to represent.

9        A  Plaintiff's Exhibit M-89 is the report of an

10  engineering investigation made on De Luz watershed Parcel No.

11  53.  And the name shown on the cover of the report indicates

12  this to be the property of De Luz School District of San Diego

13  County.  De Luz School District of San Diego County.

14       Q  Was this report made under your direction and super-

15  vision?

16       A  Yes, sir.

17       Q  Would you step to Plaintiff's Exhibit M-32 and mark

18  with a red X the property covered by this report?

19       A  The property reported on in Plaintiff's Exhibit M-89

20  is shown on Plaintiff's Exhibit M-32 delineated by a line with

21  the number 53 encircled, contained within the limits of the

22  property.  And I will mark the property with a red X.  It shows

23  the East Fork of De Luz Creek cutting through the extreme

24  northwest corner of the property north of the school building.

25       LT. MILLER:  I submit into evidence Plaintiff's Exhibit

Z-21

XR

1   M-89 for Identification as Plaintiff's Exhibit M-89.

2        MR. SACHSE:  No objection, your Honor.  I have a couple

3   of questions.

4        THE MASTER:  It will be received and so marked.

5

6                    CROSS-EXAMINATION

7   BY MR. SACHSE:

8        Q  Colonel, again directing your attention to M-68, I

9   see the symbols for two intermittent streams crossing this

10  property in a southeasterly to northwesterly direction.  Do

11  you see them?

12       A  Yes, sir.

13       Q  What is your characterization of those streams?

14       A  Those streams are intermittent in flow, water running

15  in them only during and following periods of rainfall and

16  runoff.

17       Q  However, I also notice that De Luz Creek intersects

18  the extreme northwesterly corner of this property; is that

19  correct?

20       A  That is the East Fork of De Luz Creek.

21       Q  The East Fork of De Luz Creek.  Thank you.

22       A  Yes, sir.

23       Q  And can you by examining the photograph or any other

24  material here tell me whether you find any substantial

25  alluvium deposits in this area?

Z-22

1    A   Yes, sir.   The geology section in Plaintiff's Exhibit

2  M-89 shows an alluvial deposit along the East Fork of De Luz

3  Creek.

4    Q   That would be in the extreme northwesterly portion

5  of the property?

6    A   Yes, sir.

7    Q   Now with regard to water sources on the property

8  other than the alluvium or De Luz Creek, what would your con-

9  clusion be as to the character of water that might be developed

10  elsewhere on the property?

11    A   Well, outside of the alluvial deposit adjacent to the

12  East Fork of De Luz Creek and the lower portion of the inter-

13  mittent stream draining westerly through the property, there

14  is very little likelihood of developing any substantial supply

15  of ground water.

16    Q   And with the exceptions you just stated, would you

17  conclude that any other ground water developed would be vagrant

18  percolating local ground water?

19    A   Again we come to that fringe of residuum and jointing

20  contiguous to the alluvium, and undoubtedly movement of water

21  from the upland areas into the alluvium.

22    Q   So you could not draw a definite conclusion?

23    A   No, sir.

24    MR. SACHSE:   That is all.

25

Z-23

REDIRECT EXAMINATION

BY LT. MILLER:

Q  Referring back to the engineering report again,
Colonel, would your opinion be that any withdrawal of ground
waters from the land classifications III and VI would have an
immediate effect upon the water supply of De Luz Creek itself?

MR. SACHSE:  Would you re-read the question, Mr.
Reporter.

(Question read.)

MR. SACHSE:  I have no objection.

THE WITNESS:  The Class VI area shown on the soils map
contained in Plaintiff's Exhibit M-89 as a narrow strip en-
circled by the red or Class III area is comprised of coarse-
grain clastics, c-l-a-s-t-i-c-s, which are alluvial in nature.
And as to that particular portion of the Class VI land and the
Class III land surrounding it, my answer would be that withdrawal
of water from that area would affect the elevation of the ground
water plane in the East Fork alluvial area.

LT. MILLER:  I have no further questions with respect to
that parcel, your Honor.


DIRECT EXAMINATION

BY LT. MILLER:

Q  I hand you Plaintiff's Exhibit M-90 for Identifica-
tion, and ask you what it purports to represent.

Z-24

1    A  Plaintiff's Exhibit M-90 is the report of an engineer-

2  ing investigation on De Luz watershed Parcel No. 63.  The name

3  shown on the cover of the report is that of Daun, D-a-u-n --

4  and Dorothy D. Gillett.

5    Q  Was this report made under your direction and super-

6  vision?

7    A  Yes, sir.

8    Q  Would you step to Plaintiff's Exhibit M-32 and mark

9  with a red X the property covered by this report?

10    A  The property reported on in Plaintiff's Exhibit M-90

11  is delineated on Plaintiff's Exhibit M-32 with the number 63

12  encircled within the limitations of the property.  And the

13  property is both within and without De Luz Creek watershed, but

14  is wholly within the Santa Margarita watershed.  I will indi-

15  cate with a red cross on Plaintiff's Exhibit M-32 the property

16  reported on.

17    LT. MILLER:  I submit into evidence Plaintiff's Exhibit

18  M-90 for Identification as Plaintiff's Exhibit M-90.

19    THE MASTER:  It will be received in evidence and so

20  marked.

21

22                    CROSS-EXAMINATION

23  BY MR. SACHSE:

24    Q  Col. Bowen, directing your attention to the aerial

25  photograph and soil classification map on Exhibit M-90, I notice

XR

685

Z-25

1   the watershed line of the De Luz Creek watershed is not indi-

2   cated thereon.  Is that right?

3          A   That is correct, sir.

4          Q   So it would appear to me, purely looking at it with

5   the naked eye, that the only parcel you have indicated as

6   irrigable that is within the De Luz Creek watershed is the

7   small parcel of Class III land in the northwest; is that right?

8          A   Yes, sir.  And the report contained in Plaintiff's

9   Exhibit M-90 shows the area of the Class III land, you have

10  indicated, to be about 2.1 acres.

11         Q   And the remainder of the irrigable land would be all

12  outside of the De Luz Creek watershed; is that right?

13         A   Yes, sir.

14         Q   Now, again directing your attention to Exhibit M-68,

15  I see a symbol for an intermittent stream running-- apparently

16  originating on this parcel, and running northeast, from the

17  northeast to the west.  Do you see the stream?

18         A   Yes, sir.

19         Q   Would you characterize that as an intermittent stream

20  flowing only during and immediately after rains?

21         A   Yes, sir.

22         Q   Do you find any substantial alluvial deposits indi-

23  cated in the area?

24         A   No, sir.

25         Q   Then it would be your opinion-- and I am confining my

Z-26

1    question now to the De Luz Creek watershed only.  It would be

2    your opinion any water developed therein would be local vagrant

3    percolating ground water?

4        A   Yes, sir, as applied only to the portion within the

5    De Luz Creek watershed.

6        Q   Yes, sir.  Only the portion within the De Luz Creek.

7        A   Yes.

8

9                     DIRECT EXAMINATION

10   BY LT. MILLER:

11       Q   I will hand you Plaintiff's Exhibit M-91 for Iden-

12   tification and ask you what it purports to represent.

13       A   Plaintiff's Exhibit M-91 is a report of an engineer-

14   ing investigation made on De Luz watershed Parcel No. 88.  The

15   cover of the report shows the names of A. S. and Eileen B.

16   Richardson.

17       Q   Was this report made under your direction and

18   supervision?

19       A   Yes, sir.

20       Q   Would you step to Plaintiff's Exhibit M-32 and mark

21   with a red X the property covered by this report?

22       A   The property reported on in Plaintiff's Exhibit M-91

23   is delineated on Plaintiff's Exhibit M-32 with the number 88

24   encircled within the limitations of the property.  The property

25   is situated astride the westerly divide of the watershed of

Z-27

1  De Luz Creek and of the Santa Margarita River.  It is partly

2  within the Santa Margarita River watershed and partly without

3  the Santa Margarita River watershed.  I will indicate with a

4  red X on Plaintiff's Exhibit M-32 the location of the parcel

5  described in Plaintiff's Exhibit M-31.

6      LT. MILLER:  I submit into evidence Plaintiff's Exhibit

7  M-91 for Identification as Plaintiff's Exhibit M-91.

XR

8      THE MASTER:  It will be received and so marked.

9  BY LT. MILLER:

10     Q  Colonel, that engineering report only covers the

11  portion of that property which lies within the Santa Margarita

12  River watershed?

13     A  Yes, sir.

14     LT. MILLER:  No further questions.

15

16                   CROSS-EXAMINATION

17  BY MR. SACHSE:

18     Q  Now in this case, Colonel, the portion of this

19  parcel that is outside De Luz Creek watershed is also outside

20  Santa Margarita River watershed.

21     A  Yes, sir.

22     Q  Colonel, are there any stream water sources on this

23  parcel within the Santa Margarita River watershed?

24     A  Referring to Plaintiff's Exhibit M-91, page 2, under

25  the engineering section, it states that domestic and stock

Z-28

3

1  water is provided this property by a six-foot diameter dug well

2  located about 200 feet southeast of the house.  There is no

3  indication of any other water developed.

4      Q  Do you know of your own knowledge, or by reference

5  to the map can you tell us whether there are any streams

6  existing on this property within the watershed?

7      A  The property reported on in Plaintiff's Exhibit M-91

8  is in the headwaters of Cottonwood Creek, tributary to the De

9  Luz Creek.  That is, the portion within the Santa Margarita

10  River watershed is in the headwaters of Cottonwood Creek.

11      Q  Do you find any symbol on M-68 showing Cottonwood

12  Creek on this property?

13      A  There is no symbol extending into this property,

14  Mr. Sachse.  But reference to the contours of the intermittent

15  stream symbols might be extended up to intersect the upward

16  sloping V's of the contours.  In other words, water draining or

17  running off of this property would follow the depressions

18  indicated by contours on Plaintiff's M-68 and flow into the

19  intermittent stream symbolized for Cottonwood Creek and its

20  tributaries.

21      Q  Have you any knowledge of any stream as such on this

22  property?

23      A  Oh, yes, sir.  There is water that runs through that

24  wash there shown on the map, Plaintiff's Exhibit M-68, during

25  periods of rainfall and runoff.

Z-29

MR. SACHSE:  Now, your Honor, I am going to move it be stricken.  I think we are getting down to the same question I was arguing or discussing before this morning.  Your Honor is well aware there is all kinds of law and order on what is or what is not a watercourse.  And the mere fact the contour of the soil causes rainfall or even melting snow to follow a certain channel does not make that a watercourse.  And if you are going to ultimately be required, as apparently the United States contends, to make an allocation of the waters, it is to our interests to very clearly define whether any of these parcels are or are not on watercourses.  We have got to know it. And I think the answer of the witness is non-responsive and I will ask it be stricken, and we will try to take another crack at it, find out whether there is a stream here or not.

