ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

           Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

          Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**Volume:** 14

**Pages** 1765-1886

**Date:** July 1, 1958

**Place:** Fallbrook, California

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS

1113 FIRST NATIONAL BUILDING

SAN DIEGO 1, CALIFORNIA

BELMONT 9-4191

1
2
3    <u>APPEARANCES</u>:
4
5        WILLIAM H. VEEDER, ESQ.,
           For the United States of America.
6        DAVID W. MILLER,(USN),
           For the United States of America.
7
8        WILLIAM E. BURBY, ESQ.,
           For the United States of America.
9        FRANZ SACHSE, ESQ.,
           For Fallbrook Public Utility District
10           and individually named defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | 1767 | 1771 | 1777 | |
| | | 1787 | 1793 | |
| | 1806 | 1810 | | |
| | | 1850 | | |
| | | 1855 | | |
| | 1861 | 1863 | | |
| | 1866 | 1867 | | |
| | 1871 | 1873 | 1875 | 1876 |
| | 1881 | 1882 | | |
| | 1885 | 1886 | | |

| For the Defendants: | | | | |
|---|---|---|---|---|
| David R. Foss | 1779 | 1783 | | |
| Minnie Jave | 1797 | 1803 | | |
| Hugh Donald Anderson | 1819 | 1835 | | |
| William Judson Ross | 1845 | | | |
| Anna Doerrer | 1854 | | | |

1766

## INDEX TO EXHIBITS

|  | Iden. | Evid. |
|---|---|---|
| M-92 – Tabulation of land classes | 1768 | 1769 |
| M-93 – Report of Engineering Investigation | 1806 | 1807 |
| M-94 – Report of Engineering Investigation | 1806 | 1808 |
| M-95 Report of Engineering Investigation | 1808 | 1809 |
| MD-T – Decree Quieting Title (Foss) | 1779 | 1781 |
| MD-U – Deed (Hugh Anderson) | 1819 | 1820 |

Z-1

1

2    <u>Fallbrook, California, July 1, 1958.  9:30 A.M.</u>

3    THE MASTER:  Will the attorneys state their appearance

4    for the record?

5    MR. VEEDER:  William H. Veeder for the United States.

6    MR. MILLER:  David Miller.

7    MR. BURBY:  William E. Burby.

8    MR. SACHSE:  Franz Sachse for the Fallbrook Water

9    District and the individual named defendants.

10   THE MASTER:  There appear to be no defendants here in

11   proper person this morning in the audience.

12   At the conclusion of the hearing yesterday we were con-

13   sidering Parcels 39 and 42, and Col. Bowen was on the stand.

14   I assume we might as well continue and finish with those par-

15   cels before taking up your defendants, Mr. Sachse.  Is that

16   agreeable?

17   MR. SACHSE:  That is very agreeable.

18   THE MASTER:  Col. Bowen, will you then take the stand?

19

20   ALLEN C. BOWEN,

21   recalled as a witness, having been previously sworn, testified

22   as follows:

23   THE MASTER:  Can we have Exhibit M-56.

24   I believe that you were about to go into the question of

25   the amount of irrigable acreage on each of these two parcels.

Z-2

XI

1    THE WITNESS:  Yes, your Honor.

2    MR. VEEDER:  This has the acreage that has been shown on

3  the document.  You might mark that as an exhibit.  We will have

4  it marked for identification as Plaintiff's Exhibit M-92.

5    MR. SACHSE:  Is that e-i-n or i-e-n?

6    THE MASTER:  E-i-n, Mr. Klein.

7  BY MR. VEEDER:

8    Q  I hand you Plaintiff's Exhibit marked for identifica-

9  tion M-92, and ask you to state into the record what it is.

10    A  Plaintiff's Exhibit M-92 is a tabulation of land

11  classes, land utilization.

12    Q  For which property?

13    A  For Parcel No. 39 and Parcel No. 42, De Luz watershed.

14  Both parcels are delineated on Plaintiff's Exhibit M-68 and

15  marked with the respective parcel number in a circle within

16  the limits of the property.

17    Q  Was that prepared under your direction?

18    A  Yes.

19    Q  And do you know it to be accurate of your own knowledge?

20    A  I do.

21    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

22  marked for Identification M-92.

23    MR. SACHSE:  Have you a copy of that?

24    MR. VEEDER:  Yes.

25    The offer is made, your Honor.

Z-3

XR

1      THE MASTER:  Yes.  It will be received in evidence and

2   marked Plaintiff's Exhibit M-92.

3      You may go ahead.

4      THE WITNESS:  Your Honor, when we made the survey on

5   these two parcels in 1956 it was under one ownership and that

6   is the reason that the report was set up without breaking down

7   the classes and utilization of land by parcel numbers.

8      Referring to Plaintiff's Exhibit M-92 it shows that

9   Parcel No. 39 has a total of 37.6 acres of irrigable land.  The

10   recommended land use for that Parcel No. 39 includes row crops,

11   permanent pasture, avocados and citrus.

12      Parcel No. 42, as shown on Plaintiff's Exhibit M-92, has

13   35.1 acres of irrigable land, and the recommended land use

14   plan for development is in avocados, row crops, citrus and

15   permanent pasture.

16      The duty of water and the sum total maximum water require-

17   ments for each parcel for a year are shown on the exhibit.

18   BY MR. VEEDER:

19      Q   Will you state, Col. Bowen, the streams which traverse

20   or abut upon Parcel No. 39?

21      A   Parcel No. 39 is traversed by De Luz Creek, and as is

22   shown in Plaintiff's Exhibit M-67 and 56, the confluence of

23   Cottonwood Creek with De Luz Creek is within the exterior

24   boundaries of Parcel No. 39.

25      De Luz Creek traverses that parcel from north to south,

Z-4

following closely along the westerly margin of the property.

Q   Now state what streams traverse or are on Parcel 42.

A   De Luz Creek traverses the southeast corner of Parcel No. 42, entering the easterly boundary of the parcel and proceeding in a southwesterly direction across the corner, leaving the southerly boundary of Parcel 42 to enter Parcel 39.

Q   Are there any structures on either of those parcels, Colonel, for diversion or distribution of water on the land?

A   At the time of the survey, as reported on Page 3 of Plaintiff's Exhibit M-56, the engineering section shows that that property is served with a well on the bank of De Luz Creek providing domestic water.

THE MASTER:   That was for both parcels at that time?

THE WITNESS:   Yes, sir.   That is the only development on the combined parcels at that time.

BY MR. VEEDER:

Q   And where is that well located?   Is that on 39 or 42?

A   That was on Parcel No. 42.

Q   What further developments are there on those two parcels, starting first with Parcel No. 39?

A   At the time of the survey there was no irrigation on Parcel 39.

Q   Now, what about Parcel 42?

A   At the time of the survey there was no irrigation on Parcel 42.

Z-5

1     Q   When was the last time that you observed those lands,

2  or a member of your staff observed those lands?

3     A   The last time I observed those lands was the 26th of

4  June, 1958.

5     Q   And what was the condition of development at that time?

6  Was there any development at all there?

7     A   No, sir.   I don't recall any development at that time.

8     MR. VEEDER:   We have no further questions, your Honor.

9

10                  CROSS-EXAMINATION

11  BY MR. SACHSE:

12     Q   Col. Bowen, when you refer to the streams that go

13  through 42, you used the word "De Luz Creek."   You mean the

14  West Fork, do you not?

15     A   Well--

16     Q   I mean the westerly of the two forks?

17     A   I called that the main De Luz Creek in the past, Mr.

18  Sachse.

19     Q   Now, I notice that Exhibit 68, M-68, appears to show

20  the confluence of De Luz Creek and Cottonwood Creek as outside

21  the boundaries of 39, whereas your testimony was that it is

22  within the boundary.   Now which of those two is more accurate

23  from a boundary standpoint?

24     A   The representation on Plaintiff's Exhibit M-56 is

25  the more accurate of the two.

Z-6

1    Q  In other words, the aerial has accurately plotted

2    thereon the boundary limitations of the parcel?

3        A  Yes, sir.

4        Q  So this line on M-68 is slightly off, the confluence

5    of the two streams should be within 39?

6        A  Yes, sir, or the confluence is slightly off--

7        Q  On the map?

8        A  Yes, on the map.

9        Q  Colonel, to help me get oriented, can you show me on

10   there the road that goes up the fork?

11       A  This white line crosses Cottonwood Creek and goes

12   along the margin of this cultivated area and proceeds on up,

13   crossing Parcel No. 42, about midway through the yellow sec-

14   tion.

15       MR. VEEDER:  When you say cultivated area, where is that?

16       THE WITNESS:  The cultivated area on the Garnsey property.

17   BY MR. SACHSE:

18       Q  With reference to the intermittent stream symbols

19   that have been brushed in on Parcel 42, you see the symbols

20   to which I refer?

21       A  Yes, sir.

22       Q  How would you characterize those streams?

23       A  Those are small tributaries of De Luz Creek, flowing

24   only during periods of rainfall and runoff.

25       Q  I see one other intermittent stream symbol on Parcel

Z-7

1    39 flowing northeast to southwest, and then turning sharply to

2    the west.  Do you see the one to which I refer?

3        A  Yes, sir.

4        Q  Would you characterize that the same way?

5        A  Yes, sir.

6        Q  Now, as to De Luz Creek itself, do you know what its

7    present condition as far as runoff is concerned, on these

8    parcels?

9        A  No, sir.  Within the boundaries of this parcel I

10   haven't checked the present condition of De Luz Creek stream

11   flow.

12       Q  With regard to Cottonwood Creek, particularly where

13   it crosses right outside of these parcels, you have been up

14   there recently, haven't you?

15       A  Yes.

16       Q  Do you recall that the crossing itself was dry but

17   that the ground on both sides of the crossing was muddy?

18       A  Yes, sir, that is my recollection.

19       Q  And do you have any knowledge as to the condition of

20   the surface flow of the stream on Parcel 39 at and below the

21   confluence with Cottonwood and De Luz Creek?

22       A  No, sir.

23       Q  With reference to Parcel 42, Colonel, have you examined

24   the contours to determine whether or not all of 42 lies within

25   the De Luz Creek drainage or whether a part actually drains

1247

Z-8

1  into Cottonwood Creek area?

2  A  The westerly portion of Parcel No. 42, approximately

3  10 acres, drains into Cottonwood Creek.

4  Q  The westerly ten acres does drain into Cottonwood

5  Creek, in your opinion?

6  A  It does, in fact, drain into Cottonwood Creek.

7  Q  Yes.  And as far as 39 is concerned, the entire parcel

8  drains into De Luz Creek, does it not?

9  A  Yes, sir.

10  MR. SACHSE:  I have no further questions.

11  THE MASTER:  Col. Bowen, in the answer which Mr. Lloyd

12  E. Klein and Mrs. Elizabeth Klein made, as owners of Parcel 39,

13  they state that they claim the right to take water from any

14  wells or springs on the property.  I believe you have testified

15  there is no well at present on Parcel 39.  Are there any springs

16  on that parcel, to your knowledge?

17  THE WITNESS:  No, sir.  I have no knowledge of the exist-

18  ence of any springs on Parcel No. 39.

19  THE MASTER:  Now the defendants also in their answer claim

20  the right to percolating water of any kind.  In your opinion

21  would water obtained from wells hereafter dug on Parcel 39 be

22  a part of the flow of any stream or would it be so-called

23  local or vagrant percolating water?

24  THE WITNESS:  Your Honor, the source of water on Parcel

25  No. 39 is the recent and older alluvium bordering De Luz Creek,

Z-9

1    and that water would be part of the stream of De Luz Creek.

2         THE MASTER:  Would it be possible to obtain water on any

3    part of Parcel 39 that would not be a part of De Luz Creek?

4         THE WITNESS:  Well, the higher ground in Parcel 39 is in

5    contact with alluvial deposits and in my opinion subsurface

6    flow can occur moving from the joints and fractures in the

7    granitic material into the alluvium.

8         THE MASTER:  So that also would then be actually from the

9    flow of the stream?

10        THE WITNESS:  Yes.

11        THE MASTER:  Now, in connection with the answer filed by

12   Mr. Lewis-- L-e-w-i-s-- J. Klein, and Eleanor L. Klein, as

13   owners of Parcel 42, they refer to the existing well on that

14   property to which you have testified, and state that there are

15   45 acres suitable for tillage; 15 acres suitable for avocados

16   and citrus, and 30 acres suitable for corn, permanent pasture,

17   truck gardening and fruits.

18        Now, you have testified that the total area, irrigable

19   acreage, I believe, was 33.1.  Was that correct?

20        THE WITNESS:  35.1.

21        THE MASTER:  35.1.  Their total is 45 acres.  Can you

22   advise me how much land you have indicated is suitable for

23   avocados and citrus, if any, and how much, if any, is suitable,

24   for example, for pasture, truck gardening and fruits?

25        THE WITNESS:  Yes, your Honor.  The plan we have developed

Z-10

1  for Parcel No. 42, the report of which is contained in Plain-

2  tiff's Exhibit M-56, and the tabulation of land use appears on

3  Plaintiff's Exhibit M-92, shows 11 acres adapted to avocados,

4  19.6 acres in row crops, 2.8 acres in citrus, and 1.7 acres

5  permanent pasture.

6       THE MASTER:  Now, in their answer they also refer to the

7  right to drill additional wells.  In your opinion is water

8  from the present well obtained from the subterranean sources

9  of De Luz Creek and would--  Strike that-- Just answer as to

10  that one well, at the present time-- or is that local water?

11      THE WITNESS:  No, sir, that well is located in the

12  alluvium deposit adjacent to De Luz Creek.

13      THE MASTER:  Is there any location on Parcel 42 where

14  additional wells could be drilled which would not tap the

15  subsurface flow of the creek or water flowing into the creek?

16      THE WITNESS:  Well, the best source of water on Parcel

17  No. 42 is in the alluvium adjoining De Luz Creek, and it would

18  be inadvisable to drill a well in the upland property property

19  portion of the property which is classified as VII, as shown

20  with the brown color in Plaintiff's Exhibit M-56 as occupying

21  the westerly approximately one-third of Parcel 42.

22      THE MASTER:  Then is it correct that in your opinion any

23  wells that would be dug on that property, and which would

24  actually produce water, would be producing it either from sub-

25  surface flow of the stream or would intercept water which would



Z-11

1   flow into the stream?

2        THE WITNESS:  With the exception, your Honor, of that

3   approximately ten acres in the westerly portion of Parcel No.

4   42 which drains--

5        MR. VEEDER:  May I interrupt?  I haven't been able to

6   follow you on the ten acres.

7        THE WITNESS:  There is a ridge which runs generally north

8   and south through the westerly portion of the property which

9   divides drainage flowing directly into De Luz Creek and that

10  which flows westerly into Cottonwood Creek; as to that portion

11  of approximately ten acres which drains westerly into Cotton-

12  wood Creek, any water which was derived from that portion of the

13  property would, in my opinion, be vagrant percolating water

14  and no part of the stream.

15       THE MASTER:  I have no further questions.  Mr. Veeder,

16  do you have any?

17

18                    REDIRECT EXAMINATION

19  BY MR. VEEDER:

20       Q  In regard to the westerly half, virtually the westerly

21  half of Parcel 42, will you state the land class of that

22  property?

23       A  Well, the bulk of the western half of Parcel 42 as

24  shown on the soil survey map contained in Plaintiff's Exhibit M-

25  56 is Class VII land.  It is considered to be non-irrigable.

Z-12

1    The remainder of that half is comprised almost wholly of Class

2    IV land, shown in blue on the soil survey contained in Plain-

3    tiff's Exhibit M-56, and as to the Class IV land that is

4    irrigable.

5         Q  When you say it is considered not irrigable, is that

6    your opinion, Colonel?

7         A  That is my opinion, yes, sir.

8         MR. VEEDER:  I have no further questions.

9         MR. SACHSE:  I have nothing further.

10        THE MASTER:  That is all I have.

11        Mr. Sachse, I believe you have a defendant here?

12        MR. SACHSE:  Yes, your Honor.  I have at present in court

13   Mr. David R. Foss, who is one, I believe it is, of eight or nine

14   heirs of the Estate of Albert Foss, presently the owner of

15   Parcel 19.

16        Now there has been no engineering report completed by the

17   United States as yet on Parcel 19.  However, since Mr. Foss is

18   from out of town, and since there is no present development on

19   this property, I would like to put him on now, to offer proof

20   of his filing and what knowledge he has, and when the engineering

21   report is ready and if there is any reason to bring him back, we

22   can do so.

23        THE MASTER:  Very well, then.

24        MR. SACHSE:  Will you take the stand, Mr. Foss.

25

1779

Z-13

1      DAVID R. FOSS,

2  one of the defendants herein, called as a witness in his own

3  behalf, being first duly sworn, testified as follows:

4

5      DIRECT EXAMINATION

6  BY MR. SACHSE:

7      Q  Will you state your full name, Mr. Foss?

8      A  David R. Foss.

9      Q  Will you look at the map here, Mr. Foss, at the parcel

10  that is delineated on the map as 19?

