Case 3:51-cv-01247-JO-SBC   Document 4735   Filed 09/24/63   PageID.44339   Page 1 of 157   ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

———

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

Volume:   15

Pages     1887-2041

Date:     July 2, 1958

Place:    Fallbrook, California

### RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS

1113 FIRST NATIONAL BUILDING

SAN DIEGO 1, CALIFORNIA

BELMONT 9-4191

1    APPEARANCES:

2          WILLIAM H. VEEDER, ESQ.,
              For United States of America.
3
          WILLIAM E. BURBY, ESQ.,
4             For United States of America.

5          LT. DAVID W. MILLER,
              For United States of America.
6
          FRANZ R. SACHSE, ESQ.,
7             For Fallbrook Public Utility District

8

9          HOMER C. and MARION J. McDOWELL,
              in pro per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | 1890 | 1891 | 1911 | 1919 |
| | | | 1922 | 1926 |
| | | | | 1989 |
| | | 1991 | | |
| | 2034 | 2035 | | 2014 |

| For the Defendants: | | | | |
|---|---|---|---|---|
| Felix R. Garnsey | 1928 | 1962 | 1987 | |
| Richard F. Mathews | 2018 | 2033 | | |

1888

## INDEX TO EXHIBITS

| | | Iden. | Rec'd |
|---|---|---|---|
| **For the Plaintiff:** | | | |
| M-96 | Report of Engineering investigation on De Luz watershed Parcel No. 37. | 1889 | 1890 |
| | | | |
| **For the Defendants:** | | | |
| MD-W | Application to divert water | 1948 | 1949 |
| MD-X | Storage permit | 1947 | 1949 |

1889

b2

1      Fallbrook, California, July 2, 1958; 9:30 A.M.

2

3      THE CLERK:  Court is now in session.

4      THE MASTER:  Are you ready?

5      MR. VEEDER:  Yes, your Honor.

6      THE MASTER:  Are you ready?

7      MR. SACHSE:  Yes.

8      THE MASTER:  Will counsel give their appearances?

9      MR. VEEDER:  William H. Veeder for the United States.

10     LT. MILLER:  David W. Miller for the United States.

11     MR. BURBY:  William E. Burby for the United States.

12     MR. SACHSE:  Franz R. Sachse for Fallbrook Public Utility

13  District, and named individual defendants.

14     THE MASTER:  Are there any defendants in the courtroom

15  who are appearing without an attorney?   I note Mr. McDowell.

16     Is there any other defendant without an attorney?

17     Very well.  Will you proceed, then?

18     MR. VEEDER:  Will you take the stand, please, Colonel

19  Bowen.

20     Would you mark this for identification, the Garnsey

21  engineering report?  And that will be Plaintiff's Exhibit--

22     THE CLERK:  M-96.

23     MR. VEEDER:  M-96.

24

25

b3

1                     ALLEN C. BOWEN,

2    recalled as a witness, having been previously sworn, testified

3    as follows:

4

5                     DIRECT EXAMINATION

6    BY MR. VEEDER:

7        Q  Colonel Bowen, I hand you Plaintiff's Exhibit marked

8    for Identification M-96, and I ask you to state what that

9    identification is?

10       A  Plaintiff's Exhibit M-96 is a copy of the report of

11   an engineering investigation made on De Luz watershed Parcel

12   No. 37, and the name appearing on the cover of the report is

13   Felix R. and Theodora L. Garnsey.

14       Q  Was that prepared under your direction, Colonel?

15       A  Yes, sir.

16       Q  Do you know it to be accurate and correct?

17       A  Yes, sir.

18       MR. VEEDER:  I offer in evidence Plaintiff's Exhibit

19   marked Identification M-96.

20       THE MASTER:  That will be received in evidence and so

21   marked.

22       Did you wish to interrogate Colonel Bowen--

23       MR. VEEDER:  I thought I would let Mr. Sachse go ahead.

24       THE MASTER:  I would suggest that Colonel Bowen mark on

25   the map with a red X Parcel 37 in the same fashion as the others.

1891

4b

1      THE WITNESS:  Referring to Plaintiff's Exhibit M-32,

2  the property reported on in Plaintiff's Exhibit M-96, is delin-

3  eated with the number 37 encircled contained within the exterior

4  boundaries of the property.  And I will mark with a red pencil

5  a cross through that property.

6      MR. SACHSE:  I wonder if we could at the same time by

7  agreement with Mr. Veeder or Lt. Miller get rid of that little

8  mark in the middle?

9      THE MASTER:  Number 43 is entirely encircled by 37.

10      MR. SACHSE:  It is another ownership that is a relative

11  of Mr. Garnsey's, it is a cemetery tract.

12      THE MASTER:  It is an island completely surrounded by 37.

13      MR. VEEDER:  What do you want?

14      MR. SACHSE:  I don't think there will be an appearance

15  on it.

16      THE MASTER:  My notes indicate that a half acre domestic

17  stipulation has been filed with reference to that parcel.

18      MR. VEEDER:  We can check it off and get rid of it.

19

20                      CROSS-EXAMINATION

21  BY MR. SACHSE:

22      Q  Colonel Bowen, I will direct your attention to M-68.

23  Am I correct in stating that Cottonwood Creek flows through this

24  parcel from the northwest to a junction with the west fork of

25  De Luz Creek just off the east line of the property in Section

5b

1    29?

2        A   Plaintiff's Exhibit M-68 shows that Cottonwood Creek

3    enters the northerly boundary of Parcel No. 37 and flows south-

4    easterly to its confluence with the main stem of De Luz Creek,

5    and that confluence is shown within the boundaries of Parcel No.

6    37 on Plaintiff's Exhibit M-68.   But on Plaintiff's Exhibit M-96

7    the confluence of Cottonwood and De Luz Creek is shown outside

8    the boundaries of Parcel No. 37.

9        Q   Now, this is the same confluence we were discussing

10   in connection with the Klein property yesterday, was it not?

11       A   Yes, sir.

12       Q   And it is your opinion that the photograph is perhaps

13   more correct than the map, and the confluence is just off the

14   Garnsey property?

15       A   Yes, sir.

16       Q   Now, with particular reference to the land utilization

17   overlay I see it indicates that De Luz Creek, or the west fork of

18   De Luz Creek does abut on the east line of the Garnsey property.

19   Is that correct?

20       A   Yes, sir.   The land classification map contained in

21   Plaintiff's Exhibit M-96 shows that the main stem of De Luz Creek

22   enters the parcel and flows for a distance of approximately an

23   eighth of a mile through the property, and leaves the property

24   just shortly above its confluence with Cottonwood Creek.

25       Q   Now, moving south on the land utilization overlay map

b6

1   I see an intermittent stream symbol, and a substantial area of

2   Class VIII soil crossing the property from west to east.  Do you

3   see to what I am referring?

4       A   Yes, sir.

5       Q   Can you describe that stream, please?

6       A   Well, that--

7       MR. VEEDER:  Your Honor, I would--  Could we have these

8   references as to legal description, the smallest legal descrip-

9   tion, because right now I haven't the slightest idea where it is.

10   I would like to have it in the record when the Colonel is testi-

11   fying.

12       THE MASTER:  In other words, the quarter section through

13   which the streams run?

14       MR. VEEDER:  Yes.

15       THE MASTER:  Very well.  Colonel, if you will identify the

16   quarter sections through which Cottonwood Creek and the main stem

17   of De Luz Creek run, and also this intermittent stream runs.

18       MR. SACHSE:  Let's back up and start over again, Colonel.

19       Q   With Cottonwood Creek it enters the Garnsey property in

20   the southwest quarter of Section 19.  Is that correct--southeast

21   quarter of Section 19?

22       A   Yes, sir.  More particularly, the south half of the

23   southeast quarter of the southeast quarter, Section 19, Township

24   8  South, Range 4 West; and it flows through the northwest quar-

25   ter of the northeast quarter of Section 30, Township 8 South,

7b

1   Range 4 West; the northeast quarter of the northeast quarter,

2   Section 30, 8 South, 4 West; the southeast quarter of the north-

3   east quarter, Section 30, 8 South, 4 West; and the southwest

4   quarter of the northwest quarter, Section 29, 8 South, 4 West--

5       Q   Now, that particular section--that particular quarter

6   section is the point of its confluence with De Luz Creek, is it

7   not?

8       A   No, sir.  Its confluence with De Luz Creek is in the

9   southeast quarter of the northwest quarter, Section 29, 8 South,

10  4 West, as shown in Plaintiff's Exhibit M-96.

11      Q   All right.  Will you similarly trace the flow of De

12  Luz Creek to its confluence with Cottonwood Creek?

13      A   De Luz Creek flows through Parcel No. 37, wholly within

14  the southwest quarter of the northwest quarter, Section 29, 8

15  South, 4 West.

16      Q   Now, Colonel, directing your attention to M-38-- pardon

17  me, M-68, I see an intermittent stream symbol in the south half

18  of Section 30, flowing from west to east.  Do you see the symbol

19  to which I refer?

20      A   Yes, sir.

21      Q   Now, that symbol enters the Garnsey property in the

22  northeast quarter of the southeast quarter--

23      A   No, sir, in the northwest quarter of the southeast

24  quarter, Section 30, 8 South, 4 West.

25      Q   That is right.  And flows across the Garnsey property

1    in a westerly to easterly direction--

2          MR. VEEDER:  Now, that is an unnamed--

3          MR. SACHSE:  Unnamed stream.

4          THE WITNESS:  Yes, sir, it flows through the northeast

5    quarter of the southeast quarter, Section 30, 8 South, 4 West;

6    and it flows through the northwest quarter of the southwest

7    quarter, Section 29, 8 South, 4 West, and has its confluence

8    with De Luz Creek easterly of Parcel No. 37.

9    BY MR. SACHSE:

10         Q   All right.  Now, what kind of a stream is that?

11         A   That is an intermittent stream.

12         Q   By that you mean a stream that flows only during and

13   after periods of rainfall?

14         A   Yes, sir.

15         Q   You visited this area yesterday, did you not, Colonel?

16         A   Yes, sir.

17         Q   Did you notice whether or not the stream was flowing

18   at the point where the road crosses it on Parcel 37?

19         A   Yes, sir.

20         Q   Was it flowing?

21         A   No, sir.

22         Q   And similarly did you notice whether or not Cottonwood

23   Creek was flowing at the point where the road crosses Cottonwood

24   Creek on Parcel 37?

25         A   There was no surface flow across the concrete ford.

9b

1    Q  But there was damp spots on both sides of the ford,

2   was there not?

3    A  Yes, sir, and some standing water.

4    Q  Now, Colonel Bowen, I will direct your attention to the

5   land utilization map in Exhibit M-96, and I see a large symbol

6   in the watershed of Cottonwood Creek for a dam and a lake.  Are

7   you familiar with that?

8    A  Yes, sir.

9    Q  Can you tell us what it is?

10    A  An earth dam, impounding water in the reservoir, sym-

11   bolized on the land classification--soil classification map in

12   Plaintiff's Exhibit M-96.

13    Q  Referring particularly to page 3 of M-96, the tabula-

14   tion at the top of the page water surface 2.9 acres.  Do you see

15   the figure to which I refer?

16    A  Yes, sir.

17    Q  Is that the water surface of the lake we have just

18   discussed?

19    A  Yes, sir.

20    Q  Now, there is in this property also a reservoir, is

21   there not?

22    A  Yes, sir.

23    Q  Can you locate that for us on the land utilization

24   chart?  I direct your attention, Colonel, I believe you will

25   find it directly south of the cemetery plot.

10b

1      A  Yes, sir.  The reservoir--  Referring to the land

2  classification map in Plaintiff's Exhibit M-96, it is approxi-

3  mately the center of the parcel, a dash--a rectangle bounded by

4  a dash line with the abbreviation for cemetery contained in it.

5  And on the photograph the reservoir appears as a dark rectangle

6  surrounded by a white rectangle.

7      Q  Now, are there any other water storage facilities in

8  this tract, to your knowledge--surface storage facilities?

9      A  No, sir, not to my knowledge.

10      Q  Now, I notice a great many intermittent stream symbols

11  brushed in on the map other than the Cottonwood Creek, De Luz

12  Creek and the intermittent stream we have heretofore discussed.

13  Would you characterize all of those as streams running only

14  during and after heavy rain?

15      A  Yes, sir.

16      Q  Now, with reference to the soil classification, am I

17  correct in saying that a large portion of the center of tract--

18  of Parcel 37 is alluvial material shown generally in the yellow

19  areas on the land utilization map?

20      A  Yes, sir, that is correct.

21      Q  And I see in your report the--am I correct in assuming

22  that in your opinion such material is an excellent water producing

23  source?

24      A  Yes, sir.  On page 1 of the report, in the last para-

25  graph in the geology section, it describes the characteristics

11b

1   of those clastics.

2       Q   Are you familiar with the wells on the property?

3       A   The well is located, or wells are located about 300

4   feet southeast of the residence, which appears on the photograph

5   centrally located in the easterly part of the parcel, large

6   trees and buildings indicate the location of the residence.

7       Q   Are you aware, Colonel, that there are actually two

8   wells very close together in that same area?

9       A   Yes, sir.  I used plural in wells.  One supplies domes-

10   tic water, and the other a three foot diameter concrete lined

11   dug well, 54 feet deep, is adjacent to the domestic well.  And it

12   is reported on page 3 of Plaintiff's Exhibit M-96 in the engin-

13   eering section.

14       Q   Now, I notice on page 3 in the engineering section the

15   sentence, "De Luz Creek is also a good water source and could

16   supply additional water to this property.  At present this source

17   is not being used."

18      When you say "not being used," do you have in mind the

19   fact that there is no pumping from the De Luz Creek alluvium?

20       A   No, sir, there is no permanent surface diversion in

21   there.

22       Q   In your opinion--

23      MR. VEEDER:  I didn't understand the response to that.

24      THE WITNESS:  I say there is no permanent surface diversion

25   on the De Luz Creek which flows through the property.

12b

BY MR. SACHSE:

1

2    Q  In so far as this alluvial material which you have

3    testified is the best source of water is concerned, what water

4    source do you believe supplies the alluvial material?

5    A  Well, that is part of the De Luz stream.

6    Q  In other words, you feel that the extractions from the

7    underground in effect are a part of both De Luz Creek and Cotton-

8    wood Creek streams.  Is that right?

9    A  Yes, sir.

10   Q  Now, Colonel, are you familiar with the mechanical

11   operations of the irrigation system on this property?

12   A  I believe it is largely by sprinklers.

13   Q  I have in mind, rather, how the water is moved from

14   its sources to its points of application.

15   A  I am not sure I understand the question.

16   Q  Well, I think it is covered in the engineering section

17   of your report on page 3, and I simply want to bring it out in

18   testimony.

19   Am I not correct in saying that water is moved by gravity

20   from the reservoir in Cottonwood Creek to the earth filled

21   reservoir south of the cemetery, and from that point either by

22   gravity or by use of boosters to the point of application else-

23   where on the parcel?

24   A  Yes, sir, that is correct.

25   Q  And the wells to which you have already testified can

13b

1      be used also to directly irrigate off the pump, can they not?

2          A  Yes, sir.

3          Q  I notice on the same page in a section of your report

4      you refer to a 40 acre foot capacity reservoir.  Have you calcu-

5      lated that capacity, or was that an estimate?

6          A  We didn't make any cross sections on the reservoir.

7          Q  That is a calculation based on its surface area and

8      estimated depth then?

9          A  Yes, sir.

10         Q  Now, am I not correct in saying that the Garnsey pro-

11     perty is the most intensively developed property that you know

12     of at this time in the De Luz watershed?

13         A  Yes, sir.

14         Q  I notice in your report, Colonel, pages 2 and 3, you

15     refer to maximum developed acres on page 3; and then on page

16     2 to the areas suitable for irrigation.

17             Now, you are not implying that all of those areas are

18     presently developed, are you?

19         A  No, sir.

20         Q  Do you have any calculation of the amount of land that

21     is presently in cultivation?

22         A  No, sir.

23         Q  Colonel Bowen, I have before me--I will show this to

24     you solely to refresh your recollection--an undated document

25     that is signed Captain Willis E. Lee, and it appears to be an

**1901**

14b

1   earlier report.  I am not going to offer this, I simply want you

2   to use it to refresh your recollection.  If you will look in

3   there I think you will find a calculation of the actual culti-

4   vated acreage at the time that report was made.

5        A  At the time that this first investigation was made in

6   May of 1952 it is reported that 25 acres of deciduous fruit,

7   that is peaches and grapes, 15 acres of row crops, and 20 acres

8   of pasture were being irrigated.

9        Q  Now, what are you using to refresh your recollection?

10       A  I am using a copy of an engineering report prepared

11   in 1952 on this same Parcel No. 37.

12       Q  And a report prepared by the same office of which you

13   are now in charge?

14       A  Yes, sir.

15       Q  Now, can you estimate for us whether there is a greater

16   amount of acreage in cultivation today, or a lesser amount?

17       A  I believe there is a greater amount in irrigation to-

18   day.

19       Q  Now, Colonel, with reference to other water sources

20   on the property other than the alluvium or the streams, and

21   with particular reference to the portion of this property loca-

22   ted in the north half of the northeast quarter of Section 30,

23   Township 8 South, Range 4 West, what would your opinion be as

24   to the ground waters found in that area?

25       MR. VEEDER:  I am going to object to that question, your

15b

1  Honor.  I don't understand it, to begin with.  "What is your

2  opinion with regard to the ground waters found in that area."

3       MR. SACHSE:  I will rephrase the question.

4       Q  Would you conclude that any ground waters developed

5  in that area would necessarily be part of Cottonwood Creek, or

6  would be vagrant local percolating water?

7       A  Referring to the soils map, the land classification map

8  contained in Plaintiff's Exhibit M-96, Cottonwood Creek, as

9  heretofore stated, flows through the north half of the northeast

10  quarter of Section 30.  And the Class VIII, the purple area,

11  and the Class II or yellow area immediately above the reservoir

12  shown on the map are alluvial in character, and any water ex-

13  tracted from those areas is part of the Cottonwood stream,

14  Cottonwood Creek.

15       Q  Now, with particular reference to the Class VII soils,

16  I think as shown in the overlay in Field 1, watershed protection,

17  what would your conclusions be as to water developed in those

18  areas?

19       MR. VEEDER:  Now, again I ask that we get legal subdivisions

20  on those.

21       THE MASTER:  It is the same subdivisions referred to before.

22       THE WITNESS:  Field 1 shown on the land utilization overlay

23  in Plaintiff's Exhibit M-96 includes that area of Class VIII land

24  along Cottonwood Creek.  Referring more particularly then to the

25  Class VII or brown colored areas which are contained in Field

16b

1    No. 7, they are in contact with the alluvium bordering Cotton-

2    wood Creek, and water can move through the joints, fractures

3    and the residual materials into that alluvium underground.

4    BY MR. SACHSE:

5        Q  Well, then, do you care to express any opinion as to

6    whether waters developed in this area you have just described

7    would or would not be vagrant percolating ground water?

8        A  In the Class VII lands in the northwest quarter of

9    the northeast quarter, Section 30, 8 South, 4 West, it would

10   be my opinion that waters   developed in that Class VII area

11   would be vagrant percolating water.

12       Q  Now, Colonel, directing your attention to the southerly

13   portion of Parcel 37, am I correct in stating that there is

14   a small subwatershed divide there and, if so, will you locate

15   it for us more exactly?  A subwatershed divide between Camps

16   Creek and De Luz Creek?

17       A  Yes, sir.  Referring to Plaintiffs Exhibit M-68, it is

18   noted that a ridge line in the southeast quarter of the south-

19   east quarter moving diagonally from the northwest to the south-

20   east forms a divide between Camps Creek and De Luz Creek; Camps

21   Creek to the south and west, and De Luz Creek to the north and

22   east.

23       Q  Now, Colonel, would you look again at the land utiliza-

24   tion overlay on Exhibit M-96, and am I correct in saying that

25   that divide would follow the high ground shown as Field No. 7

17b

1    on the overlay?

2        A  Yes, sir, that's correct.

3        Q  Now, what is the character of the material lying south

4    and west of that divide in the watershed of Camps Creek as to

5    alluvial or non-alluvial?

6        A  A small portion of it may be alluvial in nature, but

7    the majority of the lands classified in the southeast quarter

8    of the southeast quarter of Section 30, 8 South, 4 West, are

9    non-alluvial in nature.

10       Q  And what is your opinion of those soils in Fields 13,

11   14 and 15 as shown on the land utilization overlay as far as

12   water producing potential is concerned?

13       MR. VEEDER:  I am going to object, your Honor, to any

14   further testimony along this line, because it is apparent that

15   there has been no compliance with State law in regard to the

16   appropriation rights to the use of water.

17       I have examined the applications submitted to me this

18   morning by Mr. Sachse, and I am referring now to application

19   number 13505 and to application number 9783.  It is apparent

20   that there are two kinds and types of claims that have been made.

21   I will change the word "claim" to applications.

22       The one application is, as I see it, an application to

23   appropriate one second foot of water from De Luz--from Cotton-

24   wood Creek by a direct diversion, the point of diversion being

25   located south 45 degrees and east 85 degrees from the southeast

corner of Section 19, being within the northwest of the north-

east of Section 30, Township 8 South, Range 4 West.

It is apparent that the pumping that is being done and

has been done doesn't conform with that point of diversion.

In fact, as the Colonel has now testified, that there is no

established point of diversion for the irrigation of this

property.

The next objection which I desire to interpose is that the

application 13505 is apparently for a storage right, and it is

evident that water could not be utilized in many of the areas

concerning which evidence is now being  elicited from the

structure purportedly built pursuant to--I am assuming pursuant

to this application.

