# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

**REPORTER'S TRANSCRIPT**

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**Volume:** 16

**Pages** 2042-2168

**Date:** July 14, 1958

**Place:** Fallbrook, California

RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS

1113 FIRST NATIONAL BUILDING

SAN DIEGO 1, CALIFORNIA

BELMONT 9-4191

```
 1
 2
 3      APPEARANCES:
 4
 5              LT. DAVID W. MILLER
                 For the United States of America
 6
        FRANZ R. SACHSE, ESQ.
 7        For Fallbrook Public Utility District
          and named individual defendants
 8
        MILTON MILKES, ESQ.,
          Deputy District Attorney
 9        For De Luz School District
10      JOHN BRICKER MYERS, ESQ. (afternoon
          session only)
11        For Lawrence William and
          Mary Constance Butler
12      RAY C. EBERHARD, ESQ. (part of afternoon
          session only)
13        For Samuel and Hazel Wilson

14      MRS. A. B. DINSEN, in Propria Persona
15
16
17                          - - -
                             -
18                           -
19
20
21
22
23
24
25
```

# INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | | 2059 | | |
| | | 2060 | | |
| | 2063 | | | |
| | | 2063 | | |
| | | 2070 | | |
| | 2079 | | | |
| | | 2083 | | |
| | | 2113 | | |
| | | 2125 | | |
| | | 2131 | | |
| | | | 2132 | |
| | | 2139 | | |
| | | 2162 | | |

| For the Defendants: | D | X | | |
|---|---|---|---|---|
| Chloe L. Baxter | 2046 | 2050 | | |
| Harry Ashton | 2055 | | | |
| Ruth Kellum Dinsen | 2074 | | | |
| Rudolph C. Foss | 2093 | 2102 | | |

2043

## INDEX TO EXHIBITS

| For the Plaintiff: | Iden. | Rec'd |
|---|---|---|
| M-97 Homestead Cert. No. 772 | 2052 | 2052 |
| M-98 Report of Engineering Investigation, Parcels 66 and 67 | 2063 | 2064 |
| M-99 Report of Engineering Investigation, Parcel No. 5 | 2079 | 2080 |
| M-100 Report of Engineering Investigation, Parcel No. 12 | 2080 | 2081 |
| M-101 Report of Engineering Investigation, Parcel No. 19 | 2080 | 2082 |
| M-102 Report of Engineering Investigation, Parcel No. 60 | 2082 | |

| For the Defendants: | | |
|---|---|---|
| MD-AA   Five Deeds (Foss) and patent. | | 2102 |
| MD-BB   Grant Deed (King) | | 2123 |

2044

Z-1

<u>Fallbrook, California, July 14, 1958. 9:30 A. M.</u>

THE CLERK:   Court is now in session.

THE MASTER:   Will counsel state their appearances for the record.

LT. MILLER:   David W. Miller for the United States.

MR. MILKES:   Milton Milkes for the De Luz School District.

MR. SACHSE:   Franz Sachse for the Fallbrook Public Utility District and named individual defendants.   And I would like to state for the record that Mr. Dennis asked me to offer his apologies this morning.   He is tied up in court this morning, but he will appear in court tomorrow with the defendant Jones, who is now one of his clients.

THE MASTER:   That is on Parcel 54?

MR. SACHSE:   55, I believe it is.

THE MASTER:   We may have more than one Jones.

MR. SACHSE:   It is Parcel 55, Jones.

THE MASTER:   That is Fred M. Jones and Grace R. Jones.

Now are there any defendants here in pro per who are not represented by attorneys?   I notice Mrs. Baxter is here.

MRS. BAXTER:   Well, they brought me in case they needed a witness for the De Luz School.

THE MASTER:   I see.   Are there any other individual defendants?

MRS. DINSEN:   A. B. Dinsen, Parcels 66 and 67.

2045

Z-2

1    THE MASTER:  That is Parcels 66 and 67?

2    MRS. DINSEN:  Yes.

3    THE MASTER:  Wait, I have Parcel 67 as owned by the United

4    States, I believe.  Have you acquired that from the Government?

5    MRS. DINSEN:  Yes, sir.

6    THE MASTER:  Very well.  Do you wish to be heard today on

7    that?

8    MRS. DINSEN:  It doesn't matter.

9    THE MASTER:  I imagine we can probably reach you later in

10   the day then.

11   LT. MILLER:  We are prepared to introduce Mrs. Dinsen's

12   report, your Honor.  And she has received a copy of it.  So

13   whatever time is convenient, why we will introduce it.

14   THE MASTER:  Well, I believe we will proceed then first

15   to De Luz School District, and then probably to Mrs. Dinsen.

16   MRS. EDITH PARKER:  I have a communication from La Canada,

17   a Mrs. Stansbury.  She asked me if I would appear for her and

18   answer.  She has some property in De Luz.

19   THE MASTER:  Well, what is the nature of the communication?

20   Do you have an answer filed by her or--

21   MRS. PARKER:  Yes, when you get around to it.

22   THE MASTER:  We will proceed now with the De Luz School

23   District .

24   MR. MILKES:  Yes.  Has the Government's report been intro-

25   duced yet on the De Luz School District?

Z-3

1    LT. MILLER:  It has.

2    THE MASTER:  Which parcel is that, Mr. Miller?

3    LT. MILLER:  Parcel 53, your Honor.  And the exhibit was

4    M-89.

5    MR. MILKES:  The Government's report is acceptable to the

6    School District in so far as the report deals with highest

7    potential irrigation use.  We feel the report is accurate.

8    However, we would like to call one witness to testify as to the

9    current use being made of the water sources for school purposes.

10   The report does not deal with that.  And we feel that the

11   current use might have a priority over irrigation use.

12   THE MASTER:  Very well.  You may call your witness then.

13   MR. MILKES:  Mrs. Baxter, would you take the stand, please.

14   THE CLERK:  You have been sworn before, haven't you?

15   MRS. BAXTER:  Yes.

16   THE CLERK:  You are still under oath.

17

18                      CHLOE L. BAXTER,

19   called as a witness by and on behalf of defendant De Luz School

20   District, having been previously sworn, testified as follows:

21

22                     DIRECT EXAMINATION

23   BY MR. MILKES:

24       Q  What is your name, please?

25       A  Chloe Baxter.

Z-4

1    Q   And your address?

2    A   Mail address?

3    Q   Yes.

4    A   Route 2, Box 34, Fallbrook.

5    Q   And are you the Clerk for the De Luz School District?

6    A   No, I am not.

7    Q   What is your capacity with the School District?

8    A   I am not on the School Board.  Mrs. Parker is the Clerk.

9    Q   You were on the School Board?

10   A   Oh, yes, years ago.

11   Q   What were the years that you were on the School Board?

12   A   Let me see, I went on in 1928.  I hadn't thought about

13   that.  Well, I was on for nine years.

14   Q   Starting in 1928?

15   A   In '28.

16   Q   And can you recall when the School District built its

17   well which is now using the water from the De Luz Creek?

18   A   This present well?

19   Q   Yes.

20   A   They didn't put down that well when I was on.  Do you

21   know what year?

22   MRS. PARKER:  I don't know the year.

23   MR. MILKES:  She isn't testifying.

24   THE MASTER:  She can testify later to what she knows.

25   All you can testify to now is to what you know.

Z-5

1    THE WITNESS:  Yes.  Well, I didn't mean to be out of

2    order, your Honor.  I wasn't on the Board when this present

3    well was put down.  I had just gone on the Board in '28 when

4    the one well was put down.  And it didn't have enough water.

5    Do you want me to go ahead?

6    BY MR. MILKES:

7        Q  Can you remember approximately what year that was when

8    the well was put down?

9        A  That was in '28.

10       Q  1928?

11       A  '28 or '29.  '29.  '29.

12       Q  How many pupils generally matriculate at the school?

13       A  Well, at that time there was about sixteen or seventeen.

14   Our attendance has fluctuated back and forth.  This last year

15   I think there was ten, I believe.

16       Q  And for what purposes does the school need water?

17       A  Well, for the-- what any school would need water for,

18   the children.

19       Q  Do you have a drinking fountain?

20       A  Oh, yes.

21       Q  How many drinking fountains are there?

22       A  I think there is just one.

23       Q  And are there toilet facilities?

24       A  Yes.

25       Q  One toilet?

Z-6

1    A    Two.

2    Q    And is there a kitchen?

3    A    Yes.

4    Q    And is there shrubbery around the schoolhouse?

5    A    Yes, there is.   There is a lawn and shrubbery.

6    Q    And that is watered from the well; is that right?

7    A    Yes, that is watered from the well now.

8    Q    Is the State Division of Forestry using the water to

9    maintain a fire control camp on the school property?

10    A    Well, they are not now.   They did.   Let's see, I don't

11    remember whether they were there more than one year or not.

12    I believe they were.   They were located right in the back of

13    the school by the baseball diamond back there.

14    Q    Is the school open during the summer months?

15    A    You mean for school?

16    Q    Yes.

17    A    Not for school.

18    Q    Is the schoolhouse used for any other purpose besides--

19    A    Well, as a community center.

20    Q    Is it used as a community center?

21    A    Yes.

22    MR. MILKES:   That is all I had, your Honor, to ask Mrs.

23    Baxter.

24    THE MASTER:   Lt. Miller.

25

Z-7

CROSS-EXAMINATION

BY LT. MILLER:

Q  Mrs. Baxter, was the well which was placed in operation in 1929 the same one that is being used today?

A  No.  That well was right there as you drive in the schoolhouse, you will see that pump house frame built out of-- frame pump house.  It didn't have enough water.

Q  And when did the well that is now in operation-- when was it placed into operation for the first time, if you know?

A  Well, I don't know exactly, Lt. Miller.  I wasn't on the Board.  And I should know, I live there, but it has been a few years.

Q  There has been a continuous use of water from one of the two pumps, though, from 1929 to this date, in so far as you know?

A  Oh, yes.  I am going to tell you this,-- I don't know whether it is important or not.  But the well was put down in 1929 so that there would be water when school opened.  But it was a warm fall, I remember very well, and there wasn't enough water to do any irrigating at all.  And so we put in a two-inch line down to the creek and dug out quite a good-sized sump and pumped from there for irrigating.  And we used that for several years. Quite a good many years that was used.  They later put in a -- like a cement box down in that sump, don't you know, and pumped out of that.

Z-8

1    Q   Then that sump was later replaced by the well that is

2    now in use?

3    A   Then they put down this new well and took the pipe out

4    of the creek and didn't pump directly from it.  But the new

5    well isn't very far from the creek.

6    LT. MILLER:  Right.  No further questions, your Honor.

7    MR. SACHSE:  I have nothing, your Honor.

8    THE MASTER:  Any redirect examination?

9    MR. MILKES:  No.

10   THE MASTER:  Then you may step down, Mrs. Baxter.

11   MR. MILKES:  That is all, your Honor.

12   THE MASTER:  That is, you are not calling Mrs.--

13   MR. MILKES:  No, her evidence would be cumulative to what

14   Mrs. Baxter testified.

15   THE MASTER:  Then do you have any other evidence to pre-

16   sent?

17   MR. MILKES:  No.

18   THE MASTER:  As I understand it, you accept the report,

19   M-89, as far as it goes as to agricultural uses?

20   MR. MILKES:  That is right.

21   THE MASTER:  And as to the character and type of soil?

22   MR. MILKES:  That is right.

23   THE MASTER:  You, of course, are under no obligation to

24   stay any longer, unless you desire to.  You are perfectly

25   welcome to--

Z-9

1  MR. SACHSE:  Will there be any further evidence to intro-

2 duce, your Honor?

3  LT. MILLER:  Yes, we have a patent to introduce that will

4 affect the area now owned by the De Luz School District.

5  THE MASTER:  Very well.

6  LT. MILLER:  And with your permission I will ask the Clerk

7 to mark this as Plaintiff's Exhibit for Identification .

8  THE CLERK:  M-97.

XI 9  LT. MILLER:  M-97 for Identification.

10  (Homestead Certificate No. 772 marked Plaintiff's Exhibit

11 No. M-97 for Identification.)

12  LT. MILLER:  I will hand Plaintiff's Exhibit M-97 for

13 Identification to the counsel for their examination.

14  I submit into evidence, your Honor, Plaintiff's Exhibit

15 M-97 for Identification as Plaintiff's Exhibit M-97.

16  THE MASTER:  Is there any objection?

17  MR. MILKES:  No.

18  MR. SACHSE:  No objection.

XR 19  THE MASTER:  It will be received in evidence and marked

20 Plaintiff's Exhibit M-97.  Do you have any further testimony

21 affecting this property?

22  LT. MILLER:  Nothing further.

23  THE MASTER:  Very well.

24  Are you an attorney representing any defendant in this

25 case?

Z-10

1    MR. ASHTON:  Yes, your Honor, I am representing A. S.

2  and Eileen Richardson.  I haven't specified this on the

3  calendar.  I supposed we could come any time.

4    THE MASTER:  I think you can.  If you are prepared, why

5  we might as well proceed at the present time.  Will you state

6  your name?

7    MR. ASHTON:  Harry Ashton.

8    MR. SACHSE:  What was the property, please, sir?

9    MR. ASHTON:  So far as preparation, I am ready, yes, your

10  Honor.

11    LT. MILLER:  It is Parcel 88, I believe.

12    THE MASTER:  That is A. S. Richardson and Eileen Richard-

13  son.

14    MR. ASHTON:  That is it.

15    THE MASTER:  That is Exhibit M-91, the engineering report.

16    MR. SACHSE:  That is Parcel 88?

17    THE MASTER:  Yes.

18    MR. ASHTON:  That report has been introduced, has it, your

19  Honor?

20    THE MASTER:  The report on that property has been intro-

21  duced as Exhibit M-91.  Do you wish to look at the exhibit it-

22  self?

23    MR. ASHTON:  I have this report that was mailed to us.

24    THE MASTER:  Mr. Clerk, will you give Mr. Ashton Exhibit

25  M-91.

Z-11

1    THE CLERK:  Yes.  I have it right here.

2    MR. ASHTON:  Yes, this is the one of which I have a copy.

3    I have, your Honor, no evidence to introduce.  I had ex-

4    pected to have Mr. Richardson with me.  He would be the only

5    one that would testify.  And he was, unfortunately, taken ill

6    and is unable to come this morning.

7    THE MASTER:  Is there any other evidence you wish to

8    offer, or do you wish to cross-examine Col. Bowen with regard

9    to the report?

10   MR. ASHTON:  I don't think it is necessary to cross-

11   examine him.  I think the exhibit-- possibly I can make my

12   statement from the exhibit.

13   THE MASTER:  Very well.

14   MR. ASHTON:  There are just certain things I want to point

15   out.  There are a few things that I may have to state that may

16   be in the nature of hearsay or conclusions.  If there are any

17   objections I will--

18   THE MASTER:  Are you going to be in a sense offering

19   testimony so that you should be sworn?

20   MR. ASHTON:  No, I don't think-- well, possibly it would

21   be all right if I were sworn, because I have examined the

22   property myself.  I have been on it, and I can make certain

23   statements with reference to it that might be in the nature

24   of evidence.

25

2055

Z-12

1                         HARRY ASHTON,

2    called as a witness by and on behalf of the defendants A. S.

3    and Eileen B. Richardson, sworn, testified as follows:

4

5         THE WITNESS:  I went on to this property about a month

6    and a half ago, shortly prior to the original meeting at this

7    location.  And I walked over the whole thing.  In the report

8    it mentions the fact that there is a well, apparently a dug

9    well located on the property, and that near that well is a

10   capped eight-inch casing.  That casing is a round hole about

11   80 feet deep.  I have looked at the log of that hole.  It was

12   drilled for a well.  And it is absolutely no water all the

13   way down.  It is in that sort of rock that underlies that

14   whole property, and it didn't run into any fissures or anything

15   like that where there was any accumulation of water.

16        I didn't know whether the engineers knew what the nature

17   of that hole was.

18        You will notice-- when you inspect the property you will

19   notice on it a number of fruit trees.  There are some apple

20   trees and pear trees, which are quite old.  They are apparent

21   to anybody that they are quite old.  And they lie along that--

22   in the upper part of the exhibit there, on that Class II land.

23   I don't believe there is any production from them.  In fact, the

24   most of them have pretty well died away.

25        Your Honor will notice, if you examine that exhibit, the

Z-13

1   map in the back of the exhibit, that about the only water that

2   can reach this land, this particular land, is that which God

3   in His wisdom drops on it.  The ridge there that separates the

4   Santa Margarita River watershed from the others almost

5   surrounds this property, and any water from any other source

6   runs in a different direction.  There is a 40-acre piece that

7   is over on the other side of the watershed, which, of course,

8   there is water from there, which isn't involved in this law-

9   suit, as I understand it.  And practically the only water

10  that can reach this particular land must fall on it.  It can't

11  run into it from any other direction, except at the southeast

12  corner there, there is probably some water that could run down

13  that hill.  However, the tendency to run would be so that very

14  little of it would reach this particular land.  So that I

15  think that the defendants here should have their right con-

16  firmed to-- I don't know how much water falls on it.  But at

17  least they should have their right confirmed to all water that

18  falls on that land or originates on that land.  It is true that

19  there has never been any particular use of it by creating ponds

20  and storage.  That well that is there, that dug well, of course

21  it accumulates water during the rainy season.  Runoff water, is

22  what it is.  And that goes dry in the summertime.  There are

23  other springs down on the other side of the divide which Mr.

24  Richardson, the owner, is contemplating developing, and putting

25  in a pump to pump water up to the top of the ridge, where he

Z-14

1   has a small reservoir.  I believe maybe the engineers have seen

2   that reservoir.

3       LT. MILLER:  May I interrupt counsel at this point, since

4   this is in the nature of a summation and testimony, just to

5   clarify this point?  When you say "the other side of the ridge"

6   about those springs, you mean over in the watershed other than

7   the De Luz watershed.

8       THE WITNESS:  Other than the Santa Margarita River, yes.

9   As you will notice, the watershed boundary just about parallels

10  the-- or follows the division between that northwest 40 and the

11  other piece of property there.

12      I wish your Honor had a copy of this.  Yes, there.  And

13  the fact of the matter is there are springs over there in that

14  40, and Mr. Richardson contemplates developing those springs.

15  Actually, all he is using it for and expects to use it for is

16  probably for recreation, sort of a loafing place, and to enjoy

17  themselves.  But in the event it ever comes up for sale, some

18  fixation of the water rights on the property would be desir-

19  able, and I believe should be had.

20      THE MASTER:  There are no springs so far as you know on the

21  portion of the property that is within the Santa Margarita

22  watershed; is that correct?

23      THE WITNESS:  No, there doesn't seem to be, from my exam-

24  ination.  I didn't see any springs on that particular property.

