Case 3:51-cv-01247-JO-SBC   Document 4737   Filed 09/24/63   PageID.44624   Page 1 of 149

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

**BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER**

UNITED STATES OF AMERICA,

        Plaintiff,

     vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

       Defendants.

No. 1247-SD-C

---

**REPORTER'S TRANSCRIPT**

**Volume:** 17

**Pages:** 2169-2315

**Date:** July 15, 1958

**Place:** Fallbrook, California

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1   APPEARANCES:

2        LT. DAVID W. MILLER,
             For the United States of America.

3        W. B. DENNIS, ESQ.,
             For Santa Margarita Irrigation District.

4

5        FRANZ SACHSE, ESQ.,
             For Fallbrook Public Utility District.

6

7        DAUN I. GILLETTE,
             In pro per.

8        CHARLES RIZZO,
             In pro per.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD |
|---|---|---|---|
| Allen C. Bowen | 2173 | 2174 | |
| | | 2216 | |
| | | 2219 | |
| | | 2224 | |
| | | | 2236 |
| | | 2239 | |
| | | | 2240 |
| | | 2310 | |
| | | 2313 | |

| For the Defendants: | D | X | RD |
|---|---|---|---|
| Daun I. Gillette | 2205 | 2213 | 2220 |
| Donald James Anderson | 2241 | | |
| John Eliot Coit | 2243 | 2256 | 2273 |
| Frederick Morris Jones | 2275 | 2301 | |

2170

# INDEX TO EXHIBITS

| | | Iden. | Rec'd |
|---|---|---|---|
| **For the Plaintiff:** | | | |
| M-103 | Engineering report on Parcel 22 | 2173 | 2173 |
| M-104 | Engineering report on Parcel 55 | 2174 | 2174 |
| | | | |
| **For the Defendants:** | | | |
| MA-55 | Report and Map (Jones) | 2251 | |
| MB-55 | Deed (Jones) | 2277 | 2277 |
| MC-55 | Photograph | 2279 | |
| MD-55 | Photograph | 2286 | 2287 |

Fallbrook, California, July 15, 1958, 9:30 A.M.

1     THE CLERK:  Court is now in session.

2     THE MASTER:  Will the attorneys state their appearances

3  for the record?

4     LT. MILLER:  David W. Miller for the United States.

5     MR. DENNIS:  W. B. Dennis for the Defendants F.M. Jones

6  and Grace Jones, Parcel 55, I believe it is, on Plaintiff's

7  Exhibit 68, M-68.

8     MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility

9  District and named individual defendants.

10     This is perhaps a good time to state for the record, your

11  Honor, that Defendant King, Parcel 60, is satisfied with the

12  engineering report submitted by the United States, and does not

13  desire to present additional testimony.

14     THE MASTER:  Thank you.

15     Are there any defendants who are not represented by counsel

16  who are present in the audience and wish to present any evidence

17  today?

18     MR. GILLETTE:  Gillette.

19     THE MASTER:  Did you wish to present any evidence today?

20     MR. RIZZO:  Sir?

21     THE MASTER:  Did you wish to present any evidence today?

22     MR. RIZZO:  Well, I have no evidence, I just want to know

23  what the score is.

24     THE MASTER:  Can you state your name for the record?

25     MR. RIZZO:  I want to know whether I can use my water to

2b

1   drink or not.

2          THE MASTER:  I think you can use the water to drink.  Can

3   you state your name for the record, please?

4          MR. RIZZO:  Charles Rizzo.

5          THE MASTER:  Mr. Dennis, I think we will proceed with the

6   Jones property.

7          MR. DENNIS:  As I understand, we will follow the usual

8   procedure, that the Government will put Colonel Bowen on in

9   regard to the engineering report on the parcel.

10          THE MASTER:  That engineering report has not been presented

11   in evidence?

12          LT. MILLER:  No, it has not, your Honor.

13          I ask the Clerk to mark this Plaintiff's Exhibit for

14   Identification.

15          THE CLERK:  That will be M-103.

16          LT. MILLER:  I will hand Plaintiff's Exhibit 103 to counsel

17   for their examination.

18          I ask the Clerk to mark this Plaintiff's Exhibit 104 for

19   Identification.

20          I will hand Plaintiff's Exhibit M-104 for Identification

21   to counsel for their examination.

22          MR. DENNIS:  This is a copy of the report which has been

23   handed to me, with the exception of the corrections which were

24   made on it this morning?

25          LT. MILLER:  That is correct.

3b

ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified
as follows:


DIRECT EXAMINATION

BY LT. MILLER:

Q   Colonel, I will hand you Plaintiff's Exhibit M-103
for Identification and ask you if that  purports to be an
engineering report made under your direction and supervision?

A   It is.

LT. MILLER:   At this time we submit Plaintiff's Exhibit
M-103 for Identification into evidence as Plaintiff's Exhibit
M-103.

THE MASTER:   That will be received in evidence as Plain-
tiff's Exhibit M-103.

BY LT. MILLER:

Q   Colonel, would you step to the board and mark on
Plaintiff's Exhibit M-32 the location of the property covered
by Plaintiff's Exhibit M-103?

A   Yes, sir.   The property reported on in Plaintiff's
Exhibit M-103, the name Alfred W. and Asaura M. Silva on the
cover, report of De Luz watershed Parcel 22, with the number 22
encircled within the boundaries of the property, the property is
largely outside of the De Luz watershed on the east.   And I will
with a red pencil mark a cross on that property on Plaintiff's

4b

1    Exhibit M-32.

2         Q   I hand you Plaintiff's Exhibit M-104 for Identification

3    and ask you if that purports to be an engineering study made

4    under your direction and supervision?

5         A   It is.

6         LT. MILLER:   At this time we offer into evidence Plaintiff's

7    Exhibit M-104 for Identification as Plaintiff's Exhibit M-104.

8         THE MASTER:   That will be received in evidence and so

9    marked.

10   BY LT. MILLER:

11        Q   Colonel, would you again step to the Exhibit M-32 and

12   mark the boundaries of the property covered by M-104?

13        A   Plaintiff's Exhibit M-104 is the report of an investi-

14   gation made on Parcel 55, which is delineated on Plaintiff's

15   Exhibit M-32 with the numeral 55 encircled within the exterior

16   boundaries.   And on M-32 I will mark with a cross with a red

17   pencil to indicate Parcel 55.

18        LT. MILLER:   We have no further questions of the witness

19   at this time, your Honor.

20        THE MASTER:   All right.   Mr. Dennis.

21

22                        CROSS-EXAMINATION

23   BY MR. DENNIS:

24        Q   Colonel Bowen, I call your attention to the exhibit

25   which has been marked M-104 for Identification.   Could you tell

5b

1  us over what period of time the investigation covered that

2  resulted in the report?

3      A  Well, the investigation of the Parcel 55 reported on

4  in Plaintiff's Exhibit M-104 was made concurrently with the

5  investigation of the adjoining Parcel No. 56, the Mitchell pro-

6  perty.  And the soil survey of these two properties together

7  required about two days time in May, '58.

8      Q  You had made no investigation of these two parcels

9  prior to that time?

10     A  No, sir.

11     Q  And calling your attention to Plaintiff's M-84, and

12 the information which is reflected on that exhibit, would you

13 say that the exhibit in so far as it pertains to Parcel 55 is

14 correct, or is the investigation which is reflected in the

15 engineering report M-104 more apt to correctly reflect the

16 condition and soil classifications of the property?

17     A  The soil classification included in Plaintiff's Exhibit

18 M-104 reflects greater study, more detailed examination of the

19 property, and is more accurate than the information contained

20 for that parcel on Plaintiff's Exhibit M-84.

21     Q  Now, I notice that your report M-104 you refer to the

22 fact that "The climate of this area is semi-arid, with warm to

23 hot, dry summers and cool, moist winters."

24     I wonder if you could explain what you meant by that lan-

25 guage a little more in detail?

6b

1      A  Well, the semi-arid refers to an area with an average

2  annual rainfall of around 10 to 15 inches.  In this country the

3  rainfall occurs from October through March or into April; and

4  ordinarily from about on through until the next October there is

5  no rainfall in the area.

6      The summer temperatures range in the 90's, and at times

7  in the low hundreds, in this area.

8      The area is surrounded by mountains, and seldom in the

9  summertime does it get the benefit of the cooling breezes that

10  the coastal area does.

11      Q  Would the temperature in the summer be similar to that

12  that you would encounter in the Fallbrook area?

13      A  Well, it may get even a little warmer up in this area.

14  We haven't had any weather stations up there, but because of the

15  relationship with the Santa Margarita Mountains on the west

16  screening it from the ocean it is not as open to ocean breezes

17  as the Fallbrook area.  But otherwise it would be somewhat

18  similar to Fallbrook.

19      Q  And then referring to the cool, moist winters, what would

20  you say the temperatures would be in the winters on this particu-

21  lar parcel of property?

22      A  Well, the temperatures would vary from a low of around,

23  oh, slightly below freezing, particularly in the bottoms of the

24  canyons on the property, to around say 32 degrees on the upper

25  slopes.  And the average wintertime temperature would be somewhat

7b

1    the same as in the Fallbrook area.

2         Q   Ordinarily where you observed sumac growing on the

3    slopes you would say that that particular land would be for all

4    practical   purposes what we would refer to as frost free?

5         A   Well, Mr. Dennis, I have never subscribed to that

6    theory.  I think Mr. Sachse described it in the hearing here one

7    time as an old wives tale.  I am not absolutely sure that sumac

8    is a good indicator of frost free country.

9         Q   But you would say that winters on this particular

10   parcel, the temperatures would be similar to that in the Fall-

11   brook area?

12        A   Yes, sir.

13        Q   What are the elevations on this particular parcel?

14        A   Referring to Exhibit M-68, the U.S.G.S. topographic

15   map, the high point, 1,018 feet, is in the southern 40, on the

16   easterly boundary of the southern 40.  And from that high point

17   it drops to a low of about 450 or 60 feet in the extreme north-

18   west corner.  That corner is on the alluvial plane of the East

19   Fork of the De Luz Creek.

20        Q   Most of the property lies above the 600 foot contour?

21        A   Yes, sir.

22        Q   Now, calling your attention to that part of your report

23   that you have designated geology, I notice that you state that

24   the  underlying structure south of the stream that you indicate

25   is an intermittent stream in your report has a different structure

8b

1   or origin than that from the property lying on the other side

2   of the stream.   As I understand, the only difference in the types

3   of rock encountered is the fact that one has a pink feldspar

4   and the other has a light feldspar?

5       A   Well, there are four differences in the chemical nature

6   of the Santiago Peak intrusives than the Roblar leucogranite,

7   but those are the immediately identifiable or outstanding char-

8   acteristics of the two formations.

9       Q   They both weather about the same?

10      A   Yes, sir, they weather about the same.

11      Q   And the residual soil that is left by weathering has

12  practically the same chemical characteristics and the same

13  mechanical characteristics?

14      A   Yes, sir, they are similar.

15      Q   And the permeability left by the weathering are about

16  similar?

17      A   Yes, sir.

18      Q   And the infiltration?

19      A   Well, that is a functional permeability, so my answer

20  would be the same.

21      Q   Very close to it?

22      A   Yes, sir.

23      Q   But you would say it is about the same?

24      A   Yes, sir.

25      Q   And could you describe for the Master the type of

9b

1  weathering that occurs in granite of the character that you

2  found on Parcel 55?

3      A  Well, the granite--  Of course, any granitic material

4  is comprised of numerous minerals which crystalized out as the

5  magma cooled, and those minerals have differing coefficients of

6  expansion, so that when they are warmed by the summer sun one

7  mineral will expand more than another, causing stresses to

8  develop in the granitic material.  And the stresses result in

9  fractures and flaking off of some of the minerals so that

10  initially rather massive fractures occur, and the exposed sur-

11  face of the rock tends to flake off and ultimately break down;

12  any changes in temperature, of course, can affect that.  That

13  would occur throughout the year, in the winter as well as in

14  the summer.

15      There is not much freezing in this area to hurry the

16  weathering process, but as the granitic material breaks down and

17  some finer materials result some of the more primitive forms

18  of plant life get a foothold, and the growth of the plants and

19  the decomposition of the plants tend to hasten the weathering

20  until ultimately larger plants can get a foothold, and ultimately

21  in this area the climax growth is generally what we would call

22  a chaparral, which is present on this particular property.

23      Q  And in this weathering process where it is broken down

24  into the finer particles do you find large boulders, generally

25  rounded in character, which are a little bit harder material and

10b

1    don't weather to the same extent as the surrounding material?

2         A   Well, both of these particular granitic formations

3    don't have the pronounced grounded boulder outcroppings which

4    characterize other formations in the area, they tend to be more

5    angular in nature.

6         Q   But you do find these large boulders which are angular

7    both on the surface and under the ground of the finer particles?

8         A   That is right.

9         Q   And as I understand it, as you go down the weathering

10   is less evident, you find a more compact soil?  You don't

11   suddenly drop from the top soil to bedrock?

12        A   Oh, no, sir.  You have what is known as residuum,

13   residuum material, which extends to variable depths throughout

14   this area, and that in effect grades from the soil that is

15   developed on the surface to the relatively unweathered granitic

16   materials below.

17        Q   Now, I noticed in the same paragraph you refer to the

18   fact that there is a coarse gruss.  Would you define that word

19   for the benefit of the Master and myself?

20        A   Well, gruss is just the angular stones, which are the

21   coarser residue of the weathering process.

22        Q   That you would say would be what the layman would call

23   the top soil?

24        A   No, sir.  Top soil, speaking of soil as such, the

25   pedological process is also a function of climate and plant

growth, including micro-organisms which grow in the soil; and

11b

1    the virgin undisturbed top soil will be comprised mainly of

2    three horizons.   There will be the A horizon, which would be

3    characterized by the presence of organic matter, humus, which

4    had accumulated from the growth and decomposition of plant

5    growth on the surface.

6         The B horizon, which is known as the subsoil.

7         And C horizon which is the parent material, in this in-

8    stance, it would be the residuum which was relatively unaffected

9    by pedological processes.

10        Q   What would you call an AP horizon?

11        A   Which horizon?

12        Q   AP.

13        A   AP?

14        Q   Yes.

15        A   I wouldn't call any AP horizon.

16        Q   You are not familiar with that term?

17        A   Well, not as you use it, Mr. Dennis.

18        Q   Now, I noticed under geology you say, "The mantle

19   deposits overlying both types are generally products of--"

20   Strike that.

21        "Sources of water on the property are poor, as the only

22   water to be encountered in igneous rocks is that which might be

23   coursing along joints and fractures.  Alluvial or residual de-

24   posits on the property capable of ground water storage in any

25   quantity are non-existent."

12b

1      And I take it by that you mean that there is no basin

2  underlying Parcel 55 similar to the basins that you referred to

3  as the Pauba Basin or the Camp Pendleton Basin?

4      A   Well, there is no basin of any substance beneath this

5  property, Mr. Dennis.

6      Q   You found no alluvium of any kind?

7      A   Well, there is a little bit of alluvium in the northeast

8  corner, which I mentioned as being part of the East Fork of De

9  Luz Creek, alluvial fill.

10      Q   That wouldn't be connected with the alluvium, though,

11  that underlies the McDowell properties, for instance?

12      THE MASTER:   You referred to the northeast.

13      THE WITNESS:   The northwest, your Honor, yes, sir.

14      Well, that alluvium is continuous on down the East Fork

15  of De Luz Creek on into its confluence with De Luz Creek, and

16  below.   It is also continuous upstream along the East Fork of

17  De Luz Creek.

18  BY MR. DENNIS:

19      Q   Calling your attention then to Plaintiff's Exhibit M-84,

20  do you believe that the area which is designated Class IV lands

21  should be extended over to the northwest corner of 55, Parcel 55?

22      A   No, sir.   Referring to Plaintiff's Exhibit M-84, the

23  Class II area, a corner of which comes into the northwest corner

24  of Parcel 55, is the alluvial area to which I allude.

25      Q   So that you feel that a portion of Parcel 55, being the

13b

1  northwest corner, overlies the alluvium that is fed by the

2  waters of De Luz Creek?

3      A  By the East Fork of De Luz Creek, about .8 of an acre,

4  Mr. Dennis.

5      Q  But the water within that portion of the alluvium would

6  either tend to substantiate the flow of De Luz Creek or would be

7  fed by the flow of De Luz Creek?

8      A  Yes, sir, water in that portion of the property would

9  be a part of the East Fork of De Luz Creek.

10     Q  Now, did your investigation disclose any springs on the

11 property?

12     A  No, sir, I didn't find any springs on the property.

13     Q  Did you personally make a physical inspection of this

14 property, Colonel?

15     A  Yes, sir.

16     Q  That was in May of '58?

17     A  I was on this property on the 12th of July of '58, Mr.

18 Dennis.

19     Q  On the 12th of July?

20     A  Yes, sir.

21     Q  Now, calling your attention to the map symbols contained

22 in the engineering report, I find the term effective depth. What

23 did you mean by the term effective depth?  Does that represent

24 the distance from the surface of the ground to the first layer

25 of soil that would restrict the satisfactory extension of roots

14b

1    in errant water?

2        A   Generally that is what effective depth means, Mr.

3    Dennis, but it also can mean the depth to very coarse material

4    which would not retain water and would limit the root growth to

5    the soil developed above that coarse material.

6        Q   Well, now, as used in engineering report M-104 what

7    does it refer to?

8        A   As used in Plaintiff's Exhibit M-104, effective depth

9    is the depth of the root zone to the relatively unweathered

10   granitic material below.

11       Q   Now, when you say relatively unweathered are you re-

12   ferring to bedrock, or just a material that hasn't been weathered

13   to the same extent as the material on the surface?

14       A   Well, there is a zone of weathering as I described

15   there, and we didn't drill through to the unweathered material,

16   the completely unweathered bedrock, but to the unyielding portion

17   of the weathered bedrock.

18       Q   Now, calling your attention to your slope classes, you

19   have used a different classification from that which is ordin-

20   arily used by the Department of Agriculture, have you not?

21       A   No, sir.  This slope classification conforms to national

22   standards developed by the Department of Agriculture.

23       Q   Isn't it true that under the national standards of

24   classifications that a slope say designated as Class A would have

25   a range of zero to 2% rather than a range of zero to 1%?

15b

1        A   No, sir.  Those slopes vary from survey to survey.

2   The slopes are determined for each survey undertaken and set

3   up, they are not uniform throughout the country.  As you will

4   note on the legend page of Plaintiff's Exhibit M-104, the

5   page entitled Map Symbols, there are actually two slope classes

6   shown, one for moderately erodible soils, with a different

7   range for each slope class, and one for highly erodible soils

8   with in some instances a different range for each slope class.

9   The A class in each one of those types of soils is the same,

10  but in the moderately erodible soils the B class ranges from

11  2 to 7%, whereas in the highly erodible soils it ranges from

12  2 to 4%, and similarly on through the steeper lands.

13       Q   Well, you are familiar with the guide for soil survey

14  legends put out by the United States Department of Agriculture,

15  the Soil Conservation Service for the State of California, are

16  you not?

17       A   Yes, sir.

18       Q   And the slope classes which you used in M-104 are dif-

19  ferent then the ones contained on page 13 of that document, are

20  they not?

21       A   Well, Mr. Dennis, I think the  word guide speaks for

22  itself, it doesn't say that this is the Bible.

23       Q   So you have made changes from what is set forth in that

24  document?

25       A   I believe this legend that is included with Plaintiff's

16b

1  Exhibit M-104 reflects very closely the accepted practice for

2  the Soil Conservation Service in the Fallbrook area.

3      Q  I see.  Now, where you have the term erosion on map

4  symbols does that apply to erosion which has already taken place,

5  or is it the susceptibility of the land to erosion?

6      A  Where the erosion symbol is used in the legend, that

7  being the final numeral in the denominator of the fractional

8  symbol, that indicates the amount of top soil that has been

9  removed by accelerated erosion.

10     Q  At the time the report was made?

11     A  Yes, sir.

12     Q  And that applies to this particular report M-104?

13     A  Yes, sir.

14     Q  Now, in reference to the term texture modifiers, which

15  you use in the map symbols, I find the word "r" for rock outcrop.

16  Does that in your report represent an outcropping of bedrock,

17  or just a ledge of unweathered boulders?

18     A  Well, a ledge of unweathered boulders is generally

19  attached to the bedrock.  Naturally we don't take a shovel and

20  dig around it, but whenever an outcrop or a large ledge of un-

21  weathered boulders occurs it is harder material than the

22  surrounding material, and it is usually attached to the bedrock.

