ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

           Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT

**Volume:** 18

**Pages** 2316-2426

**Date:** July 23, 1958

**Place:** Fallbrook, California

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____ DEPUTY

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

APPEARANCES:

    LT. DAVID W. MILLER,
        For United States of America.

    FRANZ R. SACHSE,
        For Fallbrook Public Utility District.

    W. B. DENNIS,
        For Santa Margarita Mutual Water Company.

    AUGUSTINE and FRANCES M. FREDY,
        In pro per.

    VERIA V. CLICK, in pro per.

# INDEX TO WITNESSES

| For the Plaintiff; | Direct | Cross |
|---|---|---|
| Allen C. Bowen | 2344 | 2320 |
| | 2380 | 2338 |
| | | 2349 |
| | | 2384 |
| | | 2386 |

| For the Defendant: | | |
|---|---|---|
| Augustine Fredy | 2334 | 2342 |
| Veria V. Click | 2353 | 2358 |
| | 2367 | |

# INDEX TO EXHIBITS

| For the Plaintiff: | | Iden. | Evid. |
|---|---|---|---|
| M-105 | Deed | 2318 | 2319 |
| M-106 | Deed | 2318 | 2319 |
| M-107 | Deed | 2318 | 2319 |
| M-108 | Deed | 2318 | 2319 |
| M-109 | Deed | 2318 | 2319 |
| M-110 | Deed | 2318 | 2319 |
| M-111 | Deed | 2318 | 2319 |
| M-112 | Deed | 2318 | 2319 |
| M-113 | Deed | 2318 | 2319 |
| M-114 | Deed | 2318 | 2319 |
| M-115 | Deed | 2318 | 2319 |
| M-116 | Deed | 2318 | 2319 |
| M-117 | Deed | 2318 | 2319 |
| M-118 | Deed | 2318 | 2319 |
| M-119 | Deed | 2318 | 2319 |
| M-120 | Deed | 2318 | 2319 |
| M-121 | Engineering Report on Parcel No. 16 | 2331 | 2332 |
| M-122 | Engineering Report on Parcel No. 21 | 2344 | 2344 |
| M-123 | Aerial Photo No. 4-0165 | 2344 | 2345 |
| M-44B | Tabulation of acreages of various classes of land on parcels. | 2346 | 2348 |
| M-124 | Property descriptions | 2358 | 2372 |
| M-125 | List of descriptions for Boundary lines of parcels. | 2361 | 2361 |
| M-126 | (Exhibit not described.) | 2362 | 2362 |
| M-127 | (     "          "          "     ) | 2362 | 2362 |
| M-128 | (     "          "          "     ) | 2362 | 2362 |
| | | | |
| For the Defendant: | | | |
| MA-31 | Grant deed (Click) | 2368 | 2368 |
| MB-31 | Map | 2370 | 2370 |
| MC-31 | Surveyor notes | 2370 | 2370 |

1b

<u>Fallbrook, California, July 23, 1958, 9:40 A.M.</u>

THE CLERK:   Court is now in session.

THE MASTER:   I don't know when Mr. Dennis will be here, so I think we might as well start and have Colonel Bowen present testimony on some of these parcels concerning which no answers have been filed.

You have something you want to present, Lt. Miller?

LT. MILLER:   Yes, your Honor.   I have a series of deeds which I would like to get marked for identification.   I don't care to introduce them now, because counsel have not had an opportunity to examine them.

But I have another exhibit based upon these particular exhibit numbers, so if I may I will have these marked for identification.

THE MASTER:   Very well.   You may proceed to do that.

The record should show that the only counsel present are Lt. Miller for the United States, and Mr. Sachse for the various defendants he represents.

LT. MILLER:   I will hand these photostatic copies of deeds and patents to the clerk and ask him to mark them for identification.

Let the record show that I have handed to the defense counsel Plaintiff's Exhibits M-105 for Identification through M-120 for Identification for his examination.

2b

1      MR. SACHSE:  If you want to go ahead and do anything with

2  these I will get the stuff off later.  I know there will be no

3  argument, they are just deeds.

4      LT. MILLER:  In that event, your Honor, I submit into

5  evidence Plaintiff's Exhibits M-105 for Identification through

6  M-119 for Identification.

7      THE MASTER:  These will be received in evidence then and

8  so numbered as Plaintiff's Exhibits M-105 to M-119, inclusive.

9      LT. MILLER:  And I also offer into evidence Plaintiff's

10  Exhibit M-120 for Identification as Plaintiff's Exhibit M-120.

11  And in that connection, your Honor, I would like to state that

12  the purpose of the introduction of this deed is to show the

13  legal description of the parcel, which is marked 31 on Plaintiff's

14  Exhibit M-32.

15      This is introduced inasmuch as the answer of the defendant

16  who owns that parcel makes certain allegations about the descrip-

17  tion which is being used by the United States.

18      MR. SACHSE:  Who is that, Click?

19      LT. MILLER:  Click, yes.  And this is introduced solely

20  for the purpose of showing the description which was utilized

21  in plotting Parcel 31 on Plaintiff's Exhibit M-32.

22      THE MASTER:  This will be received in evidence as Plain-

23  tiff's Exhibit M-120.

24      LT. MILLER:  I have nothing further, your Honor, at this

25  time.

3b

1    THE MASTER: Well, then, Colonel Bowen, will you resume

2  the stand?

3

4                    ALLEN C. BOWEN,

5  recalled as a witness, having been previously sworn, testified

6  as follows:

7

8                    CROSS-EXAMINATION

9    THE MASTER: Now, I believe during the previous examina-

10  tions we had covered Parcels 1 to 15. Parcel 16, Fredy, has been

11  deferred, and I had expected that they would be here today.

12    Do you have any word from them about that, Lt. Miller?

13    LT. MILLER: Your Honor, we delivered a copy of their

14  report to them yesterday evening, and I have no indications from

15  them as to whether or not they desire to appear. I thought that

16  we would defer introducing the report in the event that they do

17  show up.

18    THE MASTER: Yes, I think we will defer that until later

19  today.

20    Now, Parcel 18 we have also deferred. Do you know whether

21  those defendants expect to be here today?

22    LT. MILLER: No indication, your Honor.

23    THE MASTER: Well, shall we proceed with Parcel 18 then,

24  Colonel Bowen?

25    THE WITNESS: Yes, sir. Parcel No. 18, De Luz watershed,

4b

1   as shown on Plaintiff's Exhibit M-68, would be number 18
2   encircled.  I have drawn in Section 21, 8 South, 4 West.  Por-
3   tions of this parcel are also in Sections 22 and 28, 8 South,
4   4 West.

5        Referring to Plaintiff's Exhibit M-68, there is an inter-
6   mittent stream symbol rising on the Santa Rosa Grant of the Vail
7   Ranch which cuts across the northeast corner of Parcel 18, through
8   the southeast corner--the northwest corner of Section 18--of
9   Parcel 18; the southeast corner of Parcel 16, through--diagonally
10  through Parcel 15 from the northeast to the southwest, and then
11  through Parcel 30, that being the same tributary to the East Fork
12  of De Luz Creek which was testified to in regard to the Bleecker
13  property, Parcel No. 30.

14       Also a much lesser intermittent stream rises in the south-
15  westerly portion of Parcel 18 and close to its confluence with
16  De Luz Creek outside of the limits of the property.

17       The southeast corner of the portion of the property Parcel
18  No. 18 which lies in Section 22, 8 South, 4 West, corners on the
19  East Fork of De Luz Creek.

20       May I have the Parcel No. 19 report, Mr. Edwards, please?
21  That is the Foss and others.  It was one of the later reports
22  entered.

23       LT. MILLER:  M-101.

24       THE WITNESS:  M-101?

25       LT. MILLER:  Yes.  And then the report that is immediately

5b

1   underneath that is on Parcel 28 and 29, and it is M-80.

2        THE CLERK:  M-80?

3        LT. MILLER:  80, yes.

4        THE WITNESS:  The land classification map, your Honor,

5   which is contained in Plaintiff's Exhibit M-101 shows that the

6   East Fork of De Luz Creek cuts through the extreme southeast

7   corner of Parcel 18, as previously described with reference to

8   Plaintiff's Exhibit M-68.  And with the exception of the older

9   terrace deposits in the southeast corner, and the extremely

10  limited alluvium within Parcel 18, the waters underlying this

11  parcel are vagrant, percolating, and not a part of the De Luz

12  stream.

13  BY THE MASTER:

14        Q   Now, in what portions of 18 would there be alluvium?

15        A   In the extreme southeast corner, your Honor, referred

16  to by reference to Plaintiff's Exhibit M-101 and Plaintiff's

17  Exhibit M-68, through which flows the East Fork of De Luz Creek.

18        Q   Is it possible to describe the area in the southeast

19  corner with any more exactness as to the total land covered by

20  the alluvium, or underlain by the alluvium?  Is the number of

21  acres--

22        A   Well, the alluvium is apparently less than one acre in

23  that--in Parcel 18.  The alluvium which is along the East Fork

24  of De Luz Creek, by reference to Plaintiff's Exhibit M-101, is

25  less than an acre.  Some of these older terrace deposits which

6b

1   are shown on the land class map of Plaintiff's Exhibit M-101

2   extend into Parcel 18, and it appears occupying an area of only

3   two or three acres.

4        Q  Now, the water under those terraced areas would be local

5   water.  Is that correct?

6        A  No, sir, the few acres that are in the older terraced

7   formation, and this small portion of less than an acre that

8   abuts upon the stream, as shown on Plaintiff's Exhibit M-101

9   land classification map, would be the only areas in my opinion

10  where the ground water would be a part of the stream.

11       Q  Now, those terraced areas are all in the southeast

12  corner of this parcel.  Is that correct?

13       A  Referring to the land classification map in Plaintiff's

14  Exhibit M-80, your Honor, there are shown land Class IV and VI;

15  also segments of this old terrace formation which extend beyond

16  the boundaries of the property reported on in Plaintiff's Exhibit

17  M-80, into Parcel 18.

18       Q  M-80 deals with Parcel 29.  Is that correct?

19       A  Yes, sir, Parcel 29 and Parcel 28.  But again those

20  areas are very small, because they terminate very close to the

21  property line.  The photograph indicates a slope steep and

22  sharply just north of the Parcel 28 and Parcel 29.

23       Q  Would those areas all be within 300 feet of the south

24  line of Parcel 18?

25       A  Yes, sir, approximately.

7b

1    Q  Now, is there any use of water now being made by any

2  portion of Parcel 18?

3    A  None to my knowledge, your Honor.  This testimony I am

4  giving this morning is based on reconnaissance survey, subject

5  to correction if it is desired that more detailed surveys of

6  these properties be made.

7    Q  Yes, this is understood as to all of your testimony

8  this morning.

9    A  But to my knowledge there are no water uses on Parcel

10  18.  There are 68 acres of irrigable land in the property, and

11  it is Class IV and VI land, high enough elevation--  In reference

12  to Parcel 28 and 29 reported in Plaintiff's Exhibit M-80, similar

13  adjoining land is found suitable for avocados from the standpoint

14  of soil depth and site location and internal drainage.  In my

15  opinion this entire area in Parcel 18 of irrigable land, namely

16  68 acres, is suited for avocados.

17    Q  And the total number of acres in the parcel is how many?

18    A  About 380, your Honor.

19    THE MASTER:  Lt. Miller, as far as your records indicate

20  this is all one parcel of property.  Is that correct?

21    LT. MILLER:  That is correct, your Honor.

22    THE MASTER:  Do you have any questions?

23    LT. MILLER:  No, sir.

24    THE MASTER:  Mr. Sachse?

25    MR. SACHSE:  No questions.

8b

1    THE MASTER:  Well, now, I understand that Mr. Anderson

2  expects to be here today with reference to Parcel 21.  I assume

3  we should pass that temporarily.

4    MR. SACHSE:  The last word I had from him, your Honor, he

5  would be here if he had anything he wanted to say.  If he doesn't

6  show up I think you can assume that he is very well satisfied.

7    THE MASTER:  Well, I think we will defer that until later

8  in the day and give him an opportunity to appear.

9    Now, we have Parcel 22 on Silva.  Is he to appear today?

10    LT. MILLER:  Your Honor, he was at the last hearing.

11    THE MASTER:  Yes.

12    LT. MILLER:  And a copy of the report on his property has

13  been introduced, and I believe he spoke to your Honor during the

14  noon recess and said that he was satisfied with the portion of

15  the report that was within the De Luz watershed.

16    THE MASTER:  That is correct.

17    LT. MILLER:  And he also spoke to me and indicated that he

18  would like for us to look at the land again that lies in the

19  adjoining watershed, that is the Sandia, and we expressed a

20  willingness to do that.  But he apparently is satisfied with the

21  portion of his land that is within the De Luz watershed, in that

22  report.

23    THE MASTER:  My records do not indicate that there has

24  been any actual testimony as to the report, although the report

25  has been introduced.

9b

1      LT. MILLER:  I think that is correct, your Honor.

2      THE MASTER:  Colonel Bowen, do you wish at the present time

3  then to give us further information with reference to Parcel 22,

4  which is Exhibit M-103?

5      THE WITNESS:  Well, with reference to Plaintiff's Exhibit

6  M-103, the portion of Parcel 22 which lies within the De Luz

7  Creek watershed is the southwest corner of the property.

8      The land classification map in Plaintiff's Exhibit M-103

9  shows a Class VII area which is in the southwest corner of the

10  parcel; and the ridge line which runs approximately through the

11  center of the Class VII area from the northwest to the southeast

12  is the divide between Sandia Creek on the east and De Luz Creek

13  on the west.  Now, that divide is shown on Plaintiff's Exhibit

14  M-68 as passing along the ridge line which is in the center

15  of Section 26, 8 South, 4 West.  And of that portion in the De

16  Luz Creek watershed the extreme southeastern corner is shown as

17  Class III on the land classification map in Plaintiff's Exhibit

18  M-103.

19      The Class III land is astride the Santa Margarita truck

20  trail which leads from the vicinity of the Division of Forestry

21  Fire Station on the De Luz road through the Rivers Ranch, the

22  Doville Ranch on down through Sandia and back to the Santa

23  Margarita River.

24      The area of the Class III land which is within the water-

25  shed of De Luz Creek is 1.8 acres, and that is the only area

10b

1  which is irrigable within the De Luz Creek watershed on Parcel

2  22.

3       The ground waters on this parcel within the De Luz Creek

4  watershed are vagrant, percolating waters, not a part of the De

5  Luz stream system.

6  BY THE MASTER:

7       Q  Now, this parcel does not appear to be riparian to any

8  actual stream.  Is that correct?

9       A  Within the De Luz Creek watershed, your Honor, the only--

10  well, there is practically no trace of a stream at all.  It is

11  right up at the top of the divide as shown on Plaintiff's Exhibit

12  M-68.

13       Q  So that there is no actual intermittent stream entering

14  the De Luz Creek watershed traversing any portion of Parcel 22

15  within the watershed?

16       A  Well, this intermittent stream which bisects Parcel No.

17  23 generally from the northwest to the--as it flows from the

18  southeast to the northwest, as shown by the contours, actually

19  rises on and gathers water from a portion of Parcel 22.

20       Q  But is that the type of stream which flows only during

21  and immediately after heavy rain?

22       A  Yes, sir.

23       Q  Is there any use now being made of water within the De

24  Luz Creek watershed on Parcel 22?

25       A  No, sir, there is no use of water being made on the

11b

1  property at the present time.

2      Q  Now, Mr. and Mrs. Silva in the answer which they have

3  filed allege that there is a spring upon the land which runs

4  all year in rainy years and most of the year in dry years.  Do

5  you know of the existence of such a spring and, if so, is it

6  within the De Luz Creek watershed or in the portion of Parcel 22

7  which is outside the De Luz Creek watershed?

8      A  No, I do not know whether it is in the De Luz Creek

9  watershed or the Sandia Creek watershed.

10      THE MASTER:  Are there any questions by counsel?

11      LT. MILLER:  No questions.

12      MR. SACHSE:  No questions, your Honor.

13      THE MASTER:  Well, I believe then that the next parcel

14  concerning which we have not so far heard testimony is Parcel

15  59, James and Nettie Loy, L-o-y.

16      THE WITNESS:  I have Parcel 25, your Honor, on my list.

17      LT. MILLER:  I think that has already been testified to

18  the last time.

19      THE MASTER:  Yes, I think that was testified to, Colonel

20  Bowen.

21      LT. MILLER:  With respect to Parcel 59, your Honor,

22  Exhibit M-88 might be of some assistance.

23      THE WITNESS:  M-88, please, Mr. Edwards.

24      Parcel No. 59, referring to Plaintiff's Exhibit M-68,

25  lies astride the Santa Margarita truck trail and is bordered on

12b

1   the north in part by Parcel 55, the Jones property, and Parcel

2   58; bordered on the east by Parcel 60.

3       Now, the symbol for an unimproved road appears on Plain-

4   tiff's Exhibit M-68 as running from east to west through the

5   property, and entering the property on the east is an intermittent

6   stream which parallels the road for a short distance, and then

7   departs from the road in a southerly and westerly direction and

8   leaves the property near the southwest corner of the parcel.

