ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

               Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

          Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

| | |
|---|---|
| **Volume:** | 19 |
| **Pages** | 2427-2461 |
| **Date:** | August 22, 1958 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3   APPEARANCES:

4

5         WILLIAM H. VEEDER, ESQ.,
         Representing the United
6         States of America.

7         LCDR DONALD W. REDD, U.S.N.,
         Representing the United
8         States of America.

9         FRANZ R. SACHSE, ESQ.,
         Representing Fallbrook
10        Public Utility District

11        MR. and MRS. DON I. GILLETT,
         In Pro Per.

12

13             - - -

14              -

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

For the Plaintiff:                          D          X

    Allen C. Bowen                    2429       2456

# EXHIBITS

|                                | Iden. | Evid. |
| ------------------------------ | ----- | ----- |
| M-90A - Engineering report     | 2429  | 2430  |
| M-129 - Map                    | 2440  | 2441  |

Z-1

<u>Fallbrook, California, August 22, 1958. 9:30 A.M.</u>

1

2

3     THE MASTER:  Are you ready to proceed, Mr. Veeder?

4     MR. VEEDER:  Well, I want to be sure that we have-- I

5 think the Colonel should take the stand and we will just offer

6 this report in evidence.

7     THE MASTER:  Court will be in session.

8     Will you state your appearances for the record, please?

9     MR. VEEDER:  William H. Veeder for the United States of

10 America.

11     MR. SACHSE:  Franz R. Sachse for the Fallbrook Public

12 Utility District and individual named defendants.

13     THE MASTER:  I notice Mr. and Mrs. Gillett are in the

14 courtroom.

15     May I have your name?

16     MRS. TROTTER:  I am Mrs. Trotter.

17     THE MASTER:  Do you have land in this area?

18     MRS. TROTTER:  No, I don't think so.  I am on North

19 Stagecoach Lane.

20     THE MASTER:  That is not in the area we are considering

21 today, but you are very welcome to be present and view the

22 proceedings.

23     Col. Bowen, will you take the stand, please.

24     I understand, Mr. Veeder, that you have a revised report

25 concerning the Gillett property.  Is that correct?

Z-2

MR. VEEDER: Yes, sir, we do. And we would like to have it marked for identification.

I think it would be advisable to have this marked with a subnumber of the original.

LCDR REDD: That is M-90, was the original exhibit.

MR. VEEDER: That will be M-90A, if that is agreeable with your Honor.

THE MASTER: Yes. I believe M-90 is one that was offered after the original addendum, and that is the reason there is now an M-90A.

MR. VEEDER: That is correct.

THE MASTER: Very well. Then the revision should be marked M-90A.


ALLEN C. BOWEN,

recalled as a witness, having been previously sworn, testified as follows:


DIRECT EXAMINATION

BY MR. VEEDER:

Q Col. Bowen, I hand you Plaintiff's Exhibit marked M-90A and ask you to state into the record what it is.

A Plaintiff's Exhibit M-90A is an engineering report of the investigation made on the property of Don I. and Dorothy D. Gillett, which is also known as De Luz Watershed Parcel No. 63,

Z-3

XR

1    shown on Plaintiff's Exhibit M-68.

2         Now, this investigation-- or, report of the investigation

3    is the same as Plaintiff's Exhibit M-90, with the exception of

4    additional irrigable acreage, determined by field survey in

5    company of Mr. Gillett, following the last hearing before your

6    Honor.

7         Q   This was made under your direction.   Is that correct,

8    Colonel?

9         A   Yes, sir.

10        Q   And to your personal knowledge is it accurate?

11        A   Yes, sir.

12        MR. VEEDER:   We offer in evidence Plaintiff's Exhibit M-90A.

13        THE MASTER:   That will be received in evidence and so

14   marked.

15   BY MR. VEEDER:

16        Q   Now, will you state, Colonel, the changes which have been

17   made by reason of--   May I start that again?

18             Will you state into the record the changes that have

19   been made in regard to Plaintiff's Exhibit M-90 by reason of

20   this new investigation and the report which is now in evidence

21   as M-90A?

22        A   Yes, sir.   Referring to Plaintiff's Exhibit M-90A,

23   page 2, tabulation of land classification shows a change of

24   Class III land from 2.1, as originally reported, to 11.0 acres;

25   and a reduction in the Class VII acreage from 618.3 to 609.4.

Z-5

Referring to Page 3 of Plaintiff's Exhibit M-90A, the corresponding change was made in the tabulation of adapted crops and future potential water use, bringing the future potential water use up to 70.7 acre feet per year instead of 79.8 acre feet per year.

And referring to the soil survey drawn on an aerial photo base, the additional acreage of Class III land is delineated thereon shown in the northerly portion of the property.

Your Honor, comparing the map contained in Plaintiff's Exhibit M-90A with that contained in Plaintiff's Exhibit M-90 are the area of Class III land lying in the approximate position as delineated by Mr. Gillett on the map contained in Plaintiff's Exhibit M-90, namely, lying largely within the Southwest Quarter of the Southeast Quarter, Section 3, Township 9 South, Range 4 West.

Further additions were made as shown on Plaintiff's Exhibit M-90A in the Southeast Quarter of the Northeast Quarter, Section 3, 9 South, 4 West; and also in the Northeast Quarter of the Northeast Quarter of Section 3, 9 South, 4 West.

Q   Was there agreement between you and Mr. Gillett in regard to the acreages and locations of the revised portions, Col. Bowen?

