ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

            Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

| | |
|---|---|
| **Volume:** | 21 |
| **Pages** | 2539-2614 |
| **Date:** | October 20, 1958 |
| **Place:** | |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

2539

APPEARANCES:

    WILLIAM H. VEEDER, ESQ., representing
     the United States of America.

    LCDR DONALD W. REDD, U.S.N., representing
     the United States of America.

    WILLIAM E. BURBY, ESQ., representing the
     United States of America.

    FRANZ R. SACHSE, ESQ., representing the
     Fallbrook Public Utility District.

    P. W. WILLETT, ESQ., representing
     Alta M. Terriere, and others.
     (Afternoon session only.)

    GEORGE GRAHAM, in pro per.

    MR. and MRS. WILLIAM L. BAGBY, in pro per.

    FRED ANDERSON, in pro per.

- - -
-
-

2540

## INDEX TO WITNESSES

For the Plaintiff:

| | Direct | Cross |
|---|---|---|
| Allen C. Bowen | 2571<br>2610 | 2602 |

## INDEX TO EXHIBITS

| | | | Iden. | Evid. |
|---|---|---|---|---|
| F-2 | Tabulation of riparian properties | | 2544 | 2589 |
| F-3 | Key to Assessor's Maps | | 2569 | 2575 |
| F-4-A to F-4-K | List | | | 2579 |
| F-1-DB | Map | | | 2569 |
| F-1-EB | Map | | | 2569 |

1        Fallbrook, California, Monday, October 20, 1958. 9:45 A.M.

2

3        THE CLERK: Court is now in session.

4        THE MASTER:  Will counsel state their appearance for the

5   record?

6        MR. VEEDER:  William H. Veeder for the United States.

7        LCDR REDD:  Lcdr. Redd for the United States.

8        MR. BURBY:  William E. Burby for the United States.

9        MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility

10  District and named individual defendants.

11       THE MASTER:  Are there any individual defendants here who

12  are appearing in proper person without attorneys?

13       MR. GRAHAM:  My place is right there--

14       THE MASTER:  I didn't understand you, sir.

15       MR. GRAHAM:  My place is right there at the south, you

16  see.

17       THE MASTER:  Could you state your name?

18       MR. GRAHAM:  Graham, George Graham.

19       THE MASTER: George Graham.  Very well.

20       MR. GRAHAM:  And 1247 is the case number.

21       THE MASTER:  Yes.  That is the number for this entire case.

22  Are there any other defendants that are here that are not

23  represented by counsel?

24       MRS. TERRIERE:  Your Honor, I have a counsel, but he isn't

25  here.  I am Alta Terriere.

2542

1   THE MASTER:  Mr. Willett.

2   MRS. TERRIERE:  Mr. Willett.

3   MRS. BAGBY:  Your Honor, we are not represented by counsel.

4 It is Bagby, William L. Bagby, Mr. and Mrs. William L. Bagby.

5   THE MASTER:  Very well.  Now, with reference to the find-

6 ings on the De Luz Creek watershed, the draft of the findings

7 will be completed this week and will be submitted to all counsel

8 of record and to the defendants in the De Luz Creek area.  I

9 believe that notice of substantially 33 to 35 days following

10 the mailing of the findings should be ample to allow the

11 individual defendants, as well as counsel, to prepare objections.

12 And I will propose then to notice the time for hearing objec-

13 tions to the findings as Monday, December the 30th, at 9:30

14 A.M., here at the Reche School House.

15   In that connection I would desire additional information

16 with reference to Parcel 19 in the De Luz Creek area.  I can't

17 find in the transcript a statement as to the nature of the water

18 underlying that parcel.

19   MR. SACHSE:  Who was that?

20   THE MASTER:  That is the several Fosses.   It is a whole

21 series of Fosses.

22   MR. SACHSE:  The ones I represent?

23   THE MASTER:  Yes.  So if Col. Bowen has that information

24 available I would like to receive that testimony today, if

25 possible.

1      MR. VEEDER:  Just a minute.

2      LCDR REDD:  He will be here at 11.

3      MR. VEEDER:  Will he have the data on that?

4      LCDR REDD:  I think he probably will.

5      THE MASTER:  The information seems to be adequate for my

6  purposes on the other parcels.  It may be that after I have

7  prepared the findings and submitted them to counsel that they

8  will find it was inadequate.  But I regard it as adequate.

9      Now I understand, Mr. Veeder, that Col. Bowen cannot be

10  here until about an hour from now.

11      MR. VEEDER:  About 11 o'clock, yes, sir.

12      THE MASTER:  Is there any evidence which you could

13  present in the meantime by way of exhibits, particularly with

14  reference to ownership of property in the Fallbrook area, and

15  the map which will be a key to the various maps which were

16  introduced last week?

17      MR. VEEDER:  Not until he is here.

18      THE MASTER:  Not until he is here?

19      MR. VEEDER:  No.  I would rather just talk about it in-

20  formally, and then have him put it in evidence.

21      THE MASTER: Very well.  Is there any defendant then who

22  wishes to present testimony concerning property in the Fallbrook

23  Creek area?

24      Mr. Sachse, do you have any evidence you wish to present?

25      MR. SACHSE:  No, your Honor.  My position as of now, and

1  until the United States does something further, is that I have

2  understood that they were going to introduce this lengthy ex-

3  hibit of descriptions and ownerships.  When that was done I

4  was going to check it against my own parcels to see if I had

5  any disagreement.

6      MR. VEEDER:  I think this.  We have a list of parcels here.

7      LCDR REDD:  These are riparian.

8      MR. VEEDER:  That is right.  The properties riparian to

9  Fallbrook Creek.  And it would occur to me that Mr. Sachse might

10  like to review this.

11      MR. SACHSE:  I will have to check it against the deeds.

12      MR. VEEDER:  It will probably save time.

13      THE MASTER:  Very well.  Would you care to offer that in

14  evidence at the present time and then have Col. Bowen testify

15  concerning it after he arrives?

16      MR. VEEDER:  If it would be helpful to your Honor, I think

17  it probably would be all right to have this marked.

18      THE MASTER:  Yes.

19      MR. VEEDER:  What is the last exhibit, Mr. Clerk?

20      THE CLERK:  Let's see, the last one was F-1-CB.

21      MR. VEEDER:  I would like to have this marked for iden-

22  tification.  It would be F-2, I believe.

23      THE CLERK: F-2.  O.K.

24      MR. VEEDER:  Your Honor, we are offering the tabulation,

25  properties riparian to Fallbrook Creek, pages 1 through 52, as

1   Plaintiff's Exhibit F-2.

2       I would like to have Col. Bowen testify in regard to it.

3   But I believe that it is in form now to be offered, and the

4   offer is so made.

5       MR. SACHSE:  Now, may I ask there will be an additional--

6   you do contemplate, as I understood it, another exhibit which

7   would cover the rest of the stuff in the watershed.

8       MR. VEEDER:  That is correct.

9       MR. SACHSE:  Then to finish my reply to your question,

10   your Honor, as far as my clients are concerned, on the present

11   state of the record, if the descriptions of their lands are

12   correct and satisfactory-- and, of course, I have no reason to

13   doubt that they are right, although I would like to check them--

14   if the descriptions are right I will offer no evidence for any

15   defendant on the basis that the present state of the record is

16   such that I am satisfied with it.  All my defendants, with one

17   exception, are diverters from subsurface.

18       THE MASTER:  They are not riparian owners?

19       MR. SACHSE:  They may be riparian owners, but there is no

20   surface diversion.  And I am going on the basis of Col. Bowen's

21   testimony that all the subsurface water in the watershed is to

22   be treated as vagrant local percolating ground water, and in

23   the absence of something other than that I intend to offer no

24   evidence, with the one exception that I have already introduced

25   the deeds, that is, as to the defendants Rogers, who have a

1    reserved easement-- who assert a reserved easement right to take

2    not to exceed 150 acre feet per year of sewage effluent dis-

3    charge from the Fallbrook Sanitary District.  I think it is

4    a contractual obligation.  But I wanted the United States to

5    have the claim put in front of them, in case they had a claim

6    against it.  But I have no surface diverters.  And as the record

7    now stands, I would be perfectly content to rest the case for

8    all of my clients.

9         THE MASTER:  Very well.  Then unless you have some other

10   exhibits to identify, Mr. Veeder, we could take a recess until

11   Col. Bowen arrives.

12        MR. VEEDER:  I would like to, as I indicated to your Honor

13   on the phone, I would like to touch upon some of these points,

14   to the end that our position will be completely clear.

15        THE MASTER:  Do you want this on the record or off?

16        MR. VEEDER:  Yes, very much so.

17        THE MASTER:  Very well.

18        MR. VEEDER:  I view the matter this way, that even though a

19   man-- the diversions are only from the ground water-- he never-

20   theless is entitled to have declared riparian-- his lands

21   riparian, and we would like to have such a declaration.  I would

22   like to inquire of counsel if that is what he means when he

23   says that, predicated upon the testimony presently in the

24   record, he is satisfied to simply say, well, there are no surface

25   diversion and we are limiting ourselves to pumping.  Is that

1    correct?

2        MR. SACHSE:  Yes.  I think the easy way to cover it would

3    be to be very specific  and take any concrete case.  It would

4    be my understanding that as the record stands at the present

5    time your Honor would be forced to this kind of a finding:  Such

6    and such land is riparian to Fallbrook Creek. --we are assuming

7    the fact that it is-- The waters underlying this same parcel

8    of land are, however, vagrant, local, percolating ground waters,

9    not a part of the stream.

10       Now, at such time as this hypothetical defendant commenced

11   surface diversions, he would definitely be asserting a correla-

12   tive right with all other riparians.  But as such time as he

13   continued to pump only from the underground water, under such a

14   finding he would be at liberty to do so in whatever amount

15   or quantity he needed, as long as he didn't hurt his neighbor.

16   That is how I conceive the thing would work out.

17       THE MASTER:  As I see it, if the evidence had showed that

18   Fallbrook Creek flowed the year round, then even at the present

19   time if an individual was not making any surface diversion, I

20   would feel obliged to make findings as to what the riparian

21   rights of that property would be.  In other words, that would

22   not affect the rights to the ground water.  But if there were

23   water in the creek which would be available during substantial

24   periods of the year, I would go along with Mr. Veeder's theory

25   to make findings as to his riparian rights.  However, the

1  testimony in the record so far is that Fallbrook Creek does not

2  flow except during and immediately following periods of rain.

3  And on that basis I would go along with you and make findings

4  it was riparian during periods of rainfall and immediate periods

5  thereafter, but the amount of water that would be diverted to

6  strictly riparian uses during the time the land was riparian

7  was so negligible that further findings would not be required

8  as to strictly riparian rights.

9       MR. SACHSE:  I think we are in accord.

10      THE MASTER:  So to a certain extent I think I agree with

11  both of you, and I think I see the positions of both of you.

12      MR. VEEDER:  My concern along that line, your Honor, is

13  this, and it is our desire now that we are at issue to get or

14  obtain a complete and effective decree for perpetuity, as close

15  as we can come to it.

16      THE MASTER:  Sure.

17      MR. VEEDER:  And the concern, frankly, which I feel is

18  based upon some past experience in these matters, which has been

19  reflective of an inability to anticipate what will happen in

20  this year, next year, or five years from now.  It occurs to me

21  that these people, following what has transpired in the past,

22  will probably increase their uses to some degree, whatever is

23  available.  That has been the history.  Now, if I understand

24  Mr. Sachse's position in the matter, assuming that they were

25  to put down additional wells to the point where they actually

1   depleted the waters in Fallbrook Creek, even during the period

2   of runoff--

3       THE MASTER: Wait a minute.  They wouldn't be depleting the

4   water in Fallbrook Creek, because the waters they had taken from

5   were vagrant waters which were not part of Fallbrook Creek.

