ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

| | |
|---|---|
| **Volume:** | 24 |
| **Pages** | 2681-2812 |
| **Date:** | February 10, 1959 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1 | APPEARANCES:

2 |   For the United States         WILLIAM H. VEEDER, ESQ.
       of America                   LCDR, DONALD W. REDD, U.S.N.
3 |

4 |   For Fallbrook Public
       Utility District and         FRANZ R. SACHSE, ESQ.
       named individual
5 |    defendants

6 |   For the State of              ADOLPHUS MOSKOVITZ, ESQ.
       California                   FRED GIRARD, ESQ.
7 |

8 |   For William Butler            JOHN B. MYERS, ESQ.

9 |   For Fred Jones                W. B. DENNIS, ESQ.

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

Fallbrook, California, Tuesday, February 10, 1959.   9:35 A. M.

THE CLERK:   Court is now in session.

THE MASTER:   Will counsel state their appearances for the record.

MR. VEEDER:   William H. Veeder for the United States of America.

LCDR. REDD:   Lcdr. Redd for the United States of America.

MR. SACHSE:   Franz Sachse for the Fallbrook Public Utility District and named individual defendants.

MR. MOSKOVITZ:   Adolphus Moskovitz, Deputy Attorney-General for the State of California, and Fred Girard, Deputy Attorney General, for the State of California.

THE MASTER:   Mr. Dennis.

MR. W. B. DENNIS:   I will put in an appearance for Fred Jones.

THE MASTER:   Are there any individual defendants in the courtroom who are not represented by counsel?   I know I see Mr. Matthews is represented by counsel.   Are you represented by counsel?

MR. BAGBY:   No, sir.

THE MASTER:   Will you state your name, then?

MR. BAGBY:   Bagby.

THE MASTER:   Mr. Bagby.   And the gentleman--

A VOICE:   No, I am just here.

2683

1        THE MASTER:   Just an interested observer?

2        A VOICE:   Yes, an interested observer.

3        THE MASTER:   I think in view of the fact the Fallbrook

4   Creek objections are shorter and findings are shorter that I

5   will consider those first.   And I will follow the same procedure

6   which I followed at the hearing of objections by those other

7   than the Government for the findings on Fallbrook Creek.   That

8   is, I will go through the objections and indicate my tentative

9   thoughts, and then after that any counsel can have full oppor-

10  tunity to present any thoughts in opposition to what I have

11  said.   I believe probably that will save time, rather than to

12  have counsel present their positions first, where it may be

13  that I am already convinced of the correctness of that posi-

14  tion.   So we will take up the findings of fact and conclusions

15  of law proposed for the Fallbrook Creek watershed.

16        First, on page 1, line 20, there is a typographical error

17  which has not been noted by anybody else.   Namely, the date

18  November 1 should be changed to November the 3rd, which was

19  the actual date of the hearing.   So that change will be made.

20        Then turning to the objections raised by the United

21  States, which are the only objections which have been filed

22  with reference to Fallbrook Creek, the first objection under

23  the heading "Background of Exceptions", after referring to the

24  existence of Lake O'Neill, states on page 1, line 27, that:

25            "It is the position of the United States

1          of America that it succeeded to an appropriative

2          right to the use of water in Fallbrook Creek

3          for Lake O'Neill".

4      To the best of my recollection, there is no evidence be-

5  fore me of any appropriative right of the Government to use

6  water for Lake O'Neill.

7      Finding No. VI, which I have proposed, on page 4 states

8  that:

9          "No evidence has been introduced respecting

10          any prescriptive rights or concerning any

11          rights to appropriate water from Fallbrook

12          Creek, or any tributary thereof."

13      And that finding has not been challenged by the United

14  States. So as far as the record is concerned, I do not see the

15  basis for this statement in the Background of Exceptions.

16      Now, there may be such evidence introduced before Judge

17  Carter. If so, in making his final findings he will, of course,

18  consider it. But I see nothing in the record before me on

19  which to base any such findings in connection with Fallbrook

20  Creek.

21      MR. VEEDER:  Would you like a response on that proposition

22  from me now or do you want to go all the way through?

23      THE MASTER:  On that point we might have a response now.

24  I think in general I would like to go all the way through.

25      MR. VEEDER:  Well, I feel this way, your Honor, in regard

1    to the background data that we set forth in connection with

2    Lake O'Neill that the gist of your findings of fact and con-

3    clusions of law was encompassed in Conclusion No. II to the

4    effect that there would be no need of any adjudication.  As it

5    is there presented, we necessarily take exception to it, be-

6    cause this case, in our view, cannot be tried piecemeal.  We

7    believe that the reference to your Honor was for the purpose

8    of defining and limiting and declaring facts as seen.  To state

9    that there should be no adjudication, as you do in paragraph

10   II of the Conclusions of Law, would, we believe, create a hiatus.

11   And that gave rise to our statement contained in the Background

12   of Exceptions.  We feel this, that Fallbrook Creek and one

13   hundred other small creeks constitute the composite of the yield

14   of the stream.  In other words, every one of these streams are

15   small.  And what you say in regard to a small stream in one

16   place can very easily be applicable to all others.  We feel

17   that the objective of the hearing was to delineate and define

18   the streams and to declare the lands riparian to the stream,

19   and such prescriptive rights as may exist.

20        Now, the logical sequitur of a statement that there would

21   be no adjudication would be to leave a blank spot in part of the

22   watershed.

23        Now, our feeling in regard to the matter is this, that

24   there are riparian lands in the watershed of the Fallbrook

25   Creek, that it is only reasonable to presume that a man will

1    make some development of whatever water is there.  That is the

2    history of the West.  We want to have, as nearly as possible,

3    a specification of those lands.  And the immediate concern that

4    we have, of course, is the fact that as competition for water

5    increases throughout the Santa Margarita River Valley there

6    necessarily is a reduction in the quantity of water that will

7    reach us.

8         Now, we know that in many of these places the land owners

9    are not using their riparian rights to the fullest extent, or

10   at all.  But we do feel that with the data that is in the

11   record there could be a delineation and a definition of the

12   riparian rights which someday, we don't know when or to the

13   fullest extent, but someday they will be in competition with

14   Lake O'Neill.  Because we know increasingly we are going to be

15   called upon to look to the minor tributaries-- Fallbrook Creek

16   is one of them, De Luz is another-- for the water requisite to

17   recharge the basin and supply Lake O'Neill with the needed

18   fresh water.

19        Now, it may be helpful, your Honor, at this point.  We

20   have just run off a tabulation.  I realize this may be a little

21   ahead of time in the hearing.  But we have run off a tabulation

22   which we don't purport to make complete.  But we did that-- the

23   form that we have prepared will be the kind and type of form

24   that would be helpful in the delineation of the rights of all

25   parties.  And I think again we come back a a basic factor, your

     Honor, that hasn't been decided even in the major case, and

1  that is whether there is to be an allocation of water in this

2  litigation.  We don't believe there is or can be.  We believe

3  that all that can be determined is the ownership of rights.

4  That is the reason for the background, why we brought in Lake

5  O'Neill, and why we believe that the existence of Lake O'Neill,

6  while it may not have been part of this case, part of the hear-

7  ing here, is an element that has to be taken into consideration

8  in our view, and we will put in evidence in regard to it,

9  rather than have the findings stand as they are.  That is one

10  of the reasons why this sort of split personality the lawsuit

11  has makes it extremely difficult for the United States, because

12  we are here one day and four days in San Diego.  We put in

13  evidence in regard to Lake O'Neill.  Maybe we should put the

14  same evidence in here in regard to Lake O'Neill.

15      MR. SACHSE:  With your Honor's permission, I would like to

16  reserve any comments I have until you have finished all of

17  them.

18      THE MASTER:  Sure.  In that connection it is my opinion,

19  based upon the evidence that has heretofore been presented,

20  and upon the uncontradicted testimony of Col. Bowen, that no

21  findings beyond those which I have proposed to make would be

22  required.  I think my reasons for that will be expressed in

23  somewhat more detail as I consider the balance of the objec-

24  tions.  This Background of Exceptions and the reference to Lake

25  O'Neill and appropriative rights was, of course, not a specific

1   objection, but a general statement.  The same is true of the

2   general objection No. II, that the findings are inadequate,

3   failing to describe in sufficient detail Fallbrook Creek, its

4   sources and the area which it drains.

5       On that point I would state this, that the area which

6   the creek drains is specifically set forth in Exhibits F-4-A

7   to F-4-P, inclusive.  That is, those are the metes and bounds

8   descriptions of all the parcels of property which are included

9   in the Fallbrook Creek area.  Those exhibits are incorporated

10  by reference as Exhibit A of the proposed findings.  So that

11  the area of the Fallbrook Creek watershed is specifically de-

12  fined by this metes and bounds description.  The precise course

13  which the stream follows through that watershed is, I believe,

14  immaterial in the light of the remaining findings and the

15  evidence as a whole.  So that I do not believe objection No.

16  II is well taken.

17      Now, objection III states that Finding No. II contains the

18  following statement: "Descriptions of said riparian parcels and

19  the apparent owners of each such parcel are set forth in

20  Plaintiff's Exhibit F-2 introduced in evidence herein."

21      And the objection continues that it is improper to go

22  beyond the scope of the finding to find matters to which it

23  purports to relate.  And that Exhibit F-2 should be incorpor-

24  ated into the findings by reference and made a part of them.

25      Well, I am not certain that the objection is well taken,

1     since Exhibit F-2 is a supplementary cross-reference.  In other

2     words, the matter is therein referred to simply for purpose of

3     convenience.  The complete information on Exhibit F-2 is con-

4     tained in Exhibits F-4-A to F-4-P, which are incorporated by

5     reference.  However, if the Government has no objection to

6     preparing the necessary duplicate copies of Exhibit F-2 to be

7     attached to the findings, along with Exhibits F-4-A to F-4-P,

8     which are already incorporated as Exhibit A, I will amend the

9     finding by adding at page 3, line 3, at the conclusion of the

10     finding as now contained the following words:  "A copy of

11     which exhibit marked Exhibit B is attached hereto and this

12     reference incorporated herein the same as though herein set

13     forth in full".

14       So we will then have the riparian lands as set forth in

15     Exhibit F-2 in evidence specifically attached as Exhibit B to

16     the findings.

17       Now, objection IV on page 3 refers to a preliminary find-

18     ing.  Finding No. III declares that certain defendants have

19     entered into agreements or stipulations with the United States

20     of America.  The objection is that the names of these defend-

21     ants and the description of the property to which the stipula-

22     tions pertain should be set forth in the findings or incorpor-

23     ated by reference.  If rights were dependent upon the execution

24     of the stipulations, the objection would certainly be well

25     taken.  However, in the light of Conclusion of Law No. II, and

1  as long as that conclusion stands, the additional information

2  which is here requested is superfluous.  In other words, the

3  Conclusion of Law is that the execution of the stipulations

4  shall not be deemed to have affected the rights of the parties.

5  So if that be true, then I see no need to encumber the findings

6  with a long list of people and a long list of property de-

7  scriptions when the conclusion of law is that it doesn't amount

8  to anything.  In the event Judge Carter or the Circuit Court

9  of Appeals on an appeal should determine that the execution

10 of the stipulations did affect rights, then the original

11 stipulations are part of the pleadings and the information

12 desired can be obtained as readily at that time as at the

13 present time.  And I think that at the present time it would

14 simply result in a needless prolongation of the findings to

15 include this information.  As I say, if I am wrong no addi-

16 tional evidence would have to be taken.  The matter is contained

17 in the pleadings on file and could be corrected at that time

18 as well as at the present time.

19      Objection No. V states that:  "Finding No. IV apparently

20 was intended to relate to non-riparian lands and non-riparian

21 rights."  That is correct.  The objection continues:  "Reference

22 in that connection is made to the fact that there apparently

23 exist impounding reservoirs on Fallbrook Creek which undoubtedly

24 affect the surface runoff of the stream.  It is essential that

25 reference be made to those parcels and to the waters which they

1 impound; the basis upon which the water is thus impounded;

2 whether it is prescriptive or appropriative; and fully to

3 describe those facilities together with any others which may

4 exist."

5      I am not certain that I understand the last part of that

6 objection. But, in any event, there is no evidence in the

7 record of any impounding reservoirs in the Fallbrook Creek

8 area, excepting a single reservoir on the property of Alta

9 Terriere from which the uncontradicted evidence is no water has

10 ever been pumped, transcript page 2517, lines 8 to 12, and page

11 2520, lines 10 to 20. This reservoir has a total capacity of

12 five acre-feet, transcript page 2520, lines 19 to 24. The

13 testimony also shows that this reservoir is used solely for

14 flood and erosion control, page 2521, lines 15 to 20. There

15 is, in addition, a single statement of Col. Bowen that "There

16 are other ponds in this area." That is page 2608, lines 16

17 and 17. But the statement is ambiguous on the point whether

18 the ponds are artifical or natural. It is not a statement that

19 they are created by dams. It is simply a statement there are

20 other ponds. I presume they are artificial, but there is no

21 evidence to that effect. In any event, I do not see that upon

22 the basis of this single impounding reservoir of five acre-feet

23 of Alta Terriere any modification is required in Finding IV.

24 The objection relies upon facts which are not contained in the

25 record.

2692

1        Objection VI states:  "Having reviewed the flow of

2    Fallbrook Creek, the finding contains this statement:  'It is

3    unnecessary to make any further findings at this time with

4    reference to the nature and character of any of said parcels,

5    or the water uses and rights thereof.'"  The objection con-

6    tinues:  "Riparian lands are situated throughout the watershed

7    of the stream in question.  Development of those lands reduces

8    and will reduce the quantities of water reaching Lake O'Neill,
                                    the
9    in particular, and/Naval reservoir in general.  Failure to

10   (a) determine the water uses --

11        MR. VEEDER:  Isn't that "Naval Enclave"?

12        THE MASTER:  Naval Enclave, correct.

13        "Failure to (a) determine the water uses, (b) the

14   nature and extent of the riparian lands, (c) the rights to the

15   use of water, is contrary to sound practice and to the law.

16            "It is observed in passing that impounding

17            reservoirs, referred to above, now exist on

18            Fallbrook Creek; they reduce the quantity of

19            water reaching the Enclave.  Future developments

20            must necessarily be anticipated.  As a conse-

21            quence the measure of the rights must be known and

22            the extent of their potential use be declared in

23            this proceeding."

24        Now, there is no place in the objections a challenge of

25   the statement of the finding that except during periods of

2693

1   heavy precipitation and immediately thereafter no water flows

2   in Fallbrook Creek, or that the total withdrawals of water are

3   negligible.  And even if that finding were challenged, I believe

4   it is entirely supported by the transcript references.  I can

5   refer to those references.  Page 2526, lines 13 to 21, page 2527,

6   lines 15 to 20, page 2598, line 16, to page 2600, line 17, page

7   2602, line 20, to page 2604, line 6, page 2605, lines 5 to 10,

8   and page 2620, lines 11 to 15.

9       I cannot see how any finding could be made in the light

10  of the transcript other than the language of Finding V, that

11  Fallbrook Creek is an intermittent stream which flows only

12  during and immediately after periods of heavy precipitation,

13  and the further finding that the water underlying the area is

14  vagrant water.  Therefore, it follows, as far as I am concerned,

15  that unless some defendant specifically demands an affirmative

16  finding of his rights, the finding to that effect need not be

17  made at the request of the plaintiff, because the finding which

18  has been made in effect says that irrespective of the rights

19  and uses of the defendants, the plaintiff can't be damaged.

20  The plaintiff doesn't--

21      MR. VEEDER:  May I hear that once more, your Honor?  I

22  fell off the sled when the reporter interrupted your statement.

23      THE MASTER:  The statement was that the finding is, in

24  effect, that regardless of the rights and uses of the defend-

25  ants, the plaintiff can't be damaged.  That is to say, if the

1   creek flows only during periods of heavy precipitation, and if

2   the water underlying the ground is vagrant water, then the

3   defendants are entitled to take all the water they can get

4   while the water is running and the plaintiff won't be damaged

5   by that taking.

6        Now, I see you shaking your head, Mr. Veeder, and--

7        MR. VEEDER: Yes, sir.

8        THE MASTER:  --I recall that during the examination of

9   the witnesses you made statements which seemed to me were en-

10  tirely contrary to the testimony.  This was after Col. Bowen

11  had testified in part to the effect that, in any event, if

12  they took water out of the ground that later precipitation

13  and so forth would have to go into the ground and the flow to

14  Camp Pendleton would be affected in some manner.  After that

15  testimony Col. Bowen was again on the stand and was examined

16  by counsel, including yourself, and some of the statements that

17  I referred to in the transcript references were made by him

18  after all of that comment by you.  And they were still to the

19  effect that the water was vagrant water and not part of the

20  stream.

21       MR. VEEDER:  May I inquire, your Honor?  Are you speak-

22  ing now of surface runoff or subsurface water, or both?

23       THE MASTER:  I am speaking of all the water, because

24  the questions as asked and the testimony as stated in the

25  record would refer, as I interpret it, and I think it is the

1   only interpretation that can be made, to the surface flow of

2   the stream and the subsurface flow, if any, the subsurface

3   water.  The water on the surface of the ground and the water

4   under the surface of the ground.  I think that all the water,

5   in the light of the testimony, is of such nature that it re-

6   mains in the Fallbrook Creek watershed and that none of it from

7   that area would pass into the enclave, even if the defendants

8   weren't using it, or that the most that can be said is that

9   the amount would be negligible.  And there is no testimony

10   in the record to show that a single drop of that water would

11   get onto the enclave if the defendants didn't use it.

12           MR. VEEDER:  Now, in regard to surface runoff--

13           THE MASTER:  Or in regard to subsurface flow, there is

14   no testimony in the record which would indicate that any of

15   that water would ever get to the enclave.

16           Now, I know that you have indicated your opinion that

17   it would.  But I can't find any testimony to that effect.

18           Now, in connection with my ruling I would refer to

19   Judge Carter's pre-trial ruling, pages 81 and 82, which are

20   quoted at pages 2560 and 2561 of the transcript in this case.

21           Now Objection No. VII on page 4 of the Objections re-

22   lates to Conclusion of Law No. 1, which is that:  "No pre-

23   scriptive or appropriative rights with reference to the use

24   in the Fallbrook Creek watershed of water constituting a

25   portion of the surface or subsurface flow of the Santa

1   Margarita River, or its tributaries, has been perfected.".

2        The objection states that, after quoting the finding,

3   states:  "Absent evidence there can be no finding; absent

4   findings, there can be no 'conclusions of law thereon', all

5   as provided by Rule 52(a) of the Federal Rules of Civil Pro-

6   cedure.  As a consequence the Conclusion of Law is wholly

7   without basis and should be stricken."

8        I cannot agree with the premise as to the law.  It seems

9   to have been the law in California for at least 83 years that

10   it is the duty of the trial court to find upon all the material

11   issues made by the pleadings, whether evidence be introduced

12   or not, and if there be no finding on a material issue, a

13   judgment cannot be supported.  That quotation is from Speegle

14   vs. Leese, 51 Cal. 415, decided in 1876.  And in Golson vs.

15   Dunlap, 73 Cal. 157, the Supreme Court stated:  "If no evidence

16   was introduced, the court should have found the fact against

17   the parties upon whom was the burden of proof, or, in other

18   words, in accordance with the presumption".  Which, in this

19   instance, was against the defendants.

20        Leviston vs. Ryan, 75 Cal 293.  "If sufficient evidence

21   to satisfy the mind of the court was not produced by the parties,

22   it should have found the fact against the party on whom was

23   the burden of proof, and the burden in this case was upon the

24   defendant."

