ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

REPORTER'S TRANSCRIPT

Volume:     28

Pages     2942 - 3022

Date:      May 25, 1959

Place:     Fallbrook, California

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

| | Direct | Cross |
|---|---|---|
| Allen C. Bowen | 3005 | 2946 3016 |
| Carl N. Halde | 2963 | |
| Arnold Glindset | 2993 | |
| G. G. Pepple | 3007 | |
| P. W. Willett | 3008 | |

## INDEX TO EXHIBITS

| | | Ident. | Evid. |
|---|---|---|---|
| MR-37A | Letter | 2945 | 2945 |
| MR-37B | Map | 2950 | 2980 |
| MR-37C | Report | 2953 | 2954 |
| MR-37D | Photograph | 2969 | |
| MR-40 | Tabulation and partial photograph | 3004 | 3006 |

(Reports on:)

| | | | |
|---|---|---|---|
| MR-41 | Frank W. Fowler | 3010 | 3011 |
| MR-42 | Clerk C. Barnes | 3010 | 3012 |
| MR-43 | William L. Beck | 3010 | 3013 |
| MR-44 | Brunson, Peterson and Yaras | 3010 | 3013 |
| MR-45 | Jacob A. McKathnie | 3010 | 3014 |
| MR-46 | Harry E. Emery | 3010 | 3015 |
| MR-47 | W. E. Knight | 3010 | 3016 |
| MR-48 | Blaine W. Lanterman | 3010 | 3018 |
| MR-49 | William D. Hayes | 3010 | 3019 |

APPEARANCES:

      WILLIAM H. VEEDER, ESQ. and
      LCDR. DONALD W. REDD, U. S. N.,
       For United States of America.

      FRANZ R. SACHSE, ESQ.
       For Fallbrook Public Utility District
       and individually named defendants.

      TOM HALDE, ESQ.
       For Carl N. Halde.

      P. W. WILLETT, ESQ.
       For Eugene Neal Swearingen
       and Ardyth Louise Lattimer.

      ARNOLD GLINDSET, in pro per.

      GEORGE STAHLMAN, ESQ.
       For the Vail Company.
       Part of session only.

1      Fallbrook, California, Monday, May 25, 1959; 9:40 A.M.

2

3      THE CLERK:  Court is now in session.

4      THE MASTER:  Will counsel state their appearances for the

5  record, please?

6      MR. VEEDER:  William H. Veeder for the United States.

7      LCDR. REDD:  Donald W. Redd, for the United States.

8      MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility

9  District and individually named defendants.

10     MR. HALDE:  Tom Halde for Carl N. Halde and Hester M. Halde.

11     MR. WILLETT:  P. W. Willett for Lattimer and Swearingen,

12  Eugene Swearingen and Ardyth Lattimer.

13     THE MASTER:  Are there any individual defendants present

14  who are not represented by counsel?

15     Will you state your name, please?

16     MR. GLINDSET:  Arnold Glindset.

17     THE MASTER:  Very well.  Mr. Halde has come from some distance,

18  so, Mr. Veeder, can we present the evidence with respect to his

19  parcel?  I believe it is 121.

20     MR. VEEDER:  I think that his soil survey is already a

21  matter of record, your Honor.

22     THE MASTER:  I believe that is MR-37.

23     MR. VEEDER:  That is right, it is MR-37.  As I understand,

24  he has some evidence respecting his title he desires to put in.

25  I have looked at it.  So far as I am concerned, there is no

2945

1  objection to it, although we do reserve the right to rebut it

2  if our investigation indicates a need for it.

3      THE MASTER:  Mr. Halde, do you wish to offer any exhibits?

4      MR. HALDE:  Yes, your Honor, I would like to offer a letter

5  dated May 8, 1959, from the Union Title Insurance Company, the

6  signator R. A. Pellegrin, a letter concerning the chain of

7  title of the subject property, and which is designated parcel

8  121 in the record here, and which generally deals with the

9  southwest quarter of the northeast quarter of Section 11,

10  Township 9 South, Range 3 West, which ownership is in my client.

11  And I will offer this at this time.

12      THE MASTER:  Let's see, that will be received then as

13  Exhibit --

14      MR. VEEDER:  MR-40.  Excuse me, your Honor.

15      THE MASTER:  I am wondering if that will confuse it with the

16  plaintiff's exhibits.

17      MR. VEEDER:  Well, his number is MR-37.  We might make it

18  MR-37A.

19      THE MASTER:  I think that might be better.  Make it MR-37A.

20      MR. HALDE:  All right, offer this.

21      MR. VEEDER:  There is no objection, your Honor, by the

22  United States.

23      (Letter dated May 8, 1959, received in evidence as Defendant

24  Halde's Exhibit MR-37A.)

25      MR. HALDE:  I have been served with a copy of MR-37, and in

that connection I would like to ask Colonel Bowen a few

1   questions if he is here, and call him as an adverse witness.

2     THE MASTER:  Colonel Bowen, will you take the stand?

3     MR. VEEDER:  I would like the record to show it is not

4   necessarily as an adverse witness that he has been called.  He

5   is a friend of the people.

6     THE MASTER:  He is called for cross-examination, however.

7

8              ALLEN C. BOWEN,

9   recalled as a witness for cross-examination, having been pre-

10   viously sworn, testified as follows:

11     MR. HALDE:  I guess, your Honor, I am not familiar with

12   your procedure here.  Has the Colonel been sworn in this case?

13     THE MASTER:  Yes, he has testified at great length.

14     MR. HALDE:  I would assume so, but I didn't know.

15

16             CROSS EXAMINATION

17

18   BY MR. HALDE:

19    Q  Colonel, I just received a copy of this report the other

20   day and there are a few matters I would like to ask you about.

21   First of all, was this report prepared by you?

22    A  This report was prepared under my supervision and direc-

23   tion.

24    Q  I see.  And did you make any of the physical findings in

25   connection with the report?  By that I mean did you make a

1    physical examination of the subject property?

2        A  Yes, I have checked out the property.

3        Q  Then are the findings as related on pages 1 and 2 your

4    findings from your own inspection or someone else's?

5        A  Well, I checked these findings here.  The detailed

6    findings were made by a person or persons working under my

7    supervision.

8        Q  Well, specifically looking at page 1, were the findings

9    relative to ground water storage, which is related on the

10   last paragraph of page 1, were those your conclusions based

11   upon your physical inspection or that of someone in your

12   department or under your command?

13       A  They are my conclusions based on my physical inspection.

14       Q  I see.  Now, prior to the time you made this inspection --

15   incidentally, when was it you were actually to the property?

16       A  On or about the 23rd of April.

17       Q  Of this year?

18       A  Yes, sir.

19       Q  I notice on page 2, in referring to the engineering data,

20   you state it was compiled by your office on April 14, 1952; is

21   that correct?

22       A  Yes, sir.

23       Q  And did you have a written report of the physical findings

24   made from the inspection that was conducted on April 14, 1952?

25       A  It wasn't written up in this form, Mr. Halde.  It was

1   notes that were taken by the party in the field.

2   Q  Well, didn't you tender a report to Mr. and Mrs. Halde

3   concerning that particular examination in 1952?

4   A  I don't recall.

5   Q  Did you have a Captain Willis L. Lee under your command

6   at that time?

7   A  Yes, sir.

8   Q  And did you also have a second lieutenant by the name of

9   Charles B. Moreno and did you have a sergeant by the name of

10  Dryden?

11  A  Yes, sir.

12  Q  Now, how about another by the name of Clement, another

13  person, some other personnel?

14  A  An officer by the name of Clement, yes, sir.

15  Q  Colonel, I would like to show you what purports to be a

16  report from the Office of Ground Water Resources.

17  MR. HALDE:  Have you seen this, Mr. Veeder?

18  MR. VEEDER:  I perhaps have.  I don't recall it.  When was

19  this written?

20  MR. HALDE:  1952.

21  MR. VEEDER:  If I have seen it, it has slipped my memory.

22  I would have to check it back, Mr. Halde.

23  BY MR. HALDE:

24  Q  Will you look this over, Colonel, and see if this re-

25  freshes your recollection as to whether or not a written report

1    wasn't written up relative to that inspection in 1952?

2        A  Yes, sir.  This report was prepared by the Office of

3    Ground Water Resources.

4        Q  That would be someone directly under your command; is that

5    correct?

6        A  Yes, sir.

7        Q  All right.  Thank you.

8        In connection with your physical findings on this last

9    inspection on April 23, you state that ground water storage

10    is not good on the property.

11        Now, what portion of the property are you considering when

12    you make that statement in this report?

13        A  I am considering the entire property, Mr. Halde.

14        Q  The entire property?

15        A  Yes, sir.

16        Q  Would it be your opinion in this statement then that

17    insofar as the entire -- the whole 40 acres or the present

18    balance of 38.1 acres that now exists has no ground water

19    storage at all?

20        A  Well, there is undoubtedly ground water storage in the

21    narrow band of alluvium which is along Rainbow Creek.  But with

22    that exception, it is extremely unlikely you have any substan-

23    tial quantity of ground water.

24        Q  Well, in the alluvium along the creek, wouldn't it be your

25    opinion there is substantial ground water storage there?

1    A  Well, there is just a narrow band of alluvium there, and

2  I wouldn't say there is a substantial storage.  But whatever

3  water is in that alluvial fill supports the surface stream, is

4  part of the stream flow.

5    Q  Colonel, this is just a rough diagram of the area.

6  Referring to this topographic section of that 40 acre parcel,

7  I wonder if you would mark on there what area you consider

8  there to be any ground water storage in whatsoever.

9    THE MASTER:  Do you wish to offer this then as an exhibit?

10    MR. HALDE:  Yes, your Honor.

11    THE MASTER:  Then you wish it to be marked for identifica-

12  tion.

13    MR. HALDE:  Yes, at this time.

14    THE MASTER:  MR-37B for identification.  Do you want to give

15  this to the clerk?

16    (Map marked Defendant Halde's Exhibit MR-37B for identifi-

17  cation.)

18    MR. HALDE:  Perhaps he has a red pencil there that would be

19  easier to mark with.  May we borrow a red pencil from you, then?

20    Q  If you would, Colonel, whenever you feel you have studied

21  this sufficiently, mark the area on this diagram where you feel

22  there is ground water storage along the creek.

23    A  Referring to Plaintiff's Exhibit MR-34, the area mapped

24  as alluvium extending downstream in Rainbow Valley into Section

25  11, 9 South, 3 West, enters the particular sixteenth of a

Section which we are discussing here, namely, the southwest

1  quarter of the northeast quarter of Section 11, 9 South, 3

2  West. So, Mr. Halde, just roughly on this MR-37B for identifi-

3  cation I will indicate that a narrow band of alluvium joins

4  Rainbow Creek extending from the easterly boundary of the 40,

5  and as the creek leaves the property inthe southwest corner

6  there is again some alluvial material which I have indicated in

7  red. And the portions in between those has very little alluvium

8  whatsoever. I would say that the portions encircled in red on

9  MR-37B are generally the alluvial portions found in the property,

10  or portions of alluvium found in the property in which you

11  could best expect to find ground water.

12      Q  Colonel, did I understand you correctly? Are you

13  saying there is no alluvium between the two red marks that you

14  place on this 37B?

15      A  There is very little, and on this scale here you would

16  undoubtedly have some more refinement of the outline to that

17  alluvial body.

18      Q  Is that something that is visually apparent?

19      A  Yes, sir.

20      Q  Don't you have to make test borings in order to determine

21  whether there is ground water present in any given area?

22      A  Yes, sir.

23      Q  Did you make any test bores in this particular instance?

24      A  Well, we bored some shallow holes in there but we didn't

25  drill out the area with the idea of locating ground water.

