ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

UNITED STATES OF AMERICA,

               Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

           Defendants.

No. 1247-SD-C

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

**REPORTER'S TRANSCRIPT**

| | |
|---|---|
| **Volume:** | 29 |
| **Pages** | 3023 - 3058 |
| **Date:** | June 22, 1959 |
| **Place:** | Fallbrook, California |

RANDOL, FIVECOAT & STEWART

CERTIFIED SHORTHAND REPORTERS

1113 FIRST NATIONAL BUILDING

SAN DIEGO 1, CALIFORNIA

BELMONT 9-4191

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### INDEX TO WITNESSES

|                 | Direct | Cross |
|-----------------|--------|-------|
| Allen C. Bowen  | 3026   | 3030  |
| W. B. Haney     | 3053   |       |

### INDEX TO EXHIBITS

|         |            | Ident. | Evid. |
|---------|------------|--------|-------|
| MR-33-1 | Overlay    | 3027   | 3028  |
| MT-1    | Map        | 3042   | 3043  |
| MT-2    | Tabulation | 3044   | 3046  |

1  APPEARANCES:

2

3      WILLIAM H. VEEDER, ESQ., and
       LT. CHARLES W. SALTER, U. S.N.,
4       For United States of America

5      FRANZ R. SACHSE, ESQ.,
        For Fallbrook Public Utility District
6       and individually named defendants

7      ARNOLD GLINDSET, in pro.per.

8      MARY MEDEARIS, in pro.per.

9      RAY G. PETERS, in pro.per.

10     W. B. HANEY, in pro.per.

11

12

13

14

15

16

17.

18

19

20

21

22

23

24

25

3025

Fallbrook, California, Monday, June 22, 1959; 9:45 A.M.

THE CLERK:  Court is now in session.

THE MASTER:  Will counsel state their appearance for the record?

MR. VEEDER:  William H. Veeder for the United States of America.

LT. SALTER:  Lt. Charles W. Salter for the United States of America.

MR. SACHSE:  Franz Sachse for the Fallbrook Public Utility District and certain individual defendants.

THE MASTER:  Are there any individual defendants in the audience who are not represented by attorneys?

MRS. MEDEARIS:  Mary Medearis.  I am here.

THE MASTER:  Anybody else in the audience not represented by an attorney?

MR. GLINDSET:  Arnold Glindset.

MR. PETERS:  Yes, I am not represented by counsel.

THE MASTER:  And what is your name?

MR. PETERS:  Ray G. Peters.

THE MASTER:  Very well.  Mr. Glindset, did you wish to present any further evidence at this time?

MR. GLINDSET:  Well, I think it is up to Col. Bowen to.  He has  made a little more extensive study with me on it, and then he was going back to the Base to further complete his investigation

1   And I would like to know what he has come up with.

2   THE MASTER:   Col. Bowen, do you want to take the stand in

3   regard to this further investigation you have made?

4   MR. GLINDSET:   Do you mind my looking over your shoulder?

5   THE MASTER:   MR-33 is Arnold Glindset.

6

7                    ALLEN C. BOWEN,

8   recalled as a witness, having been previously sworn, testified

9   as follows:

10

11                   DIRECT EXAMINATION

12

13  BY MR. VEEDER:

14     Q   Col. Bowen, would you state into the record the extent of

15  your investigation in regard to the properties in question which

16  are set forth in Exhibit MR-33?

17     A   Yes, sir.   On Friday of last week, the 19th of June, I

18  met Mr. Glindset on his property, and together we traveled by

19  Jeep and afoot to the higher portion of his property, namely,

20  parcel 19 in the Rainbow watershed.   And we examined some of the

21  areas that have been delineated on the map contained in Plaintiff's

22  Exhibit MR-33 on the ground, and then following our view of the

23  premises I returned to the office and examined the stereo pair

24  of aerial photographs to further pin down some of these question-

25  able delineations.   Mr. Glindset was particularly interested in

1    the possibility that there might be some small areas in the

2    easterly portion of the larger parcel which is delineated on

3    Plaintiff's Exhibit MR-33 that would lie in Section 6, Township

4    9 South, Range 2 West.  And neither from my field examination

5    nor from my stereo examination was I able to find any areas that

6    in my opinion are susceptible of practical or profitable

7    irrigation in that portion of Section 6 I have previously

8    mentioned.

9    However, I did enlarge the area delineated about centrally

10   in the larger parcel. It had been previously delineated as a

11   Class VI soil site, with 20% slopes, and found, as indicated in

12   the report MR-33, suited to avocado development.

13   I have here in my hand an overlay, which indicates the area

14   No. 2 as the former site that was delineated, and lying southerly

15   of that area No. 1, the enlarged area, which I came up with,

16   that has the red No. 1 in that.

17   MR. VEEDER:  Just one moment, Colonel.

18   THE WITNESS:  Yes.

19   MR. VEEDER:  I wonder if there would be some way of identify-

20   ing that overlay as an exhibit or supplementary exhibit, if we

21   are going to put in evidence in regard to acreage.

22   THE MASTER:  I think that might be called Exhibit MR-33-1.

23   MR. VEEDER: I think we had better do that.

24   THE MASTER:  And then it will be so marked, and then it

25   should be in some manner attached to MR-33.

3028

1    MR. VEEDER:  The problem is how can we have this marked with-

2  out ruining it, from your standpoint?

3    THE WITNESS:  What I can do is have the map changed and

4  reproduced and added at a later date, if that would be suitable.

5  It would be more permanent than the overlay.

6    MR. VEEDER: I think what we ought to do, so there will be no

7  question on this, we should put this overlay, MR-33-1, put it in

8  an envelope and have the envelope marked in that manner, because

9  I think it would ruin the overlay to put the exhibit stamp on it.

10    THE MASTER:  Either do that or attach a sheet of plain paper

11  to one edge of it and then stamp the exhibit number on that.   I

12  don't think we have any envelopes available here.

