Case 3:51-cv-01247-JO-SBC   Document 4751   Filed 09/24/63   PageID.45561   Page 1 of 38
ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

---

### BEFORE HON. JOHN M. CRANSTON, SPECIAL MASTER

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | |
| Defendants. | |

### REPORTER'S TRANSCRIPT

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| Volume: | 31 |
| Pages | 3082 - 3118 |
| Date: | September 17, 1959 |
| Place: | Fallbrook, California |

RANDOL, FIVECOAT & STEWART
CERTIFIED SHORTHAND REPORTERS
1113 FIRST NATIONAL BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-4191

1

2

3

## INDEX TO WITNESSES

|  | D | X |
|---|---|---|
| Allen C. Bowen | 3094 | 3097 |
|  | 3100 | 3105 |

## INDEX TO EXHIBITS

|  |  | Ident. | Evid. |
|---|---|---|---|
| MT-5 | Temecula River Above Vail Dam, Land Ownership Map. | 3094 | 3095 |
| MT-6 | Temecula Creek Watershed, Legal Descriptions and Ownership. | 3096 | 3100 |
| MR-37D-1 | Supplemental Report, Carl N. Halde | 3111 | |

APPEARANCES:

    WILLIAM H. VEEDER, ESQ., and
    LCDR DONALD W. REDD, U. S. N.,
     For United States of America,

    FRANZ R. SACHSE, ESQ.,
     For Fallbrook Public Utility District
     and individually named defendants

    MR. GEORGE STAHLMAN, ESQ.,
     For the Vail Company

LESTER W. and LETA HAGMAN, in pro per.

G. A. SPANIOL, in pro per.

FLETCHER H. and THEDA B. HAYWARD, in pro per.

JOHN H. and MARIE L. RICHIE, in pro per.

ANNIE E. BERGMAN, in pro per.

1   Fallbrook, California, Thursday, September 17, 1959; 9:30 A.M.

2

3        THE CLERK:  Court is now in session.

4        THE MASTER:  Will counsel state their appearance for the

5   record, as usual?

6        MR. VEEDER:  William H. Veeder for the United States of

7   America.

8        LCDR REDD:  LCDR Donald W. Redd for the United States of

9   America.

10       MR. SACHSE:  Franz R. Sachse for Fallbrook Public Utility

11   District and individually named defendants.

12       MR. STAHLMAN:  George Stahlman for Vail Company.

13       MR. VEEDER:  Your Honor, I notice there are a number of

14   individuals here, I don't know if they are appearing by counsel

15   or for themselves.

16       THE MASTER:  Will any individual defendants who are here

17   and not represented by counsel state their names, please?

18       MR. HAGMAN:  My name is Lester W. Hagman, and Leta Hagman.

19       THE MASTER:  Where is your property located?

20       MR. HAGMAN:  Mine is close to Redig Corners.  I have the

21   exact description in the car; if you would like to have it I

22   can get it from the car.

23       THE MASTER:  Would you like to present testimony in this

24   matter, or are you here to hear the testimony?

25       MR. HAGMAN:  I have no testimony other than my answer.

1      MR. SPANIOL:   My name is G. A. Spaniol, and I live west

2   of him about a thousand feet on Highway 79.   And my answer was

3   sent in, and that is the last I heard of it.

4      THE MASTER:   Any testimony that you want to present?

5      MR. SPANIOL:   Nothing to tell.

6      MR. HAYWARD:   My name is Fletcher H. Hayward, and my wife's

7   name is Theda B. Hayward, and we own property in Sections 23,

8   26 and 27, Township 8 South, Range 1 East.

9      THE MASTER:   Do you wish to present any testimony today?

10      MR. HAYWARD:   I don't believe that I can, because I have

11   already turned in a report on the property, both cases, and there

12   was a soil survey made, and the report has not reached me yet.

13   But I know that I went over the land with the soil engineer that

14   was out to survey the place, and he says, I understand, that the

15   case has been worked up but no report has been turned in yet.

16      THE MASTER:   Mr. Veeder or Col. Bowen, do you know anything

17   about the situation?

18      MR. VEEDER:   We will bring that out when Col. Bowen is on

19   the stand, your Honor.

20      MR. STAHLMAN:   May I ask about the other two gentlemen who

21   have answered, do they have surveys?

22      MR. SPANIOL:   Yes.   I had the Marines out there and they

23   were supposed to send me a picture of it, but I never heard a

24   word from them.

25      THE MASTER:   Mr. Veeder, do you have any testimony on that

1    at a later time?

2        MR. VEEDER:  We will undertake it.

3        MR. HAGMAN:  Well, I had one, but the one that owned the

4    property prior to me, Matt Singer, I believe the Marines surveyed

5    it in '54 or '55, something like that.

6        MR. VEEDER:  We will check these matters out, your Honor.

7        MR. RICHIE:  My name is John H. Richie, my wife Marie L.

8    Richie, and we own property adjoining the Cottle land, on the

9    west side of the Cottle land; and I was told that my land would

10   be surveyed by the County Water Conservation, I believe, but

11   nothing has been said to me, I have never been notified.

12       THE MASTER:  Aside from any survey which may have been

13   made, which may be referred to later, is there any evidence

14   that you wish to present in this action?

15       MR. RICHIE:  Pardon me?

16       THE MASTER:  I say is there any evidence you wish to pre-

17   sent?

18       MR. RICHIE:  What evidence would that have to be?  Would

19   that have to be the amount of water I get, or would that be

20   the case of it?

21       THE MASTER:  Well, you could be permitted to present any

22   evidence which you wish to present, which would be competent

23   and pertinent to determining the water requirements, and the

24   nature of your land.

25       MR. RICHIE:  Well, the ranch --

1          THE MASTER:   I am not asking you to testify now, but I am

2    asking if you want to be heard.

