**JUDGMENT**

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

ENTERED DEC - 1 1965
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED NOV 20 1965
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

Rec'd 10/21/65

UNITED STATES OF AMERICA
   Appellant and Cross-Appellee

vs.

FALLBROOK PUBLIC UTILITY DISTRICT
et al.,
   Appellees and Cross-Appellants,

STATE OF CALIFORNIA
   Intervener

No. 18,931

(D.C.No. 1248)

APPEAL from the United States District Court for the ____Southern____

District of ___California, Southern Division._____

THIS CAUSE came on to be heard on the Transcript of the Record from the United States District Court for the ____Southern____ District of __California, Southern Division,__

_____ and was duly submitted.

ON CONSIDERATION WHEREOF, It is now here ordered and adjudged by this Court, that the _____ judgment of the said District Court in this Cause as to the rights of the United States against Vail Ranch be, and hereby is reversed; and that this matter be, and hereby is remanded to said District Court with instructions that the final judgment be appropriately modified to the end that the 1940 state court decree is reinstated, subject to the rights of Vail to seek relief from that judgment in accordance with the views expressed in the opinion of this court; and in all other respects the said judgment of the said District Court be, and hereby is affirmed.

A TRUE COPY.
ATTEST: OCTOBER 19, 1965
Frank H Schmid,  Clerk

Filed and entered___May 26, 1965___

/

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Appellant and Cross-Appellee,*

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, ET AL.,
    *Appellees and Cross-Appellants,*

STATE OF CALIFORNIA,
    *Intervener.*

No. 18,931

[May 26, 1965]

On Appeal from the United States District Court for the
Southern District of California, Southern Division

Before: HAMLEY, MERRILL and BROWNING, Circuit Judges

MERRILL, Circuit Judge:

This action is brought by the United States to quiet title to its rights to the use of waters of the Santa Margarita River system in San Diego and Riverside counties, California. Those waters are used by the United States to supply the needs of a "Naval Enclave" consisting of Camp Pendleton (a Marine Corps training base), an ammunition depot, and a naval hospital. From final judgment entered by the District Court for the Southern District of California, Southern Division,[1] the United States has taken this appeal. Its principal grievance is that it has been denied any right enforceable against upper users to continue in its diversion

---

[1] The report of the District Court's actions referred to in this opinion appears at 193 F.Supp. 342 (1961). For a history of prior litigation in this case see *United States v. Fallbrook Public Utility Dist.* (S.D. Cal. 1958) 165 F.Supp. 806, 812-813.

of a substantial portion of the waters which it uses to installations located within the enclave but beyond the watershed of the river.[2]

The Naval Enclave extends eastward from the Pacific Ocean and consists of some 135,000 acres of land acquired by the United States in 1942 and 1943, principally from the Rancho Santa Margarita and from public domain. Exclusive jurisdiction has been ceded to the United States by California.

The watershed of the Santa Margarita River includes some 742 square miles within San Diego and Riverside counties. The area is semiarid. The river itself has been described as a typical Southern California river, the flow of which consists, in combination, of surface flow and underflow.[3] Surface flow is intermittent

---

[2] The decree in part provides:

"That except as to reasonable and proper riparian uses on lands within the Naval Enclave upstream from the point of confluence of the Santa Margarita River with Deluz Creek * * * no upstream riparian, overlying owner, prescriptor or appropriator shall be required to release water or curtail reasonable and beneficial water uses so as to allow water to reach the Naval Enclave for any purpose, unless and until water exportation from the Santa Margarita River watershed by the United States of America is abandoned, and the ground water levels within the younger alluvial deposits which underlie the Santa Margarita River downstream from said point of confluence of said Deluz Creek with the Santa Margarita River have been restored to that level at which they would have been if such exportation had not taken place."

[3] The nature of underground waters as recognized by California law is explained in 51 Cal.Jur.2d 856, as follows:

"Sec. 388. *In General.* The underground waters of California are divided generally into three classes: (1) the underflow of surface streams; (2) definite underground streams with defined channels, beds, and banks * * *; and (3) percolating waters, which are those waters that move through the soil, do not move in a stream but generally are found in a basin under the ground, and do not form a part of the body or flow, surface or underground, of any stream. Percolating waters may either be rain waters slowly infiltrating the soil, or they may be waters seeping from streams that have left a definite stream bed and are no longer part of the flow thereof * * *."

