FILED

JUN 27 1960

Walter Luce

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
              v.                         )    No. 1247-SD-C
                                         )
FALLBROOK PUBLIC UTILITY DISTRICT,       )
a public service corporation of          )
the State of California, et al.,         )
                                         )
                    Defendants.          )

ENTERED

JUN 27 1968

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

ORDER APPROVING MEMORANDUM OF UNDERSTANDING
AND AGREEMENT AND AMENDING MODIFIED FINAL
JUDGMENT AND DECREE

1.    The court entered its final judgment and
decree in this cause on May 8, 1963.  On April 6, 1966, this
Court entered its modified final judgment and decree as
directed by the Court of Appeals in its decision dated
May 26, 1965.

2.    The modified final judgment and decree
catalogued the water rights in the Santa Margarita River
Stream System of the various parties to this cause but did
not purport or attempt to apportion the waters of the said
stream system or the uses thereof between the parties to this
cause.

3.    It has long been recognized by the Court, the
United States of America and the Fallbrook Public Utility
District that the aforesaid modified final judgment and
decree leaves unsolved many serious problems with respect
to the use of the waters of the Santa Margarita River Stream
System and the division of these waters between the United
States and Fallbrook Public Utility District under their
respective water rights.  The United States and Fallbrook
Public Utility District recognize that neither can, without

further serious controversy, effectively utilize its water rights in the Santa Margarita Stream System and that the water rights of the stream system cannot be developed fully in the absence of a physical solution which makes equitable provisions as between them for the manner in which each of them shall make use of the waters of the stream system to which it is entitled under its water rights as determined by the modified final judgment and decree.

4. Subject to the approval of this Court and subject also to congressional authorization of the project therein provided for, the United States and Fallbrook Public Utility District have negotiated and executed an agreement for such a physical solution which is embodied in the attached Memorandum of Understanding and Agreement, dated March 4, 1968.

5. This cause is now before the Court pursuant to the petition of the United States and Fallbrook Public Utility District for approval of the aforesaid Memorandum of Understanding and Agreement and for amendment of the Modified Final Judgment and Decree in this cause by incorporation of this Memorandum of Understanding and Agreement into same; and pursuant to Notice of Hearing for such purpose duly served upon all parties to the cause except those heretofore determined to have no interest in this proposed amendment. Upon consideration of the aforesaid petition and the matter presented at the hearing on this petition on the _27_ day of _____ 1968:

- 2 -

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that
the attached Memorandum of Understanding and Agreement,
dated March 4, 1968, is approved. The Modified Final
Judgment and Decree in this cause is amended by the
incorporation of this Memorandum of Understanding and Agree-
ment into the same.

DATED: _June 17_ , 1968

_____
JUDGE
United States District Court

- 3 -

## MEMORANDUM OF UNDERSTANDING AND AGREEMENT

This memorandum of understanding and agreement made the 4th day of March , 196 8 , between the United States of America (hereinafter referred to as the "United States") through the Attorney General of the United States, the Secretary of the Interior, and the Secretary of the Navy, and the Fallbrook Public Utility District (hereinafter referred to as "Fallbrook"), a public service corporation of the State of California, acting through its Board of Directors, Witnesseth:

Whereas, the United States and Fallbrook are the last water users on the lower Santa Margarita River;

Whereas, the United States, Fallbrook, and others have been involved for the past decade and a half in litigation to determine, inter alia, their respective rights to use the waters of the Santa Margarita River system;

Whereas, the United States and Fallbrook desire to compose the differences which remain between them in connection with the above-mentioned litigation and to proceed jointly with a unified and comprehensive program for sound management and maximum beneficial utilization of the water resources of the lower Santa Margarita River;

Whereas, in a report entitled "Santa Margarita Project, California, Reconnaissance Report," June 1966, Region 3 of the Bureau of Reclamation, United States Department of the Interior, stated its conclusions and recommendations as follows:

1. Conclusions

a. Both Camp Pendleton and the Fallbrook Public Utility District are in a water deficient area in which the local water supply is insufficient to meet present and projected water requirements.

b. The flows of the Santa Margarita River have not been fully developed for beneficial use because of long litigation over water rights.

c. Limited local water supplies can be developed at a cost comparable to the cost of alternate imported supplies.

d. A physical solution is attainable.

e. A joint project, consisting of either one or two dams, is economically justified and appears to be financially feasible.

f. The smaller two-dam plan has the largest net benefits of the three plans considered.

g. The plans studied would provide regulatory storage for imported water so that it could be accepted on a uniform delivery schedule.

2. Recommendations. It is recommended that:

a. Officials of the United States and the Fallbrook Public Utility District actively negotiate a physical solution including an agreement on operation of a project.

b. The Bureau of Reclamation initiate feasibility studies to demonstrate the financial feasibility of the project which will implement the negotiated physical solution.

c. The two-dam plan consisting of a 140,000 acre-foot DeLuz Reservoir and a 36,500 acre-foot Fallbrook Reservoir be the primary plan considered in future studies;

Whereas, the Department of the Navy and Fallbrook have agreed, subject to the various approvals hereinafter provided for, upon the general terms of a physical solution predicated upon the construction of a two-dam project to be constructed and owned by the United States, and operated as a single water conservation facility by the Bureau of Reclamation;

Whereas, the Department of the Navy and Fallbrook have agreed upon a plan for allocation of the water developed by such a project;

Whereas, the Department of the Navy and Fallbrook desire that the Bureau of Reclamation proceed with its studies to determine the feasibility of a project to implement that physical solution; and

Whereas, the United States and Fallbrook are the owners of the water rights in the Santa Margarita River system and the appropriation permits and licenses described and decreed to each of them, respectively, in the Modified Final Judgment and Decree entered on April 6, 1966, in the case entitled United States v. Fallbrook Utility District, et al., No. 1247-SD-C, in the United States District Court for the Southern District of California, Southern Division, (now U. S. District Court for the Southern District of California). In addition, the United States is the holder of Permit No. 15,000 issued by the State Water Rights Board of the State of California on November 18, 1965.

NOW, THEREFORE, in evidence of the understandings and agreements which have been reached, the United States and Fallbrook, subject to the various approvals hereinafter provided for, do hereby declare such understandings and agreements to be as follows:

1. The United States will prosecute a Feasibility Study of the project recommended in the Reconnaissance Report of June 1966, on the Santa Margarita Project, and Fallbrook will lend any necessary technical or other similar assistance which may be requested of it by the United States.

2. On the condition that the project shall have been determined, upon completion in due form of such feasibility study, to be financially, economically, and engineeringly feasible, the signatory officers of the United States and their representatives, subject to the requisite clearance within the Executive Branch of the Government, will cooperate with Fallbrook in attempting to obtain appropriate congressional authorization for such project, including the initiation and sponsorship of requests consistent with Executive policy requirements for new legislation or the modification of

3

existing legislation, and, further, within the established Executive Policy guidelines referred to above, to seek to obtain the authorization for and the appropriation of funds sufficient to construct and operate the recommended project as it is generally described in the Reconnaissance Report, as that general description may be modified by this agreement and by the Feasibility Report hereinabove provided for.

3. Upon receipt of the necessary authorizations and the appropriation of funds for the project, the United States, acting through the Bureau of Reclamation, will, following execution by Fallbrook of a reclamation construction and repayment contract and such other contracts as may be required by law, initiate and prosecute the construction of the project to its completion and will operate it under the authority of Section 9 of the Reclamation Project Act of 1939, the act authorizing the project, and such other provisions of existing law as may be applicable or such other authority as Congress may provide for the construction and operation of this project; provided, that Fallbrook Public Utility District will share in the reimbursable costs of the project construction, operation, maintenance and replacement on the basis of an equitable allocation of costs as determined by the Secretary of the Interior using the standard allocation procedure. It is the desire of the parties to this agreement that the Interior-Fallbrook agreements for Fallbrook's sharing in the said reimbursable costs of the project be water-service contract type arrangements.

4. Fallbrook agrees to transfer to the United States such of the property it now holds for a reservoir at its so-called Lippincott site as may be required for construction and operation of the project; provided, that Fallbrook shall not be required to transfer such property at a value less than its appraised fair market value, as of the date of approval of this agreement by the Court as provided in Section 21, unenhanced by any increase in value attributable to

1  the project.

2  5.  Operation of the project to be constructed under this agreement

3  shall be commenced at such time as the Secretary of the Interior,

4  after giving notice to the Department of the Navy, Fallbrook and

5  any other affected parties, shall determine that sufficient of the

6  project has been completed and is operable and that operation of the

7  project is feasible.  Project water shall be allocated 60 percent

8  to the United States and 40 percent to Fallbrook to be determined

9  on a continuing basis by the project operator after consultation

10 with Fallbrook and the designee of the Secretary of the Navy, pro-

11 vided, that in every water year the United States may first use so

12 much as necessary of the project water to satisfy its rights to use

13 the waters of the Santa Margarita River system within the Naval

14 Enclave as those rights are determined by the above referred to

15 Modified Final Judgment and Decree entered on April 6, 1966, in

16 the said case entitled United States v. Fallbrook Public Utility

17 District, et al., No. 1247-SD-C, or as such Modified Final Judg-

18 ment and Decree may be further modified from time to time.  The

19 rights of the United States referred to in the foregoing proviso

20 are more specifically described as follows:

21         a.  Its riparian rights to use the waters of the

22      Santa Margarita River system upon its lands within the

23      Naval Enclave, as those rights are presently defined in

24      Interlocutory Judgment No. 37, as amended and as incor-

25      porated into said Modified Final Judgment and Decree,

26      and as the same may hereafter be further defined by

27      further modification of said Modified Final Judgment

28      and Decree;

29         b.  Its Lake O'Neill right, as defined in Inter-

30      locutory Judgments No. 24 and 24a, as incorporated into

31      said Modified Final Judgment and Decree, and as the

32      same may hereafter be further defined by further

modification of said Modified Final Judgment and

Decree; and

    c.  Its rights as against the successor and successors in interest to Vail Company to use the waters of the Santa Margarita River system on its lands within the Naval Enclave but outside the watershed of said river, to the extent that the inflows into the project facilities in any such water year include water available for such use in accordance with the 1940 stipulated judgment, or any modification thereof, in the case of Rancho Santa Margarita v. Vail Company, et al., in the Superior Court of the State of California in and for San Diego County, incorporated into and made a part of said Modified Final Judgment and Decree.

