**FILED**

OCT 31 1974

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By Myra Roberts DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, a public service corporation of the State of California, et at., | ) ) ) ) | |
| Defendants. | ) ) ) | |

PETITION
FOR APPROVAL OF MEMORANDUM OF UNDERSTANDING AND AGREEMENT
AND FOR ORDER AMENDING MODIFIED FINAL JUDGMENT AND DECREE.

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants Fallbrook Public Utility District, Kaiser Aetna and The
Metropolitan Water District of Southern California, by and through their res-
pective attorneys, petition the Court and in support of this Petition allege as
follows:

1.   The Court entered its Final Judgment and Decree in this Cause on May 8,
1963, and its Modified Final Judgment and Decree on April 6, 1966, as directed
by the Court of Appeals in its Decision dated May 26, 1965.   On June 27, 1968,
this Court amended the Modified Final Judgment and Decree in this Cause by
incorporating a Memorandum of Understanding and Agreement, dated March 4,

1   1968, between the United States and Fallbrook Public Utility District, for a physi-

2   cal solution to permit utilization of their respective water rights determined by

3   the Modified Final Judgment and Decree.

4       2.   The Metropolitan Water District of Southern California has subse-

5   quently constructed a Dam and Reservoir with a capacity of some 44,000 acre-feet

6   in Auld Valley, Riverside County, on Tucalota Creek which is a tributary of

7   the Santa Margarita River by way of Santa Gertrudis Creek and Murietta Creek.

8   That Dam and Reservoir are known as the Robert A. Skinner Dam and Reservoir,

9   and have been built to regulate and store water which The Metropolitan Water

10  District imports into the Santa Margarita River system for eventual export to

11  various areas in San Diego County. Although those facilities will unavoidably

12  impound small amounts of surface waters of Tucalota Creek for short periods

13  of time, they will not appropriate any of the surface flows of Tucalota Creek,

14  as described more specifically in the attached Affidavit of Carver E. Hildebrand.

15      3.   Article V of the Modified Final Judgment and Decree retains continuing

16  jurisdiction over the use of all surface waters within the watershed of the Santa

17  Margarita River system, and Article II thereof adopts Interlocutory Judgment 28

18  by reference, which in turn retains continuing jurisdiction over the impoundment

19  of the surface waters of said systems.

20      4.   Because of the complexities of this litigation, the Court adjudicated the

21  rights of the parties to this Cause by a series of separate trials covering various

22  sub-watersheds involving limited areas and numbers of defendants; and by enter-

23  ing interlocutory judgments, beginning in 1961, as the trial concerning each seg-

24  ment was concluded; with interlocutory judgments on all areas within the water-

25  shed being entered prior to May 8, 1963.

26      5.   The sub-watersheds containing areas affected by Skinner Dam and

27  Reservoir are those of Santa Gertrudis Creek and Tucalota Creek, the waters

28  of which were adjudicated by Interlocutory Judgments 31 and 31A, respectively.

29  In connection with the construction of Skinner Dam and Reservoir, The Metro-

30  politan Water District purchased approximately 5,700 acres of land within those

31  sub-watersheds and acquired thereby relatively small riparian and overlying water

32  rights previously adjudicated by Interlocutory Judgments 31 and 31A.

-2-

6. Subject to the approval of this Court Fallbrook Public Utility District, Kaiser-Aetna, and The Metropolitan Water District of Southern California have developed in cooperation with Plaintiff an agreement for operation of Skinner Dam and Reservoir, which is embodied in the attached Memorandum of Understanding and Agreement, to assure that the temporary impoundments described above will not impair any adjudicated water rights downstream of that Dam.

WHEREFORE, petitioners pray that the Court enter its Order fixing the time for Hearing on this Petition and providing the manner in which, and the persons to whom, notice of such Hearing shall be given, and that at such time the aforesaid Memorandum of Understanding and Agreement be approved by the Court and that the Modified Final Judgment and Decree in this Cause be amended by the incorporation of this Memorandum of Understanding and Agreement, and that the Court decree that the procedures set forth in said Memorandum be binding on all parties to this litigation.

Respectively submitted,

Dated: October 31, 1974

Robert P. Will
General Counsel

Victor E. Gleason
Deputy General Counsel

By _____
Attorneys for The
Metropolitan Water District of
Southern California

-3-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

Sachse and James

By _____
Attorneys for the Fallbrook
Public Utility District


Fritz R. Stradling
Rutan & Tucker

By _____
Attorneys for Kaiser-Aetna

-4-

ROBERT P. WILL, General Counsel
JOHN M. DAVENPORT, Assistant General Counsel
VICTOR E. GLEASON, Deputy General Counsel
1111 Sunset Boulevard
Los Angeles, California 90012
626-4282

Attorneys for
The Metropolitan Water District
    of Southern California

**FILED**

OCT 31 1974

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,            )       NO. 1247-SD-C
                                   )
        v.                         )       AFFIDAVIT OF
                                   )       CARVER E. HILDEBRAND
FALLBROOK PUBLIC UTILITY DISTRICT, )       IN SUPPORT OF PETITION
a public service corporation of the)       FOR ORDER SETTING
State of California, et al.,        )       NOTICE REQUIREMENTS
                                   )       AND HEARING
              Defendants.          )

STATE OF CALIFORNIA  )
                     )  SS.
COUNTY OF LOS ANGELES)

        CARVER E. HILDEBRAND, being first duly sworn, deposes and

says:

        I am the Hydrographic Engineer for The Metropolitan Water

District of Southern California (hereinafter referred to as

"Metropolitan"), and am familiar with the hydrologic effects of the

operation of dams and reservoirs generally, and of Lake Skinner

specifically.

