RONALD ALBU
MICHAEL D. COX
GEORGE FORMAN
BRUCE R. GREENE
California Indian Legal Services
1860 So. Escondido Blvd.,P.O. Box 1868
Escondido, California 92025

Attorneys for the Pechanga Band of Mission Indians

FILED
NOV 25 1974
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By [signature] DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, PECHANGA BAND OF MISSION INDIANS, Plaintiff-Intervenor, v. FALLBROOK PUBLIC UTILITY DISTRICT, et. al., Defendants. | CASE NO. 1247-SD-C<br>MEMORANDUM IN OPPOSITION TO PETITION FOR APPROVAL OF MEMORANDUM OF UNDERSTANDING AND AGREEMENT ON OPERATION OF LAKE SKINNER |

Defendants Fallbrook Public Utility District, Kaiser Aetna, and the Metropolitan Water District of Southern California have asked this Court to amend its Modified Final Judgment & Decree to incorporate a proposed Memorandum of Understanding and Agreement on the Operation of Lake Skinner. This memorandum of understanding and agreement is apparently desired by the Metropolitan Water District of Southern California (MWD) because it neglected to obtain rights to impound, even temporarily, the natural flow of the Santa Margarita River from the downstream holders of water rights in the natural flow of the Santa Margarita River, as determined by this Court.

The Pechanga Band of Mission Indians, equitable owners of the Pechanga Indian Reservation, are also equitable owners of rights to the use of waters of the Santa Margarita River Stream system. This Court found in its Findings of Fact, Conclusions of Law and Inter-

locutory Judgment No. 41, at paragraph 40, p. 13-14, adopted by reference and incorporated into the Final Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree, as follows:

> The United States of America when it withdrew the Indian Lands...to form the Pechanga Indian Reservation, intended to reserve rights to the use of waters of the Santa Margarita River stream system which under natural conditions would be physically available on the Indian Reservation, including rights to the use of ground waters sufficient for the present or future needs of the Indians residing thereon.

This Court further determined, pg. 11, paragraph 33, that a portion of the Pechanga Indian Reservation is a part of the Murrieta-Temecula Ground Water Area and overlies ground waters within that area. Because the operation of Lake Skinner could affect the water supply of the Pechanga Indian Reservation, the Pechanga Band of Mission Indians is concerned about the precise terms of the proposed Memorandum of Understanding and Agreement.

The Pechanga Band has two major objections to this proposal. First, the Band believes that the present proposal may result in damage to the Murrieta-Temecula Groundwater Basin because of the quality of water which may be released from Lake Skinner and because the proposed methods of calculating discharges may be inadequate. Secondly, the Band objects to the enforcement provisions, or lack thereof, in the proposed Memorandum of Understanding and Agreement.

## ASSERTED BENEFITS OF THE PROPOSED MEMORANDUM

The notice sent to parties to this action indicated that the proposed Memorandum of Understanding and Agreement will benefit downstream property owners from the dam because flood waters will be impounded and released on a gradual basis and thus conserved to feed the underground system. Attachement F to the proposed Memorandum also asserts that benefits will be derived from the "averaged rate of Release" of Local Runoff and, in the event of a major flood,

from the dampening of Local Runoff intensity due to the limit of Metropolitan's discharge facilities.

No attempt is made to substantiate these assertions, and a careful reading of the Memorandum indicates that these benefits will not be an objective of the parties. One of the principles stated in the agreement is that "both surface and subsurface water Outflow will approximate the flows that would have occurred in the absence of the Reservoir." (p. 3, lines 6-8). In accordance with this principle, the Memorandum recites, "Releases from the Reservoir into Tucalota Creek will begin shortly after the daily quantity of Local Runoff is computed and will be adjusted daily as required by subsequent determinations of Local Runoff." (p. 5, lines 20-23). Releases of storm flows would be "continued during and following each flood event." (p. 5, ln 10). The Memorandum also states that, "No Storage Space is specifically reserved in the Reservoir for flood control or conservation use," (p. 5, lines 16-17). Attachment F states, "Metropolitan did not construct the project for the purpose of flood control, and does not intend to allocate any Storage Capacity in the Reservoir for flood control." Metropolitan, however, does offer "for due consideration" to provide flood control storage when it is available. Such capacity is not likely to be very great in any event as Attachment E indicates that only 1000 acre-feet of Storage space will be kept available during the rainy season, and that flood waters filling the Dam above the spillway crest elevation will flow through the ungated spillway.

