**ENTERED**

JAN 16 1975

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT of CALIFORNIA
BY *Myra Roberson*

**FILED**

JAN 16 1975

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By *Myra Roberson* DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>     v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT<br>a public service corporation of the State of<br>California, et al.,<br><br>       Defendants. | No. 1247-SD-C<br><br>FINDINGS OF FACT<br>AND ORDER ON LAKE<br>SKINNER OPERATION<br>AND WATERMASTER<br>SERVICE |

Defendants Fallbrook Public Utility District, Kaiser Aetna and The Metropolitan Water District of Southern California having filed a Joint Petition with this Court to approve a Memorandum of Understanding and Agreement on Operation of Lake Skinner, and this Petition having been heard upon appropriate notice and good cause appearing, this Court makes the following Findings and Order:

1. The court entered its Final Judgment and Decree on May 8, 1963; and entered a Modified Final Judgment and Decree on April 6, 1966, as directed by the Court of Appeals in its Decision dated May 26, 1965. On June 27, 1968, this Court amended the Modified Final Judgment and Decree in this cause by incorporating a Memorandum of Understanding and Agreement, dated March 4, 1968, between the United States and the Fallbrook Public Utility District.

2. Article V of the Modified Final Judgment and Decree retains continuing jurisdiction as to the use of all surface waters within the watershed of the Santa Margarita River system and of all underground or subsurface waters that have been determined to be a part of any specific river or creek, or to add to, contribute to, or support the Santa Margarita River stream system; and Article II thereof adopts by reference Interlocutory Judgment 28 entered herein

1   on May 26, 1961, Article II of which in turn retains continuing jurisdiction over

2   the impoundment or diversion of the surface waters of said stream system.

3      3.  The Metropolitan Water District of Southern California, referred to

4   herein as "Metropolitan," has recently constructed a Dam and Reservoir with

5   a storage capacity of some 44,000 acre-feet in Auld Valley, Riverside County

6   at a cost of approximately 28 million dollars; on Tucalota Creek which is a

7   tributary of the Santa Margarita River by way of Santa Gertrudis Creek and

8   Murrieta Creek.  That Dam was formerly known as Auld Valley Dam and

9   is now known as the Robert A. Skinner Dam; and the Reservoir formed by

10   that Dam is now known as Lake Skinner.  The Robert A. Skinner Dam and

11   Lake Skinner are referred to herein collectively as the "Project."

12      4.  The Project lies within the Tucalota Creek subwatershed which is a

13   part of the Santa Gertrudis Creek subwatershed, as those subwatersheds are

14   described in Interlocutory Judgments 31 and 31A filed herein on January 25, 1963

15   and July 27, 1961, respectively, both of which Interlocutory Judgments have been

16   incorporated into Article II of the Modified Final Judgment and Decree.  At the

17   Project site, Tucalota Creek is normally a dry stream bed with no surface

18   waterflow except during short storm periods during winter months.

19      5.  The purpose of the Project is to provide regulatory and emergency storage

20   capacity for water imported from outside the Southern California coastal plain,

21   rather than to impound surface waters of the Santa Margarita River system.

22   However, Skinner Dam and Lake Skinner will unavoidably impound small amounts

23   of waters of Tucalota Creek.

24      6.  Operation of Lake Skinner will facilitate the service of supplemental

25   water imported from outside the Southern California Coastal plain, for use

26   within Riverside and San Diego Counties, including the Santa Margarita River

27   Watershed; and will thus facilitate augmentation of that watershed's water supply.

28   The value of imported water stored in Lake Skinner exceeds 55 dollars per

29   acre foot and is projected to increase substantially in the future.

30      7.  Metropolitan has acquired approximately 5700 acres of land within the

31   Tucalota Creek subwatershed as described in said Interlocutory Judgments

32   31 and 31A, along with respective appurtenant water rights described in said

Interlocutory Judgments; and is a party of record in this cause.

8.  Kaiser Aetna is a California general partnership composed of Temecula Properties, Inc., a California corporation; Kaiser Rancho California, Inc., a California corporation; Westward Properties, Inc., a California corporation; and Aetna Life Insurance Company, a Connecticut corporation; is a successor in interest to Rancho California and The Vail Company; and is a party to this cause.

9.  Subject to the approval of this Court, Fallbrook Public Utility District, Kaiser Aetna and Metropolitan have negotiated and executed an Agreement on operation of Lake Skinner to assure that surface waters will be released promptly from Lake Skinner to compensate for any impoundment in Lake Skinner of waters of Tucalota Creek that would otherwise flow at the site of Skinner Dam; and that the Project will not impair any rights adjudicated by the Modified Final Judgment and Decree.  That Agreement is embodied in the attached Memorandum of Understanding and Agreement, dated November 12, 1974; and is referred to herein as the "Agreement."

10.  The procedures for operation of Lake Skinner embodied in the Agreement provide a reasonable criteria for assuring that the operation of Lake Skinner will not impair any rights, including those of the Pechanga Band of Mission Indians, adjudicated by the Modified Final Judgment and Decree, and in fact will to some extent benefit areas downstream of Lake Skinner by incidentally providing a degree of flood control and water conservation.

11.  The operation of Lake Skinner under the Agreement will result in the release into Tucalota Creek of water imported from outside the Southern California coastal plain, that will contain somewhat larger amounts of certain dissolved salts than would otherwise flow down Tucalota Creek in surface waters, but smaller amounts of such salts than are contained in local Auld Valley ground waters.  Additional salts introduced into the watershed in that manner will be limited and will be insignificant in comparison to the amounts of additional salts introduced into the watershed as a result of normal agricultural irrigation operations.

12.  The Court designated Colonel A. C. Bowen to perform Watermaster duties relating to the determination of water extractions from the Santa Margarita

-3-

River stream system, by Interlocutory Judgment 45 filed herein on
December 12, 1962 and incorporated into Article II of the Final Judgment
and Decree. Colonel Bowen has continued to perform related watermaster
duties as General Manager of the Santa Margarita-San Luis Rey Watershed
Planning Agency and that Agency's predecessor agencies.

