

1  N. GREGORY TAYLOR, General Counsel
   KAREN L. TACHIKI, Assistant General Counsel
2  VICTOR E. GLEASON, Sr. Dep. General Counsel, SBN 31698
   The Metropolitan Water District of
3     Southern California
   350 S. Grand Avenue
4  P.O. Box 54153
   Los Angeles, CA 90054-0153
5
   (213) 217-6318
6
   Attorneys for Defendants The Metropolitan Water
7     District of Southern California

**FILED**

NOV 3 1994

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

8

9
                IN THE UNITED STATES DISTRICT COURT
10
               FOR THE SOUTHERN DISTRICT OF CALIFORNIA
11

12
                                    )  CIV. NO. 1247-SD-T
13                                  )
                                    )  **MEMORANDUM OF POINTS AND**
14                                  )  **AUTHORITIES IN SUPPORT OF**
                                    )  **MOTION TO APPROVE AND**
15  UNITED STATES OF AMERICA,       )  **INCORPORATE MEMORANDUM OF**
                                    )  **UNDERSTANDING AND AGREEMENT ON**
16                  Plaintiff,      )  **OPERATION OF DOMENIGONI VALLEY**
                                    )  **RESERVOIR; AND TO AMEND**
17          v.                      )  **MODIFIED FINAL JUDGMENT AND**
                                    )  **DECREE ACCORDINGLY.**
18  FALLBROOK PUBLIC UTILITY        )
    DISTRICT, et al.,               )
19                                  )  Date: 12/5
                    Defendants.     )  Time: 2:00 p.m.
20                                  )  Place: Courtroom 1
                                    )
21  _____)

22                           **INTRODUCTION**

23      The Metropolitan Water District of Southern California

24  (Metropolitan)[1] submits for approval the attached Memorandum of

25  _____

26  [1]  Metropolitan is a regional water agency formed under the
    Metropolitan Water District Act (Stats. 1969, ch. 209, as amended;
27  West's Water Code - Appendix § 109; Deering's Uncodified Act
                                                    (continued...)

                              - 1 -

1  Understanding and Agreement on Operation of Domenigoni Valley

2  Reservoir (Domenigoni MOU)[2/], dated September __, 1994 which it

3  has entered into with the principal parties to this case, the

4  United States of America, Fallbrook Public Utility District

5  (Fallbrook) and Rancho California Water District (Rancho).

6  The Domenigoni MOU sets criteria to assure that

7  Domenigoni Valley Reservoir will be operated so as to avoid impacts

8  on the rights established by the Judgment[3/] in this action.

9  Metropolitan is constructing the Reservoir on an intermittent

10  stream in Domenigoni Valley located in the upper reaches of the

11  Warm Springs Creek Sub-Watershed, to store only water which

12  Metropolitan imports into the Watershed (Majors Decl.).

13  ARGUMENT

14  Approval of the Domenigoni MOU falls within the Court's

15  retained jurisdiction under the Judgment. It will assist

16  administration of the Judgment by providing a specific process for

17  assuring that Domenigoni Valley Reservoir operations will not

18  interfere with the rights which the Judgment established.

---

20  1/ (...continued)
   9129b).  It is a regional water agency that imports water from
21  Northern California and the Colorado River, and delivers it to the
   coastal plain of Southern California.  Through its 27 member public
22  agencies, Metropolitan provides almost 60 percent of the water used
   by nearly 16 million people living in portions of San Diego,
23  Riverside, Orange, San Bernardino, Los Angeles and Ventura counties
   (Declaration of Dennis G. Majors (Majors Decl.).  Citations to the
24  four declarations filed concurrently herewith will be in the form
   (_____ Decl.)

25  2/    Attached and incorporated herein as Exhibit A.

26
   3/    Formally referred to as Modified Final Judgment and Decree,
27  entered on April 6, 1966.

1    The Court has approved similar post-Judgment MOUs and in

2  fact incorporated them into the Judgment.  The Domenigoni MOU has

3  been developed in consultation with the Watermaster and the

4  Steering Committee which the Court has appointed to assist it in

5  administering the Judgment.

6    I.   **The Court Has Jurisdiction to Approve the Domenigoni MOU.**

7    The Judgment expressly retained jurisdiction over this

8  case.  Article V provides:

9    "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this
     Court retains continuing jurisdiction of this cause as to the
10    use of all surface waters within the watershed of the Santa
     Margarita River and all underground or sub-surface waters
11    within the watershed of the Santa Margarita River, which are
     determined in any of the constituent parts of this Modified
12    Final Judgment to be a part of the sub-surface flow of any
     specific river or creek, or which are determined in any of the
13    constituent parts of this Modified Final Judgment to add to,
     contribute to, or support the Santa Margarita River stream
14    system."

15    In addition, the portion of the Judgment adjudicating the

16  Warm Springs Creek Sub-Watershed also specifically retains

17  jurisdiction over that area, by in incorporating Interlocutory

18  Judgment (IJ) 36 and IJ 36A[4/].  They establish appurtenant water

19  rights for respective land parcels on the basis of whether they

20  _____

21  [4/]   Article II of the Judgment.  The second Order in IJ 36
     provides that:

22    "...the correlative overlying rights and correlative
     riparian rights described in this Interlocutory Judgment shall
23    be and are subject to the continuing jurisdiction of this
     Court." (Exhibit A, Attach F.)

24  Article V of the IJ 36A Order similarly provides:

25    "This Court retains continuing jurisdiction with respect
     to surface waters, in any, found on those lands described on
26    Exhibit B of these Findings of Fact, Conclusions of Law and
     Interlocutory Judgment" (Idem)

27

overly alluvial or granitic deposits and whether they abut Warm Springs Creek or its underflow[5].

Furthermore, the Judgment retains jurisdiction under IJ 28 over surface impoundments.  Article II of the IJ 28 Order provides:

> "This Court retains continuing jurisdiction of this cause and of the parties hereto, their heirs, successors and assigns, for the purpose of regulating[,] controlling, restricting or prohibiting any impoundment or diversion of the surface waters of the Santa Margarita River system."

## II.  The Court has Previously Approved Post-Judgment MOUs

The Court has previously exercised its retained jurisdiction in this case, to approve MOUs among various parties. It approved the MOU between the United States and Fallbrook regarding their respective rights to use waters of the Santa Margarita River system by a June 27, 1968 Order which incorporated that MOU into the Judgment.

More directly in point for the present motion, the Court approved the MOU among Metropolitan, Fallbrook and Rancho's predecessors on operation of Lake Skinner Reservoir, by a January 16, 1975 Order which also incorporated that MOU into the Judgment. Metropolitan constructed Lake Skinner on Tucalota Creek exclusively for  storage of water which Metropolitan imports into the watershed for eventual use in Riverside and San Diego Counties.  The Domenigoni MOU now before the Court was patterned after the Skinner MOU (Maurath Decl., ¶5).

---

5/    Exhibit A, Attachment F.

### III. Metropolitan has Standing

Judgment Article IX allows invocation of the Court's reserved jurisdiction "upon the motion of any party to this cause, his heirs, successors or assigns, made upon notice and in accordance with the Rules of this Court."  Metropolitan has succeeded to essentially all of the lands within Domenigoni and Diamond valleys, some 13,000 acres and the related appurtenant rights covered by the Judgment (Case Decl.).  Article VI of the Domenigoni MOU requires that Metropolitan present that MOU to this Court for approval and incorporation into the Judgment.

The Court has previously recognized Metropolitan's standing in this case, by its January 16, 1975 Order approving the Memorandum of Understanding and Agreement for Operation of Metropolitan's Lake Skinner, and by its September __, 1994 Order designating Metropolitan a member of the Steering Committee for this case.

### IV.   The Domenigoni MOU Provides an Effective Process
### For Protecting Judgment Rights.

The Domenigoni MOU provides detailed criteria and procedures for assuring that operation of that Reservoir will not impair the rights established by the Judgment in this action (Maurath Decl).  It also documents Metropolitan's commitment in the Final Environmental Impact Report for the Domenigoni Project[6] that the natural runoff captured by the Reservoir would be released

---

[6]   Eastside Reservoir Project Final Environmental Impact Report (EIR), October, 1991, State Clearinghouse #89081422, pp. 5-5 to 5-9.  Copies of those pages are attached hereto and incorporated as Exhibit B.

1   to Warm Springs Creek[7/].  In short, the Domenigoni MOU is designed

2   to ensure that the Reservoir will release to Warm Springs Creek,

3   the same quantity of water that would have naturally flowed  in

4   that Creek in absence of the Reservoir (Maurath Decl., p. 7).

5         The Domenigoni MOU was developed in consultation with the

6   Watermaster and the Steering Committee appointed by this Court and

7   has been executed by the principle parties to this action (Exhibit

8   A, p. 1).  It states the basic commitment that the Reservoir will

9   store only imported water and other water that would not have been

10   available in the absence of the Reservoir (Exhibit A, Art. ¶ A).

11         The MOU is a self-contained working document.  It sets

12   out operating principles (Arts. I and IV), implementing criteria

13   (Art. II), procedural, computational, reporting, review and

14   modification processes (Arts. V, VI, VII and VIII, and Attachments

15   B,C,D and E), description of relevant matters (Recitals, Art. III,

16   and Attachments A and G) and the Warm Springs Creek Interlocutory

17   Judgments 36 and 36A (Attachment F).

18         The MOU uses the same approach as the MOU which the Court

19   approved on January 16, 1975 for Lake Skinner Reservoir.

20   Metropolitan constructed Lake Skinner in the mid-1970s on Tucalota

21   Creek to store imported water also.  Metropolitan has operated Lake

---

24   7/   The Final EIR estimates average annual runoff captured by the
     Reservoir at 264 acre-feet per year.  It specifies that that water
25   would be released to the stream downstream of the west dam at the
     approximate time and quantity of the inflow, noting that during
26   large flood flows the releases would be spread over a longer period
     to avoid extremely high flows in Warm Springs Creek.
27   (Final EIR p. 5-5).

1   Skinner under that MOU for the past two decades (Maurath Decl.,

2   p. 2)

3        The Domenigoni MOU required some modification because of

4   some significant differences between the two reservoir sites.  One

5   important difference is that Domenigoni Reservoir does not drain a

6   large area of the water shed as does Lake Skinner.  In addition to

7   a significant smaller upstream watershed, Domenigoni is eighteen

8   times larger than Lake Skinner.  These differences require a

9   different process for measuring watershed inflow (Maurath Decl.,

10  pp. 2-5).

11       In addition, Domenigoni Valley Reservoir is located about

12  2 miles upstream of a geologic formation, identified as a bedrock

13  lip, that prevents groundwater from flowing into the Santa

14  Margarita River System downstream.  That geologic formation thus

15  essentially limits natural runoff from the Domenigoni tributary

16  area to that system, to surface flows (Mann Decl.).  Indeed, IJ 36

17  specifically finds that:

18           "The southern limit of said ground water basin is in the
             general vicinity of the south line of Section 9, T 6 S, R 2 W,
19           S.B.M.  At that point the said ground water basin is enclosed
             by a lip of basement complex material rising to elevation
20           1400', which lip prevents the movement of ground water from
             said basin southwesterly into the remainder of Warm Springs
21           Creek sub-watershed and the Santa Margarita River watershed,
             excepting at such times as the ground waters north of said lip
22           exist at or above elevation 1400'.

23           The presence of said basement complex lip is a barrier to
             the movement of all ground waters within said basin below
24           elevation 1400', and causes such ground waters to move out of
             said basin and out of the Santa Margarita River watershed and
25           into Menifee Valley of the San Jacinto River watershed in
             Section 8, T 6 S, R 2 W, S.B.M." (Finding IV)

26

27

- 7 -

1    Recent studies and tests performed in connection with
2    construction of Domenigoni Valley Reservoir have verified the
3    continuing existence of that situation.  The bedrock lip elevation
4    is in fact higher than 1400' (ranging from 1409' to 1416') and the
5    groundwater elevation in that area is well below that level
6    (approximately 1358') (Mann Decl., pp 3,4).

7    **IV. The Domenigoni Reservoir Project Benefits the Area**

8    The Domenigoni Valley Reservoir Project is needed to
9    ensure reliable delivery of water to Metropolitan's service area
10   which includes much of the Santa Margarita River Watershed[8/].  It
11   will provide that reliability by providing storage reserves for
12   droughts and other emergencies, seasonal variations in supply and
13   demand, increase the ability to operate Metropolitan's water
14   distribution conjunctively with groundwater basins, and facilitate
15   maintenance of other components of Metropolitan's distribution
16   system (Exhibit B).

17   That increased water service reliability will benefit the
18   two Metropolitan member public agencies, San Diego County Water
19   Agency and Eastern Municipal Water District that provide imported
20   water to the Watershed.  The Watermaster's most recent annual
21   report indicates that about 40% of the 71,000 acre-feet of water
22   used within the Watershed in the 1992-93 water year was obtained
23   through Metropolitan's distributions system (Santa Margarita River

24
25

---

26   8/   The Reservoir will receive water imported into Southern
     California by Metropolitan's Colorado River Aqueduct and by the
27   California Aqueduct of the State Water Project.  (Majors Decl.)

1  <u>Watershed Annual Watermaster Report for Water Year 1992-93</u>, July
2  1994, pp. 1, 25).

3                              CONCLUSION

4          The Memorandum of Understanding and Agreement on

5  Operation of Domenigoni Valley Reservoir provides an effective

6  cooperative mechanism for assuring that its operation will not

7  interfere with rights established by the Modified Final Judgment

8  and Decree, and thus should be amended into that Judgement.

