

ORIGINAL

1  N. GREGORY TAYLOR, General Counsel
   KAREN L. TACHIKI, Assistant General Counsel
2  VICTOR E. GLEASON, Senior Deputy General Counsel
   The Metropolitan Water District of
3     Southern California
   350 S. Grand Avenue
4  P.O. Box 54153
   Los Angeles, CA 90054-0153
5
   (213) 217-6318
6
   Attorneys for The Metropolitan Water
7     District of Southern California

8

9               UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

12

13  UNITED STATES OF AMERICA,        )  Civ. No. 1247-SD-T
                                      )
14                                    )  **REPORT ON NOVEMBER 17, 1994**
                    Plaintiff,        )  **STEERING COMMITTEE HEARING ON**
15                                    )  **THE MEMORANDUM OF**
                                      )  **UNDERSTANDING AND AGREEMENT**
16      v.                            )  **FOR OPERATION OF DOMENIGONI**
                                      )  **VALLEY RESERVOIR**
17                                    )
    FALLBROOK PUBLIC UTILITY          )  Date:      January 9, 1995
18  DISTRICT, et al.,                 )  Time:      9:30 a.m.
                                      )  Courtroom:    1
19                                    )
                    Defendants.       )
20  _____ )

21          The attached material reports on the November 17, 1994,

22  public hearing of the Santa Margarita River Watershed Steering

23  Committee as directed by the court's October 21, 1994 Order Setting

24  Hearing and Notice Requirements for Public Comments on the

25  Memorandum of Understanding and Agreement for Operation of

26  Domenigoni Valley Reservoir (MOU).  That material consists of the

27  Declaration of Victor Gleason and Exhibits A through H.

                            -1-

FILED

DEC - 7 1994

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                       DEPUTY

1    The October 21 Order is attached as Exhibit A.  The last

2  sentence of section 1 of the Order provides that The Metropolitan

3  Water District of Southern California, as the movant for approval

4  of the MOU,

5           "shall cause the hearing to be transcribed,
             assist the Steering Committee in responding to
6           the comments received, and shall report such
             responses to this court within 20 days after
7           the hearing."

8

9    DATED: _Dec 6, 1994_____.

10

11           N. GREGORY TAYLOR, General Counsel
             KAREN L. TACHIKI, Assistant General
12               Counsel
             VICTOR E. GLEASON, Senior Deputy
13               General Counsel

14

15           _____

16           Victor E. Gleason
             Attorneys for The Metropolitan Water
17               District of Southern California

18

19

20

21

22

23

24

25  VEG:gld
    smr/hrgrpt3

26

27


                            -2-

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. NO. 1247-SD-T |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF VICTOR GLEASON** |
| v. | ) | |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT et al., | ) | |
| | ) | |
| Defendants. | ) | |

I, Victor Gleason, declare as follows:

1.  I am employed by The Metropolitan Water District of Southern California (Metropolitan) as a Senior Deputy General Counsel.  In that position, I have participated in the present proceedings in this case and attended the Santa Margarita River Watershed Steering Committee's November 17 public hearing on the Memorandum of Understanding and Agreement for Operation of Domenigoni Valley Reservoir (MOU) and subsequent related discussions.

2.  The November 17 hearing lasted approximately one hour[1].  A corrected certified copy of the transcript of the

---

1.  The hearing commenced at 10:10 a.m. and concluded at 11:05 a.m. (Exh. A, pp. 1 and 45).  Public notice of the hearing had been published concurrently on October 27, November 3 and November 10 in the Fallbrook Enterprise, the Riverside Press-Enterprise, the Temecula California and the Hemet News (Exh. D).

Steering Committee's November 17, 1994 hearing is attached to this report as Exhibit B.  The hearing included introductory remarks by the Steering Committee Chair and the Watermaster (Exh. B, pp. 3 to 7); a description of the Domenigoni Valley Reservoir Project and the MOU by Metropolitan[2/] (Exh. B, pp. 7-25); comments on the MOU by counsel for the Domenigoni family (Exh. B, pp. 26-38, 43 to 45); and Metropolitan's response to those comments (Exh. B, pp. 39-44). No other persons voiced objections to the MOU at the hearing.

3.   Exhibit D to this report consists of four proofs of publication of the notice of the hearing, on October 27, November 3, and November 10, 1994, by four newspapers in the area as required by section 3 of the October 21 Order.  Exhibit E is a copy of the Steering Committee's Notice of, and Agenda for, the hearing.  Metropolitan also caused posting of Public Notice at the locations specified by section 2 of the October 21 Order.

4.   Pursuant to comments made during the hearing[3/], counsel for Metropolitan met with counsel for the Domenigoni family shortly after adjournment of the hearing for approximately two hours to resolve the concerns raised at the hearing.  The Santa Margarita River Watershed Watermaster, along with members of the Domenigoni family and staff and consultants for Metropolitan, also participated in that meeting.

---

2.   Mr. Majors described the Domenigoni Valley Project (Exh. B, pp. 11 to 16), and Dr. Maurath described the operating criteria contained in the MOU (Exh. B, pp. 16 to 25).  Copies of the 12 slides used by Dr. Maurath in his description of the MOU are attached to this report as Exhibit C and are referenced in the transcript by letters A through L.

3.   Exhibit B, pp 34 to 44.

1         5.   The meeting resulted in an agreement to amend the MOU
2    to resolve the concerns raised by the Domenigoni family.  That
3    agreement was documented the next day, after coordination with the
4    Steering Committee, by a stipulation, attached to this report as
5    Exhibit F.

6         6.   The court approved the stipulation on November 21 and
7    reset its hearing on Metropolitan's motion for approval of the MOU
8    for 9:30 a.m., January 9, 1995.  Metropolitan filed the Amended MOU
9    with the court on November 23, 1994, and served it on the other
10   parties pursuant to the October 21 Order Setting Hearing and
11   Service Requirements.

12        7.   A marked-up copy of the MOU originally filed with the
13   court is attached to this report as Exhibit G to indicate the
14   provisions of the originally filed MOU that have accordingly been
15   amended or deleted.

16        8.   Exhibit H is a copy of a December 2, 1994 letter from
17   counsel for the Domenigoni Family commenting on the draft of this
18   report and requesting certain changes.  Those changes have been
19   incorporated in this report.  Pursuant to the last comment on the
20   first page of Exhibit H, Figure C-1, a colored map showing the
21   location of monitoring wells and surface water sampling points for
22   the Domenigoni Valley Reservoir Project ground water monitoring and
23   mitigation, will also be deleted from the Amended MOU which
24   Metropolitan filed on November 23.[4]

25

26

_____

27       4.  Figure C-1 was included in the stipulated MOU amendment
(p. C-3 of Exh. A to Exh. F).

