ORIGINAL

FILED

03 AUG -8 PM 3: 52

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

ARTHUR L. LITTLEWORTH, Bar No. 022041
C. MICHAEL COWETT, Bar No. 53353
JAMES B. GILPIN, Bar No. 151466
MELISSA W. WOO, Bar No. 192056
LAW OFFICES OF
**BEST BEST & KRIEGER LLP**
402 WEST BROADWAY, 13TH FLOOR
SAN DIEGO, CALIFORNIA 92101-3542
TELEPHONE: (619) 525-1300
TELECOPIER: (619) 233-6118

Attorneys for Defendant
RANCHO CALIFORNIA WATER DISTRICT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT, EASTERN MUNICIPAL WATER DISTRICT, RANCHO CALIFORNIA WATER DISTRICT, et al.,<br><br>Defendants. | Case No. 1247-SD-GT<br>Judge: Hon. Gordon Thompson, Jr.<br><br>NOTICE OF LODGMENT IN SUPPORT OF RANCHO CALIFORNIA WATER DISTRICT'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND SUPPLEMENTARY AND AMENDATORY COMPLAINT<br><br>DATE: August 25, 2003<br>TIME: 2:00 p.m.<br>DEPT: 8 |

SDLIT\AXA\283198

OFFICE

FILED   LODGED

APR - 8 1965

MAR 2 9 1965
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

ENTERED
APR - 8 1965
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

FALLBROOK PUBLIC UTILITY DISTRICT,
a public service corporation of
the State of California, et al.,

    Defendants.

No. 1247-SD-C

MODIFIED
FINAL JUDGMENT
AND DECREE

The above-entitled cause came on regularly for trial before the Honorable James M. Carter, United States District Judge, following remand from the United States Circuit Court of Appeals for the Ninth Circuit, which directed that this Court ". . . enter no judgment until the entire suit can be disposed of at the same date."

Because of the complexities of this litigation and the fact that the physical water resources were located throughout the watershed, this Court determined that the said mandate could best be complied with by adjudicating the rights of the parties to the cause in segments of the watershed involving limited areas and numbers of defendants and by entering interlocutory judgments as the trial concerning each such segment was concluded. Proceeding in this manner, this

Exh. A1

Court has entered interlocutory judgments as the trial pro-
gressed, each of which concerns a specified area within the
Santa Margarita River watershed, or a limited legal issue
presented by the parties. These interlocutory judgments
expressly provided that they were not final and not operative
until made a part of the final judgment. This Court having
entered orders or interlocutory judgments on all areas within
the watershed and all issues presented for decision, and the
rights to the use of the waters of the Santa Margarita River
stream system having been adjudicated in those interlocutory
judgments, this Court therefore entered its final judgment
and decree on May 8, 1963, whereby the said Interlocutory
Judgments or Orders were listed, and the same, together with
the Findings of Fact and Conclusions of Law attached thereto,
were adopted as the final Findings of Fact, Conclusions of
Law, and Judgment and Decree of the Court. Appeal from said
Final Judgment and Decree was taken to the United States
Court of Appeals. The Court of Appeals, by its decision
dated May 25, 1965, reversed the judgment of this Court as to
the rights of the United States against Vail Company, and re-
manded the cause "with instructions that the final judgment
be appropriately modified to the end that the 1940 state
court decree is reinstated, subject to the rights of Vail
to seek relief from that judgment in accordance with the
views hereinbefore expressed." In all other respects, the
final judgment and decree was affirmed. By its order dated
October 4, 1965, the Court of Appeals denied the United
States petition for rehearing and clarification.

The cause is now before the Court pursuant to the mandate

- 2 -

Exh. A2

of the Court of Appeals for appropriate modification of the
Final Judgment consistent with that Court's opinion, and pur-
suant to Notice of Hearing for such purpose duly served upon
all parties to the cause except those heretofore determined
to have no interest in the required modification.  Upon con-
sideration of the mandate and opinion of the Court of Appeals
and the Final Judgment heretofore entered herein, the Court
hereby makes and enters the following Findings of Fact,
Conclusions of Law, and Modified Final Judgment and Decree:

FINDINGS OF FACT

I

On or about May 5, 1930, the Superior Court of the State
of California in and for the County of San Diego entered
findings of fact, conclusions of law and judgment in Case
No. 42850 in the records of said Court.  The parties to said
action were the Rancho Santa Margarita, Vail Company and
various individuals interested in that Company, the Executors
of the Will of Murray Schloss, deceased, and Philip Flaytow.
The Rancho Santa Margarita, the Executors of the Will of
Murray Schloss, deceased, and Philip Flaytow did not appeal
from said judgment.  Vail Company did appeal from certain
portions only of it.  Thereafter and on or about July 12,
1938, the Supreme Court of the State of California reversed
certain portions of the judgment.  Said Supreme Court remanded
the case with directions that the new trial be limited to
those matters specifically disapproved and affirmed the trial
court's judgment as to all other matters.  Said decision of
the Supreme Court is recorded in 11 Cal.2d 501.  Thereafter
on or about December 26, 1940, the Superior Court of the

- 3 -

3

State of California in and for the County of San Diego in said Case No. 42850 entered a final judgment pursuant to the stipulation of the parties. A copy of the 1940 stipulated judgment is attached hereto as Exhibit A.

Vail Company and the Executors of the Will of Murray Schloss, deceased, are parties to the action before this Court and Vail Company's successor in interest, Rancho California, has now voluntarily appeared herein. The United States of America, a party to this action, is in privity with and the successor of the Rancho Santa Margarita, and Max Henderson, party in this action, is in privity with and the successor of Philip Flaytor.

## II

By Interlocutory Judgment No. 25 herein, dated April 25, 1961, this Court made certain findings of fact on the basis of which it concluded, inter alia, (1) that the said 1930 findings of fact and judgment and the 1940 stipulated judgment in the said state court action must be considered one judgment, (2) that the said state court judgment was inequitable and should not be enforced as such by a court of equity, and (3) that the said state court judgment was not a contract, but if it were it had been rescinded by Vail Company. Interlocutory Judgment No. 25 then enjoined the United States and the other parties to said state court action from enforcing or attempting to enforce in any manner any "judgment, provision or term, finding of fact or conclusion of law" set forth in the said state court action in either the Supreme Court of California or the Superior Court in and for San Diego County.

