1  ANDREW F. WALCH, Senior Counsel
2  MICHAEL A. GHELETA, Trial Attorney
   United States Department of Justice
   Environment and Natural Resources Division
3  999 18th Street, Suite 945
   Denver, Colorado, 80202
4  Telephone: (303) 312-7303
   Facsimile: (303) 312-7379
5
   Attorneys for the United States of America
6
.7
8
9                UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11

12                                    )   CASE NO. 51CV1247-SD-GT
13  UNITED STATES OF AMERICA,          )
                                       )   UNITED STATES' RESPONSE TO
14                      Plaintiff,     )   WATERMASTER'S LETTER OF
                                       )   SEPTEMBER 9, 2003
15  vs.                                )
                                       )   Date:   October 20, 2003
16                                     )   Time:  2 p.m.
   FALLBROOK PUBLIC UTILITY DISTRICT,  )   Courtroom:    8
17  et.al.                             )   Hon. Gordon Thompson, Jr.
                                       )
18                     Defendants.     )
                                       )
19  _____)

20

21

22                            INTRODUCTION

23        Pursuant to the Court's Order of August 20, 2003, Plaintiff United States of America hereby

24  responds to the September 9, 2003 letter submitted to the Court by James Jenks, Watermaster for

25
   the Santa Margarita River Watershed.  The Watermaster's letter was written pursuant to the Court's

26  August 20, 2003 Order that the Watermaster provide additional information regarding the Santa

27  Margarita River Watershed ("Watershed") by responding to five questions posed by the Court.

28

FILED

03 OCT -7  AM 9: 16

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

nunc pro tunc
10/06/00

1    Following the Court's issuance of its August 20, 2003 Order, and prior to the Watermaster's

2    response, the United States submitted an ex parte request for clarification of the Court's Order on

3

4    August 29, 2003 .[1]  While the Court declined to pose the questions suggested by the United States

5    to elicit the views of the Watermaster on the related issues and subject matter contained therein, the

6    United States appreciates the opportunity to bring this information before the Court and the

7
     Watermaster and to explain it more fully in this response to the Watermaster's letter.  The United
8
9    States addresses the Watermaster's response to each of the Court's questions below.

10                                                    **DISCUSSION**

11   1)    *Does the original consent decree, as appended by subsequent incorporated agreements,*
12         *govern just the natural flows of water within the Watershed or imported water as well?*

13         The Watermaster's letter suggests that the Court lacks jurisdiction over imported water.

14   However, the letter does not cite any language in support of this conclusion from the 1966 modified
15
16   final judgment and decree ("1966 decree"),[2] which is the focus of the Court's question.  Instead, the

17   Watermaster relies largely upon a single statement he has included in the annual Watermaster

18   Reports in response to a comment made on a draft report over a decade ago aimed at imported water

19

20   ────────────────

21   [1]In filing its ex parte application, the United States was not attempting to pose entirely new questions
     asking for additional information about the Watershed.  Rather, the United States sought clarification
22   from the Court regarding the issues raised in the August 20, 2003 Order, and the subject matter which
     the United States understood to underlie the Court's inquiries.  Thus, the United States respectfully
23   requested that the Court pose to the Watermaster several related questions allowing the Watermaster
     to more fully explore the issues and the subject matter which the United States understood were being
24   inquired into by the Court, especially in relation to the allegations contained in the United States'
     second supplementary and amendatory complaint.
25

26   [2]The United States assumes that the Court was referring to the 1966 modified final judgment and decree
     in this question.  As a point of clarification, the 1966 modified final judgment and decree was not a
27   consent decree, but rather a litigated decree entered after trial by U.S. District Court Judge James M.
     Carter.  The only consent decree associated with this case is the 1940 stipulated judgment, entered on
28   December 26, 1940 by the Superior Court of the State of California for San Diego County.  See 1966
     Modified Final Judgment and Decree at 3-4, Exhibit A.

in storage in surface reservoirs, which is not subject to the Court's jurisdiction.  Examination of the language of the 1966 decree itself leads to a different conclusion.

The United States maintains that the Court has jurisdiction over <u>the use</u> of imported water where such use has an impact on natural flows in the Watershed, or where such use adversely affects the exercise of prior vested water rights.  Jurisdiction over the use of imported flows in the present case was previously established by the Court in the 1966 modified final judgment and decree, wherein it retained jurisdiction over "the use of all surface waters within the watershed of the Santa Margarita River and all underground or sub-surface water ... which ... add to, contribute to, or support the Santa Margarita River stream system," 1966 Modified Final Judgment and Decree, ¶ V, at 14, and also retained jurisdiction over present and future appropriative rights "insofar as such uses may conflict with or be adverse to the exercise of any prior vested water right ... ." <u>id.</u> at ¶ VII, at 15.

The Court's exercise of jurisdiction over the use of imported water which impacts natural flows or prior vested water rights is supported by <u>City of Los Angeles v. City of San Fernando, et al.</u>, 14 Cal.3d 199, 260 (1975).   In <u>San Fernando</u>, the court stated:

> The right to withdraw amounts of appropriated water contributed to the channel of a stream is provided by Water Code section 7075 . . . which states: "Water which has been appropriated may be turned into the channel of another stream, mingled with its water, and then reclaimed; <u>but in reclaiming it the water already appropriated by another shall not be diminished.</u>" . . . The rule codified by this statute applies as well to the addition and withdrawal of water in an underground basin.

14 Cal.3d at 260 (emphasis added, citations omitted).  The Watermaster's letter overlooks this no injury rule and its applicability in this case when the letter erroneously concludes that <u>San Fenando</u> supports a lack of jurisdiction over imported water here.

While <u>San Fernando</u> recognized the general rule that the importer has the superior right to reclaim that which he imports, the court in <u>San Fernando</u> specifically acknowledged that there are

1  instances in which that right is subject to the jurisdiction of and limitations prescribed by the courts.

2  In fact, the court in <u>San Fernando</u> ruled that on remand, the trial court should take jurisdiction of the

3
4  use of the imported reclaimed water and determine whether the general rule applied or if the need

5  existed to treat the use of that imported, commingled water under different more equitable rules.  14

6  Cal.3d at 294.  One such equitable rule was that if an insufficient supply was found to exist, then the

7
   plaintiff should be allocated the groundwater it requires for reasonable beneficial use from the part
8
9  of the supply constituting return flow attributable to plaintiff's imports.  <u>Id.</u>  In the instant case,

10 defendants' imports which are used and then reclaimed are not being put to reasonable beneficial

11 use within the Watershed, but instead a substantial portion of the imports would be exported out of

12
   the Watershed to the detriment of the United States and Fallbrook.
13
14         As observed in the Watermaster's letter, the Appointment Order requires that the

15 Watermaster collect and report information on water imported for use in the Watershed.  Moreover,

16 an entire section of the annual Watermaster Report is devoted to distinguishing the relative rights of

17
   the Rancho California Water District ("Rancho") to native waters and to return flows from the direct
18
19 use of imported waters, including detailed calculations aimed at giving Rancho return flow credits

20 under the application of the <u>San Fernando</u> decision. See, <u>e.g.</u>, Exhibit 1 hereto (September 2003

21 Watermaster Report at pp. 57-63).[3/]  This information concerning imported water in the annual

22 Watermaster Report indicates that the Watermaster has a role in differentiating imported water from
23
24 native water in the Watershed.  The Watermaster Report, however, fails to make provision for the

25 ─────────────────────

26 [3/]The Watermaster's calculation of return flow credit is based on quantity alone and does not address
   the issue of changes in downstream water quality due to the impact of poorer quality return flow from
27 the direct use of imported water. Although the Watermaster's argument in the Annual Report states that
   the portion of native water exported from the Watershed is replaced by the return flow portion of
28 imported water, it fails to address the issue of whether a degradation of water quality must be mitigated
   at a ratio greater than a 1:1 exchange.

