p-34

1 crossed their land. They were superior to that extent.

2 But when they are not taking it, they run correlatively

3 both forward and backward.

4     MR. STAHLMAN: Oh, no.

5     MR. SACHSE: Yes.

6     MR. VEEDER: Mr. Girard, Mr. Sachse, Mr. Stahlman

7 and your Honor, if I may tender a thought, the problem

8 becomes more complex in regard to the Cahuilla Indian

9 Reservation than in regard to the Ramona by reason of the

10 fact that the withdrawal was in 1875 prior to the act of

11 1877. It is an extremely complex legal question.

12     THE COURT: 1877 was the Desert Land Act.

13     MR. VEEDER: That is correct, and these withdrawals were

14 made for the Cahuillas antecedent to that date, and I think --

15     MR. SACHSE: Your Honor --

16     MR. VEEDER: Why don't you let me finish, please.

17 So I think it is essential, if we are going to go

18 into any diagrams by Mr. Girard, that he use 1875.

19     MR. GIRARD: I am using the Ramona Indian one because

20 that is the one I have up here. I would be happy to use

21 the other one.

22     THE COURT: Gentlemen, I don't foresee any problem

23 about these Indian rights. You have six Indians on Pechanga,

24 none on Ramona, and 35 on Cahuilla. Why can't we put this

25 problem over and cross the bridge when we get to it?

JOHN SWADER, OFFICIAL REPORTER

CAR026 1265

6

p-35

1    MR. GIRARD: I would be very happy to.

2    MR. SACHSE: I'd be happy to.

3    MR. VEEDER: The point is, I want a ruling.

4    THE COURT: Why should we argue out the intricate problem involving all these statutes, dates of withdrawal, when there has not been presented to the Court any problem concerning these Indian lands, and when the Court is going to keep continuing jurisdiction of the case, and some day if some Indian comes along and he is not getting his share of water then is time enough to go in and find out what all this means?

12    MR. SACHSE: I think that is the only possible solution.

13    THE COURT: Why isn't that the answer, Mr. Veeder?

14    MR. VEEDER: Because I think this matter has to be concluded.

16    THE COURT: Why?

17    MR. VEEDER: Because I'm asking for a quiet title. I am asking that these rights be adjudicated. I simply say, let's take the facts as they are, let's take the law as it exists, and let's apply it.

21    THE COURT: We can make the finding that if there are rights in connection with these Indian Reservations to water, the Court does not now pass upon the full nature or extent of them. No problem has arisen. There are relatively few Indians living on the Reservation, none on one of them,

p36

and when the problem is presented is time enough to go into the matter. If you can give me some other reason than because, I want to listen to you. Does this affect the Marine Corps if we don't go ahead and try to spell out in detail what kind of rights these six Indians have up in Pechanga?

MR. VEEDER: I say right now, your Honor, that the confusion between the number of Indians on the Reservation and the rights to the use of water which adhere to and are part of the reservation -- I'll start again. There is no relation whether there is an Indian or 500 Indians on the land. There is a Reservation to that land, presently and in the future, for the quantities of water required to meet their demands. Now I have tried to figure out a ceiling so that the valley would know the maximum quantity that could ever be called for by these Indians.

THE COURT: Mr. Veeder, these so-called ceilings are all illusory.

MR. VEEDER: They may be illusory.

THE COURT: They don't have any reality. You talk about somebody the same as this riparian ground up in the desert country; it is riparian, but there is no water to use. So what is the use of even computing the acreages or the water duty?

MR. VEEDER: I have made my point, your Honor, and I

JOHN SWADER, OFFICIAL REPORTER

CAR026 1267

p-39

1    the Indians; they took ahead of them.

2    MR. VEEDER: If you had any background in water law
3    you would know there were no riparian rights in Arizona.
4    There are probably some appropriative rights in Arizona,
5    but there are no riparian rights.

6    MR. GIRARD: There are prior vested rights, and that
7    is all a riparian right is.

8    MR. VEEDER: I have stated specifically in here in
9    regard to appropriative rights that we would recognize the
10   prior appropriative rights.

