I

111TH CONGRESS
1ST SESSION

# H. R. 4285

To authorize the Pechanga Band of Luiseno Mission Indians Water Rights Settlement, and for other purposes.

————————————

## IN THE HOUSE OF REPRESENTATIVES

DECEMBER 11, 2009

Mrs. BONO MACK (for herself, Mr. GRIJALVA, Ms. RICHARDSON, Mr. CALVERT, Mr. BACA, and Mr. ISSA) introduced the following bill; which was referred to the Committee on Natural Resources

————————————

# A BILL

To authorize the Pechanga Band of Luiseno Mission Indians Water Rights Settlement, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE.**

4    (a) SHORT TITLE.—This Act may be cited as the

5 "Pechanga Band of Luiseño Mission Indians Water

6 Rights Settlement Act".

7    (b) TABLE OF CONTENTS.—The table of contents of

8 this Act is as follows:

Sec. 1. Short title.
Sec. 2. Purposes.
Sec. 3. Definitions.
Sec. 4. Approval of the pechanga settlement agreement.

Sec. 5. Tribal Water Right.
Sec. 6. Satisfaction of claims.
Sec. 7. Waiver of claims.
Sec. 8. Water facilities.
Sec. 9. Pechanga Settlement Fund.
Sec. 10. Miscellaneous provisions.
Sec. 11. Authorization of appropriations.
Sec. 12. Repeal on failure of enforceability date.

**SEC. 2. PURPOSES.**

The purposes of this Act are—

    (1) to achieve a fair, equitable, and final settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed for—

        (A) the Band; and

        (B) the United States acting in its capacity as trustee for the Band and Allottees;

    (2) to achieve a fair, equitable, and final settlement of certain claims by the Band against the United States;

    (3) to authorize, ratify, and confirm the Pechanga Settlement Agreement to be entered into by the Band, RCWD, EMWD, and the United States;

    (4) to authorize and direct the Secretary—

        (A) to execute the Pechanga Settlement Agreement; and

3

1          (B) to take any other action necessary to

2      carry out the Pechanga Settlement Agreement

3      in accordance with this Act; and

4          (5) to authorize the appropriation of funds nec-

5      essary for the implementation of the Pechanga Set-

6      tlement Agreement and this Act.

**SEC. 3. DEFINITIONS.**

8      In this Act:

9          (1) ADJUDICATION COURT.—The term "Adju-

10      dication Court" means the U.S. District Court for

11      the Southern District of California exercising con-

12      tinuing jurisdiction over the Adjudication Pro-

13      ceeding.

14          (2) ADJUDICATION PROCEEDING.—The term

15      "Adjudication Proceeding" means litigation initiated

16      by the United States regarding relative water rights

17      in the Santa Margarita River Watershed in United

18      States v. Fallbrook Public Utility District et al., Civ.

19      No. 3:51–cv–01247 (S.D.C.A.), including any litiga-

20      tion initiated to interpret or enforce the relative

21      water rights in the Santa Margarita River Water-

22      shed pursuant to the Adjudication Court's con-

23      tinuing jurisdiction over the Fallbrook Decree.

24          (3) AFY.—The term "AFY" means acre-feet

25      per year.

4

(4) ALLOTTEE.—The term "allottee" means a person who holds a beneficial real property interest in an Indian allotment that is—

(A) located within the Reservation; and

(B) held in trust by the United States.

(5) BAND.—The term "Band" means the sovereign government of the Pechanga Band of Luiseño Mission Indians, which is organized under section 16 of the Act of June 18, 1934 (25 U.S.C. 476), acting on behalf of itself and its members.

(6) BRINE DISPOSAL FACILITY NOTICE.—The term "Brine Disposal Facility Notice" has the meaning set forth in section 5 of the Recycled Water Infrastructure Agreement.

(7) CLAIMS.—The term "claims" means rights, claims, demands, actions, compensation or causes of action whether known or unknown as of the date of the Pechanga Settlement Agreement.

(8) DEMINERALIZATION AND BRINE DISPOSAL PROJECT.—The term "Demineralization and Brine Disposal Project" has the meaning set forth in section 1 of the Recycled Water Infrastructure Agreement.

(9) EMWD.—The term "EMWD" means Eastern Municipal Water District, a municipal water dis-

5

1    trict organized and existing in accordance with the

2    Municipal Water District Law of 1911, Division 20

3    of the Water Code of the State of California, as

4    amended.

5        (10) EMWD CONNECTION FEE.—The term

6    ''EMWD Connection Fee'' has the meaning set forth

7    in section 2.3(b) of the Extension of Service Area

8    Agreement.

9        (11) ENFORCEABILITY DATE.—The term ''en-

10   forceability date'' means the date on which the Sec-

11   retary publishes in the Federal Register the state-

12   ment of findings described in section 7(f).

13       (12) ESAA CAPACITY AGREEMENT.—The term

14   ''ESAA Capacity Agreement'' means the ''Agree-

15   ment to Provide Capacity for Delivery of ESAA

16   Water'', among the Band, RCWD and the United

17   States.

18       (13) ESAA WATER.—The term ''ESAA Water''

19   means imported potable water that the Band re-

20   ceives from EMWD and MWD pursuant to the Ex-

21   tension of Service Area Agreement.

22       (14) EXTENSION OF SERVICE AREA AGREE-

23   MENT.—The term ''Extension of Service Area

24   Agreement'' means the ''Agreement for Extension of

25   Existing Service Area'', among the Band, EMWD,

6

1   the United States and MWD for purposes of provi-
2   sion of water service by EMWD to a designated por-
3   tion of the Reservation using water supplied by
4   MWD.

5       (15) FALLBROOK DECREE.—The term
6   "Fallbrook Decree" means the "Modified Final
7   Judgment And Decree", entered in the Adjudication
8   Proceeding on April 6, 1966. The term "Fallbrook
9   Decree" includes all court orders, interlocutory judg-
10  ments and decisions supplemental to the "Modified
11  Final Judgment And Decree", including Interlocu-
12  tory Judgment No. 30, Interlocutory Judgment No.
13  35, and Interlocutory Judgment No. 41.

14      (16) INDIAN TRIBE.—The term "Indian tribe"
15  has the meaning given the term in section 4 of the
16  Indian Self-Determination and Education Assistance
17  Act (25 U.S.C. 450b).

