1              UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,        .
                                     . Docket
5              Plaintiff,            . No. 51-cv-1247-GPC-RBB
                                     .
6              v.                    . November 15, 2013
                                     . 1:30 p.m.
7   FALLBROOK PUBLIC UTILITY         .
    DISTRICT, ET AL.,                .
8                                    .
               Defendants.           . San Diego, California
9   . . . . . . . . . . . . . . . .

10

    TRANSCRIPT OF HEARING OBJECTIONS ANNUAL WATERMASTER REPORT
11           BEFORE THE HONORABLE GONZALO P. CURIEL
                 UNITED STATES DISTRICT JUDGE

12

13                  A-P-P-E-A-R-A-N-C-E-S

14  For the Watermaster:   Brunick, McElhaney & Kennedy
                           1839 Commercenter West
15                         San Bernardino, California 92408
                           By:  WILLIAM J. BRUNICK, ESQ.

16

    Director of the Fallbrook Public Utility District:
17                         ARCHIE D. MCPHEE
                           40482 Gavlan Mountain Road
18                         Fallbrook, California 92028

19

20

21

22  Court Reporter:        Chari L. Possell, RPR, CRR
                           USDC Clerk's Office
23                         333 West Broadway, Suite 420
                           San Diego, California 92101
24                         chari_possell@casd.uscourts.gov

25  Reported by Stenotype, Transcribed by Computer

```
 1           SAN DIEGO, CALIFORNIA; NOVEMBER 15, 2013; 1:30 P.M.

 2                              -o0o-

 3           THE CLERK:  Number 17 on calendar, case 51-cv-1247,

 4   United States of America versus Fallbrook Public Utility

 5   District for Hearing Objections to Annual Watermaster Report.

 6           THE COURT:  Appearances, please.

 7           MR. BRUNICK:  Bill Brunick appearing for the

 8   Watermaster, Your Honor.

 9           THE COURT:  And, sir?

10           MR. McPHEE:  I didn't understand the question, sir.

11           THE COURT:  I am asking for the parties here to

12   identify themselves.  You are, sir?

13           MR. McPHEE:  I am Archie McPhee.

14           THE COURT:  All right.  Good afternoon, sir.

15           MR. McPHEE:  I am a director of the Fallbrook Public

16   Utility District.

17           THE COURT:  Let the record so note.

18      We are here on a set of objections to the annual

19   Watermaster report that has been filed July of 2013, the annual

20   Watermaster report, water year 2011 to 2012.  And as a starting

21   point, let me give some background regarding this case.

22      This case was originated or filed on January 25, 1951, and

23   it sought a judicial determination on all respective water

24   rights within the Santa Margarita River watershed.  The final

25   judgment decree was entered on May 8, 1963.  And that decree
```

1    was appealed to the United States Court of Appeals for the

2    Ninth Circuit; thereafter a modified final judgment and decree

3    was entered on April 6, 1966.  Among other things, the decree

4    provided that this Court would retain continuing jurisdiction

5    of the cause as to the use of all surface waters within the

6    watershed of the Santa Margarita River and all underground or

7    subsurface waters within the watershed of the Santa Margarita

8    River, which are determined in any of the constituent parts of

9    the modified final judgment to be a part of the subsurface flow

10   of any particular specific river or creek or which are

11   determined in any of the constituent parts of the modified

12   final judgment to add to, contribute to, or support the Santa

13   Margarita River stream system.

14       Thereafter, as part of the Court's authority in

15   maintaining jurisdiction in this action, in March of 1989, the

16   Court issued an order appointing a Watermaster to administer

17   and enforce the provisions of the modified final judgment and

18   decree and subsequent orders of the Court.  At that time, in

19   March of 1989, the Court further described the Watermaster's

20   powers and duties as well as procedures for funding and

21   operating the Watermaster's office.

22       Also in 1989, Court appointed a steering committee that

23   was designed in order to provide further review and monitoring

24   of the Court's order, that the -- I am sorry -- the Court's

25   judgment, and the decree in this case.

1       At the conclusion of 2011 to 2012, that steering committee

2   was comprised of representatives from the United States, the

3   Eastern Municipal Water District, the Fallbrook Public Utility

4   District, Metropolitan Water District of Southern California,

5   Pechanga Band of Indians, Western Municipal Water District, and

6   Rancho California Water District.  Ultimately as noted the

7   purposes of the steering committee are to assist the Court,

8   assist the litigation, and assist the Watermaster.

9       Under section 2 of the appointing order of the

10  Watermaster, the Watermaster is directed and ordered to submit

11  a written report containing findings and conclusions to the

12  Court after the end of each water year.  As far as what is to

13  be contained within those annual reports, that is information

14  and data contained are based on information reported to the

15  Watermaster by various water users within the watershed and

16  others.  Within the Watermaster's report itself, they

17  essentially acknowledge that they are passing on information,

18  and that they don't necessarily guarantee the completeness and

19  the accuracy of the information presented in the report.

20      So that's a qualifier in terms of what the Watermaster

21  furnishes to the Court each year.

22      And in compliance with this Court order to the

23  Watermaster, as indicated, the Watermaster has submitted a

24  report for water year 2011-2012.

25      Mr. McPhee filed, within the time frame provided for

1    objections, objections to the Watermaster report on August 26,

2    2013.  Within the objections, there are a number of

3    allegations, none more serious than the claim that there are

4    criminal actions taking place in the course of overseeing this

5    order.  Specifically, at page 5, paragraph 11, "There are

6    several federal employees stationed in Camp Pendleton who have

7    been specifically charged with crimes including money kickbacks

8    on contracts."  To the extent that is true, that is not before

9    the Court.  That has -- at this point, has been demonstrated to

10   have nothing to do with the actual Watermaster report on the

11   use of water in 2011 to 2012.

12       There is also a reference, at paragraph 14, at page 6, to

13   post office return card delivery requests not honored.

14   Ultimately, again, that would not relate to the Watermaster's

15   report.

16       There are a number of allegations that have been made, but

17   let me begin my inquiry of Mr. McPhee and direct myself to the

18   report itself.  The report is broken out into 13 sections, and

19   the first section is summary, and then the second is the

20   introduction.  I assume you have no objection or no problems

21   with either section 1 or 2; is that correct, Mr. McPhee?

