F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

# [DISCUSSION DRAFT]

114TH CONGRESS
2D SESSION

# H. R. _____

To authorize the Pechanga Band of Luiseño Mission Indians Water Rights
Settlement, and for other purposes.

_____

## IN THE HOUSE OF REPRESENTATIVES

M__. _____ introduced the following bill; which was referred to the
Committee on _____

_____

# A BILL

To authorize the Pechanga Band of Luiseño Mission Indians
Water Rights Settlement, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5 "Pechanga Band of Luiseño Mission Indians Water

6 Rights Settlement Act".

7    (b) TABLE OF CONTENTS.—The table of contents of

8 this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Purposes.

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

2

Sec. 3. Definitions.
Sec. 4. Approval of the Pechanga settlement agreement.
Sec. 5. Tribal Water Right.
Sec. 6. Satisfaction of claims.
Sec. 7. Waiver of claims.
Sec. 8. Water facilities.
Sec. 9. Pechanga Settlement Fund.
Sec. 10. Miscellaneous provisions.
Sec. 11. Authorization of appropriations.
Sec. 12. Expiration on failure of enforceability date.
Sec. 13. Antideficiency.

## SEC. 2. PURPOSES.

The purposes of this Act are—

   (1) to achieve a fair, equitable, and final settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed for—

      (A) the Band; and

      (B) the United States, acting in its capacity as trustee for the Band and Allottees;

   (2) to achieve a fair, equitable, and final settlement of certain claims by the Band and Allottees against the United States;

   (3) to authorize, ratify, and confirm the Pechanga Settlement Agreement to be entered into by the Band, RCWD, and the United States;

   (4) to authorize and direct the Secretary—

      (A) to execute the Pechanga Settlement Agreement; and

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

3

1           (B) to take any other action necessary to
2       carry out the Pechanga Settlement Agreement
3       in accordance with this Act; and
4           (5) to authorize the appropriation of amounts
5       necessary for the implementation of the Pechanga
6       Settlement Agreement and this Act.

7   **SEC. 3. DEFINITIONS.**

8       In this Act:

9           (1) ADJUDICATION COURT.—The term "Adju-
10      dication Court" means the United States District
11      Court for the Southern District of California, which
12      exercises continuing jurisdiction over the Adjudica-
13      tion Proceeding.

14          (2) ADJUDICATION PROCEEDING.—The term
15      "Adjudication Proceeding" means litigation initiated
16      by the United States regarding relative water rights
17      in the Santa Margarita River Watershed in United
18      States v. Fallbrook Public Utility District et al., Civ.
19      No. 3:51–cv–01247 (S.D.C.A.), including any litiga-
20      tion initiated to interpret or enforce the relative
21      water rights in the Santa Margarita River Water-
22      shed pursuant to the continuing jurisdiction of the
23      Adjudication Court over the Fallbrook Decree.

**[Discussion Draft]**

4

1          (3) ALLOTTEE.—The term "Allottee" means an

2     individual who holds a beneficial real property inter-

3     est in an Indian allotment that is—

4               (A) located within the Reservation; and

5               (B) held in trust by the United States.

6          (4) BAND.—The term "Band" means Pechanga

7     Band of Luiseño Mission Indians, a federally recog-

8     nized sovereign Indian tribe that functions as a cus-

9     tom and tradition Indian tribe, acting on behalf of

10     itself and its members, but not acting on behalf of

11     members in their capacities as Allottees.

12          (5) CLAIMS.—The term "claims" means rights,

13     claims, demands, actions, compensation, or causes of

14     action, whether known or unknown.

15          (6) EMWD.—The term "EMWD" means East-

16     ern Municipal Water District, a municipal water dis-

17     trict organized and existing in accordance with the

18     Municipal Water District Law of 1911, Division 20

19     of the Water Code of the State of California, as

20     amended.

21          (7) EMWD CONNECTION FEE.—The term

22     "EMWD Connection Fee" has the meaning set forth

23     in the Extension of Service Area Agreement.

24          (8) ENFORCEABILITY DATE.—The term "en-

25     forceability date" means the date on which the Sec-

**[Discussion Draft]**

5

1    retary publishes in the Federal Register the state-
2    ment of findings described in section 7(e).

3        (9) ESAA CAPACITY AGREEMENT.—The term
4    "ESAA Capacity Agreement" means the "ESAA
5    Capacity Agreement", among the Band, RCWD and
6    the United States.

7        (10) ESAA WATER.—The term "ESAA Water"
8    means imported potable water that the Band re-
9    ceives from EMWD and MWD pursuant to the Ex-
10   tension of Service Area Agreement and delivered by
11   RCWD pursuant to the ESAA Water Delivery
12   Agreement.

13       (11) ESAA WATER DELIVERY AGREEMENT.—
14   The term "ESAA Water Delivery Agreement"
15   means the agreement among EMWD, RCWD, and
16   the Band, establishing the terms and conditions of
17   water service to the Band.

18       (12) EXTENSION OF SERVICE AREA AGREE-
19   MENT.—The term "Extension of Service Area
20   Agreement" means the "Extension of Service Area
21   Agreement", among the Band, EMWD, and MWD,
22   for the provision of water service by EMWD to a
23   designated portion of the Reservation using water
24   supplied by MWD.

25       (13) FALLBROOK DECREE.—

**[Discussion Draft]**

6

1          (A) IN GENERAL.—The term "Fallbrook

2     Decree" means the "Modified Final Judgment

3     And Decree", entered in the Adjudication Pro-

4     ceeding on April 6, 1966.

5          (B) INCLUSIONS.—The term "Fallbrook

6     Decree" includes all court orders, interlocutory

7     judgments, and decisions supplemental to the

8     "Modified Final Judgment And Decree", in-

9     cluding Interlocutory Judgment No. 30, Inter-

10    locutory Judgment No. 35, and Interlocutory

11    Judgment No. 41.

12    (14) FUND.—The term "Fund" means the

13    Pechanga Settlement Fund established by section 9.

14    (15) INDIAN TRIBE.—The term "Indian tribe"

15    has the meaning given the term in section 4 of the

16    Indian Self-Determination and Education Assistance

17    Act (25 U.S.C. 450b).

18    (16) INJURY TO WATER RIGHTS.—The term

19    "injury to water rights" means an interference with,

20    diminution of, or deprivation of water rights under

21    Federal or State law.

22    (17) INTERIM CAPACITY.—The term "Interim

23    Capacity" has the meaning set forth in the ESAA

24    Capacity Agreement.

F:\LMS\114TH\LMS_091.XML            **[Discussion Draft]**

7

1          (18) INTERIM CAPACITY NOTICE.—The term
2      ''Interim Capacity Notice'' has the meaning set
3      forth in the ESAA Capacity Agreement.

