

MAY 1 7 2016

The Honorable Rob Bishop
Chairman, Committee on Natural Resources
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

We write to provide our views on S. 1983, the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act ("Pechanga Settlement").  The Administration is supportive of the Pechanga Settlement if it is amended to conform to the attached redline of S. 1983 as reported out of the Senate Committee on Indian Affairs on February 3, 2016.  S. 1983 would authorize and approve an agreement among the Pechanga Band of Luiseño Indians, ("Pechanga" or "Band"), Rancho California Water District ("RCWD"), and the United States, and certain collateral agreements, including agreements with Eastern Municipal Water District ("EMWD"), and Metropolitan Water District ("MWD") ("Agreements").  The Pechanga Settlement, if amended, will bring to successful conclusion decades of conflict and uncertainty over water rights and years of negotiations through a comprehensive settlement that resolves the Band's water-rights claims and secures sufficient water to meet the Band's current and future water needs while protecting the legitimate interests of RCWD and its customers.

Although the Pechanga Settlement is a creative and forward-looking settlement that fulfills important Federal trust obligations, encourages cooperative and efficient water management, and provides important benefits to the American taxpayer, the Office of Management and Budget advises that it is still assessing and evaluating the information necessary for it to definitively conclude whether the proposed settlement meets all of the *Criteria and Procedures*.[1]

### 1.  Background

Pechanga is a federally recognized Indian tribe with a reservation of over 6,000 acres located northeast of San Diego, California, near the city of Temecula.  Pechanga Creek, a tributary of the Santa Margarita River, runs through the length of the Pechanga Reservation.  In 1951, the United States initiated the *Fallbrook* litigation[2] to protect the Federal water rights of the United States adding claims for three Indian tribes – Pechanga, the Ramona Band of Cahuilla Indians

---

[1] *Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims* (*Criteria and Procedures*) (55 FR 9223, March 12, 1990)
[2] *United States v. Fallbrook Public Utility District et al.,* Civ. No. 3:51-cv-01247 (S.D.C.A.).

("Ramona"), and the Cahuilla Band of Indians ("Cahuilla") in 1958.[3]  In 1963, the Court issued an order, Interlocutory Judgment 41 ("IJ 41"), finding that each of the three Indian tribes had reserved rights to surface and groundwater in the Santa Margarita River watershed.[4]  The Court did not quantify the tribes' water rights but made certain *prima facie* findings regarding the nature and extent of each of the tribe's water rights.[5]  As a result, all three tribes have "decreed" but "unquantified" federally reserved water rights.  S. 1983 quantifies Pechanga's water rights in a manner that is consistent with the Court's *prima facie* findings in IJ 41 and protects existing water uses.

The Secretary of the Interior appointed a Federal negotiation team in 2008 to support Pechanga's efforts to negotiate a settlement of its water rights claims.  Since then the United States has been working closely with the Band to negotiate the terms of the settlement and resolve Pechanga's claims against the United States regarding the development and protection of Pechanga's water rights.  In addition to quantifying the Band's reserved water rights in the Santa Margarita watershed, S.1983 settles the Band's claims against the United States, including a breach of the Federal trust responsibility, in connection with Pechanga's water rights.

Through negotiations, the Band has been able to engage its neighbors in a multi-year process of building mutual trust and understanding, resulting in a settlement that benefits all of the parties by securing adequate water supplies for the Band and encouraging cooperative water resource management among all parties.[6]  Living in Southern California, the settling parties were faced with a tremendous challenge to identify available water resources and protect each party's legitimate rights and expectations.  As discussed in detail below, the Band will obtain a commitment for the delivery of water through sharing the locally available water supply and agreeing to arrangements that would allow all of the parties to benefit from the delivery of other water sources outside the basin; in return, the Band would commit to not claim their full rights.  As a result, the Band will have an adequate supply of water while at the same time maximizing the use and the protection of local sources.

If their Agreements are not authorized and approved through legislation, the United States, Pechanga, and the local water districts would in all likelihood resume litigating a number of divisive, conflicting and expensive claims.  All parties would miss an opportunity to seize upon the cooperative relationships the parties in the basin fostered during the course of their negotiations.

The Pechanga Reservation lies in a rapidly urbanizing part of Riverside County, with neighbors in close proximity. Pechanga and RCWD have had a groundwater management agreement in

---

[3] Although the reservations of the three bands are all located within the Santa Margarita River watershed, Cahuilla and Ramona are located in the upper part of the watershed, which is hydrologically distinct from the area where Pechanga is located.  As a result, Cahuilla and Ramona are negotiating a separate settlement involving entirely different parties than those involved in the Pechanga Settlement.

[4] Modified Final Judgment and Decree, *United States v. Fallbrook Public Utility District et al.*, Civ. No. 3:51-cv-01247 (S.D.C.A.)(Apr. 6, 1966).

[5] The Court recognized various overlying rights for RCWD, as set forth in Interlocutory Judgments 30 and 35.

[6] *Criteria and Procedures*, No. 10.

place since 2006 to address concerns with over-pumping in the Wolf Valley Basin, which underlies the Reservation and RWCD's off-reservation service area. The groundwater management agreement will be expanded to allow the Band to increase its use of the basin's safe water yield from 50 percent to 75 percent. As a result, the Band will obtain a greater share of the local high-quality groundwater. In exchange for agreeing to provide the Band with a larger share of high-quality groundwater, RCWD will receive recycled water under an agreement with the Band and EMWD. The Pechanga Settlement includes plans for the construction of infrastructure necessary for these arrangements.

We are pleased that through negotiations with the parties our previous concerns about costs, water quality, and the extent of Federal responsibilities have now been addressed. The total Federal cost of S. 1983, as amended in February 2016, is $28.5 million, substantially less than the approximately $50 million price tag of the legislation as originally introduced. [7] Our concerns about the quality of the water that would be included as part of the Band's water right also have been addressed, as explained above. Federal responsibilities in S. 1983 have been addressed in a way that resolves concerns that we had previously expressed about the lack of clarity regarding the United States' responsibility in implementing the Pechanga Settlement.

The Band and its neighbors are to be credited for successfully negotiating a settlement of their dispute. After decades of conflict, this settlement not only resolves the Band's Federal reserved water-rights claims, but also achieves other goals such as effective management and conservation of groundwater, addressing water quality issues, and alleviating water shortages in the basin.

