<span style="color:red">**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION – FOR DISCUSSION PURPOSES ONLY –**</span>

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

## PECHANGA BAND OF LUISEÑO MISSION INDIANS WATER RIGHTS SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016, by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS**, a federally recognized Indian Tribe (**"*Pechanga*"**), **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*") and the **UNITED STATES OF AMERICA** acting by and through the Secretary of the Department of the Interior.

## RECITALS

A.    In 1951, the United States initiated litigation over water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.,* Civ. No. 3:51-cv-01247 (S.D.C.A.) ("*Adjudication Proceeding*").

B.    The Adjudication Proceeding eventually expanded to include all water users within the Santa Margarita River Watershed, including three Indian Tribes (Pechanga, the Ramona Band of Cahuilla Indians, and Cahuilla Band of Indians).  The United States, as trustee, represented all three tribes in the Adjudication Proceeding.

C.    The U.S. District Court for the Southern District of California issued a series of interlocutory judgments establishing water rights for various water users as part of the Adjudication Proceeding.   These interlocutory judgments were eventually encompassed in the Fallbrook Decree in 1966.  The U.S. District Court retained jurisdiction to be able to interpret and enforce the Fallbrook Decree.  The U.S. District Court in such role is hereinafter referred to as the "*Adjudication Court.*"

D.    On November 8, 1962, the Adjudication Court issued Interlocutory Judgment No. 41 "concerning the rights to the use of waters of Santa Margarita River Stream System held in trust by the U.S.A. in connection with the Ramona, Cahuilla and Pechanga Indian Reservations."

E.    In 1975, Pechanga filed a Complaint in Intervention in the Adjudication Proceeding to "enjoin the unlawful interference and destruction of its rights to the present and future use of the waters of the Santa Margarita River by the defendants named in this action."  In 2006, the Cahuilla Band and the Ramona Band also filed Complaints in Intervention in the Adjudication Proceeding to quantify and enforce their water rights reserved in Interlocutory Judgment No. 41.

1

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

F.  On December 21, 2006, Pechanga and RCWD entered into the Groundwater Management Agreement for the management of the water in the Wolf Valley Groundwater Basin (as that term is defined in such agreement).

G.  On January 8, 2008, Pechanga and EMWD entered a Recycled Water Agreement providing for the sale and purchase of recycled water.

H.  On March 13, 2008, Pechanga requested that the Secretary of the Interior seek settlement of the water rights claims involving Pechanga, the United States, and non-Federal third parties through the formation of a Federal Negotiation Team under the Criteria and Procedures for Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223. The Secretary agreed to form a Federal Negotiation Team on August 1, 2008.

I.  Recognizing that final resolution of Pechanga's claims to water rights and injuries to water rights in the Adjudication Proceeding and certain other claims against the United States and other parties may take many years, entail great expense, prolong uncertainty concerning the availability of water supplies, and seriously impair the long-term economic well-being of all Parties, Pechanga, RCWD and the United States, have agreed to settle permanently certain disputes as specified herein, and to seek federal funding, in accordance with applicable law, for the implementation of this Agreement.

J.  As part of this settlement, the Parties seek to enhance the capacity for delivery of ESAA Water (as hereinafter defined) as necessary to allow for deliveries to Pechanga, to improve the quality of effluent delivered to Pechanga pursuant to its Recycled Water Agreement with EMWD, and to improve water quality for the Wolf Valley Groundwater Basin.

K.  In keeping with its trust responsibility to Indian tribes and to promote tribal sovereignty and economic self-sufficiency, it is the policy of the United States to settle whenever possible water rights claims of Indian tribes without lengthy and costly litigation.

L.  The Parties seek to memorialize the settlement among them. The settlement is set forth in this Agreement, which includes the agreements attached as Exhibits that are listed in Section 1.3.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

## AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.     **Interpretation and Construction of Agreement.**

      1.1     **Definitions.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlements Act, Public Law ____.

"*Adjudication Court*" means the U.S. District Court for the Southern District of California exercising continuing jurisdiction over the Adjudication Proceeding.

"*Adjudication Proceeding*" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.,* Civ. No. 3:51-cv-01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the Adjudication Court's continuing jurisdiction over the Fallbrook Decree.

"*AFY*" means acre-feet per Year.

"*Agency Agreement*" means a recorded document by which a real property owner of land located within the RCWD service area has assigned the right to manage any water rights appurtenant to such owner's real property to RCWD for the benefit of all RCWD customers.

"*Agreement*" means this agreement and the Exhibits attached hereto.

"*Allottee*" means an individual who holds a beneficial real property interest in an Indian allotment that is: (A) located within the Pechanga Reservation; and (B) held in trust by the United States.

"*Amended GMA*" means the "Amended and Restated Groundwater Management Agreement" between Pechanga and RCWD, setting forth terms and conditions governing their joint management of groundwater pumping from the Wolf Valley Groundwater Basin, which is hereby incorporated by reference.  A copy of the Amended GMA is attached as Exhibit A.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

"*Appendix*" means an attachment to this Agreement designated as an Appendix.  For clarity, such term does not include Exhibits.

"*Claims*" means rights, claims, demands, actions, compensation or causes of action whether known or unknown.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 7(e) of the Act.

"*ESAA Capacity Agreement*" means the "Agreement to Provide Capacity for Delivery of ESAA Water", among Pechanga, RCWD and the United States which is hereby incorporated by reference.  A copy of the ESAA Capacity Agreement is attached as Exhibit G.

"*ESAA Water Delivery Agreement*" means the agreement among Pechanga, RCWD and EMWD, establishing the terms and conditions of water service to Pechanga, which is hereby incorporated by reference.  A copy of the ESAA Water Delivery Agreement is attached as Exhibit H.

"*Exhibit*" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference.  For clarity, such term does not include any Appendix.

"*Extension of Service Area Agreement*" means the "Agreement for Extension of Existing Service Area", among Pechanga, EMWD, and MWD for the provision of water service by EMWD to a designated portion of the Pechanga Reservation using water supplied by MWD, which is hereby incorporated by reference.  A copy of the Extension of Service Area Agreement is attached as Exhibit F.

"*Fallbrook Decree*" means the "Modified Final Judgment And Decree" entered in the Adjudication Proceeding on April 6, 1966, a copy of which is attached to this Agreement as Appendix 1.  The term "Fallbrook Decree" includes all court orders, interlocutory judgments and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

"*Injury to Water Rights*" means an interference with, diminution of, or deprivation of water rights under Federal or State law.

4

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

"*Interlocutory Judgment No. 30*" means Interlocutory Judgment No. 30 issued in the Adjudication Proceeding on March 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

"*Interlocutory Judgment No. 35*" means Interlocutory Judgment No. 35 issued in the Adjudication Proceeding on May 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

"*Interlocutory Judgment No. 41*" means Interlocutory Judgment No. 41 issued in the Adjudication Proceeding on November 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

"*Member*" or "*Members*" means any person or persons duly enrolled as members of the Pechanga Band of Luiseño Mission Indians.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Ch. 209, as amended).

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.  The United States' participation as a Party shall be in the capacity as described in the definition of the term "United States".

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Reservation*" means land depicted on the map attached as <u>Exhibit I</u>.  The term "Pechanga Reservation" is solely for the purposes of this Agreement, the Act and any judgment or decree issued by the Adjudication Court approving the Agreement,  and not for any of the Exhibits, and shall not be used for any other purpose.

"*Pechanga Water Code*" means a water code to be adopted by Pechanga in accordance with <u>Section 7</u>.

"*RCWD*" means the Rancho California Water District organized pursuant to California Water Code section 34000 *et seq.*  and includes all real property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

5

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

"*RCWD Water Rights*" means RCWD's water rights in the Santa Margarita River Watershed, as the successor in interest to the Vail Company, as set forth in Interlocutory Judgment No. 30 and Interlocutory Judgment No. 35.

"*Recycled Water Agreement*" means the "Recycled Water Agreement (Agreement No. 04-07)", dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water Agreement (Agreement No. 04-07)" between Pechanga and EMWD, providing for the sale and purchase of recycled water, which is hereby incorporated by reference.  A copy of the Recycled Water Agreement is attached as <u>Exhibit B</u>.

"*Recycled Water Infrastructure Agreement*" means the "Agreement for Recycled Water Infrastructure" among Pechanga, RCWD, and the United States, which is hereby incorporated by reference.  A copy of the Recycled Water Infrastructure Agreement is attached as <u>Exhibit E</u>.

"*Recycled Water Scheduling Agreement*" means the "Agreement for Ordering, Scheduling, Delivery and Payment for Recycled Water" among Pechanga, EMWD and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Scheduling Agreement is attached as <u>Exhibit D</u>.

"*Recycled Water Transfer Agreement*" means the "Recycled Water Transfer Agreement" between Pechanga and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Transfer Agreement is attached as <u>Exhibit C</u>.

"*Santa Margarita River Watershed*" means the watershed that is the subject of the Adjudication Proceeding and the Fallbrook Decree.

"*Secretary*" means the Secretary of the United States Department of the Interior.

"*Section*" means a section or subsection of this Agreement.

"*Settlement Coordination Committee*" means the committee of individuals chosen by Pechanga and RCWD to coordinate the activities, actions and obligations established by this Agreement and in the Act.

"*State*" means the State of California.

"*Tribal Water Right*" means the water rights ratified, confirmed and declared to be valid for the benefit of Pechanga and Allottees, as specifically set forth and described in <u>Section 2</u>.

"*United States*" except as set forth in Section 2.1 hereof,  means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

6

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

"*Wolf Valley Groundwater Basin*" means that groundwater subject to the jurisdiction of the Adjudication Court located beneath Wolf Valley, as depicted in exhibit A-4 of the Amended GMA.

"*Year*" means a calendar year of January through December.

1.2     **Construction.**

(a)     The words "include," "includes," and "including" will be deemed to be followed by "without limitation." The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(b)     The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

1.3     **Exhibits.**

(a)     Following is a list of Exhibits included in this Agreement:

Exhibit A:     Amended and Restated Groundwater Management Agreement

Exhibit B:     Recycled Water Agreement

Exhibit C:     Recycled Water Transfer Agreement

Exhibit D:     Recycled Water Scheduling Agreement

Exhibit E:     Recycled Water Infrastructure Agreement

Exhibit F:     Extension of Service Area Agreement

Exhibit G:     ESAA Capacity Agreement

Exhibit H:     ESAA Water Delivery Agreement

Exhibit I:     Map depicting Pechanga Reservation

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

(b)     All of the Parties have reviewed the Exhibits, and no Party shall object to or contest the terms and conditions of the Exhibits in any judicial, administrative or legislative proceedings relating to the approval, interpretation or enforcement of this Agreement.

(c)     Amendments to Exhibits shall be governed by, and no Party shall have any right to object to an amendment to an Exhibit except as provided in Section 17.3.

(d)     Each Exhibit shall be binding only on the specific parties to such Exhibit.

(e)     No Party shall have, by reason of this Agreement, any third-party enforcement or other rights under any Exhibit to which said Party is not a party, unless otherwise provided in the Exhibit.

(f)     A definition in an Exhibit shall be confined to the Exhibit in which it appears unless such definition is specifically incorporated by reference in this Agreement or in another Exhibit.

**1.4     Appendices.**

(a)     Following is a list of Appendices attached to this Agreement:

Appendix 1:   Fallbrook Decree

Appendix 2:   Form of Proposed Judgment and Decree

(b)     Each Appendix is attached to this Agreement for informational purposes only and is not incorporated in or made part of this Agreement.

**2.     Tribal Water Right.**

**2.1**     The Parties, including the United States in all of its capacities (except as trustee for Indian tribes other than Pechanga), ratify, confirm, declare to be valid, and shall not object to, dispute, or challenge in the Adjudication Proceeding, or in any other judicial, legislative or administrative proceeding, the Tribal Water Right as such is further described below.

**2.2**     A Tribal Water Right of up to 4,994 acre-feet of water per year that, under natural conditions, is physically available on the Reservation is confirmed in accordance with the Findings of Fact and Conclusions of Law set forth in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree.

8

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

2.3     The Tribal Water Right as set forth in Subsection 2.2 shall be held in trust by the United States on behalf of Pechanga and the Allottees in accordance with this section; include the priority dates described in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree; and not be subject to forfeiture or abandonment.

2.4     Subject to the terms of this Agreement, the Act, the Fallbrook Decree, and applicable Federal law, Pechanga may use the Tribal Water Right for any purpose on the Pechanga Reservation.

2.5     Pechanga shall have the right, subject to applicable Federal law, to allocate water to all users on the Pechanga Reservation pursuant to the Pechanga Water Code and manage, regulate, and govern the use on the Pechanga Reservation of the Tribal Water Right in accordance with this Agreement.

2.6     Pechanga and the United States recognize that, pursuant to 25 U.S.C. § 381, Allottees within the Pechanga Reservation are entitled to a just and equitable allocation of water by Pechanga for irrigation and domestic purposes from the Tribal Water Right.

2.7     Pechanga and the United States shall not seek the enforcement of the Tribal Water Right in the Adjudication Proceeding for so long as this Agreement, including all of its Exhibits, remains in force and effect.  In the event that this Agreement, or any of its Exhibits, is terminated for any reason, other than expiration of a stipulated term for such agreement,  Pechanga and the United States shall have the right to seek enforcement of the Tribal Water Right without limitation.  In the event of termination, if Pechanga or the United States seek enforcement of the Tribal Water Right, RCWD shall have the right to unilaterally terminate the Amended GMA without further cause.

2.8     Notwithstanding Section 3, in the event that this Agreement, or any of its Exhibits, is terminated for any reason after the Enforceability Date, other than expiration of a stipulated term for such agreement, 1) the Tribal Water Right survives the termination of this Agreement, or any of its Exhibits, and 2) the RCWD Water Rights survives the termination of this Agreement, or any of its Exhibits but the United States and Pechanga shall be able to object to any use of water by RCWD that is not authorized by the otherwise ratified and confirmed RCWD Water Rights.

3.     **RCWD Water Rights.**

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

The Parties, including the United States, ratify, confirm, and declare to be valid the RCWD Water Rights.  Subject to Section 2.8(2) regarding possible objections to unauthorized water use, the United States and Pechanga, shall not object to, dispute, or challenge the RCWD Water Rights in the Adjudication Proceeding, or in any other judicial or administrative proceeding.

**4.     Amended and Restated Groundwater Management Agreement.**

Pechanga and RCWD have entered into the Amended GMA, which agreement shall be enforceable in accordance with its terms.

**5.     Recycled Water Agreements.**

**5.1**     Pechanga and EMWD have entered into the Recycled Water Agreement, which agreement shall be enforceable in accordance with its terms.

**5.2**     Pechanga and RCWD have entered into the Recycled Water Transfer Agreement, which agreement shall be enforceable in accordance with its terms.

**5.3**     Pechanga, RCWD and EMWD have entered into the Recycled Water Scheduling Agreement, which agreement shall be enforceable in accordance with its terms.

**5.4**     Pechanga, RCWD, and the United States have entered into the Recycled Water Infrastructure Agreement, which agreement shall be enforceable in accordance with its terms.

**6.     ESAA and Related Agreements.**

**6.1**     Pechanga, EMWD and MWD have entered into the Extension of Service Area Agreement, which agreement shall be enforceable in accordance with its terms.

**6.2**     Pechanga, RCWD, and the United States have entered into the ESAA Capacity Agreement, which agreement shall be enforceable in accordance with its terms.

**6.3**     Pechanga, EMWD and RCWD have entered into the ESAA Water Delivery Agreement, which agreement shall be enforceable in accordance with its terms.

**7.     Pechanga Water Code.**

**7.1**     No later than eighteen (18) months following the Enforceability Date, Pechanga shall enact a comprehensive water code governing the use of the Tribal Water Right. Any provisions of the Pechanga Water Code affecting the rights or interests of Allottees shall be

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

approved by the Secretary. The Secretary shall administer the Tribal Water Right until the Pechanga Water Code is enacted and required approvals are obtained from the Secretary, at which time Pechanga shall have authority, subject to the Secretary's authority under section 7 of the Act of February 8, 1887 (25 U.S.C. § 381), to manage, regulate and govern the use of the Tribal Water Right.  The Pechanga Water Code shall include, at a minimum, the following provisions, subject to the approval of the Secretary:

(a)     that allocations of water to Allottees shall be satisfied with water from the Tribal Water Right;

(b)     that charges for delivery of water for irrigation purposes for Allottees shall be assessed on a just and equitable basis;;

(c)     a process by which an Allottee may request that the Band provide water for irrigation or domestic purposes in accordance with the Act;

(d)     a due process system for the consideration and determination by the Band of any request by an Allottee (or any successor in interest to an Allottee) for an allocation of such water for irrigation or domestic purposes on allotted land, including a process for appeal and adjudication of any denied or disputed distribution of water and resolution of any contested administrative decision;

(e)     Pechanga's right to prohibit the severance of water rights from allotted lands;

(f)     conditions, limitations and permit requirements relating to the storage, recovery and use of any portion of the Tribal Water Right in accordance with this Agreement;

(g)     Pechanga's right to regulate the appurtenant right of allotted lands to an allocation of the Tribal Water Right, to ensure the use of such water on such allotted lands is reasonable and beneficial;

(h)     a requirement that any Allottee who seeks an authorization to divert or pump water, not otherwise reported by Pechanga, for use on his or her allotment install and maintain, at his or her expense, devices to measure and record such diversion or pumping, and that the Allottee use his or her best efforts to maintain such measuring and recording devices in accordance with industry standards; and

11

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

(i)       a requirement that the Allottee report to Pechanga at least quarterly the diversions or pumping measured and recorded with the devices required by <u>Section 7.1(h)</u>.

**7.2**       Nothing in this Agreement shall be construed to affect the right of an Allottee or any successor in interest to an Allottee to transfer, convey or lease pursuant and subject to all applicable Federal laws his or her interest in allotted lands, including appurtenant water rights, provided that such water rights remain appurtenant to such allotted lands.

**8.       <u>Waiver of Claims By Pechanga and the United States Acting in its Capacity as Trustee for Pechanga.</u>**

**8.1**       Subject to the retention of rights set forth in <u>Section 12</u>, in return for recognition of the Tribal Water Right and other benefits as set forth in the Act and this Agreement, Pechanga, and the United States, acting as trustee for Pechanga hereby waive and release all claims for water rights within the Santa Margarita River Watershed that Pechanga, or the United States acting as trustee for Pechanga, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Act and this Agreement.

**8.2**       Subject to the retention of rights set forth in <u>Section 12</u>, and notwithstanding any provisions to the contrary in this Agreement, Pechanga and the United States, on behalf of Pechanga and Allottees, fully release, acquit and discharge RCWD from the following Claims:

(a)       Claims for Injuries to Water Rights in the Santa Margarita River Watershed for land located within the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(b)       Claims for Injuries to Water Rights in the Santa Margarita River Watershed for land located within the Pechanga Reservation arising or occurring at any time after June 30, 2009 resulting from the diversion or use of water in a manner not in violation of this Agreement or the Act;

(c)       Claims for subsidence damage to land located within the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(d)       Claims for subsidence damage arising or occurring after June 30, 2009 to land located within the Pechanga Reservation resulting from the diversion of underground water in a manner consistent with this Agreement or the Act; and

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

(e)      Claims arising out of, or relating in any manner to, the negotiation or execution of this Agreement or the negotiation or execution of the Act.

**9.      Waiver of Claims By RCWD.**

**9.1**      Subject to the retention of rights set forth in <u>Section 13</u>, and in return for the ratification, confirmation and declaration to be valid of the RCWD Water Rights and other benefits, including the commitments by Pechanga and the United States as set forth in this Agreement and the Act, RCWD hereby waives and releases all claims for water rights within the Santa Margarita River Watershed that RCWD asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Fallbrook Decree.

**9.2**      Subject to the retention of rights set forth in <u>Section 13</u>, and in return for the ratification, confirmation and declaration to be valid of the RCWD Water Rights and other benefits, including the commitments by Pechanga and the United States as set forth in this Agreement and the Act, RCWD fully releases, acquits and discharges Pechanga and the United States (solely in its capacity as trustee on behalf of Pechanga and Allottees) from the following Claims:

(a)      Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(b)      Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time after June 30, 2009 resulting from the diversion or use of the Tribal Water Right or any other water in a manner not in violation of this Agreement or the Act;

(c)      Claims for subsidence damage to lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(d)      Claims for subsidence damage arising or occurring after June 30, 2009 to lands located outside the Pechanga Reservation resulting from the diversion of underground water in a manner not in violation of this Agreement or the Act; and

(e)      Claims arising out of or relating in any manner to the negotiation or execution of this Agreement or the negotiation or execution of the Act.

**10.      Waiver by the United States Acting in Its Capacity as Trustee for Allottees.**

13

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

Subject to the retention of rights set forth in <u>Section 12</u>, in return for recognition of the Tribal Water Right and other benefits as set forth in the Act and this Agreement, the United States, acting as trustee for Allottees hereby waives and releases all claims for water rights within the Santa Margarita River Watershed that the United States, acting as trustee for the Allottees, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in this Agreement and the Act..

11.   <u>Waiver by Pechanga as to the United States</u>.

