JAMES B. GILPIN, Bar No. 151466
james.gilpin@bbklaw.com
BEST BEST & KRIEGER LLP
655 West Broadway, 15th Floor
San Diego, CA  92101
Telephone:  (619) 525-1300
Facsimile:  (619) 233-6118

Attorneys for Defendant
RANCHO CALIFORNIA WATER DISTRICT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT, et al.,<br><br>Defendant. | Case No.  51-cv-1247-GT-RBB<br><br>Judge: The Hon. Gonzalo P. Curiel<br><br>RESPONSE ON BEHALF OF THE SANTA MARGARITA RIVER WATERSHED STEERING COMMITTEE TO THE ORDER DATED JANUARY 31, 2017 |

1    Defendant Rancho California Water District, on behalf of the Santa Margarita River

2    Watershed Steering Committee ("Steering Committee") made up of the United States of America,

3    Fallbrook Public Utility District, Rancho California Water District, Eastern Municipal Water

4    District, Metropolitan Water District of Southern California, Pechanga Band of Luiseño Mission

5    Indians, and Western Municipal Water District, respectfully submits this response to the Order

6    issued by the Court on January 31, 2017:

7        The Steering Committee has completed negotiations with Michael J. Preszler and a copy

8    of the Professional Services Agreement between the Steering Committee and Michael J. Preszler

9    Consulting, Inc. dba California Water Consulting (the "Agreement") is attached hereto as Exhibit

10   "A."  The Agreement is being executed by the Steering Committee and Mr. Preszler and will be

11   filed with the Court once executed by the parties.

12   Dated:  February 1, 2017                     BEST BEST & KRIEGER LLP

13

14                                              By:_____

15                                                 JAMES B. GILPIN
                                                   Attorneys for Defendant
16                                                 RANCHO CALIFORNIA WATER
                                                   DISTRICT
17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
655 WEST BROADWAY, 15TH FLOOR
SAN DIEGO, CA 92101

60028.00006\29534872.1

RESPONSE TO ORDER DATED 1/31/17
Case No. 51-cv-1247-GT-RBB

# EXHIBIT A

# PROFESSIONAL SERVICES AGREEMENT BETWEEN SANTA MARGARITA RIVER WATERSHED WATERMASTER STEERING COMMITTEE AND MICHAEL J. PRESZLER CONSULTING, INC. dba CALIFORNIA WATER CONSULTING

## 1. PARTIES AND DATE.

This Agreement is made and entered into this February 1,2017, by and between SANTA MARGARITA RIVER WATERSHED WATERMASTER STEERING COMMITTEE ("STEERING COMMITTEE") and Michael J. Preszler Consulting, Inc., a California corporation, transacting business under the fictitious business name of California Water Consulting ("CONSULTANT"). STEERING COMMITTEE and CONSULTANT are sometimes individually referred to as "Party" and collectively as "Parties" in this Agreement.

## 2. RECITALS.

2.1    In 1966; a Modified Final Judgment and Decree ("Judgment") was entered by the United States District Court ("Court") in the case of the United States v. Fallbrook Public Utility District, et al., Case No. 1247-SD-T ("Fallbrook Case"), pursuant to which the Court retained continuing jurisdiction of all surface waters, all underground or subsurface waters within the Watershed of the Santa Margarita River Watershed and appointed a Watermaster to administer and enforce the provisions of the Judgment.

2.2    On February 3, 1989, the Court entered an Order for the Appointment of a Steering Committee ("1989 Steering Committee Order") [Docket No. 4805] in the Fallbrook Case appointing a steering committee known as the Santa Margarita River Watershed Watermaster Steering Committee ("STEERING COMMITTEE") to assist the Watermaster and the Court in oversight and management of the case. The Duties and Responsibilities of the STEERING COMMITTEE are attached hereto and incorporated herein as Exhibit "A."

2.3    Initially, STEERING COMMITTEE was comprised of a representative appointed by each of the following parties: the United States of America, Fallbrook Public Utility District, and Rancho California Water District. STEERING COMMITTEE is currently comprised of a representative appointed by the United States of America, Fallbrook Public Utility District, Rancho California Water District, Eastern Municipal Water District, Metropolitan Water District of Southern California, Pechanga Band of Luiseño Mission Indians, and Western Municipal Water District.

2.4    Pursuant to the 1989 Steering Committee Order, the duties and responsibilities of STEERING COMMITTEE include the responsibility to recommend to the Court a candidate for the position of Watermaster in the Santa Margarita River Watershed.

2.5    Following a search and submission of a Motion to Appoint a New Watermaster by the STEERING COMMITTEE, the Court has appointed Michael J. Preszler of Michael J. Preszler Consulting, Inc., doing business as California Water Consulting, to serve as

Watermaster for the Santa Margarita River Watershed to fulfill the roles and responsibilities set forth in Order for the Appointment of a Watermaster; Powers and Duties ("1989 Watermaster Order") [Docket No. 4809], and as specified in subsequent instructions and orders of the Court.

2.6     CONSULTANT desires to perform and assume the role and responsibilities of the Watermaster for the Santa Margarita River Watershed as set forth in the 1989 Watermaster Order, and as specified in subsequent instructions and orders of the Court.

2.7     The Court directed the STEERING COMMITTEE to complete negotiations and to enter into a professional services agreement with CONSULTANT to serve as Watermaster for the Santa Margarita River Watershed.

2.8     STEERING COMMITTEE and CONSULTANT have negotiated and agreed upon the following terms and conditions whereby CONSULTANT will serve as the Watermaster for the Santa Margarita River Watershed upon the retirement of the current Watermaster Charles W. Binder and provide the services as set forth in Order for the 1989 Watermaster Order [Docket No. 4809] and as specified in subsequent instructions and orders of the Court.

3.     TERMS.

3.1     Scope of Services and Term.

3.1.1   CONSULTANT promises and agrees to provide and furnish all services necessary to fully and adequately provide to the Court and STEERING COMMITTEE the services described in the Scope of Services attached hereto and incorporated herein as Exhibit "B" and such other services as may be necessary and required in subsequent instructions and orders of the Court and/or STEERING COMMITTEE ("Services").

3.1.2   Subject to the Termination Provisions set forth in Section 3.15.1, CONSULTANT shall serve as Watermaster pursuant to the Order of Court for an indefinite term, at the discretion of the Court, commencing on January 23, 2017 ("Commencement Date").

