1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBITS

## TABLE OF CONTENTS

| | Pages |
|---|---|
| **EXHIBIT 1, Pechanga Settlement Agreement and Exhibits** | **1-358** |
| Pechanga Settlement Agreement | 1-20 |
| Exhibit A: Amended and Restated Groundwater Agreement | 21-129 |
| Exhibit B: Amendment No. 1 to Recycled Water Agreement | 130-132 |
| Exhibit C: Recycled Water Transfer Agreement | 133-142 |
| Exhibit D: Recycled Water Scheduling Agreement | 143-153 |
| Exhibit E: Recycled Water Infrastructure Agreement | 154-162 |
| Exhibit F: Extension of Service Area Agreement | 163-295 |
| Exhibit G: ESAA Capacity Agreement | 296-310 |
| Exhibit H: ESAA Water Delivery Agreement | 311-326 |
| Exhibit I: Map depicting Pechanga Reservation | 327 |
| Appendix 1: Fallbrook Decree | 328-355 |
| Appendix 2: Form of Proposed Judgment and Decree | 356-358 |
| **EXHIBIT 2, Pechanga Settlement Act** | **359-375** |
| **EXHIBIT 3, Declaration- Donald Pongrace** | **376-381** |
| **EXHIBIT 4, Declaration- Patrick Barry** | **382-386** |
| **EXHIBIT 5, Declaration- James Gilpin** | **387-390** |

**EXECUTION VERSION**

# PECHANGA BAND OF LUISEÑO MISSION INDIANS WATER RIGHTS SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "***Agreement***") is made and entered into as of November 29, 2017, by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS**, a federally recognized Indian Tribe (**"*Pechanga*"**), **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("***RCWD***") and the **UNITED STATES OF AMERICA** acting by and through the Secretary of the Department of the Interior.

## RECITALS

A.   In 1951, the United States initiated litigation over water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.,* Civ. No. 3:51-cv-01247 (S.D.C.A.) ("***Adjudication Proceeding***").

B.   The Adjudication Proceeding eventually expanded to include all water users within the Santa Margarita River Watershed, including three Indian Tribes (Pechanga, the Ramona Band of Cahuilla Indians, and Cahuilla Band of Indians). The United States, as trustee, represented all three tribes in the Adjudication Proceeding.

C.   The U.S. District Court for the Southern District of California issued a series of interlocutory judgments establishing water rights for various water users as part of the Adjudication Proceeding.   These interlocutory judgments were eventually encompassed in the Fallbrook Decree in 1966. The U.S. District Court retained jurisdiction to be able to interpret and enforce the Fallbrook Decree. The U.S. District Court in such role is hereinafter referred to as the "***Adjudication Court***."

D.   On November 8, 1962, the Adjudication Court issued Interlocutory Judgment No. 41 "concerning the rights to the use of waters of Santa Margarita River Stream System held in trust by the U.S.A. in connection with the Ramona, Cahuilla and Pechanga Indian Reservations."

E.   In 1975, Pechanga filed a Complaint in Intervention in the Adjudication Proceeding to "enjoin the unlawful interference and destruction of its rights to the present and future use of the waters of the Santa Margarita River by the defendants named in this action." In 2006, the Cahuilla Band and the Ramona Band also filed Complaints in Intervention in the Adjudication Proceeding to quantify and enforce their water rights reserved in Interlocutory Judgment No. 41.

F.   On December 21, 2006, Pechanga and RCWD entered into the Groundwater Management Agreement for the management of the water in the Wolf Valley Groundwater Basin (as that term is defined in such agreement).

1

EXHIBIT 1
Page 1

G.  On January 8, 2008, Pechanga and EMWD entered a Recycled Water Agreement providing for the sale and purchase of recycled water.

H.  On March 13, 2008, Pechanga requested that the Secretary of the Interior seek settlement of the water rights claims involving Pechanga, the United States, and non-Federal third parties through the formation of a Federal Negotiation Team under the Criteria and Procedures for Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223. The Secretary agreed to form a Federal Negotiation Team on August 1, 2008.

I.  Recognizing that final resolution of Pechanga's claims to water rights and injuries to water rights in the Adjudication Proceeding and certain other claims against the United States and other parties may take many years, entail great expense, prolong uncertainty concerning the availability of water supplies, and seriously impair the long-term economic well-being of all Parties, Pechanga, RCWD and the United States, have agreed to settle permanently certain disputes as specified herein, and to seek federal funding, in accordance with applicable law, for the implementation of this Agreement.

J.  As part of this settlement, the Parties seek to enhance the capacity for delivery of ESAA Water (as hereinafter defined) as necessary to allow for deliveries to Pechanga, to improve the quality of effluent delivered to Pechanga pursuant to its Recycled Water Agreement with EMWD, and to improve water quality for the Wolf Valley Groundwater Basin.

K.  In keeping with its trust responsibility to Indian tribes and to promote tribal sovereignty and economic self-sufficiency, it is the policy of the United States to settle whenever possible water rights claims of Indian tribes without lengthy and costly litigation.

L.  The Parties seek to memorialize the settlement among them. The settlement is set forth in this Agreement, which includes the agreements attached as Exhibits that are listed in Section 1.3.

2

EXHIBIT 1
Page 2

## **AGREEMENT**

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1. **Interpretation and Construction of Agreement.**

   **1.1    Definitions.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlements Act, Subtitle D of Title III of Public Law 114-322.

"*Adjudication Court*" means the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Adjudication Proceeding.

"*Adjudication Proceeding*" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.,* Civ. No. 3:51-cv-01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the Adjudication Court's continuing jurisdiction over the Fallbrook Decree.

"*AFY*" means acre-feet per Year.

"*Agency Agreement*" means a recorded document by which a real property owner of land located within the RCWD service area has assigned the right to manage any water rights appurtenant to such owner's real property to RCWD for the benefit of all RCWD customers.

"*Agreement*" means this agreement and the Exhibits attached hereto.

"*Allottee*" means an individual who holds a beneficial real property interest in an Indian allotment that is: (A) located within the Pechanga Reservation; and (B) held in trust by the United States.

"*Amended GMA*" means the "Amended and Restated Groundwater Management Agreement" between Pechanga and RCWD, setting forth terms and conditions governing their joint management of groundwater pumping from the Wolf Valley Groundwater Basin, which is hereby incorporated by reference.  A copy of the Amended GMA is attached as Exhibit A.

"*Appendix*" means an attachment to this Agreement designated as an Appendix.  For clarity, such term does not include Exhibits.

"*Claims*" means rights, claims, demands, actions, compensation or causes of action, whether known or unknown.

EXHIBIT 1
Page 3

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e) of the Act.

"*ESAA Capacity Agreement*" means the "ESAA Capacity Agreement", among Pechanga, RCWD and the United States which is hereby incorporated by reference. A copy of the ESAA Capacity Agreement is attached as Exhibit G.

"*ESAA Water Delivery Agreement*" means the agreement among Pechanga, RCWD and EMWD, establishing the terms and conditions of water service to Pechanga, which is hereby incorporated by reference. A copy of the ESAA Water Delivery Agreement is attached as Exhibit H.

"*Exhibit*" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference. For clarity, such term does not include any Appendix.

"*Extension of Service Area Agreement*" means the "Extension of Service Area Agreement", among Pechanga, EMWD, and MWD for the provision of water service by EMWD to a designated portion of the Pechanga Reservation using water supplied by MWD, which is hereby incorporated by reference. A copy of the Extension of Service Area Agreement is attached as Exhibit F.

"*Fallbrook Decree*" means the "Modified Final Judgment And Decree" entered in the Adjudication Proceeding on April 6, 1966, a copy of which is attached to this Agreement as Appendix 1. The term "Fallbrook Decree" includes all court orders, interlocutory judgments and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

"*Injury to Water Rights*" means an interference with, diminution of, or deprivation of water rights under Federal or State law.

"*Interlocutory Judgment No. 30*" means Interlocutory Judgment No. 30 issued in the Adjudication Proceeding on March 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

"*Interlocutory Judgment No. 35*" means Interlocutory Judgment No. 35 issued in the Adjudication Proceeding on May 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

"*Interlocutory Judgment No. 41*" means Interlocutory Judgment No. 41 issued in the Adjudication Proceeding on November 8, 1962, including all court orders, judgments and decisions supplemental to that interlocutory judgment.

4

EXHIBIT 1
Page 4

"*Member*" or "*Members*" means any person or persons duly enrolled as members of the Pechanga Band of Luiseño Mission Indians.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Ch. 209, as amended).

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.  The United States' participation as a Party shall be in the capacity as described in the definition of the term "United States".

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Reservation*" means land depicted on the map attached as <u>Exhibit I</u>.  The term "Pechanga Reservation" is solely for the purposes of this Agreement, the Act and any judgment or decree issued by the Adjudication Court approving the Agreement,  and not for any of the Exhibits, and shall not be used for any other purpose.

"*Pechanga Water Code*" means a water code to be adopted by Pechanga in accordance with <u>Section 7</u>.

"*RCWD*" means the Rancho California Water District organized pursuant to California Water Code section 34000 *et seq.*  and includes all real property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

"*RCWD Water Rights*" means RCWD's water rights in the Santa Margarita River Watershed, as the successor in interest to the Vail Company, as set forth in Interlocutory Judgment No. 30 and Interlocutory Judgment No. 35.

"*Recycled Water Agreement*" means the "Recycled Water Agreement (Agreement No. 04-07)", dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water Agreement (Agreement No. 04-07)" between Pechanga and EMWD, providing for the sale and purchase of recycled water, which is hereby incorporated by reference.  A copy of the Recycled Water Agreement is attached as <u>Exhibit B</u>.

"*Recycled Water Infrastructure Agreement*" means the "Agreement for Recycled Water Infrastructure" among Pechanga, RCWD, and the United States, which is hereby incorporated by reference.  A copy of the Recycled Water Infrastructure Agreement is attached as <u>Exhibit E</u>.

"*Recycled Water Scheduling Agreement*" means the "Agreement for Ordering, Scheduling, Delivery and Payment for Recycled Water" among Pechanga, EMWD and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Scheduling Agreement is attached as <u>Exhibit D</u>.

5

EXHIBIT 1
Page 5

"*Recycled Water Transfer Agreement*" means the "Recycled Water Transfer Agreement" between Pechanga and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Transfer Agreement is attached as Exhibit C.

"*Santa Margarita River Watershed*" means the watershed that is the subject of the Adjudication Proceeding and the Fallbrook Decree.

"*Secretary*" means the Secretary of the United States Department of the Interior.

"*Section*" means a section or subsection of this Agreement.

"*Settlement Coordination Committee*" means the committee of individuals chosen by Pechanga and RCWD to coordinate the activities, actions and obligations established by this Agreement and in the Act.

"*State*" means the State of California.

"*Tribal Water Right*" means the water rights ratified, confirmed and declared to be valid for the benefit of Pechanga and Allottees, as specifically set forth and described in Section 2.

"*United States*" except as set forth in Section 2.1 hereof,  means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

"*Wolf Valley Groundwater Basin*" means that groundwater subject to the jurisdiction of the Adjudication Court located beneath Wolf Valley, as depicted in exhibit A-4 of the Amended GMA.

"*Year*" means a calendar year of January through December.

## 1.2    Construction.

(a)    The words "include," "includes," and "including" will be deemed to be followed by "without limitation." The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(b)    The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

## 1.3    Exhibits.

(a)    Following is a list of Exhibits included in this Agreement:

Exhibit A:    Amended and Restated Groundwater Management Agreement

6

EXHIBIT 1
Page 6

|  |  |
|---|---|
| Exhibit B: | Recycled Water Agreement |
| Exhibit C: | Recycled Water Transfer Agreement |
| Exhibit D: | Recycled Water Scheduling Agreement |
| Exhibit E: | Recycled Water Infrastructure Agreement |
| Exhibit F: | Extension of Service Area Agreement |
| Exhibit G: | ESAA Capacity Agreement |
| Exhibit H: | ESAA Water Delivery Agreement |
| Exhibit I: | Map depicting Pechanga Reservation |

(b)    All of the Parties have reviewed the Exhibits, and no Party shall object to or contest the terms and conditions of the Exhibits in any judicial, administrative or legislative proceedings relating to the approval, interpretation or enforcement of this Agreement.

(c)    Amendments to Exhibits shall be governed by, and no Party shall have any right to object to an amendment to an Exhibit except as provided in Section 17.3.

(d)    Each Exhibit shall be binding only on the specific parties to such Exhibit.

(e)    No Party shall have, by reason of this Agreement, any third-party enforcement or other rights under any Exhibit to which said Party is not a party, unless otherwise provided in the Exhibit.

(f)    A definition in an Exhibit shall be confined to the Exhibit in which it appears unless such definition is specifically incorporated by reference in this Agreement or in another Exhibit.

### 1.4    Appendices.

(a)    Following is a list of Appendices attached to this Agreement:

Appendix 1:   Fallbrook Decree

Appendix 2:   Form of Proposed Judgment and Decree

(b)    Each Appendix is attached to this Agreement for informational purposes only and is not incorporated in or made part of this Agreement.

### 2.    Tribal Water Right.

7

EXHIBIT 1
Page 7

**2.1**     The Parties, including the United States in all of its capacities (except as trustee for Indian tribes other than Pechanga), ratify, confirm, declare to be valid, and shall not object to, dispute, or challenge in the Adjudication Proceeding, or in any other judicial, legislative or administrative proceeding, the Tribal Water Right as such is further described below.

**2.2**     A Tribal Water Right of up to 4,994 acre-feet of water per year that, under natural conditions, is physically available on the Reservation is confirmed in accordance with the Findings of Fact and Conclusions of Law set forth in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree.

**2.3**     The Tribal Water Right as set forth in Subsection 2.2 shall be held in trust by the United States on behalf of Pechanga and the Allottees in accordance with this section; include the priority dates described in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree; and not be subject to forfeiture or abandonment.

**2.4**     Subject to the terms of this Agreement, the Act, the Fallbrook Decree, and applicable Federal law, Pechanga may use the Tribal Water Right for any purpose on the Pechanga Reservation.

**2.5**     Pechanga shall have the right, subject to applicable Federal law, to allocate water to all users on the Pechanga Reservation pursuant to the Pechanga Water Code and manage, regulate, and govern the use on the Pechanga Reservation of the Tribal Water Right in accordance with this Agreement.

**2.6**     Pechanga and the United States recognize that, pursuant to 25 U.S.C. § 381, Allottees within the Pechanga Reservation are entitled to a just and equitable allocation of water by Pechanga for irrigation and domestic purposes from the Tribal Water Right.

**2.7**     Pechanga and the United States shall not seek the enforcement of the Tribal Water Right in the Adjudication Proceeding for so long as this Agreement, including all of its Exhibits, remains in force and effect.  In the event that this Agreement, or any of its Exhibits, is terminated for any reason, other than expiration of a stipulated term for such agreement, Pechanga and the United States shall have the right to seek enforcement of the Tribal Water Right without limitation.  In the event of termination, if Pechanga or the United States seek enforcement of the Tribal Water Right RCWD shall have the right to unilaterally terminate the Amended GMA without further cause.

**2.8**     Notwithstanding Section 3, in the event that this Agreement, or any of its Exhibits, is terminated for any reason after the Enforceability Date, other than expiration of a stipulated term for such agreement, 1) the Tribal Water Right survives the termination of this Agreement, or any of its Exhibits, and 2) the RCWD Water Rights survive the termination of this Agreement, or any of its Exhibits but the United States and Pechanga shall be able to object to any use of water by RCWD that is not authorized by the otherwise ratified and confirmed RCWD Water Rights.

8

EXHIBIT 1
Page 8

### 3.    RCWD Water Rights.

The Parties, including the United States, ratify, confirm, and declare to be valid the RCWD Water Rights.  Subject to Section 2.8(2) regarding possible objections to unauthorized water use, the United States and Pechanga shall not object to, dispute, or challenge the RCWD Water Rights in the Adjudication Proceeding, or in any other judicial or administrative proceeding.

### 4.    Amended and Restated Groundwater Management Agreement.

Pechanga and RCWD have entered into the Amended GMA, which agreement shall be enforceable in accordance with its terms.

### 5.    Recycled Water Agreements.

**5.1**    Pechanga and EMWD have entered into the Recycled Water Agreement, which agreement shall be enforceable in accordance with its terms.

**5.2**    Pechanga and RCWD have entered into the Recycled Water Transfer Agreement, which agreement shall be enforceable in accordance with its terms.

**5.3**    Pechanga, RCWD and EMWD have entered into the Recycled Water Scheduling Agreement, which agreement shall be enforceable in accordance with its terms.

**5.4**    Pechanga, RCWD, and the United States have entered into the Recycled Water Infrastructure Agreement, which agreement shall be enforceable in accordance with its terms.

### 6.    ESAA and Related Agreements.

**6.1**    Pechanga, EMWD and MWD have entered into the Extension of Service Area Agreement, which agreement shall be enforceable in accordance with its terms.

**6.2**    Pechanga, RCWD, and the United States have entered into the ESAA Capacity Agreement, which agreement shall be enforceable in accordance with its terms.

**6.3**    Pechanga, EMWD and RCWD have entered into the ESAA Water Delivery Agreement, which agreement shall be enforceable in accordance with its terms.

### 7.    Pechanga Water Code.

**7.1**    No later than eighteen (18) months after the Enforceability Date, Pechanga shall enact a Pechanga Water Code governing the use of the Tribal Water Right. Any provisions of the Pechanga Water Code affecting the rights or interests of Allottees shall be approved by the

9

EXHIBIT 1
Page 9

Secretary. The Secretary shall administer the Tribal Water Right until the Pechanga Water Code is enacted and required approvals are obtained from the Secretary, at which time Pechanga shall have authority, subject to the Secretary's authority under section 7 of the Act of February 8, 1887 (25 U.S.C. § 381), to manage, regulate and govern the use of the Tribal Water Right. The Pechanga Water Code shall include, at a minimum, the following provisions, subject to the approval of the Secretary:

(a)     that allocations of water to Allottees shall be satisfied with water from the Tribal Water Right;

(b)     that charges for delivery of water for irrigation purposes for Allottees shall be assessed on a just and equitable basis;;

(c)     a process by which an Allottee may request that the Band provide water for irrigation or domestic purposes in accordance with the Act;

(d)     a due process system for the consideration and determination by the Band of any request by an Allottee (or any successor in interest to an Allottee) for an allocation of such water for irrigation or domestic purposes on allotted land, including a process for appeal and adjudication of any denied or disputed distribution of water and resolution of any contested administrative decision;

(e)     a requirement that any Allottee with a claim relating to the enforcement of rights of the Allottee under the Pechanga Water Code or relating to the amount of water allocated to land of the Allottee must first exhaust remedies available to the Allottee under tribal law and the Pechanga Water Code before initiating an action against the United States or petitioning the Secretary pursuant to subsection 3405(d)(4) of the Act;

(f)     Pechanga's right to prohibit the severance of water rights from allotted lands;

(g)     conditions, limitations and permit requirements relating to the storage, recovery and use of any portion of the Tribal Water Right in accordance with this Agreement;

(h)     Pechanga's right to regulate the appurtenant right of allotted lands to an allocation of the Tribal Water Right, to ensure the use of such water on such allotted lands is reasonable and beneficial;

(i)     a requirement that any Allottee who seeks an authorization to divert or pump water, not otherwise reported by Pechanga, for use on his or her allotment install and maintain, at his or her expense, devices to measure and record such diversion or pumping, and that the Allottee use his or her best efforts to maintain such measuring and recording devices in accordance with industry standards; and

10

EXHIBIT 1
Page 10

(j)    a requirement that the Allottee report to Pechanga at least quarterly the diversions or pumping measured and recorded with the devices required by <u>Section 7.1(h)</u>.

**7.2**    Nothing in this Agreement shall be construed to affect the right of an Allottee or any successor in interest to an Allottee to transfer, convey or lease pursuant and subject to all applicable Federal laws his or her interest in allotted lands, including appurtenant water rights, provided that such water rights remain appurtenant to such allotted lands.

## 8.    Waiver of Claims By Pechanga and the United States Acting in its Capacity as Trustee for Pechanga.

**8.1**    Subject to the retention of rights set forth in <u>Section 12</u>, in return for recognition of the Tribal Water Right and other benefits as set forth in the Act and this Agreement, Pechanga, and the United States, acting as trustee for Pechanga hereby waive and release all claims for water rights within the Santa Margarita River Watershed that Pechanga, or the United States acting as trustee for Pechanga, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Act and this Agreement.

**8.2**    Subject to the retention of rights set forth in <u>Section 12</u>, and notwithstanding any provisions to the contrary in this Agreement, Pechanga and the United States, on behalf of Pechanga and Allottees, fully release, acquit and discharge RCWD from the following Claims:

(a)    Claims for Injuries to Water Rights in the Santa Margarita River Watershed for land located within the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(b)    Claims for Injuries to Water Rights in the Santa Margarita River Watershed for land located within the Pechanga Reservation arising or occurring at any time after June 30, 2009 resulting from the diversion or use of water in a manner not in violation of this Agreement or the Act;

(c)    Claims for subsidence damage to land located within the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(d)    Claims for subsidence damage arising or occurring after June 30, 2009 to land located within the Pechanga Reservation resulting from the diversion of underground water in a manner consistent with this Agreement or the Act; and

(e)    Claims arising out of, or relating in any manner to, the negotiation or execution of this Agreement or the negotiation or execution of the Act.

