## UNCONDITIONAL LIEN WAIVER AND RELEASE

DATE: _____

TO WHOM IT MAY CONCERN:

The undersigned has been paid in full for all labor, services, equipment or materials furnished to _____ ("Contractor") on the job for the Rancho California Water District ("District") located at _____ in the County of Riverside, State of California ("Property").

The undersigned does hereby waive and release Contractor and District from any and all liability for liens for all materials delivered and labor performed by it, all Mechanic's Liens, including ones that have been recorded, Stop Notices, or any right against a Labor and Material Bond, to or for the Job and the Property on which is it located.

This Unconditional Lien Waiver and Release, Materials and Labor, is made in accordance with Civil Code s3262 and s5 of the Water System Construction Agreement between Rancho California Water District and Developer _____, dated _____

NOTICE:  THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS.  THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID.  IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.

_____        _____
                       Firms Name

_____        _____
                       Address

_____        _____
                       City, State

_____     By: _____
                       Authorized Representative

8/1/91                 APPENDIX "Q"

EXHIBIT 1
Page 124

W.O. _____

### WATER SYSTEM GRANT DEED

FOR VALUABLE CONSIDERATION paid and received,

_____ hereby grant(s) to Rancho California Water District all right, title and interest in the water system improvements for the entire domestic water distribution system facilities for the development referenced with records of the County of Riverside, State of California as _____ and agrees to indemnify the District for any and all claims, liens, causes of action or any type of liability arising from or in any way related to the construction of said facilities.

Said water system improvements are shown in detail on the construction drawings (Sheets ____ thru ___) for said development.  This Grant Deed is in accordance with Section 5 of the Water System Agreement between Rancho California Water District and _____, dated _____ and is effective upon Developer providing the Unconditional Lien Waiver and Release and upon filing of the Notice of Completion by the District for the aforementioned water system improvements.

SELLERS for his heirs, executors and administrators, covenants and agrees to warrant and defend this sale of property, goods and chattels, against all and every persons claiming the same.

DATE: _____

_____

BY: _____

SEAL AND NOTARIAL ACKNOWLEDGEMENT

8/1/91                    APPENDIX "R"

EXHIBIT 1
Page 125

When recorded return to:
RANCHO CALIFORNIA WATER DISTRICT
42135 Winchester Road
Post Office Box 9017
Temecula, CA 92589-9017



# AGENCY AGREEMENT NO. _____

THIS AGREEMENT, made this _____ day of _____, 20 _____, by and

between _____

(hereinafter referred to as "Landowner"), and RANCHO CALIFORNIA WATER DISTRICT, a public corporation organized and existing under Division 13 of the Water Code of the State of California (hereinafter referred to as the

"District"), for the property described as follows: _____

_____ (legal description attached).

## WITNESSETH:

WHEREAS, the District has power and authority to act as agent for the extraction, diversion, storage and distribution of water owned by other parties; and

WHEREAS, Landowner is the owner of certain land within the District described in Exhibit "A" attached hereto and made a part hereof; and

WHEREAS, said land owned by Landowner is a portion of land found by the United States District Court, United States of America vs. Fallbrook Public Utility District, et al., in the United States District Court, Southern District of California, Southern Division, Case No. 1247, affirmed in part by the United States Court of Appeals for the Ninth Circuit, Case No. 18931, to be land riparian to certain rivers and streams, including the Santa Margarita River and its tributaries, and also which may be land overlaying percolating waters under a court decree entered December 26, 1940 in the case Rancho Santa Margarita vs. Vail, 11 Cal.2d 501 (1939), and reinstated by the United States Court of Appeals for the Ninth Circuit in said Case No. 18931; and

WHEREAS, Landowner, without transferring any water right and privilege pertaining to said land, does desire to empower the District to act as its agent and the agent of its successors and assigns to extract, store and divert the water to which it is entitled (hereinafter referred to as "local water") and to supply the same to its land and all other land having, under the laws of the State of California or pursuant to any judgement or contract, a legal right to have said water applied thereon.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

Section 1. Landowner hereby designates the District its exclusive agent and the exclusive agent of its assigns and successors in interest for the extraction, diversion, storage, blending and distribution of all local water upon or under the lands of Landowner referred to in the recitals hereof for the purpose of putting said local water to beneficial use to the fullest extent of which it is capable for the lands and inhabitants of Landowner and all other lands within the watershed of the Santa Margarita River, and its tributaries on which said local water now and hereafter may be

legally applied. It is the intention of Landowner by this Agreement to maintain a binding and permanent arrangement whereby said local water shall be properly maintained and be perpetually delivered and distributed to all of said lands entitled thereto and the subdivisions thereof for the use of Landowner, its assigns and its successors in interest and other owners of such lands.

Section 2. Landowner hereby grants to the District the right to blend local water with imported supplemental water, to distribute imported water to Landowner in lieu of or in addition to the distribution of local water and to store imported water under the lands of Landowner.

Section 3. Landowner agrees that all local water to be used by Landowner within the District shall be obtained from the District or its assigns and successors in interest. Landowner shall not divert or extract within or outside the boundaries of the District local water for Landowner's own use within the District nor shall Landowner supply local water for use within the District by others. Landowner further agrees not to divert or extract within the District local water for use by Landowner or others outside the District. Landowner reserves to itself, its assigns and its successors in interest all water rights and privileges presently owned and which may be hereinafter acquired pertaining to said land and nothing in this Agreement shall be construed as appropriating or dedicating said water rights or any water to public use.

Section 4. This agency shall be effective and irrevocable in perpetuity and the same shall be deemed an agency coupled with an interest, provided, however, this Agreement shall terminate and be of no further force or effect upon a determination by any court of competent jurisdiction in an appropriate action that the method of extraction and distribution of said local water herein provided is not a proper method of exercising the riparian and other water rights of Landowner.

Section 5. The District agrees to divert, extract, store and distribute local water for the benefit of Landowner. The District agrees to acquire by lease, purchase, gift or otherwise all wells and water distribution facilities useful and necessary to extract, store and distribute said local

./15/04                    APPENDIX "S"

EXHIBIT 1
Page 126

water to the lands and inhabitants entitled thereto in accordance with this Agreement. Nothing contained herein shall prohibit the District from exercising any of its powers granted by the California Water District Law nor shall the District be prohibited from acquiring supplemental water for distribution to all lands within the District.

Section 6. This Agreement shall not be assignable by the District without the written consent of Landowner; provided, however, the District may contract with any municipal, public or private corporation for the management and operation of any water facilities owned by or leased by the District.

Section 7. The District shall have full control of the allocation of all costs of acquisition and construction of District facilities using any method or a combination of methods, as set forth in the California Water District Law, or raising funds to defray said costs. The District may adopt such rules and regulations for the distribution of local water as it deems necessary. The District may allocate the distribution of the available local water in any manner authorized in the California Water District Law or the rules and regulations of the District adopted pursuant to said law. Rates and charges for the distribution of local water may be made and shall be payable by Landowner, its assigns and the successors in interest as determined by the Board of Directors of the District from time to time; provided, however, said rates and charges shall not be so set to discriminate between water users in substantially the same classification.

SECTION 8. Neither the District nor the Landowner warrants the quantity or quality of the local water to be extracted and distributed by the District.

SECTION 9. The District and Landowner intend that the provisions of the Agency Agreement shall constitute covenants that run with the land and shall inure to the benefit of and be binding upon the assigns and successors in interest of the District and Landowner. The District and Landowner therefore agree as follows: (a) The District is the owner of land and water distribution facilities within its boundaries which will be benefitted by the Agency Agreement. The District land benefits from the Agency Agreement because wells located on the District land have a more assured reliable water supply. The District land particularly benefitted by the terms of this Agency Agreement is described in Exhibit "B" of that certain Agency Agreement recorded in the Office of the County Recorder of Riverside as Document No. 398782 by the District

on October 22, 1992, which is incorporated herein by reference. Landowner's land benefits from the rights set forth in Sections 1 and 5 above to connect to the District's water system. The covenants of this Agency Agreement also benefit all other landowners within the boundaries of the District who have similarly covenanted with the District, by securing a reliable region-wide water source, and its attendant increased property values. The boundaries of the District are described in Exhibit "C" of that certain Agency Agreement recorded in the Office of the County Recorder of Riverside as Document No. 398782 by the District on October 22, 1992, which is incorporated herein by reference. Landowner is the owner of land which is affected by the covenants of this Agency Agreement and is described in Exhibit "A". (b) The covenants of this Agency Agreement shall be binding upon the successive owners of the land described in Exhibit "A" or any interest therein or a portion thereof for the benefit of the District land and facilities and other landowners who have similarly covenanted with the District. (c) The parties agree that the acts required by this Agency Agreement relate to the use, repair, maintenance and improvement of the land described in Exhibit "A". (d) The parties agree that the Agency Agreement shall be recorded at the County Recorder's Office of Riverside County. It is further agreed that this Agency Agreement shall not be effective until it is recorded at the office of the Riverside County Recorder, and consent for recordation is hereby given.

SECTION 10. In the event Landowner shall convey, transfer or in any manner alienate title to all or any portion of the real property of Landowner located within the District, the successors in interest in the lee simple estate or any lessor estate of said real property shall execute an Agency Agreement in the identical form hereof as a condition precedent to said transfer; provided, however, non-compliance with said condition shall in no wise be construed to annul or terminate the agency created hereby and all rights and duties hereunder shall be binding on the assigns and successors in interest of the real property of Landowner located within the District.

SECTION 11. If any one or more of the terms, provisions, covenants or conditions of this Agency Agreement shall to any extent be declared invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction, the finding or order or decree of which becomes final, none of the remaining terms, provisions, covenants and conditions of this Agency Agreement shall be affected thereby and each provision of this Agency Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____

("Landowner")

(CORPORATE SEAL)

_____

ATTEST:

Secretary: _____

RANCHO CALIFORNIA WATER DISTRICT

By: _____

General Manager            District

EXHIBIT 1
Page 127

# Exhibit A-6

EXHIBIT 1
Page 128

Great Oak Rock - Well 2
Granitic Well
Exhibit A-7

Great Oak Rock - Well 1
Granitic Well
Exhibit A-7

Zone V - Rock 1
Granitic Well
Exhibit A-7

Zone V - Rock 2
Granitic Well
Exhibit A-7

Pechanga Tribal
Government

Pechanga Reservation

Map Area

Mt Olympus

Temecula

1 inch = 750 feet

Copyright © 2013 DeLorme

2013 DWMT 1120 Granitic Wells

EXHIBIT 1
Page 129

**AMENDMENT NO. 1
TO
RECYCLED WATER AGREEMENT (AGREEMENT NO. 04-07)**

This Amendment No 1. To Recycled Water Agreement (Agreement No. 04-07) (this "*Amendment*") is made and entered into this 29th day of November, 2017, by and between **EASTERN MUNICIPAL WATER DISTRICT** ("*District*") and **THE PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Customer*"), whose address is 45000 Pechanga Parkway, Temecula CA 92592.

## RECITALS

WHEREAS, District and Customer are parties to that certain Recycled Water Agreement (Agreement No. 04-07), dated January 8, 2008 (the "*Agreement*"); and

WHEREAS, Customer has requested that the Agreement be amended to provide for a longer term and to confirm Customer's right to transfer to a third party Customer's right to receive any unused portion of Customer's Annual Allocation from time to time;

WHEREAS, after due consideration of such request, the District has determined that it is in the interest of the District to agree to such amendments; and

WHEREAS, District and Customer have determined that, for purposes of implementing such amendments, the Agreement shall be amended as provided herein;

NOW, THEREFORE, in consideration of the above recited premises, together with other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending legally to be bound, the parties agree as follows:

## AGREEMENT

1.   Unless otherwise defined herein, capitalized terms used in this Amendment shall have the meanings respectively assigned to such terms in the Agreement.

2.   The Agreement is amended as follows:

   (a)   Section 1 (Agreement Term) is amended by deleting the existing text in its entirety and substituting the following therefor:

      "The term of this Agreement shall begin on January 1, 2008 and shall continue for an initial period of fifty (50) years and for two additional periods of twenty (20) years each, for an aggregate period of ninety (90) years, unless (i) terminated by District, solely due to a good faith determination that there is or will be a shortage of supply of recycled water sufficient to meet the requirements of this Agreement, at the end of the initial fifty (50) year period or at the end of the first additional twenty (20) year period by written notice delivered to Customer no

EXHIBIT 1
Page 130

later than three (3) years prior to the expiration of such period and setting out in reasonable detail the basis for the underlying determination of shortage of supply, or (ii) earlier terminated pursuant to <u>Section 15</u>."

(b)    <u>Sub-section A of Section 2 (Assignment)</u> is amended by deleting the existing text in its entirety and substituting the following therefor:

"Customer may at any time, without the consent of the District, sell, assign, or transfer to a third party Customer's right to receive any portion of the Annual Allocation specified in <u>Section 12.A</u>, for such period and subject to such terms and conditions as may be determined between Customer and such third party; and the District shall cooperate with Customer and such third party in the implementation of such sale, assignment and transfer following receipt of written notice thereof; <u>provided</u>, <u>however</u>, that (i) as between District and Customer, Customer shall be responsible for making all arrangements for delivery to the third party of the sold, assigned or transferred Annual Allocation quantities, (ii) Customer shall remain liable to District for payment for Annual Allocation quantities delivered to such third party in the event such third party fails to make such payment in accordance with the terms of this Agreement, and (iii) such third party shall agree with Customer to be bound by the terms and conditions of this Agreement to the extent of such sale, assignment or transfer.  Except as provided by the foregoing, Customer may not sell, sublease, assign or transfer its rights or delegate its responsibilities or obligations hereunder without District's prior written consent, which consent shall not be unreasonably withheld."

3.    All other covenants, terms and conditions of the Agreement not explicitly modified by this Amendment remain in full force and effect.

4.    The undersigned individuals hereby warrant and represent that they each have full legal authority to sign this Amendment and bind the parties hereto.

EXHIBIT 1
Page 131

**IN WITNESS WHEREOF**, the parties have caused this Amendment No. 1 To Recycled Water Agreement (Agreement No. 04-07) to be executed as of the date first above written.

EASTERN MUNICIPAL WATER DISTRICT

By: _____

Paul D. Jones II
General Manager

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By: _____

Mark Macarro
Tribal Chairman

EXHIBIT 1
Page 132

<div align="center">

**EXECUTION VERSION**

**RECYCLED WATER TRANSFER AGREEMENT**

</div>

THIS RECYCLED WATER TRANSFER AGREEMENT (this "*Agreement*") is made and entered into as of November 29, 2017, by and between **PECHANGA BAND OF LUISEÑO MISSIONS INDIANS,** a federally recognized Indian Tribe ("*Pechanga*"), and **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*").

<div align="center">

**RECITALS**

</div>

1.  On January 8, 2008, Pechanga and Eastern Municipal Water District ("*EMWD*") entered into a Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed to sell Pechanga recycled water ("EMWD Recycled Water") in the amount of one thousand (1,000) acre feet per year ("AFY") under the terms and conditions set forth in such agreement.

2.  On February 28, 2008, RCWD and EMWD entered a Wheeling Agreement for Recycled Water pursuant to which RCWD agreed to wheel the EMWD Recycled Water to Pechanga.

3.  On August 5, 2009, EMWD and Pechanga executed Amendment No. 1 to the Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed that Pechanga may, without the consent of EMWD, sell, assign or transfer to a third party Pechanga's right to receive any portion of its annual allocation of recycled water. The amendment and the Recycled Water Agreement are collectively referred to as "Recycled Water Agreement."

4.  The Parties, as a part of a comprehensive water rights settlement, seek to enable RCWD to use a portion of Pechanga's allocation of EMWD Recycled Water, such portion to be equal to, subject to Section 2(d), not less than three hundred (300) AFY, and not more than four hundred seventy five (475) AFY in any given Year.

<div align="center">

**AGREEMENT**

</div>

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.  **Definitions.**  Capitalized terms used in this Agreement shall have the meanings set

<div align="center">

1

</div>

EXHIBIT 1
Page 133

forth below.

"*AFY*" means acre-feet per Year.

"*Amended GMA*" means the "Amended and Restated Groundwater Management Agreement" between Pechanga and RCWD, setting forth terms and conditions governing their joint management of groundwater pumping from the Wolf Valley Groundwater Basin.

"*Agreement*" means this Recycled Water Transfer Agreement by and between the Pechanga and RCWD, dated as of the date first written above.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*EMWD Recycled Water*" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"*EMWD Recycled Water Agreement*" means the Recycled Water Agreement by and between Pechanga and EMWD, dated January 8, 2008 (Agreement No. 04-07), as amended by Amendment No. 1.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e) of the Act.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*RCWD*" means the Rancho California Water District, organized pursuant to California Water Code section 34000 *et seq.* and includes all real property owners for whom RCWD acts as an agent pursuant to an agency agreement.

EXHIBIT 1
Page 134

"**Section**" means a section or subsection of this Agreement.

"**Year**" means a calendar year of January through December.

2.       **Transfer of Right to Receive Recycled Water.**

(a)      Subject to Section 2(d), Pechanga hereby transfers its right to receive a portion of its allocation of EMWD Recycled Water to RCWD.   Subject to Section 2(d), RCWD shall be entitled to receive an amount of EMWD Recycled Water not less than three hundred (300) AFY and not more than four hundred seventy-five (475) AFY of EMWD Recycled Water.

(b)      On January 31 of each Year, Pechanga shall notify RCWD of the estimated annual amount of EMWD Recycled Water that is available to RCWD for such Year.  RCWD shall, within twenty (20) days, confirm to Pechanga and EMWD its receipt of the notice and the amount of EMWD Recycled Water that RCWD will accept that Year.

(c)      RCWD shall make contractual arrangements with EMWD to order, schedule, receive and pay for EMWD Recycled Water in a manner that will: (*x*) ensure timely ordering, scheduling and payment of the EMWD Recycled Water that RCWD will accept in such Year; (*y*) not interfere in any way with deliveries of EMWD Recycled Water to Pechanga in such Year; and (*z*) ensure that Pechanga has no responsibility for any charges, fees or costs of any kind associated with the EMWD Recycled Water that RWCD will accept in such Year.

i.      RCWD shall provide to Pechanga a copy of all contractual arrangements entered into with EMWD in accordance with this Section 2(c).

ii.      Any contractual arrangement with EMWD entered into by RCWD in accordance with Section 2(c) shall include a contractual provision providing that Pechanga shall timely receive a copy of all notices, correspondence, and other written documentation exchanged between the parties thereto in accordance therewith.

(d)      In the event EMWD reduces the total amount of EMWD Recycled Water in accordance with section 12(D) of the Recycled Water Agreement, the amount of EMWD Recycled Water transferred to RCWD as set forth in Section 2(a) shall be reduced as follows:

EXHIBIT 1
Page 135

i.      Any reduction by EMWD up to one hundred seventy-five (175) AFY shall reduce the maximum amount of transferred EMWD Recycled Water on an acre-foot by acre-foot basis. By way of example, if EMWD were to reduce Pechanga's total allocation of EMWD Recycled Water from one thousand (1,000) AFY to eight hundred fifty (850) AFY, then the maximum of water transferred in accordance with Section 2(a) shall be reduced by one hundred fifty (150) AFY from four hundred seventy-five (475) AFY to three hundred twenty-five (325) AFY;

ii.     Any reduction by EMWD in excess of one hundred seventy-five (175) AFY shall: (x) reduce the maximum amount transferred from four hundred seventy-five (475) AFY to the same amount as the minimum amount transferred in accordance with Section 2(a); (y) reduce the minimum amount transferred from three hundred (300) AFY to an amount equal to three hundred (300) AFY times the percentage that the total EMWD reduction represents to the original total allocation of EMWD Recycled Water to Pechanga. By way of example, if EMWD were to reduce Pechanga's total allocation of EMWD Recycled Water from one thousand (1,000) AFY to seven hundred fifty (750) AFY, then the minimum and maximum amount to be transferred in accordance with Section 2(a) shall be equal to three hundred (300) AFY minus (three hundred (300) AFY times .25), or two hundred twenty five (225) AFY. Pechanga's remaining entitlement would be equal to seven hundred fifty (750) AFY minus two hundred twenty-five (225) AFY, or five hundred twenty-five (525) AFY.

3.      **Effective Date.**  This Agreement shall be effective on the Enforceability Date.

4.      **Term.**  This Agreement shall have the same term as Amendment No. 1 to the Recycled Water Agreement and shall be extended to the extent said Agreement is extended.

5.      **Termination.**   In the event the Amended Groundwater Management Agreement is terminated for any reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Amended Groundwater Management Agreement without further action by either Party unless the Parties otherwise agree.

6.      **Representations and Warranties.**

(a)     **Representations and Warranties of Pechanga.**    Pechanga represents and

EXHIBIT 1
Page 136

warrants to RCWD as follows:

    i.    Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

    ii.    Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

    iii.    This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

    iv.    There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

    v.    To the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(b)    **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga as follows:

    i.    RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

    ii.    RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

    iii.    This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance

EXHIBIT 1
Page 137

with its terms.

iv.   There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

v.   To the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(c)   **Breach of Representation or Warranty.**   Any representation or warranty made by a Party in this <u>Section 6</u> that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

7.   **Dispute Resolution.**

(a)   Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)   Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party.  Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)   In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the

EXHIBIT 1
Page 138

American Arbitration Association.    Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)  Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)  Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

8.    **Release of Information.**    All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, will be subject to the prior approval of both Parties, which approval shall not be unreasonably withheld.

9.    **Assignment.**    Neither Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party, provided, however, that Pechanga may assign this Agreement without the prior consent of RCWD to another tribal entity of Pechanga if the assignee assumes all of Pechanga's obligations under this Agreement and otherwise agrees to be bound by and consents to each of the provisions of this Agreement.

10.   **Third Parties.**   This Agreement shall not be binding upon, inure to the benefit of or confer rights upon any person or entity that is not a Party to this Agreement.

11.   **Entire Agreement.**   This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts or representations by or among the Parties and their agents, written or oral, to the extent they relate in any way to the subject matter hereof.

EXHIBIT 1
Page 139

12.   **Notice.**   All notices, requests, payments, reports and other communications provided for or permitted to be given or made under this Agreement must be in writing and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other address or addressee as the Party to receive such notice shall have designated by written notice as required by this Section 12.   Notice or payment shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 12:

As to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA   92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

As to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP

EXHIBIT 1
Page 140

655 West Broadway, 15th Floor
San Diego, CA  92101

13.   **Service of Process.**  Any Party may make service on any other Party by sending a copy
of the process by certified U.S. mail, as provided under Federal Rules of Procedure 4(c),
to the Party to be served at the address and in the manner provided for the giving of
notices in Section 12.

14.   **Construction.**  This Agreement has been freely and fairly negotiated among the Parties.
If an ambiguity or question of intent or interpretation arises, this Agreement will be
construed as if drafted jointly by the Parties and no presumption or burden of proof will
arise favoring or disfavoring any Party because of the authorship of any provision of this
Agreement.  The words "include," "includes," and "including" will be deemed to be
followed by "without limitation."  The word "person" includes individuals, entities,
regulators and other governmental bodies.  The words "this Agreement," "herein,"
"hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a
whole and not to any particular subdivision unless expressly so limited.

15.   **Headings.**   The Section headings contained in this Agreement are inserted for
convenience only and shall not affect in any way, and shall not be considered in, the
meaning or interpretation of this Agreement.

16.   **Amendments;  Waivers.**   No  amendment,  modification,  waiver,  replacement,
termination or cancellation of any provision of this Agreement will be valid, unless the
same is in writing and signed by Pechanga and RCWD.  No waiver by a Party of any
breach by the other Party of any of the terms or conditions of this Agreement, or of any
right of such Party hereunder, shall be construed as a waiver of any subsequent breach by
the other Party of the same or other terms or conditions, or of the future exercise by such
Party of the same or any other right hereunder.  Neither the failure nor any delay on the
part of a Party to exercise any right or remedy under this Agreement will operate as a
waiver thereof, nor does any single or partial exercise of any right or remedy preclude
any other or subsequent exercise of the same or of any other right or remedy.

17.   **Governing Law.**  This Agreement shall be governed by and construed in accordance
with the laws of California, without regard to any choice of laws or conflicts of laws
provisions which would direct the application of the laws of any other jurisdiction.  The
venue for arbitration proceedings shall be Riverside County, California.

18.   **Severability.**  The provisions of this Agreement will be deemed severable and the
invalidity or unenforceability of any provision will not affect the validity or
enforceability of the other provisions hereof; provided, however, that, if any provision of
this Agreement, as applied to a Party or to any circumstance, is determined not to be

EXHIBIT 1
Page 141

enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

19.  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as of the date first above written.

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By: _____
Tribal Chairman
Date: __11/29/17_____

Approved as to form:          By: _____
General Counsel

RANCHO CALIFORNIA WATER DISTRICT

By: _____
General Manager
Date: __11/29/17_____

Approved as to form:          By: _____
General Counsel

EXHIBIT 1
Page 142

<div align="center">

**EXECUTION VERSION**

**RECYCLED WATER SCHEDULING AGREEMENT**

</div>

THIS RECYCLED WATER SCHEDULING AGREEMENT (this "*Agreement*") is made and entered into as of November 29, 2017, among the **PECHANGA BAND OF LUISEÑO MISSIONS INDIANS,** a federally recognized Indian Tribe ("*Pechanga*"), **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*") and **EASTERN MUNICIPAL WATER DISTRICT**, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended ("*EMWD*").

<div align="center">

**RECITALS**

</div>

1.  On January 8, 2008, Pechanga and EMWD entered into a Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed to sell Pechanga recycled water ("EMWD Recycled Water") in the amount of one thousand (1,000) acre feet per year ("AFY") under the terms and conditions set forth in such agreement.

2.  On February 28, 2008, RCWD and EMWD entered a Wheeling Agreement for Recycled Water pursuant to which RCWD agreed to wheel the EMWD Recycled Water to Pechanga.

3.  On August 5, 2009, EMWD and Pechanga executed Amendment No. 1 to the Recycled Water Agreement (Agreement No. 04-07) pursuant to which EMWD agreed that Pechanga may, without the consent of EMWD, sell, assign or transfer to a third party Pechanga's right to receive any portion of its annual allocation of recycled water. The amendment and the Recycled Water Agreement are collectively referred to as "Recycled Water Agreement."

4.  As a part of a comprehensive water rights settlement, RCWD and Pechanga have entered into the Recycled Water Transfer Agreement.

5.  The Parties seek to establish through this Agreement the protocol for scheduling, ordering and delivering the portion of Pechanga's allocation of EMWD Recycled Water that Pechanga has agreed to transfer to RCWD pursuant to the Recycled Water Transfer Agreement.

EXHIBIT 1
Page 143

<u>**AGREEMENT**</u>

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      **Definitions.**   Capitalized terms used in this Agreement shall have the meanings set forth below.

"***AFY***" means acre-feet per Year.

"***Agreement***" means this Recycled Water Scheduling Agreement by and between the Pechanga, RCWD and EMWD, dated as of the date first written above.

"***Delivery Point***" means the point for delivery of EMWD Recycled Water to RCWD pursuant to this Agreement, as depicted as Point of Connection "A" on the map attached as <u>Exhibit D-1</u>.

"***EMWD***" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"***EMWD Recycled Water***" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"***Enforceability Date***" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e) of the Act.

"***Exhibit***" means an exhibit to this Agreement, each of which is hereby incorporated herein by this reference.

"***Party***" means any entity represented by a signatory to this Agreement and "***Parties***" means more than one of such entities.

"***Pechanga***" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"***RCWD***" means the Rancho California Water District, organized pursuant to California Water Code section 34000 *et seq.* and includes all real property owners for whom RCWD acts as an agent pursuant to an agency agreement.

"***Recycled Water Agreement***" means the Recycled Water Agreement (Agreement No. 04-07)" dated January 8, 2008, as amended by "Amendment No. 1 to Recycled Water

EXHIBIT 1
Page 144

Agreement (Agreement No. 04-07)" between Pechanga and EMWD, providing for the sale and purchase of recycled water.

"*Recycled Water Transfer Agreement*" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD, which is hereby incorporated by reference.

"*Section*" means a section or subsection of this Agreement.

"*Year*" means a calendar year of January through December.

2.  **List of Exhibits.**

| Exhibit No. | Exhibit Name |
|---|---|
| D-1 | Delivery Point |

3.  **Scheduling Receipt and Payment for EMWD Recycled Water.**

    (a)    The Parties agree that to facilitate the use of EMWD Recycled Water by RCWD, pursuant to the Recycled Water Transfer Agreement, RCWD shall receive its transferred portion of Pechanga's allocation of EMWD Recycled Water, in accordance with the following protocol:

    i.    The Parties shall arrange for operational scheduling to provide for deliveries at the mutual convenience of the Parties, without interference with EMWD's scheduled deliveries of EMWD Recycled Water to Pechanga.

    ii.    EMWD shall deliver EMWD Recycled Water to RCWD at the Delivery Point. EMWD deliveries of EMWD Recycled Water to RCWD shall be metered at the Delivery Point using meters owned, operated and read by RCWD.

    iii.    EMWD shall invoice RCWD monthly at the same rate charged to Pechanga pursuant to the Recycled Water Agreement.

    iv.    RCWD shall pay EMWD's invoice directly to EMWD.

    v.    EMWD shall provide RCWD and Pechanga with an accounting of any reconciliation adjustments made in relation to the delivery of EMWD Recycled Water ordered by RCWD.

4.  **Effective Date.** This Agreement shall be effective on the Enforceability Date.

EXHIBIT 1
Page 145

**5.**      **Termination.**  In the event the Recycled Water Agreement is terminated for any reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Recycled Water Agreement without further action by either Party unless the Parties otherwise agree.

**6.**      **Representations and Warranties.**

(a)      **Representations and Warranties of Pechanga.**   Pechanga represents and warrants to RCWD and EMWD as follows:

     i.      Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

     ii.      Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

     iii.      This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

     iv.      There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

     v.      Except as set forth in Exhibit D-1, to the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(b)      **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga and EMWD as follows:

     i.      Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

     ii.      RCWD is not a party to any agreement, covenant or other

EXHIBIT 1
Page 146

agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.    This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

iv.    There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

v.    Except as set forth in <u>Exhibit D-1</u>, to the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(c)    **<u>Representations and Warranties of EMWD</u>**.  EMWD represents and warrants to Pechanga and RCWD as follows:

i.    Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of EMWD.

ii.    EMWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

iii.    This Agreement constitutes a legal, valid, and binding obligation of EMWD enforceable against it in accordance with its terms.

iv.    There is no pending or threatened action or proceeding against or affecting EMWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of EMWD or the ability of EMWD to perform its obligation under this Agreement.

v.    Except as set forth in <u>Exhibit D-1</u>, to the best of EMWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license,

EXHIBIT 1
Page 147

certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

(d)     **Breach of Representation or Warranty.**     Any representation or warranty made by a Party in this Section 6 that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

**7.     Release.** Pechanga, RCWD and EMWD expressly recognize that scheduling, billing and payment provisions of this Agreement differ from those of the Recycled Water Agreement, and EMWD and RCWD agree to release and hold Pechanga, its officials, agents, and employees, harmless on account of damage or claim of damage of any nature arising out of, or connected with, this Agreement.   All parties expressly recognize that after the effectiveness of this Agreement, and until such time as it terminates, Pechanga has no responsibility to provide water delivery schedules to EMWD, or to pay for such unused portion of Pechanga's allocation of EMWD Recycled Water transferred to RCWD.

**8.     Notices.** All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA  92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA  92593

and to:

Donald R. Pongrace

EXHIBIT 1
Page 148

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

<u>If to RCWD</u>:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101

<u>If to EMWD</u>:

Paul D. Jones II
General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA   92572-8300

9.   **Amendments; Waivers**.   No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder. Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

10.   **Governing Law**.   This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

EXHIBIT 1
Page 149

11.    **Dispute Resolution.**

    (a)    Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.   Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and EMWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

    (b)    Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party. Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

    (c)    In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

    (d)    Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

    (e)    Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and EMWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

12.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

EXHIBIT 1
Page 150

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as of the date first above written.

EASTERN MUNICIPAL WATER DISTRICT

By:_____
General Manager
Date:_____

Approved as to form:        By:_____
General Counsel

RANCHO CALIFORNIA WATER DISTRICT

By:_____
General Manager
Date:_____

Approved as to form:        By:_____
General Counsel

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By:_____
Tribal Chairman
Date:_____

Approved as to form:        By:_____
General Counsel

EXHIBIT 1
Page 151

Exhibit D-1

EXHIBIT 1
Page 152



EXHIBIT 1
Page 153

**EXECUTION VERSION**

## RECYCLED WATER INFRASTRUCTURE AGREEMENT

THIS RECYCLED WATER INFRASTRUCTURE AGREEMENT (this "*Agreement*") is made and entered into as of November 29, 2017, by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Pechanga*"), a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT**, a California water district organized pursuant to California Water Code section 34000 *et seq.* ("*RCWD*") and the **UNITED STATES OF AMERICA** ("*United States*"), acting through the Secretary of the Department of the Interior.

## <u>RECITALS</u>

A.   RCWD and Pechanga have agreed to a comprehensive settlement of all of Pechanga's claims to water rights in the Santa Margarita River Watershed, which settlement is memorialized in the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("*Settlement Agreement*").

B.   As part of the Settlement Agreement, Pechanga and RCWD entered a Recycled Water Transfer Agreement, by which Pechanga agreed to transfer a portion of the EMWD Recycled Water Pechanga is entitled to receive to RCWD.

C.   RCWD and EMWD entered a Recycled Water Scheduling Agreement, pursuant to which the Parties established a protocol for ordering and delivering the portion of Pechanga's allocation of EMWD Recycled Water that Pechanga agreed to transfer to RCWD pursuant to the Recycled Water Transfer Agreement.

D.   In furtherance of the Settlement Agreement, Pechanga and RCWD seek to mutually benefit from the use of Recycled Water and, in furtherance of that effort, require development and construction of Recycled Water Infrastructure, as set forth in this Agreement.

E.   The U.S. Congress has authorized, ratified and confirmed the Settlement Agreement by act of Congress, Subtitle D of Title III of Public Law No. 114-322 ("Act"). In the Act, Congress authorized, as a portion of the settlement to which Pechanga is entitled, funds to pay for Pechanga's agreed upon share of the Recycled Water Infrastructure.

F.   The Parties hereto seek to agree upon the process pursuant to which Pechanga will provide to RCWD funds for the design and construction of the Recycled Water Infrastructure.

1

EXHIBIT 1
Page 154

## AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

**1.**     **Definitions.**   Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Settlement Act, Subtitle D of Title III of Public Law No. 114-322.

"*AFY*" means acre-feet per Year.

"*Agreement*" means this Recycled Water Infrastructure Agreement by and between the Pechanga, RCWD, and the United States dated as of the date first written above.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*EMWD Recycled Water*" means water EMWD is to deliver to Pechanga pursuant to the EMWD Recycled Water Agreement.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e) of the Act.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Settlement Fund*" means the fund established by section 3409 of the Act.

"*Pechanga Recycled Water Infrastructure Account*" means the account established by section 3409(c)(1) of the Act.

2

EXHIBIT 1
Page 155

"***RCWD***" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"***Recycled Water Infrastructure***" means the Storage Pond.

"***Recycled Water Scheduling Agreement***" means the "Recycled Water Scheduling Agreement", between Pechanga, RCWD, and EMWD.

"***Recycled Water Transfer Agreement***" means the "Recycled Water Transfer Agreement", between Pechanga and RCWD.

"***Section***" means a section or subsection of this Agreement.

"***Settlement Agreement***" has the meaning set forth in Recital A.

"***Storage Pond***" means the Storage Pond No. 5 that RCWD designed and constructed in order to enable RCWD to utilize the EMWD Recycled Water to be delivered to RCWD pursuant to the Recycled Water Transfer Agreement.

"***United States***" means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

"***Year***" means a calendar year of January through December.

## 2.    Pechanga Recycled Water Infrastructure Account.

(a)     Section 3409(c)(1) of the Act established the Pechanga Recycled Water Infrastructure Account as an account held in trust by the United States within the Pechanga Settlement Fund.

(b)     Section 3411(a)(1) of the Act authorized appropriations to be made into the Pechanga Recycled Water Infrastructure Account in an amount equal to two million six hundred fifty-six thousand  three hundred seventy-four dollars ($2,656,374).

(c)     Section 3408(c)(2) of the Act established the purpose of the Pechanga Recycled Water Infrastructure Account to provide funds to allow Pechanga to pay for Pechanga's share of the costs associated with the design and construction of the Storage Pond in accordance with this Agreement.

(d)     Funds deposited into the Pechanga Recycled Water Infrastructure Account for the purpose described in <u>Section 2(c)</u> above shall have interest accrue thereon for disbursement in accordance with the provisions of this Agreement.

EXHIBIT 1
Page 156

3.      **Effective Date.**  This Agreement shall be effective on the Enforceability Date.

4.      **Storage Pond.**

      (a)      Subject to <u>Section 4(c)</u>, within fifteen (15) days after the Enforceability Date Pechanga shall file a written request to the Secretary that will allow for disbursement of funds from the Pechanga Recycled Water Infrastructure Account under Section 3411(a)(1) directly to RCWD in an amount equal to all funds in the Pechanga Recycled Water Infrastructure Account; and

      (b)      Pechanga shall have no obligation to pay for the Storage Pond if the Act and Settlement Agreement are not approved.

      (c)      If Pechanga withdraws the funds in the Pechanga Recycled Water Infrastructure Account pursuant to the Act, subject to the availability of funds in the Pechanga Recycled Water Infrastructure Account, Pechanga shall make payment directly to RCWD in an amount equal to all funds in the Pechanga Recycled Water Infrastructure Account.

5.      **Notices.**  All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

      If to Pechanga:

      Mark Macarro
      Chairman
      Pechanga Band of Luiseño Indians
      P.O. Box 1477
      Temecula, CA   92593

      With a copy to:

      General Counsel
      Pechanga Band of Luiseño Indians
      P.O. Box 1477
      Temecula, CA   92593

      and to:

      Donald R. Pongrace
      Akin Gump Strauss Hauer & Feld LLP
      1333 New Hampshire Avenue, NW
      Suite 400

<div align="center">4</div>

EXHIBIT 1
Page 157

Washington, DC   20036

If to the United States:

Assistant Secretary for Indian Affairs
U.S. Department of the Interior
1849 C St. NW, 4660 MIB
Washington, DC 20240-0001

And to:

Regional Director
Pacific Regional Office
Bureau of Indian Affairs
2800 Cottage Way
Sacramento, CA 95825

And to:

Chief, Indian Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004

And to:

Associate Solicitor
Division of Water Resources
1849 C Street, NW  MS 6413
Washington, DC 20240
If to RCWD:

General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA   92101

**6.**    **Termination.**  In the event the Recycled Water Transfer Agreement is terminated for any

5

EXHIBIT 1
Page 158

reason, either in accordance with its terms or pursuant to an arbitration decision or court order, this Agreement shall automatically terminate fourteen (14) days after such termination of the Recycled Water Transfer Agreement without further action by any Party unless the Parties otherwise agree.

7.   **Representations and Warranties.**

    (a)   **Representations and Warranties of Pechanga.**   Pechanga represents and warrants to RCWD as follows:

        (i)   Pechanga's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of Pechanga.

        (ii)   Pechanga is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

        (iii)   This Agreement constitutes a legal, valid, and binding obligation of Pechanga enforceable against it in accordance with its terms.

        (iv)   There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

        (v)   To the best of Pechanga's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

    (b)   **Representations and Warranties of RCWD.**   RCWD represents and warrants to Pechanga as follows:

        (i)   RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

        (ii)   RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

        (iii)   This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

6

EXHIBIT 1
Page 159

(iv)    There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

(v)    To the best of RCWD's knowledge, the validity of this Agreement, the execution and delivery by it of this Agreement and the performance by it of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state or local judiciary, regulatory or administrative body.

**8.**    **Breach of Representation or Warranty.**    Any representation or warranty made by a Party in <u>Section 7</u> that shall prove to have been incorrect in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

**9.**    **Amendments; Waivers**.    No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder. Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**10.**    **Governing Law**.    This Agreement shall be governed by and construed in accordance with the laws of California and the United States, as applicable, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

**11.**    **Dispute Resolution.**

(a)    Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)    With respect to any dispute arising under this Agreement, prior to pursuing dispute resolution  pursuant to either Section 11(c) or 11(f), each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by another Party.  Any Party with a grievance or complaint arising under this Agreement shall notify the other Parties in writing of its grievance or complaint at the other Parties' respective address of record.

7

EXHIBIT 1
Page 160

Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In the event of any dispute between RCWD and Pechanga arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  RCWD and Pechanga shall each initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)     Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)     Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

(f)     In the event of any dispute between the United States and RCWD or Pechanga arising under this Agreement, a Party shall have the right to petition the Adjudication Court for such relief as may be appropriate to enforce the terms, conditions, and limitations as provided in this Agreement.  The United States acknowledges and agrees that the Adjudication Court has jurisdiction to hear such disputes between the Parties arising under this Agreement.

**12.     Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

8

EXHIBIT 1
Page 161

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and dated as
of the date first above written.

### PECHANGA BAND OF LUISEÑO MISSION INDIANS

By: _____
         Tribal Chairman

Date: _____11/29/17_____

Approved as to form:      By: _____
                                          General Counsel

### RANCHO CALIFORNIA WATER DISTRICT

By: _____
         General Manager

Date: _____11/29/17_____

Approved as to form:      By: _____
                                          General Counsel

### THE UNITED STATES OF AMERICA

By: _____
         Secretary of the Interior

Dated: _____29Nov17_____

9

EXHIBIT 1
Page 162

## EXTENSION OF SERVICE AREA AGREEMENT

This "Extension of Service Area Agreement" (this "*Agreement*") is made and entered into on _October 11_, 2017 (the "*Effective Date*"), by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Pechanga*"), a federally recognized Indian tribe, **EASTERN MUNICIPAL WATER DISTRICT** ("*EMWD*"), a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended, and **THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA**, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended) ("*Metropolitan*"). The foregoing signatories to this Agreement are referred to hereafter individually as "*Party*" or collectively as "*Parties*."

## PREAMBLES

A.   Metropolitan was organized and exists for the purpose of providing a supplemental supply of imported water to the 26 public agencies that make up its service area in southern California. These member agencies include EMWD.

B.   Metropolitan is generally limited by law to providing supplemental water supplies to its member agencies for domestic and municipal uses. Pursuant to Metropolitan's Administrative Code Sections 4200 and 4509, Metropolitan's supplemental water supplies may not be sold or delivered outside of its district boundaries without the approval of its board of directors.

C.   EMWD was organized and exists for the purpose of providing water service to its service area located in Riverside County, California. As a member agency of Metropolitan, EMWD's service area is wholly included within Metropolitan's district boundaries.

D.   The Pechanga is a federally recognized Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members but not members in their capacities as Allottees. The Pechanga Reservation ("*Reservation*") includes the lands held in trust for the Pechanga by the United States, as shown on Exhibit F-6.

E.   By Certificate of Completion issued by the Local Agency Formation Commission of Riverside County, California, the boundaries of Metropolitan and EMWD were reorganized to incorporate within Metropolitan's and EMWD's service area those areas of land depicted on the map attached hereto as Exhibit F-1 and identified as the "*Existing Area*". The Existing Area was annexed to Metropolitan and EMWD in two parts: the area to the north recorded on April 25, 1983 (designated LAFCO #82-16-3) and the area to the west recorded on July 19, 1967 (designated LAFCO #67-26-5). The Existing Area became a part of the Reservation in April of 2003.

F.   As part of a comprehensive settlement of its claims for water rights in the Santa Margarita River Watershed, Pechanga has requested that Metropolitan's and EMWD's service area be extended to include certain additional Reservation acreage (the "*Extended Area*", as more particularly depicted and described in Exhibit F-2). The combined

EXHIBIT 1
Page 163

Existing Area and Extended Area are referred to in this Agreement as the "***Consolidated Area***", which is more particularly depicted and described in Exhibit F-3. Metropolitan and EMWD have agreed to provide treated water service to the Consolidated Area in accordance with the terms and conditions specified in this Agreement. Rancho California Water District ("RCWD") has agreed to deliver such treated water to Pechanga pursuant to the terms and conditions of a separate agreement executed by EMWD, Pechanga and RCWD which establishes delivery, billing and operational protocols ("ESAA Water Delivery Agreement").

G. Metropolitan and EMWD recognize and respect the inherent sovereignty of Pechanga as a tribal government and by this Agreement to provide water service to the Consolidated Area acknowledge that they do not exercise any governmental or regulatory control over the Reservation. The terms and conditions of this Agreement establish the contractual basis for the service of water for use in the Consolidated Area of the Reservation only, and do not affect the sovereign authority of Pechanga over the Reservation. Water served pursuant to this Agreement is not deemed extraterritorial service by virtue of these circumstances and this Agreement.

H. Pechanga acknowledges and agrees by this Agreement that Metropolitan and EMWD are public agencies created under and bound by the laws of the State of California. The terms and conditions of this Agreement establish the contractual basis for the service of water for use in the Consolidated Area of the Reservation only, and Pechanga acknowledges that its execution of this Agreement includes the contractual condition that the use of water provided by EMWD, including water imported by Metropolitan for EMWD, shall be pursuant to the same terms, conditions, and obligations as are applicable to all other customers of EMWD and Metropolitan and that the status of Pechanga as a sovereign tribal government does not relieve or absolve Pechanga from contractual compliance with such terms, conditions and obligations on the same basis as all other customers of EMWD and Metropolitan. Pechanga further acknowledges that the provisions of this Agreement are the conditions pursuant to which the legislative bodies governing EMWD and Metropolitan have granted consent to the extension of their service areas to include the Extended Area.

I. Pechanga expressly agrees that water delivered to Pechanga by EMWD includes water imported by Metropolitan, and such water cannot be used, directly or indirectly, in any manner which intentionally or avoidably results in the benefit of areas outside of the Consolidated Area. This prohibition applies both to the direct use of such water outside of the Consolidated Area and the indirect use by substitution of the water supplies made available under this Agreement and the ESAA Water Delivery Agreement to Pechanga for water supplies that Pechanga would otherwise use in the Consolidated Area, for example, Pechanga could not sell its Tribal Water Right off the Reservation and use Imported Water in its place. The Parties acknowledge that Pechanga may use its Tribal Water Right pumped from the Consolidated Area in other areas of the Reservation and that the provision of Imported Water may provide a benefit to areas outside of the Consolidated Area; the Parties agree that this benefit shall not constitute a violation of this Agreement or the MWD Administrative Code.

EXHIBIT 1
Page 164

J.      The Parties acknowledge the comprehensive settlement of Pechanga's claims for water rights in the Santa Margarita River Watershed will be effected through federal legislation known as "Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act" (Subtitle D of Title III of Public Law No. 114-322) (hereinafter the "Settlement Act"), and further acknowledge such legislation limits use of the Tribal Water Rights, as defined in the Act and herein, to use on the Reservation.

K.      The Parties agree that this Preamble is a substantive and enforceable part of this Agreement and desire in this Agreement to provide for extension of water service to the Consolidated Area and to set forth terms and conditions that will govern such service in accordance with this Preamble.

**NOW, THEREFORE**, it is agreed as follows:

EXHIBIT 1
Page 165

## AGREEMENT

## 1.   Construction.

**1.1   Definitions.** Capitalized terms used in this Agreement shall have the meanings respectively ascribed thereto below or as set forth elsewhere in this Agreement.

"*AF*" means acre-feet.

"*AFY*" means acre-feet per Year.

"*Agreement*" means this Extension of Service Area Agreement, including all Appendices, as the same may be amended from time to time.

"*Consolidated Area*" means the area of land on the Reservation that includes both the Existing Area and the Extended Area, and is identified as the Consolidated Area and depicted in the map attached hereto as Exhibit F-3.

"*Delivery Commencement Date*" shall be the date on which deliveries of water to the Consolidated Area under this Agreement and the ESAA Water Delivery Agreement shall commence, as such date is established pursuant to Section 2.2.

"*Dispute*" is defined in Section 8.1.

"*Effective Date*" is defined in the first paragraph of this Agreement.

"*EMWD*" is defined in the first paragraph of this Agreement.

"*EMWD Connection Fee*" has the meaning set forth in Section 2.3.1(b) of this Agreement.

"*EMWD Water Shortage Contingency Plan*" means the plan approved by EMWD's Board of Directors in Ordinance No. 117.2, effective April 1, 2009, as amended from time to time, or any other plan or method that EMWD's Board of Directors adopts in the future to allocate water supply in substitution of the foregoing.

"*Exhibit*" means an Exhibit to this Agreement, each of which is incorporated herein by this reference.

"*Existing Area*" means the area of land on the Reservation identified as the Existing Service Area and depicted in the map attached hereto as Exhibit F-1.

"*Extended Area*" means the additional area of land on the Reservation to be incorporated into the EMWD service area pursuant to this Agreement, and identified as the Extended Service Area and depicted in the map attached hereto as Exhibit F-2.

"*Fallbrook Adjudication Court*" means the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Fallbrook Adjudication Proceeding.

EXHIBIT 1
Page 166

"*Fallbrook Adjudication Proceeding*" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in *United States v. Fallbrook Public Utility District et al.*, Civ. No. 3:51–cv–01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the continuing jurisdiction of the Fallbrook Adjudication Court over the Fallbrook Decree.

"*Fallbrook Decree*" means the "Modified Final Judgment And Decree", entered in the Fallbrook Adjudication Proceeding on April 6, 1966 and includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

"*Holiday*" includes January 1, the third Monday in January (observance of Martin Luther King Jr.'s birthday), the third Monday in February, (Presidents' Day), March 31 (observance of Cesar Chavez's Birthday), the Friday before Easter, the last Monday in May (Memorial Day), July 4, the first Monday in September (Labor Day), November 11 (Veterans Day), Thanksgiving Day, the day following Thanksgiving Day, December 24, December 25, December 31, and any day or portion of a day declared by MWD's Board of Directors as a Holiday. If any Holiday other than December 24 and 31 falls on Sunday, the following Monday is a Holiday. If any Holiday falls on Saturday, the preceding Friday is a Holiday.

"*Imported Water*" means any water delivered to Pechanga pursuant to this Agreement and the ESAA Water Delivery Agreement.

"*Initial Delivery Point*" means the delivery point indicated on the map attached in Exhibit F-5.

"*Month*" means a calendar month, unless otherwise provided.

"*Metropolitan*" is defined in the first paragraph of this Agreement.

"*MWD Administrative Code*" means the code adopted by Metropolitan's Board of Directors on January 11, 1977, as amended from time to time.

"*MWD Connection Fee*" has the meaning set forth in Section 2.3.1(a) of this Agreement.

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Reservation*"" means the reservation of the Pechanga Band of Luiseño Mission Indians, as delineated in Exhibit F-6.

"*Section*" means a section or subsection of this Agreement.

EXHIBIT 1
Page 167

"*Tribal Water Right*" means the water established and confirmed by section 3405 of the federal legislation known as "Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act" (Subtitle D of Title III of Public Law No. 114-322).

"*Year*" means a calendar year of January through December.

**1.2.1**   The words "include," "includes," and "including" will be deemed to be followed by "without limitation." The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

**1.2.2**   The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way, and shall not be considered in, the meaning or interpretation of this Agreement.

**1.2.3**   Under no circumstances shall this Agreement be construed as a conveyance, abandonment, or waiver of any water right or right to the use of water from the Colorado River or the California State Water Project which is held and owned by Metropolitan.

**1.2**   **Exhibits.**   The following Exhibits are included in this Agreement:

Exhibit F-1:   Existing Area

Exhibit F-2:   Extended Area

Exhibit F-3:   Consolidated Area

Exhibit F-4:   Required Approvals

Exhibit F-5:   Initial Delivery Point

Exhibit F-6:   Map of Reservation

Exhibit F-7:   MWD's Best Management Practices

**2.**   **Water Service.**

**2.1**   **Nature of Service.**

**2.1.1**   Subject to the terms, conditions, and obligations of this Agreement, and the ESAA Water Delivery Agreement, Metropolitan and EMWD shall provide treated water service to the Consolidated Area to the same extent and under the same terms and conditions as all other Metropolitan customers. Pechanga acknowledges and agrees that this water service provides the Consolidated Area with imported supplemental water supplies delivered by Metropolitan to EMWD for use within the service areas of Metropolitan and EMWD.

**2.1.2**   Pechanga acknowledges and agrees that the terms, conditions and obligations of this Agreement are the same as would be applicable to other customers of EMWD

EXHIBIT 1
Page 168

and Metropolitan and that this Agreement binds Pechanga to such terms, conditions and obligations.

**2.1.3** For any period during which EMWD has implemented the EMWD Water Shortage Contingency Plan, sales and provision of water to Pechanga hereunder shall be limited to an amount equal to a percentage of the average amount of water used from all sources on the Consolidated Area in the previous three calendar years, such percentage to be equal to the percentage of water which Rancho California Water District would receive under EMWD's Water Shortage Contingency Plan, Wholesale Supply Allocation, as defined in EMWD's Administrative Code and as amended from time to time, during the water supply allocation period as reported by EMWD.

**2.2      Delivery Commencement Date.** The Delivery Commencement Date shall be such date as may be specified in a written notice from Pechanga to EMWD given thirty (30) days prior to such date; provided, however, that such date shall be no earlier than the date on which all of the following have occurred:

(a)      all approvals specified in Exhibit F-4 have been obtained and are in full force and effect;

(b)      water is operationally available and capable of being delivered to and received at the Delivery Point; and

(c)      Pechanga shall have paid the EMWD Connection Fee and Metropolitan Connection Fee required pursuant to Section 2.3.1(a) and (b), below.

**2.3      Fees, Costs, and Water Service Rates.**

**2.3.1    Connection Fees and Processing Costs.**

(a)      Pechanga shall pay to Metropolitan the Metropolitan Connection Fee for the extension of Metropolitan's service area that is calculated in the same manner, and paid in lieu of, an annexation fee. This fee shall equal the sum of the net present value of the amount equivalent to ad valorem taxes and the processing fee established by Metropolitan Administrative Code section 3100(b)(7) and an amount equal to the annexation charge that would be due on the total acreage of the Extended Area using the per-acre charge formula set forth in Metropolitan Administrative Code sections 3300 and 4301. As of January 1, 2017, the fee is estimated to be $3,094,457. The full amount of the fee will be calculated by Metropolitan upon written notice from Pechanga that all other conditions except payment of the connection fees have been satisfied. Metropolitan will provide Pechanga with a written invoice setting forth the amount of the fee and the calculations made in determining the fee. Pechanga shall pay the Metropolitan Connection Fee in full to satisfy the condition to the Delivery Commencement Date set forth in Section 2.2(c), above.

(b)      Pechanga shall pay to EMWD the EMWD Connection Fee for the extension of the EMWD service area that is calculated in the same manner, and paid in lieu of, an annexation fee. This fee shall be based upon the total acreage of the Extended Area and computed on the basis of EMWD's present value of the property-related fees, including standby

EXHIBIT 1
Page 169

charges, which would otherwise have been collected if the total acreage were subject to property assessments, which as of January 1, 2017 is estimated to be $ 63,072.11. The full amount of the fee will be calculated by EMWD upon written notice from Pechanga that all conditions except payment of the connection fees have been satisfied.  EMWD will provide Pechanga with a written invoice setting forth the amount of the fee and the calculations made in determining the fee.  Pechanga shall pay the EMWD Connection Fee in full to satisfy the condition to the Delivery Commencement Date set forth in Section 2.2(c), above.

(c)     Except as specified in paragraphs (a) and (b) above, EMWD and Metropolitan shall not charge Pechanga any processing fees, property-related assessments, or other property-related charges that would normally be imposed for the annexation of land, in connection with the procedures for obtaining approvals required for execution and implementation of this Agreement and the extension of the EMWD and Metropolitan service areas and, to the extent required, EMWD and Metropolitan hereby expressly waive all such property–related fees, assessments, and charges.

2.3.2   **Property Taxes and Assessments.**   The parties agree and acknowledge that property owners within the joint service areas of EMWD and Metropolitan are responsible to pay ad valorem property taxes and other charges imposed by EMWD and Metropolitan and collected by the Riverside County Assessor through property tax bills.  In recognition of the sovereignty of Pechanga and except as provided in Section 2.3.1, no ad valorem property taxes or property-related assessments shall be imposed or collected by EMWD or Metropolitan on the Consolidated Area of the Reservation.

2.3.3   **EMWD Payments to Metropolitan.**   EMWD shall pay Metropolitan for all water purchased from Metropolitan that is delivered to Pechanga at the applicable rates charged by Metropolitan.   Payments due from EMWD to Metropolitan shall be made in accordance with the MWD Administrative Code.

3.     **Other Terms and Conditions of Service.**

3.1     **Metropolitan's and EMWD's Administrative Codes and All Other Laws Applicable to Metropolitan's and EMWD's Provision of Water.**  Pechanga acknowledges and agrees that the delivery of Imported Water necessarily includes the provision of Metropolitan's imported supplemental water.  The use of Imported Water in the Consolidated Area shall be on the same terms, conditions, and obligations as are applicable to all other customers of Metropolitan and EMWD as set forth in the MWD and EMWD Administrative Codes as amended from time to time.  Pechanga acknowledges that Metropolitan and EMWD are government entities organized and existing under the laws of the State of California, and that the powers and duties of Metropolitan and EMWD to provide water delivery under this agreement are subject to all state and federal laws that apply to Metropolitan's or EMWD's provision of water, including, but not limited to the California Water Code and executive orders issued by the Governor of the State of California. Pechanga agrees that its rights and obligations as a recipient of water provided by Metropolitan and EMWD pursuant to the terms and conditions of this agreement are subject to the terms and conditions of any state or federal laws that apply to Metropolitan's or EMWD's provision of water to the same extent as all other Metropolitan and EMWD customers.  Consistent with the acknowledgements in Preambles I and J, Section 3.9,

EXHIBIT 1
Page 170

and in addition to the restriction set forth in section 3405(b)(2) of the Settlement Act, Pechanga acknowledges that sections 3104, 4200, and 4509 of the MWD Administrative Code restrict the use of Metropolitan's imported water supplies solely for purposes lying within the service area of Metropolitan and its member agencies, and that pursuant to this Agreement, Pechanga agrees that these provisions apply contractually to the provision of Imported Water to the Consolidated Area.

**3.2** **Initial Delivery Point.** The Initial Delivery Point means the delivery point for water provided by EMWD to Pechanga under this Agreement and shall be as depicted in Exhibit F-5. Pechanga may modify the Initial Delivery Point at any time upon written notice to EMWD, provided such modified delivery point is capable of taking deliveries of water.

**3.3** **Interruptions.** Whenever repairs or maintenance of Metropolitan's or EMWD's system, in the opinion of the General Manager of Metropolitan or EMWD, respectively, shall require suspension of provision of water at any Delivery Point, such provision may be suspended without liability on the part of Metropolitan or EMWD. In addition to shutdowns, water may from time to time be unavailable, or available only in limited quantities at a service connection because of reductions or eliminations in flow. Reasons for shutdowns may change from time to time. Metropolitan and EMWD shall exercise reasonable efforts to provide advance notice to Pechanga of any interruption that is not an emergency.

**3.4** **Hydraulic Transients.**

**3.4.1** **General.** Pechanga shall avoid the creation of conditions that could cause hydraulic transients to damage Metropolitan's or EMWD's facilities.

**3.4.2** **Reduction or Suspension of Deliveries.** Metropolitan's or EMWD's General Manager may reduce or suspend provision of water to Pechanga if he determines that Pechanga has failed to install reliable protective devices to protect Metropolitan's and EMWD's facilities from damage from hydraulic transients and that a substantial risk of such damage exists.

**3.5** **Facilities.**

**3.5.1** **Pechanga Responsibilities.** Pechanga shall be responsible, at its cost, for the design, installation and construction of any facilities on its side of the Initial Delivery Point, or any subsequently noticed delivery point, required to receive water provided by EMWD. Pechanga shall provide EMWD and Metropolitan with reasonable opportunity to review and comment on any such designs and shall incorporate any EMWD and Metropolitan comments reasonably required to ensure that such facilities may be operated without damage to EMWD's or Metropolitan's system.

**3.5.2** **EMWD and Metropolitan Responsibilities.** EMWD and Metropolitan shall operate and maintain facilities for provision of water to Pechanga in accordance with applicable standards. EMWD and Metropolitan shall have no obligation (a) to provide additional works or facilities, necessary for the sale and provision of water from works owned and operated by EMWD or Metropolitan, or (b) to construct or furnish water treatment facilities to maintain or better the quality of water provided through EMWD's or Metropolitan's service connection.

EXHIBIT 1
Page 171

**3.6**     **Suspension of Deliveries.**  As stated in the MWD Administrative Code, section 4503, Suspension of Deliveries, as amended from time to time, Pechanga agrees that it shall have sufficient resources such as local reservoir storage, groundwater production capacity, system interconnections, or alternate supply source to sustain a seven-day interruption in provision of Metropolitan water based on annual average demands.  Pechanga shall be responsible for and reimburse direct costs, excluding labor costs, incurred by Metropolitan in the event that a scheduled non-emergency interruption of up to seven days is postponed or cancelled at the request of EMWD on behalf of Pechanga as a result of insufficient local resources; provided that Metropolitan shall have sole discretion over whether to agree to any such request for a postponement or cancellation of a scheduled non-emergency interruption of service.

**3.7**     **Environmental Documentation; Permits and Consents; Compliance.**

**3.7.1**  Pechanga shall be responsible for the cost of the preparation of any documentation, defense of any legal challenge related to Metropolitan's or EMWD's compliance with the National Environmental Policy Act ("NEPA") and/or the California Environmental Quality Act ("CEQA") and other applicable state laws or any other challenge to the transaction contemplated by this Agreement.  EMWD will serve as Lead Agency for any CEQA documents and analysis.  Any costs incurred by Metropolitan or EMWD, using such attorneys and experts as in their sole discretion they determine to be reasonably necessary, in defense of the transaction shall be reimbursed by Pechanga.

**3.7.2**  Pechanga shall be responsible for obtaining and maintaining in effect all applicable permits, consents and licenses that may be required to be obtained and maintained exclusively by Pechanga to enable Pechanga to purchase and receive water as contemplated by this Agreement.

**3.7.3**  Except as provided in Preambles I and J and Section 3.1, nothing in this provision is intended to imply or be interpreted that Pechanga is subject to any water or air pollution laws and regulations of the State of California, or that Pechanga has waived any argument it may have with respect to the same.

**3.8**     **Allocation of Liability.**

**3.8.1**  Metropolitan, EMWD, and their officers, agents, and employees shall not be liable to Pechanga or any third party that makes use of water provided pursuant to this Agreement for the provision of water, including the quality of water provided, or failure to supply water, nor for the control, carriage, handling, use, disposal, or distribution of, or any limitations to the use, disposal or distribution of such water by any regulatory body or other third party on water sold to Pechanga after such water has been received by or on behalf of Pechanga at the Initial Delivery Point.

Metropolitan and EMWD, its officers, agents and employees shall also not be liable for any claim of damage of any nature whatsoever (including but not limited to property damage, personal injury, or death) arising out of or connected with the provision of water, including the quality of water provided, or failure to supply water, nor for the control, carriage, handling, use, disposal, or distribution of or any limitations to the use, disposal or distribution of

EXHIBIT 1
Page 172

such water that may be imposed by any regulatory body or other third party on water sold to Pechanga under this Agreement after such water has been received by Pechanga at the Initial Delivery Point.

Pechanga shall, and hereby do, indemnify, defend and hold harmless Metropolitan and EMWD and their officers, agents, and employees from any and all such liability, damages, or claims of damages and shall reimburse Metropolitan or EMWD for costs of repair of Metropolitan's or EMWD's facilities and other damages resulting from the operations of Pechanga.

**3.8.2**   Pechanga and its officers, agents, employees and members shall not be liable to Metropolitan or EMWD, for any claim of damage of any nature whatsoever (including property damage, personal injury, or death) arising out of or connected with the control, carriage, handling, use, disposal, or distribution of, water prior to such water being delivered to Pechanga at the Initial Delivery Point, excepting, however, claims by Metropolitan or EMWD for costs of repair to Metropolitan's or EMWD's facilities and other damages resulting from the operations of Pechanga.

### 3.9     Restrictions on Re-sale and Use.

**3.9.1**   Consistent with the acknowledgements in Preambles I and J, subject to Section 3.1, and in addition to the restriction set forth in section 3405(b)(2) of the Settlement Act, Pechanga expressly agrees that water delivered to Pechanga by EMWD includes water imported by Metropolitan, and such water cannot be used, directly or indirectly, in any manner which intentionally or avoidably results in the benefit of areas outside of the Consolidated Area. This prohibition applies both to the direct use of such water outside of the Consolidated Area and the indirect use by substitution of the water supplies made available under this Agreement and the ESAA Water Delivery Agreement to Pechanga for water supplies that Pechanga would otherwise use in the Consolidated Area, for example, Pechanga could not sell its Tribal Water Right off the Reservation and use Imported Water in its place.  The Parties acknowledge that Pechanga may use its Tribal Water Right pumped from the Consolidated Area in other areas of the Reservation and that the provision of Imported Water may provide a benefit to areas outside of the Consolidated Area; the Parties agree that this benefit shall not constitute a violation of this Agreement or the MWD Administrative Code.

**3.9.2**   Imported Water sold and provided to Pechanga shall not be used for agricultural purposes.  Agricultural purposes are the growing or raising, in conformity with recognized practices of husbandry, for the purposes of commerce, trade, or industry, or for use by public educational or correctional institutions, of agricultural, horticultural, or floricultural products, and produced (a) for human consumption or for the market, or (b) for the feeding of fowl or livestock produced for human consumption or for the market, or (c) for the feeding of fowl or livestock for the purpose of obtaining their products for human consumption or for the market, such products to be grown or raised on a parcel of land having an area of not less than one acre utilized exclusively therefore.

EXHIBIT 1
Page 173

3.9.3   Notwithstanding any other provision of this Agreement, Pechanga shall have the right to use the Tribal Water Right for any beneficial purpose at any location on the Reservation.

**3.10    Service Conditions Related to Pechanga Sovereignty.**   It is understood that while intended to be analogous to water service provided by Metropolitan and EMWD to other similarly situated customers located within the boundaries of their service areas, water service to be provided under this Agreement shall at all times and in all respects be implemented in a manner that recognizes the sovereignty of Pechanga except as provided in Sections 3.1 and 8.1. Without limitation of the foregoing, it is agreed by EMWD and Metropolitan as follows:

3.10.1 **Limitation of Effect**.   Nothing in this Agreement confers jurisdiction on any State court except as provided in Section 8.1.  The Parties explicitly acknowledge and agree that the enforcement of such terms, conditions and obligations of this Agreement shall be solely pursuant to the dispute resolution provisions of this Agreement in Section 8.1 and not through any other mechanism.

3.10.2 **No Entry Without Notice**.   Except for entry upon rights-of-way for their facilities or in the event of an emergency, no employee acting in the course and scope of their employment or agent acting on behalf of Metropolitan or EMWD shall enter onto the Reservation for any purpose without written permission from Pechanga authorizing such entry. In seeking such written permission, Metropolitan or EMWD shall provide Pechanga with at least forty-eight (48) hours written notice of their request to enter the Reservation, such notice to specifically indicate the purpose of the requested entry and the names of the individuals for whom permission to enter is sought.  In the event of an emergency, Metropolitan or EMWD will provide as much notice as feasible.   Any individual for whom permission to enter the Reservation is granted by Pechanga shall be accompanied in such entry by a designated individual representing Pechanga.

**3.11    EMWD Preferential Rights.**   For purposes of calculating EMWD's preferential right to purchase water pursuant to section 135 of the Metropolitan Water District Act (Stats. 1969, Ch. 209, as amended), EMWD's payments to Metropolitan in lieu of taxes and other assessments for the capital cost and operating expense of Metropolitan's works that would otherwise be payable on the Consolidated Area lands except for the sovereignty of the Pechanga shall be included.  Nothing in this Agreement, affects Metropolitan's right to include any of its rate components, including but not limited to the Readiness-to-Serve Charge and Capacity Charge, in its preferential right calculation.

## 4.    Term.

This Agreement shall become effective on the Effective Date when the last party signs and shall remain in effect until any party terminates it per Section 5 below or the area is deannexed or otherwise removed from Metropolitan and EMWD's service areas and the provision of water ceases. This Agreement may be terminated only in accordance with Section 5 or Section 9.3. Notwithstanding the foregoing, suspension of water provisions shall be available as a remedy for breach of this Agreement until the breach that caused the suspension has ceased.

EXHIBIT 1
Page 174

5.    **Termination.**

    **5.1    Written Agreement.**  This Agreement may be terminated at any time by written agreement signed by the Parties.

    **5.2    Pechanga Alternate Supply.**  This Agreement may be terminated upon thirty (30) days written notice given by Metropolitan or EMWD to Pechanga in the event that Pechanga:  (a) enters into any arrangement with any party that would reduce the amount of Colorado River or State Water Project water available to Metropolitan, or (b) enters into an arrangement with another entity to receive water supplied directly or indirectly by Metropolitan to that entity, or (c) obtains by arrangement a supplemental supply of water for the Consolidated Area from another source, or (d) the Consolidated Area, or any portion thereof, shall be conveyed out of ownership of the United States in trust for Pechanga.  In the event of such termination, the provisions of this Agreement governing the Parties' financial obligations and allocation of liability, as well as the general provisions, shall continue until the specified obligations have been fulfilled.

    **5.3    Settlement Act.**  This Agreement shall be automatically terminated in the event: (1) the waivers and releases of claims authorized by the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act (Subtitle D of Title III of Public Law No. 114-322) expire pursuant to section 3407(g) of said Act; (2)  Pechanga seeks congressional authorization for off-Reservation transfer or sale of water sold and provided by Metropolitan and EMWD to Pechanga pursuant to this Agreement and the ESAA Water Delivery Agreement; or (3) upon expiration of the Act pursuant to section 3412 of the Act.

    **5.4    Off-Reservation Uses.**    Except for uses allowed in Preambles I and J and Sections 3.1 and 3.9, Metropolitan or EMWD may terminate this Agreement in the event Pechanga sells, exchanges, or uses Imported Water outside the Consolidated Area or its Tribal Water Right outside the Reservation.

6.    **Record-Keeping.**  Each Party shall maintain and, upon reasonable advance notice, shall make available for inspection and audit by the other Parties during regular office hours, accurate records pertaining to the times and quantities of sales and provision of water under this Agreement.

7.    **Obligation to Work in Good Faith.**  Each Party shall have the obligation to work in good faith to satisfy the conditions of this Agreement and to attempt in good faith to informally resolve any disputes under this Agreement.

8.    **Disputes.**

    **8.1    Dispute Resolution and Limited Waiver of Sovereign Immunity.**

        **8.1.1**    The Parties agree that in the event of a dispute, the parties shall make a good faith effort to meet in person to resolve any disputes arising under this Agreement. However, if the parties are unable to reach a mutually acceptable resolution, the Parties agree to submit the dispute to the United States District Court for the Southern District of California, or in the event the district court cannot accept jurisdiction, the Superior Court of California for

EXHIBIT 1
Page 175

Riverside County.  Pechanga hereby grants a limited waiver of sovereign immunity solely to Metropolitan and EMWD as follows:

      i. Waiver is limited to proceedings brought for interpretation, violation or breach of this Agreement.

      ii. Waiver shall commence as of the effective date of this Agreement and shall terminate upon the termination, cancellation, or completion of each party's obligations to perform pursuant to this Agreement.

      iii. Waiver is granted solely and exclusively to Metropolitan and EMWD and not to any other individual or entity.

      iv. Waiver is limited to actual damages and shall not include any punitive or exemplary damages.

      v. Waiver is limited to the Pechanga Band of Luiseño Indians and does not waive the immunity of any other agency or instrumentality of the Tribe.

**8.1.2**   Counsel for Pechanga shall provide a written opinion that the waiver of sovereign immunity is effective and that this Agreement has been authorized and signed in a manner, which binds Pechanga to its terms.

**8.1.3**   Pechanga acknowledges that the waiver of sovereign immunity in this Section 8.1 is an essential term under this Agreement, without which EMWD and Metropolitan would not have entered into this Agreement.  Pechanga agrees that this Agreement shall automatically terminate without action by any party in the event that a claim of sovereign immunity, or a claim based on non-compliance with the requirements of 25 U.S.C. § 81, is raised by Pechanga or the United States in connection with the resolution of any dispute, claim, arbitration, or litigation arising from, or brought in connection with, this Agreement or any action taken to implement this Agreement or with regard to the obligation of the Tribe, as set forth in this Agreement, to comply with the provisions of Metropolitan's or EMWD's Administrative Code as they exist at the time of execution of this Agreement or may be modified in the future.

**8.1.4**   The Parties shall seek a determination from the Secretary of the Interior that this Agreement is not covered by 25 U.S.C. § 81, pursuant to subsection (c) thereof. Pechanga acknowledges that the assumption that this Agreement is not covered by section 81 and thus enforceable without Secretarial approval is an essential term under this Agreement, without which EMWD and Metropolitan would not have entered into this Agreement.  Pechanga agrees that this Agreement shall automatically terminate if it is determined that Secretarial approval is required and it is not obtained within 180 days of such a determination.

**8.1.5**   The Parties shall seek an order in the Fallbrook Adjudication, as part of the approval of the Pechanga Water Settlement Agreement, that would make interpretation and enforcement of this Agreement subject to the continuing jurisdiction of such court in the same manner as the Pechanga Water Settlement Agreement and any exhibits thereto.

**8.2**   **Presentation of Claim.**  Prior to bringing any action for money damages against EMWD or Metropolitan, Pechanga shall present a claim in accordance with the California Government Claims Act (Cal. Govt. Code Section 810, *et seq.*).

EXHIBIT 1
Page 176

**8.3** **Available Remedies.** In addition to specific remedies provided in this Agreement, any legal or equitable remedies for breach of contract shall be available to the Parties to this Agreement, except that termination of the Agreement shall not be a remedy except as provided in Sections 5.2, 8.1.3, 8.1.4, and 9.3, and monetary damages shall be limited as a remedy for a breach as provided in Section 9.3. In the event a final monetary judgment for a breach of the Agreement is entered against Pechanga, no judgment lien shall be enforceable against any Reservation lands, but Imported Water provided pursuant to this Agreement may be suspended until the judgment is paid in full.

9. **General Representations and Warranties; Covenants.**

   9.1 **Representations and Warranties of the Parties.**

   Each Party represents and warrants to the other Parties as follows:

   **9.1.1** Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action of such Party.

   **9.1.2** It is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

   **9.1.3** This Agreement constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms.

   **9.1.4** There is no pending or threatened action or proceeding against or affecting such Party before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the ability of such Party to perform its obligations under this Agreement.

   9.2 **Covenants.** Each Party represents and warrants to, and covenants with, each of the other Parties that it will undertake, implement, pursue and complete diligently and in good faith all actions required to cause the Delivery Commencement Date to occur, and will cooperate with each other Party to enable such other Party to comply with the foregoing covenant. Without limitation of the foregoing, each of EMWD and Metropolitan represents and warrants to, and covenants with, Pechanga that it will promptly undertake and diligently pursue all applications, procedures and processes that may be required to obtain third party approvals required to be obtained by it in order to implement this Agreement, including certification by the appropriate Local Agency Formation Commission of the boundaries of the Consolidated Area and registration thereof. In addition to the restriction set forth in section 3405(b)(2) of the Settlement Act, Pechanga covenants with EMWD and Metropolitan that Imported Water shall only be used on the Consolidated Area, and shall not be put to a use that directly or indirectly benefits areas outside the Consolidated Area and the Tribal Water Rights shall not be used outside the Reservation or used in any manner that directly or indirectly benefits areas outside the Reservation except as provided in Preambles I and J and Sections 3.1 and 3.9.

   9.3 **Breach of Representation, Warranty or Covenant.** Any representation or warranty made by a Party in Section 9.1 that shall prove to have been incorrect in any material

EXHIBIT 1
Page 177

respect as of the Effective Date, and any failure of a Party to perform in accordance with the covenants set forth in Section 9.2, shall constitute a material breach of this Agreement by the Party giving such representation, warranty or covenant and shall entitle any other Party to bring an action to terminate this Agreement or to have the Agreement declared void and unenforceable. No Party shall be entitled to recover monetary damages for making false representations or warranties set forth in Section 9.1 or breaching the covenants in Section 9.2.

## 10.    Miscellaneous Provisions.

**10.1    Release of Information.**    All press releases relating to this Agreement or the implementation of the transactions hereunder, and the method of the release for publication thereof, shall be subject to the prior approval of each of the Parties, which approval shall not be unreasonably withheld.  Notwithstanding the foregoing, Pechanga acknowledges that EMWD and Metropolitan are California governmental agencies subject to the California Public Records Act (Cal. Gov't Code §§ 6250, et seq.), and are obligated to provide copies of public records upon appropriate request.  It shall not be a breach of this Section for EMWD or Metropolitan to provide records pursuant to a request made in compliance with the California Public Records Act.  Metropolitan and EMWD will provide written notice and an opportunity to Pechanga to respond to any request so made.

**10.2    Assignment; Successors in Interest.**

**10.2.1**  No Party may assign or transfer any of its rights or obligations under this Agreement without the express written consent of the other Parties.

**10.2.2**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted assigns and successors in interest.

**10.3    No Third-Party Rights.**    The Parties do not intend, and this Agreement shall not be construed to, bind, inure to the benefit of or confer rights upon or grant remedies to any person, firm, corporation, public or private entity, or other party not a Party to this Agreement.

**10.4    Notice.**    All notices, requests, reports and other communications provided for or permitted to be given or made by a Party under this Agreement must be in writing signed by such Party's duly authorized representative, and must be given by personal delivery, or by certified or registered United States mail (postage prepaid, return receipt requested), addressed as follows or addressed to such other addressee or address as the Party to receive such notice shall have designated by written notice as required by this Section 10.4. Notice shall be deemed to have been effective and properly delivered or made on the earlier of (a) if given by personal delivery, the date of actual delivery, (b) if sent by certified or registered mail, the first business day that is at least four (4) calendar days after the notice or payment has been deposited in the U.S. mails in accordance with this Section 10.4:

If to Pechanga:

Mark Macarro
Chairman
Pechanga Band of Luiseño Indians

EXHIBIT 1
Page 178

P.O. Box 1477
Temecula, CA 92593

With a copy to:

General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA 92592


If to EMWD:

Paul D. Jones II
General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA 92572-8300


If to MWD:

General Manager
The Metropolitan Water District of Southern California
        By personal service or overnight delivery:
                700 North Alameda Street
                Los Angeles, CA 90012-2944
        By U.S. mail:
                P.O. Box 54153
                Los Angeles, CA 90054-0153

With a copy to:

Manager, Water Resource Management Group
The Metropolitan Water District of Southern California
        By personal service or overnight delivery:
                700 North Alameda Street
                Los Angeles, CA 90012-2944
        By U.S. mail:
                P.O. Box 54153
                Los Angeles, CA 90054-0153

    **10.5**   **Uncontrollable Force.**  No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when a failure of performance shall be due to an uncontrollable force. The term "***uncontrollable force***" shall mean an action of the elements, the act or threat of any public enemy; Acts of God; court order; war and war defense conditions; and strikes or other labor disputes; or other causes beyond its control. Each Party

EXHIBIT 1
Page 179

shall use reasonable diligence to avoid any such delay or default and to resume performance under this Agreement as promptly as possible after any such delay or default. However, nothing contained herein shall be construed so as to require a Party to settle any strike or labor dispute in which it may be involved. A Party rendered unable to fulfill any of its obligations under this Agreement by reason of an uncontrollable force shall give prompt written notice of such fact to the other Parties and shall exercise due diligence to remove such inability to the fullest extent practicable with all reasonable dispatch.

### 10.6   Entire Agreement; Exclusivity.

**10.6.1 Entire Agreement Among the Parties.** This Agreement, together with the Exhibits, constitutes the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior understandings, agreements, statements, contracts, or representations by or among the Parties and their agents, written or oral, to the extent they relate to the subject matter hereof.

**10.6.2 Exclusivity of Terms and Conditions of Service.** This Agreement, and the ESAA Water Delivery Agreement, exclusively shall govern the terms and conditions of the sale and provision of water by EMWD to Pechanga.

**10.7   Amendments.** No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement shall be valid, unless the same is in writing and signed by the Parties. Notwithstanding this provision, Pechanga acknowledges and contractually agrees to comply with the terms and conditions for service as set forth in the MWD and EMWD Administrative Codes as amended over time as is required of all other Metropolitan and EMWD customers. As set forth in Section 3.1, Pechanga also acknowledges and contractually agrees to comply with any other state or federal laws that apply to Metropolitan's or EMWD's provision of water as is required of all other Metropolitan and EMWD customers.

**10.8   Waivers.** No waiver by a Party of any breach by another Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any other term, condition or right, or as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or as a waiver of the future exercise by such Party of the same or any other right. Neither the failure nor any delay on the part of a Party to insist on the strict performance of any term or condition of this Agreement or to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy to the same extent as all other Metropolitan customers.

**10.9   Governing Law.** This Agreement shall be interpreted, governed by, and construed under and in accordance with all applicable federal and State of California laws, Metropolitan's Act and Administrative Code, the Municipal Water District Act (EMWD's enabling authority), EMWD's Administrative Code, and all contracts governing the provision of water under this Agreement.

**10.10 Severability.** The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the

EXHIBIT 1
Page 180

other provisions hereof; provided, however, that, if any provision of this Agreement, as applied to a Party or to any circumstance, is determined not to be enforceable in accordance with its terms, the Parties agree that the provision may be modified in a manner consistent with its objectives such that it is enforceable, and/or specific words or phrases may be deleted, and in its modified form, such provision will then be enforceable and will be enforced.

**10.11   Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

**10.12   Approvals.**   A conditional approval of this Agreement or of the transactions contemplated hereby by a Party or any third party shall not be effective unless accepted in writing by all Parties; and no Party shall be under any obligation to agree to any conditions imposed by another Party or a third party on its (their) approval of this Agreement or of the transactions contemplated hereby.

**IN WITNESS WHEREOF**, the Parties have caused this Extension Of Service Area Agreement to be executed.

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By:_____
Tribal Chairman

Date:_____

Approved as to form:                    By:_____
General Counsel

EXHIBIT 1
Page 181

EASTERN MUNICIPAL WATER DISTRICT

By:_____
General Manager

Date:_____

Approved as to form:      By:_____
General Counsel

THE METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA

By:_____
General Manager  *CHAIRMAN OF THE BOARD*

Date:_____

Approved as to form:      By:_____
General Counsel

EXHIBIT 1
Page 182

Exhibit F-1

EXHIBIT 1
Page 183



Extension of Service Area Agreement
Exhibit F-1: Existing Area

EXHIBIT 1
Page 184

Exhibit F-2

EXHIBIT 1
Page 185



Extension of Service Area Agreement
Exhibit F-2: Extended Area

The Metropolitan Water District of Southern California
Engineering Services Group

EXHIBIT 1
Page 186

# Exhibit F-3

EXHIBIT 1
Page 187



Extension of Service Area Agreement
Exhibit F-3: Consolidated Area

EXHIBIT 1
Page 188

Exhibit F-4

EXHIBIT 1
Page 189

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

### RESOLUTION NO. 2016-032

**A RESOLUTION OF THE BOARD OF DIRECTORS OF THE EASTERN MUNICIPAL WATER DISTRICT MAKING APPLICATION TO THE LOCAL AGENCY FORMATION COMMISSION OF RIVERSIDE COUNTY FOR A REORGANIZATION PROCEEDING WHICH WILL RESULT IN THE CONCURRENT ANNEXATION OF CERTAIN PROPERTY OF EMWD AND MWD SERVICE AREA**

**WHEREAS**, Eastern Municipal Water District (EMWD) is duly organized and exists under the provisions of the Municipal Water District Law of 1911 (Water Code, Section 71000 et seq.); and

**WHEREAS**, at the request of the beneficial owner of the property, the Pechanga Band of Luiseño Mission Indians, the Board of Directors of EMWD desires to initiate proceedings for the concurrent annexation to the certain territory hereinafter described and designated as the 106th Fringe Area to EMWD and MWD; and

**WHEREAS**, it has been determined that EMWD shall have service responsibility for the provision of water and sewer services in the territory described herein, and that, for the provision of such services, there shall not be any exchange of property tax revenue within the territory.

**NOW, THEREFORE, THE BOARD OF DIRECTORS OF EASTERN MUNICIPAL WATER DISTRICT, DOES HEREBY RESOLVE, DETERMINE AND ORDER AS FOLLOWS**:

1.     The Local Agency Formation Commission of Riverside County, California be hereby requested to initiate and pursue to completion a Reorganization proceeding, pursuant to the applicable provisions of the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (Section 56000 *et seq.*, of the Government Code of the State of California), which will result in concurrent annexation of the 106th Fringe Area within EMWD and MWD service area;

2.     The proposed 106th Fringe Area is materially developed, and a description of the boundaries of the territory is set forth in Exhibit D.

3.     This proposal is consistent with the sphere of influence of EMWD and MWD;

4.     The terms and conditions to be associated with such Reorganization are that:

a.     The owner(s) of the subject property shall be obligated to pay EMWD such sums of money as are in the future determined by EMWD's Board of Directors to be necessary to cover all of the District's expenses associated with the subject Reorganization proceedings, such payments to be paid prior to the completion of the Reorganization proceedings; and

b.     MWD shall, under terms and conditions fixed by its Board of Directors, concurrently extended service to the subject property;

5.     The reasons for the proposed Reorganization are:

EXHIBIT 1
Page 190

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

a.    A final settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed. More specifically, the Pechanga Settlement Act satisfies Pechanga's claims against Rancho California Water District and the United States. EMWD and MWD, can fulfill the terms and conditions of said Settlement Act by providing water service to the subject property, in accordance with to the terms and conditions of the respective agencies; and

b.    As the subject property develops in the future, it may require additional utility-type sewer collection, treatment and disposal system facilities and service. EMWD's current programs provide sewer facilities and service; any future expansion would be covered under the same programs;

6.    This Board certifies that this project meets the criteria for Categorical Exemption provided for within CEQA Guidelines Section 15301 and 15319;

7.    It is hereby requested that proceedings for annexation to EMWD and MWD's service area proposed herein be taken; and

8.    There will be no transfer of ad valorem property tax revenue as a result of the concurrent annexation of subject territory, which is legally described on Exhibit D, to EMWD: and

9.    The Secretary of EMWD is hereby authorized and directed to file a certified copy of this Resolution with the Executive Officer of the Local Agency Formation Commission of Riverside County, California.

10.    This Resolution shall be effective upon its adoption.

DATED:    March 16, 2016

Randy A. Record, President

I hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the Eastern Municipal Water District at its meeting held on March 16, 2016.

ATTEST:

Sheila Zelaya, Board Secretary

(SEAL)

2

EXHIBIT 1
Page 191

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

## RESOLUTION NO. 2016-033

**A RESOLUTION OF THE BOARD OF DIRECTORS OF EASTERN MUNICIPAL WATER DISTRICT MAKING APPLICATION TO THE BOARD OF DIRECTORS OF THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA FOR CONSENT TO ANNEX THE 106TH FRINGE AREA CONCURRENTLY TO EASTERN MUNICIPAL WATER DISTRICT AND THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA**

**WHEREAS**, Eastern Municipal Water District (EMWD) is duly organized and exists under the provisions of the Municipal Water District Law of 1911 (Water Code, Section 71000 et seq.); and

**WHEREAS**, Pechanga Band of Luiseño Mission Indians, a federally recognized Indian tribe and the beneficial owner(s) of the property described in attached Exhibit D, requested service to said property, hereinafter referred to as the 106th Fringe Area, concurrently to The Metropolitan Water District of Southern California (MWD) and Eastern Municipal Water District (EMWD); and

**WHEREAS**, said territory is uninhabited in that fewer than twelve (12) registered voters reside therein; and

**WHEREAS**, this Board of Directors, by its Resolution, has initiated proceedings for the annexation to said territory to EMWD and MWD pursuant to the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (Section 56000, *et seq.* of the Government Code); and

**WHEREAS**, the Local Agency Formation Commission of Riverside County is designated as the Conducting Authority for said proposed service area extension; and

**WHEREAS**, MWD's Board of Directors must give its consent for the annexation, and fix the terms and conditions upon which said territory may become a part of MWD's service area.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Directors of EMWD as follows:

1. That EMWD does hereby apply to the Board of Directors of MWD for consent to an annexation to EMWD and concurrent annexation to MWD, that certain territory called the 106th Fringe Area, and for said Board of Directors to fix the terms and conditions for such annexation to MWD;

2. That the territory referred to as the 106th Fringe Area is located in the County of Riverside, State of California, and the exterior boundaries are more particularly described in attached Exhibit D; and

3. That the Secretary of EMWD is hereby directed to send a certified copy of this Resolution to the Board of Directors of MWD.

EXHIBIT 1
Page 192

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

    4.   This Resolution shall be effective upon its adoption.

DATED:     March 16, 2016

<div align="right">
Randy A. Record, President
</div>

    I hereby certify that the foregoing is a full, true and correct copy of the Resolution adopted by the Board of Directors of the Eastern Municipal Water District at its meeting held on March 16, 2016.

ATTEST:

Sheila Zelaya, Board Secretary

(SEAL)

2

EXHIBIT 1
Page 193

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

BEING A PORTION OF LITTLE TEMECULA RANCHO TOGETHER WITH A PORTION OF
SECTIONS 28, 29, 30, 32 AND 33 OF TOWNSHIP 8 SOUTH, RANGE 2 WEST, S.B.B&M. MORE
PARTICULARLY DESCRIBED AS FOLLOWS:
**COMMENCING** AT THE INTERSECTION OF THE CENTERLINE OF PECHANGA PARKWAY(PALA
ROAD PER RECORD OF SURVEY BOOK 54, PAGES 89 AND 90) AND THE  CENTERLINE OF VIA
EDUARDO AS SHOWN ON TRACT MAP 19939-2 FILED IN BOOK 170, PAGES 5 THROUGH 9
INCLUSIVE, BOTH RECORDS OF RIVERSIDE COUNTY, CALIFORNIA
**THENCE** SOUTHEASTERLY ALONG SAID CENTERLINE OF PECHANGA PARKWAY, ALSO BEING
THE SOUTHWESTERLY LINE OF 13TH FRINGE AREA ANNEXATION 1967, SOUTH
47°44'44"EAST, A DISTANCE OF 30.03 FEET TO THE **TRUE POINT OF BEGINNING** SAID POINT
BEING THE COMMON CORNER OF SAID TRACT MAP 19939-2 AND THE INDIAN RESERVATION
PECHANGA AS SHOWN ON SAID TRACT MAP;
**THENCE** CONTINUING ALONG SAID CENTERLINE OF PECHANGA PARKWAY AS SHOWN ON
SAID RECORD OF SURVEY AND SAID SOUTHWESTERLY LINE OF 13TH FRINGE AREA
ANNEXATION 1967 THE FOLLOWING COURSES, SOUTH 47°44'44" EAST, A DISTANCE OF
1,636.90 FEET;
**THENCE** SOUTH 45°15'08" EAST, A DISTANCE OF 1,094.51 FEET;
**THENCE** SOUTH 48°07'47" EAST, A DISTANCE OF 556.12 FEET;
**THENCE** SOUTH 46°10'38" EAST, A DISTANCE OF 553.25 FEET;
**THENCE** SOUTH 42°45'22" EAST, A DISTANCE OF 138.15 FEET;
**THENCE** SOUTH 41°34'47" EAST, A DISTANCE OF 675.67 FEET;
**THENCE** SOUTH 44°49'05" EAST, A DISTANCE OF 609.18 FEET;
**THENCE** SOUTH 43°00'59" EAST, A DISTANCE OF 452.29 FEET;
**THENCE** SOUTHWESTERLY LEAVING SAID CENTERLINE, SOUTH 85°00'58" WEST, A DISTANCE
OF 141.07 FEET;
**THENCE** NORTH 89°10'25" WEST, A DISTANCE OF 399.98 FEET;
**THENCE** SOUTH 86°38'11" WEST, A DISTANCE OF 45.33 FEET;
**THENCE** SOUTH 78°45'25" WEST, A DISTANCE OF 74.05 FEET;
**THENCE** SOUTH 76°55'49" WEST, A DISTANCE OF 267.72 FEET TO THE BEGINNING OF A NON
TANGENT CURVE CONCAVE NORTH, HAVING A RADIUS OF 544.69 FEET AND A RADIAL LINE
THAT BEARS NORTH 15°23'17" WEST;
**THENCE** WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 22°42'12" AND AN
ARC DISTANCE OF 215.83 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE
SOUTH, HAVING A RADIUS OF 216.44 FEET AND A RADIAL LINE THAT BEARS SOUTH 06°24'00"
WEST;
**THENCE** WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 36°47'50" AND AN
ARC DISTANCE OF 139.00 FEET;
**THENCE** SOUTH 57°44'11" WEST, A DISTANCE OF 88.00 FEET;
**THENCE** SOUTH 51°16'39" WEST, A DISTANCE OF 70.23 FEET;
**THENCE** SOUTH 46°51'07" WEST, A DISTANCE OF 44.97 FEET;
**THENCE** SOUTH 33°18'45" WEST, A DISTANCE OF 100.23 FEET;

Page 1 of 12

EXHIBIT 1
Page 194

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 66°50'37" WEST, A DISTANCE OF 226.39 FEET;
**THENCE** SOUTH 13°43'29" WEST, A DISTANCE OF 35.75 FEET;
**THENCE** SOUTH 75°32'33" WEST, A DISTANCE OF 55.25 FEET;
**THENCE** SOUTH 73°00'27" WEST, A DISTANCE OF 71.78 FEET;
**THENCE** NORTH 46°12'00" WEST, A DISTANCE OF 26.05 FEET;
**THENCE** SOUTH 42°28'04" WEST, A DISTANCE OF 26.20 FEET;
**THENCE** SOUTH 19°22'14" EAST, A DISTANCE OF 116.20 FEET;
**THENCE** SOUTH 71°04'44" EAST, A DISTANCE OF 151.55 FEET;
**THENCE** NORTH 68°23'44" EAST, A DISTANCE OF 300.60 FEET;
**THENCE** EAST, A DISTANCE OF 26.28 FEET;
**THENCE** SOUTH 78°47'39" EAST, A DISTANCE OF 39.85 FEET;
**THENCE** SOUTH 88°53'57" EAST, A DISTANCE OF 35.05 FEET;
**THENCE** NORTH 70°47'37" EAST, A DISTANCE OF 173.27 FEET;
**THENCE** NORTH 62°58'03" EAST, A DISTANCE OF 209.49 FEET;
**THENCE** NORTH 70°15'59" EAST, A DISTANCE OF 147.47 FEET;
**THENCE** NORTH 52°23'37" EAST, A DISTANCE OF 57.70 FEET;
**THENCE** NORTH 73°58'22" EAST, A DISTANCE OF 72.07 FEET;
**THENCE** SOUTH 83°09'46" EAST, A DISTANCE OF 43.60 FEET;
**THENCE** SOUTH 24°05'37" EAST, A DISTANCE OF 44.54 FEET;
**THENCE** SOUTH 00°14'20" EAST, A DISTANCE OF 64.84 FEET;
**THENCE** SOUTH 03°31'56" WEST, A DISTANCE OF 51.75 FEET;
**THENCE** SOUTH 06°42'02" WEST, A DISTANCE OF 122.62 FEET;
**THENCE** SOUTH 22°05'50" WEST, A DISTANCE OF 69.27 FEET;
**THENCE** SOUTH 06°08'19" WEST, A DISTANCE OF 427.84 FEET;
**THENCE** SOUTH 20°34'40" EAST, A DISTANCE OF 57.95 FEET;
**THENCE** SOUTH 49°34'44" EAST, A DISTANCE OF 91.24 FEET;
**THENCE** SOUTH 27°50'54" EAST, A DISTANCE OF 84.61 FEET;
**THENCE** SOUTH 07°11'23" EAST, A DISTANCE OF 65.17 FEET;
**THENCE** SOUTH 20°49'59" EAST, A DISTANCE OF 54.47 FEET;
**THENCE** SOUTH 19°17'24" EAST, A DISTANCE OF 94.74 FEET;
**THENCE** SOUTH 09°39'10" EAST, A DISTANCE OF 30.11 FEET;
**THENCE** SOUTH 07°12'19" WEST, A DISTANCE OF 28.35 FEET;
**THENCE** SOUTH 12°25'39" WEST, A DISTANCE OF 33.04 FEET;
**THENCE** SOUTH 16°42'45" EAST, A DISTANCE OF 24.73 FEET;
**THENCE** SOUTH 33°13'11" EAST, A DISTANCE OF 28.67 FEET;
**THENCE** SOUTH 03°30'49" EAST, A DISTANCE OF 32.52 FEET;
**THENCE** SOUTH 37°06'57" WEST, A DISTANCE OF 24.34 FEET;
**THENCE** SOUTH 69°34'59" WEST, A DISTANCE OF 25.79 FEET;
**THENCE** WEST, A DISTANCE OF 26.06 FEET;
**THENCE** SOUTH 09°01'53" WEST, A DISTANCE OF 47.89 FEET;
**THENCE** SOUTH 05°48'42" EAST, A DISTANCE OF 44.35 FEET;

Page 2 of 12

EXHIBIT 1
Page 195

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 06°02'23" WEST, A DISTANCE OF 37.79 FEET;
**THENCE** SOUTH 17°58'06" EAST, A DISTANCE OF 43.19 FEET;
**THENCE** SOUTH 07°08'13" EAST, A DISTANCE OF 45.59 FEET;
**THENCE** SOUTH 06°31'11" WEST, A DISTANCE OF 31.99 FEET;
**THENCE** SOUTH 57°40'18" EAST, A DISTANCE OF 10.63 FEET;
**THENCE** SOUTH 39°56'15" EAST, A DISTANCE OF 15.66 FEET;
**THENCE** SOUTH 01°14'44" EAST, A DISTANCE OF 25.10 FEET;
**THENCE** SOUTH 43°52'00" WEST, A DISTANCE OF 23.01 FEET;
**THENCE** SOUTH 00°36'18" EAST, A DISTANCE OF 96.60 FEET;
**THENCE** SOUTH 34°38'47" EAST, A DISTANCE OF 45.08 FEET;
**THENCE** SOUTH 69°52'45" EAST, A DISTANCE OF 22.41 FEET;
**THENCE** SOUTH 22°28'03" EAST, A DISTANCE OF 17.53 FEET;
**THENCE** SOUTH 00°27'28" WEST, A DISTANCE OF 38.48 FEET;
**THENCE** SOUTH 28°45'44" WEST, A DISTANCE OF 35.04 FEET;
**THENCE** SOUTH 18°57'05" WEST, A DISTANCE OF 67.21 FEET;
**THENCE** SOUTH 34°09'35" WEST, A DISTANCE OF 37.42 FEET;
**THENCE** SOUTH 75°58'15" WEST, A DISTANCE OF 76.98 FEET;
**THENCE** NORTH 67°38'13" WEST, A DISTANCE OF 21.77 FEET;
**THENCE** NORTH 75°24'16" WEST, A DISTANCE OF 19.56 FEET;
**THENCE** SOUTH 55°19'04" WEST, A DISTANCE OF 25.67 FEET;
**THENCE** SOUTH 72°46'19" WEST, A DISTANCE OF 54.16 FEET;
**THENCE** SOUTH 80°53'04" WEST, A DISTANCE OF 79.02 FEET;
**THENCE** SOUTH 83°46'02" WEST, A DISTANCE OF 35.28 FEET;
**THENCE** SOUTH 64°43'09" WEST, A DISTANCE OF 31.80 FEET;
**THENCE** SOUTH 38°57'19" WEST, A DISTANCE OF 46.68 FEET;
**THENCE** SOUTH 32°14'42" WEST, A DISTANCE OF 93.72 FEET;
**THENCE** SOUTH 54°12'42" WEST, A DISTANCE OF 30.23 FEET;
**THENCE** SOUTH 78°05'03" WEST, A DISTANCE OF 38.05 FEET;
**THENCE** NORTH 75°19'32" WEST, A DISTANCE OF 36.23 FEET;
**THENCE** NORTH 56°11'11" WEST, A DISTANCE OF 45.72 FEET;
**THENCE** NORTH 49°50'58" WEST, A DISTANCE OF 51.44 FEET;
**THENCE** NORTH 36°29'56" WEST, A DISTANCE OF 30.88 FEET;
**THENCE** NORTH 22°24'37" WEST, A DISTANCE OF 44.30 FEET;
**THENCE** NORTH 35°36'48" WEST, A DISTANCE OF 51.72 FEET;
**THENCE** NORTH 41°51'50" WEST, A DISTANCE OF 49.01 FEET;
**THENCE** NORTH 17°34'10" WEST, A DISTANCE OF 71.07 FEET;
**THENCE** NORTH 27°43'58" WEST, A DISTANCE OF 45.87 FEET;
**THENCE** NORTH 15°33'24" WEST, A DISTANCE OF 110.23 FEET;
**THENCE** NORTH 31°03'01" WEST, A DISTANCE OF 48.14 FEET;
**THENCE** NORTH 41°41'26" WEST, A DISTANCE OF 57.28 FEET;
**THENCE** NORTH 45°01'08" WEST, A DISTANCE OF 35.52 FEET;

Page 3 of 12

EXHIBIT 1
Page 196

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** NORTH 18°20'15" WEST, A DISTANCE OF 38.47 FEET;
**THENCE** NORTH 04°44'50" WEST, A DISTANCE OF 74.02 FEET;
**THENCE** NORTH 17°16'47" WEST, A DISTANCE OF 61.08 FEET;
**THENCE** NORTH 01°25'41" WEST, A DISTANCE OF 55.92 FEET;
**THENCE** NORTH 02°19'20" EAST, A DISTANCE OF 39.96 FEET;
**THENCE** NORTH 05°59'52" WEST, A DISTANCE OF 49.86 FEET;
**THENCE** NORTH 09°54'46" EAST, A DISTANCE OF 35.80 FEET;
**THENCE** NORTH 24°47'42" EAST, A DISTANCE OF 79.41 FEET;
**THENCE** NORTH 01°01'40" EAST, A DISTANCE OF 34.81 FEET;
**THENCE** NORTH 17°48'35" WEST, A DISTANCE OF 43.05 FEET;
**THENCE** NORTH 39°52'45" WEST, A DISTANCE OF 34.52 FEET;
**THENCE** NORTH 54°20'30" WEST, A DISTANCE OF 95.49 FEET;
**THENCE** NORTH 44°38'24" WEST, A DISTANCE OF 116.06 FEET;
**THENCE** SOUTH 19°26'35" EAST, A DISTANCE OF 108.20 FEET;
**THENCE** SOUTH 53°39'34" WEST, A DISTANCE OF 212.08 FEET;
**THENCE** NORTH 67°11'51" WEST, A DISTANCE OF 165.97 FEET;
**THENCE** SOUTH 53°23'43" WEST, A DISTANCE OF 220.98 FEET;
**THENCE** SOUTH 81°51'52" WEST, A DISTANCE OF 34.43 FEET;
**THENCE** NORTH 68°31'23" WEST, A DISTANCE OF 109.85 FEET;
**THENCE** NORTH 43°44'07" WEST, A DISTANCE OF 33.55 FEET;
**THENCE** NORTH 31°58'23" WEST, A DISTANCE OF 126.93 FEET;
**THENCE** NORTH 39°41'47" WEST, A DISTANCE OF 67.89 FEET;
**THENCE** NORTH 54°54'18" WEST, A DISTANCE OF 34.42 FEET;
**THENCE** NORTH 69°25'20" WEST, A DISTANCE OF 83.47 FEET;
**THENCE** NORTH 78°45'46" WEST, A DISTANCE OF 47.42 FEET;
**THENCE** SOUTH 81°45'48" WEST, A DISTANCE OF 98.33 FEET;
**THENCE** SOUTH 77°40'26" WEST, A DISTANCE OF 27.28 FEET;
**THENCE** NORTH 85°12'31" WEST, A DISTANCE OF 24.99 FEET;
**THENCE** NORTH 71°46'30" WEST, A DISTANCE OF 26.13 FEET;
**THENCE** NORTH 35°04'18" WEST, A DISTANCE OF 36.75 FEET;
**THENCE** NORTH 25°07'31" WEST, A DISTANCE OF 71.58 FEET;
**THENCE** NORTH 37°27'16" WEST, A DISTANCE OF 59.68 FEET;
**THENCE** NORTH 56°20'02" WEST, A DISTANCE OF 45.91 FEET;
**THENCE** NORTH 73°57'13" WEST, A DISTANCE OF 49.18 FEET;
**THENCE** NORTH 81°20'53" WEST, A DISTANCE OF 103.13 FEET;
**THENCE** NORTH 79°13'41" WEST, A DISTANCE OF 68.82 FEET;
**THENCE** SOUTH 22°01'08" WEST, A DISTANCE OF 120.61 FEET;
**THENCE** SOUTH 18°20'45" EAST, A DISTANCE OF 264.69 FEET;
**THENCE** SOUTH 47°40'30" EAST, A DISTANCE OF 23.96 FEET;
**THENCE** SOUTH 35°02'27" EAST, A DISTANCE OF 24.26 FEET;
**THENCE** SOUTH 27°49'54" EAST, A DISTANCE OF 26.05 FEET;
**THENCE** SOUTH 22°14'22" EAST, A DISTANCE OF 35.98 FEET;

Page 4 of 12

EXHIBIT 1
Page 197

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 33°51'36" EAST, A DISTANCE OF 7.89 FEET;
**THENCE** SOUTH 43°51'51" EAST, A DISTANCE OF 37.95 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE NORTHWEST, HAVING A RADIUS OF 59.20 FEET AND A RADIAL LINE THAT BEARS SOUTH 56°08'43" WEST;
**THENCE** SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 116°36'44" AND AN ARC DISTANCE OF 120.49 FEET;
**THENCE** SOUTH 80°17'33" WEST, A DISTANCE OF 25.47 FEET;
**THENCE** SOUTH 81°49'32" WEST, A DISTANCE OF 24.03 FEET;
**THENCE** SOUTH 80°16'23" WEST, A DISTANCE OF 51.78 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE NORTHEAST, HAVING A RADIUS OF 59.58 FEET AND A RADIAL LINE THAT BEARS NORTH 04°01'42" WEST;
**THENCE** NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 54°32'53" AND AN ARC DISTANCE OF 56.72 FEET;
**THENCE** NORTH 35°07'15" WEST, A DISTANCE OF 30.40 FEET;
**THENCE** NORTH 49°02'01" WEST, A DISTANCE OF 13.10 FEET;
**THENCE** NORTH 66°33'10" WEST, A DISTANCE OF 31.38 FEET;
**THENCE** NORTH 66°10'50" WEST, A DISTANCE OF 11.83 FEET;
**THENCE** NORTH 63°55'01" WEST, A DISTANCE OF 30.89 FEET;
**THENCE** NORTH 45°16'27" WEST, A DISTANCE OF 72.53 FEET;
**THENCE** NORTH 42°35'39" WEST, A DISTANCE OF 158.13 FEET;
**THENCE** NORTH 52°30'03" WEST, A DISTANCE OF 81.98 FEET;
**THENCE** NORTH 28°39'00" WEST, A DISTANCE OF 36.92 FEET;
**THENCE** NORTH 24°44'50" WEST, A DISTANCE OF 41.04 FEET;
**THENCE** NORTH 44°45'56" WEST, A DISTANCE OF 63.32 FEET;
**THENCE** NORTH 32°35'51" WEST, A DISTANCE OF 46.48 FEET;
**THENCE** NORTH 09°06'29" WEST, A DISTANCE OF 41.85 FEET;
**THENCE** NORTH 15°13'43" EAST, A DISTANCE OF 43.45 FEET;
**THENCE** NORTH 28°11'15" EAST, A DISTANCE OF 43.63 FEET;
**THENCE** NORTH 42°06'12" EAST, A DISTANCE OF 56.94 FEET;
**THENCE** NORTH 71°05'10" EAST, A DISTANCE OF 50.76 FEET;
**THENCE** NORTH 82°09'29" EAST, A DISTANCE OF 149.77 FEET;
**THENCE** SOUTH 88°56'08" EAST, A DISTANCE OF 20.09 FEET;
**THENCE** NORTH 17°31'49" WEST, A DISTANCE OF 21.80 FEET;
**THENCE** NORTH 61°08'03" EAST, A DISTANCE OF 32.12 FEET;
**THENCE** NORTH 30°12'26" WEST, A DISTANCE OF 52.63 FEET;
**THENCE** NORTH 43°42'37" WEST, A DISTANCE OF 43.99 FEET;
**THENCE** NORTH 23°14'44" WEST, A DISTANCE OF 61.47 FEET;
**THENCE** NORTH 62°47'35" WEST, A DISTANCE OF 22.20 FEET;
**THENCE** NORTH 87°07'06" WEST, A DISTANCE OF 80.75 FEET;
**THENCE** SOUTH 79°00'42" WEST, A DISTANCE OF 53.19 FEET;
**THENCE** NORTH 89°47'56" WEST, A DISTANCE OF 31.14 FEET;

Page 5 of 12

EXHIBIT 1
Page 198

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 72°48'20" WEST, A DISTANCE OF 30.78 FEET;
**THENCE** NORTH 60°53'23" WEST, A DISTANCE OF 16.99 FEET;
**THENCE** NORTH 16°32'43" WEST, A DISTANCE OF 19.52 FEET;
**THENCE** NORTH 08°26'32" EAST, A DISTANCE OF 130.99 FEET;
**THENCE** NORTH 12°47'58" WEST, A DISTANCE OF 26.92 FEET;
**THENCE** NORTH 37°43'48" WEST, A DISTANCE OF 58.04 FEET;
**THENCE** NORTH 53°10'42" WEST, A DISTANCE OF 34.27 FEET;
**THENCE** NORTH 88°36'06" WEST, A DISTANCE OF 27.76 FEET;
**THENCE** SOUTH 80°45'20" WEST, A DISTANCE OF 33.96 FEET;
**THENCE** NORTH 64°07'22" WEST, A DISTANCE OF 24.15 FEET;
**THENCE** NORTH 16°18'00" WEST, A DISTANCE OF 17.76 FEET;
**THENCE** NORTH 17°47'16" EAST, A DISTANCE OF 46.13 FEET;
**THENCE** NORTH 22°15'40" WEST, A DISTANCE OF 23.29 FEET;
**THENCE** NORTH 51°01'26" WEST, A DISTANCE OF 31.00 FEET;
**THENCE** NORTH 11°27'14" WEST, A DISTANCE OF 24.60 FEET;
**THENCE** NORTH 12°27'29" EAST, A DISTANCE OF 78.85 FEET;
**THENCE** NORTH 04°01'19" WEST, A DISTANCE OF 57.00 FEET;
**THENCE** NORTH 11°07'45" WEST, A DISTANCE OF 43.30 FEET;
**THENCE** NORTH 16°03'23" EAST, A DISTANCE OF 33.49 FEET;
**THENCE** NORTH 26°10'58" EAST, A DISTANCE OF 30.63 FEET;
**THENCE** NORTH 03°00'06" EAST, A DISTANCE OF 27.38 FEET;
**THENCE** NORTH 07°32'16" WEST, A DISTANCE OF 41.98 FEET;
**THENCE** NORTH 89°45'01" WEST, A DISTANCE OF 44.89 FEET;
**THENCE** NORTH 05°19'07" WEST, A DISTANCE OF 28.69 FEET;
**THENCE** NORTH 29°54'59" WEST, A DISTANCE OF 467.72 FEET;
**THENCE** NORTH 49°28'01" WEST, A DISTANCE OF 354.14 FEET;
**THENCE** NORTH 63°03'10" WEST, A DISTANCE OF 39.70 FEET;
**THENCE** NORTH 52°09'01" WEST, A DISTANCE OF 37.35 FEET;
**THENCE** SOUTH 40°38'20" WEST, A DISTANCE OF 430.71 FEET;
**THENCE** SOUTH 37°43'56" WEST, A DISTANCE OF 67.71 FEET;
**THENCE** SOUTH 50°53'07" WEST, A DISTANCE OF 101.53 FEET;
**THENCE** NORTH 84°57'42" WEST, A DISTANCE OF 46.05 FEET;
**THENCE** NORTH 60°20'51" WEST, A DISTANCE OF 44.51 FEET;
**THENCE** NORTH 09°32'40" WEST, A DISTANCE OF 56.96 FEET;
**THENCE** NORTH 86°56'10" WEST, A DISTANCE OF 25.22 FEET;
**THENCE** SOUTH 55°00'45" WEST, A DISTANCE OF 51.02 FEET;
**THENCE** NORTH 77°20'26" WEST, A DISTANCE OF 52.88 FEET;
**THENCE** NORTH 45°16'35" WEST, A DISTANCE OF 64.17 FEET;
**THENCE** NORTH 63°03'38" WEST, A DISTANCE OF 52.04 FEET;
**THENCE** NORTH 29°40'43" EAST, A DISTANCE OF 57.71 FEET;
**THENCE** NORTH 11°21'28" EAST, A DISTANCE OF 85.36 FEET;

EXHIBIT 1
Page 199

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** NORTH 34°15'27" EAST, A DISTANCE OF 121.56 FEET;
**THENCE** NORTH 37°31'43" EAST, A DISTANCE OF 58.68 FEET;
**THENCE** NORTH 38°15'56" WEST, A DISTANCE OF 164.21 FEET;
**THENCE** NORTH 44°05'38" WEST, A DISTANCE OF 132.74 FEET;
**THENCE** NORTH 52°55'04" EAST, A DISTANCE OF 52.60 FEET;
**THENCE** NORTH 71°31'10" EAST, A DISTANCE OF 60.47 FEET;
**THENCE** NORTH 81°03'14" EAST, A DISTANCE OF 139.31 FEET;
**THENCE** NORTH 89°14'53" EAST, A DISTANCE OF 62.57 FEET;
**THENCE** SOUTH 75°59'05" EAST, A DISTANCE OF 116.64 FEET;
**THENCE** SOUTH 87°01'42" EAST, A DISTANCE OF 19.20 FEET;
**THENCE** NORTH 28°20'49" EAST, A DISTANCE OF 24.69 FEET;
**THENCE** NORTH 62°21'34" WEST, A DISTANCE OF 34.07 FEET;
**THENCE** NORTH 73°19'11" WEST, A DISTANCE OF 99.86 FEET;
**THENCE** NORTH 78°30'40" WEST, A DISTANCE OF 57.91 FEET;
**THENCE** NORTH 62°25'44" WEST, A DISTANCE OF 48.47 FEET;
**THENCE** NORTH 50°29'14" WEST, A DISTANCE OF 82.29 FEET;
**THENCE** NORTH 55°05'17" WEST, A DISTANCE OF 66.34 FEET;
**THENCE** NORTH 43°43'29" WEST, A DISTANCE OF 31.03 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE EAST, HAVING A RADIUS OF 120.52 FEET AND A RADIAL LINE THAT BEARS NORTH 58°16'44" EAST;
**THENCE** NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 72°45'13" AND AN ARC DISTANCE OF 153.04 FEET;
**THENCE** NORTH 35°33'21" EAST, A DISTANCE OF 81.46 FEET;
**THENCE** NORTH 39°13'31" EAST, A DISTANCE OF 240.88 FEET;
**THENCE** NORTH 45°56'44" WEST, A DISTANCE OF 186.67 FEET;
**THENCE** NORTH 65°48'16" WEST, A DISTANCE OF 72.06 FEET;
**THENCE** NORTH 45°51'01" WEST, A DISTANCE OF 358.72 FEET;
**THENCE** NORTH 17°02'39" WEST, A DISTANCE OF 77.53 FEET;
**THENCE** NORTH 38°56'33" WEST, A DISTANCE OF 98.32 FEET;
**THENCE** NORTH 73°39'23" WEST, A DISTANCE OF 55.12 FEET;
**THENCE** NORTH 10°22'39" WEST, A DISTANCE OF 77.02 FEET;
**THENCE** NORTH 52°36'14" WEST, A DISTANCE OF 193.94 FEET;
**THENCE** SOUTH 62°57'56" WEST, A DISTANCE OF 37.49 FEET;
**THENCE** NORTH 89°49'17" WEST, A DISTANCE OF 31.81 FEET;
**THENCE** NORTH 76°30'52" WEST, A DISTANCE OF 19.57 FEET;
**THENCE** SOUTH 75°30'58" WEST, A DISTANCE OF 13.84 FEET;
**THENCE** SOUTH 08°47'41" EAST, A DISTANCE OF 27.17 FEET;
**THENCE** SOUTH 28°05'13" WEST, A DISTANCE OF 40.42 FEET;
**THENCE** SOUTH 80°21'35" WEST, A DISTANCE OF 154.72 FEET;
**THENCE** NORTH 85°07'52" WEST, A DISTANCE OF 52.26 FEET;
**THENCE** SOUTH 74°47'30" WEST, A DISTANCE OF 80.23 FEET;
**THENCE** SOUTH 89°47'52" WEST, A DISTANCE OF 77.08 FEET;

Page 7 of 12

EXHIBIT 1
Page 200

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 74°53'49" WEST, A DISTANCE OF 44.94 FEET;
**THENCE** SOUTH 57°47'55" WEST, A DISTANCE OF 42.54 FEET;
**THENCE** NORTH 84°34'19" WEST, A DISTANCE OF 22.26 FEET;
**THENCE** NORTH 52°23'00" WEST, A DISTANCE OF 44.89 FEET;
**THENCE** NORTH 47°22'56" WEST, A DISTANCE OF 47.69 FEET;
**THENCE** NORTH 73°26'11" WEST, A DISTANCE OF 44.65 FEET;
**THENCE** NORTH 72°50'36" WEST, A DISTANCE OF 24.00 FEET;
**THENCE** NORTH 42°43'50" WEST, A DISTANCE OF 24.56 FEET;
**THENCE** NORTH 20°39'11" WEST, A DISTANCE OF 19.63 FEET;
**THENCE** NORTH 02°45'28" WEST, A DISTANCE OF 52.03 FEET;
**THENCE** NORTH 39°43'14" WEST, A DISTANCE OF 19.57 FEET;
**THENCE** SOUTH 82°35'59" WEST, A DISTANCE OF 9.92 FEET;
**THENCE** SOUTH 68°20'10" WEST, A DISTANCE OF 85.30 FEET;
**THENCE** SOUTH 77°58'34" WEST, A DISTANCE OF 63.48 FEET;
**THENCE** NORTH 84°16'11" WEST, A DISTANCE OF 44.56 FEET;
**THENCE** NORTH 66°39'50" WEST, A DISTANCE OF 46.70 FEET;
**THENCE** NORTH 61°55'13" WEST, A DISTANCE OF 35.28 FEET;
**THENCE** NORTH 78°10'42" WEST, A DISTANCE OF 46.00 FEET;
**THENCE** NORTH 47°39'38" WEST, A DISTANCE OF 21.40 FEET;
**THENCE** NORTH 11°32'30" WEST, A DISTANCE OF 53.57 FEET;
**THENCE** NORTH 07°43'38" WEST, A DISTANCE OF 26.93 FEET;
**THENCE** NORTH 28°52'55" WEST, A DISTANCE OF 157.01 FEET;
**THENCE** NORTH 07°05'08" EAST, A DISTANCE OF 25.26 FEET;
**THENCE** NORTH 27°06'33" EAST, A DISTANCE OF 53.07 FEET;
**THENCE** NORTH 08°07'11" EAST, A DISTANCE OF 50.85 FEET;
**THENCE** NORTH 00°05'27" WEST, A DISTANCE OF 54.09 FEET;
**THENCE** NORTH 10°38'41" EAST, A DISTANCE OF 52.06 FEET;
**THENCE** NORTH 17°12'50" EAST, A DISTANCE OF 35.07 FEET;
**THENCE** NORTH 00°18'17" EAST, A DISTANCE OF 59.95 FEET;
**THENCE** NORTH 11°35'10" WEST, A DISTANCE OF 37.42 FEET;
**THENCE** NORTH 26°19'22" WEST, A DISTANCE OF 38.37 FEET;
**THENCE** NORTH 36°37'53" WEST, A DISTANCE OF 31.77 FEET;
**THENCE** NORTH 14°45'26" WEST, A DISTANCE OF 30.94 FEET;
**THENCE** NORTH 09°47'40" EAST, A DISTANCE OF 64.49 FEET;
**THENCE** NORTH 24°08'28" WEST, A DISTANCE OF 21.40 FEET;
**THENCE** NORTH 46°46'00" WEST, A DISTANCE OF 64.88 FEET;
**THENCE** NORTH 20°06'58" WEST, A DISTANCE OF 27.32 FEET;
**THENCE** NORTH 07°36'08" WEST, A DISTANCE OF 28.45 FEET;
**THENCE** NORTH 81°30'31" WEST, A DISTANCE OF 5.53 FEET;
**THENCE** SOUTH 19°02'14" WEST, A DISTANCE OF 47.28 FEET;
**THENCE** SOUTH 16°05'09" WEST, A DISTANCE OF 51.48 FEET;
**THENCE** SOUTH 35°28'03" WEST, A DISTANCE OF 66.35 FEET;

EXHIBIT 1
Page 201

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 41°10'25" WEST, A DISTANCE OF 25.17 FEET;
**THENCE** SOUTH 32°23'01" WEST, A DISTANCE OF 61.64 FEET;
**THENCE** SOUTH 57°08'48" WEST, A DISTANCE OF 29.71 FEET;
**THENCE** SOUTH 79°26'45" WEST, A DISTANCE OF 44.48 FEET;
**THENCE** NORTH 62°36'39" WEST, A DISTANCE OF 26.55 FEET;
**THENCE** NORTH 51°48'20" WEST, A DISTANCE OF 48.81 FEET;
**THENCE** NORTH 74°15'11" WEST, A DISTANCE OF 37.44 FEET;
**THENCE** NORTH 87°39'05" WEST, A DISTANCE OF 56.83 FEET;
**THENCE** NORTH 71°02'00" WEST, A DISTANCE OF 52.95 FEET;
**THENCE** SOUTH 57°46'31" WEST, A DISTANCE OF 23.70 FEET;
**THENCE** SOUTH 41°47'28" WEST, A DISTANCE OF 59.18 FEET;
**THENCE** SOUTH 34°56'19" WEST, A DISTANCE OF 24.97 FEET;
**THENCE** SOUTH 54°00'55" WEST, A DISTANCE OF 27.13 FEET;
**THENCE** SOUTH 83°21'03" WEST, A DISTANCE OF 30.93 FEET;
**THENCE** NORTH 84°10'48" WEST, A DISTANCE OF 33.29 FEET;
**THENCE** SOUTH 88°19'16" WEST, A DISTANCE OF 38.19 FEET;
**THENCE** NORTH 75°02'21" WEST, A DISTANCE OF 49.74 FEET;
**THENCE** NORTH 67°21'35" WEST, A DISTANCE OF 21.39 FEET;
**THENCE** SOUTH 80°11'49" WEST, A DISTANCE OF 19.16 FEET;
**THENCE** SOUTH 36°14'51" WEST, A DISTANCE OF 16.35 FEET;
**THENCE** SOUTH 08°01'24" WEST, A DISTANCE OF 28.55 FEET;
**THENCE** SOUTH 45°11'22" WEST, A DISTANCE OF 22.52 FEET;
**THENCE** NORTH 87°10'58" WEST, A DISTANCE OF 18.46 FEET;
**THENCE** NORTH 54°27'38" WEST, A DISTANCE OF 21.08 FEET;
**THENCE** NORTH 29°05'56" WEST, A DISTANCE OF 33.34 FEET;
**THENCE** NORTH 09°21'18" WEST, A DISTANCE OF 66.42 FEET;
**THENCE** NORTH 01°24'30" WEST, A DISTANCE OF 140.84 FEET;
**THENCE** NORTH 78°21'49" WEST, A DISTANCE OF 39.91 FEET;
**THENCE** NORTH 00°40'45" WEST, A DISTANCE OF 35.11 FEET;
**THENCE** NORTH 85°11'56" EAST, A DISTANCE OF 33.89 FEET;
**THENCE** NORTH 10°37'17" WEST, A DISTANCE OF 266.22 FEET TO THE BEGINNING OF A NON
TANGENT CURVE CONCAVE EAST, HAVING A RADIUS OF 147.72 FEET AND A RADIAL LINE
THAT BEARS NORTH 79°25'24" EAST;
**THENCE** NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44°13'29" AND
AN ARC DISTANCE OF 114.02 FEET;
**THENCE** NORTH 21°48'52" WEST, A DISTANCE OF 29.88 FEET;
**THENCE** NORTH 16°18'30" WEST, A DISTANCE OF 26.35 FEET;
**THENCE** NORTH 37°29'35" WEST, A DISTANCE OF 41.61 FEET;
**THENCE** NORTH 46°08'36" WEST, A DISTANCE OF 74.38 FEET;
**THENCE** NORTH 46°02'22" WEST, A DISTANCE OF 67.60 FEET;
**THENCE** NORTH 50°37'35" WEST, A DISTANCE OF 20.11 FEET;
**THENCE** NORTH 60°31'48" WEST, A DISTANCE OF 16.84 FEET;

Page 9 of 12

EXHIBIT 1
Page 202

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** SOUTH 35°55'32" WEST, A DISTANCE OF 62.62 FEET;
**THENCE** SOUTH 45°18'12" WEST, A DISTANCE OF 17.11 FEET TO THE BEGINNING OF A
TANGENT CURVE CONCAVE NORTH,  HAVING A RADIUS OF 36.10 FEET;
**THENCE** WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 89°31'37", AND AN
ARC DISTANCE OF 56.41 FEET;
**THENCE** NORTH 44°33'39" WEST, A DISTANCE OF 39.19 FEET;
**THENCE** NORTH 40°42'11" WEST, A DISTANCE OF 18.41 FEET;
**THENCE** NORTH 66°44'23" WEST, A DISTANCE OF 39.74 FEET;
**THENCE** NORTH 80°20'41" WEST, A DISTANCE OF 60.38 FEET;
**THENCE** NORTH 38°25'27" WEST, A DISTANCE OF 14.75 FEET TO THE BEGINNING OF A NON
TANGENT CURVE CONCAVE SOUTH, HAVING A RADIUS OF 14.02 FEET AND A RADIAL LINE
THAT BEARS SOUTH 77°06'01" WEST;
**THENCE** WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 171°10'13" AND AN
ARC DISTANCE OF 41.88 FEET;
**THENCE** SOUTH 01°21'16" EAST, A DISTANCE OF 34.74 FEET;
**THENCE** SOUTH 11°58'52" WEST, A DISTANCE OF 55.48 FEET;
**THENCE** SOUTH 20°24'42" WEST, A DISTANCE OF 56.61 FEET;
**THENCE** SOUTH 15°56'36" WEST, A DISTANCE OF 63.36 FEET;
**THENCE** SOUTH 30°55'19" WEST, A DISTANCE OF 28.57 FEET;
**THENCE** SOUTH 44°33'26" WEST, A DISTANCE OF 34.63 FEET;
**THENCE** SOUTH 33°25'41" WEST, A DISTANCE OF 39.74 FEET;
**THENCE** SOUTH 53°25'18" WEST, A DISTANCE OF 59.15 FEET;
**THENCE** SOUTH 32°22'51" WEST, A DISTANCE OF 53.12 FEET;
**THENCE** SOUTH 38°45'16" WEST, A DISTANCE OF 48.46 FEET;
**THENCE** SOUTH 46°37'10" WEST, A DISTANCE OF 39.33 FEET;
**THENCE** SOUTH 26°26'45" WEST, A DISTANCE OF 32.80 FEET;
**THENCE** SOUTH 05°22'15" WEST, A DISTANCE OF 27.26 FEET;
**THENCE** SOUTH 22°40'20" EAST, A DISTANCE OF 53.57 FEET;
**THENCE** SOUTH 84°22'52" EAST, A DISTANCE OF 37.87 FEET;
**THENCE** SOUTH 02°42'58" WEST, A DISTANCE OF 33.86 FEET;
**THENCE** SOUTH 14°33'40" WEST, A DISTANCE OF 49.46 FEET;
**THENCE** SOUTH 11°38'35" EAST, A DISTANCE OF 37.87 FEET;
**THENCE** SOUTH 31°17'07" EAST, A DISTANCE OF 28.25 FEET;
**THENCE** SOUTH 40°57'47" EAST, A DISTANCE OF 131.06 FEET;
**THENCE** SOUTH 29°19'52" EAST, A DISTANCE OF 33.29 FEET;
**THENCE** SOUTH 01°38'36" EAST, A DISTANCE OF 20.46 FEET;
**THENCE** SOUTH 38°54'10" WEST, A DISTANCE OF 21.46 FEET;
**THENCE** SOUTH 71°10'34" WEST, A DISTANCE OF 77.44 FEET;
**THENCE** SOUTH 60°31'08" WEST, A DISTANCE OF 77.99 FEET;
**THENCE** SOUTH 77°56'00" WEST, A DISTANCE OF 44.87 FEET;

Page 10 of 12

EXHIBIT 1
Page 203

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** NORTH 75°00'06" WEST, A DISTANCE OF 44.59 FEET;
**THENCE** NORTH 56°12'31" WEST, A DISTANCE OF 28.67 FEET;
**THENCE** NORTH 33°37'00" WEST, A DISTANCE OF 57.87 FEET;
**THENCE** NORTH 44°22'23" WEST, A DISTANCE OF 53.06 FEET;
**THENCE** NORTH 52°53'58" WEST, A DISTANCE OF 95.54 FEET;
**THENCE** NORTH 47°55'14" WEST, A DISTANCE OF 43.57 FEET;
**THENCE** NORTH 64°37'08" WEST, A DISTANCE OF 51.81 FEET;
**THENCE** SOUTH 46°36'45" WEST, A DISTANCE OF 77.43 FEET;
**THENCE** SOUTH 23°25'28" WEST, A DISTANCE OF 25.71 FEET;
**THENCE** NORTH 65°13'25" WEST, A DISTANCE OF 25.39 FEET;
**THENCE** NORTH 55°10'13" WEST, A DISTANCE OF 158.42 FEET;
**THENCE** NORTH 27°57'45" WEST, A DISTANCE OF 198.72 FEET;
**THENCE** NORTH 15°36'51" WEST, A DISTANCE OF 292.65 FEET;
**THENCE** NORTH 30°58'41" WEST, A DISTANCE OF 83.20 FEET;
**THENCE** NORTH 01°41'58" WEST, A DISTANCE OF 19.58 FEET;
**THENCE** NORTH 26°25'09" EAST, A DISTANCE OF 60.09 FEET;
**THENCE** NORTH 05°15'09" EAST, A DISTANCE OF 35.84 FEET;
**THENCE** NORTH 01°34'28" WEST, A DISTANCE OF 38.85 FEET;
**THENCE** NORTH 08°27'38" EAST, A DISTANCE OF 31.27 FEET;
**THENCE** NORTH 00°01'30" EAST, A DISTANCE OF 30.52 FEET;
**THENCE** NORTH 22°09'40" EAST, A DISTANCE OF 29.30 FEET;
**THENCE** NORTH 44°50'31" EAST, A DISTANCE OF 46.20 FEET;
**THENCE** NORTH 59°10'58" EAST, A DISTANCE OF 56.06 FEET;
**THENCE** NORTH 68°05'06" EAST, A DISTANCE OF 21.60 FEET;
**THENCE** NORTH 15°32'41" EAST, A DISTANCE OF 79.99 FEET;
**THENCE** NORTH 41°12'35" EAST, A DISTANCE OF 39.80 FEET;
**THENCE** NORTH, A DISTANCE OF 92.63 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE EAST, HAVING A RADIUS OF 84.34 FEET AND A RADIAL LINE THAT BEARS NORTH 72°57'17" EAST;
**THENCE** NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 48°09'33" AND AN ARC DISTANCE OF 70.89 FEET TO A REVERSE CURVE CONCAVE SOUTHWEST HAVING A RADIUS OF 23.10 FEET AND A RADIAL LINE THAT BEARS NORTH 58°53'10" WEST;
**THENCE** NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 86°11'59" AND AN ARC DISTANCE OF 34.75 FEET TO A REVERSE CURVE CONCAVE EASTERLY HAVING A RADIUS OF 42.13 FEET AND A RADIAL LINE THAT BEARS NORTH 34°54'51" EAST;
**THENCE** NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 83°00'33" AND AN ARC DISTANCE OF 61.04 FEET;
**THENCE** NORTH 27°55'24" EAST, A DISTANCE OF 32.90 FEET;
**THENCE** NORTH 44°41'25" WEST, A DISTANCE OF 26.92 FEET;
**THENCE** NORTH 28°17'16" WEST, A DISTANCE OF 33.56 FEET;
**THENCE** NORTH 14°38'19" WEST, A DISTANCE OF 43.39 FEET;
**THENCE** NORTH 00°49'38" WEST, A DISTANCE OF 51.39 FEET;

Page 11 of 12

EXHIBIT 1
Page 204

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

# EXHIBIT

METROPOLITAN WATER DISTRICT
106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

**THENCE** NORTH 10°20'38" EAST, A DISTANCE OF 46.71 FEET;
**THENCE** NORTH 22°39'34" EAST, A DISTANCE OF 162.07 FEET TO A POINT ON THE LITTLE TEMECULA RANCHO LINE AS SHOWN ON PARCEL MAP 11533 FILED IN BOOK 63, PAGES 84 AND 85 RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, SAID RANCHO LINE ALSO BEING THE SOUTHEASTERLY LINE OF SAID 13TH FRINGE AREA ANNEXATION 1967;
**THENCE** NORTHEASTERLY ALONG SAID LINE, NORTH 34°05'49" EAST, A DISTANCE OF 528.27 FEET;
**THENCE** CONTINUING NORTHEASTERLY ALONG SAID LINE NORTH 34°05'49" EAST, A DISTANCE OF 333.06 FEET TO THE NORTHERLY CORNER OF LOT "A" OF SAID PARCEL MAP 11533, SAID NORTHERLY CORNER ALSO BEING THE WESTERLY CORNER OF 26TH FRINGE AREA ANNEXATION 1985;
**THENCE** SOUTHEASTERLY ALONG THE NORTHEASTERLY LINE OF PARCEL 1, LOTS "A", "D", "E", "F", AND "G" OF SAID PARCEL MAP 11533, ALSO BEING THE SOUTHWESTERLY LINE OF 26TH FRINGE AREA ANNEXATION 1985, SOUTH 47°44'42" EAST, A DISTANCE OF 3,857.78 FEET;
**THENCE** NORTHEASTERLY LEAVING SAID LINE AND ALONG THE SOUTHEASTERLY LINE OF SAID 26TH FRINGE AREA ANNEXATION 1985, NORTH 43°47'26" EAST, A DISTANCE OF 1,943.65 FEET TO THE **TRUE POINT OF BEGINNING**.

**EXCEPTING** THEREFROM THE "25TH FRINGE AREA ANNEXATION 1983" LYING WITHIN SAID DESCRIBED ABOVE PARCEL.

CONTAINING 457.89 ACRES, MORE OR LESS.

AS SHOWN ON EXHIBIT "B" ATTACHED HERETO MADE A PART THEREOF.

2 MARCH-16

DENNIS W. JANDA                    DATED
PLS. 6359

The Metropolitan Water District
of Southern California
Geodetics & Mapping Team
ANNEXATION - CONDITIONAL REV
Reviewer: B.G.   Date: 3/7/16

Page 12 of 12

EXHIBIT 1
Page 205

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals



EXHIBIT 1
Page 206



EXHIBIT 1
Page 207

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals



# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 3 OF 9

METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

SCALE:1"=400'

EXHIBIT 1
Page 208

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals



# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 4 OF 9

25TH FRINGE AREA
ANNEXATION 1983

SEE SHEET 3

SEE SHEET 5

SEE SHEET 3

PECHANGA PKWY

SCALE: 1" = 400'

METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

EXHIBIT 1
Page 209

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 5 OF 9



METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

SCALE: 1'=400'

EXHIBIT 1
Page 210



EXHIBIT 1
Page 211

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 7 OF 9

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L1 | N47°44'44"W | 1636.90' |
| L2 | N45°15'08"W | 1094.51' |
| L3 | N48°07'47"W | 556.12' |
| L4 | N46°10'38"W | 553.25' |
| L5 | N42°45'22"W | 138.15' |
| L6 | N41°34'47"W | 675.67' |
| L7 | N44°49'05"W | 609.18' |
| L8 | N43°00'59"W | 452.29' |
| L9 | N85°00'58"E | 141.07' |
| L10 | N89°10'25"W | 399.98' |
| L11 | N86°38'11"E | 45.33' |
| L12 | N78°45'25"E | 74.05' |
| L13 | N76°55'49"E | 267.72' |
| L14 | N57°44'11"E | 88.00' |
| L15 | N51°16'39"E | 70.23' |
| L16 | N46°51'07"E | 44.97' |
| L17 | N33°18'45"E | 100.23' |
| L18 | N66°50'37"E | 226.39' |
| L19 | N13°43'29"E | 35.75' |
| L20 | N75°32'33"E | 55.25' |
| L21 | N73°00'27"E | 71.78' |
| L22 | N46°12'00"W | 26.05' |
| L23 | N42°28'04"E | 26.20' |
| L24 | N19°22'14"W | 116.20' |
| L25 | N71°04'44"W | 151.55' |
| L26 | N68°23'44"E | 300.60' |
| L27 | N90°00'00"W | 26.28' |
| L28 | N78°47'39"W | 39.85' |
| L29 | N88°53'57"W | 35.05' |
| L30 | N70°47'37"E | 173.27' |
| L31 | N62°58'03"E | 209.49' |
| L32 | N70°15'59"E | 147.47' |
| L33 | N52°23'37"E | 57.70' |
| L34 | N73°58'22"E | 72.07' |
| L35 | N83°09'46"W | 43.60' |
| L36 | N24°05'37"W | 44.54' |
| L37 | N00°14'20"W | 64.84' |
| L38 | N03°31'56"E | 51.75' |
| L39 | N06°42'02"E | 122.62' |
| L40 | N22°05'50"E | 69.27' |
| L41 | N06°08'19"E | 427.84' |
| L42 | N20°34'40"W | 57.95' |
| L43 | N49°34'44"W | 91.24' |
| L44 | N27°50'54"W | 84.61' |
| L45 | N07°11'23"W | 65.17' |
| L46 | N20°49'59"W | 54.47' |
| L47 | N19°17'24"W | 94.74' |
| L48 | N09°39'10"W | 30.11' |
| L49 | N07°12'19"E | 28.35' |
| L50 | N12°25'39"E | 33.04' |
| L51 | N16°42'45"W | 24.73' |
| L52 | N33°13'11"W | 28.67' |
| L53 | N03°30'49"W | 32.52' |
| L54 | N37°06'57"E | 24.34' |
| L55 | N69°34'59"E | 25.79' |
| L56 | N90°00'00"W | 26.06' |
| L57 | N09°01'53"E | 47.89' |
| L58 | N05°48'42"W | 44.35' |

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L59 | N06°02'23"E | 37.79' |
| L60 | N17°58'06"W | 43.19' |
| L61 | N07°08'13"W | 45.59' |
| L62 | N06°31'11"E | 31.99' |
| L63 | N57°40'18"W | 10.63' |
| L64 | N39°56'15"W | 15.66' |
| L65 | N01°14'44"W | 25.10' |
| L66 | N43°52'00"E | 23.01' |
| L67 | N00°36'18"W | 96.60' |
| L68 | N34°38'47"W | 45.08' |
| L69 | N69°52'45"W | 22.41' |
| L70 | N22°28'03"W | 17.53' |
| L71 | N00°27'28"E | 38.48' |
| L72 | N28°45'44"E | 35.04' |
| L73 | N18°57'05"E | 67.21' |
| L74 | N34°09'35"E | 37.42' |
| L75 | N75°58'15"E | 76.98' |
| L76 | N67°38'13"W | 21.77' |
| L77 | N75°24'16"W | 19.56' |
| L78 | N55°19'04"E | 25.67' |
| L79 | N72°46'19"E | 54.16' |
| L80 | N80°53'04"E | 79.02' |
| L81 | N83°46'02"E | 35.28' |
| L82 | N64°43'09"E | 31.80' |
| L83 | N38°57'19"E | 46.68' |
| L84 | N32°14'42"E | 93.72' |
| L85 | N54°12'42"E | 30.23' |
| L86 | N78°05'03"E | 38.05' |
| L87 | N75°19'32"W | 36.23' |
| L88 | N56°11'11"W | 45.72' |
| L89 | N49°50'58"W | 51.44' |
| L90 | N36°29'56"W | 30.88' |
| L91 | N22°24'37"W | 44.30' |
| L92 | N35°36'48"W | 51.72' |
| L93 | N41°51'50"W | 49.01' |
| L94 | N17°34'10"W | 71.07' |
| L95 | N27°43'58"W | 45.87' |
| L96 | N15°33'24"W | 110.23' |
| L97 | N31°03'01"W | 48.14' |
| L98 | N41°41'26"W | 57.28' |
| L99 | N45°01'08"W | 35.52' |
| L100 | N18°20'15"W | 38.47' |
| L101 | N04°44'50"W | 74.02' |
| L102 | N17°16'47"W | 61.08' |
| L103 | N01°25'41"W | 55.92' |
| L104 | N02°19'20"E | 39.96' |
| L105 | N05°59'52"W | 49.86' |
| L106 | N09°54'46"E | 35.80' |
| L107 | N24°47'42"E | 79.41' |
| L108 | N01°01'40"E | 34.81' |
| L109 | N17°48'35"W | 43.05' |
| L110 | N39°52'45"W | 34.52' |
| L111 | N54°20'30"W | 95.49' |
| L112 | N44°38'24"W | 116.06' |
| L113 | N19°26'35"W | 108.20' |
| L114 | N53°39'34"E | 212.08' |

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L115 | N67°11'51"W | 165.97' |
| L116 | N53°23'43"E | 220.98' |
| L117 | N81°51'52"E | 34.43' |
| L118 | N68°31'23"W | 109.85' |
| L119 | N43°44'07"W | 33.55' |
| L120 | N31°58'23"W | 126.93' |
| L121 | N39°41'47"W | 67.89' |
| L122 | N54°54'18"W | 34.42' |
| L123 | N69°25'20"W | 83.47' |
| L124 | N78°45'46"W | 47.42' |
| L125 | N81°45'48"E | 98.33' |
| L126 | N77°40'26"E | 27.28' |
| L127 | N85°12'31"W | 24.99' |
| L128 | N71°46'30"W | 26.13' |
| L129 | N35°04'18"W | 36.75' |
| L130 | N25°07'31"W | 71.58' |
| L131 | N37°27'16"W | 59.68' |
| L132 | N56°20'02"W | 45.91' |
| L133 | N73°57'13"W | 49.18' |
| L134 | N81°20'53"W | 103.13' |
| L135 | N79°13'41"W | 68.82' |
| L136 | N22°01'08"E | 120.61' |
| L137 | N18°20'45"W | 264.69' |
| L138 | N47°40'30"W | 23.96' |
| L139 | N35°02'27"W | 24.26' |
| L140 | N27°49'54"W | 26.05' |
| L141 | N22°14'22"W | 35.98' |
| L142 | N33°51'36"W | 7.89' |
| L143 | N43°51'51"W | 37.95' |
| L144 | N80°17'33"E | 25.47' |
| L145 | N81°49'32"E | 24.03' |
| L146 | N80°16'23"E | 51.78' |
| L147 | N35°07'15"W | 30.40' |
| L148 | N49°02'01"W | 13.10' |
| L149 | N66°33'10"W | 31.38' |
| L150 | N66°10'50"W | 11.83' |
| L151 | N63°55'01"W | 30.89' |
| L152 | N45°16'27"W | 72.53' |
| L153 | N42°35'39"W | 158.13' |
| L154 | N52°30'03"W | 81.98' |
| L155 | N28°39'00"W | 36.92' |
| L156 | N24°44'50"W | 41.04' |
| L157 | N44°45'56"W | 63.32' |
| L158 | N32°35'51"W | 46.48' |
| L159 | N09°06'29"W | 41.85' |

METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

EXHIBIT 1
Page 212

Extension of Service Area Agreement
Exhibit F-4:    Required Approvals

# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 8 OF 9

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L160 | N15°13'43"E | 43.45' |
| L161 | N28°11'15"E | 43.63' |
| L162 | N42°06'12"E | 56.94' |
| L163 | N71°05'10"E | 50.76' |
| L164 | N82°09'29"E | 149.77' |
| L165 | N88°56'08"W | 20.09' |
| L166 | N17°31'49"W | 21.80' |
| L167 | N61°08'03"E | 32.12' |
| L168 | N30°12'26"W | 52.63' |
| L169 | N43°42'37"W | 43.99' |
| L170 | N23°14'44"W | 61.47' |
| L171 | N62°47'35"W | 22.20' |
| L172 | N87°07'06"W | 80.75' |
| L173 | N79°00'42"E | 53.19' |
| L174 | N89°47'56"W | 31.14' |
| L175 | N72°48'20"E | 30.78' |
| L176 | N60°53'23"W | 16.99' |
| L177 | N16°32'43"W | 19.52' |
| L178 | N08°26'32"E | 130.99' |
| L179 | N12°47'58"W | 26.92' |
| L180 | N37°43'48"W | 58.04' |
| L181 | N53°10'42"W | 34.27' |
| L182 | N88°36'06"W | 27.76' |
| L183 | N80°45'20"E | 33.96' |
| L184 | N64°07'22"W | 24.15' |
| L185 | N16°18'00"W | 17.76' |
| L186 | N17°47'16"E | 46.13' |
| L187 | N22°15'40"W | 23.29' |
| L188 | N51°01'26"W | 31.00' |
| L189 | N11°27'14"W | 24.60' |
| L190 | N12°27'29"E | 78.85' |
| L191 | N04°01'19"W | 57.00' |
| L192 | N11°07'45"W | 43.30' |
| L193 | N16°03'23"E | 33.49' |
| L194 | N26°10'58"E | 30.63' |
| L195 | N03°00'06"E | 27.38' |
| L196 | N07°32'16"W | 41.98' |
| L197 | N89°45'01"W | 44.89' |
| L198 | N05°19'07"H | 28.69' |
| L199 | N29°54'59"W | 467.72' |
| L200 | N49°28'01"W | 354.14' |
| L201 | N63°03'10"W | 39.70' |
| L202 | N52°09'01"W | 37.35' |
| L203 | N40°38'20"E | 430.71' |
| L204 | N37°43'56"E | 67.71' |
| L205 | N50°53'07"E | 101.53' |
| L206 | N84°57'42"W | 46.05' |
| L207 | N60°20'51"W | 44.51' |
| L208 | N09°32'40"W | 56.96' |
| L209 | N86°56'10"W | 25.22' |
| L210 | N55°00'45"E | 51.02' |
| L211 | N77°20'26"W | 52.88' |
| L212 | N45°16'35"W | 64.17' |
| L213 | N63°03'38"W | 52.04' |
| L214 | N29°40'43"E | 57.71' |
| L215 | N11°21'28"E | 85.36' |
| L216 | N34°15'27"E | 121.56' |
| L217 | N37°31'43"E | 58.68' |

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L218 | N38°15'56"W | 164.21' |
| L219 | N44°05'38"W | 132.74' |
| L220 | N52°55'04"E | 52.60' |
| L221 | N71°31'10"E | 60.47' |
| L222 | N81°03'14"E | 139.31' |
| L223 | N89°14'53"E | 62.57' |
| L224 | N75°59'05"W | 116.64' |
| L225 | N87°01'42"W | 19.20' |
| L226 | N28°20'49"E | 24.69' |
| L227 | N62°21'34"W | 34.07' |
| L228 | N73°19'11"W | 99.86' |
| L229 | N78°30'40"W | 57.91' |
| L230 | N62°25'44"W | 48.47' |
| L231 | N50°29'14"W | 82.29' |
| L232 | N55°05'17"W | 66.34' |
| L233 | N43°43'29"W | 31.03' |
| L234 | N35°33'21"E | 81.46' |
| L235 | N39°13'31"E | 240.88' |
| L236 | N45°56'44"W | 186.67' |
| L237 | N65°48'16"W | 72.06' |
| L238 | N45°51'01"W | 358.72' |
| L239 | N17°02'39"W | 77.53' |
| L240 | N38°56'33"W | 98.32' |
| L241 | N73°39'23"W | 55.12' |
| L242 | N10°22'39"W | 77.02' |
| L243 | N52°36'14"W | 193.94' |
| L244 | N62°57'56"E | 37.49' |
| L245 | N89°49'17"W | 31.81' |
| L246 | N76°30'52"W | 19.57' |
| L247 | N75°30'58"E | 13.84' |
| L248 | N08°47'41"W | 27.17' |
| L249 | N28°05'13"E | 40.42' |
| L250 | N80°21'35"E | 154.72' |
| L251 | N85°07'52"W | 52.26' |
| L252 | N74°47'30"E | 80.23' |
| L253 | N89°47'52"E | 77.08' |
| L254 | N74°53'49"E | 44.94' |
| L255 | N57°47'55"E | 42.54' |
| L256 | N84°34'19"W | 22.26' |
| L257 | N52°23'00"W | 44.89' |
| L258 | N47°22'56"W | 47.69' |
| L259 | N73°26'11"W | 44.65' |
| L260 | N72°50'36"W | 24.00' |
| L261 | N42°43'50"W | 24.56' |
| L262 | N20°39'11"W | 19.63' |
| L263 | N02°45'28"W | 52.03' |
| L264 | N39°43'14"W | 19.57' |
| L265 | N82°35'59"E | 9.92' |
| L266 | N68°20'10"E | 85.30' |
| L267 | N77°58'34"E | 63.48' |
| L268 | N84°16'11"W | 44.56' |
| L269 | N66°39'50"W | 46.70' |
| L270 | N61°55'13"W | 35.28' |
| L271 | N78°10'42"W | 46.00' |
| L272 | N47°39'38"W | 21.40' |
| L273 | N11°32'30"W | 53.57' |
| L274 | N07°43'38"W | 26.93' |

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L275 | N28°52'55"W | 157.01' |
| L276 | N07°05'08"E | 25.26' |
| L277 | N27°06'33"E | 53.07' |
| L278 | N08°07'11"E | 50.85' |
| L279 | N00°05'27"W | 54.09' |
| L280 | N10°38'41"E | 52.06' |
| L281 | N17°12'50"E | 35.07' |
| L282 | N00°18'17"E | 59.95' |
| L283 | N11°35'10"W | 37.42' |
| L284 | N26°19'22"W | 38.37' |
| L285 | N36°37'53"W | 31.77' |
| L286 | N14°45'26"W | 30.94' |
| L287 | N09°47'40"E | 64.49' |
| L288 | N24°08'28"W | 21.40' |
| L289 | N46°46'00"W | 64.88' |
| L290 | N20°06'58"W | 27.32' |
| L291 | N07°36'08"W | 28.45' |
| L292 | N81°30'31"W | 5.53' |
| L293 | N19°02'14"E | 47.28' |
| L294 | N16°05'09"E | 51.48' |
| L295 | N35°28'03"E | 66.35' |
| L296 | N41°10'25"E | 25.17' |
| L297 | N32°23'01"E | 61.64' |
| L298 | N57°08'48"E | 29.71' |
| L299 | N79°26'45"E | 44.48' |
| L300 | N62°36'39"W | 26.55' |
| L301 | N51°48'20"W | 48.81' |
| L302 | N74°15'11"W | 37.44' |
| L303 | N87°39'05"W | 56.83' |
| L304 | N71°02'00"W | 52.95' |
| L305 | N57°46'31"E | 23.70' |
| L306 | N41°47'28"E | 59.18' |
| L307 | N34°56'19"E | 24.97' |
| L308 | N54°00'55"E | 27.13' |
| L309 | N83°21'03"E | 30.93' |
| L310 | N84°10'48"W | 33.29' |
| L311 | N88°19'16"E | 38.19' |
| L312 | N75°02'21"W | 49.74' |
| L313 | N67°21'35"W | 21.39' |
| L314 | N80°11'49"E | 19.16' |
| L315 | N36°14'51"E | 16.35' |
| L316 | N08°01'24"E | 28.55' |
| L317 | N45°11'22"E | 22.52' |
| L318 | N87°10'58"W | 18.46' |
| L319 | N54°27'38"W | 21.08' |

METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

EXHIBIT 1
Page 213

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

# EXHIBIT
## THIS EXHIBIT IS TO BE ATTACHED TO THE LEGAL DESCRIPTION

SHEET 9 OF 9

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L320 | N29°05'56"W | 33.34' |
| L321 | N09°21'18"W | 66.42' |
| L322 | N01°24'30"W | 140.84' |
| L323 | N78°21'49"W | 39.91' |
| L324 | N00°40'45"W | 35.11' |
| L325 | N85°11'56"E | 33.89' |
| L326 | N10°37'17"W | 266.22' |
| L327 | N21°48'52"W | 29.88' |
| L328 | N16°18'30"W | 26.35' |
| L329 | N37°29'35"W | 41.61' |
| L330 | N46°08'36"W | 74.38' |
| L331 | N46°02'22"W | 67.60' |
| L332 | N50°37'35"W | 20.11' |
| L333 | N60°31'48"W | 16.84' |
| L334 | N35°55'32"E | 62.62' |
| L335 | N45°18'12"E | 17.11' |
| L336 | N44°33'39"W | 39.19' |
| L337 | N40°42'11"W | 18.41' |
| L338 | N66°44'23"W | 39.74' |
| L339 | N80°20'41"W | 60.38' |
| L340 | N38°25'27"W | 14.75' |
| L341 | N01°21'16"W | 34.74' |
| L342 | N11°58'52"E | 55.48' |
| L343 | N20°24'42"E | 56.61' |
| L344 | N15°56'36"E | 63.36' |
| L345 | N30°55'19"E | 28.57' |
| L346 | N44°33'26"E | 34.63' |
| L347 | N33°25'41"E | 39.74' |
| L348 | N53°25'18"E | 59.15' |
| L349 | N32°22'51"E | 53.12' |
| L350 | N38°45'16"E | 48.46' |
| L351 | N46°37'10"E | 39.33' |
| L352 | N26°26'45"E | 32.80' |
| L353 | N05°22'15"E | 27.26' |
| L354 | N22°40'20"W | 53.57' |
| L355 | N84°22'52"W | 37.87' |
| L356 | N02°42'58"E | 33.86' |
| L357 | N14°33'40"E | 49.46' |
| L358 | N11°38'35"W | 37.87' |
| L359 | N31°17'07"W | 28.25' |
| L360 | N40°57'47"W | 131.06' |
| L361 | N29°19'52"W | 33.29' |
| L362 | N01°38'36"W | 20.46' |
| L363 | N38°54'10"E | 21.46' |
| L364 | N71°10'34"E | 77.44' |
| L365 | N60°31'08"E | 77.99' |
| L366 | N77°56'00"E | 44.87' |
| L367 | N75°00'06"W | 44.59' |
| L368 | N56°12'31"W | 28.67' |
| L369 | N33°37'00"W | 57.87' |
| L370 | N44°22'23"W | 53.06' |
| L371 | N52°53'58"W | 95.54' |
| L372 | N47°55'14"W | 43.57' |
| L373 | N64°37'08"W | 51.81' |
| L374 | N46°36'45"E | 77.43' |
| L375 | N23°25'28"E | 25.71' |
| L376 | N65°13'25"W | 25.39' |
| L377 | N55°10'13"W | 158.42' |

### LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L378 | N27°57'45"W | 198.72' |
| L379 | N15°36'51"W | 292.65' |
| L380 | N30°58'41"W | 83.20' |
| L381 | N01°41'58"W | 19.58' |
| L382 | N26°25'09"E | 60.09' |
| L383 | N05°15'09"E | 35.84' |
| L384 | N01°34'28"W | 38.85' |
| L385 | N08°27'38"E | 31.27' |
| L386 | N00°01'30"E | 30.52' |
| L387 | N22°09'40"E | 29.30' |
| L388 | N44°50'31"E | 46.20' |
| L389 | N59°10'58"E | 56.06' |
| L390 | N68°05'06"E | 21.60' |
| L391 | N15°32'41"E | 79.99' |
| L392 | N41°12'35"E | 39.80' |
| L393 | N00°00'00"E | 92.63' |
| L394 | N27°55'24"E | 32.90' |
| L395 | N44°41'25"W | 26.92' |
| L396 | N28°17'16"W | 33.56' |
| L397 | N14°38'19"W | 43.39' |
| L398 | N00°49'38"W | 51.39' |
| L399 | N10°20'38"E | 46.71' |
| L400 | N22°39'34"E | 162.07' |
| L401 | N34°05'49"E | 528.27' |
| L402 | N34°05'49"E | 333.06' |
| L403 | N47°44'42"W | 3857.78' |
| L404 | N43°47'26"E | 1943.65' |

### CURVE TABLE

| CURVE | DELTA | RADIUS | LENGTH |
|-------|-------|--------|--------|
| C1 | 22°42'12" | 544.69' | 215.83' |
| C2 | 36°47'50" | 216.44' | 139.00' |
| C3 | 72°45'13" | 120.52' | 153.04' |
| C4 | 44°13'29" | 147.72' | 114.02' |
| C5 | 89°31'37" | 36.10' | 56.41' |
| C6 | 171°10'13" | 14.02' | 41.88' |
| C7 | 48°09'33" | 84.34' | 70.89' |
| C8 | 86°11'59" | 23.10' | 34.75' |
| C9 | 83°00'33" | 42.13' | 61.04' |
| C10 | 116°36'44" | 59.20' | 120.49' |
| C11 | 54°32'53" | 59.58' | 56.72' |

METROPOLITAN WATER DISTRICT

106TH FRINGE AREA TO EASTERN
MUNICIPAL WATER DISTRICT

PREPARED BY:
DENNIS JANDA, INC.
42164 REMINGTON AVE.
TEMECULA, CA 92590
951-699-8874

EXHIBIT 1
Page 214

Extension of Service Area Agreement
Exhibit F-4: CEQA Document

F I L E D / P O S T E D
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

E-201600206
02/24/2016 04:03 PM  Fee: $ 50.00
Page 1 of 2

Removed _____ By _____ Deputy

**Eastern Municipal Water District**

2270 Trumble Road
P.O. Box 8300
Perris, CA 92572-8300

## Notice of Exemption

**To:** Office of Planning and Research
1400 Tenth Street
P.O. Box 3044
Sacramento, CA 95812-3044

**To:** County Clerk
County of Riverside
27424 Gateway Drive
Riverside, CA 92502-0751

### Project Information

**Title:** **Pechanga Band of Luiseño Mission Indians Extension of Existing Service Area**

**Location:** Bounded north by Pechanga Parkway; west by Rainbow Canyon Road; south and east by the Pechanga Golf Course. Township 8 South, Range 2 West, Sections 19, 28, 29, 30, 32, 33; SBB&M.

**City:** Temecula

**County:** Riverside

**Description of Nature, Purpose, and Beneficiaries of Project:**

The purpose of the Pechanga Band of Luiseño Mission Indians Extension of Existing Service Area (proposed project) is to provide imported water service through Eastern Municipal Water District (Eastern) and Metropolitan Water District of Southern California (Metropolitan), with physical delivery provided through Rancho California Water District (Rancho). Both Eastern and Metropolitan are working with the Pechanga Band of Luiseño Mission Indians (Pechanga) to extend imported water service to reservation land within Pechanga's commercial zone, which includes a casino, parking lot, gas station with mini mart, recreation vehicle area, and golf course. The gross acreage of the overall commercial zone is approximately 458 acres including public roads. The net area of the commercial zone, minus any deductions for public roads subject to further confirmation, is estimated to be approximately 452 acres. The actual acreage would be confirmed when the map and legal description are finalized.

The proposed project is an extension of existing service area and would use the existing infrastructure for water delivery. There would be no new infrastructure developed through this proposed project. Should there be a future need for new infrastructure to be developed the appropriate CEQA analysis would be required at that time, as a separate action, independent of this proposed project.

The proposed project follows Pechanga Parkway on the north and Rainbow Canyon Road on the west boundaries; and the perimeter of the Journey at Pechanga golf course on the south and east border (Map Attached). The area consists of portions of parcels purchased from private property owners by Pechanga which grandfathered the original Assessor's Parcel Numbers (APN). A complete APN list can be found attached.

The extension of service area, will allow for public utility service offered through Eastern, Metropolitan and Rancho to provide imported water service to Pechanga's commercial zone. By extending the existing service area and providing imported water service, the proposed project would allow Pechanga to maintain the health and safety of the people they serve.

**Agency Approving and Carrying Out Project:**     Eastern Municipal Water District

**Exempt Status:**  ☑  Categorical Exemption (Section 15301(b))

**Exempt Status:**  ☑  Categorical Exemption (Section 15319(a))

**Reasons why project is exempt:**  The proposed project is an extension of existing service area, using existing infrastructure/facilities, and no development is proposed through this action. As a result it would not have a substantial adverse effect on the environment. This project meets the criteria for Categorical Exemption provided for within CEQA Guidelines §15301 and §15319.

EXHIBIT 1
Page 215

Extension of Service Area Agreement
Exhibit F-4:  CEQA Document

*Eastern Municipal Water District*
*Pechanga Band of Luiseño Mission Indians Extension of Existing Service Area*
*Notice of Exemption*
*Page 2*

**15301.     Existing Facilities**

*Class I includes the operation of existing public or private structures or facilities involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination.  Examples include but are not limited to:*

    *(b)   Existing facilities of both investor and publicly owned utilities used to provide electric power, natural gas, sewerage, or other public utility services.*

**15319.     Annexations of Existing Facilities and Lots for Exempt Facilities**

*Class 19 includes  the following annexations:*

    *(a)   Annexations to a city or special district of areas containing existing public or private structures developed to the density allowed by the current zoning or pre-zoning of either the gaining or losing governmental agency whichever is more restrictive, provided, however, that the extension of the utility service to existing facilities would have a capacity to serve only the existing facilities.*

**EMWD Contact Person:**     Helen Stratton, CEQA/NEPA Analyst II     **Phone:**     (951) 928-3777, ext 4545

Jayne Joy, P.E.
Director of Environmental and Regulatory Compliance

3/24/2016
Date

Date Received for filing at OPR:

EXHIBIT 1
Page 216

Extension of Service Area Agreement
Exhibit F-4: CEQA Document

EXHIBIT 1
Page 217

Extension of Service Area Agreement
Exhibit F-4:  CEQA Document

| No. | APN | Total Acres | ESA Acres |
|---:|---|---:|---:|
| 1 | 918-150-001 | 48.71 | 6.76 |
| 2 | 918-150-003 | 67.54 | 2.86 |
| 3 | 918-180-005 | 31.00 | 28.53 |
| 4 | 918-180-014 | 233.79 | 183.60 |
| 5 | 918-180-019 | 16.94 | 16.77 |
| 6 | 918-180-020 | 18.98 | 10.21 |
| 7 | 918-180-021 | 27.72 | 18.68 |
| 8 | 918-180-022 | 30.08 | 19.27 |
| 9 | 918-210-012 | 151.72 | 2.36 |
| 10 | 918-220-007 | 21.30 | 3.56 |
| 11 | 918-220-008 | 11.54 | 11.98 |
| 12 | 918-220-009 | 5.72 | 5.68 |
| 13 | 918-220-010 | 20.01 | 19.91 |
| 14 | 918-220-011 | 22.57 | 22.54 |
| 15 | 918-220-012 | 22.58 | 9.68 |
| 16 | 918-230-019 | 8.02 | 7.74 |
| 17 | 918-230-020 | 13.65 | 14.33 |
| 18 | 918-230-021 | 19.69 | 19.26 |
| 19 | 918-230-022 | 18.86 | 12.02 |
| 20 | 918-230-023 | 15.24 | 13.19 |
| 21 | 918-250-010 | 1.21 | 1.13 |
| 22 | 918-250-011 | 4.84 | 3.35 |
| 23 | 918-250-012 | 20.06 | 3.32 |
| 24 | 918-250-013 | 20.09 | 14.59 |
| 25 | 918-250-015 | 20.05 | 0.14 |

EXHIBIT 1
Page 218

### RESOLUTION 9207

RESOLUTION OF THE BOARD OF DIRECTORS OF
THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA
CONSENTING TO EASTERN MUNICIPAL WATER DISTRICT'S
106th FRINGE AREA ANNEXATION AND FIXING THE TERMS AND
CONDITIONS OF THE ANNEXATION TO
THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA

WHEREAS, the Board of Directors of the Eastern Municipal Water District ("Eastern"), a municipal water district, situated in the county of Riverside, state of California, pursuant to Resolution No. 2016-033 in accordance with the provisions of the Metropolitan Water District Act (MWD Act), has applied to the Board of Directors of The Metropolitan Water District of Southern California (Metropolitan) for consent to annex thereto certain territory situated in the county of Riverside referred to as the 106th Fringe Area, more particularly described in an application to the Riverside County Local Agency Formation Commission (LAFCO), concurrently with the annexation thereof to Eastern, such annexation to Metropolitan to be upon such terms and conditions as may be fixed by the Board of Directors of Metropolitan;

WHEREAS, the beneficial owner of the territory identified as a portion of the reservation lands of the Pechanga Band of Luiseño Mission Indians (Pechanga) and described in the Extension of Service Area Agreement (ESAA) (Property) has applied for inclusion into Eastern and Metropolitan;

WHEREAS, completion of said annexation shall be contingent upon approval by the LAFCO;

WHEREAS, in recognition of the inherent sovereignty of Pechanga as a tribal government, no ad valorem property taxes or property-related assessments shall be imposed on the Property, and instead, Pechanga will pay present value charges equivalent to taxes or assessments that otherwise would be levied;

WHEREAS, completion of said annexation shall be further contingent upon LAFCO conditioning its approval of the 106th Fringe Area upon a requirement that a charge for the present value of Metropolitan's existing and established taxes, benefit assessments, or property-related fees or charges in place in the service area, as identified below, are paid on the territory being annexed to the agency;

EXHIBIT 1
Page 219

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

WHEREAS, Metropolitan has levied and collected ad valorem taxes on parcels within the territory of Eastern.  Such charges for calendar year 2016 are described in Resolution 9195, adopted by Metropolitan's Board on August 18, 2015;

WHEREAS, since fiscal year 1992-93, Metropolitan has levied and collected water standby charges pursuant to Section 134.5 of the MWD Act on parcels within the territory of Eastern.  Such charges for fiscal year 2015-16 are described in Resolution 9191, adopted by Metropolitan's Board on May 12, 2015;

WHEREAS, upon annexation, the territory will be within Metropolitan's service area, Metropolitan's water will be available to such territory and such area will receive the benefit of the projects provided in part with proceeds of Metropolitan ad valorem taxes and water standby charges;

WHEREAS, as a requirement of this annexation and pursuant to the ESAA, the Pechanga will pay Metropolitan $2,896,442, which includes Metropolitan's per-acre annexation fee, a $5,000 processing fee, and $562,591 that represents the present value of the ad valorem taxes that otherwise would be levied;

WHEREAS, as a requirement of this annexation and pursuant to the ESAA, the Pechanga will pay Eastern $62,782.02, which represents the present value of the standby charges that otherwise would be levied, which will be used to offset the Readiness to Service Charges Eastern will owe Metropolitan for service to the Property.

WHEREAS, pursuant to the provisions of the California Environmental Quality Act (CEQA), Eastern determined that this proposed annexation was categorically exempt on February 24, 2016, and Metropolitan finds that this land contains existing private structures and that the extension of utility services to the existing facilities would have a capacity to serve only the existing facilities.  This extension of service also involves land of the minimum size for facilities exempted by Section 15303 in the State CEQA Guidelines.  In addition, the overall activities associated with the extension of service process consists of the operation, repair, maintenance, permitting, leasing, licensing or minor alteration of the existing private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of this determination.  Accordingly, the proposed action qualifies under two Categorical Exemptions (Sections 15301 and 15319 of the State CEQA Guidelines).; and

2

EXHIBIT 1
Page 220

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

WHEREAS, it appears to this Board of Directors that such application should be granted, subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of Metropolitan, acting as Responsible Agency, has reviewed and considered Eastern's request for extension of service in the 106th Fringe Area, and determined that the proposed action qualifies under two Categorical Exemptions (Class 1, Section 15301 and Class 19, Section 15319 of the State CEQA Guidelines) prior to approval of the final terms and conditions for extending the service for the 106th Fringe Area; and subject to the following terms and conditions and the terms of the ESAA, does hereby grant the application of the governing body of Eastern for consent to annex the 106th Fringe Area to Metropolitan and does hereby fix the terms and conditions;

Section 1.  The annexation of said area to Eastern shall be made concurrently with the service area annexation thereof to Metropolitan, and all necessary certificates, statements, maps, and other documents required to be filed by or on behalf of Eastern to effectuate the action shall be filed on or before December 31, 2018.

Section 2.  Prior to filing a request for a Certificate of Completion of the proceedings with LAFCO, Eastern shall submit a certified copy of LAFCO's resolution approving the service area annexation to the Member Agency, and Pechanga shall pay to Metropolitan $2,896,442 for its annexation fee, if the annexation is completed by December 31, 2016.  If the annexation is completed during the 2017 or 2018 calendar year, the annexation charge will be calculated based on the then-current rate, in accordance with Metropolitan's Administrative Code Section 3300.

Section 3.      a. Metropolitan shall be under no obligation to provide, construct, operate, or maintain feeder pipelines, structures, connections, and other facilities required for the delivery of water to said area from works owned and operated by Metropolitan.

b. Eastern shall not be entitled to demand that Metropolitan deliver water to Eastern for use, directly or indirectly, within said area, except for domestic or municipal use therein.

c. The delivery of all water by Metropolitan, regardless of the nature and time of use of such water shall be subject to the water service regulations, including rates and charges promulgated from time to time by Metropolitan.

3

EXHIBIT 1
Page 221

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals

         d. Except upon the terms and conditions specifically approved by the Board of Directors of Metropolitan and in the ESAA, water sold and delivered by Metropolitan shall not be used in any manner which intentionally or avoidably results in the direct or indirect benefit of areas outside Metropolitan, including use of such water outside Metropolitan or use thereof within Metropolitan in substitution for other water outside Metropolitan.

         Section 4.  LAFCO has conditioned approval of the annexation upon a requirement that Pechanga pay a charge equal to the present value of future payments for all previously established and collected taxes, benefit assessments, or property-related fees or charges on territory being annexed to the agency.

         Section 5.  That the Board of Directors of Metropolitan, acting as a Responsible Agency, has reviewed and considered Eastern's request for extension of service in the 106th Fringe Area, and determined that the proposed action qualifies under two Categorical Exemptions (Class 1, Section 15301 and Class 19, Section 15319 of the State CEQA Guidelines) prior to approval of the final terms and conditions for extending the service area for the 106th Fringe Area; and subject to the following terms and conditions, does hereby grant the application of the governing body of Eastern for consent to extend service to the 106th Fringe Area to Metropolitan and does hereby fix the terms and conditions.

         Section 6.  That the General Manager and General Counsel are hereby authorized to do all things necessary and desirable to accomplish the purposes of this resolution, including, without limitation, the commencement of defense of litigation.

         Section 7.  That if any provision of this resolution or the application to any member agency, property or person whatsoever is held invalid, that invalidity shall not affect the other provisions or applications of this resolution which can be given effect without the invalid portion or application, and to that end the provisions of this resolution are severable.

         BE IT FURTHER RESOLVED that the Board Executive Secretary is directed to transmit forthwith to the governing body of Eastern a certified copy of this resolution.

EXHIBIT 1
Page 222

Extension of Service Area Agreement
Exhibit F-4:   Required Approvals


I HEREBY CERTIFY that the foregoing is a full, true and correct copy of a resolution adopted by the Board of Directors of The Metropolitan Water District of Southern California, at its meeting held on April 12, 2016.


Secretary of the Board of Directors
of The Metropolitan Water District
of Southern California

5

EXHIBIT 1
Page 223

Exhibit F-5

EXHIBIT 1
Page 224



EXHIBIT 1
Page 225

Exhibit F-6

EXHIBIT 1
Page 226



EXHIBIT 1
Page 227

Exhibit F-7

EXHIBIT 1
Page 228

Extension of Service Area Agreement
Exhibit F-7:    MWD's Best Management Practices

## Documentation for Annexation of Lands to
## The Metropolitan Water District of Southern California
## Water Use Efficiency Compliance Statement

### A.  General Information

| Description of Annexing Area | Member Agency: Eastern Municipal Water District |
|---|---|
| | Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño Mission Indians) |
| | Annexing Water Demand: 0 GPD |
| | Peaking Water Demand: 0 GPD |
| | Percent MWD Supplied: No additional water is anticipated at this time nor over the next 6 years. |
| | Development Plans: |
| | The subject property is located southwest of Pechanga Parkway, and primarily south of the intersection of Pechanga Parkway and Wolf Valley Road within Riverside County.  Total annexation consists of approximately 458 acres with a casino, hotel, restaurants and golf course (Resort) occupying a majority of the acreage. |
| | While the proposed property to be annexed is primarily developed, the Resort is currently in process of expansion but no further development, expansion plans or additional water needs are contemplated at this time. The Pechanga Band of Luiseño Mission Indians (Pechanga) have existing agreements for potable and recycled water delivery as well as existing groundwater production thus, current local water supplies adequately meet current demands.  The Recycled Water Agreement between Eastern Municipal Water District and Pechanga provides up to 1,000 acre-feet of recycled water per year through December 31, 2057 with two additional 20 year periods available for renewal. |
| | Metropolitan Water District, Eastern Municipal Water District and the Pechanga Band of Luiseño Mission Indians (Pechanga) have agreed, in concept, to the Extension of Service Area Agreement which is an integral part of the Pechanga Water Rights Settlement Act (Act).  The Act is a settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed.  Pechanga may, in the future, which is considered to be no less than 6 years after this document is approved by MWD's Board of Directors, decide to request additional water per the ESAA. |
| | Zoning: |
| | Resort and Recreation |
| | Additional Water Agencies Involved in Annexation: |
| |    1. N/A |
| |    2. |
| |    3. |

EXHIBIT 1
Page 229

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

**B.   Member Agency Water Use and Efficiency Plans**

| | |
|---|---|
| 1. Does your agency minimize annual water demand by incorporating water conservation measures into new development plans and service agreements?<br><br>Describe service area wide actions. | Member Agency Response: Yes ☑ No ☐<br>Description:<br><br>In mid-2015, EMWD adopted new development standards to further promote conservation throughout its service area. Beginning in July 2015, all new developments are prohibited from having non-functional turf, including turf in the front yards of new homes. With more than 60 percent of water in EMWD's service area being used outdoors, this was designed to be a long-term strategy to minimize the impact of new development. EMWD's service area is currently 40 percent built out, making it one of the few regions in Southern California that will see significant population growth in the coming decades. EMWD also helped the County of Riverside adopt a similar ordinance prohibiting turf in the front yards of new homes in all unincorporated areas of Riverside County.<br><br>EMWD has also prohibited the installation of non-functional turf in all new Commercial, Industrial, and Institutional (CII) developments. While turf is being allowed in functional areas of new development, including parks and schools, it is no longer permitted within common area landscaping that provides no functional community benefit. Non-functional turf can best be described as turf that is only ever walked in when it is being mowed.<br><br>EMWD performs its Water Supply Assessments based on the General Plans of the cities and County that it serves. If developers exceed the demands outlined in those General Plans – such as through an increase in density – they are required to help fund conservation programs that will further reduce potable water demand in other portions of the service areas. All new development is also required to go through a Recycled Water Candidacy Review, which will determine the feasibility of recycled water use for irrigation purposes. Many times, if a development is within one mile of an existing recycled water pipeline, the developer will be required to extend the existing facilities to provide recycled water to areas such common area landscape, parks and schools. EMWD currently uses 100 percent of its recycled water for beneficial reuse and recycled water accounts for 35 percent of its overall water supply portfolio. As further development takes place, increasing wastewater flows, there will be a volumetric increase in available recycled water that will be put to use to meet the growing demands of our community.<br><br>EMWD is responsible for conserving the available water supply, protecting the integrity of water supply facilities, and implementing a contingency plan in times of drought, supply reductions, failure of water distribution systems, or emergencies. Therefore, EMWD adopted the Water Shortage Contingency Plan (WSCP) to regulate the delivery and consumption of water use during water shortages.<br><br><br>Supporting Documentation:<br>Link to EMWD's Administrative Code and WSCP: http://www.emwd.org/home/showdocument?id=6000 |
| 2. Does your service area maximize use of groundwater, surface water, and recycling to reduce annual demand on MWD?<br><br>Describe service area wide actions.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Administrative Code § 3107 (a) | Member Agency Response: Yes ☑ No ☐<br>Description:<br><br>Yes, EMWD produces about 17% of its supplies from local groundwater.  Other sources of water include recycled water produced from four regional water reclamation facilities, two reverse osmosis desalination plants, two microfiltration plants, and a groundwater recharge operation.  Plans are underway for one additional desalination plant and expanding our groundwater recharge program.<br><br>In addition, in response to the State Water Resources Control Board's mandate for reduction in per capita use of potable water, EMWD, among other initiatives, is pursuing additional recycled water use that offsets existing potable demand. The Recycled Water Accelerated Retrofit Program is designed to advance recycled water retrofit projects to achieve approximately 410 acre-feet per year of potable water.  The Program incorporates streamlined business processes, technical support, and financial incentives to expedite the permitting, design, and construction of retrofit sites.  Public agencies, schools, parks, and cities are targeted retrofit customers and an underlying objective is to offset potable water use while focusing on maintaining functional turf for public benefit.<br><br><br>Supporting Documentation:<br><br>Brochure - Maximizing Resources<br>Brochure - Salinity Management Program<br>Administrative Code Article 6, Recycled Water Use<br>Groundwater Management Plan |

Member Agency: Eastern Municipal Water District          Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 230

Extension of Service Area Agreement
Exhibit F-7:     MWD's Best Management Practices

| 3. Does your service area use storage and groundwater facilities and conservation to minimize peak demand on MWD?<br><br>Describe service area wide actions. | Member Agency Response: Yes ☑ No ☐<br>Description:<br><br>Yes, EMWD utilizes its storage facilities and groundwater basins to reduce peak demand on MWD. EMWD maintains 80 water reservoirs that hold more than 190 million gallons of water and 21 wells that produce 18,800 AFY.  All of the aforementioned facilities help EMWD reduce its reliance on MWD during critical peak demand. EMWD forecasts demand and adjusts tank levels accordingly.  If the District anticipates significant system demand the tanks will be filled in excess of standard levels. EMWD also accomplishes reduced pumping during peak hours to utilize storage and conserve energy. EMWD also has a groundwater recharge program consisting of spreading ponds in the Hemet/San Jacinto area that are used to store excess water during wet periods.  This program has been expanded with the construction of a major raw water transmission pipeline that made State Water Project available to recharge the sub-basin. A  Water harvesting project has been constructed using an old MWD reservoir to capture water from Riverside County Flood Control and the Water Conservation District storm drains.<br><br>Peak demands on MWD are further reduced by on-going conservation measures in place due to the drought.  In 2015, the maximum monthly demand was 8,227 AF, which occurred in August.  The maximum monthly demand in 2013 was 10,093 AF, which occurred in July.  The reduction in maximum monthly demand from 2013 to 2015 was just over 18%.<br><br>Outdoor water conservation is promoted throughout our service area. Programs such as weather-based controllers for residential and commercial landscape accounts; the nozzle replacement program, and landscape restrictions as outlined in the Administrative Code Article 6 are all examples of outdoor water conservation programs supported by EMWD.<br><br>EMWD moved into Stage 4c of the WSCP effective January 6, 2016: Mandatory Outdoor Reduction and has implemented the following water restrictions:<br><br>• Mandatory reduction of outdoor water use enforced through changes to EMWD's water-budget based tiered rate structure and observation-based penalties will be increased for violations of the water use efficiency requirements<br><br>• Watering or irrigating of lawn, landscape, or other vegetated areas with sprinklers should be limited to the following schedule: June through August – a maximum of two days a week, September through May – a maximum of one day a week<br><br>• Changes to the tiered rate structure was set according to the following level:<br>Stage 4c: Tier 2 (Outdoor Use) water budgets will be decreased up to 100 percent -<br>EMWD is currently in this stage. Water budgets have been reduced 70 percent<br><br>• All water used in excess of water budget will be charged at the highest "Wasteful" (Tier 4) water use rate<br><br>• CII customers are not allowed to water non-functional turf<br><br>• EMWD will issue a warning letter for all reported violations. Subsequent violations will result in fines which start at $50 for residential customers and $200 for commercial properties<br><br><br><br>Supporting Documentation:<br><br>Link to EMWD's Administrative Code and WSCP: http://www.emwd.org/home/showdocument?id=6000<br>Brochure - Hemet / San Jacinto Conjunctive Use Program<br>Report - Active Production Wells<br>Report - Active Tank List |
| Administrative Code § 3107 (b) | |

Member Agency: Eastern Municipal Water District          Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 231

Extension of Service Area Agreement
Exhibit F-7:    MWD's Best Management Practices

| 4. Does your agency offer all MWD new development conservation programs?<br><br>Describe how they are promoted. | Member Agency Response: Yes☑ No☐<br>Description:<br><br>Yes, EMWD's new development conservation programs, including residential water surveys, water-wise landscape/irrigation workshops, high efficiency washing machine rebates, moisture sensors, CII program, etc are offered to all of our customers including new development. For many rebates EMWD has added funding to encourage additional participation. As outlined in the Conservation Department Programs pamphlet, these programs are offered to all new customers as well as subagencies.  These are promoted via bill stuffers, EMWD's web site, newspaper articles and advertisements, and community outreach meetings such as Chambers of Commerce events, homeowners association meetings and civic associations, etc.  Subagencies are able to participate in MWD rebates through the region wide program.<br><br><br>Supporting Documentation:<br><br>CII Regional Rebate Program Agreement No. 66644<br>Residential Region wide Rebate Program Agreement 70031<br>Monthly Customer Newsletters<br>Conservation Promotional Flyers |
| Administrative Code § 3107 (b) | |
| 5. Does your agency have a specific conservation program for new development independent of MWD funding?<br><br>Describe. | Member Agency Response: Yes☑ No☐<br>Description:<br><br>Yes, Article 6 in EMWD's Administrative Codes require new landscaping is designed with a water budget of 50% evapotranspiration. Budgets are enforced for single-family, multi-family, and landscape accounts utilizing the domestic water system through a budget based tiered rate.  EMWD ordinance 72.25 requires that prior to the issuance of a meter, the customer shall calculate a water budget for each landscape area; and then the water budget and the factors used to calculate the budget will be submitted to EMWD for review. For the new meter to be issued, the calculated water budget for the landscape area cannot exceed the maximum budget limits calculated by EMWD. Whether a single lot or a part of a subdivision, before issuing a meter EMWD must verify the landscape installed in new development meets the landscape efficiency standard set by Ordinance 72.25. The Landscape water budget worksheet can be used to provide the required information to EMWD and can be used for one lot or a series of lots and must be reviewed by conservation before a meter is released. EMWD will also accept a copy of the Landscape Documentation Package or similar submittal with the required information included. This information must be reviewed and approved by EMWD conservation staff prior to meters being released.<br><br>EMWD is the first water agency in Riverside County to offer the Qualified Water Efficient Landscaper (QWEL) professional certification program which provides landscape professionals with 24 hours of education on principles of proper plant selection for the local climate, irrigation system design and maintenance, and irrigation system programming and operation. In order to obtain the QWEL certification an individual must demonstrate their ability to perform an irrigation system audit as well as pass the QWEL exam.<br><br>EMWD has initiated a long term campaign to encourage all customers to use water wisely. EMWD sponsors workshops on California-friendly plants to promote landscaping using drought tolerant plants and the Water Waste Program to report/correct the wasteful use of water.  The New Residential Development Campaign is targeted at new residential customers and consists of a welcome letter, a quarterly newsletter containing seasonal tips and ideas for water conservation, and a survey. EMWD enforces local and state landscape ordinances through the use of budgets based tiered rates. Effective September of 2008 new customers have a lower water budget than existing customers.<br><br><br>Supporting Documentation:<br><br>Link to EMWD's Administrative Code and WSCP: http://www.emwd.org/home/showdocument?id=6000<br>Brochures - WUIW<br>Water Efficient Landscape Workshop<br>Water Waste Program - Sample Letter<br>New Residential Development Campaign – Letter and Brochures |
| Administrative Code § 3107 (b) | |

Member Agency: Eastern Municipal Water District                    Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 232

Extension of Service Area Agreement
Exhibit F-7:    MWD's Best Management Practices

| 6. Does your service area use recycled water in accordance with California Water Code Sections 13550 - 13557?<br><br>Describe service area wide actions. | Member Agency Response: Yes ☑ No ☐<br>Description:<br><br>Yes. EMWD has an extensive recycled water distribution system consisting of more than 170 miles of pipeline linking five regional water reclamation facilities.  More than 6,000 AF of storage pond capacity have been constructed at ten locations throughout our service area for seasonal storage of surplus recycled water.  About 34,500 AFY of recycled water is sold to customers at 110 different sites, ranking EMWD among the top water recycling agencies in California.  Recycled water is conditioned for new projects serviced by EMWD that meet the Recycled Water Facilities and Service Guidelines adopted by EMWD's Board of Directors as required in Water Code sections 13550-13557<br><br><br><br><br><br><br>Supporting Documentation:<br><br>Brochure - EMWD Recycling Program<br>Recycled Water Policy & Guidelines<br>Report - Recycled Water Production & Sales |
| Administrative Code § 3107 (c) | |
| 7. Are Best Management Practices conditioned on all new development?<br><br>Describe BMP implementation.<br>Describe BMP implementation in new development. | Member Agency Response: Yes ☑ No ☐<br>Description:<br><br>Yes.  In fulfillment of the BMP's, all of the incentives/rebates are offered to new development within our service area.  As a condition of service, new development must agree to meet all code requirements established by their respective City or County, as applicable.  Each of these agencies has stringent landscape codes.  Large commercial landscaping requires a dedicated landscape irrigation meter, submittal of plans for approval, and an approved water budget enforced through a budget based tiered rate.  EMWD also requires new homes to install water efficient landscaping in accordance with the State Model ordinance enforced through a budget based tiered rate.   EMWD is a leading member of the Riverside County Water Task Force whose purpose is to promote water use best management practices for cities and other entities throughout Riverside County.<br><br><br><br><br>Supporting Documentation:<br><br>County of Riverside Landscape Requirements<br>Riverside County Water Task Force Program |
| Administrative Code § 3107 (d) | |

Member Agency: Eastern Municipal Water District          Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 233

Extension of Service Area Agreement
Exhibit F-7:    MWD's Best Management Practices

| | |
|---|---|
| 8. Can your agency sustain a 7-day interruption in service as described in MWD Admin. Code Section 4503? | Member Agency Response: Yes ☑ No ☐<br><br>EMWD would be able to sustain a 7-day interruption in service as described in MWD's Administrative Code Section 4503. EMWD has a diverse portfolio of water supplies including 5 active connections to MWD system. Depending on their location, these connections are either supplied by the SPW or CRW. Additionally, EMWD has over 190 MG of elevated storage, 21 active wells, two Microfiltration and two brackish water desalters. Shutdowns in excess of 2 days during the peak demand months would require additional conservation efforts. |
| Administrative Code § 3107 (e) | |
| 9. Are your agency and all other agencies listed in (A) above signatory to the California Urban Water Conservation Council's BMP MOU? | Member Agency Response: Yes ☑ No ☐<br>Form of Documentation:<br><br>Yes. EMWD is signatory to CUWCC BMP's<br><br>Form of Documentation:<br><br>February 5, 1992 Board Letter – Approving Signatory to the CUWCC  MOU |
| Administrative Code § 3107 (f) | |
| 10. Has your agency and all other agencies listed in (A) submitted a report to CUWCC? | Member Agency Response: Yes ☑ No ☐<br>Form of Documentation:<br><br>EMWD Year 2012/2013 BMP Reports<br>AB 1420 Compliance Documentation and supporting information.<br>2010 UWMP  Section 8 |
| Administrative Code § 3107 (f) | |

Member Agency: Eastern Municipal Water District          Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 234

Extension of Service Area Agreement
Exhibit F-7:     MWD's Best Management Practices

| 11. Are your agency and all other agencies listed in (A) above in compliance with the California Urban Water Conservation Council's MOU? | Member Agency Response: Yes ☑ No ☐ <br> Form of Documentation: <br><br> Yes. EMWD submitted a report to CUWCC in February 2016 for the 2013/2014 and 2014/2015 fiscal years. EMWD is at 100% compliance. The supporting documentation for 1420 compliance and the 2010 UWMP provide equivalent information to the CUWCC reports. <br><br> EMWD is also in compliance with the 20x2020 regulation. EMWD's baseline usage was calculated at 196 gallons per capita-day (GPCD). In 2015, EMWD was at 130 GPCD, a reduction of 34%. |
| Administrative Code § 3107 (f) | |

## MWD

**MWD Employee Name:**                                    **File Date:**
Ethel Young                                                           4/12/2016
**MWD Employee Name:**                                    **Review Date:**
Ellen Mackey                                                         3/17/2016
**Notes:**

## MWD Member Agency

The following member agency assures compliance with the provisions of Metropolitan's Water-Use Efficiency Guidelines for the next six years as indicated in Metropolitan's Administrative Code § 3107 and shall report to Metropolitan regarding such compliance.

**Agency Name:**                                                **Date:**
Eastern Municipal Water District
Typing your name on this form will have the same effect as a hard-copy or original signature.
**Agency Representative Name:**
Paul D. Jones II, P.E., General Manager
**Notes:**

Member Agency: Eastern Municipal Water District          Annexation Name: 106th Fringe Area (Pechanga Band of Luiseño

EXHIBIT 1
Page 235

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

## Division III

## ANNEXATIONS

| Chapter | | Sec. |
|---|---|---|
| 1 | Annexation Procedure | 3100 |
| 2 | Policies Related to Annexations | 3200 |
| 3 | Financial Policies Related to Annexations | 3300 |

## Chapter 1

## ANNEXATION PROCEDURE

Sec.
3100.  Request for Annexation
3101.  Submittal of Request
3102.  Board Consideration of Request for Annexation
3103.  Board Approval of Request for Annexation
3104.  Mandatory Terms and Conditions
3105.  Waiver of Charge and Fee
3106.  Payment Requirement
3107.  Water Use Efficiency Guidelines
3108.  Time for Completion of Annexation

**§ 3100.   Request for Annexation.**

(a)  Board approval process.

The Board will act to approve annexations in a one or two step process.  The member public agency shall indicate its preference for a one or two step process, with the process selected subject to the approval of the General Manager or Executive Committee.  In either case, all annexation requests must comply with all requirements of Section 3100(b), (c) and (d).

(1)  Two step Board approval process.

In a two step Board approval process, the member public agency shall submit requirements of Section 3100(b) for conditional Board consideration and thereafter, when appropriate, the requirements of Section 3100(c) for final Board consideration.

(2)  One step Board approval process.

If a one step Board approval process is selected, a notice of intent, legal description and map (Section 3100(b) 1) must be received and approved by the District prior to filing a

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 236

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

submittal request with the Local Agency Formation Commission (LAFCO).  Within 30 days of receipt, the District will review, and approve or comment upon these materials.  Once LAFCO approval and all other requirements pursuant to Section 3100(b) and (c) have been obtained, the member public agency shall submit said documentation to the District for Board consideration.

(b) Conditional approval submittal requirements.

A request for annexation of area to the District shall be made in writing and executed on behalf of the member public agency or proposed member public agency within which the area is or is proposed to be situated.

The request shall include:

(1) A legal description and a detailed map of the area proposed to be annexed, clearly indicating the metes and bounds of the area and the gross and net acreage for the area with sufficient documentation to support the gross and net acreage specified;

(2) A certificate from the assessor of the county within which the area proposed to be annexed is situated setting forth the assessed valuation of each parcel included within the area;

(3) Identification of the ownership of each parcel included within the area proposed to be annexed;

(4) A statement setting forth whether the number of voters within the area proposed to be annexed is less than 12, or 12 or more; and

(5) A description of:

(i) Present use of each of the parcels included within the area proposed to be annexed;

(ii) Existing or proposed development plans for such parcels;

(iii) An estimate of total annual and peak demands for water service to the area proposed to be annexed; and

(iv) An estimate of the portion of such annual and peak demands to be supplied by the District.

(6) A plan for implementing the water use efficiency guidelines set forth in Section 3107;

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 237

(7) Payment of $5,000 processing fee to cover the District's cost of handling the request for annexation, unless waived pursuant to Section 3105;

(8) A statement indicating if it is proposed that payment for the annexation charge is to be pursuant to Sections 3106(b) and (c), and sufficient justification to demonstrate security for future payments, in a form approved by the General Counsel with Board approval; and

(9) The member public agency within which the area is situated shall furnish such other information as may be requested by the District's General Manager.

(c) Final approval submittal requirements.

Prior to final approval of the proposed annexation, as provided in Section 3103, the request shall be supplemented by the member public agency with the following materials:

(1) Any changes to the annexation documentation submitted previously;

(2) Certified copy of member public agency resolution requesting approval of the annexation; and

(3) Documents complying with the California Environmental Quality Act (CEQA).

(d)  Annexation completion requirements.

Prior to submitting a request to LAFCO for recording the Certificate of Completion for the proposed annexing area, the member public agency must submit to the District the following materials:

(1) Certified copy of member public agency resolution(s) accepting District final terms and conditions and ordering a reorganization;

(2) Payment of the annexation charge pursuant to Section 3106(a) or provision of appropriate and fully executed documentation pursuant to Section 3106(b); and

(3) Certified copy of LAFCO resolution approving the annexation to the member public agency.

(e)  Reattachment requests.

The General Manager is authorized to approve, without payment of processing fees or annexation charges, the reannexation of any territory which has deannexed from the District under reasonable terms and conditions as may be established by the General Manager, which shall include payment of any property taxes, standby charges or other avoided charges for the period of deannexation.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 238

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

M.I. 38048 – January 9, 1990; subparagraph (a)(5) added and amended by M.I. 38538 - October 9, 1990, paragraph (a) amended by M.I. 40406 - August 24, 1993; amended by M.I. 41898 - May 14, 1996; paragraph (a) amended by M.I. 42193 – December 10, 1996; paragraphs (a), (a)(1), (b), (b)(9), (c)(2) amended, (c)(3) deleted, (c)(4) renumbered, paragraphs (d)(1) and (2) amended, (d)(3) added, and paragraph (e) amended by M. I. 44582 – August 20, 2001; paragraph (a) amended, and subparagraph (a)(2) amended by M.I. 50155 - June 9, 2015.

### § 3101.   Submittal of Request.

A request for annexation and all information required in connection therewith shall be submitted to the General Manager.

M.I. 38048 – January 9, 1990; amended by M. I. 44582 – August 20, 2001.

### § 3102.   Board Consideration of Request for Annexation.

The Board, and any standing committee of the Board reviewing a request for annexation, will consider such request at their next regular meeting taking place no earlier than 75 days after receipt by the District of the request for annexation and all information required to be submitted by the one or two step Board approval process.

M.I. 38048 – January 9, 1990; amended by M.I. 38538 - October 9, 1990, amended by M.I. 40406 - August 24, 1993; amended by M.I. 41898 - May 14, 1996; amended by M. I. 44582 – August 20, 2001.

### § 3103.   Board Approval of Request for Annexation.

(a) Two step Board approval process

Unless otherwise stated in the request for annexation, the Board will act on the request:

(1) By establishing preliminary terms and conditions for the conditional approval of the annexation upon filing of the submittals required by Section 3100(b).

(2) By considering final approval of the annexation subject to terms and conditions then to be established after receipt of the submittals required by Section 3100(c)

(b) One step Board approval process

The Board will consider approval of the annexing area subject to terms and conditions then to be established after receipt of all submittals required pursuant to Sections 3100(b) and (c).

M.I. 38048 – January 9, 1990; paragraph (a) amended and paragraph (b) added by M.I. 41898 - May 14, 1996; paragraphs (a)(1) and (a)(2) amended by M. I. 44582 – August 20, 2001; paragraph (b) amended by M.I. 50155 - June 9, 2015.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 239

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

### § 3104.   Mandatory Terms and Conditions.

All terms and conditions of annexation shall contain the following provisions:

(a) The sale and delivery of all water by the District, regardless of the nature and time of use of such water, shall be subject to regulations promulgated from time to time by the District.

(b) Except upon terms and conditions specifically approved by the Board, water sold and delivered by the District shall not be used in any manner which intentionally or avoidably results in the direct or indirect benefit of areas outside the District including use of such water outside the District or use thereof within the District in substitution for other water used outside the District.

(c) No District water shall be sold or delivered to any member public agency for use, directly or indirectly, for agricultural purposes as defined in Section 4106 within the annexing area.

(d) The District shall not be obligated to provide additional works or facilities, necessitated by the annexing area, for the delivery of water from works owned and operated by the District.

(e) The annexation shall be completed by the date established pursuant to Section 3108(a).

M.I. 38048 - January 9, 1990; paragraph (e) added by M.I. 40406 - August 24, 1993.

### § 3105.   Waiver of Charge and Fee.

The processing fee and the annexation charge may be waived in cases where the Board itself requests a small annexation to prevent or close a "window" in an existing member public agency or pursuant to Section 3100(e).

M.I. 38048 – January 9, 1990; amended by M.I. 41898 - May 14, 1996.

### § 3106.   Payment Requirements.

(a) All annexation charges shall be paid in full in cash prior to completion of the annexation except where the Board approves installment payments pursuant to Section 3106(b) and (c).

(b) Subject to Board approval, a portion of the annexation charge may be paid in installments upon terms and conditions listed in Section 3106(c), and in form approved by the General Counsel, if the member public agency assumes the obligation for said payments, to be collected

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 240

Extension of Service Area Agreement
Exhibit F-7: MWD's Best Management Practices

as part of monthly water sales invoices, or other security is provided which guarantees said payments.

(c) Installment payments shall be subject to the following terms and conditions pursuant to each ownership:

(1) Minimum down payment of 10%.

(2) Maximum term of 15 years.

(3) Interest at the greater of the weighted average yield on invested funds of the District or the Districts then current cost of borrowing funds.

(4) Minimum net annexation acreage of 50 acres; or

(5) Under such other conditions as may be determined by the Board of Directors.

M.I. 38048 – January 9, 1990; paragraph (a) amended and paragraphs (b) and (c) added by M.I. 41898 - May 14, 1996.

### § 3107.   Water Use Efficiency Guidelines.

The member agency representing the parcels considered for annexation shall submit evidence of compliance with the following:

(a) Annual member agency water demand shall be minimized by incorporating water conservation measures into new development plans and service agreements.  Use of groundwater, local surface water, and recycled wastewater supplies shall be maximized to reduce demands on the District.

(b) Peak demands on the District shall be minimized by construction and operation of local storage and groundwater production facilities.  Member agencies shall offer all District sponsored water conservation programs to new developments and encourage participation in those programs.  Member agencies shall offer a specific program, independent of District funding, to new development to encourage water use efficiency of landscapes or other water savings opportunity.

(c) Recycled water of adequate quality shall be used whenever it is available to be used, in accordance with California Water Code Sections 13550-13554.

(d) "Best management practices" conservation measures shall be conditioned on all new developments within the member agency consistent with applicable City or County building codes for areas already within the District, and to District water conservation guidelines for annexing areas.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 241

Extension of Service Area Agreement
Exhibit F-7: MWD's Best Management Practices

(e) Local storage, groundwater production capacity, system interconnections, and other measures shall be able to sustain a 7-day interruption in service from the District pursuant to MWD Administrative Code Section 4503 "Suspension of Deliveries."

(f) The member agency, wholesale water agency, and local water purveyor of the annexing area shall be signatories and in compliance with the California Urban Water Conservation Council (CUWCC) Memorandum of Understanding (MOU) Regarding Urban Water Conservation in California. The District may request amendments to the water conservation measures to be imposed on new development within the member agency based on current water-use efficiency policies and reasonable conservation practices and measures.

Reporting Requirements:

The member public agency shall be responsible for assuring compliance with these provisions and shall report to the District on a yearly basis regarding such compliance. Reports would include the following information regarding the member agency:

(a) Incorporated conservation measures in new development plans and service agreements;
(b) Recycled water, groundwater, and local surface water use including total annual production of local water supplies;
(c) 7-day interruption contingency;
(d) Report as submitted to CUWCC; and
(e) Member agency and local water purveyor shall have submitted a current Urban Water Management Plan (UWMP) provided the agency or purveyor is required to submit a UWMP under State law.

District staff shall review the reports and provide an annual information report to the Board on member agencies' reporting compliance. District staff will ensure that the annexing member agency is in compliance with its reporting before presenting subsequent annexation requests to the Board. Staff shall provide any prior member agency reports to the Board for its consideration in future annexation requests. The District's General Manager or designee is authorized to make minor adjustments to reporting requirements for member agencies as deemed reasonable and appropriate. Reporting requirements under this section of the Code are required for annexation requests after April 1, 2005. Reporting will be continuous on an annual basis for a six-year period following the latest annexation by the member agency.

M.I. 38538 – October 9, 1990; amended by M.I. 39787 - August 20, 1992; amended by M.I. 41898 - May 14, 1996; paragraphs (a), (b), (c), (d), and (e) amended, and paragraph (f) added by M. I. 45941 – October 12, 2004.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 242

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

### § 3108.   Time for Completion of Annexation.

(a)  The annexation shall be completed by December 31 of the year following the year in which the annexation receives approval of the Board.  If the annexation is not completed by that date, a new request in conformance with Section 3100(b) and (c) must be made.  A one year extension of the time in which to complete the annexation may be granted if a request for the extension is made in writing by the member public agency prior to the expiration date.  The request for extension of time shall include the following:

(1)  Specific details as to why the annexation could not be completed within the time provided;

(2)  A resolution from the member public agency requesting an extension of time and reaffirmation of the terms and conditions established by the Board;

(3)  Any changes that have occurred in the circumstances of the annexation since the terms and conditions were established;

(4)  Payment of a $1,500 processing fee to cover the District's costs of handling the request for time extension;

(5)  A certificate from the assessor of the county within which the area proposed to be annexed is situated setting forth the assessed valuation of each parcel included within the area; and

(6)  Any other information as may be requested by the District's General Manager.

(b)  If the General Manager finds that there is no significant change in the circumstances surrounding the annexation, he shall grant an extension for one year subject to any new mandatory terms and conditions which have been adopted by the Board since the original approval of the annexation, and further subject to payment of the current annexation charges.  If the General Manager finds that there are significant changes in the circumstances surrounding the annexation, he shall submit the request for extension to the Board in accordance with Section 3102.

(c)  The General Manager shall find that there is a significant change in the circumstances surrounding the annexation if the size of the annexation area changes, the proposed water usage in the annexation area increases, the intensity or type of land use changes, the CEQA documents are modified or additional documents are issued, or there is any other change in the circumstances of the annexation which the General Manager deems to be significant.

M.I. 40406 - August 24, 1993; amended by M.I. 41898 - May 14, 1996.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 243

# Chapter 2

## POLICIES RELATED TO ANNEXATIONS

Sec.
3200.   Water Availability
3201.   Annexation Criteria - Avoidance of Windows

### § 3200.   Water Availability.

In treating with application for annexation as member public agencies the District will give its favorable consideration only to areas of sufficient size and water requirements to justify as economically feasible the delivery of imported water.  Preferably such areas should be so located as to control the entire production of water from local underground water basins affected.

> Section 301.1.2 - Special Water Problems Committee - October 26, 1938. Section 301.1.2 repealed and Section 3100 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; renumbered Section 3200 by M.I. 38048 – January 9, 1990; amended by M.I. 41898  - May 14, 1996.

### § 3201.   Annexation Criteria - Avoidance of Windows.

An area proposed for annexation shall not, after annexation, leave an unannexed area entirely surrounded by area annexed to the District ("window") unless the Board finds that the District's interests will not be adversely affected by the existence of such window.

> Section 301.5 based on Water Problems Committee Statement - November 19, 1962; amended by M.I. 36333 - October 14, 1986. Section 301.52 repealed and Section 3102 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; renumbered Section 3201 by M.I. 38048 – January 9, 1990.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 244

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

# Chapter 3

## FINANCIAL POLICIES RELATED TO ANNEXATIONS

Sec.
3300.   Annexation Charge Computation
3301.   Taxes for Past Annexations

### § 3300.   Annexation Charge Computation.

Annexation Charge - The annexation charge for areas newly annexing to the District shall be the greater of the amounts computed under Sections 3300(a) and 3300(b):

(a) Back-Tax Computation - The annexing area shall be required to pay an amount that bears the same relation to total District taxes levied and annexation taxes to be levied (both exclusive of interest or adjusting factors) as the assessed valuation of the annexation area bears to the assessed valuation of the District, all data to be as of the August 31 preceding the year in which the annexation will be effective, and back interest to be simply calculated by multiplying the amount established as the bare back tax obligation by 5 percent and the resultant by half the number of years since taxes were first levied by the District.

(b) Per-acre Charge - The annexation charge per acre of land, other than land devoted to public roads, streets, highways, and freeways, to be paid by the annexing areas shall be determined by dividing the sum of the estimated replacement cost of the District's facilities and the participation rights in facilities of the State Water Project and other non-District owned projects in which Metropolitan participates, less accumulated depreciation of the District's facilities and participation rights on a replacement cost basis, less outstanding bonded indebtedness of the District's facilities and participation rights, by the total acreage within the service area of the District, all as of the end of the recently completed fiscal year.

M.I. 38048 – January 9, 1990; amended by M.I. 38304 - June 12, 1990; paragraph (b) amended by M.I. 39744 - July 14, 1992; paragraph (b) amended by M.I. 40406 - August 24, 1993; amended by M.I. 41204 - January 10, 1995; paragraph (b) amended by M. I. 46106 – February 8, 2005.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 245

Extension of Service Area Agreement
Exhibit F-7: MWD's Best Management Practices

## § 3301.   Taxes for Past Annexations.

(a) Effective with the 1981-82 fiscal year a tax rate of 18.75 cents per $100 of assessed valuation (to be stated as .1875% for tax levying and collecting purposes) has been established to collect annexation charges from areas annexed to the District after September 13, 1966 and before July 1, 1978 and such rate shall be continued until the annexation charge and interest on unlevied balances thereof have been raised provided, however, that in an area annexing after August 19, 1976 and before July 1, 1978 such rate shall in no event be levied for any fiscal year following the fiftieth year after the area has been annexed to the District.

(b) Effective with the 1981-82 fiscal year a tax rate of 18.75 cents per $100 of assessed valuation (to be stated as .1875% for tax levying and collecting purposes) has been established to collect the balance of the annexation charges from areas which annexed to the District prior to September 13, 1966, and such rate shall be continued until said balance of the annexation charges and interest on unlevied balances thereof have been raised.

(c) If for any reason (due to adoption in this State of tax limitation Constitutional initiatives, legislation or otherwise), any or all of the District's taxes to raise the minimum annexation charge are unable to be levied, then the Board shall have the option to collect such charge, or unlevied balances thereof, with interest at 5 percent per annum, within said area through any lawful means now, or to become, available to the District.

M.I. 38048 – January 9, 1990; paragraph (a) & (b) amended by M. I. 47286 - November 20, 2007.

Provisions updated to reflect the actions of the Board of Directors through its 6/9/2015 meeting.

EXHIBIT 1
Page 246

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## Division IV

## WATER SERVICE POLICIES

| Chapter | | Sec. |
|---|---|---|
| 1 | Definitions | 4100 |
| 2 | Regional Water Management | 4200 |
| 3 | Water Sales Revenues | 4300 |
| 4 | Classification and Rates | 4400 |
| 5 | Water Service Regulations - General | 4500 |
| 6 | [Repealed] | 4600 |
| 7 | Service Connections | 4700 |
| 8 | System Interconnections - Hydraulic Transients | 4800 |
| 9 | [Repealed] | 4900 |

## Chapter 1

## DEFINITIONS

Sec.
4100.   General
4101.   Colorado
4102.   State
4103.   Treated Water
4104.   Untreated Water
4105.   Domestic and Municipal Purposes
4106.   Interim Agricultural Water Program Purposes
4107.   Groundwater Replenishment by Spreading
4108.   Groundwater Replenishment by Injection
4109.   In-Lieu Groundwater Replenishment
4110.   Direct Reservoir Replenishment
4111.   In - Lieu Reservoir Replenishment
[4112. Repealed]
[4113. Repealed]
4114.   Replenishment Service
[4115. Repealed]
[4116. Repealed]
4117.   Cooperative Storage Program
4118.   Cooperative Storage Program Sale
4119.   Wheeling Service
4120.   Purchase Order; Purchase Order Commitment
4121.   Supply Rates
4122.   Base Firm Demand; Initial Base Firm Demand
4123.   System Access Rate
4124.   Water Stewardship Rate
4125.   System Power Rate

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 247

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

4126.   Treatment Surcharge
4127.   Emergency Storage Program Purposes

## § 4100.   General.

The definitions in this Chapter shall govern the meaning of the terms when used in this Division.

Res. 7666 - April 13, 1976; Section 313.2 amended by M.I. 33642 - March 10, 1981.  Section 312.2 repealed and Section 4100 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4101.   Colorado.

"Colorado" as a source of water shall mean water obtained by the District from the Colorado River through facilities owned by the District.

Res. 7666 - April 13, 1976; Section 312.2.1 amended by M.I. 33642 - March 10, 1981.  Section 312.2.1 repealed and Section 4101 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4102.   State.

"State" as a source of water shall mean water obtained by the District from facilities of the California State Water Project.

Res. 7666 - April 13, 1976; Section 312.2.2 amended by M.I. 33642 - March 10, 1981.  Section 312.2.2 repealed and Section 4102 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4103.   Treated Water.

"Treated water" shall mean water that is treated by filtration and disinfection at any District water treatment facility.

Res. 7666 - April 13, 1976; Section 312.2.3 amended by M.I. 33642 - March 10, 1981.  Section 312.2.3 repealed and Section 4103 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 40976 - August 19, 1994.

## § 4104.   Untreated Water.

"Untreated water" shall mean water that is not treated water.

Res. 7666 - April 13, 1976; Section 312.2.4 amended by M.I. 33642 - March 10, 1981.  Section 312.2.4 repealed and Section 4104 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4105.   Domestic and Municipal Purposes.

"Domestic and municipal purposes" shall mean, but is not limited to, the use of water for all domestic, municipal, commercial, industrial, and recreational purposes.

Provisions  updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 248

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

Res. 7666 - April 13, 1976; Section 312.2.5 amended by M.I. 33642 - March 10, 1981.  Section 312.2.5 repealed and Section 4105 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 44005 - May 17, 2000.

## § 4106.   Interim Agricultural Water Program Purposes.

"Interim Agricultural Water Program purposes" shall mean the service of water pursuant to the Interim Agricultural Water Program and this Division IV which is delivered and used for the growing or raising, in conformity with recognized practices of husbandry, for the purposes of commerce, trade, or industry, or for use by public educational or correctional institutions, of agricultural, horticultural, or floricultural products, and produced (1) for human consumption or for the market, or (2) for the feeding of fowl or livestock produced for human consumption or for the market, or (3) for the feeding of fowl or livestock for the purpose of obtaining their products for human consumption or for the market, such products to be grown or raised on a parcel of land having an area of not less than one acre utilized exclusively therefor.

(a)"Interim Agricultural Water Program purposes limited to the growing of field and nursery crops and row crops" shall mean the service of water related to the growing of crops generally planted and harvested annually or more frequently, and other Interim Agricultural Water Program purposes not included in the definitions of Sections 4106(b) and 4106(c).

(b)"Interim Agricultural Water Program purposes limited to the growing of trees and vines" shall mean the service of water limited to the growing of crops which are planted less frequently than annually in the expectation of long-term yield therefrom.

(c)"Interim Agricultural Water Program purposes limited to the feeding of fowl or livestock" shall mean the service of water encompassing the raising of animals for human consumption or for the market or for the purpose of obtaining their products for human consumption or for the market.

(d) The Interim Agricultural Water Program was discontinued after December 31, 2012.

Res. 7666 – April 13, 1976; Section 312.2.6 amended and paragraphs (a), (b) and (c) [formerly Sections 313.2.6.1 - 312.2.6.3] added by M.I. 33642 – March 10, 1981.  Section 312.2.6 repealed and Section 4106 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; Section renamed and paragraphs (a)-(c) amended by M. I. 44005 - May 17, 2000; Paragraph amended by M.I. 44812 - March 12, 2002; added paragraph (d) by M.I. 50323 - December 8, 2015.

## § 4107.   Groundwater Replenishment by Spreading.

"Groundwater replenishment by spreading" shall mean the act of spreading or causing to be spread, water for the purpose of replenishing natural groundwater basins, without regard to subsequent use of the water.

Res. 7666 - April 13, 1976; Section 312.2.7 amended and paragraphs (a)and (b) [formerly Sections 313.2.7.1 - 312.2.7.2] added by M.I. 33642 - March 10, 1981.  Section 312.2.7 repealed and Section 4107 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended and paragraphs (a) and (b) deleted by M.I. 42608 - September 9, 1997.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 249

### § 4108.   Groundwater Replenishment by Injection.

"Groundwater replenishment by injection" shall mean the act of injecting or causing to be injected, water for the purpose of replenishing natural groundwater basins.

(a) "Direct replenishment by injection" shall mean groundwater replenishment that results from the act of injecting without regard to subsequent use of the water.

(b) "Seawater barrier groundwater replenishment" shall mean groundwater replenishment having as a principal purpose the injection of water for the purpose of maintaining groundwater barriers designed and intended to avoid the contamination of groundwater storage basins by the intrusion of seawater.

Former Section 4108 renumbered to Section 4109 and new Section 4108 added by M.I. 42608 - September 9, 1997; paragraph (b) amended by M. I. 44812 - March 12, 2002; paragraph (b) deleted and paragraph (c) renumbered by M. I. 45249 - March 11, 2003; amended paragraph (a) by M.I. 50323 - December 8, 2015.

### § 4109.   In-Lieu Groundwater Replenishment.

"In-lieu groundwater replenishment" shall mean maintenance or replenishment of water supplies in groundwater basins by reduction or elimination of extraction therefrom through the substitution of deliveries of water to consumers from surface distribution facilities in lieu of such extraction.

Section 312.2.8 - M.I. 33642 - March 10, 1981.  Section 312.2.8 repealed and Section 4108 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 41468 - June 13, 1995; Section 4108 renumbered to Section 4109 by M.I. 42608 - September 9, 1997.

### § 4110.   Direct Reservoir Replenishment.

"Direct reservoir replenishment" shall mean the act of storing water in surface reservoirs for long-term storage by delivering water directly into a reservoir.

Section 312.2.9 - M.I. 33642 - March 10, 1981.  Section 312.2.9 repealed and Section 4109 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 41617 - October 10, 1995; Section 4109 renumbered to Section 4110 by M.I. 42608 - September 9, 1997; paragraph and title amended by M. I. 45249 - March 11, 2003; amended by M.I. 50323 - December 8, 2015.

### § 4111.   In-Lieu Reservoir Replenishment.

"In-lieu reservoir replenishment" shall mean the act of storing water in surface reservoirs for long-term storage by reducing or eliminating local supply outflow, through substitution of deliveries of water to consumers from surface distribution facilities in lieu of such withdrawals, thus conserving storage acquired from local sources.

Previous Section 4110 renumbered to Section 4111 and new Section 4110 added by M.I. 41617 - October 10, 1995; Section 4110 renumbered to Section 4111 by. M.I. 42608 - September 9, 1997; paragraph and title amended by M. I. 45249 - March 11, 2003; amended by M.I. 50323 - December 8, 2015.

Provisions  updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 250

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

[§ 4112 repealed by M. I. 45249 - March 11, 2003.]

[§ 4113 repealed by M. I. 44812 - March 12, 2002.]

### § 4114.   Replenishment Service.

"Replenishment Service" shall mean delivery of water for long-term storage in either
groundwater basins or surface reservoirs by direct or in-lieu means.  Direct means shall be either
through groundwater spreading or through injection.  The Replenishment Service Program was
discontinued after December 31, 2012.

> M.I. 37006 - February 9, 1988; amended by M.I. 37764 - July 11, 1989; amended by M.I. 41468 - June 13,
> 1995; amended by M.I. 42109 - October 8, 1996; paragraph and title amended by M. I. 45249 - March 11, 2003;
> amended by M.I. 50323 - December 8, 2015.

[§ 4115 repealed by M. I. 44812 - March 12, 2002]

[§ 4116 repealed by M. I. 44812 - March 12, 2002]

### § 4117.   Cooperative Storage Program.

"Cooperative Storage Program" shall mean the program that provides a means for
coordinating the District's carryover storage needs with storage capacity available to member
public agencies, on the basis that the stored water will eventually be released to respective
participating member public agencies pursuant to the regulations provided by Section 4517.

> M.I. 40976 - August 19, 1994; Original Section 4117 repealed and Section 4118 renumbered 4117 by M.I.
> 44005 - May 17, 2000.

### § 4118.   Cooperative Storage Program Sale.

"Cooperative Storage Program Sale" shall describe the transaction that occurs at the time
a water delivery is made by the District under the Cooperative Storage Program.  Any such
delivery is deemed a sale to the receiving member public agency when delivered to it for storage,
with payment to the District deferred as provided in subsection 4517(i).  For administrative
record keeping purposes, such a transaction will be recorded as an advance delivery until
invoiced as a sale by the District at the time of release.

> M.I. 40976 - August 19, 1994; amended by M.I. 41404 - May 9, 1995; Original Section 4119 renumbered 4118
> by M.I. 44005 - May 17, 2000; amended by M. I. 44812 - March 12, 2002.

### § 4119.   Wheeling Service.

"Wheeling Service" shall mean the use of Metropolitan's facilities, including its rights to
use State Water Project facilities, to transport water not owned or controlled by Metropolitan to
its member public agencies, in transactions entered into by Metropolitan for a period of up to one
year.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 251

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

M.I. 42335- March 11, 1997; Original Section 4120 renumbered 4119 by M. I. 44005 - May 17, 2000.

### § 4120.   Purchase Order; Purchase Order Commitment.

"Purchase Order" shall mean a member agency's written commitment to purchase a specified total volume of water from the District during a specified period, as provided in Section 4404. "Purchase Order commitment" shall mean the amount of system water a member agency commits to purchase over the term of the Purchase Order.

M. I. 44812 - March 12, 2002; amended by M. I. 45249 - March 11, 2003; amended by M.I. 49952 - November 18, 2014.

### § 4121.   Supply Rates.

"Supply Rate" shall mean (i) the Tier 1 Supply Rate and (ii) the Tier 2 Supply Rate, as applicable to a particular purchase of water pursuant to Section 4404. The Tier 1 and Tier 2 Supply Rate shall be set from time to time by the District to recover the cost of maintaining existing supplies and developing additional supplies of water.

M. I. 44812 - March 12, 2002.

### § 4122.   Base Period Demand; Revised Base Firm Demand; Initial Base Firm Demand.

"Base Period Demand" shall mean the amount specified in a member agency's Purchase Order, that is either: a) the member agency's Revised Base Firm Demand, as specified in this Section; or b) the member agency's highest fiscal year purchases from fiscal year 2003 through 2014; provided, however, that if the member agency's five-fiscal year rolling average of purchases of water from the District for the most recent five fiscal year period, excluding water purchased under an interruptible program, exceeds the member agency's Initial Base Period Demand, then the member agency's Base Period Demand for each subsequent calendar year shall be increased to the member agency's five-fiscal year rolling average. "Initial Base Firm Demand" shall mean the member agency's highest annual delivery of water from the District, excluding water delivered under Long-Term Seasonal Storage Service, Interruptible Service, and Interim Agricultural Water Program Service, during any fiscal year from fiscal year 1989/90 through fiscal year 2001/02.

Effective as of January 1, 2013, each member agency's Revised Base Firm Demand is as follows:

| Member Agency | Revised BFD |
| --- | --- |
| Anaheim | 27,154 |
| Beverly Hills | 14,867 |
| Burbank | 18,640 |
| Calleguas | 122,498 |
| Central Basin | 119,617 |

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 252

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

| | |
|---|---:|
| Compton | 5,620 |
| Eastern | 102,694 |
| Foothill | 13,081 |
| Fullerton | 12,554 |
| Glendale | 29,135 |
| Inland Empire | 103,648 |
| Las Virgenes | 22,999 |
| Long Beach | 57,560 |
| Los Angeles | 372,959 |
| MWDOC | 311,769 |
| Pasadena | 23,533 |
| San Diego | 655,903 |
| San Fernando | 1,049 |
| San Marino | 1,998 |
| Santa Ana | 21,797 |
| Santa Monica | 12,344 |
| Three Valleys | 83,248 |
| Torrance | 23,297 |
| Upper San Gabriel | 74,698 |
| West Basin | 175,024 |
| Western | 94,567 |

M. I. 44812 - March 12, 2002; amended by M. I. 45249 - March 11, 2003; added second and third paragraphs by M.I. 49272 - December 11, 2012; amended first and third paragraphs, and deleted second paragraph by M.I. 49952 - November 18, 2014.

### § 4123.   System Access Rate.

"System Access Rate" shall mean a dollar per acre-foot water rate imposed by the District to recover a portion of the District's costs associated with the conveyance and distribution system, including capital, operating and maintenance costs.

M. I. 44812 - March 12, 2002.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 253

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## § 4124.   Water Stewardship Rate.

"Water Stewardship Rate" shall mean a dollar per acre-foot water rate imposed by the District to recover a portion of the costs of the District's financial commitment to conservation, water recycling, groundwater recovery and other water management programs approved by the Board.

§ 4124 Repealed by M. I. 45249 - March 11, 2003; Re-adopted by M.I. 49187 - September 11, 2012.

## § 4125.   System Power Rate.

"System Power Rate" shall mean a dollar per acre-foot water rate imposed by the District to recover the melded cost of power necessary to pump water from the State Water Project and Colorado River through the conveyance and distribution system for the District's member public agencies.

M. I. 44812 - March 12, 2002.

## § 4126.   Treatment Surcharge.

"Treatment Surcharge" means a dollar per acre-foot water rate imposed by the District to recover the District's costs of providing water treatment capacity and operations.

M. I. 44812 - March 12, 2002.

## § 4127   Emergency Storage Program Purposes.

"Emergency Storage Program purposes" shall mean delivery of water pursuant to the Emergency Storage Program for the purpose of emergency storage in surface water reservoirs and storage tanks.  Emergency Storage Program purposes include initially filling a newly constructed reservoir or storage tank and replacing water used during an emergency.  Emergency Storage Program service shall be governed by the provisions of Sections 4507 and 4518.

M.I. 45941 – October 12, 2004.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 254

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## Chapter 2

## REGIONAL WATER MANAGEMENT

Sec.

4200.   Water Availability
4201.   Mission Statement
4202.   Avoidance in District Service Area of Overlapping or Paralleling Governmental
        Authorities (Laguna Declaration)
4203.   Water Transfer Policy
4204.   Sale of Water by State in District Boundaries
4205.   Sale of Water by One Member Public Agency to Another
4206.   Carryover Storage
4207.   Exchange of Water
4208.   No Recreational Use of Lake Mathews
4209.   Contracts
4210.   Water Conservation
4211.   Sale of Water to State or Federal Governmental Agencies

### § 4200.   Water Availability.

District water will be available only to cities and areas now or hereafter included within the legal boundaries of the District. This means that District water will not be sold or released under any terms to any area as long as such area is outside the boundaries of the District except as may be approved by the Board.

Section 301.1.1 - Special Water Problems Committee - October 26, 1938.  Section 301.1.1 repealed and Section 4200 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 40976 - August 19, 1994.

### § 4201.   Mission Statement.

The mission of The Metropolitan Water District of Southern California is to provide its service area with adequate and reliable supplies of high quality water to meet present and future needs in an environmentally and economically responsible way.

M.I. 39412 - January 14, 1992.

### § 4202.   Avoidance in District Service Area of Overlapping or
###            Paralleling Governmental Authorities (Laguna Declaration).

  (a) The District is prepared, with its existing governmental powers and its present and projected distribution facilities, to provide its service area with adequate supplies of water to meet expanding and increasing needs in the years ahead. When and as additional water resources are required to meet increasing needs for domestic, industrial and municipal water, the District will be prepared to deliver such supplies.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 255

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(b) Taxpayers and water users residing within the District already have obligated themselves for the construction of an aqueduct supply and distribution system. This system has been designed and constructed in a manner that permits orderly and economic extensions and enlargements to deliver the District's full share of Colorado River water and State Project water as well as water from other sources as required in the years ahead. Establishment of overlapping and paralleling governmental authorities and water distribution facilities to service Southern California areas would place a wasteful and unnecessary financial burden upon all of the people of California, and particularly the residents of Southern California.

Section 301.2 based on M.I. 14727 - December 16, 1952.  Section 301.2 repealed and Section 4201 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; Section 4201 renumbered Section 4202 by M.I. 39412 - January 14, 1992.

## § 4203.   Water Transfer Policy.

To meet its public water supply objectives in the future, Metropolitan will vigorously pursue the development of water transfers, subject to the following considerations:

(a) Water transfers, including water marketing, will be developed only on a voluntary basis with willing partners;

(b) A full-range of water transfer options will be pursued, including arrangements with appropriate state and federal agencies, public and private water entities, and individual water users;

(c) Water transfers will be designed to protect and, where feasible, enhance environmental resources;

(d) Water transfers will be designed to avoid contributing to or creating a condition of long-term groundwater overdraft;

(e) Efforts will continue to develop water transfers in cooperation with the agricultural community, which seek to avoid unreasonable operational and financial impacts; and

(f) Strategies will be developed to appropriately address community impacts of water transfers.

M.I. 39412 - January 14, 1992.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 256

Extension of Service Area Agreement
Exhibit F-7:  MWD's Best Management Practices

### § 4204.   Sale of Water by State in District Boundaries.

The State shall make no other contract to supply project water for use within the boundaries of the District without the consent of the District, and shall not authorize any other contractor to supply project water for use outside such other contractor's boundaries and within the boundaries of the District without the consent of the District.

> Section 322.13.1 based on Amendment No. 12 to Metropolitan - State Water Contract dated November 11, 1960 - Article 15(d) thereof; amended by M.I. 33642 - March 10, 1981;  Section 322.13.1 repealed and Section 4202 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; Section 4202 renumbered Section 4204 by M.I. 39412 - January 14, 1992.

### § 4205.   Sale of Water By One Member Public Agency to Another.

The General Manager and General Counsel shall report to the Board any sale of water by one member public agency to another.  The District will not deliver water at the request of one member public agency into the territory of another member public agency without written authorization from both affected member public agencies.

> Section 322.13.2 based on M.I. 15647 - May 4, 1954; amended by M.I. 32690 - April 10, 1979; amended by M.I. 33642 - March 10, 1981.  Section 322.13.2 repealed and Section 4203 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; Section 4203 renumbered Section 4205 by M.I. 39412 - January 14, 1992; amended by M. I. 45637 - January 13, 2004.

### § 4206.   Carryover Storage.

(a) The General Manager is authorized to store District water in any storage facility within any member public agency of the District where storage capacity is available. Further, the General Manager is instructed that no water is to be delivered or supplied under any storage contract until he has determined that sufficient water supplies will be available to fill the District's storage reservoirs.

(b) The General Manager is authorized to modify any arrangements with member public agencies for storage of water to provide for carryover storage, which modification shall be effective only when in writing and executed by the General Manager.

(c) Following the conclusion of each calendar year, the General Manager shall evaluate the District's carryover storage and determine the amount of carryover storage the District is expected to need during the ensuing calendar year.

> Section 322.13.3 based on M.I. 25031 - December 14, 1965; paragraph (b) [formerly Section 322.13.3.2] added by M.I. 27396 - March 11, 1969; amended by M.I. 33642 - March 10, 1981; paragraph (a) [formerly Section 322.13.3.1] amended by M.I. 35992 - March 11, 1986.  Section 322.13.3 repealed and Section 4204 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; Section 4204 renumbered Section 4206 by M.I. 39412 - January 14, 1992; paragraph (a) amended by M.I. 40976 - August 19, 1994; paragraph (c) added by M.I. 40969 - August 19, 1994; paragraph (b) amended by M.I. 41404 - May 9, 1995.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 257

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## § 4207.   Exchange of Water.

(a) The District's policy is that any exchange of Colorado River water for State Project water between the District and any state water service contractors shall be based upon such contractor paying all of the costs associated with delivery of State water at such contractor's delivery point, or at such other point as may be mutually agreed upon, which would result in the lowest cost to the District under such exchange.

(b) If two or more member public agencies of the District desire to enter into a water exchange arrangement, the District will cooperate in such an arrangement, subject to available capacity in the District's facilities and subject to availability of water for such exchange purposes, as determined by the District.

(c) The General Manager is authorized to enter into any economically beneficial water exchange agreement, in form approved by the General Counsel, without prior Board approval upon a determination that the exchange provides water quality benefits.  The annual total of all exchanges under this subsection authority shall not exceed 50,000 acre-feet.  The annual cumulative net exchange cost of exchanges under this subsection shall not exceed $500,000. Water exchanges authorized under this subsection are exempt from competitive bidding requirements under the terms of Administrative Code Section 8103.  Such agreement shall be reported to the Board at the next meeting after which it is made.

Section 322.13.4 – paragraph (b) [formerly Section 322.13.4.2] based on M.I. 23612 – February 11, 1964 and paragraph (a) [formerly Section 322.13.4.1] based on M.I. 25756 – December 13, 1966; amended by M.I. 33642 – March 10, 1981.  Section 322.13.4 repealed and Section 4205 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; Section 4205 renumbered Section 4207 by M.I. 39412 - January 14, 1992; paragraph (c) added by M. I. 44109 - July 11, 2000.

## § 4208.   No Recreational Use of Lake Mathews.

The policy existing since 1939 that Lake Mathews not be used for recreational purposes is reaffirmed.

Section 322.13.6 based on M.I. 16404 – May 10, 1955 and M.I. 31249 – April 24,1961; amended by M.I. 33642 – March 10, 1981; renumbered 322.13.5 by M.I. 34182 – April 13, 1982.  Section 322.13.5 repealed and Section 4206 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; [§ 4207 - repealed by M.I. 36806 - September 22, 1987.]; Section 4206 renumbered Section 4208 by M.I. 39412 - January 14, 1992.

## § 4209.   Contracts.

The District may join or enter into agreements with member public agencies to make more effective use of water resources, including agreements providing for the wheeling, exchange, or banking of water, so long as such agreements serve a purpose of the District.

Section 322.6.12 - March 10, 1981, effective July 1, 1981;  Section 322.6.12 repealed and Section 4208 adopted by  M.I. 36464 – January 13, 1987, effective April 1, 1987; Section 4208 renumbered Section 4209 by M.I. 39412 - January 14, 1992.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 258

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## § 4210.   Water Conservation.

It shall be the policy of the District to undertake and support water conservation programs.  To that end, the District may develop and implement such programs and enter into agreements with member public agencies and other organizations to make more efficient use of water resources through water conservation programs so long as such agreements serve a beneficial purpose of the District.

M.I. 36775 - August 18, 1987; Section 4209 renumbered Section 4210 by M.I. 39412 - January 14, 1992.

## § 4211.   Sale of Water to State or Federal Governmental Agencies.

Subject to the provisions of Section 131 of the Metropolitan Water District Act, the General Manager is authorized to enter into contracts for the sale of water for any purpose or use with the United States of America or with any board, department, or agency thereof or with the State of California.  Such contracts shall contain at a minimum the following terms:

1.    The State or Federal Governmental Agency shall furnish, install, and remove, at no expense to Metropolitan, the facilities required to pump, measure, and transport the water.

2.    Metropolitan's option to sell water to a State or Federal Governmental Agency shall be limited to a total quantity of 100 acre-feet per year, per connection, per agency.

3.    The price of the water shall be Metropolitan's rate per acre-foot for the class of water in effect at the time of delivery, plus  a reasonable capital facility charge and a minimum monthly standby rate if the connection is not used during a billing period.

4.    The State or Federal Governmental Agency shall hold Metropolitan harmless from all claims and damages resulting from interruptions in water deliveries and from all damages resulting directly or indirectly from Metropolitan's delivery of water to the State or Federal Governmental Agency.

5.    The agreement shall be terminable by either party upon giving written notice to the other party thirty days prior to the effective date of termination.

M.I. 42055 - September 10, 1996.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 259

# Chapter 3

## WATER SALES REVENUE

Sec.
4300.   General
4301.   Cost of service and Revenue Requirement
[4302.  Repealed]
[4303.  Repealed]
4304.   Apportionment of Revenues and Setting of Water Rates
4305.   Setting of Charges to Raise Fixed Revenue

## § 4300.   General.

The amount of revenue to be raised through the sale of water at rates and charges established pursuant to Sections 4400 and 4401 shall be determined in accordance with the provisions of this chapter.

> Section 311.1 - M.I. 33007 - November 13, 1979, as clarified by M.I. 33059 - January 15, 1980.  Section 311.1 repealed and Section 4300 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M. I. 44812 - March 12, 2002; amended by M.I. 49187 - September 11, 2012.

## § 4301.   Cost of Service and Revenue Requirement.

(a) The District shall fix rates for water such that anticipated water sales revenues, together with anticipated revenues from any water standby or availability of service charge (such as the readiness-to-serve charge or capacity charge) or assessment, ad valorem  tax revenues, and other revenues pay the expenses of the District, provide for repairs and maintenance, provide for payment of the purchase price or other charges for property or services or other rights acquired by the District, and provide for the payment of the interest and principal of the District's outstanding bonded debt.  Subject to the foregoing, such rates and charges shall reflect the costs of the District's major service functions, including water supply, conveyance, power, storage, distribution and treatment to the greatest degree practicable.

(b) Notwithstanding the provisions in subsection (a) above, amounts raised by ad valorem property taxation shall not exceed the limitations established by section 124.5 of the Act and, subject to those limitations, shall be not less than the approximate equivalent of the amounts levied for fiscal year 1990-91.

> Section 311.2 - M.I. 33007 - November 13, 1979, as clarified by M.I. 33059 - January 15, 1980.  Section 311.2 repealed and Section 4301 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended and paragraph (b) added by M.I. 38749 - February 12, 1991; paragraph titled changed and paragraph (a) amended by M. I. 44812 - March 12, 2002; paragraph (a) amended by M. I. 46148 - March 8, 2005; paragraphs (a)-(b) amended by M.I. 49187 - September 11, 2012.

[§ 4302 Repealed by M. I. 44812 - March 12, 2002]

[§ 4303 Repealed by M. I. 44812 – March 12, 2002]

Provisions  updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 260

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

### § 4304.   Apportionment of Revenues and Setting of Water Rates.

(a) Not later than at its February meeting the General Manager shall present to the Finance and Insurance Committee of the Board:

(1) Determinations of the revenue requirements and cost of service analysis supporting the rates and charges required during the biennial period beginning the following July 1, as determined by the General Manager in accordance with current Board policies, and,

(2) Recommendations of rates including, but not limited to, the System Access Rate, Water Stewardship Rate, System Power Rate, Treatment Surcharge, and the Supply Rates for the various classes of water service to become effective each January 1 of the biennial period.  These recommended rates shall be the General Manager's determination, made in accordance with current Board policies, of the rates necessary to produce substantially the revenues to be derived from water sales during the biennial period beginning the following July 1.

(b) Not later than at its February meeting, the General Manager shall also present to the Finance and Insurance Committee  recommendations regarding the continuation of a water standby charge or the imposition of an availability of service charge (such as the readiness-to-serve charge and capacity charge), which shall be the General Manager's determination, made in accordance with current Board policies, of the charge necessary to produce substantially the revenues to be derived from fixed revenue sources, if any, exclusive of taxes, during the biennial period beginning the following July 1 which the Finance and Insurance Committee has determined to be necessary.

(c) Not later than its February meeting the Finance and Insurance Committee shall set a time or times for, and shall thereafter hold, one or more meetings of the Finance and Insurance Committee, to be held prior to its regular April meeting, at which interested parties may present their views regarding the proposed water rates and availability of service charges to said committee.  The Finance and Insurance Committee shall direct the General Manager to cause the publication of a notice of such public hearing to be published in newspapers of general circulation within the District's service area.  Such notice shall be published not less than 10 days prior to the public hearing.

(d) Not later than its regular April meeting the Finance and Insurance Committee shall make its determination regarding the revenue requirement to be paid from water rates and the water rates to become effective each January 1 of the biennial period and shall recommend said water rates to the Board no later than the Board's regular April meeting.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 261

(e) Not later than its April meeting, the Board shall establish water rates for deliveries beginning each January 1 of the biennial period.

(f) Proposals for changes in water rates to become effective at times other than on January 1 shall require adequate notice to the public and a hearing before such proposals are acted upon by the Board, unless the Board finds that an immediate change in water rates is urgent.

Section 311.5 - M.I. 32924 – September 18, 1979, as clarified by M.I. 33059 – January 15, 1980; paragraph (g) [formerly Section 311.5.7] amended by M.I. 34867 – September 13, 1983.  Section 311.5.7 repealed and Section 4304 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; amended, new paragraphs (d), (f), (i) and (j) added and other paragraphs renumbered by M.I. 39976 - December 8, 1992; paragraphs (b) through (g), (i) and (j) amended by M.I. 41389 - May 9, 1995; paragraphs (a)-(d) amended by M.I. 42193 - December 10, 1996; paragraphs (b) through (g), and (i) and (j) amended by M.I. 43587 - June 8, 1999; paragraphs (a) through (k) amended by M. I. 44582 – August 20, 2001; paragraphs (a) – (g), (i), and (j) amended by M. I. 44812 - March 12, 2002;  paragraph (a) amended, (a) (i) & (a) (ii) added, paragraphs (b) & (c) deleted, paragraphs (d) (e) (f) renumbered to (b) (c) (d), paragraph (g) renumbered to (e) and amended, paragraphs (h) (i) renumbered to (f) (g), and paragraphs (j) (k) renumbered to (h) (i), by order of  M. I. 45537 - October 14, 2003; paragraphs (a)-(e) and (g)-(h) amended by M. I. 46064 – January 11, 2005; paragraphs (a) through (e), (g) and (h) amended (committee name change) by M. I. 46148 - March 8, 2005; paragraphs (a)-(i) amended by M.I. 46983 February 13, 2007; paragraph(b) and (c) amended, paragraph (d) deleted and renumbered by M.I. 47636 - September 9, 2008; paragraphs (c)-(e) amended by M.I. 48171 - February 9, 2010; paragraphs (a)-(g) amended by M.I. 48534 - January 11, 2011; amended § 4304 title, amended paragraphs (a)-(f), deleted former paragraphs (f) and (g), and renumbered former paragraph (h) by M.I. 49187 - September 11, 2012.

## § 4305.   Setting of Charges to Raise Fixed Revenue.

(a) Not later than its regular May meeting each year, the Finance and Insurance Committee shall make its final determination regarding the water standby charge or other fixed revenue charge, if any, for the fiscal year beginning the following July 1, and shall recommend such charge, if any, to the Board at its regular May meeting.

(b) Not later than such May meeting, the Board shall consider and take action upon the recommendations, if any, of the Finance and Insurance Committee regarding a fixed revenue source, exclusive of taxes, to become effective the following January 1 or for the fiscal year beginning the following July 1, as determined by the Board for each fixed revenue source.

M.I. 49187 - September 11, 2012.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 262

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

# Chapter 4

## CLASSIFICATION AND RATES

Sec.
4400.   Basic Statement
4401.   Rates
4402.   Readiness-to-Serve Charge
4403.   Capacity Charge
4404.   Purchase Orders
4405.   Wheeling Service

### § 4400.   Basic Statement.

The rates and charges set forth herein, so far as practicable, shall result in revenue to meet the obligations set forth in Section 134 of the Metropolitan Water District Act.

Section 312.1 based on Res. 7666 - April 13, 1976; amended by M.I. 33642 - March 10, 1981.  Section 312.1 repealed and Section 4400 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 41468- June 13, 1995.

### § 4401.   Rates.

(a) The rates per acre-foot for water sold and delivered for each class of service on order of any member public agency for use therein shall be as follows:

(1) For all water that does not meet criteria for other classes of service or special programs as defined in this Division, each of the following is applicable:

System Access Rate:

| **Effective Date:** | 01/01/2016 | **Rate:** | $259.00 |
| | 01/01/2017 | | $289.00 |
| | 01/01/2018 | | $299.00 |

Water Stewardship Rate:

| **Effective Date:** | 01/01/2016 | **Rate:** | $ 41.00 |
| | 01/01/2017 | | $ 52.00 |
| | 01/01/2018 | | $ 55.00 |

System Power Rate:

| **Effective Date:** | 01/01/2016 | **Rate:** | $138.00 |
| | 01/01/2017 | | $124.00 |
| | 01/01/2018 | | $132.00 |

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 263

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

Treatment Surcharge (Applicable to treated water):

| **Effective Date:** | 01/01/2016 | **Rate:** | $348.00 |
| | 01/01/2017 | | $313.00 |
| | 01/01/2018 | | $320.00 |

Supply Rate:

Tier 1 Supply Rate – The Tier 1 Supply Rate shall apply to water purchases which in the aggregate for any calendar year, are less than or equal to 60 percent of the Revised Base Firm Demand of such member agency as specified in Section 4122, unless that member agency has executed a Purchase Order, as defined in Section 4120, in which case the Tier 1 Supply Rate applies to water purchases as established by the Purchase Order terms.

| **Effective Date:** | 01/01/2016 | **Rate:** | $156.00 |
| | 01/01/2017 | | $201.00 |
| | 01/01/2018 | | $209.00 |

Tier 2 Supply Rate –The Tier 2 Supply Rate shall apply when a member agency's cumulative total of water purchases for the calendar year exceeds 60 percent of the member agency's Revised Base Firm Demand as specified in Section 4122, or according to the terms of a Purchase Order for member public agencies that execute a Purchase Order.

| **Effective Date:** | 01/01/2016 | **Rate:** | $290.00 |
| | 01/01/2017 | | $295.00 |
| | 01/01/2018 | | $295.00 |

(2) [Reserved]

(b) The rates for water established by Section 4401(a) shall not apply to water sold and delivered by the District to any purchaser other than a member public agency; and said rates for water shall not apply to water sold and delivered by the District for any use outside the District, or to water sold and delivered by the District for any use within the District in substitution for water used outside the District, regardless of whether or not such water be purchased by, or delivered pursuant to the order of, any member public agency; but such water shall be sold and delivered pursuant to such contract and upon such terms and conditions as the Board shall authorize and determine for each such transaction.

(c) For purposes of agreements existing under the Local Resource Program, Local Project Program, Groundwater Recovery Program and other similar programs, references to the "full service water rate," "full service treated water rate," "treated non-interruptible water rate" or "other prevailing rate" or to the "reclaimed water rate" or "recycled service rate" shall be deemed

Provisions  updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 264

to refer to the sum of the System Access Rate, Water Stewardship Rate, System Power Rate, the expected weighted average of Tier 1 Supply Rate and Tier 2 Supply Rate (equal to the estimated sales revenues expected from the sale of water at the Tier 1 and Tier 2 Supply Rates divided by the total District sales in acre-feet expected to be made at the Tier 1 and Tier 2 Supply Rates), a Capacity Charge expressed on a dollar per acre-foot basis and Treatment Surcharge.

Section 312.3 based on Res. 7666 - April 13, 1976; paragraphs (a)(1) through (a)(3) [formerly Sections 312.3.1 through 312.3.3] amended by M.I. 31919 – August 19, 1977, M.I. 33644 – March 10, 1981; amended by M.I. 33642 – March 10, 1981; paragraphs (a)(1) through (a)(3) amended by M.I. 34156 – March 9, 1982, effective July 1, 1982, M.I.34635 - March 8, 1983 effective July 1, 1983, M.I. 34851 – September 13, 1983 effective January 1, 1984; paragraphs (a)(4) and (a)(5) [formerly Sections 312.3.4 and 312.3.5] added and paragraphs (b) and (c) [formerly Sections 312.3.4 and 312.5] renumbered by M.I. 34867 – September 13, 1983; paragraph (a)(4) amended by M.I. 34930 – November 8, 1983, effective January 1, 1983; paragraphs (a)(1) through(a)(3) amended by M.I. 35064 – March 13, 1984 effective July 1, l984; paragraph (a)(4) amended by M.I. 35482 – January 8, 1985; paragraphs (a)(1) through (a)(3) amended by M.I. 35558 – March 12, 1985 effective July 1, 1985, M.I. 36001 – March 11, 1986.  Section 312.3 repealed and Section 4401 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; paragraph (a)(1) through (a)(3) and (a)(5) amended by M.I. 36540 - March 10, 1987, effective July 1, 1987; paragraph (c) deleted by M.I. 36811 - September 22, 1987; paragraph (a)(4) amended by M.I. 37006 - February 9, 1988; paragraphs (a)(1) through (a)(3) and (a)(5) amended by M.I. 37045 - March 8, 1988, effective July 1, 1988; par. (a)(4) amended by M.I. 37566 - March 14, 1989 and pars. (a)(1) through (a)(3) and (a)(5) amended by M.I. 37574 - March 14, 1989, effective July 1, 1989; paragraph (a)(4) amended by M.I. 37764 - July 11, 1989, effective August 1, 1989; paragraphs (a)(1) through (a)(5) amended by M.I. 38196 - April 17, 1990, effective July 1, 1990; paragraph (b) renumbered to (c) and new paragraph (b) added by M.I. 38196 - April 17, 1990; paragraphs (a)(1) through (a)(5) amended by M.I. 38867 - April 9, 1991, effective July 1, 1991; paragraph (b) repealed and paragraph (c) renumbered by M.I. 39370 - December 10, 1991; paragraph (a)(1), and (a)(3) through (a)(5) amended by M.I. 39503 - March 10, 1992, effective July 1, 1992; paragraphs (a)(1), and (a)(3) through (a)(5) amended by M.I. 40142 - March 9, 1993, effective July 1, 1993 and April 1, 1993 respectively; paragraph (a)(5) amended for rate to become effective July 1, 1993 by M.I. 40173 - April 13, 1993; paragraphs (a)(1), (a)(3) through (a)(6) amended by M.I. 40731 - March 8, 1994; paragraphs (a)(1) through (a)(3) and (a)(5) amended and (a)(6) added by M.I. 40865 - June 14, 1994; paragraph (a) amended, paragraph (b) added and paragraph (c) amended and renumbered by M.I. 41468 - June 13, 1995; paragraph (a)(3) amended by M.I. 41652 - November 14, 1995; paragraph (a) amended by M.I. 41816 - March 12, 1996 to be effective January 1, 1997; paragraph (a)(1) amended by M.I. 42278 - February 11, 1997; paragraphs (a)(1)  through (a)(4) amended and paragraph (a)(5) added by M.I. 42335 and 42336 - March 11, 1997; paragraphs (a)(1) and (a)(2) amended by M.I. 42608 - September 9, 1997; paragraphs (a) (1), (2), (3), (4), and (b) amended by M.I. 42870 - March 10, 1998; paragraphs (a) (1), (2), (3), (4), and (b) amended by M.I. 43354 - January 12, 1999;  paragraphs (a) (1), (2), (3), and (4) amended by M.I. 43936 – March 14, 2000; paragraphs (a)(1), (2), (3), (4), and (5) amended by M.I. 44386 – March 13, 2001; paragraph (a) (1) and (2) amended, paragraphs (a) (3), (4), and (5) sub-paragraph (b) deleted, old paragraph (c) renamed (b), and new paragraphs (a) (3) and (c) added by M. I. 44812 - March 12, 2002; paragraph (a) (2) amended by M. I. 45249 - March 11, 2003;  paragraph (c) amended by M. I. 45257 - March 11, 2003; paragraphs (a) (1), (2), (3) amended by M.I. 45690 – March 9, 2004; paragraph (c) amended by M. I. 45943 – October 12, 2004; paragraph (a) (1), (2), (3) amended by M. I. 46149 - March 8, 2005; paragraph (a) (1) (2) (3) amended by M. I. 46593 – March 14, 2006; paragraph (a)(1)-(3) amended by M. I. 47064 – April 10, 2007; paragraph (a)(3) amended by M. I. 47259 – October 9, 2007; paragraphs (a)(1)(2) and (3) amended by M.I. 47422 – March 11, 2008; paragraphs (a)(1)(2) and (3) amended by M.I. 47859 – April 14, 2009; paragraph (a)(1) amended by M.I. 48232 – April 13, 2010; paragraphs (a)(1)-(3) amended by M.I. 49026 – April 10, 2012; paragraph (a)(2) amended by M.I. 49272 - December 11, 2012; paragraph (a)(1) amended, paragraph (a)(2) deleted and reserved, and paragraph (3) deleted by M.I. 49734 – April 8, 2014; amended paragraph (a)(1) sections covering "Tier 1 Supply Rate," and "Tier 2 Supply Rate" by M.I. 49952 - November 18, 2014; amended paragraph (a)(1) to reflect approved water rates effective January 1, 2017 and January 1, 2018 by M.I. 50438 – April 12, 2016.

## § 4402.  Readiness-to-Serve Charge.

(a) The readiness-to-serve charge shall be set by the Board from time to time to recover the costs of emergency system storage and the cost of system conveyance capacity for peak and standby use not recovered by property tax revenue.  The readiness-to-serve charge will be

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 265

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

allocated among the member public agencies beginning January 1, 2003, in proportion to the average of deliveries (including exchanges and transfers) through Metropolitan's system (in acre feet) to each member public agency during the ten-year period ending June 30, 2001; and thereafter as a ten-year rolling average; provided that Metropolitan sales of reclaimed water under the Local Projects Program, and Local Resources Program, groundwater under the Groundwater Recovery Program and deliveries under Replenishment and Interim Agricultural Water Service shall not be included in the water deliveries calculation.

(b) The readiness-to-serve charge shall be due monthly, quarterly or semiannually, as agreed upon by Metropolitan and the member public agency.  If a standby charge is collected on behalf of a member public agency, the member public agency will be credited for the amount of net collections.  This charge is subject to the provisions of Sections 4507 and 4508.

(c) The General Manager shall establish and make available to member public agencies procedures for administration of the readiness-to-serve charge, including filing and consideration of applications for reconsideration of their respective readiness-to-serve charge.  The General Manager shall review any applications for reconsideration submitted in a timely manner.  The General Manager shall also establish reasonable procedures for the filing of appeals from his determination.

M.I.  41468  - June 13, 1995; paragraph (b) amended by Resolution 8492 adopted by M.I. 41816 - March 12, 1996; paragraphs (b) and (e) amended by M. I. 44582 – August 20, 2001; paragraph (a) amended, paragraphs (b) and (c) deleted, paragraphs (d) and (e) renamed (b) and (c) respectively by M. I. 44812 - March 12, 2002; paragraph (a) amended by M. I. 45249 and M. I. 45257 - March 11, 2003; paragraph (a) amended by M. I. 45943 – October 12, 2004.

## § 4403.  Capacity Charge.

(a) Beginning January 1, 2004, the capacity charge shall be payable by each member agency for system capacity based on the maximum summer day demand placed on the system between May 1 and September 30 for the three-calendar year period ending December 31, 2002, and thereafter for a rolling three-calendar year period.

(b) The capacity charge shall be due monthly, quarterly or semiannually, as agreed upon by Metropolitan and the member public agency.

M.I.  41468 - June 13, 1995; paragraphs (b) and (f) amended by M. I. 44582 – August 20, 2001; old Section deleted and renamed, new paragraphs (a)-(d) added by M. I. 44812 - March 12, 2002; paragraphs (a) and (b) amended by M. I. 45249 - March 11, 2003 and paragraphs (a) and (b) amended and paragraphs (c) and (d) deleted by M. I. 45257 - March 11, 2003; paragraph (a) amended by M. I. 45943 – October 12, 2004; Section title and paragraph (b) amended by M. I. 46148 - March 8, 2005.

## § 4404.  Purchase Orders.

(a) The General Manager shall establish and make available to member public agencies the form of the Purchase Order and procedures for its administration.  The General Manager shall establish a deadline by which all Purchase Orders shall be executed by member public agencies

Provisions  updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 266

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

that desire to enter into such agreements with the District.  Following the deadline established by the General Manager, no member public agencies will be allowed to execute Purchase Orders.

(b) The term of the Purchase Orders shall be specified in the Purchase Order.  All Purchase Orders in effect for the same time period shall be on substantially the same terms. All amendments to Purchase Orders require approval by the Board.

(c) Each member public agency executing a Purchase Order shall commit to purchase at least its Purchase Order Commitment during the term of the Purchase Order.

(d) Purchase Orders shall permit a member public agency to purchase up to 90 percent of its Base Period Demand at the Tier 1 Supply Rate for the term of the Purchase Order.

(e) All water deliveries under a Purchase Order shall be subject to the operational conditions and constraints contained in this Division.  In addition, all billings and payments for such water shall be subject to the provisions of this Division in the same manner as other water delivered by Metropolitan.

> M.I. 41468 - June 13, 1995; old Section deleted and renamed, new paragraphs (a)-(g) added by M. I. 44812 - March 12, 2002; paragraph (d) amended by M.I. 48800 – September 13, 2011; amended paragraphs (b), (d), and (e), deleted prior paragraphs (e) and (f), and renumbered prior paragraph (g) as paragraph (e) by M.I. 49952 - November 18, 2014.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 267

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## § 4405.   Wheeling Service.

(a)   Subject to the General Manager's determination of available system capacity, Metropolitan will offer wheeling service. The determination whether there is unused capacity in Metropolitan's conveyance system, shall be made by the General Manager on a case-by-case basis in response to particular requests for wheeling.

(b)   The rates for wheeling service shall include the System Access Rate, Water Stewardship Rate and, for treated water, the Treatment Surcharge, as set forth in Section 4401. In addition, wheeling parties must pay for their own cost for power (if such power can be scheduled by the District) or pay the District for the actual cost (not system average) of power service utilized for delivery of the wheeled water.  Further, wheeling parties shall be assessed an administration fee of not less than $5,000 per transaction.

M.I.  42335  - March 11, 1997; paragraph (a) amended, paragraphs (b) and (c) deleted, and new paragraph (b) added by M. I. 44812 - March 12, 2002.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 268

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## Chapter 5

## WATER SERVICE REGULATIONS - GENERAL

Sec.
4500.  Adoption of Regulations
4501.  Obligation to Pay for Water Delivered
4502.  Liability and Indemnification
4503.  Suspension of Deliveries
4504.  Rates of Flow
4505.  Estimates of Water Requirements and Schedules of Deliveries
4506.  Metering of Water
4507.  Billing and Payment for Water Deliveries
4508.  Additional Payment and Reporting in the Event of Delinquency in Payment for Water
4509.  Water Restricted to Use Within the District
4510.  Application of Regulations
4511.  Notices
4512.  Sales Subject to System and Water Availability
4513.  Equal Opportunity Requirements
[4514. Repealed]
[4515. Repealed]
[4516. Repealed]
4517.  Cooperative Storage Program
4518.  Emergency Storage Program

### § 4500.  Adoption of Regulations.

Subject to all applicable provisions of the Metropolitan Water District Act, as said Act may be amended from time to time, the following regulations shall govern the service of water by the District.

Section 322.1 based on Res. 7260 - May 12, 1970, amending Res. 3896 - August 18, 1950; amended by M.I. 33642 - March 10, 1981.  Section 322.1 repealed and Section 4500 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4501.  Obligation to Pay for Water Delivered.

(a) All water delivered through any service connection to a member public agency for use within the member public agency shall be supplied in accordance with the provisions of the Metropolitan Water District Act and the rules and regulations of the District governing such service, as set forth in Chapter 5. The District shall bill the member public agency for all water delivered through the service connection, and the member public agency shall pay the District for all water so delivered at the rate or rates and within the period from time to time fixed by the Board.

(b) In the event that any member public agency shall request in writing a delivery of water directly by the District into any distribution system owned by some other agency which serves

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 269

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

water within the corporate area of the member public agency, the member public agency shall be obligated to pay the District for all water so delivered at the rates and under the conditions from time to time fixed by the Board; and such delivery into such other system shall constitute delivery to such member public agency for the purpose of these regulations.

(c) Member public agency system losses of District-supplied water are losses that are inherent in the operation of a water distribution system. These include losses occasioned by evaporation, seepage, spillage, leakage, pipeline failure, or system testing. Such losses shall be charged to a member public agency in direct proportion to the classes of service in which they occur and at the rates prescribed in Section 4401 for water sold and delivered for each such class of service. Such system losses shall not affect a member public agency's obligation to sustain an interruption or reduction in the delivery of water as set forth in this Code.

Section 322.2 based on Res. 7260 – May 12, 1970, amending Res. 3896 – August 18, 1950; amended by M.I. 33642 – March 10, 1981.  Section 322.2 repealed and Section 4501 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; paragraphs (a) and (c) amended by M.I. 40865 - June 14, 1994; paragraph (a) amended by M.I. 41468 - June 13, 1995; paragraph (c) amended by M.I. 42278 - February 11, 1997; Paragraph (c) amended by M. I. 44005 - May 17, 2000; amended paragraph (a) by M.I. 50323 - December 8, 2015.

## § 4502.   Liability and Indemnification.

Neither the District nor any of its officers, agents, or employees shall be liable for the control, carriage, handling, use, disposal, or distribution of water supplied or delivered by the District to a member public agency after such water has been delivered to such member public agency; nor for claim of damage of any nature whatsoever, including but not limited to property damage, personal injury or death, arising out of or connected with the control, carriage, handling, use, disposal, or distribution of such water beyond the point of such delivery; and the member public agency shall indemnify and hold harmless the District and its officers, agents, and employees from any such damages or claims of damages, and shall reimburse the District for costs of repair of the District's facilities and other damages resulting from the operations of the member public agency. Neither the member public agency nor any of its officers, agents, or employees shall be liable for the control, carriage, handling, use, disposal, or distribution of water prior to such water being delivered to the member public agency; nor for claim of damage of any nature whatsoever, including but not limited to property damage, personal injury or death, arising out of or connected with the control, carriage, handling, use, disposal, or distribution of such water prior to its delivery to such member public agency, excepting, however, claims by the District for costs of repair to the District's facilities and other damages resulting from the operations of the member public agency; and the District shall indemnify and hold harmless the member public agency and its officers, agents, and employees from any such damages or claims of damages, except claims by the District for costs of repair of the District's facilities and other damages resulting from the operations of the member public agency.

Section 322.3 based on Res. 7260 – May 12, 1970, amending Res. 3896 – August 18, 1950; amended by M.I. 33642 – March 10, 1981; amended by M.I. 34826 – August 17, 1983.  Section 322.3 repealed and Section 4502 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; amended by M. I. 44812 - March 12, 2002.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 270

### § 4503.   Suspension of Deliveries.

(a) Whenever repairs or maintenance of the District's system, in the opinion of the General Manager of the District, shall require suspension of delivery of water at any point or points, such delivery may be suspended without liability on the part of the District; provided, that except in cases of emergency, as determined by the General Manager, notice of such suspension of service shall be given to the affected member public agency in advance of such suspension. Metropolitan will make a concerted effort to notify and work with member public agencies regarding all scheduled interruptions.  The District will schedule non-emergency interruptions for the low demand months of the year, typically October through April, in coordination with the member public agencies.

(b) Each member agency shall have sufficient resources such as local reservoir storage, groundwater production capacity, system interconnections or alternate supply source to sustain:

(1) A seven-day interruption in Metropolitan deliveries from raw and treated water distribution facilities based on average annual demands of the affected facility.

(2) For service connections installed or modified after December 31, 2008 on raw water conveyance facilities, a seven-to twenty-one-day interruption in Metropolitan raw water deliveries based on average annual demand of the affected facility.

If a member public agency has been provided with a sixty (60) day notice of when an interruption in service is to occur, the member public agency shall be responsible for and reimburse direct costs, excluding labor costs, incurred by Metropolitan in the event that a scheduled non-emergency interruption is postponed or cancelled at the request of the member public agency as a result of insufficient local resources, and the District agrees to such cancellation or postponement.  Direct costs shall be determined by Metropolitan's General Manager, in consultation with the affected member agency.  These direct costs shall be applied to the member public agency's water invoice following cancellation or postponement of the shutdown.

(c) Except in cases of emergency, the District, working with the member agencies, will produce a shutdown schedule each September for the annual shutdown season from October through April.  The District will also develop a three-year shutdown schedule, which will give notice of the proposed shutdowns greater than seven days at least one-year in advance.

Section 322.4 based on Res. 7260 – May 12, 1970, amending Res. 3896 – August 18, 1950; amended by M.I. 33642 – March 10, 1981.  Section 322.4 repealed and Section 4503 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; amended by M.I. 42278 - February 11, 1997; paragraph amended by M. I. 44812 - March 12, 2002; paragraph amended by M. I. 45943 – October 12, 2004; paragraphs assigned (a), (b), (c), & (d) designations and amended by M. I. 45988 – November 9, 2004; paragraph (b) amended, (b)(1) and (2) added by M. I. 47730 - December 9, 2008; deleted paragraph (d) by M.I. 50323 - December 8, 2015.

### § 4504.   Rates of Flow.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 271

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(a) Within any 24-hour period, changes in rate of flow through any service connection serving a member public agency will be limited to ten (10) percent above and below the previous 24-hour average rate of flow except when a specific request for a change in rate that would exceed such limitations has been made to the District; such requests (1) shall be made at least 6 hours in advance of the time such change is to be made; (2) shall be approved by the General Manager only if in his judgment the change would not adversely affect the District's ability to apportion available water equitably. The General Manager is hereby authorized to reduce the maximum obtainable rate of flow at any service connection where this regulation is being violated and in the event the capacity of the distribution system is insufficient to accommodate the above mentioned daily fluctuations in delivery rate, the General Manager shall regulate the rates of flow at any or all service connections so as to assure equitable service to all agencies. However, the District will endeavor to meet all reasonable demands for service so long as comparable service can be provided to all member public agencies being served from a related section of the District's distribution system.

(b) When flow through a service connection serving a member public agency is reduced below ten (10) percent of the requested or actual maximum design capacity of the meter, whichever is less, at that connection during a period when the service connection turnout valve is in the open position, the member public agency will be charged as though a flow equaling ten (10) percent of the capacity of such meter were being delivered, as determined by the General Manager, unless the District has been advised by the member public agency that no deliveries are required at that connection for a specified period. This Section 4504(b) shall not apply to those service connections which are not connected to pressure pipelines of the District or to those service connections being operated intermittently in a manner determined by the General Manager to be of benefit to the District under conditions such that when flow does occur at these service connections it exceeds ten (10) percent of the meter capacity. The General Manager shall have the power to waive the requirements of this Section 4504(b), with respect to any meter where the agency served by the meter is doing everything within its capability, as determined by the General Manager, to adjust its facilities and operations so as to be able to take delivery at rates of flow not less than ten (10) percent of the requested or actual maximum design capacity of the meter, whichever is less, at that connection during a period when the service connection turnout valve is in the open position.

(c) When flow through a service connection serving a member public agency is increased above the actual maximum design capacity of the meter, the member public agency will be charged as though a flow equaling one hundred and twenty-five (125) percent of the capacity of such meter were being delivered, as determined by the General Manager.

(d) The General Manager shall have the power to waive the provisions of Sections 4504(a), 4504(b) and 4504(c) for a specified period with respect to any service connection if in his judgment such a waiver will serve to accomplish the current objectives of the District and will not adversely affect the operation of the District's distribution system or impair its ability to provide service to all member public agencies.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 272

Paragraph (b) [formerly Section 322.5.2] based on Res. 7241 - February 10, 1970 and Res. 7260 - May 12,1970; paragraph (a) [formerly Section 322.5.1] based on Res. 7260 - May 12, 1970 amending Res. 3896 - August 18, 1981; paragraph (c) [formerly Section 322.5.3] added by M.I. 31817 - June 14, 1977; section amended by M.I. 33642 - March 10, 1981.  Section 322.5 repealed and Section 4504 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; paragraph (a) amended, paragraph (c) added and paragraph (d) renumbered and amended by M.I. 42278 - February 11, 1997.

## § 4505.   Estimates of Water Requirements and Schedules of Deliveries.

(a) General. - Before July 1 of each year, each member public agency shall furnish the District, in form provided by the District, with an estimate of the amounts of water to be furnished to such member public agency by the District. These estimates will be used by the District in planning the construction needed to complete the District's ultimate aqueduct and distribution system; in planning the future operation of such system; and in preparing notices for submission to the State Department of Water Resources which will be used by the State to order power for pumping on the State Water Project.

(b) Contents of Estimates

(1) Each estimate furnished by a member public agency pursuant to Section 4505(a) shall contain, as a minimum, for each service connection and for each month of the year beginning with the succeeding July 1, and for the entire member public agency for each month of the succeeding four years, the following information:

(i) The quantity of water to be delivered by Metropolitan to the member public agency in full service.

(ii) With regard to water estimated to be delivered in full service, the quantity of water to be used for seawater barrier groundwater replenishment.

(iii) With regard to water estimated to be delivered in full service, the quantity of water to be used for:

(aa) groundwater replenishment

(bb) reservoir replenishment.

(2) The estimate shall constitute the member public agency's request for deliveries for the first of the five years covered therein.

Section 322.6 based on Res. 7260 – May 12, 1970; amended and paragraph (b) [formerly Section 322.6.2] added by M.I. 33642 – March 10, 1981] effective July 1, 1981; paragraph (a) [formerly Section 322.6.1] amended by M.I. 36374 - November 18, 1986.  Sections 322.6.1 and 322.6.2 repealed and Section 4505 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; paragraph (b)(iii) added and previous paragraph (b)(iii) renumbered to (b)(iv) and amended by M.I. 37764 - July 11, 1989; paragraphs (b)(1)(ii) and (iv) amended and subparagraph (cc) repealed by M.I. 40865 - June 14, 1994; paragraph (a) amended by M.I. 41468 - June 13, 1995; paragraphs (a) and (b)(1) amended by M.I. 42278 - February 11, 1997; Paragraphs ((b) (1) (ii), (iii); (aa), and (bb) amended by M I. 44005 - May 17, 2000; sub-paragraph(aa) amended by M. I. 44812 - March 12, 2002; sub-paragraph (iii) deleted and renumbered, sub paragraphs (aa) and (cc) amended, and (dd) added by M. I. 45249 - March 11, 2003; amended paragraph (a), deleted former paragraphs (b)(1)(ii), (b)(1)(iv)(bb), and

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 273

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(b)(1)(iv)(dd), renumbered former paragraph (b)(1)(iii) to current paragraph (b)(1)(ii), renumbered and amended
former paragraph (b)(1)(iv) to current paragraph (b)(1)(iii), renumbered and amended former paragraph
(b)(1)(iv)(aa) to current paragraph (b)(1)(iii)(aa), renumbered and amended former paragraph (b)(1)(iv)(cc) to
current paragraph (b)(1)(iii)(bb) by M.I. 50323 - December 8, 2015.

## § 4506.   Metering of Water.

All water delivered by the District shall be metered. Meter readings shall be made on or
about the last day of each calendar month for billing purposes. Meters and control valves on
water lines of the District shall be owned and operated by the District. Any member public
agency may have any meter through which water is served from the District's facilities to any
area within such member public agency tested by the District at any time. Any member public
agency affected shall have the right to be represented by a qualified observer at and during any
such tests. In the event that any such test shall disclose an error exceeding 2 percent, an
adjustment shall be made in charges made to the affected member public agency, covering the
known or estimated period of duration of such error, but in no event exceeding six months, and
the expenses of such test shall be borne by the District; otherwise, such expense shall be borne by
the member public agency requesting such test.

Section 322.7 based on Res. 7260 - May 12, 1970; amended by M.I. 33642 - March 10, 1981.  Section 322.7
repealed and Section 4506 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4507.   Billing and Payment for Water Deliveries.

(a)  **Timeframe for Billing and Payment.**   Except as noted herein below, invoices shall
be mailed electronically, or, if requested by the member agency, by hardcopy via United States
mail, not later than the tenth day of the month following delivery to a member public agency.
Each such invoice shall indicate the date of mailing and the date on which the payment
thereunder becomes delinquent and shall show the total amount of water delivered for each class
of service, the charges for water sold and delivered for each class, the readiness-to-serve and
capacity charges, as applicable, and the total amount due and owing, all as determined by the
General Manager. Payment of the amount shown on any such invoice shall be due on the last
business day of that month and shall be delinquent if not received by the Treasurer of the District
before the close of crediting activity on the last business day of the first month following such
date of mailing. When making any such payment the member public agency shall specify the
invoice or invoices to which the payment shall be credited by the District.

(1) For purposes of Section 4507(a), "business day" shall mean any day other than
a Saturday, a Sunday, or a Holiday (as defined in Section 1106).

(2) For purposes of Section 4507(a), "received by the Treasurer of the District"
shall mean receipt either (1) in the office of the Treasurer or (2) by crediting pursuant to advance
agreement with the Treasurer to the District's general demand account at the District's principal
depository bank, in such form that the funds are immediately available for investment or other
use or disposal by the District.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 274

(3) For purposes of Section 4507(a), "crediting activity" shall mean either (1) 2:00 p.m. if payment is delivered to the office of the Treasurer, or (2) the cutoff time for crediting by the District's principal depository bank of that day's transactions if payment is initiated by wire transfer, automated clearinghouse transfer, interbranch transfer, direct deposit, or by other means pursuant to advance agreement with the Treasurer.

If, under advance agreement with the Treasurer, a member agency has authorized payment of any invoice by automated clearinghouse transfer initiated by the Treasurer, the Treasurer shall initiate such transfer for processing two business days prior to the business day on which such payment shall be delinquent. Failure of such transfer shall not relieve such member agency from liability for such payment or charges in the event such payment should become delinquent, except as specifically provided under advance agreement with the Treasurer.

(b) **Full Service and Emergency Storage Program Facility.**  In cases where water through a particular facility is delivered during any month for full service or Emergency Storage Program Service, the bill for water delivered in such month will be prepared by applying the rates for water sold and delivered in full service to the total quantity of water delivered. If the member public agency desires to receive credit for water used in Emergency Storage Program Service, the facts concerning the quantities of water so used must be certified to the District via the District's electronic certification and billing system by an authorized user for the member public agency purchasing such water as provided for in Section 4507 (c).  The amount of such credits shall be based on the difference in water rates in effect at the time the water is used.

(c) **Late Certifications.**  Based on available information, the District will notify a member agency for any certification that it has not received, if known, three months from the end of the month for which the agency would normally certify.  No certification received after six months following the end of any month in which such a credit is claimed will be accepted. Certifications must be received by Metropolitan before 3:30 p.m. on the third working day after the end of the month to receive credit for any preceding month on the next bill, subject to the provisions with respect to late certifications in this Section. This Section applies to all cases where a certification is required to receive a credit, whether or not specifically named in this Section, unless otherwise provided by this Code.

(d) **Determination by General Manager as to Type of Delivery.**  In the event the respective quantities of water sold and delivered in any month on order of any member public agency for use therein in any water program or contract requiring certification,  are not determinable to the satisfaction of the General Manager in time for preparing regular monthly bills, then billing and payment for all water sold and delivered in such month to such member public agency shall be made at the rates prescribed for water used in full service in Section 4401(a)(1) hereof.  Upon the determination by the General Manager of the correct quantities of water sold and delivered and used in any water program or contract requiring certification, any adjustment which is necessary to give effect to the applicable credit for the water used in any water program or contract requiring certification, shall be made by application of credits on subsequent purchases of water from the District by such member public agency. Such

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 275

adjustments shall not be made in cases where a claim for the applicable credit is not submitted within the period provided in Section 4507(c).

(e)  **Obligation to Pay for Appropriate Class of Service.**  If water has been sold and delivered at the rates prescribed for water sold in any water program or contract and appropriate certifications have been submitted for the water so used, but the water has in fact been used in full service or another class of service, the member public agency shall be obligated to pay the difference between the rates prescribed for water sold for the applicable water program or contract and the rates prescribed for the class of service actually used.

(f)  **Submission of Documentation by Member Agency.**  With respect to water sold and delivered at the rates prescribed for water sold under water programs or contract (unless otherwise specified in an agreement with the District), original documentation supporting the use of such water as certified must be submitted no later than December 31 following the end of the fiscal year for which a certification is submitted, unless otherwise specified in an agreement with the District.  If the documentation is not submitted by December 31 following the end of the fiscal year for which a certification was submitted, an agency will receive a late penalty of $2,500.  If the agency does not submit documentation by February 28/29 following the end of the fiscal year for which a certification was submitted, it shall be conclusively presumed that:

(1)  The water sold from the District was used for full service, and the District's next monthly billing shall reflect such adjustment; or

(2)  The yield was not produced as certified and the District's next monthly billing shall reflect such adjustment.

This provision will apply individually to each program or agreement that an agency or sub-agency participates in separately.

(g) **Review Process.**  With respect to water sold and delivered at the rates prescribed for water sold under water programs or contract (unless otherwise specified in an agreement with the District) the District will complete its review within twelve months from date of receipt of the original supporting documentation.

(1) Should the District not complete its review within twelve months of the submittal of all source documentation, the review will be considered complete and the certifications final.

(2) When the review is completed, the District will notify the member agency of its initial findings for its comments.  The member agency will provide its comments within 60 days.  Metropolitan staff and the agency will work together to reconcile any differences.

(3) If the member agency and Metropolitan staff cannot reconcile the differences, Metropolitan's Water System Operations' Group Manager has the responsibility to consult with the member agency and make a final ruling, subject to the General Manager's oversight.  If the

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 276

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

ruling is unsatisfactory to the agency, it can be appealed to Metropolitan's Finance and Insurance Committee.

(4) If the member agency does not provide further documentation correcting Metropolitan staff findings within the 60 day comment period as specified in (g) (2), then it shall be conclusively presumed that the District's findings are correct and the District's next monthly billing shall reflect such adjustment.

(h) **Discovery of Mistakes or Errors.**   In the event a mistake or error is discovered in a District water sales record, the General Manager shall initiate appropriate corrective action.  No mistake or error made more than three years prior to its discovery shall be corrected unless otherwise specified in an agreement with the District.  In the event a mistake or error is discovered by a member agency in its water sales record or certifications, no mistake or error made more than three years prior to its discovery shall be corrected unless otherwise specified in an agreement with the District.

(1) A District water sales record shall include a water billing invoice, or district invoice for other water-related charges.

(2) If the District finds the mistake or error, the discovery of the mistake or error shall be documented in writing to the member agency.  The date of discovery for corrective action purposes shall be the date notice is sent to the member agency.

(3) If the member agency discovers the mistake or error, the discovery of the mistake or error shall be documented in writing to the District by either a revised certification form or letter, whichever is applicable.  The date of discovery for corrective action purposes shall be the date the certification or letter is received by the District.

(4) If an incorrect invoice has been issued to a member public agency, the General Manager shall notify the affected agency of any adjustment and the manner of making any required credit or charge, neither of which shall bear interest.

(5) Mistakes or errors shall also include but are not limited to mistakes or errors in metering or recording deliveries to member agencies, entry or calculation errors in fixed charges, discovery of errors in either a member agency or sub-agency submitted certification(s), or processing of a certification(s) for the Local Projects Program, the Local Resources Program, the Groundwater Recovery Program, Conservation Credit Program, or any other water management program or storage programs or agreements unless specified otherwise in the contract.

(6) Any mistakes or error for a fiscal year period that is less than five acre-feet cumulative by agency or sub-agency, by program or agreement, shall be waived.

(i) **Rate Change.**  In the event that deliveries of water are made by the District to member public agencies over a billing period during which the District's water rates change, the General Manager may cause the meters recording deliveries of water during such period to be

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 277

read at the end of the period and the statement of charges for such deliveries of water may be based on a proration between the previous and new water rates for the periods of time during which each were in effect as determined by the General Manager.

> Section 322.8 based on Res. 7291 – October 13,1970; amended, paragraphs (c) through (h) [formerly Sections 322.8.3 through 322.8.8] added, and paragraph (i) [formerly Section 312.9] amended and renumbered by M.I. 33642 – March 10, 1981; paragraphs (c) and (f)(2) amended by M.I. 33691 – April 14, 1981; paragraph (a) [formerly Section 322.8.1] amended and paragraphs (a)(1) through (a)(3) added by M.I. 34215 – May 11, 1982; paragraph (d) amended by M.I. 35430 – December 11, 1984; paragraph (a) amended by M.I. 36374 – November 18, 1986.  Section 322.8 repealed and Section 4507 adopted by M.I. 36464 – January 13, 1987, effective April 1, 1987; paragraph (a) amended by M.I. 37271 - August 23, 1988; amended by M.I. 37764 - July 11, 1989; paragraph (c) amended by M.I. 39082 - July 9, 1991; paragraph (f) amended by M.I. 40389 - August 24, 1993; paragraphs (a), (a)(2) and (3) amended by M.I. 40463 - September 21, 1993; paragraphs (c), (d), (f) through (i)(1) and (2) and (j), (k) and (l) amended by M.I. 40865 - June 14, 1994; paragraph (a) amended by M.I. 41468 - June 13, 1995; paragraphs (e) and (f) amended by M.I.41617 - October 10, 1995; paragraphs (a), (b), (d)-(m) amended by M.I. 42278 - February 11, 1997;  Titles added to paragraphs (a)-(n), original paragraphs (b)-(l) renumbered and amended, new paragraphs (k)-(m) (1)-(6) added, and paragraph (m) amended and (m) (1)-(6) added by M. I. 44005 - May 17, 2000; paragraph (l)(3) amended by M.I. 44582 – August 20, 2001; paragraphs (a) and (f) amended and new paragraph (o) added by M. I. 44812 - March 12, 2002; paragraphs (a), (d), (e), (i), (j), (k), (l), (m)(5) amended by M. I. 45249 - March 11, 2003; paragraphs (e), (i), and (j) amended by M.I. 45941 – October 12, 2004; paragraph (a) amended by M. I. 46148 - March 8, 2005; paragraph (l)(3) amended by M. I. 46983 - February 13, 2007; paragraphs (c), (i)(3), (j) amended, paragraph (g) added and renumbered by M. I. 47259 - October 9, 2007; paragraphs (l), (m), (n)(1)-(6), (o), (p) amended by M.I. 47672 – October 14, 2008; paragraphs (c), (e), (i)(3), (j) amended by M.I. 47998 - August 18, 2009; paragraph (3) amended by M.I. 48534 - January 11, 2011; deleted paragraph (p) by M.I. 49952 - November 18, 2014; deleted former paragraphs (b), (c), (d), (g), (h), and (i), renumbered former paragraph (e) to current paragraph (b), renumbered former paragraph (f) to current paragraph (c), renumbered former paragraph (j) to current paragraph (d), renumbered former paragraph (k) to current paragraph (e), renumbered former paragraph (l) to current paragraph (f), renumbered former paragraph (m) to current paragraph (g), renumbered former paragraph (n) to current paragraph (h), renumbered former paragraph (o) to current paragraph (i), amended paragraphs (b), (d), (e), (f), (g), and (h) by M.I. 50323 - December 8, 2015.

## § 4508.   Additional Payment and Reporting in the Event of Delinquency in Payment for Water.

In the event any member public agency shall be delinquent in the payment for water delivered and other charges as invoiced by the District, an additional charge equal to two (2) percent of such delinquent payment for each month or portion thereof that such payment remains delinquent shall be assessed, and the member public agency shall pay such charge to the District in addition to the amount of such delinquent payment. Notwithstanding the above, if the total period of delinquency does not exceed five (5) business days, the additional charge shall be equal to one (1) percent of such delinquent payment. Invoices for delinquencies including additional charges shall be mailed not later than the tenth day of each month. In the event any member public agency shall be delinquent for more than thirty (30) days in the payment for water, such delinquency shall be reported by the General Manager to the Board of Directors of the District at its next meeting. The Board, in its discretion and upon such other conditions as it may prescribe after giving the member public agency a reasonable opportunity to be heard, may order the termination of service to such member public agency until all delinquent payments, including additional charges, are made to the District or may authorize such other actions as may be legally available to effectuate collection.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 278

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

Section 322.9 based on Res. 7291 - October 13, 1970; amended by M.I. 33642 - March 10, 1981; amended by M.I. 34215 - May 11, 1982 effective July 1, 1982.  Section 322.9 repealed and Section 4508 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987; amended by M.I. 41468 - June 13, 1995.

## § 4509.   Water Restricted to Use Within the District.

In order to insure that water served by the District is not used for the direct or indirect benefit of areas outside the District, the amount of water served by the District's facilities that shall be made available to any member public agency shall be limited to an amount equal to that required for uses within the area of the District lying within, or served by or through, such member public agency. No area lying outside the boundaries of the District shall be served with water from the District's facilities, except as service to such area may, when found to be such by the Board, be a reasonably unavoidable incident to the service of such water within the District, and under such circumstances the amount of water served by the District that shall be made available to any member public agency shall be limited to an amount equal to that required for uses within the area of the District lying within, or served by or through, such member public agency. Any question of fact involved in the application of this Section 4509 shall be finally determined by the Board, after giving the member public agency concerned adequate opportunity to present pertinent factual evidence and the views of such member public agency.

Section 312.10 based on Res. 7260 - May 12, 1970; amended by M.I. 33642 - March 10, 1981.  Section 322.10 repealed and Section 4509 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4510.   Application of Regulations.

The provisions hereof shall not be applicable to service of water to the United States of America, or to any board, department or agency thereof, to the State of California, or to the service of surplus water under contract made in accordance with statute, but such service shall be controlled by the applicable contract.

Section 312.11 based on Res. 7260 - May 12, 1970; amended by M.I. 33642 - March 10, 1981.  Section 322.11 repealed and Section 4510 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4511.   Notices.

All notices and communications from member public agencies of the District, relating to the service of water or the administration of these regulations by the District, shall be addressed to the General Manager, Post Office Box 54153, Los Angeles, California  90054.

Section 312.12 based on Res. 7260 - May 12, 1970; amended by M.I. 33642 - March 10, 1981.  Section 322.12 repealed and Section 4511 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4512.   Sales Subject to System and Water Availability.

The District will endeavor to satisfy all requests for water sales and deliveries made by the member public agencies.  Deliveries shall be subject to operational, supply or demand

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 279

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

conditions, as determined by the General Manager.  The District will develop annual operating plans in coordination with member public agencies.   The annual operating plans shall be developed to meet requested deliveries under anticipated conditions.  In the event of adjustments to deliveries due to changes in planned operations or in supply or demand conditions, the District and the member public agencies will communicate and coordinate operations.

M.I. 36811 - September 22, 1987; amended by M.I. 40865 - June 14, 1994; amended by M.I. 42278 - February 11, 1997; amended by M.I. 50323 - December 8, 2015.

### § 4513.   Equal Opportunity Requirements.

Pursuant to contract between agencies of the United States and the District, any delivery of water by the District to a member public agency shall be subject to the following provisions. For the purposes of these provisions only, the member public agency is therein referred to as "Contractor."

(a)  The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.  The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.  Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Federal Contracting Officer setting forth the provisions of this nondiscrimination clause.

(b)  The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without discrimination because of race, color, religion, sex, or national origin.

(c)  The Contractor will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Federal Contracting Officer, advising said labor union or workers' representative of the Contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, as amended, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d)  The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e)  The Contractor will furnish all information and reports required by said amended Executive Order and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 280

Federal Contracting Officer and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Federal Government contracts in accordance with procedures authorized in said amended Executive Order, and such other sanctions may be imposed and remedies invoked as provided in said amended Executive Order, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of said amended Executive Order, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

M.I. 36781 - August 18, 1987.

[§ 4514    repealed by M.I. 50323 - December 8, 2015.]

[§ 4515 - M.I. 38295 - June 12, 1990; repealed by M.I. 41468 - June 13, 1995.]

[§ 4516 — M. I. 40969 — August 19, 1994; repealed by M. I.44812 - March 12, 2002.]

### § 4517.  Cooperative Storage Program.

(a) The Cooperative Storage Program that provides a means for coordinating storage capacity available to the District's member public agencies, with the District's annual carryover storage needs as those needs are determined under Subsection 4206(c). The purpose of the Program is to place additional amounts of imported water in local storage to improve regional water supply reliability within the District's service area, in a manner that will recognize local costs and risks of participating in the program, but will not adversely impact either the District's finances or the member public agencies' ability to participate in the Replenishment Service Program.

(b) Storage Allocation - The General Manager shall allocate needed storage by reservoir and by groundwater basin to optimize the availability and usefulness of the storage to the District; and shall administer the Program so that, in any fiscal year, Program water in storage

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 281

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

shall be accessible to offset demands on the District that year by the participating member public
agency pursuant to subsection (h).

(c) Availability of Water for Storage - The General Manager may make water available
during the period May 1 through September 30, for storage under the Cooperative Storage
Program, upon notice to the respective participating member public agency, subject to a
determination that the storage will increase the District's ability to receive imported water
supplies.

(d) Application for Participation - Member public agencies may apply for participation in
the Cooperative Storage Program by filing a written application containing at least the following:

(1) A verified statement that the member public agency will comply with the
requirements of this section.

(2) A water supply and demand estimate based on historical data to ensure that:

(i) The agency's participation in the Program will not offset its firm purchases of
water from the District, and

(ii) The agency will store additional imported District water.

(iii)The estimate may be updated if conditions change, provided the updating is
first agreed to in writing by the agency and the District.

(3) A proposal for placing water provided by the District under this Program in
storage available to the member public agency, and for administering that storage pursuant
to this Section.

(4) An estimate of any expected losses of Program water while that water is in the
proposed storage, and the method of estimating those losses.

(5) Evidence of compliance with the California Environmental Quality Act prior
to delivery of imported water for placement in Program storage.

(6) If more than one member public agency overlies a common groundwater
basin, the overlying member public agencies may file a joint application, with each such
agency providing a separate water supply and demand estimate for its respective service
area pursuant to subsection (d)(2) and any other separate information the General Manager
may require.

(e) Approval for Participation - The General Manager shall approve an application for
participation in the Program upon determination that it is consistent with the requirements of this
section.  The General Manager shall approve the application in writing which shall include a
monthly estimate of total demand, water purchased from Metropolitan, available local supplies,

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 282

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

and the maximum quantity of District water which shall qualify for storage under the Program, and those figures shall be approved by signature of a duly authorized representative of the participating member public agency prior to storage of water under the Program. Any later modification to said figures must be approved by both parties in writing.  The application of any modification shall not be effective until approved in writing.  The District shall conduct end-of-the-year verifications of stored water.

(f) Storing Process

(1) The District will deliver at its cost, available imported water to the respective participating member public agency at its appropriate District service connection, for Program storage by direct or in-lieu methods, following verbal or electronic acceptance by that agency. This delivery shall be deemed to be a Cooperative Storage Program sale by the District to the member public agency as defined in Section 4118, subject to the payment requirements of subsection (i) and (j) of this Section.

(2) The agency will, at its cost, cause the water to be placed in storage in a manner that meets all applicable storage requirements; and shall warrant that the stored water shall not be withdrawn or used until after the District releases the stored water pursuant to this Section.

(3) Program water delivered to a member public agency shall not offset a firm water sale of District Water by that agency.  If a participating member public agency's firm water purchases from the District on a monthly basis during the May through September period are less than the District's firm water sales on a monthly basis during the same period in any one of the last five years, the agency must clearly demonstrate to the District, in writing, that such reduction occurred due to the availability of unexpected local water supplies.  Any resulting change in the baseline established pursuant to Subsection (e) shall be approved in writing by the General Manager prior to becoming effective.  Should the agency fail to make the required demonstration, the District shall bill the agency at the firm water rate for that portion of Cooperative Storage water delivered which will bring the firm water sales up to the agreed base amount of firm water for the month(s) in question.

(g) Storage Accounting

(1) Each participating member public agency shall maintain a Program storage account for Program water it stores, which shall account for monthly deliveries, releases, and storage losses approved by the District, if any, and other information which the General Manager shall deem necessary.

(2) The District shall bear reasonable and equitable losses of stored water provided that the General Manager approves the respective member public agency's justification of the loss criteria prior to placement of water into storage and shall consider those losses in allocating Program storage. Otherwise the District shall not bear any loss of stored water.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 283

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(3) Water stored under this Program shall be stored by a participating agency in such a manner as to assure that such water can be produced by that agency when released by Metropolitan.  Program water delivered to a member public agency for storage shall be considered local water produced in that year for purposes of Replenishment Service.

(h) <u>Release of Stored Water</u> - The General Manager shall release stored Program water to the participating member public agency in which it is stored under the following criteria:

(1) Water Delivered to Storage Prior to 1995

(i) In an fiscal year when Replenishment Service deliveries are available, the General Manager may release, up to half of the Program water stored by the respective member public agency, in place of the agency's request for delivery of Replenishment Service through the District's distribution system, except for conditions described in provisions (iv) and (v) of this subsection;

(ii) In a fiscal year in which Replenishment Service or Full Service deliveries have been suspended, the General Manager shall release, and the participating member public agency shall accept, up to half of the Program water stored by the respective public agency, to the extent the agency requests that release, except for conditions described in provisions (iv) and (v) of this subsection;

(iii) During an emergency such as an earthquake, when District water service is interrupted, the General Manager shall release up to all stored Program water stored by the respective member public agency, to the extent of the interruption in water service and that the agency requests that release;

(iv) When the Program water stored by the respective member public agency is less that ten percent of the agency's average annual purchase of Replenishment Service, whichever is applicable, deliveries for the prior four years, the General Manager may release all of the Program water stored by the agency;

(v) In any fiscal year during which a participating member public agency's Replenishment Service or Program water release request is less than its average annual purchase of Seasonal Storage Service or Replenishment Service, whichever is applicable, of the prior four years, the General Manager may release the Program water stored by the respective member public agency in combination with Replenishment Service sales up to the agency's four-year average Seasonal Storage Service or Replenishment Service purchase. The District shall not release more than half of the Program water stored by the respective member public agency for this purpose and shall provide the agency with a 90-day advance notice of the release.

(2) Water Delivered to Storage After 1994

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 284

(i) The General Manager may release in a fiscal year up to one-third of the total amount of Program water placed in storage by a respective member public agency in place of that agency's request for delivery of water from the District's distribution system or for Replenishment Service, in order to fill Diamond Valley Lake, meet operational requirements, or reduce or eliminate shortages. Program water used to reduce or eliminate shortages, or for operational requirements may be released during any ten months selected by the General Manager during a twelve-month period from the time of release. Program Water may be released at any time in place of the agency's request for Replenishment Service.

(ii) Upon release of Program water by District, the participating member agency shall furnish to District, within 60 days, water supply and demand data based on historical information sufficient to document that it has produced the amount of Program water released to it.

(iii) The General Manager shall release stored Program water to the respective member public agency no later than ten years after delivering it to that agency for storage.

(iv) If a member public agency receives delivery of Program water for storage after 1994, any Program water that agency has stored in previous years shall also be subject to the release provisions of this Subsection (h)(2).

(v) Participating Member Public Agencies may transfer Program water they have placed into storage under the Program into other long-term water storage programs the District may develop as part of its Integrated Resource Plan under mutually agreeable transfer terms, executed in writing by both parties.

(i) <u>Payment</u>

(1) The participating member public agency shall pay the District's incremental costs of delivering Program water for storage plus interest at the average yield on the District's investment portfolio, from the date of delivery to the member public agency to the date of the invoice. Pursuant to the provisions of Section 4507, the District will invoice the member public agency on or about July 10 of the calendar year following the year in which the water is delivered.

(2) At the time the General Manager releases stored Program water to the respective participating member public agency the District shall invoice the respective participating member public agency pursuant to the provisions of Section 4507, at the applicable treated or untreated Replenishment Service rate in effect when the respective Program water was placed in storage, less any previous payment for the incremental costs of delivering the water for storage (but not including credit for the interest required by Subsection (i)(1)).

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 285

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(3) Water released from storage to the participating member public agency shall be the oldest water then in storage.

(4) Readiness-to-Serve Charge Treatment.

(i) Program water delivered to storage prior to April 12, 1994 shall be exempted from the Readiness-to-Serve charge determination. Those charge determinations shall be applied to water delivered to storage after that date, except as applied in (ii) below, when the stored water is released to the participating member public agency.

(ii) The Readiness-to-Serve charge for Program water delivered for storage in 1995 shall be $36 per acre foot and will be paid monthly as the water is released to the member public agency.

(j) Penalty - A participating member public agency shall pay the applicable treated or untreated Full Service water rates for Program water the District delivers to it for placement in storage, to the extent it fails to comply with all the requirements of this Section.

(k) Indemnification - Participating member public agencies shall indemnify and defend the District, its employees, officers and directors for any injuries or damages that may be caused as a result of placing Program water in storage, storage itself, or storage releases and related withdrawal or use of Program water.

M.I. 40969 - August 19, 1994; paragraphs (a) through (i)(4)(ii) amended and renumbered, paragraph (k) repealed and paragraph (l) renumbered by M.I 41404 - May 9, 1995; paragraphs (h) and (j) amended by M.I. 42278 - February 11, 1997;  paragraphs (f) and (h) (i) amended by M.I. 44005 - May 17, 2000; paragraph (i) (1) and (i) (4)(i) (ii) amended by M. I. 44812 - March 12, 2002; paragraphs (a), (g)(3), (h), (h)(i), (iii)-(v), (2)(i), (iv), and (i)(2) amended by M. I. 45249 - March 11, 2003.

## § 4518        Emergency Storage Program.

(a) The Emergency Storage Program is for the purpose of delivering water for emergency storage purposes.  A member public agency may request delivery of water under the Emergency Storage Program.  The minimum delivery of water for emergency purposes pursuant to any request is 10 acre-feet.  Deliveries under the Emergency Storage Program, in the aggregate, are limited to 100,000 acre-feet annually, subject to available surplus and capacity to deliver.  Water delivered under the Emergency Storage Program can be used only for Emergency Storage Program purposes.  On-going operating losses such as evaporation cannot be replaced through the Emergency Storage Program.  Water delivered through the Emergency Storage Program is subject to interruption by Metropolitan due to supply, water quality, or operational conditions. Water delivered pursuant to the Emergency Program may be withdrawn from emergency storage only to the extent that:

(1) The local agency's governing body declares an emergency requiring public notice and extraordinary conservation measures.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 286

(2) The emergency requires use of stored water for a period greater than seven days; and

(3) Operational storage has been completely used.

(b) Applicable rate – Water delivered through the Emergency Storage Program will be billed at the then applicable Tier 1 cost including System Access Rate, System Power Rate, Water Stewardship Rate and Tier 1 Supply Rate.  The Treatment Surcharge will apply to treated water deliveries.  Water delivered through the Emergency Storage Program is not to be included in the calculation of a member agency's Readiness-to-Serve Charge or Capacity Charge.

(c) Certification

(1) Certification process is subject to the rules specified in Section 4507.

(2) On a monthly basis, a participating member public agency will certify the volume of water delivered for Emergency Storage Program purposes for billing purposes via the District's electronic certification and billing system.

(3) A member public agency that has received water under the Emergency Storage Program shall certify to Metropolitan whether water delivered through the Emergency Storage Program is maintained as emergency storage and/or indicate the emergency for which the storage water was withdrawn.  In the event of an emergency where the water is unavailable due to its prior use to meet non-emergency demands, the water will be re-billed to the member agency at the then current Tier 2 cost.

M.I. 45941 – October 12, 2004; paragraph (2) amended by M.I. 47998 - August 18, 2009.

**[Chapter 6 - repealed by M.I. 41468 - June 13, 1995]**

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 287

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

## Chapter 7

## SERVICE CONNECTIONS

Sec.
4700.   General Authorization
4701.   Authority for Execution of Service Connection Agreements
4702.   Special Service Connection Terms and Conditions
4703.   Appeal of Decisions Regarding Service Connections
4704.   Compliance with Environmental Obligations for Service Connections
4705.   Fair Value of Outlet
4706.   Effect of Hydroelectric Facilities on Service Connections
4707.   Temporary Service Connections
4708.   General Manager's Report on Service Connections

### § 4700.   General Authorization.

The General Manager is authorized to construct, or have constructed, any service connection requested by a member public agency, which, in the opinion of the General Manager, should be authorized and which is not specifically precluded by resolution of the Board; subject to such terms and conditions as shall be deemed by him to be reasonable and proper, and which shall, however, include the following:

(a) The District shall cause a service connection to be constructed pursuant to a written request by a member public agency in accordance with plans and specifications approved by the General Manager and by an authorized representative of member public agency. All equipment and materials required for constructing the service connection shall be acquired by the District in its customary manner, or the District may utilize therefor suitable equipment and materials on hand.

(b) The service connection shall include the facilities for diversion of water from the District's system and for delivery of such water into the pipeline distribution system of member public agency or of member public agency's affected distributor. The service connection up to and including the fitting connecting with the pipeline through which member public agency will receive water delivered through the service connection, which shall include metering instruments and a cabinet therefor, shall be the property of the District and shall be operated, maintained and controlled by the District.

(c) The costs of constructing the service connection shall be estimated by the General Manager, who shall inform the member public agency representative regarding the amount of such estimate. The total amount of such estimate shall be deposited by member public agency in advance of any action toward construction of the service connection, including all items peculiar only to a given service connection, or it may be deposited in stages, as follows:

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 288

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

(1) Estimated cost of final design, prior to commencement of final design.

(2) Cost of items of equipment and material requiring long term delivery, six weeks prior to the delivery date for such items, as estimated by General Manager.

(3) All remaining costs, six weeks prior to commencement of field construction; provided, however, that if the field construction period is estimated by the General Manager to exceed 90 calendar days, then payment of the remaining costs may be staged over the construction period, if the member public agency should so choose, by a series of advance deposits in amounts estimated by the General Manager to be sufficient to cover the construction in progress, but the first such advance deposit shall be made six weeks prior to commencement of field construction.

(4) Such deposits shall be held and used to defray the costs of constructing the service connection, and until such deposits have been received, except as provided in Section 4700(c)(3) the District shall not be required to undertake the construction of the service connection.

(d) Upon completion of construction of the service connection, the District shall render to member public agency a statement of all costs, audited and certified in accordance with the customary practice of the District, incurred by the District in constructing the service connection; if such costs shall exceed the sum of money theretofore deposited by member public agency with the District as provided hereinbefore in Section 4700(c) member public agency promptly shall pay to the District the amount by which such costs shall exceed such deposit; and if such costs are less than the said sum of money so deposited, any unexpended balance of such deposit shall be returned by the District to member public agency. Said costs incurred by the District shall include the costs of general administrative service and overhead expense, determined in accordance with the methods of cost accounting customarily employed by the District.

(e) Member public agency shall cause to be granted to the District or the District shall acquire at member public agency's expense, directly from the fee owner of the affected land, such easement as may be necessary in the opinion of the General Manager for the construction, operation, maintenance and repair of the service connection. Said easement and the grant thereof shall be approved by the District's General Counsel; provided, however, that fee title to the property required for such service connection may be acquired in the same manner as an easement and in lieu of an easement if the General Manager and member public agency agree that it would be advantageous to do so.  Member public agency shall provide, or the District may obtain, at member public agency's sole cost and expense, a policy of title insurance insuring that clear title to the easement, or fee, is vested in "The Metropolitan Water District of Southern California, a public corporation of the State of California," subject to any encumbrances that have been approved in writing by the General Manger. The amount of title insurance shall be determined by the acquisition cost, unless the acquisition is made without cost or for less than the amount of the coverage which will be provided for the price paid for the title report, in which case the title policy shall be in the amount of such coverage.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 289

(f) Upon completion of the service connection, the District shall be responsible for any subsequent maintenance, alteration, reconstruction or relocation of such service connection except changes which are requested by a member public agency, which changes shall be handled as a new service connection. However, prior to the release of water by the District into the pipeline distribution system of member public agency or of member public agency's affected distributor, each agency shall install its own flow control device or devices as a means of maintaining uniform flow. Should the service connection be of the type that delivers water into an open channel or basin for groundwater replenishment use, then member public agency shall have the following options for the design, construction, ownership and maintenance of the required flow control device or devices.

(1) The District at the request of member public agency will design, construct, own, operate and maintain such flow control device or devices deemed necessary for the regulation of water deliveries, in which case the District's responsibility shall not extend beyond the ownership of the flow control facility, and any and all liabilities arising from release of water in the quantities agreed upon by member public agency and the District shall be the full responsibility of member public agency. Construction of the aforementioned facility shall be included as an additional feature of the service connection and the related cost shall be included as a part of the total cost of the service connection.

(2) Member public agency may design, construct, own, and maintain the aforementioned flow control facility, in which case the District's responsibility shall not extend beyond ownership of its meter facility, and any and all liabilities arising from release of water in the quantities agreed upon by member public agency and the District shall be the full responsibility of member public agency. However, the quantity of water delivered to member public agency through the flow control facility at any time shall be only as requested by member public agency, subject to the ability of the District to operationally meet such requests.

Section 321.1 based on Res. 7489 - April 10, 1973 amending Res. 7038 - November 14, 1967; paragraph (f) [formerly Section 321.1.6 amended by M.I. 32690 - April 10, 1979 and M.I. 33642 - March 10, 1981. Section 321.1 repealed and Section 4700 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

## § 4701.   Authority for Execution of Service Connection Agreements.

The General Manager is authorized to execute on behalf of the District any agreement or agreements necessary or proper to be entered into between the District and a member public agency in order to provide for the construction of a service connection in the manner and subject at least in part to the terms and conditions set forth in this Chapter. Each such agreement shall be in form approved by the General Counsel of the District.

Section 321.2 based on Res. 7489 - April 10, 1973 amending Res. 7038 - November 14, 1967; amended by M.I. 32690 - April 10, 1979; amended by M.I. 35992 - March 11, 1986. Section 312.2 repealed and Section 4701 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 290

### § 4702.   Special Service Connection Terms and Conditions.

If a service connection is requested by a member public agency to which the terms and conditions, or any portion thereof, whether as required by the General Manager or as required by this Chapter 6, are inappropriate in either the opinion of the General Manager or the member public agency, such request may be presented to the Board for its determination of appropriate terms and conditions, together with the reasons why the required terms and conditions are claimed to be inappropriate.

Section 321.3 based on Res. 7489 - April 10, 1973 amending Res. 7038 - November 14, 1967; amended by M.I. 32690 - April 10, 1979.   Section 312.2 repealed and Section 4702 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4703.   Appeal of Decisions Regarding Service Connections.

Any affected member public agency may appeal to the Board from any decision or action of the General Manager hereby authorized. The decision of the Board of Directors shall be final. Subject to Sections 4702 and 4703, the General Manager shall make all determinations of fact.

Section 321.4 based on Res. 7489 - April 10, 1973 amending Res. 7038 - November 14, 1967.  Section 321.4 repealed and Section 4703 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4704.   Compliance with Environmental Obligations for Service Connections.

Member public agencies are responsible for ensuring that the obligations of lead agencies as described in the California Environmental Quality Act and its implementing guidelines are fulfilled. The District shall fulfill all other obligations that may arise from its involvement in construction of the service connections and shall provide such information as it has available which is necessary to insure compliance with the Act and its implementing guidelines.

Section 321.5 based on Res. 7489 - April 10, 1973 amending Res. 7038 - November 14, 1967.  Section 321.5 repealed and Section 4704 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4705.   Fair Value of Outlet.

The fair value of an outlet installed during pipeline construction will be established by the General Manager at the time a service connection is constructed at the outlet, and the charge to a member public agency for such an outlet will be based on this fair value; provided that any outlet larger than 24 inches or any outlet installed after a pipeline is placed in operation shall be charged for its actual cost.

Section 321.7 - M.I. 27804 - October 14, 1969; amended by M.I. 32690 - April 10, 1979; renumbered 321.6 by M.I. 33596 - February 10, 1981.  Section 321.6 repealed and Section 4705 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 291

### § 4706.   Effect of Hydroelectric Facilities on Service Connections.

(a) The operation of a hydroelectric generating facility on the District's water distribution system may result in a reduction in the District's minimum design pressure at the downstream service connection through which a member public agency has been receiving water pursuant to Section 4700(f). In that event, the District may, at its own expense, in order to facilitate its water distribution or maintain maximum generation of the hydroelectric power, take reasonable and appropriate measures, either to adjust its own system to continue to supply water to the affected member public agency at such minimum design pressure, or to enable the agency to pump the water on its system to a pressure equal to such minimum design pressure.

(b) For purposes of this section, the minimum design pressure is defined as the lessor of:

(1) The pressure resulting from the design flow hydraulic gradient, as shown on the District's hydraulic profiles or,

(2) The pressure resulting from a low-flow hydraulic gradient in a reach of pipeline which was designed for "falling head."

Section 321.8 - M.I. 33443 - October 14, 1980; renumbered 321.7 by M.I. 33596 - February 10, 1981.
Section 321.7 repealed and Section 4706 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4707.   Temporary Service Connections.

The General Manager is authorized to enter into and to perform any agreement for the construction and removal of a temporary service connection requested by a member public agency or other governmental agency to serve its needs for a limited time. Notwithstanding the provisions of Section 4700, such agreement may be upon such terms and conditions as the General Manager and the requesting entity may agree upon and may provide for payment of the cost of construction and removal of the temporary service connection based upon an estimate prepared by the General Manager.

Section 321.8 - M.I. 33596 - February 10, 1981.  Section 321.8 repealed and Section 4707 adopted by
M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4708.   General Manager's Report on Service Connections.

The General Manager shall report quarterly to the Engineering and Operations Committee of the Board new service connections approved by him pursuant to this Chapter with the estimated cost and approximate location of each.

Section 321.6 based on Res. 7489 April 10, 1973 amending Res. 7038 November 14, 1967; amended by
M.I. 32690 - April 10, 1979; renumbered 321.9 by M.I. 33596 - February 10, 1981; amended by M.I. 36065 -
May 13, 1986.  Section 321.9 repealed and Section 4708 adopted by M.I. 36464 - January 13, 1987, effective
April 1, 1987; title and Section amended by M. I. 44582 – August 20, 2001; amended by M. I. 46983 - February
13, 2007; section amended by M.I. 48081 – November 10, 2009.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 292

<h1 style="text-align:center">Chapter 8</h1>

<h2 style="text-align:center">SYSTEM INTERCONNECTIONS - HYDRAULIC TRANSIENTS</h2>

Sec.
4800.   Definitions
4801.   General
4802.   Notice of New Construction or Alterations
4803.   Reduction or Suspension of Deliveries

### § 4800.   Definitions.

(a) As used in this Chapter 8, "hydraulic transient" means a change in pressure or flow-rate resulting from the sudden stoppage or increase of flow of water in a pipeline.

(b) As used in this Chapter 8, "new construction or modification" means new construction or modification on or affecting any part of a member public agency's or subagency's distribution system which is directly connected to the District's distribution system and which could cause a hydraulic transient affecting or potentially affecting the District's system.

> Section 322.5.4.1 - M.I. 34826 - August 17, 1983.  Section 322.5.4.1 repealed and Section 4800 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4801.   General.

Member public agencies shall avoid, and shall cause their subagencies to avoid, the creation of conditions that could cause hydraulic transients to damage the District's facilities. Where a member public agency or a subagency installs hydroelectric or pumping facilities on a pipeline that is directly connected to the District's system such condition may be avoided by the installation of reliable protective devices including, but not limited to, surge tanks, bypass or feeder tanks, and pressure relief valves.

> Section 322.5.4.2 - M.I. 34826 - August 17, 1983.  Section 322.5.4.2 repealed and Section 4801 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

### § 4802.   Notice of New Construction or Alterations.

Each member public agency shall notify the District of any proposed new construction or modification and shall require each subagency to provide such notice to the District with regard to any proposed new construction or modification. Such notice shall be accompanied by project plans and specifications. Within 30 days after receipt of the notice, the District shall notify the member public agency or subagency of its comments on such plans and specifications for the purpose of minimizing the possibility of hydraulic transients that could damage the District's facilities.

> Section 322.5.4.3 - M.I. 34826 - August 17, 1983; amended by M.I. 35992 - March 11, 1986.  Section 322.5.4.3 repealed and Section 4802 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 293

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

### § 4803.   Reduction or Suspension of Deliveries.

The General Manager is authorized to reduce or suspend deliveries to any member public agency if he determines that a member public agency or subagency has failed to install reliable protective devices to protect the District's facilities from damage from hydraulic transients and that a substantial risk of such damage exists.

Section 322.5.4.4 - M.I. 34826 - August 17, 1983.  Section 322.5.4.4 repealed and Section 4803 adopted by M.I. 36464 - January 13, 1987, effective April 1, 1987.

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 294

Extension of Service Area Agreement
Exhibit F-7:   MWD's Best Management Practices

**[Chapter 9 – repealed by M.I. 50323 - December 8, 2015]**

Provisions updated to reflect the actions of the Board of Directors through its 4/12/2016 meeting.

EXHIBIT 1
Page 295

<div align="center">

**EXECUTION VERSION**

**ESAA CAPACITY AGREEMENT**

</div>

THIS ESAA CAPACITY AGREEMENT (this "*Agreement*") is made and entered into as of November 29, 2017 ("Effective Date"), by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS (*"Pechanga"*)**, a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT** ("*RCWD*"), a California water district organized pursuant to California Water Code section 34000 *et seq.*, and the **UNITED STATES OF AMERICA**, acting through the Secretary of the Department of the Interior.

<div align="center">

**RECITALS**

</div>

A.    Pechanga, RCWD, and the United States of America, among others, have agreed to a comprehensive settlement of all of Pechanga's claims for water rights in the Santa Margarita River Watershed.  The Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("*Settlement Agreement*") memorializes the settlement.

B.    As part of the Settlement Agreement, Pechanga, MWD (as hereinafter defined) and EMWD (as hereinafter defined) agreed to an Extension of Service Area Agreement ("*ESAA*"), which is attached to the Settlement Agreement as Exhibit F.  The ESAA provides for MWD and EMWD to provide treated water to Pechanga ("*Imported Water*").

C.    In furtherance of the Settlement Agreement and the ESAA, Pechanga, the United States of America, and RCWD seek to provide capacity within RCWD's distribution system to enable RCWD to deliver Imported Water to Pechanga on an interim and permanent basis.

D.    The United States Congress has authorized, ratified, and confirmed the Settlement Agreement by act of Congress.  *See* Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Subtitle D of Title III of Pub. L. No. 114-322 (2016) (the "**Act**"). In the Act, Congress authorized, as a portion of the settlement to which Pechanga is entitled, funds to pay for water delivery capacity to provide for the delivery of Imported Water to Pechanga.

E.    The Parties seek to establish the terms and conditions, pursuant to which RCWD shall provide such water delivery capacity to Pechanga.

<div align="center">

**AGREEMENT**

</div>

**IT IS AGREED AS FOLLOWS:**

**1.    Definitions.**    Capitalized terms used in this Agreement shall have the meanings set forth below.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Subtitle D of Title III of Pub. L. No. 114-322 (2016).

"*AFY*" means acre-feet per Year.

"*Agreement*" means this ESAA Capacity Agreement, by and among Pechanga, RCWD, and the United States of America, dated as of the date first written above.

EXHIBIT 1
Page 296

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with Division 20 of the California Water Code.

"*Enforceability Date*" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e) of the Act.

"*ESAA Capacity*" means capacity within RCWD's distribution system necessary to provide Imported Water to Pechanga on an interim and long term basis.

"*ESAA Water Delivery Agreement*" means the agreement attached to the Settlement Agreement (as hereinafter defined) as Exhibit H.

"*Imported Water*" means any water delivered to Pechanga pursuant to the ESAA and the ESAA Water Delivery Agreement.

"*Interim Capacity*" has the meaning set forth in Exhibit G-1. "Interim Capacity Notice" has the meaning set forth in Section 4(b)(i) of this Agreement.

"*MWD*" means The Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended).

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*Pechanga Settlement Fund*" means the fund established by section 3409 of the Act. "Pechanga ESAA Delivery Capacity  Account" means the account established by section 3409(c)(2) of the Act.

"*Permanent Capacity*" has the meaning set forth in Exhibit G-2.

"*RCWD*" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"*Section*" means a section or subsection of this Agreement.

"*Settlement Agreement*" has the meaning set forth in Recital A.

"*United States*" means the United States or the United States of America acting in its capacity as trustee for Pechanga, its Members and Allottees.

"*Year*" means a calendar year of January 1 through December.

EXHIBIT 1
Page 297

2.    **List of Exhibits.**

| Exhibit No. | Exhibit Name |
|---|---|
| G-1 | Description of Interim Capacity |
| G-2 | Description of Permanent Capacity |

3.    **Pechanga ESAA Delivery Capacity Account.**

(a)  Section 3409(c)(2) of the Act directed the Secretary of the Department of the Interior to establish the Pechanga ESAA Delivery Capacity Account as an account held in trust by the United States within the Pechanga Settlement Fund.

(b)  Section 3411(a)(2) of the Act authorized $17,900,000 to be appropriated into the Pechanga ESAA Delivery Capacity Account, such amount to be adjusted to account for changes in construction costs since June 30, 2009, as is indicated by ENR Construction Cost Index, 20-City Average, as applicable to the types of construction required for the Band to provide the infrastructure necessary for the Band to provide the Interim Capacity and Permanent Capacity in the event that RCWD elects not to provide the Interim Capacity or Permanent Capacity as set forth in the ESAA Capacity Agreement and contemplated in sections 3408(d)(2)(D) and 3408(d)(3)(D) of the Act, with such adjustment ending on the date on which funds authorized to be appropriated under this section have been deposited in the Fund.

(c)    Section 3408(d) of the Act directed the Secretary to use funds from the ESAA Delivery Capacity Account to allow for:

(i)    Pechanga's payment to RCWD for Interim Capacity and Permanent Capacity in accordance with this Agreement; or

(ii)    Pechanga's share of the costs associated with the design and construction of the ESAA Capacity in accordance with this Agreement.

(d)    Section 3409(a) of the Act provides that funds deposited into the Pechanga ESAA Delivery Capacity Account shall have interest accrue thereon for disbursement in accordance with the provisions of this Agreement.

4.    **RCWD Interim Capacity Commitment.**

(a)    RCWD shall provide Interim Capacity to Pechanga for the delivery of Imported Water to Pechanga beginning on the date that deliveries are to commence pursuant to this Agreement.

(b)    In consideration of RCWD's commitment to provide Interim Capacity as set forth in Section 4(a) of this Agreement, Pechanga shall, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, pay for such Interim Capacity, in accordance with the following procedure and schedule:

(i)  Within thirty (30) days after the occurrence of the later of (a) the Enforceability Date or (b) the date that deliveries of Imported Water are scheduled to occur

EXHIBIT 1
Page 298

in accordance with the terms and conditions of this Agreement, RCWD shall provide written notice to Pechanga that it shall be ready to commence deliveries of Imported Water in an amount up to the amounts possible under the Interim Capacity ("Interim Capacity Notice").

(ii)   The Interim Capacity Notice shall include a request for payment in the amount of one million dollars ($1,000,000), as adjusted in accordance with Section 3411(a) of the Act, which shall constitute the full and complete consideration to be paid to RCWD by Pechanga for RCWD's provision of Interim Capacity until the later of the date on which (x) Permanent Capacity is made available to Pechanga pursuant to this Agreement, or (y) deliveries of Imported Water cease permanently, pursuant to and in accordance with the terms of the ESAA Water Delivery Agreement.

(iii)   Pechanga shall not be responsible for any additional charges, fees, assessments or costs from RCWD in connection with RCWD's delivery of Imported Water to Pechanga using the Interim Capacity.

(iv)   Subject to Section 4(b)(vi) of this Agreement, upon receipt of the Interim Capacity Notice, Pechanga shall promptly file a written request to the Secretary for disbursement of funds from the Pechanga ESAA Delivery Capacity Account in an amount equal to the amount set forth in the Interim Capacity Notice.

(v)   Upon receipt of the written request from Pechanga in accordance with Section 4(b)(iv) of this Agreement and confirmation that such written request conforms to the requirements of this Agreement and the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, the Secretary shall make payment directly to RCWD in an amount equal to the amount set forth in Pechanga's written request.

(vi)   If Pechanga withdraws the funds in the ESAA Delivery Capacity account pursuant to the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, Pechanga shall make payment directly to RCWD in an amount equal to the amount set forth in the Interim Capacity Notice.

(c)   If RCWD does not provide the Interim Capacity Notice required pursuant to the ESAA Capacity Agreement by the date that is 60 days after the date required under the ESAA Capacity Agreement, the amounts in the Pechanga ESAA Delivery Capacity account for purposes of the provision of Interim Capacity and Permanent Capacity, including any interest that has accrued on those amounts, shall be available for use by Pechanga to provide alternative interim capacity in a manner that is similar to the Interim Capacity and Permanent Capacity that Pechanga would have received had RCWD provided such Interim Capacity and Permanent Capacity.

5.   **RCWD Permanent Capacity Commitment.**

(a)   RCWD shall provide Permanent Capacity to Pechanga for the delivery of Imported Water to Pechanga at such time as RCWD is physically capable of providing such capacity but in no event later than five (5) years after the Enforceability Date.

(b)   In consideration of RCWD's commitment to provide Permanent Capacity as set forth in Section 5(a) of this Agreement, Pechanga shall, subject to the availability of funds in

EXHIBIT 1
Page 299

and from the ESAA Delivery Capacity Account, make a payment for such Permanent Capacity, in accordance with the following procedure and schedule:

(i)      At any time after the Enforceability Date has occurred, and at such time as RCWD is physically capable of making a permanent commitment of capacity equal to the Permanent Capacity, RWCD shall provide written notice of said event to Pechanga (the "Permanent Capacity Notice"). RCWD shall submit the Permanent Capacity Notice not later than five (5) years after the Enforceability Date. If RCWD does not submit the Permanent Capacity Notice to Pechanga by such date, then the funds set aside in the Pechanga ESAA Delivery Capacity Account to pay for Pechanga's contribution to the Permanent Capacity, including any interest that has accrued thereon, shall be available for use by Pechanga to design and construct alternative Imported Water delivery facilities in accordance with Section 6 of this Agreement.

(ii)     The Permanent Capacity Notice shall include a request for payment in the amount of sixteen million nine hundred thousand dollars ($16,900,000), as adjusted in accordance with Section 3411(a) of the Act, plus any interest accrued on the funds set aside in the Pechanga ESAA Delivery Capacity Account prior to the date of the issuance of the Permanent Capacity Notice. The amount of interest accrued on such funds for purposes of the Permanent Capacity Notice shall be as set by the Secretary upon written request from RCWD for a statement of such amount of interest.

(iii)    Subject to Section 5(b)(vii) of this Agreement, upon receipt of the Permanent Capacity Notice, Pechanga shall promptly file a written request to the Secretary that will allow for disbursement of funds from the Pechanga ESAA Delivery Capacity Account in an amount equal to the amount set forth in the Permanent Capacity Notice.

(iv)    Upon receipt of the written request from Pechanga in accordance with Section 5(b)(iii) above and confirmation that such written request conforms to the requirements of this Agreement and the Act, subject to the availability of funds in the Pechanga ESAA Water Delivery Capacity Account, the Secretary shall make payment directly to RCWD in an amount equal to the amount set forth in Pechanga's written request.

(v)     The amount paid pursuant to Section 5(b)(iv) of this Agreement, combined with the payment made pursuant to Section 4 of this Agreement, shall constitute the full and complete consideration to be paid to RCWD by Pechanga for RCWD's provision of Permanent Capacity.

(vi)    Pechanga shall not be responsible for any additional charges, fees, assessments, or costs from RCWD in connection with RCWD's provision of Permanent Capacity to Pechanga, except as provided in the ESAA Water Delivery Agreement, attached as Exhibit H to the Settlement Agreement.

(vii)   If Pechanga withdraws the funds in the ESAA Delivery Capacity Account pursuant to the Act, subject to the availability of funds in the Pechanga ESAA Delivery Capacity Account, Pechanga shall make payment directly to RCWD in an amount equal to the amount set forth in the Permanent Capacity Notice.

EXHIBIT 1
Page 300

**6.     Alternative ESAA Water Delivery Facilities.**

If RCWD does not submit the Permanent Capacity Notice to Pechanga within five (5) years of the Enforceability Date, then the funds set aside in the Pechanga ESAA Delivery Capacity Account to pay for such Permanent Capacity, including any interest that has accrued thereon, shall be available for use by Pechanga to design and construct alternative Imported Water delivery facilities in accordance with this Section 6. In such event, promptly after the date five (5) years after the date on which the Act is enacted into law, Pechanga and the Secretary will meet and confer to develop plans for the design and construction of alternative Imported Water delivery facilities that will, with the funds available in the Pechanga Imported Water Delivery Facilities Account, provide delivery capacity for Pechanga to receive the same amount of Imported Water as it would have received from RCWD had it provided the Permanent Capacity. The fact that RCWD does not submit the Permanent Capacity Notice to Pechanga within five (5) years of the date on which the Act is enacted into law does not absolve RCWD of its obligation to provide Interim Capacity to Pechanga, which obligation shall continue for so long as Pechanga requires.

**7.     Notices.**

All notices required to be given hereunder shall be in writing and may be given in person, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom notice is given, when delivered to the designated address of the Party, or if mailed, forty-eight (48) hours after deposit in the United States mail addressed as shown below or to such other address or addressee as such Party may from time to time designate in writing.

If to Pechanga:
Mark Macarro
Chairman
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA    92593

With a copy to:
General Counsel
Pechanga Band of Luiseño Indians
P.O. Box 1477
Temecula, CA    92593

and to:

Donald R. Pongrace
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW Suite 400
Washington, DC    20036

If to the United States:
Assistant Secretary for Indian Affairs
U.S. Department of the Interior
1849 C St. NW, 4660 MIB

EXHIBIT 1
Page 301

Washington, DC 20240-0001

And to:

Regional Director
Pacific Regional Office
Bureau of Indian Affairs
2800 Cottage Way
Sacramento, CA 95825

And to:

Chief, Indian Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004

And to:

Associate Solicitor
Division of Water Resources
1849 C Street, NW  MS 6413
Washington, DC 20240
<u>If to RCWD</u>:
General Manager
Rancho California Water District
42135 Winchester Road
Temecula, CA   92590

With a copy to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway, 15th  Floor
San Diego, CA   92101

**8.**     <u>**Termination.**</u>

In the event the Recycled Water Transfer Agreement is terminated for any reason, either in accordance with its terms or pursuant to court order, this Agreement shall automatically terminate fourteen (14) day after such termination of the Recycled Water Transfer Agreement without further action by any Party unless the Parties otherwise agree.

**9.**     **Representations and Warranties.**

　　(a)     **Representations and Warranties of Pechanga.**  Pechanga     represents and warrants to RCWD as follows:

　　　　(i)     Pechanga's execution, delivery, and performance of this Agreement

EXHIBIT 1
Page 302

have been duly authorized by all necessary action of Pechanga.

(ii)     Pechanga is neither a party to any agreement, covenant, or other agreement or instrument nor subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

(iii)     This Agreement is a legal, valid, and binding obligation of Pechanga enforceable against Pechanga in accordance with this Agreement's terms.

(iv)     There is no pending or threatened action or proceeding against or affecting Pechanga before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of Pechanga or the ability of Pechanga to perform its obligation under this Agreement.

(v)     To the best of Pechanga's knowledge, the validity of this Agreement; the execution and delivery by Pechanga of this Agreement; and Pechanga's performance of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent or similar authorization from any federal, state, or local judicial, regulatory, or administrative body.

(b)     **Representations and Warranties of RCWD.**  RCWD represents and warrants to Pechanga as follows:

(i)     RCWD's execution, delivery and performance of this Agreement have been duly authorized by all necessary action of RCWD.

(ii)     RCWD is not a party to any agreement, covenant or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on its ability to fulfill any of its responsibilities under this Agreement.

(iii)     This Agreement constitutes a legal, valid, and binding obligation of RCWD enforceable against it in accordance with its terms.

(iv)     There is no pending or threatened action or proceeding against or affecting RCWD before any tribunal or governmental authority which may, in any one case or in the aggregate, materially adversely affect the operations, properties, or business of RCWD or the ability of RCWD to perform its obligation under this Agreement.

(v)     To the best of RCWD's knowledge, the validity of this Agreement; the execution and delivery by RCWD of this Agreement; and the performance by RCWD of its obligations hereunder will not require any permit, license, certificate, waiver, notice, approval, consent, or similar authorization from any federal, state or local judicial, regulatory, or administrative body.

**10.     Breach of Representation or Warranty.**  Any representation or warranty made by a Party in <u>Section 9</u> that  shall prove  to have been incorrect  in any material respect as of the effective date of this Agreement shall be deemed to constitute a material breach of this Agreement by the Party giving such representation or warranty.

EXHIBIT 1
Page 303

**11.     Amendments; Waivers.**     No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

**12.     Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of California and the United States, as applicable, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

**13.     Dispute Resolution.**

(a) Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit.  Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)     With respect to any dispute arising under this Agreement, prior to pursuing dispute resolution  pursuant to either Section 11(c) or 11(f),  each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by another Party.  Any Party with a grievance or complaint arising under this Agreement shall notify the other Parties in writing of its grievance or complaint at the other Parties' respective address of record.  Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)     In the event of any dispute between RCWD and Pechanga arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association.  RCWD and Pechanga shall each initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party.  Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d)     Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

EXHIBIT 1
Page 304

(e)      Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

(f)      In the event of any dispute between the United States and RCWD or Pechanga arising under this Agreement, a Party shall have the right to petition the Adjudication Court for such relief as may be appropriate to enforce the terms, conditions, and limitations as provided in this Agreement. The United States acknowledges and agrees that the Adjudication Court has jurisdiction to hear such disputes between the Parties arising under this Agreement.

**14.      Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

EXHIBIT 1
Page 305

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and dated as of the date first above written.

### PECHANGA BAND OF LUISEÑO MISSION INDIANS

By:_____
    Tribal Chairman

Date:_____11 / 29 / 17_____

Approved as to form:

By:_____

### RANCHO CALIFORNIA WATER DISTRICT

By:_____
    General Manager

Date:_____11 29 17_____

Approved as to form:

By:_____

### THE UNITED STATES OF AMERICA

By:_____
    Secretary of the Interior

Dated:_____29 Nov 17_____

EXHIBIT 1
Page 306

Exhibit G-1

EXHIBIT 1
Page 307



MWDSC San Diego Pipeline
No. 3 ByPass

EM-20 Turnout
Point of Connection 'A'
Between MWDSC/EMWD and RCWD

RCWD
EM-20 Flow Control
Facility

**INTERIM CAPACITY**

The interim capacity of delivered ESAA
water from the Point of Connection "A" to
the Point of Connection "B", is defined as
a maximum of 3,100 gallons per minute.
The maximum flow rate of ESAA water
and Delivered Groundwater, per the
Amended and Restated Groundwater
Management Agreement, shall be limited
to a total of 3,100 gallons per minute to
the Point of Connection "B".

Existing
Point of Connection 'B'
Between RCWD & Pechanga
8" Water Meter
Service Connection

**Legend**

— MWDSC Pipelines

— Portion of RCWD's
1305 Pressure Zone
Distribution System

RANCHO CALIFORNIA WATER DISTRICT

42135 Winchester Road · Temecula · CA · 92590 · (951) 296-6900

| EXHIBIT G-1 | Geographic Information Services | SUBJECT: *ESAA Capacity Agreement* *Description of Interim Capacity* | | | SHEET 1 OF 1 SHEETS |
| --- | --- | --- | --- | --- | --- |

SCALE: As Shown

PREPARED BY: J. Gonzalez

EXHIBIT 1
Page 308

Exhibit G-2

EXHIBIT 1
Page 309



**PERMANENT CAPACITY**

The permanent capacity of delivered ESAA water from the Point of Connection "A" to the Point of Connection "B" and "C", is defined as a maximum of 4,935 gallons per minute. The maximum flow rate of ESAA water and Delivered Groundwater, per the Amended and Restated Groundwater Management Agreement, shall be limited to a total of 6,200 gallons per minute and 3,100 gallons per minute to either Point of Connection "B" and "C".

RANCHO CALIFORNIA WATER DISTRICT

42135 Winchester Road - Temecula - CA - 92590 - (951) 296-6900

EXHIBIT G-2

Geographic Information Services

SUBJECT: *ESAA Capacity Agreement*
*Description of Permanent Capacity*

SCALE: *As Shown*

SHEET 1 OF 1 SHEETS

PREPARED BY: *J. Gonzalez*

### EXECUTION VERSION

### ESAA WATER DELIVERY AGREEMENT

THIS **ESAA WATER DELIVERY AGREEMENT** (this "*Agreement*") is made and entered into as of November 29, 2017 ("*Effective Date*"), by and among the **PECHANGA BAND OF LUISEÑO MISSION INDIANS** ("*Pechanga*"), a federally recognized Indian Tribe, **RANCHO CALIFORNIA WATER DISTRICT** ("*RCWD*"), a California water district organized pursuant to California Water Code section 34000 *et seq.*, and **EASTERN MUNICIPAL WATER DISTRICT** ("*EMWD*"), a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.  Pechanga, RCWD, and EMWD are each individually sometimes called "*Party*" and sometimes collectively called "*Parties.*"

RECITALS

A.      RCWD and Pechanga have agreed to a comprehensive settlement of Pechanga's claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed, which is memorialized in the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("*Settlement Agreement*").

B.      The Settlement Agreement recognizes that Pechanga, the Metropolitan Water District of Southern California ("*Metropolitan*"), and EMWD agreed to an Extension of Service Area Agreement ("*ESAA*"), attached to the Settlement Agreement as Exhibit F.  The ESAA provides for Metropolitan and EMWD to provide treated water service to Pechanga ("*Imported Water*") for use in the Consolidated Area as defined in Preambles F and J of the ESAA.

C.      The Settlement Agreement also recognizes that Pechanga and RCWD entered into an Amended and Restated Groundwater Management Agreement, attached to the Settlement Agreement as Exhibit A.  This Agreement provides for RCWD to pump and deliver groundwater from the Wolf Valley Groundwater Basin to Pechanga upon request in exchange for a groundwater delivery charge, among other matters.

D.      In furtherance of the Settlement Agreement and the ESAA, Pechanga and RCWD have agreed that Pechanga will purchase capacity to enable RCWD to deliver Imported Water

EXHIBIT 1
Page 311

from Metropolitan and EMWD to Pechanga on an interim and long term basis ("*ESAA Capacity*") pursuant to the ESAA Capacity Agreement attached as Exhibit G to the Settlement Agreement.

E.     The Parties seek to establish delivery, billing and other operational protocols necessary to enable RCWD to deliver Imported Water to Pechanga.

F.     The Parties acknowledge the comprehensive settlement of Pechanga's claims for water rights in the Santa Margarita River Watershed will be effected through federal legislation known as the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Subtitle D of Title III of Pub. L. No. 114-322 (2016), and further acknowledge such legislation limits use of the Tribal Water Right, as defined in the Act and herein, to use on the Reservation.

<u>AGREEMENT</u>

IT IS AGREED AS FOLLOWS:

1.     **<u>Construction.</u>**

    **1.1     <u>Definitions.</u>** Capitalized terms used in this Agreement shall have the meanings respectively ascribed thereto below or as set forth elsewhere in this Agreement.

"*Act*" means the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Subtitle D of Title III of Pub. L. No. 114-322 (2016).

"*AFY*" means acre-feet per Year.

"*Agreement*" means this ESAA Water Delivery Agreement by and among Pechanga, RCWD, and EMWD dated as of the date first written above.

"*Consolidated Area*" means the area of land on the Reservation, as that term is defined in Section 3(33) of the Act, that includes both the Existing Area and the Extended Area, as those two terms are defined in Exhibit F to the Settlement Agreement, and is identified as the Consolidated Area and depicted in the map attached hereto as Exhibit F-3.

"*Effective Date*" is defined in the first paragraph of this Agreement.

"*EMWD*" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Act of 1911, Division 20 of the Water Code of the State of California, as amended.

"*Imported Water*" means any water delivered to Pechanga pursuant to the ESAA and this Agreement.

EXHIBIT 1
Page 312

"*Party*" means any entity represented by a signatory to this Agreement and "*Parties*" means more than one of such entities.

"*Pechanga*" means the Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members (but not members in their capacities as Allottees).

"*RCWD*" means the Rancho California Water District, a California water district organized pursuant to California Water Code section 34000 *et seq.*

"*Section*" means a section or subsection of this Agreement.

"*Settlement Agreement*" has the meaning set forth in Recital A of this Agreement.

"*Tribal Water Right*" means the water established and confirmed by Section 5 of the Act.

"*Year*" means a calendar year of January 1 through December 31.

2.      **Deliveries.**  RCWD agrees to facilitate the delivery of Imported Water, which Pechanga is entitled to purchase from EMWD pursuant to the ESAA, on a continual basis at the capacity established in the ESAA Capacity Agreement.

3.      **Points of Connection.**  RCWD will deliver Imported Water to Pechanga from the ESAA Delivery Point, depicted as Point of Connection "A" on the map attached as Exhibit H-1 to this Agreement, to the Pechanga Delivery Point, depicted as Point of Connections "B" and "C" on the map attached as Exhibit H-2 to this Agreement.

4.      **Environmental Compliance Costs.**  EMWD will serve as Lead Agency for any California Environmental Quality Act (CEQA) documents and analysis.  Pechanga will reimburse to EMWD any costs incurred by EMWD in connection with completion of environmental documentation required by the CEQA and/or the National Environmental Policy Act and/or for purposes of approval of this Agreement, to the extent such costs would be recoverable by EMWD in connection with an annexation of land into the EMWD service area by any other customer.  EMWD will provide a separate invoice to Pechanga for such reimbursable costs.

Pechanga shall be responsible for the cost of the preparation of any defense of any legal challenge related to Metropolitan's, EMWD's, or RCWD's compliance with the National Environmental Policy Act ("NEPA") and/or the California Environmental Quality Act

EXHIBIT 1
Page 313

("CEQA") and other applicable state laws or any other challenge to the transaction contemplated by this Agreement.

5.   **Rates for Delivered Imported Water.**   EMWD will continue to be billed by Metropolitan for water delivered through service connection EM-20 (identified in Exhibit H-1) to RCWD.  The cost of RCWD's delivery of Imported Water to Pechanga will be passed on to Pechanga based upon EMWD and RCWD Rates, as described below, including operation and maintenance costs of RCWD for delivery of the Imported Water through RCWD's intervening system, as follows:

(a)   *EMWD Rates*. EMWD will bill RCWD for deliveries at its various turnouts, including deliveries of Imported Water made to Pechanga through RCWD at the ESAA Delivery Point.  Such billing shall include a nominal per acre-foot EMWD administrative overhead fee; charges incurred by EMWD under Metropolitan's current rate structure including Metropolitan's full-service, treated, volumetric rate for deliveries; readiness-to-serve charges ("*RTS*"); capacity charges ("*CC*"); and other Metropolitan charges as may be assessed (collectively, "*Water Delivery Costs*").  These charges will be determined as follows:

(i)   RTS charges will be billed on a per acre-foot basis, twice annually at the time that Metropolitan bills EMWD.

(ii)   CC will be based upon actual peaking demands for Imported Water delivery, measured in cubic feet per second, at the Pechanga Delivery Point.

(iii)   Metropolitan may assess additional costs or fee components to all of its customers in the future, which are not yet defined, or may change the content, manner, and timing of billing its member agencies.  Components of Metropolitan's rates and charges that comprise the Water Delivery Costs described herein are based upon Metropolitan's current rate structure and may be subject to change in the future.  In the event Metropolitan alters its rate structure or assesses additional costs or fee components to all of its customers in the future, EMWD shall assess RCWD amended Water Delivery Costs that include Metropolitan's charges under any new rate structure in a manner that recovers costs equivalent to the components described herein, as well as any additional costs or fee components imposed by Metropolitan. This includes the proportionate penalties which may be assessed under Metropolitan's Water Supply Allocation Plan.

EXHIBIT 1
Page 314

(b)     *RCWD Rates*. RCWD's charge for ESAA delivery of imported water through its 1305 zone system from the ESAA Delivery Point to the Pechanga Delivery Point will be a unit dollar per acre-foot delivery rate to cover the proportional share of cost of operations, maintenance and replacement for transmission and distribution within RCWD's 1305 Zone. The rate will be updated annually. The rate will be no more than the charges for these items assessed to RCWD's 1305 Zone retail customers.

(c)     *EMWD Rate Change*. In the event that deliveries of Imported Water are made over a billing period during which EMWD's rate for the sale and delivery of water changes, EMWD may cause the meters recording deliveries of water during such period to be read at the end of the period and the statement of charges for such deliveries of water may be based on a proration between the previous and new rate for the periods of time during which each were in effect as determined by EMWD.

(d)     *Metropolitan Rate Change*. In the event Metropolitan makes changes to its rates or rate structure that may affect the amount or structure of EMWD's rates (including but not limited to the setting of new baselines for tiered deliveries), or assesses additional costs or fees on its customers, EMWD will work in good faith with Pechanga and RCWD to ensure any changes to EMWD's rates are passed on fairly and equitably to Pechanga and RCWD.

(e)     *Metropolitan Tier 1 Allocation*. Metropolitan currently has a tiered rate structure, which may be amended over time. During periods of water supply allocation, use over an allocated amount is charged at a Tier 2 rate, the full service rate, plus an Allocation Surcharge for exceeding amounts available under an allocation. As Metropolitan will not provide an initial incremental Tier 1 allocation to EMWD (and therefore to RCWD) for Imported Water deliveries to Pechanga, Pechanga will establish its own Tier 1 maximum beginning the first year of deliveries and continuing over a five-year period, using a five-year rolling average thereafter. Alternatively, Pechanga may be required to establish an alternative methodology as may be adopted by Metropolitan from time to time for its member agencies. Such charge will be billed and paid for in accordance with this Section.

(f)     *Exemption from Fees and Assessments*. Except as otherwise provided in this Agreement and the ESAA, EMWD and RCWD will not impose any property-related fee, assessment, tax or charge on the Consolidated Area for the delivery of Imported Water. In recognition of the sovereignty of Pechanga, no monetary lien will be imposed on Pechanga or the Reservation to secure payment of any fees, costs, or rates payable from Pechanga pursuant to this

EXHIBIT 1
Page 315

Agreement, but delivery of Imported Water pursuant to this Agreement may be suspended until payment is made in full, including penalty and interest charges, pursuant to the RCWD Administrative Code.

6.   <u>Billing and Payment of Imported Water Charges</u>.   EMWD will itemize the incremental components of its monthly billing to RCWD that are associated with the Water Delivery Costs described in Section 5 of this Agreement.   EMWD will maintain separate charge accounting for RCWD and Pechanga as distinct entities.   RCWD will pass through Water Delivery Costs assessed by EMWD as well as its own charges for delivery of Imported Water to Pechanga.

(a)   *Payment by RCWD to EMWD*.   Except as otherwise provided in this Agreement, the terms and conditions of billing by EMWD and payment by RCWD under this Agreement are governed by the procedures established in the EMWD Administrative Code, at Title 5, Article 3, commencing with section 5.301, or any amendments thereto approved by the EMWD.

(b)   *Payment by Pechanga to RCWD*.   RCWD will bill Pechanga for Imported Water-related rates, charges, and fees.   Except as otherwise provided in this Agreement or the Amended and Restated Groundwater Management Agreement, the terms and conditions of billing by RCWD and payment by Pechanga to RCWD under this Agreement are governed by the procedures established in Part III, Chapter 1, Section 1.6 of the RCWD Administrative Code.

(c)   *Deposit to Secure Payment to RCWD*.   Pechanga will provide a deposit equal to one-twelfth (1/12) of the prior year's billings to be reviewed and adjusted annually and held by RCWD in an interest-bearing account as assurance of payment for invoices delivered pursuant to Section 5(b) above.   This deposit will be held by RCWD and will be drawn upon should Pechanga fail to make timely payments after notice to Pechanga of an alleged delinquency payment and an opportunity for Pechanga to cure.   If RCWD draws down on the deposit, RCWD will notify Pechanga within five (5) business days in writing that the deposit must be replenished.   Pechanga must replenish the deposit within five (5) business days after written notification from RCWD.   Failure to replenish the deposit and keep the account paid on a current basis will result in suspension of Imported Water delivery pursuant to Section 5(f) above.

7.   <u>Metering</u>.   All Imported Water and groundwater delivered by RCWD to Pechanga will be metered at the Pechanga Delivery Point.   RCWD shall determine the total amount of Imported Water and groundwater delivered to Pechanga under Section 2.3 of the Amended and Restated Groundwater Management Agreement and will deduct the amount of groundwater delivered to determine the net amount of Imported Water delivered to Pechanga.   RCWD will report to

EXHIBIT 1
Page 316

Pechanga its determination of the net amount of Imported Water delivered to Pechanga and provide Pechanga three (3) business days to review and comment on such determination prior to reporting to EMWD delivery volume and flow information for Imported Water deliveries provided by RCWD to Pechanga.  Meter readings will be made on or about the last day of each calendar month for billing purposes.  Meters and control valves on water lines of RCWD will be owned and operated by RCWD.  Pechanga may have any meter through which Imported Water is delivered from RCWD's facilities at the Pechanga Delivery Point tested by RCWD.  Pechanga will have the right to be represented by a qualified observer at and during any such test.  In the event that any such test shall disclose an error exceeding two (2) percent, an adjustment shall be made in charges to Pechanga, covering the known or estimated duration of such error, but in no event exceeding six (6) months, and the expenses of such test shall be borne by RCWD; otherwise such expense shall be borne by Pechanga.  If necessary to make any further adjustments to the volume and flow information as allocated between Imported Water and groundwater deliveries as a result of metering errors, such reconciliation shall be done at least annually.

8.      <u>Pechanga Responsibilities for Facilities</u>.  Pechanga will be responsible, at its cost, for the design, installation, and construction of any facilities on its side of the Pechanga Delivery Point, or any subsequently noticed delivery point, required to receive deliveries of water from RCWD under this Agreement.   Pechanga will provide Metropolitan, EMWD, and RCWD with reasonable opportunity to review and comment on any such designs and will incorporate any Metropolitan, EMWD, and RCWD comments reasonably required to ensure that such facilities may be operated without damage to Metropolitan's, EMWD's, or RCWD's system.

9.      <u>Water Delivery Interruptions</u>.  Whenever repairs or maintenance of Metropolitan's, EMWD's, or RCWD's system is required, in the opinion of the General Manager of Metropolitan, EMWD or RCWD, respectively, will require suspension of delivery of Imported Water at any delivery points.  Such delivery may be suspended without liability on the part of Metropolitan, EMWD or RCWD.  In addition to shutdowns, Imported Water may from time to time be unavailable, or available only in limited quantities at a service connection because of reductions or eliminations in flow.   Reasons for shutdowns may change from time to time. EMWD and RCWD will exercise reasonable efforts to provide advance notice to Pechanga of any interruption that is not an emergency.  Pechanga will maintain the capability within its onsite water system to handle planned or unplanned Imported Water delivery interruptions.

EXHIBIT 1
Page 317

10.     Termination.

10.1.   Settlement Act.  This Agreement shall be automatically terminated in the event: 1) the waivers and releases of claims authorized by the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act (Subtitle D of Title III of Public Law 114-322,) expire pursuant to Section 3407(g) of said Act; 2)  Pechanga seeks congressional authorization for off-Reservation transfer or sale of water sold and delivered by EMWD to Pechanga pursuant to the ESAA and this Agreement; or 3) upon expiration of the Act pursuant to Section 3412 of the Act.

10.2  Off Reservation Uses.  Except for uses allowed in Preamble I and Sections 3.1 and 3.9 of the ESAA, EMWD may terminate this Agreement in the event Pechanga sells, exchanges, or uses Imported Water outside the Consolidated Area or its Tribal Water Right outside the Reservation.

11.     Allocation of Liability.

(a)     RCWD and its officers, agents, and employees shall not be liable to Pechanga or any third party by reason of RCWD's obligations under this Agreement for (i) the control, carriage, handling, use, disposal, or distribution of, or any limitations to the use, disposal or distribution of such Imported Water that may be imposed by any regulatory body or other third party on Imported Water delivered to Pechanga under this Agreement after such Imported Water has been received by or on behalf of Pechanga at the Pechanga Delivery Point, or (ii) any claim of damage of any nature whatsoever (including but not limited to property damage, personal injury or death) arising out of or connected with the provision of or any failure to deliver Imported Water to Pechanga.  Pechanga shall, and hereby does, indemnify, defend and hold harmless RCWD and its officers, agents, and employees from any and all such damages or claims of damages and shall reimburse RCWD for costs of repair of RCWD's facilities and other damages resulting from the operations of Pechanga.

(b)     Pechanga and its officers, agents, employees and members shall not be liable to RCWD or any third party by reason of Pechanga's status as purchaser under this Agreement, for any claim of damage of any nature whatsoever (including property damage, personal injury or death) arising out of or connected with the control, carriage, handling, use, disposal, or distribution of, Imported Water prior to such Imported Water being delivered to the Pechanga

EXHIBIT 1
Page 318

Delivery Point, excepting, however, claims by RCWD for costs of repair to RCWD's facilities and other damages resulting from the operations of Pechanga.

12. _Notices_. All notices required to be given hereunder shall be in writing and may be given in person, by electronic mail transmission, by facsimile transmission, or by United States mail postage prepaid, and shall become effective at the earliest of actual receipt by the Party to whom the notice is given, when delivered to the designated address of the party or to such other address or addressee as such Party may from time to time designate in writing.

|  |  |
|---|---|
| If to Pechanga: | Mark Macarro<br>Chairman<br>Pechanga Band of Luiseño Indians<br>P.O. Box 1477<br>Temecula, CA 92593<br>Fax:    (951) 537-8332<br>Email:  mark@pechanga-nsn.gov |
|  | With a copy to: |
|  | General Counsel<br>Pechanga Band of Luiseño Indians<br>P.O. Box 1477<br>Temecula, CA 92593<br>Fax:    (951) 693-2293<br>Email:  sbodmer@pechanga-nsn.gov |
|  | And to: |
|  | Donald R. Pongrace<br>Akin Gump Strauss Hauer & Feld LLP<br>1333 New Hampshire Avenue, NW<br>Suite 400<br>Washington, DC 20036<br>Fax:    (202) 887-4288<br>Email:  dpongrace@akingump.com |
| If to RCWD: | General Manager<br>Rancho California Water District<br>42135 Winchester Road<br>Temecula, CA 92590<br>Fax:    (951) 296-6860<br>Email:  armstrongj@ranchowater.com |

EXHIBIT 1
Page 319

And to:

James Gilpin
Best Best & Krieger LLP
655 West Broadway
15th Floor
San Diego, CA 92101
Fax:    (619) 233-6118
Email:  James.Gilpin@bbklaw.com

If to EMWD:                Paul D. Jones, II
General Manager
Eastern Municipal Water District
2270 Trumble Road
P.O. Box 8300
Perris, CA 92572-8300
Fax:    (951) 928-6112
Email:  jonesp@emwd.org

And to:

Steven P. O'Neill
Olivarez, Madruga, Lemieux & O'Neill
4165 East Thousand Oaks Boulevard, #350
Westlake Village, CA 91362
Fax:    (805) 495-2787
Email:  steve@lemieux-oneill.com

13.    <u>Amendments: Waivers</u>:  No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the Parties.  No waiver by a Party of any breach by the other Party of any of the terms or conditions of this Agreement, or of any right of such Party hereunder, shall be construed as a waiver of any subsequent breach by the other Party of the same or other terms or conditions, or of the future exercise by such Party of the same or any other right hereunder.  Neither the failure nor any delay on the part of a Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or subsequent exercise of the same or of any other right or remedy.

14.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to any choice of laws or conflicts of laws provisions which would direct the application of the laws of any other jurisdiction.  The venue for arbitration proceedings shall be Riverside County, California.

EXHIBIT 1
Page 320

15.   Dispute Resolution

(a)   Pechanga is a sovereign Indian Nation, and as such it possesses sovereign immunity from suit. Nothing in this Agreement is or shall be deemed to be a waiver of Pechanga's sovereign immunity from suit, which immunity is expressly asserted, except that Pechanga agrees to waive its immunity for the limited and sole purposes of compelling arbitration by RCWD and EMWD and of enforcing arbitration of any decision rendered pursuant to the terms and conditions of this Agreement.

(b)   Prior to pursuing any arbitration, each Party shall, whenever possible, attempt to resolve any grievances, complaints or disputes that are brought to its attention by the other Party. Each Party shall notify the other Party in writing of any material dissatisfaction with the other Party's performance at its address of record. Within ten (10) days of receipt of such notice, unless the problem has been resolved, the Parties shall meet and confer in good faith to determine what remedial action, if any, is necessary.

(c)   In the event of any dispute between the Parties hereto arising under this Agreement, such dispute shall be submitted to mandatory binding arbitration, to be conducted in Riverside County, CA, pursuant to the Commercial Rules of the American Arbitration Association. Each Party shall initially pay its own arbitration costs and expenses, but the arbitrator may, in its discretion, include such costs and expenses, together with reasonable attorneys' fees, as part of the award to the prevailing party. Any award of the arbitrators may be submitted for enforcement to a court of competent jurisdiction located in Riverside County, CA.

(d) Judicial remedies are specifically limited to the enforcement of an award of money damages by arbitration pursuant to this Agreement; provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to execute against any assets of Pechanga except to award the prevailing party the amounts paid or payable under this Agreement, costs of arbitration, court costs to enforce the arbitration decision and legal fees incurred during arbitration and any subsequent court proceedings to enforce the arbitration decision.

(e)   Pechanga's limited waiver of its sovereign immunity as provided herein extends only to an arbitration, action to compel arbitration and action to confirm or enforce arbitration awards by RCWD and EMWD, and no other person or entity, for money damages in an amount not to exceed the amounts paid or payable under this Agreement, for Pechanga's breach of this Agreement.

16.   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be considered an original but all of which, taken together, shall constitute one and the same instrument.

EXHIBIT 1
Page 321

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and dated as of the date first above written.

PECHANGA BAND OF LUISEÑO MISSION INDIANS

By: _____
        Tribal Chairman

Date: _____

Approved as to form:     By: _____
                             General Counsel

RANCHO CALIFORNIA WATER DISTRICT

By: _____
        General Manager

Date: _____

Approved as to form:     By: _____
                             General Counsel

EASTERN MUNICIPAL WATER DISTRICT

By: _____
        General Manager

Date: _____

Approved as to form:     By: _____
                             General Counsel

EXHIBIT 1
Page 322

Exhibit H-1

EXHIBIT 1
Page 323



EXHIBIT 1
Page 324

Exhibit H-2

EXHIBIT 1
Page 325



EXHIBIT 1
Page 326