

**Pechanga Tribal Government**

**Pechanga Indian Reservation**

Legend
- Highways
- Sections
- Counties
- Kelsey Tract
- Original Boundary
- Pechanga Reservation

0    2,500    5,000 Feet

1 inch = 2,500 feet

Map Area

This document/map is property of the Pechanga Band of Luiseño Indians ("Pechanga"). This document/map is considered confidential information by Pechanga, and is intended for use by recipient only for the purposes agreed upon by Pechanga. Do not reproduce, publish, alter or distribute this document/map without written permission from Pechanga. Pechanga assumes no warranty or legal responsibility for the information contained on this document/map. Data and information represented on this document/map is subject to change and may not be complete or appropriate for all purposes. Pechanga should be consulted for the most current information. Document/maps may not be to scale and are for relative location purposes only

Printed: 3/22/2017 03:56 PM

2017LGL 0322 Sel Prcels

EXHIBIT 1
Page 327

WFLMD

FILED LODGED

MAR 25 1966

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

APR - 6 1966

CLERK, U.S. DISTRICT COURT By
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

DEPUTY

ENTERED

IN THE UNITED STATES DISTRICT COURT   APR - 6 1966

CLERK, U.S. DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA SOUTHERN DISTRICT OF CALIFORNIA

By_____

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, | ) | MODIFIED |
| a public service corporation of | ) | FINAL JUDGMENT |
| the State of California, et al., | ) | AND DECREE |
| Defendants. | ) | |

The above-entitled cause came on regularly for trial be-
fore the Honorable James M. Carter, United States District
Judge, following remand from the United States Circuit Court
of Appeals for the Ninth Circuit, which directed that this
Court ". . . enter no judgment until the entire suit can be
disposed of at the same date."

Because of the complexities of this litigation and the
fact that the physical water resources were located through-
out the watershed, this Court determined that the said mandate
could best be complied with by adjudicating the rights of the
parties to the cause in segments of the watershed involving
limited areas and numbers of defendants and by entering
interlocutory judgments as the trial concerning each such
segment was concluded. Proceeding in this manner, this

16—76776-1
GPO

EXHIBIT 1
Page 328

1   Court has entered interlocutory judgments as the trial pro-

2   gressed, each of which concerns a specified area within the

3   Santa Margarita River watershed, or a limited legal issue

4   presented by the parties.  These interlocutory judgments

5   expressly provided that they were not final and not operative

6   until made a part of the final judgment.  This Court having

7   entered orders or interlocutory judgments on all areas within

8   the watershed and all issues presented for decision, and the

9   rights to the use of the waters of the Santa Margarita River

10   stream system having been adjudicated in those interlocutory

11   judgments, this Court therefore entered its final judgment

12   and decree on May 8, 1963, whereby the said Interlocutory

13   Judgments or Orders were listed, and the same, together with

14   the Findings of Fact and Conclusions of Law attached thereto,

15   were adopted as the final Findings of Fact, Conclusions of

16   Law, and Judgment and Decree of the Court.  Appeal from said

17   Final Judgment and Decree was taken to the United States

18   Court of Appeals.  The Court of Appeals, by its decision

19   dated May 26, 1965, reversed the judgment of this Court as to

20   the rights of the United States against Vail Company, and re-

21   manded the cause "with instructions that the final judgment

22   be appropriately modified to the end that the 1940 state

23   court decree is reinstated, subject to the rights of Vail

24   to seek relief from that judgment in accordance with the

25   views hereinbefore expressed."  In all other respects, the

26   final judgment and decree was affirmed.  By its order dated

27   October 4, 1965, the Court of Appeals denied the United

28   States petition for rehearing and clarification.

29        The cause is now before the Court pursuant to the mandate

30                              - 2 -

EXHIBIT 1
Page 329

of the Court of Appeals for appropriate modification of the Final Judgment consistent with that Court's opinion, and pursuant to Notice of Hearing for such purpose duly served upon all parties to the cause except those heretofore determined to have no interest in the required modification.  Upon consideration of the mandate and opinion of the Court of Appeals and the Final Judgment heretofore entered herein, the Court hereby makes and enters the following Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree:

## FINDINGS OF FACT

## I

On or about May 5, 1930, the Superior Court of the State of California in and for the County of San Diego entered findings of fact, conclusions of law and judgment in Case No. 42850 in the records of said Court.  The parties to said action were the Rancho Santa Margarita, Vail Company and various individuals interested in that Company, the Executors of the Will of Murray Schloss, deceased, and Philip Playtor. The Rancho Santa Margarita, the Executors of the Will of Murray Schloss, deceased, and Philip Playtor did not appeal from said judgment.  Vail Company did appeal from certain portions only of it.  Thereafter and on or about July 12, 1938, the Supreme Court of the State of California reversed certain portions of the judgment.  Said Supreme Court remanded the case with directions that the new trial be limited to those matters specifically disapproved and affirmed the trial court's judgment as to all other matters.  Said decision of the Supreme Court is recorded in 11 Cal.2d 501.  Thereafter on or about December 26, 1940, the Superior Court of the

- 3 -

EXHIBIT 1
Page 330

1   State of California in and for the County of San Diego in

2   said Case No. 42850 entered a final judgment pursuant to the

3   stipulation of the parties.  A copy of the 1940 stipulated

4   judgment is attached hereto as Exhibit A.

5       Vail Company and the Executors of the Will of Murray

6   Schloss, deceased, are parties to the action before this

7   Court and Vail Company's successor in interest, Rancho

8   California, has now voluntarily appeared herein.  The United

9   States of America, a party to this action, is in privity with

10  and the successor of the Rancho Santa Margarita, and Max

11  Henderson, party in this action, is in privity with and the

12  successor of Philip Playtor.

13                          II

14      By Interlocutory Judgment No. 25 herein, dated April 25,

15  1961, this Court made certain findings of fact on the basis

16  of which it concluded, inter alia, (1) that the said 1930

17  findings of fact and judgment and the 1940 stipulated judg-

18  ment in the said state court action must be considered one

19  judgment, (2) that the said state court judgment was in-

20  equitable and should not be enforced as such by a court of

21  equity, and (3) that the said state court judgment was not a

22  contract, but if it were it had been rescinded by Vail

23  Company.  Interlocutory Judgment No. 25 then enjoined the

24  United States and the other parties to said state court ac-

25  tion from enforcing or attempting to enforce in any manner

26  any "judgment, provision or term, finding of fact or conclu-

27  sion of law" set forth in the said state court action in

28  either the Supreme Court of California or the Superior Court

29  in and for San Diego County.

30                        - 4 -

EXHIBIT 1
Page 331

### III

In its said opinion of May 26, 1965, the Court of Appeals determined that the 1940 stipulated judgment in the said state court action was not based upon the 1930 findings of fact but "upon agreement between the litigants." The Court of Appeals further stated: "It was upon that agreement that the California court relied and not upon the facts then (or earlier) existing." It was held that the 1940 stipulated judgment constituted a valid agreement between the parties to the stipulation, that the Vail Company had not established that it was entitled to rescind the agreement or that the United States had in any way repudiated it or estopped itself to assert its continuing validity and effectiveness, and that in any relitigation of rights as between the successor in interest of Rancho Santa Margarita and Vail Company, such relitigation "starts from where it last left off, which in this case, as to Vail, would be the 1940 decree."

### IV

While holding that the 1940 stipulated state court judgment is valid and enforceable in this litigation as between the parties to that action, the Court of Appeals further noted "that some relief might be proper should Vail be able to show that mistakes of fact have caused it harm of sufficient magnitude to justify reformation." Without prejudging the question, the Court gave two examples of the kinds of circumstances which might, on application and adequate showing, be basis for some relief.

### V

It is therefore plain that for this Court to carry out

- 5 -

EXHIBIT 1
Page 332

1   the mandate of the Court of Appeals it is necessary that

2   Interlocutory Judgment No. 25, and the Conclusions of Law on

3   which it is based, be withdrawn and that there be included in

4   the final judgment of this Court a provision that the 1940

5   stipulated state court judgment is valid and enforceable as

6   between the parties thereto and their respective successors

7   in interest, subject to the rights of any of such parties

8   and their successors in interest to seek some relief from

9   the provisions thereof on showing that mistakes of fact have

10   caused the applicant harm of sufficient magnitude to justify

11   reformation.

12      The question whether the Findings of Fact on which Inter-

13   locutory Judgment No. 25 is based are of continuing validity

14   in light of the decision of the Court of Appeals is one about

15   which there is, or may be, considerable controversy between

16   the parties.  Without prejudging this question as to any of

17   such findings, the entry of this Modified Final Judgment and

18   Decree shall be without prejudice to the right of any party

19   in any future proceeding herein to attack or assert the

20   validity of any such Findings of Fact.

21                  VI

22      There are other provisions of the several Interlocutory

23   Judgments, as incorporated into the Final Judgment, and the

24   Findings of Fact and Conclusions of Law on which the same were

25   based, which are or may be inconsistent with the Court of

26   Appeals determination respecting the enforceability of the

27   1940 stipulated state court judgment as between the parties

28   thereto and their respective successors in interest.  However,

29   in view of the Court's continuing jurisdiction in this matter,

30                - 6 -

16—76773-1
GPO

EXHIBIT 1
Page 333

1  the Court perceives no immediate need to modify and correct
2  every provision in the constituent parts of the final judg-
3  ment as heretofore entered which is not wholly consistent
4  with the reinstatement of the 1940 stipulated state court
5  judgment. With the understanding that an application or
6  applications to modify such possibly inconsistent provisions
7  may be considered hereafter, none of the parties has at this
8  time requested that the Court take action now to do more than
9  the minimum required for compliance with the mandate of the
10  Court of Appeals.

### CONCLUSIONS OF LAW

### I

13  The 1940 stipulated judgment in the state court action
14  referred to in Finding I above, a copy of which is Exhibit A
15  hereto, is a valid and binding obligation of the parties
16  thereto and is enforceable in this action as between the
17  parties thereto and their successors in interest as such an
18  obligation and as a valid judgment of the Court by which the
19  same was entered. The said stipulated judgment should there-
20  fore be incorporated into and adopted as part of the Final
21  Judgment of the Court in this action. Consistent with the
22  mandate of the Court of Appeals, it is necessary that in so
23  incorporating the said 1940 stipulated judgment into this
24  Court's Final Judgment, and in adopting the same as a part
25  thereof, there be reserved to the parties thereto and their
26  successors in interest, the right to seek relief from any of
27  the provisions of said 1940 stipulated judgment with respect
28  to which it can be and is shown that mistakes of fact have

29

30

- 7 -

16—76775-1
GPO

EXHIBIT 1
Page 334

1   caused harm to the applicant of sufficient magnitude to justi-
2   fy reformation.

3                              II

4       The list of interlocutory judgments contained in para-
5   graph 1 of this Court's Final Judgment, dated May 8, 1963,
6   should be modified to conform to the provisions hereof with
7   respect to Interlocutory Judgment No. 25.

8                              III

9       The right of any affected party to apply for modification
10   of any other provision of the several interlocutory judgments,
11   as incorporated into the Final Judgment, or of the Findings
12   of Fact or Conclusions of Law on which the same are based,
13   upon showing of incompatability with or inconsistency be-
14   tween such provision and the Court of Appeals determination
15   respecting enforceability of the 1940 stipulated state court
16   judgment and this Court's continuing jurisdiction to consider
17   any such application, should be expressly reserved.

18                              IV

19       In all other respects, the Final Judgment of this Court,
20   as entered herein on May 8, 1963, should be continued in
21   force and effect.

22

23                     MODIFIED FINAL JUDGMENT

24       NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

25                              I

26       IT IS ORDERED, ADJUDGED, AND DECREED that the 1940 stip-
27   ulated judgment in the state court action, referred to in
28   Finding I above and attached hereto as Exhibit A, is a valid
29   and binding obligation of the parties thereto, is enforceable

30                           - 8 -

*8*

EXHIBIT 1
Page 335

in this action as between the parties thereto and their successors in interest as such an obligation and as a valid judgment of the Court by which the same was entered, and is adopted as a part of and incorporated into this Modified Final Judgment, provided, that there is expressly reserved to the parties thereto and their successors in interest, the right to apply for relief from any of the provisions of said stipulated judgment with respect to which it can be and is shown that mistakes of fact have caused the applicant harm of sufficient magnitude to justify reformation.

### I-A

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Interlocutory Judgment No. 25, and the Conclusions of Law on which the same is based, are hereby withdrawn; provided, that the entry of this Modified Final Judgment and Decree shall be without prejudice to the right of any party in any future proceeding herein to attack or assert the validity of any of the Findings of Fact in said Interlocutory Judgment No. 25.

