STEVE BODMER
Pechanga Office of General Counsel
P.O. Box 1477
Temecula, California 92593
Telephone: 951-770-6171
E-mail: sbodmer@pechanga-nsn.gov
*Attorney for Plaintiff-Intervenor/Defendant
Pechanga Band of Luiseño Indians*

JAMES B. GILPIN
Best Best & Krieger LLP
655 West Broadway, 15th Floor
San Diego, CA 92101
Telephone: 619-525-1300
E-mail: James.Gilpin@bbklaw.com
*Attorney for Rancho California Water District*

PATRICK BARRY (*Pro Hac Vice*)
Department of Justice
P.O. Box 44378
Washington, D.C. 20026-4378
Telephone: 202-305-0254
E-mail: Patrick.Barry@usdoj.gov
*Attorney for the United States*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT, *et al.*,<br><br>Defendants. | Case No. 51-01247-GPC-RBB<br>Judge: Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br><br>**JOINT MEMORANDUM IN SUPPORT OF THE JOINT MOTION FOR CONSENT JUDGMENT AND DECREE ADOPTING SETTLEMENT AGREEMENT**<br><br>Hearing Date: May 25, 2018<br>Hearing Time: 1:30 p.m. |

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ................................................................................................ 1

II. SUMMARY OF AGREEMENT .................................................................... 3

III. JURISDICTION ............................................................................................. 5

IV. BURDEN OF PROOF AND STANDARD OF REVIEW ........................... 6

V. THE SETTLEMENT AGREEMENT IS THE PRODUCT OF GOOD FAITH, ARMS-LENGTH NEGOTIATIONS AND CONFORMS TO APPLICABLE LAW ....................................................................................... 7

    A. The Settlement Agreement Is the Product of Good Faith, Arms-Length Negotiations ............................................................................. 8

    B. The Settlement Agreement Conforms to Applicable Law ................ 10

VI. CONCLUSION ............................................................................................. 12

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Colville Confederated Tribes v. Walton*
647 F.2d 42 (9th Cir. 1981) ............................................................................... 11

*Earth Island Inst., Inc. v. S. California Edison Co.*
838 F. Supp. 458 (S.D. Cal. 1993) ...................................................................... 6

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) ............................................................................ 6

*Low v. Trump Univ., LLC*
246 F. Supp. 3d 1295 (S.D. Cal. 2017) (Curiel, J.) ............................................ 6

*Officers for Justice v. Civil Serv. Comm'n*
688 F.2d 615 (9th Cir. 1982) .......................................................................... 6, 7

*S.E.C. v. Randolph*
736 F.2d 525 (9th Cir. 1984) .............................................................................. 7

*Sierra Club, Inc. v. Electronic Controls Design, Inc.*
909 F.2d 1350 (9th Cir. 1990) ............................................................................ 6

*United States v. Adair*
723 F.2d 1394 (9th Cir. 1983) .......................................................................... 11

*United States v. Chevron U.S.A., Inc.*
380 F. Supp. 2d 1104 (N.D. Cal. 2005) .............................................................. 6

*United States v. Fallbrook Pub. Util. Dist.*
347 F.2d 48 (9th Cir. 1965) ............................................................................ 1, 3

*United States v. Oregon*
913 F.2d 576 (9th Cir. 1990) .......................................................................... 6, 7

*United States v. Preston*
352 F.2d 352 (9th Cir. 1965) ............................................................................ 11

*Winters v. United States*
207 U.S. 564 (1908) ......................................................................................... 11

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Federal Statutes**

Blackfeet Water Rights Settlement, Pub. L. No. 114-322, §3715, 130 Stat. 1814, 1832-1834 (2016) ................................................................. 8

Choctaw Nation of Oklahoma and the Chickasaw Nation Water Settlement, Pub. L. No. 114-322, §3608(e), 130 Stat. 1796, 1802-1804 (2016) ............................................................................................ 9

Crow Tribe Water Rights Settlement, Pub. L. No. 111-291, §407, 124 Stat. 3097, 3104-3106 (2010) ....................................................................... 9

General Allotment Act, Chapter 119, § 7, 24 Stat. at 390 (codified at 25 U.S.C. § 381) ................................................................. 12

