BRUCE D. BERNARD (CO 12166)
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1361
Email: bruce.bernard@usdoj.gov

Attorneys for Plaintiff UNITED STATES OF AMERICA

MARTHA H. LENNIHAN (SBN 122478)
LENNIHAN LAW
6645 Garden Highway
Sacramento, California 95837
Telephone: (916) 799-4460
Email: mlennihan@lennihan.net

Attorneys for FALLBROOK PUBLIC UTILITY DISTRICT

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br> )<br>Plaintiff, )<br> )<br>vs. )<br> )<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, *et al.*, )<br> )<br>Defendants. )<br>_____ ) | CASE NO. 51cv1247-GPC(RBB)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT** |

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................ 1

II.     THE SETTLEMENT AGREEMENT ............................................................. 5

        A.      Overview of Settlement Agreement.................................................. 5

        B.      Water Rights Owned by Parties and Exercise of those Water Rights for
                Project Purposes............................................................................... 7

                1.      Existing water rights (pre-Project)............................................ 7

                2.      Shared ownership of post-1914 appropriative water rights. ...... 8

                3.      Changes to Parties' water rights to enable them to be utilized for
                        Project purposes. ......................................................... 9

        C.      Dismissal of claims between Parties.................................................. 10

        D.      Project funding................................................................................ 10

III.    MAJOR REGULATORY COMPLIANCE .................................................... 12

        A.      National Environmental Policy Act / California Environmental Quality Act. ..... 12

        B.      Endangered Species Act. .................................................................. 12

IV.     PUBLIC NOTICE OF SANTA MARGARITA CONJUNCTIVE USE PROJECT. ....... 13

V.      STANDARD OF REVIEW FOR COURT APPROVAL OF SETTLEMENTS.............. 15

VI.     THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT AS
        REQUESTED ............................................................................................ 17

        A.      The Settlement Agreement provides a physical solution to the Parties' water
                rights dispute in a manner that is consistent with the direction of the Court
                and national and statewide priorities................................................. 17

        B.      The Settlement Agreement meets the applicable standards for Court
                approval of settlements. ................................................................... 18

        C.      The Parties' request that the Court retain jurisdiction to enforce the
                Settlement Agreement is consistent with the Court's continued jurisdiction
                over this action................................................................................ 20

VII.    CONCLUSION........................................................................................... 22

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Ahern v. Cent. Pac. Freight Lines,*
4      846 F.2d 47 (9th Cir. 1988) ............................................................... 15

5

*Citizens for a Better Env't v. Gorsuch,*
     718 F.2d 1117 (D.C. Cir. 1983)........................................................... 17
6

7

*Class Plaintiffs v. City of Seattle,*
     955 F.2d 1268 (9th Cir. 1992) ...................................................... 15, 19
8

*Earth Island Inst., Inc. v. S. Cal. Edison Co.,*
9      838 F. Supp. 458 (S.D. Cal. 1993) .............................................. 16, 20

10

*Hanlon v. Chrysler Corp.,*
11      150 F.3d 1011 (9th Cir. 1998) ............................................... 16, 17, 20

*Kokkonen v. Guardian Life Ins.,*
12      511 U.S. 375 (1994)........................................................................... 21

13

*Low v. Trump Univ., LLC,*
     246 F. Supp. 3d 1295 (S.D. Cal. 2017)........................... 15, 16, 17, 19, 20
14

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,*
15      616 F.2d 1006 (7th Cir. 1980) ........................................................... 17

16

*Officers for Justice v. Civil Serv. Comm'n,*
     688 F.2d 615 (9th Cir. 1982) ................................................. 16, 17, 20
17

*Rancho Santa Margarita v. Vail,*
18      81 P.2d 533 (Cal. 1938) ....................................................................... 1

19

*Rodriguez v. W. Publ'g Corp.,*
     563 F.3d 948 (9th Cir. 2009) ...................................................... 15, 19
20

*S.E.C. v. Randolph,*
21      736 F.2d 525 (9th Cir. 1984) ...................................................... 16, 19

22

*Sierra Club, Inc. v. Elec. Controls Design, Inc.,*
     909 F.2d 1350 (9th Cir. 1990) .................................................... 16, 20
23

*United States v Fallbrook Pub. Util. Dist.,*
24      347 F.2d 48 (9th Cir. 1965) .................................................................. 2

25

*United States v. Chevron U.S.A., Inc.,*
     380 F. Supp. 2d 1104 (N.D. Cal. 2005)............................................. 15
26

*United States v. Montrose Chem. Corp.,*
27      50 F.3d 741 (9th Cir. 1995) ........................................................ 15, 19

28

*United States v. Oregon*,
   913 F.2d 576 (9th Cir. 1990) ................................................................. 16, 17, 20

*United States v. Rohm & Haas Co.*,
   721 F. Supp. 666 (D.N.J. 1989) .............................................................. 17

**Statutes**

42 U.S.C. § 4332(2)(C) ................................................................................ 12

CAL. CODE REGS. tit. 23, § 681 ................................................................... 9

CAL. PUB. RES. CODE § 2100 ....................................................................... 12

CAL. WATER CODE §§ 79500-79591 ........................................................... 12

*National Defense Authorization Act for Fiscal Year* 2016,
   Pub. L. No. 114-92, 129 Stat. 726 (2016) ............................................... 11

**Regulations**

82 Fed. Reg. 3,295 (Jan. 11, 2017) ......................................................... 12, 14

**MEMORANDUM**

Plaintiff the United States of America, acting by and through the Department of the Navy and the United States Marine Corps, for the benefit of the Marine Corps Base, Camp Pendleton ("United States"), and Defendant Fallbrook Public Utility District ("Fallbrook") (the United States and Fallbrook collectively referred to as the "Parties") submit this memorandum of points and authorities in support of their joint motion for approval of the Santa Margarita River Conjunctive Use Settlement Agreement ("Settlement Agreement").  The Parties request the Court to exercise its continued jurisdiction in this matter and enter the attached proposed order: (i) approving the Settlement Agreement as attached as Attachment 1 to the Parties' motion and to the proposed order; (ii) incorporating the Settlement Agreement into the Modified Final Judgment and Decree filed April 6, 1966 in replacement of the Parties' Memorandum of Understanding and Agreement dated March 4, 1968, which was previously incorporated into the 1966 Modified Final Judgment and Decree by Order dated June 27, 1968; (iii) dismissing all pending claims between the Parties; and (iv) retaining jurisdiction to enforce the Settlement Agreement.  The Parties' motion and this memorandum are supported by the Declaration of Paul R. Boughman ("Boughman Decl.") attached hereto as Exhibit 1, and the Declaration of Jack Bebee ("Bebee Decl.") attached hereto as Exhibit 2.

