Curtis G. Berkey (CA State Bar No. 195485)
BERKEY WILLIAMS LLP
2030 Addison Street, Suite 410
Berkeley, CA 94704
Tel: 510/548-7070
Fax: 510/548-7080
E-mail: cberkey@berkeywilliams.com
*Attorney for Plaintiff-Intervenor,*
*Ramona Band of Cahuilla*

Lester J. Marston (CA State Bar No. 081030)
RAPPORT AND MARSTON
405 West Perkins Street
Ukiah, California 95482
Tel: 707/462-6846
Fax: 707/462-4235
E-mail: marston1@pacbell.net
*Attorney for Plaintiff-Intervenor,*
*Cahuilla Band of Indians*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>RAMONA BAND OF CAHUILLA,<br>CAHUILLA BAND OF INDIANS,<br><br>        Plaintiffs-Intervenors,<br>vs.<br><br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br><br>        Defendants. | CIVIL NO.: 51-CV-01247-GPC-RBB<br><br>**PLAINTIFF-INTERVENORS'<br>RESPONSE TO OBJECTION BY<br>DEFENDANT RANCHO CALIFORNIA<br>WATER DISTRICT TO PROPOSED<br>WATERMASTER BUDGET FOR 2018-<br>19 FOR THE SANTA MARGARITA<br>RIVER WATERSHED**<br><br>Date:   April 5, 2019<br>Time:  1:30 p.m.<br>Dept.: 2D<br><br>Hon. Gonzalo P. Curiel |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................... i

INTRODUCTION ................................................................................................ 1

ARGUMENT...................................................................................................... 6

    I.      The Factual Premise of the Objections is False........................................... 6

    II.     The Watermaster's Estimated Budget for Work on the Tribes'
           Settlement Does Not Properly Account for the Facts the Process
           is Nearly Completed and Inaccurately Includes Costs Beyond
           Those Required for Tribal Settlement ........................................................ 7

    III.    Steering Committee Funding for the Watermaster's Work on
           the Anza Settlement is Consistent with Its Responsibilities to
           Assist the Court and the Watermaster in the Conduct of the
           *Fallbrook* Litigation................................................................... 10

    IV.    The Implication that the Steering Committee Has Borne a
           Disproportionate Burden for Tribal Settlement Costs is Wrong ............... 11

    V.      Allocation of Watermaster Costs According to the Benefits that
           Work Provides to Specific Steering Committee Members Would
           Set an Unworkable Precedent................................................................ 12

CONCLUSION.................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Nance v. E.P.A.,*
  645 F. 2d 701 (9th Cir. 1981) ................................................................. 6

*Seminole Nation v. United States,*
  316 U.S. 286 (1942) ............................................................................. 6

*United States v. Fallbrook Pub. Util. Dist.,*
  347 F. 2d 48 (9th Cir. 1965) ........................................................... 1, 3

*Winters v. United States,*
  207 U.S. 564 (1908) ............................................................................. 1

**STATUTES**

25 U.S.C. § 177 ......................................................................................... 7
28 U.S.C. § 1746 ....................................................................................... 2

**RULES**

Federal Rule of Evidence 201 ................................................................. 2

**REGULATIONS**

*Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights* Claims,
  55 Fed. Reg. 9223 (March 12, 1990) ................................................... 6

**INTRODUCTION**

Pursuant to this Court's Order of January 30, 2019 (Document 5680), Plaintiff-Intervenor Ramona Band of Cahuilla ("Ramona Band") and Plaintiff-Intervenor Cahuilla Band of Indians ("Cahuilla Band") submit this response to the Objection by Defendant Rancho California Water District to the Watermaster's proposed budget for 2018-19, as joined by four other members of the Santa Margarita River Watershed Watermaster Steering Committee ("Objectors").

