Curtis G. Berkey (CA State Bar No. 195485)
BERKEY WILLIAMS LLP
2030 Addison Street, Suite 410
Berkeley, CA 94704
Tel: 510/548-7070
Fax: 510/548-7080
E-mail: cberkey@berkeywilliams.com
*Attorney for Plaintiff-Intervenor,*
*Ramona Band of Cahuilla*

Lester J. Marston (CA State Bar No. 081030)
RAPPORT AND MARSTON
405 West Perkins Street
Ukiah, California 95482
Tel: 707/462-6846
Fax: 707/462-4235
E-mail: marston1@pacbell.net
*Attorney for Plaintiff-Intervenor,*
*Cahuilla Band of Indians*

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>RAMONA BAND OF CAHUILLA,<br>CAHUILLA BAND OF INDIANS,<br><br>　　　　　Plaintiffs-Intervenors,<br>vs.<br><br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br><br>　　　　　Defendants. | CIVIL NO.: 51-CV-01247-GPC-RBB<br><br>**DECLARATION OF CURTIS G. BERKEY IN SUPPORT OF PLAINTIFF-INTERVENORS' RESPONSE TO OBJECTION BY DEFENDANT RANCHO CALIFORNIA WATER DISTRICT TO PROPOSED WATERMASTER BUDGET FOR 2018-19 FOR THE SANTA MARGARITA RIVER WATERSHED**<br><br>Date:　April 5, 2019<br>Time:　1:30 p.m.<br>Dept.:　2D<br><br>Hon. Gonzalo P. Curiel |

I, Curtis G. Berkey, declare as follows:

1.      I am counsel to Plaintiff-Intervenor Ramona Band of Cahuilla in the above-captioned case.

2.      I make this Declaration based on my personal knowledge of the facts contained herein, or upon facts I believe to be true based on information and belief as indicated herein.

3.      Upon information and belief, Exhibit A to this Declaration is a true and correct copy of the Reporter's Transcript of Proceedings, CAR026 1178, 1267, 1270, 1276-1279, held on August 8, 1962 in the *Fallbrook* case.

4.      Upon information and belief, Exhibit B is a true and correct copy of the minutes of a meeting of the Santa Margarita River Watershed Steering Committee held on October 20, 2015.

5.      Between 2010 and 2016, the Santa Margarita River Watershed Watermaster worked with the Ramona Band of Cahuilla, Cahuilla Band of Indians and Pechanga Band of Luiseño Indians, along with other parties in the Tribes' water rights settlement negotiations, to determine whether the Watermaster should be designated as the monitoring entity for the California Statewide Groundwater Elevation Monitoring Program (CASGEM Program). Upon information and belief, the Watermaster devoted many hours to this effort.  Exhibit C to this Declaration is a memorandum prepared by the Watermaster and submitted to the Anza Basin Legal Committee and Anza Basin Technical Committee explaining the CASGEM program and its requirements.  On June 2, 2016, by letter to the California Department of Water Resources, the Watermaster requested that his office be appointed as the CASGEM

1

program Monitoring Entity for the Anza and Cahuilla Groundwater Basins, subject to approval of this Court.  Upon information and belief, Exhibit D is a true and correct copy of this letter.

6.      In 2018, the Ramona Band of Cahuilla received a grant from the California Department of Water Resources in the amount of $600,000 under the Proposition 1 Integrated Regional Water Management Grant Program to enable the U.S. Geological Survey to undertake the first phase of a groundwater study in the Anza and Cahuilla Groundwater Basins.  The Band has entered into a contract for this purpose with the USGS.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 8, 2019                          _/s/Curtis G. Berkey_____
                                              Curtis G. Berkey

CIVIL NO.: 51-CV-1247-GPC-RBB

# EXHIBIT A

VOLUME 202                                                          20,168

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
        v.                         )        No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY DISTRICT, )
et al.,                            )
                                   )
              Defendants.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, August 8, 1962

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General |
|  | CDR. DONALD W. REDD |
| For the Defendants: |  |
| Vail Company | GEORGE STAHLMAN, ESQ. |
| Fallbrook Public Utility District, et al: | FRANZ R. SACHSE, ESQ. |
| State of California | FRED GIRARD, ESQ. |

CAR026 1178

p36

1   ... and when the problem is presented is time enough to go

2   into the matter.  If you can give me some other reason than

3   because, I want to listen to you.  Does this affect the

4   Marine Corps if we don't go ahead and try to spell out in

5   detail what kind of rights these six Indians have up in

6   Pechanga?

7       MR. VEEDER:  I say right now, your Honor, that the

8   confusion between the number of Indians on the Reservation

9   and the rights to the use of water which adhere to and are

10  part of the reservation -- I'll start again.  There is no

11  relation whether there is an Indian or 500 Indians on the

12  land.  There is a Reservation to that land, presently and

13  in the future, for the quantities of water required to meet

14  their demands.  Now I have tried to figure out a ceiling

15  so that the valley would know the maximum quantity that

16  could ever be called for by these Indians.

17      THE COURT:  Mr. Veeder, these so-called ceilings are

18  all illusory.

19      MR. VEEDER:  They may be illusory.

20      THE COURT:  They don't have any reality.  You talk about

21  somebody the same as this riparian ground up in the desert

22  country; it is riparian, but there is no water to use.  So

23  what is the use of even computing the acreages or the water

24  duty?

25      MR. VEEDER:  I have made my point, your Honor, and I

20,260

p-39

1   the Indians; they took ahead of them.

2       MR. VEEDER:  If you had any background in water law

3   you would know there were no riparian rights in Arizona.

4   There are probably some appropriative rights in Arizona,

5   but there are no riparian rights.

6       MR. GIRARD:  There are prior vested rights, and that

7   is all a riparian right is.

