```
 1                  UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,     .
                                   . Docket
 5             Plaintiff,          . No. 51-cv-1247-GPC-RBB
                                   .
 6             v.                  . April 5, 2019
                                   . 1:30 p.m.
 7   FALLBROOK PUBLIC UTILITY      .
     DISTRICT, et al.,             .
 8                                 .
               Defendants.         . San Diego, California
 9   . . . . . . . . . . . . . . .

10
                    TRANSCRIPT OF MOTION HEARING
11            BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE
12

13                     A-P-P-E-A-R-A-N-C-E-S

14   For the Watermaster:    Brunick, McElhaney & Kennedy
                             1839 Commercenter West
15                           San Bernardino, California 92408
                             By:  WILLIAM J. BRUNICK, ESQ.
16

17   For the Plaintiff United States of America:
                             U.S. Department of Justice
18                           999 Eighteenth Street
                             Suite 370
19                           Denver, Colorado 80202
                             By:  BRUCE D. BERNARD, ESQ.
20                           - and -
                             Department of Justice
21                           Environmental & Natural Resources
                               Division
22                           Indian Resources Section
                             P.O. Box 7611
23                           Ben Franklin Station
                             Washington, DC 20044
24                           By:  F. PATRICK BARRY, ESQ.

25   ///
```

```
 1                    A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

 2   For the Intervenor Plaintiff Ramona Band of Cahuilla:
                              Berkey Williams LLP
 3                            2030 Addison Street, Suite 410
                              Berkeley, California 94704
 4                       By:  CURTIS G. BERKEY, ESQ.

 5
     For the Defendant Rancho California Water District:
 6                            Best Best & Krieger
                              655 West Broadway, 15th Floor
 7                            San Diego, California 92101
                         By:  JAMES BELL GILPIN, ESQ.
 8

 9   For the Defendant Eastern Municipal Water District:
                              Olivarez Madruga Lemieux O'Neill, LLP
10                            4165 E. Thousand Oaks Boulevard
                              Suite 350
11                            Westlake Village, California 91362
                         By:  MANUEL D. SERPA, ESQ.
12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1            SAN DIEGO, CALIFORNIA; APRIL 5, 2019; 1:30 P.M.
 2                              -o0o-
 3            THE CLERK:  Calling Item Number 13 on the calendar,
 4   Case Number 51-cv-1247, United States of America v. Fallbrook
 5   Public Utility District, on for a motion hearing.
 6            THE COURT:  Appearances, please.
 7            MR. GILPIN:  Good afternoon, Your Honor.  James
 8   Gilpin for Rancho California Water District, the party filing
 9   the objection.
10       The principal issue, Your Honor, we sought to raise is
11   should the watermaster costs --
12            THE COURT:  Is that the only appearance on behalf of
13   the moving party?
14            MR. GILPIN:  I misunderstood, Your Honor.
15            MR. SERPA:  Good afternoon, Your Honor.  Manuel Serpa
16   on behalf of Eastern Municipal Water District.  We joined in
17   Rancho's objection.
18            THE COURT:  All right.  And then, anyone else who
19   intends to -- wishes to be heard on the other side?
20            MR. BERKEY:  Good afternoon, Your Honor.  Curtis
21   Berkey for plaintiff-intervenor Ramona Band.
22            THE COURT:  Anyone else?
23            MR. BRUNICK:  Bill Brunick, if the Court has
24   questions, appearing for the watermaster.
25            THE COURT:  All right.  So, we are here on objections
```

1  to the watermaster's report for Water Year 2016 and 2017.  Back
2  on December 17 of 2018, the watermaster, Michael Preszler,
3  provided the Court with his annual watermaster report, and
4  copies of the letter and the report were provided to members of
5  the steering committee and others.  The order noted that any
6  party objecting to any portion of the annual watermaster report
7  was required to file a written notice within 30 days of
8  service.
9      And, in fact, January 11, 2019, Rancho California Water
10 District did file objections, and those objections have been
11 joined by a number of other parties, representatives,
12 associated with the steering committee.
13     And so, at this time, the Court has reviewed the positions
14 of the parties, the watermaster.  And ultimately, let me make a
15 couple of observations, and then we will move forward in terms
16 of how do we improve upon what we otherwise have in place.
17     It's clear from the outset that the purpose of the
18 steering committee is to provide guidance to the Court.  It is
19 made up and consists of parties who have significant interest
20 in this litigation, interest in having their voices heard on
21 how water allocation issues are addressed.  The Court
22 appreciates the participation and efforts, the contributions of
23 the steering committee.
24     It's always been understood that the steering committee
25 members would bear the costs and fees of the watermaster, who