THE MASTER:  Well, the answer was at least partially responsive, so the motion to strike will be denied.  But I will permit you to ask further questions to try to clarify the answer, if there is any doubt in your mind as to what he meant. And frankly, there is some doubt in my mind as to what he meant. BY MR. SACHSE:

Q  Then, Col. Bowen, the upward pointing V's that you referred to on M-68, through which the intermittent stream symbol could be extended, represent, do they not, a drainage down which water would flow if it rains; is that right?

A  Yes, sir.  But, your Honor, this is simply the

Z-30

1   cartographer's representation of the location of the stream,

2   and not necessarily intended to mean that the stream ran to

3   that point and then ceased.

4       Q   Col. Bowen, do you have any knowledge at all of how

5   many days of the year or in what seasons you might find-- or

6   you would find water flowing down that drainage area in Parcel

7   88?

8       A   Well, with the exception of possible springs, the

9   only time water would be flowing in that watercourse would be

10  during and immediately after periods of rainfall and runoff.

11      Q   Now this property sits astride the ridge, does it not?

12  It is very high ground?

13      A   Yes, sir.

14      Q   And I assume you find no alluvial deposits up there,

15  do you?

16      A   No, sir.  The deposits up there are residual in

17  nature rather than alluvial.

18      Q   So they may contain a limited amount of ground water

19  from the surrounding hills that drain into them; is that right?

20  They are better water holders than the granodiorite, but not as

21  good as alluvium; is that correct?

22      A   They are.  The residual material will absorb and

23  retain water, yes, sir, in addition to the cracks and joints

24  in the undecomposed portion of the bedrock.

25      Q   Well, assuming a water source is developed by drilling

Z-31

1   a well on this area, or digging a well, would it be your

2   opinion that those waters were vagrant local percolating ground

3   waters or part of the stream?

4       A   Well, as I previously testified, there is a well dug

5   on the property.  And it is my opinion that the water extracted

6   from that well is vagrant percolating water, not part of any

7   stream system.

8       MR. SACHSE:  That is all, your Honor.

9       LT. MILLER:  Mr. Clerk, could you give me Plaintiff's

10  Exhibit M-39?

11

12                  REDIRECT EXAMINATION

13  BY LT. MILLER:

14      Q   Colonel, I will hand you Plaintiff's Exhibit M-39,

15  and ask you if that is not the report upon the John C. and

16  Chloe L. Baxter property?

17      A   Yes, sir, it is.

18      LT. MILLER:  Your Honor, as a matter of procedure, in

19  introducing these addendums I would like to ask the Clerk to

20  mark this as Plaintiff's Exhibit M-39A, so that it could be

21  inserted in the back of the folder, and be in a spot where

22  anyone would notice it immediately upon considering Plaintiff's

23  Exhibit M-39.

24      MR. SACHSE:  Do we need to do that?  I mean I have

25  absolutely no objection to attaching these.  And it seems to

1702

Z-32

1  me we will end up with another fifty exhibit numbers here.

2  Can't we simply make a notation in the record that each of these

3  exhibits have added to them this addendum, and let it go at

4  that?  Suit yourself, Dave, but I--

5      THE MASTER:  Well, I think that Mr. Sachse's suggestion

6  would certainly save time.  And I would think it would

7  accomplish the same purpose, Mr. Miller.  As I understand, you

8  have sent this addendum, or a copy of it, to each person who

9  has previously requested an engineering report.  Is that

10  correct?

11      LT. MILLER:  That is correct.  To each person who has

12  an engineering report that has been introduced at these hear-

13  ings, they have been supplied with a copy of what I propose to

14  introduce this morning.

15      THE MASTER:  I would think that a statement into the

16  record by you to that effect, and possibly an enumeration then

17  of the reports, would be sufficient.  Then this could go in

18  as a new exhibit, with the understanding that a duplicate of

19  that had been attached to exhibits, and then number each one

20  of those.  It would save introducing a great number of those

21  documents and attaching them physically to each of the reports.

22      LT. MILLER:  In other words, your Honor's desire would

23  be to take just one of the addendums, have it marked as an

24  exhibit, and thereafter request permission to attach a copy of

25  each of these addendums to the exhibit already introduced.

Z-33

1       THE MASTER:  Yes.

2       LT. MILLER:  Yes, sir.

3       MR. SACHSE:  I think it would be a lot faster and save

4  us some reporter's time.

5       LT. MILLER:  May I suggest, since I don't have a blank

6  one, I introduce the one on the Baxters as M-39A, and there-

7  after say that one exactly like the one in the Baxters--

8       THE MASTER:  Yes.  I think that is the simplest pro-

9  cedure.

10       LT. MILLER:  Yes, sir.  Would you mark this as Plain-

11  tiff's Exhibit M-39A for Identification?

12       I will show it to counsel.

13       MR. SACHSE:  I have seen it.

XI       14  BY LT. MILLER:

15       Q  Colonel, looking at M-39A for Identification, could

16  you state what it purports to be?

17       A  Plaintiff's Exhibit M-39A is entitled "Addendum to

18  Engineering Report" on the John C. Baxter and Chloe Baxter

19  property.  And it states that in the event irrigable lands are

20  devoted to the raising of permanent pasture, a project duty of

21  4.2 acre feet per year would be required.  And then goes on

22  to add that a smaller quantity of water per acre per year would

23  be adequate with the adoption of a more practical and profitable

24  agricultural development.  And finally is a description of the

25  term "project duty" as that water which must be applied to the

Z-34

1   crop, plus the sum of losses occurring between the point of

2   supply and the point of use.  Finally with a date 24 June, '58,

3   and my signature-- or a facsimile of my signature.

4       Q  Colonel, are the statements contained within this

5   addendum an expression of your opinion?

6       A  Yes, sir.

7       LT. MILLER:  I submit into evidence Plaintiff's Exhibit

8   M-39A for Identification as Plaintiff's Exhibit M-39A, and

9   request that it be attached to Plaintiff's Exhibit M-39.

10      MR. SACHSE:  Your Honor, I think solely for the record

11  that I should make an objection.  I question the materiality

12  of water duty figures for other than an extremely limited

13  purpose.  I believe that if it is the intent by water duty

14  evidence to provide your Honor with a basis on which water

15  allocations can be made, it is absolutely outside any authority

16  found anywhere in California law.  I have checked this as

17  carefully as I can, the various cases involving adjudication

18  of riparian rights on a stream, and I have yet to find one

19  where water duty was considered as a factor.  Rancho Santa

20  Margarita vs. Vail, irrigable acreage, yes.  Prather against

21  Hoberg, irrigable acreage, yes.  Half Moon Bay against Cowell,

22  they made it a little tougher.  They said, "Practical,

23  profitable economic irrigation".  But I have found no case in

24  which water duty as such could be considered in making an

25  allocation.

Z-35

1        Now I realize this may have limited value in determining

2    irrigable acreage.  But I want to make my position clear, that

3    we are not at all conceding the applicability of this sort of

4    evidence to any apportionment your Honor might make.  And we

5    also don't think your Honor should make an apportionment.

6        THE MASTER:  I think you have made your position clear

7    for the record, and you will have ample opportunity in briefs

8    to make it even clearer.

9        MR. SACHSE:  I will, sir.

10       THE MASTER:  The objection is overruled, and this will

XR.   11   be received in evidence as Exhibit M-39A.  And the Clerk will

12   be directed to attach it to Exhibit M-39.

13   BY LT. MILLER:

14       Q  Col. Bowen, would similar addendums in your opinion

15   be appropriate to attach to the other engineering reports which

16   have been submitted into evidence here?

17       A  Yes, sir.  To those reports which have not had the

18   statements, which are contained in essence in the addendum,

19   in the reports, it would be an appropriate addition.

20       LT. MILLER:  Your Honor, in view of that testimony I

21   request that addendums which I will supply to the Clerk be

22   attached to Plaintiff's Exhibits M-40, through M-63, which

23   are the exhibits comprising the engineering reports which have

24   been introduced heretofore that did not contain such a notation.

25       MR. SACHSE:  I have no objection.

Z-36

1    THE MASTER:  Well, I understand, Lt. Miller, that copies

2  of these addenda have been submitted to the property owners

3  involved in these reports M-40 through M-63, inclusive.

4    LT. MILLER:  That is true with the exception of two

5  or three which will be mailed out within the next day or two.

6    THE MASTER:  Yes.  Well, on that understanding then the

7  addenda similar to M-39A may be delivered to the Clerk and

8  marked by him as Exhibits M-40-A through M-63A, inclusive,

9  and attached to those respective reports and received in

XR    10  evidence, subject to the statement you have made.

11    LT. MILLER:  Yes, sir.

12    Q  Now, Colonel, the fact that the addendum has been

13  attached to these reports, does that fact in any way alter

14  your opinion with respect to the maximum number of acres that

15  you think could be properly irrigated, as shown in the body of

16  those reports?

17    A  No, sir.  That doesn't affect the irrigable acreage.

18    Q  The irrigable acreage in your opinion is still the

19  same as that shown in each of these reports?

20    A  Yes, sir.

21    Q  Now also in the body of the report there is indicated

22  a particular type of crop which was considered to be suitable

23  for growth on particular areas of the property covered.  Now

24  in your opinion are those crops the most practical and profit-

25  able use of the land so indicated?

Z-37

1    A   Yes, sir.  The land use tabulation contained within

2   each report shows, in our opinion, the most practical and

3   profitable use of the land under full development if water

4   were available.

5    Q   In essence, the addendum is merely stating that you

6   believe that permanent pasture could be grown on the land if

7   they so desired to do so?

8    A   Yes, sir.

9    Q   Without regard to whether or not it is a practical

10  and profitable means of using the land?

11    A   Yes, sir, without consideration of economic returns.

12    LT. MILLER:  No further questions, your Honor.

13    MR. SACHSE:  I have none.  Your Honor, I see Mrs. Myers

14  has just come in.  Her report was just entered.  If you could

15  give me just five minutes I think we could get one more defend-

16  ant.

17    THE MASTER:  Surely.  Do you want to take a recess to

18  talk to her?

19    MR. SACHSE:  Yes.

20    THE MASTER:  We will take a five-minute recess.

21    (Recess.)

22    MR. SACHSE:  Your Honor, I am ready.  I will only take a

23  minute.