11      A  Yes.

12      Q  I will circumscribe it for you.  Is that the property

13  which you and your brothers and sisters own?

14      A  That is the property.

15      MR. SACHSE:  Will you mark this for identification, please,

16  as MD-T.

17  BY MR. SACHSE:

18      Q  I will hand you a photostat of the decree quieting

19  title, marked MD-T for Identification, and ask you if the

20  property described therein is Parcel 19?

21      MR. VEEDER:  Your Honor, I don't want to complicate this,

22  but there is no showing that Mr. Foss knows what Parcel 19 is

23  or where it is located.

24      MR. SACHSE:  I just got through showing him.

25      MR. VEEDER:  But he did not testify in regard to it.  Now

my only thought is that I probably have no objection to it, but

XI

Z-14

1    I see no basis whatever for trying to prove title with an

2    uncertified copy of a decree.   That is what he is attempting.

3         MR. SACHSE:   Let's get this straight.   If we are going to

4    start to object to certification-- there hasn't been a single

5    certified copy that has gone in yet--

6         THE MASTER:   This is a photostat of a certified document.

7         MR. SACHSE:   The document itself is not certified.

8         MR. VEEDER:   Well--

9         THE MASTER:   In other words, you are objecting on the

10   ground that this document itself has not been certified, even

11   though it is a copy of a certified document?

12        MR. VEEDER:   I have no way of knowing, your Honor, any-

13   thing about it.

14        MR. SACHSE:   I will withdraw the offer.   Mr. Veeder shows

15   up exactly what the United States wants to do, make it tough.

16   They have told every one of these people here that they would

17   accept as their title a document that coincided with their own

18   records.   Everything has been going along fine and Mr. Veeder

19   comes back from Washington-- trouble.   I will withdraw the

20   offer.   I will submit a certified copy.

21        MR. VEEDER:   I realize that Mr. Sachse is having a little

22   temper this morning.   We have made no objection whatever to this

23   man's title and I am sure that Mr. David Miller would have told

24   me if he did not think this man was the record owner.   I simply

25   don't think that this is any way of proving a title and I don't

Z-15

1    believe your Honor would accept it as proof of a title.

2         Now, we have made no objection whatever to Mr. Sachse's

3    title.  We are simply saying -- and I believe our reputation

4    is somewhat at stake on many, many things that are going on--

5    I simply say when this gentleman is asked to look at Parcel 19

6    and testify that it is the same property that is in the decree,

7    I simply say that is no way of proving title.  We haven't

8    objected to it.

9         MR. SACHSE:  Are you going to object to the introduction

10   of this?  I will offer the instrument and you can object to the

11   instrument or you don't have to.

12        MR. VEEDER:  I object on the ground it is incompetent,

13   irrelevant and immaterial.

14        THE MASTER:  If the only objection is that it is in-

15   competent, irrelevant and immaterial, the objection is over-

16   ruled and the document will be received in evidence as MD-T.

17        MR. SACHSE:  The document, your Honor, will speak for

18   itself.  It can be identified as to any map to establish what

19   land it refers to.

20        THE MASTER:  That is correct.

21        MR. VEEDER:  That was the point I was making, it would

22   have to be testified to.

23   BY MR. SACHSE:

24        Q  Mr. Foss, are you one of the sons of Albert J. Foss?

25        A  I am.

Z-16

1    Q   And what was the relationship of Albert J. Foss to

2    Parcel 19?

3    A   His relation?

4    Q   How did he get it?   Do you know?

5    A   Well, personally, I think some of it was homesteaded

6    and some was purchased.   This was way back before I was born.

7    Q   Before your time.   Then that can go out.   How long

8    have you known about the property?

9    A   All my life and I am around 70 years of age.

10    Q   What uses were made of the property by your father?

11    A   Well he used it mainly as a bee ranch.   He had a cabin

12    and a bee house on it prior to about 1900, and meanwhile that

13    burned down and there have been several fires down through

14    there, and some of it was carried away, of course, through the

15    years.

16    Q   Now, is there any agricultural development of any kind?

17    A   No.   There has never been any agricultural development.

18    Q   The East Fork of De Luz Creek runs through the property,

19    does it not?

20    A   It does.

21    Q   And is there any water development of any kind on De

22    Luz Creek, on this property?

23    A   Not on our property, no.

24    Q   Do you know of any springs or other sources of water

25    than De Luz Creek anywhere on the property?

Z-17

1        A   No, I do not.   I do not.

2        Q   Do you have any plans yourself of immediate future

3   development of the property?

4        A   No.   We have none at all.

5        Q   You have not yet received from the Marine Corps any

6   engineering report or soil study of this property?

7        A   No.

8        Q   However, you have and you do request such a report?

9        A   No, we haven't requested it.

10       Q   You haven't requested such a report?

11       A   No.

12   MR. SACHSE:   I have no further questions.

13   THE MASTER:   Mr. Veeder?

14

15                      CROSS-EXAMINATION

16   BY MR. VEEDER:

17       Q   Mr. Foss, have there been any livestock ever grazed

18   on your property?

19       A   Well, there has been livestock grazed on the property,

20   but not owned by us.   The only thing that has been on the

21   place that has been used, it has been used a good deal by the

22   public as a fine camping ground, and we have never objected to

23   their being there, going camping.

24       Q   What is the source of water for that recreational

25   area?

Z-18

1      A   Well, there is water comes down through what they
2    call De Luz Creek.   There is water there the year round.   I
3    never remember seeing that place dry.   There has always been
4    water on that property for, well, we will say quite a distance
5    around, especially toward the ocean, where that water goes down
6    and probably don't come up again for two or three miles down
7    the canyon.   But there is always water, there has always been
8    water there.

9      Q   When you said that you had not grazed the property
10   yourself, did you lease it for grazing purposes?

11     A   No.

12     Q   People just ran their stock on there?

13     A   Yes; poor fence, you see, and the stock was just
14   running loose in there.

15     Q   And there is grass coverage in that area?

16     A   Oh, yes, quite a bit.   There is quite a bit.

17     Q   And is that ranch subirrigated, to your knowledge,
18   from De Luz Creek, any of it?

19     A   Well, some of it could be.

20     Q   And in the spring of the year when the water is
21   higher, does it flood any of these grazing areas?   Have you
22   observed that?

23     A   Yes, it has during the flood year-- it flooded that--
24   but ordinarily it does not.

25     Q   Now, there is no reason or concern that you know of

Z-19

1   why that couldn't be converted into an agricultural area?

2       A   Not if you want-- it all depends on just how much

3   money you want to spend on it to develop the land. There is

4   quite a bit of property there that could be used for agri-

5   cultural purposes.

6       Q   And you intend to claim water for that land, do you

7   not?

8       A   Well, we want to, yes.

9       MR. VEEDER:   I have no further questions.

10      MR. SACHSE:   Nothing further.

11      THE MASTER:   Mr. Foss, in the answer you allege that the

12  East Fork of De Luz Creek flows through the land and also

13  that there is a tributary of the East Fork which flows through

14  Lot 3 of that property.   Now, what can you tell us about that

15  tributary?

16      THE WITNESS: Well, there is one that flows back of that.

17  It would flow down during the rainy season.   That would be,

18  approximately, about the only time that any water would run

19  down in there is from the rains on the mountain there.

20      THE MASTER:   And then this unnamed tributary that you

21  refer to in your answer flows only during rainy seasons and

22  immediately afterwards?

23      THE WITNESS:   That is all.

24      THE MASTER:   It has no sustained flow?

25      THE WITNESS:   No.

1786

Z-20

2

1    THE MASTER:  That is all.

2    MR. VEEDER:  Your Honor, before the witness is dismissed,

3    there is a question about the preparation of the report, the

4    engineering report by Col. Bowen's office.  That is to be

5    undertaken, as I understand it.  That is desired?

6    MR. SACHSE:  Pardon me?

7    MR. VEEDER:  The engineering report is desired?

8    MR. SACHSE:  Yes.

9    MR. VEEDER:  Well, of course, there may be additional

10   questions at the time when our report is completed.

11   MR. SACHSE:  I realize that.

12   MR. VEEDER:  We may have to ask other questions.

13   MR. SACHSE:  Yes.  We will get him in if necessary.  If

14   the preparation of the report makes it necessary to have Mr.

15   Foss's testimony, either for the United States or for himself,

16   as I said--

17   MR. VEEDER:  He will be available at that time?

18   MR. SACHSE:  Yes.  This is simply a convenience to enable

19   him to get the title in on the hope and assumption that nothing

20   further will be needed.  If it is needed he will be available.

21   MR. VEEDER:  We have no further questions.

22   THE MASTER:  Then you are dismissed at this time.  Thank

23   you, Mr. Foss.

24   MR. SACHSE:  Could we take five minutes now?  I see one

25   or two people who are here and I want to find out what they

Z-21

1  have and whether they will go on or not.

2          (Recess.)

3

4                    ALLEN C. BOWEN,

5  recalled as a witness, having been previously sworn, testified

6  further as follows:

7

8                    CROSS-EXAMINATION

9  BY MR. SACHSE:

10          Q   Colonel, I will direct your attention to Government's

11  Exhibit M-52, which covers Parcel 45.

12              On Exhibit M-68 will you please indicate the parcel

13  on M-68 for the Court?

14          A   Yes.  Parcel No. 46 is delineated on Plaintiff's

15  Exhibit M-68 with a number 45 in a circle contained within the

16  exterior boundaries.  It is located within Section 30, Town-

17  ship 8 South, Range 4 West, and is traversed from west to east

18  by Camps Creek a tributary to De Luz Creek.

19          Q   I also notice an intermittent stream symbol running

20  from west to east across the property.  Do you see the symbol

21  to which I refer?

22          A   Yes, sir.

23          Q   Can you characterize that stream for me?

24          A   That is an intermittent stream which flows only during

25  and immediately after periods of rainfall and runoff.

1788

Z-22

1    Q   M-52, the engineering report, was prepared by your

2    staff and under your supervision.  Is that correct?

3    A   Yes.

4    Q   Are you generally personally familiar with this

5    property?

6    A   Yes, sir.

7    Q   How many acres does it consist?

8    A   About 230 acres.

9    Q   And with particular reference to page 3 of your report,

10   I find that you have, and your staff have, identified 147.3

11   acres of the total as being irrigable.  Is that correct?

12   A   Yes, sir.  That is the figure that is shown on page 3

13   of Plaintiff's Exhibit M-52.

14   Q   Generally, and generally speaking, it would appear that

15   the only non-irrigable land lies on the westerly portion, a

16   little bit at the extreme northeasterly portion.  Is that right?

17   A   Yes, sir.  Referring to the soil survey in Plaintiff's

18   Exhibit M-52, Field numbers 1, 3, 8, 6, 17 and 18 are non-

19   irrigable.

20   Q   Now, Col. Bowen, with particular reference to Field 6,

21   shown in purple, and which area is traversed by Camps Creek

22   and by, apparently, another intermittent tributary, and

23   referring to page 4 of your report, the top of the page, you

24   state, "The following areas are not considered suitable for

25   irrigation and should be left for grazing, watershed protection

Z-23

1    and wildlife." Do you see the language to which I refer?

2         A  Yes, sir.

3         Q  Now, Field 6 consists of 37.3 acres and would it be

4    your opinion that a part of that could be put into permanent

5    pasture or used for grazing purposes?

6         A  Well, it is shown on the soil survey, contained in

7    Plaintiff's Exhibit M-52 as Class VIII land adjacent to Camps

8    Creek and portions of the tributaries of Camps Creek, and the

9    soils are very coarse grained  alluvium, subject to overflow,

10   and for that reason, in my opinion, it would be best left in

11   the watershed protection coverage.  There is no doubt but what

12   some grazing could be carried on in the area from time to time,

13   as it is mostly covered with a fairly heavy stand of trees.

14        Q  But you do not believe any is suitable for clearing

15   and permanent pasture?

16        A  No, sir.

17        Q  Do you have any knowledge of the existence of springs

18   on the property-- Withdraw that.  Do you know how the present

19   water supply for the property is obtained?

20        A  Yes, sir.  As shown on page 4 of Plaintiff's Exhibit

21   M-52, under the engineering section, it states that the

22   property received both irrigation and domestic water from a

23   spring located on the premises.

24        Q  Is that spring the spring referred to as flowing from

25   an old mining tunnel?

Z-24

1    A  Yes.

2    Q  Will you locate the tunnel on the aerial photograph?

3    A  Yes, sir.  Referring to the land utilization overlay

4  a portion of Plaintiff's Exhibit M-52 located in Field No. 5

5  is a circle with the letter W within it, which is the source

6  of water, and the pipe line, symbolized, leads from the source

7  to a circle within Field No. 12 which is a reservoir above the

8  house.

9    Q  Have you ever examined the tunnel?

10    A  No, sir.

11    Q  Do you know-- Withdraw that.  With reference to 68,

12  M-68, I see immediately above the circled figure 45 what

13  appears to be a reservoir symbol.  Is that the same reservoir?

14    A  Yes, sir, located between the two houses, symbolized

15  on Plaintiff's Exhibit M-68 within Parcel No. 45.

16    Q  Well, then, it would appear that the mine tunnel is

17  some distance up the sidehill from Camps Creek, or do you know?

18    A  It is located well above Camps Creek on a ridge

19  which projects out between Camps Creek and the small tributary.

20    Q  Would you conclude that water percolating into that

21  tunnel is vagrant percolating ground waters or is it a part of

22  Camps Creek?

23    A  As described on page 2 of Plaintiff's Exhibit M-52,

24  the second paragraph from the bottom describes the tunnel and

25  states that the tunnel course is in the general vicinity of

Z-25

1   igneous contact and, in my opinion, the water in that tunnel

2   comes from the joints and fractures in the igneous rock.

3       Q   And that is not, therefore--

4       A   It would not be a part of Camps Creek stream flow.

5       Q   Do you know of any other springs on the property,

6   either developed or undeveloped?

7       A   No, sir.  I know of no other springs on the property.

8       Q   With reference to the westerly have of Parcel 45, in

9   which this mine tunnel is located, would it also be your opinion

10  that should any other water sources be developed in that steeper

11  country that that water would be or would not be a part of the

12  water of Camps Creek?

13      A   Well, included within the western half of the property,

14  as shown on the soil survey in Plaintiff's Exhibit M-52, are

15  the coarse-grained clastics joining Camps Creek, and water

16  derived from them is, in my opinion, a part of the stream flow

17  of Camps Creek, and for an indeterminate distance into the

18  igneous rock adjoining the alluvium the water would flow from

19  the joints and fractures into the alluvium and would be

20  considered in contact with the stream.

21      Q   Well, is there any portion of the land indicated on

22  the land utilization chart-- and you can use the field numbers

23  if you would-- where you feel that water developed would not

24  be a part of the stream?

25      A   Well, in my opinion the higher portion of Field 1--

Z-26

1    Q   How about Field 8?

2    A   Field 8.

3    Q   In the southwest?

4    A   Yes, sir; the higher portion of Field 1, Field 8, the

5    higher portion of Field 5 and the higher portion running out

6    into Field 4, and the higher portions of Field No. 7.

7    Q   How about Field 18 in the extreme northeast which

8    appears to drain into a different watershed?

9    A   Yes, sir, Field 18.

10   Q   Do I understand you to say that in all those areas

11   you would assume that water developed through drilling or

12   digging would be not a part of a stream system?

13   A   That is my opinion.

14   Q   Now, Col. Bowen, on the aerial photograph there has

15   been brushed in a number of intermittent stream symbols.  Could

16   we say that with the exception of Camps Creek all those symbols

17   indicate streams that flow only immediately during and after

18   heavy rains?

19   A   Yes.

20   Q   Camps Creek, however, has a somewhat longer flow,

21   does it not?

22   A   Yes, it has the most sustained flow.

23   Q   And it is also underlined by a certain amount of

24   alluvium and has some basin systems underneath it, does it not?

25   A   Yes, sir.

Z-27

Q  Do you know anything about the present agricultural developments?

A  There is an orchard located in the vicinity of the house, but I don't recall the area of that.

Q  That is the orchard that would appear in the yellow portion of Field 13?

A  Yes, sir.

Q  Which appears to indicate rows.  Are those rows of trees which we see?

A  Yes, sir.  That is what it appears to be.

MR. SACHSE:  I believe that is all, your Honor.

THE MASTER:  Mr. Veeder?

MR. VEEDER:  Yes, I would like to ask a few questions.

MR. SACHSE:  Excuse me.  I have one more question that I overlooked.

Q  Col. Bowen, the addendum has been attached to this report, has it not?

A  Yes.  The addendum, Plaintiff's Exhibit 52-A, is attached to Plaintiff's Exhibit M-52.

MR. SACHSE:  That is all.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q  In your opinion, in the state of nature, Col. Bowen, would the waters presently diverted and taken from the spring

Z-28

1    in your Field No. 5 reach the main stem of De Luz Creek?

2        MR. SACHSE:   I object to that as he has testified it is

3    a vagrant percolating ground water not a part of any stream.