So the testimony up to this point, in my view, should be

stricken, and I move to strike it, because there is no compli-

ance with State law.  There is no authority, as I see it, to

utilize any of the water other than the rights claimed pursuant

to the application to which I have made reference.  And I ob-

serve that for application number 9783 permit number 5505 was

issued, and it conforms with the application.  Similarly, permit

number 8166 apparently conforms with application number 13505.

Thus we have pumping from the alluvium for which no authority

has been obtained, and in my view Mr. Sachse's client has not

conformed with State law, and I don't believe that they have

any right to the use of water under the State laws of California.

19b

1    MR. SACHSE:  This is the greatest non-sequitur I have

2    heard in my life.

3    THE MASTER:  I don't think it is necessary.  In my view,

4    regardless of the applications to appropriate water, the testi-

5    mony is pertinent to the sources of underground water which

6    are available for use on this property under proper conditions,

7    and therefore this testimony is just as material and relevant

8    as testimony concerning the nature of water found under any

9    other parcel of property.

10    Now, the mere fact that the water may or may not be used

11    in accordance with permits is in my opinion immaterial.  And the

12    objection is overruled, and the motion to strike is denied.

13    MR. VEEDER:  I desire to interpose an additional objection,

14    your Honor, that the evidence which has been introduced and is

15    now being elicited does not conform with the pleadings, and that

16    there is a variance between this evidence which is now being

17    elicited and pleadings which were filed in this case on June 18,

18    1951; and there apparently was an additional filing in response

19    to the amendatory and supplemental complaint, the answer is

20    dated April 25, 1958.

21    Now, the evidence which is being offered is certainly

22    at variance with the answer, and I would ask your Honor to ob-

23    serve the paragraphs number 11 and--  Beg your pardon--9 and 10

24    of the--he has got it scattered through here--paragraph 5,

25    apparently a prescriptive right is claimed; and in paragraphs

20b

1   9 and 10 apparently an effort is being made to set up these

2   claims made pursuant to the applications to which I made refer-

3   ence.

4        MR. SACHSE:  Now, your Honor, to save your time reading

5   all of this, Mr. Veeder mentioned 9 and 10 which plead the

6   applications, that is quite correct.  But if you will just jump

7   back to eight, the immediately preceeding paragraph, it claims

8   the right to use a reasonable amount of water flowing in the

9   creeks as riparian owners, claims the right to use the under-

10  ground percolating waters.

11       Paragraph 3 pleads that the defendant's property overlies

12  water bearing strata, sand and gravel, and it pleads the right

13  to use those waters.

14       I haven't offered a word of testimony on the permits yet.

15  If Mr. Veeder wants to wait, he will have plenty of chance to

16  object.

17       My purpose now is to establish the rights of the Garnsey's

18  to  other than appropriative waters.

19       THE MASTER:  I think, Mr. Veeder, the Court must receive

20  evidence as to all sources of water within the watershed, and

21  also evidence that constitutes parts or does not constitute

22  parts of the subsurface flow of any stream within the watershed.

23  And in order to reach that decision I think we must have evi-

24  dence as fully as can be supplied with reference to that water

25  in each parcel of property; and the fact that it may or may not

21b

1   be within the issues raised by any particular answer does not,

2   I believe, justify the Court in precluding the introduction of

3   such evidence.

4        MR. VEEDER:  Well, I have my objection in.

5        THE MASTER:  The objection is overruled.  And you may

6   proceed, Mr. Sachse.

7        MR. SACHSE:  Well, rather than to ask the reporter to

8   dig back to the last question I think I can remember it.

9        Q   I was directing your attention to Fields 13, 14 and 15

10  as shown in the land utilization overlay, and which lie in the

11  Camps Creek watershed, and ask your opinion of the materials

12  in those fields as far as water producing capabilities are con-

13  cerned?

14        A   The soils in those Fields 13, 14 and 15, as shown on

15  the land utilization overlay contained in Plaintiff's Exhibit

16  M-96, are largely primary soils; that is, they are developed

17  in place as opposed to secondary or transported soil.  But the

18  relatively slight relief of those fields is evidenced by the

19  Classes III and IV in Field 14, most particularly, have resulted

20  in a deeper weathering, and that deeper soil continues on to the

21  clastics contained in Camps Creek, and it is possible for water

22  to move underground through that area into the Camps Creek allu-

23  vium.

24        THE MASTER:  You used the phrase "relatively slight relief"?

25        THE WITNESS:  Yes, sir.

22b

1      THE MASTER:  What do you mean by that phrase?

2      THE WITNESS:  Well, the relief is the degree of slope

3  and--

4      THE MASTER:  It is the relief in the same sense as when

5  you refer to a relief map then?

6      THE WITNESS:  Yes, sir.

7  BY MR. SACHSE:

8      Q  So if I understand you correctly, would it be your

9  opinion that water developed in those fields might be a part of

10  the stream system of Camps Creek?

11      A  Yes, sir.

12      Q  Now, do we not have--I frankly can't read the contours

13  accurately enough--but do we not have also another divide--  Let

14  me rephrase that.

15      Directing your attention to the divide that we just dis-

16  cussed, as shown generally speaking in Field No. 7--

17      A  Yes, sir.

18      Q  --drainage east of that divide would go where, immedi-

19  ately east of the divide?

20      A  Well, it flows into De Luz Creek.

21      Q  Well, would it flow into De Luz Creek direct, is what

22  I am trying to find out, or would it flow into De Luz Creek or

23  would it flow into De Luz Creek via the intermittent stream

24  shown in purple?

25      A  A portion of the water drainage easterly from the

1910

23b

1   divide contained in Field No. 7 as shown on the land utilization

2   overlay, Plaintiff's Exhibit M-96, would flow into the unnamed

3   tributary traversing the property, and contained within the

4   purple or Class VIII area south of the cemetery, and a portion

5   of it would flow into De Luz Creek by way of the small intermit-

6   tent stream shown traversing Fields 16 and 17 on the land utili-

7   zation overlay.

8   Q  With particular reference then to the waters that might

9   be developed in Field 16, what would your conclusion be as to

10   whether or not they would be part of the waters of any stream?

11   A  Well, although the soils in Field No. 16 shown on the

12   land utilization overlay are upland soils, are residual soils

13   in character, they are in contact with an extensive area of

14   alluvium which is shown in Field 18 to the north, and 17 to the

15   south and east, and water could move through the residuum and

16   the joints and fractures in through that alluvial and be in

17   contact with the water in the alluvium.

18   Q  Have you made any calculations of the depth of the

19   alluvium, for example, in Field 10?

20   A  No, sir.  The only information that we have of the

21   depth of the alluvium is contained--I mean is revealed by the

22   wells which penetrate the alluvium.

23   Q  And they did not go to bedrock, as I understand it?

24   A  No, sir, that is my understanding.

25   Q  So the alluvium would appear to be at least 53 feet

24b

1   deep in the first well?

2        A   Yes, sir--   54 feet is the depth of the well.

3        Q   And have you made any other tests elsewhere in the

4   alluvium that might indicate its depth?

5        A   No, sir, we have drilled no deep wells in that alluvial

6   body.

7        Q   So then you would be unable to estimate the water

8   holding capacity of the alluvial basin here?

9        A   That is correct.

10       MR. SACHSE:   I think that is all, sir.

11       THE MASTER:   Mr. Veeder?

12       MR. VEEDER:   I have a few questions.

13

14                    REDIRECT EXAMINATION

15  BY MR. VEEDER:

16       Q   Now, Colonel, have your investigations revealed the

17  place of use of the waters impounded in the reservoir constructed

18  on Cottonwood Creek?

19       A   Yes, sir.   The water impounded in the reservoir on

20  Cottonwood Creek is used generally throughout the irrigated

21  area on the property.

22       Q   And it is not limited to any particular pieces or

23  parcels of land.   Is that correct?

24       A   That is correct, sir.

25       Q   And how is that water distributed from the reservoir,

25b

1    by pipe line?

2         A  Yes, sir.

3         Q  And is the water used, for example, in your Field 10?

4    Is that storage water that is impounded there--I mean used there?

5         MR. SACHSE:  What field?  I didn't hear the number.

6         MR. VEEDER:  10.

7         MR. SACHSE:  10?

8         MR. VEEDER:  Yes.

9         THE WITNESS:  Yes, sir, when it is available.

10   BY MR. VEEDER:

11        Q  And what about Field 8?

12        A  Yes, sir, water may be supplied to Field 8 from the

13   reservoir.

14        Q  And how is it delivered to that field?

15        A  By pipe line and sprinklers.

16        Q  Is it gravity or pumped?

17        A  I believe that the water has to be pumped up to that

18   field, it is a little higher elevation.

19        Q  Now, in regard to Field 18, how is the water impounded

20   in the reservoir on Cottonwood Creek and delivered?

21        A  I don't believe Field 18 is being presently irrigated.

22        Q  It is not?

23        A  No, sir.  But I assume if it were--

24        Q  Well, if it is not being irrigated there is no question.

25        Now, you stated that there was no set point of diversion

26b

1   for the surface use of water.  Is that correct?

2        MR. SACHSE:  I don't recall such a statement.

3        THE MASTER:  I don't recall that statement, Mr. Veeder.

4   BY MR. VEEDER:

5        Q  Where is the point of diversion for the surface diver-

6   sions from Cottonwood Creek?

7        A  Well, the source of diversion is the dam.

8        Q  The point of diversion?

9        A  The point of diversion is the dam.

10        Q  And where is that dam?

11        A  The dam is located on Cottonwood Creek in--

12        Q  Now, I want to be sure.  You are speaking of the dam

13   which impounds the water for the reservoir, or are you speaking

14   of the diversion dam?

15        A  I am speaking of the earth filled dam which impounds

16   water in the reservoir.

17        Q  And do you know whether that diversion takes direct

18   flow water, or whether it is impounded water that is diverted?

19        A  Well, from that point water is delivered from the large

20   reservoir on Cottonwood Creek to the irrigation system.

21        Q  Would you state whether the direct flow of Cottonwood

22   Creek is sufficient to irrigate the lands which are presently be-

23   ing irrigated?

24        MR. SACHSE:  I will object, if the Court please.  There

25   is no foundation that this witness has any knowledge whatsoever

27b

1    as to the flow of Cottonwood Creek.

2         THE MASTER:  It was stated in the record.  That objection

3    is probably well taken.  I don't believe there is anything in

4    his testimony to show that he is familiar with the flow of the

5    creek.  He may be, but the record doesn't so show.

6    BY MR. VEEDER:

7         Q  Have you observed the flow of Cottonwood Creek, Colonel?

8         A  Yes, sir.

9         Q  Throughout the dry season of the year?

10        A  Well, I have observed it from time to time and point

11   to point in about every month of the year.

12        Q  And based upon those observations, would you state

13   whether in your opinion the flow of Cottonwood Creek would be

14   adequate to irrigate all of the lands presently irrigated during

15   the period from July of each year through August of each year?

16        MR. SACHSE:  I will object again, your Honor, until there

17   is some foundation.  As to the flow of Cottonwood Creek at

18   what point?  We have testimony from Colonel Bowen that it was

19   dry yesterday at one place, but standing water some place else.

20        THE MASTER:  Can you limit your question--

21        MR. VEEDER:  I will ask some more questions, your Honor;

22   this is very important to us.

23        Q  Throughout the Garnsey property have you observed the

24   flow of Cottonwood Creek during the dry season of the year?

25        A  Well, at points along the creek.  I have never walked

28b

1    out the entire creek through the Garnsey property.

2            Q   Well, at the northern extremity have you at the point

3    where the Cottonwood Creek enters the Garnsey property, have you

4    observed the flow of Cottonwood Creek?

5            A   No, sir, I have never gone right down into the creek--

6            Q   Have you observed the flow of Cottonwood Creek above

7    the reservoir?

8            A   Yes, sir, above the reservoir, but beyond the Garnsey

9    property.

10            Q   And how far above the Garnsey property?

11            A   Approximately an eighth of a mile.

12            Q   Are there any--  What confluence, if any, or effluence

13    tributaries to Cottonwood Creek are situated between that area

14    where you have made your observations and the northern line of

15    the Garnsey property?

16            A   There are no significant effluences to Cottonwood

17    Creek below the point I made the observations.

18            Q   What is your opinion as to the point where you observed

19    Cottonwood Creek, and where Cottonwood Creek enters the Garnsey

20    property as to whether the point of observation would be

21    reflective of the flow of the water entering the Garnsey property?

22            MR. SACHSE:   I will object, if the Court please, it is

23    incomprehensible and there is no foundation for comparing what

24    happened an eighth of a mile above with what happened an eighth

25    of a mile below.

29b

1        THE MASTER:  I think the question is comprehensible as

2   to whether the stream flow would be different an eighth of a

3   mile above.  It is a question of weight and may be inquired into

4   by you in cross-examination.  The objection is overruled. At

5   least I understand the question.  Do you understand the question,

6   Colonel Bowen?

7        THE WITNESS:  Yes, sir.  It is a little difficult on

8   this stream, Mr. Veeder--

9        MR. VEEDER:  I will ask you another question then.

10       Q   What points on the Garnsey property have you observed

11  Cottonwood Creek flowing?

12       MR. SACHSE:  What was the last word, did you say "flowing"?

13       MR. VEEDER:  Yes.

14       THE WITNESS:  Well, I have observed Cottonwood Creek flow-

15  ing on the Garnsey property a short distance above its confluence

16  with De Luz Creek.

17  BY MR. VEEDER:

18       Q   And based on that observation is it your opinion--now,

19  speaking of the period after July 1st--in your opinion would

20  the surface flow be sufficient to irrigate all of the lands

21  presently irrigated?

22       MR. SACHSE:  If your Honor please, I will object--  I have

23  no objection to that answer--to that question being answered,

24  but not the way it is put.  That is a compound question; that

25  involves three different conclusions, how much water was in the

30b

1   creek, how much land was being irrigated, and to which of the

2   irrigated lands would the waters be put.  If Mr. Veeder was to

3   ask him what he thinks the flow of the creek was at that point

4   I have no objection.

5        MR. VEEDER:  I am not asking him that.  I am asking him

6   if the flow that he observed was in his opinion sufficient to

7   irrigate the lands that are presently irrigated on the property.

8        MR. SACHSE:  There is no information as to crops--  Colonel

9   Bowen testified expressly he didn't know, and this report doesn't

10  show what is presently being irrigated.

11       THE MASTER:  Just a moment.  Colonel Bowen testified to

12  the land which was irrigated in 1952, as shown by the previous

13  report, and testified that at the present time a greater acreage

14  was being irrigated.  That is my recollection, the extent of his

15  testimony as to present acreage.  I believe that the question

16  is definite enough, if the Colonel thinks that he can answer it.

17  The objection is overruled.

18       THE WITNESS:  I did not believe that the surface flow of

19  Cottonwood Creek near its confluence with De Luz Creek in the

20  dry months of the year is adequate to irrigate the lands presently

21  being irrigated on the Garnsey property.

22  BY MR. VEEDER:

23       Q  Have you personal knowledge as to the source of the

24  water then that is presently being used to irrigate the lands

25  presently irrigated on the Garnsey property?

31b

1      A   Well, some of the water is being taken out of the

2   reservoir on Cottonwood Creek, and some is being pumped from the

3   surface stream flow of Cottonwood Creek near its point of con-

4   fluence with De Luz Creek.

5      Q   Have you any way of knowing whether that water that is

6   being pumped is stored water or whether it is natural surface

7   flow of the stream?

8      A   Natural surface flow of the stream.

9      Q   It is not stored water that is being used then?

10     A   No, sir.

11     Q   Now, have you knowledge as to when the stored water of

12  Cottonwood Creek is utilized?

13     A   Well, it is utilized--

14  MR. SACHSE:   Have you knowledge.   Can I ask that that

15  question be answered?

16  MR. VEEDER:   That is right.

17  THE MASTER:   The question is do you have knowledge.

18  THE WITNESS:   Well, I haven't actually--  The answer would

19  be that I have not actually witnessed the operation, but that is

20  a primary source of water, that reservoir on Cottonwood Creek.

21  BY MR. VEEDER:

22     Q   It is a primary source of water?

23     A   Yes, sir.

24     Q   For the irrigation of the Garnsey property?

25     A   That and the well that I testified as being near the

1919

32b

1    house.

2        MR. VEEDER:   I have no further questions.

3        MR. SACHSE:   Take a short recess, your Honor?   Is this

4    a good time?

5        THE MASTER:   Yes.   We will take a ten minute recess.

6        (Recess.)

7        MR. SACHSE:   I have a few questions on recross-examination.

8

9                    RECROSS-EXAMINATION

10   BY MR. SACHSE:

11       Q   Colonel Bowen, have you either yourself or under your

12   supervision ever made any stream flow measurements of Cottonwood

13   Creek?

14       A   No, sir.

15       Q   Have you any hearsay stream flow measurements from other

16   sources of Cottonwood Creek?

17       A   No, sir.

18       Q   Have you or your own staff ever made  any stream flow

19   measurements of De Luz Creek above its confluence with Cotton-

20   wood Creek?

21       A   No, sir.

22       Q   Have you any hearsay information on that question?

23       A   No, sir.

24       Q   Have you made any calculations of the subsurface flow

25   of De Luz Creek above the junction of Cottonwood Creek?

33b

1    A  No, sir.

2    Q  Have you made any calculations as to the subsurface

3  flow of Cottonwood Creek?

4    A  No, sir.

5    Q  Then it would be impossible for you to calculate the

6  amount of water that is available for use by riparian owners on

7  Cottonwood Creek.  Is that right?

8    MR. VEEDER:  I object to that, it calls for a legal con-

9  clusion.

10    THE MASTER:  I think the objection is well taken.  The

11  objection is sustained.

12  BY MR. SACHSE:

13    Q  When you answered Mr. Veeder's question, Colonel, re-

14  garding the ability to irrigate the Garnsey property with the

15  surface flow of Cottonwood Creek, do you know how many acres

16  are presently irrigated on the Garnsey property?

17    A  No, sir.

18    Q  Do you know what crops are on the Garnsey property at

19  the present time?

20    A  Yes, sir.

21    Q  Well, you know there is a corn field you drive past

22  going up De Luz Creek?

23    A  That is right.

24    Q  Do you know how many acres of corn?

25    A  No, sir, we haven't measured the acreage in corn.

34b

1    Q   Do you know how many acres are in squash?  Did you

2    see the squash field?

3    A   Yes, sir.

4    Q   Do you know how many acres are in that?

5    A   No, sir.

6    Q   The water duties would be different?

7    A   I would say the requirements for corn and squash would

8    be about the same.

9    Q   All right.  How many acres are in grapes?

10   A   We didn't measure the acreage for any crops.

11   Q   The water requirements would be very different than

12   squash and corn?

13   A   Yes, sir.

14   Q   Do you know how many acres are in deciduous?

15   A   No, sir.

16   Q   That water duty would be different, wouldn't it?

17   A   Yes, sir.

18   Q   I will direct your attention to Field 7.  Do you know

19   what plantings actually exist south of Field 7, if any?

20   A   No, sir.

21   Q   Do you know whether there are any?

22   A   No, sir.

23   MR. SACHSE:  I have no further questions.

24

25

35b

REDIRECT EXAMINATION

BY MR. VEEDER:

Q  Colonel Bowen, referring to Exhibit M-96, would you take a pencil and mark where you observed the flow of Cottonwood Creek the last time that you were on that stream?

A  Yes, sir.  With a black pencil on the land classifica-tion map, Plaintiff's Exhibit M-96, I will mark an X--with a red pencil I will mark an X at the approximate point where I observed surface stream flow in the Cottonwood Creek on the 1st of July, 1958.

Q  And where else did you observe Cottonwood Creek?  How far up the stream did you look at that time?

A  Well, I observed the flow of the creek at the concrete ford crossing the creek about, oh, an eighth of a mile above the red X I have marked on the map.

Q  Now, would you show where you crossed the creek?

A  I will mark with a red circle on the land classification map in Plaintiff's Exhibit M-96 the approximate location of the ford crossing Cottonwood Creek on the Garnsey property.

Q  Now, where did you--  Strike that.

And where is the corn field along the road, would you mark that, before you came to the ford?

A  North of the ford.  The corn field is in the Class II area colored yellow on the land classification map in Plaintiff's Exhibit M-96, that yellow area north of Cottonwood Creek and

36b

1  west of De Luz Creek is corn.

2      Q  Now, how much water was flowing past the ford at the

3  time you crossed?

4      MR. SACHSE:  What date, please.

5      MR. VEEDER:  On this July 1st.

6      THE WITNESS:  On July 1, 1958, there was no surface

7  flow at the ford.

8  BY MR. VEEDER:

9      Q  So based upon your knowledge as an expert, how many

10  acres of corn could be irrigated by the surface flow of Cotton-

11  wood Creek as of July 1, 1958?

12      MR. SACHSE:  Surface flow at the ford?

13      MR. VEEDER:  Yes, surface flow at the ford.

14      THE WITNESS:  Zero.

15  BY MR. VEEDER:

16      Q  And based on your observations, near the eastern ex-

17  tremity of the Garnsey property how many acres of corn do you

18  believe could be irrigated with the surface flow of Cottonwood

19  Creek?

20      A  I would estimate about ten or 15 acres of corn could be

21  irrigated.

22      Q  Now, how many acres of grapes  do you think could be

23  irrigated from the surface flow of Cottonwood Creek at the ford?

24      A  Zero.  No surface flow in Cottonwood Creek at the ford.

25      Q  From your observations, would it be possible to irrigate

37b

1    any corn or grapes from the surface flow of Cottonwood Creek

2    as of July 1, 1958?