25  There is, what shall we call it, sort of swampy places down

Z-15

1  along the creek in that lower Class II and Class-- Class II

2  land there, the light-colored land down at the south end there.

3  There are sort of swampy places along the creek. But there

4  doesn't seem to be any continuous flow, like a spring flow

5  would be, from any of that land there. The springs are over

6  on the other side of the watershed boundary there, from what

7  examination I made of it. There has been-- there is indica-

8  tions on that lower piece of land that that has at one time or

9  another been farmed for grain. There were some old harvesting

10  implements located down there. It looked like they had probably

11  been there twenty years, without having been used. And that

12  is substantially all of the development so far as agriculture

13  goes that is on the property. That particular land now is in

14  pasture. Whether it has been developed or just whether it is

15  wild growth, I don't know.

16      I notice in the report, and I think that is substantially

17  right, that they give it a developed acreage of about 37½ out

18  of that total of 75 in the land that is in the watershed. They

19  give it an irrigation requirement of 3.83 acre feet per year.

20  I don't know what the annual rainfall up in that area is.

21  Probably it is-- well, I won't state what it probably is, be-

22  cause it would be a mere guess. Are any of the engineers here

23  that might be able to supply that information?

24      THE MASTER: Col. Bowen might be able to advise you on

25  that. Do you wish to call him and examine him?

Z-16

1    MR. ASHTON:  Yes, I would like to know that particular

2    fact, if I may.

3    THE MASTER:  Col. Bowen, do you care to take the stand,

4    then?

5

6                           ALLEN C. BOWEN,

7    recalled as a witness, having been previously sworn, testified

8    as follows:

9

10                         CROSS-EXAMINATION

11   BY MR. ASHTON:

12       Q  Colonel, are you familiar with the annual rainfall in

13   the area of this particular property?

14       A  Generally, yes, sir.

15       Q  And will you state generally what the annual rainfall

16   is in that particular location?

17       A  The average annual rainfall up in there is around 25

18   inches per year.

19       Q  Around 25 inches per year?

20       A  Yes, sir.

21       Q  Then if you have the average rainfall, there would be

22   on this particular land about 150 acre feet of water fall on

23   this land per year; is that right?

24       A  Yes, sir.  That is about right.  That would be an

25   average, some years less, some years more.

Z-17

1    Q   Some years less, some years more?

2    A   Yes, sir.

3    Q   And that would be from the water which fell on this

4    particular land only, not runoff; is that right?

5    A   No, sir.  That is the total fall on the land.  And

6    some of that will run off.

7    Q   Well, it would run off, but that fall would be-- if it

8    were stopped there, it would be the water that fell right down

9    on that land, not some that ran in from other sources; is that

10   right?

11   A   Yes, sir.  That is right.

12   MR. ASHTON:  I believe that is all I want to ask the

13   Colonel.

14   LT. MILLER:  No questions.

15   MR. SACHSE:  May I ask him a couple of questions about the

16   report itself?

17   THE MASTER:  Yes, surely.

18

19                    CROSS-EXAMINATION

20   BY MR. SACHSE:

21   Q   Col. Bowen, with reference to Parcel 88, I don't find

22   any extension of an intermittent stream symbol into that parcel.

23   Is there an actual flowing stream into it?

24   A   No, sir.  There is an intermittent stream course that

25   crosses the southerly 40, Parcel No. 88.

Z-18

1      Q   And it would be flowing only immediately during and

2   after rains?

3      A   Yes, sir.

4      Q   And assuming development of ground water on the parcel,

5   would it be your opinion that is vagrant local percolating

6   ground water?

7      A   Yes, sir.

8   MR. SACHSE:  That is all.

9   MR. ASHTON:  That is all.

10   THE MASTER:  You have no further questions?

11   MR. ASHTON:  No further questions.

12   THE MASTER: That is all, then.

13   MR. ASHTON:  I don't know just how your Honor proposes to

14   make these findings, but in view of that testimony I think that

15   the amount of water allocated to this particular property

16   should be as much as can be used out of the water that falls on

17   it.   And if that is 150 acre feet per year on the average,

18   then it should be that amount.   That is, that owner should

19   be entitled to use as much of that water as he wants to.   If

20   he can't use it all, or doesn't use it all and it runs off

21   down the stream, I mean that is all right, too.   But I don't

22   think we should be limited to any less than the amount that

23   falls on that particular land.

24      I think that is all I have to present.   I wish Mr.

25   Richardson were here so that he could possibly give a little

Z-19

1  more history about the fact that this land has been used back

2  since the time it was homesteaded in 1909.  And apparently at

3  that time there were not jobs around the military installations and

4  so forth.  That man raised a family on that land, and he must

5  have had some water to do it with.  And so consequently the

6  water has been used for an extensive length of time.

7      That is, your Honor, all I have to say at this time.

8      THE MASTER:  Thank you.  As I understand, you do not

9  question the actual classification of the soils contained in

10 the report.

11     MR. ASHTON:  No, there is no question of the classifica-

12 tions of the soil or any part of the engineering report.  I

13 am quite gratified to-- was quite gratified to receive this.

14 I think they have done a good job and have given us a fair

15 appraisal of the conditions as they exist there.  I hope the

16 other ones-- and I think they will be as good.

17     THE MASTER:  Thank you.  Do you represent any client on

18 any other parcel of property?

19     MR. ASHTON:  Yes, your Honor.  I represent the Wallaces.

20 And I don't know the number of the parcel.  But it is down on

21 the slope of Palomar Mountain.

22     THE MASTER:  That is not in this area.

23     MR. ASHTON:  It is not in this area, no.  It is in another

24 area.

25     THE MASTER:  Very well.  That concludes your presentation

Z-20

1   in so far as this parcel-- this watershed is concerned?

2        MR. ASHTON:  Yes, your Honor.

3        THE MASTER:  Very well.  Now I believe unless there is some

4   reason to the contrary we might as well take up Mrs. Dinsen,

5   I believe it is, then, on Parcel 66.

6        LT. MILLER:  Your Honor, that report has not been intro-

7   duced as yet.  And if it would meet with the Court's wish, we

8   could put Col. Bowen on the stand for the purpose of introducing

9   that.

10       THE MASTER:  Yes, can you do that?  And, Mrs. Dinsen, you

11   might come up where you can take notes, if you desire.  Col.

12   Bowen.

13

14                       ALLEN C. BOWEN,

15   recalled as a witness, having been previously sworn, testified

16   as follows:

17

18                    DIRECT EXAMINATION

19   BY LT. MILLER:

20       Q  You are the same Lt. Col. Allen C. Bowen who has been

21   sworn and testified heretofore?

22       A  Yes, sir.

23       LT. MILLER:  I will ask the Clerk to mark this as

24   Plaintiff's Exhibit M-98 for Identification.

25

XI

Z-21

BY LT. MILLER:

Q   Colonel, I will hand you M-98 for Identification, and ask you to state what it purports to represent.

A   Plaintiff's Exhibit M-98 is a report of an engineering investigation made on De Luz watershed Parcels Numbers 66 and 67.   The name on the cover of the report is that of Adolph B. and Ruth Kellum Dinsen.

LT. MILLER:   I will hand Plaintiff's Exhibit M-98 for Identification to Mrs. Dinsen and to Mr. Sachse for their examination.

MR. SACHSE:   Did I understand correctly that this is 67 and 68 now?

LT. MILLER:   66 and 67.

MR. SACHSE:   66 and 67.   The parcel indicated on Plaintiff's Exhibit M-32 as 68 is actually hers.

LT. MILLER:   You mean 67.

MR. SACHSE:   Yes, 67 is actually hers.

LT. MILLER:   She will probably introduce the patent on it. That is our belief.

At this time, your Honor, I introduce or offer Plaintiff's Exhibit M-98 for Identification into evidence as Plaintiff's Exhibit M-98.

THE MASTER:   That will be received in evidence as Plaintiff's Exhibit M-98.

XR

Z-22

BY LT. MILLER:

Q  Col. Bowen, would you step to Plaintiff's Exhibit M-32 and mark with a red X the property covered by this report?

A  The report contained in Plaintiff's Exhibit M-98 is that of Parcels 66 and 67, delineated on Plaintiff's Exhibit M-32 with the number 66 encircled within the outer boundaries of that property, and the number 67 encircled with a line pointing to the small triangular property represented by that parcel.  Both of these parcels have a common boundary with the Naval Reservation boundary.  And I will with a red pencil mark an X in each of these parcels.

Parcel 66 is traversed from north to south by the hard-surfaced De Luz Road.

Q  The report, which is Plaintiff's Exhibit M-98, was made under your supervision and direction?

A  Yes, sir.

LT. MILLER:  No further questions.

THE MASTER:  Mrs.Dinsen, do you have any questions to ask Col. Bowen concerning the report?

MRS. DINSEN:  Well, I don't know if-- it is not exactly to ask Col. Bowen.  But we want to know if it would be acceptable if an accredited surveyor would make a statement of the number of acres that is tillable.  We believe that there is more land tillable than is mentioned in the report.

THE MASTER:  Well, of course a surveyor probably would not

Z-23

1   be qualified to testify as to tillable acreage.  But if you

2   had someone who was qualified to judge the nature of soils,

3   of course his testimony would be admissible.  Now a surveyor

4   might also be qualified to determine the irrigable acreage, but

5   if his only knowledge is in the surveying of land line, he might

6   be competent to survey land and not know the type or character

7   of the land he was surveying.

8        MRS. DINSEN:  Yes.

9        THE MASTER:  Do you wish to ask Col. Bowen any questions

10   in support of your statement that you believe more land is

11   tillable or irrigable than he has indicated?

12        MRS. DINSEN:  Yes.

13

14                    CROSS-EXAMINATION

15   BY MRS. DINSEN:

16        Q  We believe, Col. Bowen, that there is a piece of land

17   south of the spring.  It would be north of that high hill.  It

18   is a piece of land we call the meadow.  And it seems it is not

19   shown on this map.  I may be wrong on that.

20        A  Mrs. Dinsen, is that the parcel colored blue in the

21   northeasterly portion of Parcel No. 66?

22        Q  I think it would be a little bit farther north and east.

23        THE MASTER:  Mrs. Dinsen, can you possibly show Col. Bowen

24   on the map the exact parcel that you mean?  Can you show him

25   on this copy of the map that he has?

Z-24

1    MRS. DINSEN:  Right in here it may be.  There is a great

2    deal of underbrush between here and up in there.  It is hard

3    to get to.  But after the fire in 1945 everything was burned

4    off, so we know about the land in there.  It isn't very big,

5    either.

6    THE WITNESS:  Is it included within that area of Class IV

7    land colored blue there, near the spring, Mrs. Dinsen?

8    MRS. DINSEN:  I believe not.  I believe it is not included.

9    Generally speaking, we believe that more land has been tilled

10   than the amount given here.

11   THE MASTER:  But do you have any evidence that you can

12   offer in support of that statement, Mrs. Dinsen?

13   MRS. DINSEN:  Not at this time, no.

14   THE MASTER:  Do you wish then to reserve the right to

15   offer additional evidence at a later time?  And if so, when?

16   Because we are trying to conclude these hearings this week,

17   if possible.  You referred to a surveyor.  Do you have someone,

18   some specific individual in mind?

19   MRS. DINSEN:  No.

20   THE MASTER:  That you believe can testify--

21   MRS. DINSEN:  No, we don't.

22   THE MASTER:  Well, could I urge you to try to find what-

23   ever individual you desire to have testify, and let us know by

24   tomorrow afternoon whether you do have any further evidence

25   which you wish to offer, because we expect to terminate the

Z-25

1   hearings tomorrow, if possible.  And certainly as soon there-

2   after as we have finished hearing from all witnesses who

3   desire to testify.  We don't want to preclude you from offering

4   the evidence, but if you want to offer it you will have to get

5   it in this week.

6   MRS. DINSEN:  That may be impossible.

7   THE MASTER:  Can you at least let us know tomorrow

8   afternoon whether you have anyone in mind?  In other words,

9   the hearings may continue beyond tomorrow if we have witnesses

10  who are available and wish to testify, but in the absence of

11  knowledge that there is some definite witness who wants to

12  testify, the hearings will conclude as soon as we finish with

13  the available witnesses.

14  MR. DINSEN:  Yes, we can do that.  We can let you know.

15  THE MASTER:  Then there are no further questions you have

16  of Col. Bowen at this time?

17  MRS. DINSEN:  I believe not.  I want to ask some questions

18  about the right to put in a well and so forth, but I believe

19  it wouldn't be of Col. Bowen.

20  THE MASTER:  Well, you mean those are questions as to your

21  legal rights?

22  MRS. DINSEN:  Yes.

23  THE MASTER:  I don't think that is in the nature of

24  evidence, Mrs. Dinsen.  I could try to answer those questions

25  for you possibly informally, but the actual determination would

Z-26

1  have to be made at the end of the entire case.  In other words,

2  there is no statement I could make now as to any piece of

3  property which would be binding or constitute a final determin-

4  ation.

5       MRS. DINSEN:  Yes, we realize that.

6       THE MASTER:  Mr. Sachse, do you have any questions?

7       MR. SACHSE:  Yes.

8       LT. MILLER:  Your Honor, perhaps before we move off this

9  one point, and not interrupt with Mr. Sachse's examination,

10  we would be happy to have a representative of the United States

11  go out to the Dinsen property again and look at the particular

12  pieces she has in mind.  And that might assist her.  I don't

13  know.  But we would like to extend that offer to Mrs. Dinsen,

14  to look at it.  We think the report is accurate, but if she

15  has particular areas in mind we would be happy to send someone

16  out to look at them again.

17       MRS. DINSEN:  That would be fine.

18       THE MASTER:  Mrs. Dinsen, then if you can see either

19  Col. Bowen or Lt. Miller during the recess you can arrange

20  for them to go out at a particular time and look at that area

21  of the property.

22       MRS. DINSEN:  That would be fine.

23       THE MASTER:  Mr. Sachse.

24

25

Z-27

CROSS-EXAMINATION

BY MR. SACHSE:

Q   Colonel, are there any streams other than intermittent, flowing during and after rains, present on this property?

A   No, sir.

Q   And are there any substantial alluvial deposits on the property, ground water basins?

A   No, sir.  There are some rather deeply weathered areas of residuum in there, which may have a small portion of alluvium.  But it is largely residuum.

Q   And your conclusion then as to any water that might be developed by drilling on the property is that it would be vagrant local percolating ground water?

A   Yes, sir.

MR. SACHSE:  That is all.

THE MASTER:  Lt. Miller.

LT. MILLER:  No questions.

BY THE MASTER:

Q   There are no soil conservation dams on the property?

A   Yes, sir.  There are two small earth fill dams, your Honor.  Referring to the land classification map in Plaintiff's Exhibit M-98, located about centrally in Parcel 66 is a comb-shaped symbol to the east of the north-south De Luz Road.  This symbol indicates a small earth fill structure astride the intermittent stream which heads in Parcel No. 67 and flows

Z-28

1  westerly.  North of that symbol just described, and also east

2  of the De Luz Road, on the major intermittent stream which

3  flows southwesterly through the property, is another symbol

4  indicating a small earth fill dam.

5      Q  But these two streams are included in the general

6  statement which you made in answer to Mr. Sachse's question

7  that they flow only immediately during and after periods of

8  rain?

9      A  Yes, your Honor.

10     THE MASTER:  Any further questions?

11     MR. SACHSE:  Nothing from me, sir.

12     THE MASTER:  That is all, then.  We might take our recess

13  at this time, and then you can discuss with Mrs. Dinsen the

14  possibility of examining the property.

15     (Recess.)

16     THE CLERK:  Court is now in session.

17     LT. MILLER:  May it please the Court, before we continue

18  with Mrs. Dinsen's case, during the recess one of the defend-

19  ants, Mr. Fredy, whose property is shown as Parcel 16, I

20  believe, has indicated that he would like to have an engineering

21  study made of his land.

22     Now for the United States to accomplish that, which it is

23  willing to do, we would need to have about ten days, assuming

24  there might be some other requests, too.  And we would

25  recommend to the Court that perhaps a hearing date for perhaps

Z-29

1   the latter part of next week could be set, so that the reports

2   could be completed and submitted to the defendants, and then

3   introduced at that hearing.

4       THE MASTER:  That is perfectly agreeable as far as I am

5   concerned.  I am inclined to believe we can't finish everything

6   tomorrow, in any event.  And it might be that we should try

7   to adjourn tomorrow, and have one day of hearings, say Tuesday

8   or Wednesday of next week, as a final windup.  That would

9   give any other defendants opportunity to appear.  And also in

10  Mrs. Dinsen's case it would mean if she did wish, after dis-

11  cussion with representatives of the Government this afternoon

12  or tomorrow, to try to produce additional evidence, that would

13  give her until next week to produce it.  And it would give

14  any other defendant such opportunity.

15      Mr. Sachse, does it make any difference to you which date

16  next week we would try to set for our final windup?

17      MR. SACHSE:  With one qualification, that I would prefer

18  not Monday, the 21st, because of this indefinite status of our

19  eminent domain proceeding.  I don't know.  While I have

20  arranged to be free from the eminent domain proceeding, I

21  think on the day they are set I would like to be available in

22  case there is an injunction or restraint or something or other.

23      THE MASTER:  Suppose we set a hearing date then for

24  Wednesday the 23rd.  That would permit two days, as far as your

25  other action is concerned.

Z-30

1    MR. SACHSE:   Tuesday would be all right, or Wednesday.

2    THE MASTER:   I think we might as well make it Wednesday.

3    That would give one more day as far as Col. Bowen's staff is

4    concerned.   And I think we should be able to finish up on that

5    day, besides whatever hearings were held this week.   So we

6    will then set a hearing for Wednesday, July 23, at 9:30.   And,

7    Mr. Fredy, we will then defer any consideration of your property

8    until the Marine Corps has had an opportunity to make a more

9    detailed study of your property and submit a copy to you.   And

10   that will then be considered on Wednesday, July 23.   And you

11   should plan to be present at that time, if you still have any

12   questions to present concerning the report.   And also if you

13   wish to present any evidence outside the report as to your use

14   of the property and your plans for the future.

15   We will now return to Mrs. Dinsen's property.   Lt. Miller,

16   I believe you had a statement you wish to make with respect

17   to the title of Parcel 67.

18   LT. MILLER:   Yes, sir.   Mrs. Dinsen has shown to me a

19   patent from the United States, which contains a description

20   of property as follows:   "Lot 1 of Section 9, Township 9 South,

21   Range 4 West."

22   This property is shown on Plaintiff's Exhibit M-32 as

23   Parcel 67.   And the United States would like to stipulate with

24   Mrs. Dinsen that in fact she does have such a patent for land

25   so described.

Z-31

1    THE MASTER:   Mrs. Dinsen, did you understand what Lt.

2  Miller said?   In effect, your Parcel 67 is obtained under a

3  different title than Parcel 66.