23  The "r" is not used to indicate loose boulders that may have

24  rolled downhill.

25     Q  No.  But ordinarily in making your soil surveys, as I

17b

1    understand it, the "r" represents an outcropping of bedrock.

2    Am I wrong?

3         A   Yes, sir.

4         Q   I am correct in that?

5         A   You are correct, that is an outcropping of bedrock.

6         Q   And that is what you meant it to represent in your

7    report?

8         A   Yes, sir.

9         Q   And is it or isn't it usual in connection with making

10   soil surveys to also precede that with a symbol which indicates

11   the measure, the quantity, rather than the size of the outcrop-

12   pings?  For instance, that 40% or 50% of the area is subject to

13   rock outcroppings?

14        A   No, sir, I don't believe that is the usual practice.

15        Q   You don't think that is the usual practice?

16        A   No, sir.

17        Q   Do you know whether or not they recommend that in the

18   guide for soil survey legends?

19        A   I don't recall it, Mr. Dennis.

20        Q   Now, calling your attention to the last page at para-

21   graph 2 of the report which has been marked M-104 for Identifi-

22   cation, is it fair to say that the conclusion that I have drawn

23   from that paragraph, that the lands which are designated Class

24   VI lands and Class IV lands could be used for permanent pasture?

25        A   Yes, sir, permanent pasture could be seeded on those

18b

lands.

Q   And if they were used for permanent pasture they would require a project duty, as you have estimated, of 4.2 acre feet instead of the project duty of 2.35 acre feet?

A   2.35 is the field duty, Mr. Dennis, not the project duty.

Q   The field duty.

A   You will note the next to last paragraph on page 2 of Plaintiff's Exhibit M-104 so states.

Q   I notice that you have made a note that 10% for project loss could reasonably be assumed?

A   Yes, sir.

Q   Now, have you any idea as to how many head of cattle or how many head of horses can be pastured on an acre of permanent pasture in this particular area that we are discussing?

A   What area are we discussing, Mr. Dennis?

Q   Parcel 55 and the De Luz watershed.

A   Well, speaking of the De Luz watershed, there is a great variation of soils, they range from the level valley lands typified in large areas on the Garnsey ranch and others to hillside sites suitable for avocados such as designated on the property reported on in Plaintiff's Exhibit M-104, and the different sites would have different carrying capacity.   The leveler bottom lands would undoubtedly carry more cattle than would the steeper hillside sites.

19b

Q  Well, how many cattle would the level sites carry?

LT. MILLER:  Is he referring to the level sites within Parcel 55?  We had a compound question before, and perhaps it would be well to restrict it.

MR. DENNIS:  The general knowledge of the witness is what I was going to inquire into.

Q  In regard to those parcels which you have designated on Parcel 55 of Class IV and Class VI lands, if they were devoted to permanent pasture how many head of cattle would you be able to pasture on the 22 acres of land?

A  About one animal unit per acre.

Q  On permanent pasture?

A  Yes, sir.

Q  That is your best judgment at the present time?

A  Yes, sir.

Q  Would you have any idea what the rent would be per month for one head in this area?

A  No, sir.  I am not familiar with pasture rentals in this area, I would just have to make an estimate.

Q  And you wouldn't be interested in the rentals if you were putting horses instead of cattle on the property?

A  I didn't understand that question.

Q  I say you do not know what the rental for horses on permanent pasture is at the present time in this area?

A  Well, I used the term animal unit.

20b

1      Q  Well, animal unit then.  Or let me ask this question

2  then, Colonel, it is usual in this particular area to charge

3  more per animal unit if horses are pastured on permanent pasture

4  than if cattle is pastured on permanent pasture, is it not?

5      A  Well, an animal unit, Mr. Dennis, is used by the live-

6  stock man as a common denominator to determine value of pasturage,

7  and doesn't refer to one head of any particular type of stock.

8  Horses can be reduced to the animal unit figure as well as can

9  sheep, price per animal unit, or the rental per animal unit would

10  remain the same regardless of the type of stock pastured on it. It

11  would be necessary then to reduce the type of stock to the

12  common denominator of an animal unit.

13      Q  As I understand your testimony then, the price to pas-

14  ture an animal unit does not vary with the type of animal in-

15  volved?  In other words, does it cost more to pasture a horse

16  than it does a cow?

17      A  It depends on the size of the horse and the size of the

18  cow, Mr. Dennis.

19      Q  In other words, it depends on the size and not the fact

20  that is a horse or a cow.  Is that your testimony at this moment?

21      A  Yes, sir.

22      Q  Now, have you any idea how long it takes to develop

23  permanent pasture, to clear the land and get a stand so you

24  can turn horses or cattle into the field?

25      A  I would say it would take about a year, Mr. Dennis.

21b

Q   And have you any ideas as to what it would cost to clear the land and develop it until such time as you could turn cattle or horses into the field?

A   Well, there again it depends a lot on the site, Mr. Dennis.

Q   In this particular--in reference to Parcel 55.

A   Referring to Parcel 55 and the land classification map contained in Plaintiff's Exhibit M-104, at the extreme south end of the property is some Class II land, in the extreme northwest corner of the property is some Class II land; those sites could be placed into permanent pasture much more readily and less expensively than could the steeper sites classified as IV and VI within the property.

Also in the eastern 40 of the property is an area of Class III land which could be cleared and placed into vegetative cover more cheaply than could the steeper slopes.

Q   Well, do you know how much it would cost per acre?

A   That would vary from site to site.

Q   Well, from a minimum to a maximum.

Let me ask you this, Colonel, have you had any experience in regard to clearing land of this character and planting it to permanent pasture on which you could justify your estimate?

A   No, sir.   I cleared and planted a lot of permanent pasture, but none on sites like this, except for those Class II areas that I have previously mentioned.

2192

22b

1     Q   And have you any idea what it would cost to maintain

2   the permanent pasture after it was ready to turn the cattle and

3   horses into the field?

4     A   That would be the cost of irrigation; it would have to

5   be sprinkler irrigated on the steeper sites.   It would depend on

6   whether one used portable pipe or fixed pipe, the cost of moving

7   the pipe, the cost of pumping the water and delivering it to the

8   site.

9     Q   Have you had any experience in regard to the production

10  and delivery of water and irrigating property of this character

11  upon which you could base a cost estimate?

12    A   No, sir, I have had no experience with delivering water

13  to scattered sites of this nature.

14    Q   Have you had any experience on which you could base a

15  figure as to the estimate of cost of developing the property

16  located within land classifications IV and VI as delineated in

17  M-104 to avocados?

18    A   No, sir, I have never developed such land myself.

19    Q   Do you have any information as to how long you are going

20  to have to maintain that land before the avocados will pay the

21  cost of maintenance and operation?

22    A   Yes, sir.   Avocados start producing about three years

23  of age, in a quantity that might start paying off the cost.

24    Q   That will completely defray the cost of operation and

25  mainenance?

23b

1       A  No, sir, I said they begin producing.

2       Q  How long is it before they will pay the cost of opera-

3   tion and maintenance?

4       A  Well, the cost of operation and maintenance are variable,

5   and I wouldn't know how long before you could start paying it

6   off on this site.

7       Q  And have you any idea as to what the return per acre

8   is if you get ten cents per pound for your avocados?

9       A  It would depend on how many pounds of avocados you got

10  per acre.

11      Q  I realize that.

12      LT. MILLER:  Well, the question, your Honor, wasn't sus-

13  ceptible of any other answer.  If he realizes that let's give

14  him a question that he can answer intelligently.  That is an

15  observation rather than an objection.

16  BY MR. DENNIS:

17      Q  Have you ever had any opportunity or occasion to make

18  an investigation to determine what you can expect to obtain by

19  way of gross returns from the property planted to avocados per

20  acre at various prices, at the market price, today's market

21  price?

22      A  I have never made any economic study of avocado pro-

23  duction, Mr. Dennis.

24      Q  I see.  Then how can you say that it would be more

25  economical to plant the areas signified as Class IV and VI in

24b

1   your report M-104 to avacados or to a crop which would only

2   require 2.35 acre foot per year, as against permanent pasture

3   that would require 4.2?

4       A   Well, avocados have been bringing a higher return per

5   acre than has permanent pasture.

6       Q   Well, how do you know?  You don't know what permanent

7   pasture brings, you have testified; and you have testified you

8   have made no study as to avocados.  On what do you base your

9   statement that you have just made that avocados bring a higher

10  return than permanent pasture?

11      A   Based upon generally accepted practice in the area,

12  Mr. Dennis.

13      Q   Could it be that the generally accepted practice in

14  the area was more dictated by the quantity of water which was

15  available than perhaps the return from the crop?

16      A   No, sir.

17      Q   In your opinion it wouldn't.  Now, I notice that in

18  respect to the avocados you state 2.35 acre foot per year for

19  irrigation requirements, to which you state there could be an

20  additional requirement of 10% for project loss.  If you were

21  required to store your water in surface reservoirs during the

22  rainy or wet season and hold it over until the dry season would

23  the project loss be more than 10% or less than 10% in this

24  particular area?

25      A   Well, it would depend on the particular season, Mr.

25b

1    Dennis.   The evaporation losses vary from year to year with the

2    temperature, the amount and rate of wind movement.

3       Q  Well, what is the accepted evaporation loss for surface

4    reservoirs in the De Luz watershed, and in particular say in the

5    area where the east branch of De Luz Creek meets the main branch

6    of De Luz Creek?

7       A  Evaporation loss from the free surface in that area

8    would be about 42 inches a year.

9       Q  And if it was 42 inches a year then your project loss

10   would be considerably more than the 10% which you have set forth

11   in M-104?

12       LT. MILLER:  Your Honor, I will object to that question.

13   If this is all hypothetical, of course, then we had better put

14   all of the hypothetical facts in, such as if there was a reser-

15   voir, and if that reservoir was of a certain capacity on this

16   property.

17       THE MASTER:  Well, of course if the loss is 42 inches a

18   year, if the reservoir was 420 inches deep it would be exactly

19   10%.  If it was larger the percentage would be less, and if it

20   was smaller the percentage would be more.  That is a simple

21   mathematical computation.

22   BY MR. DENNIS:

23       Q  If you are compelled to use surface reservoirs would

24   you expect to have a project loss of more than 10%?

25       A  I have previously testified, Mr. Dennis, that the

26b

1   project loss can range from 10%; each project has to be analyzed

2   and the factors weighed and considered in determining that loss,

3   and it might vary from the 10%.

4       Q   How high might it be?

5       A   Well, on a very inefficient project it could range up

6   to 50 to 60%.

7       Q   Now, I noticed that in your report M-104 on several

8   occasions you refer to an intermittent stream which divides or

9   traverses the property, and yet I do not find on the aerial

10  photograph or the portion of the aerial photograph which is

11  enclosed in that report the usual symbol which I have noticed

12  on other ones indicating the location of that intermittent stream.

13  I wonder if you would take a pencil and place it on M-104.

14      A   Yes.  With a red pencil I will draw on Plaintiff's--

15  the land classification map, Plaintiff's Exhibit M-104 the

16  intermittent stream symbol, a dash and three dots, traversing

17  the property from east to west, and approximately midway between

18  the northerly and the southerly boundaries.

19      Q   Now, are there any other intermittent streams that

20  traverse the property under discussion, which is Parcel 55?

21      A   Well, there are many other gullies and arroyos, Mr.

22  Dennis, as evidenced by the photograph.

23      Q   Well, calling your attention to Plaintiff's Exhibit

24  M-68 and Plaintiff's Exhibit M-84 I noticed that on those two

25  exhibits you have a symbol which indicates that there is an

26z
27b

1    intermittent stream in the southeast portion of Parcel 55--

2    southwest portion of Parcel 55.

3        A   There is a stream that heads in the southern 40 of

4    Parcel 55 and drains northwesterly to its confluence with the

5    East Fork of De Luz Creek.   In addition to that there are many

6    other such--

7        Q   Would you like to place the symbol for that particular

8    stream on Plaintiff's Exhibit M-104?

9        A   It would be a pleasure, Mr. Dennis.  With a red pencil

10   I will ascribe on Plaintiff's Exhibit M-104 land classification

11   map the symbol for an intermittent stream which arises--

12       Q   Now, that is not--

13       A   --outside the property and flows to its confluence

14   with the previous intermittent stream centrally located in the

15   property.   You wanted the one in the south 40, Mr. Dennis?

16       Q   The one which shows on M-68 and on M-84.   I do not

17   believe that that is the one you have just placed on M-104?

18       A   Yes, sir.

19       Q   Is it?

20       A   No, sir, it is not.   That particular stream has many

21   different branches.   The one that appears on Plaintiff's Exhibit

22   M-68 is rising in the northwest corner of the south 40 as shown

23   on the photograph, and I will mark that with a red pencil on the

24   land classification map in Plaintiff's Exhibit M-104.

25       Q   Now, have you personally ever had the opportunity of

28b

1    observing the area that we are just discussing that lies in

2    the neighborhood of the symbol that you have put on designating

3    an intermittent stream?

4        THE MASTER:  That is the one in the southwest corner?

5        MR. DENNIS:  In the southwest corner.

6        THE WITNESS:  I never was right down in the bottom of that

7    draw there, Mr. Dennis.

8    BY MR. DENNIS:

9        Q  So that you would not be able to describe the characters

10   of the bank or the channel?

11       A  No, sir.

12       Q  And if I asked you the same question about the inter-

13   mittent stream which you put on M-104, but which is not shown

14   on M-68 and M-84, your answer would be the same?

15       A  No, sir.

16       Q  You have observed that?

17       A  Yes, sir.

18       Q  Does that have well defined banks?

19       A  Well, it is a deeply incised gully, V-shaped canyon

20   that drops right down to the channel through which water runs

21   when it rains.

22       Q  Is there vegetation growing in the bottom of it?

23       A  Yes, sir, there is some vegetation growing there.

24       Q  Now, would you say that it would be a correct statement

25   to say that the waters which you would find on Parcel 55 are

29b

1   surface waters which are the result of direct rainfall, which

2   are passing over the property from a higher to a lower level

3   through gullies and washes and depressions until they could be

4   gathered in such quantities to flow in a well defined channel?

5        LT. MILLER:  Your Honor, we will object to that question

6   as being compound, to start with.  That would be our basis.

7        THE MASTER:  Will you read the question, Mr. Reporter?

8        (Record read.)

9        THE MASTER:  I don't think it is compound.  It is a little

10   bit complex.  If the witness can understand it and knows what

11   it means you may answer it.

12        THE WITNESS:  I haven't observed any surface waters on

13   this property, Mr. Dennis.

14  BY MR. DENNIS:

15        Q  Well, have you ever observed any waters flowing in any

16   one of the intermittent streams which you referred to when you

17   placed the symbol for an intermittent stream on M-104?

18        A  No, sir.

19        Q  Have you had an opportunity of observing the flow of

20   De Luz Creek, or the east branch of the De Luz Creek in the

21   last month?

22        A  Yes.

23        Q  Are there waters flowing in the east branch of De Luz

24   Creek?

25        A  In places.

30b

1   Q   Are there waters flowing in the main branch of the De

2   Luz Creek?

3   A   In places.

4   Q   And would your answer be the same if I asked you the

5   same question and referred to Cottonwood Creek?

6   A   Yes, sir.

7   Q   Roblar Creek?

8   A   Yes, sir.

9   Q   Fern Creek?

10   A   Yes, sir.

11   Q   Camps Creek?

12   A   Yes.

13   Q   Sandia?

14   A   Yes, sir.

15   Q   And Fallbrook Creek?

16   A   The only water I have observed in Fallbrook Creek re-

17   cently is sewage effluent, Mr. Dennis.

18   Q   Rainbow Creek?

19   LT. MILLER:   Your Honor, we will object to that as being

20   beyond the scope of this hearing.   It is very interesting but

21   we might as well limit it as much as we can to relevant matters

22   to this hearing.

23   MR. DENNIS:   I think it is relevant in that it has a direct

24   bearing on whether or not these so-called intermittent streams

25   or water courses within the law of California are relative to

31b

1    riparian rights.  In other words, if there is not water flowing

2    in these gullies and washes at such time as water ordinarily

3    flows in the streams they don't qualify as a water course.

4        THE MASTER:  Of course, the whole matter is relative.

5    They don't all stop at one time and all start at one time.

6        MR. DENNIS:  That is right.  I was going to pursue this

7    a little further, however.

8        LT. MILLER:  Your Honor, may I point out one thing.  The

9    objection was not to the creeks in the De Luz watershed, but

10   when we came to Rainbow and Fallbrook, when we get outside of the

11   area--

12       MR. DENNIS:  I am satisfied.

13       THE MASTER:  On the theory that Mr. Dennis is advancing,

14   it would be relevant any place in the Santa Margarita River

15   watershed, and for that matter I suppose any place in Southern

16   California.  And trying to define which is an intermittent creek

17   and how long a stream has to flow to be intermittent.  So you

18   may pursue that line of questioning if you wish, Mr. Dennis.

19       MR. DENNIS:  I think there is enough in the record.  I

20   could have stopped maybe after the first four or five.

21       Q  Now, you refer to the fact that we have this intermittent

22   stream which passes through the center of Parcel 55.  I wonder

23   if you would draw on Plaintiff's M-33F the watershed of that

24   stream?

25       A  Where is the exhibit, Mr. Dennis?

32b

1     M-33F is the exhibit before me.  Is that the one, Mr.

2 Dennis?

3     Q   That is correct, M-33F.

4     A   Referring to Plaintiff's Exhibit M-33F, and the inter-

5 mittent stream which Mr. Dennis refers to as arising in Section

6 34, 8 South, 4 West, and flowing easterly through the northerly

7 part of Section 33, 8 South, 4 West, M-33F is a copy of the same

8 topographic map as used for Plaintiff's Exhibit M-68.  And the

9 watershed of that particular creek--  May I have some light,

10 Mr. Dennis?

11     Q   Am I in your light?

12     A   --is formed by the ridge line which I am connecting

13 with a black pencil, contains the northwesterly corner of Sec-

14 tion 34, 8 South, 4 West, and the southwesterly corner of Sec-

15 tion 27, 8 South, 4 West, and the southeasterly corner of Sec-

16 tion 28, 8 South, 4 West, to a hill on the northern section line

17 of Section 33, 8 South, 4 West, with the elevation 992 shown

18 on the map; thence down the ridge which follows approximately

19 that section line, on to its confluence with the East Fork of

20 De Luz Creek at the De Luz School site.  Now, the southerly

21 watershed boundary follows down the ridge which crosses the

22 approximate center of Section 33, 8 South, 4 West, to the top of

23 a hill with the elevation 1,018, again from the De Luz School

24 coming up the grade south of the school to the high point of

25 ground, up to the top of the ridge in the Southeast Quarter of

33b

1    Section 32, 8 South, 4 West, to complete the watershed boundary.

2        Q   Now, I wonder if you would put the crest that divides

3    the watershed boundary between the most southerly of the inter-

4    mittent streams which show on the map and which bisects the

5    plaintiff's property?

6        A   Yes, sir.   Coming from the confluence of those two

7    streams within the De Luz School District property up the ridge

8    to the top of the ridge, and following on up to hill number

9    1,018.

10       Q   And the intermittent stream which you put on M-104,

11   which was not on M-68 or on M-84, would lie in the watershed of

12   the first stream?

13       A   That is correct.

14       THE MASTER:   When you say the first stream--

15       MR. DENNIS:   The first intermittent stream which he put

16   on M-104, which is the one traversing the central part of Parcel

17   55.

18       MR. SACHSE:   The northerly of the two?

19       MR. DENNIS:   The northerly of the two.

20       Q   Colonel, would you be in a position to be able to

21   estimate the acreage which lies in the watershed of each of

22   those intermittent streams?

23       A   Yes, sir.   I would estimate about 280 to 300 acres in

24   the northerly two of the watersheds I have delineated, largely

25   within Section 33, 8 South, 4 West, on Plaintiff's Exhibit M-33F.

34b

1    And approximately 80 to 100 acres in the smaller of the two

2    which lies largely in Section 32, 8 South, 4 West, and is delin-

3    eated on Plaintiff's Exhibit M-33F.

4          Q   Colonel, do you know of your knowledge whether or not

5    there is any water development easterly and northerly of Parcel

6    55 in the watershed of the stream we have called stream number

7    1, which is the most northerly of the streams bisecting Parcel

8    55?  Are there any wells, any dams?