9       That is a stream which flows only during and after high

10  precipitation and runoff, your Honor.

11      The ground waters in this parcel are vagrant, percolating,

12  and not a part of the De Luz stream system.

13      The irrigable acreage which is in the valley bordering the

14  stream is 34 acres, Class II and III land, would be suited to the

15  production of row crops.

16  BY THE MASTER:

17      Q   Is there any use now being made of water on this pro-

18  perty?

19      A   No, sir, not to my knowledge.

20      Q   And is there any evidence that the land has in the past

21  been irrigated or cultivated?

22      A   There is evidence that some of that valley floor has

23  been cleared of vegetation, but the vegetation has grown back in.

24  There is no evidence of any irrigation.

25      Q   Are there any streams on the property, to your knowledge?

13b

1        A   Not to my knowledge, your Honor.

2        THE MASTER:   Are there any questions by counsel?

3        LT. MILLER:   No questions.

4        MR. SACHSE:   No questions, your Honor.

5        THE MASTER:   The next parcel concerning which we have had

6   no testimony so far, according to my records, is Parcel 61,

7   Kendrick and Stucker.

8        LT. MILLER:   Exhibits M-90 and M-102 lie in the proximity

9   of that property.

10        THE WITNESS:   Parcel No. 61, your Honor, is delineated on

11   Plaintiff's Exhibit M-68 with the number 61 encircled within

12   the outer limitations of it.   The Santa Margarita truck trail

13   runs through the southerly portion of the property generally in

14   an east-west direction.   It is bounded on the north and south--

15   or, north and west by Parcel No. 60, reported on in Plaintiff's

16   Exhibit M-102, and on the south a portion of the southern boun-

17   dary is coincident with the northern boundary of Parcel No. 63,

18   reported in Plaintiff's Exhibit M-90.

19        Now, referring to land classification maps in Plaintiff's

20   Exhibit M-90 and M-102, it shows that the adjoining land on those

21   common boundaries to be Class VII in Parcel 60 and 63, and to the

22   best information available to me at the present time, your Honor,

23   all of the land in Parcel 61 is Class VII and non-irrigable.

24   BY THE MASTER:

25        Q   Are there any streams traversing any portion of Parcel

14b

1    61?

2        A   No, sir.   That is up in the headwaters near the divide

3    on the eastern boundary of the De Luz watershed, and the little

4    gullies that cross this property as shown by the contours on

5    Plaintiff's Exhibit M-68 are in the nature of headwaters.

6        Q   What would be the nature of any underground water

7    sources on this property?

8        A   Any underground water on this property, your Honor,

9    would be in my opinion vagrant, percolating, and not a part of

10   the De Luz stream system.

11       Q   Is there any present use of water on this property to

12   your knowledge?

13       A   Not to my knowledge, your Honor.

14       THE MASTER:   Off the record.

15       (Discussion off record.)

16       THE MASTER:   Back on the record.

17       Now, Mr. and Mrs. Fredy have entered the courtroom since

18   the beginning of the session this morning and are now present,

19   and we will therefore proceed to consider Parcel 16 which is

20   owned by them.

21       Lt. Miller, I believe you have an engineering report on

22   this property to be introduced?

23       LT. MILLER:   That is correct, your Honor.   I will ask the

24   Clerk to mark this Plaintiff's Exhibit M-121 for Identification.

25       I will hand Plaintiff's Exhibit M-121 for Identification

15b

1  to Mr. and Mrs. Fredy for their examination, and to Mr. Sachse

2  for his.

3  Colonel, I will hand you Plaintiff's Exhibit M-121 for

4  Identification and ask you if that is an engineering report that

5  was made under your direction and supervision?

6  THE WITNESS:  It is.

7  LT. MILLER:  At this time, your Honor, I submit into

8  evidence--or, offer into evidence Plaintiff's Exhibit M-121 for

9  Identification as Plaintiff's Exhibit  M-121.

10  THE MASTER:  That will be received in evidence as Plain-

11  tiff's Exhibit M-121.

12  LT. MILLER:  Now, Colonel, would you step to Plaintiff's

13  Exhibit M-32 and place a red cross in the parcel that is covered

14  by that engineering report?

15  THE WITNESS:  Plaintiff's Exhibit M-121, the report of

16  De Luz watershed Parcel No. 16, that parcel is delineated on

17  Plaintiff's Exhibit M-32 with the number 16 encircled within the

18  outer limits of the property.  And I will mark that Parcel 16 on

19  Plaintiff's Exhibit M-32 with a red X.

20  LT. MILLER:  I have no further questions, your Honor.

21  BY THE MASTER:

22  Q  Well, Colonel Bowen, can you refer to Exhibit M-121 and

23  advise me what the report shows, and what your information is

24  with reference to the soil classification of the property in this

25  parcel, and the nature of the water supply?

16b

1    A  Yes, your Honor.  Referring to the land classification

2  map contained in Plaintiff's Exhibit M-121, I call attention to

3  the intermittent stream, which is also shown on Plaintiff's

4  Exhibit M-68, rising in the Santa Rosa Grant of the Vail Ranch

5  and flowing in a southwesterly direction through the southeast

6  corner of Parcel 16, leaving the southern boundary of Parcel 16,

7  flowing through Parcel 15, thence through Parcel 30, that being

8  the same intermittent stream previously testified to that flows

9  only during and immediately following periods of high runoff--

10  or, high precipitation and runoff.

11    And on the land classification map contained in Plaintiff's

12  Exhibit M-121 indicates that the entire area of the parcel is

13  Class VII and non-irrigable.

14    The ground waters under that parcel, your Honor, of Parcel

15  16, as shown in Plaintiff's Exhibit M-121, are vagrant and perco-

16  lating, not a part of the stream system.

17    The geology section on page 1 of Plaintiff's Exhibit M-121

18  indicates the entire property is underlain by Woodson Mountain

19  granodiorite.

20    Page 2 of Plaintiff's Exhibit M-121 under engineering in-

21  dicates no water sources developed on the property at the present

22  time.

23    .THE MASTER:  Now, Mr. and Mrs. Fredy, do you have any

24  questions that you wish to ask Colonel Bowen concerning this re-

25  port?

17b

1    MR. FREDY:  Well, actually he stated that it is Class VII

2  land and it is not irrigable, but of course I disagree, like

3  a lot of other people do.

4    THE MASTER:  Well, I mean of course you have the oppor-

5  tunity to testify as a witness.  My question now is are there

6  any questions that you wish to ask him with reference to the

7  nature of his investigation, or anything else?

8    MR. FREDY:  No.

9    LT. MILLER:  No questions.

10    THE MASTER:  Mr. Sachse, any questions that you wish to

11  ask?

12    MR. SACHSE:  No questions.

13    THE MASTER:  Well, Colonel Bowen, I suggest that you step

14  down.  And, Mr. Fredy, if you wish to testify then you may take

15  the witness chair.

16

17                    AUGUSTINE FREDY,

18  called as a witness in his own behalf, being first duly sworn,

19  testified as follows:

20

21                    DIRECT EXAMINATION

22    THE MASTER:  Now, you may state anything which you desire,

23  Mr. Fredy, as to the reasons why you believe that this classifi-

24  cation is erroneous, or add any additional facts which you have;

25  or you may state what you wish to use the property for, what

18b

1    uses you are now making of it, or anything else relating to the

2    property.

3    THE WITNESS:  Well, the only question I have is how much

4    water can I take off of that property.

5    THE MASTER:  Well, of course, that is the ultimate fact

6    to be decided in this case, and that would have to be based upon

7    the testimony that is presented.  So if there are reasons why

8    you think the land should not be classified as Class VII can you

9    tell me what they are?

10   THE WITNESS:  Well, it has a potential, I mean, for avo-

11   cados.  And it is frostless, and there is about five acres on

12   that one hillside there that can be planted.

13   BY THE MASTER:

14   Q  Well, now, referring to Exhibit M-121, and to the

15   aerial photograph in the back, can you indicate on the photo-

16   graph--that is, using the copy which has been introduced in

17   evidence--the area which you believe can be irrigated?

18   A  Well, the southwestern portion here.

19   Q  Well, can you mark it with this red pencil?

20   A  On this map here?

21   Q  Yes.

22   A  This general area here.

23   Q  Maybe a black pencil would show up better.

24   A  This is quite a slope, but I believe it can be planted

25   and the soil kept on the hill.

19b

1     Q  That is you have marked with a black pencil in the

2  southeast corner--

3     A  No, that is the southwest corner.

4     Q  --southwest corner an area which you believe could be

5  planted to avocados?

6     A  Yes, sir.

7     Q  What is the nature of the soil in that area?

8     A  Well, according to their soil chemist it was very

9  erodible, and it was fair soil.  But if it was to be planted

10  it would have to be watched very closely.

11     Q  Now, do you disagree with the statement, you said

12  according to the soil chemist it was very erodible?  Is that a

13  fair statement?

14     A  Yes, that is a fair statement.

15     Q  Well, now, do you believe that any portion of the pro-

16  perty other than this area which you have indicated in the south-

17  west corner is irrigable?

18     A  Well, that depends on how you look at it.  I would say

19  yes.

20     Q  Well, what other portion then?

21     A  Well, just above that where I am indicating with my

22  pencil.

23     Q  Can you mark in the other area with your pencil?

24     A  This area right here.

25     Q  Well, can you mark that heavily enough so as to make at

20b

1    least an impression on the photograph?  Well, you have now marked

2    an oval or a circular area to the northeast of the area previously

3    marked?

4         A  Right.

5         Q  And do you believe that is also irrigable?

6         A  Yes, sir.  The soil there is not as good as it is on

7    that one hillside, but it can be planted.

8         Q  Is there anything else that you--any other portion of

9    this property which you believe is irrigable?

10        A  No, that is all that can be planted.

11        Q  Now, do you know of any sources of water on the pro-

12   perty?

13        A  Yes, we have a spring on the property which has never

14   dried up, it is down in Rock Creek itself.

15        Q  Can you indicate that with an X on the map?

16        A  Yes, sir.  It is approximately right in there.

17        Have you been down there?

18        COLONEL BOWEN:  Yes.

19        THE WITNESS:  Have you noticed that seepage we have coming

20   up there?

21        COLONEL BOWEN:  Yes.

22   BY THE MASTER:

23        Q  You have indicated the location of the spring near the

24   southeastern boundary of the area previously marked on the map?

25        A  Yes.

21b

1    Q   During what portion of the year does that spring flow?

2    A   That spring has always held moisture and always had

3  a certain amount of water in it.

4    Q   Do you have any idea of the amount of flow?

5    A   No, I don't.

6    Q   Well, now, is there any other testimony that you wish

7  to offer with reference to your property?

8    A   No, I guess not.

9  THE MASTER:  Mrs. Fredy, do you wish to offer any testimony?

10  MRS. FREDY:  No.

11  THE MASTER:  Very well then, that will be all.

12

13                    ALLEN C. BOWEN,

14  recalled as a witness, having been previously sworn, testified

15  as follows:

16

17                   CROSS-EXAMINATION

18  BY THE MASTER:

19    Q   Colonel Bowen, I would like to ask you to come back

20  and state why in your opinion the portion Mr. Fredy believes is

21  irrigable is not irrigable, what consideration led you to

22  classify that as Class VII land?

23    A   The area delineated by Mr. Fredy with an oval boundary

24  on the land classification map contained in Plaintiff's Exhibit

25  M-121 is extremely steep and, as indicated by the white dots

22b

1   throughout the area on the photograph, covered with the typical

2   rounded huge granite boulders that are typical of the Woodson

3   Mountain granodiorite.

4        The slopes are 45%, by my observation personally yesterday,

5   and many of them go much over 45%.  The symbols shown in that

6   area, the fractional symbol in the northern part of the parcel

7   on land classification map contained in Plaintiff's Exhibit M-121,

8   indicates a 45% slope.

9        The 4 in the enumerator fractional symbol indicates a

10  soil depth that is shallow, with many rock outcrops.  These

11  rock outcrops are evident on the photograph, as I previously

12  testified.

13       And the erosion symbol 3 indicates that a substantial loss

14  of soil has occurred in the past.

15       Now, with reference to the southwest corner, which Mr.

16  Fredy indicated by a rectangle, including the area separately

17  designated on the land classification map in Plaintiff's Exhibit

18  M-121, is as indicated by the symbol of lesser slope, being

19  35%; that is in the lower range of the slopes generally found in

20  Class VII land.  The soil depth is a little greater, but it is

21  characterized by a stony condition, and also the erosion symbol

22  indicates a substantial loss of top soil in the past.

23       Mr. Fredy has planted some trees out there on a site which

24  he bulldozed out apparently for a house, I observed a pepper

25  tree, I believe an ash, and a couple of eucalyptus.  There is

2540

23b

1    no doubt but what they will grow if they are kept watered. But

2    in my opinion that developement into commercial avocado produc-

3    tion would be uneconomic and unfeasible.

4        Q  Now, this property lies to the south of a portion of

5    the Matthews property. That is correct, isn't it?

6        A  Yes, sir. The northerly boundary of the Parcel 16 is

7    common to a portion of the southerly boundary of Parcel 14, which

8    is Mr. Matthews' property.

9        Q  Well, now, Mr. Matthews has planted avocados on the

10   property which you classified as Class VII. That is correct,

11   is it not?

12       A  Yes, sir.

13       Q  Now, how does the Fredy property which you have classi-

14   fied as Class VII compare to the Matthews' property which you

15   classified as Class VII and on which avocados are now growing?

16       A  May I see that exhibit, please?

17       Q  That would be M-41-- No, M-85.

18       A  Now, the area-- Referring to Plaintiff's Exhibit M-85,

19   and the terraced area which Mr. Matthews has placed in avocados,

20   it is included within the same body of Class VII land which

21   occupies the easterly portion of the Matthews' property, and

22   extends southerly into the Fredy property, but the part that is

23   in avocados on Mr. Matthews' land doesn't have the tremendous

24   outcroppings of rock which are typical of the higher eastern

25   portion of the Matthews' property and the bulk of the Fredy

24b

1   property.

2        Q   How does the slope compare?

3        A   The slopes are comparable, your Honor, ranging 40 to

4   45% and more.

5        Q   Except for the rock outcrop what is the depth of soil

6   comparison between the Matthews' Class VII property and the

7   Fredy Class VII property?

8        A   Well, the symbol indicates the depth of the soil to

9   be approximately 10 to 20 inches throughout that area, your

10  Honor, on both the Matthews and the Fredy property.

11       Q   Would it be fair to state then that the only difference

12  between the Matthews and the Fredy property then is that in your

13  opinion the Fredy property has the greater amount of rock out-

14  crop?

15       A   There is much of the Class VII area on the Matthews'

16  property, your Honor, that lying easterly of the pond as shown

17  on the land classification map in Plaintiff's Exhibit M-85,

18  which has a tremendous coverage of rock outcrops and differs in

19  that respect rather markedly from the slope where the avocados

20  are planted.   And that easterly portion of the Matthews' pro-

21  perty is almost identical in relief and character of outcrop-

22  pings and depth of soil to the Fredy property.

23       Q   Well, but then the difference between the easterly

24  portion of the Matthews' property and the Class VII property

25  which is planted is primarily in the rock outcroppings?

25b

1          A  Yes, your Honor.

2          THE MASTER:  Do you have any further questions now, Mr.

3     Fredy?

4          MR. FREDY:  Well, your Honor, at one time the Matthews'

5     property was completely covered with this outcropping that you

6     are talking about.

7          THE MASTER:  Well, you may, of course, make any statement

8     that you wish to that effect, but I was wondering at the pre-

9     sent time if you have any questions of Colonel Bowen?

10         MR. FREDY:  No, sir.

11         THE MASTER:  Now, you may proceed to make any statements

12     that you wish.

13

14                         AUGUSTINE FREDY

15     recalled as a witness, having been previously sworn, testified

16     as follows:

17

18                      REDIRECT EXAMINATION

19         THE WITNESS:  Well, as I said, at one time Matthews'

20     property was completely covered from one end to the other with

21     this outcropping of rock and, of course, he had heavy equipment

22     come in there and clear it off.

23     BY THE MASTER:

24         Q  Do you mean they hauled the rocks away?

25         A  Well, they bulldozed them off the property down into

26b

1  those canyons.

2      Q  How long ago was that?

3      A  Oh, anywhere from we will say eight years ago.

4      Q  Is there anything else you wish to offer?

5      A  No, sir.

6      THE MASTER:  Lt. Miller, do you have any questions?

7      LT. MILLER:  No, sir.

8      THE MASTER:  Mr. Sachse?

9      MR. SACHSE:  No, sir.

10      THE MASTER:  Well, then, I believe that will conclude

11  the testimony at least at this time on this parcel.

12      I notice Mr. Anderson arrived.

13      MR. SACHSE:  Could we take a short recess?

14      THE MASTER:  Yes, it is time for a recess, anyway, so we

15  will recess for ten minutes.