A   I have not discussed this finding with Mr. Gillett, but it was my understanding that he was in agreement with the soil surveyor from my office at the time the survey was made.

Z-6

1    Q   Do you have any other and further statement to make

2    in regard to the amended report?

3    A   No, sir.

4    MR. VEEDER:   Well, your Honor, I think that concludes

5    the Gillett matter from the standpoint of the United States.

6    THE MASTER:   Well, I would like to ask Col. Bowen two

7    or three questions, and then of course I will give Mr. and

8    Mrs. Gillett an opportunity to ask him any questions, and also

9    to present any evidence which they wish to present.

10    Q   Referring to Exhibit M-68, it appears that Parcel 63

11    is partially within and partially without the De Luz Creek

12    watershed.   Now, the first additional area of Class III land

13    concerning which you testified appears clearly to be in the

14    portion of the Gillett property which is outside the watershed.

15    That is correct, is it not?

16    A   That is correct, your Honor.

17    Q   Now, the most southerly of the additional portions of

18    Class III land which are in the northeast quarter of Section

19    3 appears to be very close to the watershed line as shown on

20    Exhibit M-68.   Can you tell me whether that portion is within

21    or without the De Luz Creek portion of the watershed?

22    A   That portion is within the De Luz Creek watershed, your

23    Honor.

24    Q   Now, in the figures which you have given on pages 2 and

25    3 of M-90A of Class III land and water usage, have you included

Z-7

1    the portion in the southeast quarter, which is outside the De

2    Luz Creek watershed?

3         A   Yes, your Honor.

4         Q   Can you segregate that from the portions which are

5    within the watershed?   That is, how many acres are included

6    within this portion of Class III land in the northeast--

7    correction-- in the southeast corner?

8         A   There are approximately five acres, your Honor, of

9    Class III land which are shown on the survey lying outside of

10   the De Luz Creek watershed; the remaining approximately 6 acres

11   of additional Class III land lie within the De Luz Creek water-

12   shed.

13        Q   Well, now, the total area of Class III land is 11 acres.

14   Is that right?

15        A   Yes, sir.   That includes the 2.1 acres which were

16   originally found to be in the De Luz Creek watershed also lying

17   within the northeast quarter of Section 3.

18        Q   Well, looking at the map it would appear that this

19   area in the southeast quarter is not five acres, if the three

20   other areas only equal six acres.

21        A   Well, that was only an approximation, your Honor.   I

22   do have the areas by-- or, the acreages by areas, but not in

23   my possession.   I can probably get those by telephone this

24   morning.

25        Q   Well, I would appreciate if you could get those, and

z-8

1    then you could testify to that at a later session this morning.

2         A   Yes, sir.

3         THE MASTER:  Those are the only questions which I had.

4         Mr. Sachse, do you have any questions?

5         MR. SACHSE:  I have no questions, no.

6         THE MASTER:  Mr. and Mrs. Gillett, do you wish to interro-

7    gate Col. Bowen at the present time, or do you wish to offer

8    any testimony?

9         MR. GILLETT:  I would like to see the report, yes.

10        MRS. GILLETT:  We haven't seen the amended report.

11        THE MASTER:  You haven't?

12        MRS. GILLETT:  We haven't received a copy of it.

13        THE MASTER:  Very well.  Will you present a copy of this

14   to Mr. and Mrs. Gillett?

15        Well, I would suggest then that while the Gilletts are

16   examining the report we might proceed to have Col. Bowen answer

17   some other questions which I had in connection with other

18   phases of the case.

19        MR. VEEDER:  Yes, your Honor.  Will we stay on the record

20   while that is being done?

21        THE MASTER:  I would think so, yes.

22        Q   Col. Bowen, during the period since the last hearing

23   I have been going over the transcript in connection with

24   proposed findings, and I have been unable to find any place in

25   the transcript where certain information is given which I

2435

Z-9

1  believe you may be able to supply.

2      At the time you were testifying with reference to Parcel 2

3  on Plaintiff's  M-68 you referred to an intermittent stream,

4  but you did not at that time state whether that was the type

5  of stream which flows only during and immediately after a heavy

6  rain, or whether it flowed for any extended period of time.  Can

7  you give me any further information with reference to the

8  character of that stream?

9      A  Yes, sir.  In my opinion the stream symbolized as an

10  intermittent stream on Parcel No. 2, as shown on Plaintiff's

11  Exhibit M-68, is a stream which flows only during and shortly

12  after periods of high precipitation and runoff.

13      Q  Thank you.  Now, there is also testimony which is,

14  according to the transcript as I read it, not entirely complete

15  with reference to the streams which flow through Parcel 15.

16  Now, there are two portions of Parcel 15, two separate parcels.

17  Can you state the character of the intermittent streams which

18  flow through each of those parcels?

19      A  Part of Parcel 15, your Honor, as shown on Plaintiff's

20  Exhibit M-68, is approximately 40 acres, described as the

21  Northeast Quarter of the Southeast Quarter of Section 20, 8

22  South, 4 West, and there are no symbols indicating streams in

23  that particular forty.  However, the contours indicate draws

24  and gullies in there.  Any of those are of the character that

25  would flow immediately and shortly after periods of high

Z-10

1  precipitation and runoff.