6       MR. VEEDER:  Your Honor has touched precisely the point which

7   concerns me.  It is inconceivable if these waters, assuming

8   that they are pumping in the immediate vicinity of Fallbrook

9   Creek, or any of the other creeks throughout the Santa Margarita

10  River Valley, I daresay that there would be a reduction in the

11  quantity of water that would run off in the ultimate.  Now,

12  will the decree be  of this character, that no diversion by

13  pumping will be permitted which would be in any way-- which

14  would in any way affect the surface runoff of Fallbrook Creek;

15  is that the kind and type of decree that would be entered, may

16  I inquire?  Because I think that is the crux of this whole

17  matter.  For example, we have this situation.  Up on Tecolote

18  Creek a man named Burrell, B-u-r-r-e-l-l -- is he a client of

19  yours?

20      MR. SACHSE:  No.

21      MR. VEEDER:  He has talked to me very extensively.  Mr.

22  Hall has talked to me.  Mr. Hall is the engineer for the Vail

23  Estate Company.  And here has been the history of the situation

24  up there.  Admittedly the land does not have an alluvial mantle.

25  But it does have what they call residuum, which I believe is not

1   a great deal different than that which we find in Fallbrook

2   Creek.  Mr. Burrell tells me that there has been a constant and

3   a steady depletion of wells that his father had dug back as

4   early as 1906.  The net  result being, as I understand the

5   circumstances, that there is, even though in many instances the

6   water appears to be vagrant in character, the depletion of them

7   would reduce the quantity of water in the stream, and in the

8   aggregate would have a serious effect upon the overall runoff.

9         Now my desire, as I have expressed before, is to have the

10  rights of all declared and all adjudicated, and to be sure that

11  when we are through this protracted matter we will be through

12  for all time, and it will not be such a decree that it would

13  ever have to be opened up again on the basis of diversion and

14  use of water.  Fallbrook Creek does and has in the past, and

15  as recently as the last few months,  contributed a substantial

16  quantity of water into Lake O'Neill, and it has in the past

17  whenever there has been runoff.

18        Now it is true that quite possibly we are looking for

19  something that is remote.  I am not sure.  But I sincerely

20  hope whatever decree your Honor enters would be in contemplation

21  of a circumstance which would preclude pumping, if it were shown

22  that it did constitute a diminution of runoff arising in this

23  matter.  That though it is an intermittent stream, the reduc-

24  tion of whatever ground water there is could result in the

25  periods of even brief runoff of reducing it, of reducing the

1 surface flow by having to fill up areas which have been depleted

2 through pumping.

3    THE MASTER:  Of course, you wouldn't be entitled, in any

4 event, to complete prohibition of pumping, even assuming your

5 first premise.

6    MR. VEEDER:  Oh, no.

7    THE MASTER:  Because they would be entitled to whatever

8 would constitute a reasonable use.

9    MR. VEEDER:  They would be entitled to their correlative

10 share.  And that is precisely what I mean.

11    THE MASTER:  But on the evidence as it is in the record

12 so far, I think your premises are contrary to the evidence.

13    MR. VEEDER:  Well, which brings us to the additional

14 proposition that concerns me greatly, is that I will ask your

15 Honor for a finding to the effect that these waters are not in

16 any way interconnected with Fallbrook Creek, and that if such a

17 finding is made, then there can be no diminution of the stream,

18 of the runoff.  And again we come to the proposition, the

19 unique proposition of our own witness being the one who testified

20 to that circumstance.

21    THE MASTER:  Sure.

22    MR. VEEDER:  And I want it completely understood by all

23 that the United States is extremely anxious that everyone's

24 rights be protected and everyone's rights be cared for, and

25 that if Mr. Sachse wants to adopt Col. Bowen's testimony I

1 would like to have him say so specifically, and then have it

2 on the basis of complete agreement among all parties, rather

3 than have the United States rather sort of the movant in this

4 matter, which might very well curtail the individual rights in

5 years to come.

6 THE MASTER: Of course, Mr. Sachse could only speak for

7 the defendants he represents.

8 MR. VEEDER: Oh, yes, I understand that. I think he will

9 speak for anybody. I have always kidded him about that. But I

10 would like to-- if that is his position, why it is all right

11 with me. But I talked to Mr. Rankin at quite great length about

12 this on the telephone. I said, "Now, we are coming to this

13 position of being the one to introduce evidence that these

14 people are not entitled"-- I don't mean "entitled". But "Their

15 rights are such they do not have any interest in any runoff in

16 the Santa Margarita River." Well, he says, "If that is the

17 case, why it is fine." But he says, "We, of course, have to

18 have a specific finding in regard to parcels of land."

19 THE MASTER: I would certainly make such a finding as to

20 all the land which does not abut upon Fallbrook Creek. Now, the

21 only question which I thought we started to discuss this morning

22 was this question as to findings as to the property which does

23 abut upon the creek, so that it is riparian at least during

24 periods of rainfall, but in which instances the owners are only

25 making subsurface diversions, and it was my thought that even

1  though at the present time they are only making subsurface

2  diversions, you would still have to have a finding that they

3  were riparian during the periods of the flow of the creek, and

4  they would have whatever riparian rights they wished to assert

5  during that period of time.  In other words, as I see it, those

6  rights are negligible.

7      MR. VEEDER:  Well, the point that I desire to make is that

8  assuming a man is riparian and he is pumping, no surface diver-

9  sion, suppose that in the aggregate it was shown that the pump-

10 ing by those riparians actually reduced the flow of the creek,

11 irrespective of the fact-- irrespective of the fact it has been

12 found that those rights-- that the only thing he has exercised

13 is a percolating right-- if that should occur, then he probably

14 would be enjoined, would he not, from that pumping?  He could be

15 enjoined, I should say.

16     MR. SACHSE:  I disagree.  I would like to be heard briefly.

17     MR. VEEDER:  The reason why I am opening this up, I want to

18 hear from Mr. Sachse on this matter.

19     THE MASTER:  I would like to hear from you.

20     MR. SACHSE:  Again, let us be concrete.  It is perfectly

21 possible in water law to have a man who is riparian to a stream,

22 which runs through his land, part of the time, but the under-

23 ground water underlying part of his land might not be a part of

24 that stream.  Now, that is the condition that I think exists in

25 Fallbrook Creek drainage as of the present state of the record.

1    We have a stream, there isn't any question about it, that flows

2    at least part of the year, and we have people that are riparian

3    to it, and as riparians they have rights correlative with the

4    United States and with other users on that stream, rights to

5    surface diversions.  We also have testimony that all the waters

6    underlying this two square miles are not a part of Fallbrook

7    Creek, and hence not a part of the Santa Margarita River system.

8    So any diversion of those waters, the underground waters, would

9    have no relation whatsoever-- could have no relation as a matter

10   of law.  It would have to be so held that they have no relation

11   to what happens to Fallbrook Creek.

12        Now, what you take out of it,  if you take out from the

13   top of Fallbrook Creek, yes.  But what you take out of the under-

14   ground, no.

15        I was just flipping through this fast, and right off the

16   bat the very first one is Rogers.  I would expect a finding in

17   his case would be entered that the Rogers land, 1, is riparian,

18   because it is.  The creek runs right through it.  There is no

19   question about it.  And a finding, 2, that his land overlies

20   vagrant local percolating ground water, not a part of the stream.

21   And in his case, the third complicating factor of that contract,

22   which we don't have to go into now.  And I think that is what

23   you would have to find.  And then we take some other defendant

24   that does not abut on the creek proper, as, for example, my own

25   four acres up on Fallbrook Street, the finding would, I presume,

1   be this land is not riparian to any stream, does not abut upon

2   any stream, and that the waters underlying are vagrant, local

3   percolating ground water, not a part of the Santa Margarita

4   River system.  And that would satisfy me eminently.

5        MR. VEEDER:  Then may I inquire in regard-- what was the

6   name of the first party?

7        MR. SACHSE:  Rogers.

8        MR. VEEDER:  Rogers.  And the lands, do they abut upon

9   or are they intersected by the stream?

10        MR. SACHSE:  They are intersected in part and abut on the

11   rest, traversed.

12        MR. VEEDER:  Traversed by it.

13        MR. SACHSE:  Traversed by it, yes.

14        MR. VEEDER:  Well, again, seeking only the facts, it would

15   strike me that it is quite conceivable that a well put down

16   in the vicinity of the stream would actually have a draft upon

17   the stream.

18        MR. SACHSE:  It is quite conceivable, but the record as of

19   now is that is not the fact.  And your Honor is going to be

20   bound by the testimony.  Now I am satisfied with the testimony

21   the way it stands, that any well that is punched down here is

22   not taking waters of Fallbrook Creek.  That is the state of the

23   testimony.  Now, if it is going to be changed, then change it.

24        MR. VEEDER:  Then may I inquire, assuming that a well is

25   put down and, in fact, draws water from the surface flow of this

2556

1    Fallbrook Creek, in the light of the evidence now in the record

2    would that man be precluded from using his pump?

3          MR. SACHSE:   What man?

4          MR. VEEDER:   I mean the one whose lands are traversed by

5    Fallbrook Creek.   He puts down a well.   In the process it

6    appears that the well actually pulls down the surface flow of

7    the stream, which is the usual case.   Now, under those circum-

8    stances would he be precluded from using his well?

9          MR. SACHSE:   No.

10         MR. VEEDER:   I am on his club, if you know what I mean.

11         MR. SACHSE:   He would have res judicata the law of the

12   case, 69 different findings saying this water is not a part

13   of the Santa Margarita River system.

14         THE MASTER:   It seems to me, Mr. Veeder, the only manner

15   in which your hypothetical case could arise would be if he was

16   actually not getting underground water from a well, but was

17   actually getting water from the stream itself.   In other words,

18   if he dug his hole in the river bed and the water that was

19   coming out of it was the water that was flowing down the river

20   and running into the hole, instead of water coming out of the

21   bottom of the hole, then your situation might arise from the

22   facts.   Otherwise, your hypothetical case is one which will

23   always remain hypothetical, and could never arise.

24         MR. VEEDER:   Your Honor, I am an old hand at taking a dim

25   view of hypothetical cases.

1        We will enter this exhibit later.  I would like to just

2   put it up here for a moment, solely for purposes of illustration.

3        I am pointing now to Key to Assessor's Map of Fallbrook

4   Creek Watershed Area.  It hasn't been marked, but I am just

5   locating here.  Here is an area marked 94W38.  And I am tender-

6   ing to your Honor this thought:  Conceivably a well could be

7   dug in the immediate vicinity of the stream, and that well, con-

8   ceivably-- undoubtedly, in my view, would constitute a burden

9   upon the runoff.

10       THE MASTER:  According to the uncontradicted testimony in

11  the record so far, that is inconceivable.  Then you are conceiv-

12  ing a situation which is contrary to Col. Bowen's testimony.

13       MR. VEEDER:  Well, no, I don't believe that Col. Bowen--

14  that is the one reason why I am anxious to have this moment of

15  soul searching.  I don't believe that Col. Bowen testified

16  that it is inconceivable-- I think is the word that has been

17  used-- that a well could be drilled which would intercept

18  surface runoff from Fallbrook Creek.