25        Turning to more recent litigation, Ellenberger vs.

1    Oakland, 59 Cal. App.(2d) 337, the Court says:  "If there is

2    no evidence upon an issue, the finding should be against the

3    party who has the burden of proof."

4         And in a Federal case, 100 Fed.(2d) 287, Shapleigh vs.

5    United Farms, the Fifth Circuit says:  ". . .a court that is

6    left without knowledge of a fact after exploring to the full

7    every channel of information must needs decide against the

8    litigant who counts upon the fact as an essential of his claim."

9         Since no evidence has been introduced respecting any

10   prescriptive rights or appropriative rights to water from

11   Fallbrook Creek has been introduced in this case, I think it

12   is my duty to find there are no such appropriative or pre-

13   scriptive rights.

14        Now, of course, we come to Conclusion of Law No. II,

15   which is the basis for Objection No. VIII, which Mr. Veeder

16   has already referred to.  The objection is that the conclusion

17   contains serious error, that it goes beyond the scope of the

18   order of reference, because the conclusion declares that:

19   "Whenever a stipulation between the United States of America

20   and defendants, as defined in Finding III has been, or is here-

21   after executed with reference to a parcel, or portion of a

22   parcel of property in the Fallbrook Creek watershed, said

23   stipulation shall not be construed as, and the execution of

24   such stipulation shall not constitute, any limitation upon, or

25   determination of the rights of the owner of such parcel either

1   to develop or to use water upon said parcel."  That is the
2   end of the reference of the conclusion.

3       "There is not a scintilla of authority thus to construe
4   the stipulations of the United States of America.  Objection
5   is similarly made to the balance of the Conclusion as being
6   beyond the scope of the order of reference."

7       The authority for making that conclusion, as I see it,
8   rests in the inherent power of any court to relieve any party
9   from the adverse effect of a stipulation, where such relief
10  is necessary to secure justice.  Under the evidence and the
11  uncontradicted testimony of Col. Bowen, the use of the water
12  by the defendants in the Fallbrook Creek area cannot injure
13  the plaintiff.  Therefore, the plaintiff should not, because
14  these stipulations have been executed by certain defendants,
15  have the right to limit the use of water by those defendants
16  when it does not have such a right as against the owners of
17  other parcels in the watershed who have not executed such
18  stipulation.

19      I would refer in this connection to the same portion
20  of Judge Carter's pre-trial opinion, pages 81 and 82, which is
21  referred to at pages 2560 and 2561 of the Transcript.  And I
22  think I might even read that.  This is a quotation from the
23  pre-trial opinion.

24          "To summarize, water which is not a
25      part of the Santa Margarita, its tributaries

1        or underlying basins, and factually not a

2        part of the stream, is not the subject of

3        the relief sought by the Government in this

4        case.  The existence of such water, when

5        found by the trier of facts, will entitle

6        the owner of the property upon which it is

7        located to a decree that the water is not

8        part of the river."

9    It is also, I believe-- that is the finding.  The con-

10   clusion is also justified by the pre-trial stipulation of issues,

11   quoted at page 2566 of the transcript.

12        "Rights to vagrant percolating ground

13        waters which are not part of the Santa

14        Margarita River and its tributaries will

15        not be adjudicated in this action.  The

16        question as to whether any particular ground

17        water is or is not part of the Santa Margarita

18        River and its tributaries is a question of

19        fact to be decided by this Court."

20   So in view of the fact that I have found that the water

21   is vagrant percolating water, then I think the conclusion of

22   law follows that an owner of property, by executing the stipula-

23   tion, should not have his rights to the use of that vagrant,

24   percolating water limited when they would not otherwise be

25   limited by the judgment.  I think it follows inevitably.  And

1   under the pre-trial stipulation, under the pre-trial opinion of

2   Judge Carter, and under the inherent power of any court to

3   relieve a party from the effect of a stipulation if the failure

4   to grant such relief would create injustice, I think that the

5   conclusion of law is proper.

6        Now, I realize that the Government holds a contrary view.

7   And Judge Carter, of course, would have perfect authority, if

8   he saw fit, to declare the conclusion improper.  But my view

9   at the present is that the conclusion is proper.

10       I believe that passes upon the objections, and now in

11   the light of what I have said Mr. Veeder or any other counsel

12   has perfect opportunity to express himself.

13       MR. VEEDER:  Well, your Honor, our objection to the last

14   conclusion is the one to which I will allude first.  The objec-

15   tion which we tendered to your Honor was that there did not

16   reside with your Honor the power to pass upon the stipulations

17   voluntarily entered into by a substantial number of people.  I

18   realize that the matter is one ultimately probably to be de-

19   cided by the Court.  But certainly there is nothing in your

20   order of reference that so empowered your Honor.

21       Now, it may be that the Court has the inherent power,

22   but I respectfully submit that in the case of a Special Master

23   his powers are within the four corners of the reference.

24       For that reason we must necessarily take issue with

25   what you have just said.  We don't believe you have the power

1    to declare invalid the agreements voluntarily entered into.  We

2    believe that the law is very clear on the matter of your

3    Honor's authority, which is not as broad as the inherent power

4    of the Court.

5        Enough from that standpoint.  In regard to an offer of

6    settlement of the nature that were signed by the Solicitor

7    General and the land owners, the law is very clear on the

8    subject that an agreement to avoid litigation is a good con-

9    sideration.  And a good consideration is sufficient to support

10   a contract between the parties.

11       I realize that if an individual who signed the stipula-

12   tion desired to challenge the equity of it, the Court might

13   resolve the matter.  I don't know whether we should proceed

14   on this particular issue any further.  We do believe that the

15   United States has proceeded in good faith to relieve these people

16   of litigation, and we have proceeded in good faith to settle

17   with them wherever possible.  And we necessarily want our

18   objections to stand at your Honor's effort to upset those agree-

19   ments of settlement.

20       It is very important from our view that in a general

21   adjudication that the rights be concluded with as great finality

22   as possible to avoid future litigation.  We believe that in

23   fairness to the people in the Fallbrook Creek area that it would

24   be a rather simple matter to simply declare their lands

25   riparian, and for all time to conclude this long, drawn-out case

2702

1    I see the logical sequitur of your Honor's position is

2   this, that perhaps five years from now, as the competition for

3   the water becomes more severe, we will have occasion perhaps

4   to relitigate these matters.  I have seen it happen.  I have

5   seen it happen on the Walker River within the last two years,

6   seemingly unimportant rights.  In this instance they happened

7   to belong to the United States.  Everyone said, "Well, those

8   are small rights."  But they were sufficiently important for

9   the Department of Agriculture to ask us to reopen for the

10  purpose of putting in evidence fifteen years after the decree

11  was entered.

12    My own view is that the United States has offered suffi-

13  cient evidence in the record so that there could be a declara-

14  tion of which are riparian.  There could be a declaration in

15  regard to the possibility that these people could use their

16  water and their lands without threat of future litigation.

17    I think that is the primary reason why I am concerned.

18  I have been concerned that we decide nothing.  And I think we

19  should.

20    In regard to paragraph 7 of our Objections, which were

21  directed to Finding No. VI, your Honor alluded to the question

22  of the burden of proof.

23    Now, I think that we will all agree that in a normal

24  circumstance the burden of proof was not upon the United States

25  in the hearings in regard to Fallbrook Creek.  I believe

1    everyone agrees to that. It is not for the United States ever

2    to prove the negative. We show and we have shown rights to the

3    use of water in the Santa Margarita River. And having shown

4    that, the burden resided with the defendants to appear and

5    prove their rights or suffer default or disclaimer.

6         Now, we don't want defaults and we don't want disclaimers.

7    We want to be very sure that every man in the watershed has his

8    rights protected. That is our belief as the National Govern-

9    ment.

10        So when we raised the point, as we did, in regard to the

11   matters of no evidence having been introduce, ergo, no conclu-

12   sion of law, we believe that we are right in that connection.

13        And this leads to the next phase of the matter that I

14   would like to bring up. I would like to suggest that, as I

15   would suggest in regard to the De Luz watershed, that the

16   parties tender their ideas as to what should be included in

17   the findings of fact, and in that way to proffer to your Honor

18   what we think could, and in my view as the lawyer responsible

19   ultimately to conclude these matters, that we have as fully

20   as possible a determination and a delineation, not only through

21   the Fallbrook Creek area, through the De Luz, Sandia, and every

22   place else, so that when we are through with this there will

23   be a final decree that will be res adjudicata against the

24   United States of America, which would preclude any further claims

25   on Fallbrook Creek or any other creek at some future time, to

1   the end this litigation will be complete.

2        Now I truly believe it has been unfortunate that our

3   witnesses-- that the United States was in the position of

4   introducing evidence on behalf of defendants.  But this has

5   been a unique lawsuit in many regards.  For that reason, I

6   would suggest that we make a tender to your Honor in regard

7   to the propositions alluded to in paragraph 7, and make our

8   statements to your Honor as to what we believe are riparian

9   lands  Also, that we tender to your Honor a description of the

10  reservoirs and the ponds to which Col. Bowen testified, and

11  to define and to limit those.

12       Now, the question has been raised repeatedly as to the

13  nature and character of Fallbrook Creek in particular, and to

14  the Santa Margarita River in general.  The Santa Margarita

15  River is not unique in any sense of the word.  I think it is

16  not a great deal different from most of the shallow streams

17  in the West.  It is intermittent a great part of the time. But

18  whatever water there is is extremely important.  And it is a

19  composite, as I have said before, of all these streams that

20  make for the yield of whatever we receive at the Enclave.

21       So again I would suggest that even if the water is only

22  there for a brief period, those lands are riparian during that

23  time and should be so declared.  Because we don't believe, in

24  our own view, that the litigation should be left unconcluded.

25  We believe that it should be concluded.  We believe that the

only way to conclude it is by a final decree that would be
binding upon the United States of America.  Which brings to
us a very important issue of law, and we believe that it goes
to the jurisdiction of the Federal Court.  Under the circum-
stances that have been outlined, we don't believe the Federal
Court has any jurisdiction, absent the case in controversy.
And we want to be very sure that the general principle is
applied throughout the whole watershed.

In other words, if a man disclaims we don't believe
there is any issue at all to be tried.  If he answers, we say
there is an issue to be tried.  And if, as in these cases,
offers of settlement have been signed, we believe that it is
a recognition by both parties that there is some right and
interest that is involved, and that they have agreed among
themselves to be bound by it.  In other words, the reason why
I am greatly concerned about your Honor's ruling about these
offers of settlement, I believe those are res adjudicata.  I
believe we would be bound by them.  And I believe the owner
would be, too.

Now, in connection with the findings which have been
made-- I am referring now to paragraph 3-- the matter, as I
stated before, pertains primarily to the scope of the Refer-
ence to your Honor.  I have already touched on that point.  I
have stated that in our view, while the Court itself may have
the inherent power, I do not believe that a Special Master has

1  the power of the Court, but rather that his powers are speci-

2  fied and limited and defined by the Order of Reference.

3      So there is no need of laboring that.  But before

4  proceeding, I would state again, though, that we believe that

5  each of these stipulations which were signed should be made

6  part of the findings, and the lands to which they pertain

7  should be included.  We feel, moreover, that it would be de-

8  sirable to spell out definitely and in precise language in

9  the findings themselves a full description of Fallbrook Creek,

10  rather than to pursue the course that your Honor outlined,

11  namely, by a further reference.  I think that irrespective of

12  what is done, Fallbrook Creek should be described.  It should

13  be described from its headwaters, it should be described down

14  to and through Lake O'Neill.  Because Lake O'Neill is an on-

15  channel reservoir.  And as the Supreme Court of the State of

16  California has recognized in 11 Cal.(2d), in the case of Rancho

17  Santa Margarita vs. Vail, it described in some detail the

18  Fallbrook Creek.  It pointed out that water from Fallbrook

19  Creek, intermittent in character though that stream may be,

20  enters Lake O'Neill, and that the waters of Fallbrook Creek

21  are there impounded.  So we believe that it would be essential

22  to describe Fallbrook Creek from its source to Lake O'Neill,

23  point out that Lake O'Neill impounds such water as flows

24  through it.

25      I have been greatly concerned about your Honor's

1   reference that the evidence is insufficient to show that any

2   water-- that all waters of the Fallbrook Creek are vagrant.

3   I believe there is a well-defined channel, and I believe under

4   the law of the State of California when water enters a well-

5   defined channel that the waters there are riparian and not

6   vagrant and surface waters.  I believe that to be the law.

7        I have started these observations with the thought which

8   I expressed that the United States undertake, based upon the

9   record as it sees it, based upon the record before Judge

10  Carter, if necessary, to tender to your Honor and to the Court

11  for consideration a set of proposed findings and a set of

12  proposed conclusions of law, that you review them, that all

13  parties review them, that all parties file their objections

14  to them, have arguments on them, if you desire, and if those

15  findings of fact and conclusions of law are found to be objec-

16  tionable to your Honor, then they can be rejected by you and

17  we can file our exceptions with the Court.  I believe it would

18  be more helpful to you.  I know that it would be more satis-

19  factory to us if we could pursue that course.  Then there would

20  be a specified and well-defined, well delineated course for

21  consideration.  And we could be specific in connection with

22  the objections which we have made.  We could be specific in

23  regard to the kind and type of findings that we would suggest.

24  We would then be specific in regard to the conclusions which

25  we think essential in this matter.  And as I handed your Honor

a copy of what we think would be the format for a decree, we
would undertake to tender thoughts as to each parcel of land
to which we think a decree could be applicable.  In that way,
then, everyone would have the opportunity to make his objec-
tions.

Now, in connection with this format that we have
tendered, it may be there are things that should be placed on
it.  Parties may desire to add something to it.  Your Honor
may desire to do the same thing.  We think we are now down to
the precedent stage in this matter, and this format, or one
similar to the one tendered to the Court along last September
at his request--

THE MASTER:  That is, you mean to Judge Carter?

MR. VEEDER:  Yes.  Yes.  And I believe there are improve-
ments that could be made upon it, probably.  Moreover, the
format as prepared would, of course, be alluded to by a
narrative as to the factors to which it pertained and how it
was prepared, and a fuller explanation.  The format itself is
not complete.  But we would have findings which-- we would
tender findings which would be explanatory of the format.

Now, that is our thought, your Honor, in regard to the
findings that we have now been discussing.

THE MASTER:  I might make a few observations on what
Mr. Veeder has said before any other counsel comment to the
extent that they desire to do so.

1        In the first place, nothing that I have found in the

2    findings or nothing in the conclusions of law which in any

3    manner tend to indicate any bad faith on the part of the

4    Government in executing the stipulations.  I wanted that to be

5    clearly understood.  I do not believe that the language con-

6    tained in the findings or conclusions is any indication that

7    the stipulations were not executed in good faith by both

8    parties.

9        With reference to the statements that there should be a

10   declaration as to which lands are riparian, the findings as

11   prepared do, of course, set forth that the lands described in

12   the Exhibit A which are identified by the letter "R" on the

13   margin, and which are also now listed on Exhibit B, are

14   riparian.

15       The findings and conclusions then state in effect that

16   it is not necessary, at least at this time, specifically to

17   delcare the rights which those riparian owners have.

18       Now, on the evidence as I see it, I am still convinced

19   that to go beyond and to try to set forth specific rights of

20   those riparian owners at the present time, when none of the

21   defendants have asked for such delineation, is borrowing

22   trouble.  Now, I recognize the truth in what Mr. Veeder says,

23   that at a future time it may be that these defendants them-

24   selves may wish some further adjudication of their rights.

25   But certainly my present thought still is, and I am not trying

1    to be stubborn in any sense.  I just can't see any reason for

2    the contrary now.  My thought now is that until such time as

3    some of the defendants themselves, by reason of their own uses,

4    become engaged in controversies over their rights to use water,

5    on the evidence that is now presented the Government, the

6    plaintiff, which is now objecting, has no basis upon which it

7    could raise any valid objection to any riparian use of water

8    by any of these defendants.

9         Now, with reference to the finding as to the reservoirs

10   and ponds, if that was to be done it would require, of course,

11   introduction of additional evidence.

12        MR. VEEDER:  Could I tender a thought on that?  I didn't

13   touch on that.

14        THE MASTER:  Yes.

15        MR. VEEDER:  I talked to Mr. Moskovitz about that.  Here

16   is what I would rather do on that.  Rather than open up addi-

17   tional testimony as to Fallbrook Creek, we would make a run

18   through and make a tender to counsel who are interested of a

19   copy of a proposed stipulation in regard to those areas.  That

20   might save time.

21        THE MASTER:  Well, the stipulation would then have to

22   be, in effect, testified to.  It, of course, could be done

23   briefly in court so as to be introduced in evidence to be bind-

24   ing upon defendants and upon the parties who would not stipulate

25   to it.

1    MR. VEEDER: I quite agree.  I think that you or Judge

2  Carter should view it and make a finding on it.

3    THE MASTER:  Yes.  That would merely be a speedy means

4  of putting that information in.

5    Well, I certainly would see no objection to having such

6  a physical determination, unless some of the parties objected

7  to it upon some basis which is not now apparent to me.  And

8  they will have an opportunity to do that, if they so desire.

9  As far as describing the course of Fallbrook Creek, it is true

10  the findings now don't.  They merely describe the parcels of

11  land.  I certainly would have no objection to including in the

12  findings a statement, providing that it is based upon anything

13  in the evidence.  And at the present time I do not believe that

14  there is a definite statement in the transcript as to the

15  precise course of the stream.  It is, of course, shown on the

16  numerous maps which have been introduced.  And some witness,

17  based upon those maps and based upon personal knowledge, of

18  course, could in brief order insert such a description in the

19  transcript.  But I do not believe there is any such description

20  at the present time.

21    MR. VEEDER:  Our Exhibit 29, which are the quads, in

22  the main case would have all of them.

23    THE MASTER:  Yes.  And, of course, it may be that even

24  though such a finding is not made in these findings which I

25  am now proposing and which, of course, will ultimately be

1    submitted to Judge Carter, a finding as to the course of each

2    specific stream might very well-- very appropriatively be made

3    by him as part of the final determination of the case. That,

4    of course, is a matter of appropriate literary composition,

5    to a certain extent, whether in final findings he would try

6    to define the course of each stream consecutively, and then

7    take up each stream individually, or how that would be arranged.

8    Certainly such description would have an appropriate place some

9    place in the findings.

10        I do not believe that anything in the findings indicates,

11   or anything which I said indicates-- in any event, I did not

12   intend to indicate that I believe that waters on the surface

13   in a well-defined channel were vagrant waters.  The findings,

14   of course, are to the effect when this Fallbrook Creek is

15   actually flowing during these periods of heavy precipitation,

16   there are riparian lands.  The underground water is always

17   vagrant.  And the surface water, in effect the finding is it

18   flows only during the period of heavy rainfall, and that it

19   is therefore unnecessary, because of that physical fact, to

20   go into greater detail.

21        With reference to the proposal that the Government now

22   submit a new form of findings and conclusions, the preparation

23   of a form of findings by one of the litigants is, of course,

24   the usual method actually followed.  In this case I undertook

25   to prepare them, merely with such assistance as any counsel

1  offered to submit, which was possibly assuming a greater

2  burden than was required.

3       I would like to hear from other counsel as to whether

4  they believe that in so far as the Fallbrook Creek area is

5  concerned it would be better to start all over, in effect, or

6  whether they believe that the present findings, with whatever

7  modifications I have indicated, are sufficient before I would

8  make any determination upon that offer by Mr. Veeder. Does

9  any other counsel wish to be heard now?

10      MR. SACHSE:  Yes, your Honor, very briefly. I am not

11 going to make any comment on the stipulation, Mr. Veeder's

12 question about the stipulation. I have no clients who signed

13 stipulations and anything I would have to say would be amicus

14 curiae comment only.