1  Q  Where did you drill any test bores on this particular

2  property?

3  A  We bored test holes in making our soil survey and we

4  bored holes in each one of these areas delineated as a soil

5  site found in the map contained in Plaintiff's Exhibit MR-37.

6  Q  Did you drill any holes whatsoever along the creek bed in

7  order to determine whether or not there was any water along

8  Rainbow Creek?

9  A  Mr. Halde, I have stated we drilled no holes with the

10  intent of attempting to locate water.

11  Q  Then as a matter of fact it is true, is it not, Colonel,

12  that you don't know whether or not there is any ground water

13  below that creek or not.

14  A  No, sir, I don't.

15  Q  All right.  It would then be inconsistent -- your report

16  MR-37 would be completely inconsistent, would it not, with the

17  previous report that you had  back in 1952 when you referred to

18  the presence or absence of ground water on the property; isn't

19  that correct?

20  A  Perhaps if you are going to discuss inconsistencies with

21  that report, Mr. Halde, you had better let me read it and

22  refresh my memory.

23  Q  Fine.  Directing your attention to page 3, the last

24  sentence of the second paragraph, would you read that?

25  A  Yes, sir.  That statement is inconsistent with the one in

42?

1   the current report.

2      MR. HALDE:  May I read that into the record, your Honor?

3      THE MASTER:  Sure.

4      MR. HALDE:  Referring to page 3, the last sentence of para-

5   graph 2 on said page of the report of April, 1952, it states:

6         "It is believed that the alluvial material is suffi-

7   cient" --

8      MR. VEEDER:  Excuse me, Mr.Halde.  I would suggest this be

9   marked as an exhibit, the other report, to the end we can

10  cross-examine and perhaps rebut some of this or explain certainly

11  what is said to be an inconsistency.

12     MR. HALDE:  I have no objection to that.

13     THE MASTER:  Very well.  Then this will be marked Exhibit

14  MR-37C.

15     MR. HALDE:  Do you have an extra copy of it?

16     MR. VEEDER:  Yes, I do.

17     MR. HALDE:  Perhaps he can offer it, then.

18     MR. VEEDER:  What we will do is offer this and withdraw it,

19  and substitute, if we may.

20     THE MASTER:  Very well.

21     MR. HALDE:  That is fair enough.

22     MR. VEEDER:  Is that agreeable to you?

23     MR. HALDE:  Surely.  In any event, to go on, it states: --

24     THE MASTER:  Do you wish to have that marked?

25     MR. VEEDER:  I don't want the whole file marked.  I am sorry

2954

1    to interrupt counsel.

2        MR. HALDE:   That is quite all right.

3        MR. VEEDER:   This will be Exhibit 37C?

4        THE MASTER:   The 1952 report then will be received in

5    evidence as Exhibit MR-37C, with the right to remove it and

6    substitute a copy.

7        (1952 report received in evidence as Defendant Halde's

8    Exhibit MR-37C.)

9        MR. VEEDER:   Thank you.

10       MR. HALDE:   Thank you, your Honor.

11       For the record, if we may, reference is made to that one

12   sentence of the latter report just offered.   It is as follows:

13           "It is believed that alluvial material of sufficient

14       thickness exists to serve as a substantial underground

15       reservoir."

16       Q  Colonel, in connection with the physical findings of the

17   alluvium as you just marked on this other exhibit, No. MR-37B,

18   is it your opinion that these red marks are of less than 400

19   feet in width?

20       A  Well, I will refer again to Plaintiff's Exhibit MR-34,

21   and it will be noted that this particular sixteenth of a

22   section we are discussing has a rather large body of residuum

23   mapped on it.   And what was identified as alluvium in this 1952

24   report in the valley floor has been more recently and more

25   recently and more properly identified as residuum.

1    Q   Well, --

2    A   So that is what resulted in the difference here in the

3    two reports.  As far as the alluvium is concerned, Mr. Halde,

4    it is probably not 400 feet wide.

5    Q   But needless to say, there is an inconsistency relative

6    to the opinion of the extent of this alluvium; isn't that

7    true?

8    A   This last opinion is more reliable.  It is based on more

9    study.

10    Q   I see.  Now, you visited the north portion of this

11    particular property, did you not?  By that I mean that portion

12    north of the county road.  The county road about divides it.

13    A   Yes, sir.

14    Q   And I believe your report indicates there is present

15    what you referred to on page 3 as a swimming pool on the northern

16    half of the property with a capacity of about 30,000 gallons.

17    On the third paragraph of page 3 of MR-37.

18    A   Yes, sir.

19    Q   I am referring to this exhibit, 37-B.  Where would you

20    place it on this map, the swimming pool that you are referring

21    to?

22    A   Well, the swimming pool is shown on Plaintiff's MR --

23    Is this the plaintiff's exhibit?

24    MR. VEEDER:  Well, yes, MR-37C.

25    THE WITNESS:  MR-37C, with the symbol indicated as a

1    reservoir.

2    BY MR. HALDE:

3        Q  You didn't physically visit that, then.  You are referring

4    now to the report of April, '52, aren't you?

5        A  Well, Mr. Halde, the report of MR-37 indicates that we

6    took the engineering data from the report of '52.

7        Q  All right.

8        A  On page 2 it states the engineering data that follows is

9    taken from the engineering report compiled by this office

10   dated April 14, '52.

11       Q  Well, referring to that report, then, the one of April

12   of  '52, is there any reference to a 30,000 gallon swimming

13   pool on the northern portion of the property?

14       A  Yes, sir.

15       Q  Where do you find that?

16       A  The top of page 2 on MR-37C.  It says there is a swimming

17   pool of about 30,000 gallons capacity.

18       Q  Does that relate  to the northern half of the property?

19       A  In the narrative it doesn't identify it, Mr. Halde, as to

20   which portion of the property it is in.

21       Q  As a matter of fact, it is the 30,000 gallon swimming

22   pool right behind Mr. Halde's house, isn't it?

23       A  Well, I suppose if you say there is a 30,000 gallon

24   swimming pool there and there is one, it is.

25       MR. VEEDER:  I move to strike the statement, because it may

1    become important.  And certainly counsel is not under oath and

2    the witness certainly was being facetious when he agreed to

3    this.  I think we will have to check this matter out.

4         THE MASTER:  The answer may be stricken.  If you wish to

5    make any further inquiry, you may.

6         MR. HALDE:  I will, your Honor.

7         Q  Referring to page 2 -- rather, page 1 of that report of

8    April, '52, and the next to the last paragraph, the first

9    sentence therein, it says there is one ground storage reservoir

10   about 1,500,000 gallons capacity in that report.  Now, Colonel,

11   isn't it consistent with your findings that what you referred

12   to in your latter report as the swimming pool is in fact the

13   ground storage reservoir on the northern half of the property?

14        A  I would have to check that out, Mr. Halde.

15        Q  All right, fine.  Now, did you physically inspect the

16   other storage reservoirs or check dams that you found on the

17   property yourself?

18        A  No, sir.  I haven't been up there to those check dams.

19        Q  I notice in MR-37 you indicate on page 3, the second

20   paragraph, in referring to these the record I believe shows that

21   you state one has a capacity of about five acre feet and the

22   other about six acre feet.  How did you arrive at those figures,

23   Colonel, from what source?

24        A  An engineer under my supervision went out and measured

25   the area and the depth to arrive at an approximation of the

storage volume.

Q   Who was the engineer that did this?

A   Lt. Woods.

Q   Were his findings reduced to writing and incorporated herein?

A   Yes, sir.

Q   What reference do you have?

A   I beg pardon?

Q   Where do you have a reference to Lt. Woods' findings in that connection?

A   I just told you about it.

Q   Well, do you have some other document you are referring to?

A   No, sir. I am referring to my memory.

Q   To your own memory.  I see.  This is something he told you, then, instead of something you as a matter of fact know of your own knowledge?

A   He was working under my supervision when he went out there and made these measurements.

Q   Did he survey it with a transit, do you know?

A   I rather doubt that he did.

Q   He made a rough estimate or guess, didn't he?

A   No, sir.

MR. VEEDER:   I object to the question.   It is double-barrelled, he made a rough estimate or guess.   Now, you have one -- an

1    estimate is one.

2    MR. HALDE:  I will agree it is compound and I will withdraw

3    it, and ask it again.

4    Q  He was just guessing, was he not, Colonel, when he made

5    those figures?

6    A  No, sir.

7    THE MASTER:  Incidentally, Mr. Halde, I have interpreted the

8    witness's testimony so far to indicate that Lt. Woods reduced

9    his report to writing and that Col. Bowen has examined that

10   written report.  That is the impression which I have from his

11   testimony today.  If you believe the testimony does not bear

12   that out, you then would have the right to ask further questions.

13   MR. VEEDER:  It is immaterial.  It is also improper cross-

14   examination.  I fully intend to later --

15   BY MR. HALDE:

16   Q  In any event, that report is not here in this room today,

17   Colonel?

18   A  You mean the original from which this final report was

19   made?  No, sir.

20   Q  It hasn't been offered in evidence, so far as you know?

21   A  No, it is all contained in MR-37.

22   Q  As a matter of fact, the information contained in Plaintiff

23   MR-37 is merely your conclusions based on other information

24   that has been supplied to you; isn't that correct?

25   A  Well, I have made some field checks, Mr. Halde, to

1    support the conclusions arrived at.

2        Q  But in connection with all of the statement, you made no

3    physical inspection of the dams.  That was something someone

4    told you, wasn't it?

5        A  Yes, sir.  I relied on people working under my supervision

6    to go out and get the details.

7        Q  As a matter of fact, most of the report contained in

8    MR-37 is a result of someone else's investigation and not your

9    own; isn't that correct?

10       MR. VEEDER: I object to this, your Honor.  I object to this.

11   The witness has been qualified long ago and has been shown to

12   have under supervision men who are doing the work for him, and

13   under his direction.  And this evidence is offered based upon

14   that factual situation.  Certainly Col. Bowen couldn't be

15   expected to go out and walk over every foot of the way.  And if

16   there is something wrong with this report, we are anxious to

17   run it through ourselves.  I feel that the government has done

18   all that it can in these matters, and it is certainly desirous,

19   and I know Col. Bowen of all people is desirous, of being

20   accurate in these matters.  And I think what we would like to

21   do in this regard is to go out, check this thing once more, and

22   offer some additional evidence.  I don't believe that will

23   impose on counsel.  He will be advised of all the facts.  We

24   have no desire to make any one -- I am objecting strenuously to

25   what amounts to a pretty harsh cross-examination of Col. Bowen.

We all know how he has done this work.   We know it has been
under his direction.   And we will straighten these things out.
I don't believe there is any great inconsistency.   All we can
do is supplement the report, and we will take care of it, your
Honor.

THE MASTER:   I think the objection to the question is
probably well taken on the basis it is calling for the opinion
of the witness.   I think the evidence already given, plus any
other evidence which counsel wishes to offer as to the actual
method used in creating this information, would be proper.   But
the objection to the particular question is sustained.

MR. HALDE:   Thank you, your Honor.   I don't believe there is
going to be any problem in this connection.   We all appreciate
Col. Bowen's position.   My only reason for going into this is
to show that the government has made two separate independent
examinations of the property, and there is presently in
evidence two reports which are substantially inconsistent with
the physical findings made on the two separate times.   For the
Court's consideration, for whatever purpose it might show, we
intend to at this time adopt a portion of MR-37 and will not
refute the findings found on page 3, paragraph 4, where it
refers to future potential water uses insofar as they are
concerned with agricultural developments of 74 acre feet per
year.   And we will adopt that finding as, insofar as it is
consistent with agricultural development, a figure that we feel

1    is fair, and giving all credence to Col. Bowen and his staff.