13    MR. VEEDER:  The mechanics worry me not at all, just so we

14  don't ruin the overlay.

15    THE MASTER:  Yes.

16    MR. VEEDER:  But I do think it should be in evidence as long

17  as he has testified to it.

18    THE MASTER:  You are offering it in evidence, then?

19    MR. VEEDER:  Yes.

20    THE MASTER:  It will be received in evidence as Exhibit MR-33-1

21  And I will ask the clerk, after the testimony to it has been

22  concluded, to make it in an appropriate fashion by attaching a

23  sheet so that the overlay itself will not be affected.

24    MR. VEEDER:  And we have the right of withdrawal, so the

25  Colonel can make up the new map.

1       THE MASTER:   That is correct.   The exhibit MR-33 and Exhibit

2   MR-33-1 can be withdrawn for that purpose.   Now, will you continue

3   your testimony, Colonel, with reference to Exhibit MR-33-1.

4       (Overlay received in evidence and marked Plaintiff's Exhibit

5   MR-33-1.)

6       THE WITNESS:   Yes, sir.   MR-33-1 is an overlay prepared on

7   a small sheet of acetate paper containing black lined delineations

8   with the red numerals 1, 2 and 3 inside the three delineations

9   shown.   The tabulation on the left in the red gives the acreage

10  for each of these parcels, or each of those sites, 1, 2, and 3.

11  And the tabulation on the right is the planimeter reading,

12  giving the square inches for each of those sites.

13      Now, the area No. 1 on the overlay is the area which is in

14  addition to the previously delineated site.   The area No. 3 is

15  that rock pile on the northerly portion of the previously

16  delineated site, which I delineated from the acreage of Mr.

17  Glindset.   So we came up with an addition of 3.4 acres and a

18  deletion of nine tenths of an acre, which is a total increase of

19  two and a half acres suited to avocados.

20      THE MASTER:   Mr. Glindset, do you wish to ask Col. Bowen

21  any questions now?

22      MR. GLINDSET:   Yes.

23

24

25

1                          CROSS EXAMINATION

2

3   BY MR. GLINDSET:

4       Q   First of all, do you have your clean topo map with you?

5       A   No, sir.

6       MR. VEEDER:   I think some of them are in evidence.

7       THE WITNESS:   They are in evidence.

8       MR. VEEDER:   We have the topos for this area.   I don't have

9   the exhibit number, but I know they are in evidence.

10      THE MASTER:   It is in that map folder.

11      MR. VEEDER:   May we have the topos, please?

12      These aren't the ones.   The U. S. G. S. survey maps.

13      MR. GLINDSET:   Well, if you don't mind looking at mine

14  again.   As you know before, I had a hard time reading this

15  photo, and I can't visualize or imagine anything in there.   But

16  you know from the topo as we stood up there and looked from that

17  point we were -- by the way, your Honor, we stood on this point

18  adjoining -- we stood on a point that the Colonel mentioned,

19  adjoining the additional area that he added to this.

20      MR. VEEDER: Could we have Mr. Glindset sworn, your Honor?

21      THE MASTER:   I believe he was sworn previously.

22      MR. VEEDER:   If this is a continuing swearing, it is all

23  right with me.

24      THE MASTER:   He was sworn at the previous hearing, I believe.

25      MR. VEEDER:   Just so it is continuing.   I believe he was,

1   too, but sometimes --

2       THE MASTER:  Yes, he was sworn at page 2993.  So it will be

3   unnecessary to swear him again.

4       MR. GLINDSET:  This area 1 that is shown on your additional

5   three acres -- :

6       THE WITNESS:  MR-33-1.

7       MR. GLINDSET:  MR-33-1, yes.  Is the area that we stood

8   closest to and could visualize and see actually that it was an

9   area that was suitable for avocados, as you say.  But we could

10  not, you know, -- we did not walk on to this area, your Honor.

11  We didn't follow all the way over here.  So I had my -- you had

12  your topo, and we looked across this area, and then from the

13  topo we were able to visualize all these different areas.  So

14  my main contention is that this area here that we saw that the

15  Colonel has added to the acreage --

16      THE MASTER:  That is, you are now referring on the overlay

17  to the area marked 1.

18      MR. GLINDSET:  To the area marked 1, yes.  There are similar

19  areas in this northerly portion of the property which I maintain

20  indicates -- it does indicate that on the topo map.  And --

21      THE MASTER:  Now, have you made any measurements on the

22  ground yourself or on the map to determine the acreage of these

23  areas?

24      MR. GLINDSET:  I haven't gone over the property.  And as the

25  Colonel knows, it is just about impossible to walk through there.

1    We had a hard time going to the point where we could see the

2    property, see this particular area here close up.  But we were

3    not able to traverse this area here, under the dense brush

4    unless we wanted to spend a lot of time and effort to get over

5    there.

6         But I will say this, that from this topo map the indications

7    are there are similar areas that the Government has added here,

8    there are similar areas over in this remote area to the north

9    side and in this central area also.

10        THE MASTER:  That is, you are referring to the northeast

11   area and the --

12        MR. GLINDSET:  And the central area.

13        THE MASTER:  And the central area.

14        MR. GLINDSET:  What  I am trying to say is all we have

15   visualized close up is the south area.

16        THE MASTER:  But you have no idea of the extent of those

17   areas?

18        MR. GLINDSET:  No, but in pinpointing this particular area

19   here on the topo, it doesn't look -- it looks similar to this

20   area over in here, although from your map I will --

21        THE MASTER:  Your reference to the first area is the area

22   marked 1 and 2 on the overlay?