3          MR. RICHIE:   I would like to be heard for one reason, I am

4    practically on the same raft as Camp Pendleton on account of

5    the water users above me depriving me of water.   I get no water --

6    For instance, in 1958 I pumped three hours and 10 minutes on the

7    22nd of July, and on the 23rd of July I pumped five minutes and

8    the water went back.

9          THE MASTER:   I think what we had better do is have you wait

10   until the Government has presented whatever evidence it has

11   which would be pertinent to your property, and then if you want

12   to add anything to it or say anything in regard to that we could

13   hear you after they have presented their evidence then.

14         MR. RICHIE:   I see.   That is all I have to say.   I just

15   wanted to bring that point up.

16         THE MASTER:   Is there anyone else?

17         MR. VEEDER:   Call Col. Bowen.

18         MR. SACHSE:   Before you proceed, Mr. Veeder, can I ask a

19   couple of questions on this transcript, to get squared away?

20         I was, as the Court is aware, absent at the last hearing

21   on July 20th.   And in a very hasty examination of the transcript,

22   your Honor, I observe that you asked for certain data from the

23   record before Judge Carter on ground waters, and so on.   Have you

24   gone into the question of ground water on Pechanga Creek?

25         THE MASTER:   Mr. Veeder's office furnished me with certain

information; rather voluminous, as a matter of fact.  I had a brief discussion with reference to that with Judge Carter and determined that I would not try to go through all of that record until after I had had some further discussion with counsel here, and until it was apparent to me the extent to which I should take cognizance of that record.  So I have not actually read any portion of the record before Judge Carter in connection with Pechanga Creek.

MR. SACHSE:  I have just received from Mr. Veeder the Pechanga Creek ownerships, and I have not had time to plot the very few parcels I have in that watershed.  But in accordance with our previous understanding I would like to later, not today, to call Col. Bowen and make inquiry on those few parcels I have on Pechanga Creek.  Apparently those questions were not asked, and you are familiar with the questions I have been habitually asking Col. Bowen.

MR. VEEDER:  We are certainly agreeable with that, there is no problem on that.

MR. SACHSE:  There is one other very brief matter on, to use Mr. Veeder's word, "housekeeping", that I think perhaps should be brought up now.  In December last your Honor submitted proposed findings on De Luz Creek, and in January on Fallbrook Creek.  Hearings were had before your Honor on objections.  In the case of De Luz Creek the United States expressed the desire to attempt to more clearly delineate by metes and bounds

1   descriptions the line of demarcation between waters described

2   as vagrant, local, and waters described as part of the stream.

3        I have checked over my transcripts, and the last indication

4   of any time from the United States as to when this would be

5   available is that Mr. Veeder hoped it would be available by a

6   date in February.

7        In the case of Fallbrook Creek that problem did not exist

8   because, as your Honor will recall, your finding was that all

9   ground waters in the creek watershed were vagrant and local.

10       Now, I want to request at this time of your Honor that your

11  findings be lodged with Judge Carter.  I don't think it is fair

12  to the individial clients, individual defendants, on the two

13  watersheds to have the findings of the Master in their individual

14  cases just hanging forever in a state of flux.  And I think they

15  should be lodged with Judge Carter and the wheels of the Federal

16  Rules start to turn in order that they can be made final, made

17  interlocutory, adopted by Judge Carter, changed by Judge Carter,

18  or corrected.  And so at this time I would like to request of

19  your Honor that the De Luz Creek and Fallbrook Creek findings

20  be lodged with the Federal Court as promptly as possible. And

21  I would like to advise your Honor and counsel that I intend in

22  the future to make the same request as to any other Master's

23  findings which you complete.

24       MR. VEEDER:  I am in accord with that, your Honor.  I think

25  that under the circumstances that it would probably be as

1    expedient for you to proceed -- I don't know why Franz uses the

2    word "lodge", if I --

3        MR. SACHSE:  File is the correct word.

4        MR. VEEDER: File the findings as you have them prepared,

5    and we go ahead on that basis.  We have found this, that there

6    are innumerable answers throughout the areas which we have been

7    and are now checking and tabulating.  It occurs to me that Mr.

8    Sachse's position is correct, that future disposition should be

9    made of those matters as we are more in a position to be specific

10   in regard to the individual tracts. It is a large task, and larger

11   than I had thought.  So I think that the thing to do, rather

12   than wait any further checking by the United States is simply

13   to go ahead and proceed as you had originally intended to do,

14   and in due time we will file a review of these parcels by parcel

15   tabulations; we will file the tabulations parcel by parcel

16   reviews, what we think are factors that will be important in the

17   ultimate disposition of this matter.

18       THE MASTER:  Very well.  I will proceed to file the De Luz

19   Creek and the Fallbrook Creek findings as previously adopted by

20   me with Judge Carter, for whatever action any party may wish to

21   take before Judge Carter in accordance with the rules he has

22   set forth for such proceedings in his court.

23       MR. STAHLMAN:  If your Honor please, in relation to the

24   statement you made regarding the rather voluminous matters

25   which Mr. Veeder has submitted to you in connection with the

1   Pechanga Creek, do you have reference to the exhibits which I

2   see here?

3       MR. VEEDER:   The exhibits which were entered in the case

4   before Judge Carter.   In other words,what we delivered to Mr.

5   Cranston was the material geological in nature and the exhibits.

6       MR. STAHLMAN:   It is all evidence?

7       MR. VEEDER:   It had already been entered as exhibits

8   before Judge Carter.