"Sec. 390. *Underflow of Surface Streams—In General.* The underflow of a surface stream is that water in soil, sand, and gravel composing the bed of a stream which supports the stream in its natural state and is essential to its existence. The underflow and the surface flow

*Fallbrook Public Utility District, et al.* 3

and, during the summer months, virtually nonexistent throughout a substantial portion of the river system. Rainfall usually occurs during the months of November through March. Most of the river's surface flow occurs after periods of precipitation and, on occasions following flash floods, the volume of flow during a period of a few hours or days can constitute a substantial portion of the entire annual surface flow. Accordingly the water users of the river rely on wells to avail themselves of the river's water. The heavy volume of surface flow occurs during non-irrigation season and is of benefit in the replenishing of the underground basins which form an important part of the river's underground system.

The river proper commences at the confluence of its two principal tributaries, Temecula Creek and Murietta Creek, thirty-one miles inland from the ocean and eleven miles inland from the boundary of the Naval Enclave. From that point the river flows through Temecula Canyon, a deeply incised rock canyon, to enter the enclave.

The underflow of the river, and of Temecula and Murietta creeks above their confluence, is through the porous sand and gravel of what may be termed subterranean canyons or valleys

"See. 393. *Underground Streams—In General.* * * * In determining whether water is part of an underground stream or is percolating water, the fact that the water is under pressure is immaterial. The material fact is whether there is a flow in a defined channel, or whether it is part of a diffused body of water that is without definite bed and banks confining its flow, but it may be moving in a definite direction and still not be a stream. The channel of a subterranean stream is defined when it is confined by impervious sides and beds, and can be bounded by reasonable inference though it may be undefined to human knowledge with exactness. The fact that water is percolating through loose, permeable material filling such a bed does not change its nature as a subterranean stream * * *."

"Sec. 395. *Percolating Waters—In General.* * * * The essential fact to be ascertained in determining whether underground water is percolating water is that it does not form a part of the body or flow, surface or subterranean, of any stream. Waters of an underground lake or reservoir, or waters that form part of the body or flow of any stream, surface or subsurface, are not percolating waters * * *."

must be in contact with each other, and must flow in the same general direction in order to be part of the same stream * * *.

(referred to throughout the testimony in the District Court as the "younger alluvial deposits"), the sides and bottom of which are composed of relatively impervious rock (referred to as the "older alluvial deposits"). When the walls of the subterranean valleys constrict into narrow canyons the waters rise to flow upon the surface, dropping again to form an underflow as the canyons again widen into valleys. While water is found (and reached by wells) within the older deposits, it is percolating water (see footnote 3, *supra*). While it does, by percolation, ultimately contribute to the river system it does not, in its percolating state, form a part of the river's underflow. (See footnote 3.)

On emerging from Temecula Canyon and entering the Naval Enclave the river's surface flow drops below ground to form the Coastal Basin. It is the subterranean overflow from this basin which reaches the ocean as the mouth of the Santa Margarita River.

It is from this basin that the United States, by wells, draws the water which it uses upon the Naval Enclave.

The predecessor of the United States, the Rancho Margarita, also pumped water from the Coastal Basin, using large quantities of it for irrigation. In 1937 the Rancho installed an extensive system for the irrigation of lands both inside and outside the watershed of the Santa Margarita River.

Since its acquisition of the Rancho the United States has continued to use the Rancho's wells and diversion system and has drilled additional wells and constructed a complex distribution system to serve the enclave, increasing the quantities of water drawn from the basin. As tabulated in the findings of the District Court, use from 1942 to 1960 amounted to from 2390 to 3340 acre-feet within the watershed and from 2890 to 3910 acre-feet outside the watershed.

The District Court has found that all uses of the United States, both within and without the watershed, are for reasonable and beneficial purposes; that no use is improper or unlawful or has injured any party to this action. Moreover it has found that the United States contributes to the recharge of the Coastal Basin by the return to it of treated sewage effluent and that it has diligently pursued conservation practices.