If, in any water year the uses by the United States by operation of the immediately foregoing proviso shall exceed the United States' allocation of project water hereunder for such year and the water available to it during such year under Section 6 hereof, such excess quantity shall be credited to Fallbrook's water account as water available for use by Fallbrook in excess of its 40 percent allocation in future years. Thereafter, every such credit to Fallbrook's account shall be exhausted as rapidly as possible, unless Fallbrook and the designee of the Secretary of the Navy from time to time agree differently, by the use of waters included in the United States' 60 percent annual allocations without interfering with United States' uses under its rights referred to in the immediately preceding proviso.

6. Water contributed to the Santa Margarita River by that portion of the watershed located below the DeLuz damsite and by tributaries which flow into the river below that point shall not be considered to be project water and therefore shall not be subject to the

allocation provisions of this agreement, or included within the water so allocated, and the right to use the same shall belong solely to the United States; provided, however, that such water shall be taken into account in determining the total amount of water available to the United States in connection with the provisions of Section 5 which authorize short-run over-allocations of water to the United States when its allocation of project water would be inadequate to satisfy its needs under the rights specified in the proviso in said Section 5.

7. Water taken under Permit No. 12599 (Yackey) issued by the State Water Rights Board of the State of California, shall be included within, rather than in addition to, the total amount of water available to Fallbrook under the 40 percent allocation provided by this agreement.

8. Fallbrook shall deliver potable water through its water distribution system (including any extension thereof made necessary by this section of this agreement) to satisfy the requirement of the Naval Weapons Station, Fallbrook. In return for such service, the United States shall compensate Fallbrook for the handling and treatment costs of such water, such compensation to be established by separate agreement between the Department of the Navy and Fallbrook. Said deliveries shall commence at a time mutually agreeable to the Department of the Navy and Fallbrook. The water delivered by Fallbrook shall be a part of the water allocated to the United States and shall not be charged against Fallbrook's allocated share.

9. If the Secretary of the Navy or his designee shall at any time determine that any portion of the water allocated to the United States is excess to the requirements of the United States, as those requirements may be defined by the Secretary or his designee, the excess water shall be made available for sale first to Fallbrook, and if Fallbrook does not desire to purchase all or any part of

1  such excess, it may be made available for sale to the DeLuz Heights
2  Municipal Water District. If the DeLuz Heights Municipal Water
3  District does not desire to purchase all or any part of such ex-
4  cess, then it may be made available for sale to such qualified
5  parties as the Secretary of the Interior or his designee shall des-
6  ignate, provided, that sales and deliveries of such waters shall be
7  in accordance with authorizations under applicable federal or state
8  laws, regulations, licenses or permits in effect at the time of the
9  proposed sale or delivery.
10 10. If Fallbrook shall determine that any portion of the water al-
11 located to Fallbrook is excess to Fallbrook's requirements, such
12 excess water shall be made available first to the United States,
13 and if the United States does not desire to purchase all or any
14 part of the excess, it may be offered for sale first to DeLuz
15 Heights Municipal Water District. If DeLuz Heights Municipal Water
16 District does not desire to purchase all or any part of such excess,
17 then it may be made available for sale to such qualified parties as
18 may be designated by the Secretary of the Interior or his designee,
19 provided, that sales and deliveries of such waters shall be in ac-
20 cordance with authorizations under applicable federal or state laws,
21 regulations, licenses or permits in effect at the time of the pro-
22 posed sale or delivery.
23 11. If at any time, or from time to time, capacity is determined
24 to be available in the project facilities in excess of the total
25 amount of capacity which is required for the regulation and stor-
26 age of Santa Margarita River water, for flood control, and for other
27 project purposes, all as may be determined by the Secretary of the
28 Interior or his designee, the availability of such excess capacity
29 for the storage of imported water shall be certified to the
30 Secretary of the Navy or his designee and to Fallbrook and shall be
31 allocated to the United States and Fallbrook on the basis of 60
32 percent and 40 percent, respectively. If at any time either party

8

shall not desire to use all of its allocated share of any excess
capacity, it shall permit its use by the other party, or if the
other party does not desire to use all or any part of it, by such
qualified and responsible third parties as may be designated by
the Secretary of the Interior or his designee, provided, that stor-
age of imported waters in the project reservoirs shall be in
accordance with authorizations under applicable federal or state
laws, regulations, licenses or permits in effect at the time such
water is delivered for storage.

12.  Deliveries of their respective shares of project water and im-
ported water shall be made to the parties from either or both of
the two project reservoirs at such times and from such reservoir(s)
as may be designated by the requesting party, subject to the con-
currence of the operator with respect to sound operation of the
project; provided, that the project operator shall not require
Fallbrook to take delivery from the lower (DeLuz) reservoir, pro-
vided further, that no adjustments shall be made for deliveries
reasonably made from a reservoir or at a time other than that des-
ignated by the requesting party; and provided further, that to the
extent practicable and consistent with good conservation and water
management practices (as they are determined by the project opera-
tor) and the needs of national defense (as they are determined by
the Secretary of the Navy or his designee) the project facilities
shall be operated in a manner which will minimize fluctuation of
and will maintain the highest practicable water level in the upper
(Fallbrook) reservoir.

13.  Charges for project water and for capacity allocated to
Fallbrook for the storage of imported water shall be levied against
Fallbrook on the basis of water charges for project water and
charges for its allocated storage space, as those charges are es-
tablished in the subsequent agreements between the Secretary of the
Interior and Fallbrook on the basis of the criteria contained in the

Bureau of Reclamation's Feasibility Report, or as provided by Congress. Such charges shall remain fixed for the period of the repayment contract but will thereafter be subject to renegotiation if and as provided by law; provided, that title to the project facilities shall remain in the United States unless Congress shall provide otherwise. The payment by or on account of Fallbrook of charges thereunder shall not affect the title of the United States to the project facilities. Receipt by the United States of charges for project water or the storage of imported water by third persons not party to this agreement, likewise shall not affect the title of the United States to the project facilities.

14. Subject to modification in the repayment contract:

    a. The proceeds from charges to Fallbrook for project water and storage space for imported water allocated to it shall be credited against Fallbrook's current obligation to the United States.

    b. The proceeds from charges for the use by Fallbrook or third parties of project water or storage capacity allocated to the United States shall be covered into miscellaneous receipts of the Treasury of the United States unless otherwise provided by law.

    c. The proceeds received by Fallbrook from charges to the United States or to third parties for project water and storage space for imported water allocated to Fallbrook shall be transmitted to the United States and shall be credited against Fallbrook's obligation to the United States for the last year of the repayment contract, and if such proceeds exceed the total obligation for that year, against the obligation for the next preceding years beginning with the next-to-the-last year and continuing forward to the present.

15. For the purpose of determining the quantities of water in

storage which are delivered or are deliverable to any party from
time to time the following principles shall apply:

    a. Evaporation losses of water in storage shall
be charged to the respective parties in direct pro-
portion to the volume of water in their respective
storage accounts.

    b. In the event of spills past DeLuz dam, im-
ported water then in storage will be deemed to have
spilled before any project water spills and such
spills shall be charged to the parties for whom im-
ported water is then being held in proportion to the
respective quantities of imported water being held
for them.

    c. In the event of spills of project water past
DeLuz dam, the water so spilled shall be assigned to
the respective parties in direct proportion to the
volume of project water in their respective storage
accounts when the spill or spills occur.

    d. Seepage past DeLuz dam into the Santa
Margarita Coastal Basin, as determined by the proj-
ect operator, shall be charged against the United
States' allocation of project water.

16. Variations in the quality of the water stored in or impounded
by the project reservoirs shall not be taken into account in al-
locating water under this agreement, and neither shall variations
in the quality of water allocated or delivered to a party to this
agreement give that party any right of action or claim against the
other or the project operator; provided, that nothing in this sec-
tion shall preclude either the Navy or Fallbrook from bringing an
action against the other for acts or omissions which result in de-
gradation of water quality to its injury.

17. Notwithstanding any other provision of this agreement or

anything which might reasonably be implied or inferred therefrom, nothing herein shall be construed to affect in any manner any rights to the use of water from the Santa Margarita River or its tributaries which the United States holds in any capacity, whether as owners or trustee or otherwise, of lands in the Santa Margarita River watershed other than those rights which it holds in connection with, or which are exercisable with respect to, its lands which are located within the Naval Enclave. With respect to the rights of the United States and Fallbrook referred to in the last recital hereof on page 3, nothing in this agreement shall be construed as a transfer of or an attempt to transfer such rights or any part thereof between the parties.