        Metropolitan constructed Auld Valley Dam and Lake Skinner

in 1973 to serve as a regulatory and emergency storage facility

for water which Metropolitan imports into the watershed for eventual

export to various areas in San Diego County.  Auld Valley Dam and

Lake Skinner are located eight miles south of the community of

Winchester and one-half mile east of the intersection of

Washington Avenue and Benton Road, and lie on Tucalota Creek which

1   is tributory to Murrieta Creek by way of Santa Gertrudis Creek, as

2   indicated on the attached map.  These facilities fall within the

3   Tucalota Creek and Santa Gertrudis Creek subwatersheds which have

4   been adjudicated by Interlocutory Judgments 31A and 31 respectively.

5        Auld Valley Dam is approximately one mile long and 100 feet

6   high and creates Lake Skinner reservoir which has a capacity of over

7   44,000 acre feet and a surface area, when full, of approximately

8   1,140 acres.  These facilities have been designed to pass all local

9   runoff which originates in the watershed upstream of the Dam.  That

10  design required extensive hydrologic studies over the entire area,

11  including data such as stream parameters, topography, geology,

12  climatology, soil characteristics, ground cover and use, precipitation

13  and local runoff.  From these studies it was determined that the area

14  of the Tucalota Creek drainage basin upstream of Auld Valley Dam is

15  approximately 52 square miles; that the mean annual runoff at

16  Auld Valley Dam is 2,400 acre feet; and that the annual historical

17  runoff at that point over a 59 year period of record has ranged

18  between 15,900 acre feet and 280 acre feet, representing, respec-

19  tively, one percent and ninety-nine percent probabilities of

20  exceedance.  It has been determined that the maximum possible sub-

21  surface flow at the damsite is approximately 0.5 acre-feet per day

22  (113 gallons per minute or 0.25 cubic feet per second).

23       Metropolitan will release all runoff from the Tucalota Creek

24  drainage basin above Auld Valley Dam soon after that runoff occurs,

25  and any impoundment of that runoff in Lake Skinner will be for very

26  short periods of time related to runoff measurement and flow release

27  characteristics.  Metropolitan will monitor the level of groundwater

28  immediately below the damsite by means of a representative well and

29  will maintain that groundwater at levels no lower than those that

30  would have existed in the absence of Auld Valley Dam.  The quality

31  of the imported water which Metropolitan will store in Lake Skinner

32  will be adequate for all intended uses, and releases of water from

- 2 -

1  Lake Skinner will have little if any effect on the groundwater

2  quality downstream.  Metropolitan's operation of Auld Valley Dam and

3  Lake Skinner will not impair any downstream water rights adjudicated

4  by the Modified Final Judgment filed in this case on June 27, 1968.

CARVER E. HILDEBRAND

Subscribed and sworn to before me this Fourteenth day of

August, 1974.

Notary Public

OFFICIAL SEAL
SOPHIE S. WALSH
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Mar. 1, 1977

- 3 -



<u>MEMORANDUM OF UNDERSTANDING AND AGREEMENT</u>
<u>ON OPERATION OF LAKE SKINNER</u>

This Memorandum of Understanding and Agreement dated this
fifteenth day of August, 1974, among THE METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA (herein referred to as "Metropolitan"), a public
corporation of the State of California; UNITED STATES OF AMERICA
(herein referred to as the "United States") through the Attorney
General of the United States, the Secretary of the Interior, and the
Secretary of the Navy; FALLBROOK PUBLIC UTILITY DISTRICT (herein
referred to as "Fallbrook"), a public corporation of the State of
California; and KAISER AETNA, (herein referred to as "Kaiser"), a
California general partnership composed of Temecula Properties, Inc.,
a California corporation, Kaiser Rancho California, Inc., a California
corporation, Westward Properties, Inc., a California corporation,
Kaiser Hawaii Kai Development Co., a Nevada corporation, and Aetna
Life Insurance Company, a Connecticut corporation and successor in
interest to Rancho California and The Vail Company.

Whereas, the United States District Court for the Southern
District of California, in the case entitled <u>United States v.</u>
<u>Fallbrook Public Utility District, et al.</u>, No. 1247-SD-C (herein
referred to as "The Action"), has adjudicated water rights to the
Santa Margarita River stream system (herein referred to as "System")
by the Modified Final Judgments and Decrees entered on April 6, 1966
and June 27, 1968 (herein referred to as the "Judgment");

Whereas, the United States, Fallbrook, and Kaiser are the
principal water users in the System, have been involved for the past
two decades in litigation to determine, the respective rights and
duties of the users of the waters of the System, and are parties of
record in the Action;

Whereas, Article V of the 1966 Order in the Judgment
retains continuing jurisdiction as to the use of all surface waters
within the watershed of the System, and Article II thereof adopts

1    Interlocutory Judgment 28 by reference, which in turn retains contin-
2    uing jurisdiction over the impoundment of the surface waters of the
3    System;