Because of the stated intentions regarding the operation of Lake Skinner and the methods to be followed, the purported benefits of conservation and flood control are not likely to be substantial, and are outweightd by the disadvantages of the proposed Memorandum as discussed below.

///

///

WATER RELEASED UNDER THE MEMORANDUM WOULD RESULT IN A SUBSTANTIAL DECLINE IN WATER QULAITY

One of the stated principles of the proposed Memorandum of Understanding and Agreement is that "the Outflow from Lake Skinner will have no significant effect on the quality of the water downstream of the Dam." (p. 3, lines 17-19). The Memorandum also states at p. 5, lines 27-28 that the "quality of the imported water which is stored in the Reservoir will be adequate for all intended uses." Neither of the assertions claims that the quality of the releases will be equal to the quality of the water impounded. Attachment H to the proposed Memorandum deals with water quality. It indicated that Lake Skinner has been filled exclusively with Colorado River water. It states that future Imports into the Reservoir will consist of a blend of Colorado River water and State project water. No indication is given of how many months or years will pass before such a mix will be available at Lake Skinner. Certainly, no obligations are imposed by the Memorandum on Metropolitan regarding when the claimed mix must be made available. The table submitted with Attachment H indicates that the total dissolved solids (TDS) in the water which is presently the only water available for releases is 719 compared to TDS of only 200 for Murrieta Creek storm flows. Sulfates compare at 312 for present Reservoir water and only 25 for Murrieta Creek storm flows. The logical result of the method of operation detailed in the proposed agreement is that Metropolitan will be releasing its relative low quality Colorado River water at the two bottom Dam outlets and will be acquiring in return the relatively clean runoff into its Reservoir. The Pechanga Band objects to such a trade which could create or contribute to salinity problems in the Murrieta-Temecula Groundwater basin and therefore objects to the proposed Memorandum of Understanding and Agreement.

///

THE QUANTITY TO BE RELEASED IS INSUFFICIENT

The Pechanga Band also objects to the failure to release rainfall on the Reservoir into Tucalota Creek. Attachment A to the proposed Memorandum of Understanding and Agreement describes the Reservoir as having a capacity of over 44,000 acre-feet with a surface area of approximately 1140 acres when the Reservoir is full. Attachment D at pg. 2 paragraph 4, states, "Precipitation which falls on the Reservoir surface, including that portion which would have run off in the absence of the Reservoir will be credited to Metropolitan." The proposed agreement goes on to minimize the effect of this appropriation by stating that "the average annual volume of Local Runoff is only 5.2 percent of the annual precipitation on the Drainage Basin." No account is given of the other 94.8 percent of the average Local Runoff or why Metropolitan should be entitled to claim the full amount of rainfall on the reservoir. Apparently the rainfall on the surface of the Reservoir will not be released because Metropolitan does not consider the amounts to be significant. However, in order to protect Metropolitan, provision is made in Attachment G that, "If seepage through the Dam results in Groundwater levels in excess of those that would have existed in the absence of the Dam, as indicated by Groundwater levels in the key well, Metropolitan may pump such excessive seepage back into the Reservoir." No justification is given why supposedly small amounts of water falling on the surface of the Reservoir should be disregarded in Metropolitan's favor, but that the small amounts of seepage which may occur should be returned to Metropolitan.

ENFORCEMENT

The only provision relating to enforcement of the proposed Memorandum of Understanding and Agreement is stated on pg. 6 as follows:

Metropolitan will file a copy of the Monthly

Record Sheet described in Attachment E hereto, with the Watermaster prior to the end of each respective following month. The Watermaster will in turn deliver copies of each month's sheet to each party to the Judgment.

The Watermaster is described as, "The individual appointed pursuant to Interlocutory Judgment 45 as incorporated in the Judgment." From these scant provisions, it is not clear that the Watermaster under this agreement is obligated to do anything more than receive copies of reports and distribute them. In view of the fact as stated in Attachment H to the proposed Memorandum that one tenth of the total storm flow in the Santa Margarita Basin will be controlled by this dam, the proposed Memorandum must be much more precise as to the duties of the Watermaster and must offer substantially greater assurance to the holders of rights downstream that the releases will be calculated precisely and accurately and that all releases will actually be made. No provision is made for the expenses of the Watermaster in the language of the proposed Memoransum. To the extent that the Watermaster's office is defined by Interlocutory Judgment 45, it is inaccurate. Interlocutory Judgment 45 provides:

> Lieutenant Colonel A. C. Bowen, Officer in Charge of the Office of Ground Water Resources, Marine Corps Base, Camp Pendleton, California, be and hereby is designated to obtain factual information directed to determining the amounts of water which are presently being consumptively used, the amounts of land which have waters from the Santa Margarita River stream system applied thereon, and the amounts of water which are physically available for use within the Santa Margarita River watershed. Said Lieutenant Colonel A. C. Bowen shall from time to time and upon due notice submit the factual information obtained to this Court, either by direct testimony or written reports, PROVIDED that any party to this cause shall have the right to examine him concerning said matters and introduce such other evidence which may be relevant.

In fact, Colonel A. C. Bowen has been retired from that office for four years and no longer has any official ties with the Office of Ground Water Resources, Marine Corps Base, Camp Pendleton. Further, he has not had the resources since his retirement to

fulfill the requirements of the above quoted order. The information sought to be obtained has never been submitted to this court, either by direct testimony or written reports. The Statement of Judge James M. Carter filed October 31, 1974 indicates that the Santa Margarita and San Luis Rey Watershed Planning Agency, of which Col. A. C. Bowen is general manager will monitor the releases, however, that requirement is not embodied in the proposed Memorandum. In view of the fact that the requirements of Interlocutory Judgment 45 have not been met, the Pechanga Band objects to the enforcement provisions, or lack thereof in the Memorandum of Understanding and agreement and the reliance on a scheme of reporting which long ago ceased to exist.

For all of the above reasons, the Pechanga Band of Mission Indians asks this Court not to approve the Petition to incorporate the Memorandum of Understanding and Agreement on the Operation of Lake Skinner, as presently constituted, and not to amend its Modified Final Judgment and Decree to incorporate this Memorandum until the objections of the Pechanga Band have been met.

Dated: November 25, 1974

Respectfully submitted,

RONALD ALBU
MICHAEL D. COX
GEORGE FORMAN
BRUCE R. GREENE
California Indian Legal Services

[signature]
by RONALD ALBU

United States v. Fallbrook Public Utility District, et al
United States District Court SDCal No. 1247-SD-C

STATEMENT OF JUDGE JAMES M. CARTER

To allay any concern that the proposed order in the Fallbrook case concerning the Robert A. Skinner Dam and Reservoir in Auld Valley will adversely affect downstream property owners, I set forth hereafter, in laymen's language, the results of the proposed order.

The court has continuing jurisdiction of the matter, and it will be its obligation to see to it that the proposed order will not adversely affect or take away or injure the water rights of property owners downstream from the dam.

How release of water from the dam will be managed.

1. The dam has been built to store imported water brought to the reservoir by the Metropolitan Water District through its San Diego Canal.

2. The dam will temporarily impound the ordinary surface and underground flow in the stream at the dam site.

3. The ordinary surface flow into the reservoir created by the dam will be measured and calculated and a like amount of water released from the reservoir.

4. The underground water immediately downstream from the dam will be maintained at the approximate level that would have existed in the absence of the dam.

5. The release of surface and underground local water (as distinguished from Metropolitan water) will be monitored by the Santa Margarita and San Luis Rey Watershed Planning Agency, of which Col. A. C. Bowen is general manager.

6. Flood waters (some of which flow downstream to the Camp Pendleton Base, and occasionally flow into the sea) will be temporarily impounded to the extent that there is empty storage capacity in the reservoir to retain them. The flood waters so impounded will be released on a more gradual basis than would otherwise occur in times of flood.

7. Local runoff from lands owned by Metropolitan will be released into Tucalota Creek along with the runoff from other upstream lands. The rainfall on the reservoir surface will be retained in Lake Skinner as Metropolitan water.

8. Thus it is apparent that no property owners downstream from the dam will have their water rights adversely affected. In fact, they will benefit, since flood waters, which in part flow to the sea in times of major storms, will be released on a more gradual basis and will thus be conserved to feed the underground system.

The court issues a word of caution.

The employment of an attorney is a decision for the land owner. But the court cannot conceive how any landowner will be deprived of his water rights, and the expense of employing counsel may be an unnecessary burden.

DATED: October 31, 1974.

FILED

OCT 31 1974

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By Myra Robertson DEPUTY

James M. Carter
JAMES M. CARTER
United States Circuit Judge