13. The Santa Margarita-San Luis Rey Watershed Planning Agency is a
public entity formed under the joint exercise of powers provisions of the
Government Code of the State of California to, among other things, adopt
and update a water quality Management Plan for the Santa Margarita and San
Luis Rey Watershed. Each of the members of that Agency is a public agency.

14. Said Agency has agreed to provide Watermaster service within the
watershed of the Santa Margarita River through its General Manager,
Colonel A. C. Bowen, to monitor accordingly administration of the Lake
Skinner Operating Criteria embodied in the Agreement, and to advise
this Court promptly if Colonel Bowen is unable to continue to perform those
duties on behalf of that Agency; all pursuant to the attached document dated
January 16, 1975 and entitled "Consent To Provide Watermaster Service For
The Watershed of The Santa Margarita River." That method of monitoring
the administration of the Agreement and of performing related Watermaster
duties together with the continuing jurisdiction provisions of the Modified Final
Judgment and Decree provide adequate means to assure that Lake Skinner
operations do not impair water rights adjudicated by the Modified Final Judgment
and Decree.

IT IS THEREFORE HEREBY ORDERED that

A. The attached Memorandum of Understanding and Agreement on Oper-
ation of Lake Skinner, dated November 12, 1974, is approved; the Modified
Final Judgment and Decree in this cause is amended by incorporation of said
Memorandum into the same; the procedures set forth in said Memorandum
are binding on all parties to this cause; and the third cause of action in
the Complaint in Intervention filed in this cause by the Pechanga Band of
Mission Indians is dismissed on the merits.

B. Colonel A. C. Bowen, General Manager of the Santa Margarita-

-4-

1    San Luis Rey Watershed Planning Agency is appointed watermaster to

2    administer and enforce the provisions of the Modified Final Judgment

3    and Decree and the subsequent instructions and orders of this Court, and

4    the Watermaster's duties shall include monitoring administration of the

5    Memorandum of Understanding and Agreement on Operation of Lake Skinner.

6    Said Agency shall promptly advise this Court if Colonel Bowen is unable

7    to continue to act as Watermaster on behalf of that Agency.

8        C.   The Court shall retain continuing jurisdiction over administration

9    of said Memorandum of Understanding and Agreement pursuant to

10   Article V of the Modified Final Judgment and Decree and Article II

11   of Interlocutory Judgment 28 as incorporated in Article II of the Modified

12   Final Judgment and Decree.

DATED: January _16_, 1975

_James M. Carter_
JAMES M. CARTER
United States Circuit Judge

-5-

<u>MEMORANDUM OF UNDERSTANDING AND AGREEMENT</u>
<u>ON OPERATION OF LAKE SKINNER</u>

3    This Memorandum of Understanding and Agreement dated this
4  twelfth day of November, 1974, among THE METROPOLITAN WATER DISTRICT
5  OF SOUTHERN CALIFORNIA (herein referred to as "Metropolitan"), a
6  public corporation of the State of California; FALLBROOK PUBLIC
7  UTILITY DISTRICT (herein referred to as "Fallbrook"), a public
8  corporation of the State of California; and KAISER AETNA. (herein
9  referred to as "Kaiser"), a California general partnership composed
10 of Temecula Properties, Inc., a California corporation, Kaiser
11 Rancho California, Inc., a California corporation, Westward
12 Properties, Inc., a California corporation, Kaiser Hawaii Kai
13 Development Co., a Nevada corporation, and Aetna Life Insurance
14 Company, a Connecticut corporation and successor in interest to
15 Rancho California and The Vail Company.

16       Whereas, the United States District Court for the Southern
17 District of California, in the case entitled <u>United States v.</u>
18 <u>Fallbrook Public Utility District, et al.</u>, No. 1247-SD-C (herein
19 referred to as "The Action"), has adjudicated water rights to the
20 Santa Margarita River stream system (herein referred to as "System")
21 by the Modified Final Judgments and Decrees entered on April 6, 1966
22 and June 27, 1968 (herein referred to as the "Judgment");

23       Whereas, Fallbrook, and Kaiser are the principal water
24 users in the System; have been involved for the past two decades
25 in litigation to determine, the respective rights and duties of the
26 users of the waters of the System; and are parties of record in the
27 Action;

28       Whereas, Article V of the 1966 Order in the Judgment
29 retains continuing jurisdiction as to the use of all surface waters
30 within the watershed of the System, and Article II thereof adopts
31 Interlocutory Judgment 28 by reference, which in turn retains contin-
32 uing jurisdiction over the impoundment of the surface waters of the

1  System;

2        Whereas, Metropolitan has now completed construction of a

3  dam and reservoir with a capacity of some 44,000 acre feet in Auld

4  Valley, Riverside County, on Tucalota Creek which is a tributary of

5  the Santa Margarita River by way of Santa Gertrudis Creek and

6  Murietta Creek, being known as Auld Valley Dam and Lake Skinner

7  (herein referred to as the "Project");

8        Whereas, the Project's purpose is to provide regulatory

9  storage capacity for the San Diego pipelines, rather than to impound

10 surface water of the System as set forth more fully in Attachment A

11 hereto;

12       Whereas, the Project will nonetheless unavoidably impound

13 small amounts of surface waters of the system for short periods of

14 time;

15       Whereas, the Project lies within the Tucalota Creek sub-

16 watershed which is a part of the Santa Gertrudis Creek sub-watershed

17 as described in Interlocutory Judgments 31 and 31A, both of which

18 have been incorporated by reference into the Judgment;

19       Whereas, Metropolitan has acquired a portion of the lands

20 riparian to Tucalota Creek, along with the respective appurtenant

21 water rights set forth in Interlocutory Judgment 31 listed in Attach-

22 ment B hereto;

23       Whereas, the defendants in the Action, that are listed in

24 Attachment C hereto, have assigned all or part of their water rights

25 in Tucalota Creek to Metropolitan;

26       NOW, THEREFORE, in evidence of the understandings and agree-

27 ments which have been reached, the undersigned parties to this memoran-

28 dum do hereby declare such understandings and agreements to be as

29 follows:

30    I.   Metropolitan will operate the Project in accordance with the

31 following principles:

32           A.   The basic function of Lake Skinner is to provide

-2-

regulatory Storage Capacity for the San Diego Pipelines.   Only
water that would not have been available in the Drainage Basin in
the absence of the Reservoir is to be stored for Export.