9

10  DATED: September 30, 1994.

11

12                          N. GREGORY TAYLOR, General Counsel
                            KAREN L. TACHIKI, Asst. General Counsel
13                          VICTOR E. GLEASON, Sr.Dep. General Counsel

14                          Victor E. Gleason

15                          _____
     Victor E. Gleason

16                          Attorneys for The Metropolitan Water
                            District of Southern California
17

18
     VEG:ljo
19   vicgle\p&a.smr

20

21

22

23

24

25

26

27

# ATTACHMENT A

# PROJECT DESCRIPTION AND BACKGROUND INFORMATION

# DOMENIGONI VALLEY RESERVOIR PROJECT

## MEMORANDUM OF UNDERSTANDING AND AGREEMENT ON OPERATION OF DOMENIGONI VALLEY RESERVOIR

### SEPTEMBER 1994

*THE METROPOLITAN WATER DISTRICT*
*OF*
*SOUTHERN CALIFORNIA*

Domenigoni Valley Reservoir Project
Two California Plaza
350 South Grand Avenue
Los Angeles, California  90071-3123

EXHIBIT A

## TABLE OF CONTENTS

**Page**

Recitals                                                                1

Article I - Operating Principles                                        3

Article II - Implementing Criteria                                      4

Article III - Definitions                                               7

Article IV - Protection of Parties to the Action                       10

Article V - Protection of Parties to MOU                               10

Article VI - Submission to Court                                       10

Article VII - Transfer Limitation                                      10

Article VIII - Review and Modification                                 10

Article IX - U.S. Participation                                        10

Article X - Ongoing Litigation                                         11

List of Attachments

| | |
|---|---|
| Attachment A | Project Description and Background Information |
| Attachment B | Procedure for Calculating Surface Runoff and Surface Water Quality |
| Attachment C | Procedure for Determining Downstream Groundwater Elevations |
| Attachment D | Monthly Record Sheet |
| Attachment E | Interlocutory Judgments 36 and 36A |
| Attachment F | Domenigoni Valley Area Parcels |

i

MEMORANDUM OF UNDERSTANDING AND AGREEMENT
ON OPERATION OF DOMENIGONI VALLEY RESERVOIR

THIS MEMORANDUM OF UNDERSTANDING AND AGREEMENT ("MOU") is
entered into as of the _____ day of _____, 1994, by and between THE
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA ("Metropolitan"), a
public entity; FALLBROOK PUBLIC UTILITY DISTRICT ("Fallbrook"), a public entity;
RANCHO CALIFORNIA WATER DISTRICT ("Rancho"), a public entity; and the UNITED
STATES, solely in its capacity as a water rights holder in the Santa Margarita River stream
system.

Recitals

A.     The United States District Court for the Southern District of California
("Court") has adjudicated water rights to the Santa Margarita River stream system
("System"), in the case entitled United States v. Fallbrook Public Utility District, et al., No.
1247-SD-C ("the Action"), by the Modified Final Judgment and Decree entered on April 6,
1966 and Amendatory Orders of June 27, 1968, January 16, 1975 and March 13, 1989
("Judgment").

B.     Fallbrook, Rancho, and the United States are the principal existing and
potential water users in the System; have been involved for some time in the Action to
determine the respective rights and duties of the users of the waters of the System; and are
parties of record in the Action.

C.     The Judgment retains continuing jurisdiction as to the use of all surface waters
and certain underground waters within the watershed of the System, and Article II of the
1966 Decree adopts Interlocutory Judgment 28, which specifically retains continuing
jurisdiction over impoundment of the surface waters of the System.

D.    Metropolitan is in the process of constructing an impoundment for imported water, known as the Domenigoni Valley Reservoir Project ("Project"), within the Warm Springs Creek Sub-Watershed of the System.  Although the Project's purpose is to provide regulatory storage capacity for Metropolitan's imported water distribution network, it will nonetheless unavoidably impound small amounts of surface waters of the System for short periods of time.  Attachment A to this MOU contains a general description of the Project.

E.    Article II of the 1966 Decree adopts Interlocutory Judgments 36 and 36A, for the Warm Springs Creek Sub-Watershed, which is tributary to Murrieta Creek.  Warm Springs Creek flows through the Project site.  Finding II of Interlocutory Judgment 36 states that Warm Springs Creek is an intermittent stream both as to time and place, flowing only during and immediately after periods of heavy precipitation and runoff.  Copies of Interlocutory Judgments 36 and 36A are appended to this MOU as Attachment E.  The exhibits to these Judgments are not included.

F.    The Project is located upstream of a geological feature described in Findings IV and V of Interlocutory Judgment 36, as being located in the general vicinity of the south line of Section 9, T6S, R2W, S.B.M.  Those Findings further described that feature as a "bedrock lip".

G.    Conclusion III and the third Order of Interlocutory Judgment 36 state that (a) groundwaters contained within alluvium north of the bedrock lip are not part of the System, so long as the groundwater level contained in the alluvium immediately north of the bedrock lip remains below elevation 1400 feet above Mean Sea Level (MSL); and (b) the groundwater elevation in that area is below 1400 feet MSL.  Recent investigations demonstrate that the groundwater elevation within alluvium north of the bedrock lip is currently at 1355 feet MSL.  Historic groundwater elevation data indicated that groundwater elevations near the bedrock lip have been below 1400 feet MSL since at least the late 1950's. Finding IV of Interlocutory Judgment 36 further states that the bedrock lip causes

- 2 -

groundwater that reaches that point to move out of the System and into the San Jacinto River watershed, when the groundwater elevation is below 1400 feet MSL.

H.      Finding IV of Interlocutory Judgment 36A determines that groundwater in basement complex or weathered basement complex, rather than alluvium, is not part of the System.

I.      Metropolitan is in the process of acquiring over 13,000 acres of land within the Domenigoni Valley, along with respective appurtenant water rights set forth in Interlocutory Judgments 36 and 36A.  A listing of the specific parcels being acquired is given in Attachment F.

J.      Metropolitan will continue to coordinate with the parties to this MOU in efforts to improve water resource management programs involving the Santa Margarita River Basin.

NOW THEREFORE, the parties agree as follows:

Article I.  Metropolitan will operate the Project in accordance with the following principles:

A.      The basic function of the Reservoir is to provide regulatory storage capacity for Metropolitan's imported water distribution system.  The Reservoir will store only water that would not have been available in the absence of the Reservoir.

B.      The quantity and quality of surface runoff that would flow past the West Dam, in the absence of the Reservoir, will be determined and a like quantity of water, of similar quality, will be released from the Reservoir or San Diego Canal (SDC) into Warm Springs Creek.

- 3 -

C.   Rainfall on the reservoir will be retained in the Reservoir, subject to principle A, until it is released subject to principle B, or such time as it returns to the atmosphere as evaporation.

D.   Water conservation and flood control are not explicit functions of the Reservoir.

E.   During reservoir operation the groundwater immediately downstream from the West Dam will be monitored by means of representative wells.  Metropolitan will restore production capability to groundwater wells through seepage from the reservoir, or other appropriate actions, to ensure and maintain historical water availability to affected well owners.

F.   The outflow from the Reservoir will have little or no significant effect on the quality of the Warm Springs Creek water downstream of the West Dam.

G.   During the period of construction requiring dewatering of excavations, downstream groundwater users that are deprived of their existing source of groundwater as a result of these dewatering operations will be supplied water of similar quality by Metropolitan.

Article II.   Metropolitan will implement those principles by operating the Project under the following criteria:

A.   Surface runoff that would normally flow downstream of the West Dam, in the absence of the Reservoir, shall be determined as set forth in Attachment B hereto.

- 4 -

**B.**     Reservoir releases shall be determined as follows:

1.     Mitigation releases from the Reservoir into Warm Springs Creek will begin within 24 to 72 hours after the surface runoff occurs, and will be adjusted daily as required by subsequent determinations of surface runoff.

2.     The rate of release from the Reservoir into Warm Springs Creek will be limited to the lesser of 50 cubic feet per second (cfs) or the computed mean daily rate of surface runoff that would have occurred at the West Dam in the absence of the Reservoir, except as noted in paragraphs 3 and 4.

3.     Releases into Warm Springs Creek, pursuant to paragraph 2, shall occur within reasonable and safe limits that would neither impair Metropolitan's use of the Project nor expose it to public liability. These flows may be limited as requested by the Watermaster.

4.     The start of any release from the Reservoir into Warm Springs Creek will be made at a low rate, and any increases in the rate of release will be made gradually in order that downstream parties may be alerted. This will be in addition to advance verbal notification of a pre-established list of critical downstream parties.

5.     Within the constraints imposed by physical limitations and other operating limits, as mentioned in paragraphs 2, 3, and 4 above, releases to Warm Springs Creek will be made at rates similar to those of the natural runoff that would have occurred in the absence of the Reservoir.

6.    Releases from the Reservoir into Warm Springs Creek will be continued following each flood event until the total computed quantity of surface runoff has been released.

C.    No storage space is specifically reserved in the Reservoir for flood control or conservation use. The releases from the Reservoir into Warm Springs Creek will be made through the Forebay or San Diego Canal.

D.    The elevation of groundwater downstream of the West Dam will be monitored at the well of record in the southern half of the south half of Section 9, T6S, R2W, S.B.M. This well is designated MO-6. Attachment C provides a more detailed explanation of the procedure for monitoring groundwater elevations during reservoir operation.

E.    During the period of construction requiring dewatering of excavations, downstream groundwater levels will be monitored. Any downstream groundwater user that experiences a significant decline in well production, which reduces their water supply below a reasonable level, will be supplied water of similar quality by Metropolitan. Attachment C contains a more detailed explanation of the procedure for monitoring groundwater levels during construction.

F.    The quality of the imported water that is stored in the Reservoir will be adequate for intended uses. Releases from the facilities will have little, if any, significant effect on the general water quality, as compared to the water quality that would have existed in the absence of the Reservoir. Attachment B provides a brief summary of the water quality associated with sources that will be used for operation of the Domenigoni Valley Reservoir.

- 6 -

G.    Metropolitan will file a copy of the monthly record sheet, described in Attachment D hereto, with the Watermaster prior to the end of each respective following month.  The Watermaster will in turn deliver copies of each month's sheet to the parties hereto, other than Metropolitan.

Article III.    The following terms used in the MOU shall have the respective meaning given below unless otherwise indicated:

A.    <u>Alluvium</u> - The alluvial material, generally of a young geologic age, underlying the Domenigoni Valley and Menifee Valley.  This material is referred to as younger alluvium in Finding III of Interlocutory Judgment 36.

B.    <u>Downstream</u> - The area immediately west of (below) the West Dam and hydrologically down gradient from the Project including only that part of the Santa Margarita River system that would have received water from Warm Springs Creek in the absence of the DVR project.  In terms of delineating the extent of the alluvial aquifer this refers to the south half Section 3, north half Section 10, and east half Section 9, T6S, R2W, S.B.M.

C.    <u>DVR Watershed</u> - The Domenigoni Valley Reservoir (DVR) watershed, consisting of the 17.2 square mile drainage area tributary to Warm Springs Creek, upstream from the West Dam.  This includes the reservoir area.

D.    <u>East Dam</u> - An embankment dam that forms the eastern boundary of the Domenigoni Valley Reservoir.

E.    <u>Export</u> - Water that is released from the Reservoir into the Metropolitan water distribution system.

- 7 -

F.   Forebay - A water impoundment structure located downstream of the West Dam used to hold water for transfer in and out of the Reservoir, and in and out of the San Diego Canal.

G.   Groundwater - The water contained in the alluvial and rock aquifers within the zone of saturation in the basin downstream of the West Dam.

H.   Import - Water that flows into the Reservoir through the SDC and Eastside Pipeline.

I.   Inflow - Surface runoff and subsurface flow into the Reservoir from the area between the East and West Dams and above the Reservoir elevation.

J.   Maximum Storage Capacity - The maximum volume of water that may be stored in the Reservoir when the Reservoir surface water elevation is equal to the spillway crest elevation.

K.   Outflow - Discharges made through the Forebay or Reservoir outlets into Warm Springs Creek, seepage beneath the East, West, or Saddle Dams, and other subsurface flow out of the Reservoir.

L.   Project - The Domenigoni Valley Reservoir Project (DVRP) includes the East, West and Saddle Dams, and all ancillary facilities.

M.   Mitigation Release - Water that is released through the Forebay or West Dam outlets, or the San Diego Canal, into Warm Springs Creek.

N.   Reservoir - The Domenigoni Valley Reservoir created by the East, West and Saddle dams.

O.  <u>Saddle Dam</u> - An embankment dam that forms part of the northern boundary of the Domenigoni Valley Reservoir.

P.  <u>Steering Committee</u> - The Court appointed committee consisting of representatives from the substantial water users within the Santa Margarita Watershed.

Q.  <u>Storage</u> - The volume of water actually stored in the Reservoir at a given time.

R.  <u>Storage Space</u> - The difference between maximum storage capacity of the Reservoir and the storage at a given time.

S.  <u>Subsurface Flow</u> - Groundwater flowing below the ground surface.

T.  <u>Surface Runoff</u> - Surface water runoff from the tributary watershed that would have occurred at the West Dam in the absence of the East and West Dams.

U.  <u>Watermaster</u> - The individual designated by the court to act as Watermaster for the Santa Margarita River Watershed, to administer and enforce the provisions of the modified final Judgment and Decree and subsequent instructions and orders of the court.

V.  <u>Well of Record</u> - the well, or group of wells, designated as providing a representative groundwater elevation downstream of the West Dam for purposes of demonstrating compliance with the operating criteria.

W.  <u>West Dam</u> - An embankment dam that forms the western boundary of the Domenigoni Valley Reservoir.

Article IV.   Metropolitan's operation of the Project in the manner described in Articles I and II, above, will not impair the rights of any of the parties to the Action.

Article V.   Notwithstanding any other provisions in this MOU, or anything that might reasonably be implied or inferred therefrom, nothing herein shall be construed to affect in any manner any rights to the use of water from the Santa Margarita River or its tributaries that the Parties to this MOU hold.  Nothing in this MOU shall be construed as a transfer of or an attempt to transfer such rights or any part thereof between the Parties.

Article VI.   Upon execution of this MOU by the respective undersigned representatives on behalf of Fallbrook, Rancho, the United States, and Metropolitan, Metropolitan shall present this instrument to the United States District Court for the Southern District of California for approval and incorporation into the Judgment as the Court may determine appropriate under the circumstances.  Upon approval by the Court, this MOU shall become fully effective.