1       9.   The attached report and this declaration were

2  prepared in coordination with the Santa Margarita River Watershed

3  Steering Committee and Watermaster.

4       I declare under penalty of perjury that the foregoing is

5  true and correct.   Executed on December 6, 1994, at Los Angeles,

6  California.

Victor E. Gleason

VEG:gld
smr\vgdecl1

- 4 -

# EXHIBIT  A

## Order Setting Hearing and Notice Requirements for Public Comments on the MOU & Agreement for Operation of Domenigoni Valley Reservoir

```
                                        ┌─────────────────────────────┐
                                        │         FILED  ORIGINAL     │
                                        │   ┌───────────────────┐     │
                                        │   │   NOV  3 1994      │     │
                                        │   └───────────────────┘     │
                                        │   CLERK, U.S. DISTRICT COURT │
                                        │ SOUTHERN DISTRICT OF CALIFORNIA│
                                        │ BY                    DEPUTY  │
                                        └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civ. No. 1247-SD-C |
| Plaintiff, | ORDER SETTING HEARING AND NOTICE REQUIREMENTS FOR PUBLIC COMMENT ON THE MEMORANDUM OF UNDERSTANDING AND AGREEMENT FOR OPERATION OF DOMENIGONI VALLEY RESERVOIR |
| v. | |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | |
| Defendants. | |

After consideration of the proposed "Motion to Approve Memorandum of Understanding and Agreement on Operation of Domenigoni Valley Reservoir and to Amend Modified Final Judgment Accordingly" (Motion) and its supporting documents, lodged by The Metropolitan Water District of Southern California,

///

///

1   IT IS HEREBY ORDERED AND DIRECTED THAT:

2           1.   The Steering Committee established by this
3   court's March 13, 1989 Order shall hold a public hearing beginning
4   at 10:00 a.m., November 17, 1994, at the offices of Rancho
5   California, 42135 Winchester Road, Temecula, to receive comments on
6   the Memorandum of Understanding and Agreement on Operation of
7   Domenigoni Reservoir (MOU) which is incorporated as Exhibit A to
8   the Memorandum of Points and Authorities in support of the Motion.
9   Movant shall cause the hearing to be transcribed, assist Steering
10  Committee in responding to the comments received, and shall report
11  such responses to this court within 20 days after the hearing.

12          2.   Movant shall promptly (a) post the Public Notice
13  attached to this Order as Exhibit 1 in a public area, and (b) make
14  copies of the MOU available to the public for examination during
15  normal working hours at the offices of:

16                      The Clerk of this Court
                        940 Front Street, San Diego
17
                        Fallbrook Public Utility District
18                      990 E. Mission Road, Fallbrook

19                      Rancho California Water District
                        42135 Winchester Road, Temecula
20
                        Lake Skinner Reservoir
21                      33740 Borel Road, Winchester

22                      Domenigoni Valley Reservoir Field Office
                        30015 Rawson Road, Hemet
23

24  ///

25  ///

26  ///

27  ///

- 2 -

3.   Movant shall also cause publication of the Public Notice attached to this Order as Exhibit 1, once a week, for at least three consecutive weeks prior to November 17, 1994, in the Riverside Press Enterprise, the Fallbrook Enterprise, the Temecula Californian, and the Hemet News.

DATED:   October _21_, 1994

_____
Judge, United States District Court

VEG:gld
sc-order

- 3 -

## EXHIBIT 1

### PUBLIC NOTICE

Pursuant to jurisdiction retained by the Final Judgment and Decree in <u>United States of America v. Fallbrook Public Utility District et al.</u>, No. 1247-C, the Federal District Court for the Southern District of California, the court-appointed Steering Committee will hold a hearing on November 17, 1994, starting at 10:00 a.m., or as soon thereafter as possible, at the offices of Rancho California Water District, 28061 Diaz Road, Temecula, to receive comments from the public on a Memorandum of Understanding and Agreement for Operation of Domenigoni Valley Reservoir (MOU) on Warm Springs Creek, a tributary of the Santa Margarita River by way of Murrieta Creek.

The Metropolitan Water District of Southern California (Metropolitan) has developed the MOU in consultation with the principal parties in the case (the United States, Fallbrook public Utility District, and Rancho California Water District), as well as the Watermaster, to assure that the operation of Domenigoni Valley Reservoir will not impair any of the rights adjudicated by the Judgment in this case.   The principal parties have indicated their approval of the MOU.

Metropolitan is in the process of constructing Domenigoni Valley Reservoir to provide regulatory storage capacity for water which Metropolitan imports to its six-county service area, including significant areas of the Santa Margarita River System Watershed, and other areas in Riverside and San Diego counties.   The MOU provides that Metropolitan will not appropriate Warm Springs Creek flows and will ensure that the Reservoir will release to Warm Springs Creek, the same quantity of water that would have naturally flowed in that Creek in the absence of the Reservoir.   The portion of the Watershed draining into the Reservoir represents only 2.3 percent of the drainage area of the Santa Margarita River Watershed.

Copies of the Memorandum of Understanding and Agreement and supporting documents filed with the court may be examined during normal working hours at the offices of:

a.   The Offices of the Clerk of the Federal District Court, 940 Front Street, San Diego

b.   Fallbrook Public Utility District, 990 E. Mission Road, Fallbrook

c.   Rancho California Water District, 42135 Winchester Road, Temecula

d.    Skinner Reservoir, 33740 Borel Road Winchester, and

e.    Domenigoni Valley Reservoir Field Office, 30015
      Rawson Road, Hemet.

* * * * * * * *

VEG:gld
notice1

-2-

# EXHIBIT 1

## PUBLIC NOTICE

Pursuant to jurisdiction retained by the Final Judgment and Decree in <u>United States of America v. Fallbrook Public Utility District et al.</u>, No. 1247-C, the Federal District Court for the Southern District of California, the court-appointed Steering Committee will hold a hearing on November 17, 1994, starting at 10:00 a.m., or as soon thereafter as possible, at the offices of Rancho California Water District, 42135 Winchester Road, Temecula, to receive comments from the public on a Memorandum of Understanding and Agreement for Operation of Domenigoni Valley Reservoir (MOU) on Warm Springs Creek, a tributary of the Santa Margarita River by way of Murrieta Creek.

The Metropolitan Water District of Southern California (Metropolitan) has developed the MOU in consultation with the principal parties in the case (the United States, Fallbrook public Utility District, and Rancho California Water District), as well as the Watermaster, to assure that the operation of Domenigoni Valley Reservoir will not impair any of the rights adjudicated by the Judgment in this case.  The principal parties have indicated their approval of the MOU.

Metropolitan is in the process of constructing Domenigoni Valley Reservoir to provide regulatory storage capacity for water which Metropolitan imports to its six-county service area, including significant areas of the Santa Margarita River System Watershed, and other areas in Riverside and San Diego counties.  The MOU provides that Metropolitan will not appropriate Warm Springs Creek flows and will ensure that the Reservoir will release to Warm Springs Creek, the same quantity of water that would have naturally flowed in that Creek in the absence of the Reservoir.  The portion of the Watershed draining into the Reservoir represents only 2.3 percent of the drainage area of the Santa Margarita River Watershed.

Copies of the Memorandum of Understanding and Agreement and supporting documents filed with the court may be examined during normal working hours at the offices of:

a.   The Offices of the Clerk of the Federal District Court, 940 Front Street, San Diego

b.   Fallbrook Public Utility District, 990 E. Mission Road, Fallbrook

c.   Rancho California Water District, 42135 Winchester Road, Temecula

d.   Skinner Reservoir, 33740 Borel Road Winchester, and

e.   Domenigoni Valley Reservoir Field Office, 30015 Rawson Road, Hemet.

* * * * * * *

VEG
notice2

# EXHIBIT  B


# Transcript of November 17, 1994 Hearing

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    UNITED STATES OF AMERICA,        )

5                      Plaintiff,     )

6            vs.                      )  No. 1247 SD

7    FALLBROOK PUBLIC UTILITY         )

8    DISTRICT, et al.,                )

9                      Defendants.    )

10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12        REPORTER'S TRANSCRIPT OF PROCEEDINGS

13     IN RE:  DOMENIGONI VALLEY RESERVOIR PROJECT

14

15            SANTA MARGARITA RIVER WATERSHED

16             STEERING COMMITTEE MEETING

17                42135 Winchester Road

18             Temecula, California  92590

19

20            Thursday, November 17, 1994

21                   10:10 A.M.

22   REPORTED BY:

23   JOAN E. WHIPPLE, CSR NO. 5336

24

     PAGES 1 - 46

Case
SHORTHAND
REPORTING

An Affiliate of

NOON&PRATT
AN Isot river LEGAL SERVICES COMPANY

3530 WILSHIRE BOULEVARD
SUITE 1700
LOS ANGELES, CA 90010
(818) 348-4531
(800) 300-3171

2