- 4 -

Exh. A4

### III

In its said opinion of May 16, 1965, the Court of Appeals determined that the 1940 stipulated judgment in the said state court action was not based upon the 1930 findings of fact but "upon agreement between the litigants." The Court of Appeals further stated: "It was upon that agreement that the California court relied and not upon the facts then (or earlier) existing." It was held that the 1940 stipulated judgment constituted a valid agreement between the parties to the stipulation, that the Vail Company had not established that it was entitled to rescind the agreement or that the United States had in any way repudiated it or estopped itself to assert its continuing validity and effectiveness, and that in any relitigation of rights as between the successor in interest of Rancho Santa Margarita and Vail Company, such relitigation "starts from where it last left off, which in this case, as to Vail, would be the 1940 decree."

### IV

While holding that the 1940 stipulated state court judgment is valid and enforceable in this litigation as between the parties to that action, the Court of Appeals further noted "that some relief might be proper should Vail be able to show that mistakes of fact have caused it harm of sufficient magnitude to justify reformation." Without prejudging the question, the Court gave two examples of the kinds of circumstances which might, on application and adequate showing, be basis for some relief.

### V

It is therefore plain that for this Court to carry out

- 5 -

Exh. A5

the mandate of the Court of Appeals it is necessary that
Interlocutory Judgment No. 23, and the Conclusions of Law on
which it is based, be withdrawn and that there be included in
the final judgment of this Court a provision that the 1940
stipulated state court judgment is valid and enforceable as
between the parties thereto and their respective successors
in interest, subject to the rights of any of such parties
and their successors in interest to seek some relief from
the provisions thereof on showing that mistakes of fact have
caused the applicant harm of sufficient magnitude to justify
reformation.

The question whether the Findings of Fact on which Inter-
locutory Judgment No. 23 is based are of continuing validity
in light of the decision of the Court of Appeals is one about
which there is, or may be, considerable controversy between
the parties. Without prejudging this question as to any of
such findings, the entry of this Modified Final Judgment and
Decree shall be without prejudice to the right of any party
in any future proceeding herein to attack or assert the
validity of any such Findings of Fact.

VI

There are other provisions of the several Interlocutory
Judgments, as incorporated into the Final Judgment, and the
Findings of Fact and Conclusions of Law on which the same were
based, which are or may be inconsistent with the Court of
Appeals determination respecting the enforceability of the
1940 stipulated state court judgment as between the parties
thereto and their respective successors in interest. However,
in view of the Court's continuing jurisdiction in this matter,

- 6 -

Exh. A6

the Court perceives no immediate need to modify and correct every provision in the constituent parts of the final judgment as heretofore entered which is not wholly consistent with the reinstatement of the 1940 stipulated state court judgment. With the understanding that an application or applications to modify such possibly inconsistent provisions may be considered hereafter, none of the parties has at this time requested that the Court take action now to do more than the minimum required for compliance with the mandate of the Court of Appeals.

### CONCLUSIONS OF LAW

#### I

The 1940 stipulated judgment in the state court action referred to in Finding I above, a copy of which is Exhibit A hereto, is a valid and binding obligation of the parties thereto and is enforceable in this action as between the parties thereto and their successors in interest as such an obligation and as a valid judgment of the Court by which the same was entered. The said stipulated judgment should therefore be incorporated into and adopted as part of the Final Judgment of the Court in this action. Consistent with the mandate of the Court of Appeals, it is necessary that in so incorporating the said 1940 stipulated judgment into this Court's Final Judgment, and in adopting the same as a part thereof, there be reserved to the parties thereto and their successors in interest, the right to seek relief from any of the provisions of said 1940 stipulated judgment with respect to which it can be and is shown that mistakes of fact have

- 7 -

Exh. A7

caused harm to the applicant of sufficient magnitude to justi-
fy reformation.

## II

The list of interlocutory judgments contained in para-
graph 1 of this Court's Final Judgment, dated May 8, 1963,
should be modified to conform to the provisions hereof with
respect to Interlocutory Judgment No. 25.

## III

The right of any affected party to apply for modification
of any other provision of the several interlocutory judgments,
as incorporated into the Final Judgment, or of the Findings
of Fact or Conclusions of Law on which the same are based,
upon showing of inseparability with or inconsistency be-
tween such provision and the Court of Appeals determination
respecting enforceability of the 1940 stipulated state court
judgment and this Court's continuing jurisdiction to consider
any such application, should be expressly reserved.

## IV

In all other respects, the Final Judgment of this Court,
as entered herein on May 8, 1963, should be continued in
force and effect.

### MODIFIED FINAL JUDGMENT

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

## I

IT IS ORDERED, ADJUDGED, AND DECREED that the 1940 stip-
ulated judgment in the state court action, referred to in
Finding I above and attached hereto as Exhibit A, is a valid
and binding obligation of the parties thereto, is enforceable

- 8 -

Exh. A8

in this action as between the parties thereto and their successors in interest as such an obligation and as a valid judgment of the Court by which the same was entered, and is adopted as a part of and incorporated into this Modified Final Judgment, provided, that there is expressly reserved to the parties thereto and their successors in interest, the right to apply for relief from any of the provisions of said stipulated judgment with respect to which it can be and is shown that mistakes of fact have caused the applicant harm of sufficient magnitude to justify reformation.

## I-A

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Interlocutory Judgment No. 25, and the Conclusions of Law on which the same is based, are hereby withdrawn; provided, that the entry of this Modified Final Judgment and Decree shall be without prejudice to the right of any party in any future proceeding herein to attack or assert the validity of any of the Findings of Fact in said Interlocutory Judgment No. 25.

## II

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that each of the following Interlocutory Judgments or Orders and the Findings of Fact and Conclusions of Law attached thereto, including amendments, if any, are also adopted by reference as part of and incorporated into the Final Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree of this Court:

- 9 -

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| 1 | April 7, 1961 | Jack & Cosette Garner (Wilson Creek Area) - now merged into 33A |
| 2 thru 21 | April 7, 1961 | Fallbrook & Area South (non-riparian) - now included in Amended 39A |
| | November 21, 1962 | Amendment to 1 (Parcels to be included in 42 - Rainbow) |
| 22 | April 7, 1961 | Regarding Water Rights on Lands Originally Conveyed by Mexican Grants |
| 23 | April 7, 1961 April 4, 1962 | Appropriative Rights - FPUD ... Amendment to 23 |
| 24 | April 13, 1961 | Non-Statutory Appropriative Rights of USA in NWR for Lake O'Neill |
| 24A | May 7, 1963 | Stipulation Respecting Appropriative Rights to Use of Waters of SMR for Lake O'Neill - USA & FPUD |
| 25 | April 25, 1961 | Subject to provisions of paragraph I-A and any other applicable provisions of this Modified Final Judgment and Decree |
| 26 | April 25, 1961 | Ovintt (Parcels in 33 and 34A) |
| 27 | April 25, 1961 | Knox (All parcels included in 40) |
| 28 | May 24, 1961 | Miscellaneous Surface Impoundments |
| | December 8, 1961 | Amendments to 29A, 31A, 32A, 33A & 34A (Explanation of parcel numbers) |
| | February 8, 1962 | Amendments to 29A, 31A, 32A, 33A, 34A & 38A (Jurisdiction of surface waters) |
| 29A | August 1, 1961 | Saddle Creek sub-watershed (All Parcels now included in 39A) |