1   use of imported water which may impact natural flows or adversely affect vested water rights in the

2   Watershed – both areas which are within the Court's retained jurisdiction, and which are at issue in

3   the second supplementary and amendatory complaint.[4]

4

5   2)   *How is treated wastewater handled within the Watershed under the consent decree?*

6       Unlike imported water, the use of which in the Watershed was relatively insignificant at the

7   time of issuance of the 1966 decree,[5] treated wastewater was expressly addressed in Interlocutory

8   Judgment No. 37, entered in 1962, because Camp Pendleton had for many years been reusing its

9   sewage effluent as part of the exercise of its water rights.  See Interlocutory Judgment No. 37,

10  Finding of Fact No. 26, pp. 26-27 (Exhibit 2 hereto).  The Court specified that this reuse of sewage

11  effluent was to be taken into account in any future apportionment proceedings undertaken by the

12  Court, thereby recognizing that treated wastewater is subject to this Court's jurisdiction.  Id.,

13

14  Conclusion of Law No. 12, pp. 47-48.  Also, as with the use of imported water, the use of reclaimed

15  water could result in return flows intermingling with surface and supporting underground waters in

16  the Watershed.  Therefore, as noted in the Watermaster's letter, the Appointment Order charges the

17

18  Watermaster with collecting and reporting information on the use of reclaimed water in the

19  Watershed.  The Watermaster has also recognized the application of prior vested rights to the

20  exportation of the native water portion of treated wastewater and has for several years addressed that

21

22

23

24  [4]The Watermaster refers to two provisions of the Cooperative Agreement, which provide that Rancho
    may opt to meet its flow obligations at the Gorge with deliveries of imported water, and that Rancho
25  may pump imported or reclaimed water recharged into groundwater through its VDC operations.
    Neither of these provisions conflict with the proposition that the Court retains jurisdiction over the use
26  of imported water which may impact natural flows or adversely affect vested water rights in the
    Watershed.

27
    [5]Total imports of water to the Watershed were 6,287 acre-feet in 1966 and 81,873 acre-feet in 2002.
28  See Exhibit 1 hereto (September 2003 Watermaster Report at p. 34, Table 5.4).

concern in his annual Watermaster Report to the Court. See, e.g., Exhibit 1 hereto (September 2003

Watermaster Report at pp. 49-51).[6/]

3)      *The impact of the "Four Party Agreement," since its inception, on both the quantity and*
        *quality of the water within the Watershed.*

        The Watermaster correctly observes that the Four Party Agreement has not been fully

implemented since its inception in 1990.  As indicated in the second supplementary and amendatory

complaint, not long after the Four Party Agreement's inception, the parties entered into standstill

agreements in 1992 and 1996, suspending performance under the Four Party Agreement while

smaller flows were released through demonstration projects attempting to assess environmental

impacts.  See Second Supplementary and Amendatory Complaint at Count 27, ¶¶ 13, 14.

        However, the United States disagrees with the conclusion at page 4 of the Watermaster's

letter that "[b]ecause no discharges have been made under the Agreement, it has had no impact on

either the quantity or quality of water in the watershed."  The initial implementation of the Four

Party Agreement did result in the degradation of water quality in the basin.  Prior to the suspensions

to allow completion of the demonstration projects and in reliance on future flows pursuant to the

Four Party Agreement, the United States and Fallbrook Public Utility District ("Fallbrook")

performed their obligations under the Agreement by strongly supporting the defendants' request,

eventually granted, to lower the upper basin standard for total dissolved solids (TDS) from 500 mg/l

to 750 mg/l, allowing a 50 percent degradation in TDS water quality.  This lowering of the TDS

---

[6/]The Watermaster cites two provisions from the Cooperative Agreement providing that Rancho may
satisfy its flow requirements to the United States at the Gorge with flows from the Live Stream
Discharge Project.  Again, this provision does not conflict with the proposition that the Court retains
jurisdiction over the use of imported water impacting natural flows or adversely affecting vested water
rights in the Watershed.

standard allowed the degradation of water quality by treated wastewater discharged in the upper basin of the Santa Margarita watershed.  <u>See</u> Second Amendatory and Supplementary Complaint, Count 27, ¶¶ 8-10.

It was anticipated, however, that the degradation in water quality due to the lowering of the TDS standard would be offset by augmented flows and mitigation facilities provided by defendants under the Four Party Agreement.  Defendants have now indicated that they have no intention of fully implementing the Four Party Agreement, and thus providing the augmented flows and mitigation facilities that were promised in return for Camp Pendleton's and Fallbrook's support of lowered water quality standards in the upper Watershed.  Moreover, the increasing export of defendants' treated effluent out of the Watershed will ensure that such promised flow augmentation will not occur.  Accordingly, in its second supplementary and amendatory complaint, the United States alleged that it objected to "the exportation of treated wastewater from the Santa Margarita River watershed, regardless of whether the source is waters native to the Santa Margarita River or waters imported into the basin, because such exportation results in the further degradation and diminution of waters native to the basin, [and] adversely impacts the quality and quantity of water otherwise available for beneficial use by the Naval Enclave and Fallbrook. . . ."  Second Supplementary and Amendatory Complaint, Count 28, ¶ 2.[2/]

Indeed, the current General Manager of Eastern Municipal Water District ("Eastern"), Anthony Pack, agreed with the position that exporting reclaimed water out of the watershed could

---

[2/]While the United States has asserted in Count 30 a claim for breach of the Four Party Agreement, Counts 28 and 29 seek a declaration of rights and an injunction with respect to the export out of the Watershed of treated wastewater, wholly apart from any obligations under or breach of the Four Party Agreement.  In this regard, the United States has alleged that "the exportation of treated wastewater from the Santa Margarita River watershed . . . results in the further degradation and diminution of waters native to the basin, adversely impacts the quality and quantity of water otherwise available for beneficial use by the Naval Enclave and Fallbrook, and disregards the rules prohibiting unreasonable use and injury to prior vested rights."  Second Amendatory and Supplementary Complaint, Count 28, ¶ 2.

CASE NO. 51-CV-1247 (GT)

adversely impact the quality and quantity of water downstream.  Mr. Pack did so when he sent a letter to Eastern on behalf of Camp Pendleton, as a Lieutenant Colonel with the United States Marine Corps, in 1989 commenting upon the Rancho Temecula Effluent Pipeline.[8]  Mr. Pack wrote:

> As we have repeatedly stated, Camp Pendleton is opposed to any wastewater discharge scheme which would transfer water out of the Santa Margarita watershed. The Draft EIS acknowledges that a large amount of wastewater coming into the RCWRF is local groundwater from the Santa Margarita Basin.  As demand continues to grow, it is reasonable to assume that more and more groundwater will find its way to the water reclamation plant.  If that water is removed from the watershed, there could well be significant adverse impacts on the quality and quantity of groundwater remaining in the watershed, especially in downstream areas.

See Exhibit 3 hereto (emphasis added).

Thus, pursuant to the provisions of the Four Party Agreement, the water quality of the upper Watershed, as measured by TDS standards, has for many years been degraded by the lowering of those standards from 500 mg/l to 750 mg/l, a 50 percent degradation in the quality of the waters that are a primary source for Camp Pendleton's water supply.  This lowered water quality will not be offset by the augmentation flows promised by defendants in the Four Party Agreement, since defendants' treated effluent will now be exported out of the Watershed, to the detriment of Camp Pendleton and Fallbrook.[9]  The impact of removing this water from the Watershed can only be mitigated through the replacement of water similar in both quantity and quality.  The Four Party Agreement, its initial implementation, and the failure to fully implement it have had and will in the future continue to have an adverse impact on the quality and quantity of water within the Watershed.

---

[8] The pipeline was an alternative in the live stream discharge project that resulted in the execution of the Four Party Agreement.

[9] Nor will the lowered water quality be ameliorated by the mitigation facility promised under the Four Party Agreement.  See Second Supplementary and Amendatory Complaint, Count 27, ¶¶ 8, 10.

4)    *Whether or not the Four Party Agreement, since its inception, impacts the original parties' riparian and appropriative rights to water in the Watershed.*

The Watermaster's letter concludes that since the Four Party Agreement has not been fully implemented since its inception in 1990, it has not impacted riparian and appropriative rights in the Watershed.  The United States believes this conclusion is wrong.  As discussed in the section immediately above, the degradation in water quality brought about by the Four Party Agreement, and the export of treated effluent by defendants – instead of using the effluent to augment streamflows and mitigate the lowered water quality allowed by the Four Party Agreement – impact Camp Pendleton's ability to use water under its riparian and appropriative rights in the Watershed.  See Second Supplementary and Amendatory Complaint at Count 27, ¶¶ 19-20.

Moreover, the additional flows provided under the Four Party Agreement likely would have solved the water quantity issues of the two downstream parties, Camp Pendleton and Fallbrook.  The United States pursued water rights settlements with other parties over the past 13 years in good faith and with the expectation that the wastewater releases anticipated under the Four Party Agreement would occur.  Now, the parties either must find another settlement solution, or litigate their respective water rights in this action.

5)    *Whether or not Mr. Jenks, as Watermaster, administers, enforces or oversees any part of the "Four Party Agreement."*

As observed by the Watermaster's letter, the Four Party Agreement provides that the Watermaster is to measure the quantities of wastewater delivered to the downstream parties.  This confirms that the Watermaster does have a role in administering, enforcing or overseeing the Four Party Agreement.

- 9 -

## CONCLUSION

The United States respectfully requests that the Court consider the matters discussed above, many of which were not addressed by the Watermaster's September 9, 2003 letter to the Court, in determining whether to allow the United States' second supplementary and amendatory complaint to be filed in this action.