11   MR. GIRARD: Sure, you have, because there aren't any.

12   THE COURT: I still can't see why we have to get this
13   in this judgement. We have found the acreage on these
14   three reservations. We have found the irrigable acreage.
15   We know how much could be irrigated. We have evidence in
16   the record as to how many Indians were on them in 1959. And
17   we could make a further finding that there has been no
18   evidence presented that any Indian is in need of water or
19   has suffered from any problem up to this date. There have
20   been no allotments on these reservations. There are no
21   questions of assignment to third persons. And these matters
22   will all be held for a future day, and when the problem
23   arises we will find out. The only thing we have to do is
24   to make some general finding that there are these inchoate
25   unprecisely defined Indian rights upstream.

JOHN SWADER, OFFICIAL REPORTER

CAR026 1270

8-5

1   we have made -- presently I can't, as a practical matter, see
2   any problem arising from the Indian Reservations, even on an
3   apportionment.
4   MR. SACHSE: I think that is absolutely right. And in
5   the light of the fact that there is not any apportionment
6   anyway, why waste our time?
7   MR. GIRARD: I think we can redraft these conclusions
8   of law pretty much along the line Mr. Veeder has, except we
9   will cut down a lot of these repetitious findings on
10  priorities, and I really don't know that there is any need
11  to go through them. Or do you?
12  MR. SACHSE: No.
13  THE COURT: Suppose we follow this, Mr. Veeder, to which
14  you apparently strenuously object, how are we hurt? How is
15  our final decision affected?
16  MR. VEEDER: Because I truly think such a decree will
17  be totally abortive. I don't think it will mean a thing.
18  THE COURT: It doesn't mean a thing, because we post-
19  pone the problem until it arises. It may never arise.
20  MR. VEEDER: I am paid to get a quiet title decree here,
21  and that is what I desire, and I want the Indian rights
22  quieted as they relate to other rights. My view is that what
23  is being proposed now may put it off for a hundred years, and
24  I don't believe I will be bothered at that time. But I don't
25  think we are going to accomplish a thing    without proceeding

CAR026 1276

8-6

1    through. I would be delighted to argue with Mr. Girard
2    either here or in my office on his picture there. I hate
3    to see us abandon the idea of an ultimate and effective
4    decree, and I think that is what we are going to do if we
5    follow this procedure. However, if that is your Honor's
6    ruling, there is no sense taking any more of your Honor's
7    time. Mr. Girard and I can attempt to work out language that
8    will conform with your rulings.

9    THE COURT: For the life of me, it is hard to imagine
10   a situation within probably the rest of the time I am on
11   this Bench where a problem would come up on these Indian
12   Reservations.

13   MR. VEEDER: I would be gravely in error to try to
14   anticipate that. But it is our position in this litigation
15   thatwhat we are seeking here is to have a final decree and
16   determination of the extent, nature and character of the
17   Indian rights in regard to these three Reservations. I think
18   there is confusion gotten into this matter by reason of the
19   fact that the question of the number of Indians that are on
20   the land was brought up. I don't believe that has a thing
21   to do with it. I think it is entirely possible that ultimately
22   they might sell some of the land. I think it is entirely
23   possible that they might increase the number of Indians on the
24   land. It is their land. It was set aside for them. And my
25   own view is that we should have a determination of the extent

CAR026 1277

11

8-7

1  of the rights which were reserved for those Indians.

2  MR. STAHLMAN: Could it be that the reason you are
3  so intent that the quantity of water should be expressed is
4  your belief, not here expressed however, that these rights
5  may be transferred to some other Governmental agency?

6  MR. VEEDER: I haven't any idea of that, Mr. Stahlman.

7  MR. GIRARD: Certainly you would concede that you
8  would not ask that the Indian rights be catalogued in amount,
9  as was done by Mr. Riskind in Arizona.

10  MR. VEEDER: I would say the maximum quantity should be
11  indicated.

12  MR. GIRARD: You would recognize that the maximum
13  quantity would be a ridiculous figure.

14  THE COURT: And then you ignore it completely on any
15  apportionment, because it is not being used.

16  Well, I haven't any fear that we will have any problem
17  about the Indians doing any extensive farming. I think if
18  problems arise it will be as a result of allotments or someone
19  else acquiring an allotment from an Indian and then trying
20  to assert some superior water right to it.