18      (17) INJURY TO WATER RIGHTS.—The term
19  "Injury to Water Rights" means an interference
20  with, diminution of, or deprivation of water rights
21  under Federal or State law.

22      (18) INTERIM CAPACITY.—The term "Interim
23  Capacity" has the meaning set forth in section 1 of
24  the ESAA Capacity Agreement.

7

1  (19) INTERIM CAPACITY NOTICE.—The term

2 "Interim Capacity Notice" has the meaning set

3 forth in section 4(b) of the ESAA Capacity Agree-

4 ment.

5  (20) MWD.—The term "MWD" means the

6 Metropolitan Water District of Southern California,

7 a metropolitan water district organized and incor-

8 porated under the Metropolitan Water District Act

9 of the State of California (Stats. 1969, Chapter 209,

10 as amended).

11  (21) MWD CONNECTION FEE.—The term

12 "MWD Connection Fee" has the meaning set forth

13 in section 2.3(a) of the Extension of Service Area

14 Agreement.

15  (22) PECHANGA ESAA DELIVERY CAPACITY AC-

16 COUNT.—The term "Pechanga ESAA Delivery Ca-

17 pacity Account" means the fund authorized by sec-

18 tion 11(a)(2) of this Act.

19  (23) PECHANGA RECYCLED WATER INFRA-

20 STRUCTURE ACCOUNT.—The term "Pechanga Recy-

21 cled Water Infrastructure Account" means the fund

22 authorized by section 11(a)(1) of this Act.

23  (24) PECHANGA SETTLEMENT AGREEMENT.—

24 The term "Pechanga Settlement Agreement" means

25 that agreement, together with the exhibits thereto.

8

1    The parties to the Pechanga Settlement Agreement

2    are the Band, the United States on behalf of the

3    Band, its members and allottees, RCWD and

4    EMWD.

5        (25) PECHANGA SETTLEMENT FUND.—The

6    term "Pechanga Settlement Fund" means the fund

7    authorized by section 9 of this Act.

8        (26) PECHANGA WATER CODE.—The term

9    "Pechanga Water Code" means a water code to be

10   adopted by the Band in accordance with section 5(f).

11       (27) PECHANGA WATER FUND ACCOUNT.—The

12   term "Pechanga Water Fund Account" means the

13   fund authorized by section 11(a)(3) of this Act.

14       (28) PERMANENT CAPACITY.—The term "Per-

15   manent Capacity" has the meaning set forth in sec-

16   tion 1 of the ESAA Capacity Agreement.

17       (29) PERMANENT CAPACITY NOTICE.—The

18   term "Permanent Capacity Notice" has the meaning

19   set forth in section 5(b) of the ESAA Capacity

20   Agreement.

21       (30) RCWD.—The term "RCWD" means the

22   California water district organized pursuant to Cali-

23   fornia Water code section 34000 et seq. and includes

24   all real property owners for whom RCWD acts as an

25   agent pursuant to an agency agreement.

9

1       (31) RECYCLED WATER INFRASTRUCTURE

2      AGREEMENT.—The term "Recycled Water Infra-

3      structure Agreement" means the "Agreement for

4      Recycled Water Infrastructure" among the Band,

5      RCWD, and the United States.

6       (32) RECYCLED WATER TRANSFER AGREE-

7      MENT.—The term "Recycled Water Transfer Agree-

8      ment" means the "Recycled Water Transfer Agree-

9      ment" between the Band and RCWD.

10       (33) RESERVATION.—The term "Reservation"

11     means land depicted on the map attached to the

12     Pechanga Settlement Agreement as exhibit I. The

13     term "Reservation" is solely for the purposes of the

14     Pechanga Settlement Agreement only, and not for

15     any of the exhibits, and shall not be used for any

16     other purpose.

17       (34) SANTA MARGARITA RIVER WATERSHED.—

18     The "Santa Margarita River Watershed" means the

19     watershed that is the subject of the Adjudication

20     Proceeding and the Fallbrook Decree.

21       (35) SECRETARY.—The term "Secretary"

22     means the Secretary of the United States Depart-

23     ment of the Interior.

24       (36) STATE.—The term "State" means the

25     State of California.

10

1     (37) STORAGE POND.—The term "Storage

2   Pond" has the meaning set forth in section 1 of the

3   Recycled Water Infrastructure Agreement.

4     (38) TRIBAL WATER RIGHT.—The term "Tribal

5   Water Right" means the water rights ratified, con-

6   firmed and declared to be valid for the benefit of the

7   Band and allottees as specifically set forth and de-

8   scribed in section 5 of the Act.

9  **SEC. 4. APPROVAL OF THE PECHANGA SETTLEMENT**

10          **AGREEMENT.**

11   (a) IN GENERAL.—Except as modified by this Act,

12  and to the extent the Pechanga Settlement Agreement

13  does not conflict with this Act, the Pechanga Settlement

14  Agreement is authorized, ratified, and confirmed. To the

15  extent amendments are executed to make the Pechanga

16  Settlement Agreement consistent with this Act, such

17  amendments are also authorized, ratified, and confirmed.

18   (b) EXECUTION OF PECHANGA SETTLEMENT AGREE-

19  MENT.—To the extent that the Pechanga Settlement

20  Agreement does not conflict with this Act, the Secretary

21  is directed to and shall promptly execute the Pechanga

22  Settlement Agreement, including all exhibits to or parts

23  of the Pechanga Settlement Agreement requiring the sig-

24  nature of the Secretary. Nothing herein precludes the Sec-

25  retary from approving modifications to exhibits to the

11

1 Pechanga Settlement Agreement not inconsistent with this
2 Act, to the extent such modifications do not otherwise re-
3 quire Congressional approval pursuant to the Trade and
4 Intercourse Act, 25 U.S.C. 177, or pursuant to other Fed-
5 eral statute.

6 (c) EXECUTION OF EXTENSION OF SERVICE AREA
7 AGREEMENT, RECYCLED WATER INFRASTRUCTURE
8 AGREEMENT AND ESAA CAPACITY AGREEMENT.—The
9 Secretary shall execute the Extension of Service Area
10 Agreement, the Recycled Water Infrastructure Agreement
11 and the ESAA Capacity Agreement within 60 days of the
12 enactment of this Act. Such agreements shall be effective
13 and enforceable as between the parties to such agree-
14 ments, except the United States, as from the date all par-
15 ties thereto have executed such agreements. Such agree-
16 ments shall be enforceable as to the United States only
17 as from the enforceability date.