22            MR. McPHEE:  I don't have any objection, Your Honor.

23            THE COURT:  Section 3 is regarding surface water

24   availability and use.  Did you have any specific objections to

25   this section as to the report?

1          MR. McPHEE:  I can't remember.  I have to review my

2     notes.  I have been working on this thing for about a week, and

3     it's getting a little tired.  But if you could repeat what it

4     is.

5          THE COURT:  And I am looking at the section 3,

6     surface water availability and use, and there is essentially

7     four paragraphs that precede this section made up of a number

8     of tables and graphs which revealed the measured surface water

9     flow.

10         MR. McPHEE:  Your Honor, talking about the

11    Watermaster report?

12         THE COURT:  Yes.  Yes.  That's why we are here.

13         MR. McPHEE:  The actual report?

14         THE COURT:  Yes.  You don't have any quarrel with

15    that section?

16         MR. McPHEE:  I don't have any quarrel with that.

17         THE COURT:  How about the next section, as far as

18    water surface availability?

19         MR. McPHEE:  I am not aware of water surface

20    availability.

21         The problem with the whole situation, I am -- I have been

22    a director elected in 2010, and I was a director for a year and

23    a half before I even knew there was a Watermaster.  And I

24    didn't find it out from Mr. Brady or anybody on the Public

25    Utility District.  I found it out from a director from the

1    Rainbow Water Utility District.  And he showed me what a

2    Watermaster report was, and that's when I made a request to get

3    another copy.

4           THE COURT:  And you were provided with a copy?

5           MR. McPHEE:  Yes, I was.

6           THE COURT:  And keeping in mind that what we are

7    doing here today is to determine whether or not there is

8    something that's missing from the report that this Court has

9    otherwise ordered to be included in it, or if there's something

10   that's inaccurate.  And at this point, I understand you have no

11   quarrel with section 1, 2, 3, and 4.

12       Section 5 is as to imports and exports.  Do you have any

13   quarrel with that section?

14          MR. McPHEE:  Yes, I have.

15          THE COURT:  And what is your quarrel as to what is

16   laid out at section 5, which starts at page 33?

17          MR. McPHEE:  What is section 5?

18          THE COURT:  That's relating to imports/exports.

19       Is there something here in section 5 that in your view is

20   inaccurate?

21          MR. McPHEE:  Can I dig out my information here and

22   have a look?

23          THE COURT:  All right.

24          MR. McPHEE:  I had to work right through to it to

25   last night, so I am a little -- not --

1          THE COURT:  Take your time, sir.

2          MR. McPHEE:  One of the problems that I am having is

3     that I requested a naval criminal investigative service to look

4     at the same items you are talking about right now, and they

5     have promised to have a complete report finished on November

6     the 28th.  November 28.  And I would like to postpone this

7     investigation until their investigation is complete.

8          THE COURT:  All right.  Well, and I guess that brings

9     me to my first observation, that what we are doing here in

10    Court is determining whether or not the Watermaster has

11    followed the directive of this Court in terms of preparing the

12    annual report, and it looks like the Watermaster has prepared

13    the annual report.  And then the question is is there something

14    in here that's wrong or that is otherwise objectionable.  So

15    that's what I am trying to figure out, section by section, if

16    you have a problem with something that's reported in section 5.

17    That is a report that has already been furnished to you.

18         MR. McPHEE:  Let me see.  Let me look at my notes

19    here.

20         Well, in section 5, I have entered my qualifications.  I

21    am a civil engineer and a chemical engineer.  And that's

22    what -- and also I have -- let me see.  I have a teaching

23    credential for the grades 13 and 14.  It's in value for life,

24    and the subject matter is engineering mathematics, so I thought

25    I would drop that off.  That was enclosure one.  Let's see what

1    I have here.

2        I have something here from -- I don't know whether you are

3    interested in this or not.  But I have something from the --

4    from Camp Pendleton that indicates there's unnecessary -- I am

5    not a real good scholar -- but there's an unnecessary

6    relationship between Mr. Brady and GS14 in the Camp Pendleton.

7    So I don't know whether that has any relationship to what you

8    are talking about.

9            THE COURT:  Let me do this.  Let me make clear, what

10   brings us here is the report that was prepared by the

11   Watermaster and to determine whether or not the report itself,

12   what is in the document, whether or not it's, in your view,

13   inaccurate.  And if you think it's inaccurate, I want you to

14   point to me the page and what paragraph where there's

15   inaccurate information.

16           MR. McPHEE:  Okay.  I can get to that.  But this

17   person by the name of -- civil servant John -- let me see if I

18   can get my glasses on here.  I am getting old, Your Honor, and

19   I need glasses.

20           THE COURT:  As do I.

21           MR. McPHEE:  John Simpson, with GS14.  And he refers

22   to me being a bad guy, I guess.

23           THE COURT:  We are not here to determine whether or

24   not you are a good guy or bad guy.  We are trying to figure out

25   if the Watermaster report is proper.

1        MR. McPHEE:  He wants help from Brady because there

2   is a naval criminal investigative service going on here.

3        THE COURT:  And I am sure there may be a number of

4   related matters that are outside of this report and that could

5   probably take us down rabbit holes we don't want to go down.

6      So, I guess, returning to my question, as to section 5,

7   regarding imports and exports of water, you have reviewed that

8   section.  Is there anything in section 5 that you assert is

9   wrong?

10       MR. McPHEE:  Okay.  I don't know whether this applies

11  or not, but I have been accused of unethical treatment.

12       THE COURT:  That's not what is in section 5.  That

13  wouldn't apply.

14       MR. McPHEE:  That has no bearing on this?

15       THE COURT:  No.  No, sir.  Doesn't sound like you

16  have any dispute with section 5.  How about section 6, water

17  rights?  Do you have any dispute as to what is set out?

18       MR. McPHEE:  Yeah, the water rights, according to the

19  Watermaster report, neither Camp Pendleton nor the Public

20  Utility District have water rights on the Santa Margarita

21  River.

22       THE COURT:  Let me ask you, which portion of

23  section 6 do you believe is incorrect?  And then if you can

24  point out that for me and explain to me what the basis of your

25  claim that it's incorrect.

1          MR. McPHEE:  What I am saying in section 6 is that

2     the public utility district have traded off their water rights,

3     according to the -- Mr. Steel who is the head dude in the U.S.