4          (19) INTERLOCUTORY JUDGMENT NO. 41.—The
5      term ''Interlocutory Judgment No. 41'' means Inter-
6      locutory Judgment No. 41 issued in the Adjudica-
7      tion Proceeding on November 8, 1962, including all
8      court orders, judgments and decisions supplemental
9      to that interlocutory judgment.

10         (20) MWD.—The term ''MWD'' means the
11     Metropolitan Water District of Southern California,
12     a metropolitan water district organized and incor-
13     porated under the Metropolitan Water District Act
14     of the State of California (Stats. 1969, Chapter 209,
15     as amended).

16         (21) MWD CONNECTION FEE.—The term
17     ''MWD Connection Fee'' has the meaning set forth
18     in the Extension of Service Area Agreement.

19         (22) PECHANGA ESAA DELIVERY CAPACITY AC-
20     COUNT.—The term ''Pechanga ESAA Delivery Ca-
21     pacity account'' means the account established by
22     section 9(c)(2).

23         (23) PECHANGA RECYCLED WATER INFRA-
24     STRUCTURE ACCOUNT.—The term ''Pechanga Recy-

**[Discussion Draft]**

8

1    cled Water Infrastructure account'' means the ac-
2    count established by section 9(c)(1).

3        (24) PECHANGA SETTLEMENT AGREEMENT.—
4    The term ''Pechanga Settlement Agreement'' means
5    the Pechanga Settlement Agreement, dated April 8,
6    2016, together with the exhibits to that agreement,
7    entered into by the Band, the United States on be-
8    half of the Band, its members and Allottees, MWD,
9    EMWD, and RCWD, including—

10            (A) the Extension of Service Area Agree-
11        ment;

12            (B) the ESAA Capacity Agreement; and

13            (C) the ESAA Water Delivery Agreement.

14        (25) PECHANGA WATER CODE.—The term
15    ''Pechanga Water Code'' means a water code to be
16    adopted by the Band in accordance with section 5(f).

17        (26) PECHANGA WATER FUND ACCOUNT.—The
18    term ''Pechanga Water Fund account'' means the
19    account established by section 9(c)(3).

20        (27) PECHANGA WATER QUALITY ACCOUNT.—
21    The term ''Pechanga Water Quality account'' means
22    the account established by section 9(c)(4).

23        (28) PERMANENT CAPACITY.—The term ''Per-
24    manent Capacity'' has the meaning set forth in the
25    ESAA Capacity Agreement.

**[Discussion Draft]**

9

1    (29) PERMANENT CAPACITY NOTICE.—The

2    term "Permanent Capacity Notice" has the meaning

3    set forth in the ESAA Capacity Agreement.

4    (30) RCWD.—

5        (A) IN GENERAL.—The term "RCWD"

6        means the Rancho California Water District or-

7        ganized pursuant to section 34000 et seq. of

8        the California Water Code.

9        (B) INCLUSIONS.—The term "RCWD" in-

10        cludes all real property owners for whom

11        RCWD acts as an agent pursuant to an agency

12        agreement.

13    (31) RECYCLED WATER INFRASTRUCTURE

14    AGREEMENT.—The term "Recycled Water Infra-

15    structure Agreement" means the "Recycled Water

16    Infrastructure Agreement" among the Band,

17    RCWD, and the United States.

18    (32) RECYCLED WATER TRANSFER AGREE-

19    MENT.—The term "Recycled Water Transfer Agree-

20    ment" means the "Recycled Water Transfer Agree-

21    ment" between the Band and RCWD.

22    (33) RESERVATION.—

23        (A) IN GENERAL.—The term "Reserva-

24        tion" means the land depicted on the map at-

**[Discussion Draft]**

10

1    tached to the Pechanga Settlement Agreement

2    as Exhibit I.

3         (B) APPLICABILITY OF TERM.—The term

4    ''Reservation'' shall be used solely for the pur-

5    poses of the Pechanga Settlement Agreement,

6    this Act, and any judgment or decree issued by

7    the Adjudication Court approving the Pechanga

8    Settlement Agreement.

9    (34) SANTA MARGARITA RIVER WATERSHED.—

10   The term ''Santa Margarita River Watershed''

11   means the watershed that is the subject of the Adju-

12   dication Proceeding and the Fallbrook Decree.

13   (35)   SECRETARY.—The   term   ''Secretary''

14   means the Secretary of the Interior.

15   (36) STATE.—The term ''State'' means the

16   State of California.

17   (37) STORAGE POND.—The term ''Storage

18   Pond'' has the meaning set forth in the Recycled

19   Water Infrastructure Agreement.

20   (38) TRIBAL WATER RIGHT.—The term ''Tribal

21   Water Right'' means the water rights ratified, con-

22   firmed, and declared to be valid for the benefit of

23   the Band and Allottees, as set forth and described

24   in section 5.

F:\LMS\114TH\LMS_091.XML **[Discussion Draft]**

11

1 SEC. 4. APPROVAL OF THE PECHANGA SETTLEMENT

2      AGREEMENT.

3      (a) RATIFICATION OF PECHANGA SETTLEMENT

4 AGREEMENT.—

5           (1) IN GENERAL.—Except as modified by this

6      Act, and to the extent that the Pechanga Settlement

7      Agreement does not conflict with this Act, the

8      Pechanga Settlement Agreement is authorized, rati-

9      fied, and confirmed.

10          (2) AMENDMENTS.—Any amendment to the

11     Pechanga Settlement Agreement is authorized, rati-

12     fied, and confirmed, to the extent that the amend-

13     ment is executed to make the Pechanga Settlement

14     Agreement consistent with this Act.

15     (b) EXECUTION OF PECHANGA SETTLEMENT AGREE-

16 MENT.—

17          (1) IN GENERAL.—To the extent that the

18     Pechanga Settlement Agreement does not conflict

19     with this Act, the Secretary is directed to and

20     promptly shall execute—

21               (A) the Pechanga Settlement Agreement

22          (including any exhibit to the Pechanga Settle-

23          ment Agreement requiring the signature of the

24          Secretary); and

25               (B) any amendment to the Pechanga Set-

26          tlement Agreement necessary to make the

**[Discussion Draft]**

12

1     Pechanga Settlement Agreement consistent with

2     this Act.