## 2. Consistency with the *Criteria and Procedures*, including Criteria 4 and 5(a) and (b).

The Pechanga Settlement is consistent with the United States' responsibility as trustee to Indians and will secure to the Band the right to use and benefit from Reservation water resources, thus ensuring the Band will receive equivalent benefits for claims it will waive as part of the Pechanga Settlement.[8] The *Criteria and Procedures* reflect Federal policy that disputes over Indian water rights should be resolved through negotiated settlements rather than litigation and establish the framework for the United States' participation in settlement negotiations of Indian reserved water-rights claims. Indian water rights are vested property rights for which the United States has a trust responsibility. Under S. 1983, the Band will receive equivalent benefits for claimed rights which it, and the United States as trustee, will release as part of the proposed Pechanga Settlement. S. 1983 will bring to conclusion decades of effort by the Band and the United States to achieve water security for the Pechanga people.

Early in its history, the Band had desirable lands and sufficient water, but because of encroachments by settlers who did not respect tribal interests in land or water, the Band was pushed off its valuable aboriginal lands up into rocky barrens where the Pechanga Reservation was first established in 1882. Water was in scarce supply on the Reservation and, during the

---

[7] The amount of the Federal contribution is set forth in the Act, as a total of all authorizations of appropriations, at $28.5 million in 2009 dollars. The Congressional Budget Office has scored the cost to the Federal Government in 2015 dollars at $33 million.

[8] *Criteria and Procedures*, Preamble.

next few decades, the United States secured additional land and water resources in an effort to improve conditions for the Band. In recent years, at the request of the Band, the Federal negotiation team has worked closely with the Band to support its efforts to negotiate a settlement that secures a sufficient water supply to make the Pechanga Reservation sustainable as a permanent homeland for the Pechanga people.

The Band worked collaboratively with the local parties and United States to target funding for initiatives that will allow the Band to manage Reservation water resources and promote economic self-sufficiency. To account for the limited water sources within the Santa Margarita River watershed, the parties developed a settlement with creative and innovative solutions. The parties structured their Agreements to use all available water resources, including groundwater, recycled water and imported water, in a way that provides Pechanga with a means of meeting its current and future water needs in the most economical and equitable manner. In addition to the contractual elements that provide "wet" water to Pechanga and make the overall arrangement work for the other parties, a critical element of the Pechanga Settlement is final quantification of the Band's Federal reserved rights to water (the "Tribal Water Right"). The Pechanga Settlement recognizes a Tribal Water Right for the Band of up to 4,994 acre feet per year, an amount consistent with the *Fallbrook* Court's findings. The *Fallbrook* Court's findings included a limitation on the Tribal Water Right, such that the right is limited to water that under natural conditions is physically available on the Reservation. The Pechanga Settlement follows that approach and references the exact language included in IJ 41.

The Pechanga Settlement provides significant benefits to the United States, both fiscal and otherwise, by securing a final resolution of a decades-long controversy, including the waiver of claims, in exchange for a commensurate Federal contribution of $28.5 million over a five-year period. The United States will fund infrastructure development in order to facilitate the sharing arrangements agreed to by the parties and will help offset costs associated with imported water. The Band's and the local parties' contributions to the settlement are significant. The Band bears primary responsibility for paying for the water it will import from MWD and it estimates that the present value of its costs will exceed $44 million. RCWD estimates the value of its contribution, based upon its agreement to forgo the right to use 25 percent of the high quality groundwater that the Band will be entitled to use, at more than $33 million. The parties, including the Bands and the United States, have expended decades of effort to secure a fair and reasonable allocation of the limited supply of water available in the basin.

As originally introduced in 2010, the Federal contribution to the Pechanga Settlement was in excess of $50 million. The Administration scrutinized Federal costs and worked closely with the Band and the local parties to reduce the overall cost of the Pechanga Settlement to the Federal Government to the current cost of $28.5 million. The Administration notes that the non-Federal contribution, including both the Band's and RCWD's contributions, represents substantially more than the total Federal contribution to the settlement.

### 3. Approval in writing of Settlement Agreement and draft Amendment.

The settling parties do not intend to execute the Agreements before the settlement is approved by Congress. The settling parties have agreed to the legislative text and are working on technical edits to the text of their settlement agreement.

4. **Conveyance to court of Settlement Agreement and draft Amendment.**

The settling parties plan to file a joint status report with the *Fallbrook* Court to alert the Court that the settling parties have reached a settlement.

5. **List of claims being settled.**

- All of the Band's water rights claims in the Santa Margarita Basin would be settled as part of the proposed Pechanga Settlement.
- Pechanga is waiving all claims against the United States relating to water rights in, or water of, the Santa Margarita River Watershed that the United States asserted or could have asserted in any proceeding, including the *Fallbrook* case, except to the extent that those rights are recognized in the Agreements or the legislation.
- Pechanga is also waiving all claims against the United States relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights in the Santa Margarita River Watershed.
- Pechanga is waiving all claims against the United States relating to the pending litigation of claims relating to the water rights of Pechanga in the *Fallbrook* case.
- Pechanga is waiving all claims against the United States relating to the negotiation or execution of the Pechanga Settlement Agreement or the negotiation or execution of the legislation.
- RCWD is waiving all claims for water rights within the Santa Margarita River Watershed that RCWD asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Fallbrook Decree.
- RCWD also is waiving:
  o Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;
  o Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time after June 30, 2009, resulting from the diversion or use of the Tribal Water Right or any other water in a manner not in violation of this Agreement or the Act;
  o Claims for subsidence damage to lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;
  o Claims for subsidence damage arising or occurring after June 30, 2009, to lands located outside the Pechanga Reservation resulting from the diversion of underground water in a manner not in violation of this Agreement or the Act; and
  o Claims arising out of or relating in any manner to the negotiation or execution of this Agreement or the negotiation or execution of the Act.

**6. The settlement and proposed legislation do not include financial authorizations for claims already settled by Congress or claims that have no legal basis.**

The Administration has carefully reviewed S. 1983 to ensure that the legislation does not include any financial authorizations for claims that have already been settled by Congress or claims that have no legal basis. All of the authorized appropriations and the claims being settled in S. 1983 are a matter of first impression that have not been previously addressed or authorized.

We look forward to working with you and the Committee to complete the Pechanga Settlement.

Sincerely,


Alletta D. Belin
Chair, Working Group on
  Indian Water Settlements
Department of the Interior


Peter J. Kadzik
Assistant Attorney General
  for Legislative Affairs
Department of Justice

114TH CONGRESS
1ST SESSION

# S. 1983

To authorize the Pechanga Band of Luiseño Mission Indians Water Rights
Settlement, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES
AUGUST 5, 2015

Mrs. BOXER (for herself and Mrs. FEINSTEIN) introduced the following bill; which was read twice and
referred to the Committee on Indian Affairs

---

# A BILL

To authorize the Pechanga Band of Luiseño Mission Indians Water Rights
Settlement, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,*

SECTION 1. **SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Pechanga Band of Luiseño
Mission Indians Water Rights Settlement Act".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Purposes.
Sec. 3. Definitions.
Sec. 4. Approval of the Pechanga Settlement Agreement.
Sec. 5. Tribal Water Right.
Sec. 6. Satisfaction of claims.
Sec. 7. Waiver of claims.
Sec. 8. Water facilities.