Subject to the retention of rights set forth in <u>Section 12</u>, Pechanga hereby waives and releases:

(a)     all Claims against the United States (including the agencies and employees of the United States) relating to claims for water rights in, or water of, the Santa Margarita River Watershed that the United States, acting in its capacity as trustee for Pechanga, asserted, or could have asserted, in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Act and this Agreement;

(b)     all Claims against the United States (including the agencies and employees of the United States) relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses or injuries to hunting, fishing, gathering or cultural rights due to loss of water or water rights, claims relating to interference with, diversion or taking of water or water rights, or claims relating to failure to protect, acquire, replace, or develop water, water rights or water infrastructure) in the Santa Margarita River Watershed that first accrued at any time up to and including the enforceability date;

(c)     all Claims against the United States (including the agencies and employees of the United States) relating to the pending litigation of claims relating to Pechanga's water rights in the Adjudication Proceeding; and

(d)     all Claims against the United States (including the agencies and employees of the United States) relating to the negotiation or execution of this Agreement or the negotiation or execution of the Act.

12.   <u>Reservation of Rights and Retention of Claims by Pechanga and the United States</u>.

Notwithstanding the waivers and releases authorized in the Act and provided in this Agreement, Pechanga and the United States retain:

14

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016**

(a)      all Claims for enforcement of this Agreement and the Act;

(b)      all Claims against any person or entity other than the United States and RCWD, including claims for monetary damages;

(c)      all Claims for water rights that are outside the jurisdiction of the Adjudication Court;

(d)      all rights to use and protect water rights acquired on or after the date of enactment of the Act; and

(e)      all remedies, privileges, immunities, powers and Claims, including Claims for water rights, not specifically waived and released pursuant to the Act and this Agreement.

**13.      <u>Reservation of Rights and Retention of Claims by RCWD</u>.**

Notwithstanding the waivers and releases provided in this Agreement, RCWD retains:

(a)      all Claims for enforcement of this Agreement and the Act;

(b)      all Claims against persons other than the Parties;

(c)      all Claims for water rights that are outside the jurisdiction of the Adjudication Court;

(d)      all rights to use and protect water rights acquired on or after the date of enactment of the Act; and

(e)      all remedies, privileges, immunities, powers and Claims, including Claims for water rights, not specifically waived and released pursuant to the Act and this Agreement.

**14.      <u>Limitation of Effect</u>.**

Nothing in this Agreement or the Act:

(a)      affects the ability of the United States, acting as sovereign, to take actions authorized by law, including any laws relating to health, safety, or the environment, including—

(i)   the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);

15

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

(ii)  the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

(iii)  the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

(iv)  any regulations implementing the Acts described in subparagraphs (i) through (iii);

(b)  affects the ability of the United States to take actions acting as trustee for any other Indian Tribe or an Allottee of any other Indian tribe;

(c)  confers jurisdiction on any State court—

(i)  to interpret Federal law regarding health, safety, or the environment;

(ii)  to determine the duties of the United States or other parties pursuant to Federal law regarding health, safety, or the environment; or

(iii)  to conduct judicial review of Federal agency action; or

(d)  waives any claim of a Member of Pechanga in an individual capacity that does not derive from a right of Pechanga;

(e)  limits any funding that RCWD would otherwise be authorized to receive under any federal law, including the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h et seq.) as that Act applies to permanent facilities for water recycling, demineralization, and desalination, and distribution of nonpotable water supplies in Southern Riverside County, California;

(f)  characterizes any amounts received by RCWD under this Agreement or the Act as Federal for purposes of section 1649 of the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h-32); or

(g)  affects the requirement of any Party to this Agreement or any of the Exhibits thereto to comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or the California Environmental Quality Act prior to performing the respective obligations of that Party under this Agreement or any Exhibits to this Agreement.

## 15.  Replacement, Substitution and Satisfaction.

16

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

**15.1**    The benefits realized by Pechanga and Allottees under this Agreement and the Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims of Pechanga against the United States that are waived and released pursuant to this Agreement and the Act.

**15.2**    The benefits realized by the Allottees under this Agreement and the Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims that are waived and released pursuant to this Agreement and the Act and any Claims of the Allottees against the United States that the Allottees have or could have asserted that are similar in nature to any claim described in this Agreement or the Act.

**15.3**    Any entitlement of Pechanga or the United States on behalf of Pechanga and Allottees to water for lands located within the Pechanga Reservation shall be satisfied out of the Tribal Water Right and other benefits granted, confirmed or recognized by Pechanga and the United States on behalf of Pechanga and Allottees by this Agreement and in the Act.

**16.**    **Settlement Coordination Committee.**

**16.1**    The Parties shall establish the Settlement Coordination Committee to coordinate the activities, actions and obligations established by this Agreement and in the Act.

**16.2**    The Settlement Coordination Committee shall be comprised of one (1) individual designated in writing by each Party.  Each Party shall provide written notice to all other Parties of the individual designated to represent such Party on the Settlement Coordination Committee.

**16.3**    The Settlement Coordination Committee shall meet regularly and in the first ten (10) years after the date of enactment of the Act, shall meet no less than every six (6) months. The first meeting shall be held within six (6) months of the date of enactment of the Act.

**16.4**    The Chair of the Settlement Coordination Committee shall rotate among members every twelve (12) months.  The first Chair of the Settlement Coordination Committee shall be the individual designated by Pechanga as its representative to the Settlement Coordination Committee.

**17.**    **Other Provisions.**

**17.1**    **Other Tribes Not Adversely Affected.**  Nothing in this Agreement quantifies or diminishes any land or water right, or any Claim or entitlement to land or water, of an Indian tribe, band, or community other than Pechanga.

17

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

**17.2    Entire Understanding.**  This Agreement constitutes the entire understanding among the Parties.  Evidence of conduct or statements made in the course of negotiating this Agreement, including, but not limited to previous drafts of this Agreement, is inadmissible in any legal proceedings other than one for approval or confirmation of this Agreement.

**17.3    Modifications to Agreement and Amendments to Exhibits.**  No modification of this Agreement shall be effective unless it is in writing, signed by all Parties, and is approved by the Adjudication Court.  Notwithstanding the foregoing, Exhibits to this Agreement may be amended by the parties to such Exhibits in accordance with their terms, without court approval, unless such approval is required in the Exhibit or by law; provided, however, that no amendment of any Exhibit may violate any provisions of the Act, or this Agreement, or adversely affect the rights under this Agreement of any Party who is not a signatory of such an amendment.

**17.4    Venue.**  Any Party shall have the right to petition the Adjudication Court for such declaratory or injunctive relief as may be necessary to enforce the terms, conditions, and limitations of this Agreement and monetary relief as provided for in this Agreement.

**17.5    Governing Law.**  This Agreement shall be construed in accordance with applicable Federal law.

**17.6    Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

**17.7    Anti-Deficiency Act.**  The expenditure or advance of any money or the performance of any obligation by the United States, in any of its capacities, under this Agreement shall be contingent upon appropriation of funds therefor.  No liability shall accrue to the United States, in any of its capacities, in the event funds are not appropriated.

**17.8    No Benefit to Members of Congress or Resident Commissioners.**  No member of or delegate to Congress or Resident Commissioner shall be admitted to any share of this Agreement or to any benefit that may arise herefrom. This restriction shall not be construed to extend to this Agreement if made with a corporation or company for its general benefit.

**17.9    Federal Authority.**  Public Law ___ is the Act that authorizes the Federal action required to carry out this Agreement. If any amendment of the Act is enacted prior to the Enforceability Date that materially and adversely affects a Party's rights or interests under this Agreement without the written consent of that Party, then that Party, upon its written notice to all other Parties, shall be relieved of its rights, obligations, and entitlements hereunder; provided, however, that such written notice must be given no later than the Enforceability Date.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

**17.10  Notices.**  All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by U.S. mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the U.S. mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:                       Mark Macarro
                                      Chairman
                                      Pechanga Band of Luiseño Indians
                                      P.O. Box 1477
                                      Temecula, CA 92593

                                      With a copy to:

                                      General Counsel
                                      Pechanga Band of Luiseño Indians
                                      P.O. Box 1477
                                      Temecula, CA 92593

                                      And to:

                                      Donald R. Pongrace
                                      Akin Gump Strauss Hauer & Feld LLP
                                      1333 New Hampshire Avenue, NW
                                      Suite 400
                                      Washington, DC 20036

If to the United States:              _____
                                      _____
                                      _____

If to RCWD:                           General Manager
                                      Rancho California Water District
                                      42135 Winchester Road
                                      Temecula, CA 92590

                                      And to:

19

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

James Gilpin
Best Best & Krieger LLP
655 West Broadway
15th Floor
San Diego, CA 92101

**17.11   Obligation to Seek Approval and Enforceability of Agreement.**

(a)     The Parties shall cooperate in seeking approval of this Agreement by the Adjudication Court by jointly filing in the Adjudication Proceeding a proposed judgment and decree in substantially the same form as Appendix 2 to this Agreement.

(b)     Each Party shall have the obligation to work in good faith to satisfy the conditions set forth in section 7(e) of the Act.

(c)     Except as provided in Sections 17.11(a) and (b) and in certain Exhibits, no Party, by reason of its execution of this Agreement, shall be required to perform any of the obligations or be entitled to receive any of the benefits under this Agreement until the Enforceability Date.

**17.12   Authority to Execute.**  By signing this Agreement each signatory represents and warrants that he or she has the authority to execute it.  Without limitation of the foregoing, RCWD represents that it has full authority under each Agency Agreement to bind the property owner that is party to such Agency Agreement to this Agreement, and RCWD shall, and hereby does, indemnify, defend and hold harmless Pechanga and the United States against any Claim asserted by any such property owner and arising from or in connection with this Agreement.

**17.13   Duplicate Originals and Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which, when taken together, shall constitute one and the same instrument. This Agreement also may be executed in duplicate originals, each of which shall constitute an original Agreement.

20

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

PECHANGA SETTLEMENT AGREEMENT
CONFIDENTIAL DRAFT
May 24, 2016

**IN WITNESS WHEREOF,** the Parties have executed this Agreement dated as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By:_____
        Tribal Chairman
Date:_____

Approved as to form:        By:_____

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
        General Manager
Date:_____

Approved as to form:        By:_____
        General Counsel

**UNITED STATES OF AMERICA, U.S. DEPARTMENT OF THE INTERIOR**

By: _____

Subscribed and sworn before me this ____ day of _____ 2014,

        By _____

        _____
SEAL        Notary
        My commission expires:_____

21

## AMENDED AND RESTATED
## GROUNDWATER MANAGEMENT AGREEMENT

THIS AMENDED AND RESTATED GROUNDWATER MANAGEMENT AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016, by and between the **PECHANGA BAND OF LUISEÑO MISSION INDIANS**, a federally recognized Indian Tribe ("*Pechanga*"), which term shall include all individuals and governmental bodies having authority over the assumption or performance of obligations, or the exercise of rights, by Pechanga hereunder) and **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code Section 34000, *et seq.* ("*RCWD*"), which term shall include all property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

## RECITALS

A.    Pechanga and RCWD entered a "Groundwater Management Agreement", dated December 21, 2006, governing the terms and conditions pursuant to which they will jointly manage groundwater pumping from the Wolf Valley Groundwater Basin in a manner that does not exceed safe yield and that protects groundwater resources in the Wolf Valley Groundwater Basin for present and future uses (the "*Original Agreement*").

B.    Pechanga and RCWD agree that the increasing groundwater salinity in the Wolf Valley Groundwater Basin is a matter of increasing concern for water users in the Wolf Valley Groundwater Basin.

C.    Under the Act, Congress has authorized a portion of the authorized appropriations to be used by Pechanga to cooperatively develop groundwater desalination activities with RCWD in the Wolf Valley Groundwater Basin in order to mitigate the potential for even higher salinity in the Wolf Valley Basin as a result of the Pechanga Settlement Agreement and its exhibits and activities authorized thereunder.

D.    Pechanga and RCWD now desire to amend the Original Agreement to re-define the basis of each Party's Annual Entitlement for purposes of allocation of the Safe Yield; memorialize the initial determination of the Safe Yield; provide for periodic review of the Safe Yield in the future; and cooperatively develop groundwater desalination activities, among other purposes.

E.    The intention of the Parties is that, in order to facilitate contract administration, the present Agreement serve as an amendment and restatement of the Original Agreement modified in conformity with section 9.13 of the Original Agreement, such modifications to take effect as from the Amendment Effective Date.

## **AGREEMENT**

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

**1.**     **Definitions.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"*AAA*" has the meaning set forth in <u>Section 6.5</u>.

"*AAA Rules and Procedures*" has the meaning set forth in <u>Section 6.5</u>.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlement Act, Public Law No. _____.

"*AFY*" means acre-feet per Year.

"*Agency Agreement*" means a recorded document by which a real property owner of land located within the RCWD service area has assigned the right to manage any water rights appurtenant to such owner's real property to RCWD for the benefit of all RCWD customers.

"*Amendment Effective Date*" means the date on which the Secretary of the Interior publishes in the Federal Register the statement of findings described in section 7(e) of the Act;

"*Annual Energy Index*" means the percentage determined by dividing: (a) the electrical energy costs, expressed in cost per kilowatt hour, incurred by RCWD for electric energy it purchases for groundwater pumping in the Year just prior to the Year for which the Annual Energy Index is being calculated, by (b) the electrical energy costs, expressed in cost per kilowatt hour, incurred by RCWD for electric energy it purchases for groundwater pumping in the Year that is two (2) Years prior to the Year for which the Annual Energy Index is being calculated.

"*Annual Entitlement*" has the meaning set forth in <u>Section 2.1</u>.

"*Available Aquifer Capacity*" means the capacity within the Wolf Valley Basin for additional groundwater storage as determined from time to time by the Technical Committee pursuant to <u>Section 3.5.2</u>.  For each of the first five (5) Years commencing with the Year in which the Amendment Effective Date occurs, the Available Aquifer Capacity shall be eight thousand (8,000) acre feet.

"*Carryover Account*" means an account established by each Party to account for the amount of their respective unused Annual Entitlement, if any, from Year to Year.

"*Decision*" has the meaning set forth in Section 3.4.

"*Delivered Groundwater*" has the meaning set forth in Section 2.2. "*Delivered Groundwater Charge*" has the meaning set forth in Section 2.2.4. "*Delivered Groundwater Facilities*" means those facilities required for RCWD to transport and deliver Delivered Groundwater to Pechanga, as specified in Exhibit A-1.

"*Delivered Groundwater Facilities Site*" means any area on which the Delivered Groundwater Facilities will be located, including reasonable lay down areas, as delineated in Exhibit A-2.

"*Delivery Point*" means any point or points at which Delivered Groundwater is delivered to Pechanga under this Agreement.  The initial Delivery Point shall be as specified in Exhibit A-1.

"*Dispute*" has the meaning set forth in Section 6.1.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*ESAA Capacity Agreement*" means the "ESAA Capacity Agreement", between Pechanga, RCWD, and the United States which is hereby incorporated by reference. A copy of the *ESAA Capacity Agreement* is attached to the Pechanga Settlement Agreement as exhibit G.

"*ESAA Water Delivery Agreement*" means the "ESAA Water Delivery Agreement" among Pechanga, RCWD and EMWD.

"*Exhibit*" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference.

"*Extension of Service Area Agreement*" means the "Extension of Service Area", among Pechanga, EMWD, and MWD for the provision of water service by EMWD to a designated portion of the Pechanga Reservation using water supplied by MWD, which is hereby incorporated by reference. A copy of the Extension of Service Area Agreement is attached to the Pechanga Settlement Agreement as exhibit F.

"*Fallbrook Decree*" means the "Modified Final Judgment And Decree", entered in *United States v. Fallbrook Public Utility District,* Civ. No. 1247-SD-C, on April 6, 1966.  The

term "Fallbrook Decree" includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30 issued on March 8, 1962, Interlocutory Judgment No. 35 issued on May 8, 1962, and Interlocutory Judgment No. 41 issued on November 8, 1962.

"*Granitic Wells*" means wells constructed for purposes of extracting water from granitic material which the Parties have agreed are pumping water from the "basement complex" of the Wolf Valley Groundwater Basin as defined in the Fallbrook Decree and, accordingly, do not affect the Safe Yield.

"*Groundwater Records*" has the meaning set forth in Section 4.3.

"*Groundwater Reports*" has the meaning set forth in Section 4.1.

"*Imported Water*" means any water delivered to Pechanga pursuant to the Extension of Service Area Agreement and the ESAA Water Delivery Agreement.

"*Mediation Procedures*" has the meaning set forth in Section 6.2.

"*Month*" means a calendar Month.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Ch. 209, as amended).

"*MWD Shortage Allocation*" means an action to apportion water pursuant to section 350 of the California Water Code.

"*Original Agreement*" has the meaning set forth in Recital A.

"*Original Effective Date*" means December 21, 2006.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Annual Usage*", with respect to any Year, means the sum of (a) the amount of groundwater pumped by Pechanga from the Basin during such Year, plus (b) the amount of Delivered Groundwater delivered to Pechanga by RCWD pursuant to this Agreement during such Year.

"*Pechanga Settlement Agreement*" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement, together with the exhibits thereto.  The parties to

the Pechanga Settlement Agreement are the Pechanga Band of Luiseño Mission Indians and its members, the United States on behalf of the Band and its members, and RCWD.

"**RCWD**" means the Rancho California Water District organized pursuant to California Water Code section 34000 *et seq.* and includes all real property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

"**RCWD Annual Usage**", with respect to any Year, means the remainder of (a) the total amount of groundwater pumped by RCWD from the Basin during such Year, *minus* (b) the amount of Delivered Groundwater delivered to Pechanga by RCWD pursuant to this Agreement during such Year.

"**RCWD Facility Requirements**" means the document entitled "Rancho California Water District Water System Facility Requirements," dated August 1, 1991, a copy of which is attached as Exhibit A-5.

"**Recycled Water Agreement**" means the "Recycled Water Agreement (Agreement No. 04-07)," dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water Agreement (Agreement No. 04-07)," between Pechanga and EMWD, providing for the sale and purchase of recycled water, which is hereby incorporated by reference. A copy of the Recycled Water Agreement is attached to the Pechanga Settlement Agreement as exhibit B.

"**Recycled Water Infrastructure Agreement**" means the "Recycled Water Infrastructure Agreement", among Pechanga, RCWD, and the United States, which is hereby incorporated by reference. A copy of the Recycled Water Infrastructure Agreement is attached to the Pechanga Settlement Agreement as exhibit E.

"**Recycled Water Scheduling Agreement**" means the "Recycled Water Scheduling Agreement," among Pechanga, EMWD, and RCWD, which is hereby incorporated by reference. A copy of the Recycled Water Scheduling Agreement is attached to the Pechanga Settlement Agreement as exhibit D.

"**Recycled Water Transfer Agreement**" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD, which is hereby incorporated by reference. A copy of the Recycled Water Transfer Agreement is attached to the Pechanga Settlement Agreement as exhibit C.

"**Representative**" has the meaning set forth in Section 3.1.

"**Reservation**" means the reservation of the Pechanga Band of Luiseño Mission Indians, as depicted in the map attached as Exhibit A-3.

"**Right of Way**" means RCWD's easements and rights of way on which the Delivered Groundwater Facilities Site will be located, as delineated in Exhibit A-2.

"*Safe Yield*" means the best professional estimate, following a comprehensive review and analysis of the best available groundwater, hydrologic, and climatic data for the Basin, of the amount of groundwater available for pumping from the Basin in any given Year without causing an undesirable result.

"*Section*" means a section or subsection of this Agreement.

"*Technical Committee*" means the committee of technical experts appointed by the Parties pursuant to Section 3.1.

"*Term*" has the meaning set forth in Section 10.1.

"**Watermaster**" means the Santa Margarita Watermaster, appointed in the case of *United States v. Fallbrook Public Utility District,* Civ. No. 3:51-cv-01247 (S.D.C.A.).

"*Wolf Valley Groundwater Basin*" or "*Basin*" means that groundwater located beneath Wolf Valley as more definitely depicted in Exhibit A-4**.**

"*Year*" means a calendar year of January through December.

## 2.    Annual Entitlements from the Basin.

**2.1**    **Annual Entitlement.**  The combined amount of groundwater pumped from the Basin by the Parties in any Year shall not exceed the Safe Yield. In any given Year, each Party shall be entitled to pump no more than its respective percentage share of the Safe Yield, as follows:

RCWD --    twenty-five percent (25%); and

Pechanga --    seventy-five percent (75%);

such respective share of the Safe Yield for each Party being its "*Annual Entitlement*" for purposes of this Agreement.

**2.1.1**    For each of the first five (5) Years commencing with the Year in which the Amendment Effective Date occurs, the Safe Yield shall be two thousand one hundred (2,100) AFY.

**2.1.2**    Prior to expiration of the five (5) Year period specified in Section 2.1.1, and prior to expiration of each period of three (3) Years thereafter, for the duration of the Term, the then-current Safe Yield shall be verified or re-determined for purposes of the ensuing three (3) Year period by Decision of the Technical Committee and notified to the Parties.

       **2.1.3**   Water pumped from Granitic Wells shall not be included in determining a Party's usage of its Annual Entitlement.  Granitic Wells being operated by Pechanga as of the date of this Agreement are specified in <u>Exhibit A-7</u>.