3.1.3   All Services shall be subject to, and performed in accordance with this Agreement, the exhibits attached hereto and incorporated herein by reference, and all applicable local, state and federal laws, rules and regulations.

3.2     Independent Contractor.

3.2.1   STEERING COMMITTEE retains CONSULTANT as an independent contractor and not as an employee.  No employee or agent of CONSULTANT shall become an employee of STEERING COMMITTEE.

3.2.2   CONSULTANT will determine the means, methods and details of performing the Services subject to the requirements of this Agreement.

//

//

3.3     Provision of Services.

        3.3.1     CONSULTANT shall perform the Services expeditiously, at the discretion of the Court and the STEERING COMMITTEE, within the term of this Agreement. CONSULTANT represents that it has the professional and technical personnel required to perform the Services in conformance with such conditions.

        3.3.2     CONSULTANT shall comply with all applicable laws, ordinances, codes and regulations of the federal, state and local government.

        3.3.3     CONSULTANT's services will be performed in accordance with generally accepted professional practices and principles and in a manner consistent with the level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions.

3.4     Key Personnel/Consultant's Representative.

        3.4.1     CONSULTANT has represented to STEERING COMMITTEE that certain key personnel, Michael J. Preszler will perform and coordinate the Services under this Agreement.

        3.4.2     CONSULTANT hereby designates Michael J. Preszler to act as its representative for the performance of this Agreement ("CONSULTANT'S REPRESENTATIVE"). CONSULTANT'S REPRESENTATIVE shall have full authority to represent and act on behalf of the CONSULTANT for all purposes under this Agreement.

        3.4.3     CONSULTANT'S REPRESENTATIVE shall supervise and direct the Services, using the standard of care defined in this Agreement, and shall be responsible for all means, methods, techniques, sequences and procedures and for the satisfactory coordination of all portions of the Services under this Agreement.

        3.4.4     CONSULTANT'S REPRESENTATIVE agrees to work closely with STEERING COMMITTEE in the performance of Services and shall be available to STEERING COMMITTEE at all reasonable times.

        3.4.5     Should Michael J. Preszler become unavailable, CONSULTANT may not substitute other personnel without prior written approval of STEERING COMMITTEE and/or order of the Court.

3.5     Compensation and Expenses.

        3.5.1     CONSULTANT shall receive compensation for all Services rendered under this Agreement as follows:

        3.5.1.1     CONSULTANT shall receive compensation, as detailed in the Compensation Schedule attached hereto and incorporated herein as Exhibit "C." CONSULTANT's compensation shall be reviewed by the STEERING COMMITTEE annually,

on a water year basis (October 1st, Y1-September 30, Y2), and shall be adjusted by the STEERING COMMITTEE by an amendment to this Agreement.

        3.5.1.2    For all services performed by CONSULTANT during the first five years of this Agreement, STEERING COMMITTEE shall retain and place in an interest-bearing escrow account Two and One Half percent (2.5%) of the amount paid to CONSULTANT up to but not in excess of $5,000.00 per year until the total amount of the retention reaches $25,000.00. The retention shall be withheld up and until CONSULTANT completes five (5) years of service. Upon the completion of five (5) years of service, the retention shall be released to CONSULTANT. If CONSULTANT terminates this Agreement before the 5th year anniversary, the retention will be forfeited and returned to the STEERING COMMITTEE. Five (5) years of service shall be calculated from the Commencement Date.

    3.5.2    <u>Reimbursement of Expenses.</u>

        3.5.2.1    CONSULTANT shall be reimbursed by the STEERING COMMITTEE for the following "out of pocket" expenses: travel, postage, copying, long distance telephone, and the like.

    3.6    CONSULTANT shall submit to the STEERING COMMITTEE, for all services actually performed, a monthly itemized invoice for services, specifying the nature of services performed, the person performing the services, the number of hours expended in performing the services, and the expenses incurred in performing the services. The invoice shall describe the amount of Services and supplies provided since the initial commencement date of Services under this Agreement, and since the start of the subsequent billing periods, through the date of the invoice. CONSULTANT's fees shall be due and payable within thirty (30) days of the date of the invoice. Monthly invoices shall be submitted to

    "Watermaster of Santa Margarita River Watershed"
    c/o Fallbrook Public Utility District
    Accounting Department
    P.O. Box 2290
    Fallbrook, CA 92088-2290

or as otherwise directed by the STEERING COMMITTEE.

    3.7    <u>Conflicts of Interest.</u>

    3.7.1    CONSULTANT represents and warrants that it does not have personal bias or prejudice concerning any party to the Fallbrook Case, or any personal knowledge of disputed evidentiary facts concerning the proceeding as of Commencement Date.

    3.7.2    CONSULTANT represents and warrants that it does not have any existing contracts or serve as a consultant on work for any of the parties to the Fallbrook Case and members of the STEERING COMMITTEE including but not limited to the United States of America, Fallbrook Public Utility District, Rancho California Water District, Eastern Municipal

Water District, Metropolitan Water District of Southern California, Pechanga Band of Luiseño Mission Indians, and/or Western Municipal Water District.

        3.7.3     CONSULTANT represents and warrants that it, either individually or as a fiduciary, does not have a financial interest in the subject matter in controversy, or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

        3.7.4     During the term of this Agreement, CONSULTANT shall not enter into any contracts with, or undertake work for or on behalf of any of the parties to the Fallbrook Case including but not limited to the United States of America, Fallbrook Public Utility District, Rancho California Water District, Eastern Municipal Water District, Metropolitan Water District of Southern California, Pechanga Band of Luiseño Mission Indians, and/or Western Municipal Water District.

3.8     Office and Office Services.

CONSULTANT shall provide all office space and office equipment necessary to the execution of this agreement.

3.9     Standard of Care.

        3.9.1     CONSULTANT represents that it has all licenses, permits, qualifications and approvals of whatever nature that are legally required to perform the Services and that such licenses and approvals shall be maintained throughout the term of this Agreement.

        3.9.2     As provided for in the indemnification provisions of this Agreement, CONSULTANT shall perform, at its own cost and expense and without reimbursement from STEERING COMMITTEE, any services necessary to correct errors or omissions which are caused by CONSULTANT'S failure to comply with the standard of care provided for herein.

3.10     Laws and Regulations.

        3.10.1     CONSULTANT shall keep itself fully informed of and in compliance with all local, state and federal laws, rules and regulations in any manner affecting the performance of the Services and shall give all notices required by law.