## 9.    Waiver of Claims By RCWD.

11

EXHIBIT 1
Page 11

**9.1**     Subject to the retention of rights set forth in <u>Section 13</u>, and in return for the ratification, confirmation and declaration to be valid of the RCWD Water Rights and other benefits, including the commitments by Pechanga and the United States as set forth in this Agreement and the Act, RCWD hereby waives and releases all claims for water rights within the Santa Margarita River Watershed that RCWD asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Fallbrook Decree.

**9.2**     Subject to the retention of rights set forth in <u>Section 13</u>, and in return for the ratification, confirmation and declaration to be valid of the RCWD Water Rights and other benefits, including the commitments by Pechanga and the United States as set forth in this Agreement and the Act, RCWD fully releases, acquits and discharges Pechanga and the United States (solely in its capacity as trustee on behalf of Pechanga and Allottees) from the following Claims:

(a)     Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(b)     Claims for Injuries to Water Rights in the Santa Margarita River Watershed for lands located outside the Pechanga Reservation arising or occurring at any time after June 30, 2009 resulting from the diversion or use of the Tribal Water Right or any other water in a manner not in violation of this Agreement or the Act;

(c)     Claims for subsidence damage to lands located outside the Pechanga Reservation arising or occurring at any time up to and including June 30, 2009;

(d)     Claims for subsidence damage arising or occurring after June 30, 2009 to lands located outside the Pechanga Reservation resulting from the diversion of underground water in a manner not in violation of this Agreement or the Act; and

(e)     Claims arising out of or relating in any manner to the negotiation or execution of this Agreement or the negotiation or execution of the Act.

## 10.     <u>Waiver by the United States Acting in Its Capacity as Trustee for Allottees.</u>

Subject to the retention of rights set forth in <u>Section 12</u>, in return for recognition of the Tribal Water Right and other benefits as set forth in the Act and this Agreement, the United States, acting as trustee for Allottees hereby waives and releases all claims for water rights within the Santa Margarita River Watershed that the United States, acting as trustee for the Allottees, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in this Agreement and the Act..

## 11.     <u>Waiver by Pechanga as to the United States.</u>

12

EXHIBIT 1
Page 12

Subject to the retention of rights set forth in <u>Section 12</u>, Pechanga hereby waives and releases:

(a)     all Claims against the United States (including the agencies and employees of the United States) relating to claims for water rights in, or water of, the Santa Margarita River Watershed that the United States, acting in its capacity as trustee for Pechanga, asserted, or could have asserted, in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Act and this Agreement;

(b)     all Claims against the United States (including the agencies and employees of the United States) relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses or injuries to hunting, fishing, gathering or cultural rights due to loss of water or water rights, claims relating to interference with, diversion or taking of water or water rights, or claims relating to failure to protect, acquire, replace, or develop water, water rights or water infrastructure) in the Santa Margarita River Watershed that first accrued at any time up to and including the enforceability date;

(c)     all Claims against the United States (including the agencies and employees of the United States) relating to the pending litigation of claims relating to Pechanga's water rights in the Adjudication Proceeding; and

(d)     all Claims against the United States (including the agencies and employees of the United States) relating to the negotiation or execution of this Agreement or the negotiation or execution of the Act.

**12.    Reservation of Rights and Retention of Claims by Pechanga and the United States.**

Notwithstanding the waivers and releases authorized in the Act and provided in this Agreement, Pechanga and the United States retain:

(a)     all Claims for enforcement of this Agreement and the Act;

(b)     all Claims against any person or entity other than the United States and RCWD, including claims for monetary damages;

(c)     all Claims for water rights that are outside the jurisdiction of the Adjudication Court;

(d)     all rights to use and protect water rights acquired on or after the Enforceability Date of the Act; and

(e)     all remedies, privileges, immunities, powers and Claims, including Claims for water rights, not specifically waived and released pursuant to the Act and this Agreement.

**13.    Reservation of Rights and Retention of Claims by RCWD.**

13

EXHIBIT 1
Page 13

Notwithstanding the waivers and releases provided in this Agreement, RCWD retains:

(a)     all Claims for enforcement of this Agreement and the Act;

(b)     all Claims against persons other than the Parties;

(c)     all Claims for water rights that are outside the jurisdiction of the Adjudication Court;

(d)     all rights to use and protect water rights acquired on or after the Enforceability Date of the Act; and

(e)     all remedies, privileges, immunities, powers and Claims, including Claims for water rights, not specifically waived and released pursuant to the Act and this Agreement.

**14.     Limitation of Effect.**

Nothing in this Agreement or the Act:

(a)     affects the ability of the United States, acting as sovereign, to take actions authorized by law, including any laws relating to health, safety, or the environment, including—

(i)  the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);

(ii)  the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

(iii)  the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

(iv)  any regulations implementing the Acts described in subparagraphs (i) through (iii);

(b)     affects the ability of the United States to take actions acting as trustee for any other Indian Tribe or an Allottee of any other Indian tribe;

(c)     confers jurisdiction on any State court—

(i)     to interpret Federal law regarding health, safety, or the environment;

(ii)     to determine the duties of the United States or other parties pursuant to Federal law regarding health, safety, or the environment; or

(iii)     to conduct judicial review of Federal agency action; or

(d)     waives any claim of a Member of Pechanga in an individual capacity that does not derive from a right of Pechanga;

14

EXHIBIT 1
Page 14

(e)     limits any funding that RCWD would otherwise be authorized to receive under any federal law, including the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h et seq.) as that Act applies to permanent facilities for water recycling, demineralization, and desalination, and distribution of nonpotable water supplies in Southern Riverside County, California;

(f)     characterizes any amounts received by RCWD under this Agreement or the Act as Federal for purposes of section 1649 of the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h-32); or

(g)     affects the requirement of any Party to this Agreement or any of the Exhibits thereto to comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or the California Environmental Quality Act prior to performing the respective obligations of that Party under this Agreement or any Exhibits to this Agreement.

## 15.     Replacement, Substitution and Satisfaction.

**15.1**     The benefits provided to Pechanga and Allottees under this Agreement and the Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims of Pechanga against the United States that are waived and released pursuant to this Agreement and the Act.

**15.2**     The benefits realized by the Allottees under this Agreement and the Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims that are waived and released pursuant to this Agreement and the Act and any Claims of the Allottees against the United States that the Allottees have or could have asserted that are similar in nature to any claim described in this Agreement or the Act.

**15.3**     Any entitlement of Pechanga or the United States on behalf of Pechanga and Allottees to water for lands located within the Pechanga Reservation shall be satisfied out of the Tribal Water Right and other benefits granted, confirmed or recognized by Pechanga and the United States on behalf of Pechanga and Allottees by this Agreement and in the Act.

## 16.     Settlement Coordination Committee.

**16.1**     The Parties shall establish the Settlement Coordination Committee to coordinate the activities, actions and obligations established by this Agreement and in the Act.

**16.2**     The Settlement Coordination Committee shall be comprised of one (1) individual designated in writing by each Party.  Each Party shall provide written notice to all other Parties of the individual designated to represent such Party on the Settlement Coordination Committee.

**16.3**     The Settlement Coordination Committee shall meet regularly and in the first ten (10) years after the date of enactment of the Act, shall meet no less than every six (6) months. The first meeting shall be held within six (6) months of the date of enactment of the Act.

15

EXHIBIT 1
Page 15

**16.4**    The Chair of the Settlement Coordination Committee shall rotate among members every twelve (12) months.  The first Chair of the Settlement Coordination Committee shall be the individual designated by Pechanga as its representative to the Settlement Coordination Committee.

## 17.    Other Provisions.

**17.1    Other Tribes Not Adversely Affected.**  Nothing in this Agreement quantifies or diminishes any land or water right, or any Claim or entitlement to land or water, of an Indian tribe, band, or community other than Pechanga.

**17.2    Entire Understanding.**  This Agreement constitutes the entire understanding among the Parties.  Evidence of conduct or statements made in the course of negotiating this Agreement, including, but not limited to previous drafts of this Agreement, is inadmissible in any legal proceedings other than one for approval or confirmation of this Agreement.

**17.3    Modifications to Agreement and Amendments to Exhibits.**  No modification of this Agreement shall be effective unless it is in writing, signed by all Parties, and is approved by the Adjudication Court.  Notwithstanding the foregoing, Exhibits to this Agreement may be amended by the parties to such Exhibits in accordance with their terms, without court approval, unless such approval is required in the Exhibit or by law; provided, however, that no amendment of any Exhibit may violate any provisions of the Act, or this Agreement, or adversely affect the rights under this Agreement of any Party who is not a signatory of such an amendment.

**17.4    Venue.**  Any Party shall have the right to petition the Adjudication Court for such declaratory or injunctive relief as may be necessary to enforce the terms, conditions, and limitations of this Agreement and monetary relief as provided for in this Agreement.

**17.5    Governing Law.**  This Agreement shall be construed in accordance with applicable Federal law.

**17.6    Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

**17.7    Anti-Deficiency Act.**  The expenditure or advance of any money or the performance of any obligation by the United States, in any of its capacities, under this Agreement shall be contingent upon appropriation of funds therefor.  No liability shall accrue to the United States, in any of its capacities, in the event funds are not appropriated.

**17.8    No Benefit to Members of Congress or Resident Commissioners.**  No member of or delegate to Congress or Resident Commissioner shall be admitted to any share of this Agreement or to any benefit that may arise herefrom. This restriction shall not be construed to extend to this Agreement if made with a corporation or company for its general benefit.

16

EXHIBIT 1
Page 16

**17.9** **Federal Authority.** Subtitle D of Title III of Public Law 114-322 is the Act that authorizes the Federal action required to carry out this Agreement. If any amendment of the Act is enacted prior to the Enforceability Date that materially and adversely affects a Party's rights or interests under this Agreement without the written consent of that Party, then that Party, upon its written notice to all other Parties, shall be relieved of its rights, obligations, and entitlements hereunder; provided, however, that such written notice must be given no later than the Enforceability Date.

**17.10** **Notices.** All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by U.S. mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the U.S. mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA 92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA 92593

And to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC 20036

If to the United States:

Assistant Secretary for Indian Affairs
U.S. Department of the Interior
1849 C St. NW, 4660 MIB
Washington, DC 20240-0001

And to:

17

EXHIBIT 1
Page 17

Regional Director
Pacific Regional Office
Bureau of Indian Affairs
2800 Cottage Way
Sacramento, CA 95825

And to:

Chief, Indian Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004

And to:

Associate Solicitor
Division of Water Resources
1849 C Street, NW  MS 6413

Washington, DC 20240
If to RCWD:                           General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA 92590

And to:
James Gilpin
Best Best & Krieger LLP
655 West Broadway
15th Floor
San Diego, CA 92101

### 17.11   Obligation to Seek Approval and Enforceability of Agreement.

(a)     The Parties shall cooperate in seeking approval of this Agreement by the Adjudication Court by jointly filing in the Adjudication Proceeding a proposed judgment and decree in substantially the same form as Appendix 2 to this Agreement.

(b)     Each Party shall have the obligation to work in good faith to satisfy the conditions set forth in section 3407(e) of the Act.

18

EXHIBIT 1
Page 18

(c)     Except as provided in <u>Sections 17.11(a) and (b)</u> and in certain Exhibits, no Party, by reason of its execution of this Agreement, shall be required to perform any of the obligations or be entitled to receive any of the benefits under this Agreement until the Enforceability Date.

**17.12   Authority to Execute.**  By signing this Agreement each signatory represents and warrants that he or she has the authority to execute it.  Without limitation of the foregoing, RCWD represents that it has full authority under each Agency Agreement to bind the property owner that is party to such Agency Agreement to this Agreement, and RCWD shall, and hereby does, indemnify, defend and hold harmless Pechanga and the United States against any Claim asserted by any such property owner and arising from or in connection with this Agreement.

**17.13   Duplicate Originals and Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which, when taken together, shall constitute one and the same instrument. This Agreement also may be executed in duplicate originals, each of which shall constitute an original Agreement.

19

EXHIBIT 1
Page 19

**IN WITNESS WHEREOF,** the Parties have executed this Agreement dated as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By: _____
            Tribal Chairman

Date: _____

Approved as to form:        By: _____

**RANCHO CALIFORNIA WATER DISTRICT**

By: _____
            General Manager

Date: _____

Approved as to form:        By: _____
            General Counsel

**THE UNITED STATES OF AMERICA**

By: _____
            Secretary of the Interior

Dated: _____

20

EXHIBIT 1
Page 20

<div align="center">

**EXECUTION VERSION**

**AMENDED AND RESTATED
GROUNDWATER MANAGEMENT AGREEMENT**

</div>

THIS AMENDED AND RESTATED GROUNDWATER MANAGEMENT AGREEMENT (this "*Agreement*") is made and entered into as of November 29, 2017, by and between the **PECHANGA BAND OF LUISEÑO MISSION INDIANS**, a federally recognized Indian Tribe ("*Pechanga*"), which term shall include all individuals and governmental bodies having authority over the assumption or performance of obligations, or the exercise of rights, by Pechanga hereunder) and **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code Section 34000, *et seq.* ("*RCWD*"), which term shall include all property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

<div align="center">

**<u>RECITALS</u>**

</div>

A.    Pechanga and RCWD entered a "Groundwater Management Agreement", dated December 21, 2006, governing the terms and conditions pursuant to which they will jointly manage groundwater pumping from the Wolf Valley Groundwater Basin in a manner that does not exceed safe yield and that protects groundwater resources in the Wolf Valley Groundwater Basin for present and future uses (the "*Original Agreement*").

B.    Pechanga and RCWD agree that the increasing groundwater salinity in the Wolf Valley Groundwater Basin is a matter of increasing concern for water users in the Wolf Valley Groundwater Basin.

C.    Under the Act, Congress has authorized a portion of the authorized appropriations to be used by Pechanga to cooperatively develop groundwater desalination activities with RCWD in the Wolf Valley Groundwater Basin in order to mitigate the potential for even higher salinity in the Wolf Valley Basin as a result of the Pechanga Settlement Agreement and its exhibits and activities authorized thereunder.

D.    Pechanga and RCWD now desire to amend the Original Agreement to re-define the basis of each Party's Annual Entitlement for purposes of allocation of the Safe Yield; memorialize the initial determination of the Safe Yield; provide for periodic review of the Safe Yield in the future; and cooperatively develop groundwater desalination activities, among other purposes.

E.    The intention of the Parties is that, in order to facilitate contract administration, the present Agreement serve as an amendment and restatement of the Original Agreement modified in conformity with section 9.13 of the Original Agreement, such modifications to take effect as from the Amendment Effective Date.

EXHIBIT 1
Page 21

## **AGREEMENT**

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      **Definitions.**  Capitalized terms used in this Agreement shall have the meanings set forth below.

"*AAA*" has the meaning set forth in <u>Section 6.5</u>.

"*AAA Rules and Procedures*" has the meaning set forth in <u>Section 6.5</u>.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlement Act, Subtitle D of Title III of Public Law No. 114-322.

"*AFY*" means acre-feet per Year.

"*Agency Agreement*" means a recorded document by which a real property owner of land located within the RCWD service area has assigned the right to manage any water rights appurtenant to such owner's real property to RCWD for the benefit of all RCWD customers.

"*Amendment Effective Date*" means the date on which the Secretary of the Interior publishes in the Federal Register the statement of findings described in section 3407(e) of the Act;

"*Annual Energy Index*" means the percentage determined by dividing: (a) the electrical energy costs, expressed in cost per kilowatt hour, incurred by RCWD for electric energy it purchases for groundwater pumping in the Year just prior to the Year for which the Annual Energy Index is being calculated, by (b) the electrical energy costs, expressed in cost per kilowatt hour, incurred by RCWD for electric energy it purchases for groundwater pumping in the Year that is two (2) Years prior to the Year for which the Annual Energy Index is being calculated.

"*Annual Entitlement*" has the meaning set forth in <u>Section 2.1</u>.

"*Available Aquifer Capacity*" means the capacity within the Wolf Valley Basin for additional groundwater storage as determined from time to time by the Technical Committee pursuant to <u>Section 3.5.2</u>.  For each of the first five (5) Years commencing with the Year in which the Amendment Effective Date occurs, the Available Aquifer Capacity shall be eight thousand (8,000) acre feet.

EXHIBIT 1
Page 22

"***Carryover Account***" means an account established by each Party to account for the amount of their respective unused Annual Entitlement, if any, from Year to Year.

"***Decision***" has the meaning set forth in <u>Section 3.4</u>.

"***Delivered Groundwater***" has the meaning set forth in <u>Section 2.2</u>.

"***Delivered Groundwater Charge***" has the meaning set forth in <u>Section 2.2.4</u>.

"***Delivered Groundwater Facilities***" means those facilities required for RCWD to transport and deliver Delivered Groundwater to Pechanga, as specified in <u>Exhibit A-1</u>.

"***Delivered Groundwater Facilities Site***" means any area on which the Delivered Groundwater Facilities will be located, including reasonable lay down areas, as delineated in <u>Exhibit A-2</u>.

"***Delivery Point***" means any point or points at which Delivered Groundwater is delivered to Pechanga under this Agreement.  The initial Delivery Point shall be as specified in <u>Exhibit A-1</u>.

"***Dispute***" has the meaning set forth in <u>Section 6.1</u>.

"***EMWD***" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"***ESAA Capacity Agreement***" means the "ESAA Capacity Agreement", between Pechanga, RCWD, and the United States which is hereby incorporated by reference. A copy of the ***ESAA Capacity Agreement*** is attached to the Pechanga Settlement Agreement as exhibit G.

"***ESAA Water Delivery Agreement***" means the "ESAA Water Delivery Agreement" among Pechanga, RCWD and EMWD.

"***Exhibit***" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference.

"***Extension of Service Area Agreement***" means the "Extension of Service Area", among Pechanga, EMWD, and MWD for the provision of water service by EMWD to a designated portion of the Pechanga Reservation using water supplied by MWD, which is hereby incorporated by reference. A copy of the Extension of Service Area Agreement is attached to the Pechanga Settlement Agreement as exhibit F.

"***Fallbrook Decree***" means the "Modified Final Judgment And Decree", entered in *United States v. Fallbrook Public Utility District,* Civ. No. 1247-SD-C, on April 6, 1966.  The

EXHIBIT 1
Page 23

term "Fallbrook Decree" includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30 issued on March 8, 1962, Interlocutory Judgment No. 35 issued on May 8, 1962, and Interlocutory Judgment No. 41 issued on November 8, 1962.

"*Granitic Wells*" means wells constructed for purposes of extracting water from granitic material which the Parties have agreed are pumping water from the "basement complex" of the Wolf Valley Groundwater Basin as defined in the Fallbrook Decree and, accordingly, do not affect the Safe Yield.

"*Groundwater Records*" has the meaning set forth in Section 4.3.

"*Groundwater Reports*" has the meaning set forth in Section 4.1.

"*Imported Water*" means any water delivered to Pechanga pursuant to the Extension of Service Area Agreement and the ESAA Water Delivery Agreement.

"*Mediation Procedures*" has the meaning set forth in Section 6.2.

"*Month*" means a calendar Month.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Ch. 209, as amended).

"*MWD Shortage Allocation*" means an action to apportion water pursuant to section 350 of the California Water Code.

"*Original Agreement*" has the meaning set forth in Recital A.

"*Original Effective Date*" means December 21, 2006.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Annual Usage*", with respect to any Year, means the sum of (a) the amount of groundwater pumped by Pechanga from the Basin during such Year, plus (b) the amount of Delivered Groundwater delivered to Pechanga by RCWD pursuant to this Agreement during such Year.

"*Pechanga Settlement Agreement*" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement, together with the exhibits thereto. The parties to

EXHIBIT 1
Page 24

the Pechanga Settlement Agreement are the Pechanga Band of Luiseño Mission Indians and its members, the United States on behalf of the Band and its members, and RCWD.

"*RCWD*" means the Rancho California Water District organized pursuant to California Water Code section 34000 *et seq.* and includes all real property owners for whom RCWD acts as an agent pursuant to an Agency Agreement.

"*RCWD Annual Usage*" with respect to any Year, means the remainder of (a) the total amount of groundwater pumped by RCWD from the Basin during such Year, *minus* (b) the amount of Delivered Groundwater delivered to Pechanga by RCWD pursuant to this Agreement during such Year.

"*RCWD Facility Requirements*" means the document entitled "Rancho California Water District Water System Facility Requirements," dated August 1, 1991, a copy of which is attached as Exhibit A-5.

"*Recycled Water Agreement*" means the "Recycled Water Agreement (Agreement No. 04-07)," dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water Agreement (Agreement No. 04-07)," between Pechanga and EMWD, providing for the sale and purchase of recycled water, which is hereby incorporated by reference.  A copy of the Recycled Water Agreement is attached to the Pechanga Settlement Agreement as exhibit B.

"*Recycled Water Infrastructure Agreement*" means the "Recycled Water Infrastructure Agreement," among Pechanga, RCWD, and the United States, which is hereby incorporated by reference.  A copy of the Recycled Water Infrastructure Agreement is attached to the Pechanga Settlement Agreement as exhibit E.

"*Recycled Water Scheduling Agreement*" means the "Recycled Water Scheduling Agreement," among Pechanga, EMWD, and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Scheduling Agreement is attached to the Pechanga Settlement Agreement as exhibit D.

"*Recycled Water Transfer Agreement*" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD, which is hereby incorporated by reference.  A copy of the Recycled Water Transfer Agreement is attached to the Pechanga Settlement Agreement as exhibit C.

"*Representative*" has the meaning set forth in Section 3.1.

"*Reservation*" means the reservation of the Pechanga Band of Luiseño Mission Indians, as depicted in the map attached as Exhibit A-3.

"*Right of Way*" means RCWD's easements and rights of way on which the Delivered Groundwater Facilities Site will be located, as delineated in Exhibit A-2.