### II

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that each of the following Interlocutory Judgments or Orders and the Findings of Fact and Conclusions of Law attached thereto, including amendments, if any, are also adopted by reference as part of and incorporated into the Final Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree of this Court:

- 9 -

EXHIBIT 1
Page 336

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| 1 | April 7, 1961 | Jack & Cosette Garner (Wilson Creek Area) - now merged into 33A |
| 2 thru 21 | April 7, 1961 | Fallbrook & Area South (non-riparian) - now included in Amended 39A |
| | November 21, 1962 | Amendment to 2 (Parcels to be included in 42 - Rainbow) |
| 22 | April 7, 1961 | Regarding Water Rights on Lands Originally Conveyed by Mexican Grants |
| 23 | April 7, 1961 April 4, 1962 | Appropriative Rights - FPUD Amendment to 23 |
| 24 | April 13, 1961 | Non-Statutory Appropriative Rights of USA in SMR for Lake O'Neill |
| 24A | May 7, 1963 | Stipulation Respecting Appropriative Rights to Use of Waters of SMR for Lake O'Neill - USA & FPUD |
| 25 | April 25, 1961 | Subject to provisions of paragraph I-A and any other applicable provisions of this Modified Final Judgment and Decree |
| 26 | April 25, 1961 | Oviatt (Parcels in 33 and 34A) |
| 27 | April 25, 1961 | Knox (All parcels included in 40) |
| 28 | May 24, 1961 | Miscellaneous Surface Impoundments |
| | December 8, 1961 | Amendments to 29A, 31A, 32A, 33A & 34A (Explanation of parcel numbers) |
| | February 8, 1962 | Amendments to 29A, 31A, 32A, 33A, 34A & 38A (Jurisdiction of surface waters) |
| 29A | August 1, 1961 | Sandia Creek sub-watershed (All Parcels now included in 39A) |

-10-

16—7c778-1
GPO

10

EXHIBIT 1
Page 337

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|--------|----------------------------------------------|-------------------------------------|
| 30 | March 8, 1962 | Murrieta-Temecula Ground Water Area (Riverside County subdivisions) |
|  | July 3, 1962 | Amendment to 30 (Storage Units 1, 2, 3, 4 - approximately 418,000 ac.ft.) |
|  | March 6, 1963 | Amendment to 30 - Respecting Stipulation--Settling Rights |
| 30A | March 13, 1963 | Murrieta-Temecula - Outside Ground Water Area |
| 31 | January 25, 1963 | Santa Gertrudis (Lower Murrieta) |
| 31A | July 27, 1961 | Tucalota Creek Sub-watershed Amended (Lower Murrieta) |
|  | March 6, 1963 | Amendment to 31A - Respecting Stipulation - Settling Rights |
| 32 | December 11, 1962 | DeLuz Creek Sub-watershed |
|  | March 6, 1963 | Amendment to 32 - Respecting Stipulation - Settling Rights |
| 32A | August 4, 1961 | DeLuz Creek Sub-watershed |
| 33 | December 11, 1962 | Anza Valley, Wilson Creek & Coahuilla-Down to ground water area |
| 33A | August 4, 1961 | Wilson & Coahuilla Creeks Sub-watershed |
|  | March 6, 1963 | Amendment to 33A - Respecting Stipulation - Settling Rights |
|  | April 9, 1963 | Amendment to 33A - Interlocutory Judgment 1 merged into 33A |
| 34 | February 20, 1963 | Temecula Creek above Aguanga Ground Water Area |
|  | March 6, 1963 | Amendment to 34 - Respecting Stipulation - Settling Rights |
| 34A | December 7, 1961 | Temecula Creek Sub-watershed Above Vail Dam |

-11-

16—70775-1
GPO

//

EXHIBIT 1
Page 338

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| | March 6, 1963 | Amendment to 34A - Respecting Stipulation - Settling Rights |
| 35 | June 4, 1962 | Vail Company (Temecula Creek Below Vail Dam and to the Gorge) |
| 35A | December 11, 1962 | Vail Company |
| 36 | July 3, 1962 | Warm Springs & Diamond-Domenigoni (Upper Murrieta) |
| 36A | February 20, 1963 | Warm Springs (Upper Murrieta) |
| | March 6, 1963 | Amendment to 36A - Respecting Stipulation - Settling Rights |
| 37 | April 6, 1962 | Military Enclave |
| | November 8, 1962 | Amendment to 37 (Sewage effluent discharges & Water conservation practices) |
| | February 20, 1963 | Amendment to 37 (Exclusive jurisdiction) |
| 38 | | (No Judgment #38) |
| 38A | January 3, 1962 | Temecula Creek Sub-watershed - Below Vail Dam and above Gorge |
| | March 6, 1963 | Amendment to 38A - Respecting Stipulation - Settling Rights (1/30/62 Order setting aside 38A 2/1/62 Order vacated) |
| 39 | December 11, 1962 | SMR - Below Gorge and above Enclave (Includes Sandia) |
| | April 9, 1963 | Amendment to 39 - (Includes Fallbrook and Area South) |
| 39A | November 8, 1962 | SMR - Below Gorge and above Enclave (Includes 29A) |
| | March 13, 1963 | Amendment to 39A (Includes Fallbrook and Area South) (Also 2 thru 21) |
| 40 | December 12, 1962 | Aguanga Ground Water Area (Temecula & Wilson) |

-12-

| Number | Date Interlocutory Judgment or Order Entered | Brief Description of Subject Matter |
|---|---|---|
| 41 | November 8, 1962 | Indian Reservations |
| 42 | October 10, 1962 | Rainbow Creek |
| 42A | February 25, 1963 | Rainbow Creek |
| 43 | February 6, 1963 | Cottle & Gibbon |
| 44 | May 8, 1963 | National Forest Lands |
| 45 | December 12, 1962 | Order Regarding Water Extractions |
|  | January 27, 1966 | Order Superseding No. 45 and Order of September 3, 1964 |

Provided, that there is hereby expressly reserved the jurisdiction of this Court to consider, and the right of any affected party to make application for, modification of any of the provisions of said Interlocutory Judgments or Orders, or of the Findings of Fact and Conclusions of Law attached thereto, which is incompatible or inconsistent with the provisions of paragraph I of this Modified Final Judgment or with the Court of Appeals' determination respecting enforceability of the said 1940 stipulated state court judgment as between the parties thereto and their respective successors in interest.

### III

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that questions with respect to interpretation and application of the said 1940 stipulated state court judgment which are not hereby specifically decided will be considered and determined upon application of any affected party after notice to other affected parties.

-13-

EXHIBIT 1
Page 340

## IV

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the judgment provisions as set forth in the aforesaid interlocutory judgments and orders and the original Final Judgment herein are effective as of May 8, 1963, the date of entry of said Final Judgment (or any later dates as of which a modification of any thereof may have been entered), and that the modifications of the said Final Judgment hereby made are effective as of the date of entry of this Modified Final Judgment and Decree.

## V

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court retains continuing jurisdiction of this cause as to the use of all surface waters within the watershed of the Santa Margarita River and all underground or sub-surface waters within the watershed of the Santa Margarita River, which are determined in any of the constituent parts of this Modified Final Judgment to be a part of the sub-surface flow of any specific river or creek, or which are determined in any of the constituent parts of this Modified Final Judgment to add to, contribute to, or support the Santa Margarita River stream system.

## VI

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the STATE OF CALIFORNIA STATE WATER RIGHTS BOARD, or its successor agencies as may be provided by the laws of the State of California, shall continue to exercise its statutory jurisdiction over all present or future

-14-

14

EXHIBIT 1
Page 341

appropriative rights to the use of waters of the Santa

Margarita River and its tributaries.

### VII

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

this Court shall also continue to exercise jurisdiction

concerning all present or future appropriative rights

insofar as such uses may conflict with or be adverse to

the exercise of any prior vested water right within the

Santa Margarita River watershed, as adjudicated by the

provisions of the Interlocutory Judgments or orders

above set forth and by this Modified Final Judgment.

### VIII

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that

this Court reserves the right to amend, nunc pro tunc,

upon its own motion either with or without notice, any

interlocutory judgment or order or exhibit attached

thereto or this Modified Final Judgment, for the purpose

of correcting errors or inaccuracies in names, legal

descriptions or other similar factual data contained in

said interlocutory judgments or orders or exhibits, as

provided in Rule 60A of the Federal Rules of Civil

Procedure.

### IX

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the

continuing jurisdiction reserved by this Court will be

exercised on the Court's own Motion, or upon the motion

of any party to this cause, his heirs, successors, or

assigns, made upon notice and in accordance with the

Rules of this Court.

-15-

EXHIBIT 1
Page 342

X

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that neither this Modified Final Judgment and Decree nor any Interlocutory Judgment or order incorporated herein shall in any manner affect the right of the United States of America to acquire by the exercise of the power of eminent domain property including water rights of any nature as is or may be authorized by the laws of the United States of America; nor shall this Modified Final Judgment and Decree or any Interlocutory Judgment or order incorporated herein prevent any defendant from acquiring property including water rights of any nature by the exercise of the power of eminent domain as is or may be authorized by the laws of the State of California.

DATED:   4/6/66           , 1966.


JAMES M. CARTER, Judge
United States District Court

-16-

16

EXHIBIT 1
Page 343

EXHIBIT "A"

Cosgrove & O'Neil,
1031 Rowan Bldg.,
458 So. Spring St.,
Los Angeles, Calif.
    Trinity 6656
Attorneys for Plaintiff

O'Melveny & Myers,
900 Title Insurance Bldg.,
433 So. Spring St.,
Los Angeles, Calif.
    Michigan 2611
Attorneys for Defendants.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN and For the County of San Diego

| | |
|---|---|
| RANCHO SANTA MARGARITA a corporation | — No. 42850 |
| Plaintiff | |
| vs. | |
| N. R. Vail, Mary Vail Wilkinson, Mahlon Vail, Edward N. Vail, Margaret Vail Bell, The Vail Company, an association of persons transacting business under that common name, N. R. Vail, Mary Vail Wilkinson, Mahlon Vail, Edward N. Vail and Margaret Vail Bell, as Trustees of said Vail Company, Mahlon Vail, Executor of the Estate of Margaret R. Vail, Deceased, and Laura Perry Vail, Executrix of the Estate of William Banning Vail, Deceased. | STIPULATED JUDGMENT |
| Defendants. | |
| Guy Bogart, Lucy Parkman Bogart and Fred Reinhold, Executors of the will of Murray Schloss, deceased, and Philip Playtor, | |
| Interveners. | |

This cause came on regularly for trial in the above entitled court and depart-
ment thereof on Monday, October 18, 1926, at the hour of 10:00 o'clock A. M., be-
fore the court, Honorable L. D. Jennings, Judge, presiding; Messrs. Hunsaker, Britt
& Cosgrove appearing as attorneys for the plaintiff, Messrs. Haas & Dunnigan, Messrs.
Ward, Ward & Ward, Messrs. Stephens & Stephens, and Messrs. O'Melveny, Milliken &
Tuller, appearing as attorneys for defendants, and Walter Gould Lincoln, Esq.,
appearing as attorney for intervenors. The introduction of evidence, oral and
documentary, being completed, arguments, oral and in writing, having been submitted,
the court having considered the same and being fully advised in the premises,
findings of fact and conclusions of law having been signed by the court and filed
with the clerk thereof, and judgment on said findings and conclusions having been
signed and entered; defendants and each of them thereupon appealed from said judg-
ment and from each part thereof, but said interveners

EXHIBIT A

EXHIBIT 1
Page 344

did not appeal from said judgment; the Supreme Court of said State of California
upon said appeal having reversed said judgment and directed a new trial upon cer-
tain issues designated in the opinion of said court reported Rancho Santa Margarita,
a corporation, vs. Margaret R. Vail, et al., L. A. No. 15078, 11 Cal. (2nd) 501,
and said plaintiff and defendants having stipulated to the entry of the following
judgment,

Now, therefore, IT IS ORDERED, ADJUDGED AND DECREED that:

Section First:  The plaintiff, Rancho Santa Margarita, a corporation, and
defendants, N. R. Vail, Mary Vail Wilkinson, Mahlon Vail, Edward N. Vail, Margaret
Vail Bell, the Vail Company, an association of persons transacting business under
that common name, N. R. Vail, Mary Vail Wilkinson, Mahlon Vail, Edward N. Vail and
Margaret Vail Bell, as Trustees of said Vail Company, Mahlon Vail, Executor of the
estate of Margaret R. Vail, Deceased, and Laura Perry Vail, Executrix of the
Estate of William Banning Vail, Deceased, and interveners, Guy Bogart, Lucy Parkman
Bogart and Fred Reinhold, Executors of the Will of Murray Schloss, Deceased, and
Philip Playtor, have and each has rights in and to the waters of the Temecula-
Santa Margarita River and its tributaries, and in and to the use of said waters for
all beneficial and useful purposes on their respective lands herein more specifically
described.

Section Second:  The plaintiff is entitled to take and use upon the whole or
any part of its lands lying within the Rancho Santa Margarita y Las Flores, San
Diego County, California, sixty-six and two-thirds per cent (66-2/3%) of the water
of said Temecula-Santa Margarita River and all its tributaries which naturally,
when not artificially diverted or abstracted, flows and descends in the channel
thereof at that certain joint gaging station hereinafter in this judgment designated
as Measuring Station No. Six (6).

Section Third:  Defendants are entitled to take and use upon the whole or any
part of their lands hereinafter mentioned, thirty-three and one-third per cent
(33-1/3%) of the water of said Temecula-Santa Margarita River and all its trib-
utaries which naturally, when not artificially diverted or abstracted, flows and
descends in the channel thereof at that certain joint gaging station hereinafter
designated Measuring Station No. Six (6).

EXHIBIT 1
Page 345

- 3 -

The lands of the defendants herein referred to consist of those certain lands in Riverside County, California, known as Pauba Grant, Lost A, B, C, and D of Little Temecula Grant, or Rancho as shown on the Wolf partition map of Little Temecula Grant as described in the final decree of partition in the case of William Wold vs. Ramona Wolf, being Case No. 5756 in the Superior Court of San Diego County, State of California, said final decree of partition being recorded in Book 199 of Deeds, page 464, et seq., records of San Diego County, California, the southeasterly approximately one-half of Temecula Grant, excluding therefrom the town site of the unincorporated city of town of Temecula and the various parcels of land owned by persons other than the defendants herein, as shown by map entitled "Triangulation Map of Pauba Ranch and Vicinity, Riverside County" received in evidence in this case and marked "Plaintiff's Exhibit No. U-4", which exhibit has been incorporated into and constitutes a part of the Transcript on Appeal in this action, (reference is hereby made to said Transcript and to said Exhibit No. U-4 and by such reference said exhibit is incorporated into and constitutes a part of this judgment), Santa Rosa Grant, and Vail governments lands, which said Vail government lands, approximately four hundred sixty (460) acres in area, are more particularly described as: Those certain lands lying within sections twenty-one (21), twenty-seven (27), twenty-eight (28) and twenty-nine (29) of Township Eight (8) south, Range Two (2) west, S. B. B. M., Riverside County, California, and being more particularly identified as Lots Nineteen (19), Twenty (20), Twenty-one (21), Twenty-six (26), Twenty-seven (27), Thirty (30) and Thirty-one (31) of Block Fifteen (15), and those portions of Lots Seventeen (17) and Eighteen (18) of said Block Fifteen (15) lying without but contiguous to the southeasterly boundary of Lot D of said Little Temecula Grant.