Gila River Indian Community Water Rights Settlement, Pub. L. No. 108-451, § 204, 118 Stat. 3499, 3502-3505 (2004) ................................. 9

Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. 114-322, §§ 3401-3413, 130 Stat. 1627, 1755-1771 (2016) ............................................................................... 3, 4, 5, 9, 11, 12

**Regulations**

55 Federal Register 9223 (Mar. 12, 1990) ............................................................... 2

The Pechanga Band of Luiseño Mission Indians ("Pechanga"), Rancho California Water District ("RCWD") and the United States (collectively the "Submitting Parties") hereby respectfully submit this joint memorandum in support of their motion for a consent Judgment and Decree adopting the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Agreement ("Settlement Agreement"). The Submitting Parties have entered into the Settlement Agreement and now respectfully ask this Court to exercise its continuing jurisdiction over the Fallbrook Decree and enter a consent judgment and decree adopting the Settlement Agreement as an enforceable order of the Court.

## I.  BACKGROUND

In 1951, the United States initiated litigation in this Court over water rights in the Santa Margarita River Watershed "to quiet title to its rights to the use of waters of the Santa Margarita River systems in San Diego and Riverside Counties, California." *United States v. Fallbrook Pub. Util. Dist.,* 347 F.2d 48, 51 (9th Cir. 1965). This litigation eventually expanded to include all water users within the Santa Margarita Watershed, including three Indian Tribes: Pechanga, Ramona Band of Cahuilla Indians, and Cahuilla Band of Indians. In 1963, the Court entered a number of Interlocutory Judgments and issued a final judgment and decree, whereby the Interlocutory Judgments or Orders were listed and together with the Findings of Fact and Conclusions of Law were adopted as the final Findings of Fact, Conclusions of Law, and Judgment and Decree of the Court. Modified Final Judgment and Decree, Doc. No. 4489 at 2. The Judgment and Decree was appealed to the United States Court of Appeals. *Id.* In 1966, the Court entered the Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree ("Fallbrook Decree") that examined and established water rights for various water users in the case. *Id.* at 3. In Interlocutory Judgment 41 ("IJ 41"), entered in 1962 and adopted in the Fallbrook Decree, the Court "ordered, adjudged and decreed that the United States of America intended to reserve, and did reserve, rights to the use of the

1  waters of the Santa Margarita River stream system which under natural conditions
2  would be physically available on the Pechanga Indian Reservation, including rights
3  to the use of ground waters sufficient for the present and future needs of the Indians
4  residing thereon." Doc. No. 4430 at 21. The Court established Pechanga's
5  irrigable acreage and water duty requirements on a prima facie basis. *Id.* at 14-15.
6  The Court defined "prima facie" evidence as "that which suffices for the proof of a
7  particular fact until contradicted or overcome by other evidence." *Id*. at 15.
8  Nevertheless, the Court determined that there was no issue of apportionment at that
9  time. Thus, Pechanga's rights were decreed but were not finally quantified.

In 1974, Pechanga filed a motion to intervene as a plaintiff-intervenor in its own right. Doc. No. 4784. In 1975, the Court granted the motion, and Pechanga proceeded to file a complaint to enjoin certain defendants from using more than their adjudicated entitlements under the Fallbrook Decree. Doc. No. 4790. The complaint was subsequently resolved and Pechanga has remained a party to the Fallbrook proceedings ever since.

The Submitting Parties began settlement negotiations in 2007 to resolve the quantification of Pechanga's rights. On March 13, 2008, Pechanga requested that the Secretary of the Interior seek settlement of the water rights claims involving Pechanga, the United States, and non-Federal third parties, through the formation of a Federal Negotiation Team under the Criteria and Procedures for Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims. *See* Working Group in Indian Water Settlements; Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223 (Mar. 12, 1990). The Secretary agreed to form a Federal Negotiation Team on August 1, 2008. In accordance with its trust responsibility to Indian tribes, it is the policy of the United States to settle, whenever possible, water rights claims of Indian tribes without lengthy and costly litigation.