I.      **BACKGROUND**

The Santa Margarita River water disputes between the United States Marine Corps Base Camp Pendleton ("Camp Pendleton") and Fallbrook and their predecessors have a lengthy and complex history—dating back at least as far as the early 1900s.[1]  This Settlement Agreement has

---

[1]      The Parties' predecessors had previously litigated riparian rights in State Court. *Rancho Santa Margarita v. Vail*, 81 P.2d 533 (Cal. 1938).  The 1940 Stipulated Judgment that resulted

1  been negotiated over the course of many decades to resolve this long-running water rights

2  dispute between Camp Pendleton and Fallbrook.  The Settlement Agreement represents the

3  opportunity to end this litigation saga between the Parties in a creative and mutually beneficial

4  manner.

5      The present case was filed in 1951, when the United States sued to quiet title to the use of

6  water on the River, and enjoin others' interference therewith.  *United States v Fallbrook Pub.*

7  *Util. Dist.*, 347 F.2d 48, 51 (9th Cir. 1965).  A significant catalyst for the litigation between

8  Camp Pendleton and Fallbrook was their dispute over the character and relative priorities of their

9  water rights.  The case subsequently expanded to include all water users within the Santa

10  Margarita Watershed.

11      In 1963, the Court finalized a number of Interlocutory Judgments and issued a final

12  Judgment and Decree, whereby the Interlocutory Judgments or Orders were listed and, together

13  with the Findings of Fact and Conclusions of Law attached to those Interlocutory Judgments or

14  Orders, were adopted as the final Findings of Fact, Conclusions of Law, and Judgment and

15  Decree of the Court (Doc. No. 4489).  This 1963 Final Judgment and Decree was appealed to the

16  United States Court of Appeals for the Ninth Circuit.  Upon remand, in 1966 this Court entered

17  its Findings of Fact, Conclusions of Law, and Modified Final Judgment and Decree (Doc. No.

18  4768) ("Fallbrook Decree").

19      This litigation, culminating with entry of the Fallbrook Decree, resolved the central issue

20  of the existence and relative priorities of the Parties' water rights.  However the question of how

21  these Parties would perfect and exercise those rights and to what extent each Party's use of its

22  _____

23  from that action, as entered on remand by the San Diego County Superior Court, is reflected in
and attached to the 1966 Modified Final Judgment and Decree in this case (Doc. No. 4768).

water rights would interfere with the other Party's water use was left open.  Since the entry of the Fallbrook Decree in 1966, Camp Pendleton and Fallbrook—with the urging of the Court—have explored the development of a physical solution that would provide for the exercise of the Parties' water rights in a manner that would minimize the conflict between their rights and provide a more secure water supply for both Parties.

In March 1968, the United States, through the Secretary of the Interior and the Secretary of the Navy, and Fallbrook entered into a Memorandum of Understanding and Agreement ("1968 MOU").  That 1968 MOU addressed the construction and operation of two proposed dams, referred to as the "Two-Dam Project," as the physical solution to the Parties' longstanding water rights dispute.  In May of that year, the Parties filed a petition for approval of the 1968 MOU and for amendment of the Fallbrook Decree by incorporation of the 1968 MOU into that Decree.  *See* Petition for Approval of Memorandum of Understanding and Agreement and for Order Amending Modified Final Judgment and Decree, May 22, 1968 (Doc. No. 4770), with attached March 4, 1968 Memorandum of Understanding and Agreement.  In June 1968, the Court entered an Order granting the Parties' request.  *See* Order Approving Memorandum of Understanding and Agreement and Amending Modified Final Judgment and Decree, June 27, 1968 (Doc. No. 4773) ("1968 Order").

The Court's 1968 Order approving the 1968 MOU noted that the Fallbrook Decree "catalogued the water rights in the Santa Margarita River Stream System of the various parties to this cause but did not purport or attempt to apportion the waters of the said stream system or the uses thereof between the parties to this cause."  1968 Order ¶ 2.  The Court then highlighted the importance of the United States and Fallbrook finding a physical solution that provided for an

equitable allocation of water to the two Parties under their water rights adjudicated by the

Fallbrook Decree:

> 3.      It has long been recognized by the Court, the United States of America and the Fallbrook Public Utility District that the aforesaid modified final judgment and decree leaves unsolved many serious problems with respect to the use of the waters of the Santa Margarita River Stream System and the division of these waters between the United States and Fallbrook Public Utility District under their respective water rights. The United States and Fallbrook Public Utility District recognize that neither can, without further serious controversy, effectively utilize its water rights in the Santa Margarita Stream System and that the water rights of the stream system cannot be developed fully in the absence of a physical solution which makes equitable provisions as between them for the manner in which each of them shall make use of the waters of the stream system to which it is entitled under its water rights as determined by the modified final judgment and decree.

*Id.* ¶ 3.

Not long thereafter, the National Environmental Policy Act of 1969 ("NEPA") and the

Endangered Species Act of 1973 ("ESA") were enacted.  The analyses carried out under those

authorities resulted in the determination that the two proposed surface dams would cause

unacceptable environmental impacts and the Two-Dam Project did not go forward.  The 1968

MOU ultimately expired by its own terms in 1978.  *See* 1968 MOU ¶ 21.  With the demise of the

Two-Dam Project as envisioned by the 1968 MOU and approved by the Court's 1968 Order, the

question of what project would replace the Two-Dam Project and constitute the "physical

solution" to this water dispute was back on the table.