As this Court knows, in 1951 the United States as trustee for the Ramona Band and the Cahuilla Band ("Tribes") asserted claims on their behalf in *Fallbrook* to establish the Tribes' federal reserved water rights under *Winters v. United States,* 207 U.S. 564 (1908). In 1962, this Court entered an interlocutory judgment that recognized the Tribes' federal water rights, including groundwater rights, in amounts "sufficient for the present and future needs of the Indians," with a priority date of 1891 for the Ramona Band and 1875 for the Cahuilla Band. *See Findings of Fact, Conclusions of Law and Interlocutory Judgment No. 41 Concerning the Rights to the Use of Waters of Santa Margarita River Stream System Held in Trust by the U.S.A. in Connection with the Ramona, Cahuilla and Pechanga Indian Reservations,* November 8, 1962 (Document 4430) ("I.J. 41"). Interlocutory Judgment 41 was incorporated into the Final Decree issued by this Court on May 8, 1963 (Document 4489) and affirmed by the Ninth Circuit Court of Appeals in 1965. *United States v. Fallbrook Pub. Util. Dist.,* 347 F. 2d 48 (9th Cir. 1965).

Through no fault of the Tribes or the United States, the 1962 Interlocutory Judgment did not quantify the Tribes' federal reserved water rights. The attorney for the United States

1

as trustee appearing on behalf of the Tribes at the time of the hearing urged this Court to enter a "final decree on the extent, nature and character of the Indian rights in regard to these three reservations." *Reporter's Transcript of Proceedings,* August 8, 1962 at CAR026 1279, attached to *Declaration of Curtis Berkey,* Exhibit A ("*Berkey Declaration*").  This Court, however, deferred that determination to a later time.  The Tribes were granted intervention in 2007 to quantify the rights established in I.J. 41. To avoid lengthy and costly litigation, the Tribes immediately organized settlement discussions to resolve their water rights claims with finality and certainty. This Court granted a temporary stay for that purpose on June 30, 2008 (Document 5046), which has since been periodically extended based on progress reports.[1] The scope of the negotiations was broadened at the request of the Defendants, who number in the thousands, to include allocation of water to them under certain rights and conditions to be spelled out in a settlement agreement.  By order of this Court, the Watermaster has participated in the settlement discussions since 2008.

From the earliest interlocutory judgment, this Court acknowledged the need for a watermaster to assist the Court and the parties in monitoring water production in order to ensure that the rights established by the interlocutory judgments are not impaired, that water

---

[1] The assertion in the Declaration of Eva Plazjer that the Watermaster has expended funds on the "Anza Settlement Proceedings" since 2006 is incorrect. The first stay of litigation for settlement discussion purposes was not entered until 2008. *Declaration of Eva Plazjer in Support of Objection by Defendant Rancho California Water District to Proposed Watermaster Budget for 2018-19 for the Santa Margarita River Watershed,* ¶ 15.  Objectors have not provided an accurate account of the funds expended on the Anza Settlement Proceedings, nor distinguished between funds expended on the settlement process and funds expended on other administrative tasks pertinent to water use and hydrology in the Anza Valley.  In any event, the Plazjer Declaration is an unsworn declaration that is not subscribed as true under penalty of perjury, as required by 28 U.S.C. § 1746.  As a result, the statements it contains are not admissible evidence, and at most, its attachments may be judicially noticed by this Court under Federal Rule of Evidence 201.

2

supplies are protected against diminishment, and that the Final Decree is fairly and rationally administered and enforced throughout the watershed.  For example, in Interlocutory Judgment No. 45 in 1963, this Court recognized the need to "ascertain the amount of water being consumptively used within the Santa Margarita River Watershed, or the amount of land which is being irrigated," and further underscored the need for "complete factual data from which it can be ascertained in many areas of the watershed the amount of water available for extraction without injury to groundwater storage areas."  *Order Relating to Determining Water Extractions from the Santa Margarita River Stream System,* December 12, 1962 (Document 4442), ¶ 2.  The first Watermaster, Lt. Colonel A.C. Bowen, was appointed a year later. *Order Approving Form for "Monthly Water Consumption & Crop Data"; and Directing Col. Bowen to Proceed with Water Measuring,* September 3, 1964 (Document 4758).  Colonel Bowen's powers were confirmed by judgment dated January 16, 1975, as required to "administer and enforce the provisions of the Modified Final Judgment and Decree and the subsequent instructions and orders of this Court."  *Judgment,* January 16, 1975 (Document 4791).