8       MR. VEEDER:  I have stated specifically in here in

9   regard to appropriative rights that we would recognize the

10  prior appropriative rights.

11      MR. GIRARD:  Sure, you have, because there aren't any.

12      THE COURT:  I still can't see why we have to get this

13  in this judgement.  We have found the acreage on these

14  three reservations.  We have found the irrigable acreage.

15  We know how much could be irrigated.  We have evidence in

16  the record as to how many Indians were on them in 1959.  And

17  we could make a further finding that there has been no

18  evidence presented that any Indian is in need of water or

19  has suffered from any problem up to this date.  There have

20  been no allotments on these reservations.  There are no

21  questions of assignment to third persons.  And these matters

22  will all be held for a future day, and when the problem

23  arises we will find out.  The only thing we have to do is

24  to make some general finding that there are these inchoate

25  unprecisely defined Indian rights upstream.

CAR026 1270

8-5

1  we have made -- presently I can't, as a practical matter, see

2  any problem arising from the Indian Reservations, even on an

3  apportionment.

4      MR. SACHSE:  I think that is absolutely right.  And in

5  the light of the fact that there is not any apportionment

6  anyway, why waste our time?

7      MR. GIRARD:  I think we can redraft theseconclusions

8  of law pretty much along the line Mr. Veeder has, except we

9  will cut down a lot of these repetitious findings on

10  priorities, and I really don't know that there is any need

11  to go through them.  Or do you?

12      MR. SACHSE:  No.

13      THE COURT:  Suppose we follow this, Mr. Veeder, to which

14  you apparently strenuously object, how are we hurt?  How is

15  our final decision affected?

16      MR. VEEDER:  Because I truly think such a decree will

17  be totally abortive.  I don't think it will mean a thing.

18      THE COURT:  It doesn't mean a thing, because we post-

19  pone the problem until it arises.  It may never arise.

20      MR. VEEDER:  I am paid to get a quiet title decree here,

21  and that is what I desire, and I want the Indian rights

22  quieted as they relate to other rights.  My view is that what

23  is being proposed now may put it off for a hundred years, and

24  I don't believe I will be bothered at that time.  But I don't

25  think we are going to accomplish a thing    without proceeding

JOHN SWADER - OFFICIAL REPORTER

8-6

1    through. I would be delighted to argue with Mr. Girard

2    either here or in my office on his picture there. I hate

3    to see us abandon the idea of an ultimate and effective

4    decree, and I think that is what we are going to do if we

5    follow this procedure. However, if that is your Honor's

6    ruling, there is no sense taking any more of your Honor's

7    time. Mr. Girard and I can attempt to work out language that

8    will conform with your rulings.

9         THE COURT: For the life of me, it is hard to imagine

10   a situation within probably the rest of the time I am on

11   this Bench where a problem would come up on these Indian

12   Reservations.

13        MR. VEEDER: I would be gravely in error to try to

14   anticipate that. But it is our position in this litigation

15   thatwhat we are seeking here is to have a final decree and

16   determination of the extent, nature and character of the

17   Indian rights in regard to these three Reservations. I think

18   there is confusion gotten into this matter by reason of the

19   fact that the question of the number of Indians that are on

20   the land was brought up. I don't believe that has a thing

21   to do with it. I think it is entirely possible that ultimately

22   they might sell some of the land. I think it is entirely

23   possible that they might increase the number of Indians on the

24   land. It is their land. It was set aside for them. And my

25   own view is that we should have a determination of the extent

JOHN SWADER, OFFICIAL REPORTER

CAR026 1277

8-7

1    of the rights which were reserved for those Indians.

2        MR. STAHLMAN:   Could it be that the reason you are

3    so intent that the quantity of water should be expressed is

4    your belief, not here expressed however, that these rights

5    may be transferred to some other Governmental agency?

6        MR. VEEDER:   I haven't any idea of that, Mr. Stahlman.

7        MR. GIRARD:   Certainly you would concede that you

8    would not ask that the Indian rights be catalogued in amount,

9    as was done by Mr. Riskind in Arizona.

10        MR. VEEDER:   I would say the maximum quantity should be

11    indicated.

12        MR. GIRARD:   You would recognize that the maximum

13    quantity would be a ridiculous figure.

14        THE COURT: And then you ignore it completely on any

15    apportionment, because it is not being used.

16        Well, I haven't any fear that we will have any problem

17    about the Indians doing  any extensive farming.  I think if

18    problems arise it will be as a result of allotments or someone

19    else acquiring an allotment from an Indian and then trying

20    to assert some superior water right to it.

21        I think we might all be better off -- when I  speak

22    of "we" I mean the landowners in the valley -- not to have

23    these Indian rights spelled out too precisely.  If somebody

24    tries to buy some of this land, let him know that he is going

25    to have a lawsuit on his hands.

JOHN SWADER, OFFICIAL REPORTER

CAR026 1278

20,269

8

1    MR. VEEDER: Your Honor has said so well that when
2    we get through there will be no adjudication of the rights
3    to the use of water for the Indians.

4        THE COURT: But the Court will have jurisdiction when
5    the matter comes up. You give this Indian some superior
6    right, and some promoter goes up to Cahuilla and gets a
7    bunch of allotments made to the Indians and then buys the
8    Indian land and pumps the valley dry. I would rather have
9    him faced with the problem of having the right adjudicated
10   when he got ready to do this.

11       Take a recess.

12       (Recess taken.)

13       (Another case called.)

14       THE COURT: I am just wondering, in view of the
15   position we are going to take on these Indians, whether it
16   would be more expeditious to do some revision on the rest of
17   these findings and judgments before we spend time going over
18   them all. Maybe you could work this afternoon and I can get
19   some work done.