1   is in place to assist the Court in overseeing this massive
2   settlement order providing for divvying out and apportioning
3   water to the various stakeholders.
4       With respect to the court orders that have been put in
5   place, none of them speak in terms of the watermaster's work
6   being limited to the steering committee's service areas.  And I
7   think that's for good reason.
8       The objectors have proposed to parcel out the
9   watermaster's work on the Anza settlement and have parties,
10  entities outside of the steering committee, responsible.  And
11  on paper, it may make sense, but in practice, it would be
12  difficult to implement and manage because then any work by the
13  watermaster conducted outside the steering committee members'
14  geographic purview would be subject to challenge.  That
15  wouldn't help this Court in terms of managing the valuable
16  resources that it is required to manage and oversee.  It would
17  create litigation on a frequent level or frequent basis that
18  would be expensive and probably would be more expensive than
19  the actual costs that were being incurred.
20      In addition, there does appear to be overlap between the
21  work conducted with the Anza settlement and the other basins,
22  which would make it even more difficult to apportion or parcel
23  out the costs.
24      One of the objections, that no steering committee members
25  have any rights or interest in the Anza basin, is not exactly

1  true.  To the extent that the United States is a steering
2  committee member, it acts as a trustee in the tribes and has an
3  interest in the Anza settlement.  As noted by the watermaster,
4  the individual entities' amount for the watermaster work in the
5  Anza settlement amounts to about $8,571 for the 2018 and 2019
6  year.  So, given those circumstances, it would be my tentative
7  ruling to overrule the objections.
8      At the same time, I do appreciate the concerns raised by
9  the parties, and I believe that there has been, perhaps, some
10 discussion between the watermaster and the steering committee
11 regarding the Cahuilla Band joining the steering committee once
12 the settlement is approved, where then it also will bear the
13 watermaster's costs, not only for matters relating to this Anza
14 area but the other areas that are part of this litigation and
15 order.
16     Let me inquire along those lines, with respect to the
17 Cahuilla Band joining the steering committee, is that still
18 something that the Cahuilla Band is prepared to do and is
19 interesting in doing?
20         MR. BERKEY:  Yes.  I can answer that, Your Honor.
21 Curtis Berkey.  Good afternoon.
22     The settlement parties in the tribe water rights claim are
23 discussing a number of options to cover the watermaster costs
24 to implement the settlement agreement.  Some of those options
25 are confidential.  The important point is that the parties

1  recognize and have committed to covering the watermaster's
2  costs for his work to implement the settlement agreement once
3  it is approved by this Court.
4      So, whether it is joining the committee or there's some
5  other mechanism to do so, we agree that that has to happen, so
6  I think this is kind of a short-term problem that may be moot
7  because, at some point, there will be an alternative means to
8  cover those costs.
9          THE COURT:  So, then, all of the costs that have been
10 incurred by the watermaster would be covered in that scenario?
11         MR. BERKEY:  All of the costs to implement the
12 agreement, that is correct.
13     Now, whether there's perfect correspondence between the
14 hours spent and the -- if they were to join -- if we purchase
15 seats on the steering committee, I understand that's $85,000 a
16 year, whether it's one seat or two seats.  There's still issues
17 to resolve.  Our understanding and hope is that the way the
18 watermaster's role is being defined, that that amount would be
19 sufficient to cover those costs.  We are still in the process
20 of finalizing that.
21         THE COURT:  All right.  And so, are the costs being
22 tracked as far as what would be reimbursed once all of this is
23 resolved?
24         MR. BRUNICK:  Yes, Your Honor.  Bill Brunick for the
25 watermaster.