24    THE MASTER:  Very well.

25    MR. SACHSE:  Mrs. Myers, will you come up and be sworn,

Z-38

1          CORA H. MYERS,

2     one of the defendants herein, called as a witness in her own

3     behalf, sworn, testified as follows:

4

5               DIRECT EXAMINATION

6     BY MR. SACHSE:

7          Q   Your name is Cora H. Myers?

8          A   Yes.

9          Q   Mrs. Myers, you have received from the Government a

10    copy of--

11          LT.MILLER:   86.

12    BY MR. SACHSE:

13          Q   You received from the Government a copy of this

14    document which I will now hand you, marked Exhibit M-86, did

15    you not?

16          A   Yes, I did.

17          Q   Mrs. Myers, if you will turn around and look at the

18    map.  Col. Bowen has identified your property as being the

19    small triangular piece marked 32 on the map.

20          A   Yes.

21          MR. SACHSE:   Will you mark this as MD-R, please, Mr.

22    Clerk?

23          THE CLERK:   Yes.

24    BY MR. SACHSE:

25          Q   Mrs. Myers, I will hand you a photograph marked M-DR

Z-39

1   for Identification, and ask you if that isn't the deed to this

2   property, a photograph of the deed.

3        A   Yes, that is my deed.

4        MR. SACHSE:   I will offer this in evidence, your Honor.

5        LT. MILLER:   No objection, your Honor.

6        THE MASTER:   It will be received in evidence as Defend-

XR    ✓    7   ants' Exhibit MD-R.

8   BY MR. SACHSE:

9        Q   Mrs. Myers, you are living on this property, are you

10  not?

11       A   Yes.

12       Q   Where do you obtain your water?

13       A   From my well.

14       Q   And the well is in the extreme southerly tip of your

15  property; is that right?

16       A   Yes.

17       Q   And what development have you on your property?   You

18  have a home?

19       A   Yes, I have a home, flowers and trees and chickens,

20  and lots of pine trees.

21       Q   You have recently planted--

22       A   I planted 50 pine trees, and I am figuring on getting

23  50 more.   And I have, oh, lots of other big trees.

24       Q   You have no agricultural development or farming

25  development except the chickens; is that right?

1710

Z-40

1   A   That is all.

2   Q   Do you have on your property any dams or reservoirs?

3   A   Two reservoirs.

4   Q   Now, what are those?

5   A   Up on the hill.

6   Q   Do either of them catch runoffs from the rains?

7   A   Yes, one, the big one does, has quite a bit of water

8   in it when it rains.

9   Q   I don't believe it is indicated on the exhibit.

10   A   I don't go in the little one.  I am afraid of snakes.

11   Q   Do you pump from your well to that reservoir also?

12   A   No, the reservoirs, neither one of them have been in

13   use.

14   Q   They are just soil conservation dams constructed to

15   catch water runoff; is that right?

16   A   Well, the big dam has water in it, but it comes from

17   the rain.  I don't know where it would run off at.

18   Q   That is what I mean.  It comes from the rain water?

19   A   Yes.  And I have never been around the little dam to

20   see what it has in it.

21   MR. SACHSE:  I have nothing further, your Honor.  Oh,

22   excuse me, I do.

23   Q   Mrs. Myers, again directing your attention to the

24   exhibit, you are quite satisfied with Col. Bowen's analysis

25   of your irrigable land, are you not?

Z-41

1      A   Well, I don't understand this pink thing here.

2      Q   All it means is that all of your land is irrigable.

3      A   Oh, that is all right, yes.   I am satisfied with that.

4      MR. SACHSE:   I have no further questions.

5      THE WITNESS:   I didn't know what that was.

6

7                         CROSS-EXAMINATION

8   BY LT. MILLER:

9      Q   Mrs. Myers, could you take the red pencil and place

10   a red X on the map in Plaintiff's Exhibit M-86 where your large

11   reservoir is located?

12      MR. SACHSE:   I suggest you identify her house for her,

13   Dave.

14      THE WITNESS:   This little thing here, is that the house?

15      LT. MILLER:   Um-hmm.

16      THE WITNESS:   Then this must be the hill, if this is the

17   house, because my property doesn't go around the house.   It

18   goes around a little island in front of the house.

19      MT. MILLER:   Let me just point out to you that here is

20   the De Luz-Murrieta Road.

21      THE WITNESS:   Yes.

22      LT. MILLER:   And here is the north.   And ask you to take

23   just a second and see if you can orient yourself.

24      THE WITNESS:   Is this the hill?

25      LT. MILLER:   This is a hill in behind your house, I am

1712

Z-42

1  pretty sure.

2          THE WITNESS:  Well, I will say this up here is the end

3  of my hill.

4          THE MASTER:  That is the northerly boundary of your

5  property.

6          MR. SACHSE:  That is right.  The hill runs like so.

7          THE WITNESS:  Is this the hill up here?  Then my little

8  reservoir is here and then this is the end of the hill.  Then

9  there is a dropoff that goes down into McDowell's 40 acres.

10  It just goes down right big steep.  And this is the big

11  reservoir.  Well, over in here is all bushes.  And I don't go

12  over there and see if there is any water from the rain, because

13  I just don't go there on account of snakes.  But here I have

14  been up there when it rains and this whole thing in here has

15  been full of water.  And then this is fenced off there into

16  his property.  He has a fence around it.

17  BY LT. MILLER:

18          Q  Mrs. Myers, could you place the numeral 1 where your

19  small reservoir is?

20          A  Right up direct right up in the back of my-- if this

21  is my house, see, the little reservoir is right up at the top

22  of that hill.

23          Q  Just put a 1 on this map where you have indicated.

24          A  1.

25          Q  And 2 where you have indicated the large reservoir.

Z-43

1    You don't make any use of the water from either of those

2 reservoirs?

3    A  No.

4    LT. MILLER:  No further questions, your Honor.

5    MR. SACHSE:  I have nothing further.  That is all, Mrs.

6 Myers, thank you.

7    THE WITNESS:  O.K.

8    LT. MILLER:  Your Honor, I have two more addenda which

9 I forgot to ask permission to attach.  And those are on

10 Plaintiff's Exhibits M-79 and M-80.  And I request permission

11 to also submit those to the Clerk for attachment to the reports,

12 which were those exhibits.

13    THE MASTER:  Those will be received in evidence as

XR

14 Exhibits M-79A and M-80-A and attached to the reports in the

15 same fashion.  Do you have any further evidence?

16    LT. MILLER:  Nothing further.

17    THE MASTER:  Then I would suggest that we recess now

18 until 1:30.  And you will have some other witnesses then.

19    MR. SACHSE:  I have Mr. Couch coming in for certain, and

20 I may have others, but I have had no word from them.

21    THE MASTER:  Very well.

22    (Adjournment until 1:30 P.M., June 30, 1958.)

23

24

25

Z-48

1        <u>Fallbrook, California, June 30, 1958. 1:27 P.M.</u>

2

3            THE MASTER:  We might as well go ahead.  I don't think

4    any other counsel are going to appear.

5            THE CLERK:  Court is now in session.

6            MR. SACHSE:  I would like to call Col. Bowen, your

7    Honor.

8

9                        ALLEN C. BOWEN,

10    recalled as a witness, having been previously sworn, testified

11    as follows:

12

13                        CROSS-EXAMINATION

14    BY MR. SACHSE:

15            Q   Col. Bowen, I would direct your attention to Plain-

16    tiff's Exhibit M-54, being an engineering report on the property

17    of Frank E. and Anna J. Couch, Parcel 47, delineated on Exhibit

18    M-68.  Could you please point out the location of the parcel

19    for the benefit of the Court?

20            A   Yes, sir.  Referring to Plaintiff's Exhibit M-68,

21    your Honor, the parcel reported on in Plaintiff's Exhibit M-54

22    is delineated as an approximately 40 acres, through which Camps

23    Creek traverses the northeasterly corner.  The 40 has a common

24    corner with an 80.  The southwest corner of the 40 corners on

25    the northeast corner of the 80, which runs approximately a

Z-45

1 half a mile east and west, and a quarter of a mile north and

2 south.  Each of these, the 40 and the 80, each has a number 47

3 delineated and encircled within them.

4     Q  Now still with relation to the map, Colonel, Camps

5 Creek flows through the extreme northeasterly portion of the

6 northeasterly 40; is that right?

7     A  Yes, sir.

8     Q  And I notice on the map a broken line indicating an

9 intermittent stream which apparently originates at the westerly

10 boundary of the south 80, then traverses the northwesterly

11 part of the south 80 and then again enters the northwest 80.

12 Do you see the stream to which I refer?

13     A  Yes, sir.

14     THE MASTER:  Enters the northeast 40, you mean.

15     MR. SACHSE:  Enters the northeast 40, yes.

16     THE WITNESS:  Leaves the northeast 40 near the south-

17 easterly corner of that 40 and continues on to its confluence

18 with Camps Creek outside of the boundaries to the property.

19 BY MR. SACHSE:

20     Q  I will direct your attention particularly to the

21 aerial photo and soil map appearing in Exhibit M-54.  Are you

22 personally familiar with both portions of this property?

23     A  Yes, sir.

24     Q  Have you been on it?

25     A  Yes sir.

Z-46

Q   All of it?

A   Well, I haven't covered every acre, Mr. Sachse, personally.

Q   But you have been on both portions of it?

A   Yes, sir.

Q   Now I notice that there has been inked in intermittent stream symbols in most of the canyons that appear in the aerial photograph.  That has been done by your staff and under your supervision?

A   Yes, sir.  That indicates the presence of a draw.

Q   It is not the indication of those symbols to indi-cate that a stream flows in those draws at any time other than during and after rainfall, is it?

A   No, sir.  Those are intermittent stream symbols indicating that the stream flow occurs only from time to time, not continuously.

Q   Now, however, calling your attention to Camps Creek, this is a little more of a stream than the others, isn't it?

A   Camps Creek drains a larger area, yes, sir.

Q   And has a longer period during which it has surface flow than these other canyons, does it not?

A   Yes, sir.  I would say that normally a stream with a larger watershed draining into it will sustain flow for a longer period than one of its tributaries.

Q   Do you have any opinion as to whether there is any

Z-47

substantial alluvial deposits underlying that part of Camps Creek?

A  Well, the alluvial deposits would be confined to the immediate vicinity of Camps Creek, shown as Class VIII, and Class III land adjoining it in the northeast corner of the soil survey, contained in Plaintiff's Exhibit M-54.

Q Can you check the acreage figures and tell us what the total acreage of those parts would be?