4        THE MASTER:   The question is a little different from

5    that which has been asked and answered.   The objection is

6    overruled.

7        THE WITNESS:   Mr. Veeder, at that point you are reaching

8    a questionable zone as to whether or not the joints and cracks

9    intercepted by the tunnel are contiguous to the alluvium

10   adjacent to Camps Creek.   In my opinion it probably would be,

11   in a state of nature, vagrant percolating water.

12   BY MR. VEEDER:

13       Q   Now, in regard to the areas along the creek, does it

14   appear that there would be any means of diverting the water

15   out for application to any of the lands-- I am referring now

16   to Field No. 6-- is there any way that water could be diverted

17   out and used for pasture or for any other purpose, or is that

18   too tough?

19       A   Your question refers to just in Field No. 6?

20       Q   Field No. 6, or any other place on the property.

21       A   Yes, it would be possible to divert water from the

22   vicinity of Camps Creek and divert it to other portions of the

23   property.

24       Q   Would it be financially feasible, in your opinion?

25       A   Yes, sir.

Z-29

1    Q   During a period of heavy runoff, is it possible that
2 you can make a better utilization of water by simply putting
3 a dam across the creek and flooding out some pasture for the
4 short period of time that the water is available?

5    A   Yes, sir, but it would be possible, in my opinion, to
6 spread the waters and induce a more efficient recharge of the
7 underground storage areas.

8    Q   Have you made any calculations as to the--  Strike
9 that question.  You have referred to a basin storage.  Were
10 you referring to alluvial deposits in Camps Creek?

11    A   No, sir, those alluvial deposits are so coarse that
12 they readily fill from the stream flow, but I was referring
13 to some of the abutting material such as in Field No. 13.

14    Q   And you think that those lands, that that alluvium,
15 is charged from the natural flow of Camps Creek.  Is that right?

16    A   Yes, sir.

17    Q   And would it be possible, in your opinion, to develop
18 the ground water in that area?

19    A   Yes, sir.

20    MR. VEEDER:  I have no further questions.

21    MR. SACHSE:  I have no questions.

22    THE MASTER: Col. Bowen, in answer to Mr. Sachse you
23 stated that on the higher portions of the ridges in Fields 1,
24 8, 5, 4, 7 and 18, water could be developed that would not be
25 a part of any stream system.  Is it true that water developed

Z-30

in wells in other portions of this parcel would constitute water which would be a part of Camps Creek stream system?

THE WITNESS:  Yes, sir, in my opinion the lower portions of the igneous material are in contact with alluvium material bordering Camps Creek, and its tributaries, and water found in the joints and fractures of those lower elements of granitic material in my opinion would be in the alluvium field adjoining Camps Creek.

BY MR. SACHSE:

Q   Col. Bowen, with reference to the Master's last question, that would not be true of Field 2?

A   No, sir.  I mean Camps Creek and its tributaries.

Q   Field 2 is not on a tributary of Camps Creek?

A   That is correct.

MR. SACHSE:  I have nothing further.

MR. VEEDER:  I have no further questions.

THE MASTER:  Is the defendant going to testify?

MR. SACHSE:  Yes.  Mrs. Jave, please speak out so the reporter can hear you.  He has to know what you say.

1797

Z-31

1    MINNIE JAVE,

2  one of the defendants herein, called as a witness in her own

3  behalf, being first duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    MR. SACHSE:  Your Honor, I understand that the records

6  of the United States, to the best of their knowledge, disclose

7  that she is the owner of Parcel 45.  Is that correct, Mr. Veeder?

8    MR. VEEDER:  That is correct.  We are checking out the

9  patent on this particular area and there may be some rebuttal

10  in that connection.

11    MR. SACHSE:  I understand there is a possibility that

12  some of these lands have been severed.  We understand that.

13    THE MASTER:  Very well.  But at least the present owner-

14  ship is all in Minnie Jave, the entire Parcel 45.

15    MR. VEEDER:  That is correct.

16    MR. SACHSE:  Only there may be some possible division

17  or separation at sometime in the past.

18    MR. VEEDER:  Yes.  Actually there has been some severance

19  of certain parcels of land from the one in question.

20    MR. SACHSE:  If you find such evidence that will be

21  introduced, also?

22    MR. VEEDER:  Later.  That is correct.

23  BY MR. SACHSE:

24    Q  Will you state your name?

25    A  Minnie Jave.

Z-32

1    Q   And where do you live, Mrs. Jave?

2    A   On De Luz.

3    Q   On the property that Col. Bowen has just discussed?

4    A   Yes.

5    Q   How long have you lived there?

6    A   Well, I bought the ranch in 1936 and I have lived

7    there since '38.

8    Q   And will you tell us what improvements you have on

9    the property?

10   A   Well, there has not been much improvement made since I

11   bought the ranch.

12   Q   I mean what improvements there are there.  I don't

13   care whether you made them or not.

14   A   There are lemon trees.

15   Q   How many?

16   A   150, and oranges and avocados, grapefruit and limes.

17   Q   And do you know how many acres you have planted to

18   orchard?

19   A   There is about 15 acres.

20   Q   About 15, did you say?

21   A   Yes, that I irrigate.

22   Q   Well, that is not all orchard, however, is it?

23   A   Mostly all orchard.  It is scattered.

24   Q   And you do have some pasture?

25   A   Yes.

Z-33

Q   That you irrigate?

A   No, sir, not at the present time.

Q   You do not irrigate that?

A   No, sir.

Q   You have cattle on the property?

A   Yes, sir.

Q   How many?

A   I have eleven cows and seven young stock.

Q   And are those grazing off simply natural grass or irrigated cover?

A   The natural grass, and partly between the trees, the lemon trees.

Q   In other words, your lemon grove is in grass, you haven't disced it.

A   No.

Q   Is that right?  You obtain your water supply from this mine tunnel that Col. Bowen testified to?

A   Yes, sir.

Q   And how do you transport that water to your house and to the grove?

A   Sprinklers.

Q   Do you have a pipe line from the tunnel?

A   Yes, sir.

Q   To a reservoir?

A   Yes, sir.

Z-34

1    Q  Do you know how large the reservoir is?

2    A  135--

3    Q  Thousand?

4    A  --thousand gallons.

5    Q  And is that reservoir-- does that supply pressure,

6  gravity water to your grove, or do you pump?

7    A  No, it is gravity.

8    Q  Do you have any wells in Camps Creek or the area near

9  it?

10    A  No, sir.

11    Q  Do you have any wells anywhere on the place?

12    A  No, sir.

13    Q  Do you know of any other springs or water sources

14  anywhere on your property?

15    A  Yes.  I have another spring which has never been

16  developed.

17    Q  Now, Mrs. Jave, could you show us-- could you tell us

18  by reference to this map-- and I will help orient you by point-

19  ing it out-- right there is your present mine tunnel.

20    A  Yes.

21    Q  Now, could you take a pencil and mark where, with

22  relation to your present mine tunnel, where this other spring

23  is?

24    A  Well, it is on the northwest side.

25    Q  Of the same hill?

Z-35

1      A  No, this other side.

2      Q  Could you show us about where you think it is on this?

3      A  Well, this is north, isn't it?

4      Q  This is north here.

5      A  This is north.

6      Q  And this is west.

7      A  Well, I don't know just how far I go over in there,

8  but there is a spring over in here.  It does not come down

9  Camps Creek at all.  It goes into De Luz Creek and so on.  It

10  flows down toward the Garnsey place.

11      Q  In other words, you have found a spring on the

12  intermittent canyon that runs westerly toward the Garnsey

13  property.  Is that right?

14      A  Yes.

15      Q  Now, have you done anything to develop that?

16      A  No, nothing at all.

17      Q  Was it just a seep out of the rocks?

18      A  No.  There is a seep out of the rocks but it runs

19  the whole year round.

20      Q  It runs all year?

21      A  Yes, and it is not always underground.  Most of that

22  is underground.

23      Q  Now, what is the condition of the flow in Camps Creek

24  on your property?

25      A  Now?

Z-36

1    Q   Is there water on the surface?

2    A   No.

3    Q   How long ago did the surface runoff stop, on Camps

4    Creek?

5    A   It would be--  Days or months?

6    Q   This year?  About when it stopped?

7    A   I really don't know exactly because it is a trip that

8    I don't make so very often.

9    Q   You don't get down into that canyon?

10   A   No.

11   Q   And this other tributary into which the spring runs,

12   do you know the one I refer to-- the one to which I refer?

13   A   You mean the one that has not been developed?

14   Q   That is right.

15   A   Yes.

16   Q   Is that flowing now?

17   A   Yes.

18   Q   That is?

19   THE MASTER:  Wait just a minute.  Do you mean the spring

20   was flowing now or the stream was flowing?

21   THE WITNESS:  The stream is flowing now.  It does come

22   out of the spring, because-- I haven't walked up the stream,

23   but I know there is water coming down from it.

24   BY MR. SACHSE:

25   Q   Do you know whether that spring-- pardon me-- that

Z-37

1    stream is flowing off of your property?

2        A  Yes.

3        Q  Onto the Garnsey property?

4        A  It goes down to the Garnsey, down toward that way, yes.

5        Q  But you don't know for sure how far it flows?

6        A  No, I do not.

7        Q  With reference to photograph in M-52, the two squares

8    are your house on this overlay.  Do you understand?

9        A  Yes.

10       Q  Now, your orchard is located in Field 13 immediately

11   in this area?

12       A  Yes, all that.  It is partly on the side and it comes

13   all the way down past both houses.

14       Q  So it would be, generally speaking, in this yellow

15   area on the map.  Is that right?

16       A  Yes.

17   MR. SACHSE:  I think that is all.

18   MR. VEEDER:  I have a few questions.

19

20                    CROSS-EXAMINATION

21   BY MR. VEEDER:

22       Q  What are your plans for future development, Mrs. Jave?

23       A  Well, I want to make a permanent pasture so I can

24   have more livestock.

25       Q  Have you given any thought to the number of acres you

2-38

1    would like to have in it?

2        A  Yes, about 145, somewhere in through there.

3        Q  You would like to bring in 135 additional acres of

4    pasture?

5        A  Yes.

6        Q  What would be the source of water that you would use

7    for your permanent pasture?

8        A  Well, that is why I want to get this other spring

9    developed and get some wells or dams or things of that kind in

10   there.

11       Q  In other words, the idea that Col. Bowen testified to

12   about the supplying of water from Camps Creek would fit into

13   your plans?

14       A  Yes.

15       Q  Now, have you given thought as to where you would

16   locate the wells that you have in mind?

17       A  Yes.

18       Q  Where would you-- referring to Exhibit 52-- where would

19   you like to have these wells located?

20       A  Well, here.

21       Q  Can you identify those?

22       A  Here is my grove.

23       Q  Your grove is in this yellow part?

24       A  Yes.  And then it is right down in through here.

25       Q  Now you are pointing to Field No. 6.  Is that right?

Z-39

1     A  Yes.

2     Q  This purple area in here?

3     A  Yes.

4     Q  It would be your plan to put wells down into the sub-

5 surface flow of the creek.  Is that right?

6     A  Yes.

7     Q  Now, in regard to the development of your spring which

8 you say is up in the northwest portion, would you conduct the

9 water over into this yellow area or where would you use the

10 water from that source?

11     A  Well, wherever it would be handiest, don't you know.

12 It is gravity flow.

13     Q  You would want to use gravity on that?

14     A  Yes, sir.

15     Q  And you would use that for purposes of permanent

16 pasture, too?

17     A  Yes, sir.

18     Q  In other words, you are thinking more of a livestock

19 economy rather than putting in any fruit trees?

20     A  Yes.

21     Q  Now, have you given any thought to any further de-

22 velopment of your place from the standpoint of bringing in

23 additional citrus or avocados?

24     A  No, not entirely, as I just have the amount of water

25 for permanent pasture.

Z-40

3

XI

XI

1      Q   You will use that?

2      A   Yes, sir.

3      MR. VEEDER:   I have no further questions.

4      MR. SACHSE:   That is all.

5      THE MASTER:   Do you have another witness now, Mr. Sachse?

6      MR. SACHSE:   Yes, we can start on the Anderson property.

7      THE MASTER:   Very well.  Col. Bowen, take the stand again.

8

9                         ALLEN C. BOWEN,

10   recalled as a witness, having been previously sworn, testified

11   further as follows:

12      MR. SACHSE:   This report has not been introduced, has it?

13      MR. VEEDER:   No, it has not.

14      MR. SACHSE:   Do you want to do it before I go into it?

15      MR. VEEDER:   We might as well.  This would be Plaintiff's

16   Exhibit 93, would it not?

17      THE MASTER:   93.

18      MR. VEEDER:   Would you mark it M-93.  Mark this M-94.

19

20                       DIRECT EXAMINATION

21   BY MR. VEEDER:

22      Q   Col. Bowen, I hand you Plaintiff's Exhibit M-93 for

23   Identification, and ask you to state what it is.

24      A   Plaintiff's Exhibit M-93 is the report of an

25   engineering investigation carried out on De Luz watershed,

Z-41

1  Parcel No. 48, and it shows that to be the property of Nina B.

2  Anderson.

3      Q   Was that prepared under your direction, Col. Bowen?

4      A   Yes, sir.

5      Q   Do you know that it is accurate from the standpoint

6  of the data set forth in that report?

7      A   Yes, sir.

8      MR. VEEDER:   I offer in evidence Plaintiff's Exhibit M-93.

9      THE MASTER:   That will be received in evidence and so

XR      10  marked.

11  BY MR. VEEDER:

12     Q   I hand you Plaintiff's Exhibit marked M-94 for Iden-

13  tification, Col. Bowen, and I ask you to state what that exhibit

14  is.

15     A   Plaintiff's Exhibit M-94 is the report of an engineer-

16  ing investigation made on De Luz watershed, Parcel No. 48.

17     THE MASTER:   The same parcel to which you have previously

18  referred?

19     MR. SACHSE:   There are two parcels numbered 48 on the

20  map.

21     THE WITNESS:   Your Honor, Plaintiff's Exhibit M-93 is

22  delineated on Plaintiff's Exhibit M-68 within the limitations

23  of the property shown as No. 48, encircled.   Fern Creek

24  traverses the southerly portion of this parcel from the west to

25  the east.

Z-42

1    Plaintiff's Exhibit M-94, when our investigation was made,

2  was in other ownership, which has since been combined with the

3  Anderson property, and it refers to approximately 40 acres,

4  also delineated on Plaintiff's Exhibit M-68, and has a number

5  48 encircled within the exterior limits.  Both of these

6  parcels are within Section 31, Township 8 South, Range 4 West.

7  BY MR. VEEDER:

8    Q  Was Plaintiff's Exhibit marked for Identification

9  M-94 prepared under your direction?

10    A  Yes, sir.

11    Q  And to your knowledge are the statement and the exhibit

12  attached to it accurate?

13    A  Yes, sir.

14    MR. VEEDER:  I will offer in evidence Plaintiff's Exhibit

15  marked M-94 for Identification.

XR    16    THE MASTER:  It will be received in evidence and so marked.

17    Do you have anything further now?

18    MR. VEEDER:  We have another exhibit here, your Honor.

19    THE MASTER:  You might as well introduce them all at once.

20    MR. VEEDER:  May I have this marked for identification,

21  M-95.

22    Q  Col. Bowen, I hand you Plaintiff's Exhibit marked M-95

23  for Identification, and ask you to state what it is.

24    A  Plaintiff's Exhibit M-95 is a copy of a report of an

25  engineering investigation made on De Luz Watershed Parcel No. 9,

Z-43

1    and the name shown on the cover of the report is that of Anna

2    Doerrer.

3        Q   Was that engineering report prepared under your

4    direction?

5        A   Yes, sir.

6        Q   To your knowledge is that accurate?

7        A   Yes, sir.

8        MR. VEEDER:   I offer in evidence Plaintiff's Exhibit

9    marked M-95 for Identification.

XR   10       THE MASTER:   That will be received and so marked.

11   BY MR. VEEDER:

12       Q   Col. Bowen, on M-32, show the engineering report that

13   has gone into the record.

14       MR. SACHSE:   I think it would be just these last two;

15   the Jave one has already been shown.

16       THE MASTER:   Yes; the last two.

17       THE WITNESS:   Referring to Plaintiff's Exhibit M-32

18   the two portions, Parcel No. 48, reported on in Plaintiff's

19   Exhibits M-93 and M-94, are shown on Plaintiff's Exhibit M-32

20   with the number 48 encircled within the limits.   I will take

21   this red pen and mark a cross on Plaintiff's Exhibit M-32.

22       THE MASTER: Will this show up better?

23       THE WITNESS:   Yes.   Plaintiff's Exhibit M-95 is also

24   shown on Plaintiff's Exhibit M-32, with the number 9 encircled

25   outside of the limits of the property, with a line into it

Z-44

1    indicating the location.  With a red pencil I will mark an X

2    within the parcel reported on Plaintiff's Exhibit M-95.