3          MR. SACHSE:   Where?

4          MR. VEEDER:   Referring to your field--

5          MR. SACHSE:   Flow where?

6    BY MR. VEEDER:

7          Q   Referring to the point on the eastern extremity of the

8    land of the Garnsey property, taking into consideration surface

9    flow that you observed there on July 1st, would it be possible,

10   practical and profitably possible to irrigate the 15 acres of

11   corn to which you made reference?

12         MR. SACHSE:   The question has been asked and answered

13   that he could irrigate he would estimate 15 acres of corn.   If

14   that isn't the question that is being asked I will ask Mr.

15   Veeder to restate the question.

16         MR. VEEDER:   I stated practical and profitably, I said.

17         MR. SACHSE:   I have no objection.

18         MR. VEEDER:   That is what I said.

19         THE WITNESS:   Yes, sir.   Just a short bit north of the

20   stream bed, the field north of the stream bed.

21   BY MR. VEEDER:

22         Q   Now, from that point would it be practical and profit-

23   able to irrigate the grape patch down further south from there

24   that you observed on July 1, 1958?

25         A   Referring to the grapes in Field 10--

38b

Q   That is right.

A   --which are southwest of the house and westerly of the road I would say it would be practical to irrigate that vineyard with water from Cottonwood Creek.

Q   Depending--   Taking into consideration the quantity of water that was available on July the 1st?

MR. SACHSE:  If the Court please, this is cross-examining his own witness.  He has got his answer.  And it is argumentative, cross-examining his own witness.

THE MASTER:  I believe the question is still proper.  He is merely questioning to take into consideration certain factors which I do not believe is improper cross-examination of his own witness.

MR. VEEDER:  To begin with, I don't believe he is my own witness.  I think that he is Mr. Sachse's witness.

THE MASTER:  Well, regardless of that, I believe it is still proper.

MR. SACHSE:  I am glad to have him, frankly.

THE WITNESS:  Do you mean in addition to the corn?

MR. VEEDER:  Yes.

THE WITNESS:  Well, I think that corn field north of Cottonwood Creek would just about take the entire stream flow of Cottonwood Creek at the point marked with a red X on the land class map.

BY MR. VEEDER:

Q   So would you answer the question then in regard to

1926

39b

1   the grapes?

2       A   In my opinion there wouldn't be enough additional water

3   to supply the vineyard in Field 10.

4       MR. VEEDER:   I have no further questions.

5

6                       RECROSS-EXAMINATION

7   BY MR. SACHSE:

8       Q   Colonel Bowen, you testified that you thought De Luz

9   Creek at the point, Field 8, the yellow area, was a practical

10  source of water?

11      A   Yes, sir.

12      Q   Would that be a practical source of water to irrigate

13  everything in Field 8 and 9?

14      MR. VEEDER:   Now, I object to that, because there is a

15  legal question as to whether they had a right to take the water.

16      THE MASTER:   The question is simply directed to physical

17  possibility.   The legal question will be decided later.   The

18  objection is overruled.

19      THE WITNESS:   On the property there wouldn't be quite

20  enough stream flow in De Luz Creek as of 1 July, 1958 at the

21  point--or, for the distance through which it flows on the Garnsey

22  property to satisfy the irrigation requirements for Fields 8

23  and 9.

24  BY MR. SACHSE:

25      Q   Now, do you know of any diversion in the De Luz Creek

1927

40b

1    watershed who supplies his entire needs from the surface flow

2    of any of the streams in that area?

3        A   Was the question in regard to the diversion?

4        Q   Do you know of any diverter of water from streams who

5    satisfies his entire needs with surface diversions?

6        A   I believe Dr. Wilson testified that he did.   I am not

7    exactly sure on that, but there are very few.

8        Q   There are very few?

9        A   Yes, sir.

10       Q   Is it not a fact that practically every irrigation

11   use in the De Luz Creek watershed today depends on getting its

12   water in the dry season from subsurface flow?

13       A   Yes, I believe that the preponderance of the diversions

14   are subsurface in nature.

15       Q   And you have already testified that you have no infor-

16   mation of any kind as to the subsurface flow in the De Luz

17   Creek or the Cottonwood Creek?

18       A   That is correct.

19   MR. SACHSE:   I have no further questions.

20   MR. VEEDER:   I have no further questions.

21   THE MASTER:   Colonel Bowen, in answer to questions by

22   Mr. Sachse with reference to Fields 13, 14 and 15 you said that

23   water underlying those fields might be part of the Camps Creek

24   system.   In your opinion is it more likely that it is part of

25   that system or is it more likely that it is not part of that

41b

1   system?

2        THE WITNESS:  In my opinion it is more likely that it is

3   part of that system, your Honor.

4        THE MASTER:  And you stated that water developed in Field

5   16 could move through joints and fractures, and so forth, and

6   be in contact with the alluvium.  Did you mean that it is more

7   likely that it does do that, or it is more likely that it does

8   not?

9        THE WITNESS:  In my opinion it is more likely that it is

10  in contact with the alluvium, your Honor.

11       THE MASTER:  That is all.

12       MR. VEEDER:  I have nothing.

13       MR. SACHSE:  I will call Mr. Garnsey.

14

15                      FELIX R. GARNSEY,

16  called as a witness in his own behalf, being first duly sworn,

17  testified as follows:

18

19                      DIRECT EXAMINATION

20  BY MR. SACHSE:

21       Q  Will you state your name and address, please, Mr.

22  Garnsey?

23       A  Felix R. Garnsey, Rural Route 2, Box 26, Fallbrook.

24       Q  And is that address the address of Parcel 37 shown

25  on Exhibit M-68?

1929

42b

1          MR. VEEDER:   Is that the address?

2     BY MR. SACHSE:

3          Q   Is your residence on Parcel 37 shown on Exhibit M-68?

4          A   Yes, sir.

5          Q   How long have you lived there?

6          A   Oh, since about 1913.

7          Q   What is your educational background?

8          A   Well, I went to high school in Santa Ana and Los

9     Angeles; grammar school in De Luz, high school in Santa Ana and

10    Los Angeles, and Junior College in Santa Ana, and a semester at

11    S.C. in Los Angeles, the University of Southern California.

12         Q  What is your occupation?

13         A   Farmer.

14         Q   And do you make your living on the property shown as

15    Parcel 37 on M-68?

16         A   Well, I try.

17         Q   Now, I believe you heard all of Colonel Bowen's testi-

18    mony this morning on the witness stand?

19         A   Yes, sir.

20         Q   To speed some of this up, do you have any quarrel at

21    all with his description of what streams run through your land,

22    or where they enter it or where they leave it?

23         A   None at all.

24         Q   How long have you been familiar with the ranch opera-

25    tion carried on on Parcel 37?

43b

1      A   Well, ever since I was six or seven years old, I

2   suppose.

3      Q   Now, will you tell us what the present development of

4   the property is?  Start out with the buildings, and then go on

5   to plantings.

6      A   Well, we have our residence, it is a three bedroom

7   home; and we have a guest house right near it, 40 or 50 feet

8   south of it; then we have housing for as many as 15 nationals

9   near the location of the two wells.

10     Q   Nationals, you mean Mexican National Ranchero labor?

11     A   Yes.  Then my brother has a cabin just west of the

12   Tittle property, a little triangle that is blocked out.

13     Q   So the record is clear, that little triangle on M-68

14   is right under the Garnsey ranch on the map, Parcel 38?

15     A   Yes.  Something seems to be--

16     THE MASTER:  Well, the parcel marked 38 on the map is

17   not a triangle, it is a four-sided figure.

18   BY MR. SACHSE:

19     Q   Well, is that the Tittle property?

20     A   Yes, sir.

21     Q   Now, what crops--  Strike crops.

22     What present agricultural development is on your property?

23     A   Well, we have about seven acres of peaches, and eight

24   or nine acres of grapes; and currently we are irrigating about

25   15 or maybe 16 acres of corn.

44b

1     Q   As we go along perhaps--   Let's locate these plantings

2  with reference to the soil overlay.   In which of the fields

3  indicated on the land utilization overlay in M-96 are your

4  grapes?

5     A   In Field 10 and Field 8; the south portion of Field 10,

6  and all of Field--I believe all of Field 8 there.

7     Q   All right.   Now, where are your peaches located?

8     A   That field--   They are in the fields just north and

9  south of the plot marked cemetery.

10    MR. VEEDER:   What is the number of that field?

11    THE WITNESS:   They are not numbered.

12  BY MR. SACHSE:

13     Q   It is part of 10?

14     A   Is it?   Oh, yes, I see.

15     Q   Just north and just south of the cemetery.   Is that

16  right?

17     A   Yes.

18     Q   Now, drawing your attention to Field 8 and that portion

19  of it marked in yellow alongside of De Luz Creek, what is

20  planted in that field?

21     A   The yellow portion is planted to corn.

22     Q   The Field 9 next to it in blue, is anything planted in

23  that?

24     A   No.

25     Q   Now, drawing your attention to the yellow portion of

45b

1    Field 8 lying immediately north of Cottonwood Creek--

2           A   The yellow portion of Field 8?

3           Q   Yes.   Field 8 winds around-- lying immediately north

4    of Cottonwood Creek, what is planted in that?

5           A   Banana squash.

6           Q   Now, what other areas are presently planted?

7           A   The portion just south of the yellow portion in Field

8    8 and Field 10, the yellow portion that is also in squash on

9    both sides of Cottonwood Creek there.

10          Q   All right, go ahead.   Anything else that is presently

11   planted?

12          A   That is it for right now.

13          Q   Now, during the recent past--by recent past I mean

14   within the last six or eight months--have there been any addi-

15   tional areas planted?

16          A   Yes.

17          Q   Not crops now, but areas?

18          A   Yes.   We had several acres of strawberries in Field

19   8--no, Field 14.

20          Q   And that would be generally speaking in the blue part of

21   the northeasterly part of 14.   Is that right?

22          A   Yes.

23          Q   All right.   Is there anything else that has been re-

24   cently in the last six months been under irrigation?

25          A   Yes.   In Field 18 there is a portion east of the road

46b

1    leading--county road leading to the ranch, there is about five

2    acres that was planted to sudan grass.

3        Q  Did you harvest the sudan grass?

4        A  I got ten steers off it.

5        Q  In other words, you are using the sudan grass as a

6    permanent pasture rather than to harvest?

7        A  That is right, yes.

8        Q  Now, did you irrigate it?

9        A  Yes.

10       Q  Now, have you told us all of the area that has been

11   irrigated in the recent past?

12       MR. VEEDER:  When you say recent past--

13   BY MR. SACHSE:

14       Q  Within the past six months?

15       A  Yes, I think that is all of field--  Let's just leave

16   it the way it was.  I think that is about it.

17       Q  Now, Mr. Garnsey, please do the same thing, but this

18   time tell us everything that has ever been irrigated at any time

19   on your property, going through it by fields.  Start out with

20   Field 9.

21       MR. VEEDER:  I object to the question, your Honor, "at

22   any time."

23       MR. SACHSE:  At any time.

24       MR. VEEDER:  The gentleman says he was only there since

25   1913.

47b

1        MR. SACHSE:  Within his own knowledge, I will accept that

2   modification.

3        MR. VEEDER:  There is quite a difference.

4   BY MR. SACHSE:

5        Q  Start up with Field 9, please.  Has Field 9 ever been

6   irrigated?

7        A  Where is Field 9?

8        Q  The blue up at the northeast.

9        A  Oh, no.  No, it has never been irrigated.

10       Q  Now, the yellow portion of Field 2 alongisde of De

11   Luz Creek is presently irrigated, and has been irrigated in the

12   past?

13       A  Yes.  I have irrigated--  It has been irrigated several

14   different years, this year and several different ones.

15       Q  How about Field 8?

16       A  That has been irrigated every year since 1945.

17       THE MASTER:  Now, wait.  8 includes several subdivisions.

18   BY MR. SACHSE:

19       Q  Well, the red portion of 8, let's make it clear.

20       A  Yes, the red portion every year, and the blue portion

21   most years--or, the yellow portion most years.

22       Q  Since when?

23       A  Since 1945.

24       Q  And have those--  What crops have you put in them?

25       A  In the yellow portion of Field 8 was also in grapes

1935

48b

1  up until three or four years ago.

2  THE MASTER:  Now, there are two yellow portions of Field

3  8, one to the east and one to the west.

4  THE WITNESS:  The west portion was in grapes, and that

5  was irrigated.

6  BY MR. SACHSE:

7  Q  And have the grapes been removed?

8  A  Yes.

9  Q  And since the removal of the grapes, what type of

10  crops has it been used for?

11  A  This year it is squash, and it hasn't been used for

12  too much.  We have had black eyes in it several different years

13  since 1945.

14  Q  All right.  Now, let's move on south into Field 10.

15  Now, what portion of the yellow area of Field 10 has been irri-

16  gated at some time, within your knowledge?

17  A  All of Field 10 in yellow, south of--let's see here--

18  south of Cottonwood Creek, except the small portion in here.

19  MR. SACHSE:  All right.  Can we agree, Mr. Veeder, he is

20  indicating except a small portion northeast of the cemetery

21  south of Cottonwood Creek?

22  MR. VEEDER:  That is right.

23  BY MR. SACHSE:

24  Q  Now, please move down to the next field, Field 18, and

25  tell us.

49b

1   A   Field 18, that has been--originally it was in grapes.

2  We irrigated those with a pump and a two-and-a-half-inch pipe

3  running up through it, not too successfully, but we irrigated

4  them.   That was back as far as 1934-35, in that general area,

5  within a year or two.

6   Q When did you remove the grapes?

7   A  I think those were removed in 1949.

8   Q  Now, continuing, has any part of Field 7 ever been

9  irrigated?

10   A  Let's go back to 18.   18 has been in black eyes and

11  corn, oh, at least every other year since the grapes were pulled

12  out, I would say.

13   Q  Now, have you ever irrigated any part of Field 7 shown

14  in brown?

15   A  No.

16   THE MASTER:  That is Field 7, you understand, extends over

17  a very wide area on the map.

18   THE WITNESS:  I see.  Well, it is still the same answer,

19  I haven't irrigated any of it.

20  BY MR. SACHSE:

21   Q  Now then, Field 13, have you irrigated any part of that?

22   A  No.

23   Q  Field 14, I believe, is the one you told us you had

24  strawberries in part of it?

25   A  Yes.

50b

1    Q  Is that the only crop you have ever had in that?

2    A  It is the only irrigated crop, yes.

3    Q  The next field, 15?

4    A  No irrigation there.

5    Q  16?

6    A  None there.

7    Q  17, in red.

8    A  About six acres--  I guess that is yellow.  I would say

9    there is five or six acres just west of the road, the road

10   approaching our house, that has been planted to black eyes, and

11   irrigated.

12   Q  Now, I will indicate the blue area, which is partly in

13   Field 18 and partly in Field 19 shown in blue in the overlay,

14   how about that?

15   A  That has all been under irrigation.  I had it in perma-

16   nent pasture; that was, I believe, in 1953.

17   Q  No crops other than permanent pasture?

18   A  That is right.

19   Q  Now, going to the northern part of the property you

20   will find--

21   A  Excuse me.  Could I correct that?  The lower part of

22   this--  This is all 18?

23   Q  18 is partly blue and partly yellow at that point?

24   A  We have had black eyes in this portion partly yellow

25   and partly blue.  Well, it is the same portion that is now in

51b

1  sudan grass, and has been in black eyes several different years

2  in the past, seven or eight.

3     Q  Now, directing your attention to the northerly portion

4  of the overlay, and indicated in yellow is Field 5.  Has that

5  ever been irrigated?

6     A  No.

7     Q  And then there are three orange fields around it, 2,

8  3, 4 and 6, have they ever been irrigated?

9     A  No.

10    Q  And the dark brown area which is indicated as Field

11 1, has that ever been irrigated?

12    A  No.

13    Q  Now, Mr. Garnsey, could you estimate for us what the

14 total acreage that has ever been irrigated on your property is,

15 not at one time, but the total that has ever been under irriga-

16 tion since your knowledge?

17    MR. VEEDER:  I am going to object.  And I am going to

18 object from here on to counsel's leading questions.  I have

19 refrained because I didn't want to delay this unnecessarily.

20 We are getting down now--

21    MR. SACHSE:  Do you think I am telling him the answers,

22 Mr. Veeder?  He knows more about this than I do.

23    THE MASTER:  The present question--

24    MR. VEEDER:  The present question is excepted.

25    THE WITNESS:  As to how many acres I have ever irrigated?

52b

1      MR. VEEDER:  I am going to object again to this question.

2   There is absolutely no basis for him to testify without a speci-

3   fic period as a specific statement as to his knowledge how old

4   he was, how he would make the estimation, how he would make

5   the determinations.  There is no foundation for the question.

6      THE MASTER:  I think there is sufficient foundation in

7   the fact that he has lived on the property to refer to the

8   total number of acres that have been irrigated at any time.  The

9   question specifically states they did not have to be irrigated

10   at the same time.  I think it is up to cross-examination as to

11   the accuracy of his observations, when he made them, and so

12   forth.

13      The objection is overruled.

14      THE WITNESS:  Well, my estimate would be about 70 acres.

15   It could be five more, or five less.

16   BY MR. SACHSE:

17      Q  Now, Mr. Garnsey, I will direct your attention to

18   Exhibit M-96, that is the book you have before you, and particu-

19   larly to page 3, and the last calculation that appears on that

20   page, indicating that Colonel Bowen's staff have found 171

21   acres of your property to be irrigable.  Do you agree or dis-

22   agree?

23      A  Well, I could probably scratch up another acre or two,

24   but I think we are close enough that there is no point.

25      Q  With reference now particularly to the soil map at

1940

53b

1   the back of it, do you have any serious disagreement as to any

2   of the areas he has indicated as non-irrigable or irrigable?

3      A   Well, I don't think anything serious.   I am going to

4   irrigate some of it that they have here, but it is still not

5   serious.

6      Q   Now, Mr. Garnsey, where do you get your domestic water?

7      A   From a well that Colonel Bowen has already testified

8   about.

9      Q   Is that well used for any purpose other than domestic?

10      A   No.

11      Q   And that well is in the yellow area--

12      MR. VEEDER:   I am going to  object to that.

13   BY MR. SACHSE:

14      Q   --on page 10.   Is that right?

15      MR. VEEDER:   I am going to object to that.

16      THE MASTER:   This is purely a formal question, to speed

17   up the trial I think a leading question is permissible, particu-

18   larly since it was testified to by Colonel Bowen.

19      The objection is overruled.

20   BY MR.SACHSE:

21      Q   Where is the well?

22      A   Oh, it is 200 feet southeast of our house, roughly.

23      Q   The house which is shown with a large oak tree, and so

24   on, in Field 10.   Is that right?

25      A   Yes.

1941

54b

1      Q   Now, you have another well that Colonel Bowen testified

2  to.   Where is that?

3      A   About 50 feet north of the  domestic well.

4      Q   What do you use that well for?

5      A   I used it to suppliment our irrigation last year by

6  means of portable pipes tied in to our reservoir part of the

7  time, and part of the time directly on our peach trees.

8      MR. SACHSE:   Do you have any objection--  I know you are

9  going to object to the introduction of it, but do you have

10  any objection to making it a single document?

11      MR. VEEDER:   No.

12      MR. SACHSE:   This one is W, and this one is next in order.

13      Q   Now, Mr. Garnsey, I will direct your attention to the

14  soil utilization overlay and the blue area to which you heard

15  Colonel Bowen testify that is the lake.   Do you find that on the

16  overlay, the reservoir?

17      A   What is that?

18      Q   You have found it on the overlay?

19      A   Yes.

20      Q   Now, will you describe that, please?

21      A   Well, it is an earth filled dam.   According to the

22  Soil Conservation it originally could have had I think 4.45 acre

23  feet, and Colonel Bowen said it now covers about 3, and he is

24  probably right.   And the reason is sediment, largely from last

25  winter's runoff has pinched it in.

55b

1     Q   Now, starting at the lake will you describe how you

2   use the water--  Do you use the water impounded in the lake for

3   any purpose?

4     A   Oh, yes.

5     Q   Now, starting at the lake, will you describe how you

6   use it?

7     A   We have an eight inch gravity line, it is about close to

8   three feet below the surface of the lake when it is full, and

9   that runs down to our reservoir just south of the plot marked

10   cemetery.  And that is how we get our water from the pond--the

11   pond down below the cemetery is, I guess you would call it, a

12   regulatory pond from which we do our pumping for the gravity.

13     Q   Now, stopping at that pond for a moment, what portions

14   of your property do you irrigate by gravity from that reservoir?

15     A   All of Field 10 marked yellow that is east of the

16   reservoir, except the portion that is about an acre, or slightly

17   more, south of Cottonwood Creek.

18     Q   Now, how do you move water from that reservoir to other

19   areas of your ranch?

20     A   We have a six inch Transite line running from the reser-

21   voir through Field 18, and up roughly to the center of Field 14,

22   the center of the blue field--the blue section of the Field 14.

23     Q   That is uphill, isn't it?

24     A   That is right.

25     Q   How do you get the water up there?

56b

1          A   We have a ten horse booster pump in an unnamed creek

2     just below the reservoir.

3          Q   And then by the time you have crossed Field 7 is it

4     starting downhill again?

5          A   Yes, it starts down very sharply.   That was irrigated

6     both as furrow irrigation and sprinkler, both ways.

7          Q   Now, how do you irrigate the fields north of Cottonwood

8     Creek?

9          A   That is done altogether with sprinklers.

10          Q   Well, how do you get the water to those fields?

11          A   Currently we have--   I believe Mr. Veeder was out and

12     saw our operation yesterday.

13          MR. VEEDER:   It is very fine.

14          THE WITNESS:   It is Field No. 2.   We have an eight inch

15     line that runs from our reservoir straight east generally al-

16     most to our house, and then it runs northerly and down into the

17     creek bottom, oh, roughly in the center of the red portion of

18     Field 8, and from there we use portable pipe.   We have a booster

19     pump.   I have my tractor for power on it, and the source from

20     our reservoir through this eight inch line by gravity down to

21     the pump, and the pump picks it up on the tractor for power into

22     the grapes or into the yellow portion of the Field 8.