4    MR. DINSEN:   Yes.

5    THE MASTER:   Very well.   Now, Mrs. Dinsen, do you wish to

6  testify at this time concerning the use you are making of your

7  property?   If you do, why you should be sworn by the Clerk,

8  and then you can tell what use you are making of the property

9  and what you intend to use the property for.

10    MRS. DINSEN:   Yes.

11

12                         RUTH KELLUM DINSEN,

13  one of the defendants herein, called as a witness in her own

14  behalf, being duly affirmed, testified as follows:

15

16                         DIRECT EXAMINATION

17  BY THE MASTER:

18    Q   Will you state your name for the record, please, Mrs.

19  Dinsen?

20    A   Ruth Kellum Dinsen.

21    Q   And you are the owner of Parcels 66 and 67?

22    A   Yes.

23    Q   Can you state what use you are making of the property?

24    A   We are using it for pasture, for natural pasture.   And

25  at the present time we can water only the lath house.   We don't

Z-32

1   have water for more than that.  We have had a garden on the

2   slope from the oak tree down to the road.

3       Q  Now what size is the lath house?

4       A  40 feet by 40 feet.

5       Q  And what do you grow in there?

6       A  Succulent plants.

7       Q  Now is there any other property that you irrigate at

8   all aside from the lath house?

9       A  No.

10      Q  Have you irrigated other property in the past?

11      A  We have.  The slope from the oak tree down to the road,

12  for a garden.

13      Q  Now how much of an area is involved in that?

14      A  Oh, about one acre.

15      Q  And is that acre shown as irrigable on Plaintiff's

16  Exhibit M-98, the engineering report on your property?

17      A  I don't know.

18      THE MASTER:  May I have the report?

19      LT. MILLER:  I think the Clerk has it, your Honor.

20  BY THE MASTER:

21      Q  This acre you have been talking about, can you show me

22  where that is on Plaintiff's Exhibit M-98?  This I believe is

23  the road, if that helps you to identify your location.

24      A  It would be this-- that looks like a little row of

25  trees.  They are evergreen trees we planted.

Z-33

Q  You are referring to an area immediately to the south-west of the blue area, which is the most northwesterly of the blue area shown on the map; is that correct?

A  Well, it might be right in here.  It is from the oak tree, that row of evergreens.  We planted the evergreens.  And we had garden on both sides of that.

THE MASTER: Col. Bowen, can you try to identify various landmarks on this map for Mrs. Dinsen?

COL. BOWEN:  These are the eucalyptus trees where the house is at.  This is the De Luz Road.  This is your northerly pond, the earth fill conservation dam.  This little black symbol right here, across the draw here--

THE WITNESS:  It is just--

COL. BOWEN:  This is the draw or gully which comes down, heads up in the easterly portion of your property, and flows westerly and then southwesterly through the property, across through the property this way in the vicinity of that earth fill dam.

THE WITNESS:  Yes, it is east, up the hill east from there.

COL. BOWEN:  East.   In this arm of Class III land, colored red, which projects northward from the main body of Class III land centrally located on the property?

THE WITNESS:  Well, it is up right here.

COL. BOWEN:  To further orient you, Mrs. Dinsen, this

Z-34

1   line here marks the pole line or communication line which goes

2   across the property.  This clearing here is the right of way

3   for that pole line.

4       THE WITNESS:  Well, it crosses the pole line.  It would go

5   from this stem up to here.

6       COL. BOWEN:  Down in the bottom of the draw?

7       THE WITNESS:  No, it is on the slope.

8       COL. BOWEN:  This is the banks and the slope that the

9   water during and immediately following rain flows through.  And

10  then this red area is up on the slope on the east of the dam.

11  BY THE MASTER:

12      Q  You say there is about an acre in there that has been

13  cultivated in the past?

14      A  Yes, at least an acre.

15      Q  What was grown on it?

16      A  Strawberry plants, all kinds of garden, beets,

17  rutabagas.  Just a home garden.

18      Q  There is nothing being grown on it now, though?

19      A  No.

20      Q  Now is there anything else you wish to state with

21  reference either to your present use of the property or your

22  anticipated use?

23      A  We would like to put a well in on the west side of the

24  road and on the east side of the road for pasture, for watering

25  stock, or for putting a house on each side of the road.

Z-35

1      Q  You have heard the statements of Col. Bowen with

2  reference to these streams.  Do you agree that they flow only

3  during rains and immediately after rainy seasons?

4      A  Yes.

5      Q  They go dry shortly after the rains stop?

6      A  Yes, they do.

7      LT. MILLER:  No questions.

8      THE MASTER:  Mr. Sachse?

9      MR. SACHSE:  I have no questions.

10      THE MASTER:  Unless you have something further, Mrs.

11  Dinsen--

12      THE WITNESS:  I don't.

13      THE MASTER:  I suggest if you let us know tomorrow whether

14  you will wish to present any further testimony.

15      MRS. DINSEN:  I will.

16      THE MASTER:  Mr. Sachse, do you have any --

17      MR. SACHSE:  I have Mr. Foss here.  And Mr. Foss's report

18  has been delivered to us, but has not been introduced in

19  evidence.  If the United States wants to put it in evidence,

20  I would like to cross-examine Col. Bowen on it and then go

21  ahead with Foss.  Then we also have a report on the King

22  property.    The  Kings are in Laguna Beach.  And on a

23  reading of this report it is my opinion that they will be

24  entirely satisfied.  But what I would like to do to be safe,

25  your Honor, is cross-examine Col. Bowen on that in their

Z-36

1    absence, and then call them tonight, and be able to tell you

2    tomorrow morning whether or not they are definitely through.

3        THE MASTER:  Very well.  We will proceed with the Foss

4    property first.

5        MR. SACHSE:  The Foss property, please.  Have you intro-

6    duced it?

7        LT. MILLER:  No, we haven't.  And we will recall Col.

8    Bowen at this time and introduce several of these which will be

9    coming up.  And I will ask the Clerk to mark this as Plain-

10   tiff's Exhibit for Identification.

11       THE CLERK:  M-99.

12       MR. SACHSE:  Who is that, Dave?

13       LT. MILLER:  That is Rudolph Foss.  Do you desire to

14   look at it?

15       MR. SACHSE:  No, you have given me a copy.  Thank you.

16

17                    ALLEN C. BOWEN,

18   recalled as a witness, having been previously sworn, testified

19   as follows:

20

21                  DIRECT EXAMINATION

22   BY LT. MILLER:

23       Q  Col. Bowen, I will hand you Plaintiff's Exhibit M-99

24   for Identification, and ask you to state what it purports to

25   represent.

XI

2080

Z-37

1    A  Plaintiff's Exhibit M-99 is a report of an engineering

2    investigation made on De Luz watershed Parcel No. 5.  The name

3    appearing on the cover of the report is that of Rudolph C. Foss.

4    Q  Was that report made under your direction and super-

5    vision?

6    A  Yes, sir.

7    LT. MILLER:  At this time, your Honor, we offer into

8    evidence Plaintiff's Exhibit M-99 for Identification as

9    Plaintiff's Exhibit M-99.

XR    10   THE MASTER:  That will be received in evidence as Plain-

11   tiff's Exhibit M-99.

12   BY LT. MILLER:

13   Q  Colonel, would you step to Plaintiff's Exhibit M-32

14   and mark with a red cross the property covered by Plaintiff's

15   Exhibit M-99?

16   A  Yes, sir.  The property reported on in Plaintiff's

17   Exhibit M-99, being that of Parcel 5, is delineated on Plain-

18   tiff's Exhibit M-32 with a numeral 5, encircled, contained

19   within the outer limits of the property.  The property is

20   traversed from the north with Cottonwood Creek, which travels

21   in a southeasterly direction, leaving the property on the

22   southerly boundary.  I will mark with a red X the parcel

23   reported on in Plaintiff's Exhibit M-99.

24   LT. MILLER:  I will ask the Clerk to mark this Plaintiff's

25   Exhibit M-100 for Identification.  And mark these M-101 and

Z'-38

1   M-102 for Identification.

2   Q  Colonel, I will hand you Plaintiff's Exhibit M-100 for

3   Identification, and ask you to state what it purports to

4   represent.

5   A  Plaintiff's Exhibit M-100 is a report of an engineering

6   investigation made on De Luz watershed Parcel No. 12.

7   Q  Was this report made under your direction and super-

8   vision?

9   A  Yes, sir.

10   LT. MILLER:  I submit into evidence Plaintiff's Exhibit

11   M-100 for Identification as Plaintiff's Exhibit M-100.

XR

12   THE MASTER:  That will be received as Plaintiff's Exhibit

13   M-100.

14   BY LT. MILLER:

15   Q  Would you step to Plaintiff's Exhibit M-32 and mark with

16   a red X the property covered by this exhibit?

17   MR. SACHSE:  It has already been done, because we testi-

18   fied on this, didn't we?

19   THE MASTER:  Yes.  He testified concerning this property,

20   using M-42.

21   THE WITNESS:  Now the property reported on in Plaintiff's

22   Exhibit M-100 is delineated on Plaintiff's Exhibit M-32 with

23   the number 12, encircled, contained within the outer limits.

3

24   I will mark that property with a red cross and note that De

25   Luz Creek traverses this property from the northeast to the

Z-39

1    southwest.

2    BY LT. MILLER:

3        Q  I hand you Plaintiff's Exhibit M-101 for Identification,

4    and ask you if that purports to be an engineering report made

5    under your direction and supervision.

6        A  Yes, sir.  Plaintiff's Exhibit M-101 is the report of

7    an engineering investigation made on De Luz Parcel No. 19,

8    with the name "Foss, et al." on the cover of the report.

9        LT. MILLER:  I submit into evidence Plaintiff's Exhibit

10   M-101 for Identification as Plaintiff's Exhibit M-101.

XR   11       THE MASTER:  That will be received, and so marked.

12   BY LT. MILLER:

13       Q Col. Bowen, would you step to Plaintiff's Exhibit M-32

14   and mark with a red X the property covered by this report?

15       A  The property reported on in Plaintiff's Exhibit M-101

16   is delineated on Plaintiff's Exhibit M-32 with the number 19,

17   encircled, contained within the outer limits.  I will mark with

18   red pencil a cross indicating that parcel, and note that the

19   East Fork of De Luz Creek and the Murrieta-De Luz Road traverse

20   this property from the northeast to the southwest.

21       Q  I will hand you Plaintiff's Exhibit M-102 for Iden-

22   tification, and ask you if that is an engineering report made

23   under your direction and supervision.

24       A  Yes, sir.  This is a report of an engineering investi-

25   gation made on De Luz Parcel No. 60.  The name Fred T. and

Z-40

1    Edith H. King appears on the cover.

2          LT. MILLER:  I submit into evidence Plaintiff's Exhibit

3    M-102 for Identification as Plaintiff's Exhibit M-102.

XR

4          THE MASTER:  That will be received in evidence and so

5    marked.

6    BY LT. MILLER:

7          Q  Would you step to Plaintiff's Exhibit M-32 and mark

8    with a red X the property covered by that report?

9          A  The property reported on in Plaintiff's Exhibit M-102

10   is delineated on Plaintiff's Exhibit M-32 with the number 60,

11   encircled, within the outer limits of the property.  With a

12   red pencil I will mark on Plaintiff's Exhibit M-32 the loca-

13   tion of that parcel.

14         LT. MILLER:  Nothing further to offer at this time, your

15   Honor.

16         THE MASTER:  Mr. Sachse, do you wish to examine Col. Bowen?

17         MR. SACHSE:  Yes.

18

19                        CROSS-EXAMINATION

20   BY MR. SACHSE:

21         Q  Colonel, I will direct your attention first to M-99,

22   the Rudolph Foss property.  Have you recently been on this

23   property personally?

24         A  Yes, sir.

25         Q  How recently?

Z-41

A   The 5th of July, 1958.

Q   And this is a very large parcel.  How much of it did you traverse?

A   I traversed the Tenaja truck trail, which winds through the property.

Q   Now directing your attention first to the stream marked on M-68 as the main stem of Cottonwood Creek,-- that is the portion of Cottonwood Creek with the name on it on M-68-- do you see the portion to which I refer?

A   Yes, sir.

Q   Now is that a generally flowing stream throughout the Rudolph Foss property, or is it one of the intermittent streams?

A   I didn't traverse that creek throughout.  The point I observed, water was flowing in it on the 5th of July, 1958.

Q   Now then, directing your attention to the branch of Cottonwood Creek that enters the Foss property in Section 24, flowing from west to east, and intersecting with Cottonwood Creek in Section 19, do you see that branch?

A   Yes, sir.

Q   Now can you describe the condition of that stream when you crossed it on the Tenaja truck trail?

A   Where the Tenaja truck trail intersects the intermittent stream flowing easterly from Section 24, Township 8 South, Range 5 West into Section 19, 8 South, 4 West, at it confluence with Cottonwood Creek, at the point where it crosses Tenaja

Z-42

1    truck trail there was on the 5th of July, 1958, a good stream

2    flowing through there.  And I watered four horses and one mule,

3    plus the riders, at that point.

4        Q   I observed the same stream.  And the next question I

5    was going to ask you, do you know or did you examine-- I

6    didn't-- is this a stream that is coming from farther up the

7    hillside, or is that a spring that is coming out of the rocks

8    there?

9        A   Well, part of it comes out of the rocks there.  There

10   is an abrupt descent at that point.  There is a cliff over

11   which the entire stream flows, and during and immediately

12   following rainfall it is quite a spectacular waterfall.  Most

13   of that area up there now is seeping.  That is, there are

14   seeps and springs in most of that area because of the heavy

15   rainfall we received in as late as April.  And some of that

16   is coming out of the rocks.  I don't know how much of it is

17   flowing above that point, nor how far above that point it is

18   flowing as a surface stream.

19       Q   Did you attempt to make any measurement of the flow?

20       A   No, sir.

21       Q   All right.  Now directing your attention to the inter-

22   mittent stream symbol on M-68 that flows almost from north to

23   south, originating in Section 18, and down through 19, to its

24   confluence with Cottonwood Creek in 19.

25       A   Yes, sir.

2086

Z-43

1    Q  Are you familiar with that stream?

2    A  No, sir.  I didn't check that stream.

3    Q  Do you find any substantial alluvial deposits located

4  in the Foss property, Parcel 5?

5    A  As noted on page 2 of Plaintiff's Exhibit M-99, the

6  final paragraph of the section on geology, which begins on page

7  1, it states that coarse alluvial deposits are located along

8  Cottonwood Creek in the southern portion of Section 19.

9    Q  Those are of no substantial extent, however, as I read

10  your report.

11    A  That is right.  It states further that these deposits

12  are thin and restricted in extent.

13    Q  Do you know where the property derives its present

14  water supply?

15    A  Referring to page 3 of Plaintiff's Exhibit M-99, under

16  the section headed "Engineering", it states that domestic

17  water is supplied from a developed spring located approximately

18  800 feet northwest of the Foss residence.

19    Q  Is there any agricultural development currently on the

20  property, to your knowledge?

21    A  No, sir.  There is none to my knowledge.

22    Q  Well, Col. Bowen, I want to ask you about your opinion

23  as to percolating ground waters.  And since this is a large

24  parcel, I think we had better do it by sections.  And if you

25  want to approach M-68, I think it might be easiest.  Directing

2-44

your attention first to that portion of the parcel which is
located in Section 18, it is about the west half-- the West
Half of the East Half of fractional 18.  Do you see the sec-
tion to which I refer?

A  Yes, sir.  On Plaintiff's Exhibit M-68 the elevation
1671 appears.

Q  How would you classify, in your opinion, waters that
might be developed in that portion of the property?

A  That portion of the property within Section 18, 8 South,
4 West, it is my opinion that water is vagrant, percolating, and
not a part of the stream system.

Q  Now taking it by quarter sections, moving immediately
south, it would be, I believe, the Northwest Quarter of the
Northeast Quarter of Section 19.  Do you follow me, the next
40 south?

A  Yes, sir.

Q  How would you classify ground waters in that section?

A  Now referring to Plaintiff's Exhibit M-68, and more
particularly to the Northwest Quarter of the Northeast Quarter,
Section 19, 8 South, 4 West, it is my opinion that any waters
within that sixteenth of a section are vagrant percolating, and
not a part of the stream system.

Q  All right.  Now please, Colonel, if you will move to the
west, and let's take the North Half of the Northwest Quarter
of 19.  And disregarding the stream flow of Cottonwood Creek

z-45

1   itself, assuming the development of ground waters in that

2   parcel, what would your opinion be?

3       A   Any ground water in that 80 would be vagrant and

4   percolating in nature, not a part of the stream system.   Exclud-

5   ing, of course, the surface flow in the Cottonwood Creek.

6       Q   Excluding the surface flow, yes.   And proceeding to

7   the west, the next 40, which would be the Northeast Quarter

8   of the Northeast Quarter of 24, would you answer the same

9   question, please?

10      A   Yes, sir.   Excepting the surface stream flow of

11  Cottonwood Creek through the sixteenth, ground waters con-

12  tained therein would be vagrant, percolating, not a part of

13  the stream system.

14      Q   Now taking the next 40 to the south of that, which

15  would be the Southeast Quarter of the Northeast Quarter of 24,

16  would you answer the same question?

17      A   Yes, sir.   The ground water there is vagrant and

18  percolating in nature, not a part of the stream system.

19      Q   And then let's take the 120 lying west of that.   That

20  would be the Southwest Quarter of the Northeast Quarter of

21  24 and the South Half of the Northwest Quarter of 24.   Would

22  your answer be the same?

23      A   Yes, sir.   Vagrant, percolating ground water, not a

24  part of the stream system.

25      Q   Now take the Southeast Quarter of 24.   That is the

2089

Z-46

1   quarter in which this substantial stream flow that you observed

2   on the 5th of July is located, is it not?

3       A   Yes, sir.

4       Q   And disregarding the flow of that stream, what would

5   your opinion be as to ground waters developed in that quarter

6   section?

7       A   That they are vagrant and percolating in nature, not a

8   part of the stream system.

9       Q   Would we be safe in saying that, with the exception

10  of the very small strip of alluvium referred to in your report

11  on page 2, or the surface flows of the streams themselves,

12  any water developed on Parcel 5 would be vagrant local percolat-

13  ing ground waters, or is there any exception other than that

14  small alluvial area you have referred to?

15      A   No, sir.   Other than the alluvial material referred to

16  in the report, Plaintiff's Exhibit M-99, the waters within this

17  property are vagrant and percolating, not a part of the stream

18  system.

19      Q   Col. Bowen, this property generally is very steep, is

20  it not?

21      A   Yes, sir.

22      Q   And during and after rainfalls the runoff is likely to

23  be extremely rapid; is that not correct?