9          A   The Mitchells have--who own Parcel No. 56, lying east

10   of the Jones' property--have a cabin on the site and have dug

11   a shallow well or sump on that creek.  To the best of my know-

12   ledge that is the only development upstream from Parcel 55.

13         THE MASTER:  Mr. Dennis, about how much longer will this

14   examination take?

15         MR. DENNIS:  Probably I have got about two other things I

16   wanted to ask him about.

17         THE MASTER:  Do you want to ask him about them now or

18   take the recess?

19         MR. DENNIS:  Let's take the recess.  I think the reporter

20   is probably tired.

21         (Recess taken.)

22         THE MASTER:  Are there any defendants that have come in

23   during the morning session who are not represented by counsel

24   and who wish to present evidence at this time?  If so, I would

25   ask Mr. Dennis to interrupt the presentation of his case, which

35b

1   apparently will take the balance of the morning if it is continued

2   at this time.

3         Now, notices were sent out to various defendants advising

4   them that if they came in their testimony would be heard.  Now,

5   is there anybody in the audience who wishes to present any evi-

6   dence at this time or who wishes to examine Colonel Bowen or

7   any other witnesses at this time?

8         MR. GILLETTE:  We have an exhibit we would like to present.

9         THE MASTER:  What is your name?

10         MR. GILLETTE:  Gillette.

11         THE MASTER:  Do you wish to present evidence in regard

12   to your exhibit?

13         MR. GILLETTE:  Yes.

14         THE MASTER:  Very well.  Colonel Bowen, will you step down,

15   please?

16         MR. GILLETTE:  I want to present this as Exhibit B.

17

18                   DAUN I. GILLETTE,

19   called as a witness in his own behalf, being first duly sworn,

20   testified as follows:

21

22                   DIRECT EXAMINATION

23         THE CLERK:  What is your full name?

24         THE WITNESS:  Daun I. Gillette.

25         THE MASTER:  Will you be seated, Mr. Gillette?

2206

36b

1    Q   Now, what is this that you wish to present?

2    A   This evidence, there is lands that we have that are

3    not included in the Ground Water Resources Survey that are

4    suitable for irrigation and some crops.

5    Q   That is you mean that there are lands which you own

6    which the engineering report has indicated are not irrigable

7    that you believe are irrigable?

8    A   Yes.

9    Q   Now, what is the nature of the testimony that you wish

10   to present to that effect?

11   A   Well, we have pictures here showing the ground.

12   Q   Which parcel of property is yours, Mr. Gillette?

13   LT. MILLER:  63, your Honor.  And Plaintiff's Exhibit M-90

14   was the report on the Gillette property, which has been intro-

15   duced heretofore.

16   THE MASTER:  May I have Exhibit M-90, Mr. Clerk?

17   Q   Well, now, there is a map, or aerial photograph at the

18   back of Exhibit M-90.  Now, do I understand you want to present

19   photographs of certain portions of this property?

20   A   Yes, that are not marked in any other color except as

21   Class VII.  We believe it is better than Class VII.

22   Q   Well, now, are these the photographs?

23   A   Yes.

24   Q   Well, I suggest that you submit them to Lt. Miller for

25   his examination.

2

37b

1     Can you identify for Lt. Miller and Colonel Bowen the

2 areas in Exhibit M-90 which are shown on the photograph which

3 you have now presented?

4     LT. MILLER:  Your Honor, in examining the document which

5 was proferred to me by Mr. Gillette, I notice that there is a

6 two page statement attached to this document which purports to

7 be an answer to the report which was prepared on the property

8 and has been introduced as Exhibit M-90.

9     Now, it might be suggested to the Court that that could

10 be incorporated as part of their answer, and then perhaps Mr.

11 Gillette could testify to the materials that are in here.  We

12 do not believe that it is proper to have the written statement

13 go in.

14     In so far as the pictures are concerned, Mr. Sachse points

15 out that they do relate to the portion of the property that is

16 over in the adjoining watershed.  However, we would have no

17 objection to their being introduced so that the record could be

18 complete as far as the Gillette property is concerned subject,

19 of course, to the witness being able to identify where the pic-

20 tures were taken, by whom, and what area is covered by the pic-

21 tures.

22     THE MASTER:  Now, if these pictures are not in this

23 watershed they are beyond the scope of this examination.

24     MR. SACHSE:  Yes.  I would have to object, your Honor.

25

38b

BY THE MASTER:

Q   Are these lands of which you have taken pictures, are they in the De Luz Creek or the Santa Margarita watershed, or are they outside of this watershed?

A   They are in the De Luz Creek watershed.

Q   Are they shown within the boundaries of this parcel as outlined?

A   Yes, they are in this boundary; in fact, they are right in here.

Q   Now, you state that they are located in the south half of the Southwest Quarter of Section 3.

MR. SACHSE:   South half of the Southwest Quarter of Section 3 is outside of the watershed.

THE MASTER:   They are in Parcel 63, but only part of Parcel 63 is in this watershed?

MR. SACHSE:   I don't know, your Honor.   It may be that Mr. Gillette's typed indication of where they are is wrong, but if they are in the south half of the Southwest Quarter of Section 3 then they are not in the watershed, they are out of the watershed and over in the Santa Margarita watershed proper.

THE MASTER: Well, as shown on Exhibit M-68, the De Luz Creek watershed cuts across your property diagonally from the southwest corner across towards the northeast, and all of this portion below the indentation is outside the De Luz Creek watershed.

39b

1        Now, it is the De Luz Creek watershed that we are concerned

2    with in this present hearing.  Now, the portion of your property

3    which is south and east of that line, which is in the main

4    Santa Margarita watershed, is not now before the Court for

5    consideration.  So this land in this southerly portion of your

6    property would be material when we come to the consideration of

7    that area, that watershed, but it is not material at this time,

8    if any defendant objects to considering it at the present time.

9    It is in your property and it is in the entire watershed, but it

10   is not in the De Luz Creek watershed.

11       MR. SACHSE:  As a matter of fact, your Honor--  Has this

12   been offered in evidence yet?

13       THE MASTER:  Yes, that is in evidence.  M-90 is in evidence.

14       MR. SACHSE:  I didn't examine M-90, but M-90 doesn't show

15   the watershed line, and I don't know whether we shouldn't object

16   even that M-90 go out.  The watershed line apparently runs up

17   through here somewhere, and maybe Mr. Gillette is right.  I think

18   he is.

19       THE MASTER:  Well, I think that there is no question that

20   his land is not included within the watershed.

21       THE WITNESS:  I would like to explain, if I may, why I

22   think it is in the watershed.

23       THE MASTER:  You may certainly do that.

24       THE WITNESS:  It slopes to the northwest, and the creek

25   that is at the bottom of the slope, runs through that area.

40b

1    southwest, and it goes through the Government property--

2    BY THE MASTER:

3        Q   Well, can you indicate on Exhibit M-90 the creek that

4    you are referring to and the way in which it slopes?  Can you

5    take this red pencil and mark on Exhibit M-90 the creek that

6    you are referring to?

7        A   Right down through here.

8        Q   Can you mark it on the photo?

9        A   Now, where it goes back across the road I don't know.

10       Q   Well, you have indicated with this red pen on Exhibit

11   M-90 the course of a stream flowing in a southwesterly direction

12   across the lower portion of your property, and then on through

13   the Camp Pendleton boundary.  Is that correct?

14       A   That is the Camp Pendleton boundary.

15       Q   And then flowing off towards the southeast in Camp

16   Pendleton.  Now, this property that is referred to, as shown

17   in the pictures that you have handed to me, is on land which

18   drains into this creek?  Is that correct?

19       A   Yes.

20       Q   Well, I think what we should do would be to file the

21   answer which you have presented, which is really an amended

22   answer since you already have one answer on file; this would be

23   received as an amended answer with the exhibits attached to it,

24   and you may offer any evidence which you wish with regard to

25   these pictures.  And the Government, of course, would have the

41b

1   right to offer any evidence to show that what you said was in

2   error, or to support the correctness of their map which indicates

3   that this does not drain into De Luz Creek.

4        Now, from what you have indicated if the stream flows in

5   this way it is not going to flow into De Luz Creek, so this does

6   not contradict the map, it shows it is part of the Santa Margarita

7   watershed and not the De Luz Creek watershed.

8        However, we will file this answer and you may testify

9   concerning the exhibits and location on M-90 of the precise area

10  shown in these three pictures which constitute Exhibit B to your

11  answer.

12       Can you state where the top picture in your answer is

13  located on Exhibit M-90?

14       A   The top picture would be along the easterly side of

15  this--

16       Q   Can you mark that with a number 1?  And the second

17  picture with a number 2?

18       A   The second picture would be down in here.

19       Q   And number 3?

20       A   Number 3 would be right over here.

21       Q   Now, can you explain these pictures, who took them, what

22  do they show?

23       A   Well, we took them in May of 1958, and they show that

24  the slope is gentle enough that it can be irrigated for pasture

25  or avocados.

42b

1 Q What is growing in these pictures at the present time?

2 A Brush.

3 Q Now, is there anything else that you wish to state in

4 connection with these?  What area in acres do you contend is

5 of this character?

6 A Well, I would have no idea of the amount of acres.  The

7 only way I could tell would be to measure it, and it is prac-

8 tically impossible to measure because the brush is so dense and

9 high.  I would have to go through there with something to get

10 rid of the brush.

11 Q What portion of the southwesterly area of your property

12 is of this character?  Can you indicate on a percentage basis?

13 A It would be right in here.

14 Q Can you circle the area on the map?  You have drawn an

15 oval near the southeasterly corner of your property with this

16 red pencil, and the area inside that oval is the type shown in

17 these pictures.  Is that correct?

18 A Yes.

19 Q And you believe that that would be the irrigable land?

20 A Yes.

21 Q Is there any other portion of your property which you

22 believe to be irrigable?

23 A Well, there is various other places similar to that,

24 probably not quite as large, right over along in here.

25 Q Can you indicate those on the aerial photograph?  You

43b

1  have drawn another generally oval area near the center portion

2  of your property, near the southerly boundary.

3      A  No doubt but what there is other, but due to the high

4  brush it is practically inaccesible on foot.

5      Q  Now, is there anything else that you wish to say about

6  your property?  Is there any other portion of the report with

7  which you disagree?

8      A  Yes.  It says an undeveloped spring with an approximate

9  flow of one to two gallons is located in the Southeast Quarter

10  of the Northeast Quarter of Section 3.  At the present no use

11  is being made of the flow.  Well, I walked over in that vicinity,

12  and to my knowledge after the surface waters from the winter

13  rains have quit flowing there is no spring flowing at this time.

14      Q  Very well.  Is there anything else in the report with

15  which you disagree?

16      A  That is all that I can think of now.

17      Q  Is there any other evidence then that you wish to offer?

18      A  No, that is all.

19  THE MASTER:  Lt. Miller, do you have any questions?

20  LT. MILLER:  Yes, sir.

21

22                    CROSS EXAMINATION

23  BY LT. MILLER:

24      Q  Mr. Gillette, when you took the pictures which are

25  part of your amended answer you were just standing on the ground

44b

1   and shot out pretty close to horizontal to the ground as far

2   as aiming the camera?

3       A  Well, I didn't pay any particular attention to whether

4   the camera was level or whether it was with the slope of the

5   ground.

6       Q  Did you stand on a relatively level spot and just shoot

7   out over the terrain and get as much of the ground in your

8   focus as you could?

9       A  Yes.

10       Q  Now, the areas that are shown by these photographs are

11  similar to the areas that you have marked on Plaintiff's Exhibit

12  M-90 with the red ovals?   Do you understand the question?

13  Well, I will withdraw the question.

14       THE MASTER:  As a matter of fact, I understand, Lt. Miller,

15  the areas that he photographed, part of the areas--

16       LT. MILLER:  I was attempting to establish whether or not

17  the remaining area that he encircled is similar to this in its

18  physical features.

19       THE WITNESS:  Yes, somewhat.

20  BY LT. MILLER:

21       Q  Somewhat.  Is there any marked difference in those

22  areas between what is shown in the photographs?  The photographs

23  cover only a portion of the area that he has marked with an oval

24  on the aerial photograph.

25       A  Of course, when you get out--and it isn't shown in the

45b

1    picture--it starts to get hilly and rocky.

2        Q   Does it drop off rather sharply to either side of those

3    oval areas?

4        A   No.

5        Q   It becomes more hilly and rocky on either side of the

6    oval areas?

7        A   Yes.

8        Q   Now, you didn't make any scientific analysis of the

9    soil in these oval areas, did you?

10       A   Well, of course I am not capable of doing that, and

11   we have hired no one to do that, no.

12       Q   All right.  Did you make any measurement of the slope

13   in those areas that are marked by the ovals, the average slope

14   of the hills in those areas?

15       A   Just what I could see with the naked eye.

16       Q   No scientific instrument was used?

17       A   No.

18       LT. MILLER:  No further questions, your Honor.

19       THE MASTER:  Mr. Sachse, do you have any questions?

20       MR. SACHSE:  I don't think so.  I think the photographs

21   speak for themselves, your Honor.

22       THE MASTER:  Mr. Dennis?

23       MR. DENNIS:  No questions.

24       THE MASTER:  Do you wish to say anything in answer to the

25   questions that Lt. Miller asked you, in addition to your answers

46b

1    to his questions?

2          THE WITNESS:  No.

3          THE MASTER:  I would suggest then, Mr. Gillette, that while

4    you are here that Colonel Bowen testify with reference to this

5    report.  And you may listen with reference to what he says, and

6    you may wish to testify further after he has concluded.  So if

7    you will step down from the witness chair.

8          Colonel Bowen.

9          MRS. GILLETTE:  I am Dorothy D. Gillette, and I wish to

10   make a correction.  This answer was not an amended answer to

11   our original answer to the complaint.  This is our answer to the

12   evidence that is submitted by the Government from the Ground

13   Water Resources' report on our property.  This is only in answer

14   to that, it is not an amendment to our original answer to the

15   complaint.

16         THE MASTER:  Yes, I understand what you intend it to be.

17

18                         ALLEN C. BOWEN,

19   recalled as a witness, having been previously sworn, testified

20   as follows:

21

22                     CROSS-EXAMINATION

23         THE MASTER:  Do you want to interrogate the Colonel con-

24   cerning this report?

25         LT. MILLER:  Your Honor, I have no questions with respect

47b

1   to it.  I think the report speaks for itself.

2   BY THE MASTER:

3       Q   Well, Colonel, can you testify in general to your

4   findings with reference to Parcel 63, particularly the portion

5   of Parcel 63 which is within the De Luz Creek watershed, assuming

6   that all of it is not in the watershed?

7       I would like also your statements as to whether all of

8   the property is or is not within the De Luz Creek watershed.

9       A   Your Honor, referring to Plaintiff's Exhibit M-68,

10  being a print of the U.S.G.S. topographic map, 7.5 minute series,

11  entitled The Fallbrook Quadrangle, the watershed shown traversing

12  Parcel No. 63, dividing--or, defining the De Luz Creek watershed

13  is correctly placed thereon, and as your Honor noted the divide

14  crosses the property from a point slightly above the East Quarter

15  corner of Section 3, 9 South, 4 West, moving diagonally to the

16  south of west, and turning and paralleling for a short distance

17  the U.S. Naval Reservation boundary, from which point it departs

18  in a southerly direction.  The intermittent stream channel

19  described by Mr. Gillette as shown on Plaintiff's Exhibit M-68

20  drains southerly through the U.S. Naval Reservation to its con-

21  fluence with the Santa Margarita River in Section 15, 9 South,

22  4 West.

23      Q   Then the areas which he has circled are outside the

24  De Luz Creek subtributary of the Santa Margarita River watershed--

25  subwatershed of the Santa Margarita River watershed?

48b

1    A  Yes, sir, your Honor.  The areas that Mr. Gillette has

2  encircled on the land classification map, Exhibit M-90, are

3  outside of the De Luz Creek watershed, but within the Santa

4  Margarita River watershed.

5    Q  Now, what can you say of the general nature of the

6  property, that is the soil classifications and any other streams

7  in addition to the one stream that you have referred to?

8    A  Was your Honor's query only with regard to the De

9  Luz Creek portion of the property?

10    Q  I think while Mr. Gillette is here we might consider

11  the entire area.

12    A  Referring again to Plaintiff's Exhibit M-68, in the

13  northern part of Parcel 63 which is within Section 3, 9 South,

14  4 West, there is shown an intermittent stream symbol, originating

15  within Parcel 63 and flowing south of east to its confluence

16  with De Luz Creek beyond the limits of Parcel 63.

17    These streams, as symbolized on Plaintiff's Exhibit M-68,

18  are intermittent in character, flowing only during and immediately

19  following periods of high precipitation and runoff.

20    Any ground water in the area of Parcel 63 in my opinion

21  is vagrant percolating water, not a part of the stream system.

22    Within the watershed of De Luz Creek, as shown on land

23  classification map contained in Plaintiff's Exhibit M-90, there

24  is only one small portion of land which is irrigable, 2.1 acres

25  of Class III land, which is shown on the land classification map

49b

1    colored red in the northeasterly corner of the property.

2         Now, all of the other irrigable land shown on the land

3    classification map in Plaintiff's Exhibit M-90, which is com-

4    prised of Class II and Class IV lands in the southeastern corner,

5    is outside of the De Luz Creek watershed, but within the Santa

6    Margarita River watershed.  And the acreage of those Class II

7    and Class IV lands in the southeast corner is 13.1 acres of

8    irrigable land.

9         THE MASTER:  That is all that I have.

10         Mr. Gillette.

11         MR. GILLETTE:  Could I ask him another question?

12         THE MASTER:  Surely, you may ask him any question you

13    wish.

14

15                    CROSS-EXAMINATION

16    BY MR. GILLETTE:

17         Q  Did he personally walk over this ground to find these

18    places?

19         A  No, sir, but members of my office did, under my direc-

20    tion and supervision.

21         Q  They walked over the whole area so they wouldn't miss

22    any acre spots or portions of acres in between the hills?

23         A  Well, Mr. Gillette, in a large rough area like that it

24    is possible to miss a fraction of an acre.

25         Q  Well, there could be then other spots or tables you

50b

1    might say that could be irrigated?

2        A   Well, there are other areas within the parcel, Mr.

3    Gillette, which do have sufficient depth of soil, but insufficient

4    area to make them economically feasible for the developing of

5    irrigation.

6        Q   Well, I understand this adjudication of water is forever,

7    and if it is developed in acres or half acre parcels, as some

8    of Southern California is, they would grow either crops or trees,

9    and they would have to have water available.

10       A   If water was available.

11       Q   They would have to have water on them?

12       A   Yes, sir, if they could find it.

13   MR. GILLETTE:  I guess that is all I have.

14   THE MASTER:  Mr. Dennis, any questions?

15   MR. DENNIS:  No questions.

16   THE MASTER:  Mr. Sachse?

17   MR. SACHSE:  No questions.

18   THE MASTER:  I think that is all, Colonel Bowen.

19   Now, Mr. Gillette, do you wish to make any additional

20   statements as to what Colonel Bowen has testified to?

21   MR. GILLETTE:  Yes, I would.

22   THE MASTER:  Very well.

23                    DAUN I. GILLETTE,

24                    REDIRECT EXAMINATION

25   THE WITNESS:  I would like to say that I believe--that I

51b

1     would like to have more water adjudicated than enough for 15

2     and some odd acres they have here.  15.2.  Is that correct?

3          THE MASTER:  15.2 is the total irrigable acreage as shown

4     on Exhibit M-90, that is correct.

5          Well, are you able to give any real estimate as to the

6     additional acreage on your property of the character of which you

7     have indicated in these two oval areas on the map attached to

8     Exhibit M-90?

9          THE WITNESS:  No, not at this time, I wouldn't be able to

10    say any number of acres at all.

11         THE MASTER:  Well, there will be a further hearing in this

12    matter a week from tomorrow.  If by that time you are able to

13    give any figure in acreage I would suggest that you do so.

14    Otherwise, we will simply consider it on the basis of what you

15    have testified to and the indications you made on the map.

16         THE WITNESS:  All right.

17         THE MASTER:  Mrs. Gillette, did you wish to testify to any-

18    thing?

19         MRS. GILLETTE:  No.  But I do have a question concerning

20    the map--I mean the report there that is made by the Ground

21    Water Resources.  Will that be included in the De Luz Creek

22    watershed only, or in the Santa Margarita as a whole?  In other

23    words, this is what I am getting at:  The answer that we have

24    filed with you this morning with the pictures seems to cover

25    both the Santa Margarita watershed and the De Luz watershed, and

52b

1   I am wondering if it would be possible for us to file an answer

2   only in the De Luz Creek watershed and an answer for the Santa

3   Margarita watershed?

4          THE MASTER:  I don't believe so.  It would be considered

5   in each area as it applies to this area.