16      (Recess.)

17      (W.B. Dennis, Esq., now present in courtroom.)

18      THE CLERK:  Court is now in session.

19      THE MASTER:  I notice that Mr. Anderson has come in.

20  Mr. Sachse, do you wish to consider his report?

21      MR. SACHSE:  Yes, your Honor.  There is an engineering

22  report, if the United States will introduce it--

23      LT. MILLER:  We are prepared to introduce the report.

24      I will ask Colonel Bowen to take the stand.

25

ALLEN C. BOWEN

27b

1   recalled as a witness, having been previously sworn, testified

2   as follows:

3

4

5                           DIRECT EXAMINATION

6       LT. MILLER:  I ask the Clerk to mark this for Identifica-

7   tion.  I will hand Plaintiff's Exhibit M-122 for Identification

8   to counsel.

9       MR. SACHSE:  I have one.

10  BY LT. MILLER:

11      Q  Colonel, I will hand you Plaintiff's Exhibit M-122 for

12  Identification and ask you if that is a report that was made

13  under your direction and supervision?

14      A  It is.

15      LT. MILLER:  At this time, your Honor, we offer Plaintiff's

16  Exhibit M-122 for Identification into evidence as Plaintiff's

17  Exhibit M-122.

18      THE MASTER:  That will be received in evidence and so

19  marked.

20      LT. MILLER:  I will ask the Clerk to mark this on the

21  reverse, if he would, for Identification.

22      I will hand Plaintiff's Exhibit M-123 for Identification

23  to counsel for their examination.

24      Q  Colonel, I will hand you Plaintiff's Exhibit M-123

25  for Identification and ask you to state what it purports to

1    represent?

2        A   Plaintiff's Exhibit M-123 is a large reproduction of

3    a vertical aerial photograph number 4-0164, dated 29 March,

4    1955.

5        This enlarged photograph is used as a field sheet for

6    soil surveys.

7        Q   Colonel, are the soil classifications for Parcels 21

8    and 23 shown on Plaintiff's Exhibit M-123 for Identification?

9        A   They are.

10       LT. MILLER:  At this time, your Honor, I offer into evi-

11   dence Plaintiff's Exhibit M-123 for Identification, but request

12   leave of the Court to substitute a photographic representation

13   of the portion of this exhibit which covers Parcels 21 and 23.

14       MR. SACHSE:  There is no objection.

15       THE MASTER:  This will be received in evidence then as

16   Plaintiff's Exhibit M-123, and permission granted to make the

17   suggested substitution.

18       Might I ask if this is actually a photo of the same type

19   as the series M-66?

20       THE WITNESS:  Yes, your Honor.

21       THE MASTER:  It was taken at the same time with the M-66

22   series?

23       THE WITNESS:  At approximately the same time, the same

24   year and the same time of the season, your Honor.

25

2346

29b

BY LT. MILLER:

Q   Colonel, directing your attention to Plaintiff's
Exhibit M-122, which purports to be an engineering report on
Parcel 21, could you mark on Plaintiff's Exhibit M-32 the area
covered by that report?

A   The parcel reported on in Plaintiff's Exhibit M-122
is delineated on Plaintiff's Exhibit M-32 with the number 21
encircled contained within the outer limits of the property.
With a red pencil I will mark an X indicating the location of
that parcel on Plaintiff's Exhibit M-32, it being in the easterly
portion of the De Luz Creek watershed, and the northern boundary
is common to the Santa Rosa Grant part of the Vail Ranch, which
is also the Riverside County line.

Q   Now, directing your attention to page 2 of Plaintiff's
Exhibit M-122, are the land classifications shown on that page
taken from the aerial photo which has been introduced as M-123?

A   They are.

LT. MILLER:   I will ask the Clerk to mark this for Iden-
tification.   I will ask that that be marked as Plaintiff's
Exhibit M-44B for Identification.

I will hand Plaintiff's Exhibit M-44A to counsel for their
examination.

Q   Colonel, I will hand you Plaintiff's Exhibit M-44A for
Identification and ask you to state what it purports to repre-
sent.

30b

1        A  Plaintiff's Exhibit M-44A is a tabulation of the acre-

2   age of various classes of land found on Parcel 23, De Luz Creek

3   watershed.

4        These acreages of land classes were taken from the parcel

5   as shown on Plaintiff's Exhibit M-123.  In addition to the

6   tabulation giving the acreage of land by classes, and additional

7   table indicating the type of crops and the future potential

8   water use is also contained on Plaintiff's Exhibit M-44A.

9        Q  I will hand you Plaintiff's Exhibit M-44 and ask you

10  if that is not an engineering report on Parcel 23 as shown on

11  Plaintiff's Exhibit M-32?

12       A  It is.

13       Q  You find therein a tabulation of the irrigable acreage

14  and potential water use for Parcel 23, do you not?

15       A  Yes, contained on page 2 of Plaintiff's Exhibit M-44

16  there is such a tabulation.

17       Q  Plaintiff's Exhibit M-44A for Identification purports

18  to show that same information?

19       A  Yes, sir.

20       Q  Is Plaintiff's Exhibit M-44A for Identification the

21  correct tabulation, in your opinion?

22       A  Yes, sir.

23       LT. MILLER:  At this time, your Honor, I offer into evi-

24  dence Plaintiff's Exhibit M-44A for Identification as Plaintiff's

25  Exhibit M-44A.

31b

1    MR. SACHSE:  It is understood that that is to be a re-

2  placement for page 2 in M-44?

3    LT. MILLER:  I don't believe we can replace it, but it

4  should be placed in there together with page 2 that is already

5  in there.

6    THE MASTER:  Yes.  This will be received in evidence as

7  Plaintiff's Exhibit M-44A, and it is understood that to the

8  extent that the information given on M-44A is different than

9  the tabulation on page 2 of Exhibit M-44, Exhibit M-44A super-

10  cedes and corrects Exhibit M-44.  Is that correct?

11    LT. MILLER:  That is correct, your Honor.

12    Did the Court indicate that that would be received into

13  evidence?

14    THE MASTER:  Yes, it is received.

15    LT. MILLER:  I have no further questions, your Honor.

16    MR. SACHSE:  Before I examine Colonel Bowen, Lt. Miller

17  do I understand that the photograph, the large aerial, that you

18  have just introduced, M-123--

19    THE MASTER:  It has been identified, but I am not certain

20  it has been introduced.  It will be received as Plaintiff's

21  Exhibit M-123.

22    MR. SACHSE:  Is it intended that a portion of that photo-

23  graph replace or supercede the present sketch of property

24  classifications found in Exhibit M-44?

25    LT. MILLER:  That is correct, your Honor, it does cover

32b

1   the same area.

2       And I believe I should ask Colonel Bowe if this is not

3   the correct delineation of the land classifications in his

4   opinion.   And with your permission I will do so.

5       Q  Colonel, directing your attention to Plaintiff's

6   Exhibit M-123 and the portion which covers the area that is

7   marked Parcel 23 on Plaintiff's Exhibit M-32, is that a more

8   correct delineation of the land classifications for Parcel 23

9   than that shown in the engineering report which has heretofore

10  been introduced as Plaintiff's Exhibit M-44?

11      A  It is.

12      LT. MILLER:   No further questions.

13

14                    CROSS-EXAMINATION

15  BY MR. SACHSE:

16      Q  Colonel Bowen, these two exhibits, M-122 and M-44

17  cover what is now a single ownership, Mr. John Anderson.   Is

18  that correct?

19      A  That is my understanding, yes, sir.

20      Q  And in so far as any streams appear, intermittent

21  stream symbols appear on either of these two parcels, M-21 or

22  23?

23      THE MASTER:   Do you mean Parcel 21 or 23?

24  BY MR. SACHSE:

25      Q  21 or 23.   How would you characterize those streams?

33b

1    A   They are intermittent streams flowing only during

2    and immediately following periods of high precipitation and

3    runoff.

4    Q   Generally speaking--  Withdraw that.

5    The waters found underground on Parcels 21 and 23, as

6    distinct from any surface runoff, how would you characterize

7    those underground waters?

8    A   In my opinion they are vagrant, percolating, and

9    not a part of the De Luz stream system.

10   MR. SACHSE: Your Honor, on behalf of Mr. Anderson, we

11   will accept the delineations in the two engineering reports of

12   the irrigable acreage and land classifications as presented by

13   the United States on Exhibits M-122 and M-44, as corrected.

14   And I have no further questions.

15   I have not appeared--  I think Mr. Anderson is in pro per

16   up to now.  For convenience of the United States, and so they

17   will know how to serve, and so on, if it can be shown that I

18   am appearing in behalf of Mr. John Anderson, and future service

19   can be made on me.

20   THE MASTER:  My records indicate that Mr. Anderson,

21   Donald Anderson, has not actually filed any answer or made

22   any technical appearance either in pro per or otherwise.  There

23   was an answer filed on Parcel 23.

24   MR. SACHSE:  By Doville.

25   THE MASTER:  By Dodge, and another answer filed by Doville.

34b

1   There has been no technical answer filed on Parcel 21.

2          MR. SACHSE:  What would your Honor prefer?  I would be

3   happy to file a formal answer, if you like.

4          THE MASTER:  I think it might be well, to clear up the

5   record, to file an answer.

6          MR. SACHSE:  I will cover them both.

7          THE MASTER:  Yes, for both Parcel 21 and Parcel 23.

8          MR. SACHSE:  I will do that.  I have no further questions

9   of Colonel Bowen.

10         THE MASTER:  Mr. Dennis?

11         MR. DENNIS:  No questions.

12  BY THE MASTER:

13         Q  Colonel Bowen, what present use if being made on either

14  Parcel 21 or on Parcel 23?

15         A  Parcel 21, your Honor, is reported in Plaintiff's Exhibit

16  M-122, there are no present developed uses on the property.

17         On Parcel 23, as reported in Plaintiff's Exhibit M-44,

18  there is development, your Honor.  The report contained in

19  Plaintiff's Exhibit M-44 states that there are no surface di-

20  versions on the property, but since the preparation of this

21  report an earth filled dam has been constructed.

22         In referring to Plaintiff's Exhibit M-68, the earth filled

23  dam is east of the road junction which was shown in the approxi-

24  mate center of Parcel 23, and the Santa Margarita truck trail

25  continues on from that junction in a southwesterly direction,

35b

1    and the road into the ranch house branches off in a northeasterly

2    direction.

3        And on the intermittent stream, which is symbolized on

4    Plaintiff's Exhibit M-68, as traversing Parcel 23 from the south-

5    east to the northwest where it enters Parcel 21, on that stream

6    is an earth filled dam which I observed yesterday.

7        The reports in Plaintiff's Exhibit M-44 at the time of

8    the report were four shallow dug wells, and water was pumped

9    from those wells and distributed to the irrigated area of the

10   property.  At the time of the report the Dovilles--which,

11   incidentally, was February, 1953--the Dovilles were irrigating

12   about one acre of alfalfa.

13       Although the report does not state it in the irrigation

14   section, in the history section, contained on page 1 of the

15   report, Plaintiff's Exhibit M-44, it indicated about five acres

16   of lemons and three acres of walnuts were irrigated in the past.

17   The lemons are still there, as I observed yesterday, your Honor.

18   No information was available at that time from the owners re-

19   garding the water use.

20       THE MASTER:  I notice the answers previously filed make

21   no allegation with reference to current usage of water.

22       Mr. Sachse, do you have any further questions?

23       MR. SACHSE:  No questions, your Honor.

24       LT. MILLER:  No questions.

25       MR. DENNIS:  No questions.

36b

1    THE MASTER:  That is all, Colonel Bowen, as far as this

2  property is concerned.

3    I notice that Miss Click is in the courtroom.  Do you

4  wish to present any evidence, Miss Click, with reference to your

5  property, Parcel 31?

6    MISS CLICK:  Well, I would like to show where the land is

7  at.

8

9                      VERIA V. CLICK

10  called as a witness in her own behalf, being first duly sworn,

11  testified as follows:

12

13                     DIRECT EXAMINATION

14  BY THE MASTER:

15    Q  Now, you own, as I understand it, with your husband--

16    A  My mother and I.

17    Q  --Parcel No. 31, shown on the map near the De Luz

18  School as shown on Exhibit M-68?

19    A  Yes, we own that.

20    Q  Now, is there anything which you wish to state with

21  reference to your use of water on that property?

22    A  Yes.  There is two springs on that place, and that is

23  the only flow of water in that creek during the dry season.

24  And we pump water from that stream for irrigation, and these

25  springs supply the water.

37b

1        And there is wells, there has been wells on the place,

2   there is wells on it now.

3        Well, we own on both sides of the road there, which I

4   don't know--does this show the road?

5        Q   Well, the ownership of the land isn't questioned, it

6   is just a question of--

7        A   It is the water rights you want to know about?

8        Q   Yes.  What use do you make of water?

9        A   We use it for domestic and irrigation and domestic use.

10   And if you want to know what that land will grows there, well,

11   it was in walnuts until the fire burned it up.

12       Q   How many acres were in walnuts?

13       A   There were about 30 acres in walnuts.  But there is

14   nothing left there now, the fire burned it up. So it would grow

15   alfalfa, any kind of fruit, walnuts; part of it will grow

16   avocados, lemons and oranges, because it is on a slope.  There is

17   85 acres on one side, and 16 acres on the other side of the road.

18       Q   And your present water supply is from these wells and

19   springs?

20       A   And the creek.  See, the springs supply the water, but

21   it flows in Rattlesnake Creek; but above that there is no water,

22   it just comes from these springs.  We own the land and pay the

23   tax on the land on which the water rises and flows.

24       Q   Can you tell me how much water you use for how long you

25   irrigate, how many acres you irrigate?

38b

1      A  No, I can't tell you that, I don't know.  We just use

2   the water we need.

3      Q  About how many acres are planted now?

4      A  Well, as I told you, the walnuts burned up.

5      Q  Yes, but I mean--

6      A  Nothing.  Just around the house.  I guess now about

7   five acres around the house is all we had left.

8      THE MASTER:  Lt. Miller, do you have any questions?

9      LT. MILLER:  Well, your Honor, I would like to call to

10  the Court's attention the fact that Colonel Bowen has testified

11  with respect to this property.  The United States has not made

12  an engineering report concerning the property.  However, on the

13  14th of July, Colonel Bowen in response to questions by your

14  Honor did give testimony with respect to it.  And I think that

15  such testimony should be made known to Miss Click, and I do

16  have a copy of the transcript.  I don't know what the correct

17  procedure would be, but I believe it would be well to either

18  read it back while Miss Click is here so that she may see if

19  there is any question she has with respect to it, or to allow

20  her to read it and then see if she desires to cross-examine

21  Colonel Bowen with respect to it.

22     THE MASTER:  Well, I think the thing to do might be to

23  hand a copy of the transcript to Miss Click so that she may

24  read that, and then she will have an opportunity to ask Colonel

25  Bowen any questions she desires.  Do you have your copy of the

39b

1    transcript there?

2        LT. MILLER:  Yes, I do, your Honor.  I think the testimony

3    covers a few pages, and perhaps she would want to do it at a

4    recess rather than right at this moment.

5        THE MASTER:  Well, I am wondering, Miss Click, if you

6    could examine the transcript which Lt. Miller will hand you,

7    that is testimony which Colonel Bowen has given concerning your

8    property, and while you are doing that we might proceed with

9    some other testimony here.  Then after you have examined that

10   if you want to ask Colonel Bowen any questions or if you want

11   to say anything in answer to what he has said you will have

12   that opportunity.  All right.

13       LT. MILLER:  Your Honor, one further matter.  This morning

14   the United States introduced a decree which covered the property

15   shown as Parcel 31 and which is owned by Miss Click and her

16   mother, and that is Plaintiff's Exhibit M-120.  And in view of

17   the statements in the answer of Mrs. Click and Miss Click I

18   believe this should be brought to the attention of the witness.

19   And again, if she desires to make any statements with respect to

20   that that she would have the opportunity to do so.

21       THE MASTER:  Well, I will show you this Exhibit M-120

22   which has been introduced, which purports to be a certified copy

23   of a judgment rendered in an action brought by L. G. Click and

24   Alma F. Click, husband and wife, and Veria V. Click, plaintiffs,

25   against the Seaboard Title Company and Seaboard Surety Corporation.

40b

1   Now, this judgment was apparently rendered by Judge Gordon

2   Thompson on August 31, 1937.  Are you familiar with that?

3   THE WITNESS:  I had no chance to get to the Court, and

4   that was based upon that map which is a fraud.

5   THE MASTER:  I see.  Well, this judgment has been intro-

6   duced in evidence.  Now, to the extent that you wish to contro-

7   vert this you will have the chance to do so.

8   THE WITNESS:  Well, this--  I had no chance to get to the

9   Court when this was on, and this map No. 532 made by James

10  Singer is a fraud.  I have had his files examined in my presence,

11  and the manager of the company where he had his office said it

12  was a fraud and absolutely worthless, it wasn't worth the paper

13  it was written on.  And I had Mr. Freeland in San Diego,

14  engineer, examine it, and he said it is the worst map he ever

15  saw put on record, it is worthless.