2      The remaining approximately 40 acres of Parcel 15, described

3  as the Southwest Quarter of the Southwest Quarter, Section 21,

4  8 South, 4 West, is an intermittent stream, as symbolized on

5  Plaintiff's Exhibit M-68 previously testified to in regards to

6  the Fredy and the Bleeker property, and that stream is inter-

7  mittent in character, flowing only during and immediately after

8  periods of high precipitation and runoff.

9      Q  Now, there is also certain testimony with regard to the

10  streams in Parcel 53, the De Luz School District, and the

11  record is not entirely clear as to the nature of any inter-

12  mittent streams in that parcel; that is, I am excluding from

13  that question, of course, the actual De Luz Creek, concerning

14  which there is considerable testimony.

15      A  Yes, sir.  Referring to Plaintiff's Exhibit M-68,

16  Parcel No. 53 delineated thereon, there are two intermittent

17  stream symbols which traverse-- are shown traversing the

18  property generally from east to west, tributary to the East

19  Fork of De Luz Creek.  And those streams are intermittent in

20  character, flowing only during and immediately after periods

21  of high precipitation and runoff.

22      Q  Now, in your opinion would water developed from wells

23  upon Parcel 53 be a portion of the flow of De Luz Creek, or

24  would it be vagrant water, or would it be-- would it depend

25  upon the location of the well?

Z-11

1    A   It would depend upon the location of the well, your

2   Honor.   The alluvial material which adjoins the East Fork of

3   De Luz Creek and which adjoins the lower portion of the inter-

4   mittent stream tributary to the East Fork of De Luz Creek

5   contains water which in my opinion is a part of the stream

6   system.   Wells drilled, however, in the granitic materials

7   occupying the southerly and easterly portions of Parcel 53

8   would only tap water which would be vagrant and percolating,

9   and not a part of the stream system.

10    Q   Now, Exhibit M-89 is the engineering report on that

11   property.   Would it be possible by reference to that exhibit

12   to set those boundaries with any more definiteness?

13    A   Yes, your Honor.   With reference to the soil survey on

14   aerial photo base, which is a part of Plaintiff's Exhibit M-89,

15   your Honor, it is my opinion that all of the area shown as

16   Class VII colored in brown contains water of the character

17   described as vagrant, percolating, and not a part of the stream

18   system.

19    The areas colored orange, which are shown in contact with

20   but outside of the Class III or red area-- that is lying

21   south and east of the red area-- would also contain vagrant,

22   percolating ground water.

23    The alluvium to which I have referred occupies a part of

24   the area shown as Class VI, colored in orange on the land

25   classification map, Plaintiff's Exhibit 89, and part of the

Z12

1   Class III or red area, and waters extracted from those areas

2   in my opinion are part of the stream system.

3        Q  But except for that area that you have last described,

4   water developed on the property would be vagrant water?

5        A  Yes, sir.

6        THE MASTER:  Could we have Exhibit MA-55, and also M-104?

7        MR. SACHSE:  That is Dennis's client, isn't it?

8        THE MASTER:  Yes.

9        Q  Col. Bowen, you will recall testimony concerning the

10  Jones property, Parcel 55, and M-104 is the Government's

11  engineering report on--

12       A  No, your Honor, that is incorrect.

13       Q  M-104 is the Government's report on that property.

14  Can you give me the areas of irrigable land in the northerly

15  80 acres, as shown on report M-104, excluding the irrigable

16  acreage in the southerly 120 acres?

17       A  Yes, your Honor.  If I may, I have a tabulation.

18       Referring to Plaintiff's Exhibit M-104, and more

19  particularly to the land classification map contained therein,

20  the areas shown as Class III and Class VI in the northerly 80

21  measure a total of 18 acres.

22       Referring to Defendant's Exhibit MA-55, the irrigable

23  acreage shown on the map contained in MA-55 for the northerly

24  80 acres measures 43 acres, your Honor.

25       Q  Thank you.  Then I have a similar question in regard

Z-13

1  to the nature of the underlying water in Parcel 13.  I believe

2  that your testimony with reference to Parcel 40 was that any

3  underlying water would be part of the stream system.  Now, is

4  that true of water underlying Parcel 13, or is it true in part,

5  or is it not true at all?

6    A  It is true in part, your Honor.  Speaking of Parcel 13,

7  as shown on Plaintiff's Exhibit M-68.

8    Q  I wonder if we could have Exhibit M-42, which is the

9  engineering report on that property.

10    A  Referring to the geology section, your Honor, of

11  Plaintiff's Exhibit M-42, page 2, it describes the property

12  as overlying in part the alluvium-- recent alluvium and older

13  alluvium found along De Luz Creek; it further indicates that

14  the granitic material underlying the remainder of the property

15  is rather deeply weathered, and that this weathered residuum

16  allows the penetration and percolation of water.

17    Therefore, in my opinion, in reference to the land

18  classification map contained in Plaintiff's Exhibit M-42, the

19  bulk of the property overlies water which is either in the

20  recent alluvium, the older alluvium or terrace formations as

21  shown in the northwesterly corner of the map colored in yellow,

22  red and blue.  The yellow and blue area in the easterly portion

23  of the property is primarily the deeply weathered granitic

24  material.

25    The southerly portion of the Class VII land shown in

Z-14

1    the westerly extension of the property in my opinion would

2    contain water only found in the crevices and fissures of the

3    underlying granitic material and would be vagrant, percolating,

4    and not a part of the stream.

5        The remainder of the upper material is in contact with

6    the terrace material and recent alluvium, and water moves sub-

7    surfacely through the residuum and through the cracks and

8    fissures into the terrace materials which is quite pervious,

9    and thence into the recent alluvium along the stream bottom.