19       Now the inconceivable thing to me would be that it could

20  be stated here that under no circumstances could a well be

21  drilled which might interfere with the surface runoff of

22  Fallbrook Creek.  And that is the point I am trying to make.

23  As I say, I am for the individual user.  And I would think it

24  would be desirable to have a finding that the man is the owner

25  of X acres of land, that it abuts upon or is traversed by

1    Fallbrook Creek, and that he is entitled to share correlatively

2    from that creek, and let it stand that way.  Then he would be

3    permitted to share correlatively on the basis of if he dug a

4    well in the area, and would not be charged, as I think he would

5    be, of invading the rights of his neighbors, perhaps, or the

6    rights of someone else, because he would be just taking his

7    correlative share.  The thing that concerns-- as I said, the

8    thing that concerns me, I don't believe that Col. Bowen intended

9    to say that under no circumstances could a man put down a well

10   in the vicinity of Fallbrook Creek which would not constitute a

11   depletion of the surface flow.  I sincerely hope that that is

12   not the interpretation placed upon his testimony, for the

13   reasons which I expressed, that Mr. Burrell up here in the

14   upper watershed, under circumstances not different from this,

15   has stated that he is observing there is a decline in the quanity

16   of water available by reason of pumping from the area, even

17   though there is nothing to-- apparently when they first put

18   the wells down they didn't realize that it would be draining

19   the general vicinity, or that there would be an invasion of the

20   runoff, surface runoff.

21       Now I don't want to be quoting Mr. Burrell too greatly.

22   But his circumstance seemed to point up-- and Mr. Hall's

23   testimony tended to point up in the overall geology that that

24   is precisely what occurs; that even though you view it as

25   percolating ground water, nevertheless when you reduce the

2559

1 quantity of water in the ground water you do reduce the surface

2 flow, and in so doing you are in effect competing for the avail-

3 able supply of water.

4     THE MASTER:  Well, you certainly don't reduce the surface

5 flow for any period of time subsequent to your diversion up

6 until, at least, the next rainfall.  That is, supposing that

7 you are diverting in the month of June, and there is no surface

8 flow at that time, you obviously aren't affecting any surface

9 flow then, as I understand your contention.

10     MR. VEEDER:  It is not a contention, your Honor.  It is

11 just a concern which I have.

12     THE MASTER:  Your concern is say by pumping in the month

13 of June, when there is no surface flow, you are going to reduce

14 or shorten the period of surface flow during the following

15 rainy season.

16     MR. VEEDER:  Right.  That is precisely the point.

17     MR. SACHSE:  Your Honor,--

18     THE MASTER:  If during the following rainy season, whether

19 there had been any pumping or not, there would have been no

20 real riparian use of water, then it seems to me it is still an

21 academic question.  In other words, if, regardless of the pump-

22 ing during one month of June, the only time you could have

23 exercised a riparian right would have been say for three days

24 or two days or 50 hours during rainfall in the following rainy

25 season, it seems to me you still have a purely academic matter.

1   MR. VEEDER: I am not so sure that when the owner puts down

2 a well which reduces the quantity of water which sustains the

3 surface flow that he is not truly exercising a riparian right.

4 I believe it is quite conceivable that the ground, the alluvium,

5 shallow though it may be-- in the areas abutting upon the stream,

6 shallow though they may be, it is quite possible his pumping

7 from the well would be in the exercise of his riparian right.

8 Now all I am pleading for here is that we have a realistic-- we

9 have a realistic decree, to the end that this man could exercise

10 a right of the nature that I just described by reason of his

11 riparian interest.

12   THE MASTER: Well, I certainly would want to make a decree

13 which would permit him to exercise it. Mr. Sachse.

14   MR. SACHSE: Yes, your Honor. I think we are overlooking

15 something here. I have before me Judge Carter's opinion, pre-

16 trial opinion, and on page 81, this is what he says, after a

17 lengthy discussion of percolating waters:

18     "To summarize, water which is not a part

19     of the Santa Margarita, its tributaries or under-

20     lying basins, and factually not a part of the

21     stream, is not the subject of the relief sought

22     by the Government in this case. The existence of

23     such water, when found by the trier of fact, will

24     entitle the owner of the property upon which it is

25     located to a decree that the water is not part of

1          the river.  Such owners will, under the cases cited

2          above, have correlative rights with adjoining

3          owners in connection with that water.  But it is

4          not the purpose of this case to adjudicate such

5          correlative rights to water which is not part of

6          the stream."

7     That is page 81 and 82.

8     Now look at the testimony.  It is my opinion that the

9 ground waters are vagrant, percolating, and not a part of any

10 defined channel, hence not a part of the Fallbrook Creek, and

11 hence the Santa Margarita stream system.  And then I will

12 repeat it again, the same thing, to me it is absolutely crystal

13 clear within the limitation that Judge Carter set forth in his

14 pretrial opinion that if the evidence remains in its present

15 state, and if these facts are found by your Honor, these people

16 are going to get a decree stating that the underground waters

17 are not a part of the stream system.  Now if there is surface

18 water running across their lands, and they are riparian, why

19 they are riparian and they will be subject to possible restric-

20 tions on their use of that surface water.  But not of the under-

21 ground percolating water.

22     THE MASTER:  That is my present view, Mr.Veeder, that Mr.

23 Sachse has correctly analyzed the opinion and the evidence.

24     MR. VEEDER:  Well, just so the record is clear from the

25 standpoint of the United States, it is quite possible, I believe,

1  that in years to come we will encounter what I think would be a

2  tragic circumstance if a man should put down a well and it

3  should be found that it is depleting the surface flow of the

4  stream.  Now if it should deplete the surface flow of the

5  stream, I believe then he would be restrained from using the

6  water from his well.  I believe that the facts-- it would be a

7  simple matter.  The Court would have continuing jurisdiction.

8  Evidence could be introduced to show the man was actually re-

9  ducing the runoff.  And under those circumstances it would be

10  declared to be an exercise of a riparian-- of a right of some

11  kind.  Now, it occurs to me the simple way to handle it is

12  simply say he has a riparian right to so many acres of land,

13  that he has a right to participate correlatively in whatever

14  waters are part of the Fallbrook Creek, and have a finding to

15  that effect, rather than this attempt to cut off all ground

16  waters from the surface runoff of the stream.  I think that it

17  could be accomplished very simply and might avoid a great deal

18  of difficulty in years to come.

19       THE MASTER:  Well, I think that the finding should certainly

20  not in any way ever preclude him from exercising any riparian

21  right he might have, if he chose to exercise it.

22       MR. VEEDER:  Albeit the surface or ground water situation.

23       THE MASTER:  As I understand the situation, though, it

24  seems to me it is a situation where the rule of de minimis

25  applies, and that the exercise of the riparian right would

1   probably be so minute, have such a negligible effect upon any-

2   body, that it is not worth the expense, the difficulty in

3   trying to ascertain the number of irrigable acres which each

4   person has, unless you simply are going to state that all the

5   land which is actually riparian to the stream is irrigable, and

6   that their correlative riparian rights would be based, in effect,

7   upon the actual acreage.

8       MR. VEEDER:  I would be surprised if any of those lands

9   in the Fallbrook area should not be entitled to riparian rights

10  of some kind, whether it be irrigation or domestic use or some

11  other use.  I don't want to see the decree restrictive.   That

12  is my point.

13      THE MASTER:  In other words, is it your thought that the

14  evidence would show that the land which is physically riparian--

15  that is, which abuts upon the river-- is all of it irrigable?

16      MR. VEEDER:  No, no, no.  I didn't say that, your Honor.

17  I said it is all susceptible of some kind of enjoyment of the

18  riparian right.  I don't believe we should-- I truly would be

19  opposed in this quite thickly populated area to undertake to

20  limit that in their right to irrigation.  I think that the

21  people in Fallbrook are entitled, for whatever water is there,

22  to the enjoyment of the full riparian right, not limited to

23  irrigation.  And, moreover, as I said before, if in the exer-

24  cise of the riparian right the man does deplete the surface

25  runoff, I want to see him protected in it.

1    THE MASTER:  Your thought would be, then, to assess a

2  statement that the land would be riparian and is entitled to

3  correlative riparian rights with all other owners, without the

4  necessity of going on beyond that and stating that parcel A has

5  two irrigable acres and parcel B a half an acre, or anything

6  like that.

7    MR. VEEDER:  I would be inclined, under the circumstances,

8  to say that should be done.  But then I would take the additional

9  step and say if in the pumping it does appear that he is de-

10  pleting the surface flow, even for water he isn't entitled to--

11  I don't want to say he is entitled to it.  I don't want to see

12  the people in Fallbrook limited to percolating vagrant ground

13  water.

14    THE MASTER:  Nobody-- I don't think anybody is attempting

15  that.  Certainly Mr. Sachse isn't attempting that.

16    MR. SACHSE:  Not at all.

17    THE MASTER:  And I am not attempting to limit the rights

18  of these owners.  The only question, it seems to me, is the

19  philosophic question as to whether under the evidence as it is

20  now in the record, it could ever by any stretch of the imagina-

21  tion be contended that the taking of any subsurface water

22  affected the stream.  And as I have said before, on the present

23  state of the record I don't see how it could be.

24    Now if there is additional evidence which indicates that

25  is possible, then we might have to go farther.

2565

1    MR. VEEDER:  Then I would strongly recommend that your

2  Honor make a field investigation, however brief, because I would

3  not want to be a party to a decree which would limit the people

4  in the area solely to vagrant ground water.

5    THE MASTER:  No decree which I would ever recommend would

6  so limit them.

7    MR. SACHSE:  Mr. Veeder, you are setting up a straw man.

8  If they are riparian, they are riparian and the waters under-

9  lying would be treated as not a part of the stream.  That would

10  be the decree, I expect, from the present state of the record.

11    THE MASTER:  It seems to me it is both..

12    MR. SACHSE:  It is both.

13    MR. VEEDER:  The only point Mr. Sachse-- and I am now

14  agreeing with him--

15    MR. SACHSE:  You apparently agree they can be intermingled.

16    MR. VEEDER:  I simply say on a basis of a great deal of

17  experience in this field that when a man puts down a well very

18  close to the stream, irrespective of any esoteric finding that

19  might be written, the fact is that he may very well reduce the

20  stream flow.  And if he does so, he may be violating a decree

21  which has been entered.  And I simply say that I would put it

22  down this way.  Say the man is riparian, he is entitled to exer-

23  cise his riparian right in any manner, which would also include

24  pumping.  So that he would not be limited to vagrant percolating

25  ground water, but he would be permitted, with his pump, to take

1   some riparian water.  That is all I am saying.

2          MR.SACHSE:  I would like to ask Mr. Veeder how he expects

3   to handle this, then.  This is the pretrial stipulation of

4   issues.  Mr. Veeder signed it himself.

5              "Waters the rights to which are to be

6              adjudicated.

7              "Those waters which are part of the Santa

8              Margarita River and its tributaries.

9              "Rights to vagrant percolating ground

10             waters which are not part of the Santa Margarita

11             River and its tributaries will not be adjudicated

12             in this action.  The question as to whether any

13             particular ground water is or is not part of the

14             Santa Margarita River and its tributaries is a

15             question of fact to be decided by this Court."

16         The United States signed this thing.  So did I.  So did

17   Judge Carter.  Now if the only evidence in the record, Mr.

18   Veeder, is that all of the underground water in a certain given

19   area is not a part of the Santa Margarita River and its

20   tributaries, how are we going to get around this specific

21   stipulation, that rights to such waters will not be adjudicated

22   in this action.  That is all I am saying.  Surface waters we

23   will adjudicate, the underground waters we won't.

24         MR. VEEDER: I have never been a party to closing my eyes

25   to a fact.  I believe that any time a well drains the surface

1    flow it is going to be contrary to the facts found, irrespective

2    of what is in the record.

3        THE MASTER:  Of course, if the well drains the surface

4    flow, then it is not taking the underground water.  But as I

5    have said before, the findings and the decree would certainly

6    protect anyone in the exercise of a riparian right as to

7    riparian water.