15      As to the findings as written, and representing

16 approximately 40 individual land owners, I am satisfied with

17 the findings. I believe they are proper. And I request your

18 Honor to make no modifications in them beyond those which you

19 have discussed here, such as the inclusion of an additional

20 exhibit for the record. Mr. Veeder made the suggestion that

21 the ponds and reservoirs might be indicated by stipulation.

22 Again, so far as I am aware, I have no client involved in that

23 physical situation. I have no objection at all to that. I

24 think it would be helpful if the findings could be elaborated

25 to that extent. I don't think the findings should be held

1   up, however, by stipulation.  Anything can be found by Judge

2   Carter right down to the last minute.  And I don't feel that

3   your Honor can make findings, because there has been no

4   testimony before you on these ponds.  If by stipulation the

5   evidence can be presented to Judge Carter, it presents no

6   problem to amending it later.  And I wouldn't want these findings

7   held up.

8          Now, on the last question as to the resubmission of

9   proposed findings, I think your Honor is too charitable when

10  you said you did it with whatever assistance you got from

11  counsel.  Your Honor, I am sure, hasn't forgotten that you

12  sent a memorandum to all counsel of record July 3rd last year

13  posing five or six questions that were basically involved in

14  the draft of these findings.  According to my file, you received

15  answers from me, from the State of California, from Mr. Dennis,

16  and even from Mr. Swing, who took no active part in the pro-

17  ceedings.  I don't have any answer from the United States in

18  my file.  Maybe they filed one, but I never got a copy of it.

19         In my particular case your Honor will recall that I

20  tendered to you a summation of what I believed the findings

21  should include as to every one of my clients.  I am strongly

22  opposed, and I want to go on record as opposing, any reopening

23  of these findings, any tender of your Honor's responsibility

24  to the United States to draft these findings.  I am satisfied

25  with the findings of the Special Master.  I am not inclined to

2715

1    substitute Mr. Veeder for a Special Master.

2         What is perhaps more important as far as these individual

3    clients are concerned, to me the critical objective is to get

4    them out of this lawsuit, stop the endless expense and nuisance.

5    I feel it is my obligation to do everything possible to shorten

6    the time of these proceedings, either before you or his Honor.

7    And I will not consent to anything that I feel unnecessarily

8    prolongs them.  I think the findings that are now on file

9    accurately reflect the record.  I don't think they can be

10   changed without reopening the whole matter of evidence before

11   your Honor.  And I would object to such reopening.  I realize,

12   of course, that the United States can make the request to open

13   and can offer additional evidence before Judge Carter.  But I

14   don't want it done in two places.  I would resist the reopening

15   of the findings by your Honor.  And I hope your Honor will

16   expedite formal action and will expedite transmittal of your

17   proposed findings to Judge Carter, in order that this whole

18   thing can be shortened as much as possible.

19        THE MASTER:  Mr. Moskovitz.

20        MR. MOSKOVITZ:  The State of California is satisfied

21   with the findings and conclusions that you have come up with.

22   I think that Mr. Veeder did have an opportunity, had he wished

23   to take it at this time, to make specific suggestions as to

24   how the findings should be changed.  His suggestions were general

25   ones.  From my point of view, I don't see that the findings

2716

1  do need improvement, and I am willing to go along with them as

2  they are now.  I think the important thing is what you have

3  found in your finding No. V as to the character of the waters,

4  which makes unnecessary the more specific type of findings Mr.

5  Veeder desires.  And I think you have analyzed it correctly

6  there may come a time, although it seems unlikely, when riparian

7  owners may wish a more specific description of their rights.

8  But I can't see that this time is very immediate or may ever

9  come.  And I think it is a wise course to follow to make your

10  findings just no more specific than necessary to meet the issues

11  that are presented at the time and the facts that are presented

12  before you.  The fact that the surface stream is present only

13  when it rains, or immediately thereafter, indicates to me that

14  there can be no material use of water when it flows from the

15  surface stream, because at that time there is no need for

16  water.  And as for the character of the ground waters, they may

17  be taken without affecting the stream.  For that reason, there

18  is no necessity for any further specificity.  As a consequence,

19  the State doesn't feel you should reopen at this time.  However,

20  there is opportunity before the final decree is entered for

21  additional suggestions to be made by Mr. Veeder, if he wants to.

22  If it is done here, I think probably the result will merely be

23  a duplication of effort.  I don't think Mr. Veeder will be

24  prejudiced by not reopening these hearings at this time to

25  get more evidence or to put in more specific suggestions as to

1  findings.

2          THE MASTER:  Mr. Dennis.

3          MR. DENNIS:  I have no observations at this time.

4          THE MASTER:  Mr. Veeder, do you care to make any further

5  comments?

6          MR. VEEDER:  Well, from the standpoint of reopening, I

7  will tender this thought to you.  I don't know whether reopen-

8  ing was proper or not.  I don't think I used the term "reopen".

9  I would like, though, to follow through as I have suggested,

10  tender to your Honor-- and I think it is a reasonable request--

11  a suggested form of findings and let you consider them.  I

12  believe that is fair, if we undertake the burden, and tender

13  them to Judge Carter at the same time.  We feel very strongly--

14  at least I feel very strongly about these offers of settlement.

15  Now, no counsel here is concerned with them.  We are concerned

16  with them.  We are greatly concerned about that.  We believe,

17  moreover, that life being as short as it is, when you have an

18  opportunity to conclude litigation once and for all, by all

19  means conclude it.  We don't believe your Honor's findings and

20  conclusions do that.  We would like to have it as specific and

21  as definite as possible, and to wind this lawsuit up as we go.

22  This having tag ends, we will have tag ends sticking out from

23  under the covers for all time if we don't button these things

24  up as we go.

25          Now, I have tendered what I think is a reasonable way

1  of doing it.  I think we have suggested a reasonable means.

2  As I say, I think that the basic difficulty that arose here is

3  the disparity between our thinking and the thinking of Mr.

4  Sachse, for example.  We say there is no such thing as an

5  allegation of water.  He says there is an allegation of water.

6  I say there is a finding of fact and conclusion of law neces-

7  sary as to the right to the use of water, and that is the only

8  thing this involves.  I think that we can tender findings and

9  conclusions without opening this matter up again.  If Mr.

10  Sachse feels it opens it up, then we would be heard on it.

11  But I think we can make an offer which, when those findings

12  and conclusions are entered, will stop this for all time.

13      I think there is a real reason for it, a real reason to

14  stop any further litigation on this river. And the only way

15  to do it is by a decree that is res adjudicata, and res

16  adjudicata against the National Government and against everyone

17  else on the stream.  That is my view on it.

18      We would, if you want to specify a time as to when we

19  would make an offer of the proposed findings and conclusions,

20  we would be glad to have you limit us.  As I understand it, there

21  is going to be a period in here when there would be no further

22  hearings, and we would try to have that all done by the next

23  time we take up.

24      THE MASTER:  Of course, as I understand it, the Court

25  is under no obligation to allow oral argument in regard to

1   findings.  That is, the findings in the last analysis are the

2   findings that the Court makes.  Any argument which is allowed

3   is done, of course, for the purpose of assisting the Court in

4   making the findings, so that so far as possible they will be

5   correct.  The findings will have to be rewritten to the extent

6   of the addition to paragraph 2 that I have referred to.  I

7   would have no objection to allowing the plaintiff up until

8   Friday of this week to suggest other specific objections in

9   writing.  I will then proceed to adopt or reject those without

10  the necessity of further argument by counsel, and submit them

11  to Judge Carter.  Judge Carter, of course, will hear argument,

12  if any party desires to argue them before him, and he, of

13  course, has full power to accept them or reject them.

14          With reference to the one point which Mr. Veeder has

15  indicated concerns him the most, namely, the effect of the

16  stipulations, I might state there will be no need for him to

17  file any specific objection or alternative conclusion on that

18  basis, because that conclusion will remain.  I would be remiss,

19  I believe, in not submitting that conclusion to Judge Carter.

20  Because if it is not submitted by the Master, it won't be

21  submitted by anybody, presumably.  Because the parties who

22  signed it are not represented by counsel.  So that if the

23  Government is injured, the rights of the Government can be

24  protected by argument before Judge Carter.  If I were to

25  eliminate that, and if the rights of those defendants were

2720

1  thereby affected, their rights might not properly be presented

2  to Judge Carter. So that I think that finding, that conclusion

3  must stay in the conclusions of law which I will tender to him.

4  So counsel for the Government will have until Friday to present

5  any specific rewording of any other conclusion or of the

6  findings. And as soon as I receive those objections and

7  proposals, I will consider them and will then proceed to make

8  the findings and conclusions, to sign them, and to forward them

9  to the Court, to Judge Carter, without the necessity of further

10  oral argument upon the findings or the conclusions. Certainly

11  in so far as additional evidence with reference to the reservoirs

12  and ponds, if that is presented by stipulation that can be done

13  before Judge Carter. The course of the stream itself, I believe

14  that can be presented before him as part of the main case just

15  as well as here. To present it here would require reopening

16  the findings, and I am not inclined to do so.

17       We will take a recess at this time for the benefit of

18  the Reporter before continuing with the De Luz Creek objections.

19       MR. MYERS: May I ask one question before the adjourn-

20  ment? Does this apply to De Luz Creek or just Fallbrook?

21       THE MASTER: This is just Fallbrook.

22       (Recess.)

23

24

25

1    THE MASTER:  We will now take up the De Luz Creek

2  findings as proposed.  At the previous session on January 12th

3  I considered objections which had been filed by Mr. Sachse and

4  by the State of California, and at that time submitted certain

5  suggested changes.  However, by inadvertence I had not brought

6  with me at that time the precise revisions which I proposed

7  to make to Conclusions of Law numbers VIII and IX in order to

8  meet one of the objections proposed by the State of California

9  to the effect that the underlying waters which constituted part

10  of the subsurface flow of the creek had not been sufficiently

11  referred to in the conclusions.  So I have distributed to

12  counsel who are now present a proposed revision of Conclusions

13  of Law numbers VIII and IX.

14    The general nature of the revision is that the conclu-

15  sions have been modified by adding after the word "riparian"

16  wherever the word appeared in the conclusions the phrase "or

17  which overlie the subsurface flow of".  At least that is the

18  general tenor of the revision.  And counsel will, of course,

19  have an opportunity to consider these proposed revisions during

20  the course of my comments and during the noon recess.  And if

21  there is any objection to this proposed revision, that can,

22  of course, be made this afternoon.

23    The only additional objections which I have received since

24  January 12th with regard to the De Luz Creek findings are the

25  exceptions of the United States.  And I will now proceed to

1   give my preliminary thoughts with reference to these exceptions,

2   and will then invite counsel's comments with regard to the ex-

3   ceptions and my thoughts concerning them.

4       Exception 1 is a general exception.  It does not relate

5   to any specific finding or conclusion.

6       Exception 2 again is a statement that the findings are

7   necessarily inadequate by reason of the fact that the Vail

8   Company, which is the largest owner of land in the De Luz Creek

9   watershed, has not introduced evidence and the United States

10  has not introduced evidence.  Again it goes to no specific

11  finding or conclusion.  And I do not believe any further comment

12  is required.

13      Objection No. 3 states that Finding No. V should spe-

14  cifically declare or locate the streams upon which the particular

15  tracts abut and the lands which are riparian should be declared

16  in that category.

17      Now, Finding V, to which this objection is directed,

18  is a finding of parcels of property which are traversed by

19  intermittent streams which flow only during and immediately

20  after periods of heavy precipitation; during said times there

21  is some water in said streams which forms a part of the Santa

22  Margarita River system; except for said brief periods, no water

23  flows in any of said streams across any of the parcels of

24  property referred to in this Finding V, and except during said

25  periods of heavy precipitation and immediately thereafter said

parcels are not riparian to the Santa Margarita River, or any
of its tributaries; and the waters, if any, underlying any and
all of said parcels are vagrant, percolating waters not a part
of the surface or subsurface flow of any stream or creek within
the boundaries of the Santa Margarita River watershed; there is
no evidence that any specific amount of water could be with-
drawn from any of said intermittent streams and put to bene-
ficial use upon any of said parcels of property during said
periods of high precipitation and immediately thereafter, and
the total amount of water which could be so diverted and used
during said period is negligible; it is unnecessary to make any
further findings at this time with reference to the nature and
character of any of said parcels, or the water uses and rights
thereof.

Because of the nature of the finding, I do not believe
any useful purpose would be served by encumbering the record
with specific statements as to the names of the streams.  This
is to a certain extent similar to an objection which was
considered in connection with Fallbrook Creek.  I believe that
the additional information would merely extend the length of
the findings.  The name of the stream is immaterial, assuming
the stream has a name, even.  And my present thought is the
objection is not well taken.

The next objection, No. 4, is:

"Throughout the Findings the term is used

2724

1               that designated individuals are the 'apparent'

2               owners.  It would appear preferable to state

3               that those individuals were the owners of

4               record on a given date."

5     My thought there is this isn't an action to determine

6  who are the owners of the property, that a judgment rendered

7  herein should not be res adjudicata on actual ownership.  It

8  should be res adjudicata as to the rights of the lands.  But

9  the finding should merely be as to apparent ownership.  And if

10  it turns out there has been some mistake in the record, and

11  that actually Mr. Jones owns a parcel instead of Mr. Smith,

12  Mr. Jones should not be precluded by any finding that Mr. Smith

13  is the actual owner.  Mr. Jones would be bound by the rights,

14  would be limited to whatever water rights are decreed for that

15  parcel.  But he would not be debarred from asserting his title.

16     Objection No. 5 states that:

17               "Throughout the Findings exhibits are

18               incorporated by reference.  Under the cir-

19               cumstances the Findings are inadequate in

20               themselves, making it requisite to go beyond

21               their scope to ascertain the matters to

22               which they relate.  Destruction or loss

23               of said exhibits would resuld in rendering

24               the findings negatory."

25               Exhibit M-125-A, which gives the legal

1  description of all parcels, is attached to the Findings as

2  Exhibit A and is incorporated by reference.  The other exhibits

3  I have referred to only for purposes of convenience.  And it

4  is at least my present thought that destruction or loss of

5  those exhibits would not affect the findings.  It might make

6  it possibly a little more difficult to understand some specific

7  reference.  But I think it could still be understood, even if

8  the particular exhibit should be destroyed.  I do not believe,

9  therefore, at the present time that it would be essential to

10  try to incorporate these other exhibits in the findings.

11       Now, if counsel can point out any specific exhibit where

12  the exhibit should be incorporated, I will be glad to have that

13  done.

14       Objection No. 6 begins the objections to specific parcels

15  of property.  Mr. Dennis is here and Mr. Myers, and I believe,

16  therefore, that it might be proper at this time for their

17  convenience to refer to the specific objections which are

18  raised to the findings on the parcels of property in which

19  they are interested, and then if they desire they would not

20  have to remain, although, of course, they would be welcome to

21  remain for consideration of the balance of the findings.

22       We will then come back and consider the other specific

23  findings.  Let's see, Mr. Myers represented Mr. and Mrs. Butler,

24  the owners of Parcel 49, which is referred to in Finding No. 38.

25  The objections to Finding 38--

2726

1      MR. SACHSE:  On page 17, your Honor.

2      THE MASTER:  --is on page 17, Objection 35.  Subparagraph

3  (a) of the objection:

4          "It is found in Finding XXXVIII that 'the

5          portion of the property in Township 8 South'

6          and so forth, 'is riparian to Fern Creek and

7          Camps Creek.'  However, it is impossible to

8          ascertain from the Findings whether Fern

9          Creek and Camps Creek merge within the

10         boundaries of the property.  If the said

11         streams do not merge within the boundaries

12         of the property, the Findings are deficient

13         in that they fail to describe the specific

14         portions of Parcel 49 riparian to the re-

15         spectibe streams."

16     As I view the record, the evidence shows that Fern Creek

17  and Camps Creek merge just to the east of this parcel.  And if

18  that is correct, I think it would be well to amend the Findings

19  on page 45, line 7, by adding after the words "and Camps Creek",

20  at the beginning of the line, the words "which converge immed-

21  iately to the east of the parcel."

22     MR. VEEDER:  Could I have that line again, your Honor,

23  to which you are referring?

24     THE MASTER:  It is on page 45, line 7, after the words

25  at the beginning of the line "and Camps Creek".

1        MR. MYERS:  Page 45?

2        THE MASTER:  45 of the Findings.  After the words "and

3   Camps Creek" add the words "which converge immediately to the

4   east of the parcel".  Do you find the reference there?

5        CDR. REDD:  Yes.

6        THE MASTER:  Now, as far as finding the specific portions

7   which are riparian to the respective streams, I know of no

8   testimony in the record which would give a metes and bounds

9   description of those portions.  There has been no survey made,

10  as far as the record shows.  It would be possible to add in

11  this finding a general statement similar to a general statement

12  which was added to Finding 37 on page 43, lines 14 and 15, to

13  the effect that the portion of the parcel which is within the

14  watershed of Fern Creek is riparian to Fern Creek, and the

15  portion within the watershed of Camps Creek is riparian to

16  Camps Creek.

17      I see that was done on lines 14 and 15, page 43, with

18  reference to Parcel 48.  And a similar amendment would be

19  proper, and I will make that on page 45 at lines 6 and 7, using

20  the same general language used in lines 14 and 15 on page 43.

21  But I do not see at the present time how it can become any

22  more exact on this than that, because I guess there isn't any

23  other description in the record.

24      Now point B, under Objection 35:

25           "It is found that 'the waters underlying the

1        alluvium adjacent to Fern Creek and Camps

2        Creek in said Township 8 and said unnamed

3        tributary in Township 9 constitute a por-

4        tion of the subsuface flow of said creek.'

5        However, it is impossible to ascertain from

6        the Findings which portions of the parcel

7        overlie the subsurface flow of the respective

8        stream systems or how many acres overlie

9        subsurface flow of the respective streams.

10        Accordingly, it is recommended that the

11        lands overlying subsurface flow of the

12        respective streams within the parcel be

13        described."

14        Again, as I stated on the hearing on the objections

15 raised by the State, and this is the same objection raised in

16 more specific fashion, I know of no way to make the description

17 any more definite.  Again, there is no sufficient evidence

18 to give a metes and bounds description of this alluvial area.

19 No precise language has been submitted to me by any party

20 which could make it more specific.

21        Objection C:

22        "It is found that water has been diverted

23        from Fern Creek on Parcel 48 for storage and

24        use on Parcel 49 up to the capacity of an 8

25        inch concrete pipe or the extent of flow of

1          the stream, whichever is less, since 1898,

2          and that when the diversion flow is in ex-

3          cess of the needs of Parcel 48 water is

4          stored in a 27 acre-foot capacity reservoir

5          for later use.  However, it is impossible

6          to ascertain from the findings how much water

7          has been diverted, stored, or used in any

8          given year."

9     I have not been able since I received these exceptions to

10  find any evidence in the record which will enable this finding

11  to be made any more definite.  If Mr. Myers can point to any

12  specific testimony, or if any other counsel can, which would

13  enable the finding to be made more definite, I would appreciate

14  it.  My present belief is, though, that the finding goes as far

15  as the evidence justifies.

16          Objection D:

17          "It is found that Parcel 49 'contains 120

18          acres, 65.1 acres of which are irrigable.'

19          However, from the Findings it is impossible

20          to ascertain which portions of the parcel

21          are irrigable."