2    MR. VEEDER:  Well, the United States asks leave, your Honor,

3    to leave this matter open, to further investigate this, to

4    advise Mr. Halde as to the result of it, and at some subsequent

5    time to conclude this matter.  I would rather not cross-examine

6    at this time, or whatever my examination would be under the

7    circumstances.

8    THE MASTER:  I take it it would be redirect examination.

9    MR. VEEDER:  You name it, your Honor.

10   THE MASTER:  That leave will be granted, provided that Mr.

11   Halde is given ample opportunity to be present, if he desires

12   to, at the presentation of any such evidence, and again to

13   offer any further evidence to rebut this new evidence.

14   MR. HALDE:  Thank you, your Honor.  I do have a considerable

15   distance to come.

16   MR. VEEDER:  We will get the results of the report to you,

17   Mr. Halde, and perhaps it will be unnecessary for you to make

18   the trip.

19   MR. HALDE:  O. K., fine.  I have no further questions of

20   the Colonel at this time.

21   MR. VEEDER:  We have no questions, your Honor, at this time.

22   MR. SACHSE:  I have no questions.

23   THE MASTER:  Do you wish to offer any further testimony?

24   MR. HALDE:  Yes, I do, your Honor.  I would like to call

25   Carl Halde very briefly.

1      THE MASTER:  Very well.

2

3                    CARL N. HALDE,

4  one of the defendants herein, called as a witness in his own

5  behalf, sworn, testified as follows:

6

7                    DIRECT EXAMINATION

8

9  BY MR. HALDE:

10     Q  Mr. Halde, you are one of the defendants in this action,

11  are you?

12     A  That is right.

13     Q  And you have been present during the testimony concerning

14  the northeast quarter of the southwest quarter, Section 11,

15  Township 9, Range 3 West?

16     A  Yes.

17     Q  Is that your property?

18     A  Yes, it is.

19     Q  When did you acquire this property, Mr. Halde?

20     A  In 1946.

21     Q  Generally how many acres does it consist of?

22     A  Well, it consists of 40 acres, less the roadways.  They

23  have taken out for highways.  It makes it about 37.5 now.

24     Q  In connection with that particular property, is there a

25  stream running through it?

1    A  Yes, there is.  Rainbow Creek runs through it in wet

2  weather.

3    Q  Will you describe generally where it runs?

4    A  Well, the creek comes in on the easterly border, approxi-

5  mately halfway, and winds around and goes out at the southwest

6  corner.

7    Q  And generally what is the length of that particular

8  creek on your property?

9    A  Well, it is about 12, 13 hundred feet, the way it winds.

10    Q  During the course of your ownership of this property,

11  have you ever conducted any tests to determine whether or not

12  there was any ground water in it?

13    A  Yes, I have.

14    Q  And how many tests or test bores, or whatever it is you

15  have done, have you conducted?

16    A  Well, approximately probably 200, maybe.

17    Q  Generally in what area did you conduct these tests?

18    A  Well, along Rainbow Creek, both sides of it.  And also

19  another little branch canyon that comes into it.

20    Q  For the moment, considering the tests you made along

21  Rainbow Creek, did you find ground water or water in the test

22  holes?

23    A   Yes.

24    MR. VEEDER:  I am going to object, your Honor.  The witness

25  has not qualified.  There is no basis whatever for his statement

1    in regard to ground water, his tests for ground water.  And

2    there is nothing to show he has the background or training to

3    make an investigation in regard to the question of ground water.

4        MR. HALDE:  I don't think, your Honor, you have to be an

5    expert in order to testify whether or not you find water in the

6    bottom of a hole.

7        MR. VEEDER:  Well, it is quite one thing, your Honor, in my

8    view, to say a man went out and dug a hole and found water.  It

9    is quite another to say he conducted tests for the purpose of

10   ascertaining the presence and the quantities and locations of

11   ground water.  And I renew my objection that this witness has

12   not been qualified.

13       THE MASTER:  I believe the witness may state what acts

14   he performed and what he found, and whether or not that would

15   constitute ground water would be a matter which the Court would

16   eventually have to determine, based upon that and other evidence.

17   So without having the witness attempt to characterize the nature

18   of the water, if any, that he found, he may testify to the holes

19   which he dug and whatever the results of the digging was.  So

20   the objection will be overruled.

21   BY MR. HALDE:

22       Q  Can you describe for the Court, Mr. Halde, generally what

23   you did in making these tests?

24       A  Well, I have drilled down with a posthole augur and a

25   test hole drill and I have done it continuously practically

1   every year to just -- I never have missed.  There is always

2   water in there.  There is right today.

3   Q  Over the course of your ownership of this land have there

4   been years that have been drier than others insofar as rainfall

5   is concerned?

6   A  Yes.

7   Q  And did you conduct any tests in the drier years?

8   A  Yes, sir.

9   Q  And what were your findings insofar as the tests were

10  concerned?

11  A  As far as tests, I always found water.

12  Q  Has there ever been a time when you haven't found water

13  in making these tests?

14  A  No, there hasn't.

15  Q  All right.  Now, Mr. Halde, after you acquired this

16  property did you have any intentions as to the development of

17  the northern portion of the property?

18  MR. VEEDER:  I object, your Honor, regarding intentions.

19  MR. HALDE: May I finish my question, counsel?

20  THE MASTER:  You may proceed.

21  MR. VEEDER:  Let him finish the question.

22  THE MASTER:  You may finish the question.

23  MR. HALDE:  All right.

24  Q  After you acquired this property, did you have any

25  intentions of developing the property, the northern portion of

1    the property to any extent other than agriculturally?

2       A   Yes.

3       MR. VEEDER:   I object, your Honor, on the grounds that it

4    is incompetent, irrelevant, and immaterial, and not tending to

5    prove any issue in the case.   What his intentions were has not

6    one thing to do in regard to the availability of ground water

7    or the availability of water or the issues in a quiet title

8    proceedings.   And what does the intention have to do with this

9    matter?

10      THE MASTER:   The question may possibly be irrelevant, but I

11   don't believe the answer will be particularly lengthy.   And I

12   think I will permit the witness to answer it for whatever value

13   it may have.

14      MR.HALDE:   Your Honor, we would like to find out -- at this

15   time it is a foundation-laying question, to be followed up by

16   other questions along the line.   And I would like to, if there

17   is going to be an objection each time we ask a question of this

18   similar nature, to make an offer of proof subject to a motion to

19   strike.   In that way the Court can hear it.

20      MR. VEEDER:   Just so I have a continuing objection.

21      THE MASTER:   Very well.   The objection has been overruled.

22   BY MR. HALDE:

23      Q   What was your intention as to the development of the

24   northern portion of your property except for agricultural

25   purposes?

1    A   Well, my intentions were to put in a fish pool, fish pond,

2   commercial fish pond.

3    Q   And referring to the exhibit which has been identified as

4   MR-37B, can you point out the area wherein you intended to do

5   that?

6    A   Well, the area is in the northern section, right where the

7   dam is today that is started there.   That is this one  and this

8   one here.

9    THE MASTER:   That is, by the reference to "this one" and

10   "this one here" --

11    THE WITNESS:   Yes.

12    THE MASTER: -- you referred to two double lines running across

13   the map from one side to the other shortly above the course of

14   Rainbow Creek?

15    THE WITNESS:   Yes, sir.

16   BY MR. HALDE:

17    Q   And in that connection did you do anything physically to

18   the property in furtherance of that intention?

19    A   Do anything what?

20    Q   Did you do anything physically to the property in further-

21   ance of your intention?

22    A   Well, I started to put in the check dams, two check dams.

23    Q   Those are the ones you just described?

24    A   That is right.

25    MR. HALDE:   I have a photograph.   I would like the witness to

1   identify it.   Maybe we can mark it for identification.

2      Q   What does this picture depict, Mr. Halde?

3      A   This is a picture of water accumulated behind the check

4   dam, the northerly --

5      Q   Which of the check dams are you referring to?

6      A   The northerly check dam.

7      THE MASTER:   Will you mark that with an X on Plaintiff's

8   Exhibit MR-37B for identification?

9      Can you mark the picture then MR-37D for identification?
   (Photograph marked Plaintiff's Exhibit MR-37D for identification.)

10      MR. VEEDER:   I am going to object to the offer, your Honor,

11   on the grounds it goes beyond the scope of the pleadings.

12   Certainly the witness is testifying in regard to an appropriative

13   right.   There is not a scintilla of evidence that there has

14   been compliance with state law.   This is the first time I have

15   ever said that.   And he has claimed a riparian right to store

16   water, and manifestly there is no right of that character

17   within the riparian tenure.

18      I refer in that regard to the ninth separate and distinct

19   affirmative defense, which says:

20         "In addition to ordinary riparian uses, defendants

21      and each of them have the right to store and use annually

22      the sum of approximately five acre feet per acre from the

23      Rainbow Creek, for a total sum of approximately 200 acre

24      feet per annum."

25      Now, I admit the ambiguity.   But nevertheless, reading the

1    pleadings, giving them every break in regard to the pleading,

2    I submit that he is now endeavoring to prove a riparian right

3    that cannot possibly be exercised under the circumstances,

4    and that this evidence goes far beyond the pleadings.

5        MR. HALDE:  May I be heard on it at the proper time, your

6    Honor?

7        THE MASTER:  You may be heard right now.

8        MR. HALDE:  Have you finished, Mr. Veeder?

9        MR. VEEDER:  I hesitated a moment there.  Go ahead.

10       THE MASTER:  Very well, Mr. Veeder.

11       MR. VEEDER:  No, he may go ahead.

12       MR. HALDE:  Your Honor, we take the position quite contrary

13   to Mr. Veeder.  We take the position that the Supreme Court of

14   the State of California in the case of Prather vs. Holberg

15   has already decided you don't necessarily have to have an

16   agricultural use to satisfy a riparian right.  A beneficial

17   use can be other than agricultural.  And it is our intention

18   that in this particular instance any impounding of water for

19   the use of fish, that that is within the terms of a riparian

20   right.  That there can be a beneficial use acquired, too, and

21   we intend to show how much water was in fact impounded and how

22   much water need be impounded to carry out this project.  And

23   that is a use that the court should consider in making apportion-

24   ment, if they are going to make apportionment.

25       MR. SACHSE:  Your Honor, the millenium has arrived.  I am

1  concurring in Mr. Veeder's objection. I think the evidence is

2  inadmissible.   I think it is disposed of in Judge Carter's

3  pre-trial opinion. And I think Mr. Halde is confusing what

4  may be a proper riparian use of water for a fish pond and the

5  acquisition of a right to impound the water. The riparian

6  as such has no right to impound any water. If he is going to

7  impound it, he is going to impound it under a State permit.

8  And there is no evidence of a permit here. I don't believe

9  this evidence should be admitted in the absence of some State

10  appropriation.

11     MR. VEEDER: May I gild the lily here? The millenium has

12  arrived. We, of course, take the position that a riparian

13  owner can use and exercise riparian right for any use. Bene-

14  ficial use is the full criterion. We are using water for

15  military purposes. Mr. Sachse may not agree. But, in any

16  event, we do say it goes beyond the scope of the pleadings.

17  This is not a riparian right. All he is claiming is a riparian

18  right, and we certainly object to any further evidence on it.

19     THE MASTER: I believe, Mr. Halde, the argument which you

20  advanced does not establish the admissibility of this particular

21  evidence because there is no question of the fact that this

22  would be a proper riparian use but the evidence you are seeking

23  to introduce does not support a riparian use, as has been

24  pointed out.

25     MR. HALDE: Well, your Honor, I, of course, would like to

1   reiterate I feel the Supreme Court of the State of California

2   have already decided this question relative to whether or

3   not it is a riparian use, in the case of Prather vs. Holberg.