23        MR. GLINDSET:  Yes.

24        THE MASTER:  When you refer to "this area and this area", it

25   doesn't make much sense unless you tie it in some way.

1      MR. GLINDSET:  Excuse me.

2      THE MASTER:  So you say the area on the overlay is similar

3  to the area in the northeasterly portion of the property; is

4  that what you mean?

5      MR. GLINDSET:  And also the central portion of the property.

6      THE MASTER:  That is, that would be the east central portion.

7      MR. GLINDSET:  The east central.  So from a distance it is

8  very deceiving, because -- because the terrain is up and down.

9  You will remember, Colonel, we discussed an area in the very

10  easterly portion of the property, which from the topo looked very

11  good, but there was one ridge in front of it, so we could not

12  even see over that ridge to see what there was behind that

13  ridge, in between the two ridges.  So I thought that with your

14  stereoscope you were going to come up with some minute acreages

15  in there that might be -- from the topo I had guessed, oh, about,

16  you know, as we discussed up there, about four acres or more up

17  at the north end of the property, the northeastern quarter of

18  the property.  And then various other acreages.  It is more or

19  less contiguous also, this area running down from the northern

20  part to the northeastern part -- no, the north central part.

21      THE MASTER:  East central part.

22      MR. GLINDSET:  East central part.  Excuse me.

23  BY THE MASTER:

24      Q  Well, Col. Bowen, did you examine this area in the north

25  central and east central portions with the stereoscopic maps?

1    A  Yes, sir, I did, in great detail, your Honor.  I was unable

2  to find anything in the northeast or easterly portion of that

3  part of Section 6 owned by  Mr. Glindset which was anywheres

4  near comparable with this area delineated on the overlay, MR-33-1.

5    Q  In what respect do the areas differ?

6    A  Extremely steep and much rockier, your Honor.  These rocks

7  are these white spots through there, and under the stereoscope

8  they just seem to jump right up to you there.  It is much steeper

9  land and much more rocky.  In that respect the topographic map

10  that Mr. Glindset refers to is a little misleading, because it

11  does show, running down this ridge which runs almost north and

12  south in the easterly part of the property, it seems to indicate

13  areas of lesser slope, as evidenced by the wider spacing of the

14  contours.  But that impression that one derives from the topo-

15  graphic map isn't borne out by stereoscopic examination of the

16  aerial photographs.

17  BY MR. GLINDSET:

18    Q  In other words, Colonel, you are saying that the topo

19  map is in error, then, that your photographic map is more

20  accurate.

21    A  Well, the topo is not necessarily in error, Mr. Glindset.

22  There is only a limited amount of information that can be put

23  on a topographic map, whereas an aerial photograph has -- it is

24  a photographic reproduction of that portion of the earth's

25  surface.  It has everything on it.

1      MR. GLINDSET:  Now, this particular area, your Honor, that

2  is circled in MR-- What is the number?

3      THE MASTER:  -33-1.

4      MR. GLINDSET:  -- 33-1 and 2 does show up in true proportion

5  on your topo.  Then why shouldn't the balance of this area that

6  I am contending also be as indicated on the topo?

7      THE WITNESS:  The topo doesn't show the rocks, Mr. Glindset,

8  which are out there.  And you can see those under the stereoscope.

9      MR. GLINDSET:  Well, I will grant this, this area in here is

10  very rocky, and that this particular area that you had circled

11  here --

12      MR. VEEDER:  Is that area No. 1 to which he is now referring?

13      THE MASTER:  He is now referring to the area in the central

14  portion of the map on Exhibit MR-33, which was marked 2 on

15  Exhibit MR-33-1.

16      MR. VEEDER:  Excuse me, Mr. Glindset.  I am trying to follow

17  you.

18      MR. GLINDSET:  That is my fault.

19      I will go to your photographic map, and if I see dark areas,

20  which naturally would be the indication of dense brush and good

21  soil, probably, in between the rocks, and then going to the topo,

22  following the topography, and if I  saw a dark area which would

23  coincide with a level area on the topo map, then to me that is

24  an indication of something that should be included in this.

25      THE MASTER:  Is it your contention the white specks and marks

1    which appear on the aerial photograph in Exhibit MR-33 do not

2    actually represent rock outcrops?

3        MR. GLINDSET:  No.

4        THE MASTER:  That they represent something else?

5        MR. GLINDSET:  I will grant that you can't get away from

6    that.  The photo, if it shows all that rock, it isn't feasible

7    for avocado production and so forth.  But where you have dark

8    areas and those same areas on the topo indicate a level area,

9    then why couldn't that be included for avocado production?

10        THE MASTER:  What is the difference in elevation between

11   the contours on the topographic map?

12        THE WITNESS:  This particular one, your Honor, it is 20

13   feet vertical intervals.  That is the Temecula Quadrangle, U.

14   S. Geologic Survey seven and a half minute series.  The light

15   colored contour lines are 20 foot vertical intervals and the

16   dark ones are a hundred foot vertical intervals.

17        THE MASTER:  Well, I think I get the difference in opinion

18   between you, Mr. Glindset, and Col. Bowen.  Is there anything

19   else you can offer to help me?  That is, I am going to have to

20   make some determination based upon what you have said and

21   upon what the Colonel has said.

22        Now, there is no need to repeat what you have already said,

23   but is there any additional material which you would want me to

24   consider in making this determination?

25        MR. GLINDSET:  Well, I probably for the record should make a

1  statement that I realize that this whole area is rugged and

2  highly inaccessible, and probably wouldn't be practical or

3  economical at the present price of say avocados to open this

4  territory up.  But what the future holds is something else.