9       MR. STAHLMAN:   These exhibits, Mr. Sachse has a copy of

10  MT-3, 4, 5, and 6.  Do you have copies for me?

11      MR. VEEDER: We have copies for you.  This is 6.

12      THE MASTER:   In further answer to your question, Mr.

13  Stahlman, the matter that I referred to was all evidence previously

14  introduced before Judge Carter, either portions of the transcript

15  or copies of certain maps and documents.

16      MR. STAHLMAN:   And those are all matters relating to

17  Pechanga Creek, and the general situation?

18      MR. VEEDER:   That is right.   The question arose, and I

19  think it is one of the perplexities which we have under the

20  modus operandi, so to speak, is that we have now concurrent

21  tribunals which are increasingly interested in the same basic

22  data.

23      THE MASTER:   It was my thought after talking to Judge Carter

24  that I would not endeavor to read through all the portions of

25  the transcript or examine those exhibits in detail until I had

1   all of the testimony which you intend to present here, so that

2   I would  have that background before going over the transcript.

3        MR. VEEDER:  Well, I think it is a matter of correlation

4   similar to the findings to which I have just made reference.

5   We have a great number of people who have pleaded and claimed

6   rights which I am trying to figure out what to do with and how

7   best to handle it.  We are going to tender a proposal to Judge

8   Carter on the 22nd in regard to some of these matters.  Mr.

9   Sachse and I have been working on an interlocutory judgment, and

10  we are trying to work out the best way to handle these parties

11  most expeditiously.

12        MR. SACHSE:  May I ask just one more question on these

13  findings?  I don't have it in my file, but I have a recollection,

14  your Honor, that you also proposed a tentative draft of findings

15  on the area north of Fallbrook Creek, south of Rainbow Creek --

16  I mean west of Rainbow Creek and south of the river, did we not?

17  What is the status of those, while we are kicking this around?

18        THE MASTER:  I have a tentative draft here, and my recol-

19  lection is that I gave copies to counsel.

20        MR. SACHSE:  I have a copy in my office.

21        THE MASTER:  But I had not sent copies out to all individual

22  defendants, pending any comments which counsel might have, so

23  that it would avoid double mimeographing.

24        Now, has any counsel any comments to make on that tentative

25  draft?  If not, I will have these findings mimeographed and

1    sent out to the individual defendants affected by them.

2        MR. VEEDER:   I think that would be the thing to do, your

3    Honor.

4        MR. SACHSE:   I concur.

5        THE   MASTER:   Then we can send out the ones prepared.

6        MR. VEEDER:   Call Col. Bowen.   I have forgotten whether we

7    swear the witness every time, or whether the original swearing is

8    a carryover.

9        THE MASTER:   It is a continuous event.

10       MR. STAHLMAN:   I would like to make just one comment, if I

11   may, in connection with what some of these people who are

12   appearing by themselves here this morning have indicated, that

13   they filed an answer; I think it might be well to state that the

14   answer does not constitute evidence.   And they might be familiar

15   with that situation, that the answer itself is merely a claim.

16       THE MASTER:   That is true.   The answer constitutes only a

17   claim, and if there is evidence contrary to the answer, the

18   defendant who prepared the answer should testify in support of

19   the answer.

20       Now, the only way to find out whether there is any evidence

21   contrary to the answer is to hear what testimony is presented

22   by the United States and see if that does conflict with your

23   answer.

24       MR. VEEDER:   Your Honor, are you ready for us to proceed?

25       THE MASTER:   Yes.

1    MR. VEEDER: We are going to put in this MT-5. Would the

2    clerk please mark this copy for us? This is the same one as

3    MT-5.

4

5                        ALLEN C. BOWEN,

6    recalled as a witness, having been previously sworn, testified

7    as follows:

8

9                     DIRECT EXAMINATION

10

11   BY MR. VEEDER:

12       Q   Col. Bowen, I refer to the map marked MT-5 for identi-

13   fication and ask you to state into the record the content of

14   the title block, and to state under whose direction that map

15   was prepared.

16       A   MT-5 is entitled Temecula River Above Vail Dam, Land

17   Ownership Map. This map was prepared under my direction and

18   supervision.

19       Q   And is it accurate to your knowledge?

20       A   Yes, sir.

21       Q   Now, I observe that there are numbers marked throughout

22   the area depicted on this map, and they are circled. Would you

23   state into the record what those numbers which are circled

24   represent?

25       A   They reporesent the parcel numbers in that subject

     watershed of the Santa Margarita River.

1    Q   And when you say parcel numbers what do you mean by

2   that?

3    A   The parcels are the tracts in single ownership.   This

4   is an ownership plat, and the parcel is a tract of land owned

5   by one apparent owner or owners.

6    MR. VEEDER:   We offer in evidence the exhibit marked for

7   identification MT-5.

8    MR. SACHSE:   No objection.   But may I ask, Mr. Veeder,

9   Cdr. Redd called my attention earlier to some ownership changes.

10   As of what date are these ownerships keyed to your MT-6?

11    MR. VEEDER:   It would be necessarily the date of the notice

12   of Lis Pendens.

13    MR. SACHSE:   In other words, this does not reflect any

14   recent ownership changes?

15    MR. VEEDER:   There may be some reflections, but we are

16   standing on the list of ownership.

17    MR. SACHSE:   Does this map show ownership as of the date

18   of Lis Pendens?

19    MR. VEEDER:   I can't say from memory any specific on this

20   one; we have made changes from time to time where we have been

21   apprised of them where there has been a transfer of title.

22    MR. SACHSE:   As far as you know it is the parties as of

23   the Lis Pendens date?

24    MR. VEEDER:   That is right.

25    THE MASTER:   It will be received in evidence as Exhibit

1    MT-5.

2    BY MR. VEEDER:

3        Q   Col. Bowen, I hand you Identification marked MT-6 and

4    ask you to state into the record what is contained in that

5    Identification.

6        A   Plaintiff's MT-6 for Identification is entitled Temecula

7    Creek Watershed, Legal Descriptions and Ownership, and consists

8    of 150 pages of parcel descriptions.  The parcels being the

9    same as depicted on Plaintiff's Exhibit MT-5.