The two principal riparian owners upon the river system and the two principal disputants in this action are the United States and the Vail Ranch. It is on the Vail Ranch that Temecula Creek and Murietta Creek join to form the Santa Margarita River. In 1948, pursuant to state permit, the Vail Ranch dammed the waters of Temecula Creek to form the Vail Reservoir, by which the waters of that creek are completely controlled and regulated and by means of which Vail diverts water to irrigate certain of its lands in Pauba Valley.

In 1923 an action in the state courts was brought against Vail by Rancho Santa Margarita to secure an apportionment between them of the waters of the river. After a protracted trial and a judgment which was reversed in part by the California Supreme Court (*Rancho Santa Margarita v. Vail* (1939) 11 Cal.2d 501, 81 P.2d 533), settlement negotiations resulted in an agreement between the parties which, by stipulation, was incorporated into a court decree entered December 26, 1940.

By this agreement and decree the waters of the river were apportioned one third to Vail and two thirds to the Rancho. The agreement and decree also provided that the Rancho could use the waters allocated to it both within and without the river's watershed and that Vail could use its allocated waters on certain specified nonriparian land. The District Court concluded that the United States has succeeded to the Rancho's rights under this decree.

Fallbrook Public Utility District is a relative newcomer on the river. Its claims are not riparian but appropriative and, under California law, are thus limited to such waters as are not required by the riparian owners. It has secured from the state a license to a direct flow appropriation of two-and-one-half cubic feet per second with a 1946 priority, and has three unperfected claims with 1946 and 1947 priorities to store water in a proposed reservoir situated immediately upstream from the eastern boundary of the Naval Enclave.

Early in this present litigation, on November 29, 1951, a stipulation was entered into between the United States and the State of California, as intervenor in the action *in parens patriae*, "for the clarification of the issues in this litigation and for the benefit of all of the parties to this cause." By this stipulation the United

6                          *United States of America vs.*

States excluded from the scope of this quiet title suit any claim that rights had been acquired by virtue of its sovereign status, and agreed that the issue was simply the extent of its rights secured pursuant to California law.[4]

The District Court by its judgment has ruled that since neither the United States nor its predecessor had secured any state permit to appropriate water for diversion, its rights were limited to riparian rights; that since use outside the watershed is not a valid riparian use it had no right under California law, enforceable against upper users, that water be let down for use outside the watershed. The court thus held the United States to its 1951 stipulation, while relieving Vail of its 1940 agreement and decree upon the ground that changed circumstances had rendered the application of that decree inequitable.

It is this result which the United States protests upon this appeal.

*Cross-Appeal of Fallbrook*

Before proceeding to discuss the contentions of the United States we shall deal with the cross-appeal filed by Fallbrook Public Utility District. Fallbrook challenges the determination of the District Court that the use of water by the United States on its riparian land is a valid use.

Fallbrook's position is simply that a municipal use (which, it contends, is the nature of the use made by the United States within the enclave) is not a proper riparian use; that historically

---

[4] "The stipulation provides in pertinent part:

II

That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of the water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

III

That the United States of America claims by reason of its sovereign status no right to the use of a greater quantity of water than is stated in Paragraph II, hereof.

IV

That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California."

and traditionally riparian use has been confined to domestic use or to such private uses as the watering of crops and livestock on riparian lands; that the right to use waters for municipal or other extraordinary purposes must¹ be secured by appropriation.

We cannot agree. We find no such distinction in California law. Since 1928, by constitution and statute, California has recognized that so long as the use is reasonable and the methods of use are not wasteful "riparian rights in a stream or water course attach to * * * so much of the flow thereof as may be required * * * for the purposes for which such lands are or may be made adaptable * * *." Cal.Const. Art. XIV, §3; Cal. Water Code, §101.

The authorities on which Fallbrook relies are distinguishable. They deal with propositions of law not applicable here.⁵

---

⁵These propositions are as follows:

a. That riparian use may not be excessive and accordingly that an industrial or institutional use may be disapproved to the extent that it exceeds the share of the river to which the user is entitled as riparian owner. *Salem Flouring Mills v. Lord* (1902) 42 Ore. 82, 69 Pac. 1033.