18. The Secretary of the Interior shall have the power to adopt and apply reasonable rules and regulations for the operation of the project facilities so long as those rules and regulations are not inconsistent with this agreement, any further agreements which the parties may make for the purpose of specifying the manner and mode of operation of the project facilities, and the act or acts of Congress authorizing construction and operation of the project; provided, that if any of the rules and regulations so adopted are considered to be unreasonable or inconsistent with this agreement, such further agreements of the parties or such act or acts of Congress by either Fallbrook or the Secretary of the Navy, judicial review of such rule or regulation shall be had by proceedings in the United States District Court for the Southern District of California under its continuing jurisdiction in the Fallbrook case to which reference has previously been made in this agreement.

19. Fallbrook and the United States recognize that this agreement does not deal with all matters respecting the use and operation of the project facilities which should eventually be subjects of an agreement or agreements between them. In recognition of that fact, the parties agree to negotiate in good faith toward mutually

1   acceptable solutions to such subjects.

2   20.   The United States may undertake such action by way of nego-

3   tiation, litigation, or otherwise, as in its sole discretion if

4   considers appropriate to protect, exercise, more precisely define

5   or modify the rights and obligations of the United States as

6   against Rancho California, the present owner of the former Vail

7   Ranch, and its successors in interest.

8   21.   This memorandum and agreement shall be executed on behalf of

9   Fallbrook and by the undersigned officers on behalf of the United

10  States.   Upon such execution, this instrument shall be presented

11  to the United States District Court for the Southern District of

12  California for approval and incorporation into the decree in the

13  Fallbrook case following such proceedings as the Court may deter-

14  mine appropriate in the circumstances.   Upon approval by the Court,

15  this agreement shall become fully effective, subject to approval

16  by Congress of the project contemplated herein, by its authori-

17  zation and appropriation of funds for the project; provided, that

18  if the reclamation construction and repayment contract and other

19  agreements required by law are not executed by Fallbrook, this

20  agreement shall be void at such time as Fallbrook expresses in

21  writing its unconditional and final refusal to execute such con-

22  tract, or after the expiration of ten years from the date of exe-

23  cution hereof, whichever occurs earlier.   If either the United

24  States or Fallbrook concludes that the approval of the Water

25  Resources Control Board of the State of California, or its succes-

26  sor agency, is either necessary or desirable fully to protect

27  rights under permits or licenses issued by the State of California

28  which may be utilized or relied upon in connection with the project,

29  the parties agree that they will cooperate to obtain such approval,

30  it being understood that in any such proceedings, the United States

31  may, as it did in proceedings precedent to the issuance of Permit

32  No. 15,000, appear in the interest of comity only

13

without acquiescing in the State's jurisdiction over it with respect to the project.

22. Unless the context clearly indicates a different meaning was intended, these definitions shall be used in construing the following terms:

a. The term "project facilities" shall mean the physical facilities which are necessary to the successful and reasonable operation of the water conservation and management facility envisioned by this agreement and the subsequent Feasibility Report on the Santa Margarita Project:

b. The term "project water" shall mean all inflow into the project facilities except water imported for storage in the project, and shall not include that portion of the water of the Santa Margarita River which originates or is contributed to that river at points below the lower (DeLuz) reservoir;

c. The term "water year" shall mean the period from October 1st of each calendar year through September 30th of the next calendar year;

d. The term "imported water" shall mean water produced outside the Santa Margarita River watershed and brought to the Santa Margarita River watershed by aqueducts, pipelines, or other artificial means;

e. The term "Naval Enclave" means the area described in Finding of Fact No. 1 in Interlocutory Judgment No. 37, included in and incorporated into the Modified Final Judgment and Decree in the Fallbrook case..

f. The term "Fallbrook case" means the case of United States v. Fallbrook Utility District, et al., No. 1247-SD-C in the United States District Court for

the Southern District of California.

23. No assignment or transfer of this agreement or any part or interest therein shall be valid unless approved by the Secretary of the Interior and the Secretary of the Navy.

24. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this agreement or to any benefit that may arise herefrom; but this restriction shall not be construed to extend to this agreement if made with a corporation or company for its general benefit.

25. Notice

    a.  One copy each of any notice authorized or required to be given to the United States shall be delivered to the Commanding General, Marine Corps Base, Camp Pendleton, California 92055, to the Attorney General of the United States, Department of Justice, Washington, D. C. 20530, and to the Secretary of the Interior, Department of the Interior Building, Washington, D. C. 20240.

    Any notice authorized or required to be given to Fallbrook shall be delivered to the business office of the Fallbrook Public Utility District, Mission Road and Santa Margarita Drive, Fallbrook, California 92028.

    b.  The designation of the addressees or the addresses given above may be changed by notice given in the manner provided in this section.

1    IN WITNESS WHEREOF the undersigned Attorney General and the
2   Secretaries of the Interior and of the Navy have executed this
3   memorandum of understanding and agreement in behalf of the United
4   States, and the Fallbrook Public Utility District, by authority of
5   its Board of Directors, has caused the same to be executed in its
6   behalf by the President of its said Board and attested by its
7   Secretary.

UNITED STATES OF AMERICA

By _Ramsey Clark_
         Attorney General

_Stewart Udall_
         Secretary of the Interior

_Paul R. Ignatius_
         Secretary of the Navy


FALLBROOK PUBLIC UTILITY DISTRICT

By _Frank C. Rogers_
         President of the Board of Directors

ATTEST:

_Katherine Eisenberg_
         Secretary

16

WHEREAS the FALLBROOK PUBLIC UTILITY DISTRICT has been negotiating with representatives of the ATTORNEY GENERAL, the SECRETARY OF THE INTERIOR, and the SECRETARY OF THE NAVY of the UNITED STATES OF AMERICA relative to the execution of an Agreement by all of the said parties intended to establish an apportionment of the waters of the Santa Margarita River between the UNITED STATES OF AMERICA (Navy Department) and the FALLBROOK PUBLIC UTILITY DISTRICT and to provide for the joint efforts of the parties for the construction of a two dam project on the said River; and

WHEREAS, on September 19, 1967, a final draft of the proposed Memorandum of Understanding and Agreement was approved by representatives of all parties; and

WHEREAS, FALLBROOK PUBLIC UTILITY DISTRICT wishes at this time to indicate its formal approval and to authorize the execution of the said Agreement and to thereafter forward the same for execution by the other agencies involved;

NOW, THEREFORE, BE IT RESOLVED that the Memorandum of Understanding and Agreement, a copy of which is attached to this Resolution be and the same is hereby approved by the Board of Directors of the FALLBROOK PUBLIC UTILITY DISTRICT; and

BE IT FURTHER RESOLVED that the President

- 1 -

and Secretary of the Board of Directors of the **FALLBROOK PUBLIC UTILITY DISTRICT** are hereby authorized to execute the same on behalf of said District.

I hereby certify that the foregoing is a true copy of a **RESOLUTION** unanimously adopted by the Board of Directors of the **FALLBROOK PUBLIC UTILITY DISTRICT** at its regular meeting, October 9, 1967.

*Katherine Enigenburg*

**KATHERINE ENIGENBURG,**
**SECRETARY**

Approved as to
form and legality:

*Geo. R. Bechel*
Attorney

- 2 -

Chambers of
James M. Carter
San Diego, Calif. 92101

815 Charter Oil Bldg.

March 6, 1974

Hon. Edward J. Schwartz
Chief Judge, U. S. District Court
Federal Building - 325 West F St.
San Diego, California

Re: United States vs. Fallbrook
District Court No. 1247

Dear Judge Schwartz:

There are probably some minor matters coming up in
the above case. The final judgment reserved con-
tinuing jurisdiction in the district court.

The litigants have requested that when these matters
arise, they be assigned to me, and subject to your
approval, I agree.

Accordingly, Judge Chambers has given me a designation
to sit in the Southern District through June 30, 1975.
It is dated February 25, 1974, and is on file with the
Clerk in San Diego.

If any matters are filed in the Fallbrook case, will
you please refer them to me and have the Clerk advise
me and supply copies of the pleadings?

Sincerely,

JAMES M. CARTER
United States Circuit Judge

cc: W. W. Luddy, Clerk
U.S. District Court-San Diego

RECEIVED

MAR 7 - 1974

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# The Metropolitan Water District of Southern California

Office of General Counsel

August 23, 1974

Donald W. Redd, Esq.
Franz Sachse, Esq.
Fritz R. Stradling, Esq.
Colonel A. C. Bowen

**RECEIVED**

AUG 27 1974

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Gentlemen:

Re: U.S. v. Fallbrook PUD
USDC SD Cal. 1247-SD-C

Pursuant to previous comunications, we enclose for your review and comments copies of (1) a draft Joint Petition for an Order approving The Memorandum of Understanding and Agreement on Lake Skinner operation, (2) a draft Order designating October 31, 1974, as the date for Hearing the Petition and setting notice requirements, and (3) a draft Public Notice for general distribution. The Court agreed to the October 31 hearing date and suggested this type of procedure during the August 20 procedure conference which it held with Colonel Bowen and counsel for Fallbrook Public Utility District and The Metropolitan Water District.