4          Whereas, Metropolitan has now completed construction of a
5    dam and reservoir with a capacity of some 44,000 acre feet in Auld
6    Valley, Riverside County, on Tucalota Creek which is a tributary of
7    the Santa Margarita River by way of Santa Gertrudis Creek and
8    Murietta Creek, being known as Auld Valley Dam and Lake Skinner
9    (herein referred to as the "Project");

10          Whereas, the Project's purpose is to provide regulatory
11    storage capacity for the San Diego pipelines, rather than to impound
12    surface water of the System as set forth more fully in Attachment A
13    hereto;

14          Whereas, the Project will nonetheless unavoidably impound
15    small amounts of surface waters of the system for short periods of
16    time;

17          Whereas, the Project lies within the Tucalota Creek sub-
18    watershed which is a part of the Santa Gertrudis Creek sub-watershed
19    as described in Interlocutory Judgments 31 and 31A, both of which
20    have been incorporated by reference into the Judgment;

21          Whereas, Metropolitan has acquired a portion of the lands
22    riparian to Tucalota Creek, along with the respective appurtenant
23    water rights set forth in Interlocutory Judgment 31 listed in Attach-
24    ment B hereto;

25          Whereas, the defendants in the Action, that are listed in
26    Attachment C hereto, have assigned all or part of their water rights
27    in Tucalota Creek to Metropolitan;

28          NOW, THEREFORE, in evidence of the understandings and agree-
29    ments which have been reached, the undersigned parties to this memoran-
30    dum do hereby declare such understandings and agreements to be as
31    follows:

32          I.   Metropolitan will operate the Project in accordance with the

-2-

following principles:

    A.   The basic function of Lake Skinner is to provide regulatory Storage Capacity for the San Diego Pipelines.  Only water that would not have been available in the Drainage Basin in the absence of the Reservoir is to be stored for Export.

    B.   Lake Skinner will be operated so that both surface and subsurface water Outflow will approximate the flows that would have occurred in the absence of the Reservoir.

    C.   The quantity of all Local Runoff into Lake Skinner will be determined and a like quantity of water will be released from the Reservoir into Tucalota Creek.

    D.   Local Runoff from lands owned by Metropolitan will be released into Tucalota Creek and the rainfall on the Reservoir will be retained in Lake Skinner.

    E.   Water conservation and flood control are not explicit functions of Lake Skinner.

    F.   The Groundwater immediately downstream from the Dam will be maintained at the approximate level that would have existed in the absence of the Project.

    G.   The Outflow from Lake Skinner will have no significant effect on the quality of the water downstream of the Dam.

II.   Metropolitan will implement those principles set forth in Article I, above, by operating the Project under the following criteria:

    A.   Local Runoff shall be determined as follows with more specific descriptions set forth in Attachment D hereto:

        1.   Local Runoff into the Reservoir from the Drainage Basin above the Dam will be computed daily.

        2.   Local Runoff into the Reservoir will be computed as a residual quantity in a water balance of all other measured Imports, Inflows, Exports, Outflows, and changes in Storage Content of the Reservoir.

-3-

3.   Local Runoff from the Rawson Creek sub-drainage basin will be gaged by a flume to more accurately measure the runoff from this area during moderate rainfall occurrences.

4.   In the determination of Local Runoff, no distinction will be made between runoff from lands belonging to Metropolitan and runoff from land owned by others.

5.   Rainfall on the Reservoir surface will not be included as a component of Local Runoff into the Reservoir but will be considered as if it were a Metropolitan Import.

6.   Evaporation from the Reservoir surface will be included in the water balance as if it were a Metropolitan Export.

7.   Miscellaneous consumptive uses of water for the Skinner Filtration Plant, for recreational developments and other local uses, will be included in the water balance as if the water were a Metropolitan Export.

B.   Reservoir Releases shall be determined as follows, with more specific description set forth in Attachment E hereto:

1.   Releases from the Reservoir into Tucalota Creek will begin shortly after the daily quantity of Local Runoff is computed and will be adjusted daily as required by subsequent determinations of Local Runoff.

2.   The rate of Release from the Reservoir into Tucalota Creek will be limited to the computed mean daily rate of Local Runoff into the Reservoir, except as noted in paragraph 3, below.

3.   Releases into Tucalota Creek may be made as requested by the Watermaster, within reasonable and safe limits that would neither impair Metropolitan's use of the Project nor expose it to public liability.

4.   The start of any Release from the Reservoir into

-4-

Tucalota Creek will be made at a low rate, and any increases
in the rate of Release will be made gradually to alert down-
stream parties.

5.   Within the constraints imposed by physical limi-
tations and other operating limits as mentioned in Paragraph
3, above, Releases to Tucalota Creek will be made at rates
similar to those which would have occurred in the absence of
the Reservoir.

6.   Releases from the Reservoir into Tucalota Creek
will be continued during and following each flood event
until the total computed quantity of Local Runoff has been
released.

7.   As a general operating procedure, freeboard will
be maintained between the elevation of the water surface and
the spillway crest elevation.

C.   No Storage Space is specifically reserved in the
Reservoir for flood control or conservation use; and Releases
from the Reservoir into Tucalota Creek will normally be made
through the Dam outlets, as described more fully in Attachment F
hereto.

D.   The water level of the Groundwater immediately below
the Dam will be monitored by means of a representative well, and
will be maintained at levels that would have existed in the
absence of the Project by means of Releases from the Reservoir,
if seepage through the Dam and Subsurface Flows are inadequate
for this purpose, as more fully described in Attachment G hereto.