B.   Lake Skinner will be operated so that both surface and
subsurface water Outflow will approximate the flows that would
have occurred in the absence of the Reservoir.

C.   The quantity of all Local Runoff into Lake Skinner will
be determined and a like quantity of water will be released from
the Reservoir into Tucalota Creek.

D.   Local Runoff from lands owned by Metropolitan will be
released into Tucalota Creek and the rainfall on the Reservoir
will be retained in Lake Skinner.

E.   Water conservation and flood control are not explicit
functions of Lake Skinner.

F.   The Groundwater immediately downstream from the Dam
will be maintained at the approximate level that would have
existed in the absence of the Project.

G.   The Outflow from Lake Skinner will have no significant
effect on the quality of the water downstream of the Dam.

II.   Metropolitan will implement those principles set forth in
Article I, above, by operating the Project under the following
criteria:

A.   Local Runoff shall be determined as follows with more
specific descriptions set forth in Attachment D hereto:

1.   Local Runoff into the Reservoir from the Drainage
Basin above the Dam will be computed daily.

2.   Local Runoff into the Reservoir will be computed
as a residual quantity in a water balance of all other
measured Imports, Inflows, Exports, Outflows, and changes
in Storage Content of the Reservoir.

3.   Local Runoff from the Rawson Creek sub-drainage
basin will be gaged by a flume to more accurately measure

-3-

the runoff from this area during moderate rainfall occurrences.

4. In the determination of Local Runoff, no distinction will be made between runoff from lands belonging to Metropolitan and runoff from land owned by others.

5. Rainfall on the Reservoir surface will not be included as a component of Local Runoff into the Reservoir but will be considered as if it were a Metropolitan Import.

6. Evaporation from the Reservoir surface will be included in the water balance as if it were a Metropolitan Export.

7. Miscellaneous consumptive uses of water for the Skinner Filtration Plant, for recreational developments and other local uses, will be included in the water balance as if the water were a Metropolitan Export.

B. Reservoir Releases shall be determined as follows, with more specific description set forth in Attachment E hereto:

1. Releases from the Reservoir into Tucalota Creek will begin shortly after the daily quantity of Local Runoff is computed and will be adjusted daily as required by subsequent determinations of Local Runoff.

2. The rate of Release from the Reservoir into Tucalota Creek will be limited to the computed mean daily rate of Local Runoff into the Reservoir, except as noted in paragraph 3, below.

3. Releases into Tucalota Creek may be made as requested by the Watermaster, within reasonable and safe limits that would neither impair Metropolitan's use of the Project nor expose it to public liability.

4. The start of any Release from the Reservoir into Tucalota Creek will be made at a low rate, and any increases in the rate of Release will be made gradually to alert down-

stream parties.

5. Within the constraints imposed by physical limitations and other operating limits as mentioned in Paragraph 3, above, Releases to Tucalota Creek will be made at rates similar to those which would have occurred in the absence of the Reservoir.

6. Releases from the Reservoir into Tucalota Creek will be continued during and following each flood event until the total computed quantity of Local Runoff has been released.

7. As a general operating procedure, freeboard will be maintained between the elevation of the water surface and the spillway crest elevation.

C. No Storage Space is specifically reserved in the Reservoir for flood control or conservation use; and Releases from the Reservoir into Tucalota Creek will normally be made through the Dam outlets, as described more fully in Attachment F hereto.

D. The water level of the Groundwater immediately below the Dam will be monitored by means of a representative well, and will be maintained at levels that would have existed in the absence of the Project by means of Releases from the Reservoir, if seepage through the Dam and Subsurface Flows are inadequate for this purpose, as more fully described in Attachment G hereto.

E. The quality of the imported water which is stored in the Reservoir will be adequate for all intended uses; and Releases from the Reservoir will have little if any, effect on the general water quality as compared to the quality that would have existed in the absence of the Reservoir, as more fully described in Attachment H hereto.

F. Metropolitan will file a copy of the monthly Record Sheet described in Attachment E hereto, with the Watermaster prior

1    to the end of each respective following month.  The Watermaster
2    will in turn deliver copies of each month's sheet to each party
3    to the Judgment.

4    III.   The following terms used in this Memorandum of Understanding
5    and Agreement, shall have the respective meaning given below unless
6    otherwise indicated:

7         A.    Dam--The Auld Valley Dam constructed by Metropolitan on
8    Tucalota Creek.

9         B.    Discharge Capacity--The maximum capability of the Dam
10   outlets or spillway with the Dam valves or gates in a full-open
11   position.

12        C.    Drainage Basin--The area tributary to Tucalota Creek
13   upstream from the Auld Valley Dam.

14        D.    Export--Water which is released from the Reservoir
15   through the San Diego pipelines evaporation from the Reservoir
16   surface and local consumptive use by Metropolitan.

17        E.    Groundwater--The general subsurface water body in the
18   zone of saturation in the basin downstream of the Dam.

19        F.    Import--Water which flows into the Reservoir through
20   the San Diego Canal and pipelines and rainfall on the Reservoir
21   surface.

22        G.    Inflow--Local Runoff and Subsurface Flow into the
23   Reservoir from the Drainage Basin above the Dam.

24        H.    Local Runoff--Surface water runoff from the Drainage
25   Basin into the Reservoir.

26        I.    Outflow--Releases made through the Dam outlets and over
27   the Dam spillway into Tucalota Creek and seepage through the Dam
28   and other Subsurface Flow.