Article VII.   No assignment or transfer of the rights defined in this MOU or any part or interest therein shall be valid unless approved by all the Parties hereto.

Article VIII.   The criteria and reservoir release data referred to in Article II hereof, and the formulae included in the Attachments hereto shall be periodically reviewed and, based on operating experience, will be modified if deemed necessary or appropriate by the Parties hereto.

Article IX.   Participation in this MOU is not to be construed as binding the United States regarding any rights, claims, obligations, interests, responsibilities, or duties it may have regarding the Domenigoni Valley Reservoir Project other than as a water rights holder in the Santa Margarita River System.

- 10 -

Article X.     This MOU is not intended to be a determination of the nature or extent of water rights acquired by Metropolitan in connection with its land acquisitions for the Domenigoni Valley Reservoir Project, nor to create any estoppel to claims in litigation now pending in connection with those land acquisitions.

IN WITNESS WHEREOF the undersigned have executed this Memorandum of Understanding and Agreement on behalf of their respective principals.

**THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA**

**APPROVED AS TO FORM**

N. Gregory Taylor
General Counsel

_____
John R. Wodraska
General Manager

_____

**FALLBROOK PUBLIC UTILITY DISTRICT**

By:_____
[name]
[title]

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
[name]
[title]

**UNITED STATES OF AMERICA**

By:_____
[name]
[title]

- 11 -

Metropolitan will construct a reservoir in Domenigoni and Diamond Valleys, Riverside County, State of California (Figure A-1). This reservoir will be known as the Domenigoni Valley Reservoir (DVR). Figure A-2 presents a more detailed location map of the Project, which is near the San Diego Canal (SDC) and the northern boundary of the Santa Margarita River Watershed. It will be located three miles south of, and between, the communities of Winchester and Hemet or about 70 miles east of the City of Los Angeles. The DVR project is compatible with the highest standards of water management. The need for the project was determined only after implementing studies of extensive water conservation, wastewater reclamation, groundwater conjunctive use, decontamination of groundwater aquifers, water transfers, and related water management measures. The five primary objectives the reservoir will accomplish are to:

- o   provide emergency storage of imported water,
- o   provide carryover (drought) storage of imported water,
- o   provide seasonal storage of imported water,
- o   preserve operating reliability of imported water, and
- o   optimize groundwater programs within Metropolitan's service area.

Figure A-2 depicts the general layout of project facilities. The DVR will be formed by two earth/rockfill dams, 4.4 miles apart, within the Domenigoni and Diamond Valleys, plus a third saddle dam of the earth/rockfill type at the low point in the north rim. Associated hydraulic structures consist of an inlet/outlet tower, pump station, connecting tunnels, forebay and spillway. The East Dam will be approximately 178 feet high and 10,800 feet long, while the West Dam will be approximately 280 feet high and over 8,000 feet long. The Saddle Dam will be approximately 174 feet high and 2,300 feet long. The total earthwork volume of the East and West Dams is approximately 98,000,000 cubic yards. Relocations within the reservoir area include Newport Road and its parallel utilities, which will be relocated north of the valley, and the SDC. The SDC crossed the valley under the axis of the West Dam, and has already been relocated west of the West Dam.

A - 1

DVR will serve as a regulatory and emergency water storage facility for imported water. When completed, the reservoir will nearly double the amount of surface storage available in Metropolitan's service area. This will provide for more reliable delivery of imported water during peak summer months, droughts, and emergencies. It will cover 4,800 acres and hold 800,000 acre feet, or 261 billion gallons of water when the reservoir is full. SWP water will be delivered to the reservoir via the new underground Inland Feeder and its extension, the Eastside Pipeline, which will be located adjacent to the SDC. Water from the CRA will be delivered to the reservoir via the SDC. Water from the canal will be diverted into the pumping forebay west of the West Dam and pumped into the reservoir by pumping plant P-1. Deliveries from the reservoir into the CRA will be through the Eastside Pipeline, bypassing the P-1 pumping plant. Deliveries to the SDC will be made through P-1 and the forebay into the canal.

DVR will also serve as a public recreation area under a Master Plan developed with county agencies, surrounding cities and communities, and recreation and environmental interests. This plan includes development proposals for camping, picnicking, golfing, fishing, and boating with related recreational facilities. In addition, a trail system is proposed for equestrians and hikers that will link the DVR recreation areas and also connect these areas with Lake Skinner and Salt Creek. Two separate wildlife preserves are also part of the DVR project: the newly created Dr. Roy E. Shipley Reserve and the expanded Santa Rosa Plateau Ecological Reserve.

After construction of the DVR project, reservoir operation will significantly modify surface and most subsurface water flows regimes from the present 17.2-square-mile Domenigoni Valley watershed to Warm Springs Creek. As part of this project Metropolitan has acquired a portion of the lands riparian to Warm Springs Creek and overlying the Domenigoni/Menifee aquifer, along with the respective appurtenant water rights.

A - 2





VICINITY MAP

NOT TO SCALE

THE METROPOLITAN WATER DISTRICT
OF SOUTHERN CALIFORNIA

M.W.D. FACILITIES WITHIN
SANTA MARGARITA RIVER
WATERSHED BOUNDARY

Figure A-2



**ATTACHMENT B**

PROCEDURE FOR CALCULATING SURFACE RUNOFF
AND SURFACE WATER QUALITY

Watershed and Runoff Characteristics

The drainage system of the Domenigoni watershed essentially forms the headwater basin of Warm Springs Creek, a tributary of the Santa Margarita River through Murrieta Creek. Upstream from the West Dam, the drainage area can be considered in two parts: (1) the entire drainage area of 17.2 square miles; and (2) the Goodhart Canyon Creek drainage area of 4.2 square miles. Figure B-1 depicts the boundaries of both of these drainage areas. Field investigation has shown that the watershed and runoff characteristics of Goodhart Canyon up to the area of the East Dam resemble, to a reasonable extent, those characteristics found in Domenigoni Valley.

During operation, the Domenigoni Valley Reservoir will intercept runoff originating upstream from the West Dam. Under pre-project conditions, the rain falling upstream of the West Dam may be considered as having two methods of disposal:

(1)    a very large percentage of the rain is locally converted to vapor by evaporation and transpiration;

(2)    a small percentage of the rain becomes runoff and joins the surface flows of Warm Springs Creek.

During operation of the Reservoir it will be necessary to mitigate for the second means of disposal (2) on an individual storm basis. To determine the mitigation release it is planned to measure the volume of runoff from the Goodhart Canyon drainage area by means of a detention basin located just east of the East Dam. The volume of runoff can then be correlated to the mitigation release required.

## Method for Determining Surface Runoff Volume for Release

The Goodhart Canyon detention basin will have a capacity of 1,070 acre-feet, based on a theoretical 8-day event with a 100-year recurrence period. This is adequate to store the entire volume of the most severe storm of record. Additionally, 1.5 feet of freeboard will be provided above the 1,070 acre-feet storage level.

The basin will be located in the southeast corner of the East Side Recreation Area. It will receive sheet flow from along its southern bank and concentrated runoff from a gully that will be diverted from flowing toward the East Dam to the detention basin. The maximum water surface elevation in the basin during the design event will be 1623.5 feet MSL. The lowest elevation in the basin will be 1,600 feet MSL. The invert of the outlet pipe culvert will be elevation 1,608 feet, resulting in less than 50 acre-feet of dead storage. The low area, below the outlet, will act as a sediment trap and will be cleaned as required to maintain the elevation versus capacity curve of the basin.

A continuous level measurement will be made to monitor the stored volume in the detention basin. Any level increase in the basin below the invert of the outlet culvert will correspond directly to runoff volume from Goodhart Canyon. The flowrate through the outlet culvert will be measured and integrated to determine the volume of Goodhart Canyon runoff released from the detention basin. This volume will be added to the change in stored volume in the basin, based on the level measurement and the elevation versus capacity curve. Based on the observed field conditions during operation of the detention basin the precise procedure for measuring the volume of runoff from Goodhart Canyon could be further refined, if necessary, to account for such factors as seepage from the basin. However, continuous monitoring of detention basin water level should preclude the need for such refinement.

An increase in stored volume will be recorded as a positive value and a decrease in stored volume will be recorded as a negative value. When the outflow volume added to the change in stored volume in the detention basin is greater than zero this value corresponds to the

runoff from Goodhart Canyon during the period being analyzed. A negative or zero sum of these values indicates there has been no runoff into the basin, and no additional mitigation release is required to be determined for that period of time.

Using a straight forward linear extrapolation of the Goodhart Canyon runoff to determine the mitigation release is based on two assumptions. First, the differences in rainfall over the two drainage areas are negligible. Second, the difference in runoff per square mile in the entire Domenigoni Valley drainage area compared to the runoff per square mile in the Goodhart Canyon drainage area is negligible. Thus, the mitigation volume to be released downstream from the West Dam is calculated as $17.2/4.2 = 4.1$ times the volume of runoff measured at the detention basin.

<u>Source, Location and Rate of Release</u>

Ultimately, the mitigation flows must be discharged into the existing natural drainage of Warm Springs Creek and the groundwater aquifer at the Project boundary. Mitigation flows will be released from the Reservoir or a point on the SDC to the defined existing Warm Springs Creek. This method of discharge requires a small improved channel from the release location, across the West Side Recreation Area, to culverts that will be installed under Holland Road. The new culverts will discharge into the existing drainage ditch along the east side of Winchester Road. Drainage flows continue south in the existing ditch to an existing box culvert, which crosses under Winchester Road and discharges into the existing Warm Springs Creek.

For this proposed mitigation the project boundary is Holland Road. When dam construction cuts off natural drainage through the valley, the ability to make mitigation releases must be in place. Mitigation releases shall be made within reasonable and safe limits that would neither impair Metropolitan's use of the Project nor expose it to public liability.

B - 3

The volume of runoff from Goodhart Canyon will be determined for each 24-hour period. This volume will be multiplied by 4.1 to determine the mitigation release volume. When this volume corresponds to a mean daily flowrate of less than 50 cfs, releases will be made at the mean daily flowrate or the maximum reasonable and safe limit, whichever is less. If releases are already being made at the reasonable and safe limit, up to 50 cfs, because of a prior event, the subsequent event volume will be added to the prior event and releases will be continued at the reasonable and safe limit, up to 50 cfs, until the entire volume of required release has been made. When the mean daily flowrate exceeds 50 cfs, releases will be made at 50 cfs, or the maximum reasonable and safe limit, until the required release volume has been met. The mitigation release rate will be limited to a maximum discharge capacity of 50 cfs or the maximum reasonable and safe limit, in order to avoid access, overflow, and other problems downstream.

Calculation of a daily flow duration curve indicates that significant runoff occurs at or above a daily flow of 50 cfs for 0.10 percent exceedance time and is associated with the major storms. In most cases mitigation flow would be able to be released within 24 hours following the precipitation at this flow rate. Only in extremely unusual situations would a release system sized in this manner take longer than a week to pass the required flow for a given storm.

Rainfall on the Reservoir

Rainfall that falls on the Reservoir surface, which under pre-reservoir conditions would normally be disposed of locally by evaporation and transpiration, will also naturally evaporate from the surface of the Reservoir. Thus, current mitigation releases are designed to ensure that the quantity of runoff that is released downstream, after the Domenigoni Valley Reservoir is constructed, is the same quantity of runoff that would have naturally occurred had the Reservoir not been construction, as provided by operating principles A, B, and C of Article II.

B - 4

Water Quality of the Release

The following table includes a comparison of concentrations (in mg/l) of selected constituents of imported water and Lake Skinner water. The data are from the 1992 Metropolitan Water District Annual Report, which is the most recent report containing comprehensive chemical analyses for these waters.

| Constituent | Units | Colorado River Water | State Water Project | Surface Water Winchester Road | Lake Skinner |
|---|---|---|---|---|---|
| TDS | mg/l | 641 | 375 | 358 | 624 |
| Alkalinity | mg/l | 135 | 87 | 65 | 130 |
| Bicarbonate ($HCO_3$) | mg/l | 165 | 106 | 80 | 154 |
| Calcium (Ca) | mg/l | 76 | 27 | 28 | 72 |
| Chloride (Cl) | mg/l | 83 | 104 | 29 | 87 |
| Hardness | mg/l | 311 | 131 | 122 | 298 |
| Magnesium (Mg) | mg/l | 29.5 | 15.5 | 5.2 | 29 |
| Nitrate ($NO_3$) | mg/l | 0.8 | 2.85 | 19 | 0.6 |
| Potassium (K) | mg/l | 4.5 | 3.8 | 149 | 4.5 |
| Sulfate ($SO_4$) | mg/l | 260 | 72 | 105 | 245 |
| Boron (B) | mg/l | 0.1 | 0.22 | 0.1 | 0.14 |
| Conductivity | $\mu$mho/cm | 1033 | 677 | 454 | 1014 |

Additional samples are being collected to substantiate the above results. It should be noted that the imported water, which will be used in this project, has essentially the same chemical composition as water released for surface water mitigation at Lake Skinner.

For comparison, the concentrations are included from a surface water sample collected at the culvert that passes under Winchester Road. The sampling location is identified in Figure C-1 as SW-4, located approximately 2,500 feet south of the intersection of Holland and Winchester roads. The sample was collected on 19 March 1994 during high flow conditions. The elevated levels of nitrate observed in the Winchester Road surface water sample are the

B - 5

result of irrigation water being mixed with surface runoff.  Elevated levels of nitrate would not be associated with reservoir construction or operation.



ATTACHMENT C

PROCEDURE FOR DETERMINING DOWNSTREAM GROUNDWATER ELEVATIONS

General:  The Diamond and Domenigoni Valleys comprise a groundwater basin filled with alluvium, bounded by areas of consolidated rock materials that are considerably less permeable than the alluvial deposits.  Downstream of the West Dam these rocks are similar in texture and composition to granite.  The southerly limit of the groundwater basin is in the general vicinity of the south line of Section 9, T6S, R2W, S.B.M.