```
 1    APPEARANCES:

 2          STEERING COMMITTEE MEMBERS:

 3              JOHN F. HENNIGAR

 4              C. MICHAEL COWETT

 5              GORDON W. TINKER

 6              JOHN H. ROBERTUS

 7              KEVIN L. WATTIER

 8              JAMES S. JENKS (WATER WASTER)

 9

10          FOR THE METROPOLITAN WATER DISTRICT OF

11          SOUTHERN CALIFORNIA:

12              VICTOR E. GLEASON, ESQ.

13              SENIOR DEPUTY GENERAL COUNSEL

14              350 South Grand Avenue

15              Los Angeles, California  90071

16              (213) 217-6318

17

18          FOR THE DOMENIGONI FAMILY LANDOWNERS:

19              LAW OFFICES OF SUSAN M. TRAGER

20              BY:  SUSAN M. TRAGER, ESQ.

21                   LARRY B. MC KENNEY, ESQ.

22              2100 S.E. Main Street

23              Suite 104

24              Irvine, California  92714

25              (714) 752-8971
```

1            TEMECULA, CALIFORNIA

2         Thursday, November 17, 1994

3              * * * * *

4         MR. HENNIGAR:  I believe we have all the

5    players here.  I would like to call the meeting to

6    order at this time.

7              I am John Hennigar, general manager

8    here of Rancho California Water District and also

9    chairman of the Steering Committee, and I would

10   just like to announce for the record that this is

11   a special meeting of the Steering Committee

12   established by the court in the case of

13   United States of America versus Fallbrook Public

14   Utility District.  This meeting is being held

15   pursuant to court order issued by the Honorable

16   Gordon Thompson, Jr., dated October 21, 1994.  A

17   transcript of these proceedings will be prepared

18   by the court reporter who is present and will be

19   submitted to the court.

20             I will mention this again later on,

21   but I would ask that anyone speaking, any comments

22   from the public, if you would be kind enough to

23   come to the podium, use the microphone and please

24   identify yourself, your full name for the benefit

25   of the court reporter.

1                    At this time I would like to

2      introduce the members of the Steering Committee

3      present.

4                    We have, on the far end, the

5      watermaster, court appointed, for the Santa

6      Margarita Watershed, Mr. Jim Jenks, on the end.

7                    Seated next to him, representing the

8      Metropolitan Water District for Southern

9      California, is Kevin Wattier.

10                   Next to him, representing the Marine

11     Corps Base, Camp Pendleton, is Colonel John H.

12     Robertus.

13                   On my immediate left is our legal

14     counsel, C. Michael Cowett.

15                   I have already introduced myself.

16     And on my right is Gordon Tinker, the general

17     manager of Fallbrook Public Utility District, also

18     on the Steering Committee.

19                   At this time I would like to turn to

20     Mr. Jenks the watermaster for his opening

21     comments.

22        MR. JENKS:  Thank you, John.  I just would

23     like to briefly outline the purpose of the hearing

24     here today.  I guess everybody is aware that

25     Metropolitan Water District is in the process of

1    constructing a dam in Domenigoni Valley, within

2    the Santa Margarita Watershed.  Although the

3    primary purpose of the dam is to regulate and

4    store imported water supplies, it will

5    nevertheless impound small quantities of local

6    water which would otherwise flow into the Santa

7    Margarita stream system.

8            The surface water of the Santa

9    Margarita stream system has been under the

10   continuing jurisdiction of the U.S. District Court

11   since May 8, 1966, when the court entered its

12   final judgement and degree.

13           In addition to maintaining

14   jurisdiction over surface waters, the court also

15   has jurisdiction over impoundments that are

16   constructed within the watershed.  The court has

17   previously exercised this jurisdiction over

18   impoundments when an MOU was approved for the Lake

19   Skinner operations back in 1975.

20           So with the coming of the Domenigoni

21   Reservoir, it has been necessary to develop a new

22   MOU which would govern how local waters are

23   regulated in Domenigoni Reservoir.

24           An agreement along those lines has

25   been developed.  There are copies of it on the

6

1   back table, and it has been signed by the

2   principal water users in the watershed.

3              As John mentioned, on October 21st

4   the court directed the Steering Committee to hold

5   a public hearing for the purpose of soliciting

6   comments from the public with respect to this

7   MOU.

8              Following this hearing, the Steering

9   Committee is to report to the court the results of

10  the hearing and any responses that the Steering

11  Committee may care to make within 20 days.

12             So information received at this

13  public hearing will assist the court as it

14  prepares to adopt the MOU for future use within

15  the watershed.

16             The agenda today, following my

17  remarks, we will expect to hear a brief

18  description of the project from Dennis Majors with

19  Metropolitan, that will be followed by a brief

20  description of the MOU, and then I believe John

21  will open the hearing to public comments, although

22  I guess we can open the hearing right now.

23  MR. HENNIGAR:   Yes, if that's the end of

24  your opening comments, I will open the public

25  hearing at this particular time.   And following

that, I would invite either Mr. Gleason or Mr. Majors to introduce the spokespeople, if there are others, from Metropolitan, and to make a presentation.

MR. JENKS: I might note, too, that Metropolitan has prepared a little card here in which people who may wish to speak can fill their name in and their address so we can follow up with you at the end of the hearing.

MR. HENNIGAR: Dennis or Vic, either one.

MR. MAJORS: I will just make some very brief remarks. Vic Gleason is our deputy general counsel on the project and he is going to make some opening remarks and put it into legal perspective as to what this MOU does for Metropolitan. And then I will do kind of an overview description of the project. Following that we will turn it over to Garry Maurath, one of our technical people, who will discuss the technical aspect of the MOU.

With that I am going to let Vic make some opening remarks.

MR. GLEASON: Thank you, Dennis.

The process that we are following parallels pretty closely the process that we used

1    when we constructed Lake Skinner 20 years ago, on

2    the Tucalota branch of the system.  That was a

3    branch on a different sub-system but somewhat in

4    the same proximity as the new Domenigoni Reservoir

5    that's under construction -- or under design for

6    construction currently.

7              The process that we used was a

8    memorandum of understanding and agreement

9    process.  That was developed shortly after the

10   judgement was issued in 1966 to resolve some of

11   the underlying water rights issues at that time.

12   A memorandum of understand between Fallbrook and

13   the United States was approved and we took that as

14   a mechanism for Lake Skinner.

15             We made some changes, but it was

16   presented to the court, Judge Carter, who was the

17   original trial judge, and had come down from the

18   Ninth Circuit to hear that proceeding.  It worked

19   its way through the process fairly well, we had a

20   hearing before the judge, and exhaustive, at least

21   an extensive, debate, and hearing of the views,

22   and, finally, a resolution.  That was 1975.

23             In the past 20 years the MOU for

24   Skinner has worked well.  These technical matters

25   require some sort of criteria rather than overly

1   extensive precision, and the MOU criteria do

2   that.  Over the 20 years there have been three

3   modifications of the Skinner Reservoir MOU that

4   resolved the detailed issues that experience

5   showed needed to be modified.

6          We have built that same process into

7   the MOU for Domenigoni Reservoir.  That will allow

8   the parties and the court to adjust it if things

9   aren't working correctly.

10         I want to emphasize that the purpose

11  of this MOU is merely to provide the court

12  documentation and the assurances, the undertaking

13  if you will, that Metropolitan, when it operates

14  that reservoir, will operate it in such a way that

15  it will operate consistently without impairing any

16  of the rights established by the judgement in this

17  case.

18         We have done that with Lake Skinner

19  and now we are doing it with Domenigoni.

20         The following speakers will indicate

21  that there were some modifications because of the

22  difference in physical dimensions and locations of

23  the two reservoirs.  They will indicate that the

24  process that we have gone through, (and the

25  process has been under way for over a year and a