-10-

Exh. A10

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| 30 | March 8, 1962 | Murrieta-Temecula Ground Water Area (Riverside County subdivisions) |
| | July 3, 1962 | Amendment to 30 (Storage Units 1, 2, 3, 4 - approximately 418,000 ac.ft.) |
| | March 6, 1963 | Amendment to 30 - Respecting Stipulation--Settling Rights |
| 30A | March 13, 1963 | Murrieta-Temecula - Outside Ground Water Area |
| 31 | January 25, 1963 | Santa Gertrudis (Lower Murrieta) |
| 31A | July 27, 1961 | Tucalota Creek Sub-watershed Amended (Lower Murrieta) |
| | March 6, 1963 | Amendment to 31A - Respecting Stipulation - Settling Rights |
| 32 | December 11, 1962 | DeLuz Creek Sub-watershed |
| | March 6, 1963 | Amendment to 32 - Respecting Stipulation - Settling Rights |
| 32A | August 4, 1961 | DeLuz Creek Sub-watershed |
| 33 | December 11, 1962 | Anza Valley, Wilson Creek & Coahuilla-Down to ground water area |
| 33A | August 4, 1961 | Wilson & Coahuilla Creeks Sub-watershed |
| | March 6, 1963 | Amendment to 33A - Respecting Stipulation - Settling Rights |
| | April 9, 1963 | Amendment to 33A - Interlocutory Judgment 1 merged into 33A |
| 34 | February 20, 1963 | Temecula Creek above Aguanga Ground Water Area |
| | March 6, 1963 | Amendment to 34 - Respecting Stipulation - Settling Rights |
| 34A | December 7, 1961 | Temecula Creek Sub-watershed Above Vail Dam |

-11-

Exh. A11

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| | March 6, 1963 | Amendment to 34A - Respecting Stipulation - Settling Rights |
| 35 | June 4, 1962 | Vail Company (Temecula Creek Below Vail Dam and to the Gorge) |
| 35A | December 11, 1962 | Vail Company |
| 36 | July 3, 1962 | Warm Springs & Diamond-Domenigoni (Upper Murrieta) |
| 36A | February 20, 1963 | Warm Springs (Upper Murrieta) |
| | March 6, 1963 | Amendment to 36A - Respecting Stipulation - Settling Rights |
| 37 | April 6, 1962 | Military Enclave |
| | November 8, 1962 | Amendment to 37 (Sewage effluent discharges & Water conservation practices) |
| | February 20, 1963 | Amendment to 37 (Exclusive jurisdiction) |
| 38 | | (No Judgment #38) |
| 38A | January 3, 1962 | Temecula Creek Sub-watershed - Below Vail Dam and above Gorge |
| | March 6, 1963 | Amendment to 38A - Respecting Stipulation - Settling Rights (1/30/62 Order setting aside 38A 1/1/62 Order vacated) |
| 39 | December 11, 1962 | SHR - Below Gorge and above Enclave (Includes Sandia) |
| | April 9, 1963 | Amendment to 39 - (Includes Fallbrook and Area South) |
| 39A | November 8, 1962 | SHR - Below Gorge and above Enclave (Includes 29A) |
| | March 13, 1963 | Amendment to 39A (Includes Fallbrook and Area South) (Also 2 thru 21) |
| 40 | December 12, 1962 | Aguanga Ground Water Area (Temecula & Wilson) |

-12-

12

Exh. A12

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| 41 | November 6, 1962 | Indian Reservations |
| 42 | October 10, 1962 | Rainbow Creek |
| 42A | February 25, 1963 | Rainbow Creek |
| 43 | February 6, 1963 | Cottle & Gibbon |
| 44 | May 8, 1963 | National Forest Lands |
| 45 | December 12, 1962 | Order Regarding Water Extractions |
|  | January 27, 1966 | Order Superseding No. 45 and Order of September 3, 1964 |

Provided, that there is hereby expressly reserved the jurisdiction of this Court to consider, and the right of any affected party to make application for, modification of any of the provisions of said Interlocutory Judgments or Orders, or of the Findings of Fact and Conclusions of Law attached thereto, which is incompatible or inconsistent with the provisions of paragraph I of this Modified Final Judgment or with the Court of Appeals' determination respecting enforceability of the said 1940 stipulated state court judgment as between the parties thereto and their respective successors in interest.

### III

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that questions with respect to interpretation and application of the said 1940 stipulated state court judgment which are not hereby specifically decided will be considered and determined upon application of any affected party after notice to other affected parties.

-13-

13

Exh. A13

## IV

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the judgment provisions as set forth in the aforesaid interlocutory judgments and orders and the original Final Judgment herein are effective as of May 8, 1963, the date of entry of said Final Judgment (or any later dates as of which a modification of any thereof may have been entered), and that the modifications of the said Final Judgment hereby made are effective as of the date of entry of this Modified Final Judgment and Decree.

## V

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court retains continuing jurisdiction of this cause as to the use of all surface waters within the watershed of the Santa Margarita River and all underground or sub-surface waters within the watershed of the Santa Margarita River, which are determined in any of the constituent parts of this Modified Final Judgment to be a part of the sub-surface flow of any specific river or creek, or which are determined in any of the constituent parts of this Modified Final Judgment to add to, contribute to, or support the Santa Margarita River stream system.

## VI

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the STATE OF CALIFORNIA STATE WATER RIGHTS BOARD, or its successor agencies as may be provided by the laws of the State of California, shall continue to exercise its statutory jurisdiction over all present or future

-14-

14

Exh. A14

appropriative rights to the use of waters of the Santa Margarita River and its tributaries.

## VII

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court shall also continue to exercise jurisdiction concerning all present or future appropriative rights insofar as such uses may conflict with or be adverse to the exercise of any prior vested water right within the Santa Margarita River watershed, as adjudicated by the provisions of the Interlocutory Judgments or orders above set forth and by this Modified Final Judgment.