Dated: October _3_, 2003

Respectfully submitted,

ANDREW F. WALCH
Senior Counsel
MICHAEL A. GHELETA
Trial Attorney

U.S. Department of Justice
Environment & Natural Resources Div.
General Litigation Section
999 - 18th Street, Suite 945
Denver, CO  80202

ATTORNEYS FOR THE UNITED STATES

Of Counsel
John Tew
Office of General Counsel
U.S. Department of the Navy

Capt. Jennifer Ash
U.S. Marine Corps
Camp Pendleton

- 10 -                                    CASE NO. 51-CV-1247 (GT)

1

## CERTIFICATE OF SERVICE

2      The undersigned hereby certifies that she is an employee in the Denver Field Office of
the United States Department of Justice, Environment and Natural Resources Division, Natural
3 Resources Section, 999 18th Street, Suite 945, Denver, Colorado 80202; and is a person of such age
and discretion to be competent to serve papers.

4

       And that on October 3, 2003, she served a copy of the attached:

5

6      1.      **UNITED STATES' RESPONSE TO WATERMASTER'S
               LETTER OF SEPTEMBER 9, 2003**

7      in the manner specified below to the persons hereinafter named, at the places and addresses
stated below:

8

**By First Class U.S. Mail:**

9

10 Melissa W. Woo, Esq.
Best Best & Krieger, LLP
402 West Broadway, 13th Floor
11 San Diego, CA 92101-3542
Email: cmcowett@bbklaw.com
12 Fax: 619/233-6118
       *Attorneys for Rancho California Water District*

13

14 Tom Bruyneel, Esq.
Redwine and Sherrill
15 1950 Market Street
Riverside, CA 92501-1701
16 Email: tbruyneel@redwineandsherrill.com
Fax: 909/684-9583

17

18 John G. McClendon
Van Blarcome, Leibold, McClendon & Mann
19 24322 Mill Creek Drive, Suite 150
Laguna Hills, CA 92653
20 Phone: 949/457-6300
Fax: 949/457-6305
21 Email: john@CEQA.com
       *Attorneys for Eastern Municipal Water District*

22

23 Robert H. James, Esq.
205 W. Alvarado St.
24 Fallbrook, CA 92028
Email: rhjames@sbcglobal.net
25 Fax: 760/728-9648
       *Attorney for Fallbrook Public Utilities District*

26

27

28

                                                          51 CV 1247-SD-GT

1   James J. Jenks
      Santa Margarita River Watershed
2   P.O. Box 631
      Fallbrook, CA 92088
3   Fax: 760/728-1990
          *Watermaster*

4

5

6

                             Helena Engelhart, Legal Assistant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

51 CV 1247-SD-GT

United States of America v. Fallbrook Public Utilities District

**EXHIBITS IN SUPPORT OF UNITED STATES' RESPONSE TO WATERMASTER'S LETTER OF SEPTEMBER 9, 2003**

Exhibit No. 1     Santa Margarita River Watershed, Annual Watermaster Report, Water Year 2001-2002; United States of America v. Fallbrook Public Utility District, et al., dated September 2003.................................................. 1, 34, 49-51, 57-63

Exhibit No. 2     Findings of Fact, Conclusions of Law, and Interlocutory Judgment, dated April 6, 1962............................................................................ 1, 26-27, 47-48

Exhibit No. 3     Correspondence from A.J. Pack, Deputy Assistant Chief of Staff of the United States Marine Corp to Eastern Municipal Water District re Draft EIR for the Ranch Temecula Effluent Pipeline........................................................1