21  I think we might all be better off -- when I speak
22  of "we" I mean the landowners in the valley -- not to have
23  these Indian rights spelled out too precisely. If somebody
24  tries to buy some of this land, let him know that he is going
25  to have a lawsuit on his hands.

JOHN SWADER, OFFICIAL REPORTER

CAR026 1278

12

MR. VEEDER: Your Honor has said so well that when we get through there will be no adjudication of the rights to the use of water for the Indians.

THE COURT: But the Court will have jurisdiction when the matter comes up. You give this Indian some superior right, and some promoter goes up to Cahuilla and gets a bunch of allotments made to the Indians and then buys the Indian land and pumps the valley dry. I would rather have him faced with the problem of having the right adjudicated when he got ready to do this.

Take a recess.

(Recess taken.)

(Another case called.)

THE COURT: I am just wondering, in view of the position we are going to take on these Indians, whether it would be more expeditious to do some revision on the rest of these findings and judgments before we spend time going over them all. Maybe you could work this afternoon and I can get some work done.

MR. VEEDER: That suits me, Judge.

MR. SACHSE: May I give his Honor a copy of this proposed Rainbow.

Bill, you have been over it many times.

MR. VEEDER: Yes.

MR. SACHSE: I would hope you would go over it tonight.

CAR026 1279

20,708

1   for signature. However, I crossed up Commander Redd's

2   office a little bit in setting out this format and he hasn't

3   quite got the exhibits ready. They will be prepared by the

4   next hearing for sure and we can just attach them. The

5   exhibits are not quite ready for this judgment yet. The

6   basic reason is that I had a finding in here which expressly

7   required the delineation of those lands which overlie the

8   deep aquifer, and that has to be put on the exhibits.

9        MR. SACHSE:  The judgment is done.

10       MR. GIRARD:  The judgment is done. Just ready for the

11  exhibits.

12       THE COURT:  You say by the next meeting. You mean not

13  tomorrow? You mean a month from now or whenever we meet.

14       MR. GIRARD:  I presume so.

15       THE COURT:  Mr. Veeder, do you have underlying

16  objections to this?

17       MR. VEEDER:  Yes, I do. But this conforms with what

18  your Honor has said.

19       THE COURT:  All right.

20       MR. GIRARD:  The next one is Interlocutory Judgment

21  No. 41, which concerns the Indians. This we will have ready

22  for signature tomorrow, if your Honor will permit us just to

23  delete the last page, page 24, and substitute a new page 24.

24  The reason for that is that Mr. Veeder desired -- and I think

25  correctly -- an express interlocutory provision providing,

JOHN SWADER, OFFICIAL REPORTER

CAR026 1732

14

1  in essence, that you are not making findings, conclusions of
2  law, etc. concerning the amount of water required for the
3  Indians' use or the rights of future assignees of the Indians
4  and you reserve jurisdiction to determine that in any future
5  proceeding. In other words, the interlocutory judgment would
6  correspond with the language in Finding of Fact No. 12 on
7  page 24, the last paragraph. I have written that finding.
8  It will be inserted as Finding No. 16 on page 24. We will
9  just type a new page 24 which will have one additional judg-
10 ment, not finding, and that will be ready for signature
11 tomorrow morning.

12 THE COURT: Here is the original and my copy. I hand it
13 to you.

14 MR. GIRARD: All right. My secretary Mr. Sachse has
15 complete notes.

16 THE COURT: I think you gentlemen get more work done
17 when I am not here.

18 MR. GIRARD: The next one, your Honor, is De Luz Creek
19 findings, No. 32, prepared by Mr. Sachse.

20 MR. SACHSE: This is not ready for signature. However,
21 we have hammered it out, except for the exhibits and except
22 for a practical question which we have to take up with your
23 Honor.

24 MR. VEEDER: Your Honor, this is a problem that has
25 arisen by reason of the fact that your De Luz findings of