18 (d) NATIONAL ENVIRONMENTAL POLICY ACT OF
19 1969.—

20    (1) ENVIRONMENTAL COMPLIANCE.—In imple-
21    menting the Pechanga Settlement Agreement, the
22    Secretary shall promptly comply with all applicable
23    aspects of the National Environmental Policy Act of
24    1969 (42 U.S.C. 4321 et seq.), the Endangered Spe-

12

1 cies Act of 1973 (16 U.S.C. 1531 et seq.), and all
2 other applicable environmental Acts and regulations.

3    (2) EXECUTION OF THE PECHANGA SETTLE-
4 MENT AGREEMENT.—Execution of the Pechanga
5 Settlement Agreement by the Secretary under this
6 section shall not constitute a major Federal action
7 under the National Environmental Policy Act of
8 1969 (42 U.S.C. 4321 et seq.). The Secretary is di-
9 rected to carry out all Federal compliance necessary
10 to implement the Pechanga Settlement Agreement.

11    (3) LEAD AGENCY.—The Bureau of Reclama-
12 tion shall be designated as the lead agency with re-
13 spect to environmental compliance.

**SEC. 5. TRIBAL WATER RIGHT.**

15    (a) INTENT OF CONGRESS.—It is the intent of Con-
16 gress to provide to each allottee benefits that are equiva-
17 lent to or exceed the benefits allottees currently possess,
18 taking into consideration—

19    (1) the potential risks, cost, and time delay as-
20 sociated with litigation that would be resolved by the
21 Pechanga Settlement Agreement and this Act;

22    (2) the availability of funding under this Act;

23    (3) the availability of water from the Tribal
24 Water Right and other water sources as set forth in
25 the Pechanga Settlement Agreement; and

13

1    (4) the applicability of section 7 of the Act of

2    February 8, 1887 (25 U.S.C. 381) and this Act to

3    protect the interests of allottees.

4    (b) CONFIRMATION OF TRIBAL WATER RIGHT.—

5       (1) IN GENERAL.—The Tribal Water Right is

6    ratified, confirmed, and declared to be valid.

7       (2) CHARACTERISTICS OF TRIBAL WATER

8    RIGHT.—The Tribal Water Right shall be equal to

9    4,994 AFY of water that is subject to the jurisdic-

10   tion of the Adjudication Court. The priority date for

11   3,019 AFY of the Tribal Water Right shall be June

12   27, 1882. The priority date for 182 AFY of the

13   Tribal Water Right shall be August 29, 1893. The

14   priority date for 729 AFY of the Tribal Water Right

15   shall be January 9, 1907. The priority date for 563

16   AFY of the Tribal Water Right shall be March 11,

17   1907. The priority date for 501 AFY of the Tribal

18   Water Right shall be May 25, 1931.

19      (3) USE.—Subject to the terms of the

20   Pechanga Settlement Agreement, this Act and the

21   Fallbrook Decree, the Band may use the Tribal

22   Water Right for any purpose on the Reservation.

23   (c) HOLDING IN TRUST.—The Tribal Water Right

24   shall be held in trust by the United States for the use

14

1 and benefit of the Band, and the allottees in accordance
2 with this section.

3    (d) ALLOTTEES.—As specified in and provided for in
4 this Act:

5        (1) APPLICABILITY OF ACT OF FEBRUARY 8,
6        1887.—The provisions of section 7 of the Act of Feb-
7        ruary 8, 1887 (25 U.S.C. 381), relating to the use
8        of water for irrigation purposes shall apply to the
9        Tribal Water Right.

10        (2) ENTITLEMENT TO WATER.—Any entitle-
11        ment to water of an allottee under Federal law for
12        such allottee's allotment shall be satisfied by the
13        Band and no allottee shall have any additional enti-
14        tlement to water except as set forth in the Pechanga
15        Settlement Agreement and this Act.

16        (3) EXHAUSTION OF REMEDIES.—Before as-
17        serting any claim against the United States under
18        section 7 of the Act of February 8, 1887 (25 U.S.C.
19        381), or any other applicable law, an allottee shall
20        exhaust remedies available under the Pechanga
21        Water Code or other applicable tribal law.

22        (4) CLAIMS.—Following exhaustion of remedies
23        available under the Pechanga Water Code or other
24        applicable tribal law, an allottee may seek relief

15

1    under section 7 of the Act of February 8, 1887 (25

2    U.S.C. 381), or other applicable law.

3        (5) AUTHORITY.—The Secretary shall have the

4    authority to protect allottees' rights as specified in

5    this section.

6    (e) AUTHORITY OF BAND.—

7        (1) IN GENERAL.—Except as provided in para-

8    graph (2), the Band shall have authority to use, al-

9    locate, distribute, and lease the Tribal Water

10   Right—

11           (A) in accordance with the Pechanga Set-

12        tlement Agreement; and

13           (B) subject to approval of the Secretary of

14        the Pechanga Water Code under section 5(f).

15       (2) LEASES BY ALLOTTEES.—Notwithstanding

16   paragraph (1), an allottee may lease any interest in

17   land held by the allottee, together with any water

18   right determined to be appurtenant to the interest in

19   land.

20   (f) PECHANGA WATER CODE.—

21       (1) IN GENERAL.—No later than eighteen (18)

22   months following the enforceability date, the Band

23   shall enact a Pechanga Water Code, that provides

24   for—

16

1         (A) the management, regulation and gov-

2     ernance of all uses of the Tribal Water Right

3     in accordance with the Pechanga Settlement

4     Agreement; and

5         (B) establishment by the Band of condi-

6     tions, permit requirements, and other limita-

7     tions relating to the storage, recovery, and use

8     of the Tribal Water Right in accordance with

9     the Pechanga Settlement Agreement.