4     Bureau of Reclamation, that the public utility district has no

5     water rights on the Santa Margarita River.  Now, they have

6     water rights on the Santa Margarita River watershed, way up

7     there in -- in Riverside County, but they don't have any rights

8     on the Santa Margarita River itself.

9          THE COURT:  Well, if you could do this for me, sir.

10    Could you point out to me the paragraph and the particular

11    sentence in section 6 which you believe is incorrectly set out?

12         MR. McPHEE:  Can you repeat?

13         THE COURT:  Yes.  Section 6 in the report relates to

14    water rights.  And 6.1 is general background regarding water

15    rights.  6.2 is the Appropriative Surface Water Rights section,

16    and then there is a table thereafter.  There is 6.3, Fallbrook

17    PUD Changes of Point of Diversion and Place of Use for Permit

18    No. 11356.  6.4 is Federal Reserved Water Rights Claims by

19    Cahuilla and Ramona Bands.  6.5 is Federal Reserved Water

20    Rights Claims by Pechanga Band.

21       Is there anything in any of the sections that you believe

22    was improperly reported?

23         MR. McPHEE:  Let's see, if I can dig -- you are

24    talking about in this Watermaster report here?  That's what you

25    are referring to?

1          THE COURT:  Yes, sir.

2          MR. McPHEE:  And we are talking about the U.S.

3    Department of the Navy has water rights.

4          THE COURT:  So if you could point to me what page you

5    are --

6          MR. McPHEE:  Right here, table 6.1 of the Watermaster

7    report.

8          THE COURT:  Table 6.1.  Let me turn to Table 6.1,

9    sir.  All right.  Table 6.1.

10         MR. McPHEE:  There is nothing in there to verify that

11   the public utility has any water rights on the Santa Margarita

12   River.

13         THE COURT:  When you are saying public utility, you

14   are saying Fallbrook Public Utility District that there's no

15   right afforded to the Fallbrook Public Utility District?

16         MR. McPHEE:  No.  Not -- the Santa Margarita River.

17      Now, if you look at the geography of this whole thing, we

18   have a big dam in the -- I guess you might call it Tucalota

19   Creek, and -- I mean -- let me see.  Where is this.

20         THE COURT:  What I need for you to identify in

21   Table 6.1, what about that table is wrong?  What do you rely

22   upon?

23         MR. McPHEE:  There's nothing about that table that's

24   wrong.  But the fact of the matter is that Temecula Creek is an

25   independent creek by name, and it flows -- Temecula Creek flows

1    into -- this is Temecula Creek flows into Temecula, and then it

2    becomes another creek and another name.  But branching off

3    Temecula Creek is the Santa Margarita River.  And the Santa

4    Margarita River -- near the border of Riverside County and

5    Santa Margarita River, there's a break-off, and part of that

6    Temecula Creek becomes the Santa Margarita River, and flows

7    into San Diego County.

8         So actually if -- in actuality, there is a big difference

9    between the Santa Margarita River and Temecula Creek.  Temecula

10   Creek never enters into San Diego County.

11        THE COURT:  I guess -- and I hate to beat a dead

12   horse -- but what I want to know is what portion of Table 6.1

13   is inaccurate?  We have the source of water for a number of

14   application IDs, and some of the sources are identified as

15   Temecula Creek.

16        MR. McPHEE:  What I keep getting at the meetings is

17   that the Fallbrook Public Utility District has water rights on

18   the Santa Margarita River, and it doesn't.  It has water rights

19   on the Santa Margarita River watershed, but not on the Santa

20   Margarita River itself.

21        THE COURT:  And keeping in mind that we are not here

22   to dispute or question the judgment in this case and how it's

23   been interpreted by a particular party in this, but we are here

24   to determine whether or not this report should be accepted as

25   provided.

1          MR. McPHEE:  Okay.  I misunderstood what it was all

2     about, then.

3          Anyways, the U.S. Department of Navy owns water rights on

4     the Santa Margarita River, but the Fallbrook Public Utility

5     District does not.

6          THE COURT:  Are you saying that there's nothing in

7     here that shouldn't have been here -- should be in here?

8          MR. McPHEE:  There's a misconception on reading this

9     table, and I get it almost every meeting that I attend, is that

10    the Santa Margarita -- that the Fallbrook Public Utility

11    District has rights on the Santa Margarita River.  I think what

12    is wrong in there, Tucalota Creek -- you know where it's at?

13         THE COURT:  Sir --

14         MR. McPHEE:  Would anybody intelligent -- any

15    intelligent person read it without knowing the geography of the

16    system?

17         THE COURT:  Keeping in mind, we are not here to give

18    me a geography test so much as to determine whether or not

19    there's something about this report that is wrong or needs to

20    be corrected, and seeing --

21         MR. McPHEE:  Tucalota Creek should be abbreviated

22    Riverside County.

23         THE COURT:  So you don't dispute the name of the

24    creek, but there needs to be an additional qualifier of what

25    county it's located?

1          MR. McPHEE:  Well, if you are reading the Table 6.1,

2     you have the misconception that Tucalota Creek is in San Diego

3     county.  It's not.

4          THE COURT:  Is that the extent of your challenges to

5     section 6?

6          MR. McPHEE:  Well, I think it's big because the water

7     from Tucalota Creek never leaves Riverside county.

8          THE COURT:  Again, you are focused on this additional

9     qualifier of identifying the county where these creeks are

10    located?

11         MR. McPHEE:  Yes.  If I read this here, I would say

12    that it's -- that it defines everything in San Diego County,

13    but it doesn't.

14         THE COURT:  Say that last part again?

15         MR. McPHEE:  I beg your pardon?

16         THE COURT:  Would you repeat the last statement you

17    made.

18         MR. McPHEE:  I am saying, if I am reading this table

19    6.1, and I come down to Fallbrook Public Utility District, and

20    the source of water is Tucalota Creek, the source of the water

21    is not even in San Diego County.

22         THE COURT:  So that's the extent of your objection?

23         MR. McPHEE:  Well, it's very misleading.  I mean,

24    it's at least -- Tucalota Creek is at least 60 miles north of

25    the San Diego County border.

1          THE COURT:  And I will ask the water district to make

2     a note of that objection, and I will ask you to respond to

3     that.

4          What about in section 7, Water Production and Use, do you

5     have any objection to the information contained there?

6          MR. McPHEE:  Water production and use?  Can I look at

7     my notes here?