3         (2) MODIFICATIONS.—Nothing in this Act pre-

4     cludes the Secretary from approving modifications to

5     exhibits to the Pechanga Settlement Agreement not

6     inconsistent with this Act, to the extent those modi-

7     fications do not otherwise require congressional ap-

8     proval pursuant to section 2116 of the Revised Stat-

9     utes (25 U.S.C. 177) or other applicable Federal

10    law.

11    (c) ENVIRONMENTAL COMPLIANCE.—

12        (1) IN   GENERAL.—In   implementing   the

13    Pechanga Settlement Agreement, the Secretary shall

14    promptly comply with all applicable requirements

15    of—

16            (A) the National Environmental Policy Act

17        of 1969 (42 U.S.C. 4321 et seq.);

18            (B) the Endangered Species Act of 1973

19        (16 U.S.C. 1531 et seq.);

20            (C) all other applicable Federal environ-

21        mental laws; and

22            (D) all regulations promulgated under the

23        laws described in subparagraphs (A) through

24        (C).

F:\LMS\114TH\LMS_091.XML                **[Discussion Draft]**

13

1       (2) EXECUTION OF THE PECHANGA SETTLE-
2   MENT AGREEMENT.—

3           (A) IN GENERAL.—Execution of the
4       Pechanga Settlement Agreement by the Sec-
5       retary under this section shall not constitute a
6       major Federal action under the National Envi-
7       ronmental Policy Act of 1969 (42 U.S.C. 4321
8       et seq.).

9           (B) COMPLIANCE.—The Secretary is di-
10      rected to carry out all Federal compliance nec-
11      essary to implement the Pechanga Settlement
12      Agreement.

13      (3) LEAD AGENCY.—The Bureau of Reclama-
14  tion shall be designated as the lead agency with re-
15  spect to environmental compliance.

16  **SEC. 5. TRIBAL WATER RIGHT.**

17      (a) INTENT OF CONGRESS.—It is the intent of Con-
18  gress to provide to each Allottee benefits that are equal
19  to or exceed the benefits Allottees possess as of the date
20  of enactment of this Act, taking into consideration—

21          (1) the potential risks, cost, and time delay as-
22      sociated with litigation that would be resolved by the
23      Pechanga Settlement Agreement and this Act;

24          (2) the availability of funding under this Act;

**[Discussion Draft]**

14

1    (3) the availability of water from the Tribal

2    Water Right and other water sources as set forth in

3    the Pechanga Settlement Agreement; and

4    (4) the applicability of section 7 of the Act of

5    February 8, 1887 (25 U.S.C. 381), and this Act to

6    protect the interests of Allottees.

7    (b) CONFIRMATION OF TRIBAL WATER RIGHT.—

8    (1) IN GENERAL.—A Tribal Water Right of up

9    to 4,994 acre-feet of water per year that, under nat-

10    ural conditions, is physically available on the Res-

11    ervation is confirmed in accordance with the Find-

12    ings of Fact and Conclusions of Law set forth in In-

13    terlocutory Judgment No. 41, as affirmed by the

14    Fallbrook Decree.

15    (2) USE.—Subject to the terms of the

16    Pechanga Settlement Agreement, this Act, the

17    Fallbrook Decree and applicable Federal law, the

18    Band may use the Tribal Water Right for any pur-

19    pose on the Reservation.

20    (c) HOLDING IN TRUST.—The Tribal Water Right,

21    as set forth in subsection (b), shall—

22    (1) be held in trust by the United States on be-

23    half of the Band and the Allottees in accordance

24    with this section;

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

15

1          (2) include the priority dates described in Inter-

2     locutory Judgment No. 41, as affirmed by the

3     Fallbrook Decree; and

4          (3) not be subject to forfeiture or abandonment.

5     (d) ALLOTTEES.—

6          (1) APPLICABILITY OF ACT OF FEBRUARY 8,

7     1887.—The provisions of section 7 of the Act of Feb-

8     ruary 8, 1887 (25 U.S.C. 381), relating to the use

9     of water for irrigation purposes shall apply to the

10    Tribal Water Right.

11         (2) ENTITLEMENT TO WATER.—Any entitle-

12    ment to water of an Allottee under Federal law shall

13    be satisfied from the Tribal Water Right.

14         (3) ALLOCATIONS.—Allotted land located within

15    the exterior boundaries of the Reservation shall be

16    entitled to a just and equitable allocation of water

17    for irrigation and domestic purposes from the Tribal

18    Water Right.

19         (4) EXHAUSTION OF REMEDIES.—Before as-

20    serting any claim against the United States under

21    section 7 of the Act of February 8, 1887 (25 U.S.C.

22    381), or any other applicable law, an Allottee shall

23    exhaust remedies available under the Pechanga

24    Water Code or other applicable tribal law.

**[Discussion Draft]**

16

1      (5) CLAIMS.—Following exhaustion of remedies

2    available under the Pechanga Water Code or other

3    applicable tribal law, an Allottee may seek relief

4    under section 7 of the Act of February 8, 1887 (25

5    U.S.C. 381), or other applicable law.

6      (6) AUTHORITY.—The Secretary shall have the

7    authority to protect the rights of Allottees as speci-

8    fied in this section.

9    (e) AUTHORITY OF BAND.—

10      (1) IN GENERAL.—Except as provided in para-

11    graph (2), the Band shall have authority to use, al-

12    locate, distribute, and lease the Tribal Water Right

13    on the Reservation in accordance with—

14        (A) the Pechanga Settlement Agreement;

15      and

16        (B) applicable Federal law.

17      (2) LEASES BY ALLOTTEES.—

18        (A) IN GENERAL.—An Allottee may lease

19      any interest in land held by the Allottee, to-

20      gether with any water right determined to be

21      appurtenant to that interest in land.

22        (B) WATER RIGHT APPURTENANT.—Any

23      water right determined to be appurtenant to an

24      interest in land leased by an Allottee shall be

25      used on such land on the Reservation.

17

1   (f) PECHANGA WATER CODE.—

2      (1) IN GENERAL.—Not later than 18 months

3  after the enforceability date, the Band shall enact a

4  Pechanga Water Code, that provides for—

5      (A) the management, regulation, and gov-

6      ernance of all uses of the Tribal Water Right

7      in accordance with the Pechanga Settlement

8      Agreement; and

9      (B) establishment by the Band of condi-

10     tions, permit requirements, and other limita-

11     tions relating to the storage, recovery, and use

12     of the Tribal Water Right in accordance with

13     the Pechanga Settlement Agreement.