Sec. 9. Pechanga Settlement Fund.
Sec. 10. Miscellaneous provisions.
Sec. 11. Authorization of appropriations.
Sec. 12. ~~Repeal~~ Expiration on failure of enforceability date.
Sec. 13. Antideficiency.

SEC. 2. **PURPOSES.**

The purposes of this Act are—

(1) to achieve a fair, equitable, and final settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed for—

(A) the Band; and

(B) the United States, acting in its capacity as trustee for the Band and Allottees;

(2) to achieve a fair, equitable, and final settlement of certain claims by the Band and Allottees against the United States;

(3) to authorize, ratify, and confirm the Pechanga Settlement Agreement to be entered into by the Band, RCWD, and the United States;

(4) to authorize and direct the Secretary—

(A) to execute the Pechanga Settlement Agreement; and

(B) to take any other action necessary to carry out the Pechanga Settlement Agreement in accordance with this Act; and

(5) to authorize the appropriation of amounts necessary for the implementation of the Pechanga Settlement Agreement and this Act.

SEC. 3. **DEFINITIONS.**

In this Act:

(1) ADJUDICATION COURT.—The term "Adjudication Court" means the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Adjudication Proceeding.

(2) ADJUDICATION PROCEEDING.—The term "Adjudication Proceeding" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in United States v. Fallbrook Public Utility District et al., Civ. No. 3:51–cv–01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the continuing jurisdiction of the Adjudication Court over the Fallbrook Decree.

(3) ALLOTTEE.—The term "Allottee" means an individual who holds a beneficial real property interest in an Indian allotment that is—

(A) located within the Reservation; and

(B) held in trust by the United States.

(4) BAND.—The term "Band" means Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members, but not acting on behalf of members in their capacities as Allottees.

(5) CLAIMS.—The term "claims" means rights, claims, demands, actions, compensation, or causes of action, whether known or unknown.

(6) EMWD.—The term "EMWD" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Law of 1911, Division 20 of the Water Code of the State of California, as amended.

(7) EMWD CONNECTION FEE.—The term "EMWD Connection Fee" has the meaning set forth in the Extension of Service Area Agreement.

(8) ENFORCEABILITY DATE.—The term "enforceability date" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 7(e).

(9) ESAA CAPACITY AGREEMENT.—The term "ESAA Capacity Agreement" means the "ESAA Capacity Agreement," to Provide Capacity for Delivery of ESAA Water", among the Band, RCWD and the United States.

(10) ESAA WATER.—The term "ESAA Water" means imported potable water that the Band receives from EMWD and MWD pursuant to the Extension of Service Area Agreement and delivered by RCWD pursuant to the ESAA Water Delivery Agreement.

(11) ESAA WATER DELIVERY AGREEMENT.—The term "ESAA Water Delivery Agreement" means the agreement among EMWD, RCWD, and the Band, establishing the terms and conditions of water service to the Band.

(12) EXTENSION OF SERVICE AREA AGREEMENT.—The term "Extension of Service Area Agreement" means the "~~Agreement for~~ Extension of ~~Existing~~ Service Area Agreement", among the Band, EMWD, and MWD, for the provision of water service by EMWD to a designated portion of the Reservation using water supplied by MWD.

(13) FALLBROOK DECREE.—

(A) IN GENERAL.—The term "Fallbrook Decree" means the "Modified Final Judgment And Decree", entered in the Adjudication Proceeding on April 6, 1966.

(B) INCLUSIONS.—The term "Fallbrook Decree" includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

(14) FUND.—The term "Fund" means the Pechanga Settlement Fund established by section 9.

(15) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

(16) INJURY TO WATER RIGHTS.—The term "injury to water rights" means an interference with, diminution of, or deprivation of water rights under Federal or State law.

(17) INTERIM CAPACITY.—The term "Interim Capacity" has the meaning set forth in the ESAA Capacity Agreement.

(18) INTERIM CAPACITY NOTICE.—The term "Interim Capacity Notice" has the meaning set forth in the ESAA Capacity Agreement.

(19) INTERLOCUTORY JUDGMENT NO. 41.—The term "Interlocutory Judgment No. 41" means Interlocutory Judgment No. 41 issued in the Adjudication Proceeding on November 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

(20) MWD.—The term "MWD" means the Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended).

(21) MWD CONNECTION FEE.—The term "MWD Connection Fee" has the meaning set forth in the Extension of Service Area Agreement.

(22) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—The term "Pechanga ESAA Delivery Capacity account" means the account established by section 9(c)(2).

(23) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—The term "Pechanga Recycled Water Infrastructure account" means the account established by section 9(c)(1).

(24) PECHANGA SETTLEMENT AGREEMENT.—The term "Pechanga Settlement Agreement" means the Pechanga Settlement Agreement, dated April 8, 2016~~June 17, 2014~~, together with the exhibits to that agreement, entered into by the Band, the United States on behalf of the Band, its members and Allottees, MWD, EMWD, and RCWD, including—

(A) the Extension of Service Area Agreement;

(B) the ESAA Capacity Agreement; and

(C) the ESAA Water Delivery Agreement.

(25) PECHANGA WATER CODE.—The term "Pechanga Water Code" means a water code to be adopted by the Band in accordance with section 5(f).

(26) PECHANGA WATER FUND ACCOUNT.—The term "Pechanga Water Fund account" means the account established by section 9(c)(3).

(27) PECHANGA WATER QUALITY ACCOUNT.—The term "Pechanga Water Quality account" means the account established by section 9(c)(4).

(28) PERMANENT CAPACITY.—The term "Permanent Capacity" has the meaning set forth in the ESAA Capacity Agreement.

(29) PERMANENT CAPACITY NOTICE.—The term "Permanent Capacity Notice" has the meaning set forth in the ESAA Capacity Agreement.

(30) RCWD.—

(A) IN GENERAL.—The term "RCWD" means the Rancho California Water District organized pursuant to section 34000 et seq. of the California Water Code.

(B) INCLUSIONS.—The term "RCWD" includes all real property owners for whom RCWD acts as an agent pursuant to an agency agreement.