       **2.2**     <u>**Delivered Groundwater.**</u>   In lieu of actually pumping groundwater itself from the Basin, Pechanga may request RCWD to pump its Annual Entitlement, or any portion thereof, and deliver such water directly to Pechanga, pursuant to Water Code sections 1810 *et seq*. ("***Delivered Groundwater***"); <u>provided,</u> <u>however,</u> that during the "Interim Capacity" as that term is defined in the ***ESAA Capacity Agreement***, RCWD shall not be required to deliver Imported Water and Delivered Groundwater, combined, at a rate in excess of three thousand one hundred (3,100) gallons per minute.  Any amount of Delivered Groundwater shall not exceed and shall be subtracted from Pechanga's Annual Entitlement, and shall not be charged against RCWD's Annual Entitlement.  With respect to Delivered Groundwater, the following shall apply:

       **2.2.1**   Delivered Groundwater shall be delivered by RCWD to Pechanga at the Delivery Point specified in <u>Exhibit A-1</u>.  Pechanga shall have the right at any time to designate other Delivery Points on the Reservation for purposes of delivery and receipt of Delivered Groundwater, subject to the following –

       (a)     Any new facilities constructed for purposes of any new Delivery Point shall be Delivered Groundwater Facilities for purposes of this Agreement, all other defined terms herein which relate to Delivered Groundwater Facilities shall be construed as referring to such new facilities, and <u>Exhibit A-1</u> and <u>Exhibit A-2</u> shall be modified or supplemented as required to reflect the scope and siting of, and any known additional approvals required for, the new Delivered Groundwater Facilities.

       (b)     This Agreement shall govern Pechanga's and RCWD's rights and obligations with respect to construction and use of such new Delivered Groundwater Facilities.  Without limitation of the foregoing, Pechanga shall be responsible for all Delivered Groundwater Facilities Costs incurred with respect to any new Delivered Groundwater Facilities required to be constructed for purposes of establishing any new Delivery Point.  Any new Delivered Groundwater Facilities shall be constructed and installed in compliance with the RCWD Facility Requirements, as they may have been amended at the time of such construction and installation.

       (c)     Pechanga, with RCWD's cooperation and assistance, shall obtain any approvals required for construction, ownership, and operation of new Delivered Groundwater Facilities required for establishment of a new Delivery Point.

       **2.2.2**   RCWD's obligation to deliver Delivered Groundwater to Pechanga pursuant to <u>Section 2.3 sha</u>ll not commence until the Delivered Groundwater Facilities have been completed and accepted by RCWD in accordance with <u>Section 5.1.</u>

       **2.2.3**   All Delivered Groundwater shall meet the same water quality standards applicable to any delivery of water by RCWD to any customer similarly situated to Pechanga.

     **2.2.4**     For each acre-foot of Delivered Groundwater actually delivered to Pechanga, Pechanga shall pay to RCWD an amount (the "***Delivered Groundwater Charge***"), being the sum of a fixed component and a variable component, determined as follows:

     (a)     During 2006 and 2007, the fixed component amount was $56.00. In each Year thereafter, the fixed component shall be adjusted by a percentage amount equal to the percentage change in the U.S. Department of Labor, Bureau of Labor Statistics Consumer Price Index for the previous Year.

     (b)     During 2006 and 2007, the variable component amount was $129.00. In each Year thereafter, the variable component shall equal the well production costs set by RCWD for customers in Pressure Zone 1305.

     **2.3**     RCWD shall deliver a statement to Pechanga with respect to Delivered Groundwater and delivered Imported Water by the tenth (10th) business day of each Month. With respect to Delivered Groundwater and Imported Water delivered during the preceding Month, the statement shall set forth (i) the amount of Delivered Groundwater; (ii) the amount of delivered Imported Water; and (iii) the aggregate Delivered Groundwater Charge. Each statement shall be accompanied by such information as is necessary to enable Pechanga reasonably to determine the accuracy of the statement.

     **2.3.1**     Payments by Pechanga of amounts rightfully payable to RCWD as set forth in a statement rendered pursuant to  this Section 2.3 will  be made to RCWD no later than thirty (30) business days after the date of the statement. Payment shall be made by wire transfer to such bank account as may be designated in writing from time to time by RCWD, or by such other means as is mutually acceptable to the Parties.

     **2.3.2**     In the event either Party discovers a discrepancy with respect to any statement, such Party shall promptly advise the other Party of such discrepancy. Adjustments for such discrepancies will be reflected on the next statement issued following verification of such discrepancy, but in no event, except in cases of fraud, will an adjustment be made for discrepancies discovered more than thirty-six (36) Months following the date of issuance of the relevant invoice.

     **2.3.3**     Subject to the provisions of Section 2.3.4:

     (a)     Following commencement of deliveries of Delivered Groundwater, RCWD shall not have the right unilaterally to interrupt or suspend deliveries of Delivered Groundwater to Pechanga in the absence of a final arbitral award issued in accordance with Section 6 permitting such interruption or suspension.

     (b)     Notwithstanding the provisions of Section 2.3.3(a), RCWD shall have the right to interrupt deliveries of Delivered Groundwater to the extent required to address emergencies involving, or to undertake repairs or maintenance to, the Delivered Groundwater Facilities or other facilities on RCWD's system. RCWD shall notify Pechanga (i) in advance, promptly following the

scheduling of any repairs or maintenance that will cause an interruption of deliveries, and (ii) as soon as reasonably possible following an emergency that has caused an interruption of deliveries.

    **2.3.4**   In the event that RCWD receives written notice from MWD or EMWD objecting to RCWD's delivery of Delivered Groundwater or ESAA Water to Pechanga as being in violation of MWD's statutory authority and its rules and regulations, the following provisions shall apply:

    (a)   RCWD shall provide a copy of such written notice to Pechanga and shall cooperate with Pechanga in an effort to resolve the issue with MWD, including taking any procedural steps permitted under MWD's rules and regulations to appeal, protest or otherwise address the objection of MWD.

    (b)   Pechanga reserves the right at all times to litigate the right of RCWD to continue delivering Delivered Groundwater or Imported Water under the terms of this Agreement or the Extension of Service Area Agreement.  RCWD (i) will not take any action that may prejudice any right of Pechanga to challenge a determination of MWD that RCWD's delivery of Delivered Groundwater under this Agreement or Imported Water under the Extension of Service Area Agreement is in violation of MWD's statutory obligations or rules and regulations, and (ii) will comply with any final judgment affirming RCWD's right to deliver Delivered Groundwater to Pechanga under this Agreement or Imported Water under the Extension of Service Area Agreement.

    (c)   RCWD shall continue deliveries of Delivered Groundwater hereunder and Imported Water under the Extension of Service Area Agreement unless and until the earlier of (i) its having received Pechanga's written notification that Pechanga will not challenge (or will not continue to challenge) MWD's determination, or (ii) in the event Pechanga does challenge such determination, issuance of a final judicial determination (following completion of all appeals or expiration of the time for filing appeals) that RCWD does not have the right to continue deliveries of Delivered Groundwater in accordance with this Agreement or Imported Water under the Extension of Service Area Agreement.

    (d)   In the event deliveries of Delivered Groundwater are discontinued pursuant to Section 2.3.4(c):

        (i)   Pechanga shall have the right to take groundwater directly from an RCWD well, upon payment of the costs of connecting thereto; and

        (ii)   provisions of this Agreement will be amended as required to accommodate implementation of such Groundwater source.

    **2.4**   **Pechanga Estimate of Pumping, Delivered Groundwater, and Imported Water Needs.**

    **2.4.1**  During the Term, Pechanga shall cause to be prepared and delivered to RCWD by the first (1st) business day of each Month, a good-faith estimate of:

(a)     the amount of groundwater that Pechanga anticipates it will pump during the then current Month;

(b)     the amount of Delivered Groundwater that Pechanga anticipates it will need delivered by RCWD during the then current Month; and,

(c)     the amount of Imported Water that Pechanga anticipates it will need delivered by RCWD during the then current Month.

**2.4.2**   Pechanga shall have no liability to RCWD related to the development by Pechanga or the use by RCWD of such estimates. RCWD shall be entitled to rely on such estimates of Pechanga for purposes of estimating the amount of groundwater from the Wolf Valley Groundwater Basin that is available for RCWD annual usage during such Year. Any RCWD excess pumping or Pechanga excess pumping resulting from reliance on such estimates shall be subject only to reconciliation pursuant to Section 9 and without reference to Pechanga's estimates provided pursuant to Section 2.4.1 with respect to the relevant Year.

3.    **Technical Committee.**

**3.1**    **Composition.**   A committee of technical experts shall be appointed by the Parties to carry out the responsibilities set forth in this Section 3 (the "***Technical Committee***"). The Technical Committee shall be composed of (a) two (2) persons, one (1) each to be appointed by Pechanga and RCWD, each respectively to serve as the appointing Party's voting representative (each a "***Representative***"), and (b) any other persons appointed by either Party to participate in the Technical Committee meetings on such Party's behalf; provided, however, that only the Representative for each Party shall be authorized to present that Party's position or vote on that Party's behalf with respect to any matter on which the Technical Committee may have to decide. Each Representative shall have one (1) vote. In the event that the position of a Technical Committee member shall fall vacant due to the removal or resignation of such member, such vacancy shall be filled promptly by the appointing Party.  If a Representative is unable to perform or is prevented from performing his or her duties, the Party having appointed such Representative shall temporarily designate  an               alternate Representative.

**3.2**      **Cooperation.**  The Parties and their representatives shall cooperate in good faith in Technical Committee deliberations and shall supply any information necessary, or requested by the Technical Committee, to facilitate the reaching of agreement and making of Decisions regarding the matters within the responsibility of the Technical Committee as specified in Section 3.5.  The Technical Committee shall use all reasonable efforts to reach agreement on the matters within its responsibility under Section 3.5.   _____

**3.3**     **Meetings.**  The Technical Committee shall hold a minimum of one (1) regular meeting every twelve (12) Months during the Term, at such time and place as shall be agreed by the Representatives, and at which meeting matters subject to Decision under this Agreement, or matters otherwise referred to the Technical Committee for Decision, shall be considered. Either Party may request that an extraordinary meeting of the Technical Committee be held at any other time, upon notice given to the other Party given at least ten (10) business days prior to such meeting and specifying the matter or matters to be considered.  The Parties shall

cooperate in good faith to schedule meetings of the Technical Committee at which, at a minimum, both Representatives will be present.  Meetings of the Technical Committee shall be chaired alternately by the respective Representatives.

       **3.4**      **Decisions.**   Any approval, recommendation, decision or other action  of  the Technical Committee (a "***Decision***") shall be by unanimous vote of the voting Representatives. A Decision shall be final if the voting Representatives of both Parties accept such Decision in a written statement signed by such Representatives and delivered to each Party. Such written statement shall include all policies adopted by the Technical Committee and other documentation relevant to the Technical Committee's Decision. In the event that the voting Representatives are unable to reach agreement on any issue on which the Representatives are required to make a Decision, either Party may seek binding arbitration of such issue pursuant to the provisions set forth in <u>Section 6</u>.

       **3.5**      **Areas of Responsibility.**   The Technical Committee shall make Decisions regarding and be responsible for:

          **3.5.1**   considering and verifying or re-determining the Safe Yield at such times as are specified in <u>Section 2.1.2</u>;

          **3.5.2**   considering and verifying or re-determining  the Available  Aquifer Capacity; and

**3.5.3**   any other actions or studies assigned to it upon the joint request of the Parties in writing from time to time.

**3.6**   **Costs.**  Each Party shall bear the costs and expenses (a) associated with the participation of its respective Representative and other designees attending meetings of or otherwise assisting the Technical Committee, and (b) representing one-half of the costs and expenses incurred by the Technical Committee resulting from the conduct of its affairs and the fulfillment of its obligations under Section 3.5.

## 4.   **Reporting; Record-Keeping.**

**4.1**   **Monthly Groundwater Reports.**  During the Term and in accordance with the current reporting policies established by the Technical Committee from time to time, each Party shall cause to be prepared and delivered to the other Party reasonably detailed Monthly reports, based on information available to such Party, regarding quantities of Basin groundwater pumped, delivered, received or used by such Party during the preceding Month and the water levels in wells pumped during the preceding Month ("*Groundwater Reports*").  The Groundwater Report prepared by Pechanga shall include a denomination of the amount of Imported Water and the amount of Delivered Groundwater delivered during the previous month.   Each Party shall Deliver its Groundwater Report to the other Party on or before the fifteenth (15th) day of the Month following the Month (or partial Month) to which such Groundwater Report relates. Each Party shall provide a copy of each of its reports to the Watermaster for his information. All statements of groundwater amounts pumped from the Basin shall be stated both in the aggregate and separately for each pumping site.

**4.2**   **Annual Groundwater Reports.**  During the Term each Party shall cause to be prepared and delivered to the other Party and to the Watermaster, by the thirtieth (30th) day of April of each Year, an annual report providing a summary of the information provided in the Groundwater Reports pursuant to Section 4.1 herein for the preceding Year.

**4. 3**   **Groundwater Records.**  During the Term each Party shall maintain accurate books of account and records of its groundwater testing, delivery (including  invoicing), pumping, or receipt (including records of payment) ("*Groundwater Records*").   Copies of any compilations and of all such Groundwater Records shall be retained until the end of the third full Year following the Year in which such compilation was created.  All the Groundwater Records shall be the property of the Party that keeps such Groundwater Records.   All Groundwater Records of each Party shall be made available to the other Party upon two (2) business days' notice, at the place of business of the Party keeping such Groundwater Records, during the Term and until the end of the third full Year following the Year in which any permitted termination of this Agreement occurs, for examination, audit, inspection, and copying (at no expense to the Party keeping such Groundwater Records) solely for purposes of confirming the due performance of this Agreement and for no commercial purpose.

## 5.   **Construction of Water Delivery Infrastructure.**

**5.1**   **Requirements and Procedures.**  Design, engineering, construction, installation, and transfer of new Delivered Groundwater Facilities shall be undertaken in accordance with,

and be governed by, the RCWD Facility Requirements and such agreements as are entered by the Parties in compliance therewith.  Notwithstanding application of the RCWD Facility Requirements, however, the Parties intend that the following provisions shall apply:

(a)    RCWD undertakes to issue a "Notice to Proceed" in accordance with the construction agreement entered pursuant to the RCWD Facility Requirements without undue delay once applicable conditions precedent are met.

(b)    Pechanga may select vendors, suppliers and contractors for procurement, design, engineering, construction, and installation of the Delivered Groundwater Facilities in its discretion; provided, however, that the terms of agreements with such contractors are consistent with the RCWD Facility Requirements and, provided, further, that Pechanga shall be primarily responsible to RCWD for the conduct of such contractors while on the Delivered Groundwater Facilities Site or elsewhere on the Right of Way.

(c)    RCWD shall provide, or cause to be provided to, Pechanga and its contractors access to the Right of Way and to the Delivered Groundwater Facilities Site for purposes of completion of the Delivered Groundwater Facilities.

(d)    Pechanga and RCWD each shall appoint a representative who has primary responsibility for communications and approvals concerning all matters relating to completion of the Delivered Groundwater Facilities.

(e)    Inspections by RCWD of completed Delivered Groundwater Facilities that must be undertaken to verify compliance with the RCWD Facility Requirements shall be undertaken without undue delay.

(f)    Upon successful completion of inspections verifying compliance of the Delivered Groundwater Facilities with the RCWD Facility Requirements, RCWD shall issue the "Notice of Completion" in accordance with the construction agreement entered pursuant to the RCWD Facility Requirements, and transfer of the Delivered Groundwater Facilities to RCWD shall be completed, without undue delay; provided, however, that subparagraph 5D of the form of Water System Construction Agreement included as "Appendix L" to the RCWD Facility Requirements shall not apply, and Pechanga shall not be required to enter an Agency Agreement with RCWD as a condition to issuance of the "Notice of Completion" or for any other purpose.

(g)    Subject only to the provisions of Section 2.2.1, on and after transfer of the Delivered Groundwater Facilities to RCWD, Pechanga will have no further obligation to RCWD to construct and pay for additional facilities for the delivery of Delivered Groundwater, or to repair, maintain, or replace the Delivered Groundwater Facilities.

**5.2    Interpretation of Documents.**  It is intended that the provisions of Section 5.1 be construed in harmony with the RCWD Facility Requirements. In the event of a conflict between the terms of the RCWD Facility Requirements and the provisions of Section 5.1, the provisions of Section 5.1 shall prevail.  In any event, the provisions of Article 6 of this Agreement shall apply to any disputes arising between the Parties under or in connection with the RCWD Facility Requirements.

6.      **Dispute Resolution.**

6.1      **Amicable Resolution.**  The Parties agree to attempt to resolve all claims, disputes, controversies, or other matters in question between the Parties arising out of, or relating to, this Agreement, including the deliberation, action, or activity of the Technical Committee ("***Dispute***"), promptly, equitably and in a good faith manner.

6.2      **Mediation of Technical Committee Disputes.**  Notwithstanding any other provision of this <u>Section 6</u>, with respect to any Dispute concerning the determination of Safe Yield or Available Aquifer Capacity by the Technical Committee or any other matter assigned to the Technical Committee by or pursuant to this Agreement, before submitting such Dispute to arbitration, the Parties agree first to try in good faith to settle the dispute by requesting that the Watermaster serve as a mediator to resolve the Dispute by applying the process and rules of the Commercial Mediation Procedures of the American Arbitration Association ("***Mediation Procedures***").  If the Watermaster refuses or is unable to serve as a mediator, the Parties agree that either Party may submit the matter for mediation by the American Arbitration Association pursuant to the Mediation Procedures. If, under the Mediation Procedures, the mediator or either Party terminates the mediation of such Dispute, either Party may submit the Dispute to arbitration pursuant to this <u>Section 6</u>.

6.3      **Submission to Arbitration.**  Either Party may submit any Dispute that cannot be resolved between the Parties to arbitration by written notice to the other Party irrespective of the magnitude thereof, the amount in dispute or whether such Dispute would otherwise be considered justiciable or ripe for resolution by any court or arbitral tribunal.  This Agreement and the rights and obligations of the Parties shall remain in full force and effect pending the award in such arbitration proceeding.

6.4      **Notice of Arbitration.**  The notice for arbitration shall be given in accordance with <u>Section 10.7</u> and shall specify with particularity the nature of the Dispute, the particular provisions of this Agreement that are at issue, and the proposed relief sought by the Party seeking arbitration.

6.5      **Appointment of Arbitrators.**  The arbitration shall be conducted before a panel composed of three (3) arbitrators, each of whom shall be a person familiar, by profession or experience, with the issues in controversy.  Within fourteen (14) business days after delivery of a notice of arbitration, each Party shall appoint an arbitrator, obtain its appointee's acceptance of such appointment and deliver written notification of such appointment and acceptance to the other Party.  If a Party fails or refuses to select an arbitrator after fourteen (14) calendar days, an arbitrator may be chosen on behalf of such Party by the American Arbitration Association ("***AAA***") and in the manner provided in the American Arbitration Association Commercial Arbitration Rules and Procedures ("***AAA Rules and Procedures***").  Within fourteen (14) days of being appointed, the two (2) Party-appointed arbitrators shall jointly appoint the third (who shall be the chairperson), and shall obtain the acceptance of such appointment and deliver written notification of such appointment to the Parties.  If a Party fails to appoint its arbitrator within the specified period, or if the two (2) arbitrators appointed fail to appoint the third arbitrator within a period of fourteen (14) business days after appointment of the second arbitrator, then such arbitrator shall be appointed by the AAA pursuant to the AAA Rules and

Procedures.

**6.6**     **Disqualification of Arbitrator.**  No person may serve as an arbitrator if, because of employment or other relationship with the Parties, the nature of the matter to be arbitrated, or otherwise, such person could not serve as a judge in such matter if such person were a judge.

**6.7**     **Rules of Arbitration.**  Arbitration shall be conducted pursuant to the AAA Rules and Procedures in effect on the Original Effective Date; <u>provided</u>, <u>however</u>, that any waiver of sovereign immunity shall be governed solely and exclusively by <u>Section 6.16.</u>

**6.8**     **Time.**  Time is of the essence in the resolution of Disputes pursuant to this <u>Section 6</u>.  All deadlines shall be strictly enforced against the Parties.

**6.9**     **Submission of Evidence.**  Each Party may submit evidence in writing to the arbitrators for their consideration within forty-five (45) calendar days after written notice of the arbitration request has been received.

**6.10**     **Arbitral Hearing.**     The arbitrators may, in their sole discretion, determine whether a hearing would assist them in rendering a fair and equitable decision.  In any event, such hearing, if held, must be held within sixty (60) calendar days after written notice of the arbitration request has been received.

**6.11**     **Conduct of Arbitration.**  The arbitrators shall comply with and follow to the extent possible the AAA Rules and Procedures with respect to impartiality and independence, and shall render an independent, impartial review of the claim(s) presented, and each arbitrator shall act independently and shall not be either Party's representative.   The arbitrators' deliberations are confidential and shall not be disclosed to third parties. Each arbitrator shall be disqualified as a witness, consultant, or expert for either Party in any Dispute.  No written communication shall be made between the arbitrators and a Party without the other Party receiving a copy, and no oral communications shall take place without the other Party being present.

**6.12**     **Arbitral Award.**  The arbitrators shall render a reasoned decision and award, by majority vote, no later than ninety (90) calendar days after written notice of the arbitration request has been received.

**6.13**     **Arbitral Remedies.**     The arbitrators may fashion any legal and equitable remedies that they deem necessary to provide appropriate relief to an aggrieved Party, including damages and injunctive relief; provided, <u>however</u>, <u>that in no</u> event shall termination of this Agreement be available as a remedy and the arbitrators shall have no authority to grant such remedy; and, <u>provided, further, that</u> in no event shall either Party be liable for indirect or consequential damages in connection with any breach hereof.

**6.14**     **Enforcement of Arbitral Award.**  The arbitrators' decision will be final and binding on the Parties, will not be subject to appeal and may be entered as an order in any court of competent jurisdiction in the United States.  Each Party agrees to submit to the jurisdiction of any such court for purposes of the enforcement of any such order and for no

other purpose. No Party will sue the other except for enforcement of the arbitrators' decision if the other Party is not performing in accordance with the arbitrators' decision. The provisions of this Agreement will be binding on the arbitrators and nothing in this Agreement shall be construed so as to permit the arbitrators to modify this Agreement.