        3.10.2     CONSULTANT shall be liable for all violations of local, state and federal laws, rules and regulations in connection with the provision of the Services.  If the CONSULTANT performs any work knowing it to be contrary to such laws, rules and regulations and without giving written notice to STEERING COMMITTEE, CONSULTANT shall be solely responsible for all costs arising therefrom.

        3.10.3     CONSULTANT shall defend, indemnify and hold STEERING COMMITTEE its members, officers, representatives, and agents free and harmless, pursuant to the indemnification provisions of this Agreement, from any claim or liability arising out of any failure or alleged failure to comply with such laws, rules or regulations.

3.11    Insurance.

      3.11.1    CONSULTANT shall, at its expense, procure and maintain for the duration of the Agreement, and shall also require all of its subcontractors to procure and maintain, insurance coverage meeting at least the following minimum levels of coverage:

      (A)    *General Liability*: Insurance Services Office Commercial General Liability coverage (occurrence form CG 0001).    CONSULTANT shall procure and maintain, and require its subconsultants to procure and maintain, Commercial General Liability coverage at least as broad as Insurance Services Office Commercial General Liability coverage in the amount of One Million Dollars ($1,000,000) per occurrence for bodily injury, personal injury and property damage.

      (a)    Commercial General Liability Insurance must include coverage for the following:

      i.    Bodily Injury and Property Damage;
      ii.    Personal Injury/Advertising Injury;
      iii.    Premises/Operations Liability;
      iv.    Products / Completed Operations Liability;
      v.    Aggregate Limits that Apply per Project;
      vi.    Contractual Liability with respect to this Contract;
      vii.    Broad Form Property Damage; and
      viii.    Independent Binders Coverage.

      (b)    All such policies shall name the STEERING COMMITTEE, its officers, employees, agents and Steering Committee designated volunteers as Additional Insureds under the policy.

      (c)    The general liability program may utilize either deductibles or provide coverage excess of a self-insured retention, subject to written approval by the STEERING COMMITTEE.

      (B)    Automobile Liability: Insurance Services Office Business Auto Coverage form number CA 0001, code 1 (any auto).    At all times during the performance of the work under this Agreement, CONSULTANT shall procure and maintain, and require its subconsultants to procure and maintain Automobile Liability: Insurance Services Office Business Auto Coverage in the amount of One Million Dollars ($1,000,000) combined single limit (each accident) for bodily injury and property damage including coverage for owned, non-owned and hired vehicles, in a form and with insurance companies acceptable to STEERING COMMITTEE.

      (a)    Coverage for automobile liability insurance shall be at least as broad as Insurance Services Office Form Number CA 0001 (ed. 1/87) covering automobile liability, Code 1 (any auto).

(b)    The automobile liability program may utilize deductibles, but not a self-insured retention, subject to written approval by the STEERING COMMITTEE.

(c)    All such policies shall name the STEERING COMMITTEE, its officers, employees, agents and STEERING COMMITTEE designated volunteers as Additional Insureds under the policies.

(C)    *Workers' Compensation and Employer's Liability*: If it employs any persons, CONSULTANT shall procure and maintain, and require its subconsultants to procure and maintain, Workers' Compensation insurance as required by the State of California and Employer's Liability Insurance - Workers' Compensation limits as required by the Labor Code of the State of California with Employer's Liability limits of One Million Dollars ($1,000,000) per accident for bodily injury or disease.

(D)    *Professional Liability/Errors and Omissions*: Professional Liability/Errors and Omissions. CONSULTANT shall procure and maintain, and require its subconsultants to procure and maintain, for a period of five (5) years following completion of the Services, professional liability/errors and omissions liability insurance appropriate to their profession in an amount not less than $1,000,000 per claim, and shall be endorsed to include contractual liability. "Covered Professional Services" as designated in the Professional Liability/Errors and Omissions policy must specifically include work performed under this Agreement.

3.11.2    CONSULTANT shall not commence the Services under this Agreement until it has provided evidence satisfactory to STEERING COMMITTEE that it has secured all insurance required under this section.

3.11.3    In addition, CONSULTANT shall not allow any subcontractor to commence work on any subcontract until it has provided evidence satisfactory to STEERING COMMITTEE that the subcontractor has secured all insurance required under this section.

3.11.4    Requirements of specific coverage or limits contained in this section are not intended as a limitation on coverage, limits, or other requirement, or a waiver of any coverage normally provided by any insurance.

3.11.5    Any available coverage shall be provided to the parties required to be named as additional insured pursuant to this Agreement. Defense costs shall be payable in addition to the limits in accordance with terms set forth in Section 3.15.6 entitled "Attorney's Fees."

3.11.6    Insurance Endorsements. The insurance policies shall contain the following provisions, or if they do not contain such provisions, CONSULTANT shall provide endorsements on forms supplied or approved by STEERING COMMITTEE to add the following provisions to the insurance policies:

(A)    Commercial General Liability.  The commercial general liability policy shall be endorsed to provide the following: (1) STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers shall be covered as additional insureds using ISO endorsement forms CG 20 10 10 01 and 20 37 10 01, or endorsements providing the exact same coverage; (2) the insurance coverage shall be primary insurance as respects STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers, or, if excess, shall stand in an unbroken chain of coverage excess of the CONSULTANT 's scheduled underlying coverage.  Any insurance or self-insurance maintained by STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers shall be excess of the CONSULTANT 's insurance and shall not be called upon to contribute with it in any way; and (3) the insurance coverage shall contain or be endorsed to provide waiver of subrogation in favor of STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers or shall specifically allow CONSULTANT to waive its right of recovery prior to a loss.  CONSULTANT hereby waives its own right of recovery against STEERING COMMITTEE, and shall require similar written express waivers and insurance clauses from each of its subconsultants.

(B)    Automobile Liability.  The automobile liability policy shall be endorsed to provide the following: (1) STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers shall be covered as additional insureds with respect to the ownership, operation, maintenance, use, loading or unloading of any auto owned, leased, hired or borrowed by the CONSULTANT or for which the CONSULTANT is responsible; (2) the insurance coverage shall be primary insurance as respects STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers, or if excess, shall stand in an unbroken chain of coverage excess of the CONSULTANT 's scheduled underlying coverage.    Any insurance or self-insurance maintained by STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers shall be excess of the CONSULTANT 's insurance and shall not be called upon to contribute with it in any way; and (3) the insurance coverage shall contain or be endorsed to provide waiver of subrogation in favor of STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers or shall specifically allow CONSULTANT to waive its right of recovery prior to a loss.  CONSULTANT hereby waives its own right of recovery against STEERING COMMITTEE, and shall require similar written express waivers and insurance clauses from each of its subconsultants.