EXHIBIT 1
Page 25

"*Safe Yield*" means the best professional estimate, following a comprehensive review and analysis of the best available groundwater, hydrologic, and climatic data for the Basin, of the amount of groundwater available for pumping from the Basin in any given Year without causing an undesirable result.

"*Section*" means a section or subsection of this Agreement.

"*Technical Committee*" means the committee of technical experts appointed by the Parties pursuant to Section 3.1.

"*Term*" has the meaning set forth in Section 11.1.

"*Watermaster*" means the Santa Margarita Watermaster, appointed in the case of *United States v. Fallbrook Public Utility District,* Civ. No. 3:51-cv-01247 (S.D.CA.).

"*Wolf Valley Groundwater Basin*" or "*Basin*" means that groundwater located beneath Wolf Valley as more definitely depicted in Exhibit A-4.

"*Year*" means a calendar year of January through December.

## 2.    Annual Entitlements from the Basin.

2.1    **Annual Entitlement.**  The combined amount of groundwater pumped from the Basin by the Parties in any Year shall not exceed the Safe Yield. In any given Year, each Party shall be entitled to pump no more than its respective percentage share of the Safe Yield, as follows:

RCWD --    twenty-five percent (25%); and

Pechanga --    seventy-five percent (75%);

such respective share of the Safe Yield for each Party being its "*Annual Entitlement*" for purposes of this Agreement.

2.1.1    For each of the first five (5) Years commencing with the Year in which the Amendment Effective Date occurs, the Safe Yield shall be two thousand one hundred (2,100) AFY.

2.1.2    Prior to expiration of the five (5) Year period specified in Section 2.1.1, and prior to expiration of each period of three (3) Years thereafter, for the duration of the Term, the then-current Safe Yield shall be verified or re-determined for purposes of the ensuing three (3) Year period by Decision of the Technical Committee and notified to the Parties.

EXHIBIT 1
Page 26

2.1.3    Water pumped from Granitic Wells shall not be included in determining a Party's usage of its Annual Entitlement.  Granitic Wells being operated by Pechanga as of the date of this Agreement are specified in Exhibit A-6.

2.2    **Delivered Groundwater.**  In lieu of actually pumping groundwater itself from the Basin, Pechanga may request RCWD to pump its Annual Entitlement, or any portion thereof, and deliver such water directly to Pechanga, pursuant to Water Code sections 1810 *et seq.* ("**Delivered Groundwater**"); provided, however, that during the "Interim Capacity" as that term is defined in the *ESAA Capacity Agreement*, RCWD shall not be required to deliver Imported Water and Delivered Groundwater, combined, at a rate in excess of three thousand one hundred (3,100) gallons per minute.  Any amount of Delivered Groundwater shall not exceed and shall be subtracted from Pechanga's Annual Entitlement, and shall not be charged against RCWD's Annual Entitlement.  With respect to Delivered Groundwater, the following shall apply:

2.2.1    Delivered Groundwater shall be delivered by RCWD to Pechanga at the Delivery Point specified in Exhibit A-1.  Pechanga shall have the right at any time to designate other Delivery Points on the Reservation for purposes of delivery and receipt of Delivered Groundwater, subject to the following –

(a)    Any new facilities constructed for purposes of any new Delivery Point shall be Delivered Groundwater Facilities for purposes of this Agreement, all other defined terms herein which relate to Delivered Groundwater Facilities shall be construed as referring to such new facilities, and Exhibit A-1 and Exhibit A-2 shall be modified or supplemented as required to reflect the scope and siting of, and any known additional approvals required for, the new Delivered Groundwater Facilities.

(b)    This Agreement shall govern Pechanga's and RCWD's rights and obligations with respect to construction and use of such new Delivered Groundwater Facilities. Without limitation of the foregoing, Pechanga shall be responsible for all Delivered Groundwater Facilities Costs incurred with respect to any new Delivered Groundwater Facilities required to be constructed for purposes of establishing any new Delivery Point.    Any new Delivered Groundwater Facilities shall be constructed and installed in compliance with the RCWD Facility Requirements, as they may have been amended at the time of such construction and installation.

(c)    Pechanga, with RCWD's cooperation and assistance, shall obtain any approvals required for construction, ownership, and operation of new Delivered Groundwater Facilities required for establishment of a new Delivery Point.

2.2.2    RCWD's obligation to deliver Delivered Groundwater to Pechanga pursuant to Section 2.3 shall not commence until the Delivered Groundwater Facilities have been completed and accepted by RCWD in accordance with Section 5.1.

2.2.3    All Delivered Groundwater shall meet the same water quality standards applicable to any delivery of water by RCWD to any customer similarly situated to Pechanga.

EXHIBIT 1
Page 27

2.2.4    For each acre-foot of Delivered Groundwater actually delivered to Pechanga, Pechanga shall pay to RCWD an amount (the "**Delivered Groundwater Charge**"), being the sum of a fixed component and a variable component, determined as follows:

(a)    During 2006 and 2007, the fixed component amount was $56.00. In each Year thereafter, the fixed component shall be adjusted by a percentage amount equal to the percentage change in the U.S. Department of Labor, Bureau of Labor Statistics Consumer Price Index for the previous Year.

(b)    During 2006 and 2007, the variable component amount was $129.00. In each Year thereafter, the variable component shall equal the well production costs set by RCWD for customers in Pressure Zone 1305.

2.3    RCWD shall deliver a statement to Pechanga with respect to Delivered Groundwater and delivered Imported Water by the tenth (10th) business day of each Month. With respect to Delivered Groundwater and Imported Water delivered during the preceding Month, the statement shall set forth (i) the amount of Delivered Groundwater; (ii) the amount of delivered Imported Water; and (iii) the aggregate Delivered Groundwater Charge. Each statement shall be accompanied by such information as is necessary to enable Pechanga reasonably to determine the accuracy of the statement.

2.3.1    Payments by Pechanga of amounts rightfully payable to RCWD as set forth in a statement rendered pursuant to this Section 2.3 will be made to RCWD no later than thirty (30) business days after the date of the statement. Payment shall be made by wire transfer to such bank account as may be designated in writing from time to time by RCWD, or by such other means as is mutually acceptable to the Parties.

2.3.2    In the event either Party discovers a discrepancy with respect to any statement, such Party shall promptly advise the other Party of such discrepancy. Adjustments for such discrepancies will be reflected on the next statement issued following verification of such discrepancy, but in no event, except in cases of fraud, will an adjustment be made for discrepancies discovered more than thirty-six (36) Months following the date of issuance of the relevant invoice.

2.3.3    Subject to the provisions of Section 2.3.4:

(a)    Following commencement of deliveries of Delivered Groundwater, RCWD shall not have the right unilaterally to interrupt or suspend deliveries of Delivered Groundwater to Pechanga in the absence of a final arbitral award issued in accordance with Section 6 permitting such interruption or suspension.

(b)    Notwithstanding the provisions of Section 2.3.3(a), RCWD shall have the right to interrupt deliveries of Delivered Groundwater to the extent required to address emergencies involving, or to undertake repairs or maintenance to, the Delivered Groundwater Facilities or other facilities on RCWD's system. RCWD shall notify Pechanga (i) in advance, promptly following the

EXHIBIT 1
Page 28

scheduling of any repairs or maintenance that will cause an interruption of deliveries, and (ii) as soon as reasonably possible following an emergency that has caused an interruption of deliveries.

      **2.3.4**   In the event that RCWD receives written notice from MWD or EMWD objecting to RCWD's delivery of Delivered Groundwater or ESAA Water to Pechanga as being in violation of MWD's statutory authority and its rules and regulations, the following provisions shall apply:

      (a)   RCWD shall provide a copy of such written notice to Pechanga and shall cooperate with Pechanga in an effort to resolve the issue with MWD, including taking any procedural steps permitted under MWD's rules and regulations to appeal, protest or otherwise address the objection of MWD.

      (b)   Pechanga reserves the right at all times to litigate the right of RCWD to continue delivering Delivered Groundwater or Imported Water under the terms of this Agreement or the Extension of Service Area Agreement.  RCWD (i) will not take any action that may prejudice any right of Pechanga to challenge a determination of MWD that RCWD's delivery of Delivered Groundwater under this Agreement or Imported Water under the Extension of Service Area Agreement is in violation of MWD's statutory obligations or rules and regulations, and (ii) will comply with any final judgment affirming RCWD's right to deliver Delivered Groundwater to Pechanga under this Agreement or Imported Water under the Extension of Service Area Agreement.

      (c)   RCWD shall continue deliveries of Delivered Groundwater hereunder and Imported Water under the Extension of Service Area Agreement unless and until the earlier of (i) its having received Pechanga's written notification that Pechanga will not challenge (or will not continue to challenge) MWD's determination, or (ii) in the event Pechanga does challenge such determination, issuance of a final judicial determination (following completion of all appeals or expiration of the time for filing appeals) that RCWD does not have the right to continue deliveries of Delivered Groundwater in accordance with this Agreement or Imported Water under the Extension of Service Area Agreement.

      (d)   In the event deliveries of Delivered Groundwater are discontinued pursuant to Section 2.3.4(c):

      (i)   Pechanga shall have the right to take groundwater directly from an RCWD well, upon payment of the costs of connecting thereto; and

      (ii)   provisions of this Agreement will be amended as required to accommodate implementation of such Groundwater source.

### 2.4   **Pechanga Estimate of Pumping, Delivered Groundwater, and Imported Water Needs.**

      **2.4.1**   During the Term, Pechanga shall cause to be prepared and delivered to RCWD by the first (1st) business day of each Month, a good-faith estimate of:

EXHIBIT 1
Page 29

(a)     the amount of groundwater that Pechanga anticipates it will pump during the then current Month;

(b)     the amount of Delivered Groundwater that Pechanga anticipates it will need delivered by RCWD during the then current Month; and,

(c)     the amount of Imported Water that Pechanga anticipates it will need delivered by RCWD during the then current Month.

**2.4.2**   Pechanga shall have no liability to RCWD related to the development by Pechanga or the use by RCWD of such estimates. RCWD shall be entitled to rely on such estimates of Pechanga for purposes of estimating the amount of groundwater from the Wolf Valley Groundwater Basin that is available for RCWD annual usage during such Year. Any RCWD excess pumping or Pechanga excess pumping resulting from reliance on such estimates shall be subject only to reconciliation pursuant to <u>Section 9</u> and without reference to Pechanga's estimates provided pursuant to <u>Section 2.4.1</u> with respect to the relevant Year.

**3.     <u>Technical Committee.</u>**

**3.1     <u>Composition.</u>**   A committee of technical experts shall be appointed by the Parties to carry out the responsibilities set forth in this <u>Section 3</u> (the "***Technical Committee***"). The Technical Committee shall be composed of (a) two (2) persons, one (1) each to be appointed by Pechanga and RCWD, each respectively to serve as the appointing Party's voting representative (each a "***Representative***"), and (b) any other persons appointed by either Party to participate in the Technical Committee meetings on such Party's behalf; <u>provided</u>, <u>however</u>, that only the Representative for each Party shall be authorized to present that Party's position or vote on that Party's behalf with respect to any matter on which the Technical Committee may have to decide. Each Representative shall have one (1) vote. In the event that the position of a Technical Committee member shall fall vacant due to the removal or resignation of such member, such vacancy shall be filled promptly by the appointing Party. If a Representative is unable to perform or is prevented from performing his or her duties, the Party having appointed such Representative shall temporarily designate an alternate Representative.

**3.2     <u>Cooperation.</u>**   The Parties and their representatives shall cooperate in good faith in Technical Committee deliberations and shall supply any information necessary, or requested by the Technical Committee, to facilitate the reaching of agreement and making of Decisions regarding the matters within the responsibility of the Technical Committee as specified in <u>Section 3.5</u>. The Technical Committee shall use all reasonable efforts to reach agreement on the matters within its responsibility under <u>Section 3.5</u>.

**3.3     <u>Meetings.</u>**   The Technical Committee shall hold a minimum of one (1) regular meeting every twelve (12) Months during the Term, at such time and place as shall be agreed by the Representatives, and at which meeting matters subject to Decision under this Agreement, or matters otherwise referred to the Technical Committee for Decision, shall be considered. Either Party may request that an extraordinary meeting of the Technical Committee be held at any other time, upon notice given to the other Party given at least ten (10) business days prior to such meeting and specifying the matter or matters to be considered. The Parties shall

EXHIBIT 1
Page 30

cooperate in good faith to schedule meetings of the Technical Committee at which, at a minimum, both Representatives will be present. Meetings of the Technical Committee shall be chaired alternately by the respective Representatives.

**3.4**    **Decisions.**   Any approval, recommendation, decision or other action of the Technical Committee (a "***Decision***") shall be by unanimous vote of the voting Representatives. A Decision shall be final if the voting Representatives of both Parties accept such Decision in a written statement signed by such Representatives and delivered to each Party. Such written statement shall include all policies adopted by the Technical Committee and other documentation relevant to the Technical Committee's Decision. In the event that the voting Representatives are unable to reach agreement on any issue on which the Representatives are required to make a Decision, either Party may seek binding arbitration of such issue pursuant to the provisions set forth in Section 6.

**3.5**    **Areas of Responsibility.**   The Technical Committee shall make Decisions regarding and be responsible for:

**3.5.1**   considering and verifying or re-determining the Safe Yield at such times as are specified in Section 2.1.2;

**3.5.2**   considering and verifying or re-determining the Available Aquifer Capacity; and

**3.5.3**   any other actions or studies assigned to it upon the joint request of the Parties in writing from time to time.

**3.6**    **Costs**.   Each Party shall bear the costs and expenses (a) associated with the participation of its respective Representative and other designees attending meetings of or otherwise assisting the Technical Committee, and (b) representing one-half of the costs and expenses incurred by the Technical Committee resulting from the conduct of its affairs and the fulfillment of its obligations under Section 3.5.

**4.**    **Reporting; Record-Keeping.**

**4.1**   **Monthly Groundwater Reports.**   During the Term and in accordance with the current reporting policies established by the Technical Committee from time to time, each Party shall cause to be prepared and delivered to the other Party reasonably detailed Monthly reports, based on information available to such Party, regarding quantities of Basin groundwater pumped, delivered, received or used by such Party during the preceding Month and the water levels in wells pumped during the preceding Month ("***Groundwater Reports***"). The Groundwater Report prepared by Pechanga shall include a denomination of the amount of Imported Water and the amount of Delivered Groundwater delivered during the previous month. Each Party shall Deliver its Groundwater Report to the other Party on or before the fifteenth (15th) day of the Month following the Month (or partial Month) to which such Groundwater Report relates. Each Party shall provide a copy of each of its reports to the Watermaster for his information. All statements of groundwater amounts pumped from the Basin shall be stated both in the aggregate and separately for each pumping site.

**4.2**   **Annual Groundwater Reports.**   During the Term each Party shall cause to be

EXHIBIT 1
Page 31

prepared and delivered to the other Party and to the Watermaster, by the thirtieth (30th) day of April of each Year, an annual report providing a summary of the information provided in the Groundwater Reports pursuant to <u>Section 4.1</u> herein for the preceding Year.

   **4.3**     <u>**Groundwater Records.**</u>  During the Term each Party shall maintain accurate books of account and records of its groundwater testing, delivery (including invoicing), pumping, or receipt (including records of payment) ("***Groundwater Records***").   Copies of any compilations of and of all such Groundwater Records shall be retained until the end of the third full Year following the Year in which such compilation was created.   All the Groundwater Records shall be the property of the Party that keeps such Groundwater Records.   All Groundwater Records of each Party shall be made available to the other Party upon two (2) business days' notice, at the place of business of the Party keeping such Groundwater Records, during the Term and until the end of the third full Year following the Year in which any permitted termination of this Agreement occurs, for examination, audit, inspection, and copying (at no expense to the Party keeping such Groundwater Records) solely for purposes of confirming the due performance of this Agreement and for no commercial purpose.

**5.**     <u>**Construction of Water Delivery Infrastructure.**</u>

   **5.1**     <u>**Requirements and Procedures.**</u>  Design, engineering, construction, installation, and transfer of new Delivered Groundwater Facilities shall be undertaken in accordance with, and be governed by, the RCWD Facility Requirements and such agreements as are entered by the Parties in compliance therewith.   Notwithstanding application of the RCWD Facility Requirements, however, the Parties intend that the following provisions shall apply:

   (a)     RCWD undertakes to issue a "Notice to Proceed" in accordance with the construction agreement entered pursuant to the RCWD Facility Requirements without undue delay once applicable conditions precedent are met.

   (b)     Pechanga may select vendors, suppliers and contractors for procurement, design, engineering, construction, and installation of the Delivered Groundwater Facilities in its discretion; <u>provided</u>, <u>however</u>, that the terms of agreements with such contractors are consistent with the RCWD Facility Requirements and, <u>provided</u>, <u>further</u>, that Pechanga shall be primarily responsible to RCWD for the conduct of such contractors while on the Delivered Groundwater Facilities Site or elsewhere on the Right of Way.

   (c)     RCWD shall provide, or cause to be provided to, Pechanga and its contractors access to the Right of Way and to the Delivered Groundwater Facilities Site for purposes of completion of the Delivered Groundwater Facilities.

   (d)     Pechanga and RCWD each shall appoint a representative who has primary responsibility for communications and approvals concerning all matters relating to completion of the Delivered Groundwater Facilities.

   (e)     Inspections by RCWD of completed Delivered Groundwater Facilities that must be undertaken to verify compliance with the RCWD Facility Requirements shall be undertaken without undue delay.

EXHIBIT 1
Page 32

(f)     Upon successful completion of inspections verifying compliance of the Delivered Groundwater Facilities with the RCWD Facility Requirements, RCWD shall issue the "Notice of Completion" in accordance with the construction agreement entered pursuant to the RCWD Facility Requirements, and transfer of the Delivered Groundwater Facilities to RCWD shall be completed, without undue delay; provided, however, that subparagraph 5D of the form of Water System Construction Agreement included as "Appendix L" to the RCWD Facility Requirements shall not apply, and Pechanga shall not be required to enter an Agency Agreement with RCWD as a condition to issuance of the "Notice of Completion" or for any other purpose.

(g)     Subject only to the provisions of Section 2.2.1, on and after transfer of the Delivered Groundwater Facilities to RCWD, Pechanga will have no further obligation to RCWD to construct and pay for additional facilities for the delivery of Delivered Groundwater, or to repair, maintain, or replace the Delivered Groundwater Facilities.

**5.2     Interpretation of Documents.** It is intended that the provisions of Section 5.1 be construed in harmony with the RCWD Facility Requirements. In the event of a conflict between the terms of the RCWD Facility Requirements and the provisions of Section 5.1, the provisions of Section 5.1 shall prevail. In any event, the provisions of Section 6 of this Agreement shall apply to any disputes arising between the Parties under or in connection with the RCWD Facility Requirements.

**6.     Dispute Resolution.**

**6.1     Amicable Resolution.** The Parties agree to attempt to resolve all claims, disputes, controversies, or other matters in question between the Parties arising out of, or relating to, this Agreement, including the deliberation, action, or activity of the Technical Committee ("***Dispute***"), promptly, equitably and in a good faith manner.

**6.2     Mediation of Technical Committee Disputes.** Notwithstanding any other provision of this Section 6, with respect to any Dispute concerning the determination of Safe Yield or Available Aquifer Capacity by the Technical Committee or any other matter assigned to the Technical Committee by or pursuant to this Agreement, before submitting such Dispute to arbitration, the Parties agree first to try in good faith to settle the dispute by requesting that the Watermaster serve as a mediator to resolve the Dispute by applying the process and rules of the Commercial Mediation Procedures of the American Arbitration Association ("***Mediation Procedures***"). If the Watermaster refuses or is unable to serve as a mediator, the Parties agree that either Party may submit the matter for mediation by the American Arbitration Association pursuant to the Mediation Procedures. If, under the Mediation Procedures, the mediator or either Party terminates the mediation of such Dispute, either Party may submit the Dispute to arbitration pursuant to this Section 6.

**6.3     Submission to Arbitration.** Either Party may submit any Dispute that cannot be resolved between the Parties to arbitration by written notice to the other Party irrespective of the magnitude thereof, the amount in dispute or whether such Dispute would otherwise be considered justiciable or ripe for resolution by any court or arbitral tribunal. This Agreement and the rights and obligations of the Parties shall remain in full force and effect pending the award in such arbitration proceeding.

EXHIBIT 1
Page 33

6.4     **Notice of Arbitration.** The notice for arbitration shall be given in accordance with Section 11.7 and shall specify with particularity the nature of the Dispute, the particular provisions of this Agreement that are at issue, and the proposed relief sought by the Party seeking arbitration.

6.5     **Appointment of Arbitrators.** The arbitration shall be conducted before a panel composed of three (3) arbitrators, each of whom shall be a person familiar, by profession or experience, with the issues in controversy. Within fourteen (14) business days after delivery of a notice of arbitration, each Party shall appoint an arbitrator, obtain its appointee's acceptance of such appointment and deliver written notification of such appointment and acceptance to the other Party. If a Party fails or refuses to select an arbitrator after fourteen (14) calendar days, an arbitrator may be chosen on behalf of such Party by the American Arbitration Association ("**AAA**") and in the manner provided in the American Arbitration Association Commercial Arbitration Rules and Procedures ("***AAA Rules and Procedures***"). Within fourteen (14) days of being appointed, the two (2) Party-appointed arbitrators shall jointly appoint the third (who shall be the chairperson), and shall obtain the acceptance of such appointment and deliver written notification of such appointment to the Parties. If a Party fails to appoint its arbitrator within the specified period, or if the two (2) arbitrators appointed fail to appoint the third arbitrator within a period of fourteen (14) business days after appointment of the second arbitrator, then such arbitrator shall be appointed by the AAA pursuant to the AAA Rules and Procedures.