Section Fourth:  The intervener Philip Playtor is entitled to take and use upon the whole or any part of his lands riparian to said Temecula-Santa Margarita River, as hereinafter delineated and defined, one (1) miner's inch continuous flow of the waters of said Temecula-Santa Margarita River.  The lands of said Philip Playtor riparian to said river are described as follows:  The northwest one-quarter (NW$\frac{1}{4}$) of the southeast one-quarter (SE$\frac{1}{4}$) and the south one-half (S$\frac{1}{2}$) of the south one-half (S$\frac{1}{2}$) of section thirty-three (33) and the southwest one-quarter (SW$\frac{1}{4}$) of the southwest one-quarter (SW$\frac{1}{4}$) of section thirty-four (34), Township Eight (8) South, Range Three (3) West, S. B. M., Riverside County, California.

*19*

EXHIBIT 1
Page 346

- 4 -

Section Fifth:  The interveners Guy Bogart, Lucy Parkman Bogart and Fred
Reinhold, as executors under the will of Murray Schloss, deceased, own certain
real property in San Diego County, California, of which approximately twenty (20)
acres are riparian to a certain tributary of said Temecula-Santa Margarita River
by the name of Stone Creek and are susceptible of practical and profitable irri-
gation with the water of said creek, said approximately twenty (20) acres being
described as follows:  The south one-half $(S\frac{1}{2})$ of the northeast one-quarter $(NE\frac{1}{4})$
of the northeast one-quarter $(NE\frac{1}{4})$ of section four (4) Township Nine (9) South,
Range Three (3) west, S. B. M., San Diego County, in said state.  Said inter-
veners are entitled to take from the surface and subsurface waters of said Stone
Creek and use the same on said twenty (20) acres riparian to said Stone Creek,
throughout said dry or irrigation season of each calendar year and from the 1st
day of May of each year until the 31st day of October of the same calendar year,
the entire flow of the waters of said Stone Creek and all its tributaries which
naturally, when not artificially diverted or abstracted, flows or descends in the
channel thereof to and upon said twenty (20) acre parcel; and are entitled to take
from said Stone Creek, during the rainy or winter season of each year, for use
upon said twenty (20) acres of riparian land for all beneficial purposes, five (5)
miner's inches continuous flow.

Section Sixth:  The waters of said stream and its tributaries herein apportion-
ed to the interveners shall be deducted from the fractional part of the waters of
said stream herein allotted to plaintiff.

Section Seventh:  For the purpose of dividing among, and allocating to, the
parties of this action, the waters of the Temecula-Santa Margarita River and its
tributaries, at the places and in the amounts specified in this judgment, the
plaintiff and the defendants immediately shall establish, and thereafter shall
maintain jointly (unless established and/or maintained by U. S. Geological Survey,
Division of Water Resources State Department of Public Works, or other public body),
stream-flow (automatically registering) gaging stations at the following three
locations on the Temecula-Santa Margarita River:

Station No. One (1):  The upper end of Nigger Canyon at or near the present
location of the Nigger Canyon gaging station;

Station No. Three (3):  The upper end of Temecula Gorge, immediately down-
stream from the confluence of Murrieta Creek, at or near the present location of

EXHIBIT 1
Page 347

- 5 -

the Temecula Gorge gaging station;

Station No. Six (6): The Narrows, at or near the present location of the Ysidora gaging station.

And plaintiff and defendants shall establish and maintain jointly (unless established and/or maintained by U. S. Geological Survey, Division of Water Resources State Department of Public Works, or other public body), gaging stations for measuring (and automatically registering) the surface flow of said stream, or any of its tributaries, at any point thereon where the plaintiff, the defendants, or the intervoners, or any of them, hereafter may construct or maintain appliances for the diversions of the surface flow of said stream, or any of its tributaries. (The cost of establishing and maintaining joint gaging stations as are required hereunder, including the taking of measurements and observations thereof, shall be borne equally by the plaintiff and the defendants.)

Each party shall establish and maintain meters to determine and automatically register the amount of the underground waters abstracted or diverted by such party from the underground waters of Temecula-Santa Margarita River and/or its tributaries by means of wells, either artesian or pumped (except windmill wells and/or domestic use wells of the parties and/or their tenants); such meters shall be of a type which will meet the approval of both plaintiff and defendants or the approval of either party and the engineer in charge of the Los Angeles office of the U. S. Geological Survey, and shall be installed and maintained in such manner and place as to be available for inspection by either plaintiff or defendants at all times.

Section Eighth: Whenever the total normal flow of said Temecula-Santa Margarita River (when not artificially diverted or abstracted) measured at gaging station No. Three (3) exceeds the total normal flow measured at Gaging Station No. Six (6), then and in that instance the flow of said stream at said Gaging Station No. Three (3) shall be considered as the total flow of said stream, and at such time the apportionments and allotments herein provided for shall be predicated upon the flow of said stream at said Gaging Station No. Three (3).

Section Ninth: For the purpose of apportioning to defendants thirty-three and one-third per cent (33-1/3%) of the waters of said stream as in Section Third provided, it shall be deemed that an amount of water equal to one-half (1/2) the surface flow at Station No. Six (6) or Station No. Three (3), wherever the flow is the

EXHIBIT 1
Page 348

- 6 -

greater (as provided in Section Eighth), pumped and/or diverted from the subsurface and/or surface waters of said river at points upstream from said Station No. Three (3), shall constitute thirty-three and one-third per cent (33-1/3%) of the waters of said stream.

It is recognized that the practical operation of the various pumping plants upon the defendants' lands for irrigation makes it difficult, if not impossible, for defendants to abstract and divert each day an amount of water the exact equivalent of the proportion of the stream flow measured at Station No. Six (6) or Station No. Three (3) to which defendants are entitled under this decree. Accordingly, whenever it is observed that defendants are abstracting and diverting, or have abstracted and diverted surface and/or underground waters in amounts in excess of that to which they are entitled hereunder, defendants, upon learning or being informed of such fact, thereupon shall reduce their diversions below the amount to which they are entitled under this decree, and shall continue such reduced diversions for the same period of time as near as is practicable and in an amount equivalent to the amount of water which defendants had diverted in excess of that to which they were entitled under this decree.

Section Tenth:  In addition to the thirty-three and one-third per cent (33-1/3%) of the waters of said stream herein in Section Third allotted to defendants, they may also divert or abstract from the underground waters of said Temecula-Santa Margarita River, but not from the surface waters of said stream, at the places, during the times and upon the conditions hereinafter in this Section specifically set forth, but not otherwise, a specified amount of subsurface water herein in this judgment referred to as "Storage Water".  The amount of Storage Water which the defendants may divert or abstract during any irrigation season shall be determined by the elevation of water (When not artificially disturbed) on May 1st of each year in a certain well located on defendants' land known as Windmill Well, in accordance with the following table:

| Depth to water below ground surface as shown in casing of Windmill Well on May 1st | Amount of Storage Water defendants may divert and apply to beneficial use during irrigation season |
|---|---|
| 20 feet or less | 1,500 acre feet |
| 30 feet | 1,125 acre feet |
| 40 feet | 750 acre feet |
| 50 feet | 375 acre feet |
| 60 feet or more | No acre feet |



EXHIBIT 1
Page 349

- 7 -

At depths to water intermediate to those above stated proportionate quantities of water may be taken.

The spreading of flood water which does not involve surface impoundment (either temporary or otherwise) but which may raise the level of water in the underground basin in which said Windmill Well is drilled and upon which said well is located, shall not be considered as an artificial disturbance of the elevation of water in said Windmill Well.  Storage water may be directed and used only upon said lands of defendants hereinbefore described and not elsewhere.

For the purpose of indicating the places at which said Storage Water may be pumped, reference is hereby made to "Plaintiff's Exhibit No. 265".  Said Exhibit by reference has been incorporated into and constitutes a part of the Transcript on Appeal in this action.  Reference is hereby made to said Transcript and to said Exhibit No. 265 and by such reference said Exhibit is incorporated into and constitutes a part of this judgment.

Shown upon said Exhibit No. 265, and extending in a generally northerly and southerly direction, is a certain line of wells (hereafter referred to as the E line of wells) desiganted on said Exhibit as E-3, E-2 North, E-1 North, E-1 South and E-2 South.

Easterly thereof, shown upon said Exhibit, and extending in a generally north-westerly and southeasterly direction, is a certain line of wells (hereafter referred to as the P. V. line of wells) designated on said Exhibit as P.V.9, P.V.6, and P.V.6X.  Immediately adjacent to said P.V. line of wells and parallel thereto, is a certain highway commonly known as Old Warners Ranch Road (now not in common use).

(a)  Not more than Thirty per cent (30%) of said Storage Water which defendants are entitled to pump during any irrigation season may be pumped from that portion of defendants' lands lying between a line drawn through said E line of wells and extended across said underground basin, and a line drawn through said P.V. line of wells and extended across said basin.

(b)  At least seventy per cent (70%) of said Storage Water which defendants are entitled to pump during any irrigation season shall be pumped from that portion of defendants' lands lying easterly of a line drawn through said P. V. line of wells and extended across said underground basin.

The well hereinbefore described as Windmill Well is situated on Pauba Grant South Sixty-seven degrees fifteen minutes (S 67 deg. 15 min?) East of B.M.11 a

EXHIBIT 1
Page 350

23

- 8 -

distance of approximately eleven hundred (1100) feet, and South forty-seven degrees twenty minutes (S 47 deg. 20 min) West of B.M. 12 a distance of approximately fifteen hundred eighty (1580) feet, said bench marks being designated as Nos. 11 and 12 on said Exhibit No. 265.

Should said Windmill Well collapse or otherwise cease to be available or useful for the purpose of determining ground water elevations in the vicinity thereof, then another well shall be drilled by the defendants in the same general location, at approximately the same ground surface elevation above sea level, but not to exceed a distance of one hundred (100) feet from the location of said Windmill Well. Such new well shall be approximately the same depth and diameter of casing as said Windmill Well.  In event the parties hereto are unable to agree upon location, depth and diameter of casing of such well, these matters, upon petition of the parties hereto or either of them, shall be determined by order of this court.

For the purpose of determining defendants' total diversions of the waters of the Temecula-Santa Margarita River and its tributaries (meaning thereby to include both the allotment of thirty-three and one third per cent (33-1/3%) of the waters of the river as defined in Section Third, and the additional Storage Water as defined in this Section Tenth hereof), any water abstracted or diverted by defendants from the underground waters of said river (including underground basins of percolating water within the watershed of said river and its tributaries) by use of wells or pumps or other means of diversion, whether now existing or hereafter established, except as hereinafter in this section provided, shall be added to any surface diversions by the defendants from the waters of said river.  Such abstractions by the defendants of the underground waters of the Temecula-Santa Margarita River are, and for all purposes of this judgment shall be (except as hereinafter provided) considered as diversions of the waters of said river, and are and shall be chargeable against the fractional part of the surface flow of said stream and the additional amount of Storage Waters herein allotted to defendants.

Water abstracted or diverted from said underground Water of said river which shall not be subject to the provisions of this section are as follows:

1.  Windmill wells maintained by defendants for the purpose of supplying water for cattle.

2.  Water used by defendants or their tenants for domestic use exclusively (but not including any irrigation use);



EXHIBIT 1
Page 351

- 9 -

3. Waters which defendants may pump directly into the surface flow of said stream pursuant to the requirements of Section Eleventh hereof.

Section Eleventh:

Part 1.  During the irrigation season of each year, to wit, May 1 to October 31, inclusive, excepting as otherwise in Part 1 of this Section permitted, defendants shall cause to be maintained at Gaging Station No. Three (3) a constant flow of water of not less than three (3) cubic feet per second (one (1) cubic foot per second being the equivalent of fifty (50) miner's inches.).

The surface flow at said Station No. Three (3) may be permitted to fall below three (3) cubic feet per second during said irrigation season upon the following conditions and not otherwise:

1. Said surface flow shall not be permitted to fall below three (3) cubic feet per second for any continuous period of more than ten (10) days:

2. An interval of at least ten (10) days shall elapse between periods during which said surface flow falls below three (3) cubic feet per second:

3. Defendants shall contribute to the surface flow at Station No. Three (3), by means of pumping from Temecula Alluvial Basin, or otherwise, an amount of water equal to the amount that the actual flow during said period was less than the required flow of three (3) second feet;

4. Such contributions shall be made at the same rate and over the same period (as near as practicable) as the rate at which said surface flow was less than Three (3) second feet;

5. Such contributions shall be made immediately following the period in which said required flow of three (3) second feet was not maintained;

6. Defendants by means of pumping underground waters directly into the surface flow of the stream or otherwise during any period in which said required flow of three (3) second feet was not maintained, shall always maintain a constant surface flow at Station No. Three (3) of not less than two (2) second feet.

Part II:  In the event that, during the irrigation season of any year, to wit, May 1 to October 31, inclusive, the irrigation of crops on said lands of defendants reasonably requires more water than they otherwise are entitled to take under this decree, defendants may abstract and divert underground waters only, in amounts in excess of that to which they are otherwise entitled hereunder.  Such excessive diversions may be made upon the following conditions and not otherwise:

25

EXHIBIT 1
Page 352

- 10 -

1. Excessive diversions shall not continue for a period to exceed eight (8) days consecutively;

2. Following any period of excessive diversion, an interval shall elapse before any further period of excessive diversion, which interval shall not be less than the number of days during the period of excessive diversions immediately preceding;

3. Defendants shall reduce their diversions below the amount to which they are otherwise entitled under this decree, such reductions to be in an amount not less than the amount of water which defendants have diverted in excess of that to which they are otherwise entitled under this decree;

4. Such reductions of their diversions shall be made by defendants immediately following the period during which such excessive diversions were made and shall be completed within ten (10) days thereafter;

5. Defendants, at least one (1) day in advance of the commencement of such diversions, shall advise plaintiff in writing of their requirement and of their intention to avail themselves of the privilege of excessive diversions afforded under part II of this Section.