Recognizing that, absent settlement, final resolution of the pending proceedings as they relate to Pechanga's rights may take many years, entail great expense, prolong uncertainty regarding Pechanga's water supply, and impair the long-term economic well-being of all parties, the Submitting Parties have agreed to settle permanently the disputes as provided in the Settlement Agreement. Water rights at issue in the *Fallbrook* litigation claimed by Pechanga and the United States for the benefit of Pechanga and allottees are permanently settled by the Pechanga Settlement Agreement among the Submitting Parties. Congress enacted the Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act, Pub. L. No. 114-322, §§ 3401-3413, 130 Stat. 1627, 1755-1771 (2016) ("Settlement Act") in 2016, which ratified the Settlement Agreement to the extent consistent with the Settlement Act. The parties subsequently entered into the Settlement Agreement.

## II. **SUMMARY OF AGREEMENT**[1]

The Settlement Act authorizes, ratifies, and confirms the Pechanga Settlement Agreement, which quantifies and confirms Pechanga's rights in accordance with the Findings of Fact and Conclusions of Law set forth in IJ 41, as affirmed by the Fallbrook Decree. The Settlement Agreement settles specified claims among the Submitting Parties and addresses legal claims and water resources that are subject to the jurisdiction of this Court.

The Settlement Act ratifying the Settlement Agreement provides for review by this Court. It states in pertinent part that, as a condition of enforceability, the Secretary must publish a statement of findings stating that, "(1) the Adjudication Court has approved and entered a judgment and decree approving the Pechanga Settlement Agreement in substantially the same form as Appendix 2 to the

---

[1] This Memorandum includes only a brief summary of the Settlement Agreement and its Exhibits, and should not be used to interpret the Settlement Agreement or any of its Exhibits.

Pechanga Settlement Agreement. . . ." P.L. 114-322, § 3407(e)(1). The "Adjudication Court" is defined as "the United States District Court for the Southern District of California, which exercises continuing jurisdiction over the Adjudication Proceeding." *Id*. at § 3403(1). The Settlement Act further provides that:

> If the Secretary does not publish a statement of findings under section 3407(e) by April 30, 2021, or such alternative later date as is agreed to by the Band and the Secretary, as applicable—(1) this subtitle expires on the later of May 1, 2021, or the day after the alternative date agreed to by the Band and the Secretary; ….

*Id*. at § 3412(1). Accordingly, the Submitting Parties request that this Court approve the Settlement Agreement.

The Pechanga Settlement Agreement includes nine exhibits. Eight exhibits are separate supporting agreements required for the Settlement Agreement to take effect, and one exhibit is a map of the Pechanga Reservation. Additionally, two appendices are included with the Agreement. The Agreement, exhibits, and appendices attached to the Settlement Agreement include:

(a) Pechanga Water Settlement Agreement;
(b) Amended and Restated Groundwater Management Agreement (Exhibit A);
(c) Amendment No. 1 to Recycled Water Agreement (Exhibit B);
(d) Recycled Water Transfer Agreement (Exhibit C);
(e) Recycled Water Scheduling Agreement (Exhibit D);
(f) Recycled Water Infrastructure Agreement (Exhibit E);
(g) Extension of Service Area Agreement (Exhibit F);
(h) ESAA Capacity Agreement (Exhibit G);
(i) ESAA Water Delivery Agreement (Exhibit H);
(j) Map depicting Pechanga Reservation (Exhibit I);
(k) Fallbrook Decree (Appendix 1);
(l) Form of Proposed Judgment and Decree (Appendix 2).

Together, the Settlement Agreement and its exhibits provide the necessary contractual agreements to resolve Pechanga's longstanding claims to water rights in

the Santa Margarita River Watershed, secure necessary water supplies for Pechanga's current and future needs, and provide terms necessary to make the Settlement Agreement work for RCWD and its customers.

### III. JURISDICTION

The Submitting Parties request the Court incorporate the water rights settled in the Settlement Agreement for the Santa Margarita Watershed, and issue a final judgment pursuant to Paragraph 16 of IJ 41 and Paragraph V of the Fallbrook Decree.