After many unsuccessful attempts and decades of conflict, Camp Pendleton and

Fallbrook have now reached a good faith, arms-length negotiated agreement on a physical

solution, the Santa Margarita Conjunctive Use Project ("Conjunctive Use Project" or "Project"),

which secures a reliable yield for the benefit of both Parties and passes environmental muster.  In

effect, this Settlement Agreement replaces the 1968 MOU, and puts in place the Parties' long-

awaited agreement on a viable physical solution to their water rights dispute that will enable the exercise of their water rights in a mutually beneficial manner.  The Parties are now working as partners in furtherance of the Project's success.

The Settlement Agreement sets forth the terms under which the Project will be constructed and operated in some detail.  The Settlement Agreement fully resolves the claims between Camp Pendleton and Fallbrook not previously resolved by the Court.  The many claims raised between other parties to this action, and by Camp Pendleton or Fallbrook against other parties, or by other parties against Camp Pendleton or Fallbrook, are not affected by this Settlement Agreement.  A summary of principal provisions of the Settlement Agreement is provided below.

## II.     THE SETTLEMENT AGREEMENT

### A.      Overview of Settlement Agreement.

The Settlement Agreement provides for the Parties' construction, operation and sharing of benefits from the Santa Margarita River Conjunctive Use Project as the physical solution called for by the Court.  The fundamental concept of the Project is that Camp Pendleton will divert and store flows from the River in the natural aquifers underlying Marine Corps Base, Camp Pendleton ("Base"), and then deliver an agreed-upon amount of untreated water to Fallbrook in accordance with a schedule reflecting the hydrology associated with various water year types.  Camp Pendleton will then retain all other Project water for use on the Base as needed.  Any water in excess of the agreed-upon deliveries to Fallbrook and the water requirements of the Base will be available for purchase by Fallbrook with capital or in-kind services.  Fallbrook will pay for Project water at rates lower than those it pays for imported water.

The Settlement Agreement provides that Camp Pendleton and Fallbrook will share ownership of their post-1914 appropriative water rights on a 70% (Camp Pendleton) / 30% (Fallbrook) basis.  The Parties generally retain an interest in Project yield in approximately those same ratios—varying somewhat based on the hydrologic year type.  The Parties' shared ownership of water rights and yield of the Project creates a common interest in the efficient exercise of the Parties' water rights and eliminates the conflict between those rights.

The Settlement Agreement provides that the Project will be constructed and operated by Camp Pendleton and Fallbrook in their respective jurisdictions.  This structure allows Camp Pendleton to maintain autonomy on-Base, as directed by the Department of the Navy.

The Settlement Agreement is also designed to improve Camp Pendleton's options for water supply in the event of a severe drought or other water supply emergency.  Camp Pendleton's access to imported water is now very limited.  Although the San Diego County Water Authority ("SDCWA") has annexed most of the Base into the service area of the SDCWA, which confers to Camp Pendleton an entitlement to imported water from the SDCWA, the Base presently lacks an adequate means for delivery of such water.  The new bi-directional pipeline between Camp Pendleton and Fallbrook will enable the delivery of imported water from the SDCWA to the Base in the event of a water supply emergency.  The Settlement Agreement also includes a "water banking" arrangement, wherein the timing of deliveries to Fallbrook can be adjusted, or other compensation provided to Fallbrook, to make more Project water available to the Base.  This affords Camp Pendleton the opportunity for an additional increment of water supply in the event of drought or other emergency.

The Settlement Agreement provides for a Management Committee to oversee implementation of the Conjunctive Use Project and the Settlement Agreement, and a Technical Committee, to make technical determinations and recommendations to the Management

1   Committee.  The Settlement Agreement includes informal and formal dispute resolution

2   mechanisms and remedies, and provides that if dispute resolution is unsuccessful, either Party

3   may seek judicial resolution of the dispute.

4       **B.    Water Rights Owned by Parties and Exercise of those Water Rights for Project Purposes.**

5

6       **1.    Existing water rights (pre-Project).**

7       The Parties are dedicating all of their below-listed water rights to generate water supply

8   through Project operations.  The Parties' water rights are listed below in order of seniority.

9

**Table 1        Existing Water Rights**

| Water Right | SWRCB Application #/ Interlocutory Judgment # | Original Holder | Priority Date | Amount (ac ft/yr) |
|---|---|---|---|---|
| Riparian | IJ 37 | Navy | n/a | 4,000 |
| Pre-1914 Right (Lake O'Neill) | IJ 24/24A | Navy | 1883 | 1,200 |
| Permit 8511 | 11587 | Fallbrook | 1946 | 10,000 |
| Permit 11357 | 12179 | Fallbrook | 1947 | 10,000 |
| Permit 15000 | 21471 | Navy | 1963 | |
|     Part A (surface storage) | 21471A | | | 165,000 |
|     Part B (undergd storage) | 21471B | | | 4,000 |
| License 10494 (from Permit 15000 Part B) | 21471B | Navy | 1963 | 4,000 |

22      Camp Pendleton has historically exercised its riparian right as confirmed by Interlocutory

23  Judgment 37 by diverting up to 4,000 acre feet per year of water for use on-Base within the

24  watershed boundary.  Camp Pendleton currently exercises this riparian right by direct diversion

25  through twelve groundwater wells pumping from the alluvial aquifer associated with the Santa

26  Margarita River.  Camp Pendleton has historically exercised its pre-1914 appropriative right as

27  confirmed by Interlocutory Judgment 24/24A to store 1,200 acre feet in Lake O'Neill and to

28  make releases from the Lake for use on the Base.

Permits 8511 and 11357 were originally issued to Fallbrook for the diversion and storage of a combined total of 20,000 acre feet per year for use within the boundaries of Fallbrook's service area. These rights are junior to Camp Pendleton's riparian and pre-1914 rights, but senior to Camp Pendleton's 1963 appropriative rights.