By order dated March 13, 1989, this Court appointed Colonel Bowen's replacement and further defined the powers and responsibilities of that office, focusing again on the duties necessary to administer and enforce the interlocutory judgments in the *Fallbrook* case as a whole.  In none of these orders or the judgment is there any suggestion that the Watermaster's responsibilities should be broken down according to the basin in which the work is done, or according to the parochial interests of the members of the Santa Margarita River Watershed Steering Committee.  On the contrary, the Watermaster's authority extends

to all 45 interlocutory judgments and their implementation and enforcement, regardless of the physical location of the basin within the Santa Margarita River Watershed.

Against this history of Watermaster work throughout the entire Watershed, Objectors now complain that they should not be required to pay for any costs associated with the Watermaster's work on the "Anza Settlement Proceedings," because 1) the "Anza [Groundwater] Basin has little or no measurable effect on the downstream basins"; and 2) none of the members of the Steering Committee has "rights or interests" in the Anza Basin. *Objection by Defendant Rancho California Water District to Proposed Watermaster Budget for 2018-19 for the Santa Margarita River Watershed* (Document 5667) at 7. The Objectors do not address the effect of the Cahuilla Groundwater Basin on other hydrological formations in the Santa Margarita River Watershed, but their argument would logically extend to those water sources as well.[2]

The Objections should be denied for five reasons:  First, the assertion that no Steering Committee member has interests or rights in Anza is false. The United States brought the case as trustee on behalf of the Tribes and has served on the Steering Committee since its formation.[3] The United States' representative has acknowledged he represents the United States as a whole, including specifically the Bureau of Indian Affairs as trustee for the Tribes, and not Camp Pendleton exclusively.  Second, the Objections are not well taken because the Watermaster budget does not account for the fact that the Anza settlement

---

[2] The Tribes note that this statement constitutes a waiver by the Objectors to any objection to the terms of a settlement and final decree quantifying the Tribes' federal reserved water rights.

[3] Consistent with its duties to represent the Tribes as trustee, the United States did not join the objections raised by Rancho California Water District.

process is nearing completion, which will substantially diminish the Watermaster's time and costs, and the budget further includes costs for work that is outside the Anza settlement process.  Third, Steering Committee funding for the Watermaster's Anza work is consistent with its responsibility to assist the Court and the Watermaster in conducting the *Fallbrook* litigation.  The Objectors incorrectly assert that the Watermaster is running up the costs by doing work outside the scope of his authority under this Court's orders.  Fourth, the implication that the Objectors have borne a disproportionate share of the Anza settlement costs is wrong.  Fifth, the requested relief would embed an unworkable and unprecedented principle for the Watermaster's budget requiring allocation of costs to those individual Steering Committee members who most directly benefit from particular projects.

The Objectors request that if the Watermaster Budget is approved, this Court should "assess the parties to the Anza Settlement Proceedings the costs of the Watermaster associated with those proceedings."  *Id.* at 8.  The Objectors do not specify the parties on whom costs should be assessed, the method for assessing such costs, how costs should be allocated among thousands of parties, or the entity that would assess and collect them.  Nor do they address the likelihood that the expense of assessing costs on thousands of parties served by the Tribes would exceed by a large margin the funds that would be collected.  As Objectors know, there is no water district or other water-related governmental agency that serves the Anza Valley through which costs could be assessed and collected.  Cost assessments against that massive group of parties would be prohibitively complex and costly. Objectors' assessment request should be denied.

///

**ARGUMENT**

I.      The Factual Premise of the Objections is False

The factual premise of the objection is that no member of the Steering Committee contributes to the costs of the Watermaster for his work in the negotiations of the Tribes' water rights claims.  That premise is false.  The United States has been a member of the Steering Committee from its inception, and it represents the interests of the Ramona Band and Cahuilla Band as trustee under federal law.  It is axiomatic Indian water rights are held in trust by the United States.  *Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims,* 55 Fed. Reg. 9223 (March 12, 1990) ("Indian water rights are vested property rights for which the United States has a trust responsibility, with the United States holding legal title to such water in trust for the benefit of the Indians.").  The federal trust duty applies to all federal agencies. *Nance v. E.P.A.,* 645 F. 2d 701, 711 (9th Cir. 1981) ("any federal government action is subject to the United States' fiduciary responsibility toward Indian tribes.").