20       MR. VEEDER: That suits me, Judge.

21       MR. SACHSE: May I give his Honor a copy of this
22   proposed Rainbow.

23       Bill, you have been over it many times.

24       MR. VEEDER: Yes.

25       MR. SACHSE: I would hope you would go over it tonight.

JOHN SWADER, OFFICIAL REPORTER    CAR026 1279

# EXHIBIT B

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

## *SANTA MARGARITA RIVER WATERSHED*

### WATERMASTER STEERING COMMITTEE MEETING

On October 20, 2015, a meeting of the Watermaster Steering Committee was held at the Rancho California Water District Board Room.

| Steering Committee Members | Representing |
|---|---|
| John Simpson, Chair | Camp Pendleton |
| Marc Luker, Vice Chair | Pechanga Band of Luiseño Mission Indians |
| Charlie Bachmann | Eastern Municipal Water District |
| Jeff Marchand | Fallbrook Public Utility District |
| Amy Dorado | Metropolitan Water District |
| Fred Edgecomb | Rancho California Water District |
| Karly Gaynor | Western Municipal Water District |

The following were also present:

Chuck Binder, Watermaster
Alisa Nichols, Watermaster Office
Mike McPherson, Consultant for Camp Pendleton
Dan Bartu, Camp Pendleton
Dave Depoy, Camp Pendleton
Greg Seaman, Camp Pendleton
Paul Boughman, Camp Pendleton
Steve Reich, Stetson Engineers, Inc.
Shane Sibbett, Elsinore Valley Municipal Water District
Rod Lewis, Pechanga Band of Luiseño Mission Indians
Dennis Sanford, Rainbow Municipal Water District
John Gomez, Jr., Ramona Band of Cahuilla
Justin Haessly, Rancho California Water District
Craig Elitharp, Kennedy Jenks Consultants
Doug McPherson, Bureau of Reclamation
Michele Staples, Jackson, DeMarco, Tidus & Peckenpaugh

Mr. Simpson called to order the Steering Committee of the Santa Margarita River Watershed Watermaster at 10:13 a.m.  Mr. Binder welcomed everybody to the regularly scheduled quarterly Steering Committee meeting.

Mr. Binder introduced Mr. Fred Edgecomb as representing Rancho California WD, and also Ms. Karly Gaynor representing Western MWD.

Case 3:51-cv-01247-JO-SBC   Document 5690-1   Filed 03/08/19   PageID.68213   Page 14 of 31

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 2 of 12


1.    Approval of Minutes of July 21, 2015 Steering Committee Meeting

Mr. Binder inquired if there were any comments regarding the minutes from the July 21, 2015 Steering Committee meeting and requested a motion approving the minutes.  Mr. Luker moved the minutes be approved and Mr. Edgecomb seconded the motion.  The minutes were approved unanimously.

2.    USGS Gaging Station and Groundwater Monitoring Operations

Mr. Binder reported the Joint Funding Agreement between the Watermaster and USGS for 2015-16 is now fully executed and a copy was enclosed in the previously provided agenda memorandum packet, along with the October 1, 2015 letter from the USGS describing the monitoring program.  Mr. Binder reported the total program cost to the Watermaster for 2015-16 is $242,475, which is reflected in the budget presented in the final Annual Watermaster Report for Water Year 2014 that was submitted to the Court on August 26, 2015.

3.    MWD Diamond Valley Lake/Lake Skinner Operations

A.  Diamond Valley Lake

Mr. Binder reported that for Water Year 2014-15 through August 31, 2015, MWD records show 1.543 AF of local runoff were required to be released into Warm Springs Creek in accordance with the Diamond Valley Lake MOU.

Mr. Binder reported that for Water Year 2014-15 through August 31, 2015, records show a cumulative total of 978.0 AF of imported water were delivered for agricultural uses in Domenigoni Valley.  Mr. Binder further reported readings for September 3, 2015, indicate the groundwater elevation for Monitoring Well MO6 is 1369.92 feet, which is below the decreed elevation of 1400.00 feet, indicating that the groundwater in Domenigoni Valley is not presently within the Court's jurisdiction.

B.  Lake Skinner

Mr. Binder reported that for Water Year 2014-15 through August 31, 2015, MWD records show no local runoff into Lake Skinner and thus no water was required to be released into Tucalota Creek in accordance with the Lake Skinner MOU.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Mr. Binder reported that for Water Year 2014-15 through September 30, 2015, MWD records show releases to Tucalota Creek of 41.4 AF for groundwater replenishment purposes and 58.5 AF for maintenance purposes. Mr. Binder noted that both of those types of releases replenish downstream groundwater levels. Mr. Binder reported the September 25, 2015 reading for Monitoring Well AV-28B below Lake Skinner Dam shows a groundwater elevation of 1356.70 feet, which is 0.06 feet above the minimum elevation of 1356.64 feet that would require any additional releases into Tucalota Creek. Mr. Binder stated it is expected that MWD will continue to make additional releases to maintain groundwater levels above the minimum elevation until the groundwater levels increase as a result from natural recharge from precipitation.

Mr. Binder also reported MWD makes additional maintenance releases from the MWD distribution system at various locations throughout the Watershed. Mr. Binder reported the records show the additional maintenance releases for Water Year 2014-15 through August 31, 2015 as 143.35 AF.

Mr. Binder informed the group that in accordance with Section 1D of Attachment E to the Lake Skinner MOU, on October 1, 2015, the Watermaster submitted a letter to MWD with the Annual Update of Table 1—Required Releases for Water Year 2015-16 for Lake Skinner. Mr. Binder stated a copy of the letter was enclosed in the previously provided agenda memorandum packet. Mr. Binder further stated that there were minor changes to the parcel ownership for lands below Lake Skinner but that there were no changes to the required releases.