1    Yes, we are tracking the costs.
2         THE COURT: And at this point, do you have an
3    estimate as to what those costs are?
4         MR. BRUNICK: They are in Mr. Preszler's declaration.
5    But a total amount, I do not know.
6         THE COURT: All right. Let me inquire, then, of
7    Rancho California Water District, given what has been offered,
8    given my concerns about creating little mini trials any time a
9    steering committee member isn't happy with a particular cost
10   that's been incurred by the watermaster, what is wrong with
11   what is being offered at this point by Cahuilla?
12        MR. GILPIN: Well, Your Honor, we spent a year trying
13   to get to a position, and there was no position before Rancho
14   filed its objections.
15     I would just note that your concern may be well-founded,
16   but that has not occurred in this case since 2006, when the
17   watermaster began to incur expenses on behalf of the upper Anza
18   basin. As we laid out in our papers, that's about $475,000
19   that are isolated to the costs simply associated with that Anza
20   settlement.
21     So I don't think you are going to get issues in front of
22   you every time someone on the steering committee objects. In
23   fact, this objection was a collaborative objection by the
24   members of the steering committee, as you saw through the
25   joinders.

1          I would also say, it is not uncommon -- I want to talk
2    about the joint representation.  Because I think that that's
3    been blurred relative to what the United States' role is in the
4    steering committee, because Pechanga, who is also represented
5    by the United States in its trustee capacity, is a separate
6    member of the steering committee.  It pays its one-seventh
7    share of the costs associated with that.
8          So, the United States -- my understanding of the steering
9    committee role has been representing penalties, interest.  And
10   I would let them speak to that.  But there have not been
11   representatives there on behalf of Cahuilla relative to the
12   Anza.
13            THE COURT:  But one of the proposals is for Cahuilla
14   to join, correct, the steering committee?
15            MR. GILPIN:  I think that's been a proposal that's
16   been discussed.  As they indicated -- I don't know where the
17   85,000 came from, but that may be their share of the
18   watermaster budget, would be a one-eighth interest.  I haven't
19   calculated it.
20            THE COURT:  Let me ask you, from the United States,
21   do you believe that the United States, given this role that
22   they play also defending or representing the interest of the
23   different tribes, that that role should be taken into account
24   in apportioning the cost that the United States should pay,
25   that it should pay a higher percentage?

1          MR. GILPIN:  Well, I would leave it to them; but the
2    logic would be, if they are representing three different
3    parties on the steering committee, leave it to them on those
4    interests, but --
5          THE COURT:  What is the government's position on
6    that?
7          MR. BARRY:  Your Honor, Patrick Barry for the United
8    States.
9       If I could just take a moment, the United States owns the
10   fee interest in the Ramona, Cahuilla, and Pechanga Indian
11   reservations.  It is the United States.  So that when Camp
12   Pendleton sits in that seat, it represents the United States of
13   America.  It does not represent Camp Pendleton.
14      The individual tribes have a beneficial interest in the
15   lands that they are located on.  And they have every right to
16   pay for a seat, as Pechanga has done, and contribute.  But as
17   to the United States, there's just one United States, and it
18   sits in that seat.  Currently, it is occupied by Camp
19   Pendleton, but it could be occupied by a member of the BIA.  We
20   are talking about that now, how to alternate because of the
21   costs.
22         THE COURT:  So, with respect to recognizing what you
23   said, that the United States represents not only Camp Pendleton
24   but, in different forms, the Indian reservations, and given the
25   size of the land that's involved, as to the tribes, given the

1  costs that have been incurred over the course of time, do you
2  believe that it would be fair for the government to pay more of
3  the costs since it is the only committee member with an
4  interest in the Anza settlement?
5           MR. BARRY: No. If I might explain my response --
6  and no, I do not think so.
7      The business model that we currently see now, which is the
8  steering committee, which assumes the costs of the watermaster,
9  was established in 1989. At that time -- I have not been
10 associated with the steering committee since 1989, but I helped
11 draft some of the documents. It was always intended that the
12 steering committee would add parties, substantial users or
13 major users in the basin, to defray the watermaster costs.
14 So -- that has not been followed up on, however, those kinds of
15 cures to this problem.
16          THE COURT: So, who do you think should be driving
17 that? Is it the parties? The steering committee? The Court?
18 The watermaster?
19          MR. BARRY: I think the steering committee at this
20 point in time, and we would gladly contribute to that process
21 because we are a member of the steering committee. But there
22 ought to be -- I mean, I want to say I agree with Mr. Gilpin,
23 that the seven parties on the steering committee are bearing a
24 significant cost. But rather than turn their sights on the
25 folks in the Anza and Cahuilla basins, they ought to be