A  The report shows the acreage of Class VIII land to be seven-tenths of an acre.  And that particular Class III land adjoining it is not separately measured, but combined with the total Class III acreage.  However, the area of the Class III land adjoining the Class VIII land in Plaintiff's Exhibit M-54 appears to be about of equal size, which would make the total area about one and a half acres.

Q  About one and a half acres in your opinion of alluvial area on the property?

A  Yes, sir.

Q  How recently were you on this property, Colonel?

A  1956.

Q  You personally?

A  Yes, sir.

Q  Then you haven't physically observed the property since that date?

A  No, sir.  I haven't been on the property since that

Z-48

1   date.

2      Q   Colonel, I will direct your attention to the white

3   line that runs generally along the northerly line of the

4   property, running into the property, and then following right

5   along the north line.  Do you see the line to which I refer?

6      A   Yes, sir.

7      Q   Is that a roadway?  Am I right?

8      A   Yes, sir.

9      Q   Again, you have not been over that roadway since '56?

10  It goes in to the Mercy Anderson property.

11     A   Yes, sir.  I recall it goes in to the Mercy Anderson

12  property and that it does cut through-- swing into the Couch

13  property.  I probably have traversed that road since then.

14     Q   I will ask you if it is not a fact that immediately

15  adjoining the road, and particularly that portion in dark brown

16  indicated as Class VII land, the land is entirely cleared,

17  disced, and ready for planting, and has been so throughout the

18  past winter?

19     A   I haven't been in there the past winter, Mr. Sachse.

20     Q   Now I will direct your attention to the larger areas

21  shown in brown as Class VII land.  I do not find anywhere any

22  soil area indications such as I find for the other classes of

23  land on the Class VII.  Do you see to what I am referring?

24     A   There are no soil contacts shown within the 80 acres

25  contained within Plaintiff's Exhibit M-54 colored in brown.

1719

Z-49

1    Q  Do you know how many borings, if any, your staff

2  made on the 80-acre parcel?

3    A  No, sir.  I don't know how many borings were made

4  on that.

5    Q  Do you know whether anybody walked over the 80-acre

6  parcel?

7    A  Absolutely, yes, sir.  My soil surveyor walked over

8  the entire area.

9    Q  Colonel, I will direct your attention to approximately

10  the center of the 80-acre parcel, where there is an inter-

11  mittent stream symbol.  And you will see a small symbol of

12  cross picks, pick and shovel.  Do you see the symbol to which I

13  refer?

14    A  Yes, sir.

15    Q  What is it?

16    A  That is an exploratory shaft that was put down there

17  alongside a dike.

18    Q  Who put it in, do you know?

19    A  No, sir.  I don't know who put it in.

20    Q  As a matter of fact, I will ask you if it isn't

21  true that is an old quartz shaft, mining shaft, and that your

22  people when they observed this property didn't even find it

23  and that Mr. Couch had to show it to them on a second return

24  trip.

25    A  Well, we expect the owner to be cooperative and show

Z-50

1 us any pertinent details.

2     Q   What I am getting at, Col. Bowen, is the apparent

3 lack of detail on this large 80-acre block, detailed informa-

4 tion concerning this large 80-acre block. And I would like to

5 find out why there is so little detail on this one.

6     A   Well, principally because it is in an area of very

7 rough, mountainous terrain and there are no level or even

8 moderately sloping sites in there. And the area is considered

9 not susceptible to profitable and practical irrigation.

10     Q   Now, Col. Bowen, I don't see any, in that entire

11 80-acre parcel, I see no soil classification symbols of any

12 kind that would justify you in saying there are no moderate

13 slopes.  Is there such symbol that I have overlooked?

14     A   Yes, sir.  The copy of the map contains portions of

15 other properties adjacent to it. And referring to the soils

16 map contained in Plaintiff's Exhibit M-54, in the northeast--

17 correction, the northwest 40 of the Northwest Quarter, Section

18 31, 8 South, 4 West, is contained a soil symbol and a land

19 classification symbol.  And that soil symbol and the land

20 classification symbol describes the entire area shown by the

21 contact to the north and to the east.  There are no contacts

22 south of it.

23     Q   Directing your attention, Colonel, to the very large

24 area immediately north of the road, not the Couch property, but

25 the property immediately north-- Do you follow me?

1321

Z-51

A   Yes, sir.

Q   That area I would guess consists of over 160 acres, doesn't it?

A   I believe it does.

Q   Yes.   Now I see that that area is very definitely marked off by different soil classification lines, whereas nothing of the kind again appears in the south 80 of the Couch property.

A   That is correct, sir.

Q   Now, will you look at M-68, please, on the wall, and I will ask you if the general terrain in Parcel 45, particularly the northwesterly third thereof, isn't just about the same as the general terrain on the Couch property?

A   No, sir.   Referring to Plaintiff's Exhibit M-68, Parcel No. 45, nowhere are the contour lines as closely spaced as they are in the 80-acre parcel, No. 47, which is the South Half of the Northwest Quarter, Section 31, 8 South, 4 West.

Q   Well, let me direct your attention again to the southwesterly portion of 47.   That is the 80-acre piece.   It appears to me from reading the map that running from about the southwest corner, sort of an amoeba-shaped parcel, with a lot of arms sticking out from it, appears to be a more gently sloping ridge that extends northeasterly right up diagonally across this property, doesn't it?

A   There is a ridge which separates the drainage flowing

Z-52

1   into Camps Creek from that flowing into Fern Creek.  South of

2   that ridge the water drains into Fern Creek and north of the

3   ridge it drains into Camps Creek and tributaries to Camps Creek.

4       Q  And it would appear from contours along that property

5   along that ridge and the fingers running north and south from

6   it, it is not remarkably steep, is it?

7       A  Well, it is remarkably steep.  It is a narrow ridge.

8   You can walk along the top of it, it is true, but it drops

9   sharply from both sides of the ridge.  And the country is

10  extremely characterized by extremely shallow soils and rock

11  outcrops.

12      Q  Col. Bowen, you are not telling me that ridge is so

13  narrow you can only walk along one edge.  That is an 80-acre

14  piece, and the ridge takes up a pretty good-sized piece in the

15  middle of it, doesn't it?

16      A  Compared to the 80-acre piece, it takes up a very

17  small portion of the property.

18      Q  Have you actually been on that ridge yourself?

19      A  No, sir, I haven't been up on that ridge.

20      Q  Then do you know of your own knowledge there are

21  substantial portions of that ridge which are or are not capable

22  of irrigation, assuming the availability of water?

23      A  Based on the soil report contained in Plaintiff's

24  Exhibit M-54 and examination of the topography shown on

25  Plaintiff's Exhibit M-68, I would say there is no portion of

Z-53

1    that 80 acres of Mr. Couch's property which is susceptible of

2    practical and profitable irrigation.

3         Q   That is based on a soil report.  My question was did

4    you know of your own knowledge that --

5         A   Well, again I say I haven't been on every acre of

6    that 80.

7         Q   And you haven't been along that ridge?

8         A   No, sir.

9         Q   Now with reference to water sources, assuming a

10   development of water in the southwesterly 80, other than runoff

11   of the intermittent stream, would you characterize any such

12   waters as vagrant local percolating ground waters?

13        A   Yes, sir, I would.

14        Q   Now, then, when you get up into the northwesterly 40,

15   however, what would your characterization be, or would it

16   change?

17        A   Well, speaking of the northeasterly--

18        Q   Northeasterly, pardon me, yes.

19        A   --40 of the Couch property, that contains a sub-

20   stantial area of more gently sloping lands, sloping down to

21   a tributary of Camps Creek.  It also contains--  the extreme

22   northeasterly corner is crossed by Camps Creek, with some

23   alluvial fill adjacent to the creek.  And in the instance of

24   the northeasterly 40 I would say that a portion of it is in

25   contact with the stream, and that waters contained within it

Z-54

1   are part of the stream.

2       Q   Now directing your attention particularly to the

3   Class VII land in the northeasterly 40 and in the southwesterly

4   quarter of that 40-- do you follow me?

5       A   Yes, sir.

6       Q   It appears to me from examination of the contours on

7   M-68 that actually a considerable part of that land you have

8   classed as Class VII land has a relatively gentle slope up from

9   the intermittent stream.

10      A   Again, Mr. Sachse, I would differ with you on that.

11  The contours in Plaintiff's Exhibit M-68 show close spacing,

12  indicating a steep slope.

13      Q   Everything to the south and west of the intermittent

14  stream?

15      A   Well, we have drawn our contact south and west of

16  the intermittent stream on the soil survey contained in Plain-

17  tiff's Exhibit M-54.  Everything that is south and west of the

18  contact is characterized by shallow soil, rocky outcrop, steep

19  slope.

20      Q   But your contact line on the photograph approaches

21  very close to -- practically adjoins the intermittent stream.

22  Now check it on the contours, please.

23      A   Examination of Plaintiff's Exhibit M-68 reveals a

24  close spacing of the contours on the northeasterly 40 of the

25  Couch property to begin very close to the stream also.  I see

Z-55

1    no difference between the two.  The fact of the matter is the

2    photograph speaks for itself.  One can observe the change in

3    slope very easily on the photograph.

4         Q  Do you know the present water sources of this

5    property?

6         A  Well, at the time that we made our survey there was

7    a well supplying domestic water.  The well was located in the

8    northeast corner of the northeast 40.

9         Q  In or near to Camps Creek or Camps Creek alluvium?

10        A  Yes, sir.

11        Q  Do you know anything about its size or its capacity

12   or what kind of a well it is?

13        A  Referring to Plaintiff's Exhibit M-54, the page

14   showing the engineering information, it simply states that

15   domestic water is presently being supplied from a dug well

16   located 50 feet west of Camps Creek.  And it doesn't indicate

17   the capacity of that well.

18        Q  Do you know what plantings are presently on the

19   property?

20        A  No, sir, I don't.

21        Q  And you don't know the extent of ground that has been

22   brushed off, cleared and disced, since the time of your survey?

23        A  No, sir.

24        MR. SACHSE:  I have nothing further of Col. Bowen.

25        LT. MILLER:  No questions.

Z-56

1    MR. SACHSE:  Mr. Couch, will you come up and be sworn.

2

3                    FRANK E. COUCH,

4    one of the defendants herein, called as a witness in his own

5    behalf, sworn, testified as follows:

6

7                    DIRECT EXAMINATION

8    BY MR. SACHSE:

9         Q  Will you state your full name, please?

10        A  Frank Emerson Couch.

11        Q  Where do you live, Mr. Couch?

12        A  417 North Comstock, Whittier, California.

13        MR. SACHSE:  That is MD-S

14        Q  Mr. Couch, I will hand you a photograph, a grant deed,

XI  15   that is marked Exhibit MD-S for Identification, ask you if that

16   is a photograph of the deed to your property?