3         MR. VEEDER:  I have nothing further.

4         THE MASTER:  Mr. Sachse, you may proceed.

5

6                    CROSS-EXAMINATION

7    BY MR. SACHSE:

8         Q  Colonel, I would like to direct your attention first

9    to M-54, being the engineering report originally made on the

10   property identified as Ila V. Shelton's.  Is that correct?

11   Have I got it right?

12        A  Yes.

13        Q  Now in the ownership of Anderson?

14        A  Yes, sir.

15        Q  The southeasterly corner of this parcel corners on the

16   remainder of the Anderson property.  Is that correct?

17        A  That is correct, sir.

18        Q  Now, first directing your attention to the stream

19   symbols that appear on the aerial photograph of this parcel,

20   how would you characterize these streams?

21        MR. VEEDER:  It would be helpful if we could have the

22   legal description.  May we have that before you go on?

23        MR. SACHSE:  All right.

24        THE WITNESS:  Yes, sir.  That portion of Parcel No. 48

25   reported on in Plaintiff's Exhibit M-94, is the northeast

1841

Z-45

1  Quarter of the Northwest Quarter, Section 31, Township 8 South,

2  Range 4 West.

3  BY MR. SACHSE:

4      Q  Now, with particular reference to the intermittent

5  stream symbols that appear in that parcel, how would you

6  characterize those streams?

7      A  The streams flowing through this property are inter-

8  mittent in nature, flowing only during and immediately follow-

9  ing periods of heavy runoff-- heavy rainfall and runoff.

10      Q  Is there anything in this soil survey, or in the text

11  of the survey, that indicates any substantial alluvial deposits

12  in this parcel?

13      A  No, sir.

14      Q  Then I assume that the only water that might be

15  developed on this parcel would, in your opinion, be local,

16  vagrant percolating ground water and not a part of any stream.

17  Is that right?

18      A  Yes, sir.

19      Q  Col. Bowen, I don't know whether there is a very

20  slight error on my copy-- I imagine that I see a different

21  color at this corner, or has that no significance, at the

22  very lower end of the field with the Roman numeral VI?

23      A  Yes, sir.  That is a little finger of Class III land

24  which extends over into the property and that property adjoining

25  it on the west.

1812

Z-46

1    Q  And it is so small that it is not calculated in your

2    acreage figures.  Is that right?

3    A  Yes, sir, that was included within Class VI.

4    Q  You included it in the Class VI total?

5    A  Yes, sir.

6    Q  Do you know of any water sources on this property?

7    A  No, sir.

8    Q  Do you know of any development on this property at

9    the present time?

10   A  No, sir.

11   Q  Now, Colonel, I direct your attention to Exhibit M-93,

12   with particular reference to the land utilization photograph.

13   In the easterly portion of this parcel I see what is identified

14   in the overlay as Field 8, principally shown in purple.  Do

15   you see to what I refer?

16   A  Yes, sir.

17   Q  That is the stream channel of Camps Creek, is it not,

18   and the land adjoining it?

19   A  Yes, sir.

20   Q  Now then, that runs through the parcel from north to

21   south, northwest to southeast.  Is that right?

22   A  Yes, sir.

23   Q  Now, in the southerly portion of this parcel I see

24   what is indicated as Field 12, generally in yellow.  Do you

25   see that field?

Z-47

1        A  That is in orange.

2        Q  Orange?  Pardon me.  My coloring.  That is generally

3   the channel and the land lying immediately next to it, of Fern

4   Creek.  Is that correct?

5        A  Yes, sir.

6        Q  Now, could you indicate for us by an appropriate mark

7   on the photograph the approximate line of division between the

8   Fern Creek and Camps Creek watersheds on this property?

9        A  Yes, sir.  The ridge dividing the runoff into Camps

10   Creek and that into Fern Creek, traverses the property

11   diagonally from the inner corner surrounded by Field 10 to the

12   westerly boundary of Field 8.

13        Q  Would you draw that on the photograph?

14        A  I will, with a black pencil, I will delineate the

15   approximate location of that watershed line.

16            With a red pencil, on the soil survey map attached

17   to Plaintiff's Exhibit M-93, I have delineated the approximate

18   location of the divide between Camps Creek and Fern Creek.

19        Q  Col. Bowen, have you been on this property recently

20   yourself?

21        A  No, sir.  I haven't been on this property recently.

22        Q  Have you yourself ever observed the water diversion

23   that is described on page 3 of the text of the report?

24        A  Yes, sir.  In about 1956 I was up Fern Creek that far.

25        Q  And then you saw the pressure box and diversion system

through which the water is piped from Fern Creek over the water-
shed line to Camps Creek watershed.   Is that correct?

A   I did not follow out the line.

Q   Do you know it is a fact that the water from the Fern
Creek watershed is presently piped over the watershed line for
use on Camps Creek?

A   The report in Plaintiff's Exhibit M-93, on page 3,
indicates that domestic and irrigation water is supplied by
this diversion on Fern Creek, and inasmuch as the domestic and
irrigation use is in Camps Creek, it follows that the diversion
goes from Fern Creek to Camps Creek.

Q   Are you familiar with the location of the residence
and the present cultivated areas on this property?

A   The present cultivated area is-- the basis for my
information-- is located largely in Field No. 2 as shown on
the overlay, land utilization overlay in Plaintiff's Exhibit
M-93.   I don't remember the other places where irrigation has
been applied.

Q   Well, to refresh your recollection, Colonel, the white
road which you can see faintly on the map going up through the
middle of Field 1-- do you see it?

A   Yes, sir.

Q   That is the same road, I believe, you recall, that you
take as you go to the Cox property or if you go to the Mercy
Anderson property.   Do you recall that?

Z-49

1  A Yes, sir, that is correct.

2  Q Along that road am I correct in saying that there is

3 irrigated pasture?

4  A Yes, sir, I believe that is correct.

5  Q And the development is in the center and right of

6 Field 2, between Field 4 and the easterly boundary of the

7 property?  You see the area that appears to be stippled.  Do

8 you recall what that is?

9  A That is an orchard, as I recall.

10  Q Are you familiar with the flow of Camps Creek through

11 this property at the present time?

12  A No, sir.  I am not familiar with it at the present

13 time.

14  Q Are you familiar with the flow of Fern Creek at the

15 present time?

16  A No, sir, not at the present time.

17  Q Well, Col. Bowen, can you express an opinion as to

18 which of the two streams carries the more continuous surface

19 flow, or do you know?

20  A No, sir.  I can't express an opinion with regard to

21 the relative flow between those two streams.

22  Q Now, the area which you indicate in purple is, generally

23 speaking, fed by Camps Creek.  Is that right?

24  A Yes.

25  Q Which is classed as Clas VIII soil, not suitable for

1216

Z-50

1    cultivation by reason of the rocky, rough and extreme hazard

2    of overflow?

3        A   That is right, the very coarse-grain clastic along

4    Camps Creek.

5        Q   Now, I notice that the soil along Fern Creek, on the

6    other hand, you have classed as Class VI.  Am I correct?

7        A   Yes, sir.

8        Q   Is the distinction between the classification of the

9    soil on Camps Creek and Fern Creek based on borings and actual

10   tests of the submaterial or something else?

11       A   It is based on actual borings and tests.

12       Q   And I notice that your soil land use overlay suggests

13   that the land along Fern Creek could best be used as permanent

14   pasture, the land within 12?

15       A   Yes, sir.

16       Q   How recently have you been up that creek?

17       A   About two years.

18       Q   What is the extent of the vegetation in it?

19       A   There is a rather prolific tree growth along Fern

20   Creek.

21       Q   Now, I notice that Field 11 you have classed as

22   suitable for avocados in your land utilization overlay?

23       A   Yes, sir.

24       Q   Whereas Field 12, which is Class VI soil, is permanent

25   pasture.  Now, is the reason--  Does it have anything to do with

Z-51

1   the frost characteristics of the two fields?

2       A  Yes, sir.  The lands in Field 12 are low, lying along

3   the creek, subject to frost hazard, while the lands in Field 12

4   are up on the upland material where air drainage keeps the

5   temperatures at a higher range.

6       Q  However, if so desired, an operator could equally well

7   use Class VI soil in Field 11 for purposes of pasture, could he

8   not?

9       A  Yes, sir, and we have so stated.  However, permanent

10  pasture probably wouldn't give as high a return as avocados.

11      Q  Now Field 13 you have indicated as suitable for row

12  crops, and Field 7-- withdraw that.  I am getting all mixed up.

13  Field 12 you have indicated as suitable for row crops, the pink

14  area?

15      A  Yes, sir.

16      Q  And Field 7, the pink area, the same kind of soil,

17  for permanent pasture.  Why the distinction?

18      A  Primarily because that is a small area, and there is a

19  finger of Class VI land included within Field 7, which is not

20  suitable for row crops and therefore the best management of

21  that particular property is in permanent pasture which does not

22  require the tillage.  It is difficult to work and till a small

23  field.

24      Q  So I am sure I understand this overlay correctly,

25  Field 2, as I read it, includes not only the Class III soil

Z-52

1   shown in pink, but also the Class VI soil shown in orange.  Is

2   that right?

3        A   That is correct, sir.

4        Q   And, similarly, Field 1 includes not only these Class

5   III soils shown in pink, but the Class VI shown in orange and

6   the Class IV shown in blue.  Is that right?

7        A   No, sir.  The Class VI and IV are part of Field 21.

8        Q   That is what I did not have straight.  With relation

9   to the intermittent stream symbols that have been brushed into

10  this parcel, and I am excepting therefrom Camps Creek and Fern

11  Creek, how would you characterize them?

12       A   They would be characterized by flowing only during and

13  immediately following periods of rainfall and runoff.

14       Q   Am I correct in reading your findings on page 3 of the

15  report that out of a total of 158.4 acres-- pardon me-- 240.1

16  acres, page 2 of the report-- pardon me, Colonel-- you find

17  81.7 to be irrigable?

18       A   Yes, sir.

19       Q   Assuming the owner of this property wanted to go into

20  a livestock-- large scale livestock operation would it be your

21  opinion that part of the area shown as Class VII land could be

22  placed into permanent pasture?

23       A   No, sir.

24       Q   For what reason?

25       A   The best plan is irrigation of permanent pasture on

Z-53

1    the soils most favorable to it, and utilize the Class VII land

2    surrounding them for occasional grazing; the slopes are very

3    steep in there, and to do much grazing in there would result

4    in the dimunition of the thin topsoil.

5        Q  Could that be true if the pasture were, in fact,

6    irrigated and fertilized and graze controlled?

7        A  Yes, sir, it would be true in any event.

8        MR. SACHSE:  I think that is all, Colonel.

9        MR. VEEDER:  I have no questions.

10       THE MASTER:  You are excused, temporarily.

11       MR. SACHSE:  I will call Mr. Anderson.  Mr. Anderson, use

12   the exhibit, not your own copy, for reference.

13

14               HUGH DONALD ANDERSON,

15   one of the defendants herein, called as a witness in his own

16   behalf, storn, testified as follows:

17       MR. SACHSE:  What is the number on the deed, Mr. Clerk?

18       THE CLERK:  That would be U.

19       MR. SACHSE:  MD-U.

20

21               DIRECT EXAMINATION

22   BY MR. SACHSE:

23       Q  Will you state your full name, Mr. Anderson?

24       A  Hugh Donald Anderson.

25       Q  And are you the husband of Nina B. Anderson?

Z-54

1          A   I am.

2          Q   I will hand you a photograph of a deed marked Exhibit

3   MD-U, and ask you if you know what it is.

4          A   Yes.   This is the deed to the two parcels that have

5   been referred to here.

6          MR. SACHSE:   I offer in evidence Defendants' MD-U, your

7   Honor.

8          MR. VEEDER:   No objection.

XR   9     THE MASTER:   It will be received and marked Defendants'

10  Exhibit MD-U.

11  BY MR. SACHSE:

12         Q   Mr. Anderson, you observed Col. Bowen's delineation

13  of the property on Exhibit M-68, did you not?

14         A   Yes, sir, I did.

15         Q   And that is correct, is it not?

16         A   That is correct.

17         Q   How long have you owned this property?

18         A   Since last November.

19         Q   And do you reside on it?

20         A   Yes, we do.

21         Q   Mr. Anderson, what is your past experience and back-

22  ground, businesswise?

23         A   Well, I was raised on a farm, and have farmed in

24  California for 31 years.

25         Q   Where did you so farm?

Z-55

A   In Orange County and Riverside County.   I raised row crops, beans, alfalfa, and engaged in the raising and livestock grazing.

Q   You are now residing on Parcel 48?

A   Yes.

Q   What improvements are on it?

A   Well, there is a small house.   The main house burned down four or five years ago.   There is a small house there, a sheet iron garage and workshop and a barn for some head of cattle, and hay storage.

Q   What planted areas are on the property?

A   Well, there are three small fields of permanent pasture and another field that is irrigated and has been used for growing barley and Sudan grass, and then a larger field in the northeast corner that is excellent native pasture.   And the rest is just spots here and there of natural grass, which is very good pasture, too.

Q   You have an orchard on your property?

A   Yes.   There is a family orchard of all kinds of fruits for a home garden, and an acre and a half, I imagine, of olive trees and ten quite large lemon trees.

Q   Do you have any livestock on the property?

A   We have 36 head of cattle on the property.

Q   Now, where do you obtain your water supply?

A   From a spring that runs the length of Fern Creek.   We

Z-56

1  own Fern Creek for about three-quarters of a mile, and we have

2  an intake pretty well to the west side of the property where

3  we own Fern Creek.  That is piped from it.

4      Q  Excuse me.  Let's go a little slowly.  Describe the

5  intake which you have.

6      A  Well, we have a cement dam that backs up the water,

7  and from that there is a three-inch pipe running to a weir box

8  that is screened.  And from the weir box to the home site,

9  which is in Camps Creek, there is about a mile of two-inch

10 steel pipe.

11     Q  Was that dam and weir box and pipe in operation when

12 you took over the property?

13     A  Yes.

14     Q  And is that your entire water source at this time?

15     A  At this time.

16     Q  Have there in the past, to your knowledge, been any

17 old or abandoned wells or anything of that kind in Camps Creek?

18     A  No, there has never been.  They started to cut down the

19 trees to build a dam and had, I believe, a permit to build a

20 dam under the Soil Conservation several years ago.

21     Q  Nothing was done?

22     A  They got a tractor and started to excavate and got

23 mired down and it took two other tractors to pull him out, so

24 he quit.

25     Q  At any rate, in any event, the entire water source,

1823

Z-57

1   both domestic and irrigation, at the present time is derived

2   from Fern Creek through this small concrete dam or weir box

3   and the mile of pipe you just described?

4       A   That is correct.

XI   5       MR. SACHSE:  Will you mark this MD-V, please.

6   BY MR. SACHSE:

7       Q   I will hand you a document marked MD-V for Identifica-

8   tion, entitled "Water Notice" legally in Daniels, bearing the

9   recording stamp April 11, 1892.  Will you look at that, please,

10  and tell me what it is?

11      A   Yes.  I know what it is.

12      Q   What is it?  Where did you get it, first?

13      A   When we bought the property from Mr. Ross we were

14  given this in escrow as evidence that we had a water right

15  for water from Fern Creek.

16      Q   You have been given the original of that?

17      A   The original of that, yes.

18      MR. SACHSE:  Now, your Honor, I am going to have Mr. Ross

19  here this afternoon.  He won't be here this morning.  But I

20  will at this time offer the document.

21      THE MASTER:  You have no objection?

22      MR. VEEDER:  No.

23      THE MASTER:  It will be received in evidence, then, as

24  Defendants' MD-V.

25

Z-58

1  BY MR. SACHSE:

2      Q   Now, with reference to that water notice, it claims

3  a hundred inches of water.   There is no possibility that that

4  amount could ever be diverted through that two-inch pipe, is

5  there?

6      A   No.

7      Q   Have you made any attempt to calculate the actual

8  amount of water that is diverted by gravity through this pipe?

9      A   Yes.   I have measured the water at different times.

10     Q   How recently?

11     A   Well, this morning was the last time.

12     Q   What did you find the flow of the pipe to be?

13     A   I went up to the weir box and there was quite a bit

14  of algae and one thing and another on the screen, and it was

15  covered.   I tried to get that-- scrape that off-- but I couldn't.

16  So it is being retarded quite a little bit, and I was getting

17  35 gallons of water a minute.

18     Q   Now, have you measured it on other occasions so that

19  you have a comparison?

20     A   Well, yes.   This spring, when it was muddy, when there

21  was a lot of sediment in it I was only getting about 28 gallons

22  and another time when I could get down to the bottom of it and,

23  with a wire brush clean the screen all off and keep the leaves

24  from behind the dam, I would get about 42 gallons per minute.

25     Q   So your minimum that you have knowledge of was how

Z-59

1   much?

2       A  The minimum-- the lowest, the least amount?

3       Q  The least flow you know of?

4       A  About 32.

5       Q  And the highest about 42?

6       A  About 42.

7       Q  42.  Now, that water enters the water stream of Camps

8   Creek.  Is that right?

9       A  That is correct.

10       Q  In describing your agricultural development, you have

11   no agricultural development at this time in the Fern Creek

12   watershed, do you?