23     BY MR. SACHSE:

24          Q   Now, backing up to the line from the lake to the reser-

25     voir, how big did you say that line was?

57b

1    A  Eight inch.

2    Q  Now, do you use that line for any direct irrigation?

3    A  Oh, occasionally yes.  We have an opening in it, and

4  come down into the yellow portion of Field 10, but it really

5  doesn't amount to much.

6    Q  So then am I correct in saying that your pressure for

7  most of your irrigation is obtained here by gravity from the

8  reservoir below the cemetery or by booster?

9    A  The pressure?

10    Q  The pressure to irrigate.  Is that right?

11    A  Yes, it is either gravity or else boosting with a pump.

12    Q  When did you build this lake?

13    A  That was in 1949, I believe.

14    Q  Did you make any filing with the State of California

15  for permission to impound water?

16    A  Yes.

17    MR. VEEDER:  Your Honor, I have proceeded on the assump-

18  tion that my objection in regard to the variance between the

19  evidence and the pleadings is a continuing one.  May I have it

20  on that basis?

21    MR. SACHSE:  I have no objection to it continuing, but I

22  would restate again why--because I don't, frankly, see the

23  bearing.  We have pleaded two appropriations in the pleadings.

24    THE MASTER:  Well, it may be assumed that you have made

25  a continuing objection, that the objection has been overruled.

58b

1    I will frankly state that I at the present agree with Mr. Sachse

2    that I don't see the basis for the objection.

3         MR. VEEDER:  Well, I will be glad to explain it, your

4    Honor.  It is absolutely impossible from the pleadings to find

5    out or to ascertain the place of use of the water, or the point

6    of diversion.

7         THE MASTER:  Well, I apprehend the point of your objection,

8    but I don't see how it is applicable to the evidence so far

9    elicited, because that would be pertinent, in any event, to

10   other portions of the pleading.  And I think it is possible to

11   make inconsistent allegations in the pleadings, and the evidence

12   can support one allegation and not support another allegation

13   in the same pleading.

14        MR. VEEDER:  Well, maybe I haven't made myself clear.

15   From our standpoint, the evidence that is being introduced does not

16   fall within the scope of the pleading filed.  There is absolutely

17   no way for me to ascertain from examining this pleading the

18   place of use of the water, the quantity of water used or the

19   point of diversion, the place of use, or any of the other ele-

20   ments which I believe are absolutely essential to permit the

21   introduction of this kind of testimony.

22        MR. SACHSE:  Your Honor, I appreciate that you seem to be

23   sympathetic to my position at the moment, but I would like to

24   get on the record because Mr. Veeder is pressing this pretty

25   hard.

59b

1        In the first place, we contend that Mr. Garnsey has the

2   same rights as any other land owner in the De Luz Creek watershed.

3   If he is riparian he has the right to the use of the surface

4   or subsurface stream flow.  It will be up to you to determine

5   that.

6        We contend his right to the use of the riparian water

7   is correlative with the others, and it is riparian with his land.

8        In the second place, we contend Mr. Garnsey's land overlies

9   alluvial basins, and that his right to the use of those waters

10   is correlative with other land owners.

11        We specifically point out to your Honor that both of those

12   rights are pleaded in this answer.  And we contend that for

13   either a riparian or an overlying right it is not necessary to

14   point out a place of diversion where you use it on your overlying

15   or riparian land.

16        Now, with respect to the permits, which have not been offered,

17   Mr. Veeder is correct that an appropriation is for use on

18   specific property, on specific land.  However, we have pleaded

19   the existence of permits by number to the use of a certain amount

20   of water on the Garnsey land.

21        Now, if our proof fails to establish the existence of

22   such permits then Mr. Veeder may have an objection, but we have

23   definitely pleaded the existence of permit 5505 and permit 8166,

24   both of which permits from the State of California are for uses

25   on the Garnsey land.  So I see no conceivable basis for the

1947

60b

1    objection at this time.

2        THE MASTER:  Well, I think probably counsel on both sides

3    has stated their objections, and the reasons in support of the

4    offer fully enough for the present purpose, and that any further

5    argument should be at a later time.  And I suggest that we pro-

6    ceed to take further testimony at the present time.

7        Incidentally, I might add, Mr. Sachse, that the file which

8    I have contains only the supplemental answer, or the answer to

9    the supplemental and amandatory complaint.  I do not have a

10   copy of your original answer.

11       MR. SACHSE:  I will try to get one.  The situation there is

12   I did not file the original answer, I became counsel later, but

13   I can get you a copy.

14       THE MASTER:  Yes, it will make it easier for me to con-

15   sider this at a later time.

16       MR. VEEDER:  Did you overrule the objection?

17       THE MASTER:  I am overruling the objection.

18       MR. SACHSE:  I may be repeating the same question you just

19   objected to.

20       Q  Did you apply to the State of California for a permit

21   to store this water?

22       A  Yes.

23       Q  I will hand you three documents stapled together and

24   marked Exhibit MD-X, and ask you to examine them, please, and

25   tell us if you know what they are?

1948

61b

1          THE MASTER:  Mr. Sachse, do we have any MD-W?

2          MR. SACHSE:  We do, but it is the next one, and it is

3    right here.  I inadvertently took them in the wrong order.

4          THE WITNESS:  Yes, this is a permit--  I am trying to see

5    what number.  There it is.

6    BY MR. SACHSE:

7          Q  Tell the application number please, for the record.

8          A  Application number 13505.

9          Q  And the permit number?

10         A  8166.

11         Q  And what does that application and permit relate to?

12   It will speak for itself.  But is this a storage permit, or what

13   is it?

14         MR. VEEDER:  I object, your Honor.  The document speaks

15   for itself.

16         THE MASTER:  The objection is well taken.

17         MR. SACHSE:  I will withdraw the question.  Let his Honor

18   read it.

19         Q  Now, I will hand you a document, a set of three docu-

20   ments, again marked MD-W, and will you please examine them and

21   tell us what they are?

22         A  Yes.  This is an application to divert water, applica-

23   tion number 9783, and permit number 5505.

24         MR. SACHSE:  I will offer these two documents, MD-W and

25   MD-X for Identification, in evidence, your Honor.

62b

1    MR. VEEDER:  I have no objection, your Honor.

2    THE MASTER:  They will be received and marked as Exhibits

3  in evidence with the same designations they have been given for

4  Identification purposes.

5  BY MR. SACHSE:

6    Q  Now, Mr. Garnsey, taking last summer's operations, that

7  is the summer of 1957, from what sources did you obtain water

8  for your irrigation operations?

9    A  From the well I indicated, and from my dam.

10    Q  Can you make any estimate as to what portion of your

11  water came from your wells and what portion came from your dam?

12    A  Way the biggest portion came from the dam.  I would say,

13  estimating, probably 95% was from the dam.

14    Q  And when did you say this dam was completed?

15    A  In 1949, I believe.

16    Q  Now, what plans, if any, do you have for additional

17  development on your property in the future?

18    A  Well, Colonel Bowen pointed out the area in Field 10

19  is alluvial and it does have water under it, and my present well

20  hasn't panned out--  Well, I will go back, I imagine it was

21  about ten years ago I had two test holes put in right near the

22  well sites, and they went down around 70 feet.  Both of them just

23  go 100 feet or so apart, and they are both at the same level.

24  And I didn't mark the exact spot where those holes were bored,

25  unfortunately, I assumed I could put another one within 25 feet

63b

1    and get it the same level.  I am either on bedrock or an enormous

2    boulder.  So it is about 15 or 16 feet short of 71 feet deep.

3    So we have got to dig another one some day.

4         Q  Could you be more specific as to what your plans are

5    with relation to the wells in the alluvial area?

6         A  Well, generally we have to get a well or wells; it might

7    take several before we are lucky enough to get one that will

8    produce.  But one way or the other we have to get a well in there

9    that will take advantage of the water that is in that underground

10   basin, or whatever you call it.

11        Q  You are speaking of the area in Field 10.  Is that right?

12        A  Right.

13        Q  Have you any plans for well development in any other

14   areas of the ranch?

15        A  Call it a well, or perhaps sump would be more correct.

16   In the yellow portion of Field 8, very near the junction of the

17   west branch of the De Luz Creek and the Cottonwood Creek.

18        Q  On which stream?

19        A  Well, right near the junction on my property, near the

20   point where the two of them join.  Some day we think it might

21   be worth having a bulldozer go in and excavate a sump.  The

22   water table is very close to the surface, and we plan to try

23   that some day.

24        Q  Now, do you have any plans for the construction of

25   additional storage facilities on your property?

64b

1 A Yes.  I planned in '56--

2 Q I didn't hear that.  You planned what?

3 A We planned in 1956 to put a dam across the canyon just

4 south of the red portion in Field 8.  That was not as much--

5 The primary purpose of that was to fill in the basin with

6 alluvium between the yellow portion on one side of Cottonwood

7 Creek and Field 10, and the yellow portion of the north side

8 of Cottonwood Creek and Field 8.

9 Q What do you mean the primary purpose was for that?

10 A Well, if we put in that dam and hydraulicked the

11 sediment that is collected in the dam reservoir down through,

12 we could let the sediment come down and fill in the Cottonwood

13 Creek and make one level field out of it.  And at the same time

14 we would tend to raise the water level in all of the alluvium

15 in all of the yellow area in Field 10.

16 Q May I be sure that I understand you?  Your plan was to

17 construct a dam across Cottonwood Creek?

18 A That is right.

19 Q Not for water  conservation, but with the idea of

20 spreading water behind it and spreading alluvial material behind

21 it?

22 A Yes, to catch the alluvium and make a field and-- You

23 might not have a drop of water in that.  Assuming I had construc-,

24 ted that and it was full of sand, at present it wouldn't have a

25 drop of water in it.  But still that water that had accumlated

65b

1   and stored in there would percolate in a southeasterly direction

2   into the field marked 10, and I think would be a benefit to my-

3   self and everyone below us.

4       Q   Now, do you have any plans with relation to a lake for

5   future improvement of it?

6       A   Well, certainly I have to get the sand that is erroded--

7   I mean erroded materials that have come in.  We have a 30-inch

8   pipe to it.  The fire that started on Camp Pendleton, I believe

9   in 1950, burned off all of the watershed, and the minute it

10  started draining we opened up the pond and let all of the ashes

11  we could through, or sediments and sand, and at one time it had

12  considerably more sediment than it has now, and we hydraulicked

13  that out.

14      Q   When you say hydraulicked out do you mean through this

15  eight inch pipe?

16      A   Yes, through the eight inch pipe.  Certainly we will

17  have to repeat that process, and I would like to enlarge it as

18  much as I could.  And if I thought that Camp Pendleton wouldn't

19  mind too much I wouldn't mind raising that dam another eight or

20  ten feet.

21      Q   At the time these applications were filed--  Let me

22  please get their numbers specifically.

23      Referring specifically to MD-W, application filed December

24  6th, 1939, were there any protests from anyone?

25      A   No.

66b

1    Q   Now, referring specifically to MD-X, application filed

2  December 12, 1949, was there any protests to the filing of that?

3    A   No protest.  Camp Pendleton sent a staff of engineers,

4  or two or three of them down in a jeep or car, I have forgotten;

5  they went over the whole project, our dam, our reservoir, and

6  looked at what we have been doing with our irrigation projects,

7  and all, and scared me half to death.  But they didn't file an

8  objection.   And that was, I believe, in early spring.  And

9  subsequently the Department of Water Resources, I believe it was,

10  in August I gave them another opportunity to file an objection,

11  and they didn't.  In neither case did they file an objection.

12    Q   Now, Mr. Garnsey, with regard to the flow of Cottonwood

13  Creek, can you tell us how far downstream from the dam there is

14  any surface flow today?

15    A   Today?

16    Q   Today or yesterday.

17    A   I haven't looked at it for a week or two, but I would

18  guess--

19    MR. VEEDER:  I object.

20    MR. SACHSE:  Don't guess.

21    Q   Tell us when the last time was that you could tell us

22  where the downstream flow ended below the dam.

23    A   I don't think I can answer that question.  I haven't

24  been up and looked at the creek for the last week or ten days.

25    Q   Well, how recently have you been up to see the surface

67b

1   flow below the dam?

2        A   The surface flow, I have noticed where it has stopped,

3   was at the cement surface crossing.  That is the last place I

4   have noticed that it stopped.

5        Q   How long ago did you last see surface flow at the

6   cement crossing?

7        A   I would say two weeks.

8        Q   And today that cement crossing is dry, but it is muddy

9   on both sides and below?

10       A   That is right.

11       Q   Now, what is the last occasion that you saw surface

12   flow in the unnamed intermittent stream, if you will look at

13   the land utilization chart that appears in purple, north of

14   Field 18?

15       A   I would say that stopped flowing about two months ago,

16   at the point just south of our reservoir.

17       Q   Now, have you observed surface flow in the De Luz

18   Creek on the easterly boundary of Field 8?  Or when did you

19   last observe surface flow in De Luz Creek at that point?

20       A   About two weeks ago.  And I concluded there wasn't

21   sufficient water to keep my pump going, so I didn't even try

22   to set up there.  I had hoped I could irrigate this corn patch,

23   but I decided there wasn't enough water to keep the pump going,

24   and I didn't try.

25       Q   Now, to the best of your recollection when did water

68b

1   stop flowing over the concrete slab on Cottonwood Creek last

2   year?

3        A   It never started.

4        Q   All right.   The year before?

5        A   It stopped about the middle of February.   That is my

6   recollection.

7        Q   Now, could you give us the same information, when last

8   year did you notice the flow stop in the intermittent stream

9   north of Field 18?

10       A   That one never started.

11       Q   And what was the situation last year with regard to the

12   surface flow of De Luz Creek?

13       A   Do you mean above the confluence with Cottonwood Creek?

14       Q   Above the confluence of Cottonwood Creek.

15       A   Well, people on that side had a better break than I

16   did.   That one ran right well, I would judge possibly until

17   April at the junction of Cottonwood and De Luz Creek.   But I am

18   guessing, I didn't see it.

19       MR. VEEDER:   I move it be stricken.

20       MR. SACHSE:   No objection.

21       THE MASTER:   It will be stricken.

22   BY MR. SACHSE:

23       Q   Mr. Garnsey, will you look at the land utilization chart,

24   and you will see a great many symbols, broken black lines of

25   intermittent streams other than Cottonwood Creek, De Luz Creek,

1956

69b

1    and the one shown in purple we have just been discussing.  How

2    would you describe those streams?

3        A   I think just like Colonel Bowen did.  They have water

4    running in them on wet years during rains, and that is just

5    about it normally.  In this dry cycle almost none of them have

6    had any substantial amount.  Some of them not even while it

7    was raining for the last eight or ten years.

8        Q   Do you have any knowledge of any springs or water

9    sources, particularly in the brown area Class VII land?

10       A   Yes.  The area that is added in on our west boundary

11   on the unnamed creek, that runs through our field just south of

12   Field No. 10, that was traded by my grandfather for a triangle

13   in the northwest corner of our property--

14       THE MASTER:  You mean the southwest?

15       THE WITNESS:  The southwest corner of our property.  And

16   the reason he traded was to get a spring in that general area for

17   his domestic purposes.

18   BY MR. SACHSE:

19       Q   Can you indicate the approximate location of that spring?

20       A   I will mark an X in the stream bed just east of the

21   western boundary of this portion.

22       THE MASTER:  That is in the portion of your property which

23   projects out in the center of the westerly line of your property?

24       THE WITNESS:  Correct.

25

70b

BY MR. SACHSE:

1

2    Q  Now, you said that spring was used for a time for

3    domestic water?

4    A  Yes.  My grandparents used it for a long while,

5    and we used it ourselves up till I was 12 or 14 years old.

6    Q  Is it put to any use today?

7    A  No.

8    Q  It just flows into the creek channel?

9    A  Well, seeps would be a better word since the drouth

10   came on.

11   Q  Do you know of any other springs on your property

12   anywhere?

13   A  Yes.  There is a spring in--

14   Q  Will you put a red X on the spring, if you will?

15   A  I will mark an X here.  And you tell me where it is.

16   THE MASTER:  Can you describe it with reference to the

17   field in the overlay?

18   BY MR. SACHSE:

19   Q  You have marked the red X immediately south of the

20   Field 2 as indicated on the land utilization overlay.  All right.

21   Are there any others, Mr. Garnsey?

22   A  There is another small--  Well, it is a seepish spot;

23   it has a fern bed and a few things like that, possibly could be

24   developed into domestic water.  In fact, I think my grandparents

25   did  use it.  That is about at the northern most point of the

1958

71b

1    field marked 3.  I will put an X there.

2         Q  The northern most point of the field marked 3?

3         A  Yes.

4         MR. SACHSE:  Your Honor, I think I am done.  And it is

5    so close to 12 I would like, if I could, to review my notes,

6    and there might be one or two more  questions.

7         THE MASTER:  If Mr. Veeder has some questions to ask be-

8    fore noon you could resume after noon, if there is no objection

9    that they might technically be redirect.

10        MR. VEEDER:  Why don't we suspend then and get back five

11   minutes early?

12        THE MASTER:  I anticipate we may have a full afternoon.

13        We will recess then until 1:25.

14        (Adjournment until 1:25 P.M., July 2, 1958.)

15

16

17

18

19

20

21

22

23

24

25

Z-1

<u>Fallbrook, California, July 2, 1958.  1:25 P. M.</u>

THE CLERK:  Court is now in session.

MR. VEEDER:  Are you through, Mr. Sachse?

MR. SACHSE:  No, I have about three or four questions, Mr. Veeder.

Q  Mr. Garnsey, during the past year have any water level measurements been taken in your wells on Parcel 37?

A  Yes.

Q  When?

A  To the best of my recollection somebody came out from Col. Bowen's office I think about the first of the year.

Q  And have there been more than one occasion when this was done?

A  Yes.  Within, I think, the last month, the second.

Q  Were the same wells measured?

A  Yes.

Q  Now, did you take part in those measurements?

A  I went over and showed them, and I think helped the fellows measure in both cases.

Q  Do you know of your own knowledge what the measurements disclosed?

A  Yes.

Q  Give us the time of each one, please.

A  The first one disclosed that the well was about 54 feet deep.

Z-2

1    Q   That was in January?

2    A   Yes, I think in January; in that general time area,

3  anyway, maybe February.

4    Q   And then the second one?

5    A   Well, the same depth, but the water level-- the static

6  water level the first time, I think it showed a depth of six

7  feet.

8    Q   I want to be sure I understand.  Six feet of what,

9  from the top?

10    A   The static level was six feet from the bottom.

11    Q   From the bottom.  And what was the static level in the

12  second measurement?

13    A   About ten feet deeper.

14    Q   Sixteen feet from the bottom?

15    A   Fifteen and a half or sixteen, yes.

16    Q   All right.  Now, you testified that Cottonwood Creek

17  at your ford stopped flowing within the last month?

18    A   Yes.

19    Q   When during the past winter did it start flowing at

20  that point?

21    A   Well, it started in the first rain, about the first

22  of February; somewhere in the first week of February I would

23  say.

24    Q   And what was the characteristic of the stream flow of

25  Cottonwood Creek from that time until it stopped flowing?

Z-3

1      A  Well, every time it rained it flowed terrifically.  Our

2   spillway is better than 40 feet wide, and I would judge that

3   it had about two feet of water in it all the time after the

4   first time that the pond filled up.  Each subsequent rain,

5   while it was raining it varied from perhaps a foot to two feet

6   in depth, and continued that way through the last rain, when-

7   ever it was.  And I judge there was a good six or eight inches

8   for three or four weeks after the last rain.

9      Q  Now, is that same type of flow characteristic of the

10   west branch of De Luz Creek for the winter, this past winter?

11      A  I would say so.

12      Q  Now, Theodora L. Garnsey is your wife?

13      A  That is right.

14      Q  And Lewis J. Garnsey was your father?

15      A  That is right.

16      Q  Is he living?

17      A  No.

18   MR. SACHSE:  I understand that the United States will

19   stipulate that the title to Parcel 37 has been in those three

20   names, but there are a number of different transfers that may

21   later require clarification, require possible severances, and

22   things of that nature?

23   MR. VEEDER:  That is right.  In other words, we are not

24   agreeing that these lands are riparian.

25   MR. SACHSE:  But you are agreeing that the parcel is in

Z-4

1   in the three names, Felix R. Garnsey, Theodora L. Garnsey, and

2   Lewis J. Garnsey?

3        MR. VEEDER:  Yes.

4        MR. SACHSE:  That is all.

5

6                    CROSS-EXAMINATION

7   BY MR. VEEDER:

8        Q   Mr. Garnsey, did I understand you to say that you were

9   planning on utilizing the waters of De Luz Creek in your future

10  development?

11       A   Could be from either--  I assume you are referring

12  to that sump hole I was planning to dig at the junction of

13  Cottonwood Creek and De Luz Creek?

14       Q   Yes, that is right.

15       A   Well, that water could come from either, in that

16  case.  There would be no way of saying it definitely came from

17  one stream or the other.

18       Q   You are not presently diverting any water from the

19  De Luz Creek.  Is that right?

20       A   This year I haven't.  Last year I did, or the year

21  before.

22       Q   Are you claiming water out of the De Luz Creek?

23       A   As a riparian I certainly would.

24       Q   As a riparian.  But you are claiming no appropriative

25  rights out of De Luz Creek.  Is that right?

Z-5

1    A   Only the two I have offered, and they are both on

2 Cottonwood Creek.

3    Q   So whatever claims you are making on De Luz Creek are

4 strictly limited to your riparian claim?