24      A   Yes, sir.

25      Q   And there are numerous locations on this property,

Z-47

1  are there not, where small storage developments, involving an

2  acre or two of surface, could be constructed to trap water

3  runoff?

4      A  Yes, sir.  This property has a highly dissected relief,

5  and there are many places where small conservation type dams

6  could be constructed.

7      Q  Without the benefit of the coloring, am I correct or am

8  I overlooking something here, Colonel?  Am I correct in stating,

9  generally speaking, you found the irrigable area to be spread

10  along immediately adjacent to the two stems of De Luz Creek,

11  of Cottonwood Creek?  I see IV land.  Will you indicate to me,

12  oh, by just indicating with the pointer here, the area as you

13  found it.

14      A  Referring to Plaintiff's Exhibit M-99, the areas

15  approximately adjacent to and adjacent to Cottonwood Creek and

16  its tributaries from the point where it leaves the property on

17  the southerly boundaries, those areas shown as Class III,

18  Class VI, Class IV, Class IV, Class II, at the confluence or

19  north of the confluence of the tributaries in the southeasterly

20  corner of Cottonwood Creek, Class III, Class VI, Class III

21  and the Class VI areas, generally these areas are clustered

22  around the confluence of Cottonwood Creek and the tributary

23  flowing southerly from Section 18, through 19, to its con-

24  fluence with Cottonwood Creek.

25      Q  Colonel, I will direct your attention to two small

Z-48

1    parcels in the Southwest Quarter of the Southwest Quarter of 19.

2         A  Yes, sir.

3         Q  Both classified VII, which is the same classification

4    as the much larger areas surrounding them.

5         A  Yes, sir.

6         Q  And apparently exactly the same fractional soil symbol,

7    excepting for slope.  Am I right?

8         A  Yes, sir.  They each have 4rL5A in the numerator.  And

9    the only difference is in the percentage of slope, one being

10   in the E slope class, the other, the larger area being in the

11   F slope class.

12        Q  A 25-degree slope of and by itself would not make

13   property not irrigable, would it?

14        A  That is 25% slope?

15        Q  Pardon me.  25% slope of and by itself would not do it?

16        A  No, sir.

17        Q  So then I assume the reason is because of the other

18   symbols involved, the rocky, the shallow soil and so on; is that

19   correct?

20        A  Yes, sir.  Rock outcrop, extremely shallow soil.

21        Q  Now, for example, I find in the Southwest Quarter of

22   the North--  No, Southwest Quarter of the Southeast Quarter

23   of 19 I see a small symbol classed as classification VI.  Do

24   you see that symbol?

25        A  Yes, sir.

Z-49

1   Q  Now, I notice that that symbol classification is

2   identical with the two to which we just referred, except that

3   it has a somewhat steeper slope.  And it has the modifying

4   symbol "Stony" as distinct from "Rocky"; is that correct?

5   A  Now the "S" on the latter symbol, Mr. Sachse, indi-

6   cates stony.  But the "R" indicates rock outcrops on the

7   former symbol.  In other words, the rock on the two small

8   parcels in the Southwest Quarter of the Southwest Quarter of

9   Section 19, 8 South, 4 West, is attached to the great mass

10  of rock below.  And in the latter area which you described as

11  being in the Southwest of the Southeast, Section 19, the

12  stones are free to move about, and not attached.

13  Q  Have you made or your office made any stream flow

14  measurements of any of the streams within this parcel?

15  A  No, sir.

16  Q  Have you tested the depth of the alluvium anywhere

17  within these parcels?

18  A  No, sir.

19  MR. SACHSE:  I think that is all.

20  LT. MILLER:  No questions.

21  MR. SACHSE:  I will call Mr. Rudolph Foss. I think we

22  can perhaps finish up here.  May I have just a moment?

23  THE MASTER: Surely.

24

25

Z-50

1                          RUDOLPH C. FOSS,

2   one of the defendants herein, called as a witness in his own

3   behalf, sworn, testified as follows:

4

5                         DIRECT EXAMINATION

6   BY MR. SACHSE:

7        Q   Will you state your full name, please?

8        A   Rudolph Carl Foss.

9        Q   Where do you live, Mr. Foss?

10       A   In De Luz, on Cottonwood Creek.

11       Q   And I will direct your attention to Exhibit M-68, if

12   you will look up here.   There is a large parcel indicated as

13   No. 5.   Is that your property?

14       A   Um-hmm.

15       Q   And how long have you owned that property?

16       A   Well, I bought six parcels.   And as the years went by

17   I appropriated them, put them together, made one parcel.   And

18   the first parcel I bought was this Southwest Quarter of Section

19   19 there.

20       Q   Be seated, Mr. Foss, and we will go through these,

21   get these deeds in.

22       MR. SACHSE:   Off record for a moment.

23       (Discussion off record.)

24       MR. SACHSE:   Just make it one exhibit.   This will be

25   MD-AA.

Z-51

1    THE CLERK:  Yes.

2  BY MR. SACHSE:

3    Q  Mr. Foss, I will hand you what has been marked for

4  identification as Defendant's Exhibit MD-AA, and it consists

5  of six deeds or--

6    THE MASTER:  Six or five?

7    MR. SACHSE:  Five deeds and a patent.

8    Q  Will you examine those, please, and tell us if they

9  represent the deeds to Parcel No. 5?

10    A  Yes, sir.  This is the first parcel right here that

11  I purchased--

12    MR. SACHSE:  Let the record indicate that the witness--

13    THE WITNESS:  --in October of 1946.

14    MR. SACHSE:  --is showing the date of the 4th of October,

15  '56.  I don't think anything further is necessary.  Lt. Miller,

16  the deeds speak for themselves as to whether there has been

17  severance.

18    LT. MILLER:  I agree.  I would like to examine them before

19  you introduce them.  I know you told me over the phone what

20  they are.

21    THE MASTER:  With reference to the time of acquisition,

22  I suppose that each property was acquired at or about the time

23  that--

24    MR. SACHSE:  The time of recordation.  The time of

25  recordation, that is the time we will have to accept.

Z-52

1      THE MASTER:  There is no question of one property having

2  been acquired many years before the deed was recorded?

3      MR. SACHSE:  No.  We will accept the recordation dates.

4      Q  How long have you lived on the property, Mr. Foss?

5      A  Well, permanently fourteen months later than that date.

6      Q  Fourteen months after the 4th of October?

7      A  Something like that.

8      Q  Of 19--

9      THE MASTER:  That would be about January of '48, then.

10      THE WITNESS:  Yes, about around the first-- the month of

11  January.

12  BY MR. SACHSE:

13      Q  About January 1st.  And what development is on the

14  property now?

15      A  Well, the house that I live in and the workshop.  It

16  is a building that is 21 by-- well, 17 by 21 feet.  And there is

17  a pipe line from the spring that I developed for the house

18  to a water tank of about twenty-two or twenty-three hundred

19  gallons.  And from the tank to the house, a pipe line.  Then

20  there was a pipe line leading from down crossing Cottonwood

21  Creek in the westerly-- in the easterly direction to a field

22  that I had a family orchard on.  And I abandoned that about

23  three years ago.  And for-- on account of-- I abandoned it

24  not because there wasn't enough water and so on, but the

25  terrain there invited deer and game and one thing and another,

Z-53

1   and they destroyed practically the family orchard for me.

2   So I just abandoned it for that reason.

3       Q   Where do you get your water for domestic purposes?

4       A   About 800 feet north-- about 750 to 800 feet northwest

5   of the-- yes, northwest of the house.

6       Q   And is that from a spring?

7       A   A spring, yes.

8       Q   Describe to the Court how you developed the spring.

9   What is there?

10      A   Well, the spring was developed through solid rock.

11  And rock drills and one thing and another.  And then a stone

12  wall built up to hold the water in up there.  And then a roof

13  out of concrete was made so that the stream-- the quick flow

14  would flow over the top of it and continue the flow, just so

15  I got the spring water out of there.  And the pipe lines

16  starting up there were developed to a reservoir that I put in

17  there, with the intent of putting in an avocado grove or

18  something of that nature there.  But I found that the soil was

19  only eighteen inches there, and that there was a clay deposit,

20  a thick clay deposit immediately below that.  And so I abandoned

21  that.  And instead of putting that reservoir up there and

22  completing it, why I kept -- kept the pipe line going straight

23  down to the house.

24      Q   Now at the present time you have no agricultural de-

25  velopment of any kind?

Z.-54

1    A   None at all except what -- well, just a little garden

2    around the house there.   There is no--

3    Q   What are your plans for this property in the future?

4    A   It is recreational property.   I figure to-- well, for

5    hunting, so on, sell a chunk off here and there, possibly to

6    try to form a hunting club or something of that nature.

7    Q   Now did you hear the testimony of Col. Bowen, where he

8    stated that in his opinion there were many sites within this

9    property where small dams could be constructed to impound

10   winter runoffs?

11   A   Yes.

12   Q   You heard him say that?

13   A   Yes, I heard him say that.

14   Q   Now, what are you planning?   What is your thinking along

15   that line?

16   A   My plans for that is in the future I would apply to the

17   State of California to put in these dams.   And I was figuring

18   on four of them, four or five.

19   Q   Now could you take, please, the photograph in Exhibit

20   M-99 and indicate approximately -- draw a line, a red line across

21   the canyon where you contemplate constructing such dams.

22   A   That is this one here.   Is this the top of the ridge

23   here?

24   Q   Yes.   The ridge seems to be almost right underneath

25   the numbers.

2098

2-55

1    MR. SACHSE:  Now let the record indicate the witness has

2    drawn three horizontal lines-- four, pardon me.  Four horizontal

3    lines across Cottonwood Creek and its two unnamed tributaries.

4    THE WITNESS:  Now I may want to do this.  I will say what--

5    I will mention it.  Where there is a waterfall up here, and

6    I want to put a small dam in there, so that I can take the water

7    from there and run it into-- Pardon me here.  Well, there is

8    a place in here where I talked it over with the Soil Conserva-

9    tion people, and they told me that I could-- it was a very

10   nice location for a 1,000,000-gallon storage basin in there.

11   And the intent was that to put a dam right above the waterfall,

12   and then take the water by pipe over to this reservoir.

13       Q  Now may I see if I can make this a little clearer.  The

14   water fall to which you refer is on the Cottonwood Creek

15   property?

16       A  Yes.

17       Q  At the point of this waterfall, make an X as distinct

18   from the other line.

19       A  Well, it is right here where they ended up here.

20       Q  Yes.  You are right.  I was all wrong.  Your idea

21   would be to take--

22       A  Then as this water comes down here, then I will have a

23   dam there and then take the water on this side of the hill

24   here and then there is a gully, big gully in there.  And I have

25   a road.  They put roads all through the hills up here.  But

Z-56

1   they are overgrown now.

2      Q  Let me try to place it, Mr. Foss.

3      A  I am trying to place this here.  I think it is right

4   in about -- right in about there, somewhere in there.  Right

5   where that writing is there.

6      Q  Try to answer this question.  The point I am trying to

7   make is would you take the water from the waterfall over the

8   divide, out of Cottonwood Creek and into the next creek to the

9   east, or would you keep it in the divide of Cottonwood Creek?

10      A  No, I can't do that.  That would be against State law.

11   Because I tell you where this property-- this property here

12   in the northeast quarter is not riparian to this water stream

13   here.

14     LT. MILLER:  Well, we will move to strike the point what

15   is not riparian and what State law is.

16     THE WITNESS:  You understand what I mean.

17     LT. MILLER:  I know your point.

18     THE WITNESS:  They wouldn't let me do it in the first

19   place.  But there is a great big gully up there, where I thought

20   at the time when they was making that soil conservation, that

21   I would like to put a reservoir in there, see.

22   BY MR. SACHSE:

23      Q  Now, Mr. Foss,--

24      A  That eventually will be my intent.

25     THE MASTER:  The witness's statement as to what is or is

Z-57

1  not riparian will be stricken.

2  BY MR. SACHSE:

3     Q  Mr. Foss, try to answer my questions, because I want

4  this record straight.  Your intention would be to construct a

5  dam where you mark the X?

6     A  Yes.

7     Q  For purposes of diverting water, not storing it there,

8  but diverting it to another canyon within the same watershed

9  where you would construct a reservoir; is that right?

10    A  Well, no, that isn't the purpose of it.  The purpose

11  of it you see that is quite high up there, and this reservoir

12  would be practically on the same elevation.  So with that

13  water I could run a pipe line from there right straight down

14  to the top of the hill there and take care of all this water

15  situation over in here in this agricultural stuff here.  And

16  this is all riparian to that, to that creek there.

17     MR. SACHSE:  The riparian can go out.

18     LT. MILLER:  Yes.

19  BY MR. SACHSE:

20     Q  I am talking about only the physical work you contem-

21  plate doing.  The physical work would be to construct a dam

22  where you mark the X for purposes of diverting water; is that

23  right, not storing it within the--

24     A  Well, it would be a small dam in order that when that

25  water comes down there with such swiftness, that drops down

2-58

1  with such a speed, it is spooming-- spooming water.  It is

2  all in-- I don't know quite how to describe it.  But you can

3  understand what I mean.  And that carries sediment with it.

4  It will fill that dam right up there.  So the idea would be

5  to put in back of this dam pipe lines with holes so the water

6  can filter through in that manner to this reservoir.

7      Q   Which reservoir would be in the same watershed?

8      A   That is right.

9      Q   From which you take it out?  O.K.  Now, have you knowledge

10  of any springs on your property?

11      A   Oh, yes.  I mentioned there are sixteen there in my

12  reply to the summons.  And there is a whole lot more than that.

13  Ordinarily we look for springs from July the 20th to August the

14  21st, and if there is any indication of water, why that is a

15  prospective spring.  And I know that there are quite a number

16  more than whatever I have ever indicated.  But I am not look-

17  ing at that.  I didn't buy this property from an agricultural

18  purpose.  That wasn't my-- I did not have that in mind.

19      Q   Now have you had an opportunity to examine M-99, the

20  engineering report?

21      A   Um-hmm, I have.

22      Q   You heard Col. Bowen's testimony, did you not, that

23  in his opinion the ground waters underlying most of your

24  property were in fact percolating local ground waters?

25      A   That is right.

Z-59

Q   Now is there anything in this report with which you disagree?

A   Well, it seems to me there is more agricultural ground than was considered there.

Q   But you have just testified you have no immediate contemplation of agricultural--

A   I don't have any, no.

Q   Have you ever measured the runoff of that spring to your house, your domestic supply?

A   Well, yes.  We kept tab on it for, oh, about nine years or so, eight and a half, nine years.

Q   Do you know what its flow is?

A   Yes, it runs about 600 gallons a day in the summertime when it is dry.  In the winter, when it rains during the wet season, why it runs up to about 14 to 16 hundred gallons.

MR. SACHSE:  I have nothing further.  Oh, excuse me, your Honor.  I don't think I offered MD-AA.

THE MASTER:  That will be received in evidence as Defendant's Exhibit MD-AA.

XR

CROSS-EXAMINATION

BY LT. MILLER:

Q   Mr. Foss, Cottonwood Creek leaves your property, shown as Parcel No. 5 shown on this exhibit, as your southerly boundary; is that correct?

Z-60

1    A   That is right.

2    Q   Does it thereafter flow on to the property of Mr. Felix

3    Garnsey, in so far as you know?

4    A   It does.

5    Q   Now have you recently observed the creek flow at the

6    point where it leaves your property to go on to Mr. Garnsey's

7    property?

8    A   Well, I have just looked down there, but I haven't

9    paid much attention to it, because they have been there so

10   long.

11   Q   Is there water in it today, flowing in it today, if

12   you know?

13   A   Yes, there, is.

14   Q   Has there been water flowing in that creek since say

15   September of last year, if you know?

16   A   I don't think it flowed that early.

17   Q   So last summer it did dry up at that point on the

18   surface?

19   A   That is right.

20   Q   Now referring to Plaintiff's Exhibit M-99, the red

21   lines which you have placed on there you have indicated would

22   be dams that you would like to construct in the future?

23   A   That is right.

24   Q   Now these dams, I would gather from looking at your

25   marks, would go completely across the tributaries that later

Z-61

1    form and then flow on to Mr. Garnsey's property.

2        A   That is right.  But this one over here, I will have

3    to mention.  That would be-- there isn't enough water to put--

4    for yearly flow, because that whole basin there only flows

5    about-- well, I have been up there twelve years, and there is

6    only three years that any water ever did come down there.

7        THE MASTER:  That is the most easterly of the dams you

8    have indicated?

9        THE WITNESS:  That is right, yes.  That is where I am

10   basing my springs on, on that east side there.

11   BY LT. MILLER:

12       Q   Mr. Foss, would it be your intention that you would

13   store the water in these dams and then use it as the occasion

14   arose to use it?

15       A   Yes, as need took place.  That is the idea.

16       Q   Right.  Would you intend to have any sort of spillway

17   or pipe underneath the dam to let the water pass under or over

18   the dam?

19       A   Why, yes.  I will build it according to the State

20   regulations for dams.  That is what I would do.

21       Q   But it would be your intention to store the water

22   there whenever you could get it, and when the runoff was enough

23   that it would spill over the top, then you would let that go

24   by?

25       A   That is right.

Z-62

1    Q   That is correct.   Now in your opinion if you were to

2    have each of these dams that you contemplate, would that

3    reduce the flow of Cottonwood Creek on to the property of Mr.

4    Garnsey?

5        MR. SACHSE:   If your Honor please, I will object.   The

6    witness has testified he will construct his dam in accordance

7    with State permits and specifications.   And there is no

8    evidence of any kind sufficient to lay a foundation that this

9    man can testify whether he will ever get such a permit, what

10   the flow of that creek is, or anything of the kind.

11       LT. MILLER:   Your Honor, we have allowed him to testify

12   as to what he would like to do with this property.

13       MR. SACHSE:   What he would like to do.

14       LT. MILLER:   And we have entered into speculative fields,

15   and we would merely like to point out to the Court what it is

16   going to do if such dams are erected, to the people immediately

17   below.   And we think that the objection is not well founded,

18   and that the witness knows the flow of the stream-- it is

19   almost an apparent matter if you are going to dam you are going

20   to reduce the flow.   We would like to have it on the record

21   from Mr. Foss that he intends to store rather than just to

22   have a filtering structure to allow the water to pass through.