6          MRS. GILLETTE:  Then this answer that we filed this morning

7   will include our lands that are in the De Luz watershed?

8          THE MASTER:  Yes.

9          MRS. GILLETTE:  And also in the Santa Margarita watershed?

10         THE MASTER:  Yes.  It appears both from the uncontradicted

11  statements by Mr. Gillette and Colonel Bowen that this stream

12  which is shown on the map flows into the Santa Margarita, so

13  that by this line which is marked in the ovals is not in the

14  De Luz Creek watershed and would not be included in any findings

15  made in connection with the De Luz watershed; that would have to

16  be made in the findings that are included in the Santa Margarita.

17  And if by that time you have any additional evidence to offer as

18  to the Santa Margarita land you would be entitled to present it

19  at that time.  But the hearings with reference to the De Luz

20  Creek watershed will definitely be closed next week, and it will

21  have to be considered on the De Luz Creek watershed, it will

22  have to be considered on any evidence you have presented now or

23  any you might present next Wednesday.

24         MRS. GILLETTE:  The answer that we have filed has not been

25  read, of course.  I wondered if it would be advisable to read

53b

1   such an answer rather than submit it as a written answer?

2         THE MASTER: Do you mean this answer has not been read?

3         MRS. GILLETTE: Yes. In other words, that answer applies

4   to our lands in the De Luz Creek watershed, as well as the land

5   that lies in the Santa Margarita watershed.

6         THE MASTER: As I say, it is filed and it is considered

7   in the case, and--

8         MRS. GILLETTE: And it is not necessary to read it?

9         THE MASTER: It is not necessary to read it out loud, no.

10        MRS. GILLETTE: I wanted to be certain.

11        THE MASTER: That is not necessary.

12        MRS. GILLETTE: If it will be considered as our answer

13   for both of those watersheds, I have no further statement to

14   make. And I want to reiterate again that this definitely is

15   not an amended answer to the Court summons, this is an answer

16   only to the Government Ground Water Resources report.

17        THE MASTER: Very well.

18     Now, are there any other defendants here without attorneys

19   who wish to present evidence at this time?

20     I gather there are none then, so you may continue, Mr.

21   Dennis.

22        MR. DENNIS: Colonel Bowen.

23

24

25

54b

ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified as follows:

CROSS-EXAMINATION  (continued)

BY MR. DENNIS:

Q  In connection with the investigation of the Jones property, Parcel 55, which you and your office made, how many auger  holes or borings did you make on Parcel 55?

A  I don't know, Mr. Dennis.

Q  Do you have your field notes here?

A  There is no record kept of the number of holes bored on these, Mr. Dennis.  We carry the aerial photograph, use it as a field sheet with us in the field, and make our penciled notes on there.  They are incorporated in when the map is carried back to the office, and the field work completed, and the pen-ciled notations are erased.

Q  Have you the aerial photograph present in which you made these notations?

A  Yes, sir.

Q  And does it show the location of the borings or the auger holes that you made on the Jones property?

A  No, sir.  The land classification map contained in Plaintiff's Exhibit 104 is a photographic reproduction of the field sheet, with the exception of the additions made in the

55b

1   northwest corner.

2       Q  So your office has absolutely no record as to the num-

3   ber of borings or test holes that you made on Parcel 55?

4       A  No, sir.

5       Q  Then you are not in a position to estimate whether you

6   made one or two?

7       A  Well, I know it is more than one, because I saw some

8   evidences of borings made while I was out there, but I wouldn't

9   know.

10      Q  Well, do you know whether your office made those

11  borings or whether they were made by someone else?

12      A  No, sir, I couldn't say.

13      Q  Did you personally make any borings while you were

14  out there?

15      A  No, sir.

16      Q  Now, how did you arrive at the slopes?

17      A  With an Abney level.

18      Q  When you were in the field?

19      A  Yes, sir.

20      Q   And you did not determine the slopes from the topo-

21  graphic maps?

22      A  No, sir.

23      Q  Well, now, did you keep any record as to the depth of

24  these test holes or auger holes that you put down?

25      A  The record is contained in the fractional symbols in

56b

1    land classification map.

2         Q  You have no other record than that?

3         A  No, sir.

4         Q  Did you make any mechanical test to determine the tex-

5    tures of the soils?

6         A  Well, the standard test of rubbing the soil between the

7    thumb and forefinger was used.

8         Q  That is the only mechanical test that you made?

9         A  That is the usual one for an edaphologist, he checks

10   his field from time to time by running mechanical analyses in

11   the laboratory; but obviously it would be impossible to make

12   such an analysis on each site.

13        Q  Would you say that is in accordance with the standards

14   set forth in the Soil Survey Manual in the Agricultural Handbook

15   No. 18?

16        A  By all means, that is in accordance with the nationally

17   accepted practice.

18        Q  You are familiar with the Soil Survey Manual, are you

19   not?

20        A  I am familiar with many soil survey manuals.

21        Q  Are you familiar with the Agricultural Handbook No. 18,

22   issued in 1951 by the Department of Agriculture?

23        A  May I look at it, Mr. Dennis?

24        Q  I haven't it here.

25        A  I can't recall that particular one.

57b

1       Q   Are you familiar with the Guide for Soil Conservation

2   Surveys, issued in 1948?

3       A   Yes, sir.

4       Q   Would you say that the practice of using your thumb

5   and forefinger are methods recommended in that document?

6       A   Mr. Dennis, I told you that that was a nationally

7   accepted method.  And Dr. Kellogg, the head of the Soil Con-

8   servation in the Soil Conservation Service, has rubbed down many

9   a sample between his thumb and forefinger to determine its

10  texture.  I dare say you couldn't find any expert that has not.

11      Q   And would you say that that is the only test that they

12  use?

13      A   No, sir.  I stated that is checked from time to time

14  with a mechanical analysis in the laboratory.

15      Q   Now, calling your attention to the aerial photograph

16  that is contained in M-104, is it true or not true that Class--

17  the areas designated as II, III, IV, VI and VII all bear the

18  symbol  that shows that they have the same type of underlying

19  material?

20      A   Yes, sir, Mr. Dennis.  You are referring to the A which

21  indicates acid rock.

22      Q   And is it true that the symbol which shows the permea-

23  bility of the subsurface is the same for all soils in M-104, with

24  the possible exception of the small area  placed on there this

25  morning?

58b

1    A   With the exception of the Class II and IV area in the

2    extreme northwest corner the permeability symbol is the same for

3    each of the soil sites within Parcel 55, as shown on the soils

4    map Plaintiff's Exhibit M-104.

5    Q   And your testimony would be the same for the symbols

6    that represents the texture of the soil?

7    A   Yes, sir, with the exception of that very tiny sliver

8    of Class IV land in the northwest corner, the texture is all

9    indicated with a letter.

10   Q   I assume that that change in the northwest corner was

11   made as a result of your visit to the property on July 12th?

12   A   Yes, sir.

13   Q   Now, could you point out or indicate on the M-104,

14   the aerial photograph, the location of the rock outcroppings on

15   Parcel 55?

16   A   Well, they are throughout the area, Mr. Dennis.

17   Q   Would you say they were numerous?

18   A   Yes, sir.

19   Q   Is there any particular portion of the property that

20   you could indicate in which there was rock outcropping?

21   A   Certainly.

22   Q   I wonder if you would do so?

23   A   Referring to the land classificatin map in Plaintiff's

24   Exhibit M-104, in climbing to the top of the hill which is shown

25   on Plaintiff's Exhibit M-68 as being hill number 992, located in

59b

1    the south half of the Southwest Quarter of Section 28, 8 South,

2    4 West--correction--yes, sir, that is right, the south half of

3    the Southwest Quarter of Section 28--in climbing to the top of

4    that hill there I climbed--

5        Q   Would you mark that with the symbol "r"?

6        A   The symbol "r" pertains to the whole area and is con-

7    tained in the fractional symbol.  There were rock outcroppings.

8    There were rock outcrops on the top of the hill running westerly

9    from there.  Similarly, in climbing from the southern boundary

10   of the property up to the high point of land there I climbed

11   around and over many outcroppings of rock.

12       Q   Will you indicate those areas on M-104?

13       A   Those areas are indicated, Mr. Dennis, by the symbol.

14       Q   Well, do you mean to indicate to the Master that be-

15   cause you put the symbol "r", which means rock outcrop, that this

16   whole area is covered by outcroppings of rock?

17       A   There are outcroppings throughout the area.

18       Q   Would you say that within the area which you show on

19   Plaintiff's M-104, designated Class VII lands and which bear the

20   symbol "r" representing rock outcrops, that 50% of that area is

21   covered by the bedrock on the surface or which indicates, as you

22   testified, a rock outcropping?

23       A   No, sir.

24       Q   Would you say that 25% of it was covered by rock out-

25   cropping?

60b

1      A   The rock outcroppings are scattered through the area,

2   Mr. Dennis.   I couldn't estimate what portion of the area was

3   covered by rock outcropping.

4      Q   Well, would you testify that there is more than 15% of

5   the area that is covered by the rock outcroppings?   I didn't get

6   your answer.

7      A   On the basis of the portions which I myself examined I

8   would say that there was more than 15%.

9      Q   Would you say there was more than 20%?

10      A   But I didn't personally cover every acre of ground on

11   there; so speaking of Parcel 55 as a whole I could not answer

12   your question as to what percentage of the area was covered by

13   rock outcroppings.

14      Q   I think I understood your testimony that you could not

15   locate on M-104 any auger hole or test hole by people who worked

16   under your direction or supervision?

17      A   That is correct.

18      Q   Now, in this type of soil and the type of weathering

19   that you experience  in Parcel 55, it is entirely possible that

20   in putting down an auger hole or a test  hole that you could hit

21   a rock that would be located some distance above the bedrock or

22   solid material, below which the roots of plants and moisture

23   would penetrate satisfactorily?

24      A   Well, it might be possible, yes, sir, that stones would

25   be covered by material which had eroded down from higher slopes

2231

61b

1    and would stop the progress of an auger through the soil.

2         Q   Well, in the type of country that you find in the De

3    Luz watershed you would expect to encounter boulders and rocks

4    in the weathered material, would you not, which would prevent

5    your extending an auger hole to a greater depth than the top

6    of the rock?

7         A   Oh, yes, sure.

8         Q   And what is the practice of men who are operating under

9    your supervision and direction when they place an--put an auger

10   hole down and encounter a hard material at a foot or two foot

11   depth?  Do they move over ten feet and put another one down,

12   or go to the next area?

13        A   If the surface features would indicate that they had

14   hit a local stone or boulder they would move over; but if indi-

15   cations were that that ten inch depth was characteristic they

16   would move on to the next acre.

17        Q   Do I understand your testimony then to be that you can

18   tell from the surface indications whether or not there are

19   boulders or rocks below the surface of the ground in this type

20   of rock?

21        A   You certainly can.  Where you have ten inches of soil

22   there will be stones and boulders exposed on the surface.

23        Q   Now, in regard to the symbol in regard to the texture

24   modifiers on M-104, as I understand you found there was stony,

25   some cobbly, some rock outcrop.  Is that correct?

62b

A  We also have a gravelly symbol modifying the Class II and Class III lands in the northwest corner, and also a gravelly symbol in the Class III lands which are in the easterly 40; gravelly symbols in the Class IV land, midway along the east-west intermittent stream; also on the Class IV area and the Class II area on the south; the Class VI area is modified with the symbol "c" for cobbly, "s" for stony.

Q  Now, do you indicate on Plaintiff's M-104 those areas where you found severe erosion?

A  Those areas are indicated, Mr. Dennis, with the three erosion symbols which appear as the fine--

Q  I realize that.  But as far as--

A  The symbol applies to the entire area of Class VII soils, Class VII lands.

Q  Is it your testimony then, and do you purport to state to the Court that all of the lands which are shown as Class VII lands have been subject to severe erosion?

A  Yes, sir.

Q  100%?

A  That is the dominating feature, Mr. Dennis.  You can find practically no soil on much of it, and some of it on lower portions of the slopes you may find accumlations, but that entire area is characterized by severe erosion.

Q  In other words, you would say that there is severe erosion in the Class VII lands?

2233

63b

1      A  It has been severely eroded, yes.

2      Q  And as I understand from reading the map symbols, the

3  reasons given for placing the lands in Class VII rather than

4  Class IV or Class VI are the effective depth of the soil, the

5  texture modifiers, the erosion and the slope?

6      A  Yes, sir.

7      Q  Otherwise they are substantially the same as the Class

8  VI and the Class IV lands?

9      A  Well, there is no otherwise about it, Mr. Dennis.  Those

10  are major differences.

11      Q  But those are the major differences.   And so if you

12  were in error as to the effective depth and the slope of the lands

13  and the erosion you would probably place the Class VII lands in

14  Class IV or Class VI?

15      A  Yes, sir.  Take the northern and southern acres and

16  straighten that property out, and pile a little more soil on

17  it--

18      Q  No.  I say if you were in error in your inspection

19  of the property.  And you have nothing in your possession to show

20  the depth of the soil within the areas designated as Class VII

21  lands?

22      A  Yes, sir, the symbol indicating soil depth is included

23  in the fractional symbol.  That doesn't indicate the depth at

24  any point, but it indicates that the observations throughout the

25  area found the soil to be very shallow.  And from my own

1    observations when I was on the property the 12th of July I

2    observed that.  You don't even need an auger to find that the

3    soil is very shallow; there is on many places no soil at all.

4         Q  Now, would you say any waters that might be encountered

5    on Parcel 55 would be what you refer to as vagrant waters which

6    do not form a part of any stream within the De Luz watershed?

7         A  Yes, sir.

8         Q  And I think you would testify, or have testified, have

9    you not, that these intermittent streams might be described as

10   gullies or washes through which water only flows during periods

11   of heavy precipitation, or immediately thereafter?

12        A  Well, these are very definite stream channels, Mr.

13   Dennis, that have been eroded down; but they only carry water

14   during and immediately following periods of high precipitation

15   and runoff.

16        Q  You say they were definitely stream channels.  What

17   was the depth of the stream channel when you observed it?

18        A  Varied widths.

19        Q  The most northerly intermittent stream on Parcel 55

20   as it passes through the Jones property, what would be the width

21   of the channel?

22        A  Would you be more specific on the stream, please, Mr.

23   Dennis?

24        Q  The most northerly stream.

25        A  The most northerly stream that I have symbolized?

2235

65b

1    Q   That you have symbolized.  Have you had an occasion
2  to observe the channel of that stream through Parcel 55?
3    A   Yes, sir.  I would say it is probably around 25 to 30
4  feet in width.
5    Q   And would you say--
6    A   It varies more and less than that.
7    Q   Would you say it has well defined banks?
8    A   Well, it is the bottom of a V-shaped canyon.  The
9  canyon itself is indicative of the fact that water has run there
10  for many, many ages.
11    Q   Did you examine the channel on July 12th?
12    A   Yes, sir.
13    Q   And you walked down through the channel?
14    A   No.
15    Q   Beg pardon?
16    A   I did not walk down through the channel.
17    Q   How did you examine the channel, from what point?
18    A   From the point where it is common to the Mitchell
19  property.
20    Q   And what was the condition of the channel on May the
21  12th, was it dry--or, on July 12th, was it dry?
22    A   Yes, sir.  When I say dry, there was no surface flow
23  at the time, but there were local wet spots.
24    Q   Were there any banks, well defined banks?
25    A   I don't know how better defined they could be than

66b

1  being at the bottom of a V-shaped canyon.

2  Q  And as I take it this examination that you made of the

3  channel on July 12th was just the other side of the Mitchell

4  wells?

5  A  No.  I say I made the examination at the point common

6  to both properties.

7  Q  Well, you couldn't determine that?  You couldn't

8  determine that point with accuracy, because there has never been

9  a survey made, could you?

10  A  Well, I passed the point and returned.

11  Q  In other words, you walked down from the Mitchell wells

12  down onto the Jones property?

13  A  Yes, sir.

14  Q  Down the channel of the stream?

15  A  Yes, sir.

16  Q  And from the point that you left the Mitchell wells

17  you found a well defined channel with wet spots in it, but no

18  surface flow?

19  A  Yes, sir.

20  MR. DENNIS:  I think that is probably all.

21  THE MASTER:  Lt. Miller?

22  LT. MILLER:  Yes, just a couple of questions, your Honor.

23

24  REDIRECT EXAMINATION

25  BY LT. MILLER:

Q  Colonel, referring to the engineering report on the

67b

1  Jones property, and the land that is classified as II in the

2  northwest corner, in your opinion would ground waters in that

3  area be a part of the East Fork of De Luz Creek or, on the con-

4  trary, would they be vagrant and percolating waters?

5  A  The waters in that eight tenths of an acre, I believe

6  I have previously testified, are part of the East Fork of the

7  De Luz Creek; the small corner of Class II land in the northwest

8  corner overlies the alluvial plane over which and through which

9  De Luz Creek courses.

10  Q  When you testified waters--any waters that would be

11  found on the property would be vagrant and percolating you did

12  not mean to include that area?

13  A  No, sir.

14  Q  And you also only intended to include ground waters,

15  and not the intermittent surface flow that you would find?

16  A  Yes, sir.

17  LT. MILLER:  No further questions, your Honor.

18  MR. DENNIS:  No further questions.

19  THE MASTER:  Mr. Sachse, do you have any questions?

20  MR. SACHSE:  No questions, your Honor.

21  THE MASTER:  You may step down, Colonel Bowen.

22  MR. DENNIS:  Do you want to start with another witness,

23  your Honor, or shall we start with him when we come back from

24  the noon recess?

25  THE MASTER:  Unless you can finish with him in a few

68b

1    minutes we had better wait until after the noon recess.

2          Since our morning recess are there any defendants who

3    came in after our morning recess and who wish to present evidence?

4    I see two hands.

5          We will recess now until 1:30.

6          (Noon recess.)

- - - -

Z-1

1    <u>Fallbrook, California, July 15, 1958.  1:30 P. M.</u>

2

3    THE MASTER:  Mr. Sachse, I understand that you have Mr.

4  Anderson to present at this time?

5    MR. SACHSE:  Yes.  We can dispose of the Anderson parcel

6  very rapidly, if Col. Bowen would take the stand, please.

7

8              ALLEN C. BOWEN,

9  recalled, as a witness, having been previously sworn, testified

10  as follows:

11

12              CROSS-EXAMINATION

13  BY MR. SACHSE:

14    Q  Col. Bowen, I will hand you Exhibit M-44 and direct

15  your attention to Parcel 23 as shown on M-68.  Will you indi-

16  cate that to the Court, please?

17    A  Yes, sir.  Parcel No. 23, which is the property

18  reported on in Plaintiff's Exhibit M-44, is delineated on

19  Plaintiff's Exhibit M-68 shown as approximately a quarter of a

20  section, being the Southwest Quarter, Section 26, 8 South, 4

21  West, with the number 23 encircled within the exterior limits

22  of the property.  It lies on the easterly side of the De Luz

23  watershed, and the crest of the watershed runs through the

24  northeasterly portion of the property for a short distance.

25    Q  Are you familiar with the property, Colonel?

Z-2

1    A  Yes, sir.

2    Q  You have driven that truck trail over the top?

3    A  Yes, sir.

4    Q  Are you familiar with the intermittent stream that is

5  indicated running down through the middle of it?

6    A  Yes, sir.

7    Q  Would you classify that as flowing only during and

8  after periods of heavy precipitation?

9    A  Yes, sir.

10    Q  I will direct your attention to the land classifica-

11  tion in Exhibit M-44, and there is a geology page, I believe,

12  immediately following.  How would you characterize ground

13  waters that might be found beneath the surface on that parcel?

14    A  I would characterize the ground waters lying beneath

15  the surface of Parcel No. 23 as being vagrant percolating, and

16  not a part of the stream system.

17    MR. SACHSE:  That is all I have of this witness, your

18  Honor.

19    If I could call Mr. Anderson for just a moment, unless

20  somebody has cross.

21

22               REDIRECT EXAMINATION

23  BY LT. MILLER:

24    Q  Colonel, that would not include the flow in the stream

25  after the precipitation during the rainy months?