16  BY THE MASTER:

17  Q  Do you have any information to the effect that this

18  judgment was not rendered, however, by the Court?

19  A  That I don't know.

20  THE MASTER:  Well, now, I would suggest then that you

21  examine the transcript which Lt. Miller will give to you, and

22  you may take a seat in the rear of the courtroom and examine that,

23  and then offer any further evidence you may wish.

24  MR. DENNIS:  Your Honor, I have one question I would like

25  to ask.

41b

1                           CROSS-EXAMINATION

2    BY MR. DENNIS:

3        Q  You referred to Rattlesnake Creek, I think?

4        A  That is Rattlesnake Creek.

5        Q  That is a new name to me.  Can you tell me which

6    Rattlesnake Creek is?

7        A  I can show you.

8        THE MASTER:  Can you show it on this M-68?

9        THE WITNESS:  This is Rattlesnake Creek, see, that little

10   green line there, that is Rattlesnake Creek.

11   BY MR. DENNIS:

12       Q  You are showing what we have been ordinarily calling

13   the East Fork of De Luz Creek?

14       A  Yes, but the real name is Rattlesnake Creek.

15       THE MASTER:  But it is the same stream, Mr. Dennis, that

16   has previously been referred to in this case as the East Fork

17   of De Luz Creek.

18       THE WITNESS:  I will show you here.

19       THE MASTER:  I think that answers Mr. Dennis's question,

20   Miss Click.

21       LT. MILLER:  Your Honor, before Miss Click retires to

22   look at the transcript I would like to have this map marked for

23   Identification.

24       THE MASTER:  Is that Exhibit M-124?

25       LT. MILLER:  Yes, sir, your Honor.

42b

1      I will show Exhibit M-124 for Identification to counsel

2      MR. SACHSE:  We have got a copy before us, I believe.  Yes,

3  that is the same one.  That is the one you want.

4      LT. MILLER:  Your Honor, with your permission I will have

5  this map marked M-124.  The other one was not inked in as this

6  one is, which I will submit.

7      THE MASTER:  Very well.

8      LT. MILLER:  Your Honor, prior to offering this into

9  evidence I would like to state its purpose.  It reflects the

10  property descriptions of deeds and patents and decrees which

11  have heretofore been introduced into evidence, in so far as

12  those descriptions would appear to produce a severance in the

13  boundaries of the various parcels on the  De Luz Creek ownership

14  map.  That is the red line shown in Parcel 87 is a portion of

15  the property described in the patent which has been introduced

16  as Plaintiff's Exhibit M-115.

17      Similarly with respect to Parcel 5, the red lines show

18  the limits of the property described in the Defendants' Exhibits

19  MD-AA, and the various deeds being shown by their book and page

20  numbers underneath the symbol for the defendants' exhibit.  And

21  I particularly point out at this time the red line which goes

22  through Parcel 31, which Miss Click has testified to be the

23  property of herself and her mother, and indicate that thereon

24  it shows that patent introduced as M-97 would apparently cause

25  a severance in a portion of that property.  I do not intend to

43b

1   offer that at this time, your Honor, primarily because it does

2   affect Miss Click's property, and I believe she should have an

3   opportunity to examine the patent M-97 and also to examine the

4   map at her leisure before the offer is made.

5      THE MASTER:  Well, do you understand that, Miss Click?

6   In other words, what Lt. Miller has said is that it appears

7   that the property that you now own was not all acquired under

8   the same title at all times--that is, that it was at one time in

9   two separate parcels, or more.   And this is offered, this

10  Exhibit M-97, as establishing the fact that regardless of the

11  fact that it may all be owned as one parcel now that at some

12  time in the past it was not all owned as one parcel?

13     THE WITNESS:  Well, it has all been one parcel since we

14  owned that.

15     THE MASTER:  Yes.  That is not contested, is it?

16     LT. MILLER:  No, your Honor, only that this patent when

17  it was issued was only to a portion of this property, and the

18  remaining portion was originally patented under another instru-

19  ment.

20     THE MASTER:  Yes.  I would suggest that you examine this

21  patent and the portion of the transcript that Lt. Miller will

22  hand to you, and if you want to examine M-120 you may do so,

23  and then if you have anything you wish to say in response to

24  that then you may do so.

25     LT. MILLER:  May I say something else?  It just occurs to

44b

1   me that I have something else that should be marked before

2   Miss Click leaves the stand, also.

3        I will ask the Clerk to mark this for Identification.

4   And I will hand Plaintiff's Exhibit M-125 for Identification to

5   the defense counsel for their examination.

6        Your Honor, may I make a statement with respect to M-125

7   for Identification, also?

8        It is a list of descriptions tied into the De Luz watershed

9   ownership map showing the descriptions that were used to plot

10  in the various parcel boundary lines.

11       This was prepared pursuant to request of the Court, and

12  following the directions of the Court the description of the

13  lands of the Vail Company and the United States have not been

14  placed upon that exhibit, and in the cases where deeds have

15  been introduced the exhibit makes reference to the exhibit num-

16  ber of the deed.

17       And I particularly direct the Court's attention and Miss

18  Click's attention to the fact that the description of Parcel 31

19  as shown on Plaintiff's Exhibit M-125 is that it is the descrip-

20  tion of the decree which has been introduced as Exhibit M-120.

21       And I do offer, your Honor, Plaintiff's Exhibit M-125

22  for Identification into evidence as Plaintiff's Exhibit M-125

23  at this time.

24       THE MASTER:   That will be received in evidence as Plain-

25  tiff's Exhibit M-125.

45b

1    Now, is there any documents which you intend to submit

2  or offer into evidence which you believe should be submitted to

3  Miss Click for examination?

4    LT. MILLER:  No, your Honor, that is all.

5    THE MASTER:  Do you wish to examine these documents?  And

6  then after you have done that, if you wish to make any further

7  statements or offer any further testimony you may do that.

8    Lt. Miller, can you give her the portion of the transcript

9  and indicate the pages?

10    LT. MILLER:  Yes, your Honor.

11    Well, your Honor, while we are introducing exhibits I

12  might as well complete the ones that the United States has today,

13  and ask that the Clerk mark these for Identification.

14    I will hand Plaintiff's Exhibits M-126 for Identification,

15  M-127 and M-128 for Identification to counsel for their examin-

16  ation.

17    MR. DENNIS:  No objection.

18    LT. MILLER:  I offer into evidence Plaintiff's Exhibits

19  M-126, 127 and 128.

20    THE MASTER:  These will be received in evidence as Exhibits

21  M-126, 127 and 128, respectively.

22    LT. MILLER:  I have nothing further, your Honor.

23    THE MASTER:  Off the record.

24    (Discussion off record.)

25    THE MASTER:  Well, while Miss Click is examining the

46b

1  transcript maybe we could proceed with one of the parcels as

2  to which there has been no other testimony.

3     MR. DENNIS:  Your Honor, I wonder if this would be a good

4  time to make that statement relative to the De Luz watershed,

5  M-68, so we could have it in the record?

6     THE MASTER:  Surely.

7     MR. DENNIS:  I think it has been agreed between the

8  attorneys for the plaintiff and for the defendants who are

9  here that Colonel Bowen will place on a copy of M-68 the water-

10  shed of the East Fork of De Luz Creek, and that portion of

11  De Luz Creek below the confluence that drains directly into

12  De Luz Creek, as distinguished from the watershed of any tribu-

13  tary of De Luz Creek below the confluence of the East Fork at

14  some time prior to the time that we meet, so that we may intro-

15  duce that in evidence the next time we convene.

16     THE MASTER:  Do you understand, Colonel Bowen, exactly

17  what Mr. Dennis wishes you to do?

18     COLONEL BOWEN:  No, sir.

19     THE MASTER:  Will you explain it?

20     MR. DENNIS:  I wonder, Colonel Bowen, if you will place

21  on a copy of M-68 the watershed of the East Fork of De Luz

22  Creek the same as you did for the unnamed tributary that bisects

23  Parcel 55 when you placed it on Exhibit 33-F?  Do you recall

24  doing that?

25     COLONEL BOWEN:  Yes, sir, I would be delighted to place

47b

1    the watershed of the East Fork of De Luz Creek on a topographic

2    map.

3         MR. DENNIS:  And also that portion of the De Luz Creek

4    below the confluence of the East Fork that drains directly into

5    De Luz Creek.

6         LT. MILLER:  Do you mean Santa Margarita?

7         MR. DENNIS:  No, De Luz Creek.  In other words, you have

8    on the map De Luz Creek--  For instance, at this point, the

9    East Fork of De Luz Creek meets the stream, intermittent stream

10   which we have referred to as De Luz Creek.  And from that point

11   it continues to go down through the watershed as a single stream.

12   Now, you will notice from the contours that a portion of this

13   property drains directly into De Luz Creek, as distinguished

14   from that portion which would drain into Camps Creek, or into

15   Fern Creek, or Roblar Creek, or any other tributary of De Luz

16   Creek.  And what I want you to do is to place that portion of

17   the watershed that drains directly into De Luz Creek and not

18   into any tributary of De Luz Creek.

19        COLONEL BOWEN:  I don't understand that request, Mr.

20   Dennis.  Roblar Creek, Camps Creek, Fern Creek all flow into

21   De Luz Creek.

22        MR. DENNIS:  That is right.  And I want just that portion

23   of De Luz Creek that does not flow into Camps Creek--which is

24   not a part of the watershed of Camps Creek, Roblar Creek, or

25   Fern Creek, or any other tributary of De Luz Creek.

48b

1   THE MASTER:  Well, I suppose Colonel Bowen's trouble is

2   about the definition of the word tributary, that any water which

3   flows into De Luz Creek may be flowing into a tributary before

4   it gets into De Luz Creek.

5   MR. DENNIS:  I am sure of that, but that is a problem the

6   Master is going to have to meet.

7   MR. SACHSE:  If he doesn't call them creeks, he won't.

8   MR. DENNIS:  I think my request takes into consideration

9   that Colonel Bowen is going to have to determine, as far as his

10  judgment is concerned, or opinion, what are tributaries of

11  De Luz Creek and what are not tributaries of De Luz Creek.

12  LT. MILLER:  Your Honor, this has got me confused, too.

13  And I thought I understood what Mr. Dennis wanted when we had

14  spoken earlier.  May I suggest that we talk about it during

15  the noon recess, and he can restate it again so that Colonel

16  Bowen can go over the map with him?

17  MR. DENNIS:  I don't know that I can make it any plainer.

18  LT. MILLER:  I think when we discuss it informally we

19  can then, and it can again be stated in the record.

20  THE MASTER:  I think it is clear what Mr. Dennis wants.

21  At least I think I understand what Colonel Bowen's thought in

22  connection with it is, that it may be difficult to do what we

23  both know Mr. Dennis wants done.  Do you think I have correctly

24  stated your thoughts, Colonel Bowen?

25  COLONEL BOWEN:  Well, it is difficult, your Honor, to

49b

1    the extent that I am not sure I understand what Mr. Dennis

2    desires.

3         THE MASTER:  Off the record for a minute now.

4         (Discussion off record.)

5         THE MASTER:  Maybe you had better restate your request

6    for the record, Mr. Dennis.

7         MR. DENNIS:  All right.  I think it is agreed that Colonel

8    Bowen will place on a copy of M-68 the watershed of De Luz

9    Creek and its various tributaries.

10        THE MASTER:  Well, the watershed of De Luz Creek is al-

11   ready on M-68.  So you mean he will place on M-68 the subwater-

12   sheds of De Luz Creek?

13        MR. DENNIS:  Yes.

14        LT. MILLER:  And I think it is further agreed that this

15   has no binding legal effect, but is purely an indication of

16   subwatersheds?

17        MR. DENNIS:  That is right.  In other words, it is going

18   to be up to the Master to determine what is a water course,

19   and what are the watersheds and what are not.  But he will then

20   have something to refer to and see the area on whatever this

21   exhibit happens to be.

22        LT. MILLER:  Your Honor, it has been called to my atten-

23   tion that on M-68 the upper portion of the watershed is not

24   shown, and the United States would resolve that in whatever

25   manner the Court wishes.  And the westerly portion, that is

50b

1    correct.   Perhaps it would be better to put it on one of these

2    prints, Mr. Dennis, such as this M-32.

3        MR. DENNIS:   It would be satisfactory so far as I am

4    concerned to put it on M-32.

5        LT. MILLER:   We will face that problem when we come to

6    it, your Honor, if we have the understanding that we may put

7    it on either, whichever appears to be most convenient.

8        THE MASTER:   Yes.   I think possibly M-32 might be better,

9    but we will leave that to the discretion of Colonel Bowen after

10   he has worked out the details.

11       MR. DENNIS:   I think any map, so long as it shows the

12   various parcels and holdings in the De Luz Creek watershed.

13       THE MASTER:   Off the record.

14       (Discussion off record.)

15       THE MASTER:   Back on the record.

16

17                        VERIA V. CLICK

18   recalled as a witness, having been previously sworn, testified

19   further as follows:

20

21                    DIRECT EXAMINATION    (continued)

22   BY THE MASTER:

23       Q  Miss Click, you have now examined the transcript of

24   what Colonel Bowen testified to?

25       A  Yes, I have examined it, and there are some things in

51b

1    there I don't agree with.

2        Q  Will you please state what they are then?

3        A  This one states that L. G. Click--  My father was not

4    even living at that time.

5        Q  You are now referring to the certified copy of the

6    judgment?

7        A  Yes.  My father never owned any property there.  That

8    is one mistake.

9        And the description here is not according to our deed

10   and title.

11       Q  That is the description set forth in the judgment

12   M-120 you say is not the description in your deed?

13       A  No.

14       Q  Now, do you have a copy of your deed?

15       A  I have my deed right here.

16       Q  Do you wish to offer this in evidence?

17       A  Yes, that would be all right, I should think.

18       THE MASTER:  Very well.  Then this grant deed from

19   Jack Rissman and Elizabeth Rissman to Veria V. Click and Alma

20   F. Click will be received in evidence as MD-31.  Very well.

21       Q  Now, you claim title to the property described in this

22   deed?

23       A  Yes.

24       Q  All right.  Now, what other comments do you have to

25   make upon any of the exhibits or from the portion of the

2369

52b

transcript affecting your property?

A  I have-- Let's see.  Now, I have a map here that was made by an engineer, and I have his field notes.  Would you want that?

Q  Well, now, what does the map show?

A  It shows he surveyed, that was in '36.

THE MASTER:  Lt. Miller, do you care to examine this?

THE WITNESS:  Now, this is his field notes.  And this is the map that goes with the title of the property; this is the title, and this is the map that goes with the title.

BY THE MASTER:

Q  Well, the description in this title of policy insurance is the same as in the deed?

A  Absolutely.

Q  I don't think there is any reason to put both of them in.

A  That is the field notes, and that is the survey I had made of Section 32.

THE MASTER:  Lt. Miller, do you have any objection to the introduction of these documents into evidence?

LT. MILLER:  Well, your Honor, I don't believe that we do.  I rather doubt their relevancy.  I don't know if there is a date appears on any of these.

BY THE MASTER:

Q  Can you state when the survey was made?

53b

1      A  Yes, the date is on this.  May the 28th, 1934.

2          LT. MILLER:  I don't think it is relevant, but we don't

3    have any objection to it, your Honor.

4          THE MASTER:  Mr. Dennis and Mr. Sachse, do you have any

5    objection to the introduction of these documents?

6          MR. DENNIS:  No objection.

7          MR. SACHSE:  No objection.

8          THE MASTER:  Then the map will be received as Exhibit MB-31.

9          THE CLERK:  The other one should have been MA-31.

10         THE MASTER:  The deed is MA-31.  The map will be MB-31.

11         Q  And the notes of Mr. Frank P. Gowen?

12         A  Yes.

13         THE MASTER:  The surveyor.  That will be MC-31.

14         Q  Now, you state that the notes, Exhibit MC-31, are the

15   notes which the surveyor made in preparing the map which is MB-31?

16         A  Yes.

17         Q  And that this was made on May 28, 1934?

18         A  Yes.

19         Q  Very well.  Now is there anything else which you wish

20   to offer into evidence, or do you have any comments upon Colonel

21   Bowens  testimony?

22         A  Yes.  Here where he states he is not aware of any springs

23   on the property.  There is two springs on the property.

24         Q  Very well.  Of course you know he did not say there

25   weren't any, he said he didn't know about any.

54b

1   A   That is not the De Luz-Murrieta Road, that is Road A-11.

2   Q   But the road is properly referred to as to its location?

3   A   The road here, he says the Murrieta-De Luz Road, but it

4   is not the Murrieta-De Luz Road, it is known as Road A-11.

5   Q   Very well.  Now, is there anything else that you ques-

6   tion in his testimony?

7   A   And of course he speaks here of that being De Luz Creek.

8   That is not De Luz Creek, that is Rattlesnake.

9   Q   Very well.

10   A   And there is more than 55 acres in the place, too.  He

11   speaks of 55 acres, there is more than 55 acres.  The title

12   company said there was 85 acres on one side of the road and

13   16 on the other.