10   Waters from those sources would be a part of the stream system.

11       Q   Then do I understand you correctly that water under-

12   lying the Class VII land would be vagrant water; water under-

13   lying the remaining portions of the property would be part

14   of the stream system?

15       A   Yes, your Honor.

16       Q   Now, at the last session, or the next to the last

17   session, Mr. Dennis had requested you to prepare a map which

18   would delineate the watershed boundaries of the various

19   tributaries or components of the De Luz Creek watershed.  Have

20   you been able to prepare such a map?

21       A   Yes, sir, we have prepared such a map.

22       MR. VEEDER:  I would like to have this map designated De

23   Luz Creek Watershed, subwatershed and ownership marked for

24   identification.

25       THE CLERK:  That would be M-129.

XI

Z-15

1    BY MR. VEEDER:

2        Q  Col. Bowen, I hand you Plaintiff's Exhibit M-129 marked

3    for identification, and ask you to state into the record what

4    it is.

5        MR. SACHSE:  Have you got one there I can work with?

6        THE WITNESS:  Your Honor, Plaintiff's Exhibit M-129 is a

7    line map of the De Luz Creek watershed showing the crest of

8    the watershed of De Luz Creek--

9    BY MR. VEEDER:

10       Q  Now, Col. Bowen, was this map prepared under your

11   direction?

12       A  Yes, sir.

13       Q  And do you personally know it to be accurate?

14       A  Yes, sir.

15       MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

16   M-129, marked for identification.

17       THE MASTER:  That will be received in evidence and so

18   marked.

19       MR. VEEDER:  Do you want it marked now?

20       THE MASTER:  Do you want him to testify now to it and

21   then it can be marked?

22       MR. VEEDER:  All right.

23   BY THE MASTER:

24       Q  Can you explain further what this map shows, Colonel?

25       A  Yes, sir.  In addition to the outer perimeter of the

Z-16

1   De Luz Creek watershed shown as a heavy black line, subwater-

2   sheds of De Luz Creek within the exterior boundaries of the

3   watershed are shown by similar heavy black lines.  And in

4   addition to that the ownership is platted on the map with the

5   parcel numbers inscribed where possible within the parcels

6   designated, and where those parcels are too small to inscribe

7   the number, the number is indicated by a line extending from

8   the circle around the number to the property so numbered.

9       Q  And those numbers are, of course, the same as on M-68

10  and the previous numbered maps?

11      A  Yes, your Honor.

12      Q  And the ownerships tie into Exhibit M-31 and the previous

13  exhibits as to ownership?

14      A  Yes, your Honor.  Shown on this map, your Honor,

15  Plaintiff's Exhibit M-129, is the watershed of the East Fork

16  of De Luz Creek.  The main stem of De Luz Creek down to its--

17  The main stem of De Luz Creek is shown clear on through to

18  its confluence with the Santa Margarita River.  The watershed

19  of Cottonwood Creek, Camps Creek, Fern Creek, Roblar Creek,

20  the unnamed tributary which arises in Parcel 24 and flows

21  westerly through Parcels 60, 58, 59, 54, 65, 52, 91, to its

22  confluence with De Luz Creek in Parcel No. 76.

23      Q  And those are the main components of the De Luz Creek

24  stream system.  Is that correct?

25      A  That is correct, your Honor.

Z-17

1    MR. VEEDER:  By components you mean the affluence and

2    the tributaries.  Is that right?

3    THE WITNESS:  Yes, sir.

4    THE MASTER:  I believe that that answers the questions

5    which I have at the present time.

6    Now, in view of the questions which I have asked do counsel

7    have any questions they wish to ask Col. Bowen?  Mr. Sachse,

8    I asked him some questions about some property of one of your

9    clients.

10    MR. SACHSE:  No, I am quite satisfied with the replies.

11    I have nothing on that.

12    THE MASTER:  Mr. Veeder, do you have any questions?

13    MR. VEEDER:  Not at the moment, your Honor.

14    THE MASTER:  Off the record.

15    (Discussion off record.)

16    THE MASTER:  Back on the record.  And I will ask you to

17    ask your questions of Col. Bowen.

18    Mrs. Gillett, do you have any questions now?  I understand

19    you have had an opportunity to examine the report M-90A.  And

20    do you wish to ask Col. Bowen any questions concerning it?

21    MRS. GILLETT:  Well, the question, one or two questions

22    that we had.  They mention an undeveloped spring on page 2

23    of this report with a capacity of one to two gallons per

24    minute, located in the Southeast Quarter of the Northeast

25    Quarter of Section 3.  Is this spring of any importance as far

Z-18

1   as this lawsuit is concerned?  In other words, is the Government

2   making any claim to the water of such streams?  I don't know

3   whether Col. Bowen can answer that question.

4       THE MASTER:  Mr. Veeder, do you care to answer that

5   question?

6       MR. VEEDER:  Well, I believe it poses a legal question,

7   and it certainly wouldn't be proper for me to respond to it

8   in the record.  I believe it will be a matter of fact upon

9   which your Honor will make findings and upon which you will

10  predicate cases of law.

11      THE MASTER:  I think that is true.  What I had in mind

12  was questions as to actual facts.

13      MRS. GILLETT:  Yes.  The reason I asked that particular

14  question concerning that spring, I wasn't sure with the ruling

15  that Judge Carter had made.  Perhaps I misunderstand such a

16  ruling, but I was wondering about the kind of water, whether

17  or not we should attach any importance to that.