8        MR. VEEDER:  All right.  Then, as I understand it, we will

9    not have entered in this decree a statement that all ground

10   waters are vagrant and percolating, but it is conceivable in

11   this decree that part of them might be part of the riparian

12   right.

13       MR. SACHSE:  We will wait and see what the evidence says.

14       THE MASTER:  Not on the present state of the evidence.

15   Now it is possible that there may be evidence to that effect,

16   but there isn't any at the present time.

17       MR. VEEDER:  Well, I would surmise some would be put in by

18   the defendants.  I don't know.

19       MR. SACHSE:  You let me worry about my case.

20       MR. VEEDER:  I-- I won't say it.  I started out on a new

21   tack this week.  I am concerned about your clients, Mr. Sachse.

22       MR. SACHSE:  O.K.

23       THE MASTER:  We might take a recess at this time.

24       (Recess.)

25       THE CLERK:  Court is in session.

1   THE MASTER: Inasmuch as Col. Bowen seems to have been

2 detained longer than expected, we will recess now until 1 o'clock.

3   (Noon recess.)

1    <u>Fallbrook, California, Monday, October 20, 1958.  12:55 P. M.</u>

2

3         THE CLERK:  Court is now in session.

4         MR. VEEDER:  Your Honor, we have added to the Plaintiff's

5    Exhibit F-1 the two tracts which have now been marked F-1-DB

6    and F-1-EB, and they have been made part of the overall exhibit

7    and placed in the proper part of the exhibit to be in sequence,

8    from the geographic standpoint.  And we now make the offer of

9    those two pages.

10         THE MASTER:  They will be received in evidence as Exhibits

11   F-1-DB and F-1-EB.  Those are the maps which were referred to

12   by Cdr. Redd at the hearing last week as not being available at

13   that time.

14         MR. VEEDER:  That is correct.  Now we would also like to

15   have marked for identification the Key to Assessor's Maps of

16   the Fallbrook Watershed.  That would be F-3.

17         THE CLERK:  That will be, yes, F-3.

18         THE COURT:  Very well.  Now, before proceeding further

19   I wonder if, for the sake of the record, I should not note that

20   Mr. Willett is in the courtroom and that Cdr. Redd has advised

21   me that the property which was described by Mr. and Mrs. Martin

22   in their answer, and which is referred to at pages 2522 and

23   2523 of the transcript, is actually outside the watershed.  So

24   that that property is not involved in this litigation.  However,

25   Mr. and Mrs. Martin are beneficiaries of two trust deeds which

1  affect property inside the watershed.  One of them is a trust

2  deed on property in Section 10, Township 9 South, Range 3 West,

3  given by Ingals, I-n-g-a-l-s, recorded November 25, 1953, Book

4  5058, page 242.  And the other is a trust deed on property in

5  Section 12, Township 9 South, Range 3 West, given by Schultz,

6  recorded February 13, 1958, Book 4747, page 13.  So for that

7  reason I think they are properly named as defendants, but their

8  own property, which they own in fee, is not involved in this

9  action.  Is there anything further you wish to state on that,

10  Mr. Willett?

11      MR. WILLETT:  No.  But will that be the order of the

12  Court, that this particular property described in my answer is

13  not within the watershed?

14      THE MASTER:  I assume that will be the order at least by

15  implication, and I presume we can make it as a specific declara-

16  tion, if you so wish.

17      MR. WILLETT:  Yes.

18      THE MASTER:  Yes.

19      MR. VEEDER:  Your Honor, we would like to call Col. Bowen

20  to the stand--

21      THE MASTER:  Very well.

22      MR. VEEDER:  --to testify in regard to certain of the

23  exhibits, some of which have already been admitted, but on which

24  data has been added in accordance with your Honor's instructions

25

1          ALLEN C. BOWEN,

2  recalled as a witness, having been previously sworn, testified

3  as follows:

4

5                    DIRECT EXAMINATION

6  BY MR. VEEDER:

7          Q  Now, Col. Bowen, I hand to you Plaintiff's Exhibit

8  F-1-A, which was previously admitted, and refer to the course

9  of Fallbrook Creek which has been added to the pages where it

10  appears, and ask you whether that was done under your direction.

11          A  Yes, sir.

12          Q  Now, would you state into the record the procedure

13  followed in determining the course of the creek and the drafting

14  or placing upon the pages of the map to which we have referred

15  as Exhibit F-1-A?

16          THE MASTER: When you say F-1-A, you mean the series

17  beginning F-1-A.

18          MR. VEEDER:  That is correct.

19          THE WITNESS:  Yes, sir.  Copies of these Assessor's

20  Maps, Exhibits F-1-A through F-1-CB were taken to the field and

21  a survey party, using a plane table, and a steel tape where

22  necessary, set up at various points and plotted the course of

23  Fallbrook Creek and its obvious or principal tributaries, wherever

24  they were noted, where a dimension of width in the creek channel

25  appeared to be significant.  Referring, for example, to

1  Plaintiff's Exhibit F-1-D, where in some instances it follows

2  the property boundaries, as parcels 38 and 34, boundaries

3  between 46 and 44 and 45 and 44, and the question as to whether

4  a property was contiguous to the creek might arise, the actual

5  width of the stream was plotted.  In some instances where the

6  ownership was comparatively large and the creek obviously went

7  through the ownership, well within the exterior boundaries

8  of the ownership, such as on Plaintiff's Exhibit F-1-E, parcel

9  No. 74, just a single line indicating the thread of the stream was

10 plotted.

11      THE MASTER:  In each case the line is the symbol for an

12 intermittent stream, with a dash and dots.

13      THE WITNESS:  A dash and three dots, symbolizing an inter-

14 mittent stream, your Honor.  And where again, as shown on

15 Plaintiff's Exhibit F-1-E, parcel 74, an area is enclosed by

16 the intermittent stream symbol, indicating an intermittent pond.

17 Not all all of the intermittent ponds were shown, but those

18 that had any significant size were shown.

19      THE MASTER:  Intermittent pond there is used in the same

20 sense as which you previously testified?

21      THE WITNESS:  Yes, your Honor.  Again, speaking of inter-

22 mittent ponds, referring to Plaintiff's Exhibit F-1-H--

23      THE MASTER:  That is the property of Mrs. Terriere.

24      THE WITNESS:  The property of Mrs. Terriere, yes, your

25 Honor, lying between the old Highway 395 on the north and the

1  Santa Fe Railway right of way on the south, the double line of

2  the intermittent stream symbol indicates the stream channel at

3  its widest, to show the perimeter of the intermittent pond which

4  is created by the check dam Mrs. Terriere testified to.   On

5  those exhibits, copies of the Assessors Maps, where no inter-

6  mittent stream symbol appears, there was no channel with well-

7  defined banks or bed to symbolize.   And the absence of such a

8  symbol indicates   there is no defined stream channel, with the

9  exception--

10        MR. VEEDER:  One moment, Colonel.

11        Q  Would the instances where there was no bed or bank,

12  would that be by reason of the activity of man or would that be

13  a state of nature situation that exists?

14        A  Well, it could be both.  This course of Fallbrook

15  Creek has been realigned and changed from its natural channel

16  in some instances.  Generally, however, it loses its identity

17  as a stream with well-identified beds and banks high up in the

18  watershed.  The only place lower down in the watershed where a

19  stream symbol does not show was where it runs through the town

20  of Fallbrook.

21        MR. VEEDER:  I think I might as well interrogate now in

22  regard to F-1, and it might be I can work one against the other,

23  for the better correlation of testimony.

24        THE MASTER:  Very well.

25

1 BY MR. VEEDER:

2     Q  I refer, Col. Bowen, to Plaintiff's Exhibit marked

3 for identification F-3, and ask you to state into the record

4 what that identification depicts.

5     A  Plaintiff's Exhibit F-3 is entitled "Key to Assessor's

6 Map of the Fallbrook Creek Watershed Area".  It was prepared

7 under my direction, and shows the relationship of the Assessor's

8 Maps previously introduced, one to the other, and also the

9 relationship to the watershed.  For example, your Honor, Plain-

10 tiff's Exhibit F-1-A is a copy of Assessor's Map of Book 93W,

11 page 17, Sheet 4 of 4.  Now that particular page appears in the

12 extreme upper reaches of the Fallbrook Creek watershed, de-

13 lineated on Plaintiff's Exhibit F-3, with the Book No. 93W, the

14 page number 17, and the sheet number 4.

15     Q  Colonel, I will just ask you one more question, then

16 I will make the offer, so your testimony will go ahead.

17     A  Yes.

18     Q  Now, will you state whether Fallbrook Creek is located

19 on that identification F-3, which is "Key to Assessor's Maps

20 of the Fallbrook Creek Watershed Area"?

21     A  Yes, sir.  Fallbrook Creek is depicted as an inter-

22 mittent stream, with the words "Fallbrook Creek" indicating its

23 alignment.

24     Q  Now, is this map accurate, to your personal knowledge,

25 Colonel?

1      A  Yes, sir.

2      MR. VEEDER:   The United States of America offers Plain-

3   tiff's Exhibit F-3 in evidence.

4      THE MASTER:   That will be received in evidence and marked

5   as Plaintiff's Exhibit F-3.

6   BY MR. VEEDER:

7      Q  Now, would you go ahead with the explanation you were

8   making to the Special Master, Colonel, in regard to the key and

9   the locations, correlating them back with F-1; if you would,

10  please?

11     A  Yes, sir.   I have already shown the location of F-1-A

12  on F-3.  Now, referring to Plaintiff's Exhibit F-1-B, which is

13  93W, page 18, sheet 1 of 5, that particular page or that par-

14  ticular sheet is shown on Plaintiff's Exhibit F-3 in the extreme

15  upper portion of the map.  And the symbol 93W-18 indicates the

16  book and page; and in each instance on Plaintiff's Exhibit F-3

17  the letter "P" is used to indicate the sheet number.   So that the

18  "P" might be --

19     Q  Now, your sheet number refers to F-1; is that correct?

20     A  Refers to F-1-B.  For example, this is sheet number--

21  F-1-B is sheet number 1 of 5, and the P-1 indicates that.

22     Q  Yes.   It is the F-1 series, not just F-1-B.   It is the

23  F-B series that is correlated and tied back to--

24     A  Yes, sir.  It is the entire series.  I was using F-B-1

25  as an example to pick out a particular sheet.

1        THE MASTER:  And the arrows which I notice on certain

2   of the markings indicate the extreme outside limits, or point

3   to the extreme outside limits of the area shown by that par-

4   ticular map; is that correct?

5        THE WITNESS:  Yes, sir.  The arrows in effect subtend the

6   outer limits of the land surface which is depicted on the

7   Assessor's Map numbered and contained within the area.  And then

8   the symbol, double line of dots, indicates the outer perimeter

9   of that particular Assessor's sheet on Plaintiff's Exhibit F-3.

10  BY MR. VEEDER:

11       Q  Now, I hand you the Plaintiff's Exhibit which has been

12  admitted in evidence.  It is numbered F-2.  And I ask you to state

13  into the record what this is comprised of and correlate it with

14  F-1 and F-3, if you would, please.

15       A  Plaintiff's Exhibit F-2 is a list of the names of

16  owners, parcel numbers, and description of the property of each

17  of the owners of those lands which are contiguous to Fallbrook

18  Creek.  The first parcel number on Plaintiff's Exhibit F-2, for

19  example, is Parcel No. 4W-25-155, and would be found on Plain-

20  tiff's Exhibit F-1-AA as Assessor's No. 155.  As shown on

21  Plaintiff's Exhibit F-1-AA, the name of the owner of that property

22  and the metes and bounds description of the property, or legal

23  description of the property, is shown in Plaintiff's Exhibit F-2.