22     I do not believe that it makes any difference in this

23  case which particular 65.1 acres are irrigable.  The entire

24  parcel is riparian.  Therefore, from the point of view of the

25  plaintiff, if we are determining merely the total burden upon

1  the stream, we have set forth that 65 acres are irrigable.  We

2  have set forth the uses which can be made of the property.  That

3  is, so many acres can be used for row crops, so many for

4  avocados, so many for pasture.  I see no reason to say that

5  the 65 acres that can be irrigated are in any particular

6  physical location, say five acres here or ten acres there, or

7  that all 65 is in any one particular spot.  Also, it would be

8  almost impossible, without prolonging the findings to an

9  interminable degree, to define the specific 65 acres which are

10  irrigable.

11        MR. SACHSE:  Could I suggest we argue that one now?

12  That is a repeated objection by Mr. Veeder throughout, and I

13  have some thoughts, and I would like to hear Mr. Veeder's.

14        THE MASTER:  Yes.  I think at the present time I would

15  like to hear what Mr. Myers and Mr. Veeder have to say in

16  regard to the Butler property in particular, and also to hear

17  the thoughts of counsel on this reiterated objection that we

18  should specify the particular acres which are irrigable.

19        Now, in the two instances-- and there are only two or

20  three- where there is a portion of a parcel which is riparian

21  and a part which is not, then I think the objection is well

22  taken and that the finding should, to the extent possible,

23  specify whether the irrigable land is in the riparian or the

24  non-riparian portion.  And I propose in the amendments which I

25  would make in those instances to specify that, so that the

1   Government or anyone else can know whether that particular land

2   is riparian and has the right to take water from the stream.

3   But, frankly, where the entire parcel is riparian I

4   can't see what advantage is served.

5   Now, if it be said that the property may later be sold

6   and that you want to know whether the-- part of it may be sold,

7   and then you want to know what the grantee and the grantor have,

8   how many acres each one of them has that is riparian, again in

9   so far as the plaintiff is concerned it won't make any differ-

10   ence.  The total burden on the stream would be the same,

11   whether it is owned by one person or two persons.

12   MR. VEEDER:  Oh, but, your Honor, if there is a sever-

13   ance so that part of the land is no longer abutting upon the

14   stream, that severance results in a diminution of the riparian

15   acreage competing with us for the available supply of water.

16   And that is why that is important.

17   THE MASTER:  That becomes important at that time only--

18   and I think it is going to be impossible in this litigation to

19   try and answer every question that is going to arise in the

20   next hundred years.  And also the land can probably be divided

21   in such a way that it would none of it-- in other words, the

22   Government can't count on that severance.

23   MR. VEEDER:  You see, we--

24   THE MASTER:  If the purpose of the lawsuit is-- one

25   purpose, at least, is so the Government can make plans for the

1  to locate those lands in the smallest legal subdivision.  Now,

2  I realize it is an onerous undertaking.  But I do feel that it

3  would be possible, for example, to say that these lands are

4  riparian, give the description, then allude/those those riparian

5  lands which are irrigated, and say that they are located in

6  the Southwest Quarter of the Southwest Quarter of the Southwest

7  Quarter, getting down to about ten acres, and say that those

8  lands are situated in there.  Then in regard to the non-

9  irrigable land, say the balance of the lands are situated in

10  the South Half of the Southeast Quarter, if that were the case.

11      THE MASTER:  Of course, if you have part of them

12  irrigable and part non-irrigable in the same ten-acre section,

13  you are going to make matters worse by attempting to be spe-

14  cific where you can't be.

15      MR. VEEDER:  Well, my own view-- my own view is if we

16  are able to determine there are five acres of irrigable land,

17  we should be able to describe it.

18      THE MASTER:  But if you get it down to a ten-acre parcel

19  and there is a very irrigular shape to five acres out of that

20  ten acres that are irrigable, then unless you get a metes and

21  bounds description of that, if you try to cut it merely to a

22  ten-acre piece you are either saying all of it is irrigable or

23  none of it is irrigable.

24      MR. VEEDER:  Whether it desired to run out a metes and

25  bounds description on anything as small as a ten-acre parcel

2734

1   is something that I wouldn't want to get into now.  My own view,

2   and I have seen this done, is where you would have a small

3   map, a map which subdivides the lands by legal subdivisions

4   to very small size, and you can make reference to them that way.

5   In other words, the statements which I make in regard to

6   Fallbrook Creek and which I make in regard to De Luz Creek is

7   that I believe that we have to be more specific or face litiga-

8   tion at some later date.  And certainly we don't want to have

9   that problem.  We believe that it is possible-- we have done it.

10   We have been in the business for quite awhile and we have done

11   it ourselves.  And we do know that it may be true that there is

12   drudgery involved in it.  But I think that we can be specific,

13   and I think that we should be.  And when the day comes-- when

14   the day comes, and I think it must, to have a decree entered

15   which is meaningful, we will have to chronicle the rights and

16   we will have to chronicle a description of the lands.  And I

17   don't think that we should leave the specific Master hearings,

18   as I feel we are leaving the Fallbrook hearing, with so many

19   things to be decided by the Court.  And that is why when I

20   went through these findings in De Luz Creek I felt that it was

21   highly desirable to treat these matters in the most definitive

22   manner that we could.  And so it is true it would take considerable

23   work.  But I would believe that unless you had a situation where

24   you said, "Well, there are two acres of land out of eight that

25   are irrigable", it might be under those circumstances we would

2735

1    have to use some other device.  But where you have 65 acres
2    there is no reason in my mind why they cannot be defined and
3    delineated and declared.  Because it is of sufficient size
4    so that we would know.  That would be my recommendation.  It
5    might be you would have to weigh and decide on each individual
6    tract how it should be done.  But I do think we can be more
7    definite, and I do think we should chronicle the right.

8         MR. MYERS:  May I make an observation to the Court?

9         THE MASTER:  Yes, Mr. Myers.

10        MR. MYERS:  With regard to this matter that Mr. Veeder is
11   talking about at the present time, I have been very careful,
12   since I have represented Mr. Butler in the purchase of this land
13   right after the war, that he did not segregate any of the land
14   from the riparian stream, for this very reason we are bringing
15   up.  Now, I think it would be mighty fine if we could do as Mr.
16   Veeder suggests, but I don't think it is possible.  I searched
17   titles when I was going to law school two summers, and to
18   describe this irrigable land by any legal description, I don't
19   believe it is possible.  If it can be done, I have no objection
20   to it.  I think it is going to take us an awfully long time
21   to do it.  In that regard, it would certainly be beneficial to
22   my owner if it was possible.  You can see where we own 120 acres,
23   and if you were ever contemplating subdividing, which I think
24   is possible in the future-- I think that is something that is
25   going to happen in the future, but it is quite a ways off.  Now,

1  how are we going to describe these irrigable lands?  I welcome

2  your suggestion, but I don't think it is going to accomplish

3  anything.

4      We have accepted the Government's geology.  If we could

5  in some way refer to this in the findings, that part in the

6  geology report where it shows the irrigable acreage, by that

7  kind of a description, but I don't think that would be

8  sufficient.  And if you can suggest any better way to do it

9  than that, I am wide open to it.  I have no objection at all.

10 I can say this, that I have advised my client-- and I imagine

11 the same problem has been confronted by other counsel-- that he

12 had better not segregate his riparian stream or any portion of

13 it if he wants water for any other part of the land.

14      Now, I don't know how you are going to describe this

15 irrigable acreage these irrigable acres, when some of them are

16 just off the stream a little bit.  And I think the best way

17 to get a picture of what I am talking about, if I am not clear,

18 is to look at the geology itself, which we have accepted without

19 objection at all as presented by the Government.

20      THE MASTER:  That, of course, is the problem.

21      MR. MYERS:  That is my problem.  I don't know how else

22 to do it.

23      MR. VEEDER:  We wrote the objections with full knowledge

24 of the geology, and a complete cognizance of the problem. But

25 I don't believe that merely because it is difficult is sufficient

2737

1   reason not to go to the extent possible in being definite. And

2   I think that we could be more definite than we have been. That

3   is my view. And we should be as definite as the facts will

4   permit.

5        THE MASTER: Well, in this specific case I have before me

6   Exhibit M-55, which contains this geology. And the reference is

7   to five of the ten acres which are irrigable, five of the ten

8   acres which are not irrigable. As Mr. Butler has indicated,

9   these areas are shaped very irregularly. I don't see any

10  possible basis how this could be divided into ten-acre rectangles,

11  and the irrigable acreage included or excluded from those ten-

12  acre rectangles. I think that we have got this down to the

13  smallest possible area in that we say the 65.1 out of the 120

14  acres are irrigable, unless we actually go to a metes and bounds

15  description of these areas, 2, 4, 5, 9, and 10, as shown in

16  Exhibit M-55. And nobody has done that, and I don't think any

17  useful purpose would be served by doing it.

18       MR. VEEDER: You have reaised the additional point that

19  I think is important, out of the 100 acres. Now, assuming that

20  a man-- and I think that there is no doubt about it, these

21  lands are going to be sold, sold off-- what portion of the 100

22  acres to be sold, what portion of the 60 acres, what will be

23  the effect if there isn't more definitive location. I simply

24  say that-- I simply say we have been spinning our wheels. We

25  know these lands need water. We know that without water they

1   are without value.  We know there is going to be an increased

2   use of water.  When you say here is a hundred acres, 60 of it

3   is irrigable, suppose that he sells 25 acres of it, just

4   suppose he does--

5         THE MASTER: I have thought about that question, Mr.

6   Veeder.  It seems to me the only answer you can make to that is

7   that in so far as the Government is concerned-- and that is

8   your client-- that is, I am not in any way belittling your

9   sincere interest in the other parties.  But I am trying to

10   consider this from a practical viewpoint.  So far as your own

11   client, the Government, is concerned, this adjudication, as it

12   is proposed, would say out of that whole 120 acres there is

13   only 65 acres that is irrigable.  And you can rely on that,

14   whether it is sold into 65 parcels or remains in one parcel,

15   or what happens as between the present owner of that property

16   and any future owners, it seems to me the situation boils down

17   about to this, that the decree will be a binding adjudication

18   in that whole area that there is a certain amount of irrigable

19   land.  When that is sold every owner of that property takes

20   subject to that total picture.  If it is sold into 20 parcels,

21   and those 20 owners thereafter try to use more than-- try to

22   irrigate more than the 65 acres, then the Government has the

23   same rights against 20 of them collectively it would if one

24   owner were trying to use it.  And the total amount they can use

25   is only on the total of 65 acres.  Between themselves they are

1   going to have to fight it out then.  And my present view

2   certainly is that they would be in a lot better position to try

3   to fight it out then and to enter a specific decree on a metes

4   and bounds description that Jones now has 10 acres of this

5   irrigable land and that Smith has 2 acres and Brown has no

6   acres of irrigable land, than we are now.  That is, it seems

7   to me to try to go into all those points with this specificity

8   is in the nature of dicta in a court's decision, that the

9   Court is now called upon at the request of the Government to

10   make a finding as to the total riparian acreage now so that the

11   Government can make its plans intelligently, and that is a

12   reasonable request to the Court.  But for the Court to try to

13   say if this land is split up later, then we are going to have

14   this effect, is like a court deciding a question to go into

15   dicta on what would happen in certain cases not now before the

16   Court.

17       MR. VEEDER:  Perhaps I didn't make myself clear.

18   Certainly I would say there would be no ground whatever for

19   a court to make such a finding.  You inquired why is it

20   important.

21       THE MASTER:  I appreciate why.

22       MR. VEEDER:  And I certainly would not spell out what

23   might occur.  I am simply saying, though, that when one

24   represents the National Government he can't come along and say,

25   "This is fine.  If they touch that water we will knock them for

1  a loop." I don't believe that.  I think this, that there

2  resides with us who represent the United States of America the

3  obligation to be as precise as we can.  That is all I say.  And

4  I say if I find that we are in a position to take advantage of

5  one of the citizens of the United States we by all means should

6  not.  And more than that, we should see a decree is entered

7  that will protect the individual.  I have spent the whole day

8  talking against my client, in effect, because it is certainly

9  great for me to say, "Well, Fallbrook Creek, get them out.  Get

10  De Luz out."  Because ultimately we know that, one, we have

11  immunity from suit by and large, so nobody is going to sue us.

12  Secondly, there is not a great deal of threat because the

13  average individual simply doesn't have the resources to have a

14  general adjudication.  My only plea here, your Honor, is that

15  in these instances where we are setting up precedence which

16  will be followed throughout the watershed that we should be

17  learning and we should be setting up guideposts so that when

18  we get to the individual in another area who is similarly

19  situated we will be in a position to take care of them expe-

20  ditiously.  And I think-- I don't believe it is a waste of

21  time at this juncture to say, well, Fallbrook Creek should have

22  a declaration with regard to riparian rights and that we should

23  declare and define the names of the streams in the De Luz area,

24  and that we should define and declare those who have riparian

25  rights.  True, they don't have riparian water very long.  But

1  as long as the water is there they are entitled to it, and it

2  may be-- we are seeing a changing economy almost every day.

3  What we are doing now will be binding upon those lands fifty

4  years from now.  And while we have been insisting on going--

5  the fact is, you know we did.  We asked to wait until our case

6  in chief is virtually through before we got into this phase of

7  it, because I think we have hurried a little too much.  I do

8  believe we can take great care in the preparation of these

9  findings.  And I do believe that we will be able to incorporate

10  by reference perhaps-- perhaps spell out the description of

11  these lands.  And when we have done that we will know that that

12  man will not have to litigate in regard to the right to use

13  the water we hope forever.  We hope everything will be concluded

14  as completely as possible.  It is not only the responsibility

15  of the United States to say we are going to drive a hard

16  bargain.  We are going to get all the water we can.  I don't

17  believe that.  I think we should say we owe these people a

18  responsibility, and we are going to help them as much as we can.

19  That is what I would like to do.  And I would like in each

20  instance-- in regard to Mr. Butler, I think if we can get more

21  specific in regard to his lands, the better job we are doing.

22  I don't purport to be representing another man's client, but

23  I do know what has happened in the past.  I do know we have

24  cases before us right at the moment where had there been a

25  little more diligence at the time the decree was entered some

1    farmer wouldn't be spending $5,000 to litigate his rights later

2    on.  That is my point.

3        THE MASTER:  Just one at a time here.

4        MR. MOSKOVITZ:  Pardon me.

5        THE MASTER:  Yes.

6        MR. MOSKOVITZ:  Mr. Cranston, I think it is important

7    to remember the limitations of a finding now as to irrigability.

8    What will it really mean?  It means as of this date, on the

9    evidence presented to you, a certain number of acres are now

10   regarded to be irrigable.  But this is not a finding which is

11   going to be binding for all time.  I believe everybody has

12   recognized that.  Irrigability changes with changing economy,

13   with change in practices, in methods of growing crops.  Ten

14   or fifteen years ago a lot of the land which is now used for

15   avocados was thought to be completely non-irrigable.  And

16   these changes may occur next year or ten years from now.  I

17   think Mr. Veeder's anxiety to be specific and to settle problems

18   now for all time is something we just cannot do.  And if someone

19   comes in ten years from now and says, "I believe five more of

20   my acres are irrigable today.", he has a chance to prove that

21   to the Court.  The Court will retain continuing jurisdiction.

22   And even after you decide a certain number of acres are

23   irrigable, that does not mean there cannot be beneficial use

24   of water on other lands for other purposes than irrigation of

25   crops-- for livestock, for recreational purposes.  If the land

1   is riparian, there are all kinds of beneficial uses that can be

2   made.  And I think you are going to go to a lot of trouble to

3   be specific when it won't gain you anything in the final

4   analysis.  And I think this whole case is suffering from that,

5   an attempt to settle all problems for all time, when there

6   really aren't very many problems that need settling now.

7           THE MASTER:  Mr. Myers.

8           MR. MYERS:  Well, I don't entirely agree with Mr.

9   Moskovitz:  I think Mr. Veeder's idea is very fine if there is

10  any way possible to do it.  This problem has confronted me

11  for a long time, not only in water, but it has been a big item.

12  And I think it is with everybody here.  But how are we going to

13  do it from a standpoint of a subsequent-- the rights of a

14  subsequent purchaser or a severance, when it comes to a legal

15  description and you segregate it or any part of it from the

16  riparian stream.  I think you are going to go into greater

17  trouble unless you can think of some way.  And the simplest

18  way at this time, it would seem to me, if you are agreeable,

19  if you could incorporate this geology by reference, and if it

20  meant anything if it was done.

21          THE MASTER:  Well, I have thought about trying to

22  incorporate these geological reports by reference.  Aside from

23  the fact they would prolong the findings interminably, and by

24  the time you add the findings on De Luz to the findings on

25  Fallbrook, to the findings on everything else, you are going to

2744

1 have thousands of pages of findings. No matter how concise you

2 make them, you still come up with a point in general, which is

3 what Mr. Moskovitz said. Even if you had a metes and bounds

4 description, instead of merely a picture which is in all these,

5 changing conditions I think would have to be recognized. In

6 other words, if there is some device which is obtained, which

7 is perfected, under which land which is not now irrigable

8 because it is rocky, say, or too much clay or something, they

9 get some chemical or some means by which that land can be made

10 into perfectly good irrigable land, then it is going to be

11 irrigable land from then on and no decree made now would pre-

12 clude a person from physically making his land irrigable.

13 I am inclined to think that my first statement about

14 the decision and the dicta is still applicable, that for the

15 present, at the present time we are finding what land is

16 irrigable on the present state of human knowledge and geology

17 and farming practices, under present ownerships. To try to pin

18 it down to more limited parcels-- if they were nice rectangular

19 blocks and you could say, "This specific ten acres is irrigable

20 and this specific ten acres isn't", if you could do that

21 without unnecessary length, it might possibly be desirable, or

22 would be desirable, I would say. But where the only possibility

23 of making it more definite would be in metes and bounds

24 description, which isn't in the record, I can't see it.

25 MR. VEEDER: Your Honor, that very point, now, of course,

2745

1   we all know that by an order to show cause in this kind of a

2   decree you open it up.  If land has gone sour, why it is no

3   longer irrigable.  It can be thrown out.

4        THE MASTER:  Yes.

5        MR. VEEDER:  I don't know how much time Mr. Moskovitz

6   has spent in this business, but I don't think it is very much.

7   The point that I make is that it is possible, for example, to

8   take the Southwest Quarter of the Southwest Quarter.  That is

9   a 40-acre parcel.  I don't have the description before me.  But

10  it is possible to say that there lies in the south half of that

11  parcel 20 acres of irrigable land, as more specifically defined

12  in the soil survey.  Now, it is completely possible to maintain

13  the soil surveys in the court so that when there is an ultimate--

14  somebody wants to change, says, "Well, this land now will raise

15  avocados.", why there is nothing wrong in going in and finding

16  on an order to show cause.  The only thing I am saying is

17  when we get through, you put a man's name down, you put down

18  Mr. Butler's name here, you will describe his property, you

19  will find the location of any reservoirs that he has.  He will

20  have a description of his riparian rights.  If he has overlying

21  rights, you will refer to them.  Then you can put in the South

22  Half of the Southwest Quarter has been found to be irrigable.

23  So when you get through it is not a matter of an interminable

24  decree.  The whole thing would appear in about that much space

25  on one piece of paper, because you would do nothing more or less

1  than summarize it on a sheet. So you would not have as you

2  have, your Honor, in my view your finding wouldn't be of the

3  narrative type. You would have a very simple-- and this is the

4  only kind of decree I have ever seen. You would have a very

5  simple device. You would have irrigable acres, ten acres in

6  the Southwest of the Southwest. You would have-- if you had

7  40 acres overall, you would put in the 40 acres.

8       Now, it is true that you wouldn't have a metes and bounds

9  description, but you would be able to ascertain by looking at

10  this man's name and running it across here to see how much land

11  he actually is entitled to irrigate. You would also know the

12  number of-- the ultimate demand that he could put upon the

13  stream.