4       THE MASTER:   I think we are all agreed it is proper riparian

5   use, but the question is the testimony you are now seeking to

6   introduce does not relate to riparian use.

7       MR. HALDE:   The objection was made I believe on the ground

8   this testimony was as against a prescriptive use and not --

9       THE MASTER:   Appropriative.

10      MR. HALDE:   Appropriative use, that is right.

11      THE MASTER:   On the basis the riparian has no right to store.

12      MR. HALDE:   It is our contention insofar as this particular

13  impounding of water is concerned it is not a storage, it is

14  not something that is storage for a future use, but is used

15  at the time that it is impounded.

16      MR. VEEDER:   That is precisely the point.

17      THE MASTER:   The objection will be sustained.   You may make

18  an offer of proof if you wish.

19      MR. HALDE:   Well, the point I am trying to get at, your

20  Honor, is this:   I would like to have --

21      MR. VEEDER:   Is this the offer?

22      THE MASTER:   Do you want to make an offer of proof through

23  this witness?

24      MR. HALDE:   Yes, I would like to have this witness testify

25  to the physical facts relative to the amount of water needed in

1    this operation and the amount of water actually used in this

2    operation in the past, so that the Court can be aware of those

3    physical facts in the event that it is later determined

4    that our contention is proper.

5        THE MASTER:  You may make an offer of what you would prove

6    by this witness.

7    BY MR. HALDE:

8        Q  All right, Mr. Halde, --

9        MR. VEEDER: I object, your Honor.

10        THE MASTER:  That would be your statement as to what you

11    would prove by him if he were permitted to answer the question.

12        MR.HALDE:  The physical facts regarding the amount of water

13    needed in this particular instance and the matter of water

14    actually used in this instance.

15        THE MASTER:  Will you state then what he would testify to?

16        MR. HALDE:  He will testify to the areas of the various

17    check dams, the amount of water that can be impounded.

18        MR. VEEDER:  I didn't intend to be so emphatic, your Honor,

19    but that is not an offer of proof.

20        THE MASTER:  The offer of proof would be your own statement

21    as to the evidence that he would state if he were to answer

22    the question.

23        MR. VEEDER:  Let the record show Mr. Sachse has moved away.

24    The millenium is over.

25        MR. HALDE:  Insofar as this is concerned, your Honor, the

testimony of this witness will show that this area behind the

northernmost check dam will require on its completion 25 acre

feet per annum for immediate utilization as a commercial --

or rather a fishing pond.  At the lower check dam it will

require for immediate utilization on its completion ten acre

feet per annum.  For a total of 35 acre feet per annum.  And in

addition thereto, there will be certain losses that this witness

will show, bringing the totals up to approximately 75 to 80

acre feet per annum to be used in this instance.

THE MASTER:  That is to be used for a commercial fish pond?

MR. HALDE:  That is right.

MR. SACHSE:  If your Honor please, I would object to the

offer of proof on the ground -- I don't have my Water Code here

with me.  I can't give you the section.  But any impoundment of

25 acre feet in California under the provisions of the California

Water Code can only be accomplished through the vehicle of an

appropriation.  I don't care whether a man is a riparian or

not.  The impoundment of that amount of water requires an

appropriation.

The pre-trial opinion in this case stated that the water

laws of the State of California apply.   And the very offer of

proof of Mr. Halde clearly establishes that this impoundment

could only be accomplished through an appropriation before the

Water Rights Board.

MR. VEEDER:  I am going to object to the offer of proof as not

1    being in proper form, to begin with.  And secondly, I think it

2    is at variance with the pleading.  And I submit that an offer

3    of proof can't depart from the pleading.

4         In addition to ordainary riparian uses, so forth and    so

5    forth, for a total sum of approximately 200 acre feet per annum.

6         Now, I couldn't -- from his statement I couldn't calculate

7    what he was talking about.  From the standpoint of the aggregate

8    demand of the stream, 200 acre feet in a stream of that kind is

9    a lot of water.  If he is claiming 200 acre feet, fine.  If he

10   is not, I think we should have the pleading corrected.  We are

11   going to have to meet that.

12   THE MASTER:  Insofar as the contention that the allegations

13   in the pleadings are in excess of the amount now sought, I don't

14   think that constitutes a variance any more than alleging in a

15   damage action you have been injured in the extent of $10,000

16   and establishing you have been damaged to the extent of $5,000

17   constitutes a variance.

18        The offer of proof would be denied, though, upon the basis

19   set forth by Mr. Sachse, that under the provisions of the

20   Water Code an appropriation of that amount would require a

21   permit.

22   MR. VEEDER:  Well, I raised the point, your Honor.  If there

23   is going to be a remittitur or a reduction, then the pleadings

24   should be amended accordingly and amended now.

25        THE MASTER:  I don't think that is a sound basis of objection,

1    Mr. Veeder.  In other words, a party can claim more than the

2    proof shows he is entitled to, and you don't have to amend the

3    pleadings down to the exact point the evidence shows.

4         MR. HALDE:  Let's make the plaintiff amend its complaint

5    too, your Honor.  They have alleged the water use of practically

6    every acre in San Diego is 4.3 acre feet per acre, or something

7    of that nature.

8         THE MASTER:  I have held against Mr. Veeder on that point,

9    Mr. Halde, so you don't need to worry about that.

10        MR. HALDE:  In any event, your Honor, I assume my offer is

11   rejected at this time.

12        THE MASTER:  It is rejected on the basis set forth by Mr.

13   Sachse that it would require a permit, and there has been no

14   evidence of a permit to appropriate water to that extent.

15        MR. HALDE:  I don't believe Judge Carter's pre-trial opinion

16   precluded us from -- or pre-trial order precluded us from

17   putting on evidence of riparian uses.

18        THE MASTER:  That is quite correct.  And there is no effort

19   to prevent you from putting on evidence of riparian uses.  But

20   the basis is that this evidence would relate to an appropriative

21   rather than a riparian use.

22        MR. HALDE:  Well, that is a matter that I think has not been

23   yet determined, either by Judge Carter or by this court in this

24   particular case.  I think we are the first to bring up the

25   question of whether or not water for the use of a fishing pond

is a riparian use.  And it is our contention under the Prather
case that it is, because it is something that is needed
immediately in order to sustain the life of the animal -- or
the fish, rather.  You have got to have water.  They won't
live without it.  So the matter of using the water immediately
is in our opinion a riparian use that is subject to evidence
in this particular instance, and subject to this case insofar
as apportionment is concerned, if there is going to be an
apportionment.

MR. VEEDER:  I would agree the fishery is a proper riparian
use, your Honor.

THE MASTER:  Yes, there is no question on that.

MR. VEEDER:  And the only thing we object to is his appro-
priative right, the original objection that was made.

MR. SACHSE:  Could I take a whack at this Prather case?  I
am thoroughly familiar with it.  It has been cited in some of
the Fallbrook briefs.

Now, Prather against Holberg is a case of two riparians, and
furthermore, the only two riparians on this particular short
stream.  They control the entire stream between the two of them.
They both ran resorts, with fish ponds, swimming pools, that
type of use.  And they were the only users on the stream.  They
owned the entire riparian water and there were no appropriative
rights.  So the decision in the Prather vs. Holberg simply is
that as one riparian against another these were proper uses.

It was a case of the pot calling the kettle black, so to speak.  Both of them were contesting the same kind of use. There could be no interference.  The court could not interfere in behalf of one riparian as against the other.  But the court at no time in Prather vs. Holberg recognizes or in any way overthrows the fundamental law of the State that a riparian can't impound.  All he can do is back up water long enough to get a head for irrigation purposes.  That is Hornbook water law in California.

While the use of running water to support fishing is a proper use, the impounding of that water to create a pond to keep these fish in can be accomplished only under an appropriation.  And I again concur in the objection of the United States. I think that this is improper evidence of a riparian use, and if Defendant Halde is attempting to prove an appropriation, then the evidence is inadmissible under Judge Carter's pre-trial ruling to the effect that appropriations since 1923 shall be accomplished under State law.   And there is no evidence of a filing.  So if he is proving an appropriative right and there is no evidence of a filing, it is inadmissible.

MR. HALDE:  This calls for some argument, if I may, your Honor.  If we are going to start talking about Hornbook law, I think insofar as the law is concerned that a riparian use is prior to an appropriative use.  A riparian owner has the right to use the water before an appropriator.

1    THE MASTER:  There is no question about that.

2    MR. HALDE:  There is no question that is fundamental, I

3    think.

4    Now, in connection with storing or impounding waters, if you

5    are going to store or impound water for agricultural use I

6    would say that is strictly an appropriative use.  You have to

7    file with the State Water Rights Board, and the first to file

8    has the priority.  But where you are building a check dam in

9    accordance with various practices of -- in accordance with the

10   Agricultural Department's recommendation and the waters that

11   are naturally impounded by the check dams are used immediately

12   for the production of fish, I submit that that is not an

13   appropriative use.  It is a riparian use.  And that we should

14   be given the opportunity to produce evidence as to the amount

15   that would be of beneficial riparian use in this instance.

16   THE MASTER:  Now, Mr. Halde, could you establish -- would

17   you expect to establish that the water flows through the dam

18   continuously?

19   MR. HALDE:  You are darn right, if I get that far.

20   THE MASTER:  That is, the dam does not impound it so that it

21   cuts off the flow below?

22   MR. HALDE:  That is right.

23   THE MASTER:  Well, I will permit you to ask the witness

24   questions to establish that fact, subject to a motion to strike

25   which Mr. Veeder may wish to make.

1      MR. VEEDER:  I think, your Honor, I want the record clear

2      that I interpose an objection first as to the form.  I have

3      several objections, but one objection to which your Honor did

4      not allude was the form as to the offer of proof.  I think in

5      this matter it is essential he follow the proper form of

6      offer of proof.  I don't think he did.  Just so my record --

7      you have overruled the objection, but I want it very clear.

8      THE MASTER:  Gentlemen, the record shows you objected to the

9      form of the offer of proof.

10     MR. HALDE:  May I proceed, your Honor, or would you like to

11     take the morning recess?

12     THE MASTER:  Yes, we might take a short recess and then

13     we will proceed in five minutes.

14     (Recess.)

15     MR. HALDE:  May I resume?

16     THE MASTER:  Yes, court is now in session.

17     MR. HALDE:  Before I forget it, I would like to offer these

18     two exhibits which have been offered for identification into

19     evidence at this time, 37B and 37C.

20     MR. VEEDER:  I am going to object certainly to 37B as being

21     part of the evidence in regard to the impoundment of water.

22     I assume my objection is going to be overruled.

23     MR. SACHSE:  I have no objection to it going in evidence.

24     THE MASTER:  Exhibits MR-37B and C will be received in

25     evidence.

BY MR. HALDE:

Q   Mr. Halde, in connection with the check dam that is presently in existence, when was that built?

A   That was built in 1926.

Q   That is the same one that is marked X on 37B; is that right?

A   That is right.

Q   Is that the same one that is photographed -- depicted in the photograph marked MR-37D?

A   The same one.

Q   Now, sir, in connection with the pond that picture depicts, is that something that stays continuously there?

A   No, it runs through. It runs --

Q   Does the water run down the stream?

A   Yes, sir.

Q   In the Rainbow Creek?

A   That is right.

Q   And when is this pond filled, ordinarily?

A   Well, it is filled every runoff we have in the rain.

Q   Is any other water used to supplement it at this time?

A   Well, just those two check dams.

Q   You don't pump anything into it, do you?

A   Not at the present time.

Q   All right.  And based upon your knowledge of the property, have you an estimate as to the amount of volume that the larger

1  of the two has?