5  It might be practical later on.

6  THE MASTER:  Your point then would be this, that the land is

7  actually susceptible of growing avocados, and if at a future

8  time economic conditions were such that the price of avocados

9  would increase or the cost of producing them would go down, it

10  would then become economically feasible to grow them.

11  MR. GLINDSET:  Right.

12  THE MASTER:  I think I understand your point of view on it.

13  And you think the area involved is -- would you say approximately

14  four acres?

15  MR. GLINDSET:  I hate to say, because I am just in the dark

16  as far as -- I have been told by people who have walked over it

17  after a brush fire that there is about 20 acres across -- out

18  of the 80 acres, out of the easterly portion of the property.

19  Let's put it that way, comprising 80 acres, there is about 20

20  acres that could be planted to avocados.

21  MR. VEEDER:  I am going to have to object to that, your Honor,

22  as pure hearsay.  I don't want to interrupt this at all, if I

23  can help it, but I do think we have just about reached the point

24  where I think we have to rely on what Col. Bowen has said to

25  us.

1      THE MASTER:  The testimony, of course, that Mr. Glindset

2  heard from some other persons would be hearsay, and that portion

3  of the answer would have to be stricken.

4      Is there anything else you can offer then, Mr. Glindset?

5      MR. GLINDSET: I don't think so, no.

6      THE MASTER:  Do you want to ask Col. Bowen any other questions

7  then?

8      MR. GLINDSET:  I haven't a question to ask, but I would like

9  to make another little statement.  I am not questioning the

10  integrity of the Government, Col. Bowen, or anybody.  This man

11  that works under you, Mr. Campbell, he spent a lot of time reading

12  this with the stereoscope, reading this, and he is -- I don't

13  think that he was trying to give me any false information.  But

14  when he looked over this particular area through the stereoscope,

15  he came up with about the same information that you have testi-

16  fied.  But I would like to see somebody who could sit down and

17  look at that, who is not in connection with the Government, and

18  be able to delineate all these areas with  the stereoscope.  I

19  can't myself.

20      MR. VEEDER:  Let the record show this material, this aerial

21  and the equipment and so forth are available.  If Mr. Glindset

22  or anyone else wants to look at them, the Government agrees to

23  it, your Honor.

24      THE MASTER:  Very well, Mr. Glindset.  Suppose we leave it

25  this way, the Government has offered to make the stereoscopic

1  equipment available to anyone you wish to look through the

2  stereoscope at the aerial maps, and if you can find anybody

3  that you think can properly examine then through the stereo-

4  scope, you ask him to examine them and then he can come and

5  testify at the next hearing in regard to whatever he finds and

6  give us any additional information.  So you find someone that

7  you want to have look at those maps through the stereoscope,

8  and then if he has any testimony that you wish to present at

9  the next hearing, why we will hear whatever he has to say.

10      MR. GLINDSET:  I see.

11      THE MASTER:  Then there is nothing further you have at this

12  time?

13      MR. GLINDSET:  No, sir.

14      THE MASTER:  Off record a minute.

15      (Discussion off record.)

16      THE MASTER:  Did you wish to present any evidence?

17      MRS. MEDEARIS:  Are you talking to me?

18      THE MASTER:  I am talking to the gentleman in the back row.

19      MR. RAY PETERS:  I don't know that I have much testimony to

20  give.  I just have a paper here that I got from the Marines

21  at Camp Pendleton.  I am very well satisfied with it.

22      MR. SACHSE:  Your Honor, before Mr. Peters starts, I happen

23  to know he is on the next map.  I have got one thing I would

24  like to clear up on the Rainbow watershed, please.

25      MR. VEEDER:  I think we ought to offer these exhibits prior

3040

1   to Mr. Peter's statement.

2        THE MASTER:  Very well.  Then we will offer the exhibits.

3   Then whatever Mr. Peters has to say may fit in better.

4        MR. SACHSE:  I would like to clear this up for the record.

5   Your Honor may recall that at the last hearing the Government

6   introduced MR-38, which had an aerial photograph of the Frank

7   Capra property, and which showed a dam and reservoir as being

8   on the Capra property.  And at that time I raised the question

9   that I thought the delineation on the photograph might be an

10  error, and that it was our understanding that the dam and reser-

11  voir was on the adjoining parcel 61, owned by W. D. Hayes.

12        Both Mr. Hayes and Mr. Capra are my clients.  We have gone

13  out and tried with the naked eye to sight from point to point,

14  and it does appear that perhaps a part of the dam structure

15  is on the Capra property. And we are having an actual field

16  survey made tomorrow.  We have no interest in who gets the dam

17  or who doesn't.  The point is the record should be correct.  And

18  I have made arrangements with Col. Bowen to turn over that

19  survey to the United States.  If then they feel they want to

20  change any language in Exhibit MR-38 which refers to the dam as

21  being on the Capra property, it is all right with me.  If they

22  don't want to change it, it is all right with me.  But the

23  survey will be turned over to the  United States sometime next

24  week, and we will try to clarify exactly who owns the dam

25  structure.

1       THE MASTER:  And further testimony based upon that

2   investigation would then be available at the next hearing

3   after next week?

4       MR. SACHSE:  If it is needed.  I don't think there is

5   really any need.  We know the dam is there.  The United States

6   has extablished what it is.  There is no quarrel with the

7   statement as to the number of acre feet it impounds.  The only

8   question is if at some remote future date injunctive relief

9   should be required by the United States against the dam, I

10  think our record ought to tell us against whom the injunction

11  ought to run.  So I am just trying to make absolutely certain

12  that we know who owns the dam.  And we don't care which of the

13  two owners it is.  But we are going to turn over our survey

14  to Col. Bowen.  If he wants to make a change, all right.   If

15  he doesn't, all right.