10       Q   And that is related directly to MT-5.  Is that correct,

11   Colonel?

12       A   Yes, sir, that is correct.

13       Q   And are there legal descriptions for each parcel in the

14   exhibit?

15       A   Yes, sir, there are.

16       THE MASTER:  There does not seem to be a legal description

17   for Parcel 1, is there?

18       THE WITNESS:  That is correct, your Honor.  Parcel 1 is a

19   portion of the Vail Ranch, which appears in the upper left-hand

20   corner of Plaintiff's Exhibit MT-5.  That is not described in

21   MT-6.

22       MR. VEEDER:  Nor does this purport to relate, your Honor,

23   to the Vail property.

24       THE MASTER:  Now, in MT-6, for example on page 41, there

25   are Parcels 81-A-29-64; 81-A-29-65, and so forth.  The parcel

3097

1   number which appears on the map is simply the last two digits,

2   64, 65 and 66.  Is that correct?

3        THE WITNESS:  Yes, your Honor.  Referring to Plaintiff's

4   Exhibit MT-5, Section 29, Township 8 South, Range 1 East, it

5   is noted that Parcel Nos. 64, 65 and 66 conform to those parcels

6   on page 41 to which your Honor alluded.

7        THE MASTER:  Well, the first numbers and the latter are

8   intended to designate the township and range?

9        THE WITNESS:  Yes, sir.

10       THE MASTER:  And section?

11       THE WITNESS:  The township and range, and following the

12   dash the next number indicates the section; and following the

13   section and the dash the number indicates the parcel.

14       MR. VEEDER:  We offer in evidence the exhibit marked for

15   identification MT-6.

16       MR. STAHLMAN:  MT-6, may I ask some questions just for

17   clarification, please?

18       THE MASTER:  Surely.

19

20                        CROSS EXAMINATION

21

22   BY MR. STAHLMAN:

23       Q  Col. Bowen, on the first page, Parcel 1, on the Vail

24   property, that refers to No. 1?

25       A  The portion of the Pauba Ranch, Mr. Stahlman, which

caps?

1    appears in the upper left-hand corner of Plaintiff's Exhibit

2    MT-5, and adjacent to Vail Lake.

3         Q  Now, going to the next page, for instance Parcel 2,

4    that is also Vail ownership, is it, or is that United States?

5         LCDR REDD:  Parcel 2 is all United States.

6         MR. STAHLMAN:  That is what I gathered.  I see.

7         THE MASTER:  Parcel 2 appears to extend from page 2 to

8    page 17.

9         MR. STAHLMAN:  Yes.  Where is the No. 2 marked on here to

10   indicate it?

11        LCDR REDD:  It is all of your shaded areas.

12        THE WITNESS:  The parcel number doesn't appear to, be

13   marked on that particular portion of the Government land.  How-

14   ever, the Government land is indicated on MT-5 with different

15   forms of shading.  The National Forsest land is indicated with

16   a wavy cross section; the Indian land is indicated with a

17   horizontal hatching; and the Public Domain or Bureau of Land

18   Management is indicated with a diamond crosshatching.

19        MR. VEEDER:  You should have the legend on that.  On the

20   original map we do have the legend showing that delineation.

21        THE WITNESS:  Yes, sir.  For example, Mr. Stahlman, on

22   page 2 of Plaintiff's Exhibit MT-6, Parcel 2 is shown as

23   comprised of a number of portions of sections.  The first one

24   is in Range 8 South, 1 West, Section 13, and is described as

25   the southeast quarter of the northwest quarter, the south one

1    half of the northeast quarter, and the northeast quarter of the

2    southeast quarter of Section 13, and appears on Plaintiff's

3    Exhibit MT-5 with the diamond cross section, Bureau of Land

4    Management.

5         Then the next portion of Parcel 2 is in 8 South, 1 West,

6    Section 19, and is shown as Bureau of Land Management Land by

7    the crosshatching design on Plaintiff's Exhibit MT-5.

8         The next portion of Parcel 2 is in Range 8 South, 1 West,

9    Section 20, which is also shown with the Bureau of Land Management

10   design on MT-5.

11        The next portion of Parcel 2, 8 South, 1 West, Section 22,

12   is shown to be National Forest land with the wavy cross section

13   on Plaintiff's Exhibit MT-5, and so forth on through it.

14        MR. STAHLMAN:   I have that.

15        Q   Now, the other, on page 1 of MT-6, Parcel 1 is described

16   as that portion of the Vail Ranch within the Temecula watershed,

17   and there being a description of all the other lands.   What was

18   the reason there was no description of the Vail land?

19        MR. VEEDER:   There are several reasons.

20        THE WITNESS:   That would be a metes and bounds description,

21   for one thing, Mr. Stahlman.

22        MR. VEEDER:   At this point I would like to interject

23   something of interest to Mr. Stahlman and Mr. Sachse, and to

24   the Court, of course.   There has been filed with the Court a

25   motion and an order entered withdrawing from this proceeding

certain tracts of land.   I think everyone has received a copy of

that order.   And of course the Vail Company is being heard

before the Court.   Similarly, there are several tracts appearing

on MT-5 which are included in that order of withdrawal.   I intend

to go through -- and your Honor has agreed to it, as I recall --

to go through and mark the Court's copy of MT-6, and we will

do the same for you, and to show the ones that are covered by

the order which brings those cases before Judge Carter.

MR. STAHLMAN:   That answers my question and clarifies this

matter for me.

THE MASTER: Exhibit MT-6 will then be received as Exhibit

MT-6.