b. That a riparian owner has no right as such to make water available to nonriparian users. Cases cited by Fallbrook in which municipal use was held to be an improper riparian use and a diversion of water were cases in which the water was delivered by the municipality to private nonriparian users. *Antioch v. Williams Irrigation Dist.* (1922) 188 Cal. 451, 205 Pac. 688; *City of Lodi v. East Bay Municipal Util. Dist.* (1936) 7 Cal.2d 316, 60 P.2d 439; *City of Emporia v. Soden* (1881) 25 Kan. 410, 37 Amer. Rept. 265; *Pernell v. City of Henderson* (1941) 220 N.C. 79, 16 S.E.2d 449.

c. That *as between riparian owners* the distinction between "ordinary" or "natural" and "extraordinary" or "artificial" is recognized generally and in California in order to determine whether one riparian owner may claim priority over another. *Cowell v. Armstrong* (1930) 210 Cal. 218, 290 Pac. 1036; *Salem Flouring Mills v. Lord, supra*; *McCord v. Big Brother Movement* (Ch. 1936) 120 N.J. Eq. 446, 185 Atl. 480.

*Cowell v. Armstrong, supra,* is a clear example of this proposition. There, a riparian owner claimed a prior right of "domestic" use to water two thousand head of cattle over the "artificial" use made by upper riparian users in the irrigation of their lands. The court held that the watering of two thousand head of cattle was not a domestic use and that there was no prior right as against other riparian users to this commercial use of water. It appears from the opinion, however, that the Superior Court had granted the stock waterer priority over a nonriparian *appropriator,* which determination was not appealed.

8                *United States of America vs.*

Accordingly we find no merit in Fallbrook's contentions. Upon Fallbrook's cross-appeal, judgment is affirmed.

## Appeal of the United States

Broadly speaking, the concern of the United States is with its ability to continue in its use of water in aid of its project, free from interruption by the assertion of adverse rights by other users. In general, its power to do so as to downstream users was established by *Dugan v. Rank* (1963) 372 U.S. 609. Its ability to do so as to upstream users is its present concern.

At the outset it is important to note one distinction between this case and *Dugan v. Rank*. There the rights of the United States were based upon its exercise of the powers of eminent domain through seizure of the water rights of downstream users. This is not the case here. Whether and how the United States may seize the water rights of upper users is a question we do not reach in this case. Accordingly the ability of the United States to prevail in its use over the rights of upper users is, in a most important aspect, not before us in this matter.

This is because of the 1951 stipulation between the United States and California, to which we have already referred (see footnote 4, *supra*), by which the United States narrowed the issues in suit to exclude any claim of right acquired by virtue of its sovereign status.[6] The issue before us is, then, the relatively narrow one of the extent of the rights of the United States to the use of the waters of the Santa Margarita River or of its Coastal Basin acquired by the United States pursuant to the laws of the State of California. These are the only rights to which the United States in this action seeks to quiet title.

## Appropriative and Prescriptive Rights

The United States contends that to the extent that it has diverted water from the watershed it has acquired an appropriative right under state law.

---

[6] The United States proposes that the stipulation, in its use of the phrase "measured in accordance with the laws of the State of California," should be read as meaning that state law applies only in the determination of the volume extent of its rights. This clearly is not the sense of the stipulation read in its entirety.

The District Court rejected this contention for the reason that neither the United States nor its predecessor, the Rancho Santa Margarita, had applied for or secured a state permit as required by state law.[7]

This ruling is attacked by the United States on two grounds.

First, it contends that despite its stipulation it cannot be expected to comply with state "police regulations" and therefore the procedural requirement of an application to the California Water Rights Board should not be applied to it.

We are not impressed with this argument upon the present issue. Federal reluctance to submit to state requirements and regulations may well justify a governmental policy, in the acquisition of water rights, of proceeding in eminent domain rather than by the state-created right of appropriation. It cannot, however, give rise to the proposition that the United States can acquire appropriative rights under state law other than through compliance with state law.

Second, the United States contends that under California law no application or license is required in the acquisition of a right to take water from an underground basin such as the Coastal

---

[7] "The California Water Code provides in section 1225 that "No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division [of the Water Code]."

Section 1252 provides: "Any person may apply for and secure from the department, in conformity with this part and in conformity with reasonable rules and regulations adopted from time to time by it, a permit for any unappropriated water."

Section 1252.2 expressly invites compliance by the United States. It provides: "All rights and privileges conferred by this part upon any person in relation to the appropriation of water are likewise conferred upon the United States, the State, and any entity or organization capable of holding an interest in real property in this State."