In view of the three week notice required, we would of course appreciate your suggestions on the format and specific procedures as soon as possible so that we may circulate the Petition for signatures and file formal pleadings with the Court before the end of September.

Very truly yours,

Robert P. Will
General Counsel

Victor E. Gleason
Deputy General Counsel

Enclosure
cc: Judge James M. Carter (with enclosure)

1111 Sunset Boulevard, Los Angeles, Calif. / Mailing address: Box 54153, Los Angeles, Calif. 90054 / Telephone: (213) 626-4282

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | NO. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, a public service corporation of the State of California, et at., | ) ) ) ) | |
| Defendants. | ) ) ) | |

PETITION
FOR APPROVAL OF MEMORANDUM OF UNDERSTANDING AND AGREEMENT
AND FOR ORDER AMENDING MODIFIED FINAL JUDGMENT AND DECREE.

TO THE HONORABLE JUDGE OF THIS COURT:

The plaintiff, by and through its attorneys, and defendants Fallbrook Pub-

lic Utility District, Kaiser Aetna and The Metropolitan Water District of Southern

California, by and through their respective attorneys, petition the Court; and in

support of this Petition allege as follows:

1. The Court entered its Final Judgment and Decree in this Cause on May 8,

1963, and its Modified Final Judgment and Decree on April 6, 1966, as directed

by the Court of Appeals in its Decision dated May 26, 1965. On June 27, 1968,

this Court amended the Modified Final Judgment and Decree in this Cause by

incorporating a Memorandum of Understanding and Agreement, dated March 4,

1968, between the United States and Fallbrook Public Utility District, for a physi-
cal solution to permit utilization of their respective water rights determined by
the Modified Final Judgment and Decree.

2. The Metropolitan Water District of Southern California has subse-
quently constructed a Dam and Reservoir with a capacity of some 44,000 acre-feet
in Auld Valley, Riverside County, on Tucalota Creek which is a tributary of
the Santa Margarita River by way of Santa Gertrudis Creek and Murietta Creek.
That Dam and Reservoir are known as Auld Valley Dam and Lake Skinner, and
have been built to regulate and store water which The Metropolitan Water District
imports into the Santa Margarita River system for eventual export to various
areas in San Diego County. Although those facilities will unavoidably impound
small amounts of surface waters of Tucalota Creek for short periods of time,
they will not appropriate any of the surface flows of Tucalota Creek.

3. Article V of the Modified Final Judgment and Decree retains continuing
jurisdiction over the use of all surface waters within the watershed of the Santa
Margarita River system, and Article II thereof adopts Interlocutory Judgment 28
by reference, which in turn retains continuing jurisdiction over the impoundment
of the surface waters of said systems.

4. Because of the complexities of this litigation, the Court adjudicated the
rights of the parties to this Cause by a series of separate trials covering various
sub-watersheds involving limited areas and numbers of defendants; and by enter-
ing interlocutory judgments, beginning in 1961, as the trial concerning each seg-
ment was concluded; with interlocutory judgments on all areas within the water-
shed being entered prior to May 8, 1963.

5. The sub-watersheds containing areas affected by Auld Valley Dam and
Lake Skinner are those of Santa Gertrudis Creek and Tucalota Creek, the waters
of which were adjudicated by Interlocutory Judgments 31 and 31A, respectively.
In connection with the construction of Auld Valley Dam and Lake Skinner, The
Metropolitan Water District purchased approximately 5,700 acres of land within
those sub-watersheds and acquired thereby relatively small riparian and overlying
water rights previously adjudicated by Interlocutory Judgments 31 and 31A.

6. Subject to the approval of this Court, the United States, Fallbrook Public

Utility District, Kaiser-Aetna, and The Metropolitan Water District of Southern California have negotiated and executed an agreement for operation of Auld Valley Dam and Lake Skinner, which is embodied in the attached Memorandum of Understanding and Agreement, dated August 15, 1974, to assure that the temporary impoundments described above will not impair any adjudicated water rights downstream of Auld Valley Dam.

WHEREFORE, petitioners pray that the Court enter its Order fixing the time for Hearing on this Petition and providing the manner in which and the persons to whom notice of such Hearing shall be given, and that at such time the aforesaid Memorandum of Understanding and Agreement be approved by the Court and that the Modified Final Judgment and Decree in this Cause be amended by the incorporation of this Memorandum of Understanding and Agreement.

Respectively submitted,


Dated: September _____, 1974

By_____
      Attorneys for The United States







Sache and James

By_____

      Attorneys for Fallbrook Public
      Utility District

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY DISTRICT, ) | ORDER FIXING TIME |
| a public service corporation of the State of ) | FOR HEARING AND SETTING |
| California, et at., ) | NOTICE REQUIREMENTS |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

Upon presentation and consideration of the attached Petition, IT IS HEREBY

ORDERED AND DIRECTED:

I

That a hearing will be held on the subject matter of the attached Petition

on the 31st day of October, 1974, at 10:00 A.M. in courtroom _____ of the United

States District Court, 325 "F" Street, San Diego, California.

II

That the following will receive notice of this hearing by having a copy

of this Order and the attached Petition, without its attached Memorandum of Un-

derstanding and Agreement, mailed to their attorney of record, if represented

by an attorney, or to them individually at their last known address if not repre-

sented by an attorney:

      1. The State of California.

      2. All parties listed in Exhibit A of Inter-
         locutory Judgment 31 downstream of
         Auld Valley Dam.

3. All parties listed in Exhibit B of Inter-
locutory Judgment 31A downstream of
Auld Valley Dam.

### III

That this Order and the attached Petition will be published once a week for at least three consecutive weeks in the Riverside Daily Enterprise and in the Fallbrook Enterprise;

### IV

That the attached Public Notice be distributed to as many resident property owners within the Santa Margarita Watershed as practicable; and

### V

That copies of the Memorandum of Understanding and Agreement attached to the Petition may be examined during normal working hours at the offices of:

The Clerk of this Court, 325 "F" Street, San Diego

The Santa Margarita-San Luis Rey Watershed Planning Agency,
418 South Main Street, Fallbrook

Rancho California, The Plaza, Rancho California; and

The Constable of Murrieta Township.

Dated: September ____, 1974

_____
James M. Carter, JUDGE

The United States District Court for the
Southern District of California

## PUBLIC NOTICE

Pursuant to jurisdiction retained by the Final Judgment in United States v. Fallbrook Public Utility District, No. 1247-SD-C, this Court will hold a hearing on October 31, 1974 in the Federal District Court in San Diego to approve a Memorandum of Understanding and Agreement on the operation of Auld Valley Dam and Lake Skinner, on Tucalota Creek, a tributary of the Santa Margarita River by way of Santa Gertrudis Creek and Murrieta Creek. The principal parties of that suit (the United States, Fallbrook Public Utility District, and Kaiser Aetna, successor in interest to Racho California) have entered into an Agreement with The Metropolitan Water District of Southern California to assure that the operation of Auld Valley Dam and its reservoir, Lake Skinner, will not impair any of the rights adjudicated by the Modified Final Judgment. Representatives of those entities have held several meetings with representatives of the San Diego Regional Water Quality Control Board, Eastern Municipal Water District, the San Diego County Water Authority, the Attorney General's office and others in developing the Memorandum of Understanding and Agreement.

The Metropolitan Water District recently constructed Auld Valley Dam and Lake Skinner to provide regulatory storage capacity for Northern California and Colorado River water which The Metropolitan Water District delivers to various areas in San Diego County. Although Auld Valley Dam will unavoidably impound small amounts of Tucalota Creek water for short periods of time, the Memorandum of Understanding and Agreement provides that Auld Valley Dam will not appropriate Tucalota Creek flows. Auld Valley Dam will in fact provide downstream areas flood control protection to the extent that its design will attenuate the rate of flood flows.

Copies of the Memorandum of Understanding and Agreement may be examined during normal working hours at the offices of:

The Clerk of this Court, 325 "F" Street, San Diego;

The Santa Margarita-San Luis Rey Watershed Planning Agency, 418 South Main Street, Fallbrook;

Kaiser-Aetna, the Plaza, Rancho California; and

The Constable of Murrieta Township.

Dated: September ___, 1974

_____
James M. Carter, JUDGE

ROBERT P. WILL, General Counsel
JOHN M. DAVENPORT, Assistant General Counsel
VICTOR E. GLEASON, Deputy General Counsel
1111 Sunset Boulevard
Los Angeles, California 90012
626-4282

Attorneys for
The Metropolitan Water District
     of Southern California

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | NO. 1247-SD-C |
| v. | ) | AFFIDAVIT OF |
| | ) | CARVER E. HILDEBRAND |
| FALLBROOK PUBLIC UTILITY DISTRICT, | ) | IN SUPPORT OF MOTION |
| a public service corporation of the | ) | FOR ORDER SETTING |
| State of California, et al., | ) | NOTICE REQUIREMENTS |
| | ) | AND HEARING |
| Defendants. | ) | |

STATE OF CALIFORNIA )
                     )  SS.
COUNTY OF LOS ANGELES)

CARVER E. HILDEBRAND, being first duly sworn, deposes and says:

I am the Hydrographic Engineer for The Metropolitan Water District of Southern California (hereinafter referred to as "Metropolitan"), and am familiar with the hydrologic effects of the operation of dams and reservoirs generally, and of Lake Skinner specifically.