E.   The quality of the imported water which is stored in
the Reservoir will be adequate for all intended uses; and Releases
from the Reservoir will have little if any, effect on the general
water quality as compared to the quality that would have existed
in the absence of the Reservoir, as more fully described in
Attachment H hereto.

-5-

F.   Metropolitan will file a copy of the monthly Record Sheet described in Attachment E hereto, with the Watermaster prior to the end of each respective following month.  The Watermaster will in turn deliver copies of each month's sheet to each party to the Judgment.

III.   The following terms used in this Memorandum of Understanding and Agreement, shall have the respective meaning given below unless otherwise indicated:

A.   Dam--The Auld Valley Dam constructed by Metropolitan on Tucalota Creek.

B.   Discharge Capacity--The maximum capability of the Dam outlets or spillway with the Dam valves or gates in a full-open position.

C.   Drainage Basin--The area tributary to Tucalota Creek upstream from the Auld Valley Dam.

D.   Export--Water which is released from the Reservoir through the San Diego pipelines evaporation from the Reservoir surface and local consumptive use by Metropolitan.

E.   Groundwater--The general subsurface water body in the zone of saturation in the basin downstream of the Dam.

F.   Import--Water which flows into the Reservoir through the San Diego Canal and pipelines and rainfall on the Reservoir surface.

G.   Inflow--Local Runoff and Subsurface Flow into the Reservoir from the Drainage Basin above the Dam.

H.   Local Runoff--Surface water runoff from the Drainage Basin into the Reservoir.

I.   Outflow--Releases made through the Dam outlets and over the Dam spillway into Tucalota Creek and seepage through the Dam and other Subsurface Flow.

J.   Release--Water which flows through the Dam outlets or over the Dam spillway into Tucalota Creek.

-6-

K.    Reservoir--Lake Skinner created by Auld Valley Dam.

L.    Storage Capacity--The maximum volume of water which may be stored in the Reservoir.

M.    Storage Content--The volume of water actually stored in the Reservoir at a given time.

N.    Storage Space--The Storage Capacity of the Reservoir which is not filled with water at a given time.

O.    Subsurface Flow--All water flowing below the land surface.

P.    Watermaster--The individual appointed pursuant to Interlocutory Judgment 45 as incorporated in the Judgment.

IV.    Metropolitan's operation of the Project in the manner described in Articles I and II will not impair the downstream rights of any of the parties to the Action.

V.    Notwithstanding any other provision of this Agreement or anything which might reasonably be implied or inferred therefrom, nothing herein shall be construed to affect in any manner any rights to the use of water from the Santa Margarita River or its tributaries which the Parties to this Agreement hold.  Nothing in this Agreement shall be construed as a transfer of or an attempt to transfer such rights or any part thereof between the parties.

VI.    Upon execution of this Memorandum and Agreement by the respective undersigned representatives on behalf of the United States, Fallbrook, Kaiser and Metropolitan, Metropolitan shall present this instrument to the United States District Court for the Southern District of California for approval and incorporation into the Judgment as the Court may determine appropriate in the circumstances.  Upon approval by the Court this Agreement shall become fully effective.

VII.    No assignment or transfer of the rights defined in this Agreement or any part or interest therein shall be valid unless approved all the parties hereto.

VIII.    The criteria and reservoir release data referred to in

-7-

1  Article II hereof, the terms used in Article III hereof, and the

2  formulae included in the Attachments hereto shall be periodically

3  reviewed and, based on operating experience, will be modified if

4  deemed necessary or appropriate by the parties hereto.

5      IX.   No member of or Delegate to Congress or Resident Commissioner

6  shall be admitted to any share or part of this Agreement or to any

7  benefit that may arise herefrom; but this restriction shall not be

8  construed to extend to this Agreement if made within a corporation or

9  company for its general benefit.

10       IN WITNESS WHEREOF the undersigned have executed this

11  Memorandum of Understanding and Agreement on behalf of their respective

12  principals.

13

14         THE METROPOLITAN WATER DISTRICT
         OF SOUTHERN CALIFORNIA

15

16        _____

17         John H. Lauten
       General Manager

18  ATTEST:

19

20  _____

21     Norton L. Norris
    Executive Secretary

22

23  APPROVED AS TO FORM
AND EXECUTION:

24

25  Robert P. Will
General Counsel

26

27  _____

28

29

30

31

32

UNITED STATES OF AMERICA

DEPARTMENT OF JUSTICE


By_____



DEPARTMENT OF THE INTERIOR


By_____



DEPARTMENT OF THE NAVY


By_____

ATTEST:


_____


FALLBROOK PUBLIC UTILITY DISTRICT


By_____

ATTEST:


_____


KAISER AETNA


By_____

## BACKGROUND INFORMATION

1. The Metropolitan Water District of Southern California has constructed a Dam and Reservoir in Auld Valley, Riverside County, State of California, known as Lake Skinner. Specifically, the Reservoir is located eight miles south of the community of Winchester and one-half mile east of the intersection of Washington Avenue and Benton Road. (See attached map.)