29        J.    Release--Water which flows through the Dam outlets or
30   over the Dam spillway into Tucalota Creek.

31        K.    Reservoir--Lake Skinner created by Auld Valley Dam.

32        L.    Storage Capacity--The maximum volume of water which

-6-

1    may be stored in the Reservoir.

2        M.   Storage Content--The volume of water actually stored in

3    the Reservoir at a given time.

4        N.   Storage Space--The Storage Capacity of the Reservoir

5    which is not filled with water at a given time.

6        O.   Subsurface Flow--All water flowing below the land

7    surface.

8        P.   Watermaster--The individual appointed pursuant to Inter-

9    locutory Judgment 45 as incorporated in the Judgment.

10    IV.   Metropolitan's operation of the Project in the manner

11  described in Articles I and II will not impair the downstream rights

12  of any of the parties to the Action.

13    V.   Notwithstanding any other provision of this Agreement or

14  anything which might reasonably be implied or inferred therefrom,

15  nothing herein shall be construed to affect in any manner any rights

16  to the use of water from the Santa Margarita River or its tributaries

17  which the Parties to this Agreement hold.  Nothing in this Agreement

18  shall be construed as a transfer of or an attempt to transfer such

19  rights or any part thereof between the parties.

20    VI.   Upon execution of this Memorandum and Agreement by the

21  respective undersigned representatives on behalf of Fallbrook, Kaiser

22  and Metropolitan, Metropolitan shall present this instrument to the

23  United States District Court for the Southern District of California

24  for approval and incorporation into the Judgment as the Court may

25  determine appropriate in the circumstances.  Upon approval by the

26  Court this Agreement shall become fully effective.

27    VII.   No assignment or transfer of the rights defined in this

28  Agreement or any part or interest therein shall be valid unless

29  approved all the parties hereto.

30    VIII.   The criteria and reservoir release data referred to in

31  Article II hereof, the terms used in Article III hereof, and the

32  formulae included in the Attachments hereto shall be periodically

1  reviewed and, based on operating experience, will be modified if
2  deemed necessary or appropriate by the parties hereto.
3      IX.   No member of or Delegate to Congress or Resident Commissioner
4  shall be admitted to any share or part of this Agreement or to any
5  benefit that may arise herefrom; but this restriction shall not be
6  construed to extend to this Agreement if made within a corporation or
7  company for its general benefit.
8          IN WITNESS WHEREOF the undersigned have executed this
9  Memorandum of Understanding and Agreement on behalf of their respective
10 principals.
11
12                                        THE METROPOLITAN WATER DISTRICT
13                                          OF SOUTHERN CALIFORNIA
14
15                                        John H. Lauten
                                          General Manager
16 ATTEST:
17
18   Norton L. Norris
19   Norton L. Norris
     Executive Secretary
20
21 APPROVED AS TO FORM
22 AND EXECUTION:
23 Robert P. Will
   General Counsel
24
25 By  Victor E. Gleason
     Victor E. Gleason
26   Deputy General Counsel
27
28
29
30
31
32

                              -8-

1 | ATTEST:

2

3 | *Anita Macha*

4 | FALLBROOK PUBLIC UTILITY DISTRICT

5

6

7 | By *William Kann*

8 | ATTEST:

9

10 |

11 | KAISER AETNA

12

13 | By *Fritz Stiolling*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

## BACKGROUND INFORMATION

1.    The Metropolitan Water District of Southern California
has constructed a Dam and Reservoir in Auld Valley, Riverside County,
State of California, known as Lake Skinner.  Specifically, the
Reservoir is located eight miles south of the community of
Winchester and one-half mile east of the intersection of Washington
Avenue and Benton Road.  (See attached map.)

2.    Lake Skinner was built to serve as a regulatory and
emergency water storage facility integral with Metropolitan's San
Diego Canal and Pipelines.  This portion of Metropolitan's water
distribution system transports over 100 billion gallons of water
annually to semi-arid regions of Southern California.  Lake Skinner
will also serve as a public recreation area under an agreement be-
tween the County of Riverside and Metropolitan.  This agreement
includes development proposals for camping, fishing, and boating
with related support facilities.  Also proposed are picnic areas,
playgrounds, hiking trails, a museum or interpretive center for the
protection of historical artifacts and areas, and a wildlife pre-
serve with water access.

3.    The Dam is approximately one mile in length and 100 feet
high and creates a Reservoir with a capacity of over 44,000 acre-
feet with a surface area of approximately 1,140 acres, when the
Reservoir is full.  Capacity and surface area are plotted as
functions of elevation on the accompanying graph.  Initial filling
of the Reservoir was accomplished by the importation of water
through the San Diego Canal.  All local rainfall runoff from the
52 square miles of the Tucalota Creek drainage basin which flows
into the Reservoir will be released into Tucalota Creek soon after
such runoff occurs.

4.    Tucalota Creek is a tributary of the Santa Margarita
River via the Santa Gertrudis and Murrieta Creeks.  The Santa
Margarita River system and the water rights applicable thereto are

-2-

currently under the continuing jurisdiction of the U.S. District
Court in San Diego (United States v. Fallbrook PUD, No. 1247-SD-C).
The court expressly retained jurisdiction over the impoundment of
the surface waters of that river system.  However, Metropolitan
advised the State Water Resources Control Board on January 16, 1969,
that Lake Skinner would not collect Tucalota Creek flow for its use.