Quantifying groundwater flow downstream from the reservoir presents a significant problem, thereby making it difficult to regulate.  Metropolitan has been continuously monitoring selected wells in the Valley since April 1990.  Additional monitoring wells specifically designed and located to provide "representative" groundwater elevation and quality data have recently been constructed.

From an extensive field investigation program, including aquifer pumping tests conducted at the West Dam site, it has been estimated that the underflow through this aquifer of alluvium was between 80 to 140 acre-feet per year at the 1993-1994 seasonal level.  This estimate is based on an average hydraulic gradient of 0.0056, a saturated cross-sectional area of the north alluvial channel beneath the West Dam axis of 88,900 ft$^2$, and a range in hydraulic conductivities of 150 - 250 gpd/ft$^2$, based on the results of aquifer pumping tests.

Reservoir Operation Impacts:  The extent and location of this groundwater basin alluvium have been delineated and incorporated by exhibit reference into Interlocutory Judgment 36.  In addition, the Court adjudged that all ground waters below an elevation of 1,400 feet MSL, contained in areas of alluvium located north of the south line of Section 9, T6S, R2W, S.B.M., are not a part of the waters of the Santa Margarita River system due to the presence of a bedrock lip rising to elevation 1,400 feet MSL.

This bedrock lip is a barrier to the southward movement of all ground waters below elevation 1,400 feet and causes such ground waters to move westward into the Menifee Valley of the San Jacinto River watershed, instead of down Warm Springs Creek.  Recent data indicate that water levels in the alluvial aquifer continue to be below elevation 1,400 feet MSL in the

C - 1

immediate vicinity of the bedrock lip.  In July 1994 the groundwater elevation observed in MO-6, located about 2,000 feet northeast of the bedrock lib was 1355.7 ft MSL.  A copy of the hydrograph for MO-6 is included at the end of this Attachment.

However, a shallow perched zone in the immediate vicinity of the bedrock lip provides a source of groundwater that flows over the bedrock lip and into the Santa Margarita basin. Field evidence and the 1960 Court testimony suggest that the volume of groundwater flowing over the bedrock lip and into the Santa Margarita River basin is about 1 acre-feet per year. This is local recharge into the basin and would not be affected by the construction or operation of the DVR project.  Finding V of Interlocutory Judgment 36 determined that groundwater that does move over the bedrock lip and down Warm Springs Creek is consumed almost in its entirety by evaporation and transpiration losses within a relatively short distance downstream.  In addition, the quality of water flowing over the bedrock lip will not be affected by construction or operation of the DVR project.

Reservoir Construction Impacts:  Construction related impacts will be limited to impacts resulting from dewatering operations associated with dam foundation and cutoff-wall construction at the East and West dams.  Smaller scale dewatering operations will be conducted at the Saddle dam, Pumping Plant 1 (P-1), and the rock borrow areas; however, the cone of depression associated with each of these operations will be limited in areal extent, contained entirely within the project boundary, and not impact downstream groundwater users adjacent to the project boundary, or Santa Margarita River system users downstream of the bedrock lip.

Construction dewatering for the East Dam could lower groundwater levels under the private property near the south end of the dam.  The effect is not expected to be a significant impact on that area.  Because of the very low probability that such an event will occur, mitigation will be handled on a case by case basis.

Construction dewatering for the West Dam will impact downstream groundwater users near the excavation for the dam foundation. Distance-drawdown data obtained during the West Dam test excavation dewatering operations, and the physical parameters of the aquifers beneath the West Dam measured during a 72-hour pumping test were used to predict the radius of influence of construction dewatering operations in the vicinity of the North Bedrock Channel beneath the West Dam. Based on these data only groundwater users east of Winchester road should experience any significant decline in groundwater levels during construction dewatering for the West Dam. In addition, the effects of dewatering the north channel may be reduced to an extent by natural recharge from the temporary holding pond designed to store groundwater produced during dewatering operations. Metropolitan will take appropriate actions to ensure and maintain historical water availability to affected well owners. No adverse impacts to groundwater quality are expected to result from construction activities.

Monitoring Procedure: Downstream groundwater elevations will be determined by physical observation of groundwater elevations in domestic wells, agricultural wells, and selected monitoring wells, designed and installed by the project specifically for this purpose. The datum for groundwater elevations is Mean Sea Level as established by the 1988 North American Datum. Groundwater elevations shall be measured monthly for at least one hydrologic year to establish the baseline groundwater flow regime. These data will be used to calibrate a numerical groundwater flow model of the Domenigoni Valley Reservoir area. Simulation runs of the model will be used to predict the direction and velocity of groundwater flow during operation of the reservoir.

After the baseline hydrologic conditions are defined a select number of strategically placed wells will be designated as "signature" wells for defining the local groundwater flow conditions. Monthly water elevation data measured only in these wells will define the groundwater elevation and local groundwater flow directions for purposes of these criteria.

C - 3

Construction Monitoring: During construction dewatering, a comprehensive monitoring program will be implemented to provide both an accurate determination of groundwater elevation and the rate of change in groundwater elevation over time and space. Six of the permanent monitoring wells MO-1, MO-2, MO-3, MO-13, MO-14, and MO-15 will be used to monitor groundwater elevations in areas near the West and East dams. The locations of these wells are shown in Figure C-1. In addition, numerous temporary monitoring wells/piezometers will be used to supplement the database created from the long-term monitoring wells. Piezometers nests located along the relocated San Diego Canal will provide particularly useful data downstream of the West Dam. Data gathered during dewatering operations will be used to define the change in static groundwater levels resulting from construction related dewatering. These changes in water level will be used to identify those areas in the vicinity of the dewatering operations that are impacted, and to establish the magnitude of the impact. Metropolitan will take appropriate actions to ensure and maintain historical water availability to affected well owners. No adverse impacts to groundwater quality are expected to result from construction activities.

During dewatering operations the frequency of monitoring groundwater elevations in selected wells, located in the vicinity of dewatering operations, will be weekly for the initial two (2) months of dewatering and bi-weekly thereafter, until two months following cessation of the dewatering operation. Monthly groundwater elevation maps will be constructed to map changes in water levels and evaluate trends associated with these changes. Groundwater levels will be measured monthly for all other designated monitoring wells during the entire construction period. Groundwater quality of selected monitoring wells will be conducted on a yearly basis during construction.

Operational Monitoring: During reservoir operation groundwater levels will be measured on a monthly basis for selected monitoring wells. The determination of which monitoring wells will be used for long-term monitoring will be based on the results of baseline hydrogeologic investigations. The selected wells will include some, but not all, of the wells labeled with the prefix "MO" in Figure C-1. To simplify the process of demonstrating compliance with

Recital "G" and operating criteria "D" well MO-6 is designated as the well of record. Groundwater levels measured in this well will be used to determine if the groundwater elevation in the alluvium exceeds 1400 feet MSL.

If seepage from the reservoir results in groundwater elevations, in the area between the West Dam and Winchester Road, in excess of those that would have existed in the absence of the Reservoir, no mitigation is required, unless such excess results in the discharge of groundwater at the surface immediately adjacent to the reservoir. However, Metropolitan reserves the right to recover all such excess water resulting from reservoir seepage. Metropolitan will restore production capability to groundwater wells through seepage from the reservoir, or other appropriate actions, to ensure and maintain historical water availability to affected well owners.

C - 5



LEGEND

⊕ MONITORING WELLS

⊕ SURFACE WATER QUALITY SAMPLING POINTS

⊕ GROUNDWATER QUALITY SAMPLING POINTS

⊕ GEOTECHNICAL TEST HOLES

⊕ MONITORING WELL MONTHLY MEASURING DISCONTI.

PRELIMINARY

Domenigoni Valley Reservoir Project

EBASCO / Ebasco & Woodard
Woodward - Clyde

DISTRIBUTION SYSTEM
DOMENIGONI VALLEY RESERVOIR PROJECT
GROUND WATER MONITORING / MITIGATION

LOCATION OF MONITORING WELLS
AND SURFACE WATER SAMPLING POINTS

SHEET
FIG. C-1

SPECIFICATIONS
X-XXXX

WORK ORDER
4-7536

DWG          REV

METROPOLITAN WATER DISTRICT

PEN TABLE: MNDHCOLR.TBL 3/8/94

GRAPH FILE NAME:        /usr/eng/work/0l613007.dgn



LOCATION - North: 2185303   East: 6305229
GROUND SURFACE ELEVATION: 1445.8 ft NAVD88
STICKUP: 2.1 feet above ground surface

| DATE MEASURED | DEPTH BELOW TOP OF CASING, ft | ELEVATION OF GROUNDWATER SURFACE, ft | DATE MEASURED | DEPTH BELOW TOP OF CASING, ft | ELEVATION OF GROUNDWATER SURFACE, ft | DATE MEASURED | DEPTH BELOW TOP OF CASING, ft | ELEVATION OF GROUNDWATER SURFACE, ft |
|---|---|---|---|---|---|---|---|---|
| 07/22/94 | 92.3 | 1355.6 | | | | | | |

SCREEN PERFORATION: 0.040-inch slot (110.5-30.5 ft) SAND PACK: Lonestar #3 (115-25.5 ft)
TYPE/THICKNESS OF SEAL(s): Bentonite pellets 25.5-20.5 ft, 5% bentonite-cement
grout 20.5 ft to surface, with steel protective casing
AQUIFER COMPLETION: alluvium;   MONITORING REQUIREMENTS: long term, water level

Project:  Domenigoni  Valley  Reservoir

Project Location:  Riverside  County,  California

GROUNDWATER ELEVATION
vs. TIME  in  Boring No. MO- 6

SNA 9/7/94 DVGWEL DVRAL



BASCO / Black & Veatch Woodward-Clyde

Proj. Feature:  WB

**ATTACHMENT D**


**MONTHLY RECORD SHEET**

Routine monitoring data will be forwarded to the Watermaster in accordance with the operating principles set forth in section I of these criteria.  Specific data will include:

    a.       Monthly groundwater elevation data.

    b.       Mitigation releases from the reservoir or the SDC, including release quantity, time of release, duration of release, and flow rate of the release.

    c.       Import and natural surface water quality data [submitted when collected]

    d.       Daily stage measurements at the Goodhart Canyon detention basin.

    e.       Daily measurements at the Goodhart Canyon gaging station, if constructed

    f.       Estimated daily local runoff.

    g.       Daily precipitation at the reservoir.

ATTACHMENT E

INTERLOCUTORY JUDGMENT No. 36, dated 3 JULY 1963

INTERLOCUTORY JUDGMENT No. 36A, dated 20 FEBRUARY 1968

(WITHOUT EXHIBITS)

LAW OFFICES
SACHSE AND PRICE
1092 South Main Street
FALLBROOK, CALIFORNIA
RANdolph 8-1154

*[SPACE BELOW FOR FILING STAMP ONLY]*

ENTERED

JUL 3 - 1962

LODGED

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By ............
Deputy Clerk

Attorneys for   Defendants

☐ 18 1961

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By ............
DEPUTY

IN THE UNITED STATES DISTRICT COURT

FILED

SOUTHERN DISTRICT OF CALIFORNIA

JUL 3 - 1962

SOUTHERN DIVISION

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By ............
DEPUTY

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND INTERLOCUTORY
JUDGMENT No. 36, WARM SPRINGS
CREEK SUB-WATERSHED.

## FINDINGS OF FACT

### I

Warm Springs Creek, a tributary of Murrieta Creek, rises in Sections nine (9) and fifteen (15), Township six (6) South, Range one (1) West, S.B.M., and flows in a generally southwesterly direction through areas known as Diamond and Domenigoni Valleys. It leaves Domenigoni Valley at a point near the Southeast (SE) corner of the Southwest Quarter (SW 1/4) of the Southwest Quarter (SW 1/4) of Section nine (9), Township six (6) South, Range two (2) West, S.B.M. From that point Warm Springs Creek proceeds in a generally south and westerly direction throughout a rather deeply incised valley to its point of confluence with Murrieta Creek in Section twenty-four (24), Township seven (7) South, Range three (3) West, S.B.M. The course and location of Warm Springs Creek are delineated upon U. S. Exhibits 274, and 208-F, made a part hereof

- 1 -

1247

1   by reference.

2                              II

3            Warm Springs Creek is an intermittent stream both as to

4   time and place, flowing only during and immediately after periods

5   of heavy precipitation and run-off.  There is no evidence as to the

6   amount or rate of flow of Warm Springs Creek, or as to the average,

7   maximum, minimum, normal or anticipated flow of Warm Springs Creek,

8   and the Court expressly makes no findings thereon because of such

9   lack of evidence.

10                             III

11           Warm Springs Creek has its source in and flows through

12  Diamond and Domenigoni Valleys.  These valleys comprise a ground

13  water basin filled with sedimentary material described herein as

14  younger alluvium.  The extent and location of said ground water

15  basin is delineated upon United States Exhibits 274 and 208-F,

16  made a part hereof by reference.

17           The ground water basin referred to herein is part of a

18  continuous body of younger alluvium which extends from within the

19  San Jacinto River watershed in Sections 33 and 34, T5S, R 1 W,

20  and Section 3, T6S, R 1 W, across the watershed divide in Sections

21  3 and 4, T6S, R 1 W, and Sections 32 and 33, T 6 S, R 2 W, S.B.M.

22  into the Santa Margarita River watershed; thence continuing in a

23  generally westerly and southwesterly direction as delineated on

24  United States Exhibits 274 and 208-F; thence crossing the water-

25  shed divide out of the Santa Margarita River watershed and into

26  the San Jacinto River watershed in Sections 8 and 9, T6S, R 2 W,

27  S.B.M.

28                             IV

29           The southerly limit of said ground water basin is in the

30  general vicinity of the south line of Section 9, T 6 S, R 2 W,

31  S.B.M.  At that point the said ground water basin is enclosed by

32  a lip of basement complex material rising to elevation 1400°,

- 2 -

1649

1  which lip prevents the movement of ground water from said basin
2  southwesterly into the remainder of Warm Springs Creek sub-
3  watershed and the Santa Margarita River watershed, excepting at
4  such times as the ground waters north of said lip exist at or above
5  elevation 1400'.