1   half,) was to put the criteria together and then

2   put it together in a memorandum of understanding

3   and agreement.

4        We presented it to the Steering

5   Committee at its last two quarterly meetings.  We

6   received extensive comments from the Steering

7   Committee and from others, and have incorporated

8   those into the earlier drafts, and the signed and

9   executed provision, which is dated September 28th,

10  has been served on some 100 or so parties that

11  would be impacted or potentially impacted, in

12  addition to the people who have signed the

13  memorandum of understanding.

14       We have also filed a motion with the

15  court in San Diego asking for its approval and

16  incorporation of this memorandum of understanding

17  into the judgement as it has done with the other

18  memorandums of understanding over the years.  The

19  court has set a hearing for December the 5th on

20  this matter, and that process will be moving

21  forward.  That will be about the time that we will

22  report to the court on the transcript and the

23  comments and developments in this hearing today.

24       With that I might mention there was

25  one additional witness or declarant that we have,

1    Dr. John Mann, who is here and may address some

2    subjects.

3              On the table in the back, in addition

4    to the cards that Mr. Jenks had mentioned, we also

5    have copies of the declarations that we have of

6    the experts that we have filed with the court, and

7    the memorandum of understanding, of course, and

8    some other material describing Metropolitan and

9    the project.

10   MR. MAJORS:  May I introduce one other

11   person that's here, Bill MacMillan in the rear is

12   assistant superintendent at Lake Skinner.

13             I am just going to take some time and

14   just orient you with the project a bit, a bit of

15   an overview.  For the members that are sitting

16   behind here, it might be difficult, but I will

17   make it as clear as possible.  I am giving you an

18   overview and essentially why Domenigoni is located

19   where it's at.

20             You see the Domenigoni Reservoir

21   project here in the green area that forms a

22   multispecies reserve and our operational areas of

23   our reservoir.  Why is Domenigoni located where

24   it's at?  Principally because of where the

25   Colorado River Aqueduct is coming in this

1    direction and state Water Project coming right at

2    the hub.  If we have a water storage reservoir

3    here at the proper elevation and we can actually

4    move water to about 90 percent of our service area

5    by gravity.

6               So in terms of the right place for

7    the reservoir, indeed service area wide, if we

8    were looking for broad reasonable storage, this is

9    clearly the place.  It does several things.  It

10   holds water for emergency purposes, which we find

11   as we go to the future we are short on, for

12   drought purposes and even for larger summertime

13   demands, but it also has the ability to store

14   water to be more or less on call and available to

15   deliver to groundwater basins, that is, imported

16   water delivered to groundwater basins as a local

17   purveyor may want to call upon that water.  He is

18   going to percolate local water when it's

19   available, but this gives the ability, kind of

20   synergistically, to operate the reservoir with

21   groundwater basins right here locally or

22   throughout our service area.  So the location to

23   do that is generally ideal.

24               The operations, to give you an idea

25   how water gets into and out of the reservoir, here

1    is the Colorado River Aqueduct coming into the

2    east down the existing San Diego Canal to the left

3    side here, to the forebay, and from there pumped

4    up into the reservoir.  We do mix a little bit of

5    state water in there as well.  But we also have

6    another pipeline that has been designed to deliver

7    water out of the reservoir, to the north, to the

8    Colorado River, back into Lake Mathews.  That's

9    called the Eastside Pipeline, a 12-foot

10   pressurized pipe, that virtually at any level

11   of Domenigoni we can put water into that

12   pipe, 12-foot diameter steel pipe, and deliver it

13   in all of the western part of our service area.

14             It also becomes an extension, you

15   might say, of the Inland Feeder project, which is

16   a new pipeline project to bring additional

17   capacity that we now have on the east branch of

18   the State Water Project right here.  We have more

19   capacity that we can actually bring into the

20   service area, and that pipeline actually is built

21   down to the Colorado River Aqueduct.  We pick it

22   up there and put water into the reservoir by

23   gravity from Lake Silverwood and Devil Canyon

24   Power Plant, delivering water to the reservoir,

25   and in the summertime we reverse flow into that

1    pipe and deliver water from the reservoir.  To the

2    west and south of Western Riverside County, and

3    San Diego County, we deliver water during need to

4    the forebay which then goes on into Lake Skinner

5    and into the San Diego area, as well as Western

6    Riverside County.

7              I want to say briefly that

8    permittingwise, the project was completed in the

9    EIR in 1991.  Our board certified an EIR for the

10   project and subsequent to that -- during that

11   period there were mitigation needs met over at the

12   Santa Rosa Plateau here, where all of our

13   biological needs were met.  Agreements have been

14   signed for those biological losses and are in

15   effect.  And set up all around the reservoir is a

16   multispecies reserve that in fact, allows us

17   premitigation for up to 16 plant and animal

18   species that are not yet listed.  We have also

19   mitigated in advance for any potential listing

20   that we could have.

21             Any other permits that are required,

22   the SWPPP is on file right now with an NOI with

23   the state.  And other construction permits are

24   being obtained prior to each construction

25   contract.

1          So as far as permits for

2     jurisdiction, the Corps has found that it's not

3     jurisdictional from a 404 standpoint.  So those

4     permits are all in place at this time.

5          Perhaps just going back here for a

6     moment, as to a couple of features of the project,

7     we do have an inlet tower right over in here that

8     brings water into the reservoir, and a multilevel

9     arrangement where we can take water out of the

10    reservoir at any level in 25-foot increments.  We

11    have butterfly valves that allow us to do that.

12    So it becomes very good from a water quality

13    perspective extracting at any particular layer of

14    the reservoir that we want.

15          We have a West Dam over here and an

16    East Dam, combined, that forms the reservoir

17    itself.

18          As far as what we are doing right

19    now, the project is in design and we have

20    completed some of the early relocation projects,

21    the San Diego Canal and the relocation of the

22    roadway, Newport Road, which travels through the

23    valley at this time is being moved to the north.

24    There is a delivery pipeline being built at this

25    time.

1          The main thing in 1995, we will dig

2    the foundations of the dam, have those dug out in

3    early '95, but not below groundwater.

4          And in 1996 we will go where

5    necessary, below groundwater, and then construct

6    the dams over the next 3-1/2 years.

7          Just on another note, there is a

8    pretty broad recreational plan with the project as

9    well.  It's one that produces about 1.8 million

10   visitors a year.  Very extensive plan that would

11   become the third largest visited reservoir in the

12   State of California, behind Shasta and Folsom, and

13   so a great benefit to the community, and, in

14   total, spinning off about 70 million in spending a

15   year from that recreational complex.

16          Just an overview of the project,

17   where it's going.  We are in a construction mode,

18   beginning on that right now.

19          We are going to have Garry Maurath,

20   with Ebasco Services, our senior principal

21   hydrogeologist, go over the technical aspects of

22   MOU and how it's implemented.

23      MR. MAURATH:  What I would like to talk

24   about now is essentially the guts of the MOU.

25          The MOU is designed similar to the

1    Lake Skinner MOU, in that we have a series of

2    operating principles that Metropolitan tends to

3    adhere to during construction and operation of the

4    reservoir.

5            There are seven basic principles.  I

6    would like to go through them one by one, talking

7    a little bit about the principles and then the

8    criteria that Metropolitan is going to apply to

9    ensure implemenation of those principles.

10           The first principle, and probably the