## VIII

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court reserves the right to amend, _nunc pro tunc_, upon its own motion either with or without notice, any interlocutory judgment or order or exhibit attached thereto or this Modified Final Judgment, for the purpose of correcting errors or inaccuracies in names, legal descriptions or other similar factual data contained in said interlocutory judgments or orders or exhibits, as provided in Rule 60A of the Federal Rules of Civil Procedure.

## IX

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the continuing jurisdiction reserved by this Court will be exercised on the Court's own Motion, or upon the motion of any party to this cause, his heirs, successors, or assigns, made upon notice and in accordance with the Rules of this Court.

-15-

15

Exh. A15

X

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that neither this Modified Final Judgment and Decree nor any Interlocutory Judgment or order incorporated herein shall in any manner effect the right of the United States of America to acquire by the exercise of the power of eminent domain property including water rights of any nature as is or may be authorized by the laws of the United States of America; nor shall this Modified Final Judgment and Decree or any Interlocutory Judgment or order incorporated herein prevent any defendant from acquiring property including water rights of any nature by the exercise of the power of eminent domain as is or may be authorized by the laws of the State of California.

DATED: 11/6/66                    , 1966.

JAMES M. CARTER, Judge
United States District Court

-15-

16

**CONFORMED COPY**

# COOPERATIVE WATER RESOURCE

# MANAGEMENT AGREEMENT

between

## CAMP PENDLETON

and

## RANCHO CALIFORNIA WATER DISTRICT

**March, 2002**

Exh. B01

## COOPERATIVE WATER RESOURCE
## MANAGEMENT AGREEMENT

1.   <u>Purpose.</u>   This Cooperative Water Resources Management Agreement ("Agreement") is between the United States, on behalf of Camp Pendleton (sometimes "Camp Pendleton"),  and the Rancho California Water District, ("District"), and is effective upon approval of the Court.  Certain terms used in this Agreement are defined in Exhibit "A" hereto, including a map of the Santa Margarita River watershed.  At the present time, two Judgments affect the rights of the parties with respect to water supplies from the Santa Margarita River watershed.  The first is a Stipulated Judgment in the case of <u>Rancho Santa Margarita v. Vail</u>, San Diego Superior Court Action No. 42850 ("1940 Judgment").  The second is the Judgment in the case of <u>United States v. Fallbrook Public Utility District</u>, Civ. No. 1247, S.D. Cal. ("Fallbrook Case"). However, these Judgments do not fully meet the needs of the parties for effective water management under present conditions.  The meanings of certain provisions of the 1940 Judgment are also in dispute.   The parties, therefore, propose to manage these water resources in a practical way that will meet their needs, consistent with the essential rights and obligations of the two Judgments, while avoiding potential conflicts over disputed provisions.

2.   <u>Term</u>. Unless sooner terminated because of an uncured default as set forth in  Section 15 below, this Agreement shall remain in effect for a minimum of 10 years

RVPUB\ALL:560907 March 21, 2002

Exh. B02

from its effective date, and until either party exercises its right to terminate as set forth in Section 16 below.

3.   <u>Incorporation in Fallbrook Case and Continuing Jurisdiction</u>.   The Agreement will be submitted to the Court for approval and incorporated by stipulation into the Fallbrook Case, pursuant to the Court's continuing jurisdiction therein, and will be administered by the Watermaster appointed by the Federal District Court, Southern District of California, by order dated March 13, 1989, or subsequent order.   The Court shall retain continuing jurisdiction to make such further orders as may be necessary to interpret or enforce this Agreement,  provided that the Court shall not have the power to modify the terms of this Agreement or the 1940 Judgment.  If either party believes there is a substantial change of circumstances, the parties shall attempt to reach agreement as may be appropriate in light of the changed circumstances, or shall engage in mediation if agreement is not reached.

4.   <u>1940 Judgment</u>.   The United States is the successor in interest to the plaintiff Rancho Santa Margarita in the 1940 Judgment. The Rancho California Water District is a successor in interest to the defendants in the 1940 Judgment, and has certain rights and obligations under  a 1978 Agreement between KACOR Realty and Rancho California Water District relative to Vail Lake. Both parties have certain rights and entitlements under the 1940 Judgment and are obligated to comply therewith. Without waiving their rights and entitlements under the 1940 Judgment, the parties

Exh. B03

intend to forbear enforcing them for so long as this Agreement is in effect and being complied with. The parties realize that certain provisions of this Agreement differ from the 1940 Judgment. For example, the measurement of the flows required to be maintained under this Agreement will be accomplished at USGS Gage ID No. 11044000 on the Santa Margarita River near Temecula ("the Gorge"), and those guaranteed flows to Camp Pendleton are in terms of usable flows, including habitat maintenance flows, instead of total flows. Without waiving any of their rights and entitlements under the 1940 Judgment, the parties agree that, to the extent provisions of this Agreement are inconsistent with the 1940 Judgment, the provisions of this Agreement shall control for so long as this Agreement is in effect and being complied with. The parties agree further that, so long as this Agreement is in effect and is being complied with, neither party will undertake any proceeding with respect to the 1940 Judgment against the other, either judicially or administratively. Should either party fail to comply with this Agreement, or should it expire or be terminated, the parties preserve their respective rights to enforce the 1940 Judgment against each other, as each interprets it, and the provisions of this Agreement shall not be used to supply meaning to the 1940 Judgment.

5.   Guaranteed Flows at the Gorge.

(a)   The parties have developed a Groundwater Model, which indicates that the simulated total natural streamflow at the Gorge over the period 1935-1998 would have averaged 30.35 cfs, without diversions or pumping.  For the purpose of establishing flow requirements, the daily natural streamflow at the Gorge was simulated using the Hydrologic Simulation Program Fortran (HSPF) model developed by Camp Pendleton and reviewed by both parties.   Both models are more fully described in Exhibit "B" hereto.  Flows at the Gorge, as set forth in the table on page 5, are based on two-thirds of the median natural flow during very wet, above normal, below normal, and critically dry conditions.   Daily flow values for  very wet and critically dry conditions are based on the daily median flows for the periods 1937 to 1946 and 1957 to 1966, respectively.  Above normal flows are based on the mean of the median of very wet flows and the median of all flows for the period 1931-1996.  Similarly, below normal flows are based on the mean of the median of critically dry flows and the median of all flows for the period 1931-1996.  This methodology eliminates the large storm flows from the calculation of required flows for Camp Pendleton (two-thirds of natural flow), and results in average annual flows ranging from 3.6 cfs to 15.6 cfs, with a median flow of 8.8 cfs for the period 1931-1996.  The results of the modeling efforts and the above calculations are shown on the following table:

|  | Critically Dry Flow | Below Normal Flow | Above Normal Flow | Very Wet Flow |
|---|---|---|---|---|
| Month | cfs | cfs | cfs | cfs |
| Jan - April | 4.5 | 8.0 | 17.8 | 24.1 |
| May | 3.8 | 5.7 | 11.7 | 15.7 |
| June | 3.3 | 4.9 | 9.4 | 12.2 |
| July | 3.0 | 4.3 | 7.8 | 9.7 |
| August | 3.0 | 4.4 | 7.6 | 9.2 |
| September | 3.0 | 4.1 | 7.4 | 9.4 |
| October | 3.0 | 3.9 | 7.7 | 10.1 |
| November | 3.0 | 4.5 | 8.8 | 11.5 |
| December | 3.3 | 5.3 | 10.4 | 13.5 |

The hydrologic conditions described in the table above are derived from a hydrologic index combining the October through April natural streamflow at the Murrieta Creek gage, and the October through April natural streamflow at Vail Lake. Natural flow at Murrieta Creek is calculated using the rainfall/run-off relationship between rainfall at Wildomar and the HSPF natural flow at Murrieta Creek. Natural flow at Vail Lake is calculated using the run-off correlation between Aguanga streamflow and inflow to Vail Lake during the period water years 1958 to 1996.

On May 1st of each year the October through April rainfall at Wildomar is used to estimate natural flow at Murrieta, and the October through April measured

streamflow at Aguanga is used to estimate natural flow at Vail Lake. A simple computer spreadsheet, maintained and operated by the Technical Advisory Committee ("TAC"), adjusts for antecedent conditions and calculates the hydrologic index based on these input parameters. The computer spreadsheet is more fully described in Exhibit "C" hereto. Once the hydrologic condition is determined, the above table is then used to prescribe the flows at the Gorge.

Recognizing the seasonal variations in such flows that naturally occur under different hydrologic conditions, it is agreed that the District hereby guarantees winter and monthly minimum average flows at the Gorge as hereinafter provided. Full implementation of such guarantee requires the construction of certain facilities, which the District agrees to construct as expeditiously as possible. Any make-up obligations in excess of 3.0 cfs shall commence upon completion of such facilities, but in no event later than June 1, 2002, unless precluded by law.

(b)     The winter period includes the months of January through April. For the winter period, minimum daily flow requirements are: 11.5 cfs for very wet and above normal conditions; 8.0 cfs for below normal conditions; and 4.5 cfs for critically dry conditions. Notwithstanding the foregoing, in the first winter period following the effective date of this Agreement, the minimum daily flow requirement is 11.5 cfs, calculated on a 10 day running average. The District shall provide whatever make-up water is needed to meet this requirement. On May 1st immediately following the first

RVPUB\ALL\560907  March 21, 2002

Exh. B07

winter period, and on each May 1st thereafter, the hydrologic condition for the immediately preceding October-April period shall be determined. Such condition, and the daily flow requirements set forth in this Section 5(b), shall be used to determine the actual flow requirement for the prior winter period, and whether this requirement was exceeded. In providing minimum daily flows of 11.5 cfs during the first winter period, if the District has provided make-up water in excess of its actual requirement, the District shall be entitled to a credit for such excess. The quantity of the excess flow shall be converted to a cfs equivalent, and applied during the following winter periods to reduce the 11.5 cfs requirement. In all years following the first winter period, the same procedure shall be followed, provided that the minimum daily flow requirement for each winter period shall be 11.5 cfs, less any credit unused in a previous year, and less any credit established by the May 1st accounting of the prior year.

(c)    The non-winter period includes the remaining months of May through December. Minimum daily flow requirements, calculated on a 10 day running average, for the non-winter months are provided by the above table, based upon the particular hydrologic condition established on May 1st for the prior October-April period; provided that the 10 day average shall begin on the 11th day of each month. The District shall provide whatever make-up water is required to meet these monthly requirements.

RVPUB\ALL\560907  March 21, 2002

Exh. B08

(d)     Notwithstanding any provision to the contrary, the District shall not be required to provide more than the equivalent of 11.5 cfs make-up water for any month.

(e)     When the District is required under this Section to provide make-up water in any calendar year in excess of 4000 acre feet, measured at the Gorge, it shall be entitled to a credit for the excess, taking into account transmission losses, to be applied during the following two winter periods. Any deliveries pursuant to Section 17 are outside of, and in addition to, this subsection. The United States shall have the option of eliminating the District's credit in this subsection by the United States, or its designee, paying the District a cash amount equal to The Metropolitan Water District of Southern California's then current price for untreated water.

(f)     Notwithstanding any provision to the contrary, the District guarantees that flows, based upon a 10 day running average, shall at no time be less than 3.0 cfs, and this obligation is independent of the construction of any facilities.

(g)     Camp Pendleton, with the cooperation of the District, shall institute a monitoring program to assess the impacts of the parties' operations under this Agreement on the water supply, water quality and riparian habitat within Camp Pendleton. If adverse impacts are observed or if notice of such impacts is provided to Camp Pendleton by the Environmental Protection Agency, Fish and Wildlife Service, or other monitoring agencies, the District will cooperate with Camp Pendleton to assess operations under this Agreement to determine whether and what changes may be

RVPUB\ALL\560907 March 21, 2002

Exh. B09

needed to remedy such impacts. The District agrees to participate in good faith in appropriate watershed protection or watershed planning activities aimed at preserving water quality, enhancing watershed recharge, and encouraging watershed conservation within the Santa Margarita River watershed.

     6.    <u>Makeup Water.</u> Compliance with the requirements of Section 5 shall be based upon actual flow measurements as recorded by the USGS gage at the Gorge. Any losses of makeup water incurred between the point of discharge by the District and the Gorge shall be borne by the District, and shall not diminish the United States' entitlement, as measured at the Gorge. Makeup water which the District may be required to release at the Gorge in order to comply with the requirements of Section 5 may be supplied at its option from: (1) its wells upstream of the Gorge; (2) flows from its Live Stream Discharge Project subject to the provisions of the NPDES Permit and Section 9 below; (3) deliveries from its domestic water system; (4) deliveries of imported water from The Metropolitan Water District of Southern California; (5) or Vail Reservoir. With the consent of Camp Pendleton, the District may substitute treated water by exchange or direct delivery to Camp Pendleton for flow at the Gorge. Makeup water that the District releases to the stream shall meet all requirements of the California Water Quality Control Board, San Diego Region, and shall not cause a violation of any rule, regulation, standard or objective established by federal, state, or

local enforcement agencies, including but not limited to the federal and state Safe Drinking Water Acts.