# *SANTA MARGARITA RIVER WATERSHED*

## ANNUAL WATERMASTER REPORT

## WATER YEAR 2001-2002

### *UNITED STATES OF AMERICA*
### *V.*
### *FALLBROOK PUBLIC UTILITY DISTRICT, ET AL*

### CIVIL NO. 1247 - SD-T

**JAMES S. JENKS**
**WATERMASTER**
**P. O. BOX 631**
**FALLBROOK, CA.  92088**
**(760) 728-1028**
**FAX (760) 728-1990**

SEPTEMBER 2003

United States
Exhibit No.1

## TABLE 5.4
## SANTA MARGARITA RIVER WATERSHED
## IMPORTS/EXPORTS

Quantities in Acre Feet

| | IMPORTS | | | | | | | | | CAMP PENDLETON | | | EXPORTS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR | EASTERN MWD | ELSINORE VALLEY MWD | FALLBROOK PUD IV 1/ | MWD 2/ | RAINBOW MWD | RANCHO CAL WD | U.S. NAVAL WS | WESTERN MWD 3/ | TOTAL IMPORTS | EXPORT | WASTEWATER RETURNS | NET EXPORT | U.S. NAVAL WS | EASTERN MWD | ELSINORE VALLEY MWD | FALLBROOK PUD | TOTAL EXPORTS |
| 1966 | 1,604 | NR | 3,351 | | 1,308 | 0 | 0 | 24 | 6,287 | 3,251 | 974 | 2,277 | 0 | 0 | 0 | 0 | 2,277 |
| 1967 | 1,630 | NR | 2,852 | | 1,095 | 0 | 0 | 20 | 5,597 | 3,180 | 1,243 | 1,937 | 0 | 0 | 0 | 0 | 1,937 |
| 1968 | 1,464 | NR | 3,423 | | 1,317 | 0 | 0 | 27 | 6,231 | 3,268 | 1,214 | 2,154 | 0 | 0 | 0 | 0 | 2,154 |
| 1969 | 1,741 | NR | 2,837 | | 1,253 | 0E | 0 | 25 | 5,856 | 3,276 | 1,170 | 2,106 | 0 | 0 | 0 | 0 | 2,106 |
| 1970 | 1,411 | NR | 3,538 | | 1,689 | 0E | 0 | 31 | 6,675 | 3,809 | 1,113 | 2,696 | 0 | 0 | 0 | 0 | 2,696 |
| 1971 | 1,383 | NR | 3,405 | | 1,650 | 0E | 76E | 34 | 6,548 | 3,527 | 1,090 | 2,437 | 0 | 0 | 0 | 0 | 2,437 |
| 1972 | 1,470 | NR | 3,916 | | 2,037 | 0E | 115E | 34 | 7,572 | 3,543 | 1,168 | 2,375 | 0 | 0 | 0 | 0 | 2,375 |
| 1973 | 1,533 | NR | 3,210 | | 1,816 | 0E | 115E | 30 | 6,504 | 3,544 | 1,187 | 2,357 | 0 | 0 | 0 | 0 | 2,357 |
| 1974 | 1,501 | NR | 3,387 | | 2,049 | 0 | 115E | 38 | 7,708 | 3,532 | 1,140 | 2,392 | 0 | 0 | 0 | 0 | 2,392 |
| 1975 | 1,593 | NR | 3,597 | | 1,247 | 0 | 115E | 38 | 6,902 | 3,098 | 1,530 | 1,568 | 0 | 0 | 0 | 0 | 1,568 |
| 1976 | 2,493 | NR | 4,827 | | 2,239 | 119 | 115E | 35 | 9,828 | 3,619 | 1,497 | 2,122 | 0 | 0 | 0 | 0 | 2,122 |
| 1977 | 2,947 | NR | 5,217 | | 2,343 | 1,845 | 115E | 24 | 12,486 | 3,194 | 1,416 | 1,778 | 0 | 0 | 0 | 0 | 1,778 |
| 1978 | 2,551 | 569 | 5,202 | | 2,188 | 5,774 | 115E | 26 | 16,425 | 3,071 | 1,283 | 1,788 | 0 | 0 | 0 | 0 | 1,788 |
| 1979 | 1,894 | 712 | 5,723 | | 2,348 | 7,009 | 115E | 24 | 17,824 | 4,756 | 1,427 | 3,329 | 0 | 0 | 0 | 0 | 3,329 |
| 1980 | 1,192 | 696 | 6,464 | | 2,469 | 10,126 | 115E | 25 | 21,047 | 3,651 | 1,405 | 2,246 | 0 | 0 | 0 | 0 | 2,246 |
| 1981 | 1,716 | 798 | 6,543 | | 3,153 | 15,282 | 115E | 34 | 28,642 | 3,892 | 1,249 | 2,643 | 0 | 0 | 0 | 0 | 2,643 |
| 1982 | 1,112 | 678 | 7,079 | | 2,460 | 13,378 | 115E | 34 | 24,856 | 3,761 | 1,273 | 2,488 | 0 | 0 | 0 | 0 | 2,488 |
| 1983 | 1,211 | 658 | 6,720 | | 2,190 | 5,752 | 102 | 26 | 16,672 | 3,000 | 1,242 | 1,758 | 26E | 0 | 0 | 1,003 | 2,787 |
| 1984 | 699 | 699 | 8,506 | | 3,068 | 6,716 | 94 | 26 | 19,946 | 3,243 | 1,120 | 2,123 | 26E | 0 | 0 | 1,032 | 3,181 |
| 1985 | 679 | 808 | 7,831 | | 3,410 | 7,155 | 116 | 27 | 20,015 | 3,377 | 1,200 | 2,177 | 26E | 0 | 0 | 1,060 | 3,263 |
| 1986 | 760 | 882 | 8,565 | | 2,945 | 11,174 | 120 | 30 | 24,474 | 3,326 | 981 | 2,345 | 16P | 0 | 4 | 1,098 | 3,457 |
| 1987 | 1,155 | 558 | 8,656 | | 3,290 | 16,368 | 128 | 36 | 21,655 | 3,444 | 1,799 | 1,645 | 26 | 0 | 55 | 1,129 | 2,805 |
| 1988 | 1,047 | 1,002 | 8,633 | | 2,985 | 17,864 | 145 | 36 | 32,108 | 3,457 | 1,872 | 1,628 | 26 | 0 | 74 | 1,154 | 2,820 |
| 1989 | 3,746 | 1,341 | 9,066 | | 3,003 | 22,895 | 109 | 29 | 40,203 | 3,418 | 1,446 | 1,972 | 23 | 0 | 114 | 1,181 | 3,250 |
| 1990 | 5,601 | 2,255 | 10,103 | | 3,818 | 22,030 | 109 | 20 | 43,974 | 2,971 | 1,451 | 1,520 | 27 | 0 | 134 | 1,271 | 2,932 |
| 1991 | 9,479 | 2,421 | 7,962 | | 2,904 | 26,992 | 99 | 20 | 44,133 | 2,168 | 949 | 1,219 | 13 | 0 | 140 | 960 | 2,056 |
| 1992 | 8,593 | 2,190 | 7,893 | | 2,277 | 16,931 | 99 | 25 | 38,008 | 2,426 | 1,548 | 878 | 7 | 0 | 150 | 1,003 | 2,108 |
| 1993 | 5,393 | 1,914 | 6,925 | | 1,965 | 11,411 | 117 | 30 | 27,755 | 2,329 | 1,926 | 403 | 16 | 705 | 170 | 1,255 | 2,529 |
| 1994 | 7,150 | 3,221 | 7,250 | 547 | 1,651 | 16,368 | 73 | 41 | 35,788 | 2,702 | 1,501 | 1,201 | 16 | 3,159 | 185 | 1,068 | 5,603 |
| 1995 | 4,625 | 3,117 | 6,638 | 1,005 | 1,815 | 15,108 | 125 | 41 | 31,750 | 2,781 | 1,170 | 1,611 | 12 | 3,398 | 213 | 1,153 | 6,408 |
| 1996 | 4,181 | 4,181 | 8,181 | 3,521 | 1,429 | 23,600 | 105 | 42 | 43,689 | 3,577 | 1,884 | 1,693 | 12 | 2,993 | 226 | 1,035 | 6,330 |
| 1997 | 3,284 | 4,203 | 7,894 | 5,023 | 1,601 | 26,992 | 109 | 42 | 47,542 | 3,643 | 1,932 | 1,711 | 6 | 3,201 | 247 | 1,021 | 6,165 |
| 1998 | 5,117 | 5,100 | 6,382 | 3,781 | 1,727 | 24,890 | 109 | 41 | 42,935 | 3,742 | 2,073 | 1,669 | 8 | 4,513 | 254 | 1,482 | 7,919 |
| 1999 | 4,327 | 6,134 | 7,430 | 712 | 2,217 | 19,584 | 111 | 42 | 58,041 | 3,558 | 2,130 | 1,428 | 5 | 4,133 | 279 | 1,377 | 7,197 |
| 2000 | 7,256 | 7,172 | 9,365 | 689 | 2,115 | 34,480 | 104 | 59 | 82,277 | 4,072 | 2,115 | 1,957 | 7 | 3,649 | 310 | 1,634 | 7,526 |
| 2001 | 5,848 | 6,592 | 8,398 | | 1,804 | 55,409 | 73 | 73 | 65,386 | 3,653 | 2,075 | 1,578 | 5 | 4,457 | 310 | 1,643 | 7,996 |
| 2002 | 8,117 | 7,596 | 9,580 | 595 | 1,676 | 54,148 | 97 | 64 | 81,873 | 3,701 | 1,950 | 1,751 | 9 | 5,325 | 412 | 1,495 | 8,992 |

1/ Includes DeLuz Heights MWD prior to 1991
2/ Metropolitan Water District direct deliveries in Domenigoni Valley
3/ Improvement District A - Rainbow Canyon Only (WR.13)
NR - Not Reported

E - Estimate
P - Partial year data

concluded that most of the production from Well No. 1 and all of the production from Well No. 2 are from the deep aquifer. Interlocutory Judgment No. 33 concluded that waters contained in the deep aquifer did not add to, support or contribute to the Santa Margarita River stream system and were, therefore, declared to be outside the Court's jurisdiction.

Thus, most of the water produced by the Anza Mutual Water Company is outside the Court's jurisdiction. The relatively small portion pumped from the shallow aquifer in Well No. 1 is pumped under a groundwater appropriative right.

Eastern Municipal Water District

Eastern MWD is a member agency of MWD and its service area includes a portion of the Rancho California WD. Within the Watershed, the District wholesales water to Rancho California WD and also sells water directly to consumers. Water sold to Rancho California WD is listed in this report as imported water to the Rancho California WD service area.

Eastern MWD's service area outside Rancho California WD is located in the northern part of the Watershed. Water for their service area is imported or produced locally from groundwater.

Imports, not including water wholesaled to Rancho California WD or delivered to Elsinore Valley MWD, totaled 12,777 acre feet. A portion of that import amounting to 4,954 acre feet was exported from the Santa Margarita River Watershed resulting in net import to the watershed of 8,117 acre feet. These data are shown in Appendix A.

Groundwater production for the 2001-2002 Water Year in the Santa Margarita River Watershed totaled 13 acre feet from Well 7S/3W-15N which is 345 feet deep. The well is generally perforated between the depths of 106 and 333 feet. Recent static water levels in Eastern MWD's well have varied from a depth of 102 feet in December 1987, to as low as 177 feet in January 2002. The well is located within the Murrieta-Temecula Groundwater Area where the older alluvium is at ground surface. Thus the well produces water from the older alluvium under groundwater appropriative rights.

In addition to producing fresh water, Eastern MWD also reclaims wastewater at its Temecula Valley Regional Water Reclamation Facility.

Disposition of wastewater from the Temecula Valley Regional Water Reclamation Facility (Facility) service area for Water Years 2000-2001 and 2001-2002 is shown below:

|  | 2000-2001 | | 2001-2002 | |
|---|---|---|---|---|
|  | Quantity | Percent | Quantity | Percent |
|  | AF | % | AF | % |
| Used in Santa Margarita | 4,571 | 51 | 4,843 | 48 |
| Used outside Santa Margarita | 3,249 | 36 | 4,863 | 48 |
| Reuse | 7,820 | 87 | 9,706 | 96 |
| Unaccounted for Production | 1,208 | 13 | 462 | 4 |
| TOTAL PRODUCTION | 9,028 | 100 | 10,168 | 100 |

It can be noted that the quantities of reclaimed wastewater used within the Santa Margarita River Watershed increased from 4,571 acre feet in 2000-2001 to 4,843 acre feet in 2001-2002. During the same period reuse outside the Santa Margarita River Watershed also increased from 3,249 acre feet to 4,863 acre feet. From the foregoing it may be concluded that 48 percent of the wastewater is reused in the watershed and 48 percent is used outside the watershed. Unaccounted for production decreased from a 1,208 acre feet to 462 acre feet. Unaccounted for production includes changes of storage in Winchester and Sun City storage ponds, evaporation and percolation losses, and discharges to the Santa Ana Watershed.

Because of concerns about the potential export of native Santa Margarita water, the sources of water supply to the Facility service area were determined and are shown on Table 7.3. In 2001-2002, 24 percent of the supply to the service area was groundwater. Thus, the percent of wastewater reused within the Santa Margarita Watershed exceeded the percent of groundwater in the supply, and on a proportional basis there was no export of native waters.