10     (2) INCLUSIONS.—Subject to the approval of

11 the Secretary, the Pechanga Water Code shall pro-

12 vide that—

13         (A) tribal allocations of water to allottees

14     shall be satisfied with water from the Tribal

15     Water Right;

16         (B) charges for delivery of water for irriga-

17     tion purposes for allottees shall be assessed in

18     accordance with section 7 of the Act of Feb-

19     ruary 8, 1887 (25 U.S.C. 381);

20         (C) there is a process by which an allottee

21     may request that the Band provide water for ir-

22     rigation use in accordance with this Act;

23         (D) there is a due process system for the

24     consideration and determination by the Band of

25     any request by an allottee, or any successor in

17

1     interest to an allottee, for an allocation of such

2     water for irrigation purposes on allotted land,

3     including a process for—

4          (i) appeal and adjudication of any de-

5          nied or disputed distribution of water; and

6          (ii) resolution of any contested admin-

7          istrative decision; and

8     (E) there is a requirement that any allot-

9     tee with a claim relating to the enforcement of

10    rights of the allottee under the Pechanga Water

11    Code or relating to the amount of water allo-

12    cated to land of the allottee must first exhaust

13    remedies available to the allottee under tribal

14    law and the Pechanga Water Code before initi-

15    ating an action against the United States or pe-

16    titioning the Secretary pursuant to subsection

17    (d)(4).

18    (3) ACTION BY SECRETARY.—

19    (A) IN GENERAL.—The Secretary shall ad-

20    minister the Tribal Water Right until the

21    Pechanga Water Code is enacted in accordance

22    with paragraph (1) and those provisions requir-

23    ing approval pursuant to paragraph (2).

24    (B) APPROVAL.—The Pechanga Water

25    Code shall not be valid unless—

18

1          (i) the provisions of the Pechanga

2     Water Code required by paragraph (2) are

3     approved by the Secretary; and

4          (ii) each amendment to the Pechanga

5     Water Code that affects a right of an allot-

6     tee is approved by the Secretary.

7     (C) APPROVAL PERIOD.—

8          (i) IN GENERAL.—Except as provided

9     by clause (ii), if the Secretary does not ap-

10    prove or disapprove the Pechanga Water

11    Code before the date that is 180 days after

12    the date on which the Pechanga Water

13    Code is submitted to the Secretary for ap-

14    proval, the Pechanga Water Code shall be

15    considered to have been approved by the

16    Secretary to the extent that it is not incon-

17    sistent with the Pechanga Settlement

18    Agreement or this Act.

19         (ii) MUTUAL EXTENSION OF AP-

20    PROVAL PERIOD.—The Pechanga Water

21    Code may not be considered to have been

22    approved by the Secretary under clause (i)

23    if the Secretary and the Band agree to ex-

24    tend the approval period.

19

1    (g) EFFECT.—Except as otherwise specifically pro-
2 vided in this section, nothing in this Act—

3        (1) authorizes any action by an allottee against
4    any individual or entity, or against the Band, under
5    Federal, State, tribal, or local law; or

6        (2) alters or affects the status of any action
7    pursuant to section 1491(a) of title 28, United
8    States Code.

**SEC. 6. SATISFACTION OF CLAIMS.**

10    (a) IN GENERAL.—The benefits provided to the Band
11 and the allottees under the Pechanga Settlement Agree-
12 ment and this Act shall satisfy all claims of the Band and
13 the allottees waived pursuant to section 7.

14    (b) NO RECOGNITION OF WATER RIGHTS.—Notwith-
15 standing subsection (a) and except as provided in section
16 5(d), nothing in this Act recognizes or establishes any
17 right of a member of the Band or an allottee to water
18 within the Reservation.

**SEC. 7. WAIVER OF CLAIMS.**

20    (a) IN GENERAL.—

21        (1) WAIVER OF CLAIMS BY THE BAND AND THE
22    UNITED STATES.—

23            (A) Subject to the retention of rights set
24        forth in subsection (c), notwithstanding any
25        provisions to the contrary in the Pechanga Set-

20

1    tlement Agreement, and in return for the ratifi-
2    cation, confirmation and declaration to be valid
3    of the Tribal Water Right and other benefits,
4    including the commitments by RCWD and
5    EMWD as set forth in the Pechanga Settlement
6    Agreement and this Act, the Band, and the
7    United States on behalf of the Band and
8    allottees waive any and all of the following
9    claims—

10           (i) claims for water rights in the
11       Santa Margarita River Watershed for
12       lands located within the Reservation aris-
13       ing from time immemorial and, thereafter,
14       forever; and

15           (ii) claims for water rights in the
16       Santa Margarita River Watershed that are
17       based on aboriginal occupancy for lands
18       overlying the Santa Margarita River Wa-
19       tershed arising from time immemorial and,
20       thereafter, forever.

21       (B) Subject to the retention of rights set
22    forth in subsection (c), notwithstanding any
23    provisions to the contrary in the Pechanga Set-
24    tlement Agreement, and in return for the ratifi-
25    cation, confirmation and declaration to be valid

21

1   of the Tribal Water Right and other benefits,
2   including the commitments by RCWD and
3   EMWD as set forth in the Pechanga Settlement
4   Agreement and this Act, the Band and the
5   United States on behalf of the Band and
6   allottees fully release, acquit and discharge
7   RCWD and EMWD from the following
8   claims—

9   (i) claims for Injuries to Water Rights
10  in the Santa Margarita River Watershed
11  for lands located within the Reservation
12  arising or occurring at any time up to and
13  including June 30, 2009;

14  (ii) claims for Injuries to Water
15  Rights in the Santa Margarita River Wa-
16  tershed for lands located within the Res-
17  ervation arising or occurring at any time
18  after June 30, 2009, resulting from the di-
19  version or use of water in a manner not in
20  violation of the Pechanga Settlement
21  Agreement or this Act;

22  (iii) claims for subsidence damage to
23  land located within the Reservation arising
24  or occurring at any time up to and includ-
25  ing June 30, 2009;

22

1          (iv) claims for subsidence damage
2          arising or occurring after June 30, 2009,
3          to lands located within the Reservation re-
4          sulting from the diversion of underground
5          water in a manner not in violation of the
6          Pechanga Settlement Agreement or this
7          Act; and

8          (v) claims arising out of or relating in
9          any manner to the negotiation or execution
10         of the Pechanga Settlement Agreement or
11         the negotiation or execution of this Act.