8          THE COURT:  Yes.  Sure.

9          MR. McPHEE:  Water production and use.  It's pretty

10    misleading because San Diego County -- FPUD, for example, gets

11    its water from Riverside County, there's a lake there in

12    Riverside County.  I forget the name of the lake.  I have to

13    look it up.  But anyways, the lake -- the pipeline comes from

14    the lake in Riverside County and goes into the Fallbrook Public

15    Utility District.  All of the water we are getting is -- let's

16    see.

17         This is the first I have ever been in court, so you will

18    have to -- I guess you don't have to do anything, really, but I

19    would like to have a little bit of --

20         THE COURT:  Go right ahead, sir.

21         MR. McPHEE:  For example, on this particular month I

22    have the data, we have 3,788,404 gallons of water during the

23    month of -- during this particular month.

24         THE COURT:  And again, I am going to ask you to focus

25    on the report and identify for me by page and sentence what the

1    Watermaster got wrong.  Is there anything in section 7 that you

2    believe the Watermaster got wrong?

3              MR. McPHEE:  Referring to the --

4              THE COURT:  Water production and use of the

5    Watermaster report.  All my questions are directed at the

6    report because that's the only reason that we are here today.

7              MR. McPHEE:  Okay.  One of the comments I had is --

8    oh, yeah.  On page 6, you have the McPhee objection is timely

9    and comments and objections are addressed below -- it should be

10   the third McPhee objection, not just the McPhee objection.  The

11   other two were not timely.

12             THE COURT:  I am sorry.  Did you point to something

13   in the Watermaster report in section 7 as being defective?

14             MR. McPHEE:  Yeah.

15             THE COURT:  What at section 7 is problematic or

16   wrong?  Keeping in mind that section 7 begins at page 53.

17             MR. McPHEE:  Page 53?

18             THE COURT:  Yes.

19             MR. McPHEE:  Oh, of the Watermaster report.  I don't

20   have a copy of the Watermaster report.

21             THE COURT:  Do you have a copy?

22             MR. BRUNICK:  I have a copy.

23             THE COURT:  Thank you.

24             MR. McPHEE:  We are talking about water production

25   and use.  We are talking about water production and use, and

1   saying major purveyors of reported production, one of the

2   things, that I have -- I am wondering about is the fact that I

3   have -- in my property, I have the Santa Margarita River

4   flowing about quarter of a mile from my house, and I have water

5   flowing through my property into the Santa Margarita River, but

6   they don't list me as a water purveyor on here.

7         THE COURT:  Well, I guess that's your objection, that

8   you should be listed as a major water purveyor?

9         MR. McPHEE:  One of them.

10        THE COURT:  You think that you are a major water

11  purveyor?

12        MR. McPHEE:  Well, at this time of the year, there is

13  no water flowing --

14        THE COURT:  So then you wouldn't be a major water

15  purveyor?

16        MR. McPHEE:  -- but according to the Supreme Court,

17  that's immaterial.  I haven't made a decision on that, even if

18  it's part-time, though.

19        THE COURT:  Did the Watermaster get it wrong when he

20  failed to identify you as a major water purveyor?

21        MR. McPHEE:  I would think so.

22        THE COURT:  Anything else in section 7?

23        MR. McPHEE:  I am not a major, but by the Supreme

24  Court, I am --

25        THE COURT:  Keeping in mind that the report limited

1    itself to major water purveyors, is there anything --

2         MR. McPHEE:  But the Supreme Court of the United

3    States of America has made a decision that even if your water

4    doesn't flow through your property all year round, I am still a

5    purveyor.

6         THE COURT:  It doesn't sound like there's anything

7    here that suggests otherwise.  But the question is as to the

8    information contained in the Watermaster report, is it wrong?

9    And at this point, as I understand it, you are not claiming to

10   be a major water purveyor?

11        MR. McPHEE:  No, I am not a major water purveyor, but

12   according to the Supreme Court decision, I am a -- what was it

13   called?  Even though it doesn't flow all year-round, I am a --

14   what do they call it? -- a supplier of water to the Santa

15   Margarita River.

16        THE COURT:  Is there anything else in section 7 that

17   you have a problem with?

18        MR. McPHEE:  I am just looking at it right now, Your

19   Honor.  I am sorry I am not prepared for this.

20        THE COURT:  For future purposes, you can just pretty

21   much keep in mind that if you have an objection to a portion of

22   this report, then what you would want to do is identify the

23   portion of the report, and then provide the Court with all the

24   information and evidence that you have that suggests that that

25   section of the report is inaccurate, and that way that will

1    help everyone.

2              MR. McPHEE:  I thought I was doing that, but I guess

3    I wasn't.

4              THE COURT:  Not so much.

5              MR. McPHEE:  The division is -- there's -- one of the

6    questions I have for you is we have a boundary called -- a

7    boundary between Riverside County and San Diego County, and

8    part of that boundary -- on the Riverside part of the boundary,

9    there's Temecula Creek; flows all the way across into Murrieta,

10   and then changes its name in Murrieta.  And south comes the

11   Santa Margarita River, and all the water from the Santa

12   Margarita River flows into the ocean.  I don't know where that

13   water goes from Temecula Creek.

14       But the problem that I have, and maybe I can describe to

15   you -- the problem I have is we have certain rules and

16   regulations.  For example, because that water on the Santa

17   Margarita River flows into the ocean, it's a jurisdictional

18   water of the United States of America.  But the Temecula Creek

19   portion of that water is not a jurisdictional water of the

20   United States of America.  And one of my objections is that the

21   Marine Corps has built a dam across the Santa Margarita River

22   to provide the Camp Pendleton residents with shower water,

23   irrigation water, et cetera, et cetera.  I guess the -- shower

24   water, irrigation water, agricultural water, producing

25   agricultural water, and using it all up.

```
 1          What they did is put a partial dam across the Santa
 2   Margarita River, which I don't think they are entitled to do.
 3   And there was no permits issued.  They didn't get anything from
 4   the federal government -- actually, they need permits from the
 5   federal government, the state government, and the county
 6   government, because it's jurisdictional water of the United
 7   States of America.  They never got that.  So t hey just took
 8   that water from the Santa Margarita River and created water for
 9   themselves.
10          And now they have the right to -- they have a right to
11   create a desalination plant because Camp Pendleton is right on
12   the -- borders the ocean, and they don't want to do that.
13          And one of my problems right now is they -- the plan is
14   for Camp Pendleton to build a bigger, wider, stronger, higher
15   dam of water that's flowing on the ocean.  They are violating
16   all kinds of environmental requirements and environmental laws,
17   and they are creating, like, a big partial lake behind the dam.
18   And then they are going to dig -- what I foresee is they are
19   going to dig wells and transport that water from Camp Pendleton
20   into Fallbrook.
21          THE COURT:  Let me make an observation, sir.  This
22   case has existed now for more than 60 years.
23          MR. McPHEE:  Yeah, uh-huh.
24          THE COURT:  It's resulted in numerous orders,
25   judgments, reversal on appeal, and amended judgments, and
```

1    because of the complexity of this case, the Court, in its

2    infinite wisdom, years ago decided we needed to have a

3    Watermaster to keep track of water, identify where it's coming

4    from, where it's going, so that the Court could keep an eye on

5    the universe of water rights or water, I should say, that's

6    being utilized.