14      (2) INCLUSIONS.—Subject to the approval of

15  the Secretary, the Pechanga Water Code shall pro-

16  vide—

17      (A) that allocations of water to Allottees

18     shall be satisfied with water from the Tribal

19     Water Right;

20      (B) that charges for delivery of water for

21     irrigation purposes for Allottees shall be as-

22     sessed on a just and equitable basis;

23      (C) a process by which an Allottee may re-

24     quest that the Band provide water for irrigation

**[Discussion Draft]**

18

1 or domestic purposes in accordance with this
2 Act;

3    (D) a due process system for the consider-
4 ation and determination by the Band of any re-
5 quest by an Allottee (or any successor in inter-
6 est to an Allottee) for an allocation of such
7 water for irrigation or domestic purposes on al-
8 lotted land, including a process for—

9       (i) appeal and adjudication of any de-
10 nied or disputed distribution of water; and

11       (ii) resolution of any contested admin-
12 istrative decision; and

13    (E) a requirement that any Allottee with a
14 claim relating to the enforcement of rights of
15 the Allottee under the Pechanga Water Code or
16 relating to the amount of water allocated to
17 land of the Allottee must first exhaust remedies
18 available to the Allottee under tribal law and
19 the Pechanga Water Code before initiating an
20 action against the United States or petitioning
21 the Secretary pursuant to subsection (d)(4).

22 (3) ACTION BY SECRETARY.—

23    (A) IN GENERAL.—The Secretary shall ad-
24 minister the Tribal Water Right until the

F:\LMS\114TH\LMS_091.XML                    [Discussion Draft]

19

1          Pechanga Water Code is enacted and approved

2          under this section.

3               (B) APPROVAL.—Any provision of the

4          Pechanga Water Code and any amendment to

5          the Pechanga Water Code that affects the

6          rights of Allottees—

7                    (i) shall be subject to the approval of

8               the Secretary; and

9                    (ii) shall not be valid until approved

10              by the Secretary.

11              (C) APPROVAL PERIOD.—The Secretary

12         shall approve or disapprove the Pechanga

13         Water Code within a reasonable period of time

14         after the date on which the Band submits the

15         Pechanga Water Code to the Secretary for ap-

16         proval.

17    (g) EFFECT.—Except as otherwise specifically pro-

18 vided in this section, nothing in this Act—

19         (1) authorizes any action by an Allottee against

20    any individual or entity, or against the Band, under

21    Federal, State, tribal, or local law; or

22         (2) alters or affects the status of any action

23    pursuant to section 1491(a) of title 28, United

24    States Code.

20

1  **SEC. 6. SATISFACTION OF CLAIMS.**

2      (a) IN GENERAL.—The benefits provided to the Band

3  under the Pechanga Settlement Agreement and this Act

4  shall be in complete replacement of, complete substitution

5  for, and full satisfaction of all claims of the Band against

6  the United States that are waived and released pursuant

7  to section 7.

8      (b) ALLOTTEE CLAIMS.—The benefits realized by the

9  Allottees under this Act shall be in complete replacement

10  of, complete substitution for, and full satisfaction of—

11          (1) all claims that are waived and released pur-

12      suant to section 7; and

13          (2) any claims of the Allottees against the

14      United States that the Allottees have or could have

15      asserted that are similar in nature to any claim de-

16      scribed in section 7.

17      (c) NO RECOGNITION OF WATER RIGHTS.—Except

18  as provided in section 5(d), nothing in this Act recognizes

19  or establishes any right of a member of the Band or an

20  Allottee to water within the Reservation.

21      (d) CLAIMS RELATING TO DEVELOPMENT OF WATER

22  FOR RESERVATION.—

23          (1) IN GENERAL.—The amounts authorized to

24      be appropriated pursuant to section 11 shall be used

25      to satisfy any claim of the Allottees against the

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

21

1    United States with respect to the development or

2    protection of water resources for the Reservation.

3        (2) SATISFACTION OF CLAIMS.—Upon the com-

4    plete appropriation of amounts authorized pursuant

5    to section 11, any claim of the Allottees against the

6    United States with respect to the development or

7    protection of water resources for the Reservation

8    shall be deemed to have been satisfied.

9  **SEC. 7. WAIVER OF CLAIMS.**

10    (a) IN GENERAL.—

11        (1) WAIVER OF CLAIMS BY THE BAND AND THE

12    UNITED STATES ACTING IN ITS CAPACITY AS TRUST-

13    EE FOR THE BAND.—

14            (A) IN GENERAL.—Subject to the retention

15        of rights set forth in subsection (c), in return

16        for recognition of the Tribal Water Right and

17        other benefits as set forth in the Pechanga Set-

18        tlement Agreement and this Act, the Band, and

19        the United States, acting as trustee for the

20        Band, are authorized and directed to execute a

21        waiver and release of all claims for water rights

22        within the Santa Margarita River Watershed

23        that the Band, or the United States acting as

24        trustee for the Band, asserted or could have as-

25        serted in any proceeding, including the Adju-

**[Discussion Draft]**

1     dication Proceeding, except to the extent that

2     such rights are recognized in the Pechanga Set-

3     tlement Agreement and this Act.

4          (B) CLAIMS AGAINST RCWD.—Subject to

5     the retention of rights set forth in subsection

6     (c) and notwithstanding any provisions to the

7     contrary in the Pechanga Settlement Agree-

8     ment, the Band and the United States, on be-

9     half of the Band and Allottees, fully release, ac-

10    quit, and discharge RCWD from—

11          (i) claims for injuries to water rights

12          in the Santa Margarita River Watershed

13          for land located within the Reservation

14          arising or occurring at any time up to and

15          including June 30, 2009;

16          (ii) claims for injuries to water rights

17          in the Santa Margarita River Watershed

18          for land located within the Reservation

19          arising or occurring at any time after June

20          30, 2009, resulting from the diversion or

21          use of water in a manner not in violation

22          of the Pechanga Settlement Agreement or

23          this Act;

24          (iii) claims for subsidence damage to

25          land located within the Reservation arising

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

23

1          or occurring at any time up to and includ-

2          ing June 30, 2009;

3               (iv)   claims   for   subsidence   damage

4          arising or occurring after June 30, 2009,

5          to land located within the Reservation re-

6          sulting from the diversion of underground

7          water in a manner consistent with the

8          Pechanga Settlement Agreement or this

9          Act; and

10              (v) claims arising out of, or relating in

11         any manner to, the negotiation or execu-

12         tion of the Pechanga Settlement Agree-

13         ment or the negotiation or execution of

14         this Act.