(31) RECYCLED WATER INFRASTRUCTURE AGREEMENT.—The term "Recycled Water Infrastructure Agreement" means the "Agreement for Recycled Water Infrastructure Agreement" among the Band, RCWD, and the United States.

(32) RECYCLED WATER TRANSFER AGREEMENT.—The term "Recycled Water Transfer Agreement" means the "Recycled Water Transfer Agreement" between the Band and RCWD.

(33) RESERVATION.—

(A) IN GENERAL.—The term "Reservation" means the land depicted on the map attached to the Pechanga Settlement Agreement as Exhibit I.

(B) APPLICABILITY OF TERM.—The term "Reservation" shall be used solely for the purposes of the Pechanga Settlement Agreement, this Act, and any judgment or decree issued by the Adjudication Court approving the Pechanga Settlement Agreement.

(34) SANTA MARGARITA RIVER WATERSHED.—The term "Santa Margarita River Watershed" means the watershed that is the subject of the Adjudication Proceeding and the Fallbrook Decree.

(35) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(36) STATE.—The term "State" means the State of California.

(37) STORAGE POND.—The term "Storage Pond" has the meaning set forth in the Recycled Water Infrastructure Agreement.

(38) TRIBAL WATER RIGHT.—The term "Tribal Water Right" means the water rights ratified, confirmed, and declared to be valid for the benefit of the Band and Allottees, as set forth and described in section 5.

## SEC. 4. APPROVAL OF THE PECHANGA SETTLEMENT AGREEMENT.

(a) RATIFICATION OF PECHANGA SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—Except as modified by this Act, and to the extent that the Pechanga Settlement Agreement does not conflict with this Act, the Pechanga Settlement Agreement is authorized, ratified, and confirmed.

(2) AMENDMENTS.—Any amendment to the Pechanga Settlement Agreement is authorized, ratified, and confirmed, to the extent that the amendment is executed to make the Pechanga Settlement Agreement consistent with this Act.

(b) EXECUTION OF PECHANGA SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—To the extent that the Pechanga Settlement Agreement does not conflict with this Act, the Secretary is directed to and promptly shall execute—

(A) the Pechanga Settlement Agreement (including any exhibit to the Pechanga Settlement Agreement requiring the signature of the Secretary); and

(B) any amendment to the Pechanga Settlement Agreement necessary to make the Pechanga Settlement Agreement consistent with this Act.

(2) MODIFICATIONS.—Nothing in this Act precludes the Secretary from approving modifications to exhibits to the Pechanga Settlement Agreement not inconsistent with this Act, to the extent those modifications do not otherwise require congressional approval pursuant to section 2116 of the Revised Statutes (25 U.S.C. 177) or other applicable Federal law.

(c) ENVIRONMENTAL COMPLIANCE.—

(1) IN GENERAL.—In implementing the Pechanga Settlement Agreement, the Secretary shall promptly comply with all applicable requirements of—

(A) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(B) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(C) all other applicable Federal environmental laws; and

(D) all regulations promulgated under the laws described in subparagraphs (A) through (C).

(2) EXECUTION OF THE PECHANGA SETTLEMENT AGREEMENT.—

(A) IN GENERAL.—Execution of the Pechanga Settlement Agreement by the Secretary under this section shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) COMPLIANCE.—The Secretary is directed to carry out all Federal compliance necessary to implement the Pechanga Settlement Agreement.

(3) LEAD AGENCY.—The Bureau of Reclamation shall be designated as the lead agency with respect to environmental compliance.

SEC. 5. **TRIBAL WATER RIGHT.**

(a) INTENT OF CONGRESS.—It is the intent of Congress to provide to each Allottee benefits that are equal to or exceed the benefits Allottees possess as of the date of enactment of this Act, taking into consideration—

(1) the potential risks, cost, and time delay associated with litigation that would be resolved by the Pechanga Settlement Agreement and this Act;

(2) the availability of funding under this Act;

(3) the availability of water from the Tribal Water Right and other water sources as set forth in the Pechanga Settlement Agreement; and

(4) the applicability of section 7 of the Act of February 8, 1887 (25 U.S.C. 381), and this Act to protect the interests of Allottees.

(b) CONFIRMATION OF TRIBAL WATER RIGHT.—

(1) IN GENERAL.—A Tribal Water Right of up to 4,994 acre-feet of water per year that, under natural conditions, is physically available on the Reservation is confirmed in accordance with the Findings of Fact and Conclusions of Law set forth in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree.

(2) USE.—Subject to the terms of the Pechanga Settlement Agreement, this Act, the Fallbrook Decree and applicable Federal law, the Band may use the Tribal Water Right for any purpose on the Reservation.

(c) HOLDING IN TRUST.—The Tribal Water Right, as set forth in subsection (b), shall—

(1) be held in trust by the United States on behalf of the Band and the Allottees in accordance with this section;

(2) include the priority dates described in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree; and

(3) not be subject to forfeiture or abandonment.

(d) ALLOTTEES.—

(1) APPLICABILITY OF ACT OF FEBRUARY 8, 1887.—The provisions of section 7 of the Act of February 8, 1887 (25 U.S.C. 381), relating to the use of water for irrigation purposes shall apply to the Tribal Water Right.

(2) ENTITLEMENT TO WATER.—Any entitlement to water of ~~allotted land located within the exterior boundaries of the Reservation~~an Allottee under Federal law shall be satisfied from the Tribal Water Right.

(3) ALLOCATIONS.—Allotted land located within the exterior boundaries of the Reservation shall be entitled to a just and equitable allocation of water for irrigation and domestic purposes from the Tribal Water Right.

(4) EXHAUSTION OF REMEDIES.—Before asserting any claim against the United States under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or any other applicable law, an Allottee shall exhaust remedies available under the Pechanga Water Code or other applicable tribal law.

(5) CLAIMS.—Following exhaustion of remedies available under the Pechanga Water Code or other applicable tribal law, an Allottee may seek relief under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or other applicable law.

(6) AUTHORITY.—The Secretary shall have the authority to protect the rights of Allottees as specified in this section.

(e) AUTHORITY OF BAND.—

(1) IN GENERAL.—Except as provided in paragraph (2), the Band shall have authority to use, allocate, distribute, and lease the Tribal Water Right on the Reservation in accordance with—

(A) the Pechanga Settlement Agreement; and

(B) applicable Federal law.

(2) LEASES BY ALLOTTEES.—

(A) IN GENERAL.—An Allottee may lease any interest in land held by the Allottee, together with any water right determined to be appurtenant to that interest in land.

(B) WATER RIGHT APPURTENANT.—Any water right determined to be appurtenant to an interest in land leased by an Allottee shall be used on such land on the Reservation.