**6.15 Costs of Arbitration.** The costs of the arbitration shall be shared equally by the Parties, but the Parties shall bear their own costs and attorneys' fees associated with their participation in the arbitration.

**6.16 Limited Waiver of Sovereign Immunity.** Pechanga hereby provides a strictly limited waiver of its sovereign immunity in any court of competent jurisdiction for the sole and exclusive purpose of enforcement of an arbitration award rendered pursuant to this Section 6. Pechanga does not waive any immunity or other rights it may have under law with respect to claims or causes of action by parties other than RCWD.

## 7. Future Cooperation.

The Parties shall cooperate in good faith to develop additional potable and non-potable water supplies to satisfy any future needs that Pechanga may have.

## 8. Representations and Warranties.

**8.1 Representations and Warranties of Pechanga.** Pechanga represents and warrants to RCWD as follows:

**8.1.1** Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of the Pechanga Band of Luiseño Mission Indians.

**8.1.2** Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

**8.1.3** This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

**8.1.4** There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligations under this Agreement.

**8.1.5** Except as set forth in Exhibit A-6, to the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

**8.2 Representations and Warranties of RCWD.** RCWD represents and warrants to Pechanga as follows:

8.2.1   Its execution, delivery a n d performance of this Agreement have been duly authorized by all necessary action of RCWD.

8.2.2   Each real property owner pumping groundwater from the Wolf Valley Groundwater Basin within the boundaries of RCWD, other than Pechanga, has entered into an Agency Agreement with RCWD and, with the exception of groundwater pumped by Pechanga, no groundwater from the Wolf Valley Groundwater Basin is pumped by any person, partnership, government or private entity other than RCWD.

8.2.3   RCWD has full authority under each Agency Agreement to bind the real property owner that is party to such Agency Agreement to this Agreement, and RCWD shall, and hereby does, indemnify, defend and hold harmless Pechanga against any rights, claims, demands, actions, compensation or causes of action. asserted by any such property owner against Pechanga and arising from or in connection with this Agreement.

8.2.4   RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

8.2.5   This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

8.2.6   There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

8.2.7   Except as set forth in Exhibit A-6, to the best of RCWD's knowledge, the validity of this Agreement; the execution and delivery by RCWD of this Agreement; and the performance by RCWD of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent, or similar authorization from any federal, state or local judicial, regulatory, or administrative body.

**8.3**   **Breach of Representation or Warranty.**  Any representation or warranty made by a Party in this Section 8 that shall prove to have been incorrect in any material respect as of the Original Effective Date shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

**9.**   **Carryover Accounts.**

**9.1**   Each Party shall maintain a Carryover Account. Subject to the provisions of this Section 9, each Party shall have the right to credit its own Carryover Account with the balance of any unused portion of such Party's Annual Entitlement in any given Year. Such crediting shall only occur at the end of any given Year after accounting for all groundwater used from the Wolf Valley Groundwater Basin by such Party.

**9.2**   The total number of credits in both Parties' respective Carryover Accounts in any given Year shall not exceed the then current Available Aquifer Capacity.  RCWD shall be

entitled to accrue no more than twenty-five percent (25%) of the total number of credits in the then current Available Aquifer Capacity. Pechanga shall be entitled to accrue no more than seventy-five percent (75%) of the total number of credits in the then current Available Aquifer Capacity.

**9.3** If the Technical Committee were to reduce the Available Aquifer Capacity in a given Year such that either RCWD or Pechanga were to then be holding more credits than otherwise allowed under their respective portion of the Available Aquifer Capacity, the Party in excess may retain such credits for a period of no more than three (3) additional years, provided that such Party use at least thirty-three percent (33%) of the excess credits in its Carryover Account each Year thereafter until such time as the total number of credits is within the allowed maximum for such Party. If such Party does not use at least thirty-three percent (33%) of the excess credits in its Carryover Account in a given Year, then such excess credits shall be deducted from such Party's Carryover Account at the end of such Year.

**9.4** RCWD may use any credits in its Carryover Account in excess of two hundred (200) acre feet of credits, up to a maximum of four hundred (400) acre-feet, as supplemental water supply in any given Year.

**9.5** Pechanga may use any credits in its Carryover Account in excess of eight hundred (800) acre feet of credits, up to a maximum of one thousand six hundred (1,600) acre- feet, as supplemental water supply in any given Year.

**9.6** During a period of MWD Shortage Allocation, either Party may use the credits in its Carryover Account as a supplemental supply of water without reference to the limits set forth in Sections 9.4 and 9.5.

**9.7** In the event that a Party has no credits in its Carryover Account, and such Party exceeds its Annual Entitlement in a given Year, then the amount of such Party's Annual Entitlement for the succeeding Year shall be reduced by the amount of its excess pumping in such Year.

## 10. Groundwater Desalination Activities.

10.1 Pechanga and RCWD shall meet and confer on a cooperative basis to cooperatively plan desalination activities in the Wolf Valley Groundwater Basin.

10.2 Pechanga may use the funds available from Section 11(a)(4) of the Act to fund its contribution, if any, to such groundwater desalination activities in the Wolf Valley Groundwater Basin.

## 11. Miscellaneous Provisions.

**11.1 Perpetual Term.** The term of this Agreement (the "*Term*") shall commence on the Amendment Effective Date and shall remain in effect in perpetuity. This Agreement may be terminated exclusively (i) by mutual agreement of the Parties in a writing signed by both Parties; or (ii) by operation of contract pursuant to Section 11.2. Termination of this Agreement shall not be available as a remedy for a Party's breach.

**11.2     Termination for Dissolution.**  This Agreement shall automatically terminate and be of no further force or effect, without further action required by Pechanga, in the event that (a) RCWD or any regulator takes any action (i) to legally dissolve RCWD, or (ii) to discontinue or otherwise cease the operations or functions of RCWD, whether in whole or in part, in the capacity that they are performed by RCWD on the Original Effective Date; or (b) RCWD becomes unable to perform its obligations under this Agreement as a result of action of a regulator or a court of competent jurisdiction.

**11.3     Release of Information.**  All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, will be subject to the prior approval of both Parties, which approval shall not be unreasonably withheld.

**11.4     Assignment.**  Neither Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party, provided, however, that Pechanga may assign this Agreement without the prior consent of RCWD to another tribal entity of the Pechanga Band of Luiseño Mission Indians if the assignee assumes all of Pechanga's obligations under this Agreement and otherwise agrees to be bound by and consents to each of the provisions of this Agreement.

**11.5     Third Parties.**  This Agreement shall not be binding upon, inure to the benefit of, or confer rights upon any person or entity that is not a Party to this Agreement.

**11.6     Entire Agreement.**  This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts or representations by or among the Parties and their agents, written or oral, to the extent they relate in any way to the subject matter hereof.

**11.7     Notice.**  All notices, requests, payments, reports and other communications provided for or permitted to be given or made under this Agreement must be in writing and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other address or addressee as the Party to receive such notice shall have designated by written notice as required by this Section 10.7. Notice or payment shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 10.7:

As to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:
General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

<u>As to RCWD</u>:
General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101

   **11.8    Service of Process.**   Any Party may make service on any other Party by sending a copy of the process by certified U.S. mail, as provided under Federal Rules of Procedure 4(d), to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 10.7</u>.

   **11.9    Construction.**   This Agreement has been freely and fairly negotiated among the Parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." The word "person" includes individuals, entities, regulators and other governmental bodies. The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

**11.10   Headings.** The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

**11.11   Amendments; Waivers.** No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by Pechanga and RCWD. No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder. Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**11.12   Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction. The venue for arbitration proceedings shall be Riverside County, California.

**11.13   Severability.** The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that, if any provision of this Agreement, as applied to a Party or to any circumstance, is determined not to be enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

**11.14   Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**11.15   Effectiveness of Agreement.** This Agreement shall become effective on the Amendment Effective Date. Until the Amendment Effective Date, the Original Agreement shall remain in effect and shall continue to govern the rights and obligations of the Parties.

**11.16   Termination**. If the Pechanga Settlement Agreement is not approved or otherwise terminated, all related agreements, attached as exhibits thereto, including this Agreement, and the Parties' obligations thereunder are automatically terminated and the Original Agreement shall remain in effect and shall govern the rights and obligations of the Parties.

*[SEPARATE SIGNATURE PAGES FOLLOW]*

**IN WITNESS WHEREOF:**

Rancho California Water District has caused this Amended and Restated Groundwater Management Agreement to be executed by its duly authorized representative as of the date first above written.

**RANCHO CALIFORNIA WATER DISTRICT**


By:  _____

Name: _____
                Matthew Stone

Title:  General Manager


**AND** *[Tribe Signature Follows]*

**IN WITNESS WHEREOF:**

The Pechanga Band of Luiseño Mission Indians has caused this Amended and Restated Groundwater Management Agreement to be executed by its duly authorized representative as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By: _____

Name: _____

Title:

**AMENDMENT NO. 1**
**TO**
**RECYCLED WATER AGREEMENT (AGREEMENT NO. 04-07)**

This Amendment No 1. To Recycled Water Agreement (Agreement No. 04-07) (this
"*Amendment*") is made and entered into this _____ day of _____, 2016, by and between
**EASTERN MUNICIPAL WATER DISTRICT** ("*District*") and **THE PECHANGA BAND
OF LUISEÑO MISSION INDIANS** ("*Customer*"), whose address is 45000 Pechanga Parkway,
Temecula CA 92592.

**RECITALS**

WHEREAS, District and Customer are parties to that certain Recycled Water Agreement
(Agreement No. 04-07), dated January 8, 2008 (the "*Agreement*"); and

WHEREAS, Customer has requested that the Agreement be amended to provide for a longer
term and to confirm Customer's right to transfer to a third party Customer's right to receive any
unused portion of Customer's Annual Allocation from time to time;

WHEREAS, after due consideration of such request, the District has determined that it is in the
interest of the District to agree to such amendments; and

WHEREAS, District and Customer have determined that, for purposes of implementing such
amendments, the Agreement shall be amended as provided herein;

NOW, THEREFORE, in consideration of the above recited premises, together with other good
and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and
intending legally to be bound, the parties agree as follows:

**AGREEMENT**

1.      Unless otherwise defined herein, capitalized terms used in this Amendment shall have the
        meanings respectively assigned to such terms in the Agreement.

2.      The Agreement is amended as follows:

        (a)      Section 1 (Agreement Term) is amended by deleting the existing text in its
                 entirety and substituting the following therefor:

                 "The term of this Agreement shall begin on January 1, 2008 and shall
                 continue for an initial period of fifty (50) years and for two additional
                 periods of twenty (20) years each, for an aggregate period of ninety
                 (90) years, unless (i) terminated by District, solely due to a good faith
                 determination that there is or will be a shortage of supply of recycled
                 water sufficient to meet the requirements of this Agreement, at the end
                 of the initial fifty (50) year period or at the end of the first additional
                 twenty (20) year period by written notice delivered to Customer no

later than three (3) years prior to the expiration of such period and setting out in reasonable detail the basis for the underlying determination of shortage of supply, or (ii) earlier terminated pursuant to Section 15."

(b)     Sub-section A of Section 2 (Assignment) is amended by deleting the existing text in its entirety and substituting the following therefor:

"Customer may at any time, without the consent of the District, sell, assign, or transfer to a third party Customer's right to receive any portion of the Annual Allocation specified in Section 12.A, for such period and subject to such terms and conditions as may be determined between Customer and such third party; and the District shall cooperate with Customer and such third party in the implementation of such sale, assignment and transfer following receipt of written notice thereof; provided, however, that (i) as between District and Customer, Customer shall be responsible for making all arrangements for delivery to the third party of the sold, assigned or transferred Annual Allocation quantities, (ii) Customer shall remain liable to District for payment for Annual Allocation quantities delivered to such third party in the event such third party fails to make such payment in accordance with the terms of this Agreement, and (iii) such third party shall agree with Customer to be bound by the terms and conditions of this Agreement to the extent of such sale, assignment or transfer.  Except as provided by the foregoing, Customer may not sell, sublease, assign or transfer its rights or delegate its responsibilities or obligations hereunder without District's prior written consent, which consent shall not be unreasonably withheld."

3.     All other covenants, terms and conditions of the Agreement not explicitly modified by this Amendment remain in full force and effect.

4.     The undersigned individuals hereby warrant and represent that they each have full legal authority to sign this Amendment and bind the parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Amendment No. 1 To Recycled Water Agreement (Agreement No. 04-07)  to be executed as of the date first above written.

EASTERN MUNICIPAL WATER DISTRICT         PECHANGA BAND OF LUISEÑO MISSION INDIANS


By: _____              By: _____
          Paul D. Jones II                                      Mark Macarro
          General Manager                                  Tribal Chairman

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

## RECYCLED WATER TRANSFER AGREEMENT

THIS RECYCLED WATER TRANSFER AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016, by and between **PECHANGA BAND OF LUISEÑO MISSIONS INDIANS,** a federally recognized Indian Tribe ("*Pechanga*"), and **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*").

## <u>RECITALS</u>

1.   On January 8, 2008, Pechanga and Eastern Municipal Water District ("*EMWD*") entered into a Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed to sell Pechanga recycled water ("EMWD Recycled Water") in the amount of one thousand (1,000) acre feet per year ("AFY") under the terms and conditions set forth in such agreement.

2.   On February 28, 2008, RCWD and EMWD entered a Wheeling Agreement for Recycled Water pursuant to which RCWD agreed to wheel the EMWD Recycled Water to Pechanga.

3.   On August 5, 2009, EMWD and Pechanga executed Amendment No. 1 to the Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed that Pechanga may, without the consent of EMWD, sell, assign or transfer to a third party Pechanga's right to receive any portion of its annual allocation of recycled water.  The amendment and the Recycled Water Agreement are collectively referred to as "Recycled Water Agreement."

4.   The Parties, as a part of a comprehensive water rights settlement, seek to enable RCWD to use a portion of Pechanga's allocation of EMWD Recycled Water, such portion to be equal to, subject to <u>Section 2(d)</u>, not less than three hundred (300) AFY, and not more than four hundred seventy five (475) AFY in any given Year.

## <u>AGREEMENT</u>

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and

1

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      **Definitions.**   Capitalized terms used in this Agreement shall have the meanings set forth below.

"*AFY*" means acre-feet per Year.

"*Amended GMA*" means the "Amended and Restated Groundwater Management Agreement" between Pechanga and RCWD, setting forth terms and conditions governing their joint management of groundwater pumping from the Wolf Valley Groundwater Basin.

"*Agreement*" means this Recycled Water Transfer Agreement by and between the Pechanga and RCWD, dated as of the date first written above.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*EMWD Recycled Water*" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"*EMWD Recycled Water Agreement*" means the Recycled Water Agreement by and between Pechanga and EMWD, dated January 8, 2008 (Agreement No. 04-07), as amended by Amendment No. 1.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

"*RCWD*" means the Rancho California Water District, organized pursuant to California Water Code section 34000 *et seq.*

"*Section*" means a section or subsection of this Agreement.

"*Year*" means a calendar year of January through December.

2.  **Transfer of Right to Receive Recycled Water.**

(a)  Subject to Section 2(d), Pechanga hereby transfers its right to receive a portion of its allocation of EMWD Recycled Water to RCWD.  Subject to Section 2(d), RCWD shall be entitled to receive an amount of EMWD Recycled Water not less than three hundred (300) AFY and not more than four hundred seventy-five (475) AFY of EMWD Recycled Water.

(b)  On January 31 of each Year, Pechanga shall notify RCWD of the estimated annual amount of EMWD Recycled Water that is available to RCWD for such Year.  RCWD shall, within twenty (20) days, confirm to Pechanga and EMWD its receipt of the notice and the amount of EMWD Recycled Water that RCWD will accept that Year.

(c)  RCWD shall make contractual arrangements with EMWD to order, schedule, receive and pay for EMWD Recycled Water in a manner that will: (*x*) ensure timely ordering, scheduling and payment of the EMWD Recycled Water that RCWD will accept in such Year; (*y*) not interfere in any way with deliveries of EMWD Recycled Water to Pechanga in such Year; and (*z*) ensure that Pechanga has no responsibility for any charges, fees or costs of any kind associated with the EMWD Recycled Water that RWCD will accept in such Year.

    i.   RCWD shall provide to Pechanga a copy of all contractual arrangements entered into with EMWD in accordance with this Section 2(c).

    ii.  Any contractual arrangement with EMWD entered into by RCWD in accordance with Section 2(c) shall include a

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

contractual provision providing that Pechanga shall timely receive a copy of all notices, correspondence, and other written documentation exchanged between the parties thereto in accordance therewith.

(d)     In the event EMWD reduces the total amount of EMWD Recycled Water in accordance with section 12(D) of the Recycled Water Agreement, the amount of EMWD Recycled Water transferred to RCWD as set forth in Section 2(a) shall be reduced as follows:

i.     Any reduction by EMWD up to one hundred seventy-five (175) AFY shall reduce the maximum amount of transferred EMWD Recycled Water on an acre-foot by acre-foot basis.  By way of example, if EMWD were to reduce Pechanga's total allocation of EMWD Recycled Water from one thousand (1,000) AFY to eight hundred fifty (850) AFY, then the maximum of water transferred in accordance with Section 2(a) shall be reduced by one hundred fifty (150) AFY from four hundred seventy-five (475) AFY to three hundred twenty-five (325) AFY;

ii.    Any reduction by EMWD in excess of one hundred seventy-five (175) AFY shall: (*x*) reduce the maximum amount transferred from four hundred seventy-five (475) AFY to the same amount as the minimum amount transferred in accordance with Section 2(a); (*y*) reduce the minimum amount transferred from three hundred (300) AFY to an amount equal to three hundred (300) AFY times the percentage that the total EMWD reduction represents to the original total allocation of EMWD Recycled Water to Pechanga.  By way of example, if EMWD were to reduce Pechanga's total allocation of EMWD Recycled Water from one thousand (1,000) AFY to seven hundred fifty (750) AFY, then the minimum and maximum amount to be transferred in accordance with Section 2(a) shall be equal to three hundred (300) AFY minus (three hundred (300) AFY times .25), or two hundred twenty five (225) AFY.  Pechanga's remaining entitlement would be equal to seven hundred fifty (750) AFY minus two hundred twenty-five (225) AFY, or five hundred twenty-five (525) AFY.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

**3.**     **Effective Date.**  This Agreement shall be effective on the date that the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act is enacted into law.

**4.**     **Term.**  This Agreement shall have the same term as Amendment No. 1 to the Recycled Water Agreement and shall be extended to the extent said Agreement is extended.

**5.**     **Termination.**   In the event the Amended Groundwater Management Agreement is terminated for any reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Amended Groundwater Management Agreement without further action by either Party unless the Parties otherwise agree.

**6.**     **Representations and Warranties.**

(a)     **Representations and Warranties of Pechanga.**   Pechanga represents and warrants to RCWD as follows:

      i.     Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

      ii.     Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

      iii.     This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

      iv.     There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

      v.     To the best of Pechanga's knowledge, the validity of this

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(b)   **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga as follows:

i.   RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

ii.   RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.   This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

iv.   There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

v.   To the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(c)   **Breach of Representation or Warranty.**   Any representation or warranty made

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

by a Party in this <u>Section 6</u> that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

7.      **Dispute Resolution.**

(a)     Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)     Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party.  Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)     Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

(e)     Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

8.     **Release of Information.**     All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, will be subject to the prior approval of both Parties, which approval shall not be unreasonably withheld.

9.     **Assignment.**     Neither Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party, provided, however, that Pechanga may assign this Agreement without the prior consent of RCWD to another tribal entity of Pechanga if the assignee assumes all of Pechanga's obligations under this Agreement and otherwise agrees to be bound by and consents to each of the provisions of this Agreement.

10.     **Third Parties.**     This Agreement shall not be binding upon, inure to the benefit of or confer rights upon any person or entity that is not a Party to this Agreement.

11.     **Entire Agreement.**     This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts or representations by or among the Parties and their agents, written or oral, to the extent they relate in any way to the subject matter hereof.

12.     **Notice.**     All notices, requests, payments, reports and other communications provided for or permitted to be given or made under this Agreement must be in writing and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other address or addressee as the Party to receive such notice shall have designated by written notice as required by this Section 12.  Notice or payment shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 12:

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

As to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:


General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

As to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101


**13.**     **Service of Process.**  Any Party may make service on any other Party by sending a copy

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

of the process by certified U.S. mail, as provided under Federal Rules of Procedure 4(c), to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 12</u>.

14.   **Construction.**  This Agreement has been freely and fairly negotiated among the Parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  The word "person" includes individuals, entities, regulators and other governmental bodies.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

15.   **Headings.**  The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

16.   **Amendments; Waivers.**  No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by Pechanga and RCWD.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

17.   **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

18.   **Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; <u>provided</u>, <u>however</u>, that, if any provision of this Agreement, as applied to a Party or to any circumstance, is determined not to be

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER TRANSFER AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

19.    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By:_____
          Tribal Chairman
Date:_____

Approved as to form:          By:_____
                                        General Counsel

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
          General Manager
Date:_____

Approved as to form:          By:_____
                                        General Counsel

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

**RECYCLED WATER SCHEDULING AGREEMENT**

THIS RECYCLED WATER SCHEDULING AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016, among the **PECHANGA BAND OF LUISEÑO MISSIONS INDIANS,** a federally recognized Indian Tribe ("*Pechanga*"), **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*") and **EASTERN MUNICIPAL WATER DISTRICT**, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended ("*EMWD*").