(C)    Workers' Compensation and Employers Liability Coverage. If such a policy is required, the insurer shall agree to waive all rights of subrogation against STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers for losses paid under the terms of the insurance policy which arise from work performed by the CONSULTANT.

(D)    All Coverages.  Each insurance policy required by this Agreement shall be endorsed to state that: (A) coverage shall not be suspended, voided, reduced or canceled except after thirty (30) days prior written notice by certified mail, return receipt requested, has been given to STEERING COMMITTEE; and (B) any failure to comply with reporting or other provisions of the policies, including breaches of warranties, shall not affect

coverage provided to STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers.

3.11.7    <u>Separation of Insureds; No Special Limitations</u>.  All insurance required by this Section shall contain standard separation of insureds provisions.  In addition, such insurance shall not contain any special limitations on the scope of protection afforded to STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers.

3.11.8    <u>Deductibles and Self-Insurance Retentions</u>.  Any deductibles or self-insured retentions must be declared to and approved by STEERING COMMITTEE. CONSULTANT members shall guarantee that, at the option of STEERING COMMITTEE, either: (1) the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects STEERING COMMITTEE, its members, officials, officers, employees, agents and volunteers; or (2) the CONSULTANT shall procure a bond guaranteeing payment of losses and related investigation costs, claims and administrative and defense expenses.

3.11.9    <u>Acceptability of Insurers</u>.  Insurance is to be placed with insurers with a current A.M. Best's rating no less than A:VII, admitted to transact in the business of insurance in the State of California, or otherwise allowed to place insurance through surplus line brokers under applicable provisions of the California Insurance Code or any federal law, and satisfactory to STEERING COMMITTEE.

3.11.10    <u>Verification of Coverage</u>.  CONSULTANT shall furnish STEERING COMMITTEE with original certificates of insurance and endorsements effecting coverage required by this Agreement on forms satisfactory to STEERING COMMITTEE.  The certificates and endorsements for each insurance policy shall be signed by a person authorized by that insurer to bind coverage on its behalf, and shall be on forms provided by the STEERING COMMITTEE if requested.  All certificates and endorsements must be received and approved by the STEERING COMMITTEE before work commences.   The STEERING COMMITTEE reserves the right to require complete, certified copies of all required insurance policies, at any time.

3.11.11    <u>Subconsultants</u>.  CONSULTANT shall not allow any subcontractors or subconsultants to commence work on any subcontract until they have provided evidence satisfactory to the STEERING COMMITTEE that they have secured all insurance required under this section. Policies of commercial general liability insurance provided by such subcontractors or subconsultants shall be endorsed to name STEERING COMMITTEE as an additional insured using ISO form CG 20 38 04 13 or an endorsement providing the exact same coverage.   If requested by CONSULTANT, STEERING COMMITTEE may approve different scopes or minimum limits of insurance for particular subcontractors or subconsultants.

3.11.12    <u>Compliance with Coverage Requirements</u>.  If at any time during the life of the Agreement, any policy of insurance required under this Agreement does not comply with these specifications or is canceled and not replaced, STEERING COMMITTEE shall notify the CONSULTANT in writing of the noncompliance or cancellation of the required policy of insurance. If the CONSULTANT fails to resolve the matter and reinstate the required insurance within two (2) business days, then the STEERING COMMITTEE has the right but not the duty

to obtain the insurance it deems necessary and any premium paid by STEERING COMMITTEE will be promptly reimbursed by CONSULTANT or STEERING COMMITTEE will withhold amounts sufficient to pay premium from CONSULTANT payments.

3.12    Maintenance of Records.

  3.12.1    Books, documents, papers, accounting records, and other evidence pertaining to costs incurred shall be maintained by CONSULTANT and made available at all reasonable times for inspection by STEERING COMMITTEE and the Court. All prior Watermaster digital and paper files, documents, accounting records, evidence pertaining to costs incurred and other archives shall be turned over to the CONSULTANT upon commencement of this Agreement.

3.13    Extra Work.

  3.13.1    At any time during the term of this Agreement, STEERING COMMITTEE may request that CONSULTANT perform Extra Work.

  3.13.2    As used herein, "Extra Work" means any work which is not described in Exhibit "B" and is required by subsequent order of the Court.

  3.13.3    CONSULTANT shall not perform, nor be compensated for, Extra Work without written authorization from STEERING COMMITTEE.

  3.13.4    Where Extra Work is ordered by the Court, the STEERING COMMITTEE will prepare an amendment to this Agreement that adds a scope of services ordered by the Court and will be executed by CONSULTANT and STEERING COMMITTEE Extra Work will be billed to the STEERING COMMITTEE on the same terms, conditions and fee schedule hereunder unless, the court approves an amended fee schedule or orders otherwise.

  3.13.5    Amendments for Extra Work shall not render ineffective or invalidate unaffected portions of this Agreement.

  3.13.6    Within 90 days of the commencement date, CONSULTANT shall review with the STEERING COMMITTEE items covered by Court Order 4902, Section II. Powers and Duties of the Watermaster, Item 14 … duties as may be assigned by the Court… and listed in Exhibit C.  The CONSULTANT shall work with the STEERING COMMITTEE to define the limits of these duties and propose compensation mechanism for activities outside the service areas of current STEERING COMMITTEE members.

3.14    Accounting Records.

  3.14.1    CONSULTANT shall maintain complete and accurate records with respect to all costs and expenses incurred under this Agreement.  All such records shall be clearly identifiable.

3.14.2    CONSULTANT shall allow a representative of STEERING COMMITTEE during normal business hours to examine, audit, and make transcripts or copies of such records and any other documents created pursuant to this Agreement.

3.14.3    CONSULTANT shall allow inspection of all work, data, documents, proceedings, and activities related to the Agreement deemed non-confidential by the Watermaster for a period of three (3) years from the date of final payment under this Agreement.

3.15    <u>General Provisions</u>.