6.6     **Disqualification of Arbitrator.** No person may serve as an arbitrator if, because of employment or other relationship with the Parties, the nature of the matter to be arbitrated, or otherwise, such person could not serve as a judge in such matter if such person were a judge.

6.7     **Rules of Arbitration.** Arbitration shall be conducted pursuant to the AAA Rules and Procedures in effect on the Original Effective Date; provided, however, that any waiver of sovereign immunity shall be governed solely and exclusively by Section 6.16.

6.8     **Time.**     Time is of the essence in the resolution of Disputes pursuant to this Section 6. All deadlines shall be strictly enforced against the Parties.

6.9     **Submission of Evidence.**     Each Party may submit evidence in writing to the arbitrators for their consideration within forty-five (45) calendar days after written notice of the arbitration request has been received.

6.10    **Arbitral Hearing.**     The arbitrators may, in their sole discretion, determine whether a hearing would assist them in rendering a fair and equitable decision. In any event, such hearing, if held, must be held within sixty (60) calendar days after written notice of the arbitration request has been received.

6.11    **Conduct of Arbitration.** The arbitrators shall comply with and follow to the extent possible the AAA Rules and Procedures with respect to impartiality and independence, and shall render an independent, impartial review of the claim(s) presented, and each arbitrator shall act independently and shall not be either Party's representative. The arbitrators'

EXHIBIT 1
Page 34

deliberations are confidential and shall not be disclosed to third parties. Each arbitrator shall be disqualified as a witness, consultant, or expert for either Party in any Dispute. No written communication shall be made between the arbitrators and a Party without the other Party receiving a copy, and no oral communications shall take place without the other Party being present.

**6.12    Arbitral Award.** The arbitrators shall render a reasoned decision and award, by majority vote, no later than ninety (90) calendar days after written notice of the arbitration request has been received.

**6.13    Arbitral Remedies.**    The arbitrators may fashion any legal and equitable remedies that they deem necessary to provide appropriate relief to an aggrieved Party, including damages and injunctive relief; provided, however, that in no event shall termination of this Agreement be available as a remedy and the arbitrators shall have no authority to grant such remedy; and, provided, further, that in no event shall either Party be liable for indirect or consequential damages in connection with any breach hereof.

**6.14    Enforcement of Arbitral Award.** The arbitrators' decision will be final and binding on the Parties, will not be subject to appeal and may be entered as an order in any court of competent jurisdiction in the United States. Each Party agrees to submit to the jurisdiction of any such court for purposes of the enforcement of any such order and for no other purpose. No Party will sue the other except for enforcement of the arbitrators' decision if the other Party is not performing in accordance with the arbitrators' decision. The provisions of this Agreement will be binding on the arbitrators and nothing in this Agreement shall be construed so as to permit the arbitrators to modify this Agreement.

**6.15    Costs of Arbitration.** The costs of the arbitration shall be shared equally by the Parties, but the Parties shall bear their own costs and attorneys' fees associated with their participation in the arbitration.

**6.16    Limited Waiver of Sovereign Immunity.** Pechanga hereby provides a strictly limited waiver of its sovereign immunity in any court of competent jurisdiction for the sole and exclusive purpose of enforcement of an arbitration award rendered pursuant to this Section 6. Pechanga does not waive any immunity or other rights it may have under law with respect to claims or causes of action by parties other than RCWD.

**7.    Future Cooperation.**

The Parties shall cooperate in good faith to develop additional potable and non-potable water supplies to satisfy any future needs that Pechanga may have.

**8.    Representations and Warranties.**

**8.1    Representations and Warranties of Pechanga.**    Pechanga represents and warrants to RCWD as follows:

**8.1.1**    Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of the Pechanga Band of Luiseño Mission Indians.

EXHIBIT 1
Page 35

**8.1.2**    Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

**8.1.3**    This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

**8.1.4**    There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligations under this Agreement.

**8.1.5**    To the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

**8.2**    <u>**Representations and Warranties of RCWD.**</u>   RCWD represents and warrants to Pechanga as follows:

**8.2.1**    Its execution, delivery a n d performance of this Agreement have been duly authorized by all necessary action of RCWD.

**8.2.2**    Each real property owner pumping groundwater from the Wolf Valley Groundwater Basin within the boundaries of RCWD, other than Pechanga, has entered into an Agency Agreement with RCWD and, with the exception of groundwater pumped by Pechanga, no groundwater from the Wolf Valley Groundwater Basin is pumped by any person, partnership, government or private entity other than RCWD.

**8.2.3**    RCWD has full authority under each Agency Agreement to bind the real property owner that is party to such Agency Agreement to this Agreement, and RCWD shall, and hereby does, indemnify, defend and hold harmless Pechanga against any rights, claims, demands, actions, compensation or causes of action asserted by any such property owner against Pechanga and arising from or in connection with this Agreement.

**8.2.4**    RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

**8.2.5**    This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

**8.2.6**    There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

EXHIBIT 1
Page 36

8.2.7    To the best of RCWD's knowledge, the validity of this Agreement; the execution and delivery by RCWD of this Agreement; and the performance by RCWD of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent, or similar authorization from any federal, state or local judicial, regulatory, or administrative body.

8.3    **Breach of Representation or Warranty.**  Any representation or warranty made by a Party in this <u>Section 8</u> that shall prove to have been incorrect in any material respect as of the Original Effective Date shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

9.    **Carryover Accounts.**

9.1    Each Party shall maintain a Carryover Account. Subject to the provisions of this <u>Section 9</u>, each Party shall have the right to credit its own Carryover Account with the balance of any unused portion of such Party's Annual Entitlement in any given Year. Such crediting shall only occur at the end of any given Year after accounting for all groundwater used from the Wolf Valley Groundwater Basin by such Party.

9.2    The total number of credits in both Parties' respective Carryover Accounts in any given Year shall not exceed the then current Available Aquifer Capacity. RCWD shall be entitled to accrue no more than twenty-five percent (25%) of the total number of credits in the then current Available Aquifer Capacity. Pechanga shall be entitled to accrue no more than seventy-five percent (75%) of the total number of credits in the then current Available Aquifer Capacity.

9.3    If the Technical Committee were to reduce the Available Aquifer Capacity in a given Year such that either RCWD or Pechanga were to then be holding more credits than otherwise allowed under their respective portion of the Available Aquifer Capacity, the Party in excess may retain such credits for a period of no more than three (3) additional years, provided that such Party use at least thirty-three percent (33%) of the excess credits in its Carryover Account each Year thereafter until such time as the total number of credits is within the allowed maximum for such Party. If such Party does not use at least thirty-three percent (33%) of the excess credits in its Carryover Account in a given Year, then such excess credits shall be deducted from such Party's Carryover Account at the end of such Year.

9.4    RCWD may use any credits in its Carryover Account in excess of two hundred (200) acre feet of credits, up to a maximum of four hundred (400) acre-feet, as supplemental water supply in any given Year.

9.5    Pechanga may use any credits in its Carryover Account in excess of eight hundred (800) acre feet of credits, up to a maximum of one thousand six hundred (1,600) acre- feet, as supplemental water supply in any given Year.

9.6    During a period of MWD Shortage Allocation, either Party may use the credits in its Carryover Account as a supplemental supply of water without reference to the limits set forth in <u>Sections 9.4</u> and <u>9.5</u>.

9.7    In the event that a Party has no credits in its Carryover Account, and such Party

EXHIBIT 1
Page 37

exceeds its Annual Entitlement in a given Year, then the amount of such Party's Annual Entitlement for the succeeding Year shall be reduced by the amount of its excess pumping in such Year.

**10.     Groundwater Desalination Activities.**

**10.1**     Pechanga and RCWD shall meet and confer on a cooperative basis to cooperatively plan desalination activities in the Wolf Valley Groundwater Basin.

**10.2**     Pechanga may use the funds available from Section 3411(a)(4) of the Act to fund its contribution, if any, to such groundwater desalination activities in the Wolf Valley Groundwater Basin.

**11.     Miscellaneous Provisions.**

**11.1     Perpetual Term.**  The term of this Agreement (the "*Term*") shall commence on the Amendment Effective Date and shall remain in effect in perpetuity.  This Agreement may be terminated exclusively (i) by mutual agreement of the Parties in a writing signed by both Parties; or (ii) by operation of contract pursuant to Section 11.2.  Termination of this Agreement shall not be available as a remedy for a Party's breach.

**11.2     Termination for Dissolution.**  This Agreement shall automatically terminate and be of no further force or effect, without further action required by Pechanga, in the event that (a) RCWD or any regulator takes any action (i) to legally dissolve RCWD, or (ii) to discontinue or otherwise cease the operations or functions of RCWD, whether in whole or in part, in the capacity that they are performed by RCWD on the Original Effective Date; or (b) RCWD becomes unable to perform its obligations under this Agreement as a result of action of a regulator or a court of competent jurisdiction.

**11.3     Release of Information.**   All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, will be subject to the prior approval of both Parties, which approval shall not be unreasonably withheld.

**11.4     Assignment.**  Neither Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party, provided, however, that Pechanga may assign this Agreement without the prior consent of RCWD to another tribal entity of the Pechanga Band of Luiseño Mission Indians if the assignee assumes all of Pechanga's obligations under this Agreement and otherwise agrees to be bound by and consents to each of the provisions of this Agreement.

**11.5     Third Parties.**  This Agreement shall not be binding upon, inure to the benefit of, or confer rights upon any person or entity that is not a Party to this Agreement.

**11.6     Entire Agreement.**  This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts or representations by or among the Parties and their agents, written or oral, to the extent they relate in any way to the subject matter hereof.

EXHIBIT 1
Page 38

**11.7**     __Notice.__   All notices, requests, payments, reports and other communications provided for or permitted to be given or made under this Agreement must be in writing and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other address or addressee as the Party to receive such notice shall have designated by written notice as required by this Section 11.7.  Notice or payment shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 11.7:

As to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:
General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

As to RCWD:
General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101

**11.8**     __Service of Process.__   Any Party may make service on any other Party by sending

EXHIBIT 1
Page 39

a copy of the process by certified U.S. mail, as provided under Federal Rules of Procedure 4(d), to the Party to be served at the address and in the manner provided for the giving of notices in Section 11.7.

**11.9    Construction.**  This Agreement has been freely and fairly negotiated among the Parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  The word "person" includes individuals, entities, regulators and other governmental bodies.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

**11.10    Headings.**  The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

**11.11    Amendments; Waivers.**  No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by Pechanga and RCWD.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**11.12    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

**11.13    Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that, if any provision of this Agreement, as applied to a Party or to any circumstance, is determined not to be enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

**11.14    Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**11.15    Effectiveness of Agreement.**  This Agreement shall become effective on the Amendment Effective Date.  Until the Amendment Effective Date, the Original Agreement shall

EXHIBIT 1
Page 40

remain in effect and shall continue to govern the rights and obligations of the Parties.

**11.16   <u>Termination</u>.** If the Pechanga Settlement Agreement is not approved or otherwise terminated, all related agreements, attached as exhibits thereto, including this Agreement, and the Parties' obligations thereunder are automatically terminated and the Original Agreement shall remain in effect and shall govern the rights and obligations of the Parties.

*[SEPARATE SIGNATURE PAGES FOLLOW]*

EXHIBIT 1
Page 41

**IN WITNESS WHEREOF:**

Rancho California Water District has caused this Amended and Restated Groundwater Management Agreement to be executed by its duly authorized representative as of the date first above written.

**RANCHO CALIFORNIA WATER DISTRICT**

By: _____

Name: _Stephen J. Corona_

Title:   General Manager

**AND *[Tribe Signature Follows]***

EXHIBIT 1
Page 42

**IN WITNESS WHEREOF:**

The Pechanga Band of Luiseño Mission Indians has caused this Amended and Restated Groundwater Management Agreement to be executed by its duly authorized representative as of the date first above written.

**PECHANGA BAND OF LUISEÑO MISSION INDIANS**

By: _____

Name: ___MARK MACARRO___

Title:   Chairman

EXHIBIT 1
Page 43

# Exhibit A-1

EXHIBIT 1
Page 44



EXHIBIT 1
Page 45

Exhibit A-2

EXHIBIT 1
Page 46

EXHIBIT "B"

**RCWD**
**WATER EASEMENT**

That portion of Lot "E" of Little Temecula Rancho (Pechanga Indian Reservation) in Unincorporated Territory of the County of Riverside, State of California, as set apart in the Decree of Partition Recorded June 28, 1892 in Book 199, Page 454 of Deeds, Records of San Diego County, California, included within a strip of land 12.00 feet in width the centerline of said strip being described as follows:

**COMMENCING** at the centerline intersection of Via Eduardo with Pechanga Parkway (Pala Road) as shown on the map filed in Book 112, Pages 55 and 56 of Records of Survey in the office of the County Recorder of said Riverside County;

thence along the centerline of said Pechanga Parkway (Pala Road) South 47°44'32" East 216.90 feet to the **TRUE POINT OF BEGINNING**;

thence South 42°15'18" West 49.00 feet;

thence South 47°44'32" East 26.45 feet to the **POINT OF TERMINATION**.

**CONTAINING:**     905 square feet, more or less.

EXHIBIT "B" attached hereto and by this reference made a part hereof.

This description was prepared by me or under my direction.

_Thomas E. Verloop_          12/8/2006
Thomas E. Verloop, RLS 5348,     Date:
My license expires 12/31/07

LICENSED LAND SURVEYOR
THOMAS E. VERLOOP
NO. LS 5348
Exp.12/31/07
STATE OF CALIFORNIA

---

RBF CONSULTING                                    December 8, 2006
40810 County Center Drive, Suite 100                 JN 15101569-M1
Temecula, CA 92591-6022                              Page 1 of 1

H:\PDATA\15101569\Admin\LEGALS\569lgl001.doc

EXHIBIT 1
Page 47



SCALE: 1"=50'

LOT "E"
LITTLE TEMECULA RANCHO
199/454 Dds S. D. CO.
PECHANGA INDIAN RESERVATION

DATA TABLE

| NO. | BEARING/DELTA | RADIUS | LENGTH |
|-----|---------------|--------|--------|
| 1 | S42°15'18"W | --- | 49.00' |
| 2 | S47°44'32"E | --- | 26.45' |

( ) = INDICATES RECORD DATA PER
      RECORD OF SURVEY 112/55–56.

EXHIBIT "B"
RCWD
WATER EASEMENT

DECEMBER 08, 2006

SCALE 1"=50'

RBF CONSULTING
PLANNING ■ DESIGN ■ CONSTRUCTION
40810 COUNTY CENTER DRIVE, SUITE 100
TEMECULA, CALIFORNIA 92591-6022
951.676.8042 • FAX 951.676.7240 • www.RBF.com

JOB NO.
15101569–M1

EXHIBIT 1
Page 48

RBF CONSULTING

JOB ID : 15101569                              DATE 12/08/2006  AT 11:51:23
FILE NAME : H:\PDATA\15101569\CADD\MAPPING\1569EX001.TRV


TRAVERSE OF : water easement CL - open              -- TRAV # 1

        BEARING      DISTANCE        NORTHING        EASTING
                   STARTING  AT  2111927.8720    6300070.9850  PT #  2019
  S 47-44-32.00 E   219.6000  TO  2111780.1982    6300233.5169  PT #  2020
  S 42-15-28.00 W    49.0000  TO  2111743.9320    6300200.5660  PT #  2021
  S 47-44-32.00 E    26.4500  TO  2111726.1452    6300220.1423  PT #  2022


  ERROR OF CLOSURE     NORTH = 0.0038192        EAST = -0.0042732
            BEARING   N 48-12-40.00 W       DISTANCE = 0.0057
  (OPEN TRAVERSE)  AREA = 0.0 SF       0.0000 ACRES

EXHIBIT 1
Page 49

RBF CONSULTING

JOB ID : 15101569                          DATE 12/08/2006  AT 11:51:23
FILE NAME : H:\PDATA\15101569\CADD\MAPPING\1569EX001.TRV


TRAVERSE OF : Water Easement area                    -- TRAV # 2

|  | BEARING | DISTANCE | | NORTHING | EASTING | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | STARTING | AT | 2111784.2361 | 6300229.0726 | PT # | 2025 |
| S 47-44-32.00 E | 12.0000 | TO | 2111776.1665 | 6300237.9542 | PT # | 2026 |
| S 42-15-28.00 W | 43.0000 | TO | 2111744.3410 | 6300209.0381 | PT # | 2027 |
| S 47-44-32.00 E | 20.4500 | TO | 2111730.5890 | 6300224.1737 | PT # | 2028 |
| S 42-15-28.00 W | 12.0000 | TO | 2111721.7075 | 6300216.1041 | PT # | 2023 |
| N 47-44-32.00 W | 32.4500 | TO | 2111743.5291 | 6300192.0869 | PT # | 2024 |
| N 42-15-28.00 E | 55.0000 | TO | 2111784.2361 | 6300229.0726 | PT # | 2025 |

ERROR OF CLOSURE      NORTH = 0.0000000        EAST = 0.0000008
             BEARING   N 90-00-00.00 E   DISTANCE = 0.0000
             AREA  =  905.4 SF       0.0208 ACRES
             PERIMETER = 174.9000

EXHIBIT 1
Page 50



EXHIBIT 1
Page 51



EXHIBIT 1
Page 52

Exhibit A-3

EXHIBIT 1
Page 53



Pechanga Tribal Government
Pechanga Indian Reservation
Highways
Sections
Counties
Kelsey Tract
Original Boundary
Pechanga Reservation
0
2,500
5,000
Feet
1 inch = 2,500 feet
N
Map Area
French Valley
Murrieta
Temecula
Pala
Pauma
Fallbrook
Bonsall
76
Original Boundary
Kelsey Tract
Section 29
Section 13
Section 14
Section 15
Section 16
Section 17
Section 18
Section 19
Section 20
Section 21
Section 22
Section 23
Section 24
Section 25
Section 26
Section 27
Section 28
Section 30
Section 31
Section 32
Section 33
Section 34
Section 35
Section 36
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Section 7
Section 8
Section 9
Section 10
Section 11
Section 12
79
15
This document/map is property of the Pechanga Band of Luiseño Indians ("Pechanga"). This document/map is considered confidential information by Pechanga, and is intended for use by recipient only for the purposes agreed upon by Pechanga. Do not reproduce, publish, alter or distribute this document/map without written permission from Pechanga. Pechanga assumes no warranty or legal responsibility for the information contained on this document/map. Data and information represented on this document/map is subject to change and may not be complete or appropriate for all purposes. Pechanga should be consulted for the most current information. Documents/maps may not be to scale and are for relative location purposes only.
\2017\LGL 0322 Sel Prcels
Printed: 3/22/2017 03:50 PM

Exhibit A-4

EXHIBIT 1
Page 55



Exhibit 1.15: Wolf Valley Groundwater Basin

EXHIBIT 1
Page 56

Exhibit A-5

EXHIBIT 1
Page 57

RANCHO CALIFORNIA WATER DISTRICT

WATER SYSTEM FACILITY REQUIREMENTS

AUGUST 1, 1991

RANCHO CALIFORNIA WATER DISTRICT
42135 WINCHESTER ROAD
TEMECULA, CALIFORNIA  92590
TELEPHONE (951) 296-6900

EXHIBIT 1
Page 58

RANCHO CALIFORNIA WATER DISTRICT
WATER SYSTEM FACILITY REQUIREMENTS

## TABLE OF CONTENTS

SECTION I        INTRODUCTION

SECTION II       PROCEDURES - CONSTRUCTION DRAWING APPROVAL

SECTION III      DESIGN CRITERIA

SECTION IV       CONSTRUCTION DRAWING PREPARATION

SECTION V        PROCEDURES - WATER SYSTEM FACILITY CONSTRUCTION

## APPENDICES

APPENDIX A       FLOWCHART FOR CONSTRUCTION DRAWING APPROVAL

APPENDIX B       PLAN CHECK STATUS SHEET

APPENDIX C       ENGINEERING SERVICE APPLICATION

APPENDIX D       GENERAL CONSTRUCTION NOTES

APPENDIX E       LEGEND AND ESTIMATE OF QUANTITIES

APPENDIX F       CONSTRUCTION APPROVAL BOX/WATER SYSTEM CERTIFICATION

APPENDIX G       WATER CONSTRUCTION DRAWINGS CHECKLIST

APPENDIX H       GRANT OF EASEMENT

APPENDIX I       FLOWCHART FOR CONSTRUCTION OF WATER FACILITIES

APPENDIX J       CONSTRUCTION STATUS SHEET

APPENDIX K       CONTRACTOR INFORMATION SHEET

APPENDIX L       WATER SYSTEM CONSTRUCTION AGREEMENT

APPENDIX M       CERTIFICATION OF STREETS TO FINAL GRADE

APPENDIX N       CERTIFICATE OF INSURANCE

APPENDIX O       FAITHFUL PERFORMANCE BOND

APPENDIX P       UNMETERED CONSTRUCTION WATER APPLICATION

APPENDIX Q       MATERIAL AND LABOR RELEASE

APPENDIX R       WATER SYSTEM GRANT DEED

APPENDIX S       AGENCY AGREEMENT

8/1/91

EXHIBIT 1
Page 59

SECTION I

INTRODUCTION

EXHIBIT 1
Page 60

SECTION I
INTRODUCTION

A.    GENERAL

To assure a reliable supply of water for the Rancho California area, the Rancho California Water District was formed in 1965 for the properties generally east of I-15. A companion Santa Rosa Ranches Water District was formed in 1966 for the properties generally west of I-15. The two Districts were consolidated under its present name in 1977.