Parts I and II of this Section Eleventh are complementary one of the other and not inconsistent one with the other and hereafter shall be so construed. The purpose of Part I is to require defendants to maintain a constant flow at Station No. Three (3) of not less than three (3) cubic feet per second excepting under the conditions stated when the flow may be permitted to fall below three (3) cubic feet per second but not below two (2) cubic feet per second, and when such diminution of the stream flow occurs the amount of such diminution shall be contributed by the defendants by pumping directly into the surface flow of the stream from the Temecula Alluvial Basin or otherwise. Part II permits defendants under the conditions stated to use for short periods amounts of water in excess of their allotment but requires them to contribute shortly thereafter the amount of such excessive diversions by reducing (in an amount not less than the amount of such excessive diversions) the amount of the diversions to which they are otherwise entitled. No part of such excessive diversions is required to be contributed by defendants through direct pumping from the subsurface waters of the Temecula Alluvial Basin into the surface flow of the stream if, during the period of such excessive diversions, the constant stream flow at Station No. Three (3) equals or exceeds three (3) second feet.

EXHIBIT 1
Page 353

- 11 -

Section Twelfth:  Defendants at all times shall be entitled to divert from the Temecula-Santa Margarita River and its tributaries, and to apply to beneficial use upon their said lands, an amount of water equal to one-half the amount which the plaintiff is entitled to divert from said river and its tributaries and apply to beneficial use upon its lands.

For the purpose of determining the amount of water which defendants are entitled to divert and apply to such beneficial use, computations of the amount of water diverted and applied to beneficial use by each of the parties hereto shall be made monthly, based on joint measurements maintained as herein required.  In event said measurements disclose that the amount of water which defendants are entitled to divert and apply to beneficial use pursuant to the provisions of this judgment is less than one-half the amount being applied to beneficial use by plaintiff, thereupon defendants shall be entitled to increase their diversions and applications to beneficial use to an amount sufficient to make defendants' diversions and applications to beneficial use equal to one-half the amount diverted and applied by plaintiff; provided, however, that such additional diversions and applications, if and when made, shall be in addition to diversions made under Sections Third and Tenth hereof, and shall be made by defendants during the irrigation season in which such right accrues, or in the first subsequent season, or part in the same season and the remainder in the first subsequent season, and such diversion, if any, shall be made by pumping from the underground basin at points easterly from said P. V. line of wells.

Section Thirteenth:  Each of the parties hereto shall have the right to construct dams or reservoirs on its or their respective lands or elsewhere, for the purpose of intercepting or impounding or conserving such party's share of the flood waters of said river and its tributaries; provided, however, in the event any such dam or reservoir is hereafter constructed by defendants for such purpose, the rights of defendants to abstract and divert Storage Water pursuant to Section Tenth hereof shall cease and terminate.

Defendants shall not make, during any irrigation season, any surface diversions of the waters of said river at the Bridge Pumping Plant, The Cantarini Pumping Plant or the Tule Pumping Plant referred to in the findings herein, or at any other point

EXHIBIT 1
Page 354

- 12 -

on said Temecula-Santa Margarita River below the point of Rising Water as shown on said Exhibit No. 265.

Section Fourteenth:  The plaintiff, Rancho Santa Margarita, a corporation, shall have and recover of and from the defendants, its costs and disbursements herein taxed at Six Thousand Thirty-six and 62/100 Dollars ($6,036.62).

Dated at San Diego, California, this 26 day of December, 1940.


Gordon Thompson

Judge

Records indicate that this judgment was recorded in San Diego and Riverside Counties on 26 December 1940.

EXHIBIT 1
Page 355

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 51-01247-GPC-RBB |
| Plaintiff, | **JUDGMENT AND DECREE** |
| v. | Hon. Gonzalo P. Curiel |
| FALLBROOK PUBLIC UTILITY DISTRICT, *et al.*, | |
| Defendants. | |

1.     The Court has considered the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("Settlement Agreement"), dated November 29, 2017, and the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act ("Settlement Act"), which permanently resolve the water rights claims of the Pechanga Band of Luiseño Mission Indians ("Pechanga"), its Members, and Allottees; and of the United States acting on behalf of Pechanga, its Members, and Allottees, to the waters of the Santa Margarita River Watershed for land within the exterior boundaries of the Pechanga Reservation.  A copy of the Settlement Agreement is attached to this Judgment and Decree.

**NOW THEREFORE,** it is hereby adjudged and decreed as follows:

2.     The Settlement Agreement, including all of the Exhibits thereto, is incorporated into this Judgment and Decree.

3.     The Settlement Agreement, including all of the Exhibits thereto, is hereby approved.

4.     The Settlement Agreement and the Settlement Act confirm a Tribal Water Right of up to four thousand nine hundred ninety-four (4,994) acre-feet of water per year that, under natural conditions, is physically available on the Reservation.  Subject to the terms of the Settlement Agreement, the Settlement Act, the Fallbrook Decree, and applicable Federal Law, the Tribal Water Right

may be used for any purpose on the Pechanga Reservation, in accordance with Section 3405(b) of the Settlement Act.  The Tribal Water Right shall have the priority dates set forth in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree.  The Kelsey Tract, Lot E of the Little Temecula Grant, shall have a priority date of March 11, 1907, consistent with the description of the Kelsey Tract deed in paragraph 30 of Interlocutory Judgment No. 41.

5.     Any entitlement to water located within the Pechanga Reservation shall be satisfied out of the Tribal Water Right described in the preceding paragraph of this Judgment and Decree.

6.     Pechanga and the United States retain the respective rights specified in Section 12 of the Settlement Agreement and Section 3407(c) of the Settlement Act.

7.     In exchange for the benefits realized under the Settlement Agreement and as authorized by the Settlement Act, Pechanga and the United States have agreed to waivers and releases of claims, as recognized in Paragraphs 8, 10, and 11 of the Settlement Agreement and Section 3407(a) of the Settlement Act.

8.     The benefits provided to Pechanga under the Settlement Agreement and the Settlement Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims of Pechanga against the United States that are waived and released pursuant to the Agreement and the Act.

9.     The benefits realized by the Allottees under the Settlement Agreement and the Settlement Act shall be in complete replacement of, complete substitution for, and full satisfaction of all Claims of the Allottees that are waived and released pursuant to the Agreement and the Act and any Claims of the Allottees against the United States that the Allottees have or could have asserted that are similar in nature to any claim described in the Agreement or the Act.

10.     The claims by Pechanga; its Members; and Allottees; and the United States on behalf of Pechanga, its Members, and Allottees to water from the Santa

- 2 -

EXHIBIT 1
Page 357

1  Margarita River Watershed are fully, finally and permanently adjudicated by this

2  Judgment and Decree.

3       11.    Nothing in this Judgment and Decree or the Settlement Agreement

4  shall be construed to quantify or otherwise affect the entitlement to water of any

5  other Indian tribe, band or community, or the United States on their behalf, other

6  than Pechanga and the United States acting on behalf of Pechanga, its Members

7  and Allottees.

8       12.    This Court retains jurisdiction over this matter for enforcement of this

9  Judgment and Decree and the Settlement Agreement, including the entry of

10  injunctions, restraining orders or other remedies under law or equity.

11       DATED this _____ day of _____, 2018.

12

13

14                           _____

15                           Hon. Gonzalo P. Curiel

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

EXHIBIT 1
Page 358

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1755

# Subtitle D—Pechanga Water Rights Settlement

**SEC. 3401. SHORT TITLE.**

This subtitle may be cited as the "Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act".

**SEC. 3402. PURPOSES.**

The purposes of this subtitle are—

(1) to achieve a fair, equitable, and final settlement of claims to water rights and certain claims for injuries to water rights in the Santa Margarita River Watershed for—

(A) the Band; and

(B) the United States, acting in its capacity as trustee for the Band and Allottees;

(2) to achieve a fair, equitable, and final settlement of certain claims by the Band and Allottees against the United States;

(3) to authorize, ratify, and confirm the Pechanga Settlement Agreement to be entered into by the Band, RCWD, and the United States;

(4) to authorize and direct the Secretary—

(A) to execute the Pechanga Settlement Agreement; and

(B) to take any other action necessary to carry out the Pechanga Settlement Agreement in accordance with this subtitle; and

(5) to authorize the appropriation of amounts necessary for the implementation of the Pechanga Settlement Agreement and this subtitle.

**SEC. 3403. DEFINITIONS.**

In this subtitle:

(1) ADJUDICATION COURT.—The term "Adjudication Court" means the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Adjudication Proceeding.

(2) ADJUDICATION PROCEEDING.—The term "Adjudication Proceeding" means litigation initiated by the United States regarding relative water rights in the Santa Margarita River Watershed in United States v. Fallbrook Public Utility District et al., Civ. No. 3:51–cv–01247 (S.D.C.A.), including any litigation initiated to interpret or enforce the relative water rights in the Santa Margarita River Watershed pursuant to the continuing jurisdiction of the Adjudication Court over the Fallbrook Decree.

(3) ALLOTTEE.—The term "Allottee" means an individual who holds a beneficial real property interest in an Indian allotment that is—

(A) located within the Reservation; and

(B) held in trust by the United States.

(4) BAND.—The term "Band" means Pechanga Band of Luiseño Mission Indians, a federally recognized sovereign Indian tribe that functions as a custom and tradition Indian tribe, acting on behalf of itself and its members, but not acting on behalf of members in their capacities as Allottees.

Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act.

EXHIBIT 2
Page 359

(5) CLAIMS.—The term "claims" means rights, claims, demands, actions, compensation, or causes of action, whether known or unknown.

(6) EMWD.—The term "EMWD" means Eastern Municipal Water District, a municipal water district organized and existing in accordance with the Municipal Water District Law of 1911, Division 20 of the Water Code of the State of California, as amended.

(7) EMWD CONNECTION FEE.—The term "EMWD Connection Fee" has the meaning set forth in the Extension of Service Area Agreement.

(8) ENFORCEABILITY DATE.—The term "enforceability date" means the date on which the Secretary publishes in the Federal Register the statement of findings described in section 3407(e).

(9) ESAA CAPACITY AGREEMENT.—The term "ESAA Capacity Agreement" means the "ESAA Capacity Agreement", among the Band, RCWD, and the United States.

(10) ESAA WATER.—The term "ESAA Water" means imported potable water that the Band receives from EMWD and MWD pursuant to the Extension of Service Area Agreement and delivered by RCWD pursuant to the ESAA Water Delivery Agreement.

(11) ESAA WATER DELIVERY AGREEMENT.—The term "ESAA Water Delivery Agreement" means the agreement among EMWD, RCWD, and the Band, establishing the terms and conditions of water service to the Band.

(12) EXTENSION OF SERVICE AREA AGREEMENT.—The term "Extension of Service Area Agreement" means the "Extension of Service Area Agreement", among the Band, EMWD, and MWD, for the provision of water service by EMWD to a designated portion of the Reservation using water supplied by MWD.

(13) FALLBROOK DECREE.—

(A) IN GENERAL.—The term "Fallbrook Decree" means the "Modified Final Judgment And Decree", entered in the Adjudication Proceeding on April 6, 1966.

(B) INCLUSIONS.—The term "Fallbrook Decree" includes all court orders, interlocutory judgments, and decisions supplemental to the "Modified Final Judgment And Decree", including Interlocutory Judgment No. 30, Interlocutory Judgment No. 35, and Interlocutory Judgment No. 41.

(14) FUND.—The term "Fund" means the Pechanga Settlement Fund established by section 3409.

(15) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

(16) INJURY TO WATER RIGHTS.—The term "injury to water rights" means an interference with, diminution of, or deprivation of water rights under Federal or State law.

(17) INTERIM CAPACITY.—The term "Interim Capacity" has the meaning set forth in the ESAA Capacity Agreement.

(18) INTERIM CAPACITY NOTICE.—The term "Interim Capacity Notice" has the meaning set forth in the ESAA Capacity Agreement.

(19) INTERLOCUTORY JUDGMENT NO. 41.—The term "Interlocutory Judgment No. 41" means Interlocutory Judgment No.

EXHIBIT 2
Page 360

41 issued in the Adjudication Proceeding on November 8, 1962, including all court orders, judgments, and decisions supplemental to that interlocutory judgment.

(20) MWD.—The term "MWD" means the Metropolitan Water District of Southern California, a metropolitan water district organized and incorporated under the Metropolitan Water District Act of the State of California (Stats. 1969, Chapter 209, as amended).

(21) MWD CONNECTION FEE.—The term "MWD Connection Fee" has the meaning set forth in the Extension of Service Area Agreement.

(22) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—The term "Pechanga ESAA Delivery Capacity account" means the account established by section 3409(c)(2).

(23) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—The term "Pechanga Recycled Water Infrastructure account" means the account established by section 3409(c)(1).

(24) PECHANGA SETTLEMENT AGREEMENT.—The term "Pechanga Settlement Agreement" means the Pechanga Settlement Agreement, dated April 8, 2016, together with the exhibits to that agreement, entered into by the Band, the United States on behalf of the Band, its members and Allottees, MWD, EMWD, and RCWD, including—

　　(A) the Extension of Service Area Agreement;

　　(B) the ESAA Capacity Agreement; and

　　(C) the ESAA Water Delivery Agreement.

(25) PECHANGA WATER CODE.—The term "Pechanga Water Code" means a water code to be adopted by the Band in accordance with section 3405(f).

(26) PECHANGA WATER FUND ACCOUNT.—The term "Pechanga Water Fund account" means the account established by section 3409(c)(3).