The Fallbrook Decree and IJ 41 each reserve to the court continuing jurisdiction that specifically includes the power to quantify Pechanga's rights in the future. Paragraph 16 of IJ 41 provides "that there is no issue presently presented which requires this Court to make" a quantification ruling, and that "[j]urisdiction is reserved by this Court to make such findings of fact, conclusions of law and judgment provisions in the future should the need occur." This provision, like the rest of IJ 41, is incorporated into the Fallbrook Decree. Likewise, Paragraph V of the Fallbrook Decree states that the "Court retains continuing jurisdiction" over the waters of the Santa Margarita watershed. Paragraph IX provides "that the continuing jurisdiction reserved by this Court will be exercised on the Court's own Motion, or upon the motion of any party to this cause, his heirs, successors, or assigns, made upon notice and in accordance with the Rules of this Court." In accordance with Paragraph IX of the Fallbrook Decree and Paragraph 16 of IJ 41, the Submitting Parties respectfully request the Court exercise its continuing jurisdiction to resolve further matters not previously adjudicated, namely, the quantification of Pechanga's rights and related specified claims against the United States and RCWD. The Submitting Parties also request that the Court enter the Settlement Agreement as a consent judgment, so as to satisfy the statutory conditions for the enforceability of the Settlement Agreement under the Settlement Act.

## IV. BURDEN OF PROOF AND STANDARD OF REVIEW

"[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge[.]" *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1299 (S.D. Cal. 2017) (Curiel, J.) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). In exercising this discretion, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Low*, 246 F. Supp. at 1300. "The Court's review of the Consent Decree is conducted in light of the public policy favoring settlement." *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005). "[A] district court should enter a proposed consent judgment if the court decides that it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990); *Earth Island Inst., Inc. v. S. California Edison Co.*, 838 F. Supp. 458, 463 (S.D. Cal. 1993). "As long as the consent decree comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the parties' agreement may be entered by the court." *Id.* (internal quotation marks and citations omitted).

Under this standard, the proponents of a settlement bear an initial burden of showing that it "was the product of good faith, arms-length negotiations." *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). The court must also be satisfied that the proposed judgment "conforms to applicable laws." *Id.* at 580. If these initial standards are met, "a negotiated decree is presumptively valid." *Id.* at 581 (internal quotations and citations omitted).

Moreover, in reviewing proposed consent judgments, "courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) (citing cases). Accordingly, "the court need not require that the decree be 'in the public's *best* interest' if it is otherwise reasonable." *Oregon*, 913 F.2d at 581 (quoting *Randolph*, 736 F.2d at 529) (emphasis in original). The reviewing court is not to attempt "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625.

Here, as shown below, the Settlement Agreement is the culmination of an extensive, good-faith, arms-length negotiation, and conforms to applicable law.

## V. THE SETTLEMENT AGREEMENT IS THE PRODUCT OF GOOD FAITH, ARMS-LENGTH NEGOTIATIONS AND CONFORMS TO APPLICABLE LAW

After nine years of settlement negotiations, in 2016 the Parties reached a final Settlement Agreement. Joint Motion at ¶ 11. The Submitting Parties purposefully chose to negotiate a settlement instead of focusing on litigation that would have involved significant expense, time, and resources. *Id.* at ¶ 12. The Settlement Agreement settles with finality Pechanga's longstanding water claims in the Santa Margarita River Watershed, provides the resources to meet Pechanga's current and future water needs, and, most importantly, provides Pechanga with "wet" water rather than just rights on paper. *Id*. The Settlement Agreement provides certainty for RCWD and its customers and for all water users in the Santa Margarita River Watershed by settling Pechanga's water rights. *Id*. Despite the significant differences in perspectives among the Submitting Parties, the Submitting Parties actively worked towards the Settlement Agreement and its many exhibits in an innovative manner that provides benefits for each Party. *Id*. at ¶ 11.

### A. The Settlement Agreement Is the Product of Good Faith, Arms-Length Negotiations

The Submitting Parties approached the settlement negotiation process from an innovative perspective, looking at all the available water resources, including groundwater, recycled water, and imported water, and structured the Water Settlement to use all these water resources in a way that not only fulfills Pechanga's water rights but also provides attractive provisions for the water purveyors in the Basin and in California. As a result, the numerous contractual agreements with RCWD, EMWD and MWD included as exhibits to the Settlement Agreement bring together a variety of water resources.