State Water Resources Control Board ("SWRCB") Order 73-50 divided Camp Pendleton's Permit 15000 into Part A and Part B to provide for above-ground storage of 165,000 acre feet per year (Part A), and underground storage of 4,000 acre feet per year (Part B). In 1954, the underground storage portion of Permit 15000 (Part B) was licensed at 4,000 acre feet per year (License 10494). Permit 15000 (Part A) is for the portion of the original water right that was to be used for on-stream storage (originally envisioned as above-ground reservoirs, *i.e.*, the Two-Dam project). SWRCB Order 73-50 also provided for the transfer of the three state-issued water right permits held by the Parties (Permit 8511, Permit 11357, Permit 15000) to the Bureau of Reclamation for the benefit of Camp Pendleton and Fallbrook, in anticipation that Reclamation would construct and operate the project eventually developed. However, as discussed below, those rights were recently transferred back to Camp Pendleton and Fallbrook.

### 2. Shared ownership of post-1914 appropriative water rights.

The Settlement Agreement provides for the Parties to jointly hold title to their post-1914 appropriative water rights on a 70% (Camp Pendleton) / 30% (Fallbrook) basis. Camp Pendleton will continue to hold the riparian right and the pre-1914 right, which will also be exercised for Project purposes, with the yield to be shared by the Parties. *See* Interlocutory Judgment Nos. 24, 24A, 37, as amended (Doc. Nos. 4262 (IJ 24), 4486 (IJ 24A), 4394 (IJ 37), 4429 (amendment to IJ 37), 4456 (amendment to IJ 37)). Having no further role with respect to the Project, in 2017 the Bureau of Reclamation transferred the three water rights permits it held back to Camp Pendleton (70%) and Fallbrook (30%) in conformance with that shared ownership term of the Settlement Agreement. Camp Pendleton recently transferred a 30% interest in License 10494 to Fallbrook.

As a result of the foregoing transfers, the Parties' shared interest in the post-1914 water rights called for by the Settlement Agreement has been accomplished: Camp Pendleton now

holds a 70% interest, and Fallbrook a 30% interest, in the three permits and the license for the Parties' post-1914 appropriative water rights.  The Parties are now working collaboratively on water rights—a milestone after decades of conflict and litigation.

### 3. Changes to Parties' water rights to enable them to be utilized for Project purposes.

All of the water rights identified in Table 1 will be exercised to generate Project yield.  In order to accomplish that goal, changes to the post-1914 appropriative water rights were required to be approved by the SWRCB.

Water right permits issued by the SWRCB provide that water must be put to beneficial use within the period of time stated in the permit.  When a permit holder is unable to complete diversion and delivery facilities and apply water to beneficial use within the period set forth in the permit, the holder may file a petition to extend the permits.  CAL. CODE REGS. tit. 23, § 681. California's Water Code regulations also provide that a permit or license holder may seek to change the water right as defined in the permit or license.  *Id.*  §§ 791-795, 1700.  In 2008 and 2009, the Parties filed petitions with the SWRCB to extend the time to apply water to beneficial use under Permits 8511, 11357, and 15000 Part B, and to change these three permitted rights, as well as the water right represented by License 10494A (licensed from Permit 15000 Part A), to make them available for purposes of the Conjunctive Use Project.

In November 2018, the SWRCB issued Order WR 2018-0117 Exec, In the Matter of Permits 851, 11357 and 1500B and License 10494.  In February 2019, the SWRCB issued Order WR 2019-0012 EXEC, which corrected two errors or oversights in the earlier order.  Those Orders: (i) approved the Parties' petitions for extension of time; (ii) approved in large part the Parties' petitions for change in place of use, purpose of use, point of diversion, method of diversion, and distribution of storage; and (iii) issued amended permits and amended license. The approved extensions and changes will enable the Parties to jointly exercise these water rights consistent with Project operations and purposes.

The amended permits and license changed the elements of these water rights so that they are now available for purposes of the Conjunctive Use Project instead of the Two-Dam project

previously envisioned by the Parties.  These changes included moving the primary point of diversion from the above-ground dam sites to the location of Camp Pendleton's existing weir, and identifying several new wells as points of diversion.  Fallbrook's existing Red Mountain Reservoir also was added as a point of surface water storage in order to enhance Project efficiency under certain hydrologic conditions.  *See* Vicinity Map at Exhibit 3 to Settlement Agreement.  Finally, the geographic area in which the water may be used under these permits and license was changed such that all of the water can now be used both on Camp Pendleton and within Fallbrook's service area.[2]

### C.    Dismissal of claims between Parties.

The Settlement Agreement provides for dismissal of the Parties' remaining claims against one another in the litigation ("Resolved Claims"), and mutual release from liability for the Resolved Claims.  The Resolved Claims are defined to include all of the Parties' remaining claims against one another in this action, but not the claims by or against other parties to this action.  The Settlement Agreement therefore does not resolve claims brought by the United States as trustee for three Native American Indian Tribes [3] against neighboring landowners in the northern part of the Santa Margarita River Basin.

### D.    Project funding.

Under the terms of the Settlement Agreement, each Party is responsible for Project facility construction, operation, and regulatory compliance within its own jurisdiction.  As addressed in the Declaration of Paul R. Boughman attached hereto as Exhibit 1, the primary water diversion and storage facilities are located on Camp Pendleton.  Boughman Decl. ¶ 19.[4]

---

[2]     The riparian right will provide a portion of the Project's yield by continued direct diversion of water for use on-Base, and within the watershed, consistent with Interlocutory Judgment 24/24A.  The pre-1914 water right for Lake O'Neill will also contribute to Project yield.

[3]     The three Tribes that are parties to this litigation are: (1) the Pechanga Band of Luiseño Mission Indians, (2) the Ramona Band of Cahuilla Indians, and (3) the Cahuilla Band of Indians.