Interlocutory Judgment No. 41 acknowledged that the United States holds the tribal water rights and resources in trust on behalf of the Tribes, and the Supreme Court has held the United States to "the most exacting fiduciary standards" in carrying out such trust duties to Indian tribes.  I.J. 41 ¶ 14 at 23; *Seminole Nation v. United States,* 316 U.S. 286, 296-97 (1942).

That the federal representative to the Steering Committee comes from Camp Pendleton does not change the fact it is the United States as a whole -- not Camp Pendleton -- that has membership on the Committee.  *Order for the Appointment of a Steering Committee,*

6

March 13, 1989 (Document 4808) at 1 ("Initially, the Steering Committee shall be comprised of a representative appointed by each of the following parties:  the United States of America . . . .").  The current United States representative on the Committee has acknowledged that he does not represent solely Camp Pendleton.  The Minutes of the Steering Committee for October 20, 2015, record a statement by John Simpson from Camp Pendleton that "he can speak for both Camp Pendleton and BIA (Bureau of Indian Affairs) because he is the United States representative on the Steering Committee and that Camp Pendleton is funding the share of the Watermaster budget to be paid by the United States." (emphasis added). *Santa Margarita River Watershed Watermaster Steering Committee Meeting,* October 20, 2015, at 10-11, attached to *Berkey Declaration* as Exhibit B.

II.  The Watermaster's Estimated Budget for Work on the Tribes' Settlement Does Not Properly Account for the Facts the Process is Nearly Completed and Inaccurately Includes Costs Beyond Those Required for Tribal Settlement

The Tribes' settlement process is nearing completion, with parties having set April 1, 2019 as the target date for a settlement agreement.  *Order Granting Motion to Extend Stay,* January 17, 2019 (Document 5672) at 4 (noting that "[s]ince the last request of the parties to extend the stay, the parties have shown significant progress in reaching an overall settlement of the case.").  Following the completion of the draft settlement agreement, the role of the Watermaster in that process will be substantially diminished, because the focus of the work will shift to the U.S. Department of the Interior for its review, the federal Office of Management and Budget for its review, and Congress for its approval.  Settlement of the Tribes' water rights claims will require congressional approval because water rights are interests appurtenant to land protected by the Trade and Intercourse Act, 25 U.S.C. § 177,

which requires congressional approval for the disposition or compromise of Indian interests in land. Further, Congress will be asked to appropriate funds to implement the Tribes' settlement. Although the Watermaster may help in preparing certain exhibits to the settlement agreement, the bulk of that work will be conducted by the parties.  There is no need for this Court to impose cost-sharing on the Anza parties for the coming year when it is likely there will be very little for the Watermaster to do in the coming months.

Further, Objectors improperly attribute the Watermaster's work generally in the Anza Groundwater Basin and the Cahuilla Groundwater Basin to work on the Tribes' water rights claims settlement process.  The Watermaster's work in the Anza Valley has never been solely limited to the tribal settlement process.  For example, the Watermaster spent many hours working with the parties in these Basins on the question of whether his office should be designated as the monitoring entity under the California Statewide Groundwater Elevation Monitoring Program (CASGEM program). *See Memorandum from Charles W. Binder to Anza Basin Legal Committee and Anza Basin Technical Committee,* September 1, 2010, attached as Exhibit C, without attachments, to *Berkey Declaration*.  Neither the Watermaster nor the Objectors have broken out the hours and funds spent by the Watermaster on this work. As a result, the Watermaster's estimate of tribal settlement process costs inaccurately includes costs of the CASGEM program work, which is on-going.  *Berkey Declaration* ¶ 5 and Exhibit D (Letter of June 2, 2016 from Charles W. Binder, Watermaster, to Timothy Ross, California Department of Water Resources, requesting designation as the CASGEM Program Monitoring Entity for the Cahuilla Valley Groundwater Basin, subject to court approval).