4. <u>MWD Update of Lake Skinner MOU</u>

Mr. Binder asked the representative for MWD to provide a status report on updating the Lake Skinner Memorandum of Understanding (MOU). Ms. Dorado reported that MWD is currently still working through some of the issues internally prior to distributing a draft amended MOU for the signatory parties to review. Ms. Dorado inquired if the Steering Committee members had any questions regarding the update. There were no questions.

5. <u>Camp Pendleton/RCWD Cooperative Water Resource Management Agreement (CWRMA)</u>

A. <u>Groundwater Management Model Runs</u>

Mr. Binder stated the Technical Subgroup of the Technical Advisory Committee (TAC) is continuing with updating the CWRMA Groundwater Model and conducting groundwater management model runs, including the model runs requested by the

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 4 of 12

Watermaster to improve accounting and reporting practices for Rancho California WD Vail Lake and groundwater operations.

B.    Next TAC Meeting

Mr. Binder reported the TAC will conduct its next regularly scheduled quarterly meeting after the Steering Committee meeting on October 20, 2015, at 11:00 a.m., at the offices of Rancho California WD to discuss ongoing activities for implementation of the CWRMA.    Mr. Binder noted the agenda includes a discussion of the groundwater management model runs.

6.    Quantification of Federal Reserved Water Rights Claims by Cahuilla, Ramona, and Pechanga Bands

A.    Cahuilla and Ramona Bands

Mr. Binder explained that although the Cahuilla and Ramona bands each filed separate claims, the current settlement discussions are continuing in a joint proceeding for the Anza area.    Mr. Binder reported there has been increased activity in the settlement discussions and Court appearances since the last Steering Committee meeting.    Mr. Binder noted the Watermaster continues to participate in the settlement discussions and status conferences.    Mr. Binder reported that a telephonic status conference before Judge Brooks was held on August 7, 2015, and in-person status conferences before Judge Brooks were held on July 22 and September 29, 2015.    Mr. Binder further reported the next telephonic status conferences are scheduled for October 14 and November 10, 2015, and a hearing is scheduled before Judge Brooks on November 2, 2015. Mr. Binder stated the current Temporary Stay of Proceedings (Stay) is set to expire on October 19, 2015, but the Tribes have filed a joint motion to extend the Stay and it is expected that the Stay will be extended for another 90 days.

B.    Pechanga Band

Mr. Binder reported that proceedings are continuing for the Pechanga Band Proposed Settlement Agreement and Settlement Act.    Mr. Binder noted there are no activities to report by the Watermaster and invited Pechanga's representative to brief the group on the status of the Pechanga Water Settlement Act.

Mr. Luker stated that on August 5, 2015, California Senators Barbara Boxer and Diane Feinstein introduced Senate Bill 1983 Pechanga Band of Luiseño Mission Indians Water Rights Settlement Act.    Mr. Luker reported that the Pechanga Band is continuing to work with House members to follow procedures outlined by Rob

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 5 of 12

Bishop, Chairman of the House Committee on Natural Resources, introduced in February 2015.  Mr. Luker informed the group that the Tribe continues to engage the local districts to work through the agreements.  Mr. Luker explained that once the agreements and procedural steps are finalized, the Bill will be introduced in the House.

7. <u>Annual Watermaster Report for Water Year 2014</u>

Mr. Binder stated that the final 2014 Annual Watermaster Report was noticed and distributed on August 26, 2015, to all parties on the Watermaster Distribution List.  Mr. Binder reported that on August 27, 2015, the Court posted the final report (Docket Nos. 5490 through 5490-3) to the electronic docket for notice to the parties in the *Fallbrook Case*.  Mr. Binder noted a copy of the transmittal letter (Docket No. 5490) was enclosed in the previously provided agenda memorandum packet.  Mr. Binder reported no written objections were filed within the 30-day objection period, and thus by standing order, the Court accepted the report as complete and final.

8. <u>Annual Watermaster Report for Water Year 2015</u>

Mr. Binder reported that work on the preparation of the Annual Watermaster Report for Water Year 2015 has begun.  Mr. Binder stated that Steering Committee members have most likely received the annual letters requesting data.  Mr. Binder expressed that the Watermaster office appreciates timely responses and continued cooperation in providing data.

9. <u>Watermaster Reporting for Sustainable Groundwater Management Act (SGMA)</u>

Mr. Binder noted that background information and a summary of the Watermaster reporting requirements were provided in the October 6, 2015 memorandum from Watermaster to Steering Committee entitled "Watermaster Reporting Requirements under California Sustainable Groundwater Management Act (SGMA)," previously provided in the agenda memorandum packet.  Mr. Binder stated that the Steering Committee last discussed SGMA at the October 21, 2014 Steering Committee meeting, shortly after Governor Brown signed the Act.  Mr. Binder noted that at the request of the Steering Committee, Watermaster would provide periodic updates.

Mr. Binder expressed that since the Act was signed by Governor Brown on September 16, 2014, the public and stakeholders have had an opportunity to participate in seminars, webinars, and conferences; and that most everyone is up to speed on the Act.  Mr. Binder explained that SGMA was established as part of

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 6 of 12

a comprehensive three-bill package that includes AB 1739 (Dickinson), SB 1168 (Pavley), and SB 1319 (Pavley) to provide the framework for statewide groundwater management by local authorities. Mr. Binder indicated the state agencies charged with administration of the Act are both the Department of Water Resources (DWR) and the State Water Resources Control Board (SWRCB). Mr. Binder noted a copy of the Act and the related statutory provisions, as chaptered, were provided as an attachment to the October 6, 2015 memorandum.