1  thinking about how do we expand the base of billing so that the
2  watermaster's fees are defrayed for everybody.
3      THE COURT: Do you have a response with respect to
4  that, that, ultimately, this question and issue is best
5  addressed as a starting point by the steering committee in the
6  form of adding parties to defray the costs?
7      MR. GILPIN: Well, that's one of the alternatives
8  that's been under discussion and explored, Your Honor. I guess
9  I thought that's what we were trying to do.
10     I am not trying to single out Cahuilla or Ramona. We were
11 simply objecting that the parties in the lower basin are
12 bearing the burden of the expense associated with settlement
13 discussions amongst the parties in the upper basin. And, you
14 know, similar to, I guess, private mediation or something, all
15 these parties are represented. Those parties typically bear
16 the cost and the expense associated with those mediation
17 settlement efforts. We are just bearing that expense, which
18 will go away.
19     They have said they have a proposal to deal with what I
20 think are the watermaster's anticipated costs once there's a
21 settlement, which I think we should segregate out because they
22 have said the cost is probably less than their seat at the
23 table, and maybe they want to bear that on their own. I don't
24 know.
25     I don't have an objection to broadening the base. In

1  fact, that's what we are trying to do, is find a way for the
2  costs incurred by parties to be equitably borne by the parties
3  causing those costs.
4          MR. BERKEY:  May I clarify one point?
5     To the extent that the parties are discussing buying a
6  seat on the steering committee as a way to finance the cost,
7  but if the non-Indian community would be expected to also buy a
8  seat, we are not talking about a single seat for the tribe to
9  purchase.  So it would be upwards of $170,000 or so, and that
10 was my point about making sure that the financing mechanism is
11 sufficient to cover the watermaster's costs post-settlement.
12         THE COURT:  Is there any other party who wishes to be
13 heard with respect to these issues?
14         MR. SERPA:  Your Honor, it is my client's position,
15 Eastern, that this is a situation that the Court's order
16 setting up a steering committee does specifically contemplate.
17 As it states, that the Court may -- the steering committee
18 shall share the costs, fees, and expenditures of the
19 watermaster, along with any other party, as specified by the
20 Court.
21    So that is contemplated and, our position is, justified in
22 this circumstance.  It's to help share in the cost of the
23 watermaster activity.
24    From Eastern's standpoint, in support of Rancho's
25 objection, I would just add that we don't believe that the

1  steering committee alone should bear the costs without limit on
2  the watermaster activity, that these are costs on activity that
3  the district cannot affect; its own conduct cannot affect the
4  amount of the costs and doesn't benefit its own ratepayers.
5  And at this point, there's no limit what that cost may be or
6  time period the cost may be on.
7        So it's Eastern's position that this is an appropriate
8  situation where assessments for other parties that benefit from
9  the watermaster's work should help share in the costs.
10       Eastern's not interested in setting up, as you expressed
11 concern for, a precedent where we are dividing up costs by
12 beneficiary.  I don't think Eastern wants that.  But there are
13 circumstances where everyone that benefits from the
14 watermaster's work should help pay the costs.  And setting up
15 assessments like that are not unprecedented and is the case in
16 many basins.  Sometimes it is a token amount; every pumper pays
17 a small amount to help defray the cost of the watermaster.
18            THE COURT:  Would these assessments be set up just in
19 the Anza area?
20            MR. SERPA:  No.  Throughout.
21       Well, our position is that, depending upon the Court's
22 position, there are circumstances where assessments should be
23 made, whether it is a one-time assessment or on an ongoing
24 basis, at a very small level, so that the steering committee
25 members themselves are not bearing all the costs.

1          And I would ask the Court to put itself in the position of
2    Eastern's board, Eastern's ratepayers.  At this point, they are
3    paying for costs that their conduct cannot affect, cannot
4    limit, that they are obligated and forced to pay and have no
5    limit and does not benefit its ratepayers directly.
6               THE COURT:  Well, certainly, it doesn't benefit them
7    in every instance directly.  But, to the extent that we are
8    talking about a resource -- water -- that is shared, that is
9    mutable, that is moving at any particular moment, and that
10   there are so many moving parts, there are so many various
11   interests to be considered, that a seat on the steering
12   committee provides input, a voice, the ability to influence
13   something that is larger than any particular part of the
14   steering committee or part of this, the basins that we have
15   management over.
16        And so, yes, you wouldn't be able to tell your customers
17   that this particular decision had the effect of influencing
18   their life in any particular way; but that organically,
19   globally, that every steering committee member has a power much
20   greater than any customer otherwise would.  So there is a
21   benefit that accompanies being a steering committee member.
22   Would you agree with that?
23              MR. SERPA:  Absolutely.  But is every watermaster
24   action taken benefiting them?
25         And, obviously, Eastern feels -- agrees with your