17        A  It is.

18        Q  Now, did you observe Col. Bowen's delineation of the

19   property on the contour map, M-68?

20        A  I did.

21        Q  He indicated the correct property, did he not?

22        A  That is right.

23        Q  You gave your address as Whittier.  How much time

24   do you spend on this property?

25        A  Every weekend, from Friday-- Thursday evening until

Z-57

1    Sunday evening.

2         Q   And has that been true since your acquisition?

3         A   Yes, sir.

4         Q   Now what improvements are on the property now?

5         A   Well, it was progressive.  The first thing was the

6    well.

7         Q   All right.  Let's start with that.  The well is

8    located in the low spot near or in Camps Creek; is that right?

9         A   That is right.

10        Q   What kind of a well is it?

11        A   It is a dug well.

12        Q   How deep?

13        A   Put in by a professional.  It is 55 foot deep.

14        Q   Do you have laterals?

15        A   I do.

16        Q   Have you ever test pumped it?

17        A   Yes, sir.  That is, the driller did.

18        Q   What did it pump?

19        A   30 gallons a minute.  That is by the--

20        Q   Now what kind of power do you have on the well?

21        A   At the present time I have a gas engine.

22        Q   Is that the only water source for your property at

23    this time?

24        A   At this time, yes, sir.

25        Q   Do you have a dwelling on the property?

1728

Z-58

A   Yes, sir.

Q   Any other buildings or structures?

A   There is an old shack building down by the well. That was originally there.  This building I put up was a new building, and it stands on down the road, approximately at the other corner of the 40 acres.

Q   Now what plantings do you present have on the property?

A   Well, right now I have 125 Macadamia nut trees, some of which are a little over a year, about a year and a half old, and part of which were put in this last winter. And there is approximately 30 or 40 deciduous trees and citrus trees.

Q   Now do you have any land cleared preparatory to planting, but as yet unplanted?

A   I do.  I have had approximately 18 acres brushed off.  And I have planted approximately I would say 12 acres in barley and vetch.

Q   Now could you take the--

LT. MILLER:  That was in barley and what?

MR. SACHSE:  Barley and--

THE WITNESS:  Barley and vetch.

MR. SACHSE:  V-e-t-c-h.

THE WITNESS:  V-e-t-c-h, legume.

MR. SACHSE:  Soil-building legumes.

Q   Directing your attention to the soil map on Exhibit M-54, could you first please locate your house, the approximate

Z-59

location of the dwelling?

A  It is approximately right there.

Q  Well, make a little X where the house is.

A  Can I mark on here?

Q  Yes, mark right on there.

A  Approximately there.

Q  Now, first without marking the map, but just tell us generally with relation to the colored portions of the map where has your clearing and planting been done, referring to the colors rather than--

A  Well, it has been down this road.  The road comes down here.  Down the road towards the corner of the 40 where Camps Creek crosses.  And this whole area down here, down to this corner.  And following right on up in here, this whole business in here.

Q  In other words, am I correct in stating that, very generally speaking, you have cleared most of the Class III land shown on the--

A  That is right.

Q  --map, and also brushed off and cleared -- and also the Class VII land, shown across the easterly boundary and across the northeast corner?

A  This slope here.  There is only one little bitty corner down here that it is really good soil, but it just drops right off to the road.  It is right down-- let's see, it

Z-60

1   is right down-- it is in this little bit at the corner right

2   in here.

3       Q   You can be seated again.  Let me get this straight

4   then.  Your present clearing includes the soil indicated as

5   Class III on the soil map.

6       A   That is right.

7       Q   And the portion along the east line and across the

8   northeast corner indicated as Class VII?

9       A   There might be a very little bit along here that

10  hasn't been cleared off.  And this down in here has been

11  brushed, but all the rest of this land in here has been

12  planted to barley and vetch.

13      Q   Now, directing your attention to the intermittent

14  stream symbol--

15      A   Yes.

16      Q   --that is shown across the southwesterly quarter of

17  this property, have you done any clearing or work on the other

18  side, south and southwest of the stream?

19      A   No, sir.

20      Q   And have you been over that ground?

21      A   I have, yes.

22      Q   What is your opinion of that soil by comparison with

23  the soil you have just discussed in the Class III area?

24      A   Well, I think-- it is my opinion, my belief that with

25  modern methods of terracing that there is plenty of good soil

Z-61

1    in there.  There is only one very small rocky outcrop, which is

2    right in this area right in here, that is really rocky.

3              THE MASTER:  When you say "in this area right in here"--

4              THE WITNESS:  Right there.

5          THE MASTER:  Can you mark that with a circle?

6          THE WITNESS:  Yes, I can.

7    BY MR. SACHSE:

8          Q   Now, Mr. Couch, I want to direct your attention to

9    the 80-acre parcel of your land.

10         A   Yes, sir.

11         Q   Have you been over that?

12         A   I have.

13         Q   Now with  particular reference to the mine symbol--

14         A   Yes, sir.

15         Q   Can you tell what it is?

16         A   It has-- I have been told it was a --

17         Q   Don't tell us what you have been told.  Just tell us

18   what you see when you go there.

19         A   Well, there is a quartz-- and I am not a geologist,

20   but I would guess that someone dug gold out of there.

21         Q   How deep is it?  I don't care what they dug out.

22         A   It is 51 foot deep.

23         Q   Is this a vertical shaft or a horizontal shaft or a

24   sloping shaft?

25         A   I would say it is, generally speaking, horizontal,

Z-62

5.

1    and slightly downgrade at the bottom.

2          Q  Going into the side of the hill?

3          A  Slopes down, that is right.

4          Q  Can you walk into it?

5          A  Yes, sir.  I can stand up in it.

6          Q  Do you find any indication of water in the shaft?

7          A  No, sir.

8          Q  Now with regard to these canyons on this southwest 80

9    that are indicated as intermittent streams on the photograph--

10   do you see the ones to which I refer?

11         A  Yes, I do.

12         Q  Would you agree with Col. Bowen's description that

13   those are streams only in the sense they flow during and

14   immediately after rains?

15         A  Yes, sir.

16         Q  Do you have presently any soil conservation or water

17   storage dams on the property?

18         A  No, sir.

19         Q  Do you have any plans for construction?

20         A  Yes, sir.

21         Q  Could you indicate for the Court, perhaps by drawing

22   a heavy line with a pencil, the spot where you plan such a dam?

23         A  In this.  This plan is by consultation with the

24   Federal Land Office.

25         Q  Soil Conservation?

Z-63

1    A   Soil Conservation in Fallbrook.  And right at the

2    confluence of this, these two streams where they come down here,

3    and this one comes around here, right in there is where they

4    said it was a satisfactory place, where there was plenty of good

5    soil to build a dam.  They didn't recommend it down in the

6    stonier areas in this deep draw canyon-- arroyo.

7    Q   Just draw a heavy pencil mark, a line at the point.

8    Now have you given any consideration of the possibility of

9    similar structures in the southwest 80?

10   A   Yes, I have.

11   Q   Have you arrived at any conclusions?

12   A   Only in so far as progressive development of this

13   ranch is concerned, because I felt that I had problems on this

14   40 acres first, and that I would develop dams farther up these

15   draws for-- to hold percolating waters or--

16   Q   Winter runoff?

17   A   That is right.

18   Q   What do you intend to do with this acreage you have

19   brushed off and cleared?

20   A   I am going to continue planting trees.

21   Q   What kind of trees?

22   A   Macadamia nut trees.

23   Q   What is the frost condition of that ground?

24   A   Well, I in the three years and three months that I

25   have had this property, I have seen no indication of frost.

Z-64

Q   On this area that you are talking about now?

A   That is right, yes, sir.

Q   And a Macadamia nut is a subtropical, is it not?

A   That is right.  I don't know whether you are interested in my indicator or not.

Q   Maybe we are.  What do you mean, you saw no indication of frost?

A   I have been told that the sumac is the thing to watch for frost.  And I have seen no frosted sumac in any of that area.

MR. SACHSE:  That is the standard old wives' tale in the area.

LT. MILLER:  Will you stipulate it is an old wives' tale?

MR. SACHSE:  That is right.

LT. MILLER:  Well, we will let it in, then.

THE WITNESS:  Well, I haven't run any recording thermometers, in other words.

BY MR. SACHSE:

Q   Now how are you irrigating your trees at present?

A   At the present time it is by water line.  That is, hand watering.

Q   You do not have sprinklers installed?

A   No, sir.

Q   You are basin irrigating?

Z-65

1    A  That is right.

2    Q  And they are irrigated directly off the pump.  You

3  pump right straight from the well to the tree?

4    A  That is right.

5    Q  You have no reservoir?

6    A  No, sir.

7    MR. SACHSE:  I think that is all.  Just a moment, please.

8    Q  Oh, can you tell us something about the flow of

9  Camps Creek, how long during the year normally it continues to

10  run?

11    A  Well, I can tell you this year that Camps Creek flowed

12  until the first-- I would say within a week of the first of

13  June, or first of-- yes, May, June, that is right.

14    Q  Your road actually crosses Camps Creek, does it not?

15    A  That is right.

16    Q  You have to ford the creek?

17    A  Yes, sir.

18    Q  So if it is running you know it?

19    A  Yes, sir.

20    Q  And is that characteristic of the preceding years?

21    A  Well, I wouldn't know, sir, except that they told me

22  this was the end of seven or eight or eleven years or something

23  like that of dry seasons.

24    MR. SACHSE:  That can go out.

25    THE WITNESS: I don't know.

Z-66

BY MR. SACHSE:

Q  You have no personal recollection of how long it ran in preceding years?

A  No, sir.

THE MASTER:  The answer preceding this would then be stricken as hearsay.

MR. SACHSE:  I have no further questions.  You can cross-examine.


CROSS-EXAMINATION

BY LT. MILLER:

Q  Mr. Couch, directing your attention to the aerial photograph in Exhibit M-54, and particularly to the dark brown land so classified--

A  Yes.

Q  --in the northeast corner, have you actually had any plantings in this area before this time?

A  Before this time?

Q  Today, before today.

A  Along this area here it is all planted to barley and vetch, this area right in here.

THE MASTER:  That is the brown area?

THE WITNESS:  Yes, sir.  Now this, there is some of this that is stony right in here.  There is a very small portion. But there is a-- as far as this is concerned here, this is

Z-67

barley and vetch.

BY LT. MILLER:

Q So that would be the northerly portion of that brown area?