13       A  No.

14       Q  What are your plans for future development of the

15   property, Mr. Anderson?

16       A  We own two Caterpillar tractors and bulldozers and

17   we have a carryall and a sheep's foot, which are the necessary

18   tools to build dams, and we expect to build four or five

19   conversion dams.  Two of them likely will be in Fern Creek and

20   maybe two or three in Camps Creek watershed.

21       Q  Now, as to the cropping or land use, what are your

22   plans for the future?

23       A  We want to contour some of the steeper parts and we

24   want to run through and contour places for growth of natural

25   pasture and possibly some of them do a little sprinkling, and

Z-60

1    then on the less steep areas we want to put as much as we can

2    in permanent pasture.

3        Q   Well, does that imply that you intend to operate a

4    cattle operation?

5        A   Yes.   That is all we are interested in is raising

6    cattle.

7        Q   This orchard that shows on your land, that is an

8    olive grove?

9        A   There is an olive grove and we have an acre or so of

10   all kinds of fruit for the home.

11       Q   Do you have any intention of developing your property

12   into avocados or citrus?

13       A   I would like to put a few avocados in, and possibly

14   a few oranges or tangerines in on the higher portions which are

15   absolutely frostless.

16       Q   And you would agree with Col. Bowen's interpretation

17   that any of the suitable land at the bottom of the creek would

18   be definitely subject to frost hazard?

19       A   Yes, that is only for pasture.

20       Q   Now, I direct your attention particularly to the land

21   utilization survey on Exhibit M-93, and starting at the northerly

22   40, the one which contains Fields 1, 2 and 8, mostly 1, 2, 8

23   and 9?

24       A   Yes, sir.

25       Q   Now, do you agree or disagree with the classification

     you find in that 40?

4

1327

Z-61

1    A   I disagree with 3 and 4, and part of 8 that are shown

2  as watershed-- what do they call it?

3    Q   Watershed protection?

4    A   Watershed protection.  They can be irrigated, practically

5  all of those.  There is rock outcropping on the highest points

6  on them, but all around them there is quite a little bit of,

7  oh, that sugar bush is one name for it-- and then-- it is white--

8  I can't think of the name of that-- but it is in the floral

9  guide shown as sugar-- it is sumac, white sumac.  There is a

10  lot of clumps of that that grows where it is almost frostless,

11  and that is very good soil.  And there is a lot of natural grass

12  growing on that and with some irrigation you could get excellent

13  pasturage there, which they show as waste land.

14    Q   Now actually the few cattle you have on the property

15  now can wander around and graze on it, can they not?

16    A   Yes.  They haven't been turned into the canyon.  We

17  have been grazing on the rest of it, and the ones that are

18  outside that are on the dry pasture are rolling fat.  They are

19  really fatter than the ones we have on irrigated pasture.  We

20  keep them separate.

21    Q   Now, you said you had some disagreement with Field 8,

22  which is shown partly in purple and partly in brown.  What is

23  that?

24    A   Well, that can be made into limited pasture, not

25  sprinkled the year round but sprinkled.  When there is water

Z-62

1  in Camps Creek we could do some sprinkling on that and get

2  excellent semi-irrigated pasture.

3     Q   Now then, if you will take the next 40 immediately

4  south, which includes portions of Fields 1 and 2--

5     A   Yes.

6     Q   But also Fields 5, 7, 13 and 10 and part of 11, do

7  you generally agree or disagree with the classification in

8  that 40?

9     A   Yes, I agree with that except 5.  There is quite a

10  bit of that that can be made into nice pasture, but the rest

11  of it is 5 and 10.

12     Q   Take the next 40 to the west, and let's stay inside

13  the Camps Creek drainage.  Do you see the red line?

14     A   Yes.  Yes, I see the red line.

15     Q   Now, do you agree or disagree?

16     A   Yes, I agree there.  That is very fair, the classifica-

17  tion they have for that.  That is excellent soil and it would

18  be nice for avocados or any kind of fruit, as well as permanent

19  pasture.

20     Q   And you are satisfied with the soil areas that the

21  Colonel has classified in Class VII, also?

22     A   Yes, sir.

23     Q   Now, dropping down into the Fern Creek drainage, let's

24  treat all of that as a single piece.  What are your comments

25  on the land classification in the Fern Creek drainage?

Z-63

1   A   In the Fern Creek drainage?

2   Q   Yes.

3   A   The land that he has designated as the northeast

4   corner, in orange, is very nice land, and that immediately

5   adjoining Fern Creek, we figure on putting that in alfalfa and

6   it is nice flat land and a good deep soil.

7       Now, in 12 he has for permanent pasture, and some of

8   that is pretty rocky but there are some nice little places

9   in there, where you could take the cottonwood and willow trees

10  out and it will be fine for growing trees, and there is quite a

11  movement now to grow Christmas trees, and we figure on cleaning

12  some of that out and putting Christmas trees in, which is more

13  profitable than growing poplars on it.

14  Q   How about the fields on both sides of it, marked 8?

15  Are you generally satisfied or dissatisfied with the classifi-

16  cation of that land?

17  A   There is, right at the end of the west of the first

18  40, that would be the southeast 40 as shown on the map here,

19  there is a gully or a stream coming in from the south and

20  there is a lot of nice land in that that they haven't-- we

21  figure on putting in trees.  It is dark in there and Christmas

22  trees want dark land.  But outside of that I haven't been over

23  the ranch.

24  Q   Now, is that east or west of the intermittent stream

25  referred to?

Z-64

A   That is south of the stream.   It runs at right angles to Fern Creek.

Q   Now, you said that there is an intermittent stream entering Fern Creek from the south?

A   Yes.

Q   Now where with relation to that intermittent stream is that area you are speaking of?

A   On either side.

Q   On both sides of it?

A   On both sides of it, yes.

Q   Now would you look , please at Exhibit M-94.  This represents the 40-acre parcel which corners on the larger one to the northwest.  Is that right?

A   That is correct.

Q   Is there any development on that parcel at the present time at all?

A   It has been cleared and made into a natural pasture in the years past, but there is nothing on it.  There is no development of any kind other than the natural pasturage.

Q   Is there any water source, developed water source, on it, to your knowledge?

A   No.  There is a seepage of water there-- there was when I looked at it in October-- the first time there was water seeping on top, and there are some nice sycamore trees on it, indicating that there is water close to the surface.

Z-65

1    Q   In what portion-- can you locate those with relation

2   to the colored areas?

3    A   It is right at the-- I think that is maybe a stream

4   gully running through, outside of the orange.

5    Q   You can take this red pencil, if you wish, and mark

6   with an X where you found those seeps or that seep.

7    A   Right there; right in there.  The sycamore trees are

8   there, too.  That is beautiful deep soil.

9    MR. VEEDER:  The northwest corner?

10    THE WITNESS:  Yes.

11    MR. SACHSE:  Would you agree that he drew the X right

12   over the mark you made of Class VI soil?

13    COL. BOWEN:  Yes, just north of that little Class III

14   land.

15    THE WITNESS:  That is beautiful deep soil, six or eight

16   feet deep, nice loamy soil.

17   BY MR. SACHSE:

18    Q   Now, the streams that are shown on this 40 in the

19   aerial photo, if you will look at it again, are any of those

20   anything more than streams that flow during and after rains?

21    A   That is all.  There wouldn't be any water there.

22   There isn't any water on any of them now.

23    Q   Now, with regard to the other 40, what are you plans

24   for its development?

25    A   Just clear off some more of the brush and develop, try

Z-66

1   to get a well, and if we can pump, irrigate the best part and

2   put the rest that is level enough into natural pasturage.

3       Q   And what would your comments be with respect to the

4   classification made by Col. Bowen with reference to the soils

5   as shown there?

6       A   Well, according to the color on here-- I haven't read

7   what he says-- I have not seen this before.   I think his

8   classification is very fair.

9       Q   The VI soil and the little finger of red that he has

10  shown where your X is, are classified by him as irrigable.

11      A   Yes.   That is correct, I believe.

12      Q   Now, to go back to the other exhibit, M-93, please.

13  What is the state of flow in Fern Creek-- pardon me-- in

14  Camps Creek at the present time, Mr. Anderson?

15      A   There is no water flowing.   We have three-quarters,

16  almost three-quarters of a mile of Camps Creek on the northeast

17  40 acres, and there is no water  until you get right to the

18  south end of that, and from there on down it is still flowing.

19      Q   In other words, so I understand it, looking at the

20  upper northeast corner of your property you will see a white

21  road that crosses Camps Creek.

22      A   Yes.

23      Q   Now, at that point is Camps Creek dry or wet?

24      A   There is just a little, just a trickle of water there.

25  It is practically dry.

Z-67

1     Q   Now, then you say--

2     MR. VEEDER:   I am not located on that.

3     MR. SACHSE:   I am sorry.

4     MR. VEEDER:   The northwest?

5     MR. SACHSE:   I am speaking of a point where the road goes

6   in to Couch, Walling and Anderson.

7     THE WITNESS:   Yes.

8   BY MR. SACHSE:

9     Q   At this time you say it is almost dry?

10     A   It is almost dry.

11     Q   Now, how far down your property, and if you can locate

12   it by reference to any of these soil symbols, does flow become

13   appreciable?

14     A   You will see there is an area marked bright green

15   there, a little small area.

16     THE MASTER:   That is blue.

17     THE WITNESS:   Yes, blue.   Right west of there the creek

18   is running.

19   BY MR. SACHSE:

20     Q   In other words, that would be next to the symbol

21   3gL5A?

22     A   That is correct.

23     Q   From there on--

24     A   From there on down it is flowing.

25     Q   Now, what about Fern Creek?

Z-68

A   Fern Creek is flowing the full length of the three-quarters of a mile on our property.

Q   Now, at the point where your diversion weir, your diversion box is constructed, can you estimate what percentage of the water of Fern Creek you are taking at that point, today?

A   Not a quarter--

Q   And is Fern Creek getting larger as it gets downstream from there?

A   No.  It gets smaller all the time.

Q   From there on?

A   It is not noticeable for quite a distance, but it gets smaller all the way down.

Q   In other words, at this season of the year there are no other tributaries feeding Fern Creek below your diversion?

A   No.  No, none at all.

Q   Any of the intermittent streams shown on the photo are dry?

A   They are dry.  They just run in water from gullies during the rainy season.

Q   And can you state of your own knowledge whether Fern Creek is flowing at the point it leaves your property?

A   Yes, it is still flowing when it leaves our property.

Q   Now, Mr. Butler's diversion--  Withdraw that.  Were you present during Mr. Butler's testimony?

A   No, I was not.

Z-69

1    Q   You know, however, that Mr. Butler, who owns Parcel

2    49, has a diversion sump on your property.  That is true, is it

3    not?

4    A   I know it now, but I didn't know it when I bought the

5    property.

6        MR. VEEDER:  I will object to the form of the question.

7        MR. SACHSE:  You mean it is leading?

8        MR. VEEDER:  The questions are leading.

9    BY MR. SACHSE:

10   Q   Is there water flowing today at the point of the

11   Butler diversion?

12   A   You mean where he has his dam?

13   Q   Yes.

14   A   Yes, there is water flowing to it and there is water

15   flowing-- he has an eight-inch pipe running from the diversion

16   to the weir box, and there is water flowing through that and

17   water flowing past that runs over his dam and floods on to his

18   property about 150 feet further to the east.

19       MR. SACHSE: I have no further questions.

20       THE MASTER:  Mr. Veeder?

21

22                    CROSS-EXAMINATION

23   BY MR. VEEDER:

24   Q   You stated that you intended to build two check dams

25   on Fern Creek?

Z-70

1    A   Yes.

2    Q   Now, how would you utilize the water from the creek?

3    A   No, that is not what I meant to say.  I figure on

4    building a couple of check dams on tributaries that run into

5    Fern Creek during the winter rains.

6    Q   I see.

7    A   Fern Creek has-- I bought the place in October last

8    year-- yes, sometime in October-- and then we closed our deal

9    on the 27th of November, and I would say that there was at

10   least 50 inches of water flowing in Fern Creek then, down as

11   far as our dam and flowing on past for quite a distance.

12   Q   So you didn't intend to say that you would be impound-

13   ing on Fern Creek?

14   A   No.  It would be-- it drains such a large area that

15   if you put anything, a dam in there and it washed away, why

16   the neighbors below would take your property away from you for

17   damages.

18   Q   Now, where would you locate-- I am not laughing at

19   you, I was just laughing at Mr. Sachse's humor-- Where would

20   you locate those check dams that you say you would locate on

21   Fern Creek?

22   A   One would be in what you show on your map as 11A,

23   coming down through there.

24   THE MASTER:  That is about on the line which would connect

25   the northerly part of the southwestern portion of your property

Z-71

if that line was extended across to the southerly part of the northeasterly portion.

BY MR. VEEDER:

Q Could I ask you to mark an X with a red pencil on there so we will know where that is?

What would be the purpose of--

THE MASTER: Make that a little bit plainer, Mr. Anderson.

BY MR. VEEDER:

Q What would be the purpose? Would you pump from the impoundment?

A No. I built two dams up in Riverside County in the Cleveland National Forest, on a piece of property I had there, and it drained quite a little area, and in July and in the summer the creek ran dry and I built a dam 28 feet high and impounded the runoff, some part of the runoff water in the winter and from that time on there was a three-inch pipe flow of water running all the way below the dam that runs into San Mateo Creek, which runs into Camp Pendleton on the north side. There was never any water running in the stream in July and now there is water running twelve months of the year. Since we built the dam the land on either side of the dam is impregnated with water during the winter and it seeps out and runs down below all summer long.

Q What utilization would you make then of the water that you impound?

Z-72

A   I wouldn't figure making any particular use of it
unless I might want to water the alfalfa I had on the north
side of it.   The main thing would be to hold this water back
so that I could put more water in Fern Creek.

Q   In other words, then, from your description of where
you were going to locate these structures, would they contribute
to your present diversion?

A   No.   I don't need any addition to that, but I want to
grow alfalfa near the one on the north side of Fern Creek and
that would fill the ground up with water there and keep the
moisture up.

Q   You would subirrigate?   Is that what you intend to do?

A   Yes.

Q   And what acreage would you bring under cultivation
through that type of structure?

A   Well, on the north side of Fern Creek there there would
be about 15 acres that you indicate is good land.

Q   And on the other area?

A   On the other side would be just for-- I would have to
figure on growing trees there.   It would be just to irrigate
those trees.

Q   Your idea then would be to just simply subirrigate
without having a distribution system?

A   Yes.

Q   Now, in regard to your development on Camps Creek,

Z-73

1    you similarly stated you intended to put a dam on Camps Creek?

2         A   Yes.

3         Q   Would they be on the main stem of that creek or would

4    they be on tributaries?

5         A   One I think would be on the main creek itself.

6         Q   And what size structure would you contemplate on that?

7         A   Well, I think that Butler and Dr. Wilson, who are the

8    only two below me, and I believe that they would both be glad

9    to have one put in there because it would keep the water

10   seeping in it all summer below.

11        Q   And what size?

12        A   At the place they intended to do it before, build the

13   dam before, I think about 80 feet across.

14        Q   May I ask you to mark on Plaintiff's Exhibit M-93

15   where you contemplate that development?

16        A   Right there. I would put the dam in here and put the

17   diversion here and the flooding back here.

18        Q   You say--

19        A   There is a little winter stream coming down here, but

20   running dry in the summer. I noticed in Riverside County they

21   just run them down the side of the dam, but you dassn't do that

22   in this creek. There is too much water in the winter. I would

23   run it into another creek and let it run back in.

24        Q   What type of structure would you put in?

25        A   An earthen dam.

1840

Z-74

Q   An earthen dam?

A   Yes.

Q   And do you have any idea how much water you would impound with that structure?

A   No, I haven't any.  I would like to raise the water about 15 or 18 feet high, but I haven't had an instrument on it to know how far the dam would back, but it wouldn't come anywhere near impounding the amount of water that the State requires you to get a permit for.  I don't remember what that is, but I know it is 18 or 20 acre feet that you have to get a special permit from the State to build.  It wouldn't be in that class of dam at all.

Q   And what use would you make of that water?

A   Irrigating permanent pasture on the northeast 40.

Q   Would you pump from it?

A   Yes, pump from it.

Q   You would pump from that?

A   Yes.

Q   And you would use a sprinkler?

A   Yes, sprinklers altogether.

Q   Where would your other structure be on Camps Creek?

A   Well, this one that I would divert over that, I would run it off of my diversion and I would go further up on that creek and put in one.

Q   On what you have called a winter stream?

1841

Z-75

A   Yes, a winter stream.

Q   What kind and type of structure would you put there?

A   An earthen structure, the same.  That would be small.

Q   Have you any idea of the size of that structure?

A   Well, that would be a very small one that would, maybe back water back 300 feet and 30 feet or 40 feet wide.