5    A   As of now, yes.

6    Q   Now, in constructing your dam did you take into con-

7 sideration the rights of any other users downstream when you

8 put in that structure?

9    A   No.

10    Q   Is it built so that you can release water down to the

11 claimants below you?

12    A   I could if--   It has a 30-inch drain through it.

13    Q   And for practical purposes does that structure take

14 all of the water of Cottonwood Creek during the dry season of

15 the year?

16    A   That is a hard question to answer, because I have never

17 measured any-- I have never dug a hole or anything to see what

18 was going through.   It is obvious that the willows and all that

19 are below the dam-- they were alive when the dam was built, and

20 they are still living vigorously.

21    Q   Let's limit your answer to the surface flow of Cotton-

22 wood Creek.   For practical purposes the dam completely shuts off

23 the surface flow of Cottonwood Creek?

24    A   When?

25    Q   During the summer months?

Z-6

1    A   Yes.  But I would like to clarify that to the extent--

2    Q   Now, your answer is yes?

3    MR. SACHSE:  Wait a minute.  The witness can clarify that.

4  I would like him to finish the answer.

5  BY MR. VEEDER:

6    Q   In other words, you now have a structure that shuts off

7  the entire flow of Cottonwood Creek surface flow during the dry

8  months of the year?

9    THE MASTER:  You can answer that yes or no, and then

10  explain it.

11   THE WITNESS:  I would say yes, but I would like to point

12  out that in a dry cycle like this there would have been no

13  surface flow at that point without the dam.

14  BY MR. VEEDER:

15   Q   You are impounding water, in other words, during the

16  dry season of the year.  Is that correct?

17   A   I would say that I was, definitely.

18   Q   And how much of a carryover do you usually have?  Now,

19  this is an exceptional year.  How much water do you usually

20  impound in that structure, behind that structure?

21  MR. SACHSE:  Mr. Veeder, could you be more specific?

22  BY MR. VEEDER:

23   Q   From 1949 down to date.

24   A   We built that in 1949, and since then there have been

25  three years -- I believe three years that it didn't quite fill

Z-7

1    up; two for sure.

2         Q   And the rest of the time it filled up?

3         A   It filled up, and lots of water went over.

4         Q   So as a matter of fact, though, you are relying almost

5    entirely for your operation, your surface water diversions,

6    from impounded water.  Is that right?  You said 95% of it.

7         A   It is impounded in a sense, but at the same time in

8    the winter months and the spring months there is a current

9    flow just like right now.  The water is all impounded.   There

10   is water coming down Cottonwood Creek, sure; it is dammed up

11   by the dam, but it is coming on through.  But the same as if

12   it was up--

13        Q   Are you saying that you are not impounding water on

14   Cottonwood Creek?

15        A   I have the water impounded, of course, but the ques-

16   tion is whether I am using impounded water or whether I am

17   using the natural flow that would come through.

18        Q   The water does go in, though, and is impounded?

19        A   Yes, and then comes back out.  Currently I think I am

20   taking it out a little faster than it is coming in.

21        Q   Now, you use that impounded water on every part of

22   your land.  Is that correct?

23        A   Yes, part of the time.

24        Q   And that is used on what you might think to be your

25   riparian land?

Z-8

1          MR. SACHSE:   I didn't get the question.   The question is

2   or is not being used?

3   BY MR. VEEDER:

4          Q   It is being used on what you might consider to be your

5   riparian land?

6          A   Certainly.   I consider all of my land to be riparian.

7          Q   Riparian to De Luz Creek?

8          A   Riparian to one creek or another, yes.   It is riparian

9   to something, all of it.

10          Q   In your view?

11          A   Yes.

12          Q   Now, what about the waters that you pump out of your

13   alluvial basin there, do you restrict the pumping of that water

14   to lands which overlie the basin?

15          A   Not necessarily.

16          Q   In other words, you might pump this water out and--

17          A   What I pumped--

18          Q   May I finish the question?   Just a moment.

19          A   O.K.

20          Q   In other words, you pump water out of your basin?   You

21   have this land utilization, would you look at it?

22          A   Field No. 10?

23          Q   Yes--   No, No. 8.   That one north of Cottonwood Creek.

24   Now, do you use pumped water on that land?

25          A   This last year--

Z-9

1    Q  You can answer that yes or no.

2    A  I just don't know whether I had the pump going here

3  at the time I pumped up there or not.  I could have, or

4  couldn't have, I just don't remember.

5    Q  Well, now, you remember down through the years you

6  have been farming, you remember--

7    A  Down through the years I haven't.  I just put the

8  well in last year.  I have used water out of the other well; I

9  had the same pump set on that.

10    Q  Now, did you ever use any pumped water up there?

11    A  If I had it would be a very negligible amount.  I

12  would say no rather than yes that I had.

13    Q  And what is the source of water for that tract?

14    A For Tract 8 that comes out of the dam most years.  You

15  saw the tractor sitting in the creek bottom?

16    Q  Yes.

17    A  I pumped all of the irrigation I have done on that

18  field, I pumped out of the creek.

19    Q  You are taking that surface flow?

20    A  That is correct.  If I irrigate again, which I plan

21  to do, that will be out of the dam, of course.

22    Q  Now, with regard to your lands which you said you have

23  put in strawberries, does that land overlie the alluvial basin

24  on your property?

25    MR. SACHSE:  I will object to that.  This witness is

Z-10

1   not qualified.  If Mr. Veeder wants to ask him what land it

2   overlies on the map.

3      THE MASTER:  I think the objection is sustained to the

4   form of the question.  If you wish to ask him whether it is

5   over a basin concerning which Col. Bowen testified.

6      MR. VEEDER:  Well, your Honor, I believe that the direct

7   examination shows that this witness referred to the alluvial

8   basin.  And I think the inquiries were directed to that.

9      THE MASTER:  You may answer.

10      THE WITNESS:  Part of my strawberries were over the

11   alluvial basin, and part of them were south of it-- well, here,

12   look at this and you can tell me what this is, this little

13   triangle in here, short of an acre.  That I would judge wasn't

14   over the alluvial basin.

15      THE MASTER:  Can you identify that for the record, Mr.

16   Veeder?

17      MR. VEEDER:  Yes.  You had better take a pencil and mark

18   a crosshatch on the area that is off of the basin, in his view

19   off of the alluvial basin.

20      THE WITNESS:  Should I just pencil in that area, then?

21      MR. VEEDER:  Yes, that is right.  Now--

22      THE WITNESS:  And there is another one, too, if you are

23   interested.

24      MR. VEEDER:  Yes.

25      THE WITNESS:  This one up here in blue.

Z-11

BY MR. VEEDER:

Q   The blue area similarly would you mark that with the red pencil?

A   Shall I mark an X in it?  Is that O.K.?

Q   That is all right.

THE MASTER:  And you have also marked a semicircular line in the upper portion of the yellow part of Field 18?

MR. VEEDER:  That is correct.

THE WITNESS:  I marked an area in red indicating an area planted to strawberries in the northernmost portion of Field 18.

BY MR. VEEDER:

Q   Now, have you personally observed any relationship between the flow of Cottonwood Creek and De Luz Creek with the level of your ground water basin?

A   Yes.

Q   Would you state the circumstances, what your observations have been?

A   Well, my observations have been that when Cottonwood Creek and De Luz Creek flow for a substantial amount of time that the water table in my wells will raise approximately ten feet.

Q   In other words, you think that there is a direct relationship between--

A   There would almost have to be, because Col. Bowen's men were out and checked it.  I wish I could remember the exact

1970

Z-12

1    time, but I can't.  But I would say it was in January or

2    February.  I believe the rains had started then, or we were in

3    our rainy season, but it still hadn't come up.  When we dug

4    the well the static level was at the 50-foot mark.

5        Q  Have you given any consideration as to the surface

6    area of what you considered yourself to be the subterranean

7    ground water basin?

8        MR. SACHSE:  Your Honor, that one I will object to.  I

9    don't think the witness is qualified.

10       MR. VEEDER:  I think the witness can answer whether he

11   can answer or not.

12       THE MASTER:  The way the question is framed he can answer

13   it, what he considers to be a subterranean basin.

14       THE WITNESS:  Well, when you look at this plat, I would

15   say that it is pretty obvious that all of this area--

16       THE MASTER: Well, you have to testify now by what you

17   think, not ask the Colonel.

18       THE WITNESS:  That is right.

19       MR. VEEDER:  I am anxious to have the expert see it.

20       THE WITNESS:  I would say that all of this, the two flows

21   here constitute a basin, this whole general area here.

22   BY MR. VEEDER:

23       Q  That would be Field No. 10?

24       A  Field 10, and the yellow portion of Field 8, and the

25   yellow portion of-- they would all be in the same general basin.

Z-13

1   There are two streams involved, but they are all one basin.

2       Q   And you have observed the relationship between the

3   surface flow and the water--

4       A   That is right.   When there is water in these streams

5   the water table definitely rises.

6       Q   Now, in regard to your filing 9783--

7   MR. SACHSE:   Is that the permit?

8   THE WITNESS:   Is that the first one or the second one?

9   BY MR. VEEDER:

10      Q   That is the direct flow right as distinguished from

11  your storage.   That is December 6, 1939.

12      A   Yes.

13      Q   Now, I note in that application the point of diversion

14  is in Section 19, if you will observe.   You are right here.

15      A   I didn't say it was in Section 19, I said the point of

16  diversion is--

17      Q   From the--

18      A   Southwest Quarter.

19      Q   Where is that located?   Have you located that?   It is

20  in Section 30.

21      A   It is a little difficult to say exactly, but give or

22  take a couple of hundred feet it should be right in here.

23  MR. SACHSE:   We are getting a lot of X's.   Could you put

24  a circle around that?

25  THE MASTER:   That is a cross with a circle.

19772

Z-14

1          THE WITNESS:  As the indication of the original diversion

2     point.

3          THE MASTER:  In Field No. 5 mark the original diversion

4     point.

5     BY MR. VEEDER:

6          Q  Now, are you diverting water from that point now?

7          A  No.

8          Q  Have you made a change of point of diversion and place

9     of use?

10         A  I have attempted to.  That is in the process now.  I

11    didn't realize one was necessary, and it was called to my

12    attention by the Department of Water Resources, or whatever

13    their name is.

14         Q  In other words, this Exhibit MD-W, which is Application

15    9783, and the permit, which is No. 5505, are not reflective of

16    the facts as they presently exist.  Is that right?

17         A  That is right, yes, sir.

18         Q  Now--

19         A  I can't remember whether I did or didn't when I built

20    the dam.  At the time I built the dam I asked them for an

21    amended point of diversion, and they came back and said, "You

22    need a new application."

23         Q  In other words, we are not to rely very heavily upon

24    Exhibit MD-W?

25         MR. SACHSE:  I will object, and move that it be stricken,

Z-15

1   as the document will speak for itself.  And Mr. Veeder is not

2   calling attention to the fact that there is an order extending

3   time.

4        THE MASTER:  The objection is sustained.

5        MR. VEEDER:  I will withdraw the question.

6        Q  In other words, your described direct flow diversion

7   under 9783 is not presently being exercised.  Is that right?

8        A  Correct.

9        Q  And now I observe that the permit which was issued

10  to you March 8, 1940, relates of course to the point of diver-

11  sion and the place of use as shown on your application?

12       A  That is right.

13       Q  So the permit is not reflective of your present use?

14       MR. SACHSE:  Same objection, your Honor.  I ask that the

15  question be stricken and the witness not answer.  There is a

16  time extension attached.

17       MR. VEEDER:  I would like to bring this out, your Honor,

18  right now, if I may, that--

19       THE MASTER:  Well, the form of the question is objection-

20  able.  You can ask him if any diversion is now being made at

21  any point specified in the permit.

22       MR. VEEDER:  I don't understand your Honor's ruling on

23  this.

24       THE MASTER:  Well, you are asking him to interpret the

25  permit.  You can ask him if the point where he is now diverting

1974

Z-16

1    the water is the point specified in the permit.

2         MR. VEEDER:  I will start another series of questions,

3    if it is all the same, your Honor.

4         THE MASTER:  Very well.

5    BY MR. VEEDER:

6         Q   Do you have a permanent point of diversion at the

7    present time on Cottonwood Creek for the exercise of your direct

8    flow rights?

9         A   Yes, sir.

10        Q   And where is that situated?

11        A   That is situated, oh, about 15 feet from the high

12   water mark in my dam, and about ten feet north.

13        Q   In other words, you are diverting at the present time

14   from your storage reservoir.  Is that right?

15        A   It would be kind of silly to do it any other way.

16        Q   Well, now, answer the question.

17        A   Yes, sir, I am.

18        Q   Now, how do you know whether you are exercising direct

19   flow right or a storage right under those circumstances?

20        MR. SACHSE:  Object to the question, it is argumentative.

21   If the witness is taking the water that is all he is doing.

22        MR. VEEDER:  Well, your Honor, I think it is extremely

23   important to know whether this witness is using stored water

24   or direct flow water, and certainly-- if he can answer the

25   question--

Z-17

MR. SACHSE:  He has permits to use both.

THE MASTER:  Well, I think the question is proper, at least it goes to the question of which right he thinks he is using.

The objection is overruled.

THE WITNESS:  Well, I guess the way I ought to answer this, I think I am using direct flow rights all the time I am irrigating this lower 160 this covers, and I think I am using storage water all the time I am going on something else.

BY MR. VEEDER:

Q  But you don't really know?

A  Nobody knows.  How can they?

Q  Answer the question.

A  I still say nobody knows, and nobody can.

THE MASTER:  That is an answer, Mr. Veeder.  If nobody knows, he doesn't know.

BY MR. VEEDER:

Q  Now, in regard to your using water at the present time are you, when you are pumping it out of Cottonwood Creek--

A  I am not pumping it out, it is gravitying.

Q  I thought you were running your motor the other day. Is that stored water you are using?

A  I don't know, but it is coming down from the dam through that 8-inch pipe, through my reservoir, around through the 8-inch pipe in Field 10, and down to the tractor.

Z-18

1    Q   So you might be using stored water and you might not

2    be using stored water?

3    A   That is right.

4    Q   And it might be part of both.  Is that correct?

5    A   It is part of both, it can't be anything else.

6    Q   Now, have you ever-- Has Cottonwood Creek ever dried

7    up above your reservoir?

8    A   Yes, for a distance of-- I will put it this way--

9    Q   Does it dry up every year?

10   A   It has never dried up to the point where I had my

11   original diversion under this permit, even in this drouth

12   period.  Down below it, and between there and my dam, the water

13   disappears and goes underground at that point.  That is

14   characteristic of the creek every year before I built the dam,

15   whether I used the water or not.

16   Q   In other words, every year there has been a-- the

17   creek does dry up above your reservoir?

18   A   The water goes underground for a ways.

19   Q   The surface stream dries up above your reservoir.  Is

20   that right?

21   A   I would say every year; possibly the very wettest, not.

22   Q   Every year it does?

23   A   Practically every year.

24   Q   And when does that usually occur?

25   A   It varies with the--

Z-19

1   Q   Well, on the average.  Does it dry up during August?

2   A   August or September.

3   Q   And from that period on then all of the water that you

4   use for purposes of irrigation could be considered stored water.

5   Is that right?

6   MR. SACHSE:  Just a minute.  I don't understand the ques-

7   tion.  Ask the reporter to read it.

8   (Record read.)

9   MR. SACHSE:  All right.

10   THE WITNESS:  No, that is not right.

11   BY MR. VEEDER:

12   Q   In other words, you might be using some water from

13   your wells?

14   A   No, the stream.  Just because it doesn't have surface

15   flow it has underground water, and since I have built my dam

16   the water piles up in there.

17   Q   Now, what investigations have you made in regard to

18   the underground flow on the Cottonwood Creek?

19   A   I haven't made any.

20   Q   In other words, it is pure guesswork whether there is

21   ground water flowing down Cottonwood Creek and into your

22   reservoir.  Is that right?

23   A   No, there is no guesswork about it, because in September

24   or October---  'I do use an electric pump in there when the water

25   in my dam drops below the level of my gravity line.

Z-20

1    Q  Now, when does that occur, usually?

2    A  Oh, it is hard to say, probably in July most years.

3    MR. SACHSE:  Now, can the witness answer the other ques-

4    tions?  He said it is not guesswork because -- Now, tell us

5    why it isn't guesswork.

6    MR. VEEDER:  Why don't you wait for redirect examination?

7    THE MASTER:  I think the witness should finish the answer

8    he started to make which was interrupted by the question at

9    the time.

10   THE WITNESS:  Well, the thing is I know there is under-

11   ground water comes down that that my dam is catching, because

12   when I stop taking water out the level starts rising in

13   August, September, October, right through until it starts

14   raining again.

15   BY MR. VEEDER:

16   Q  Now, in regard to building of your dam did you go to

17   bedrock on that?

18   A  Yes, sir, it was built under the supervision of--

19   Q  You did go to bedrock?

20   A  --Soil Conservation, and we went in as far as we could

21   get on it.

22   Q  Now, when you said that you used 95% of the water that

23   you use for irrigation comes from that reservoir, you are in

24   effect stating then, are you not, that you are not depending

25   on your direct flow right?  I will restate the question if it

Z-21

1    will help you.

2        A  Let's come again on that.

3        Q  You say that 95% of your water that you use for

4    purposes of irrigation is the impounded water.  Is that right?

5        A  No.

6        Q  Well, didn't you say 95% of your water came from the

7    reservoir?

8        A  95% of the water comes out of Cottonwood Creek.  A

9    great deal of it is impounded, a great deal of it isn't; I am

10   using both.  What I meant was 95% came out of Cottonwood Creek

11   instead of out of the well labeled No. 10.

12       Q  Have you any idea how many acre feet of water you use

13   a year on your property?

14       A  I have never measured it, and I imagine you would have

15   to call it speculation or guesswork, or whatever your legal

16   terminology is.

17       Q  So there would be no response to the question.

18           Now, in regard to your statement that there were 70

19   acres of land which were irrigated, was that an aggregate or

20   was it actual acreage irrigated?  The maximum that was ever

21   irrigated, to your personal knowledge, was that 70 acres?

22       A  Yes.

23       Q  At one time?

24       A  After all, I am just looking at these fields and

25   hazarding a rough guess of how much area--  I mean, Col. Bowen

1980

Z-22

1    could probably go around each one of them and come up with an

2    exact answer, if that is important.

3        Q   You believe that 70 acres--

4        A   It is within 10% accurate, I would judge.

5        Q   And you are stating that that is the historical

6    maximum.  Is that right?

7        A   That is right.

8        Q   In your recollection.  Now, in regard to your future

9    developments, how many acres do you intend to bring in?

10       A   Well, I think Col. Bowen has answered that question

11   for me here somewhere.  Whatever he has got, that is it.

12       Q   You believe that your maximum will be, I think, 171

13   acres.  Is that right?

14       A   I still think I might get another one or two, but we

15   will let it go at that.

16       Q   Now, in connection with your use of water then what

17   would be in your opinion the number of acre feet of water that

18   you would require to raise the kind and type of crops that you

19   have this year?

20       MR. SACHSE:  I will object.  How much?  On how much

21   acreage?

22       THE MASTER:  On his present acreage?

23       MR. VEEDER:  That is right.

24       MR. SACHSE:  O.K.

25       THE WITNESS:  You mean just what I am irrigating right

Z-23

1   now?  That isn't all I plan to irrigate this year, incidentally.

2   BY MR. VEEDER:

3       Q   You are going to bring in some more?

4       A   Oh, certainly; at least Field No. 18.

5       Q   Would you estimate how many acre feet of water you

6   think you will use this year then?

7       A   To this extent, I will definitely use all that I can

8   get in that dam, all that comes down.  That thing will be dry

9   as a bone before the next rains unless there is something

10  unusual, cloudbursts in October, or something, it will all be

11  gone.

12      Q   Now, will you state based on the acreage that you have

13  in cultivation and which you anticipate to bring into cultiva-

14  tion the number of acre feet that you will use during 1958,

15  during the 1958 irrigation season?  You know how much water it

16  will take to make a crop, do you not, for your corn?

17      A   No, sir, because it takes a whole lot more to make it

18  when you have hundred degree weather than when you have seventy

19  degree weather, and I don't know what the temperature is going

20  to be.

21      Q   Let's go back to last year.  You said you had about 70

22  acres in last year.  How many acre feet of water do you think

23  you used last year?

24      A   I don't think I said I had 70 acres in.

25      Q   70 acres?  Didn't you say you had 70 acres in last

Z-24

1  year?

2      A   No.   I think we said that the maximum I have irrigated

3  is 70 acres.

4      Q   Well--

5      THE MASTER:   There is no statement in the record, to my

6  knowledge, as to how much was actually planted last year.

7      THE WITNESS:   In any given year, no.

8  BY MR. VEEDER:

9      Q   Well, how many acres did you have in last year?

10     A   Again we are going to have to do some guessing.   Just

11  looking at this map and the areas I irrigated, I would judge

12  around 30, possibly 35 acres.

13     Q   Is that all you had last year?

14     A   It didn't rain much last year.

15     Q   And how many acres do you have in this year?

16     A   Currently?

17     Q   Yes.

18     A   About 38.   But that isn't-- I will have more later on,

19  that is all I am using up to now.   As soon as my current crops

20  are up I will start using water on other fields.

21     Q Could you estimate how many acre feet of water you used

22  last year?

23     A   No, because I would just be guessing.   I don't think

24  my--

25     Q   So you have no way of knowing?

Z-25

1        A  I would have no way of knowing, really.

2        Q  Whether you are complying with the--

3        A  Well, I talked with-- Anticipating that this question

4    might come up I talked with some of the Japs about how much

5    they consider strawberries need.