23       MR. SACHSE:   I think this is very serious, your Honor.   I

24   am going to renew my objection.   The question of whether or

25   not any man can build a dam to take winter runoff on these

2-63

1   streams is, in my mind and in the mind of other counsel, as

2   you are well aware, completely outside the jurisdiction of the

3   Court, not only your Honor, but the jurisdiction of Judge

4   Carter as well.  We believe that the right to impound winter

5   runoff is solely within the jurisdiction-- to give a permit to

6   impound is solely within the jurisdiction of the State Water

7   Rights Board.  The testimony, as far as I understand it, that

8   has been heretofore offered by many people, by many, not just

9   Mr. Foss, to the fact that they may be contemplating construc-

10  tion of a dam, has not been to give them any right, but simply

11  to point out to the Court the character and flow of these

12  streams, that the only way this water can be used for any

13  practical purpose is by such an impounding.  And I do not

14  believe your Honor can make a finding that Mr. Foss can or cannot

15  build a dam.  Or I don't believe your Honor can make a legal

16  conclusion that he can or cannot build a dam.  I believe you

17  can consider the fact of his intentions, his future hopes,

18  just the way you can consider the fact that someone plans to

19  develop all his land agriculturally, to determine what the

20  burden might be, but not from the standpoint of limiting his

21  rights.

22      LT. MILLER:  Your Honor, if I understand the statement

23  of counsel he is stating that he does not assert a right to

24  build any of these dams unless they have a permit from the

25  State under the appropriative system of the State.  Is that

2107

Z-64

1    correct?

2        MR. SACHSE:   That is correct in Mr. Foss's case, because

3    his structures will be of such a size that they come within

4    the provisions of the Water Code and the Dam Act.   Now I am

5    not-- I do not want any misunderstanding, that I am making a

6    blanket statement that every soil conservation barrier that

7    goes across a five-foot channel here will be under State permit.

8    There have been many of that type of structure discussed

9    also, Lt. Miller.   But the Foss structures would all be under

10   State permit.

11       LT. MILLER:   If you are not asserting any riparian or

12   appropriative right or anything of that nature with respect

13   to these proposed structures, then I am inclined to agree it

14   is something that might happen in the future.   Probably the

15   whole matter is immaterial.   But we have gone into it this

16   far, and it would seem appropriate to continue a bit further

17   to be sure the Court clearly has in mind what Mr. Foss does

18   propose in the way of physical construction, without respect

19   to legal right in connection with that construction.

20       THE MASTER:   I think that is perfectly proper to describe

21   what he intends to do.   But I think probably Mr. Sachse's

22   point as to the legal right and so forth is well taken.

23       LT. MILLER:   Well, I don't think we ever asked him that.

24       MR. SACHSE:   The question to which I objected, your Honor,

25   was the question on the effect of the flow of the stream.

Z-65

1    LT. MILLER:  In what word does the legal right come into

2    that?  It is beyond me.

3    MR. SACHSE:  I don't think there is any proper foundation

4    to establish this witness is qualified to testify, particularly

5    when he can't even build the structures unless somebody else

6    tells him how to do build them.

7    THE MASTER:  The effect on the flow of the stream would be

8    so dependent on the type of structure and the permit that is

9    granted.

10   MR. SACHSE:  That is the point.  It is too remote.

11   LT. MILLER:  Your Honor, I won't press this very much

12   further.  But the witness has testified on direct examination,

13   not in response to our questions, that he is going to place--

14   he would like to place structures at various points indicated

15   on the exhibit.  Now the type of structure that he wants to

16   place there is solely within in his mind.  In other words, he

17   is the only one that knows what he intends to put at those red

18   lines.  And we would like to develop what he has in mind for

19   whatever relevancy it may have to the Court.

20   THE MASTER:  I think you can.

21   MR. SACHSE:  I will withdraw it, your Honor.  I think it

22   is fair enough.  It is getting marginal, and I think my objec-

23   tion probably is to weight, as to how much significance his

24   conclusion is going to have.

25   THE MASTER:  You can certainly go into the question as

to what he wants to put up.  But as to the effect it would have

Z-66

1   on the flow of the stream, that is either a matter which is

2   obvious, or it is a matter which would be very difficult to

3   testify to without knowing exactly what the structure is.  Be-

4   cause while the structure is going to be filled, it is going

5   to cut down on the flow of the stream.  After it is filled and

6   water is going over the spillway, it is not having any ill

7   effect.  So it is difficult for the witness to answer that

8   question without going into the time of the year, the flow

9   of the stream, the size of the dam and everything else.

10      LT. MILLER:  Your Honor, perhaps if I would withdraw that

11   question and start over again, and perhaps after this discus-

12   sion we will be able to phrase our questions to fit within the

13   scope of what appears to be proper.

14      THE MASTER: I think you can do that.

15   BY LT. MILLER:

16      Q  Mr. Foss, where you have marked the red lines on the

17   aerial photograph that is in Plaintiff's Exhibit M-99, those

18   are the places that you would like and intend, if possible, in

19   the future to construct some sort of dam; is that correct?

20      A  That is right.

21      Q  Now in the operation of these dams, in so far as you

22   envision them, would you use the water throughout the year

23   from behind those dams?

24      A  Well, I don't think I would use very much of it in the

25   wintertime, during the rainy season, if that is what you mean.

2-67

Q  So primarily you would have in mind holding the water from the rainy season for use in the summer season?

A  That is right.

Q  And would not intend, as you plan now, to allow any of that water to pass unless it was to spill over the top of the dam.

A  Well, naturally, yes.

Q  Yes.

A  I wouldn't want to try--

Q  Wait, you have answered the question, so let it go at that.  Now you are familiar with the flow of the stream through your property and on Mr. Garnsey's property, are you not?

A  Well, that part that-- just that part of the land from my house down below there, I very seldom go down there to watch that part of the stream, if that is what you mean.  I go there once in awhile, but not very often.  Now what is it you want to know about that?

Q  Well, that is the extent of your familiarity are these occasional visits to that portion?

A  Listen, I don't think he knows where the line is there and neither do I.  So--

Q  I am talking about the general vicinity, not necessarily right at the line.

A  Yes, sir.

Q  You only go down there periodically throughout the

Z-68

1  year?

2      A  Yes.

3      Q  And would you say that generally speaking there is a

4  flow there only in the winter at that point where it goes into

5  the Garnsey property, on the surface?

6      A  Well, the water flow is there from-- well, I would say

7  from November until -- in all the years I would say for about

8  four or five months there.  Five months, anyhow.

9      Q  That would be on an average?

10     A  On an average, yes.

11     Q  You would have surface flow?

12     A  Surface flow.

13     Q  And do you or do you not know what the average of the

14  subsurface flow would be through the year?

15     A  No, I don't.

16     Q  You don't know whether there is or is not subsurface

17  flow there?

18     A  I think there is, but not to be any judge or say so.

19     Q  All right.  Now the way you would intend to operate these

20  dams you have marked with the red lines, it would be your

21  intention to diminish the flow of the stream out of your

22  property into Mr. Garnsey's property to the extent that these

23  dams would impound water; is that correct?

24     A  That is right.

25     LT. MILLER:  No further questions.

69

1     MR. SACHSE:   I have no questions.

2     THE MASTER:   That is all, Mr. Foss.

3     THE WITNESS:   That is all?

4     THE MASTER:   Yes.  Do you wish to ask Col. Bowen any

5   further questions?

6     MR. SACHSE:   No, I have nothing further, your Honor.

7     (Discussion off record.)

8     THE MASTER:   We are in recess until 1:30.

bl

<u>Fallbrook, California, July 14, 1958, 1:25 P.M.</u>

THE CLERK:  Court is now in session.

MR. SACHSE:  I would like to, if I could, your Honor, to ask Colonel Bowen a few questions about these other three exhibits.

THE MASTER:  Very well, Colonel Bowen.

MR. SACHSE:  I think we will dispose of them, then.


ALLEN C. BOWEN

recalled as a witness, having been previously sworn, testified as follows:


CROSS-EXAMINATION

BY MR. SACHSE:

Q  Colonel Bowen, first I will ask you to refer to Plaintiff's Exhibit M-100, Taylor and Lewis, which is Parcel 12.  You will recall when you testified on that parcel I believe you used one of the adjoining ones.  Do you recall which of the adjoining parcels it was that you used?

THE MASTER:  My notes show M-42.

MR. SACHSE:  Oh, Exhibit M-42.  Wait a minute.

THE MASTER:  Not Parcel 42.

MR. SACHSE:  That would be Shaver you used the report on.

THE MASTER:  Yes, on the Shaver property.

b2

1          THE WITNESS:  Yes, sir.

2    BY MR. SACHSE:

3          Q  Now can you of your own knowledge point out any changes

4    you would care to make in your testimony regarding this parcel,

5    now that you have made a survey of it separately?  Frankly, I

6    find none.

7          A  No, sir.  I think the irrigable acreage is unchanged

8    from that which I have earlier testified.

9          Q  But if there should be any discrepancies, I presume

10   you would want the written to take precedence over the other?

11   I have found none.

12         A  Yes, sir.  The Plaintiff's Exhibit M-100--

13         Q  Is the detail an  accurate report on the irrigable

14   acreage and classifications?

15         A  Yes, sir.

16         MR. SACHSE:  I have nothing further on that one.

17         LT. MILLER:  No questions.

18   BY MR. SACHSE:

19         Q  I will call your attention to M-101, being the pro-

20   perty of David Foss, et al., Parcel No.--

21         A  De Luz watershed Parcel 19.

22         Q  19, that is right.   Now when you testified on that one,

23   Colonel Bowen, we had no engineering report  available to which

24   you could refer.

25         A  That is correct.

b3

1    Q   So directing your attention to the aerial photograph,

2   with the exception of De Luz Creek itself are any of the streams

3   or canyons such that carry water at any time except during and

4   after a rain?

5    A   With the exception of De Luz Creek, the tributaries

6   which traverse the property reported on Plaintiff's Exhibit

7   M-101 are intermittent in character, flowing only during and

8   immediately following periods of high precipitation and runoff.

9    Q   I believe, according to my notes, you testified that

10  the channel of De Luz Creek did contain small and relatively

11  shallow deposits of alluvium up its length in this parcel.

12   A   Yes, sir.  It does contain--the channel does contain

13  alluvium material.

14   Q   And that the material referred to at the top of page

15  2, where you state--

16   A   Yes, sir.

17   Q   --these alluvial deposits provide an excellent source

18  of water for the property.

19   A   Yes, sir.

20   Q   Now, with the exception of these alluvial deposits,

21  have you any opinion as to the character of water that might

22  be developed elsewhere on the property?

23   A   Referring to the land classification map on aerial

24  photo       in Plaintiff's Exhibit M-101, north of the stream

25  are shown areas largely classified as VI, small areas almost

b4

1  completely delineated within the boundaries of the property--

2  that is, delineated in whole or in part, showing predominantly

3  20% slope.  And those areas are remnants of an old stream terrace,

4  which is alluded to on page 1 in the geology section of the

5  report.  And there is--in my opinion the ground waters therein

6  and the ground waters in the bedrock unlying those segments of

7  the old terrace, being in contact with the alluvium over which

8  and through which the fork of De Luz Creek flows, could in my

9  opinion be part of the stream--could be in contact and therefore

10  part of the stream.

11      Q  In that particular easterly portion of the property,

12  De Luz Creek takes a substantial bend to the south, does it not?

13      A  Yes, sir.  In the easterly portion of the property.

14      Q  And would the material south of the De Luz road and in-

15  side of the bend of De Luz Creek be this type you have just

16  talked about?

17      A  Yes, sir.

18      Q  Looking at the Class VII land west and south of the

19  land to which you have just referred, being very steep slopes,

20  apparently, what would your opinion be of ground waters under-

21  lying that area?

22      A  On the higher portion of the Class VII lands shown in

23  the southerly and easterly portion of the property delineated in

24  the aerial photograph in Plaintiff's Exhibit M-101, the ground

25  would be--I mean the ground water would be vagrant and percolating,

and not a part of the stream.  But the lower slope in contact

with the alluvium could be water found in fissures there and

could be in contact with the stream.

    Q  Do you have any water runoff measurements on this

property?

    A  No, sir.

    Q  Do you have any calculation of the alluvial deposits

on this property?

    A  No, sir.

    MR. SACHSE:  That is all.

    LT. MILLER:  No questions.

BY MR. SACHSE:

    Q  Colonel, I would like to direct your attention to

Exhibit M-102, King.

    MR. SACHSE:  On this parcel I, of course, don't have a

witness, your Honor.  But I have what purports to be Mr. King's

grant deed.  With the consent of the United States, I will offer

it.

    LT. MILLER:  I will check it.

BY MR. SACHSE:

    Q  Now, Colonel, this is a big parcel.  Would you indicate

its outline for the Court, please, on M-68?

    A  Yes, sir.  The parcel reported on in Plaintiff's Exhibit

M-102 is Parcel No. 60, shown on Plaintiff's M-68 with the

number encircled, contained within the boundaries of the property.

b6

1   And M-68 shows a symbol indicating an earth road which enters

2   the property on the westerly boundary, just below the words

3   "Rivers Ranch", and joins a north-south road, graded earth road

4   which traverses the property from north to south.  And there

5   is an intermittent stream entering the property from the north

6   and paralleling the road to its confluence with another inter-

7   mittent stream which enters the property on the east, flowing

8   westerly.  The confluence is located at a symbol on Plaintiff's

9   Exhibit M-68 centrally located in Section 34, 8 South, 4 West,

10  which indicates an intermittent pond.  From that pond the stream

11  flows westerly to a point where it leaves the property, flowing

12  outside of the property through Parcel 58, and crossing the

13  stream at the northeasterly corner of the property, which is

14  located in the northwest corner of the Southwest Quarter of the

15  Southeast Quarter, Section 33, 8 South, 4 West, at which point

16  it leaves the property in its course to the west and its con-

17  fluence with De Luz Creek outside of the property.

18       Q   Colonel, referring to the two intermittent streams you

19  just described, are they of the kind that flow only during and

20  after periods of precipitation?

21       A   Yes, sir.

22       Q   Now, directing your attention to the first of the two

23  photographs on your Exhibit M-102, I see this symbol like a

24  comb across the creek.  That is the symbol for a dam, is it not?

25       A   Yes, sir.

1    Q   And is that the dam that is referred to on page 3 in

2    the engineering report, the very top of the page?

3    A   Yes, sir.

4    Q   That being a reservoir by an earth dam which is pre-

5    sently partially destroyed and holds no water?

6    A   Yes, sir.

7    Q   And this intermittent pond that is indicated on M-68,

8    is that the pond impounded behind that dam?

9    A   Yes, sir.

10    Q   Now, directing your attention again to the aerial

11    photograph, I see a long finger of Class III soil extending

12    almost due north from the northeast corner on that parcel.  Do

13    you see the one I am referring to?

14    A   Yes, sir.

15    Q   And which lays outside of the remainder of the King

16    parcel, as shown on the second photograph.

17    A   Yes, sir.

18    Q   Now does that symbol have any relationship to the

19    area of water impounded behind that dam?

20    A   By that you mean the soil contact that delineates the

21    parcel of Class III land contained partly within and partly

22    without?

23    Q   Yes.  Is that the same as the pond.

24    A   No, sir.

25    Q   The pond would be a great deal smaller?

b8

1      A   The pond area, your Honor, shown on the aerial photo-

2   graph contained in Plaintiff's Exhibit M-102 as a dashed line.

3   That would be the approximate size of the pond.

4      THE MASTER:   Now this white line, is that the road?

5      THE WITNESS:   That is the road, yes, your Honor.

6      THE MASTER:   And the pond, I take it, never floods the

7   road; is that correct?

8      THE WITNESS:   That is correct, your Honor.

9   BY MR. SACHSE:

10      Q   Colonel, what is your opinion as to the character

11   of waters that you would find underlying this parcel, with the

12   exception of any flow that might be running in the intermittent

13   stream?

14      A   It would be vagrant and percolating in nature, and not

15   a part of the De Luz stream system.

16      Q   Do you know of any present water development on the

17   property?

18      A   The windmill well on the property, referring to page 2

19   of Plaintiff's Exhibit M-102, the bottom paragraph, part of the

20   engineering section, which states that there is a 33 foot deep

21   66 inch diameter concrete lined windmill well located in the

22   southwest corner of the Southeast Quarter of the Northwest

23   Quarter, Section 34, 8 South, 4 West.

24      Q   However, there is no use, as far as you are aware, be-

25   ing made of that well, is there?

A   No, sir.

Q   And there is no present agricultural development, to the best of your knowledge, is there?

A   No, sir.

Q   Have you been on that property fairly recently?

A   Yes, sir.   I was on the property the 12th of July, 1958.

Q   Colonel, I am not very good at estimating acreage, frankly.   But it appeared to me that a good part of the property lying below and generally on both sides of the destroyed dam had been in the past obviously dry farmed.   Did you notice? Did you observe that?

A   Yes, sir.

Q   Now, is that in general the acreage that you have indicated as being irrigable, or would that be greater than the acreage you have indicated as being irrigable?

A   Referring to the first photograph contained in Plaintiff's Exhibit M-102, your Honor, the new photograph, and the first one which shows the bulk of the property, including the pond symbol, the irrigable area adjacent to the intermittent stream entering from the north and paralleling the road, Class III land, the long strip of Class III land adjoining the stream is irrigable.   The area in which the pond is located is irrigable.   The Class III area extending westerly of the dam symbol and southerly of the road is irrigable.   And the area

b10

1    north of the road, classified as IV, is irrigable.  And that

2    contains all of the cleared area as shown on the photograph,

3    plus a portion of the uncleared area.

4        Q. In other words, all that I referred to as apparently

5    having been dry farmed, which you can see as been brushed out,

6    is included with the area you have indicated as being irrigable?

7        A  Yes, sir.

8        MR. SACHSE:  I have nothing further on this parcel.

9        LT. MILLER:  No questions.

10        MR. SACHSE:  That is all I have then at this moment.

11   BY THE MASTER:

12        Q  Colonel Bowen, you referred to this pond as an inter-

13   mittent pond.  Is intermittent used there in the same sense

14   which you used it referring to an intermittent stream?

15        A  Yes, sir.  An intermittent pond is one which has water

16   only from time to time.  This particular dam impounding was

17   constructed to impound water, and has been damaged, so the value

18   of the dam is much less than originally conceived.  But even

19   though that were totally repaired, the only time that water would

20   flow into it would be during the winter season.  And in the

21   absence of flow during the long dry summer season, would result

22   in a shrinkage of the pond area, and very likely the complete

23   drying up of the pond during the summer season.

24        Q  I take it from your present statement there is no

25   present use of the well on the property.  Is there present use

bil

1    of the water from the pond?  Is there any diversion from that?

2        A  No, sir.

3        THE MASTER:  Just for my own information, will Mr. King

4    be present tomorrow?

5        MR. SACHSE:  Probably not.  I intend to call him tonight

6    and tell him the substance of Colonel Bowen's testimony.  And

7    quite frankly he probably won't come down.  But I would like to

8    leave it open.

9        THE MASTER:  Yes, he would have the privilege of coming

10   tomorrow.

11       MR. SACHSE:  May I have this marked MD-BB, the deed to

12   the property?