Z-3

1    A  No, sir.  I limited it to ground water.

2    LT. MILLER:  Nothing further, your Honor.

3    MR. SACHSE:  Call Mr. Anderson, please.

5    DONALD JAMES ANDERSON,

6  called as a witness in his own behalf, being first duly sworn,

7  testified as follows:

9    DIRECT EXAMINATION

10  BY MR. SACHSE:

11    Q  Will you state your full name, if you will, please?

12    A  Donald James Anderson.

13    Q  Where do you live, Mr. Anderson?

14    A  Fallbrook, De Luz area.

15    Q  Directing your attention to the parcel shown on M-68,

16  Parcel 23, will you look at the map, please?  Is that the

17  property that you are purchasing?

18    A  That is correct.

19    Q  What is your status in the acquisition of the property?

20    A  It is in escrow.

21    Q  And the seller is Mildred E. Dodge?

22    A  That is right.

23    Q  I direct your attention to Exhibit M-44, being the

24  Government soil-- engineering report, pardon me, prepared by

25  the Office of Ground Water Resources on this parcel.  Have you

Z-4

1    examined that report?

2          A   I have.

3          Q   And have you any particular comments or criticisms

4    regarding it?

5          A   No, I haven't.

6          MR. SACHSE:   I have nothing further.

7          Your Honor, I would like to indicate that Mr. Anderson is

8    also acquiring Parcels 20 and 21.   Two of them, is it not, or

9    just 21?

10          THE WITNESS:   21.

11          MR. SACHSE:   And as I understand it, Colonel, you have no

12    data, but you might have some by next Wednesday on that one.

13    Is that correct?   That is Carter.

14          COL. BOWEN:   I have some data, your Honor, similar to

15    that that I was testifying on yesterday afternoon.   In regards

16    to Parcel 21?

17          MR. SACHSE:   21.   Do you contemplate making any more

18    detailed study of that parcel?

19          COL. BOWEN:   If it is desired, yes, sir.

20          MR. SACHSE:   We will withhold that testimony, then.

21          THE MASTER:   That was my understanding, that the Ground

22    Water Resources staff would make a report on Parcel 21 which

23    would be available for the hearing a week from tomorrow, and

24    that a copy would be furnished to Mr. Anderson as soon as it

25    has been completed so that he would have some opportunity

Z-5

1   to examine it before the hearing.

2        MR. SACHSE:  Then I have nothing further from Mr.

3   Anderson in connection with Parcel 23.

4        THE MASTER:  Might I just ask this one question.  I under-

5   stood you to say you had no comment to make upon the engineering

6   report.  By that do you mean that you agree with it substan-

7   tially?

8        THE WITNESS:  Yes, sir.

9        THE MASTER:  That is all.

10       LT. MILLER:  No questions.

11       MR. SACHSE:  That is all, Mr. Anderson.  If you want to

12   come back then Wednesday we will wind it up.

13       THE MASTER:  Now, there seem to be no other defendants

14   not represented by counsel in the courtroom.  So you may proceed,

15   Mr. Dennis.

16       MR. DENNIS:  Dr. Coit.

17

18                  JOHN ELIOT COIT,

19   called as a witness in behalf of defendants F. M. and Grace

20   Jones, being first duly sworn, testified as follows:

21

22                  DIRECT EXAMINATION

23   BY MR. DENNIS:

24       Q  Will you state your full name, please?

25       A  John Eliot Coit.

Z-6

1    Q   How old are you?

2    A   I am seventy-eight.

3    Q   And where were you born?

4    A   San Antonio, Texas.

5    Q   And would you briefly state your education from ele-

6 mentary school through college?

7    A   I can't hear very well.

8    Q   I said would you briefly state your education from

9 entering elementary school through college?

10    A   Well, I graduated from North Carolina State College

11 of Agriculture, and then went to Cornell University, where I

12 took my master's degree in 1905, and continued on to take my

13 Doctor of Philosophy Degree in Horticulture in 1907.

14    Q   And what courses did you take when you were in college?

15    A   Horticulture, Botany, Plant Physiology, principally;

16 general agriculture courses.

17    Q   And after you completed your college work will you

18 state your first employment?

19    A   I accepted a position as horticulturist of the

20 University of Arizona Experiment Station.

21    Q   And what were your duties?

22    A   I was stationed with my family in Phoenix, and

23 commuted back and forth between Tucson and Phoenix.  My

24 principal duties was the study of the citrus and olive industries,

25 and the promotion of those industries in Arizona; and also the

Z-7

1  studies of other subtropical fruits, such as table grapes, figs,

2  and so forth.

3      Q   And how long did you remain in that position?

4      A   Approximately two and a half to three years.

5      Q   And what was your next employment?

6      A   I was next employed by the University of California

7  to study the citrus and subtropical fruit industries, and was

8  stationed with my family in Whittier at what was then known as

9  the Pathological Laboratory of the University, and I worked on--

10  principally on decays of citrus fruits, development of

11  varieties of avocados, and the development of new varieties of

12  walnuts.

13     Q   And how long did you remain in that position, approx-

14  imately?

15     A   Two or three years.   I don't know exactly.

16     Q   And what was your next employment?

17     A   I was next appointed superintendent of the citrus

18  experiment station at Riverside, which at that time was a much

19  smaller institution than it is now.  It was located on Rubidoux

20  Mountain.  And I had charge of the research work and citrus

21  fertilization, and other experimental work for the university.

22     Q   And how long did you remain as superintendent of the

23  experimental station?

24     A   I think about a year and a half or two years.

25     Q   And what was your next employment?

Z-8

1    A   I was next sent to Berkeley to organize a division

2  of citrus and horticulture and farmology, and head a new depart-

3  ment, which I moved my family to Berkeley and did that for a

4  number of years as Professor of Citriculture.

5    Q   And did that involve citrus, avocados, and other sub-

6  tropical fruits?

7    A   Citrus, avocados, walnuts, and all of the various

8  subtropical fruits.

9    Q   And about how long did you remain as a professor?

10    A   About six and a half years, seven years, maybe.

11    Q   And what was your next employment?

12    A   I resigned from the university at the end of World War

13  II to organize Coit Agricultural Service.

14    THE MASTER:   That is World War II, you said?

15    THE WITNESS:   Yes.   I neglected to state that before I

16  resigned from the university during the war they asked me to

17  organize the Farm Bureau in Tehama County, which I did, and

18  then to go down and organize the Farm Bureau in Los Angeles

19  County, which I did, and then to serve as a war emergency job

20  as head Farm Advisor in Los Angeles County, which I did until

21  the end of the war.

22  BY MR. DENNIS:

23    Q   Doctor, I think you misunderstood the Master's ques-

24  tion.   Did you organize the Coit Agricultural Service after the

25  first World War or after the second World War?

Z-9

1    A   I organized that in 1919, in the fall of 1919.

2    Q   And what are the duties of the Coit Agricultural

3  Service?

4    A   Principally the supervision and exporting of citrus

5  and subtropical fruit ranches, and in a few cases management.

6  Also, exporting and reporting for prospective buyers on orchards

7  of citrus and subtropical fruits, especially avocados.  Also,

8  the adjudication of many disputes with respect to fire damage

9  in orchards.  And many other functions which I won't go into.

10   Q   Well, now, when you state that you advise people in

11  regard to the purchase of property for agricultural and citrus

12  purposes, does that include both developed and undeveloped

13  properties?

14   A   Yes.

15   Q   And how long have you been acquainted with the Santa

16  Margarita River watershed and the San Luis Rey watershed?

17   A   Ever since 1924 or '25.  I forget which year I first

18  was in there.

19   Q   And the Coit Agricultural Services have been limited

20  more or less to San Diego, Orange, Los Angeles, Ventura and

21  Santa Barbara Counties?

22   A   Principally so, but also in Southern Texas and occa-

23  sionally in Northern California, and Mexico, and so on.

24   Q   Have you been the author of any books on the subject?

25   A   Yes.

Z-10

1    Q   I wonder if you would name a number of them.

2    A   Well, I wrote and published Citrus Fruits as a

3  college university textbook in 1915, published by the McMillan

4  Company in New York, which has been translated into Hebrew and

5  Spanish, and I think some other languages, now out of print.

6    Q   Any other works?

7    A   Oh, I published a number of bulletins when I was in

8  university work, and a great many articles.  I was editor of

9  the yearbook of the California Avocado Society for a great many

10 years, and have contributed to that extensively over the years.

11   Q   Were you a director of the California Avocado

12 Society?

13   A   Not at this time.

14   Q   Were you at one time?

15   A   Yes, I was a director for about 28 years.

16   Q   And were you ever a director of Calavo Growers of

17 California?

18   A   Yes.

19   Q   For about how long?

20   A   Twenty years.

21   Q   Were you ever the director of any citrus association?

22   A   Yes.  In behalf of my clients, not owning a citrus

23 grove, but in behalf of several clients I was a director of the

24 Amanda Park Citrus Association for several years.

25   Q   Have you ever owned and operated any property in the

Z-11

1    Santa Margarita River watershed?

2         A  Yes.

3         Q  What type of property was it?

4         A  Well, in about 1923, I think it was, or '24-- I

5    forget exactly-- I bought 20 acres of land on what used to be

6    known as Hood Road-- the name has been changed, I don't know

7    what name it is now-- it overlooks the Santa Margarita Valley.

8         Q  What type of development was on that property?

9         A  Avocados.

10        Q  And have you ever owned and operated an avocado grove

11   in the San Luis Rey watershed?

12        A  No.

13        Q  In the Vista area?

14        A  Yes.

15        Q  And you have advised -- rendered your services to

16   landowners in both the Santa Margarita River watershed and the

17   San Luis Rey watershed?

18        A  I didn't hear the first part of it.

19        Q  I say you have rendered services to landowners in both

20   the Santa Margarita River watershed and the San Luis Rey water-

21   shed?

22        A  Yes, at various times.

23        Q  I wonder if you would name one or two of the larger

24   plantings that you have either supervised or are supervising at

25   the present time in the Fallbrook area?

Z-12

1    A   Well, the largest one I am supervising at the present

2    time is the Doolan orchard, which is nearer to San Marcos than

3    it is Fallbrook.   And I have supervised in years gone by a

4    number of avocado and citrus orchards in Fallbrook, but no large

5    ones at the present time.

6        Q   The Doolan acreage is approximately how many acres?

7        A   73 acres of 12-year-old avocados, and 28 acres of

8    6-year-old lemons, and about 20 acres of new lemons planted

9    this year.

10       Q   Now, when did you first have an opportunity to examine

11   the property owned by Mr. Jones, which you have heard Col. Bowen

12   testify to, and which is designated as Parcel 55 on Plaintiff's

13   Exhibit M-68?

14       A   On July the 3rd of this year.

15       Q   And what was the occasion of your visit to the

16   property?

17       A   Mr. Jones asked me to go with him.

18       Q   For what purpose?

19       A   To find out how much, if any, of his land was in my

20   judgment suitable for citrus and avocado culture on a commercial

21   scale.

22       Q   Now, will you explain to us just what you did when

23   you went out on the property, where you went and what you did?

24       A   We first walked around over what is shown on the map

25   as Parcel 1.

Z-13

1    Q  Now, when you refer to the map you are referring to

2  the map attached to your report for Mr. Jones?

3    A  That is correct.

4    MR. DENNIS:  I wonder if I might have this marked for

5  identification.

6    THE MASTER:  It should be.

7    MR. DENNIS:  I wonder how we should mark it.

8    THE MASTER:  Well, I think this should be MA-55.

XI

9    MR. DENNIS:  MA-55.

10    Q  I wonder if you will continue, Dr. Coit, and tell us

11  what you did when you went on the property?

12    A  We walked about over the property shown as Section

13  1, Parcel 1, examining the soil, and the type of brush that

14  was growing on it, and the degree of slope, and so on.

15    Q  And where did you go from there?

16    A  We then went back to the car and drove around to the

17  east side and parked as near as we could to the property line

18  opposite Parcel 2, and walked through the property from the

19  eastern boundary following this intermittent stream clear through

20  to the western boundary, examining the slopes on either side,

21  and the character and type of brush and, of course, boring

22  occasional holes to examine the soil.

23    Q  And then what did you do?

24    A  Then we went up to Parcel 4 and went over that, and

25  bored holes, and examined the slopes, the degree of sloping

Z-14

1  land, which was beyond the red line and beyond the cultivable

2  area; and also from that point we could see a part of what is

3  known as Parcel 3.  But I did not go up to the very top plateau

4  on Parcel 3.

5      Q  Did you go on any portion of Parcel 3?

6      A  I am not sure.  I think I did in one place, but I am

7  not right sure now.

8      Q  And you say you bored some holes?

9      A  Yes.

10      Q  Now, when you say "we", that was Mr. Jones?

11      A  Mr. Jones went with me in order to point out the

12  boundaries and the corners so that I would not go astray.  And

13  he carried soil samples with him that he had taken on a previous

14  time, all numbered.  And we located as many of those holes as

15  we could, and I examined the soil sample that came out of the

16  hole and checked his notes, and in many cases between those

17  holes I asked him to bore additional holes, which he did, and I

18  examined the soil; but we did not mark the locations of the holes

19  that we made on July the 3rd.

20      Q  And approximately how many holes did you bore and

21  examine?

22      A  On the what?

23      Q  Approximately how many holes did you bore and how many

24  holes did you examine?

25      LT. MILLER:  May I ask, is this on July 3rd?

Z-15

1      MR. DENNIS:  Yes, on July 3rd.

2      THE WITNESS: We bored approximately ten holes, and ex-

3  amined approximately five or six holes that he had bored

4  previously.

5  BY MR. DENNIS:

6      Q  And do the circles, the little small circles with the

7  numbers on the plat or map that you are examining and which

8  is attached to your report, indicate the approximate location

9  of the holes that you examined or bored?

10     A  Yes.

11     Q  And what did you observe when you were making the

12  inspection of the property in respect to the erosion on Parcel

13  55?

14     A  Well, I didn't see any serious surface erosion.

15     Q  And what did you see relative to outcroppings of bed-

16  rock on Parcel 55?

17     A  Oh, yes, there were in some places considerable out-

18  croppings of what we call granite boulders.  And in some places

19  they were mainly observable and were excluded in the map.  In

20  other places they were so covered with brush that it was very

21  difficult in the time we had to find them all and exclude them.

22     Q  And in relationship to slopes what did you observe?

23     A  Most of the slopes, the easier slopes, were in the

24  range of cultivatability, with the exclusion of those on the

25  map.

Z-16

1  Q  Now, did you do anything else at the time that you

2 examined the map on July the 3rd?

3  A  Well, we tried to make an examination of Parcel 5,

4 but we were unable to find the northwest corner marker.  So we

5 had to find the bench mark on the road across the stream bed,

6 and then sight up the eastern boundary to find the line.  There-

7 fore, I didn't make any holes on that property-- there weren't

8 any made while I was there, and didn't climb up on it.  But I

9 could see from below that the slopes of a part of that were

10 easy to cultivate.

11  Q  And then after you made these examinations you made a

12 report for Mr. Jones?

13  A  Yes.

14  Q  And that report is the document that you have in your

15 hand which has been marked MA-55 for Identification?

16  A  MA-55, that is correct.

17  MR. DENNIS:  I would like to offer it in evidence at

18 this time.

19  LT. MILLER:  No objection.

20  THE MASTER:  It will be received in evidence and marked

21 MA-55.

XR

22 BY MR. DENNIS:

23  Q  Now, as a result of the examination you made of the

24 property, and the experience you have had, did you come to any

25 conclusion as to what amount of acreage was susceptible to

Z-17

1  planting avocados?

2       A  Yes.

3       Q  I wonder if you would give us your conclusions?

4       A  Parcel No. 1, a total acreage of 56.19.

5          Parcel 2, 8.38.

6          Parcel 3, 41.16.

7          Parcel 4, 20.95.

8          And Parcel 5, 8.84.

9          Making a total of 135.52 acres, from which I have

10  deducted 15% because it was not practicable in the time avail-

11  able to climb all through that terrifically dense brush and find

12  all the small outcroppings and things of that sort, and also

13  because it is my experience that when you come to plan out, lay

14  off and put in pipe lines and plant a tract of this kind you

15  have to give and take a little, you can't follow the map pre-

16  cisely.  For these reasons I deducted 15%, or 20.33 acres,

17  leaving a net of 115.19 acres, which in my opinion are suitable

18  ground and location for citrus and avocado commercial culture.

19       Q  Now, have you any opinion as to the amount of water

20  that it would take to raise avocados on the Parcel 55, or those

21  portions of Parcel 55 that you have indicated would be satis-

22  factory for the raising of avocados?

23       A  Yes.

24       Q  Would you give us your conclusions in that respect?

25       A  I think on these light soils it would take a little

Z-18

1    more water than the average in the Fallbrook area.  And I would

2    put the water duty for avocados and citrus at from 2.5 acre

3    feet to 3 acre feet per acre per annum, assuming normal rain-

4    fall.

5         Q  Now, that is applied water, is it, Dr. Coit, water

6    which you would apply by irrigation?

7         A  That is right.

8         Q  And if you had years when rainfall was not normal

9    either because of the quantity or the way in which the rain was

10   spaced, how much water do you think applied-- applied water would

11   be required?

12        A  After a dry winter you would need more water.

13        Q  Approximately how much more?

14        A  It would depend on how dry.

15        Q  Well, would there be years when you might require 4

16   acre feet per acre for mature avocados for this type of soil,

17   with the slope which we have on Parcel 55?

18        A  There might be, 3½ to 4 acre feet, after an extremely

19   dry winter.

20        MR. DENNIS:  I think that is all.

21        THE MASTER:  Lt. Miller.

22

23                        CROSS-EXAMINATION

24   BY LT. MILLER:

25        Q  Dr. Coit, looking at the map which you have prepared

Z-19

1 and which is in the folder-- if you would open that up, sir,

2 and refer to it-- did you have a copy of that map or a similar

3 map with you on this date of July the 3rd when you went on the

4 property?

5     A  No.

6     Q  Where did you put your field notes?  Did you place

7 field markings on any type of map on that date?

8     A  I was furnished a copy of the United States Geological

9 Survey map with this property already marked on it with regard

10 to the boundaries.  I found that that was on such an exceedingly

11 small scale that I couldn't -- the contours were so close to-

12 gether you couldn't do much, so I requested that that area be

13 blown up big enough and the contours made prominent so that I

14 could work with more accuracy.

15     Q  Well, may I ask you, sir, if looking at M-68 immed-

16 iately behind you on this bulletin board-- Is that the scale

17 of map that you used on July the 3rd?  This is Parcel 55, if

18 that would be of any assistance.

19     A  I think it is.

20     Q  Approximately that scale, at any rate?

21     A  I think it is.

22     Q  And you made your marks in the field on a map of that

23 size.  Is that correct, sir.

24     A  No, I didn't make any mark on that map.

25     Q  Did you carry all of this information in your head?

Z-20

1    A   Yes.  When I looked at the slopes and examined the

2  soil samples I carried that information in my head, except that

3  Mr. Jones who was with me and had his map of where he took the

4  soil samples on a previous day, why, we followed his map.

5    Q   Well, you don't know if he made those soil samplings

6  on the immediately preceding day, you meant some day in the past

7  with respect to the samplings Mr. Jones made?

8    A   I don't know just exactly when, but I would say since

9  the end of the rains.

10   Q   Now, referring to the map which is defense Exhibit MA-

11  55, and the numbers that are circled thereon, that is your best

12  estimate of the locations after you got back to your office as

13  to where you took soil samples.  Is that correct, sir?

14   A   No.

15   Q   Then how did you locate those spots?

16   A   I took his map that he made when he bored the original

17  holes, and with his map I placed them as near as I could in the

18  exact spots and numbered them with his numbers.

19   Q   Now, let me ask you this, sir, aren't some of these

20  numbers that are circled referring to holes which you made on

21  that date of July the 3rd?

22   A   No.

23   Q   So the only holes or circled numbers on here refer

24  to holes which had been made on previous days.  Is that right?

25   A   That is right.

Z-21

1    Q  And not in your presence?

2    A  Some of them are the holes that I inspected on July

3  the 3rd, some of them.

4    Q  Now, let me ask you how you inspected them.  Did you

5  reach down into the hole and grab some dirt and rub it through

6  your hands, or exactly how did you inspect it?

7    A  He had the soil auger with him, and in some cases he

8  would run it down in them; and he had the bottles of samples,

9  and I would take the stopper out and look at it and look at the

10  hole and see that it was the right thing.  They varied, of

11  course, in color and type in various parts.

12    Q  Well, can you by the mere examination of a hole

13  determine the soil depth?