14   Q   Now, is there anything else that you wish to add?

15   A   I believe that is all.  I believe I have covered most

16   of it.

17   THE MASTER:  Very well then.  Thank you for coming, Miss

18   Click, and you can take this back with you.  And this belongs

19   to Lt. Miller.

20   THE WITNESS:  Are these mine?

21   THE MASTER:  No, these are now in evidence.

22   THE WITNESS:  That is all then?

23   THE MASTER:  Yes.

24   LT. MILLER:  Your Honor, before Miss Click leaves I will

25   at this time offer into evidence Plaintiff's Exhibit M-124 for

55b

1  Identification as Plaintiff's Exhibit M-124.

2       THE MASTER:  That will be received in evidence as Plaintiff's

3  Exhibit M-124.

4       Q  You have seen that exhibit. Do you have any comment in

5  regard to that, Miss Click?

6       A  Which one is that?

7       Q  That is this map of the watershed which shows parcels

8  of property.

9       A  I see.  Well, to my knowledge I don't know whether it

10  is right or not, I am not an engineer.

11       THE MASTER:  Very well, that is all then, Miss Click.

12       Well, I think at this time we will take our noon recess

13  until 1:30.

14       (Noon recess.)

15

16

17                    - - - - -

18

19

20

21

22

23

24

25

Z-1

1        Fallbrook, California, July 23, 1958.  1:30 P. M.

2

3        THE MASTER:  Are you ready?

4        MR. DENNIS:  Ready.

5        MR. SACHSE:  Ready.

6        THE MASTER:  You may proceed, then.

7        LT. MILLER:  Your Honor, as you have noted, what has been

8    marked and offered and accepted into evidence this morning as

9    M-44A represents a duplication of exhibit numbers, there having

10   already been an M-44A which was the addendum to engineering

11   report No. 8 South, 4 West, Section 26, on the property of Paul

12   and Laura Doville, which exhibit was introduced on June 30,

13   1958.  In view of that, I ask the Clerk to re-identify what was

14   this morning marked as M-44A as M-44B, and again offer it into

15   evidence at this time as M-44B.

16       THE MASTER:  The tabulation of Col. Bowen which was offered

17   and received in evidence this morning as M-44A will now be

18   received and re-marked as Exhibit M-44B.  And the testimony of

19   Col. Bowen this morning with reference to Exhibit M-44A will

20   be deemed to be rendered with reference to M-44B, that being

21   the identical document.

22       Now, did you wish also, Lt. Miller, to have permission to

23   remove Exhibit M-125 for the purpose of making copies for

24   counsel?

25       LT. MILLER:  Yes, your Honor.

Z-2

1    THE MASTER:  Well, permission will be granted to remove

2    Exhibit 125 to make copies for counsel, and then the exhibit

3    will be returned to the Clerk after the copies have been made.

4        This might be a good time for the Master to state for the

5    record that on Thursday, July 17th, the Special Master and the

6    Clerk, in company with Col. Bowen and Col. Robertson of the

7    Marine Corps, and Mr. Sachse and Mr. Dennis, counsel for various

8    defendants, toured the De Luz Creek watershed.

9        I will endeavor to state the course which we followed,

10   and if there is any error or omission I will ask that that be

11   corrected for the record.

12       We entered the De Luz Creek watershed on the De Luz Road

13   near Parcel 67, as shown on Exhibit M-68.  We entered on

14   Parcel 66, 65 and 68, and followed an intermittent stream to

15   the corner of Camp Pendleton.  We stopped and looked across

16   DeLuz Creek at Parcel 71 and 72.  We then proceeded on through

17   Parcel 69, Parcel 70, Parcel 76 and Parcel 91.

18       We turned and went into and around the house on this

19   parcel, and then proceeded a very short distance up the road

20   and again turned in onto the Butler property, or returned to

21   reach the Butler property.

22       We crossed the main stem of De Luz Creek in Parcel 51,

23   then went up the hill across Parcels 77 and 78 into Parcel 49,

24   which is the Butler property.

25       And we proceeded then to the boundary between Parcel 49

     and 48, and saw the diversion concerning which Mr. Butler

Z-3

1    testified, which is in Parcel 48.

2            We then went back to the road, retraced our steps a

3    short distance and turned up the Santa Margarita Truck Trail

4    in Parcel 91, then on through Parcels 51, 52 and 54, following

5    an intermittent stream.

6            Then we proceeded across Parcel 59 and across a corner of

7    Parcel 60 into Parcel 58.  We there left the Santa Margarita

8    Truck Trail and took a private road across Parcel 58 into

9    Parcel 56, which is the property of Eve Mitchell.  We observed

10   the Mitchell cabin and a well on an intermittent stream.  We

11   also observed Parcel 55 from various points on Parcel 56, and

12   drove around in Parcel 56.  We then returned by the same route

13   we had come to the De Luz Road.

14           We proceeded northerly on that road through Parcel 51 to

15   Parcel 50, the Wilson property, and through Parcel 36, the

16   McDowell property.

17           We observed the De Luz School on Parcel 53, also observed

18   Parcels 32 and 31.  The road was the boundary for Parcels 33,

19   34 and 35.

20           We stopped at a ford and identified the stream which

21   flowed across the Bleeker property.

22           We then crossed Parcel 29, the LeVack property, and

23   observed the air strip concerning which there was testimony.

24           We saw Parcel 26, the walnut grove, crossed a portion of

25   Parcel 26, went back into Parcel 29, then across 27, across a

corner of 26 again, into Parcel 19, the David Foss property, and to the northwest corner of Parcel 20, the Parker property.

We turned around at the county line between San Diego and Riverside Counties which is, also, of course, the southerly boundary of the Vail property, and retraced our course to the junction in Parcel 50.

While we were in Parcel 29 and 30 we could observe the northerly slope of the Jones property, Parcel 55.

We then turned to the right on a dirt road leading to the Garnsey property, Parcel 37. We stopped at a ford below the confluence of the main stem of De Luz Creek and the easterly fork.

We then went along the northerly boundary of the Wilson property, 50; the McDowell, 36, and cut across the Anderson property, Parcel 48.

We observed a portion of Parcel 37, and the road parallels Camps Creek for a distance. We crossed Camps Creek in the northeast corner of Parcel 47 and took the road along the boundary of Parcels 46, 47, 48 and 45, and proceeded as far as the Mercy Pyeatt property, Parcel 46.

We retraced our steps back to the junction on Parcel 50, and went north across Parcel 36 into Parcel 37, and observed at this time the cemetery property, Parcel 43.

After lunch at the shore of the pond or lake on the Garnsey property we observed the Butler reservoir and diversions,

Z-5

1   the Garnsey reservoir and diversions, then proceeded along the

2   truck trail through Parcel 5, the Rudolph Foss property, from

3   which we could observe Parcel 6, the Baxter property; and

4   proceeded to a point from which it was possible to see a con-

5   siderable portion of the entire De Luz Creek watershed.

6       We then returned to the Garnsey property, proceeded from

7   there through Parcel 42, the Lewis Klein property; and Parcel

8   7, the Rowley property.

9       We observed and went upon the Shaver property, Parcels

10  11, 12 and 13.

11      We then went through Parcel 10, which is listed as the

12  Smelser property, and proceeded into Parcel 14, the Matthews

13  property, and observed the lakes or ponds concerning which Mr.

14  Matthews testified, and the avocado plantings that he had made.

15      We then retraced our course to the De Luz Road, and

16  followed on the De Luz Road to the point in Parcel 69 which

17  adjoins the military reservation.  At that point we left the

18  De Luz Road and entered the military reservation, and pro-

19  ceeded along the military road which crossed De Luz Creek

20  twice and in general was close to the creek at all times, to a

21  point where we turned to the left to enter the Fallbrook

22  Ammunition Depot; returned from there to Fallbrook.

23      Now, if any of the gentlemen who were on the trip wish

24  to make any corrections, additions or point out any omissions

25  I will be very pleased to have them do so.

Z-6

1      COL. BOWEN:  If your Honor please, I have a suggestion

2  to make as regards the property first entered, the private

3  property first entered within the watershed as Parcel 66.   I

4  believe your Honor said we entered Parcel 67, which we did not

5  actually do.

6      THE MASTER:  I intended to say we entered near Parcel 67

7  in Parcel 66.

8      COL. BOWEN:  Yes, sir.  And traversing the Camp Pendleton

9  property we actually crossed De Luz Creek four times, your

10  Honor, instead of two.

11      THE MASTER:  That is within the military reservation?

12      COL. BOWEN:  Yes, sir.

13      THE MASTER:  Thank you.

14      MR. SACHSE:  One other minor correction, your Honor.  You

15  referred to Parcels 11, 12 and 13, Shaver.  It is 11 and 13,

16  Shaver; and 12 is the defendant whom I have represented, and

17  identified as Taylor Lewis, and in the complaint it is Kogen.

18      THE MASTER:  That is correct.  11 and 13 are owned by

19  Shaver, 12 is now Taylor Lewis, although on Exhibit M-31 I

20  believe in the complaint referred to as Kogen, Godfrey, Jost,

21  and others.

22      MR. SACHSE:  That is right.

23      MR. DENNIS:  I might have misunderstood you, but I thought

24  when you said we left Parcel 36 we went into Parcel 37 and then

25  43?

Z-7

1    MR. SACHSE:   We observed 43.

2    MR. DENNIS:   We went through 43.

3    THE MASTER:   43 is the cemetery plot.

4    MR. DENNIS:   Pardon me.   These red lines here threw me

5    off on 37 and 43.

6    I wonder if you want to put anything in the record in

7    regard to the stream flow when we crossed the stream in Parcel

8    51 as to whether there was any surface flow, and whether there

9    was any surface flow at the ford below the confluence of the

10   East Fork?

11   MR. SACHSE:   We can stipulate, if anybody wants to.   My

12   best recollection-- Suppose we take it off the record for a

13   minute?

14   THE MASTER:   Yes.

15   (Discussion off record.)

16   THE MASTER:   Back on the record.

17   In addition to the reservoirs previously mentioned, we

18   saw reservoirs on the Shaver property, Parcel 13; on the Wilson

19   property; and we saw from the road the dams creating the

20   reservoirs on the Rowley property; and saw the reservoirs from

21   a distance on the Matthews property.

22   Now, Col. Bowen, if you can resume the stand and state for

23   the record the conditions as to the flow of water which we

24   observed in the various creeks and tributaries which we crossed

25   or observed?

Z-8

ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified as follows:

DIRECT EXAMINATION

THE WITNESS: Yes, your Honor. On the road that leads from the hard-surfaced De Luz Road to the Butler property, it crosses De Luz Creek at a ford within the exterior limits of Parcel No. 51. And on the 17th of July, your Honor has mentioned as the date that the party described viewed this area, there was an estimated flow of approximately 50 miner's inches at that ford.

At the ford that is located north of the road junction where the hard-surface road and the earth road known as the Tenaja Truck Trail join, the Tenaja Truck Trail crosses the main fork of De Luz Creek-- or, I mean the main De Luz Creek downstream from the confluence with the East Fork of De Luz Creek. And at that ford, which is located approximately on the boundary lines of Parcel 36 and Parcel 50, there was a flow of water estimated at approximately 75 miner's inches on that date, 17 July.

MR. DENNIS: I wonder if we might have the witness identify those various fords on M-68, the location of them, with a cross?

THE MASTER: I am wondering if the verbal description

Z-9

1    isn't sufficient to identify them.

2        MR. DENNIS:  There is if you get a transcript.  But for

3    those of us who are not getting transcripts it is much easier

4    to refer to a map.

5        THE MASTER:  Is there any objection to him marking on

6    Exhibit M-68?

7        LT. MILLER:  No objection.

8        MR. SACHSE:  Not from me.

9        THE MASTER:  Very well.

10       THE WITNESS:  If your Honor wishes, referring to Plain-

11   tiff's Exhibit M-68, I will circle with a red pencil the ford

12   within Parcel 51 previously described; a ford on the boundary

13   of Parcel 36 and 50 previously described.

14       Proceeding on up the East Fork of De Luz Creek, and re-

15   ferring to Plaintiff's Exhibit M-68, there was a small surface

16   stream flow in the ford located-- the ford crossing the East

17   Fork of De Luz Creek located in the eastern portion of Parcel

18   36; no estimate of the amount of stream flow was made.  I will

19   circle that ford with a red circle, also, on Plaintiff's M-68.

20       MR. DENNIS:  Colonel, was there surface flow there at that

21   time?

22       THE WITNESS:  There was surface flow at that time, yes,

23   sir.

24       The ford which Mr. Sachse mentioned crossing the tributary

25   to the East Fork of De Luz Creek in Parcel 30 was dry at the

Z-10

1   time we crossed it; I will circle that ford, also, with a red

2   pencil.

3       The Murrieta-De Luz Road shown, and so labeled on Plain-

4   tiff's Exhibit M-68, crossed the East Fork of De Luz Creek

5   again in the northern portion of Parcel No. 26, and there was a

6   small surface stream flow at that point, flowing underneath the

7   ford; I will mark that with a red circle.

8       And the same road crossed the East Fork of De Luz Creek

9   in Parcel 19; I will circle that ford with a red pencil.  And

10  there was also a surface stream flow at that point.

11      Proceeding northerly on the main stem of the De Luz

12  Creek, where the road crosses Cottonwood Creek, tributary to

13  De Luz Creek, the ford is within Parcel 37, there was no

14  surface stream flow observed on 17 July, 1958.  I will circle

15  that with a red pencil.

16      No other fordings of Cottonwood Creek were made, but

17  surface stream flow was observed from the road upstream from

18  the earth fill dam on the Garnsey property which is astride

19  Cottonwood Creek.

20      On the Rowley property, Parcel No. 7, there was a small

21  stream flow passing underneath the ford which is off of the

22  public highway and within the privately-owned Rowley property.

23      MR. DENNIS:  Colonel, when you say stream flow, that

24  was surface stream flow, was it not?

25      THE WITNESS:  Yes, sir.  That crossing is just opposite

Z-11

1  the house shown within Parcel 40 on Plaintiff's Exhibit M-68.

2     We crossed De Luz Creek in the Matthews property where a

3  stone and concrete structure has been built across the creek,

4  and there was no apparent surface flow going beyond that dam.

5  I will mark that with a red circle.

6     Now, the remainder of the crossings of De Luz Creek were

7  all made within Camp Pendleton, and there were four of them,

8  and each of those fords were dry fords.  I will circle each of

9  the four fords as they appear on Plaintiff's Exhibit M-68

10  within the boundaries of Camp Pendleton.

11     The fourth one, your Honor, is just off of the lithographed

12  portion of M-68, and just shortly above the confluence of De

13  Luz Creek with the Santa Margarita River.  It would appear

14  approximately where the red circle is shown on the margin of

15  the map.

16     Now, referring to Plaintiff's Exhibit M-84, that fourth

17  ford will be circled in red.  That is the fourth ford within

18  the Camp Pendleton portion of the De Luz Creek watershed, is

19  encircled on Plaintiff's Exhibit M-84.

20  BY LT. MILLER:

21     Q  Col. Bowen, did you on this date observe whether or

22  not there was any surface flow coming into the structure on the

23  Matthews property on the De Luz Creek?

24     A  No, sir, we made no observation of the surface inflow.

25     Q  Did you make any observation near the Rowley property

Z-12

1   which would lead you to state whether or not there was water

2   in the alluvium at that portion of the stream?

3       A   Yes, sir, we did.

4       Q   Could you state what that observation was, please?

5       A   Our observation was to walk over and examine the site

6   that Mrs. Rowley had testified to before his Honor; namely,

7   an exploratory trench that had been cut into the alluvium, I

8   believe with a bulldozer-- I believe she testified that was

9   done with a bulldozer-- and that trench was filled with water

10  to a point, oh, I guess four or five feet below the natural

11  ground surface.

12      Q   There was no surface flow that you observed immediately

13  above this dug-out area?

14      A   No, sir.

15      LT. MILLER:   No further questions, your Honor.

16      MR. SACHSE:   I have one, I think.

17

18                        CROSS-EXAMINATION

19  BY MR. SACHSE:

20      Q   Col. Bowen, did you mark our crossing, or did we cross

21  Roblar Creek?   Did the road run across Roblar?

22      A   Yes, sir, we went across Roblar Creek.

23      Q   Would you circle that one and testify from that one?

24      A   Yes, sir.   We crossed Roblar Creek on a wooden bridge,

25  and that bridge is located within Camp Pendleton just shortly

Z-13

1   above the confluence of Roblar Creek with De Luz Creek, and I

2   will circle the location of that crossing on Plaintiff's Exhibit

3   M-68 with a red pencil.

4        There was no surface flow in Roblar Creek observed at

5   that point on the 17th of July, '58.

6        MR. SACHSE:  That is the only addition I had to this,

7   your Honor.

8        MR. DENNIS:  That is the only questions I have relative

9   to the inspection trip.