18      The question in our mind is where is that spring

19  located.  We haven't been able to find it.

20      THE MASTER:  Well, do I understand you then to state that

21  you question the existence of the undeveloped spring that is

22  referred to in the report?

23      MR. GILLETT:  Yes.

24      THE MASTER:  Now, aside from that, is there anything in

25  the amended report with which you disagree?

Z-19

1    MRS. GILLETT: Yes, there is one other question that we

2  had in mind, and that is the number of acre feet per year which

3  is allowed.

4    THE MASTER: Of course that is a matter which would only

5  be decided at the termination of the entire case.

6    MRS. GILLETT: That is what we were wondering.

7    THE MASTER: In other words, I cannot at the present time

8  set forth or tell any defendant how much water that particular

9  defendant would receive, assuming that any effort is made in

10  the judgment to allot specific quantities of water. In other

11  words, that whole question has to await the final determination

12  of the case.

13    The question is do you agree or do you disagree with the

14  computations which have been made by Col. Bowen and his staff

15  with reference to the actual nature and character of your

16  acreage? That is, do you think that he has correctly character-

17  ized the land itself?

18    MR. GILLETT: I think that is about as accurate as we can

19  get it.

20    THE MASTER: I didn't understand the answer.

21    MR. GILLETT: I think that is right.

22    THE MASTER: In other words, you think his characterization

23  of the land is correct?

24    MRS. GILLETT: As near as we can arrive at this time in

25  its undeveloped state, yes. But getting back to my question

Z-20

1   as to the number of acre feet per year that is allowed, this

2   figure that the Government has put in our report as being

3   allowed is not a definite figure?

4       THE MASTER:  Well, that is not any figure as to any

5   amount that is allowed.  The figures in the report are the

6   Government's computations of the amount of water which could

7   be used to grow the specific crops referred to.  And the

8   Government, of course, cannot allow anybody more water than

9   exists there.

10      MR. VEEDER:  May I interpose right here?  One, the

11  Government isn't allowing anyone anything in the sense that

12  these reports are made; Col. Bowen is simply putting down as

13  a soil scientist and an agricultural engineer what he as a

14  scientist believes the situation calls for.  And again I

15  would like to make further clarification, this is a suit in

16  which the United States is a party, and it is not the United

17  States allowing anything.  It is for the Court to decree.  And

18  your statement in regard to the spring, Mrs. Gillett, I want

19  to be clear, too.  The United States here is simply asking

20  for a determination, it is not making any statement as to

21  allowances or gratuities, or anything else.  We are just try-

22  ing to have the Court have these facts before it for determina-

23  tion.  And the fact that the United States is plaintiff has

24  nothing to do with allowing or granting or according to anyone

25  rights at all.  In fact, we are just like anyone else in this

Z-21

1   suit seeking to have our rights determined.

2       MRS. GILLETT:  Perhaps I should put it this way, in your

3   summons, which was 4.2 acre feet per acre, why is ours less?

4   Let me put it that way.

5       MR. VEEDER:  I think you might ask the Colonel.  I will

6   give you the view of a lawyer on it.  We took the view in

7   regard to the lands of the United States, which are largely

8   undeveloped, that the water duty for those lands should be

9   calculated on the basis of irrigated pasture, which is about

10  4.2 water duty, which would have about that.

11      In making these calculations which the Colonel has under-

12  taken he has simply shown your lands which would be susceptible

13  for a higher utilization than just plain grazing, just natural

14  pasture.  Now, it so happens that avocados, for example, and

15  citrus-- I haven't looked at your report myself, but I assume

16  that that must be a part of it-- they have what is called a

17  higher water duty, which means it takes a less amount to raise

18  those.  I think in this report 4.2 is made reference to as the

19  duty for water for pasture.  Is that right?

20      THE WITNESS:  Yes, sir.  That addendum is attached to

21  Plaintiff's Exhibit M-90.

22      THE MASTER:  That addendum states, Mrs. Gillett, that in

23  the event the property were devoted to permanent pasture it

24  would require 4.2 acre feet per acre as a project duty, that

25  would be the amount which must be applied to the crops.  And in

Z-22

1   addition it would have to have some allowance for the amount

2   of water lost in getting the water onto the crops, so that

3   the position I believe is clear that any property which is

4   devoted to that type of use, whether it is Government property

5   or individual property, would require that amount of water.

6   Of course, as Mr. Veeder has said, this lawsuit cannot actually

7   create any water or assure anybody that he will receive the

8   full amount of water which his land could actually use.

9        Well, I think possibly then that your previous state-

10   ments make it clear that you have no disagreement then at the

11   present time with the engineering report as modified with

12   reference to the nature of your soil?

13   MRS. GILLETT:  That would be correct, as far as nature

14   of the soil is concerned.  As far as the number of acre feet

15   of water per year is concerned, yes, we definitely disagree.

16   As far as the soil is concerned, we aren't asking any other

17   survey to be made.

18   THE MASTER:  In other words, you think he has properly

19   classified the soil on your property.  It would then be a

20   matter for the Court to determine in connection with your

21   property, as well as everybody else's property, what the legal

22   right are, based upon those facts, and nobody is bound by this

23   statement of 4.2 acre feet, or by any other quantity.

24        Now, is there any additional testimony then that you care

25   to present?