24       THE MASTER: Now, on that Exhibit F-1-AA, does parcel 155

25  extend from the fence line on the Santa Margarita y Las Flores

1  to the boundary of the Rancho; is that correct, or does it

2  extend to the dotted line?  I assume it extends to the solid

3  line.  This is just for my own information in interpreting this

4  map.

5      THE WITNESS:  It extends to the dash line.

6      THE MASTER: To the dash line?

7      THE WITNESS:  Yes, sir.

8      THE MASTER:  And the course of the river is indicated

9  from the northeast to an east-west direction just below the

10  railroad.

11      THE WITNESS:  Yes, sir.  It is approximately parallel

12  to the railroad.  The direction of the flow of the creek on each

13  one of these F-1 series maps is indicated on the margin of the

14  map by an arrow, showing the direction in which the creek is

15  flowing across that particular parcel or parcels.

16      THE MASTER: And this particular area seems to be a

17  hundred feet or so wide, apparently.

18      THE WITNESS:  The scale of this sheet F-1-AA, your Honor,

19  is one inch equals 100 feet, and it appears that is approximately

20  50 feet in width at that point.

21      MR. VEEDER:  I have had marked for identification as

22  Plaintiff's Exhibit F-4-A, B series.

23      Q  I hand F-4-A to you, Col. Bowen, and I ask you to state

24  into the record what is set forth in that tabulation.

25      A  The F-4 series of exhibits show the ownership and

1   legal description of properties within the Fallbrook Creek

2   watershed.

3       MR. VEEDER:  We have a few more of those lists to complete,

4   your Honor, and we would like to make this offer, and then

5   supplement it as the lists are completed.  This is not entirely

6   finished.  If that is permissible?

7       THE MASTER:  Yes.  Now, does this list, the F-4 series,

8   include F-2, or is this exclusive of F-2?

9       MR. VEEDER:  It includes F-2.

10      THE MASTER:  So, in other words, the F-4 series includes

11  riparian as well as non-riparian, so to speak.

12      MR. VEEDER: That is correct.  And again I hasten to add,

13  if anyone disagrees with us on whether or not the land is

14  riparian or not, that we are simply bringing information to the

15  Court.  We are not purporting to represent whether a man is or

16  is not riparian.

17      THE MASTER:  That is understood.  Now, is there any

18  indication in the F-4 series as to whether a particular parcel

19  which is set forth in that series is also on F-2?

20      LCDR. REDD:  No, sir.

21      MR. VEEDER:  It is not shown on there, but the record

22  should show that they are incorporated, if F-2 is incorporated

23  into F-4.

24      THE MASTER:  Yes.  I was wondering if that could be

25  indicated on F-4 at a later time, whether say parcel 2  as

1  listed on F-4 is on F-2 or is not.

2        MR. VEEDER:  We can do that, yes, your Honor.  And I

3  think that would be--

4        THE MASTER:  I think it would simplify matters consider-

5  ably.

6        MR. VEEDER:  I think it would be a very wise idea.  I

7  would like to have the Colonel, though-- well, first I will make

8  the offer of F-4-A, with the understanding that your Honor will

9  permit that there be added the additional parcels as that work

10  is completed.  There was quite a drive to get the riparian lands

11  done, and we will finish up the rest of them in time for the

12  hearing on November 3rd.  So everything will be completed.

13        THE MASTER:  Very well.  The series, so far as it is now

14  completed from F-4-A through F-4-K, inclusive, is received in

15  evidence and marked as indicated.  And it is understood that the

16  list can be completed by the time of the hearing on November 3rd.

17        MR. VEEDER:  Your Honor, I would like to have Col. Bowen,

18  if he would, correlate those two lists back on to this exhibit

19  F-3.

20        Q  Now, Colonel, would you state how those areas which

21  are set forth on F-2 and F-4 are correlated on to F-3?

22        A  Again referring, your Honor, to Plaintiff's Exhibit F-2,

23  the first property listed, Parcel 94W-25-155, which has already

24  been tied to Plaintiff's Exhibit F-1-AA, can be found in regard

25  to the township, range and section or parcel number also by

1  reference to Plaintiff's Exhibit F-3.  The book and page number,

2  94W-25, which is the first part of the parcel number, is shown

3  in the lower left-hand corner of Plaintiff's Exhibit F-3.   And

4  the intermittent stream symbol, showing the alignment of Fall-

5  brook Creek, flows through the area, indicating the location on

6  that particular sheet.   The same is true of each of the other

7  parcels described in both Plaintiff's Exhibit F-2 and Plaintiff's

8  Exhibit F-4.

9       THE MASTER:  Now, the various sections of Plaintiff's

10  Exhibit F-4 seem to be prepared by reference to specific pages

11  of the Assessors Maps or sheets of the F-1 series; is that correct?

12       THE WITNESS:  Yes, your Honor.  Plaintiff's Exhibit F-4-A,

13  which is 93W, page 19, is shown on Plaintiff's Exhibit F-3 as

14  occupying an area--

15       THE MASTER:  94 or 93?

16       THE WITNESS:  This is 93W, your Honor, 19.  It is an

17  area where the stream symbol Fallbrook Creek forks, one fork

18  coming from the northeasterly direction and the other from an

19  easterly direction, to join and flow southwesterly.  Plaintiff's

20  Exhibit F-4-B shows the-- lists the ownership in the Donath &

21  Pierce tract, found on Assessor's Map, Book 93W, page 38.   In

22  that particular, the parcel listed and the owner shown on

23  Plaintiff's Exhibit F-4-B would appear on Plaintiff's Exhibit

24  F-3 in the upper portion of the watershed, with a book and page

25  number 93W-38.  And in this instance the name of the tract,

2581

1  Donath and Pierce delineated by a rectangular line comprised of

2  dots and dashes, showing the outer limits of that tract.

3          MR. VEEDER:  Do you have further--

4          MR. SACHSE:  May I inquire a question, Mr. Veeder?

5  BY MR. SACHSE:

6          Q  Is there any particular rhyme or reason as to how these

7  parcel numbers are selected within the sheets, Colonel, within

8  the exhibits?  Is it from east to west or--

9          A  I can't--

10         MR. VEEDER:  Those are the Assessor's numbers.

11 BY MR. SACHSE:

12         Q  The assessor's parcel number?

13         A  Parcel number, yes, sir.

14         MR. SACHSE:  All right.

15         THE MASTER: That is, the parcel numbers on F-4-B are the

16 same as the parcel numbers shown on the maps in the F-1 series.

17         MR. VEEDER:  Yes, sir.

18         MR. SACHSE:  That is what I wanted to know.

19         THE MASTER:  I should have said in the F-4 series.

20         MR. VEEDER:  That is correct, your Honor.

21         THE MASTER:  The same as the parcel numbers in the F-1

22 series.

23         MR. VEEDER:  That is right, your Honor.

24         Q  Now, Col. Bowen, from your observations of Fallbrook

25 Creek would you state whether there is a correlation or a

1  relationship or a continuity between the surface runoff in the

2  watershed of Fallbrook Creek and the ground waters within the

3  watershed of that stream?

4       A   Well, at times there is a continuity between surface

5  water and ground water.

6       Q   What would you say is the source of the ground water

7  which underlies the area within the confines of the watershed

8  in question?

9       A   The source of the ground water goes back to the

10  hydrologic cycle, the rain that falls on the surface and percol-

11  ates through the residuum.

12       Q   Does what?  constitutes the source of the supply; is

13  that correct?

14       A   Yes, sir.  The only source of supply is rainfall.

15  There is no other outside source.  Now, in a state of nature,

16  of course.  There is Colorado water used in the area and some

17  return from that may augment the ground water. But the only

18  source of natural recharge to the residuum in the Fallbrook

19  surface is that in the form that comes from rain which falls

20  on the surface.

21       Q   And what would be the effect on the surface runoff

22  should the ground water in the immediate vicinity of that

23  surface runoff be drawn down or the supply depleted, assuming

24  by pumps?

25       A   Well, since the only source of recharge to the ground

1  water supply is rainfall and runoff, disregarding the imported

2  waters, naturally there would be a depletion, a small depletion

3  of the runoff by extracting water from the ground water supply.

4       Q  Now, what in your opinion is the relationship between

5  the surface flow and the ground waters within the Fallbrook

6  Creek watershed from the standpoint of the movement of ground

7  water downgrade, down through the--

8       MR. SACHSE:  I will object, if the Court please, no

9  proper foundation laid, no showing of ground water contours or

10  anything of that kind to enable him to answer this question.  I

11  assume you are talking about ground water, not surface water.

12  That was the question, as I got it, ground water.

13       MR. VEEDER:  Well, I will rephrase the question.

14       Q  Colonel Bowen, are you familiar with the tributaries

15  of-- are you familiar with Fallbrook Creek and its tributaries?

16       A  Yes, sir.

17       Q  And would you state the course of that creek from the

18  upper reaches of its tributaries down to its terminus?

19       A  Well, Fallbrook Creek rises generally east and north

20  of the Town of Fallbrook, as shown on Plaintiff's Exhibit F-3.

21  It flows in a southwesterly direction to a point where it enters

22  the Naval Reservation, that point being illustrated on Plaintiff's

23  Exhibit F-3 by reference to 94W-25, sheet 4.  And from that

24  point the creek continues to flow generally in a southwesterly

25  direction to the point where it enters Lake O'Neill at Camp

2584

1 Pendleton.

2       Q   Now, what, in your opinion, is the course of the ground

3 water and, indeed, the surface water within the watershed of

4 the Santa Margarita River?

5       MR. SACHSE:  I will object.  It is a compound question.

6 I would like them separated, your Honor.

7       MR. VEEDER:  I will be glad to separate them.

8       Q   What is the course of the ground water?

9       MR. SACHSE:  I will object.  There is no foundation laid

10 for any testimony from this witness as to the course of the

11 ground water.  The witness has previously testified that in his

12 opinion the ground waters are vagrant, percolating, and not a

13 part of any defined channel.  And without a showing, a determin-

14 ation of ground water contours, there is no foundation for

15 additional testimony on his part.

16       MR. VEEDER:  I think it is entirely possible, your Honor,

17 that this matter goes to the weight of the witness's testimony.

18       MR. SACHSE:  Impeaching your own witness.

19       THE MASTER:  No, he is not impeaching him.  He is stating

20 that your objection to his testimony goes to the weight of his

21 testimony.

22       MR. SACHSE:  Oh, I see.

23       THE MASTER:  I suppose technically the objection may be

24 well taken. The witness has said he is familiar with the creek.

25 He has also testified the ground water is not part of the creek.

1   So he has not testified he is familiar with the ground water as

2   such.

3          MR. VEEDER:  May I submit, your Honor, that without

4   objection this witness has testified, just within the last 15

5   minutes, that there would be some relationship between the

6   surface flow and the ground water, and that having gone in

7   without objection, I submit we are entitled to proceed with this

8   course of examination.

9          MR. SACHSE:  Just a moment.  The witness testified--

10         THE MASTER:  I think counsel can waive an objection for,

11  you might say, as long as he wants to, and then decide to raise

12  it, if it does actually go to the ability of the witness to

13  testify.

14         MR. SACHSE:  Your Honor, may I make the objection--

15         MR. VEEDER:  It doesn't, however, at this juncture go to

16  admissibility.  I submit it goes to weight.  Because if we read

17  the whole transcript now in the light of this witness's complete

18  testimony, it is apparent that we have a much broader picture

19  than we had when he commenced to testify.  So the sole and only

20  question I submit now is not whether this witness is qualified--

21  because we all admit his qualifications, certainly Mr. Sachse

22  does-- it now goes to the question of whether there is a conflict

23  in what he has previously said.  I submit there is no conflict.