14       THE MASTER: Of course, Mr. Veeder, you have that now,

15  although not in the precise form that you suggest. You have

16  that information now in this finding as to the 65.1 out of 120.

17  The point we have been discussing is whether you should try

18  to break it down, instead of saying 65.1 out of this 120, that

19  you should say 10 of that is in one forty and 30 is another

20  forty and 25 is in another forty. Now, that makes no difference

21  whatsoever at the present time. It becomes important only in

22  the event of subsequent division of property and disputes

23  between the then owners as to how they divide their rights. My

24  own thought is that if anybody can present a division in that

25  manner in concise form I see no objection to putting it in the

1  findings.  But at the present time there is nothing in the

2  record upon which I, anyway, could make such a division.  That

3  is, I couldn't, on the basis of the Exhibit M-55 or any other

4  testimony, work out a statement that there was any particular

5  number of irrigable acres in any particular 40-acre tract out

6  of this 120.  Anything I would have done at that would have

7  been mere guesswork and based upon my analysis of these areas

8  of the field as they showed on the map, and try to correlate

9  them to sections.  And I might have guessed right and I might

10  not have guessed right.  It seems to me that to break it down

11  into your 40-acre tracts, even into 40-acre tracts and cer-

12  tainly into smaller tracts, would require testimony which just

13  isn't in the record.  In other words, it would require an

14  analysis of further testimony by Col. Bowen that, based upon

15  Exhibit M-55 in this case, that area 2, which has 5.2 acres

16  of land, that all happens to be apparently in one 40-acre

17  section.  But area 4, with 18 acres, extends into two different

18  40-acre sections.  And you would have to divide that between

19  those two sections.  Area 5, which contains 31.6 acres, is not

20  all in one 40-acre section.  So that it would require addi-

21  tional testimony not in the record to incorporate in the

22  findings the specificity which you desire.

23       MR. VEEDER:  Well, I think, as I have said, it may be

24  that we should be more specific than we have been, but that--

25       THE MASTER:  To make the findings as definite as you

2748

1   want, I think we would have to take additional testimony. I

2   don't think the testimony is in the record which would enable

3   accurate findings to be made on this 40-acre parcel basis that

4   you have referred to.

5        MR. VEEDER:  There was a great deal of very close work

6   upon these, because you see you have an area 2 which can

7   be located.

8        THE MASTER:  Area 2 may be, but others can't be.

9        MR. VEEDER:  5.2 acres, area 4, 18.5 acres.

10       THE MASTER:  Yes, but there is no testimony of how much

11  of that is in one 40-acre section and how much is in another

12  40-acre section.

13       MR. VEEDER:  It may be we should have more testimony,

14  I am not sure.

15       THE MASTER:  If you are going to have more testimony,

16  then it seems to me, Mr. Veeder, the thing to do would be on

17  that point to leave the findings as they are and present them

18  to Judge Carter.  Then if he determines that the findings should

19  be more definite on those points, then the testimony can be

20  taken after he has made a ruling upon that point.  But I

21  certainly would not be inclined to reopen the case for addi-

22  tional testimony in the De Luz Creek watershed solely for the

23  purpose of specifying which particular 40-acre section the

24  particular irrigable area is in, when there seems to be no

25  dispute on the finding as to the total irrigable acreage.  That

1   is, the other parties have accepted the Government findings

2   where I have put them in.  The Government seems to have

3   accepted my findings as to total acreage where I have departed

4   from the Government's findings.  My thought would be if we

5   are going to try to consider taking additional testimony that

6   should only be done after Judge Carter has indicated he thinks

7   such testimony is necessary.  Secondly, I would have no objec-

8   tion, if counsel wished to present this matter to Judge Carter,

9   to having him present it to him.  Mr. Myers.

10      MR. MYERS:  I think I kind of speak for the other counsel

11   with the same problem.  When I put on this first testimony of

12   an affirmative right, I had this problem:  "How much water did

13   you use in the past?"  And trying to get my client to describe

14   the irrigable acres.  In both cases I was unable to lay a

15   sufficient foundation for a description, except a word phrase-

16   ology, which my client was incapable of doing.  And I had no

17   other way to do it.  So I presented a photograph which I put

18   into evidence of this panorama of this area.  I didn't know

19   how else to do it.  And it is the same two problems as the

20   first one.  I had those two problems.  I never did establish

21   how many acres actually from a metes and bounds, because I

22   couldn't.  I couldn't do it tomorrow if I was required to go

23   back and get the testimony.  And that is the problem.  So we

24   just accepted Col. Bowen's geology, since they had no objection

25   to putting it into evidence.  I don't know how else we could

1   have done it.  I would like to do this, but I don't think it
2   is possible.  If there are some suggestions-- this isn't going
3   to do any good, as I see it, to clear title to this for a
4   subsequent buyer.  I wish it would be.  I wish we could do it,
5   because the problem will arise someday in the future, there is
6   no question about it.  If somebody, even-- I don't know, my
7   client has no intention of doing this.  So it isn't-- I can say
8   that definitely.  But it might be possible he might die someday
9   and the children might want to divide it up, I don't know.  But
10  I don't know how we are going to do it.  I had the same problem
11  putting on my testimony, and these two objections are raised
12  by Mr. Veeder here.  There is no evidence of how much water
13  we used in the past.  He objected himself because I couldn't
14  lay a sufficient foundation.  And if you recall I tried to
15  qualify my client as an estimator in the picture business,
16  made appraisals as a layman.  I don't think an expert could
17  have done it.  There is no way to measure it.  The same way
18  with this property.  It is the same problem we all had when the
19  shoe was on the other foot.  I don't see how we are going to do
20  it.  I couldn't figure out a way.  It is fine.  It is a fine
21  idea.

22          THE MASTER:  Mr. Dennis.

23          MR. MYERS:  I am open to suggestions.

24          MR. DENNIS:  I think your Honor's findings are the only
25  way it could be, in the state of the record.  Certainly there

1    is no way you can find a certain 23 acres is the acreage which

2    is susceptible of irrigation of a particular tract of land.

3    However, I don't believe that it is necessary for such a

4    finding to be made as requested by Mr. Veeder, for a number

5    of reasons.  I take exception.  He says he has never seen a

6    decree like this.  I say he should look at the first decree

7    which was entered in this particular action.  And certainly that

8    was the decree which was prepared by counsel for the Govern-

9    ment.  And they did not go into the specific subject that we

10   are talking about.

11            I notice on the format which he has he apparently has

12   nothing other than a column for the number of irrigable acres.

13   It doesn't purport to set forth or is there space set forth

14   for a description of those acres which are irrigable.  And that

15   brings it down I think to your Honor's remark that such a find-

16   ing would serve no useful purpose.  And I am sure that is true,

17   because if the land is riparian all of that land has riparian

18   rights.  That is the extent-- the nature of the right and the

19   measure of the right.  Now, as to the extent of the right,

20   that is, the extent of the right to use water, that is going to

21   vary from time to time.  And so far as I recall we haven't yet

22   in these proceedings made up our minds as to whether or not

23   the extent, that is, the percentage of water to which each

24   riparian owner is going to be using, is going to be based on

25   the number of his riparian acres or whether it is going to be

1  based on the number of his acres which are irrigable or whether

2  it is going to be based on the amount of water which he could

3  use on his irrigable acres, taking into consideration the duty

4  of water which is testified to in these particular matters.

5  And in any event, if he is not irrigating his land his percent-

6  age of water at any particular time is going to be cut down.

7  It is going to change from time to time.  And it seems to me

8  when your Master has found-- when you have found that there

9  are certain lands which are riparian, then you have established

10 that those lands have riparian rights.  And then the amount of

11 acres which are irrigable may or may not be material, depend-

12 ing upon what position the Court may take as to how you are

13 going to divide this water up.  And the Court is not, nor is

14 the Master, going to be required to make any finding as to John

15 Jones is entitled to 10% of the flow of the Santa Margarita

16 River or De Luz Creek at one particular time until there has

17 been some showing that at the time that flow is there and that

18 use is being made there is a deficiency.  And so far as I recall

19 there has been no showing made before the Master in these

20 hearings that the water of De Luz Creek has at any time been

21 insufficient to take care of the needs of the riparian owners.

22 That is, in the past and up to the time of this particular

23 trial.  And so it seems to me we are talking about something

24 that is highly hypothetical at the present time.  And I don't

25 believe that there is any requirement that you are going to

1  have to decide which 63 or 23 acres are susceptible of irriga-

2  tion, because as I recall the Cowles vs. Half Moon Bay case,

3  which is one of the few cases which did not say you divide the

4  water on the basis of irrigable acres.  The court said it was

5  necessary to find which particular acres were subject to profit-

6  able and economic irrigation.  And in that case they divided

7  the water not on the basis of the land which was subject to

8  irrigation, but it was that land which was subject to profitable

9  and economic irrigation.  And they said in that case that where

10  there was no evidence that water could be transported econ-

11  omically and could be put to use on a particular acre which was

12  susceptible of irrigation, that where there is no evidence

13  water could be put there and raise a crop and money made on it,

14  then those acres should not be taken into consideration in

15  determining what percentage Joe Doakes was entitled to.

16         So I don't see here your Honor is required to find or

17  has to find that certain acres by metes and bounds or by refer-

18  ence to a description are those acres which were susceptible

19  to irrigation.

20         THE MASTER:  What you have said, Mr. Dennis, reminds me

21  of something that I had noted and forgotten to bring out.  I

22  have here the transcript of the proceedings before Judge

23  Carter on January 23rd, page 7808.  Mr. Veeder says:

24              "You cannot decree the quantity of

25          water available.  You cannot say that

2754

1    there is or is not a surplus, because you

2    don't know.  And no one knows.  All we are

3    asking, and the sole and only reason for a

4    quiet title proceeding, is just exactly what

5    we have asked for and what we have been talk-

6    ing about for a year.  We are saying we want

7    to know the extent of the riparian lands.  We want

8    to know the maximum quantity that could be

9    reasonably used upon that land.  We want to

10   know the prescriptive rights," and so forth.

11   "But we don't ask you to find, and no one in

12   water litigation ever asked to have a quanti-

13   tative allocation of water.  It would be

14   impossible.  But we can say that here is a

15   ceiling which would establish the maximum

16   quantity that could ever be used."

17       Now, I think that is a fair statement of what the Govern-

18   ment is entitled to.  I think it is pretty nearly the only

19   judgment that can be rendered, that is, a statement as to

20   the extent of the riparian lands.  And if we go further and

21   also define what the non-irrigable lands are at the present

22   time in the parcels as they now exist, that that is as far

23   as it is reasonably possible and practical to go, and that we

24   are borrowing trouble if we try to go any farther.

25       MR. VEEDER:  Well, if anyone is laboring under the

2755

1   idea that I have ever thought other than what I said right there,

2   namely, that you can't allocate water, you decide rights-- what

3   I have tried to get across today, and apparently I have not,

4   is I think it would be possible to be more specific than we

5   have been in regard to the description of the irrigable land.

6   I think it is important.  But beyond that, if the record won't

7   sustain it, well, we shall see.

8        MR. SACHSE:  Your Honor, I would like to make an addi-

9   tional comment on this.  Mr. Veeder, I don't want to cut you

10   short.

11        MR. VEEDER:  Are you ruling on my ability to continue

12   to speak?

13        MR. SACHSE:  No, go ahead.  When you are finished.

14        MR. VEEDER:  I would like to finish up, if I could.  So

15   far as I am concerned I say let's be as specific as we can.  I

16   believe we can be more specific than we have been.  To the ex-

17   tent possible, let's be specific.  Now, I see it is 12:15.

18        THE MASTER:  Very well.  We will finish up this one

19   point and then we will take our recess.

20        Mr. Sachse.

21        MR. SACHSE:  I am very much concerned about something.

22   I wrote it down.  I hope Mr. Veeder didn't mean it.  Mr. Veeder

23   used these exact words:  "We are entitled to know how many

24   acres the land owner is entitled to irrigate."  Now, if I got

25   his quotes wrong, I am sorry.  But, your Honor, that is not

1   what irrigable acreage determines.  I am in complete accord with

2   Mr. Dennis.  I have in front of me the brief I submitted to

3   your Honor.  And I cited Half Moon Bay against Cowles.  And

4   the case specifically holds that after you use the yardstick

5   of irrigable acreage to determine the share of the stream to

6   which a man is entitled, he can put that share to use any-

7   where on his land and for any reasonable and beneficial pur-

8   pose, and no decree can stop him from so doing.  And I don't

9   think we should for one minute assume that the finding of 65

10  irrigable acres in the Butler case, even if we make it specific,

11  which I don't think we can-- if you could find that a given

12  quarter section was all irrigable and was the only irrigable

13  land in a riparian tract, you still would have absolutely no

14  right to say to this man, "You can only use water on that

15  particular quarter section."

16        MR. VEEDER:  Will it stop you, Franz-- I don't know

17  where you got the idea that you just expressed.

18        MR. SACHSE:  I quoted it.

19        MR. VEEDER:  I certainly have not said such a thing.

20        MR. SACHSE:  All right.

21        MR. VEEDER:  If I did say, I surely didn't mean it.  That

22  is one way of stopping the statement.

23        MR. SACHSE:  That is good.

24        THE MASTER:  Is there anybody that has anything additional

25  to say on this point that hasn't been said?  If not we, will

1   take a recess until-- is 1:15 too soon?  I think from the looks

2   of it we are going to have a lengthy afternoon session, be-

3   cause we have a lot of other findings to be considered.

4        MR. DENNIS:  1:15 is all right so far as I am concerned.

5        MR. SACHSE:  I think 1:30 would be better, your Honor.

6   It is kind of hard to fit into all of these eateries on

7   Tuesday.  One of them is closed.

8        (Adjournment to 1:30 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2758

Fallbrook, California, Tuesday, February 10, 1959   1:30 P.M.

THE COURT:  Now, does anyone have anything additional
to add to what was said this morning in connection with Objec-
tion 35 to the Findings on Parcel 49?  Unless somebody has
something else to say on that, I think we might proceed to
Objection 36 on Parcel 50, because Mr. Myers indicated that he
will advise Mr. Eberhard: of comments which I make in connec-
tion with these objections.  And then Mr. Eberhard would have
an opportunity to present anything to me in writing which he
wished to present.

I might state he telephoned me yesterday and stated he
had just received the objections on Saturday, and that he would
not be able to be here today.  And if he did have any comments
to make he would present them in writing.

The objections to the findings on Parcel 50 are in
general similar to those on Parcel 49.  Objection A, under
Objection 36 to Finding XXXIX is that there is a finding that
since 1911, when a claim for 50 inches of water measured under
a 4-inch pressure was filed that water has been diverted from
a weir across the bedrock of the channel of De Luz Creek located
in the Northeast Quarter of the parcel.  However, it is im-
possible to ascertain from the Findings the rate of flow of the
water so diverted in any given year or the total amount of
water diverted in any given year.  There is a finding that

8759

1   65 acre-feet per year from De Luz Creek is used, but there is

2   no finding as to whether this is taken under a riparian claim

3   or an appropriative claim.

4         I do not at the present time have in mind any evidence

5   in the record which would enable me to make this finding any

6   more definite.  If either Mr. Veeder or Mr. Myers and Mr.

7   Eberhard or any other counsel can indicate to me any evidence

8   which will answer these questions which are raised I should be

9   very happy to make the finding more definite.  In the absence

10  of some indication by counsel, however, I do not think I can

11  make the finding more definite.

12        Objection B:  It is found that "the waters underlying

13  the alluvium adjacent to Camps Creek and De Luz Creek consti-

14  tute a portion of the subsurface flow of said creeks."  However,

15  it is impossible to ascertain from the Findings which portions

16  of the parcel overlie the subsurface flow of the streams or

17  how many acres overlie the subsurface flow.

18        I believe that what I have said in connection with Mr.

19  Veeder's objections probably expresses my attitude on this.  I

20  don't find anything in the record which would enable a more

21  accurate description.  And I don't know that it is essential

22  that he state now how many acres overlie the subsurface flow.

23  The alluvial area can be determined by examination on the

24  ground.  Even if we had a metes and bounds survey in the findings,

25  that would have to be related to the ground by some physical

1  work on the ground.  It would probably be easier to do that for

2  a trained surveyor.  It might not be as easy for an ordinary

3  individual to ascertain from such a metes and bounds description

4  the precise area as it would be to determine the area by

5  reference to the nature of the soil.  In any event, it is

6  another case where I don't know.  I can't find any evidence

7  in the record to make it more definite.

8        Objection C:  It is found that Parcel 50 contains 80

9  acres, 49.3 of which are irrigable.  It is impossible to

10  ascertain from the Findings which portions of the property are

11  irrigable.

12        Well, of course, we discussed that I guess at too great

13  length this morning.  The entire parcel is riparian, and there-

14  fore on the viewpoint I expressed this morning seems to me that

15  it is not necessary to define the specific 49.3 acres.

16        Now, Mr. Veeder, can you point me to any evidence which

17  would enable me to make those findings more definite?

18        MR. VEEDER:  Do you have a soil geological survey on

19  this?

20        THE MASTER:  I have them all here.  Let me see which

21  one that would be?  That would be M-57.

22        MR. VEEDER:  Well, I observe that Col. Bowen has made

23  the determination of acreages.  And I find that we do have, as

24  in the Butler case, concerning which we talked this morning.

25  It would be possible, I think, to locate and determine the areas

2761

1    And I think it would be possible for counsel to have planimetered

2    the areas and to tender proposed findings based upon those

3    measurements.  In other words, I do believe it would be possible

4    both in the Butler case and in this case for counsel represent-

5    ing these individuals, by the simple method of planimetering,

6    to tender to you findings which would render more specific the

7    findings in regard to each one of these pieces of land.

8         THE MASTER:  Of course, that would require introduction

9    of evidence to the effect that the planimetering had been done

10   and was accurate.  I mean that couldn't be done simply by

11   submitting a document without opening the case for evidence on

12   that point.

13        MR. VEEDER:  Well, I don't know.  My own thought is this,

14   that if there is evidence in the record susceptible of being

15   interpreted in the manner that I have stated, I believe it is

16   evidence, and I don't know that you would have to have any

17   evidence in addition to it.  In other words, when a lawyer

18   tenders findings he frequently has to make an interpretation

19   or has to employ technical help to make the interpretation, and

20   in that manner draw findings in the proper form.  Now, what I

21   am saying is equally applicable to the Butler case, that we do

22   have the little subdivisions delineated.  We do know the

23   corners.  We do know the locations.  And I believe there is

24   a means pursuant to which those areas could be defined spe-

25   cifically.

1          THE MASTER:  Mr. Myers, is there anything you care to say

2     in regard to this property of Mr. Wilson.  I recognize he is

3     not your client.

4          MR. MYERS:  No.  All I can do in this regard is to go

5     back to the same problem we had.  And I can refer you to our

6     transcript of Mr. Butler's testimony regarding this same point,

7     page 606 and continuing on, where we were trying to describe the

8     particular acreage then being irrigated, and in relation to the

9     geology and so on, the difficulty, and Mr. Veeder's objection to

10    the lack of the foundation.  And we introduced a photograph to

11    try and describe it.  And then in my inadequate manner I tried

12    to get Mr. Butler to describe it, as you would do legally, and

13    it is not a very successful job.  And that is contained between

14    pages 606 and 611.  And everybody is going to have that same

15    problem.  But at that time when I offered that I was trying to

16    prove the particular acres which at the present time could be

17    irrigated and which he had presently and in the past been

18    irrigating.  Because I was trying to see if I couldn't establish

19    a prescriptive right.  And because I couldn't get a measurement

20    of water and a sufficient designation of the acreage being

21    irrigated in the past continuously for a period of time and

22    presently, I just gave up, frankly, trying to establish a

23    prescriptive right.  Now, I don't think you can.  If I could,

24    I would like to know.  If we are going back and reopen this and

25    nobody is going to object to that kind of testimony now, I

2763

1  think I might be able to establish a prescriptive right.  But I

2  have got those two elements.