2      MR. VEEDER:  I am going to object on the ground there is no

3  proper foundation as to the storage capacity of the structure,

4  and also there is no evidence that the witness is qualified to

5  estimate the volume of water.

6      MR. HALDE:  I will lay a little foundation.

7      THE MASTER:  Very well.

8  BY MR. HALDE:

9      Q  Mr. Halde, how old  are you, sir?

10     A  I am 66 years old.

11     Q  And have you lived in the country any portion of your

12  66 years?

13     A  Lived where?

14     Q  In the country.

15     A  Yes, I lived here all my life.

16     Q  And during the course of your existence, do you refer to

17  a field as acres?  During the course of your knowledge of living

18  in the country, do you refer to areas as being so many acres?

19     A  That is right, yes.

20     Q  Do you feel you have the ability to determine by visual

21  inspection how many acres a certain parcel of land has?

22     A  Yes.

23     Q  Do you feel you have the ability over your years of looking

24  at a piece of property such as this check dam is, this pond,

25  to determine how much capacity it has in terms of acres?

1    A  Yes.

2    MR. VEEDER:  I didn't hear the last part of that question.

3  Would you read the question?  I mean read the question and

4  answer.

5    (Record read.)

6  BY MR. HALDE:

7    Q  I am referring to the surface of the pond as an area of

8  acres.

9    A  Well, the area is -- one of them -- one acre, and the

10  other has about three acres.

11    Q  And what is the depth of the larger of the two?

12    MR. VEEDER:  I object as to the question of depth.  He must,

13  your Honor, in my view, designate the particular portion con-

14  cerning which the witness is going to testify as to depth.

15  Certainly there are shallow areas and areas which vary in depth,

16  and I think it is necessary we be advised as to the portion of

17  the impoundment concerning which his testimony as to depth is

18  concerned.

19    THE MASTER:  Can you make your question more definite, Mr.

20  Halde?

21    MR. HALDE:  I think I can.

22    Q  How deep is it at its deepest point when it is full now?

23    A  At the present time, 16 feet.  The other end, 10 feet.

24    THE MASTER:  This is the one with the surface area of three

25  acres?

1    THE WITNESS:  16 feet.

2    THE MASTER:  Yes.

3  BY MR. HALDE:

4    Q  Considering the contour of land, have you arrived at an

5  opinion as to the volume of water that is in this pond?

6    MR. VEEDER:  I am going to object, your Honor, to that.  The

7  witness is not qualified.  Certainly there is nothing to show

8  he has the capacity or the ability or the background to deter-

9  mine the volume of water impounded behind the structure.  More-

10  over, there is insufficient evidence in the record and there is

11  certainly insufficient reference in the question to permit a

12  conclusion as to the storage capacity of the structure, because

13  obviously, as we have seen from the evidence in the record, the

14  contour is a rough area.  The contour varies.  The depth of

15  portions of land seem to have an elevation a great deal higher

16  than other portions of land.  We haven't in the record the

17  evidence as to the type of the impounding barrier.  And absent

18  that kind and type of material in evidence, it would be

19  absolutely impossible to make a determination as to the number

20  of acre feet that this structure could impound.

21    THE MASTER:  I believe the objection goes to the weight

22  rather than the admissibility of the evidence, and I understand

23  that Colonel Bowen is going to examine the property, in any

24  event, so you will have opportunity to rebut the testimony if

25  you disagree with the statements the witness may make.

1   MR. VEEDER:   May I renew my objection further that it is

2   obvious that this is an appropriative right to a very large

3   degree, because he is now using the term "acre feet", and

4   certainly the acre feet of storage smacks only of the appropria-

5   tive or prescriptive right and cannot under the circumstances

6   be a riparian right.

7       It is true that a reservoir might fill up and water might

8   spill under and over, and it is true under those circumstances

9   water entering and flowing out through could be the riparian

10  yield.   But it certainly is impossible to talk about acre feet

11  and storage and depth without getting into the question of

12  appropriative rights.   And the original objection of the United

13  States is renewed in regard to this phase of the testimony.

14      THE MASTER:   The objection is overruled and the witness may

15  answer the question, which is, in general, what is the volume

16  of water behind the dam?

17      MR. VEEDER:   May I ask again, the volume of water behind the

18  dam or the maximum capacity which can be impounded?

19      THE MASTER:   The question apparently related to the amount

20  behind the dam now.   At least that is the answer the witness is

21  giving, as I understand it.

22      MR. HALDE:   As a matter of fact, there is none now, but

23  there has been in the past.   And that was the question.

24      MR. SACHSE:   The volume of water in the dam, the capacity of

25  the dam when it is full.   That is what the question was.

MR. VEEDER: I object again because there is no evidence of the high water contour here, how far the water will go back.

MR. HALDE: This appears to be a case of the pot calling the kettle black. They have offered into evidence and it has been stipulated, estimates by Col. Bowen indicating the acre feet of water impounded in these particular ponds.

MR. VEEDER: I am not calling anyone anything any more.

THE MASTER: Just a minute, the objection has been over-ruled, so the witness may answer the question without further argument of counsel.

BY MR. HALDE:

Q You can answer that, if you will, Dad.

A I have forgot the question.

MR. HALDE: That is the usual case.

Q Give us your estimate, based upon your opinion through your many years of experience, as to the volume of water that can be impounded behind the present large check dam.

A Well, it is about 25 acre feet.

Q All right. And what is your opinion based on the same experience insofar as the smaller of the two is concerned?

A Ten acre feet.

MR. HALDE: All right, I have no further questions then, your Honor.

MR. SACHSE: Your Honor, I took a moment to glance very hastily at this answer, and, of course, it has not necessarily

been served on defendants, as you are aware.  And there is an

order dispensing with cross-pleadings.  I didn't quite follow

Mr. Veeder's earlier objection, but I think I do now.  It appears

to me there is no prayer or affirmative defense of any kind set

up asserting either an appropriative or prescriptive right.  I

have read this hastily.  But I don't see any assertion of

either appropriative or prescriptive right.  And therefore I

would like at this time to move to strike all the testimony

relating to the impounding of water on Rainbow Creek on the

ground it is outside the pleadings.  If the defendant wants to

amend to assert an appropriative or prescriptive right, I have

no objection at all.  On the present state of the pleadings,

there is no basis at all.

THE MASTER:  The motion will be denied at the present time

and the Court will examine the pleadings and the testimony and

any findings which are made will be findings which are

supported by allegations in the pleadings as well as testimony.

And if the Court believes that the evidence goes beyond the

scope of the pleadings, those findings will be made with

reference to such evidence.

I would like to ask the witness two or three questions

myself.

Q  You stated, Mr. Halde, that you had made certain tests

and that you had dug holes with a post hole augur and so forth,

I believe.

1    A   That is right.

2    Q   How deep are the holes?

3    A   All the way from three to 12, 14 feet deep or deeper.

4    Q   And were they dug in the bed of the stream?

5    A   And along the side and in the bed and along the side of

6    it.

7    Q   How far from the center of the stream were the ones which

8    you say were along the side?

9    A   I would say the longest one is probably -- approximately

10   150 feet out from the center of the channel.

11   Q   In what portions of the stream bed as it progresses

12   through your property were the holes dug?

13   A   From the creek bottom where it enters, to where it leaves

14   my property.

15   Q   That is the easterly part, the center part and the south-

16   westerly part?

17   A   That is right.  And some in the northerly part where the

18   dry stream comes through.

19   Q   Now, how does the water flow through the dam?

20   A   It percolates through it.

21   Q   That is, there is no spillway as such?

22   A   There is a spillway.

23   Q   That is at the top of the dam?

24   A   That is right.

25   Q   Is there any type of discharge method through the dam

1    itself other than percolation?

2        A  No.

3        Q  That is, when the water flows into the dam none can go

4    below it unless it has reached the top of the spillway or unless

5    it seeps through; is that correct?

6        A  That is right.

7        THE MASTER:  Very well.

8        MR. VEEDER:  I am going to reserve cross-examination until

9    after we have made our investigation and made the report, Mr.

10   Halde.  And I think we can do a better job and a shorter job

11   and perhaps even eliminate some of it, your Honor, in the light

12   of the record now.

13       MR. SACHSE:  No questions, your Honor.

14       THE MASTER:  Is there any further testimony then you wish to

15   present, Mr. Halde?

16       MR. HALDE:  No, your Honor.  That is all so far as we are

17   concerned.

18       THE MASTER:  Very well.  Then, as I understand it, the

19   Government will have Col. Bowen make a further report or investi-

20   gation upon this report and will then advise Mr. Halde of the

21   results of that revised investigation.  And an opportunity will

22   be given to either side at a later date then to present additional

23   evidence, if either side so desires.

24       MR. VEEDER:  And cross-examine, if we so desire.  I will try

25   to avoid it, because I realize they have to come some distance.

1    THE MASTER:  Very well.

2    MR. HALDE:  In connection with the cross-examination that Mr.

3    Veeder has reserved, if he is going to defer that to a later

4    date, can we have a transcript of this morning's proceedings

5    prepared at the Government's expense so we will have the

6    opportunity to object to anything that might be beyond the

7    scope of this cross-examination?

8    MR. VEEDER:  I am not going to agree to that.

9    MR. HALDE:  Otherwise I would like to have the --

10   MR. VEEDER:  I will tell you what I will do.  I will make a

11   copy of our transcript available to you.  I am not going to

12   assume the responsibility of paying for another copy.  Where,

13   Mr. Halde, do you live?

14   MR. HALDE:  Santa Barbara.  I have approximately 200 miles

15   to come down here.

16   MR. VEEDER:  I understand your problem.  We will get you a

17   copy of the transcript.  But I would be reluctant to cross-

18   examine.  It may not be necessary.

19   THE MASTER:  Very well.

20   MR. VEEDER:  And I would like at this time to withdraw MR-37C.

21   THE MASTER:  For the purpose of making a copy?

22   MR. VEEDER:  Yes, your Honor.

23   THE MASTER:  Very well, that may be withdrawn and a copy

24   substituted for it.

25   MR. HALDE:  Is there any reason why this witness can't be

1  excused?

2     THE MASTER:  No, the witness may now be excused.  Would it

3  be possible at this time, Mr. Veeder, to set any definite date

4  for any further evidence in connection with this property,

5  assuming that such further evidence or cross-examination is

6  necessary?

7     MR. VEEDER:  It would be impossible, your Honor, at this

8  time.  But I will communicate immediately with Mr. Halde on

9  the subject.

10    THE MASTER:  Very well.  You are dismissed, then, Mr. Halde.

11    (George Stahlman, Esq., attorney for Vail estate, now

12  present.)

13    MR. VEEDER:  Your Honor, at this time I would like to make

14  a restatement.  Mr. Sachse and Mr. Stahlman are both interested

15  in this, I believe.  We are now in an area in which evidence is

16  being introduced which in our opinion involves the stipulated

17  judgment.  Now, that is the stipulated judgment between the

18  national government and the Vail Company, because --

19    THE MASTER:  You are in an area here in these proceedings

20  or San Diego?

21    MR. VEEDER:  No, no, the area from Temecula Gorge on down

22  to the Camp.  And we are going to put in engineering reports

23  and maps and other matter.  We are at the present time under-

24  taking to check out and be sure of the areas of the smaller

25  land owners -- Max Henderson is one of them, and others -- whose

1    property might be affected by the stipulated judgment.

2       I also understand that a brief has been filed, stating that

3    all parties are interested in the stipulated judgment.

4       While we desire to go ahead and put in our evidence that we

5    have here today, it may be that we will ask to have the question

6    of the stipulated judgment and all related matters tried out

7    before Judge Carter, because he now has the matter under

8    consideration and evidence is going in regardless of it.  So

9    Mr. Stahlman is here.  I want him to know it may be we will

10   bring in these other parties for trial in San Diego rather than

11   having it here.