16      THE MASTER:  Very well.

17      MR. VEEDER:  Well, Mr. Sachse, at the next hearing to which

18  his Honor made reference you are going to be someplace in

19  Switzerland, I suppose.

20      MR. SACHSE:  That is quite right.  As I say, we have no

21  interest in which way the dice falls on this.  It is just I want

22  to be sure we know who is subject to restraint.

23      THE MASTER:  Very well.

24      MR. VEEDER:  If that is all, then, Mr. Sachse, --

25      MR. SACHSE:  That is all I have now.

1    MR. VEEDER:  -- I will hand you --

2    First, your Honor, before proceeding, I would like to have

3 an indication from your Honor as to how you desire to have the

4 new exhibit identified.   I am now alluding to the properties

5 of the Santa Margarita watershed below Temecula Gorge and above

6 De Luz creek confluence.  Are these to be numbered in the MR

7 series or would it be the MT series?

8    THE MASTER:  Maybe we should call these the MT series.

9    MR. VEEDER:  All right.  I will have the identification

10 placed on them on the MT series basis, then.

11   MT-1 --

12   MR. SACHSE:  That is the map, MT-1?

13   MR. VEEDER:  Yes.

14   (Map marked Plaintiff's Exhibit MT-1 for identification.)

15 BY  MR. VEEDER:

16   Q  Col. Bowen, I hand you the map marked MT-1 for identifi-

17 cation, ask you to state into the record under whose direction

18 that map was prepared.

19   A  It was prepared under my direction and supervision.

20   Q  And would you read into the record the title block?

21   A  The title block which appears on MT-1 for identification

22 is "Santa Margarita River watershed below Temecula Gorge and

23 above the De Luz Creek confluence".  Sub-title, "Land ownership".

24   Q  And would you state generally into the record what is

25 depicted on MT-1?

A    A heavy dark line, irregular in nature, which dominates MT-1, is the watershed crest.  On the left it divides Sandia Creek from De Luz Creek.  On the north, north and east, it divides the Murrieta Creek drainage from the Sandia, and other minor affluents to the Santa Margarita River.   On the south it divides the Rainbow Creek watershed from the minor affluents draining into the Santa Margarita River upstream from the confluence of Rainbow Creek and the river.  And then on the map are --

Q    That is the Santa Margarita River?

A    The Santa Margarita River. -- are delineated the owner-ships, which are designated with parcel numbers, encircled, and by and large those parcel numbers are included within the exterior boundaries of the parcel.

Q    Now, to your personal knowledge is this map accurate?

A    Yes, sir.

MR. VEEDER:  We offer in evidence MT-1.

THE MASTER:  That will be received in evidence and so marked.

(Plaintiff's Exhibit MT-1 for identification marked Plaintiff's Exhibit MT-1.

BY THE MASTER:

Q    Colonel, this heavy boundary line that you have referred to does not extend across the entire southerly portion of the map.  What is the reason for that?

1    A   Well, it begins on the -- in the lower left-hand corner,

2    your Honor, at the Naval Reservation boundary.   It was not

3    extended through the Naval Reservation.   And the area south

4    of the river has previously been considered by your Honor,

5    namely, Fallbrook Creek, and the minor affluent to the Santa

6    Margarita River northerly from Fallbrook Creek and southerly

7    from the Santa Margarita River.   And those areas are -- plus

8    a little of Rainbow Creek, subtend the watershed line across

9    the southerly portion of the map.

10    Q   In other words, if I understand you correctly then,

11    from the point on the easterly portion of the map where this

12    line ends the area considered   is that which lies north of the

13    Santa Margarita River itself until you go as far west as the

14    boundaries of Camp Pendleton?

15    A   Yes, sir.

16    MR. SACHSE:   Colonel, would you identify the stippled

17    areas shown?

18    THE WITNESS:   The diagonally hatched areas shown on the

19    map are public domain.   That is on MT-1.

20    THE MASTER: Other than Camp Pendleton, that is not cross-

21    hatched.

22    THE WITNESS:   No, sir.   The Naval Reservation is not

23    cross-hatched.

24    (Tabulation marked Plaintiff's Exhibit MT-2 for identifica-

25    tion.)

1  BY MR. VEEDER:

2      Q   I hand you, Col. Bowen, a tabulation marked MT-2 for

3  identification, ask you to state for the record --

4      MR. VEEDER:  May we put that up, your Honor?

5      THE MASTER:  Yes.

6  BY MR. VEEDER:

7      Q   -- and ask you to state into the record what is contained

8  in that tabulation.

9      A   Plaintiff's Exhibit MT-2 for idenfification is a

10 tabulation of land ownerships, Santa Margarita River watershed

11 below Temecula Gorge and above De Luz Creek confluence.

12     Q   Would you relate that tabulation to Plaintiff's Exhibit

13 MT-1, which has just been received in evidence?

14     A   MT-2 for identification is a written description of

15 those land ownerships delineated on Plaintiff's Exhibit MT-1.

16     Q   Now, under whose direction was this tabulation prepared?

17     A   Prepared under my direction.

18     Q   And is it accurate to your personal knowledge?

19     A   Yes, it is.

20     MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

21 marked MT-2 for identification.

22     MR. SACHSE:  If your Honor please, I have a great many

23 clients in this area, and apparently the United States has not

24 brought a spare copy.  Lt. Salter says he will supply me with

25 one.  Can I look it over now?

1      THE MASTER:   Yes.   That will be received, subject to the

2  right of Mr. Sachse to offer any objection which he   may have to

3  any specific description.