DIRECT EXAMINATION


BY MR. VEEDER:

Q   Col. Bowen, in regard to Mr. Hayward's parcel, which as

I remember is Parcel No. 98 and 86, he inquired in regard to the

soil survey.   It is my understanding that the survey has been

completed on his property.   Is that correct?

A   Yes, sir, the field work has been completed, but the

office work yet remains to be done.

MR. VEEDER:   And we will submit to Mr. Hayward a copy of

that report for his perusal, and if he has objection, your

Honor, we will afford him an opportunity to bring that into

the record.

THE MASTER:  Mr. Hayward, do you understand then that you are to receive a copy of a soil report which is being prepared but hasn't been completed on your property?

MR. HAYWARD:  Yes, thank you.

THE MASTER:  Now, I presume then that you would want to wait until you receive that before you offer any evidence. However, if you have anything you wanted to present now you would have an opportunity to do so.

MR. STAHLMAN:  May I ask another question?  I presume there are other soil surveys that are not finished in that area?

MR. VEEDER:  I am sorry.

MR. STAHLMAN:  I say I presume there are other soil surveys that are not finished in that area.  Is that correct?

THE WITNESS:  There are others in that area, yes, sir.

MR. STAHLMAN:  Is there anything that might indicate when they might be finished?

THE WITNESS:  Well, we are working primarily now on reports to be presented in court in San Diego..  For example, we are committed to complete reports on properties owned by clients of Mr. Krieger's; also committed to complete the Cottell-Gibbon property represented by Mr. Grover.  And I have given those priority, and that is the reason some of these people whose field work has been done have not received a complete report of our investigation.  .

1          THE MASTER:  Well, those reports would be completed by the

2    1st of November, would they not?

3          THE WITNESS:  We would make every effort to do that, your

4    Honor.

5          THE MASTER:  Well, I would suggest that if it is possible

6    that you try to complete them between now and the end of October,

7    and that they be sent out to the individual defendants, and at

8    the time they are sent out the defendants would receive a notice

9    that that report would then be presented before the Court here

10   on a specific date, and that they could be present at that time

11   to present any evidence which they had in contravention of the

12   report, or an addition or supplement to the report.

13         MR. VEEDER:  It is certainly agreeable with the United

14   States, your Honor.

15         THE MASTER:  So that, Mr. Hayward, you will then at some

16   time receive a copy of the report, and when you receive the

17   report there will also be a specific date set when you could

18   appear and make any comments that you wanted to concerning the

19   report.

20         MR. HAYWARD:  Thank you.

21         MISS BERGMAN: May I ask a question?

22         THE MASTER:  What is your name?

23         MISS BERGMAN:  Annie E. Bergman.  And I received this

24   paper that my case will not be heard until September 22nd, and

25   I made no such request. In the answer that I made to this case

1   I answered my own, I didn't have any legal advice except yours,

2   and I made my own answer and I requested that there would be no

3   decision until I had received my Water Resources survey.

4       THE MASTER:  Have you received a survey yet?

5       MISS BERGMAN:  No, I have not.

6       THE MASTER:  That must be one that is set  before Judge

7   Carter in San Diego, Mr. Veeder?

8       MR. VEEDER:  Yes, your Honor.  Annie Bergman is a big

9   land owner up there, and we had thought that we could do a

10  complete analysis of her area, and of these others, and put it

11  in the record before Judge Carter, because we think there is

12  going to be an impact on the stream of holdings of such size.

13  Oviatt is another one.  And the reason Mrs. Bergman's land has

14  been separately treated is because she is a large land owner in

15  there.  However, if she has an objection to Judge Carter hearing

16  it she can state it and let him dispose of it.

17      MISS BERGMAN:  I asked that my Water Resources survey

18  would be my evidence in the case and I would be willing to stand

19  on that, but I haven't received the survey yet.  And we are

20  going as far as we can yet.

21      THE MASTER:  I take it that your case would not be heard

22  before Judge Carter until this soil survey report was available

23  to him. Now, you understand from what Mr. Veeder said that

24  Judge Carter has retained the right to try the major land owners

25  and those whose land abuts directly upon the stem of the Santa

1   Margarita River.  And your property is included in that

2   property, so presumably unless that order is changed no testi-

3   mony with reference to your property would be presented before

4   me at all.

5       MISS BERGMAN:  Well, will it be necessary for me and for

6   my daughter Esther Trunnell to go to that hearing all the time,

7   straight on through?

8       MR. VEEDER:  No.  I shouldn't be advising her.  I would

9   say that I don't think it is necessary at all.

10      MISS BERGMAN:  To be present?

11      MR. VEEDER:  No, ma'am.  What we would do, though, the

12  day your property is being considered we would notify you and

13  if you would desire, and I would recommend to you that on that

14  day you be there.

15      MISS BERGMAN:  I would again like to ask my property not be

16  considered until I have a copy of the survey.

17      MR. VEEDER:  Nor do we desire to present it until then.

18      THE MASTER:  I would suggest that you plan to be present

19  on the date when you are notified that your property would be

20  considered specifically.  But I think probably Mr. Veeder is

21  correct in saying that you need not be present in San Diego on

22  every day that they are hearing the case down there.

23      MR. VEEDER:  I think it is unnecessary, but I recommend

24  that you be there on your day.

25      MISS BERGMAN:  My son-in-law was thinking of going.

1    MR. STAHLMAN: May I ask, do you intend to put in any soil

2  surveys in this particular section in connection with this?

3    MR. VEEDER: We have none today.   That concludes, except

4  for a matter that I am not --

5    MR. SACHSE:  If this is a new matter I have one or two

6  questions on the map.