Sectin 1300 provides for notice of filing of applications, and other sections provide for investigation of applications by the Department of Water Resources, the filing of protests, the noticing and holding of hearings, action by the department and judicial review of such action.

Deference to municipalities is paid by section 1460. This is not by way of immunity from the provisions of the Code, however. Instead, municipalities, upon their applications for permits, receive preferred priorities in right to use of water.

Basin since section 1200 makes the requirement of a permit applicable only to "surface waters, and to subterranean streams flowing through known and definite channels." In support of its contention that the Coastal Basin is thus excluded the United States relies on *Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 343 P.2d 450.

That case dealt with the Santa Ana River system. The opinion states:

> "There can be no question of the existence of underground basins of large areas and considerable depth, in which water is relatively stationary, and in the lower levels of which, particularly in the San Bernardino Basin, it may not be in motion at all. These basins from that standpoint may be regarded as distinct geographical units. On the other hand, at least from their upper levels, the basins spill into each other and feed the general downward flow of the river." 173 Cal.App.2d at 174, 343 P.2d at 470.

The court concluded that the waters of these basins were percolating waters and that under section 1200 the permit requirement did not apply.

But it does not follow that the waters of all underground basins are percolating waters. The factual issue remains whether the basins form a part of a subterranean stream flowing through known and definite channels.

The *Orange County* case is distinguishable from the instant case upon this factual issue. In that case the basins were huge subterranean lakes; the uppermost of three basins was twenty-five miles long and twelve miles wide; the lowest basin was thirty miles long and twenty miles wide. The basins did not constitute an underflow connected with the surface flow of the river. They were relatively stationary and lay twelve hundred to two thousand feet deep.

In the case before us the findings of the District Court are clear to the effect that the underground flow through the younger alluvial deposits, including the basins, constituted a subterranean stream flowing through known and definite channels, with the bed and banks of the stream formed by the juncture with the older alluvial deposits.

The United States challenges this finding as clearly erroneous. It asserts that the record demonstrates, and that the District Court itself recognized, that the contact point between the older and younger alluvial deposits had not been definitely established. It relies on *City of Los Angeles v. Pomeroy* (1899) 124 Cal. 597, 57 Pac. 584, for the proposition that the burden of proof that ground waters are in a known and definite channel rests upon the party making such claim.

The *Pomeroy* case, however, holds that a finding on this issue does not require absolute knowledge, but may be based on reasonable inferences drawn from the evidence.

While the court below did state that the contact points between the older and younger deposits were not known with absolute exactness, still it found that they were sufficiently well known for the United States to be able, with the strong support of expert testimony, to delineate them. It was this delineation which was accepted by the District Court.

Further it is to be noted that the wells from which the United States draws the greater portion of its water lie not on the fringes of the Coastal Basin but within or closely adjacent to the river itself, as delineated on maps introduced by the United States.

We conclude that the findings of the District Court on the issue of appropriative rights are not clearly erroneous.

The United States contends in the alternative that it has by its years of diversion acquired a prescriptive right to export water from the watershed. Whether the exclusivity of section 1225 (see footnote 7) has not eliminated prescriptive rights subsequent to 1914 from California law apparently remains a debatable question. See Kletzing, Prescriptive Water Rights In California, 39 Calif.Law Rev. 369 (1951). Assuming, however, that it has not, it most certainly has established that "prescription" as a source of right requires something more than was required for pre-1913 appropriation.

That "something more" is the element of adversity—open and adverse use. A right acquired by prescription, as is true of one acquired by adverse possession, is not one appropriated from the public domain. It is a right taken by adverse use from one in



whom it formerly was vested. Under California law such rights cannot be acquired against upper users because the lower use has not adversely affected them. *Pabst v. Finnand*, 190 Cal. 124, 211 Pac. 11 (1922).

Nor do we see how "prescription" can be asserted against a subsequent appropriator on the basis of use made before he ever appeared on the scene. This is to equate prescription and appropriation. This is to write section 1225 out of the Water Code.