Metropolitan constructed Auld Valley Dam and Lake Skinner in 1973 to serve as a regulatory and emergency storage facility for water which Metropolitan imports into the watershed for eventual export to various areas in San Diego County. Auld Valley Dam and Lake Skinner are located eight miles south of the community of Winchester and one-half mile east of the intersection of Washington Avenue and Benton Road, and lie on Tucalota Creek which

is tributary to Murrieta Creek by way of Santa Gertrudis Creek, as indicated on the attached map. These facilities fall within the Tucalota Creek and Santa Gertrudis Creek subwatersheds which have been adjudicated by Interlocutory Judgments 31A and 31 respectively.

Auld Valley Dam is approximately one mile long and 100 feet high and creates Lake Skinner reservoir which has a capacity of over 44,000 acre feet and a surface area, when full, of approximately 1,140 acres. These facilities have been designed to pass all local runoff which originates in the watershed upstream of the Dam. That design required extensive hydrologic studies over the entire area, including data such as stream parameters, topography, geology, climatology, soil characteristics, ground cover and use, precipitation and local runoff. From these studies it was determined that the area of the Tucalota Creek drainage basin upstream of Auld Valley Dam is approximately 52 square miles; that the mean annual runoff at Auld Valley Dam is 2,400 acre feet; and that the annual historical runoff at that point over a 59 year period of record has ranged between 15,900 acre feet and 280 acre feet, representing, respectively, one percent and ninety-nine percent probabilities of exceedance. It has been determined that the maximum possible subsurface flow at the damsite is approximately 0.5 acre-feet per day (113 gallons per minute or 0.25 cubic feet per second).

Metropolitan will release all runoff from the Tucalota Creek drainage basin above Auld Valley Dam soon after that runoff occurs, and any impoundment of that runoff in Lake Skinner will be for very short periods of time related to runoff measurement and flow release characteristics. Metropolitan will monitor the level of groundwater immediately below the damsite by means of a representative well and will maintain that groundwater at levels no lower than those that would have existed in the absence of Auld Valley Dam. The quality of the imported water which Metropolitan will store in Lake Skinner will be adequate for all intended uses, and releases of water from

1 Lake Skinner will have little if any effect on the groundwater

2 quality downstream. Metropolitan's operation of Auld Valley Dam and

3 Lake Skinner will not impair any downstream water rights adjudicated

4 by the Modified Final Judgment filed in this case on June 27, 1968.

6 ~~_Carver E. Hildebrand_~~
   CARVER E. HILDEBRAND

8 Subscribed and sworn to before me this Fourteenth day of

9 August, 1974.

10 ~~_Sophie S. Walsh_~~
   Notary Public



OFFICIAL SEAL
SOPHIE S. WALSH
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Mar. 1, 1977



<u>MEMORANDUM OF UNDERSTANDING AND AGREEMENT</u>
<u>ON OPERATION OF LAKE SKINNER</u>

This Memorandum of Understanding and Agreement dated this fifteenth day of August, 1974, among THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA (herein referred to as "Metropolitan"), a public corporation of the State of California; UNITED STATES OF AMERICA (herein referred to as the "United States") through the Attorney General of the United States, the Secretary of the Interior, and the Secretary of the Navy; FALLBROOK PUBLIC UTILITY DISTRICT (herein referred to as "Fallbrook"), a public corporation of the State of California; and KAISER AETNA, (herein referred to as "Kaiser"), a California general partnership composed of Temecula Properties, Inc., a California corporation, Kaiser Rancho California, Inc., a California corporation, Westward Properties, Inc., a California corporation, Kaiser Hawaii Kai Development Co., a Nevada corporation, and Aetna Life Insurance Company, a Connecticut corporation and successor in interest to Rancho California and The Vail Company.

Whereas, the United States District Court for the Southern District of California, in the case entitled <u>United States v.</u> <u>Fallbrook Public Utility District, et al.</u>, No. 1247-SD-C (herein referred to as "The Action"), has adjudicated water rights to the Santa Margarita River stream system (herein referred to as "System") by the Modified Final Judgments and Decrees entered on April 6, 1966 and June 27, 1968 (herein referred to as the "Judgment");

Whereas, the United States, Fallbrook, and Kaiser are the principal water users in the System, have been involved for the past two decades in litigation to determine, the respective rights and duties of the users of the waters of the System, and are parties of record in the Action;

Whereas, Article V of the 1966 Order in the Judgment retains continuing jurisdiction as to the use of all surface waters within the watershed of the System, and Article II thereof adopts

Interlocutory Judgment 28 by reference, which in turn retains contin-
uing jurisdiction over the impoundment of the surface waters of the
System;

Whereas, Metropolitan has now completed construction of a
dam and reservoir with a capacity of some 44,000 acre feet in Auld
Valley, Riverside County, on Tucalota Creek which is a tributary of
the Santa Margarita River by way of Santa Gertrudis Creek and
Murietta Creek, being known as Auld Valley Dam and Lake Skinner
(herein referred to as the "Project");

Whereas, the Project's purpose is to provide regulatory
storage capacity for the San Diego pipelines, rather than to impound
surface water of the System as set forth more fully in Attachment A
hereto;

Whereas, the Project will nonetheless unavoidably impound
small amounts of surface waters of the system for short periods of
time;

Whereas, the Project lies within the Tucalota Creek sub-
watershed which is a part of the Santa Gertrudis Creek sub-watershed
as described in Interlocutory Judgments 31 and 31A, both of which
have been incorporated by reference into the Judgment;

Whereas, Metropolitan has acquired a portion of the lands
riparian to Tucalota Creek, along with the respective appurtenant
water rights set forth in Interlocutory Judgment 31 listed in Attach-
ment B hereto;

Whereas, the defendants in the Action, that are listed in
Attachment C hereto, have assigned all or part of their water rights
in Tucalota Creek to Metropolitan;

NOW, THEREFORE, in evidence of the understandings and agree-
ments which have been reached, the undersigned parties to this memoran-
dum do hereby declare such understandings and agreements to be as
follows:

I.    Metropolitan will operate the Project in accordance with the

-2-

following principles:

    A.    The basic function of Lake Skinner is to provide regulatory Storage Capacity for the San Diego Pipelines. Only water that would not have been available in the Drainage Basin in the absence of the Reservoir is to be stored for Export.

    B.    Lake Skinner will be operated so that both surface and subsurface water Outflow will approximate the flows that would have occurred in the absence of the Reservoir.

    C.    The quantity of all Local Runoff into Lake Skinner will be determined and a like quantity of water will be released from the Reservoir into Tucalota Creek.

    D.    Local Runoff from lands owned by Metropolitan will be released into Tucalota Creek and the rainfall on the Reservoir will be retained in Lake Skinner.

    E.    Water conservation and flood control are not explicit functions of Lake Skinner.

    F.    The Groundwater immediately downstream from the Dam will be maintained at the approximate level that would have existed in the absence of the Project.

    G.    The Outflow from Lake Skinner will have no significant effect on the quality of the water downstream of the Dam.

II.    Metropolitan will implement those principles set forth in Article I, above, by operating the Project under the following criteria:

    A.    Local Runoff shall be determined as follows with more specific descriptions set forth in Attachment D hereto:

        1.    Local Runoff into the Reservoir from the Drainage Basin above the Dam will be computed daily.

        2.    Local Runoff into the Reservoir will be computed as a residual quantity in a water balance of all other measured Imports, Inflows, Exports, Outflows, and changes in Storage Content of the Reservoir.

3. Local Runoff from the Rawson Creek sub-drainage basin will be gaged by a flume to more accurately measure the runoff from this area during moderate rainfall occurrences.

4. In the determination of Local Runoff, no distinction will be made between runoff from lands belonging to Metropolitan and runoff from land owned by others.

5. Rainfall on the Reservoir surface will not be included as a component of Local Runoff into the Reservoir but will be considered as if it were a Metropolitan Import.

6. Evaporation from the Reservoir surface will be included in the water balance as if it were a Metropolitan Export.

7. Miscellaneous consumptive uses of water for the Skinner Filtration Plant, for recreational developments and other local uses, will be included in the water balance as if the water were a Metropolitan Export.

B. Reservoir Releases shall be determined as follows, with more specific description set forth in Attachment E hereto:

1. Releases from the Reservoir into Tucalota Creek will begin shortly after the daily quantity of Local Runoff is computed and will be adjusted daily as required by subsequent determinations of Local Runoff.

2. The rate of Release from the Reservoir into Tucalota Creek will be limited to the computed mean daily rate of Local Runoff into the Reservoir, except as noted in paragraph 3, below.

3. Releases into Tucalota Creek may be made as requested by the Watermaster, within reasonable and safe limits that would neither impair Metropolitan's use of the Project nor expose it to public liability.

4. The start of any Release from the Reservoir into

-4-

Tucalota Creek will be made at a low rate, and any increases in the rate of Release will be made gradually to alert downstream parties.

5.   Within the constraints imposed by physical limitations and other operating limits as mentioned in Paragraph 3, above, Releases to Tucalota Creek will be made at rates similar to those which would have occurred in the absence of the Reservoir.

6.   Releases from the Reservoir into Tucalota Creek will be continued during and following each flood event until the total computed quantity of Local Runoff has been released.

7.   As a general operating procedure, freeboard will be maintained between the elevation of the water surface and the spillway crest elevation.

C.   No Storage Space is specifically reserved in the Reservoir for flood control or conservation use; and Releases from the Reservoir into Tucalota Creek will normally be made through the Dam outlets, as described more fully in Attachment F hereto.