2. Lake Skinner was built to serve as a regulatory and emergency water storage facility integral with Metropolitan's San Diego Canal and Pipelines. This portion of Metropolitan's water distribution system transports over 100 billion gallons of water annually to semi-arid regions of Southern California. Lake Skinner will also serve as a public recreation area under an agreement between the County of Riverside and Metropolitan. This agreement includes development proposals for camping, fishing, and boating with related support facilities. Also proposed are picnic areas, playgrounds, hiking trails, a museum or interpretive center for the protection of historical artifacts and areas, and a wildlife preserve with water access.

3. The Dam is approximately one mile in length and 100 feet high and creates a Reservoir with a capacity of over 44,000 acrefeet with a surface area of approximately 1,140 acres, when the Reservoir is full. Capacity and surface area are plotted as functions of elevation on the accompanying graph. Initial filling of the Reservoir was accomplished by the importation of water through the San Diego Canal. All local rainfall runoff from the 52 square miles of the Tucalota Creek drainage basin which flows into the Reservoir will be released into Tucalota Creek soon after such runoff occurs.

4. Tucalota Creek is a tributary of the Santa Margarita River via the Santa Gertrudis and Murrieta Creeks. The Santa Margarita River system and the water rights applicable thereto are

-2-

currently under the continuing jurisdiction of the U.S. District Court in San Diego (United States v. Fallbrook PUD, No. 1247-SD-C). The court expressly retained jurisdiction over the impoundment of the surface waters of that river system. However, Metropolitan advised the State Water Resources Control Board on January 16, 1969, that Lake Skinner would not collect Tucalota Creek flow for its use.

   5.   The facilities at Lake Skinner were designed to effectively pass all local runoff which originates in the basin upstream of the Dam. This design required extensive hydrologic studies over the entire area, including data such as stream parameters, topography, geology, climatology, soil characteristics, ground cover and use, precipitation, and local runoff. From these studies it was estimated that the mean annual local runoff, which occurred at the damsite, was 2,400 acre-feet. It was further estimated that the annual local runoff range over a 59-year period of record was between 15,900 acre-feet and 280 acre-feet. Respectively, these volumes have a one-percent and ninety-percent probability of exceedance.1/ It has been determined that the maximum possible subsurface flow at the damsite was approximately 0.5 acre-feet per day (113 gpm or 0.25 cfs).2/

   6.   Now that the Dam has been constructed and the facilities are operational, it is necessary that a detailed criterion be established for the following purposes:

      a.   Determining the quantity and rate of local runoff from the drainage basin above Lake Skinner.

      b.   Determining the quantity of water that should be released from Lake Skinner to maintain downstream water rights

---

1/  W. A. Wahler & Associates.   Preliminary Design Report--Auld Valley Reservoir--Part C.

2/  MWD Report No. 863.   Hydrology of the Auld Valley Reservoir Area.

-3-

in at least the same magnitude as existed in the absence of
Lake Skinner, and providing for the release of this water into
Tucalota Creek downstream of the Reservoir.

    c.   Maintaining the groundwater level downstream of the
Reservoir as close as possible to that which would have existed
in the absence of Lake Skinner.

Attachment A





Attachment A

Attachment B

## METROPOLITAN'S AULD VALLEY PROPERTY

Metropolitan has acquired 6,058.77 acres of land in Auld Valley in connection with the construction of the Auld Valley Dam, Lake Skinner and related facilities.  Interlocutory Judgments 31 and 31A categorize property in this area as either riparian or non-overlying and adjudicate the respective water rights of specific parcels within the Tucalota Creek & Santa Gertrudis Creek watersheds. Approximately 4,450 acres of the property that Metropolitan acquired were classified as riparian and approximately 1,250 acres were classified as non-overlying.  The remaining acreage is not located within the relevant watersheds.  Thus, Metropolitan now owns all or part of the property designated in those Judgments by the following parcel numbers:

| Riparian | Non-overlying |
|---|---|
| 61W-67 | 61&2E;61&2W;71&2W-1 |
| 61W-31-81 | 61W;71W;62W-67 |
| 71W-67 | 62W-32-127 |
| 71W-7-94 | 71W-6-93 |
| 72W-1-129 | 72W-3-134 |
| 72W-1-130 | 72W-7,12,13-141 |
| 72W-1-131 | 72W-11-145 |
| 72W-1,2,3-132 | 72W-12-146 |
| 72W-11,12-132 | |
| 72W-2-133 | |
| 72W-3,4,9,10,22-135 | |

Attachment C

## METROPOLITAN'S ASSIGNED RIGHTS

The following Defendants in <u>United States v. Fallbrook</u> <u>PUD</u> have assigned all or portions of their adjudicated riparian rights to the indicated lands in Auld Valley to Metropolitan:

| Defendants | Riparian Parcels |
| --- | --- |
| AULD, Barbara Ann & William K. | 72W-1,2,3,11,12-132 |
| BAATZ, Elmer | 72W-1-129 |
| BASHAW, J. N. & Helen J. | 72W-2-133 |
| BUTTON, Jesse D. & Lota T. | 71W-7-94 |
| DIETTERICK, Mary R. | 72W-1-130 |
| GARTLER, Stanley | 72W-1-131 |
| HOTCHKISS, Ray B. & Minnie J. | 61W-31-81 |
| MEEK, Nathan A., Jr., & Wilma | 61W-31-81 |
| NICOLAS, Marius A. & Mary | 72W-3,4,10-135 |
| RAWSON, Lewis | 71W-6-67 |
| ROBERTS, John L. | 71W-6-67 |
| ROBERTSON, Alma C. | 72W-1,2,3,11,12-132 |
| SCHUMATE, Olive O. | 72W-1-129 |
| SHIPLEY, Roy E. & Beryl | 61W-31-67 |