    5.    The facilities at Lake Skinner were designed to effec-
tively pass all local runoff which originates in the basin upstream
of the Dam.  This design required extensive hydrologic studies over
the entire area, including data such as stream parameters, topog-
raphy, geology, climatology, soil characteristics, ground cover and
use, precipitation, and local runoff.  From these studies it was
estimated that the mean annual local runoff, which occurred at the
damsite, was 2,400 acre-feet.  It was further estimated that the
annual local runoff range over a 59-year period of record was be-
tween 15,900 acre-feet and 280 acre-feet.  Respectively, these
volumes have a one-percent and ninety-percent probability of
exceedance.1/  It has been determined that the maximum possible
subsurface flow at the damsite was approximately 0.5 acre-feet per
day (113 gpm or 0.25 cfs).2/

    6.    Now that the Dam has been constructed and the facilities
are operational, it is necessary that a detailed criterion be
established for the following purposes:

        a.    Determining the quantity and rate of local runoff
    from the drainage basin above Lake Skinner.

        b.    Determining the quantity of water that should be
    released from Lake Skinner to maintain downstream water rights

---

1/  W. A. Wahler & Associates.  Preliminary Design Report--Auld
    Valley Reservoir--Part C.

2/  MWD Report No. 863.  Hydrology of the Auld Valley Reservoir Area.

-3-

in at least the same magnitude as existed in the absence of
Lake Skinner, and providing for the release of this water into
Tucalota Creek downstream of the Reservoir.

 c. Maintaining the groundwater level downstream of the
Reservoir as close as possible to that which would have existed
in the absence of Lake Skinner.

## BACKGROUND INFORMATION

1.   The Metropolitan Water District of Southern California
has constructed a Dam and Reservoir in Auld Valley, Riverside County,
State of California, known as Lake Skinner.  Specifically, the
Reservoir is located eight miles south of the community of
Winchester and one-half mile east of the intersection of Washington
Avenue and Benton Road.  (See attached map.)

2.   Lake Skinner was built to serve as a regulatory and
emergency water storage facility integral with Metropolitan's San
Diego Canal and Pipelines.  This portion of Metropolitan's water
distribution system transports over 100 billion gallons of water
annually to semi-arid regions of Southern California.  Lake Skinner
will also serve as a public recreation area under an agreement be-
tween the County of Riverside and Metropolitan.  This agreement
includes development proposals for camping, fishing, and boating
with related support facilities.  Also proposed are picnic areas,
playgrounds, hiking trails, a museum or interpretive center for the
protection of historical artifacts and areas, and a wildlife pre-
serve with water access.

3.   The Dam is approximately one mile in length and 100 feet
high and creates a Reservoir with a capacity of over 44,000 acre-
feet with a surface area of approximately 1,140 acres, when the
Reservoir is full.  Capacity and surface area are plotted as
functions of elevation on the accompanying graph.  Initial filling
of the Reservoir was accomplished by the importation of water
through the San Diego Canal.  All local rainfall runoff from the
52 square miles of the Tucalota Creek drainage basin which flows
into the Reservoir will be released into Tucalota Creek soon after
such runoff occurs.

4.   Tucalota Creek is a tributary of the Santa Margarita
River via the Santa Gertrudis and Murrieta Creeks.  The Santa
Margarita River system and the water rights applicable thereto are

Attachment A

-2-

currently under the continuing jurisdiction of the U.S. District Court in San Diego (<u>United States v. Fallbrook PUD</u>, No. 1247-SD-C). The court expressly retained jurisdiction over the impoundment of the surface waters of that river system. However, Metropolitan advised the State Water Resources Control Board on January 16, 1969, that Lake Skinner would not collect Tucalota Creek flow for its use.

5.    The facilities at Lake Skinner were designed to effectively pass all local runoff which originates in the basin upstream of the Dam. This design required extensive hydrologic studies over the entire area, including data such as stream parameters, topography, geology, climatology, soil characteristics, ground cover and use, precipitation, and local runoff. From these studies it was estimated that the mean annual local runoff, which occurred at the damsite, was 2,400 acre-feet. It was further estimated that the annual local runoff range over a 59-year period of record was between 15,900 acre-feet and 280 acre-feet. Respectively, these volumes have a one-percent and ninety-percent probability of exceedance.[1]/ It has been determined that the maximum possible subsurface flow at the damsite was approximately 0.5 acre-feet per day (113 gpm or 0.25 cfs).[2]/

6.    Now that the Dam has been constructed and the facilities are operational, it is necessary that a detailed criterion be established for the following purposes:

      a.    Determining the quantity and rate of local runoff from the drainage basin above Lake Skinner.

      b.    Determining the quantity of water that should be released from Lake Skinner to maintain downstream water rights

---

[1]/  W. A. Wahler & Associates.  <u>Preliminary Design Report--Auld Valley Reservoir--Part C.</u>

[2]/  MWD Report No. 863.  <u>Hydrology of the Auld Valley Reservoir Area.</u>

-3-

in at least the same magnitude as existed in the absence of
Lake Skinner, and providing for the release of this water into
Tucalota Creek downstream of the Reservoir.

     c.   Maintaining the groundwater level downstream of the
Reservoir as close as possible to that which would have existed
in the absence of Lake Skinner.

Attachment A



Attachment A

THE METROPOLITAN WATER DISTRICT
OF SOUTHERN CALIFORNIA
FILTRATION SYSTEM
LAKE SKINNER
AREA CAPACITY CURVE

## METROPOLITAN'S AULD VALLEY PROPERTY

Metropolitan has acquired 6,058.77 acres of land in Auld Valley in connection with the construction of the Auld Valley Dam, Lake Skinner and related facilities. Interlocutory Judgments 31 and 31A categorize property in this area as either riparian or non-overlying and adjudicate the respective water rights of specific parcels within the Tucalota Creek & Santa Gertrudis Creek watersheds. Approximately 4,450 acres of the property that Metropolitan acquired were classified as riparian and approximately 1,250 acres were classified as non-overlying. The remaining acreage is not located within the relevant watersheds. Thus, Metropolitan now owns all or part of the property designated in those Judgments by the following parcel numbers:

| Riparian | Non-overlying |
|---|---|
| 61W-67 | 61&2E;61&2W;71&2W-1 |
| 61W-31-81 | 61W;71W;62W-67 |
| 71W-67 | 62W-32-127 |
| 71W-7-94 | 71W-6-93 |
| 72W-1-129 | 72W-3-134 |
| 72W-1-130 | 72W-7,12,13-141 |
| 72W-1-131 | 72W-11-145 |
| 72W-1,2,3-132 | 72W-12-146 |
| 72W-11,12-132 | |
| 72W-2-133 | |
| 72W-3,4,9,10,22-135 | |