6          The presence of said basement complex lip is a barrier
7  to the movement of all ground waters within said basin below
8  elevation 1400', and causes such ground waters to move out of
9  said basin and out of the Santa Margarita River watershed and into
10  Menifee Valley of the San Jacinto River watershed in Section 8,
11  T 6 S, R 2 W, S.B.M.

12.
                                V
13.          Due to the relatively low permeability of the alluvium
14  underlying Warm Springs Creek at and near said basement complex
15  lip, the quantities of ground water which can percolate through
16  it are small.  At such times as the ground water level in said
17  basin is above elevation 1400', the larger proportion of such
18  ground waters move westerly out of the Santa Margarita River
19  watershed and into Menifee Valley of the San Jacinto River water-
20  shed; and the smaller proportion of such ground waters move over
21  the basement complex lip and on down Warm Springs Creek.  The
22  ground waters which do move down Warm Springs Creek downstream from
23  the south line of Section 9, T6S, R 2 W, S.B.M. are consumed
24  almost in their entirety by evaporation and transpiration losses
25  within a relatively short distance downstream.

26                              VI
27          United States Exhibit 208-F, incorporated herein by
28  reference delineates  the sub-watershed of Warm Springs Creek,
29  and its relation to the Murrieta-Temecula Ground Water Area,
30  subject of interlocutory Judgment 30 herein.  On said map are
31  delineated the geologic formations found in said sub-watershed,
32  including the areas of younger alluvium that comprise Diamond and

- 7 -                                    1840

Domenigoni Basin. There are also delineated thereon the exterior
boundaries of all land ownerships in said sub-watershed, indicated
by parcel numbers, as said land ownerships appeared at the date
of recordation of Notice of Lis Pendens, April 9, 1958, in Book
2252, page 17, Official Records of Riverside County.

Attached hereto, marked Exhibit A, and made a part
hereof by reference, is a tabulation of the land ownerships
delineated upon United States Exhibit 208-F, which tabulation
indicates property descriptions and apparent ownerships, and in
addition thereto may contain factual statements concerning the
following matters:

1. Wells.

2. Surface diversions.

3. Gross acreages.

4. Irrigated acreages.

5. Irrigable acreages.

6. Water duty.

The factual statements contained in said Exhibit which
pertain to well and surface diversions are true as of the date of
this Interlocutory Judgment. The factual statements as to apparent
ownerships are set forth for convenience only, and are not neces-
sarily correct and are not intended to be determinative or probative
on the issue of ownership of any real property described in said
Exhibit.

The factual statements contained in said exhibits which
pertain to gross acreages, irrigated acreages, irrigable acreages
and water duty almost without exception are based on evidence
introduced in this case by the United States of America with an
express assurance by its counsel that apportionment was not being
sought at this stage of the litigation; because of this fact and
the fact that this Court is not at this time making any order
apportioning or regulating the use of the waters involved herein,

that facts pertaining to gross acreages, irrigated acreages, irrigable acreages and water duty are not material to any issue decided by Interlocutory Judgment No. 36 entered herewith; that in the exercise of this Court's continuing jurisdiction in this cause said facts may well be material to an issue presented to this Court in the future; therefore, this Court finds that such factual statements which are contained in said Exhibit A which pertain to gross acreages, irrigated acreages, irrigable acreages and water duty are supported by the evidence in this case and such factual statements shall be prima facie evidence as to gross acreages, irrigated acreages, irrigable acreages and water duty in any subsequent proceeding before this Court in this cause; as used herein prima facie evidence is that which suffices for the proof of a particular fact until contradicted or overcome by other evidence.

VII

Certain defendants are presently extracting waters from the ground water basins of Diamond and Domenigoni Valleys and are using such waters for domestic and agricultural purposes upon their lands.

All of the uses to which such defendants are putting water upon their lands, and all of the methods of use of water by defendants are reasonable and beneficial and within the limitations imposed upon the use of water by the Constitution and Statutes of the State of California. Under present conditions it would be wasteful and unreasonable and contrary to the Constitution and Statutes of the State of California to require that the water level in Diamond and Domenigoni Basins be maintained at elevation 1400' or above, and any such requirement would interfere with the reasonable use of the said ground waters by overlying landowners.

VIII

That the issue of apportionment as to the quantity of

1851

the ground waters of Diamond or Domenigoni basins to which any
overlying landowners may be entitled has not been reached at
this stage in this case, and the Court has taken no evidence
directed to this issue.  This issue is left open, is not decided
herein and shall be litigated by this Court if and when in the
future it becomes necessary to do so.

IX

That because of the fact that the movement of ground
waters within Diamond and Domenigoni Basins is westerly and out
of the Santa Margarita River watershed and into the San Jacinto
watershed it would be impossible for this Court at this time to
make an allocation of said waters among all owners of lands over-
lying said basins in that those persons who own lands which over-
lie said basin within the San Jacinto watershed are not parties
to this suit.

X

The course of Warm Springs Creek downstream from the
south line of Section 9, T 6 S, R 2W, S.B.M. to the boundary of
the Murrieta-Temecula Ground Water area which is more particularly
described in Interlocutory Judgment No. 30 herein, is delineated
upon United States Exhibit No. 208-F, made a part hereof by
reference.  Throughout most of this area there are areas of
younger alluvium, the location and extent of which is delineated
upon United States Exhibit 208-F.  These younger alluvial deposits
are water-bearing when saturated, and rest upon and are confined
laterally by deposits of consolidated rock described on said
Exhibit 208-F as "basement complex" or "basement complex (weathered)".
These deposits of consolidated rock are essentially non-water-
bearing, and the materials of which they are composed are con-
siderably more compacted and less permeable than the alluvial
deposits.  As a result thereof, any ground waters found within
said alluvial deposits do not move laterally or vertically into

- 6 -

1.852

7

1    the consolidated rocks, but on the contrary move down the

2    hydraulic gradient through the younger alluvial deposits.

3                              XI

4            At such times as there is surface flow of Warm Springs

5    Creek, the location of such surface flow fluctuates considerably

6    and shifts its position upon the younger alluvial deposits from

7    season to season and even within each rainy season.

8                              XII

9            The deposits of consolidated rock on either side of the

10   younger alluvial deposits and upon which said younger alluvial

11   deposits rest, impede any ground waters within said younger

12   alluvial deposits from moving out of the younger alluvial deposits

13   and into the consolidated rock, and do in fact act in the same

14   manner as substantially impermeable bed and banks of a surface

15   stream.  The ground waters within said younger alluvial deposits

16   are in fact in a known and defined channel and do constitute the

17   underground stream of Warm Springs Creek.  The ground waters, if

18   any, contained within said alluvial deposits are a part of the

19   waters of the Santa Margarita River system.

20                             XIII

21           Attached hereto marked Exhibit B, and incorporated

22   herein, are descriptions of the smallest tract of land held

23   under one chain of title, a portion of which abuts upon Warm

24   Springs Creek as herein described.

25                             XIV

26           The ground waters, if any, contained within areas of

27   basement complex, basement complex (weathered), volcanic rock

28   or older continental deposits as delineated on Exhibit 208-F

29   within the sub-watershed of Warm Springs Creek are the subject

30   of Interlocutory Judgment 36-A in these proceedings.

31                           ·····

32                           ·····

- 7 -

1853

8

## CONCLUSIONS OF LAW

### I

All surface waters upon lands depicted on United States Exhibits 274 and 208-F within the sub-watershed of Warm Springs Creek are a part of the Santa Margarita River and are subject to the continuing jurisdiction of this Court.

### II

All ground waters found within areas of younger alluvium downstream from the south line of Section 9, T 6 S, R 2 W, S.B.M. as such areas of younger alluvium are depicted upon United States Exhibit 274 and 208-F, are a part of the Santa Margarita River system and are subject to the continuing jurisdiction of this Court.

### III

At the present time, and so long as the ground waters contained within areas of younger alluvium immediately north of the south line of Section 9, T 6 S, R 2 W, S.B.M. remain below elevation 1400', all ground waters contained within areas of younger alluvium north of said line, as the same are depicted upon United States Exhibits 274 and 208-F, are not a part of the Santa Margarita River system and do not contribute to the waters of said river system downstream from said south line of Section 9, T 6 S, R 2 W, S.B.M.

### IV

That it would be wasteful and unreasonable, and contrary to the provisions of Article XIV, Section 3, California Constitution, to require the maintenance of a water level in Diamond and Domenigoni Valleys at elevation 1400' or above for the purpose of supporting a ground water movement southwesterly past the south line of Section 9, T 6 S, R 2 W, S.B.M. and down Warm Springs Creek, and for that reason the extractions of ground water from within Diamond and Domenigoni Basins will not be

- 8 -

1 presently regulated or restricted in these proceedings for the
2 purpose of maintaining such a flow.  However, the Court will
3 retain continuing jurisdiction of this cause for the purpose
4 of reviewing or reconsidering possible control of future ground
5 water extractions should substantial changes in circumstances so
6 require.

7                                    V

8        Those lands described in Exhibit A attached hereto and
9 incorporated herein which in whole or in part overlie Diamond
10 and Domenigoni Basins north of the south line of Section 9,
11 T 6 S, R 2 W, S.B.M., as the same are delineated upon United States
12 Exhibits 274 and 208-F have correlative overlying rights to the
13 use of the ground waters contained within the younger alluvial
14 deposits of said basins.

15                                   VI

16        All lands described in Exhibit B attached hereto and
17 incorporated herein have a correlative riparian right to the use
18 of the waters of Warm Springs Creek as the  same have been
19 defined herein.

20                                  VII

21        That at the present status of this case the issue of
22 apportionment or the quantity of proportion of waters to which any
23 lands are entitled has not been presented and this Court has taken
24 no evidence directed to establishing whether any water uses pursuant
25 to riparian or overlying rights are reasonable or unreasonable as to
26 amount of water used in the light of the correlative rights which may
27 exist as to such waters, and this issue is left open, is not decided
28 herein and shall be litigated by this Court if and when in the fu-
29 ture it becomes necessary to do so; in the exercise of this contin-
30 uing jurisdiction this Court will judge and pass upon the exercise
31 of such riparian or overlying right based on the facts as they
32 may then appear and pursuant to California law.

LAW OFFICES
SWING AND PRICE
115, MAIN STREET
LOMPOC, CALIF.

1855
40

INTERLOCUTORY JUDGMENT

2    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that all

3 surface waters which flow over or upon the lands depicted on

4 United States Exhibits 274 and 208-F within the Santa Margarita

5 River watershed, which exhibits are incorporated herein by

6 reference, are a part of the Santa Margarita River and subject

7 to the continuing jurisdiction of this Court.

8    IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

9 ground waters contained within areas of younger alluvium down-

10 stream from the south line of Section 9, T 6 S, R 2 W, S.B.M.,

11 as such areas of younger alluvium are depicted upon United States

12 Exhibits 274 and 208-F, which Exhibits are incorporated herein

13 by reference, are a part of the Santa Margarita River and subject

14 to the continuing jurisdiction of this Court.

15    IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

16 ground waters contained in areas of younger alluvium located

17 north of the south line of Section 9, T 6 S, R 2 W, S.B.M.,

18 as such areas of younger alluvium are depicted on United States

19 Exhibits 274 and 208-F, incorporated herein by reference are not

20 a part of the waters of the Santa Margarita River system at

21 this date, but this Court retains continuing jurisdiction of this

22 cause to further consider such question at such time as the

23 elevation of such ground waters may change.

24    IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

25 lands described in Exhibit A attached hereto and incorporated

26 herein, which overlie in whole or in part younger alluvial deposits

27 of Diamond and Domenigoni Basins as the same are delineated upon

28 United States Exhibits 274 and 208-F, incorporated herein, have

29 correlative overlying rights to the use of the ground waters con-

30 tained in the younger alluvial deposits on said lands.

31    IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all

32 lands described on Exhibit B attached hereto and incorporated

- 10 -

11

1  herein have correlative riparian rights to the use of the waters
2  of Warm Springs Creek.

3         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the
4  correlative overlying rights and correlative riparian rights
5  described in this Interlocutory Judgment shall be and are subject
6  to the continuing jurisdiction of this Court.

7         IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the
8  issue of apportionment has not been presented and this Court
9  has taken no evidence directed to establishing whether the use
10 of any waters herein adjudged to be subject to the continuing
11 jurisdiction of this Court are reasonable or unreasonable as to
12 amount of water used in the light of correlative rights which
13 may exist as to such waters and this issue is left open, is not
14 decided herein and shall be litigated by this Court if and when
15 in the future it becomes necessary to do so.

16        IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this
17 Interlocutory Judgment is not appealable, is not final and shall
18 not be operative until made a part of the final judgment, and this
19 Court expressly reserves jurisdiction to modify or vacate it,
20 either upon its own motion or upon motion of any party to this
21 proceeding until such time as final judgment in this case is
22 entered.

23 Dated: _____7/3,_____, 1962

24
25
26                                    _____
                                           JUDGE
27
28
29
30
31
32

- 11 -

1357
12

ENTERED

FEB 20 1962

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT CALIFORNIA

FILED

FEB 20 1962

CLERK, U.S. D.S.T. CT. COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants,

No. 1247-SD-C

WARM SPRINGS CREEK SUB-WATERSHED

INTERLOCUTORY JUDGMENT No. 36-A

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND INTERLOCUTORY JUDGMENT No. 36-A,
RESPECTING LANDS IN THE SUB-WATERSHED
OF WARM SPRINGS CREEK UPSTREAM FROM
THE BOUNDARY OF THE MURIETTA-TEMECULA
GROUND WATER AREA.

This Court, based upon the record before it in the subject case, makes and enters the following Findings of Fact:

I

The United States Court of Appeals for the Ninth Circuit remanded this case for trial, declaring that: "The only proper method of adjudicating the rights on a stream, whether riparian or appropriative or mixed, is to have all owners of land on the watershed and all appropriators who use water from the stream involved in another watershed in court at the same time."