11    most basic principle, is that the facility is

12    designed to provide storage capacity for imported

13    water of the Metropolitan (Slide A) systems.  The

14    reservoir is not designed to have a flood control

15    feature The only water that is going to be stored

16    here is water that would not have occurred if the

17    reservoir had not been constructed.  So primarily

18    we are looking at a reservoir where there's no

19    storage space for flood control.  It is for

20    storage of imported water only.

21           The second principle (Slide B), and I

22    will talk about this one in a little greater

23    detail, is that the quality of surface runoff

24    flowing past the West Dam -- or the quantity, I

25    should say, the quantity of surface runoff flowing

1   past the West Dam will not change as a result of

2   this reservoir being built.

3                   To do that, I would like to talk a

4   little bit about how we are going to measure what

5   kind of flows would have flowed past the West

6   Dam.

7                   Here is a picture of the 742 square

8   mile Santa Margarita River Watershed (Slide C).

9   As you can see, the Domenigoni project sits along

10   the northern boundary of that watershed.  Actually

11   it occupies a very small percentage, only about

12   2.3 percent of the 742 square miles of the

13   watershed is drained by this project.

14                   Let's take a little closer look at

15   the Domenigoni/Lake Skinner area.  I think we can

16   see this a little clearer here (Slide D), why

17   there is a difference between this MOU and the

18   Lake Skinner MOU.  You take a look at Lake Skinner

19   down here, we see the dark green area is the

20   drainage basin behind Lake Skinner that's about 54

21   square miles.  The light green area here is the

22   drainage area behind the Domenigoni Valley

23   Reservoir, a mere 17.2 square miles.  So we have

24   quite a difference in the size of the drainage

25   areas between the two reservoirs.

1            Likewise, you can also see that the

2     size of Domenigoni Valley Reservoir, which has a

3     capacity of about 800,000 acre feet, is

4     significantly larger than Lake Skinner, which has

5     a capacity of about 44,000 acre-feet.

6            I guess to put a little better

7     perspective on this, if we were to compare the

8     size or the capacity of the reservoir to the size

9     of the drainage area, we see these are two very

10    different systems (Slide E).  The ratio of the

11    size of the Domenigoni Valley Reservoir to its

12    drainage area is on the order of about 70 -- a

13    little more than 70 acre-feet of storage per acre

14    of drainage area.  Whereas at Lake Skinner, the

15    ratio is closer to about 1.2, there's about 1.2

16    acre-feet of storage per acre of drainage area.

17            At Lake Skinner, the quantity of

18    runoff that is calculated flowing past Lake

19    Skinner is determined by what's called a

20    mass-balance technique.  Basically we measure the

21    amount of participation, water running in, water

22    running out.

23            On a drainage area of this size, and

24    of a relatively small reservoir of only 44,000

25    acre-feet, we can make fairly accurate

1    determinations.

2              However, for Domenigoni Valley

3    Reservoir, being 800,000 acre-feet, is very

4    difficult to measure accurately.  Changes in the

5    storage in that reservoir.  So that the method

6    used to measure runoff for Lake Skinner doesn't

7    work so well for Domenigoni.

8              What we have proposed in the

9    Domenigoni MOU is a slightly different method of

10   determining how much mitigation runoff there will

11   be.  To do this we have taken a look -- here's the

12   Domenigoni watershed (Slide E) -- and we have

13   broken it down into the Goodhart Canyon watershed,

14   which is hydrologically above Domenigoni Valley.

15   What we propose doing is using a detention basin

16   constructed near the mouth of Goodhart Canyon to

17   capture all the runoff from Goodhart Canyon.  Then

18   it is a simple question of measuring the runoff

19   from Goodhart Canyon, multiplying it by the ratio

20   of the area of Goodhart Canyon to the area of the

21   entire drainage area, to come up with a value for

22   how much runoff would occur downstream of the West

23   Dam.

24              This is the surface runoff that will

25   flow into the Warm Springs Creek and eventually

1    into Santa Margarita River.

2              So the main principle we were

3    concerned with -- let me put that up again (Slide

4    B) -- is that we were looking at establishing that

5    Metropolitan intends to ensure that the quantity

6    of surface runoff flowing past the West Dam will

7    not change.

8              I have talked a little bit how we are

9    going to measure what that quantity is.  Here is

10   how Metropolitan plans on releasing that runoff

11   (Slide F).  It is going to be released from the

12   San Diego Canal or the reservoir when it becomes

13   operational.  Basically we are going to measure

14   the runoff into Goodhart Canyon.  Then the

15   mitigation flows will begin within 24 to 72 hours

16   after a storm event.  Basically the release flow

17   will be no greater than 50 cfs.  Ideally the

18   releases are going to be timed to approximate what

19   the release would have been if the dam had not

20   been there, to the maximum extent possible.

21   Releases are going to be made within reasonable

22   and safe limits.  In other words, we do not want

23   to cause property damage downstream of the

24   reservoir.

25              Releases are generally going to start

1      low and increase slowly.  That will give

2      downstream property owners some warning.  In

3      addition, there will be a service list prepared

4      where there may be some notification when these

5      releases are going to be occurring, to the extent

6      possible.  Lastly, these releases are going to

7      continue until the entire quantity, 100 percent of

8      the mitigation release flow, has been released

9      downstream.

10             The third major principle is that

11     rainfall that falls on the reservoir will be

12     released or evaporate back into the atmosphere

13     (Slide G).  No rainfall falling on the reservoir

14     will be retained for other purposes.  So 100

15     percent will be either released or returned to the

16     atmosphere via evaporation.

17             The fourth major principle, we talked

18     a little bit about before, related to the first

19     one, is that there is no explicit flood control

20     function of this reservoir (Slide H).  Excess

21     capacity for controlling floods has not been built

22     into the reservoir.  All surface runoff that would

23     have occurred at the reservoir, had the reservoir

24     not been there, will be discharged downstream into

25     Warm Springs Creek.  As we mentioned before, this

1    mitigation runoff will come from the San Diego

2    Canal or the reservoir when it becomes

3    operational.

4              The fifth major principle of this MOU

5    is that Metropolitan will ensure and maintain

6    historical groundwater availability (Slide I).

7              This is primarily designed for those

8    groundwater rights holders in the immediate

9    vicinity of the reservoir.  To do this,

10   Metropolitan will provide operating data to the

11   watermaster on a monthly basis.  This data will

12   include groundwater elevations.  In addition,

13   Metropolitan will monitor groundwater levels in

14   the vicinity of the bedrock lip.

15             Let me talk a little bit about that.

16   You see here (Slide J) a plan of the reservoir.

17   In the south portion of Section 9, where these

18   three borings are situated, is a feature called a

19   bedrock lip.  This feature prevents groundwater

20   that would be flowing through Domenigoni Valley

21   from entering the Santa Margarita River

22   Watershed.  Thus any groundwater flowing out of

23   Domenigoni Valley does not flow into the Santa

24   Margarita River Watershed, to the south here, as

25   long as water levels in the vicinity of this

1    bedrock lip do not rise above 1400 feet in

2    elevation.

3                So in terms of this memorandum of

4    understanding, our key concern is to monitor

5    groundwater levels in the vicinity of the bedrock

6    lip to ensure that they are below 1400 feet.  To

7    do this we have installed a monitoring well.  We

8    refer to it here (Slide J) as MO-6.  This is a

9    well specifically designed as a monitoring well.

10   It has been installed by Metropolitan.  We have

11   been gathering data for at least the last several

12   months.  Typically water levels right now in that

13   well, are at an elevation of about 1355 feet,

14   approximately 45 feet below the bedrock lip.

15               The sixth major principle is that

16   runoff mitigation releases will have little or no

17   significant effect on Warm Springs Creek water