    7.   <u>Safe Yield Operation</u>.

    (a)    The District agrees to manage its pumping of the "natural supply of groundwater" in the area upstream of the Gorge on a "safe yield" basis.  The term "natural supply of groundwater" as it is used herein includes all return flows that recharge the groundwater supply, including return flows from imported and reclaimed water. "Safe yield" recognizes that groundwater levels will fluctuate during hydrologic cycles, and that amounts of pumping may also vary from year to year, but that the District's pumping over time will not cause damage to the aquifers. The District's demands in excess of safe yield will be met from imported or reclaimed water supplies.

    (b)    In addition to its pumping of the natural supply, the District shall be entitled to pump such amounts of direct import water recharge and direct reclaimed water recharge as may have been percolated and stored underground by way of the VDC operations or other direct recharge facilities.

    (c)    So long as the quantity of groundwater extracted by the District, including makeup and emergency water provided hereunder, does not exceed safe yield as set forth above, and subject to Section 19 of this Agreement, there are no restrictions on the number of wells which the District may operate, where they may be located, the

aquifers from which they may draw water, or the amounts of groundwater which may be pumped from each well.

(d)     The District, with the cooperation of Camp Pendleton, shall install and maintain a multi-level monitoring network to obtain additional data which, when reviewed with the data from the surface monitoring system, may be used to assess safe-yield operations. The District, in consultation with Camp Pendleton, shall update the Groundwater Model from time to time but in no event less frequently than every five years. The Groundwater Model will be updated with current data and such other improvements as may be appropriate, and shall be utilized to monitor conditions, and to indicate whether adjustments to the District's pumping are required to operate within the safe yield of the basin.

8.     Vail Dam and Reservoir.

(a)     The District holds Permit 7032 from the State Water Resources Control Board for the construction and operation of Vail Dam and Reservoir. The Reservoir will be operated in accordance with such permit, as amended by the District's current application on file with the Board. The District's operations of the Reservoir are also constrained by its agreement with KACOR Realty, Inc., dated April 28, 1978, with respect to recreation levels in the Reservoir. The United States is not a party to this KACOR agreement and disputes the applicability of the Vail Lake recreational pool limit to the United States. The District agrees, in accord with the Mahlon Vail

RVPUB\ALL\560907 March 21, 2002

Exh. B12

letter dated October 6, 1947, that its yield from the Reservoir and all losses including net evaporation are chargeable against its one-third share under the 1940 Judgment. Moreover, the District agrees that the pumping of water that has been released from the Reservoir and has percolated underground downstream shall be a part of, and not an addition to, the natural supply and safe yield of the basin.

(b)     The United States on behalf of Camp Pendleton only will withdraw without prejudice the protest filed with the State Water Resources Control Board to the District's Permit 7032 change petition, provided that if this Agreement should be terminated, the United States shall have the right to reinstitute its protest, and any Permit amendments shall be conditioned upon such right.   The United States will also seek dismissal of the case entitled <u>United States of America v. Rancho California Water District</u>, Riverside County Superior Court, Case No. EO 14837, Court of Appeal, Fourth Judicial District, Case No. 229096, each side to bear its own costs and attorneys fees.   Except as allowed under Permit 7032, or any license confirming such rights, the District agrees that it will not seek rights from the State Water Resources Control Board, or otherwise, to store natural surface water flows of the Santa Margarita River or its tributaries.

(c)     On December 2, 1999 Vail Lake USA, LLC, as a claimed successor to KACOR Realty, Inc. under the April 28, 1978 Agreement with the District, gave notice to the District alleging that the District had failed to perform its obligations under

RVPUB\ALL\560907 March 21, 2002

Exh. B13

the Agreement; that Vail Lake USA, LLC was exercising its claimed right of reversion; and that it intended to retake possession of Vail Dam and Reservoir, among other properties. The District disputes this claim, and believes that it is without merit. However, the District's rights and obligations under this Agreement stem in part from the acquisition of Vail Dam and Reservoir pursuant to the April 28, 1978 Agreement, and should Vail Lake USA, LLC be successful in its claim, it may be necessary to modify this Agreement section accordingly. The District agrees to oppose, and the United States shall take such action as it deems appropriate, any effort by Vail Lake USA, LLC, or its successor, through amendment of Permit 7032 or otherwise, to export any waters subject to such permit for use outside of the Santa Margarita River watershed, or otherwise to interfere with the historic use of such stored waters.

9.   <u>Live Stream Discharge Project</u>.   Subject to the provisions of the Four Party Agreement, or any amendments thereto, flows discharged to the stream by the District from its Santa Rosa Water Reclamation Facility pursuant to and in compliance with Order No. 96-54, NPDES Permit No. CA0108821, or any amendments thereto or extension thereof, shall be considered part of the flows at the Gorge to which the United States is entitled, and may be used to provide any makeup water required to meet such entitlements.

10.   <u>Monitoring</u>.   In addition to the monitoring programs required under Section 5(g) hereunder, the Watermaster appointed in the Fallbrook Case shall measure

RVPUB\ALL\560907 March 21, 2002

Exh. B14

and monitor both water flows and water quality at the Gorge, and shall incorporate into his reports the results of all monitoring programs provided for in this Agreement.

11.     Use of Flows.   The flows at the Gorge guaranteed herein, and any make up obligation by the District, shall be subject to the reasonable and beneficial use requirements of federal and California law.   It is expressly recognized   that the minimum flows set forth in Section 5 may be used to meet the ecological habitat maintenance requirements for the riparian corridor below the Gorge, and that such use constitutes a reasonable and beneficial use.

12.     Upstream Pumping by Others.   To the extent that it is legally capable, the District shall be responsible for controlling, if necessary, any pumping or diversions by non-federal entities within its boundaries.   Except for any actions undertaken by any Indian tribe, band or community or any federal agency, and further excepting any actions affecting federal lands or the trust resources of any Indian tribe, band or community located within the Santa Margarita River watershed, the parties agree to act jointly, by judicial means or otherwise, to prevent any pumping or diversion upstream of the Gorge by others located outside of the boundaries of the District from adversely affecting flows at the Gorge.   In any event, none of the pumping upstream of the Gorge shall affect the District's obligations set forth in Sections 5 and 6.