Estimates of water production and use for the period 1966-2002 are shown in Appendix B.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

TABLE 7.3

*SANTA MARGARITA RIVER WATERSHED*
WATER DELIVERIES TO TEMECULA VALLEY
REGIONAL WATER RECLAMATION FACILITY SERVICE AREA

| | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Eastern MWD** | AF | % | AF | % | AF | % | AF | % | AF | % |
| Deliveries to TVRWRF Service Area | | | | | | | | | | |
| 1. Groundwater | 240 | | 669 | | 630 | | 355 | | 13 | |
| 2. Import 1/ | 5,117 | | 4,327 | | 7,256 | | 5,948 | | 8,117 | |
| 3. Total | 5,357 | | 4,996 | | 7,886 | | 6,303 | | 8,130 | |
| | | | | | | | | | | |
| **Rancho California WD** | | | | | | | | | | |
| Deliveries to TVRWRF Service Area | | | | | | | | | | |
| 1. Groundwater 2/ | 7986 | | 7,319 | | 7,149 | | 7,481 | | 6,427 | |
| 2. Import 3/ | 2,865 | | 5,941 | | 8,643 | | 8,076 | | 11,791 | |
| 3. Total 4/ | 10,851 | | 13,260 | | 15,792 | | 15,557 | | 18,218 | |
| | | | | | | | | | | |
| **Total Deliveries to TVRWRF Service Area** | | | | | | | | | | |
| 1. Groundwater | 8,226 | 50.8% | 7,988 | 43.8% | 7,779 | 32.9% | 7,836 | 35.8% | 6,440 | 24.4% |
| 2. Import | 7,982 | 49.2% | 10,268 | 56.2% | 15,899 | 67.1% | 14,024 | 64.2% | 19,908 | 75.6% |
| 3. Total | 16,208 | 100.0% | 18,256 | 100.0% | 23,678 | 100.0% | 21,860 | 100.0% | 26,348 | 100.0% |

1/ EMWD imports are based on discharges from EM-17.
2/ Based on ratio of groundwater to total production in Rancho Division of RCWD
3/ Based on ratio of import to total production in Rancho Division of RCWD
4/ Total RCWD deliveries in TVRWRF Service Area

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Imported Water Return Flows

During 2001-2002, Rancho California WD imported 37,883 acre feet of water for direct use compared to 23,743 acre feet in 2000-2001.   Quantities of imported water delivered to the Rancho Division and the Santa Rosa Division are shown below for Water Years 2000-2001 and 2001-2002.

| Month | Rancho Division Imports | | Santa Rosa Division Imports | | Total Imports | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| October | 703 | 1,074 | 1,120 | 2,098 | 1,823 | 3,172 |
| November | 75 | 370 | 639 | 749 | 714 | 1,119 |
| December | 76 | 0 | 810 | 96 | 886 | 96 |
| January | 140 | 122 | 375 | 501 | 515 | 623 |
| February | 0 | 394 | 87 | 732 | 87 | 1,126 |
| March | 0 | 799 | 110 | 1,493 | 110 | 2,292 |
| April | 157 | 953 | 462 | 1,688 | 619 | 2,641 |
| May | 525 | 1,685 | 1,500 | 2,875 | 2,025 | 4,560 |
| June | 948 | 1,765 | 2,609 | 2,963 | 3,557 | 4,728 |
| July | 1,416 | 2,216 | 2,981 | 3,590 | 4,397 | 5,806 |
| August | 1,820 | 3,230 | 2,873 | 2,725 | 4,693 | 5,955 |
| September | 1,384 | 3,076 | 2,933 | 2,689 | 4,317 | 5,765 |
| Total | 7,244 | 15,684 | 16,499 | 22,199 | 23,743 | 37,883 |

Return flows for 2001-2002 based on imported water use in the Rancho Division and Santa Rosa Division are shown on Table 7.5 and on Table 7.6.

In those tables, imported water is allocated to agricultural, ag/domestic, commercial and domestic uses in each of eight hydrogeologic areas in the Rancho Division service area.  This allocation is the proportion of the total deliveries to each use that is made up of imported water.  In 2001-2002, 64.47 percent of the supply to the Rancho Division was imported and 71.18 percent of the supply to the Santa Rosa Division was imported.

In general the Santa Rosa Division does not overlie the groundwater area.  However there are several areas classified as being in the Santa Rosa Division that do overlie the groundwater area and generate return flows from imported supplies.  Data from most of these lands have been reported since December 1991.

United States
Exhibit No. 1

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

TABLE 7.5

### SANTA MARGARITA RIVER WATERSHED
### RANCHO CALIFORNIA WATER DISTRICT
### RETURN FLOW CREDIT
2001-2002
RANCHO DIVISION
Quantities in Acre Feet

#### HYDROGEOLOGIC AREAS

| | 0 NO HYDRO-GEO CODE | 1 MURRIETA WOLF 1/2 QYAL 1/2 QTOAL | 2 SANTA GERTRUDIS QYAL | 3 LOWER MESA QTOAL | 4 PAUBA QYAL | 5 SOUTH MESA QTOAL | 6 UPPER MESA QTOAL | 7 PALOMAR QTOAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **AGRICULTURAL \*** | | | | | | | | | |
| Total Use | 1,453.07 | 689.57 | 598.95 | 2,915.13 | 326.81 | 1,197.20 | 1,490.68 | 1,348.17 | 10,019.58 |
| % Import | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | |
| Import Use | 936.83 | 444.58 | 386.16 | 1,879.46 | 210.70 | 771.87 | 961.08 | 869.20 | 6,459.88 |
| % Credit | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | |
| Credit | 234.21 | 111.15 | 96.54 | 469.86 | 52.68 | 192.97 | 240.27 | 217.30 | 1,614.97 |
| | | | | | | | | | |
| **AG/DOMESTIC** | | | | | | | | | |
| Total Use | 638.30 | 53.84 | 0.00 | 21.95 | 627.32 | 44.39 | 526.87 | 145.44 | 2,057.91 |
| % Import | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | |
| Import Use | 411.53 | 34.71 | 0.00 | 14.15 | 404.45 | 28.62 | 339.56 | 93.77 | 1,326.79 |
| % Credit | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | |
| Credit | 102.88 | 8.68 | 0.00 | 3.54 | 101.11 | 7.16 | 84.89 | 23.44 | 331.70 |
| | | | | | | | | | |
| **COMMERCIAL** | | | | | | | | | |
| Total Use | 195.34 | 1,330.27 | 915.89 | 1,521.89 | 78.09 | 298.12 | 151.42 | 6.58 | 4,497.60 |
| % Import | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | |
| Import Use | 125.94 | 857.66 | 590.50 | 981.20 | 50.34 | 192.21 | 97.62 | 4.24 | 2,899.72 |
| % Credit | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | |
| Credit | 12.59 | 85.77 | 59.05 | 98.12 | 5.03 | 19.22 | 9.76 | 0.42 | 289.97 |
| | | | | | | | | | |
| **DOMESTIC** | | | | | | | | | |
| Total Use | 1,006.47 | 2,127.79 | 1,646.72 | 11,623.71 | 579.21 | 2,948.23 | 1,237.66 | 484.33 | 21,654.45 |
| % Import | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | 64.47 | |
| Import Use | 648.90 | 1,371.84 | 1,061.69 | 7,494.11 | 373.43 | 1,900.80 | 798.16 | 312.26 | 13,961.19 |
| % Credit | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | |
| Credit | 162.22 | 342.96 | 265.42 | 1,873.53 | 93.36 | 475.20 | 199.54 | 78.07 | 3,490.30 |
| | | | | | | | | | |
| **TOTAL USE** | 3,293.18 | 4,201.47 | 3,161.56 | 16,082.68 | 1,611.42 | 4,487.95 | 3,406.75 | 1,984.53 | 38,229.54 |
| | | | | | | | | | |
| **TOTAL** | | | | | | | | | |
| Total Import Use | 2,123.20 | 2,708.80 | 2,038.34 | 10,368.92 | 1,038.93 | 2,893.50 | 2,196.42 | 1,279.48 | 24,647.58 |
| Total Credit | 511.91 \*\* | 548.55 | 421.01 | 2,445.05 | 252.18 | 694.54 | 534.46 | 319.23 | 5,726.94 |
| Total Credit Qyal | | 274.28 | 421.01 | | 252.18 | | | | 947.47 |
| Total Credit Qtoal | | 274.28 | | 2,445.05 | | 694.54 | 534.46 | 319.23 | 4,267.56 |

\* Includes golf course and landscape irrigation
\*\* This credit not applied to either Qyal or Qtoal