12    (2) CLAIMS BY THE UNITED STATES AGAINST
13    THE BAND.—Subject to the retention of rights set
14    forth in subsection (c), to the extent consistent with
15    this Act, the United States, in all its capacities (ex-
16    cept as trustee for an Indian tribe other than the
17    Band), as part of the performance of obligations
18    under the Pechanga Settlement Agreement, is au-
19    thorized to execute a waiver and release of any and
20    all claims against the Band, or any agency, official,
21    or employee of the Band, under Federal, State, or
22    any other law for—

23         (A) claims for Injuries to Water Rights in
24         the Santa Margarita River Watershed for lands
25         located within the Reservation arising or occur-

23

1          ring at any time up to and including June 30,

2          2009;

3               (B) claims for Injuries to Water Rights in

4          the Santa Margarita River Watershed for lands

5          located within the Reservation arising or occur-

6          ring at any time after June 30, 2009, resulting

7          from the diversion or use of water in a manner

8          not in violation this Agreement or the Act;

9               (C) claims for subsidence damage to land

10         located within the Reservation arising or occur-

11         ring at any time up to and including June 30,

12         2009;

13              (D) claims for subsidence damage arising

14         or occurring after June 30, 2009, to lands lo-

15         cated within the Reservation resulting from the

16         diversion of underground water in a manner not

17         in violation of this Agreement or the Act; and

18              (E) claims arising out of or relating in any

19         manner to the negotiation or execution of this

20         Agreement or the negotiation or execution of

21         the Act.

22    (3) CLAIMS BY THE BAND AGAINST THE

23 UNITED STATES.—Subject to the retention of rights

24 set forth in subsection (c), the Band, on behalf of

24

1     itself and its members, is authorized to execute a

2     waiver and release of—

3           (A) all claims against the United States,

4           its agencies, or employees relating to claims for

5           water rights in or water of the Santa Margarita

6           River Watershed or any other river systems

7           outside of the Santa Margarita River Water-

8           shed that the United States acting in its capac-

9           ity as trustee for the Band asserted, or could

10          have asserted, in any proceeding, including but

11          not limited to the Adjudication Proceeding;

12          (B) all claims against the United States,

13          its agencies, or employees relating to damages,

14          losses, or injuries to water, water rights, land,

15          or natural resources due to loss of water or

16          water rights (including but not limited to dam-

17          ages, losses or injuries to hunting, fishing,

18          gathering or cultural rights due to loss of water

19          or water rights; claims relating to interference

20          with, diversion or taking of water or water

21          rights; or claims relating to failure to protect,

22          acquire, replace, or develop water, water rights

23          or water infrastructure) in the Santa Margarita

24          River Watershed that first accrued at any time

25          up to and including June 30, 2009;

25

1            (C) all claims against the United States,
2        its agencies, or employees encompassed within
3        the case Pechanga Band of Luiseño Indians v.
4        Salazar, Civ. No. 1:06–cv–02206 (D.D.C);

5            (D) all claims against the United States,
6        its agencies, or employees relating to the pend-
7        ing litigation of claims relating to the Band's
8        water rights in the Adjudication Proceeding;
9        and

10           (E) all claims against the United States,
11       its agencies, or employees relating to the nego-
12       tiation, execution or the adoption of the
13       Pechanga Settlement Agreement, exhibits there-
14       to, or this Act.

15   (b) EFFECTIVENESS OF WAIVERS AND RELEASES.—
16 The waivers under subsection (a) shall take effect on the
17 enforceability date.

18   (c) RESERVATION OF RIGHTS AND RETENTION OF
19 CLAIMS.—Notwithstanding the waivers and releases au-
20 thorized in this Act, the Band on behalf of itself and its
21 members and the United States acting in its capacity as
22 trustee for the Band retain—

23           (1) claims for enforcement of the Pechanga Set-
24       tlement Agreement and this Act;

26

1       (2) claims against persons other than RCWD

2   and EMWD;

3       (3) claims for water rights that are outside the

4   jurisdiction of the Adjudication Court;

5       (4) claims for water rights for lands within the

6   Santa Margarita River Watershed that are outside

7   the Reservation; provided, however, that such claims

8   are for water rights consistent with water rights rec-

9   ognized for such lands in the Fallbrook Decree;

10      (5) rights to use and protect water rights ac-

11   quired on or after the enforceability date; and

12      (6) remedies, privileges, immunities, powers and

13   claims, including claims for water rights, not specifi-

14   cally waived and released pursuant to this Act and

15   the Pechanga Settlement Agreement.

16   (d) EFFECT OF PECHANGA SETTLEMENT AGREE-

17 MENT AND ACT.—Nothing in the Pechanga Settlement

18 Agreement or this Act—

19      (1) affects the ability of the United States act-

20   ing in its sovereign capacity to take actions author-

21   ized by law, including but not limited to any laws re-

22   lating to health, safety, or the environment, includ-

23   ing but not limited to the Clean Water Act, the Safe

24   Drinking Water Act, the Comprehensive Environ-

25   mental Response, Compensation, and Liability Act,

27

1    Resource Conservation and Recovery Act, and the

2    regulations implementing such Acts;

3        (2) affects the ability of the United States to

4    take actions acting in its capacity as trustee for any

5    other Indian tribe or allottee;

6        (3) confers jurisdiction on any State court to—

7            (A) interpret Federal law regarding health,

8        safety, or the environment or determine the du-

9        ties of the United States or other parties pursu-

10       ant to such Federal law; or

11           (B) conduct judicial review of Federal

12       agency action; or

13       (4) waives any claim of a member of the Band

14   in an individual capacity that does not derive from

15   a right of the Band.

16   (e) TOLLING OF CLAIMS.—

17       (1) IN GENERAL.—Each applicable period of

18   limitation and time-based equitable defense relating

19   to a claim described in this section shall be tolled for

20   the period beginning on the date of enactment of

21   this Act and ending on the earlier of—

22           (A) December 31, 2015; or

23           (B) the enforceability date.

24       (2) EFFECTS OF SUBSECTION.—Nothing in this

25   subsection revives any claim or tolls any period of

28

1 limitation or time-based equitable defense that ex-
2 pired before the date of enactment of this Act.

3 (3) LIMITATION.—Nothing in this section pre-
4 cludes the tolling of any period of limitations or any
5 time-based equitable defense under any other appli-
6 cable law.