7              MR. McPHEE:  Mm-hmm.  Mm-hmm.

8              THE COURT:  So at this point, why we are here is to

9    review the Watermaster's report.  And it's not to determine

10   whether or not someone's engaged in illegal conduct somewhere

11   or another.  It's not to determine whether or not the U.S.

12   Marine Corps is taking more water than they should or preparing

13   to build something in violation of environmental laws.

14       To the extent that's your view, this isn't the proper

15   forum to do it.  Just like you said a moment ago, that you have

16   certain rules and regulations about your situation, so do I; so

17   does the Court.

18             MR. McPHEE:  Okay.

19             THE COURT:  So the Court can't entertain all of these

20   various questions or issues that you may have regarding the

21   Marine Corps' diversion, alleged diversion of water, and

22   creating wells and doing anything they are not supposed to.  If

23   that's the case, then there's other mechanisms, but it is not

24   this mechanism.  The only thing we are here for is to look at

25   the Watermaster's report and see did he do what the Court asked

 1   him to do.  And so far, through section 7, I can't tell that

 2   there's anything that the Watermaster has done in the report

 3   that wasn't called for and/or is otherwise wrong.

 4       So let me inquire as to Sections 8 through the final

 5   section, section 13, have you identified any other points

 6   within the report that you have a position that that's wrong,

 7   they got it wrong, they misreported?

 8           MR. McPHEE:  Can I go back a little bit to -- I don't

 9   think there's anything in this report that allows the

10   Camp Pendleton Marine Corps to, number one, rent land out to an

11   agricultural association.

12           THE COURT:  Keeping in mind, reports aren't orders.

13   Reports don't have the effect of law and give rights to anyone.

14           MR. McPHEE:  Okay.

15           THE COURT:  A report is just a report.  It is the one

16   that the Court has directed the Watermaster to prepare so I can

17   keep an eye on what is going on with a judgment of the Court.

18       So that's why we are here, sir, and that's what I want to

19   know.  Is there something in the 13 sections --

20           MR. McPHEE:  What about damming the water?  There's

21   nothing -- that's not -- that is not a problem?  You will allow

22   a dam on the water?

23           THE COURT:  Sir, to the extent that it's a problem

24   under federal law --

25           MR. McPHEE:  Yeah.

1        THE COURT:  -- then this isn't the proper mechanism

2   to address that.  Here, we are only dealing with the

3   Watermaster's report that was prepared.

4        MR. McPHEE:  Oh, that's the only thing you are

5   talking about?

6        THE COURT:  That's the only reason we are here.  We

7   are not here for anything else.  Just like you said, you have

8   rules and regulations; I do, too.  I can't go beyond my review

9   of the Watermaster's report.

10       MR. McPHEE:  Okay.  Thanks for the information.  I

11  appreciate it.

12     I was a little uncertain about what my concerns are about

13  and why I am being persecuted for something that possibly I

14  thought was wrong, that is wrong, but it's not part of the

15  Watermaster's report.  Is that what you are saying?

16       THE COURT:  Well, what I am saying is the reason that

17  we are all here today is to look at the Watermaster's report

18  and determine whether or not it's correct, and if there's

19  something that's incorrect, then I would like for you to point

20  to me to show me that information about the water use is

21  incorrect because it reports 5,000 versus 50,000, or it

22  identifies somebody as a major purveyor when they are not a

23  major purveyor.  To the extent that that is your contest or

24  issue with the report, then we can ask for a response.  But as

25  of this moment, I still haven't heard anything specifically

 1  relating to the report, to show that the report --

 2          MR. McPHEE:  It has to be in this document; is that

 3  what you are saying?

 4          THE COURT:  Yes.  Yes, sir.

 5          MR. McPHEE:  What is unauthorized water use, on

 6  page 79?

 7          THE COURT:  All right.  79.  Unauthorized water use.

 8      You are asking me a question, but my question to you is

 9  what in this section 8 is wrong or incorrect?  Is there

10  something that you believe was misreported?

11          MR. McPHEE:  I believe that unauthorized water use is

12  creating a dam, a larger dam across the Santa Margarita River,

13  which backs up more water, creates well water, and then the

14  Marine Corps puts in pumps and piping and sends it over to the

15  border between the Marine Corps and Fallbrook, Fallbrook Public

16  Utility District.  And then Fallbrook Public Utility District

17  takes this water and uses it.

18          THE COURT:  Again, the question is is there something

19  about 8.1 which speaks in general about complaints of

20  unauthorized water uses?

21          MR. McPHEE:  Small dams and reservoirs, Rancho

22  California Water District -- what we are saying there is --

23  what we have done in the past is if the Rancho California Water

24  District is not getting enough water, we have to provide it

25  with more water from the Santa Margarita River.  I think that's

1    what that says.

2         THE COURT:  8.1 says, "From time to time, there are

3    complaints of unauthorized water uses of various types in the

4    watershed.  Such complaints are investigated in accordance with

5    the powers and duties of the Watermaster.  The status of the

6    current list of unauthorized uses is described as follows:"

7       And it describes unauthorized small storage ponds, Rancho

8    California Water District water use, exportation of treated

9    wastewater derived from native waters.

10        MR. McPHEE:  A guy by the name of Simms in there was

11   using water for personal use.  I think he's quit doing it.