15     (2) CLAIMS BY THE UNITED STATES ACTING IN

16 ITS CAPACITY AS TRUSTEE FOR ALLOTTEES.—Sub-

17 ject to the retention of claims set forth in subsection

18 (c), in return for recognition of the Tribal Water

19 Right and other benefits as set forth in the

20 Pechanga Settlement Agreement and this Act, the

21 United States, acting as trustee for Allottees, is au-

22 thorized and directed to execute a waiver and release

23 of all claims for water rights within the Santa Mar-

24 garita River Watershed that the United States, act-

25 ing as trustee for the Allottees, asserted or could

**[Discussion Draft]**

24

1    have asserted in any proceeding, including the Adju-

2    dication Proceeding, except to the extent such rights

3    are recognized in the Pechanga Settlement Agree-

4    ment and this Act.

5    (3) Claims by the band against the

6    united states.—Subject to the retention of rights

7    set forth in subsection (c), the Band, is authorized

8    to execute a waiver and release of—

9        (A) all claims against the United States

10       (including the agencies and employees of the

11       United States) relating to claims for water

12       rights in, or water of, the Santa Margarita

13       River Watershed that the United States, acting

14       in its capacity as trustee for the Band, as-

15       serted, or could have asserted, in any pro-

16       ceeding, including the Adjudication Proceeding,

17       except to the extent that those rights are recog-

18       nized in the Pechanga Settlement Agreement

19       and this Act;

20       (B) all claims against the United States

21       (including the agencies and employees of the

22       United States) relating to damages, losses, or

23       injuries to water, water rights, land, or natural

24       resources due to loss of water or water rights

25       (including damages, losses or injuries to hunt-

F:\LMS\114TH\LMS_091.XML                    **[Discussion Draft]**

25

1        ing, fishing, gathering, or cultural rights due to

2        loss of water or water rights, claims relating to

3        interference with, diversion, or taking of water

4        or water rights, or claims relating to failure to

5        protect, acquire, replace, or develop water,

6        water rights, or water infrastructure) in the

7        Santa Margarita River Watershed that first ac-

8        crued at any time up to and including the en-

9        forceability date;

10            (C) all claims against the United States

11        (including the agencies and employees of the

12        United States) relating to the pending litigation

13        of claims relating to the water rights of the

14        Band in the Adjudication Proceeding; and

15            (D) all claims against the United States

16        (including the agencies and employees of the

17        United States) relating to the negotiation or

18        execution of the Pechanga Settlement Agree-

19        ment or the negotiation or execution of this

20        Act.

21        (b) EFFECTIVENESS OF WAIVERS AND RELEASES.—

22    The waivers under subsection (a) shall take effect on the

23    enforceability date.

24        (c) RESERVATION OF RIGHTS AND RETENTION OF

25    CLAIMS.—Notwithstanding the waivers and releases au-

**[Discussion Draft]**

26

1    thorized in this Act, the Band, on behalf of itself and the

2    members of the Band, and the United States, acting in

3    its capacity as trustee for the Band and Allottees, retain—

4            (1) all claims for enforcement of the Pechanga

5        Settlement Agreement and this Act;

6            (2) all claims against any person or entity other

7        than the United States and RCWD, including claims

8        for monetary damages;

9            (3) all claims for water rights that are outside

10       the jurisdiction of the Adjudication Court;

11           (4) all rights to use and protect water rights ac-

12       quired on or after the enforceability date; and

13           (5) all remedies, privileges, immunities, powers,

14       and claims, including claims for water rights, not

15       specifically waived and released pursuant to this Act

16       and the Pechanga Settlement Agreement.

17   (d) EFFECT OF PECHANGA SETTLEMENT AGREE-

18   MENT AND ACT.—Nothing in the Pechanga Settlement

19   Agreement or this Act—

20           (1) affects the ability of the United States, act-

21       ing as a sovereign, to take actions authorized by law,

22       including any laws relating to health, safety, or the

23       environment, including—

F:\LMS\114TH\LMS_091.XML                **[Discussion Draft]**

27

1              (A) the Comprehensive Environmental Re-

2          sponse, Compensation, and Liability Act of

3          1980 (42 U.S.C. 9601 et seq.);

4              (B) the Safe Drinking Water Act (42

5          U.S.C. 300f et seq.);

6              (C) the Federal Water Pollution Control

7          Act (33 U.S.C. 1251 et seq.); and

8              (D) any regulations implementing the Acts

9          described in subparagraphs (A) through (C);

10     (2) affects the ability of the United States to

11   take actions acting as trustee for any other Indian

12   tribe or an Allottee of any other Indian tribe;

13     (3) confers jurisdiction on any State court—

14          (A) to interpret Federal law regarding

15          health, safety, or the environment;

16          (B) to determine the duties of the United

17          States or other parties pursuant to Federal law

18          regarding health, safety, or the environment; or

19          (C) to conduct judicial review of Federal

20          agency action;

21     (4) waives any claim of a member of the Band

22   in an individual capacity that does not derive from

23   a right of the Band;

24     (5) limits any funding that RCWD would other-

25   wise be authorized to receive under any Federal law,

1 including, the Reclamation Wastewater and Ground-

2 water Study and Facilities Act (43 U.S.C. 390h et

3 seq.) as that Act applies to permanent facilities for

4 water recycling, demineralization, and desalination,

5 and distribution of nonpotable water supplies in

6 Southern Riverside County, California;

7 (6) characterizes any amounts received by

8 RCWD under the Pechanga Settlement Agreement

9 or this Act as Federal for purposes of section 1649

10 of the Reclamation Wastewater and Groundwater

11 Study and Facilities Act (43 U.S.C. 390h–32); or

12 (7) affects the requirement of any party to the

13 Pechanga Settlement Agreement or any of the exhib-

14 its to the Pechanga Settlement Agreement to comply

15 with the National Environmental Policy Act of 1969

16 (42 U.S.C. 4321 et seq.) or the California Environ-

17 mental Quality Act (Cal. Pub. Res. Code 21000 et

18 seq.) prior to performing the respective obligations

19 of that party under the Pechanga Settlement Agree-

20 ment or any of the exhibits to the Pechanga Settle-

21 ment Agreement.