(f) PECHANGA WATER CODE.—

(1) IN GENERAL.—Not later than 18 months after the enforceability date, the Band shall enact a Pechanga Water Code, that provides for—

(A) the management, regulation, and governance of all uses of the Tribal Water Right in accordance with the Pechanga Settlement Agreement; and

(B) establishment by the Band of conditions, permit requirements, and other limitations relating to the storage, recovery, and use of the Tribal Water Right in accordance with the Pechanga Settlement Agreement.

(2) INCLUSIONS.—Subject to the approval of the Secretary, The the Pechanga Water Code shall provide—

(A) that allocations of water to Allottees shall be satisfied with water from the Tribal Water Right;

(B) that charges for delivery of water for irrigation purposes for Allottees shall be assessed on a just and equitable basis in accordance with section 7 of the Act of February 8, 1887 (25 U.S.C. 381);

(C) a process by which an Allottee (or any successor in interest to an Allottee) may request that the Band provide water for irrigation or domestic purposes in accordance with this Act;

(D) a due process system for the consideration and determination by the Band of any request by an Allottee (or any successor in interest to an Allottee) for an allocation of such water for irrigation or domestic purposes on allotted land, including a process for—

(i) appeal and adjudication of any denied or disputed distribution of water; and

(ii) resolution of any contested administrative decision; and

(E) a requirement that any Allottee ~~(or any successor in interest to an Allottee)~~ with a claim relating to the enforcement of rights of the Allottee ~~(or any successor in interest to an Allottee)~~ under the Pechanga Water Code or relating to the amount of water allocated to land of the Allottee must first exhaust remedies available to the Allottee under tribal law and the Pechanga Water Code before initiating an action against the United States or petitioning the Secretary pursuant to subsection (d)(4).

(3) ACTION BY SECRETARY.—

(A) IN GENERAL.—The Secretary shall administer the Tribal Water Right until the Pechanga Water Code is enacted and approved under this section.

(B) APPROVAL.—Any provision of the Pechanga Water Code and any amendment to the Pechanga Water Code that affects the rights of Allottees—

(i) shall be subject to the approval of the Secretary; and

(ii) shall not be valid until approved by the Secretary.

(C) APPROVAL PERIOD.—The Secretary shall approve or disapprove the Pechanga Water Code within a reasonable period of time after the date on which the Band submits the Pechanga Water Code to the Secretary for approval.

(g) EFFECT.—Except as otherwise specifically provided in this section, nothing in this Act—

(1) authorizes any action by an Allottee ~~(or any successor in interest to an Allottee)~~ against any individual or entity, or against the Band, under Federal, State, tribal, or local law; or

(2) alters or affects the status of any action pursuant to section 1491(a) of title 28, United States Code.

## SEC. 6. SATISFACTION OF CLAIMS.

(a) IN GENERAL.—The benefits provided to the Band under the Pechanga Settlement Agreement and this Act shall be in complete replacement of, complete

substitution for, and full satisfaction of all claims of the Band against the United States that are waived and released pursuant to section 7.

(b) ALLOTTEE CLAIMS.—The benefits realized by the Allottees under this Act shall be in complete replacement of, complete substitution for, and full satisfaction of—

(1) all claims that are waived and released pursuant to section 7; and

(2) any claims of the Allottees against the United States that the Allottees have or could have asserted that are similar in nature to any claim described in section 7.

(c) NO RECOGNITION OF WATER RIGHTS.—Except as provided in section 5(d), nothing in this Act recognizes or establishes any right of a member of the Band or an Allottee to water within the Reservation.

(d) CLAIMS RELATING TO DEVELOPMENT OF WATER FOR RESERVATION.—

(1) IN GENERAL.—The amounts authorized to be appropriated pursuant to section 11 shall be used to satisfy any claim of the Allottees against the United States with respect to the development or protection of water resources for the Reservation.

(2) SATISFACTION OF CLAIMS.—Upon the complete appropriation of amounts authorized pursuant to section 11, any claim of the Allottees against the United States with respect to the development or protection of water resources for the Reservation shall be deemed to have been satisfied.

SEC. 7. **WAIVER OF CLAIMS.**

(a) IN GENERAL.—

(1) WAIVER OF CLAIMS BY THE BAND AND THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR THE BAND.—

(A) IN GENERAL.—Subject to the retention of rights set forth in subsection (c), in return for recognition of the Tribal Water Right and other benefits as set forth in the Pechanga Settlement Agreement and this Act, the Band, on behalf of itself and the members of the Band (but not on

~~behalf of a tribal member in the capacity of Allottee),~~ and the United States, acting as trustee for the Band, are authorized and directed to execute a waiver and release of all claims for water rights within the Santa Margarita River Watershed that the Band, or the United States acting as trustee for the Band, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Pechanga Settlement Agreement and this Act.

(B) CLAIMS AGAINST RCWD.—Subject to the retention of rights set forth in subsection (c) and notwithstanding any provisions to the contrary in the Pechanga Settlement Agreement, the Band and the United States, on behalf of the Band and Allottees, fully release, acquit, and discharge RCWD from—

(i) claims for injuries to water rights in the Santa Margarita River Watershed for land located within the Reservation arising or occurring at any time up to and including June 30, 2009;

(ii) claims for injuries to water rights in the Santa Margarita River Watershed for land located within the Reservation arising or occurring at any time after June 30, 2009, resulting from the diversion or use of water in a manner not in violation of the Pechanga Settlement Agreement or this Act;

(iii) claims for subsidence damage to land located within the Reservation arising or occurring at any time up to and including June 30, 2009;

(iv) claims for subsidence damage arising or occurring after June 30, 2009, to land located within the Reservation resulting from the diversion of underground water in a manner consistent with the Pechanga Settlement Agreement or this Act; and

(v) claims arising out of, or relating in any manner to, the negotiation or execution of the Pechanga Settlement Agreement or the negotiation or execution of this Act.

(2) CLAIMS BY THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR ALLOTTEES.—Subject to the retention of claims set forth in subsection (c), in return for recognition of the ~~water rights of the Band~~Tribal

Water Right and other benefits as set forth in the Pechanga Settlement Agreement and this Act, the United States, acting as trustee for Allottees, is authorized and directed to execute a waiver and release of all claims for water rights within the Santa Margarita River Watershed that the United States, acting as trustee for the Allottees, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent such rights are recognized in the Pechanga Settlement Agreement and this Act.