## RECITALS

1.      On January 8, 2008, Pechanga and EMWD entered into a Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed to sell Pechanga recycled water ("EMWD Recycled Water") in the amount of one thousand (1,000) acre feet per year ("AFY") under the terms and conditions set forth in such agreement.

2.      On February 28, 2008, RCWD and EMWD entered a Wheeling Agreement for Recycled Water pursuant to which RCWD agreed to wheel the EMWD Recycled Water to Pechanga.

3.      On August 5, 2009, EMWD and Pechanga executed Amendment No. 1 to the Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed that Pechanga may, without the consent of EMWD, sell, assign or transfer to a third party Pechanga's right to receive any portion of its annual allocation of recycled water.  The amendment and the Recycled Water Agreement are collectively referred to as "Recycled Water Agreement."

4.      As a part of a comprehensive water rights settlement, RCWD and Pechanga have entered into the Recycled Water Transfer Agreement.

5.      The Parties to seek to establish through this Agreement the protocol for scheduling, ordering and delivering the portion of Pechanga's allocation of EMWD Recycled Water that Pechanga has agreed to transfer to RCWD pursuant to the Recycled Water Transfer Agreement.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

**<u>AGREEMENT</u>**

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

**1.      <u>Definitions</u>.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"***AFY***" means acre-feet per Year.

"***Agreement***" means this Recycled Water Scheduling Agreement by and between the Pechanga, RCWD and EMWD, dated as of the date first written above.

"***Delivery Point***" means the point for delivery of EMWD Recycled Water to RCWD pursuant to this Agreement, as depicted as Point of Connection "A" on the map attached as <u>Exhibit D-1</u>.

"***EMWD***" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"***EMWD Recycled Water***" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"***Exhibit***" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference.

"***Party***" means any entity represented by a signatory to this Agreement and "***Parties***" means more than one of such entities.

"***Pechanga***" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"***RCWD***" means the Rancho California Water District, organized pursuant to California Water Code section 34000 *et seq.*

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

"**Recycled Water Agreement**" means the Recycled Water Agreement (Agreement No. 04-07)" dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water Agreement (Agreement No. 04-07)" between Pechanga and EMWD, providing for the sale and purchase of recycled water.

"**Recycled Water Transfer Agreement**" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD, which is hereby incorporated by reference.

"**Section**" means a section or subsection of this Agreement.

"**Year**" means a calendar year of January through December.

2. **List of Exhibits.**

| Exhibit No. | Exhibit Name |
|---|---|
| D-1 | Delivery Point |

3. **Scheduling Receipt and Payment for EMWD Recycled Water**.

(a)     The Parties agree that to facilitate the use of EMWD Recycled Water by RCWD, pursuant to the Recycled Water Transfer Agreement, RCWD shall receive its transferred portion of Pechanga's allocation of EMWD Recycled Water, in accordance with the following protocol:

  i.     The Parties shall arrange for operational scheduling to provide for deliveries at the mutual convenience of the Parties, without interference with EMWD's scheduled deliveries of EMWD Recycled Water to Pechanga.

  ii.     EMWD shall deliver EMWD Recycled Water to RCWD at the Delivery Point.  EMWD deliveries of EMWD Recycled Water to RCWD shall be metered at the Delivery Point using meters owned, operated and read by RCWD.

  iii.     EMWD shall invoice RCWD monthly at the same rate charged to Pechanga pursuant to the Recycled Water Agreement.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

iv.     RCWD shall pay EMWD's invoice directly to EMWD.

v.      EMWD shall provide RCWD and Pechanga with an accounting of any reconciliation adjustments made in relation to the delivery of EMWD Recycled Water ordered by RCWD.

**4.     Effective Date.**  This Agreement shall be effective on the date that the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act is enacted into law.

**5.     Termination.**  In the event the Recycled Water Agreement is terminated for any reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Recycled Water Agreement without further action by either Party unless the Parties otherwise agree.

**6.     Representations and Warranties.**

(a)     **Representations and Warranties of Pechanga.**     Pechanga represents and warrants to RCWD and EMWD as follows:

i.      Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

ii.     Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.    This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

iv.     There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

v.      Except as set forth in Exhibit D-1, to the best of Pechanga's

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION – FOR DISCUSSION PURPOSES ONLY –**

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(b)    **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga and EMWD as follows:

i.    Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

ii.    RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.    This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

iv.    There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

v.    Except as set forth in Exhibit D-1, to the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(c)    **Representations and Warranties of EMWD.**  EMWD represents and warrants to Pechanga and RCWD as follows:

i.    Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of EMWD.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

ii.   EMWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.   This Agreement constitutes a legal, valid, and binding obligation of EMWD enforceable against it in accordance with its terms.

iv.   There is no pending or threatened action or proceeding against or affecting EMWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of EMWD or the ability of EMWD to perform its obligation under this Agreement.

v.   Except as set forth in <u>Exhibit D-1</u>, to the best of EMWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(d)   **Breach of Representation or Warranty.**   Any representation or warranty made by a Party in this <u>Section 6</u> that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

7.   **Release.** Pechanga, RCWD and EMWD expressly recognize that scheduling, billing and payment provisions of this Agreement differ from those of the Recycled Water Agreement, and EMWD and RCWD agree to release and hold Pechanga, its officials, agents, and employees, harmless on account of damage or claim of damage of any nature arising out of, or connected with, this Agreement.   All parties expressly recognize that after the effectiveness of this Agreement, and until such time as it terminates, Pechanga has no responsibility to provide water delivery schedules to EMWD, or to pay for such unused portion of Pechanga's allocation of EMWD Recycled Water transferred to RCWD.

8.   **Notices.** All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION – FOR DISCUSSION PURPOSES ONLY –**

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

If to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER SCHEDULING AGREEMENT**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

San Diego, CA  92101

If to EMWD:

Paul D. Jones II
General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA  92572-8300

**9.** **Amendments; Waivers**.   No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder. Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**10.** **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

**11.** **Dispute Resolution.**

(a)    Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and EMWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)    Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party. Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice,

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)     Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)     Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and EMWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

**12.     Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER SCHEDULING AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as of the date first above written.

**EASTERN MUNICIPAL WATER DISTRICT**

By:_____
        General Manager
Date:_____

Approved as to form:        By:_____
                                            General Counsel

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
        General Manager
Date:_____

Approved as to form:        By:_____
                                            General Counsel

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By: _____
        Tribal Chairman
Date:_____

Approved as to form:        By:_____
                                            General Counsel

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER INFRASTRUCTURE AGREEMENT**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

## RECYCLED WATER INFRASTRUCTURE AGREEMENT

THIS RECYCLED WATER INFRASTRUCTURE AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016, by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Pechanga*"), a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*") and the **UNITED STATES OF AMERICA** ("*United States*"), acting through the Secretary of the Department of the Interior.

## RECITALS

A.   RCWD and Pechanga have agreed to a comprehensive settlement of all of Pechanga's claims to water rights in the Santa Margarita River Watershed, which settlement is memorialized in the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("*Settlement Agreement*").

B.   As part of the Settlement Agreement, Pechanga and RCWD entered a Recycled Water Transfer Agreement, by which Pechanga agreed to transfer a portion of the EMWD Recycled Water Pechanga is entitled to receive to RCWD.

C.   RCWD and EMWD entered a Recycled Water Scheduling Agreement, pursuant to which the Parties established a protocol for ordering and delivering the portion of Pechanga's allocation of EMWD Recycled Water that Pechanga agreed to transfer to RCWD pursuant to the Recycled Water Transfer Agreement.

D.   In furtherance of the Settlement Agreement, Pechanga and RCWD seek to mutually benefit from the use of Recycled Water and, in furtherance of that effort, require development and construction of Recycled Water Infrastructure, as set forth in this Agreement.

E.   The U.S. Congress has authorized, ratified and confirmed the Settlement Agreement by act of Congress, Public Law No. [] ("Act").  In the Act, Congress authorized, as a portion of the settlement to which Pechanga is entitled, funds to pay for Pechanga's agreed upon share of the Recycled Water Infrastructure.

F.   The Parties hereto seek to agree upon the process pursuant to which Pechanga will

1

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

provide to RCWD funds for the design and construction of the Recycled Water Infrastructure.

## AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      **Definitions.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlement Act, Public Law No. _____.

"*AFY*" means acre-feet per Year.

"*Agreement*" means this Recycled Water Infrastructure Agreement by and between the Pechanga, RCWD, and the United States dated as of the date first written above.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*EMWD Recycled Water*" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 7(d)(7)(f) of the Act.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Settlement Fund*" means the fund established by section 9 of the Act.

2

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

"*Pechanga Recycled Water Infrastructure Account*" means the account established by section 9(c)(1) of the Act.

"*RCWD*" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"*Recycled Water Infrastructure*" means the Storage Pond.

"*Recycled Water Scheduling Agreement*" means the "Recycled Water Scheduling Agreement", between Pechanga, RCWD, and EMWD.

"*Recycled Water Transfer Agreement*" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD.

"*Section*" means a section or subsection of this Agreement.

"*Settlement Agreement*" has the meaning set forth in Recital A.

"*Storage Pond*" means the Storage Pond No. 5 that RCWD designed and constructed in order to enable RCWD to utilize the EMWD Recycled Water to be delivered to RCWD pursuant to the Recycled Water Transfer Agreement.

"*United States*" means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

"*Year*" means a calendar year of January through December.

2.    **Pechanga Recycled Water Infrastructure Account.**

(a)    Section 9(c)(1) of the Act established the Pechanga Recycled Water Infrastructure Account as an account held in trust by the United States within the Pechanga Settlement Fund.

(b)    Section 11(a)(1) of the Act authorized appropriations to be made into the Pechanga Recycled Water Infrastructure Account in an amount equal to two million six hundred fifty-six thousand  three hundred seventy-four dollars ($2,656,374).

3

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

(c)     Section 8(c)(2) of the Act established the purpose of the Pechanga Recycled Water Infrastructure Account to provide funds to allow Pechanga to pay for Pechanga's share of the costs associated with the design and construction of the Storage Pond in accordance with this Agreement.

(d)     Funds deposited into the Pechanga Recycled Water Infrastructure Account for the purpose described in Section 2(c) above shall have interest accrue thereon for disbursement in accordance with the provisions of this Agreement.

**3.     Effective Date.**  This Agreement shall be effective on the date that the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act is enacted into law.

**4.     Storage Pond.**

(a)     Subject to Section 4(c), within fifteen (15) days after the Enforceability Date Pechanga shall file a written request to the Secretary that will allow for disbursement of funds from the Pechanga Recycled Water Infrastructure Account under Section 11(a)(1) directly to RCWD in an amount equal to all funds in the Pechanga Recycled Water Infrastructure Account; and

(b)     Pechanga shall have no obligation to pay for the Storage Pond if the Act and Settlement Agreement are not approved.

(c)     If Pechanga withdraws the funds in the Pechanga Recycled Water Infrastructure Account pursuant to the Act, subject to the availability of funds in the Pechanga Recycled Water Infrastructure Account, Pechanga shall make payment directly to RCWD in an amount equal to all funds in the Pechanga Recycled Water Infrastructure Account.

**5.     Notices.**  All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians

4

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

P.O. Box 1477
Temecula, CA   92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

If to the United States:

[     ]

If to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101

6.      **Termination.**  In the event the Recycled Water Transfer Agreement is terminated for any reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Recycled Water Transfer Agreement without further action by any Party unless the Parties otherwise agree.

5

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

7.    **Representations and Warranties.**

    (a)    **Representations and Warranties of Pechanga.**    Pechanga represents and warrants to RCWD as follows:

        (i)    Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

        (ii)    Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

        (iii)    This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

        (iv)    There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

        (v)    To the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

    (b)    **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga as follows:

        (i)    RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

        (ii)    RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

        (iii)    This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

6

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

(iv)    There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

(v)    To the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

**8.    Breach of Representation or Warranty.**    Any representation or warranty made by a Party in Section 7 that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

**9.    Amendments; Waivers**.    No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder. Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**10.    Governing Law**.    This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

**11.    Dispute Resolution.**

(a)    Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and EMWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

7

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

(b)    Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party.  Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)    In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)    Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)    Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and EMWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

**12.    Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

8

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**RECYCLED WATER INFRASTRUCTURE AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**


**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By:_____
       Tribal Chairman

Date:_____

Approved as to form:    By:_____
       General Counsel

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
       General Manager

Date:_____

Approved as to form:    By:_____
       General Counsel

**UNITED STATES OF AMERICA**

By:

THIS **DRAFT** REMAINS **SUBJECT** TO **CLIENT** REVIEW AND **MODIFICATION**
– FOR **DISCUSSION** PURPOSES **ONLY** –

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

## EXTENSION OF SERVICE AREA AGREEMENT

This "Extension of Service Area Agreement" (this "***Agreement***") is made and entered into on _____, 2016 (the "***Effective Date***"), by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("***Pechanga***"), a federally recognized Indian tribe, **EASTERN MUNICIPAL WATER DISTRICT** ("***EMWD***"), a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended, and **THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA**, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended) ("***Metropolitan***").  The foregoing signatories to this Agreement are referred to hereafter individually as "***Party***" or collectively as "***Parties***."

## PREAMBLES

A.     Metropolitan was organized and exists for the purpose of providing a supplemental supply of imported water to the 26 public agencies that make up its service area in southern California.  These member agencies include EMWD.

B.     Metropolitan is generally limited by law to providing supplemental water supplies to its member agencies for domestic and municipal uses.  Pursuant to Metropolitan's Administrative Code Sections 4200 and 4509, Metropolitan's supplemental water supplies may not be sold or delivered outside of its district boundaries without the approval of its board of directors.

C.     EMWD was organized and exists for the purpose of providing water service to its service area located in Riverside County, California.  As a member agency of Metropolitan, EMWD's service area is wholly included within Metropolitan's district boundaries.

D.     The Pechanga is a federally recognized Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members but not members in their capacities as Allottees.  The Pechanga Reservation ("***Reservation***") includes the lands held in trust for the Pechanga by the United States, as shown on Exhibit F-6.

E.     By Certificate of Completion issued by the Local Agency Formation Commission of Riverside County, California, the boundaries of Metropolitan and EMWD were reorganized to incorporate within Metropolitan's and EMWD's service area those areas of land depicted on the map attached hereto as Exhibit F-1 and identified as the "***Existing Area***".  The Existing Area was annexed to Metropolitan and EMWD in two parts:  the area to the north recorded on April 25, 1983 (designated LAFCO #82-16-3) and the area

1

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

to the west recorded on July 19, 1967 (designated LAFCO #67-26-5).  The Existing Area became a part of the Reservation on _____.

F.    As part of a comprehensive settlement of its claims for water rights in the Santa Margarita River Watershed, Pechanga has requested that Metropolitan's and EMWD's service area be extended to include certain additional Reservation acreage (the "***Extended Area***", as more particularly depicted and described in Exhibit F-2).  The combined Existing Area and Extended Area are referred to in this Agreement as the "***Consolidated Area***", which is more particularly depicted and described in Exhibit F-3.  Metropolitan and EMWD have agreed to provide treated water service to the Consolidated Area in accordance with the terms and conditions specified in this Agreement.  Rancho California Water District ("RCWD") has agreed to deliver such treated water to Pechanga pursuant to the terms and conditions of a separate agreement executed by EMWD, Pechanga and RCWD which establishes delivery, billing and operational protocols ("ESAA Water Delivery Agreement").

G.    Metropolitan and EMWD recognize and respect the inherent sovereignty of Pechanga as a tribal government and by this Agreement to provide water service to the Consolidated Area acknowledge that they do not exercise any governmental or regulatory control over the Reservation.  The terms and conditions of this Agreement establish the contractual basis for the service of water for use in the Consolidated Area of the Reservation only, and do not affect the sovereign authority of Pechanga over the Reservation.  Water served pursuant to this Agreement is not deemed extraterritorial service by virtue of these circumstances and this Agreement.

H.    Pechanga acknowledges and agrees by this Agreement that Metropolitan and EMWD are public agencies created under and bound by the laws of the State of California.  The terms and conditions of this Agreement establish the contractual basis for the service of water for use in the Consolidated Area of the Reservation only, and Pechanga acknowledges that its execution of this Agreement includes the contractual condition that the use of water provided by EMWD, including water imported by Metropolitan for EMWD, shall be pursuant to the same terms, conditions, and obligations as are applicable to all other customers of EMWD and Metropolitan and that the status of Pechanga as a sovereign tribal government does not relieve or absolve Pechanga from contractual compliance with such terms, conditions and obligations on the same basis as all other customers of EMWD and Metropolitan.  Pechanga further acknowledges that the provisions of this Agreement are the conditions pursuant to which the legislative bodies governing EMWD and Metropolitan have granted consent to the extension of their service areas to include the Extended Area.

I.    Pechanga expressly agrees that water delivered to Pechanga by EMWD includes water imported by Metropolitan, and such water cannot be used, directly or indirectly, in any manner which intentionally or avoidably results in the benefit of areas outside of the

2

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

Consolidated Area.  This prohibition applies both to the direct use of such water outside of the Consolidated Area and the indirect use by substitution of the water supplies made available under this Agreement and the ESAA Water Delivery Agreement to Pechanga for water supplies that Pechanga would otherwise use in the Consolidated Area, for example, Pechanga could not sell its Tribal Water Right off the Reservation and use Imported Water in its place.  The Parties acknowledge that Pechanga may use its Tribal Water Right pumped from the Consolidated Area in other areas of the Reservation and that the provision of Imported Water may provide a benefit to areas outside of the Consolidated Area; the Parties agree that this benefit shall not constitute a violation of this Agreement or the MWD Administrative Code.

J.      The Parties acknowledge the comprehensive settlement of Pechanga's claims for water rights in the Santa Margarita River Watershed will be effected through federal legislation known as "Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act" (Public Law No. XXX-XXX) (hereinafter the "Settlement Act"), and further acknowledge such legislation limits use of the Tribal Water Rights, as defined in the Act and herein, to use on the Reservation.

K.      The Parties agree that this Preamble is a substantive and enforceable part of this Agreement and desire in this Agreement to provide for extension of water service to the Consolidated Area and to set forth terms and conditions that will govern such service in accordance with this Preamble.

NOW, THEREFORE, it is agreed as follows:

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

<u>AGREEMENT</u>

1.      <u>Construction.</u>

 **1.1**   <u>Definitions.</u> Capitalized terms used in this Agreement shall have the meanings respectively ascribed thereto below or as set forth elsewhere in this Agreement.

 "*AF*" means acre-feet.

 "*AFY*" means acre-feet per Year.

 "*Agreement*" means this Extension of Service Area Agreement, including all Appendices, as the same may be amended from time to time.

 "*Consolidated Area*" means the area of land on the Reservation that includes both the Existing Area and the Extended Area, and is identified as the Consolidated Area and depicted in the map attached hereto as <u>Exhibit F-3</u>.

 "*Delivery Commencement Date*" shall be the date on which deliveries of water to the Consolidated Area under this Agreement and the ESAA Water Delivery Agreement shall commence, as such date is established pursuant to <u>Section 2.2</u>.

 "*Dispute*" is defined in <u>Section 8.1</u>.

 "*Effective Date*" is defined in the first paragraph of this Agreement.

 "*EMWD*" is defined in the first paragraph of this Agreement.

 "*EMWD Connection Fee*" has the meaning set forth in <u>Section 2.3.1(b)</u> of this Agreement.

 "*EMWD Water Shortage Contingency Plan*" means the plan approved by EMWD's Board of Directors in Ordinance No. 117.2, effective April 1, 2009, as amended from time to time, or any other plan or method that EMWD's Board of Directors adopts in the future to allocate water supply in substitution of the foregoing.

 "*Exhibit*" means an Exhibit to this Agreement, each of which is incorporated herein by this reference.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

"*Existing Area*" means the area of land on the Reservation identified as the Existing Service Area and depicted in the map attached hereto as <u>Exhibit F-1</u>.

"*Extended Area*" means the additional area of land on the Reservation to be incorporated into the EMWD service area pursuant to this Agreement, and identified as the Extended Service Area and depicted in the map attached hereto as <u>Exhibit F-2</u>.

"*Fallbrook Adjudication Court*" means the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Fallbrook Adjudication Proceeding.

"*Fallbrook Adjudication Proceeding*" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.*, Civ. No. 3:51–cv–01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the continuing jurisdiction of the Fallbrook Adjudication Court over the Fallbrook Decree.

"*Fallbrook Decree*" means the "Modified Final Judgment And Decree", entered in the Fallbrook Adjudication Proceeding on April 6, 1966 and includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

"*Holiday*" includes January 1, the third Monday in January (observance of Martin Luther King Jr.'s birthday), the third Monday in February, (Presidents' Day), March 31 (observance of Cesar Chavez's Birthday), the Friday before Easter, the last Monday in May (Memorial Day), July 4, the first Monday in September (Labor Day), November 11 (Veterans Day), Thanksgiving Day, the day following Thanksgiving Day, December 24, December 25, December 31, and any day or portion of a day declared by MWD's Board of Directors as a Holiday. If any Holiday other than December 24 and 31 falls on Sunday, the following Monday is a Holiday. If any Holiday falls on Saturday, the preceding Friday is a Holiday.

"*Imported Water*" means any water delivered to Pechanga pursuant to this Agreement and the ESAA Water Delivery Agreement.

"*Initial Delivery Point*" means the delivery point indicated on the map attached in <u>Exhibit F-5</u>.

"*Month*" means a calendar month, unless otherwise provided.

"*Metropolitan*" is defined in the first paragraph of this Agreement.

5

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

"***MWD Administrative Code***" means the code adopted by Metropolitan's Board of Directors on January 11, 1977, as amended from time to time.