3.15.1    Termination of Agreement.

3.15.2    Nothing in this Agreement shall limit STEERING COMMITTEE's Duties and Responsibilities identified in the 1989 Steering Committee Order [Docket No. 4805] in the Fallbrook Case appointing STEERING COMMITTEE attached hereto as Exhibit "A."

3.15.3    Nothing in this Agreement shall limit the CONSULTANT's Duties of the Watermaster identified in the 1989 Watermaster Order [Docket No. 4809] in the Fallbrook Case appointing the Watermaster attached hereto as Exhibit "B."

3.15.3.1    During the time that the CONSULTANT serves as Watermaster pursuant to the Order of the Court, as set forth in Section 3.1, the terms of this agreement shall remain in effect. If, at the discretion of the Court, the CONSULTANT no longer serves as Watermaster, the STEERING COMMITTEE may terminate the whole or any part of this Agreement at any time and without cause by giving written notice to CONSULTANT of such termination, and specifying the effective date thereof, at least seven (7) days before the effective date of such termination. Notwithstanding the foregoing, the Court may terminate this Agreement, in whole or in part, at any time and without cause, such termination being effective immediately. The STEERING COMMITTEE and/or its members reserve the right to seek an Order of Court to terminate CONSULTANT.

3.15.3.2    Upon termination, CONSULTANT shall be compensated only for those Services which have been rendered to STEERING COMMITTEE, and CONSULTANT shall be entitled to no further compensation.

3.15.3.3    CONSULTANT shall not be entitled to payment for unperformed Services, and shall not be entitled to damages or compensation for termination of this Agreement by STEERING COMMITTEE except for the amounts authorized herein.

3.15.3.4    If this Agreement is terminated as provided herein, STEERING COMMITTEE may require CONSULTANT to provide all finished or unfinished Documents and Data (defined below) and other information of any kind prepared by CONSULTANT in connection with the performance of Services under this Agreement. CONSULTANT shall be required to provide such documents and other information within fifteen (15) days of the request.

3.15.3.5    In the event this Agreement is terminated in whole or in part as provided herein, STEERING COMMITTEE may procure, upon such terms and in such manner as it may determine appropriate, services similar to those terminated.

3.15.3.6    In the event this Agreement is terminated in whole or in part as provided herein, STEERING COMMITTEE will release the retention as retained in Section 3.5.1.2.

3.15.3.7    In the event CONSULTANT terminates this Agreement on or before the completion of five (5) years of service, STEERING COMMITTEE shall be entitled to keep the retention specified in Section 3.5.1.2 of this Agreement.

3.15.4    Delivery of Notices.   All notices permitted or required under this Agreement shall be given to the respective Parties at the following address, or at such other address as the respective parties may provide in writing for this purpose:

| **STEERING COMMITTEE** | **CONSULTANT** |
|---|---|
| Attn: WATERMASTER | Michael J Preszler Consulting, Inc. |
| c/o Fallbrook Public Utility District | Michael J. Preszler |
| P.O. Box 2290 | 3096 Clermont Way |
| Fallbrook, CA  92088-2290 | El Dorado Hills, CA 95762 |

Such notice shall be deemed made when personally delivered or when mailed, forty-eight (48) hours after deposit in the U.S. Mail, first class postage prepaid and addressed to the Party at its applicable address. Actual notice shall be deemed adequate notice on the date actual notice occurred, regardless of the method of service.

3.15.5    Cooperation; Further Acts.   The Parties shall fully cooperate with one another, and shall take any additional acts or sign any additional documents as may be necessary, appropriate or convenient to attain the purposes of this Agreement.

3.15.6    Attorney's Fees.   If either Party commences an action against the other Party, either legal, administrative or otherwise, arising out of or in connection with this Agreement, the prevailing party in such litigation shall be entitled to have and recover from the losing party reasonable attorney's fees and all other documented costs of such action.

3.15.7    Indemnification.    To the fullest extent permitted by law, CONSULTANT shall defend, indemnify and hold STEERING COMMITTEE, its members, officers, employees, volunteers, and agents free and harmless from any and all claims, demands, causes of action, costs, expenses, liability, loss, damage or injury, in law or equity, to property or persons, including wrongful death, in any manner arising out of, pertaining to, or relating to any negligence, recklessness, or willful misconduct of CONSULTANT, its officials, officers, employees, agents, subconsultants, and/or subcontractors arising out of or in connection with the performance of the Services, or this Agreement; except with respect to such matters resulting from or arising out of the negligence, recklessness, or willful misconduct of STEERING COMMITTEE, its members, officers, employees, volunteers, and agents.

       3.15.8     Entire Agreement.  This Agreement contains the entire Agreement of the Parties with respect to the subject matter hereof, and supersedes all prior negotiations, understandings or agreements.  This Agreement may only be modified by a writing signed by both Parties.

       3.15.9     Governing Law.  This Agreement shall be governed by the laws of the State of California.  Venue shall be in San Diego County, California.

       3.15.10    Successors and Assigns.  This Agreement shall be binding on and shall inure to the benefit of the successors in interest, executors, administrators and assigns of each Party.

       3.15.11    Assignment or Transfer.   CONSULTANT shall not assign, hypothecate, or transfer, either directly or by operation of law, this Agreement or any interest herein without the prior written consent of STEERING COMMITTEE.  Any attempt to do so shall be null and void, and any assignees, hypothecates or transferees shall acquire no right or interest by reason of such attempted assignment, hypothecation or transfer.

       3.15.12    Subcontracting.   CONSULTANT shall notify the STEERING COMMITTEE prior to subcontracting any portion of the work required by this Agreement, except as expressly stated herein.  Subcontracts, if any, shall contain a provision making them subject to all provisions stipulated in this Agreement.

       3.15.13    Construction; References; Captions.  Since the Parties or their agents have participated fully in the preparation of this Agreement, the language of this Agreement shall be construed simply, according to its fair meaning, and not strictly for or against any Party.  Any term referencing time, days or period for performance shall be deemed calendar days and not work days.  All references to CONSULTANT include all personnel, employees, agents, and subcontractors of CONSULTANT, except as otherwise specified in this Agreement.   All references to STEERING COMMITTEE include its members, officers, employees, agents, and volunteers except as otherwise specified in this Agreement.  The captions of the various articles and paragraphs are for convenience and ease of reference only, and do not define, limit, augment, or describe the scope, content, or intent of this Agreement.