The Rancho California Water District is a public agency governed by an elected seven-member Board of Directors to serve four-year staggered terms. The District is directed by its General Manager and three Division Directors: Finance, Operations and Maintenance, and Engineering.

Rancho California Water District supplies its customers water for potable and non-potable uses.

Potable water users are supplied from Rancho California Water District's potable production wells and Metropolitan Water District potable water aqueducts.

Non-potable water users are supplied from Vail Lake, Metropolitan Water District's non-potable aqueducts, and Rancho California Water District's non-potable production wells.

B.    POLICY

Rancho California Water District's basic policy is that the user benefiting from the service must pay for the cost of the necessary facilities. The District normally designs and constructs all primary facilities and the Developer normally designs and constructs all secondary facilities.

Primary facilities are those facilities required to produce and deliver water to each pressure zone from water sources, whether domestic or imported. Storage facilities, pumping stations, treatment facilities, water production wells, Metropolitan Water District aqueduct connections, and major supply pipelines are considered to be primary facilities.

Secondary facilities are designated as those facilities necessary to distribute the required waters throughout a pressure zone. Distribution mains, pressure reducing stations, and pipeline appurtenances are considered to be secondary facilities.

In some situations, minor pumping stations, reservoirs and transmission mains may be considered secondary facilities when their function can be entirely locally defined.

The District may elect, at its discretion, to oversize secondary facilities to meet anticipated future demands. In such cases, the District may fund the oversizing as a primary facility.

The District's General Manager, at his discretion, may allow deviations from these requirements. All requests for variances to these requirements must be in writing, stating the reasons for the request.

EXHIBIT 1
Page 61

C.     REQUIREMENTS

1.   Developer shall design, construct, and dedicate to Rancho California Water District the secondary water facilities in accordance with the requirements of Rancho California Water District.

2.   Developer shall provide all financial arrangements necessary to plan, design, and construct the project.

3.   Developer shall obtain and dedicate water utility right-of-way to Rancho California Water District. Water facilities must be in either dedicated road right-of-way or in easements granted to Rancho California Water District.

4.   Developer shall pay current applicable fees (refer to District's <u>Customer Guide Rates and Charges</u>) in addition to completing those requirements listed above. Fees may include: Plan Checking Fees, Connection Charges, Inspection Fees, Added Facilities Charges, Zone of Benefit Fees, Front Footage Charges, Main Participation Charges or Primary Facilities Fees, Service Connection Fees, and Meter Charges. District staff should be consulted for current and applicable fees.

5.   Rancho California Water District will review all drawings, and may revise, modify, or require redesign of any concepts, drawings, or details submitted. All concepts and drawings must be approved by the District's Engineering Manager and Director of Engineering.

6.   The Developer shall provide the District with a corrosion site survey for all CML/CMC steel pipelines. If required, the Developer shall have a cathodic protection design performed by a qualified engineer.

7.   Procedures for development of water systems are similar for Tract Map developments, Parcel Map developments, and single lot main extension developments. Most procedures and design requirements herein have been prepared for Tract Map developments, but certain portions apply to all water system development work within Rancho California Water District's service area.

8.   When applicable, the Developer shall also submit for review all improvement drawings within existing or future public rights-of-way for approval by the City of Temecula, City or Murrieta, or County of Riverside Engineering Department. All plan check, inspection and permit fees required by the City/County shall be paid, and all other requirements of the City/County shall be fulfilled prior to any construction within the public rights-of-way.

8/1/91                          -2-

EXHIBIT 1
Page 62

SECTION II

PROCEDURES
CONSTRUCTION DRAWING APPROVAL

8/1/91

EXHIBIT 1
Page 63

SECTION II
PROCEDURES
CONSTRUCTION DRAWING APPROVAL

A.    CONSTRUCTION DRAWINGS APPROVAL

District staff will review all water construction drawings and may revise, modify, or require redesign of any concepts, drawings, or details submitted. All concepts and drawings must be approved by District staff. Construction must begin within one year of approval of Water Construction Drawings. If more than one year has elapsed, the project must go through plan check procedure again before starting construction. The steps required to obtain Water Facilities Construction Drawing approval are as follows:

1.    Submit Engineering Service Application and Plan Check Deposit.

2.    Submit Tract Water System and Hydraulic Network Analysis.

3.    Submit first plan check.

4.    Submit subsequent plan checks.

5.    Submit original Construction Drawings for approval.

6.    Provide District with drawings.

A flowchart for Construction Drawing Approval is shown in Appendix "A". A plan check status sheet to be used by District staff is shown in Appendix "B". Each required step is discussed in detail below:

1.    Submit Engineering Service Application and Plan Check Deposit

The Engineering Service Application (available from the District) shall be completed and filed with the Engineering Services staff. The plan check deposit shall be submitted with the completed application. A copy of the Engineering Service Application is shown in Appendix "C".

2.    Submit Tract Water System and Hydraulic Network Analysis

Approximately one week after receiving the completed engineering services application and the plan check deposit, District staff will provide hydraulic grade elevation at connections to the District system. District staff may, in addition, provide design recommendations for the water system.

Based on hydraulic grade elevations and design recommendations provided by the District, Developer shall submit to the District the following:

a.    One copy of the County of Riverside, City of Temecula, or City of Murrieta Conditions of Approval.

b.    Two copies of a master plan of the Tract with the proposed water facilities superimposed on same. Said plan shall show the node network, pipeline diameters, length, elevation at nodes, valve locations, and fire hydrant locations.

8/1/91                                         -3-

EXHIBIT 1
Page 64

    c.      Two copies of the hydraulic network analysis of the proposed water system.

    d.      Fire flow letter from the appropriate fire protection agency, Riverside County Fire Department, Murrieta Fire Protection District, or California Division of Forestry.

Details regarding hydraulic network analysis are included in Section III, <u>Design Criteria</u>.

District staff will review the Tract Water System and the hydraulic network analysis and return one set with comments to the Developer. Minor revisions may be incorporated in the first plan check submittal. If major revisions are required, the Tract Water System and hydraulic network analysis shall be resubmitted until approved by District staff.

3.    <u>Submit First Plan Check</u>

After review and approval of Tract Water System and hydraulic network analysis, Developer shall submit the following:

    a.      Three copies of the water construction drawings.

    b.      One copy of the sewer construction drawings.

    c.      One copy of the street improvement drawings.

    d.      One copy of the grading plan.

    e.      One copy of the approved Tract Water System and hydraulic network analysis.

    f.      Two copies of easement documents.

    g.      One copy of Tract/Parcel Map.

    h.      Corrosion Site Survey (for Steel Pipe Only)

    i.      Copy of receipt showing submittal to appropriate City/County for plan check of facilities within public rights-of-way.

Submittals must be complete or they will be rejected. Each submittal shall include a transmittal listing all items submitted and referencing the District project number and account number.

Details regarding waterline design criteria are included in Section III, <u>Design Criteria</u>. Details regarding preparation of construction drawings and easement documents are included in Section IV, <u>Construction Drawing Preparation</u>.

Water and sewer drawings should be combined and shown on the same drawing whenever possible.

8/1/91              -4-

EXHIBIT 1
Page 65

The District will provide comments on one set of the water construction drawings and return same to Engineer for revisions. The goal of the District staff is to complete the first plan check within three weeks of receipt of submittal. Plan review time varies depending on the number of plans in the review process, size of project, complexity of plans, and completeness of drawings.

4.   Submit Subsequent Plan Checks

For each subsequent plan check, Developer shall submit the following:

a.   Previous District plan check set and copy of previous District transmittal.

b.   Three copies of revised water construction drawings.

c.   Two copies of easement documents.

d.   Any additional material requested.

e.   One copy of revised submittal showing City/County comments for facilities to be installed in public rights-of-way.

Submittals must be complete or they will be rejected. If drawings and easement documents are not yet satisfactory, District will make comments on one set of the drawings and easement documents and return same to Engineer for revisions. This procedure will be repeated as necessary until drawings and easement documents are complete. If Engineer does not return previous District plan sets, then plan check procedure will start from the beginning including payment of plan check deposit.

Each cycle of the subsequent plan check would normally be completed in approximately three weeks.

5.   Submit Original Construction Drawings for Approval

After all plan checks are completed and the water construction drawings are acceptable to the District, the original drawings shall be submitted to the District for signature. Prior to District approval of the water construction drawings, Developer shall pay all remaining plan checking fees and submit:

a.   Previous District plan check set and one copy of revised water construction drawings.

b.   Copy of tentative tract/parcel map showing dedications of streets for road purposes and public utilities purposes,

or

c.   Executed Grant of Easement, minimum width of 30 feet.

6.   Provide District with Drawings

When drawings have been fully approved by all agencies, the Developer shall provide the District with a clean set of photo mylars and three sets of bluelines for District's use.

EXHIBIT 1
Page 66

# SECTION III

## DESIGN CRITERIA

8/1/91

EXHIBIT 1
Page 67

## SECTION III
## DESIGN CRITERIA

Water systems for inclusion into the District's service area shall be designed in accordance with the District's Standard Specifications and Standard Drawings for Water and Sanitary Sewer Facilities, dated March 1, 1990 or latest revision, and the following criteria:

A.   HYDRAULIC NETWORK ANALYSIS CRITERIA

The District reserves the right to determine the criteria for each water system or sub-system based upon conditions that may exist for that particular location, anticipated level of development, planned use, or other criteria. In general, however, the water system shall be sized to handle the highest demand within the general area of the tract and shall conform to the following minimum standards:

1.   Pipeline Diameters

The minimum pipeline diameter is 6"*. The District accepts only the following diameters: 6*, 8, 12, 16, 20, 24, 30, 36, 42, and 48 inches.

* Must meet criteria specified in Item 6, below, System Analysis.

2.   Pipeline Friction Factors

Pipeline friction factors shall be as follows:

| Pipe<br>Material | Hazen-Williams<br>Coefficient |
|---|---|
| Cement Mortar Lined<br>Steel Pipe and Asbestos<br>Cement Pipe | C=120 |
| Polyvinyl Chloride Pipe | C=130 |

3.   Water System Unit Demands

Average Day unit demands shall be as follows:

| | Land Use | | Average Day unit<br>Demand Factors |
|---|---|---|---|
| 1. | Specific Plan | | |
| a. | Residential | 600 | GPD/DU |
| b. | Commercial | 2,000 | GPD/AC |
| c. | Business Park/Industrial | 2,500 | GPD/AC |
| d. | Park/Golf Course/Resort Commercial | 4 | AF/AC/YR |
| e. | School | To be determined on<br>an individual basis | |
| f. | Open Space | 1.5 | AF/AC/YR |

8/1/91                                    -6-

EXHIBIT 1<br>Page 68

2. Southwest Area Plan

| | | | |
|---|---|---|---|
| a. | Very Low Density/Low Density (1 DU/AC) | 1,500 | GPD/DU |
| b. | Medium Low Density (2-4 DU/AC) | 1,000 | GPD/DU |
| c. | Medium Density/Medium High Density/ High Density (5-16 DU/AC) | 600 | GPD/DU |
| d. | Future Specific Plan | 1,000 | GPD/DU |
| e. | Commercial | 2,000 | GPD/AC |
| f. | Business Park/Industrial | 2,500 | GPD/AC |
| g. | Vineyard | 1.2 | AF/AC/YR |
| h. | Park/Golf Course | .4 | AF/AC/YR |
| i. | Wildlife/Reserve | 0 | |
| j. | Resort Commercial | .4 | AF/AC/YR |
| k. | Open Space | 1.5 | AF/AC/YR |
| l. | Agricultural (Avocado, Citrus, Horse Ranch) | 2 | AF/AC/YR |

* Only used when no detail available. Otherwise use items 1, a-f.

4. Peaking Factors

The peaking factors to be used, are as follows:

a. Maximum Day Demand

For the Santa Rosa Division, Maximum Day Demand shall equal 3.0 times the Average Day Demand for Zones 1440, 1670, and 1990. For all other zones, the Maximum Day Demand shall equal 2.5 times the Average Day Demand.

For the Rancho Division, Maximum Day Demand shall equal 3.0 times Average Day Demand for Zones 1610 and 1790. For all other zones, the Maximum Day Demand shall equal 2.5 times the Average Day Demand.

b. Peak Demand

For all zones, the Peak Demand shall equal two times the Maximum Day Demand.

5. Fire Flow

The fire flow requirements shall be in accordance with the applicable standards of the Insurance Services Office (ISO) and shall be those required by the Riverside County Fire Department, Murrieta Fire Protection District, or California Division of Forestry for the type of development under consideration.

6. System Analysis

The proposed water system shall be analyzed for the following two conditions:

a. Peak Demand Flow

b. Maximum Day Demand plus Fire Flow

EXHIBIT 1
Page 69

For the Peak Demand flow condition, the pressure at each node shall be designed for 60 psi minimum. A minimum pressure of 40 psi may be allowed if static pressure is less than 60 psi. The maximum pressure at each node shall be 120 psi. The maximum velocity in the pipeline shall be 5 feet per second.

For the Maximum Day Demand plus fire flow, the pressure at each node shall be a minimum of 20 psi and a maximum of 120 psi. The maximum velocity in the pipeline shall be 10 feet per second. Fire flow should be taken from the hydrant furthest from the connection(s) to the District's distribution system, at the highest system elevation, and as directed by District.

B.   WATER CONSTRUCTION DRAWING DESIGN CRITERIA

1.   Pipeline Location

Unless otherwise approved by the District, all waterlines shall be located on the south or west side of the street, 7 feet off of curb face or berm per the Riverside County Road Department standards. Location is not to interfere with other existing utilities.

Pipe joint deflection shall not be more than manufacturer's recommended offset in a curved alignment. Joint deflection angle shall be indicated on all horizontal and vertical curves.

Waterline installation near sewer lines shall be in accordance with State Department of Health Services, Criteria for the Separation of Watermains and Sanitary Sewers. In general, waterlines should cross perpendicular to sewer lines a minimum of 1 foot above the sewer. If waterline crosses beneath the sewer then it should have a minimum separation of one foot, have no joints within 10 feet of each side of the sewer and shall be constructed of materials per aforementioned criteria. Waterlines parallel to sewer lines shall be located a minimum of ten feet from the sewer line.

When crossing other utilities, provide a minimum of one foot vertical clearance.

2.   Minimum Pipe Cover

The minimum cover over the top of pipe shall be 42 inches from finished road grade, and shall provide adequate depth so that gate valve stems and operating nuts have 12 inch clearance to finished road grade. When 42 inches of cover cannot be provided, concrete encasement or protective slab construction over the pipeline may be considered. Consult with District staff.

3.   Pipe Materials

Unless otherwise authorized by District, all waterlines larger than 16 inches diameter shall be cement mortar lined and cement mortar coated welded steel pipe or cement mortar lined and wrapped steel pipe in accordance with District standards. All

8/1/91   -8-

EXHIBIT 1
Page 70

waterlines 16 inches and smaller shall be Polyvinyl Chloride Pipe (PVC) in accordance with District standards unless conditions dictate the use of CML/CMC steel pipe. In some cases, District may allow the use of Asbestos Cement Pipe (ACP). Minimum allowable pipe shall be as follows:

PVC Pipe - Class 150
CML & C Steel Pipe, diameter 24" and smaller - 12 ga
CML & C Steel Pipe, diameter larger than 24" - 10 ga
AC Pipe (where acceptable to District) - Class 200

4.   Pipe Slope

Minimum slope of waterlines shall be 0.5% unless otherwise authorized by District.

5.   Valves

Valves 12" and smaller shall be resilient seated gate valves per District standards. Valves 16" and larger shall be butterfly valves per District standards. Valves 24" and larger shall have a bypass valve installed around the mainline valve. Valves shall be the same size as nominal pipeline diameter.

Three valves shall be installed on each tee and four valves shall be installed on each cross. Valves shall be spaced at 1,320 foot maximum intervals or as directed by District staff.

6.   Fire Hydrants

Fire hydrants shall be in accordance with District standards, constructed at right angles to the waterline.

Fire hydrants shall be located per the requirements of the Riverside County Fire Department as stated in the Tract Conditions of Approval but no greater than 1000 foot intervals.

7.   Air Valves

Air valves shall be combination air vacuum and air release valves in accordance with the District standards, constructed at right angles to the waterline.

Air valves shall be located at all high points of pipeline and downstream of valves. Minimum size of air valves shall be 1" and shall be sized as follows:

| Air Valve Size | Pipeline Diameter |
|---|---|
| 1" | 8" & 12" |
| 2" | 16", 20", & 24" |
| 4" | 30" |
| Consult with District staff | > 30" |

8.   Blowoffs

Blowoffs shall be in accordance with District Standards, located at right angles to the waterline. Where possible, fire hydrants shall be used in place of blowoffs.

EXHIBIT 1
Page 71

Blowoffs shall be located at all low points of the pipeline at all dead-ends or terminal points, and upstream of valves. Minimum size of blowoffs shall be 4". Consult with District staff regarding required size.

9.   <u>Water Services</u>

Water services shall be in accordance with District standards, constructed at right angles to the watermain and shall be sized per the following table:

| Lateral Size | Meter Size | Maximum Capacity |
|---|---|---|
| 1" | 3/4" Disc | 30 GPM |
| 1" | 1" Disc | 50 GPM |
| 1-1/2" | 1-1/2" Multi Jet | 100 GPM |
| 2" | 2" Multi Jet | 125 GPM |
| 2" | 2" Turbine | 160 GPM |
| 4" | 3" Turbine | 300 GPM |
| 4" | 4" Turbine | 750 GPM |
| 6" | 6" Turbine | 1,550 GPM |
| 8" | 8" Turbine | 2,500 GPM |

No service laterals shall be installed between fire hydrants, blow offs, or air valves and pipeline dead ends.

All non-residential water services shall have a District approved backflow prevention device installed adjacent to meter unless otherwise approved by District.

10.   <u>Minimum Design Pressure</u>

Minimum design pressure shall be the static pressure plus 25% with the total rounded up to the nearest 25 psi.

11.   <u>Control Valves, Pressure Relief Valves, and Other Special Valves</u>

Control valves, pressure relief valves, and other special valves shall be designed and located as directed by District staff.

12.   <u>Easement Criteria</u>

Pipelines not located within public right-of-way must be located in easements granted to the District on the District's Grant of Easement form. Easements shall be a minimum of 30 feet in width unless otherwise approved by the District. Easements for other utilities may overlap District easement only if proper separations are maintained. Details for grant of easement documents are included in Section IV, <u>Construction Drawing Preparation</u>.

EXHIBIT 1
Page 72

## SECTION IV

## CONSTRUCTION DRAWING PREPARATION

8/1/91

EXHIBIT 1
Page 73

## SECTION IV
## CONSTRUCTION DRAWING PREPARATION

A.   GENERAL

Engineer shall prepare water system improvement drawings that are clear, concise, and meet District standards.

Drawings shall be drawn in ink on D size mylar sheets (24" x 36") with Rancho California Water District approval block.

The drawings shall be professional quality drawings especially prepared as WATER DRAWINGS or WATER AND SEWER DRAWINGS.  Work shall be of standard engineering practice and shall be legible and present the proposed construction without confusion.

Water and sewer design may be shown on the same drawings if the drawings are clear and concise.  The District shall be the sole judge as to when separate drawings are necessary.

B.   COVER SHEET

The cover sheet shall show as a minimum:

1.   General notes (Appendix "D")

2.   Legend (Appendix "E")

3.   Estimate of quantities (Appendix "E")

4.   Approval for Construction Box (Appendix "F")

5.   Water System Certification (Appendix "F")

6.   Index of Drawings

7.   Vicinity Map

   a.   Scale

   b.   North Arrow

   c.   Street Names

   d.   Title and Location of Project

8.   Index Map

   a.   Scale

   b.   North Arrow

   c.   Tract Layout with Street Names and Lot Numbers

8/1/91                                -11-

EXHIBIT 1
Page 74

    d.    Proposed Waterlines Identified by Size and Type

    e.    Symbols for all Appurtenances

          1.    Fire Hydrants

          2.    Air Valves

          3.    Blowoffs

          4.    Tees, Crosses

          5.    Valves

          6.    Water Services

    f.    Sheet Numbers Corresponding to Plan and Profile Sheets

The use of a second sheet to include all information is permissible.

C.    **PLAN AND PROFILE SHEETS**

The plan/profile sheets shall be drawn at a horizontal scale of 1"=40' and a vertical scale of 1"=4', and as a minimum the drawings shall show the following:

PLAN PORTION

1.    Title Block

Title block shall show Tract No., pressure zone, and scale of drawings. District approval blocks shall be incorporated into the title block.

2.    North Arrow

North Arrow shall point up or to the left if possible to conform with Item 11.

3.    Right-of-Way

Existing and proposed right-of-way shall be identified with dimensions for same shown.

4.    Curb Separation

Existing and/or proposed curb separation shall be identified with dimensions for same shown.

5.    Easements

Existing or proposed easements shall be identified with dimensions for same shown.

6.    Street Names

All street names shall be shown.

8/1/91                -12-

EXHIBIT 1
Page 75

7.   Lot Lines

All lot lines and parcel lines shall be shown.  All lots shall be numbered or labeled. All adjacent tracts shall be identified.

8.   Utilities

All existing and proposed Utilities shall be shown.  Utilities to be shown shall include, but not be limited to, water (existing water lines shall be identified by District Plan No.), sewer, gas, power, telephone, storm drain, irrigation, traffic, and cable television.  Each utility shall be identified with a symbol and the size of the utility shall be shown.

9.   Existing and Proposed Improvements

All existing surface improvements shall be shown including, but not limited to, curb and gutter, edge of pavement, power poles, driveways, sidewalks, and fences.