(27) PECHANGA WATER QUALITY ACCOUNT.—The term "Pechanga Water Quality account" means the account established by section 3409(c)(4).

(28) PERMANENT CAPACITY.—The term "Permanent Capacity" has the meaning set forth in the ESAA Capacity Agreement.

(29) PERMANENT CAPACITY NOTICE.—The term "Permanent Capacity Notice" has the meaning set forth in the ESAA Capacity Agreement.

(30) RCWD.—

　　(A) IN GENERAL.—The term "RCWD" means the Rancho California Water District organized pursuant to section 34000 et seq. of the California Water Code.

　　(B) INCLUSIONS.—The term "RCWD" includes all real property owners for whom RCWD acts as an agent pursuant to an agency agreement.

(31) RECYCLED WATER INFRASTRUCTURE AGREEMENT.—The term "Recycled Water Infrastructure Agreement" means the "Recycled Water Infrastructure Agreement" among the Band, RCWD, and the United States.

(32) RECYCLED WATER TRANSFER AGREEMENT.—The term "Recycled Water Transfer Agreement" means the "Recycled Water Transfer Agreement" between the Band and RCWD.

(33) RESERVATION.—

EXHIBIT 2
Page 361

(A) IN GENERAL.—The term "Reservation" means the land depicted on the map attached to the Pechanga Settlement Agreement as Exhibit I.

(B) APPLICABILITY OF TERM.—The term "Reservation" shall be used solely for the purposes of the Pechanga Settlement Agreement, this subtitle, and any judgment or decree issued by the Adjudication Court approving the Pechanga Settlement Agreement.

(34) SANTA MARGARITA RIVER WATERSHED.—The term "Santa Margarita River Watershed" means the watershed that is the subject of the Adjudication Proceeding and the Fallbrook Decree.

(35) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(36) STATE.—The term "State" means the State of California.

(37) STORAGE POND.—The term "Storage Pond" has the meaning set forth in the Recycled Water Infrastructure Agreement.

(38) TRIBAL WATER RIGHT.—The term "Tribal Water Right" means the water rights ratified, confirmed, and declared to be valid for the benefit of the Band and Allottees, as set forth and described in section 3405.

## SEC. 3404. APPROVAL OF THE PECHANGA SETTLEMENT AGREEMENT.

(a) RATIFICATION OF PECHANGA SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—Except as modified by this subtitle, and to the extent that the Pechanga Settlement Agreement does not conflict with this subtitle, the Pechanga Settlement Agreement is authorized, ratified, and confirmed.

(2) AMENDMENTS.—Any amendment to the Pechanga Settlement Agreement is authorized, ratified, and confirmed, to the extent that the amendment is executed to make the Pechanga Settlement Agreement consistent with this subtitle.

(b) EXECUTION OF PECHANGA SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—To the extent that the Pechanga Settlement Agreement does not conflict with this subtitle, the Secretary is directed to and promptly shall execute—

(A) the Pechanga Settlement Agreement (including any exhibit to the Pechanga Settlement Agreement requiring the signature of the Secretary); and

(B) any amendment to the Pechanga Settlement Agreement necessary to make the Pechanga Settlement Agreement consistent with this subtitle.

(2) MODIFICATIONS.—Nothing in this subtitle precludes the Secretary from approving modifications to exhibits to the Pechanga Settlement Agreement not inconsistent with this subtitle, to the extent those modifications do not otherwise require congressional approval pursuant to section 2116 of the Revised Statutes (25 U.S.C. 177) or other applicable Federal law.

(c) ENVIRONMENTAL COMPLIANCE.—

(1) IN GENERAL.—In implementing the Pechanga Settlement Agreement, the Secretary shall promptly comply with all applicable requirements of—

(A) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

EXHIBIT 2
Page 362

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1759

(B) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(C) all other applicable Federal environmental laws; and

(D) all regulations promulgated under the laws described in subparagraphs (A) through (C).

(2) EXECUTION OF THE PECHANGA SETTLEMENT AGREE-MENT.—

(A) IN GENERAL.—Execution of the Pechanga Settlement Agreement by the Secretary under this section shall not constitute a major Federal action under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) COMPLIANCE.—The Secretary is directed to carry out all Federal compliance necessary to implement the Pechanga Settlement Agreement.

(3) LEAD AGENCY.—The Bureau of Reclamation shall be designated as the lead agency with respect to environmental compliance.

### SEC. 3405. TRIBAL WATER RIGHT.

(a) INTENT OF CONGRESS.—It is the intent of Congress to provide to each Allottee benefits that are equal to or exceed the benefits Allottees possess as of the date of enactment of this Act, taking into consideration—

(1) the potential risks, cost, and time delay associated with litigation that would be resolved by the Pechanga Settlement Agreement and this subtitle;

(2) the availability of funding under this subtitle;

(3) the availability of water from the Tribal Water Right and other water sources as set forth in the Pechanga Settlement Agreement; and

(4) the applicability of section 7 of the Act of February 8, 1887 (25 U.S.C. 381), and this subtitle to protect the interests of Allottees.

(b) CONFIRMATION OF TRIBAL WATER RIGHT.—

(1) IN GENERAL.—A Tribal Water Right of up to 4,994 acre-feet of water per year that, under natural conditions, is physically available on the Reservation is confirmed in accordance with the Findings of Fact and Conclusions of Law set forth in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree.

(2) USE.—Subject to the terms of the Pechanga Settlement Agreement, this subtitle, the Fallbrook Decree, and applicable Federal law, the Band may use the Tribal Water Right for any purpose on the Reservation.

(c) HOLDING IN TRUST.—The Tribal Water Right, as set forth in subsection (b), shall—

(1) be held in trust by the United States on behalf of the Band and the Allottees in accordance with this section;

(2) include the priority dates described in Interlocutory Judgment No. 41, as affirmed by the Fallbrook Decree; and

(3) not be subject to forfeiture or abandonment.

(d) ALLOTTEES.—

(1) APPLICABILITY OF ACT OF FEBRUARY 8, 1887.—The provisions of section 7 of the Act of February 8, 1887 (25 U.S.C. 381), relating to the use of water for irrigation purposes shall apply to the Tribal Water Right.

EXHIBIT 2
Page 363

(2) ENTITLEMENT TO WATER.—Any entitlement to water of an Allottee under Federal law shall be satisfied from the Tribal Water Right.

(3) ALLOCATIONS.—Allotted land located within the exterior boundaries of the Reservation shall be entitled to a just and equitable allocation of water for irrigation and domestic purposes from the Tribal Water Right.

(4) EXHAUSTION OF REMEDIES.—Before asserting any claim against the United States under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or any other applicable law, an Allottee shall exhaust remedies available under the Pechanga Water Code or other applicable tribal law.

(5) CLAIMS.—Following exhaustion of remedies available under the Pechanga Water Code or other applicable tribal law, an Allottee may seek relief under section 7 of the Act of February 8, 1887 (25 U.S.C. 381), or other applicable law.

(6) AUTHORITY.—The Secretary shall have the authority to protect the rights of Allottees as specified in this section.

(e) AUTHORITY OF BAND.—

(1) IN GENERAL.—Except as provided in paragraph (2), the Band shall have authority to use, allocate, distribute, and lease the Tribal Water Right on the Reservation in accordance with—

(A) the Pechanga Settlement Agreement; and

(B) applicable Federal law.

(2) LEASES BY ALLOTTEES.—

(A) IN GENERAL.—An Allottee may lease any interest in land held by the Allottee, together with any water right determined to be appurtenant to that interest in land.

(B) WATER RIGHT APPURTENANT.—Any water right determined to be appurtenant to an interest in land leased by an Allottee shall be used on such land on the Reservation.

(f) PECHANGA WATER CODE.—

(1) IN GENERAL.—Not later than 18 months after the enforceability date, the Band shall enact a Pechanga Water Code, that provides for—

(A) the management, regulation, and governance of all uses of the Tribal Water Right in accordance with the Pechanga Settlement Agreement; and

(B) establishment by the Band of conditions, permit requirements, and other limitations relating to the storage, recovery, and use of the Tribal Water Right in accordance with the Pechanga Settlement Agreement.

(2) INCLUSIONS.—Subject to the approval of the Secretary, the Pechanga Water Code shall provide—

(A) that allocations of water to Allottees shall be satisfied with water from the Tribal Water Right;

(B) that charges for delivery of water for irrigation purposes for Allottees shall be assessed on a just and equitable basis;

(C) a process by which an Allottee may request that the Band provide water for irrigation or domestic purposes in accordance with this subtitle;

(D) a due process system for the consideration and determination by the Band of any request by an Allottee (or any successor in interest to an Allottee) for an allocation

EXHIBIT 2
Page 364

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1761

of such water for irrigation or domestic purposes on allotted land, including a process for—

(i) appeal and adjudication of any denied or disputed distribution of water; and

(ii) resolution of any contested administrative decision; and

(E) a requirement that any Allottee with a claim relating to the enforcement of rights of the Allottee under the Pechanga Water Code or relating to the amount of water allocated to land of the Allottee must first exhaust remedies available to the Allottee under tribal law and the Pechanga Water Code before initiating an action against the United States or petitioning the Secretary pursuant to subsection (d)(4).

(3) ACTION BY SECRETARY.—

(A) IN GENERAL.—The Secretary shall administer the Tribal Water Right until the Pechanga Water Code is enacted and approved under this section.

(B) APPROVAL.—Any provision of the Pechanga Water Code and any amendment to the Pechanga Water Code that affects the rights of Allottees—

(i) shall be subject to the approval of the Secretary; and

(ii) shall not be valid until approved by the Secretary.

(C) APPROVAL PERIOD.—The Secretary shall approve or disapprove the Pechanga Water Code within a reasonable period of time after the date on which the Band submits the Pechanga Water Code to the Secretary for approval.

(g) EFFECT.—Except as otherwise specifically provided in this section, nothing in this subtitle—

(1) authorizes any action by an Allottee against any individual or entity, or against the Band, under Federal, State, tribal, or local law; or

(2) alters or affects the status of any action pursuant to section 1491(a) of title 28, United States Code.

## SEC. 3406. SATISFACTION OF CLAIMS.

(a) IN GENERAL.—The benefits provided to the Band under the Pechanga Settlement Agreement and this subtitle shall be in complete replacement of, complete substitution for, and full satisfaction of all claims of the Band against the United States that are waived and released pursuant to section 3407.

(b) ALLOTTEE CLAIMS.—The benefits realized by the Allottees under this subtitle shall be in complete replacement of, complete substitution for, and full satisfaction of—

(1) all claims that are waived and released pursuant to section 3407; and

(2) any claims of the Allottees against the United States that the Allottees have or could have asserted that are similar in nature to any claim described in section 3407.

(c) NO RECOGNITION OF WATER RIGHTS.—Except as provided in section 3405(d), nothing in this subtitle recognizes or establishes any right of a member of the Band or an Allottee to water within the Reservation.

EXHIBIT 2
Page 365

(d) CLAIMS RELATING TO DEVELOPMENT OF WATER FOR RESERVATION.—

(1) IN GENERAL.—The amounts authorized to be appropriated pursuant to section 3411 shall be used to satisfy any claim of the Allottees against the United States with respect to the development or protection of water resources for the Reservation.

(2) SATISFACTION OF CLAIMS.—Upon the complete appropriation of amounts authorized pursuant to section 3411, any claim of the Allottees against the United States with respect to the development or protection of water resources for the Reservation shall be deemed to have been satisfied.

**SEC. 3407. WAIVER OF CLAIMS.**

(a) IN GENERAL.—

(1) WAIVER OF CLAIMS BY THE BAND AND THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR THE BAND.—

(A) IN GENERAL.—Subject to the retention of rights set forth in subsection (c), in return for recognition of the Tribal Water Right and other benefits as set forth in the Pechanga Settlement Agreement and this subtitle, the Band, and the United States, acting as trustee for the Band, are authorized and directed to execute a waiver and release of all claims for water rights within the Santa Margarita River Watershed that the Band, or the United States acting as trustee for the Band, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent that such rights are recognized in the Pechanga Settlement Agreement and this subtitle.

(B) CLAIMS AGAINST RCWD.—Subject to the retention of rights set forth in subsection (c) and notwithstanding any provisions to the contrary in the Pechanga Settlement Agreement, the Band and the United States, on behalf of the Band and Allottees, fully release, acquit, and discharge RCWD from—

(i) claims for injuries to water rights in the Santa Margarita River Watershed for land located within the Reservation arising or occurring at any time up to and including June 30, 2009;

(ii) claims for injuries to water rights in the Santa Margarita River Watershed for land located within the Reservation arising or occurring at any time after June 30, 2009, resulting from the diversion or use of water in a manner not in violation of the Pechanga Settlement Agreement or this subtitle;

(iii) claims for subsidence damage to land located within the Reservation arising or occurring at any time up to and including June 30, 2009;

(iv) claims for subsidence damage arising or occurring after June 30, 2009, to land located within the Reservation resulting from the diversion of underground water in a manner consistent with the Pechanga Settlement Agreement or this subtitle; and

EXHIBIT 2
Page 366

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1763

(v) claims arising out of, or relating in any manner to, the negotiation or execution of the Pechanga Settlement Agreement or the negotiation or execution of this subtitle.

(2) CLAIMS BY THE UNITED STATES ACTING IN ITS CAPACITY AS TRUSTEE FOR ALLOTTEES.—Subject to the retention of claims set forth in subsection (c), in return for recognition of the Tribal Water Right and other benefits as set forth in the Pechanga Settlement Agreement and this subtitle, the United States, acting as trustee for Allottees, is authorized and directed to execute a waiver and release of all claims for water rights within the Santa Margarita River Watershed that the United States, acting as trustee for the Allottees, asserted or could have asserted in any proceeding, including the Adjudication Proceeding, except to the extent such rights are recognized in the Pechanga Settlement Agreement and this subtitle.