Each of the Submitting Parties has been represented by experienced counsel who have been involved in the negotiation proceedings for nearly a decade. Representatives from the United States and RCWD have also been involved in aspects of related litigation involving other Tribes. Throughout the settlement negotiations, the Parties faced difficulty in reaching a compromise that was acceptable to all parties. *See* Joint Motion at ¶ 11. All the Parties engaged hydrological experts to review and consider the water rights claims involved and to assist the principals in crafting the Settlement Agreement terms. *Id*. After numerous meetings and exchanges of draft versions of the documents, the Parties were able to reach a fair and equitable settlement for Pechanga, RCWD and the United States. *Id*.

All allottees have been adequately and fairly represented by the United States in this matter as their trustee, *id*. at 7, and have not attempted to intervene as individuals during the course of these lengthy settlement negotiations. Pechanga worked closely with the Federal Negotiation Team in their efforts to protect allottee rights, and the Settlement Agreement includes provisions in support of allottees' rights to their share of tribal water. The inclusion of provisions on behalf of allottees is consistent with other approved Indian water settlements, *See* Blackfeet

Water Rights Settlement, Pub. L. No. 114-322, §3715, 130 Stat. 1814, 1832-1834 (2016); Choctaw Nation of Oklahoma and the Chickasaw Nation Water Settlement, Pub. L. No. 114-322, §3608(e), 130 Stat. 1796, 1802-1804 (2016); Crow Tribe Water Rights Settlement, Pub. L. No. 111-291, §407, 124 Stat. 3097, 3104-3106 (2010); Gila River Indian Community Water Rights Settlement, Pub. L. No. 108-451, § 204, 118 Stat. 3499, 3502-3505 (2004), and provides allottees with protections provided to other tribal allottees.

Both the United States and Pechanga actively participated in this settlement. On July 22, 2016, the Obama Administration issued a formal letter in support of the Settlement Act. Furthermore, Congress has repeatedly considered and vetted the Settlement Agreement since 2009. Congress authorized, ratified, and confirmed the Settlement Agreement to be entered into by Pechanga, RCWD, and the United States after considering nine versions of legislation over the course of seven years, from 2009-2016. The legislation was amended numerous times to address the United States' concerns with the legislation and to incorporate further settlement provisions between the Parties. *See* H.R.5984, 114th Cong. (2016); S.2848, 114th Cong. § 8009 (2016); S.1983, 114th Cong. (2015); S.612, 114th Cong. Subtitle D §§ 3404-13 (2015); H.R.2508, 113th Cong. (2013); S.1219, 113th Cong. (2013); H.R.5413, 111th Cong. (2010); S.2956, 111th Cong. (2010); H.R.4285, 111th Cong. (2009). Further, the Senate Committee on Indian Affairs and the House Natural Resources Subcommittee on Water and Power held several hearings on the legislation, which have included testimony from representatives on behalf of each of the Submitting Parties on various occasions.

The Settlement Agreement is the culmination of years of negotiations, by informed parties, who worked hard to create a win-win situation without having to pursue costly and time-consuming litigation. The Settlement Agreement benefits all of the parties, secures adequate water supplies for Pechanga and its members, and for allottees and encourages cooperative water resources management among

all of the parties.

## B. The Settlement Agreement Conforms to Applicable Law

The Settlement Agreement conforms to all applicable federal law and fits within the broader framework of the Fallbrook Decree and IJ 41.  The Settlement Agreement and exhibits settle issues within the scope of the litigation in a manner that is consistent with federal law governing tribal water rights.

In IJ 41, the United States recognized reserved water rights for Pechanga.  IJ 41 (Doc. No. 4430), was incorporated in the Court's Modified Final Judgment and Decree or "Fallbrook Decree" (Doc. No. 4489), in which the Court examined and established water rights for various water users involved in the case.  In IJ 41, the Court concluded that each of the three Tribes (Ramona, Cahuilla, and Pechanga) possess a recognized Federally Reserved Water Right, noting the following with respect to Pechanga,

> United States of America intended to reserve and did reserve rights to use of the waters of the Santa Margarita River stream system which under natural conditions would be available on the Pechanga Indian Reservation including rights to the use of ground waters sufficient for the present and future needs of the Indians residing thereon [in accordance with specific priority dates for certain areas of the Reservation].