[4]     A list of primary Project facilities and locations is set forth in Exhibit 4 to the Settlement Agreement.

These facilities include the bi-directional pipeline, the weir within the channel of the Santa Margarita River, and several new wells. *Id.* Construction of the weir is a major project involving replacement of the existing vertical steel sheet pile weir with a new four-section inflatable weir spanning the entire 250-foot width of the Santa Margarita River, and anchored with a two-foot-thick concrete slab foundation. *Id.*

Funding for Camp Pendleton's portion of the Project was approved under the military construction authorization in the National Defense Authorization Act for Fiscal Year 2016 which appropriated $44.5 million for construction of the Project. Pub. L. No. 114-92, § 2201, 129 Stat. 726, 1149-50 (2016). Camp Pendleton has also secured the major regulatory approvals required for construction of the facilities for which it is responsible and construction of those facilities is well under way. Boughman Decl. ¶ 20. Camp Pendleton has substantially completed construction of the bi-directional pipeline and is nearing completion of the weir construction. *Id.* In total, Camp Pendleton has already contracted for and spent approximately two-thirds of the $44.5 million appropriated for the Project. *Id.*

As addressed in the Declaration of Jack Bebee attached hereto as Exhibit 2, Fallbrook's portion of the Project includes construction of a new water treatment plant located at the District's boundary with the Naval Weapons Station, which is adjacent to Camp Pendleton. Bebee Decl. ¶ 14. The pipeline from Camp Pendleton will deliver Project water to Fallbrook's new treatment plant. *Id.* As noted above, Project water may also be stored in Fallbrook's existing treated water reservoir, Red Mountain Reservoir, to enhance Project yield. *Id. See* Vicinity Map at Exhibit 3 to Settlement Agreement.

Fallbrook has begun securing the necessary funding for construction of Project facilities within its service area, including state and regional funding and support. Bebee Decl. ¶ 15.

1    Fallbrook has obtained over $2.5 million of State Proposition 50 funding[5] in connection with the

2    Project's inclusion in the San Diego Integrated Regional Water Management Plan.  *Id.*  Fallbrook

3    is in the process of obtaining State Revolving Fund financing for the additional costs of

4    construction of its portion of the Project.  *Id.*

5    **III.    MAJOR REGULATORY COMPLIANCE**

6        **A.    National Environmental Policy Act / California Environmental Quality Act.**

7        The Parties have prepared an Environmental Impact Statement/Environmental Impact

8    Report ("EIS"/"EIR") providing the necessary analysis and public disclosure of the Project's

9    potential environmental impacts under NEPA and the California Environmental Quality Act

10   ("CEQA").[6]  Only three comment letters were received, one of which supported the Project.

11   Responses to the comments were duly provided.  The Fallbrook Board of Directors certified the

12   EIR under CEQA on September 26, 2016.  The Department of the Navy issued a Record of

13   Decision regarding the EIS on January 3, 2017.  82 Fed. Reg. 3,295 (Jan. 11, 2017).  The Parties

14   have thus completed applicable NEPA and CEQA requirements and are not aware of any

15   unresolved public opposition to the Project.

16       **B.    Endangered Species Act.**

17       Two Biological Opinions ("BOs") have been issued for the Project to address rare and

18   endangered species concerns.  The United States Fish and Wildlife Service ("USFWS") issued

19   its BO addressing listed terrestrial species on September 15, 2015.  The National Oceanic and

20   Atmospheric Administration's National Marine Fisheries Service ("NMFS") issued its BO

21   concerning potential steelhead in the Santa Margarita River on September 28, 2017.  Both BOs

22   call for an adaptive management plan ("AMP") approach to resource management.  The NMFS

23

24   _____

25   [5]    Proposition 50 was enacted by the Water Security, Clean Drinking Water, Coastal and

26   Beach Protection Act of 2002, codified at CAL. WATER CODE §§ 79500-79591.

     [6]    Under NEPA, 42 U.S.C. §§ 4321–4370m-12, federal agencies are required to prepare an

27   Environmental Impact Statement for "major Federal actions significantly affecting the quality of

28   the human environment."  42 U.S.C. § 4332(2)(C).  The CEQA, similar to NEPA, requires an
     Environmental Impact Report.  CAL. PUB. RES. CODE §§ 2100 *et seq.*

1   BO further required re-construction of Camp Pendleton's weir to facilitate fish passage and other

2   measures that increase instream flows for fish and reduce project yield for diversion and

3   consumptive use by the Base and Fallbrook.  The AMP involves monitoring of operations,

4   reporting and coordination with USFWS and NMFS, and making adjustments to Project

5   operations as may be appropriate based upon analyses of the data and changing conditions.  An

6   annual Facilities Operations Plan ("FOP") will be prepared each year to implement the AMP

7   requirements.  These requirements have been incorporated into the Settlement Agreement.

8   Camp Pendleton is developing and will implement the AMP and FOP.  Annual reports will be

9   submitted to USFWS and NMFS, and posted on a publicly-available website.

10  **IV.    PUBLIC NOTICE OF SANTA MARGARITA CONJUNCTIVE USE PROJECT.**

11              There has been considerable public notice and opportunity for input regarding the Santa

12  Margarita Conjunctive Use Project.  Both the NEPA and CEQA processes involved public notice

13  and opportunity to comment on the environmental documents.  Bebee Declaration at ¶ 17.

14  Notice has been published in the Federal Register concerning compliance under NEPA and

15  CEQA, as well as completion of the two BOs under the ESA.  A Federal Register Notice was

16  issued on January 11, 2017, addressing completion the of NEPA, CEQA, ESA and National

17  Historic Preservation Act processes for the Project as follows:

18

19

20          A Notice of Availability/Notice of Completion for the Draft EIS/EIR was
            published in the **Federal Register** on May 9, 2014, and a Notice of Completion
21          was provided to the California State Clearinghouse on May 9, 2014 to
            initiate a 45-day public review of the Draft EIS/EIR.  A public meeting was
22          held on May 29, 2014 at the FPUD, and the public review period for the Draft
            EIS/EIR concluded on July 10, 2014.  Written and verbal comments on the Draft
23          EIS/EIR were provided by the United States Environmental Protection Agency
            (USEPA) and FPUD Board members, respectively.
24

25          The Final EIS/EIR was published in the **Federal Register** on October 14, 2016;
            written comments were received from the USEPA on November 14, 2016 and are
26          being addressed through the consultation process with the United States Army
            Corps of Engineers (USACE) and completion and implementation of the Adaptive
27          Management Plan/Facilities Operating Plan (AMP/FOP).