Likewise, the Watermaster's and Objectors' accounting of past expenses inaccurately includes the cost of the Watermaster's work to ensure the Santa Margarita River Watershed complies with the reporting requirements of the California Sustainable Groundwater Management Act (SGMA).  The minutes of the Steering Committee for October 20, 2015, show the extensive work the Watermaster devoted to this project, which specifically included the Anza basins.  *Berkey Declaration,* Exhibit B.  Objectors' accounting fails to segregate this work from the Watermaster's tribal settlement work.

The Watermaster has also assisted the Tribes and the United States with certain technical questions related to the successors to the landowners determined to have overlying water rights in Interlocutory Judgment No. 33.  *Findings of Fact, Conclusions of Law, and Interlocutory Judgment No. 33 Pertaining to Anza and Cahuilla Ground Water Basins and Cahuilla and Wilson Creeks,* December 11, 1962 (Document 4436). When the Tribes intervened in this case in 2007, there was no accurate list of landowner parties for the Anza and Cahuilla Groundwater Basins.  In fact, a list of successor landowners to the original parties with rights under Interlocutory Judgment 33 had never been prepared.  Although the consultants for the United States and the Tribes took the lead in updating the landowner party lists, the Watermaster provided assistance.  That work was broadly necessary not only to complete the quantification of the Tribes' water rights, but also to establish the scope of this Court's jurisdiction and the parties to the modified final decree for this part of the Watershed. Objectors fail to distinguish work that broadly benefits the Watershed from work on settlement of the Tribes' water rights.  Because Objector's accounting ignores the near-

9

completion of settlement and inaccurately includes costs beyond those specific to tribal water rights negotiations, it should be disregarded.

III.   Steering Committee Funding for the Watermaster's Work on the Anza Settlement is Consistent with Its Responsibilities to Assist the Court and the Watermaster in the Conduct of the *Fallbrook* Litigation

The Steering Committee's responsibility is to "assist the Court and to facilitate [the *Fallbrook*] litigation . . . ."  *Order for the Appointment of a Steering Committee* at 1 (Document 4808).  With regard to its relationship with the Watermaster, the Committee's primary duty is to coordinate "the conduct of the litigation," through quarterly meetings "to discuss the status of the Watermaster's investigations in [the] Santa Margarita River Watershed. . . . ."  *Id.,* section III 4.  Further, the Committee is to carry out "[a]ny other tasks as determined to be necessary by the Court."  *Id.*, section III, 6.  These provisions make clear that the Steering Committee's responsibilities are watershed wide, and not limited to the specific areas where they serve customers in the Watershed.  As a result, funding the Watermaster's work on the Anza settlement fulfills those responsibilities, particularly because that work falls within the scope of his authority under this Court's orders.

The Watermaster has participated in this work pursuant to the order and direction of this Court, as the Objectors admit. This Court's orders establishing the Watermaster office and its scope of authority reasonably encompass this work.  Broadly speaking, the Watermaster's work in the Anza settlement process is part and parcel of his responsibility to administer and enforce the interlocutory judgments and modified final decree in *Fallbrook*. As noted, Interlocutory Judgment No. 41 established the Tribes' water rights but did not complete the task of quantification.  Further, Interlocutory Judgment No. 33 recognized that

10

thousands of landowners in the Anza and Cahuilla Groundwater Basins have overlying rights to groundwater, but did not allocate or characterize those rights among competing water users. To complete this unfinished work, the Anza settlement parties' consultants, with assistance from the Watermaster, generated technical data regarding basin hydrology, safe yield, groundwater management tools, and related information.  This technical work to establish a sound hydrologic basis for settlement generated data and information necessary to the Watermaster, whom this Court charged with administering the interlocutory judgments by assessing water production, gauging adverse pumping impacts, and identifying threats to the basins' water supply.  In other words, the settlement has broadened and enhanced knowledge and understanding about this neglected part of the watershed.  The Watermaster's assistance in this regard is consistent with his administration and enforcement responsibilities.  Just as the Watermaster has provided assistance to individual members of the Steering Committee with regard to disputes related to water rights under the modified final decree without a dedicated amount in the budget for that particular purpose, the Watermaster may provide such assistance to the Anza settlement parties consistent with his administration duties.