Mr. Binder explained the Act pertains to all groundwater basins throughout the state that are identified and defined in DWR Bulletin 118 and there are three Bulletin 118 basins within the Watershed. Mr. Binder noted the Act includes an exemption for adjudicated basins as provided in §10720.8(a) that specifically lists the Santa Margarita River Watershed as an exempted adjudicated area. Mr. Binder reported that as the three Bulletin 118 basins located within the Watershed are adjudicated, they are not subject to the general requirements of the Act, but as specified in §10720.8(f), the Watermaster must comply with certain requirements under the Act. Mr. Binder further reported that the Watermaster will need to report and provide information to DWR on or before April 1, 2016.

Mr. Binder reported that the Watermaster has initiated discussions with DWR to determine specific requirements for the Santa Margarita River Watershed Watermaster. Mr. Binder stated the Watermaster anticipates submitting the requested information to DWR prior to April 1, 2016. Mr. Binder reported that the first submittal to DWR will be a copy of all judgments, including Interlocutory Judgments, and Court documents related to the *Fallbrook Case*, as well as, all prior Annual Watermaster Reports and Annual CWRMA Reports. Mr. Binder stated that the Watermaster anticipates submitting the above documents to DWR as soon as possible. Mr. Binder reported that in terms of ongoing reporting requirements, the Watermaster will continue submitting to DWR copies of Annual Watermaster Report and Annual CWRMA Report, referencing monitoring plans and groundwater data collected as part of the CASGEM plans. Mr. Binder noted that If DWR requests additional information or believes there is a deficiency in current reporting, the Watermaster will address any concerns at that time. Mr. Binder stated the Watermaster will notify the Steering Committee when the required submittals to DWR have been completed.

10.   CASGEM Groundwater Elevation Monitoring Program

Mr. Binder stated that at the July 2015 Steering Committee meeting there was an extensive discussion regarding the CASGEM monitoring program. Mr. Binder reported since that meeting, efforts have continued to designate the CASGEM Monitoring Entity and prepare monitoring programs for the two DWR Bulletin 118

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

basins within the Santa Margarita River Watershed that presently do not have a CASGEM Monitoring Plan in place: (1) Basin No. 9-4—Santa Margarita Valley Groundwater Basin (located on Camp Pendleton), and (2) Basin No. 9-6—Cahuilla Valley Groundwater Basin (also known as the Anza-Cahuilla Groundwater Basin).

Mr. Binder noted that the Watermaster had subsequently been informed that Camp Pendleton is working with DWR to become the Monitoring Entity for Basin No. 9-4 and asked the representative from Camp Pendleton to provide an update on the status of the CASGEM Monitoring Plan for Basin No. 9-4. Mr. Simpson confirmed that Camp Pendleton made the decision to pursue being the CASGEM Monitoring Entity for Basin No. 9-4. Mr. Simpson explained that Camp Pendleton Water Resources Division is now recognized as a municipal utility pursuant to San Diego County codes and thus DWR has approved Camp Pendleton as the CASGEM Monitoring Entity for Basin 9-4. Mr. Simpson noted that Mr. Dan Bartu is the contact person for the CASGEM Monitoring Program.

Mr. Binder reported that on August 24, 2015, the Watermaster sent an e-mail to the Steering Committee members and representatives, and legal counsel for the parties involved in the current negotiations for the Anza-Cahuilla Indian Water Rights Settlement, providing background information for the Watermaster to assume the role as CASGEM Monitoring Entity for Basin No. 9-6. Mr. Binder stated that included in the August 24, 2015 e-mail were the following documents that were also previously provided in the agenda memorandum packet:

1. August 24, 2015 Draft Joint Motion and Stipulation Authorizing the Watermaster for the Santa Margarita River Watershed to Serve as the Groundwater Monitoring Entity.

2. August 24, 2015 Draft Order Authorizing the Watermaster to Serve as Monitoring Entity Under California Water Code §§ 10920 et seq.

Mr. Binder reported that subsequent to sending out the August 24, 2015 e-mail, the Watermaster received affirmative responses from legal counsel for various parties as well as comments with requested edits. Mr. Binder noted that there was no feedback on substantive changes for the two documents.

Mr. Binder informed the group that the purpose of having this item on the agenda is to have a discussion among Steering Committee members and then put to vote Steering Committee authorizing Watermaster to proceed with working with various legal counsel to submit the joint motion and stipulation to the Court in the *Fallbrook Case*. Mr. Binder opened up the topic for discussion.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Ms. Dorado inquired about the additional costs that this would add to the Watermaster annual budget. Mr. Binder explained that the Watermaster has entered into preliminary discussions with DWR regarding the monitoring plan requirements and associated costs. Mr. Binder reported DWR indicated on a preliminary basis that approximately 20 wells should be included in the monitoring program and that the wells need to be measured twice a year. Mr. Binder also reported that he received estimates from the USGS to perform the measurements and the cost would be $12,000 per year. Mr. Binder explained that the final number of wells to be included in the monitoring plan would be determined as part of developing the specific aspects of the plan. Mr. Binder further reported the initial in-house cost for Watermaster time to work with DWR to prepare the monitoring plan and enter into agreements with property owners to monitor the wells is estimated at $20,000, but it is believed the actual costs may be lower. Mr. Binder stated that moving forward, the primary costs would be the annual contract with USGS for conducting the groundwater measurements and the costs for Watermaster staff to enter and upload the data to the DWR CASGEM website would be minimal. Mr. Binder noted the Watermaster could either amend the current Joint Funding Agreement with the USGS or enter into a separate cost agreement to conduct the groundwater monitoring.