1  principle because they have been sharing the costs for a long
2  time and wish to continue to do so.  But there are
3  circumstances, as contemplated in the Court's '89 order, that
4  other parties help to pay the costs.
5          THE COURT:  So, in this instance, as it relates to
6  these costs, then, these are ones that you believe are best
7  left paid through some assessment process?  Or is it your view
8  that the Court should charge the two tribes for the costs that
9  have been identified?  Recognizing that, as of this time, the
10 tribes themselves are prepared to pay some fair share of these
11 expenses; they are not looking to get off scot-free or be a
12 freeloader in any sense of the word.  It is a matter of timing.
13         MR. SERPA:  We supported Rancho's motion.  We support
14 that position.  But we also think that there are circumstances,
15 stepping back, that general assessments should be levied to
16 help share the costs generally, whether now or on an ongoing
17 basis.
18         THE COURT:  Even independent of the issues of
19 force --
20         MR. SERPA:  Right.  And that that is the case in many
21 basins.  It is not unprecedented.  It is not unworkable.
22     And, separately, Your Honor, let's say the Anza settlement
23 process breaks down tomorrow and there's another ten years of
24 continuing costs.  If we come back three years from now, would
25 the Court's position change or, you know -- I think the

```
 1  district's concern is the lack of any limits.
 2           THE COURT:  The lack of --
 3           MR. SERPA:  Lack of any limits, either time limits or
 4  money limits.  They are willing to do their fair share, and
 5  they have been and will continue to do so.  But they think,
 6  under certain circumstances, the costs should be shared.
 7  That's the case in many basins.  This is one of them.
 8      And, alternatively, let's say I come back and tell the
 9  board the Court's position, and that they say, "We don't think
10  we benefit, the district benefits.  Let's get off the steering
11  committee."  It's not clear what options they would have to do
12  that or what would happen to the steering committee if they
13  insisted on that position.
14      So we are just asking for some framework that helps share
15  the costs, that puts some sense of limit, because the district
16  feels like it's borne an unreasonable degree of the costs for
17  an unending period of time, and so some restriction, some
18  contemplation should be put into place for assessing the other
19  parties.
20           THE COURT:  All right.  Thank you.
21      And with respect to Cahuilla Band's willingness to join
22  the steering committee once the settlement is approved, is
23  there any reason why Cahuilla Band wouldn't be prepared to join
24  the steering committee even if the settlement is not approved,
25  or while it's being considered for approval?
```

1           MR. BERKEY: That's a possibility, I think. I can
2   only speak for the Ramona Band of Cahuilla, not the Cahuilla
3   Band of Indians. They have joined our response.
4       I think that's something we are willing to consider as far
5   as resources. The Ramona Band of Cahuilla does not have a
6   gaming facility. Their resources are limited. But we did have
7   two meetings with the steering committee to try to address
8   this. We discussed some ideas going forward. Certainly, we
9   are open to having that conversation and continuing those
10  discussions.
11          THE COURT: I will request that the parties continue
12  on that front.
13      I am going to take the matter under submission and
14  determine what fixes are realistic or viable, and so we will
15  issue an order in the near future. All right?
16          ALL: Thank you, Your Honor.
17      (End of proceedings at 2:02 p.m.)
18                             -o0o-

```
 1                    C-E-R-T-I-F-I-C-A-T-I-O-N
 2
 3          I hereby certify that I am a duly appointed,
 4  qualified and acting official Court Reporter for the United
 5  States District Court; that the foregoing is a true and correct
 6  transcript of the proceedings had in the aforementioned cause;
 7  that said transcript is a true and correct transcription of my
 8  stenographic notes; and that the format used herein complies
 9  with rules and requirements of the United States Judicial
10  Conference.
11              DATED:  April 18, 2019, at San Diego, California.
12
13                              /s/   Chari L. Bowery
                                _____
14                              Chari L. Bowery
                                CSR No. 9944, RPR, CRR
15
```