A That is right.

Q You have planted--

A Yes, sir.

Q --in the past and you have it planted today?

A There is barley and vetch in there.

Q And when did you first plant this area?

A Let's see, that was planted when you fellows were out there, your man Campo was there in the winter-- in the spring of '56, I believe it was.

Q In the spring?

A In the winter, you know, in the preceding year.

Q In the winter of '56 is when you first planted it?

A That is right, preceding when you fellows came out, your men came out.

Q Now is this a crop that requires irrigation?

A No, sir.

Q This is a dry farm--

A Purely a nurse crop, yes, sir.

Q And the vetch is used merely to build up the soil?

A Yes, sir.

Q Has no commercial value?

Z-68

638

1    A  As far as I am concerned, no.

2    Q  Right.  And the barley, what use have you made of

3 that crop?

4    A  The very same use as a nurse crop to hold the vetch.

5    Q  So you have really made no commercial use of this

6 area?

7    A  No, sir, only a nurse crop for the soil, sir.

8    Q  Right.  Now in the southerly portion of that same

9 dark brown area, Class VII land in the northeast corner of your

10 property, you have cleared that land?

11    A  It was brushed off, but I would not say that it was a

12 real good job of brushing off.  It was disced.

13    Q  Right.  And you haven't had it planted?

14    A  No, sir.

15    Q  And it is pretty rocky and pretty steep in many

16 places?

17    A  Yes, sir.

18    Q  Now with respect to the southwesterly portion of that

19 property, which is in the dark brown,--

20    A  Yes, sir.

21    Q  Did you testify that you had cleared that land or not?

22    A  No, sir.

23    Q  You have not cleared the land?

24    A  No, sir.

25    Q  But you did state that in your opinion the soil in

Z-69

1739

that land was the equivalent of what soil also found on your

land?  Where do you think there is a similar soil to that you

find in the dark brown area in the southwest corner?

A  Well, there are areas in there that I would say are

similar to the brown area in the north, or the-- the southeast,

that you have brown there.

Q  That are in the northeast?

A  In this area here, yes, sir.

Q  So the similarity is in the dark brown in this

portion, in the southwesterly portion of that northerly 40 is

to the dark brown in the northeasterly portion; is that right?

A  Yes, sir.

Q  You have not had any scientific examination made

of that soil?

A  No, sir.

Q  Other than this report?

A  That is right.

Q  What is your normal business in Whittier?

A  I happen to be an engineer at North American Aviation.

Q  All right.  You are not a professional in farming,

other than this weekend business?

A  I spent my whole life in farming, not as a professional,

but as a hobby, prior to coming to California six years ago.

Q  And where was that?

A  That was in Indiana.  I also had a commercial green-

house in Indiana, growing annuals, perennials, trees.  And I

Z-70

1  developed a dam in Indiana to hold water, by Purdue University's

2  extension service civil engineering.  I had plantings of

3  thousands of evergreens on this ten acres.

4       Q  And all of this in the Midwest?

5       A  Yes, sir.

6       Q  And your only experience in this Western climate and

7  soils is what you have had up on your ranch in De Luz?

8       A  Yes, sir.

9       Q  Mr. Couch, is it not true that not only did the

10 personnel that did the soil work on your property go over to

11 this mine shaft, but they lost their smoking pipe down this

12 mine shaft?

13      A  They lost it on the way back there, yes, sir.  And I

14 have it for Mr. Campo.

15      LT. MILLER:  No further questions, your Honor.

16      MR. SACHSE:  I have just one question.

17

18                     REDIRECT EXAMINATION

19 BY MR. SACHSE:

20      Q  When you refer to a nurse crop, as on this 18 acres

21 or so you have cleared, by that do you mean a crop to prepare

22 the soil for permanent commercial plantings later on?

23      A  Yes, sir.

24      MR. SACHSE:  That is all.

25      THE MASTER:  Mr. Couch--

Z-71

1     MR. SACHSE:  I have one question I would like to recall

2  Col. Bowen on out of order, if I may.  But I realize I should

3  have done it.  It would be improper redirect, but it is just

4  one minor question.

5     THE MASTER:  I want to ask Mr. Couch a couple of ques-

6  tions, so maybe we can finish up with him and then you can

7  call Col. Bowen back.

8     MR. SACHSE:  Yes, sir.

9  BY THE MASTER:

10     Q  Do you have any ideas as to any specific portions

11  of the southwesterly 80 acres which could be planted, and any

12  crops that you believe could be planted on that area?

13     A  I do, sir.

14     Q  Can you explain what that is?

15     A  I have been over this land many times.  And at one

16  time I went back to see this old mine. I was in areas where,

17  not being a geologist, the best thing I had was a little

18  wrecking bar.  And I found areas in there that I could take

19  this wrecking bar and very easily push it into compost, good

20  rich soil.  Now they may be small areas, but they are worth-

21  while looking after for a future time, as I say.

22     Q  How large are those areas?

23     A  Well, I would say anywhere probably-- the one I

24  looked at, one of these was I know more than an acre.  And I

25  don't know how many of them there is-- I didn't actually count

1542

Z-72

1 them-- that is on this slope.  And it is very rich soil, because

2 anyone that has been in there will know that the lush growth

3 of brush that is in there is rough to go through.  It is green

4 as grass right now.  And that is why I am sure that the boys

5 didn't know that there was a mine there.  If they were looking at

6 aerial photographs, Campo told me--

7     LT. MILLER:  I will have to move to strike anything he

8 told him.  I don't have any idea what it is, but--

9     THE MASTER:  Well, let's see--

10     THE WITNESS:  They didn't know where the mine was.

11     THE MASTER:  I take it that might be admissible as an

12 admission.  The motion to strike will be denied.

13     LT. MILLER:  All right, your Honor.

14     THE MASTER:  The objection will be overruled.  He hasn't

15 said what he said yet.

16     THE WITNESS:  All right.

17     THE MASTER:  You may go on.

18     THE WITNESS:  The reason they didn't know the mine was

19 there was because there was no tailings showing from the aerial

20 photograph.  They couldn't see the tailings because of the

21 heavy brush that is in there.

22 BY THE MASTER:

23     Q  You have no idea what the total acreage of this type

24 of soil is, though; is that correct?

25     A  In this 80 acres?

Z-73

1    Q  Yes.

2    A  No, sir, I haven't.  I couldn't honestly say.

3    THE MASTER:  That is all I have.

4    MR. SACHSE:  I have just one question, I think, of Col.

5 Bowen.  It is improper cross, I realize.  That is, I should

6 say I should have done it before.  It is not improper.

7        THE MASTER: Col. Bowen, will you resume the stand?

8        COL. BOWEN:  Yes, sir.

9

10                    ALLEN C. BOWEN

11 resumed stand.

12

13                CROSS-EXAMINATION (Continued)

14 BY MR. SACHSE:

15    Q  Col. Bowen, in your earlier testimony weeks ago when

16 you first discussed the different types of soil surveys, you

17 referred to a detailed survey, a detailed reconnaissance, and

18 a reconnaissance, I believe.  Do you recall?

19    A  Yes, sir.

20    Q  Is the fact that the upper portion of this photograph

21 shows a much more detailed analysis than the 80 acres, is that

22 indicative of any difference in the type of survey that the

23 two portions received?

24    A  Yes, sir.  Referring to Plaintiff's Exhibit M-54,

25 the soils map contained therein, a portion of the property on

Z-74

1    the northerly margin of the photograph indicates gentler slopes,

2    deeper soils and more irrigable land, Classes III, IV, VI,

3    than exists in the southwesterly 80 of the Couch property

4    reported on in Plaintiff's Exhibit M-54.

5          Q   I don't think you quite understood my question.   What

6    I was asking you, does the more detailed breakdown of the

7    land indicated along the upperly margin of the photograph

8    indicate there was a more detailed survey made of that land

9    than there was of the Couch southwest 80?

10          A   Yes, sir.

11          Q   In other words, the more detailed survey is reflected

12    by the greater detail of breakdown in soil classification; is

13    that right?

14          A   Yes, sir.   In order to establish those contacts, it

15    is necessary to bore more holes.

16          MR. SACHSE:   I have no further questions.

17          THE MASTER:   Any questions?

18          LT. MILLER:   Yes, sir, I do.

19

20                      REDIRECT EXAMINATION

21    BY LT. MILLER:

22          Q   Colonel, in using the aerial photos similar to the

23    one attached to Exhibit M-54, is use made of the stereoscopic

24    glasses or lenses to study these aerial photos?

25          A   Yes, sir.   In the preparation of these reports a

Z-75

1  stereoscope is used to examine stereo pairs containing the

2  properties investigated.  Now the type of map contained in

3  Plaintiff's Exhibit M-54 does not lend itself to interpretation

4  with a stereoscope, because, in the first place, it is a photo

5  copy.  Some detail is lost in copying the original.  And

6  secondly, it is necessary to have a pair of photographs, each

7  taken at a little-- from a little different point, but each

8  containing the outlines of the property, in order to give the

9  stereoscopic effect.  A stereoscope in essence is a device which

10  allows one eye to look at one image and the other eye to look

11  at the same image taken from a little different angle.  And it

12  gives the perception of depth, three-dimensional perception.

13      Q  By the use of this method can you perceive more

14  accurately the steepness of slopes in  mountainous areas such

15  as is covered by this?

16      A  Yes, indeed.

17      Q  Did you use a stereoscopic lens at any time in exam-

18  ining the aerial photos on the Couch property?

19      A  Yes, sir.

20      Q  And is it your opinion that the Class VII land, as

21  shown on this report, is non-irrigable based in part upon that

22  stereoscopic examination?

23      A  Yes, sir.

24      Q  Now, referring particularly to the southwest 80 acres

25  here, and referring to the testimony of Mr. Couch that in areas

746

Z-76

1   in this 80 acres you will find lush native growth, would that

2   in any way alter your opinion that this land is Class VII, or

3   non-irrigable land?

4       A   No, sir.  Referring to Plaintiff's Exhibit M-54, the

5   soil map contained therein, and more particularly the southwest

6   80 acres, indicates that the symbol shows the mine shaft.  And

7   the vicinity or the area of the photograph immediately to the

8   west of the mine shaft symbol is on a north-facing slope.  And

9   as I have previously testified, it is quite the rule in this

10  country that the north-facing slopes, which in this soils map

11  shows as a darker area, are characterized by soils of sub-

12  stantial depth, humus, and forest duff of significant accumu-

13  lation, and they do produce a very-- an abundance of native

14  growth.

15      Q   What in your opinion would occur in an area like this

16  if you were to clear the native growth off with the purpose of

17  putting the land into agricultural development?