Q   Have you observed similar kind and type of structures in the De Luz area that you have described?

A   Yes.  I have a place in Fallbrook, not in the watershed, but in the San Luis Rey, and there are four earthen dams on that and they all held well except that this winter when we had more rainfall than usual, they came up to the top and washed a little at the corners, but not to amount to anything. But they did not have the proper spillway.

MR. VEEDER:  I observe that it is noon, your Honor.  I would like to continue now, if I could-- if this witness would like to be released now I would go on further.

MR. MASTER:  You may have some questions of Col. Bowen and he would probably have to come back this afternoon.

MR. SACHSE:  Yes.  I plan to have Mr. Ross here, who is his predecessor.

MR. VEEDER:  If that is the case we will have Mr. Anderson back, also.

THE MASTER:  Very well.  We will recess until 1:30.

(Adjournment until 1:30 P.M., July 1, 1958.)

Z-76

<u>Fallbrook, California, July 1, 1958, 1:30 P.M.</u>

THE MASTER:  Mr. Anderson, will you resume the stand.


HUGH DONALD ANDERSON,

the witness on the stand at time of recess, resumed the stand,

further testified as follows:


CROSS-EXAMINATION  (continued)

BY MR. VEEDER:

Q   Now, you have testified that there was a two inch

pipe.  Is that the size of the structure in your irrigation line?

A   That is correct.

Q   And do you intend to abandon the balance of the hundred

miner's inches for which you--

A   No, I would like to have it.  But I would like to have

the rest.

Q   You are not planning to give up--

A   Oh, no.  No, I don't think I am giving any of that up.

Q   You intend then, in other words I want that very clear--

A   Yes.

Q   --you intend to claim the full 100 miners inches?

A   Yes.

Q   Now, in regard to the future development that you anti-

cipate, could you give us the aggregate in acres that you think

Z-77

1    will be brought under cultivation, or under irrigation?

2         A   Under irrigation?   That is-- would you-- if you water

3    it twice during a year would you call that irrigation?

4         Q   Why certainly-- you shouldn't ask me questions.   What

5    I am trying to find out, you do intend to irrigate some addi-

6    tional land?

7         A   Yes.

8         Q   And would you state the maximum that you think that

9    you will irrigate?

10        A   I think about 125 acres of the 247, and on the other

11   40, which is in the separate parcel, I think 20 acres will be

12   the most I would want to irrigate on that.

13        Q   You figure on 145 aggregate acres?

14        A   Yes.

15        Q   And have you stated the aggregate irrigated acreage

16   that you are now operating?

17        A   No.   I haven't been asked that.

18        Q  Well, I am asking you that.   How many acres are you

19   presently irrigating?

20        A   I imagine about eight or nine acres.

21        Q   And have you given any thought as to the time that

22   it will take to bring in your maximum acreage up there?

23        A   It will take us a couple of years, at least two years.

24        Q   You presently have that equipment to do it?

25        A   Yes.   We have the equipment to do it, to build all

Z-78

1   the dams up to any Government specification or California State

2   specification.

3       Q   Then you have the equipment to subjugate the land to

4   irrigation that you have to develop.  Is that right?

5       A   I have three-inch and four-inch aluminum pipe and

6   overhead sprinklers, enough to irrigate 200 acres.

7       Q   Oh, you have?

8       A   I have that at the present time.  I brought it from

9   my ranch in Orange County.

10      Q   In other words, you are equipped to bring this land in

11  very rapidly?

12      A   Yes.

13      Q   Have you given any thought as to the maximum quantity

14  of water that you would require for that acreage?

15      A   No, I haven't, because it is just the last year in

16  Orange County that we had to pay for the water we take out of

17  the ground-- to pay for the water that comes in from the

18  Metropolitan Water District, and I don't know how much that you

19  actually use because, before that, we had an unlimited supply

20  of water and we just pumped it and we didn't know how much we

21  were using, or make any record of it.

22      Q   But you do calculate you will greatly increase your

23  demands?

24      A   Yes.

25      Q   The way you are intending to proceed?

Z-79

1        A   Yes. Of course, some of the water that we put on

2   the land will go back into the watershed again, because you

3   don't-- it doesn't all sink into the ground and stay there.

4        MR. VEEDER:   I have no further questions.

5        MR. SACHSE:   I have nothing further from Mr. Anderson.

6        THE MASTER:   That is all, Mr. Anderson.

7        MR. SACHSE:   I would like to call Mr. Ross, if I may.

8   He is here and it will be very brief.   It is in connection

9   with the Anderson property.

10

11                    WILLIAM JUDSON ROSS,

12   called as a witness in behalf of the defendants, being first

13   duly sworn, testified as follows:

14

15                    DIRECT EXAMINATION

16   BY MR. SACHSE:

17        Q   Will you state your full name, please.

18        A   William Judson Ross.

19        Q   Mr. Ross, are you the former owner of Parcel 48, now

20   owned by Mr. Anderson?

21        A   That is right.

22        Q   And how long did you own that property before you sold

23   it to Mr. Anderson?

24        A   Two and a half years.

25        Q   Now, how long prior to that had you been acquainted

Z-80

1  with the property or known of it?

2      A  Eighteen years.

3      Q  And how intimate an acquaintance has that been?

4      A  There was a long lapse from the eighteen years ago

5  until three or four years ago.  In the summer of 1940 I was a

6  visitor at the adjoining ranch and had occasion to go on to the

7  Bluebird Ranch, and through it, and hike up Fern Creek to its

8  source.

9      Q  The Bluebird Ranch is the one that you sold Anderson?

10     A  Yes.

11     Q  Now, did you observe the diversion works in Fern

12 Canyon in the summer of 1940?

13     A  Yes.

14     Q  What were they?

15     A  A dam or weir box to divert, stop up the stream, and

16 there was a two-inch pipe at that point going off down the

17 creek, down the creek bed.

18     Q  Do you know where that water went, where the pipe went?

19     A  I did not walk the length of the pipeline.

20     MR. VEEDER:  Objection; that would be hearsay.  He said

21 he didn't know.

22     THE MASTER:  He said he has not walked the pipeline.  There

23 is no other question pending at the present time, Mr. Veeder.

24 BY MR. SACHSE:

25     Q  Do you know where the water arrived at the residence

Z-81

1    and so on, such as the plan for the Bluebird Ranch was in 1940?

2        MR. VEEDER:  How the water got there?  I object on the

3    basis that he doesn't know.  He hadn't walked down it and he

4    wasn't sure.

5        MR. SACHSE:  He said he hadn't walked the pipe line.  All

6    I want to know is how the water got to the house.

7        THE MASTER:  I think it is a perfectly permissible

8    question.

9        MR. VEEDER:  You have ruled, your Honor?

10       THE MASTER:  The question is proper and the witness may

11   answer, if he knows the answer.  The objection is overruled.

12       THE WITNESS:  May I have the question again?

13       MR. SACHSE:  I will rephrase it.

14       Q  Do you know where the water was delivered to the

15   residence and planning of the Bluebird Ranch in 1940?

16       A  Yes.

17       Q  Where?

18       A  To the house and to the household use, to a large part

19   of the area where it is now in use, and to a part that is now

20   pasture; to a hillside, to some grapes and lemon trees, and

21   substantially the same area as is now under cultivation.

22       Q  And was that same area supplied with water when you

23   purchased the ranch in 1955, did you say?

24       A  Yes.

25       Q  That same general area?

Z-82

1      A   Yes.

2      Q   And it was being irrigated in 1940?  Did you say '40?

3      A   At my visit, yes.

4      Q   And was there any other water source on the ranch in

5   1955?

6      A   No.

7      Q   Than the source which you mentioned?

8      A   No.

9      Q   At the time of your purchase in 1955, or thereafter,

10   did you walk the pipe line on more than one occasion?

11      A   Yes.

12      Q   And at that time did the pipe cross the divide from

13   Fern Creek to Camps Creek?

14      A   Yes.

15      Q   What size pipe was it?

16      A   Two-inch.

17      MR. SACHSE:  That is all.

18      MR. VEEDER:  I have no questions.

19      THE MASTER:  Thank you, Mr. Ross.

20      MR. SACHSE:  I have nothing further on the Anderson

21   parcel.

22      THE MASTER:  Do you have any other parcel or any other

23   defendants here?

24      MR. SACHSE:  No, sir.

25      MR. VEEDER:  There is one thing we would like to inquire

Z-83

1   about.  You do admit, and will agree, that the two parcels,

2   48, are separate and distinct parcels of land. Is that correct?

3   MR. SACHSE:  I don't know.  I don't know how the title

4   was to Mr. Ross, Mr. Veeder.  I know the title is in single

5   documents to Anderson, but if your records indicate that I

6   will stipulate to it.

7   MR. VEEDER:  We would have to check it out.

8   MR. SACHSE:  I don't know.  I will ask him right now, if

9   you want me to.  I will so stipulate:  It was two separate

10  transactions at two different times.  Is that enough?  Two

11  separate transactions and at two different times?

12  MR. VEEDER:  All right.

13  THE  MASTER:  I don't think Col. Bowen was asked, when he

14  was testifying in regard to this property, with reference to

15  subterranean sources of water, and I think it might be well if

16  you would resume the stand and give us your testimony in

17  connection with that.

18

19              ALLEN C. BOWEN,

20  recalled as a witness, having been previously sworn, testified

21  further as follows:

22  MR. SACHSE:  Do you want me to go ahead, your Honor?

23  THE MASTER:  Yes.

24

25

1850

Z-84

CROSS-EXAMINATION

BY MR. SACHSE:

Q   Will you state from Exhibit 94-- I believe you have already testified there are no streams in that parcel other than streams that would flow immediately during and after periods of rainfall?

A   That is right.

Q   What would your conclusion be as to any water that might be developed by digging into the underground in that parcel?

A   It would be my opinion that that would be vagrant percolating water, not a part of the stream system.

MR. SACHSE:   I think we did do this on my examination-- I did it on the other ones--

Q   Let's start with the northeast 40.   That appears to show a substantial deposit of alluvium from Camps Creek, does it not?

A   Yes, sir.

Q   And as to that 40 would you conclude that water developed by digging into the underground was part of the stream?

A   Yes, sir.

Q   Is that entire 40 in the Camps Creek watershed?

A   Referring to the northeasterly 40?

Q   Yes, sir.

A   Yes, sir, it is entirely within the watershed of Camps

Z-85

1  Creek.

2      Q   Then if you take the 40 immediately to the south of

3  that, what would your conclusion be as to the water that might

4  be developed by digging into the underground other than in the

5  stream bed of Camps Creek in that 40?

6      A   Camps Creek drains through the center of that 40, and

7  there is alluvium material deposited along the creek.  It would

8  be my opinion that waters developed in that sixteenth of a

9  section would be part of the stream.

10      Q   Now then, Colonel, if you will move to the west and

11  consider next the land in the next 40 west, within the Camps

12  Creek watershed-- do you follow me?

13      A   Yes, sir.

14      Q   What would your conclusion be as to the subterranean

15  water in that area?

16      MR. VEEDER:   His characterization?

17      MR. SACHSE:   The same characterization, yes.

18      THE WITNESS:   There the higher ground, particularly in

19  the steeper slopes, classified as VII on the soil survey map

20  included in Plaintiff's Exhibit M-93, it would be my opinion

21  that those higher lands contained vagrant percolating waters

22  not a part of the stream system.

23  BY MR. SACHSE:

24      Q   Now, Colonel, can you make any generalization regarding

25  the lands in the Fern Creek watershed as to the character of

1852

Z-86

1  water that might be developed, as to whether or not it was a

2  part of the stream system?

3      MR. VEEDER:  I am going to object to that, the generaliza-

4  tion.  As far as we are concerned--

5      MR. SACHSE:  I will withdraw the question.

6      Q Colonel, take the next 40, the lowest, the most

7  westerly 40 in the Fern Creek watershed.  What would your

8  conclusion be as to the underground waters in that 40 as to

9  whether or not they are a part of the stream system?

10      A  Well, a part of the waters in that 40 is a part of the

11  Fern Creek stem system, and in direct contact with Fern Creek,

12  the ground water body.  And the higher lands shown as Class VII

13  in the southerly part of that 40 would, in my opinion, be

14  vagrant percolating water.

15      Q  Did I say westerly or easterly, or were you referring

16  to the westerly or easterly?

17      A  I was referring to the easterly; you said the next

18  one south.

19      Q All right.  Then let's take the next to the west, the

20  remainder of the Fern Creek drainage.  What would your con-

21  clusion be as to ground water in that area?

22      A  Ground water in a portion of that 80 shown in Plain-

23  tiff's Exhibit M-93 is the westerly 80 acres of the property,

24  and a portion of the water is part of the stream flow of Fern

25  Creek, and that lying within the alluvium and the granitic

Z-87

1 material adjoining on the lower slopes.  The granitic material

2 in the higher slopes, water is present only in the fractures

3 and joints and in the thin residual material on the surface, and

4 in my opinion would be vagrant percolating water.

5    Q  Did you state whether or not that would be within the

6 Class VII material or into the Class VI?

7    A  The indefinite zone of demarcation would occur in

8 the Class VII.

9    Q  The boundary between VII and VI at the lower end of

10 VII.  Is that right?

11    A  No, sir.  The zone of demarcation would occur within

12 the Class VII area.

13    Q  What I am trying to establish, Colonel, is whether

14 or not we are going up a hill.  As you get on higher ground,

15 as I understand your testimony--

16    A  Yes, sir.

17    Q  --as you get on higher ground it is Class VII.  It

18 would be your opinion that the waters thereunder would be

19 vagrant percolating local ground waters?

20    A  Yes, sir, with regard to this particular 80 acres.

21 MR. SACHSE:  That is all.

22 THE MASTER:  Any questions, Mr. Veeder?

23 MR. VEEDER:  No.

24 THE MASTER:  That is all, Colonel.

25    I see that Mrs. Doerrer has entered the room.  Do you

**1854**

Z-88

1  wish to testify, Mrs. Doerrer, in connection with your soil

2  report?

3        MRS. DOERRER:  When you have finished.

4        THE MASTER: We have finished with this particular parcel.

5  If you wish to testify now would be the time to do it.

6

7                    ANNA DOERRER,

8  one of the defendants herein, called as a witness in her own

9  behalf, being first duly sworn, testified as follows:

10

11       THE MASTER:  Now, Mrs. Doerrer, I understand that you

12  have received an engineering report upon your property, and a

13  copy of that has been introduced in evidence in this action

14  as Exhibit M-95.  Now, have you examined that report?

15       THE WITNESS:  Yes.

16       THE MASTER:  Do you agree with that report and accept it?

17       THE WITNESS:  Yes, sir.

18       THE MASTER:  Or do you have any questions concerning it?

19       THE WITNESS:  No, I haven't.

20       THE MASTER:  Do you have any statement that you want to

21  make about that report?

22       THE WITNESS:  No.

23       THE MASTER:  Well, unless one of the attorneys here wants

24  to ask you some questions, I guess that is about all, then.

25       MR. SACHSE:  No questions.

Z-89

MR. VEEDER:  I have no questions.

THE MASTER:  I think that is all, then, Mrs. Doerrer,
unless you have some statement you want to make.

THE WITNESS:  No, I haven't.

THE MASTER:  Very well, then.  You may be excused at
this time and I hope your back gets better.

Well, I think at this time we might-- Do you want to ask
Col. Bowen some questions about the report?

MR. VEEDER:  I was going to ask Col. Bowen to explain
the report.  She agrees with it.


                    ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified
further was follows:


THE MASTER:  Can you state for Mrs. Doerrer, and for the
record, the findings which are contained in this engineering
report, Exhibit M-95?

THE WITNESS:  Yes, your Honor.  The property owned by
Mrs. Anna Doerrer, and reported on in Plaintiff's Exhibit M-95,
is delineated on Plaintiff's Exhibit M-68, and marked as
Parcel No. 9.  That parcel is contained within Section 20,
Township 8 South, Range 4 West, and is located on a low terrace
abutting upon the main stem of De Luz Creek.

There are 2.8 acres within the property and of that amount

1856

Z-90

1   it is my opinion that 2.8 acres are irrigable.

2       It is comprised of Classes II, III, IV and VI.   2.4

3   acres of it are best suited to row crops, as reported on page

4   2 of Plaintiff's Exhibit M-95.   The remainder, .4 of an acre,

5   is best suited to avocado production.

6       The domestic and irrigation water now being supplied to

7   the property comes from a new well which is about 108 feet

8   deep, located adjacent to the house.   The well and the pump

9   is powered by a 2-horsepower electric motor, and the water

10  is delivered to a pressure tank of approximately 250 gallon

11  capacity.

12      Prior to the construction of this new well domestic

13  water was supplied by a 14-foot dug well which was located on

14  the property of an adjoining landowner.

15      It is my opinion that inasmuch as this property is located

16  almost wholly on older alluvial and some recent alluvial fill,

17  adjacent to De Luz Creek, that water from this source is part

18  of the stream of De Luz Creek.

19          THE MASTER:   Are there any questions by counsel?

20          MR. SACHSE:   I might just have one.   May I see the

21  photo?