6        Q  Now, who are they?  Are they working for you?

7        A  They aren't working for me, but they are friends of

8    mine in this area, and their water requirements would be

9    similar to mine.

10       Q  So that would be hearsay?

11       A  No.

12       Q  Well, it would be hearsay if you asked somebody else

13   what it would be.

14       A  Well, I was just trying to find out roughly what it

15   took for them.  I don't care whether you do or don't get the

16   answer.

17       Q  Now, in regard to your storage claim, I observe that

18   you intend to irrigate, according to your application, approx-

19   imately 86 acres.  Is that correct?

20       A  That was correct, that was my estimate at the time.

21       Q  And you have now changed that.  Is that right?

22       A  Each year you get more adept at using water and

23   finding out the possibilities; yes, it keeps climbing.

24       Q  So you have increased the--

25       A  The potential.

Z-26

1    Q   --the area that you are irrigating from this at the

2    present.  Is that right?

3    MR. SACHSE:  Just a minute.  I want that question read

4    before I object.  Irrigating from what?

5    MR. VEEDER:  From the reservoir.

6    THE MASTER:  Read the question.

7    (Record read.)

8    MR. SACHSE:  What is "this"?

9    MR. VEEDER:  From the reservoir.

10   MR. SACHSE:  I move the answer be stricken, because it

11   said "from this."

12   THE MASTER:  The answer may be stricken.  You will re-

13   phrase the question, and the witness will wait for the question

14   to be asked before he answers.

15   MR. VEEDER:  I think that would be most helpful.

16   Q   I observe that your application related to 86 acres

17   of land to be irrigated from your--

18   A   Could I ask which application this is you are talking

19   about?

20   Q   13505.

21   A   That is the second one.

22   Q   And that is dated 1949, it is your storage right.

23   MR. SACHSE:  Let me again say that is not a storage

24   right, it is both, Mr. Veeder.  It is both a stream flow and a

25   storage permit.

Z-27

1    THE MASTER:  In any event, it is the second application,

2  of 1949?

3    MR. VEEDER:  That is right.

4    Q  The acreage referred to there is 86 acres that you

5  intended to irrigate pursuant to this application?

6    A  Yes.

7    Q  Now, I observe that your Application No. 9683 relates

8  to 130 acres.  How is it then that you are using storage water

9  upon all of your property if you originally intended to limit

10  it to 86 acres?

11    A  I am not using any water on all of my property.  A lot

12  of my property has never had any irrigated, I have already

13  testified to that, I think.

14    Q  Where are the 86 acres then that you had reference to

15  when you filed your application?  What 86 acres?

16    A  I think they are on the permit, aren't they?

17    Q  Well, I can't tell myself.

18    MR. SACHSE:  If the Court please--

19  BY MR. VEEDER:

20    Q  Do you limit yourself to the 86 acres from the stand-

21  point of stored water?

22    A  I hope not.  I hope I haven't.

23    Q  In other words--

24    A  See, between the two applications I acquired 80 acres

25  of ground, and I assumed that the one application was covering

Z-28

1   all of my first-- or, most of the first part of it.  And when I

2   put in my second, well, I thought I had better add in some

3   other, because some of the ground overlaps.  My thinking was

4   I have one place I am going to put the water on, and the only

5   reason I had any figure was because I had to have one.

6       Q  Now, you have, anyway, in the use of your water not

7   limited yourself to the areas referred to in the applications,

8   but rather have irrigated throughout your entire farm.  Is that

9   right?

10      A  I think all of the water has been put on-- all of it,

11  I know, has been put on ground that I anticipated irrigating

12  on these permits, and no other.

13      Q  Are you saying now that you limited yourself to the

14  86 acres?

15      A  I didn't say I had limited it.  I say that what I

16  have irrigated would have been land covered by those 86 acres,

17  yes.

18      Q  Do you think that you have irrigated any lands not

19  covered by it?

20      A  No.

21      Q  Now, how would you know that, in view of the kind and

22  type of irrigation system that you have?

23      A  Well, I know where my ground is, and I haven't gone

24  up on any of that Class VIII stuff to put out any water, and

25  don't anticipate doing it with one exception that Col. Bowen

Z-29

1    and I talked over a little bit, maybe.

2         MR. VEEDER:  I have no further questions.

3         MR. SACHSE:  I have just one.

4

5                    REDIRECT EXAMINATION

6    BY MR. SACHSE:

7         Q  I think the first question you answered of Mr. Veeder,

8    or the second, had to do with your claimed riparian rights on

9    De Luz Creek.  Now, you don't mean to imply that that is the

10   only stream that you thought you had riparian right on, do you?

11        A  No.  De Luz Creek and Cottonwood Creek, both of them.

12        Q  And have you ever contended that all of your irriga-

13   tion water comes from the State permits?

14        A  I have never given it a thought either way.

15        MR. VEEDER:  That is a complete answer.

16        MR. SACHSE:  A complete answer.

17        Q  Do you assert rights as an overlying landowner or a

18   riparian landowner in addition to your permits?

19        A  Certainly.

20        MR. SACHSE:  I have no further questions.

21        MR. VEEDER:  I have no questions.

22        THE MASTER:  Mr. McDowell, you have requested to be

23   advised when Mr. Garnsey testified.  You have been here during

24   the time he has testified.  Do, you have any questions?

25        MR. McDOWELL:  The only question I wanted to ask was the

Z-30

1    dam cutting the flow of water off down De Luz Creek in the

2    summertime.   They call that De Luz Creek now; we call it

3    Cottonwood.

4           THE MASTER:  You are still talking about the same dam

5    that the testimony heretofore has referred to as Cottonwood?

6           MR. McDOWELL:  Yes.

7           THE MASTER:  Now, you may ask Mr. Garnsey any questions

8    that you wish to ask him in regards to the facts.

9           MR. McDOWELL:  That was the only question I wished to

10   ask, was that by having a dam it would cut down the flow of the

11   stream through our ranch.

12          MR. SACHSE:  I move it be stricken.   That is a statement,

13   not a question.

14          THE MASTER:  The statement may be stricken, because it

15   isn't a question.

16          Now, are there any questions that you want to ask Mr.

17   Garnsey about that?

18          MR. McDOWELL:  Well, I don't know.

19          THE MASTER:  That is, he has already testified in some

20   detail as to the nature and operation of the dam.

21          MR. McDOWELL:  Well, he already has his dam in and there

22   is nothing else you can do.

23          THE MASTER:  Well, if you wish to present evidence of your

24   own and to testify later you may do so.   My question now is are

25   there any additional facts about which you want to ask Mr.

Z-31

1  Garnsey questions at the present time that he hasn't already

2  gone into?

3       MR. McDOWELL:  Not at this time,

4       THE MASTER:  Very well.

5       MR. SACHSE:  I would like to have Col. Bowen for about

6  one more question.

7       THE MASTER:  Very well.  You may step down.

8       MR. SACHSE:  Col. Bowen, please.

9

10                    ALLEN C. BOWEN,

11  recalled as a witness, having been previously sworn, testified

12  as follows:

13

14                  RECROSS-EXAMINATION

15  BY MR. SACHSE:

16       Q  Col. Bowen, did you hear Mr. Garnsey's testimony

17  regarding the measurements taken of his wells?

18       A  Yes, sir, I did.

19       Q  Were those personnel connected with your office?

20       A  Those personnel that made the measurements this month

21  were, but I am not sure who those people were last January or

22  February.

23       Q  Well, the reason I ask is I find no reference what-

24  soever to any well measurements in this engineering report.

25  Now, have personnel of your office been taking well measurements

Z-32

1  elsewhere in the De Luz Creek watershed?

2       A   Just to determine depth of wells.   Although we may

3  note the static level of the water, we haven't been reporting

4  that.

5       Q   Well, have you made notes of the static level else-

6  where in the De Luz Creek watershed?

7       A   I believe so, yes, sir.

8       Q   I wonder if you would get us a statement of all of the

9  findings you have as to static level of water of wells in the

10 De Luz Creek watershed?

11      A   I would be very happy--

12      MR. VEEDER:   Have you answered the question?

13      THE WITNESS:   I haven't completed my answer.

14      MR. VEEDER:   You are too fast on the trigger.   O.K.

15      I might say that we are going to introduce quite ex-

16 tensive testimony in the main case, as I said, in regard to

17 geology, and some of that is going to be in regard to level;

18 but some of the material is raw now and I want to check it

19 before we release it to Mr. Sachse.

20      MR. SACHSE:   Is that going to be introduced?

21      MR. VEEDER:   Oh, yes.

22      THE MASTER:   Any questions, Mr. Veeder?

23      MR. VEEDER:   No.

24      MR. SACHSE:   Col. Bowen, if you want to stay put, unless

25 his Honor wants to take a recess, and we will start in on the

Z-33

1    Matthews case.

2         MR. VEEDER:  Mr. Sachse, it would be helpful to us if

3    you have copies of the Garnseys' deed.  Do you have them?

4         MR. SACHSE:  I have two of them, but I can get some more.

5         THE MASTER:  Then you will supply Mr. Veeder with copies

6    of the deeds?

7         MR. SACHSE:  I will give you two of them right away, and

8    I will give you some more.

9         MR. VEEDER:  Thank you.

10        THE MASTER:  Now, this next testimony will relate then

11   to Parcel 14, Matthews?

12        MR. SACHSE:  Mr. Matthews, yes, your Honor.

13        Has this gone into evidence yet?

14        THE MASTER:  Yes, M-85.

15

16                   ALLEN C. BOWEN,

17   recalled as a witness, having been previously sworn, testified

18   as follows:

19

20                   CROSS-EXAMINATION

21   BY MR. SACHSE:

22        Q  Col. Bowen, I will hand you Government Exhibit M-85,

23   and ask you to please indicate it on M-68 for the benefit of

24   the Court.

25        A  The property reported about in Plaintiff's Exhibit M-85

Z-34

is delineated on Plaintiff's Exhibit M-68, with the numeral 14 encircled, contained within the exterior boundaries of the property.

The northerly boundary of the property is contiguous to the Santa Rosa Ranch, part of the Vail Ranch, and that line is also the Riverside County line.  De Luz Creek flows through the northwesterly corner of the property.

Q  De Luz Creek flows through the northwesterly corner. Is that correct?

A  Yes, sir.

Q  Now, do you find any other water sources indicated on Exhibit M-68 upon which Parcel 14 abuts or which traverse 14?

A  Referring to Plaintiff's Exhibit M-68, there are no intermittent stream symbols other than that indicating De Luz Creek within the exterior limits of Parcel 14.

Q  Now, with particular reference to the land utilization photograph attached to Exhibit M-85, I see thereon four symbols for lakes or ponds, extending in a row from southwest to northeast.  Do you see them?

A  Yes, sir.  But those are not the only symbols.

Q  No.  I am referring only just to the four that extend more or less from southwest to northeast.

A  Yes, sir.

Q  Can you describe the type of ground on which those four ponds are located?

Z-35

A   Well, the dams constructed there are in a small draw which heads up in the easterly portion of the property and flows southeasterly to a confluence with De Luz Creek just outside the southwesterly corner of the Parcel 14.

Q   Now, when you say flows, you do not indicate that there is a stream there, do you?

A   It is an intermittent stream.

Q   That would flow during and after rain only?

A   During and after rainfall and runoff.

Q   Yes.  Now, are you familiar with the diversion works of Mr. Matthews on De Luz Creek?

A   Yes, sir.

Q   Can you describe them for the Court, please?  First locate them on the aerial photo for the Court, if you will.

A   Referring to Plaintiff's Exhibit M-58 and the land classification map contained therein, De Luz Creek flows through the northwesterly corner of the property as indicated by the intermittent stream symbol, and it is bordered by Class VIII land colored in purple on the map, and within that Class VIII area in the northwesterly corner of the property is the symbol for a dam, and a blue area indicates the approximate surface of the reservoir behind the dam.  That dam is a-- you might even call it a Cyclopean concrete type construction, large rocks and boulders embedded in concrete.

Q   Is there an outlet pipe through it, to your knowledge?

1    A   I believe there is an outlet pipe through it, but I

2  am not certain of that.

3    Q   Now, is there a well or sump, or a means of diversion

4  from that dam, to your knowledge?

5    A   Yes, sir.  In the upper part of the reservoir there

6  is a concrete structure with a pump house and pump, and a

7  pipe line which goes up the hill and over to the concrete

8  reservoir situated on the hill above the house, and shown as

9  a blue oval.

10    Q   The blue oval immediately southeast of the red portion

11  of Field 6, or the upper red portion of Field 6?

12    A   Yes, sir.

13    Q   Now, that is not a dam as such, that is a reservoir,

14  is it not?

15    A   Well, that oval is a reservoir, yes, sir.

16    Q   Now, you personally have examined the Matthews

17  property, have you not?

18    A   Yes, sir.

19    Q   Then you are aware that there are a number of developed

20  springs on the property?

21    A   Yes, sir.

22    Q   Do you recall the particular developed spring that

23  lies in back of the house?

24    A   Yes, sir.

25    Q   Now, can you describe it so the Court knows what we

Z-37

1  mean by developed spring, what that is?

2      A   Well, it is an area that has been cleaned of vegetative

3  growth and earth, and in this instance a concrete structure

4  has been used to collect the spring water for delivery to the

5  house.

6      Q   Now, could you put a numeral 1, if you please-- I

7  suggest a 1-- at the approximate location of that spring?

8      A   With a red pencil I will mark on the land classifica-

9  tion map in Plaintiff's Exhibit M-85 the numeral 1, indicating

10  the approximate location of the spring supplying domestic

11  water to the house.

12      Q   Now, that spring is located rather high on the hillside,

13  is it not, above De Luz Creek?

14      A   Yes, sir.

15      Q   Would you conclude that the waters of that spring are

16  vagrant percolating ground waters, or a part of the waters

17  of De Luz Creek?

18      A   I would conclude that the waters of that spring are

19  vagrant percolating ground waters and are not a part of the

20  waters of De Luz Creek.

21      Q   Are you aware of the spring below the house which is

22  tied into Mr. Matthews' pressure pump system?

23      A   I didn't examine that particular spring, no.

24      Q   Do you know the location of it?

25      MR. VEEDER:   I am going to interpose an objection at

Z-38

1    this juncture.   I find no reference in the pleadings to any

2    of these springs concerning which counsel for defendant is now

3    interrogating.   And I object on the ground that the material

4    on the basis of his present procedure is incompetent, irrele-

5    vant and immaterial, not tending to prove any issue in this

6    case, nor any issue raised in the pleading.

7        MR. SACHSE:   Your Honor, if that is true I will ask

8    leave to amend the answer.   We did this hastily.   We have

9    learned that Mr. Matthews has rights to extensive ground waters.

10   I will request leave to file an amendment, and continue with

11   the examination.

12       THE MASTER:   I think the objection is well taken on the

13   state of the pleadings, at least on the answer.   But I will

14   let you have the right to amend your answer, and will rule that

15   Mr. Sachse continue to question Col. Bowen concerning them.

16   Then if Mr. Veeder, by reason of the failure in the pleadings,

17   does require any additional time to present any rebuttal in

18   answer to such testimony he would be granted such time.

19       MR.VEEDER:   I would reserve the time, in addition, your

20   Honor.   I think that the formal amendment should be made

21   rather than just an amendment on the basis of any evidence

22   introduced.

23       MR. SACHSE:   I will drop the Matthews case right now and

24   can file another amendment.   This is up to the convenience of

25   the Court and Mr. Veeder.

Z-39

1    MR. VEEDER:  No, I am perfectly willing to stand by your

2    Honor's ruling, but I am asking that a formal amendment be

3    made.

4    THE MASTER:  The ruling is that a formal written pleading

5    be filed, but the case will now continue.  And you may continue

6    to examine Col. Bowen, and then present Mr. Matthews later.

7    BY MR. SACHSE:

8    Q  Are you familiar with the general location of that

9    spring, Col. Bowen?  Let me refresh your recollection.  As you

10   drive up the roadway did you notice a trickle of water running

11   down across the pasture below the road?

12   A  I don't recall that.

13   Q  Well, let me state this, then, if it will help us--

14   MR. VEEDER:  Now, Mr. Sachse--

15   MR. SACHSE:  This is cross-examination.  I am trying to

16   get some facts out, let me alone.

17   MR. VEEDER:  I would be pleased to let you alone if I

18   could.  But the point I am trying to make is that if you are

19   about to testify I would like to have you under oath.

20   MR. SACHSE:  I am going to attempt to refresh Col. Bowen's

21   recollection.  If he tells me he doesn't know, that is that.

22   Q  Col. Bowen, I will remind you that between the road-

23   way up to the Matthews' house and the Matthews' house on the

24   bank there is a developed spring.  Have you ever seen it?

25   MR. VEEDER:  I move to strike the question, your Honor.

Z-40

1    I think there is a point beyond which we can't go on this

2    thing.

3         THE MASTER:  The form of the question is possibly objec-

4    tionable.  I believe it is perfectly proper for Mr. Sachse to

5    ask Col. Bowen if he had seen a spring in a particular area.

6         MR. SACHSE:  I will rephrase it.

7         Q  Col. Bowen, have you ever seen a spring below the

8    Matthews' house and above the road up to the house?

9         A  No, sir.

10        Q  Have you seen any other springs on the Matthews'

11   property than the one you just described?

12        A  Yes, sir, I have seen some of the undeveloped seeps

13   on the property.

14        Q  Before we go to those, have you seen the spring that

15   supplied domestic water to the old house, the house that is down

16   near De Luz Creek?

17        A  No, sir, I didn't see that spring.

18        Q  Col. Bowen, am I correct in stating that the entire

19   Matthews' parcel rises rather sharply from De Luz Creek?

20        A  You are correct, sir.

21        Q  Now, what would be your conclusions as to waters found

22   seeping or developed underground on the portions of the

23   Matthews' property located within Section 21, Township 8 South,

24   Range 4 West?

25        A  In my opinion the portion of Parcel No. 14 in De Luz

1999

Z-41

Creek watershed contained in Section 21, 8 South, 4 West, the
ground water contained within that portion is vagrant percolat-
ing ground water and not part of the De Luz stream.

Q   Now, considering the easterly half of that part of
Parcel 14 that is within Section 20, what would your conclu-
sions be on the same question?

A   My opinion in regards to the southeasterly portion
of that part of the parcel lying in Section 20 would be the
same as my opinion with regards to the portion lying in Section
21.   But the northern part of that easterly half of the property
lying in Section 20 is verging on the lower lying materials
shown as Class II and IV lands, abutting upon the De Luz Creek
stream bed, and there is a subsurface contact between those
lower lands which are part alluvial fill and the joints and
fractures and residuum on the higher ground.

Q   Now, Colonel, let me direct your attention particularly
to the aerial photograph of Exhibit M-85.   And I notice that
the central irrigable portion indicated on the photograph is
separated from De Luz Creek by a strip of land indicated by you
as non-irrigable?

A   Yes, sir.

Q   Can you clarify your last answer as to what waters
might be in contact with the stream by reference to that aerial
photo?

A   Referring to the aerial photograph, the land on which

Z-42

3

the land classification map is made in Plaintiff's Exhibit M-85,
the blue, yellow, orange and red colored areas lying easterly
of a brown Class VII strip, which divides the aforementioned
lands from the creek bottom, would be in my opinion ground
waters, vagrant percolating ground waters not applying to the
stream.

Q   Now, can you look at the overlay and tie that down
to saying that in your opinion everything contained in Field 6
and westerly thereof would overlie vagrant percolating ground
waters not a part of any stream?

THE MASTER:   Do you mean easterly?

BY MR. SACHSE:

Q   Field 6 and easterly thereof?

A   Yes, sir.

Q   And the area you feel would be in contact with the
stream would be the irrigable areas indicated in Fields 1, 2,
3, 4.   Is that right?

A   Those, and the lower slopes of the land rising from
the De Luz Creek bottom to the higher ground.

THE MASTER:   That is a portion of Field 5 which lies west
of Field 6?

THE WITNESS:   Yes, sir.

THE MASTER:   West and north of Field 6?

THE WITNESS:   Yes, sir.

Z-43

BY MR. SACHSE:

    Q   Now, Col. Bowen, let me direct your attention on the aerial photograph to that portion of the photograph lying southeast of Field 4, on which I see a number of faint white parallel lines.  Do you see to what I am referring?

    A   Yes, sir.

    Q   Those are terraces, are they not?

    A   Yes, sir.

    Q   Planted to avocados, are they not?

    A   Yes, sir.

    Q   Do you know how old the avocados are?

    A   Matthews says they are five years old.

    Q   Do you have any reason to doubt that, sir?

    A   Mr. Matthews is an honorable man.  I have no reason to doubt what he says.

    Q   Are those trees irrigated?

    A   Yes, sir.

    Q   Do they look healthy and thrifty to you?

    A   Well, not as healthy and thrifty as trees on more favorable sites, but they are still producing avocados.

    Q   But your staff has determined this area which is producing avocados is not irrigable.  Is that correct?

    A   Not only my staff, but I have checked it out myself twice and it was also my opinion it was not irrigable.

    Q   It would be your opinion that in any water allocation

Z-44

1   Mr. Matthews would get no water for the trees he has already

2   planted?

3        MR. VEEDER:  I will object.

4        THE MASTER:  The question is argumentative.  The objec-

5   tion is sustained.

6   BY MR. SACHSE:

7        Q  Well, continuing down the photograph from the terraced

8   area I have just shown you, and remaining within the Class VII

9   area, is it not a fact that the bulk of the remainder of that

10  area has been cleared, brushed, and is in permanent pasture?

11       A  I don't think the bulk of it has been cleared, Mr.

12  Sachse; a portion of it has.

13       Q  And it is piped, is it not?

14       A  Yes, sir.

15       Q  And you observed large permanent Rainbird sprinklers

16  set in it, didn't you?