13       I offer Exhibit MD-BB in evidence.

14       THE MASTER:  It will be received and so marked.  Do you

15   have any further evidence you wish to present this afternoon,

16   Mr. Sachse?

17       MR. SACHSE:  Your Honor, this disposes of all of the

18   individuals who I represent, so I have nothing, either in case

19   in chief or rebuttal at this time.

20       THE MASTER:  Well, then, I would suggest that we simply

21   start, beginning with Parcel 2, and take up whatever evidence

22   Colonel Bowen can offer with reference to these areas where there

23   has been no engineering report requested.  And in most of the

24   cases there has not even been an answer filed.  In certain cases

25   an answer has been filed, but it has been in pro per.  But the

b12

1    owners of the property have not appeared to testify.

2        MR. SACHSE: Your Honor, if we can go off record for just

3    a minute.

4        THE MASTER:  Very well, off the record.

5        (Discussion off record.)

6        LT. MILLER:  Your Honor, before we start this line of

7    questioning, I would like to state on behalf of the United

8    States that the type of information which Colonel Bowen has

9    with respect to these properties we have not had permission to

10   go on is very limited.  And the opinions that he has, of course,

11   will be based upon purely reconnaissance of the area and a

12   study of the aerial photos of the area and his general knowledge.

13   We believe that the Court has a right to develop this evidence.

14   We think that Colonel Bowen should be the Court's witness at

15   this instance, since this is developing evidence for defendants.

16   And we want to make it clear, though, that the United States

17   would like to at any time undertake to make an engineering

18   report of these lands if the people so desire.  Because the

19   evidence isn't as detailed as it should be in many cases.  And

20   only if we have the opportunity to go on the property could we

21   do the thorough type of job which has been evidenced here before.

22   So we do go on record that at any time in the future, before or

23   after the findings, the United States stands ready to conduct

24   an engineering report and survey of these properties.

25       THE MASTER:  That statement is appreciated.  Of course, I

bI3

1  presume there will have to be some cutoff date for the presen-

2  tation of evidence as to this subwatershed, and the same way

3  in which there will be a final date for evidence in the case as

4  a whole.  But at least until such time as such final cutoff date

5  is reached, that offer would remain open then.  Well, now, for

6  the orderly presentation of this material, do you wish to examine

7  Colonel Bowen?

8      LT. MILLER:  No, sir.  I would like for the Court to con-

9  sider Colonel Bowen as its witness.

10     THE MASTER:  Very well.

11     LT. MILLER:  Since this is strictly evidence for defendants

12  who have not appeared.

13

14              ALLEN C. BOWEN,

15  recalled as a witness, having been previously sworn, testified

16  as follows:

17

18              CROSS-EXAMINATION

19  BY THE MASTER:

20     Q  Colonel Bowen, suppose you then start with Parcel 2 and

21  give us what information you have gained through this reconnais-

22  sance survey which you and your staff have conducted, referring

23  to Exhibits M-68, M-32, or any of the other exhibits to aid you

24  in your testimony.

25     A  Yes, your Honor.  De Luz watershed Parcel No. 2 is

b14

1  delineated on Plaintiff's Exhibit M-68, lying partly within

2  Sections 16, 18, 19 and 20.  The corner, to those sections is

3  within this property.  All of those sections being in Township

4  8 South, Range 4 West.  The northerly boundary of the parcel is

5  common to the Santa Rosa Ranch, a part of the Vail Ranch line,

6  and also the Riverside-San Diego County line.  The property is

7  traversed by an intermittent stream which enters the property

8  from the Vail Ranch at the extreme northwest corner, flows

9  southerly for a distance of approximately a thousand feet, and

10 then its course is southeasterly across the property to a point

11 about midway on the easterly boundary, where it leaves the pro-

12 perty and flows onto its ultimate confluence with De Luz Creek

13 in Parcel No. 12, which is reported on in Plaintiff's Exhibit

14 M-100.  According to the topography, as shown on Plaintiff's

15 Exhibit M-68, this is a very steep, precipitous area.  The

16 exhibit, combined land classification map--

17      LT. MILLER:  Yes, sir.  I have it here.

18      MR. SACHSE:  Is that M-84?

19      LT. MILLER:  Yes.

20      THE WITNESS:  Also referring to Plaintiff's Exhibit M-84,

21 Parcel No. 2 is delineated.  It is noted that the preponderance

22 of the property is Class VII, non-irrigable land, with only a

23 small portion of Class VI land, which, in my opinion, is irri-

24 gable, near the point northerly of where the intermittent stream

25 previously referred to leaves the property.

bI5

BY THE MASTER:

    Q  That is the Class VIII, isn't it?

    A  There is some Class VIII, your Honor, and Class VI.

    Q  This is Class VIII?

    A  Class VIII is this small portion which is partly within Parcel 2 and partly within Parcel 10.

    Q  That is, the Roman numeral VII to the left of the parcel line  covers both Parcel 2 and the adjoining parcel to the west; is that correct?

    A  Yes, sir.  And the other parcel--everything that is outside of the nearest contact.  That Class VIII area is one acre, about one acre in area.  And the Class VI land is about one acre in area.  So on the basis of information presently before me, in my opinion there is only one acre of irrigable land on this property.

    Q  Now, is that irrigable land crossed by the intermittent stream to which you have testified?

    A  No, sir.  It is northerly of the intermittent stream, separated from the intermittent stream by Class VIII land.

    Q  Now, is the property all on the same subwatershed with that particular intermittent stream?

    A  No, your Honor.  In the Northeast Quarter of the Northeast Quarter, Section 19, 8 South, 4 West, there is a ridge line shown on Plaintiff's Exhibit M-68 which divides that sixteenth of a section, and the 20 below it and the quarter below that,

b16

and everything westerly of that ridge line flows into a tribu-
tary of Cottonwood Creek.  Similarly, in the south portion of
the Southwest Quarter of the Northwest Quarter, and all of the
Northwest Quarter of the Southwest Quarter, Section 20, 8 South,
4 West, drain directly into De Luz Creek and are not tributary
or do not drain into the intermittent streams flowing across the
property.

    Q  The balance of the property does drain into that stream?

    A  Yes, sir.

    Q  Are there any alluvial deposits in that property?

    A  No, sir.  According to the best knowledge available to
me at the present time, with the possible exception of that
small section of Class VIII land, which in my opinion is clastic
material, there is no significant deposit of alluvium.

    Q  And do you know if there are any springs on the property?

    A  No, sir.  I do not.

    Q  Would any underlying water on any portion of the pro-
perty outside the actual area of the stream be a part of the
flow of the stream, or would that be what has been referred to
as vagrant, percolating water?

    A  Your Honor, in my opinion, any underground water on this
parcel would be vagrant, percolating water, not part of the
stream system.

    THE MASTER:  Mr. Sachse, do you have any questions?

    MR. SACHSE:  No.  That is all, sir.

b17

1       LT. MILLER:  No questions.

2       THE MASTER:  I understand, Mr. Myers, if you have any

3  questions at any time you will--

4       MR. MYERS:  I will ask them.

5       THE MASTER:  I will not ask you then each time.

6       MR. MYERS:  Yes, your Honor.

7       THE MASTER:  By the way, the record should show that Mr.

8  Myers has appeared.  He has been present during the afternoon

9  session.  He was not here for the morning session.

10  BY THE MASTER:

11      Q  Now, Colonel Bowen, can you proceed then to Parcel 3.

12  The record might show that according to information which I have

13  the owners of Parcel 2 were served on April 14th and April 30th,

14  and have not filed an answer.  The owner of Parcel 3 was served

15  on April 17th and has not filed an answer.

16      A  De Luz watershed Parcel No. 3, your Honor, is delineated

17  on both Plaintiff's Exhibits M-68 and M-84.  The numeral 3 en-

18  circled is contained within the exterior limits of the property

19  on both exhibits.

20      Referring to Plaintiff's Exhibit M-68, the northerly

21  boundary of the parcel is contiguous to the Vail Ranch, the

22  Santa Rosa grant.  And the property lies partly in Section 18,

23  8 South, 4 West, and partly within Section 13, 8 South, 5 West.

24  The portion within Parcel 13 is traversed generally from north

25  to south by the Tenaja truck trail.

b18

1        Referring to Plaintiff's Exhibit M-84, Parcel No. 3 shows,

2   delineated thereon, some area of Class II and Class III land,

3   both classes of which are irrigable.  The combined total of Class

4   II and III, or the combined irrigable acreage in Parcel No. 3, on

5   the basis of information presently before me, is 19 acres, all

6   of that lying west of the Tenaja truck trail, well up towards

7   the watershed divide of Santa Margarita River.  The headwaters

8   of Cottonwood Creek rise partly within this Parcel No. 3.  And

9   referring to Plaintiff's Exhibit M-68, the topographic map,

10  shows that all of the surface draining generally to the south

11  in this property drains into Cottonwood Creek, with a very small

12  portion in the extreme easterly corner, where the contours are

13  closely spaced, indicating a very steep slope, that portion

14  drains into this unnamed tributary which drains southerly to its

15  confluence with Cottonwood Creek within the Foss property.  That

16  is Parcel No. 5, the Foss property.

17        Q  As was testified to this morning?

18        A  Yes, sir.  In my opinion, your Honor, all of the water

19  underlying this property is vagrant, percolating water, not a

20  part of the stream system of De Luz Creek and its tributaries.

21        Q  Now, are you familiar at all with the actual flow into

22  the headwaters of Cottonwood Creek within this parcel?

23        A  It is intermittent in character, your Honor, flowing

24  primarily during and immediately following periods of high rain-

25  fall and runoff.

b19

1    Q   And do you know of any springs on the property?

2    A   I know of none, your Honor.

3    Q   Are there any agricultural uses on the property at the

4  present time?

5    A   I know of none, your Honor.   I observed none when I

6  came down through there on the 5th of July, 1958.

7    Q   Now, have you stated how many acres, in your opinion,

8  are irrigable on this property?

9    A   Yes, your Honor.   I stated that 19 acres of land on

10  Parcel No. 3, De Luz watershed, were irrigable.

11    Q   And what crops in general would that be suitable for?

12    A   Well, the elevation of the irrigable portion of this

13  parcel is in the neighborhood of 2,200 feet, your Honor.   And in

14  my opinion irrigated pasture would be the best use for the irri-

15  gable lands on Parcel No. 3.

16    THE MASTER:   Any questions by Mr. Sachse?

17    MR. SACHSE:   Just a moment.

18

19                   CROSS-EXAMINATION

20  BY MR. SACHSE:

21    Q   Colonel Bowen, all of Parcel 3 is within the De Luz

22  watershed, isn't it?

23    A   Yes, sir.

24    Q   It doesn't go out--have you been on it and observed a

25  residence at all and where he gets his water supply, Groebli?

b20

1     A  I believe he has a couple of little wells up there.

2  I think I saw them pumping when I rode by there.

3     Q  To refresh your recollection, as you go up the canyon

4  there is a sign that says "Please be careful of fire.  If you

5  were an animal, you would hate to be burned alive" and so on.

6     A  Oh, yes.  The house sits off to the east of the Tenaja

7  truck trail.

8     Q  Right.

9     A  I didn't go up to his house.

10    Q  Then you do not know in fact there is a spring there?

11    A  No, sir.

12    Q  I believe it is actually the headwater spring of

13  Cottonwood Creek?

14    A  Yes, sir.

15    Q  You have not observed it yourself?

16    A  No, sir.

17    MR. SACHSE:  I have nothing further.

18    THE MASTER:  Lt. Miller?

19    LT. MILLER:  Yes.

20

21              REDIRECT EXAMINATION

22  BY LT. MILLER:

23    Q  Colonel, is the testimony you are giving on each of

24  these parcels where you have not made a detailed survey about the

25  same information, the base of your testimony is the same in each

b21

1  case?

2       A  Yes, sir.

3       Q  Could you outline to the Court exactly what you are

4  basing this testimony upon?

5       A  Yes.  The testimony that I am offering in regard to

6  these parcels is based on reconnaissance over the years from

7  1952 on, examination of aerial photographs with a stereoscope,

8  comparison of the information derived from detailed surveys on

9  adjoining properties and--well, you might say occasional examin-

10  ation in connection with going to and from other properties in

11  the vicinity.

12       Q  Would there in some cases, in your opinion, be revisions

13  in your testimony if you had or should have in the future an

14  opportunity to make a detailed study of the property?

15       A  Oh, very, very definitely.  It is very possible that

16  given access to the property we would find areas irrigable in

17  nature of which on the basis of my present knowledge I am not

18  aware.

19       LT. MILLER:  No further questions, your Honor.

20       MR. SACHSE:  Your Honor, I would like to have one standing

21  question, if I may.  I think it would save repetition of Colonel

22  Bowen.  Just each time or any time if you ever have made an

23  actual spring measurement or stream measurement, you will so

24  state, save me asking you each time have you ever done it on the

25  parcel in question.  Volume of flow, I mean from any spring or

b22

1    any stream.

2        THE WITNESS:  I believe I can answer that right now, your

3    Honor, that we have made none.

4        THE MASTER:  On any of them.  A standing answer to the

5    standing question.

6        Then we will proceed to Parcel 4.  My information indicates

7    that the owners were served on April 26th and have filed no

8    answer in this case.

9        THE WITNESS:  Parcel No. 4 is delineated on both Plaintiff's

10   Exhibits M-68 and M-84.  It lies immediately south and joins

11   Parcel No. 3, heretofore testified to.

12   BY THE MASTER:

13       Q  Between that and Parcel 5, as shown on Plaintiff's

14   Exhibit M-68?

15       A Yes, sir.  And examination of the topographic map

16   indicates very steep, rugged slopes, particularly in the easterly

17   half of the parcel.  This parcel is also traversed on the west

18   by the Tenaja truck trail from north to south, and by an inter-

19   mittent stream symbolized and shown as Cottonwood Creek.  On

20   the basis of information presently available, your Honor, there

21   is no irrigable land on Parcel No. 4.  It has all been classi-

22   fied as VII on the basis of our present information.

23       Q  Would any underground water be a portion of this same

24   system of Cottonwood Creek or would it be vagrant water?

25       A  No, sir.  The underground water in Parcel 4, in my

b23

1    opinion, is vagrant, percolating, and not part of the Cottonwood

2    Creek stream system.

3        Q   And can you describe the nature of the flow of Cotton-

4    wood Creek through this property?

5        A   No, your Honor.  I didn't observe the nature of the

6    flow of Cottonwood Creek in this property.  It lies well below

7    the road which traverses the westerly portion of the property.

8        Q   Are you aware of any springs on the property?

9        A   Your Honor, there are springs all over in that area

10   this year.  I don't specifically recall any, but most of the

11   cut banks along the road are weeping following the extremely

12   heavy precipitation we had last spring.

13       Q   Is there any development on that property?  Is it

14   occupied?

15       A   No development to my knowledge, your Honor.

16       Q   Is there a house on it?

17       A   I am not aware of a house on this property.

18       Q   And as far as you know then there is no well on the

19   property?

20       A   So far as I know there is no well.

21   THE MASTER:  Mr. Sachse?

22   MR. SACHSE:  No questions.

23   LT. MILLER:  No questions.

24   THE MASTER:  The next parcel, according to my records,

25   that we do not already have testimony concerning is Parcel 10.

b24

1   The information I have indicates the owners there were served

2   on April 17, and have not filed an answer.

3       THE WITNESS:  Parcel No. 10, your Honor, is delineated

4   on Plaintiff's Exhibit M-68 with the No. 10 encircled, contained

5   within the exterior limits of the property.  That is traversed--

6   it is contiguous to or adjoins the Matthews property on the east

7   and the Taylor and Lewis property on the south.  Parcel No. 12

8   adjoins the southerly boundary of the property.  Approximately

9   80 acres in area.  De Luz Creek enters the easterly boundary of

10  the property slightly below the northeast corner, and flows

11  southerly through the property, leaving the property just west-

12  erly of the southeast corner.  The intermittent stream described

13  as rising on the Santa Rosa and flowing through Parcel No. 2

14  enters this property from the--on the west, flows easterly to the

15  road, whence it turns sharply and flows southerly to its con-

16  fluence with De Luz Creek within Parcel No. 12.  Now, the graded

17  earth road which leads up to the Matthews house on Parcel No.

18  14 traverses this property from the northeast to the southwest.

19  On the basis of the information available to me now, your Honor,

20  there are 35 acres of irrigable land in this parcel, most of it

21  lying in the--with reference to Plaintiff's Exhibit M-84, where

22  the parcel is delineated and the land classes are shown thereon,

23  the irrigable land lies mostly in the northerly portion and in

24  the easterly portion adjacent to De Luz Creek and the unnamed

25  tributaries to De Luz Creek which flow through the property.

2137

b25

BY THE MASTER:

Q   Do you know what crops could be grown upon that irrigable land?

A   Yes, sir.   On the gentler sloping lands within the property, Class II, comprising of about 13 acres, would be best suited to row crops because of the the frost hazard involved, they being low lying and adjacent to the creek.

MR. SACHSE:   We have a point here.   M-100 covers this almost perfectly.   In M-100 you can see this almost perfectly.

THE WITNESS:   Referring to Plaintiff's Exhibit M-100, your Honor, on the land classification map, the Parcel No. 10 is shown to the north of the covered 40 acres which accompanies the report in Plaintiff's Exhibit M-100, and shows the streams described that course through the property, Class IV, Class II and Class VI lands which are shown on Plaintiff's Exhibit M-84. And of those about 21 acres would be, in my opinion, adapted to row crops and the remaining 14, being steeper slope, are lands Class IV and VI, would be suited for avocado production.

BY THE MASTER:

Q   Now what can you say about the flow of the stream through this property?

A   The flow is intermittent in character, your Honor.

Q   Does it flow into the summertime or only during and immediately after heavy rains?

A   Your Honor, there is a rather substantial body of

b26

1   alluvium in this property, which is comprised of the Class II

2   and Class IV lands.  And in the summertime, to the best of my

3   knowledge, the flow through this property is underground in

4   nature.

5        Q  And any water developed on the portion of the property

6   with the overlying alluvium would be part of the stream, I

7   presume?

8        A  Yes, sir.

9        Q  Now is there any portion of the property where under-

10  ground water would not be part of the subterranean flow of the

11  stream?

12       A  Well, the high ground in the southwesterly portion of

13  the property, which is Class VII land, as shown on the photo-

14  graph contained in Plaintiff's Exhibit M-100 as being a rough

15  darker colored area, waters contained in the higher portion of

16  that in my opinion would be vagrant and percolating in nature.

17  In the Class VII land, as one nears the lower alluvial areas in

18  the Class VII area, the fissures and joints in the rocks,

19  granitic formations, could be in contact  underground with the

20  alluvial fill, and the waters of the lower portion could be in

21  contact with the waters of the alluvium, and hence part of the

22  stream.