14    A  Yes.

15    Q  The effective soil depth?

16    A  Yes.

17    Q  Just by reaching your hand down into the hole?

18    A  No, I don't reach my hand down into the hole.

19    Q  Well, would you just look?

20    A  Running the soil auger down.

21    Q  But on certain occasions you didn't run the soil

22  auger down, did you?

23    A  Not in every case, no.

24    Q  So how did you estimate the soil depth on those holes?

25    A  Well, I didn't measure the actual depth of every one

Z-22

1   of these holes, but of course when you bore a hole since the

2   rains naturally there is some soil that is thrown in there,

3   and you can compare that with what is in the bottle.

4       Q   Well, now, referring to the areas that are shaded

5   green on your map, and the numbers that are circled there, did

6   you find that on every occasion the soil depth was sufficient

7   to raise avocados, or did you make any determination?

8       A   Yes, all of the circles that are included in the

9   colored areas in every case I found sufficient depth to raise

10   avocados commercially.

11       Q   But you didn't really determine the depth on all of

12   those holes now, did you?

13       A   No.  I judge a great deal by the density of brush and

14   other factors.  From many years of experience we can tell whether

15   it is good land suitable for planting, without too much hole

16   boring.

17       Q   Can you tell by looking at a virgin piece of land

18   just by the type of growth that is on it whether or not it

19   would raise avocados?

20       A   Frequently, yes.

21       Q   Could you on this land?

22       A   Yes.

23       Q   On all of it?

24       A   I think so.

25       Q   Now, I just want to ask you--

Z-23

1     MR. DENNIS:  Could I have that question and the answer

2  read back again?

3     (Preceding three questions and answers read.)

4     MR. DENNIS:  I thought maybe he misunderstood him, but

5  I am sure he didn't.

6  BY LT. MILLER:

7     Q  If you do misunderstand, Dr. Coit--

8     A  I don't hear.

9     Q  I am trying to speak loudly, sir.

10    A  What is the question?

11    Q  You have answered it, there is none pending.

12    A  I see.

13    Q  I am getting ready to ask one.

14       You don't know which of these circled numbers repre-

15  sent holes you actually examined and which ones you did not ex-

16  amine.  Is that correct, sir?

17    A  I think some of them, but I didn't make any notes to

18  keep a record of just which they are.  I think No. 9 and No. 5

19  both I carefully examined, and possibly No. 21, and No. 7 I

20  am quite sure of.  And we bored more holes all around No. 7,

21  but we didn't take any samples.

22    Q  Now, No. 7 is up in Parcel 4, Dr. Coit, is it not?

23    A  Yes.

24    Q  Did you during your tour of that property have a

25  copy of the aerial photo similar to this?

Z-24

1    A   I don't think we did, but I don't remember whether
2    we had that with us or not.  But I have seen that at some time,
3    but I don't remember where I saw it.

4    Q   Dr. Coit, I will show you a map in the back of Plain-
5    tiff's Exhibit M-104 and ask you to familiarize yourself with
6    this generally.  I think you will find it to be the same
7    property as was covered by your report.

8    A   Well, as far as I know it is the same.

9    Q   Yes, it looks the same.

10   Now, did I understand your testimony to be that
11   you did not go up on Parcel 5 as shown in your map in the
12   defense Exhibit MA-55?

13   A   That is right.

14   Q   Now, at what point did you observe Parcel 5 from?

15   A   We observed it from the road along here, and looking
16   up, and sighting up this boundary line-- see, that lines up
17   with the bench marks-- so that gives us a chance to get this
18   line; but we did not find this corner, apparently it had been
19   washed away, or something.

20   Q   Well, may I ask you, sir, is this the road that is
21   shown here with the name Murrieta on it that you observed this
22   from?

23   A   Yes.

24   Q   Is your eyesight as keen as it was when you were a
25   younger man?

Z-25

1   A   No.

2   Q   Can you see distances very well?

3   A   I could see that distance all right.

4   Q   You could see that distance.  Could you see if there

5   were any rock outcrops on part of it?

6   A   I could if they were prominent.

7   Q   They would have to be real prominent?

8   A   Yes.

9   Q   This is undeveloped, is it not?

10  A   It is brush land.

11  Q · Now, did I also understand your testimony to be that

12  you did not go on to Parcel 3 as shown in the map that you have

13  prepared?

14  A   I am not sure that I did.

15  Q   Well, how long was it after you went on to the property

16  that you prepared this map that is in defense Exhibit MA-55?

17  A   Right away, that night and the next day.

18  Q   But you are not sure today whether or not you went on

19  Parcel 3?

20  A   I didn't get over it extensively, but I may have

21  gotten into the edges.  But this map wasn't in existence then,

22  and it is very difficult to tell when you walk around here just

23  exactly where you have been.

24  Q   It was very difficult for you to put these contours

25  as to actually the areas you thought were irrigable, was it not?

Z-26

1    A  No, that was not.

2    Q  You could carry this whole picture of this piece of

3  land in your head and put it on the map?

4    A  Yes, and put the contours on the map where the slopes

5  were suitable.

6    Q  How many hours did you actually spend on the land of

7  Mr. Jones on July the 3rd?

8    A  From 8:30 or 9 o'clock in the morning until I think it

9  was after 5; all day long.

10    Q  Part of that time was spent driving around on the

11  road getting to and from, but the remaining portion of the time

12  was spent up on the land?

13    A  Practically all of the time was spent right on the

14  land.

15    Q  Now, I notice that within Parcel 3 that there are

16  several circled holes with numbers?

17    A  Yes.

18    Q  You did not examine those holes, did you?

19    A  No, sir.  I examined the samples that came from them.

20    Q  Well, that was based upon what Mr. Jones told you?

21    A  Yes.

22    Q  And he apparently showed you where he had taken these

23  samples?

24    A  That is right.  He showed me his map.

25    Q  But you don't know the soil depth in those holes?

Z-27

1          A But I know what the--

2          Q Well, you have answered it.

3          Now, I notice in your report-- and I will ask you to

4    turn to page 1 of your report, Dr. Coit-- and in the last

5    paragraph there is the sentence, "Where the great density of

6    brush made it impracticable to locate and exclude all small

7    rock outcrops, a 15% deduction is made for planting adjustments."

8          Now, you have testified that you made this deduction

9    because you couldn't determine exactly what percentage of the

10   land under the brush was composed of rock outcrops.  Is that

11   correct?

12         A    That is partly correct.

13         Q    Well, go ahead and make it completely correct.

14         A    That 15% includes, as I explained in my testimony, not

15   only the rock outcrops but what give and take that a man has to

16   do when he lays off and pipes and plants a rough tract of land.

17   You will find that in one place there is a little tongue of

18   good land that runs out that isn't on the map, you decide to

19   use that; and another place after you get on it and get it

20   cleared, you say I can only get three or four trees in there,

21   it wouldn't pay to run a pipe line up there.  There is usually

22   that kind of adjustment, and usually you lose some percentage.

23   And also I am assuming that in the heavy brush there were

24   probably some rock outcrops that I couldn't see without spending

25   two or three weeks climbing through it.

2266

Z-28

1    Q   Well, Dr. Coit, couldn't it be just as true that that

2   percentage could have been 30%, as far as you know today, as

3   well as 15%?

4        A   I don't think so.

5        Q   But you don't know, you couldn't see it?

6        A   In my opinion 15% is about right.

7        Q   About the best guess you could make just looking at

8   that brush?

9        A   In my opinion it isn't a guess, it is based on ex-

10   perience.

11       Q   Now, Dr. Coit, looking at the aerial photo that is in

12   Plaintiff's Exhibit M-104, and directing your attention to the

13   south 40 acres of that property, you note thereon, do you not,

14   that there are some very sharp rocks in the terrain from these

15   crests down into little gullies and up again.  Is that not

16   correct, sir?

17       A   Well, the only very sharp one is in the southeast

18   corner, that is excluded.

19       Q   Well, let me point particularly to the aerial photo

20   and ask you--

21       A   I can't see that.

22       Q   You can't see it well enough?

23       A   The photo is almost black, and the colors are faint,

24   and the contours are so microscopical that I can't tell you.

25       Q   Right.  Well, do you recall from the day that you

Z-29

1   were on the property in this portion if there were not some

2   decided drops in elevation there in the terrain?

3       A   I don't think there were any serious ones.

4       Q   There were no slopes--

5       A   That would not come out under the 15%.

6       Q   Well, now, that is what I wanted to find out.   Did

7   you exclude these sharp sloping areas in this 15%, as well as

8   the rock outcrops?

9       A   If they were too sharp to be usable, yes, they would

10  be excluded, yes, the same as a boulder outcrop.

11      Q   Well, let me ask you then, sir, in all of this green

12  area that is marked Parcel 1 are there portions there that

13  would not be suitable for avocado culture?

14      A   There may be a few very small spots in there.

15      Q   And you think that the 15% would cover the rock out-

16  croppings there, plus the shallow soil that you might find in

17  certain areas, plus the slopes that are too great for avocados,

18  that that would all be taken care of in the 15% figure?

19      A   I didn't see any slopes there that would be too

20  great for avocados.

21      Q   Dr. Coit, in using a contour map, the closer the

22  contour lines the steeper the slope.   Is that correct, sir?

23      A   That is correct.

24      Q   Now, this slope here which you excluded is very

25  similar to this slope here, is it not, sir?

Z-30

1    A  Yes.

2    Q  Now--

3    A  It is not very similar, it is-- This is more of an
4  even slope that if you will notice has two little gullies in it
5  which break it up; therefore, it is not as good a slope to
6  plant as this is.

7    Q  Right.  So far as you know these two slopes are
8  exactly the same, except for the difference in this which has
9  a few more gullies than this one?

10   A  Assuming that those contours are accurate.

11   THE MASTER:  I think maybe for the record that the two
12  slopes compared are a slope in the northeasterly portion of
13  Parcel 1 and which is colored green, and a slope in the white
14  area between Parcel 1 and Parcel 2.

15   THE WITNESS:  There is another factor in that that I
16  should bring out, of course, and that is that I took into
17  consideration sometimes the location of a piece of land, if
18  it was too small to reach and plant economically.

19  BY LT. MILLER:

20   Q  Now, Dr. Coit, how did you measure the various slopes
21  on this date, by eye or by instrument?

22   A  By instrument.

23   Q  By instrument?

24   A  On the map.

25   Q  Well, you didn't have the map with you on that day?

Z-31

1    A   I used an instrument in laying off these red lines,

2    following the contours around, inorder to include lands which

3    was not too steep for planting.

4    Q   This instrument you refer to is just a little instru-

5    ment to draw the line in, not an instrument you used out in the

6    field that day?

7    A   Not an instrument in the field, it is a ruler to

8    measure.   These are 20-foot contours.

9    Q   So a good bit of your opinion is based on an examina-

10    tion of the contour map when you got back to the office?

11    A   My opinion of what?

12    Q   Your opinion of what land is irrigable and what land

13    is not irrigable?

14    A   Was based on my examination of the land in the field,

15    plus my working out on the contour map in the office.

16    Q   Well, did you use a level in the field to actually

17    determine the degree of slope of the hills out there?

18    A   No.

19    Q   You did not?

20    A   No.

21    Q   Now, Mr. Jones employed you to do this work.   Is that

22    correct?

23    A   Right.

24    Q   And did you at the time you went onto the property

25    know that the reason for the report was to introduce it in this

Z-32

1   litigation as distinguished from being for immediate development

2   of the property?

3       A   I don't understand that question.

4       Q   All right, I will withdraw it.

5           What was your understanding of the use to be made

6   of the report on the day that you went out to do the field work?

7       A   He wanted to find out how much of this land was suit-

8   able for avocado and citrus culture, principally.

9       Q   Did you know that this report was to be introduced

10  in this litigation?

11      A   Well, I supposed it would be introduced somewhere,

12  that is the reason I made the map.

13      Q   Right.   So you knew when you did the report that it

14  was going to be introduced in connection with this water suit?

15      A   Yes.

16      Q   Right.   Now, Dr. Coit, I will direct your attention

17  to a page in Plaintiff's Exhibit M-104, which has the heading

18  "Water Duty for Agricultural Crops Grown in the Santa Margarita

19  Watershed," and particularly to where it says, "Avocados, 2.35,"

20  and thereafter it says, "Annual irrigation requirement for

21  avocados taken from Bureau of Reclamation, Escondido, Survey

22  of Area, Water Use, dated August, 1948," by Lawrence E. Hall

23  and J. L. Bristo.

24          Now, sir, are you familiar with this report that is

25  referred to there?

Z-33

1     A   I am not sure that I am, no.

2     Q   Are you familiar with the two gentlemen who purportedly

3  authored this?

4     A   No.

5     Q   Dr. Coit, did you use that old and noted technique

6  of determining the texture of the soil by rubbing it between

7  your fingers?

8     A   No.

9     Q   You didn't.  How did you determine it?

10    A   I poured it out into my hand and examined it to see

11  whether it was clay, or adobe, or sand, or gravel, or loam, or

12  just what general type it was.  And I know from experience the

13  general type which is suitable for avocados, having grown them

14  in the soils for many, many years.

15    Q   Dr. Coit, how close did you ever get to Parcel 3 on

16  this date?  Where was the closest point you observed it from?

17    A   I can't tell, because this road on this map-- this map

18  shows-- it goes clear on up into here, and I can't tell just

19  where it went.  It went around this way and up in here.  We

20  drove in the car up in here to Parcel 4.

21    Q   So the closest point would be on this road as you

22  went up, that is where you made your observation of Parcel 3?

23    A   No.  We climbed up on some of this land in here until

24  I could get a view up the slopes.

25    Q   But you can't point out to the Court the exact spot

Z-34

1  that you stood on, or the approximate spot?

2      A  No.

3      THE MASTER:  At the point where you indicated on the map

4  when you said "up here" was somewhere east of the easterly

5  boundary of the property.  Now, is that correct?

6      THE WITNESS:  We went through here from the eastern

7  boundary, this boundary, clear through to this boundary.

8      THE MASTER:  That was following the course of the inter-

9  mittent stream?

10      THE WITNESS:  Yes.

11      THE MASTER:  Then when you were examining it from the

12  road you were referring to a point which would be somewhere east

13  of the easterly boundary?

14      THE WITNESS:  Yes, that is right.  And then from a point

15  in Parcel 4 we walked up as far as we could through the brush

16  there to observe -- The brush was very, very thick up there.

17  BY LT. MILLER:

18      Q  And did you have any difficulty seeing over?

19      A  You could see over it.

20      Q  But you couldn't see what was under it when you saw

21  over it, could you?

22      A  Well, I know from experience that when brush is that

23  dense that it has got to have some good soil under it.

24      Q  Now, Dr. Coit, on the westerly portion of Parcel 3 how

25  close were you to that?

Z-35

3.

A   I wasn't very close to the westerly portion, no.

Q   Now, the intermittent stream symbol is shown going through the middle of the property.  You say you did walk down that?

A   Yes.

Q   And I gather from the contours that that is a narrow and then a wide stream channel?

A   That is correct.

Q   Wide in spots and narrow in spots?

A   Correct.

LT. MILLER:  Nothing further, your Honor.

MR. DENNIS:  I just have one question.


REDIRECT EXAMINATION

BY MR. DENNIS:

Q   Dr. Coit, when you indicated the position just east of Parcel 55 from which you observed Parcel 3, you were in-dicating the position would be four or five hundred feet east?

A   Yes, yes.

LT. MILLER:  Could we mark that spot with a red X right now?

MR. DENNIS:  Yes, I think that would be a good idea.

THE WITNESS:  How shall I mark it, with a circle here? I don't remember, frankly, just exactly how this road goes up into there, but we got out here and walked around in here.  I

2274

Z-36

1  would think about there, your Honor.

2      THE MASTER:  Well, you have marked the red circle where

3  you think you stood when you examined Parcel 3?

4      THE WITNESS:  Yes.

5      MR. DENNIS:  That is all.

6      THE MASTER:  Do you have any further questions, Lt.

7  Miller?

8      LT. MILLER:  No, sir, nothing further.

9      THE MASTER:  Mr. Sachse?

10     MR. SACHSE:  No questions.

11     THE MASTER:  That is all, Dr. Coit.

12     MR. DENNIS:  Mr. Jones.

13     LT. MILLER:  Your Honor, before we proceed further, I

14  might point out to counsel and to the Court that we believe it

15  might be very appropriate for the Court to go and view this

16  property.  There has been considerable discussion about the

17  Class VII lands, and dispute among the parties as to whether

18  it is irrigable, and this seems to be a case of where you have

19  the benefit of Dr. Coit's study and the testimony of the United

20  States, and fairly extensive study, and we would recommend to

21  the Court that we make a view of those premises in conjunction

22  with an entire view of the De Luz watershed, which we believe

23  would be appropriate for the Court to do.

24     THE MASTER:  I certainly intend to go over the entire

25  watershed at some time.  And this might be a good time to

Z-37

1   consider when that should be.  As far as I am concerned I could

2   do it either this week or next week.  I don't know how many

3   counsel would wish to accompany me on this expedition.

4          MR. SACHSE:  I would, your Honor.

5          MR. DENNIS:  I would.

6          THE MASTER:  Off the record.

7          (Discussion off record.)

8          THE MASTER:  Let's take our recess now.

9          (Recess.)

10

11                FREDERICK MORRIS JONES,

12   called as a witness in his own behalf, being first duly sworn,

13   testified as follows:

14

15                 DIRECT EXAMINATION

16   BY MR. DENNIS:

17          Q   Will you state your full name?

18          A   Frederick Morris Jones.

19          Q   How old are you, Mr. Jones?

20          A   Fifty.

21          Q   Where were you born?

22          A   Hollywood.

23          Q   Have you ever had any agricultural experience?

24          A   Oh, roughly about 35-- between 30 and 35 years.

25          Q   Will you briefly state in detail what that has

Z-38

1 consisted of?

2     A  Well, soil preparation for avocado and citrus, and

3 terracing.

4     Q  Where did that first take place?

5     A  The first little job was in La Habra Heights for the

6 Hart Company, one of the developers of Vista.  And also the

7 plantation on the Irvine, which is one of the largest in the

8 country, I understand, to date.

9     Q  When you say plantation, what type of crop?

10     A  Principally avocados; soil preparation and terracing,

11 and like work.

12     Q  What other agricultural experience have you had?

13     A  Oh, dry farm, soil conservation work.  That is where

14 we prevent loss of moisture, to preserve moisture for dry farm

15 crops.

16     Q  Have you ever had any experience in the Santa Margarita

17 River watershed?

18     A  Well, 26 years.

19     Q  What type of farming did you do, and where did you

20 farm in the Santa Margarita River watershed?

21     A  Well, I should say the Santa Margarita Ranch, the

22 Las Flores section of the Santa Margarita Ranch, really.  But

23 it was dry farm principally; some irrigated area there, but

24 principally dry farm, beans and grain.

25     Q  That is what was known as the McGee Ranch?

Z-39

1      A   Yes.

2      Q   What was your position there?

3      A   I was foreman.

4      Q   And you have heard the testimony relative to Parcel

5   55.   When did you acquire that property?

6      A   It was bought in '54, and 1955.   I think the deed

7   reads December sometime in 1954.

8      MR. DENNIS:   I think I have already shown this to coun-

XI      9   sel.   This has been marked MB-55 for Identification, and I now

10   wish to offer it in evidence.

11      THE MASTER:   That will be received then in evidence as

XR      12   Defendant's Exhibit MB-55.

13   BY MR. DENNIS:

14      Q   And I take it you inspected the property before you

15   purchased it, and you have made frequent trips over the

16   property since that time?

17      A   Yes.

18      Q   And are there any springs on the property?

19      A   Well, there is two or three that are-- that I think

20   could possibly be developed into minor water developments, that

21   is just from my general observation.

22      Q   Does the water from the springs flow on the surface

23   or over the boundaries of your property?

24      A   No.

25      Q   And since you have owned the property you have paid

Z-40

1    the taxes on it?

2        A   Yes, I have.

3        Q   And have you any plans for developing it?

4        A   I have.

5        Q   And what are those plans?

6        A   Well, I intended when I bought to develop water by

7    check dams and also wells, if it would be permitted, within the

8    areas of the confines of the ranch.

9        Q   I take it from your testimony that unless permitted

10   by-- unless stopped by order of this Court that-- and prohibited,

11   you intend to construct check dams and soil conservation dams

12   on the property?

13       A   That is my intention, yes.

14       Q   That was your purpose prior to the time you were

15   served with a summons in this case?

16       A   Yes.

17       Q   Did you have an occasion to take some photographs of

18   your property?