10       LT. MILLER:  Your Honor, before we proceed further, if

11  you were going into new matters, I do have a statement I would

12  like to make.

13       With respect to the portion of the transcript which I

14  showed to Miss Click this morning, I would like for the record

15  to show that the pages I indicated to her are pages 2151,

16  starting with line 22, through the remainder of that page, then

17  all of page 2152, page 2153, page 2154, and page 2155, through

18  line 7.  That is all I have, your Honor.

19       THE MASTER:  Mr. Dennis, I believe you said during the

20  recess that you had some questions of Col. Bowen with reference

21  to this Click property?

22       MR. DENNIS:  Well, it is with reference to the stream,

23  yes, in view of Miss Click's testimony that there was no

24  surface flow in the stream.

25

Z-14

1                    ALLEN C. BOWEN,

2   recalled as a witness, having been previously sworn, testified

3   as follows:

4

5                    CROSS-EXAMINATION

6   BY MR. DENNIS:

7       Q   I think, Col. Bowen, you are thoroughly familiar with

8   the stream bed of the East Fork of De Luz Creek, are you not?

9       A   Yes, sir.

10      Q   You have had an opportunity to examine it many times

11  during different periods of the year?

12      A   Yes, sir.

13      Q   And the stream from the time that it crosses the

14  Riverside County Line to its confluence with the De Luz Creek

15  has well-defined beds and channels, has it not?

16      A   Yes, sir.

17      Q   And the water you observed in spots within the area

18  that I just mentioned between the Riverside County line and its

19  confluence with the main branch of De Luz Creek, water flowing

20  on the surface during all times of the year in spots?

21      A   In places along the course of that stream, yes, sir.

22      Q   And then there will be intervals in which there will

23  be no surface flow?

24      A   Yes, sir.

25      Q   And are those portions of the stream bed where you

Z-15

1   observed no surface flow generally areas in which there are

2   deposits of alluvium?

3       A  Yes, sir.

4       Q  And those deposits of alluvium would be the areas

5   shown on Plaintiff's Exhibit M-37, the areas designated as

6   Class VIII lands along the bed or channel of the East Fork of

7   De Luz Creek?

8       A  It will also include most of those areas shown as

9   Class II and Class III adjoining the Class VIII lands, which

10  define the stream bed of the East Fork of De Luz Creek.

11      Q  And the alluvium in the beds were made up of sands and

12  gravels and boulders and other porous materials?

13      A  Yes, sir.

14      Q  Which will hold a considerable quantity of water?

15      A  Yes, sir.

16      Q  And have you had any opportunity to observe the move-

17  ments, or are you in a position where you could give any

18  opinion as to what direction the water moves through the sands

19  and the gravels of the alluvium material?

20      A  Yes, sir.  It follows the gradient of the stream.

21      Q  It follows the gradient of the stream.  Do you have

22  any information as to the elevation of the water table in the

23  alluvium deposits?

24      A  No, sir.

25      MR. DENNIS:  I think that is all.

Z-16

1        LT. MILLER:  No questions.

2        MR. SACHSE:  No questions.

3        THE MASTER:  I believe you have stated that you have now

4    offered in evidence all of the exhibits that you have for the

5    time being?

6        LT. MILLER:  Yes, that is true, your Honor.

7        THE MASTER:  Then I believe we might proceed, Col. Bowen,

8    to a statement as to the information that you have with refer-

9    ence to Parcel 62, which I believe is the next parcel concern-

10    ing which no testimony has yet been offered.

11        THE WITNESS:  Yes, your Honor.  Parcel No. 62, De Luz

12    watershed, is delineated on Plaintiff's Exhibit M-68 and on

13    Plaintiff's Exhibit M-84, and the number 68 encircled is

14    contained within the outer limits and so delineated.

15        THE MASTER:  62?

16        THE WITNESS:  Excuse me, your Honor, No. 62, yes, sir.

17    Parcel No. 62 is delineated on Plaintiff's Exhibit M-68.  And

18    the number 62 encircled is within the outer limits of that

19    property.

20        Parcel No. 62 lies largely outside the watershed of the

21    De Luz Creek, but wholly within the watershed of the Santa

22    Margarita River.  As shown on Plaintiff's Exhibit M-68, the

23    Parcel 62 is situated on the divide of-- on the eastern divide

24    of the De Luz Creek, and the property is traversed by the

25    Santa Margarita Truck Trail which enters it in the northwest

Z-17

1   corner and proceeds in a northwest-southeast direction through

2   the portion within De Luz Creek.

3   Inasmuch as it is on the divide there are no intermittent

4   streams of any major size; the gullies and washes indicated by

5   the contours on Plaintiff's Exhibit M-68 will run only during

6   and immediately after periods of high precipitation and runoff.

7   And on the basis of the information presently available

8   to me, your Honor, the 50 acres of Parcel 62 which are within

9   the De Luz Creek watershed are Class VII and non-irrigable.

10  The waters underlying a portion of Parcel 62 within the

11  De Luz Creek watershed are vagrant, percolating waters, and not

12  a part of the De Luz Creek stream system.

13  BY THE MASTER:

14  Q   Do you know of any use which is being made of this

15  property at the present time?

16  A   I know of none, your Honor.   That is, I know of none

17  within--

18  Q Within the De Luz Creek?

19  A   Within De Luz Creek, your Honor.   There is some farming

20  in the portion that is outside of De Luz Creek watershed.

21  THE MASTER:   Are there any questions from any counsel?

22  BY MR. SACHSE:

23  Q   Is this what they call Jericho Valley, that 62, do you

24  know, Col. Bowen?   It isn't a valley.

25  A   I couldn't say, I have never heard that particular

Z-18

1  name ascribed to it.  There is a little valley high up there

2  on the watershed, though.  It could well be, I don't know.

3       THE MASTER:  Mr. Dennis?

4       MR. DENNIS:  No questions.

5       THE MASTER:  Then Parcel 64, Frank and Lillie M. Crabtree.

6       THE WITNESS:  Parcel No. 64 is delineated on Plaintiff's

7  Exhibit M-68, shown with the number 64 encircled within the

8  outer limits of that property, and it lies westerly of Parcel

9  63, the Gillett property.  It consists of approximately 120

10 acres.  The intermittent stream which traverses the northwesterly

11 corner of Parcel 63 crosses Parcel 64 flowing in an easterly

12 direction, and leaving Parcel 64 into Parcel 65, to its ultimate

13 confluence with De Luz Creek within Parcel No. 69.

14      That stream flows only during and immediately after

15 periods of high precipitation and runoff.

16      The ground waters underlying Parcel 64 are, in my opinion,

17 vagrant and percolating, and not a part of the De Luz Creek

18 stream system.

19      And on the basis of information presently available to

20 me, your Honor, the entire parcel is Class VII and non-irrigable.

21 BY THE MASTER:

22      Q  Well, now, I notice on the contour map M-68 there seems

23 to be some fairly level land adjoining the creek going through

24 Parcel 64. Would any portion of that be subject to cultivation?

25      A  Referring, your Honor, to Plaintiff's Exhibit M-90,

Z-19

1   which has a common boundary with the easterly boundary of

2   Parcel 64, that entire area is shown on the land classification

3   map of Plaintiff's Exhibit M-90 as Class VII, non-irrigable

4   land.  And a portion of that valley does extend into Parcel 63.

5   On the basis of my present knowledge of the property, your

6   Honor, it is all Class VII.  It appears on the photograph

7   here, which is in Plaintiff's Exhibit M-90, that that canyon

8   is fairly steep.  It doesn't give much evidence of the valley

9   floor as shown on the map.  However, inasmuch as we are going

10  to review the survey of the Gillett property, your Honor, we

11  will check that valley when we are up there on Parcel 64.

12        Q  And if you find anything at variance in addition to

13  what you have reported so far we can receive that on further

14  hearings.

15        A  Yes, sir.

16        Q  Is any use at the present time being made of this

17  property?

18        A  None to my knowledge, your Honor.

19        THE MASTER:  The answer which has been filed by the

20  Crabtrees does not indicate that any use is now being made of

21  the property.

22        Are there any questions from counsel?

23        MR. DENNIS:  No questions.

24        MR. SACHSE:  No questions.

25        THE MASTER:  The next property then which I have listed

Z-20

1    is Parcel 65, Loretta Page and Robert Ormsby.

2         THE WITNESS:  Parcel No. 65 is delineated on Plaintiff's

3    Exhibit M-68, and also on Plaintiff's Exhibit M-84, with the

4    number 65 encircled within the exterior limits of the property.

5         The southern portion is traversed by the Fallbrook-De Luz

6    Road.

7         There is, referring to Plaintiff's Exhibit M-68, an

8    intermittent stream which departs from Parcel 64 and flows in

9    a southwesterly direction across the property, leaving Parcel

10   65 near the southwestern corner.  That intermittent stream,

11   your Honor, flows only during and immediately after periods of

12   high precipitation and runoff.

13        The ground waters underlying Parcel No. 65 are, in my

14   opinion, vagrant, percolating, and not a part of the De Luz

15   stream system.

16   BY THE MASTER:

17        Q  Now, I notice that there is apparently another stream

18   in the extreme nothwesterly corner, and another one in the

19   southeasterly corner.  Can you describe the nature of those

20   streams?

21        A  Yes, sir.  Those streams are the same nature as the

22   one I previously testified that bisects Parcel 65.

23        Now, the map, Plaintiff's Exhibit M-68, indicates an

24   unimproved road branching off of the hard-surfaced Fallbrook-

25   De Luz Road and going northerly through the property to the

Z-21

1    intermittent stream symbol, which completely bisects the

2    property; and also symbolized are two buildings, the small

3    black rectangles that are near Hill No. 591 contained within

4    Parcel 65, as shown on Plaintiff's Exhibit M-68, indicating some

5    development, but I have no knowledge of the extent of it, your

6    Honor.

7         On the basis of information available to me, the property,

8    including this portion which I failed to mention, your Honor,

9    which extends down to and has a common boundary with the Camp

10   Pendleton boundary, the total area is approximately 646 acres;

11   and of that amount, on the basis of the knowledge that I have

12   presently before me, there are 17 acres of irrigable land in

13   Parcel 65.

14        MR. DENNIS:  Colonel, are there two 65's, or two pieces

15   that are contiguous pieces that are numbered 65?

16        THE WITNESS:  Yes, sir, part of the same parcel.

17   BY THE MASTER:

18        Q   Now, are there any streams in the lower parcel of No.

19   65?

20        A   No, sir, there are none symbolized on Plaintiff's

21   M-68.  And my testimony with regard to the ground waters on

22   Parcel 65 apply also to the smaller portion which corners on

23   the southwest corner of the-- well, I had better describe it as

24   being that portion of 65 which is within Section 9, Township 9

25   South, Range 4 West.  The remaining portion of Parcel 65 is

Z-22

1   partly within Section 4 and partly within Section 5, 9 South,

2   4 West.

3       THE MASTER:  Now, Lt. Miller, does your exhibit on

4   conveyances or severances indicate that both portions of 65 are

5   a single parcel, or separate, assuming that the two properties

6   merely corner upon each other that they can be contiguous, has

7   there been any past severance?

8       LT. MILLER:  Well, your Honor, I have to confess that I

9   don't know, but I would offer to make a statement on it at the

10  next hearing.  I do have another map, which I don't have with

11  me.

12      THE MASTER:  In other words, if they have been severed

13  in the past we won't have the question to decide, whether those

14  parcels are one parcel in so far as any riparian rights are

15  concerned.

16      MR. DENNIS: If you hold it is not a watercourse there

17  is no question of riparian rights or severance.

18      THE MASTER:  Are there any questions by counsel with

19  reference to Parcel 65?

20      MR. DENNIS:  Just one question, perhaps.

21      Q  And that is, is the so-called intermittent stream that

22  you testified to that bisects Parcel 65, does it have the same

23  characteristics and the same flow as the streams which you

24  testified to bisected Parcel 55?  That is the Jones property.

25      A  Yes, sir, I think my testimony is essentially the

Z-23

1    same in regard to both of those streams.

2        MR. DENNIS:  That is all.

3        THE MASTER:  Very well.  Then we will proceed to the

4    next one, which I believe is Parcel 68, Merkle, Simms and

5    Jedlick.

6        THE WITNESS:  Yes, sir.  Parcel No. 68 is delineated on

7    Plaintiff's Exhibit M-68 and also on Plaintiff's Exhibit M-84,

8    with the number 68 encircled within the exterior limits of the

9    property.

10       The property consists of portions of Sections 4, 5 and 8,

11   9 South, 4 West, and is traversed by the hard-surfaced

12   Fallbrook-De Luz Road which traverses the northerly portion in

13   a generally easterly-westerly direction.  The road parallels

14   the intermittent stream as symbolized on Plaintiff's Exhibit

15   M-68.  The intermittent stream flows to a confluence with De

16   Luz Creek within the boundaries of Camp Pendleton.  The con-

17   fluence is outside of the Parcel No. 68.

18       The parcel does adjoin the Naval Reservation, Camp

19   Pendleton, in part on the south half of the westerly boundary,

20   and along the southerly boundary of the sixteenth of a section

21   which lies within Section 8.

22       The stream flowing through this property, your Honor, as

23   shown on Plaintiff's Exhibit M-68, is an intermittent stream

24   flowing only during and immediately after periods of high

25   precipitation and runoff.

Z-24

1  On the date, your Honor, that we made the tour of De Luz

2 Creek watershed, 17 July, 1958, Mr. Dennis called attention

3 to an earth-filled dam on that stream which had been constructed,

4 and there was a little water in it at that time.

5  If I may go back to the Parcel 65, your Honor?

6  THE MASTER: Surely.

7  THE WITNESS:  On that same tour we observed, and I have

8 observed at previous dates, earth-filled dams built on Parcel

9 65 near the De Luz Road.

10  The ground waters underlying Parcel No. 68, with the

11 exception of one acre in the extreme northwest corner, which,

12 on the basis of information available to me, examination of the

13 parcel on Plaintiff's Exhibit M-84, indicates about one acre

14 of Class II land in the extreme northwest corner of Parcel 68

15 where the intermittent stream flowing from Parcel 65 cuts across

16 the corner.  And I am not prepared to testify at the moment

17 whether that may be part of the alluvium of De Luz Creek or not.

18  On the basis of my present information, though, excluding

19 that one acre, the ground waters in Parcel 68 are vagrant,

20 percolating, and not part of the De Luz Creek stream system.

21  My examination of Plaintiff's Exhibit M-59, your Honor,

22 shows that the--

23  MR. SACHSE:  Which parcel does that cover?

24  THE WITNESS:  Bryant.

25  THE MASTER:  Parcel 69.

Z-25

1      THE WITNESS:  The land classification map shows the

2 Emmes property, which is Parcel No. 70, and indicates the Class

3 II area which I have previously mentioned as projecting into

4 Parcel No. 68, but this land classification map contained in

5 Plaintiff's Exhibit M-59 shows that that Class II area terminates

6 within the boundaries of the Emmes property and doesn't project

7 into the Parcel 68.  On the basis of an examination of the land

8 classification map in Plaintiff's Exhibit M-59 I will withdraw

9 that reservation as to the one acre in the northwesterly corner

10 of Parcel 68 and state that all of the ground waters under-

11 lying Parcel 68 are, in my opinion, vagrant, percolating, and

12 not a part of the De Luz Creek stream system.

13 BY THE MASTER:

14      Q  Have you stated the number of irrigable acres, if any,

15 in Parcel 68, in your opinion?

16      A  In my opinion, your Honor, and based on the information

17 available to me at the present, there are no irrigable lands

18 within Parcel No. 68, it all being Class VII which, in my

19 opinion, is non-irrigable.

20      THE MASTER:  Are there any questions, Mr. Dennis?

21      MR. DENNIS:  No questions.

22      MR. SACHSE:  No questions.

23      LT. MILLER:  No questions.

24      THE MASTER:  You may proceed then to Parcel 73 and Parcel

25 74, I believe Exhibit M-87 is a report on this property, which

Z-26

1   there has been no testimony concerning.

2        Do you want to ask Col. Bowen any questions concerning

3   this report?

4        LT. MILLER:  No, your Honor.

5        THE MASTER:  Will you examine the report M-87, Col.

6   Bowen?

7        THE WITNESS:  M-87, please, Mr. Edwards.

8        De Luz watershed Parcels 73 and 74 are reported in

9   Plaintiff's Exhibit M-87.  They are delineated on Plaintiff's

10   Exhibit M-68, with the numbers 73 and 74 within the respective

11   parcels designated.

12        Now, these properties are almost completely surrounded

13   by Camp Pendleton, with the exception of the eighth of a mile

14   boundary common with Holsworth on the north, that is Parcel 72;

15   the remaining northern boundary is common to Camp Pendleton.

16   All of the western boundary is common to Camp Pendleton.  The

17   western quarter mile of the southern boundary of Parcel 73

18   is common to Camp Pendleton, and the southerly boundary of 74

19   is common to Camp Pendleton.  And the northerly quarter mile

20   of the easterly boundary of 73 is common to Camp Pendleton.