1     MR. GILLETT:   No.

2     MR. VEEDER:   I wonder if they would like to ask some

3  questions as to how the Colonel arrived at the acre foot

4  determination, because I think they are worried about the

5  proposition that could probably be straightened out by the

6  Colonel.

7     THE MASTER:   Colonel, could you answer the question that

8  Mr. Veeder has posed?  And it may assist the Gilletts in under-

9  standing this situation.

10    THE WITNESS:   Yes, your Honor.  With reference to Plain-

11  tiff's Exhibit M-90A, page 3, there is shown a total of 14.6

12  acres of land which are suited to production of avocados.

13  Now, those 14.6 acres include the bulk of the Class III lands,

14  those lands which have a sufficient depth of soil and free

15  draining characteristics, and located at such elevations or

16  in such sites where air drainage assures the warm tempera-

17  tures desirable for avocados, and those sites considered

18  suitable for avocados are suggested to you as avocado sites.

19  They are adapted for other purposes, of course, also.  You

20  may not be interested in growing avocados, but if you were

21  to grow avocados on those sites adapted to them the requirement

22  for avocados, as determined by various State and Federal

23  agencies in this part of the country, averages about 2.35

24  acre feet of water per year applied to the land.

25    As his Honor has stated, there are, of course, some losses,

Z-24

1   we call them project losses, which occurs between the point of

2   diversion and the place of use which would increase that figure

3   by an amount that could be calculated, determined on the

4   efficiency of your irrigation system.

5       Similarly, the sites which are recommended for irrigated

6   pasture are, for example, those down where your house is in the

7   southeast corner of the property where there is a hardpan, and

8   other factors which make it undesirable for avocados.  And

9   on those sites we have indicated, as shown in the tabulation on

10  page 3 of Plaintiff's Exhibit M-90A, suitability for irrigated

11  pasture.  And again the duty of water for irrigated pasture

12  applied to the ground is generally recognized in this area as

13  3.83 acre feet per year; add a 10% loss on that for project

14  duty and you arrive at the 4.2 acre feet per acre per year,

15  which is included in the addendum to Plaintiff's Exhibit M-90,

16  which is the first report of the engineering investigation on

17  your property.

18  BY MR. VEEDER:

19      Q  In other words, when you have set forth in your report,

20  Colonel, a statement as to the maximum acre feet that would

21  be used in the event avocados were planted, you are simply

22  making a scientific calculation and not any attempt to allot

23  water?

24      A  Oh, yes, sir.  This might be considered as-- this report

25  of an engineering investigation considered as a guide for the

Z-25

1    best use and development of the land only.

2        Q  And it has nothing to do with the rights of the use

3    of water?

4        A  No, sir, nothing.

5        THE MASTER:  Does that clarify it in your minds?

6        MRS. GILLETT:  Yes.  As I say, we were happy with the

7    report, except the number of acre feet that we might be

8    allowed as a result of this survey.  As long as that will be

9    decided that is all right with us, but we were not in complete

10   agreement with the acre feet.

11       THE MASTER:  The report, as indicated, is a guide for the

12   use of the property.  And in so far as it describes the

13   physical nature of the property it is a guide to the Court in

14   trying to decide the entire question.  But the actual determina-

15   tion as to how much water shall be allotted is not determined

16   in any way by the report, nor are the legal questions determined

17   as to whether the decree will ever spell out how many acre

18   feet of water any particular piece of property is entitled to.

19       Now, while Mr. and Mrs. Gillett are here it might be

20   well for you to state, Col. Bowen, whether or not you have made

21   any revisions in your estimate as to Parcel 64.  At the time

22   evidence was considered on that parcel there was testimony that

23   you were going to examine 63, and you might have a revision on

24   your estimate as to 64?

25       THE WITNESS:  Your Honor, I instructed my soil surveyor

Z-26

1   to inspect that portion of 64 particularly.  Referring to

2   Plaintiff's Exhibit M-68, your Honor remarked on the contours

3   indicating the presence of a valley along the intermittent

4   stream flowing westerly through Parcel 64, the same stream that

5   arises on Parcel 63.  And that stream-- or, the lands bordering

6   that intermittent stream were inspected at the same time that

7   the check was made on Parcel 63.  And the lands are not suited

8   to irrigation, and classified as Class VII.

9       THE MASTER:  In other words, the further investigation has

10  not changed your opinion as to the nature of the soil in

11  Parcel 64?

12      THE WITNESS:  That is correct, your Honor.

13      THE MASTER:  Well, now, I think we will take a brief

14  recess at this time to permit Col. Bowen to endeavor to obtain

15  by telephone his actual record with reference to the portion

16  of Class III land in Parcel 63 which is outside the De Luz

17  Creek watershed, and the parcel which is inside the watershed.

18      And it may be that Mr. and Mrs. Gillett will wish to wait

19  until he has presented that testimony, also.

20      So we will take a recess at this time.

21      (Recess.)

22      THE MASTER:  Col. Bowen, will you resume the stand.

23      THE WITNESS:  Yes, sir.

24  BY THE MASTER:

25      Q  Were you able during the recess to obtain the

Z-27

1   information requested with reference to the allocation of the

2   additional Gillett irrigable acreage as to the property in the

3   watershed and the property outside of the watershed?

4       A   Yes, your Honor.

5       Q   Can you state what you have ascertained?

6       A   Referring to Plaintiff's Exhibit M-90A, the combined

7   acreage of the three parcels of Class III land as shown lying

8   in the East Half of the Northeast Quarter of Section 3, 9

9   South, 4 West, that acreage is 7.9, all of which is within the

10  De Luz Creek watershed.

11      THE MASTER:  Mr. and Mrs. Gillett, you have heard that

12  testimony.  Do you have any disagreement with it?