24         THE MASTER:  I don't see the conflict at the present time.

25  What is your objection?

1   MR. SACHSE: My objection is this: Mr. Veeder is well

2   aware of the fact he has introduced a half dozen exhibits in the

3   hearings before Judge Carter that ground water contours are a

4   very different kettle of fish than surface contours, and that a

5   foundation must be laid before any witness can testify to the

6   location of ground water, the gradient and the direction of

7   flow or anything else.  Now it might be very simple for a witness

8   to testify that in his opinion they are vagrant and percolating.

9   That same witness might have absolutely no foundation or no

10  knowledge at all sufficient to attempt to show the course that

11  they actually follow without a foundation as to the determination

12  of ground water contours.  There is no such foundation here.

13       MR. VEEDER:  Mr. Sachse has introduced-- he is trying to

14  add half a dozen others.  And at 2:30 in the afternoon it doesn't

15  work.  I haven't mentioned ground water contours.

16       MR. SACHSE:  You have asked the direction of flow.

17       MR. VEEDER: Excuse me, Mr. Sachse, until I am through.

18  I have asked a very simple question.  What would be the course

19  of the ground water and the surface water in the Fallbrook Creek

20  watershed?  Now, I submit that a man with the background and

21  education and training of Col. Bowen is certainly qualified to

22  respond to the questions that I have asked.  Your Honor may or

23  may not give weight to this phase of the testimony.  But I

24  respectfully submit if a man is qualified to testify in regard

25  to ground water at all he is entitled to testify in regard to

2587

1   the general course of the surface and ground water down through

2   the valley.

3        MR. SACHSE:  May I make that voir dire for a minute,

4   your Honor?  It might settle the whole thing.

5        THE MASTER:  Yes.

6

7                    VOIR DIRE EXAMINATION

8   BY MR. SACHSE:

9        Q  Col. Bowen, have you taken well measurements in the

10  Fallbrook Creek watershed?

11       A  No, sir.

12       Q  Have you attempted anywhere to delineate the ground

13  water contours of the Fallbrook Creek watershed?

14       A  No, sir.

15       Q  You are familiar, of course, with how that is done?

16       A  Yes, sir.

17       Q  You make the determination of a subsurface contour

18  in much the same way that a surface contour is made, that is,

19  from point of reference to point of reference to point of

20  reference; am I correct?

21       A  Yes, sir.

22       Q  And by determining ground water contours and delineat-

23  ing them on a map, it is possible to determine the direction of

24  flow of subsurface waters, is it not?

25       A  That is correct, sir.

1    Q  And you have not done that?

2    A  No, sir.

3    Q  In this watershed?

4    A  No, sir.

5    MR. SACHSE:  I have no further voir dire.

6    MR. VEEDER:  I submit that it is entirely possible --

7  if your Honor wants to hear a few more words from me in that

8  regard-- it is entirely possible for a witness to testify as

9  to the general course of water in the stream without having

10 ground water level contours in a vast area.  And I am glad that

11 Mr. Sachse has given blessing to our testimony in the upper

12 reaches.  In the upper reaches we do have a vast area where the

13 establishment of the contours on down the valley towards the

14 Murrieta Creek is extremely important.  But here a relatively

15 narrow area, where Col. Bowen is completely familiar-- I will

16 ask some more questions if you desire to have me do so, but I

17 don't see why we should prolong a matter which seems to me so

18 obvious from the standpoint of the course of waters.

19    THE MASTER:  I am inclined to agree with you, Mr. Veeder,

20 to this extent:  I think the testimony of the Colonel is ad-

21 missible.  The points Mr. Sachse raise do go primarily to the

22 weight of the testimony.  And I will permit Col. Bowen to answer

23 the questions.  But I would suggest, in line with my observations

24 as to the weight of the testimony, that if you can qualify him to

25 any greater extent it might be advisable to do so.

1    Incidentally, Mr. Veeder, I notice Exhibit F-2 appears

2 only to have been marked for identification.  I don't believe

3 it was actually introduced in evidence.

4    MR. VEEDER:  2-- I thought 2 had been offered.  Well, I

5 offer it now, your Honor.

6    THE MASTER:  I don't think it was.  It will be received in

7 evidence as Exhibit F-2.

8    MR. VEEDER:  Thank you very much.

9    THE MASTER:  You may proceed.

10    MR. VEEDER:  Before I do proceed, your Honor, I would

11 like to point out that we have had a very complete study in

12 geology of this whole area, and while I don't have that exhibit,

13 I would like to interrogate along that line, if I may.

14    THE MASTER:   Very well.

15

16                 FURTHER DIRECT EXAMINATION

17 BY MR. VEEDER:

18    Q  Col. Bowen, what geologic investigation has been made

19 under your direction in the area of Fallbrook Creek and related

20 smaller affluents of the Santa Margarita River?

21    A  We made a complete areal geology study.

22    Q  And did that encompass--

23    A  It encompasses a mapping of geologic formations in

24 the Fallbrook Creek watershed, a delineation on a planimetric

25 map or identification in general terms.

1        Q   And under whose direction was that made?

2        A   Made under my direction.

3        Q   And during the course of that survey, what investigation

4   was undertaken in regard to the soils and deposits which exist

5   above the basement complex in this area?  Am I clear?  Am I a

6   good enough geologist to ask a sensible question?

7            THE MASTER:   What do you mean by "basement complex"?

8            MR. SACHSE:   We all know.  We have been using it in San

9   Diego.

10           MR. VEEDER:   The basement complex is simply the bedrock

11  which underlies the residuum and alluvium which constitute the

12  upper soils.

13           THE MASTER:   I assumed that was it.

14           MR. SACHSE:   I will stipulate that is a reasonably

15  accurate explanation.

16  BY MR. VEEDER:

17           Q   Don't you have the question?

18           A   No, sir.  I understood you were going to clarify the

19  question.  As far as I am concerned, the area is entirely base-

20  ment complex, with deeply weathered residuum.

21           MR. VEEDER:   That was the response I wanted.  So no one

22  has any objection.

23           Q   Now, from your analysis of the topography of the land

24  and the residuum which comprises the surface of this particular

25  area, is it possible to make a determination as to the course

1      of ground water in the area?

2              A  Not with any definiteness.  Water goes downhill.

3              Q  That is what we wanted to know.  And where are the

4      tributaries of the stream and the main stem of the stream as they

5      relate to Lake O'Neill, from the standpoint of their respective

6      elevations?

7              MR. SACHSE:  Wait a minute.  I don't follow that at all.

8              MR. VEEDER:  All right.  I will ask--

9              Q  What are the respective elevations of the main stem

10     of Fallbrook Creek and the tributaries of Fallbrook Creek as

11     they relate to Lake O'Neill?

12             A  Well, the gradient is generally to the southwest.

13     Referring to Plaintiff's Exhibit F-3, the highest ground in

14     the Fallbrook Creek watershed is along the solid black line

15     which marks  the perimeter of the upper portion of the watershed.

16     And there are no points along there indicating the highest

17     knolls, but generally the Fallbrook Creek watershed  slopes from

18     the watershed towards the creek channel, and from the northeast

19     to the southwest.

20             Q  Basically what would be the course of ground water in

21     the confines of the watershed as you have just described them?

22             A  Well, water, as I say, flows downhill.  And the course

23     would generally be from the higher ground to the lower ground

24     occupied by the stream channel, and from the upper or north-

25     easterly portion of the watershed in a southwesterly direction.

1      Q   Now what is your opinion as to the hydrologic contin-

2   uity of the ground water in that area from the highest to the

3   lowest point from the standpoint of elevation within the water-

4   shed?

5      A   Are you speaking of the entire watershed,--

6      Q   Yes.

7      A   --Mr. Veeder, both within and without the Naval

8   Reservation?

9      Q   Let's restrict it to the boundary, down to the southern

10   boundary of the Naval Ammunition Depot as depicted on Plain-

11   tiff's Exhibit No. F-3.

12      MR. SACHSE:   Easterly boundary, you mean, Mr. Veeder.

13      THE MASTER:   You mean southerly or easterly?

14      MR. VEEDER:  Easterly.   I beg your pardon.   Easterly.

15      MR. SACHSE:   The question is limited to the area of

16   Fallbrook Creek watershed as delineated on Plaintiff's Exhibit

17   F-3?

18      MR. VEEDER:   That is correct.   That is the only testimony

19   that is in the record.

20      THE WITNESS:   It is difficult to answer the question,

21   Mr. Veeder, as to continuity of water.   There are variations

22   in depth of this residuum, we know.   There are some rock out-

23   crops in the area.

24   BY MR. VEEDER:

25      Q   Could you locate the rock outcrops?

1      A   No, sir.   I would have to refer to my geologic maps

2   and notes on that.   I don't have them with me.

3      MR. VEEDER:   Your Honor, that is one of the problems with

4   which we are confronted here is the fact that we have this

5   detailed survey which has been made and which was proposed for

6   entry in the case in chief.   And we believe in the case in chief

7   evidence will be shown that there is a hydrologic continuity.

8   But I hesitate to leave the record as it now stands, for the

9   reasons I expressed this morning into the record.   I would like

10  to ask Col. Bowen a few more questions, though, in regard to it.

11  And we will supplement this evidence when the-- we hope to have

12  it offered in evidence by Friday of next week-- Friday of this

13  week, this geology to which I have made reference, in which a

14  study has been made.   And there will be an exhibit offered in

15  evidence by Lt. Walker.   We will have it marked and re-offered

16  here to evidence some of these things concerning which I am

17  interrogating now, if that is agreeable to your Honor.

18      THE MASTER:   Very well.

19  BY MR. VEEDER:

20      Q   Now, Col. Bowen, would you state whether in your

21  opinion the pumping of water throughout the watershed of the

22  Fallbrook Creek, as depicted on Plaintiff's Exhibit F-3, would

23  have effect upon the surface flow of the stream?

24      MR. SACHSE:   Object, it has been asked and answered in

25  the testimony last week.   I have it right in front of me.

1      MR. VEEDER:  Are you referring to today's testimony?

2      MR. SACHSE:  I am referring to the testimony last Monday

3  by the same witness in the same case in discussing the same

4  watershed.  "Generally throughout the residuum it is my opinion

5  that the ground waters are vagrant, percolating and not a part

6  of any defined channel, hence not a part of the Fallbrook Creek,

7  and hence the Santa Margarita stream system."

8      MR. VEEDER:  I don't believe that is the situation.  This

9  witness said "generally," and here we have a circumstance where

10  I truly believe, your Honor, that the land owners within

11  Fallbrook Creek-- Mr. Sachse doesn't represent them all.  I have

12  a responsibility to them, too.  After all, they pay my salary.

13  The point I make is that I can't believe that they should be

14  limited to percolating, vagrant ground waters when this witness

15  has now testified, and testified without objection, that there

16  is an interrelationship between the surface flow and the ground

17  water, and that if a riparian pumped from this stream he would

18  affect--

19      THE MASTER:  The witness hasn't testified to the last

20  part of that, Mr. Veeder.  He did give certain testimony which

21  could be interpreted in accordance with the first part of your

22  statement.

23      MR. VEEDER:  Let me ask a couple of questions then.

24      Q  What would be the effect of pumping in the immediate

25  vicinity of the Fallbrook Creek as depicted on Plaintiff's

1    Exhibit No. F-3?

2         MR. SACHSE:  I will make the same objection, your Honor.

3    I will remind you further of the very next sentence of Col.

4    Bowen's testimony.  "We have mapped no significant alluvium

5    anywhere within the approximately two square miles of Fallbrook

6    Creek watershed which lies outside of the U. S. Naval Reserva-

7    tion, hence we don't have a defined ground water body, as is

8    true on some of the other tributaries of the Santa Margarita

9    River."  Then on cross I asked the Colonel just one question:

10   "Col. Bowen, was your general testimony that the entire two

11   square miles of the Fallbrook Creek drainage, outside of the

12   Ammunition Depot, it is your opinion that the waters underlying

13   them would be local, vagrant, percolating and not a part of any

14   stream?"  Answer:  "Yes, sir."