3          THE MASTER:  Well, I don't think we can say that, assum-

4  ing the case were reopened, that such evidence could probably

5  be admitted without objection from anybody.  That would be an

6  unwarranted assumption.

7          MR. MYERS:  I concede that, but that is the problem.  I

8  don't think I can do it properly.  What standard are you going

9  to use here of describing this property, and what standard of

10  measurement are you going to use for measuring the water in this

11  particular unique situation?  As Mr. Veeder so astutely stated,

12  that is the problem all of us have had.  And I was the first

13  to have had it in establishing the affirmative right.  And I

14  couldn't see how we were ever going to establish it in this

15  case.  I felt maybe in that regard I had failed somewhere.  But

16  I don't think anybody else has been able to do it.  That is all

17  I have in that regard.  I think the same applies to Mr. Wilson.

18          THE MASTER:  Does any other counsel have any comments to

19  make on these particular objections to this finding in connec-

20  tion with these two parcels?

21          We should probably refer at this time to the further

22  objections which are contained on page 26 of the Government's

23  objections, the objections to conclusions of law.

24          Objection No. 4 simply is that the findings do not

25  support Conclusion of Law No. IV.  As a consequence, it is

2764

1    objectionable.

2        Now, Conclusion of Law No. IV is found on page 61 of

3    the Findings.

4            "The owners of Parcel 49 have acquired

5            and now possess an appropriative right" as

6            set forth in the conclusion.

7        Then Conclusion of Law, Objection No. 5 on page 26 of

8    the Government's Objections is similar.

9            "Conclusions of Law No. V declares the

10           existence of an appropriative right to a

11           specific quantity of water.  However, the

12           Findings fail to support the Conclusion.

13           As a consequence it is objectionable."

14       And Conclusion of Law No. V was that the owners of Parcel

15   50 have acquired and now possess an appropriative right to divert

16   65 acre-feet of water, as set forth in the Conclusion.

17       I think that in response to the Objection No. IV I should

18   amend Finding XXXVIII on page 46 by adding in line 23, following

19   the last part of the word "mentioned", which is the beginning

20   of the line, "t-i-o-n-e-d", and before the words "to the

21   capacity", inserting at that point the phrase "and applied to

22   beneficial use upon the property".

23       MR. MYERS:  I didn't get those words.

24       THE MASTER:  "And applied to beneficial use upon the

25   property".  I think the evidence does warrant that finding.

2765

1    I don't see, though, how I can on the evidence make the finding

2    any more definite in any other respect.  I will leave the con-

3    clusion of law for Judge Carter's final determination.  If he

4    believes the evidence is insufficient to support that conclu-

5    sion, it should be stricken.  I think probably the evidence,

6    although I wish it could be more definite, is sufficient to

7    support the conclusion.  In so far as Conclusion of Law No. V

8    and the objections to that are concerned, my thought is that the

9    conclusion should stand, that the evidence, although it is not

10   too complete, is sufficient to justify the conclusion.

11           Now, while Mr. Dennis is here we shall turn to Parcel 55.

12   That is Objection 39, to Finding XLII.

13           The objection is, (a), that there is uncertainty as to

14   the location of eight-tenths of an acre that is found to overlie

15   a part of the subsurface flow.

16           I think that the uncertainty is not too great.  The

17   reference in the finding is:

18                   "The waters underlying a small alluvial

19                   area containing approximately eight-tenths

20                   of an acre in the extreme northwesterly corner

21                   of the parcel in said Section 28 adjacent to

22                   the bed of the East Fork of De Luz Creek

23                   constitute a part of the subsurface flow of

24                   that creek",

25   without a specific metes and bounds description, which has not

1  been furnished and is not in the record.  I don't see how it

2  could be made more definite.  I think it is definite enough

3  so it could be determined for all practical purposes in the

4  future.

5              "(b)  There is no finding as to whether

6              or not any specific amount of water could be

7              withdrawn from any of said intermittent stream

8              and put to a beneficial use.  It is merely

9              found that 'There is no evidence' on this

10             point."

11      I think that the finding probably goes a little bit

12  farther than the objection indicates.  There is the language on

13  page 51 of the Findings, lines 27 and 28, following the language

14  which is referred to in the objection:  "And the total amount

15  of water which could be so diverted and used during said period

16  is negligible".  In other words, the finding as a whole recites

17  that there is no evidence that any specific amount of water

18  could be withdrawn from any of said intermittent stream-- that

19  is certainly true.  There isn't any evidence on that point.  --

20  and put to beneficial use within any portion of the parcel, and

21  the total amount of water which could be so diverted and used

22  during said period is negligible.

23      That part of the Finding hasn't been attacked.  I think

24  it is proper to leave that statement in.  If any party wished

25  to assert that a specific amount of water could be diverted,

2767

1   then I think that that particular party should introduce evi-

2   dence to that effect.  In the absence of the introduction of

3   such evidence, I think a finding along the lines suggested is

4   proper.

5         Then the third point of objection to this Finding C:

6           "There is uncertainty in that it cannot be

7           ascertained from the finding where the 43

8           irrigable acres are located with respect to

9           a tract of 80 acres."

10      Well, we have the same objection again that we have dis-

11   cussed at length.  The finding is that that entire 80 acres is

12   riparian.  And on the basis of our previous discussion that the

13   entire area is riparian, I regard as not essential to locate the

14   specific 43 irrigable acres.

15      Now, does any counsel again have anything to say which

16   hasn't already been said?  That is, I appreciate I am certainly

17   not satisfying Mr. Veeder on the rulings on these objections

18   for uncertainty.  If there is anything else, Mr. Veeder, you

19   wish to point out--

20      MR. VEEDER:  No.  I think what I said in regard to the

21   Butler tract and what I said in regard to the other tracts of

22   land which we just considered point up my view that I believe

23   it would be possible to delineate the irrigable acreage in

24   each legal subdivision, and that in my view the decree ultimately

25   entered will suffer by reason of a failure to do so.

1      THE MASTER:  Mr. Dennis, do you have anything to say on

2  these?

3      MR. DENNIS:  No.  I am perfectly satisfied with the

4  findings. What Mr. Veeder says is true, but it will serve no

5  purpose.  So far as .83 of an acre, I would like to make this

6  observation, that the land either abuts upon or is traversed

7  by a stream.  Whether it is either the underground flow or the

8  surface flow, it is riparian, and it is not necessary for the

9  Court to state in its findings-- or the Master in his findings

10  to state what portion of that land or that parcel abuts on or

11  is traversed by the stream.  It is not necessary to go into

12  detail as to where the stream goes over that particular part.

13      THE MASTER:  Very well.  We will go back now, then, to

14  the earlier objections which I had passed over.  So that if Mr.

15  Myers and Mr. Dennis don't care to stay for the entire time,

16  at least they had my thoughts on the findings and the objections

17  that specifically referred to their own clients.

18      We had covered, I believe, the first five objections

19  or exceptions.

20      Objection 6 deals with Parcel 5, Finding VI.  The first

21  portion of the objection deals with the specification of which

22  26.5 acres are irrigable out of 889.8 which had been discussed

23  at great length.  The entire parcel is riparian, and therefore

24  I believe that it is unnecessary to specify which particular

25  acres are irrigable.

3769

1 The next portion of the objection, lines 18 to 23 on

2 page 3, state that the findings themselves must be complete.

3 To go outside of their scope would lend to confusion.  Accord-

4 ingly, the lands described in Exhibit M-99 as being alluvial in

5 character should be described with particularity in the findings.

6 That refers to the statement in the findings on page 10,

7 lines 24 and 25.  There is a previous statement beginning in

8 line 19, that the waters underlying a small strip of alluvium

9 approximately 29.1 acres in area located in subparcel A below

10 the confluence of Cottonwood Creek and the unnamed tributary

11 which flows in a general direction from north to south,

12 constitute a portion of the subsurface flow of said Cottonwood

13 Creek.  Then the language referred to in the exception, "the

14 said alluvial area is more particularly described in Plaintiff's

15 Exhibit M-99."

16 Now, this reference is simply a matter of convenience.

17 The finding would be complete without it.  And I see no objec-

18 tion to such a reference.

19 I have already said if we had a metes and bounds de-

20 scription you would have to have outside assistance to identify

21 it on the ground.  And I think that a reference to an exhibit

22 which is in the case is proper.  Certainly in the case of

23 findings of this nature which, while they may be final in

24 one sense, are still preliminary in a sense.  And they will be

25 presented to Judge Carter for his final determination.  And I

2770

1  do not see anything objectionable in calling his attention to

2  an exhibit which he can look at if he wishes to to assist him

3  in determining the general sufficiency or accuracy of the

4  finding.

5       The next portion of the objection, lines 25 to 31, states

6  that domestic water for the house located on the premises is

7  obtained from a spring located about 750-800 feet northwest of

8  the house.  And there is nothing in the findings to designate

9  where either the house or the spring is located.

10      Well, the statement in the finding may be surplusage.

11  It is put in as a matter of record that at the present time

12  domestic water is obtained from the spring and not from a creek,

13  and is not intended to be a limitation upon the right of any

14  party or a statement in the future they can only obtain water

15  from a spring.  I view it as immaterial where the house and

16  spring are, as long as they are both upon the parcel of

17  property.  Another house could be put on any other part of the

18  property.  Another source of water could be used for the present

19  house.  They are merely matters of information to try to assist

20  the parties in determining present usages and present water

21  supplies.  Since they don't determine legal rights, I don't

22  think that the record need be encumbered by a precise location

23  of either the house or the spring.

24      Objection No. 7, page 4, the first portion, lines 3 to

25  6, relates to Finding VII, and to the portion that states that

2771

the waters underlying the westerly one-half of the parcel are

vagrant.  The description as to what constitutes the westerly

one-half is too indefinite and uncertain.

There is no metes and bounds description available as to

the lands overlying these vagrant waters, or the lands overlying

the waters which are part of the stream.  The purpose of the

action was stated by Mr. Veeder in language which I read this

morning from the hearing before Judge Carter, and I do not

believe that it could be extended to a precise delineation of

each square foot of ground overlying vagrant waters or waters

which are part of a stream.  And, in any event, the evidence

isn't definite enough at the present time to justify such

findings.  I may be wrong, but I would say that sufficient unto

the day is the evil thereof.  And there are enough issues that

are involved in the lawsuit to be settled without trying to

settle the rights between subsequent purchasers of property in

the event that they become involved in conflict between them-

selves.  If a controversy does arise at a later date as to

whether a particular well is extracting vagrant water or

percolating water, then I think that controversy must be settled

on the basis of precise evidence and surveys which are then

submitted, and that I can't attempt now to draw a precise metes

and bounds boundary, particularly when there is no evidence in

the record which would permit that.

The second portion of the objection is the finding that

2772

35 acres of the tract are irrigable is too uncertain.  Again
the entire parcel is riparian, so that objection has been
covered by what we have said at great length.

Objection 8a states that there is a finding in Finding
VII-A that there is a surface diversion of water from De Luz
Creek.  The Findings are silent as to the physical facts per-
taining to the diversion, its location, its carrying capacity,
and so forth.  The right claimed under the diversion is a
riparian right, and therefore in my opinion while the finding
that there is a surface diversion may be surplusage, certainly
the present methods of diversion are not a limitation upon the
rights of the owners, and therefore it is unnecessary to specify
the period of use, the place of use, carrying capacity, the
time when the right is exercised and so forth.  The statement
might possibly just be eliminated from the findings.  But again
I think we might as well include it for the benefit of all the
parties.  But it is in no sense a measure of anybody's riparian
right, and therefore I don't think those details need be given.
In any event, I don't think there is any evidence in the record
which would supply that information.

(b)  This is another version of the same objection we
have had many times before, that it is not specified sufficiently
and definitely enough what are the boundaries of the waters
underlying the alluvium adjacent to De Luz Creek and underlying
the easterly one-third of the parcel which constitute a portion

1   of the subsurface flow of De Luz Creek.  Further, there is a

2   finding that the waters, if any, underlying the westerly two-

3   thirds of the parcel are not a part of the stream system.  The

4   respective areas should be more specifically described.

5        I know of no evidence in the record which would justify

6   such a description.  If, upon the available evidence, without

7   reopening the case, any more definite description can be made,

8   I would be receptive to a modification of the finding, because

9   I certainly would like to make the findings as definite as

10  possible.  But I would have to have such evidence pointed out.

11       Then Objection (c) is a similar objection to those raised

12  previously, that the finding as to this specific location of

13  the 35.4 irrigable acres should be made.  Here again the entire

14  parcel is riparian.  There is no question of prescriptive or

15  appropriative rights.  And my viewpoint has been expressed in

16  the argument on the other objections of a similar nature.

17       Objection 9 to Finding VIII.  It is found that the

18  present domestic water supply is obtained from a well, "and

19  there is no present diversion from De Luz Creek."  However,

20  there is no means by which the location of the well can be

21  ascertained.  The structure should be specifically located and

22  the basis for concluding that it does not utilize De Luz Creek

23  water should be set forth.

24       Well, I think the location of the well is immaterial.

25  If anybody buys the land now they know where the well is at the

2774

1    present time.  A new well may be dug six months from now, and

2    this well may be abandoned.  So it is a matter of information

3    and no more.  The finding does not state that the well does not

4    use water from De Luz Creek.  To the contrary, it declares that

5    all the water underlying the property is a part of De Luz Creek.

6    And therefore the water in the well is part of the subsurface

7    flow of the creek.  The finding simply was there was no present

8    diversion from the creek.  And in order to make it clear that

9    that referred to a surface diversion only, I will add at the

10   end of Line 11 on page 13 the word "surface", so as to make it

11   clear that the finding is to the effect that present water is

12   obtained from a well and that there is no present surface

13   diversion from De Luz Creek.  And the balance of the finding

14   would indicate that the water from the well is part of the sub-

15   surface flow of De Luz Creek.

16        Exception No. 10 to Finding IX is in regard to the loca-

17   tion of the lands which overlie vagrant waters.  And that has

18   been covered in the comments I previously made that there is

19   no evidence in the record which would make the finding more

20   specific.

21        The second objection is to the finding that 35 of the 80-

22   acre parcel are irrigable, and they are not identified.  Here

23   again the entire area is riparian, and that has been covered in

24   the previous comments.

25        Objections 11, 12 and 13 are all of the same nature.  In

1   each case the entire property is riparian.  And the same

2   principles that I have referred to would apply in all cases,

3   including the objection in No. 13 to the fact there is no

4   finding with reference to the two wells, as to their location

5   and use and capacity.

6       Objection 14 relates to Finding XIII.  Subparagraphs (a),

7   (b), and (c), are covered by my comments on the preceding

8   findings.  Paragraph (d) is also covered, except that I will

9   add a sentence-- a phrase at the end of the finding, ". .all the

10  irrigable land is actually in the riparian portion of the

11  property."  That is established from the evidence which is now

12  in the record.  That is, there is 96 acres of land in the entire

13  parcel.  Part of it is riparian and part of it is not.  A

14  reference to the exhibits and to the testimony shows that the

15  entire irrigable portion is in the riparian land.  So at the

16  end of line 14 on page 18 I will add the words "Said 42.4 acres

17  are all located in the portion of said parcel which is riparian

18  to De Luz Creek.

19      Objection 15 to Finding XIV is that it is uncertain in

20  that it doesn't describe the area considered to be overlying

21  a part of the subsurface flow of De Luz Creek.  That description

22  is as definite as I can make it, based upon the evidence.  The

23  evidence on this parcel in particular was not lengthy.  There was

24  no engineering report on this parcel.  Reference was made to

25  engineering reports upon adjacent property, and that was all.

1    The second part of the objection was that there was a

2   finding of 20 acres of said northerly subparcel are irrigable.

3   But there is no description of said 20 acres, and there is no

4   means by which it can be ascertained as to whether said 20 acres,

5   or any portion thereof, overlies a portion of the alluvial

6   deposits that constitute a part of the subsurface flow of DeLuz

7   Creek.

8    Well, I don't know that it is essential that information

9   be contained.  But the examination of the transcript indicates

10  to my satisfaction that none of the 20 acres does overlie the

11  alluvial deposits.  That is my interpretation, anyway, of the

12  testimony.  And so on page 19, line 14, following the semi-

13  colon almost at the end of the line, and before the words "the

14  most" I would insert this phrase:  "none of said 20 acres over-

15  lies the above-mentioned alluvial deposits."

16   Objections 16 and 17 relate to the sufficiency of the

17  location of irrigable acres and alluvial areas. In each case

18  all of the land is riparian, and what I have said in regard to

19  other findings covers these exceptions.

20   Then Objection 18, on page 9, lines 15 to 19, the same

21  principles apply.  That is the only description I can find

22  in the record for these areas is the description which I have

23  attempted to give in my findings.

24   Page 9, lines 19 to 22, with reference to the location

25  of the well and the reservoir, is also covered, I believe, by

2777

what I have said in reference to the objections to other findings which have referred to a well. The entire property is riparian to the East Fork of De Luz Creek. Therefore, all the property has riparian rights. The statement as to the location of the well is, in my opinion, immaterial. They could take water from this well and use it or they could drill another well some place else. The rights of the land are not dependent upon the present location of a well.

Then Objection 19, the first portion of the objection has been covered in so far as the location of the 31 irrigable acres out of the 160. The second portion of the objection says: "Further, there is ambiguity in the finding that 'the waters underlying the balance of said property are, or may be, part of the subsurface flow.'" with the emphasis added by the objector.

The testimony is what caused the use of that language. Col. Bowen stated at pages 1363 and 1364 of the transcript that to give a more definite answer would require some geological investigation and study.

While he could definitely state that the Northeast Quarter of the Southeast Quarter of Section 28, Township 8 South, Range 4 West, overlay vagrant, percolating waters, as to the balance of the area he stated that it was possible that water could move through the soil mantle into the creek bed, but that he could not express any definite opinion. So I don't

2778

1   see how in fairness to the record I could make a statement that

2   it is part of the subsurface flow, because the testimony of

3   the witness is that he couldn't express a definite opinion.  If

4   there is any portion of the transcript which clears up that

5   ambiguity in the record and I am referred to it, I will try to

6   make the finding more definite.

7        Objection 20 relates to Finding XVIII and the specific

8   location of the irrigable acres.  The entire parcel is riparian,

9   and the objection is covered by what I have said in regard to

10  similar objections.

11       Objection 21.  All of the objections are covered by what

12  I have previously stated, excepting lines 17 to 21 on page 10,

13  where the statement is made that:  "Ambiguity is involved to

14  the extent that said parcel contains 152½ acres, 89 of which

15  are irrigable.  It is not clear that said parcel refers to the

16  entire tract or only to the tract found to be within the water

17  system."

18       To remove any ambiguity I shall amending Finding XIX

19  on page 24, lines 25 and 26 in this respect, so as to read:

20  "Said combined parcels"-- that is, Parcels 28 and 29-- "contain

21  152½ acres; 89 acres of Parcel 29 are irrigable."  That is the

22  end of the quotation and the end of the change.  The record shows

23  that no part of Parcel 28 is irrigable, and Parcel 28 was not

24  riparian.  Parcel 29 is riparian.  So I believe that modifica-

25  tion will make it clear that the irrigable acres are all in the

1  portion of the property that is riparian, but that the total

2  acreage includes also the non-riparian parcel 28.