12      THE MASTER:  I think if any party is claiming rights which

13   would involve the validity or invalidity of the stipulated

14   judgment, the rights of such parties should be determined in

15   San Diego by Judge Carter at the time he passes upon the judgment

16   as a whole, rather than have evidence in that connection

17   presented before me, as well as presenting similar evidence

18   as to other parties before him.  So that any evidence presented

19   here will relate to the physical nature of the property and

20   other questions, and any findings I would make would be subject

21   to whatever findings and conclusions he may finally make with

22   reference to the effect of that judgment.

23      MR. VEEDER:  Yes, just so it is understood.

24      MR. STAHLMAN:  That is satisfactory.

25      MR. VEEDER:  Mr. Sachse?

1    MR. SACHSE:  It is agreeable.

2    MR. VEEDER:  Mr. Pepple is here and we have delivered to him

3  an amendment to his exhibit, which I believe was marked MR-63.

4  It is Tract 63, is it not?

5    THE MASTER:  By the way, there is a gentleman in the front

6  row who wishes to offer some brief evidence and then leave to

7  attend a funeral.  Will you state your name, please?

8    MR. GLINDSET:  Arnold Glindset.  I have been trying to get

9  a clean copy.  I have got my own topographic map here.

10   THE MASTER:  Off the record a minute.

11   (Discussion off record.)

12

13                   ARNOLD GLINDSET,

14  one of the defendants herein, called as a witness in his own

15  behalf, sworn, testified as follows:

16

17                  DIRECT EXAMINATION

18

19  BY THE MASTER:

20   Q  Will you state your name for the record?

21   A  Arnold Glindset, G-l-i-n-d-s-e-t.  This topo map,

22  Pechanga quadrangle, shows two 40's, 80 acres.  In other

23  words, 80 acres.  The Temecula quadrangle shows 160 acres.

24  This is approximate.

25   Q  You have a total of 240 acres?

A   A total of 240.  Your report shows 244.  I have sold five acres out of that, so roughly 240 acres.  Now, the Colonel has been very cooperative, and his staff.  And the Colonel came out himself.  The last -- the main bone of contention here that I have had with the government on this has been -- up until the time the Colonel came out has been that I didn't think that the staff has been out and looked over the property in its entirety.

Q   What is the engineering report on your property, is that MR-33?

MR. VEEDER:  That is right, that is the exhibit.

THE WITNESS:  So the Colonel came out and I asked him -- I called it to his attention that the upper part of the property, comprising -- which appears on this Temecula quadrangle, 80 acres, approximate, is very inaccessible.  At the time your man from -- this fellow from Oregon, can you give the Court his name?

COL. BOWEN:  Price.

THE WITNESS:  Price, who seemed to be a very competent man. We covered the lower end of the property, which was accessible. We started up over the terrain.  It is very rough and dense brush and it is hard to get through.  In the upper end of it, parts in the various sections is leveled out.  But still the brush makes it inaccesible.  So Mr. Price and I, we stopped at a point which is indicated here, which the Court will see is in the very center of the property.

1    MR. VEEDER:  You are referring to Plaintiff's Exhibit MR-33?

2    THE WITNESS:  Right.

3 BY THE MASTER:

4    Q  And you are referring to a point approximately in the

5 center of that?

6    A  In the center.  In other words, we started up here.  Here

7 is the lower terrain here -- in other words, two 40's wide,

8 three this way.

9    Q  You are referring to the area marked on the map as land

10 of type VI?

11   A  Right.  And then we started up over the hill and we

12 stopped at a point -- still at a point which is still marked

13 type VI.

14   Q  And that is the type VI in a general almost circular --

15   A  Almost circular area in the center of the property.

16   Q  Yes.

17   A  Where this arrow is there is a rocky point there.  We

18 stood there and surveyed this particular area here by sight.

19   MR. VEEDER: I ask that it be identified from the standpoint

20 of direction.

21   THE WITNESS:  That would be -- this is an easterly direction.

22 This is west.  So it would be the central part, as much as

23 possible.  Then from here on over, I will be frank with you,

24 I haven't been over it.

25

BY THE MASTER:

Q   When you say "here on over" you are --

A   From here in an easterly direction, to the easterly, and the boundary of the property, I have not been over 90 percent of that area.   In other words, I have made exploratory jaunts, crawling through deer trails, one thing and another.   But I found a lot of level ground in there, not a lot -- I will take that back.   I am exaggerating.   I have found various level areas.

Mr. Price and I, we left the area.   And when Col. Bowen came out there and checked with me, he said he was going to send a man out with his stereoscope -- not a stethoscope.   And also we would go over the area.

This man, Mr. Campbell, came out.   And he sat down with me at the house and we looked through this stereoscope.   And I will be frank with you, it took me about two hours to begin to fathom it.   In other words, I couldn't -- I couldn't --

MR. VEEDER:   I have had the same problem.

THE WITNESS:   Have you?   It wasn't until such time as I had two pencils down here and began to trace the area with the pencil that I could begin to see his way of looking at it.   In other words, I am not doubting -- the man is probably honest a hundred percent in his findings.   But I did put a few questions to him and he scratched his head.   Excuse me, he was perplexed in a way.   But I found various areas there that by tracing these two

1 pencil points, which I think had been overlooked.

2 THE MASTER:  Do you want to ask Col. Bowen any questions

3 about those or do you want to testify as to specific acres that

4 you think are contrary to what is shown in the report?

5 THE WITNESS:  No, I won't testify as to that, because I will

6 say this, that after Mr. Campbell and Col. Bowen left I did make

7 more trips up there and the rattlesnakes scared me out.  And so

8 I don't blame these fellows for not --

9 MR. VEEDER:  I am not going up there.

10 THE WITNESS:  So how about getting one of your men going up

11 in a whirly-bird and just go over it, and whatever -- I think I

12 can look down.

13 THE MASTER:  Mr. Glindset, is there any evidence you wish to

14 present that is at variance with what is in this engineering

15 report?

16 THE WITNESS:  What evidence I submit is just what I think is

17 there.  In other words, I would like Col. Bowen to explain one

18 thing to me, and it wasn't explained to my satisfaction by Mr.

19 Campbell, and that is this:  I think Mr. Campbell did the best he

20 could.  But I had based my estimate of the 80 acres in compari-

21 son to the Government's 40 acres, figuring that there is about

22 25 to 30 acres up on these -- up these easterly 80 acres which

23 I think, using the Temecula or the Pechanga quadrangle seem to

24 be fairly level ground which could be probably used for agri-

25 cultural purposes, similar to what I have been doing on the

lower portion of the property.  Col. Bowen did state that he found out afterwards from Mr. Campbell or somebody that Mr. Price at a later date had gone up there and made a reconnoiter around in this area up from the easterly part of the property.

THE MASTER:  Col. Bowen, can you state with reference to what Mr. Glindset has testified?

COL. BOWEN:  I did, your Honor, check into the matter of the physical  survey of this eastern portion of Mr. Glindset's property as depicted in MR-33.  By that I mean the larger of the two parcels shown on the map in MR-33.  And it is, as Mr. Glindset has stated, rather rough, rocky area, with very heavy brush, difficult to go through.  I did discover, however, that Mr. Price, who made the soil survey, much of it in company with Mr. Glindset, did walk over to this property from the Rainbow truck trail up in near the prison camp up the creek there when he was up to make a survey of parcel No. 18, Rainbow watershed, which is also a part of Mr. Glindset's holdings.

His findings at that time were the soils were very shallow, your Honor, as indicated in the map.  The rock outcrop shown by these white dots scattered through the eastern part of the larger property, delineated on the map in Plaintiff's Exhibit MR-33, indicate rock outcrop, primarily Woodson Mountain granodiorite.  Mr. Glindset has had a great deal of experience in planting trees out among rocks, though.  However, we are doing -- I will say what he has done looks very good.  But in

1   my opinion the soils are too shallow, the slopes too steep, and

2   there is no water, no ready source of water available to that

3   area.  There is no ground water up in there.  If Mr. Glindset

4   were to take water from Rainbow Creek, which runs through the

5   property, he would have to pump it a considerable distance, from

6   an elevation of about 1120 feet to 2100 feet, which is the

7   high point indicated there.  The lift itself from the creek

8   would be prohibitive from the standpoint of cost.

9       MR. GLINDSET:  Excuse me.

10      THE MASTER:  Col. Bowen, were these pictures, the aerial

11   photographs which are incorporated in the report of exhibit

12   MR-33, were they taken before or after the planting of the

13   trees you referred to?

14      COL. BOWEN:  I believe these pictures were taken before much

15   of the planting, but some of the planting had made at the time

16   the pictures were taken and show up in the area just south of

17   the reservoir.

18      THE MASTER:  There are no pictures available to me, though,

19   on the eastern portion of the property which you refer to as

20   being rocky?

21      COL. BOWEN:  No, sir.  There is nothing planted up there.

22   That is in native chaparral, native brush and vegetation.  The

23   plantings Mr. Glindset has made are all located in the westerly

24   portion of the property and south and north of the reservoir

25   which shows there, and continuing on to the southwesterly

1    corner there through that area which is designated as Class VI

2    on the map contained in Plaintiff's Exhibit MR-33.

3        THE MASTER:  All right, do you want to ask Col. Bowen any

4    questions, Mr. Glindset?

5        MR. GLINDSET:  Yes, your Honor.  In regard to his statement

6    that I would have to pump water from the creek at 1100 feet to

7    2100 feet -- is that what you said?

8        COL. BOWEN:  I said that was about it.

9        MR. GLINDSET:  I think you are taking the very extremes.

10       COL. BOWEN:  Yes, sir.'

11       MR. GLINDSET:  You are taking -- there along the creek, you

12    know at the back end -- call it the north end of the creek where

13    the cascade is --

14       COL. BOWEN:  Yes, sir.

15       MR. GLINDSET:  That I think would be an elevation of approxi-

16    mately 1300 feet, would it not?  And that also would be the

17    best place to pump the water up to this higher area.  It would

18    be a shorter distance, because the creek runs diagonally --

19    Strike that -- because the creek as it leaves my property at

20    the north end is --

21       COL. BOWEN:  You mean as it enters your property at the north

22    end, Mr. Glindset.

23       MR. GLINDSET:  You are right, enters the property.

24       COL. BOWEN:  The cascade Mr. Glindset mentioned is shown on

25    the aerial photo contained in Plaintiff's Exhibit MR-33 as a

white line.  It is solid granodiorite which crops out and over which the creek descends when it flows just before it enters the Class VI area, which includes the reservoir site.  And it is true that the elevation of the creek bed in that cascade area is about 1300 feet.

MR. GLINDSET:  Then, Colonel, would you not say then this would be a good spot to pump this water up this ravine?  And the lift there I would say wouldn't be much over 200 feet --I may be wrong -- to this area.  And this is the area, your Hornor, which I think should be explored a little bit.  I will grant you this, Colonel, that this is an outcropping of rock in here, but --

THE MASTER:  The area which you say should be explored is the area to the southwest of the rock outcrop area?

MR. GLINDSET:  Right, which indicated by your photograph here indicates a dense brush.

COL. BOWEN:  Your Honor, to satisfy Mr. Glindset I am willing to go up there with him and brave the rattlesnakes, and we will walk out in there.

MR. VEEDER:  Now the Government is in danger here.  You take care of him.

THE MASTER:  We will ask you to wear rattlesnake boots.

Did you wish to offer any further evidence or do you wish to have Col. Bowen examine your property and offer a subsequent report?

1    MR. GLINDSET:  Your Honor, I would like to submit one other

2    evidence, I know which you probably are going to refute me.  I

3    would like to state I have raised avocados for about 24 years

4    in San Diego County, and I have raised avocados in similar

5    rocky soil in the Mount Helix area near San Diego, which you

6    are probably familiar with.