4      (Plaintiff's Exhibit MT-2 for identification marked Plaintiff's

5  Exhibit MT-2.)

6  BY MR. VEEDER:

7      Q   Col. Bowen, I ask you, alluding to both Plaintiff's

8  Exhibits MT-1 and MT-2, to identify those properties, which,

9  based upon your investigation, are referred to in the stipulated

10  judgment between the United States of America and the Vail

11  Company, that stipulated judgment being dated December 26, 1940,

12  and entered in the Superior Court of San Diego.

13      A   Referring to Plaintiff's Exhibit MT-1 --

14      Q   Could I ask you to use a red pencil and just check them

15  off as you go?

16      THE MASTER:   Mr. Veeder, nobody seems to have a red

17  pencil.

18      MR. SACHSE:   The clerk has got one.

19      THE CLERK:   Here is a red pencil.

20      THE WITNESS:   Referring to Plaintiff's Exhibit MT-1, of

21  course a portion of the Vail Ranch is shown, including a portion

22  of the Santa Rosa grant, and that portion of the Temecula and

23  Little Temecula where the Murrieta Creek and Temecula Creek

24  join together to form the Santa Margarita River, and a portion

25  of the Naval Reservation at Camp Pendleton, formerly Rancho

1    Santa Margarita y Las Flores, is shown in the left-hand corner.

2        THE MASTER:  The portion of the Vail Ranch you have

3    referred to is marked parcel 3; is that correct?

4        THE WITNESS:  Yes, sir.  Now, the interested parties to the

5    stipulated judgment previously mentioned are the Murray Schloss

6    Foundation -- that is parcel No. 4, delineated on Plaintiff's

7    Exhibit MT-1. It comprises a rather large area, consisting of

8    portions of a number of Sections.

9        THE MASTER:  Mr. Veeder, did you wish the Colonel to mark

10   each of these parcels with a red pencil?

11       MR. VEEDER:  I think if he just encircles them with a red

12   pencil, the No. 3, which is the Vail Company, and then mark

13   No. 4, so they will stand out more clearly and as they are

14   segregated on that map.

15       THE WITNESS:  With a red pencil I have marked a square

16   around parcel No. 3, indicating the Vail Ranch holdings.  I

17   have marked a square around parcel No. 4, indicating the Murray

18   Schloss Foundation.  And I have marked a square around parcel

19   No. 55, which is presently occupied by Dr. Henderson, successor

20   in interest of Plater, who was a party to the stipulated agree-

21   ment.

22   BY MR. VEEDER:

23       Q  Can you state the Section and Township in which that is?

24   I mean the Section in which that is situated?

25       A  Now the Henderson property which I have marked with a red

square, parcel No. 55 on MT-1, is the South half of the South

half of Section 33, and the northwest of the southeast of

Section 33, Township 8 South, Range 3 West, and the southwest of

the southwest of Section 34, 8 South, 3 West.

Q  Are there any other parcels, Colonel?

A  No, sir.

Q  And just for the record, the Murray Schloss estate is

in Section 26; is that right?

What are the other areas?

A  The Murray Schloss estate is partly in Section 21 --

Correction -- Section 22, 23, 26, 27, 28, 34, 35, all in 8 South,

3 West; and a portion of Sections 3 and 4, 9 South, 3 West.

THE MASTER:  What about Section 24 in the first Township

you referred to?

THE WITNESS:  There is a portion of Sections 23 and 24,

8 South, 3 West, which is the Vail Company ownership.  That will

be part of parcel No. 3, as delineated on MT-1.

BY MR. VEEDER:

Q  Colonel, --

THE MASTER:  Just a minute, so I can get this straight.

The boundary between parcel 3 and parcel 4 then is the straight

line going north and south which is just to the east of the

figures "22" for Section 22; is that correct?

A  Yes, sir, that is correct.

MR. VEEDER:  It might be helpful if you could just run the

1   red pencil around the exterior boundaries of the Murray Schloss

2   estate and also in regard to tract No. 3, that area immediately

3   adjacent to the river.

4          THE MASTER:  If that is true, I don't see where any portion

5   of the Murray Schloss Foundation is in Section 23.

6          THE WITNESS:  Your Honor, it is the southwest of the

7   southeast quarter, Section 23, 8 South, 3 West, indicated by this

8   connecting line.

9          THE MASTER:  It just corners in there; is that correct, then?

10         THE WITNESS:  Yes, sir.

11         THE MASTER:  And 4A is a separate ownership?

12         THE WITNESS:  Yes, 4A is indicated in Plaintiff's Exhibit

13  MT-2 as owned by Shane, husband and wife.

14         MR. VEEDER:  I don't care whether we do it on the record

15  or during the recess, but I believe we ought to delineate the

16  Murray Schloss estate and the Vail Company properties on the

17  exhibit.

18         THE MASTER:  I think that would be helpful, and I think it

19  can be done during recess.

20  BY MR. VEEDER:

21         Q  Now, Colonel, would you indicate the areas which have

22  been acquired by the Fallbrook Public Utility District through

23  a condemnation proceeding?   Just give the tract numbers, if

24  you would.

25         A  Yes, sir.  That is tract No. 35, as delineated in

1   Plaintiff's Exhibit MT-1.

2        Q   And that is in Section --

3        A   That is largely in Sections --

4        MR. SACHSE:   Your Honor, that is a very irregular parcel.

5   Can I suggest it would be wise -- I have plotted it myself and

6   colored it -- before the next session that Col. Bowen color

7   that one in?

8        THE MASTER:   I think that would be advisable.

9        MR. SACHSE:   That runs all up and down the river, and it is

10  hard to follow with just a line.

11       THE MASTER:   Can you mark that in color on the map, then?

12       THE WITNESS:   Yes, sir.

13       MR. VEEDER:   I have no further questions, your Honor.

14       MR. SACHSE:   I have no questions, your Honor.

15       THE MASTER:   Now, do you wish to present additional exhibits

16  before we take a recess?