7    MR. VEEDER:  Why don't you go ahead.

8

9                    CROSS EXAMINATION

10

11  BY MR. SACHSE:

12    Q  Col. Bowen, I want to get quite clear on what this map

13  means.  The black line on the northerly -- the heavy line along

14  the northerly edge of MT-5, the solid black line is the water-

15  shed between the Temecula Creek and Coahuila Creek to the south,

16  and Wilson Creek and so on, to the north. Is that correct?

17    A  Yes, sir.   The irregular, for the most part, solid

18  black line which extends around the perimeter of the map

19  depicted on MT-5 represents the crest of the divide which

20  divides the drainage flowing directly into Temecula Creek;

21  Temecula Creek occupying a central position generally in the

22  map, and flowing from the lower right-hand corner of the map

23  to the upper left-hand corner into Vail Lake.  There is one

24  exception to the solidity of that watershed divide, as shown

25  through the upper right-hand quadrant of the map, it is a

1  heavy dashed line extending from -- through Sections 9, 16, 15,

2  14, and 13, 8 South, 2 East; Sections 18, 17, 20, 21 and 22,

3  8 South, 3 East.  And that is dashed through that reach because

4  the control in the area is very poor.

5      THE MASTER:  What do you mean by control?

6      THE WITNESS:  Well, the ground control.  The surveys up in

7  that area, your Honor, are entirely inadequate.  The best

8  surveys that we have are on the scale of 1 to 62,500, which were

9  prepared by the Army Mapping Service many years ago.  And there

10  are substantial errors in those maps, so we used aerial photo-

11  graphs and Bureau of Land Management plats to establish the

12  relationship of the sections to the divide.

13      MR. SACHSE:  May I inquire again?

14      Q  However, the portion lying immediately north of this

15  broken line is still within the Santa Margarita River drainage,

16  although not within -- or, may or may not be within the Temecula

17  Creek drainage.  Is that what you are saying?

18      A  Yes, sir.

19      Q  That the line of demarcation between that portion of

20  the Santa Margarita River drainage that is shown on MT-5 and

21  that portion of the Santa Margarita River drainage which drains

22  into Wilson Creek and Coahuila Creek is this line which is

23  difficult to establish?

24      A  Yes, sir.

25      MR. VEEDER:  Your Honor, the subject watershed.

1       THE WITNESS:  The watershed on the south line --

2  BY MR. SACHSE:

3       Q  The southerly line on Exhibit MT-5 represents the

4  drainage of the Santa Margarita River itself?

5       A  Yes, sir.

6       Q  Now, is there any reason, Col. Bowen, why Coahuila

7  Creek drainage is included on MT-5 instead of being a separate

8  one, or is there no significance to it?

9       A  Well, the only significance, Mr. Sachse, is that Temecula

10  Creek above Vail Dam is a logical subdivision of the Santa

11  Margarita River watershed, and owing to the general similarity

12  between Coahuila Creek and Chihuahua Creek, and the other

13  drainage into Temecula Creek, there were not more detailed

14  subdivisions of that particular portion of the watershed.

15       Q  Now, Col. Bowen, are you prepared to testify to the

16  same general questions that have been asked you previously as to

17  the character of ground waters in this area, whether or not they

18  are a part of the stream system?

19       A  Not at the present time.  We are working on the geology

20  of that area in detail as we complete our field work for these

21  engineering reports.

22       Q  I am asking this simply to save time.  No useful purpose

23  would be served by  my singling out three or four parcels, or

24  would you prefer to wait until the whole job is done?

25       A  I would prefer to wait until the whole job is done.

1      MR. SACHSE:  Nothing further.

2

3  BY MR. STAHLMAN:

4      Q  The dotted line you made, and the explanation you made

5  of determining that exact line of drainage is because of the

6  flat area through there, is it not?

7      A  No, sir.

8      Q  What is the reason?

9      A  That isn't the difficulty here, Mr. Stahlman.  The

10  difficulty is that the Government surveys out in there in some

11  instances are very old and section corners have been lost.  So

12  the problem is in relating the crest of the divide to the sections

13  through which they flow.

14      Q  I see.  I was wrong.

15      A  But that is rather mountainous country back through

16  there, the divide is easy to depict.  But whether it is a

17  hundred feet from a section corner, or 50 feet, is not too easy

18  to determine, and that is the reason that was dashed.

19      MR. VEEDER:  We have nothing more.-- the United States has

20  nothing more in this particular area, although I have an

21  extraneous matter to call to your Honor's attention and ask for

22  direction, if there is nothing more.

23      THE MASTER:  I have one question.

24      Q  I think I understand the system followed but, for

25  example, Col. Bowen, this parcel 256, which seems to take in

1  most of Section 17 here, although only one portion in the lower

2  left-hand corner is within the watershed as shown here the

3  description contained in MT-6 would be of the entire area of

4  256 rather than the part in the watershed.  Is that correct?

5       A  Yes, sir, that is correct.

6       Q  And the same would be true of all the other parcels,

7  I assume, where the dotted line traverses a parcel, the legal

8  description in the exhibit is the entire parcel, and only a

9  portion of the parcel is within this watershed?  That would be

10  true say of 245, 195?

11      A  245 is a good example.  As it appears on MT-5, a small

12  portion of it is in the Coahuila Creek drainage to the north;

13  and MT-6, on page 124, that parcel is described as the southeast

14  quarter of the southwest quarter, Section 18, Township 8 South,

15  3 East, which encompasses the entire 80, and that is true of

16  the other parcels through which that dashed watershed line

17  passes.  The watershed line, as Mr. Sachse pointed out, is

18  within the Santa Margarita watershed.