In support of its position the Government relies on *Orange County Water Dist. v. City of Riverside*, 173 Cal.App.2d 137, 343 P.2d 450 (Dist.Ct.App. 1959), where it is stated:

"* * * While it is settled law that a downstream appropriator of water cannot by any length of use gain prescriptive rights as against an upper riparian owner, the same doctrine is not applied as between two appropriators but as between them the rule is first in time, first in right. *Antioch v. Williams Irrigation Dist.*, 188 Cal. 451, 457, 205 P. 688, and cases cited." 343 P.2d at 450.

The court, in that case and in the cited case of *Antioch v. Williams Irrigation Dist.*, was actually deciding the priority of rights between appropriators whose appropriative rights had arisen under California law prior to 1913, i.e., before California's present Water Code. While the opinions use the term "prescriptive rights," the rights to which the label was applied were pre-1913 appropriative rights and were founded on priority of use but not on adversity.

We conclude that the District Court was not in error in determining that the United States had no appropriative or prescriptive right under California law to divert water from the watershed.

*Right to Make Public Use Free From Injunction*

The United States attacks the District Court's judgment (see footnote 2) as in effect an injunction against exportation of water—an injunction against its use of water upon its public project, which, it asserts, is contrary to California law. It is no answer, it asserts, to say that it remains free to do as it pleases with such water as reaches the Enclave. It asserts that to deny

it the right to demand water to satisfy its nonriparian public use is tantamount to an injunction against that use.

As we view the position of the United States in this respect, it is that if it needs something more than it is now getting to enable it to continue doing what it has done in the past, it must be given that something more or *it* is being enjoined.

We cannot agree with this reasoning or with this concept of what constitutes injunction. It is the United States that complains of upstream interference and seeks to halt it. The District Court decree simply announces the conditions under which, under California law, the United States may do so.

We find no merit in this contention.

### Riparian Rights as Against Vail Ranch

By virtue of the 1940 stipulated state court decree to which the United States has succeeded, its rights as against Vail are founded on a basis not applying to its rights against other users.

That decree made two determinations which are of vital concern to the United States in this litigation: (1) The Riparian rights of the parties to the use of water as between themselves were apportioned. (2) The right of the United States as against Vail to export its share of the stream outside the watershed was established. That decree has been wiped out by the District Court. Its opinion on this subject is set forth in *United States v. Fallbrook Public Utility District* (S.D.Cal. 1961) 193 F.Supp. 342.

The court found the decree defective in that it purported to allocate all the waters of the stream between the litigants in disregard of the rights of other users who had not even been made parties. The court rejected the suggestion of the United States that the decree be construed simply as a division between the litigants of such rights as they possessed in combination. The court's rejection was upon the ground that this was not what the decree said.

In this we feel that the court placed undue emphasis upon the scope of the language used in the decree. Of necessity the decree must be recognized to be limited in its operation to the subject

matter over which the court had jurisdiction, which, of course, was no more than the rights of the litigants before it.

The 1940 decree followed years of dispute and costly litigation between the two major claimants on the stream. The settlement of the rights of these two disputants was an important result not lightly to be rejected simply because it was not universally binding.

In our judgment the decree must be construed as a division between the United States and the Vail Ranch of such riparian rights as they possess in combination.

Next the court reasoned that since the decree was one allocating the waters of a stream system, and since such decrees are universally recognized to be subject to modification to meet changed circumstances, it was proper to examine into the question of changed circumstances. Upon such examination the court concluded that "* * * these changes in conditions render inequitable and, in fact, inoperative, the water allocation provided in the 1940 judgment." 193 F.Supp. at 353. In its considerations of changed circumstances the court treated the decree as founded upon findings of fact entered in 1930 upon an earlier decree which had in part been reversed by the California Supreme Court. See: *Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 81 P.2d 533.

In our judgment the District Court has erred in its construction of the nature of the decree and its susceptibility to modification.

In the ordinary case a decree allocating the waters of a stream is based upon many factual circumstances relating to such matters as extent of riparian holdings and extent of beneficial use of waters. Since these factual circumstances are subject to change, the allocations based upon them are subject to change accordingly.

The 1940 decree was not based upon such considerations or upon court findings relating to them. It was based upon agreement between the litigants. It was upon that agreement that the California court relied and not upon the facts or circumstances then (or earlier) existing. This was recognized by this court when

*Fallbrook Public Utility District, et al.* 15

this same agreement was before it earlier in these proceedings. We then stated:

"But this stipulated judgement between two litigants is contractual in character between the principals to the agreement and is not binding upon the Water District or the State. Thus the correlative rights between the Vail Estate and the government have been settled by agreement." *People of the State of California v. U.S.* (9 Cir. 1956) 235 F.2d 647, 657.