D.   The water level of the Groundwater immediately below the Dam will be monitored by means of a representative well, and will be maintained at levels that would have existed in the absence of the Project by means of Releases from the Reservoir, if seepage through the Dam and Subsurface Flows are inadequate for this purpose, as more fully described in Attachment G hereto.

E.   The quality of the imported water which is stored in the Reservoir will be adequate for all intended uses; and Releases from the Reservoir will have little if any, effect on the general water quality as compared to the quality that would have existed in the absence of the Reservoir, as more fully described in Attachment H hereto.

-5-

F. Metropolitan will file a copy of the monthly Record Sheet described in Attachment E hereto, with the Watermaster prior to the end of each respective following month. The Watermaster will in turn deliver copies of each month's sheet to each party to the Judgment.

III. The following terms used in this Memorandum of Understanding and Agreement, shall have the respective meaning given below unless otherwise indicated:

A. Dam--The Auld Valley Dam constructed by Metropolitan on Tucalota Creek.

B. Discharge Capacity--The maximum capability of the Dam outlets or spillway with the Dam valves or gates in a full-open position.

C. Drainage Basin--The area tributary to Tucalota Creek upstream from the Auld Valley Dam.

D. Export--Water which is released from the Reservoir through the San Diego pipelines evaporation from the Reservoir surface and local consumptive use by Metropolitan.

E. Groundwater--The general subsurface water body in the zone of saturation in the basin downstream of the Dam.

F. Import--Water which flows into the Reservoir through the San Diego Canal and pipelines and rainfall on the Reservoir surface.

G. Inflow--Local Runoff and Subsurface Flow into the Reservoir from the Drainage Basin above the Dam.

H. Local Runoff--Surface water runoff from the Drainage Basin into the Reservoir.

I. Outflow--Releases made through the Dam outlets and over the Dam spillway into Tucalota Creek and seepage through the Dam and other Subsurface Flow.

J. Release--Water which flows through the Dam outlets or over the Dam spillway into Tucalota Creek.

-6-

K.    **Reservoir**--Lake Skinner created by Auld Valley Dam.

L.    **Storage Capacity**--The maximum volume of water which may be stored in the Reservoir.

M.    **Storage Content**--The volume of water actually stored in the Reservoir at a given time.

N.    **Storage Space**--The Storage Capacity of the Reservoir which is not filled with water at a given time.

O.    **Subsurface Flow**--All water flowing below the land surface.

P.    **Watermaster**--The individual appointed pursuant to Interlocutory Judgment 45 as incorporated in the Judgment.

IV.    Metropolitan's operation of the Project in the manner described in Articles I and II will not impair the downstream rights of any of the parties to the Action.

V.    Notwithstanding any other provision of this Agreement or anything which might reasonably be implied or inferred therefrom, nothing herein shall be construed to affect in any manner any rights to the use of water from the Santa Margarita River or its tributaries which the Parties to this Agreement hold. Nothing in this Agreement shall be construed as a transfer of or an attempt to transfer such rights or any part thereof between the parties.

VI.    Upon execution of this Memorandum and Agreement by the respective undersigned representatives on behalf of the United States, Fallbrook, Kaiser and Metropolitan, Metropolitan shall present this instrument to the United States District Court for the Southern District of California for approval and incorporation into the Judgment as the Court may determine appropriate in the circumstances. Upon approval by the Court this Agreement shall become fully effective.

VII.    No assignment or transfer of the rights defined in this Agreement or any part or interest therein shall be valid unless approved all the parties hereto.

VIII.    The criteria and reservoir release data referred to in

-7-

1  Article II hereof, the terms used in Article III hereof, and the

2  formulae included in the Attachments hereto shall be periodically

3  reviewed and, based on operating experience, will be modified if

4  deemed necessary or appropriate by the parties hereto.

5      IX.   No member of or Delegate to Congress or Resident Commissioner

6  shall be admitted to any share or part of this Agreement or to any

7  benefit that may arise herefrom; but this restriction shall not be

8  construed to extend to this Agreement if made within a corporation or

9  company for its general benefit.

10          IN WITNESS WHEREOF the undersigned have executed this

11  Memorandum of Understanding and Agreement on behalf of their respective

12  principals.

14                                    THE METROPOLITAN WATER DISTRICT
                                          OF SOUTHERN CALIFORNIA

16                                    _____
17                                          John H. Lauten
                                          General Manager

18  ATTEST:

20  _____
            Norton L. Norris
21          Executive Secretary

23  APPROVED AS TO FORM
    AND EXECUTION:
24

25  Robert P. Will
    General Counsel
26

27  _____

-8-

```
 1                          UNITED STATES OF AMERICA

 2                          DEPARTMENT OF JUSTICE

 3

 4                              By_____

 5

 6                          DEPARTMENT OF THE INTERIOR

 7

 8                              By_____

 9

10

11                          DEPARTMENT OF THE NAVY

12

13                              By_____

14   ATTEST:

15

16

17   _____

18                          FALLBROOK PUBLIC UTILITY DISTRICT

19

20                              By_____

21   ATTEST:

22

23   _____

24                          KAISER AETNA

25

26                              By_____

27

28

29

30

31

32
```

## BACKGROUND INFORMATION

1.    The Metropolitan Water District of Southern California
has constructed a Dam and Reservoir in Auld Valley, Riverside County,
State of California, known as Lake Skinner.  Specifically, the
Reservoir is located eight miles south of the community of
Winchester and one-half mile east of the intersection of Washington
Avenue and Benton Road.  (See attached map.)

2.    Lake Skinner was built to serve as a regulatory and
emergency water storage facility integral with Metropolitan's San
Diego Canal and Pipelines.  This portion of Metropolitan's water
distribution system transports over 100 billion gallons of water
annually to semi-arid regions of Southern California.  Lake Skinner
will also serve as a public recreation area under an agreement be-
tween the County of Riverside and Metropolitan.  This agreement
includes development proposals for camping, fishing, and boating
with related support facilities.  Also proposed are picnic areas,
playgrounds, hiking trails, a museum or interpretive center for the
protection of historical artifacts and areas, and a wildlife pre-
serve with water access.

3.    The Dam is approximately one mile in length and 100 feet
high and creates a Reservoir with a capacity of over 44,000 acre-
feet with a surface area of approximately 1,140 acres, when the
Reservoir is full.  Capacity and surface area are plotted as
functions of elevation on the accompanying graph.  Initial filling
of the Reservoir was accomplished by the importation of water
through the San Diego Canal.  All local rainfall runoff from the
52 square miles of the Tucalota Creek drainage basin which flows
into the Reservoir will be released into Tucalota Creek soon after
such runoff occurs.

4.    Tucalota Creek is a tributary of the Santa Margarita
River via the Santa Gertrudis and Murrieta Creeks.  The Santa
Margarita River system and the water rights applicable thereto are

currently under the continuing jurisdiction of the U.S. District Court in San Diego (United States v. Fallbrook PUD, No. 1247-SD-C). The court expressly retained jurisdiction over the impoundment of the surface waters of that river system. However, Metropolitan advised the State Water Resources Control Board on January 16, 1969, that Lake Skinner would not collect Tucalota Creek flow for its use.

5.   The facilities at Lake Skinner were designed to effectively pass all local runoff which originates in the basin upstream of the Dam. This design required extensive hydrologic studies over the entire area, including data such as stream parameters, topography, geology, climatology, soil characteristics, ground cover and use, precipitation, and local runoff. From these studies it was estimated that the mean annual local runoff, which occurred at the damsite, was 2,400 acre-feet. It was further estimated that the annual local runoff range over a 59-year period of record was between 15,900 acre-feet and 280 acre-feet. Respectively, these volumes have a one-percent and ninety-percent probability of exceedance.1/ It has been determined that the maximum possible subsurface flow at the damsite was approximately 0.5 acre-feet per day (113 gpm or 0.25 cfs).2/

6.   Now that the Dam has been constructed and the facilities are operational, it is necessary that a detailed criterion be established for the following purposes:

    a.   Determining the quantity and rate of local runoff from the drainage basin above Lake Skinner.

    b.   Determining the quantity of water that should be released from Lake Skinner to maintain downstream water rights

---

1/  W. A. Wahler & Associates.   Preliminary Design Report--Auld Valley Reservoir--Part C.

2/  MWD Report No. 863.   Hydrology of the Auld Valley Reservoir Area.