Attachment D

## COMPUTATION OF LOCAL RUNOFF

1.   The quantity of water which is additional to Metropolitan's importation will be computed from a water balance pursuant to attached Procedure 1.  All water imported through the San Diego Canal to the Reservoir will be gaged by an acoustical flowmeter. Exports from the Reservoir will be measured at several locations, including San Diego Pipelines 3 and 4.  Releases made through the two bottom Dam outlets to Tucalota Creek will also be gaged.  The Discharge Capacity of the two bottom Dam outlets as a function of Reservoir elevation is shown on attached Graph 1.  In addition to these outlet facilities, emergency outflows from the Reservoir may occur over the Dam spillway and through the Dam's emergency discharge pipeline.  Releases through these two facilities can be estimated because their Discharge Capacities are rated in terms of Reservoir stage pursuant to attached Graphs 2 and 3.  The Dam's emergency discharge pipeline will be used only in rare events requiring rapid dewatering.  Dam spillway discharge will occur only on rare occasions during exceptionally large flood events.

2.   Metropolitan has installed a weather station at Lake Skinner, including a rain gage and an evaporation pan which make it possible to determine rainfall and evaporative loss on the Reservoir surface.  Additionally, recording devices at the Reservoir keep a constant record of water surface elevation.

3.   Determination of the quantity of water to be released into Tucalota Creek downstream is further complicated by the fact that the available water in Lake Skinner has been increased by virtue of the fact that a water surface now exists where previously there was a semi-arid valley.  The average annual rainfall for the 52-square mile Drainage Basin is 16.9 inches.[1]  This would result in 47,000 acre-feet of annual Local Runoff if 100 percent of the

---

[1]  W. A. Wahler & Associates.   Preliminary Design Report--Auld Valley Reservoir--Part C.

-2-

rainfall actually ran off; however, the average annual Local Run-
off from the Drainage Basin into the Reservoir is only 2,400 acre-
feet or approximately 5.2 percent of the rainfall that falls in the
Basin.  Since the 1,140-acre Reservoir surface has an effective
Local Runoff of 100 percent, the 16.9 inches of annual rainfall will
yield 1,600 acre-feet of Local Runoff, instead of the 83.5 acre-feet
the same area would have yielded had the Reservoir not been created.

4.   Due to the fact that the Judgment does not explicitly
apportion specific quantities of water, Metropolitan does not now
intend to exercise any of the specific water rights applicable to
the approximately 4,450 acres of riparian land which it has purchased
for the Project.  However, precipitation which falls on the Reservoir
surface, including that portion which would have run off in the
absence of the Reservoir will be credited to Metropolitan.  As
indicated in paragraph 3 above, the average annual volume of Local
Runoff is only 5.2 percent of the annual precipitation on the
Drainage Basin.

5.   An inherent problem exists in the computation of Local
Runoff by the method outlined in Procedure 1.  A very small error
in one gage reading could result in a substantial error in the
Local Runoff calculations for moderate-duration, low-intensity
rainfall.  It has been observed that during small storm events
that Local Runoff enters Lake Skinner only from Rawson Creek.
Metropolitan will construct a Parshall flume in Rawson Creek so as
to accurately measure Local Runoff from this subdrainage basin.
Additionally, small earth dikes will be constructed in each major
inlet channel to Lake Skinner.  The readings obtained from the
recording device on the flume will be used as a measure of Local
Runoff to Lake Skinner in lieu of the quantity calculated in
Procedure 1, provided the earth dikes are undisturbed in all other
inlet channels.  This method should provide much greater accuracy
in establishing Local Runoff for moderate-duration, low-intensity
rainfall.

Attachment D

## PROCEDURE 1

Procedure for determining quantity and rate of water accumulated in Lake Skinner, which is additional to Metropolitan's importation, for each 24-hour period.

Definitions:

I = Import from San Diego Canal in acre-feet

O = Export through outlet conduit to San Diego Pipelines 3 and 4 in acre-feet

D = Release through outlet works to Tucalota Creek in acre-feet

E = Evaporation from Reservoir surface in acre-feet

S = Change in Reservoir Storage Content in acre-feet

Q = External accumulation in acre-feet

R = Rate of accumulation (24-hour* average in cfs)

Calculations:

$$Q = S + O + D + E - I$$

$$R = 0.504 \, Q$$

*The period of calculation is to be the 24 hours starting and ending at 0700 hours.

Attachment D

GRAPH I



RATING CURVES

LAKE SKINNER BOTTOM OUTLETS

FEB. 19, 1974

RATING CURVE
LAKE SKINNER SPILLWAY SYSTEM

Attachment D   GRAPH 2

FEB. 14, 1974



GRAPH 3

Attachment D

RATING CURVE
60" EMERGENCY DISCHARGE OUTLET
LAKE SKINNER

## RESERVOIR RELEASES

1.   Local Runoff into Lake Skinner will be released down-
stream at a rate no higher than the 24-hour average rate of
accumulation of the Local Runoff, unless higher flows are requested
by appropriate authorities as indicated in attached Procedure 2.
Procedure 2 and the attached Monthly Record Sheet provide details
regarding Reservoir Releases.  Such Releases will begin approxi-
mately four hours after the preceding 24-hour accumulation period.