## METROPOLITAN'S ASSIGNED RIGHTS

The following Defendants in <u>United States v. Fallbrook</u> <u>PUD</u> have assigned all or portions of their adjudicated riparian rights to the indicated lands in Auld Valley to Metropolitan:

| Defendants | Riparian Parcels |
|---|---|
| AULD, Barbara Ann & William K. | 72W-1,2,3,11,12-132 |
| BAATZ, Elmer | 72W-1-129 |
| BASHAW, J. N. & Helen J. | 72W-2-133 |
| BUTTON, Jesse D. & Lota T. | 71W-7-94 |
| DIETTERICK, Mary R. | 72W-1-130 |
| GARTLER, Stanley | 72W-1-131 |
| HOTCHKISS, Ray B. & Minnie J. | 61W-31-81 |
| MEEK, Nathan A., Jr., & Wilma | 61W-31-81 |
| NICOLAS, Marius A. & Mary | 72W-3,4,10-135 |
| RAWSON, Lewis | 71W-6-67 |
| ROBERTS, John L. | 71W-6-67 |
| ROBERTSON, Alma C. | 72W-1,2,3,11,12-132 |
| SCHUMATE, Olive O. | 72W-1-129 |
| SHIPLEY, Roy E. & Beryl | 61W-31-67 |

## COMPUTATION OF LOCAL RUNOFF

1.  The quantity of water which is additional to Metro-
politan's importation will be computed from a water balance pur-
suant to attached Procedure 1.  All water imported through the San
Diego Canal to the Reservoir will be gaged by an acoustical flowmeter.
Exports from the Reservoir will be measured at several locations,
including San Diego Pipelines 3 and 4.  Releases made through the
two bottom Dam outlets to Tucalota Creek will also be gaged.  The
Discharge Capacity of the two bottom Dam outlets as a function of
Reservoir elevation is shown on attached Graph 1.  In addition to
these outlet facilities, emergency outflows from the Reservoir may
occur over the Dam spillway and through the Dam's emergency dis-
charge pipeline.  Releases through these two facilities can be
estimated because their Discharge Capacities are rated in terms of
Reservoir stage pursuant to attached Graphs 2 and 3.  The Dam's
emergency discharge pipeline will be used only in rare events
requiring rapid dewatering.  Dam spillway discharge will occur only
on rare occasions during exceptionally large flood events.

2.  Metropolitan has installed a weather station at Lake
Skinner, including a rain gage and an evaporation pan which make it
possible to determine rainfall and evaporative loss on the Reservoir
surface.  Additionally, recording devices at the Reservoir keep a
constant record of water surface elevation.

3.  Determination of the quantity of water to be released
into Tucalota Creek downstream is further complicated by the fact
that the available water in Lake Skinner has been increased by
virtue of the fact that a water surface now exists where previously
there was a semi-arid valley.  The average annual rainfall for the
52-square mile Drainage Basin is 16.9 inches.[1]  This would result
in 47,000 acre-feet of annual Local Runoff if 100 percent of the

---

[1]  W. A. Wahler & Associates.  Preliminary Design Report--Auld
Valley Reservoir--Part C.

-2-

rainfall actually ran off; however, the average annual Local Run-
off from the Drainage Basin into the Reservoir is only 2,400 acre-
feet or approximately 5.2 percent of the rainfall that falls in the
Basin. Since the 1,140-acre Reservoir surface has an effective
Local Runoff of 100 percent, the 16.9 inches of annual rainfall will
yield 1,600 acre-feet of Local Runoff, instead of the 83.5 acre-feet
the same area would have yielded had the Reservoir not been created.

   4.   Due to the fact that the Judgment does not explicitly
apportion specific quantities of water, Metropolitan does not now
intend to exercise any of the specific water rights applicable to
the approximately 4,450 acres of riparian land which it has purchased
for the Project. However, precipitation which falls on the Reservoir
surface, including that portion which would have run off in the
absence of the Reservoir will be credited to Metropolitan. As
indicated in paragraph 3 above, the average annual volume of Local
Runoff is only 5.2 percent of the annual precipitation on the
Drainage Basin.

   5.   An inherent problem exists in the computation of Local
Runoff by the method outlined in Procedure 1. A very small error
in one gage reading could result in a substantial error in the
Local Runoff calculations for moderate-duration, low-intensity
rainfall. It has been observed that during small storm events
that Local Runoff enters Lake Skinner only from Rawson Creek.
Metropolitan will construct a Parshall flume in Rawson Creek so as
to accurately measure Local Runoff from this subdrainage basin.
Additionally, small earth dikes will be constructed in each major
inlet channel to Lake Skinner. The readings obtained from the
recording device on the flume will be used as a measure of Local
Runoff to Lake Skinner in lieu of the quantity calculated in
Procedure 1, provided the earth dikes are undisturbed in all other
inlet channels. This method should provide much greater accuracy
in establishing Local Runoff for moderate-duration, low-intensity
rainfall.

Attachment D

## PROCEDURE 1

Procedure for determining quantity and rate of water accumulated
in Lake Skinner, which is additional to Metropolitan's importation,
for each 24-hour period.