II

Proceeding in accordance with that mandate, the Complaint and Amendatory and Supplementary Complaint in this cause was served

- 1 -

1945

upon the owners of the lands within the watershed of the Santa
Margarita River and all appropriators who used water from that
stream in any other watershed.  Moreover, those parties named in
the cause who could not  be served personally were served by
publication.

### III

. The subject matter of this case, based upon the pleadings
and the issues joined in  it, relates only to the rights to the
use of the waters of the Santa Margarita River, its tributaries and
to the ground waters which feed, add to, support and contribute to
the waters of the Santa Margarita River and its tributaries.

### IV

' There are situated within the watershed of the Santa
Margarita River and the sub-watershed of Warm Springs Creek up-
stream from the boundary of the Murrieta-Temecula Ground Water
Area as the same is described in Interlocutory Judgment No. 30
herein, certain parcels or tracts of lands which do not overlie
any of the ground waters which feed, add to, support or contribute
to the waters of the Santa Margarita River or its tributaries.
Those lands are comprised of basement complex or weathered basement
complex, the ground waters of which, if any, are vagrant, local
and percolating, not a part of the surface or sub-surface flow or
sub-surface basins of the Santa Margarita River, below Temecula
Gorge and above the Naval Enclave, nor do these ground waters feed,
add to, support or contribute to the waters of the Santa Margarita
River or any of its tributaries

    a.  Attached to this Interlocutory Judgment marked
        Exhibit A and made a part hereof by reference is
        an alphabetical list of the apparent owners of all
        parcels of land referred to in these Findings.

    b.  Attached to this Interlocutory Judgment marked
        Exhibit B and made a part hereof by reference are

- 2 -

1946

5

land descriptions of all parcels of land referred
to in these Findings.

c.   Attached hereto marked Exhibit C and made a part
hereof by reference is a map, U.S.A. Exhibit 208-F
in these proceedings, on which map are located all
of the lands referred to in these Findings.  There
are set forth on said Map, Exhibit C hereunto
attached, lands, the ground waters of which add to,
contribute and support the Santa Margarita River and
its tributaries and are a part of the waters of
that stream system.  References to those lands have
been deleted from the tabulation of names (Exhibit A)
and the legal descriptions (Exhibit B) referred to
above, and although the exterior boundaries of such
lands appear on said map Exhibit C, this Interlocu-
tory Judgment does not relate to them.

d.   All of the lands referred to in "a" "b" and "c"
above appear in  the Notices of Lis Pendens, recorded
April 8, 1958, in Book 7028, page 159, Official
Records, San Diego County, California; and recorded
April 9, 1958, in Book 2252, page 17, Official
Records, Riverside County, California.  The apparent
owners referred to in this Interlocutory Judgment
were the owners of record on the dates last mentioned,
unless specific information has been received of the
transfer of a particular parcel, then the change is
reflected in the name of the apparent owners.

V

This Court retains continuing jurisdiction over all
surface waters within the drainage area of the watershed of the
Santa Margarita River and its tributaries, within  the area which
is the subject of this Interlocutory Judgment.

- 3 -

1947

CONCLUSIONS OF LAW

This Court makes the following Conclusions of Law respecting the lands referred to in Finding IV above and which are described in Exhibit B:

I

The defendants referred to in Finding IV, their successors, heirs, executors, administrators and assigns, have no rights to the use of ground waters which feed, add to, support or contribute to the waters of the Santa Margarita River or its tributaries, within the area subject of this Interlocutory Judgment, in connection with the lands referred to in Finding IV, which are described with particularity in Exhibit B.

II

There is not at issue before this Court in this cause and there is not decreed, determined or adjudged, inter sese, as to the lands or owners of land referred to in Finding IV in this cause, the rights, if any, to the use of the vagrant, local, percolating waters which may underlie any of the lands referred to in the above set forth Finding IV and which are described with particularity in Exhibit B of these Findings of Fact, Conclusions of Law and Interlocutory Judgment.

III

The United States of America, and all other parties to this action, having rights to the use of waters of the Santa Margarita River or its tributaries, as those rights are or may hereafter be determined by the final judgment of this Court, are entitled to have quieted their title in and to those rights against any and all adverse claims of the defendants referred to in Finding IV, who are listed in Exhibit A of these Findings of Fact, Conclusions of Law and Interlocutory Judgment, their heirs, successors, executors, administrators and assigns, asserted by reason of their ownership of the lands described with particularity in Exhibit B

- 4 -

1948

of these Findings of Fact, Conclusions of Law and Interlocutory Judgment.

IV

The defendants referred to in Finding IV, whose names are listed in Exhibit A and whose lands are described with particularity in Exhibit B of these Findings of Fact and Conclusions of Law, their heirs, successors, administrators, executors and assigns, are entitled to have quieted their titles in and to their rights to the use of the vagrant, local, and percolating ground waters, if any, underlying those lands described in Exhibit B, against the adverse claims, if any, of the United States of America and all parties to this cause, their heirs, successors, administrators, executors and assigns, by reason of rights asserted by the United States of America and all parties to this cause, their heirs, successors, administrators, executors and assigns, in and to the use of the waters of the Santa Margarita River and its tributaries.

V

This Court retains continuing jurisdiction with respect to surface waters, if any, found on those lands described on Exhibit B of these Findings of Fact, Conclusions of Law and Interlocutory Judgment.

VI

The preceding Findings of Fact and Conclusions of Law do not in any way pertain to surface waters which arise upon, flow across or which are diverted or are impounded upon the lands, to which they have application.

INTERLOCUTORY JUDGMENT

IT IS HEREBY

ORDERED, ADJUDGED AND DECREED, that:

I

The defendants referred to in Finding IV and listed in

1949

Exhibit A of these Findings, the apparent owners of the lands des-
cribed with particularity in Exhibit B of these Findings of Fact,
Conclusions of Law and Interlocutory Judgment, their heirs,
successors, executors, administrators and assigns, by reason of
their ownership of those lands, have no right, title or interest in
or to the ground waters which feed, add to, support or contribute
to the waters of Santa Margarita River and its tributaries, within
the area subject of this Interlocutory Judgment.

II

The titles to the rights of the United States of America
and all other parties in this action having rights in and to the
surface and ground waters of the Santa Margarita River and its
tributaries, as they are adjudicated, decreed and determined by
the final Judgment of this Court, shall be and they are forever
quieted against any and all adverse claims of the defendants
referred to in Finding IV, and who are listed in Exhibit A, their
heirs, successors, administrators, executors and assigns, who
assert rights by reason of their ownership of the lands described
in Exhibit B of these Findings of Fact, Conclusions of Law and
Interlocutory Judgment; and those defendants, and each of them,
and their heirs, successors, executors, administrators and assigns,
who by reason of their ownership of the lands described in Exhibit
B assert rights in the vagrant, local, percolating waters therein,
are forever restrained from asserting, claiming or setting up any
right, title or interest in or to the waters of the Santa Marga-
rita River or its tributaries, by reason of their ownership of
those lands described in Exhibit B.

III

The ground waters, if any, which underlie the lands re-
ferred to in Finding IV, and described with particularity in
Exhibit B of these Findings of Fact, Conclusions of Law and Inter-
locutory Judgment, are vagrant, local and percolating, not a part

- 6 -

1950

of the waters of the Santa Margarita River or its tributaries, and are not in this cause adjudged, determined or decreed among the defendants listed in Exhibit A of these Findings of Fact, Conclusions of Law and Interlocutory Judgment, their heirs, executors, administrators, successors or assigns, _inter sese_.

IV

The titles to the rights of the defendants listed in Exhibit A, their heirs, executors, administrators, successors or assigns, in and to the vagrant, local percolating ground waters, if any, to which these Findings of Fact, Conclusions of Law and Interlocutory Judgment pertain, which are not a part of the waters of the Santa Margarita River and its tributaries, underlying the lands described in Exhibit B of these Findings of Fact, Conclusions of Law and Interlocutory Judgment, shall be and they are forever quieted against any and all adverse claims, if any, of the United States of America and all parties to this cause, their heirs, successors, administrators, executors and assigns, having or claiming rights in and to the surface and ground waters of the Santa Margarita River and its tributaries, and the United States of America and all other parties to this cause, their heirs, successors, administrators, executors and assigns, having or claiming rights in and to the surface and ground waters of the Santa Margarita River and its tributaries, are forever restrained from asserting, claiming or setting up any right, title or interest in or to those vagrant, local, percolating ground waters.

V

This Court retains continuing jurisdiction with respect to surface waters, if any, found on those lands described on Exhibit B of these Findings of Fact, Conclusions of Law and Interlocutory Judgment.

VI

This Interlocutory Judgment neither relates to waters

- 8 -

which arise upon, flow across, or are diverted or impounded upon
the lands to which it relates, nor does it purport to adjudicate
those rights.

VII

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, based
upon the decision of the United States Court of Appeals for the
Ninth Circuit, <u>California v. United States</u>, 235 F.2d 647 (C.A.9,
1956), that this is not a final decree, but is interlocutory in
character and by reason of the Order by this Court that all parties
are adverse one to another, thus dispensing with cross-pleadings,
all other parties to this proceeding may object to these Findings
of Fact, Conclusions of Law and Interlocutory Judgment and will be
given full opportunity upon due notice to interpose their
objections to these Findings of Fact, Conclusions of Law and
Interlocutory Judgment.

Dated: 2/20/63

_____
JAMES M. CARTER
Judge, United States District Court

NOTE:  The parcel numbers appearing on Exhibits A, B and
C attached are explained as follows:  The first number refers to
the Township; the second number refers to the Range; the next
number or numbers refer to the Section or Sections or parts of
Sections; the final number or numbers separated by a dash is the
parcel number, thus:  72W-8, 13-141 indicates Township 7 South,
Range 2 West, Sections 8 and 13 - Parcel 141.

LAW OFFICES
SWING AND PRICE
ESCONDIDO, CALIF.

1952

**ATTACHMENT F**

DOMENIGONI VALLEY AREA PARCELS

Domenigoni Valley Area Parcels
Which Metropolitan Is Acquiring

The Metropolitan Water District of Southern California (Metropolitan) is in the process of acquiring over 13,000 acres of land in Warms Springs Creek Sub-Watershed area of the Santa Margarita River Watershed, in connection with its Domenigoni Valley Reservoir Project and related imported water facilities.  The 1966 Modified Final Judgment and Decree in <u>United States v. Fallbrook PUD, et al</u> (USDC No. 1247-SD-T), through Interlocutory Judgments 36 (IJ 36) and 36A (IJ 36A) associates appurtenant water rights with ownership of land in that area as:

- Correlative Overlying Rights re Domenigoni Valley alluvium
  (IJ 36 page 10)

- Riparian Rights to Warm Springs Creek
  (IJ 36 pages 10 & 11)

- Non-Correlative Overlying Groundwater Rights
  (IJ 36A Orders III & IV)

The parcels listed in IJ 36 and IJ 36A which Metropolitan is acquiring in whole or in part, that are covered by those water rights are:

<u>Appurtenant Correlative Overlying and Riparian Rights</u>
(Per Exhibits A & B of IJ 36)

| | | |
|---|---|---|
| 51W-29-2 | 61W-4-23 | 62W-1-59 |
| 51W-31-4 | 61W-4-24 | 62W-2-60 |
| 51W-31-5 | 61W-4-25 | 62W-2-61 |
| 51W-32-7 | 61W-4-28 | 62W-2-62 |
| 51W-32-8 | 61W-5-28A | 62W-3-63 |
| 51W-33-9 | 61W-5-29 | 62W-10-76 |
| 52W-34-13 | 61W-6-30 | 62W-10-77 |
| 52W-35-15 | 61W-6-31 | 62W-10-78 |
| 52W-36-18 | 61W-6-32 | 62W-10-79 |
| | 61W-6-33 | 62W-10-80 |
| | | 62W-11-81 |
| | | 62W-12-82 |

<u>Appurtenant Non-Correlative Overlying Rights</u>
(Per Exhibit B of IJ 36A)

| | |
|---|---|
| 51W--29-1 | 62W-12-83 |
| 51W-30-3 | 62W-13-84 |
| 51W-31-6 | 62W-13-85 |
| 52W-34-14 | 62W-13-86 |
| 52W-36-16 | 62W-13-90 |
| 52W-36-17 | 62W-13-92 |
| 61W-3-19 | 62W-13-93 |
| 61W-7-35 | 62W-13-94 |
| 61W-8-36 | 62W-13-95 |
| 61W-8-37 | 62W-13-96 |
| 61W-9-38 | 62W-13-97 |
| 61W-16-47 | 62W-15-99 |
| 61W-17&18-50 | |

\* \* \* \*

# EASTSIDE RESERVOIR PROJECT

## FINAL
## ENVIRONMENTAL IMPACT REPORT

### OCTOBER 1991

### State Clearinghouse #89081422

## THE METROPOLITAN WATER DISTRICT
## OF
## SOUTHERN CALIFORNIA

**Planning Division**
**1111 Sunset Boulevard, P.O. Box 54153**
**Los Angeles, California  90054-0153**

EXHIBIT B

(cfs) and discharged to the natural waterway downstream of the dam. This arrangement avoids heavy concentrations of flow, and transport of sediment and debris would be negligible, much less than would occur under natural conditions.

*Groundwater.* Construction impacts on groundwater hydrology at the Domenigoni Valley Reservoir would be negligible. Temporary dewatering would be required at pump/generating plant P/G1 near the west dam. Dewatering would be confined to the area immediately surrounding P/G1 to allow construction of the structure.

Project construction techniques would not require introduction of water into the groundwater strata. The only water required would be for dam and embankment construction and dust control. Water would be added to dam and embankment fill materials as part of the material placement procedure to obtain optimum compaction of the material. Water added to the fill material would be carefully controlled and absorbed by the fill material. No excess water would percolate to the groundwater.

Similarly, limited amounts of water would be spread on construction haul routes to control fugitive dust. This water would be absorbed in the surface layer of soil and would not percolate to the groundwater.