18   quality (Slide K).  Mitigation releases are going

19   to be from the San Diego Canal or the reservoir

20   when it becomes operational.  The quality of the

21   water stored in the reservoir is sufficient for

22   its intended purpose.  So we do not see

23   significant degradation of water quality.  That

24   would be water quality entering the Santa

25   Margarita River Watershed.

1              And the last major principle

2    (Slide L), this relates to the fourth one

3    (Slide I), is that during construction,

4    groundwater users adjacent to the reservoir who

5    are deprived of their source of groundwater as a

6    result of construction operations, primarily the

7    construction operations associated with dewatering

8    as we construct the foundations of the East and

9    West Dam will be made whole.  For groundwater

10   users immediately adjacent to the reservoir who

11   realize a decline in their groundwater production

12   as a result of dewatering operations, Metropolitan

13   will provide an alternate source of water.  It is

14   Metropolitan's intent that these groundwater users

15   be made whole if it's due to any damage that we

16   have caused from dewatering or construction

17   operations of the reservoir.

18              So these are basically, in a

19   nutshell, the seven basic principles Metropolitan

20   intends to follow during operation and

21   construction of the reservoir.

22              Thank you very much for your time.  I

23   will turn this back over to the Steering

24   Committee.

25        MR. HENNIGAR:  Is that the completion of

1    Metropolitan's presentation?

2         MR. MAJORS:  Yes, it is.

3         MR. HENNIGAR:  At this point I would invite

4    any comments or questions from members of the

5    public who are in attendance at the hearing.  I

6    would ask that if you do so, to please come

7    forward to the podium, and once again to identify

8    yourself, full name, for the benefit of the

9    recorder, and to use the microphone to address the

10   Steering Committee.

11        MS. TRAGER:  My name is Susan Trager.  I

12   know some of you from other work.  I am a lawyer

13   in the firm of the Law Offices of Susan M. Trager

14   in Irvine.  I am here today with Larry McKenney,

15   who some of you have worked with before, and who

16   has appeared before the Steering Committee

17   meetings.  I am also here today with my clients,

18   Cindy and Andy Domenigoni, who are representatives

19   of the Domenigoni family who own most of the land

20   between the west end of the proposed project and

21   the bedrock lip that was reported, and further

22   south than that.

23             If there are questions after my

24   comments, Larry McKenney and Cindy and Andy

25   Domenigoni will be happy to respond to them.

1       I would like to thank you for

2   conducting this public hearing, and I would like

3   to thank you for also making this wonderful

4   building available for the meeting.

5       We have some serious concerns with

6   the MOU as it's written.

7       What we would like to enlist your

8   support in doing is writing in clarifications in

9   the MOU and eliminating some of the language which

10  we feel is unnecessary, removing it from the MOU,

11  so that the Domenigonis are not hurt by adoption

12  and court confirmation of this agreement that you

13  have worked out.

14      I am not here today to ask that you

15  do anything at all that upsets or overturns or

16  minimizes in any way the mitigation measures that

17  you have negotiated for your own benefits.  We are

18  not here to do that.  We certainly uphold your

19  right and your validity to negotiate whatever deal

20  you have gotten, and we would like it very much if

21  this MOU didn't interfere with the Domenigonis'

22  ability to do the very same thing in a separate

23  memorandum of understanding and mitigation

24  agreement, which, to some extent, has been sort of

25  haphazardly negotiated between the Metropolitan

1    Water District and with the Domenigoni family.

2              As you may or may not know, the

3    Domenigoni family has farmed in the Winchester

4    area the land that's described located between

5    Hemet and Winchester for about the last 125

6    years.  They have actually pumped groundwater from

7    as early as about 1905, with a well that had a

8    steam engine attached to it for a pump.

9              The land is inundated with sheet

10   flows that move in a southwesterly direction.

11   There is no channel through the Domenigoni land

12   that looks or smells or acts like a creek or a

13   stream.  So Warm Springs Creek really isn't.  And

14   while it may be ideal in some supervisors' eyes to

15   create a creek where none presently exists, there

16   is no creek there capable of carrying storm flows

17   at any time.  The water runs in sheets.

18             The Domenigonis are in fact parties

19   in U.S. v. Fallbrook, yet we are here today only

20   because of the goodness that some of you who have

21   provided us with copies of this motion and who let

22   us know that there was going to be a noticed

23   public hearing.  And it's particularly surprising

24   because Domenigonis has been in litigation with

25   Metropolitan Water District every day since

1    October 17, in the Superior Court in Riverside

2    County, and they didn't have the courtesy to tell

3    us that this MOU would include some language

4    which, according to Garry Maurath, seemingly

5    satisfies the rights and obligations and needs of

6    the pumpers who are adversely impacted upstream of

7    the bedrock lip by the construction of the

8    Domenigoni Reservoir.

9            The MOU does a couple of things that

10   we think it doesn't need to do.

11           It assumes, first of all, that Warm

12   Springs Creek is a creek, and that somehow water

13   can be spilled from the reservoir and be conveyed

14   throughout this property to somehow satisfy your

15   needs and to satisfy the mitigation requirements

16   downstream.  That's not the case.  Unless the

17   water goes through the San Diego Canal, we don't

18   know what damage or what's going to be required of

19   the Domenigoni family to, you know, to subsidize

20   this mitigation agreement.

21           You might be interested in knowing

22   that last Thursday the Metropolitan Water District

23   presented testimony at the hearing in the trial

24   against the Domenigonis to condemn several hundred

25   acres of their 3100-acre ranch, in which a couple

1    of things are at issue, the extent of damage of

2    the remainder and ultimately the value of the

3    property.   Met is contesting the Domenigonis'

4    right to produce water from that land.   They are

5    attempting to adjudicate the water rights of the

6    Domenigonis in the proceedings, and the issue of

7    the extent and the nature and the completion of

8    the mitigation measures that the Metropolitan

9    Water District has offered will also be at issue

10   in that litigation.   We don't expect to be done

11   with it until probably June of next year.

12          Met is also taking the position in

13   that litigation that the water that the

14   Domenigonis pump is not groundwater, as you and I

15   know it, from a percolating basin, but, in fact,

16   is water being produced from a subterranean

17   channel that has heretofore never been mentioned

18   by any geologist of record or any state documents

19   or in any recognized official document that

20   describes groundwater.

21          And we frankly don't know what the

22   combination of the languages as it exists now in

23   these MOU documents will have in the event that

24   the court or the jury finds that, in fact,

25   Metropolitan's 11th hour recharacterization of the

1    groundwater basin is incorrect.

2              But those are some of the problems,

3    those are some of the issues.  We are concerned

4    here because not only is there an assumption that

5    Warm Springs Creek is a creek, it also assumes

6    somehow that Met controls or can control all of

7    the land which it hasn't condemned between the

8    bedrock lip and the West Dam.

9              Metropolitan Water District last week

10   testified through one of its consulting engineers

11   that, in fact, the Domenigonis' land would have

12   been infeasible to develop because they would have

13   to have built a 17 or $18 million flood control

14   facility to convey some 6200 cfs's of flood flows

15   from a point out of the vicinity of the West Dam

16   through their property for discharge off their

17   land.

18              And I am wondering how much of

19   that 6200 cfs in the mitigation agreement provides

20   to the signatories to the MOU.  That was the

21   amount that Met asserted was the peak flow in

22   a 6-hour storm in a 100-year event.  You might

23   want to look into it.  Those are some of the

24   figures that appeared in the EIR.

25              We are concerned about that, we are

1    concerned about how that requirement, if in fact