13.     Annual Report.   By March 31 of each year, the Watermaster shall prepare an annual report for filing in the Fallbrook case on the performance of this Agreement

RVPUB\ALL\560907 March 21, 2002

Exh. B15

during the prior water year. He shall consult with the TAC on the contents of such report.

14.   <u>Technical Advisory Committee</u>.   The TAC, which shall continue to include the Watermaster, will serve as a forum for discussion and cooperation between the parties as to the performance of this Agreement. The TAC will conduct the reviews described in Sections 5 and 7, and may also, with the approval of the parties, undertake such studies as may be useful in implementing the Agreement. Such studies may include, but are not limited to, updating and reviewing the performance of the Groundwater Model and the HSPF Model; evaluating safe yield; calculating transmission losses; groundwater conditions and any changes in groundwater storage; comparing actual data with the assumptions used in negotiating this Agreement; identifying any substantially changed hydrologic conditions within the watershed; and determining losses of any groundwater stored for the account of Camp Pendleton.

15.   <u>Default</u>. Should either party fail to perform any portion of this Agreement, or otherwise breach any of its respective obligations under this Agreement, and upon notice of such breach or failure to perform, the party which is alleged to be in default shall cure its default within thirty days of receipt of notice, or within a reasonable time in the event more time is required. In the event of a dispute over the default, either party may apply to the Federal Court in the <u>Fallbrook</u> case, under its continuing jurisdiction, to obtain appropriate judicial relief.   During the pendency of the court

RVPUB\ALL\560907 March 21, 2002

proceedings, the party alleged to be in default shall continue to cure the default, unless otherwise directed by the court.  If the alleged default has been totally or partially cured, but an actual default is not finally established by the court, the curing party shall be entitled to appropriate relief to compensate it for the expense of its total or partial cure.  If the default is not cured or excused by the court, the other party shall be entitled to terminate the Agreement without further notice, notwithstanding any provision in Section 16.  Once terminated, the covenant to forbear from enforcing rights under the 1940 Judgment as set forth in Section 4 above will no longer apply and either party may then undertake judicial or administrative proceedings with respect to the 1940 Judgment.

16.    Termination.  In addition to the right to terminate upon an uncured default as set forth in the preceding Section, either party shall have the right to terminate this Agreement with or without cause upon two years written notice; provided, however, that in no event shall the right to terminate under this Section be exercised prior to ten years after the effective date of this Agreement, including the two years notice.  Once terminated, the covenant to forbear from enforcing rights under the 1940 Judgment as set forth in  Section 4 above will no longer apply, and either party may then undertake judicial or administrative proceedings with respect to the 1940 Judgment.

17.    Emergency Supplies.  In the event that the Commanding General of Camp Pendleton declares a water supply emergency based upon a drought affecting the water

RVPUB\ALL\560907 March 21, 2002

Exh. B17

supply to Camp Pendleton and its riparian habitat corridor, or upon mobilization demands requiring additional potable water supplies for Camp Pendleton, and upon agreement of the parties or approval of the Court, the District will: (1) work with Camp Pendleton to acquire untreated water from the San Diego Aqueduct of The Metropolitan Water District of Southern California, and discharging such water into the Santa Margarita River or its tributaries; (2) deliver water in the amount of any groundwater held by Camp Pendleton in the basin upstream of the Gorge into the Santa Margarita River at the Gorge; or (3) assist in supplying treated water directly or by exchange to Camp Pendleton. Camp Pendleton may acquire rights to such groundwater above the Gorge by foregoing its right to makeup water from the District; or to the extent that the District's actual flow maintenance requirements are less than the flows in the table in Section 5; provided: (1) that Camp Pendleton's rights to such groundwater in storage shall not exceed 5000 acre-feet at any one time; and provided further: (2) that the District's obligation to deliver stored groundwater shall not exceed 2200 acre-feet per year over any required makeup obligation which the District may have, and in no event at a rate in excess of 11.5 cfs. Any such groundwater held in the basin for the account of Camp Pendleton shall be subject to a proportionate share of losses. All governmental approvals required to discharge either Metropolitan Water District water or stored groundwater into the river, pursuant to this Section, shall be the responsibility of Camp Pendleton.

RVPUB\ALL\560907 March 21, 2002

Exh. B18

18.   Use of River Channel.   With respect to the flow requirements under Section 5 and the emergency surplus delivered to the Gorge under Section 17, it is the Parties' express intent that the natural channel of the Santa Margarita River serve as a conduit for delivery of those flows to Camp Pendleton.

19.   Federal and Indian Water Rights.   This Agreement is entered into by the United States solely on behalf of Camp Pendleton and not on behalf of any other federal agency or in any other capacity, including, but not limited to, its capacity as trustee for any Indian tribe, band or community.  Nothing in this Agreement may affect the water quality, water rights or the water rights claims of any Indian tribe, band or community or federal agency located within the Santa Margarita River watershed, or of the United States acting on their behalf.

20.   Representations and Warranties.  The parties to this Agreement represent and warrant as follows:

(a)   The parties affirm that the representatives executing the Agreement are empowered to do so and thereby bind the respective parties, and that there is no other condition to be satisfied or approval to be secured from any governmental or quasi-governmental agency or body in order to execute this Agreement;

(b)   Each party affirms its present competence to enter into the settlement provided for in this Agreement, with respect to the advisability of executing this Agreement, and with respect to its meaning;

RVPUB\ALL\560907 March 21, 2002

Exh. B19

(c)     Each party affirms that, as of the effective date of this Agreement, each has not previously assigned or transferred in any manner, or purported to have assigned or transferred in any manner, any of the claims set forth in this Agreement;

(d)     No party is relying upon any statement, representation or promise of any other party or any officer, director, agent, partner, employee, consultant, representative or attorney of or for any other party in executing this Agreement or in making the settlement provided for, except as expressly stated in this Agreement and admissible to interpret the Agreement.

21.     <u>Successors-in-Interest and Assigns</u>.     Subject to any restriction on transferability contained in this Agreement, this Agreement shall be binding upon and shall inure to the benefit of the successors-in-interest and assigns of each party to this Agreement.  Nothing in this Section shall create any rights enforceable by any person not a party to this Agreement, except for the rights of the successors-in-interest and assigns of each party to this Agreement, unless such rights are expressly granted in this Agreement to other specifically identified persons.

22.     <u>Integration</u>.  This Agreement is an integrated agreement and constitutes the entire Agreement between the parties and supersedes all prior and contemporaneous oral and written agreements and discussions.