United States
Exhibit No. 1

TABLE 7.6

## SANTA MARGARITA RIVER WATERSHED
### RANCHO CALIFORNIA WATER DISTRICT
### RETURN FLOW CREDIT
2001-2002
### SANTA ROSA DIVISION
Quantities in Acre Feet

| | HYDROGEOLOGIC AREAS | | | |
| | 1 MURRIETA WOLF 1/2 QYAL 1/2 QTOAL | 3 LOWER MESA QTOAL | 8 RTS 279, 280 & 285 1/4 QYAL 3/4 QTOAL | TOTAL |
|---|---|---|---|---|
| **AGRICULTURAL *** | | | | |
| Total Use | 0.00 | 0.00 | 956.16 | 956.16 |
| % Import | 71.18 | 71.18 | 71.18 | |
| Import Use | 0.00 | 0.00 | 680.57 | 680.57 |
| % Credit | 25.00 | 25.00 | 25.00 | |
| Credit | 0.00 | 0.00 | 170.14 | 170.14 |
| **AG/DOMESTIC** | | | | |
| Total Use | 0.00 | 0.00 | 0.00 | 0.00 |
| % Import | 71.18 | 71.18 | 71.18 | |
| Import Use | 0.00 | 0.00 | 0.00 | 0.00 |
| % Credit | 25.00 | 25.00 | 25.00 | |
| Credit | 0.00 | 0.00 | 0.00 | 0.00 |
| **COMMERCIAL** | | | | |
| Total Use | 0.00 | 0.00 | 586.90 | 586.90 |
| % Import | 71.18 | 71.18 | 71.18 | |
| Import Use | 0.00 | 0.00 | 417.74 | 417.74 |
| % Credit | 10.00 | 10.00 | 10.00 | |
| Credit | 0.00 | 0.00 | 41.77 | 41.77 |
| **DOMESTIC** | | | | |
| Total Use | 0.00 | 0.00 | 1,538.94 | 1,538.94 |
| % Import | 71.18 | 71.18 | 71.18 | |
| Import Use | 0.00 | 0.00 | 1,095.37 | 1,095.37 |
| % Credit | 25.00 | 25.00 | 25.00 | |
| Credit | 0.00 | 0.00 | 273.84 | 273.84 |
| **TOTAL USE** | 0.00 | 0.00 | 3,082.01 | 3,082.01 |
| **TOTAL** | | | | |
| Total Import Use | 0.00 | 0.00 | 2,193.67 | 2,193.67 |
| Total Credit | 0.00 | 0.00 | 485.76 | 485.76 |
| Total Credit Qyal | 0.00 | | 121.44 | 121.44 |
| Total Credit Qtoal | 0.00 | 0.00 | 364.32 | 364.32 |

* Includes golf course and landscape irrigation

The percentage of imported water that becomes return flow varies according to the use as follows:

| | |
|---|---|
| Agricultural Use | 25% |
| Ag/Domestic Use | 25% |
| Commercial Use | 10% |
| Domestic Use | 25% |

Based on the foregoing factors, the return flow credit for 2001-2002 is computed to be 5,726.94 acre feet for the Rancho Division and 485.76 acre feet for the Santa Rosa Division, as shown on Tables 7.5 and 7.6 respectively.

Some of the hydrogeologic areas overlie older alluvium and some overlie younger alluvium.  Comparison of exposures of younger alluvium with maps of the District's hydrogeologic areas indicates that the Santa Gertrudis, Pauba and half of the Murrieta-Wolf areas overlie younger alluvium.  The area of the Santa Rosa Division that overlies the groundwater area is one-fourth in the younger alluvium and three-fourths in the older alluvium.  Import return flows in these areas can be credited against pumping from the younger alluvium.  These credits for 2001-2002 are 947.47 acre feet for the Rancho Division and 121.44 acre feet for the Santa Rosa Division, as shown on Tables 7.5 and 7.6 respectively.

Rancho California WD imported an additional 16,265 acre feet of water for groundwater recharge in 2001-2002, of which 14,811 acre feet were recovered.

Division of Local Water

During 2001-2002, Rancho California WD pumped 39,706 acre feet of groundwater. Some of this water was pumped from the younger alluvium and some from the older alluvium.  The Court determined that water in both the younger alluvium and older alluvium add to, contribute to and support the Santa Margarita River stream system.  The primary reason for differentiating between younger alluvium and older alluvium production is that, in California, production from the younger alluvium is generally considered to be governed by water rights that apply to the regulation of surface waters.  Production from the older alluvium is generally considered to be governed by regulations that apply to groundwater.

In 1995 well logs and geophysical logs of all Rancho California WD wells were reviewed by representatives of the United States and Rancho California WD to determine the depths of the younger alluvium.  There was general agreement between the parties about the depth of the younger alluvium in production wells, except for ten wells shown on Table 7.7 of the 1994-1995 report.  The remaining disagreements relate to differences about the magnitude of the clay layer needed to define the base of the younger alluvium, the importance of neighboring well logs, and general concepts about the overall geologic setting.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

During joint development of a groundwater model of the area it was necessary to develop estimates of the transmissivity for each aquifer. These estimates were based on pump tests. The resulting transmissivity values were then used to estimate the relative groundwater production from each aquifer. For Rancho California WD wells, the percent production estimated to originate in the younger alluvium is shown in Table 7.7.

Production from the younger alluvium and older alluvium for 2001-2002 using the percentages noted in Table 7.7 is presented in Table 7.8. It may be noted that 16,138 acre feet were pumped from the younger alluvium and 23,568 acre feet were pumped from the older alluvium in 2001-2002.

The production of 16,138 acre feet from the younger alluvium, as shown on Table 7.8 includes recovery of 1,327 acre feet of Vail recharge and 14,811 feet of import recharge. The recovered Vail recharge was used for authorized uses in the Permit 7032 service area as shown in Table 7.4. Although there were no Vail releases to groundwater storage in 2001-2002 there is sufficient unrecovered recharge from prior years to offset the use of 1,327 acre feet in 2001-2002. Rancho California WD imported 16,265 acre feet of water in 2001-2002 for direct recharge of which 14,811 acre feet were recovered leaving 1,454 acre feet as unrecovered direct recharge.

Imported water carryover to 2002-2003 includes the following:

|     |                                          | AF     |
| --- | ---------------------------------------- | ------ |
| 1.  | Carryover from 2000-2001                 | 14,659 |
| 2.  | Unrecovered direct recharge in 2001-2002 | 1,454  |
| 3.  | Import Return Flow Credit for 2001-2002  | 1,068  |
| 4.  | Total Carryover to 2002-2003             | 17,181 |

Thus, there was no unauthorized use under Permit 7032 in 2001-2002 and 17,181 acre feet of imported supplies remain available to offset younger alluvium production in future years.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

TABLE 7.7

### *SANTA MARGARITA RIVER WATERSHED*
### PERCENT PRODUCTION FROM YOUNGER ALLUVIUM IN
### RANCHO CALIFORNIA WATER DISTRICT WELLS