7 (f) ENFORCEABILITY DATE.—The enforceability date
8 shall be the date on which the Secretary publishes in the
9 Federal Register a statement of findings that—

10 (1) the Pechanga Settlement Agreement has
11 been approved by the Adjudication Court;

12 (2) all funds authorized by this Act for such
13 purpose have been deposited in the Pechanga Settle-
14 ment Fund;

15 (3) the waivers and releases authorized in sub-
16 section (a) have been executed by the Band and the
17 Secretary; and

18 (4) the Extension of Service Area Agreement
19 has been approved and executed by all parties there-
20 to and is effective and enforceable in accordance
21 with its terms.

22 **SEC. 8. WATER FACILITIES.**

23 (a) IN GENERAL.—The Secretary shall, subject to the
24 availability of appropriations, using funds from the des-
25 ignated accounts of the Pechanga Settlement Fund, pro-

29

1 vide the funds necessary to fulfill the Band's obligations
2 under the Recycled Water Infrastructure Agreement and
3 the ESAA Capacity Agreement, in an amount not to ex-
4 ceed the amounts deposited in the designated accounts for
5 such purposes, in accordance with this Act and the terms
6 and conditions of such agreements.

7 (b) NON-REIMBURSABILITY.—The funds provided by
8 the Secretary pursuant to subsection (a) shall be non-re-
9 imbursable.

10 (c) RECYCLED WATER INFRASTRUCTURE.—

11 (1) IN GENERAL.—The Secretary shall, using
12 funds from the Pechanga Recycled Water Infra-
13 structure Account, provide funds for the Storage
14 Pond and the Demineralization and Brine Disposal
15 Project in accordance with this section.

16 (2) STORAGE POND.—The Secretary shall, sub-
17 ject to the availability of appropriations, provide the
18 funding necessary to fulfill the Band's obligations
19 under the Recycled Water Infrastructure Agreement
20 for the design and construction of the Storage Pond,
21 in an amount not to exceed $2,500,000, such
22 amount to be adjusted for changes since June 30,
23 2009, in construction costs as indicated by engineer-
24 ing cost indices applicable to types of construction
25 required to design and construct the Storage Pond.

30

1          (A) The procedure for the Secretary to
2      provide funds pursuant to this section shall be
3      as set forth in the Recycled Water Infrastruc-
4      ture Agreement.

5          (B) The Bureau of Reclamation shall be
6      the lead agency for purposes of the implementa-
7      tion of this section.

8          (C) The United States shall have no re-
9      sponsibility or liability for the Storage Pond to
10     be designed and constructed by RCWD.

11         (D) In the event that RCWD does not sub-
12     mit the Storage Pond Notice to the Band with-
13     in 3 years after the enforceability date, the
14     funds set aside within the Pechanga Recycled
15     Water Infrastructure Account, including any in-
16     terest that has accrued thereon, for purposes of
17     the design and construction of the Storage
18     Pond shall revert to the U.S. Treasury.

19     (3) DEMINERALIZATION AND BRINE DISPOSAL
20     PROJECT.—Upon receipt of a written request from
21     the Band pursuant to section 5(c) of the Recycled
22     Water Infrastructure Agreement, the Secretary, act-
23     ing through the Bureau of Reclamation, shall enter
24     into negotiations with RCWD and the Band to es-
25     tablish an agreement that will allow the Bureau of

31

1 Reclamation to make payment directly to RCWD in

2 the amount below. Upon execution of said agreement

3 the Secretary shall, subject to the availability of ap-

4 propriations, provide the funding necessary to fulfill

5 the Band's obligations under the Recycled Water In-

6 frastructure Agreement for the design and construc-

7 tion of the Demineralization and Brine Disposal

8 Project, in an amount not to exceed $4,460,000,

9 such amount to be adjusted for changes since June

10 30, 2009, in construction costs as indicated by engi-

11 neering cost indices applicable to types of construc-

12 tion required to design and construct the

13 Demineralization and Brine Disposal Project.

14 (A) The procedure for the Secretary to

15 provide funds pursuant to this section shall be

16 as set forth in the Recycled Water Infrastruc-

17 ture Agreement and the funding agreement re-

18 quired pursuant to section 8(c)(3).

19 (B) The Bureau of Reclamation shall be

20 the lead agency for purposes of the implementa-

21 tion of this section.

22 (C) The United States shall have no re-

23 sponsibility or liability for the Demineralization

24 and Brine Disposal Project to be designed and

25 constructed by RCWD.

32

1          (D) In the event that RCWD, the Band

2      and the United States do not enter into the

3      funding agreement required by section 8(c)(3)

4      within 5 years after the enforceability date, the

5      funds set aside within the Pechanga Recycled

6      Water Infrastructure Account, including any in-

7      terest that has accrued thereon, for purposes of

8      the      design      and      construction      of      the

9      Demineralization and Brine Disposal Project

10     shall be available for use by the Band to design

11     and construct alternative demineralization and

12     brine disposal facilities that will provide benefits

13     and improvements in the quality of ground-

14     water on the Reservation that are similar to

15     those that the Band would have received had

16     RCWD constructed the Demineralization and

17     Brine Disposal Project.

18   (d) ESAA DELIVERY CAPACITY.—

19        (1) IN GENERAL.—The Secretary shall, using

20   funds from the Pechanga ESAA Delivery Capacity

21   Account, provide funds for Interim Capacity and

22   Permanent Capacity in accordance with this section.

23        (2) INTERIM CAPACITY.—The Secretary shall,

24   subject to the availability of appropriations, using

25   funds from the ESAA Delivery Capacity Account,

33

1    provide the funding necessary to fulfill the Band's

2    obligations under the ESAA Capacity Agreement for

3    the provision by RCWD of Interim Capacity to the

4    Band in an amount not to exceed $1,000,000.

5         (A) The procedure for the Secretary to

6         provide funds pursuant to this section shall be

7         as set forth in the ESAA Capacity Agreement.

8         (B) The Bureau of Reclamation shall be

9         the lead agency for purposes of the implementa-

10        tion of this section.

11        (C) The United States shall have no re-

12        sponsibility or liability for the Interim Capacity

13        to be provided by RCWD.