12        THE COURT:  So specifically, at 8.4, it states, "Camp

13   Pendleton continues asserted that the exportation of treated

14   wastewater, the source of which is the native waters of the

15   Santa Margarita River system, without a legal basis for such

16   exportation is an unauthorized water use.  On May 17, 2012, the

17   United States Court of Appeals issued an order granting the

18   parties' joint motion to dismiss the appeals.  The Watermaster

19   is reviewing the calculations and reporting of exportation of

20   treated wastewater for possible changes in future annual

21   reports."

22      Does this relate in any way to what you were talking about

23   before about how Camp Pendleton is diverting water?

24        MR. McPHEE:  No.  No.  They just -- they -- in other

25   words, they put a dam in there, and it floods more water.  They

1   already have wells in there right now that they use for their

2   own personal purposes, but they don't use it for drinking

3   water.  So they are going to create a higher, broader, wider

4   dam, and then they are going to dig more wells, and all those

5   wells are going to be pumped into Fallbrook, which borders Camp

6   Pendleton, and they are going to put their piping, their pumps,

7   and their dams across that river so they can give us, FPUD,

8   more water.

9        THE COURT:  Given that what you just reported is

10  something that hasn't happened yet, is there any reason the

11  Watermaster should have reported that in the report for 2011 or

12  2012?

13       MR. McPHEE:  I don't know if he is aware of it or

14  not.  I have no way of knowing that.

15       THE COURT:  But it hasn't occurred yet?

16       MR. McPHEE:  I don't get much information.  Even

17  though I am on the Fallbrook Public Utility District, I don't

18  get much information from the other directors because they do a

19  lot of stuff behind my back.

20       THE COURT:  And I realize that.

21       MR. McPHEE:  And they know that if I don't like

22  something and it's unlawful, I am going to report it.  So I am

23  just kind of like -- they keep me in the dark.

24       THE COURT:  Sounds like, based upon your asserted

25  lack of information, you have nothing to challenge on

1   section 8.

2          MR. McPHEE:  I think I do have something to

3   challenge.

4          THE COURT:  As far as the information that's listed

5   here?

6          MR. McPHEE:  Oh, in the report?

7          THE COURT:  What information here is incorrect?

8          MR. McPHEE:  I don't know whether it started or not,

9   but I have heard rumors that they are planning this and

10  starting it, but I don't know for certain whether it's started

11  or not.

12         THE COURT:  To the extent those are rumors, and we

13  can't operate on rumors --

14         MR. McPHEE:  No.  No.  You are right.  You are right,

15  sir.  I apologize.

16         THE COURT:  You don't have to apologize, sir.

17     Anything about sections 9 through 13 that you believe is

18  incorrect?

19         MR. McPHEE:  There are high nitrate concentrations --

20  actually even in the Santa Margarita River up in the eastern

21  sections of Camp Pendleton.

22         THE COURT:  Is there something here in section 9.2,

23  High Nitrate Concentrations, that you believe is inaccurate?

24         MR. McPHEE:  Yes, it is, because there are also high

25  concentrations -- we have some wells, coming in my area, not

```
 1   too far from where I live, that also have high concentrations
 2   of nitrate.  They have -- actually, they have wells dug there.
 3   They can't even use the wells because of the high nitrates.  So
 4   that's not reported.
 5           THE COURT:  So you believe that this is incomplete?
 6           MR. McPHEE:  That -- yes.  Sentence one is
 7   incomplete.
 8           THE COURT:  So then I will ask the water district or
 9   Watermaster to respond to that.
10           MR. McPHEE:  We have about four wells that have a
11   high nitrate concentration.
12           THE COURT:  All right.  Anything else in section 9
13   that you have a problem with?
14           MR. McPHEE:  It says potentially adverse high salt
15   balance conditions.  I would take out the word "potentially."
16   It's there.
17           THE COURT:  Okay.  Anything else?
18           MR. McPHEE:  Number 5 says, Quagga mussel infestation
19   in imported supplies from the Colorado River system.  There
20   might be high infestation, but whereabouts?  I have never heard
21   of that in the Santa Margarita River or any of it in Temecula
22   Creek.
23           THE COURT:  Well, doesn't sound like you have
24   anything concrete to point to that is wrong.
25           MR. McPHEE:  It is wrong as far as the Santa
```

1    Margarita River is concerned, it has no business being there.

2              THE COURT:  What about section 10, water quality?

3              MR. McPHEE:  High nitrate conditions.  Let me see.

4         You know, you are pretty good.

5              THE COURT:  Thank you, sir.  I do the best I can.

6         But anything in section 10 that we need to look out for?

7              MR. McPHEE:  U.S. -- the problem I have with this is

8    I don't get this data.  You are talking about --

9              THE COURT:  In section 11?

10             MR. McPHEE:  I am a director, okay.  And I should get

11   some of this information, and I am not getting it.

12             THE COURT:  So is there something inaccurate in

13   section 11?

14             MR. McPHEE:  I don't know whether it's accurate or

15   not.  I am not getting this information.  And every director

16   should be getting this information about the dissolved oxygen,

17   pH, specific conduction and temperature --

18             THE COURT:  I am sorry.  What page are you on?

19             MR. McPHEE:  89.

20             THE COURT:  All right.  So you are at section 10.

21             MR. McPHEE:  First paragraph there, 10.1.  10.1.  And

22   I think all of the directors should get this information.  It's

23   just saying measurements, but what are the measurements?  I

24   don't know what the -- oh, they are back over here, I guess.

25   Dissolved oxygen goes from -- this is monthly -- what does the

 1   specific conductance have to do with water quality?  I don't

 2   know, and I am a chemical engineer and I have master's degree

 3   in chemical engineering.

 4           THE COURT:  And in spite of that, you can't identify

 5   something that's wrong here?

 6           MR. McPHEE:  Well, for example here, we have

 7   dissolved oxygen, collection month/year.  Okay.  We have --

 8   that's a wide range, 8.7 to 4.1 -- that would go up in January.

 9           THE COURT:  Any reason to dispute any of that

10   information, sir?

11           MR. McPHEE:  Beg your pardon?

12           THE COURT:  Any reason to dispute that information in

13   Table 10.1?

14           MR. McPHEE:  I would like an explanation.

15           THE COURT:  No reason to dispute it?

16           MR. McPHEE:  Not without an explanation.  When you

17   are going from 8.7 to 4.1, there has to be some reason for it.