22 (e) ENFORCEABILITY DATE.—The enforceability date

23 shall be the date on which the Secretary publishes in the

24 Federal Register a statement of findings that—

**[Discussion Draft]**

29

1       (1) the Adjudication Court has approved and

2   entered a judgment and decree approving the

3   Pechanga Settlement Agreement in substantially the

4   same form as Appendix 2 to the Pechanga Settle-

5   ment Agreement;

6       (2) all amounts authorized by this Act have

7   been deposited in the Fund;

8       (3) the waivers and releases authorized in sub-

9   section (a) have been executed by the Band and the

10  Secretary;

11      (4) the Extension of Service Area Agreement—

12          (A) has been approved and executed by all

13      the parties to the Extension of Service Area

14      Agreement; and

15          (B) is effective and enforceable in accord-

16      ance with the terms of the Extension of Service

17      Area Agreement; and

18  (5) the ESAA Water Delivery Agreement—

19          (A) has been approved and executed by all

20      the parties to the ESAA Water Delivery Agree-

21      ment; and

22          (B) is effective and enforceable in accord-

23      ance with the terms of the ESAA Water Deliv-

24      ery Agreement.

25  (f) TOLLING OF CLAIMS.—

**[Discussion Draft]**

30

1  (1) IN GENERAL.—Each applicable period of

2 limitation and time-based equitable defense relating

3 to a claim described in this section shall be tolled for

4 the period beginning on the date of enactment of

5 this Act and ending on the earlier of—

6   (A) April 30, 2030, or such alternate date

7   after April 30, 2030, as is agreed to by the

8   Band and the Secretary; or

9   (B) the enforceability date.

10  (2) EFFECTS OF SUBSECTION.—Nothing in this

11 subsection revives any claim or tolls any period of

12 limitation or time-based equitable defense that ex-

13 pired before the date of enactment of this Act.

14  (3) LIMITATION.—Nothing in this section pre-

15 cludes the tolling of any period of limitations or any

16 time-based equitable defense under any other appli-

17 cable law.

18 (g) TERMINATION.—

19  (1) IN GENERAL.—If all of the amounts author-

20 ized to be appropriated to the Secretary pursuant to

21 this Act have not been made available to the Sec-

22 retary by April 30, 2030—

23   (A) the waivers authorized by this section

24   shall expire and have no force or effect; and

31

1       (B) all statutes of limitations applicable to

2     any claim otherwise waived under this section

3     shall be tolled until April 30, 2030.

4    (2) VOIDING OF WAIVERS.—If a waiver author-

5  ized by this section is void under paragraph (1)—

6       (A) the approval of the United States of

7     the Pechanga Settlement Agreement under sec-

8     tion 4 shall be void and have no further force

9     or effect;

10     (B) any unexpended Federal amounts ap-

11    propriated or made available to carry out this

12    Act, together with any interest earned on those

13    amounts, and any water rights or contracts to

14    use water and title to other property acquired

15    or constructed with Federal amounts appro-

16    priated or made available to carry out this Act

17    shall be returned to the Federal Government,

18    unless otherwise agreed to by the Band and the

19    United States and approved by Congress; and

20     (C) except for Federal amounts used to ac-

21    quire or develop property that is returned to the

22    Federal Government under subparagraph (B),

23    the United States shall be entitled to set off

24    any Federal amounts appropriated or made

25    available to carry out this Act that were ex-

**[Discussion Draft]**

1    pended or withdrawn, together with any interest

2    accrued, against any claims against the United

3    States relating to water rights asserted by the

4    Band or Allottees in any future settlement of

5    the water rights of the Band or Allottees.

6  **SEC. 8. WATER FACILITIES.**

7    (a) IN GENERAL.—The Secretary shall, subject to the

8  availability of appropriations, using amounts from the des-

9  ignated accounts of the Fund, provide the amounts nec-

10  essary to fulfill the obligations of the Band under the Re-

11  cycled Water Infrastructure Agreement and the ESAA Ca-

12  pacity Agreement, in an amount not to exceed the

13  amounts deposited in the designated accounts for such

14  purposes plus any interest accrued on such amounts from

15  the date of deposit in the Fund to the date of disburse-

16  ment from the Fund, in accordance with this Act and the

17  terms and conditions of those agreements.

18    (b) NONREIMBURSABILITY OF COSTS.—All costs in-

19  curred by the Secretary in carrying out this section shall

20  be nonreimbursable.

21    (c) RECYCLED WATER INFRASTRUCTURE.—

22    (1) IN GENERAL.—The Secretary shall, using

23    amounts from the Pechanga Recycled Water Infra-

24    structure account, provide amounts for the Storage

25    Pond in accordance with this section.

**[Discussion Draft]**

33

1      (2) STORAGE POND.—

2          (A) IN GENERAL.—The Secretary shall,

3          subject to the availability of appropriations,

4          using amounts from the Pechanga Recycled

5          Water Infrastructure account provide the

6          amounts necessary for a Storage Pond in ac-

7          cordance with the Recycled Water Infrastruc-

8          ture Agreement, in an amount not to exceed

9          $2,656,374.

10          (B) PROCEDURE.—The procedure for the

11          Secretary to provide amounts pursuant to this

12          section shall be as set forth in the Recycled

13          Water Infrastructure Agreement.

14          (C) LIABILITY.—The United States shall

15          have no responsibility or liability for the Stor-

16          age Pond.

17 (d) ESAA DELIVERY CAPACITY.—

18      (1) IN GENERAL.—The Secretary shall, using

19 amounts from the Pechanga ESAA Delivery Capac-

20 ity account, provide amounts for Interim Capacity

21 and Permanent Capacity in accordance with this

22 section.

23      (2) INTERIM CAPACITY.—

24          (A) IN GENERAL.—The Secretary shall,

25          subject to the availability of appropriations,

**[Discussion Draft]**

34

1      using amounts from the ESAA Delivery Capac-

2      ity account, provide amounts necessary for the

3      provision of Interim Capacity in accordance

4      with the ESAA Capacity Agreement in an

5      amount not to exceed $1,000,000.

6      (B) PROCEDURE.—The procedure for the

7      Secretary to provide amounts pursuant to this

8      section shall be as set forth in the ESAA Ca-

9      pacity Agreement.

10      (C) LIABILITY.—The United States shall

11      have no responsibility or liability for the In-

12      terim Capacity to be provided by RCWD or by

13      the Band.