(3) CLAIMS BY THE BAND AGAINST THE UNITED STATES.—Subject to the retention of rights set forth in subsection (c), the Band, on behalf of itself and the members of the Band (but not on behalf of a tribal member in the capacity of Allottee), is authorized to execute a waiver and release of—

(A) all claims against the United States (including the agencies and employees of the United States) relating to claims for water rights in, or water of, the Santa Margarita River Watershed that the United States, acting in its capacity as trustee for the Band, asserted, or could have asserted, in any proceeding, including the Adjudication Proceeding, except to the extent that those rights are recognized in the Pechanga Settlement Agreement and this Act;

(B) all claims against the United States (including the agencies and employees of the United States) relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses or injuries to hunting, fishing, gathering, or cultural rights due to loss of water or water rights, claims relating to interference with, diversion, or taking of water or water rights, or claims relating to failure to protect, acquire, replace, or develop water, water rights, or water infrastructure) in the Santa Margarita River Watershed that first accrued at any time up to and including the enforceability date;

(C) all claims against the United States (including the agencies and employees of the United States) relating to the pending litigation of claims relating to the water rights of the Band in the Adjudication Proceeding; and

(D) all claims against the United States (including the agencies and employees of the United States) relating to the negotiation or execution of the Pechanga Settlement Agreement or the negotiation or execution of this Act.

(b) EFFECTIVENESS OF WAIVERS AND RELEASES.—The waivers under subsection (a) shall take effect on the enforceability date.

(c) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.— Notwithstanding the waivers and releases authorized in this Act, the Band, on behalf of itself and the members of the Band, and the United States, acting in its capacity as trustee for the Band and Allottees, retain—

   (1) all claims for enforcement of the Pechanga Settlement Agreement and this Act;

   (2) all claims against any person or entity other than the United States and RCWD, including claims for monetary damages;

   (3) all claims for water rights that are outside the jurisdiction of the Adjudication Court;

   (4) all rights to use and protect water rights acquired on or after the enforceability date; and

   (5) all remedies, privileges, immunities, powers, and claims, including claims for water rights, not specifically waived and released pursuant to this Act and the Pechanga Settlement Agreement.

(d) EFFECT OF PECHANGA SETTLEMENT AGREEMENT AND ACT.— Nothing in the Pechanga Settlement Agreement or this Act—

   (1) affects the ability of the United States, acting as a sovereign, to take actions authorized by law, including any laws relating to health, safety, or the environment, including—

      (A) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);

      (B) the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

      (C) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

      (D) any regulations implementing the Acts described in subparagraphs (A) through (C);

(2) affects the ability of the United States to take actions acting as trustee for any other Indian tribe or an Allottee of any other Indian tribe;

(3) confers jurisdiction on any State court—

(A) to interpret Federal law regarding health, safety, or the environment;

(B) to determine the duties of the United States or other parties pursuant to Federal law regarding health, safety, or the environment; or

(C) to conduct judicial review of Federal agency action;

(4) waives any claim of a member of the Band in an individual capacity that does not derive from a right of the Band;

(5) limits any funding that RCWD would otherwise be authorized to receive under any Federal law, including, the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h et seq.) as that Act applies to permanent facilities for water recycling, demineralization, and desalination, and distribution of nonpotable water supplies in Southern Riverside County, California;

(6) characterizes any amounts received by RCWD under the Pechanga Settlement Agreement or this Act as Federal for purposes of section 1649 of the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h–32); or

(7) affects the requirement of any party to the Pechanga Settlement Agreement or any of the exhibits to the Pechanga Settlement Agreement to comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or the California Environmental Quality Act (Cal. Pub. Res. Code 21000 et seq.) prior to performing the respective obligations of that party under the Pechanga Settlement Agreement or any of the exhibits to the Pechanga Settlement Agreement.

(e) ENFORCEABILITY DATE.—The enforceability date shall be the date on which the Secretary publishes in the Federal Register a statement of findings that—

(1) the Adjudication Court has approved and entered a judgment and decree approving the Pechanga Settlement Agreement in substantially the same form as Appendix 2 to the Pechanga Settlement Agreement;

(2) all amounts authorized by this Act have been deposited in the Fund;

(3) the waivers and releases authorized in subsection (a) have been executed by the Band and the Secretary;

(4) the Extension of Service Area Agreement—

(A) has been approved and executed by all the parties to the Extension of Service Area Agreement; and

(B) is effective and enforceable in accordance with the terms of the Extension of Service Area Agreement; and

(5) the ESAA Water Delivery Agreement—

(A) has been approved and executed by all the parties to the ESAA Water Delivery Agreement; and

(B) is effective and enforceable in accordance with the terms of the ESAA Water Delivery Agreement.

(f) TOLLING OF CLAIMS.—

(1) IN GENERAL.—Each applicable period of limitation and time-based equitable defense relating to a claim described in this section shall be tolled for the period beginning on the date of enactment of this Act and ending on the earlier of—

(A) April 30, 2030, or such alternate date after April 30, 2030, as is agreed to by the Band and the Secretary; or

(B) the enforceability date.

(2) EFFECTS OF SUBSECTION.—Nothing in this subsection revives any claim or tolls any period of limitation or time-based equitable defense that expired before the date of enactment of this Act.

(3) LIMITATION.—Nothing in this section precludes the tolling of any period of limitations or any time-based equitable defense under any other applicable law.

(g) TERMINATION.—

(1) IN GENERAL.—If all of the amounts authorized to be appropriated to the Secretary pursuant to this Act have not been made available to the Secretary by April 30, 2030—

(A) the waivers authorized by this section shall expire and have no force or effect; and

(B) all statutes of limitations applicable to any claim otherwise waived under this section shall be tolled until April 30, 2030.

(2) VOIDING OF WAIVERS.—If a waiver authorized by this section is void under paragraph (1)—

(A) the approval of the United States of the Pechanga Settlement Agreement under section 4 shall be void and have no further force or effect;

(B) any unexpended Federal amounts appropriated or made available to carry out this Act, together with any interest earned on those amounts, and any water rights or contracts to use water and title to other property acquired or constructed with Federal amounts appropriated or made available to carry out this Act shall be returned to the Federal Government, unless otherwise agreed to by the Band and the United States and approved by Congress; and

(C) except for Federal amounts used to acquire or develop property that is returned to the Federal Government under subparagraph (B), the United States shall be entitled to set off any Federal amounts appropriated or made available to carry out this Act that were expended or withdrawn, together with any interest accrued, against any claims against the United States relating to water rights asserted by the Band or Allottees in any future settlement of the water rights of the Band or Allottees.

## SEC. 8. WATER FACILITIES.

(a) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the designated accounts of the Fund, provide the amounts necessary to fulfill the obligations of the Band under the Recycled Water Infrastructure Agreement and the ESAA Capacity Agreement, in an amount not to exceed the amounts deposited in the designated accounts for such purposes plus any interest accrued on such amounts from the date of deposit in the Fund to the date of disbursement from the Fund, in accordance with this Act and the terms and conditions of those agreements.