"***MWD Connection Fee***" has the meaning set forth in <u>Section 2.3.1(a)</u> of this Agreement.

"***Party***" means any entity represented by a signatory to this Agreement and "***Parties***" means more than one of such entities.

"***Pechanga***" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"***Reservation***"" means the reservation of the Pechanga Band of Luiseño Mission Indians, as delineated in <u>Exhibit F-6</u>.

"***Section***" means a section or subsection of this Agreement.

"***Tribal Water Right***" means the water established and confirmed by section 5 of the federal legislation known as "Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act" (Public Law No. XXX-XXX).

"***Year***" means a calendar year of January through December.

> 1.2.1   The words "include," "includes," and "including" will be deemed to be followed by "without limitation." The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

> 1.2.2   The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

> 1.2.3   Under no circumstances shall this Agreement be construed as a conveyance, abandonment, or waiver of any water right or right to the use of water from the Colorado River or the California State Water Project which is held and owned by Metropolitan.

**1.2**     **<u>Exhibits.</u>**   The following Exhibits are included in this Agreement:

Exhibit F-1:   Existing Area

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

| Exhibit F-2: | Extended Area |
| Exhibit F-3: | Consolidated Area |
| Exhibit F-4: | Required Approvals |
| Exhibit F-5: | Initial Delivery Point |
| Exhibit F-6: | Map of Reservation |
| Exhibit F-7: | MWD's Best Management Practices |

**2.      Water Service.**

**2.1      Nature of Service.**

**2.1.1**   Subject to the terms, conditions, and obligations of this Agreement, and the ESAA Water Delivery Agreement, Metropolitan and EMWD shall provide treated water service to the Consolidated Area to the same extent and under the same terms and conditions as all other Metropolitan customers.  Pechanga acknowledges and agrees that this water service provides the Consolidated Area with imported supplemental water supplies delivered by Metropolitan to EMWD for use within the service areas of Metropolitan and EMWD.

**2.1.2**   Pechanga acknowledges and agrees that the terms, conditions and obligations of this Agreement are the same as would be applicable to other customers of EMWD and Metropolitan and that this Agreement binds Pechanga to such terms, conditions and obligations.

**2.1.3**   For any period during which EMWD has implemented the EMWD Water Shortage Contingency Plan, sales and provision of water to Pechanga hereunder shall be limited to an amount equal to a percentage of the average amount of water used from all sources on the Consolidated Area in the previous three calendar years, such percentage to be equal to the percentage of water which Rancho California Water District would receive under EMWD's Water Shortage Contingency Plan, Wholesale Supply Allocation, as defined in EMWD's Administrative Code and as amended from time to time, during the water supply allocation period as reported by EMWD.

**2.2      Delivery Commencement Date.** The Delivery Commencement Date shall be such date as may be specified in a written notice from Pechanga to EMWD given thirty (30) days prior to such date; provided, however, that such date shall be no earlier than the date on which all of the following have occurred:

(a)      all approvals specified in Exhibit F-4 have been obtained and are in full force and effect;

7

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

(b)      water is operationally available and capable of being delivered to and received at the Delivery Point; and

(c)      Pechanga shall have paid the EMWD Connection Fee and Metropolitan Connection Fee required pursuant to <u>Section 2.3.1(a) and (b)</u>, below.

**2.3      <u>Fees, Costs, and Water Service Rates</u>.**

**2.3.1      <u>Connection Fees and Processing Costs</u>.**

(a)      Pechanga shall pay to Metropolitan the Metropolitan Connection Fee for the extension of Metropolitan's service area that is calculated in the same manner, and paid in lieu of, an annexation fee.  This fee shall equal the sum of the net present value of the amount equivalent to ad valorem taxes and the processing fee established by Metropolitan Administrative Code section 3100(b)(7) and an amount equal to the annexation charge that would be due on the total acreage of the Extended Area using the per-acre charge formula set forth in Metropolitan Administrative Code sections 3300 and 4301.  As of [date], the fee is estimated to be $_____.   The full amount of the fee will be calculated by Metropolitan upon written notice from Pechanga that all other conditions except payment of the connection fees have been satisfied.  Metropolitan will provide Pechanga with a written invoice setting forth the amount of the fee and the calculations made in determining the fee.  Pechanga shall pay the Metropolitan Connection Fee in full to satisfy the condition to the Delivery Commencement Date set forth in <u>Section 2.2(c)</u>, above.

(b)      Pechanga shall pay to EMWD the EMWD Connection Fee for the extension of the EMWD service area that is calculated in the same manner, and paid in lieu of, an annexation fee.  This fee shall be based upon the total acreage of the Extended Area and computed on the basis of EMWD's present value of the property-related fees, including standby charges, which would otherwise have been collected if the total acreage were subject to property assessments, which as of August 24, 2015 is estimated to be $_____. The full amount of the fee will be calculated by EMWD upon written notice from Pechanga that all conditions except payment of the connection fees have been satisfied.  EMWD will provide Pechanga with a written invoice setting forth the amount of the fee and the calculations made in determining the fee.  Pechanga shall pay the EMWD Connection Fee in full to satisfy the condition to the Delivery Commencement Date set forth in <u>Section 2.2(c)</u>, above.

(c)      Except as specified in paragraphs (a) and (b) above, EMWD and Metropolitan shall not charge Pechanga any processing fees, property-related assessments, or other property-related charges that would normally be imposed for the annexation of land, in connection with the procedures for obtaining approvals required for execution and implementation of this Agreement and the extension of the EMWD and Metropolitan service areas and, to the extent required, EMWD and Metropolitan hereby expressly waive all such property-related fees, assessments, and charges.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

      **2.3.2   Property Taxes and Assessments.**  The parties agree and acknowledge that property owners within the joint service areas of EMWD and Metropolitan are responsible to pay ad valorem property taxes and other charges imposed by EMWD and Metropolitan and collected by the Riverside County Assessor through property tax bills.  In recognition of the sovereignty of Pechanga and except as provided in <u>Section 2.3.1</u>, no ad valorem property taxes or property-related assessments shall be imposed or collected by EMWD or Metropolitan on the Consolidated Area of the Reservation.

      **2.3.3   EMWD Payments to Metropolitan.**  EMWD shall pay Metropolitan for all water purchased from Metropolitan that is delivered to Pechanga at the applicable rates charged by Metropolitan.  Payments due from EMWD to Metropolitan shall be made in accordance with the MWD Administrative Code.

**3.**      **Other Terms and Conditions of Service.**

      **3.1      Metropolitan's and EMWD's Administrative Codes and All Other Laws Applicable to Metropolitan's and EMWD's Provision of Water.**  Pechanga acknowledges and agrees that the delivery of Imported Water necessarily includes the provision of Metropolitan's imported supplemental water.  The use of Imported Water in the Consolidated Area shall be on the same terms, conditions, and obligations as are applicable to all other customers of Metropolitan and EMWD as set forth in the MWD and EMWD Administrative Codes as amended from time to time.  Pechanga acknowledges that Metropolitan and EMWD are government entities organized and existing under the laws of the State of California, and that the powers and duties of Metropolitan and EMWD to provide water delivery under this agreement are subject to all state and federal laws that apply to Metropolitan's or EMWD's provision of water, including, but not limited to the California Water Code and executive orders issued by the Governor of the State of California.  Pechanga agrees that its rights and obligations as a recipient of water provided by Metropolitan and EMWD pursuant to the terms and conditions of this agreement are subject to the terms and conditions of any state or federal laws that apply to Metropolitan's or EMWD's provision of water to the same extent as all other Metropolitan and EMWD customers.  Consistent with the acknowledgements in Preambles I and J, <u>Section 3.9</u>, and in addition to the restriction set forth in section 5(b)(2) of the Settlement Act, Pechanga acknowledges that sections 3104, 4200, and 4509 of the MWD Administrative Code restrict the use of Metropolitan's imported water supplies solely for purposes lying within the service area of Metropolitan and its member agencies, and that pursuant to this Agreement, Pechanga agrees that these provisions apply contractually to the provision of Imported Water to the Consolidated Area.

      **3.2      Initial Delivery Point.**  The Initial Delivery Point means the delivery point for water provided by EMWD to Pechanga under this Agreement and shall be as depicted in Exhibit F-5.  Pechanga may modify the Initial Delivery Point at any time upon written notice to EMWD, provided such modified delivery point is capable of taking deliveries of water.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

**3.3    Interruptions.** Whenever repairs or maintenance of Metropolitan's or EMWD's system, in the opinion of the General Manager of Metropolitan or EMWD, respectively, shall require suspension of provision of water at any Delivery Point, such provision may be suspended without liability on the part of Metropolitan or EMWD.  In addition to shutdowns, water may from time to time be unavailable, or available only in limited quantities at a service connection because of reductions or eliminations in flow.  Reasons for shutdowns may change from time to time.  Metropolitan and EMWD shall exercise reasonable efforts to provide advance notice to Pechanga of any interruption that is not an emergency.

**3.4    Hydraulic Transients.**

**3.4.1    General.** Pechanga shall avoid the creation of conditions that could cause hydraulic transients to damage Metropolitan's or EMWD's facilities.

**3.4.2    Reduction or Suspension of Deliveries.**  Metropolitan's or EMWD's General Manager may reduce or suspend provision of water to Pechanga if he determines that Pechanga has failed to install reliable protective devices to protect Metropolitan's and EMWD's facilities from damage from hydraulic transients and that a substantial risk of such damage exists.

**3.5    Facilities.**

**3.5.1    Pechanga Responsibilities.** Pechanga shall be responsible, at its cost, for the design, installation and construction of any facilities on its side of the Initial Delivery Point, or any subsequently noticed delivery point, required to receive water provided by EMWD. Pechanga shall provide EMWD and Metropolitan with reasonable opportunity to review and comment on any such designs and shall incorporate any EMWD and Metropolitan comments reasonably required to ensure that such facilities may be operated without damage to EMWD's or Metropolitan's system.

**3.5.1    EMWD and Metropolitan Responsibilities.** EMWD and Metropolitan shall operate and maintain facilities for provision of water to Pechanga in accordance with applicable standards.  EMWD and Metropolitan shall have no obligation (a) to provide additional works or facilities, necessary for the sale and provision of water from works owned and operated by EMWD or Metropolitan, or (b) to construct or furnish water treatment facilities to maintain or better the quality of water provided through EMWD's or Metropolitan's service connection.

**3.6    Suspension of Deliveries.** As stated in the MWD Administrative Code, section 4503, Suspension of Deliveries, as amended from time to time, Pechanga agrees that it shall have sufficient resources such as local reservoir storage, groundwater production capacity, system interconnections, or alternate supply source to sustain a seven-day interruption in provision of Metropolitan water based on annual average demands.  Pechanga shall be responsible for and reimburse direct costs, excluding labor costs, incurred by Metropolitan in the event that a

10

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

scheduled non-emergency interruption of up to seven days is postponed or cancelled at the request of EMWD on behalf of Pechanga as a result of insufficient local resources; provided that Metropolitan shall have sole discretion over whether to agree to any such request for a postponement or cancellation of a scheduled non-emergency interruption of service.

**3.7      Environmental Documentation; Permits and Consents; Compliance.**

**3.7.1**   Pechanga shall be responsible for the cost of the preparation of any documentation, defense of any legal challenge related to Metropolitan's or EMWD's compliance with the National Environmental Policy Act ("NEPA") and/or the California Environmental Quality Act ("CEQA") and other applicable state laws or any other challenge to the transaction contemplated by this Agreement.  EMWD will serve as Lead Agency for any CEQA documents and analysis.  Any costs incurred by Metropolitan or EMWD, using such attorneys and experts as in their sole discretion they determine to be reasonably necessary, in defense of the transaction shall be reimbursed by Pechanga.

**3.7.2**   Pechanga shall be responsible for obtaining and maintaining in effect all applicable permits, consents and licenses that may be required to be obtained and maintained exclusively by Pechanga to enable Pechanga to purchase and receive water as contemplated by this Agreement.

**3.7.3**   Except as provided in Preambles I and J and Section 3.1, nothing in this provision is intended to imply or be interpreted that Pechanga is subject to any water or air pollution laws and regulations of the State of California, or that Pechanga has waived any argument it may have with respect to the same.

**3.8      Allocation of Liability.**

**3.8.1**   Metropolitan, EMWD, and their officers, agents, and employees shall not be liable to Pechanga or any third party that makes use of water provided pursuant to this Agreement for the provision of water, including the quality of water provided, or failure to supply water, nor for the control, carriage, handling, use, disposal, or distribution of, or any limitations to the use, disposal or distribution of such water by any regulatory body or other third party on water sold to Pechanga after such water has been received by or on behalf of Pechanga at the Initial Delivery Point.

Metropolitan and EMWD, its officers, agents and employees shall also not be liable for any claim of damage of any nature whatsoever (including but not limited to property damage, personal injury, or death) arising out of or connected with the provision of water, including the quality of water provided, or failure to supply water, nor for the control, carriage, handling, use, disposal, or distribution of or any limitations to the use, disposal or distribution of such water that may be imposed by any regulatory body or other third party on water sold to

11

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

Pechanga under this Agreement after such water has been received by Pechanga at the Initial Delivery Point.

Pechanga shall, and hereby do, indemnify, defend and hold harmless Metropolitan and EMWD and their officers, agents, and employees from any and all such liability, damages, or claims of damages and shall reimburse Metropolitan or EMWD for costs of repair of Metropolitan's or EMWD's facilities and other damages resulting from the operations of Pechanga.

**3.8.2**   Pechanga and its officers, agents, employees and members shall not be liable to Metropolitan or EMWD, for any claim of damage of any nature whatsoever (including property damage, personal injury, or death) arising out of or connected with the control, carriage, handling, use, disposal, or distribution of, water prior to such water being delivered to Pechanga at the Initial Delivery Point, excepting, however, claims by Metropolitan or EMWD for costs of repair to Metropolitan's or EMWD's facilities and other damages resulting from the operations of Pechanga.

**3.9**     <u>Restrictions on Re-sale and Use</u>.

**3.9.1**   Consistent with the acknowledgements in Preambles I and J, subject to <u>Section 3.1</u>, and in addition to the restriction set forth in section 5(b)(2) of the Settlement Act, Pechanga expressly agrees that water delivered to Pechanga by EMWD includes water imported by Metropolitan, and such water cannot be used, directly or indirectly, in any manner which intentionally or avoidably results in the benefit of areas outside of the Consolidated Area.  This prohibition applies both to the direct use of such water outside of the Consolidated Area and the indirect use by substitution of the water supplies made available under this Agreement and the ESAA Water Delivery Agreement to Pechanga for water supplies that Pechanga would otherwise use in the Consolidated Area, for example, Pechanga could not sell its Tribal Water Right off the Reservation and use Imported Water in its place.  The Parties acknowledge that Pechanga may use its Tribal Water Right pumped from the Consolidated Area in other areas of the Reservation and that the provision of Imported Water may provide a benefit to areas outside of the Consolidated Area; the Parties agree that this benefit shall not constitute a violation of this Agreement or the MWD Administrative Code.

**3.9.2**   Imported Water sold and provided to Pechanga shall not be used for agricultural purposes.  Agricultural purposes are the growing or raising, in conformity with recognized practices of husbandry, for the purposes of commerce, trade, or industry, or for use by public educational or correctional institutions, of agricultural, horticultural, or floricultural products, and produced (a) for human consumption or for the market, or (b) for the feeding of fowl or livestock produced for human consumption or for the market, or (c) for the feeding of fowl or livestock for the purpose of obtaining their products for human consumption or for the market, such products to be grown or raised on a parcel of land having an area of not less than one acre utilized exclusively therefore.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

3.9.3   Notwithstanding any other provision of this Agreement, Pechanga shall have the right to use the Tribal Water Right for any beneficial purpose at any location on the Reservation.

3.10   **Service Conditions Related to Pechanga Sovereignty.**   It is understood that while intended to be analogous to water service provided by Metropolitan and EMWD to other similarly situated customers located within the boundaries of their service areas, water service to be provided under this Agreement shall at all times and in all respects be implemented in a manner that recognizes the sovereignty of Pechanga except as provided in Sections 3.1 and 8.1. Without limitation of the foregoing, it is agreed by EMWD and Metropolitan as follows:

3.10.1 <u>Limitation of Effect</u>.   Nothing in this Agreement confers jurisdiction on any State court except as provided in <u>Section 8.1</u>.   The Parties explicitly acknowledge and agree that the enforcement of such terms, conditions and obligations of this Agreement shall be solely pursuant to the dispute resolution provisions of this Agreement in <u>Section 8.1</u> and not through any other mechanism.

3.10.2 <u>No Entry Without Notice</u>.   Except for entry upon rights-of-way for their facilities or in the event of an emergency, no employee acting in the course and scope of their employment or agent acting on behalf of Metropolitan or EMWD shall enter onto the Reservation for any purpose without written permission from Pechanga authorizing such entry. In seeking such written permission, Metropolitan or EMWD shall provide Pechanga with at least forty-eight (48) hours written notice of their request to enter the Reservation, such notice to specifically indicate the purpose of the requested entry and the names of the individuals for whom permission to enter is sought.   In the event of an emergency, Metropolitan or EMWD will provide as much notice as feasible.   Any individual for whom permission to enter the Reservation is granted by Pechanga shall be accompanied in such entry by a designated individual representing Pechanga.

3.11   **EMWD Preferential Rights.**   For purposes of calculating EMWD's preferential right to purchase water pursuant to section 135 of the Metropolitan Water District Act (Stats. 1969, Ch. 209, as amended), EMWD's payments to Metropolitan in lieu of taxes and other assessments for the capital cost and operating expense of Metropolitan's works that would otherwise be payable on the Consolidated Area lands except for the sovereignty of the Pechanga shall be included.   Nothing in this Agreement, affects Metropolitan's right to include any of its rate components, including but not limited to the Readiness-to-Serve Charge and Capacity Charge, in its preferential right calculation.

4.   <u>Term.</u>

This Agreement shall become effective on the Effective Date when the last party signs and shall remain in effect until any party terminates it per <u>Section 5</u> below or the area is deannexed or otherwise removed from Metropolitan and EMWD's service areas and the

13

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

provision of water ceases.  This Agreement may be terminated only in accordance with Section 5 or Section 9.3.  Notwithstanding the foregoing, suspension of water provisions shall be available as a remedy for breach of this Agreement until the breach that caused the suspension has ceased.

5.      **Termination**.

      5.1      **Written Agreement.**  This Agreement may be terminated at any time by written agreement signed by the Parties.

      5.2      **Pechanga Alternate Supply.**  This Agreement may be terminated upon thirty (30) days written notice given by Metropolitan or EMWD to Pechanga in the event that Pechanga:  (a) enters into any arrangement with any party that would reduce the amount of Colorado River or State Water Project water available to Metropolitan, or (b) enters into an arrangement with another entity to receive water supplied directly or indirectly by Metropolitan to that entity, or (c) obtains by arrangement a supplemental supply of water for the Consolidated Area from another source, or (d) the Consolidated Area, or any portion thereof, shall be conveyed out of ownership of the United States in trust for Pechanga.  In the event of such termination, the provisions of this Agreement governing the Parties' financial obligations and allocation of liability, as well as the general provisions, shall continue until the specified obligations have been fulfilled.

      5.3      **Settlement Act**.  This Agreement shall be automatically terminated in the event: (1) the waivers and releases of claims authorized by the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act (Public Law No. XXX-XXX,) expire pursuant to section 7(g) of said Act; (2)  Pechanga seeks congressional authorization for off-Reservation transfer or sale of water sold and provided by Metropolitan and EMWD to Pechanga pursuant to this Agreement and the ESAA Water Delivery Agreement; or (3) upon repeal of the Act pursuant to section 12 of the Act.

      5.4      **Off-Reservation Uses.**      Except for uses allowed in Preambles I and J and Sections 3.1 and 3.9, Metropolitan or EMWD may terminate this Agreement in the event Pechanga sells, exchanges, or uses Imported Water outside the Consolidated Area or its Tribal Water Right outside the Reservation.

14

THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

6.      **Record-Keeping.**  Each Party shall maintain and, upon reasonable advance notice, shall make available for inspection and audit by the other Parties during regular office hours, accurate records pertaining to the times and quantities of sales and provision of water under this Agreement.

7.      **Obligation to Work in Good Faith.**  Each Party shall have the obligation to work in good faith to satisfy the conditions of this Agreement and to attempt in good faith to informally resolve any disputes under this Agreement.

8.      **Disputes.**

    8.1      **Dispute Resolution and Limited Waiver of Sovereign Immunity.**
        8.1.1      The Parties agree that in the event of a dispute, the parties shall make a good faith effort to meet in person to resolve any disputes arising under this Agreement.  However, if the parties are unable to reach a mutually acceptable resolution, the Parties agree to submit the dispute to the United States District Court for the Southern District of California, or in the event the district court cannot accept jurisdiction, the Superior Court of California for Riverside County.  Pechanga hereby grants a limited waiver of sovereign immunity solely to Metropolitan and EMWD as follows:
        i. Waiver is limited to proceedings brought for interpretation, violation or breach of this Agreement.
        ii. Waiver shall commence as of the effective date of this Agreement and shall terminate upon the termination, cancellation, or completion of each party's obligations to perform pursuant to this Agreement.
        iii. Waiver is granted solely and exclusively to Metropolitan and EMWD and not to any other individual or entity.
        iv.  Waiver is limited to actual damages and shall not include any punitive or exemplary damages.
        v.  Waiver is limited to the Pechanga Band of Luiseño Indians and does not waive the immunity of any other agency or instrumentality of the Tribe.