       3.15.14    Amendment; Modification.   No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing and signed by both Parties.

       3.15.15    Waiver.  No waiver of any default shall constitute a waiver of any other default or breach, whether of the same or other covenant or condition.  No waiver, benefit, privilege, or service voluntarily given or performed by a Party shall give the other Party any contractual rights by custom, estoppel, or otherwise.

       3.15.16    No Third Party Beneficiaries.   There are no intended third party beneficiaries of any right or obligation assumed by the Parties.

3.15.17     <u>Invalidity; Severability</u>.  If any portion of this Agreement is declared invalid, illegal, or otherwise unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect.

3.15.18     <u>Equal Opportunity Employment</u>.  CONSULTANT represents that it is an equal opportunity employer and it shall not discriminate against any subcontractor, employee or applicant for employment because of race, religion, color, national origin, handicap, ancestry, sex or age.  Such non-discrimination shall include, but not be limited to, all activities related to initial employment, upgrading, demotion, transfer, recruitment or recruitment advertising, layoff or termination.

3.15.19     <u>Labor Certification</u>.    By its signature hereunder, CONSULTANT certifies that it is aware of the provisions of Section 3700 of the California Labor Code which require every employer to be insured against liability for Workers' Compensation or to undertake self-insurance in accordance with the provisions of that Code, and agrees to comply with such provisions before commencing the performance of the Services.

3.15.20     <u>Authority to Enter Agreement</u>.   CONSULTANT has all requisite power and authority to conduct its business and to execute, deliver, and perform the Agreement. Each Party warrants that the individuals who have signed this Agreement have the legal power, right, and authority to make this Agreement and bind each respective Party.

3.15.21     <u>Counterparts</u>.  This Agreement may be signed in counterparts, each of which shall constitute an original.

<u>Attached Exhibits</u>

Exhibit A – Steering Committee Duties and Responsibilities

Exhibit B - Scope of Services

Exhibit C – Compensation Schedule

Exhibit D – Watermaster Budget for Water Year 2016-2017

[Signatures on Following Page]

Dated:_____       Dated:_____


**SANTA MARGARITA RIVER**           **MICHAEL J. PRESZLER CONSULTING, INC**
**WATERSHED WATERMASTER**           **DBA CALIFORNIA WATER CONSULTING**
**STEERING COMMITTEE**


By: _____     By: _____
    Nick Kanetis, P.E.                        Michael J. Preszler, P.E.
    Chairperson                               President
    Steering Committee                        Michael J. Preszler Consulting, Inc.,
    Santa Margarita River Watershed           dba California Water Consulting
    Watermaster

## EXHIBIT "A"

### STEERING COMMITTEE
### DUTIES AND RESPONSIBILITIES

The Steering Committee shall have the responsibility for coordinating the conduct of litigation in the following manner:

1.  Recommend to the Court a candidate for the position of Watermaster in the Santa Margarita watershed;

2.  Recommend to the Court the scope of reference for the Watermaster's duties and responsibilities;

3.  Assist the Watermaster by providing information and data regarding as requested by the Watermaster;

4.  Meet with the Watermaster on a quarterly basis to discuss the status of the Watermaster's investigations in Santa Margarita watershed, including long and short term budget requirements;

5.  The Steering Committee shall review the budget and proposed expenditures of the Watermaster and make its recommendation with respect thereto; and

6.  Any other tasks as determined to be necessary by the Court.

Steering Committee meetings shall be held quarterly beginning on April 1, 1989 and shall be open to the public. Notice as to the time and place of such meetings shall be sent out to all parties on the Court approved service list ten days before the meeting date.  In addition, notice shall be posted for five consecutive days, fifteen days prior to any such meeting, at the following locations:  Fallbrook Public Utility District, 990 E. Mission Road, Fallbrook, California; Rancho California Water District, 28061 Diaz Road, Temecula, California; and at the Post Office at Anza, California.  The Steering Committee may call additional meetings at the discretion of the chairman or upon the request of a majority of the members of the Steering Committee.  Notice of such meetings shall be in the same manner as above.

**EXHIBIT "B"**
**SCOPE OF SERVICES**


**- ATTACHED BEHIND THIS PAGE –**

Exhibit B

### Duties of the Watermaster

To the extent not superseded herein, these Duties of the Watermaster incorporate by reference the powers and duties granted by Order of the Court in *United States vs. Fallbrook Public Utility District* in its Order filed March 13, 1989 (herein referred to as the "1989 Order").   The following Duties of the Watermaster are adapted from the 1989 Order to include additional duties described herein:

I

### REPORTING DUTIES

Promptly after the end of each water year[1], the Watermaster shall report to the Court, in writing, a summary of his findings and conclusions, as follows:

1.   A summary of water availability within the Santa Margarita River watershed for the previous year and, to the extent feasible, a forecast of the same for the upcoming water year.  The summary shall include a compilation, by hydrologic sub-unit, of the following water quantities:

a.   Surface Water:

1)   Surface flow of the Santa Margarita River and its tributaries, with identification by quantity of the specific sources of such surface flow, including water from natural runoff, water imported from outside the watershed, and water from each of the subsurface sources identified in the applicable interlocutory judgments.

2)   Diversions of surface water, with identification by quantity of the related consumptive uses, losses, and returns.

3)   Water in surface storage on the last day of the previous water year.

b.   Subsurface water:

1)   Extractions from each of the subsurface sources identified in the applicable interlocutory judgments, with identification by quantity of the related consumptive uses, losses, and returns.

2)   For each such subsurface source, (i) the quantity of water in subsurface storage at the end of the previous water year, (ii) the source and quantity of recharge.

---

[1] "Water Year" shall be defined as that twelve-month period beginning on October 1 and ending September 30.

8

c.     The source and quantity of water imported for use within the Santa Margarita River watershed.

d.     The source and quantity of water exported from the Santa Margarita River watershed.

2.     A list of all water users within the Santa Margarita River watershed, including for each a description of vested rights and appropriative priority dates if any.

3.     A report on the use of water by each substantial user[2] within the Santa Margarita River watershed for the previous water year showing for each such user the amount of water diverted, extracted, impounded, or imported and the amount used according to category of use, including: domestic, irrigation, other agricultural, industrial, commercial, public and such other types of uses as the Watermaster may deem appropriate.