10.   Match Lines

Match lines for each end of the street shall be shown as follows:

Sta 15+00.00 Match Line
See Sheet 5

11.   Stationing

Stationing along the centerline of the improvement shall be shown.  Unless otherwise specified, station shall increase from left to right.  Stationing shall be identified with tick marks at 100' intervals.

12.   Proposed Pipeline

Proposed pipeline shall be indicated with a heavy line.  Dimensions from street centerline to centerline of pipeline shall be shown.  Pipeline shall be identified as:

℄ ____" CML&C (__ Gauge Minimum) Pipeline

OR

℄ ____" C900 (use C905 for 16" PVC) Class ___ PVC Pipeline

13.   Appurtenances

All appurtenances including tees, crosses, elbows, and blind flanges or plugs shall be identified by station and size as follows:

Sta 12+25.00 ℄ 12" x 12" x 8" Tee

All pipeline appurtenances including air valves, blowoffs, fire hydrants, and valves shall be identified by station, size, and Rancho California Water District Standard Number as follows:

Sta 12+25.00 ℄ 2" Air Valve per RCWD Std. Dwg. No. ____

8/1/91                                  -13-

EXHIBIT 1
Page 76

All meter services shall be indicated on the drawings. The stationing of services is not required on the drawings, however, after construction of proposed facilities, the engineer shall provide the District with an "as-built" stationing table of the meter services on the record drawings.

All connections to existing water system shall be identified by station and size. A station equation and District plan number shall be used to reference existing waterlines. Detail for connection shall be used where required.

PROFILE PORTION

Only profiles for water and sewer shall be shown. All other utility profiles shall not be shown unless conflicting or where crossing over or under (i.e. storm drain).

1.  Stationing

    Stations shall be shown along bottom of profile at 100 foot intervals. Profile stationing shall line up with plan stationing.

2.  Elevations

    Elevations shall be shown on both ends of the profile sheet.

3.  Existing and Proposed Ground Surface

    Existing ground surface or pavement over the proposed pipeline shall be identified as follows:

    Existing "Top of Pavement (or ground surface) over Centerline of Pipeline"

    Proposed ground surface or pavement over the proposed pipeline shall be identified as follows:

    "Proposed Top of Pavement (or ground surface) over Centerline of Pipeline"

4.  Match Lines

    Match lines for each end of sheet shall be shown as follows:

    Sta 15+00.00 Match Line
    See Sheet 5

5.  Flow line of proposed pipeline shall be identified as follows:

    $F_L$ ____" CML&C (____ ga minimum) Pipeline

    OR

    $F_L$ ____" C900 (use C905 for 16" PVC) Class ____ PVC Pipeline.

EXHIBIT 1
Page 77

6.   Stationing and Flow Line Elevation

Pipeline stationing and flow line elevations shall be shown for each grade break as follows:

Sta 14+00.00 GB
1192.35 F̱L̲

Pipeline stationing and flow line elevations shall be shown for each tee, cross, elbow, BC, EC, hot tap, and end of pipeline as follows:

Sta 12+25.00, 12"x12"x8" Tee
1190.00 F̱L̲

Pipeline stationing and flow line elevations shall be shown for all air valves, blowoffs, and fire hydrants as follows:

Sta 12+25.00, 4" Blowoff
1190.00 F̱L̲

Pipeline station and flow line elevation shall be show for each utility crossing.

7.   Pipeline Lengths and Pipeline Slopes

Pipeline lengths and pipeline slopes shall be shown between all grade breaks as follows:

S = 0.005                    135.00 LF ___" PVC
                                   ___" CML & C

8.   Minimum Design Pressure

Minimum design pressure shall be shown at top of each sheet as follows:

Minimum Design Pressure = 175 psi

9.   Welded Joint Limits

Length of welded joints for welded steel pipe shall be identified as "Fully Welded Joints" with station limits shown.

10.   Minimum Cover

42" minimum cover shall be shown between top of pipe and existing or proposed ground surface.

11.   Maximum Cover

The maximum cover shall be 8' between the top of pipe and existing or proposed ground surface.

A checklist for the preparation of water construction drawings is shown in Appendix "G".

8/1/91                                   -15-

EXHIBIT 1
Page 78

D.     GRANT OF EASEMENTS

The Grant of Easement shall be on District form and shall consist of three parts. Grant of Easement form, legal description, and plat.

The legal description shall be designated as Exhibit "A" and if appropriate shall have the assessor's parcel number indicated on the upper right corner of the exhibits.   The legal description shall be prepared by a California Registered Civil Engineer or Land Surveyor and signed and stamped by said engineer or surveyor.

The plat shall be designated as Exhibit "B" and shall be prepared on District plat map and signed and stamped.

Copies of Grant of Easement form and plat are shown in Appendix "H".  Items to be included on the plat map are shown in said appendix.

EXHIBIT 1
Page 79

# SECTION V

## PROCEDURES
## WATER SYSTEM FACILITY CONSTRUCTION

8/1/91

EXHIBIT 1
Page 80

SECTION V
PROCEDURES
WATER SYSTEM FACILITY CONSTRUCTION

All water facility projects will be constructed by Developer and inspected by District inspectors. Work performed without the knowledge or the observation of a District inspector will not be accepted. The steps required to obtain approval of construction of water facilities are as follows:

1. Submit Engineering Service Application and Inspection Deposit.

2. Provide Submittals, Water System Construction Agreement, Bonds, and Certificate of Insurance.

3. Attend Preconstruction Meeting.

4. Notify District Regarding Construction Start.

5. Construct Water System Facilities.

6. Pressure Test and Disinfect Water System Facilities.

7. Provide Continuity Test (Steel Pipe Only)

8. Pay any Remaining Inspection Fees.

9. Connect to Existing Water System.

10. Submit Application for Unmetered Construction Water.

11. Remove Unmetered Connections.

12. Submit Drop-in Meter Application and Pay Fees.

13. Provide Unconditional Lien Waiver and Release, Water System Grant Deed, and Record Drawings.

14. Notice of Completion Filed by District and Drop-in Meters Installed by District.

A flowchart for water system facility construction is shown as Exhibit "I". A construction status sheet to be used by District is shown in Appendix "J". Each required step is discussed in detail below:

1.  Submit Engineering Service Application and Inspection Deposit

The engineering service application (available from the District) shall be completed and filed with the District staff. A copy of the engineering services application is shown in Appendix "C". The inspection deposit and three copies of approved water construction drawings shall be submitted with the completed application.

EXHIBIT 1
Page 81

2.    Provide Submittals, Water System Construction Agreement, Bonds, and Certificate of Insurance

Developer shall submit to District staff the following:

a.    Contractor information sheet (Appendix "K").

b.    Materials list (see District's Standard Specifications and Standard Drawings for Water and Sanitary Sewer Facilities, Special Provisions, Section 5)

c.    Two copies of Encroachment Permits.

d.    One copy of recorded tract/parcel map showing dedication of streets for road and public utility purposes (not required if executed Grant of Easement provided earlier).

e.    Water System Construction Agreement (Appendix "L").

After District executes Water System Construction Agreement, approves Contractor, and approves materials list, Developer shall submit the following:

a.    Copy of the Contract between Developer and Contractor verifying cost of water system facility construction.

b.    Certification of streets to final grade (Appendix "M").

c.    Certificates of Insurance for Contractor (Appendix "N").

d.    Faithful Performance Bond (Appendix "O"). Performance bonds provided to the City/County are satisfactory if the facilities to be turned over to RCWD are included.

After District reviews and approves all submittals, District staff will issue a Notice to Proceed.

Thereafter, Developer shall schedule a preconstruction meeting with District staff. A one week notice is required prior to said preconstruction meeting.

3.    Attend Construction Meeting

Preconstruction meeting shall be held at the District office and shall be attended by Developer's representative, Developer's contractor, and construction superintendent as well as by District staff.

4.    Notify District Regarding Construction Start

Contractor shall notify District, in writing, a minimum of one week prior to construction start. Prior to construction, Contractor shall submit three copies of the construction cut sheets for Districts use during construction. Waterline shall be staked at 50 foot intervals and at all water services, fire hydrants, tees, crosses, elbows, valves, air valves, blowoffs, and grade breaks.



8/1/91                                    -18-

EXHIBIT 1
Page 82

5.     Construct Water System Facilities

The water system facilities shall be constructed by Developer's contractor and inspected by District inspectors. After completion of construction, Developer's contractor shall complete all items on District's inspection list prior to testing and disinfecting water facilities.

6.     Pressure Test and Disinfect Water System Facility

After water facilities are completed to satisfaction of District inspector including all items on inspector's construction deficiencies list, and after Contractor furnishes evidence that compaction of trenches has been completed to the satisfaction of the County of Riverside Road Department, City of Temecula, or City of Murrieta, Contractor shall test and disinfect the water facility in accordance with District Standards.

After system has been tested and disinfected, District will take samples for bacteriological tests. Acceptable bacteriological test results must be obtained before District will allow connections to existing water system.

7.     Provide Continuity Test (Welded Steel Pipe Only)

After water facilities are tested and disinfected, Contractor shall perform continuity test on all corrosion control equipment. Contractor shall provide written results of said test to District. District shall approve said tests before District will allow connections to existing water system.

8.     Pay Any Remaining Inspection Fees

Before District will allow connections to existing water system, any remaining inspection fees must be paid in full.

9.     Connect to Existing Water System

After all fees have been paid and system is disinfected, Contractor may connect water facilities to existing water facility system. Contractor shall provide the District with three weeks written notification requesting a system shutdown to make tie-in's to the existing District facilities. Thereafter, District will release new water system facilities for fire protection and construction water.

10.    Submit Application for Unmetered Construction Water

Developer shall submit application for unmetered construction water with the appropriate fee to District staff (Appendix "P").

After approval of same, Developer shall install unmetered connections in accordance with District Standards.

11.    Remove Unmetered Connections

After Contractor is completed with construction, he shall remove unmetered connections and prepare for drop-in meters as follows:

a.     Construction water shall be discontinued completely and jumpers removed.
b.     Angle meter stops shall be set to proper elevation and location, meter boxes shall be set to proper elevations and locations.

EXHIBIT 1
Page 83

    c.     Sidewalks and driveways shall be placed and forms stripped on areas in vicinity of meter boxes.

    d.     Lots shall be fine graded.

12.   <u>Submit Drop-in Meter Application and Pay Fees</u>

    a.     The Drop-in Meter Application shall be completed and filed with District staff. All related meter installation and connection fees shall be submitted with the completed application. Approximately 30 days are required after receipt of the application and fees before meter will be set.

    b.     District inspector will inspect those lots requiring meters. Any deficient items will be listed on a punch list and copies will be given to Developer to correct. When all items have been resolved and accepted by inspector, said lots will be released to customer service for meter installations. There is a 2 week lead time from when lots are released for drop-in meters and when actual drop-in meters are installed.

13.   <u>Provide Unconditional Lien Waiver and Release, Water System Grant Deed, and Record Drawings</u>

Before District will install drop-in meters, Contractor shall:

    a.     Provide Unconditional Lien Waiver and Release for waterline construction (Appendix "Q").

    b.     Provide Grant Deed dedicating water system to District. Said Grant Deed is effective only after final Notice of Completion for water system facilities is filed by District staff. Grant Deed must be filed on form provided by District (Appendix "R").

            In the event an Agency Agreement is required by the District, Developer shall grant said Agency Agreement to the District on form provided by District (Appendix "S").

    c.     Water system record ("As-Builts") drawings.

14.   <u>Notice of Completion Filed by District and Drop-in Meters Installed by District</u>

After receipt, and approval of items in Section 13, District will file Notice of Completion and install drop-in meters.

8/1/91                       -20-

EXHIBIT 1
Page 84

**APPENDICES**

8/1/91

EXHIBIT 1
Page 85

# FLOWCHART FOR CONSTRUCTION DRAWING APPROVAL



APPENDIX "A"

8/1/91

EXHIBIT 1
Page 86

RANCHO CALIFORNIA WATER DISTRICT
WATER SYSTEM FACILITY REQUIREMENTS

PLAN CHECK STATUS SHEET

RCWD JOB NO. _____                              TRACT NO. _____

PARCEL MAP NO. _____

NAME OF PROJECT: _____

DEVELOPER: _____

LOCATION OF PROJECT: _____

ENGINEER: _____   PHONE: _____

|  | ITEM | DATE | INITIAL |
|---|---|---|---|
| 1. | Received Engineering Service Application and Plan Check Deposit (Engineer) | _____ | _____ |
| 2. | Provide Hydraulic Grade Elevation at Connections to Existing System (District) | _____ | _____ |
| 3. | Received: | | |
|  | -One Copy of Conditions of Approval (Engineer) | _____ | _____ |
|  | -Two Copies of Tract Map with Proposed Water System Including Valves (Engineer) | _____ | _____ |
|  | -Two Copies of Hydraulic Network Analysis of Proposed System (Engineer) | _____ | _____ |
| 4. | Review Item 3 and Provide Comments (District) | _____ | _____ |
| 5. | Received First Plan Check (Engineer): | _____ | _____ |
|  | -Three Copies of Water Construction Drawings | _____ | _____ |

EXHIBIT "B"

8/1/91

EXHIBIT 1
Page 87

| ITEM | DATE | INITIAL |
|------|------|---------|
| —One Copy of Sewer Construction Drawings (Unless Part of Water Drawings) | _____ | _____ |
| —One Copy of Street Construction Drawings | _____ | _____ |
| —One Copy of Grading Plan | _____ | _____ |
| —One Copy of Revised Tract Map with Hydraulic Network Analysis | _____ | _____ |
| —Two Copies of Easement Documents | _____ | _____ |
| —One Copy of Tract/Parcel Map | _____ | _____ |
| —Corrosion Site Survey (Steel Pipe Only) | _____ | _____ |
| —Copy of City/County Plan Check Receipt | _____ | _____ |

6.  Review First Plan Check, Provide
    Comments (District)                     _____     _____

7.  Received Second Plan Check
    (Engineer)                              _____     _____

    —Previous District Plan Check Set
     and Transmittal                        _____     _____

    —Three Copies of Revised Water
     Construction Drawings                  _____     _____

    —Two Copies of Easement Documents       _____     _____

    —Copies of Additional Information
     as Requested                           _____     _____

     _____            _____     _____

     _____            _____     _____

8.  Review Second Plan Check, Provide
    Comments (District)                     _____     _____


EXHIBIT "B"

8/1/91

EXHIBIT 1
Page 88

| ITEM | DATE | INITIAL |
|---|---|---|
| 9.  Received Third Plan Check (Engineer) | _____ | _____ |
|   -Previous District Plan Check Set and Transmittal | _____ | _____ |
|   -Three Copies of Revised Water Construction Drawings | _____ | _____ |
|   -Two Copies of Easement Documents | _____ | _____ |
|   -Copies of Additional Information as Requested | _____ | _____ |
| | | |
| 10.  Review Third Plan Check, Provide Comments (District) | _____ | _____ |
| 11.  Received Original Construction Drawings for Signature (Engineer) | _____ | _____ |
|   -Previous District Plan Check Set and One Copy of Revised Water Construction Drawings | _____ | _____ |
|   -All Remaining Plan Check Fees Paid | _____ | _____ |
|   -Copy of Tentative Tract/Parcel Map | _____ | _____ |
|        or | | |
|   -Executed Grant of Easement | _____ | _____ |
| 12.  Construction Drawings Signed (District) | _____ | _____ |
| 13.  Received One Set of Photo Mylars and Three Sets of Construction Drawings (Engineer) | _____ | _____ |

EXHIBIT "B"

8/1/91

EXHIBIT 1
Page 89

# ENGINEERING SERVICE APPLICATION

Rancho Water

8/1/91

Recycl #

| Type Of Meter | Size | No Dials | Meter No |
| --- | --- | --- | --- |

RP Mtr          RP No          Install Date

**DIVISION:**
Rancho ☐   Santa Rosa ☐   Sewer ☐

Date:
Rep:
Applicant's Name          Job # ☐          Desc.
          Job # ☐          Desc.
          Job # ☐          Desc.

Mailing Address

Post Office Box/Street

City          State          Zip          Telephone

Owner/Responsible Party

Mailing Address

Post Office Box/Street

City          State          Zip          Telephone

**SERVICES REQUIRED: Description of Service Area**

**DEPOSIT BASIS:**

Main Extension Est. $1,260.00 ☐

Assessment District Req. $4,778 ☐

Detector Check Inspection Fee $2,300.00 ☐

**PLAN CHECK:**

1st 1,000 Feet $399.00 ☐   Total LF ☐

Additional Footage $40/100 Feet ☐

Additional

LF _____   X RATE per LF _____

**INSPECTION:**

LF of Line _____          X RATE per LF $2.63= Deposit

OTHER: Description _____  = Deposit

**TOTAL DEPOSIT REQUIRED**

**FEE BASIS:**

¾ Inch Detector Check Meter $79.00 ☐

Will Serve Letters $91.00 ☐

Topo Map Copy $108.00 ☐   Duplicate Topo/Mylar $324.00 ☐

Temporary Remote Meter $242.00 ☐   Annex. Proc. $3575.00 ☐

OTHER: Description _____   Amount _____

**TOTAL FEES REQUESTED**

**CHECK ENCLOSED FOR TOTAL AMOUNT**

The undersigned customer agrees that deposits for engineering services listed above are based on estimates. In the event that actual costs should exceed the original estimate, additional payments will be required.

Signature

Signature

EXHIBIT 1
Page 90

RANCHO CALIFORNIA WATER DISTRICT
GENERAL CONSTRUCTION NOTES

1.  **GENERAL**

A.  CONTRACTOR SHALL FURNISH AND INSTALL ALL FACILITIES IN ACCORDANCE WITH THE DISTRICT'S STANDARD SPECIFICATIONS AND STANDARD DRAWINGS FOR WATER AND SANITARY SEWER FACILITIES (DATED MARCH 1, 1990 OR LATEST REVISION). THE SPECIFICATIONS AND STANDARD DRAWINGS ARE AVAILABLE FROM THE DISTRICT. CONTRACTOR SHALL BE IN POSSESSION OF DISTRICT'S SPECIFICATIONS AND STANDARD DRAWINGS ON THE JOB SITE AT ALL TIMES.

B.  ALL PERMITS REQUIRED BY LAW SHALL BE ACQUIRED BY THE APPLICANT OR THEIR CONTRACTOR.

C.  ALL CONSTRUCTION SHALL CONFORM TO CURRENT CAL OSHA SAFETY REQUIREMENTS.

D.  APPROVAL BY RCWD IMPLIES NO PERMISSION OTHER THAN THAT WITHIN THE DISTRICT'S JURISDICTION. REQUIREMENTS OF RCWD SHALL TAKE PRECEDENCE OVER REQUIREMENTS OF OTHER AGENCIES ONLY WHEN RCWD REQUIREMENTS ARE GREATER.

E.  CONTRACTOR SHALL NOTIFY RCWD'S CONTRACTS MANAGER A MINIMUM OF ONE WEEK PRIOR TO STARTING CONSTRUCTION.

F.  CONTRACTOR SHALL PROVIDE WRITTEN NOTIFICATION REQUESTING A SYSTEM SHUTDOWN FOR CONNECTIONS TO EXISTING SYSTEM. SAID NOTIFICATION SHALL BE MADE A MINIMUM OF THREE WEEKS PRIOR TO SAID SHUTDOWN TO THE RCWD CONTRACTS MANAGER.

G.  CONTRACTOR SHALL DESIGNATE A QUALIFIED SUPERINTENDENT WITH FULL AUTHORITY TO ACT ON BEHALF OF THE CONTRACTOR. SAID SUPERINTENDENT SHALL BE ON THE JOB SITE AT ALL TIMES.

H.  CONTRACTOR SHALL PERFORM ALL WORK UNDER RIVERSIDE COUNTY ROAD DEPARTMENT, CITY OF TEMECULA, OR CITY OF MURRIETA JURISDICTION IN ACCORDANCE WITH ALL REQUIREMENTS OF SAID DEPARTMENT OR CITY INCLUDING TRAFFIC CONTROL, PAVEMENT REMOVAL, TEMPORARY PAVEMENT PLACEMENT, PERMANENT PAVEMENT PLACEMENT (INCLUDING BASE MATERIAL) AND TEMPORARY AND PERMANENT TRAFFIC STRIPPING.

2.  **PIPELINE AND APPURTENANCES**

A.  ALL VALVES, PIPING, AND APPURTENANCES SHALL BE DESIGNED TO MEET OR EXCEED THE SPECIFIED MINIMUM DESIGN PRESSURE SHOWN ON THE PLAN/PROFILE SHEETS. IN ADDITION, ALL VALVES, PIPING, AND APPURTENANCES SHALL BE TESTED AT A PRESSURE OF 10% OVER SAID MINIMUM DESIGN PRESSURE. VALVES SHALL BE CAPABLE OF WITHSTANDING SAID TEST PRESSURE IN A CLOSED POSITION.

APPENDIX "D"

8/1/91

EXHIBIT 1
Page 91

B.  ALL MATERIALS, TESTING, AND INSPECTION OF PIPE SHALL BE IN CONFORMITY WITH THE REQUIREMENTS OF RANCHO CALIFORNIA WATER DISTRICT, RIVERSIDE COUNTY, CITY OF TEMECULA, AND THE AMERICAN WATER WORKS ASSOCIATION STANDARDS.   FAILURE TO MEET ANY REQUIREMENTS OF THE ABOVE REFERENCED AGENCIES WILL BE CAUSE FOR REJECTION.