(3) CLAIMS BY THE BAND AGAINST THE UNITED STATES.— Subject to the retention of rights set forth in subsection (c), the Band, is authorized to execute a waiver and release of—

(A) all claims against the United States (including the agencies and employees of the United States) relating to claims for water rights in, or water of, the Santa Margarita River Watershed that the United States, acting in its capacity as trustee for the Band, asserted, or could have asserted, in any proceeding, including the Adjudication Proceeding, except to the extent that those rights are recognized in the Pechanga Settlement Agreement and this subtitle;

(B) all claims against the United States (including the agencies and employees of the United States) relating to damages, losses, or injuries to water, water rights, land, or natural resources due to loss of water or water rights (including damages, losses or injuries to hunting, fishing, gathering, or cultural rights due to loss of water or water rights, claims relating to interference with, diversion, or taking of water or water rights, or claims relating to failure to protect, acquire, replace, or develop water, water rights, or water infrastructure) in the Santa Margarita River Watershed that first accrued at any time up to and including the enforceability date;

(C) all claims against the United States (including the agencies and employees of the United States) relating to the pending litigation of claims relating to the water rights of the Band in the Adjudication Proceeding; and

(D) all claims against the United States (including the agencies and employees of the United States) relating to the negotiation or execution of the Pechanga Settlement Agreement or the negotiation or execution of this subtitle.

(b) EFFECTIVENESS OF WAIVERS AND RELEASES.—The waivers under subsection (a) shall take effect on the enforceability date.

(c) RESERVATION OF RIGHTS AND RETENTION OF CLAIMS.—Notwithstanding the waivers and releases authorized in this subtitle, the Band, on behalf of itself and the members of the Band, and the United States, acting in its capacity as trustee for the Band and Allottees, retain—

(1) all claims for enforcement of the Pechanga Settlement Agreement and this subtitle;

EXHIBIT 2
Page 367

(2) all claims against any person or entity other than the United States and RCWD, including claims for monetary damages;

(3) all claims for water rights that are outside the jurisdiction of the Adjudication Court;

(4) all rights to use and protect water rights acquired on or after the enforceability date; and

(5) all remedies, privileges, immunities, powers, and claims, including claims for water rights, not specifically waived and released pursuant to this subtitle and the Pechanga Settlement Agreement.

(d) EFFECT OF PECHANGA SETTLEMENT AGREEMENT AND ACT.— Nothing in the Pechanga Settlement Agreement or this subtitle—

(1) affects the ability of the United States, acting as a sovereign, to take actions authorized by law, including any laws relating to health, safety, or the environment, including—

(A) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);

(B) the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

(C) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.); and

(D) any regulations implementing the Acts described in subparagraphs (A) through (C);

(2) affects the ability of the United States to take actions acting as trustee for any other Indian tribe or an Allottee of any other Indian tribe;

(3) confers jurisdiction on any State court—

(A) to interpret Federal law regarding health, safety, or the environment;

(B) to determine the duties of the United States or other parties pursuant to Federal law regarding health, safety, or the environment; or

(C) to conduct judicial review of Federal agency action;

(4) waives any claim of a member of the Band in an individual capacity that does not derive from a right of the Band;

(5) limits any funding that RCWD would otherwise be authorized to receive under any Federal law, including, the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h et seq.) as that Act applies to permanent facilities for water recycling, demineralization, and desalination, and distribution of nonpotable water supplies in Southern Riverside County, California;

(6) characterizes any amounts received by RCWD under the Pechanga Settlement Agreement or this subtitle as Federal for purposes of section 1649 of the Reclamation Wastewater and Groundwater Study and Facilities Act (43 U.S.C. 390h–32); or

(7) affects the requirement of any party to the Pechanga Settlement Agreement or any of the exhibits to the Pechanga Settlement Agreement to comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or the California Environmental Quality Act (Cal. Pub. Res. Code 21000 et seq.) prior to performing the respective obligations

EXHIBIT 2
Page 368

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1765

of that party under the Pechanga Settlement Agreement or any of the exhibits to the Pechanga Settlement Agreement.

(e) ENFORCEABILITY DATE.—The enforceability date shall be the date on which the Secretary publishes in the Federal Register a statement of findings that—

(1) the Adjudication Court has approved and entered a judgment and decree approving the Pechanga Settlement Agreement in substantially the same form as Appendix 2 to the Pechanga Settlement Agreement;

(2) all amounts authorized by this subtitle have been deposited in the Fund;

(3) the waivers and releases authorized in subsection (a) have been executed by the Band and the Secretary;

(4) the Extension of Service Area Agreement—

(A) has been approved and executed by all the parties to the Extension of Service Area Agreement; and

(B) is effective and enforceable in accordance with the terms of the Extension of Service Area Agreement; and

(5) the ESAA Water Delivery Agreement—

(A) has been approved and executed by all the parties to the ESAA Water Delivery Agreement; and

(B) is effective and enforceable in accordance with the terms of the ESAA Water Delivery Agreement.

(f) TOLLING OF CLAIMS.—

(1) IN GENERAL.—Each applicable period of limitation and time-based equitable defense relating to a claim described in this section shall be tolled for the period beginning on the date of enactment of this Act and ending on the earlier of—

(A) April 30, 2030, or such alternate date after April 30, 2030, as is agreed to by the Band and the Secretary; or

(B) the enforceability date.

(2) EFFECTS OF SUBSECTION.—Nothing in this subsection revives any claim or tolls any period of limitation or time-based equitable defense that expired before the date of enactment of this Act.

(3) LIMITATION.—Nothing in this section precludes the tolling of any period of limitations or any time-based equitable defense under any other applicable law.

(g) TERMINATION.—

(1) IN GENERAL.—If all of the amounts authorized to be appropriated to the Secretary pursuant to this subtitle have not been made available to the Secretary by April 30, 2030—

(A) the waivers authorized by this section shall expire and have no force or effect; and

(B) all statutes of limitations applicable to any claim otherwise waived under this section shall be tolled until April 30, 2030.

(2) VOIDING OF WAIVERS.—If a waiver authorized by this section is void under paragraph (1)—

(A) the approval of the United States of the Pechanga Settlement Agreement under section 3404 shall be void and have no further force or effect;

(B) any unexpended Federal amounts appropriated or made available to carry out this subtitle, together with any interest earned on those amounts, and any water rights or contracts to use water and title to other property

EXHIBIT 2
Page 369

acquired or constructed with Federal amounts appropriated or made available to carry out this subtitle shall be returned to the Federal Government, unless otherwise agreed to by the Band and the United States and approved by Congress; and

(C) except for Federal amounts used to acquire or develop property that is returned to the Federal Government under subparagraph (B), the United States shall be entitled to set off any Federal amounts appropriated or made available to carry out this subtitle that were expended or withdrawn, together with any interest accrued, against any claims against the United States relating to water rights asserted by the Band or Allottees in any future settlement of the water rights of the Band or Allottees.

### SEC. 3408. WATER FACILITIES.

(a) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the designated accounts of the Fund, provide the amounts necessary to fulfill the obligations of the Band under the Recycled Water Infrastructure Agreement and the ESAA Capacity Agreement, in an amount not to exceed the amounts deposited in the designated accounts for such purposes plus any interest accrued on such amounts from the date of deposit in the Fund to the date of disbursement from the Fund, in accordance with this subtitle and the terms and conditions of those agreements.

(b) NONREIMBURSABILITY OF COSTS.—All costs incurred by the Secretary in carrying out this section shall be nonreimbursable.

(c) RECYCLED WATER INFRASTRUCTURE.—

(1) IN GENERAL.—The Secretary shall, using amounts from the Pechanga Recycled Water Infrastructure account, provide amounts for the Storage Pond in accordance with this section.

(2) STORAGE POND.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the Pechanga Recycled Water Infrastructure account provide the amounts necessary for a Storage Pond in accordance with the Recycled Water Infrastructure Agreement, in an amount not to exceed $2,656,374.

(B) PROCEDURE.—The procedure for the Secretary to provide amounts pursuant to this section shall be as set forth in the Recycled Water Infrastructure Agreement.

(C) LIABILITY.—The United States shall have no responsibility or liability for the Storage Pond.

(d) ESAA DELIVERY CAPACITY.—

(1) IN GENERAL.—The Secretary shall, using amounts from the Pechanga ESAA Delivery Capacity account, provide amounts for Interim Capacity and Permanent Capacity in accordance with this section.

(2) INTERIM CAPACITY.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the ESAA Delivery Capacity account, provide amounts necessary for the provision of Interim Capacity in accordance with the ESAA Capacity Agreement in an amount not to exceed $1,000,000.

EXHIBIT 2
Page 370

PUBLIC LAW 114–322—DEC. 16, 2016         130 STAT. 1767

(B) PROCEDURE.—The procedure for the Secretary to provide amounts pursuant to this section shall be as set forth in the ESAA Capacity Agreement.

(C) LIABILITY.—The United States shall have no responsibility or liability for the Interim Capacity to be provided by RCWD or by the Band.

(D) TRANSFER TO BAND.—If RCWD does not provide the Interim Capacity Notice required pursuant to the ESAA Capacity Agreement by the date that is 60 days after the date required under the ESAA Capacity Agreement, the amounts in the Pechanga ESAA Delivery Capacity account for purposes of the provision of Interim Capacity and Permanent Capacity, including any interest that has accrued on those amounts, shall be available for use by the Band to provide alternative interim capacity in a manner that is similar to the Interim Capacity and Permanent Capacity that the Band would have received had RCWD provided such Interim Capacity and Permanent Capacity.

(3) PERMANENT CAPACITY.—

(A) IN GENERAL.—The Secretary shall, subject to the availability of appropriations, using amounts from the ESAA Delivery Capacity account, provide amounts necessary for the provision of Permanent Capacity in accordance with the ESAA Capacity Agreement.

(B) PROCEDURE.—The procedure for the Secretary to provide funds pursuant to this section shall be as set forth in the ESAA Capacity Agreement.

(C) LIABILITY.—The United States shall have no responsibility or liability for the Permanent Capacity to be provided by RCWD or by the Band.

(D) TRANSFER TO BAND.—If RCWD does not provide the Permanent Capacity Notice required pursuant to the ESAA Capacity Agreement by the date that is 5 years after the enforceability date, the amounts in the Pechanga ESAA Delivery Capacity account for purposes of the provision of Permanent Capacity, including any interest that has accrued on those amounts, shall be available for use by the Band to provide alternative Permanent Capacity in a manner that is similar to the Permanent Capacity that the Band would have received had RCWD provided such Permanent Capacity.

**SEC. 3409. PECHANGA SETTLEMENT FUND.**

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "Pechanga Settlement Fund", to be managed, invested, and distributed by the Secretary and to be available until expended, and, together with any interest earned on those amounts, to be used solely for the purpose of carrying out this subtitle.

(b) TRANSFERS TO FUND.—The Fund shall consist of such amounts as are deposited in the Fund under section 3411(a) of this subtitle, together with any interest earned on those amounts, which shall be available in accordance with subsection (e).

(c) ACCOUNTS OF PECHANGA SETTLEMENT FUND.—The Secretary shall establish in the Fund the following accounts:

EXHIBIT 2
Page 371

(1) Pechanga Recycled Water Infrastructure account, consisting of amounts authorized pursuant to section 3411(a)(1).

(2) Pechanga ESAA Delivery Capacity account, consisting of amounts authorized pursuant to section 3411(a)(2).

(3) Pechanga Water Fund account, consisting of amounts authorized pursuant to section 3411(a)(3).

(4) Pechanga Water Quality account, consisting of amounts authorized pursuant to section 3411(a)(4).

(d) MANAGEMENT OF FUND.—The Secretary shall manage, invest, and distribute all amounts in the Fund in a manner that is consistent with the investment authority of the Secretary under—

(1) the first section of the Act of June 24, 1938 (25 U.S.C. 162a);

(2) the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.); and

(3) this section.

(e) AVAILABILITY OF AMOUNTS.—Amounts appropriated to, and deposited in, the Fund, including any investment earnings accrued from the date of deposit in the Fund through the date of disbursement from the Fund, shall be made available to the Band by the Secretary beginning on the enforceability date.

(f) WITHDRAWALS BY BAND PURSUANT TO THE AMERICAN INDIAN TRUST FUND MANAGEMENT REFORM ACT.—

(1) IN GENERAL.—The Band may withdraw all or part of the amounts in the Fund on approval by the Secretary of a tribal management plan submitted by the Band in accordance with the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.).

(2) REQUIREMENTS.—

(A) IN GENERAL.—In addition to the requirements under the American Indian Trust Fund Management Reform Act of 1994 (25 U.S.C. 4001 et seq.), the tribal management plan under paragraph (1) shall require that the Band shall spend all amounts withdrawn from the Fund in accordance with this subtitle.

(B) ENFORCEMENT.—The Secretary may carry out such judicial or administrative actions as the Secretary determines to be necessary to enforce the tribal management plan to ensure that amounts withdrawn by the Band from the Fund under this subsection are used in accordance with this subtitle.

(g) WITHDRAWALS BY BAND PURSUANT TO AN EXPENDITURE PLAN.—

(1) IN GENERAL.—The Band may submit an expenditure plan for approval by the Secretary requesting that all or part of the amounts in the Fund be disbursed in accordance with the plan.

(2) REQUIREMENTS.—The expenditure plan under paragraph (1) shall include a description of the manner and purpose for which the amounts proposed to be disbursed from the Fund will be used, in accordance with subsection (h).

(3) APPROVAL.—If the Secretary determines that an expenditure plan submitted under this subsection is consistent with the purposes of this subtitle, the Secretary shall approve the plan.

(4) ENFORCEMENT.—The Secretary may carry out such judicial or administrative actions as the Secretary determines

EXHIBIT 2
Page 372

PUBLIC LAW 114–322—DEC. 16, 2016          130 STAT. 1769

necessary to enforce an expenditure plan to ensure that amounts disbursed under this subsection are used in accordance with this subtitle.