Doc. No. 4430 at 18.  IJ 41 further concluded that "surface waters which flow over and upon any of the lands within the Santa Margarita River watershed and which are a part of the ….Pechanga Indian Reservation[] are a part of the Santa Margarita River stream system." *Id*.  At the time the Court issued IJ 41, no specific tribal water right amounts were quantified, but the Court did develop "prima facie" findings with respect to each of the Pechanga's quantifiable water rights. *Id*. at 14-15.  IJ 41 noted that the Pechanga Indian Reservation totaled 3787 acres of land within the Santa Margarita River watershed, and that of those acres, approximately 1694 acres were irrigable, although 559 acres were not suitable for cultivation.  *Id*. at 13.  Under the then-present conditions of the Reservation, "reasonable water" for

crops included 4.00 AFY for Row Crops, 3.83 AFY for Irrigated Pasture, and a range of 1.07-3.00 AFY for fruit, grains, avocado, citrus, and alfalfa. *Id*.

Using the relevant acreage and prima facie findings set forth in IJ 41, the Submitting Parties came to an agreement that Pechanga's water right would be confirmed as up to four thousand nine hundred ninety-four (4,994) acre-feet of water per year that, under natural conditions, is physically available on the Reservation. This number is consistent with IJ 41 and its prima facie guidance. The proposed judgment and decree recognizes that Pechanga's water right is confirmed, and that Pechanga's tribal water right is subject to the terms of the Settlement Agreement, the Settlement Act, the Fallbrook Decree, and applicable Federal Law, and may be used for specific purposes as set forth under Section 3405(b) of the Settlement Act.

Furthermore, the Settlement Agreement and proposed judgment and decree are consistent with Supreme Court precedent and applicable law related to the Pechanga Reservation and resolution of tribal water rights. As IJ 41 recognized, under *Winters v. United States*, 207 U.S. 564 (1908), the creation of Pechanga's reservation necessarily reserved water rights sufficient to accomplish the purposes of the reservation. The Settlement Agreement is consistent with that law and quantifies a Tribal Water Right for Pechanga in a manner that provides certainty and accommodates competing claims to water while still accomplishing the purposes of the reservation.

The Settlement Agreement is also consistent with federal law regarding the rights of allottees. Allottees have a right to use reserved water. *See United States v. Adair*, 723 F.2d 1394, 1415-1416 (9th Cir. 1983) ("Individual Indian allottees have a right to *use* a *portion* of this reserved water.") (emphasis added); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 50 (9th Cir. 1981) ("Indian allottees have a right to *use* reserved water.") (emphasis added); *United States v. Preston*, 352 F.2d 352, 357 (9th Cir. 1965) (Indian allottees "acquired a right to *use* waters

on the reservation") (emphasis added). Section 7 of the General Allotment Act authorizes the Secretary of the Interior "to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations." Ch. 119, § 7, 24 Stat. 390 (codified at 25 U.S.C. § 381) (commonly referred to as Section 381). In negotiating the Settlement Act and the Settlement Agreement, the United States used this authority on behalf of the allottees to secure its fair distribution of water and the Settlement Agreement is consistent with 25 U.S.C. § 381 governing allottee rights and accomplishes "the intent of Congress to provide to each Allottee benefits that are equivalent to or exceed the benefits Allottees possess as of the date of enactment of this Act." *Id.* at § 3405(a).

## VI. CONCLUSION

The Submitting Parties request that, to the extent of its jurisdiction, the Court approve the Joint Motion for Consent Judgment and Decree Adopting the Settlement Agreement, including all exhibits attached hereto.

RESPECTFULLY SUBMITTED,

Dated: January 24, 2018          Pechanga Band of Luiseño Mission Indians

By: *s/Steve Bodmer*
Steve Bodmer
Attorney for Pechanga Band of
Luiseño Mission Indians
E-mail: sbodmer@pechanga-nsn.gov


Rancho California Water District

By: *s/James Gilpin*
James Gilpin
Attorney for Rancho California Water
District
E-mail: James.Gilpin@bbklaw.com

United States of America

By: *s/Patrick Barry*
Patrick Barry
Attorney for the United States of America
E-mail: Patrick.Barry@usdoj.gov