28

1

2

3

4

MCI West-MCB Camp Pendleton submitted a Biological Assessment to the USFWS on September 15, 2015, and received a Final BO on August 15, 2016, concluding that the proposed action is not likely to jeopardize the continued existence of Federal threatened and endangered species and state special status species within the project area, including least Bell's vireo, southwestern willow flycatcher, and arroyo toad . . . .

5

6

7

MCI West-MCB Camp Pendleton submitted a Biological Assessment to NMFS on February 10, 2014, and received a Final BO on September 28, 2016, concluding that the proposed action is not likely to jeopardize the continued existence of the southern California steelhead.

8

9

[State Historic Preservation Officer]/Native American Tribes: National Historic Preservation Act, Section 106 Consultation.

10

11

12

13

14

15

16

17

18

MCI West-MCB Camp Pendleton submitted a consultation letter to the SHPO on March 19, 2012, requesting concurrence on the Finding of Effect for the proposed action, and received concurrence on September 19, 2013.  MCI West-MCB Camp Pendleton consulted with the following Native American Tribes: La Jolla Band of Mission Indians; Pauma Band of Mission Indians; Pechanga Band of Luiseno Mission Indians; Rincon Band of Luiseno Indians; Pala Band of Mission Indians, Soboba Band of Luiseno Indians; San Luis Rey Band of Luiseno Indians; Juaneno Band of Mission Indians-Acjachemen Nation (Belardes); Juaneno Band of Mission Indians-Acjachemen Nation (Rivera/Romero); and Juaneno Band of Mission Indians-Acjachemen Nation (Reyes).  The Rincon Band of Luiseno Indians requested to be kept informed on all updates for the project.  The Pala Band of Mission Indians concurred with the methods for determining eligibility and treatment of historic properties and asked to be consulted if any new information or conclusions are reached.

19

82 Fed. Reg. 3,295, 3,295-99 (Jan 11, 2017).

20

21

22

23

24

25

26

27

28

The Parties have briefed the Court-appointed Watermaster, provided him with a copy of the then-draft Settlement Agreement, and incorporated his requested changes into the Settlement Agreement.  Bebee Decl. ¶ 18.  The Project and associated Settlement Agreement have been described to attendees at the Watermaster Steering Committee meetings approximately four times over the past two years.  *Id.*  Over the past several years, the Steering Committee has been comprised of representatives from Camp Pendleton, the Eastern Municipal Water District, Fallbrook, the Metropolitan Water Department of Southern California, the Pechanga Band of

1  Luiseño Mission Indians, the Western Municipal Water District, and the Rancho California
2  Water District.  *Id.*; Annual Watermaster Report Water Year 2015-16, Section 2.1 at 5.  In sum,
3  the public and all water users on the Santa Margarita River system have had considerable notice
4  of and opportunity to provide input concerning the Project.

5  **V.     STANDARD OF REVIEW FOR COURT APPROVAL OF SETTLEMENTS**

6      "The Ninth Circuit adheres to 'a strong judicial policy that favors settlements . . . .'"  *Low*
7  *v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1299 (S.D. Cal. 2017) (quoting *Class Plaintiffs v.*
8  *City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)), *aff'd,* 881 F.3d 1111 (9th Cir. 2018).  *See*
9  *also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of
10  stock in the product of an arms-length, non-collusive, negotiated resolution[.]"); *Ahern v. Cent.*
11  *Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988) (In reviewing a proposed settlement, the
12  court is to take into account the strong public policy favoring the voluntary settlement of
13  litigation); *United States v. Chevron U.S.A., Inc*., 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005)
14  (The court's review of a proposed settlement "is conducted in light of the public policy favoring
15  settlement.").

16      Courts are especially deferential to the parties in reviewing settlements where
17  governmental agencies charged with protecting public rights have taken an active role in crafting
18  the settlement.  *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746 (9th Cir. 1995).
19  "[C]ourts should pay deference to the judgment of the government agency which has negotiated

1    and submitted the proposed judgment." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)

2    (citations omitted).

3        "[T]he decision to approve or reject a settlement is committed to the sound discretion of

4    the trial judge[.]" *Trump Univ.*, 246 F. Supp. 3d at 1299 (quoting *Hanlon v. Chrysler Corp.*, 150

5    F.3d 1011, 1026 (9th Cir. 1998)).  In exercising its discretion:

6

7            the court's intrusion upon what is otherwise a private consensual agreement
             negotiated between the parties to a lawsuit must be limited to the extent necessary
8            to reach a reasoned judgment that the agreement is not the product of fraud or
             overreaching by, or collusion between the negotiating parties, and that the
9            settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

10

11   *Hanlon*, 150 F.3d at 1027 (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625

12   (9th Cir. 1982)).  "[A] district court should enter a proposed consent judgment[7] if the court

13   decides that it is fair, reasonable and equitable and does not violate the law or public policy."