IV.    <u>The Implication that the Steering Committee Has Borne a Disproportionate Burden for Tribal Settlement Costs is Wrong</u>

       The Objectors' complaints that the Watermaster is spending too much time on the Tribes' settlement process is based on an unstated assumption that the Anza settlement parties themselves are not contributing their share of those costs.  This "free ride" argument is wrong.  To take one example: Plaintiff-Intervenor Ramona Band of Cahuilla secured a $600,000 grant under Proposition 1 Integrated Regional Water Management Grant Program

from the California Department of Water Resources to enable the U.S. Geological Survey to undertake the first phase of the massive groundwater study for the Anza and Cahuilla Groundwater Basins. *Berkey Declaration* ¶ 6. The study will characterize the hydrogeology of the Anza-Cahuilla Groundwater Basin, collect and assess baseline aquifer properties, develop a hydrologic budget of inflows and outflows and collect and analyze technical data for use in developing a groundwater model. The benefits of this study extend far beyond the Tribes' water rights negotiations. The study will yield hydrologic information indispensable for the Watermaster's ability to administer and enforce Interlocutory Judgments Nos. 41 and 33.

V.     Allocation of Watermaster Costs According to the Benefits that Work Provides to Specific Steering Committee Members Would Set an Unworkable Precedent

The Watermaster frequently devotes substantial amounts of time to projects that benefit a small subset of the Steering Committee's membership, without the beneficiaries having to pay project-specific costs. For example, the United States and Fallbrook Public Utility District recently entered into a Conjunctive Use Agreement to adopt a physical solution to resolve water use and water rights disputes between those parties. *Santa Margarita River Conjunctive Use Project Settlement Agreement* (Document 5686-1). The Watermaster served on the Technical Committee that provided technical assistance to the parties in resolving the dispute and will have a major role in implementing the Agreement. *Id.* at 28 (Watermaster Reporting Requirements); at 34 (Watermaster participation on Technical Committee); at 41 (Watermaster role in dispute resolution); *see also, Minutes of Steering Committee Minutes,* October 17, 2017, section 8 (meeting of CUP parties and Watermaster), attached as Exhibit C to *Plazjer Declaration.* The same holds true for the

12

Watermaster's participation in the Cooperative Water Resource Management Agreement (CWRMA) between the United States (Camp Pendleton) and Rancho California Water District.  *Id.* at section 5 (recording Watermaster update on Groundwater Management Model runs for implementing CWRMA).

In neither of these cases have the Watermaster budgets broken out those project-related costs and assigned payment to the members who most directly benefitted.  To adopt this practice for the first time for the Anza basins would create a precedent that would be extremely difficult to sensibly and rationally implement, which most likely is the reason that practice has not been followed before.[4]  At a minimum, the Watermaster's contract would have to be amended to delete the provision that prohibits him from "undertaking work on behalf of any party to the Fallbrook case, including members of the Steering Committee." *Professional Services Agreement Between Santa Margarita River Watershed Watermaster Steering Committee and Michael J. Preszler Consulting, Inc. dba California Water Consulting,* section 3.7.4 (attached as Exhibit A to *Plazjer Declaration*).  The Watermaster's contract with the Steering Committee is consistent with the fundamental principle that he works on the *Fallbrook* case, not for individual members of the Steering Committee or other water users in the Watershed.

///

///

---

[4] For example, there are thousands of Defendant landowners in the Anza and Cahuilla Groundwater Basins who were served with the Tribes' second amended complaints. Allocating Watermaster costs and collecting fees from those parties would be extremely difficult to administer and would itself require the additional expenditure of substantial resources and costs by the parties and this Court.

**CONCLUSION**

For these reasons, the Objections to the Watermaster's budget should be denied.

Date:  March 8, 2019                    Respectfully submitted,

                                        BERKEY WILLIAMS LLP

                                        By:  /s/Curtis G. Berkey
                                             Curtis G. Berkey
                                             *Attorneys for Plaintiff-Intervenor,*
                                             *Ramona Band of Cahuilla*


                                        RAPPORT AND MARSTON

                                        By:  /s/Lester J. Marston
                                             Lester J. Marston
                                             *Attorneys for Plaintiff-Intervenor,*
                                             *Cahuilla Band of Indians*

14