Mr. Binder stated that ideally each Steering Committee member would authorize their counsel to sign the joint motion. Mr. Binder stated that it is the Watermaster's view that a unanimous vote is not necessary to move forward. Mr. Binder conveyed that the draft motion and stipulation can be revised to reflect parties in support and those parties would have their attorneys sign and counsel for Ramona and Cahuilla would sign as well.

Mr. Simpson stated that Camp Pendleton is concerned because they have their own costs and now Camp Pendleton is being asked to pay for the cost for Basin No. 9-6 to be monitored by Watermaster. Mr. Simpson inquired if the Ramona and Cahuilla Tribes have been asked to pay for Basin No. 9-6. Mr. Binder explained that presently no one in the Anza-Cahuilla Groundwater Basin has stepped up to pay for the monitoring costs, however, it is anticipated that once the parties have agreed to and entered into the settlement agreement, there will be assessments for not only the CASGEM monitoring wells, but likely additional wells in the Anza-Cahuilla Groundwater Basin. Mr. Binder noted that the request for the Steering Committee members to fund Watermaster as the CASGEM Monitoring Entity is for the interim timeframe, until the settlement agreement is final.

Mr. Simpson opined that if no one steps up to be the Monitoring Entity, the State will do it. Mr. Binder responded there is a fallback provision in Senate Bill SBX7 6 for the State to become the Monitoring Entity, but that particular provision is not

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 9 of 12

funded, and that he was not aware of the State assuming those duties in any other basins.

Mr. Binder expressed that it is the Watermaster's view that groundwater level data needs to be collected in anticipation of Watermaster requirements to certify to the Court the safe yield of the Anza-Cahuilla Groundwater Basin. Mr. Binder articulated that the Watermaster needs to be monitoring groundwater levels in order for Watermaster to properly administer IJ-33 and IJ-33A in the Anza-Cahuilla Groundwater Basin. Mr. Binder further expressed that the Watermaster is hopeful the Steering Committee will approve funding Watermaster as the CASGEM Monitoring Entity. Mr. Binder stated that if the Steering Committee does not approve, then the Watermaster will have to reconsider and come up with an alternative plan, which will include discussions with the Court on how to proceed.

Ms. Dorado stated that MWD is not ready to support the proposal and that MWD takes the position that both the Anza parties and Riverside County should be contributing.

Mr. Edgecomb stated that groundwater monitoring is in the best interest of the Watershed and that Steering Committee should fund the groundwater monitoring in the interim, however, not without established time limitations.

Mr. Luker stated that Pechanga also thinks it is in the best interest of the Watershed to have Watermaster be the CASGEM Monitoring Entity. Mr. Luker stated the Pechanga Tribal Council is not comfortable with an indeterminate timeframe for funding the monitoring program, however, Pechanga will vote to support moving forward.

Mr. Marchand asked what the benefits are for the Steering Committee. Mr. Binder responded that it is difficult to assign a tangible direct benefit for each member of the Steering Committee, rather the benefits go to the Watershed as a whole and that groundwater monitoring is something that is needed for the *Fallbrook Case* as a whole. Mr. Binder expressed that the benefits are in terms of the Watermaster administering the overall Fallbrook Decree and the water rights under the jurisdiction of the Court.

Mr. Luker stated that there are funding and grant eligibility issues related to the CASGEM monitoring program. Mr. Binder explained that there is a "hammer clause" in the statute that if the Bulletin 118 basin does not have a CASGEM Monitoring Program then entities within that basin are not eligible for grants. Mr. Binder further reported that Riverside County as an entity is not eligible for grants because Basin No. 9-6 is in non-compliance. Mr. Binder reported that one

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 10 of 12

of the direct impacts of the non-compliance is that the local group Anza Groundwater Association is not eligible for additional grants to continue the development of the groundwater model for the basin. Mr. Binder noted the groundwater model would be a useful tool for the Watermaster to administer the water rights and determine the safe yield of the groundwater basin.

Mr. Bachman stated that Eastern MWD is in favor as long as there is a cap on the amount of time. Mr. Simpson posed the question whether Watermaster could assume the role of Monitoring Entity on a year-to-year basis. Mr. Binder questioned whether DWR would accept designation of a Monitoring Entity on a year-to-year basis. Mr. Simpson responded that he believes the Watermaster cannot submit a notice of intent to assume the role of the CASGEM Monitoring Entity with such a time caveat and that conditional funding would also be problematic in framing the motion for the Court.

Mr. Binder expressed the Watermaster would like to have the Steering Committee members vote on the record in order to be able to further discuss the matter with Judge Brooks and Judge Curiel. Mr. Binder explained that the Court has indicated on a preliminary basis that Watermaster should be the Monitoring Entity but if the current Steering Committee does not support funding for the program, perhaps the Court will consider alternatives. Mr. Binder reiterated that the Watermaster is in discussions with the Ramona and Cahuilla bands and Riverside County to fund the monitoring costs but those discussions have not been fruitful at this point. Therefore, if the Court directs Watermaster to move forward, the burden of the funding would presently be on the general Watermaster budget.

Mr. Simpson requested a motion for the Watermaster to proceed with the proposed joint motion, apply to DWR to be the CASGEM Monitoring Entity for Basin No. 9-6 and that the Steering Committee fund the costs as set forth by the Watermaster. Mr. Luker moved for the motion. Mr. Bachmann seconded the motion. The Committee vote resulted in a tie vote: three (3) members voting for approval (Pechanga Band, Western MWD, and Eastern MWD), three (3) members voting in disfavor (United States represented by Camp Pendleton, MWD, and Rancho California WD), and one (1) member abstaining (Fallbrook PUD).