18      A   In my opinion if the native cover were cleared off

19  of a slope such as this contained in the soil survey, Plain-

20  tiff's Exhibit M-54, erosion would wash most of the light fluffy

21  duff, which accumulated over the years, away and seriously

22  erode the soil that has been building there for generations.

23  And consequently would ultimately result in the not only in-

24  ability to grow crops under any man-made system, but would also

25  destroy its value as a watershed area, and lead to the siltation

Z-77

of streams and other damage incident to erosion.

LT. MILLER:  No further questions, your Honor.


RECROSS-EXAMINATION

BY MR. SACHSE:

Q  Col. Bowen, would your last answer be exactly the same if you had in mind the type of culture that is practiced in this area of terraces and non-cultivation of any kind, where the cover crop is permitted to grow and simply be mowed, leaving a permanent soil anchor, and, in fact, building up the soil?

A  It is possible to physically terrace a slope such as this and protect the terrace with a vegetable cover without accruing these ills of accelerated erosion I have mentioned.

Q  And is it not correct that the characteristic of all avocado culture, and in fact most citrus culture in the Fallbrook area, is a technique of non-cultivation, of permitting the weeds to grow?

A  Yes, sir.  But very little terracing.

Q  But very little terracing.

A  Yes, sir.

Q  But when the weeds are permitted to grow in that fashion and are simply mowed, they serve to retain the soil and reduce the hazard of erosion?

A  Yes, sir.  That is why on the Class VI soils that for years were considered non-irrigable, we yielded, because

Z-78

1  of the typical culture in this area, to include Class VI soil

2  sites in the irrigable land with the practices that you have

3  described in the culture of avocados.

4      Q  I have just one other question that deals not only

5  with this, but perhaps with all these exhibits.  Colonel,  I

6  have noticed that some of these engineering studies contain

7  geological overlays, and then some contain even a second overlay

8  on which physical features such as dams and so on, wells, are

9  indicated.  Is there any basic reason why some do and some

10  don't contain those overlays?

11      A  Yes, sir.  Referring first to the geology, if the

12  geology is complex enough to warrant a map in order to aid

13  in describing it in the report, it is our practice to make an

14  overlay showing the geological context.  In this instance the

15  geology was relatively simple.  It didn't warrant the production

16  of a map or overlay.  Similarly, with the land utilization map

17  which accompanies some of these reports, but not others, if the

18  cropping pattern is complex, particularly on the larger

19  properties, which may be characterized by a wide variety of

20  soil sites, we make that land utilization overlay in order to

21  simplify the explanation in the report and cut down the narrative.

22  Now that condition was not present in preparation of Plain-

23  tiff's Exhibit M-54.

24      MR. SACHSE:  That is all.

25

Z-79

FURTHER REDIRECT EXAMINATION

BY LT. MILLER:

Q  Colonel, in your opinion is it practical and economical to terrace Class VII land such as that shown in the Couch report, M-54?

A  Well, in order to terrace a site like that it is necessary to strip a portion of the area of not only the topsoil but the subsoil, usually down to relatively unweathered granitic material, in order to bring out the terrace, and generally, because of that operation, it leaves a very limited zone for root growth and development.  Of course, if the plant has a restricted area in which for the roots to grow and feed upon, it reduces the possibility of satisfactory production of crops.

Q  Would your answer be no, that it is not practical and economic on these areas, or do you have an opinion?

A  Yes, sir.  My answer is in my opinion it is not practical nor profitable to terrace these sites and put them to a commercial enterprise.

LT. MILLER:  Nothing further, your Honor.

MR. SACHSE:  Nothing further.

BY THE MASTER:

Q  Col. Bowen, you referred in answer to some other questions I believe of Mr. Sachse of rock outcroppings.  Are there any such outcroppings on the southwesterly 80 acres?

Z-80

1   A   Yes, sir.

2   Q   What portion of the area is affected by the rock out-

3   croppings?

4   A   Well, the rock outcroppings are more pronounced,

5   referring to Plaintiff's Exhibit M-54, and particularly to the

6   southwest 80 acres, in the lighter areas showing the southerly

7   and easterly facing slopes where the soils are shallow.   And

8   if the plant cover is much less, then, of course, throughout

9   the area the outcroppings occur.   The symbol indicates with the

10  4rL5A shown in Plaintiff's Exhibit M-54 indicates the prevalence

11  of rock outcrops throughout the area symbolized, which includes

12  that southwest 80.

13  Q   Now in the coloring on this map, the lighter color

14  indicates the south and easterly slopes and the darker color

15  indicates the north and westerly slopes?

16  A   Yes, sir.

17  Q   And your characterization of the property in the

18  southwesterly 80 acres as non-irrigable is based upon rock

19  outcroppings and the degree of slope?

20  A   Yes, sir.   The slopes in there are predominantly

21  40%.

22  THE MASTER:   That is all.

23  MR. SACHSE:   That is all, sir.

24  LT. MILLER:   That is all.

25  THE MASTER:   I have one question not of the witness, but

**Z-81**

of the counsel for the plaintiff.  I observed in the answer

filed by Mr. and Mrs. Couch that the statement is made at the

bottom of page 2 and the top of page 3 that Parcels 1 and 2 are

riparian to an unnamed tributary of Camps Creek, which flows

through said parcels in a generally westerly to easterly direc-

tion.  Parcel 2 is also riparian to Camps Creek, which crosses

said parcel in the northeast corner thereof.  I take it from

that there is no contention that Parcel 2 is riparian to--

rather, Parcel 1 is riparian to Camps Creek by reason of this

cornering.

MR. SACHSE:  I will have to be careful to be sure I know

what I am talking about here.  Let's look.  Maybe I am wrong.

THE MASTER:  On Exhibit A, if I understand it correctly,

Parcel 1 is the 80 acres and Parcel 2 is the 40 acres.

MR. SACHSE:  Parcel 1 is the 80.  However, it is

erroneously described .  Your Honor has caught it.  Parcel 1

reads the south quarter.  It should be the south half of the

northwest quarter of Section 31.  I am very glad you asked me.

THE MASTER:  That is what I was thinking, that the

description doesn't indicate--

MR. SACHSE:  Doesn't add up.  With your Honor's permission--

the deed of course is correct-- but may I correct Exhibit A to

read-- Parcel 1 should read "the South Half of the Northwest

Quarter of Section 31".

THE MASTER:  Yes.  And that is Parcel 1.  And there is

Z-82

1    no--

2         MR. SACHSE:  No contention that that is riparian to

3    Camps Creek.

4         THE MASTER:  No contention that is riparian to Camps

5    Creek.

6         MR. SACHSE:  No, sir.

7         THE MASTER:  That is all I have.

8         MR. SACHSE:  Do you object if I make that change?

9         LT. MILLER:  Oh, no.  I don't know whether we introduced

10   the deed, though.

11        MR. SACHSE:  Yes, I introduced it.

12        LT. MILLER:  Did you introduce it?

13        THE CLERK:  It was marked for identification.

14        MR. SACHSE:  Only identification?

15        THE MASTER:  I think it has only been identified.

16        MR. SACHSE:  I will offer it, then.  The witness did

17   state it was his deed.

18        THE MASTER:  Yes.  That will be received in evidence as

XR  19   Defendants' Exhibit MD-S.  Then we will take a recess at this

20   time.

21        (Recess.)

22        THE CLERK: Court is now in session.

23        THE MASTER:  Mr. Mosher is in court now.  He is the

24   owner of Parcel 91, I believe.  He has advised me during the

25   recess that he does not wish to offer evidence himself, but I

Z-83

1  believe that while he is here it would be well to have Col.

2  Bowen testify at some little more detail concerning his parcel

3  than he testified this morning at the time Exhibit M-63 was

4  introduced in evidence.  So will you resume the stand, then,

5  Col. Bowen.

6       COL. BOWEN:  Yes, sir.

7

8            ALLEN C. BOWEN,

9  recalled as a witness, having been previously sworn, testified

10 as follows:

11

12            CROSS-EXAMINATION

13 BY THE MASTER:

14      Q  Can you describe the nature of the property owned

15 by Mr. and Mrs. Mosher, for the record?

16      A  Referring to Plaintiff's Exhibit M-63, report of an

17 engineering investigation on the Mosher property, which is

18 De Luz watershed Parcel No. 91-- the legal description is rather

19 involved, your Honor.  Do you want that read?

20      THE MASTER:  I don't think the legal description need be

21 read in the record, no.

22      THE WITNESS:  The outline of this parcel is also shown

23 on Plaintiff's Exhibit M-68 with the number 91 encircled within

24 the outer limits of the property.  It is traversed from north

25 to south by De Luz Creek.  The creek makes a pronounced bend

Z-84

1    to the west, and then back to the east, and leaves the property

2    at approximately the center of the southerly line.  There is an

3    unnamed tributary which enters the property at the northeast

4    corner and continues in a southwesterly direction to confluence

5    with De Luz Creek south of this property herein reported on.

6    And there is another unnamed tibutary which enters the westerly

7    boundary of the property near the northwesterly corner, and

8    continues through the property to its confluence with De Luz

9    Creek, within the outer boundaries of the property.

10        LT. MILLER:  Would it be better, Mr. Mosher, if you were

11   sitting here?  Could you follow it any better?

12        MR. MOSHER:  No, I can follow it here.

13        THE WITNESS:  The soil survey of this property, your

14   Honor, reveals Classes II, III, IV-- II, III, VI, VII and VIII.

15   The land classes II, III and VI are considered irrigable.  The

16   total irrigable acreage is 50.8 acres.  In orienting this

17   property, it should be noted that the Fallbrook-De Luz Road

18   traverses the property in a north-south direction.  The

19   irrigable soils are considered to be suitable for production

20   of row crops and permanent pasture.  Referring still to

21   Plaintiff's Exhibit M-63 on page 2, under the heading "Engineer-

22   ing", it is noted that water is presently being supplied--

23   and "presently" refers to the date of the survey, which was in

24   November of 1955-- presently being supplied the above-described

25   property from a well located on the property.  At that time

Z-85

1     the owner represented the well to be artesian about eight months

2     of each year.   Water is pumped from the well to a concrete

3     lined irrigation reservoir, capacity approximately 9,000 gallons,

4     or to a domestic water tank with a capacity of approximately

5     500 gallons on the high ground near the house.   And at the time

6     of the report there was no commercial irrigation being practiced

7     on the property.

8     BY THE MASTER:

9         Q   Now in your opinion would water developed from wells

10    on any part of the property be a part either of De Luz Creek or

11    one of its tributaries, or would there be any portion where water

12    so developed would not be a portion of the subsurface flow of

13    such a stream?