22      Q   Colonel, how close does this property actually abut

23  on De Luz Creek, or does it abut?

24      A   According to Plaintiff's Exhibit M-68 the property,

25  the easterly boundary of the property, is De Luz Creek;

**Z-91**

1857

1   approximately two or three hundred feet.

2        Q   Colonel, I see an intermittent stream symbol which

3   appears to run along the easterly portion of the boundary.   Is

4   that correct?

5        A   Yes, sir.

6        Q   Is that a stream that flows only during periods of

7   heavy precipitation?

8        A   Yes, sir.

9        MR. VEEDER:   I have one or two questions of Mrs. Doerrer,

10  by reason of this.

11       Mrs. Doerrer, may I ask, do you get your water from

12  another well?

13       MRS. DOERRER:   No.

14       MR. VEEDER:   You  used to have another well?

15       MRS. DOERRER:   Yes.   I did have another one but it ran

16  dry and I didn't get no water, and we had a man come down and

17  look at it but he said he wouldn't tackle it because it would

18  take him away; all under water, and he was afraid to do anything.

19  So my son-in-law had this drilled for me.

20       MR. VEEDER:   Do you know what caused the well to go dry?

21       MRS. DOERRER:  What is that?

22       MR. VEEDER:   Do you know what caused your well to go dry,

23  the first well?

24       MRS. DOERRER:   Well, I just don't know; short of water.

25  I guess that is about all.

Z-92

1    MR. VEEDER:  Was somebody using the water upstream?

2    MRS. DOERRER:  No, not that I know of.

3    MR. VEEDER:  You don't know why?

4    MRS. DOERRER:  No.

5    MR. VEEDER:  I have no further questions.

6    MR. SACHSE:  No questions.

7    THE MASTER:  Well, I think that is all, then.

8    That would conclude the testimony, then, with reference

9    to your specific parcel, Mrs. Doerrer.

10   MRS. DOERRER:  All right.

11   THE MASTER:  Now, I think we might proceed to consider

12   Parcel 20, which is apparently owned by John and Marjorie L.

13   Parker, Exhibit M-43.  They were sent a notice requesting them

14   to be present either yesterday or today and advising them

15   that their property would be considered, and apparently they

16   have not appeared, so I will ask you, Col. Bowen, to give

17   further details with reference to that property as shown from

18   your exhibit and your own examination of the property.

19

20               ALLEN C. BOWEN,

21   recalled as a witness, having been previously sworn, testified

22   further as follows:

23   THE WITNESS:  This is Plaintiff's Exhibit M-53, which

24   contains a report of an engineering investigation on the

25   property of John and Marjorie Parker, shown as De Luz watershed

Z-93

Parcel No. 20.

Referring to Plaintiff's Exhibit M-68, that parcel is delineated and marked with the number 20, encircled, within the exterior boundaries of it.

The northern boundary of the property is the Riverside County line and the land grant line of the Santa Rosa grant, a part of the Vail Ranch.

The East Fork of De Luz Creek leaves the Santa Rosa grant at a point about midway between the east and west boundaries of Parcel No. 20, and flows southerly and westerly through the property, leaving it at a point about 400 yards north of the southwest quarter.  This parcel is partly within Section 22 and partly within Section 27, Township 8 South, Range 4 West.

The water development on the property at present, as of the date of the report, which was made in 1956, was a dug well 25 feet deep, supplying domestic water which is pumped to a 10,000 gallon reservoir.  At that time there was no irrigation development on the property and there was no evidence nor any record of any surface diversion on the property.

The total area of the property is approximately 62.6 acres, as shown on page 1 of Plaintiff's Exhibit M-43.

The lands were classified in the tabulation of classes as being of classes as shown on page 2 of Plaintiff's Exhibit M-43.

Z-94

1        On page 3 of the same exhibit, M-43, there is shown 22½

2   acres are irrigable and that the land use plan for the property

3   indicates .8 of an acre of truck gardening, 8.2 acres of row

4   crops, 2½ acres permanent pasture and 11 acres of avocados.

5        The East Fork of the De Luz Creek traversing this property

6   is bordered and contained within alluvial fill and water ex-

7   tracted from the alluvium is, in my opinion, part of the flow

8   of the East Fork of De Luz Creek.

9        THE MASTER:  What about water extracted from the balance

10  of the property?

11       THE WITNESS:  Well, again, your Honor, the Class VII land

12  shown in brown on the soil survey report contained in Plaintiff's

13  Exhibit M-43, and referring more particularly to the higher

14  portions of that Class VII land in the southeasterly corner of

15  the property, in my opinion the waters on the higher ground of

16  Class VII land would be vagrant, percolating and not a part of

17  the stream system.

18       THE MASTER:  Are there any soil conservation dams or

19  evidences of such dams having existed in the past on this

20  property?

21       THE WITNESS:  No, sir, not to my knowledge.

22       THE MASTER:  What actual crops have been irrigated upon

23  the property, to your knowledge?

24       THE WITNESS:  None to my knowledge, your Honor.

25       THE MASTER:  Are there any further questions?

Z-95

1          MR. VEEDER:  I would have some questions.

2

3                    DIRECT EXAMINATION

4    BY MR. VEEDER:

5          Q  Col. Bowen, is that land presently suitable for

6    grazing?

7          A  Yes, sir.

8          Q  And does the forage growing on that property have as

9    its source of water the waters of De Luz Creek?

10         MR. SACHSE:  May I ask if the question could be a little

11   more specific.  It is covering an awfully big field and can

12   mean the whole thing.

13   BY MR. VEEDER:

14         Q  What area-- would you state the areas, if any, that

15   you would think would be subirrigated from the East Fork of

16   De Luz Creek, Col. Bowen?

17         A  Referring to the soil survey map contained in

18   Plaintiff's Exhibit M-43, the areas classified as 2 and 8,

19   respectively, shown in yellow and purple, along De Luz Creek,

20   are alluvial material and forage growing upon those areas in

21   my opinion would extract water from the waters in storage in the

22   alluvium.

23         Q  How does this land compare with other lands in the

24   area which are now in process of being developed for more

25   concentrated agriculture?

Z-96

1      A   Well, it is comparable to any lands in the area

2  which are recommended for similar crops.  It can grow-- for

3  example, the level part, the level land classified as II, can

4  grow a wide variety of crops and in that area, particularly,

5  it was recommended for row crops; whereas the Class VI land

6  shown in orange on the soil survey contained within Plaintiff's

7  Exhibit M-43 are suited to avocados or other subtropical fruit

8  production.

9      Q   Based upon your experience in this area, and your

10  experience generally in Southern California, would you state

11  your opinion as to whether it is reasonably anticipated that

12  that land will ultimately be subjected to concentrated crops?

13      MR. SACHSE:  I will object; no foundation laid.

14      THE MASTER:  The objection goes to the weight of the

15  evidence rather than to its admissibility.  The objection is

16  overruled.

17      THE WITNESS:  There has been practically an explosion in

18  development of land of this sort in northern San Diego County,

19  and it is my opinion that these lands will be subjugated to

20  the usage to which it is best adapted.

21      THE MASTER:  Will you clarify that?  You are now referring

22  to the $22\frac{1}{2}$ acres you have testified as irrigable?

23      THE WITNESS:  Yes, sir.

24      THE MASTER:  That was not intended to refer to the entire

25  acreage?

Z-97

1        THE WITNESS:  No.

2        MR. VEEDER:  You asked the question I was going to ask.

3   I have no further questions.

4

5                          CROSS-EXAMINATION

6   BY MR. SACHSE:

7        Q  Col. Bowen, I am referring to the intermittent stream

8   symbol which appears in the southwesterly corner of this

9   parcel.  Do you see the one to which I refer?

10       A  Yes, sir.

11       Q  Would you characterize that as a stream that flows

12  only during and after periods of heavy precipitation?

13       A  Yes, sir.

14       Q  Are you familiar with the present runoff of this fork

15  of De Luz Creek as it is flowing now, within the last week?

16       A  No, sir, not within this property.

17       THE MASTER:  The question was a sort of a double ques-

18  tion and that is, that you are not familiar with this property

19  or that it is not flowing on this property?

20       MR. SACHSE:  I understood him to say--

21       THE WITNESS:  At this time I am not familiar, this week,

22  more specifically.

23       THE MASTER:  I just wanted to be certain.

24       THE WITNESS:  I am not familiar with the stream flow in

25  the East Fork of De Luz Creek through this property this week.

Z-98

1    THE MASTER:  That is what I thought it was, but I wanted

2  to be certain if you stated positively that it was not flow-

3  ing now.

4  BY MR. SACHSE:

5    Q  Colonel, on the contour map is this entire parcel

6  within the watershed of De Luz Creek or to the north does some

7  of it drain to the intermittent streams to the south?

8    A  Well, this property, Parcel No. 20, is entirely within

9  the watershed of the East Fork of De Luz Creek.

10    MR. SACHSE:  That is all.  Thank you.

11    MR. VEEDER:  I have no questions.

12    THE MASTER:  Well, that will conclude that parcel.  We

13  will now consider Parcel 27, Exhibit No. M-46, Elizabeth Poston.

14    Col. Bowen, can you give us the same general type of

15  information that you have done in the previous cases?

16    THE WITNESS:  Referring to Plaintiff's Exhibit M-46, the

17  report of engineering investigation on the property of Elizabeth

18  Poston and also to Plaintiff's Exhibit M-68 upon which the

19  property is delineated and shown as Parcel No. 27.

20    It is noted that the East Fork of De Luz Creek flows from

21  east to west through the approximate center of the property.

22  The area of the property is approximately $7\frac{1}{2}$ acres.  Also, the

23  De Luz-Murrieta Road traverses the property near the northern

24  boundary.

25    Of the $7\frac{1}{2}$ acres of land within this parcel, as shown on

Z-99

1   page 3 of Plaintiff's Exhibit M-46, 4½ acres are considered

2   suitable for irrigation, and the land use plan recommended is

3   4.3 acres of row crops and .2 of an acre in citrus. the citrus

4   being in the very small portion of Class VI land which is in

5   the northerly part of the property.

6       The Class II land shown in yellow on the soil survey in

7   Plaintiff's Exhibit M-46 is astride the East Fork of De Luz

8   Creek, the stream bed of which is shown in purple, Class VIII

9   land.

10      The land considered irrigable, with the exception of the

11  small portion of Class VI land, is alluvial in character, and

12  on page 2 of Plaintiff's Exhibit M-46, under the engineering

13  heading, the domestic water is at present-- that is in 1956--

14  being supplied by a hand-dug well 25 feet in depth.  The water

15  surface in the well on November 5, 1956, stood at 14 feet

16  below ground surface.  There is no record of any surface

17  diversion on the property at the time of the report and there

18  is no irrigational use of water.

19      In my opinion the water extracted in the well is part of

20  the East Fork of the De Luz stream system.

21      THE MASTER:  I notice that Elizabeth Poston, in her

22  answer filed apparently relies upon this report, 17.57 acre

23  feet of water per year, which seems to be the same amount that

24  your engineering report shows would be used for crops that you

25  have set forth on page 3 of your report.

Z-100

1    THE WITNESS:  Yes, sir.  That figure is correct.

2    THE MASTER:  The record might also show that the answer

3 also alleges that on April 8, 1958, the property was sold to

4 Stanley W. Prior and Marva Prior, 3620 Lombardi Road, Pasadena,

5 California.

6    Now the answer also refers to a second parcel. Lot 33.

7    MR. VEEDER:  Can the record show whether this party, this

8 defendant, was noticed for today?

9    THE MASTER:  Yes.  The record does show that.

10    MR. VEEDER:  I did not hear your Honor say anything about

11 it.

12    THE MASTER:  She was noticed for today.  I believe the

13 record shows it, but if it does not, it will show it now.

14    Do you have any questions, Mr. Veeder?

15

16                        DIRECT EXAMINATION

17 BY MR. VEEDER:

18    Q  I will ask the same question with regard to future

19 development.  Based upon your opinion, and based upon your

20 experience in Southern California, Col. Bowen, what, in your

21 opinion, will be the reasonable development of this land?

22    A  In my opinion a reasonable development of this property

23 will be the subjugation of 4½ acres to irrigation use, with the

24 recommendation shown on page 3 of Plaintiff's Exhibit M-46.

25    Q  Now, when you state that the water was 14 feet from the

Z-101

1  surface-- from the ground level-- is that correct?  Is that

2  what you stated?

3      A  Yes.

4      Q  And where was the well situated from the stream?  How

5  far?

6      A  This well is near the stream bed of the East Fork of

7  the De Luz Creek, Mr. Veeder, but I don't recollect just how

8  far.

9      MR. VEEDER:  I have no further questions.

10

11              CROSS-EXAMINATION

12  BY MR. SACHSE:

13      Q  Col. Bowen, in answer to a question of the Master in

14  which he stated that the defendant in this case claims 17.57

15  acre feet per year, you stated that that was the future potential

16  water use as found by your report.  Is that correct?

17      A  Yes, sir, as shown on page 3 of Plaintiff's Exhibit

18  M-46.

19      Q  That is not intended to imply that it is your belief

20  that that amount of water would be available to this party in a

21  year, is it?

22      A  The statement is very clear in that, Mr. Sachse, that

23  this statement is not intended to indicate that this amount of

24  water will be available.

25      MR. SACHSE:  That is all.

Z-102

1     MR. VEEDER:  I have no further questions.

2     THE MASTER:  Very well.  We will then go to Agnes M.

3  Frank, the owner of Parcel 51, who was also sent a notice to

4  the effect that if she was to appear she could do so at this

5  time.

6     May we have Exhibit M-58?

7     Col. Bowen, can you, after examining the report and

8  Exhibit M-68, give us substantially the same type of informa-

9  tion as to this parcel?

10     THE WITNESS:  Yes, sir.  Referring to Plaintiff's Exhibit

11  M-58 and Plaintiff's Exhibit M-68, the report on De Luz water-

12  shed Parcel No. 51, shows the property to consist of approx-

13  imately 120 acres.  It is situated, referring to Plaintiff's

14  Exhibit M-68, within Section 32, Township 8 South, Range 4 West.

15     The De Luz Creek flows southerly, from north to south,

16  through the westerly 40, and the surfaced De Luz-Fallbrook Road

17  also traverses from north to south, and is generally parallel

18  with the stream, but lying easterly of the stream.

19     Of the 120 acres comprising the property, as shown on

20  page 2 of Plaintiff's Exhibit M-58,54.7 acres are suitable for

21  irrigation.  As shown on page 3 of Plaintiff's Exhibit M-58,

22  the recommended land use would be approximately half of the

23  area in row crops and the remainder in permanent pasture; that

24  is half of the area that is suited to irrigation.

25     Also on page 3 of the report, under the engineering

Z-103

1   section, it indicates that as of 1956, when this investigation

2   was made, there was no developed source of water on the

3   property, nor was there any evidence or record of any surface

4   diversions or a well on the property.

5       Referring to the soil survey contained in Plaintiff's

6   Exhibit M-58, it is noted that De Luz Creek, flowing through

7   Class VIII or the purple area from north to south is in

8   contact with alluvium which occupies the area colored

9   purple in the westerly 40 of the property and that alluvium

10  will be the best source of water for development of the

11  property, and water taken from the alluvium would be part of

12  the stream flow of De Luz Creek.

13      THE MASTER:  Now I notice the easterly 80 acres appears

14  to be, probably two-thirds of it, colored purple as Class VIII

15  land.  What is the reason for that being Class VIII rather

16  than Class VII, say?

17      THE WITNESS:  Well, your Honor, that should more properly

18  be colored brown and be shown as Clas VII.  Both classes are

19  non-irrigable.

20      THE MASTER:  If water were developed upon the easterly

21  80 acres would that be a part of the De Luz Creek system or

22  would it be local, vagrant, percolating water?

23      THE WITNESS:  Your Honor, the area shown on the land

24  classification map in Plaintiff's Exhibit M-58 in the easterly

25  80 acres, which are colored yellow and red and blue, are deeper

Z-104

1   soils occupying sites of comparatively gentle slopes, and those

2   areas which are in contact with the steeper granitic slopes,

3   colored purple in the easterly 80 could, in my opinion, be fed

4   by the joints and fractures within the granitic materials, and

5   particularly in regard to the lower slopes.  The higher slopes,

6   such as the northern third of the easterly 80 would, in my

7   opinion, be vagrant, percolating waters, not in contact with

8   the stream.

9         THE MASTER:  But except for the third--

10        THE WITNESS:  The northerly third.

11        THE MASTER:  The northerly third, it would be in contact

12   with the stream?

13        THE WITNESS:  Yes.  As to the westerly 40 acres, in my

14   opinion all of the water would be in contact with the stream.

15        THE MASTER:  You did state whether there were any springs

16   on the property and you meant there were no developed sources

17   of water.  Are there any undeveloped springs?

18        THE WITNESS:  Your Honor, I have no knowledge of any

19   springs on the property.