17       A  Yes, sir,

18       Q  And you and your staff have determined that that

19  portion is not irrigable land?

20       A  Yes, sir.

21       Q  But it is under irrigation at present, is it not?

22       A  Yes, sir.

23       Q  Is there any reason why the remainder of that strip

24  of Class VII land that we have just discussed could not be

25  terraced and produce just as good avocados as are being

Z-45

1    produced in the portion now planted?

2         MR. VEEDER:  I am going to object to the question, your

3    Honor, any reason why.

4         MR. SACHSE:  In his opinion.

5         THE MASTER:  The objection is overruled.

6         THE WITNESS:  Well, the bulk of that strip of Class VII

7    land lying between the creek bottom and the house, shown as a

8    part of Field 5 in the land utilization overlay, could be

9    terraced in the same manner as has been done on the portion

10   presently planted to avocados.

11   BY MR. SACHSE:

12        Q  Now, directing your attention to the easterly portion

13   of the parcel on the photo in Class VII land, that is extremely

14   rocky, is it not?  In fact, you can see the rocks in the photo-

15   graph?

16        A  Yes, sir.

17        Q  So you wouldn't conclude that that land could be

18   practically and profitably planted in avocados, would you?

19        A  No, sir, and so indicated by the class on the soil

20   survey in Exhibit M-85.

21        Q  Did you form any conclusion as to what portion of the

22   irrigable acreage of the Matthews property is or is not frost-

23   less?

24        A  Well, I believe that the bulk of the property which

25   we find to be irrigable is not frostless.

Z-46

1  Q   Is not frostless?

2  A   Excuse me.  Like the fellow that got twisted up and

3  said fruitless frost area instead of frostless fruit area.

4  The bulk of it is frost-free with the exception of some of those

5  low lands on the extreme west adjacent to De Luz Creek.

6  Q   In fact, is it not a fact, Colonel, that the old home

7  which is in the blue area indicated as Field 3, you have

8  indicated as being suitable for avocados, and has avocados

9  planted in it now?

10  A   Yes, sir.

11  Q   Do you have any measurements made either by your

12  office or from any other source as to the amount of stream flow

13  in De Luz Creek where it abuts the Matthews' property?

14  A   No, sir.

15  Q   Do you have any measurements made by either your own

16  office or any other source as to the possible subsurface flow?

17  A   No, sir.

18  Q   Based on the information in the aerial photograph and

19  the maps would you conclude there is any substantial alluvial

20  basin underlying this property?

21  A   Yes, sir.  Referring to page 1 of the report, Plain-

22  tiff's Exhibit N-85, the last paragraph on the page under the

23  section entitled Geology, it states that along De Luz Creek the

24  granodiorite is overlain by coarse-grained clastics to a depth

25  of approximately 15 to 20 feet.  And it goes on to describe the

Z-47

1   nature of those clastics.

2        And on page 2, the first paragraph on that page, in

3   Plaintiff's Exhibit M-85, it makes the statement that the

4   clastic material on the De Luz Creek is a good aquifer.

5        Q   That means it is good water producing material,

6   doesn't it?

7        A   Yes, sir.

8        Q   However, the portion of that alluvial material within

9   the Matthews' property, Parcel 14, is very much limited to the

10   extreme northwest corner, is it not?

11        A   Yes, sir, the area primarily shown as purple and yellow

12   in the extreme northwest corner.

13        Q   Are you familiar with the source of water for the

14   four lakes shown across the lower portion of the aerial photo-

15   graph?

16        A   They capture both surface runoff when it does occur

17   in that small watershed in which they are situated, and they

18   also receive water pumped up from De Luz Creek.

19        Q   And that water pumped from De Luz Creek would be

20   pumped from the diversion you have already described up at the

21   upper dam?

22        A   Yes, sir, in the northwest corner.

23        Q   In the northwest corner.   And do you know whether or

24   not--  Withdraw that.

25        You know, do you not, Colonel, that water is boosted

Z-48

1    from the lower three of those ponds direct to irrigation, do

2    you not?

3         A  I am not certain of the way that Mr. Matthews operates

4    that lower reservoir shown in the southwest corner of the

5    property.

6         Q  How about the other two?  Do you know whether he uses

7    them by booster for irrigation?

8         A  Yes, sir, he does.

9         Q  And the most easterly of the four reservoirs we are

10   referring to is rather a silt control reservoir rather than a

11   lake, is it not?

12        A  Yes, sir, it serves the purpose of capturing stream

13   lode, and possibly some suspended lode that would be carried

14   down from the watershed above it to prevent siltation of the

15   larger reservoir above it.  It might be called a desilting

16   basin.

17        Q  The white line, if you will look at the overlay, that

18   runs from the pink portion of Field 6, and right underneath the

19   numeral 5 in the overlay, do you see the line to which I refer?

20        A  Yes, sir.

21        Q  That is a road, is it not?

22        A  Yes, sir.

23        THE MASTER:  Mr. Sachse, are you about through with Col.

24   Bowen?

25        MR. SACHSE:  I think I am just about.  Can we take a recess

Z-49

1  now?

2       THE MASTER:  We can take a recess when you have finished

3  with him.

4       MR. SACHSE:  I think I am through with him, unless there

5  is something else I want, and I don't know what it would be.

6       THE MASTER:  We will take a ten-minute recess.

7       (Recess.)

8  BY MR. SACHSE:

9       Q  Col. Bowen, with particular reference to that portion

10 of the Class VII land which is planted to avocados, can you

11 calculate the approximate acreage so planted?

12      A  I would estimate that to be approximately four acres

13 in area.

14      Q  And can you also estimate that portion of that same

15 Class VII area extending beyond it which you testified was

16 about the same kind of soil, the same condition?

17      A  It would be approximately eight acres.

18      MR. SACHSE:  That is all, sir.  Thank you.

19      MR. VEEDER:  I have some questions.

20

21                    REDIRECT EXAMINATION

22 BY MR. VEEDER:

23      Q  Col. Bowen, I observe that the mantle of alluvium

24 overlying the granitic rock is 20 feet deep.  Do you know how

25 deep the well is concerning which you were testifying?

Z-50

1    A   The well is a little better than a hundred feet deep.

2    Q   Now, is it not entirely possible that this water that

is being pumped is not De Luz Creek water, if it is in the

granite a hundred feet?

5    A   Yes, sir, it could be fed by fissures, joints, frac-

tures and the granodiorite which it penetrates.

7    Q   And assuming that there is no connection between the

pump and the reservoir, the response that it was De Luz Creek

water that is being pumped up on the Matthews property, you

might want to change that response.   Is that correct?

11   A   Yes, sir.   There is the possibility of pumping water

from that deep well which is flowing through the joints and

fissures in the granodiorite.

14   Q   So there is nothing conclusive, in other words, as to

the source of water which Mr. Matthews is presently using on

his property, you don't know whether that is De Luz Creek water

or not, do you?

18   A   No, I don't.

19   Q   Now, have you personal knowledge whether the reservoir

is in contact with the pump?

21   MR. SACHSE:   Do you mean the one upstream?

22   MR. VEEDER:   The one that you are claiming 50 feet a

year, the one on De Luz Creek.

24   Q   Do you have personal knowledge on that?   Isn't it

entirely possible that the well from which Mr. Matthews is

Z-51

pumping is not in contact with the reservoir?

THE MASTER:  Do you mean the well is not in contact with the reservoir on the surface of the ground?

MR. VEEDER:  That is right.

MR. SACHSE:  It is cased all the way.

THE WITNESS:  It is possible that it is not, but I haven't examined it specifically with that question in mind.

BY MR. VEEDER:

Q  So again, the response that it was De Luz Creek water that is being used on the Matthews property is subject to the qualification that it would be De Luz Creek water only if there was a connection between the reservoir and the pump?

A  Yes, sir.

Q  Now, regarding the No. VII land on which the avocados are planted, would you state for the record why you believe those lands are not irrigable?

A  Referring to Plaintiff's Exhibit M-85 and the land classification map contained therein, specifically to the portion which I previously testified as being terraced and planted to avocados, classified as land Class VII or non-irrigable, the land was so classified because of its steepness; the slopes run 32, 35%, or more.  The soil is very thin on the slope, 10 to 20 inches, with perhaps local pockets where it might be deeper and trapped behind rock outcrops.

Q  Now, when you say rock outcrops, did you observe any

Z-52

1   rock outcrops in that area which you have designated VII, and

2   which at the present is terraced?

3       A  Yes, sir.

4       Q  And would you describe those rock outcrops?

5       A  Well, those are large rounded granitic, appear to be

6   boulders.  They are part of the Woodson Mountain granodiorite

7   which underlies this entire property, and which weathers

8   characteristically where it is exposed; it tends to assume a

9   rounded appearance.  And those-- And an outcropping of rock

10  is affixed to and a part of the batholith, as opposed to

11  boulders or stones that might have been transported.

12      Q  How prevalent are those outcroppings in that area

13  which is terraced and presently in avocados?

14      A  Well, they are not as prevalent as they are in some

15  other portions of the area, but they are sufficiently

16  prevalent there to warrant the inclusion of that area with the

17  symbol which shows rock outcrops; the symbol to which I refer

18  is in the easterly part of the property in the Class VII area,

19  the small r following the 4 in the soil symbol, is the symbol

20  for rock outcrop.  The 4 itself shows shallow soil, 10 to 20

21  inches in depth.

22      Q  Now, would you state the kind and type of development

23  that had to be undertaken to do that terracing?

24      A  Yes, sir.  The terraces are cut into the hill on a

25  contour; that is, the terrace itself is practically level,

Z-53

and was incised with heavy equipment so that the residuum and the very thin soil mantle was pushed to the outer portion of the terrace, and in so doing on this slope the back side of the terrace or the side of the terrace against the hill is incised into it, into the harder or less weathered portion of the granodiorite.  So in effect the terrace surface itself slopes backward toward the hill, so that during periods of rainfall the rain can travel down the terrace to a controlled outlet rather than cascading over the edge of the terrace and resulting in damaging erosion to the terraces and the portion of the slope between terraces.

Q   What is the effect on the root pattern on such a development?

A   Well, the soil is very shallow, in the first place, and in being cut out of one place and placed in another it in effect builds up the depth of the soil, but still limits the lateral growth of the roots.

Q   When you say the lateral growth of the roots would you be a little more specific?

A   Well, because the terrace is incised into relatively hard rock on the back side of the terrace the avocado roots will not grow into the back side of the terrace, they are restricted to the front portion of the terrace, and consequently they don't have as large a feeding area.  Of course, the tree takes its nutrients and the water necessary to its life from the

Z-54

1    soil, and the tree-- the root area of the tree will generally

2    conform to about the drip line of the tree.  And as the tree

3    grows up and increases in size the area occupied by roots and

4    the volume occupied by roots increases.

5        Q  Have you observed the size of the trees which are on

6    this terraced area as they relate to trees, for example, in the

7    No. II classification in the vicinity of this No. VII land?

8        A  Yes, sir.

9        Q  Would you compare for the record the growth of the

10   trees on the No. VII land as it relates to the No. II or the

11   better soil?

12       A  Well, there are a few trees at the foot of the terrace

13   slope which lie within the area classified as II and shown as

14   yellow on the land class map.  And those trees were planted

15   at the same time, the few trees, three or four, or whatever

16   they are, that are in the favorable Class II site are sub-

17   stantially larger than the trees on the terrace site and they

18   were planted at the same time.  And the indication is that

19   they are thriving and growing better and not suffering from a

20   restricted root development which the terraces impose on the

21   trees planted on them.

22       Q  Now, would you state whether in your opinion those

23   lands which you have designated as No. VII can be practically

24   and profitably irrigated for the purpose of raising avocados?

25       A  In my opinion it is not practical and profitable to

Z-55

1  subjugate Class VII lands to avocado growth.

2      Q   What has been your pattern of soil classification

3  throughout the watershed of the Santa Margarita River?   Have

4  you applied the same pattern here as you have throughout the

5  area?

6      A   Yes, sir.

7      Q   What about the lands within the naval enclave, have

8  you made the same criterion to them that you have applied to

9  Mr. Matthews' property?

10      A   Yes, sir.

11      Q   Respecting the lands which have been subjugated

12  apparently for the purpose of raising forage, which you have

13  designated in Class VII, have you made the same pattern

14  throughout the Santa Margarita River watershed?

15      A   Yes, sir.   These findings are consistent with our

16  findings throughout the watershed.

17      Q   Why have you taken the position that the lands being

18  subjugated for purposes of pasture are not suitable for irriga-

19  tion?

20      A   Because of the shallowness of the soil; the steepness

21  of the slope, and the danger of accelerated erosion, removing

22  the thin mantle of soil that is on there when the protective

23  cover is taken off.

24      Q   What would you estimate to be the duty of water upon

25  lands of that character to raise a crop-- to raise forage?

Z-56

1 A That would be about the same as the duty for more

2 favorable sites.

3 Q And what would that be, in your estimation?

4 A For permanent pasture a duty of 3.83 acre feet per

5 acre per year.

6 Q What would be the applied duty per year?

7 A It would be about 10%.

8 MR. VEEDER: I have no further questions.

9

10       RECROSS-EXAMINATION

11 BY MR. SACHSE:

12 Q Col. Bowen, I don't believe Mr. Veeder was here, but

13 you recall when we took your testimony on Parcel 13, Herbert

14 Shaver, we had a similar situation?

15 A Yes, sir.

16 Q That we had some land classified VII planted to

17 avocados?

18 A Yes, sir.

19 Q Do you consider the two types of soil about similar

20 in this case and the Shaver case?

21 A Yes, sir, they are comparable.

22 Q Now, how familiar are you with avocado culture in this

23 area?

24 A Well, I would say I am familiar with it.

25 Q Have you ever owned or operated an avocado ranch?

Z-57

1  A  Yes, sir.  I leased three acres of avocados in Vista

2  at one time, and at the present time I have some avocados planted

3  on my property which I put in and have cared for myself.

4  Q  That is down in Carlsbad way, is it not?

5  A  Yes, sir.

6  Q  What kind of a planting was your Vista property, hill

7  or level?

8  A  It was hilly.

9  Q  Was it steep?

10  A  No, sir.

11  Q  Would you care to estimate what slope they were on?

12  A  Oh, about 15%.

13  Q  There were many, many plantings in the Vista area

14  much steeper than 15%?

15  A  There are plantings up to about 20%.

16  Q  Have you ever observed the avocado grove where Reche

17  Road intersects 395, for instance?

18  A  Yes, sir.

19  Q  What would you estimate that slope to be?

20  A  Oh, around 40%.

21  Q  Is it not a fact that in successful avocado plantings

22  the first consideration, more important even than the type of

23  soil, is adequate drainage?

24  A  Internal drainage in the soil, yes, sir.

25  Q  So it is quite natural to look to the hills where the

Z-58

1   drainage is better than it is in the flats, usually, is it not,

2   for avocado planting?

3       A   Well, the principal reason for the hill sites being

4   favored over the valley sites is the relative freedom from

5   frost on the hillside.

6       Q   That is the second factor I was going to mention.   But

7   is it not also a fact that the better drainage provided by

8   the hillside sites is one of the reasons for planting on the

9   hills?

10      A   There are some excellent lands in the San Luis Rey

11  Valley, for example.

12      Q   But they are too cold?

13      A   Yes, sir.

14      Q   But given a frost-free condition, the next most

15  important thing would be adequate drainage, would it not?

16      A   Internal drainage of the soil, yes, sir.

17      Q   And is it not a fact that almost no avocado plantings

18  in this area are cultivated?

19      A   That is the only reason they are able to get by on

20  these hillside sites.

21      Q   But it is a fact that they are not cultivated, is it

22  not?

23      A   Yes, sir.

24      Q   So the fact that occasional rock outcrops, or things

25  of that kind, may appear in an avocado planting doesn't have

Z-59

1   the effect of smashing up disc blades, or things of that sort,

2   does it?

3       A   No, sir.

4       Q   What would you consider to be a-- Withdraw that.

5           Are you aware of the practice of the County Assessor

6   in assessing avocado trees, how he does it?  Do you know how he

7   does it?

8       A   No.

9       MR. VEEDER:   I will object, your Honor, to the question

10  on the ground it is immaterial.  Did he withdraw it?

11      THE MASTER:   The answer was he didn't know, so it doesn't

12  make any difference whether it was asked or not.

13      MR. VEEDER:   I have sure got a fast witness.

14  BY MR. SACHSE:

15      Q   What would you consider to be a reasonable production

16  for a five-year avocado tree in the Fallbrook area?

17      A   Well, I would hesitate to answer that, Mr. Sachse,

18  because I have never had any five-year-old trees to produce.

19      Q   You say you have had none to produce at five, enough

20  to count, the fruit.  Is that what you are saying?

21      A   Yes, sir.

22      MR. SACHSE:   I have no further questions.

23      MR. VEEDER:   I have no questions.

24      THE MASTER:   Col. Bowen, in answer to the questions by

25  Mr. Veeder you stated that the well could have been fed by the

Z-60

4

1  fissures in the granodiorite.  Is it your opinion that it is

2  more likely that it is so fed, or is it more likely that it is

3  fed by De Luz Creek?

4      THE WITNESS:  I couldn't answer that, your Honor, at the

5  present time.  I would have to study that area above it a

6  little more.

7      THE MASTER:  That is all.

8      MR. SACHSE:  Nothing.  Thank you, Colonel.

9      I will call Mr. Matthews.

10

11              RICHARD F. MATTHEWS,

12  called as a witness in his own behalf, being first duly sworn,

13  testified as follows:

14

15              DIRECT EXAMINATION

16  BY MR. SACHSE:

17      Q  Mr. Matthews, I will hand you two documents--  With-

18  draw it.

19          State your full name.

20      A  What is that?

21      Q  State your full name.

22      A  Richard F. Matthews.

23      Q  Where do you live, Mr. Matthews?

24      A  In De Luz Canyon.

25      Q  Do you live on the property that is indicated on

Z-61

1   Plaintiff's Exhibit M-68 as Parcel 14?

2      A  Yes, sir.

3      Q  I will hand you two documents, photographs of deeds,

4   marked MD-Y and MD-Z.  Will you look at them and tell me if

5   you know what they are?

6      A  These are the deeds to the pieces of property.

7   MR. SACHSE:  I will offer them in evidence.

8   MR. VEEDER:  I have no objection.

9   THE MASTER:  They will be received as Defendants' Exhibits

XR   10   MD-Y and MD-Z.

11   BY MR. SACHSE:

12      Q  Mr. Matthews, how long have you lived on the property

13   Parcel 14?

14      A  A little over eight years..

15      Q  And have you had charge of the development of it?

16      A  Yes, sir.

17      Q  Have you been present and made the decisions as to

18   where the plantings would be?

19      A  Every bit of it.  All but except once I hired De Barr

20   to lay out the planning for the avocados.

21      Q  Now, I wish you would look at the photograph, Mr.

22   Matthews, that appears in Exhibit M-85, and I will direct your

23   attention to the area where you can see the terraces in the

24   photograph.  Do you see the portion I am speaking of?

25      A  Yes, sir.

Z-62

1    Q   Now, what is planted on those terraces?

2    A   There is avocados.

3    Q   How old are they?

4    A   They are five years old.

5    Q   Have you taken a crop off of them?

6    A   Yes, sir.

7    Q   When was the last crop you took off?

8    A   Well, we picked those in December of last year, most

9    of them.

10   Q   Do you recall what your production was for that area

11   per tree?

12   A   Well, we picked 1,400 boxes on all of them.  But on

13   them terraces there is about 20 trees to a terrace, and we got

14   10 to 15 boxes off of a terrace, because I know how many we

15   had to haul out in a jeep; it was so steep we had to haul them

16   out in a jeep.

17   Q   State that again.

18   A   10 to 15 boxes we got off a terrace.

19   Q   And a terrace has how many trees?

20   A   Most of them has 20 trees, maybe there are 22 farther

21   down.  At the top I know there is 20 trees, on the first two

22   rows.

23   Q   Now, Mr. Matthews, will you describe how your water

24   system operates?  And let's start with the well and reservoir

25   that is in De Luz Creek.

Z-63

1    MR. VEEDER:  I am going to object to it on the ground

2    that there has been no evidence that there has been a compliance

3    with the State law and--

4    MR. SACHSE:  If the Court please, the property is riparian

5    to De Luz Creek and it abuts De Luz Creek, and I see no basis

6    for the objection, to complying with the State law.

7    THE MASTER:  Objection overruled.

8    BY MR. SACHSE:

9    Q  Go ahead.

10   A  Since we bought the place in 1935--

11   MR. VEEDER:  Your Honor, I desire to amplify and renew

12   the objection.

13   The allegations contained in the answer is that they are

14   claiming a storage right of 50 acre feet per year in what is

15   called the upper dam.  The reason why I am pressing this objec-

16   tion, irrespective of the fact that this land may or may not

17   be riparian, is that allegation.

18   It is evident to me that the defendant has constructed

19   a dam and is impounding water.  And until there is a showing

20   that this water is not the water that is being pumped up the

21   hill and being used to irrigate, I think the objection, with

22   all respect to your Honor, is well taken.  I think there must

23   be a showing upon some basis on which this claim of right to

24   the use of water is predicated.

25   THE MASTER:  You are referring to the contentions in

Z-64

1    paragraph 2 on page 2A of the answer with reference to a

2    prescriptive right to storage--

3        MR. VEEDER:  I am simply alluding to the fact that it is

4    being made.  I think it is highly important, in view of Col.

5    Bowen's testimony, that there be some showing as to the sources

6    of this water, and what water is actually being used.

7        Now, in the state of the record, as I see the state of

8    the record, the water that is actually used for purposes of

9    irrigation comes from the deep well; and at this juncture there

10   is no showing that there is a connection between that deep

11   well and De Luz Creek.