23       Q  That would apply to the easterly half of the parcel then;

24  is that correct?

25       A  Yes, sir.

b27

Q   Now, what present uses are being made of the property?

A   I have no knowledge of any uses on this parcel, your Honor.

Q   Is there any house on it, to your knowledge?

A   No, your Honor.   To my knowledge I have no knowledge of a house on Parcel 10.

THE MASTER:   Mr. Sachse?


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Colonel Bowen, directing your attention to the two streams on this property, the one being the West Fork of De Luz Creek and the other being the intermittent stream that flows into the west--I have used the term  "intermittent stream" to describe both of those.   Now, how would you distinguish between the two of them, the West Fork of De Luz Creek and the other?

A   Mr. Sachse, I have referred to that as the main De Luz Creek in the past, and in order to be consistent, I referred to it as that again.   It drains a much larger area, extending well up into the Santa Rosa grant, as shown on Plaintiff's Exhibit M-84.   The main De Luz Creek heads up in this arm that extends northward in the central part of the map, and flows southerly to a point where it leaves the Santa Rosa Ranch.   Whereas the smaller tributary, which comes in from the west, simply drains a relatively narrow area, extending approximately a mile up into

b28

the Santa Rosa grants.

Q   Then in so far as their physical flow characteristics are concerned, am I not right in saying the smaller intermittent one to which you just referred would actually carry surface water only during and immediately after a marked period of precipitation, whereas the larger stream, while it is intermittent, does carry surface flow for a good part of the year?

A   Oh, yes, because it has a large drainage area to sustain the flow, too.

Q   What I am trying to arrive at is the difference between these streams, some of which are definitely very much creeks, others are very much so borderline, and others of which are not creeks, but are mere ravines.  And I know you have no exact terminology for them.  But again taking this particular intermittent one, would you say it flows on the surface only during and immediately after heavy rains, or does it have any substantial period of surface flow?

A   No, it flows only during and immediately following periods of high precipitation and runoff.

MR. SACHSE:  That is all.  Thank you.

THE MASTER:  Lt. Miller.

LT. MILLER:  No questions.

THE MASTER:  Very well.  Then I believe the next parcel is Parcel 15, the owners of which were apparently served on April 15, and have not filed an answer, Frank B. and Edna Earle Pierce.

b29

1     MR. SACHSE:   Which one are we on now, sir, 17?

2     THE MASTER:   15.

3     MR. SACHSE:   15.

4     LT. MILLER:   I think M-42 might be of some assistance.

5     THE WITNESS:   And also Mr. Bleecker.   What number is that?

6     LT. MILLER:   M-47, Mr. Bleecker's.

7     THE WITNESS:   De Luz watershed Parcel No. 15, your Honor,

8 is delineated on Plaintiff's Exhibit M-68, and shown as com-

9 prising approximately two sixteenths of a section, each with the

10 number 15 encircled, and contained within them.   They have a

11 common corner. Of one portion of the property is the southwest

12 of the southwest, Section 21, 8 South, 4 West, and the other is

13 the northeast of the southeast, Section 20, 8 South, 4 West.

14 BY THE MASTER:

15     Q   Let's see, that is the northwest of the southwest,

16 isn't it?

17     A   No, sir. Here is the corner.   This is the Southwest

18 Quarter--

19     Q   Oh, yes.

20     A   --of the Southwest Quarter, Section 21.

21     Q   That is right.   That is only a part of a section.

22     A   Yes, sir.   The property is also delineated on Plaintiff's

23 Exhibit M-84 with the land classification symbols shown on it.

24 And the portion of the property is shown as the northerly of the

25 two 40's shown in part, at least, on the land classification

b30

1    map in Plaintiff's Exhibit M-42.

2         LT. MILLER:   Colonel, I think M-100 has that on it, too,

3    in more detail.

4         THE WITNESS:   And in M-100 the northerly 40 of Parcel 15

5    is shown lying immediately east of the colored portion of the

6    map contained in Plaintiff's Exhibit M-100.   The southerly 40

7    of this parcel, referring to Plaintiff's Exhibit M-68, has an

8    intermittent stream entering near the northeast corner of the

9    southerly 40, and traversing the 40 diagonally, departing, flow-

10   ing in a southerly direction near the southwest corner of the

11   southerly 40.   Now, Plaintiff's Exhibit M-68 shows no inter-

12   mittent stream symbols on the northerly 40 of Parcel 15.   And on

13   the basis of information presently available to me, your Honor,

14   there are 28 acres of irrigable land, as shown on Plaintiff's

15   Exhibit M-84 as occupying the southwest portion of the northerly

16   40, Class II, III, IV and VI.   Class IV is the bulk of it.   The

17   Class III land--

18   BY THE MASTER:

19        Q   The Class III land is in the southerly 40, isn't it?

20        A   No, sir.   The Class III land is in the northerly 40,

21   your Honor.   This portion shaded in in blue on Plaintiff's Exhibit

22   M-84 is Class III.   Now, this stringer of land shown on Plain-

23   tiff's Exhibit M-84 in the southerly quarter, or southerly por-

24   tion of Parcel 15 is Class VIII land, your Honor, which adjoins

25   the stream.

b31

1     Q  The designation VIII being down in Parcel 35, extending

2    clear up into Parcel 15; is that correct?

3     A  Yes, your Honor.  The symbol appears just below the

4    Parcel No. 35.

5     Q  Would M-47, the Bleecker engineering report, give you

6    more information on the southerly part?

7     A  No, your Honor.  Referring to Plaintiff's Exhibit M-47,

8    there is nothing outside of the Bleecker property shown on the

9    map.  That was one of the first ones we did up there at that

10    time.  Referring to the land classification map in Plaintiff's

11    Exhibit M-100, your Honor, delineated in greater detail is the

12    Class IV, VI, IV and III in the northerly of the two 40's.  And

13    on the basis of information presently available, in my opinion,

14    there are 20 acres of irrigable land within this parcel.

15     Q  And for what crops could that be used?

16     A  Possibly six acres of the lower lying land, leveler

17    land, would be suited to row crops production.  And the remain-

18    ing 14 acres suited to avacado production.

19    Now the 40 which is located in Section 21, your Honor,

20    with the exception of the alluvium, classified as VIII in the

21    southwesterly corner, and the granitic material in immediate

22    contact with that alluvium, the remaining groundwater in the

23    southerly 40 would be vagrant and percolating in nature, not

24    a part of the stream system.  With regard to the northerly 40

25    of the two in Parcel 15, part of that is indicated by that map

2144

b32

6

1  in Plaintiff's Exhibit M-100, was alluvial deposits

2  shown as Class IV and Class III, and water extracted from them

3  in my opinion, would be part of the De Luz Creek stream system.

4       Q  Water extracted elsewhere than the northerly 40 would

5  be vagrant water, however.

6       A  With the exception of the hill land that is in contact

7  with the alluvium and with the deeper residuum material on the

8  lower land, your Honor.

9       Q  Well, what portion would be left then where the water

10  would be vagrant water in this northerly 40 acres?

11      A  Well, which one is Mr. Matthew's exhibit?  That may

12  show more--

13      LT. MILLER:  M-85.

14      THE WITNESS:  M-85?

15      LT. MILLER:  Yes.

16      THE WITNESS:  Plaintiff's Exhibit M-85, your Honor, is

17  no help to us either, because there is nothing outside of the

18  property delineated, with the exception the contacts along the

19  map line there indicate Class VI and Class VII land except for

20  the extreme northwest corner of the northerly 40 of Parcel 15,

21  which will be included with that area heretofore described as

22  being in contact with the stream.  But the higher ground in the

23  extreme northerly and northeasterly portion of the northerly 40

24  Parcel 15 would, in my opinion, have vagrant, percolating water,

25  not a part of the stream system.

b33

BY THE MASTER:

Q   Now, what are the present uses of this property?

A   I don't know of any, your Honor.  I have no knowledge of any.

Q   Do you know if there is a house on either--

A   No, sir.  I do not.

Q   And there is no evidence of any past uses of water on the property?

A   I have no knowledge of that, your Honor.

THE MASTER:  Mr. Sachse, do you have any questions?

MR. SACHSE:  Nothing.

LT. MILLER:  No questions, your Honor.

THE MASTER:  Now, the next parcel is Parcel 16.  But Mr. Fredy was here this morning and I understand that you are going to check with him and will have a report for him by a week from Wednesday.

LT. MILLER:  That is correct, your Honor.

THE MASTER:  The 23rd.  So we will pass on then to Parcel 17, Albert H. and Stanley Smith, who were served on April 17, and who filed a letter, but no formal answer.

THE WITNESS:  Parcel No. 17, your Honor, is delineated on Plaintiff's Exhibit M-68 in the extreme northwesterly corner. The parcel lies partly within and partly without the Santa Margarita watershed.  The smallest portion of it lies within the Santa Margarita and De Luz watershed.  It is north of the Tenaja

b34

truck trail, and lies within Section 13, 8 South, 5 West.  The

north boundary of the parcel is common to the Vail Ranch, also

the Riverside County line.  That is high country up in there.

The symbol on the map, Plaintiff's Exhibit M-68, indicates

2,302 feet elevation.  On the basis of the information presently

available to me, there is no irrigable land on Parcel No. 17.

In my opinion, all the waters underlying this property are

vagrant, percolating, and not part of the stream system.

BY THE MASTER:

Q   I don't see any symbol even for an intermittent stream

within Parcel 17 in the watershed.  Is there?

A   No, sir.  The actual symbol doesn't appear, but examin-

ation of the contours within Parcel 17, shown on Plaintiff's

Exhibit M-68, indicates there are depressions or gullies or

washes through which water will flow during periods of rainfall

and immediately thereafter, rainfall and runoff.

Q   There would be no sustained flow after the rain ceased?

A   No, sir.

Q   So far as you know, are there any uses of water being

made on the property or are there any wells or springs?

A   I have no knowledge of any uses of water or of any

wells or springs on the property, your Honor.

THE MASTER:  Mr. Sachse?

MR. SACHSE:  Nothing.

LT. MILLER:  No questions, your Honor.

b35

1    THE MASTER: Parcel 18 then, owned by Hunt, Holdaway,

2    Giles and Caldwell, all of whom have apparently been served and

3    have not filed any answer.

4    LT. MILLER: Your Honor, on Parcel 18 they have filed an

5    answer.

6    THE MASTER: That is right.

7    LT. MILLER: And they are represented by an attorney, Mr.

8    J. B. Skeen of Salt Lake City. He filed the answer on their

9    behalf. And I would like to state that approximately a year to

10   a year and a half ago, when the United States started doing this

11   type of work in the De Luz area, Mr. Skeen was in correspondence

12   with the office of Ground Water Resources, and indicated that at

13   some time he would like to have a survey made of the property,

14   but that he would notify us. Subsequent to that date, at the

15   first Master's hearing here on May 21, one of the owners of the

16   property asked me concerning getting such a survey made. And I

17   told her that since she was represented by counsel that the re-

18   quest would have to come from her counsel. The United States

19   has not heard from Mr. Skeen in that regard, and consequently no

20   study has been made of their property. Mr. Skeen was sent a

21   notice, which the Master signed, and requested the United States

22   mail for him to the counsel and parties in the De Luz area.

23   THE MASTER: That was the same notice that was sent to all

24   the other property owners.

25   LT. MILLER: Yes, sir.

b36

1    THE MASTER:  And there has been no reply to that request?

2    LT. MILLER:  No, sir.

3    THE MASTER:  Well, we might pass that one until tomorrow

4    or next Wednesday, inasmuch as an answer was filed by Mr. Skeen.

5    So that if he should desire to present any evidence, there would

6    be no occasion to go over it twice.  We can come back to it at

7    a later time, then.  We might take our recess at this time.

8        (Recess.)

9        THE MASTER:  We will proceed then to Parcel 22.

10   LT. MILLER:  Your Honor, on Parcel 22 there has been a

11   report made on that.  We haven't introduced it yet, because Mr.

12   Silva was noticed for tomorrow in your notices to the people

13   that reports had been made on.

14       THE MASTER:  Then we will pass him back until tomorrow.

15   Then that makes Parcel 25 the next one, because on Parcel 23,

16   Mr. Anderson I believe wanted to appear possibly tomorrow.

17   I understand he is in the process of purchasing this property

18   from Dodge.

19       LT. MILLER:  Yes, sir.

20       THE MASTER:  Or he may intend to purchase it.  That will

21   make Parcel 25 the next parcel.

22       THE WITNESS:  That is immediately north of the King Ranch.

23   Maybe the King shows it.

24       MR. SACHSE:  102.

25       THE WITNESS:  Parcel No. 25, your Honor, is delineated on

b37

1   Plaintiff's Exhibit M-68 with the numeral 25 in a circle.   And

2   it contains the section corner  common to 27, 28, 33 and 34,

3   8 South, 4 West.   It has in part on a portion of the southerly

4   boundary, a portion of the easterly boundary, a common boundary

5   with the King property, as shown in Plaintiff's Exhibit M-102.

6   And shown on the aerial photograph contained in Plaintiff's

7   Exhibit M-102 is a narrow stringer of Class III land paralleling

8   the fire truck trail, and extending northerly into Parcel 25,

9   comprising about five acres, your Honor.   And with the exception

10   of that five acres, based on the knowledge presently available

11   to me, the remainder is non-irrigable.   The parcel is traversed

12   by, as shown on Plaintiff's Exhibit M-68, some intermittent

13   stream symbols, one arising just south of the section corner

14   within the property, and running westerly to its ultimate con-

15   fluence with the East Fork of De Luz Creek.   And another draining

16   northerly, arising in the property within Section 27, and flow-

17   ing northerly to its confluence with the East Fork of De Luz

18   Creek, that confluence being outside the property.   And the inter-

19   mittent stream which flows through the Parcel No. 60, the King

20   property, shown in Plaintiff's Exhibit M-102, flows through the

21   easterly portion of the property.   In my opinion, all of the

22   ground waters underlying Parcel No. 25 are vagrant, percolating

23   waters, not a part of the stream system.   The streams symbolized

24   and shown as traversing this property which I have described,

25   are intermittent in character, flowing only during and

b38

1   immediately after periods of high precipitation and runoff.

2   BY THE MASTER:

3       Q   Now, Colonel Bowen, in an answer filed by Esther C.

4   Drake, she states 120 acres are tillable, and the balance can

5   be used for grazing cattle, turkeys, chickens and poultry.

6   Also the defendant is in the act of developing this land, building

7   a home on this property.  Defendant claims the right to 380

8   acre feet of water per year from drilled or dug wells developed

9   on the stream that runs through the property.  Now, from what

10  you have testified, there is not 120 acres of tillable land; is

11  that correct?

12      A   That is my opinion, your Honor.  In addition to the

13  King property, your Honor, the Parcel No. 56, the Mitchell

14  parcel, and No. 26, the Kuhnis parcel, adjoin in part this pro-

15  perty.  May I have the exhibit numbers on those, please?

16      LT. MILLER:  Neither show any soil symbols extending over

17  into that property.

18      THE WITNESS:  May I have the exhibit numbers, please?

19      LT. MILLER:  The exhibit number on Parcel 56 is M-88.

20      THE WITNESS:  Referring to land classification map con-

21  tained in Plaintiff's Exhibit M-88, your Honor, the easterly

22  boundary is common with Parcel No. 25, and shows Class VII land

23  entirely along that boundary.  This land in this area is ex-

24  tremely rugged, rough, rocky, steep, many rock outcrops.

25      LT. MILLER:  M-45 is the Kuhnis property, which borders

1 in part.

2   THE WITNESS:  45, Mr. Edwards.

3   THE CLERK:  Yes.

4   THE WITNESS:  Land classification map contained in Plain-

5 tiff's Exhibit M-45, which adjoins the Parcel No. 25 on the north

6 for a quarter of a mile, also shows Class VII land, rocky, steep

7 slopes, very shallow soils, rock outcrops.  And the area depicted

8 in the lower right-hand corner of the map or aerial photo con-

9 tained in Plaintiff's Exhibit M-45 is part of the Parcel 25.

10 And the area lying northerly of the King property reported in

11 Plaintiff's Exhibit M-102, with the corner common to 27, 28, 33

12 and 34, heretofore described, shows practically all of the parcel

13 in the aerial photo indicates rough, highly dissected land.

14 BY THE MASTER:

15   Q  Is there any evidence of present use of any of the

16 property?

17   A  Not to my knowledge.  There is no evidence on these

18 aerial photographs, your Honor, of any use on the property.

19   THE MASTER:  Mr. Sachse, do you have any questions?

20   MR. SACHSE:  No, sir.

21   LT. MILLER:  No questions, your Honor.

22   THE MASTER:  The next one I have would be Parcel 31.  The

23 evidence that I have indicates the owners were served on April

24 14, and have filed an answer.

25   LT. MILLER:  It may be that Plaintiff's Exhibits M-47, M-86

b40

1    and M-89 in part show the terrain.

2        MR. SACHSE:  That is surrounded by Bleecker, Myers, the

3    school district.  Your school district one might show it very

4    well.

5        LT. MILLER:  That is one of the ones I mentioned.

6    BY THE MASTER:

7        Q  I might state, Colonel Bowen, that the answer filed

8    by Alma F. Click and Veria V. Click state, " We hold the title

9    and deeds to the land on which Rattlesnake Creek flows through

10   our property, and pay the taxes on both land and water.  Springs

11   rise on this land and create the only flow of water in this

12   portion of Rattlesnake Creek during the dry season of the year.

13   Water has and is now being pumped direct from Rattlesnake Creek

14   for irrigation, and has been pumped direct from Rattlesnake

15   Creek and springs for many, many years.  Also percolating water

16   from wells have been used for house use and irrigating."

17       A  Parcel No. 31, your Honor, is an odd shaped parcel.  It

18   is delineated on Plaintiff's Exhibit M-68, has a common boundary

19   and lies north of the property owned by San Diego County in

20   connection with the De Luz school.  And it adjoins in part the

21   Bleecker property and another small parcel of land lying westerly.

22   It is traversed by the East Fork of De Luz Creek, which enters

23   the northerly portion of the property and flows southwesterly

24   to point of departure in the southerly part of the property,

25   where it enters Parcel 53, the De Luz school property.  It is

b41

1   bordered along the westerly and northerly portion of the property

2   by the Murrieta-De Luz Road.

3       Q  Can you describe the Rattlesnake Creek which is referred

4   to in the answer?   Do you know what is meant by that term?

5       A  No, your Honor.  I have no idea what is meant by Rattle-

6   snake Creek.

7       Q  Are you aware of any springs on the property?

8       A  No, sir.  I am not aware of any springs on the property.

9   On the basis of the information available to me, your Honor, and

10   referring to Plaintiff's Exhibit M-84, where the property is

11   delineated and the land classes are illustrated, there are thirty

12   three acres of irrigable land.