19       A   Yes.

20       Q   When were those taken?

21       A   Those were taken, I think, Friday afternoon.   That was

22   the day that you and I were out there, I believe, Friday.

23       THE MASTER:   July 11th, last week?

24       THE WITNESS:   Yes.

25       MR. SACHSE:   What is this number, please?

Z-41

XI

1    THE MASTER:  MC-55.

2  BY MR. DENNIS:

3    Q  I will show you a number of photographs and ask you

4  if you will tell us where you stood at the time you took the

5  pictures, and also indicate on Exhibit MA-55 the location of the

6  area that the photograph depicts.

7    A  This photograph was taken by me looking west down-

8  stream at approximately this point, right about in here.

9    Q  Will you mark that with the figure 1 in red pencil?

10    THE MASTER:  It was taken to the east of your property

11  line then?

12    THE WITNESS:  Yes, I was shooting downstream.

13  BY MR. DENNIS:

14    Q  And will you put a figure 1 on the reverse side of the

15  photograph?

16    A  I took that to show the growth of the brush and the

17  general terrain of the ground.

18    Q  Then would you say that that represents a fair picture

19  of the area that you photographed?

20    A  Yes.  Yes, I would say that.

21    Q  Now, that photograph, incidentally, has on the bottom,

22  "Looking west downstream"?

23    A  That is right.

24    Q  And that is your writing?

25    A  That is right.

Z-42

1   Q   All of these pictures that I am showing you were

2   taken at the same time?

3   A   The same day.

4   Q   The same afternoon?

5   A   The same afternoon, yes, sir.

6   Q   I wonder if you will tell us where you stood at the

7   time you took that picture?

8   A   This was taken up in here, Parcel 4, standing on a

9   boulder right here some place.

10   Q   Will you mark the approximate location and mark the

11   number 2.  And will you mark number 2 on the reverse side of

12   that photograph?

13   And does that photograph fairly--

14   A   That is right.  This shows the northeast end of the

15   property, right in here, this hill right in here.

16   THE MASTER:  Let the record show the witness has marked

17   Roman numerals for No. I and No. II.

18   BY MR. DENNIS:

19   Q   Now, I will show you another photograph and ask you

20   where that photograph was taken, and ask you to mark on it the

21   same as you have the preceding photograph, the No. 3.

22   A   This is looking downstream from the second well that

23   was not mentioned, on the stream, in the bottom of the stream.

24   And that was taken approximately, oh, 40 feet from the well

25   looking down-- looking west downstream, showing the--  This is

Z-43

1  the boundary depicting this knoll right here, this is the top

2  of the hill, it shows this knoll right here.

3      Q   Will you put the figure 3 where you were standing

4  when you took that photograph?

5      A   Well, I was standing right about in here.

6      Q   And the hill that you refer to is a hill that was

7  on the white area between Parcels 1 and 2?

8      A   That is right.

9      Q   That photograph was taken the same afternoon?

10     A   This was taken from the opposite side of the creek,

11 that is the same stream that this previous picture was taken,

12 looking directly up on the property line, which traverses the

13 top of this dome.

14     Q   Will you mark the spot where you stood at the time you

15 took that picture?

16     A   That would be right down here.

17     Q   That is with a No. 4?

18     A   Yes.

19     Q   And you were facing then northwest?

20     A   I was facing south, directly south.

21     Q  Directly south?

22     A   Directly south.

23     Q   And does that picture fairly represent the area that

24 you were photographing?

25     A   Yes, sir.

A-44

1    THE MASTER:  The hill in the center of that picture is
2  the same as the hill in the center of picture No. 3?
3    THE WITNESS:  That is right.  This shows the growth up
4  the hill, and it shows the-- the approximate line of the terrain
5  that picture shows.  I have been up there, and there is a rocky
6  outcrop right on the very top.
7  BY MR. DENNIS:
8    Q  I will hand you another photograph and ask you where
9  you stood when you took that picture.
10    A  Looking south from the north side of the stream.  That
11  was taken a little farther downstream from the previous one.
12  That would be taken right about in here, as near as I can judge.
13  It was on the opposite side of the creek bed, which would be
14  right about in here.
15    Q  Will you mark that with a 5?  And also the photograph.
16    LT. MILLER:  Mr. Dennis, it has been suggested by Col.
17  Robertson, and I think it is a good one, it would help if he
13  drew an arrow in the direction in which the picture was taken.
19    MR. DENNIS:  I think that is a good idea.
20    Q  Will you do that?
21    A  Yes, sir.
22    Q  I will hand you another photograph and ask you if
23  you will explain where you stood when you took that one, and
24  which direction you were facing?
25    A  Well, this one was taken on the south end of the

Z-45

1 property, approximately in this vicinity right here, looking

2 north.

3     Q  And put the number 6 on there and the back of the

4 photograph.

5     A  This is the south end of the property, farther over,

6 looking northwest.

7     Q  And you are putting the number 7 at the spot where

8 you stood, with the arrow pointing in the direction?

9     A  Yes.

10     Q  And will you number the photograph?

11     A  This is looking north from the south end, also, and

12 this was taken in this proximity.  This would be 8.

13     Q  If you will number that on the reverse side.  That

14 picture is taken from what position?

15     A  Well, this was back again into the area of the center

16 here.  This is taken from this hill off the property, just at

17 the edge of the property here.  This would be No. 9.  That is

18 looking west from the east side.

19     Q  Will you number that on the reverse side?

20     A  This is taken from approximately the same area, that

21 would be 10, looking south.  This is that same picture where

22 the line runs over the top of the hill.  This is the northeast

23 end of the property, this is showing the erosion or the barranca,

24 really.

25     Q  Where is the barranca which is in the lower right-hand

Z-46

corner of the photograph you referred to, where would that

appear on the map?

A   That would be right in here.

Q   Now, when you say "here" would you designate that by

a circle in red and put the number, that would be 11, in the

circle?

Now, where were you standing when you took this photo-

graph?

A   I was standing in this area in here.

Q   And would you number that photograph?

And I will hand you one more.

A   Now, this is taken from the stream bed in one of the

wider sections down here, in this area here.   This is 12.

THE MASTER:   You weren't in the stream bed, then, were

you?

THE WITNESS:   Well, it was up on the side from the stream

bed, but this neck of land runs pretty much in conformity with

the bottom, and that was taken pointed in this area.

BY MR. DENNIS:

Q   I wonder if you would mark the arrow on 12 a little

more prominent?   And will you number the photograph?

Calling your attention to the photograph that you

placed the number 10 on the back of it, would you examine that

more closely, and the spot which you have indicated on the map

which is attached to M-104, and state whether that was taken

Z-47

1  from that position and in that direction?

2      A  Well, that was shooting down, yes; that was over

3  farther on this area here and shooting, as you may see, the point

4  of that hill; what I was shooting there was to get the growth.

5      Q  You were standing at this point approximately, and

6  the camera was pointed in this direction?

7      A  In a southerly direction.

8      Q  In the way that you have it?

9      A  Yes.

10     Q  Now, it says, "Looking west."

11     A  That is right.

12     Q  Do you want to make a correction there?

13     A  Yes.

14     Q  And all of these photographs that we have just

15  referred to were taken on the same afternoon?

16     A  That is right.

17     Q  And they all represent fairly the property that you

18  were photographing?

19     A  That is right.

20     Q  And when I am referring to these photographs I am

21  referring to the series of photographs given the number MC-55.

22     I would like to offer these in evidence, if there is

23  no objection.

24     LT. MILLER:  We have no objection, your Honor.

25     THE MASTER:  They will be received in evidence

XR

Z-48

XI

1   collectively as Defendant's Exhibit MC-55.

2   BY MR. DENNIS:

3         Q   Now, I have one additional photograph.   Did you take

4   this photograph?

5         A   I did.

6         Q   It has been marked MD-55 for Identification.   Will

7   you tell where you were when you took that photograph, where

8   you were when you took it and what it represents?

9         A   This is the water in the stream below the well.

10        Q   Where did you take that picture, Mr. Jones?

11        A   I would say about 40 feet below the last well.   There

12  are two wells there close together.

13        Q   And how far is that from your property line?

14        A   That is on the Mitchell property where you stepped

15  out of your car at the roadside and can see the wells right

16  there.

17        Q   And how far is it from your east property line?

18        A   Oh, that would be probably 300 yards, or something

19  like that.

20        Q   And would you place on the map attached to M-104 the

21  location where you were standing?

22        A   This would be 13, wouldn't it?

23        Q   Will you mark 13 on the back of the photograph?

24            And does that represent the bed or channel of the

25  so-called intermittent stream?

Z-49

1     A  Yes.

2     Q  And is that picture characteristic of the bed or

3  channel of the stream as it passes through your property?

4     A  Yes.  It is narrow and wide all the way through,

5  shallow and narrow.

6     Q  Now, you have had occasion to put down auger holes

7  or test holes on your property?

8     A  I did.

9     Q  Would you tell us where those auger holes are located,

10  and give us the depth of the various holes, as near as you can

11  recall in reference to the figures which are on the map at-

12  tached to M-104?

13     THE MASTER:  Did you wish to offer this exhibit in

14  evidence?

15     MR. DENNIS:  Pardon me.  Yes, I do.

XR

16     THE MASTER:  That will be received in evidence as MD-55.

17     THE WITNESS:  Well, I made the first auger hole up near

18  the marker in the center of the L of the property.  And that was

19  near to a rock outcrop, and that was between 14 and 16 inches

20  deep.  I ran it among those loose rocks; I couldn't get around,

21  it was loose, but I stopped there.

22  BY MR. DENNIS:

23     Q  How do you know it was loose rock?

24     A  I could feel it shifting around with the auger.  And

25  I sampled it, put a sample in my sack.

A-50

1    And then I went to the north of that area and took

2  No. 2. And that was also near a little rocky area that I took

3  that sample, and that was also between 14 and 16 inches deep,

4  running into loose rock.

5    LT. MILLER: May I have that last statement? Did you say

6  you ran into loose rock?

7    THE WITNESS: Yes, loose rock that would shift around

8  as I went down with the auger. It was between 14 and 16 inches

9  deep.

10    And then I took another one--

11  BY MR. DENNIS:

12    Q  Both of those were in Parcel 4, were they-- or, I

13  mean Parcel 3?

14    A  Parcel 3.

15    Q  Pardon me.

16    A  And then I took the third one a little to the southeast

17  of that second one, which was a little lighter ground and that

18  was, as I recall, about 18 inches deep; very similar ground,

19  light, and a granitic texture.

20    And from there I went southeast further and took No. 4.

21    LT. MILLER: Is that southwest or southeast that you

22  proceeded?

23    THE WITNESS: Well, I went in a southwesterly direction

24  from No. 3.

25    LT. MILLER: Right.

Z-51

1    THE WITNESS:  And took No. 4.  And that was very similar,

2  it was 16 to 18 inches deep, I don't just exactly recall right

3  now.

4       Then I went over and took 5 over on the slopes of the

5  north end of the property, and that was somewhat lighter and

6  more gravelly than the rest.

7  BY MR. DENNIS:

8       Q  Just a second, Mr. Jones.  Where is No. 5?

9       A  Right here on this slope.

10       Q  And did you give us the depth of No. 5?

11       A  Well, that was about a foot deep.

12       Q  And the numbers which appear encircled on Plaintiff's

13  MA-55-- I think I have been referring to it as 104, it should

14  be MA-55-- are the numbers corresponding to the numbers that

15  you have given in your testimony?

16       A  Yes.  And then I climbed down the hill and I started up

17  the ravine on the bottom and I took a sample, sample No. 6,

18  just away from a stream bed up on the bank; and I took No. 6,

19  which I went down about 30 or 35 inches, and sampled that.

20       Then I went from there to No. 7, which is on Parcel

21  4-- or, 6 is in Parcel 4, also.

22       I took No. 7, and that was, as I recall, about 24 or 30

23  inches deep.

24       And the following day--

25       Q  In other words, it took you all day to make those

Z-52

auger holes?

1

2     A   Climbing around and observing the ground, and every-

3   thing.   And on the following day I went out there early in the

4   morning when it wasn't so hot, and I started out with No. 8

5   right on the proximity of the southern property line.   And there

6   I ran into a light granitic type soil that was gravelly, and

7   similar in nature to the other soil, only it was a little

8   lighter.

9     Q   About what was the depth?

10     A   Well, that was about 18 inches deep.

11     And then I took one, No. 9, which is northwest from

12   that 8, and that was a little better ground, it was darker, and

13   I got a little deeper, 18 to 20 inches deep on that.

14     And then I went to 10, which is in Parcel 1, also, up

15   on the slopes of the-- it is the south slope of that ridge in

16   Parcel No. 1, to see what the ground was like there.   And it

17   was lighter than that that I had taken at 9, but there was no

18   clay, no pan of any kind in it, and that was also 16 to 18

19   inches deep.

20     And then I went a little-- Well, I went up on top of

21   the hill then and I took No. 11, which was light in texture,

22   but there was practically no depth.   I could go as deep as I

23   wanted to there without running into too much obstruction.   I

24   also sampled that.

25     And then I went across--   I started down the side and I

Z-53

1 took a sample on the side of the slope just before I got to

2 the-- just above the creek or this intermittent stream, which is

3 No. 12.  And there I got approximately 20, 24 or 30 inches

4 deep, I don't recall just exactly.

5          And then I crossed the stream and went up the slope

6 on the other side to take No. 13, and it was 16 to 18 inches

7 deep.

8          And then from there I went to the opposite side of

9 the land of Parcel No. 3 and I took a sample at a kind of a rocky

10 area there to see what it was like near the rock, and it was

11 light and not too gravelly.

12          Q  How deep was No. 14?

13          A  No. 14 was approximately 14 or 16 inches.

14          And then 15 I went to the section marker, then I

15 went back to the-- I located that from the section marker, that

16 is where the four corners intersect, then I went back up on the

17 mesa; that is all rocky knoll out in there, you can see that

18 from De Luz Valley, and I took a sample right close to that

19 rocky knoll which, surprisingly enough, it was pretty good

20 ground.

21          LT. MILLER:  Where is that?

22          THE WITNESS:  Right there.  There is a marker right there.

23 There is a marker right in there, it is a little off of the

24 line, however; it is a pipe that is stuck in a monument there.

25

Z-54

1  BY MR. DENNIS:

2         Q   How deep was that hole?

3         A   Well, that was about 18 or 20 inches deep.

4         LT. MILLER:   Your Honor, I wonder if we might just

5  identify that.   Our copy doesn't have 15 marked on it, and for

6  the record when we refer to it could we say that it was in

7  how many feet would you say from that?

8         THE WITNESS:   Well, it would probably be a hundred and

9  some feet in from the line.

10         MR. DENNIS:   Can we have Mr. Jones mark it on your copy

11  now?

12         LT. MILLER:   That might be wise, yes.

13         THE MASTER:   I think that is better if he can conform

14  your copy.

15         LT. MILLER:   Yes, sir.

16         THE WITNESS:   Then after I took 15 I walked over and

17  looked down the side toward Parcel 5, and I saw that it was

18  very rough on the back side; but down near the bottom it was

19  heavily brushed, and the contour started leveling out and it

20  looked like good ground; however, I didn't go down to it.

21         Then I came back and started down the east line of the

22  property and took 16.   It was just above the creek, or the

23  stream bed, and that was about 24 inches deep.

24         And then I took a sample just past the knoll.   Well,

25  it was quite a little ways past the knoll, next to this line,

Z-55

1   in a little ways from the line, and I took 17--

2   BY MR. DENNIS:

3        Q   When you say this line you are referring to the east

4   line of the property?

5        A   That is right.

6        Q   Of Section 33?

7        A   Well, there is one here.  Well, 17 isn't here.  17

8   was taken--

9        Q   Will you put 17 on?

10       A   Just below this rock outcropping.

11       Q   And would you place it right on Lt. Miller's copy,

12   too, please?

13       LT. MILLER:  I will do it.

14       THE WITNESS:  And that was of a rocky, small rock con-

15   dition.  It was right in a bed of rocks.

16       THE MASTER:  What was the depth of the soil?

17       THE WITNESS:  Well, it was 12 to 14 inches.

18        And then 18 was a little better; I went down, as I

19   recall, about 20 to 24 inches.  That was over the top of the

20   knoll and farther on towards the southerly end of the property.

21        Then right close to the line, or in the proximity of the

22   line, just away from a rocky area I took 19, which was gravelly

23   condition, but it still had a lot of body to it; and that was

24   about 16 or 18 inches deep.

25        Then 20 was after I passed over the top of the hill

Z-56

1  and started down the ridge towards the south end that was taken,

2  and it was somewhat lighter in color from these others; these

3  others were darker ground, considerably, and that was, oh, be-

4  tween 16 and 18 inches deep.

5      Then I took 21, that was about 20 to 24 inches deep.

6      And that was all of them that I took, that is that

7  day.

8  BY MR. DENNIS:

9      Q  Have you made other auger holes or test holes on your

10 property?

11     A  When Dr. Coit and I was out there together we took

12 samples in various places, wherever he wanted to see what the

13 ground was like I put a sample down.

14     Q  And how deep was the average hole?

15     A  Well, that day when we were walking around the property

16 we went 18 to 24 and as much as 30 inches deep.

17     Q  Did you put any holes down in Parcel 1 on the day you

18 were with Dr. Coit?

19     A  Yes.

20     Q  And what were the depths of the holes that you put down

21 at that time?

22     LT. MILLER:  I think, your Honor, I will object to that

23 unless we can pin down the location.  I don't think it is helpful

24 to the Court, and certainly difficult to rebut if it is necessary,

25 unless we pin down the location.

Z-57

1      MR. DENNIS:  I think we intend to do that.

2      LT. MILLER:  Why don't we do that as we go along?

3      THE MASTER:  Ask him to do it on the exhibit.

4  BY MR. DENNIS:

5      Q  Will you indicate on Exhibit MA-55 the places where

6  you put down the holes at the time you and Dr. Coit visited the

7  property on July 3rd, and tell us the depth of the holes?

8      A  Near where 8 was the squirrels and the rodents had

9  filled the hole up, and it was as easy to dig a new one as

10  to dig that one out; it wasn't over 15 feet from that one, that

11  was 18 to 20 inches deep.

12      Q  Did you put any other holes down in that parcel while

13  Dr. Coit was with you?

14      A  Yes.  We dug one over here on this-- just above the

15  intermittent stream.

16      Q  Referring to the stream in the southwest corner?

17      A  That is right.  And that was likewise 18 to 20 inches

18  deep.

19      Q  Will you put a cross at the approximate location?

20      A  Almost to the corner there.

21      Q  Did you put any other test holes in Parcel 1 at the

22  time that Dr. Coit made the examination of the property with

23  you on July 3rd?

24      A  Yes.  We came back to the car and drove around to

25  Mitchells' camp over here, and we walked downstream, and in

Z-58

1  there we observed the growth.  And also I got on my hands and

2  knees with the auger to go through that brush, it was so dense

3  that I couldn't get up through it without getting down on my

4  hands and knees, and I went up there some 50 or 100 feet, as

5  far as I could judge, and took a sample and brought the sample

6  out.  It was 24 inches deep.

7      Q  Will you mark the approximate location of that auger

8  hole and mark it X-1?

9      A  That would be in 2?

10     Q  That would be in Parcel 2?

11     A  Yes.  That would be about in here.  Now, you want me

12 to mark it with something else?

13     Q  Put a little 1 just at the lower corner of the X.

14     Now, did you make any other auger holes or test holes

15 while Dr. Coit was with you on July the 3rd?

16     A  Yes.  We made one on this other side, on this other

17 side of the stream.

18     Q  That is the intermittent stream?

19     A  That is right.  And as I recall we went down about 18

20 inches.

21     Q  Will you put a cross there with the small figure 2?

22     A  That would be down about in this vicinity here.

23     Q  Now, did you put down any other auger holes or test

24 holes on July 3rd with Dr. Coit?

25     A  We went up to Parcel 4, we observed the brush-- we

Z-59

1   walked up in this Parcel No. 3-- I think Dr. Coit possibly

2   forgot that we went up on this side from the stream bed-- and

3   we observed the brush and everything up in that area, which was

4   on the southern slopes.  It was lighter because of it being on

5   the south slope, the sun burning it stopped the foliage.  Any-

6   how, we went up to see what the ground was like on the slope.

7         Then we went back to the car and drove up to Parcel 4,

8   and there we took samples.

9         We observed there the only hole that I found in my

10  traversing the property that I didn't make.