21   And 74 adjoins 73 on the-- 73 has a common boundary with 74's

22   northern boundary.  74's western boundary is common with 73.

23   The area is almost an island within Camp Pendleton.

24        Referring to Plaintiff's Exhibit M-68, there is an

25   intermittent stream arising in the westerly portion of 73,

Z-27

1 running easterly and then southerly through 74, departing from

2 74 on the easterly boundary of 74 through 75 to its confluence

3 with De Luz Creek within the exterior boundaries of Camp

4 Pendleton.

5 Plaintiff's Exhibit M-68 also shows a road symbol which

6 has a junction with the military road just downstream from the

7 first fording of De Luz Creek within the Naval Reservation.

8 This road runs through 75 and the southeasterly portion of 74.

9 There are no roads through 73, unless they have been recently

10 made.

11 The stream symbolized as flowing through 73 and 74 on

12 Plaintiff's Exhibit 84 is intermittent in character, flowing

13 only during and immediately following periods of high pre-

14 cipitation and runoff.

15 Now, the Plaintiff's Exhibit M-68 shows a symbol for a

16 house located on the road described and also located on the

17 intermittent stream described.  Now, that particular house at

18 one time was occupied by one of the outstanding characters of

19 this community, namely, Nellie Smith, now deceased, and her one-

20 time husband Frank Smith, lived just north of there.  And those

21 people lived there for 25 years or more, I guess.  And there was

22 and still is a spring on that intermittent stream which supplied

23 Nellie and Frank with water, and also with raisins and sugar

24 so they could brew up a batch of popskull.

25 I have been over the property many times, your Honor, and

2400

Z-28

1  as shown in Plaintiff's Exhibit M-87 it is all Class VII, non-

2  irrigable.  It is all very steep, rough, precipitous land.  It

3  makes a fine hunting area, though, there are a lot of deer in

4  there.  The area is approximately 200 acres of the combined

5  parcels.

6  BY THE MASTER:

7      Q  What is the nature of the underground water, if any?

8      A  The underground water in these parcels, 73 and 74, are

9  in my opinion, vagrant, percolating, and not a part of the De

10 Luz stream system.

11     Q  And there is no present use of the property to your

12 knowledge?

13     A  The present owners don't occupy the place, they are

14 absentee landlords.  They have done very little to change the

15 nature and character of the property since they purchased it.

16     THE MASTER:  Any questions by counsel?

17     MR. SACHSE:  No questions.

18     MR. DENNIS:  No questions.

19     LT. MILLER:  No questions.

20     THE MASTER:  We will proceed then to Parcel 75, which

21 immediately adjoins the property you just referred to.  That

22 is McDonald.

23     THE WITNESS:  Plaintiff's Exhibit 75, your Honor, is

24 delineated on Plaintiff's Exhibit M-68-- Parcel No. 75, not

25 Plaintiff's Exhibit, but Parcel No. 75 is delineated on

Z-29

1  Plaintiff's Exhibit M-68, with the number 75 encircled within

2  the exterior limits of the property.

3      Its eastern boundary is common to Camp Pendleton; its

4  northerly boundary is common to Parcel 73; its southern boundary

5  is common to Camp Pendleton, and its western boundary is

6  common to Parcel 74.

7      The intermittent stream which arises on 73 and flows

8  through 74, flows through 75 to confluence with De Luz Creek

9  within Camp Pendleton.

10     The earth road previously testified to having its junction

11  with the De Luz military road in Camp Pendleton traverses the

12  length of Parcel 75 from east to west.

13     The stream which I previously testified which flows through

14  this property is intermittent in character, flowing only during

15  and after periods of high precipitation and runoff.

16     The ground water in Parcel 75 is vagrant and percolating,

17  and not a part of the stream system of De Luz Creek, in my

18  opinion.  And there is no irrigable land on the property, in

19  my opinion.

20  BY THE MASTER:

21      Q  And the underlying water would be vagrant?

22      A  Yes, sir.  I testified in that regard.

23      THE MASTER:  We will take a recess at this time for five

24  minutes.

25          (Recess.)

Z-30

3

1    THE MASTER:  We will proceed then with Parcel 76, which

2  I believe is the next one concerning which we have had no

3  testimony.

4    LT. MILLER:  M-59 and M-63 border on the north and south

5  of that, your Honor, and may be of some assistance to the

6  witness.  M-59 and M-63, Mr. Edwards.

7    THE MASTER:  M-59 is already here.

8    THE WITNESS:  De Luz watershed Parcel No. 76, your Honor,

9  is delineated on Plaintiff's Exhibit M-68, with the number 76

10  encircled within the outer limits of the property.

11    There is about 160 acres, occupying the center of Section

12  5, 9 South, 4 West.

13    The hard-surfaced De Luz Road traverses the property

14  throughout its length from north to south, and is paralleled

15  by the main stream of De Luz Creek, which flows southerly from

16  north to south through the property, and its course is west

17  of the hard-surfaced road.

18    Reports have been made on Parcels 69, 71 and 91, which

19  border 76 on the north and the south.

20    In addition to De Luz Creek, Plaintiff's Exhibit M-68

21  shows that an intermittent stream entering the property on the

22  north boundary, but easterly of the De Luz Road, flows under

23  the road to confluence with the De Luz Creek north of the

24  center of the property.  And that is the same intermittent

25  stream which arises in the easterly part of the De Luz watershed

Z-31

1   on Parcel 24, flowing through Parcels 60, 58, paralleling in

2   part the Santa Margarita Truck Trail, 59, 54, 65, 52, 91, and

3   then 76.  That particular intermittent stream, your Honor, as

4   previously testified, is intermittent in nature, flowing only

5   during and immediately following periods of high precipitation

6   and runoff.

7        Now, I have made no observations of the surface stream

8   flow of De Luz Creek through this property, your Honor.

9        Plaintiff's Exhibit M-63 and Plaintiff's Exhibit M-59

10  report that the best sources of water for those parcels which

11  are traversed by De Luz Creek both north and south of 76 are

12  the alluvial deposits along De Luz Creek.

13       And referring to Plaintiff's Exhibit M-84, the land

14  classification delineations indicate that alluvium continues

15  through Parcel No. 76, and that any water pumped from that

16  alluvium or from the recent, or from the older alluvium which

17  extends southerly from Parcel 91 on through 76 would be part

18  of the De Luz Creek stream system.

19       I don't know of the present uses of water on Parcel 76,

20  your Honor.

21  BY THE MASTER:

22       Q  How many acres are classified as to types of soil?

23       A  Of the total of about 160 acres, your Honor, on the

24  basis of information available to me, 58 are irrigable; those

25  comprise six acres of Class II land, 15 of Class III, 10 of

Z-e32

1  Class IV, and 27 of Class VI.

2      These irrigable lands, as indicated by Plaintiff's Exhibit

3  M-84, are adjoining the stream of De Luz Creek on both the

4  east and the west are low lying and subject to some frost

5  hazard.  For that reason the Class II, III and IV lands, and

6  particularly the Class II and III lands are best adapted, in my

7  opinion, to the production of row crops, keeping in mind the

8  frost hazard.  And the Class IV and VI lands are adapted to

9  citrus and avocados, with the avocados occupying the higher

10  slopes.

11      Q  The Class VI land is in the extreme northwest portion?

12      A  Yes, sir, as indicated on Plaintiff's Exhibit M-84.

13      Q  Then there is also some Class VI land in the south

14  central portion.  Is that correct?

15      A  No, sir.  That point that your Honor indicated is on

16  Parcel 69.

17      Q  That is right.

18      A  The southerly boundary of 76 adjoins the Emmes property

19  and the Chestmolovich property.

20      Q  Now, you have testified that water pumped from the

21  alluvium would be part of the stream.  Would the boundaries

22  of the alluvium in general correspond with the boundaries of

23  the Class II and Class III land?

24      A  Yes, sir, they would generally conform to the Class II,

25  III and VIII land, and the land shown as Class IV in the

Z-33

1   southerly portion of the property, and a portion of the Class

2   VI are older alluvium, your Honor.  There is not all of the

3   Class VI land, I don't mean to infer, is the alluvium, but

4   there is some older alluvium on the higher ground in the Class

5   VI area of Parcel 76.

6       Q  And all water developed in any portion of that would

7   be part of the stream.  Is that correct?

8       A  In any portion of the alluvium deposits, yes, either

9   recent or older.

10      Q  Yes, that is my question.  Time would not affect that

11  factor?

12      A  No, sir.

13      Q  Water developed in other portions of the property

14  would not be a part of the stream flow?

15      A  Well, your Honor, the alluvial runs from north to

16  south through the property, approximately midway in the property,

17  and the igneous formation bordering it on the east and the west

18  are in subsurface contact with the alluvium.  And in my

19  opinion water can flow from the cracks and fissures in the

20  granitic material into the alluvium, but I have no information

21  as to the extent of that.

22      Q  Then your information would not be sufficient for

23  you to say that water developed in other portions of the

24  property would definitely not be part of the stream flow?

25      A  No, sir.

Z-34

1      THE MASTER:  Lt. Miller, do you have any questions?

2      LT. MILLER:  No questions, your Honor.

3      THE MASTER:  Mr. Sachse?

4      MR. SACHSE:  No questions.

5      THE MASTER:  The next then is Parcel 78, Rose Amelia

6  Everett.

7      LT. MILLER:  That is shown on Plaintiff's Exhibit M-63,

8  also, your Honor.

9      THE WITNESS:  I have that, Mr. Edwards.

10     Parcel No. 78, your Honor, is delineated on Plaintiff's

11  Exhibit M-68, and is indicated with the number 78 encircled

12  outside of the exterior boundaries of the property, a dotted

13  line from the circle surrounding 78 leads over to the relatively

14  narrow portion of land lying between Parcels 91 and 94.

15     Now, the area of Parcel 78 is approximately five acres.

16  And referring to Plaintiff's Exhibit M-68, an intermittent

17  stream flowing easterly to a confluence of De Luz Creek within

18  Parcel 91 crosses Parcel 78 from west to east, flowing from

19  west to east.

20     The road which leads into the Butler property crosses

21  the northern end of Parcel 78.

22     In my opinion--  Well, the intermittent stream symbolizes

23  it as flowing through the northern portion of 78, is intermittent

24  in character, flowing only during and immediately after periods

25  of high precipitation and runoff.

Z-35

1       And in my opinion the waters underlying Parcel 78 are

2 vagrant, percolating, and not a part of the De Luz stream

3 system.

4       On the basis of the information available to me, your

5 Honor, there are four acres of Class III and VI land, which

6 are irrigable, and one acre of Class-- Correction, your Honor.

7       There are five acres of irrigable land, all of it is

8 irrigable; four acres are Class VI land, and one acre of

9 Class III land.

10       Now, the land classification map in Plaintiff's Exhibit

11 M-63 has the soil contacts for it, determining the land classes

12 crossing this parcel, your Honor, on the westerly margin of

13 the colored portion of the land classification map.  It

14 indicates four southerly acres of Class VI land, and the

15 northerly acre having its northern boundary common with Butler's

16 boundary is Class III land.

17 BY THE MASTER:

18       Q  Do you know if any present use is being made of this

19 property?

20       A  No, sir, I know of no present use being made of this

21 property.

22       Q  Incidentally, do you know of any present use being made

23 on Parcel 76?

24       A  I know of none, your Honor.

25       THE MASTER:  Mr. Sachse, any questions?

Z-36

1    MR. SACHSE:  No questions.

2    THE MASTER:  Lt. Miller?

3    LT. MILLER:  No questions, your Honor.

4    THE MASTER:  79, then.

5    THE WITNESS:  Parcel No. 79 is delineated on Plaintiff's

6    Exhibit M-68, shown with the number 79 encircled within the

7    exterior limits.  And it is in the North Half of the Southeast

8    Quarter of Section 6, 9 South, 4 West.

9        It is traversed diagonally from the northeast to the

10   southwest by the Montijo Road, as shown on Plaintiff's Exhibit

11   M-68.

12       There is also symbolized on Plaintiff's Exhibit M-68

13   the headwaters of an intermittent stream which flows north-

14   easterly, leaving the property at about the midpoint of the

15   northerly boundary, and flowing through Parcel 80, out through

16   Parcel 78 to a confluence with De Luz Creek in Parcel 91.

17   That stream, your Honor, is intermittent in character, flowing

18   only during and immediately following periods of high pre-

19   cipitation and runoff.

20       The ground waters underlying Parcel 79 are, in my opinion,

21   vagrant and percolating, not a part of the De Luz Stream system.

22       As delineated by the contours on Plaintiff's Exhibit M-68,

23   this is a very rough, precipitous plot of ground; the truck

24   trail switches back a couple of times within this property to

25   climb the hill.

Z-37

On the basis of information available to me none of this
is irrigable.  It is all Class VII land, about 80 acres.
BY THE MASTER:

Q  Is any use being made of the property now, to your
knowledge?

A  None to my knowledge, your Honor.

Q Parcel 80.  We have a stipulation from two of the
defendants interested in the property, but I would like to know
the general nature of the property in the same manner in which
you have given me the information on the other parcels.

LT. MILLER:  That is shown on M-63, Colonel, the picture
is shown on M-63.

MR. SACHSE:  Your Honor, what was the stipulation on 80,
do you mean the domestic water stipulation?

THE MASTER:  Yes, signed by Barbara Ann Weston; but the
Hutsons have not signed the stipulation.

THE WITNESS:  Parcel No. 80 is delineated on Plaintiff's
Exhibit M-68 and also on Plaintiff's Exhibit M-84, with the
number 80 encircled within the exterior boundaries of the
property.  It lies immediately north of Parcel 79, and the
same truck trail, Montijo Road previously mentioned, traverses
Parcel 80 in a north-south direction, with a couple of switch-
backs climbing the hill indicated within the Parcel 80.

The same intermittent stream symbol which is shown
beginning in Parcel 79 flows in a northeasterly direction

Z-38

1   through Parcel 80.  And that stream, as previously testified,

2   is intermittent in character, flowing only during periods of

3   high precipitation and runoff.

4       Now, an examination of Parcel 91, as shown in Plaintiff's

5   Exhibit M-63, which has approximately a quarter of a mile

6   boundary in common with Parcel 80, is approximately the eastern

7   quarter of a mile of the north boundary, is common with Parcel

8   91.  As shown by the contours on the map the area south of 91

9   is of much lesser relief than the bulk of the property in 80.

10  The contours throughout most of the property are very closely

11  spaced, indicating rugged terrain.  The area of lesser relief

12  is shown on similar areas to the north as Class VI land.

13      And on the basis of information presently available to

14  me, your Honor, there are 17 acres of Class VI land on this

15  property, that is Parcel No. 80.  And the crops suggested in

16  Parcel 91 on similar sites as shown in Plaintiff's Exhibit M-63,

17  page 2, are citrus or permanent pasture.  The reason for

18  recommending citrus is because of the frost hazard in that

19  particular area, low land, and the drainage is rather poor.

20      The rest of the land, your Honor, is Class VII on the

21  basis of information before me, and non-irrigable.

22      Approximately 120 acres total area of the property.

23  BY THE MASTER:

24      Q  Any underground water would be of the same character

25  as the underground water on Parcel 79?

Z-39

1     A   Yes, sir.  In my opinion it would be vagrant, percol-

2  ating, and not a part of the De Luz stream system.

3     Q   Do you know if any use is being made of this parcel

4  at the present time?

5     A   I know of none, your Honor.

6  THE MASTER:  Are there any questions?

7  MR. SACHSE:  No questions.

8  LT. MILLER:  No questions, your Honor.

9  THE MASTER:  Then Parcel 82.

10  THE WITNESS:  Parcel 82, your Honor, is delineated on

11  Plaintiff's Exhibit M-68, with the number 82 encircled within

12  the property.

13     The parcel actually extends beyond the lithograph portion

14  of the map shown on Plaintiff's Exhibit M-68.  The entire area

15  is delineated on Plaintiff's Exhibit M-84, and shown as bounded

16  on the north by the National Forest boundary.

17     This parcel is astride the watershed-- the westerly portion

18  of the watershed of De Luz Creek, bounded on the south by the

19  Naval Reservation boundary, and it is bounded on the east by

20  public domain Parcel 81.

21     Plaintiff's Exhibit M-84 shows Roblar Creek arising in

22  the National Forest to the north and flowing southerly through

23  Parcel 82, that section of Parcel 82 which may be described

24  as Section 35, 8 South, 5 West.

25     On the basis of information before me, your Honor,  ...

Z-40

1    there are 924 acres of Parcel 82 within the De Luz Creek water-

2    shed, and it is all Class VII land, non-irrigable.

3         Roblar Creek is tributary to De Luz Creek; its confluence

4    with De Luz Creek is within Camp Pendleton.  It is intermittent

5    in character, flowing only during and after periods of high

6    precipitation and runoff, with the exception of some spring flow

7    along the creek which I have observed in Camp Pendleton, which

8    continues throughout the year.  I haven't traversed that portion

9    of the creek through Parcel 82, so I have no knowledge of the

10   spring flow through there.