13      MR. GILLETT:  No.

14      THE MASTER:  Are there any questions by counsel, then?

15      MR. VEEDER:  Your Honor, there is a problem presented here,

16  and I am thinking of the Gilletts.  I am hopeful that the

17  report that is tendered here and that the evidence that has been

18  adduced will be applicable in future proceedings outside of the

19  watershed of the De Luz Creek.  In other words, have you

20  given that matter thought?  Our position is that Col. Bowen has

21  testified in regard to matters both in and outside of the

22  watershed, and that the testimony thus offered would be

23  applicable in future proceedings beyond the De Luz watershed.

24      THE MASTER:  Well, I think that is correct.  In other

25  words,--

Z-28

1    MR. VEEDER:  The Gilletts should not have to come back,

2    your Honor.

3    THE MASTER:  He has testified to the irrigable acreage,

4    and the general character of their property, both within the

5    De Luz Creek area and outside of that particular area.  And

6    that is in the record for all purposes and could be considered

7    when we are hearing evidence as to the balance of the property

8    in the adjacent subwatershed.  It would not be necessary for

9    the Gilletts to be present at that time to have this same

10   evidence presented as to the balance of the parcel of their

11   property.

12   MR. VEEDER:  That was my only concern, your Honor.  I

13   have no further questions.

14   THE MASTER:  Mr. Sachse?

15   MR. SACHSE:  I have some questions on M-129 at whatever

16   time it is orderly to do that.

17   THE MASTER:  You have no questions on that?

18   MR. SACHSE:  No, your Honor.

19   THE MASTER:  Mr. and Mrs. Gillett, you are free to leave,

20   but you may stay if  you wish.

21   MRS. GILLETT:  I have one question concerning our property

22   outside of the De Luz Creek watershed.

23   Col. Bowen, in looking at the map in back of  you there,

24   there is the blue streams there.  Do you consider those an

25   unnamed stream of the Santa Margarita River?  Do you feel

Z-29

1   they are big enough to be classified as one of the streams

2   involved in this lawsuit?

3       MR. VEEDER:  May I suggest, Mrs. Gillett, that you

4   approach M-68 and point those out, and then there will be no

5   question as to what you mean.

6       THE WITNESS:  Yes, ma'am.  Referring to Plaintiff's Exhibit

7   M-68, more particularly that portion of Parcel No. 63 lying

8   outside of the De Luz Creek watershed, there is shown an

9   intermittent stream symbol or symbols which join and continue

10  flowing southerly to confluence with the Santa Margarita

11  River.  And that stream symbolized on Plaintiff's Exhibit M-68

12  is intermittent in character.  It bears no name to my knowledge,

13  there is none shown on the map, and it flows only during and

14  immediately after periods of high precipitation and runoff.

15      MR. VEEDER:  And to what stream is it affluent?

16      THE WITNESS:  It is affluent to the Santa Margarita River.

17      MR. VEEDER:  The main stem?

18      THE WITNESS: It being within the exterior boundaries of

19  the Naval Reservation.

20      MRS. GILLETT:  That is all.

21      THE MASTER:  Then that will conclude the evidence with

22  reference to Parcel 63.

23      Now, Mr. Sachse, you have indicated that you have some

24  questions with reference to Exhibit M-129?

25      MR. SACHSE:  Yes.

Z-30

CROSS-EXAMINATION

BY MR. SACHSE:

Q   Col. Bowen, I am particularly referring to the sub-watershed shown on M-129 immediately south of the watershed of the East Fork of De Luz Creek.  Do you see the one to which I refer, an intermittent stream that runs through Parcels 23, 27, 60, 25, 58, 59, 54, 65, 52, and so on?

THE WITNESS:  Yes, sir.

Q   Now, is there any specific reason -- geologic, runoff, or anything else-- why in this delineation you singled out that unnamed tributary for a delineation of a sparate watershed?

A   The only reason, Mr. Sachse, is it is a little larger area than any of the other unnamed tributaries within the De Luz Creek watershed.  The watershed area is actually larger than that of Fern Creek, for example.

Q   Again I am not arguing, I am simply trying to find out what process was in your mind.  Observing the unnamed stream at its confluence with De Luz Creek in Parcel 35, going through Parcels 30, 15, 16, 18, and I think it is a bigger watershed.  Is there any reason why that would not be classed a separate watershed?

A   The only reason, Mr. Sachse, was it was my understanding that the Court desired the East Fork of the De Luz Creek watershed defined.  Hence, we made no breakdown within that subwatershed.

Z-31

1    Q   Are we to consider that anything that has not been

2    delineated on 129 as a separate watershed then will be auto-

3    matically regarded by you as a part of the larger watershed?

4    A   It is all part of the larger watershed, Mr. Sachse.

5    This breakdown could be carried out to much smaller watersheds,

6    subwatersheds of subwatersheds, but this map represents my

7    understanding of what his Honor wanted.

8    Q   Well, now, you have referred a number of times to

9    intermittent streams flowing only during and shortly after

10    periods of high precipitation and runoff.   Is that factor

11    considered in what you have delineated as watersheds?