15        MR. VEEDER:  I don't believe there is any law of evidence,

16   your Honor, that would preclude a witness from being interro-

17   gated further on a particular proposition.  Whereas here the

18   rights of these  land owners are directly and immediately

19   involved, I can ask a series of questions and they will be

20   subject to being stricken.  But I do submit that if it can be

21   shown that the pumping would create a cone of depression in the

22   vicinity of the surface flow, and that the surface flow would

23   recharge that cone of depression, then I submit that the owner

24   of that land has a riparian right which is a great deal more than

25   just the claim on the ordinary vagrant waters underlying the

1  parcel of land.  I think it is extremely important.

2      THE MASTER:  Of course, the objection that has been

3  made is that the question has been asked and answered.  The

4  precise question certainly hasn't been asked and answered.  I

5  think a witness is entitled to either explain or amplify or,

6  if necessary, even qualify testimony which he has previously

7  given.  I do not believe, and the objection hasn't been made,

8  that you are attempting to impeach him.

9      MR. VEEDER:  I am not attempting--

10      THE MASTER:  And I don't regard this as impeaching testi-

11  mony.  So I think that the question is proper and the objection

12  will be overruled.

13      MR. SACHSE:  May I for the record add one more objection,

14  your Honor?  Again there has been no adequate foundation laid

15  to enable this witness to testify in any way, shape or form as

16  to the direction of the flow of the ground waters.

17      THE MASTER:  The objection is overruled.

18      MR. VEEDER:  You want the question read back?

19      THE WITNESS:  Yes.

20  BY MR. VEEDER:

21      Q  I will ask you what would be the effect, Col. Bowen,

22  of the pumping of water from the immediate vicinity of Fallbrook

23  Creek, creating a cone of depression, which would extend to

24  part of the bed of Fallbrook Creek?

25      MR. SACHSE:  I object.  It is assuming facts not in

1  evidence.   There is no testimony at all that cones of depression--

2  as to cones of depression or how far they extend or anything

3  else.

4          MR. VEEDER:  I will ask some more questions then, your

5  Honor.  If you want to keep us here all day, it suits me.

6          Q   When a well is pumped down, what occurs?

7          A   A portion of the material penetrated by the well is

8  dewatered.

9          Q   And what is the technical term for the dewatered area

10  from which the water has been pumped?

11          MR. VEEDER:  Now my witness is going to be difficult.

12          THE WITNESS:  It depends a lot on the type of well or

13  wells with which one is dealing.

14  BY MR. VEEDER:

15          Q   Assuming that it is in residuum, what would be the

16  phenomena that would be created by the dewatering of the area?

17          MR. SACHSE:  I will object.  There is no sufficient facts

18  laid to enable anybody to answer that hypothetical question,

19  assuming it was in residuum.  There would be different depths,

20  differences of types of residuum, differences of capacity of

21  pumps.  It is an utterly unanswerable question in the way in

22  which it is asked.

23          MR. VEEDER:  Your Honor,--

24          THE MASTER:  I think the question is objectionable at the

25  present time in that the witness has indicated he doesn't know

1    to what precise facts the question relates.  I think you should

2    make the question more definite and specific, Mr. Veeder.

3         BY MR. VEEDER:

4         Q  Assuming that a well is drilled-- I will ask a specific

5    question-- a well being drilled in the residuum, what effect

6    is there upon the soils in which they are drilled when water is

7    pumped from those soils?

8         A  Well, again, in this area of residuum, Mr. Veeder, a

9    lot depends on the type of well that is put in.  If it is

10   drilled, it would depend upon the diameter to which it is

11   drilled.  These residuum materials are, by and large, rather

12   slowly pervious.  A small diameter drilled well is quickly

13   exhausted of its water supply.  It will dewater the area

14   rapidly immediately surrounding it, and then you have to wait

15   until some more water seeps in from the adjoining area.

16        Q  Precisely.  Now, what would be the effect of such a

17   structure in the immediate vicinity of Fallbrook Creek where it

18   has its course through the residuum?

19        MR. SACHSE:  Will you please spell out "structure", Mr.

20   Veeder?

21        MR. VEEDER:  The structure which Col. Bowen just described.

22        MR. SACHSE:  A drilled well, you mean.

23        MR. VEEDER:  A drilled well.

24        THE WITNESS:  This is a small diameter drilled well, Mr.

25   Veeder?

1      MR. VEEDER:  Well, if that will make you happier, yes.

2      THE WITNESS:  It would have a negligible effect.

3      MR. SACHSE:  May I have the answer, please?

4      (Answer read.)

5      THE MASTER:  A negligible effect.

6  BY MR. VEEDER:

7      Q  Would it have any effect-- you say it would have

8  negligible effect?

9      A  Yes, sir.

10     Q  Now, assuming that it was a well of large diameter,

11  what would the effect be?

12     A  A typical well in the Fallbrook area, Mr. Veeder?

13     Q  Would you respond to the question?

14     A  Well, how large is large, Mr. Veeder?

15     Q  Well, it is bigger than the small well to which you

16  made reference.

17     MR. SACHSE:  I will object as too vague and indefinite.

18  BY MR. VEEDER:

19     Q  Suppose a well of 14-inch diameter was drilled in the

20  immediate vicinity of the Fallbrook Creek?

21     A  Drilled wells of that diameter in this Fallbrook surface

22  are very low producers, Mr. Veeder.

23     Q  What would be the effect upon the stream flow?  Would

24  it be any at all?

25     A  Practically negligible.

1      Q  Now, from the standpoint of a dug well in the immediate
2   vicinity of Fallbrook Creek, with a large diameter, and a well
3   which would drain a larger area than the drilled well, what
4   would be the effect of that?

5      A  Well, a large dug well with laterals extended across
6   slope from the well would dewater a larger volume of the
7   residuum and make that residuum, of course, receptive of re-
8   charge by runoff when such runoff had occurred.

9      Q  Now, assuming that the runoff was in the bed of
10  Fallbrook Creek, what would be the effect upon the surface flow
11  of the stream?

12     A  Well, since all recharge in the Fallbrook Creek
13  watershed depends on rainfall and runoff, any dewatered zone
14  which is recharged would necessarily subtract water from the
15  runoff.

16     Q  Including the surface flow of Fallbrook Creek?

17     A  Yes, sir.

18     MR. VEEDER:  I reserve the right, your Honor--

19     MR. SACHSE:  For further cross-examination, Mr. Veeder?

20     MR. VEEDER:  Any resemblance between this and any kind of
21  examination is purely coincidental.  I do ask, though, the
22  privilege of putting in some of the evidence that we are going
23  to introduce before Judge Carter in regard to the geology of
24  this area.  As I said before, I cannot believe that the people
25  in Fallbrook should be limited to the vagrant ground water

1  underlying their lands  I think they do have an interest in that

2  creek, and I do believe the creek and the surface runoff re-

3  charges their water, and I can't imagine the United States would

4  desire to sit at the end of any stream and demand that all the

5  water come down to it.  Now we are taking a very strong,

6  vehement position against that.  We believe we share correlatively

7  with them, and we insist that-- we shouldn't insist, but we

8  would respectfully request that any decree reflect the right--

9      MR. SACHSE:  Are we arguing the case now, or do I have a

10  chance to cross-examine, if you don't mind?

11      MR. VEEDER:  You can cross-examine me, if you want to.

12      MR. SACHSE:  I want to cross-examine Col. Bowen.

13      THE MASTER:  I think we are all agreed, Mr. Veeder, that

14  the owners along Fallbrook Creek have riparian rights to the

15  extent that they exist, in addition to any underground rights.

16  I don't think that anybody is trying to take away riparian

17  rights from them.

18      MR. VEEDER:  I have a bad habit, though, of picking up a

19  paper once in awhile and reading something.  And I was very

20  concerned when I read the Fallbrook people were going to be

21  limited, as Mr. Sachse interprets the testimony, and reflected

22  in the paper, that they would only have vagrant ground waters.

23  And I say they do tap with their pumps riparian water, and they

24  should be protected.

25      THE MASTER:  Well, to a certain extent reading a newspaper

1    account of the litigation is a bad habit, because it is quite

2    often inaccurate.

3        MR. VEEDER:  I agree with you.

4        MR. SACHSE:  I am not going to argue any longer what I

5    contend or do not contend, your Honor.  Your Honor obviously

6    understands it perfectly.  You stated this morning to Mr. Veeder

7    this is not an "either-or" proposition.  It is an "and" propo-

8    sition.  That is exactly my position.  I contend every one of

9    my clients have a riparian right "and", Mr. Veeder, not "or"--

10   "and" a right to the vagrant local percolating waters under-

11   ground, and that the two are distinct.  And that the United

12   States has no interest whatsoever, or power to restrict their

13   use of the vagrant local percolating ground water.  Their

14   riparian right, yes, they share correlatively with the United

15   States.  Now, may I cross-examine briefly?

16       THE MASTER:  Very well, proceed with the examination.

17

18                    CROSS-EXAMINATION

19   BY MR. SACHSE:

20       Q  Col. Bowen, have you mapped or discovered any sig-

21   nificant areas of alluvium in the Fallbrook Creek watershed?

22       A  No, sir.

23       Q  Did I understand it to be your opinion that the entire

24   subsurface strata of this Fallbrook Creek watershed is basement

25   complex, in some cases deeply weathered, and in some cases not,

2603

1  but generally speaking basement complex?

2      A   Yes, sir.

3      Q   Is it not true that in such geological formations the

4  ground waters are found in cracks and fissures, the direction

5  of which may be entirely unrelated--

6      MR. VEEDER:  Objection, your Honor, beyond the scope of

7  the direct examination.

8  BY MR. SACHSE:

9      Q   --to the surface drainage?

10     MR. VEEDER:  I object.  It is beyond the scope of the

11 direct examination.

12     THE MASTER:  Overruled.  You went into the question of

13 the basement complex and so forth with Col. Bowen, and this is--

14     MR. VEEDER:  Not as a source of supply, your Honor.  I

15 won't argue, though.

16 BY MR. SACHSE:

17     Q   Do you have the question, Colonel?

18     A   May I have it read, please?

19     (Question read.)

20     THE WITNESS:  The ground water is in these cracks and

21 fissures, and also in this residuum which overlies the un-

22 weathered portion of the basement complex.

23 BY MR. SACHSE:

24     Q   In other words, you are stating there is water in the

25 residuum itself and also in movement in various cracks and

1  fissures?

2      A  Yes, sir.

3      Q  And that movement of water in cracks and fissures

4  found in the older basement complex may have actually no

5  relation to the surface contours; is that correct?

6      A  That is correct.

7      MR. SACHSE:  I have no further questions.

8  BY THE MASTER:

9      Q  Col. Bowen, when you use the word "residuum", do you

10  refer to the same geology as when you use the word "alluvium"?

11      A  No, sir.  Residuum is weathered portions of the base-

12  ment complex which has remained in place.  In other words, the

13  granitic materials weather and break down into soil sized

14  fragments, gravel, sand, silt, clays, and stay in place.

15  Whereas alluvial material is transported by water from the place

16  generally where it first is weathered or broken down, and

17  deposited in some other place, usually along a stream channel.

18  BY MR. VEEDER:

19      Q  In other words, may I ask, isn't the alluvium nothing

20  more or less than washed off weathered basement complex, in

21  many instances; isn't that right?

22      A  Well, alluvium takes in all manner of water-transported

23  materials, whether it is loessial  material, sedimentary material,

24  basement complex, terrace material, anything that is transported

25  by water.