3       Objection 22 is to Finding XX. The first portion of the

4  objection is that the reference to 390 acres is not clear

5  whether it refers to the entire tract or only this portion

6  within the De Luz Creek watershed.

7       It seems from the finding itself, page 18, line 25 of

8  the Finding, that--

9       MR. SACHSE:  Page 25, line 18, isn't it?

10      THE MASTER:  Page 25, line 18, yes.  "Said parcel con-

11  tains approximately 390 acres", which is the entire parcel.  I

12  don't see any ambiguity in the reference there.

13      The second objection:  "The finding contains no means by

14  which the 287.4 irrigable acres can be located or identified."

15  The entire parcel is riparian.

16      And then paragraph C.  "There is ambiguity in the

17  finding with respect to the flow of De Luz Creek as it pertains

18  to Parcel 30."

19      I don't see the ambiguity.  That is, if there is one

20  there it isn't apparent to me.

21      The finding is that the portion of the parcel described

22  as the Northeast Quarter and so forth is riparian to the main

23  channel of De Luz Creek; the balance of the parcel is riparian

24  to the East Fork of De Luz Creek.  The objection is that there

25  is ambiguity with reference to the flow of De Luz Creek.

1   I would appreciate having any ambiguity pointed out to

2   me after we finish going through these objections, and when

3   counsel will have an opportunity to comment on my comments.

4   Objection 23 is the same objection about this specific

5   location of the irrigable acreage, and has been covered.

6   Objection 24 (a) relates to the location of a well, which I

7   believe to be immaterial for reasons I have already stated.

8           "(b)  There is a proposed finding that

9       'The evidence is inconclusive' as to the

10      nature of the waters, if any, underlying a

11      portion of the area."

12  I couldn't find any evidence one way or the other in the

13  record as to the nature of the waters underlying the balance of

14  the parcel not included within the property described in the

15  findings on page 29, lines 16 to 27.  In other words, I found

16  there that certain portions of the underlying waters constituted

17  a portion of the subsurface flow and certain portions of the

18  underlying waters were vagrant and percolating waters.  And the

19  evidence actually was inconclusive to me as to the nature of the

20  waters underlying the balance of the property.  If any counsel

21  can show me any evidence in the record as to the nature of the

22  waters underlying the remaining portions of the property I

23  shall be very glad to amend the findings in that respect.  But

24  I couldn't find them.

25          Objection (c) under this heading again relates to the

1   specific location of irrigable acreage, and has been covered.

2        Now Objection 25 relates to the Garnsey property, Finding

3   XXXVII.

4        Paragraph (a) quotes a finding that:

5             "Large portions of this parcel overlie alluvial

6             ground water basins which basins form a part of the

7             subsurface flow of De Luz Creek, but neither the

8             area, the boundaries, nor the depth of these

9             ground water basins has been determined."

10  Well, in my mind that is a fair statement of what the

11  evidence shows.  The objection says that it is necessary that

12  the overlying lands be specifically designated, the areal ex-

13  tent of the ground water basin be defined, and the storage

14  capacity be determined.

15       It might be a good thing if that were done, but it

16  can't be done if these findings, based on the evidence in the

17  case up to the present time-- at least as I view the evidence

18  now.

19       The next objection, Section B, refers to the alleged

20  vague description of the area overlying vagrant waters.  And

21  it stated that the delineation of the ground water basin should

22  be defined and the contact between the alluvium and the residuum

23  be stated with sufficient definitive so that in the future

24  there will be no doubt as to the lands, the water-bearing

25  elements of which are part of the stream, may be known.

1          I think I understand the objection, but I don't know

2     how to put it on the record to make the definition that is

3     requested.

4          There is no objection C.

5          Objections D and E relate to appropriative rights.  And

6     I think maybe the thing to do would be to possibly pass over

7     those until the conclusion, because I anticipate Mr. Sachse

8     will probably stay for the entire discussion on the findings.

9          MR. SACHSE:  That is right.

10         THE MASTER:  And on both D and E I would like to have

11    definite comments, both from Mr. Sachse and Mr. Veeder, in

12    regard to these appropriative rights, whether the findings go

13    far enough, whether the evidence justifies making any more

14    definite findings, and also whether the findings are sufficient

15    to support the conclusions.  So if both counsel will make notes

16    to give me any help they can on those two particular objections,

17    I will appreciate it.

18         Now Objection 26 relates to Finding XXIX.  It is a

19    similar objection about the specific location of the irrigable

20    acreage out of the total acreage. And that has already been

21    covered, since the entire property is riparian property.

22         Objection 27 relates to Finding XXX.  It is the same

23    objection, that it fails to state which 8 acres out of a total

24    of 10.3 are irrigable.  On that parcel the entire parcel ex-

25    cepting the west 30 feet of the east 510 feet of the North Half

1  of the Northwest Quarter of the Northeast Quarter of the North-

2  west Quarter is riparian.

3      This is that parcel which has that very thin runner on

4  it.  The evidence does show that included in the irrigable

5  land is this westerly 30 feet, and so forth, which is not

6  riparian.  So that I think the finding should be amended on

7  page 36, line 14, by adding after the words "of which" the

8  following words:  "including said west 30 feet of the east 510

9  feet of the North Half of the Northeast Quarter of the North-

10  east Quarter of the Northwest Quarter of said Section 29", so

11  as to indicate that the irrigable acres in the riparian portion

12  are decreased by the area of that 30-foot strip.

13      But I do not believe it is necessary, for the reasons

14  already stated, to try to further define the location of the

15  irrigable acres within the balance of the parcel which is

16  riparian.

17      Objection 28.  It is another one relating to the location

18  of a well which supplies water for Parcel 41 and also for

19  Parcel 40.  I believe here again the well location is imma-

20  terial, and also the fact that at the present the water as

21  used on Parcel 40 is immaterial as far as final determination

22  or adjudication of rights is concerned.  Parcel 40 is all

23  riparian, excepting for that small 30-foot strip.  And Parcel 41,

24  excepting for the easterly 480 feet, is riparian.  The water

25  from the well is now being used upon those parcels.  Whether

1  at a subsequent date it can still be used will not be precluded

2  by any finding here.  So I don't think it is necessary to

3  specify the location of the well.  Again, a new well could be

4  dug and water from that well might be used in place of the

5  water from the present well.

6       Objection 29 relates to Finding XXXII.  Again the

7  specific location of the 35.1 irrigable acres.  And a second

8  objection:

9            "It is not indicated whether or not

10           any of the irrigable acres are within the

11           westerly ten acres that are found to be non-

12           riparian and overlie vagrant percolating

13           waters."

14      I propose to amend the finding by adding on page 38,

15  line 18, after the words "and 1.7"—it should be "acres permanent

16  pasture", where "acres" was eliminated in the typed draft--the

17  following words "none of said irrigable lands is within the

18  westerly ten acres of said parcel".  That is the end of your

19  statement.  In other words, that will make the finding

20  declar that the entire irrigable acreage is within the portion

21  of the parcel which is riparian to the main channel of De Luz

22  Creek.

23      Objection 30 is to the location of one irrigable acre

24  out of a total of four acres.  And the entire parcel is

25  riparian and the objection has been covered.

Objection 31 is that Finding XXXIV is uncertain in that it does not contain a description of the 44.2 irrigable acres that forms a part of a 641.7-acre tract.

An examination of the transcript shows that none of the irrigable land is within the portion of the property which is riparian to Camps Creek or the other streams.  So that the finding should be amended on page 40, line 18, after the words "are irrigable" by adding the words "none of said irrigable land is riparian to Camps Creek or any other stream."  In other words, all the irrigable land is non-riparian.

Objection 32 quotes from Finding XXXV certain language, and says that it is too vague and indefinite, and that the overlying land should be more specifically designated.  Again that is as definite a description as I can obtain from the evidence in the record.  If it is too vague, I don't know anything that can be done about it.

Subparagraph (b) is the same type of objection, only that it is not specified as to specific location of the 147.3 irrigable acres out of the total of 230 acres.  The entire area, however, is riparian, and what has already been said in regard to similar objections will apply here.

Objection 33.  The first point is that it is found in Finding XXXVI that a portion of the property is riparian to Camps Creek and also to an unnamed tributary, but there is no finding that the two streams merge within the boundaries of the

2786

1    parcel.

2         Well, the evidence indicates that they don't merge

3    within the parcel.  And I see no reason why that should not be

4    so found.  And so I would amend the finding by inserting on

5    page 42, line 17, after the word "direction" the words "and

6    joins Camps Creek outside the boundaries of the parcel".

7         Now, the further statement is made in the objection that

8    if the streams do not merge within the boundaries the findings

9    should delineate and describe the portions of the parcel which

10   are riparian to the respective streams.

11        If counsel wish to present a specific finding to that

12   effect I shall certainly consider it.  I was unable, upon an

13   examination of the record, to satisfy myself as to how I could

14   describe the portion with any particularity.

15        Subheading (b) of this objection is the similar objection

16   referred to that the finding doesn't specify the particular

17   30 acres out of the 40 acres which are irrigable.  That has

18   already been covered.  The entire property is riparian.

19        Objection 34 (a) relates to Parcel 48.  It says it is

20   impossible to ascertain which portions of Parcel 48 are within

21   the respective watersheds.  That was amended at the previous

22   hearing to recite that the portions of the parcel lying within

23   the watershed of Fern Creek is riparian to Fern Creek and the

24   portion lying within the watershed of Camps Creek is riparian

25   to Camps Creek.  I don't know how it can be made any more

     definite, based upon the state of the record.  If counsel again

1   can suggest any specific language, I will be happy to consider

2   it.

3       So far as Objection (b) is concerned, this again is

4   another objection to the supposed indefinite nature of the

5   description of the land which overlies vagrant and percolating

6   waters, and the land which overlies waters which are part of

7   the subsurface flow of De Luz Creek.

8       Again I don't know of anything in the record which would

9   justify a more specific designation of these two types of

10   property.

11      Then Objection (c) relates to the finding that the

12   owners have diverted 32 to 42 gallons of water per minute from

13   Fern Creek for use in Camps Creek since recording a notice

14   claiming the right to take 100 inches of water from Fern Creek

15   in 1892.  However, it cannot be ascertained from the findings

16   what use has been made of this water, whether any of it has

17   been stored or what the limit is on the total amount that can

18   be so diverted and used annually.  Furthermore, there is nothing

19   in the Finding to show the location or type of diversion works

20   used to divert the said waters.

21      Now the point of diversion is not too clearly referred

22   to in the record.  There is a point of diversion set forth in

23   Exhibits M-93 and M-94, but I haven't found in the examination

24   I have made of the transcript a specific statement as to the

25   number of feet from a boundary, or any other specific designation

1 of the actual point of diversion.  If any counsel can give me

2 further details as to that point, or any of the other alleged

3 insufficiencies here, I will appreciate it.

4 　　I do believe that the Findings should, in any event,

5 be amended on page 44, line 5, after the word "diverted" by

6 inserting the phrase "and apply to beneficial use upon said

7 parcel".  And I propose such an amendment at that place.  And

8 if Mr. Sachse and Mrs. Anderson have any comments, I will

9 appreciate them, and also any comments that Mr. Veeder has

10 with reference to the insufficiency of the references to the

11 point of diversion and so forth.

12 　　We have covered Objections 35 and 36, relating to Parcels

13 49 and 50, in our discussion this morning.

14 　　Objection 37 relates to Finding XL on Parcel 51.  This

15 has already been covered.  The entire parcel is riparian, and

16 the objection is simply as to the location of the irrigable

17 acreage and the riparian land.

18 　　Objection 38 to Finding XLI, Parcel 53.  The objection

19 is that while it is found that Parcel 53 is riparian to the

20 East Fork of De Luz Creek and to two unnamed tributaries, it is

21 impossible to ascertain whether the streams merge within the

22 boundaries of Parcel 53.

23 　　The transcript and records indicate that they do not

24 merge within the boundaries.  And I would amend Finding XLI on

25 page 50 by adding, following the words "heavy precipitation" the

1   words "which join the East Fork of De Luz Creek immediately

2   west of the westerly boundary of the property".

3        Objection (b) is a similar objection with reference to

4   the specific location of the 18.1 irrigable acres.  Since the

5   entire parcel is riparian, I do not believe the location need

6   be defined with greater particularity.

7        Objection (c) relates to the location of the well on the

8   property.  There is a finding that water for purposes of the

9   school located upon the property is obtained from the well.

10  The objection is that the location of the well and a finding

11  that the water is part of the subsurface flow of the East Fork

12  of De Luz Creek should be made.  It is immaterial, as I have

13  indicated before, in my opinion where the well is located, since

14  the entire parcel is riparian.  I think it is also immaterial

15  whether the water at the present is taken from the subsurface

16  flow of the East Fork of De Luz Creek.  That is a statement of

17  present fact.  That is the fact that the water is taken from

18  the well.  It is not a limitation upon the right of the District

19  to take water from the creek, if it is not taking water from

20  the creek at the present time.  In other words, I don't think

21  it makes any difference whether that water now comes from the

22  creek or not, if they are entitled to take water from the creek,

23  either surface flow or subsurface flow.  So I don't see why

24  the precise location of the well need be mentioned.

25        Also, I think it would be rather difficult from the state

1    of the record to indicate it.

2         Objection 39 has already been covered.  That relates to

3    Parcel 55.

4         Objection 40 relates to Parcel 69.  Those objections

5    have also been covered.  The entire property is riparian to

6    the main channel of De Luz Creek.  It is immaterial whether

7    the 8½ irrigable acres overlie vagrant percolating waters or

8    where they lie with respect to the entire 30 acres.  Since

9    they are riparian, they are entitled to stream water.  And

10   they are also entitled to any of the vagrant percolating water

11   they can get.

12        Objection 41 is the same.  The entire property is

13   riparian.  In this case all the subsurface flow-- all the

14   underlying waters are part of the subsurface flow, so that any

15   of the land, no matter how it is divided up in the future, is

16   riparian as long as it is not completely severed by some

17   foolish legal action.  And if anybody has any land that he

18   can irrigate at that time, he would be entitled to use either

19   the subsurface flow or the surface flow to irrigate it.

20        Objection 42.  The situation is the same here with

21   reference to Parcel 76 that it was with reference to Parcel 70

22   on Objection 41.

23        Objection 43 relates to Finding XLVII on Parcel 86.

24        (a)  Springs are located on Parcel 83, but it cannot

25   be ascertained from the Findings where said springs are located

1    with respect to the tract in question.

2        Well, the finding, of course, is that there are two

3    springs on Parcel 86 which are fed from a third spring located

4    on a portion of Parcel 83.  Parcel 83 is owned by the Govern-

5    ment.  Parcel 86 is owned by Mr. and Mrs. Cook, Emery A. Cook

6    and Betty B. Cook.  And the finding continues that any flow

7    from the springs located in Parcel 86 would, in a state of

8    nature, be absorbed into the ground before leaving Parcel 86,

9    and none of the waters from said springs would flow into any

10   other parcel of property.

11       Well, now, we are not concerned here with this spring

12   on Parcel 83 except that it happens to be the source of the

13   springs on 86.  The finding in effect is that the Cooks are

14   entitled to the water that comes out of the springs on 86.  I

15   haven't been able to find anything in the record that would

16   enable me to make a more definite finding as to the location

17   of the spring on Parcel 83.  And even if it were there, I don't

18   know that it would be material.  In other words, the water from

19   the springs arises on their property.  It sinks into the ground

20   on the Cooks' property.  I think that is the important factor.

21   Something might happen to the spring on 83.  It might dry up.

22   And then the water wouldn't come out of 86 any more.  But

23   particularly in view of the absence of affirmative evidence as

24   to the location of this spring on 83, I don't know there is

25   any more I can do about it.

1      Objection (b).  There is a finding the owners have filed

2  certain applications with the State Water Rights Board to

3  appropriate certain water.  There is no finding as to when the

4  applications were filed, the number of applications involved,

5  or a description of the rights which the land owner seeks to

6  initiate.

7      I think there is some merit in that objection, and I

8  would propose to amend the finding by adding on page 57, at

9  the top of the page, line 1, after the word "Board," the

10  following language, which I believe is a correct statement of

11  the record, and would be as follows:

12           "Said applications are as follows:

13           Application No. 9291, filed May 13, 1938,

14           to divert directly for beneficial use

15           without storage 0.025 cubic feet per

16           second from January 1st to December 31

17           of each season, and to divert for tempor-

18           ary storage and later beneficial use

19           4 acre feet of water per year between

20           January 1st and December 31st of each

21           year for irrigation and domestic purposes;

22           said application was acted upon by said

23           Board and Permit No. 5201 was issued by

24           said Board August 29, 1938, granting the

25           right to appropriate 0.025 cubic feet of

water per second by direct diversion from

January 1st to December 31st of each season,

and 4 acre feet per annum by storage to be

collected from January 1st to December 31st

of each season, providing that construction

should commence by December 1, 1938, and be

completed by December 1, 1942; thereafter

extensions of time have been granted within

which to complete construction work and apply

the water to beneficial use under said

application and permit, the most recent of

said extensions being dated January 14, 1954,

and extending the time for completion of said

work to December 1, 1956; since said date a

request for a further extension has been

filed, which request has not been acted upon

by the State Water Rights Board."

Now, I believe that that addition is in accordance with

the evidence. If any party believes it is not, I will cer-

tainly be glad to hear any comments upon it.

Then Objection (c) to this Finding is:

"There is a finding that the decision

herein shall be without prejudice to the

inchoate rights of any party pursuant to

said applications to appropriate water.

1              This is a conclusion of law and not a find-

2              ing of fact."

3       That may be well taken, but I always have been in the

4 habit, if I have any doubt whether a matter is a finding of

5 fact or conclusion of law, to put it in both places. Then I

6 won't find I left it out some place. So I think I will leave

7 it in as a finding of fact, even though it may be surplusage.

8       Objection 44, Finding XLVIII, Parcel 91, insufficient

9 description of a well located on the property. The property

10 is all riparian and all waters underlying the parcel are part

11 of the subsurface flow of the creek. So I regard the location

12 of the well as immaterial.

13       (b), insufficient location of the 50.8 irrigable acres

14 with respect to the total 109 acres. Again, since it is all

15 riparian, I think it is immaterial.

16       Objections 45 and 46. Objection 45 refers to Finding

17 XLIX, which provides:

18              "The evidence is insufficient to

19                 establish whether it is, or is not, econ-

20                 omically feasible to use any land in the

21                 watershed for the purpose of raising turkeys,

22                 chickens or poultry."

23       And the objection then is made if the evidence will

24 not support a finding, then there can be none.

25       Objection 46 is that Finding L is incomplete in that

1    it provides that:

2                    "The evidence is insufficient to determine

3              the amount of water which would be required

4              for any dwelling erected upon land within

5              the De Luz watershed.  The comment made in

6              the paragraph which immediately precedes is

7              applicable to the finding here involved."

8          I believe that those findings are proper in their present

9    form.  There is evidence in the record to support the state-

10   ments of fact which are made as statements of fact, namely, that

11   it is possible to raise turkeys, chickens, or poultry on the

12   land, and that dwellings can be erected upon it.  That is

13   supported by the record.  It is proper, therefore, in my

14   opinion to present these facts to Judge Carter.  And it is

15   likewise true there isn't any evidence as to the amount of

16   water which would be required for these uses, and also there

17   is no evidence whether it is economically feasible to use the

18   land for raising turkeys, poultry, and so forth.  And in view

19   of the authority which I cited this morning, I believe that in

20   a case like that it is proper to make a finding along these

21   lines for the guidance of the Court in making the eventual

22   findings in this action.