7    THE MASTER:  I am familiar with the Mount Helix area in

8    general.

9    MR. GLINDSET:  And I still have a little property left down

10   there.  And I have from experience with this Rainbow property

11   in irrigating and then going down there and irrigating trees

12   there, I do use about one half the amount of water down there

13   that I do up here.  And I will venture to say that a similar

14   piece of property in Fallbrook or Vista would not require the

15   same amount of water that that piece of property out there would

16   require.  There is a minimum amount of humidity.  There is that

17   continuous dry Santa Ana wind that is going up and down that

18   canyon, which drags that moisture out of the ground.  Therefore,

19   what I am driving at is this, this 2.35 acre feet I think is

20   very small compared to the actual requirements.  And I do know

21   that also from experience in raising avocados that the more

22   water you can give those trees in an area like that the better

23   results you are going to have.

24   MR. VEEDER:  That perhaps is something that could be investi-

25   gated at the same time.

1   COL. BOWEN:  Yes, sir.

2   MR. GLINDSET:  Now, your Honor, would this investigation --

3   Would this entail something that the Government has come up

4   with based on say a farm advisor's -- in other words, I would

5   like to know, to save time and everything, I would like to know

6   what sort of evidence or what is your source of evidence, may I

7   ask?

8   MR. VEEDER:  Right here, Col. Bowen.

9   COL. BOWEN:  I will discuss that with you, Arnold, when you

10   and I go out and climb your hill.

11   MR. GLINDSET:  Good enough.

12   THE MASTER:  Is there anything further you wish to present

13   at this time?

14   MR. GLINDSET:  That is about all.  In other words, I would

15   like to see that at least a third again as much or more.

16   THE MASTER:  When you say that, you are referring to the

17   figure of 2.35 which is used on page 3 of Exhibit MR-33?

18   MR. GLINDSET:  Right.

19   THE MASTER:  All right.

20   MR. VEEDER:  May we proceed, your Honor, with Mr. Pepple?

21   Mr. Pepple is here and I would like to have marked for identifi-

22   cation MR-40.

23   (Tabulation of land classifications and portion of aerial

24   photograph marked Plaintiff's Exhibit MR-40 for identification.)

25

1        ALLEN C. BOWEN,

2   recalled as a witness, having been previously sworn, testified

3   as follows:

4

5            FURTHER DIRECT EXAMINATION

6

7   BY MR. VEEDER:

8    Q  Col. Bowen, I hand you what has been marked Exhibit MR-40

9   and ask you to state for the record what is contained in that

10  identification.

11   A  Plaintiff's Exhibit MR-40 for identification is composed

12  of two pages, one a tabulation of land classifications and

13  future potential water uses.

14   Q  Will you state the name of the owner, please?

15   A  And the other sheet is a portion of an aerial photograph

16  containing the soil survey of the property owned by Mr. G. G.

17  Pepple.  We have "G. C.", your Honor.

18   MR. PEPPLE:  That is G. G., yes.

19   THE WITNESS:  G. G.

20   MR. PEPPLE:  G. G. Pepple, P-e-p-p-l-e.

21   THE WITNESS:  This is the property owned by Mr. G. G. Pepple,

22  parcel No. 63, Rainbow Creek watershed.  If I may borrow a red

23  pen?

24   MR. VEEDER:  Here is a red pencil.

25   THE WITNESS:  With a red pencil I will write MR-40 within

1    the exterior boundaries of parcel No. 63 as it is delineated on

2    Plaintiff's Exhibit MR-21.

3    BY MR. VEEDER:

4        Q   Under whose direction was that Identification MR-40

5    prepared, Colonel?

6        A   It was prepared under my direction.

7        Q   And is it accurate to your personal knowledge?

8        A   Yes, sir.

9        MR. VEEDER:   We offer in evidence MR-40.

10       THE MASTER:   That will be received as Plaintiff's Exhibit

11   MR-40.

12       (Plaintiff's Exhibit MR-40 for identification received in

13   evidence as Plaintiff's Exhibit MR-40.)

14       MR. VEEDER:   I would like the record to show Mr. Pepple is

15   here, and if he would care to interrogate Col. Bowen he can

16   take my chair and go ahead.

17       THE MASTER:   Mr. Pepple, do you wish to ask Col. Bowen any

18   questions concerning this exhibit?

19       MR. PEPPLE:   I just wish to make a statement.   Do you want

20   me to make it on the stand?   I am in complete accord with the

21   survey.

22       MR. VEEDER:   If that is the statement, let's have it under

23   oath.

24       THE MASTER:   Yes, you may be sworn and then state whatever

25   you wish to the Court.

1                         G. G. PEPPLE,

2   one of the defendants herein, called as a witness in his own

3   behalf, sworn, testified as follows:

4

5                     DIRECT EXAMINATION

6

7     THE WITNESS:  I am in complete accord with this survey and

8   it seems to cover everything.  But the fact that two and

9   thirty-five hundredths acre feet of water for avocados, that

10   has been considerably changed even by the University.

11     THE MASTER:  That is, you are making the same point Mr.

12   Glindset made, that the amount of water per acre for avocados

13   should be increased.

14     THE WITNESS:  It is not enough.  And by watering once a

15   week, which is recommended, it takes considerably more water

16   than two and thirty-five hundredths acre feet of water.  That

17   is the only point I wish to make.

18     THE MASTER:  You have no other corrections to make of the

19   report?

20     THE WITNESS:  No, the report, I am in complete accord with

21   the rest of the report.

22     THE MASTER:  Is there any additional evidence you wish to

23   present, anything that is not covered in the report?

24     THE WITNESS: No, except the fact the water is there and I

25   can use it.  I mean it is there at the house.  I think this has

1    already been covered, though.   It has been used since I think

2    1890 there.

3        THE MASTER:   Very well.   Do you have any questions, Mr.

4    Veeder?

5        MR. VEEDER:   I have no questions.

6        MR. SACHSE:   I have no questions.

7        THE MASTER:   Mr. Willett, do you have --

8        MR. WILLETT:   I want to give a little testimony here.

9

10                       P. W. WILLETT,

11   being first duly sworn, testified as follows:

12

13                     DIRECT EXAMINATION

14

15       MR. WILLETT:   This is pertaining to the land of Ardyth

16   Lattimer and Eugene Swearingen, and it is portions of Section

17   9, Township 9 South, and 16.   There is an intermittent stream --

18   I know all of this property because I have been connected with

19   it for so long.   It has an intermittent stream flowing across

20   said land of two flowing springs and a 40 foot well, with

21   electric pump and pipeline to the house.   And, of course, we

22   are claiming the underlying water.

23       MR. VEEDER:   Could I have the name on that tract again,

24   please?

25       MR. WILLETT:   The name?

1    MR. VEEDER:  Yes.  Lattimer, is that it?

2    MR. WILLETT:  Lattimer and Swearingen.

3    MR. VEEDER:  Lattimer and Swearingen.

4    THE MASTER:  Do you have a report on that, Mr. Veeder?

5    MR. VEEDER:  I am checking, your Honor.

6    MR. SACHSE:  92 and 92A are your parcel numbers, Bill.

7    MR. VEEDER:  I don't believe an engineering report was pre-

8    pared on that, your Honor.  The record doesn't show it.

9    Can we find that on 21, Colonel, so we will know exactly

10   where we are going?

11   COL. BOWEN:  I find parcel 92, which is an irregular parcel,

12   located astride the Willow Glen road in Section 16.

13   MR. WILLETT:  9 and 16.

14   COL. BOWEN:  And also in Section 9.  We don't show the 92A,

15   just 92.  It is in 9 and 16.  Yes, sir, you are right.

16   MR. VEEDER:  Sorry to interrupt, Mr. Willett, but I thought

17   we had better tie ourselves to an exhibit before it went any

18   further.

19   MR. WILLETT:  Yes.  That is all the testimony I think that

20   is necessary to give.  They are not claiming any riparian right,

21   but they do claim the underlying waters.

22   MR. VEEDER:  I have no questions.

23   MR. SACHSE:  I have no questions.

24   THE MASTER:  Is there any further evidence then?

25   MR. WILLETT:  No.

1       THE MASTER:   Very well.

2       MR. VEEDER:   Thank you.   Call Col. Bowen, please.

3

4                       ALLEN C. BOWEN,

5   recalled as a witness herein, having been previously sworn,

6   testified as follows:

7

8                   FURTHER DIRECT EXAMINATION

9       (Engineering report on property of Frank W. Fowler marked

10  Plaintiff's Exhibit MR-41 for identification.   Engineering

11  report on property of Clerk C. Barnes marked Plaintiff's

12  Exhibit MR-42 for identification.   Engineering report on property

13  of William L. Beck marked Plaintiff's Exhibit MR-43 for identi-

14  fication.   Engineering report on property of Brunson, Peterson

15  and Yaras marked Plaintiff's Exhibit MR-44 for identification.

16  Engineering report on property of Jacob A. McKathnie marked

17  Plaintiff's Exhibit MR-45 for identification.   Engineering

18  report on property of Harry E. Emery marked Plaintiff's Exhibit

19  MR-46 for identification.   Engineering report on property of

20  W. E. Knight marked Plaintiff's Exhibit MR-47 for identification.

21  Engineering report on property of Blaine W. Lanterman marked

22  Plaintiff's Exhibit MR-48 for identification.   Engineering

23  report on property of William D. Hayes marked Plaintiff's

24  Exhibit MR-49 for identification.)

25

1   BY MR. VEEDER:

2       Q  Col. Bowen, I hand you Identification MR-41, an engineering

3   report of Frank W. Fowler, and ask you who prepared that report.

4       A  Report MR-41 for identification was prepared under my

5   supervision and direction.

6       Q  And would you please locate on Exhibit MR-21 the tract in

7   question?

8       A  I have marked MR-41 within the exterior boundaries of

9   parcel No. 36, delineated on Plaintiff's Exhibit MR-21.

10      Q  I ask you under whose direction it was prepared, MR-41?

11      A  Under my direction.

12      Q  Is it accurate to your personal knowledge?

13      A  Yes, sir.

14  MR. VEEDER:  I offer in evidence MR-41.

15  THE MASTER:  It will be received in evidence.

16      (Plaintiff's Exhibit MR-41 for identification received in

17  evidence as Plaintiff's Exhibit MR-41.)

18  BY MR. VEEDER:

19      Q  Col. Bowen, I hand you Identification MR-42, Clerk C.

20  Barnes, and ask you under whose direction that exhibit was

21  prepared.

22      A  Plaintiff's Exhibit MR-42 was prepared under my direction.

23      Q  And that exhibit is the engineering report; is that

24  correct?

25      A  Yes, sir.

1       Q   And would you please step to MR-21 and locate the parcel

2   embraced in MR-42?

3       A   With a red pencil I have marked MR-42 within the exterior

4   boundary of parcel 38 delineated on Plaintiff's Exhibit MR-21.

5       Q   Under whose direction was MR-42 prepared, Col. Bowen?

6       A   Under my direction.

7       Q   And is it accurate, to your personal knowledge?

8       A   Yes, sir.

9   MR. VEEDER:   We offer in evidence Exhibit MR-42.

10  MR. SACHSE:   Who is the owner?

11  MR. VEEDER:   Clerk C. Barnes.

12  THE MASTER:   That will be received in evidence as Exhibit

13  MR-42.

14      (Plaintiff's Exhibit MR-42 for identification received in

15  evidence as Plaintiff's Exhibit N-42.

16  BY MR. VEEDER:

17      Q   I hand you Identification MR-43, W. L. Beck, and ask you

18  to state under whose direction this engineering report was

19  prepared?