17       MR. VEEDER:   There will be nothing further, your Honor,

18  from the United States in this matter.

19       THE MASTER:   Now, then, is there any evidence that you wish

20  to present now, Mr. Peters, in reference to this map?

21       MR. PETERS:   No, I haven't any real testimony.   I just

22  wanted to know where I stood on the matter.

23       MR. VEEDER:   I think you might want to indicate where his

24  property is situated on the map.

25       THE MASTER:   Yes.   Col. Bowen, can you indicate the location

1    of his property?

2        MR. VEEDER:  And giving the tract number, if you would,

3    please, Colonel.

4        THE WITNESS:  Ray G. Peters and Gladys P. Peters are

5    indicated in Plaintiff's Exhibit MT-2 as owners of parcel No.

6    26.  That parcel is delineated on MT-1 with No. 26 encircled

7    outside of the exterior boundaries of the property, but a line

8    leading from the circle indicates the property which is so

9    designated as 26.

10       THE MASTER:  That is riparian to the Santa Margarita

11   River on the southeast side; is that correct?

12       THE WITNESS:  No, sir.

13       MR. VEEDER:  Just a moment, I am going to have to inter-

14   pose an objection to the use of the term "riparian".  I think it

15   may abut, although I am not sure.  But the connotation of a

16   riparian characteristic may be important.

17       THE MASTER:  I will rephrase my statement, then, and ask

18   the Colonel if it abuts on the Santa Margarita River or if there

19   is property between parcel 26 and the Santa Margarita River.

20       THE WITNESS:  Parcel 26 is not contiguous to the Santa

21   Margarita River, your Honor.  It is separated from the river by

22   this parcel No. 35, which is owned by the Fallbrook Public

23   Utility District.

24       MR. SACHSE:  For the record, your Honor, this is another

25   of those situations. Mr. Peters entered into a negotiated sale

1 to the Fallbrook Public Utility District in which he executed a

2 deed in which he purported to reserve his riparian rights.  As

3 Mr. Veeder has previously pointed out, he is reserving legal

4 objections to the effect of that deed, which he intends to

5 argue before Judge Carter.  But Mr. Peters is one of those cases

6 where there is a purported reservation, although he is no longer

7 contiguous.  The testimony of Col. Bowen is correct.

8     MR. VEEDER:  I would also like to have the record show

9 the words "contiguous" and "abut" are used as synonyms, and mean

10 identically the same thing.  Is that correct, Colonel?

11     THE WITNESS:  Yes, sir.

12     THE MASTER:  Do I understand, Mr. Peters, that you have no

13 testimony which you wish to offer with respect to your parcel?

14 Is that correct?

15     MR. PETERS:  No, I don't think so.

16     THE MASTER:  Do you wish to offer any testimony?

17     MR. PETERS:  I don't have any.

18     THE MASTER:  Then my statement that you have no testimony

19 to present is a correct statement?

20     MR. PETERS:  Yes, that is correct.

21     THE MASTER:  Do you wish to ask Col. Bowen any questions on

22 your property?

23     MR. PETERS:  No.  Col. Bowen has already been over my

24 property.  He surveyed it and he gave me a recommendation, a

25 paper recommending the amount of water necessary to take care of

1    the land.  And I am very well satisfied.

2       THE MASTER:  Very well.  Now, did you wish to present any

3    testimony in reference to your property, Mrs. Medearis?

4       MRS. MEDEARIS:  All I wanted, there was a difference in the

5    number of acres on the paper that I got from the Office of

6    Ground Water Resources and what the title company gives me.  And

7    Col. Bowen has agreed to take the map and check on that.

8       THE MASTER:  Very well.  Then there is nothing you wish to

9    present at the present time?

10      MRS. MEDEARIS:  No, our report was very good.

11      THE MASTER:  Now, is there anyone else here who wishes to

12   present any evidence at the present time?

13      The gentleman behind Mr. Sachse, do you wish to present

14   any evidence?  Will you state your name for the record?

15      MR. HANEY:  W. B. Haney.  I have sold -- or rather it is in

16   escrow.  I understand the escrow is being closed today, I sold

17   48 acres of my 53 acres.  Here is the legal on it.  I didn't

18   know whether that would make any difference or not.  I reported

19   to the man who gave me the papers the other day.

20      THE MASTER:  Let's see, you have shown me the report on the

21   property of Mr. W. B. Haney.

22      MR. HANEY:  Yes, Haney.  I had 53 acres there and I am

23   selling 48 acres.  And the escrow is being closed now.  Mr.

24   Kessler of the Soil Conservation is buying it.

25      THE MASTER:  Now, do you have any questions with regard to

1    the correctness of the report -- that is, MR-30?

2        MR. HANEY:  No.  My remaining part has a water well.

3        THE MASTER:  Just a minute.  I think if Mr. Haney is going

4    to offer any testimony he should probably be sworn at this

5    time.

6

7                        W. B. HANEY,

8    being first duly sworn, testified as follows:

9

10                      DIRECT EXAMINATION

11

12   BY THE MASTER:

13       Q  Your name is Mr. W. B. Haney?

14       A  Yes.

15       Q  And you say you have sold 48 acres of your 53 acre

16   parcel?

17       A  48 acres of the 53 acres I have sold.

18       Q  And that is the property which is referred to in the

19   engineering report which has been numbered MR-30 in this case;

20   is that correct?  This has been marked MR-30; is that correct?

21       A  Yes, that is the same as this, isn't it?

22       Q  Yes.  Now, do you have any questions with regard to the

23   correctness of this report?