19      THE MASTER:  That is all I had.

20      MR. VEEDER:  Your Honor will recall that we had a matter

21  on May 25th involving the Halde property, at which time inquiry

22  was raised concerning certain impounding of waters for swimming

23  pools, and otherwise.  The exhibit to which I am referring is

24  MR-37.  Now, Mr. Halde or his lawyer is not here this morning.

25  I am somewhat reluctant to bring this matter up at this time,

1   but we do have what would be a supplement to MR-37. Whether we

2   should offer it now or wait, this matter has been submitted to

3   Mr. Halde, we have heard nothing from it, either accepting it

4   or rejecting it.   I thought that I would write a follow-up

5   letter to him on it, but I thought also we might have this marked

6   for identification now and advise him that it has been marked

7   for identification, and that unless we hear to the contrary it

8   will be made part of the record.

9        THE MASTER:  This is a supplemental report?

10       MR. STAHLMAN:  Is this in the Rainbow watershed?

11       MR. VEEDER: That is correct. This is a report prepared by

12   Col. Bowen on the subject.  It is one of the housekeeping

13   matters that we are trying to keep up with.

14       THE MASTER:  Well, I think the procedure you have suggested

15   would be advisable, namely, to mark this for identification,

16   advise Mr. Halde and his counsel that that has been done, and

17   state that the matter will be presented to the Court at a

18   specified time in the future, and if he wishes to raise any

19   objections that he should be present at that time or else

20   notify me if he can't be present at that time and we will try

21   to arrange a date at that time.

22       MR. VEEDER:  We will proceed on that basis?

23       THE MASTER:  Yes.

24       MR. VEEDER:  I would suggest that it be marked MR-37A.

25       THE MASTER: Wait.  We have an MR-37A, B, C and D already.

1   I happen to have MR-37 right in front of me.

2       MR. VEEDER:  That is right.  Let's make this MR-37 -- I

3   don't have that here, your Honor.

4       THE MASTER:  Let me check here.  It is not listed in the

5   index of the transcript on that date, but I would suggest that

6   this be marked Exhibit MR-37D-1, and we are not duplicating

7   any other exhibits.

8       MR. VEEDER:  And I will notify him, your Honor.

9       THE MASTER:  Can you send me a copy of your letter of

10  notification?

11      MR. VEEDER:  Yes, your Honor.

12      There is nothing more, is there, Colonel?

13      THE WITNESS:  No.

14      THE MASTER:  Mr. Sachse or Mr. Stahlman, do you have any

15  questions of the Colonel?

16      MR. SACHSE:  Not at this time, your Honor.

17      MR. STAHLMAN:  No questions.

18      THE MASTER:  I might state for the record that on July

19  29th Mr. Glindset telephoned me and stated he would drop his

20  contention with reference to additional acreage and that he

21  was satisfied that Col. Bowen's computation was correct.  So

22  that is now a matter for the record.

23      MR. STAHLMAN:  Well, he is batting a hundred percent now.

24      THE MASTER:  Now, as I indicated at the commencement of

25  the hearing, any defendant has a right to present testimony.

1   At the present time the record has no engineering report with

2   reference to the property of any particular defendant.  I take

3   it these reports are still in the process of preparation, those

4   who have requested them will receive them in due course, and the

5   same procedure, I think, should be followed with the other

6   defendants, as we mentioned specifically with Mr. Hayward.  They

7   should be sent a copy of the report and be advised at that time

8   when to appear.  It would seem more appropriate to hear the

9   testimony then than to have them testify now with reference to

10   an unknown quantity.

11       MR. VEEDER:  We would advise your Honor, too, as to when we

12   make such delivery.

13       THE MASTER:  Mr. Sachse, do you wish to present any matters

14   at this time, or any evidence?

15       MR. SACHSE:  I would like to ask Col. Bowen the same

16   questions about MT-4.  Have you completed your geological

17   studies of the ground water above Temecula Dam and above Vail

18   Gorge?

19       THE WITNESS:  I think by and large that was covered by Mr.

20   Kunkel in San Diego, and I haven't done any work in that partic-

21   ular area except, Mr. Sachse, in conjunction with some surveys

22   we have made on parcels in that area we have made additional

23   statements regarding the geology.

24       MR. SACHSE:  Do you have an opinion of the ground water

25   underlying any of those parcels?

1       MR. VEEDER:  I am going to object to that, that is too much

2  of a shotgun question.

3       MR. SACHSE:  Then I will name them.  I want to know if you

4  have an opinion as to any of the parcels on MT-4, then I will

5  be specific.

6       THE MASTER:  As to any specific parcel.

7       THE WITNESS: Yes, sir, I do.  We have, of course, maps, but

8  I don't have them with me and I would be hesitant to go into

9  detail on particular parcels without the geology map before me.

10      MR. SACHSE:  I have nothing further at this time.  But I

11  will ask your Honor, since this was the one that was discussed

12  during my absence, that at the next hearing, whenever it is,

13  that we ask Col. Bowen to bring his maps and I will have a few

14  very brief questions regarding those parcels delineated on MT-4.

15      THE MASTER:  Very well.  Col. Bowen, if you will bring the

16  maps with you to the next hearing.

17      That brings us to the point of setting a date for further

18  hearings on this matter.

19      MR. VEEDER:  We have gone into this matter, your Honor.

20  And as I mentioned to you, the date which we believe would be

21  most satisfactory from the standpoint of accomplishing things

22  would be November 2nd, that is a Monday.

23      MR. STAHLMAN:  Has anyone heard whether Judge Carter is

24  going ahead on the 22nd?

25      MR. VEEDER:  Judge Carter has stated there will be a

1    meeting on the 22nd, at which time there will be a continuance

2    of 30 or 40 days.

3        THE MASTER:  He indicated to me that it would probably be

4    60 days.  He said that the calendar of other matters was

5    becoming so congested --

6        MR. VEEDER:  By 30 to 40 days, I think we were talking about--

7    I was telling him I was anxious to get some of these matters

8    brought up, and he said I will tell you, you are going to wait

9    30 or 40 days, anyway.