Unless the agreement itself was subject to change as circumstances relating to the use of water might change (and certainly there is no indication whatsoever that it was intended to be of such an unstable character), the decree founded upon it was not subject to modification as a water-allocation decree normally would be.[8]

This is not to say that relief from the decree could not under any circumstances be had. The circumstances justifying such relief, however, would not be those relevant to modification of decrees of water allocation. Rather they would be those of such a character as to impel a court of equity to relieve one from his contractual obligations.

The District Court in its opinion has dealt as well with considerations of this character, and has concluded that should the 1940 decree be treated as a contract Vail was entitled to rescission and had prayed for such relief. See 193 F.Supp. at 357.

We cannot agree.

The District Court found that the United States had, in effect, repudiated the decree and had acted in such fashion that it would be inequitable to permit it to rely upon the decree. In this respect the court points to the fact that the United States has made Vail a party to the present suit and has thus imposed upon Vail the

---

[8] "In other words, where the parties claim merely as riparian proprietors, the proportions to which they may respectively be entitled may vary from time to time, in accordance with the facts existing at the respective times. But the right which one party possesses, or some portion thereof, may be transferred to another, so that the latter may hold it absolutely, as against the former, without regard to any rule of equitable apportionment as between riparian proprietors." *Los Angeles v. Baldwin* (1879) 53 Cal. 469, 474 (Rhodes, J. concurring).

burden of a costly defense; that the rights which it has asserted against Vail in this suit are not confined to those established by the 1940 decree.

We cannot find in these circumstances any repudiation of the 1940 decree. The United States throughout has made it clear that it regarded that decree as remaining in effect. It is Vail that belatedly, through an amended or supplemental answer, has sought to escape the decree.

The fact is that the United States, due to increasing upstream use, has felt it necessary to clarify the state of its rights against upstream users. It would seem clear that Vail was a necessary party to any such determination. The United States has, it is true, asserted that changed circumstances have resulted in the acquisition of additional rights against Vail. However, this seems no reason whatsoever for holding that it has repudiated the basis for those rights acquired in 1940 to which it had succeeded. The District Court's primary thesis (as we have mentioned) was that stream allocations are subject to relitigation and that relitigation is to be expected. But such relitigation does not necessarily start from scratch. Rather it starts from where it last left off, which in this case, as to Vail, would be the 1940 decree.

In short, we find nothing in the position taken by the United States in the present suit inconsistent with its continuing to assert the validity and effectiveness of the 1940 decree or which renders such assertion inequitable.

While relief in the nature of rescission thus seems inappropriate upon the grounds stated, other circumstances dealt with by the District Court suggest that some relief might be proper should Vail be able to show that mistakes of fact have caused it harm of sufficient magnitude to justify reformation.[9]

We cite two examples of such circumstances.

---

[9] "Although the equitable jurisdiction of a federal court cannot be invoked for the purpose of reviewing or correcting judgments or decrees rendered by state courts, it is well settled that federal courts have power to enjoin the enforcement of, or otherwise grant appropriate relief from, a state judgment when warranted by equitable principles and the elements of equitable and federal jurisdiction are present." Moore's Federal Practice, Vol. 7, at p. 644.

First, the decree provides that the flow to be apportioned shall be the flow as measured at Ysidoro Narrows (below the Coastal Basin and practically at the mouth of the river), or at Temecula Gorge (where the river leaves the Vail Ranch). The change and increase of use by the United States following its acquisition of the Rancho has resulted in the diminution of the flow at Ysidoro Narrows to a point where no measurements can be made there. Since the only remaining measuring point is that at Temecula Gorge, Vail may lose the benefit of all flow originating below the Gorge.