BACHELOR MTN QUADRANGLE
CALIFORNIA—RIVERSIDE CO.
7.5 MINUTE SERIES (TOPOGRAPHIC)

STATE OF CALIFORNIA
REPRESENTED BY THE
DIRECTOR OF PUBLIC WORKS

UNITED STATES
DEPARTMENT OF THE INTERIOR
GEOLOGICAL SURVEY



Attachment A

THE METROPOLITAN WATER DISTRICT
OF SOUTHERN CALIFORNIA

LAKE SKINNER

AREA CAPACITY CURVE

## METROPOLITAN'S AULD VALLEY PROPERTY

Metropolitan has acquired 6,058.77 acres of land in Auld Valley in connection with the construction of the Auld Valley Dam, Lake Skinner and related facilities. Interlocutory Judgments 31 and 31A categorize property in this area as either riparian or non-overlying and adjudicate the respective water rights of specific parcels within the Tucalota Creek & Santa Gertrudis Creek watersheds. Approximately 4,450 acres of the property that Metropolitan acquired were classified as riparian and approximately 1,250 acres were classified as non-overlying. The remaining acreage is not located within the relevant watersheds. Thus, Metropolitan now owns all or part of the property designated in those Judgments by the following parcel numbers:

| Riparian | Non-overlying |
|---|---|
| 61W-67 | 61&2E;61&2W;71&2W-1 |
| 61W-31-81 | 61W;71W;62W-67 |
| 71W-67 | 62W-32-127 |
| 71W-7-94 | 71W-6-93 |
| 72W-1-129 | 72W-3-134 |
| 72W-1-130 | 72W-7,12,13-141 |
| 72W-1-131 | 72W-11-145 |
| 72W-1,2,3-132 | 72W-12-146 |
| 72W-11,12-132 | |
| 72W-2-133 | |
| 72W-3,4,9,10,22-135 | |

## METROPOLITAN'S ASSIGNED RIGHTS

The following Defendants in <u>United States v. Fallbrook</u> <u>PUD</u> have assigned all or portions of their adjudicated riparian rights to the indicated lands in Auld Valley to Metropolitan:

| Defendants | Riparian Parcels |
|---|---|
| AULD, Barbara Ann & William K. | 72W-1,2,3,11,12-132 |
| BAATZ, Elmer | 72W-1-129 |
| BASHAW, J. N. & Helen J. | 72W-2-133 |
| BUTTON, Jesse D. & Lota T. | 71W-7-94 |
| DIETTERICK, Mary R. | 72W-1-130 |
| GARTLER, Stanley | 72W-1-131 |
| HOTCHKISS, Ray B. & Minnie J. | 61W-31-81 |
| MEEK, Nathan A., Jr., & Wilma | 61W-31-81 |
| NICOLAS, Marius A. & Mary | 72W-3,4,10-135 |
| RAWSON, Lewis | 71W-6-67 |
| ROBERTS, John L. | 71W-6-67 |
| ROBERTSON, Alma C. | 72W-1,2,3,11,12-132 |
| SCHUMATE, Olive O. | 72W-1-129 |
| SHIPLEY, Roy E. & Beryl | 61W-31-67 |

## COMPUTATION OF LOCAL RUNOFF

1.  The quantity of water which is additional to Metropolitan's importation will be computed from a water balance pursuant to attached Procedure 1.  All water imported through the San Diego Canal to the Reservoir will be gaged by an acoustical flowmeter. Exports from the Reservoir will be measured at several locations, including San Diego Pipelines 3 and 4.  Releases made through the two bottom Dam outlets to Tucalota Creek will also be gaged.  The Discharge Capacity of the two bottom Dam outlets as a function of Reservoir elevation is shown on attached Graph 1.  In addition to these outlet facilities, emergency outflows from the Reservoir may occur over the Dam spillway and through the Dam's emergency discharge pipeline.  Releases through these two facilities can be estimated because their Discharge Capacities are rated in terms of Reservoir stage pursuant to attached Graphs 2 and 3.  The Dam's emergency discharge pipeline will be used only in rare events requiring rapid dewatering.  Dam spillway discharge will occur only on rare occasions during exceptionally large flood events.

2.  Metropolitan has installed a weather station at Lake Skinner, including a rain gage and an evaporation pan which make it possible to determine rainfall and evaporative loss on the Reservoir surface.  Additionally, recording devices at the Reservoir keep a constant record of water surface elevation.

3.  Determination of the quantity of water to be released into Tucalota Creek downstream is further complicated by the fact that the available water in Lake Skinner has been increased by virtue of the fact that a water surface now exists where previously there was a semi-arid valley.  The average annual rainfall for the 52-square mile Drainage Basin is 16.9 inches.[1]  This would result in 47,000 acre-feet of annual Local Runoff if 100 percent of the

---

[1]  W. A. Wahler & Associates.  Preliminary Design Report--Auld Valley Reservoir--Part C.

rainfall actually ran off; however, the average annual Local Run-
off from the Drainage Basin into the Reservoir is only 2,400 acre-
feet or approximately 5.2 percent of the rainfall that falls in the
Basin. Since the 1,140-acre Reservoir surface has an effective
Local Runoff of 100 percent, the 16.9 inches of annual rainfall will
yield 1,600 acre-feet of Local Runoff, instead of the 83.5 acre-feet
the same area would have yielded had the Reservoir not been created.

    4.   Due to the fact that the Judgment does not explicitly
apportion specific quantities of water, Metropolitan does not now
intend to exercise any of the specific water rights applicable to
the approximately 4,450 acres of riparian land which it has purchased
for the Project. However, precipitation which falls on the Reservoir
surface, including that portion which would have run off in the
absence of the Reservoir will be credited to Metropolitan. As
indicated in paragraph 3 above, the average annual volume of Local
Runoff is only 5.2 percent of the annual precipitation on the
Drainage Basin.

    5.   An inherent problem exists in the computation of Local
Runoff by the method outlined in Procedure 1. A very small error
in one gage reading could result in a substantial error in the
Local Runoff calculations for moderate-duration, low-intensity
rainfall. It has been observed that during small storm events
that Local Runoff enters Lake Skinner only from Rawson Creek.
Metropolitan will construct a Parshall flume in Rawson Creek so as
to accurately measure Local Runoff from this subdrainage basin.
Additionally, small earth dikes will be constructed in each major
inlet channel to Lake Skinner. The readings obtained from the
recording device on the flume will be used as a measure of Local
Runoff to Lake Skinner in lieu of the quantity calculated in
Procedure 1, provided the earth dikes are undisturbed in all other
inlet channels. This method should provide much greater accuracy
in establishing Local Runoff for moderate-duration, low-intensity
rainfall.

## PROCEDURE 1

Procedure for determining quantity and rate of water accumulated in Lake Skinner, which is additional to Metropolitan's importation, for each 24-hour period.

Definitions:

    I = Import from San Diego Canal in acre-feet

    O = Export through outlet conduit to San Diego Pipelines
        3 and 4 in acre-feet

    D = Release through outlet works to Tucalota Creek in
        acre-feet

    E = Evaporation from Reservoir surface in acre-feet

    S = Change in Reservoir Storage Content in acre-feet

    Q = External accumulation in acre-feet

    R = Rate of accumulation (24-hour* average in cfs)

Calculations:

    Q = S + O + D + E - I

    R = 0.504 Q

---

*The period of calculation is to be the 24 hours starting and
 ending at 0700 hours.



RATING CURVES
LAKE SKINNER BOTTOM OUTLETS

24" SLEEVE VALVE DISCHARGE ONLY

36" HOWELL BUNGER VALVE DISCHARGE ONLY

COMBINED DISCHARGE

LAKE WATER SURFACE ELEVATION (FT)

Q (cfs)

FEB. 19, 1974



RATING CURVE
LAKE SKINNER SPILLWAY SYSTEM

FEB. 14, 1974

SPILLING   Q (cfs x 10³)



RATING CURVE
60" EMERGENCY DISCHARGE OUTLET
LAKE SKINNER

## RESERVOIR RELEASES

1.   Local Runoff into Lake Skinner will be released downstream at a rate no higher than the 24-hour average rate of accumulation of the Local Runoff, unless higher flows are requested by appropriate authorities as indicated in attached Procedure 2. Procedure 2 and the attached Monthly Record Sheet provide details regarding Reservoir Releases. Such Releases will begin approximately four hours after the preceding 24-hour accumulation period.

2.   It should be noted that if the Local Runoff rate exceeds Discharge Capacity, Metropolitan will continue to make Releases at the maximum Discharge Capacity and increase the duration of the Release until volume equivalence is reached. It should also be noted that the spillway at the Dam is ungated. Any Reservoir elevation above the Dam's spillway crest elevation will automatically result in water being spilled until the Reservoir level returns to the spillway crest elevation. Metropolitan will not use elevations in excess of the spillway crest at any time in its calculations. Therefore, any temporary surcharge storage above the spillway crest will not be included in the computation of Reservoir Releases.

3.   Metropolitan will observe a maximum Reservoir elevation during the rainy season which will keep 1,000 acre-feet of Storage Space below the Dam's spillway crest evacuated at all times except during flood events. The purpose of this is to preclude any spillway overflow in excess of that which would have naturally passed downstream.

4.   It is impossible to identify precisely that portion of the Local Runoff which will enter Reservoir bank storage during the short period of time that Local Runoff is held in Lake Skinner. However, this quantity will be small and will be more than offset by the increase in Local Runoff due to the saturated lands adjacent to the Reservoir.

## PROCEDURE 2

Procedure for determining quantity of water and rate of Release from Lake Skinner into Tucalota Creek.

Definitions:

Q = External accumulation in acre-feet

P = Precipitation on the lake surface in acre-feet

A = Actual Local Runoff into Lake Skinner that is to be released downstream in acre-feet

Calculation:

$$A = Q - P$$

Notes:

(1) Release of runoff will begin at 1100 hours after readings and calculations are made relative to the period ending at 0700 hours.

(2) The rate of release will begin at 5 cfs or less and be incremented in 5 cfs or less steps until the rate (from Procedure 1) is attained and then will be continued constant until the volume A has been released.

(3) The rate of Release possible is shown on Graph 1. Metropolitan will release incidentally stored water at rates greater than rate R upon request from responsible authorities, within reasonable limits that will neither impair Metropolitan's use of the Project nor expose it to public liability.

# THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA
## LAKE SKINNER–TUCALOTA CREEK WATER RIGHTS
### *MONTHLY RECORD SHEET*

| DAY OF MONTH (month) | $\underline{I}$ INFLOW (af) | $\underline{O}$ OUTFLOW (af) | $\underline{D}$ RELEASE (af) | $\underline{E}$ EVAPORATION (af) | $\underline{S}$ STORAGE CHANGE (af) | $\underline{Q}$ EXTERNAL WATER (af) | $\underline{R}$ RATE OF ACCUMULATION (cfs) | $\underline{P}$ PRECIPITATION (af) | $\underline{A}$ RUNOFF (af) | $\underline{LMIN}$ WELL DEPTH AV-28 (ft) | LAKE STORAGE (af) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |

NOTES

$Q = S + O + D + E - I$
$R = 0.504Q$
$A = Q - P$

## WATER CONSERVATION AND FLOOD CONTROL

1.   Lake Skinner will impound water from the Drainage Basin every time there is Local Runoff.  Because of this incidental storage characteristic and the dampening of Local Runoff intensity by the averaged rate of Release, a measure of flood control and water conservation will be provided the downstream parties.  Moreover, in the event of a major flood the limit of Metropolitan's discharge facilities will also dampen Local Runoff intensity.  This regulation is inherent in Metropolitan's facilities and the benefit thereof is derived by the downstream water users.

2.   Metropolitan did not construct the Project for the purpose of flood control, and does not intend to allocate any Storage Capacity in the Reservoir for flood control.  However, Metropolitan will normally have some Storage Space available during the mid-winter months and therefore could provide flood control and conservation storage to the extent that it does not conflict with the primary function of the Reservoir.  Such Storage Space provides the possibility of water conservation and most beneficial use of flood waters.

3.   Due to Metropolitan's operational commitments, such services as those mentioned above cannot be guaranteed.  However, for due consideration Metropolitan is prepared to provide such services when consistent with the principle function of the Reservoir.

## SUBSURFACE FLOW AND GROUNDWATER

1.    Subsurface Flow presents a significant problem as it is most difficult to determine and therefore most difficult to regulate. Metropolitan has been continuously monitoring numerous wells in the Tucalota Creek area since 1965 and has established their fluctuations and the water table in general.  Metropolitan's Report No. 863 deals with this work in great detail.  The report establishes the maximum possible Subsurface Flow where the Dam was constructed, as 0.5 acre-feet per day (113 gal/min. or .25 cfs).  Metropolitan believes that seepage through the Dam will more than offset any Subsurface Flow attributable to infiltration which would have taken place above the Dam and subsequently would have been realized downstream of the Dam. However, to insure that the natural Groundwater table integrity below the Dam is continued whole, Metropolitan is prepared to recharge that basin as required to maintain the Groundwater at levels that would have existed in the absence of the Dam (see Procedure 3).

2.    The operating criteria for Groundwater will be based on key well MWD No. AV-28, State No. 7S/2W-3-11, which is representative of the Groundwater table immediately downstream of the Reservoir. A record of this well's fluctuations since early 1965 is shown on attached Metropolitan Drawing No. D-59073.  As can be seen from the drawing, the level of this well has been abnormally varied since about mid-1968 until early 1974 by construction projects and the floods of January and February 1969.  Therefore, there exists only approximately three years of undisturbed record (1965 through 1967) to be used as a base for the Groundwater table elevation.

3.    In the area east of the bedrock constriction shown on MWD Drawing No. 20294-1, located approximately 1.4 miles downstream of the Dam on Tucalota Creek, the Groundwater level will be maintained.  So long as pumping from that area by others is not increased,

Metropolitan will recharge that basin whenever the Groundwater table
falls below the minimum of the 1965-1967 years of record. That
recharge will continue until resurfacing flow becomes visible at the
bedrock constriction. Such a recharge program should not only main-
tain the Groundwater table at levels that naturally occur in this
area, but should also maintain Groundwater levels in areas downstream
thereof by precluding excessive infiltration of runoff upstream of
the constriction.

4. If seepage through the Dam results in Groundwater levels
in excess of those that would have existed in the absence of the
Dam, as indicated by Groundwater levels in the key well, Metro-
politan may pump such excessive seepage back into the Reservoir.

## PROCEDURE 3

Procedure for maintaining the Groundwater level downstream of the Reservoir equal to that which would exist in the absence of the Project.

L MIN = low water level of well AV-28 during the undisturbed
period of record (19.18 feet from surface)

Whenever the level in Well AV-28 reaches a depth of L MIN, Release from Lake Skinner will be made at a rate less than that which would cause continuous surface flow from the discharge point to the bedrock constriction. Such Release will continue until such time as surface flow is realized at the bedrock constriction by natural resurfacing of waters from the Groundwater table.

Notes:

(1) Well AV-28 is located approximately 2,000 feet downstream of the Dam and will be constantly monitored by a recording device.

(2) L MIN is a variable which could be adjusted downward in the future. Such downward variation would only occur in events such as if pumping from the Groundwater is increased by others in the basin above the bedrock constriction and below the face of the Dam.

Attachment G



PLAN

PROFILES OF WATER TABLE
TUCALOTA CREEK

## WATER QUALITY

Lake Skinner was originally filled with Colorado River water. However, future Imports to the Reservoir will consist of a blend of Colorado River water and State project water. Initially, the blend will be 50 percent from each source with a higher proportion of State project water to be introduced in later years. Table 1 permits the comparison of several quality parameters of the naturally occurring waters in the area of Lake Skinner and the blended water Metropolitan plans to import initially. The table indicates that the quality of the imported supply compares favorably with all naturally occurring waters with the exception of storm flows. In view of this comparison and the fact that the Drainage Basin contributes only about one tenth of the total storm flow in the Santa Margarita Basin, the import of Releases on the general water quality will be inconsequential. Metropolitan's water supplies are utilized throughout Southern California for Groundwater replenishment and are considered adequate for all intended uses.

TABLE 1

| Constituent (mg/liter) | Average Values for Year Ending 12-31-73 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Colorado River Water | State Project Water | 50/50 Blend | Murrieta Creek Rising Water[1] | Murrieta Creek Storm Flows[1] | Auld & French Groundwater Basins[1] |
| TDS | 719 | 336 | 527.5 | 500-700 | 200 | 889 |
| Chlorides Cl | 96 | 62 | 79 | 130 | 30 | 148 |
| Nitrates $NO_3$ | 0.6 | 0.9 | 0.75 | 6.0 | 2.0 | 13 |
| Sulfates $SO_4$ | 312 | 91 | 201.5 | 90 | 25 | 189 |
| Boron B | 0.11 | 0.2 | 0.16 | 0.4 | 0.1 | 1.3 |

1. "Comprehensive Water Quality Management Study" by Joint Administration Committee of the Santa Margarita and San Luis Rey Watershed Planning Agencies, Volume 1, 1973. (Rising water is normal surface flow as opposed to that which occurs immediately after a large storm.)

## TUCALOTE-SANTA GERTRUDIS CREEK

Westward Ho Foods, Inc.
707 Sierra Way
Palm Springs, CA   92262

M. Edmund Nicolas, et al, Frances Thompson, et al,
Crocker National Bank Tr. Thompson F.
Tr Et Al
M. Edmund Nicolas et al c/o
Crocker National Bank
P.O. Box 58
Winchester, CA   92396

Frances Thompson
32801 Benton Road
Winchester, CA   92396

Robert K. Thompson, Frances M. Thompson
32801 Benton Road
Winchester, CA   92396

Alexander A. Borel
Rt. 2, Box 36
Murrieta, CA   92362

Rancho Bella Vista
6100 Alcove Ave.
N. Hollywood, CA   91606

Marius E. Nicolas
P.O. Box 58
Winchester, CA   92396

George Pavlinch, George R. Pavlinch
200 S. Marin
La Habra, CA   90631

Harry Yee, Margo Yee
2515 Outpost Dr.
Hollywood,CA  90068

# SANTA MARGARITA RIVER

William G. Grady, Sylvia M. Grady
1100 Miramar Place
Fullerton, CA   92631

Margarita Land & Development Company
P.O. Box 584
Fallbrook, CA   92028

John L. Wagenaar, Mary A. Wagenaar
24 Lindero Avenue
Long Beach, CA   90801

Joseph Hovelman, Grace E. Hovelman
170 N. Allen Ave., Apt. E
Pasadena, CA   91109

Semon Kasparoff
1400 W. Washington Blvd.
Montebello, CA   90640

William R. Wolf
1923 Stonewall Lane
Fallbrook, CA   92028

J.D. Perkins, Helen Perkins
Rt. 3, Box 1
Rock Mt. Road
Fallbrook, CA   92028

Kaiser-Aetna
    c/o Roger Hall
Rancho California
Temecula, CA   92390

Fallbrook Public Utility District
990 East Mission Road
Fallbrook, CA   92028

State of California
    Attorney General ~ S.D.
        Anthony Summers

United States of America
    Department of Justice
    Attention Don Redd
    Washington, C.C.   20013

    Commanding General
    Marine Corps Base
    Camp Pendleton, CA   92055

    Officer-in-Charge
    Naval Weapons Station
    Fallbrook Annex
    Fallbrook, CA   92028

    Commanding Officer
    Regional Medical Center
    U.S.N. Hospital
    Camp Pendleton, CA   92055

U S City    S.D.