2.   It should be noted that if the Local Runoff rate exceeds
Discharge Capacity, Metropolitan will continue to make Releases at
the maximum Discharge Capacity and increase the duration of the
Release until volume equivalence is reached.  It should also be
noted that the spillway at the Dam is ungated.  Any Reservoir
elevation above the Dam's spillway crest elevation will automati-
cally result in water being spilled until the Reservoir level
returns to the spillway crest elevation.  Metropolitan will not use
elevations in excess of the spillway crest at any time in its cal-
culations.  Therefore, any temporary surcharge storage above the
spillway crest will not be included in the computation of Reservoir
Releases.

3.   Metropolitan will observe a maximum Reservoir elevation
during the rainy season which will keep 1,000 acre-feet of Storage
Space below the Dam's spillway crest evacuated at all times except
during flood events.  The purpose of this is to preclude any spill-
way overflow in excess of that which would have naturally passed
downstream.

4.   It is impossible to identify precisely that portion of the
Local Runoff which will enter Reservoir bank storage during the
short period of time that Local Runoff is held in Lake Skinner.
However, this quantity will be small and will be more than offset
by the increase in Local Runoff due to the saturated lands adjacent
to the Reservoir.

## PROCEDURE 2

Procedure for determining quantity of water and rate of Release
from Lake Skinner into Tucalota Creek.

Definitions:

 Q = External accumulation in acre-feet

 P = Precipitation on the lake surface in acre-feet

 A = Actual Local Runoff into Lake Skinner that is to be
        released downstream in acre-feet

Calculation:

 A = Q - P

Notes:

(1)  Release of runoff will begin at 1100 hours after
        readings and calculations are made relative to the
        period ending at 0700 hours.

(2)  The rate of release will begin at 5 cfs or less and
        be incremented in 5 cfs or less steps until the rate
        (from Procedure 1) is attained and then will be
        continued constant until the volume A has been
        released.

(3)  The rate of Release possible is shown on Graph 1.
        Metropolitan will release incidentally stored water at
        rates greater than rate R upon request from responsible
        authorities, within reasonable limits that will neither
        impair Metropolitan's use of the Project nor expose it
        to public liability.

THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA

LAKE SKINNER—TUCALOTA CREEK WATER RIGHTS

*MONTHLY RECORD SHEET*

Attachment E

| (month) | DAY OF MONTH | $\underline{I}$ INFLOW (af) | $\underline{O}$ OUTFLOW (af) | $\underline{D}$ RELEASE (af) | $\underline{E}$ EVAPORATION (af) | $\underline{S}$ STORAGE CHANGE (af) | $\underline{Q}$ EXTERNAL WATER (af) | $\underline{R}$ RATE OF ACCUMULATION (cfs) | $\underline{P}$ PRECIPITATION (af) | $\underline{A}$ RUNOFF (af) | $\underline{LMIN}$ WELL DEPTH AV-28 (ft) | LAKE STORAGE (af) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | | | | | |
| | 2 | | | | | | | | | | | |
| | 3 | | | | | | | | | | | |
| | 4 | | | | | | | | | | | |
| | 5 | | | | | | | | | | | |
| | 6 | | | | | | | | | | | |
| | 7 | | | | | | | | | | | |
| | 8 | | | | | | | | | | | |
| | 9 | | | | | | | | | | | |
| | 10 | | | | | | | | | | | |
| | 11 | | | | | | | | | | | |
| | 12 | | | | | | | | | | | |
| | 13 | | | | | | | | | | | |
| | 14 | | | | | | | | | | | |
| | 15 | | | | | | | | | | | |
| | 16 | | | | | | | | | | | |
| | 17 | | | | | | | | | | | |
| | 18 | | | | | | | | | | | |
| | 19 | | | | | | | | | | | |
| | 20 | | | | | | | | | | | |
| | 21 | | | | | | | | | | | |
| | 22 | | | | | | | | | | | |
| | 23 | | | | | | | | | | | |
| | 24 | | | | | | | | | | | |
| | 25 | | | | | | | | | | | |
| | 26 | | | | | | | | | | | |
| | 27 | | | | | | | | | | | |
| | 28 | | | | | | | | | | | |
| | 29 | | | | | | | | | | | |
| | 30 | | | | | | | | | | | |
| | 31 | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |

NOTES
$S = O + D + E - I$
$R = 0.504Q$
$A = Q - P$

## WATER CONSERVATION AND FLOOD CONTROL

1.    Lake Skinner will impound water from the Drainage Basin every time there is Local Runoff.  Because of this incidental storage characteristic and the dampening of Local Runoff intensity by the averaged rate of Release, a measure of flood control and water conservation will be provided the downstream parties.  More-over, in the event of a major flood the limit of Metropolitan's discharge facilities will also dampen Local Runoff intensity.  This regulation is inherent in Metropolitan's facilities and the benefit thereof is derived by the downstream water users.

2.    Metropolitan did not construct the Project for the purpose of flood control, and does not intend to allocate any Storage Capacity in the Reservoir for flood control.  However, Metropolitan will normally have some Storage Space available during the mid-winter months and therefore could provide flood control and conser-vation storage to the extent that it does not conflict with the primary function of the Reservoir.  Such Storage Space provides the possibility of water conservation and most beneficial use of flood waters.