Definitions:

$I$ = Import from San Diego Canal in acre-feet

$O$ = Export through outlet conduit to San Diego Pipelines
3 and 4 in acre-feet

$D$ = Release through outlet works to Tucalota Creek in
acre-feet

$E$ = Evaporation from Reservoir surface in acre-feet

$S$ = Change in Reservoir Storage Content in acre-feet

$Q$ = External accumulation in acre-feet

$R$ = Rate of accumulation (24-hour* average in cfs)

Calculations:

$Q = S + O + D + E - I$

$R = 0.504\ Q$

---

\*The period of calculation is to be the 24 hours starting and
ending at 0700 hours.

Attachment D

GRAPH I



RATING CURVES
LAKE SKINNER BOTTOM OUTLETS

FEB. 19, 1974

RATING CURVE
LAKE SKINNER SPILLWAY SYSTEM

FEB. 14, 1974

GRAPH 3

Attachment D



RATING CURVE
60" EMERGENCY DISCHARGE OUTLET
LAKE SKINNER

## RESERVOIR RELEASES

1.   Local Runoff into Lake Skinner will be released down-
stream at a rate no higher than the 24-hour average rate of
accumulation of the Local Runoff, unless higher flows are requested
by appropriate authorities as indicated in attached Procedure 2.
Procedure 2 and the attached Monthly Record Sheet provide details
regarding Reservoir Releases.  Such Releases will begin approxi-
mately four hours after the preceding 24-hour accumulation period.

2.   It should be noted that if the Local Runoff rate exceeds
Discharge Capacity, Metropolitan will continue to make Releases at
the maximum Discharge Capacity and increase the duration of the
Release until volume equivalence is reached.  It should also be
noted that the spillway at the Dam is ungated.  Any Reservoir
elevation above the Dam's spillway crest elevation will automati-
cally result in water being spilled until the Reservoir level
returns to the spillway crest elevation.  Metropolitan will not use
elevations in excess of the spillway crest at any time in its cal-
culations.  Therefore, any temporary surcharge storage above the
spillway crest will not be included in the computation of Reservoir
Releases.

3.   Metropolitan will observe a maximum Reservoir elevation
during the rainy season which will keep 1,000 acre-feet of Storage
Space below the Dam's spillway crest evacuated at all times except
during flood events.  The purpose of this is to preclude any spill-
way overflow in excess of that which would have naturally passed
downstream.

4.   It is impossible to identify precisely that portion of the
Local Runoff which will enter Reservoir bank storage during the
short period of time that Local Runoff is held in Lake Skinner.
However, this quantity will be small and will be more than offset
by the increase in Local Runoff due to the saturated lands adjacent
to the Reservoir.

## PROCEDURE 2

Procedure for determining quantity of water and rate of Release from Lake Skinner into Tucalota Creek.

Definitions:

    Q = External accumulation in acre-feet

    P = Precipitation on the lake surface in acre-feet

    A = Actual Local Runoff into Lake Skinner that is to be released downstream in acre-feet

Calculation:

    $A = Q - P$

Notes:

(1) Release of runoff will begin at 1100 hours after readings and calculations are made relative to the period ending at 0700 hours.

(2) The rate of release will begin at 5 cfs or less and be incremented in 5 cfs or less steps until the rate (from Procedure 1) is attained and then will be continued constant until the volume A has been released.

(3) The rate of Release possible is shown on Graph 1. Metropolitan will release incidentally stored water at rates greater than rate R upon request from responsible authorities, within reasonable limits that will neither impair Metropolitan's use of the Project nor expose it to public liability.

Attachment E

THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA
LAKE SKINNER—TUCALOTA CREEK WATER RIGHTS
*MONTHLY RECORD SHEET*

| (month) | I INFLOW (af) | O OUTFLOW (af) | D RELEASE (af) | E EVAPORATION (af) | S STORAGE CHANGE (af) | Q EXTERNAL WATER (af) | R RATE OF ACCUMULATION (cfs) | P PRECIPITATION (af) | A RUNOFF (af) | LMIN WELL DEPTH AV-28 (ft) | LAKE STORAGE (af) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |

DAY OF MONTH

NOTES

$Q = S - O - D - E - I$
$R = 0.504 Q$
$A = Q - P$

## WATER CONSERVATION AND FLOOD CONTROL

1.    Lake Skinner will impound water from the Drainage Basin every time there is Local Runoff. Because of this incidental storage characteristic and the dampening of Local Runoff intensity by the averaged rate of Release, a measure of flood control and water conservation will be provided the downstream parties. More-over, in the event of a major flood the limit of Metropolitan's discharge facilities will also dampen Local Runoff intensity. This regulation is inherent in Metropolitan's facilities and the benefit thereof is derived by the downstream water users.

2.    Metropolitan did not construct the Project for the purpose of flood control, and does not intend to allocate any Storage Capacity in the Reservoir for flood control. However, Metropolitan will normally have some Storage Space available during the mid-winter months and therefore could provide flood control and conservation storage to the extent that it does not conflict with the primary function of the Reservoir. Such Storage Space provides the possibility of water conservation and most beneficial use of flood waters.

3.    Due to Metropolitan's operational commitments, such services as those mentioned above cannot be guaranteed. However, for due consideration Metropolitan is prepared to provide such services when consistent with the principle function of the Reservoir.

## SUBSURFACE FLOW AND GROUNDWATER

1.     Subsurface Flow presents a significant problem as it is
most difficult to determine and therefore most difficult to regulate.
Metropolitan has been continuously monitoring numerous wells in the
Tucalota Creek area since 1965 and has established their fluctuations
and the water table in general.  Metropolitan's Report No. 863 deals
with this work in great detail.  The report establishes the maximum
possible Subsurface Flow where the Dam was constructed, as 0.5 acre-
feet per day (113 gal/min. or .25 cfs).  Metropolitan believes that
seepage through the Dam will more than offset any Subsurface Flow
attributable to infiltration which would have taken place above the
Dam and subsequently would have been realized downstream of the Dam.
However, to insure that the natural Groundwater table integrity
below the Dam is continued whole, Metropolitan is prepared to
recharge that basin as required to maintain the Groundwater at
levels that would have existed in the absence of the Dam (see Pro-
cedure 3).