### 5.1.2.2   Operations Impacts

*Surface Water.* The surface water drainage pattern in Domenigoni Valley would be significantly altered by the reservoir, which would occupy up to 57 percent of the drainage basin between the east and west dams. Streams in the valley would be inundated and runoff from hillsides would flow directly into the reservoir. The benefit of a reservoir would be that floodflows in the area immediately downstream of the west dam would be greatly reduced so that only relatively infrequent storms would result in uncontrolled releases over the reservoir's spillway. During the winter, when large floods are most likely to occur, the reservoir level would probably be sufficiently below maximum capacity to capture all incoming flow without reaching the spillway overflow level. The spillway may operate only rarely throughout the life of the project.

The natural surface water entering the Domenigoni Valley Reservoir, including direct rainfall, would increase due to the fact that a water surface created by the reservoir would now exist where previously there was a semi-arid valley. However, the reservoir would incur a substantial loss due to the free-surface evaporation. The average annual evaporative loss was estimated to be 26,200 acre-feet for a 4,878-acre reservoir surface area.

The peak floodflow entering the reservoir area for a 100-year, 24-hour storm would increase from 2,560 cfs under present conditions to 4,610 cfs with the reservoir in place and full. However, the peak outflow downstream of the reservoir would be reduced substantially to 87 cfs due to storage of the peak flood inflow restricted by the spillway outflow capacity. With no-project conditions, the peak inflow and outflow at the proposed west dam would be 3,330 cfs for a 100-year, 24-hour winter storm over the 17.59-square-mile watershed, including Goodhart Canyon Creek.

Metropolitan does not expect to acquire rights to permanently store natural runoff captured by the reservoir. Therefore, this water, an estimated average of 264 acre-feet per year, would be released to the stream downstream from the west dam. Releases would generally be made at the time and in the approximate quantity of the pre-project inflow into the reservoir. The exception would be that large flood inflows would be spread over a longer period to avoid extremely high flows in the stream below the dam. The releases would be made from an outlet that would be incorporated into the spillway section from the San Diego Canal just downstream from the forebay. It would have a capacity of about 10 cfs. Larger releases could be made through the emergency drawdown facility whenever the reservoir is at a level higher than 1,718 feet.

Construction of the east dam would effectively divert the streamflow and the stormwater from Goodhart Canyon Creek into Salt Creek instead of Warm Spring Creek. The average annual runoff from the 4.2-square-mile Goodhart Canyon Creek basin is estimated at 82 acre-feet, and the peak flows from a 100-year, 24-hour winter storm and a 100-year, 6-hour thunderstorm would be 870 cfs and 1,690

cfs, respectively. The U.S. Army Corps of Engineers' Intermediate Regional Flood, known to be close to a 100-year flood, has an estimated peak discharge of from 7,300 cfs upstream from Lyon Avenue in Salt Creek to 13,100 cfs upstream from the Railroad Canyon Reservoir. With the inclusion of stormwater from the 4.2-square-mile Goodhart Canyon Creek, the estimated peak discharge for this flood in Salt Creek would be 8,030 cfs (a 10% increase) upstream from Lyon Avenue and 13,270 cfs (a 1.3% increase) upstream from Railroad Canyon Reservoir.

*Groundwater.* Reservoir seepage through the permeable materials in the upper 200 feet of rock comprising the north rim of the Domenigoni Valley Reservoir would be approximately 4,000 acre-feet per year at the high reservoir stage and approximately 2,300 acre-feet per year at the low stage.

West and downstream of the west dam, subsurface outflow would be reduced to almost zero. This reduction in outflow would be approximately 900 acre-feet per year.

Five irrigation wells and one domestic well are currently in service immediately west of the proposed west dam. Estimated production from these shallow wells is approximately 1,000 to 1,500 acre-feet per year. The reduced subsurface outflow from the reservoir area would reduce recharge to these wells. The apparent mining operation from the wells would not be sustainable. The domestic well is deeper than the irrigation wells and recharge to it would be reduced but is expected to be sustainable.

Normally, a portion of the outflow from Domenigoni Valley discharges to both the Santa Margarita watershed and Menifee Valley. In the area just west of the proposed west dam, a bedrock high exists at an elevation of approximately 1,400 feet. When groundwater levels exceed this elevation, a portion of the water spills southwestward into the Santa Margarita watershed down Warm Spring Creek. The majority of water, however, moves westward into Menifee Valley. When groundwater elevations in the area fall below 1,400 feet, water flows only into Menifee Valley.

After dam construction, groundwater levels are expected to decrease with time due to reduction in underflow. Without supplemental recharge, eventually all underflow tributary to the Santa Margarita watershed via the Warm Spring Creek area would cease as groundwater levels subside below the 1,400-foot bedrock lip elevation. The amount of water cut off from the Santa Margarita watershed would be small. Groundwater levels in the upper reaches of the Warm Spring Creek area may be lowered nominally. Impacts on existing wellfields downstream would be negligible. Changes in groundwater levels resulting from the minimum and maximum reservoir levels are shown on Figures 5.1.2-1 and 5.1.2-2, respectively.

Construction of the east dam would have an opposite effect in that groundwater, which now flows into Diamond and Domenigoni valleys, would be forced nearer the surface due to the effect of the subsurface barrier. Groundwater would rise 15 to 20 feet in the area and eventually become subsurface flow around the north rim as hydraulic gradients increase. Well levels in these areas would rise, and drawdown would be reduced as recharge is increased.

### 5.1.2.3   Mitigation Measures

The natural flows that would have occurred without the presence of the reservoir would be released from the reservoir to avoid adverse impacts on downstream water users.

A possible mitigation measure to minimize any flood hazards caused by flood water from Goodhart Canyon Creek would be to detain a portion of the floodflows from Goodhart Canyon Creek long enough to assure that the peak flow in the Salt Creek channel would not be exceeded. This could be accomplished by inundating some of the proposed recreation areas for the infrequent flooding event.

### 5.1.3   Water Quality

### 5.1.3.1   Construction Impacts

*Surface Water.* During construction of the Domenigoni Valley west and east dams, changes to water quality are expected to be similar to those



**Figure 5.1.2-1   Estimated Groundwater Level Impacts of the Domenigoni Valley Reservoir, Minimum Reservoir Elevation**

Case 3:51-cv-01247-JO-SBC   Document 4836   Filed 11/03/94   PageID.46541   Page 78 of 87



Figure 5.1.2-2   Estimated Groundwater Level Impacts of the Domenigoni Valley Reservoir, Maximum Reservoir Elevation

5-8

for any large construction project and could be appreciable. Erosion from site preparation and placement of fill for coffer dams may result in temporary increases in turbidity. The California Regional Water Quality Control Board (RWQCB) has set a limit of 20-percent maximum increase over the natural turbidity of the streams due to construction activity. In addition, wastewater from construction practices can introduce contaminants, such as oil products, fuels, chemicals, and lime, into the water. Sources of these contaminants would include equipment cleanup, aggregate washing, concrete cooling, and accidental spills.

*Groundwater.* There would be no effect on groundwater quality during construction. Measures would be taken to prevent surface water contamination, such as containment of fuel oil and lubricant storage areas. These measures would prevent seepage and possible contamination of the groundwater; therefore, no impacts on downstream users of groundwater would occur.

### 5.1.3.2   Operations Impacts

*Surface Water.* If the water samples from Warm Spring Creek are typical of the Domenigoni Valley drainage area, this area appears to have relatively poor water quality under normal low-flow conditions when compared to potential import waters. Both Colorado River and State Water Project (SWP) waters have lower concentrations (in milligrams per liter [mg/l]) of most constituents than are present in the average of the high and low flows of Warm Spring Creek (Table 5.1.3-1).

*Groundwater.* The operational effects of the Domenigoni Valley Reservoir on existing groundwater quality at high and low levels are shown in Figure 5.1.3-1. Seepage through the north rim at rates up to 4,000 acre-feet per year would displace native groundwater, forming a freshwater plume in the area with an average total dissolved solids (TDS) concentration of 300 mg/l compared to background levels of approximately 500 mg/l. This would improve existing groundwater quality.

Seepage from the reservoir would neither increase nor decrease contamination from other sources

outside the reservoir. Contaminant plumes which may flow through the zone of influence of the reservoir would be diluted by the volume of reservoir water seeping into the groundwater.

### 5.1.3.3   Mitigation Measures

For construction impacts, mitigation measures will be considered in the design phase of the project. Erosion can be minimized by careful use of grading management techniques, drainage ditches, and baled straw. Control procedures for surface fluids (water, oil, gasoline, asphalts, and wet concrete) include using check dams for drainage control, collecting waste fluids in ponds or other retention devices, installing equipment to avoid spills, providing concrete or asphalt wash pads for cleaning trucks and other construction equipment, and properly designing concrete equipment cleaning areas.

During project operation, no mitigation measures for surface water quality are required.

### 5.1.4   Biological Resources

*Methodology.* Impact evaluations involved determining the location and sizes of habitats expected to be disturbed by construction, inundation, and operations; identifying and assessing the type and value of the biological resources that may be potentially affected in these disturbed areas; analyzing the types of biological impacts that could result from expected physical project effects; and estimating the biological or ecological importance of these impacts. These evaluations included determining whether the impacts would be (1) directly or indirectly caused by the project; (2) caused by construction, operations, or both; and (3) of short duration (short term) or long duration (long term).

*Vegetation.* The vegetation types potentially disturbed by dam construction, support facility construction, excavation of borrow materials, and direct inundation were mapped from site surveys and 1:12,000 aerial photographs onto mylar and combined with baseline topographic maps in a computer-assisted Geographic Information System (GIS). The acreages for each habitat type were quantified by the GIS system. Habitat quality of the potentially disturbed

**Table 5.1.3-1**

**Surface Water Quality**
**Domenigoni Valley Reservoir Alternative**

| Constituent | Colorado Water | State Water Project | 60/40 Blend | Domenigoni Valley Water |
|---|---|---|---|---|
| TDS | 560 | 334 | 424 | 564 |
| Chloride | 66 | 83 | 76 | 157 |
| Nitrate | 0.75 | 1.55 | 1.23 | 3.60 |
| Sulfate | 255 | 55 | 123 | 92 |
| Boron | – | 0.38 | 0.23 | 0.60 |

areas was quantified through field measurements of cover of each vegetation layer, species richness, percent native species, and tree densities (woodlands). The values were weighted and compared against a "prime" value for each community, forming a relative habitat quality value for impact analysis.

Potential impacts to plants from reservoir construction, including inundation, soil removal, and dust pollution, were assessed. Impacts to plant habitats, such as soil removal, erosion, and compaction, were also analyzed. The intensity and likelihood of plant community disturbance, its duration, and its persistence, were estimated.

*Wildlife.* Direct impacts to wildlife, which include interference with behavior, biology, or life-history requirements, were evaluated relative to impact disturbance (i.e., construction, inundation, and operations) and whether they were of short or long duration. Direct disturbances were evaluated by determining the overlap between habitat type and wildlife species inhabiting or otherwise utilizing these habitat types, and water inundation level or other surface disturbance. The type of mortality or foraging disturbance caused by operation activities was noted for all wildlife species. The severity of habitat loss or disturbance to wildlife species as a group was estimated based on species diversity, species richness, relative density, and overall habitat quality. The severity of wildlife disturbance was judged to be directly proportional to increased species diversity. Diversity was used to characterize the wildlife community because it is an indicator of the number of ecological relationships that could be affected by dam construction, borrow sites, support facilities, and direct inundation. Therefore, impacts to a diverse wildlife community are likely to have more ecological ramifications than impacts to a simple community. Wildlife habitat quality was assessed relative to comparable habitats at other reservoir sites studied and to overall habitat quality elsewhere in the ecoregion.

Potential indirect impacts to wildlife in the region expected from project-induced activities (i.e., noise, dust pollution, increased human activity, and displacement into adjacent wildlife communities) were also assessed. Sensitive species particularly susceptible to disturbance (e.g., mountain lion [*Felis concolor*], raptor species) were noted.

**5.1.4.1  Impacts on Upland Habitats**

A total of 7,326 acres of land would be disturbed during the construction of the proposed reservoir, borrow sites, recreation areas, and support facilities (Table 5.1.4-1).

*Vegetation.* Excavation of borrow sites; construction of the dams, support facilities, and recreation areas; and inundation would result in the permanent loss of 2,502 acres of upland vegetation habitats (non-native grassland, Riversidian sage scrub, chaparral, and exotic tree habitat) in Domenigoni Valley. Non-native grassland is a botanically simple habitat both floristically and structurally. However, these



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIV. NO. 1247-SD-T |
| Plaintiff, | **DECLARATION OF DENNIS G.** |
| | **MAJORS IN SUPPORT OF MOTION TO** |
| v. | **APPROVE MEMORANDUM OF** |
| | **UNDERSTANDING ON OPERATION OF** |
| FALLBROOK PUBLIC UTILITY | **DOMENIGONI VALLEY RESERVOIR** |
| DISTRICT, et al., | |
| Defendants. | |

1.   I, Dennis G. Majors, am employed by The Metropolitan Water District of Southern California (Metropolitan) as Engineering Program Manager for the Domenigoni Valley Reservoir Project.  My responsibilities in that position include the planning, design, and construction management of that project.  Prior to joining Metropolitan in 1987, I spent 17 years in the planning, design and construction of major water resource projects with the U.S. Army Corps of Engineer Los Angeles District.  I am a registered civil engineer in the State of California.

2.   Metropolitan is a regional water supply agency which provides almost 60 percent of the water used by nearly 16 million people living in the portions of San Diego, Riverside, Orange, San Bernardino, Los Angeles and Ventura counties that make up Metropolitan's service area.  Most of the Santa Margarita River System watershed lies within Metropolitan's service area.

- 1 -

1     3. Metropolitan imports water through its Colorado

2 River Aqueduct which diverts water from the Colorado River at Lake

3 Havasu and conveys it over 200 miles to Metropolitan's service

4 area. Metropolitan also imports water from northern California

5 through the California Aqueduct of the State Water Project.