2    the court finds such a requirement exists, meshes
3    with some of the language that we feel is
4    unnecessary in this MOU, that would mitigate for
5    the effects of the project on your facilities and
6    your operations.
7             Similarly, we are concerned that any
8    language at all in this agreement affecting
9    groundwater, or in any way referencing the water
10   resources of the Domenigoni Ranch, can be used
11   either by Metropolitan Water District, or by any
12   of the signatories to this MOU, in either the
13   litigation against Metropolitan Water -- either in
14   litigation now pending between the Domenigoni
15   family and the signatories to the agreement, if
16   they can be used in some way later on, as
17   subsequently amended or now, against them.  We
18   would like that language eliminated.
19             We would like to have a stipulation
20   from you that the matter of the court approval of
21   the MOU be continued until these matters are
22   resolved between the Domenigonis and the
23   Metropolitan Water District.  We are in the
24   process of preparing the papers to seek a stay of
25   the proceedings because of the deficiencies in the

1  language in the MOU that we think should be
2  removed.

3         Some of the language that we would
4  like to see clarification on is to the effect that
5  the MOU documents do not, are not intended to
6  impair or to limit in any way the water resources
7  of all the Domenigonis and each of them.  That the
8  MOU documents are not intended to satisfy nor do
9  they satisfy Met's obligation to mitigate the
10 adverse impacts of its project to the water
11 resources of the Domenigoni family.  And we heard
12 some testimony already from Mr. Maurath this
13 morning that in the principles of this MOU somehow
14 the measurements and the monitoring of the
15 groundwater levels would somehow benefit the
16 Domenigonis.

17         They do not.  In fact, Met is taking
18 the position in the current litigation that the
19 Domenigoni family and perhaps others have been
20 depleting and overdrafting the basin, even though
21 there is no evidence to suggest that.

22         We would like to have clarification
23 language in the agreement that says whatever
24 mitigation, monitoring and measurement
25 methodologies and procedures that are agreed to by

1  the signatories to the MOU not be construed to --

2  either by the signatories to the MOU or by any

3  other party to the U.S. v. Fallbrook case, or by

4  the court -- to have been approved by the

5  Domenigoni family in any way as appropriate

6  methods in meeting the mitigation measures for the

7  monitoring measurement of their own water

8  resources, which also have to be mitigated

9  consistent with the environmental impact report

10 that Met's board approved in October of '91.

11           In addition, we would like

12 clarification language saying that any mitigation

13 provided by Met to the signatories to the MOU,

14 pursuant to the MOU, as they now or might

15 subsequently be amended, that involve release,

16 release of flows or concentrations of flows on

17 Domenigoni land, so that the mitigations that you

18 negotiated can be met, so that they can be

19 satisfied, that that water can't be dumped in any

20 concentrated area onto the Domenigonis' land

21 without advanced written consent of each of the

22 families.  Because we want to ensure that that

23 land is not damaged or impaired in some way

24 different than the natural flow of the water.

25 Because that's very, very costly.

1       Met has never indicated in a way that
2  they would subsidize that mitigation measure, and
3  there would be substantial flow damages to the
4  Domenigonis.

5       We would like that the protection
6  provisions of these paragraphs be assignable or
7  transferable to all of the successors and
8  transferees and assignees the Domenigonis would
9  have.

10       And, finally, we would like that no
11  provision of the MOU documents shall work to
12  create an estoppel against any member of the
13  Domenigoni family by either Met or by any other
14  signatory to the MOU documents.

15       None of the things we are asking for
16  cuts into your mitigation measures.  We ask that
17  you assist us in seeing that Met includes those so
18  that this MOU doesn't stand in the way of the
19  Domenigonis obtaining fair market value and just
20  compensation for the land that has been taken and
21  damaged, and their own mitigation measures
22  concerning the impact of the Domenigoni Reservoir
23  on their land.

24       I am here to answer questions.  The
25  Domenigonis are here to answer questions.  Larry

1    McKenney is here to answer questions here today as

2    well.

3         MR. HENNIGAR:  Thank you, Ms. Trager.  I am

4    going to seek some advice of legal counsel here in

5    terms of your request for continuation or

6    postponement of this hearing.

7              That seems to me that's probably

8    beyond our purview, and such request is made to

9    the court, to Judge Thompson.

10             If you care to comment on that.

11        MR. COWETT:  I think that's correct.  We are

12   here --

13        MS. TRAGER:  You are here pursuant to a

14   court order that was obtained by a representation

15   to the court that this MOU had nothing to do with

16   groundwater.  And, in fact, most of the bulk of

17   the language in it has to do with groundwater, and

18   we are very concerned about that.

19             Now, we spoke with the court clerk

20   this morning.  We were advised that the best way

21   to get the continuance was a stipulation that a

22   full noticed motion to accommodate the concerns of

23   the Domenigoni family be held, or that the matter

24   be postponed entirely until there is a resolution

25   of it later on.

1          But I think it's proper that the

2     federal court abstain from making groundwater

3     determinations that exceed its jurisdiction in

4     U.S. v. Fallbrook.  And, again, I think we haven't

5     asked for anything at all here that hurts you, and

6     that these matters can be resolved today.  And I

7     also understand that you are a member of the Best,

8     Best & Krieger law firm that are fighting the

9     Domenigonis in the very proceeding that I am

10    referring to.  So, you know, your comments here

11    are a little conflicted.

12        MR. COWETT:  Well, I really didn't have any

13    comments.  I was just trying to sort out exactly

14    how long you wanted and what jurisdiction this

15    committee has in light of the fact that the

16    committee is meeting pursuant to a court order.  I

17    assume we can recommend to the court that it be

18    continued, but we surely couldn't order that it be

19    continued.

20        MS. TRAGER:  Sure.  I understand that.  And

21    any help that you can give so that the language

22    can be worked out, you know, we will be happy to

23    do the working of the language as fast as possible

24    for you.  The reason why it took so long to come

25    here to be able to articulate what the problem is

1    is because Met's case and its presentation of the

2    facts, at least vis-a-vis the Domenigonis only,

3    seems to be unfolding as we speak.  And we are

4    doing some, as you are aware, we are doing some

5    depositions that are scheduled even next week with

6    one of the experts that are going to be testifying

7    about the status of the groundwater conditions and

8    the area between the West Dam and north of the

9    lip.

10            So, you know, things are unfolding.

11   I want to make sure that this document doesn't

12   come back and bite the Domenigonis.  I would like

13   language in there assuring everyone that the

14   benefits that you receive aren't to satisfy any

15   needs of any of the people who are not

16   signatories, but who are parties.  That's the

17   concern.  The language isn't clear about that.

18        MR. COWETT:  I might call on Mr. Gleason.  I

19   think it was the intent of the Steering Committee,

20   as near as I can tell, that language would be put

21   into the MOU that would achieve the results that

22   Domenigonis are speaking.

23        MR. GLEASON:  Yes, we have done that.

24            There are some misrepresentations

25   that Ms. Trager has mentioned and I would like to

1        have an opportunity to respond to some of those.

2                MR. HENNIGAR:  Please do.

3                MR. GLEASON:  We have not kept this hidden

4        under the bushes.  The process was presented at a

5        public hearing before the Steering Committee in

6        June.  We have moved fairly expeditiously

7        considering the complexity of the issues.

8        Nevertheless, we did not get an order from the

9        court until October the 21st.  At the September

10       meeting of the Steering Committee, a

11       representative from the Domenigoni family was here

12       and made a suggestion that they were concerned

13       about the relationship to this other matter which

14       is a state court proceeding, a separate proceeding