RVPUB\ALL\560907 March 21, 2002

Exh. B20

23.   <u>Modification in Writing</u>.   This Agreement may be modified only by a writing executed by the parties to this Agreement against whom enforcement of such modification is sought.

24.   <u>Drafting Ambiguities</u>. Each party to this Agreement and its counsel have reviewed and revised this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

25.   <u>Partial Invalidity</u>.   Each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Agreement or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability, unless such provision or such application of such provision is essential to this Agreement.

26.   <u>Waiver</u>.  Any waiver of a default under this Agreement must be in writing and shall not be a waiver of any other default concerning the same or any other provision of this Agreement.  No delay or omission in he exercise of any right or remedy shall impair such right or remedy or be construed as a waiver.  A consent to or approval of any act shall not be deemed to waive or render unnecessary consent to or approval of any other or subsequent act.

RVPUB\ALL\560907 March 21, 2002

Exh. B21

27.   Further Assurances.   Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

28.   Time of Essence.   Time and strict punctual performance are of the essence with respect to each provision of this Agreement.

29.   Headings.   The headings of the Sections of this Agreement have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Agreement, or be used in any manner in the interpretation of this Agreement.

30.   Effectiveness.   This Agreement shall become effective when it has been executed by all of the parties, and approved by the Court as provided in Section 3.

31.   Anti-Deficiency Act.   The parties to this Agreement recognize and acknowledge that any payment obligations of the United States on behalf of Camp Pendleton in satisfaction of this Agreement can only be paid from appropriated funds legally available for such purpose.  Nothing in this agreement shall be interpreted as a commitment or requirement that the United States obligate funds or pay costs in contravention of Anti-Deficiency Act, 31 USC §§ 1301, 1341, or any other applicable provision of law.

32.   Notice.   All notices or other communications required or permitted to be given to a party to this Agreement shall be in writing and shall be personally delivered,

RVPUB\ALL\560907 March 21, 2002

Exh. B22

sent by registered or certified mail, postage pre-paid, return receipt requested, or sent by an overnight express courier service that provides written confirmation of delivery to such party at the following respective addresses:

UNITED STATES:

    Assistant Attorney General
    United States Department of Justice
    Environmental and Natural Resources Division
    Washington, DC

WITH A COPY TO:

    Director, Office of Water Resources
    Box 555013, MCB
    Camp Pendleton, CA  92055-5013

DISTRICT:

    General Manager
    Rancho California Water District
    P.O. Box 9017
    Temecula, CA  92589-90017

WITH A COPY TO:

    General Counsel
    Rancho California Water District
    P.O. Box 9017
    Temecula, CA 92589-9017

UNITED STATES OF AMERICA

Date: _3/26/02_

By: _S/ ANDREW F. WALCH_
    Andrew F. Walch, Senior Counsel
    United States Department of Justice
    Environment and Natural
    Resources Division
    General Litigation Section
    999 18th Street, Suite 945
    Denver, CO  80202

Date: _3/26/02_

By: _S/ DAVID A. BICE_

    United States Marine Corps
    Camp Pendleton, California

RVPUB\ALL\560907 March 21, 2002

Exh. B24

RANCHO CALIFORNIA WATER
DISTRICT

Date: 3/26/02                    By: S/ LISA D. HERMAN
                                        President

ATTEST:

S/ LINDA M. Fregoso
     Secretary

APPROVED AS TO FORM

BEST BEST & KRIEGER LLP

S/ Arthur L. Littleworth
Arthur L. Littleworth

S/ C. Michael Cowett
C. Michael Cowett

RVPUB\ALL\560907 March 21, 2002                    Exh. B25

ORIGINAL

1   ARTHUR L. LITTLEWORTH, Bar No. 022041
2   C. MICHAEL COWETT, Bar No. 053353
    JAMES B. GILPIN, Bar No. 151466
3   MELISSA W. WOO, Bar No. 192056
    LAW OFFICES OF
4   **BEST BEST & KRIEGER LP**
    402 WEST BROADWAY, 13TH FLOOR
5   SAN DIEGO, CALIFORNIA 92101-3542
    TELEPHONE: (619) 525-1300
    TELECOPIER: (619) 233-6118
6

7   Attorneys for Defendant
    RANCHO CALIFORNIA WATER DISTRICT

8                       UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF SAN DIEGO

10

11  UNITED STATES OF AMERICA,              Case No.  1247-SD-GT
                                           Judge: Hon. Gordon Thompson, Jr.
12            Plaintiff,
                                           PROOF OF SERVICE
13       v.
                                           DATE:  August 25, 2003
14  FALLBROOK PUBLIC UTILITY               TIME:  2:00 p.m.
    DISTRICT, EASTERN MUNICIPAL            DEPT:  8
15  WATER DISTRICT, RANCHO
    CALIFORNIA WATER DISTRICT, et al.,
16
17            Defendants.

18

19

20

21

22

23

24

25

26

27

28

28   _____
     Jodie K. Goldade

1     *United States of America v. Fallbrook Public Utility District, et al.*

2     *United States District Court, Southern District, Case No. 1247-SD-GT*

3     **PROOF OF SERVICE**

    I, Jodie K. Goldade declare:

5     I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is Best Best & Krieger LLP, 402 West Broadway, 13th Floor, San Diego, California 92101-3542. On August 8, 2003, I served the within documents:

    **OPPOSITION BY DEFENDANT RANCHO CALIFORNIA WATER DISTRICT TO MOTION FOR LEAVE TO FILE SECOND SUPPLEMENTARY AND AMENDATORY COMPLAINT; REQUEST FOR JUDICIAL NOTICE AND NOTICE OF LODGEMENT**

9     ☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

11     ☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below.

13     ☐    by causing personal delivery by of the document(s) listed above to the person(s) at the address(es) set forth below.

14     ☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

16     ☒    I caused such envelope to be delivered via overnight delivery addressed as indicated on the attached service list. Such envelope was deposited for delivery by **Federal Express** following the firm's ordinary business practices.

18     Andrew F. Walch, Senior Counsel
Michael A. Gheleta, Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th Street, Suite 945
Denver, Colorado 80202
303/312-7303 Phone
303/312-7379 Fax

22     I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

25     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

27     Executed on August 8, 2003, at San Diego, California.

28     Jodie K. Goldade

LAW OFFICES OF
BEST BEST & KRIEGER LLP
402 WEST BROADWAY, 13TH FLOOR
SAN DIEGO, CALIFORNIA 92101-3542

1