| RCWD WELL NO. | LOCATION TOWNSHIP/ RANGE/ SECTION | SEAL DEPTH FEET | PERFORATED INTERVAL FEET | DEPTH YOUNGER ALLUVIUM FEET | PERCENT YOUNGER ALLUVIUM % | | REMARKS |
|---|---|---|---|---|---|---|---|
| 106 | 7S/3W-26R1 | 55 | 130-210; 250-310; 340-440; 700-740; 780-980 | 0 | 0.0% | Murrieta | No. 106 Winchester, clay 0'-40' |
| 107 | 7S/3W-26J1 | 55 | 60-120; 190-260; 280-300; 390-590 | 58 | 0.0% | Murrieta | No. 105 - gravel & clay 58'-84' |
| 108 | 7S/3W-25E1 | 55 | 60-110; 190-280; 350-410; 430-450; 470-490; 530-590 | 55 | 0.0% | Murrieta | Formerly No. 109 gravel/sandy clay 55'-70' |
| 109 | 8S/2W-17J1 | 52 | 70-150; 170-210 | 75 | 84.0% | | Brown clay and gravel 75' to 105' |
| 110 | 8S/1W-8K1 | 54 | 75-155 | 165 | 97.0% | | Clay 165'-190'. Prior to 10/23/97 perf int. 70-150; 200-240; 320-380; 420-460 |
| 113 | 7S/3W-25H1 | 52 | 96-136; 275-462; 482-542 | Shallow | 0.0% | | |
| 116 | 8S/1W-6J | Unknown | 60-120; 140-200; 220-260; 270-330; 370-390 | 150 | 94.0% | | Clay 150'-170' |
| 119 | 8S/2W-19J | 55 | 170-260; 300-470 | | 0.0% | Wolf Valley | Perforated below 170' |
| 123 | 8S/1W-7B | 55 | 100-260; 300-380; 420-500 | 135 | 65.0% | | Brown Sand Clay 135'-210' |
| 129 | 7S/2W-20L | Unknown | 180-290; 416-480; 520-600 | Shallow | 0.0% | Santa Gertrudis Creek | Cyal very shallow along Santa Gertrudis Creek |
| 132 | 8S/1W-7D | 55 | 70-390; 430-500 | 135 | 82.0% | | Brown Clay Streaks 135'-175' |
| 135 | 7S/3W-27M10 | 55 | 70-170 | 50 | 0.0% | Murrieta Valley | Silty clay 50'-69' |
| 141 | 8S/2W-11P | 55 | 120-190; 215-235; 270-380; 430-510 | 104 | 0.0% | | Silt & sand 104'-185'; Well 11L1 is 112' |
| 144 | 7S/3W-27D | 55 | 983-1123; 1143-1283; 1343-1483; 1503-1743 | 25 | 0.0% | Murrieta Valley | Sand with silty clay 25'-45' |
| 146 | 7S/3W-28 | 50 | 50-190 | 42 | 0.0% | Murrieta | |
| 152 | 8S/1W-5K | 50 | 70-470; 490-540 | 130 | 90.8% | | Forebay |
| 153 | 8S/1W-5K3 | 50 | 50-220 | 170 | 99.0% | | Forebay |
| 157 | 8S/1W-5L | 50 | 50-210 | 128 | 96.8% | | Forebay |
| 158 | 8S/1W-5K | 50 | 50-210 | 100 | 96.5% | | Forebay |
| 205 | 7S/3W-35A | 50 | 150-1000 | 10 | 0.0% | Santa Gertrudis/ Murrieta Valley | Sandy clay 10'-20' |
| 210 | 8S/2W-12K | None | 48-228 | 140 | 94.0% | | Clay cobblestones 160'-167', 175'-227' |
| 218 | 8S/2W-20B5 | 27 | 48-289 | 40 | 0.0% | | Old 28; clay with sand layer 40'-60'; now monitoring wells 427, 428 and 429 |
| 466 | 8S/3W-1P2 | Unknown | 106-822 | 49 | 0.0% | Long Canyon | Old 219, Centarinl, hard clay 49'-60' |
| 220 | 7S/3W-26C1 | 34 | 114-450 | 58 | 0.0% | | Clay 58' - 73' |
| 467 | 8S/2W-12K1 | Unknown | 50-100; 100-140 | 140 | 100.0% | | Old 221, JK, Exh. 16. Monitoring well since 1983 |
| 223 | 8S/2W-20C1 | Unknown | 48-250 | 60 | 94.0% | Wolf Valley | CAT Well; east of Wildomar Fault; nearby Exh 16 wells 17Q @62' & 17M @55' are also east of Wildomar Fault |
| 224 | 8S/2W-15D | Unknown | 48-250 | 106 | 68.0% | | Old Well 50, clay 106'-138' |
| 230 | 8S/2W-11J1 | Unknown | 24-31; 32.5-34; 35-40; 61-65; 70-76; 80-85; 86.5-91; 92.5-98.5 | >119 | 100.0% | | Old Well 30, depth of well is 119' |
| 231 | 8S/2W-20B6 | 55 | 80-120; 150-270 | 35 | 0.0% | | Old 104, P-34, Clay 20'-23'; 35'-41'; East of Wildomar Fault |
| 232 | 8S/2W-11J3 | 51 | 95-135; 175-215; 235-295 | 135 | 92.0% | | Old 111, 105, P-31; coarse sand & clay 135' - 155' |
| 233 | 8S/2W-12K2 | 51 | 95-135; 175-215; 235-295 | 145 | 88.0% | | Old 112, P32; sand and clay at 145' |
| 234 | 8S/2W-11P1 | 52 | 80-100; 120-140; 200-240; 280-320; 340-400 | 125 | 74.0% | | Brown Clay at 125'; sand and clay at 125'-140' |
| 235 | 8S/3W-1Q1 | 55 | Unknown | Shallow | 0.0% | Long Canyon | |
| 240 | 8S/2W-11L1 | Unknown | 48-298 | 112 | 86.0% | | Old Well No. 40; clay 112'-136' |
| 301 | 7S/3W-18Q1 | 93 | 140-280; 280-520; 540-640 | 26 | 0.0% | Murrieta | Old JR1; blue clay 26'-32' |

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

TABLE 7.8

### SANTA MARGARITA RIVER WATERSHED
### RANCHO CALIFORNIA WATER DISTRICT
### WELL PRODUCTION FROM YOUNGER AND OLDER ALLUVIUM
#### 2001-2002
#### Quantities in Acre Feet

| WELL NO. | QYAL | QTOAL | TOTAL |
|---|---|---|---|
| 101 | 0.00 | 132.00 | 132.00 |
| 102 | 0.00 | 144.00 | 144.00 |
| 106 | 0.00 | 758.00 | 758.00 |
| 108 | 0.00 | 333.00 | 333.00 |
| 109 | 321.72 | 61.28 | 383.00 |
| 110 | 2,087.44 | 64.56 | 2,152.00 |
| 113 | 0.00 | 668.00 | 668.00 |
| 118 | 0.00 | 122.00 | 122.00 |
| 119 | 0.00 | 790.00 | 790.00 |
| 120 | 0.00 | 1,295.00 | 1,295.00 |
| 121 | 0.00 | 431.00 | 431.00 |
| 122 | 0.00 | 430.00 | 430.00 |
| 123 | 293.80 | 158.20 | 452.00 |
| 124 | 0.00 | 630.00 | 630.00 |
| 125 | 0.00 | 442.00 | 442.00 |
| 126 | 0.00 | 909.00 | 909.00 |
| 128 | 0.00 | 1,079.00 | 1,079.00 |
| 129 | 0.00 | 17.00 | 17.00 |
| 130 | 0.00 | 641.00 | 641.00 |
| 131 | 0.00 | 918.00 | 918.00 |
| 132 | 250.10 | 54.90 | 305.00 |
| 133 | 0.00 | 295.00 | 295.00 |
| 135 | 0.00 | 27.00 | 27.00 |
| 138 | 0.00 | 1,343.00 | 1,343.00 |
| 139 | 0.00 | 952.00 | 952.00 |
| 140 | 0.00 | 191.00 | 191.00 |
| 141 | 0.00 | 419.00 | 419.00 |
| 143 | 0.00 | 490.00 | 490.00 |
| 144 | 0.00 | 185.00 | 185.00 |
| 145 | 0.00 | 525.00 | 525.00 |
| 146 | 0.00 | 11.00 | 11.00 |
| 149 | 0.00 | 405.00 | 405.00 |
| 151 | 0.00 | 0.00 | 0.00 |
| 152 | 1,214.90 | 123.10 | 1,338.00 |
| 153 | 2,640.33 | 26.67 | 2,667.00 |
| 155 | 0.00 | 79.00 | 79.00 |
| 157 | 3,242.80 | 107.20 | 3,350.00 |
| 158 | 1,615.41 | 58.59 | 1,674.00 |
| 201 | 0.00 | 0.00 | 0.00 |
| 203 | 0.00 | 407.00 | 407.00 |
| 205 | 0.00 | 1,368.00 | 1,368.00 |
| 207 | 0.00 | 0.00 | 0.00 |
| 208 | 0.00 | 0.00 | 0.00 |
| 209 | 0.00 | 0.00 | 0.00 |
| 210 | 1,413.76 | 90.24 | 1,504.00 |
| 211 | 0.00 | 1,227.00 | 1,227.00 |
| 215 | 0.00 | 0.00 | 0.00 |
| 216 | 0.00 | 0.00 | 0.00 |
| 217 | 0.00 | 1,014.00 | 1,014.00 |
| 231 | 0.00 | 242.00 | 242.00 |
| 232 | 554.76 | 48.24 | 603.00 |
| 233 | 2,189.44 | 298.56 | 2,488.00 |
| 234 | 313.02 | 109.98 | 423.00 |
| 235 | 0.00 | 1,264.00 | 1,264.00 |
| 301 | 0.00 | 43.00 | 43.00 |
| 302 | 0.00 | 0.00 | 0.00 |
| 309 | 0.00 | 2,141.00 | 2,141.00 |
| **TOTAL** | 16,137.48 | 23,568.52 | 39,706.00 |



1
2
3
4
5
6

FILED
APR 6 1962

ENTERED
APR 6 1962

7          IN THE UNITED STATES DISTRICT COURT

8          SOUTHERN DISTRICT OF CALIFORNIA

9          SOUTHERN DIVISION

10

11   UNITED STATES OF AMERICA,

12              Plaintiff,                    No. 1247-SD-C

13        vs.                                 FINDINGS OF FACT,
                                              CONCLUSIONS OF LAW, AND
14   FALLBROOK PUBLIC UTILITY                 INTERLOCUTORY JUDGMENT NO. 37
     DISTRICT, et al.,
15                                            NAVAL ENCLAVE
              Defendants.
16

17

18                    FINDINGS OF FACT

19                         1.