14        (D) In the event that RCWD does not pro-

15        vide the Interim Capacity Notice required pur-

16        suant to the ESAA Capacity Agreement within

17        60 days after the date required under such

18        agreement, the funds set aside in the Pechanga

19        ESAA Delivery Capacity Account, including any

20        interest that has accrued thereon, for purposes

21        of the provision of Interim Capacity and Per-

22        manent Capacity shall be available for use by

23        the Band to provide alternative interim capacity

24        in a manner that is similar to the Interim Ca-

25        pacity and Permanent Capacity that the Band

34

1        would have received had RCWD provided such

2        Interim Capacity and Permanent Capacity.

3        (3) PERMANENT CAPACITY.—Upon receipt of

4    the Permanent Capacity Notice pursuant to section

5    5(b) of the ESAA Capacity Agreement, the Sec-

6    retary, acting through the Bureau of Reclamation,

7    shall enter into negotiations with RCWD and the

8    Band to establish an agreement that will allow for

9    the disbursement of funds from the Pechanga ESAA

10    Delivery Capacity Account in the amount below.

11    Upon execution of said agreement the Secretary

12    shall, subject to the availability of appropriations,

13    using funds from the ESAA Delivery Capacity Ac-

14    count, provide the funding necessary to fulfill the

15    Band's obligations under the ESAA Capacity Agree-

16    ment for the provision by RCWD of Permanent Ca-

17    pacity to Pechanga in an amount not to exceed

18    $16,900,000, such amount to be adjusted for

19    changes since June 30, 2009, in construction costs

20    as indicated by engineering cost indices applicable to

21    types of construction required to design and con-

22    struct the Permanent Capacity.

23        (A) The procedure for the Secretary to

24        provide funds pursuant to this section shall be

25        as set forth in the ESAA Capacity Agreement.

35

1        (B) The Bureau of Reclamation shall be
2    the lead agency for purposes of the implementa-
3    tion of this section.

4        (C) The United States shall have no re-
5    sponsibility or liability for the Permanent Ca-
6    pacity to be provided by RCWD.

7        (D) In the event that RCWD does not pro-
8    vide the Permanent Capacity Notice required
9    pursuant to the ESAA Capacity Agreement
10   within 5 years after the enforceability date, the
11   funds set aside in the Pechanga ESAA Delivery
12   Capacity Account, including any interest that
13   has accrued thereon, for purposes of the provi-
14   sion of Permanent Capacity shall be available
15   for use by the Band to provide alternative per-
16   manent capacity in a manner that is similar to
17   the Permanent Capacity that the Band would
18   have received had RCWD provided such Perma-
19   nent Capacity.

20  **SEC. 9. PECHANGA SETTLEMENT FUND.**

21      (a) ESTABLISHMENT.—There is established in the
22  Treasury of the United States the Pechanga Settlement
23  Fund, consisting of such amounts as are deposited in the
24  fund under subsections (a)(1), (a)(2), and (a)(3) of section
25  11.

36

1    (b) Accounts of Pechanga Settlement
2 Fund.—The Secretary shall establish in the Pechanga
3 Settlement Fund the following accounts:

4        (1) Pechanga Recycled Water Infrastructure
5    Account, consisting of amounts authorized pursuant
6    to section 11(a)(1).

7        (2) Pechanga ESAA Delivery Capacity Account,
8    consisting of amounts authorized pursuant to section
9    11(a)(2).

10        (3) Pechanga Water Fund Account, consisting
11    of amounts authorized pursuant to section 11(a)(3).

12    (c) Deposits to Pechanga Settlement Fund.—

13        (1) In general.—The Secretary of the Treas-
14    ury shall promptly deposit in the Pechanga Settle-
15    ment Fund any amounts appropriated for that pur-
16    pose.

17        (2) Deposits to accounts.—The Secretary of
18    the Treasury shall deposit amounts in the accounts
19    of the Pechanga Settlement Fund established under
20    subsection (b).

21    (d) Management.—

22        (1) In general.—The Secretary shall manage
23    the Pechanga Settlement Fund, make investments
24    from the Pechanga Settlement Fund, and make
25    monies available from the Pechanga Settlement

37

1    Fund for distribution to the Band consistent with
2    the American Indian Trust Fund Management Re-
3    form Act of 1994 (25 U.S.C. 4001 et seq.) (referred
4    to in this subsection as the "Trust Fund Reform
5    Act").

6        (2) INVESTMENT OF PECHANGA SETTLEMENT
7    FUND.—Upon the enforceability date the Secretary
8    shall invest amounts in the Pechanga Settlement
9    Fund in accordance with—

10           (A) the Act of April 1, 1880 (25 U.S.C.
11        161);

12           (B) the first section of the Act of June 24,
13        1938 (25 U.S.C. 162a);

14           (C) the obligations of Federal corporations
15        and Federal Government-sponsored entities the
16        charter documents of which provide that the ob-
17        ligations of the entities are lawful investments
18        for federally managed funds, including—

19               (i) the obligations of the United
20            States Postal Service described in section
21            2005 of title 39, United States Code;

22               (ii) bonds and other obligations of the
23            Tennessee Valley Authority described in
24            section 15d of the Tennessee Valley Au-
25            thority Act of 1933 (16 U.S.C. 831n–4);

38

1          (iii) mortgages, obligations, and other

2      securities of the Federal Home Loan Mort-

3      gage Corporation described in section 303

4      of the Federal Home Loan Mortgage Cor-

5      poration Act (12 U.S.C. 1452); and

6          (iv) bonds, notes, and debentures of

7      the Commodity Credit Corporation de-

8      scribed in section 4 of the Act of March 8,

9      1938 (15 U.S.C. 713a–4); and

10      (D) the obligations referred to in section

11  201 of the Social Security Act (42 U.S.C. 401).

12      (3) DISTRIBUTIONS FROM PECHANGA SETTLE-

13  MENT FUND.—

14      (A) IN GENERAL.—Funds from the

15  Pechanga Settlement Fund shall be used for

16  each purpose described in subparagraphs (B)

17  through (D).

18      (B) PECHANGA RECYCLED WATER INFRA-

19  STRUCTURE ACCOUNT.—The Pechanga Recy-

20  cled Water Infrastructure Account shall be used

21  for expenditures by the Band in accordance

22  with section 8(c).