18           THE COURT:  Keeping in mind that at the introduction

19   of the report, 2.3, there's a qualifier, the Watermaster does

20   not guarantee the completeness and the accuracy of the

21   information in the report, but the Watermaster is doing what

22   the Court asked the Watermaster to do, which is provide

23   information based upon any number of sources that you would

24   otherwise count on.

25           MR. McPHEE:  It's all basic.  If you look at pH, it's

1  7. –– it's still basic.  All your water is basic, apparently.

2          THE COURT:  Is this the first time you have had a

3  chance to take a look at this?

4          MR. McPHEE:  Yes, it is.

5          THE COURT:  Okay.  Let me move on to section 11.

6  Have you had a chance to previously look at that section?  Did

7  you previously take a look at section 11?

8          MR. McPHEE:  Yeah, the first paragraph is –– the

9  problem I am having there is Camp Pendleton doesn't have any

10  water rights at all on that water.  That's the first two

11  paragraphs, you are talking about the U.S. –– what the heck is

12  his name –– I got confused myself.  Talking about the –– the

13  U.S. –– I got myself confused here –– the head of the Marine

14  Corps and the U.S. Navy –– what is his title?

15          THE COURT:  Brigadier General?

16          MR. McPHEE:  No.  It's the U.S. ––

17          THE COURT:  Let me ask, as far as 11.1 ––

18          MR. McPHEE:  I would change the cooperative use

19  management agreement between Camp Pendleton and Rancho –– it

20  can't be between Camp Pendleton, because Camp Pendleton is only

21  fourth in command in the Marine Corps, and they report to the

22  U.S. Secretary of the Navy.

23          THE COURT:  This says, "On August 20, 2012, the

24  cooperative water resource management agreement between Camp

25  Pendleton and Rancho California WD was approved by the District

1   Court."  Do you have any reason to dispute that, that the

2   District Court approved that?

3           MR. McPHEE:  You are the District Court?

4           THE COURT:  Yes.

5           MR. McPHEE:  Okay.  No, I don't have any -- I mean,

6   you are the boss.

7           THE COURT:  Well, it could be that they

8   misrepresented that I approved it.

9       You don't have any reason to dispute what is otherwise

10  contained in the Watermaster --

11          MR. McPHEE:  I don't have any other reason because

12  you are the District Court, so you know what you approved and

13  what you didn't approve.  But I don't think that -- I would

14  question whether -- whether they provided appropriate

15  information to you.

16          THE COURT:  And again, that goes back to addressing

17  matters that are not properly considered at this hearing.

18      Is there anything in section 12 or 13 that you believe is

19  inaccurately reported?

20          MR. McPHEE:  The administer water rights, that's your

21  job, isn't it?

22          THE COURT:  I am sorry?  What are you referencing

23  exactly, sir?

24          MR. McPHEE:  12.2, normal tasks, number 4, on page

25  103.

1        THE COURT:  12.2, which one of the tasks?

2        MR. McPHEE:  The fourth one.

3        THE COURT:  Administer water rights?

4        MR. McPHEE:  That's your job, isn't it?

5        THE COURT:  Ultimately that is the responsibility of

6   the Court, to maintain jurisdiction of this case and ensure

7   that the judgment and decree that was entered on April 6, 1966

8   is followed.

9        MR. McPHEE:  What about number 7, administer Lake

10  Skinner and Diamond Valley Lake MOU.  Is that his task?

11       THE COURT:  I would expect that was set out in the

12  original designation of the Watermaster's tasks and

13  responsibilities.

14       MR. McPHEE:  This is not 1800, this is 2000.

15       THE COURT:  Well, I don't have that actual order

16  designating the Watermaster's responsibilities, and I will just

17  ask the Watermaster to respond as to whether or not their

18  normal tasks are the ones identified within the order creating

19  the Watermaster.

20       MR. McPHEE:  What I have a problem with is

21  number 9 -- no, number 8, the steering committee.

22     Now, the San Diego County Water Authority provides all the

23  water to the -- to us, FPUD, and also provides all the water to

24  the Rainbow Water District.  Why aren't they on the steering

25  committee?

1          THE COURT:  Keeping in mind that 12.2 identifies the

2    tasks normally part of the Watermaster's office operations, it

3    doesn't sound like you dispute those are a normal part of the

4    Watermaster's office operations versus you dispute that they

5    should have that authority?  As I understand it, you don't

6    dispute they are taking up those tasks; you question why they

7    are doing it, right?

8          MR. McPHEE:  The Metropolitan Water District is on

9    the steering committee.  If they are on the steering committee,

10   why isn't it San Diego County Water Authority on it?

11         THE COURT:  Now we are getting to questions which

12   don't arise from a review of 12.2.  The question is whether or

13   not these are tasks normally part of the Watermaster office

14   operation.

15         MR. McPHEE:  Okay.  Okay.

16         THE COURT:  Do you have any reason to dispute those

17   are tasks normally part of the Watermaster's office operation?

18         MR. McPHEE:  There's number 9, prepare court reports

19   and budgets.  All right.

20         THE COURT:  Like the one we are looking at now?

21         MR. McPHEE:  I have to go through this thing with a

22   fine-tooth comb to discover the Watermaster's budgets, and it's

23   just -- if I was an auditor, I wouldn't accept that.

24         THE COURT:  Finally, is there anything in section 13

25   that you believe is not correctly stated?

1    MR. McPHEE:  Can you explain Number 12 to me?  That,

2    to me, seems like he is -- has more authority than --

3         THE COURT:  What page are you referring to?

4         MR. McPHEE:   Number 12 on page 103.

5         THE COURT:  Again, this is the Watermaster reporting

6    the normal tasks, and that is to administer Cooperative Water

7    Resource Management Agreement.  There is a Cooperative Water

8    Resource Management Agreement that was struck, and as part of

9    that agreement, the Watermaster has a role in administering it.

10        MR. McPHEE:  Is that a 20-year-old agreement?

11        THE COURT:  Let me ask the Watermaster.

12     This agreement, do you know the date of the agreement?

13        MR. BINDER:  That's 2002.

14        MR. McPHEE:  2002.  That was before the present

15   Watermaster got his job?

16        THE COURT:  And I will just ask you to direct

17   yourself to the Court.

18     So it's 2002, that was approved by the Court?

19        MR. BINDER:  That's correct, Your Honor.

20        MR. McPHEE:  Additional tasks, prepare a list of all

21   water users under court jurisdiction.  What does that mean

22   there, Your Honor?