14      (D) TRANSFER TO BAND.—If RCWD does

15      not provide the Interim Capacity Notice re-

16      quired pursuant to the ESAA Capacity Agree-

17      ment by the date that is 60 days after the date

18      required under the ESAA Capacity Agreement,

19      the amounts in the Pechanga ESAA Delivery

20      Capacity account for purposes of the provision

21      of Interim Capacity and Permanent Capacity,

22      including any interest that has accrued on those

23      amounts, shall be available for use by the Band

24      to provide alternative interim capacity in a

25      manner that is similar to the Interim Capacity

1 and Permanent Capacity that the Band would

2 have received had RCWD provided such Interim

3 Capacity and Permanent Capacity.

4 (3) PERMANENT CAPACITY.—

5 (A) IN GENERAL.—The Secretary shall,

6 subject to the availability of appropriations,

7 using amounts from the ESAA Delivery Capac-

8 ity account, provide amounts necessary for the

9 provision of Permanent Capacity in accordance

10 with the ESAA Capacity Agreement.

11 (B) PROCEDURE.—The procedure for the

12 Secretary to provide funds pursuant to this sec-

13 tion shall be as set forth in the ESAA Capacity

14 Agreement.

15 (C) LIABILITY.—The United States shall

16 have no responsibility or liability for the Perma-

17 nent Capacity to be provided by RCWD or by

18 the Band.

19 (D) TRANSFER TO BAND.—If RCWD does

20 not provide the Permanent Capacity Notice re-

21 quired pursuant to the ESAA Capacity Agree-

22 ment by the date that is 5 years after the en-

23 forceability date, the amounts in the Pechanga

24 ESAA Delivery Capacity account for purposes

25 of the provision of Permanent Capacity, includ-

36

1          ing any interest that has accrued on those

2          amounts, shall be available for use by the Band

3          to provide alternative Permanent Capacity in a

4          manner that is similar to the Permanent Ca-

5          pacity that the Band would have received had

6          RCWD provided such Permanent Capacity.

7    SEC. 9. PECHANGA SETTLEMENT FUND.

8          (a) ESTABLISHMENT.—There is established in the

9    Treasury of the United States a fund to be known as the

10   ''Pechanga Settlement Fund'', to be managed, invested,

11   and distributed by the Secretary and to be available until

12   expended, and, together with any interest earned on those

13   amounts, to be used solely for the purpose of carrying out

14   this Act.

15         (b) TRANSFERS TO FUND.—The Fund shall consist

16   of such amounts as are deposited in the Fund under sec-

17   tion 11(a) of this Act, together with any interest earned

18   on those amounts, which shall be available in accordance

19   with subsection (e).

20         (c) ACCOUNTS OF PECHANGA SETTLEMENT FUND.—

21   The Secretary shall establish in the Fund the following

22   accounts:

23              (1) Pechanga Recycled Water Infrastructure ac-

24              count, consisting of amounts authorized pursuant to

25              section 11(a)(1).

**[Discussion Draft]**

37

1      (2) Pechanga ESAA Delivery Capacity account,

2    consisting of amounts authorized pursuant to section

3    11(a)(2).

4      (3) Pechanga Water Fund account, consisting

5    of amounts authorized pursuant to section 11(a)(3).

6      (4) Pechanga Water Quality account, consisting

7    of amounts authorized pursuant to section 11(a)(4).

8    (d) MANAGEMENT OF FUND.—The Secretary shall

9    manage, invest, and distribute all amounts in the Fund

10    in a manner that is consistent with the investment author-

11    ity of the Secretary under—

12      (1) the first section of the Act of June 24,

13    1938 (25 U.S.C. 162a);

14      (2) the American Indian Trust Fund Manage-

15    ment Reform Act of 1994 (25 U.S.C. 4001 et seq.);

16    and

17      (3) this section.

18    (e) AVAILABILITY OF AMOUNTS.—Amounts appro-

19    priated to, and deposited in, the Fund, including any in-

20    vestment earnings accrued from the date of deposit in the

21    Fund through the date of disbursement from the Fund,

22    shall be made available to the Band by the Secretary be-

23    ginning on the enforceability date.

**[Discussion Draft]**

38

1   (f) WITHDRAWALS BY BAND PURSUANT TO THE

2   AMERICAN INDIAN TRUST FUND MANAGEMENT REFORM

3   ACT.—

4       (1) IN GENERAL.—The Band may withdraw all

5   or part of the amounts in the Fund on approval by

6   the Secretary of a tribal management plan sub-

7   mitted by the Band in accordance with the American

8   Indian Trust Fund Management Reform Act of

9   1994 (25 U.S.C. 4001 et seq.).

10      (2) REQUIREMENTS.—

11          (A) IN GENERAL.—In addition to the re-

12      quirements under the American Indian Trust

13      Fund Management Reform Act of 1994 (25

14      U.S.C. 4001 et seq.), the tribal management

15      plan under paragraph (1) shall require that the

16      Band shall spend all amounts withdrawn from

17      the Fund in accordance with this Act.

18          (B) ENFORCEMENT.—The Secretary may

19      carry out such judicial or administrative actions

20      as the Secretary determines to be necessary to

21      enforce the tribal management plan to ensure

22      that amounts withdrawn by the Band from the

23      Fund under this subsection are used in accord-

24      ance with this Act.

39

1    (g) WITHDRAWALS BY BAND PURSUANT TO AN EX-
2 PENDITURE PLAN.—

3        (1) IN GENERAL.—The Band may submit an
4    expenditure plan for approval by the Secretary re-
5    questing that all or part of the amounts in the Fund
6    be disbursed in accordance with the plan.

7        (2) REQUIREMENTS.—The expenditure plan
8    under paragraph (1) shall include a description of
9    the manner and purpose for which the amounts pro-
10    posed to be disbursed from the Fund will be used,
11    in accordance with subsection (h).

12        (3) APPROVAL.—If the Secretary determines
13    that an expenditure plan submitted under this sub-
14    section is consistent with the purposes of this Act,
15    the Secretary shall approve the plan.

16        (4) ENFORCEMENT.—The Secretary may carry
17    out such judicial or administrative actions as the
18    Secretary determines necessary to enforce an ex-
19    penditure plan to ensure that amounts disbursed
20    under this subsection are used in accordance with
21    this Act.