(b) NONREIMBURSABILITY OF COSTS.—All costs incurred by the Secretary in carrying out this section shall be nonreimbursable.

(c) RECYCLED WATER INFRASTRUCTURE.—

(1) IN GENERAL.—The Secretary shall, using amounts from the Pechanga Recycled Water Infrastructure account, provide amounts for the Storage Pond in accordance with this section.

(2) STORAGE POND.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the Pechanga Recycled Water Infrastructure account provide the amounts necessary for a Storage Pond in accordance with to fulfill the obligations of the Band under the Recycled Water Infrastructure Agreement for the design and construction of the Storage Pond, in an amount not to exceed $2,656,374.

(B) PROCEDURE.—The procedure for the Secretary to provide amounts pursuant to this section shall be as set forth in the Recycled Water Infrastructure Agreement.

(C) LEAD AGENCY.—The Bureau of Reclamation shall be the lead agency for purposes of the implementation of this section.

(DC) LIABILITY.—The United States shall have no responsibility or liability for the Storage Pond.

(d) ESAA DELIVERY CAPACITY.—

(1) IN GENERAL.—The Secretary shall, using amounts from the Pechanga ESAA Delivery Capacity account, provide amounts for Interim Capacity and Permanent Capacity in accordance with this section.

(2) INTERIM CAPACITY.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the ESAA Delivery Capacity account, provide amounts necessary for the provision of Interim ~~to fulfill the obligations of the Band under the ESAA~~ Capacity in accordance with the ESAA ~~Agreement for the provision by RCWD of Interim~~ Capacity Agreement ~~to the Band~~ in an amount not to exceed $1,000,000.

(B) PROCEDURE.—The procedure for the Secretary to provide amounts pursuant to this section shall be as set forth in the ESAA Capacity Agreement.

~~(C) LEAD AGENCY.—The Bureau of Reclamation shall be the lead agency for purposes of the implementation of this section.~~

(~~D~~C) LIABILITY.—The United States shall have no responsibility or liability for the Interim Capacity to be provided by RCWD or by the Band.

(~~E~~D) TRANSFER TO BAND.—If RCWD does not provide the Interim Capacity Notice required pursuant to the ESAA Capacity Agreement by the date that is 60 days after the date required under the ESAA Capacity Agreement, the amounts in the Pechanga ESAA Delivery Capacity account for purposes of the provision of Interim Capacity and Permanent Capacity, including any interest that has accrued on those amounts, shall be available for use by the Band to provide alternative interim capacity in a manner that is similar to the Interim Capacity and Permanent Capacity that the Band would have received had RCWD provided such Interim Capacity and Permanent Capacity.

(3) PERMANENT CAPACITY.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the ESAA Delivery Capacity account, provide amounts necessary for the provision of Permanent Capacity in accordance with the ESAA Capacity Agreement~~On receipt of the~~

~~Permanent Capacity Notice pursuant to section 5(b) of the ESAA Capacity Agreement, the Secretary, acting through the Bureau of Reclamation, shall enter into negotiations with RCWD and the Band to establish an agreement that will allow for the disbursement of amounts from the Pechanga ESAA Delivery Capacity account in accordance with subparagraph (B).~~

~~(B) SCHEDULE OF DISBURSEMENT.—Subject to the availability of amounts under section 9(e), on execution of the ESAA Capacity Agreement, the Secretary shall, subject to the availability of appropriations and using amounts from the ESAA Delivery Capacity account, provide amounts necessary to fulfill the obligations of the Band under the ESAA Capacity Agreement for the provision by RCWD of Permanent Capacity to the Band in an amount not to exceed the amount available in the ESAA Delivery Capacity account as of the date on which the ESAA Capacity Agreement is executed.~~

(C̶B) PROCEDURE.—The procedure for the Secretary to provide funds pursuant to this section shall be as set forth in the ESAA Capacity Agreement.

~~(D) LEAD AGENCY.—The Bureau of Reclamation shall be the lead agency for purposes of the implementation of this section.~~

(E̶C) LIABILITY.—The United States shall have no responsibility or liability for the Permanent Capacity to be provided by RCWD or by the Band.

(F̶D) TRANSFER TO BAND.—If RCWD does not provide the Permanent Capacity Notice required pursuant to the ESAA Capacity Agreement by the date that is 5 years after the enforceability date, the amounts in the Pechanga ESAA Delivery Capacity account for purposes of the provision of Permanent Capacity, including any interest that has accrued on those amounts, shall be available for use by the Band to provide alternative ~~permanent~~ Permanent ~~capacity~~ Capacity in a manner that is similar to the Permanent Capacity that the Band would have received had RCWD provided such Permanent Capacity.

SEC. 9. **PECHANGA SETTLEMENT FUND.**

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "Pechanga Settlement Fund", to be managed, invested, and distributed by the Secretary and to be available until expended, and, together with any interest earned on those amounts, to be used solely for the purpose of carrying out this Act.

(b) TRANSFERS TO FUND.—The Fund shall consist of such amounts as are deposited in the Fund under section 11(a) of this Act, together with any interest earned on those amounts, which shall be available in accordance with subsection (e).

(c) ACCOUNTS OF PECHANGA SETTLEMENT FUND.—The Secretary shall establish in the Fund the following accounts:

(1) Pechanga Recycled Water Infrastructure account, consisting of amounts authorized pursuant to section 11(a)(1).

(2) Pechanga ESAA Delivery Capacity account, consisting of amounts authorized pursuant to section 11(a)(2).

(3) Pechanga Water Fund account, consisting of amounts authorized pursuant to section 11(a)(3).

(4) Pechanga Water Quality account, consisting of amounts authorized pursuant to section 11(a)(4).

(d) MANAGEMENT OF FUND.—The Secretary shall manage, invest, and distribute all amounts in the Fund in a manner that is consistent with the investment authority of the Secretary under—

(1) the first section of the Act of June 24, 1938 (25 U.S.C. 162a);

(2) the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.); and

(3) this section.

(e) AVAILABILITY OF AMOUNTS.—Amounts appropriated to, and deposited in, the Fund, including any investment earnings accrued from the date of deposit in the Fund through the date of disbursement from the Fund, shall be made available to the Band by the Secretary beginning on the enforceability date.