        8.1.2      Counsel for Pechanga shall provide a written opinion that the waiver of sovereign immunity is effective and that this Agreement has been authorized and signed in a manner, which binds Pechanga to its terms.

        8.1.3      Pechanga acknowledges that the waiver of sovereign immunity in this Section 8.1 is an essential term under this Agreement, without which EMWD and Metropolitan would not have entered into this Agreement.  Pechanga agrees that this Agreement shall automatically terminate without action by any party in the event that a claim of sovereign immunity, or a claim based on non-compliance with the requirements of 25 U.S.C. § 81, is raised by Pechanga or the United States in connection with the resolution of any dispute, claim, arbitration, or litigation arising from, or brought in connection with, this Agreement or any action taken to implement this Agreement or with

15

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

regard to the obligation of the Tribe, as set forth in this Agreement, to comply with the provisions of Metropolitan's or EMWD's Administrative Code as they exist at the time of execution of this Agreement or may be modified in the future.

8.1.4   The Parties shall seek a determination from the Secretary of the Interior that this Agreement is not covered by 25 U.S.C. § 81, pursuant to subsection (c) thereof.  Pechanga acknowledges that the assumption that this Agreement is not covered by section 81 and thus enforceable without Secretarial approval is an essential term under this Agreement, without which EMWD and Metropolitan would not have entered into this Agreement.  Pechanga agrees that this Agreement shall automatically terminate if it is determined that Secretarial approval is required and it is not obtained within 180 days of such a determination.

8.1.5   The Parties shall seek an order in the Fallbrook Adjudication, as part of the approval of the Pechanga Water Settlement Agreement, that would make interpretation and enforcement of this Agreement subject to the continuing jurisdiction of such court in the same manner as the Pechanga Water Settlement Agreement and any exhibits thereto.

8.2     **Presentation of Claim.**  Prior to bringing any action for money damages against EMWD or Metropolitan, Pechanga shall present a claim in accordance with the California Government Claims Act (Cal. Govt. Code Section 810, *et seq*.).

8.3     **Available Remedies.**   In addition to specific remedies provided in this Agreement, any legal or equitable remedies for breach of contract shall be available to the Parties to this Agreement, except that termination of the Agreement shall not be a remedy except as provided in Sections 5.2, 8.1.3, 8.1.4, and 9.3, and monetary damages shall be limited as a remedy for a breach as provided in Section 9.3.  In the event a final monetary judgment for a breach of the Agreement is entered against Pechanga, no judgment lien shall be enforceable against any Reservation lands, but Imported Water provided pursuant to this Agreement may be suspended until the judgment is paid in full.

9.     **General Representations and Warranties; Covenants.**

9.1     **Representations and Warranties of the Parties.**

Each Party represents and warrants to the other Parties as follows:

9.1.1   Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of such Party.

16

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

9.1.2   It is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

9.1.3   This Agreement constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms.

9.1.4   There is no pending or threatened action or proceeding against or affecting such Party before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the ability of such Party to perform its obligations under this Agreement.

9.2   **Covenants.**  Each Party represents and warrants to, and covenants with, each of the other Parties that it will undertake, implement, pursue and complete diligently and in good faith all actions required to cause the Delivery Commencement Date to occur, and will cooperate with each other Party to enable such other Party to comply with the foregoing covenant.  Without limitation of the foregoing, each of EMWD and Metropolitan represents and warrants to, and covenants with, Pechanga that it will promptly undertake and diligently pursue all applications, procedures and processes that may be required to obtain third party approvals required to be obtained by it in order to implement this Agreement, including certification by the appropriate Local Agency Formation Commission of the boundaries of the Consolidated Area and registration thereof.  In addition to the restriction set forth in section 5(b)(2) of the Settlement Act, Pechanga covenants with EMWD and Metropolitan that Imported Water shall only be used on the Consolidated Area, and shall not be put to a use that directly or indirectly benefits areas outside the Consolidated Area and the Tribal Water Rights shall not be used outside the Reservation or used in any manner that directly or indirectly benefits areas outside the Reservation except as provided in Preambles I and J and Sections 3.1 and 3.9.

9.3   **Breach of Representation, Warranty or Covenant.**  Any representation or warranty made by a Party in Section 9.1 that shall prove to have been incorrect in any material respect as of the Effective Date, and any failure of a Party to perform in accordance with the covenants set forth in Section 9.2, shall constitute a material breach of this Agreement by the Party giving such representation, warranty or covenant and shall entitle any other Party to bring an action to terminate this Agreement or to have the Agreement declared void and unenforceable.  No Party shall be entitled to recover monetary damages for making false representations or warranties set forth in Section 9.1 or breaching the covenants in Section 9.2.

10.   **Miscellaneous Provisions.**

10.1   **Release of Information.**  All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, shall be subject to the prior approval of each of the Parties, which approval shall not be unreasonably withheld.  Notwithstanding the foregoing, Pechanga acknowledges that EMWD

17

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

and Metropolitan are California governmental agencies subject to the California Public Records Act (Cal. Gov't Code §§ 6250, et seq.), and are obligated to provide copies of public records upon appropriate request.  It shall not be a breach of this Section for EMWD or Metropolitan to provide records pursuant to a request made in compliance with the California Public Records Act.  Metropolitan and EMWD will provide written notice and an opportunity to Pechanga to respond to any request so made.

      **10.2**    **Assignment; Successors in Interest.**

      **10.2.1**  No Party may assign or transfer any of its rights or obligations under this Agreement without the express written consent of the other Parties.

      **10.2.2**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted assigns and successors in interest.

      **10.3**    **No Third-Party Rights.**  The Parties do not intend, and this Agreement shall not be construed to, bind, inure to the benefit of or confer rights upon or grant remedies to any person, firm, corporation, public or private entity, or other party not a Party to this Agreement.

      **10.4**    **Notice.**  All notices, requests, reports and other communications provided for or permitted to be given or made by a Party under this Agreement must be in writing signed by such Party's duly authorized representative, and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other addressee or address as the Party to receive such notice shall have designated by written notice as required by this Section 10.4. Notice shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 10.4:

      If to Pechanga:

      Mark Macarro
      Chairman
      Pechanga Band of Luiseño Indians
      P.O. Box 1477
      Temecula, CA 92593

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION – FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA 92592


If to EMWD:

Paul D. Jones II
General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA 92572-8300


If to MWD:

General Manager
The Metropolitan Water District of Southern California
    By personal service or overnight delivery:
        700 North Alameda Street
        Los Angeles, CA 90012-2944
    By U.S. mail:
        P.O. Box 54153
        Los Angeles, CA 90054-0153

With a copy to:

Manager, Water Resource Management Group
The Metropolitan Water District of Southern California
    By personal service or overnight delivery:
        700 North Alameda Street
        Los Angeles, CA 90012-2944
    By U.S. mail:
        P.O. Box 54153
        Los Angeles, CA 90054-0153


   **10.5   Uncontrollable Force.** No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when a failure of performance shall be due to an uncontrollable force.  The term "*uncontrollable force*" shall mean an action of the

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

elements, the act or threat of any public enemy; Acts of God; court order; war and war defense conditions; and strikes or other labor disputes; or other causes beyond its control.  Each Party shall use reasonable diligence to avoid any such delay or default and to resume performance under this Agreement as promptly as possible after any such delay or default.  However, nothing contained herein shall be construed so as to require a Party to settle any strike or labor dispute in which it may be involved.  A Party rendered unable to fulfill any of its obligations under this Agreement by reason of an uncontrollable force shall give prompt written notice of such fact to the other Parties and shall exercise due diligence to remove such inability to the fullest extent practicable with all reasonable dispatch.

**10.6     Entire Agreement; Exclusivity.**

**10.6.1  Entire Agreement Among the Parties.**  This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts, or representations by or among the Parties and their agents, written or oral, to the extent they relate to the subject matter hereof.

**10.6.2  Exclusivity of Terms and Conditions of Service.**  This Agreement, and the ESAA Water Delivery Agreement, exclusively shall govern the terms and conditions of the sale and provision of water by EMWD to Pechanga.

**10.7     Amendments.**  No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement shall be valid, unless the same is in writing and signed by the Parties.  Notwithstanding this provision, Pechanga acknowledges and contractually agrees to comply with the terms and conditions for service as set forth in the MWD and EMWD Administrative Codes as amended over time as is required of all other Metropolitan and EMWD customers.  As set forth in Section 3.1, Pechanga also acknowledges and contractually agrees to comply with any other state or federal laws that apply to Metropolitan's or EMWD's provision of water as is required of all other Metropolitan and EMWD customers.

**10.8     Waivers.**  No waiver by a Party of any breach by another Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any other term, condition or right, or as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or as a waiver of the future exercise by such Party of the same or any other right.  Neither the failure nor any delay on the part of a Party to insist on the strict performance of any term or condition of this Agreement or to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy to the same extent as all other Metropolitan customers.

**10.9     Governing Law.**  This Agreement shall be interpreted, governed by, and construed under and in accordance with all applicable federal and State of California laws,

20

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

Metropolitan's Act and Administrative Code, the Municipal Water District Act (EMWD's enabling authority), EMWD's Administrative Code, and all contracts governing the provision of water under this Agreement.

**10.10   Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that, if any provision of this Agreement, as applied to a Party or to any circumstance, is determined not to be enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

**10.11   Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**10.12   Approvals.**   A conditional approval of this Agreement or of the transactions contemplated hereby by a Party or any third party shall not be effective unless accepted in writing by all Parties; and no Party shall be under any obligation to agree to any conditions imposed by another Party or a third party on its (their) approval of this Agreement or of the transactions contemplated hereby.

**IN WITNESS WHEREOF**, the Parties have caused this Extension Of Service Area Agreement to be executed.

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By:_____
        Tribal Chairman

Date:_____

Approved as to form:          By:_____
        General Counsel

21

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

EASTERN MUNICIPAL WATER DISTRICT

By:_____
      General Manager

Date:_____

Approved as to form:      By:_____
      General Counsel

THE METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA

By:_____
      General Manager

Date:_____

Approved as to form:      By:_____
      General Counsel

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016**

**EXHIBIT F-1**

**[To Extension Of Service Area Agreement]**

**<u>Existing Area</u>**

**EXHIBIT F-2**

**[To Extension Of Service Area Agreement]**

**<u>Extended Area</u>**

**EXHIBIT F-3**

**[To Extension Of Service Area Agreement]**

**<u>Consolidated Area</u>**

**EXHIBIT F-4**

**[To Extension Of Service Area Agreement]**

**Required Approvals**

**Include reference to CEQA**

**EXHIBIT F-5**

**[To Extension Of Service Area Agreement]**

**<u>Initial Delivery Point</u>**

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

EXTENSION OF SERVICE AREA AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

**EXHIBIT F-6**

**[To Extension Of Service Area Agreement]**

**Map of Pechanga Reservation**

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**EXTENSION OF SERVICE AREA AGREEMENT**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

**EXHIBIT F-7**

**[To Extension Of Service Area Agreement]**

**MWD's Best Management Practices**

## ESAA CAPACITY AGREEMENT

THIS ESAA CAPACITY AGREEMENT (this "*Agreement*") is made and entered into as of _____, 2016 ("Effective Date"), by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Pechanga*"), a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT** ("*RCWD*"), a California water district organized pursuant to California Water Code section 34000 *et seq.*, and the **UNITED STATES OF AMERICA**, acting through the Secretary of the Department of the Interior.

## RECITALS

A.   Pechanga, RCWD, and the United States of America, among others, have agreed to a comprehensive settlement of all of Pechanga's claims for water rights in the Santa Margarita River Watershed.  The Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement  ("*Settlement Agreement*") memorializes the settlement.

B.   As part of the Settlement Agreement, Pechanga, MWD (as hereinafter defined) and EMWD (as hereinafter defined) agreed to an Extension of Service Area Agreement ("*ESAA*"), which is attached to the Settlement Agreement as Exhibit F.  The ESAA provides for MWD and EMWD to provide treated water to Pechanga ("*Imported Water*").

C.   In furtherance of the Settlement Agreement and the ESAA, Pechanga, the United States of America, and RCWD seek to provide capacity within RCWD's distribution system to enable RCWD to deliver Imported Water to Pechanga on an interim and permanent basis.

D.   The United States Congress has authorized, ratified, and confirmed the Settlement Agreement by act of Congress.  *See* Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. [XXX–YYY] (2016) (the "Act").  In the Act, Congress authorized, as a portion of the settlement to which Pechanga is entitled, funds to pay for water delivery capacity to provide for the delivery of Imported Water to Pechanga.

E.   The Parties seek to establish the terms and conditions, pursuant to which RCWD shall provide such water delivery capacity to Pechanga.

## AGREEMENT

**IT IS AGREED AS FOLLOWS:**

1.   **Definitions.**   Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. [XXX–YYY] (2016).

"*AFY*" means acre-feet per Year.

"*Agreement*" means this ESAA Capacity Agreement, by and among Pechanga, RCWD, and the United States of America, dated as of the date first written above.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with Division 20 of the California Water Code.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 7(f) of the Act.

"*ESAA Capacity*" means capacity within RCWD's distribution system necessary to provide Imported Water to Pechanga on an interim and long term basis.

"*ESAA Water Delivery Agreement*" means the agreement attached to the Settlement Agreement (as hereinafter defined) as Exhibit H.

"*Imported Water*" means any water delivered to Pechanga pursuant to the ESAA and the ESAA Water Delivery Agreement.

"*Interim Capacity*" has the meaning set forth in Exhibit G-1. "Interim Capacity Notice" has the meaning set forth in Section 4(b)(i) of this Agreement.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended).

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Settlement Fund*" means the fund established by section 9 of the Act. "Pechanga ESAA Delivery Capacity  Account" means the account established by section 9(c)(2) of the Act.

"*Permanent Capacity*" has the meaning set forth in Exhibit G-2.

"*RCWD*" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"*Section*" means a section or subsection of this Agreement.

"*Settlement Agreement*" has the meaning set forth in Recital A.

"*United States*" means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

"*Year*" means a calendar year of January 1 through December.

2.      **List of Exhibits.**

| Exhibit No. | Exhibit Name |
| --- | --- |
| G-1 | Description of Interim Capacity |

G-2                           Description of Permanent Capacity

**3.     Pechanga ESAA Delivery Capacity Account.**

(a)   Section 9(c)(2) of the Act directed the Secretary of the Department of the Interior to establish the Pechanga ESAA Delivery Capacity Account as an account held in trust by the United States within the Pechanga Settlement Fund.

(b)  Section 11(a)(2) of the Act authorized $17,900,000 to be appropriated into the Pechanga ESAA Delivery Capacity Account, such amount to be adjusted to account for changes, since June 30, 2009, in construction costs as indicated by engineering cost indices and applicable to the types of construction required for water delivery capacity.

(c)     Section 8(d) of the Act directed the Secretary to use funds from the ESAA Delivery Capacity Account to allow for:

(i)     Pechanga's payment to RCWD for Interim Capacity and Permanent Capacity in accordance with this Agreement; or

(ii)     Pechanga's share of the costs associated with the design and construction of the ESAA Capacity in accordance with this Agreement.

(d)     Section 9(a) of the Act provides that funds deposited into the Pechanga ESAA Delivery Capacity Account shall have interest accrue thereon for disbursement in accordance with the provisions of this Agreement.

**4.     RCWD Interim Capacity Commitment.**

(a)     RCWD shall provide Interim Capacity to Pechanga for the delivery of Imported Water to Pechanga beginning on the date that deliveries are to commence pursuant to this Agreement.

(b)     In consideration of RCWD's commitment to provide Interim Capacity as set forth in Section 4(a) of this Agreement, Pechanga shall, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, pay for such Interim Capacity, in accordance with the following procedure and schedule:

(i)   Within thirty (30) days after the occurrence of the later of (a) the Enforceability Date or (b) the date that deliveries of Imported Water are scheduled to occur in accordance with the terms and conditions of this Agreement, RCWD shall provide written notice to Pechanga that it shall be ready to commence deliveries of Imported Water in an amount up to the amounts possible under the Interim Capacity ("Interim Capacity Notice").

(ii)  The Interim Capacity Notice shall include a request for payment in the amount of one million dollars ($1,000,000), as adjusted in accordance with Section 11(a) of the Act, which shall constitute the full and complete consideration to be paid to RCWD by Pechanga for RCWD's provision of Interim Capacity until the later of the date on which (x) Permanent Capacity is made available to Pechanga pursuant to this Agreement, or (y) deliveries of Imported Water cease permanently, pursuant to and in accordance with the terms of the ESAA Water Delivery Agreement.

(iii)   Pechanga shall not be responsible for any additional charges, fees, assessments or costs from RCWD in connection with RCWD's delivery of Imported Water to Pechanga using the Interim Capacity.

(iv)   Subject to Section 4(b)(vi) of this Agreement, upon receipt of the Interim Capacity Notice, Pechanga shall promptly file a written request to the Secretary for disbursement of funds from the Pechanga ESAA Delivery Capacity Account in an amount equal to the amount set forth in the Interim Capacity Notice.

(v)   Upon receipt of the written request from Pechanga in accordance with Section 4(b)(iv) of this Agreement and confirmation that such written request conforms to the requirements of this Agreement and the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, the Secretary shall make payment directly to RCWD in an amount equal to the amount set forth in Pechanga's written request.

(vi)   If Pechanga withdraws the funds in the ESAA Delivery Capacity account pursuant to the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, Pechanga shall make payment directly to RCWD in an amount equal to the amount set forth in the Interim Capacity Notice.

**5.   RCWD Permanent Capacity Commitment.**

(a)   RCWD shall provide Permanent Capacity to Pechanga for the delivery of Imported Water to Pechanga at such time as RCWD is physically capable of providing such capacity but in no event later than five (5) years after the Enforceability Date.

(b)   In consideration of RCWD's commitment to provide Permanent Capacity as set forth in Section 5(a) of this Agreement, Pechanga shall, subject to the availability of funds in and from the ESAA Delivery Capacity Account, make a payment for such Permanent Capacity, in accordance with the following procedure and schedule:

(i)   At any time after the Enforceability Date has occurred, and at such time as RCWD is physically capable of making a permanent commitment of capacity equal to the Permanent Capacity, RWCD shall provide written notice of said event to Pechanga (the "Permanent  Capacity Notice").  RCWD shall submit the Permanent Capacity Notice not later than five (5) years after the Enforceability Date. If RCWD does not submit the Permanent Capacity Notice to Pechanga by such date, then the funds set aside in the Pechanga ESAA Delivery Capacity Account to pay for Pechanga's contribution to the Permanent Capacity, including any interest that has accrued thereon, shall be available for use by Pechanga to design and construct alternative Imported Water delivery facilities in accordance with Section 6 of this Agreement.

(ii)   The Permanent Capacity Notice shall include a request for payment in the amount of sixteen million nine hundred thousand dollars ($16,900,000), as adjusted in accordance with Section 11(a) of the Act, plus any interest accrued on the funds set aside in the Pechanga ESAA Delivery Capacity Account prior to the date of the issuance of the Permanent Capacity Notice.  The amount of interest accrued on such funds for purposes of the Permanent Capacity Notice shall be as set by the Secretary upon written request from RCWD for a statement of such amount of interest.

(iii)    Subject to Section 5(b)(vii) of this Agreement, upon receipt of the Permanent Capacity Notice, Pechanga shall promptly file a written request to the Secretary that will allow for disbursement of funds from the Pechanga ESAA Delivery Capacity Account in an amount equal to the amount set forth in the Permanent Capacity Notice.

(iv)    Upon receipt of the written request from Pechanga in accordance with Section 5(b)(iii) above and confirmation that such written request conforms to the requirements of this Agreement and the Act, subject to the availability of funds in the Pechanga ESAA Water Delivery Capacity Account, the Secretary shall make payment directly to RCWD in an amount equal to the amount set forth in Pechanga's written request.

(v)    The amount paid pursuant to Section 5(b)(iv) of this Agreement, combined with the payment made pursuant to Section 4 of this Agreement, shall constitute the full and complete consideration to be paid to RCWD by Pechanga for RCWD's provision of Permanent Capacity.

(vi)    Pechanga shall not be responsible for any additional charges, fees, assessments, or costs from RCWD in connection with RCWD's provision of Permanent Capacity to Pechanga, except as provided in the ESAA Water Delivery Agreement, attached as Exhibit H to the Settlement Agreement.

(vii)    If Pechanga withdraws the funds in the ESAA Delivery Capacity Account pursuant to the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, Pechanga shall make payment directly to RCWD in an amount equal to the amount set forth in the Permanent Capacity Notice.

**6.     Alternative ESAA Water Delivery Facilities.**

If RCWD does not submit the Permanent Capacity Notice to Pechanga within five (5) years of the Enforceability Date, then the funds set aside in the Pechanga ESAA Delivery Capacity Account to pay for such Permanent Capacity, including any interest that has accrued thereon, shall be available for use by Pechanga to design and construct alternative Imported Water delivery facilities in accordance with this Section 6.  In such event, promptly after the date five (5) years after the date on which the Act is enacted into law, Pechanga and the Secretary will meet and confer to develop plans for the design and construction of alternative Imported Water delivery facilities that will, with the funds available in the Pechanga Imported Water Delivery Facilities Account, provide delivery capacity for Pechanga to receive the same amount of Imported Water as it would have received from RCWD had it provided the Permanent Capacity.  The fact that RCWD does not submit the Permanent Capacity Notice to Pechanga within five (5) years of the date on which the Act is enacted into law does not absolve RCWD of its obligation to provide Interim Capacity to Pechanga, which obligation shall continue for so long as Pechanga requires.

**7.     Notices.**

All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or

addressee as such Party may from time to time designate in writing.