4.     A list of all unauthorized water use within the Santa Margarita River watershed, along with an explanation of actions taken or recommended to be taken with respect to such use.

5.     A statement of conditions and activities which, if continued, may pose a threat to the long-term water supply of the Santa Margarita River watershed.

6.     Report on the water quality within the Santa Margarita River watershed by hydrologic sub-unit during the previous water year.

7.     An update of the Watermaster's projected tasks, expenditures and requirements over the next five years.

8.     A proposed budget for the following water year.

9.     Other information deemed appropriate by the Watermaster.

A copy of the Watermaster's written report shall be mailed to each party listed on the Court approved mailing list, and to any party requesting a copy. In addition, five copies of the report will be made available for inspection by the public, during regular business hours, at Fallbrook Public Utility District, 990 E. Mission Road, Fallbrook, California; Rancho California Water District, 42135 Winchester Road, Temecula, California; State Department of Forestry and Fire Protection, 56560 Highway 371, Anza, California; and Hamilton School/Library, 57550 Mitchell Road, Anza, California.

---

[2] "Substantial user" means any person that claims a right to use water under the orders, judgments or decrees of this Court in the above entitled action, and any person previously designated by this Court or the Watermaster to be a substantial user; any person using water or who claims a right to use water in an amount equal to or greater than or in a manner similar to the uses designated in Exhibit A to the 1989 Order; or any person using water within the Santa Margarita River watershed and designated by the Watermaster to be a substantial user.

Any party that objects to a portion of the Watermaster's report, including the Watermaster's designation of substantial users, may do so by filing written Notice of his objection within thirty days of service of the Watermaster's report. Objections filed with this Court must refer to that portion of the Watermaster's report that is objectionable and state specifically the grounds for the objection. Thereafter, the Court may determine a date for hearing the noticed objection. Any party wishing to intervene on behalf of the objecting party or on behalf of the Watermaster may do so within the discretion of the Court.

II

POWERS AND DUTIES OF THE WATERMASTER

The Watermaster shall have the following powers and duties:

1.      To update and maintain the list of substantial users.

2.      To collect water consumption data and require monthly reports from the substantial users including, for each such user, the amount of water diverted, extracted, impounded or imported and the amount of water used, as follows:

     a.      To require every substantial user of subsurface water to supply in writing the following factual data for each well owned or operated within the watershed:

        1)      The well owner;

        2)      The location of the well;

        3)      The quantity in acre-feet of the water pumped during that month and the use by quantity to which the water was put; and

        4)      The depth in feet to water on or about the last day of that month and designate the zone(s) or aquifer(s) from which well casing perforations permit the production of water.

     b.      To require every substantial user that diverts surface water to supply in writing the following factual data for each designated point of diversion within the watershed:

        1)      The diverter's name;

        2)      The location of the point of diversion; and

        3)      The quantity in acre-feet of water diverted for the preceding month.

     c.      To require every substantial user to supply in writing the following factual data for each designated surface storage reservoir:

10

      1)      The reservoir owner;

      2)      The location of the storage facility;

      3)      The quantity, in acre-feet of water held in storage in such facility on the last day of the preceding month; and

      4)      The purpose for which such water was stored.

d.      To require every water importer subject to this Court that imports water to supply in writing the following factual data:

      1)      The importer's name;

      2)      The discharge point or point of connection of such imported water; and

      3)      The quantity in acre-feet, of water imported for the preceding month.

e.      To require every substantial user and every importer of water within the Santa Margarita River Watershed to supply in writing the following factual data:

      1)      The user's name; and

      2)      The quantity of water devoted to the uses listed below in each hydrologic sub-unit or area designated by the Watermaster:

           A.      Domestic

           B.      Agricultural irrigation

           C.      Other agriculture

           D.      Industrial

           E.      Commercial

           F.      Public

           G.      Others as Watermaster may deem appropriate.

f.      To require every producer of reclaimed waste water subject to this Court to supply in writing the following factual data:

      1)      The producers' name;

      2)      The location of use or discharge of reclaimed water; and

       3)     The quantity in acre-feet of reclaimed water produced, delivered and discharged for the preceding month.

3.      To make all reasonable efforts to collect and reconstruct water consumption data for the periods 1966 to date.

4.      To obtain necessary pump efficiency data.

5.      To operate and maintain gaging stations, investigate water availability and hydrology, and conduct water quality testing.

6.      To perform such duties as are required under the Memorandum of Understanding and Agreement on Operation of Lake Skinner.

7.      To take custody of existing records and reports, maintain proper records, and prepare periodic written reports as required by this Court.

8.      To locate and investigate unauthorized water appropriations within the Santa Margarita River watershed.

9.      To assist in locating, investigating and enjoining water quality violations within the Santa Margarita River Watershed.

10.     The Watermaster shall have the authority to enter, upon reasonable notice and at reasonable times, upon the lands of any party to conduct such tests and measurements as he deems necessary to carry out the provisions of this, or any other order of the Court with respect to the duties enumerated above.

11.     To the extent not superceded herein, this Agreement incorporates by reference the powers and duties granted by the Court in its Order filed January 27, 1966, as modified on April 6, 1966.

12.     To design, print and distribute the forms necessary to convey the information required by any applicable Order of the Court.

13.     To report to the Steering Committee, established pursuant to Court Order, on a quarterly basis regarding the status of the Watermaster's investigation, proposed budget items for the upcoming water year and to respond to questions regarding the progress of any programs established by the Watermaster in implementing this Order.

14.     To perform such other duties as may be assigned by the Court or by the Steering Committee.

15.     To perform such duties as are required under the Memorandum of Understanding and Agreement on Operation of Domenigoni Valley Reservoir (now known as Diamond Valley Lake).

16.   To perform such duties as are required under the Cooperative Water Resource Management Agreement between the United States and Rancho California Water District.

III

JURISDICTION

This Court retains jurisdiction, upon the application of any party or of the Watermaster or upon its own motion to make such further or supplemental orders or directions as may be necessary or appropriate for interpretation, enforcement or carrying out of this Court's judgments, decrees and orders with respect to the Santa Margarita River watershed.