C.  PIPE SHALL BE __" _____ IN ACCORDANCE WITH RCWD SPECIFICATIONS AND STANDARDS (PROVIDE PIPE DIAMETER FOR PVC PIPE, PROVIDE AWWA C900 OR AWWA C905 AND PIPE CLASS FOR CML & C STEEL PIPE, PROVIDE MINIMUM GA FOR STEEL CYLINDER).

D.  VALVES 12" AND SMALLER SHALL BE RESILIENT SEATED GATE VALVES IN ACCORDANCE WITH RCWD STANDARD DRAWING NOS. RW-30 AND RW-31 UNLESS OTHERWISE SPECIFIED.  VALVES 16" AND LARGER SHALL BE BUTTERFLY VALVES UNLESS OTHERWISE SPECIFIED.

E.  AIR VACUUM AND AIR RELEASE ASSEMBLIES SHALL BE INSTALLED IN ACCORDANCE WITH RCWD STANDARD DRAWING NO. _____ (RW-9, RW-10, OR RW-11).

F.  ALL SERVICE CONNECTIONS SHALL BE ___" COPPER SERVICES BY ___" METERS AS NOTED ON THE DRAWINGS.   ALL SERVICES SHALL BE LOCATED AS SHOWN ON THE DRAWINGS, ADJUSTED UNDER RCWD INSPECTION TO MISS DRIVEWAYS AND OTHER IMPROVEMENTS. SERVICES SHALL BE INSTALLED IN ACCORDANCE WITH RCWD STANDARD DRAWING NO. ___ (RW-13, RW-14, RW-15, RW-16, RW-17, OR RW-17A).

ALL NON-RESIDENTIAL METERS SHALL BE INSTALLED WITH A DISTRICT APPROVED BACKFLOW DEVICE.

G.  FIRE HYDRANTS SHALL BE CONSTRUCTED IN ACCORDANCE WITH STANDARD DRAWING NO. ___ (RW-3, RW-5, RW-6, RW-7, OR RW-8).

H.  WATERLINE CONSTRUCTION SHALL BE IN ACCORDANCE WITH STANDARD DRAWING NOS. _____ (RW-22 AND RW-25 FOR PVC PIPE, AND RW-28, RW-29, AND RW-32 THROUGH RW-36 FOR WELDED STEEL PIPE).

I.  THRUST BLOCKS SHALL BE CONSTRUCTED IN ACCORDANCE WITH RCWD STANDARD DRAWING NO. RW-26.

3.  **UTILITIES**

A.  AT LEAST 48 HOURS BEFORE COMMENCING ANY EXCAVATION, CONTRACTOR SHALL REQUEST UNDERGROUND SERVICE ALERT (1-800-422-4133) AND NON-MEMBER COMPANIES, OR UTILITIES TO MARK OR OTHERWISE INDICATE THE LOCATION(S) OF THEIR SUBSURFACE FACILITIES INCLUDING; BUT NOT LIMITED TO, STRUCTURES INCLUDING VAULTS, MAIN CONDUCTORS OR CONDUITS, AND SERVICE CONNECTIONS.

APPENDIX "D"

8/1/91

EXHIBIT 1
Page 92

B.   PRIOR TO CONSTRUCTION. CONTRACTOR SHALL EXPOSE EXISTING WATERLINES AT PROPOSED CONNECTIONS AND CROSSINGS AND VERIFY ELEVATIONS, LOCATIONS, AND SIZE OF EXISTING FACILITIES.

C.   CONTRACTOR SHALL NOT INTERRUPT OR DISTURB ANY UTILITY FACILITY WITHOUT AUTHORITY FROM THE UTILITY.  WHERE PROTECTION IS REQUIRED TO ENSURE INTEGRITY OF UTILITY FACILITIES (INCLUDING DISTRICT-OWNED UTILITIES). CONTRACTOR SHALL FURNISH AND PLACE ALL NECESSARY PROTECTION.

D.   WHENEVER A WATERLINE ENCOUNTERS A STORM DRAIN PIPE OR OTHER OBSTRUCTION AND CROSSING OVER THE OBSTRUCTION WILL RESULT IN LESS THAN 42" OF COVER OVER THE TOP OF THE WATER, THE WATERLINE SHALL CROSS UNDER THE OBSTRUCTION WITH A MINIMUM CLEARANCE OF 12".

4.   **CONSTRUCTION DRAWINGS**

A.   MINIMUM PIPE COVER SHALL BE 42" FROM FINISHED GROUND SURFACE.

B.   WATER SYSTEM PROFILE ELEVATIONS ARE TO FLOW LINE OF PIPE.

C.   STATIONING FOR PIPELINE AS SHOWN ON PLAN PORTION OF DRAWINGS IS PERPENDICULAR TO CENTERLINE OF RIGHT-OF-WAY.

D.   SEPARATION BETWEEN SEWER AND WATER SHALL CONFORM TO RIVERSIDE COUNTY STANDARD NO. 817 AND RCWD STANDARD DRAWING S-23.

5.   **CONSTRUCTION TOLERANCES**

PIPELINES SHALL BE CONSTRUCTED SO THAT ACTUAL FLOW LINE ELEVATIONS ARE WITHIN 0.1 FOOT OF DESIGN FLOW LINE ELEVATIONS. PIPELINES, WHEN INSTALLED, SHALL HAVE CONTINUOUS UPGRADE OR DOWNGRADE, CORRESPONDING WITH DESIGN SLOPE, WITHOUT ANY HIGH SPOTS. PIPELINES SHALL BE CONSTRUCTED SO THAT ACTUAL PIPELINE CENTERLINES ARE WITHIN 0.1 FOOT OF DESIGN PIPELINE CENTERLINES.

PIPELINE CONSTRUCTION SHALL CONFORM WITH CONSTRUCTION DRAWINGS IN ACCORDANCE WITH THE ABOVE SPECIFIED TOLERANCES. CONTRACTOR SHALL ASSIST DISTRICT AS REQUIRED TO CONFIRM COMPLIANCE WITH CONSTRUCTION TOLERANCES.  CONTRACTOR SHALL MAKE OR ASSIST IN MAKING ALL NECESSARY MEASUREMENTS AS DETERMINED BY DISTRICT.

6.   **INSPECTION FEE**

THREE WEEKS PRIOR TO CONSTRUCTION, A DEPOSIT FOR INSPECTION FEE WILL BE MADE.  THIS FEE IS ESTIMATED AT $_____.  SHOULD ACTUAL COSTS BE GREATER, THE BALANCE SHALL BE PAID TO THE DISTRICT BY THE APPLICANT. SHOULD ACTUAL COSTS BE LESS, THE BALANCE SHALL BE REFUNDED TO THE APPLICANT. FEES SUBJECT TO CHANGE WITHOUT NOTICE.

APPENDIX "D"

8/1/91

EXHIBIT 1
Page 93

7.   **ENGINEERING FIRM**

PRIOR TO SIGNING OF WATER CONSTRUCTION DRAWINGS BY RCWD. ALL QUESTIONS CONCERNING THIS PROJECT SHALL BE DIRECTED TO:

_____
(NAME)

_____
(TITLE)

_____
(FIRM)

APPENDIX "D"

8/1/91

EXHIBIT 1
Page 94

# LEGEND AND ESTIMATE OF QUANTITIES

1.  The Legend and Estimate of Quantities shall be included on the same sheet as the Index Map, in the following format:

| QTY | UNIT | LEGEND | DESCRIPTION | STD. DWG. |
|---|---|---|---|---|
| | L.F. |  | INSTALL ____" C900 (or C905) class____ PVC pipeline | RW-22, RW-25 |
| | L.F. |  | INSTALL ____" CML&C (__ Gauge Minimum) pipeline | RW-33, RW-34 |
| | EA |  | INSTALL ____" Resilient Wedge Valve (F x GT, F x F) | RW-30, RW-31 |
| | EA |  | INSTALL ____" Plug Valve (HIGH PRESSURE SYSTEMS ONLY) | |
| | EA |  | INSTALL ____" flanged Butterfly Valve (F x F) | RW-30, RW-31 |
| | EA |  | CONSTRUCT 6" residential fire hydrant assembly | RW-7 OR RW-8 |
| | EA |  | CONSTRUCT 6" "super" fire hydrant assembly | RW-5 OR RW-6 |
| | EA |  | CONSTRUCT 4" Blow-Off assembly | RW-4 |
| | EA |  | CONSTRUCT ____" Air and Vacuum Release Assembly | RW-9, RW-10,OR RW-11 |
| | EA |  | CONSTRUCT ____" copper water service assembly | RW-13 OR RW-14 |
| | EA |  | INSTALL ____" cast iron tee | |
| | EA |  | CONSTRUCT ____" CML & C steel tee | RW-29 |

**APPENDIX "E"**

8/1/91

EXHIBIT 1
Page 95

| | | | | |
|---|---|---|---|---|
| EA |  | INSTALL _____ wire test station | |
| EA |  ⑭ | INSTALL _____" cast iron cross | |
| EA |  ⑮ | CONSTRUCT _____" CML & C steel cross | RW-29 |
| EA | ⑯  | INSTALL cast iron end caps (size as noted on plans) | RW-24 |
| EA | ⑰  | INSTALL blind flange (size as noted on plans) | RW-24 |
| EA | ⑱  | INSTALL hot-tapping sleeve (size noted on plans) | |
| EA | ⑲  | CONSTRUCT tapping flange outlet (size as noted on plans) | RW-29 |
| EA | ⑳  | INSTALL cast iron reducer (size as noted on plans) | |
| EA | ㉑  | CONSTRUCT CML & C steel reducer (size as noted on plans) | |
| EA | ㉒  | CONSTRUCT concrete thrust block | RW-26 |
| EA | ㉓  | INSTALL 4"/6" bypass valve assembly | RW-38 |
| EA | ㉔  | INSTALL _____° cast iron elbow | |
| EA | ㉕  | CONSTRUCT _____° CML & C steel tee | |

2.  A separate entry is required for each size and type of all materials necessary for this project, including, but not limited to, size and type of pipe, valves, water services, tees, crosses, elbows, and end plugs.

**APPENDIX "E"**

EXHIBIT 1
Page 96

*TITLE SHEET SIGNATURE BLOCK*

| Rancho California Water District | | |
|---|---|---|
| APPROVED FOR CONSTRUCTION: | | |
| Director of Engineering | | Date |
| **Approvals:** | | |
| Design | Date | Contracts | Date | Operations | Date |

*WATER SYSTEM CERTIFICATION*

I certify that the design of the WATER SYSTEM in _____ is in accordance with the WATER SYSTEM MASTER PLAN of Rancho California Water District and that the water service, storage and distribution system will be adequate to supply water to said project.

This certification does not constitute a guarantee that it will supply water to said project at any specific quantities, flows, or pressures for fire protection or any other purpose.

_____     _____
Director of Engineering                              Date

*SIGNATURE BLOCK*
(All sheets except first)

| Rancho California Water District | | |
|---|---|---|
| APPROVED FOR CONSTRUCTION: | | |
| | | |
| Design | Contracts | Operations |

*CONSTRUCTION APPROVAL BOX/WATER SYSTEM CERTIFICATION*
*APPENDIX "F"*

8/1/91

EXHIBIT 1
Page 97

RANCHO CALIFORNIA WATER DISTRICT
WATER CONSTRUCTION DRAWINGS CHECK LIST

TRACT NO _____   RCWD W O _____

## COVER SHEET

| VICINITY MAP | | |
|---|---|---|
| Scale ____ | | |
| North Arrow | | |
| Street Names | | |
| Title and Location of Project | | |
| INDEX MAP | | |
| Scale ____ | | |
| North Arrow | | |
| Proposed Water/Sewer Line | | |
| Layout of Project | | |
| Appurtenances | | |
| Manhole | | |
| Fire Hydrants | | |
| Detector Checks | | |
| Air Valves | | |
| Blow-Offs | | |
| Pipeline | | |
| Quantities | | |
| Plan Layout/Sheet Reference | | |
| NOTES | | |
| Water System Certification | | |
| Notifications | | |
| General Water Notes | | |
| RCWD Signature Block | | |

8/1/91

APPENDIX 'G'

EXHIBIT 1
Page 98

RANCHO CALIFORNIA WATER DISTRICT
WATER CONSTRUCTION DRAWINGS CHECK LIST

TRACT NO _____   RCWD W.O _____

## PROFILE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SHEET NO. | | | | | | | | |
| Type. Size, and Station:<br>a.   Tees, Crosses. Elbows.<br>     Blind Flanges. Plugs.<br>     Air Valves, Blowoffs,<br>     and Fire Hydrants | | | | | | | | |
| b.   Connections to Existing<br>     Facilities | | | | | | | | |
| c.   In-line Valves | | | | | | | | |
| Stations at Bottom of Profile | | | | | | | | |
| Elevations at Side of Profile | | | | | | | | |
| Existing Ground Surface | | | | | | | | |
| Proposed Finished Ground<br>Surface or Pavement | | | | | | | | |
| Match Lines (Station & Sheet<br>Number) | | | | | | | | |
| Flow Line of Waterline<br>Identified | | | | | | | | |
| Stationing and Flow Line<br>Elevations for: | | | | | | | | |
| a.   Tees, Crosses. and Elbows | | | | | | | | |
| b.   Grade Breaks | | | | | | | | |
| c.   Hot Taps | | | | | | | | |
| d.   EC's and BC's | | | | | | | | |
| e.   Blow-Offs | | | | | | | | |
| f.   Air Valves | | | | | | | | |
| g.   End of Pipe | | | | | | | | |
| h.   Fire Hydrants | | | | | | | | |
| Pipeline Slopes | | | | | | | | |
| Pipeline Lengths | | | | | | | | |
| Minimum Design Pressure | | | | | | | | |
| Welded Joint Limits | | | | | | | | |
| 42" Minimum Cover | | | | | | | | |
| Concrete Encasement Limits | | | | | | | | |
| Separation from Sewer | | | | | | | | |

APPENDIX 'G'

8/1/91

EXHIBIT 1
Page 99

RANCHO CALIFORNIA WATER DISTRICT
WATER CONSTRUCTION DRAWINGS CHECK LIST

TRACT NO _____ RCWD W O _____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SHEET NO. | | | | | | | |
| RCWD Signature Block | | | | | | | |
| Title Block with Pressure Zone | | | | | | | |
| Scale (Hor. - 1"=40')  (Vert. - 1"=4') | | | | | | | |
| North Arrow | | | | | | | |
| Location and Width of Right-of-Way | | | | | | | |
| Location and Width of Curb Separation | | | | | | | |
| Location and Width of Easements | | | | | | | |
| Street Names | | | | | | | |
| Lot (Parcel) Lines & Numbers All Adjacent Tracts Identified | | | | | | | |
| Existing/Future Utilities | | | | | | | |
| Existing/Proposed Improvements | | | | | | | |
| Match Lines (Station & Sheet Number) | | | | | | | |
| Existing Water Dwg. Reference | | | | | | | |
| Pipeline Located per County Standard No. 817 | | | | | | | |
| Separation from Sewer | | | | | | | |
| Stations and O.D. Elevations of Crossings (water, sewer, storm drain, and reclaimed water) | | | | | | | |
| Centerline Offset to Proposed Pipeline and Other Utilities | | | | | | | |
| Centerline Stationing (100' tick marks with Station) | | | | | | | |
| Centerline Curve Data | | | | | | | |
| a.   Street | | | | | | | |
| b.   Pipeline | | | | | | | |
| Type and Size of Proposed Water Pipeline | | | | | | | |
| Service Connection (Sizes, Approximate Locations) | | | | | | | |

APPENDIX "G"

8/1/91

EXHIBIT 1
Page 100

# Rancho California Water District

SHEET

OF  SHEETS

WO #

CHECKED BY:

DATE:

DRAWN BY:

SCALE: 1" =

SUBJECT:

This Plat is Solely an Aid in Locating the Parcel(s) described in the
Attached Document. It is not a Part of the Written Description Therein

EXHIBIT  PREPARED BY:

**B**

## PLAT REQUIREMENTS:

1. North Arrow
2. Subdivision title with recording data.
3. Lot or Parcel #'s
4. Street Names
5. Right-of-Way widths
6. Township, Section and Range
7. All distances, bearings and references stated
   with legal description.
8. Point of Beginning
9. Bold and distinct line around proposed
   easement.
10. Scale
11. RCE / LS signature and stamp.

8/1/91

**APPENDIX "H"**

EXHIBIT 1
Page 101

## PLAT REQUIREMENTS:

1. North Arrow
2. Subdivision title with recording data.
3. Lot or Parcel #'s
4. Street Names
5. Right-of-Way widths
6. Township, Section and Range
7. All distances, bearings and references stated with legal description.
8. Point of Beginning
9. Bold and distinct line around proposed easement.
10. Scale
11. RCE / LS signature and stamp.

# RANCHO CALIFORNIA WATER DISTRICT

This Plat is Solely an Aid in Locating the Parcel(s) described in the Attached Document. It is not a Part of The Written Description Therein.

| EXHIBIT | PREPARED BY: | SUBJECT: | SHEET |
|---|---|---|---|
| **B** | | | OF   SHEET(S) |
| SCALE : 1"= | DRAWN BY: | DATE: | CHECKED BY: | W.O.# |

8/1/91

APPENDIX "H"

EXHIBIT 1
Page 102

Recording Requested by
RANCHO CALIFORNIA WATER DISTRICT

After Recordation Return to:

Rancho California Water District
42135 Winchester Road
Post Office Box 9017
Temecula, CA  92589-9017

Space Above This Line for Recorder's Use

## GRANT OF EASEMENT

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

hereby GRANT(S) to RANCHO CALIFORNIA WATER DISTRICT, a public corporation, a perpetual non-exclusive easement and right-of-way for pipeline or pipelines, together with incidental appurtenances, connections, and structures in, over, under, upon, along, through, and across the real property situated in _____ in the County of Riverside, State of California, hereinafter described:

together with the right to grade and improve said right-of-way and to enter upon and to pass and repass over and along said strip of land for the construction, operation, and maintenance of the facilities to be constructed in said easements by the RANCHO CALIFORNIA WATER DISTRICT.

It is understood and agreed that the easements and rights-of-way acquired herein are subject to the right of the owner, his successors and assigns, to use the surface of the land within the boundary lines of said easements and rights-of-way to the extent that such use is compatible with the full and free exercise of said easements and rights-of-way by the RANCHO CALIFORNIA WATER DISTRICT; provided, however, that no fences, block walls or other structures, or other improvements shall be constructed upon, over, and along said easements and rights-of-way without first obtaining the written consent of the RANCHO CALIFORNIA WATER DISTRICT.

No fill or paving of any nature shall be placed or maintained over the surface of the ground, nor shall any earth be removed from the cover of said pipeline after construction, without first obtaining the written approval of the RANCHO CALIFORNIA WATER DISTRICT.

IN WITNESS WHEREOF, this instrument has been executed this _____ day of _____ 2004.

CERTIFICATE OF ACCEPTANCE
This is to certify that the interest in real property
conveyed by the deed or grant dated _____
2004 from _____

to Rancho California Water District, a public agency
and subdivision in the State of California, is hereby
accepted by order of the undersigned officer on behalf
of the Board of Directors pursuant to the authority
conferred by Resolution No. 2004-5-2 of the Board of
Directors adopted on May 13, 2004 and the grantee
consents to recordation thereof by its duly authorized
officer.