(h) USES.—Amounts from the Fund shall be used by the Band for the following purposes:

(1) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—The Pechanga Recycled Water Infrastructure account shall be used for expenditures by the Band in accordance with section 3408(c).

(2) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—The Pechanga ESAA Delivery Capacity account shall be used for expenditures by the Band in accordance with section 3408(d).

(3) PECHANGA WATER FUND ACCOUNT.—The Pechanga Water Fund account shall be used for—

(A) payment of the EMWD Connection Fee;

(B) payment of the MWD Connection Fee; and

(C) any expenses, charges, or fees incurred by the Band in connection with the delivery or use of water pursuant to the Pechanga Settlement Agreement.

(4) PECHANGA WATER QUALITY ACCOUNT.—The Pechanga Water Quality account shall be used by the Band to fund groundwater desalination activities within the Wolf Valley Basin.

(i) LIABILITY.—The Secretary and the Secretary of the Treasury shall not be liable for the expenditure of, or the investment of any amounts withdrawn from, the Fund by the Band under subsection (f) or (g).

(j) NO PER CAPITA DISTRIBUTIONS.—No portion of the Fund shall be distributed on a per capita basis to any member of the Band.

**SEC. 3410. MISCELLANEOUS PROVISIONS.**

(a) WAIVER OF SOVEREIGN IMMUNITY BY THE UNITED STATES.— Except as provided in subsections (a) through (c) of section 208 of the Department of Justice Appropriation Act, 1953 (43 U.S.C. 666), nothing in this subtitle waives the sovereign immunity of the United States.

(b) OTHER TRIBES NOT ADVERSELY AFFECTED.—Nothing in this subtitle quantifies or diminishes any land or water right, or any claim or entitlement to land or water, of an Indian tribe, band, or community other than the Band.

(c) LIMITATION ON CLAIMS FOR REIMBURSEMENT.—With respect to Indian land within the Reservation—

(1) the United States shall not submit against any Indian-owned land located within the Reservation any claim for reimbursement of the cost to the United States of carrying out this subtitle and the Pechanga Settlement Agreement; and

(2) no assessment of any Indian-owned land located within the Reservation shall be made regarding that cost.

(d) EFFECT ON CURRENT LAW.—Nothing in this section affects any provision of law (including regulations) in effect on the day before the date of enactment of this Act with respect to preenforcement review of any Federal environmental enforcement action.

**SEC. 3411. AUTHORIZATION OF APPROPRIATIONS.**

(a) AUTHORIZATION OF APPROPRIATIONS.—

EXHIBIT 2
Page 373

(1) PECHANGA RECYCLED WATER INFRASTRUCTURE ACCOUNT.—There is authorized to be appropriated $2,656,374, for deposit in the Pechanga Recycled Water Infrastructure account, to carry out the activities described in section 3408(c).

(2) PECHANGA ESAA DELIVERY CAPACITY ACCOUNT.—There is authorized to be appropriated $17,900,000, for deposit in the Pechanga ESAA Delivery Capacity account, which amount shall be adjusted for changes in construction costs since June 30, 2009, as is indicated by ENR Construction Cost Index, 20-City Average, as applicable to the types of construction required for the Band to provide the infrastructure necessary for the Band to provide the Interim Capacity and Permanent Capacity in the event that RCWD elects not to provide the Interim Capacity or Permanent Capacity as set forth in the ESAA Capacity Agreement and contemplated in sections 3408(d)(2)(D) and 3408(d)(3)(D) of this subtitle, with such adjustment ending on the date on which funds authorized to be appropriated under this section have been deposited in the Fund.

(3) PECHANGA WATER FUND ACCOUNT.—There is authorized to be appropriated $5,483,653, for deposit in the Pechanga Water Fund account, which amount shall be adjusted for changes in appropriate cost indices since June 30, 2009, with such adjustment ending on the date of deposit in the Fund, for the purposes set forth in section 3409(h)(3).

(4) PECHANGA WATER QUALITY ACCOUNT.—There is authorized to be appropriated $2,460,000, for deposit in the Pechanga Water Quality account, which amount shall be adjusted for changes in appropriate cost indices since June 30, 2009, with such adjustment ending on the date of deposit in the Fund, for the purposes set forth in section 3409(h)(4).

## SEC. 3412. EXPIRATION ON FAILURE OF ENFORCEABILITY DATE.

If the Secretary does not publish a statement of findings under section 3407(e) by April 30, 2021, or such alternative later date as is agreed to by the Band and the Secretary, as applicable—

(1) this subtitle expires on the later of May 1, 2021, or the day after the alternative date agreed to by the Band and the Secretary;

(2) any action taken by the Secretary and any contract or agreement pursuant to the authority provided under any provision of this subtitle shall be void;

(3) any amounts appropriated under section 3411, together with any interest on those amounts, shall immediately revert to the general fund of the Treasury; and

(4) any amounts made available under section 3411 that remain unexpended shall immediately revert to the general fund of the Treasury.

## SEC. 3413. ANTIDEFICIENCY.

(a) IN GENERAL.—Notwithstanding any authorization of appropriations to carry out this subtitle, the expenditure or advance of any funds, and the performance of any obligation by the Department in any capacity, pursuant to this subtitle shall be contingent on the appropriation of funds for that expenditure, advance, or performance.

EXHIBIT 2
Page 374

(b) LIABILITY.—The Department of the Interior shall not be liable for the failure to carry out any obligation or activity authorized by this subtitle if adequate appropriations are not provided to carry out this subtitle.

# Subtitle E—Delaware River Basin Conservation

### SEC. 3501. FINDINGS.

Congress finds that—

(1) the Delaware River Basin is a national treasure of great cultural, environmental, ecological, and economic importance;

(2) the Basin contains over 12,500 square miles of land in the States of Delaware, New Jersey, New York, and Pennsylvania, including nearly 800 square miles of bay and more than 2,000 tributary rivers and streams;

(3) the Basin is home to more than 8,000,000 people who depend on the Delaware River and the Delaware Bay as an economic engine, a place of recreation, and a vital habitat for fish and wildlife;

(4) the Basin provides clean drinking water to more than 15,000,000 people, including New York City, which relies on the Basin for approximately half of the drinking water supply of the city, and Philadelphia, whose most significant threat to the drinking water supply of the city is loss of forests and other natural cover in the Upper Basin, according to a study conducted by the Philadelphia Water Department;

(5) the Basin contributes $25,000,000,000 annually in economic activity, provides $21,000,000,000 in ecosystem goods and services per year, and is directly or indirectly responsible for 600,000 jobs with $10,000,000,000 in annual wages;

(6) almost 180 species of fish and wildlife are considered special status species in the Basin due to habitat loss and degradation, particularly sturgeon, eastern oyster, horseshoe crabs, and red knots, which have been identified as unique species in need of habitat improvement;

(7) the Basin provides habitat for over 200 resident and migrant fish species, includes significant recreational fisheries, and is an important source of eastern oyster, blue crab, and the largest population of the American horseshoe crab;

(8) the annual dockside value of commercial eastern oyster fishery landings for the Delaware Estuary is nearly $4,000,000, making it the fourth most lucrative fishery in the Delaware River Basin watershed, and proven management strategies are available to increase oyster habitat, abundance, and harvest;

(9) the Delaware Bay has the second largest concentration of shorebirds in North America and is designated as one of the 4 most important shorebird migration sites in the world;

(10) the Basin, 50 percent of which is forested, also has over 700,000 acres of wetland, more than 126,000 acres of which are recognized as internationally important, resulting in a landscape that provides essential ecosystem services, including recreation, commercial, and water quality benefits;

(11) much of the remaining exemplary natural landscape in the Basin is vulnerable to further degradation, as the Basin

EXHIBIT 2
Page 375

STEVE BODMER
Pechanga Office of General Counsel
P.O. Box 1477
Temecula, California 92592
Telephone: 951-770-6171
E-mail: sbodmer@pechanga-nsn.gov
*Attorney for Plaintiff-*
*Intervenor/Defendant*
*Pechanga Band of Luiseño Indians*

JAMES B. GILPIN
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA 92101
Telephone: 619-525-1300
E-mail: James.Gilpin@bbklaw.com
*Attorney for Rancho California*
*Water District*

PATRICK BARRY (*Pro Hac Vice*)
Department of Justice
P.O. Box 44378
Washington, D.C. 20026-4378
Telephone: 202-305-0254
E-mail: Patrick.Barry@usdoj.gov
*Attorney for the United States*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> FALLBROOK PUBLIC UTILITY DISTRICT, *et al.*, <br><br> Defendants. | Case No. 51-01247-GPC-RBB <br> Judge: Hon. Gonzalo P. Curiel <br> Courtroom: 2D <br><br> **DECLARATION OF DONALD R. PONGRACE** <br><br> Hearing Date: <br> Hearing Time:   1:30 p.m. |

1       I, DONALD R. PONGRACE, provide this declaration under penalty of

2   perjury. If called to testify, I would testify as follows.

3       1.     I am an attorney at Akin, Gump, Strauss, Hauer & Feld, LLP in

4   Washington, D.C.

5       2.     Since 2006 I have served as outside legal counsel to the Pechanga

6   Band of Luiseño Indians ("Pechanga").

7       3.     During the course of my representation, the Pechanga leadership has

8   educated me about Pechanga's cultural history and it is my understanding that

9   Pechanga has struggled for recognition and protection of its federally reserved

10   water rights for decades.

11       4.     Beginning in 2006 and continuing throughout 2007, the Ramona Band

12   of Cahuilla Indians and Cahuilla Band of Indians, sought to initiate litigation to

13   address their water rights in the Fallbrook case. These efforts intersected with

14   Pechanga's successful efforts at negotiated management of joint water supplies, and

15   forced Pechanga to address in the Fallbrook litigation, the scope of its claims to

16   water or risk being injured by the actions of the other two Tribes.

17       5.     Beginning in 2007, Pechanga initiated settlement discussions with the

18   United States and Rancho California Water District ("RCWD").

19       6.     On March 13, 2008, Pechanga requested that the Secretary of the

20   Interior seek settlement of the water rights claims involving Pechanga, the United

21   States, and non-Federal third parties through the formation of a Federal Negotiation

22   Team under the Criteria and Procedures for Participation of the Federal

23   Government in Negotiations for the Settlement of Indian Water Rights Claims.[1]

24   The Secretary agreed to form a Federal Negotiation Team on August 1, 2008 and

25

26   _____

27 [1] *See* Working Group in Indian Water Settlements; Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223 (Mar. 12, 1990).

28

1   Pechanga began working closely with the Federal Negotiation Team to effectively

2   negotiate the terms of the settlement with the other parties in order to resolve its

3   claims against the United States in connection with the development and protection

4   of Pechanga's water rights.

5       7.      Pechanga sought to avoid litigation and instead, worked with entities

6   around Pechanga to develop mutual private agreements for sharing the limited

7   water resources in the Wolf Valley basin.  To collaboratively develop a means of

8   providing assured water supplies and cooperative management of the common

9   water basin, Pechanga adopted an approach of negotiation and reconciliation with

10  the primary water users in its portion of the Santa Margarita River Watershed,

11  primarily RCWD and the Eastern Municipal Water District ("EMWD").  These

12  efforts at negotiated management of water resources resulted in the Groundwater

13  Management Agreement between Pechanga and RCWD in 2006, and a Recycled

14  Water Agreement between EMWD and Pechanga in 2007, with the recycled water

15  being delivered to Pechanga by RCWD.  Both of these agreements have been

16  successfully implemented and are in effect today.  Neither of these agreements

17  sought to address the scope or settlement of Pechanga's overall water rights to the

18  Santa Margarita River Watershed.

19      8.      On December 17, 2008, Pechanga and RCWD, in conjunction with the

20  United States, EMWD, and the Metropolitan Water District, reached a preliminary

21  agreement on a framework for the resolution of Pechanga's claims to additional

22  water in the Santa Margarita River Watershed, as well as its other claims for

23  injuries to these rights over the years.

24      9.      Each of the parties leveraged the preliminary agreement in order to

25  develop and finalize the agreements in definitive documents, which would then be

26  used for Congressional and Court approval.

27      10.     The preliminary agreement and principle of terms were also used to

28  further negotiate the terms of the Settlement Agreement and also for drafting

Federal legislation that would ratify and approve the Settlement Agreement. Federal legislation was first introduced in the United States House of Representatives on December 11, 2009 (H.R.4285, 111th Cong. (2009)), and in the United States Senate on January 26, 2010 (S.2956, 111th Cong. (2010)).

11.   The Senate Committee on Indian Affairs and the House Natural Resources Subcommittee on Water and Power held several hearings on the legislation.  The legislation was amended numerous times to address concerns with the legislation and to incorporate further settlement provisions between the Parties.

12.   On July 22, 2016, the Obama Administration issued a formal letter in support of the Settlement Act and confirmed that the Settlement Act represents a net-benefit to the American taxpayer as compared to the consequences and costs of not settling the litigation related to Pechanga's water rights claims.

13.   The Settlement Act was enacted into law on December 16, 2016.

14.   The Extension of Service Area Agreement, exhibit F to the Settlement Agreement, was signed by Pechanga, EMWD, and the Metropolitan Water District on October 11, 2017 and approved by the Local Agency Formation Committee Board on October 19, 2017.

15.   The Settlement Agreement, its remaining exhibits, and the necessary waivers of claims were signed by the appropriate parties on November 29, 2017.

16.   As outside legal counsel to Pechanga, over the course of several years, I attended a significant number of meetings with the United States, RCWD, EMWD, and Metropolitan Water District to negotiate the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("Pechanga Settlement Agreement") to settle Pechanga's water rights claims within the Santa Margarita River Watershed.

17.   At these meetings I, along with Pechanga Tribal Council members, Pechanga's General Counsel and our technical experts, represented Pechanga's

1    legal and hydrologic position as to Pechanga's federally reserved water rights and

2    claims to water rights within the Santa Margarita River Watershed.