14   *Sierra Club, Inc. v. Elec. Controls Design, Inc.,* 909 F.2d 1350, 1355 (9th Cir. 1990); *Earth

15   Island Inst., Inc. v. S. Cal. Edison Co.*, 838 F. Supp. 458, 463 (S.D. Cal. 1993) (quoting *Sierra

16   Club*, 909 F,2d at 1355).

17

18       "In examining the settlement for 'overall fairness,' a court must review the settlement 'as

19   a whole, rather than the individual component parts.'" *Trump Univ.*, 246 F. Supp. 3d at 1299

20   (quoting *Hanlon*, 150 F.3d at 1026).  "A court cannot 'delete, modify or substitute certain

21

22   _____

23   [7]       The Settlement Agreement is not captioned or characterized by the Parties as a "consent
     judgment" or "consent decree."  However, given the scope and duration of the implementation
24   efforts for the Conjunctive Use Project outlined in the Settlement Agreement, coupled with the
     fact that the Parties are requesting the Court to approve and incorporate the Settlement
25   Agreement into the Court's decree and to retain jurisdiction to enforce the Settlement
     Agreement, the legal principles governing court approval of consent decrees are relevant to the
26   Court's review and approval of the Settlement Agreement.  A "consent decree is 'essentially a
     settlement agreement subject to continued judicial policing.'  It is not a decision on the merits or
27   the achievement of the optimal outcome for all parties, but is the product of negotiation and
     compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (citation omitted).
28

provisions.'" *Trump Univ.*, 246 F. Supp. 3d at 1299 (quoting *Officers for Justice*, 688 F.2d at 630). "Rather, '[t]he settlement must stand or fall in its entirety.'" *Trump Univ.*, 246 F. Supp. 3d at 1300 (quoting *Hanlon*, 150 F.3d at 1026).

In conducting its review, the court is not tasked with carrying out an in-depth analysis that would otherwise be required to enter a judgment on the merits after trial:

> The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable, and appropriate under the particular facts and that there has been valid consent by the concerned parties.

*Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (quoting *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)); *see also United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 686 (D.N.J. 1989) (lengthy evidentiary hearing not required when deciding whether to enter a consent decree). Nor is the reviewing court charged with attempting "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625.

Under this standard, the proponents of a settlement bear an initial burden of showing that it "was the product of good faith, arms-length negotiations." *Oregon*, 913 F.2d at 581. The court must also be satisfied that the proposed judgment "conform[s] to applicable laws." *Id.* at 580. If these initial standards are met, "a negotiated decree is presumptively valid." *Id.* at 581 (internal quotations and citations omitted).

## VI.   THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT AS REQUESTED

### A.   The Settlement Agreement provides a physical solution to the Parties' water rights dispute in a manner that is consistent with the direction of the Court and national and statewide priorities.

The Conjunctive Use Project as described in the Settlement Agreement embodies a creative means of resolving the Parties' long-standing water use conflict in a manner consistent with the urging of the Court and the authorizations and appropriations already made by Congress.  Boughman Decl. ¶ 18.  The Project will ensure a reliable local water supply for the benefit of both Parties.  *Id.* ¶ 22.  It will reduce the demand for imported water from the Sacramento San Joaquin Bay-Delta and the Colorado River, thus furthering an important statewide interest.  *Id.*  The Project is designed to avoid the significant environmental impacts associated with on-channel surface water reservoirs, in favor of the environmentally benign subterranean storage using existing natural aquifers and the shared use of water so stored.  *Id.*

The Settlement Agreement has Congressional support through the National Defense Authorization Act for Fiscal Year 2016, State support via Proposition 50 funding and the State Revolving Fund, and regional support consistent with the San Diego Integrated Regional Management Plan.  *Id.* ¶ 23.

Finally, the Settlement Agreement allows the Parties to finally and completely resolve remaining claims against one another in this litigation and to focus their efforts going forward on cooperative use of the resource in a manner that benefits both communities.  *Id.* ¶ 24.

**B.    The Settlement Agreement meets the applicable standards for Court approval of settlements.**

The Settlement Agreement is contingent on Court-approval and retained jurisdiction to enforce the Settlement Agreement in order to ensure that the Parties secure their respective benefits under this far-reaching, permanent settlement of this long-standing water dispute.  The Settlement Agreement meets the applicable standards for Court approval of settlements and the Parties request that the Court approve the Settlement Agreement pursuant to its continued jurisdiction.

As discussed above, the Ninth Circuit adheres to a strong judicial policy that favors settlement, especially settlements such as this one where governmental agencies charged with protecting public rights have taken an active role in crafting the settlement.  *Trump Univ.*, 246 F. Supp. 3d at 1299 (quoting *Class Plaintiffs*, 955 F.2d at 1276); *Montrose Chem. Corp.*, 50 F.3d at 746; *S.E.C.*, 736 F.2d at 529 (citations omitted).  Moreover, this is the type of complex case where courts afford particular deference to the settling parties' judgment that settlement is the best course for all involved.  *See W. Publ'g Corp.*, 563 F.3d at 966 (Settlement is favored where a case is "complex and likely to be expensive and lengthy to try.").

As addressed in the Boughman and Bebee Declarations, the Settlement Agreement was negotiated over a multi-year period.  Boughman Decl. ¶¶ 8-16; Bebee Decl. ¶¶ 6-12.  Once the Two-Dam Project approach was rejected, the concept of conjunctive use—storage of surface flows in the natural underground basis underlying the Base—came to the fore.  Boughman Decl. ¶ 8.  Multiple iterations of settlement approaches were debated by the Parties.  *Id.* ¶¶ 8-10.  In or around 2009, the Parties agreed to the conjunctive use approach, but envisioned that the Project would be operated entirely by Fallbrook—including on Base.  *Id.* ¶¶ 9-10.  However, this proposal to have Fallbrook operate the Project on Base was rejected by the Department of the Navy.  *Id.* ¶ 10.  The Parties renegotiated their respective roles, and landed on the current approach which calls for each Party to be responsible for facilities and operations within its jurisdiction.  *Id.*  By 2016, the Parties had reached substantial agreement concerning the Santa Margarita Conjunctive Use Project.  *Id.* ¶ 15.  Engineering design and environmental review of the Project was carried out over the last ten years.  *Id.*

The Settlement Agreement is the product of abundant negotiations, engineering input and compromises between the Parties to reach a settlement that resolves long-standing disputes in a

1   fair and reasonable manner.  *Id.* ¶ 21; Bebee Decl. ¶ 19.  The Settlement Agreement represents a