Mr. Binder stated that it is the Watermaster's understanding that the Bureau of Indian Affairs (BIA) is in support of the joint motion to submit to the Court, and noted that a representative from the Department of Justice or the BIA is not present to speak to the matter, thus it appears that the United States may have a split vote. Mr. Binder asked if Mr. Simpson was voting for the United States as a whole or for only Camp Pendleton. Mr. Simpson stated that he can speak for both Camp Pendleton and BIA because he is the United States representative on the Steering

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 11 of 12

Committee and that Camp Pendleton is funding the share of the Watermaster budget to be paid by the United States.  Mr. Binder explained that technically the United States is the member of the Steering Committee, and up to this point a Camp Pendleton representative has been sitting on the Steering Committee and that Camp Pendleton has been funding the United States' share of the budget. Mr. Binder suggested that representatives for the United States need to have internal discussions to decide whether the United States will be joining the motion to the Court and supporting funding for the Watermaster to be the Monitoring Entity.

Mr. Binder asked the three Steering Committee members that voted in favor of the motion, if they would direct their counsel to work with the Watermaster to file the motion with the Court without including the other members of the Steering Committee as signatories.  Mr. Luker stated that the Pechanga Tribal Council agreed to pay a pro-rata share of seven, not three, and inquired if the Watermaster's intention was to move forward with funding by only three members. Mr. Binder responded that the Watermaster is not asking for the three members voting in favor of the motion to solely fund the program, rather just whether the three members would join in submitting the joint motion to Court.  Mr. Binder further responded that the Steering Committee members equally share in funding the Watermaster budget and it is not the intention of the Watermaster to parse out funding for various activities by the Watermaster.  The three members voting in favor of the motion indicated they would discuss the matter with their respective attorneys to determine whether they would still join in the motion to the Court.

Mr. Binder concluded by stating he will discuss the matter with the Court and the parties involved in the current negotiations for the Anza-Cahuilla Indian Water Rights Settlement.   Mr. Binder indicated there were several alternatives for proceeding including, but not limited to:  (1) BIA, Eastern MWD, Western MWD, Pechanga, Ramona, and Cahuilla (or a subset thereof) could file the motion, (2) other members could reconsider and join in the motion, and (3) the Court could issue an Order upon its own motion.  Mr. Binder stated that he would continue discussions with the parties and the Court, and will report back to the Steering Committee at the January meeting.

11.   Election of Chairperson of Steering Committee

Mr. Binder stated the term for the current chairperson of the Steering Committee held by Mr. Simpson, representative for the United States, expires at the conclusion of the October Steering Committee Meeting.   Mr. Binder thanked Mr. Simpson for his time as the Chairperson.

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Santa Margarita River Watershed Watermaster Steering Committee
October 20, 2015 Meeting Minutes
Page 12 of 12

Mr. Binder noted the rotation list for the new chairperson was previously provided in the agenda memorandum packet.  Mr. Luker, representative for the Pechanga Band, is next in line to assume the Chair for the next year and Mr. Luker confirmed that he would assume the responsibilities of the Chair.  Mr. Binder stated that Ms. Leasa Cleland, representative for Western MWD, is set to assume the Vice Chair for the next year, however Mr. Binder reported that Western MWD has requested to defer as Vice Chair for the upcoming year, and assume that position in the following year.  Mr. Binder reported that Mr. Bachmann of Eastern MWD has graciously agreed to be Vice Chair for the upcoming year.

12.    Other Business

The meeting will be open to discuss any other business raised by members of the Steering Committee.

No other business was raised.

13.    Next Meeting

The proposed date for the next meeting is **Tuesday, January 19, 2016**, at 10:00 a.m. at the Rancho California Water District Board Room.

Mr. Simpson adjourned the meeting at 11:21 a.m.

# EXHIBIT C

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

# M E M O R A N D U M

TO:      ANZA BASIN LEGAL COMMITTEE AND ANZA BASIN TECHNICAL
         COMMITTEE (See Distribution List)

FROM:    CHARLES W. BINDER, WATERMASTER      *Chas W. Binder*

DATE:    SEPTEMBER 1, 2010

RE:      SBX7 6 GROUNDWATER ELEVATION MONITORING FOR ANZA AREA


The purpose of this memorandum is to provide the Anza Basin Legal Committee and
the Anza Basin Technical Committee with information concerning Watermaster activities
related to Senate Bill SBX7 6—Groundwater Elevation Monitoring (hereinafter "SBX7 6"
or "Bill"), particularly related to groundwater monitoring for the Anza area.  This
information should be considered by the parties as part of the ongoing water rights
settlement discussions related to developing a groundwater monitoring plan for the
Anza area.

SBX7 6 was passed as part of the November 2009 Water Package that included other
bills related to the Bay-Delta Plan (SBX7 1), bond program for water projects and
programs (SBX7 2), statewide water conservation (SBX7 7), and reporting of water
diversions and use (SBX7 8).  SBX7 6 provides for a statewide program of reporting
groundwater elevation data for groundwater "basins" or "subbasins" to be implemented
by the California Department of Water Resources (DWR).  The chaptered version of
SBX7 6 is provided as Attachment 1 and an informational flyer prepared by DWR is
provided as Attachment 2.  This program is now being referred to as the California
Statewide Groundwater Elevation Monitoring Program (CASGEM Program).  Additional
information can be found at the following DWR website dedicated to the CASGEM
Program:  http://www.water.ca.gov/groundwater/casgem/

The Bill defines "basins" or "subbasins" to mean a groundwater basin or subbasin
identified and defined in DWR Bulletin No. 118.  Three such basins are identified in
Bulletin No. 118 for the Santa Margarita River Watershed, including Basin No. 9-6
located in the Anza area:

1) Basin No. 9-4 (Santa Margarita Valley) located on Camp Pendleton
2) Basin No. 9-5 (Temecula Valley) located in the Murrieta-Temecula area
3) **Basin No. 9-6 (Cahuilla Valley) located in the Anza area**

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Memorandum to Anza Basin Legal Committee
  and Anza Basin Technical Committee
SBX7 6 Groundwater Elevation Monitoring
September 1, 2010
Page 2 of 4

Information related to these three basins as reported in DWR Bulletin No. 118 is provided as Attachment 3 and can be found at the following website:

http://www.water.ca.gov/groundwater/bulletin118/gwbasin_maps_descriptions.cfm

The Bill establishes a procedure for a "Monitoring Entity" to coordinate the monitoring activities and specifies under Section 10927(a) that "a watermaster or water management engineer appointed by a court or pursuant to statute to administer a final judgment determining rights to groundwater" may assume the responsibility of the Monitoring Entity.