14        A   Well, your Honor, inasmuch as the main stem of De Luz

15    Creek and the unnamed tributaries mentioned pass through this

16    property, and there is alluvium along the De Luz Creek confined

17    predominantly to the area shown as purple, contiguous to the

18    creek, and inasmuch as the tributaries, the one coming in from

19    the west to the east has its confluence within the property,

20    and the one traversing from the northeast to the southerly

21    portion of the property indicates the presence of some low

22    lying relatively level area, which is probably alluvium, I

23    will say that the waters derived from ground water sources

24    on this property are part of the De Luz Creek stream system.

25        Q   Now in the answer which Mr. and Mrs. Mosher have

Z-86

1   filed they state that the balance of the property, over and

2   above the 50.8 acres which are tillable land, could be used

3   for grazing cattle and for raising turkeys, chickens and fowl.

4   In your opinion is that correct?

5           A   Yes, sir.

6           Q   Could that statement properly be made for practically

7   all land in the De Luz Creek watershed, that is, the part that

8   is not irrigable, could that be used for cattle, turkeys,

9   chickens and fowl?

10          A   Yes, sir.  That would apply to all areas considered

11  to be non-irrigable.

12          Q   That would apply to the property of Mr. Couch in his

13  Class VII land that we considered before the recess, too; is

14  that correct?

15          A   Yes, sir.

16          THE MASTER:   I have no further questions of Col. Bowen.

17          MR. SACHSE:   I have just one.  It is a question of

18  curiosity, Colonel.

19

20                      CROSS-EXAMINATION

21  BY MR. SACHSE:

22          Q   Why-- as far as I am aware, this is the only such

23  soil map I have yet seen that gives Class VIII to the hilly

24  stuff.  Heretofore everyone has limited Class VIII to the rocky

25  stream channel.  I wonder if there was any particular reason

1757

Z-87

1    for it?

2          A   No, sir.   I believe that it should more properly be

3    shown as Class VII land.

4          Q   I am correct, am I not, you have given VIII only to

5    the overflow and wash areas of the stream channel?

6          A   That is correct, sir.

7          THE MASTER:   Mr. Mosher, do you have any questions now

8    that you would like to ask Col. Bowen?

9          MR. MOSHER:   Well, the only thing is on that he says

10   that the water is from the De Luz Creek.   That well, it is

11   nine feet deep, and it is 40 feet above the creek bed.   So I

12   don't see how that could come from the De Luz Creek.   Do you?

13         THE MASTER:   Col. Bowen, could you answer that question?

14         THE WITNESS:   My answer, Mr. Mosher,  was that the waters

15   were part of the De Luz Creek stream system.   Not necessarily

16   that they derived from De Luz Creek.   It is my opinion that that

17   water in your well would ultimately, if not pumped by you,

18   percolate down to De Luz Creek to the older alluvium that your

19   house is on.

20         MR. MOSHER:   I understand.   I just wondered about that.

21         THE MASTER:   Did you have any other questions?

22         MR. MOSHER:   No, I don't.

23         THE MASTER:   And as a result of what Col. Bowen has

24   testified, do you wish at the present time to offer any additional

25   testimony?

           MR. MOSHER:   No, not that I know of.

Z-88

1    THE MASTER:  Very well.  Lt. Miller, do you have any

2    questions?

3    LT. MILLER:  No, I have none from Col. Bowen.  I do think

4    it would be appropriate if Mr. Mosher would say whether or not

5    he agrees with the report while he is here, for the benefit

6    of the record.

7    THE MASTER:  Well, do you want to call him as a witness

8    to ask him that question, then?

9    LT. MILLER:  Well, I think it would be appropriate.

10   THE MASTER:  Yes.  Then, Colonel, would you step down.

11   Mr. Mosher, will you take the witness stand.

12

13                BENNIE R. MOSHER,

14   one of the defendants herein, called as a witness by and on

15   behalf of the plaintiff, sworn, testified as follows:

16

17                CROSS-EXAMINATION

18   BY LT. MILLER:

19       Q  Mr. Mosher, you have received a copy of what has

20   been here marked as Plaintiff's Exhibit M-63.

21       A  Yes.

22       Q  And you have read that report at your leisure in the

23   past?

24       A  That is right.

25       Q  Are you in agreement with the facts as reported in

Z-89

1   that report?

2       A  Yes.  So far as I know, you know.

3       LT. MILLER:  No further questions, your Honor.

4       THE MASTER:  Any questions, Mr. Sachse?

5       MR. SACHSE:  That is all.

6       THE MASTER:  That is all.

7       THE WITNESS:  O.K.

8       THE MASTER:  I would now like to ask Col. Bowen to take

9   the stand with reference to Exhibit M-56, which deals with

10  Parcels 39 and 42.

11      MR. SACHSE:  Did you say 39 and 42, your Honor?

12      THE MASTER:  Yes.  That is property owned by Mr. and

13  Mrs. Klein.  They have been mailed a notice to appear here to-

14  day if they wished to testify, and they have not appeared.  So

15  I presume that they do not care to offer any testimony of their

16  own.  But I would like to get the benefit of Col. Bowen's

17  statements and interpretation of Exhibit M-56, affecting these

18  parcels.

19      MR. SACHSE:  What is the exhibit number, please, Colonel?

20      COL. BOWEN:  Plaintiff's Exhibit M-56.

21      MR. SACHSE:  56.

22

23

24

25

Z-90

ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified
as follows:

CROSS-EXAMINATION

BY THE MASTER:

Q  Can you state for the record the general nature of
this property, its location and so forth?

A  Yes, your Honor.  This property reported on in
Plaintiff's Exhibit M-56 shows it to be that of Lloyd E. Klein
and Elizabeth Klein, as to a portion, and Lewis J. Klein and
Eleanor L. Klein as to the remainder.

Q  Taking Parcel 39 first, then-- or would you rather
take Parcel 42 first?

A  Your Honor, we reported on both parcels.  And the sum
of our findings on both parcels is tabulated in the irrigable
and non-irrigable acreage and in the land use tabulation.  So
I would have nothing to present before me to break the property
down and report our findings as regards each of the parcels
shown on Plaintiff's Exhibit M-68 as Parcel No. 42 and Parcel
No. 39.

Q  Well, give what the report shows, then, about the
two together.

A  Yes, sir.  This property, both Parcel 42 and Parcel
39, is traversed by the main De Luz Creek from north to south.

Z-291

1  The creek enters Parcel No. 42 on the easterly boundary, and

2  about three or four hundred feet south of the northeast corner

3  of Parcel 42.   De Luz Creek continues diagonally across the

4  southeast corner of Parcel 42 and enters the northerly boundary

5  of Parcel No. 39, near to but east of the northwesterly corner

6  of Parcel No. 39, and then continues southerly along the

7  westerly boundary of Parcel 39, and leaves the southerly boundary

8  of Parcel 39 three or four hundred feet east of the southwesterly

9  corner of Parcel 39.   Plaintiff's Exhibit M-56 shows the con-

10  fluence of Cottonwood Creek and De Luz Creek to be within the

11  exterior boundaries of Parcel No. 39.

12      MR. SACHSE:   Could I have that last sentence, Colonel?

13  Did you say it shows the confluence of Cottonwood and De Luz

14  to be within 39 or not to be?

15      THE WITNESS: To be within.   I refer to Plaintiff's Exhibit

16  M-56.   In fact, it would be very close to the easterly boundary--

17  correction-- to the westerly boundary of Parcel 39.   Plaintiff's

18  Exhibit M-68 shows the confluence to be outside of the Parcel

19  No. 39.   Plaintiff's Exhibit M-56 is a larger scale and is done

20  on an aerial photograph, and would be the most accurate repre-

21  sentation.   De Luz Creek in its flow through this property is

22  in contact with alluvial material, both recent and older

23  alluvium.   Referring to page 3 of Plaintiff's Exhibit M-56,

24  under "Engineering", it is noted that the property is presently

25  supplied with domestic water from a well on the bank of De Luz

Z-92

1   Creek.  Water is extracted from the well with a centrifugal

2   pump driven with a small electric motor.  No irrigation is

3   presently being practiced.  However, there is evidence of

4   irrigation of small acreages in the past.

5        Then according to the soil and land capability classi-

6   fication map there are approximately 73 acres considered suit-

7   able for irrigation.

8   BY THE MASTER:

9        Q  Can you apportion that between the two parcels?

10  I note that in the answers which have been filed Lloyd and

11  Elizabeth Klein claim 30 acres of tillable land.  That is on

12  Parcel 39.  And that Lewis and Eleanor Klein claim 45 acres

13  of tillable land on Parcel 42.  That would be a total of 75

14  acres.

15       LT. MILLER:  Your Honor, may I suggest that perhaps

16  the best way to handle that would be to give us an opportunity

17  to take it back to the office, where we could planimeter it

18  and come up with it more exactly than Col. Bowen would in

19  estimating the areas.

20       THE MASTER:  Well, I think that is a good suggestion.

21  If there is no further information you can give at the present

22  time from the report as to the separate items of this parcel,

23  could you, between now and tomorrow morning, make any further

24  computations and planimeter measurements which would be

25  required so as to give this information then?

Z-93

1    THE WITNESS:  Yes, sir.  I can have the information as

2   to both parcels tomorrow morning.

3    MR. SACHSE:  Before the Colonel leaves the stand, what

4   do the answers indicate as to the status of acquisition of the

5   two parcels?

6    THE MASTER:  The answers do not indicate that.

7    MR. SACHSE:  I wonder if Lt. Miller can tell us that,

8   what his records show.

9    LT. MILLER:  Well, I don't particularly care to say into

10   the record, but I can tell Mr. Sachse off the record what I

11   think.

12    MR. SACHSE:  That is all right with me.

13    (Discussion off record.)

14    THE MASTER:  Mr. Sachse, unless you have some questions

15   at this time--

16    MR. SACHSE:  Not now.

17    THE MASTER:  I think then we will adjourn until 9:30

18   tomorrow morning.  And at that time we will take up, of course,

19   the cases of any of the defendants who are present at that time.

20   And then I think I will try to proceed, if there is any

21   additional time, to ask Col. Bowen for any information he can

22   give with reference to the engineering reports concerning which

23   you have not yet testified in any detail.  That is, where the

24   defendants have not already appeared.

25    COL. BOWEN:  Yes, sir.

Z-94

1    THE MASTER:   So we will recess until 9:30 tomorrow.

2    (Adjournment until 9:30 A.M., July 1, 1958.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25