20        THE MASTER:  Well, the answer filed by Mrs. Frank claims

21   rights to the same quantities of water and for the same acreage

22   as set forth on page 3 of the engineering report, Exhibit M-58.

23        Do you have any questions, Mr. Veeder?

24

25

Z-106

1   every field, I think the Colonel is the man.  I see no reason

2   at all as to why he has not been permitted to testify, and I

3   see no reason for not having him testify as to the service of

4   water to the areas somewhat removed from the stream and as to

5   the means that would be adapted to deliver water there.

6        THE MASTER:  I am not wondering, as to this particular

7   question, as to his qualification, but I am wondering what

8   the relevancy of the method is.

9        MR. VEEDER:  It is extremely important, your Honor,

10   from our standpoint.  I will state that the report from

11   Bulletin No. 57 has indicated that there be no further de-

12   velopment here.  It indicated that De Luz Creek was, perhaps,

13   or had reached the maximum development at the present time.

14   We think it is highly significant and very important that the

15   record be very clear that the De Luz area is an area that will

16   develop, and the means to develop it we think is extremely

17   relevant and material in this phase of the case.

18        MR. SACHSE:  I will withdraw the objection.

19        THE MASTER:  Since the objection is withdrawn, it saves

20   me from ruling.

21   BY MR. VEEDER:

22        Q  In my opinion the best source of water for development

23   of irrigable lands within the property reported on in Plain-

24   tiff's Exhibit M-58 is a diversion from De Luz Creek which

25   traverses the westerly 40 from north to south and pumping from

1873

Z-107

1    that diversion to reservoirs constructed between irrigable

2    areas.

3        Q   What about ground water sources?

4        A   Very limited ground water sources are available on

5    this property.  There is a remnant of a so-called flood plane

6    which is shown as the yellow and red area in the easterly 80

7    acres depicted on the soil survey map in Plaintiff's Exhibit

8    M-58, but like the other development the amount of ground

9    water from that source is very small.

10       MR. VEEDER:  I have no further questions.

11

12                         CROSS-EXAMINATION

13   BY MR. SACHSE:

14       Q   Col. Bowens, did you discuss the plans with Mrs. Frank,

15   her plans for development of Parcel 51?

16       A   No, sir.

17       Q   Did you discuss with Mrs. Poston her plans for de-

18   velopment of Parcel 27?

19       A   No, sir, I did not.

20       Q   Did you discuss with Mr. and Mrs. Parker their plans

21   for development of Parcel 20?

22       A   No, sir.

23       Q   Any statement that you give as to the likelihood in

24   the near future of any of those three parcels being developed

25   is without any knowledge as to what the owner himself plans?

Z-108

1          MR. VEEDER:  Now I object to that question because there

2     was no mention in the interrogation that I presented as to the

3     development in the near future.  He was interrogated whether

4     it would be reasonable to expect that the land would be sub-

5     jugated.

6          MR. SACHSE:  I will strike the word "near", then.  I

7     will ask the question without the word "near."  I will withdraw

8     the question and start over.

9          Q   Then your statement as to possible development in the

10    future was made without any knowledge whatsoever of the owner's

11    plans for this property?

12         A   That is right.

13         Q   Now, considering Parcel 51, I see an intermittent

14    stream in the southeasterly corner of the property, approx-

15    imately.  Do you find it?

16         A   Yes, sir.

17         Q   Would that stream, in your opinion, be a stream that

18    flows only during and after periods of heavy precipitation?

19         A   Yes, sir.

20         Q   If the waters of that runoff were to be used for this

21    future development could it be used in any way other than by

22    constructing some works to impound them?

23         A   No, sir.

24         MR. SACHSE:  That is all.

25

Z-109

REDIRECT EXAMINATION

BY MR. VEEDER:

Q  Col. Bowen, how are floodwaters used and high runoff waters used to irrigate natural pasturage?

MR. SACHSE:  I object to that, your Honor; no foundation unless he knows the parcel.  The question is a general question and I would like to have it made specific.  If it is directed to this parcel there is no foundation.

MR. VEEDER:  As far as I am concerned it is a preliminary question.

THE MASTER:  I think that it is a preliminary question which may be answered.  The objection is overruled.

THE WITNESS:  By diverting water from the channel of the river and allowing it to flood over the bank.

BY MR. VEEDER:

Q  How do you determine that water spreading?

A  Well, where it is used for irrigation, that is irrigation.

Q  Now, are there any areas throughout that, either along the creek or below the intermittent creek to which Mr. Sachse made reference, where natural pasture or irrigated pasture might be developed and irrigated in the manner you describe?

MR. SACHSE:  I will object until he makes it specific. What creek?  De Luz Creek or the intermittent creek?

MR. VEEDER:  I said the one to which you made reference,

Z-110

1    the intermittent creek, Mr. Sachse.

2         MR. SACHSE:  All right.

3         THE WITNESS:  There is a suitable area right along the

4    creek for either spreading water or diverting for irrigation,

5    but it could be diverted over into the Class II and III lands

6    located, centrally located in the easterly 80, but there is

7    none of the property as shown on the soil survey in Plaintiff's

8    Exhibit M-58.

9    BY MR. VEEDER:

10        Q  What kind and type of structure would be utilized

11   under those circumstances?

12        A  It would require a diversion structure and a pump

13   lift pipe line to deliver the water.

14        Q  Would it be a fact that this storage would be involved,

15   or storage of any kind, in such a development?

16        A  Well, it would be possible to divert water without

17   impounding a great amount by diverting water during those

18   periods when it was a flowing stream.

19        MR. VEEDER:  I have no further questions.

20

21                    RECROSS-EXAMINATION

22   BY MR. SACHSE:

23        Q  Well, Col. Bowen, based on your extensive agricultural

24   knowledge do you think that it is practicable and profitable

25   irrigation to install pipes, pumps, in order to divert water

Z-111

1 during a period of or immediately after a period of heavy rain?

2 Is that practicable or profitable irrigation?

3     A   No, sir, not unless the soil is sufficiently deep and

4 underlain by porous material so that they constitute a storage

5 reservoir.

6     Q   Do you find such a storage reservoir on this parcel?

7     A   The area I referred to in the easterly 80 is a minor

8 reservoir of that nature.

9     Q   Now the area referred to, the easterly 80, drains

10 into De Luz Creek, that is going northwest, or would it drain

11 back south into the intermittent stream we have just discussed?

12     A   The land area shown as yellow and red in the easterly

13 80 on the soil map in Plaintiff's Exhibit M-58 drains southwest

14 into De Luz Creek.

15     Q   Would it drain direct into De Luz Creek or back into

16 the intermittent stream channel?

17     A   It would drain directly into De Luz Creek.

18     Q   In other words, the water would be diverted out of

19 the minor watershed of the intermittent stream into the major

20 watershed of De Luz Creek.  Is that right?

21     A   The intermittent stream is part of the watershed of

22 De Luz Creek.

23     Q   However, the juncture of the intermittent stream with

24 De Luz Creek is off this property?

25     A   Yes, it is off this property.

Z-112

1     Q  And would this water recharge the intermittent stream

2  or would it go into De Luz Creek above the juncture?

3     A  As I have said, the water draining from the Class II

4  and Class III land, centrally located in the easterly 80, would

5  drain southwesterly into De Luz Creek.

6     Q  And not back over the intermittent stream?

7     A  Not back into the intermittent stream.

8     Q  Do you care to estimate, based on any information you

9  have, the capacity of this small storage basin you have just

10  referred to?

11     A  I would have no means of estimating it.

12     Q  You wouldn't know whether it would hold ten acre feet

13  or a thousand?

14     A  No, sir.

15     MR. SACHSE:  That is all.

16     MR. VEEDER:  I have no questions.

17     THE MASTER:  How far below the southerly boundary of the

18  property does the intermittent stream join De Luz Creek?

19     THE WITNESS:  About a hundred feet, your Honor.

20     THE MASTER:  On the parcel immediately to the south of

21  Parcel 51?

22     THE WITNESS:  Yes, sir.  That creek's confluence with De

23  Luz Creek is on Parcel 91, as shown on Plaintiff's Exhibit M-68.

24     THE MASTER:  That is all.

25     MR. VEEDER:  Nothing further.

Z-113

1 (Short recess.)

2 THE MASTER: Col. Bowen, I will ask you to examine report

3 M-59, which deals with Parcel 69, owned by Newton F. and Willie

4 Mae Bryant.  They were sent a notice advising them to appear

5 today if they wished to challenge the report.  Incidentally,

6 they are the two defendants whose answer is incorporated, by

7 reference, in the form answer which I prepared for other de-

8 fendants.

9 Will you give the same general type of information

10 concerning this property as concerning the others?

11 THE WITNESS:  Yes.  Referring to Plaintiff's Exhibit M-59,

12 page No. 1, the property is described as the Southwest Quarter

13 of the Southeast Quarter, excepting the north 330 feet of

14 Section 5, Township 9 South, Range 4 West.  The parcel is

15 delineated on Plaintiff's Exhibit M-68 as joining Camp Pendleton

16 on the south.  The southerly parcel of Parcel 69 is common

17 with Camp Pendleton boundary.  The property is traversed from

18 the north to south by De Luz Creek, and it is also traversed

19 by the Fallbrook-De Luz Road, a hard-surface road, which runs

20 roughly parallel to the creek.

21 De Luz Creek, through this reach of the stream, as it

22 traverses the property is bordered by and flows over a an

23 alluvium.  On page 2 of Plaintiff's Exhibit M-59, in the

24 engineering section, it indicates that the domestic water

25 supply to the property is from a hand-dug well 32 feet deep

Z-114

1    located to the west of De Luz Creek.  Water from this well is

2    pumped to a 1,750 gallon tank located approximately 75 feet

3    above the well.  There is no record of any surface diversion

4    on the property.

5        It is noted that a well located on the east side of De

6    Luz Creek was abandoned, due to insufficient capacity.

7        The tabulation showing the types of crops, the acreage

8    of each crop and the water requirement is contained at the

9    bottom of page 2 in Plaintiff's Exhibit M-59 and shows that of

10   the 30 acres total area of the property, $8\frac{1}{2}$ acres are irrigable.

11   That acreage is comprised of Class II and III and Class IV and

12   Class VI land as delineated on the soil survey map accompanying

13   Plaintiff's Exhibit M-59.

14       The waters extracted from the well in alluvium bordering

15   De Luz Creek are part of the stream flow of De Luz Creek.

16       THE MASTER:  Is there any portion of the property, Colonel,

17   where a well could be dug and water obtained which would be not

18   part of the flow of De Luz Creek?

19       THE WITNESS:  Yes, sir.  The Class VII land shown in the

20   easterly half of the property on the soil survey map contained

21   in Plaintiff's Exhibit M-59 is above an old flood plane surface

22   which is shown by the red or Class III area westerly of it,

23   and, in my opinion, water within that Class VII land in the

24   easterly part of the property would be vagrant, percolating

25   water, not a part of the stream system.

Z-115

1                    DIRECT EXAMINATION

2    BY MR. VEEDER:

3         Q   Colonel, how reliable would be a source of supply, if

4    one were to rely upon the vagrant and percolating water within

5    these several parcels concerning which you have testified?

6         A   Those are very unreliable sources of water.

7         Q   From the standpoint of quantity derived from those

8    sources, do you think that it would be sufficient for any

9    sizeable irrigation?

10        A   No, sir.  Wells might be developed giving sufficient

11   water for a limited domestic use, but certainly it would not

12   be feasible to go to the granitic areas within the De Luz

13   watershed and put down wells with any idea of extracting any

14   significant quanity of water.

15        Q   How does this land compare with other lands in the

16   vicinity that you have observed to be fully developed?

17        A   Irrigable, and reported in Exhibit M-59 as irrigable

18   lands are comparable to any lands of similar classification in

19   the watershed of De Luz Creek.

20        Q   Based upon your experience in this area would you

21   state your opinion as to whether or not it is reasonabley

22   expected that this land would be developed in the future?

23        A   Yes, in my opinion it is reasonable to expect that

24   these irrigable lands will be developed in the future for

25   agricultural use.

Z-116

1        MR. VEEDER:  I have no further questions.

2

3                    CROSS-EXAMINATION

4   BY MR. SACHSE:

5        Q  Col. Bowen, in giving your last answer have you had

6   any conversations with either of the two defendants?

7        A  No, sir.

8        Q  In other words, you have no idea whether or not these

9   owners might not prefer to cut it up into small cabin sites?

10        A  No, sir, I have no idea.

11        Q  And you have no direct information as to their plans

12   for all or other developments?

13        A  No, sir.

14        MR. SACHSE:  That is all.

15        THE MASTER:  In their answer the defendants allege that

16   20 acres are tillable.  I assume from your statement with refer-

17   ence to the report that you would state that only 8.4 acres

18   were tillable?

19        THE WITNESS:  8.5 acres.

20        THE MASTER:  8.5 acres?

21        THE WITNESS:  Yes, sir.

22        THE MASTER:  They allege that the balance can be used

23   for grazing cattle, raising turkeys, chickens and fowl.  Would

24   you state that the balance over and above the 8.5 acres could

25   be used for those purposes?

M-117

1    THE WITNESS:  Yes, it could.

2    THE MASTER:  That is all.

3    MR. VEEDER:  I notice here that the defendants also

4    allege that they have irrigated a portion of the land in the

5    past.  Was there any sign--any determination as to the number

6    of irrigated acres?

7    THE WITNESS:  No, sir.  There was no determination of

8    how many irrigated acres there were.

9    MR. VEEDER:  I have no further questions.

10    MR. SACHSE:  Nothing further.

11    THE MASTER: Colonel, can you turn to Exhibit M-62, Parcel

12    77, where Dale L. Stinson and Emma G. Stinson appear to be the

13    owners of the property.

14    THE WITNESS:  Yes, sir.  This property consists of about

15    six acres.  It is delineated on Plaintiff's Exhibit M-68 as

16    No. 77, and the circle appears to be below the property.  The

17    easterly end of the property abuts upon De Luz Creek.  From that

18    easterly end it extends for approximately a quarter of a mile

19    to the west.

20    Of the six acres of land which comprise this property,

21    as shown on page 3 of Plaintiff's Exhibit M-62, 4.4 acres of

22    land are suitable for irrigation.  Also the report on page 3

23    of Plaintiff's Exhibit M-62, as of the date of this report,

24    the date of the investigation, 1956, there was no water being

25    supplied to the property nor was there any evidence of any

Z-118

1  surface diversion or wells.

2  THE MASTER:  I notice, Colonel, in their answer Mr. and

3  Mrs. Stinson state water for irrigation of this land is avail-

4  able by pumping from De Luz Creek which runs through this

5  property.  You say you see no evidence that they have actually

6  so pumped?

7  THE WITNESS:  As of 1956, your Honor, there was no

8  evidence.  However, that source of water on the property, your

9  Honor, referring to the soil survey map contained in Plaintiff's

10  Exhibit M-62, the Class VIII land characteristic of the coarse

11  alluvial fill on De Luz Creek at this point, colored in purple

12  in the extreme easterly portion of the property, and the Class

13  II land colored yellow, representing alluvial terrace adjacent

14  to the creek, are the best sources of water for the property.

15  Any water pumped from those areas would be part of the stream

16  flow of De Luz Creek.

17  THE MASTER:  Could any dependable source of water be

18  obtained from any other portions of that property?

19  THE WITNESS:  No, sir.  In my opinion no reliable source

20  would exist anywhere by pumping.

21  THE MASTER:  I notice that their answer contains figures

22  as to irrigable acreage and potential use which are the same

23  as those found on page 3 of your report, and that they state

24  that their intentions are in accordance with the engineering

25  report No. 220-9S/4/5, which appears to be the same number as

Z-119

1    shown on the engineering report No. M-62.

2         THE WITNESS:  Yes, sir.

3         THE MASTER:  Mr. Veeder, do you have any questions?

4

5                    DIRECT EXAMINATION

6    BY MR. VEEDER:

7         Q  How do these lands compare with other lands in the

8    area, Colonel, as you observed them to be developed for the

9    purpose of agriculture?

10        A  These lands are comparable to other lands of similar

11   classification in De Luz Creek watershed.

12        Q  Based upon your experience in this area is it your

13   opinion it is reasonably expected that these lands will be

14   ultimately developed for that purpose?

15        A  Yes, sir.  My opinion is that that is a reasonable

16   expectation.

17        Q  When you testified with regard to the development

18   of these lands, and to the parcels to which you testified this

19   morning, you have directed your testimony, have you not, to

20   use of water for the purpose of irrigation?

21        A  Yes, sir.

22        MR. VEEDER:  I have no further questions.

23

24

25

Z-120

CROSS-EXAMINATION

BY MR. SACHSE:

Q  Colonel, would your answer be the same as your answer given to me on these other properties, that you have no specific information as to the plans for development of the parcel?

A  Yes, sir.

MR. SACHSE:  No questions.

(Discussion off record.)

THE MASTER:  We will recess then until 9:30 tomorrow morning.

(Adjournment at 3:15 P.M., to July 2, 1958, at 9:30 A.M.)