12       MR. SACHSE:  If your Honor please, in the first place

13   there is no showing because we haven't had a chance to tell

14   anything.  But I would like to make something clear that perhaps

15   Mr. Veeder doesn't understand.  Maybe my semantics are poor,

16   but the upper dam, Mr. Veeder, is not the dam on De Luz Creek.

17   Read the answer.

18       MR. VEEDER:  Then I am simply inquiring as to what water--

19   Then I will inquire this, what water is the witness now asked

20   to testify about?

21       MR. SACHSE:  I started out with the dam and diversion on

22   De Luz Creek, which is not the upper dam.  Read the answer.

23       THE MASTER:  I think that the question clearly did refer

24   to De Luz Creek, and that the answer refers to the intermittent

25   stream.  And I believe that the witness should be permitted to

Z-65

1    answer the question, because it may in part answer the question

2    on which you are concerned, Mr. Veeder.

3        So the objection is overruled.

4        MR. SACHSE:  I am sure it will.

5        Q   Now, Mr. Matthews, again starting with your dam and

6    diversion on De Luz Creek which, with reference to the aerial

7    photograph in M-85, is located in the northwesterly corner of

8    your property, do you have a means of diverting water from that

9    dam or creek anywhere on your land?

10       A   Yes, sir.

11       Q   What do you have?

12       A   I have a 10-horsepower pump there that brings the

13   water out of the De Luz Creek, or I can divert it to bring it

14   out of the well which is a little over a hundred feet deep.

15       Q   In other words, you can pump either from the well

16   proper or from the pond behind the dam.  Is that right?

17       A   Yes.  That has been since '35.

18       MR. VEEDER:  Wait.  I didn't hear the response.

19       THE WITNESS:  They have been doing that since 1935, that

20   was hooked up that same way.

21       THE MASTER:  Do you want the reporter to read the answer

22   to the question?

23       (Record read.)

24       MR. VEEDER:  I am going to move to strike that, every-

25   thing beyond "Yes."

Z-66

1        MR. SACHSE:  That can go out, I will concede it is

2  hearsay.  He couldn't know it prior to his occupancy of the

3  premises.

4        THE MASTER:  The motion to strike is granted.

5  BY MR. SACHSE:

6        Q  Now, Mr. Matthews, where did your water lines go from

7  that pumping plant you just described?

8        A  It goes to the highest part of my--  well, not the

9  highest part of the land, but it goes to the cement reservoir.

10       Q  You are indicating the reservoir shown in the overlay

11  immediately northeast of Field 6.  Is that correct?

12       A  That is right.  Or I can irrigate fields and terraces

13  instead of going up there.

14       Q  You mean you can irrigate right off the pump?

15       A  I can irrigate right off of the pump, or these alfalfa

16  fields down through here; I can irrigate from that.

17       Q  Now, do you have any lines going out of the concrete

18  reservoir you just indicated and connecting with the other

19  dams and reservoirs on your property?

20       A  Yes, they connect with the lakes and the other wells

21  so you can divert the water from anywhere you want it, or you

22  can water everything at once if you want.

23       Q  Let's get these lakes straight.  Starting at the upper

24  end of the four small ponds, do you see the one to which I

25  refer in the pink area, the uppermost of the four lakes?

Z-67

1    A  Well, this is just a silt dam.

2    Q Is that the one that Col. Bowen referred to as being,

3 he thought, to intercept drainage and boulders, and so forth?

4    A  That is right.

5    Q  Now, the dam below--

6    A  There is nothing there except water.

7    THE MASTER:  There is nothing there but what?

8    THE WITNESS:  There is a 4-inch tile running from that

9 into the other lake, under the road.

10 BY MR. SACHSE:

11    Q  But there is no pump on that?

12    A  No pump.

13    Q  Now, taking the next dam down the canyon, can you

14 describe that dam and reservoir for us, please?

15    A  Well, that dam there, we have a well in there and it

16 was about 25 feet deep, the pump, then we dammed it up.  The

17 Soil Conservation came out and said it would be a good place

18 to store this water, and we put a dam there and brought it

19 up 22 feet more.  There is a 5-horse pump on that, and they can

20 pump water any place on my land.

21    Q  Before this dam was built was there a well in the

22 canyon?

23    A  Yes, sir, there was.

24    Q Was there a well?

25    A  There was a cement well and a pump.

Z-68

1    Q  When the dam was built it flooded that?

2    A  That is right.

3    Q  What did you do?

4    A  We had to come up 22 feet more with cement, casing.

5    Q  In other words, in effect you raised your well level

6  above the surface of the ground?

7    A  That is right.

8    Q  How do you get water into that pond?

9    A  Most of that water is from the shed up above.  If it

10  runs dry-- If I use up all of the other water which I had this

11  would be my last supply of water, I would pump it out of that.

12  But you can pump into that, too, if you wanted to, from the

13  other lakes or from the well.  Now, I have pumped from the

14  well up there, mostly from the well, because that is when you

15  need the water during the dry season of the year when De Luz

16  Creek stops running, you pump out of the wells up to the

17  reservoir, and if that is full it will run over into the lake.

18    Q  Now, go down to your next dam or reservoir, the next

19  one downstream.  Describe that one, please.

20    A  Well, we have a pump there, too, and there was three

21  springs there.  And above that I wanted to put the dam there

22  in the place, but the Soil Conservation said no.  There was

23  two springs between here; one is a warm spring, about 70 degree

24  temperature; there is another that flows 35 gallons of water

25  a minute that runs in here.

Z-69

1    Q   Runs into the second lake from the bottom.   Is

2   that right?

3    A   There is three springs in there within a hundred feet.

4    THE MASTER:   Those springs you have indicated on the map

5   lie about halfway between the areas of the second and third

6   lakes.   Is that correct?

7    THE WITNESS:   Yes, sir, right in here.

8   BY MR. SACHSE:

9    Q   Mark them, if you will, Mr. Matthews, with this red

10   pencil, the approximate location.

11   A   Right in there, three springs.

12   Q   Now, what can you do with the water in that pond or

13   reservoir?

14   A   I can take--   There is a 5-horsepower pump on there,

15   and that well is about 50 foot deep to the top of the water,

16   and we can divert that up to the cement reservoir or we can

17   put that down in wherever you want, anywhere on the land you

18   want it, that could go anywhere.   Any of these pumps can put

19   the water in where you want it any place on the land.

20   Q   Take the smallest dam in the extreme southwest corner

21   and describe it.

22   A   That also has a pump.   We haven't built a well there,

23   but through drilling a test hole we know that there was water

24   down there, quite a little water.   So when the test hole was

25   drilled the spring come in there, so we built a dam down there

Z-70

1   to catch this spring water, and we put a pump down there, but

2   we never put no well there.  But we use a booster pump-- this is

3   the only booster pump I have-- we boost it up into this lake

4   here.

5       Q  Up into the lake immediately above?

6       A  Yes, or irrigate this pasture down through here.

7       MR. VEEDER:  May I interrupt?  Are you talking about what

8   you have designated in your answer your upper dam?

9       MR. SACHSE:  I am going to file an amended answer and

10   will try to get better terminology.

11       The upper dam is the highest of the three reservoirs,

12   as distinct from the silt reservoir which I am not counting.

13   But now I am questioning about the lower one.

14       THE MASTER:  You are now down to the lowest dam in that

15   string of four?

16       MR. VEEDER:  As I understand it, he pumps the water from

17   there back up the hill.  Is that right?

18       THE WITNESS:  That is right.  And also along the bottom

19   here.

20   BY MR. SACHSE:

21       Q  Along the blue area?

22       A  No.

23       THE MASTER:  Along the Class VII land?

24       THE WITNESS:  That is right, through her.  There is a

25   pip line up through here, and there is one started here.

Z-71

1    THE MASTER: Wait just a minute. For the record, Mr.

2  Matthews was referring to a pipe line from the lowest reservoir

3  to the next reservoir above it, and also a pipe line across

4  the Class VII land lying between those two reservoirs.

5  BY MR. SACHSE:

6    Q   Is it true that all of your reservoirs are inter-

7  connected so you can put anything into any of the others?

8    A   That is correct. You can turn them all on at once

9  and irrigate 1,500 trees all at once.

10    Q   Now, take the past winter, what was the--

11    MR. VEEDER: I hate to persist. I am going to interrupt

12  Mr. Sachse just once more.

13    Have you pleaded, Mr. Sachse, at this juncture, your dam

14  on De Luz Creek?

15    MR. SACHSE: I have never pleaded any dam on De Luz Creek.

16    MR. VEEDER: You have not?

17    MR. SACHSE: I have not.

18    MR. VEEDER: And you are going to amend to put that in?

19  Are you going to amend to include that dam?

20    MR. SACHSE: If you keep bothering me I may. It is my

21  position I don't think it is necessary.

22    THE MASTER: I think you said a minute ago you did

23  intend to.

24    MR. SACHSE: Your Honor suggested I include springs, but

25  I conceive of no earthly reason to plead the dam on De Luz

Z-72

1   Creek when we assert no storage in it whatsoever; we have

2   asserted simply the diversion project, that is all we have

3   asserted it to be.

4        MR. VEEDER:  That is all I wanted to know, because you

5   had interrogated the Colonel about the dam and the water

6   impounded behind it.

7        MR. SACHSE:  I asked him if there was a hole through it,

8   and he said he didn't know.

9        MR. VEEDER:  Thank you very much, that is all I wanted

10  to be sure of.

11       MR. SACHSE:  To put your mind at rest, I assert no

12  storage right other than to impound enough water to get a

13  head--

14       MR. VEEDER:  Very good.  It has taken me all afternoon.

15       MR. SACHSE:  If you had asked me I would have told you.

16       THE MASTER:  I think that is enough comments between

17  counsel.

18  BY MR. SACHSE:

19       Q  Mr. Matthews, you heard me question Col. Bowen about

20  this spring that was down the hill from your house, and the

21  one he said he could not quite identify?

22       A  Yes.

23       Q  Can you describe that spring?  First, can you show on

24  the map--you have got a lot of numbers on here, maybe you had

25  better make an X this time-- the approximate location of that

Z-73

1    spring?

2         A   In back of the old house?

3         Q   No, the new house.

4         A   There is a spring back of the old house.

5         Q   I am asking you about the spring down the hill from

6    your new house to which your pressure system is connected.

7         A   It is right in here some place, right about in here.

8    Do you want an X there?

9         Q   Yes.

10        A   Right in there.

11        Q   Now, can you--

12        THE MASTER:   Just a minute.   That X is placed immediately

13   to the west of the line previously placed on the map by Col.

14   Bowen when he testified.

15        MR. SACHSE:   I realize that.   I don't think they are that

16   close together.

17        Q   Describe what you do with the water from that spring.

18        A   Use it for the new house.

19        Q   Well, how do you use it?

20        A   With a pressure tank and electric motor, a pump on it.

21        Q   And what happens when for a period of time you are not

22   using any water in the house?

23        A   It runs over the top, and then it runs under the road

24   down into De Luz Creek; and also the one down below does the

25   same thing, when De Luz Creek is dry it comes out of my well

Z-74

1    and runs into the creek.

2        Q  Was there not actually as recently as last Saturday

3    some small surface flow down your pasture from that spring?

4        A  Oh, it is still running, yes.

5        MR. VEEDER:  I think that was very good testimony, Mr.

6    Sachse.

7        MR. SACHSE:  I desire to get every fact in.

8        MR. VEEDER:  Even if you have to give them yourself.

9        THE MASTER:  Just a minute, Mr. Veeder.  If you want to

10   make an objection, make it; but don't make those comments.

11   BY MR. SACHSE:

12       Q  Do you know how many acres you have under pipe now,

13   whether it be pasture, grove, or anything?

14       A  About 37 acres.

15       Q  And can you divide that into the crops you have, how

16   much avocados--

17       A  Do you mean how many--

18       Q  How many acres of avocados?

19       A  There is pretty near 20 acres planted to avocados.

20       Q  What is in the remainder?

21       A  Alfalfa fields, permanent pasture.

22       Q  In other words, your only two irrigated crops at the

23   present time are avocados and alfalfa pasture.  Is that correct?

24       A  That is correct.  And some fruit trees we have, a

25   garden.

Z-75

1  Q  That is a small domestic planting?

2  A  Yes.

3  Q  Now, if you will look at page 3 of Col. Bowen's report

4  Exhibit M-85, at the bottom of the page you will see that in

5  Col. Bowen's opinion you have three acres suitable for avocados.

6  Do you agree or disagree with that conclusion?

7  A  Well, I disagree, because I have never been a rancher

8  or anything, but in '50 I had a letter which stated that I

9  had 20 acres, where I planted the avocados it was suitable for

10  avocados.  And there is practically 20 acres been planted and

11  all piped in, sprinklers to every tree, and I think that them

12  terraces and my trees have produced practically as much or more

13  than most trees around Fallbrook, on account of the water that

14  we have and the climate, and they come out earlier.

15  MR. SACHSE:  I have no further questions.

16  THE MASTER:  Mr. Veeder?

17

18                    CROSS-EXAMINATION

19  BY MR. VEEDER:

20  Q  Now, Mr. Matthews, the dam that you have on De Luz

21  Creek is presently impounding water, is it not?

22  A  Yes, because there is a little water coming in there

23  and none going out.  We pump out of there.

24  Q  Do you claim the right to impound water on De Luz

25  Creek?

Z-76

1    A   Well, at the time we put it in in '50 the soil company

2    said that we could pump out of it, you know; they put the dam

3    across, the Government helped us finance that and put it across,

4    so I figured that we had a right to pump out of it.

5    Q   But you didn't make a filing with the State of

6    California to--

7    A   I didn't know you had to, sir.

8    Q   Well, but you didn't do that, did you?

9    A   I never have yet, no.

10    MR. VEEDER:   I have no other questions.

11    I would like to call Col. Bowen for one or two questions.

12    THE MASTER:   Very well.

13    MR. VEEDER:   This will be in the form of rebuttal, unless

14    you have another witness to call?

15    MR. SACHSE:   No.

16

17                          ALLEN C. BOWEN,

18    recalled as a witness in rebuttal, having been previously

19    sworn, testified as follows:

20

21                        DIRECT EXAMINATION

22    BY MR. VEEDER:

23    Q   Col. Bowen, would you refer to your engineering

24    report on page 3, at the bottom of the page?  Now, I am

25    alluding to Plaintiff's Exhibit M-85, and alluding to the

Z-77

1    first column where it says, "Avocados, three acres; permanent

2    pasture, 27."  Would you state whether in your opinion any of

3    those 27 acres could be used for purposes of avocados?

4        A  Practically all of that 27 acres could be used for

5    avocados.  The fact of the matter is, as Mr. Matthews testified,

6    some of it is in avocados.  They are good avocado sites.

7        Q  Would you then explain the reason for the column as it

8    is prepared there, permanent pasture, 27.4 acres?

9        A  Yes, sir.  We, where possible, queried the landowner

10   for his plans for development of the property, and attempted to

11   fit the recommended land use into his plans in so far as the

12   soil sites would permit.  In this particular instance Mr.

13   Matthews informed us that he was interested in planting permanent

14   pasture for cattle, and so we in this tabulation indicated the

15   areas as suited to permanent pasture.

16       It doesn't preclude the possibility of the landowner on

17   this or any other property of planting any suitable crop to it.

18   We certainly don't say that there are only three acres suited

19   to avocados in this instance.

20       MR. VEEDER:  I have no other questions.

21

22                       CROSS-EXAMINATION

23   BY MR. SACHSE:

24       Q  To get one thing straight in my own mind, Colonel, you

25   answered me that the acreage presently planted of Class VII

Z-78

1    soil to avocados was approximately 4 acres.  Do you recall that?

2         A  Yes, sir.

3         Q  And the acreage that--  The additional acreage of

4    Class VII soil that could be planted was about 8 acres?

5         A  Yes, sir.

6         Q  Now, that 12-acre total is not included within your

7    30.4 acres of maximum irrigable acres, is it?

8         A  No, sir.

9         Q  It is in addition to it?

10        A  Yes, sir.

11        Q  One other question.  I will direct your attention

12   to page 3 of the report, the section on engineering, and the

13   very-- well, the middle and end of the second paragraph,

14   starting at "10-horsepower electrically driven pump."  Do you

15   see the language?

16        A  Yes, sir.

17        Q  Do I understand your testimony to be that the pump on

18   the well on De Luz Creek can take water out of the creek as

19   well as out of the well?

20        A  Yes, sir.

21        Q  And calling your attention to two sentences farther

22   on, "Domestic water is provided the ranch house by a five-foot

23   dam," et cetera.  Do you see that?

24        A  Yes, sir.

25        Q  You recall my questions about a spring by the new

Z-79

1    ranch house?

2         A   Yes, sir.

3         Q   Does reading this refresh your recollection as to that

4    installation?

5         A   Yes, sir.

6         MR. SACHSE:   I think that is all, sir.

7         THE MASTER:   Mr. Veeder, do you have any further ques-

8    tions?

9         MR. VEEDER:   I have no further questions, your Honor.

10        I would like, though-- we are about to conclude, are we

11   not?

12        THE MASTER:   Yes.

13        MR. VEEDER:   As I understand from our conversations with

14   Mr. Sachse and with you, no party will be precluded after the

15   15th of July of putting in additional testimony in regard to

16   the De Luz area.   Is that correct?

17        THE MASTER:   No, your understanding is correct.

18        Now, before we recess--

19        MR. VEEDER:   One other thing, your Honor.   We have a

20   situation where we would like to accommodate the man, and I

21   think it would necessarily involve your approval.   The cir-

22   cumstances are this, he has written a letter to us stating

23   that he would like to file an affidavit rather than going to the

24   expense of calling a witness and bringing him here, or taking

25   his deposition.   We feel that we would like to accommodate the

Z-80

1   man if it would be approved by you.  I don't know what the

2   affidavit is, we may have to rebut it, but I would prefer to

3   save the man the expense-- apparently he is out of the State--

4   either bringing him here or taking his deposition.

5       THE MASTER:  Well, that would certainly be all right as

6   far as I am concerned.

7       MR. SACHSE:  Who is he?

8       LT. MILLER:  The Richardson property.

9       MR. SACHSE:  Where is that?

10      LT. MILLER:  Parcel 88, on the fringe of the watershed.

11      THE MASTER:  I would suggest that the affidavit be

12   submitted.  Of course, if any one of the other defendants then

13   wished to challenge the affidavit he would have to produce the

14   witness or the affidavit would have to be excluded.  In other

15   words, it would only be admissible, obviously, against the

16   plaintiff if they consented, and against any individual defend-

17   ant if they didn't object.

18      MR. SACHSE:  Looking at the parcel, and knowing the

19   clients, I have, I don't think I would have any objection.  You

20   might bring the affidavit down and let it go by stipulation

21   that if he was called that he would so testify.

22      THE MASTER:  Then any individual defendant could challenge

23   it later, but in the absence of such a challenge it would be

24   evidence.

25      Mr. McDowell, in regards to Mr. Garnsey, you said you

Z-81

1   had no questions to ask him.   Is there any evidence you wish

2   to offer yourself in regards to the Garnsey property?

3       MR. McDOWELL:   Well, the only thing I wanted to find out

4   is if they are going to let the water out of that dam.

5       THE MASTER:   That is something I can't answer, and this

6   lawsuit won't necessarily determine.   But is there any evidence

7   that you yourself want to present?   Do you want to testify to

8   any new facts that you haven't already testified to as regards

9   your property?

10      MR. McDOWELL:   No.   That is my property I was looking out

11  for as to permanent pasture,

12      THE MASTER:   There is no additional testimony that you

13  want to offer that you haven't previously offered?

14      MR. McDOWELL:   No.

15      THE MASTER:   Then we will recess at this time until

16  9:30 on Monday, July 14th.   There will be no hearings next

17  week.

18      And it is my understanding that on July 14th we will have

19  testimony definitely concerning the Jones property, and the

20  property which is listed in Exhibit M-31 as belonging to

21  Mildred Dodge, but which has been bought by the son of Mr.

22  Anderson, and that he will have some testimony in connection

23  with that property.   We will also have the evidence of those

24  defendants who have been given engineering reports and who

25  care to testify.   Notices are now being sent to them directing

Z-82

1    them to appear.

2         We will also have testimony of Col. Bowen on property

3    upon which no engineering reports have been submitted so far.

4         Now, I believe all of your defendants have been covered,

5    Mr. Sachse?

6         MR. SACHSE:   Two, your Honor.   What days that week,

7    Monday, Tuesday and Wednesday?

8         THE MASTER:   Well, the hearings are scheduled for Monday

9    and Tuesday, and we will continue on Wednesday if we don't

10   finish up on Tuesday.

11        MR. SACHSE:   May I ask, the only parcels with which I am

12   concerned that do not yet have reports are Rudolph Foss, the

13   big one up at the head of Cottonwood, the great big one; the

14   other Foss has already testified, and I want to see his report

15   on it, I think, and King, 60.   Is there any possibility that

16   those would be ready before that date?   If so, I would like to

17   see them, and I may not have to bring any witnesses at all.

18        COL. BOWEN:   I can't tell you at the moment the completion

19   dates of those reports.

20        MR. SACHSE:   If you can let me know I may be able to

21   avoid calling the witnesses at all.

22        THE MASTER:   As soon as the reports are finished you will

23   furnish Mr. Sachse those reports to which he is entitled.

24        MR. VEEDER:   Mr. Sachse, can you meet with me sometime

25   tomorrow in connection with admissions and interrogatories?

Z-83

1          MR. SACHSE:  We will work that out off the record.

2          THE MASTER:  At this time we will adjourn until 9:30

3  on July 14th.

4          (Adjournment until 9:30 A.M., July 14, 1958.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25