13       Q  And what is the total acreage?

14       A  The total acreage on the basis of my information is

15   55 acres, your Honor.

16       Q  You state 33 are irrigable?

17       A  Yes, your Honor.  The irrigable portion is adjacent to

18   the East Fork of De Luz Creek.  The creek here flows over and

19   through coarse clastics, which are shown as Class VIII land on

20   the Plaintiff's Exhibit M-84.  These clastics are bordered by

21   finer alluvial material, which is shown as Class III and Class

22   II land on Plaintiff's Exhibit M-84.  It is the best source of

23   water for the property, and water taken from clastic materials

24   would be part of the De Luz Creek stream system.  There is an

25   unnamed creek, your Honor, which flows southerly through the

b-42

1    Bleecker property, previously testified to, which leaves the

2    Bleecker property and enters the northerly projection of Parcel

3    No. 31.  There is an arm projecting northerly along the road,

4    and the streams enters this unnamed tributary flowing from

5    Bleecker's, enters Parcel 31 and flows to its confluence with

6    the East Fork of De Luz Creek within Parcel 31.  That stream

7    also flows through and over alluvial material.

8        Q  Water developed in that area then would be part of the

9    flow of that stream?

10       A  Yes, sir.

11       Q  And water developed elsewhere on the property would be

12   of what character?

13       A  Well, there is very little higher ground on the property,

14   your Honor.  The bulk of it is on these lower lying lands in

15   contact with the thread of the stream of the East Fork of De

16   Luz Creek.  And the lower slopes of the higher ground, which

17   lie in the extreme easterly portion of Parcel 31, are in contact

18   subsurfacely with the alluvium, and water can move from the joints

19   and fractures into the alluvium.

20       Q  Then water developed anywhere on that property would be

21   part of the flow of the stream?

22       A  Yes, your Honor.  The best place to develop water, of

23   course, is in the alluvial fill occupying the bulk of the property.

24       Q  What use is now being made of the property, of your

25   knowledge?

b43

1      A   I don't know, your Honor.  I believe the Clicks live

2   on the property, but I don't know what uses they make of it.

3      THE MASTER:   There is no statement in their answer as to

4   the amount of land which they are now irrigating, or which they

5   claim to be irrigable.  Do you have any questions, Mr. Sachse?

6      MR. SACHSE:  No, sir.

7      LT. MILLER:  No questions, your Honor.

8      THE MASTER:  Let's see, then we have Parcel 33, where an

9   answer has been filed in pro per, Kathleen and Kenneth Hodges.

10      LT. MILLER:  I believe Plaintiff's Exhibit M-48 might

11   be helpful with respect to that property, your Honor.

12      THE WITNESS:  Parcel No. 33, your Honor, is delineated on

13   Plaintiff's Exhibit M-68 and shown in the extreme southwesterly

14   corner of the Southeast Quarter, Section 29, 8 South, 4 West,

15   as a small irregularly shaped body, a very small part projecting

16   on down into Section 32.  The number 33, encircled, is outside

17   of the limits of the property, but a dotted line leading into the

18   property indicates the one in question.  On the basis of the

19   information available to me at the present time, your Honor, there

20   are six acres of land in the property, and all six acres are

21   irrigable.

22   BY THE MASTER:

23      Q   The answer filed by Mr. and Mrs. Hodges claims that they

24   own eight and one half acres of land.  They make no statement

25   as to what portion they contend to be irrigable, or any statement

b44

1    as to what uses they are making of the property.  What streams

2    flow through this property?

3         A   There are no streams flowing the property, your Honor.

4         Q   This does not touch upon any stream?

5         A   No, sir.

6         Q   What uses could be made of the irrigable land?

7         A   The lower land, about one acre more or less, is subject

8    to frost hazard.  But the higher ground, Class VI land, about

9    five acres, the higher ground would be suited to avocados.  As

10   indicated on the land classification map, part of Plaintiff's

11   Exhibit M-48, adjoining land of similar nature and character is

12   suited to avocados.  In my opinion, about five acres is suited

13   for avocados and about one acre in row crops, your Honor.

14        Q   Now, what about underground water, if any were developed

15   on this property?

16        A   The Class III land, your Honor, in the extreme southerly

17   tip of the property, is alluvial in nature, part of the alluvium

18   brought in by the East Fork of De Luz Creek.  And water taken

19   from that source would be, in my opinion, part of the East Fork

20   of De Luz Creek.  Water on the higher ground, Class VI ground,

21   inasmuch as that is in contact within this property with the

22   alluvium, could be--water could be moving from the Class VI land

23   through the joints and fissures into the alluvium underground.

24        Q   Then in your opinion if water was developed any place

25   on the property it would be in contact with the stream, even

b-45

1   though the land itself does not touch the stream.

2       A   Well, most particularly with regard to the Class III

3   land, which is part of the stream alluvium, and to a lesser

4   extent with the higher Class VI land.  It is possible to drill

5   a well say in the higher ground, granitic material, which would

6   tap water contained in fissures and crevices in the granitic

7   material at a depth which would not be in contact with the stream.

8   But I don't have any information to indicate definitely what the

9   situation would be, your Honor.

10      Q   In other words, you couldn't state on the basis of your

11  present information what the source of the water would actually

12  be in a well drilled on the higher ground?

13      A   No, sir.

14      Q   Can you tell what present uses are being made of this

15  property?

16      A   No, I have no knowledge of the present uses of water

17  on this property.

18          THE MASTER:  Mr. Sachse?

19          MR. SACHSE:  No questions.

20          LT. MILLER:  No questions, your Honor.

21          THE MASTER:  Let's see, Parcels 34 and 35, the defendants

22  have apparently have not yet been served.  I assume, though, we

23  might as well take whatever testimony you have on this area.  If

24  they are served and file an answer, they will have an opportunity

25  to present any additional testimony they wish.

b46

1    THE WITNESS:  Parcel No. 34, your Honor, is a small parcel

2  of land shown on Plaintiff's Exhibit M-68, adjoining Parcel 33,

3  and lying easterly of Parcel 33, and adjoining Parcel 31, lying

4  westerly of Parcel 31.  On the north it is bounded by Parcel

5  35.  On the basis of the information available to me, your Honor,

6  there are three acres of land in Parcel 34, and those three

7  acres are irrigable.  Examination of Plaintiff's Exhibit M-68

8  indicates no stream traversing the property.   The Class III land

9  is alluvial material, brought down by the East Fork of De Luz

10  Creek, and water extracted from it in my opinion is part of the

11  stream flow.   The land is low lying, subject to frost, and can

12  best be used for production of row crops.

13    Q  Do you know of any actual present use of the property?

14    A  I have no knowledge of any, your Honor.

15    THE MASTER:  Lt. Miller, do you have any questions?

16    LT. MILLER:  No questions, your Honor.

17    THE MASTER:  Mr. Sachse, do you have any questions?

18    MR. SACHSE:  No questions.

19    THE MASTER:  Parcel 35.

20    THE WITNESS:  Parcel No. 35 is delineated on Plaintiff's

21  Exhibit M-68 with a number 35 encircled, contained within the

22  outer limits.  The easterly border is approximately the De Luz-

23  Murrieta Road.  Bounded on the north by the Bleecker property,

24  on the west by Parcel No. 36, and on the south by Parcels 33 and

25  34.  There are approximately, on the basis of the knowledge

7

b47

1  available to me, your Honor, approximately 17 acres of land in

2  Parcel No. 34.   Now, this parcel is depicted on the land classi-

3  fication map contained in Plaintiff's Exhibit M-48.   And the

4  common boundary to the colored portion of the map is in the

5  northeasterly portion of the colored portion of the map.   It

6  indicates a small amount of Class III land, approximately an

7  acre in area, which projects over into Parcel 35.   And the re-

8  mainder of Parcel 35, on the basis of the information available

9  to me at present, is Class VI land.   The Class III land is suit-

10 able for row crops, the Class VI land for avacados.   The total

11 area of the property, irrigable area, is 17 acres.

12 BY THE MASTER:

13     Q   Then the entire property is irrigable.

14     A   Yes, sir, on the basis of present information.

15     Q   Are there any streams flowing through the property or

16 tributaries?

17     A   No, your Honor, other than the very minor gullies and

18 washes traversing the property.   There are no streams flowing

19 through this property.

20     Q   In your opinion, would water developed from underground

21 sources be part of any underground stream, or would it be vagrant

22 water?

23     A   The small portion of Class III land, your Honor, is

24 adjoining the substantial deposit of coarse alluvial fill--correc-

25 tion.   The small portion of Class III land within Parcel 35 is

b48

1    continuous with a portion of Class III land in contact with

2    the substantial alluvial deposit along De Luz Creek within

3    Parcel No. 36.  And the waters taken from that portion of the

4    property in my opinion  are part of De Luz Creek.  This property

5    is  astride a ridge which separates the East Fork of De Luz

6    Creek from the main De Luz Creek.  Part of the water flowing

7    from this property goes into the East Fork and part into the

8    main stream.  It divides the stream in two, generally runs north

9    and south through the approximate center of the property.  There

10   is a saddle located approximately in the center of the property

11   underneath the number "35" on Plaintiff's Exhibit M-68.

12        Q   What about water developed other than in the one acre

13   of Class III land?

14        A   Your Honor, inasmuch as this property is located close

15   to both of the major streams in De Luz Creek, waters moving

16   through the joints and fissures in the granitic material under-

17   lying this property could be in contact with the ground water

18   contained in the fill, the alluvial fill on both the East Fork

19   and the main De Luz Creek.

20        Q   Do you know if any crops are being raised on the pro-

21   perty at the present time?

22        A   I have no knowledge of the development  of this property,

23   your Honor.

24        THE MASTER:  Mr. Sachse, do you have any questions?

25        MR. SACHSE:  No questions.

b49

1   LT. MILLER:   No questions.

2   THE MASTER:   By the way, Mr. Eberhard, I notice you have

3   come in during the hearing since the recess.   Do you wish to

4   present any evidence this afternoon, or are you just listening

5   at the present time?

6   MR. EBERHARD:   I am listening at the present time.

7   THE MASTER:   Very well.   Then we will proceed to Parcel

8   38.   Stipulations have been filed with reference to Parcel--

9   between the defendants  Tittle and the Government and between

10   the defendants Mitchell and the Government.   I would appreciate

11   any evidence you can give, particularly since those stipulations

12   are not binding upon other defendants.

13   LT. MILLER:   Your Honor, I believe Plaintiff's Exhibit

14   M-96 would cover that property.

15   THE WITNESS:   Thank you.

16   MR. SACHSE:   What parcel is this?

17   THE MASTER:   38, a little tiny piece out of Garnsey.

18   THE WITNESS:   Parcel No. 38, your Honor, on the basis of

19   the information available to me, is all irrigable land.   Refer-

20   ring to the land classification map in Plaintiff's Exhibit M-36,

21   the large area of Class II land, colored yellow, occupying the

22   central portion of the map, indicates Parcel No. 38 as having an

23   east line in extension with the east line of the Garnsey property,

24   and an irregular line bordering it on the northwest and south.

25   It is contained wholly within the Class II land on the Garnsey

650

1   property, and lies south, southeast of the Garnsey house.  It is

2   on the alluvial fill occupying this portion of the Garnsey

3   property.  And any water extracted from it would be part of the

4   De Luz Creek stream system.

5   BY THE MASTER:

6       Q  Is it traversed by any streams?

7       A  No, your Honor.

8       Q  What is the total acreage of the parcel?

9       A  Based on the information presently available to me,

10  your Honor, it is two acres.

11      Q  And what crops could be grown upon the property?

12      A  Row crops, your Honor.  Low lying level land would be

13  suitable to any row crops adaptable to the area, a wide variety

14  of crops.

15      THE MASTER:  Any questions from counsel?

16      LT. MILLER:  No questions.

17      MR. SACHSE:  Yes, your Honor.

18

19                      CROSS-EXAMINATION

20  BY MR. SACHSE:

21      Q  Colonel Bowen, there is a cabin on this property, isn't

22  there, or do you know?

23      A  Yes, sir.  I believe there is a house there.

24      Q  Do you know that cabin is supplied with water presently

25  from the Garnsey property, from the Garnsey well?

b51

1      A   I don't know that of my own knowledge.

2      MR. SACHSE:   That is all.

3   BY THE MASTER:

4      Q   Is the property being farmed at the present time?

5      A   I don't recall, your Honor, whether that particular

6   property is being farmed or not.

7      MR. SACHSE:   Your Honor, if you want to make a note, there

8   is a very brief discussion of it by Garnsey on page 1930 of the

9   transcript.   It is his brother's cabin site.

10     THE MASTER:   Thank you.   I believe the next parcel we have

11  is Parcel 54.

12     LT. MILLER:   Your Honor, I believe Parcel 43 is also

13  covered by stipulation.

14     THE MASTER:   That is right.   That was covered by a stipu-

15  lation.   But I think we should have testimony, for the same

16  reason we did on 38.   I skipped that page.

17     THE WITNESS:   On Parcel 43, your Honor, as shown on the

18  land classification map contained in Plaintiff's Exhibit M-96,

19  approximately centrally located on the map, are the letters

20  "CEM.", an abbreviation for "cemetery", within a rectangular

21  area bordered by a dashed line.   Now--

22  BY THE MASTER:

23     Q   It is entirely surrounded by the Garnsey property?

24     A   Entirely surrounded by the Garnsey, yes.

25     Q   And what is the nature of that property?

b52

A   The property is on the ridge between Cottonwood Creek to the north and the unnamed tributary traversing the Garnsey property from east to west, south of Cottonwood Creek, which was testified to earlier.  The property also lies just north of the Garnsey reservoir.  Part of it is overlying the alluvial fill, Class II area, which is in contact with Cottonwood Creek and with De Luz Creek.  Water taken from that portion would be part of the stream system.  That comprises about one acre, one acre of Class II land, which is irrigable.  The remainder of the area, approximately three acres, is shown on the land classification map in Plaintiff's Exhibit M-96 as Class VII, non-irrigable land.

Q   And for what would the Class II land be suitable?

A   The Class II land is suitable for row crops, your Honor.  Inasmuch as the Class VII land is on a ridge projecting out into the alluvium, as shown on the land classification map in Plaintiff's Exhibit M-96, ground waters contained in the soil mantle and in the cracks and fissures in the granitic material might be in contact with the rather deep body of alluvium which joins it on three sides.  Therefore, in my opinion waters taken from any portion of Parcel No. 43 are part of the stream system.

Q   Now, is there any stream actually flowing through this parcel?

A   No, sir.

THE MASTER:  Mr. Sachse, do you have any questions?

MR. SACHSE:  I have no questions.

b53

1    LT. MILLER:   No questions.

2    THE MASTER:   Then we come to Parcel 54.

3    LT. MILLER:   Exhibit M-89 might be helpful in this

4    instance, your Honor.

5    THE WITNESS:   Parcel 54, your Honor, is delineated on

6    Plaintiff's Exhibit M-68, with the numeral 54 encircled within

7    the outer limits of the property.   It is approximately 80 acres,

8    running a half mile north to south, a quarter of a mile from

9    east to west.   And is the east half of the southeast quarter,

10   Section 32, 8 South, 4 West.   It is traversed from east to west

11   by an unnamed tributary to De Luz Creek, which is the same trib-

12   utary that flows through the King property, Parcel No. 60,

13   earlier described.   It is also traversed from east to west by

14   the Santa Margarita truck trail which parallels the stream.

15   There is a symbol on Plaintiff's Exhibit M-68 indicating an

16   intermittent stream arising and flowing through the extreme

17   northeast corner of Parcel 54, down through Parcel No. 53, to

18   confluence with the East Fork of De Luz Creek. Referring to the

19   aerial photograph and the land classification map in Plaintiff's

20   Exhibit M-89, a portion of the property is shown southerly of

21   the De Luz school property, the common boundary being the east

22   half of the southern boundary of De Luz school property, and

23   from there south a half of a mile beyond the limits of the map.

24   The white  line on it, traversing the lower portion of the photo-

25   graph, is the Santa Margarita truck trail referred to, which

b55

1   at the present time.

2        THE MASTER:  Any questions, Mr. Sachse?

3        MR. SACHSE:  No questions.

4        LT. MILLER:  No questions, your Honor.

5        THE MASTER:  55, Mr. and Mrs. Jones, and 56, Mitchell,

6   I believe will be tomorrow.  58, Rita Smarr--

7        LT. MILLER:  Exhibits M-88 and M-102 surround that pro-

8   perty in part, your Honor.

9        THE WITNESS:  Parcel No. 58, your Honor, is delineated

10   on Plaintiff's Exhibit No. M-68 with the number encircled,

11   contained within the limitations of the property.  Now, this

12   property is also traversed by the intermittent stream previously

13   testified to on Parcel 60, the King property, and more recently

14   Parcel No. 54.  Parcel No. 58 is also traversed by the Santa

15   Margarita truck trail, and traversed by a graded earth road

16   northerly, which goes into Parcel No.56, the Mitchell property.

17   On the basis of information presently available to me, your

18   Honor, there are 56 acres of irrigable land in Parcel 58.  Of

19   those irrigable lands, they are largely along the intermittent

20   stream, referring to the first photograph in Plaintiff's Exhibit

21   M-102.  And the area downstream from the earth dam symbol and

22   outside of the King property, astride the Santa Margarita truck

23   trail, is shown the principal body of irrigable land, largely

24    Class II, Class III, Class IV, your Honor, with a separate

25   body of Class II land extending from the northeasterly corner--

b56

1    northwesterly corner of the King property, immediately below the

2    north arrow shown on the first photograph of Plaintiff's Exhibit

3    M-102.

4    BY THE MASTER:

5        Q   For what crops would that land be suitable?

6        A   That land is suited to the production of row crops,

7    particularly with regard to the Class II and III lands, your

8    Honor.  That comprises 50 acres of the total.  The Class IV lands

9    in my opinion would be best adapted to a permanent pasture,

10   permanent cover crop.

11       Q   And there is six acres of Class IV?

12       A   Six, that is right.  Six acres of Class IV.

13       Q   Now, what about water developed from underground sources?

14       A   There are a house and buildings on this property, your

15   Honor.  But I don't know of the development of water on the

16   property, nor uses to which it has been put.  In my opinion, any

17   water--ground water in Parcel No. 58 is vagrant and percolating,

18   and not a part of the stream system.  The stream flowing through

19   the property flows only during and immediately after periods of

20   high precipitation and runoff.

21       THE MASTER:  Any questions, Mr. Sachse?

22       MR. SACHSE:  No questions.

23       LT. MILLER:  No questions, your Honor.

24       THE MASTER:  I think at this time then we will recess

25   until 9:30 tomorrow.

         (Adjournment until 9:30, July 15, 1958.)