11        Q  And that was about where?

12        A  That was in this area here.

13        Q  Will you mark that with an X and put a 3?

14        A  I know it wasn't the hole I dug.

15        Q  Will you put a 3 by it, like you did 1 and 2?

16        LT. MILLER:  Is this the hole he did dig or didn't dig?

17        MR. DENNIS:  He said that is the only hole on the property

18  he did not dig.

19        LT. MILLER:  You have that marked?

20        MR. DENNIS:  Yes.

21        THE MASTER:  That one you didn't dig?

22        THE WITNESS:  That is right.  That is the only one I

23  have found.  I have been looking for sample holes.

24  BY MR. DENNIS:

25        Q  You say you dug another hole when Dr. Coit was present?

Z-60

1    A   Yes.

2    Q   Will you mark that X-4?

3    A   Yes.  I dug a hole here while Dr. Coit was with me.

4    Q   About what was the depth of that hole?

5    A   That was a good 30 inches deep.

6    Q   Now, taking into consideration your experience in

7    clearing, terracing and planting lands to avocados and citrus

8    on the Irvine and in the La Habra area, and as a result of the

9    examination you made of the property, would you say that the

10   area that is designated No. 1 in Dr. Coit's report could be

11   economically planted to avocados?

12   LT. MILLER:  Your Honor, we object to the witness's

13   giving an opinion.  If Mr. Dennis is attempting to say he is

14   qualified as an expert we would object.  We don't mind a lay

15   witness owner of the property giving his opinion, but I believe

16   the way Mr. Dennis has worded the question he is stating that

17   he has qualified the witness as horticulture expert.

18   MR. DENNIS:  No.  The witness testified that he cleared

19   land and terraced land in the La Habra and Irvine area.

20   LT. MILLER:  You are not purporting that Mr. Jones is an

21   expert in this field?

22   MR. DENNIS:  No.

23   THE MASTER:  Just a minute.  Off the record a minute.

24   (Discussion off record.)

25   MR. DENNIS:  I think the record should be clear that

Z-61

1    Mr. Jones in all instances has been referring to MA-55, and at

2    no time to M-104.

3         THE MASTER:  The record may so show.

4    BY MR. DENNIS:

5         Q  And if I asked you the same questions about Parcels

6    No. 2, 3, 4 and 5 shown on the map attached to Dr. Coit's

7    report your answer would be the same?

8         A  I think so.  I think that that property can be

9    brushed and used as a non-cultivation type weed control basin

10   for irrigation, and either portable sprinklers to the trees

11   or permanent sprinklers with what they call spitters on the

12   trees, and in the springtime when the weeds get bad they can

13   be sprayed down so as not to cause any erosion.  That is

14   apparently the way that all of the departments are doing now

15   when there is chance of erosion.

16        Q  Have you planted land as steep as this to avocados?

17        A  Much steeper.

18        Q  Did the groves mature?

19        A  They did.

20        Q  Did they produce a marketable crop?

21        A  Yes.

22        Q  Now, you have had opportunity to examine the property

23   from time to time.  Have you any remarks which you wish to make

24   about the erosion or the rock outcroppings on the property?

25        A  Well, until I had an opportunity to really look the

Z-62

1    property over it had me somewhat worried at first, but after I

2    had an opportunity to look the ground over I was pleasantly

3    surprised that the outcroppings -- where we may lose a tree

4    here and there, it will not impede or stop the development of

5    the work.

6         Q   Had this property ever been burnt over by a fire?

7         A   Yes, several times.   The most recent, I understand,

8    was in August of 1949.

9         MR. DENNIS:   I think that is all.   Oh, just one other

10   question.

11        Q   Do you know of your knowledge whether there is any

12   water development on the intermittent stream that bisects your

13   property to the east and north of your property other than the

14   Mitchell well, as testified-- Mitchell well or wells as

15   testified to by Col. Bowen?

16        A   I know of none other than those two.

17        Q   Do you know of any development on the intermittent

18   stream on the downstream side of your property as far as De Luz

19   Creek?

20        A   I have seen none.

21        Q   Have you had an opportunity to observe the flow in

22   the intermittent stream from time to time that bisects your

23   property?

24        A   Well, only after the last rain this spring.

25        Q   About what time would that be?

Z-63

1     A   Well, I just don't rightly remember.

2     Q   Were there surface waters in the stream at that time?

3     A   There was water in the stream, yes.

4     Q   There was water running at that time?

5     A   Yes.

6     MR. DENNIS:   I think that is all.

7     THE MASTER:   Lt. Miller?

8     LT. MILLER:   Yes, your Honor.

9

10                        CROSS-EXAMINATION

11  BY LT. MILLER:

12        Q   Mr. Jones, referring to the map which Dr. Coit

13  prepared, do you agree with Dr. Coit that the areas that are

14  not colored would not be irrigable?

15        A   There are some spots that could be used.

16        Q   You don't think Dr. Coit found all of the irrigable

17  areas?

18        A   Well, there are spots.  He also said that there could

19  be maybe a few acres here and there out of this colored area

20  that could be.

21        Q   Well, now, do you agree with him, also, that some of

22  this in the green area, that some of this couldn't be irrigated?

23        A   Yes.  He mentioned that small areas, rocky areas, I

24  think he has accounted for.

25        Q   I am talking about your opinion rather than Dr. Coit's.

Z-64

1     A   Yes.

2     Q   Do you also agree with Dr. Coit that there are a considerable number of slopes that are too steep shown in the green area, too steep for avocados?

5     A   Well, I don't know what you mean by too steep.

6     Q   Don't you think there is a point--

7     MR. DENNIS:   Pardon me.   I wonder about the word "considerable", if that doesn't need a definition?

9     LT. MILLER:   I will withdraw the question, your Honor.

10     Q   In your opinion are there areas in the green that are too steep for an avocado grove?

12     A   No, I don't think so.

13     Q   There is not a place in the green that is too steep in your opinion?

15     A   There are places that he mentioned, small eroded places where it would be too steep.

17     Q   So there are portions of the green that are too steep?

18     A   There are small portions.   You might miss a tree or two, but that is all.

20     Q   Are there portions of the green that could not be planted to avocados in your opinion because of rock outcrops?

22     A   Small portions.

23     Q   Just small portions?

24     A   Small portions.   It would be very hard to define definitely without spending considerable time to map it to

Z-65

1    bring to the attention--

2        Q   Couldn't it be 30% as well as 15% that Dr. Coit has

3    testified about, as far as you know?

4        A   Well, from what I have seen, and I have been over

5    all of it, I think he is awful close.

6        Q   15% would be your opinion?

7        A   I think that is very close.

8        Q   Now, considerable area is covered by brush?

9        A   That is right.

10       Q   And you don't know whether the rock outcrops--

11       A   I have been through a lot of it.  And it is hand and

12   knee work to get through it.  You can't walk through it, it is

13   too dense.  And I went through it on my hands and knees in

14   many cases to get through it.

15       THE MASTER:  For my own information, do you mean you

16   sort of crawled under it?

17       THE WITNESS:  Yes.  I had to go down on my hands and

18   knees just like a deer would; in fact, I found a good many

19   deer tracks.

20   BY LT. MILLER:

21       Q   How many hours would you say you had spent crawling

22   around on the property?

23       MR. DENNIS:  Do you mean since he purchased it?

24       LT. MILLER:  Yes.

25       THE WITNESS:  Well, I would say probably I had spent

Z-66

1  six or eight days just looking it over.

2  BY LT. MILLER:

3      Q  Now, the period which you spent in terracing

4  avocados has been a good number of years ago, hasn't it?

5      A  They don't do as much of it any more, I understand.

6      Q  How many years has it been since you did that

7  terracing work for avocados?

8      A  I think that was 1922 or '23.

9      Q  And for how many years did you do that type of work?

10     A  About four or five years.

11     Q  And then almost continuously since that period of time

12 you have been engaged in dry farming on the McGee Ranch, with

13 some irrigation?

14     A  Well, that, and also working in groves before the

15 McGee Ranch; that is, away from terracing work and stuff like

16 that, just orchard maintenance and stuff like that.

17     Q  About how many years did you do that?

18     A  That was about three or four years in between there.

19     Q  This is separate from the three or four years that

20 you worked in terracing?

21     A  Yes.  That is afterwards.

22     Q  After the terracing then you did some work in the

23 maintenance of groves?

24     A  That is right.

25     Q  And then you went out to the McGees where the past--

Z-67

1   How many years have you been at the McGees?

2       A   I went to work for Jane and Lewis McGee in September,

3   1930.

4       Q   And you were employed by them almost continuously

5   up until a recent accident?

6       A   That is right.

7       Q   And the farming which is done by the McGees and which

8   you were employed in takes place on Camp Pendleton today on

9   what was formerly the Rancho Santa Margarita?

10      A   That is right.

11      Q   However, the land is not within the Santa Margarita

12  drainage?

13      A   No.  I think I corrected that statement.

14      Q   In the Las Flores?

15      A   In the Las Flores, that is right.

16      Q   Mr. Jones, you have testified in some detail the

17  depth of various holes that you drilled with the auger.

18      A   Yes.

19      Q   And have you testified purely from memory today?

20      A   Well, I would say yes, as I recall the work that I did.

21      Q   You didn't make notes at the time you drilled the

22  holes?

23      A   I made indications on a sketch map that I had with

24  me, and I also had the topographical map and located my

25  sketches.  I didn't draw any pictures on the topographical

Z-68

1  map, but I made my sketches on another piece of paper in the

2  area of that particular hole that was representative of the

3  topographical map.

4  Q  And did you actually make notes of what you found

5  that day and what the depths were?

6  A  No.

7  Q  Well, what were you putting on the piece of paper

8  then, what information?

9  A  Well, just the location of the holes.  And I found

10  so much the same type of ground, generally speaking over all

11  of it except I think two or three holes that was so rocky,

12  that it didn't stop me from going down with my auger, it was

13  a coarser gravel.

14  Q  So you didn't make any notation at the time of the

15  depth of the holes that you were able to dig?

16  A  No, I didn't.  I should have, but I didn't.

17  Q  Did you have any markings on your auger which you had

18  previously measured by a ruler so that you could know actually

19  how deep you were?

20  A  It is one of these soil test augers with what they

21  call an eight-inch bucket on the end, and I judged from that

22  pretty much the depth.

23  Q  And you estimated the height with that to get the

24  distance?

25  A  I took all of the tests from the very bottom of the

Z-69

1  auger; not the top of the auger, but the bottom of the auger.

2       Q  Do you know what depth of soil is required for

3  avocado growth?

4       A  Well, I have planted avocados on three inches of

5  topsoil--

6       Q  So your opinion is three inches?

7       A  Three inches of topsoil, that is the truth, where we

8  had to dig holes and blast them out and haul in topsoil.  And

9  they are giving some of the prettiest avocados today that you

10  ever saw.

11       Q  In the hole that you blasted did you put soil?

12       A  Yes.

13       Q  Three inches of topsoil?

14       A  Just about that much topsoil, and the rest was white

15  as snow, decomposed limestone, and the rest was granite; in

16  fact, I did the blasting myself.

17       Q  Now, the soil samples you took you say you took it

18  from the very bottom?

19       A  I took the very bottom dirt.

20       Q  And I take it you put it in a bottle, or something

21  of that nature?

22       A  Yes.

23       Q  And that is what you gave to Dr. Coit as you went to

24  each of these holes?

25       A  Each bottle was labeled with the number of the hole

Z-70

1 and the location of it.  And if it was too rough for him to

2 get to I pointed it out and showed him from that observation.

3          LT. MILLER:  Nothing else, your Honor.

4          MR. DENNIS:  No further questions.

5          THE MASTER:  Just one question in regard to this three

6 inches of topsoil and your blasting.  As I understand, it was

7 three inches of topsoil, and you blasted a hole beneath that

8 and hauled dirt in?

9          THE WITNESS:  Yes.  When we cut the terrace there was

10 no soil left, it was all just chalk.  It was in La Habra Heights.

11          THE MASTER:  How deep a hole did you blast?

12          THE WITNESS:  About three feet.

13          THE MASTER:  How wide in diameter?

14          THE WITNESS:  Five or six feet, and filled it with

15 topsoil and planted a tree in it.

16          THE MASTER:  So the tree would then be in an area of

17 soil three feet deep and six feet in diameter?

18          THE WITNESS:  Yes, decomposed lime, and outlying granite.

19          THE MASTER:  That is all.

20          LT. MILLER:  Nothing further, your Honor.

21          MR. DENNIS:  Nothing further.

22          I think that is all, your Honor, except I do want to

23 call your Honor's attention to the M-35A, which shows that in

24 the fall of 1949 and the spring of 1950 the rainfall was .23

25 of an inch in October; a trace in September; 1.16 in November;

Z-71

1  and .86 of an inch in December; and 3.31 inches in January.

2          Now, that was after the property was burned over, as

3  Mr. Jones testified to, and I think it has some bearing on the

4  susceptibility of the soil to erosion.  While the property was

5  burned over we had five inches of rain, and we had no more

6  erosion.

7          LT. MILLER:  We assume that is in the nature of argument

8  and not in the nature of testimony, and we will not rebut it.

9          MR. DENNIS:  That is correct, other than the table

10  shows those figures.

11          THE MASTER: Do you have any rebuttal testimony from

12  Col. Bowen at this time?

13          LT. MILLER:  No, I don't believe so, your Honor.

14          There is a possibility, as we read the transcript between

15  now and next Wednesday, we might want to put on some rebuttal

16  testimony, in which case we would notify Mr. Dennis.  But at

17  this time we have nothing else to put in.

18          THE MASTER:  You have no further testimony?

19          MR. DENNIS:  No further testimony.

20          MR. SACHSE:  Mrs. Mitchell came and gestured to me and

21  said she wanted to leave.  I do not represent her-- but I guess

22  I do now-- she asked me to state for the record that Mrs. Eve

23  Mitchell, owner of Parcel 56-- Is that correct?

24          THE MASTER:  Yes.

25          MR. SACHSE:  --is entirely satisfied with the United

Z-72

1  States engineering report, Exhibit M-88, and will not appear

2  to offer any evidence.

3          THE MASTER:  Now, I wonder if in connection with that

4  statement Col. Bowen then could testify briefly with reference

5  to Exhibit M-88 on Parcel 56?  We still have a few minutes

6  before 4 o'clock.  That is so we will know what it is she is

7  satisfied with.

8          MR. SACHSE:  It is immediately adjoining the parcel he

9  has just testified about.

10

11                    ALLEN C. BOWEN,

12  recalled as a witness, having been previously sworn, testified

13  as follows:

14

15                  CROSS-EXAMINATION

16  BY THE MASTER:

17      Q  Can you give us the same information with reference to

18  this parcel, Col. Bowen, that you have with reference to the

19  other parcels?

20      A  Yes, your Honor.  The De Luz watershed Parcel No. 56

21  is reported on in Plaintiff's Exhibit M-88, and it is delineated

22  on Plaintiff's Exhibit M-68, with the number 56 encircled within

23  the outer limits of the property.

24          The property adjoins Parcel No. 55, the Jones property,

25  and lies to the east of Parcel 55.

Z-73

1    Plaintiff's Exhibit M-68 shows the intermittent

2  stream flowing from east to west through the Jones property;

3  also flows through the Mitchell property, Parcel No. 56,

4  entering the easterly boundary of 56 and flowing generally

5  through the center of the property from east to west, leaving

6  the property on the westerly boundary and entering Parcel 55.

7  That stream is intermittent in character, flowing only during

8  and after periods of high precipitation and runoff.

9    The ground waters within Parcel No. 56 are vagrant,

10  percolating in character, not a part of the De Luz stream

11  system.

12    The property has a cabin centrally located-- rather,

13  the cabin lies in the southerly forty of the property, near the

14  north boundary of the southerly forty, and a graded earth road

15  departs from the Santa Margarita truck trail and goes to the

16  north past the cabin as shown on Plaintiff's Exhibit M-68.

17  That road has been continued on up into the northerly forty of

18  Parcel 56, and access by that road can also be had to a portion

19  of the north part of Parcel 55.

20    There are some ornamental trees and shrubs around

21  the cabin.  There is a shallow dug well or sump which is

22  located adjoining the intermittent stream traversing the

23  property from east to west, and lying slightly downstream from

24  the cabin.

25    There is no apparent way of piping the water to the

cabin at the present time.  There is a bucket on the end of a

Z-74

1  rope, apparently that is how they draw water from the well to

2  irrigate the ornamental plantings around the cabin.   There is

3  water in the sump at the present time.

4         Referring to Plaintiff's Exhibit M-88 on page 2, your

5  Honor, it shows at the bottom of the page a tabulation that

6  there are a total of 50.5 acres of irrigable land, of which 5.7

7  acres, the lower lying land shown as Class III and colored pink

8  on the land classification map included within Plaintiff's

9  Exhibit M-88, is suited for row crops; and the remainder of the

10  irrigable acreage, or 44.8 acres, are suitable for avocados.

11  Those areas are shown in orange, the Class VI lands on the

12  land classification map.   The remainder of the property is

13  Class VII and non-irrigable.

14       Q   There is no evidence of any past cultivation of any

15  of the property other than the present ornamental trees that

16  you have referred to?

17       A   Well, the area around the cabin, your Honor.   The

18  cabin is located within the largest area of Class III land

19  located in the southerly forty, primarily in the southern forty.

20  And there has been some clearing along the road.   Presently

21  there is no crop being grown in there.   There are appearances

22  the roads that branch out from the cabin site to what appear

23  to be clearings for residential sites.   I don't know that they

24  are, but they have that appearance.   Those areas are in the

25  north forty and in the central portion of the property.

Z-75

1    Q  Are there any springs on the property to your

2  knowledge?

3    A  I didn't observe any, your Honor.  It is questionable

4  whether this sump could more properly be designated as a spring

5  or not.  I have testified that there is probably six or seven

6  feet of water in the sump.

7    THE MASTER:  That is all I have.  Lt. Miller, do you

8  have any questions?

9    LT. MILLER:  No questions, your Honor.

10    THE MASTER:  Mr. Dennis?

11

12                    CROSS-EXAMINATION

13  BY MR. DENNIS:

14    Q  Col. Bowen, do you know whether or not the clearings

15  that you referred to are on the Mitchell property, or are they

16  off the Mitchell property?

17    A  Well, the ones that I referred to, Mr. Dennis, are

18  on the Mitchell property.  They couldn't possibly be on the Jones

19  property, they are located, as I testified, within the central

20  portion of the property in the area-- the largest area of Class

21  III land, and in the area to the north of that Class VI land--

22    Q  You are sure they are not on the property of the owner

23  to the east?

24    A  As a matter of fact, your Honor, one clearing shows

25  on the photograph near the-- in the central part of the colored

Z-76

portion of the land classification map, within a narrow neck
of Class VI land, the light-colored area is now cleared with a
road running to it.  Another area also appears on the photo-
graph in the easterly part of the Class VI area, centrally
located in the colored portion of the map.

Q   Those are the only two cleared areas you referred to?

A   And then there are clearings, as I testified, along
the road through this Class III area.

Q   This particular location, which I guess would be what,
the southeast corner of this forty acres, how would you describe
that?  Is that a clearing?

A   We could call this point here, your Honor, the
southeast corner of the Northeast Quarter of the Northwest
Quarter of Section 33, Township 8 South, Range 4 West.

Q   Is that a clearing?

A   Yes, there has been land cleared in there.

Q   Do you know whether or not that land is on the Mitchell
property or on the adjoining property?

A   That is on the Mitchell property.

Q   So far as you know?

A   Yes.

THE MASTER:  Any further questions?

MR. DENNIS:  No further questions.

MR. SACHSE:  I have no questions, your Honor.

LT. MILLER:  No questions.

Z-77

1    THE MASTER:  Then we will adjourn at this time until

2  9:30 on Wednesday, July 23rd.

3         Off the record.

4    (Discussion off record.)

5    THE MASTER:  The hearing is adjourned until next

6  Wednesday, July 23rd, at 9:30.  And the Master and counsel

7  and representatives of the United States will tour the De Luz

8  Creek watershed on Thursday, July 17th, meeting at Mr. Sachse's

9  office at 8:45.

10    MR. SACHSE:  That is fine.  Your Honor, I think you

11  stated it wrong.  I think you stated the 16th.

12    THE MASTER:  The 23rd is what I intended to state.

13         And we will tour the watershed on Thursday, July 17th,

14  meeting at your office.

15    (Adjournment at 4:10 P.M.; hearing to be reconvened

16  Wednesday, July 23, 1958, at 9:30 A.M.)

17

18

19

20

21

22

23

24

25