11        In my opinion, the ground water underlying Parcel 82 is

12   vagrant, percolating, and not a part of the De Luz Creek stream

13   system.

14   BY THE MASTER:

15        Q  Now, the answer filed by various of the owners of

16   this property, Eckermans, Andersons, Gauldins, Petersons, and

17   others, states this land is riparian land.  That would be cor-

18   rect?

19        A  Riparian to Roblar Creek, yes, sir, on the basis of

20   present information.

21        Q  It can be used for grazing cattle, turkeys, chickens,

22   fowl?

23        A  Yes, sir.

24        Q  And parts of said land may be tillable?

25        A  They may be, your Honor, but--

Z-41

1      Q   Your present information would indicate that they are

2  not?

3      A   Yes, sir.

4      Q   "Defendants have obtained water from a spring located

5  on the property."

6      A   I have no knowledge of the spring, your Honor, but

7  there is a lot of spring activity in that country.

8      MR. SACHSE:   Your Honor, does that answer indicate that

9  it is Roblar they claim they are riparian to?   I guess that

10  is the only thing they could be riparian to.

11      THE MASTER:   They just say riparian, they don't say what.

12      MR. SACHSE:   Does Fern Creek get up that far, Colonel

13  Bowen?

14      THE WITNESS:   Well, the upper headwaters of Fern Creek

15  do rise within Parcel No. 82, within the extreme easterly por-

16  tion of 82.

17      Referring to Plaintiff's Exhibit M-68, the topographic

18  map, there is a fire truck trail which enters the northern

19  boundary of Parcel 82 near the northeast corner, and follows

20  generally down the ridge to a point where it becomes a trail

21  which follows on down the ridge to Hill No. 2537 located in the

22  southeast corner of Parcel 82.   That road and trail follows

23  along the ridge which generally divides the Roblar drainage and

24  the Fern Creek drainage.   So that portion easterly of the road

25  and trail mentioned is part of the Fern Creek watershed.   And

Z-42

1   actually some of it is a portion of the Camps Creek watershed.

2   In the northwestern corner Hill No. 2775 is on the divide

3   between Camps Creek, Fern Creek and Roblar Creek.

4           THE MASTER:  Any further questions?

5           MR. SACHSE:  Nothing for me, your Honor.

6           LT. MILLER:  No questions, your Honor.

7           THE MASTER: Parcel 84 then seems to be the next one.

8           THE WITNESS:  Parcel No. 84, your Honor, is delineated on

9   Plaintiff's Exhibit M-68, with the number 84 encircled within

10  the outer limits of the property.

11          Now, the parcel is located astride the westerly watershed

12  of De Luz Creek.  The portion westerly of De Luz Creek water-

13  shed is outside of not only De Luz but the Santa Margarita

14  watershed.  The portion that lies easterly, as shown on

15  Plaintiff's Exhibit M-68, is within De Luz Creek watershed.

16  The property is known as the Sky Ranch.

17          The truck trail leading from Santa Margarita Mountain to

18  the Tenaja guard station traverses the property in a northeast-

19  southwest fashion.

20          There is a symbol indicating a house near the road by

21  the word "Sky Ranch," which is imprinted on the map.

22          There are no symbols indicating any intermittent streams

23  flowing through the property.

24          The property is, in fact, on the crest of the watershed

25  and there has been very little opportunity for stream channels

Z-43

1    to become incised within it.

2         Any ground waters within Parcel 84 are, in my opinion,

3    vagrant, percolating, and not a part of the De Luz Stream

4    system.  That is with reference only to the portion of the

5    property in the De Luz Creek watershed.

6         Now, there is on Parcel 84 water development.  I have

7    seen from the road a reservoir, an earth-filled dam impounding

8    water.  I observed on the 5th of July when I rode by there

9    irrigation of pasture with a portable sprinkler system on this

10   property.

11        On the basis of information presently available to me,

12   your Honor, there are 41 acres of irrigable land in Parcel 84,

13   Class II and III land.  The total area of the property is about

14   60 acres.  And in my opinion, the best use of that land is for

15   permanent pasture.  And in view of its altitude, the elevation

16   being as shown by the bench mark within the property on

17   Plaintiff's Exhibit M-68, in the neighborhood of 2,409 feet,

18   that bench mark being on the divide which traverses the property.

19   And the present use for irrigation water is for pasture.

20   BY THE MASTER:

21        Q  Now, the answer which has been filed by Virgil A.

22   Claytor and Verda M. Claytor states that they "claim all the

23   riparian water rights on this land to use for stock and to

24   irrigate such crops as I want to raise."

25        Your testimony would indicate that this land is not

Z-44

1    riparian to any stream.  Is that correct?

2         A  That is correct, your Honor.

3         THE MASTER:  Are there any questions concerning this?

4         MR. SACHSE:  Off the record.

5         (Discussion off record.)

6         THE MASTER:  There are no questions?

7         MR. SACHSE:  No.

8         LT. MILLER:  Yes, I have a question, your Honor.

9         Colonel, the acreages that you have testified to only

10   referred to the land within the De Luz Creek watershed?

11        THE WITNESS:  Yes, sir.

12        LT. MILLER:  Nothing further, your Honor.

13        THE MASTER:  Very well.  We now have Parcel 85, which seems

14   to be divided into Parcel 85A and Parcel 85B.

15        LT. MILLER:  M-51, I believe, would be helpful for the

16   witness.

17        THE WITNESS:  Parcels 85A and 85B, your Honor, are

18   delineated on Plaintiff's Exhibit M-68 and also on Plaintiff's

19   Exhibit M-84.  85A appears in two locations, the first one is

20   within the 80 acres delineated, that 80 being the South Half

21   of the Southwest Quarter, Section 24, 8 South, 4 West; the other

22   portion, which also includes the symbol 85A encircled, but

23   lying outside of the area delineated, having a dotted line

24   leading to it, is the West Half of the Southwest Quarter or

25   the Northwest Quarter, Section 25, 8 South, 4 West.

Z-45

1    Parcel 85B being the remainder of the West Half of the

2    Northwest Quarter, Section 25, Township 8 South, Range 4 West.

3    As shown on Plaintiff's Exhibit M-68, there is an unimproved

4    road which branches off from the Tenaja Truck Trail within

5    Section 23, 8 South, 5 West, and proceeds southeasterly

6    through Parcel 86 and, as shown on the map, terminates in the

7    northern portion of Parcel 85A at a symbol indicating a

8    residence.  From that residence the contours, and later an

9    intermittent stream symbol, indicates Camps Creek originating

10   in 85A and flowing south by east through 85B, where it departs

11   from 85B at the southeast corner, thence flowing through Parcel

12   44, which is reported in Plaintiff's Exhibit M-51.

13   On the basis of the information presently available to

14   me, your Honor, all of Parcels 85A and 85B are Class VII land.

15   The combined acreage of 85A, the two parts of 85A, is 100

16   acres; that is Class VII land, non-irrigable.

17   85B is about 60 acres of Class VII land, non-irrigable,

18   on the basis of information presently available to me.

19   The intermittent stream which flows through these parcels

20   and is indicated as a portion of the Camps Creek drainage is

21   intermittent in character, flowing only during and immediately

22   after periods of high precipitation and runoff.

23   The ground water on both parcels, 85A and 85B, is, in

24   my opinion, vagrant, percolating, and not a part of the De Luz

25   stream system.

2418

Z-46

BY THE MASTER:

Q   Now, the answer filed by Mr. and Mrs. Ewing in connection with Parcel 85A states, "We have been using all available water from spring, well, and small dam on place by riparian right, for domestic use, livestock, orchards and truck garden crops before and since August, 1938, when we received the deed to the land which was homesteaded with inherent water rights by my uncle, C. B. Guittard."

What evidence do you have of the use of water for stock, orchards or truck garden crops?

A   I have none, your Honor.

Q   Do you know of the existence of any spring, or well, or dam on this property?

A   I know of none, your Honor.

Q   Then the answer filed on behalf of Parcel 85B by Mr. and Mrs. Olivos states, "This land is riparian land."

That would be correct in that Camps Creek, the headwaters flow through that property.  Is that correct?

A   Through 85B, yes, sir.  That is shown on Plaintiff's Exhibit M-68.

Q   "25 acres are tillable, the balance can be used for grazing cattle, for raising turkeys, chickens and domestic animals."

Your opinion is that there is no tillable land on this property?

Z-47

1      A  On the basis of knowledge presently before me, your

2  Honor, that is my opinion.

3      THE MASTER:  Any questions by counsel?

4      LT. MILLER:  No questions.

5      MR. SACHSE:  No questions.

6      THE MASTER:  The next parcel which I have is Parcel 87.

7      LT. MILLER:  M-99 would help on that.

8      THE WITNESS:  May I have M-99, please, sir?

9      Parcel No. 87, your Honor, is delineated on Plaintiff's

10  Exhibit M-68, with the number 87 encircled contained within

11  the outer limits.

12      The watershed boundary of De Luz Creek and of the Santa

13  Margarita River cuts across the northwestern corner of the

14  property; that portion lying north and westerly of the water-

15  shed boundary is outside of the Santa Margarita and of the

16  De Luz Creek watershed.

17      The property is also shown on the land classification map,

18  your Honor, contained in Plaintiff's Exhibit M-99, that being a

19  report on the Rudolph C. Foss property.

20      The Parcel 87 extends over to the section line which is

21  shown on the second page of the land classification map,

22  running from north to south.  The section corner common to 13,

23  14, and 24, all in 8 South, 5 West, is the midpoint of the

24  westerly boundary of Parcel 87.

25      And as your Honor may note on the aerial photograph there

2420

Z-48

1    is a tremendous coverage of rocky outcroppings, these white

2    dots and streaks throughout the area are typical of the

3    Woodson Mountain granodiorite, those tremendous rounded out-

4    crops.

5         The waters, in my opinion, the ground waters underlying

6    Parcel 87 are vagrant, percolating, and not a part of the

7    stream system of De Luz Creek.

8         Referring to Plaintiff's Exhibit M-68, Cottonwood Creek

9    cuts the extreme northeasterly corner of Parcel 87, and the

10   Tenaja Truck Trail also cuts through the extreme northeasterly

11   corner of Parcel 87.

12        There is a little symbol, a residence symbol or building

13   symbol, located within the property south of the Tenaja Truck

14   Trail.

15        Waters flowing through Cottonwood Creek in this particular

16   reach of the stream are intermittent in character, flowing only

17   during and immediately following periods of high precipitation

18   and runoff.

19        On the basis of information presently available to me,

20   your Honor, there are 24 acres of irrigable land in Parcel 87.

21   The total area of the parcel is approximately 240 acres.  That

22   irrigable land is Class II and III in that particular loca-

23   tion with the area of non-irrigable land best suited to permanent

24   pasture; the remainder of the property could be used for some

25   grazing.

Z-49

1    THE MASTER:  Any questions?

2    LT. MILLER:  No questions, your Honor.

3    MR. SACHSE:  No questions.

4  BY THE MASTER:

5    Q  Is there any present use of the property, to your

6  knowledge?

7    A I have no knowledge of that, your Honor.

8    THE MASTER:  I believe the next parcel is Parcel 89.

9    THE WITNESS:  Parcel 89, your Honor, is delineated on

10  Plaintiff's Exhibit M-68 and also on Plaintiff's Exhibit M-84;

11  and the aerial photograph, the second sheet of the aerial

12  photograph, contained in Plaintiff's Exhibit M-99 also shows

13  the Parcel 89.

14    And referring to Plaintiff's Exhibit M-68, Parcel 89

15  is shown being astride the watershed of De Luz Creek, being

16  partly within and partly without De Luz Creek.

17    It is an irregularly shaped body lying within Section 13,

18  8 South, 5 West.  And the portion which is outside De Luz Creek

19  watershed is also outside the Santa Margarita watershed.  It is

20  right up on the divide, there are no indications of-- the upper

21  headwaters, there are no indications of any streams at all.

22  The contours represent depressions through which water might

23  flow.

24    The ground waters within Parcel 89, particularly that

25  portion of Parcel 89 within the De Luz Creek watershed are, in

Z-50

1   my opinion, vagrant, percolating, and not a part of the De Luz

2   Creek stream system.

3        On the basis of information available to me, your Honor,

4   there are about 32 acres of Parcel 89 within the De Luz Creek

5   watershed, and of that amount about 27 acres are irrigable;

6   and the remainder Class VII lands are non-irrigable, again

7   because of the nature of the site, the elevation and the large

8   areas of non-irrigable land in the area, in my opinion the best

9   use of the land would be permanent pasture.

10  BY THE MASTER:

11       Q  How many acres of land did you say were irrigable?

12       A  27, your Honor.

13       Q  Well, you admit that they have two more acres of

14  irrigable land than they claim.  They claim they have 25 acres

15  of irrigable land.

16       A  It could happen to anyone, your Honor.

17       Q  They refer to a drilled well.  Are you familiar with

18  that?

19       A  I have seen the well in traversing that road, your

20  Honor.  There is a house on the property, and I believe --

21  well, I have seen two wells being pumped.  I don't know whether

22  they were drilled or hand dug, I didn't examine the wells.

23       Q  Are the wells within the De Luz Creek watershed, that

24  portion of the property?

25       A  I believe that one is within and one is without, your

Z-51

1   Honor.  They are located just off of the Tenaja Truck Trail

2   which crosses the northern portion of the property and also

3   crosses the divide, and I believe that one of the wells is just

4   within the divide of De Luz Creek, within the De Luz Creek

5   watershed; the other one is outside of the De Luz Creek water-

6   shed.

7        There is very little irrigation going on, I know, par-

8   ticularly in that northern portion.

9        THE MASTER:  Well, our final parcel seems to be Parcel 90.

10       MR. SACHSE:  You picked a nice short one for the last.

11   Look at the size of it.  What is there, about two acres in the

12   watershed?

13       THE WITNESS:  Parcel No. 90, your Honor, is also in

14   Section--  mostly in Section 13, 8 South, 5 West, and is bounded

15   on the south and east by Parcel 89 just testified to.

16       There is only about one acre in the watershed, your

17   Honor; the remainder of Parcel 90 lies in the San Mateo Creek

18   watershed.

19       And that one acre, on the basis of information presently

20   available to me, is irrigable.

21       The ground waters underlying that portion of Parcel 90

22   within De Luz Creek are, in my opinion, vagrant, percolating,

23   and not a part of the stream system.

24       There is no evidence of any stream course traversing that

25   one acre of land.

The bulk of the development on the property is in the San Mateo Creek watershed.

That property also, your Honor, is shown on the aerial photograph, the second page of the aerial photograph in Plaintiff's Exhibit M-99, and the clearing which is located north of the watershed boundary, south of the Riverside County line and east of the section line running north and south through the photograph. You will note the field there, the clearing on the photograph, which is symbolized as the clearing on Parcel 90, Plaintiff's Exhibit M-68. The bulk of that is outside the watershed, your Honor.

BY THE MASTER:

Q Now, there is an answer on file of G. R. Gough, as trustee, listed in Exhibit M-31 as one of the owners of Parcel 90, with Lawrence B. Johnson, listed as the owner of a life estate. This answer, however, refers to property in Section 35, Township 6 South, in San Bernardino County. So that could not apply then to this property?

A No, your Honor.

Q So there is then no answer presently on file affecting this particular property description.

LT. MILLER: Your Honor, I have a copy of a letter which was written by Mr. Johnson, and I was under the impression that it had been filed with the Clerk as an answer.

THE MASTER: Well, that is true. In other words, my file

Z-53

1   of letters such as this I do not have here with me, the only files

2   that I have here are the more formal answers.

3          LT. MILLER:  Yes, sir.

4          THE MASTER:  This letter, of course, merely points out

5   that the majority of the property flows into the San Mateo Creek

6   or River, and does not allege any facts concerning the property

7   within the De Luz Creek watershed.

8          Well, I believe that that completes your testimony,

9   Col. Bowen, then with reference to each parcel in the watershed,

10  excepting that two or three parcels where you are still making

11  further engineering reports at the request of owners, is that

12  correct, Mr. Gillett being one of them?

13         THE WITNESS:  Yes, sir, we are going to review Mr. Gillett's

14  property.

15         THE MASTER:  Well, it is my thought then at the present

16  time we should recess until August 22nd at 9:30.  At that time

17  we will receive further evidence with reference to Mr. Gillett's

18  property, and also I may at that time call for additional

19  evidence on other points, if in the meantime the examination of

20  the transcript and the records indicates to me that additional

21  information is needed.

22         Also, if any of the parties at that time find that they

23  have overlooked information which they desire to present, an

24  opportunity will be given to them to submit subject, of course,

25  to the right of any other party to object, or any other legal

Z-54

1   business.

2          Unless there is something further we will adjourn now

3   until Friday, August 22nd, at 9:30.

4          (Adjournment at 3:55 P.M.; hearing to be reconvened

5   Friday, August 22, 1958, at 9:30 A.M.)