12    MR. VEEDER:   I am going to interpose an objection here

13    on the ground that the Colonel simply undertook a task to which

14    he was directed, and he carried it out, as I understand it,

15    in accordance with directions at Mr. Dennis's request.   Now,

16    I have no objection to cross-examination on this, but I want

17    it understood that our witness, Col. Bowen, is not tendering

18    this as his conclusion, or anything more than the fulfillment

19    of a direction.

20    THE MASTER:   I think that is clear, Mr. Veeder.   But my

21    understanding of the question is that Mr. Sachse is merely

22    trying to elicit the bases used by Col. Bowen in determining

23    what constituted a separate subwatershed, and also that he is

24    not criticizing the method, he is merely trying to understand

25    it.

Z-32

1    MR. SACHSE: That is all I am after. I am trying to find

2    out exactly how much this means to me and my clients, that is

3    all.

4    THE MASTER: I think that it would be of assistance to

5    everyone to know just what factors Col. Bowen did consider.

6    MR. VEEDER: Well, not to argue with your Honor, it is

7    simply that Mr. Dennis pointed out that this is what he wanted

8    done. Isn't that correct?

9    THE WITNESS: Yes.

10   THE MASTER: In other words, if that is Col. Bowen's

11   answer, that would be the answer.

12   MR. VEEDER: That is the answer.

13   MR. SACHSE: Then I perhaps am mistaken. And so I am

14   a hundred percent clear, let me ask this, Col. Bowen:

15   Q  Did you understand that Mr. Dennis asked to have this

16   particular watershed we have been discussing, the unnamed

17   intermittent stream, delineated?

18   A  No, sir. My understanding of Mr. Dennis's request was

19   never clear at any time as to exactly what he wanted, but I

20   did make note of the fact that the East Fork of De Luz Creek,

21   Cottonwood Canyon, Camps Creek, Fern Creek and Roblar Creek,

22   which are all named tributaries, were desired. And then it

23   seemed to me like he wanted even further breakdowns of minor

24   tributaries which were affluent to De Luz Creek. And in this

25   one instance here of this unnamed tributary flowing westerly

Z-33

1   to conluence with De Luz Creek in Parcel 76 there was no

2   consideration given as to the nature or character of the

3   runoff compared with these other watersheds which were de-

4   lineated.

5      THE MASTER:  In other words, the mere fact that it has

6   been delineated on 129 as a separate subwatershed is not

7   intended to indicate that that unnamed tributary is necessarily

8   comparable to any of the other named creeks, or to vary in any

9   manner testimony which you have previously given with reference

10  to specific parcels where you have testified as to the nature

11  of the stream flowing through those parcels?  This would not

12  in any way change your previous testimony?

13     THE WITNESS:  No, your Honor.

14     MR. SACHSE:  You have done it for me.  Thanks a lot, your

15  Honor, that is what I wanted.  That is all.

16     THE MASTER:  Well, now, are there any further questions?

17  Is there any evidence which counsel wishes to present at the

18  present time with reference to the De Luz Creek area?

19        Did you wish to present any evidence, ma'am?

20     A VOICE:  No, I just dropped by.

21     MR. VEEDER:  Your Honor, in our discussion the other day

22  you referred to Parcel 65 and Parcel 63--  no, Parcel 65 in

23  regard to the patents on that land.  Do you remember that ques-

24  tion?

25        LCDR REDD:  Perhaps I could clear this up.  At the last

Z-34

1    hearing you asked Lt. Miller to check.  Parcel 65 is in two

2    sections with a common adjoining corner, and you asked the

3    question was it all patented under one patent.

4        THE MASTER:  Yes, that was at the previous session.

5        MR. VEEDER:  I guess that was where it was.

6        LCDR REDD:  That has been checked, and we have ascertained

7    that this was all issued under one patent.

8        THE MASTER:  For whatever legal effect that has?

9        LCDR REDD:  Yes, sir.

10       THE MASTER:  Very well.

11       MR. VEEDER:  I have nothing further at the moment, your

12   Honor.

13       MR. SACHSE:  I have nothing.

14       THE MASTER:  Off the record.

15       (Discussion off record.)

16       THE MASTER:  Back on the record.  The hearings will now

17   be recessed until Monday, October the 13th, at 9:30 A.M. in the

18   present location, the Reche Schoolhouse, at which time we will

19   consider evidence concerning the Fallbrook Creek area, and

20   also any additional evidence which may be necessary to complete

21   presentation of evidence with reference to the De Luz Creek

22   area.

23       It is possible at that time the Master may request the

24   presention of additional evidence if the present transcript is

25   incomplete with reference to any particular parcel of property.

Z-35

1   And an opportunity at that time will also be offered to the

2   parties to offer additional evidence, subject to all ordinary

3   accepted rules for the reopening of the case and the

4   presentation of additional evidence.

5      MR. SACHSE:   I think we can practically agree that there

6   will be no question of anybody wanting to reopen, you will

7   just have to allow it on either side.

8      MR. VEEDER:   Would you read that last sentence back to

9   me?

10      (Record read.)

11      MR. VEEDER:   I don't know what you mean.

12      MR. SACHSE:   That is confused, let me clear it up.   I

13   will say that I will certainly agree that if anyone wants to

14   reopen for any purpose there will be no objection, it has to

15   be permitted.

16      THE MASTER:   The hearing is recessed until Monday,

17   October 13th, at 9:30 A.M.

18      (Adjournment at 11:50 A.M.; hearing to be reconvened

19   Monday, October 13, 1958, at 9:30 A.M.)

20

21                 -----

22

23

24

25