2605

1    MR. VEEDER:  I have no further questions.

2    THE WITNESS:  The residuum, your Honor, is an in-place

3 phenomena, weathered and stayed right there where it weathered.

4    MR. SACHSE:  I do have one further question, your Honor.

5    Q  Is it still your opinion, Col. Bowen, that the waters

6 underlying the approximately two square miles of the Fallbrook

7 Creek watershed lying easterly of the Naval Reservation are

8 vagrant, local, percolating ground water, not a part of the

9 Santa Margarita River system?

10    A  Yes, sir.

11    MR. SACHSE:  That is all.

12    THE MASTER:  Then, Mr. Veeder.

13    MR. VEEDER:  I have no more quesdions.

14    THE MASTER:  Do you have any further evidence to present

15 with reference to any of the--

16    MR. VEEDER:  We have the geologist to present, your

17 Honor.

18    THE MASTER:  At the present time?

19    MR. VEEDER:  No.  We are going to put that in, and I

20 will also bring the data down.

21    THE MASTER:  Do you have any other evidence to present

22 with reference to any of these specific parcels along the

23 course of the Fallbrook Creek?

24    MR. VEEDER:  No, there is no more.

25    MR. SACHSE:  It was my understanding, unless I had objec-

tions-- as far as my clients are concerned, unless I find some

2606

1    error in their descriptions, why these shall be regarded as

2    stipulated to.  And I will expect to be able to tell your Honor

3    by-- what is it, the 3rd when we are here next?

4         THE MASTER:  Yes.

5         MR. SACHSE:  --whether I have any quarrel with the de-

6    scriptions that affect my people.  I won't be able to do it

7    before that.

8         THE MASTER:  You are referring to the descriptions and

9    the names on this F-4 series?

10        MR. SACHSE:  That is right, your Honor.  And also I will

11   expect, if I have any disagreement as to this F-2 on the ones

12   that are riparian, I will expect to call it to your Honor's

13   attention on the 3rd, if there should be any.

14        THE MASTER:  Yes.  Then is there any further evidence

15   which you have to present this afternoon, Mr. Veeder?

16        MR. VEEDER:  No, your Honor.  That concludes--

17        THE MASTER:  You have no further exhibits at the present

18   time?

19        MR. VEEDER:  No.  We have everything in except those we

20   must add, to which I have already made reference, which would be

21   the part of F-4.

22        THE MASTER:  Now the geology which you would have at a

23   later date does not refer to any specific parcel?

24        MR. VEEDER:  No, it does not, your Honor.  It embraces

25   this area, plus other component parts of the valley.

1       THE MASTER:  That is, you do not expect to present any

2   evidence as to the Fallbrook Creek area comparable to what was

3   offered in connection with the De Luz Creek area as to parcel by

4   parcel delineation of the types of soil?

5       MR. VEEDER:  We have no plans along that line, your Honor.

6   If you have desires on that, we could undertake it, but the

7   ownership and the parcels are smaller and the physical situation

8   is different.

9       THE MASTER:  I just wanted to ascertain whether you ex-

10  pected to offer it.

11      MR. VEEDER:  No, we don't.

12      THE MASTER:  Is there any defendant here that wishes to

13  present any evidence at this time?

14      MR. FRED ANDERSON:  I would like to ask Mr. Bowen if he

15  has checked the level of the wells in the Fallbrook area, the

16  water level.

17      THE MASTER:  I believe the Colonel has already answered

18  that, but you may answer it again, Colonel.

19      THE WITNESS:  No, I have not.

20      MR. ANDERSON:  Well, what I mean is from now back four

21  or five years.  I have found out, and I think some of the rest

22  of us agree that the water level now is at least four and five

23  feet higher than it was four or five years ago.  What causes

24  that?  We haven't had any rain.

25      MR. VEEDER: Sir, I fell off the sled back there.  You

1    are speaking of the water level in the ground?

2        MR. ANDERSON:  The water level, well, in the wells, yes.

3        MR. VEEDER:  Yes.

4        THE WITNESS: Beginning in--

5        MR. ANDERSON:  It is higher now than it was then, four

6    and five years ago.

7        THE WITNESS:  Beginning in 1955, Mr. Anderson, we started

8    a period of three years of extremely severe drouth.  And I

9    don't know what your history of water levels is, but I will have

10   to remind you that last March and April we got a rather heavy

11   precipitation and runoff, which may account for the water

12   rising to those levels, to a substantial degree.

13       MR. ANDERSON:  Will that water stay in the ground for

14   twelve months?

15       THE WITNESS: Oh, yes.  Mrs. Terriere still has some of last

16   year's runoff behind her pond up there, and other ponds in the

17   area.

18       MR. ANDERSON:  That water in that pond is helping out

19   the underground water?

20       THE WITNESS:  Yes, indeed.  That is very smart practice,

21   and a number of people in Fallbrook here are doing just that,

22   building check dams to hold back runoff and permit the water

23   to soak into the residuum material for later extraction by pumps.

24       MR. ANDERSON:  I have a report on water tested in my

25   well.  And this is for my information.  It shows chloride, 225

1   parts per million.  Where does the chloride-- the only way

2   chloride can get into your water is through the public utility;

3   is that right?

4        THE WITNESS:  No, sir.

5        MR. ANDERSON:  It can get in other ways?

6        THE WITNESS:  Yes, sir.

7        MR. SACHSE:  I think you had perhaps explain that chloride

8   and chlorine isn't the same thing.

9        THE WITNESS:  The chloride ion is found in practically

10   all natural waters, except melting show.  Practically pure water,

11   you might say.  The chloride ion is common to many salts, sodium

12   chloride, for example.  And these chloride salts make up part

13   of the rock formation over which and through which water per-

14   colates or runs. And it picks up a little as it goes along.

15   Some water has more than others.  But it is found in practically

16   all native waters.  You can't charge it--

17        MR. ANDERSON:  I understood that the chlorine that they

18   put in the water turned the tips of the avocados brown.

19        THE MASTER:  I think this is getting a little bit off the

20   subject of the litigation.  I have no objection to you discuss-

21   ing it with Col. Bowen, but--

22        MR. ANDERSON:  My idea was if this chloride and chlorine

23   was the same, how it got down in the underground waters.  We

24   must put it there with Colorado River water rather than the rain.

25        THE MASTER:  Well, maybe you can discuss this with Col.

1    Bowen after the recess.  I am not in any way attempting to limit

2    you, but I think this is off the subject that is here at issue.

3    Is there any evidence which any party wishes to introduce at

4    this time?

5         Well, if there is not, then we will recess at this time

6    until November 3rd at 9:30.  And at that time we will hear any--

7    Excuse me.

8         COL. ROBERTSON:  We have Parcel 19 on De Luz.

9         THE MASTER:  Very well.  There is some additional testi-

10   mony on Parcel 19 on De Luz Creek, which we will take at this

11   time, then.

12        MR. VEEDER:  Again may we have just a few moments recess

13   so the Colonel can check in on this?

14        THE MASTER:  Yes.  We will take a recess for five minutes.

15        (Recess.)

16

17                      ALLEN C. BOWEN, resumed stand.

18        MR. VEEDER:  Will you interrogate the witness as to

19   what you want, your Honor?

20        THE COURT:  Very well.

21

22                      DIRECT EXAMINATION

23   BY THE COURT:

24        Q  Col. Bowen, can you refer to the geologic report upon

25   Parcel 19 in the De Luz Creek watershed and advise me concerning

1  the nature of the streams which flow across the property and

2  the nature of the underground water?

3      A  Yes, your Honor.  I have before me a copy of the

4  engineering report, No. 381, 8 South, 4 West, portions of

5  Sections 22, 27 and 28.  This report was prepared by my office,

6  under my direction and supervision, and was introduced in

7  evidence as Plaintiff's Exhibit M-101, by reference to the

8  Clerk's record of exhibits.  Now, this copy of the report

9  includes the soil survey on an aerial photograph basis, and

10 also a brief  and general description of the geology and other

11 matters relating to the property.  With reference to the

12 portion of the vertical aerial photograph used as the soil

13 survey base,and attached to the copy of Plaintiff's Exhibit

14 M-101, it is noted that the east fork of De Luz Creek enters

15 the property on the eastern boundary, makes a loop to the south

16 and then to the northwest, and loops back to the southwest,

17 leaving the southern boundary of the property near the south-

18 westerly corner.  The east fork of De Luz Creek as it traverses

19 this property is an intermittent stream.  However, it is under-

20 lain by a body of recent alluvium, which is shown on the soil

21 survey map attached to Plaintiff's Exhibit M-101 as being the

22 Class VIII area, supporting the thread of the stream, and the

23 Class II area, which is parallel to the Class VIII area.  The

24 Class II and the Class VIII together is comprised largely of

25 recent alluvium, and contains ground waters which support a

2612

1  surface stream at various times of the year.  And the ground

2  waters contained in that recent alluvium are, in my opinion,

3  a part of the East Fork of the De Luz Creek stream.  In addition,

4  your Honor, there are some fragments of an older terrace which

5  was formed in older times and uplifted, generally shown as the

6  Class VI areas north of the east fork of De Luz Creek.  Those

7  older terraced formations also contain ground water which might

8  be in hydraulic contact with the ground water in the alluvium.

9  The Class VII area which lies in the southeasterly portion of

10 the plot is a steep mountainous area, rising abruptly from the

11 valley.  And except for the lower slopes of that Class VII

12 area, where the water contained in cracks and fissures, being

13 in hydraulic continuity with the water contained in the recent

14 alluvium, it would be my opinion that the upper portions of that--

15 the ground water would be vagrant, percolating, and not a part

16 of the stream.

17      THE MASTER:  Well, then, in general would it be your

18 testimony that the ground water under the entire parcel, ex-

19 cepting the Class VII land in the higher areas, the central

20 portion at the south, would be part of the flow of the stream?

21      A  Well, there are, your Honor, other areas of Class VII

22 land.  Referring again to the aerial photograph contained as a

23 part of Plaintiff's Exhibit 101, it is shown that the Riverside

24 County Line, which is coincident with the Vail-Santa Rosa Ranch

25 line, also bounds a portion of this property.  And there is some

2613

1   Class VII land which slopes down from the higher ground on

2   the Santa Rosa Ranch to and within the confines of parcel No.

3   19.  The same is true-- that is, the existence of Class VII

4   land is also shown on the soils survey map in the northwesterly

5   corner just under the north arrow on the soil survey map. The

6   higher portions of that Class VII land also, in my opinion,

7   would contain ground water that is vagrant and percolating,

8   not a part of the stream system.

9        Q  Then the water under the higher portion of the Class VII

10  land would be vagrant, the water underlying the lower portions

11  of the Class VII land and the other classes of land would be

12  part of the subsurface flow of the stream; or is that too

13  broad a generalization?

14       A  That sums up my opinion, your Honor.

15       THE MASTER:  Very well.  Do you have any questions, Mr.

16  Sachse?

17       MR. SACHSE:  I have no questions.

18       THE MASTER:  Mr. Veeder?

19       MR. VEEDER:  No.

20       MR. SACHSE:  We have received a copy of this.  I have a

21  copy of this.

22       THE MASTER:  That is all, then.  Thank you.  Then we will

23  recess at this time until 9:30, November 3rd, at which time we

24  will take further testimony with reference to the Fallbrook

25  Creek area, if any testimony is offered, and also will commence

testimony with reference to the land which is north of Fallbrook

Creek watershed, west of Rainbow Creek watershed, and south

of the Santa Margarita River.

MR. SACHSE:  If I have any conflicts that develop I will

undertake to advise LCDR. Redd or Mr. Veeder prior to the 3rd,

if I find anything wrong with these descriptions.

THE MASTER:  Very well.

-----