23         Now, Objection 47 relates to Finding LI.  The objection

24   states that:

25                    "It is found in Finding LI that after

1    periods of heavy precipitation the flow for short

2  periods of time is greatly in excess of present and foresee-

3  able future demands of lands within the De Luz watershed of

4  strictly riparian nature.  There is no evidence in the record

5  of proceedings before the Master as to the riparian rights,

6  uses or ultimate needs of the Vail Company or the United States

7  of America.  These two land owners own over half the land

8  within the De Luz Creek watershed.  In addition, no consider-

9  ation appears to have been given to the overall geology

10  presented to Honorable James M. Carter, Judge.  Furthermore,

11  the United States is the sole riparian owner on the Santa

12  Margarita River below its confluence with De Luz Creek.

13    "Accordingly, it is recommended that all of

14  Findings LI except that portion finding that De Luz Creek and

15  its tributaries fluctuate greatly in flow from year to year and

16  from time to time during the same year, be deleted."

17    In my opinion the evidence as to the flood nature of

18  De Luz Creek is sufficient to support the statement in periods

19  of heavy precipitation the flow for short periods of time is

20  greatly in excess of all foreseeable future demands of land

21  within the De Luz watershed, even including Camp Pendleton and

22  the needs of the Vail Company.  That is, the evidence shows

23  that there are short periods when there is such heavy floods

24  I cannot conceive of the supply not being sufficient for those

25  short periods of time during which, by hypothesis, it is still

1  actually raining.  So that I think that is a correct statement.

2  In other words, when you have the evidence as shown in the

3  exhibits of the number of cubic feet or acre-feet-- I guess it

4  is a question of cubic feet flowing down De Luz in these periods

5  of heavy floods, it is inconceivable that wouldn't meet all

6  riparian needs for those short periods of time.  In any event,

7  I would consider modifying the language on page 59, line 24,

8  by striking from the line the words "land within the De Luz

9  watershed of" and adding the words at the end of the line "of

10  the parcels of land hereinabove considered".  So that the

11  Finding would then be:  "After periods of heavy precipitation

12  the flow for short periods of time is greatly in excess of

13  present and foreseeable future demands of strictly riparian

14  character of the parcels of land hereinabove considered."

15      I think the broader finding is all right.  But if Mr.

16  Veeder wishes, I will make this modification so as to limit it

17  to the precise parcels here involved.  In any event, the next

18  portion of the finding:  "However, the flow is insufficient

19  to meet the ultimate needs and uses of riparian property

20  within the watershed." is, I believe, justified, because I

21  think the evidence shows it is insufficient to meet the needs

22  of the parcels which are here involved, that is, Parcels 1 to

23  92, in general, with certain exceptions which weren't con-

24  sidered.  And if it is insufficient to meet the needs of the

25  limited part we have considered, a fortiori it would be

1    insufficient to meet the needs of those parcels plus the Vail

2    Company plus the United States.  So that I believe the balance

3    would be correct.  Certainly the last portion of the findings

4    setting forth the variations, with a minimum of 65 acre-feet

5    for the year October, 1956, to September, '57, to a maximum

6    of 11,690 acre-feet for the year October, 1951 to September,

7    1952, is a proper statement of fact for whatever guidance it

8    may be to the Court.  As to the reference to the overall

9    geology, I don't see how that would affect this particular

10   finding as to the adequacy of the flow for short periods of

11   time and its inadequacy to meet the ultimate needs.

12        I, of course, have only a limited knowledge of the

13   geology presented before Judge Carter, because I haven't

14   attempted to read all of the transcript presented before him.

15   But at least at the present time I don't see how that evidence

16   could affect this particular finding on those points.

17        Now, the next objection is as to the conclusions of

18   law.

19             "The Conclusion of Law that the owners

20             of Parcel 14 have acquired a prescriptive

21             right to divert water from De Luz Creek for

22             storage purposes is not supported by the

23             Findings of Fact", Finding VIII it says.

24             It should be Finding XIII--"for the follow-

25             ing reasons:

1        "(a) There is no finding that any water

2        was diverted and applied to a beneficial use

3        during the statutory period or any other

4        period."

5      The finding is to the effect that the use has been for

6 recreation and irrigation since January 1st, 1953.

7      Now, I believe that irrigation and recreation would

8 constitute a beneficial use.  And in the period from January

9 1st, '53, would be for the statutory period.

10     The finding was modified at the hearing on January 12th

11 so as to state that the prescriptive right was only obtained

12 against all said lower owners excepting the plaintiff, United

13 States of America.  And I believe that as already modified the

14 finding is supported by the evidence and this conclusion of

15 law is supported by the finding.

16     Again I am perfectly willing to hear comments by counsel.

17 As to Objection (b):

18       "Findings of Fact do not show that the

19       use for the statutory period, or any other

20       period, was open, notorious and adverse."

21 On page 18, line 7 and 8, the statement is

22 made:  "Said diversion has been open, notorious

23 and adverse to all riparian owners located

24 downstream from the lands of said defendant."

25    Now, that is certainly a clear statement, assuming that

1    it is not necessary to go into the question with particularity

2    and state what I would regard as evidentiary facts.  In other

3    words, I take it the attack must be here that that is a con-

4    clusion of law and not a finding of fact in itself.  If that

5    is regarded as an ultimate fact, then there is a finding.  But

6    I will appreciate hearing from counsel on both sides on that

7    point.

8         Then Objection C:

9              "There is no finding that the adverse

10             claimant paid any taxes on or in connection

11             with the prescriptive right claimed, or that

12             no taxes were assessed."

13        Now, it is my understanding of the law that you don't

14   have to pay taxes to get a prescriptive right.  You have to

15   pay taxes to get adverse possession.  To get title by adverse

16   possession you have to pay taxes.  But unless there is some

17   authority of which I am not aware, payment of taxes is no

18   element of a prescriptive right.

19        Objection D:

20             "The Findings of Fact do not describe

21             with sufficient certainty the location of

22             alleged reservoirs used to store the water."

23        Well, they are referred to on page 18, lines 2 to 5,

24   located on an unnamed canyon in the Northeast Quarter of the

25   Northeast Quarter of Section 20, Township 8 South, Range 4

West.  The canyon doesn't have a name, and it is the only

canyon in that quarter section.  I don't know of any better way

to describe it. Again, if counsel can enlighten me I will be

glad to make it more definite to the extent the evidence

justifies it.

Objection 2 relates to appropriative rights on Parcel

37.  And I have asked counsel to discuss that question.  And

so when they are discussing the objections of the Findings

on Parcel 37 they can bear in mind the objection to the con-

clusion as well as to the Finding.

Objection 3 relates to the-- we have discussed it.  No,

we haven't discussed this one.  Objection 3 relates to the

owners of Parcel 48.  The statement that they have acquired

and now possess an appropriative right.  Parcel 48 is owned

by Nina B. Anderson.  I mention that in passing.  I believe I

stated that on page 44, line 5, I would add the words "and

apply to beneficial use upon said parcel."  In any event, if I

didn't say that, I will so amend the finding.  That meets the

objection there is no finding of beneficial use being made.

I suppose it means by the "owner", instead of by the "water"

as it is printed here.

Then the statement is made:  "It is impossible moreover,

to ascertain from the Findings or the Conclusions of Law the

exact location of the point of diversion, the nature of the use

or the total amount per year that may be diverted and used

1 under the appropriative right."

2     As I indicated in discussing that finding, I will appre-

3 ciate any information which counsel can give me in making the

4 finding itself any more definite.  And the attack here is

5 simply that the finding does not support the conclusion.  And

6 there is no other specific objection to the conclusion.

7     Objections 4 and 5, relating to Parcels 49 and 50, have

8 been considered.

9     Objection 6 is to the Conclusion of Law No. VI, that it

10 is not supported by the Findings of Fact to the extent that

11 it assumes the existence of inchoate rights in the owners of

12 Parcel 86 under application mentioned in Finding XLVII.

13     Well, the conclusion simply is it is without prejudice

14 to the inchoate rights of the owners of Parcel 86 under the

15 application mentioned.  If they have no inchoate rights I

16 don't see how anybody is injured.  The intent of the Finding

17 and the Conclusion both was simply to make it apparent that there

18 was no effort to preclude obtaining rights under the applica-

19 tion.  And I don't see how the plaintiff is injured by having

20 that left in.  If the right is never perfected and the State

21 Water Rights Board rules that the right has been lost plaintiff

22 won't be injured.

23     Objection 7, Conclusion of Law No. VII.  It is the same

24 objection to the similar finding in this case to the Objection

25 No. 2 in the Fallbrook Creek findings, namely, that where

1   parties who own property which overlies vagrant waters, and

2   where the streams, if any, which flow through the property

3   flow only during and immediately after periods of heavy rain-

4   fall, that their rights shall not be limited by reason of the

5   execution by them of any stipulation.  What I said with

6   reference to Fallbrook Creek would apply here, and I don't

7   think there is any reason to elaborate my comments.  I would

8   simply point out that the conclusion here is limited to those

9   parcels and, of course, is no limitation or statement that a

10  stipulation executed by the owner of some other parcel which

11  is not included within those findings is not binding upon

12  such owner.

13       I don't think I understand Objection No. 8.  It says:

14  "Conclusion of Law No. XI if pursued would present the entry

15  of judgment by reason of the objectional aspects"-- objectional,

16  which is a new word to me in itself-- "of the Findings and

17  Conclusion to which reference has been made."

18       Conclusion XI simply is that further delineation of

19  the correlative riparian rights and so forth should be

20  deferred until all of the findings of fact on the entire

21  watershed of the Santa Margarita have been entered.  Frankly,

22  as I say, I don't understand the objection No. 8.  No judgment

23  can be entered, in any event, until the entire watershed has

24  been heard.  That was the trouble that the court got into

25  which caused the first appeal in this case.

1        Then the ninth objection is that Conclusion of Law No.

2  XII is unnecessary.  I don't think it is unnecessary.  In any

3  event, it won't do any harm.

4        Well, I have talked at considerable length.  We will

5  give the reporter a rest, or a recess, and then counsel can

6  have an opportunity to take apart everything that I have said.

7        (Recess.)

8        THE MASTER:  Mr. Veeder, I suppose you might as well

9  lead off.  Then we will hear from the others.

10        MR. VEEDER:  Well, the only comment I have I believe

11  has been taken care of with the conversation which I just had

12  with Mr. Sachse.  I asked him about the quantity of water

13  utilized on the Garnsey tract.  And he advised us that there

14  has been no-- correct me if I am wrong, Franz-- that there has

15  been no measurement as to the quantity of water actually

16  utilized.  And that was, of course, the primary concern which

17  we had, both as to the direct flow right and-- I shouldn't say

18  that was the primary objection.  It is an objection that we

19  have to both those appropriative rights, because we felt we

20  should have findings in connection with them as to quantities

21  of water diverted and utilized.  I don't know whether the

22  record would support a more definite statement as to the point

23  of diversion and place of use.

24        I am now on page 12 of our objections.

25        MR. SACHSE:  Where, Bill?

1        MR. VEEDER:  12 and 13.

2        MR. SACHSE:  12 and 13 of our Objections.

3        MR. VEEDER:  Speaking now of 12 (d) and (e), on pages

4   12 and 13 in regard to Garnsey appropriative rights.

5        My only feeling is that we should be able to locate the

6   point of diversion and present use and carrying capacity of

7   the structure and the other elements that would go to make

8   up the appropriative right.  Similary in regard to the storage

9   right, I think that they should be more definite and certain.

10       Now, from the record it is impossible for me to tell

11   how much water is actually impounded, or rather has been

12   impounded, and thus constituting an appropriation.  Whether

13   your Honor can give consideration to that, I don't know.

14   The problem, as I see it, is to be more specific if we can.  I

15   certainly want to be as specific as the record will justify

16   where there is any useful purpose to be served by being

17   specific.  And certainly if we could name a specific diversion

18   point here and some of the other features of the rights I

19   think it would be well to do.

20       MR. SACHSE:  I think we could, your Honor, if Mr.

21   Veeder wants it.  There is in evidence the existing permit

22   which names a point of diversion and which does name or locate,

23   I should say, the point of diversion as being in a quarter of a

24   quarter upon Cottonwood Creek.  I did not feel it was neces-

25   sary, because the findings expressly refer to the permit

numbers, being 5505 and 8166, and they are stated in the
permits, which are a public record of the State of California,
just as much as a deed is a public record.  So it is there.
It is available if anybody wants it.  If Mr. Veeder strongly
feels it should be in these Findings, why we could refer to
them and insert the point of diversions in such and such a
quarter section and so on.

MR. VEEDER:  I think it would constitute a full
description of the appropriative right if it is done on that
basis.  If there is evidence in the record, I haven't checked
that.

MR. SACHSE:  It is in the record.  The permits them-
selves are in evidence.

THE MASTER:  Of course, that is one feature where,
because of the physical location of the exhibits, I have not
had as ready access to them as I might have if I was in the
same building with the exhibits.  Whenever I have gone to look
at the exhibits I have to go down to the Federal Courthouse
from my own office, and I had not noticed that point.

MR. SACHSE:  I have taken the position, your Honor, if
we were to adopt even Mr. Veeder's tabular system it should be
sufficient to state that defendant Garnsey is the owner of
permit so and so of the State of California authorizing a
diversion of so and so many cubic inches, or the storage of
so and so many cubic feet.  That is the fact you are finding.

1    And I don't think you have to repeat everything that appears

2    in the permit in your finding. That is why I didn't fuss about

3    making any of this more specific myself at the ti e that the

4    Findings were originally submitted. You spell out what the

5    permit is, and that is all we need to know.

6         Now, as to the second part of the question about the

7    quantity of water, your Honor did amend that finding, you

8    will recall, so it now reads:  "Said defendants have diverted

9    water for use upon certain portions of their property every

10   year since 1945, and for use upon other portions of this

11   property from about 1935 to 1939; defendants irrigated a total

12   of about 70 acres of their property, although they have never

13   irrigated all of said area at one time. Defendants have also

14   stored water since said permits No. 5505 and 8166 were issued,

15   but the precise periods of time of such storage cannot be

16   established from the record."

17        Now, that is, of course, a literal fact. Now, your

18   Honor is familiar with the mechanics under which the State

19   operates in these propositions. The Water Rights Board repre-

20   sentative will require reports and make periodic investigations

21   themselves. And at such time as they determine that the water

22   appropriated has been put to beneficial use, they will issue a

23   license. Or if it is not put to beneficial use they will

24   revoke the permit ultimately. So someday, regardless of any

25   final judgment in this case, I guess Mr Garnsey will end up

1  getting a license.  As of up to this moment, his right is in

2  a sense still inchoate also.  He has not a vested appropriative

3  right.  He has a right to go ahead and keep taking the water,

4  but it is not vested but inchoate to the exact water until he

5  proves up and gets a license.  So, again, I dan't see how you

6  can be any more specific in this case, either on the facts,

7  or how you need to be any more specific.  I am quite satisfied

8  with the findings from the standpoint of adequately setting

9  forth his rights as they presently exist.

10      THE MASTER:  Have you anything further on that, Mr.

11  Veeder?

12      MR. VEEDER:  No.

13      THE MASTER:  Well,--

14      MR. SACHSE:  I might add, your Honor, while we are

15  talking permits, this is a matter on which I just happened

16  to have just casual knowledge.  I think I should mention it

17  to the Court.  It does not concern one of my clients.  It does

18  concern the Cook property, Parcel 83-- 86.  Pardon me.  This

19  is going to hearing right now.  I happen to know, because I

20  saw a notice of it.  I don't know, I can't recall the exact

21  date in which the hearings are set, but there you will be

22  confronted with a situation.  Presumably Judge Carter will be

23  confronted with a situation where, certainly before judgment

24  would be entered, there will be a change in your findings.  I

25  don't know how it will be handled.  It is not one of my

1  clients. I just mention it, call it to your Honor's attention

2  and to Mr. Veeder's attention.

3  THE MASTER: I appreciate that. I think probably from

4  the interest Col. Cook showed in the hearings that if he does

5  receive any definite ruling that he will come in.

6  MR. SACHSE: I think he ought to come in and show what

7  he gets.

8  THE MASTER: He will probably write me a letter about

9  it. And then I would certainly request that the matter be

10  presented formally at an appropriate time, then I presume

11  before Judge Carter, because that would be at a time-- either

12  at the time these objections and the findings on the De Luz

13  Creek parcel have been written by him or at the time of the

14  final judgment.

15  MR. SACHSE: I would like to make one more request of

16  Mr. Veeder. Your Honor expressly asked him to submit, if he

17  felt he could do so, any material on Finding XXXVII and XXXVIII--

18  that is Couch and Anderson--that would make more specific

19  the description of their riparian lands and so on. Both of

20  those are my clients, and if you have suggestions, Mr. Veeder,

21  I would very much suggest--

22  MR. VEEDER: The only way we can do is check out the

23  record as it now stands and comply with those requests. And

24  we will comply with the requests.

25  THE MASTER: Do you have any comments on any others?

1        MR. VEEDER:  No, I have nothing else.

2        THE MASTER:  That is, no comments on all the rest of

3   what I said this afternoon?

4        MR. VEEDER:  Well,--

5        THE MASTER:  I am crushed.

6        MR. VEEDER:  I made my record with the filing.  So that

7   will be the record.

8        THE MASTER:  Mr. Moskovitz, do you have any comments?

9        MR. MOSKOVITZ:  No, I don't.

10       THE MASTER:  Mr. Myers, do you have anything to say about

11  any of the objections?

12       MR. MYERS:  I have talked enough.

13       THE MASTER:  Well, now, in regard to these

14  more specific identifications of any areas, do you think you

15  can have those-- how long would it take you to prepare those?

16       MR. VEEDER:  Well, when will the reporter have the

17  transcript available?

18       (Discussion off record.)

19       MR. VEEDER:  In other words, I think it would be a lot

20  more appropriate for us to take the record and go through it,

21  based on what you have said, than any other course.

22       THE MASTER:  Very well.  In a discussion had with Judge

23  Carter yesterday, he indicated he would be holding the hearings

24  in San Diego for the balance of this week, and four days a week

25  at least for the balance of this month.  I would anticipate

1   then that it would probably take the next ten days or two

2   weeks for you to obtain any more specific statement of any

3   of these areas.

4         MR. VEEDER:  Well, I would have to confer with Col.

5   Bowen and Col. Robertson on that matter, too.

6         THE MASTER:  Yes.  The next date for the hearings here

7   I believe should be Monday, March 2nd.  And prior to that time

8   I would suggest that you present any of these more definite

9   descriptions which you can prepare, so that we can hear any

10  objections from anyone to those descriptions.  In other words,

11  you prepare a description which you think is proper, the others

12  would have an opportunity at that time to object to those.

13  Assuming that satisfactory descriptions are obtained, the

14  balance of the findings can then be retyped with the more

15  definite description, where available.  And the findings could

16  then be submitted to Judge Carter for whatever action he wishes

17  to take.  I will therefore delay the actual signing of any

18  findings on the De Luz Creek watershed until an opportunity

19  has been given to make them more definite in these respects,

20  with the understanding that this will not hold the case open

21  for presentation for additional evidence, but merely for more

22  definite statements based on evidence now submitted.

23         Now I might go off record for a minute.

24         (Discussion off record.)

25         THE MASTER:  We will go back on the record.  At this

1    time the hearings, then will be adjourned until Monday, March

2    2nd, at 9:30 A.M., at this present location, at which time we

3    will consider the question of more definite descriptions in

4    certain instances in the De Luz Creek findings, and will then

5    proceed to consideration of evidence on the area which has

6    been partially covered between Fallbrook Creek watershed and

7    Santa Margarita River.

8                              -------