20      A   It was prepared under my direction.

21      Q   And would you kindly step to MR-21 and mark on that exhibit

22  the location of the Identification MR-43?

23      A   This is a rather small parcel, your Honor.   I will run

24  a red line from parcel 33, as it is delineated on Plaintiff's

25  Exhibit MR-21, and write MR-43 with a red pencil at the

1   termination of that line.

2       Q  Now, are the contents of that engineering report MR-43

3   correct to your personal knowledge?

4       A  Yes.

5       MR. VEEDER:  I offer in evidence Plaintiff's Exhibit MR-43.

6       THE MASTER:  Received in evidence as Plaintiff's Exhibit MR-43.

7       (Plaintiff's Exhibit MR-43 for identification received in

8   evidence as Plaintiff's Exhibit MR-43.)

9   BY MR. VEEDER:

10      Q  Col. Bowen, I hand you the engineering report of Brunson,

11  Peterson and Yaras, marked Plaintiff's Exhibit MR-44, and ask

12  you under whose direction that engineering report was prepared?

13      A  It was prepared under my direction.

14      Q  And would you kindly step to MR-21 and locate that tract

15  of land on that exhibit?

16      A  With a red pencil I have written MR-44 within the exterior

17  boundaries of parcel No. 53 as it is delineated on Plaintiff's

18  Exhibit MR-21.  This parcel is partly within and without the

19  Rainbow Creek watershed, your Honor, but is entirely within the

20  Santa Margarita River watershed.

21      Q  Will you state in the record whether in your opinion the

22  content of that engineering report marked MR-44 is correct?

23      A  It is.

24      MR. VEEDER:  We offer in evidence MR-44.

25      THE MASTER:  It will be received as Exhibit MR-44.

1     (Plaintiff's Exhibit MR-44 for identification received in

2   evidence as Plaintiff's Exhibit MR-44.)

3   BY MR. VEEDER:

4     Q  Col. Bowen, I hand you engineering report on Jacob A.

5   McKathnie, marked for identification MR-45, and I ask you

6   under whose direction that engineering report was prepared?

7     A  Under my direction.

8     Q  Would you kindly step to MR-21 and locate the property

9   alluded to in MR-45?

10    A  With a red pencil I have written MR-45 within the

11   exterior boundaries of parcel No. 40 as it is delineated on

12   Plaintiff's Exhibit MR-21.

13    Q  I ask you to state in the record whether in your opinion

14   the content of MR-45 is correct?

15    A  It is.

16   MR. VEEDER:  We offer in evidence MR-45.

17   THE MASTER:  That will be received and so marked.

18    (Plaintiff's Exhibit MR-45 for identification received in

19   evidence as Plaintiff's Exhibit MR-45.)

20   BY MR. VEEDER:

21    Q  I hand you, Col. Bowen, the engineering report on Harry

22   E. Emery, marked MR-46 for identification.  I ask you under

23   whose direction that engineering report was prepared?

24    A  Under mine.

25    Q  Will you kindly step  to MR-21 and locate that, the lands

1    embraced within that engineering report?

2        A  With a red pencil I have marked MR-46 within the exterior

3    boundaries of parcel No. 44 as that parcel is delineated on

4    Plaintiff's Exhibit MR-21.

5        Q  I ask you if in your opinion the content of the engineering

6    report MR-46 for identification is correct.

7        A  Yes, sir, it is.

8        Q  I hand you the engineering report for W. E. Knight,

9    marked for identification MR-47.  I ask you under whose direction

10   that report was prepared.

11       THE MASTER:  Exhibit MR-46 will be received in evidence and

12   so marked.

13       MR. VEEDED:  I intended to offer it.  I offer it now.

14       THE MASTER:  It will be received and so marked.

15       (Plaintiff's Exhibit MR-46 for identification received in

16   evidence as Plaintiff's Exhibit MR-46.)

17       THE WITNESS:  This engineering report, Plaintiff's Exhibit

18   MR-47, was prepared under my direction and supervision.

19   BY MR. VEEDER:

20       Q  Will you please step to MR-21 and locate the lands embraced

21   within that report upon that map?

22       A  With a red pencil I have written MR-47 within the

23   exterior boundaries of parcel No. 7 as that parcel is delineated

24   on Plaintiff's Exhibit MR-21.

25       Q  Is the content of MR-47 correct to your personal knowledge?

1    A  Yes, sir.

2    MR. VEEDER:  We offer in evidence MR-47.

3    MR. SACHSE:  May the record indicate I represent Knight,

4  Crabtree, et al, which MR-47 covers.  We have no objection to

5  its admission.  I do have one or two brief questions.

6    MR. VEEDER:  We have made the offer.  It has been identified.

7  Do you want to cross-examine now?

8    THE MASTER:  The exhibit will be received in evidence.

9    (Plaintiff's Exhibit MR-47 for identification received in

10  evidence as Plaintiff's Exhibit MR-47.)

11

12                    CROSS EXAMINATION

13

14  BY MR. SACHSE:

15    Q  Col. Bowen, can I direct your attention to page 3 of your

16  report?

17    A  Yes, sir.

18    Q  The second sentence refers to domestic water obtained from

19  a spring located on the hillside.  Do you find the sentence

20  to which I refer?

21    A  Yes, sir.

22    Q  Can you tell me whether that spring is located on the

23  granodiorite or in the alluvium referred to elsewhere?

24    A  The spring is located in the granodiorite.

25    Q  And the water from that spring in your opinion would not

1  be a part of the Santa Margarita River system?

2  MR. VEEDER:  Wait a minute.  I object to that now.

3  MR. SACHSE:  I am asking him a leading question.  On cross I

4  can lead.

5  MR. VEEDER:  I do think we can be specific as to whether

6  this is the source of the water or whether the spring contributes

7  to the flow of the Santa Margarita River.

8  MR. SACHSE:  That is a fair question.

9  Q  Do you feel that the spring -- the water from the spring

10  represents a part of and contributes to the flow of the Santa

11  Margarita River system?

12  A  No, sir.  I do not think that it is a part of the flow

13  of the river system.

14  Q  The next two paragraphs down, however, you refer to wells.

15  However, I assume both those two wells are dug in the alluvium.

16  A  Yes, sir.

17  Q  It is your opinion in the case of the well supply that

18  water does represent a part of the Santa Margarita River system;

19  is that correct?

20  A  Yes.

21  MR. SACHSE:  That is all.

22  MR. VEEDER:  I have no further questions.

23  Q  Col. Bowen, I hand you the engineering report on Blaine

24  W. Lanterman, marked MR-48 for identification, and ask you

25  under whose direction that engineering report was prepared?

1    A  It was prepared under my direction.

2    Q  Would you kindly step to MR-21 and locate the lands

3 embraced within MR-48?

4    A  With a red pencil I have written MR-48 within the exterior

5 boundaries of parcel No. 31 as that parcel is delineated on

6 Plaintiff's Exhibit MR-21.

7    Q  Now, to your personal knowledge is the content of MR-48

8 correct?

9    A  Yes, sir.

10   MR. VEEDER:  I offer in evidence MR-48.

11   THE MASTER: It will be received in evidence.

12   (Plaintiff's Exhibit MR-48 for identification received in

13 evidence as Plaintiff's Exhibit MR-48.)

14 BY MR. VEEDER:

15   Q  Col. Bowen, I hand you engineering report on William D.

16 Hayes.  It is marked for identification MR-49.  I ask you under

17 whose direction that report was prepared?

18   A  It was prepared under my direction and supervision.

19   Q  And would you please step to MR-21 and locate the lands

20 alluded to in MR-49?

21   A  With a red pencil I have written MR-49 within the exterior

22 boundaries of parcel No. 39 as that parcel is delineated on

23 Plaintiff's Exhibit MR-21.

24   Q  Is the content of MR-49 correct to your personal know-

25 ledge?

1        A   Yes, sir.

2        MR. VEEDER:  We offer in evidence MR-49.

3        THE MASTER:  It will be received in evidence.

4        (Plaintiff's Exhibit MR-49 for identification received in

5    evidence as Plaintiff's Exhibit MR-49.)

6        MR. VEEDER:  Your Honor, that is the extent of the evidence

7    that the United States of America has to offer at this time.

8        THE MASTER:  Mr. Sachse, do you have any additional evidence?

9        MR. SACHSE:  I have no evidence at this time.

10        THE MASTER:  Now, at the beginning of the session this

11    morning I handed to Mr. Veeder and Mr. Sachse suggested findings

12    in connection with the property north of Fallbrook Creek, west

13    of Rainbow Creek, and south of the Santa Margarita River.  I

14    would like to receive any suggestions either one of them has,

15    either now or at a later date, preparatory to them mimeographing

16    these findings and conclusions and sending them out to all

17    parties affected before having a formal hearing upon them.

18        MR.SACHSE:  I wouldn't like to attempt to comment in detail

19    now, but I did see one thing that concerns mainly language, and

20    I can mention it now.  On page 5, the first conclusion of law --

21    maybe this is just semantics, but the conclusion states that there

22    are no prescriptive or appropriative rights with reference to

23    the use of water constituting a portion of the surface or

24    subsurface flow of the Santa Margarita River or any tributary

25    within the area hereinabove described and not referred to in

1    Finding 3.

2        Well, I presume that language "not referred to in Finding 3"

3    refers to your general exception of rights on the big river.

4        THE MASTER:  That is true.  That is the purpose of the

5    finding.

6        MR. SACHSE:  Because there very definitely have been pleaded

7    and are at least in controversy prescriptive and appropriative

8    rights on the big river in this area.

9        THE MASTER:  The purpose of Finding 3 was to set forth the

10   fact that insofar as any parcels which were riparian to the

11   Santa Margarita River were concerned, no statement in any

12   subsequent portion of the findings or conclusions of law would

13   affect such parcel -- would apply to such parcel of property.

14   And then Conclusion 1 was intented to convey the thought that

15   excepting for such properties, no prescriptive rights have been

16   permitted.

17       MR. SACHSE:  I think that is right.  The only prescriptive

18   and appropriative rights I know of are the inchoate -- and some

19   of the perfected rights of the district.  There may be others,

20   but at least there has been no evidence of any of them.

21       THE MASTER:  But those are on the Santa Margarita River

22   itself.

23       MR. SACHSE:  Yes.

24       THE MASTER:  And these findings do not relate to any such

25   property.

1    MR. SACHSE:   That is right.

2    THE MASTER:   As I say, if you have any further comments on

3    them, if you could let me know, because I thought there is no

4    use in mimeographing these and sending them out to a great

5    number of defendants, who would be entitled to, of course, to

6    receive notice before they were acted upon.

7    MR. VEEDER:   We will review them.

8    THE MASTER: Now, have you been able to complete the additional

9    descriptions on either of the De Luz or the Fallbrook findings?

10   MR. VEEDER:   We haven't completed it as yet, your Honor.

11   We are working on it.  All I can say is we are going as fast

12   as we can.

13   THE MASTER:   Now, what would be the date of the next hearing,

14   as I assume there is going to be further testimony on Rainbow

15   Creek?

16   MR. VEEDER:   Well, your Honor, Cdr. Redd is going on leave.

17   Did you want to go on leave in June, the last two weeks of June?

18   LCDR. REDD:   The last two weeks of June, if I could.

19   MR. VEEDER:   Could I notify your Honor as to the time.

20   You want to get out a notice, won't you?

21   THE MASTER:   I wanted to adjourn these hearings -- in other

22   words, I have followed the practice of always adjourning to

23   another specific date, so that there is no question about having

24   notice for everybody to start in all over again.

25   (Discussion off record.)

Cdr
or
LCdr??

1    THE MASTER:   On the record, the hearings will be continued

2    until Monday, the 22nd of June, at 9:30 A. M.