24       A  The report, there is just a fraction difference in the

25   acreage of what my title shows and what they show on this.  But

1  that is just a minor thing.  It doesn't affect me or it doesn't --

2  has no bearing on this case.

3      Q  Do you have any questions with regard to the land uses

4  which are specified in the report?

5      A  The land that is mentioned out here is the land that is

6  sold to Mr. Kessler of the Soil Conservation here in Fallbrook.

7  So I advised Mr. Kessler of this report, and he seemed to be

8  satisfied with it.  He didn't make any -- I asked him this morning

9  if he was coming out, and he said no, there was nothing he could

10  do about it, so he wasn't coming out.

11     Q  Do you have any questions concerning the five acres that

12  you have retained?

13     A  The only thing I want to make a statement in this, that

14  they were setting out there was a certain amount of water

15  allowed, allocated to this property, and that I had the well.

16  This land was being watered by the well that I have.  Now I am

17  keeping the well.  I didn't sell -- I kept the five acres with

18  the water well.

19     MR. VEEDER:  Could you identify for us where that five acres

20  that remains is?

21     THE WITNESS:  It is a long description.

22     MR. VEEDER:  I wouldn't want a metes and bounds description,

23  but just generally where is the property located where you

24  reserved the five acres?

25     THE MASTER:  Can you point it out on the map, the general

1   area?

2        THE WITNESS:  Yes, it lies outside.-- I have all property

3   lying south of the road here.  It was surveyed to the middle of

4   the road.  And I kept the five acres south of the road where this

5   road goes through.  Everything south of the road is what I kept.

6        THE MASTER:  That is the extreme southwest corner of the

7   parcel?

8        MR. VEEDER:  Southwest portion, lying --

9        THE MASTER:  Lying south and west of the road?

10       THE WITNESS:  I guess part of it would be west.  Yes, south

11  and west.

12  BY THE MASTER:

13       Q  And you say by your sale to him you reserved the rights

14  to whatever water there is in the well?

15       A  No, I sold Mr. Kessler the land lying north of the road.

16  I still have the land south of the road, which has the water

17  well and all of the stream.

18       THE MASTER:  Very well.  Do you have any questions, Mr.

19  Veeder?

20       MR. VEEDER:  He has used the term "allocated to the property".

21  I wonder what he meant by that.

22       THE MASTER:  Of course, you realize, Mr. Haney, this report

23  doesn't give the property any water that it doesn't have.  In

24  other words, it is not possible by a paper report to increase

25  the amount of water available to the property.

1          THE WITNESS:  I probably should have stated what water is

2    required or is necessary for it.

3          THE MASTER:  Or what water could be put to beneficial use.

4          THE WITNESS:  Yes.

5          THE MASTER:  Do you have anything else you wish to present

6    for the record, then?

7          THE WITNESS:  No.

8          THE MASTER:  Mr. Sachse?

9          MR. SACHSE:  Nothing further.

10         THE MASTER:  Very well, that is all.

11         Now, you have no further exhibits to introduce?

12         MR. VEEDER:  No, there is nothing more from the United

13   States at this time.

14         MR. SACHSE:  Perhaps this would be an appropriate time for

15   me to state for the record, your Honor, the understanding we

16   had earlier as to my part in the future proceedings.

17         THE MASTER:  I think it would, Mr. Sachse.

18         MR. SACHSE:  I am going to be absent from the State for the

19   next 60 days.  But I have interposed no objection to further

20   hearings by your Honor.  And the understanding I have reached

21   with the United States is that they will themselves advise the

22   reporter as to any parcels on which they offer evidence who are

23   clients of mine, according to their records, and that the

24   reporter then has my authority to prepare a transcript of the

25   testimony governing those parcels, at my expense, and send them

1   to my office.  And should I have any question -- which I rather

2   doubt.  There hasn't been much so far -- why we will be entitled

3   to recall Col. Bowen or whoever testified, if necessary, to

4   clarify the record.

5       THE MASTER:  There is no objection to the United States

6   proceeding to present evidence with reference to parcels of

7   property belonging to clients of yours in your absence, under the

8   conditions you have specified.

9       MR. SACHSE:  That is right, your Honor.

10      MR. VEEDER:  The only objection I have is the reference to

11  the United States of America as "they".  It is "it" after the

12  Civil War.

13      THE MASTER:  Now, I believe, Mr. Veeder, during the

14  discussion we had off the record this morning before the court

15  was convened we determined you would be prepared to proceed with

16  reference to additional property in this area below the Temecula

17  Gorge and above the De Luz Creek confluence on July the 20th;

18  is that correct?

19      MR. VEEDER:  Your Honor, we have a map delineating the

20  general areas where our preparation is proceeding, and I think it

21  might be helpful to your Honor to look at it as a guide.  Are we

22  on or off the record?

23      THE MASTER:  We are on the record.  Do you want to go off

24  temporarily?

25      MR. VEEDER:  Why don't we go off for a little bit.

1    THE MASTER:  Very well.

2    (Discussion off record.)

3    THE MASTER:  Then at this time the hearings will be

4  adjourned to July 20th, 1959, at 9:30 A. M., at which time we

5  will consider further evidence with reference to the property

6  in the Santa Margarita River below the Temecula Gorge and above

7  the De Luz Creek confluence, and also as to property on the

8  Temecula River below the Vail Dam and above the Temecula Gorge.

9    MR. VEEDER:  That will be the Pechanga Creek.

10    THE MASTER:  It is contemplated that the hearing on July

11  20th will be continued on July 21, but that the termination is

12  tentative and is subject to change on July 20th, if required.

13    MR. VEEDER:  We have nothing further, your Honor.

14    MR. SACHSE:  I have nothing further.

15

16

17

18

19

20

21

22

23

24

25