10       MR. STAHLMAN:  If there is going to be that much time we

11   will have ample time for Col. Bowen to make a survey of the

12   Vail Ranch.

13       THE MASTER:  Making a survey of the Vail Ranch doesn't

14   help us with the hearings here.

15       MR. STAHLMAN:  It will help Judge Carter.

16       MR. VEEDER:  What was your last statement, Mr. Stahlman?

17       MR. STAHLMAN:  I said during all of this period of time

18   Col. Bowen will have an opportunity to make a survey of the

19   Vail Ranch.  I am speaking about a soil survey and a water

20   duty in connection therewith.

21       THE MASTER:  Well, what about the date of November the

22   2nd as far as you are concerned, Mr. Sachse and Mr. Stahlman?

23       MR. SACHSE:  Perfectly satisfactory.

24       THE MASTER:  Well, that is a Monday.  That is agreeable to

25   me.

1    MR. SACHSE:   What will we cover?

2    MR. VEEDER:   It will be the Wilson Creek area, which is

3    the south watershed concerning which you were inquiring.

4    THE MASTER:   Well, are you suggesting to cover any additional

5    area? My thought was that we would try to go back and get some

6    more testimony on the areas which we have on this map, which we

7    don't have any detailed testimony on yet.

8    MR. SACHSE:   That is what I want to know, what papers to

9    bring along.   If we are going to talk about the Wilson --

10   MR. VEEDER:   What we will do is this, in regards to soil

11   surveys, Mr. Hayward and others, we will of course put in that

12   data as we proceed on the Wilson Creek area, and everyone will

13   be notified.   I think the only thing we can do, your Honor, is

14   to proceed as best we can, take in this new area and bring this

15   area up to date.

16   THE MASTER: Well, I think as far as possible you should try

17   to complete one area before you go off to the next.

18   MR. STAHLMAN:   That is what I would think.

19   MR. VEEDER:   It is up to your Honor.

20   THE MASTER:   I think it is better than having one in one

21   state of completion and another in another state of completion.

22   MR. STAHLMAN:   How about the Pechanga, for instance, are

23   those surveys in?  We have jumped from there here, and now to

24   someplace else.  It seems to me, like you started out, you were

25   making some progress that way.  I doubt if you are going to make

1    sufficient progress if you jump around.

2        THE MASTER:  I think we ought to try to wind up all of the

3    unfinished areas as quickly as possible, and if that means you

4    don't start a new one because of completing the reports on the

5    old one I think that should be done.

6        MR. VEEDER:  It seems to me we get in the general statements

7    and general data and notify these people in regard to their

8    soil surveys.  I was hopeful that we would be able to wind up

9    the loose ends in the new hearing.  Now, I will certainly be

10   guided by your direction.

11       THE MASTER:  Do you think you can cover all of the engineering

12   reports that have been requested on all of the areas that have

13   now been partially considered, and take on some new territory?

14       MR. VEEDER:  That is up to Col. Bowen very largely.  What

15   is your view on that, Col. Bowen?

16       THE WITNESS:  Well, it is a problem of completing the

17   reports for these people who have requested them.  As I stated

18   earlier, we have detoured here and there to take care of Mr.

19   Krieger and Mr. Grover.  And if we could concentrate only on the

20   Temecula watershed above Vail Dam and give us an opportunity to

21   clean that up before we have defendants from Anza Valley and

22   Coahuila Valley down here expecting us to get their reports out

23   I think it would be the more orderly procedure.

24       MR. VEEDER:  If that is your Honor's desire we will be

25   happy to do that.

1      THE MASTER:   I think we should, unless you are confident

2  that you can cover that area and any additional area.   And I

3  gather that Col. Bowen is not willing to bite that off all in

4  one bite.

5      THE WITNESS:   No, sir.

6      THE MASTER:   Then I would suggest that the hearing on

7  November the 2nd be devoted to presenting additional evidence

8  and trying to complete the presentation insofar as the Govern-

9  ment is concerned of evidence on the areas which have already

10  been previously considered, and that the individual defendants

11  involved in these areas of course be given the opportunity to

12  present any evidence they have, any addition or rebuttal to

13  the Government's testimony, and that a new area not be gone

14  into until all of that testimony has been received.

15      MR. VEEDER:   We will abide by that direction, your Honor.

16      MR. SACHSE:   I will request, your Honor, on about five

17  parcels, all of which in the Pechanga are located in Section

18  30, 8 South, 2 West.   And I would like, if we could -- I am in

19  agreement with Mr. Stahlman to try to clean up the Pechanga

20  if possible so that at the next meeting, if I could ask Col.

21  Bowen, that would dispose of the Pechanga as far as I am

22  concerned.

23      THE MASTER:   I understand Col. Bowen will have his notes

24  and records available.

25      Now, what is your thought as to further hearings after the

1    2nd?  That is, will you be able to have other hearings that week

2    or the next week, or will it be necessary to take a longer

3    recess to prepare testimony for additional areas?

4         MR. VEEDER:  Before I leave at this time, your Honor, I

5    will advise you on that.  I am going to make an investigation

6    on it and see what we can do.

7         THE MASTER:  Then at the present time the hearing will

8    merely be set for November the 2nd, and the date of subsequent

9    hearings will be announced at that time.

10        We will make every effort to proceed as rapidly as possible

11   but of course there is no reason for setting dates when you

12   can't have time to prepare the exhibits necessary to introduce.

13        Well, if there is nothing further then the hearing will be

14   recessed until Monday, November the 2nd, at 9:30 A. M.

15

16

17

18

19

20

21

22

23

24

25