It may be that this result makes it impossible for the division which the parties had contemplated and had sought to secure by agreement to be obtained by a two-to-one division of the flow at Temecula Gorge and that some adjustment should be made.[10]

Second, the District Court concluded that the understanding of the parties in 1940 (as reflected by findings made ten years earlier) was that the percolating waters in the older alluvial deposits underlying the Vail Ranch did not contribute to the stream system. The result (under these facts) was that Vail could make full and unlimited use of these waters without protest by the United States. From expert testimony introduced in the instant case it is apparent that any such former understanding was erroneous; that the percolating waters in the older alluvial deposits underlying the Vail Ranch do contribute to the stream system and that the United States can claim correlative rights to their use. Some equitable adjustments may be proper under these circumstances.[11]

It is to be noted, however, that if these circumstances render relief from the decree proper, that relief relates only to the allocation of flow between the United States and Vail. No circumstances have been brought to our attention which would justify

---

[10] It is also possible that Vail may not lose this benefit since the decree gives Vail one half of what the United States takes, no matter where measurements are made.

[11] We do not prejudge the question whether this mistake of fact (assuming it to have existed in 1940, and whether it be mutual or unilateral) would as a matter of law support reformation or justify relief from the 1940 decree. Indeed it may be impossible to give relief to Vail without diminishing the flow which the United States assumed it was to share.

18                *United States of America vs.*

relieving Vail of its agreement that the United States may divert its share of the flow outside of the watershed.

We conclude that the United States is entitled to reinstatement of the 1940 decree, subject to Vail's right to apply to the District Court for relief from the decree by modification, to the end that the 1940 intent of the parties as to apportionment be realized. Such relief, however, should not affect the right of the United States as against Vail to use its share of the flow outside the watershed.

Respondents protest that the 1940 decree, since it is binding only upon two of the many users on the stream system, can serve only to confuse any over-all apportionment of the waters and cloud the rights of all not parties to that suit; that as to the United States it can serve no true or lasting usefulness since waters let down by Vail can be tapped by others not bound by the decree.

We cannot argue with the proposition that restoration of the 1940 decree as against Vail and the granting thereby to the United States of a right to divert enforceable only as to one upper user leaves the over-all delineation of rights upon the stream system in an unsettled and untidy condition.

But the District Court has not attempted a finished job of apportionment and it is clear that no party desires that that tremendous and costly undertaking be pursued where its necessity is not yet shown. It would now seem apparent that if the needs of the United States in its diversion of waters should require that other upper users by-pass water for its use, the Government must resort to an assertion or exercise of rights or powers beyond those here established. But to start with, to some extent, it has the right to require Vail to release water for diversion; and a right to that extent alone may suffice to meet its needs. Time alone will tell. The Government at least is entitled to find this out; for it would seem clear that by its disclaimer in the 1951 stipulation it relied upon these decreed rights against Vail on the assumption that they would suffice.

## Form and Scope of the Decree

This leads us to the final contention of the United States. It protests the form and scope of the decree entered by the District Court as insufficient and wholly unworkable.

The court's decree actually consists of forty-four interlocutory judgments (upon separate issues with which the court separately dealt) plus its "final judgment." The Government complains that "the judgment never has been assembled into a single coherent document from which the rights determined can be ascertained." Further, says the Government, the judgment is based upon "prima facie" findings. Further, the court expressly has left undetermined the rights of several parties.

As to the scope of the decree we recognize that the court sensibly went no further than it felt was necessary in order to resolve conflicts which now exist. If future conflicts should require further determinations and further findings of factual data, such matters can be reserved for the future.

As to the form of the decree, we sympathize with the position of the Government. Indeed, the magnitude of the judicial effort which has gone into this litigation deserves that maximum usefulness be realized and that the many determinations of the court should readily be made applicable to future problems.

However, we feel that the Government demands too much in placing this burden on the District Court. To the extent that there is no dispute as to the substance of the judgment in its forty-five separate documents, we see no reason why the parties, by stipulation, cannot incorporate it into a more workable form if such is their desire. The court has done its work in the making of the needed judicial determinations. The reduction of those determinations to useful final form is such work as courts frequently impose upon counsel. The court, in its discretion, has not required it, leaving such reduction as a voluntary rather than an imposed duty. We see no reason to disturb the situation.

## Decision

As to the rights of the United States against Vail Ranch the judgment is reversed. The matter is remanded with instructions that the final judgment be appropriately modified to the end that the 1940 state court decree is reinstated, subject to the rights of Vail to seek relief from that judgment in accordance with the views hereinbefore expressed. In all other respects, judgment is affirmed.