3.    Due to Metropolitan's operational commitments, such services as those mentioned above cannot be guaranteed.  However, for due consideration Metropolitan is prepared to provide such services when consistent with the principle function of the Reservoir.

## SUBSURFACE FLOW AND GROUNDWATER

1.    Subsurface Flow presents a significant problem as it is
most difficult to determine and therefore most difficult to regulate.
Metropolitan has been continuously monitoring numerous wells in the
Tucalota Creek area since 1965 and has established their fluctuations
and the water table in general.  Metropolitan's Report No. 863 deals
with this work in great detail.  The report establishes the maximum
possible Subsurface Flow where the Dam was constructed, as 0.5 acre-
feet per day (113 gal/min. or .25 cfs).  Metropolitan believes that
seepage through the Dam will more than offset any Subsurface Flow
attributable to infiltration which would have taken place above the
Dam and subsequently would have been realized downstream of the Dam.
However, to insure that the natural Groundwater table integrity
below the Dam is continued whole, Metropolitan is prepared to
recharge that basin as required to maintain the Groundwater at
levels that would have existed in the absence of the Dam (see Pro-
cedure 3).

2.    The operating criteria for Groundwater will be based on
key well MWD No. AV-28, State No. 7S/2W-3-11, which is representative
of the Groundwater table immediately downstream of the Reservoir.
A record of this well's fluctuations since early 1965 is shown on
attached Metropolitan Drawing No. B-59073.  As can be seen from the
drawing, the level of this well has been abnormally varied since
about mid-1968 until early 1974 by construction projects and the
floods of January and February 1969.  Therefore, there exists only
approximately three years of undisturbed record (1965 through 1967)
to be used as a base for the Groundwater table elevation.

3.    In the area east of the bedrock constriction shown on
MWD Drawing No. 20294-1, located approximately 1.4 miles downstream
of the Dam on Tucalota Creek, the Groundwater level will be main-
tained.  So long as pumping from that area by others is not increased,

Attachment G

-2-

Metropolitan will recharge that basin whenever the Groundwater table falls below the minimum of the 1965-1967 years of record.  That recharge will continue until resurfacing flow becomes visible at the bedrock constriction.  Such a recharge program should not only maintain the Groundwater table at levels that naturally occur in this area, but should also maintain Groundwater levels in areas downstream thereof by precluding excessive infiltration of runoff upstream of the constriction.

4.   If seepage through the Dam results in Groundwater levels in excess of those that would have existed in the absence of the Dam, as indicated by Groundwater levels in the key well, Metropolitan may pump such excessive seepage back into the Reservoir.

## PROCEDURE 3

Procedure for maintaining the Groundwater level downstream of the
Reservoir equal to that which would exist in the absence of the
Project.

  L MIN = low water level of well AV-28 during the undisturbed
            period of record (19.18 feet from surface)

Whenever the level in Well AV-28 reaches a depth of L MIN, Release
from Lake Skinner will be made at a rate less than that which would
cause continuous surface flow from the discharge point to the bed-
rock constriction.  Such Release will continue until such time as
surface flow is realized at the bedrock constriction by natural
resurfacing of waters from the Groundwater table.

Notes:

  (1)  Well AV-28 is located approximately 2,000 feet down-
       stream of the Dam and will be constantly monitored by
       a recording device.

  (2)  L MIN is a variable which could be adjusted downward
       in the future.  Such downward variation would only
       occur in events such as if pumping from the Ground-
       water is increased by others in the basin above the
       bedrock constriction and below the face of the Dam.

Attachment G



Attachment G

Attachment H

## WATER QUALITY

Lake Skinner was originally filled with Colorado River water. However, future Imports to the Reservoir will consist of a blend of Colorado River water and State project water. Initially, the blend will be 50 percent from each source with a higher proportion of State project water to be introduced in later years. Table 1 permits the comparison of several quality parameters of the naturally occurring waters in the area of Lake Skinner and the blended water Metropolitan plans to import initially. The table indicates that the quality of the imported supply compares favorably with all naturally occurring waters with the exception of storm flows. In view of this comparison and the fact that the Drainage Basin contributes only about one tenth of the total storm flow in the Santa Margarita Basin, the import of Releases on the general water quality will be inconsequential. Metropolitan's water supplies are utilized throughout Southern California for Groundwater replenishment and are considered adequate for all intended uses.

Attachment H

TABLE 1

| Constituent (mg/liter) | Average Values for Year Ending 12-31-73 | | | | Murrieta Creek Rising Water[1] | Murrieta Creek Storm Flows[1] | Auld & French Groundwater Basins[1] |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Colorado River Water | State Project Water | 50/50 Blend | | | | |
| TDS | 719 | 336 | 527.5 | | 500-700 | 200 | 889 |
| Chlorides Cl | 96 | 62 | 79 | | 130 | 30 | 148 |
| Nitrates $NO_3$ | 0.6 | 0.9 | 0.75 | | 6.0 | 2.0 | 13 |
| Sulfates $SO_4$ | 312 | 91 | 201.5 | | 90 | 25 | 189 |
| Boron B | 0.11 | 0.2 | 0.16 | | 0.4 | 0.1 | 1.3 |

1. "Comprehensive Water Quality Management Study" by Joint Administration Committee of the Santa Margarita and San Luis Rey Watershed Planning Agencies, Volume 1, 1973. (Rising water is normal surface flow as opposed to that which occurs immediately after a large storm.)