2.     The operating criteria for Groundwater will be based on
key well MWD No. AV-28, State No. 7S/2W-3-11, which is representative
of the Groundwater table immediately downstream of the Reservoir.
A record of this well's fluctuations since early 1965 is shown on
attached Metropolitan Drawing No. B-59073.  As can be seen from the
drawing, the level of this well has been abnormally varied since
about mid-1968 until early 1974 by construction projects and the
floods of January and February 1969.  Therefore, there exists only
approximately three years of undisturbed record (1965 through 1967)
to be used as a base for the Groundwater table elevation.

3.     In the area east of the bedrock constriction shown on
MWD Drawing No. 20294-1, located approximately 1.4 miles downstream
of the Dam on Tucalota Creek, the Groundwater level will be main-
tained.  So long as pumping from that area by others is not increased,

Attachment G

-2-

Metropolitan will recharge that basin whenever the Groundwater table falls below the minimum of the 1965-1967 years of record.  That recharge will continue until resurfacing flow becomes visible at the bedrock constriction.  Such a recharge program should not only maintain the Groundwater table at levels that naturally occur in this area, but should also maintain Groundwater levels in areas downstream thereof by precluding excessive infiltration of runoff upstream of the constriction.

4.    If seepage through the Dam results in Groundwater levels in excess of those that would have existed in the absence of the Dam, as indicated by Groundwater levels in the key well, Metropolitan may pump such excessive seepage back into the Reservoir.

## PROCEDURE 3

Procedure for maintaining the Groundwater level downstream of the Reservoir equal to that which would exist in the absence of the Project.

$L\ MIN$ = low water level of well AV-28 during the undisturbed period of record (19.18 feet from surface)

Whenever the level in Well AV-28 reaches a depth of $L\ MIN$, Release from Lake Skinner will be made at a rate less than that which would cause continuous surface flow from the discharge point to the bedrock constriction. Such Release will continue until such time as surface flow is realized at the bedrock constriction by natural resurfacing of waters from the Groundwater table.

Notes:

(1) Well AV-28 is located approximately 2,000 feet downstream of the Dam and will be constantly monitored by a recording device.

(2) $L\ MIN$ is a variable which could be adjusted downward in the future. Such downward variation would only occur in events such as if pumping from the Groundwater is increased by others in the basin above the bedrock constriction and below the face of the Dam.



Attachment G

Attachment G



## WATER QUALITY

Lake Skinner was originally filled with Colorado River water. However, future Imports to the Reservoir will consist of a blend of Colorado River water and State project water. Initially, the blend will be 50 percent from each source with a higher proportion of State project water to be introduced in later years. Table 1 permits the comparison of several quality parameters of the naturally occurring waters in the area of Lake Skinner and the blended water Metropolitan plans to import initially. The table indicates that the quality of the imported supply compares favorably with all naturally occurring waters with the exception of storm flows. In view of this comparison and the fact that the Drainage Basin contributes only about one tenth of the total storm flow in the Santa Margarita Basin, the import of Releases on the general water quality will be inconsequential. Metropolitan's water supplies are utilized throughout Southern California for Groundwater replenishment and are considered adequate for all intended uses.

## TABLE 1

| Constituent (mg/liter) | Average Values for Year Ending 12-31-73 | | | Murrieta Creek Rising Water[1] | Murrieta Creek Storm Flows[1] | Auld & French Groundwater Basins[1] |
| --- | --- | --- | --- | --- | --- | --- |
| | Colorado River Water | State Project Water | 50/50 Blend | | | |
| TDS | 719 | 336 | 527.5 | 500-700 | 200 | 889 |
| Chlorides Cl | 96 | 62 | 79 | 130 | 30 | 148 |
| Nitrates $NO_3$ | 0.6 | 0.9 | 0.75 | 6.0 | 2.0 | 13 |
| Sulfates $SO_4$ | 312 | 91 | 201.5 | 90 | 25 | 189 |
| Boron B | 0.11 | 0.2 | 0.16 | 0.4 | 0.1 | 1.3 |

1. "Comprehensive Water Quality Management Study" by Joint Administration Committee of the Santa Margarita and San Luis Rey Watershed Planning Agencies, Volume 1, 1973. (Rising water is normal surface flow as opposed to that which occurs immediately after a large storm.)

## DECLARATION OF SERVICE BY MAIL

       I, Mary Cooke, declare that I am a citizen of the United States, over 18 years of age, and not a party to the written cause; my business address is 1111 Sunset Boulevard, P. O. Box 54153, Los Angeles, California 90054.  I served a true copy of the attached proposed Findings of Fact and Order on Lake Skinner Operation and Watermaster Service, including the November 12, 1974, Memorandum of Understanding and Agreement incorporated therein, on each of the persons shown on the attached list by placing same in envelopes addressed respectively as shown on that list.

       Each said envelope was then on January 9, 1975, sealed and deposited in the United States Mail at Los Angeles, California, the County in which I am employed, with the postage thereon fully prepaid.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed on January 9, 1975, at Los Angeles, California.

                             _Mary Cooke_
                                Mary Cooke

Donald W. Redd, Esq.
United States Department of Justice
Land & Natural Resources Division
Washington, D.C.   20530

Carl J. Klein, Esq.
Assistant United States Attorney
U. S. Court House, Annex A
325 West F Street
San Diego, California 92101

Ronald Albu, Esq.
California Indian Legal Services
1860 So. Escondido Blvd.
P.O. Box 1868
Escondido, California   92025

Franz Sachse, Esq.
P.O. Box 427
Fallbrook, California   92028

Fritz R. Stradling, Esq.
Rutan & Tucker
P.O. Box 1976
Santa Ana, California 92702

Col. A. C. Bowen, General Manager
Santa Margarita-San Luis Rey
         Watershed Planning Agency
P. O. Box 475
 Fallbrook, California 92028