6 Metropolitan serves that imported water to its 27 member public

7 agencies which in turn serve it to their respective institutional

8 members and consumers.

9     4. The San Diego County Water Authority, Eastern

10 Municipal Water District of Riverside County and Western Municipal

11 Water District of Riverside County are Metropolitan member public

12 agencies that serve portions of the Santa Margarita River System

13 watershed.

14     5. Metropolitan approved the Domenigoni Valley

15 Reservoir Project on October 8, 1991 as the Eastside Reservoir

16 Project needed to meet minimum imported water storage needs for

17 Metropolitan's service area. That approval was based on several

18 years of studies and investigations which examined various other

19 alternative reservoir sites and included a comprehensive final

20 environmental impact report filed under State Clearinghouse

21 #89081422.

22     6. The Domenigoni Reservoir will double Southern

23 California's surface storage capacity. That in turn will secure

24 six months of emergency storage of imported water for

25 Metropolitan's service area in the event of a major earthquake. It

26 will also provide additional water supplies for drought protection

27 and peak summer needs.

1    7.    Colorado River water will be delivered to the

2  Reservoir through Metropolitan's San Diego Canal by way of the

3  Reservoir forebay, from which it will be pumped into the Reservoir.

4  California State Water Project water will be delivered from Lake

5  Silverwood into the Reservoir by gravity, through a new 12-foot

6  diameter, 45-mile Inland Feeder, connecting with the new 9-mile

7  Eastside Pipeline.

8    8.    The Domenigoni Valley Reservoir Project incorporates

9  extensive environmental mitigation including the Santa Rosa Plateau

10  Ecological Reserve which adds 3,700 acres to existing holdings of

11  the Nature Conservancy.  It also includes the 9,000-acre

12  Southwestern Riverside County Multi-Species Reserve, including

13  lands around the Reservoir, Lake Skinner and the 2,500-acre Dr. Roy

14  E. Shipley Reserve, as well as extensive recreational facilities.

15    9.    I have personal knowledge of the matters set forth

16  above and, if called to testify, could and would competently

17  testify to them.

18    I declare (or certify, verify or state) under penalty of

19  perjury that the foregoing is true and correct.

20  Executed on September 13 , 1994 at Los Angeles, California

21

22  _____

23  Dennis G. Majors

24  VEG:DGM:ljo
     vicgle\majors.smr

25

26

27

- 3 -



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,           )   CIV. NO. 1247-SD-T
                                    )
                Plaintiff,          )   **DECLARATION OF RANDY L. CASE**
                                    )   **IN SUPPORT OF MOTION TO**
        v.                          )   **APPROVE MEMORANDUM OF**
                                    )   **UNDERSTANDING ON OPERATION OF**
.FALLBROOK PUBLIC UTILITY           )   **DOMENIGONI VALLEY RESERVOIR**
DISTRICT, et al.,                   )
                                    )
                Defendants.         )
                                    )
                                    )
_____)

        1.   I, Randy L. Case, am employed by The Metropolitan
Water District of Southern California (Metropolitan) as Manager of
the Right of Way and Land Program.  In that position I am
responsible for acquisition, appraisal, relocation and property
management for the Domenigoni Valley Reservoir Project.  I am a
registered professional engineer in the State of California, and
hold a masters degree in Business Administration from Pepperdine
University and a Bachelor of Science degree in civil engineering
from the University of Colorado.

        2.   Metropolitan has been acquiring land for its
Domenigoni Valley Reservoir Project pursuant to the 1991
certification of its Eastside Reservoir Project Environmental
Impact Report, and is currently in the process of acquiring

- 1 -

1  essentially all of the land within the Domenigoni and Diamond

2  valleys as well as adjoining lands, totaling over 13,000 acres.

3       3.   The land which Metropolitan has or is acquiring in

4  the Domenigoni Valley include the parcels listed in Exhibits A and

5  B of Interlocutory Judgment 36 and Exhibit B of Interlocutory

6  Judgment 36A identified in table attached to this Declaration.

7  While most of those parcels are being acquired in their entirety, a

8  few of the parcels are only being partially acquired.

9       4.   If called as a witness, I could and would competently

10  testify to the above matters.

11       I declare (or certify, verify or state) under penalty of

12  perjury that the foregoing is true and correct.

13  Executed on September 14, 1994 at Los Angeles, California

14

15  _____

16                Randy L. Case

17

18

19

20

21

22

23

24

25

26

27

## Domenigoni Valley Area Parcels
## Which Metropolitan Is Acquiring

The Metropolitan Water District of Southern California (Metropolitan) is in the process of acquiring over 13,000 acres of land in Warms Springs Creek Sub-Watershed area of the Santa Margarita River Watershed, in connection with its Domenigoni Valley Reservoir Project and related imported water facilities.  The 1966 Modified Final Judgment and Decree in <u>United States v. Fallbrook PUD, et al</u> (USDC No. 1247-SD-T), through Interlocutory Judgments 36 (IJ 36) and 36A (IJ 36A) associates appurtenant water rights with ownership of land in that area as:

- Correlative Overlying Rights re Domenigoni Valley alluvium
        (IJ 36 page 10)

- Riparian Rights to Warm Springs Creek
        (IJ 36 pages 10 & 11)

- Non-Correlative Overlying Groundwater Rights
        (IJ 36A Orders III & IV)

The parcels listed in IJ 36 and IJ 36A which Metropolitan is acquiring in whole or in part, that are covered by those water rights are:

## Appurtenant Correlative Overlying and Riparian Rights
(Per Exhibits A & B of IJ 36)

| | | |
|---|---|---|
| 51W-29-2 | 61W-4-23 | 62W-1-59 |
| 51W-31-4 | 61W-4-24 | 62W-2-60 |
| 51W-31-5 | 61W-4-25 | 62W-2-61 |
| 51W-32-7 | 61W-4-28 | 62W-2-62 |
| 51W-32-8 | 61W-5-28A | 62W-3-63 |
| 51W-33-9 | 61W-5-29 | 62W-10-76 |
| 52W-34-13 | 61W-6-30 | 62W-10-77 |
| 52W-35-15 | 61W-6-31 | 62W-10-78 |
| 52W-36-18 | 61W-6-32 | 62W-10-79 |
| | 61W-6-33 | 62W-10-80 |
| | | 62W-11-81 |
| | | 62W-12-82 |

## Appurtenant Non-Correlative Overlying Rights
(Per Exhibit B of IJ 36A)

| | |
|---|---|
| 51W--29-1 | 62W-12-83 |
| 51W-30-3 | 62W-13-84 |
| 51W-31-6 | 62W-13-85 |
| 52W-34-14 | 62W-13-86 |
| 52W-36-16 | 62W-13-90 |
| 52W-36-17 | 62W-13-92 |
| 61W-3-19 | 62W-13-93 |
| 61W-7-35 | 62W-13-94 |
| 61W-8-36 | 62W-13-95 |
| 61W-8-37 | 62W-13-96 |
| 61W-9-38 | 62W-13-97 |
| 61W-16-47 | 62W-15-99 |
| 61W-17&18-50 | |

*   *   *   *



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CIV. NO. 1247-SD-T

**DECLARATION OF JOHN F. MANN JR. IN SUPPORT OF MOTION TO APPROVE MEMORANDUM OF UNDERSTANDING ON OPERATION OF DOMENIGONI VALLEY RESERVOIR**

    I, John F. Mann, Jr., declare as follows:

    1.   I have personal knowledge of the matters set forth in this declaration and, if called to testify, would competently testify to the matters stated therein.

    2.   I have been a Consulting Geologist and Hydrologist for over 43 years.  I am a Registered Geologist (No. 679) and a Certified Engineering Geologist (No. 304) in the State of California.

    3.   I hold degrees as a Geological Engineer from the Colorado School of Mines (1943) and an M.S. (1947) and Ph.D (1951) from the University of Southern California.

    4.   From 1951 through 1958 I was an Assistant and Associate Professor of Geology, and from 1958 through 1977 an Adjunct Professor of Geology at the University of Southern California.  For

- 1 -

1    that entire 26-year period I taught graduate courses in the

2    principles of Ground Water and Ground Water Management.

3        5.   In the case of <u>United States vs. Fallbrook PUD, et al.</u>

4    (No. 1247-SD-C), I testified on March 31, 1960 regarding

5    hydrogeologic conditions in Domenigoni Valley, explaining that the

6    ground water in the main alluvial aquifer beneath Domenigoni Valley

7    flows to the west, underneath the watershed divide and into Menifee

8    Valley, which is within the San Jacinto River drainage.  There

9    exists a shallow bedrock lip approximately under the south line of

10   Section 9, T6S, R2W, S.B.M. and it was pointed out that the main

11   alluvial ground waters beneath Domenigoni Valley can not flow to

12   the south into the Santa Margarita river drainage unless they rise

13   above this bedrock lip (which was estimated to be at Elevation

14   1400).

15       6.   I further testified that there are shallow ground waters

16   in the low permeability deposits overlying this bedrock lip, but

17   that these are "perched" waters derived from irrigation return, and

18   are of very poor quality.  I estimated the amount of ground water

19   flow over the bedrock lip as 2 acre-feet per year.  Interlocutory

20   Judgment No. 36 notes (in paragraph V):

21       "The ground waters which do move down Warm Springs Creek
         downstream from the south line of Section 9, T6S, R2W, S.B.M.
22       are consumed almost in their entirety by evaporation and
         transpiration losses within a relatively short distance
23       downstream."

24   ///

25   ///

26   ///

27   ///

7.   On June 15 and 16, 1994, test holes were drilled along the line of the bedrock lip, with the following results:

| Hole No. | Ground Elev. | Depth to Bedrock | Elev. Bedrock | Depth to Water 6/17/94 | Elev. of Water Table |
|----------|--------------|------------------|---------------|------------------------|----------------------|
| MO-7 | 1434.0 | 18 | 1416 | 8.6 | 1425.5 |
| MO-8 | 1434.8 | 20 | 1415 | 9.9 | 1424.9 |
| MO-9 | 1435.4 | 26 | 1409 | 10.8 | 1424.6 |

Cores were taken of the bedrock in each of these holes.   In all of the holes the rock type is tonalite (a type of granite).   Samples were taken of the shallow materials in MO-8 (the middle hole) at 5, 10, 15, and 20 feet, and grain-size distributions were determined from sieve analyses.   The materials above the bedrock lip can be described generally as silty sands.   The underground spill point is beneath Hole MO-9 (the easterly hole) at Elevation 1409.

8.   Using the information from the June 1994 test holes, I have recalculated the amount of underflow of perched ground water over the bedrock lip.   In my opinion, the recent data support a conclusion that the current amount of underflow over the bedrock lip is close to 1 acre-foot per year.   Even if the water table were to rise to the ground surface, the total amount of underflow that could be transmitted over the bedrock lip would be no more than about 2 acre-feet per year.

9.   Monitoring Well MO-6 was drilled on June 15, 1994 about 2000 feet northeast of the bedrock lip.   On June 27, the water level was measured at a depth of 87.45 feet, close to Elevation 1358.   As the spill point at the bedrock lip is Elevation 1409, the water table in the main aquifer north of the bedrock lip is about

- 3 -

1   51 feet below the level of the spill point.  In my opinion, the

2   possibility of the main water table rising and spilling over the

3   bedrock lip into the Santa Margarita River drainage is very low,

4   and even in that event, the total amount of underflow over the

5   bedrock lip would be no more than 2 acre-feet per year.

6

7           I declare (certify, verify or state) under penalty of

8   perjury that the foregoing is true and correct.

9   Executed on August 30, 1994 at Los Angeles, California.

10

11                              John F. Mann Jr.

12                              John F. Mann Jr., Ph.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27



1   N. GREGORY TAYLOR, General Counsel
    KAREN L. TACHIKI, Assistant General Counsel
2   VICTOR E. GLEASON, Sr. Dep. General Counsel, SBN 31698
    The Metropolitan Water District of
3     Southern California
    350 S. Grand Avenue
4   P.O. Box 54153
    Los Angeles, CA 90054-0153
5
    (213) 217-6318
6
    Attorneys for Defendants The Metropolitan Water
7     District of Southern California

8

9               IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12   UNITED STATES OF AMERICA,        )   CIV. NO. 1247-SD-T
                                       )
13                     Plaintiff,      )   ORDER APPROVING AND
                                       )   INCORPORATING MEMORANDUM OF
14        v.                           )   AGREEMENT AND UNDERSTANDING ON
                                       )   OPERATION OF DOMENIGONI
15   FALLBROOK PUBLIC UTILITY          )   RESERVOIR
     DISTRICT, et al.,                 )
16                                     )
                                       )
17                     Defendants.     )
     _____)

18

19        The Motion of The Metropolitan Water District of Southern

20   California (Metropolitan) for approval of the Memorandum of

21   Understanding and Agreement on Operation of Domenigoni Reservoir

22   came on regularllly for hearing on _____, 1994 at __.m.

23   in the Courtroom of the Honorable Gordon Thompson, Jr., located at

24   the United States Courthouse, 940 Front Street, San Diego,

25   California.  The United States appeared through _____

26   _____, Metropolitan appeared through _____;

27   Fallbrook Public Utility District appeared through _____

                              - 1 -

1    _____; Rancho California Water District appeared through _____

2    _____, and _____, appeared through _____

3    _____.  The matter having been submitted to the Court

4    for decision and after consideration of the briefs and arguments of

5    counsel, and all other matters presented to the Court,

6         IT IS HEREBY ORDERED,

7         1.  The Memorandum of Understanding and Agreement on Operation

8    of Domenigoni Reservoir, dated _____, 1994 is

9    hereby approved;

10        2.  The Modified Final Judgement and Decree in this cause is

11   amended by incorporation of said Memorandum into same; and

12        3.  The procedures set forth in said Memorandum are binding

13   on all parties to this cause.

14

15   DATED: _____, 1994

16                            _____

17                                 United States District Judge

18

19

20

21

22

23

24

25

26

27