15       in Riverside County, and as a result of that

16       discussion, we did add Article X to the memorandum

17       of understanding, and I would like to read that,

18       if I could.

19                     That Article X reads:

20                     "This MOU is not

21              intended to be a determination

22              of the nature or extent of water

23              rights acquired by Metropolitan

24              in connection with its land

25              acquisitions for the Domenigoni

1           Valley Reservoir Project, nor to

2           create any estoppel to claims in

3           litigation now pending in

4           connection with those land

5           acquisitions."

6                The litigation in Riverside County,

7      which is essentially an eminent domain acquisition

8      process, has been unfolding.  The trial, I

9      understand from Ms. Trager's comments, started in

10     October, about the time we received the court's

11     order for setting this hearing for today.

12               We moved along promptly, we have

13     included that language, we did send that language

14     and a copy of the MOU to her firm.  We, as soon as

15     we were able to get an order from the court,

16     setting the hearing before the court, for

17     December 5th, we initiated our service, we served

18     the Domenigonis, initiated that process, on

19     November the 3rd.

20               The other issues relating to the

21     timing aspects were that we have been in some

22     contact with them, and we certainly want to

23     resolve the problem of the language as we can.  We

24     felt it was the best way to handle the matter in

25     an expeditious way to not delay the proceedings

1    before this court.  I guess we do take, I

2    certainly take, some umbrage in the fact that

3    there appears to be some mechanism here to avoid

4    the strict jurisdictional issue, to use the

5    federal court proceeding as a mechanism to

6    leverage the state court Domenigoni acquisition

7    proceeding, and that seems to be some sort of an

8    inappropriate process.

9              But aside from that, I think the

10   issue as to the purpose that this MOU is serving

11   is to ensure that the court and the parties to

12   this memorandum, that this operation of the

13   reservoir is going to be done in a way that is

14   compatible with the judgement provisions, and is

15   separate from the jurisdictional issues that

16   Ms. Trager is referring to, the issues in terms of

17   what the allocations of the waters are between the

18   water rights holders north of that bedrock lip,

19   are issues that are not before the court at this

20   time.  We just think we are mixing apples and

21   oranges for not very clear purposes.

22             We are very happy to sit down and

23   work with Ms. Trager and her firm to try to find

24   some additional language that would resolve the

25   problem, and we will do that in good faith.  But

1   we do want the court to proceed with the process

2   of hearing and approving this MOU, because we

3   think it is something that is important for the

4   area.  It's something important, that is important

5   for the reservoir project itself, the region, and

6   beyond the area, and also it is important, with

7   some significance, that we are able to allow the

8   court to proceed in a way that doesn't unduly

9   utilize its time and burden it with these

10  technical kinds of proceedings that can be handled

11  in the Steering Committee process.

12          MR. HENNIGAR:   Thank you, Mr. Gleason.

13                  Are there any other questions or

14  comments?

15                  Apparently not.  Close the hearing?

16                  I believe at this time, hearing no

17  further request for comments or questions from the

18  public, I would declare the hearing closed.

19          MR. MC PHERSON:  Can I ask a question?  Are

20  they asking to postpone the hearing until they

21  work out the language problems with Met?  Is that

22  what they are asking?

23          MR. HENNIGAR:   That was my understanding,

24  Mike.

25          MR. MC PHERSON:  And was Met's response now

1    they want to go ahead with the hearing as scheduled?

2         MR. HENNIGAR:    That's --

3         MR. GLEASON:   Yes.   That is it.   And we are

4    certainly willing in the interim to sit down with

5    Ms. Trager and her firm and try to see if there is

6    some language --

7         MR. MC PHERSON:   The question is whether

8    there is enough time between now and December 5th

9    for you guys to work out any problems with the

10   language.

11        MS. TRAGER:   I think it can be done today.

12   And I am happy you included Section X and XI the

13   last time.   The problem, Vic, is that every time

14   we walk into court, every new day, Met has a new

15   surprise as to what the facts are.   And it seems

16   to me that you need -- you must present these

17   people the mitigations that they deserve.   We just

18   don't want you to use the Domenigoni lands to

19   convey them.

20        MR. GLEASON:   Well, but that's an issue

21   before the other court and I am not sure it's an

22   issue before this court.   What we are doing is

23   saying in here that we are trying to resolve those

24   issues in this memorandum of understanding.

25        MS. TRAGER:   I think it can be worked out,

1     and if it can be, you guys can go ahead with the

2     hearing date given.  I need to put you under

3     pressure to clarify that.

4                THE very day of the hearing that you

5     have I have to be in Riverside in trial on Met.

6     And I can't be at two places at once.

7          MR. GLEASON:  We will talk with you this

8     afternoon and see what we can do.

9          MR. HENNIGAR:  Again, I would indicate it

10    probably is appropriate at this time to close this

11    hearing.  I would also indicate, though, I don't

12    see any problem in perhaps the Steering Committee

13    hearing any additional changes or languages that

14    might be forthcoming from your discussions.

15               And in fact I would even entertain a

16    motion at this time from the Steering Committee

17    that we would invite such input in the interim

18    time that exists here to review and approve any

19    additional language that may be forthcoming based

20    on Mr. Gleason's discussions with you, Ms. Trager,

21    and we can certainly do that.  But I do not see it

22    within my authority or our jurisdiction here of

23    the Steering Committee to take any action in terms

24    of delaying the process or postponing the hearing.

25         MR. JENKS:  The court order provides the

1    Steering Committee relay the comments received

2    here today to the court, and we will ensure those

3    comments reach the court before the hearing date,

4    along with, I guess, any language that you can

5    develop in the interim that may be satisfactory to

6    the Domenigoni family.

7            MR. MC KENNEY:  I would just like to point

8    out as a matter of procedure, the motion before

9    the court has as an exhibit the executed MOU.  And

10   so it will be within the Steering Committee's

11   power if they look at changed language and decide

12   in effect to execute a new MOU and then supplement

13   the motion with it.

14           MR. HENNIGAR:  Yes.  That's basically what I

15   am inviting.  If you can work out some additional

16   language in the interim here, we would be happy to

17   hear it.

18                I guess that's the conclusion of the

19   business that comes before this committee.

20                Thank you all.

21                (TIME NOTED:  11:05 A.M.)

22

23

24

25

NOON & PRATT

1     STATE OF CALIFORNIA        )

2                                 ) ss:

3     COUNTY OF LOS ANGELES     )

4

5          I, JOAN E. WHIPPLE, C.S.R. No. 5336, do hereby

6     certify:

7          That the foregoing proceedings were taken down by

8     me in shorthand and thereafter transcribed under my

9     direction and supervision.

10         That the foregoing  45  pages contain a

11    true and correct transcription of my said shorthand

12    notes so taken.

13         I further certify that I am neither counsel for

14    nor related to any party to said action, nor in anywise

15    interested in the outcome thereof.

16         IN WITNESS WHEREOF, I have subscribed my name

17    this  5th day of     December,     1994.

18

19

20

21

22         _Joan E. Whipple, CSR No 5336_

23         JOAN E. WHIPPLE, C.S.R. No. 5336

24

25

NOON & PRATT

1

2          Rule 30 Federal Rules of Civil Procedure

3      (e)      Any changes in form or substance
                which the witness desires to make
4               shall be entered upon the Deposition
                by the officer with a statement
5               of the reasons given by the
                witness for making them.

6

7   PAGE            LINE        CHANGE          REASON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25