20   Lands of the United States
     Within the Naval Enclave
21

22          The United States of America is the owner in fee simple

23   of the lands which comprise Camp Pendleton, United States Naval

24   Ammunition Depot and the United States Naval Hospital, all of

25   which are referred to as the Naval Enclave.  There follows a

26   brief statement respecting the several tracts which comprise

27   the Naval Enclave.

28   United States Ammunition Depot

29          The United States of America on January 21, 1942,

30   by condemnation, acquired in San Diego County, California, fee

31   simple title to the lands now constituting that segment of the

CAR031 0500

United States
Exhibit No. 2

CAR031 0525

United States
Exhibit No. 2

| | | | SEWAGE EFFLUENT DISCHARGES (Acre Feet) | | |
|---|---|---|---|---|---|
| Water Year | Plant No. 1 | Plant No. 2 | Plant No. 3 | Plant No. 8 | Plant No.13 |
| 1944 | | | 228.45 | | |
| 1945 | | | 373.90 | | |
| 1946 | | | 354.64 | | |
| 1947 | | | 345.50 | | |
| 1948 | | | 477.61 | | |
| 1949 | | | 474.66 | | |
| 1950 | | | 470.74 | | |
| 1951 | | | 536.96 | | |
| 1952 | 282.00 | 172.88 | 631.94 | | |
| 1953 | 1171.74 | 866.93 | 681.48 | | |
| 1954 | 1094.02 | 704.93 | 509.14 | 54.65 | 25.02 |
| 1955 | 1054.85 | 732.03 | 586.38 | 153.01 | 181.36 |
| 1956 | 1045.38 | 724.14 | 683.15 | 249.47 | 258.89 |
| 1957 | 843.98 | 788.50 | 588.05 | 243.07 | 225.87 |
| 1958 | 880.05 | 756.09 | 570.59 | 274.67 | 229.08 |
| 1959 | 693.81 | 707.44 | 440.10 | 204.98 | 422.03 |
| 1960 | 728.22 | 677.38 | 390.42 | 252.04 | 513.03 |
| 1961 | 761.55 | 709.68 | 337.85 | 311.74 | 414.76 |

The practices described hereinabove are commendable and by reason thereof the United States of America is making a most efficient use of the natural water supply.

27.

Water Conservation Practices Within
the Naval Enclave

That the United States of America has diligently attempted to make the maximum and most efficient use of the waters available within the Naval Enclave, and in connection

26

CAR031 0825

United States
Exhibit No. 2

1  therewith has constructed spreading works to increase the natural

2  percolation of surface waters into the younger alluvial deposits

3  and has entered into a comprehensive control of phreatophytes

4  and other water-loving vegetation, and the said conservation

5  practices have in fact resulted in the conservation of waters in

6  a substantial but undetermined amount.

7                                     28.

8  Salt Water Intrusion Downstream
   From Ysidora Narrows

9

10         That the ground waters contained in the younger

11  alluvial deposits downstream from the Ysidora Narrows are

12  presently and have for many years been, as a result of salt water

13  intrusion, brackish and unfit for agricultural or domestic use;

14  that none of said waters have been used in recent times; that

15  said salt water intrusion below said Ysidora Narrows has not been

16  caused by any wrongful act of any defendant in this cause and there

17  is no known practical method whereby said salt water intrusion

18  in said area downstream from Ysidora Narrows can be corrected

19  so as to permit the beneficial use of the waters contained in

20  said younger alluvial deposits downstream from said Ysidora Nar-

21  rows for agricultural or domestic use.

22                                     29.

23  Maintenance of Fresh Water Barrier, and
    Salt Water Intrusion Upstream from
24  From Ysidora Narrows

25         Approximately two-thirds (2/3) of the younger alluvial

26  deposits which underlie the Santa Margarita River within the

27  Naval Enclave are below sea level. As a consequence, to prevent

28  salt water intrusion, the United States of America has found it

29  necessary to maintain the water levels in the Ysidora segment of

30  of those deposits at a minimum elevation of five (5) feet above

31  sea level in order to prevent the waters of the Pacific Ocean

27

United States
Exhibit No. 2        CAR031 0526

1   unreasonable as to amount of water used in the light of other
2   rights which may exist as to such waters and this issue is left
3   open, is not decided herein, and shall be litigated in this
4   Court if and when it becomes necessary to do so.
5           In the exercise of this continuing jurisdiction, this
6   Court will pass upon the exercise of such correlative rights
7   based on the facts as may then appear and pursuant to California
8   law.

9                           10.
10.         This Court does not pass upon the question of whether
11  the maintaining of natural grasses and vegetation cover on the lands
12  of the Naval Enclave within the Santa Margarita River watershed is,
13  or will be in the future, a reasonable use of water in view of the
14  other purposes for which water has been and will be used.  This
15  question is a question which may well be relevant in any apportion-
16  ment proceedings.  Jurisdiction is herein reserved to determine
17  at such future time as an apportionment proceeding or regulation
18  proceeding is presented the issue as to whether the maintaining
19  of natural grasses and vegetation cover is a reasonable use of
20  water and such issue will be determined at that time based upon
21  the facts as may then appear and pursuant to the laws of the
22  State of California.

23                          11.
24          The use of the waters of the Santa Margarita River
25  by the United States of America to maintain a fresh water barrier
26  against salt water intrusion as set forth in Finding 29 consti-
27  tutes a reasonable and beneficial riparian use of the waters of
28  said River.

29                          12.
30          The water conservation program of the United States
31  of America within the Naval Enclave and particularly the

47
United States
Exhibit No. 2

CAR031 0546

1  construction of spreading works, the control of phreatophytes

2  and the reclamation of sewage have been, and are commendable

3  practices and have resulted in the conservation of the water re-

4  sources of the Santa Margarita River on the Naval Enclave.

5          The single fact that water has been conserved by

6  the United States of America by these conservation programs will

7  not in any subsequent apportionment proceedings increase the

8  share to which the Naval Enclave may be entitled, nor will that

9  single fact reduce such future allocation as may be made to the

10  Naval Enclave.  In any future apportionment proceeding, the Court

11  at that time may take such conservation practices into account in

12  determining whether any use on the Naval Enclave is a reasonable

13  riparian use insofar as it concerns amounts of water consumptively

14  required to satisfy a beneficial riparian use.

15                    13.

16          That by reason of the Stipulation of November 29, 1951,

17  set forth in Finding 47 herein, the United States of America can

18  assert no rights to the use of the waters of the Santa Margarita

19  River within the Naval Enclave based upon its sovereignty, but on

20  the contrary, is limited to such rights as it may have acquired

21  from its predecessor in interest, or which it may have gained since

22  its acquisition of the Naval Enclave by prescription or use or

23  both as provided by California law.

24                    14.

25          That counsel for the United States of America had

26  authority to execute said Stipulation set forth in Finding 47

27  and the Attorney General of the United States of America and the

28  Department of Justice of the United States of America ratified said

29  act of said counsel.

30  - - - -

31  - - - -

United States
Exhibit No. 2          CAR031 0547



UNITED STATES MARINE CORPS
MARINE CORPS BASE
CAMP PENDLETON, CALIFORNIA 92055-5001

IN REPLY REFER TO:

5090.4432/06
LAND:jjt
November 2, 1989

EASTERN MUNICIPAL WATER DISTRICT
ATTN: William E. Plummer
      Assistant Chief Engineer
P. O. Box 8300
San Jacinto, California  92383-1300

       Re:  Draft EIR for the Rancho Temecula Effluent Pipeline

Dear Mr. Plummer:

Thank you for the opportunity to comment on the Draft
Environmental Impact Report for the proposed Rancho Temecula
Effluent Pipeline.

As we have repeatedly stated, Camp Pendleton is opposed to any
wastewater discharge scheme which would transfer water out of the
Santa Margarita watershed.  The Draft EIR acknowledges that a
large amount of wastewater coming into the RCRWRF is local
groundwater from the Santa Margarita Basin.  As demand continues
to grow, it is reasonable to assume that more and more groundwater
will find its way to the water reclamation plant.  If that water
is removed from the watershed, there could well be significant
adverse impacts on the quality and quantity of groundwater
remaining in the watershed, especially in downstream areas.

The impacts of removal of large amounts of groundwater from the
Santa Margarita basin are not considered in the Draft EIR.
Without full consideration of these impacts, the Draft EIR does
not fulfill its purpose of describing and responding to the
significant environmental effects of the proposed project.

                              Sincerely,

                              A. J. PACK
                              Lieutenant Colonel, USMC
                              Deputy Assistant Chief of Staff,
                              Facilities
                              By direction of
                              the Commanding General

United States
Exhibit No. 3