23      (C) PECHANGA ESAA DELIVERY CAPACITY

24  ACCOUNT.—The Pechanga ESAA Delivery Ca-

39

1    pacity Account shall be used for expenditures
2    by the Band in accordance with section 8(d).
3         (D) PECHANGA WATER FUND ACCOUNT.—
4    The Pechanga Water Fund Account shall be
5    used for—
6              (i) payment of the EMWD Connection
7         Fee;
8              (ii) payment of the MWD Connection
9         Fee; and
10             (iii) any expenses, charges or fees in-
11        curred by the Band in connection with the
12        delivery or use of water pursuant to the
13        Pechanga Settlement Agreement.
14   (4) WITHDRAWALS BY BAND.—
15        (A) IN GENERAL.—The Band may with-
16   draw any portion of amounts in the Pechanga
17   Settlement Fund on approval by the Secretary
18   of a tribal management plan in accordance with
19   the Trust Fund Reform Act.
20        (B) REQUIREMENTS.—
21             (i) IN GENERAL.—In addition to the
22        requirements under the Trust Fund Re-
23        form Act, the tribal management plan of
24        the Band under subparagraph (A) shall re-
25        quire that the Band spend any amounts

40

1 withdrawn from the Pechanga Settlement

2 Fund in accordance with this Act.

3   (ii) ENFORCEMENT.—The Secretary

4   may carry out such judicial or administra-

5   tive actions as the Secretary determines to

6   be necessary to enforce a tribal manage-

7   ment plan to ensure that amounts with-

8   drawn by the Band from the Pechanga

9   Settlement Fund under this paragraph are

10   used in accordance with this Act.

11  (C) LIABILITY.—The Secretary and the

12 Secretary of the Treasury shall not be liable for

13 the expenditure or investment of amounts with-

14 drawn from the Pechanga Settlement Fund by

15 the Band under this paragraph.

16  (D) EXPENDITURE PLAN.—

17   (i) IN GENERAL.—For each fiscal

18   year, the Band shall submit to the Sec-

19   retary for approval an expenditure plan for

20   any portion of the amounts described in

21   subparagraph (A) that the Band elects to

22   withdraw under this paragraph during the

23   fiscal year.

24   (ii) INCLUSION.—An expenditure plan

25   under clause (i) shall include a description

41

1          of the manner in which, and the purposes
2          for which, funds of the Band remaining in
3          the Pechanga Settlement Fund will be
4          used during subsequent fiscal years.

5              (iii) APPROVAL.—On receipt of an ex-
6          penditure plan under clause (i), the Sec-
7          retary shall approve the plan if the Sec-
8          retary determines that the plan is—

9              (I) reasonable; and

10             (II) consistent with this Act.

11     (5) ANNUAL REPORTS.—The Band shall submit
12 to the Secretary annual reports describing each ex-
13 penditure by the Band of amounts in the Pechanga
14 Settlement Fund during the preceding calendar
15 year.

16     (6) CERTAIN PER CAPITA DISTRIBUTIONS PRO-
17 HIBITED.—No amount in the Pechanga Settlement
18 Fund shall be distributed to any member of the
19 Band on a per capita basis.

20 (e) AVAILABILITY.—The amounts in the Pechanga
21 Settlement Fund shall be available for use by the Sec-
22 retary and withdrawal by the Band beginning on the en-
23 forceability date.

1   **SEC. 10. MISCELLANEOUS PROVISIONS.**

2   (a) WAIVER OF SOVEREIGN IMMUNITY BY THE

3   UNITED STATES.—Except as provided in subsections (a)

4   through (c) of section 208 of the Department of Justice

5   Appropriation Act, 1953 (43 U.S.C. 666), nothing in this

6   Act waives the sovereign immunity of the United States.

7   (b) OTHER TRIBES NOT ADVERSELY AFFECTED.—

8   Nothing in this Act quantifies or diminishes any land or

9   water right, or any claim or entitlement to land or water,

10   of an Indian tribe, band, or community other than the

11   Band.

12   (c) LIMITATION ON CLAIMS FOR REIMBURSEMENT.—

13   With respect to Indian land within the Reservation—

14       (1) the United States shall not submit against

15       any Indian-owned land located within the Reserva-

16       tion any claim for reimbursement of the cost to the

17       United States of carrying out this Act and the

18       Pechanga Settlement Agreement; and

19       (2) no assessment of any Indian-owned land lo-

20       cated within the Reservation shall be made regard-

21       ing that cost.

22   (d) EFFECT ON CURRENT LAW.—Nothing in this

23   section affects any provision of law (including regulations)

24   in effect on the day before the date of enactment of this

25   Act with respect to preenforcement review of any Federal

26   environmental enforcement action.

43

**SEC. 11. AUTHORIZATION OF APPROPRIATIONS.**

(a) AUTHORIZATION OF APPROPRIATIONS.—

(1) PECHANGA RECYCLED WATER INFRASTRUC-
TURE ACCOUNT.—There is authorized to be appro-
priated $6,960,000, such amount to be adjusted for
changes since June 30, 2009, in construction costs
as indicated by engineering cost indices applicable to
types of construction required to design and con-
struct the Storage Pond and the Demineralization
and Brine Disposal Project for deposit into the
Pechanga Recycled Water Infrastructure Account.

(2) PECHANGA ESAA DELIVERY CAPACITY AC-
COUNT.—There is authorized to be appropriated
$17,900,000, such amount to be adjusted for
changes since June 30, 2009, in construction costs
as indicated by engineering cost indices applicable to
types of construction required to provide the Interim
Capacity and the Permanent Capacity for deposit
into the Pechanga ESAA Delivery Capacity Account.

(3) PECHANGA WATER FUND ACCOUNT.—There
is authorized to be appropriated $25,382,000 for de-
posit into the Pechanga Water Fund Account for the
purposes set forth in section 9(d)(3)(D).

**SEC. 12. REPEAL ON FAILURE OF ENFORCEABILITY DATE.**

If the Secretary does not publish a statement of find-
ings under section 7(f) by December 31, 2015—

44

1      (1) this Act is repealed effective January 1,

2    2016, and any action taken by the Secretary and

3    any contract or agreement pursuant to the authority

4    provided under any provision of this Act shall be

5    void;

6      (2) any amounts appropriated under section 11,

7    together with any interest on those amounts, shall

8    immediately revert to the general fund of the Treas-

9    ury; and

10      (3) any amounts made available under section

11    11 that remain unexpended shall immediately revert

12    to the general fund of the Treasury.

○