23        THE COURT:  Let me ask, have you ever read this

24   before today?

25        MR. McPHEE:  I have gone through most of it, but not

1   all of it.

2          THE COURT:  Not this?  All right.  Doesn't sound like

3   you identified this as something that is objectionable.

4          MR. McPHEE:  Okay.  Great.

5          THE COURT:  And in section 13, the budget.  And I am

6   not asking you to tell me whether or not you agree that this is

7   the proper amounts that should be in the budget, but as to what

8   is set forth here, do you disagree that this information is

9   accurate?

10          MR. McPHEE:  I don't know whether it's accurate

11   because it hasn't been -- an auditor hasn't approved it.

12   There's no auditor stamp on there.

13          THE COURT:  All right.  And so then, at this time,

14   let me turn to the Watermaster and counsel for the Watermaster.

15   At this juncture, I think I identified two or three questions

16   for you to respond to.  Could you provide a brief response.

17          MR. BRUNICK:  First, I appreciate the Court's

18   patience in going through this.

19      I think as to the water rights issue between Fallbrook and

20   the U.S. Marine Corps, that is responded -- best addressed in

21   our pleadings, and it's concern Number 10 as to who owns what

22   between Fallbrook, the Marine Corps, and the Bureau of

23   Reclamation.  So I think our response as to concern Number 10

24   spells that out.  I think that addresses the Court's question.

25          THE COURT:  All right.  As far as this question

1    that -- or not question, but the issue that there's only a

2    reference to a particular creek and not the designation of what

3    county it's in, do you have any response as to why that is or

4    is not significant?

5           MR. BRUNICK:  I don't think it's significant.

6    Certainly we can add "Riverside" or we could add the definition

7    if the Court so desires.  But I think everyone knows, based on

8    the mapping and so on, where that is all located.  If you want

9    us to designate whether it's Riverside or San Diego County, we

10   can certainly do that in the future.

11          THE COURT:  Let me ask.  Does any part of the order

12   impact or affect waters that are in Riverside County?

13          MR. BRUNICK:  No.  No.  The order is the order, and

14   we are responding to what the court has directed us to.

15          THE COURT:  Because Riverside County would be in the

16   Central District of California?

17          MR. BRUNICK:  Riverside County -- part of Riverside

18   County is in this adjudication.

19          THE COURT:  All right.  So it would be contemplated

20   part of what the Court is administering is in Riverside County?

21          MR. BRUNICK:  That's correct.

22          MR. McPHEE:  Could you repeat that.

23          THE COURT:  The question was whether or not any part

24   of the water table, any of the creeks and the rivers that are

25   in Riverside County, are subject to the judgment and decree in

1    this case, and the response is that, yes, there are portions of

2    this water table that are in Riverside County.

3            MR. McPHEE:  Yeah.

4            THE COURT:  You agree with that?  All right.

5        So at this point, I have had an opportunity to review all

6    that has been filed.  I have had an opportunity to go over each

7    of these sections with Mr. McPhee to determine whether or not

8    there's something in the report that needs to be corrected.  At

9    this point, I am satisfied that there's nothing that's

10   incorrect.

11       There's obviously a number of issues that Mr. McPhee has

12   as to the judgment, as to the decree, as to plans by Camp

13   Pendleton.  But as I stated, those are outside of the

14   proceedings that are before the Court today, and the only

15   question before me today was whether or not there is something

16   in the Watermaster report that this Court should change or

17   modify.

18       And so, Mr. McPhee, I hope you appreciate that in the

19   future, if you have any issues with the Watermaster's report,

20   you would want to identify the page where the information is

21   contained, the challenged information, and then provide the

22   Court with evidence and not rumors, not "you believe," or those

23   kinds of challenges, but hard evidence to show that the

24   information is somehow or another incorrect, inaccurate, or

25   should be otherwise corrected.  All right, sir?

1          MR. McPHEE:  Thank you.  Yes.  I am learning, Your

2    Honor, what is admissible.

3          THE COURT:  At this time, is there anything before we

4    conclude?

5          MR. BRUNICK:  Your Honor, I think Mr. Binder, as

6    Watermaster, met with Mr. McPhee, went over all these issues

7    before the objection was filed.  The Watermaster has spent

8    basically over $25,000 just in staff time in responding to

9    this, in trying to address these concerns.  And I hope in the

10   future that Mr. McPhee will accept the Court's recommendation

11   that he be a lot more specific as to the objections he is going

12   to make because we are --

13         THE COURT:  All right.

14     Mr. McPhee, let me do that as well; to not only remind you

15   what these proceedings are about, but in the future, in dealing

16   with the Watermaster, after you receive the report, if you have

17   a problem with the report, be specific with him so that he can

18   provide you with certain answers that, frankly, I might not be

19   in a position to.  He can point you much quicker to the graphs,

20   the tables, the charts, the websites that have a lot of this

21   information that you otherwise may want to access.  Do you

22   understand, sir?

23         MR. McPHEE:  Yes, sir.  And I certainly do.

24     But I would like to put -- make one statement.  I had one

25   heck of a time getting ahold of them.  I asked my wife.  My

1   wife is pretty good.  I met the Watermaster once for one hour,

2   one time.  That's -- and any time I try to get ahold of the

3   Watermaster, I have to deal with his two assistants.

4           THE COURT:  And you know, keeping in mind that the

5   Watermaster has a lot to wrestle with, a lot to reckon with,

6   and he is just trying to follow the Court's instructions on

7   reporting to the Court on the state of this water table and the

8   uses of the water.  And so he is doing his best to accomplish

9   that.  He is not in a position to revisit issues that have been

10   decided by this Court.  He is not in a position to undertake a

11   number of the things that I think you have asked him to.

12   Hopefully, you can appreciate that, sir.

13      All right.  That will conclude this proceeding.  Thank you

14   all.

15           MR. McPHEE:  Thank you.

16           MR. BRUNICK:  Thank you.

17           MR. McPHEE:  Thanks for your help, Your Honor.

18           THE COURT:  Yes, sir.

19      (End of proceedings at 2:53 p.m.)

20                   -o0o-

21

22

23

24

25

1               C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11          DATED:  December 2, 2013, at San Diego,

12   California.

13

14                         /s/  Chari L. Possell

15                         _____
                           Chari L. Possell
16                         CSR No. 9944, RPR, CRR

17

18

19

20

21

22

23

24

25