22    (h) USES.—Amounts from the Fund shall be used by
23 the Band for the following purposes:

24        (1) PECHANGA RECYCLED WATER INFRASTRUC-
25    TURE ACCOUNT.—The Pechanga Recycled Water In-

F:\LMS\114TH\LMS_091.XML            **[Discussion Draft]**

40

1    frastructure account shall be used for expenditures
2    by the Band in accordance with section 8(c).

3      (2) PECHANGA ESAA DELIVERY CAPACITY AC-
4    COUNT.—The Pechanga ESAA Delivery Capacity
5    account shall be used for expenditures by the Band
6    in accordance with section 8(d).

7      (3) PECHANGA WATER FUND ACCOUNT.—The
8    Pechanga Water Fund account shall be used for—
9          (A) payment of the EMWD Connection
10        Fee;
11          (B) payment of the MWD Connection Fee;
12        and
13          (C) any expenses, charges, or fees incurred
14        by the Band in connection with the delivery or
15        use of water pursuant to the Pechanga Settle-
16        ment Agreement.

17      (4) PECHANGA WATER QUALITY ACCOUNT.—
18    The Pechanga Water Quality account shall be used
19    by the Band to fund groundwater desalination ac-
20    tivities within the Wolf Valley Basin.

21    (i) LIABILITY.—The Secretary and the Secretary of
22    the Treasury shall not be liable for the expenditure of,
23    or the investment of any amounts withdrawn from, the
24    Fund by the Band under subsection (f) or (g).

**[Discussion Draft]**

1    (j) No Per Capita Distributions.—No portion of

2  the Fund shall be distributed on a per capita basis to any

3  member of the Band.

4  **SEC. 10. MISCELLANEOUS PROVISIONS.**

5    (a) Waiver of Sovereign Immunity by the

6  United States.—Except as provided in subsections (a)

7  through (c) of section 208 of the Department of Justice

8  Appropriation Act, 1953 (43 U.S.C. 666), nothing in this

9  Act waives the sovereign immunity of the United States.

10    (b) Other Tribes Not Adversely Affected.—

11  Nothing in this Act quantifies or diminishes any land or

12  water right, or any claim or entitlement to land or water,

13  of an Indian tribe, band, or community other than the

14  Band.

15    (c) Limitation on Claims for Reimbursement.—

16  With respect to Indian land within the Reservation—

17      (1) the United States shall not submit against

18    any Indian-owned land located within the Reserva-

19    tion any claim for reimbursement of the cost to the

20    United States of carrying out this Act and the

21    Pechanga Settlement Agreement; and

22      (2) no assessment of any Indian-owned land lo-

23    cated within the Reservation shall be made regard-

24    ing that cost.

F:\LMS\114TH\LMS_091.XML            **[Discussion Draft]**

42

1    (d) EFFECT ON CURRENT LAW.—Nothing in this

2    section affects any provision of law (including regulations)

3    in effect on the day before the date of enactment of this

4    Act with respect to preenforcement review of any Federal

5    environmental enforcement action.

6    **SEC. 11. AUTHORIZATION OF APPROPRIATIONS.**

7       (a) AUTHORIZATION OF APPROPRIATIONS.—

8          (1) PECHANGA RECYCLED WATER INFRASTRUC-

9          TURE ACCOUNT.—There is authorized to be appro-

10         priated $2,656,374, for deposit in the Pechanga Re-

11         cycled Water Infrastructure account, to carry out

12         the activities described in section 8(c).

13         (2) PECHANGA ESAA DELIVERY CAPACITY AC-

14         COUNT.—There is authorized to be appropriated

15         $17,900,000, for deposit in the Pechanga ESAA De-

16         livery Capacity account, which amount shall be ad-

17         justed for changes in construction costs since June

18         30, 2009, as is indicated by ENR Construction Cost

19         Index, 20-City Average, as applicable to the types of

20         construction required for the Band to provide the in-

21         frastructure necessary for the Band to provide the

22         Interim Capacity and Permanent Capacity in the

23         event that RCWD elects not to provide the Interim

24         Capacity or Permanent Capacity as set forth in the

25         ESAA Capacity Agreement and contemplated in sec-

**[Discussion Draft]**

43

1 tions 8(d)(2)(D) and 8(d)(3)(E) of this Act, with

2 such adjustment ending on the date on which funds

3 authorized to be appropriated under this section

4 have been deposited in the Fund.

5 (3) PECHANGA WATER FUND ACCOUNT.—There

6 is authorized to be appropriated $5,483,653, for de-

7 posit in the Pechanga Water Fund account, which

8 amount shall be adjusted for changes in appropriate

9 cost indices since June 30, 2009, with such adjust-

10 ment ending on the date of deposit in the Fund, for

11 the purposes set forth in section 9(h)(3).

12 (4) PECHANGA WATER QUALITY ACCOUNT.—

13 There is authorized to be appropriated $2,460,000,

14 for deposit in the Pechanga Water Quality account,

15 which amount shall be adjusted for changes in ap-

16 propriate cost indices since June 30, 2009, with

17 such adjustment ending on the date of deposit in the

18 Fund, for the purposes set forth in section 9(h)(4).

19 **SEC. 12. EXPIRATION ON FAILURE OF ENFORCEABILITY**

20 **DATE.**

21 If the Secretary does not publish a statement of find-

22 ings under section 7(e) by April 30, 2021, or such alter-

23 native later date as is agreed to by the Band and the Sec-

24 retary, as applicable—

**[Discussion Draft]**

44

1       (1) this Act expires effective on the later of

2      May 1, 2021, or the day after the alternative date

3      agreed to by the Band and the Secretary;

4       (2) any action taken by the Secretary and any

5      contract or agreement pursuant to the authority pro-

6      vided under any provision of this Act shall be void;

7       (3) any amounts appropriated under section 11,

8      together with any interest on those amounts, shall

9      immediately revert to the general fund of the Treas-

10     ury; and

11      (4) any amounts made available under section

12     11 that remain unexpended shall immediately revert

13     to the general fund of the Treasury.

14  **SEC. 13. ANTIDEFICIENCY.**

15     (a) IN GENERAL.—Notwithstanding any authoriza-

16  tion of appropriations to carry out this Act, the expendi-

17  ture or advance of any funds, and the performance of any

18  obligation by the Department in any capacity, pursuant

19  to this Act shall be contingent on the appropriation of

20  funds for that expenditure, advance, or performance.

21     (b) LIABILITY.—The Department of the Interior

22  shall not be liable for the failure to carry out any obliga-

23  tion or activity authorized by this Act if adequate appro-

24  priations are not provided to carry out this Act.