(f) WITHDRAWALS BY BAND PURSUANT TO THE AMERICAN INDIAN TRUST FUND MANAGEMENT REFORM ACT.—

(1) IN GENERAL.—The Band may withdraw all or part of the amounts in the Fund on approval by the Secretary of a tribal management plan submitted by the Band in accordance with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(2) REQUIREMENTS.—

(A) IN GENERAL.—In addition to the requirements under the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), the tribal management plan under paragraph (1) shall require that the Band shall spend all amounts withdrawn from the Fund in accordance with this Act.

(B) ENFORCEMENT.—The Secretary may carry out such judicial or administrative actions as the Secretary determines to be necessary to enforce the tribal management plan to ensure that amounts withdrawn by the Band from the Fund under this subsection are used in accordance with this Act.

(g) WITHDRAWALS BY BAND PURSUANT TO AN EXPENDITURE PLAN.—

(1) IN GENERAL.—The Band may submit an expenditure plan for approval by the Secretary requesting that all or part of the amounts in the Fund be disbursed in accordance with the plan.

(2) REQUIREMENTS.—The expenditure plan under paragraph (1) shall include a description of the manner and purpose for which the amounts proposed to be disbursed from the Fund will be used, in accordance with subsection (h).

(3) APPROVAL.—If the Secretary determines that an expenditure plan submitted under this subsection is consistent with the purposes of this Act, the Secretary shall approve the plan.

(4) ENFORCEMENT.—The Secretary may carry out such judicial or administrative actions as the Secretary determines necessary to enforce an

expenditure plan to ensure that amounts disbursed under this subsection are used in accordance with this Act.

(h) USES.—Amounts from the Fund shall be used by the Band for the following purposes:

(1) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—The Pechanga Recycled Water Infrastructure account shall be used for expenditures by the Band in accordance with section 8(c).

(2) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—The Pechanga ESAA Delivery Capacity account shall be used for expenditures by the Band in accordance with section 8(d).

(3) PECHANGA WATER FUND ACCOUNT.—The Pechanga Water Fund account shall be used for—

(A) payment of the EMWD Connection Fee;

(B) payment of the MWD Connection Fee; and

(C) any expenses, charges, or fees incurred by the Band in connection with the delivery or use of water pursuant to the Pechanga Settlement Agreement.

(4) PECHANGA WATER QUALITY ACCOUNT.—The Pechanga Water Quality account shall be used by the Band to fund groundwater desalination activities within the Wolf Valley Basin.

(i) LIABILITY.—The Secretary and the Secretary of the Treasury shall not be liable for the expenditure of, or the investment of any amounts withdrawn from, the Fund by the Band under subsection (f) or (g).

(j) NO PER CAPITA DISTRIBUTIONS.—No portion of the Fund shall be distributed on a per capita basis to any member of the Band.

## SEC. 10. MISCELLANEOUS PROVISIONS.

(a) WAIVER OF SOVEREIGN IMMUNITY BY THE UNITED STATES.—Except as provided in subsections (a) through (c) of section 208 of the Department of

Justice Appropriation Act, 1953 (43 U.S.C. 666), nothing in this Act waives the sovereign immunity of the United States.

(b) OTHER TRIBES NOT ADVERSELY AFFECTED.—Nothing in this Act quantifies or diminishes any land or water right, or any claim or entitlement to land or water, of an Indian tribe, band, or community other than the Band.

(c) LIMITATION ON CLAIMS FOR REIMBURSEMENT.—With respect to Indian land within the Reservation—

(1) the United States shall not submit against any Indian-owned land located within the Reservation any claim for reimbursement of the cost to the United States of carrying out this Act and the Pechanga Settlement Agreement; and

(2) no assessment of any Indian-owned land located within the Reservation shall be made regarding that cost.

(d) EFFECT ON CURRENT LAW.—Nothing in this section affects any provision of law (including regulations) in effect on the day before the date of enactment of this Act with respect to preenforcement review of any Federal environmental enforcement action.

SEC. 11. **AUTHORIZATION OF APPROPRIATIONS.**

(a) AUTHORIZATION OF APPROPRIATIONS.—

(1) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—There is authorized to be appropriated $2,656,374, for deposit in the Pechanga Recycled Water Infrastructure account, to carry out the activities described in section 8(c).

(2) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—There is authorized to be appropriated $17,900,000, for deposit in the Pechanga ESAA Delivery Capacity account, which amount shall be adjusted for changes in construction costs since June 30, 2009, as is indicated by ENR Construction Cost Index, 20-City Average, as applicable to the types of construction required for the Band to provide the infrastructure necessary for the Band to provide the Interim Capacity and Permanent Capacity in the event that RCWD elects not to provide the Interim Capacity or Permanent Capacity as set forth in the ESAA Capacity Agreement and contemplated in sections 8(d)(2)(ED) and

8(d)(3)(~~F~~E) of this Act, with such adjustment ending on the date on which funds authorized to be appropriated under this section have been deposited in the Fund.

(3) PECHANGA WATER FUND ACCOUNT.—There is authorized to be appropriated $5,483,653, for deposit in the Pechanga Water Fund account, which amount shall be adjusted for changes in appropriate cost indices since June 30, 2009, with such adjustment ending on the date of deposit in the Fund, for the purposes set forth in section 9(h)(3).

(4) PECHANGA WATER QUALITY ACCOUNT.—There is authorized to be appropriated $2,460,000, for deposit in the Pechanga Water Quality account, which amount shall be adjusted for changes in appropriate cost indices since June 30, 2009, with such adjustment ending on the date of deposit in the Fund, for the purposes set forth in section 9(h)(4).

SEC. 12. ~~REPEAL~~ EXPIRATION ON FAILURE OF ENFORCEABILITY DATE.

If the Secretary does not publish a statement of findings under section 7(e) by April 30, 2021, or such alternative later date as is agreed to by the Band and the Secretary, as applicable—

(1) this Act expires ~~is repealed~~ effective on the later of May 1, 2021, or the day after the alternative date agreed to by the Band and the Secretary;

(2) any action taken by the Secretary and any contract or agreement pursuant to the authority provided under any provision of this Act shall be void;

(3) any amounts appropriated under section 11, together with any interest on those amounts, shall immediately revert to the general fund of the Treasury; and

(4) any amounts made available under section 11 that remain unexpended shall immediately revert to the general fund of the Treasury.

SEC. 13. ANTIDEFICIENCY.

(a) IN GENERAL.—Notwithstanding any authorization of appropriations to carry out this Act, the expenditure or advance of any funds, and the performance of any obligation by the Department in any capacity, pursuant to this Act shall be

contingent on the appropriation of funds for that expenditure, advance, or performance.

(b) LIABILITY.—The Department of the Interior shall not be liable for the failure to carry out any obligation or activity authorized by this Act if adequate appropriations are not provided to carry out this Act.