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:
General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW Suite 400
Washington, DC   20036

If to the United States:

[          ]

If to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th  Floor
San Diego, CA   92101

**8.**     **Termination.**

In the event the Recycled Water Transfer Agreement is terminated for any reason, either
in accordance with its terms or pursuant to court order, this Agreement shall
automatically terminate fourteen (14) day after such termination of the Recycled Water
Transfer Agreement without further action by any Party unless the Parties otherwise
agree.

9.      **Representations and Warranties.**

(a)      **Representations and Warranties of Pechanga.**  Pechanga      represents and warrants to RCWD as follows:

(i)      Pechanga's execution, delivery, and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

(ii)      Pechanga is neither a party to any agreement, covenant, or other agreement or instrument nor subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

(iii)      This Agreement is a legal, valid, and binding obligation of Pechanga enforceable against Pechanga in accordance with this Agreement's terms.

(iv)      There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

(v)      Except as set forth in Exhibit G-3, to the best of Pechanga's knowledge, the validity of this Agreement; the execution and delivery by Pechanga of this Agreement; and Pechanga's performance of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state, or local judicial, regulatory, or administrative body.

(b)      **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga as follows:

(i)      RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

(ii)      RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

(iii)      This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

(iv)      There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

(v)      To the best of RCWD's knowledge,  the validity of this Agreement; the execution and delivery by RCWD of this Agreement; and the performance by RCWD of its obligations hereunder will not require any permit, license, certificate, waiver, notice,

approval, consent, or similar authorization from any federal, state or local judicial, regulatory, or administrative body.

**10.     Breach of Representation or Warranty.**  Any representation or warranty made by a Party in <u>Section 9</u> that  shall prove  to have been incorrect  in any material respect as of the effective  date  of  this  Agreement  shall  be  deemed  to  constitute  a  material  breach  of this Agreement by the Party giving such representation or warranty.

**11.     Amendments; Waivers.**     No  amendment,  modification,  waiver,  replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**12.     Governing Law.**  This Agreement shall be governed by and construed in accordance with  the  laws  of  California,  without  regard  to  any  choice  of  laws  or  conflicts  of  laws provisions  which  would  direct  the  application  of  the  laws  of  any  other  jurisdiction.   The venue for arbitration proceedings shall be Riverside County, California.

**13.     Dispute Resolution.**

(a)     Pechanga  is  a  sovereign  Indian  Nation,  and  as  such  it  possesses  sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)     Prior  to  pursuing  any  arbitration,  each  Party  shall,  whenever  possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party.   Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In  the  event  of  any  dispute  between  the  Parties  hereto  arising  under  this Agreement,  such  dispute  shall  be  submitted  to  mandatory  binding  arbitration,  to  be conducted  in  Riverside  County,  CA,  pursuant  to  the  Commercial  Rules  of  the  American Arbitration  Association.    Each  Party  shall  initially  pay  its  own  arbitration  costs  and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)      Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)      Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

**14.      Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and dated as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By:_____
       Tribal Chairman
Date:_____

Approved as to form:  By:_____

**RANCHO CALIFORNIA WATER DISTRICT**

By:_____
       General Manager
Date:_____

Approved as to form:  By:_____

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA WATER DELIVERY AGREEMENT
CONFIDENTIAL DRAFT
April 8, 2016

## ESAA WATER DELIVERY AGREEMENT

THIS **ESAA WATER DELIVERY AGREEMENT** (this "*Agreement*") is made and entered into as of _____, 2016 ("*Effective Date*"), by and among the **PECHANGA BAND OF LUISEÑO MISSION   INDIANS** ("*Pechanga*"), a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT** ("*RCWD*"), a California water district organized pursuant to California Water Code section 34000 *et seq.*, and **EASTERN MUNICIPAL WATER DISTRICT** ("*EMWD*"), a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.  Pechanga, RCWD, and EMWD are each individually sometimes called "*Party*" and sometimes collectively called "*Parties*."

RECITALS

A.      RCWD and Pechanga have agreed to a comprehensive settlement of Pechanga's claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed, which is memorialized in the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("*Settlement Agreement*").

B.      The Settlement Agreement recognizes that Pechanga, the Metropolitan Water District of Southern California ("*Metropolitan*"), and EMWD agreed to an Extension of Service Area Agreement ("*ESAA*"), attached to the Settlement Agreement as Exhibit F.  The ESAA provides for Metropolitan and EMWD to provide treated water service to Pechanga ("*Imported Water*") for use in the Consolidated Area as defined in Preambles F and J of the ESAA.

C.      The Settlement Agreement also recognizes that Pechanga and RCWD entered into an Amended and Restated Groundwater Management Agreement, attached to the Settlement Agreement as Exhibit A.  This Agreement provides for RCWD to pump and deliver groundwater from the Wolf Valley Groundwater Basin to Pechanga upon request in exchange for a groundwater delivery charge, among other matters.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**ESAA Water Delivery Agreement**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

D.    In furtherance of the Settlement Agreement and the ESAA, Pechanga and RCWD have agreed that Pechanga will purchase capacity to enable RCWD to deliver Imported Water from Metropolitan and EMWD to Pechanga on an interim and long term basis ("*ESAA Capacity*") pursuant to the ESAA Capacity Agreement attached as Exhibit G to the Settlement Agreement.

E.    The Parties seek to establish delivery, billing and other operational protocols necessary to enable RCWD to deliver Imported Water to Pechanga.

F.    The Parties acknowledge the comprehensive settlement of Pechanga's claims for water rights in the Santa Margarita River Watershed will be effected through federal legislation known as the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. [XXX–YYY] (2016), and further acknowledge such legislation limits use of the Tribal Water Right, as defined in the Act and herein, to use on the Reservation.

AGREEMENT

IT IS AGREED AS FOLLOWS:

**1.    Construction.**

   **1.1    Definitions.** Capitalized terms used in this Agreement shall have the meanings respectively ascribed thereto below or as set forth elsewhere in this Agreement.

   "***Act***" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. [XXX–YYY] (2016).

   "***AFY***" means acre-feet per Year.

   "***Agreement***" means this ESAA Water Delivery Agreement by and among Pechanga, RCWD, and EMWD dated as of the date first written above.

   "***Consolidated Area***" means the area of land on the Reservation, as that term is defined in Section 3(33) of the Act, that includes both the Existing Area and the Extended Area, as those two terms are defined in Exhibit F to the Settlement Agreement, and is identified as the Consolidated Area and depicted in the map attached hereto as Exhibit F-3.

   "***Effective Date***" is defined in the first paragraph of this Agreement.

   "***EMWD***" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of

2

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016**

the Water Code of the State of California, as amended.

"*Imported Water*" means any water delivered to Pechanga pursuant to the ESAA and this Agreement.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*RCWD*" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"*Section*" means a section or subsection of this Agreement.

"*Settlement Agreement*" has the meaning set forth in Recital A of this Agreement.

"*Tribal Water Right*" means the water established and confirmed by Section 5 of the Act.

"*Year*" means a calendar year of January 1 through December 31.

2.     **Deliveries.**  RCWD agrees to facilitate the delivery of Imported Water, which Pechanga is entitled to purchase from EMWD pursuant to the ESAA, on a continual basis at the capacity established in the ESAA Capacity Agreement.

3.     **Points of Connection.**  RCWD will deliver Imported Water to Pechanga from the ESAA Delivery Point, depicted as Point of Connection "A" on the map attached as Exhibit H-1 to this Agreement, to the Pechanga Delivery Point, depicted as Point of Connections "B" and "C" on the map attached as Exhibit H-2 to this Agreement.

4.     **Environmental Compliance Costs.**  EMWD will serve as Lead Agency for any California Environmental Quality Act (CEQA) documents and analysis.  Pechanga will reimburse to EMWD any costs incurred by EMWD in connection with completion of environmental documentation required by the CEQA and/or the National Environmental Policy Act and/or for purposes of approval of this Agreement, to the extent such costs would be recoverable by EMWD in connection with an annexation of land into the EMWD service area by

3

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016**

any other customer.  EMWD will provide a separate invoice to Pechanga for such reimbursable costs.

Pechanga shall be responsible for the cost of the preparation of any defense of any legal challenge related to Metropolitan's, EMWD's, or RCWD's compliance with the National Environmental Policy Act ("NEPA") and/or the California Environmental Quality Act ("CEQA") and other applicable state laws or any other challenge to the transaction contemplated by this Agreement.

5.     **Rates for Delivered Imported Water.**     EMWD will continue to be billed by Metropolitan for water delivered through service connection EM-20 (identified in Exhibit H-1) to RCWD.  The cost of RCWD's delivery of Imported Water to Pechanga will be passed on to Pechanga based upon EMWD and RCWD Rates, as described below, including operation and maintenance costs of RCWD for delivery of the Imported Water through RCWD's intervening system, as follows:

(a)     *EMWD Rates*. EMWD will bill RCWD for deliveries at its various turnouts, including deliveries of Imported Water made to Pechanga through RCWD at the ESAA Delivery Point.  Such billing shall include a nominal per acre-foot EMWD administrative overhead fee; charges incurred by EMWD under Metropolitan's current rate structure including Metropolitan's full-service, treated, volumetric rate for deliveries; readiness-to-serve charges ("*RTS*"); capacity charges ("*CC*"); and other Metropolitan charges as may be assessed (collectively, "*Water Delivery Costs*").  These charges will be determined as follows:

(i)     RTS charges will be billed on a per acre-foot basis, twice annually at the time that Metropolitan bills EMWD.

(ii)     CC will be based upon actual peaking demands for Imported Water delivery, measured in cubic feet per second, at the Pechanga Delivery Point.

(iii)     Metropolitan may assess additional costs or fee components to all of its customers in the future, which are not yet defined, or may change the content, manner, and timing of billing its member agencies.  Components of Metropolitan's rates and charges that comprise the Water Delivery Costs described herein are based upon Metropolitan's current rate

4

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

structure and may be subject to change in the future.  In the event Metropolitan alters its rate structure or assesses additional costs or fee components to all of its customers in the future, EMWD shall assess RCWD amended Water Delivery Costs that include Metropolitan's charges under any new rate structure in a manner that recovers costs equivalent to the components described herein, as well as any additional costs or fee components imposed by Metropolitan. This includes the proportionate penalties which may be assessed under Metropolitan's Water Supply Allocation Plan.

(b)     *RCWD Rates*. RCWD's charge for ESAA delivery of imported water through its 1305 zone system from the ESAA Delivery Point to the Pechanga Delivery Point will be a unit dollar per acre-foot delivery rate to cover the proportional share of cost of operations, maintenance and replacement for transmission and distribution within RCWD's 1305 Zone.  The rate will be updated annually.  The rate will be no more than the charges for these items assessed to RCWD's 1305 Zone retail customers.

(c)     *EMWD Rate Change*.  In the event that deliveries of Imported Water are made over a billing period during which EMWD's rate for the sale and delivery of water changes, EMWD may cause the meters recording deliveries of water during such period to be read at the end of the period and the statement of charges for such deliveries of water may be based on a proration between the previous and new rate for the periods of time during which each were in effect as determined by EMWD.

(d)     *Metropolitan Rate Change*.  In the event Metropolitan makes changes to its rates or rate structure that may affect the amount or structure of EMWD's rates (including but not limited to the setting of new baselines for tiered deliveries), or assesses additional costs or fees on its customers, EMWD will work in good faith with Pechanga and RCWD to ensure any changes to EMWD's rates are passed on fairly and equitably to Pechanga and RCWD.

(e)     *Metropolitan Tier 1 Allocation*.  Metropolitan currently has a tiered rate structure, which may be amended over time.  During periods of water supply allocation, use over an allocated amount is charged at a Tier 2 rate, the full service rate, plus an Allocation Surcharge for exceeding amounts available under an allocation.  As Metropolitan will not provide an initial incremental Tier 1 allocation to EMWD (and therefore to RCWD) for Imported Water deliveries

5

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

to Pechanga, Pechanga will establish its own Tier 1 maximum beginning the first year of deliveries and continuing over a five-year period, using a five-year rolling average thereafter. Alternatively, Pechanga may be required to establish an alternative methodology as may be adopted by Metropolitan from time to time for its member agencies.  Such charge will be billed and paid for in accordance with this Section.

(f)     *Exemption from Fees and Assessments*.  Except as otherwise provided in this Agreement and the ESAA, EMWD and RCWD will not impose any property-related fee, assessment, tax or charge on the Consolidated Area for the delivery of Imported Water.  In recognition of the sovereignty of Pechanga, no monetary lien will be imposed on Pechanga or the Reservation to secure payment of any fees, costs, or rates payable from Pechanga pursuant to this Agreement, but delivery of Imported Water pursuant to this Agreement may be suspended until payment is made in full, including penalty and interest charges, pursuant to the RCWD Administrative Code.

6.     <u>Billing and Payment of Imported Water Charges</u>.  EMWD will itemize the incremental components of its monthly billing to RCWD that are associated with the Water Delivery Costs described in Section 5 of this Agreement.  EMWD will maintain separate charge accounting for RCWD and Pechanga as distinct entities.  RCWD will pass through Water Delivery Costs assessed by EMWD as well as its own charges for delivery of Imported Water to Pechanga.

(a)     *Payment by RCWD to EMWD*.  Except as otherwise provided in this Agreement, the terms and conditions of billing by EMWD and payment by RCWD under this Agreement are governed by the procedures established in the EMWD Administrative Code, at Title 5, Article 3, commencing with section 5.301, or any amendments thereto approved by the EMWD.

(b)     *Payment by Pechanga to RCWD*.  RCWD will bill Pechanga for Imported Water-related rates, charges, and fees.  Except as otherwise provided in this Agreement or the Amended and Restated Groundwater Management Agreement, the terms and conditions of billing by RCWD and payment by Pechanga to RCWD under this Agreement are governed by the procedures established in Part III, Chapter 1, Section 1.6 of the RCWD Administrative Code.

(c)     *Deposit to Secure Payment to RCWD*.  Pechanga will provide a deposit equal to one-twelfth (1/12) of the prior year's billings to be reviewed and adjusted annually and held by

6

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

RCWD in an interest-bearing account as assurance of payment for invoices delivered pursuant to Section 5(b) above.  This deposit will be held by RCWD and will be drawn upon should Pechanga fail to make timely payments after notice to Pechanga of an alleged delinquency payment and an opportunity for Pechanga to cure.  If RCWD draws down on the deposit, RCWD will notify Pechanga within five (5) business days in writing that the deposit must be replenished.  Pechanga must replenish the deposit within five (5) business days after written notification from RCWD.  Failure to replenish the deposit and keep the account paid on a current basis will result in suspension of Imported Water delivery pursuant to Section 5(f) above.

7.      <u>Metering</u>.  All Imported Water and groundwater delivered by RCWD to Pechanga will be metered at the Pechanga Delivery Point.  RCWD shall determine the total amount of Imported Water and groundwater delivered to Pechanga under Section 2.3 of the Amended and Restated Groundwater Management Agreement and will deduct the amount of groundwater delivered to determine the net amount of Imported Water delivered to Pechanga.  RCWD will report to Pechanga its determination of the net amount of Imported Water delivered to Pechanga and provide Pechanga three (3) business days to review and comment on such determination prior to reporting to EMWD delivery volume and flow information for Imported Water deliveries provided by RCWD to Pechanga.  Meter readings will be made on or about the last day of each calendar month for billing purposes.  Meters and control valves on water lines of RCWD will be owned and operated by RCWD.  Pechanga may have any meter through which Imported Water is delivered from RCWD's facilities at the Pechanga Delivery Point tested by RCWD.  Pechanga will have the right to be represented by a qualified observer at and during any such test.  In the event that any such test shall disclose an error exceeding two (2) percent, an adjustment shall be made in charges to Pechanga, covering the known or estimated duration of such error, but in no event exceeding six (6) months, and the expenses of such test shall be borne by RCWD; otherwise such expense shall be borne by Pechanga.  If necessary to make any further adjustments to the volume and flow information as allocated between Imported Water and groundwater deliveries as a result of metering errors, such reconciliation shall be done at least annually.

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

8.      Pechanga Responsibilities for Facilities.  Pechanga will be responsible, at its cost, for the design, installation, and construction of any facilities on its side of the Pechanga Delivery Point, or any subsequently noticed delivery point, required to receive deliveries of water from RCWD under this Agreement.  Pechanga will provide Metropolitan, EMWD, and RCWD with reasonable opportunity to review and comment on any such designs and will incorporate any Metropolitan, EMWD, and RCWD comments reasonably required to ensure that such facilities may be operated without damage to Metropolitan's, EMWD's, or RCWD's system.

9.      Water Delivery Interruptions.  Whenever repairs or maintenance of Metropolitan's, EMWD's, or RCWD's system is required, in the opinion of the General Manager of Metropolitan, EMWD or RCWD, respectively, will require suspension of delivery of Imported Water at any delivery points.  Such delivery may be suspended without liability on the part of Metropolitan, EMWD or RCWD.  In addition to shutdowns, Imported Water may from time to time be unavailable, or available only in limited quantities at a service connection because of reductions or eliminations in flow.  Reasons for shutdowns may change from time to time.  EMWD and RCWD will exercise reasonable efforts to provide advance notice to Pechanga of any interruption that is not an emergency.  Pechanga will maintain the capability within its onsite water system to handle planned or unplanned Imported Water delivery interruptions.

10.     Termination.

        10.1. Settlement Act.  This Agreement shall be automatically terminated in the event: 1) the waivers and releases of claims authorized by the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act (Public Law XXX-XXX,) expire pursuant to Section 7(g) of said Act; 2)  Pechanga seeks congressional authorization for off-Reservation transfer or sale of water sold and delivered by EMWD to Pechanga pursuant to the ESAA and this Agreement; or 3) upon repeal of the Act pursuant to Section 12 of the Act.

        10.2 Off Reservation Uses.  Except for uses allowed in Preamble I and Sections 3.1 and 3.9 of the ESAA, EMWD may terminate this Agreement in the event Pechanga sells, exchanges, or uses Imported Water outside the Consolidated Area or its Tribal Water Right outside the Reservation.

8

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

11.    <u>Allocation of Liability</u>.

(a)    RCWD and its officers, agents, and employees shall not be liable to Pechanga or any third party by reason of RCWD's obligations under this Agreement for (i) the control, carriage, handling, use, disposal, or distribution of, or any limitations to the use, disposal or distribution of such Imported Water that may be imposed by any regulatory body or other third party on Imported Water delivered to Pechanga under this Agreement after such Imported Water has been received by or on behalf of Pechanga at the Pechanga Delivery Point, or (ii) any claim of damage of any nature whatsoever (including but not limited to property damage, personal injury or death) arising out of or connected with the provision of or any failure to deliver Imported Water to Pechanga.  Pechanga shall, and hereby does, indemnify, defend and hold harmless RCWD and its officers, agents, and employees from any and all such damages or claims of damages and shall reimburse RCWD for costs of repair of RCWD's facilities and other damages resulting from the operations of Pechanga.

(b)    Pechanga and its officers, agents, employees and members shall not be liable to RCWD or any third party by reason of Pechanga's status as purchaser under this Agreement, for any claim of damage of any nature whatsoever (including property damage, personal injury or death) arising out of or connected with the control, carriage, handling, use, disposal, or distribution of, Imported Water prior to such Imported Water being delivered to the Pechanga Delivery Point, excepting, however, claims by RCWD for costs of repair to RCWD's facilities and other damages resulting from the operations of Pechanga.

12.    <u>Notices</u>.  All notices required to be given hereunder shall be in writing and may be given in person, by electronic mail transmission, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom the notice is given, when delivered to the designated address of the party or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:          Mark Macarro
                         Chairman
                         Pechanga Band of Luiseño Indians
                         P.O. Box 1477
                         Temecula, CA 92593

9

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016

Fax:
Email: _____

With a copy to:


General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA 92593
Fax:
Email: _____

And to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC 20036
Fax:
Email: _____


If to RCWD:                  General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA 92590
Fax:
Email: _____


And to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway
15th Floor
San Diego, CA 92101
Fax:
Email: _____


If to EMWD:                  Paul D. Jones, II

10

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

**ESAA Water Delivery Agreement
CONFIDENTIAL DRAFT
April 8, 2016**

General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA 92572-8300
Fax:     (951) 928-6112
Email:   jonesp@emwd.org

And to:

Steven P. O'Neill
Lemieux & O'Neill
4165 East Thousand Oaks Boulevard
Westlake Village, CA 91362
Fax:     (805) 495-2787
Email:   steve@lemieux-oneill.com

13.     <u>Amendments: Waivers</u>:  No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

14.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

15.     <u>Dispute Resolution</u>

        (a)     Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling

11

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION
– FOR DISCUSSION PURPOSES ONLY –**

ESAA Water Delivery Agreement
**CONFIDENTIAL DRAFT**
**April 8, 2016**

arbitration by RCWD and EMWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)     Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party. Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)  Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)     Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and EMWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

16.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and dated as of the date first above written.

PECHANGA BAND OF LUISEÑO MISSION INDIANS

**THIS DRAFT REMAINS SUBJECT TO CLIENT REVIEW AND MODIFICATION**
**– FOR DISCUSSION PURPOSES ONLY –**

**ESAA Water Delivery Agreement**
**CONFIDENTIAL DRAFT**
**April 8, 2016**

By:_____
  Tribal Chairman

Date:_____

Approved as to form:        By:_____
  Counsel

RANCHO CALIFORNIA WATER DISTRICT

By:_____
  General Manager

Date:_____

Approved as to form:        By:_____
  General Counsel

EASTERN MUNICIPAL WATER DISTRICT

By:_____
  General Manager

Date:_____

Approved as to form:        By:_____
  General Counsel

13