13

**EXHIBIT "C"**
**COMPENSATION**

- ATTACHED BEHIND THIS PAGE –

# EXHIBIT C

## COST PROPOSAL - January 24, 2017[1]
## SANTA MARGARITA RIVER WATERSHED WATERMASTER
### SUBMITTED TO SANTA MARGARITA RIVER WATERSHED WATERMASTER STEERING COMMITTEE
### BY MICHAEL J. PRESZLER CONSULTING, INC. dba as CALIFORNIA WATER CONSULTING

| | Team Member | | | | |
|---|---|---|---|---|---|
| Role on Project | Michael Preszler Watermaster | Technical Analyst | Word Processing | Hours Per Task | Cost Per Subtask |
| Rate per hour | $ 175 | $ 75 | $ 35 | | |
| **Watermaster Office Duties** | | | | | |
| Reporting Duties (Section I, Items 1-9 of Exhibit B - Scope of Services) | 225 | 378 | 32 | 634.5 | $ 68,828 |
| Powers and Duties of the Watermaster (Section II, Item 1 of Exibit B - Scope of Services) | 20 | | | 20 | $ 3,500 |
| Powers and Duties of the Watermaster (Section II, Item 2-4 of Exibit B - Scope of Services) | 275 | 462 | 39 | 775.5 | $ 84,123 |
| Powers and Duties of the Watermaster (Section II, Item 5 of Exibit B - Scope of Services) | 20 | | | 20 | $ 3,500 |
| Powers and Duties of the Watermaster (Section II, Items 6-9 of Exibit B - Scope of Services) | 40 | | | 40 | $ 7,000 |
| Powers and Duties of the Watermaster (Section II, Item 10-13 of Exibit B - Scope of Services) | 160 | | | 160 | $ 28,000 |
| Powers and Duties of the Watermaster (Section II, Item 14 of Exibit B - Scope of Services) | 340 | | | 340 | $ 59,500 |
| Total Hours | 1,080 | 840 | 70 | 1,990 | |
| Total Labor | $ 189,000 | $ 63,000 | $ 2,450 | | $ 254,450 |
| **Sub-Consultants** *(No markup)* | | | | | |
| Audit | (Independent Audit, $2,000 has been paid for 2017) | | | $ 4,600 | |
| Accounting | Accounting Services provided by FPUD | | | $ 5,700 | |
| Lease | Watermaster Office Lease (February and March) | | | $ 3,000 | |
| Legal | (legal services, assumes $5,000 has been expended in 2017) | | | $ 25,000 | |
| USGS | Gaging Station | | | $ 177,800 | |
| USGA | Surface Water Quality | | | $ 24,950 | |
| USGS | Groundwater Monitoring - Water Levels | | | $ 51,850 | |
| USGS | Groundwater Monitoring - Water Quality | | | $ - | |
| **Expenses** *(No markup)* | | | | | |
| Insurance | (Watermaster office insurance) | | | $ 600 | |
| Travel | (airfare, hotel, mileage) | | | $ 20,000 | |
| Printing | (Printing of Annual Report) | | | $ 11,500 | |
| Mailing | (Postage, Mailing Annual Report) | | | $ 2,000 | |
| Publications | | | | $ 3,300 | |
| Office Relocation | | | | $ 3,000 | |
| Miscellaneous | (only used if required) | | | $ 35,000 | |

$258,650

Total Expenses = $ 368,300

Total Budget = $ 622,750

[1] Budget represents projection of costs through September 30, 2017.

The scope of work in this proposal is limited to the hours allocated in the budget for each task.

**EXHIBIT "D"**
**WATERMASTER BUDGET FOR WATER YEAR 2016-217**

**- ATTACHED BEHIND THIS PAGE –**

60028.00001\29518186.1

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

TABLE 13.2

*SANTA MARGARITA RIVER WATERSHED*
PROPOSED WATERMASTER BUDGET FOR WATER YEAR 2016-17

| Line Item | Water Year 2016-17 | | | |
| --- | --- | --- | --- | --- |
| | Proposed Budget 2016-17 1/ | Approved Budget 2015-16 2/ | Increase Over Approved Budget 2015-16 | |
| | $ | $ | $ | % |
| *Watermaster Office* | | | | |
| Accounting Services | $8,500 | $8,400 | $100 | 1.2% |
| Audit | 6,600 | 6,600 | 0 | 0.0% |
| Clerical/Analyst | 114,200 | 115,700 | -1,500 | -1.3% |
| Conference/Training | 1,600 | 1,400 | 200 | 14.3% |
| Equipment and Furniture | 1,000 | 1,000 | 0 | 0.0% |
| Human Resources Services | 800 | 800 | 0 | 0.0% |
| Insurance | 600 | 600 | 0 | 0.0% |
| IT System/Computer | 10,000 | 10,000 | 0 | 0.0% |
| Legal Services | 30,000 | 20,000 | 10,000 | 50.0% |
| Miscellaneous | 33,400 | 1,325 | 32,075 | 2,420.8% |
| Postage | 2,000 | 2,000 | 0 | 0.0% |
| Printing | 11,500 | 10,000 | 1,500 | 15.0% |
| Publications | 3,300 | 3,300 | 0 | 0.0% |
| Rent | 18,000 | 18,000 | 0 | 0.0% |
| Supplies | 1,900 | 1,900 | 0 | 0.0% |
| Telephone | 3,000 | 3,000 | 0 | 0.0% |
| Travel | 1,500 | 1,000 | 500 | 50.0% |
| *Watermaster Services* | | | | |
| Consulting Services | 242,000 | 241,000 | 1,000 | 0.4% |
| Travel Reimbursement | 27,600 | 27,600 | 0 | 0.0% |
| **SUBTOTAL WATERMASTER OFFICE** | $517,500 | $473,625 | $43,875 | 9.3% |
| | | | | |
| **USGS** | | | | |
| Gaging Station | $177,800 | $172,175 | $5,625 | 3.3% |
| Surface Water Quality | 24,950 | 24,800 | 150 | 0.6% |
| Groundwater Monitoring - Water Levels | 51,850 | 45,500 | 6,350 | 14.0% |
| Groundwater Monitoring - Water Quality | 0 | 0 | 0 | 0.0% |
| **SUBTOTAL USGS** | $254,600 | $242,475 | $12,125 | 5.0% |
| | | | | |
| **TOTAL** | $772,100 | $716,100 | $56,000 | 7.8% |

1/   Proposed budget for 2016-17; final budget to be approved by the Court upon acceptance of the Annual Watermaster Report for Water Year 2014-15.

2/   Budget for 2015-16 approved by the Court as reported in the Annual Watermaster Report for Water Year 2013-14, published in August 2015.