DATED: _____, 2004

RANCHO CALIFORNIA WATER DISTRICT

By: _____
Brian J. Brady, General Manager

H:\EngAdmin\Forms 2000\F355.doc

EXHIBIT 1
Page 103



**FLOWCHART FOR CONSTRUCTION OF WATER FACILITIES**

SUBMIT:
1. Engineering Service Application
2. Inspection Deposit
3. 3 Copies of Approved Water Construction Drawings

SUBMIT:
1. Water System Construction Contract
2. Certification of Streets to Final Grade
3. Certificate of Insurance
4. Faithful Performance Bond

SUBMIT:
1. Contractor Information Sheet
2. Materials List
3. 2 Copies of Encroachment Permits
4. 1 Copy of Recorded Tract / Parcel Map
5. Water System Construction Agreement

DISTRICT APPROVAL:
1. Contractor
2. Materials List

DISTRICT ISSUE:
1. Notice To Proceed

SCHEDULE Pre-Construction Meetings

ATTEND Pre-Construction Meetings

NOTIFY District in Writing Regarding Construction Start

SUBMIT Construction Cut Sheets

CONSTRUCT Water System Facilities With District Inspection

COMPLETE All Items on District Inspection List

PRESSURE Test And Disinfect Water System Facility

CONTINUITY TEST Corrosion Control Equipment (Steel Pipe Only)

OBTAIN Acceptable Bacteriological Test Results

CONNECT To Existing Water System

PAY Any Remaining Inspection Fees

RELEASE System for Fire Protection and Construction Water

SUBMIT Application For Unmetered Construction Water

INSTALL Unmetered Construction Connection

REMOVE Unmetered Construction Connection

INSTALL Drop-In meters

SUBMIT:
1. Unconditional Lien Waiver and Release
2. Grant Deed For Water System Water System Record Drawings

COMPLETE All Items on Punch List

SUBMIT Drop-In Meter Application and Fees

NOTICE of Completion Filed By District

8/1/91

**APPENDIX "I"**

EXHIBIT 1
Page 104

CONSTRUCTION STATUS SHEET

RCWD Job No. _____    Inspector_____

Location: _____

Developer: _____

Contractor:_____

RECEIVED     APPROVED     SUBMITTED

_____     _____     Engineering Service Application
_____     _____     Inspection Deposit
_____     _____     Approved Water Construction Drawings (3 Sets)


_____     _____     Contractor Information Sheet
_____     _____     Materials List
_____     _____     Encroachment Permit (2 Copies)
_____     _____     Recorded Tract/Parcel Map (1 Copy)
_____     _____     Water System Construction Agreement


_____     _____     Contract for Water System Construction
_____     _____     Certification of Streets to Final Grade
_____     _____     Certificates of Insurance
_____     _____     Faithful Performance Bond
_____     _____     Labor and Materials Bond


DATE

_____     Notice to Proceed issued by District

_____     Preconstruction Meeting Conducted

_____     Received Cut Sheets

_____     Installed Waterlines and all Appurtenances

_____     Completed all Items on Inspectors Deficiency List


APPENDIX "J"

8/1/91

EXHIBIT 1
Page 105

DATE

_____ Received City/County Compaction Tests Sign-off

_____ Pressure Tested System

_____ Disinfected System

_____ Samples Taken for Bacteriological Tests

_____ Acceptable Bacteriological Results Obtained

_____ All Remaining Fees and Charges Paid

_____ Connection(s) to Existing System Completed

_____ Water System Released for Fire Protection and Construction Water

_____ Unmetered Construction Water Applications Signed

_____ Unmetered Connections Removed

_____ Ready for Drop-in Meters

_____ Received Drop-in Meter Applications

_____ Received Drop-in Meter Fees

_____ Signed Drop-in Meter Applications

RECEIVED     APPROVED     SUBMITTED

_____   _____     Material and Labor Release

_____   _____     Water System Grant Deed

_____   _____     Record Drawings

DATE

_____ Filed Notice of Completion

_____ Installed Drop-in Meters

APPENDIX "J"

8/1/91

EXHIBIT 1
Page 106

CONTRACTOR INFORMATION SHEET

Firm Name and Address: _____

_____

_____

Contractor's License No.: _____

License Class: _____

License Expiration Date: _____

Telephone No.: _____

Emergency Telephone No.: _____

Contractor's Project Manager:

Name: _____

Telephone No.: _____

Emergency Telephone No.: _____

Contractor's Superintendent:

Name: _____

Telephone No.: _____

Emergency Telephone No.: _____

Contractor's Signature: _____ Date: _____

Received:  Rancho California Water District:

By: _____ Date: _____

APPENDIX "K"
Sheet 1

8/1/91

EXHIBIT 1
Page 107

Contractor shall furnish three references for similar projects completed within the past three (3) years.

| Contract Amount | Type of Work | Date Completed | Owner (Name & Address) | Person in Charge of Project | Phone Number of Person in Charge |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

8/1/91

APPENDIX "K"
Sheet 2

EXHIBIT 1
Page 108

RANCHO CALIFORNIA WATER DISTRICT
OF RIVERSIDE COUNTY

WATER SYSTEM CONSTRUCTION AGREEMENT
(DEVELOPER INITIATED/CONTRACTOR INSTALLED)

THIS AGREEMENT is made on this ___ day of _____, 19___, by and between RANCHO CALIFORNIA WATER DISTRICT OF RIVERSIDE COUNTY, a public agency of the State of California, hereinafter designated as the "District" and _____. Ph. No. _____, located at _____, represented by _____ hereinafter designated as the "Developer".

WHEREAS, Developer is planning a development of _____ lot(s) located within the development referenced within records of the County of Riverside, State of California, as: _____ and is further identified on the map attached to and made a part of this Agreement; and

WHEREAS, said subdivision will require a water distribution system to provide domestic water service to the lands referenced above; and

WHEREAS, Developer is desirous of having the District provide domestic water service to said lands and is willing to convey to the District the water distribution system after the construction thereof, contingent upon the District's acceptance of such conveyance on the terms and conditions set forth herein.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.   District agrees to provide domestic water service to the aforesaid development in compliance with its applicable rules, regulations,

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 109

ordinances, orders when, as, and if Developer has complied with the terms and conditions contained herein.

2.   Developer agrees to construct the water system facilities necessary for aforesaid development in accordance with the following terms and conditions:

A.   Developer will cause water system facilities to be constructed as shown on the District approved water construction drawings at its expense by a qualified California licensed Contractor. Said Contractor shall be currently licensed by the State of California with either a specialty contractor, "C-34, pipeline license or a General Engineering Contractor, "A" license. Said contractor shall be experienced in the construction of domestic water systems and shall have been reviewed by the District and approved by the District as a qualified Contractor before a contract is signed and construction begins.

B.   Said water system facilities will be constructed and installed in full compliance with all applicable rules, regulations and ordinances of District including, but not limited to, District's Standard Specifications and Standard Drawings for Water and Sanitary Sewer Facilities.

C.   Water construction drawings for said water system facilities shall be approved by District prior to the presentation thereof to contractors for bidding purposes and said facilities shall be constructed and installed in full compliance with said approved water construction drawings and District specifications referenced in paragraph "B" above.

D.   The entire cost of the construction of such domestic system shall be paid by the Developer. Such construction shall be

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 110

inspected by District personnel for conformance with the approved drawings and District specifications.

E.   The District is not responsible and does not own the water system facilities until they are inspected and approved by the District, the Faithful Performance Bond is executed and accepted by the District, all fees and charges are paid in full, the Unconditional Lien Waiver and Release and the Water System Grant Deed are executed and accepted by the District.   Until such time, Developer is responsible for the facilities and is liable for all damage to said facilities.

F.   All existing District facilities shall be protected in place.   Any damaged District facilities shall be replaced or repaired by Developer at the developer's expense to the satisfaction of District.

G.   Developer will, on demand, pay all costs incurred by the District as may be necessary to complete construction including the applicable hourly rate for an inspector for such time as may be required as determined by District to inspect the construction of the water system facilities.   Said rates shall be that which is applicable at the time of actual inspection.   The inspector shall work under the supervision of District, and shall provide inspection until the water system facilities is accepted and approved as stated herein.

3.   Construction shall not begin until District issues the "Notice to Proceed".   Prior to District issuing "Notice to Proceed", Developer shall submit the following:

A.   Copy of contract between Developer and Contractor verifying cost of water system facility construction.

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 111

B.    Certification of streets to final grade.

C.    Certificates of insurance for contractor and all subcontractors on District form (A rating of A in the latest issue of Best's Key Rating Guide, Property-Casualty, Written by A.M. Best Company).

D.    A faithful performance bond with corporate surety or sureties satisfactory to the District (A rating of A in the latest issue of Best's Key Rating Guide, Property-Casualty, Written by A.M. Best Company) on District form*. Said performance bond being for not less than one hundred percent (100%) of the total contract price. Said bond guarantees the completion of the facilities (including submission of the Unconditional Lien Waiver and Release and the Water System Grant Deed) and guarantees the materials and workmanship of the installed domestic water system against failures of any type for one (1) year from the date of the filing of the "Notice of Completion". Said bond shall provide for the payment of all costs incurred by the District for the repair of such failures within the one (1) year guarantee period.

*  If separate City/County bonding is required, Developer can submit approved copy of City/County bonding in lieu of District bond.

4.    The District will provide construction water and fire protection to the development after the Contractor has completed all items on the District Inspector's Construction Deficiency List, evidence has been submitted indicating County acceptance of compaction, acceptable bacteriological test results have been obtained, and any remaining inspection fees are paid in full.

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 112

5.    The District will provide drop-in meters to the development and file a Notice of Completion after the following has been submitted:

A.    Drop-in Meter Application and all related meter installation and connection fees.

B.    Unconditional Lien Waiver and Release for waterline construction.

C.    A Grant Deed executed by Developer vesting title of said water system facilities to the District.  Said Grant Deed must be on District form and vests title only after the District files the Notice of Completion.  In the event water rights are appurtenant to the development, Developer shall also grant said water rights to the District on District form.

D.    An Agency Agreement will be required for each parcel if there is not a current Agency Agreement recorded against the property.  The Agency Agreement gives the District the right of management of the groundwater resource to the District, for the benefit of all District customers.

6.    At District's option, the terms and conditions of this Agreement will become null and void and District will have no further obligations hereunder in the event the construction of the facilities covered herein has not begun within 12 months of the date of this Agreement.  In the event construction has not been accepted by District within 24 months of the date of this Agreement, this Agreement and any other related water system facility requirements must then be revised to include any new conditions and to cover all increased costs, including any new fees and charges which may be in effect at that time.  No further work will be permitted until all provisions of this paragraph have been fulfilled.

APPENDIX 'L'

8/1/91

EXHIBIT 1
Page 113

7.    Developer agrees to hold the District free and harmless from any expense or liability resulting from the construction or installation of the water system facilities, and further agrees that Developer will indemnify the District and will hold it, its employees and agents free and harmless from and against any and all liabilities for death, injury, loss or damage to persons or property which may arise before, after or during construction of the water system facilities as a result of any work performed by Developer or on its behalf.

8.    In the event that either party shall fail to perform its part of this Agreement, and suit shall be commenced, or an attorney employed to enforce the provisions thereof, the party who fails to perform his part of the Agreement agrees to pay any and all costs involved therein, and to pay a reasonable attorney's fee.

9.    This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto, and each of them.

10.    Whenever in this Agreement notice is required to be given, the same shall be given by certified mail, postage prepaid, addressed to the respective parties at the following addresses:

To Rancho California Water District:

    Rancho California Water District
    General Manager
    P.O. Box 174
    Temecula, California  92390-0174

To Developer:

_____

_____

_____

_____

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 114

11.   This Agreement contains all of the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, shall be deemed to exist or to bind the parties hereto unless hereafter duly placed in writing and executed by the undersigned.

APPENDIX "L"

8/1/91

EXHIBIT 1
Page 115

RANCHO CALIFORNIA WATER DISTRICT

By: _____
General Manager

Date: _____

DEVELOPER

Company: _____

By: _____

Name: _____

Title: _____

Date: _____

APPENDIX 'L'

8/1/91

EXHIBIT 1
Page 116

TO:        Rancho California Water District

From:      _____

(address)  _____

           _____

Subject:   Certification of Streets to Final Grade

           Tract Map No. _____, or

           Parcel Map No. _____

1.  There has been executed a "WATER SYSTEM CONSTRUCTION AGREEMENT"
    for the water mains described above; said Agreement being between:

    a.   The Rancho California Water District, hereinafter designated
         as the "District";

    b.   _____
         hereinafter designated as the "Developer"

    All terms and conditions of said Agreement are hereby incorporated
    by reference.

2.  Pursuant to Section 3 of said Agreement, the Developer certifies
    that all streets requiring water mains are to the required Final
    Grade and ready for installation of water mains; wherein the Final
    Grade shall be defined as the finished grade of the street base or
    sub-base required by the Riverside County Road Department, the
    City of Temecula, City of Murrieta, or the District.

3.  Developer agrees that if there is a change required in the final
    grade of the street which occurs during or after the construction
    of the water mains, and requires the relocation of any water
    facilities, the Developer will make full payment for all costs
    necessary to relocate said water facilities.

    Developer:_____

    Address:_____

    City/State/Zip:_____

    Telephone:_____

    Authorized Agent (sign):_____

    Name (type):_____

    Title:_____

APPENDIX "M"

8/1/91

EXHIBIT 1
Page 117

# CERTIFICATE OF INSURANCE

This certifies to the RANCHO CALIFORNIA WATER DISTRICT, located at 42135 Winchester Road, Temecula, California 92590, that the following described policies have been issued to:

Insured: _____

Address: _____

Coverage is provided for the following operation(s)/locations(s):

_____

_____

Limits of Liability
in thousands (000)
Policy Covers

| Type of Insurance | | Each Occurrence | Aggregate |
|---|---|---|---|
| **GENERAL LIABILITY-"Occurrence" Policies Only** | | | |
| Insurer and Policy No.: | | | |
| Policy Expiration Date: | | | |
| [ ] Comprehensive Form | BODILY | | |
| [ ] Premises-Operations | INJURY | $_____ | $_____ |
| [ ] Owners & Contractors Protective | | | |
| [ ] Blanket Contractual | PROPERTY | | |
| [ ] Products and/or Completed Operations | DAMAGE | $_____ | $_____ |
| [ ] Explosion & Collapse Hazard | BODILY INJURY | | |
| [ ] Underground Hazard | & PROPERTY | | |
| [ ] Broad Form Property Damage | DAMAGE COMBINED | $_____ | $_____ |
| [ ] Policy to Include Severability of Interest Clause | | | |
| [ ] Personal Injury Exclusion "C" Removed | | | |
| | PERSONAL INJURY | $ | |

(Coverage shall be at least as broad as Insurance Services Office Commercial General Liability Coverage, Occurrence Form No. CG0001 (11/88 Revision)

1/15/04                                   APPENDIX "N"

EXHIBIT 1
Page 118

(Coverage shall be at least as broad as Insurance Services Office Commercial General Liability Coverage, Occurrence Form No. CG0001 (11-88 Revision)
AUTOMOBILE LIABILITY - "Occurrence" Policies Only
Insurer and Policy No.:
Policy Expiration Date:

| | | |
|---|---|---|
| [ ] Comprehensive Form | BODILY INJURY (EACH PERSON) | $_____ |
| [ ] Owned | BODILY INJURY (EACH OCCURRENCE) | $_____ |
| [ ] Hired | PROPERTY DAMAGE | $_____ |
| [ ] Non-Owned | BODILY INJURY PROPERTY DAMAGE COMBINED | $_____ |

(Coverage shall be at least as broad as Insurance Service Office form number CA0001 (12/90 Revision) covering automobile liability)
EXCESS LIABILITY - "Occurrence" Policies Only
Insurer and Policy No.:
Policy Expiration Date:

| | | |
|---|---|---|
| [ ] Umbrella form | BODILY INJURY & PROPERTY DAMAGE | |
| [ ] Other than umbrella form | COMBINED | $_____ |

| | | |
|---|---|---|
| [ ] WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | STATUTORY | $_____ (EACH ACCIDENT) |

Insurer and Policy No.:
Policy Expiration Date:
(Coverage shall be as broad as required by the Labor Code of the State of California and Employer's liability coverage.)

| BUILDERS RISK ("ALL RISKS") (Check appropriate box) | [ ] ON 100% OF COMPLETED VALUE BASIS |
|---|---|
| [ ] Coverage shall insure against the following: Fire, lightning, vandalism, malicious mischief, riot and civil commotion, smoke, sprinkler leakage, water damage, sandstorm, hail, and any other act of God in whatever form, *including floods and earthquakes.* | [ . ] Coverage shall insure against the following: Fire, lightning, vandalism, malicious mischief, riot and civil commotion, smoke, sprinkler leakage, water damage, windstorm, hail, and any other act of God in whatever form, *excepting floods and earthquakes.* |
| | Insurer and Policy No.: |
| | Insurer Expiration Date: |

1/15/04                                 APPENDIX "N"

EXHIBIT 1
Page 119

The following provisions apply:

1) The Rancho California Water District, the Owner's Representative, the Engineer/Architect and their directors, officers, agents, employees, consultants, and volunteers are hereto designated as additional insureds on all of the above-described insurance policies, as respects liability arising out of activities performed by or on behalf of the named insured, products and completed operations of the named insured, premises owned, leased, or used by the named insured, or automobiles owned, leased, hired, or borrowed by the named insured.

2) The above-described liability insurance policies are primary insurance and no insurance held or owned by the designated additional insureds shall be called upon or looked to in order to cover a loss under said policy; the Rancho California Water District shall not be liable for the payment of premiums or assessments under these policies.

3) None of the above-described policies will be suspended, voided, canceled, non-renewed, reduced in coverage or in limits except after thirty (30) days prior written notice by certified mail, return receipt requested, has been given to the Rancho California Water District.

4) The insurers issuing the above-described insurance policies waive all rights of subrogation against the Rancho California Water District, the Owner's Representative, the Engineer/Architect and their directors, officers, agents, employees, consultants and volunteers designated as additional insureds.

5) Any failure to comply with reporting provisions of the policies shall not affect coverage provided to the Rancho California Water District, the Owner's Representative, the Engineer/Architect and their officers, agents, employees, consultants and volunteers.

6) The named insured's insurance coverage shall apply separately to each insured against whom claim is made or suit is brought except with respect to the limits of the insurer's liability.

7) All policies shall be issued by acceptable insurance companies as determined by the District which satisfy the following requirements:

- The insurance carriers shall be qualified to do the business of insurance in the State of California and shall maintain an agent for process within the State.
- All insurance shall have a policyholder rating of not less than "A" and a financial rating of not less than "VII" according to the latest Best's Key Rating Guide.

Insurance Agency: _____

Address: _____

_____

Authorized Representative: _____

Phone: _____    Date: _____

APPROVED AS TO FORM:
Best Best & Krieger LLP
District Legal Counsel

By: _____

01/15/04

APPENDIX "N"

[WtrSysFacRqrmts]

EXHIBIT 1
Page 120

BOND NO. _____ ....

### FAITHFUL PERFORMANCE BOND
### FOR
### WATER SYSTEM CONSTRUCTION AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS:  That WHEREAS, the Rancho California Water District, has entered into a Water System Construction Agreement (All terms and conditions of said Agreement are hereby incorporated by reference) with _____ \
as  Principal,  (hereinafter  designated  as  the  'Developer'),  for construction of:

_____

_____

_____

_____ ; and

WHEREAS, said Principal is required under the terms of said Agreement to furnish a bond for the faithful performance of said contract.

NOW, THEREFORE, we, _____ ., as Developer, and _____, as Surety, are held and firmly bound unto the Rancho California Water District (hereinafter called the 'District'), in the sum of _____ DOLLARS ($_____) (this amount being not less than one hundred percent (100%) of the total price of the work), lawful money of the United States of America, for payment of which sum well and truly to be made, we bind ourselves, our heirs, executors, administrators and successors, jointly and severally, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if the hereby bonded Developer, its heirs, executors, administrators, successors, or assigns, shall in all things stand to and abide by and well and truly keep and perform all the undertakings, terms, covenants, and conditions in said Agreement and any alteration thereof, made as therein provided, all within the time and in the manner therein designated in all respects according to their true intent and meaning, then this obligation shall become null and void; otherwise it shall be and remain in full force and effect until Developer has completed construction of the facilities including repair of any damage of existing District facilities and provided District with an Unconditional Lien Waiver and Release and a Water System Grant Deed and has paid all fees and charges.

As a condition precedent to the satisfactory completion of the work (including submission of the Unconditional Lien Waiver and Release, submission of the Water System Grant Deed, payment of all fees and charges, and repair of any damage of existing District facilities), the above obligation shall hold good for a period of one (1) year after the completion of the Work and filing of the Notice of Completion by the District, during which time if Developer shall fail to make full, complete, and satisfactory repair and replacements and totally protect

8/1/91                              APPENDIX 'O'

EXHIBIT 1
Page 121

the District from loss or damage made evident during the period of one (1) year from the date of filing of the Notice of Completion by the District, and resulting from or caused by defective materials or faulty workmanship, the above obligation in penal sum thereof shall remain in full force and effect.   Notwithstanding anything in this paragraph to the contrary, the obligation of Surety hereunder shall continue so long as any obligation of Developer remains.

FURTHER, the said Surety, for value received, hereby stipulates and agrees that no change, extension of time, alteration or modification of the Agreement, or of the work to be performed thereunder, shall in any way affect its obligations on this bond; and it does hereby waive notice of any change, extension of time, alteration or modification of the Agreement or of work to be performed thereunder.

IN WITNESS WHEREOF, two (2) identical counterparts of this instrument, each of which shall for all purposes be deemed an original thereof, have been duly executed by the Developer and Surety named therein, on the _____ day of _____, 19___, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative pursuant to authority of its governing body.

| Developer | (seal) |
|---|---|

Name: _____

Title: _____

Signature: _____

| Surety | (seal) |
|---|---|

Name: _____

Title: _____

Signature: _____

Address: _____

_____

(SEAL AND NOTARIAL ACKNOWLEDGEMENT OF SURETY)

OVED AS TO FORM:

 & Krieger LLP
gal Counsel

_____

APPENDIX "O"

EXHIBIT 1
Page 122

<u>UNMETERED CONSTRUCTION WATER APPLICATION</u>

Temporary connections for house construction are necessary during the drywall installation phase; therefore, the service category of unmetered construction water is available.

The service is available for <u>construction</u> only.  This service is not to be used for landscaping or any domestic/commercial use.  Unauthorized use is subject to the conditions, as established in Penal Code Section 498, attached, and immediate discontinuance of water service.

A $____ monthly charge covers unmetered water use, standby charge, and periodic inspection by the Meter and Contracts Department personnel.

Prior to connection by the builder, the Contracts Manager will verify the following:

(1)   In-tract water system has been tested and disinfected;

(2)   Service laterals have been installed with an extra length extending a minimum of two feet above ultimate grade and 2" x 4" stakes (4 feet in length) have been installed to mark the location of the service lateral.  Said stakes shall provide for temporary mounting of the extended service lateral <u>with double check valves for the protection of the existing system</u>.  All work shall be in accordance with District's Standard Drawing No. RW-12.

At such time as the developer has completed all utility installations and established final grade to the satisfaction of the District, the temporary connection shall be removed, the delivery of water discontinued completely, and the service shall be completed in accordance with the District standard specifications.

After services have been accepted and approved by the Contracts Manager, approximately two weeks is required before meters are installed.

In accordance with the Water System Construction Agreement (all terms and conditions of said Agreement are herein incorporated by reference), the District is not responsible and does not own the water system facilities until said system is transferred to the District.  Until such time, Developer is responsible for the facilities and is liable for all damage to said facilities.

I/we hereby acknowledge my/our understanding of the aforementioned conditions and intention of unmetered construction water use.

_____          _____
Service Applicant Signature                Date

8/1/91                          APPENDIX "P"

EXHIBIT 1
Page 123