3         18.    RCWD also asserted their legal and hydrologic position as to

4    Pechanga's claims to water rights within the Santa Margarita River Watershed, as

5    well as RCWD's respective claims to water rights within the Santa Margarita River

6    Watershed and the priority of those claims which differed significantly from

7    Pechanga's position.

8         19.    I witnessed RCWD take a hard-lined approach against Pechanga's

9    position in order to protect its water supplies for its customers.

10        20.    There were many meetings that I attended where I did not think that

11   we would be able to resolve our differences and reach a settlement. I was very

12   concerned that our positions were such that a settlement would never be reached.

13        21.    We exchanged numerous proposals and counter proposals with

14   settlement terms.

15        22.    After nine years of settlement negotiations and back and forth

16   meetings with RCWD and the United States, we were ultimately able to come to a

17   final Settlement Agreement.  The Settlement Agreement reflected the parties'

18   ability to compromise and utilize various sources of water, including groundwater,

19   recycled water and imported potable water in order to meet both Pechanga's and

20   RCWD's water needs.

21        23.    In my opinion, the Pechanga Settlement Agreement represents a fair

22   compromise that not only recognizes Pechanga's water rights within the Santa

23   Margarita River Watershed, provides "wet" water to Pechanga, its tribal members

24   and allottees but also protects RCWD's customers within the Santa Margarita River

25   Watershed, and is consistent with legal decisions regarding water rights.

26        24.    The Pechanga Settlement Agreement settles Pechanga's water rights

27   claims in the Santa Margarita River Watershed and is the product of extensive

28   negotiations, work by the Water Districts, the United States and Pechanga, to reach

1  a settlement that resolves long-standing disputes in a fair and reasonable

2  conclusion.

3     Executed this __13th__ day of January, 2018, at Washington, D.C.

4

5                                          Donald R. Pongrace

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   STEVE BODMER
    Pechanga Office of General Counsel
2   P.O. Box 1477
    Temecula, California 92592
3   Telephone: 951-770-6171
4   E-mail: sbodmer@pechanga-nsn.gov
    *Attorney for Plaintiff-*
5   *Intervenor/Defendant*
    *Pechanga Band of Luiseño Indians*
6

7   JAMES B. GILPIN
    Best Best & Krieger LLP
8   655 West Broadway, 15th Floor
    San Diego, CA 92101
9   Telephone: 619-525-1300
10  E-mail: James.Gilpin@bbklaw.com
    *Attorney for Rancho California*
11  *Water District*

12  PATRICK BARRY (*Pro Hac Vice*)
    Department of Justice
13  P.O. Box 44378
14  Washington, D.C. 20026-4378
    Telephone: 202-305-0254
15  E-mail: Patrick.Barry@usdoj.gov
    *Attorney for the United States*
16

17              UNITED STATES DISTRICT COURT

18              SOUTHERN DISTRICT OF CALIFORNIA

19

20   UNITED STATES OF AMERICA,        Case No. 51-01247-GPC-RBB
                                      Judge: Hon. Gonzalo P. Curiel
21              Plaintiff,            Courtroom: 2D

22        v.                          **DECLARATION OF PATRICK
                                      BARRY**
23   FALLBROOK PUBLIC UTILITY
     DISTRICT, *et al.*,               Hearing Date:
24                                     Hearing Time:   1:30 p.m.
                Defendants.
25

26

27

28

---

60028.00006\30440414.1                    DECLARATION OF PATRICK BARRY
                                           CASE NO. 51-01247-GPC-RBB

EXHIBIT 4
Page 382

1       I, PATRICK BARRY, provide this declaration under penalty of perjury.  If

2   called to testify, I would testify as follows.

3       1.    I am an attorney at the United States Department of Justice.

4       2.    I am involved in the Santa Margarita River Watershed in the case

5   *United States v. Fallbrook Public Utility District et al.*, Civ. No. 3:51–cv–01247

6   (S.D.C.A.), commonly referred to as the *Fallbrook* case in my capacity as an

7   attorney on behalf of the United States and the United States' interests, as well as

8   the United States' trust responsibility on behalf of the Pechanga Band of Luiseño

9   Indians ("Pechanga") and allottees.

10      3.    I have been involved in the *Fallbrook* case since 1988.

11      4.    The United States initiated litigation over water rights in the Santa

12  Margarita River Watershed in the *Fallbrook* case in 1951.  The *Fallbrook* litigation

13  eventually expanded to include all water users within the Santa Margarita River

14  Watershed, including three Indian Tribes – Pechanga, Ramona Band of Cahuilla

15  Indians ("Ramona"), and Cahuilla Band of Indians ("Cahuilla").  The United States,

16  as trustee, represented all three Tribes before the *Fallbrook* Court.

17      5.    In 2007, Pechanga initiated settlement discussions with the United

18  States.

19      6.    On March 13, 2008, Pechanga requested that the Secretary of the

20  Interior seek settlement of the water rights claims involving Pechanga, the United

21  States, and non-Federal third parties through the formation of a Federal Negotiation

22  Team under the Criteria and Procedures for Participation of the Federal

23  Government in Negotiations for the Settlement of Indian Water Rights Claims.

24  The Secretary agreed to form a Federal Negotiation Team on August 1, 2008 and

25  Pechanga began working closely with the Federal Negotiation Team to effectively

26  negotiate the terms of the settlement.

27      7.    As the United States' legal counsel, I attended numerous meetings

28  with Pechanga, Rancho California Water District, Eastern Municipal Water District

and Metropolitan Water District to negotiate the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("Pechanga Settlement Agreement") to settle Pechanga's water rights claims within the Santa Margarita River Watershed.

8.      At these meetings I participated in the negotiations to protect the United States' interests and fulfill the United States' trust obligations to Pechanga and allottees.

9.      As part of the United States' negotiation team, we included members of the Bureau of Indian Affairs, Bureau of Reclamation, Fish and Wildlife and the Solicitor's office, along with technical hydrological experts that the United States retained for purposes of reviewing Pechanga's water rights claims.

10.      I witnessed Rancho California Water District assert their legal and hydrologic position as to Pechanga's claims to water rights within the Santa Margarita River Watershed, as well as Rancho California Water District's respective claims to water rights within the Santa Margarita River Watershed and the priority of those claims which differed significantly from the United States' position as to Pechanga's water rights claims.

11.      The United States paid particular attention to the interests of allottees throughout the negotiations. As the allottees' trustee, the United States has a fiduciary responsibility to protect their interests.

12.      The United States negotiated significant protections for allottees, particularly in Section 3405 of the Act which provides protections for allottee allocations for both irrigation and domestic purposes. For example, in Section 3405(d)(3), allotted land within the exterior boundaries of the Reservation shall be entitled to a just and equitable allocation of water for irrigation *and domestic purposes* from the Tribal Water Right, even though 25 U.S.C. § 381 statutorily provides allottees with a right to water for irrigation purposes only.

13.     I further witnessed Rancho California Water District take strong positions against the United States' and Pechanga's position with respect to Pechanga's rights to water within the Santa Margarita River Watershed.

14.     I attended a number of meetings where it appeared that the parties would not be able to reach a settlement because the parties' positions were on such opposite ends of the spectrum.

15.     The Parties exchanged numerous proposals and counter proposals with settlement terms that the United States considered and reviewed in great detail.

16.     The Parties reached a preliminary agreement on December 17, 2008.

17.     After years of negotiations and back and forth drafts of settlement terms, the Parties were able to compromise and reach the Pechanga Settlement Agreement that is beneficial to all parties involved.

18.     In December 2016, Congress enacted the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. 114-322, §§ 3401-3413, 130 Stat. 1627, 1755-1771 (2016) ("Settlement Act") in 2016, which ratified the Settlement Agreement to the extent consistent with the Settlement Act.

19.     On November 29, 2017, the United States participated in a signing ceremony with Pechanga and RCWD in order to execute the Settlement Agreement, its exhibits, and various waivers of claims.

20.     It is my opinion that the Pechanga Settlement Agreement represents a fair compromise that not only recognizes Pechanga's water rights within the Santa Margarita River Watershed, fulfills the United States' trust obligation to Pechanga, its tribal members, and allottees, but also provides significant benefits to Rancho California Water District and its water customers.

21.     The Pechanga Settlement Agreement settles Pechanga's water rights claims in the Santa Margarita River Watershed and is the product of abundant negotiations, work by the Water Districts, the United States and Pechanga, to reach

1   a settlement that resolves long-standing disputes in a fair and reasonable

2   conclusion.

3        Executed this 24ᵀᴴ day of January, 2018, at Washington, D.C.

4

5                                               Patrick Barry

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4
Page 386

STEVE BODMER
Pechanga Office of General Counsel
P.O. Box 1477
Temecula, California 92592
Telephone: 951-770-6171
E-mail: sbodmer@pechanga-nsn.gov
*Attorney for Plaintiff-*
*Intervenor/Defendant*
*Pechanga Band of Luiseño Indians*

JAMES B. GILPIN
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA 92101
Telephone: 619-525-1300
E-mail: James.Gilpin@bbklaw.com
*Attorney for Rancho California*
*Water District*

PATRICK BARRY (*Pro Hac Vice*)
Department of Justice
P.O. Box 44378
Washington, D.C. 20026-4378
Telephone: 202-305-0254
E-mail: Patrick.Barry@usdoj.gov
*Attorney for the United States*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT, *et al.*,<br><br>Defendants. | Case No. 51-01247-GPC-RBB<br>Judge: Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br><br>**DECLARATION OF JAMES GILPIN**<br><br>Hearing Date:<br>Hearing Time:   1:30 p.m. |

1    I, JAMES GILPIN, provide this declaration under penalty of perjury.  If
2  called to testify, I would testify as follows.

3    1.    I am an attorney at Best Best & Krieger LLP, and I am located in the
4  firm's San Diego Office.

5    2.    I represent Rancho California Water District ("RCWD") on a number
6  of matters, including negotiations and settlement discussions in the Santa Margarita
7  River Watershed in the case *United States v. Fallbrook Public Utility District et al.*,
8  Civ. No. 3:51–cv–01247 (S.D.C.A.), commonly referred to as the Fallbrook case.

9    3.    I have served as legal counsel for RCWD in settlement negotiations
10  with the Pechanga Band of Luiseño Missions Indians ("Pechanga") and the United
11  States, as well as Eastern Municipal Water District and Metropolitan Water District
12  since 2009.

13    4.    Prior to engaging in settlement discussions with Pechanga, RCWD
14  worked with Pechanga to develop mutual private agreements for the sharing of
15  limited water resources.  RCWD entered into a Groundwater Management
16  Agreement with Pechanga in 2006.  Pechanga entered into a Recycled Water
17  Agreement with EMWD in 2008 that agreed to have RCWD deliver recycled water
18  to Pechanga.  Both of these agreements are effective today and did not address
19  Pechanga's water rights to the Santa Margarita River Watershed.

20    5.    Beginning in 2007, as General Counsel for RCWD, either I or other
21  attorneys at my firm attended numerous meetings with Pechanga, Eastern
22  Municipal Water District and Metropolitan Water District and the United States to
23  negotiate the Pechanga Band of Luiseño Mission Indians Water Rights Settlement
24  Agreement ("Pechanga Settlement Agreement") to settle Pechanga's water rights
25  claims within the Santa Margarita River Watershed.

26    6.    At these meetings, I represented RCWD's interests and sought to
27  protect RCWD's water rights as set forth in the Fallbrook Decree and relevant
28  Interlocutory Judgments issued by the Fallbrook Court.

EXHIBIT 5
Page 388

1    7.    As part of my review of the various versions of the Pechanga

2    Settlement Agreement and the terms therein, I utilized our legal associates and

3    technical experts at RCWD to develop our legal and hydrological position.

4    8.    I witnessed Pechanga assert their legal and hydrologic position as to

5    Pechanga's claims to water rights within the Santa Margarita River Watershed, as

6    well as RCWD's respective claims to water rights within the Santa Margarita River

7    Watershed and the priority of those claims which differed significantly from

8    RCWD's position as to Pechanga's water rights claims.

9    9.    I further witnessed Pechanga and the United States take strong

10   positions against RCWD's position with respect to Pechanga's rights to water

11   within the Santa Margarita River Watershed.

12   10.   I attended a number of meetings where it appeared that we had reached

13   a stalemate and would be unsuccessful in reaching a final settlement.

14   11.   The Parties exchanged numerous proposals and counter proposals with

15   settlement terms that were aimed at reaching a settlement that was beneficial to all

16   of the parties involved.

17   12.   After years of negotiations and sharing of numerous settlement

18   agreement drafts, the Parties were able to reach a compromise that recognized

19   Pechanga's water rights claims and also provided for the exchange of groundwater

20   and recycled water to allow RCWD to continue to meet the needs of its customers.

21   The Parties reached a preliminary agreement on or about December 17, 2008, and

22   then a final agreement in 2016.

23   13.   On October 11, 2017, representatives from RCWD attended the

24   signing ceremony at Pechanga during which Pechanga, EMWD, and the

25   Metropolitan Water District executed the Extension of Service Area Agreement,

26   one of the exhibits to the larger Settlement Agreement.

27

28

EXHIBIT 5
Page 389

14.     On November 29, 2017, RCWD executed the Settlement Agreement, remaining exhibits to the Settlement Agreement, and waivers of claims with Pechanga and the United States.

15.     It is my opinion that the Pechanga Settlement Agreement is the product of significant compromise and represents a fair deal that is beneficial to RCWD and its customers and outweighs the additional cost and time of litigation.

16.     The Pechanga Settlement Agreement settles Pechanga's water rights claims in the Santa Margarita River Watershed and is the product of abundant negotiations, work by the Water Districts, the United States and Pechanga, to reach a settlement that resolves long-standing disputes in a fair and reasonable conclusion.

Executed this ⧸⧸ day of January, 2018, at San Diego, California.

James Gilpin

EXHIBIT 5
Page 390