2   fair compromise that that will enable the Parties to exercise their rights in a mutually beneficial

3   manner.  *Id.*

4        The court should exercise its discretion to approve the Settlement Agreement.  *See Trump*

5   *Univ.*, 246 F. Supp. 3d at 1299 (quoting *Hanlon*, 150 F.3d at 1026) ("[T]he decision to approve

6   or reject a settlement is committed to the sound discretion of the trial judge[.]").  The Settlement

7   Agreement is "the product of good faith, arms-length negotiations," *Oregon*, 913 F.2d at 581, "is

8   not the product of fraud or overreaching by, or collusion between the negotiating parties," and

9   "is fair, reasonable and adequate to all concerned."  *Hanlon*, 150 F.3d at 1026 (quoting *Officers*

10  *for Justice*, 688 F.2d at 625,  *See* Boughman Decl. ¶¶ 12-18, 21-24; Bebee Decl. ¶¶ 7-13, 19-20.

11  "[A] district court should enter a proposed consent judgment if the court decides that it is fair,

12  reasonable and equitable and does not violate the law or public policy."  *Sierra Club*, 909 F.2d at

13  1355; *S. Cal. Edison Co.*, 838 F. Supp. at 463 (quoting *Sierra Club*, 909 F.2d at 1355).  In

14  addition to its overall fairness, the Settlement Agreement "does not violate . . . public policy,"

15  *Sierra Club*, 909 F.2d at 1355, and "conform[s] to applicable laws."  *Oregon*, 913 F.2d at 581.

16  *See* Boughman Decl. ¶¶ 17-18, 21-24; Bebee Decl. ¶¶ 13, 19-20.

17       In sum, the Settlement Agreement is a product of good faith, arms-length negotiations

18  and conforms to applicable laws.  The Parties therefore request the Court to exercise its sound

19  discretion and approve the Settlement Agreement.

20       **C.      The Parties' request that the Court retain jurisdiction to enforce the**
             **Settlement Agreement is consistent with the Court's continued jurisdiction**
21           **over this action.**

22       The Settlement Agreement includes informal and formal dispute resolution mechanisms

23  and remedies, and provides that if dispute resolution is unsuccessful, either Party may seek

judicial resolution of the dispute.  Settlement Agreement at Article 11, ¶¶ 11.1 – 11.5.  In order to make the judicial dispute resolution provisions of the Settlement Agreement effective, the Court must retain jurisdiction for that purpose.  *See Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 381–82 (1994) (order of dismissal must retain jurisdiction or otherwise incorporate compliance with settlement terms as condition of dismissal in order for the settlement agreement to be enforceable in federal court).

The Parties' request that the Court retain jurisdiction to enforce the Settlement Agreement is consistent with the Court's general retention of jurisdiction in this case, and the Court-appointed Watermaster's ongoing oversight of Santa Margarita River water uses.  The Fallbrook Decree reserves to the Court continuing jurisdiction.  Section V of the Decree states that "[T]his Court retains continuing jurisdiction of this cause as to the use of all surface waters within the watershed of the Santa Margarita River and all underground or sub-surface waters within the watershed of the Santa Margarita River . . . ."

Section IX of the Fallbrook Decree provides "that the continuing jurisdiction reserved by this Court will be exercised on the Court's own Motion, or upon the motion of any party to this cause, his heirs, successors, or assigns, made upon notice and in accordance with the Rules of this Court."

This request that the Court retain jurisdiction indefinitely to enforce the Settlement Agreement is also consistent with the Court's recently entered Judgment and Decree Adopting Settlement Agreement among the Pechanga Band of Luiseño Mission Indians, the Rancho California Water District, and the United States as trustee for the Pechanga Band.  *See* Judgment and Decree Adopting Settlement Agreement, June 18, 2018 (Doc. No. 5632).  That Judgment and Decree approved and incorporated that settlement into the Judgment and Decree, and provided for the Court's retained jurisdiction to enforce the settlement agreement.

1       The Parties therefore request the Court to grant their request that, as part of the Court's

2   continuing jurisdiction over the Fallbrook Decree, the Court retain jurisdiction to enforce this

3   Settlement Agreement as incorporated into the Fallbrook Decree.

4   **VII.    CONCLUSION**

5       For the reasons stated above, the Parties ask the Court to grant their joint motion for

6   approval of the Santa Margarita River Conjunctive Use Settlement Agreement and to enter the

7   attached proposed order: (i) approving the Settlement Agreement as attached as Attachment 1 to

8   the Parties' motion and attached to the proposed order; (ii) incorporating the Settlement

9   Agreement into the Court's Modified Final Judgment and Decree filed April 6, 1966 in

10  replacement of the Parties' Memorandum of Understanding and Agreement dated March 4, 1968

11  previously incorporated into the 1966 Modified Final Judgment and Decree by Order dated June

12  27, 1968; (iii) dismissing all pending claims between the Parties; and (iv) retaining jurisdiction to

13  enforce the Settlement Agreement.

14

15

16      Respectfully submitted this 5th day of March, 2019.

17

18

19

20                          JEAN E. WILLIAMS
                            Deputy Assistant Attorney General
21                          Environment and Natural Resources Division

22                          */s/ Bruce D. Bernard*
                            BRUCE D. BERNARD
23                          UNITED STATES DEPARTMENT OF JUSTICE
                            Environment and Natural Resources Division
24                          Natural Resources Section
25                          999 18th Street, South Terrace – Suite 370
                            Denver, Colorado 80202
26                          Telephone: 303 844-1361
27                          Email: bruce.bernard@usdoj.gov

28                          Attorneys for Plaintiff the United States of America

1

2          LENNIHAN LAW

3          */s/ Martha H. Lennihan*

4          MARTHA H. LENNIHAN (SBN 122478)
           6645 Garden Highway
5          Sacramento, California 95837
           Telephone: (916) 799-4460
6          Email: mlennihan@lennihan.net

7
           Attorney for FALLBROOK PUBLIC UTILITY
8          DISTRICT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28