Other key provisions of SBX7 6 include the following:

- Parties wishing to assume the function of Monitoring Entity in accordance with the Bill must notify DWR, in writing, by January 1, 2011.

- Monitoring Entities must begin monitoring and reporting groundwater elevations on or before January 1, 2012.

- Monitoring program is to be designed to determine seasonal and long-term trends in groundwater elevations.

- If local parties do not report groundwater elevations and DWR assumes those functions such local parties would be ineligible for water grants or loans from the state.

The Watermaster has been in discussions with DWR staff as well as the Santa Margarita River Watershed Watermaster Steering Committee to better understand the CASGEM Program related to implementation in the watershed and the role of the Watermaster. These discussions resulted in a determination that the Watermaster is the logical party for assuming responsibilities as the Monitoring Entity for the three basins in the watershed. A final decision whether the Watermaster will notify DWR requesting designation as the Monitoring Entity for these three groundwater basins will be made after discussion with the Steering Committee at the October 19, 2010 Steering Committee meeting.

The Watermaster is presently reporting groundwater elevations for the basins as part of the Annual Watermaster Report. However, remaining questions relate to specific reporting requirements of DWR under the Bill and any additional efforts that may be required by the Watermaster to meet the requirements of DWR. Specific procedures and protocols for measurements and reporting are currently under development by

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Memorandum to Anza Basin Legal Committee
  and Anza Basin Technical Committee
SBX7 6 Groundwater Elevation Monitoring
September 1, 2010
Page 3 of 4

DWR staff.  The draft procedures and protocols are scheduled to be available for public review and comment in Fall 2010.

Questions and considerations related to DWR procedures and protocols include:

- Background information including well construction, depth, screen intervals, location, and owner information to be reported to DWR and made available to the public.

- Measurement protocol to establish a consistent statewide data base.

- Procedures for reporting through online electronic submittals.

Milestones and key dates for implementation of this program are listed below:

- **Fall 2010**—Public review and comment on draft procedures and protocols developed by DWR.

- Parties wishing to assume the function of Monitoring Entity in accordance with the Bill must notify DWR, in writing, by **January 1, 2011**.

- **Spring and Summer 2010**—Monitoring Entity submits monitoring network plan to DWR for approval.

- Monitoring Entities must begin monitoring and reporting groundwater elevations on or before **January 1, 2012**.

Distribution List:

Anza Basin Legal Committee

Chuck Binder
Scott McElroy
Cathy Condon
Curtis Berkey
Pat Barry
Doug Garcia
Christopher Watson
Mike McPherson
Jim Markman
Tilden Kim

WATERMASTER
SANTA MARGARITA RIVER WATERSHED

Memorandum to Anza Basin Legal Committee
   and Anza Basin Technical Committee
SBX7 6 Groundwater Elevation Monitoring
September 1, 2010
Page 4 of 4

Rob Davis
Jeff Hoskinson
Peg Battersby
Marilyn Levin
Michael Hughes
Jennifer Henderson
John Flocken

## Anza Basin Technical Committee

Chuck Binder
Assad Safadi
Dan Hart
Oliver Page
Peter Pyle
Mark Shaffer
Joe Scalmanini
Bob Pierotti
Gary Guacci
Tim Ross

# EXHIBIT D

WATERMASTER
SANTA MARGARITA RIVER WATERSHED
P.O. Box 631
Fallbrook, California 92088
(760) 728-1028
FAX (760) 728-1990

June 2, 2016

Transmitted via E-mail: timothy.ross@water.ca.gov

Mr. Timothy Ross
CASGEM Program
California Department of Water Resources
Southern Region Office
770 Fairmont Avenue, Suite 102
Glendale, CA 91203

RE:  Notification of Intent to be Designated as Monitoring Entity under CASGEM
     Program (Bulletin 118 Groundwater Basin No. 9-6)

Dear Mr. Ross:

This letter provides notification that the Watermaster Santa Margarita River Watershed (Watermaster), subject to pending approval and order by the United States District Court (Court), requests to be designated as the CASGEM Program Monitoring Entity for Bulletin 118 Groundwater Basin No. 9-6—Cahuilla Valley Groundwater Basin. Basin No. 9-6 is located within the Santa Margarita River Watershed.

The Watermaster is appointed by the Court to administer and enforce provisions of the Modified Final Judgment and Decree, and subsequent instructions and orders of the Court, regarding rights to surface water and groundwater throughout the Santa Margarita River Watershed, including the area encompassing Basin No. 9-6 (*U.S.A. v. Fallbrook Public Utility District, et al.,* Civil. No. 51-cv-1247-GPC-RBB).

The Watermaster submits this request for designation as Monitoring Entity in accordance with Section 10927(a) of Part 2.11, California Water Code. Furthermore, the Watermaster shall comply with the requirements of Part 2.11, California Water Code.

If you have any questions or require additional information, please do not hesitate to call me at (760) 728-1028 or respond by e-mail at cwbinder@smrwm.org.

Sincerely,

Charles W. Binder, P.E.
Watermaster